**BEFORE THE UNITED STATES
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION**

| | | |
|---|---|---|
| IN RE: ROUNDUP § | MDL - _____ |
| PRODUCTS LIABILITY § | |
| LITIGATION § | |

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TRANSFER OF
ACTIONS TO THE SOUTHERN DISTRICT OF ILLINOIS PURSUANT TO 28
U.S.C. § 1407 FOR COORDINATED OR CONSOLIDATED PRETRIAL
PROCEEDINGS**

Monsanto Company manufactures, markets, and distributes the weed killer Roundup which is a proprietary blend of active ingredient glyphosate and a surfactant[1] referred to as POEA. Hundreds of thousands of people across America use Roundup to kill their weeds. The problem is, at certain exposure levels, Roundup causes non-Hodgkin's lymphoma. Indeed, The International Agency for Research on Cancer ("IARC"), the specialized intergovernmental cancer agency of the World Health Organization ("WHO") tasked with conducting and coordinating research into the causes of cancer, declared in March 2015 that glyphosate is a "probable carcinogen" placing it in the second highest category. Glyphosate combined with POEA is even more toxic and carcinogenic.

The twenty one (21) actions identified in the included Schedule of Actions involve the same product (Roundup), the same active ingredient (glyphosate), the same defendant (Monsanto), and the same injury (non-Hodgkin's lymphoma). Each Roundup

---

[1] A surfactant is a compound that lowers the surface tension (r interfacial tension) between two liquids or between a liquid and a solid. Surfactants may act as detergents, wetting agents, emulsifiers, foaming agents, and dispersants.

1

Case requires extensive discovery concerning the safety, development, and marketing of Roundup® ("Roundup"), which has been on the market since the mid 1970s. Each Plaintiff will need to conduct the same complicated regulatory and scientific discovery (spanning over 40 years) to demonstrate that exposure to Roundup caused their non-Hodgkin's lymphoma ("NHL"). To date, a few of the Roundup Cases have commenced discovery, but that discovery is being conducted under different, and sometimes conflicting, judicial constraints and orders. Centralizing these cases before one MDL Judge to ensure that the discovery is done once for all claimants makes sense.

Pursuant to 28 U.S.C. § 1407 and Rule 6.2 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, Movants [2] respectfully submit this Memorandum of Law in support of their Motion for Transfer of Actions for Coordinated Pretrial Proceedings of all currently filed Roundup® ("Roundup") actions identified in the included Schedule of Actions, as well as any actions subsequently filed involving similar facts or claims arising from the development of NHL as a result of being exposed to Roundup, to the United States District Court for the Southern District of Illinois, and to centralize and coordinate all actions for pretrial proceedings before the Honorable Nancy J. Rosenstengel or the Honorable David R. Herndon, United States District Judges, Southern District of Illinois.

Presently, there are at least twenty one (21) substantially similar federal actions, filed by ten different law firms, in fourteen (14) different federal district courts[3] alleging

---

[2] Movants are the Plaintiffs in the following cases: *Hardeman v. Monsanto Co. et al.,* Case No. 3:16-cv-00525; *Giglio v. Monsanto Co., et al.*, Case No. 3:15-cv-02279;.
[3] Currently, cases are pending in the following Federal District Courts: Central District of California, Eastern District of California, Northern District of California, Southern District of Florida, District of Hawaii, Southern District of Illinois, Northern District of

2

the same wrongful conduct on the part of Defendant Monsanto Company ("Monsanto"). The undersigned law firm currently has over two hundred additional plaintiffs under contract or investigation who allege similar allegations. Several other law firms who have been litigating these cases separately have similar volumes of claimants under contract and investigation. All actions, including the Movants' actions, actions by other plaintiffs, and by future plaintiffs, involve common questions of law and fact—each plaintiff developed NHL because of exposure to Defendant's glyphosate containing herbicide Roundup. Each action asserts substantially similar claims and seeks substantially similar relief.

Transfer for centralization and coordination is appropriate because each of the related Actions and any tag-along cases arise out of the same or similar nucleus of operative facts, arise out of the same or similar alleged wrongful conduct, involve the resolution of the same or similar questions of fact and law, involve the same or similar scientific and/or medical evidence, and discovery will be substantially similar and involve many of the same documents and witnesses. By way of example, Monsanto is currently producing the same initial set of regulatory documents in several different cases. And, the same discovery disputes are beginning to surface across the Country, forcing different Courts to attempt to resolve similar disputes among different law firms—it is not surprising that these disparate proceedings have resulted in inconsistent rulings and court proceedings. The national litigation is devolving and absent a

---

Illinois, Western District of Kentucky, Eastern District of Louisiana, District of Massachusetts, Northern District of Mississippi, District of Nebraska and Western District of Wisconsin.

centralized proceeding, there will be dysfunction and disharmony among the court's overseeing these cases.

## I. FACTUAL BACKGROUND

Roundup is an herbicide comprised of the active ingredient glyphosate along with other "inert" ingredients and surfactants, namely polyethoxylated tallow amine ("POEA"). It is the most widely used agricultural chemical in human history.[4] Since glyphosate's discovery in the 1970's until the expiration of its exclusive patent in September of 2000, Monsanto was the exclusive purveyor of glyphosate-containing products in the United States, sold under the brand "Roundup." To date, Monsanto remains the largest purveyor of glyphosate-containing products in the world, and its yearly profits from Roundup sales alone total in the billions.[5]

The increase in use of Roundup has been driven largely by the proliferation of genetically engineered crops, specifically tailored to resist the activity of glyphosate. In 2010, an estimated 70% of corn and cotton and 90% of soybean fields in the United States contained Roundup Ready® seeds.[6] Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. Benbrook, C.M., et al., *Trends in Glyphosate Herbicide Use in the United States and Globally*. 28 Environmental Sciences Europe, 1 (2016).

---

[4] Douglas Main, *Glyphosate Now the Most-Used Agricultural Chemical Ever*, Newsweek Magazine, available at http://www.newsweek.com/glyphosate-now-most-used-agricultural-chemical-ever-422419 (last visited July 26, 2016)
[5] Monsanto Co., Annual Report (Form 10-K) (August 31, 2015) at 22
[6] William Neuman and Andrew Pollack, Farmers Cope With Roundup-Resistant Weeds, New York Times, available at http://www.nytimes.com/2010/05/04/business/energy-environment/04weed.html?pagewanted=all&_r=0 (last visited July 26, 2016)

4

Due to long latency period of developing NHL following Roundup exposure, the historic difficulty in identifying the cause of cancers, particularly among agricultural workers, and unmistakable influence Monsanto has exerted over agricultural science in the US and abroad, the extent of Roundup's unique carcinogenicity has only recently come to light. However, glyphosate herbicides have long been associated with various forms of cancer, particularly hematologic malignancies. Indeed, as early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties. On March 4, 1985 the EPA classified glyphosate as a Category C oncogene (Category C designation means "possibly carcinogenic" to humans: agents with limited animal evidence and little or no human data). Since the first evidence of carcinogenicity emerged, the weight of the evidence has only increased.

The most notable authority supporting the link between NHL and Roundup exposure is the World Health Organization's International Agency for Research on Cancer ("IARC"). IARC was created in 1965 as the specialized cancer agency of the World Health Organization with support of the United States. IARC promotes international collaboration in cancer research, "bringing together skills in epidemiology, laboratory sciences, and biostatistics to identify the causes of cancer[.]" International Agency for Research on Cancer, *About IARC*, http://www.iarc.fr/en/about/ (last visited June 24, 2016). IARC is transparent. The minutes and documents presented at its council meetings are publicly available and, thus, are subject to scientific scrutiny. Starting in 1971, IARC began assessing whether chemicals were carcinogenic through the Monograph program. International Agency for Research on Cancer, *Home*, http://monographs.iarc.fr/ (last visited June 24, 2016). Monograph evaluations are

performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest. The process involves a year-long evaluation of all publicly available information including: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. *Id.* ¶¶ 44-45. After reviewing the data, the Monograph Panel engages in a rigorous public scientific debate and assigns the agent into one of four groups: Group 1 (Known Human Carcinogens); Group 2A (Probable Human Carcinogens); Group 2B (Probable Human Carcinogens); and Group 3 (Not Classified). *Id.* ¶ 42. Since the Monograph program's inception, IARC has reviewed 980 agents, with only 73 (about 7%) being assessed as probable carcinogens (Group 2A). In March 2015, IARC completed a year-long assessment of glyphosate and issued an official monograph, concluding that glyphosate is a Group 2A "Probable Human Carcinogen," meaning, more likely than not exposure to glyphosate causes cancer[7].

In the Glyphosate Monograph, IARC identified several epidemiological studies of glyphosate in the United States, Canada, and Sweden and concluded there was a positive association between glyphosate exposure and NHL, even after adjusting for other pesticides. Overall, nine epidemiological studies showed positive associations between glyphosate and NHL, with several studies showing statistically significant relative risks of NHL exceeding 2.0 and even 3.0. *See* International Agency for Research on Cancer,

---

[7] Prior to IARC taking an adverse carcinogen determination on its billion-dollar product, Monsanto admitted that IARC uses the "Bradford-Hill methodology to assess causation" which is a "well-established practice for considering whether a chemical can cause cancer."[7] Also, the Federal Judiciary's Reference Manual on Scientific Evidence describes IARC as one "of the most well respected and prestigious scientific bodies," and explains that the IARC's assessments of carcinogenicity of chemicals "are generally recognized as authoritative." 3rd Edition, p. 20, 565 n. 46.

6

*Glyphosate Monograph* 12-14, Table 2.1 (2015) (hereafter "Glyphosate Monograph"), *available at* http://monographs.iarc.fr/ENG/ Monographs/vol112/mono112-09.pdf. In addition, IARC identified the mechanism by which glyphosate could cause cancer. Compl. ¶¶ 54-44. IARC reviewed multiple studies indicating that glyphosate, and the chemical it turns into while degrading, caused DNA and chromosomal damage in human cells, the precursor to developing cancer.[8] *Id.* ¶ 54. Additionally, IARC found "strong evidence" from studies showing glyphosate causes oxidative stress in humans—another well-known cause of cancer. *Id.* ¶ 55.

Additionally, Plaintiffs in the listed Schedule of Actions allege that Roundup, which contains the surfactant POEA, is more dangerous and toxic than glyphosate alone. Since as early as 1991, Monsanto has been aware that its secret and proprietary glyphosate formulations sold were significantly more toxic than glyphosate alone.[9] The safety of these "inert" ingredients is at the heart of the debate over the safety of glyphosate-containing herbicides such as Roundup as IARC has considered studies involving complete formulations while other organizations finding that glyphosate is non-carcinogenic have largely looked at glyphosate in isolation.[10] Accordingly, Plaintiffs all allege that Monsanto knew or should have known that studies as to the safety of glyphosate alone were insufficient to determine the safety of Roundup as sold to consumers.

---

[8] IARC also noted that glyphosate has been detected in the urine of agricultural workers shortly after glyphosate sprayings, indicating that there is significant exposure by those using in an agricultural setting.

[9] Martinez TT; Brown K. 1991. *Oral and pulmonary toxicology of the surfactant used in roundup herbicide*. Proc. Western Pharmacol. Soc. 34: 43-46

[10] For example, the European Food Safety Authority ("EFSA") issued a report concluding that the active ingredient in Roundup was "unlikely to pose a carcinogenic hazard to humans." However, the report only reviewed studies examining the effects of glyphosate alone.

**ARGUMENT**

## II. Transfer and Pretrial Coordination of Related Roundup Non-Hodgkin's Lymphoma Cases Will Promote the Just and Efficient Conduct of Litigation and Further the Goals of 28 U.S.C. § 1407.

Transfer and pretrial coordination of the Actions in a single court is appropriate and will promote the goals of 28 U.S.C. § 1407. Transfer is appropriate where: (A) "civil actions involving one or more common questions of fact are pending in different districts"; (B) transfer and coordination "will promote the just and efficient conduct of such actions"; and (C) transfer and coordination will serve "the convenience of parties and witnesses." 28 U.S.C. § 1407(a). As set forth below, each criteria is satisfied.

The purpose of multidistrict litigation is to "eliminate the potential for contemporaneous pretrial rulings by coordinating district and appellate courts in multidistrict related civil actions." *In re Plumbing Fixture Cases*, 298 F. Supp. 484, 491-92 (J.P.M.L. 1968). Coordination is meant to "assure uniform and expeditious treatment in the pretrial procedures in multidistrict litigation." *See* H.R.Rep. No. 1130, 90th Cong., 2d Sess. 1 (1968), reprinted in 1968 U.S.C.C.A.N. at 1901. Without centralization "conflicting pretrial discovery demands for documents and witnesses" can "disrupt the functions of the Federal courts." *Id.* at 1899. Here, centralization is the only way to ensure consistent pretrial rulings and efficient use of judicial resources.

### A. The Related Actions Involve Common Issues of Fact.

Plaintiffs identified in the Schedule of Actions have raised common factual questions by asserting claims against the Defendants focused on a singular injury, NHL, that each plaintiff alleges was caused by exposure to Monsanto's Roundup. Here, transfer, coordination, and/or centralization are appropriate because many common questions of fact exist, including, but not limited to:

- Whether Roundup was defective;
- Whether Monsanto conducted adequate testing of Roundup;
- Whether Monsanto breached its duty of care to Plaintiffs;
- Whether Monsanto had knowledge regarding the existence of a defect;
- Whether Monsanto failed to warn about the risks of the Roundup;
- Whether Monsanto breached any warranty, express or implied, related to their sale of the Roundup;
- Whether Roundup is capable of causing cancer and or NHL generally; and
- Whether Roundup is capable of causing and/or did cause the NHL and related injuries of Plaintiffs.

Because Monsanto takes the position that the Roundup does not cause cancer, significant pretrial discovery will be required to evaluate: (a) Roundup's ability to cause NHL generally; (b) Monsanto's knowledge of Roundup's propensity to cause NHL; and (c) any effort by Monsanto to conceal those risks. All of this pretrial discovery applies equally to *all* plaintiffs. Determination of these and other common issues in a single district will benefit the parties and witnesses by promoting the efficient prosecution and resolution of these Actions.

To the extent "non-common" issues of fact exist, the centralization of all Actions nevertheless ensures the pivotal common issues of fact will be able to proceed in an orderly, consistent, and efficient manner. *See In re Ephedra Prods. Liab. Litig.*, 314 F. Supp. 2d 1373 (J.P.M.L. 2004). As this Panel previously held, "transfer to a single district under Section 1407 has the salutary effect of placing all the related proceedings with respect to any non-common issues to proceed concurrently with pretrial proceedings on common issues […],; and 2) ensures expeditious resolution of all actions to the overall benefit of the parties." *Id*. Although these Roundup actions (similar to every case within any existing MDL) present certain individualized factual issues, (e.g., specific causation and damages), "Section 1407 does not require a complete identity or even a majority of common factual issues as a prerequisite to centralization." *In re Zimmer Durom Hip Cup*

*Prods. Liab. Litig.*, 717 F. Supp. 2d 1376, 1378; (J.P.M.L. 2010); *see In re Denture Cream Prods. Liab. Litig.*, 624 F. Supp. 2d 1379, 1381 (J.P.M.L. 2009). Instead, where, as here, the underlying factual and legal allegations are sufficiently similar, "[t]ransferee judges have demonstrated the ability to accommodate common and individual discovery tracks, gaining the benefits of centralization without delaying or compromising consideration of claims on their individual merits." *In re Yamaha Motor Corp. Rhino ATV Prods. Liab. Litig.*, 597 F. Supp. 2d 1377, 1378 (J.P.M.L. 2009); see *In re: Zoloft (Sertraline Hydrochloride) Products Liab. Litig.*, MDL 2342, 2012 WL 1389649 (Apr. 17, 2012) ("[W]e have found that products liability cases often present some individual factual issues, but that coordination of discovery across all actions, with the use of common and individual discovery tracks, can offer efficiencies to all parties.") (citing *In re Darvocet, Darvon & Propoxyphene Prods. Liab. Litig.*, 780 F. Supp. 2d 1379, 1381 (J.P.M.L. 2011)). "The transferee judge also can use any number of pretrial techniques, such as plaintiff fact sheets and separate motion tracks, to resolve threshold issues promptly." *In re Darvocet*, 780 F. Supp. 2d at 1381.

Indeed, Monsanto's current posture in the litigation highlights the benefits of centralization. Monsanto has argued in almost every case listed in the Schedule of Actions that courts should schedule discovery to address one threshold issue before all others: whether Roundup is capable of causing NHL. *See Giglio v. Monsanto Co.*, No. 3:15-cv-2279-BTM (S.D. Cal. June 28, 2016), ECF No. 51 ("each of Plaintiff's claims fail as a matter of law if he cannot present admissible expert testimony that the chemical alleged to have caused the injury is in fact capable of doing so ("general causation")"); *Hardeman v. Monsanto Co.,* No. 3:16-cv-00525-VC (N.D. Cal. May 3, 2016), ECF No.

48 ("[general] causation is a threshold issue"). This inquiry, which Monsanto sees as paramount, is common to every one of the Actions. Making an argument to bifurcate discovery to dozens of different Judges will lead to different Orders and/or interpretations of the Orders. If every Judge ruled the same way, consistency in the discovery process could be insured. Instead, to date, at least one Judge has ordered bifurcation and one Judge has denied bifurcation[11]. However, the Order denying bifurcation leaves enough subjective interpretation that it could conceivably be incompatible with another order ordering bifurcation, should one be entered.

### B. Coordination Promotes the Just and Efficient Management of Pretrial Proceedings for All Related Actions.

Because the Actions share common questions of fact that implicate overlapping fact and expert discovery, coordination of these actions before a single judge provides the most efficient approach to managing the cases.

The Plaintiffs in each of the twenty one pending actions are likely to seek much of the same discovery from Monsanto. Specifically, documents and deposition testimony related to (a) testing, design, labeling, marketing, and safety of Roundup and (b) Monsanto's research and evaluation of the carcinogenicity, toxicity and safety of Roundup, glyphosate, and surfactants such as POEA will be at issue in each of the Actions. Coordinating the Actions before one judge allows the parties and the court to address this overlapping discovery in an organized manner and avoid the costly duplication of efforts and judicial resources if the cases proceeded on separate schedules and in separate courts.

---

[11] Although the Court denying bifurcation is a Missouri State court, the lead counsel for that plaintiff also represents a plaintiff where a version of bifurcation was ordered, making coordination incoherent.

Coordination is also appropriate to avoid inconsistent pretrial rulings on the same or similar issues including expert challenges under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and the uncertainty and confusion that would result. *See In re Zimmer Nexgen Knee Implant Prods. Liab. Litig.*, MDL No. 2272, 2011 WL 3563293, at *1 (J.P.M.L. Aug. 8, 2011) ("Centralization under Section 1407 will eliminate duplicative discovery, [and] prevent inconsistent pretrial rulings on *Daubert* and other pretrial issues . . . ."); *In re Transocean Tender Offer Sec. Litig.*, 415 F. Supp. 382, 384 (J.P.M.L. 1976) ("[T]he likelihood of motions for partial dismissal and summary judgment in all three actions grounded at least in part on [a common issue] makes Section 1407 treatment additionally necessary to prevent conflicting pretrial rulings and conserve judicial effort.")

Such inconsistencies have already surfaced in this litigation highlighting the need for centralization. For example, two courts, in the Northern and Southern Districts of California respectively, have reached inconsistent rulings on identical issues of law related to failure to warn claims asserted by the plaintiffs. *Compare Hardeman v. Monsanto Co.*, No. 16-CV-00525VC, 2016 WL 1749680 (N.D. Cal. Apr. 8, 2016) (denying Defendant Monsanto's motion to dismiss) and *Giglio v. Monsanto Co.*, No. 15CV2279 BTM(NLS), 2016 WL 1722859 (S.D. Cal. Apr. 29, 2016) (granting in part and denying in part Monsanto's motion to dismiss). Absent centralization, there will continue to be further conflicting and inconsistent pretrial rulings by various courts throughout the country.[12]

---

[12] This Panel consistently recognizes that Section 1407 coordination is a preferred way to manage individual lawsuits that raise similar questions regarding a defendant's development, design, and testing of a particular product or device. *See, e.g.*, *In re*

Moreover, transfer, centralization and/or consolidation are especially appropriate here because this litigation is national in scope already, with at least twenty one actions pending in fourteen different federal district courts. These cases alone would justify centralization, as the Panel routinely coordinates cases involving substantially fewer actions.[13] Given the pervasive use of Roundup that has spanned for over four decades and the fact that the first Action was only filed on October 9, 2015, Movants expect that the number of similar cases filed in state and federal courts across the country will expand rapidly. *See In re Camp Lejeune, N.C. Water Contamination Litig.*, 763 F. Supp. 2d 1381, 1382 (J.P.M.L. 2011) (considering the potential for "a large number of additional related actions to be filed" as a factor weighing in favor of centralization). Indeed, as listed in the Schedule of Actions, the number of Roundup cases continue to grow. The level of filings is likely to expand as March 2017 approaches—two years following the public disclosure by the IARC of Roundup's carcinogenicity. Consequently, there is a definite need for centralized coordination of these Actions and future tag-along actions to avoid overlapping discovery and conflicting pretrial rulings. Centralization will also promote

---

*Zyprexa Prods. Liab. Litig.*, 314 F. Supp. 2d 1380, 1381-82 (J.P.M.L. 2004); *In re Prempro Prods. Liab. Litig.*, 254 F. Supp. 2d 1366, 1367 (J.P.M.L. 2003); *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 844 F. Supp. 1553, 1554 (J.P.M.L. 1994); *In re Silicone Gel Breast Implants Prods. Liab. Litig.*, 793 F. Supp. 1098, 1100 (J.P.M.L. 1992); *In re A. H. Robins Co. "Dalkon Shield" IUD Prods. Liab. Litig.*, 406 F. Supp. 540, 542 (J.P.M.L. 1975).

[13] The Panel only requires two actions pending in two federal districts for consolidation under 28 U.S.C. § 1407. *See, e .g., In re Toys "R" Us-Del., Inc., Fair Accurate Credit Transactions Act (FACTA) Litig.*, 581 F. Supp. 2d 1377-78 (J.P.M.L. 2008) (consolidating two actions pending in two districts); *In re Porsche Cars N. Am., Inc., Plastic Coolant Tubes Prods. Liab. Litig.*, 787 F. Supp. 2d 1359, 1360 (J.P.M.L. 2011) (involving four actions in four districts); *In re Milk Antitrust Litig.*, 530 F. Supp. 2d 1359, 1360 (J.P.M.L. 2008) (involving four actions in two districts); *In re Camp Lejeune, N.C. Water Contamination Litig.*, 763 F. Supp. 2d 1381, 1381-82 (J.P.M.L. 2011) (involving four actions in four districts).

judicial economy since only one court, as opposed to multiple courts throughout the country, will resolve the variety of common issues as described above.

### C. Coordination Will Serve the Convenience of Witnesses and Parties.

For many of the same reasons that coordination will promote the just and efficient management of the actions, it will also serve the convenience of the witnesses and parties. In particular, coordinating and streamlining discovery will minimize unnecessary duplication of discovery requests and expenses, such as travel costs, expert fees and electronically stored information ("ESI") management costs, and allow the parties to conserve, and more effectively focus, their resources in litigating these actions. For instance, the same 30(b)(6) depositions can be used in each of the Actions. Depositions of Monsanto's current and former management and research personnel could also be used in each of the Actions. Additionally, expert depositions could be used uniformly.

This Panel has noted the cost-saving benefits of centralization for the parties and witnesses:

> Since a Section 1407 transfer is for pretrial proceedings only, there is usually no need for the parties and witnesses to travel to the transferee district for depositions or otherwise. Furthermore, the judicious use of liaison counsel, lead counsel and steering committees will eliminate the need for most counsel ever to travel to the transferee district. And it is most logical to assume that prudent counsel will combine their forces and apportion the workload in order to streamline the efforts of the parties and witnesses, their counsel and the judiciary, thereby effectuating an overall savings of cost and a minimum of inconvenience to all concerned.

*In re Baldwin-United Corp. Litig.*, 581 F. Supp. 739, 740-41 (J.P.M.L. 1984) (citations omitted). Thus, by allowing the centralization of pretrial proceedings for the Actions, and the anticipated flood of actions in the future, current and future plaintiffs will have a single, organized, and easily accessible forum to have discovery adjudicated.

Centralization and pretrial coordination will "eliminate duplicative discovery, prevent inconsistent pretrial rulings . . . and conserve the resources of the parties, their counsel and the judiciary." *In re Temporomandibular Joint (TMJ) Implants*, 844 F. Supp. at 1554. Accordingly, centralizing the Actions in one Court benefits everyone.

### D. Voluntary Coordination is Impractical.

Voluntary coordination is impractical here. Monsanto has actively resisted all efforts to coordinate informally, even while acknowledging the common questions of fact and law that predominate Plaintiffs' claims. For example, Monsanto has opposed every administrative motion to relate cases alleging that Roundup causes NHL and has described such a decision as an "error" that should not be repeated. *See Hardeman v. Monsanto Co.,* No. 3:16-cv-00525-VC (N.D. Cal. May 10, 2016), ECF No. 56 ("the *Rubio* court nevertheless has accepted a handful of Roundup® cases under the Central District of California's related case procedures. That is, however, not a reason to repeat that error here."). Additionally, Monsanto has resisted efforts to coordinate depositions. Indeed, as one case begins discovery, there is essentially no deposition coordination with other cases. As a result, undersigned counsel is having to "redo" discovery taken in other cases. This apathy toward coordination wastes the parties and court's resources and is certain to continue absent coordination under Section 1407.

### III. The Southern District of Illinois is the Most Appropriate Forum for Transfer and Centralization for Coordination.

Three of the twenty one actions are filed in the Southern District of Illinois. No other forum has a stronger interest in the adjudication of the Actions than the Southern District of Illinois. According to the Illinois Farm Bureau, Illinois was the largest producer of soybeans and the second largest producer of corn in the United States in

15

2014.[14] Soybeans are sprayed with glyphosate containing herbicides more than any other crop with 122,473,987 pounds applied to soybeans in 2014. Benbrook, C.M., et al., *Trends in Glyphosate Herbicide Use in the United States and Globally*. 28 Environmental Sciences Europe, 1 (2016). After soybeans, corn is the second most widely sprayed crop with 68,949,452 gallons of glyphosate sprayed in 2014. *Id.* No other crop comes close. *Id*. Accordingly, Illinois' factual nexus and interest in the outcome of this litigation is extremely strong. *See In re Interest Rate Swaps Antitrust Litig*., No. MDL 2704, 2016 WL 3101844, at *2 (J.P.M.L. 2016) ("[t]his district has a strong factual connection to this litigation").

Additionally, no forum is more convenient for the parties and witnesses than the Southern District of Illinois. The Southern District of Illinois sits within twenty miles of Monsanto's global headquarters in St. Louis, providing easy access to documents and witnesses. *See In re: Lumber Liquidators Chinese-Manufactured Flooring Products Mktg., Sales Practices & Products Liab. Litig*., 109 F. Supp. 3d 1382 (J.P.M.L. 2015) ("[Defendant] is based in this district... and relevant documents and witnesses will likely be found there"). Moreover, centralization in the Southern District of Illinois allows for easy coordination with state court proceedings filed in Missouri. *See Id*. (considering ease of coordination with similar proceedings involving the same defendant). Further, although the Southern District of Illinois is extremely convenient for Monsanto, it remains a neutral venue since it is not the home state of the Defendant.

The Southern District of Illinois is well equipped to manage this multidistrict litigation and provides a convenient and accessible forum for Roundup actions filed

---

[14] Illinois Farm Bureau, *Farm & Food Facts*, 2014
https://www.ilfb.org/2014FFF/2014FFF.pdf (last visited July 26, 2016)

16

across the country. For these and other reasons further detailed below, the Actions and tag-along cases should be transferred and consolidated before the Honorable Nancy J. Rosenstengel or the Honorable David R. Herndon, United States District Judges for the Southern District of Illinois, who are currently presiding over the three actions filed in the Southern District of Illinois.

### 1. The Southern District of Illinois is a Central and Convenient Venue for Consolidated Proceedings.

The courthouse for the Southern District of Illinois is located in East St. Louis, Illinois - in close proximity to mass transit, as well as an international airport and hotels. This Panel has emphasized the fact that "although air travel renders both [coasts of the United States, California and New York] readily accessible, there is still something to be said for the convenience of a geographically central forum." *In re Library Editions of Children's Books*, 297 F. Supp. 385, 387 (J.P.M.L. 1968). In fact, this Panel recognized the innate benefits of the centrality of the Southern District of Illinois when deciding to consolidate actions in this district for the *Pradaxa* MDL. *See In re Pradaxa (Dabigatran Etexilate) Prods. Liab. Litig.*, 883 F. Supp. 2d 1355, 1356 (2012) ("[T]he Southern District of Illinois' geographically central location and accessibility also commend it for this nationwide products liability litigation.").

In addition, traveling to this central location is more convenient and efficient for counsel than traveling to other destinations in the country. For instance, the federal courthouse in the Southern District of Illinois, in East St. Louis, is only fifteen minutes from Lambert International Airport. Lambert International Airport not only offers moderately priced flights, but is one of the most central travel hubs in the nation with 250 daily departures to more than 60 nonstop destinations. As such, the Southern District of

17

Illinois is easily accessible for all parties and witnesses and is a convenient option for same day travel for regular status conferences and hearings. For these reasons, the Southern District of Illinois offers a convenient and central location, and is an appropriate choice to serve as the transferee court for these reasons alone.

### 2. The Southern District of Illinois is Well-Equipped to Efficiently Manage this Multi-District Litigation.

Two factors make the Southern District of Illinois superior to all other forums; (1) subpoena power over Monsanto's corporate witnesses, and (2) geographic proximity to Missouri, allowing for easy coordination with concurrent state court actions.

This Panel recently transferred a products liability litigation to the Southern District of Illinois, which is now substantially resolved: *In re Yasmin and Yaz (Drospirenone) Mktg., Sales Practices and Prods. Liab. Litig.*, 655 F. Supp. 2d 1343 (J.P.M.L. 2009) ("*Yaz MDL*"). In less than 27 months from the time of this Panel's Transfer Order of the *Yaz MDL* to the Southern District of Illinois, discovery was conducted, *bellwether* cases were selected and prepared for trial, *Daubert* motions were ruled upon, and shortly before the first *bellwether* trial, the parties reached a mass settlement initiative resulting in more than 16,000 cases settling in both federal and state courts.

Moreover, the judges in the Southern District of Illinois understand the importance of coordination efforts between multidistrict litigation and the various state court consolidated litigations in order to promote the just and efficient conduct of the litigation. In the *Yaz MDL*, successful cooperation and coordination efforts with the various state court jurisdictions avoided duplicative discovery and inconsistent court rulings, and ultimately resulted in the inclusion of state court claimants as participants in

the global settlement initiative. Centralization in the Southern District of Illinois provides the greatest ease for coordination with state court proceedings due to geographic proximity to the concurrent actions in Missouri.

Importantly, the Southern District of Illinois provides a well-prepared, well-staffed and overall top-notch staff and Clerk's office. In light of the previous complex litigations successfully managed and the thousands of cases on file in this district, the staff and Clerk's office in the Southern District of Illinois is experienced, efficient, and well-equipped to provide the necessary support services for managing this litigation. As an added element of efficiency and convenience for all parties, the Southern District of Illinois' Clerk's office has proven its ability to provide a state-of-the art webpage for each multidistrict litigation, which provides an abundance of useful information and easily accessible court documents for attorneys and litigants, including a list of court contacts and lead counsel, an organized listing of all Case Management orders, and minutes for each court hearing.[15] In addition, the Clerk's office at the Southern District of Illinois has implemented a streamlined process for direct filing of complaints. The efficiency and experience of the Clerk's office in a district court is absolutely vital to the successful management and administration of large-scale multidistrict litigations, and it is clear that the Clerk's office in the Southern District of Illinois has proven its abilities and exceptional work in this regard.

### 3. Judge Nancy J. Rosenstengel or Judge David R. Herndon Is Amply Qualified to Manage This Multidistrict Litigation.

---

[15] To see a complete listing of the information and court documents available, the webpage for the *Yaz MDL* is available at: http://www.ilsd.uscourts.gov/mdl/mdl2100.aspx.

There are currently three Roundup actions filed in the Southern District of Illinois, each one assigned to either Judge Rosenstengel or Judge Herndon. Both Judge Herndon and Judge Rosenstengel are amply qualified to manage this litigation, and transferring the cases to them makes sense as they already have a Roundup case on their docket. Additionally, Judge Staci M. Yandle, United States District Judge, Southern District of Illinois, is equally qualified to preside over this litigation.

### III.     CONCLUSION

For the reasons discussed above, Movants respectfully request that the Panel transfer the above-mentioned actions and all subsequently filed tag-along cases for the coordinated and consolidated pretrial proceedings before the Southern District of Illinois, and assign the matter to Judge Rosenstengel or Judge Herndon.

**Dated this 27th of July, 2016**          **Respectfully submitted,**

*/s/ Aimee H. Wagstaff*
**ANDRUS WAGSTAFF, P.C.**
Aimee H. Wagstaff, CO. Bar No. 36819
David J. Wool, CO. Bar No. 44614
7171 W. Alaska Drive
Lakewood, CO 80226
Tel: (303) 376-6360
aimee.wagstaff@andruswagstaff.com
david.wool@andruswagstaff.com

*Andrus Wagstaff, P.C. is counsel of record for Movants Edwin Hardeman and Emanuel Richard Giglio.*