ACCO,NORTHERN,(Ex),DISCOVERY,MANADR,RELATED–G

## UNITED STATES DISTRICT COURT for the CENTRAL DISTRICT OF CALIFORNIA (Western Division – Los Angeles)
## CIVIL DOCKET FOR CASE #: 2:16–cv–01609–DMG–E

Teri Michelle McCall vs Monsanto Company
Assigned to: Judge Dolly M. Gee
Referred to: Magistrate Judge Charles F. Eick
Demand: $75,000
 Related Case:  2:15–cv–07426–DMG–E
Cause: 28:1332 Diversity–Personal Injury

**Plaintiff**

Date Filed: 03/09/2016
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

| | | |
|---|---|---|
| **Teri Michelle McCall**<br>*individually, and as successor in interest for the estate of Anthony Jackson McCall, deceased* | represented by | **Cynthia L Garber**<br>Robinson Calcagnie Robinson Shapiro Davis Inc<br>19 Corporate Plaza Drive<br>Newport Beach, CA 92660<br>949–720–1288<br>Email: cgarber@rcrsd.com<br>*TERMINATED: 06/30/2016*<br>*ATTORNEY TO BE NOTICED* |
| | | **Kevin J Madonna**<br>Kennedy and Madonna LLP<br>48 Dewitt Mills Road<br>Hurley, NY 12443<br>845–481–2622<br>Fax: 845–230–3111<br>Email: kmadonna@kennedymadonna.com<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |
| | | **Michael Lin Baum**<br>Baum Hedlund Aristei and Goldman PC<br>12100 Wilshire Boulevard Suite 950<br>Los Angeles, CA 90025–7106<br>310–207–3233<br>Fax: 310–820–7444<br>Email: mbaum@baumhedlundlaw.com<br>*ATTORNEY TO BE NOTICED* |
| | | **Robert F Kennedy , Jr**<br>Kennedy and Madonna LLP<br>48 Dewitt Mills Road<br>Hurley, NY 12443<br>845–481–2622<br>Fax: 845–230–3111<br>Email: rkennedy@kennedymadonna.com<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |
| | | **Robert Brent Wisner**<br>Baum Hedlund Aristei and Goldman PC<br>12100 Wilshire Boulevard Suite 950<br>Los Angeles, CA 90025<br>310–207–3233<br>Fax: 310–820–7444<br>Email: RBWisner@baumhedlundlaw.com<br>*ATTORNEY TO BE NOTICED* |

V.

**Defendant**

**Monsanto Company**                    represented by   **Richard A Clark**
Parker Milliken Clark O'Hara and
Samuelian PC
555 South Flower Street 30th Floor
Los Angeles, CA 90071–2440
213–683–6500
Fax: 213–683–6669
Email: rclark@pmcos.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven Robert Platt**
Parker Milliken Clark O'Hara and
Samuelian PC
555 South Flower Street 30th Floor
Los Angeles, CA 90071
213–683–6500
Fax: 213–683–6669
Email: splatt@pmcos.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric G Lasker**
Hollingsworth LLP
1350 I Street NW 9th Floor
Washington, DC 20005
202–898–5800
Fax: 202–682–1639
Email: elasker@hollingsworthllp.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joe G Hollingsworth**
Hollingsworth LLP
1350 I Street NW 9th Floor
Washington, DC 20005–3305
202–898–5800
Fax: 202–682–1639
Email: jhollingsworth@hollingsworthllp.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Katharine R Latimer**
Hollingsworth LLP
1350 I Street NW 9th Floor
Washington, DC 20005
202–898–5800
Fax: 202–682–1639
Email: klatimer@hollingsworthllp.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/09/2016 | 1 | COMPLAINT Receipt No: 0973–17428088 – Fee: $400, filed by Plaintiff Teri Michelle McCall, individually, and as successor in interest for the estate of ANTHONY JACKSON MCCALL, deceased. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Attorney Robert Brent Wisner added to party Teri Michelle McCall, individually, and as successor in interest for the estate of ANTHONY JACKSON MCCALL, deceased(pty:pla))(Wisner, Robert) (Entered: 03/09/2016) |

| 03/09/2016 | 2 | CIVIL COVER SHEET filed by Plaintiff Teri Michelle McCall, individually, and as successor in interest for the estate of ANTHONY JACKSON MCCALL, deceased. (Wisner, Robert) (Entered: 03/09/2016) |
|---|---|---|
| 03/09/2016 | 3 | Request for Clerk to Issue Summons on Complaint (Attorney Civil Case Opening), 1 filed by Plaintiff Teri Michelle McCall, individually, and as successor in interest for the estate of ANTHONY JACKSON MCCALL, deceased. (Wisner, Robert) (Entered: 03/09/2016) |
| 03/09/2016 | 4 | NOTICE of Related Case(s) filed by Plaintiff Teri Michelle McCall, individually, and as successor in interest for the estate of ANTHONY JACKSON MCCALL, deceased. Related Case(s): 2:15–CV–7426; 5:16–CV–153 (Attachments: # 1 Exhibit A–1, # 2 Exhibit A–2, # 3 Exhibit B–1, # 4 Exhibit B–2)(Wisner, Robert) (Entered: 03/09/2016) |
| 03/09/2016 | 5 | NOTICE OF ASSIGNMENT to District Judge S. James Otero and Magistrate Judge Suzanne H. Segal. (et) (Entered: 03/09/2016) |
| 03/09/2016 | 6 | NOTICE TO PARTIES OF COURT–DIRECTED ADR PROGRAM filed. (et) (Entered: 03/09/2016) |
| 03/09/2016 | 7 | 21 DAY Summons Issued re Complaint (Attorney Civil Case Opening) 1 as to Defendant Monsanto Company. (et) (Entered: 03/09/2016) |
| 03/10/2016 | 8 | INITIAL STANDING ORDER upon filing of the complaint by Judge S. James Otero. (vcr) (Entered: 03/10/2016) |
| 03/14/2016 | 9 | Notice of Appearance or Withdrawal of Counsel: for attorney Richard A Clark counsel for Defendant Monsanto Company. Adding Richard A. Clark as counsel of record for Monsanto Company for the reason indicated in the G–123 Notice. Filed by defendant Monsanto Company. (Attorney Richard A Clark added to party Monsanto Company(pty:dft))(Clark, Richard) (Entered: 03/14/2016) |
| 03/14/2016 | 10 | Notice of Appearance or Withdrawal of Counsel: for attorney Steven Robert Platt counsel for Defendant Monsanto Company. Adding Steven R. Platt as counsel of record for Monsanto Company for the reason indicated in the G–123 Notice. Filed by defendant Monsanto Company. (Attorney Steven Robert Platt added to party Monsanto Company(pty:dft))(Platt, Steven) (Entered: 03/14/2016) |
| 03/14/2016 | 11 | CORPORATE DISCLOSURE STATEMENT filed by Defendant Monsanto Company identifying Monsanto Company as Corporate Parent. (Clark, Richard) (Entered: 03/14/2016) |
| 03/14/2016 | 12 | NOTICE of Interested Parties filed by defendant Monsanto Company, identifying plaintiff Teri Michelle McCall and defendant Monsanto Company. (Clark, Richard) (Entered: 03/14/2016) |
| 03/14/2016 | 13 | ORDER RE TRANSFER PURSUANT TO GENERAL ORDER 14–03 –Related Case– filed. Related Case No: 2:15–cv–07426 DMG(Ex). Case transferred from Judge S. James Otero and Magistrate Judge Suzanne H. Segal to Judge Dolly M. Gee and Magistrate Judge Charles F. Eick for all further proceedings. The case number will now reflect the initials of the transferee Judge 2:16–cv–01609 DMG(Ex). Signed by Judge Dolly M. Gee (rn) (Entered: 03/14/2016) |
| 03/14/2016 | 14 | OBJECTIONS to Notice of Related Case(s), 4 *MONSANTO COMPANYS OPPOSITION TO PLAINTIFFS NOTICE OF RELATED CASE* filed by Defendant Monsanto Company. (Clark, Richard) (Entered: 03/14/2016) |
| 03/15/2016 | 15 | NOTICE OF PRO HAC VICE APPLICATION AND FILING FEE DUE on Pro Hac Vice Application mailed to Attorney Joe G. Hollingsworth for Defendant Monsanto Company. Pro Hac Vice application has not been received by the court. Please return your completed Application of Non–Resident Attorney to Appear in a Specific Case, form G–64, or a copy of the Notice of Electronic Filing of your application and the $325.00 fee and this notice immediately. Out–of–state federal government attorneys who are not employed by the U.S. Department of Justice are required to file a Pro Hac Vice application;no filing fee is required. You have been removed as counsel of record from this case for failure to submit this filing fee. (gk) (Entered: 03/15/2016) |

| | | |
|---|---|---|
| 03/15/2016 | 16 | NOTICE OF PRO HAC VICE APPLICATION AND FILING FEE DUE on Pro Hac Vice Application mailed to Attorney Katharine R. Latimer for Defendant Monsanto Company. Pro Hac Vice application has not been received by the court. Please return your completed Application of Non–Resident Attorney to Appear in a Specific Case, form G–64, or a copy of the Notice of Electronic Filing of your application and the $325.00 fee and this notice immediately. Out–of–state federal government attorneys who are not employed by the U.S. Department of Justice are required to file a Pro Hac Vice application;no filing fee is required. You have been removed as counsel of record from this case for failure to submit this filing fee. (gk) (Entered: 03/15/2016) |
| 03/15/2016 | 17 | NOTICE OF PRO HAC VICE APPLICATION AND FILING FEE DUE on Pro Hac Vice Application mailed to Attorney Eric G. Lasker for Defendant Monsanto Company. Pro Hac Vice application has not been received by the court. Please return your completed Application of Non–Resident Attorney to Appear in a Specific Case, form G–64, or a copy of the Notice of Electronic Filing of your application and the $325.00 fee and this notice immediately. Out–of–state federal government attorneys who are not employed by the U.S. Department of Justice are required to file a Pro Hac Vice application;no filing fee is required. You have been removed as counsel of record from this case for failure to submit this filing fee. (gk) (Entered: 03/15/2016) |
| 03/15/2016 | 18 | MINUTES (IN CHAMBERS)–TRANSFER OF CASE TO JUDGE GEE by Judge Dolly M. Gee: Please take notice that this action has been reassigned to the HONORABLE DOLLY M. GEE, United States District Judge, pursuant to the Order re Transfer Pursuant to General Order 14–03 filed on March 14, 2016. Please take notice that the new Magistrate Judge is Judge Charles F. Eick. Please substitute the initials DMG in place of the current initials, so that the case number will now read CV16–01609–DMG (Ex). (iv) (Entered: 03/15/2016) |
| 03/15/2016 | 19 | INITIAL STANDING ORDER upon filing of the complaint by Judge Dolly M. Gee. (iv) (Entered: 03/15/2016) |
| 03/15/2016 | 20 | REPLY opposition to *Monsanto Company's Opposition to Plaintiff's Notice of Related Case* filed by Plaintiff Teri Michelle McCall. (Wisner, Robert) (Entered: 03/15/2016) |
| 03/17/2016 | 21 | APPLICATION for attorney Joe G. Hollingsworth to Appear Pro Hac Vice (PHV Fee of $325 receipt number 0973–17482472 paid.) filed by defendant Monsanto Company. (Attachments: # 1 Proposed Order) (Platt, Steven) (Entered: 03/17/2016) |
| 03/17/2016 | 22 | APPLICATION for attorney Katharine R. Latimer to Appear Pro Hac Vice (PHV Fee of $325 receipt number 0973–17482791 paid.) filed by defendant Monsanto Company. (Attachments: # 1 Proposed Order) (Platt, Steven) (Entered: 03/17/2016) |
| 03/17/2016 | 23 | APPLICATION for attorney Eric G. Lasker to Appear Pro Hac Vice (PHV Fee of $325 receipt number 0973–17482956 paid.) filed by defendant Monsanto Company. (Attachments: # 1 Proposed Order) (Platt, Steven) (Entered: 03/17/2016) |
| 03/18/2016 | 24 | ORDER ON APPLICATION OF NON–RESIDENT ATTORNEY TO APPEAR IN A SPECIFIC CASE PRO HAC VICE by Judge Dolly M. Gee: granting 21 APPLICATION to Appear Pro Hac Vice by Attorney Joe G. Hollingsworth on behalf of Defendant, designating Steven R. Platt as local counsel. (lt) (Entered: 03/18/2016) |
| 03/18/2016 | 25 | ORDER ON APPLICATION OF NON–RESIDENT ATTORNEY TO APPEAR IN A SPECIFIC CASE PRO HAC VICE by Judge Dolly M. Gee: granting 22 APPLICATION to Appear Pro Hac Vice by Attorney Katharine R. Latimer on behalf of Defendant, designating Steven R. Platt as local counsel. (lt) (Entered: 03/18/2016) |
| 03/18/2016 | 26 | ORDER ON APPLICATION OF NON–RESIDENT ATTORNEY TO APPEAR IN A SPECIFIC CASE PRO HAC VICE by Judge Dolly M. Gee: granting 23 APPLICATION to Appear Pro Hac Vice by Attorney Eric G. Lasker on behalf of Defendant, designating Steven R. Platt as local counsel. (lt) (Entered: 03/18/2016) |
| 03/18/2016 | 27 | PROOF OF SERVICE filed by defendant Monsanto Company, re Order on Motion to Appear Pro Hac Vice, 25 , Order on Motion to Appear Pro Hac Vice, 24 , APPLICATION for attorney Katharine R. Latimer to Appear Pro Hac Vice (PHV Fee of $325 receipt number 0973–17482791 paid.) 22 , APPLICATION for attorney Eric G. Lasker to Appear Pro Hac Vice (PHV Fee of $325 receipt number 0973–17482956 paid.) 23 , APPLICATION for attorney Joe G. Hollingsworth to Appear Pro Hac Vice (PHV Fee of $325 receipt number 0973–17482472 paid.) 21 , Order on Motion to |

| | | |
|---|---|---|
| | | Appear Pro Hac Vice, 26 served on 3/18/16. (Platt, Steven) (Entered: 03/18/2016) |
| 03/22/2016 | 28 | WAIVER OF SERVICE Returned Executed filed by Plaintiff Teri Michelle McCall. upon Monsanto Company waiver sent by Plaintiff on 3/14/2016, answer due 5/13/2016. Waiver of Service signed by Eric Lasker. (Wisner, Robert) (Entered: 03/22/2016) |
| 04/14/2016 | 29 | NOTICE OF MOTION AND MOTION to Stay Case pending ruling on Motion to Dismiss filed by Defendant Monsanto Company. Motion set for hearing on 5/20/2016 at 09:30 AM before Judge Dolly M. Gee. (Attachments: # 1 Memorandum Monsanto Companys Memorandum of Points and Authorities in Support of its Motion to Stay Discovery, # 2 Proposed Order) (Hollingsworth, Joe) (Entered: 04/14/2016) |
| 04/14/2016 | 30 | PROOF OF SERVICE filed by defendant Monsanto Company, re NOTICE OF MOTION AND MOTION to Stay Case pending ruling on Motion to Dismiss 29 *Proof of Service of Monsanto Company's Motion to Stay Discovery, Memo ISO of Motion and [Proposed] Order* served on 04/14/2016. (Platt, Steven) (Entered: 04/14/2016) |
| 04/19/2016 | 31 | NOTICE OF MOTION AND MOTION to Compel participation in Rule 26(f) conference filed by Plaintiff Teri Michelle McCall. Motion set for hearing on 5/13/2016 at 09:30 AM before Magistrate Judge Charles F. Eick. (Attachments: # 1 Joint Stipulation Regarding Motion to Compel Participation in Rule 26(f) Conference, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D)(Wisner, Robert) (Entered: 04/19/2016) |
| 04/20/2016 | 32 | (IN CHAMBERS) ORDER by Judge Dolly M. Gee. The Court sua sponte continues Plaintiff's Motion to Compel Participation in Rule 26(f) Conference 31 , presently set on May 13, 2016 at 9:30 a.m. before Judge Eick, to May 20, 2016 at 9:30 a.m. before Judge Gee. IT IS SO ORDERED. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (clee) TEXT ONLY ENTRY (Entered: 04/20/2016) |
| 04/20/2016 | 33 | MEMORANDUM in Opposition to NOTICE OF MOTION AND MOTION to Stay Case pending ruling on Motion to Dismiss 29 filed by Plaintiff Teri Michelle McCall. (Attachments: # 1 Declaration of R. Brent Wisner, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D)(Wisner, Robert) (Entered: 04/20/2016) |
| 04/26/2016 | 34 | *Amended* NOTICE of Interested Parties filed by defendant Monsanto Company, identifying in addition to plaintiff Teri Michele McCall and defendant Monsanto Company (Insurers – ACE Insurance Company, Adriatic Insurance Company, Allianz Underwriters Insurance Company, Allied World Assurance Company, American International Underwriters, Ambassador Insurance Company, American Excess Insurance Company, American Home Assurance Company, American International Reinsurance, Apollo Insurance, Appalachian Insurance Company, Argo Insurance, Aspen Insurance Holdings Limited, Associated International Insurance Company, Birmingham Fire Insurance Company of Pennsylvania, California Union Insurance Company, Canopius Bermuda Limited, Catlin Insurance (London), Columbia Casualty Insurance Company, Commercial Union Insurance Company, Continental Casualty Company, Continental Insurance Company, Employers Insurance of Wausau, Employers Mutual Casualty Company, Employers Surplus Lines Insurance Company, Endurance Insurance, Excess Insurance Company, Federal Insurance Company, Firemans Fund Insurance Company, First State Insurance Company, Granite State Insurance Company, Harbor Insurance Company, Hartford Accident & Indemnity Company, Hudson Insurance Company, Industrial Indemnity Company, Insurance Company of the State of Pennsylvania, International Insurance Company, Iron–Starr Excess Insurance, Lexington Insurance Company, London Guarantee & Accident Company of New York, Markel Insurance, Monsure, Ltd., National Casualty Company, National Union Fire Insurance Company of Pittsburgh, PA, New England Insurance Company, North Star Reinsurance Corporation, North Umberland General Insurance Company, Northbrook Excess & Surplus Insurance Company, Northbrook Insurance Company, Northwestern National Insurance Company, Old Republic Insurance Company, Pacific Employers Insurance Company, Puritan Insurance Company, Royal Indemnity Company, Starr Excess Liability Insurance Company, Starr Surplus Lines Insurance Company, St. Paul Surplus Lines Insurance Company, Transamerica Premier Insurance Company, Transport Indemnity Company, Twin City Fire Insurance Company, Unigard Mutual Insurance Company, United States Fire Insurance Company, Various London Market Insurers, XL Insurance Co., Zurich |

| | | |
|---|---|---|
| | | Insurance Company) (Monsanto Policies –. (Clark, Richard) (Entered: 04/26/2016) |
| 04/29/2016 | 35 | MINUTES OF IN CHAMBERS – ORDER RE DEFENDANT'S MOTION TO STAY AND PLAINTIFF'S MOTION TO COMPEL PARTICIPATION IN RULE 26(f) CONFERENCE by Judge Dolly M. Gee: Defendant Monsanto Company's motion to stay 29 is DENIED and Plaintiff Teri Michelle McCall's motion to compel Monsanto's participation in a Rule 26(f) conference 31 is DENIED. Court Reporter: Not Reported. (gk) (Entered: 04/29/16) |
| 05/13/2016 | 36 | NOTICE OF MOTION AND MOTION to Dismiss Case filed by Defendant Monsanto Company. Motion set for hearing on 7/15/2016 at 09:30 AM before Judge Dolly M. Gee. (Attachments: # 1 Memorandum of Points and Authorities, # 2 Proposed Order) (Hollingsworth, Joe) (Entered: 05/13/2016) |
| 05/13/2016 | 37 | REQUEST FOR JUDICIAL NOTICE re NOTICE OF MOTION AND MOTION to Dismiss Case 36 filed by Defendant Monsanto Company. (Attachments: # 1 Proposed Order)(Hollingsworth, Joe) (Entered: 05/13/2016) |
| 05/13/2016 | 38 | PROOF OF SERVICE filed by Defendant Monsanto Company, re NOTICE OF MOTION AND MOTION to Dismiss Case 36 , Request for Judicial Notice 37 served on May 13, 2016. (Hollingsworth, Joe) (Entered: 05/13/2016) |
| 06/24/2016 | 39 | MEMORANDUM in Opposition to NOTICE OF MOTION AND MOTION to Dismiss Case 36 filed by Plaintiff Teri Michelle McCall. (Attachments: # 1 Exhibit A)(Wisner, Robert) (Entered: 06/24/2016) |
| 06/24/2016 | 40 | Response to Monsanto Company's Request for Judicial Notice Opposition re: NOTICE OF MOTION AND MOTION to Dismiss Case 36 filed by Plaintiff Teri Michelle McCall. (Wisner, Robert) (Entered: 06/24/2016) |
| 06/30/2016 | 41 | NOTICE of Withdrawal of Appearance of Cynthia L. Garber filed by Plaintiff Teri Michelle McCall. (Wisner, Robert) (Entered: 06/30/2016) |
| 06/30/2016 | 42 | NOTICE of Supplemental Authority In Support of Plaintiff's Opposition to Monsanto's Motion to Dismiss filed by Plaintiff Teri Michelle McCall. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Wisner, Robert) (Entered: 06/30/2016) |
| 07/01/2016 | 43 | REPLY in Support NOTICE OF MOTION AND MOTION to Dismiss Case 36 filed by Defendant Monsanto Company. (Hollingsworth, Joe) (Entered: 07/01/2016) |
| 07/01/2016 | 44 | REPLY in Support *of Request for Judicial Notice* filed by Defendant Monsanto Company. (Hollingsworth, Joe) (Entered: 07/01/2016) |
| 07/11/2016 | 45 | NOTICE of Supplemental Authority In Support of Plaintiff's Opposition to Monsanto's Motion to Dismiss filed by Plaintiff Teri Michelle McCall. (Attachments: # 1 Exhibit A)(Wisner, Robert) (Entered: 07/11/2016) |
| 07/13/2016 | 46 | (IN CHAMBERS) ORDER by Judge Dolly M. Gee: The Court finds that Defendant's Motion to Dismiss Plaintiff's Complaint 36 presently scheduled for hearing on July 15, 2016, is appropriate for decision without oral argument. Fed. R. Civ. P. 78(b); C.D. L.R. 7–15. Accordingly, the motion is taken UNDER SUBMISSION and the hearing is vacated. IT IS SO ORDERED. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (kti) TEXT ONLY ENTRY (Entered: 07/13/2016) |

Michael L. Baum, Esq. (SBN: 119511)
mbaum@baumhedlundlaw.com
R. Brent Wisner, Esq. (SBN: 276023)
rbwisner@baumhedlundlaw.com
Cynthia Garber, Esq. (SBN: 208922)
cgarber@baumhedlundlaw.com
**BAUM, HEDLUND, ARISTEI, &
GOLDMAN, P.C.**
12100 Wilshire Blvd., Suite 950
Los Angeles, CA 90025
Telephone: (310) 207-3233
Facsimile: (310) 820-7444

Robert F. Kennedy, Jr., Esq.
rkennedy@kennedymadonna.com
Kevin J. Madonna, Esq.
kmadonna@kennedymadonna.com
**KENNEDY & MADONNA, LLP**
48 Dewitt Mills Road
Hurley, New York 12443
Telephone: (845) 481-2622
Facsimile: (845) 230-3111

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERI MICHELLE MCCALL, individually, and as successor in interest for the estate of ANTHONY JACKSON MCCALL, deceased,<br><br>    Plaintiff,<br><br>  vs.<br><br>MONSANTO COMPANY,<br><br>    Defendant. | Case No.<br><br>COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ...................................................................................2

INTRODUCTION ..........................................................................................3

PARTIES .......................................................................................................4

JURISDICTION AND VENUE .......................................................................5

WRONGFUL DEATH AND SURVIVORSHIP ALLEGATIONS...................5

FACTUAL ALLEGATIONS ...........................................................................6

    I.     Registration of Herbicides ...................................................7

    II.    Scientific Fraud Underlying the Marketing and Sale of Glyphosate .........8

    III.   Monsanto's Market Dominance .........................................9

    IV.   Monsanto Falsely Advertised Roundup as Being Safe for Decades.........10

    V.    Assessments of Glyphosate ...............................................12

    VI.   The Decedent's Exposure to Glyphosate and Subsequent Death .............18

LIMITATION ON ALLEGATIONS ..............................................................19

COUNT I:  STRICT LIABILITY (DESIGN DEFECT) ................................19

COUNT II:  STRICT LIABILITY (FAILURE TO WARN) .........................24

COUNT III:  NEGLIGENCE .........................................................................28

COUNT IV:  FRAUD .....................................................................................33

COUNT V:  BEACH OF EXPRESS WARRANTIES....................................41

COUNT V:  BREACH OF IMPLIED WARRANTIES ..................................44

EXEMPLARY DAMAGES ALLEGATIONS ...............................................47

JURY TRIAL DEMAND ...............................................................................47

PRAYER FOR RELIEF..................................................................................47

## **INTRODUCTION**

1.      Anthony Jackson McCall (a/k/a Jack McCall) operated a farm in Cambria, California for over forty years with his wife, Teri Michelle McCall ("Plaintiff"). During that time, he avoided most pesticides and herbicides out of concern they could be toxic. Mr. McCall, however, did use the weed killer Roundup, an herbicide created and manufactured by the Monsanto Company. Roundup was supposed to be safe. After all, Monsanto promoted Roundup as being harmless to humans for over thirty years—going so far as to proclaim the product safe as table salt. The truth, however, is far more insidious. The active chemical in Roundup, glyphosate, is a carcinogen, and Monsanto has known this fact for decades.

2.      In September 2015, Mr. McCall was admitted to the hospital to treat enlarged lymph nodes in his neck. That same day, he was diagnosed with an aggressive form of non-Hodgkin lymphoma. Despite an aggressive treatment involving multiple rounds of chemotherapy, Mr. McCall suffered a stroke caused by his cancer treatment on December 24, 2015. On December 26, 2015, he passed away.

3.      Three years prior to Mr. McCall's death, the family dog, Duke, who played in the areas sprayed with Roundup, also developed lymphoma. He died shortly thereafter. He was only six years old.

4.      The McCalls learned of the potential link between Roundup and cancer, shortly after he was diagnosed with cancer. The farm immediately stopped using Roundup and, to this day, does not use any glyphosate-containing products.

5.      Last year, the International Agency for Research on Cancer (IARC), an organization within the World Health Organization (WHO), conducted an exhaustive analysis on the toxicity of glyphosate. The IARC, which has already reviewed hundreds of other chemical agents, convened a panel of seventeen renowned scientists from eleven countries, specifically screened to avoid potential conflicts of interest, to conduct a systematic review of all publically available information about glyphosate. The year-long study resulted in the publication of an IARC Monograph—the

authoritative standard for cancer hazard assessment around the world. The IARC classified glyphosate as a Group 2A hazard, meaning it is a probable human carcinogen—the second highest hazard rating. Additionally, the IARC concluded there was a positive association between glyphosate exposure and non-Hodgkin lymphoma. As a result of the IARC's study of glyphosate, the State of California's Office of Environmental Health Hazard Assessment (OEHHA) has decided to list glyphosate as an agent "known to the state to cause cancer" under Proposition 65.

6. In 1970, Defendant Monsanto discovered the herbicidal properties of glyphosate and began using it in its products in 1974, and marketing it under the brand name Roundup. Roundup is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 million pounds used annually. That number grew to 185 million pounds by 2007.

7. Monsanto has represented Roundup as being safe to humans and the environment since it began selling the herbicide. Indeed, Monsanto has proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup, create no unreasonable risks to human health or to the environment. This is untrue. Before glyphosate was first approved by the Environmental Protection Agency (EPA), Monsanto knew that glyphosate could pose significant risks to human health, including a risk of causing cancer. This lawsuit seeks to hold Monsanto accountable for this misconduct.

## PARTIES

8. Plaintiff Teri McCall resides in the County of San Luis Obispo, California. Plaintiff owns a farm in Cambria, California, which Plaintiff operated with her late husband, Anthony Jackson McCall (the "Decedent"), for over 40 years. The Decedent regularly used Roundup on their farm. Plaintiff brings this action pursuant to the applicable wrongful death and survival statutes on behalf of the Anthony Jackson McCall's estate and his wrongful death beneficiaries, Teri McCall, David McCall, Paul

McCall, Maggie McCall, and Alicia Suarez.

9.      Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri. At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and was the manufacturer of the Roundup at issue.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. There is complete diversity of citizenship between the parties.  In addition, Plaintiff seeks damages in excess of $75,000, exclusive of interest and costs.

11.      This Court has personal jurisdiction over Monsanto insofar as Monsanto is authorized and licensed to conduct business in the State of California, maintains and carries on systematic and continuous contacts in this judicial district, regularly transacts business within this judicial district, and regularly avails itself of the benefits of this judicial district.

12.      Additionally, Monsanto caused tortious injury by acts and omissions in this judicial district and caused tortious injury in this district by acts and omissions outside this district while regularly doing and soliciting business, engaging in a persistent course of conduct, and deriving substantial revenue from goods used or consumed and services rendered in this judicial district.

13.      Venue is proper before this Court pursuant to 28 U.S.C. § 1391because a substantial part of the events or omissions giving rise to this claim occurred within this judicial district.

## WRONGFUL DEATH AND SURVIVORSHIP ALLEGATIONS

14.      Plaintiff is a competent adult and the surviving spouse of Anthony Jackson McCall, deceased ("Decedent"). She brings this action as successor in interest to the estate of the Decedent, and all other persons entitled to a cause of action for damages for injuries to, and the wrongful death of, the Decedent.

15.      Plaintiff brings this action pursuant to the applicable wrongful death and

1    survival statutes.

2    16.     The survivors and heirs at law of the Decedent and their relationship to

3    the Decedent are:

     Name                        Relationship

4    Alicia Suarez                Daughter

5    David McCall                 Son

6    Paul McCall                  Son

7    Maggie McCall                Daughter

8    17.     On December 26, 2015, the Decedent died as a result of complications

9    associated with Roundup-induced cancer.  Attached hereto as Exhibit A is a copy of

10   the Decedent's death certificate.

11   18.     Pursuant to Cal. Civ. P. § 337.32, attached hereto as Exhibit B is a

12   declaration by the Plaintiff, Teri Michelle McCall.

## FACTUAL ALLEGATIONS

13   19.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide

14   variety of herbicidal products around the world, including the popular herbicide

15   Roundup.

16   20.     Glyphosate interferes with a plant's ability to form aromatic amino acids

17   necessary for protein synthesis.  Plants treated with glyphosate generally die within

18   two to three days.  Because plants absorb glyphosate, it cannot be completely removed

19   by washing or peeling produce, or by milling, baking, or brewing grains.

20   21.     The herbicidal properties of glyphosate were discovered in 1970 by

21   Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to

22   the market in the mid-1970s under the brand name Roundup.

23   22.     For about 40 years, farmers around the world have used Roundup,

24   containing glyphosate, without knowing of the dangers its use poses. That is because,

25   when Monsanto first introduced Roundup, it touted glyphosate as a technological

26   breakthrough: it could kill almost every weed without causing harm either to people or

to the environment. History, however, has demonstrated otherwise. According to the WHO, the main chemical ingredient of Roundup—glyphosate—is a probable carcinogen. Those most at risk are farm workers and other individuals with workplace exposure to Roundup, such as workers in garden centers, nurseries, and landscapers. Monsanto assured the public that Roundup was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies exposing glyphosate's dangers. Monsanto orchestrated a prolonged campaign of misinformation to convince government agencies, farmers, and the general population that Roundup was safe. As a result of this deception, agricultural workers and farmers have been exposed to a carcinogen, while Monsanto has made billions.

## I.    Registration of Herbicides

23.    The manufacture, formulation, and distribution of herbicides, such as Roundup, is regulated under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. §§ 136 *et seq.* FIFRA requires that all pesticides be registered with the EPA prior to distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

24.    Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The EPA does not deem certain products "safe," but only that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

25.    FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining

whether a registration should be granted or allowed to continue to be sold in commerce.

26.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup, conduct the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting those tests. The data produced by the registrant must be submitted to the EPA for review and evaluation.  The government is not required, nor is it able, to perform the tests that are required of the manufacturer.

27.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1.  In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

28.     In the case of glyphosate, the EPA planned on releasing its preliminary risk assessment—in relation to the re-registration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

## II.     Scientific Fraud Underlying the Marketing and Sale of Glyphosate

29.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985.  After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991.  In so classifying glyphosate, however, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

30.     On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed fraud.

31.     In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup.  IBT performed approximately 30 tests on glyphosate and glyphosate-containing-products, including 9 of the 15 residue studies needed to register Roundup with the EPA.

32.     In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate.  The EPA subsequently audited IBT and determined that the toxicology studies conducted for the Roundup were invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

33.     Three top executives of IBT were convicted of fraud in 1983.

34.     In the second incident, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including several studies on Roundup. That same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

III.  **Monsanto's Market Dominance**

35.     The success of Roundup was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly.  But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup market dominance and to ward off impending competition.

36.     In response, Monsanto began the development and sale of genetically engineered "Roundup Ready" seeds in 1996.  Since Roundup Ready crops are resistant

to glyphosate, farmers can spray Roundup onto their fields during the growing season without harming the crop.  This allowed Monsanto to expand its market for Roundup even further.  By 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready seeds.  It also secured Monsanto's dominant share of the glyphosate/Roundup market through a marketing strategy that coupled proprietary Roundup Ready seeds with continued sales of its Roundup herbicide.

37.     Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready seeds, Roundup became Monsanto's most profitable product.  In 2000, Roundup accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue.  Today, glyphosate remains one of the world's largest herbicides by sales volume.

## IV.     Monsanto Falsely Advertised Roundup as Being Safe for Decades

38.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products.  Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish.  Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are:

    a.  "Remember that environmentally friendly Roundup herbicide is biodegradable.  It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences."

    b.  "And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem."

c. "Roundup biodegrades into naturally occurring elements."

d. "Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e. "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it."

f. You can apply Roundup with "confidence because it will stay where you put it," it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Roundup into natural products.

g. "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

h. "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

i. "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

j. "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area that has been treated with Roundup.

39. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a. glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

b. glyphosate-containing pesticide products or any component thereof

manufactured, formulated, distributed or sold by Monsanto are biodegradable;

c.  glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

d.  glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics";

e.  glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and,

f.  glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

40.  Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

41.  In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup.  The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."

## V.  Assessments of Glyphosate

42.  The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent.  Over time, the IARC Monograph program has reviewed 980 agents.  Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

43.  The established procedure for IARC Monograph evaluations is described

in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

44.     A year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

45.     In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

46.     In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

47.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, the Working Group consisted of 17 experts from 11 countries who met from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated after a nearly one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific

evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

48. The studies considered the various exposure groups, including occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland, municipal weed-control workers in the United Kingdom, and para-occupational exposure in farming families.

49. Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

50. Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

51. The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies showed a human health concern from agricultural and other work-related exposure to glyphosate.

52. The IARC Working Group conducted a systematic review of over 15 studies designed to assess whether there was an association between Roundup exposure in agricultural workers and Non-Hodgkin Lymphoma (NHL). The researchers reviewed each study, identified the results and assessed each study's strengths and weaknesses. The IARC Working Group concluded that, despite the limited evidence concerning the carcinogenicity of glyphosate in humans, a "positive association has been observed for non-Hodgkin lymphoma."

53. In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an

initiation-promotion study in mice.

54.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells.  One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.  In assessing the genotoxicity of glyphosate (the property of chemical agents that damages the genetic information within a cell causing mutations, which may lead to cancer), the IARC Working Group concluded "[t]here is strong evidence that glyphosate causes genotoxicity."

55.     Additionally, the IARC assessed whether glyphosate exposure can induce oxidative stress, which is thought to be involved in the development of numerous conditions, including cancer, autism, and Parkinson's disease.  The IARC concluded that "strong evidence exists that glyphosate . . . can induce oxidative stress."  This could be an important mechanism by which Roundup causes cancer.[1]

56.     The IARC Working Group also noted that glyphosate has been detected in urine of agricultural workers, indicating absorption.  The IARC Working Group specifically evaluated farm workers in the United States, and found that, within the days following the application of Roundup to a crop, approximately 60% of farm workers tested positive for glyphosate in the urine.   Additionally, the IARC Working Group noted that soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

57.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and

---

[1] In addition to DNA damage and oxidative stress, some scientists have suggested that Roundup's association with various serious health conditions is linked to the effect Roundup has on the digestive system. Specifically, some scientists believe the same mechanism that makes Roundup toxic to weeds also makes it toxic to the microbes within the human gut. When humans are exposed to Roundup, it leads to a chronic inflammatory state in the gut, as well an impaired gut barrier, which can lead to many long-term health effects, including an increased risk of cancer.

North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

58.     In addition to the IARC's assessment, in 2014, scientists published a systematic review and meta-analysis on the relationship between non-Hodgkin lymphoma and occupational exposure to agricultural pesticides, including glyphosate, in the International Journal of Environmental Research and Public Health. The study showed a statistically significant association between farm workers exposed to Roundup and non-Hodgkin lymphoma. The study confirmed two smaller studies from 2002 and 2008, published in the journal Leukemia & Lymphoma (2002) and the International Journal on Cancer (2008), both of which also showed a statistically significant increase in non-Hodgkin lymphoma among agricultural workers exposed to glyphosate.

59.     Recent studies, including a glyphosate residue study published in the Journal of Environmental & Analytical Toxicology in 2014, indicate that "chronically ill humans showed significantly higher glyphosate residues in urine than healthy population." Glyphosate has been detected in the blood and urine of agricultural workers, indicating that agricultural use of Roundup leads to its absorption.

60.     In 1995, the Northwest Coalition for Alternatives to Pesticides reported that, in California, which has the most comprehensive program for reporting pesticide-caused illness, glyphosate was the third-most reported cause of pesticide illness among agricultural workers.

61.     Several countries around the world have instituted bans on the sale of Roundup and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup are more widely known.

62.     The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup, which takes effect by the end of 2015.  In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons.  In garden centers, Roundup is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are.  Especially children are sensitive to toxic substances and should therefore not be exposed to it."

63.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

64.     France banned the private sale of Roundup and glyphosate following the IARC assessment.

65.     Bermuda banned both the private and commercial sale of glyphosate, including Roundup.  The Bermuda government explained: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

66.     The Sri Lankan government banned the private and commercial use of glyphosate out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

67.     The government of Columbia announced a ban on using Roundup and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine in response to the IARC's assessment.

68.     In late 2015, following a public comment period, the State of California's Office of Environmental Health Hazard Assessment (OEHHA) has determined to list glyphosate as an agent "known to the state to cause cancer" pursuant to Proposition 65.

69.     In November 2015, 96 prominent experts, including almost the whole IARC team, reiterated IARC's assessment that Roundup is probably a human carcinogen.

70.     In late February 2016, another 14 scientists signed a consensus statement

in the Environmental Health journal, saying regulatory estimates of tolerable exposure levels for glyphosate were based on outdated science.

## VI. The Decedent's Exposure to Glyphosate and Subsequent Death

71.     Mr. McCall served in the U.S. Army during the Vietnam War as a First Lieutenant, Artillery Forward Observer, in the 101st Airborne Division, where he was awarded the Bronze Star and Distinguished Flying Cross.

72.     When Mr. McCall returned from the war, he started a farm in Cambria, California in 1975. That same year, Mr. McCall married Plaintiff, Teri Michelle McCall, on the farm property. Over the next forty years of marriage, Mr. and Mrs. McCall had three children, David, Paul, and Maggie.

73.     Mr. McCall primarily worked the farmland himself, whereas Mrs. McCall focused on farm administration and management. They mainly grew fruit crops—apricots, peaches, plums, and apples—and also some avocados and vegetables. While working the farm, Mr. McCall would regularly apply Monsanto's Roundup as an herbicide. As a general matter, Mr. McCall refrained from using other herbicides and pesticides out of a concern they might be hazardous to his own and his family's health. Mr. McCall used Roundup in areas of the farm that could not be reached by tractor.

74.     Mr. McCall did not smoke and there was no history of cancer in his family.

75.     In 2013, the McCall's dog, Duke, who spent much of his days playing in those areas exposed to Roundup, passed away after developing lymphoma. He was only six years old. At the time, the McCalls did not suspect that the cancer was caused by Roundup exposure.

76.     In September 2015, Mr. McCall, accompanied by his wife, was admitted to a Veteran's hospital, complaining of swelling in his neck. During that visit, the treating physicians conducted a biopsy on the affected area and tested it for cancer. It came back positive for a rare and aggressive form of non-Hodgkin lymphoma.

77.     Over the next few months, Mr. McCall underwent aggressive treatment

for his cancer, including multiple rounds of chemotherapy.

78.     During this time, Mr. McCall became aware of the potential link between glyphosate and cancer.  He and the Plaintiff immediately stopped using the product on their farm, and have not used it since.

79.     Having had his immune system suppressed with the cancer treatment, on Dec 22, 2015, Mr. McCall was admitted to the Sierra Vista Hospital in San Luis Obispo, sick with fever.  He then had a stroke on Christmas Eve, while in the hospital, and passed away on Dec 26, 2015.  The stated cause of death on Mr. McCall's death certificate was "Metastatic Large Cell Lymphoma."

## LIMITATION ON ALLEGATIONS

80.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

81.     The allegations in this pleading are made pursuant to California law.  To the extent California law imposes a duty or obligation on the Defendant that exceeds those required by federal law, Plaintiff does not assert such claims.  All claims asserted herein run parallel to federal law, i.e., the Defendant's violations of California law were also violations of federal law.  Had Defendant honestly complied with California law, it would also have complied with federal law.

82.     Additionally, Plaintiff's claims do not seek to enforce federal law.  These claims are brought under California law, notwithstanding the fact that such claims run parallel to federal law.

83.     As alleged in this pleading, the Defendant violated U.S.C. § 136j and 40 C.F.R. § 156.10(a)(5) by distributing Roundup, which was misbranded pursuant to 7 U.S.C. § 136(g).  Federal law specifically prohibits the distribution of a misbranded herbicide.

## COUNT I:  STRICT LIABILITY (DESIGN DEFECT)

84. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

85. Plaintiff brings this strict liability claim against Defendant for defective design.

86. At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, including the Decedent, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant. At all times relevant to this litigation, Defendant designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup products used by Decedent, as described above.

87. At all times relevant to this litigation, Defendant's Roundup products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Decedent.

88. At all times relevant to this litigation, Defendant's Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in California and throughout the United States, including the Decedent, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

89. Defendant's Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that, when they left the hands of the Defendant's manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

90.     Defendant's Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that, when they left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

91.     At all times relevant to this action, Defendant knew or had reason to know that its Roundup products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendant.

92.     Therefore, at all times relevant to this litigation, Defendant's Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendant were defective in design and formulation, in one or more of the following ways:

a.  When placed in the stream of commerce, Defendant's Roundup products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b.  When placed in the stream of commerce, Defendant's Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c.  When placed in the stream of commerce, Defendant's Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d.  Defendant did not sufficiently test, investigate, or study its Roundup products and, specifically, the active ingredient glyphosate.

e.  Exposure to Roundup and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f.  Defendant knew or should have known at the time of marketing its

Roundup products that exposure to Roundup and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g.  Defendant did not conduct adequate post-marketing surveillance of its Roundup products.

h.  Defendant could have employed safer alternative designs and formulations.

93.  The Decedent was exposed to Defendant's Roundup products in the course of his work as a farmer, as described above, without knowledge of Roundup's dangerous characteristics.

94.  At all times relevant to this litigation, the Decedent used and/or was exposed to the use of Defendant's Roundup products in an intended or reasonably foreseeable manner, i.e., as a farmer, without knowledge of Roundup's dangerous characteristics.

95.  The Decedent could not reasonably have discovered the defects and risks associated with Roundup or glyphosate-containing products before or at the time of exposure due to the Defendant's suppression of scientific information linking glyphosate to cancer.

96.  The harm caused by Defendant's Roundup products far outweighed their benefit, rendering Defendant's product dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendant's Roundup products were and are more dangerous than alternative products and Defendant could have designed its Roundup products to make them less dangerous.  Indeed, at the time Defendant designed its Roundup products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

97.  At the time Roundup products left Defendant's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended

1   function of Defendant's herbicides.

2       98.    Defendant's defective design of its Roundup products was willful,

3   wanton, fraudulent, malicious, and conducted with reckless disregard for the health

4   and safety of users of the Roundup products, including Plaintiff herein.

5       99.    Therefore, as a result of the unreasonably dangerous condition of its

6   Roundup products, Defendant is strictly liable to Plaintiff.

7       100.   The defects in Defendant's Roundup products were substantial and

8   contributing factors in causing Decedent's injuries and death, and, but for Defendant's

9   misconduct and omissions, Decedent would not have sustained his injuries.

10      101.   Defendant's conduct, as described above, was reckless. Defendant risked

11  the lives of consumers and users of its products, including Decedent, with knowledge

12  of the safety problems associated with Roundup and glyphosate-containing products,

13  and suppressed this knowledge from the general public. Defendant made conscious

14  decisions not to redesign, warn or inform the unsuspecting public. Defendant's

15  reckless conduct warrants an award of punitive damages.

16      102.   As a direct and proximate result of Defendant placing its defective

17  Roundup products into the stream of commerce, Decedent died and Decedent's heirs

18  have sustained pecuniary loss resulting from the loss of Decedent's society, comfort,

19  attention, protection, services and support and general damages in a sum in excess of

20  the jurisdictional minimum of this Court.

21      103.   As a proximate result of the Defendant placing its defective Roundup

22  products into the stream of commerce, as alleged herein, there was a measurable and

23  significant interval of time during which Decedent suffered great mental anguish and

24  other personal injury and damages before his death.

25      104.   As a proximate result of the Defendant placing its defective Roundup

26  products into the stream of commerce, as alleged herein, before his death, Decedent

27  sustained a loss of income, loss of earning capacity and property damage, including

28  lost income from his farm.

105.   As a further proximate result of the conduct of Defendant, Plaintiff has incurred expenses for funeral, burial and other related costs pertaining to Decedent's death, in amounts to be proved at trial.

106.   WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT II:  STRICT LIABILITY (FAILURE TO WARN)

107.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

108.   Plaintiff brings this strict liability claim against Defendant for failure to warn.

109.   At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, including Decedent, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

110.   Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Decedent, and therefore had a duty to warn of the risks associated with the use of Roundup and glyphosate-containing products.

111.   At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary

to ensure its Roundup products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn Decedent of the dangers associated with Roundup use and exposure. Defendant, as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

112. At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

113. At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by Defendant's herbicides, including Decedent.

114. Despite the fact that Defendant knew or should have known that Roundup posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied or sold the product, and not known to end users and consumers, such as Decedent.

115. Defendant knew or should have known that its products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers, i.e., the reasonably foreseeable users, of the risks of exposure to its products. Defendant has wrongfully concealed information concerning the dangerous nature of Roundup and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup and glyphosate.

116. At all times relevant to this litigation, Defendant's Roundup products reached the intended consumers, handlers, and users or other persons coming into

contact with these products in California and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

117. Decedent was exposed to Defendant's Roundup products in the course of his work as a farmer, as described above, without knowledge of their dangerous characteristics.

118. At all times relevant to this litigation, Decedent used and/or was exposed to the use of Defendant's Roundup products while using them for their intended or reasonably foreseeable purposes, without knowledge of their dangerous characteristics.

119. Decedent could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products prior to or at the time of Decedent's exposure. Decedent relied upon the skill, superior knowledge, and judgment of Defendant to know about and disclose serious health risks associated with using the products.

120. Defendant knew or should have known that the minimal warnings disseminated with its Roundup products were inadequate, failed to communicate adequate information on the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

121. The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled farmers such as Decedent to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false and misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and

concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

122.   This alleged failure to warn is not limited to the information contained on Roundup's labeling.  The Defendant was able, in accord with federal law, to comply with California law by disclosing the known risks associated with Roundup through other non-labeling mediums, i.e., promotion, advertisements, public service announcements, and/or public information sources.  The Defendant, however, did not disclose these known risks through any medium.

123.   To this day, Defendant has failed to adequately and accurately warn of the risks of cancer associated with the use of and exposure to Roundup and its active ingredient glyphosate.

124.   As a result of their inadequate warnings, Defendant's Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Decedent in the course of work as a farmer.

125.   Defendant is liable to Plaintiff for injuries caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its products and the risks associated with the use of or exposure to Roundup and glyphosate.

126.   Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup products, Decedent could have avoided the risk of developing injuries and could have obtained or used alternative herbicides.

127.   As a direct and proximate result of Defendant placing its defective Roundup products into the stream of commerce, Decedent died and Decedent's heirs have sustained pecuniary loss resulting from the loss of Decedent's society, comfort, attention, protection, services and support and general damages in a sum in excess of

the jurisdictional minimum of this Court.

128.   As a proximate result of Defendant placing its defective Roundup products into the stream of commerce, as alleged herein, there was a measurable and significant interval of time during which Decedent suffered great mental anguish and other personal injury and damages before his death.

129.   As a proximate result of Defendant placing its defective Roundup products into the stream of commerce, as alleged herein, before his death, Decedent sustained a loss of income, loss of earning capacity and property damage, including lost income from his farm.

130.   As a further proximate result of Defendant's conduct, Plaintiff has incurred expenses for funeral, burial and other related costs pertaining to Decedent's death, in amounts to be proved at trial.

131.   WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT III:  NEGLIGENCE

132.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

133.   Defendant, directly or indirectly, caused Roundup products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Decedent.

134.   At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

135.   At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup products.

Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup, and, in particular, its active ingredient glyphosate.

136.   At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup and specifically, the carcinogenic properties of the chemical glyphosate.

137.   Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup products could cause or be associated with Decedent's injuries and death, and thus, created a dangerous and unreasonable risk of injury to the users of these products, including Decedent.

138.   Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup and glyphosate-containing products.

139.   As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

140.   Defendant was negligent in its promotion of Roundup, outside of the labeling context, by failing to disclose material risk information as part of its promotion and marketing of Roundup, including the Internet, television, print advertisements, etc. Nothing prevented Defendant from being honest in its promotional activities, and in

fact, Defendant had a duty to disclose the truth about the risks associated with Roundup in its promotional efforts, outside of the of the context of labeling.

141. Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant has failed to do so. Indeed, Defendant has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup and glyphosate.

142. Defendant's negligence included:

    a. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup products without thorough and adequate pre- and post-market testing;

    b. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup;

    c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

    d. Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup products so as to avoid the risk of serious harm associated with the prevalent use of Roundup/glyphosate as an herbicide;

    e. Failing to design and manufacture Roundup products so as to ensure they were at least as safe and effective as other herbicides on the market;

    f. Failing to provide adequate instructions, guidelines, and safety precautions to those persons Defendant could reasonably foresee would use and be exposed to its Roundup products;

    g. Failing to disclose to Decedent, users/consumers, and the general public

that use of and exposure to Roundup presented severe risks of cancer and other grave illnesses;

h. Failing to warn Decedent, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to the Decedent and other consumers;

i. Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup and glyphosate-containing products;

j. Representing that its Roundup products were safe for their intended use when, in fact, Defendant knew or should have known the products were not safe for their intended purpose;

k. Declining to make or propose any changes to Roundup products' labeling or other promotional materials that would alert consumers and the general public of the risks of Roundup and glyphosate;

l. Advertising, marketing, and recommending the use of the Roundup products, while concealing and failing to disclose or warn of the dangers known (by Defendant) to be associated with or caused by the use of or exposure to Roundup and glyphosate;

m. Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup products are not unsafe for use in the agricultural and horticultural industries; and

n. Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

143.    Defendant knew and/or should have known that it was foreseeable consumers such as the Decedent would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup.

144.   The Decedent did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup or its active ingredient glyphosate.

145.   Defendant's negligence was the proximate cause of Decedent's injuries and death, i.e., absent Defendant's negligence, Decedent would not have developed cancer.

146.   Defendant's conduct, as described above, was reckless. Defendant regularly risks the lives of consumers and users of its products, including Decedent, with full knowledge of the dangers of its products.  Defendant has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Decedent. Defendant's reckless conduct therefore warrants an award of punitive damages.

147.   As a direct and proximate result of Defendant placing its defective Roundup products into the stream of commerce, Decedent died and Decedent's heirs have sustained pecuniary loss resulting from the loss of Decedent's society, comfort, attention, protection, services and support and general damages in a sum in excess of the jurisdictional minimum of this Court.

148.   As a proximate result of Defendant's negligence, as alleged herein, there was a measurable and significant interval of time during which Decedent suffered great mental anguish and other personal injury and damages before his death.

149.   As a proximate result of Defendant's negligence, as alleged herein, before his death Decedent sustained a loss of income, loss of earning capacity and property damage, including lost income from his farm.

150.   As a further proximate result of Defendant's conduct, Plaintiff has incurred expenses for funeral, burial and other related costs pertaining to Decedent's death, in amounts to be proved at trial.

151.   WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with

interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT IV: FRAUD

152. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

153. Defendant has defrauded the agricultural community in general and Decedent in particular by misrepresenting the true safety of Roundup and by failing to disclose known risks of cancer.

154. Defendant misrepresented and/or failed to disclose, *inter alia*, that: glyphosate and its major metabolite aminomethylphosphonic acid (AMPA) could cause cancer; glyphosate and AMPA are known to be genotoxic in humans and laboratory animals because exposure is known to cause DNA strand breaks (a precursor to cancer); glyphosate and AMPA are known to induce oxidative stress in humans and laboratory animals (a precursor to cancer); glyphosate and AMPA interfere with the aromatic amino acids within the human gut, leading to downstream health conditions including cancer; exposure to glyphosate and AMPA is causally associated with non-Hodgkin lymphoma; and the laboratory tests attesting to the safety of glyphosate were flawed and/or fraudulent.

155. Due to these misrepresentations and omissions, at all times relevant to this litigation, Defendant's Roundup was misbranded under 7 U.S.C. § 136(g) and its distribution within California and around the United States was a violation of 7 U.S.C. § 136j and 40 C.F.R. § 156.10(a)(5).

156. The following are a selection of specific instances when the Defendant made the above misrepresentations and/or omissions concerning Roundup and/or glyphosate to Decedent:

      a. On February 1, 1989, Decedent purchased Roundup from a farm supply store in Morro Bay, California. When Decedent purchased Roundup, the labeling on the product did not warn or disclose the true safety risks of

Roundup to Decedent, as described in the preceding numbered paragraph. Since that true risk information was known to Defendant and was not reasonably knowable to reasonable consumers, the Decedent was unaware of these material facts and/or omissions prior to purchasing the product. Decedent paid $87.78 for the product, money the decedent would not have expended absent the Defendant's misrepresentations and/or material omissions.

b. On May 18, 1989, the Decedent purchased Roundup from a farm supply store in Morro Bay, California. When Decedent purchased Roundup, the labeling on the product did not warn or disclose the true safety risks of Roundup to the Decedent, as described in the preceding numbered paragraph. Since that true risk information was known to Defendant and was not reasonably knowable to reasonable consumers, Decedent was unaware of these material facts and/or omissions prior to purchasing the product. Decedent paid $87.81 for the product, money the decedent would not have expended absent Defendant's misrepresentations and/or material omissions.

c. On July 30, 1990, Decedent purchased Roundup from a farm supply store in San Luis Obispo, California. When Decedent purchased Roundup, the labeling on the product did not warn or disclose the true safety risks of Roundup to Decedent, as described in the preceding numbered paragraph. Since that true risk information was known to Defendant and was not reasonably knowable to reasonable consumers, Decedent was unaware of these material facts and/or omissions prior to purchasing the product. Decedent paid $89.00 for the product, money the decedent would not have expended absent Defendant's misrepresentations and/or material omissions.

d. On May 6 1, 1991, the Decedent purchased Roundup from a farm supply

store in San Luis Obispo, California. When Decedent purchased Roundup, the labeling on the product did not warn or disclose the true safety risks of Roundup to Decedent, as described in the preceding numbered paragraph. Since that true risk information was known to Defendant and was not reasonably knowable to reasonable consumers, Decedent was unaware of these material facts and/or omissions prior to purchasing the product. Decedent paid $89.74 for the product, money the decedent would not have expended absent Defendant's misrepresentations and/or material omissions.

e. On May 11, 1992, Decedent purchased Roundup from a farm supply store in San Luis Obispo, California. When Decedent purchased Roundup, the labeling on the product did not warn or disclose the true safety risks of Roundup to Decedent, as described in the preceding numbered paragraph. Since that true risk information was known to Defendant and was not reasonably knowable to reasonable consumers, Decedent was unaware of these material facts and/or omissions prior to purchasing the product. Decedent paid $146.26 for the product, money Decedent would not have expended absent Defendant's misrepresentations and/or material omissions.

f. On December 28, 1999, Decedent purchased Roundup from a farm supply store in San Luis Obispo, California. When Decedent purchased Roundup, the labeling on the product did not warn or disclose the true safety risks of Roundup to Decedent, as described in the preceding numbered paragraph. Since that true risk information was known to Defendant and was not reasonably knowable to reasonable consumers, the Decedent was unaware of these material facts and/or omissions prior to purchasing the product. Decedent paid $108.95 for the product, money Decedent would not have expended absent Defendant's misrepresentations and/or material

omissions.

g. On December 28, 1999, Decedent purchased Roundup from a farm supply store in San Luis Obispo, California. When Decedent purchased Roundup, the labeling on the product did not warn or disclose the true safety risks of Roundup to the Decedent, as described in the preceding numbered paragraph. Since that true risk information was known to Defendant and was not reasonably knowable to reasonable consumers, Decedent was unaware of these material facts and/or omissions prior to purchasing the product. The Decedent paid $108.95 for the product, money Decedent would not have expended absent the Defendant's misrepresentations and/or material omissions.

h. On December 28, 1999, Decedent purchased Roundup from a farm supply store in San Luis Obispo, California. When Decedent purchased Roundup, the labeling on the product did not warn or disclose the true safety risks of Roundup to the Decedent, as described in the preceding numbered paragraph. Since that true risk information was known to Defendant and was not reasonably knowable to reasonable consumers, Decedent was unaware of these material facts and/or omissions prior to purchasing the product. Decedent paid $108.95 for the product, money Decedent would not have expended absent the Defendant's misrepresentations and/or material omissions.

i. On July 31, 2002, Decedent purchased Roundup from a farm supply store in San Luis Obispo, California. When Decedent purchased Roundup, the labeling on the product did not warn or disclose the true safety risks of Roundup to Decedent, as described in the preceding numbered paragraph. Since that true risk information was known to Defendant and was not reasonably knowable to reasonable consumers, Decedent was unaware of these material facts and/or omissions prior to purchasing the product. The

Decedent paid $136.00 for the product, money Decedent would not have expended absent the Defendant's misrepresentations and/or material omissions.

j.  On March 18, 2009, Decedent purchased Roundup from a farm supply store in San Luis Obispo, California. When the Decedent purchased Roundup, the labeling on the product did not warn or disclose the true safety risks of Roundup to the Decedent, as described in the preceding numbered paragraph. Since that true risk information was known to Defendant and was not reasonably knowable to reasonable consumers, Decedent was unaware of these material facts and/or omissions prior to purchasing the product. Decedent paid $149.99 for the product, money Decedent would not have expended absent Defendant's misrepresentations and/or material omissions.

k.  On April 11, 2011, Decedent purchased Roundup from a farm supply store in San Luis Obispo, California. When Decedent purchased Roundup, the labeling on the product did not warn or disclose the true safety risks of Roundup to Decedent, as described in the preceding numbered paragraph. Since that true risk information was known to Defendant and was not reasonably knowable to reasonable consumers, Decedent was unaware of these material facts and/or omissions prior to purchasing the product. Decedent paid $79.99 for the product, money Decedent would not have expended absent Defendant's misrepresentations and/or material omissions.

l.  On September 28, 2011, Decedent purchased Roundup from a farm supply store in San Luis Obispo, California. When Decedent purchased Roundup, the labeling on the product did not warn or disclose the true safety risks of Roundup to Decedent, as described in the preceding numbered paragraph. Since that true risk information was known to

Defendant and was not reasonably knowable to reasonable consumers, Decedent was unaware of these material facts and/or omissions prior to purchasing the product. Decedent paid $107.99 for the product, money Decedent would not have expended absent Defendant's misrepresentations and/or material omissions.

m. On May 22, 2012, Decedent purchased Roundup from a farm supply store in San Luis Obispo, California. When Decedent purchased Roundup, the labeling on the product did not warn or disclose the true safety risks of Roundup to Decedent, as described in the preceding numbered paragraph. Since that true risk information was known to Defendant and was not reasonably knowable to reasonable consumers, Decedent was unaware of these material facts and/or omissions prior to purchasing the product. Decedent paid $94.99 for the product, money Decedent would not have expended absent Defendant's misrepresentations and/or material omissions.

n. On March 25, 2013, Decedent purchased Roundup from a farm supply store in San Luis Obispo, California. When the Decedent purchased Roundup, the labeling on the product did not warn or disclose the true safety risks of Roundup to Decedent, as described in the preceding numbered paragraph. Since that true risk information was known to Defendant and was not reasonably knowable to reasonable consumers, Decedent was unaware of these material facts and/or omissions prior to purchasing the product. The Decedent paid $105.99 for the product, money Decedent would not have expended absent Defendant's misrepresentations and/or material omissions.

o. On May 8, 2014, Decedent purchased Roundup from a farm supply store in San Luis Obispo, California. When Decedent purchased Roundup, the labeling on the product did not warn or disclose the true safety risks of

Roundup to Decedent, as described in the preceding numbered paragraph. Since that true risk information was known to Defendant and was not reasonably knowable to reasonable consumers, Decedent was unaware of these material facts and/or omissions prior to purchasing the product. Decedent paid 79.99 for the product, money Decedent would not have expended absent Defendant's misrepresentations and/or material omissions.

    p.  On December 22, 2014, Decedent purchased Roundup from a farm supply store in San Luis Obispo, California. When Decedent purchased Roundup, the labeling on the product did not warn or disclose the true safety risks of Roundup to Decedent, as described in the preceding numbered paragraph. Since that true risk information was known to Defendant and was not reasonably knowable to reasonable consumers, Decedent was unaware of these material facts and/or omissions prior to purchasing the product. Decedent paid $79.99 for the product, money Decedent would not have expended absent Defendant's misrepresentations and/or material omissions.

157. Decedent relied on the Defendant's misrepresentations and/or material omissions regarding the safety of Roundup and its active ingredient glyphosate in deciding whether to purchase and/or use the product on his farm. Decedent did not know nor could he reasonably have known of the misrepresentations and/or material omissions by Defendant concerning Roundup and its active ingredient glyphosate.

158. The misrepresentations and/or material omissions that form the basis of this fraud claim are not limited to statements made on the Roundup labeling, as defined under federal law, but also involve Defendant's representations and omissions made as part of its promotion and marketing of Roundup, including on the Internet, television, in print advertisements, etc. Nothing prevented Defendant from disclosing the truth about the risks associated with Roundup in its promotional efforts outside of the

labeling context, using the forms of media and promotion Defendant traditionally used to promote the product's efficacy and benefits.

159.    When Defendant made the misrepresentations and/or omissions as alleged in this pleading, it did so with the intent of defrauding and deceiving the public in general and the agricultural community and with the intent of inducing the public and agricultural community to purchase and use Roundup.

160.    Defendant made these misrepresentations and/or material omissions with malicious, fraudulent and/or oppressive intent toward Decedent and the public generally.  Defendant's conduct was willful, wanton, and/or reckless.  Defendant deliberately recommended, manufactured, produced, marketed, sold, distributed, merchandised, packaged, promoted and advertised the dangerous and defective herbicide Roundup.  This constitutes an utter, wanton, and conscious disregard of the rights and safety of a large segment of the public, and by reason thereof, Defendant, is liable for reckless, willful, and wanton acts and omissions which evidence a total and conscious disregard for the safety of Decedent and others which proximately caused the injuries as set forth herein.

161.    As a proximate result of Defendant's fraudulent and deceitful conduct and representations, Decedent died and Plaintiff has sustained damages and other losses in an amount to be proven at trial.

162.    As a proximate result of Defendant's fraud, as alleged herein, before his death, Decedent sustained a loss of income, loss of earning capacity and property damage, including lost income from his farm.

163.    As a further proximate result of Defendant's conduct, Plaintiff has incurred expenses for funeral, burial and other related costs pertaining to Decedent's death, in amounts to be proved at trial.

164.    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as

this Court deems just and proper.

## COUNT V:  BEACH OF EXPRESS WARRANTIES

165.  Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

166.  At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

167.  Defendant had a duty to exercise reasonable care in the research, development, design, testing, packaging, manufacture, inspection, labeling, distributing, marketing, promotion, sale, and release of its Roundup products, including a duty to:

    a.  ensure that its products did not cause the user unreasonably dangerous side effects;

    b.  warn of dangerous and potentially fatal side effects; and

    c.  disclose adverse material facts, such as the true risks associated with the use of and exposure to Roundup and glyphosate-containing products, when making representations to consumers and the general public, including Plaintiff.

168.  As alleged throughout this pleading, the ability of Defendant to properly disclose those risks associated with Roundup is not limited representations made on the labeling.

169.  At all times relevant to this litigation, Defendant expressly represented and warranted to the purchasers of its products, by and through statements made by Defendant in labels, publications, package inserts, and other written materials intended for consumers and the general public, that its Roundup products were safe to human health and the environment, effective, fit, and proper for their intended use.  Defendant

advertised, labeled, marketed, and promoted Roundup products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that its Roundup products would conform to the representations.

170.   These express representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Roundup and glyphosate.  Defendant knew and/or should have known that the risks expressly included in Roundup warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein.  Nevertheless, Defendant expressly represented that its Roundup products were safe and effective, that they were safe and effective for use by individuals such as the Decedent, and/or that they were safe and effective as agricultural herbicides.

171.   The representations about Roundup, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

172.   Defendant placed its Roundup products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup and its active ingredient glyphosate.

173.   Defendant breached these warranties because, among other things, its Roundup products were defective, dangerous, unfit for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose.  Specifically, Defendant breached the warranties in the following ways:

a.   Defendant represented through its labeling, advertising, and marketing materials that its Roundup products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated

with use of and/or exposure to Roundup and glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings and labels; and

b. Defendant represented that its Roundup products were safe for use and fraudulently concealed information that demonstrated that glyphosate, the active ingredient in Roundup, had carcinogenic properties, and that its Roundup products, therefore, were not safer than alternatives available on the market.

174. The Decedent detrimentally relied on the express warranties and representations of Defendant concerning the safety and/or risk profile of Roundup in making a decision to purchase the product. Decedent reasonably relied upon Defendant to disclose known defects, risks, dangers, and side effects of Roundup and glyphosate. Once Decedent discovered the relationship between Roundup and cancer, the Decedent stopped using the product on his farm. He would not have purchased or used Roundup had the Defendant properly disclose the risks associated with the product, either through advertising, labeling, or any other form of disclosure.

175. Defendant had sole access to material facts concerning the nature of the risks associated with its Roundup products as expressly stated within its warnings and labels, and Defendant knew that consumers and users such as Plaintiff could not have reasonably discovered that the risks expressly included in Roundup warnings and labels were inadequate and inaccurate.

176. Decedent had no knowledge of the falsity or incompleteness of Defendant's statements and representations concerning Roundup.

177. Decedent used and/or was exposed to the use of Roundup as researched, developed, designed, tested, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by Defendant.

178. Had the warnings, labels, advertisements, or promotional material for

Roundup products accurately and adequately set forth the true risks associated with the use of such products, including Decedent's injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Decedent could have avoided the injuries complained of herein.

179.   As a direct and proximate result of Defendant breech of express warranty, the Decedent died and Decedent's heirs have sustained pecuniary loss resulting from the loss of Decedent's society, comfort, attention, protection, services and support and general damages in a sum in excess of the jurisdictional minimum of this Court.

180.   As a proximate result of the Defendant's breech of express warranty, as alleged herein, there was a measurable and significant interval of time during which the Decedent suffered great mental anguish and other personal injury and damages before his death.

181.   As a proximate result of the Defendant's breech of express warranty, as alleged herein, before his death the Decedent sustained a loss of income, loss of earning capacity and property damage, including lost income from his farm.

182.   As a proximate result of the conduct of Defendant' breech of express warranty, Plaintiff incurred expenses for funeral, burial and other related costs pertaining to Decedent's death, in amounts to be proved at trial.

183.   WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

## COUNT V:  BREACH OF IMPLIED WARRANTIES

184.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

185.   At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup products, which are defective and unreasonably dangerous to

consumers, including the Decedent, thereby placing Roundup products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendant.

186.   Before the time Decedent was exposed to the aforementioned Roundup products, Defendant impliedly warranted to its consumers—including Plaintiff's employer—that its Roundup products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as agricultural herbicides.

187.   Defendant, however, failed to disclose that Roundup has dangerous propensities when used as intended and that use of and/or exposure to Roundup and glyphosate-containing products carries an increased risk of developing severe injuries and death, including Decedent's injuries and death.

188.   Decedent was the intended beneficiary of the implied warranties made by Defendant to the purchasers of its herbicides.

189.   The Roundup products were expected to reach and did in fact reach consumers and users, including Decedent, without substantial change in the condition in which they were manufactured and sold by Defendant.

190.   At all times relevant to this litigation, Defendant was aware that consumers and users of its products, including Decedent, would use Roundup products as marketed by Defendant, which is to say that Decedent was a foreseeable user of Roundup.

191.   Defendant intended that its Roundup products be used in the manner in which Decedent in fact used them and which Defendant impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup was not adequately tested or researched.

192.   In reliance upon Defendant's implied warranty, Decedent used Roundup as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendant.

193.   Decedent could not have reasonably discovered or known of the risks of

serious injury associated with Roundup or glyphosate.

194.   Defendant breached its implied warranty to the Decedent in that its Roundup products were not of merchantable quality, safe, or fit for their intended use, or adequately tested.  Roundup has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

195.   The harm caused by Defendant's Roundup products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

196.   As a direct and proximate result of Defendant's breech of implied warranty, Decedent died and Decedent's heirs have sustained pecuniary loss resulting from the loss of Decedent's society, comfort, attention, protection, services and support and general damages in a sum in excess of the jurisdictional minimum of this Court.

197.   As a proximate result of the Defendant's breech of implied warranty, as alleged herein, there was a measurable and significant interval of time during which Decedent suffered great mental anguish and other personal injury and damages before his death.

198.   As a proximate result of Defendant's breech of implied warranty, as alleged herein, before his death, Decedent sustained a loss of income, loss of earning capacity and property damage, including lost income from his farm.

199.   As a further proximate result of Defendant's breech of implied warranty, Plaintiff incurred expenses for funeral, burial and other related costs pertaining to Decedent's death, in amounts to be proved at trial.

200.   WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## EXEMPLARY DAMAGES ALLEGATIONS

201.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

202.   Defendant's conduct as alleged herein was done with oppression, fraud, and malice.  Defendant was fully aware of Roundup's safety risks.  Nonetheless, Defendant deliberately crafted its label, marketing, and promotion to mislead farmers and consumers.

203.   This was not done by accident or through some justifiable negligence. Rather, Defendant knew that it could turn a profit by convincing the agricultural industry that Roundup was harmless to humans, and that full disclosure of Roundup's true risks would limit the amount of money Defendant would make selling Roundup in California.  This was accomplished not only through its misleading labeling, but through a comprehensive scheme of selective fraudulent research and testing, misleading advertising, and deceptive omissions as more fully alleged throughout this pleading.  Decedent, like all other farmers within California, was robbed of his right to make an informed decision about whether to purchase and use an herbicide on his property, knowing the full risks attendant to that use.  Such conduct was done with conscious disregard of the Decedent's rights.

204.   There is no indication that Defendant will stop its deceptive and unlawful marketing practices unless it is punished and deterred.  Accordingly, Plaintiff requests punitive damages against the Defendant for the harms caused to the Decedent prior to his death.

## JURY TRIAL DEMAND

205.   Plaintiff demands a trial by jury on all of the triable issues within this pleading.

## PRAYER FOR RELIEF

206.   WHEREFORE, Plaintiff requests that the Court enter judgment in her favor and against the Defendant, awarding the Estate of the Decedent:

a. actual or compensatory damages in such amount to be determined at trial and as provided by applicable law;

b. exemplary and punitive damages sufficient to punish and deter the Defendant and others from future fraudulent practices;

c. pre-judgment and post-judgment interest;

d. costs including reasonable attorneys' fees, court costs, and other litigation expenses; and

e. any other relief the Court may deem just and proper.

Dated: March 9, 2016

**BAUM HEDLUND ARISTEI & GOLDMAN, P.C.**

 /s/ R. Brent Wisner
R. Brent Wisner (SBN: 276023)
rbwisner@baumhedlundlaw.com
Michael L. Baum, Esq. (SBN: 119511)
mbaum@baumhedlundlaw.com
Cynthia Garber, Esq. (SBN: 208922)
cgarber@baumhedlundlaw.com
12100 Wilshire Blvd., Suite 950
Los Angeles, CA 90025
Telephone:  (310) 207-3233
Facsimile:  (310) 820-7444

**KENNEDY & MADONNA, LLP**

Robert F. Kennedy, Jr., Esq.
rkennedy@kennedymadonna.com
Kevin J. Madonna, Esq.
kmadonna@kennedymadonna.com
48 Dewitt Mills Road
Hurley, New York 12443
Telephone:  (845) 481-2622
Facsimile:  (845) 230-3111

*Attorneys for Plaintiff*