CIVIL

# U.S. District Court
## Eastern District of California – Live System (Fresno)
## CIVIL DOCKET FOR CASE #: 1:16–cv–00406–DAD–SMS

Mendoza v. Monsanto Company
Assigned to: District Judge Dale A. Drozd
Referred to: Magistrate Judge Sandra M. Snyder
Case in other court:  California Central, 2:15–cv–07426
Cause: 28:1332 Diversity–Product Liability

Date Filed: 03/25/2016
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Yolanda Mendoza**

represented by **Christopher Barton Dalbey**
Weitz & Luxenberg, P.C.
1880 Century Park East
Suite 700
Los Angeles, CA 90067
310–247–0921
Fax: 310–786–9927
Email: cdalbey@weitzlux.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robin L Greenwald , PHV**
Weitz and Luxenberg PC
700 Broadway
New York, NY 10003
212–558–5802
Fax: 212–344–5461
Email: rgreenwald@weitzlux.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Hunter W Lundy , PHV**
Lundy Lundy Soileau and South LLP
501 Broad Street
P O Box 3010
Lake Charles, LA 70602
337–439–0707
Fax: 337–439–1029
Email: hlundy@lundylawllp.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kristie M Hightower , PHV**
Lundy Lundy Soileau and South LLP
501 Broad Street
P O Box 3010
Lake Charles, LA 70602
337–439–0707
Fax: 337–439–1029
Email: khightower@lundylawllp.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Maja Lukic , PHV**
Weitz and Luxenberg PC
700 Broadway
New York, NY 10003
212–558–5804
Fax: 212–293–7923
Email: mlukic@weitzlux.com

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew E Lundy , PHV**
Lundy Lundy Soileau and South LLP
501 Broad Street
P O Box 3010
Lake Charles, LA 70602
337–439–0707
Fax: 337–439–1029
Email: mlundy@lundylawllp.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**                      represented by  **Martin C. Calhoun , PHV**
Hollingsworth, LLP
1350 I Street NW
Washington, DC 20005
202–898–5800
Fax: 202–682–1639
Email: mcalhoun@hollingsworthllp.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Steven Robert Platt**
Parker Milliken Clark O'Hara and
Samuelian PC
555 South Flower Street 30th Floor
Los Angeles, CA 90071
(213) 683–6500
Fax: (213) 683–6669
Email: splatt@pmcos.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric G Lasker , PHV**
Hollingsworth LLP
1350 I Street NW 9th Floor
Washington, DC 20005
202–898–5800
Fax: 202–682–1639
Email: elasker@hollingsworthllp.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joe Hollingsworth , PHV**
Hollingsworth, LLP
1350 I Street, NW
Washington, DC 20005
202–898–5800
Fax: 202–682–1639
Email: jhollingsworth@hollingsworthllp.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Katharine R. Latimer , PHV**
Hollingsworth, LLP
1350 I Street NW
Washington, DC 20005
202–898–5850

Fax: 202–682–1639
Email: klatimer@hollingsworthllp.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Richard A Clark**
Parker Milliken Clark O'Hara & Samuelian
555 S. Flower St., 30th Floor
Los Angeles, CA 90071
213–626–6500–569
Fax: 213–626–6669
Email: rclark@pmcos.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/22/2015 | 1 | COMPLAINT Receipt No: 0973–16491166 – Fee: $400, filed by Plaintiff Enrique Rubio. (Attorney Christopher Barton Dalbey added to party Enrique Rubio(pty:pla))(Dalbey, Christopher) [Transferred from cacd on 3/25/2016.] (Entered: 09/22/2015) |
| 09/22/2015 | 2 | CIVIL COVER SHEET filed by Plaintiff Enrique Rubio. (Dalbey, Christopher) [Transferred from cacd on 3/25/2016.] (Entered: 09/22/2015) |
| 09/22/2015 | 3 | Request for Clerk to Issue Summons on Complaint (Attorney Civil Case Opening) 1 filed by Plaintiff Enrique Rubio. (Dalbey, Christopher) [Transferred from cacd on 3/25/2016.] (Entered: 09/22/2015) |
| 09/22/2015 | 4 | CERTIFICATE of Interested Parties filed by Plaintiff Enrique Rubio, (Dalbey, Christopher) [Transferred from cacd on 3/25/2016.] (Entered: 09/22/2015) |
| 09/23/2015 | 5 | NOTICE OF ASSIGNMENT to District Judge Dolly M. Gee and Magistrate Judge Gail J. Standish. (et) [Transferred from cacd on 3/25/2016.] (Entered: 09/23/2015) |
| 09/23/2015 | 6 | NOTICE TO PARTIES OF COURT–DIRECTED ADR PROGRAM filed. (et) [Transferred from cacd on 3/25/2016.] (Entered: 09/23/2015) |
| 09/23/2015 | 7 | 21 DAY Summons Issued re Complaint (Attorney Civil Case Opening) 1 as to Defendant Monsanto Company. (et) [Transferred from cacd on 3/25/2016.] (Entered: 09/23/2015) |
| 09/23/2015 | 8 | NOTICE OF FILING FEE DUE on Pro Hac Vice Application mailed to attorney Robin L Greenwald for Plaintiff Enrique Rubio. re Complaint (Attorney Civil Case Opening) 1 . Pro Hac Vice application has not been received by the court. Please return your completed Application of Non–Resident Attorney to Appear in a Specific Case, form G–64, or a copy of the Notice of Electronic Filing of your application and the $325.00 fee and this notice immediately. Out–of–state federal government attorneys who are not employed by the U.S. Department of Justice are required to file a Pro Hac Vice application;no filing fee is required. You have been removed as counsel of record from this case for failure to submit this filing fee. (et) [Transferred from cacd on 3/25/2016.] (Entered: 09/23/2015) |
| 09/23/2015 | 9 | NOTICE OF FILING FEE DUE on Pro Hac Vice Application mailed to attorney Maja Lukic for Plaintiff Enrique Rubio. re Complaint (Attorney Civil Case Opening) 1 . Pro Hac Vice application has not been received by the court. Please return your completed Application of Non–Resident Attorney to Appear in a Specific Case, form G–64, or a copy of the Notice of Electronic Filing of your application and the $325.00 fee and this notice immediately. Out–of–state federal government attorneys who are not employed by the U.S. Department of Justice are required to file a Pro Hac Vice application;no filing fee is required. You have been removed as counsel of record from this case for failure to submit this filing fee. (et) [Transferred from cacd on 3/25/2016.] (Entered: 09/23/2015) |
| 09/23/2015 | 10 | NOTICE OF FILING FEE DUE on Pro Hac Vice Application mailed to attorney Hunter W Lundy for Plaintiff Enrique Rubio. re Complaint (Attorney Civil Case Opening) 1 . Pro Hac Vice application has not been received by the court. Please |

| | | |
|---|---|---|
| | | return your completed Application of Non–Resident Attorney to Appear in a Specific Case, form G–64, or a copy of the Notice of Electronic Filing of your application and the $325.00 fee and this notice immediately. Out–of–state federal government attorneys who are not employed by the U.S. Department of Justice are required to file a Pro Hac Vice application;no filing fee is required. You have been removed as counsel of record from this case for failure to submit this filing fee. (et) [Transferred from cacd on 3/25/2016.] (Entered: 09/23/2015) |
| 09/23/2015 | 11 | NOTICE OF FILING FEE DUE on Pro Hac Vice Application mailed to attorney Matthew E Lundy for Plaintiff Enrique Rubio. re Complaint (Attorney Civil Case Opening) 1 . Pro Hac Vice application has not been received by the court. Please return your completed Application of Non–Resident Attorney to Appear in a Specific Case, form G–64, or a copy of the Notice of Electronic Filing of your application and the $325.00 fee and this notice immediately. Out–of–state federal government attorneys who are not employed by the U.S. Department of Justice are required to file a Pro Hac Vice application;no filing fee is required. You have been removed as counsel of record from this case for failure to submit this filing fee. (et) [Transferred from cacd on 3/25/2016.] (Entered: 09/23/2015) |
| 09/23/2015 | 12 | NOTICE OF FILING FEE DUE on Pro Hac Vice Application mailed to attorney Kristie M Hightower for Plaintiff Enrique Rubio. re Complaint (Attorney Civil Case Opening) 1 . Pro Hac Vice application has not been received by the court. Please return your completed Application of Non–Resident Attorney to Appear in a Specific Case, form G–64, or a copy of the Notice of Electronic Filing of your application and the $325.00 fee and this notice immediately. Out–of–state federal government attorneys who are not employed by the U.S. Department of Justice are required to file a Pro Hac Vice application;no filing fee is required. You have been removed as counsel of record from this case for failure to submit this filing fee. (et) [Transferred from cacd on 3/25/2016.] (Entered: 09/23/2015) |
| 09/24/2015 | 13 | ORDER RETURNING CASE FOR REASSIGNMENT UPON RECUSAL by Magistrate Judge Gail J. Standish. ORDER case returned to the Clerk for random reassignment Discovery pursuant to General Order 05–07. Case randomly reassigned from Magistrate Judge Gail J. Standish to Magistrate Judge Charles F. Eick for all further proceedings. The case number will now reflect the initials of the transferee Judge CV 15–07426. (esa) [Transferred from cacd on 3/25/2016.] (Entered: 09/24/2015) |
| 09/30/2015 | 14 | INITIAL STANDING ORDER upon filing of the complaint by Judge Dolly M. Gee.(SEE DOCUMENT FOR FURTHER DETAILS) (vv) [Transferred from cacd on 3/25/2016.] (Entered: 09/30/2015) |
| 09/30/2015 | 15 | MINUTE ORDER IN CHAMBERS PILOT PROJECT RE SEALED DOCUMENTS by Judge Dolly M. Gee. (SEE DOCUMENT FOR FURTHER DETAILS) (vv) [Transferred from cacd on 3/25/2016.] (Entered: 09/30/2015) |
| 10/01/2015 | 16 | APPLICATION for attorney Robin Lynn Greenwald to Appear Pro Hac Vice (PHV FEE NOT PAID.) filed by Plaintiff Enrique Rubio. (Attachments: # 1 Proposed Order, # 2 Certificate of Good Standing) (Dalbey, Christopher) [Transferred from cacd on 3/25/2016.] (Entered: 10/01/2015) |
| 10/02/2015 | 17 | NOTICE TO FILER OF DEFICIENCIES in Electronically Filed Documents RE: APPLICATION for attorney Robin Lynn Greenwald to Appear Pro Hac Vice (PHV FEE NOT PAID.) 16 . The following error(s) was found: Other error(s) with document(s) are specified below: Fee not paid. See LR 83–2.1.3.3 (c). In response to this notice the court may order (1) an amended or correct document to be filed (2) the document stricken or (3) take other action as the court deems appropriate. You need not take any action in response to this notice unless and until the court directs you to do so. (lt) [Transferred from cacd on 3/25/2016.] (Entered: 10/02/2015) |
| 10/05/2015 | 18 | RESPONSE BY THE COURT TO NOTICE TO FILER OF DEFICIENCIES IN ELECTRONICALLY FILED DOCUMENTS RE: Notice of Deficiency in Electronically Filed Documents (G–112A),, 17 by Judge Dolly M. Gee. Plaintiff shall pay the required fees within five (5) days of this order. Failure to submit the payment will result in the DENIAL of the application.. (lt) [Transferred from cacd on 3/25/2016.] (Entered: 10/06/2015) |

| 10/08/2015 | 19 | APPLICATION for attorney Maja Lukic to Appear Pro Hac Vice (PHV Fee of $325 receipt number 0973–16583194 paid.) filed by Plaintiff Enrique Rubio. (Attachments: # 1 Proposed Order, # 2 Certificate of Good Standing) (Dalbey, Christopher) [Transferred from cacd on 3/25/2016.] (Entered: 10/08/2015) |
| --- | --- | --- |
| 10/09/2015 | 20 | PROOF OF SERVICE Executed by Plaintiff Enrique Rubio, upon Defendant Monsanto Company served on 9/30/2015, answer due 10/21/2015. Service of the Summons and Complaint were executed upon CSC–Lawyers Incorporating Service, registered agent, by leaving with Ms. Becky DeGeorge in compliance with Federal Rules of Civil Procedure by service on a domestic corporation, unincorporated association, or public entity.Original Summons NOT returned. (Dalbey, Christopher) [Transferred from cacd on 3/25/2016.] (Entered: 10/09/2015) |
| 10/09/2015 | 21 | DECLARATION OF SERVICE filed by Plaintiff Enrique Rubio, re Initial Order upon Filing of Complaint – form only 14 served on 10/01/2015. (Dalbey, Christopher) [Transferred from cacd on 3/25/2016.] (Entered: 10/09/2015) |
| 10/14/2015 | 22 | ORDER ON APPLICATION OF NON–RESIDENT ATTORNEY TO APPEAR IN A SPECIFIC CASE PRO HAC VICE by Judge Dolly M. Gee: granting 16 APPLICATION to Appear Pro Hac Vice by Attorney Robin L. Greenwald on behalf of Plaintiff, designating Christopher B. Dalbey as local counsel. (lt) [Transferred from cacd on 3/25/2016.] (Entered: 10/14/2015) |
| 10/14/2015 | 23 | ORDER ON APPLICATION OF NON–RESIDENT ATTORNEY TO APPEAR IN A SPECIFIC CASE PRO HAC VICE by Judge Dolly M. Gee: granting 19 APPLICATION to Appear Pro Hac Vice by Attorney Maja Lukic on behalf of Plaintiff, designating Christopher B. Dalbey as local counsel. (lt) [Transferred from cacd on 3/25/2016.] (Entered: 10/14/2015) |
| 10/20/2015 | 24 | First AMENDED COMPLAINT against Defendant Monsanto Company amending Complaint (Attorney Civil Case Opening) 1 , filed by Plaintiffs Enrique Rubio(Dalbey, Christopher) [Transferred from cacd on 3/25/2016.] (Entered: 10/20/2015) |
| 10/20/2015 | 25 | Notice of Appearance or Withdrawal of Counsel: for attorney Steven Robert Platt counsel for Defendant Monsanto Company. Adding Steven R. Platt as counsel of record for defendant Monsanto Company for the reason indicated in the G–123 Notice. Filed by defendant Monsanto Company. (Attorney Steven Robert Platt added to party Monsanto Company(pty:dft))(Platt, Steven) [Transferred from cacd on 3/25/2016.] (Entered: 10/20/2015) |
| 10/20/2015 | 26 | Notice of Appearance or Withdrawal of Counsel: for attorney Steven Robert Platt counsel for Defendant Monsanto Company. Adding Richard A. Clark as counsel of record for defendant Monsanto Company for the reason indicated in the G–123 Notice. Filed by defendant Monsanto Company. (Platt, Steven) [Transferred from cacd on 3/25/2016.] (Entered: 10/20/2015) |
| 10/20/2015 | 27 | APPLICATION for attorney Katherine R. Latimer to Appear Pro Hac Vice (PHV Fee of $325 receipt number 0973–16649846 paid.) filed by defendant Monsanto Company. (Attachments: # 1 Proposed Order) (Platt, Steven) [Transferred from cacd on 3/25/2016.] (Entered: 10/20/2015) |
| 10/20/2015 | 28 | APPLICATION for attorney Joe G. Hollingsworth to Appear Pro Hac Vice (PHV Fee of $325 receipt number 0973–16649857 paid.) filed by defendant Monsanto Company. (Attachments: # 1 Proposed Order) (Platt, Steven) [Transferred from cacd on 3/25/2016.] (Entered: 10/20/2015) |
| 10/20/2015 | 29 | NOTICE of Interested Parties filed by defendant Monsanto Company, identifying plaintiff Enrique Rubio and defendant Monsanto Company. (Platt, Steven) [Transferred from cacd on 3/25/2016.] (Entered: 10/20/2015) |
| 10/20/2015 | 30 | CORPORATE DISCLOSURE STATEMENT filed by Defendant Monsanto Company identifying Monsanto Company as Corporate Parent. (Platt, Steven) [Transferred from cacd on 3/25/2016.] (Entered: 10/20/2015) |
| 10/20/2015 | 31 | Joint STIPULATION Extending Time to Answer the complaint as to Monsanto Company answer now due 11/20/2015, re Complaint (Attorney Civil Case Opening) 1 filed by defendant Monsanto Company.(Platt, Steven) [Transferred from cacd on 3/25/2016.] (Entered: 10/20/2015) |

| 10/21/2015 | 32 | ORDER ON APPLICATION OF NON–RESIDENT ATTORNEY TO APPEAR IN A SPECIFIC CASE PRO HAC VICE by Judge Dolly M. Gee: granting 27 APPLICATION to Appear Pro Hac Vice by Attorney Katharine R. Latimer on behalf of Defendant, designating Steven R. Platt as local counsel. (lt) [Transferred from cacd on 3/25/2016.] (Entered: 10/21/2015) |
|---|---|---|
| 10/21/2015 | 33 | ORDER ON APPLICATION OF NON–RESIDENT ATTORNEY TO APPEAR IN A SPECIFIC CASE PRO HAC VICE by Judge Dolly M. Gee: granting 28 APPLICATION to Appear Pro Hac Vice by Attorney Joe G. Hollingsworth on behalf of Defendant, designating Steven R. Platt as local counsel. (lt) [Transferred from cacd on 3/25/2016.] (Entered: 10/21/2015) |
| 10/21/2015 | 34 | PROOF OF SERVICE filed by defendant Monsanto Company, re APPLICATION for attorney Katharine R. Latimer to Appear Pro Hac Vice (PHV Fee of $325 receipt number 0973–16649846 paid.) 27 , Notice of Appearance or Withdrawal of Counsel (G–123), 26 , Notice of Appearance or Withdrawal of Counsel (G–123), 25 , APPLICATION for attorney Joe G. Hollingsworth to Appear Pro Hac Vice (PHV Fee of $325 receipt number 0973–16649857 paid.) 28 , Certificate/Notice of Interested Parties 29 , Stipulation Extending Time to Answer (30 days or less) 31 , Corporate Disclosure Statement 30 served on 10/21/2015. (Platt, Steven) [Transferred from cacd on 3/25/2016.] (Entered: 10/21/2015) |
| 10/23/2015 | 35 | APPLICATION for attorney Eric G. Lasker to Appear Pro Hac Vice (PHV Fee of $325 receipt number 0973–16669482 paid.) filed by defendant Monsanto Company. (Attachments: # 1 Proposed Order) (Platt, Steven) [Transferred from cacd on 3/25/2016.] (Entered: 10/23/2015) |
| 10/27/2015 | 36 | ORDER ON APPLICATION OF NON–RESIDENT ATTORNEY TO APPEAR IN A SPECIFIC CASE PRO HAC VICE by Judge Dolly M. Gee: granting 35 APPLICATION to Appear Pro Hac Vice by Attorney Eric G. Lasker on behalf of Defendant, designating Steven R. Platt as local counsel. (lt) [Transferred from cacd on 3/25/2016.] (Entered: 10/27/2015) |
| 10/28/2015 | 37 | APPLICATION for attorney Kristie Marie Hightower to Appear Pro Hac Vice (PHV FEE NOT PAID.) filed by Plaintiffs Enrique Rubio, Yolanda Mendoza. (Attachments: # 1 Certificate of Good Standing (La.), # 2 Certificate of Good Standing (Miss.), # 3 Proposed Order) (Attorney Christopher Barton Dalbey added to party Yolanda Mendoza(pty:pla)) (Dalbey, Christopher) [Transferred from cacd 3/25/2016.] (Entered: 10/28/2015) |
| 10/28/2015 | 38 | PROOF OF SERVICE filed by Plaintiffs Yolanda Mendoza, Enrique Rubio, re Amended Complaint/Petition 24 served on 10/26/2015. (Dalbey, Christopher) [Transferred from cacd on 3/25/2016.] (Entered: 10/28/2015) |
| 10/28/2015 | 39 | NOTICE TO FILER OF DEFICIENCIES in Electronically Filed Documents RE: APPLICATION for attorney Kristie Marie Hightower to Appear Pro Hac Vice (PHV FEE NOT PAID.) 37 . The following error(s) was found: Other error(s) with document(s) are specified below: Fee not paid. See LR 83–2.1.3.3(c). In response to this notice the court may order (1) an amended or correct document to be filed (2) the document stricken or (3) take other action as the court deems appropriate. You need not take any action in response to this notice unless and until the court directs you to do so. (lt) [Transferred from cacd on 3/25/2016.] (Entered: 10/28/2015) |
| 10/30/2015 | 40 | NOTICE TO FILER OF DEFICIENCIES in Electronically Filed Documents RE: Proof of Service (subsequent documents) 38 . The following error(s) was found: Incorrect event selected. The correct event is: Service of summons and complaint returned executed 21 days. In response to this notice the court may order (1) an amended or correct document to be filed (2) the document stricken or (3) take other action as the court deems appropriate. You need not take any action in response to this notice unless and until the court directs you to do so. (lc) [Transferred from cacd on 3/25/2016.] (Entered: 10/30/2015) |
| 10/30/2015 | 41 | RESPONSE BY THE COURT TO NOTICE TO FILER OF DEFICIENCIES IN ELECTRONICALLY FILED DOCUMENTS RE: APPLICATION for attorney Kristie Marie Hightower to Appear Pro Hac Vice (PHV FEE NOT PAID.) 37 by Clerk. Plaintiffs shall comply with the deficiency stated in Doc. # 39 within 14 days of this order. Failure to comply will result in the application being denied and the fees |

| | | |
|---|---|---|
| | | returned by the Clerk. (lom) [Transferred from cacd on 3/25/2016.] (Entered: 11/02/2015) |
| 11/03/2015 | 42 | APPLICATION for attorney Hunter W. Lundy to Appear Pro Hac Vice (PHV FEE NOT PAID.) filed by Plaintiffs Yolanda Mendoza, Enrique Rubio. (Attachments: # 1 Proposed Order, # 2 Certificate of Good Standing (La.), # 3 Certificate of Good Standing (Miss.)) (Dalbey, Christopher) [Transferred from cacd on 3/25/2016.] (Entered: 11/03/2015) |
| 11/03/2015 | 43 | APPLICATION for attorney Matthew Edward Lundy to Appear Pro Hac Vice (PHV FEE NOT PAID.) filed by Plaintiffs Yolanda Mendoza, Enrique Rubio. (Attachments: # 1 Proposed Order, # 2 Certificate of Good Standing (La.), # 3 Certificate of Good Standing (Tex.)) (Dalbey, Christopher) [Transferred from cacd on 3/25/2016.] (Entered: 11/03/2015) |
| 11/04/2015 | 44 | NOTICE TO FILER OF DEFICIENCIES in Electronically Filed Documents RE: APPLICATION for attorney Matthew Edward Lundy to Appear Pro Hac Vice (PHV FEE NOT PAID.) 43 , APPLICATION for attorney Hunter W. Lundy to Appear Pro Hac Vice (PHV FEE NOT PAID.) 42 . The following error(s) was found: Other error(s) with document(s) are specified below: Fee not paid. See LR 83–2.1.3.3(c). In response to this notice the court may order (1) an amended or correct document to be filed (2) the document stricken or (3) take other action as the court deems appropriate. You need not take any action in response to this notice unless and until the court directs you to do so. (lt) [Transferred from cacd on 3/25/2016.] (Entered: 11/04/2015) |
| 11/05/2015 | 45 | ORDER ON APPLICATION OF NON–RESIDENT ATTORNEY TO APPEAR IN A SPECIFIC CASE PRO HAC VICE by Judge Dolly M. Gee: granting 37 APPLICATION to Appear Pro Hac Vice by Attorney Kristie M. Hightower on behalf of Plaintiffs, designating Christopher B. Dalbey as local counsel. (lt) [Transferred from cacd on 3/25/2016.] (Entered: 11/05/2015) |
| 11/05/2015 | 46 | RESPONSE BY THE COURT TO NOTICE TO FILER OF DEFICIENCIES IN ELECTRONICALLY FILED DOCUMENTS RE: APPLICATION for attorney Hunter W. Lundy to Appear Pro Hac Vice (PHV FEE NOT PAID.) 42 ; APPLICATION for attorney Matthew Edward Lundy to Appear Pro Hac Vice (PHV FEE NOT PAID.) 43 by Clerk. Plaintiffs shall comply with the deficiency stated in Doc. 44 within 14 days of this order. Failure to comply will result in the applications being denied. (lom) [Transferred from cacd on 3/25/2016.] (Entered: 11/05/2015) |
| 11/09/2015 | 47 | NOTICE OF MOTION AND MOTION to Sever Claims in Plaintiffs' Amended Complaint filed by Defendant Monsanto Company. Motion set for hearing on 1/8/2016 at 09:30 AM before Judge Dolly M. Gee. (Attachments: # 1 Memorandum of Points and Authorities, # 2 Proposed Order) (Hollingsworth, Joe) [Transferred from cacd on 3/25/2016.] (Entered: 11/09/2015) |
| 11/09/2015 | 48 | NOTICE OF MOTION AND MOTION to Dismiss Case filed by Defendant Monsanto Company. Motion set for hearing on 1/8/2016 at 09:30 AM before Judge Dolly M. Gee. (Attachments: # 1 Memorandum of Points and Authorities, # 2 Proposed Order) (Hollingsworth, Joe) [Transferred from cacd on 3/25/2016.] (Entered: 11/09/2015) |
| 11/09/2015 | 49 | PROOF OF SERVICE filed by defendant Monsanto Company, re NOTICE OF MOTION AND MOTION to Sever Claims in Plaintiffs' Amended Complaint 47 , NOTICE OF MOTION AND MOTION to Dismiss Case 48 served on 11/09/2015. (Platt, Steven) [Transferred from cacd on 3/25/2016.] (Entered: 11/09/2015) |
| 11/10/2015 | 50 | ORDER ON APPLICATION OF NON–RESIDENT ATTORNEY TO APPEAR IN A SPECIFIC CASE PRO HAC VICE by Judge Dolly M. Gee: granting 42 APPLICATION to Appear Pro Hac Vice by Attorney Hunter W. Lundy on behalf of Plaintiffs, designating Christopher B. Dalbey as local counsel. (lt) [Transferred from cacd on 3/25/2016.] (Entered: 11/10/2015) |
| 11/10/2015 | 51 | ORDER ON APPLICATION OF NON–RESIDENT ATTORNEY TO APPEAR IN A SPECIFIC CASE PRO HAC VICE by Judge Dolly M. Gee: granting 43 APPLICATION to Appear Pro Hac Vice by Attorney Matthew E. Lundy on behalf of Plaintiffs, designating Christopher B. Dalbey as local counsel. (lt) [Transferred from cacd on 3/25/2016.] (Entered: 11/10/2015) |

| 12/11/2015 | 52 | NOTICE OF MOTION AND MOTION to Stay Case pending Decision on Monsanto Company's Motions to Dismiss, Sever, and Transfer filed by Defendant Monsanto Company. Motion set for hearing on 1/8/2016 at 09:30 AM before Judge Dolly M. Gee. (Attachments: # 1 Memorandum of Points and Authorities in Support of Motion, # 2 Proposed Order) (Hollingsworth, Joe) [Transferred from cacd on 3/25/2016.] (Entered: 12/11/2015) |
| 12/18/2015 | 53 | MEMORANDUM in Opposition to NOTICE OF MOTION AND MOTION to Dismiss Case 48 filed by Plaintiffs Yolanda Mendoza, Enrique Rubio. (Dalbey, Christopher) [Transferred from cacd on 3/25/2016.] (Entered: 12/18/2015) |
| 12/18/2015 | 54 | MEMORANDUM in Opposition to NOTICE OF MOTION AND MOTION to Stay Case pending Decision on Monsanto Company's Motions to Dismiss, Sever, and Transfer 52 filed by Plaintiffs Yolanda Mendoza, Enrique Rubio. (Dalbey, Christopher) [Transferred from cacd on 3/25/2016.] (Entered: 12/18/2015) |
| 12/18/2015 | 55 | MEMORANDUM in Opposition to NOTICE OF MOTION AND MOTION to Sever Claims in Plaintiffs' Amended Complaint 47 filed by Plaintiffs Yolanda Mendoza, Enrique Rubio. (Dalbey, Christopher) [Transferred from cacd on 3/25/2016.] (Entered: 12/18/2015) |
| 12/21/2015 | 56 | MEMORANDUM in Opposition to NOTICE OF MOTION AND MOTION to Sever Claims in Plaintiffs' Amended Complaint 47 *Corrected Memorandum* filed by Plaintiffs Yolanda Mendoza, Enrique Rubio. (Attachments: # 1 Redline Version of Corrected Document)(Dalbey, Christopher) [Transferred from cacd on 3/25/2016.] (Entered: 12/21/2015) |
| 12/23/2015 | 57 | REPLY In Support of NOTICE OF MOTION AND MOTION to Sever Claims in Plaintiffs' Amended Complaint 47 filed by Defendant Monsanto Company. (Hollingsworth, Joe) [Transferred from cacd on 3/25/2016.] (Entered: 12/23/2015) |
| 12/23/2015 | 58 | REPLY In Support of NOTICE OF MOTION AND MOTION to Dismiss Case 48 filed by Defendant Monsanto Company. (Hollingsworth, Joe) [Transferred from cacd on 3/25/2016.] (Entered: 12/23/2015) |
| 12/23/2015 | 59 | REPLY In Support of NOTICE OF MOTION AND MOTION to Stay Case pending Decision on Monsanto Company's Motions to Dismiss, Sever, and Transfer 52 filed by Defendant Monsanto Company. (Hollingsworth, Joe) [Transferred from cacd on 3/25/2016.] (Entered: 12/23/2015) |
| 01/06/2016 | 60 | (IN CHAMBERS) ORDER by Judge Dolly M. Gee: The Court finds that Defendants Motion to Sever and Transfer or Dismiss Claims in Plaintiffs Amended Complaint 47, Defendants Motion to Dismiss Plaintiffs Amended Complaint 48, and Defendants Motion to Stay Pending Decision on Motions to Dismiss, Sever, and Transfer 52 presently scheduled for hearing on January 8, 2016, are appropriate for decision without oral argument. Fed. R. Civ. P. 78(b); C.D. L.R. 7–15. Accordingly, the motions are taken UNDER SUBMISSION and the hearing is vacated. IT IS SO ORDERED. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (kti) TEXT ONLY ENTRY [Transferred from cacd on 3/25/2016.] (Entered: 01/06/2016) |
| 01/13/2016 | 61 | SUPPLEMENT to NOTICE OF MOTION AND MOTION to Dismiss Case 48 *Notice of Supplemental Authority* filed by Defendant Monsanto Company. (Attachments: # 1 Exhibit Mirzaie v. Monsanto Order)(Hollingsworth, Joe) [Transferred from cacd on 3/25/2016.] (Entered: 01/13/2016) |
| 01/18/2016 | 62 | Opposition Opposition re: NOTICE OF MOTION AND MOTION to Dismiss Case 48 *2:15−cv−07426−DMG−E* filed by Plaintiff Enrique Rubio. (Attachments: # 1 Exhibit Exhibit 1)(Lukic, Maja) [Transferred from cacd on 3/25/2016.] (Entered: 01/18/2016) |
| 03/24/2016 | 63 | ORDER RE MOTION TO SEVER; MOTION TO TRANSFER; MOTION TO DISMISS; AND MOTION TO STAY CASE by Judge Dolly M. Gee: The Court GRANTS Monsanto's motions to sever Plaintiffs' case 47. Plaintiff Enrique Rubio's case is transferred to the United States District Court for the Western District of Texas. Plaintiff Yolanda Mendoza's case is transferred to the United States District Court for the Eastern District of California. Monsanto=s motions to dismiss 48 and to stay 52 are DENIED as moot. (gk) [Transferred from cacd on 3/25/2016.] (Entered: 03/24/2016) |

| 03/25/2016 | 64 | CASE TRANSFERRED IN from District of California Central; Case Number 2:15–cv–07426. (Entered: 03/25/2016) |
|---|---|---|
| 03/25/2016 | 65 | CIVIL NEW CASE DOCUMENTS ISSUED; Initial Scheduling Conference set for 6/29/2016 at 01:30 PM in Courtroom 1 (SMS) before Magistrate Judge Sandra M. Snyder. (Attachments: # 1 Standing Order, # 2 Consent Form, # 3 VDRP) (Verduzco, M) (Entered: 03/25/2016) |
| 03/25/2016 | 66 | CLERK'S NOTICE Directing Attorneys Hunter W Lundy, Kristie M Hightower, Matthew E Lundy, Eric G Lasker, Joe Hollingsworth, Katharine R. Latimer, to Submit Pro Hac Vice Application to Practice in the Eastern District of California. (Attachments: # 1 PHV Instructions) (Verduzco, M) (Entered: 03/25/2016) |
| 03/25/2016 | 67 | CLERK'S NOTICE Directing Attorney Steven Robert Platt to submit Petition to Practice in the Eastern District of California.(Verduzco, M) (Entered: 03/25/2016) |
| 04/04/2016 | 68 | PRO HAC VICE APPLICATION and PROPOSED ORDER submitted by Yolanda Mendoza for attorney Robin Lynn Greenwald to appear Pro Hac Vice. (Filing fee $ 200, receipt number 0972–6402074) (Attachments: # 1 Certificate of Good Standing (La.))(Dalbey, Christopher) (Entered: 04/04/2016) |
| 04/06/2016 | 69 | PRO HAC VICE ORDER Added attorney Robin Lynn Greenwald, PHV for Yolanda Mendoza, signed by Magistrate Judge Sandra M. Snyder on 4/6/16. (Hellings, J) (Entered: 04/07/2016) |
| 04/07/2016 | 70 | PRO HAC VICE APPLICATION and PROPOSED ORDER submitted by Monsanto Company for attorney Joe G. Hollingsworth to appear Pro Hac Vice.(Filing fee $ 200) (Clark, Richard) (Entered: 04/07/2016) |
| 04/07/2016 | | PAYMENT for 70 Pro Hac Vice Application (Clark, Richard) (Entered: 04/07/2016) |
| 04/07/2016 | | PAYMENT for 70 Pro Hac Vice Application (Clark, Richard) (Entered: 04/07/2016) |
| 04/07/2016 | | PAYMENT for 70 Pro Hac Vice Application in the amount of $ 200, receipt number 0972–6408707. (Clark, Richard) (Entered: 04/07/2016) |
| 04/07/2016 | 71 | PRO HAC VICE APPLICATION and PROPOSED ORDER submitted by Monsanto Company for attorney Katharine R. Latimer to appear Pro Hac Vice. (Filing fee $ 200, receipt number 0972–6408716) (Clark, Richard) (Entered: 04/07/2016) |
| 04/07/2016 | 72 | PRO HAC VICE APPLICATION and PROPOSED ORDER submitted by Monsanto Company for attorney Eric G. Lasker to appear Pro Hac Vice. (Filing fee $ 200, receipt number 0972–6408737) (Clark, Richard) (Entered: 04/07/2016) |
| 04/07/2016 | 73 | MOTION to DISMISS by Monsanto Company. Motion Hearing set for 5/17/2016 at 09:30 AM in Courtroom 5 (DAD) before District Judge Dale A. Drozd. (Attachments: # 1 Memorandum of Points and Authorities)(Clark, Richard) (Entered: 04/07/2016) |
| 04/07/2016 | 74 | REQUEST for JUDICIAL NOTICE by Monsanto Company in re 73 Motion to Dismiss. (Clark, Richard) (Entered: 04/07/2016) |
| 04/11/2016 | 75 | PRO HAC VICE APPLICATION and PROPOSED ORDER submitted by Yolanda Mendoza. (Attachments: # 1 Certificate of Good Standing (N.Y.))(Dalbey, Christopher) (Entered: 04/11/2016) |
| 04/18/2016 | 76 | PRO HAC VICE ORDER, signed by Magistrate Judge Sandra M. Snyder on 04/13/16. *Added Attorney Maja Lukic, PHV for Yolanda Mendoza.* (Gonzalez, R) (Entered: 04/20/2016) |
| 04/18/2016 | 77 | PRO HAC VICE ORDER as to *Attorney Katherine R. Latimer for Monsanto Company,* signed by Magistrate Judge Sandra M. Snyder on 4/13/16. (Gonzalez, R) (Entered: 04/20/2016) |
| 04/18/2016 | 78 | PRO HAC VICE ORDER as to *Attorney Eric G. Lasker for Monsanto Company,* signed by Magistrate Judge Sandra M. Snyder on 4/13/16. (Gonzalez, R) (Entered: 04/20/2016) |
| 04/18/2016 | 79 | PRO HAC VICE ORDER as to *Attorney Joe G. Hollingsworth for Monsanto Company,* signed by Magistrate Judge Sandra M. Snyder on 4/13/16. (Gonzalez, R) (Entered: 04/20/2016) |

| 05/03/2016 | 80 | REQUEST for *Continuance of Motion Hearing [UNOPPOSED]* by Yolanda Mendoza re 73 MOTION to DISMISS filed by Monsanto Company, 74 MOTION for Judicial Notice filed by Monsanto Company. (Dalbey, Christopher) (Entered: 05/03/2016) |
|---|---|---|
| 05/03/2016 | 81 | OPPOSITION by Yolanda Mendoza to 73 MOTION to DISMISS. (Dalbey, Christopher) (Entered: 05/03/2016) |
| 05/03/2016 | 82 | RESPONSE by Yolanda Mendoza to 74 Request for Judicial Notice. (Attachments: # 1 Exhibit)(Dalbey, Christopher) (Entered: 05/03/2016) |
| 05/03/2016 | 83 | REQUEST for *Judicial Notice* by Yolanda Mendoza re 82 Response filed by Yolanda Mendoza, 81 Opposition to Motion filed by Yolanda Mendoza. (Attachments: # 1 Exhibit)(Dalbey, Christopher) (Entered: 05/03/2016) |
| 05/04/2016 | 84 | MINUTE ORDER: (Text Entry Only) signed by District Judge Dale A. Drozd on 5/4/2016. 80 Unopposed Request for Continuance is GRANTED; 73 Motion to Dismiss Hearing previously set for 5/17/2016, has been **CONTINUED to 6/21/2016, at 09:30 AM in Courtroom 5 (DAD) before District Judge Dale A. Drozd.** Further briefing is due in accordance with Local Rule 230. (Gaumnitz, R) (Entered: 05/04/2016) |
| 06/03/2016 | 85 | REQUEST for *Continuance of Rule 26(f) Scheduling Conference and Related Deadlines [UNOPPOSED]* by Monsanto Company re 65 Civil New Case Documents for DAD. (Hollingsworth, Joe) (Entered: 06/03/2016) |
| 06/03/2016 | 86 | PROPOSED ORDER re Request for Continuance of Rule 26(f) Scheduling Conference and Related Deadlines [UNOPPOSED] re 85 Request by Monsanto Company. (Hollingsworth, Joe) (Entered: 06/03/2016) |
| 06/07/2016 | 87 | PRO HAC VICE APPLICATION and PROPOSED ORDER submitted by Monsanto Company for attorney Martin C. Calhoun to appear Pro Hac Vice. (Filing fee $ 200, receipt number 0972–6504769) (Platt, Steven) (Entered: 06/07/2016) |
| 06/07/2016 | 88 | ORDER GRANTING defendant Monsanto Company's unopposed request to continue the Initial Scheduling Conference currently set for 6/29/2016 and CONTINUING it to 8/17/2016 at 02:00 PM in Courtroom 1 (SMS) before Magistrate Judge Sandra M. Snyder. Order signed by Magistrate Judge Sandra M. Snyder on 6/7/2016. (Rooney, M) (Entered: 06/07/2016) |
| 06/08/2016 | 89 | PRO HAC VICE ORDER signed by Magistrate Judge Sandra M. Snyder on 6/8/2016. *Added attorney Martin C. Calhoun, PHV for Monsanto Company.* (Sant Agata, S) (Entered: 06/09/2016) |
| 06/14/2016 | 90 | REPLY by Monsanto Company re 73 MOTION to DISMISS. (Hollingsworth, Joe) (Entered: 06/14/2016) |
| 06/14/2016 | 91 | REPLY by Monsanto Company re 74 Request for Judicial Notice. (Hollingsworth, Joe) (Entered: 06/14/2016) |
| 06/16/2016 | 92 | MINUTE ORDER: (TIME CHANGE ONLY) signed by District Judge Dale A. Drozd on 6/16/2016; 73 Motion to Dismiss on calendar 6/21/2016, **WILL BE HEARD at 11:30 AM** in Courtroom 5 (DAD) before District Judge Dale A. Drozd. The parties are encouraged to appear telephonically and may do so by dialing 877–402–9757 (access code 6966236), at the time of the hearing. Because the court may be hearing other matters using the same conference line, please wait to state your appearance until your case has been called and appearances are requested. Keep all background noise to a minimum. At least 24 hours prior to the hearing you must email Courtroom Deputy Renee Gaumnitz at RGaumnitz@caed.uscourts.gov, to advise the court you will be appearing telephonically. (Gaumnitz, R) (Entered: 06/16/2016) |
| 06/21/2016 | 93 | MINUTES (Text Only) for proceedings before District Judge Dale A. Drozd: MOTION HEARING held on 6/21/2016, 73 Motion to Dismiss argued and submitted; a written decision will issue. Plaintiff's Counsel C. Dalbey, K. Hightower, R. Greenwald, H. Lundy, M. Lundy, and M. Lukie telephonically present. Defendant's Counsel M. Calhoun and E. Lasker telephonically present. Court Reporter/CD Number: K. Hooven. (Gaumnitz, R) (Entered: 06/21/2016) |

| 06/23/2016 | 94 | TRANSCRIPT REQUEST by Monsanto Company for proceedings held on 06/21/2016 before Judge Dale A. Drozd. Court Reporter Karen Hooven. (Platt, Steven) (Entered: 06/23/2016) |
|---|---|---|
| 06/30/2016 | 95 | NOTICE *of Recent Authority* by Yolanda Mendoza re 73 MOTION to DISMISS. (Attachments: # 1 Exhibit)(Dalbey, Christopher) (Entered: 06/30/2016) |
| 07/06/2016 | 96 | TRANSCRIPT of Proceedings held on 6−21−16, Motion to Dismiss before District Judge Dale A. Drozd, filed by Court Reporter Karen Hooven, Phone number 559−264−0584 E−mail karenhooven@yahoo.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction must be filed within 5 court days. Redaction Request due 7/28/2016. Redacted Transcript Deadline set for 8/8/2016. Release of Transcript Restriction set for 10/6/2016. (Hooven, K) (Entered: 07/06/2016) |
| 07/08/2016 | 97 | ORDER Denying Defendant's 73 Motion to Dismiss, signed by District Judge Dale A. Drozd on 7/7/2016. (Gaumnitz, R) (Entered: 07/08/2016) |
| 07/22/2016 | 98 | ANSWER with Jury Demand by Monsanto Company.(Hollingsworth, Joe) (Entered: 07/22/2016) |

Christopher B. Dalbey (SBN 285562)
    cdalbey@weitzlux.com
**WEITZ & LUXENBERG, P.C.**
1880 Century Park East, Suite 700
Los Angeles, CA 90067
Tel.: 310-247-0921
Fax: 310-786-9927

Robin L. Greenwald
    (appearing *pro hac vice*)
    rgreenwald@weitzlux.com
Maja Lukic
    (appearing *pro hac vice*)
    mlukic@weitzlux.com
**WEITZ & LUXENBERG, P.C.**
700 Broadway
New York, NY 10003
Tel.: 212-558-5500

Fax: 212-344-5461

Hunter W. Lundy
    (*pro hac vice* anticipated)
    hlundy@lundylawllp.com
Matthew E. Lundy
    (*pro hac vice* anticipated)
    mlundy@lundylawllp.com
Kristie M. Hightower
    (*pro hac vice* anticipated)
    khightower@lundylawllp.com
**LUNDY, LUNDY, SOILEAU & SOUTH, LLP**
501 Broad Street
Post Office Box 3010
Lake Charles, LA 70602
Tel.: 337-439-0707
Fax: 337-439-1029

*Attorneys for Plaintiffs Enrique Rubio and Yolanda Mendoza*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### Western Division

| | |
|---|---|
| Enrique RUBIO and Yolanda MENDOZA,<br><br>        Plaintiffs,<br><br>v.<br><br>MONSANTO COMPANY,<br><br>        Defendant. | Case No. 2:15-cv-07426-DMG-E<br><br>**<u>AMENDED COMPLAINT</u>**<br><br>**JURY TRIAL DEMANDED** |

1

## **INTRODUCTION**

2      1.      In 1970, Defendant Monsanto Company, Inc. ("Monsanto")

3  discovered the herbicidal properties of glyphosate and began marketing it in

4  products in 1974 under the brand name Roundup®.  Roundup® is a non-selective

5  herbicide used to kill weeds that commonly compete with the growing of crops.

6  In 2001, glyphosate was the most-used pesticide active ingredient in American

7  agriculture with 85–90 million pounds used annually.  That number grew to 185

8  million pounds used in 2007.[1]  As of 2013, glyphosate was the world's most

9  widely used herbicide.

10      2.      Monsanto is a multinational agricultural biotechnology corporation

11  based in St. Louis, Missouri, and incorporated in Delaware.  It is the world's

12  leading producer of glyphosate.  As of 2009, Monsanto was the world's leading

13  producer of seeds, accounting for 27% of the world seed market.[2]  The majority of

14  these seeds are of the Roundup Ready® brand.  The stated advantage of Roundup

15  Ready® crops is that they substantially improve a farmer's ability to control

16  weeds, since glyphosate can be sprayed in the fields during the growing season

17      [1] Arthur Grube et al., U.S. Environmental Protection Agency, *Pesticides
Industry Sales and Usage, 2006–2007 Market Estimates* 14 (2011), *available at*
18  http://www.epa.gov/pesticides/pestsales/07pestsales/market_estimates2007.pdf.

19      [2] ETC Group, *Who Will Control the Green Economy?* 22 (2011), *available
at*
20  http://www.etcgroup.org/files/publication/pdf_file/ETC_wwctge_4web_Dec2011.
pdf.

1   without harming the crops.  In 2010, an estimated 70% of corn and cotton and

2   90% of soybean fields in the United States were Roundup Ready®.[3]

3       3.    Monsanto's glyphosate products are registered in 130 countries and

4   approved for use on over 100 different crops.[4]  They are ubiquitous in the

5   environment.  Numerous studies confirm that glyphosate is found in rivers,

6   streams, and groundwater in agricultural areas where Roundup® is used.[5]  It has

7   been found in food,[6] in the urine of agricultural workers,[7] and even in the urine of

8   urban dwellers who are not in direct contact with glyphosate.[8]

9   _____

10  [3] William Neuman & Andrew Pollack, *Farmers Cope With Roundup-Resistant Weeds*, N.Y. Times, May 3, 2010, *available at* http://www.nytimes.com/2010/05/04/business/energy-environment/04weed.html?pagewan.

12  [4] Monsanto, *Backgrounder-History of Monsanto's Glyphosate Herbicides* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/back_history.pdf.

14  [5] *See* U.S. Geological Survey, *USGS Technical Announcement: Widely Used Herbicide Commonly Found in Rain and Streams in the Mississippi River Basin* (2011), *available at* http://www.usgs.gov/newsroom/article.asp?ID=2909; *see also* U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate*, *available at* http://www.epa.gov/safewater/pdfs/factsheets/soc/tech/glyphosa.pdf.

16  [6] Thomas Bohn et al., *Compositional Differences in Soybeans on the Market: Glyphosate Accumulates in Roundup Ready GM Soybeans*, 153 Food Chemistry 207 (2013), *available at* http://www.sciencedirect.com/science/article/pii/S0308814613019201.

19  [7] John F. Acquavella et al., *Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study*, 112(3) Environmental Health Perspectives 321 (2004), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241861/; Kathryn Z. Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon &*

4.      On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate.  That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

5.      On July 29, 2015, IARC issued the formal monograph relating to glyphosate.  In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

6.      The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is *probably carcinogenic to humans*.  The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other haematopoietic cancers, including

---

*Glyphosate*, 112 IARC Monographs 76, section 5.4 (2015), *available at* http://dx.doi.org/10.1016/S1470-2045(15)70134-8.

[8] Dirk Brändli & Sandra Reinacher, *Herbicides found in Human Urine*, 1 Ithaka Journal 270 (2012), *available at* http://www.ithaka-journal.net/druckversionen/e052012-herbicides-urine.pdf.

lymphocytic lymphoma / chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.[9]

7.     The IARC evaluation is significant.  It confirms what has been believed for years: that glyphosate is toxic to humans.

8.     Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment.  Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

## JURISDICTION AND VENUE

9.     Federal diversity jurisdiction in this Court is proper under 28 U.S.C. § 1332 because Plaintiffs Enrique Rubio and Yolanda Mendoza are citizens of a different state from the Defendant's states of citizenship, and the aggregate amount in controversy exceeds $75,000, exclusive of interest and costs.

10.     This Court has personal jurisdiction over Monsanto under Cal. Code Civ. Proc. § 410, because Monsanto knows or should have known that its Roundup® products are sold throughout the State of California, and, more

---

[9] *See* Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, *supra.*

1  specifically, caused Roundup® to be sold to Plaintiffs and/or Plaintiffs' employers

2  in the State of California.

3       11.    In addition, Monsanto maintains sufficient contacts with the State of

4  California such that this Court's exercise of personal jurisdiction over it does not

5  offend traditional notions of fair play and substantial justice.

6       12.    Venue is proper within this District under 28 U.S.C. § 1391(b)(2)

7  because a substantial part of the events and omissions giving rise to the claims of

8  Plaintiff Enrique Rubio occurred in this District.  Plaintiff Yolanda Mendoza's

9  claims are closely related to Plaintiff Enrique Rubio's claims, such that venue is

10 proper in this District for her claims under the doctrine of pendent venue.  Further,

11 Monsanto, as a corporate entity, is deemed to reside in any judicial district in

12 which it is subject to personal jurisdiction.

13 **<u>THE PARTIES</u>**

14 **Plaintiffs**

15      13.    Plaintiff Enrique Rubio resides in Pueblo, Colorado.  On information

16 and belief, Mr. Rubio was exposed to Roundup® in Oregon from around 1986 to

17 1988, where he picked vegetables, and in Fillmore, California from in or around

18 1988 through 1993.  On information and belief, Mr. Rubio was again exposed to

19 Roundup® in El Paso, Texas from in or around 1993 through 1995.

20

14.   Plaintiff Yolanda Mendoza resides in Atwater, California.  Ms. Mendoza was exposed to Roundup® in Atwater, California, from in and around 2004 through 2015, where she personally sprayed Roundup® and/or was in close proximity to the spraying of Roundup®.

**Defendant**

15.   Defendant Monsanto is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.

16.   At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®.

**FACTS**

17.   Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

18.   Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis.  Treated plants generally die within two to three days.  Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

19.     For nearly 40 years, farms across the world have used Roundup®
without knowing of the dangers its use poses.  That is because when Monsanto
first introduced Roundup®, it touted glyphosate as a technological breakthrough: it
could kill almost every weed without causing harm either to people or to the
environment.  Of course, history has shown that not to be true.  According to the
WHO, the main chemical ingredient of Roundup®—glyphosate—is a probable
cause of cancer.  Those most at risk are farm workers and other individuals with
workplace exposure to Roundup®, such as garden center workers, nursery
workers, and landscapers.  Agricultural workers are, once again, victims of
corporate greed.  Monsanto assured the public that Roundup® was harmless.  In
order to prove this, Monsanto championed falsified data and attacked legitimate
studies that revealed Roundup®'s dangers.  Monsanto led a prolonged campaign of
misinformation to convince government agencies, farmers and the general
population that Roundup® was safe.

### *The Discovery of Glyphosate and Development of Roundup®*

20.     The herbicidal properties of glyphosate were discovered in 1970 by
Monsanto chemist John Franz. The first glyphosate-based herbicide was

introduced to the market in the mid-1970s under the brand name Roundup®.[10]

From the outset, Monsanto marketed Roundup® as a "safe" general-purpose

herbicide for widespread commercial and consumer use.  It still markets

Roundup® as safe today.[11]

### Registration of Herbicides under Federal Law

21.     The manufacture, formulation, and distribution of herbicides, such as

Roundup®, are regulated under the Federal Insecticide, Fungicide, and

Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.*  FIFRA requires that

all pesticides be registered with the Environmental Protection Agency ("EPA" or

"Agency") prior to their distribution, sale, or use, except as described by the Act.

7 U.S.C. § 136a(a).

22.     Because pesticides are toxic to plants, animals, and humans, at least

to some degree, the EPA requires as part of the registration process, among other

things, a variety of tests to evaluate the potential for exposure to pesticides,

toxicity to people and other potential non-target organisms, and other adverse

effects on the environment.  Registration by the EPA, however, is not an assurance

or finding of safety.  The determination the Agency must make in registering or

---

[10] Monsanto, *Backgrounder, History of Monsanto's Glyphosate Herbicide*
(Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-
background-materials/back_history.pdf.

[11] Monsanto, *What is Glyphosate?* (Sep. 2, 2015),
http://www.monsanto.com/sitecollectiondocuments/glyphosate-safety-health.pdf.

1  re-registering a product is not that the product is "safe," but rather that use of the

2  product in accordance with its label directions "will not generally cause

3  unreasonable adverse effects on the environment."  7 U.S.C. § 136a(c)(5)(D).

4         23.    FIFRA defines "unreasonable adverse effects on the environment" to

5  mean "any unreasonable risk to man or the environment, taking into account the

6  economic, social, and environmental costs and benefits of the use of any

7  pesticide."  7 U.S.C. § 136(bb).  FIFRA thus requires EPA to make a risk/benefit

8  analysis in determining whether a registration should be granted or a pesticide

9  allowed to continue to be sold in commerce.

10        24.    The EPA and the State of California registered Roundup® for

11  distribution, sale, and manufacture in the United States and the State of California.

12        25.    FIFRA generally requires that the registrant, Monsanto in the case of

13  Roundup®, conducts the health and safety testing of pesticide products.  The EPA

14  has protocols governing the conduct of tests required for registration and the

15  laboratory practices that must be followed in conducting these tests. The data

16  produced by the registrant must be submitted to the EPA for review and

17  evaluation.  The government is not required, nor is it able, however, to perform the

18  product tests that are required of the manufacturer.

19        26.    The evaluation of each pesticide product distributed, sold, or

20  manufactured is completed at the time the product is initially registered. The data

necessary for registration of a pesticide has changed over time.  The EPA is now

in the process of re-evaluating all pesticide products through a Congressionally-

mandated process called "re-registration."  7 U.S.C. § 136a-1.  In order to

reevaluate these pesticides, the EPA is demanding the completion of additional

tests and the submission of data for the EPA's recent review and evaluation.

27.   In the case of glyphosate, and therefore Roundup®, the EPA had

planned on releasing its preliminary risk assessment—in relation to the

reregistration process—no later than July 2015.  The EPA completed its review of

glyphosate in early 2015, but it delayed releasing the risk assessment pending

further review in light of the WHO's health-related findings.

***Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®***

28.   Based on early studies showing that glyphosate could cause cancer in

laboratory animals, the EPA originally classified glyphosate as *possibly*

*carcinogenic to humans* (Group C) in 1985.  After pressure from Monsanto,

including contrary studies it provided to the EPA, the EPA changed its

classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991.  In

so classifying glyphosate, however, the EPA made clear that the designation did

not mean the chemical does not cause cancer:  "It should be emphasized, however,

that designation of an agent in Group E is based on the available evidence at the

time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."[12]

29.    On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

30.    In the first instance, Monsanto, in seeking initial registration of Roundup® by the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®.[13]  IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

31.    In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate.  The EPA subsequently audited IBT; it too found the toxicology studies conducted for the

---

[12] U.S. Envtl. Prot. Agency, *Memorandum, Subject: SECOND Peer Review of Glyphosate* 1 (1991), *available at* http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_30-Oct-91_265.pdf.

[13] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/ibt_craven_bkg.pdf.

1   Roundup® herbicide to be invalid.[14]  An EPA reviewer stated, after finding

2   "routine falsification of data" at IBT, that it was "hard to believe the scientific

3   integrity of the studies when they said they took specimens of the uterus from

4   male rabbits."[15]

5        32.    Three top executives of IBT were convicted of fraud in 1983.

6        33.    In the second incident of data falsification, Monsanto hired Craven

7   Laboratories in 1991 to perform pesticide and herbicide studies, including for

8   Roundup®.  In that same year, the owner of Craven Laboratories and three of its

---

[14] U.S. Envtl. Prot. Agency, *Summary of the IBT Review Program Office of Pesticide Programs* (1983), *available at* http://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA&Index=1981+Thru+1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&QFieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles%5CIndex%20Data%5C81thru85%5CTxt%5C00000022%5C91014ULV.txt&User=ANONYMOUS&Password=anonymous&SortMethod=h%7C-&MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=p%7Cf&DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page&MaximumPages=1&ZyEntry=1&SeekPage=x&ZyPURL.

[15] Marie-Monique Robin, *The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply* (2011) (citing U.S. Envtl. Prot. Agency, *Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch. Washington, D.C.* (August 9, 1978)).

employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.[16]

34.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

### The Importance of Roundup® to Monsanto's Market Dominance Profits

35.     The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace.  Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly.  But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

36.     In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996.  Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop.  This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of

---

[16] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories*, *supra.*

1   American soybeans were planted from Roundup Ready® seeds.  It also secured

2   Monsanto's dominant share of the glyphosate/Roundup® market through a

3   marketing strategy that coupled proprietary Roundup Ready® seeds with

4   continued sales of its Roundup® herbicide.

5         37.    Through a three-pronged strategy of increasing production,

6   decreasing prices, and by coupling with Roundup Ready® seeds, Roundup®

7   became Monsanto's most profitable product.  In 2000, Roundup® accounted for

8   almost $2.8 billion in sales, outselling other herbicides by a margin of five to one,

9   and accounting for close to half of Monsanto's revenue.[17]  Today, glyphosate

10   remains one of the world's largest herbicides by sales volume.

11   ***Monsanto has known for decades that it falsely advertises the safety of Roundup®***

12         38.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit

13   against Monsanto based on its false and misleading advertising of Roundup®

14   products.  Specifically, the lawsuit challenged Monsanto's general representations

15   that its spray-on glyphosate-based herbicides, including Roundup®, were "**safer**

16   **than table salt"** and "**practically non-toxic**" to mammals, birds, and fish.

17   Among the representations the NYAG found deceptive and misleading about the

18

19   [17] David Barboza, *The Power of Roundup; A Weed Killer Is A Block for Monsanto to Build On*, N.Y. Times, Aug. 2, 2001, *available at*

20   http://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weed-killer-is-a-block-for-monsanto-to-build-on.html.

human and environmental safety of glyphosate and/or Roundup® are the

following:

       a)   "Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ..."

       b) "And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem."

       c) "Roundup biodegrades into naturally occurring elements."

       d) "Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

       e) "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it."

       f) "You can apply Accord with 'confidence because it will stay where you put it' it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products."

       g) "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

       h) "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

i) "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[18]

39.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

*       *       *

b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

*       *       *

c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under

_____

[18] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

all circumstances and will not move through the environment by any means.

\*      \*      \*

d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

\*      \*      \*

e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

40.    Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief it still has not done so today.

41.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[19]

### Classifications and Assessments of Glyphosate

42.    The IARC process for the classification of glyphosate followed IARC's stringent procedures for the evaluation of a chemical agent. Over time,

---

[19] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.

1   the IARC Monograph program has reviewed 980 agents.  Of those reviewed, it

2   has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents

3   to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B

4   (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and

5   one agent to be Probably Not Carcinogenic.

6   43.   The established procedure for IARC Monograph evaluations is

7   described in the IARC Programme's Preamble.[20]  Evaluations are performed by

8   panels of international experts, selected on the basis of their expertise and the

9   absence of actual or apparent conflicts of interest.

10   44.   One year before the Monograph meeting, the meeting is announced

11   and there is a call both for data and for experts.  Eight months before the

12   Monograph meeting, the Working Group membership is selected and the sections

13   of the Monograph are developed by the Working Group members.  One month

14   prior to the Monograph meeting, the call for data is closed and the various draft

15   sections are distributed among Working Group members for review and comment.

16   Finally, at the Monograph meeting, the Working Group finalizes review of all

17   literature, evaluates the evidence in each category, and completes the overall

18   evaluation.  Within two weeks after the Monograph meeting, the summary of the

19
20   [20] World Health Organization, *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble* (2006), available at http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

Working Group findings are published in *The Lancet Oncology*, and within a year

after the meeting, the finalized Monograph is published.

45.     In assessing an agent, the IARC Working Group reviews the

following information: (a) human, experimental, and mechanistic data; (b) all

pertinent epidemiological studies and cancer bioassays; and (c) representative

mechanistic data.  The studies must be publicly available and have sufficient detail

for meaningful review, and reviewers cannot be associated with the underlying

study.

46.     In March 2015, IARC reassessed glyphosate.  The summary

published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent

and probably carcinogenic in humans.

47.      On July 29, 2015, IARC issued its Monograph for glyphosate,

Monograph Volume 112.  For Volume 112, a Working Group of 17 experts from

11 countries met at IARC from March 3–10, 2015 to assess the carcinogenicity of

certain herbicides, including glyphosate.  The March meeting culminated a nearly

one-year review and preparation by the IARC Secretariat and the Working Group,

including a comprehensive review of the latest available scientific evidence.

According to published procedures, the Working Group considered "reports that

have been published or accepted for publication in the openly available scientific

literature" as well as "data from governmental reports that are publicly available."

48.     The studies considered the following exposure groups: (1) occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and (2) para-occupational exposure in farming families.

49.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

50.     Exposure pathways are identified as air (especially during spraying), water, and food.  Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

51.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden.  These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

52.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

53.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells.  One study in community residents

reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

54.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor: renal tubule carcinoma.   A second study reported a positive trend for haemangiosarcoma in male mice.  Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies.  A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

55.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption.  Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA).  Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

56.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

57.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.[21]  Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic

---

[21] Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, *supra* at 77.

1  disturbances, including the inhibition of protein and secondary product

2  biosynthesis and general metabolic disruption.

3       58.    The IARC Working Group also reviewed an Agricultural Health

4  Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators

5  in Iowa and North Carolina.[22]   While this study differed from others in that it was

6  based on a self-administered questionnaire, the results support an association

7  between glyphosate exposure and multiple myeloma, hairy cell leukemia (HCL),

8  and chronic lymphocytic leukemia (CLL), in addition to several other cancers.

9       ***Other Earlier Findings About Glyphosate's Dangers to Human Health***

10      59.    The EPA has a technical fact sheet, as part of its Drinking Water and

11  Health, National Primary Drinking Water Regulations publication, relating to

12  glyphosate.  This technical fact sheet predates IARC's March 20, 2015 evaluation.

13  The fact sheet describes the release patterns for glyphosate as follows:

14                    **Release Patterns**

15            Glyphosate is released to the environment in its use
16       as a herbicide for controlling woody and herbaceous
         weeds on forestry, right-of-way, cropped and non-cropped
         sites. These sites may be around water and in wetlands.

17            It may also be released to the environment during

18  _____

19      [22] Anneclare J. De Roos et al., *Cancer Incidence Among Glyphosate-*
    *Exposed Pesticide Applicators in the Agricultural Health Study*, 113 Envt'l Health
    Perspectives 49–54 (2005), *available at*
20  http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1253709/pdf/ehp0113-000049.pdf.

its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.[23]

60.     In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.[24]

### Recent Worldwide Bans on Roundup®/Glyphosate

61.     Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup®

---

[23] U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate*, *supra*.

[24] Caroline Cox, *Glyphosate, Part 2: Human Exposure and Ecological Effects*, 15 J. Pesticide Reform 4 (1995); W.S. Peas et al., *Preventing pesticide-related illness in California agriculture: Strategies and priorities. Environmental Health Policy Program Report*, Univ. of Cal. School of Public Health, Calif. Policy Seminar (1993).

become more widely known.   The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which will take effect by the end of 2015.  In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons.  In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are.  Especially children are sensitive to toxic substances and should therefore not be exposed to it."[25]

62.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.[26]

63.     France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.[27]

---

[25] *Holland's Parliament Bans Glyphosate Herbicides*, The Real Agenda, April 14, 2014, *available at* http://real-agenda.com/hollands-parliament-bans-glyphosate-herbicides/.

[26] Christina Sarich, *Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals Following Recent Glyphosate-Cancer Link*, Global Research, May 14, 2015, *available at* http://www.globalresearch.ca/brazils-public-prosecutor-wants-to-ban-monsantos-chemicals-following-recent-glyphosate-cancer-link/5449440; *see* Ministério Público Federal, *MPF/DF reforça pedido para que glifosato seja banido do mercado naciona*, April, 14, 2015, *available at* http://noticias.pgr.mpf.mp.br/noticias/noticias-do-site/copy_of_meio-ambiente-e-patrimonio-cultural/mpf-df-reforca-pedido-para-que-glifosato-seja-banido-do-mercado-nacional.

[27] Zoe Schlanger, *France Bans Sales of Monsanto's Roundup in Garden Centers, 3 Months After U.N. Calls it 'Probable Carcinogen"*, Newsweek, June

64.     Bermuda banned both the private and commercial sale of glyphosates, including Roundup®.  The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."[28]

65.     The Sri Lankan government banned the private and commercial use of glyphosate, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.[29]

66.     The government of Colombia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.[30]

---

15, 2015, *available at* http://www.newsweek.com/france-bans-sale-monsantos-roundup-garden-centers-after-un-names-it-probable-343311.

[28] *Health Minister: Importation of Roundup Weed Spray Suspended*, Today in Bermuda, May, 11 2015, *available at* http://www.todayinbermuda.com/news/health/item/1471-health-minister-importation-of-roundup-weed-spray-suspended.

[29] *Sri Lanka's New President Puts Immediate Ban on Glyphosate Herbicides*, Sustainable Pulse, May 25, 2015, *available at* http://sustainablepulse.com/2015/05/25/sri-lankas-new-president-puts-immediate-ban-on-glyphosate-herbicides/#.VeduYk3bKAw.

[30] *Columbia to ban coca spraying herbicide glyphosate*, BBC, May 10, 2015, *available at* http://www.bbc.com/news/world-latin-america-32677411.

*Plaintiffs' Exposure to Roundup®*

*Plaintiff Enrique Rubio*

67.    Plaintiff Enrique Rubio is 58 years old and began working in agriculture in or around 1986 in Oregon, where he picked vegetables for about two years.  In 1988, he started working in Fillmore, California, at California Water Cress Inc.  Mr. Rubio worked at this location between 1988 and 1993, during which time he worked in the fields on strawberry, cucumber, and other vegetable crops.  His duties involved spraying the fields, weeds, and bugs with Roundup® and other pesticides or chemicals.  As an applicator, Mr. Rubio drove a tractor, wore a backpack, and also utilized a hand pump to spray Roundup®.  During application, his protection was limited to a paper face mask.  Mr. Rubio sprayed two days per week and all year.

68.    Mr. Rubio subsequently moved to El Paso, Texas, for work where he worked at Sangro between 1993 and 1995.  There, Mr. Rubio also worked as an applicator, and sprayed onion and other vegetable fields.  Again, Mr. Rubio applied Roundup® once or twice per week all year.  However, the frequency at which he sprayed Roundup® in Texas was lower than while he worked in California.

69.     During the entire time that Mr. Rubio was exposed to Roundup®
and/or personally sprayed Roundup®, he did not know that exposure to Roundup®
was injurious to his health or the health of others.

70.     In 1995, Mr. Rubio was diagnosed with multiple myeloma.  From
1995 to 1997, Mr. Rubio continued to reside in El Paso.  There, he underwent
cancer treatment but was unable to work.  In 1997, Mr. Rubio moved from Texas
to Colorado to live with his nephew.  As a result of his illness, Mr. Rubio has been
out of work and subsists on government benefits.  Mr. Rubio first learned that
exposure to Roundup® can cause multiple myeloma and other serious illnesses
sometime after March 25, 2015 when IARC first published its evaluation of
glyphosate.

### Plaintiff Yolanda Mendoza

71.     Plaintiff Yolanda Mendoza lives in Atwater, California, and has lived
there since in or around 2004.  Ms. Mendoza's home is on approximately one acre
of land.  From the time she purchased her home in 2004 until in or around 2012,
Ms. Mendoza personally sprayed Roundup® approximately once every two weeks
from in or around March through November of every year.  Ms. Mendoza used a
backpack to apply the Roundup® to her property.  She recalls breathing vapors
while applying Roundup®.  Sometime in or around late 2012 or early 2013, Ms.

1   Mendoza hired landscapers to take care of her property.  The landscapers also

2   used Roundup® in the treatment of her property.

3        72.    During the entire time that Ms. Mendoza personally sprayed

4   Roundup®, she did not know that exposure to Roundup® was injurious to her

5   health or the health of others.

6        73.    In October 2013, Ms. Mendoza was diagnosed with Non-Hodgkin's

7   Lymphoma ("NHL").  Ms. Mendoza first learned that exposure to Roundup® can

8   cause NHL and other serious illnesses sometime after March 25, 2015 when IARC

9   first published its evaluation of glyphosate.

10                **TOLLING OF THE STATUTE OF LIMITATIONS**

11                        ***Discovery Rule Tolling***

12        74.    Plaintiffs had no way of knowing about the risk of serious illness

13   associated with the use of and/or exposure to Roundup® and glyphosate until

14   IARC released its formal assessment of glyphosate in March 2015.  This is the

15   quintessential case for tolling.

16        75.    Within the time period of any applicable statutes of limitations,

17   Plaintiffs could not have discovered, through the exercise of reasonable diligence,

18   that exposure to Roundup® and glyphosate is injurious to human health.

19        76.    Plaintiffs did not discover, and did not know of facts that would cause

20   a reasonable person to suspect,  the risks associated with the use of and/or

1  exposure to Roundup® and glyphosate; nor would a reasonable and diligent

2  investigation by them have disclosed that Roundup® and glyphosate would cause

3  their illnesses.

4      77.    For these reasons, all applicable statutes of limitations have been

5  tolled by operation of the discovery rule with respect to Plaintiffs' claims.

6  *** Fraudulent Concealment Tolling ***

7      78.    All applicable statutes of limitations have also been tolled by

8  Monsanto's knowing and active fraudulent concealment and denial of the facts

9  alleged herein throughout the time period relevant to this action.

10      79.    Instead of disclosing critical safety information about Roundup® and

11  glyphosate, Monsanto has consistently and falsely represented the safety of its

12  Roundup® products.

13  *** Estoppel ***

14      80.    Monsanto was under a continuous duty to disclose to consumers and

15  users of its products, including Plaintiffs, accurate safety information concerning

16  its products and the risks associated with the use of and/or exposure to Roundup®

17  and glyphosate.

18      81.    Instead, Monsanto knowingly, affirmatively, and actively concealed

19  safety information concerning Roundup® and glyphosate and the serious risks

20  associated with the use of and/or exposure to its products.

82.     Based on the foregoing, Monsanto is estopped from relying on any statutes of limitations in defense of this action.

## CLAIM ONE

### STRICT LIABILITY (DESIGN DEFECT)

83.     Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

84.     Plaintiffs bring this strict liability claim against Defendant for defective design.

85.     At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers and users, including Plaintiffs, thereby placing Roundup® products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendant.  At all times relevant to this litigation, Defendant designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by the Plaintiffs, and/or to which the Plaintiffs were exposed, as described above.

86.     At all times relevant to this litigation, Defendant's Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and

1 inherently dangerous manner that was dangerous for use by or exposure to the

2 public, and, in particular, the Plaintiffs.

3      87.    At all times relevant to this litigation, Defendant's Roundup®

4 products reached the intended consumers, handlers, and users or other persons

5 coming into contact with these products in California and throughout the United

6 States, including Plaintiffs, without substantial change in their condition as

7 designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

8      88.    Defendant's Roundup® products, as researched, tested, developed,

9 designed, licensed, manufactured, packaged, labeled, distributed, sold, and

10 marketed by Defendant were defective in design and formulation in that when

11 they left the hands of the Defendant's manufacturers and/or suppliers, they were

12 unreasonably dangerous and dangerous to an extent beyond that which an ordinary

13 consumer would contemplate.

14      89.    Defendant's Roundup® products, as researched, tested, developed,

15 designed, licensed, manufactured, packaged, labeled, distributed, sold, and

16 marketed by Defendant were defective in design and formulation in that when

17 they left the hands of Defendant's manufacturers and/or suppliers, the foreseeable

18 risks associated with these products' reasonably foreseeable uses exceeded the

19 alleged benefits associated with their design and formulation.

20      90.

91.     Therefore, at all times relevant to this litigation, Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendant, were defective in design and formulation, in one or more of the following ways:

a.     When placed in the stream of commerce, Defendant's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b.     When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c.     When placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d.     Defendant did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate.

e.      Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweighs any potential utility stemming from the use of the herbicide.

f.      Defendant knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g.      Defendant did not conduct adequate post-marketing surveillance of its Roundup® products.

h.      Defendant could have employed safer alternative designs and formulations.

92.     At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Defendant's Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

93.     Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

94.     The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that

1    which an ordinary consumer would contemplate.  Defendant's Roundup® products

2    were and are more dangerous than alternative products and Defendant could have

3    designed its Roundup® products to make them less dangerous.  Indeed, at the time

4    that Defendant designed its Roundup® products, the state of the industry's

5    scientific knowledge was such that a less risky design or formulation was

6    attainable.

7            95.    At the time Roundup® products left Defendant's control, there was a

8    practical, technically feasible, and safer alternative design that would have

9    prevented the harm without substantially impairing the reasonably anticipated or

10   intended function of Defendant's Roundup® herbicides.

11           96.    Defendant's defective design of Roundup® amounts to willful,

12   wanton, and/or reckless conduct by Defendant.

13           97.    Therefore, as a result of the unreasonably dangerous condition of its

14   Roundup® products, Defendant is strictly liable to Plaintiffs.

15           98.    The defects in Defendant's Roundup® products were substantial and

16   contributing factors in causing Plaintiffs' grave injuries, and, but for Defendant's

17   misconduct and omissions, Plaintiffs would not have sustained their injuries.

18           99.    As a direct and proximate result of Defendant placing its defective

19   Roundup® products into the stream of commerce, Plaintiffs have suffered and

20   continue to suffer grave injuries, and have endured physical pain and discomfort,

as well as economic hardship, including considerable financial expenses for

medical care and treatment.  Plaintiffs will continue to incur these expenses in the

future.

100.   WHEREFORE, Plaintiffs respectfully request that this Court enter

judgment in Plaintiffs' favor for compensatory and punitive damages, together

with interest, costs herein incurred, attorneys' fees, and all such other and further

relief as this Court deems just and proper.  Plaintiffs also demand a jury trial on

the issues contained herein.

## CLAIM TWO

### STRICT LIABILITY (FAILURE TO WARN)

101.   Plaintiffs incorporate by reference each and every allegation set forth

in the preceding paragraphs as if fully stated herein.

102.   Plaintiffs bring this strict liability claim against Defendant for failure

to warn.

103.   At all times relevant to this litigation, Defendant engaged in the

business of testing, developing, designing, manufacturing, marketing, selling,

distributing, and promoting Roundup® products, which are defective and

unreasonably dangerous to consumers, including Plaintiffs, because they do not

contain adequate warnings or instructions concerning the dangerous characteristics

1  of Roundup® and specifically, the active ingredient glyphosate.  These actions

2  were under the ultimate control and supervision of Defendant.

3      104.   Defendant researched, developed, designed, tested, manufactured,

4  inspected, labeled, distributed, marketed, promoted, sold, and otherwise released

5  into the stream of commerce its Roundup® products, and in the course of same,

6  directly advertised or marketed the products to consumers and end users, including

7  Plaintiffs, Plaintiffs' employers, Plaintiffs' co-workers, and persons responsible

8  for consumers (such as employers), and Defendant therefore had a duty to warn of

9  the risks associated with the reasonably foreseeable uses (and misuses) of

10  Roundup® and glyphosate-containing products.

11      105.   At all times relevant to this litigation, Defendant had a duty to

12  properly test, develop, design, manufacture, inspect, package, label, market,

13  promote, sell, distribute, maintain supply, provide proper warnings, and take such

14  steps as necessary to ensure that its Roundup® products did not cause users and

15  consumers to suffer from unreasonable and dangerous risks.  Defendant had a

16  continuing duty to warn Plaintiffs of the dangers associated with Roundup® use

17  and exposure.  Defendant, as manufacturer, seller, or distributor of chemical

18  herbicides, is held to the knowledge of an expert in the field.

19      106.   At the time of manufacture, Defendant could have provided warnings

20  or instructions regarding the full and complete risks of Roundup® and glyphosate-

1  containing products because it knew or should have known of the unreasonable

2  risks of harm associated with the use of and/or exposure to these products.

3      107.   At all times relevant to this litigation, Defendant failed to investigate,

4  study, test, or promote the safety or to minimize the dangers to users and

5  consumers of its Roundup® products and to those who would foreseeably use or

6  be harmed by Defendant's herbicides, including Plaintiffs.

7      108.   Despite the fact that Defendant knew or should have known that

8  Roundup® products posed a grave risk of harm, it failed to warn of the dangerous

9  risks associated with their use and exposure.  The dangerous propensities of its

10  products and the carcinogenic characteristics of glyphosate, as described above,

11  were known to Defendant, or scientifically knowable to Defendant through

12  appropriate research and testing by known methods, at the time it distributed,

13  supplied, or sold the product, and not known to end users and consumers, such as

14  Plaintiffs and Plaintiff Rubio's employers.

15      109.   Defendant knew or should have known that its Roundup® and

16  glyphosate-containing products created significant risks of serious bodily harm to

17  consumers, as alleged herein, and Defendant failed to adequately warn consumers

18  and reasonably foreseeable users of the risks of exposure to these products.

19  Defendant has wrongfully concealed information concerning the dangerous nature

20

of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

110.   At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

111.   At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

112.   Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of Plaintiffs' exposure.  Plaintiffs relied upon the skill, superior knowledge, and judgment of Defendant.

113.   Defendant knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, but it failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and

adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and horticultural applications.

114.   The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled agricultural workers, horticultural workers and/or at-home users such as Plaintiffs to utilize the products safely and with adequate protection.  Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

115.   To this day, Defendant has failed to adequately and accurately warn of the true risks of Plaintiffs' injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

116.   As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession

1   and/or control of Defendant, were distributed by Defendant, and used by

2   Plaintiffs.

3       117.   Defendant is liable to Plaintiffs for injuries caused by its failure, as

4   described above, to provide adequate warnings or other clinically relevant

5   information and data regarding the appropriate use of its Roundup® products and

6   the risks associated with the use of or exposure to Roundup® and glyphosate.

7       118.   The defects in Defendant's Roundup® products were substantial and

8   contributing factors in causing Plaintiffs' injuries, and, but for Defendant's

9   misconduct and omissions, Plaintiffs would not have sustained their injuries.

10       119.   Had Defendant provided adequate warnings and instructions and

11   properly disclosed and disseminated the risks associated with its Roundup®

12   products, Plaintiffs could have avoided the risk of developing injuries as alleged

13   herein and Plaintiffs' employers could have obtained alternative herbicides.

14       120.   As a direct and proximate result of Defendant placing its defective

15   Roundup® products into the stream of commerce, Plaintiffs have suffered and

16   continue to suffer severe injuries, and have endured physical pain and discomfort,

17   as well as economic hardship, including considerable financial expenses for

18   medical care and treatment.  Plaintiffs will continue to incur these expenses in the

19   future.

20

121.   WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.  Plaintiffs also demand a jury trial on the issues contained herein.

## CLAIM THREE

### NEGLIGENCE

122.   Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

123.   Defendant, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiffs.

124.   At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

125.   At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of its Roundup®

products.  Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup® and, in particular, its active ingredient glyphosate.

126.   At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

127.   Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause Plaintiffs' injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiffs.

128.   Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup® and glyphosate-containing products.

129.   As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing,

marketing, supply, promotion, advertisement, packaging, sale, and distribution of

its Roundup® products, in that Defendant manufactured and produced defective

herbicides containing the chemical glyphosate, knew or had reason to know of the

defects inherent in its products, knew or had reason to know that a user's or

consumer's exposure to the products created a significant risk of harm and

unreasonably dangerous side effects, and failed to prevent or adequately warn of

these risks and injuries.

130.   Despite its ability and means to investigate, study, and test its

products and to provide adequate warnings, Defendant has failed to do so.  Indeed,

Defendant has wrongfully concealed information and has further made false

and/or misleading statements concerning the safety and/or exposure to Roundup®

and glyphosate.

131.   Defendant's negligence included:

a.   Manufacturing, producing, promoting, formulating,

creating, developing, designing, selling, and/or distributing its

Roundup® products without thorough and adequate pre- and post-

market testing;

b.   Manufacturing, producing, promoting, formulating,

creating, developing, designing, selling, and/or distributing

Roundup® while negligently and/or intentionally concealing and

1    failing to disclose the results of trials, tests, and studies of exposure to

2    glyphosate, and, consequently, the risk of serious harm associated

3    with human use of and exposure to Roundup®;

4        c.    Failing to undertake sufficient studies and conduct

5    necessary tests to determine whether or not Roundup® products and

6    glyphosate-containing products were safe for their intended use in

7    agriculture, horticulture, and at-home use;

8        d.    Failing to use reasonable and prudent care in the design,

9    research, manufacture, and development of Roundup® products so as

10    to avoid the risk of serious harm associated with the prevalent use of

11    Roundup®/glyphosate as an herbicide;

12        e.    Failing to design and manufacture Roundup® products

13    so as to ensure they were at least as safe and effective as other

14    herbicides on the market;

15        f.    Failing to provide adequate instructions, guidelines, and

16    safety precautions to those persons who Defendant could reasonably

17    foresee would use and/or be exposed to its Roundup® products;

18        g.    Failing to disclose to Plaintiffs, users, consumers, and

19    the general public that the use of and exposure to Roundup®

20    presented severe risks of cancer and other grave illnesses;

h.      Failing to warn Plaintiffs, users, consumers, and the

general public that the product's risk of harm was unreasonable and

that there were safer and effective alternative herbicides available to

Plaintiffs and other users or consumers;

i.      Systematically suppressing or downplaying contrary

evidence about the risks, incidence, and prevalence of the side effects

of Roundup® and glyphosate-containing products;

j.      Representing that its Roundup® products were safe for

their intended use when, in fact, Defendant knew or should have

known that the products were not safe for their intended use;

k.      Declining to make or propose any changes to Roundup®

products' labeling or other promotional materials that would alert the

consumers and the general public of the risks of Roundup® and

glyphosate;

l.      Advertising, marketing, and recommending the use of

Roundup® products, while concealing and failing to disclose or warn

of the dangers known by Defendant to be associated with or caused

by the use of or exposure to Roundup® and glyphosate;

m.      Continuing to disseminate information to its consumers,

which indicate or imply that Defendant's Roundup® products are not

1    unsafe for use in the agricultural, horticultural industries, and/or

2    home use; and

3         n.    Continuing the manufacture and sale of its products with

4    the knowledge that the products were unreasonably unsafe and

5    dangerous.

6    132.   Defendant knew and/or should have known that it was foreseeable

7    that consumers and/or users, such as Plaintiffs, would suffer injuries as a result of

8    Defendant's failure to exercise ordinary care in the manufacturing, marketing,

9    labeling, distribution, and sale of Roundup®.

10   133.   Plaintiffs did not know the nature and extent of the injuries that could

11   result from the intended use of and/or exposure to Roundup® or its active

12   ingredient glyphosate.

13   134.   Defendant's negligence was the proximate cause of the injuries,

14   harm, and economic losses that Plaintiffs suffered, and will continue to suffer, as

15   described herein.

16   135.   Defendant's conduct, as described above, was reckless.  Defendant

17   regularly risks the lives of consumers and users of its products, including

18   Plaintiffs, with full knowledge of the dangers of its products.  Defendant has made

19   conscious decisions not to redesign, re-label, warn, or inform the unsuspecting

20

public, including Plaintiffs.  Defendant's reckless conduct therefore warrants an award of punitive damages.

136.   As a proximate result of Defendant's wrongful acts and omissions in placing its defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiffs have suffered and continue to suffer severe and permanent physical and emotional injuries.  Plaintiffs have endured pain and suffering, have suffered economic losses (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

137.   WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.  Plaintiffs also demand a jury trial on the issues contained herein.

## CLAIM FOUR

### BREACH OF EXPRESS WARRANTY

### (On Behalf of Plaintiff Yolanda Mendoza Only)

138.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

139.   At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendant.

140.   Defendant had a duty to exercise reasonable care in the research, development, design, testing, packaging, manufacture, inspection, labeling, distributing, marketing, promotion, sale, and release of its Roundup® products, including a duty to:

a.   ensure that its products did not cause the user unreasonably dangerous side effects;

b.   warn of dangerous and potentially fatal side effects; and

c.   disclose adverse material facts, such as the true risks associated with the use of and exposure to Roundup® and glyphosate-containing products, when making representations to consumers and the general public, including Plaintiff.

141.   At all times relevant to this litigation, Defendant expressly represented and warranted to the purchasers of its products, by and through statements made by Defendant in labels, publications, package inserts, and other

1  written materials intended for consumers and the general public, that its Roundup®

2  products were safe to human health and the environment, effective, fit, and proper

3  for their intended use.  Defendant advertised, labeled, marketed, and promoted

4  Roundup® products, representing the quality to consumers and the public in such a

5  way as to induce their purchase or use, thereby making an express warranty that

6  its Roundup® products would conform to the representations.

7  142.   These express representations include incomplete warnings and

8  instructions that purport, but fail, to include the complete array of risks associated

9  with use of and/or exposure to Roundup® and glyphosate.  Defendant knew and/or

10  should have known that the risks expressly included in Roundup® warnings and

11  labels did not and do not accurately or adequately set forth the risks of developing

12  the serious injuries complained of herein.  Nevertheless, Defendant expressly

13  represented that its Roundup® products were safe and effective, that they were safe

14  and effective for use by individuals such as Plaintiff Mendoza, and/or that they

15  were safe and effective as agricultural herbicides.

16  143.   The representations about Roundup®, as set forth herein, contained or

17  constituted affirmations of fact or promises made by the seller to the buyer, which

18  related to the goods and became part of the basis of the bargain, creating an

19  express warranty that the goods would conform to the representations.

20

144.   Defendant placed its Roundup® products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate.

145.   Defendant breached these warranties because, among other things, its Roundup® products were defective, dangerous, unfit for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose.  Specifically, Defendant breached the warranties in the following ways:

a.   Defendant represented through its labeling, advertising, and marketing materials that its Roundup® products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated with use of and/or exposure to Roundup® and glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings and labels; and

b.   Defendant represented that its Roundup® products were safe for use and fraudulently concealed information that demonstrated that glyphosate, the active ingredient in Roundup®, had carcinogenic properties, and that its Roundup® products, therefore, were not safer than alternatives available on the market.

146.   Upon information and belief, Plaintiff Mendoza was at all relevant times in privity with Defendant, and as such, Plaintiff Mendoza is entitled to assert this claim.

147.   On information and belief, Plaintiff Mendoza justifiably and detrimentally relied on the express warranties and representations of Defendant in the purchase and use of its Roundup® products.  When Plaintiff Mendoza made the decision to purchase Roundup®, she reasonably relied upon Defendant to disclose known defects, risks, dangers, and side effects of Roundup® and glyphosate.

148.   Defendant had sole access to material facts concerning the nature of the risks associated with its Roundup® products as expressly stated within its warnings and labels, and Defendant knew that consumers and users such as Plaintiff could not have reasonably discovered that the risks expressly included in Roundup® warnings and labels were inadequate and inaccurate.

149.   Plaintiff Mendoza had no knowledge of the falsity or incompleteness of Defendant's statements and representations concerning Roundup®.

150.   Plaintiff used and/or was exposed to the use of Roundup® as researched, developed, designed, tested, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by Defendant.

151.   Had the warnings and labels for Roundup® products accurately and adequately set forth the true risks associated with the use of such products, including Plaintiff's injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Plaintiff could have avoided the injuries complained of herein.

152.   As a direct and proximate result of Defendant's wrongful acts and omissions, Plaintiff has suffered severe injuries.  Plaintiff has endured pain and suffering, has suffered economic losses (including significant expenses for medical care and treatment), and will continue to incur these expenses in the future.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.  Plaintiff also demands a jury trial on the issues contained herein.

## CLAIM FIVE

### BREACH OF IMPLIED WARRANTIES

153.   Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

154.   At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to users and consumers, including Plaintiffs, thereby placing Roundup® products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendant.

155.   Before the time that Plaintiffs were exposed to the use of the aforementioned Roundup® products, Defendant impliedly warranted to its consumers and users—including Plaintiff Rubio's employers and Plaintiff Mendoza—that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

156.   Defendant, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiffs' injuries.

157.   Upon information and belief, Plaintiff Rubio's employers reasonably relied upon the skill, superior knowledge and judgment of Defendant and upon its implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

158.   Upon information and belief, Plaintiff Rubio's employers were at all relevant times in privity with Defendant.  Plaintiff Rubio is the intended third-party beneficiary of implied warranties made by Defendant to the purchasers of its horticultural herbicides, including the company and/or companies that employed Plaintiff Rubio, and as such, Plaintiff Rubio is entitled to assert this claim.

159.   Upon information and belief, Plaintiff Mendoza reasonably relied upon the skill, superior knowledge and judgment of Defendant and upon its implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

160.   Upon information and belief, Plaintiff Mendoza was at all relevant times in privity with Defendant, and as such, Plaintiff Mendoza is entitled to assert this claim.

161.   The Roundup® products were expected to reach and did in fact reach consumers and users, including Plaintiffs, without substantial change in the condition in which they were manufactured and sold by Defendant.

162.   At all times relevant to this litigation, Defendant was aware that consumers and users of its products, including Plaintiffs, would use Roundup® products as marketed by Defendant, which is to say that Plaintiffs were the foreseeable users of Roundup®.

163.   Defendant intended that its Roundup® products be used in the manner in which Plaintiffs in fact used them and Defendant impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

164.   In reliance upon Defendant's implied warranty, Plaintiffs used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendant.

165.   Neither Plaintiffs nor Plaintiff Rubio's employers could have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

166.   Defendant breached its implied warranty to Plaintiffs in that its Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested.  Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

167.   The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

168.   As a direct and proximate result of Defendant's wrongful acts and omissions Plaintiffs have suffered severe and permanent physical and emotional

1   injuries.  Plaintiffs have endured pain and suffering, have suffered economic loss

2   (including significant expenses for medical care and treatment) and will continue

3   to incur these expenses in the future.

4       169.   WHEREFORE, Plaintiffs respectfully request that this Court enter

5   judgment in Plaintiffs' favor for compensatory and punitive damages, together

6   with interest, costs herein incurred, attorneys' fees, and all such other and further

7   relief as this Court deems just and proper.  Plaintiffs also demand a jury trial on

8   the issues contained herein.

9   <u>**PRAYER FOR RELIEF**</u>

10       WHEREFORE, Plaintiffs request that the Court enter judgment in their

11   favor and against Monsanto, awarding as follows:

12      A.    compensatory damages in an amount to be proven at trial;

13      B.    punitive damages;

14      C.    costs including reasonable attorneys' fees, court costs, and other

15           litigation expenses; and

16      D.    any other relief the Court may deem just and proper.

17

18

19

20

1

## <u>JURY TRIAL DEMAND</u>

2

Plaintiffs demand a trial by jury on all of the triable issues within this

3

Complaint.

4

Dated: October 20, 2015
5               Los Angeles, California

6                                              **WEITZ & LUXENBERG, P.C.**

7                                                 <u>  /s/ Christopher B. Dalbey  </u>
                                               Christopher B. Dalbey (SBN 285562)
8                                                    cdalbey@weitzlux.com
                                               1880 Century Park East, Suite 700
                                               Los Angeles, CA 90067
9                                              Tel: (310) 247-0921
                                               Fax: (310) 786-9927

10
                                               Robin L. Greenwald (appearing *pro hac vice*)
11                                                  rgreenwald@weitzlux.com
                                               Maja Lukic (appearing *pro hac vice*)
12                                                  mlukic@weitzlux.com
                                               700 Broadway
13                                             New York, NY 10003
                                               Tel: (212) 558-5500
14                                             Fax: (212) 344-5461

15                                             **LUNDY, LUNDY, SOILEAU**
                                               **& SOUTH, LLP**
16                                             Hunter W. Lundy (*pro hac vice* application
                                                    anticipated)
17                                                  hlundy@lundylawllp.com
                                               Matthew E. Lundy (*pro hac vice* application
18                                                  anticipated)
                                                    mlundy@lundylawllp.com
19                                             Kristie M. Hightower (*pro hac vice*
                                                    application anticipated)
20                                                  khightower@lundylawllp.com

501 Broad Street
Post Office Box 3010
Lake Charles, LA 70602
Tel.: (337) 439-0707
Fax: (337) 439-1029

*Attorneys for Plaintiffs*