# U.S. District Court
## District of Hawaii (Hawaii)
## CIVIL DOCKET FOR CASE #: 1:16−cv−00043−JMS−RLP

Sheppard et al v. Monsanto Company
Assigned to: CHIEF JUDGE J. MICHAEL SEABRIGHT
Referred to: MAGISTRATE JUDGE RICHARD L. PUGLISI
Cause: 28:1332 Diversity−Product Liability

Date Filed: 02/02/2016
Jury Demand: Both
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Christine Sheppard**

represented by **Brian K. Mackintosh**
841 Bishop St., Suite 2201
Honolulu, HI 96813
521−3336
Email: bmackphd@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael J. Miller**
The Miller Firm LLC
The Sherman Building
108 Railroad Ave
Orange, VA 22960
(540) 672−4224
Fax: (540) 672−3055
Email: mmiller@millerfirmllc.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Timothy Litzenburg**
The Miller Firm LLC
The Sherman Building
108 Railroad Ave
Orange, VA 22960
(540) 672−4224
Fax: (540) 672−3055
Email: tlitzenburg@millerfirmllc.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Kenneth Sheppard**

represented by **Brian K. Mackintosh**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael J. Miller**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Timothy Litzenburg**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

| | | |
|---|---|---|
| **Monsanto Company** | represented by | **Eric G. Lasker** |

Hollingsworth LLP
1350 I Street N.W.
Washington, DC 20005
(202) 898–5800
Fax: (202) 682–1639
Email: elasker@hollingsworthllp.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joe G. Hollingsworth**
Hollingsworth LLP
1350 I Street, N.W.
Washington, DC 20005
(202) 898–5800
Fax: (202) 682–1639
Email: jhollingsworth@hollingsworthllp.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Katharine R. Latimer**
Hollingsworth LLP
1350 I Street, N.W.
Washington, DC 20005
(202) 898–5800
Fax: (202) 682–1639
Email: klatimer@hollingsworthllp.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael F O'Connor**
Ogawa, Lau, Nakamura &Jew
600 Ocean View Center
707 Richards Street
Honolulu, HI 96813
533–3999
Email: mfoconnor@ollon.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rosemary Stewart**
Hollingsworth LLP
1350 I Street, N.W.
Washington, DC 20005
(202) 898–5800
Fax: (202) 682–1639
Email: rstewart@hollingsworthllp.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/02/2016 | 1 | COMPLAINT against Monsanto Company ( Filing fee $ 400 receipt number 0975–1664597.), filed by Christine Sheppard. (Attachments: # 1 ~~Supplement~~ Demand for Jury Trial , # 2 ~~Supplement~~ (Proposed) Summons )(Mackintosh, Brian) Modified on 2/3/2016 (emt, ). (Entered: 02/02/2016) |

| 02/03/2016 | 2 | NOTICE of Case Assignment: Please reflect Civil case number CV 16–00043 JMS–RLP on all further pleadings. (emt, ) |
| | | <div align="center">CERTIFICATE OF SERVICE</div> Participants registered to receive electronic notifications received this document electronically at the e–mail address listed on the Notice of Electronic Filing (NEF). Participants not registered to receive electronic notifications were served by first class mail on the date of this docket entry. (Entered: 02/03/2016) |
| 02/03/2016 | | CORRECTIVE ENTRY. Please be advised that the summons affixed to the 1 Complaint, filed by Christine Sheppard, Kenneth Sheppard is signed by counsel. The filing party may resubmit the proposed summons, to omit counsel's signature and to include a signature line for the Clerk. In the alternative, the filing party may refer to the summons form on the court's website at www.hid.uscourts.gov (refer to the Civil Forms section). The filing party is asked to resubmit a proposed summons for issuance by the Clerk. For e–filing purposes, please select the filing event "Summons (Proposed)", which is located in the the "Service of Process" Category. Upon the filing of the proposed summons, the Clerk's Office will issue the summons electronically. (emt, ) (Entered: 02/03/2016) |
| 02/03/2016 | 3 | Order Setting Rule 16 Scheduling Order **TO BE SET** Before Magistrate Judge Richard L. Puglisi – Signed by CHIEF JUDGE J. MICHAEL SEABRIGHT on 2/3/2016. (Attachments: # 1 Memo from Clerk Re: Corporate Disclosure Statements) (emt, ) |
| | | <div align="center">CERTIFICATE OF SERVICE</div> Participants registered to receive electronic notifications received this document electronically at the e–mail address listed on the Notice of Electronic Filing (NEF). Participants not registered to receive electronic notifications were served by first class mail on the date of this docket entry. |
| | | **ATTACH THE SCHEDULING ORDER TO THE INITIATING DOCUMENT (COMPLAINT/NOTICE OF REMOVAL).** **THE SCHEDULING ORDER AND MEMO RE: CORPORATE DISCLOSURES MUST BE SERVED WITH THE DOCUMENT.** (Entered: 02/03/2016) |
| 02/03/2016 | 4 | CIVIL Waiver of Service Packet ~ Notice to Parties Regarding Service Pursuant to Rule 4 of the Federal Rules of Civil Procedure. (Attachments: # 1 AO 398 Notice of Lawsuit and Request to Waive Service of Summons, # 2 AO 399 Waiver of Service of Summons) (emt, ) (Entered: 02/03/2016) |
| 02/03/2016 | 5 | Summons (Proposed) (Mackintosh, Brian) (Entered: 02/03/2016) |
| 02/03/2016 | 6 | SUMMONS IN A CIVIL ACTION – Issued as to Monsanto Company. (afc) (Entered: 02/03/2016) |
| 02/12/2016 | 7 | MOTION for Pro Hac Vice *Timothy Litzenberg* Filing fee $ 300, receipt number 0975–1669102.Brian K. Mackintosh appearing for Plaintiffs Christine Sheppard, Kenneth Sheppard (Mackintosh, Brian) (Entered: 02/12/2016) |
| 02/12/2016 | 8 | MOTION for Pro Hac Vice *Michael J Miller* Filing fee $ 300, receipt number 0975–1669105.Brian K. Mackintosh appearing for Plaintiffs Christine Sheppard, Kenneth Sheppard (Mackintosh, Brian) (Entered: 02/12/2016) |
| 02/17/2016 | 9 | ORDER GRANTING THE APPLICATIONS OF TIMOTHY LITZENBURG AND MICHAEL J. MILLER TO APPEAR PRO HAC VICE *re:* 7 , 8 . Signed by U.S. MAGISTRATE JUDGE RICHARD L. PUGLISI on 2/16/2016. ~ TIMOTHY LITZENBURG, ESQ. and MICHAEL J. MILLER, ESQ. (The Miller Firm LLC) added as attorneys *pro hac vice* for plaintiffs Christine Sheppard and Kenneth Sheppard. (afc) |
| | | <div align="center">CERTIFICATE OF SERVICE</div> Participants registered to receive electronic notifications received this document electronically at the e–mail address listed on the Notice of Electronic Filing (NEF). All participants are registered to receive electronic notifications. (Entered: 02/17/2016) |

| 02/24/2016 | 10 | MOTION to Dismiss for failure to State a Claim Michael F O'Connor appearing for Defendant Monsanto Company (Attachments: # 1 Memorandum In Support of Motion, # 2 Certificate of Service)(O'Connor, Michael) (Entered: 02/24/2016) |
|---|---|---|
| 02/24/2016 | 11 | REQUEST for Judicial Notice in Support of Motion to Dismiss Plaintiffs' Complaint *re:* 10 by Monsanto Company. (Attachments: # 1 Declaration Of Erica T. Klenicki, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Certificate of Service)(O'Connor, Michael) Docket text entry modified on 2/24/2016 to include document number link to correlate to the underlying M/Dismiss, doc. no. 10 . (afc) (Entered: 02/24/2016) |
| 02/24/2016 | 12 | Corporate Disclosure Statement by Monsanto Company. (Attachments: # 1 Certificate of Service)(O'Connor, Michael) (Entered: 02/24/2016) |
| 02/24/2016 | 13 | EO: Defendant Monsanto Company's Motion to Dismiss, Doc. No. 10 , shall be heard on May 2, 2016, at 10:00 a.m. Plaintiffs Christine and Kenneth Sheppard's Opposition is due by April 4, 2016, and Defendant's Reply is due April 11, 2016. (CHIEF JUDGE J. MICHAEL SEABRIGHT)(shm, ) <hr> CERTIFICATE OF SERVICE <br><br> Participants registered to receive electronic notifications received this document electronically at the e−mail address listed on the Notice of Electronic Filing (NEF). Participants not registered to receive electronic notifications were served by first class mail on the date of this docket entry (Entered: 02/24/2016) |
| 02/26/2016 | 14 | MOTION for Pro Hac Vice *of Eric G. Lasker* Filing fee $ 300, receipt number 0975−1675343.Michael F O'Connor appearing for Defendant Monsanto Company (Attachments: # 1 Declaration of Eric G. Lasker, # 2 Attachment A)(O'Connor, Michael) (Entered: 02/26/2016) |
| 02/29/2016 | 15 | ORDER GRANTING ERIC G. LASKER'S APPLICATION TO APPEAR PRO HAC VICE *re:* 14 . Signed by MAGISTRATE JUDGE RICHARD L. PUGLISI on 2/29/2016. <br> ~ ERIC G. LASKER, ESQ. (Hollingsworth LLP) added as attorney *pro hac vice* for defendant MONSANTO COMPANY] (afc) <hr> CERTIFICATE OF SERVICE <br><br> Participants registered to receive electronic notifications received this document electronically at the e−mail address listed on the Notice of Electronic Filing (NEF). All participants are registered to receive electronic notifications. (Entered: 02/29/2016) |
| 03/09/2016 | 16 | MOTION for Pro Hac Vice *of Joe G. Hollingsworth* Filing fee $ 300, receipt number 0975−1680882.Michael F O'Connor appearing for Defendant Monsanto Company (Attachments: # 1 Declaration of Joe G. Hollingsworth, # 2 Attachments)(O'Connor, Michael) (Entered: 03/09/2016) |
| 03/09/2016 | 17 | MOTION for Pro Hac Vice *of Katharine R. Latimer* Filing fee $ 300, receipt number 0975−1680892.Michael F O'Connor appearing for Defendant Monsanto Company (Attachments: # 1 Declaration Katharine R. Latimer, # 2 Attachments)(O'Connor, Michael) (Entered: 03/09/2016) |
| 03/10/2016 | 18 | ORDER GRANTING THE APPLICATIONS OF JOE G. HOLLINGSWORTH AND KATHARINE R. LATIMER TO APPEAR PRO HAC VICE re 16 , 17 − Signed by MAGISTRATE JUDGE RICHARD L. PUGLISI on 3/10/2016. (emt, ) <hr> CERTIFICATE OF SERVICE <br><br> Participants registered to receive electronic notifications received this document electronically at the e−mail address listed on the Notice of Electronic Filing (NEF). Participants not registered to receive electronic notifications were served by first class mail on the date of this docket entry (Entered: 03/10/2016) |
| 04/04/2016 | 19 | MEMORANDUM in Opposition re 10 MOTION to Dismiss for failure to State a Claim filed by Christine Sheppard, Kenneth Sheppard. (Attachments: # 1 Declaration of Christine Sheppard)(Mackintosh, Brian) Docket text entry modified on 4/4/2016. (afc) (Entered: 04/04/2016) |
| 04/10/2016 | 20 | SUPPLEMENT re 19 Memorandum in Opposition to Motion, filed by Christine Sheppard, Kenneth Sheppard by Christine Sheppard, Kenneth Sheppard . |

| | | |
|---|---|---|
| | | (Attachments: # 1 Supplement)(Mackintosh, Brian) (Entered: 04/10/2016) |
| 04/11/2016 | 21 | REPLY re 10 MOTION to Dismiss for failure to State a Claim filed by Monsanto Company. (Attachments: # 1 Certificate of Service)(Hollingsworth, Joe) (Entered: 04/11/2016) |
| 04/18/2016 | 22 | NOTICE of Related Cases (CV 16–75 ACK–RLP and CV 16–43 JMS–RLP) by Christine Sheppard, Kenneth Sheppard (Mackintosh, Brian) Docket text modified on 4/18/2016: duplicate text deleted; title of document described further. (afc) (Entered: 04/18/2016) |
| 04/19/2016 | 23 | EO: The hearing on Defendant's Motion to Dismiss, currently set for May 2, 2016 at 10:00 a.m. is rescheduled for May 19, 2016, at 10:00 a.m. The parties' briefing is complete and will not be re–opened on account of this continuance. (CHIEF JUDGE J. MICHAEL SEABRIGHT)(shm, ) <hr> CERTIFICATE OF SERVICE <hr> Participants registered to receive electronic notifications received this document electronically at the e–mail address listed on the Notice of Electronic Filing (NEF). Participants not registered to receive electronic notifications were served by first class mail on the date of this docket entry (Entered: 04/19/2016) |
| 05/03/2016 | 24 | NOTICE of Supplemental Authority in Support of Plaintiff's Opposition to Monsanto Company's Motion to Dismiss Complaint – by Christine Sheppard, Kenneth Sheppard re 19 Memorandum in Opposition to Motion, 10 MOTION to Dismiss for failure to State a Claim Christine Sheppard, Kenneth Sheppard. (Attachments: # 1 Supplement)(Mackintosh, Brian) Docket text entry modified on 5/16/2016 to describe title of document. (afc) (Entered: 05/03/2016) |
| 05/16/2016 | 25 | RESPONSE re 24 Notice (Other), filed by Monsanto Company. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Certificate of Service)(Hollingsworth, Joe) (Entered: 05/16/2016) |
| 05/19/2016 | 26 | EP: Hearing on 10 Defendant Monsanto Company's Motion to Dismiss held. Oral arguments heard. <br> As to 13 Defendant Monsanto Company's Motion to Dismiss Plaintiff's Complaint– TAKEN UNDER ADVISEMENT. <br> Court to issue a written order (Court Reporter Cynthia Fazio.) (CHIEF JUDGE J. MICHAEL SEABRIGHT)(shm, ) <hr> CERTIFICATE OF SERVICE <hr> Participants registered to receive electronic notifications received this document electronically at the e–mail address listed on the Notice of Electronic Filing (NEF). Participants not registered to receive electronic notifications were served by first class mail on the date of this docket entry (Entered: 05/19/2016) |
| 05/23/2016 | 27 | Letter addressed to Chief Judge J. Michael Seabright from Joe G. Hollingsworth, Esq., dated May 23, 2016 Re: Request for Hawaii Case Law re Reasonable Suspicion. (emt, ) (Entered: 05/23/2016) |
| 06/01/2016 | 28 | TRANSCRIPT of Proceedings 10 DEFT. MONSANTO CO.'S M/DISM held on 5/19/16 – before Judge J. MICHAEL SEABRIGHT. Court Reporter Cynthia Fazio, Telephone number 808.541.2063. **90–Day Transcript Restriction:** PACER access to filed transcripts is restricted for 90 days from the file date to permit redaction of personal identifiers. Citations to restricted transcripts in filed documents must be limited to those portions of the proceedings that are relevant and in need of judicial review. Attaching restricted transcripts, in their entirety, to filed documents should be limited to situations with specific need. Transcript may be viewed at the court public terminal or ordered through the Court Reporter before the deadline for Release of Transcript. Redaction Request due 6/20/2016. Redacted Transcript Deadline set for 6/29/2016. Release of Transcript Restriction set for 8/29/2016. (44 pp.) (cf@hid.uscourts.gov) (Entered: 06/01/2016) |
| 06/22/2016 | 29 | EO: Rule 16 Scheduling Conference is set for 9:00AM on 7/8/2016 before MAGISTRATE JUDGE RICHARD L. PUGLISI. (MAGISTRATE JUDGE RICHARD L. PUGLISI)(agh) |

| | | CERTIFICATE OF SERVICE |
|---|---|---|
| | | Participants registered to receive electronic notifications received this document electronically at the e–mail address listed on the Notice of Electronic Filing (NEF). Participants not registered to receive electronic notifications were served by first class mail on the date of this docket entry. (Entered: 06/22/2016) |
| 06/24/2016 | 30 | LETTER: Parties' joint request to continue the June 29, 2016 Rule 16 Scheduling Conference date in *Johnson v. Monsanto*, CV 16–00075–JMS–RLP, to to the Rule 16 Scheduling Conference date scheduled for the instant case: July 8, 2016. [Letter dated 6/23/2016 addressed to U.S. Magistrate Judge Richard L. Puglisi in regards to the instant case and in *Johnson v. Monsanto*, CV 16–00075–JMS–RLP.] *Cross–reference minute order, doc no.* (29). (afc) (Entered: 06/24/2016) |
| 06/28/2016 | 31 | MOTION for Pro Hac Vice *Of Rosemary Stewart* Filing fee $ 300, receipt number 0975–1730127.Michael F O'Connor appearing for Defendant Monsanto Company (Attachments: # 1 Declaration Of Counsel (Rosemary Stewart), # 2 Declaration Attachment)(O'Connor, Michael) (Entered: 06/28/2016) |
| 06/29/2016 | 32 | ORDER GRANTING ROSEMARY STEWART'S APPLICATION TO APPEAR PRO HAC VICE *re:* 31 . Signed by U.S. MAGISTRATE JUDGE RICHARD L. PUGLISI on 6/28/2016. (afc) |
| | | ROSEMARY STEWART, ESQ. (Hollingsworth LLP) added as attorney *pro hac vice* for defendant Monsanto Company. |
| | | CERTIFICATE OF SERVICE |
| | | Participants registered to receive electronic notifications received this document electronically at the e–mail address listed on the Notice of Electronic Filing (NEF). All participants are registered to receive electronic notifications. (Entered: 06/29/2016) |
| 06/29/2016 | 33 | ORDER DENYING DEFENDANT'S MOTION TO DISMISS *re:* 10 . Signed by CHIEF U.S. DISTRICT JUDGE J. MICHAEL SEABRIGHT on 6/29/2016. (afc) |
| | | Written order follows hearing held May 4 19, 2016 on Defendant's Motion to Dismiss. Minutes of hearing: doc no. 26 . |
| | | CERTIFICATE OF SERVICE |
| | | Participants registered to receive electronic notifications received this document electronically at the e–mail address listed on the Notice of Electronic Filing (NEF). Participants not registered to receive electronic notifications were served by first class mail on the date of this docket entry. Entry modified on 6/29/2016. NEF REGENERATED. (afc). (Entered: 06/29/2016) |
| 07/05/2016 | 34 | Scheduling Conference Statement *of Defendant Monsanto Company*. (Attachments: # 1 Certificate of Service)(O'Connor, Michael) (Entered: 07/05/2016) |
| 07/06/2016 | 35 | Scheduling Conference Statement . (Mackintosh, Brian) (Entered: 07/06/2016) |
| 07/07/2016 | | CORRECTIVE ENTRY *re:* docket entry number 35 Scheduling Conference Statement filed on behalf of plaintiffs. The name of the ECF User under whose login and password the document is being electronically filed must correspond to the signature of the attorney signing the ECF filed document. In this instance the ECF Login is for Brian K. MacKintosh and the ECF signature is that of Timothy Litzenburg. (*See* LR 100.4.4; LR100.5.1). The filing party shall use its discretion should they feel the necessity to re–submit a corrected filing (afc) (Entered: 07/07/2016) |
| 07/07/2016 | 36 | MOTION to Bifurcate *Monsanto Company's Motion for Scheduling Order Regarding General Causation* Michael F O'Connor appearing for Defendant Monsanto Company (Attachments: # 1 Memorandum In Support of Motion, # 2 Declaration of Michael F. O'Connor, # 3 Certificate of Service)(O'Connor, Michael) (Entered: 07/07/2016) |
| 07/07/2016 | 37 | (Exhibits 1–10 to Declaration of Michael O'Connor re 36 *Monsanto Company's Motion for Scheduling Order Regarding General Causation*) filed by Monsanto Company. Additional Exhibits to 36 MOTION to Bifurcate Monsanto Company's Motion for Scheduling Order Regarding General Causation filed by Monsanto |

| | | |
|---|---|---|
| | | *Company.* (Attachments: #_1_ Exhibit 2, #_2_ Exhibit 3, #_3_ Exhibit 4, #_4_ Exhibit 5, #_5_ Exhibit 6, #_6_ Exhibit 7, #_7_ Exhibit 8, #_8_ Exhibit 9, #_9_ Exhibit 10)(O'Connor, Michael) *Modified on 7/8/2016 (emt, ).* (Entered: 07/07/2016) |
| 07/07/2016 | 38 | (Exhibit 11 to Declaration of Michael O'Connor re 36 Monsanto Company's Motion for Scheduling Order Regarding General Causation) Additional Exhibits to 36 MOTION to Bifurcate *Monsanto Company's Motion for Scheduling Order Regarding General Causation,* 37 Additional Exhibits, *Exhibit 11* filed by Monsanto Company. (O'Connor, Michael) *Modified on 7/8/2016 (emt, ).* (Entered: 07/07/2016) |
| 07/07/2016 | 39 | (Exhibit 12 to Declaration of Michael O'Connor re 36 Monsanto Company's Motion for Scheduling Order Regarding General Causation) Additional Exhibits to 36 MOTION to Bifurcate *Monsanto Company's Motion for Scheduling Order Regarding General Causation,* 37 Additional Exhibits, 38 Additional Exhibits *12–1, 12–2 and 12–3* filed by Monsanto Company. (Attachments: #_1_ Exhibit 12–2, #_2_ Exhibit 12–3)(O'Connor, Michael) *Modified on 7/8/2016 (emt, ).* (Entered: 07/07/2016) |
| 07/07/2016 | 40 | (Exhibits 13–28 to Declaration of Michael O'Connor re 36 Monsanto Company's Motion for Scheduling Order Regarding General Causation) Additional Exhibits to 36 MOTION to Bifurcate *Monsanto Company's Motion for Scheduling Order Regarding General Causation,* 38 Additional Exhibits, 39 Additional Exhibits, 37 Additional Exhibits, *Exhibits 13 through 28* filed by Monsanto Company. (Attachments: #_1_ Exhibit 14, #_2_ Exhibit 15, #_3_ Exhibit 16, #_4_ Exhibit 17, #_5_ Exhibit 18, #_6_ Exhibit 19, #_7_ Exhibit 20, #_8_ Exhibit 21, #_9_ Exhibit 22, #_10_ Exhibit 23, #_11_ Exhibit 24, #_12_ Exhibit 25, #_13_ Exhibit 26, #_14_ Exhibit 27, #_15_ Exhibit 28)(O'Connor, Michael) *Modified on 7/8/2016 (emt, ).* (Entered: 07/07/2016) |
| 07/07/2016 | 41 | (Exhibit 29 to Declaration of Michael O'Connor re 36 Monsanto Company's Motion for Scheduling Order Regarding General Causation) Additional Exhibits to 39 Additional Exhibits, 36 MOTION to Bifurcate *Monsanto Company's Motion for Scheduling Order Regarding General Causation,* 37 Additional Exhibits, 40 Additional Exhibits,, 38 Additional Exhibits *Exhibit 29* filed by Monsanto Company. (O'Connor, Michael) *Modified on 7/8/2016 (emt, ).* (Entered: 07/07/2016) |
| 07/08/2016 | 42 | EP: Rule 16 Scheduling Conference held on 7/8/2016. Rule 16 Scheduling Conference Order to be issued. Jury Selection/Trial is set for 09:00 AM on 1/16/2018 in Aha Kaulike before CHIEF JUDGE J. MICHAEL SEABRIGHT. Final Pretrial Conference is set for 12/5/2017 at 09:30 AM in Chambers of Magistrate Judge Richard L. Puglisi before MAGISTRATE JUDGE RICHARD L. PUGLISI. Dispositive Motions due by 8/16/2017. Discovery due by 11/17/2017. (Court Reporter In chambers – not reported) (MAGISTRATE JUDGE RICHARD L. PUGLISI)(mrf) <hr> CERTIFICATE OF SERVICE <hr> Participants registered to receive electronic notifications received this document electronically at the e–mail address listed on the Notice of Electronic Filing (NEF). Participants not registered to receive electronic notifications were served by first class mail on the date of this docket entry (Entered: 07/08/2016) |
| 07/08/2016 | 43 | RULE 16 SCHEDULING ORDER: Signed by MAGISTRATE JUDGE RICHARD L. PUGLISI on 7/8/2016. (afc) <hr> CERTIFICATE OF SERVICE <hr> Participants registered to receive electronic notifications received this document electronically at the e–mail address listed on the Notice of Electronic Filing (NEF). Participants not registered to receive electronic notifications were served by first class mail on the date of this docket entry (Entered: 07/08/2016) |
| 07/11/2016 | 44 | EO: Pursuant to Local Rule 7.2(d), the Court elects to decide 36 Monsanto Company's Motion For Scheduling Order Regarding General Causation without a hearing. Briefing shall be in accordance with Local Rule 7.4. (MAGISTRATE JUDGE RICHARD L. PUGLISI)(agh) <hr> CERTIFICATE OF SERVICE |

| | | |
|---|---|---|
| | | Participants registered to receive electronic notifications received this document electronically at the e–mail address listed on the Notice of Electronic Filing (NEF). Participants not registered to receive electronic notifications were served by first class mail on the date of this docket entry (Entered: 07/11/2016) |
| 07/13/2016 | 45 | ANSWER to 1 Complaint, with Jury Demand by Monsanto Company. (Attachments: # 1 Certificate of Service)(Hollingsworth, Joe) (Entered: 07/13/2016) |
| 07/21/2016 | 46 | MEMORANDUM in Opposition re 36 Monsanto Company's MOTION for Scheduling Order Regarding General Causation filed by Christine Sheppard, Kenneth Sheppard. (Attachments: # 1 Declaration, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit)(Mackintosh, Brian) (Entered: 07/21/2016) |

LAW OFFICE OF BRIAN K. MACKINTOSH
  BRIAN K. MACKINTOSH          9525
841 Bishop Street, Suite 2201
Honolulu, Hawaii  96813
Telephone:  (808) 521-3336
Facsimile: (808) 566-0347
bmackphd@gmail.com

*Attorney for Plaintiffs*
CHRISTINE SHEPPARD
KENNETH SHEPPARD

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| CHRISTINE SHEPPARD and KENNETH SHEPPARD, | CIVIL NO. 16-43 |
| *Plaintiffs,* vs. | COMPLAINT; DEMAND FOR JURY TRIAL; SUMMONS |
| MONSANTO COMPANY, | |
| *Defendant.* | |

## **COMPLAINT**

1. In 1970, Defendant Monsanto Company, Inc. discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had

become the most-used active ingredient in American agriculture with 85–90 millions pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

2. Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

3. Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

4. On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an

evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

5. On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

6. The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other haematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

7. The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

8. Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

## JURISDICTION AND VENUE

9. Federal diversity jurisdiction in this Court is proper under 28 U.S.C. § 1332 because Plaintiff Christine Sheppard is a citizen of a different state from the Defendant Monsanto Company's states of citizenship, and the aggregate amount in controversy exceeds $75,000, exclusive of interest and costs.

10. This Court has personal jurisdiction over Monsanto under Hawaii Revised Statute ("HRS") § 634-35, because Monsanto knows or should have known that its Roundup® products are sold throughout the State of Hawaii.

11. In addition, Monsanto maintains sufficient contacts with the State of Hawaii such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

12. Venue is proper within this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred within this judicial District.

## THE PARTIES

### Plaintiff

13. Plaintiff Christine Sheppard resides in Oceanside, California.  Kenneth Sheppard is her husband.  Formerly, she owned and worked a coffee farm in Hawaii.  She used Roundup to kill weeds on her coffee farm from approximately 1995 to 2004.

**Defendant**

14. Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.

15. At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®.

## FACTS

16. Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

17. Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce, or by milling, baking, or brewing grains.

18. For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the

WHO, the main chemical ingredient of Roundup®—glyphosate—is a probable

cause of cancer. Those most at risk are farm workers and other individuals with

workplace exposure to Roundup®, such as workers in garden centers, nurseries,

and landscapers. Agricultural workers are, once again, victims of corporate greed.

Monsanto assured the public that Roundup® was harmless. In order to prove this,

Monsanto championed falsified data and attacked legitimate studies that revealed

its dangers. Monsanto led a prolonged campaign of misinformation to convince

government agencies, farmers and the general population that Roundup® was safe.

### *The Discovery of Glyphosate and Development of Roundup®*

19. The herbicidal properties of glyphosate were discovered in 1970 by

Monsanto chemist John Franz. The first glyphosate-based herbicide was

introduced to the market in the mid-1970s under the brand name Roundup®. From

the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide

for widespread commercial and consumer use. It still markets Roundup® as safe

today.

### *Registration of Herbicides under Federal Law*

20. The manufacture, formulation and distribution of herbicides, such as

Roundup®, are regulated under the Federal Insecticide, Fungicide, and

Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.* FIFRA requires that

all pesticides be registered with the Environmental Protection Agency ("EPA" or

"Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

21. Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

22. FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

23. The EPA and the State of Hawaii registered Roundup® for distribution, sale, and manufacture in the United States and the State of Hawaii.

24. FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

25. The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

26. In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment —in relation to the reregistration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

## *Scientific Fraud Underlying the Marketing and Sale of*
## *Glyphosate/Roundup*

27. Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

28. On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

29. In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

30. In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

31. Three top executives of IBT were convicted of fraud in 1983.

32. In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

33. Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

### *The Importance of Roundup® to Monsanto's Market Dominance Profits*

34. The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate

expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

35. In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate; farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

36. Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

*Monsanto has known for decades that it falsely advertises the safety of Roundup®*

37. In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "**safer than table salt"** and "**practically non-toxic**" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a) Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

b) And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c) Roundup biodegrades into naturally occurring elements.

d) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e) This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f) You can apply Roundup with " confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Roundup into natural products.

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area that has been treated with Roundup.

38. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

* * *

b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;

* * *

c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

* * *

d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics";

* * *

e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and,

f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

39. Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

40. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

### Classifications and Assessments of Glyphosate

41. The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

42. The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

43. One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the

Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

44. In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

45. In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

46. On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC

16

Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

47. The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

48. Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

49. Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

50. The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

51. The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

52. The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

53. In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

54. The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

55. The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

56. The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

57. The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

### Other Earlier Findings About Glyphosate's Dangers to Human Health

58. The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

59. In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

### *Recent Worldwide Bans on Roundup®/Glyphosate*

60. Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which takes effect by the end of

2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

61. The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

62. France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

63. Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

64. The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

65. The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

*Plaintiff's Exposure to Roundup®*

66. Plaintiff Christine Sheppard began applying Roundup to her commercial coffee crop in or around 1995. She applied the product routinely to her farm, on which she lived, until 2004.

67. Ms. Sheppard was diagnosed with non-Hodgkins lymphoma in 2003, following eight years of Roundup application.

68. As a result of this illness, she has had to cease farming coffee, has sold the farm, and has moved to California where she continues to undergo treatment and surveillance for her lymphoma.

## CLAIM ONE

### STRICT LIABILITY (DESIGN DEFECT)

69. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

70. Plaintiff brings this strict liability claim against Defendant for defective design.

71. At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and

supervision of Defendant. At all times relevant to this litigation, Defendant designed, researched, developed, manufactured, produced, tested, assembled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by the Plaintiff, as described above.

72. At all times relevant to this litigation, Defendant's Roundup® products were manufactured, and designed in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff.

73. At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in New York and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, and marketed by Defendant.

74. Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of the Defendant's manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

75. Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

76. At all times relevant to this action, Defendant knew or had reason to know that its Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendant.

77. Therefore, at all times relevant to this litigation, Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, distributed, sold and marketed by Defendant were defective in design and formulation, in one or more of the following ways: a. When placed in the stream of commerce, Defendant's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b. When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c. When placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d. Defendant did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate.

e. Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f. Defendant knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g. Defendant did not conduct adequate post-marketing surveillance of its Roundup® products.

h. Defendant could have employed safer alternative designs and formulations.

78. Plaintiff was exposed to Defendant's Roundup® products in the course of her employment as a horticultural worker, as described above, without knowledge of their dangerous characteristics.

79. At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

80. Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

81. The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendant's Roundup® products were and are more dangerous than alternative products and Defendant could have designed its Roundup® products to make them less dangerous. Indeed, at the time that Defendant designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

82. At the time Roundup® products left Defendant's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant's herbicides.

83. Defendant's defective design of its Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including the Plaintiff herein.

84. Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendant is strictly liable to Plaintiff.

85. The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiff's grave injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained her injuries.

86. Defendant's conduct, as described above, was reckless. Defendant risked the lives of consumers and users of its products, including Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Defendant made conscious decisions not to redesign, warn or inform the unsuspecting public. Defendant's reckless conduct warrants an award of punitive damages.

87. As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

88. WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## CLAIM TWO

## STRICT LIABILITY (FAILURE TO WARN)

89. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

90. Plaintiff brings this strict liability claim against Defendant for failure to warn.

91. At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

92. Defendant researched, developed, designed, tested, manufactured, inspected, distributed, marketed, promoted, sold, and otherwise released into the

stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiff, Plaintiff's employer, Plaintiff's co-workers, and persons responsible for consumers (such as employers), and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

93. At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn the Plaintiff of the dangers associated with Roundup® use and exposure. Defendant, as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

94. At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

95. At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety or to minimize the dangers to users and

consumers of its product and to those who would foreseeably use or be harmed by Defendant's herbicides, including Plaintiff.

96. Despite the fact that Defendant knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied or sold the product, and not known to end users and consumers, such as Plaintiff and the horticultural company who employed her.

97. Defendant knew or should have known that its products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Defendant has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

98. At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in New York and throughout the United States,

including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, and marketed by Defendant.

99. Plaintiff was exposed to Defendant's Roundup® products in the course of her employment as a horticultural worker, as described above, without knowledge of their dangerous characteristics.

100. At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

101. Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendant.

102. Defendant knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, but they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

103. The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled

horticultural workers such as Plaintiff to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

104. To this day, Defendant has failed to adequately and accurately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

105. As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiff in the course of her employment as a horticultural worker.

106. Defendant is liable to Plaintiff for injuries caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically

relevant information and data regarding the appropriate use of its products and the risks associated with the use of or exposure to Roundup® and glyphosate.

107. The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiff's injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained their injuries.

108. Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup® products, Plaintiff could have avoided the risk of developing injuries as alleged herein and the company who employed Plaintiff could have obtained alternative herbicides.

109. As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer severe injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

110. WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further

relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## CLAIM THREE

## NEGLIGENCE

111. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

112. Defendant, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

113. At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

114. At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the

potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

115. At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

116. Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

117. Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

118. As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or

consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

119. Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant has failed to do so. Indeed, Defendant has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

120. Defendant's negligence included: a. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

b. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

36

d. Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

e. Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f. Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and be exposed to its Roundup® products;

g. Failing to disclose to Plaintiffs, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

h. Failing to warn Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other consumers;

i. Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

j. Representing that its Roundup® products were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended purpose;

k. Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

l. Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m. Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

n. Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

121. Defendant knew and/or should have known that it was foreseeable that consumers such as Plaintiff would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

122. Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

123. Defendant's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff suffered, and will continue to suffer, as described herein.

124. Defendant's conduct, as described above, was reckless. Defendant regularly risks the lives of consumers and users of their products, including Plaintiff, with full knowledge of the dangers of its products. Defendant has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiffs. Defendant's reckless conduct therefore warrants an award of punitive damages.

125. As a proximate result of Defendant's wrongful acts and omissions in placing its defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff has suffered and continues to suffer severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, has suffered economic losses (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

126. WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## CLAIM FOUR

## BREACH OF IMPLIED WARRANTIES

127. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

128. At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

129. Before the time that Plaintiff was exposed to the use of the aforementioned Roundup® products, Defendant impliedly warranted to its consumers—including Plaintiff—that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

130. Defendant, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

131. Plaintiff reasonably relied upon the skill, superior knowledge and judgment of Defendant and upon its implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

132. Upon information and belief, Plaintiff was at all relevant times in privity with Defendant.

133. Plaintiff is the intended third-party beneficiaries of implied warranties made by Defendant to the purchasers of its horticultural herbicides, and as such Plaintiff is entitled to assert this claim.

134. The Roundup® products were expected to reach and did in fact reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendant.

135. At all times relevant to this litigation, Defendant was aware that consumers and users of its products, including Plaintiff, would use Roundup® products as marketed by Defendant, which is to say that Plaintiff was a foreseeable user of Roundup®.

136. Defendant intended that its Roundup® products be used in the manner in which Plaintiff in fact used them and Defendant impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

137. In reliance upon Defendant's implied warranty, Plaintiff used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendant.

138. Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

139. Defendant breached its implied warranty to Plaintiff in that its Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

140. The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

141. As a direct and proximate result of Defendant's wrongful acts and omissions Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, have suffered economic loss

(including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

142. WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## CLAIM FIVE

## BREACH OF EXPRESS WARRANTIES

143. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

144. The law imposes a duty on Monsanto to be responsible in the event the product sold, namely Roundup, is fit for the use and purposes intended.

145. Defendant breached its contractually assumed implied warranty by supplying a product that caused Mrs. Sheppard non-Hodgkin lymphoma and related injuries.

146. Any warranty disclaimer or limitation of liability clause offered by Defendant for a product as dangerous as Roundup would be unconscionable and unenforceable by law.

## CLAIM SIX

## LOSS OF CONSORTIUM

147.  Kenneth Sheppard (hereinafter "Consortium Plaintiff") incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

148.  As a direct and proximate result of Defendant's wrongful acts and omissions Consortium Plaintiff has suffered the loss and/or impairment of Plaintiff's ability to perform services as a wife, because of her injuries.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter judgment in their favor and against Monsanto, awarding as follows:

A. compensatory damages in an amount to be proven at trial;

B. punitive damages;

C. costs including reasonable attorneys' fees, court costs, and other litigation expenses; and,

D. any other relief the Court may deem just and proper.

DATED: Honolulu, Hawaii, February 2, 2016.

_Brian K. Mackintosh_
BRIAN K. MACKINTOSH
Attorney for Plaintiffs
CHRISTINE SHEPPARD
KENNETH SHEPPARD