BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| In re: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741 |

INTERESTED PARTY RESPONSE OF PLAINTIFFS IN *JOHN D. SANDERS AND
FRANK TANNER v. MONSANTO COMPANY* TO MOTION TO TRANSFER

**I.**     **INTRODUCTION**

Pursuant to this Panel's Order of July 28, 2016, Plaintiffs John D. Sanders and Frank

Tanner (collectively, the "*Sanders* Plaintiffs") submit this Interested Party Response to Motion to

Transfer currently pending before this Panel.  The *Sanders* Plaintiffs are individuals within the

Central District of California who used and/or were otherwise exposed to Monsanto's herbicide

Roundup® and suffer from non-Hodgkin lymphoma ("NHL") as a result of that exposure.  There

are currently dozens of plaintiffs in various districts across the country who are in the same

position as the *Sanders* Plaintiffs—they all were deceived by Monsanto's marketing, advertising,

and public relations campaigns touting that Roundup® is safe to the environment and to human

health.  And they all have been diagnosed with, and suffer the debilitating effects of, NHL,

because of their use of and/or exposure to Roundup®.

**II.**     **FACTS RELEVANT TO CENTRALIZATION**

**A.**     **Roundup®'s Creation, Use, Market Share and Carcinogenicity**

In 1970, Monsanto discovered the herbicidal properties of glyphosate and began

marketing it in products in 1974 under the brand name Roundup®.  Roundup® is a non-selective

herbicide used to kill weeds that commonly compete with the growing of crops.  As of 2001,

glyphosate was the most-used pesticide active ingredient in American agriculture, with 85–90

million pounds used annually, and by 2007, that number grew to 185 million pounds.[1]  As of 2013, glyphosate was the world's most widely used herbicide.

Monsanto is the world's leading producer of glyphosate.  It controlled the patent on glyphosate use as an herbicide until 2001.  After that, it developed genetically-modified seeds that produce crops that are glyphosate-resistant, thus allowing application of Roundup® even during the planting and growing season.  As of 2009, Monsanto also was the world's leading producer of seeds, accounting for 27% of the world seed market,[2] and the majority of these seeds are of the Roundup Ready® brand.  In 2010, an estimated 70% of corn and cotton and 90% of soybean fields in the United States were Roundup Ready®.[3]

Roundup® is approved for use on over 100 different crops.[4]  It is ubiquitous in the environment.  Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used.[5]  It has been found in food,[6] in the

---

[1] Arthur Grube et al., U.S. Envtl. Prot. Agency, *Pesticides Industry Sales and Usage, 2006–2007 Market Estimates* 14 (2011), *available at* http://www.epa.gov/pesticides/pestsales/07pestsales/market_estimates2007.pdf.

[2] ETC Group, *Who Will Control the Green Economy?* 22 (2011), *available at* http://www.etcgroup.org/files/publication/pdf_file/ETC_wwctge_4web_Dec2011.pdf.

[3] William Neuman & Andrew Pollack, *Farmers Cope With Roundup-Resistant Weeds*, N.Y. Times, May 3, 2010, *available at* http://www.nytimes.com/2010/05/04/business/energy-environment/04weed.html?pagewan.

[4] Monsanto, *Backgrounder-History of Monsanto's Glyphosate Herbicides* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/back_history.pdf.

[5] *See* U.S. Geological Survey, *USGS Technical Announcement: Widely Used Herbicide Commonly Found in Rain and Streams in the Mississippi River Basin* (2011), *available at* http://www.usgs.gov/newsroom/article.asp?ID=2909; *see also* U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate*, *available at* http://www.epa.gov/safewater/pdfs/factsheets/soc/tech/glyphosa.pdf.

[6] Thomas Bohn et al., *Compositional Differences in Soybeans on the Market: Glyphosate Accumulates in Roundup Ready GM Soybeans*, 153 Food Chemistry 207 (2013), *available at* http://www.sciencedirect.com/science/article/pii/S0308814613019201.

urine of agricultural workers,[7] and even in the urine of urban dwellers who are not in direct contact with glyphosate.[8]

On July 29, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued a formal monograph evaluating several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it assesses the health implications from exposure to glyphosate since 2001. Following its evaluation, the IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is *probably carcinogenic to humans*. The IARC Working Group concluded that the cancer most associated with glyphosate exposure is non-Hodgkin lymphoma.[9] The IARC evaluation confirmed what had been believed for years about the human toxicity of Roundup®.

IARC was created in 1965 as the specialized cancer agency of the WHO, and its objective is to promote international collaboration in cancer research. "The Agency is inter-disciplinary, bringing together skills in epidemiology, laboratory sciences and biostatistics to identify the causes of cancer so that preventive measures may be adopted and the burden of disease and associated suffering reduced."[10] Scientists are selected on the basis of technical competency in cancer research and allied fields.[11] The United States was an original member

---

[7] John F. Acquavella et al., *Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study*, 112(3) ENVTL. HEALTH PERSPECTIVES 321 (2004), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241861/; Kathryn Z. Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, 112 IARC Monographs 76, section 5.4 (2015), *available at* http://dx.doi.org/10.1016/S1470-2045(15)70134-8.

[8] Dirk Brändli & Sandra Reinacher, *Herbicides found in Human Urine*, 1 ITHAKA JOURNAL 270 (2012), *available at* http://www.ithaka-journal.net/druckversionen/e052012-herbicides-urine.pdf.

[9] *See* Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, *supra*.

[10] IARC's Mission: Cancer research for cancer prevention, http://www.iarc.fr/en/about/index.php.

[11] About IARC, Governance, http://www.iarc.fr/en/about/governance.php.

and founder of IARC,[12] and it continues its strong support for IARC's work today.  *See* 22 U.S.C. § 290e-1 (authorizing U.S. to fund 16% of IARC's budget).

The findings of IARC are significant due to the transparency of its evaluations[13] and the fact that its evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.[14]  Over time, the IARC Monograph program has reviewed 980 agents.[15]  Because of its rigorous scientific method and independence, IARC is a widely respected organization and its findings are considered authoritative:

- The Federal Judicial Center describes IARC as one "of the most well-respected and prestigious scientific bodies" and notes that IARC's assessments of carcinogenicity are "generally recognized as authoritative."[16]

- The American Cancer Society calls IARC a "highly respected agenc[y]" and lists glyphosate as a known or probable carcinogen.[17]

- The U.S. Department of Labor's Occupational Safety and Health Administration ("OSHA") relies on IARC assessments when requiring manufacturers to warn of the potential carcinogenicity of chemicals.  29 C.F.R. § 1910.1200, Appendix A.

---

[12] The Birth of IARC, at 29, *available at:* https://www.iarc.fr/en/publications/books/iarc50/IARC_Ch2_web.pdf.

[13] IARC Governance, http://governance.iarc.fr/.

[14] IARC Monograph Preamble, at 4, *available at:* http://monographs.iarc.fr/ENG/Monographs/vol112/mono112-F06.pdf.

[15] One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts.  Six months before the Monograph meeting, the collected material is sent to the Working Group members to prepare preliminary working papers.  *Id.* at 6.  Before the Monograph meeting, those papers are distributed among Working Group members for review and comment.  Finally, at the Monograph meeting, the Working Group finalizes its review of all literature, evaluates the evidence in each category, and completes the overall evaluation.  *Id.*  In assessing an agent, the IARC Working Group ("IARC WG") reviews the following information: (1) human, experimental and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data.  *Id.* The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.  *Id.* at 4.

[16] REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, pp. 20, 565 n.46 (3d ed. 2011).

[17] Exhibit 2, American Cancer Society Web Page, pp. 1, 12.

- California requires manufacturers to warn the public when it sells chemicals listed as probable carcinogens by IARC. *Cal. Chamber of Commerce v. Brown*, 196 Cal. App. 4th 233, 242 (2011).

Monsanto's repeated criticism of IARC, in various briefs filed in cases pending in federal district courts, rings hollow.

Despite the IARC findings, as well as other evidence of Roundup®'s carcinogenicity, Monsanto has not changed its representations about Roundup®'s safety: since it began marketing Roundup® and continuing to the present it proclaims that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

**B.      Plaintiffs' Injury from Use of and/or Exposure to Roundup**

All of the claims in the now 25 filed actions arise out of the same series of transactions and occurrences, and their claims involve common questions of law and fact. All claims in the filed cases allege injuries as a direct and proximate result of Defendant's negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, and/or sale of its Roundup® products. All plaintiffs seek recovery for damages as a result of developing NHL as a direct and proximate cause of Defendant's wrongful conduct, the unreasonably dangerous and defective nature of Roundup® products and the products' active ingredient glyphosate, and the attendant effects of developing NHL. All of the cases involve common legal, factual, and medical issues.

**III.      ARGUMENT**

**A.      Transfer and Centralization is Appropriate.**

The *Sanders* Plaintiffs agree with the movants in the pending transfer motion, and the parties who filed responses in support, that transfer under 28 U.S.C. § 1407(a) for centralized pretrial coordination is warranted because "civil actions involving one or more common questions of fact are pending in different districts," and transfer for centralized pretrial

coordination "will promote the just and efficient conduct of such action." 28 U.S.C. § 1407(a). As outlined above, numerous common questions of fact cut across each and every case currently filed in various federal courts. What is more, because the health risks associated with exposure to Roundup® are still emerging, there will certainly be many more filings in the coming months, evidenced by the fact that since the filing of the motion on July 27, 2016, four more cases have been filed.

Moreover, the current posture of the pending cases illustrates why centralization is critically important. For example, confidentiality and ESI orders have been entered in certain Roundup® cases. Although Monsanto did not seek input from counsel at the time of negotiating those orders, it now expects counsel who was not part of those discussions to wholesale adopt what was entered in other cases, even when counsel does not agree to all the provisions. Indeed, counsel could not obtain access to documents produced in other cases without agreeing to those orders at least for the already produced documents.[18] Further, even though counsel has agreed to the terms of a protective order from another case, Monsanto takes the position that it expects counsel in other cases now and going forward to use the existing protective order in all federal cases, even if a particular federal district court has local variations. If these cases proceed without centralization, Monsanto could essentially strong arm counsel to wholesale agree to orders entered in other cases by different counsel as a condition to proceeding with discovery. These are but a few examples of the many in which the lack of centralization is hampering the efficient and effective litigation of these cases and why centralization is critically important now.

---

[18] Counsel's discussions with Monsanto regarding the ESI protocol and other related orders concerned *Mendoza v. Monsanto Company*, No. 1:16-cv-00406 (E.D. Cal.), but Counsel reasonably expects Monsanto to take the same approach with Counsel's other cases, including *Sanders v. Monsanto Company.* No. 5:16-cv-00726 (C.D. Cal.).

**B.**     **Suggested Transferee Courts**

As the Panel is well aware, this litigation is nation-wide in scope; Roundup® is the most widely used herbicide in the United States, and for that matter throughout the world.  People can be exposed to Roundup® in numerous ways, including in agricultural work, as a landscaper, as a gardener or nursery worker, as a municipal worker, or through home use.  There is, presumably, no location in the United States where Roundup® is not present.  Nevertheless, there are areas in the country where Roundup® is particularly likely to be more prevalent, such as areas that are heavily agricultural.  Thus, the *Sanders* Plaintiffs propose transferee courts in the agricultural areas of the Central District of California, the Eastern District of California, or the Southern District of Illinois**.**

Not only are these districts heavily agricultural, but they also have experienced judges available to undertake the immediate and active management of these cases.  And logistically, they are easily accessible by the parties and counsel from every corner of the country.

**1.**     **Central District of California**

The Central District of California satisfies the balancing test for selection of an appropriate transferee court on several grounds.  First, the Central District of California has the largest number of cases filed there, currently six plaintiffs, and they are all pending before the Honorable Dolly M. Gee.  This is not surprising as the District is heavily agricultural.  In addition, it is heavily populated; thus the other, non-agricultural uses of Roundup® will be prevalent there.

Second, the first Roundup® case was filed on September 15, 2015, in the Central District of California and assigned to Judge Gee.  *Rubio v. Monsanto Company*, 2:15-cv-07426-DMG-E

(C.D. Cal.).[19]  *See In re Land Rover I.R.3 Tire Wear Products Liab. Litig*., 598 F.Supp.2d 1384, 1386 (J.P.M.L. 2009) ("The Central District of California is an appropriate transferee forum because the first-filed and most procedurally advanced actions are pending there.").  The cases pending in the Central District of California, while not *more* advanced, are at a similarly advanced stage as cases in several other districts, the court having denied Monsanto's motion to dismiss on preemption and other grounds.  *See Hernandez v. Monsanto Co.*, Order Denying in Part & Granting in Part Def.'s Mot. Dismiss, No. 2:16-cv-01988, ECF No. 35 (C.D. Cal. Jul. 12, 2016); *see also Mendoza v. Monsanto Co.*, No. 1:16-cv-00406, 2016 WL 3648966 (E.D. Cal. Jul. 7, 2016); *Sheppard v. Monsanto Co.*, No. 1:16-cv-00043, 2016 WL 3629074 (D. Haw. Jun. 29, 2016); *Giglio v. Monsanto Co.*, No. 15-cv-02279, 2016 WL 1722859 (S.D. Cal. Apr. 29, 2016); *Hardeman v. Monsanto Co.*, No. 16-cv-00525, 2016 WL 1749680 (N.D. Cal. Apr. 8, 2016).

Third, the JPML recognizes that the Central District of California's "general docket conditions permit us to make the Section 1407 assignment knowing that the court has the resources available to manage this litigation."  *In re Classicstar Mare Lease Litig.*, 528 F. Supp. 2d 1345, 1347 (J.P.M.L. 2007).  Judge Gee currently does not have an active MDL and, moreover, the District has fewer MDLs currently than in prior years.[20]  Fourth, while not controlling, the Central District of California is an accessible and convenient forum for this MDL.  It not only has the most filed cases, but it also is home to five major airports.  And regardless of where counsel resides, Los Angeles is a destination hub for nearly every location in the country.

---

[19] While that case was later transferred to another District, the subsequent Roundup® filings in the Central District of California were assigned to Judge Gee as related to *Rubio*.

[20] United States Judicial Panel on Multidistrict Litigation, *MDL Statistics Report-Distribution of Pending MDL Dockets by District* (July 15, 2016), *available at* http://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_District-July-15-2016.pdf.

Finally, and perhaps most relevant, agriculture is a vital component of the economy of the Central District of California.  Even though the District contains the City of Los Angeles, Los Angeles County, and other developed areas including Orange County, Riverside, and the Inland Empire, it is home to over 10,000 farms covering over 2.19 million acres of District land.[21] Because Roundup® is the most commonly used herbicide in the United States, and the Central District of California—albeit largely developed—still contains vast farming areas, it stands to reason that the highest number of cases are currently pending in the Central District of California and, thus, that it is an appropriate forum for this litigation.

## 2.     Eastern District of California

The Eastern District of California is also an appropriate and convenient transferee court. Although only one case is presently pending in the Eastern District of California, it is similarly advanced as cases in other districts, the court already having denied Monsanto's motion to dismiss.  *Mendoza v. Monsanto Co.*, No. 1:16-cv-00406, 2016 WL 3648966 (E.D. Cal. Jul. 7, 2016).  The Honorable Dale A. Drozd, who is presiding over the case, is already familiar with some of the facts that Monsanto deems critical to these lawsuits, having analyzed multiple documents in connection with Monsanto's motion for the court to take judicial notice of them— documents which Monsanto submitted in connection with its motion to dismiss that Judge Drozd denied.  *See  Mendoza v. Monsanto Co.*, No. 1:16-cv-00406, 2016 WL 3648966 (E.D. Cal. Jul. 7, 2016).  There are currently no MDL proceedings pending in the district.  Given that the predominantly agricultural Central Valley of California area is within the district, the impact of Roundup® on the district is substantial; 45,920 farms encompass over 16.8 million acres of

---

[21] 2012 USDA Census of Agriculture, California,
https://www.agcensus.usda.gov/Publications/2012/Online_Resources/County_Profiles/California/.

District land.[22]  Moreover, the district contains urban and suburban areas as well in which non-agricultural uses of Roundup® are likely common.

Finally, while not a major hub, the Fresno airport is serviced daily by major domestic carriers including United, American, and Delta and thus is accessible from all areas of the country.

### 3.      Southern District of Illinois

The *Sanders* Plaintiffs also agree with the parties for the *Hardeman* and *Giglio* cases (Dkt. No. 10), that the Southern District of Illinois is an appropriate and convenient forum for these cases and adopt the arguments set forth in their brief.  In addition to those arguments, agriculture is widespread in the Southern District of Illinois, with over 24,800 farms covering more than 7.35 million acres.[23]  Furthermore, given the relative size of the District, it has a similar—if not greater—number of farms and farm acreage than the Central District of California and the Eastern District of California.

---

[22] 2012 USDA Census of Agriculture, California, https://www.agcensus.usda.gov/Publications/2012/Online_Resources/County_Profiles/California/.

[23] 2012 USDA Census of Agriculture, Illinois, https://www.agcensus.usda.gov/Publications/2012/Online_Resources/County_Profiles/Illinois/.

IV.    **CONCLUSION**

Based upon the foregoing, the *Sanders* Plaintiffs respectfully urge the Panel to enter a transfer order centralizing the pending Roundup® actions, to select a judge experienced in the management of a nationwide mass tort litigation, and to request consideration of the above proposed transferee jurisdictions.

Dated: August 17, 2016          WEITZ & LUXENBERG, P.C.


By:_____/s/ *Robin L. Greenwald*_____
                Robin L. Greenwald

Robin L. Greenwald
     rgreenwald@weitzlux.com
Maja Lukic
     mlukic@weitzlux.com
Weitz & Luxenberg, P.C.
700 Broadway
New York, NY 10003
Tel.: (212) 558-5802
Fax: (646) 293-4921

Christopher Dalbey
     cdalbey@weitzlux.com
Weitz & Luxenberg, P.C.
1880 Century Park East, Suite 700
Los Angeles, CA 90067
Tel.: (310) 247-0921
Fax: (310) 786-9927

*Counsel for the* Sanders *Plaintiffs*