## BEFORE THE UNITED STATES
## JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741<br><br>Oral Argument Scheduled |

## MONSANTO COMPANY'S OPPOSITION TO PLAINTIFFS' MOTION FOR TRANSFER OF ACTIONS PURSUANT TO 28 U.S.C. § 1407 FOR COORDINATED OR CONSOLIDATED PRE-TRIAL PROCEEDINGS

Under 28 U.S.C. § 1407, transfer is appropriate when it will serve "the convenience of parties and witnesses" *and* "promote the just and efficient conduct of such actions." Centralization here satisfies neither requirement. Great efficiencies have been realized from informal coordinated discovery efforts to date. For example, general causation discovery is well underway in two cases, with a *Daubert* hearing scheduled for May 2017. Monsanto is already voluntarily sharing the completed discovery with other plaintiffs, which will increase efficiencies in those cases as well. Once general causation discovery is complete, much of the remaining discovery will be case-specific and focused on the many individual issues inherent in product liability litigation, as well as some that are unique given plaintiffs' allegations here. Centralization will not facilitate the efficient resolution of case-specific disputes that may arise.

Granting plaintiffs' request to derail this litigation into an MDL would slow what to date has been rapid progression in several cases, none of which is in plaintiffs' preferred MDL locations, and would be antithetical to the goal of achieving an efficient resolution. This is particularly true where, as here, the number of cases involved (25) is manageable, and the limited number of counsel and jurisdictions involved also makes informal coordination a practical, efficient, and convenient alternative to an MDL. Therefore, plaintiffs' requests for an MDL

1

should be denied.  Alternatively, if the Panel decides an MDL is appropriate, Monsanto suggests

that it be located in the Northern District of California, the Southern District of California, or the

Southern District of Florida, each of which is more appropriate than the options suggested by

plaintiffs for varying reasons addressed below.

## I.      BACKGROUND

In 1974, Monsanto introduced the first Roundup®-branded products, which are herbicides

that include the active ingredient glyphosate and inactive surfactants (chemical compounds

commonly found in products such as shampoo that allow glyphosate to penetrate the waxy

surface of the weed).  Roundup®-branded products have been safely used for decades by farmers,

homeowners, and others to control unwanted weeds.

The U.S. Environmental Protection Agency ("EPA"), which has broad authority to

regulate herbicides under federal law, has described glyphosate as "one of the most safely-used

pesticides in the U.S."[1] and has repeatedly concluded that glyphosate exposure does not cause

cancer.  For example, in 1991, EPA "classified glyphosate in Group E (evidence of non-

carcinogenicity for humans), based on a lack of convincing evidence of carcinogenicity."[2]

Similar determinations were made in 2002, 2004, 2008, and 2013.[3]  In 2002, EPA also rejected a

---

[1] Letter from EPA Assistant Administrator Stephen L. Johnson to Secretary of State Colin Powell (Aug. 19, 2002), http://www.state.gov/j/inl/rls/rpt/aeicc/13237.htm.

[2] EPA, *Reregistration Eligibility Decision Document: Glyphosate*, 14 (Sept. 1993), https://www3.epa.gov/pesticides/chem_search/reg_actions/reregistration/red_PC-417300_1-Sep-93.pdf (quoting 1991 EPA finding).

[3] *See, e.g.*, Glyphosate; Pesticide Tolerances, 67 Fed. Reg. 60,934, 60,943 (Sept. 27, 2002) (to be codified at 40 C.F.R. pt. 180) ("[n]o evidence of carcinogenicity"); Glyphosate; Pesticide Tolerance, 69 Fed. Reg. 65,081, 65,086 (Nov. 10, 2004) (to be codified at 40 C.F.R. pt. 180) ("Glyphosate has no carcinogenic potential."); Glyphosate; Pesticide Tolerances, 73 Fed. Reg. 73,586, 73,589 (Dec. 3, 2008) (to be codified at 40 C.F.R. pt. 180) ("There is [an] extensive database available on glyphosate, which indicate[s] that glyphosate is not mutagenic, not a carcinogen, and not a developmental or reproductive toxicant."); Glyphosate; Pesticide

citizen group's arguments that glyphosate is carcinogenic, pointing to EPA's own analysis of some of the same genotoxicity studies, rodent cancer bioassays, and epidemiologic studies likely to be at issue here. *See* 67 Fed. Reg. at 60,935-36.[4]

In October 2015, EPA's Cancer Assessment Review Committee ("CARC") issued an 87-page final report in which it endorsed EPA's existing classification of glyphosate as "Not Likely to be Carcinogenic to Humans."[5]  After reviewing the voluminous scientific evidence demonstrating the safety of glyphosate, the EPA CARC concluded:

- "[E]pidemiological studies in humans showed no association between glyphosate exposure and [various types of] cancer," including finding that the "epidemiologic literature to date does not support a direct causal association" between glyphosate exposure and non-Hodgkin's lymphoma ("NHL").  EPA CARC Final Report at 8, 9.

- "[T]here was no evidence of carcinogenicity in the eleven [rodent] carcinogenicity studies."  *Id.* at 9.

- "[T]here is no concern for genotoxicity or mutagenicity."  *Id.*

Based on its repeated findings of safety, EPA for decades has approved labeling for various Roundup®-branded products that does not include a cancer warning, including as

---

Tolerances, 78 Fed. Reg. 25,396, 25,398 (May 1, 2013) (to be codified at 40 C.F.R. pt. 180) ("EPA has concluded that glyphosate does not pose a cancer risk to humans.").

[4] In addition to this record of safety, Roundup®-branded products offer many benefits, including increasing crop yields and reducing the need for farming practices that are damaging to the environment.  E.C. Oerke, *Crop Losses to Pests*, 144 J. Agric. Sci. 31, 38 (2006); Stephen O. Duke & Stephen B. Powles, *Glyphosate: A Once-In-A-Century Herbicide*, 64 Pest Mgmt. Sci. 319, 322 (2008).

[5] *See* Cancer Assessment Review Committee, Health Effects Division, Office of Pesticide Programs, U.S. Environmental Protection Agency, *Cancer Assessment Document – Evaluation of the Carcinogenic Potential of Glyphosate*, at 10, 77 (Final Report, October 1, 2015), http://src.bna.com/eAi ("EPA CARC Final Report").  Although this is not a final agency determination by EPA, it is clearly the final decision of the scientists within EPA tasked with making carcinogenicity evaluations and is stamped "final" on every page.

recently as March 2016.[6]  EPA has indicated that it intends to issue another determination about glyphosate after it receives the conclusions of a scientific advisory panel later this year.[7]

In addition, the only federal court to consider allegations regarding the carcinogenicity of glyphosate rejected those allegations as lacking reliable scientific support and dismissed medical monitoring claims brought by more than 2,000 plaintiffs.  *See Arias v. DynCorp*, 928 F. Supp. 2d 10, 24-25 (D.D.C. 2013) (excluding as unreliable plaintiffs' expert's causation opinion that glyphosate-based herbicides have carcinogenic effects).

Nevertheless, plaintiffs allege that because Monsanto failed to warn of glyphosate's "carcinogenic properties," they used Roundup®-branded products, which caused them to develop NHL, a general disease category encompassing dozens of distinct cancer types with different risk and causation profiles.  *See, e.g.*, Seymour Grufferman, *Epidemiology and Hereditary Aspects of Malignant Lymphoma and Hodgkin's Disease*, *in* Neoplastic Diseases of the Blood 673, 673-686 (Peter H. Wiernik et al. eds., 2003).  NHL is the fifth most common cancer group in the United States, and its immense background incidence further complicates any causation inquiry.

Plaintiffs rely on the listing of glyphosate as a "probable carcinogen" by the International Agency for Research on Cancer ("IARC") in 2015.  IARC, located in Lyon, France, is not a regulatory agency, and its determinations are not binding on any country.  Although IARC purports to "identify cancer hazards," it acknowledges that it does not evaluate "the risks

---

[6] *See, e.g.*, March 10, 2016 EPA Letter (approving labeling for Roundup®-branded herbicide), https://www3.epa.gov/pesticides/chem_search/ppls/071995-00051-20160310.pdf; March 10, 1992 EPA Letter (approving labeling for Roundup®-branded herbicide), https://www3.epa.gov/pesticides/chem_search/ppls/000524-00452-19920310.pdf.

[7] *See* 81 Fed. Reg. 48,794, 48,794-96 (July 26, 2016); *Ensuring Sound Science at EPA: Hearing Before the House of Representatives Comm. on Science, Space & Technology*, 114th Cong. (2016), https://science.house.gov/legislation/hearings/full-committee-hearing-ensuring-sound-science-epa (testimony of Gina McCarthy, EPA Administrator, at 1:37:23 – 1:37:38).

　
associated with exposure" and that its methodology allows for the designation of a substance as a "probable" carcinogen "even when risks are very low with known patterns of use or exposure."[8] IARC does not take into account levels of exposure, methods of exposure, or other factors central to a determination of whether a substance can actually cause cancer in humans under real-world exposure scenarios.[9]  Using this approach, IARC has classified a variety of everyday substances and exposures as "probable" or "known" carcinogens, including bacon, hot dogs, and red meat; alcoholic and certain hot beverages; salted fish; shiftwork; and frying food.[10]

Although IARC's classification triggered this litigation, IARC's statements about glyphosate are insufficient to establish causation, an essential element in each plaintiff's claims, under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).  Not surprisingly, IARC's statements have been soundly rejected by major regulatory and other groups that have assessed them, including the EPA CARC, the European Food Safety Authority ("EFSA"), and groups within the World Health Organization.[11]

---

[8] *See* IARC, *IARC Monographs Questions and Answers*, 3 (2015), http://www.iarc.fr/en/media-centre/iarcnews/pdf/Monographs-Q&A.pdf.

[9] *See* IARC, *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans Preamble*, 2 (Jan. 2006), http://monographs.iarc.fr/ENG/Preamble/currenta2objective0706.php.

[10] *See* IARC, *Agents Classified by the IARC Monographs, Volumes 1-116*, 1, 16, 29, 30, 35 (June 24, 2016), https://monographs.iarc.fr/ENG/Classification/ClassificationsAlphaOrder.pdf.

[11] *See, e.g.*, EPA CARC Final Report at 9 (IARC's methodological failures "may have had a significant bearing on the conclusion drawn for evidence of carcinogenicity in animals"); *id.* at 10 (same regarding genotoxicity); EFSA, *Conclusion on the Peer Review of the Pesticide Risk Assessment of the Active Substance Glyphosate* at 2, EFSA Journal 2015; 13(11):4302 (published Nov. 12, 2015), http://www.efsa.europa.eu/en/efsajournal/pub/4302 ("[G]lyphosate is unlikely to pose a carcinogenic hazard to humans and the evidence does not support classification with regard to its carcinogenic potential…."); Letter from Bernhard Url, Exec. Director, EFSA, to Prof. Christopher J. Portier, Working Group Participant, IARC at 1 (Jan. 13, 2016), https://www.efsa.europa.eu/sites/default/files/EFSA_response_Prof_Portier.pdf (IARC's finding – at most – constitutes a first "screening assessment" of "the carcinogenic potential of agents," and it does not compare with "the more comprehensive hazard assessment done by [regulatory] authorities such as EFSA…."); *id.* at 3 ("glyphosate is unlikely to pose a carcinogenic hazard to

## II.    ARGUMENT

### A.    The Panel Should Not Centralize These Actions.

#### 1.    Centralization is unnecessary because cooperation between counsel is already achieving the same efficiencies as an MDL.

The Panel has repeatedly found that "informal cooperation among the involved attorneys is both practicable and preferable to centralization."[12]  Here, informal coordination has been a success – a significant amount of the general-causation-related fact discovery from Monsanto is complete, with the remainder to conclude in two cases in less than four months.  To date, Monsanto has produced over 1.27 million pages of documents from non-custodial and custodial sources, including all of the relevant EPA registration files and the scientific studies related to glyphosate and glyphosate-containing products in humans and other mammals.  By October 15, 2016, Monsanto anticipates producing well over one million additional pages of custodian-based records after application of keyword search terms negotiated with the Miller Firm, which has the largest number of cases in the overall litigation, and under which other firms are proceeding.  *See* Scheduling Order, *Hardeman v. Monsanto Co.*, No. 3:16-cv-00525-VC, at 1-2 (N.D. Cal. June 24, 2016), ECF No. 74 ("*Hardeman/Stevick* Scheduling Order") (also requiring completion of fact witness depositions regarding general causation by December 9, 2016, with expert discovery

---

humans"); Food & Agric. Org. of the U.N., World Health Org., Joint FAO/WHO Meeting on Pesticide Residues at 2, Geneva, 9-13 May 2016, Summary Report (issued May 16, 2016), http://www.who.int/foodsafety/jmprsummary2016.pdf?ua=1 ("In view of the absence of carcinogenic potential in rodents at human-relevant doses and the absence of genotoxicity by the oral route in mammals, and considering the epidemiological evidence from occupational exposures . . . glyphosate is unlikely to pose a carcinogenic risk to humans from exposure through the diet.").

[12] *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.*, 38 F. Supp. 3d 1380, 1381 (J.P.M.L. 2014); *see also In re Cymbalta (Duloxetine) Prods. Liab. Litig. (No. II)*, 138 F. Supp. 3d 1375, 1377 (J.P.M.L. 2015); *In re OxyElite Pro & Jack3d Prods. Liab. Litig. (No. II)*, 65 F. Supp. 3d 1412, 1413-14 (J.P.M.L. 2014).

to follow prior to the scheduled May 2017 *Daubert* hearing).  This quick and efficient production is possible in part because of agreements (in cases that are in active discovery) between Monsanto's counsel and plaintiffs' counsel regarding a protective/confidentiality order applicable to Monsanto's document production, as well as other procedural orders.[13]

To facilitate efficient discovery in later cases, nine of which have yet to be served on Monsanto,[14] Monsanto will provide the same general causation materials to those plaintiffs once appropriate protective and discovery-related orders are in place.[15]  The later-filed cases contain no novel allegations that would require substantively different discovery as to the issue of general causation; therefore, additional discovery of Monsanto on this topic will be limited, if

---

[13] Counsel for the *Sanders* plaintiffs offer nothing but speculation regarding future disputes about the confidentiality/protective orders that have not to date materialized, and which Monsanto does not expect given the well-recognized need for such orders in complex product liability cases like these.  *See* Int. Party Resp. of Pls. in *John D. Sanders and Frank Tanner v. Monsanto Co.* to Mot. to Transfer at 6, ECF No. 29.

[14] *Ricci v. Monsanto Co.*, No. 1:16-cv-04583-JBS-AMD (D.N.J. filed July 28, 2016); *Johansing v. Monsanto Co.*, No. 2:16-cv-05035-DMG-E (C.D. Cal. filed July 8, 2016); *Scheffer v. Monsanto Co.*, No. 1:16-cv-11489-JCB (D. Mass. filed July 18, 2016); *Perkins v. Monsanto Co.*, No. 8:16-cv-01410-DMG-E (C.D. Cal. filed July 29, 2016); *Porath v. Monsanto Co.*, No. 3:16-cv-00518-WMC (W.D. Wis. filed July 20, 2016); *Bridgeman v. Monsanto Co.*, No. 3:16-cv-00812-NJR-SCW (S.D. Ill. filed July 13, 2016); *Harris v. Monsanto Co.*, No. 3:16-cv-00823-DRH-PMF (S.D. Ill. filed July 20, 2016); *Means v. Monsanto Co.*, No. 5:16-cv-00112-TBR (W.D. Ky. filed July 15, 2016); *Patterson v. Monsanto Co.*, No. 3:16-cv-00825-NJR-SCW (S.D. Ill. filed July 20, 2016).

[15] Plaintiffs' arguments that an MDL is needed to ensure that counsel with cases not yet in the discovery phase are not "left out" or forced to duplicate prior discovery efforts are incorrect. Coordination between the parties can eliminate these risks.  For example, Monsanto has presented two company representatives for depositions in state court cases brought by the Miller Firm in the areas of information technology and organizational structure.  Once the first Andrus Wagstaff case entered active discovery in federal court, Monsanto made those depositions available.  In addition, to facilitate Andrus Wagstaff's ability to obtain answers to its additional questions without the necessity for repeated depositions of the same employees, the parties agreed to a process that includes informal interviews and answers to written questions.  This coordinated protocol is efficient, prevents duplicative discovery, and can be used in later cases as well, making it preferable to an MDL.

any is necessary at all.[16]

      Successful informal coordination of discovery has occurred without a single discovery-related motion being filed, other than Monsanto's motions to prioritize general causation discovery, which have been granted by both federal courts to address them,[17] and motions related to when discovery should start in a given case.  Any assertions to the contrary are unfounded. For example, certain plaintiffs incorrectly claim that Monsanto refused to engage in discovery in a Central District of California case.  Int. Party Resp. in Supp. of Mot. for Transfer of Actions Pursuant to 28 U.S.C. § 1407 for Coordinated or Consolidated Pretrial Procs. at 6, ECF No. 10 ("Baum Hedlund Response").  However, as plaintiffs acknowledge, under that court's rules, the parties' discovery obligations under Federal Rule of Civil Procedure 26 are not mandatory until *after* the defendant has answered (which would be after a party's motion to dismiss has been resolved).  *Id.*  Monsanto declined plaintiffs' request to start discovery early, while its motion to dismiss was pending (which it still is).  Once discovery starts, Monsanto is willing to negotiate appropriate protective and discovery orders and, upon entry, share all previously completed discovery.  This type of case-specific disagreement is irrelevant to the transfer analysis.

      Monsanto is committed to coordinated discovery and expects that discovery disputes will be few and far between, so long as plaintiffs' counsel remain willing to negotiate reasonable

---

[16] To the extent any other allegedly common discovery of Monsanto is later identified, Monsanto expects coordinated and shared discovery will allow for efficient resolution of those issues.  For example, discovery regarding Monsanto's marketing and advertising has begun in a state court case where Monsanto's motion to sequence discovery was denied under the state court's procedural rules.  Those materials will be available in any federal cases that survive the general causation phase.

[17] Order Granting Motion for Bifurcation, *Hardeman v. Monsanto Co.*, No. 3:16-cv-00525-VC (N.D. Cal. June 16, 2016), ECF No. 66 (also ordering bifurcation in *Stevick v. Monsanto Co.*, No. 3:16-cv-02341-VC (N.D. Cal. June 16, 2016), ECF No. 20); Order Granting Defendant's Motion to Bifurcate Discovery, *Giglio v. Monsanto Co.*, No. 3:15-cv-2279-BTM (WVG) (S.D. Cal. Aug. 2, 2016), ECF No. 54.

discovery protocols and limitations.  From a coordinated discovery perspective, there is no need

for an MDL, which will disrupt what is already a smooth, ongoing, and successful process.

> **2.      Plaintiffs' efforts to undo the benefits cooperative discovery has created should not be permitted.**

Denying centralization in favor of "informal coordination and cooperative efforts by the

parties and involved courts" is particularly appropriate where cases are at differing procedural

stages, discovery in earlier cases is being shared with later-filed matters, and individual issues

predominate.  *In re Cymbalta (No. II)*, 138 F. Supp. 3d at 1376-77; *In re Mirena*, 38 F. Supp. 3d

at 1381.  As discussed above, this litigation easily meets the first two criteria for denial.

Furthermore, these cases present the exact individual differences this Panel has cited in

denying centralization of product liability claims, including the need to prove use of a Monsanto

product (as opposed to generic glyphosate-based herbicides), and differences in the alleged

injuries[18] and applicable law.  Here, plaintiffs' claims are even more disparate than others the

Panel has addressed.  For example, plaintiffs allege injuries from a variety of different herbicide

products with different formulations, product uses, and exposures that will dominate any specific

causation inquiry and raise unique liability issues based upon the different markets in which

Roundup®-branded products were sold to plaintiffs, including residential home and garden use,

industrial turf use (e.g., professional landscapers), aerial application, and agricultural exposures.

The individual nature of the claims is compounded when plaintiffs' allegations regarding

the differences in the amount and duration of exposure are considered.  Although Monsanto

---

[18] Plaintiffs allege that whether exposure to Roundup®-branded products caused them to develop NHL is a common issue.  Br. in Supp. of Pls' Mot. for Transfer of Actions to the S. Dist. of Ill. Pursuant to 28 U.S.C. §1407 for Coordinated or Consolidated Pretrial Procs. at 8-9, ECF No. 1-1 ("Pls' Opening Br.").  However, NHL is a generic heading for dozens of different types of cancer, each with different risk factors.  Although Monsanto contends that exposure to Roundup®-branded products does not cause NHL of any type, the different NHL subtypes will further complicate any specific causation inquiry.  *See supra* p. 4.

believes – and reliable science shows – that no level of glyphosate exposure increases a human's cancer risk, plaintiffs allege that exposure matters.  *See, e.g.*, Pls' Opening Br. at 8; Baum Hedlund Response at 1; Resp. in Supp. of Pls' Mot. for Transfer of Actions Pursuant to 28 U.S.C. § 1407 for Coordinated or Consolidated Pretrial Procs. at 1, ECF No. 8 ("Miller Firm Response").

    Plaintiffs also allege exposure to different Roundup®-branded products that contain varying types and levels of surfactants that allegedly make these distinct products "more dangerous and toxic than glyphosate alone."  *See* Pls' Opening Br. at 7.  Monsanto disagrees – reliable science shows that glyphosate and the surfactants mixed with it do not present a cancer risk either individually or in combination.  But in responding to these allegations, Monsanto will explain that different Roundup®-branded products contain different types of surfactants, each of which is the subject of one of five different EPA regulatory approvals.

    These widely varying allegations render plaintiffs' claims ill-suited for centralized treatment.  *See In re Spray Polyurethane Foam Insulation Prods. Liab. Litig.*, 949 F. Supp. 2d 1364, 1364 (J.P.M.L. 2013) (denying centralization where alleged exposures to different products under different circumstances were individualized facts that would predominate over common concerns).[19]  Because this discovery will vary by case, centralization offers no additional efficiencies and should be denied.

---

[19] *See also In re Mirena*, 38 F. Supp. 3d at 1381-82 (denying transfer because individual causation disputes would likely predominate given that alleged injuries had many potential causes); *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 959 F. Supp. 2d 1375 (J.P.M.L. 2013) ("As always in this type of litigation, a highly individualized inquiry is necessary to determine whether any particular plaintiff developed [the alleged injury] as a result of [the product]."); *In re Asbestos & Asbestos Insulation Material*, 431 F. Supp. 906, 906-10 (J.P.M.L. 1977) (denying centralization of 103 actions regarding workers' alleged exposure to asbestos dust where defendants' liability would be based on different state laws and each case presented unique questions of causation, liability, and damages).

Plaintiffs' claims that an MDL is necessary because courts have reached and will continue to reach inconsistent decisions "on identical issues of law related to failure to warn claims asserted by the plaintiffs" are without merit.  Pls' Opening Br. at 12.  No such rulings have occurred to date.  The one supposed example of a "conflict" that plaintiffs identify between the *Hardeman* and *Giglio* cases is not a conflict at all.  In *Hardeman*, the court declined to find at the motion to dismiss stage that allegations regarding Monsanto's failure to warn plaintiffs about alleged cancer risks were preempted by EPA's approval of Roundup®.  *Hardeman v. Monsanto Co.*, No. 16-cv-00525VC, 2016 WL 1749680, at *1 (N.D. Cal. Apr. 8, 2016).  In *Giglio*, the court reached the *same* conclusion regarding Monsanto's alleged failure to warn plaintiffs, and further addressed the separate issue of "fraud-on-the-EPA," finding that claim preempted.  *Giglio v. Monsanto Co.*, No. 15cv2279 BTM (NLS), 2016 WL 1722859, at *3 (S.D. Cal. Apr. 29, 2016).  That the *Giglio* court made an additional determination not reached by the *Hardeman* court does not make these decisions inconsistent – on the issues of law common to both opinions, the courts reached identical results.

While the possibility for inconsistent rulings exists whenever this Panel denies a request for an MDL, that risk is outweighed here by the inefficiency of consolidating cases at differing procedural postures and with predominant factual differences, particularly because procedures are already in place for shared and streamlined discovery.  *In re Cymbalta (No. II)*, 138 F. Supp. 3d at 1376-77; *In re OxyElite Pro (No. II)*, 65 F. Supp. 3d at 1412-14 (finding "[i]nformal cooperation among the involved attorneys and coordination between the involved courts [was] practicable and preferable to formal centralization" where differences predominated and efforts had been made to informally coordinate discovery across actions including differing product formulations and differing health risks).

The benefits of informal coordination and allowing cases to proceed individually are further maximized where, as here, the number of cases is relatively low and the number of counsel and jurisdictions involved is limited.[20]  *See, e.g.*, *In re Cymbalta (No. II)*, 138 F. Supp. 3d at 1375-77 (denying centralization of 41 cases where common discovery was nearly complete and shared across cases, cases were in differing procedural stages, and few counsel were involved).  Here, one firm represents Monsanto as national counsel in all cases, and four plaintiffs' firms have filed or are directly involved in 17 of the 25 pending federal cases.  It is not clear from the pleadings whether the other plaintiffs' firms are connected to the first four filers, but the nearly identical nature of the complaints and coordinated timing of the recent filings suggests close coordination among these firms.  In such situations, centralization is not appropriate.  *See In re Lipitor*, 959 F. Supp. 2d at 1376 (denying centralization where "many of the actions involve common plaintiffs' counsel" and defendant had expressed willingness to coordinate informally across these actions).

Plaintiffs' assertion that hundreds and perhaps thousands of additional cases will be filed has no effect on this analysis.  S*ee* Pls' Mot. for Transfer of Actions to the So. Dist. of Ill. Pursuant to 28 U.S.C. §1407 for Coordinated or Consolidated Pretrial Procs. at 2, ECF No. 1; Miller Firm Response at 1.  This Panel routinely rejects requests to create an MDL based on

---

[20] There are currently 25 individual cases pending in 18 federal jurisdictions, but there are not 25 actions proceeding separately.  In three of the four jurisdictions with multiple cases, those matters already have been placed before the same judge.  As this Panel has previously noted, already-coordinated matters count as one case for determining the necessity of an MDL because such judicial assignments are an informal type of consolidation and serve the same purpose and function as the MDL sought here.  *See In re 3M Company Lava Ultimate Prods. Liab. Litig.*, No. 2727, 2016 WL 4153598, at *1 (J.P.M.L. Aug. 5, 2016); *In re Monsanto PCB Water Contamination Litig.*, No. MDL 2697, 2016 WL 1383500, at *1 (J.P.M.L. Apr. 7, 2016).  Once these informal consolidations are taken into account, there are 19 federal cases here.

representations of potential future filings.[21]  Requests for centralization must be decided based on factors as they stand at the time of the motion.  *In re Mirena*, 38 F. Supp. 3d at 1381.  The rationale for that holding is exemplified here – plaintiffs in three of the four tag-along actions filed after the initial motion to transfer are represented by Andrus Wagstaff, the initial movant and a firm with which Monsanto has agreed upon the applicable discovery protocols and to whom documents are already being produced.  *Id.* (disregarding representations about expected volume of litigation where "[s]ince the filing of the motion, only six potential tag-along actions ha[d] been filed, most by the same counsel and/or counsel working in coordination with him").

### B.    If The Panel Determines That Transfer Is Appropriate, Any Of The Three Jurisdictions Monsanto Suggests Are Well-Suited To Host The MDL.

Although an MDL is not necessary for the reasons discussed above, if the Panel finds transfer is appropriate, the Northern District of California, the Southern District of California, and the Southern District of Florida are equally well-suited to host the MDL (and, for reasons set forth below, are better suited to do so than any of the venues suggested by plaintiffs).  In determining the appropriate location for an MDL, the Panel weighs a variety of factors, including (1) where the most advanced cases are pending, (2) which court is the most familiar with the issues, (3) where the earliest-filed action is located, and (4) the condition of the docket of the

---

[21] *See, e.g.*, *In re Mirena*, 38 F. Supp. 3d at 1381 ("Although plaintiffs assert that the number of actions is likely to expand substantially, the mere possibility of additional actions does not convince us that centralization is warranted."); *In re 3M Company Lava Ultimate*, 2016 WL 4153598 at *1 n.1 (same); *In re Intuitive Surgical, Inc., Da Vinci Robotic Surgical Sys. Prods. Liab. Litig.*, 883 F. Supp. 2d 1339, 1340 (J.P.M.L. 2012) (denying transfer and noting that "[w]hile proponents maintain that this litigation may encompass 'hundreds' of cases or 'over a thousand' cases," the number of actions actually filed was insufficient); *In re Lipitor*, 959 F. Supp. 2d at 1376 (Panel is "disinclined to take into account the mere possibility of future filings in our centralization calculus."); *In re Qualitest Birth Control Prods. Liab. Litig.*, 38 F. Supp. 3d 1388, 1389 (J.P.M.L. 2014) (possibility of additional claimants "does not weigh in favor of centralization").

potential transferee court.[22]  No single factor is dispositive.  *See id.*

   *Hardeman* and *Stevick*, pending in the Northern District of California before Judge Chhabria, are the most advanced cases in this litigation, making that district an appropriate one for transfer.  As discussed above, there is a schedule in place for early determination of key scientific issues in those cases, and discovery on general causation issues is proceeding apace.  *See supra* pp. 6-8.  Judge Chhabria has actively managed the cases before him and was the first judge to grant Monsanto's motion to sequence discovery in order to ensure that the cases progressed in an efficient manner.  His familiarity with the issues makes him well positioned to preside over an MDL.[23]

   *Giglio*, the oldest case still pending, is in a nearly identical advanced procedural posture.  *See Giglio v. Monsanto Co.*, No. 3:15-cv-02279-BTM-WVG (S.D. Cal. filed Oct. 9, 2015) (Moskowitz, J.).  As in *Hardeman* and *Stevick*, the *Giglio* court granted Monsanto's motion to prioritize general causation discovery and has entered the parties' agreed upon schedule for discovery and an early *Daubert* hearing (set for June 12, 2017).  Judge Moskowitz is an experienced jurist with MDL experience, and the familiarity he and Magistrate Judge Gallo have with the relevant issues in this litigation by presiding over one of its most advanced cases will facilitate the efficient resolution of an MDL.

   Finally, resolution of any coordinated matters could also be achieved efficiently in the Southern District of Florida, home to the *Ruiz* case.  *Ruiz v. Monsanto Co.*, 9:16-cv-80539-KAM

---

[22] *See In re Bextra & Celebrex Mktg., Sales Pracs. & Prods. Liab. Litig.*, 391 F. Supp. 2d 1377, 1379 (J.P.M.L. 2005); *In re Zofran (Ondansetron) Prods. Liab. Litig.*, 138 F. Supp. 3d 1381, 1382 (J.P.M.L. 2015); *In re Mirapex Prods. Liab. Litig.*, 493 F. Supp. 2d 1376, 1377 (J.P.M.L. 2007).

[23] This Panel has previously selected judges with comparable judicial experience.  *See, e.g.*, *In re Gen. Motors LLC Ignition Switch Litig.*, 26 F. Supp. 3d 1390 (J.P.M.L. 2014); *In re Incretin Mimetics Prods. Liab. Litig.*, 968 F. Supp. 2d 1345 (J.P.M.L. 2013).

(S.D. Fla. filed Apr. 11, 2016). *Ruiz* is pending before Judge Kenneth Marra, an experienced jurist well-versed in the efficient handling of MDLs. There is no question that he and the court staff are well-equipped to do so here. Plaintiffs' counsel in *Ruiz* is actively participating in bifurcated general causation discovery in the *Stevick* case, meaning there would be no delay in scheduling a *Daubert* hearing in this case if Monsanto's pending motion to sequence discovery is granted. The Southern District of Florida's docket also is less congested than that of the Northern and Southern Districts of California, or that of four of the districts proposed by plaintiffs (the Southern District of Illinois, the Eastern District of Louisiana, and the Eastern and Central Districts of California).[24] The Southern District of Florida is also the most convenient jurisdiction for Monsanto's lead counsel (located in Washington, D.C.). *See In re Jiffy Lube Int'l, Inc., Text Spam Litig.*, 802 F. Supp. 2d 1367, 1368 (J.P.M.L. 2011) (citing convenience of counsel as factor in district selection). Resolution could be achieved efficiently in this district.

**C.    The Jurisdictions Selected By Plaintiffs Are Not Best Positioned for Efficient Handling and Resolution of an MDL.**

**1.    The Southern District of Illinois is inappropriate.**

The three cases pending in the Southern District (two before Judge Nancy Rosenstengel and one before Judge David Herndon) are among the least advanced in the country. All three complaints were filed within 10 days of plaintiffs' motion for transfer and none has been served on Monsanto. The courts have had no occasion to familiarize themselves with the relevant issues, and the Southern District of Illinois has no broader connection to this litigation beyond these three undeveloped lawsuits. The agricultural industry statistics for Illinois relied upon by plaintiffs have no bearing on or nexus with the personal injury lawsuits filed by plaintiffs in the

---

[24] *See* United States Courts, *U.S. District Courts–Combined Civil and Criminal Federal Court Management Statistics* (March 31, 2016), http://www.uscourts.gov/statistics/table/na/federal-court-management-statistics/2016/03/31-1 ("District Court Caseload Statistics").

Southern District of Illinois, none of which allege agricultural exposure.[25]  Further, many other plaintiffs in this nationwide litigation allege only residential use.  Therefore, efforts to categorize these as agricultural cases are meritless, and any jurisdiction's ties to agriculture are irrelevant.[26]

The fact that Monsanto's headquarters are in St. Louis offers no increase in efficiency for consolidated proceedings because common document discovery in this litigation will be entirely electronic and witnesses will sit for depositions where the witnesses are located regardless of where the MDL is placed.  The availability of subpoena power over Monsanto employees for trial is irrelevant to the transferee district analysis because it will not increase efficiency or speed the resolution of this litigation.  Monsanto does not intend to waive its *Lexecon* rights if an MDL is created.  Therefore, although cases properly venued in the Southern District of Illinois may be tried there, others must be tried in the appropriate jurisdictions and subpoena power will change accordingly.  The same will be true in every other potential transferee district.

Physical proximity to Missouri is similarly irrelevant for any coordination that would need to take place with Missouri state court actions, given electronic and phone communication

---

[25] *See, e.g.*, Complaint at ¶ 2, *Patterson v. Monsanto Co.*, No. 3:16-cv-00825-NJR-SCW (S.D. Ill. July 20, 2016), ECF No. 1 (alleging that plaintiff applied Roundup® "on her garden and landscaping"); First Amended Complaint at ¶ 111-112, *Bridgeman v. Monsanto Co.*, No. 3:16-cv-00812-NJR-SCW (S.D. Ill. Aug. 1, 2016), ECF No. 7 (alleging only that plaintiff sprayed Roundup® to control weeds, but not where exposure occurred); First Amended Complaint at ¶ 121-122, *Harris v. Monsanto Co.*, No. 3:16-cv-00823-DRH-PMF (S.D. Ill. Aug. 8, 2016), ECF No. 7 (same).

[26] For similar reasons, the *In re Syngenta Mass Tort Actions* litigation before Judge Herndon does not provide any subject matter experience that would be relevant to a potential Roundup® MDL.  *See* Int. Party Resp. in Supp. of Mot. to Transfer Actions Pursuant to 28 U.S.C. § 1407 for Coordinated or Consolidated Procs. at 4, ECF No. 19.  Those cases involve claims by corn growers and exporters for economic losses stemming from Syngenta's alleged sale of certain modified corn seeds before China had approved corn with that modification for importation, and had nothing to do with the alleged carcinogenicity of glyphosate.  *See In re Syngenta Mass Tort Actions,* No. 3:15-cv-00255-DRH, 2016 WL 3680735 (S.D. Ill. July 12, 2016).  The fact that both companies are in the same industry is entirely irrelevant here given the obviously different subject matter of the cases.

and electronic storage and sharing of documents.  Furthermore, state court actions are also pending in Delaware, Pennsylvania, and California, with 40 total plaintiffs in Delaware state court alone, so the bulk of state court actions are nowhere near the Southern District of Illinois.

Neither Monsanto's lead defense firm nor any of the four plaintiffs' firms with the most cases are located in Missouri or the Southern District of Illinois.  Where, as here, litigation is "national in scope," this Panel has declined to treat proximity to a defendant's headquarters as decisive and instead has selected districts that offer the greatest familiarity with the issues and favorable docket conditions.[27]

Finally, the Southern District of Illinois is one of the three busiest proposed districts. There are 895 pending cases per judgeship in the district, significantly more than any of Monsanto's proposed districts and seventh-most in the country.[28]  The median time from filing to disposition for a civil case in the district is 23.5 months, and almost 40% of the district's civil cases are over three years old (compared to only 6.3% in the Southern District of California, 8.5% in the Northern District of California, and 2.3% in the Southern District of Florida).  *Id.*  In addition to sitting in a district with one of the largest caseloads per judge in the country, Judge Herndon has been requested by plaintiffs in other currently-pending requests for centralization.[29] Judge Rosenstengel has expressed her intent to have over 100 cases in a consolidated

---

[27] *See, e.g.*, *In re Bextra & Celebrex*, 391 F. Supp. 2d at 1379 (citing judicial experience and the district's capacity in transferring geographically dispersed litigation to the Northern District of California); *In re Wireless Tel. Radio Frequency Emissions Prods. Liab. Litig.*, 170 F. Supp. 2d 1356, 1358 (J.P.M.L. 2001) (citing experience with issues in litigation in transferring geographically dispersed litigation to the District of Maryland).

[28] *See* District Court Caseload Statistics.

[29] *See, e.g.*, Pl's Mot. for Consolidation and Transfer Pursuant to 28 U.S.C. § 1407, *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. and Prods. Liab. Litig.*, MDL No. 2738 (J.P.M.L. July 15, 2016), ECF No. 1.

pharmaceutical proceeding tried before the end of 2017, which will be "a massive undertaking involving all of this district's resources." *See* Order at 1-2, *Alexander v. Abbot Labs., Inc.* (*In re Depakote*), No. 3:12-cv-00052-NJR-SCW (S.D. Ill. July 6, 2016), ECF No. 485. Adding to this court's burden with another MDL is not an efficient distribution or expenditure of the court system's resources.

### 2. The District of Hawaii's remote geographic location makes it an impractical choice.

Certain plaintiffs suggest that the District of Hawaii is also an appropriate MDL venue. The familiarity and minimal connection that the District of Hawaii has with this litigation by virtue of the two lawsuits pending there are entirely outweighed by the inconvenience of the forum. The time and expense of travel make the District of Hawaii a wildly impractical MDL location. None of the lead attorneys for any party is located in Hawaii, and only one plaintiff is present within that jurisdiction, making travel for all parties and counsel to court proceedings costly and time-intensive. Furthermore, due to the time difference, the District of Hawaii courthouse is closed for significant portions of regular business hours in the rest of the country, adding a significant and unnecessary degree of difficulty in coordination between the transferee judge, counsel, and other courts. The only MDL placed in Hawaii cited by plaintiffs involved antitrust claims based on hotel room pricing *in Hawaii*, making it a logical forum choice in that situation. *See In re Hawaiian Hotel Room Rate Antitrust Litig.*, 438 F. Supp. 935 (J.P.M.L. 1977). In other instances, including litigation with a greater connection to Hawaii than exists here, the Panel has rejected Hawaii as the most appropriate forum. *See, e.g.*, *In re Capital Underwriters, Inc. Sec. Litig.*, 464 F. Supp. 955 (J.P.M.L. 1979).

In addition to those inefficiencies, the court has not resolved Monsanto's motions to sequence discovery, and discovery has not begun in either case, meaning that the Hawaii cases

are behind those in the Northern and Southern Districts of California.  As discussed above in

connection with the Southern District of Illinois, plaintiffs' assertions about Hawaii's interests in

agriculture generally carry no weight in this litigation and are irrelevant to the transfer analysis.

> **3.**     **The Central District of California is an inappropriate forum.**

For similar reasons as those discussed above, the Central District of California is not the

most appropriate jurisdiction for the efficient resolution of this litigation.  Although the district

has the greatest number of cases, its cases are significantly less advanced than cases in both the

Northern and Southern Districts of California, in which judges have already considered and ruled

on a greater diversity of issues in the litigation and have implemented a plan for its efficient

resolution.  Contrary to plaintiffs' representations, the Central District of California does not

have the earliest-filed pending case, so that factor also does not favor placement of an MDL in

this district.[30]

> **4.**     **The Eastern District of California and Eastern District of Louisiana
>            are inappropriate selections as well.**

Like the Southern District of Illinois, the Eastern District of California and the Eastern

District of Louisiana are among the busiest districts in the country.  In the Eastern District of

California, there are 1,227 pending cases per judgeship (the second-most in the country), the

---

[30] The Baum Hedlund plaintiffs incorrectly assert that the earliest filed claim still pending is that of Yolanda Mendoza, which was added to an existing complaint in the Central District of California on October 20, 2015, but later was severed and transferred to the Eastern District of California based on significant factual differences between the two plaintiffs.  *See Rubio v. Monsanto Co.*, No. 2:15-cv-07426-DMG-E, 2016 WL 3097292, at *5-6 (C.D. Cal. Mar. 24, 2016) (severing and transferring both plaintiffs' claims out of the Central District of California because "significant factual differences" existed in the circumstances under which Roundup®-based products were "applied by Plaintiffs; frequency, duration, and amount of exposure; concurrent exposures to other products; timing of exposure, location, and medical histories").  Plaintiff Emanuel Giglio filed his complaint in the Southern District of California on October 9, 2015, and this is therefore the first-filed remaining claim and should be considered as such in the transfer analysis.  *See* Complaint, *Giglio v. Monsanto Co.*, No. 3:15-cv-02279-BTM-WVG (S.D. Cal. Oct. 9, 2015), ECF No. 1.

median time from filing to disposition for a civil case is 9.4 months (which is longer than any other proposed district except the Southern District of Illinois and significantly more than any of Monsanto's proposed districts), and 14% of the district's civil cases are over three years old.[31] The Eastern District of Louisiana is in a similar position – there are 947 pending cases per judgeship (the fifth-most in the country), and 9.3% of the district's civil cases are over three years old.  Adding to either district's caseload is not an efficient use of judicial resources. Further, both districts have only a single case, and those cases are significantly less advanced than cases in both the Northern and Southern Districts of California.

## III.  CONCLUSION

Where, as here, a centralized proceeding would not result in increased convenience for the parties or witnesses or "promote the just and efficient conduct of such actions," 28 U.S.C. § 1407, requests for transfer should be denied.  If an MDL is created, the district courts proposed by Monsanto are more appropriate choices for consolidated Roundup® litigation than those suggested by plaintiffs.

Dated: August 18, 2016                      Respectfully submitted,

                                            /s/ Joe G. Hollingsworth
                                            Joe G. Hollingsworth
                                            (jhollingsworth@hollingsworthllp.com)
                                            HOLLINGSWORTH LLP
                                            1350 I Street NW
                                            Washington D.C., 20005
                                            Phone: (202) 898-5800
                                            Fax: (202) 682-1639

                                            *Attorneys for Defendant*
                                            *Monsanto Company*

---

[31] *See* District Court Caseload Statistics.