# U.S. District Court
## Eastern District of Missouri (St. Louis)
## CIVIL DOCKET FOR CASE #: 4:17-cv-01111-NAB

Bates et al v. Monsanto Company et al
Assigned to: Magistrate Judge Nannette A. Baker
Demand: $25,000
Cause: 28:1331 Fed. Question: Personal Injury

Date Filed: 03/28/2017
Jury Demand: Both
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Federal Question

**Plaintiff**

**Sterling Bates**

represented by **James T. Corrigan**
ONDER AND SHELTON, L.L.C.
110 East Lockwood
St. Louis, MO 63119
314-963-9000
Fax: 314-963-1700
Email: corrigan@onderlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Antonio Andrade, Jr.**

represented by **James T. Corrigan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Barton Baron**

represented by **James T. Corrigan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Wayne Bolt**

represented by **James T. Corrigan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Joseph R. Bork, Jr.**

represented by **James T. Corrigan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Maude Bradley**

represented by **James T. Corrigan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Faina Brainin**
*Individually, on Behalf of the Children of*
*David Z. Brainin and as Personal*
*Representative of the Estate of David Z.*
*Brainin*

represented by **James T. Corrigan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Warren Curtiss**

represented by **James T. Corrigan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Richard M. Daley**

represented by **James T. Corrigan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Joann Delfino Smith**

represented by **James T. Corrigan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Marilyn Denzine Morris**

represented by **James T. Corrigan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Geraldine Dimaio**

represented by **James T. Corrigan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Laurence B. Dittmer**

represented by **James T. Corrigan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Crystal Lynne Gray**
*Individually, and as Personal*
*Representative of the Estate of David L.*
*Gray*

represented by **James T. Corrigan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Kurt Farenchak**

represented by **James T. Corrigan**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Dennis L. Federle**                represented by **James T. Corrigan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Neil J. Hadley**                   represented by **James T. Corrigan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Clifford Hall**                    represented by **James T. Corrigan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ernest D. Hendricks**              represented by **James T. Corrigan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Pamela A. Higgenbotham**           represented by **James T. Corrigan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Susan C. McNair**                  represented by **James T. Corrigan**
*Individually, Legal Representative of, and* (See above for address)
*on behalf of, The Estate of James L. McNair,* *LEAD ATTORNEY*
*III and the Statutory Beneficiaries* *ATTORNEY TO BE NOTICED*

**Plaintiff**

**James M. Muter**                   represented by **James T. Corrigan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**David B. Ochab**                   represented by **James T. Corrigan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Leatha J. Orr**                                    represented by **James T. Corrigan**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Andrew J. Pollastro**                              represented by **James T. Corrigan**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Lori Ratzke**                                      represented by **James T. Corrigan**
*Individually, and as Legal Representative of*       (See above for address)
*the Estate of Ricky Dee Ratzke, Deceased*           *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jacob Ratzke**                                     represented by **James T. Corrigan**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Taylor Ratzke**                                    represented by **James T. Corrigan**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ethan Ratzke**                                     represented by **James T. Corrigan**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Donald G. Richardson**                             represented by **James T. Corrigan**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Irene Risner**                                     represented by **James T. Corrigan**
*Individually, and as Personal*                      (See above for address)
*Representative of the Estate of Paul Risner,*       *LEAD ATTORNEY*
*Deceased*                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Mary Ann Rogers**                                  represented by **James T. Corrigan**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Norma Saltzman**                              represented by **James T. Corrigan**
*Individually, and as Personal*                               (See above for address)
*Representative of the Estate of Ernest*                      *LEAD ATTORNEY*
*Saltzman, Jr., Deceased*                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Kyle J. Sanders**                             represented by **James T. Corrigan**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

**Plaintiff**

**James Allen Strubinger**                      represented by **James T. Corrigan**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Michael Symons**                              represented by **James T. Corrigan**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Madeline Urwin**                              represented by **James T. Corrigan**
*Individually, and as Legal Representative of*                (See above for address)
*the Estate of Robert J. Urwin, Deceased*                     *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Robert A. Urwin**                             represented by **James T. Corrigan**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Michael J. Urwin**                            represented by **James T. Corrigan**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Joshua D. Wright**                            represented by **James T. Corrigan**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Lloyd Nelius**                                represented by **James T. Corrigan**
*Individually, and on Behalf of Statutory*                    (See above for address)
*Heirs, as Wrongful Death Beneficiaries, and*

*as Personal Representative of the Estate of*
*Marie Nelius*

LEAD ATTORNEY
ATTORNEY TO BE NOTICED

**Plaintiff**

**James Brown**　　　　　represented by **James T. Corrigan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rose Byrne**　　　　　represented by **James T. Corrigan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Brett Everett**　　　　　represented by **James T. Corrigan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Cory Fisher**　　　　　represented by **James T. Corrigan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Beckett Jones**　　　　　represented by **James T. Corrigan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Kurt Knox**　　　　　represented by **James T. Corrigan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Joel MacDonald**　　　　　represented by **James T. Corrigan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Arthur Puckett**　　　　　represented by **James T. Corrigan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Pat Richard**

           represented by **James T. Corrigan**
                 (See above for address)
                 *LEAD ATTORNEY*
                 *ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

**Erwin Sikorski**

           represented by **James T. Corrigan**
                 (See above for address)
                 *LEAD ATTORNEY*
                 *ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

**Dennis Sorensen**

           represented by **James T. Corrigan**
                 (See above for address)
                 *LEAD ATTORNEY*
                 *ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

**Tim Hensley**

           represented by **James T. Corrigan**
                 (See above for address)
                 *LEAD ATTORNEY*
                 *ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

**Helena Jochaniewicz**

           represented by **James T. Corrigan**
                 (See above for address)
                 *LEAD ATTORNEY*
                 *ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

**Jim Moore**

           represented by **James T. Corrigan**
                 (See above for address)
                 *LEAD ATTORNEY*
                 *ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

**Tessie Thompson**

           represented by **James T. Corrigan**
                 (See above for address)
                 *LEAD ATTORNEY*
                 *ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

**Sally Richards**

           represented by **James T. Corrigan**
                 (See above for address)
                 *LEAD ATTORNEY*
                 *ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

**Josephine Ponella**

           represented by **James T. Corrigan**
                 (See above for address)
                 *LEAD ATTORNEY*
                 *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Lisa Chain**                                represented by **James T. Corrigan**
                                              (See above for address)
                                              *LEAD ATTORNEY*
                                              *ATTORNEY TO BE NOTICED*

**Plaintiff**

**John Webb**                                 represented by **James T. Corrigan**
                                              (See above for address)
                                              *LEAD ATTORNEY*
                                              *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**                          represented by **Ann E. Sternhell Blackwell**
                                              THOMPSON COBURN, LLP
                                              One US Bank Plaza
                                              505 N. 7th Street
                                              St. Louis, MO 63101
                                              314-552-6420
                                              Fax: 314-552-7420
                                              Email: eblackwell@thompsoncoburn.com
                                              *LEAD ATTORNEY*
                                              *ATTORNEY TO BE NOTICED*

                                              **Joe Gregory Hollingsworth**
                                              HOLLINGSWORTH, L.L.P.
                                              1350 I Street, N.W.
                                              9th Floor
                                              Washington, DC 20005
                                              202-898-5800
                                              Fax: 202-682-1639
                                              Email:
                                              jhollingsworth@hollingsworthllp.com
                                              *LEAD ATTORNEY*
                                              *ATTORNEY TO BE NOTICED*

                                              **John R. Musgrave**
                                              THOMPSON COBURN, LLP
                                              One US Bank Plaza
                                              505 N. 7th Street
                                              St. Louis, MO 63101
                                              314-552-6000
                                              Fax: 314-552-7086
                                              Email: jmusgrave@thompsoncoburn.com
                                              *LEAD ATTORNEY*
                                              *ATTORNEY TO BE NOTICED*

**Defendant**

**Osborn & Barr Communications, Inc.**        represented by **David G. Ott**
                                              ARMSTRONG TEASDALE LLP
                                              7700 Forsyth Boulevard

Suite 1800
St. Louis, MO 63105
314-621-5070
Fax: 314-552-4891
Email: dott@armstrongteasdale.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John F. Cowling**
ARMSTRONG TEASDALE LLP
7700 Forsyth Boulevard
Suite 1800
St. Louis, MO 63105
314-621-5070
Fax: 314-621-5065
Email: jcowling@armstrongteasdale.com
*ATTORNEY TO BE NOTICED*

**Scott T. Jansen**
ARMSTRONG TEASDALE LLP
3405 W. Truman Boulevard
Suite 210
Jefferson City, MO 65109-5713
573-636-8394
Fax: 573-636-8457
Email: sjansen@armstrongteasdale.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Osborn & Barr Holdings, Inc.**      represented by **David G. Ott**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John F. Cowling**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott T. Jansen**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/28/2017 | 1 | NOTICE OF REMOVAL from Circuit Court City of St. Louis, case number 1722-cc00796, with receipt number 0865-5880908, in the amount of $400 Jury Demand,, filed by Monsanto Company. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Civil Cover Sheet Civil Cover Sheet, # 8 Form Original Filing Form)(Musgrave, John) (Attachment 7 replaced on 3/29/2017) (MFG). (Entered: 03/28/2017) |
| 03/28/2017 | 2 | NOTICE OF FILING NOTICE OF REMOVAL filed by Defendant Monsanto Company Sent To: Plaintiff (Attachments: # 1 Exhibit A)(Musgrave, John) (Entered: 03/28/2017) |

| 03/28/2017 | 3 | DISCLOSURE OF ORGANIZATIONAL INTERESTS CERTIFICATE by Defendant Monsanto Company. Parent companies: None, Subsidiaries: Agroeste Sementes Paraguay S.A., Deltapine de Mexico, S. de R.L. de C.V., Dido, LLC, Hebei Ji Dai Cotton Seed Technology Company, Ltd., Liaoning Tuanhua Seeds Co., Ltd., Monsanto Korea, Inc., Publicly held company: None,. (Musgrave, John) (Entered: 03/28/2017) |
|---|---|---|
| 03/28/2017 | 4 | ANSWER to Complaint by Monsanto Company.(Musgrave, John) (Entered: 03/28/2017) |
| 03/28/2017 | 5 | Petition (Removal/Transfer) Received From: Circuit Court of the City of St. Louis, filed by Irene Risner, Donald G. Richardson, Ernest D. Hendricks, Joseph R. Bork, Jr, Leatha J. Orr, Kurt Farenchak, Dennis L. Federle, Taylor Ratzke, Crystal Lynne Gray, James Brown, Tim Hensley, Andrew J. Pollastro, David B. Ochab, Lori Ratzke, Robert A. Urwin, Jim Moore, Antonio Andrade, Jr, Lisa Chain, Clifford Hall, Geraldine Dimaio, Sally Richards, Kurt Knox, James M. Muter, Warren Curtiss, Ethan Ratzke, Norma Saltzman, Richard M. Daley, Erwin Sikorski, Beckett Jones, Joshua D. Wright, Pamela A. Higgenbotham, Brett Everett, Susan C. McNair, Marilyn Denzine Morris, Jacob Ratzke, Barton Baron, Joel MacDonald, Madeline Urwin, Kyle J. Sanders, Arthur Puckett, Faina Brainin, Michael J. Urwin, Tessie Thompson, Joann Delfino Smith, Cory Fisher, Laurence B. Dittmer, Michael Symons, Pat Richard, Maude Bradley, Josephine Ponella, Sterling Bates, Mary Ann Rogers, Helena Jochaniewicz, James Allen Strubinger, Wayne Bolt, Rose Byrne, Lloyd Nelius, Neil J. Hadley, John Webb, Dennis Sorensen.(MFG) (Entered: 03/29/2017) |
| 03/29/2017 | | Case Opening Notification: All parties must file the Notice Regarding Magistrate Judge Jurisdiction Form consenting to or opting out of the Magistrate Judge jurisdiction. Click here for the instructions. and all non-governmental organizational parties (corporations, limited liability companies, limited liability partnerships) must file Disclosure of Organizational Interests Certificate (moed-0001.pdf). Judge Assigned: Honorable Nannette A. Baker. (MFG) (Entered: 03/29/2017) |
| 03/29/2017 | 6 | ENTRY of Appearance by Ann E. Sternhell Blackwell for Defendant Monsanto Company. (Sternhell Blackwell, Ann) (Entered: 03/29/2017) |
| 03/29/2017 | 7 | NOTICE OF FILING NOTICE OF REMOVAL filed by Defendant Monsanto Company Sent To: State Court - Executed (Sternhell Blackwell, Ann) (Entered: 03/29/2017) |
| 03/29/2017 | 8 | MOTION for Leave to Appear Pro Hac Vice Joe G. Hollingsworth. The Certificate of Good Standing was attached.(Filing fee $100 receipt number 0865-5884467) by Defendant Monsanto Company. (Attachments: # 1 Attachment List of Bar Admissions, # 2 Certificate of Good Standing, # 3 Attachment Certificate of Service)(Hollingsworth, Joe) (Entered: 03/29/2017) |
| 03/29/2017 | 9 | Pursuant to Local Rule 2.08, the assigned/referred magistrate judge is designated and authorized by the court to exercise full authority in this assigned/referred action or matter under 28 U.S.C. Sec. 636 and 18 U.S.C Sec. 3401. (CSAW) (Entered: 03/29/2017) |
| 04/04/2017 | 10 | Consent MOTION to Stay *Their Time to Respond to Complaint Until Remand Has Been Decided* by Defendants Osborn & Barr Communications, Inc., Osborn & Barr Holdings, Inc.. (Cowling, John) (Entered: 04/04/2017) |
| 04/04/2017 | 11 | DISCLOSURE OF ORGANIZATIONAL INTERESTS CERTIFICATE by Defendant Osborn & Barr Communications, Inc.. Parent companies: None, Subsidiaries: None, Publicly held company: None,. (Cowling, John) (Entered: 04/04/2017) |
| 04/04/2017 | 12 | DISCLOSURE OF ORGANIZATIONAL INTERESTS CERTIFICATE by Defendant Osborn & Barr Holdings, Inc.. Parent companies: Osborn & Barr Communications, Inc., Subsidiaries: Big Club Digital, LLC, Publicly held company: None,. (Cowling, John) (Entered: 04/04/2017) |

| 04/04/2017 | 13 | ENTRY of Appearance by David G. Ott for Defendants Osborn & Barr Communications, Inc., Osborn & Barr Holdings, Inc.. (Ott, David) (Entered: 04/04/2017) |
| 04/04/2017 | 14 | ENTRY of Appearance by Scott T. Jansen for Defendants Osborn & Barr Communications, Inc., Osborn & Barr Holdings, Inc.. (Jansen, Scott) (Entered: 04/04/2017) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 04/05/2017 16:51:33 | | | |
| **PACER Login:** | hllp1982:2634105:4722683 | **Client Code:** | 1417.0005 |
| **Description:** | Docket Report | **Search Criteria:** | 4:17-cv-01111-NAB |
| **Billable Pages:** | 10 | **Cost:** | 1.00 |

**1722-CC00796**

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

# IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
## STATE OF MISSOURI

STERLING BATES                                    CASE NO.
ANTONIO ANDRADE, JR.
BARTON BARON                                       JURY TRIAL DEMANDED
WAYNE BOLT
JOSEPH R. BORK, JR.
MAUDE BRADLEY
FAINA BRAININ, INDIVIDUALLY,
ON BEHALF OF THE CHILDREN OF
DAVID Z. BRAININ AND AS
PERSONAL REPRESENTATIVE OF THE
ESTATE OF DAVID Z. BRAININ
WARREN CURTISS
RICHARD M. DALEY
JOANN DELFINO SMITH
MARILYN DENZINE MORRIS
GERALDINE DIMAIO
LAURENCE B. DITTMER
CRYSTAL LYNNE GRAY, INDIVIDUALLY,
AND AS PERSONAL REPRESENTATIVE
OF THE ESTATE OF DAVID L. GRAY
KURT FARENCHAK
DENNIS L. FEDERLE
NEIL J. HADLEY
CLIFFORD HALL
ERNEST D. HENDRICKS
PAMELA A. HIGGENBOTHAM
SUSAN C. MCNAIR, INDIVIDUALLY,
LEGAL REPRESENTATIVE OF,
AND ON BEHALF OF, THE ESTATE OF
JAMES L. MCNAIR, III, AND THE
STATUTORY BENEFICIARIES
JAMES M. MUTER
DAVID B. OCHAB
LEATHA J. ORR
ANDREW J. POLLASTRO
LORI RATZKE, INDIVIDUALLY,
AND AS LEGAL REPRESENTATIVE

1

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

**OF THE ESTATE OF RICKY DEE RATZKE,**
**DECEASED**
**JACOB RATZKE, INDIVIDUALLY**
**TAYLOR RATZKE, INDIVIDUALLY**
**ETHAN RATZKE, INDIVIDUALLY**
**DONALD G. RICHARDSON**
**IRENE RISNER, INDIVIDUALLY,**
**AND AS PERSONAL REPRESENTATIVE**
**OF THE ESTATE OF PAUL RISNER,**
**DECEASED**
**MARY ANN ROGERS**
**NORMA SALTZMAN, INDIVIDUALLY,**
**AND AS PERSONAL REPRESENTATIVE**
**OF THE ESTATE OF ERNEST SALTZMAN,**
**JR.,  DECEASED,**
**KYLE J. SANDERS**
**JAMES ALLEN STRUBINGER**
**MICHAEL SYMONS**
**MADELINE URWIN**
**MADELINE URWIN, INDIVIDUALLY,**
**AND AS LEGAL REPRESENTATIVE**
**OF THE ESTATE OF ROBERT J. URWIN,**
**DECEASED**
**ROBERT A. URWIN, INDIVIDUALLY**
**MICHAEL J. URWIN,  INDIVIDUALLY**
**JOSHUA D. WRIGHT**
**LLOYD NELIUS, INDIVIDUALLY,**
**AND ON BEHALF OF STATUTORY HEIRS,**
**AS WRONGFUL DEATH BENEFICIARIES,**
**AND AS PERSONAL REPRESENTATIVE**
**OF THE ESTATE OF MARIE NELIUS**
**JAMES BROWN**
**ROSE BYRNE**
**BRETT EVERETT**
**CORY FISHER**
**BECKETT JONES**
**KURT KNOX**
**JOEL MACDONALD**
**ARTHUR PUCKETT**
**PAT RICHARD**
**ERWIN SIKORSKI**
**DENNIS SORENSEN**
**TIM HENSLEY**
**HELENA JOCHANIEWICZ**
**JIM MOORE**
**TESSIE THOMPSON**

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

**SALLY RICHARDS**
**JOSEPHINE PONELLA**
**LISA CHAIN**
**JOHN WEBB**

_____

*Plaintiffs,*

**VS.**

**MONSANTO COMPANY,**
Serve:  CSC-Lawyers Inc. Service Co.
          221 Bolivar Street
          Jefferson City, MO 65101

**OSBORN & BARR COMMUNICATIONS,**
**INC.,**
Serve:  **HOLD SERVICE**


**OSBORN & BARR HOLDINGS, INC.,**
Serve:  **HOLD SERVICE**

*Defendants*.

_____

## COMPLAINT

COME NOW Plaintiffs, by and through their counsel, Onder, Shelton, O'Leary &

Peterson, LLC, and for their cause of action against Defendants Monsanto Company, Osborn &

Barr Communications, Inc., and Osborn & Barr Holdings, Inc., state to the Court:

**I.      INTRODUCTION**

1.      Plaintiffs bring this cause of action against Defendants pursuant to Rule 52.05(a)

of the Missouri Rules of Civil Procedure, as their claims arise out of the same series of

transactions and occurrences, and their claims involve common questions of law and/or fact.  All

claims in this action are a direct and proximate result of Defendants' negligent, willful, and

wrongful conduct in connection with the design, development, manufacture, testing, packaging,

3

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

promoting, marketing, distribution, and/or sale of the products as Roundup®. Plaintiffs in this action seek recovery for damages as a result of developing Non-Hodgkin Lymphoma ("NHL") and other cancers, which was directly and proximately caused by such wrongful conduct by Defendant, the unreasonably dangerous and defective nature of Roundup®, and its active ingredient, glyphosate, and the attendant effects of developing NHL. No Plaintiff knew of an association between exposure to Roundup® and the increased risk of developing NHL until well after July 29, 2015, when the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), first published its evaluation of glyphosate.  All of the claims involve common questions of law and fact and share legal and medical issues that arise out of all of the Plaintiffs' and/or Plaintiff's Decedents' (herein identified as "Plaintiffs") exposures to Roundup®.

**II. PARTIES**

**Plaintiffs**

2.      Plaintiff Sterling Bates is and was at all relevant times a resident of St. Louis, Missouri.  Plaintiff Bates was exposed to, purchased and used Roundup® and /or other Monsanto glyphosate-containing products ("Roundup").  He was first exposed in approximately July 2000 at 5140 Cates Avenue in the City of St. Louis, through approximately 2013, and was diagnosed with multiple myeloma.

3.      Plaintiff Antonio Andrade, Jr., is and was at all relevant times a resident of Arizona. Plaintiff Andrade was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2012 and was diagnosed with non-Hodgkin lymphoma.

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

4.     Plaintiff Barton Baron is currently a resident of Colorado and was at all relevant times a resident of Texas and Pennsylvania. Plaintiff Baron was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2000 and was diagnosed with non-Hodgkin lymphoma.

5.     Plaintiff Wayne Bolt is and was at all relevant times a resident of Pennsylvania. Plaintiff Bolt was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2013 and was diagnosed with Cutaneous T-cell lymphoma.

6.     Plaintiff Joseph R. Bork, Jr. is and was at all relevant times a resident of Virginia. Plaintiff Bork was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2013 and was diagnosed with non-Hodgkin lymphoma.

7.     Plaintiff Maude Bradley is and was at all relevant times a resident of Illinois. Plaintiff Bradley was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2015 and was diagnosed with non-Hodgkin lymphoma.

8.     Plaintiff Faina Brainin is and was at all relevant times a resident of Georgia and brings this claim individually and on behalf of the children of David. Z. Brainin, and as Personal Representative of the Estate of David Z. Brainin. David Z. Brainin was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2009 and was diagnosed with non-Hodgkin lymphoma.

9.     Plaintiff William Curtiss is and was at all relevant times a resident of Florida. Plaintiff Curtiss was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2010 and was diagnosed with non-Hodgkin lymphoma.

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

10.     Plaintiff Richard M. Daley is and was at all relevant times a resident of New York. Plaintiff Daley was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2015 and was diagnosed with non-Hodgkin lymphoma.

11.     Plaintiff Joann Delfino Smith is and was at all relevant times a resident of Texas. Plaintiff Delfino Smith was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2015 and was diagnosed with non-Hodgkin lymphoma.

12.     Plaintiff Marilyn Denzine Morris is and was at all relevant times a resident of Arizona. Plaintiff Denzine Morris was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2015 and was diagnosed with chronic lymphocytic leukemia.

13.     Plaintiff Geraldine DiMaio is and was at all relevant times a resident of New York. Plaintiff DiMaio was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2015 and was diagnosed with non-Hodgkin lymphoma.

14.     Plaintiff Lawrence B. Dittmer is and was at all relevant times a resident of Iowa. Plaintiff Dittmer was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2015 and was diagnosed with non-Hodgkin lymphoma.

15.     Plaintiff Crystal Lynne Gray is and was at all relevant times a resident of Georgia and brings this claim individually and as Personal Representative of the Estate of David L. Gray.

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

David L. Gray was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2014 and was diagnosed with non-Hodgkin lymphoma.

16.     Plaintiff Kurt Farenchak is and was at all relevant times a resident of Ohio. Plaintiff Farenchak was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2015 and was diagnosed with chronic lymphocytic leukemia.

17.     Plaintiff Dennis L. Federle is and was at all relevant times a resident of Illinois. Plaintiff Federle was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2015 and was diagnosed with chronic lymphocytic leukemia.

18.     Plaintiff Neil J. Hadley is and was at all relevant times a resident of Washington. Plaintiff Hadley was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2014 and was diagnosed with non-Hodgkin lymphoma.

19.     Plaintiff Clifford Hall is and was at all relevant times a resident of Texas. Plaintiff Hall was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2015 and was diagnosed with non-Hodgkin lymphoma.

20.     Plaintiff Ernest D. Hendricks is and was at all relevant times a resident of Washington. Plaintiff Hendricks was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2012 and was diagnosed with large B cell non-Hodgkin lymphoma.

21.     Plaintiff Pamela A. Higgenbotham is and was at all relevant times a resident of Mississippi. Plaintiff Higgenbotham was exposed to Roundup and/or other Monsanto

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

glyphosate-containing products ("Roundup") through approximately 2015 and was diagnosed with non-Hodgkin lymphoma.

22.    Plaintiff Susan McNair is and was at all relevant times a resident of South Carolina and brings this claim individually and as the Legal Representative of, and on behalf of, the Estate of James L. McNair, III, and the Statutory Beneficiaries.  James L. McNair, III was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2015 and was diagnosed with non-Hodgkin lymphoma.

23.    Plaintiff James M. Muter is and was at all relevant times a resident of Indiana. Plaintiff Muter was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2015 and was diagnosed with non-Hodgkin lymphoma.

24.    Plaintiff David B. Ochab is and was at all relevant times a resident of Michigan. Plaintiff Ochab was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2015 and was diagnosed with non-Hodgkin lymphoma.

25.    Plaintiff Leatha J. Orr is and was at all relevant times a resident of Kentucky. Plaintiff Orr was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2013 and was diagnosed with chronic lymphocytic leukemia.

26.    Plaintiff Andrew J. Pollastro is and was at all relevant times a resident of New York. Plaintiff Pollastro was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2016 and was diagnosed with non-Hodgkin lymphoma.

27.    Plaintiff Lori Ratzke is and was at all relevant times a resident of Iowa, surviving spouse and Legal Representative of the Estate of Ricky Dee Ratzke, Deceased. Jacob Ratzke,

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

Taylor Ratzke, and Ethan Ratzke are surviving children of Ricky Dee Ratzke. Ricky Dee Ratzke was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2014 and was diagnosed with non-Hodgkin lymphoma and subsequently died. As a direct and proximate result of these injuries, under Iowa's survival and wrongful death statutes, plaintiffs and the Estate of Ricky Dee Ratzke have sustained damages including the present value of the estate that the decedent would have reasonably been expected to accumulate had he lived to a normal life expectancy, medical and funeral expenses, punitive damages, the decedent's physical, mental and emotional pain and suffering, damages for loss of consortium, and all damages and recoveries authorized by Iowa law.

28.     Plaintiff Donald G. Richardson is currently a resident of Nevada and was at all relevant times a resident of California. Plaintiff Richardson was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2002 and was diagnosed with non-Hodgkin lymphoma.

29.     Plaintiff Irene Risner is and was at all relevant times a resident of Indiana, and is the surviving spouse and Personal Representative of the Estate of Paul Dean Risner, Deceased. Paul Dean Risner was at all relevant times a resident of Indiana and was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 1997 and was diagnosed with B cell non-Hodgkin lymphoma and subsequently died. As a direct and proximate result of these injuries, under Indiana's survival and wrongful death statutes, Plaintiff and the Estate of Paul Dean Risner have sustained damages including medical, funeral, hospital, and burial expenses, lost earnings of the decedent, costs of administration of the estate, loss of love, companionship, care and all recovery allowed pursuant to Indiana's General Wrongful Death Act and Survival Actions (Indiana Code §§ 34-9-3-1 *et seq*).

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

30.     Plaintiff Mary Ann Rogers is and was at all relevant times a resident of Oregon. Plaintiff Rogers was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2016 and was diagnosed with chronic lymphocytic leukemia.

31.     Plaintiff Norma Saltzman is and was at all relevant times a resident of Michigan and Personal Representative of the Estate of Ernest Saltzman, Jr., Deceased. Ernest Saltzman, Jr. was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2012 and was diagnosed with non-Hodgkin lymphoma and subsequently died. As a direct and proximate result of these injuries, under Michigan's survival and wrongful death statutes, Plaintiff and the Estate of Ernest Saltzman, Jr., have sustained damages including medical, funeral, hospital, and burial expenses, compensation for pain and suffering, damages for loss of financial support, loss of society and companionship of the deceased, and all recovery allowed pursuant to Michigan's Wrongful Death Act and for any and all claims surviving death.

32.     Plaintiff Kyle J. Sanders is and was at all relevant times a resident of Florida. Plaintiff Sanders was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2014 and was diagnosed with non-Hodgkin lymphoma and chronic lymphocytic leukemia.

33.     Plaintiff James Allen Strubinger is currently a resident of Illinois and was at all relevant times a resident of Illinois and Indiana. Plaintiff Stubinger was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2016 and was diagnosed with follicular lymphoma.

34.     Plaintiff Michael Symons is and was at all relevant times a resident of Michigan. Plaintiff Symons was exposed to Roundup and/or other Monsanto glyphosate-containing

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

products ("Roundup") through approximately 2015 and was diagnosed with B cell non-Hodgkin lymphoma.

35.     Plaintiff Madeline Urwin is and was at all relevant times a resident of Iowa. Plaintiff Madeline Urwin was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2009 and was diagnosed with chronic lymphocytic leukemia.

36.     Plaintiff Madeline Urwin brings this claim as surviving spouse and as Legal Representative of the Estate of Robert John Urwin, Deceased. Plaintiffs Robert A. Urwin and Michael J. Urwin are Robert John Urwin's surviving children. Robert John Urwin was at all relevant time a resident of Iowa. He was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2005 and was diagnosed with chronic lymphocytic leukemia and subsequently died. As a direct and proximate result of these injuries, under Iowa's survival and wrongful death statutes, plaintiffs and the Estate of Robert John Irwin have sustained damages including the present value of the estate that the decedent would have reasonably been expected to accumulate had he lived to a normal life expectancy, medical and funeral expenses, punitive damages, the decedent's physical, mental and emotional pain and suffering, damages for loss of consortium, and all damages and recoveries authorized by Iowa's wrongful death and survival laws.

37.     Plaintiff Joshua D. Wright is and was at all relevant times a resident of Pennsylvania. Plaintiff Wright was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2015 and was diagnosed with non-Hodgkin lymphoma.

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

38.     Plaintiff Lloyd Nelius, individually and on behalf of Marie Nelius' heirs, statutory
wrongful death beneficiaries, and as personal representative on behalf of the Estate of Marie
Nelius, is and was at all relevant times a resident of Texas and the surviving spouse of decedent
Marie Nelius who was first exposed to Roundup in Texas. Marie Nelius was exposed to
Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through
approximately 2013 and was diagnosed with non-Hodgkin lymphoma and died as a result of
Roundup exposure.  Plaintiff Lloyd Nelius brings his claims individually and on behalf of Marie
Nelius' children pursuant to the Texas wrongful death statute, Tex. Civ. Prac. & Rem. Code
Ann. § 71.004 (West), and as personal representative of Marie Nelius' estate pursuant to the
Texas survival action statute, Tex. Civ. Prac. & Rem. Code Ann. § 71.021 (West).  No
administration of decedent Marie Nelius' estate is pending nor is one necessary.  As a direct and
proximate result of these injuries and on behalf of the statutory class of beneficiaries identified in
Tex. Civ. Prac. & Rem. Code Ann. § 71.004, Plaintiff Lloyd Nelius has sustained the following
damages: pecuniary losses and mental anguish and pain suffered by reason of Decedent Marie
Nelius' death, medical expenses, funeral expenses, and the loss of the benefit of Decedent Marie
Nelius' services, companionship, society, comfort, instruction, guidance, counsel, training and
support which Marie would have furnished her husband had she lived; and in addition, damages
suffered by Decedent Marie Nelius between the time of her injury and death for which she might
have maintained an action but for her death, the prolonged physical pain, physical impairment,
and mental anguish and suffering endured by Decedent Marie Nelius between the time of her
injury and death pursuant to Tex. Civ. Prac. & Rem. Code Ann. § 71.021 (West).

39.     Plaintiff James Brown is and was at all relevant times a resident of Louisiana and
was exposed to Roundup in Louisiana.  Plaintiff Brown was exposed to Roundup and/or other

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

Monsanto glyphosate-containing products ("Roundup") through approximately 2014 and was diagnosed with non-Hodgkin lymphoma as a result of Roundup exposure.

40.     Plaintiff Rose Byrne is and was at all relevant times a resident of Maryland and was exposed to Roundup in Maryland.  Plaintiff Byrne was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2012 and was diagnosed with non-Hodgkin lymphoma as a result of Roundup exposure.

41.     Plaintiff Brett Everett is and was at all relevant times a resident of Indiana and was exposed to Roundup in Indiana.  Plaintiff Everett was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2016 and was diagnosed with non-Hodgkin lymphoma as a result of Roundup exposure.

42.     Plaintiff Cory Fisher is and was at all relevant times a resident of Colorado and was exposed to Roundup in Colorado.  Plaintiff Fisher was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2016 and was diagnosed with non-Hodgkin lymphoma as a result of Roundup exposure.

43.     Plaintiff Beckett Jones is and was at all relevant times a resident of Florida and was exposed to Roundup in Florida.  Plaintiff Jones was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2015 and was diagnosed with non-Hodgkin lymphoma as a result of Roundup exposure.

44.     Plaintiff Kurt Knox is and was at all relevant times a resident of Connecticut and New Mexico but was exposed to Roundup in Connecticut.  Plaintiff Knox was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") and was diagnosed with non-Hodgkin lymphoma as a result of Roundup exposure.

Case MDL No. 2741 Document 119-11 Filed 04/05/17 Page 25 of 69

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

45. Plaintiff Joel Macdonald is and was at all relevant times a resident of Arizona and was exposed to Roundup in Arizona. Plaintiff Macdonald was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2014 and was diagnosed with non-Hodgkin lymphoma as a result of Roundup exposure.

46. Plaintiff Arthur Puckett is and was at all relevant times a resident of South Carolina and was exposed to Roundup in South Carolina. Plaintiff Puckett was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2016 and was diagnosed with non-Hodgkin lymphoma as a result of Roundup exposure.

47. Plaintiff Pat Richard is and was at all relevant times a resident of Arizona, Nebraska and is currently a resident of Wyoming, but was exposed to Roundup in Arizona and Nebraska. Plaintiff Richard was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2008 and was diagnosed with non-Hodgkin lymphoma as a result of Roundup exposure.

48. Plaintiff Erwin Sikorski is and was at all relevant times a resident of Oklahoma and was exposed to Roundup in Oklahoma. Plaintiff Sikorski was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2010 and was diagnosed with non-Hodgkin lymphoma as a result of Roundup exposure.

49. Plaintiff Dennis Sorensen is and was at all relevant times a resident of Illinois and was exposed to Roundup in Illinois. Plaintiff Sorensen was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2016 and was diagnosed with non-Hodgkin lymphoma as a result of Roundup exposure.

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

50.     Plaintiff Tim Hensley is and was at all relevant times a resident of Indiana and was exposed to Roundup in both Iowa and Indiana.  Plaintiff Hensley was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2000 and was diagnosed with non-Hodgkin lymphoma as a result of Roundup exposure.

51.     Plaintiff Helena Jochaniewicz is and was at all relevant times a resident of Illinois and was exposed to Roundup in Illinois.  Plaintiff Jochaniewicz was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2016 and was diagnosed with non-Hodgkin lymphoma as a result of Roundup exposure.

52.     Plaintiff Jim Moore is and was at all relevant times a resident of Texas and was exposed to Roundup in Texas.  Plaintiff Moore was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2016 and was diagnosed with non-Hodgkin lymphoma as a result of Roundup exposure.

53.     Plaintiff Tessie Thompson is and was at all relevant times a resident of Maine and Virginia and was exposed to Roundup in both Maine and Virginia.  Plaintiff Thompson was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2016 and was diagnosed with non-Hodgkin lymphoma as a result of Roundup exposure.

54.     Plaintiff Sally Richards is and was at all relevant times a resident of Mississippi and was exposed to Roundup in Mississippi.  Plaintiff Richards was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2016 and was diagnosed with non-Hodgkin lymphoma as a result of Roundup exposure.

55.     Plaintiff Josephine Ponella is and was at all relevant times a resident of New York and was exposed to Roundup in New York.  Plaintiff Ponella was exposed to Roundup and/or

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

other Monsanto glyphosate-containing products ("Roundup") through approximately 2015 and was diagnosed with non-Hodgkin lymphoma as a result of Roundup exposure.

56.     Plaintiff Lisa Chain is and was at all relevant times a resident of Ohio. Plaintiff Chain was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") through approximately 2015 and was diagnosed with non-Hodgkin lymphoma.

57.     Plaintiff John Webb is and was at all relevant times a resident of Florida and was exposed to Roundup in Florida.  Plaintiff Webb was exposed to Roundup and/or other Monsanto glyphosate-containing products ("Roundup") and was diagnosed with non-Hodgkin lymphoma as a result of Roundup exposure.

### Defendants

58.     Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri and is a "local defendant" for purposes of Removal and Diversity Jurisdiction.  At all relevant times, Monsanto also regularly conducted, transacted, and solicited business in St. Louis, Missouri, as well as in all States of the United States.

59.     At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®.

60.     Defendant Osborn & Barr Communications, Inc. is a Missouri corporation with its headquarters and principal place of business in St. Louis, Missouri with its registered agent located in the City of St. Louis, at 7700 Forsythe Blvd., Suite 1800, St. Louis, Missouri 63105 and is a "local defendant" for purposes of Removal and Diversity Jurisdiction.

61.     Defendant Osborn & Barr Holdings, Inc. is a Missouri corporation with its headquarters and principal place of business in St. Louis, Missouri with its registered agent

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

located in the City of St. Louis, at 7700 Forsythe Blvd., Suite 1800, St. Louis, Missouri 63105 and is a "local defendant" for purposes of Removal and Diversity Jurisdiction.

62.     Osborn & Barr Communications, Inc. and Osborn & Barr Holdings, Inc. (hereinafter collectively "Osborn & Barr") was responsible for marketing Roundup and related Monsanto products until approximately 2012.  Upon information and belief, important advertising, marketing, sales and other business decisions regarding Roundup® were made from and in the State of Missouri.

63.     Plaintiffs have suffered an illness that has a latency period and does not arise until years after exposure. Plaintiffs had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup® and glyphosate until they were made aware that their illness, including non-Hodgkin lymphoma could be caused by their use and/or exposure to Roundup®. The discovery rule applies to these cases, and the statute of limitations has been tolled until the day the plaintiffs knew or had reason to know that their illnesses, including non-Hodgkin lymphoma, were linked to their use and/or exposure to Roundup®.

64.     Within the time period of any applicable statute of limitations, plaintiffs could not have discovered through the exercise of reasonable diligence that exposure to Roundup® and glyphosate is injurious to human health.

65.     Plaintiffs did not discover and did not know of facts that would cause a reasonable person to suspect the risk associated with the use of and/or exposure to Roundup® and glyphosate nor would a reasonable and diligent investigation by them have disclosed that Roundup® and glyphosate would cause their illnesses.

66.     The expiration of any applicable statute of limitations has been equitably tolled by reason of Monsanto's fraudulent misrepresentations and fraudulent concealment and fraudulent

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

conduct. Through affirmative misrepresentations and omissions, defendants actively concealed from plaintiffs the true risks associated with use of and/or exposure to Roundup®.

67.     As a result of defendants' actions, plaintiffs could not reasonably have known or learned through reasonable diligence that they had been exposed to the risks alleged herein and that those risks were the direct and proximate result of defendants' acts and omissions.

68.     Defendants are estopped from relying on any statute of limitations because of their concealment of the truth regarding the safety of Roundup®. Defendant Monsanto had a duty to disclose the true character, quality and nature of Roundup® because this was non-public information over which it continues to have exclusive control. Defendant knew that this information was not available to plaintiffs, their medical providers and/or their health facilities yet it failed to disclose the information to the public.

69.     Defendant had the ability to and did spend enormous amounts of money in furtherance of the purposes of marketing and promoting a profitable product, notwithstanding the known or reasonably knowable risks. Plaintiffs and medical professional could not have afforded to and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and they were forced to rely on defendants' representations.

### III.     BACKGROUND

70.     In 1970, Defendant Monsanto Company, Inc. discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 millions of pounds used annually. That number grew to 185 million pounds by 2007.  As of 2013, glyphosate was the world's most widely used herbicide.

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

71.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

72.     Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

73.     On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

74.     On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

75.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other hematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

76.      The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

77.      Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto and has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

78.      Osborn & Barr marketed Roundup for two decades, representing it as safe to humans and the environment, disseminating advertising and other marketing efforts that proclaim to Roundup users and potential Roundup users that the products create no unreasonable risks to human health or to the environment.

### IV.      JURISDICTION AND VENUE

79.      At all times relevant hereto, Monsanto was in the business of researching, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, labeling and packaging and Monsanto and Osborn & Barr were in the business of marketing, promoting, and/or advertising Roundup® products in the State of Missouri and the City of St. Louis.

80.      At all times relevant hereto, Monsanto was a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri, and therefore is a local defendant for purposes of Removal and diversity jurisdiction.

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

81.     At all times relevant hereto, Osborn & Barr was a Missouri corporation with its headquarters and principal place of business in St. Louis, Missouri, and therefore is a local defendant for purposes of Removal and diversity jurisdiction.

82.     Plaintiffs have timely filed this lawsuit from the time the Plaintiffs knew or reasonably knew of the injury and that it may have been wrongfully caused.

83.     Pursuant to R.S.Mo. §508.010 venue is proper in the City of St. Louis.

84.     Plaintiff Sterling Bates was first injured in the 5140 Cates Ave, City of St. Louis, and therefore was first injured by the wrongful acts or negligent conduct alleged in this action in the city of St. Louis, Missouri. Therefore, venue is proper pursuant to Mo. Rev. Stat. § 508.010.

**V.     FACTS**

85.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

86.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

87.     For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®—glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Agricultural workers are, once again, victims of corporate greed. Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® was safe.

### *The Discovery of Glyphosate and Development of Roundup®*

88.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use; Osborn & Barr joined or took over these misleading marketing efforts in the early 1990s and continued through 2012. Monsanto still markets Roundup® as safe today.

### *Registration of Herbicides under Federal Law*

89.     The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a (a).

90.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA,

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c) (5) (D).

91.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

92.     The EPA registered Roundup® for distribution, sale, and manufacture in the United States and the States of Missouri.

93.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

94.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1.  In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

95.     In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment —in relation to the re-registration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

### *Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup*

96.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

97.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

98.     In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

99.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

100.    Three top executives of IBT were convicted of fraud in 1983.

101.    In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

102.    Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

103.    Osborn & Barr was responsible for much of the marketing of Roundup between 1990 and 2012, including targeted marketing to farmers; these efforts touted Roundup's efficacy and safety, never once disclosing the EPA classification mentioned above or the fraud involved in safety testing. Osborn & Barr also helped to design the packaging for Roundup products, which never warned of the cancer risk.

104.    Osborn & Barr intensively marketed Roundup to the general public as made by a company that "puts the farmer first."  The marketing efforts were so successful that the agricultural community embraced Monsanto ever more warmly, with the U.S. Secretary of Agriculture going so far as to thank Monsanto for what it does for farmers.

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

105.     Ironically, Osborn & Barr spearheaded efforts to portray Monsanto as an anti-cancer crusader in its farmer-friendly marketing, remaining absolutely silent as to the fact that Monsanto's biggest seller triples users' risk of non-Hodgkin lymphoma.

106.     Monsanto has acknowledged that Monsanto and its sales of agricultural products including Roundup "wouldn't be the same" without Osborn & Barr.

107.     Osborn & Barr even developed and maintains a public marketing website to advance Monsanto's sales called "Growing Safely:  Focused on Safety in Agriculture" with numerous different subsections, failing to mention to consumers and potential consumers that Roundup is closely associated with cancer, nor recommending any safety precautions for the application of Roundup.  Instead, viewers are distracted by such sections as "ATV safety." Osborn & Barr also marketed and disseminated information on behalf of American Farmers for the Advancement and Conservation of Technology, a Monsanto-backed group created to convince the public that genetically-modified crops, created by Monsanto and sold as "Roundup Ready," were safe and that anti-GMO activists were cranks.

108.     Multiple studies have been ghostwritten in part and/or published by Monsanto through companies such as Intertek and Exponent, Inc. from 2000-present which minimize any safety concerns about the use of glyphosate; are used to convince regulators to allow the sale of Roundup, and are used to convince customers to use Roundup.  Such studies include, but are not limited to Williams (2000); Williams (2012); Kier & Kirkland (2013); Kier (2015); Bus (2016); Chang (2016); and the Intertek Expert Panel Manuscripts.  All of these studies have been submitted to and relied upon the public and the EPA in assessing the safety of glyphosate. Through these means Monsanto has fraudulently represented that independent scientists have concluded that Glyphosate is safe.  In fact, these independent experts have been paid by

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

Monsanto and have failed to disclose the significant role Monsanto had in creating the manuscripts. Monsanto has further ghostwritten editorials for scientists such as Robert Tarone and Henry Miller to advocate for the safety of glyphosate in Newspapers and Magazines. Monsanto has also ghostwritten letters by supposed independent scientists submitted to regulatory agencies who are reviewing the safety of glyphosate.

109.    Monsanto has also violated federal regulations in holding secret ex parte meetings and conversations with certain EPA employees to collude in a strategy to re-register glyphosate and to quash investigations into the carcinogenicity of glyphosate by other federal agencies such as the Agency for Toxic Substances and Disease Registry. Monsanto's close connection with the EPA arises in part from its offering of lucrative consulting gigs to retiring EPA officials.

110.    In March 2015, The Joint Glyphosate Task Force at Monsanto's behest issued a press release sharply criticizing IARC, stating that IARC's conclusion was "baffling" and falsely claiming that "IARC did not consider any new or unique research findings when making its decision. It appears that only by deciding to exclude certain available scientific information and by adopting a different approach to interpreting the studies was this possible."

111.    Beginning in 2011, the Federal Institute for Risk Assessment (BfR) in Germany began preparing a study on the safety of glyphosate. Through the Glyphosate Task Force, Defendants were able to co-opt this study becoming the sole providers of data and ultimately wrote the report which was rubber-stamped by the BfR. The Glyphosate Task Force was solely responsible for preparing and submitting summary of studies relied upon by the by the BfR. Defendants have used this report, which they wrote, to falsely proclaim the safety of glyphosate.

112.    In October 2015, the Defendants as members of the Joint Glyphosate Task Force wrote to the state of California to try to stop California from warning the public about the

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

carcinogenicity of glyphosate arguing that the IARC classification is mistaken.  In January of 2016 Monsanto filed a lawsuit to stop California from warning the public about the carcinogenicity of glyphosate.

### *The Importance of Roundup® to Monsanto's Market Dominance Profits*

113.    The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace.  Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

114.    In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate; farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

115.    Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other

28

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

*Monsanto has known for decades that it falsely advertises the safety of Roundup®. Osborn & Barr, founded by a former Monsanto executive and intimately familiar with Monsanto's safety and PR challenges, has also known for decades that it falsely advertises the safety of Roundup®.*

116. In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup ® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "**safer than table salt**" and "**practically non-toxic**" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

(a) Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences...

(b) And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

(c) Roundup biodegrades into naturally occurring elements.

(d) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

(e)     This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

(f)     You can apply Accord with "confidence because it will stay where you put it;" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

(g)     Glyphosate is less toxic to rats than table salt following acute oral ingestion.

(h)     Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture or use it.

(i)     You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

(j)     "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

117.    November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

(a)     its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

*  *  *

(b)     its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

*  *  *

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

(c)    its glyphosate-containing pesticide products or any component thereof stay where

they are applied under all circumstances and will not move through the

environment by any means.

* * *

(d)    its glyphosate-containing pesticide products or any component thereof are "good"

for the environment or are "known for their environmental characteristics."

* * *

(e)    glyphosate-containing pesticide products or any component thereof are safer or

less toxic than common consumer products other than herbicides;

(f)    its glyphosate-containing products or any component thereof might be classified

as "practically non-toxic."

118.    Monsanto did not alter its advertising in the same manner in any state other than

New York, and on information and belief still has not done so today.

119.    In 2009, France's highest court ruled that Monsanto had not told the truth about

the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had

falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

### Classifications and Assessments of Glyphosate

120.    The IARC process for the classification of glyphosate followed the stringent

procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has

reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known

Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to

be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one

agent to be Probably Not Carcinogenic.

121.    The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.  Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

122.    One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

123.    In assessing an agent, the IARC Working Group reviews the following information:

(a)    human, experimental, and mechanistic data;

(b)    all pertinent epidemiological studies and cancer bioassays; and

(c)    representative mechanistic data.

The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

124.    In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

125.    On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

126.    The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

127.    Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012[1].

128.    Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

129.    The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

_____

[1] Roundup rose to the most-used herbicide in the world thanks in no small part to Osborn & Barr's marketing.

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

130.   The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

131.   The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

132.   In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

133.   The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

134.   The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

135.   The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

136. The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

### Other Earlier Findings about Glyphosate's Dangers to Human Health

137. The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

### Release Patterns

138. Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available. Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

139.    In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

***Recent Worldwide Bans on Roundup®/Glyphosate***

140.    Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in light of the as the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which takes effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

141.    The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

142.    France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

143.    Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

36

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

144.     The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that Glyphosate has been linked to fatal kidney disease in agricultural workers.

145.     The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

VI.     **CLAIMS**

**COUNT I**
**STRICT LIABILITY (DESIGN DEFECT)**
(AGAINST MONSANTO)

146.     Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

147.     Plaintiffs bring this strict liability claim against Monsanto for defective design.

148.     At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, manufacturing, selling, distributing, and Monsanto a engaged in the marketing, packaging design, and promotion of Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto. At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by the Plaintiffs, as described above.

149.     At all times relevant to this litigation, Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiffs.

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

150.    At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Missouri and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

151.    Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

152.    Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

153.    At all times relevant to this action, Monsanto knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

154.    Therefore, at all times relevant to this litigation, Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Monsanto were defective in design and formulation, in one or more of the following ways:

(a)    When placed in the stream of commerce, Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

(b)    When placed in the stream of commerce, Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

(c)    When placed in the stream of commerce, Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

(d)    Monsanto did not sufficiently test, investigate, or study Roundup® products and, specifically, the active ingredient glyphosate.

(e)    Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

(f)    At the time of marketing its Roundup® products, Roundup® was defective in that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

(g)    Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products.

(h)    Monsanto could have employed safer alternative designs and formulations.

155.    Plaintiffs were exposed to Roundup® products in the course of their work, as described above, without knowledge of their dangerous characteristics.

156.    At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

157.    Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

158.    The harm caused by Roundup® products far outweighed their benefit, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate. Roundup® products were and are more dangerous than alternative products and Monsanto could have designed Roundup® products (including their packaging and sales aids) to make them less dangerous. Indeed, at the time that Monsanto designed Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

159.    At the time Roundup® products left Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of those herbicides.

160.    Monsanto's defective design of Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including the Plaintiffs herein.

161.    Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Monsanto is strictly liable to Plaintiffs.

162.    The defects in Roundup® products caused or contributed to cause Plaintiffs' grave injuries, and, but for Monsanto's misconduct and omissions, Plaintiffs would not have sustained their injuries.

163.    Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including Plaintiffs, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

knowledge from the general public. Monsanto made conscious decisions not to redesign, warn or inform the unsuspecting public. Monsanto's reckless conduct warrants an award of aggravated damages.

164.     As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiffs have suffered and continue to suffer grave injuries, and have endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

<div align="center">

**COUNT II**
**STRICT LIABILITY (FAILURE TO WARN)**
(AGAINST MONSANTO)

</div>

165.     Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

166.     Plaintiffs bring this strict liability claim against Monsanto for failure to warn.

167.     At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, , which are defective and unreasonably dangerous to consumers, including Plaintiffs, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Monsanto.

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

168.    Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiffs, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

169.    At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn the Plaintiffs of the dangers associated with Roundup® use and exposure. Monsanto, as manufacturer, seller, promoter, marketer, or distributor of chemical herbicides are held to the knowledge of an expert in the field.

170.    At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

171.    At all times relevant to this litigation, Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by these herbicides, including Plaintiffs.

172.    Despite the fact that Monsanto knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of these products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

scientifically knowable to Monsanto through appropriate research and testing by known methods, at the time they distributed, marketed, promoted, supplied or sold the product, and not known to end users and consumers, such as Plaintiffs.

173.    These products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

174.    At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Missouri and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, promoted and marketed by Monsanto.

175.    Plaintiffs were exposed to Roundup® products in the course of their personal use on his garden and lawn, without knowledge of their dangerous characteristics.

176.    At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

177.    Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiffs' exposure. Plaintiffs relied upon the skill, superior knowledge, and judgment of Monsanto.

178.    These products were defective because the minimal warnings disseminated with Roundup® products were inadequate, and they failed to communicate adequate information on

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and landscaping applications.

179. The information that Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiffs to utilize the products safely and with adequate protection. Instead, Monsanto disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

180. To this day, Monsanto has failed to adequately and accurately warn of the true risks of Plaintiffs' injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

181. As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed, marketed, and promoted by Monsanto, and used by Plaintiffs.

182. Monsanto is liable to Plaintiffs for injuries caused by their negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of these products and the risks associated with the use of or exposure to Roundup® and glyphosate.

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

183.     The defects in Roundup® products caused or contributed to cause Plaintiffs' injuries, and, but for this misconduct and omissions, Plaintiffs would not have sustained their injuries.

184.     Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products, Plaintiffs could have avoided the risk of developing injuries as alleged herein.

185.     As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiffs have suffered severe injuries and have endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.

WHEREFORE, Plaintiffs respectfully request this Court to enter judgment in Plaintiffs' favor for compensatory and punitive damages in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00)  together with interest, costs herein incurred, and all such other and further relief as  this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

### COUNT III
### NEGLIGENCE
(AGAINST MONSANTO)

186.     Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

187.     Monsanto, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiffs.

188.     At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion,

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

189.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

190.    At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

191.    Accordingly, at all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with Plaintiffs' injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiffs.

192.    Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

193.    As such, Monsanto breached the duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Monsanto manufactured, marketed, promoted, and sold defective herbicides containing the

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

chemical glyphosate, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

194.     Despite an ability and means to investigate, study, and test these products and to provide adequate warnings, Monsanto has failed to do so. Indeed, Monsanto has wrongfully concealed information and have further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

195.     Monsanto was negligent in the following respects:

(a)     Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

(b)     Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

(c)     Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

(d)     Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

(e)     Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

(f)     Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Monsanto could reasonably foresee would use and be exposed to its Roundup® products;

(g)     Failing to disclose to Plaintiffs, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

(h)     Failing to warn Plaintiffs, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiffs, Plaintiff's Decedents, and other consumers;

(i)     Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

(j)     Representing that its Roundup® products were safe for their intended use when, in fact,  Monsanto knew or should have known that the products were not safe for their intended purpose;

(k)     Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

(l)     Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

Monsanto to be associated with or caused by the use of or exposure to Roundup®

and glyphosate;

(m)     Continuing to disseminate information to its consumers, which indicate or imply

that Monsanto's Roundup® products are not unsafe for use in the agricultural and

horticultural industries; and

(n)     Continuing the manufacture and sale of its products with the knowledge that the

products were unreasonably unsafe and dangerous.

196.     Monsanto knew and/or should have known that it was foreseeable that consumers

such as Plaintiffs would suffer injuries as a result of Monsanto's failure to exercise ordinary care

in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup®.

197.     Plaintiffs did not know the nature and extent of the injuries that could result from

the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

198.     Monsanto's negligence was the proximate cause of the injuries, harm, and

economic losses that Plaintiffs suffered, as described herein.

199.     Monsanto's conduct, as described above, was reckless. Monsanto regularly risked

the lives of consumers and users of their products, including Plaintiffs, with full knowledge of

the dangers of these products. Monsanto has made conscious decisions not to redesign, re-label,

warn, or inform the unsuspecting public, including Plaintiffs. Monsanto's reckless conduct

therefore warrants an award of aggravated or punitive damages.

200.     As a proximate result of Monsanto's wrongful acts and omissions in placing

defective Roundup® products into the stream of commerce without adequate warnings of the

hazardous and carcinogenic nature of glyphosate, Plaintiffs have suffered severe and permanent

physical and emotional injuries.  Plaintiffs have endured pain and suffering and have suffered

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

economic losses (including significant expenses for medical care and treatment) in an amount to

be determined.

WHEREFORE, Plaintiffs respectfully request this Court to enter judgment in Plaintiffs'

favor for compensatory and punitive damages in an amount in excess of Twenty-Five Thousand

Dollars ($25,000.00) together with interest, costs herein incurred, and all such other and further

relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues

contained herein.

<div align="center">

**COUNT IV**
**FRAUD, MISREPRESENTATION, AND SUPPRESSION**
(AGAINST ALL DEFENDANTS)

</div>

201.    Plaintiffs incorporate by reference all of the above paragraphs as if set forth in full

herein, particularly those paragraphs which detail fraud with specificity.

202.    Defendants fraudulently, intentionally, and/or negligently misrepresented to the

public, and to the Plaintiffs, both directly and by and through the media, the scientific literature

and purported "community outreach" programs, the safety of Roundup products, and/or

fraudulently, intentionally, and/or negligently concealed, suppressed, or omitted material,

adverse information regarding the safety of Roundup.

203.    The intentional and/or negligent misrepresentations and omissions of Defendants

regarding the safety of Roundup products were communicated to Plaintiffs directly through

ghostwritten articles, editorials, national and regional advertising, marketing and promotion

efforts, as well as the packaging and sales aids. The safety of Roundup products was also

intentionally and/or negligently misrepresented to Plaintiffs and the public with the intent that

such misrepresentations would cause Plaintiffs and other potential consumers to purchase and

use or continue to purchase and use Roundup products.

<div align="center">50</div>

204.    Defendants either knew or should have known of the material representations they were making regarding the safety and relative utility of Roundup products.

205.    Defendants fraudulently, intentionally, and/or negligently made the misrepresentations and/or actively concealed, suppressed, or omitted this material information with the specific desire to induce Plaintiffs, and the consuming public to purchase and use Roundup products. Defendants fraudulently, intentionally, and/or negligently, knew or should have known that Plaintiffs and the consuming public would rely on such material misrepresentations and/or omissions in selecting and applying Roundup products.  Defendants knew or should have known that Plaintiffs would rely on their false representations and omissions.

206.    Defendants made these misrepresentations and actively concealed adverse information of severe health risks, including non-Hodgkin lymphoma, at a time when, their agents and/or employees knew or should have known, the product had defects, dangers, and characteristics that were other than what was represented to the consuming public.  Specifically, Osborn & Barr misrepresented and actively concealed, suppressed, and omitted that there had been inadequate testing of the safety and efficacy of Roundup, and that prior studies, research, reports, and/or testing had been conducted linking the use of the drug with serious health events, including non-Hodgkin lymphoma.

207.    Despite the fact that Defendants knew or should have known of reports of severe risks including non-Hodgkin lymphoma, with Roundup use and exposure, this information was strategically minimized, understated, or omitted in order to create the impression that the human dangers of Roundup were nonexistent, particularly in light of its purported utility.

51

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

208.    The fraudulent, intentional and/or negligent material misrepresentations and/or active concealment, suppression, and omissions by Defendants were perpetuated directly and/or indirectly through the advertisements, packaging, sales aids, furtive public relations efforts, and other marketing and promotional pieces authored, analyzed, created, compiled, designed, drafted, disseminated, distributed, edited, evaluated, marketed, published, and supplied by Osborn & Barr.

209.    If Plaintiffs had known the true facts concerning the risks associated with Roundup exposure, Plaintiffs would have used a safer alternative.

210.    Plaintiffs' reliance upon the material misrepresentations and omissions was justified, among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Roundup while Plaintiffs were not in a position to know the true facts because Defendants overstated the benefits and safety of Roundup and downplayed the risk of lymphoma, thereby inducing Plaintiffs to use the herbicide rather than safer alternatives.

211.    As a direct and proximate result of Defendants' actions and inactions, Plaintiffs were exposed to Roundup and suffered and will continue to suffer injuries and damages, as set forth herein.

WHEREFORE, Plaintiffs demand judgment for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, in an amount greater than Twenty-Five Thousand Dollars ($25,000.00), and all such other relief as the Court deems proper.

<div align="center">

**COUNT V**
**VIOLATION OF THE CONSUMER FRAUD ACTS**

</div>

212.    Plaintiffs incorporate by reference all of the above paragraphs as if set forth in full herein, particularly those paragraphs which allege fraud with specificity.

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

213.    Defendants fraudulently, intentionally, negligently, and/or innocently misrepresented to the public, and to the Plaintiffs, both directly and by and through the media and purported "community outreach" programs, the safety of Roundup products, and/or fraudulently, intentionally, negligently and/or innocently concealed, suppressed, or omitted material, adverse information regarding the safety of Roundup. This deception caused injury to Plaintiffs in violation of the Consumer Fraud Act of the Plaintiffs' home states which create private rights of action by the Plaintiffs.

214.    The intentional, negligent, and/or innocent misrepresentations and omissions of Defendants regarding the safety of Roundup products were communicated to Plaintiffs directly through national and regional advertising, marketing and promotion efforts, as well as the packaging and sales aids. The safety of Roundup products was also intentionally, negligently, and/or innocently misrepresented to Plaintiffs and the public with the intent that such misrepresentations would cause Plaintiffs and other potential consumers to purchase and use or continue to purchase and use Roundup products.

215.    Defendants either knew or should have known of the material representations they were making regarding the safety and relative utility of Roundup products.

216.    Defendants fraudulently, intentionally, negligently, and/or innocently made the misrepresentations and/or actively concealed, suppressed, or omitted this material information with the specific desire to induce Plaintiffs, and the consuming public to purchase and use Roundup products. Defendants fraudulently, intentionally, negligently, and/or innocently, knew or should have known that Plaintiffs and the consuming public would rely on such material misrepresentations and/or omissions in selecting and applying Roundup products. Defendants

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

knew or should have known that Plaintiffs would rely on their false representations and omissions.

217.     Defendants made these misrepresentations and actively concealed adverse information of severe health events, including the risk of non-Hodgkin lymphoma and other cancers, at a time when, their agents and/or employees knew or should have known, the product had defects, dangers, and characteristics that were other than what was represented to the consuming public.  Specifically, Defendants misrepresented and actively concealed, suppressed, and omitted that there had been inadequate testing of the safety and efficacy of Roundup, and that prior studies, research, reports, and/or testing had been conducted linking the use of the drug with serious health events, including non-Hodgkin lymphoma.

218.     Despite the fact that Defendants knew or should have known of reports of severe health risks, including non-Hodgkin lymphoma, with Roundup use and exposure, this information was strategically minimized, understated, or omitted in order to create the impression that the human dangers of Roundup were nonexistent, particularly in light of its purported utility.

219.     The fraudulent, intentional, negligent and/or innocent material misrepresentations and/or active concealment, suppression, and omissions by Defendants were perpetuated directly and/or indirectly through the advertisements, packaging, sales aids, furtive public relations efforts, and other marketing and promotional pieces authored, analyzed, created, compiled, designed, drafted, disseminated, distributed, edited, evaluated, marketed, published, and supplied by Defendants.

220.     If Plaintiffs had known the true facts concerning the risks associated with Roundup exposure, Plaintiffs would have used a safer alternative.

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

221.    Plaintiffs' reliance upon the material misrepresentations and omissions was justified, among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Roundup while Plaintiffs were not in a position to know the true facts because Defendants overstated the benefits and safety of Roundup and downplayed the health risks, including lymphoma, thereby inducing Plaintiffs to use the herbicide rather than safer alternatives.

222.    Federal law and the EPA do not authorize and specifically prohibit the deceptions, misrepresentations and omissions made by Defendants.

223.    As a direct and proximate result of Defendants' actions and inactions, Plaintiffs were exposed to Roundup and suffered and will continue to suffer injuries and damages, as set forth herein.

WHEREFORE, Plaintiffs demand judgment for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, in an amount greater than Twenty-Five Thousand Dollars ($25,000.00), and all such other relief as the Court deems proper.

## COUNT VI
## SURVIVAL AND WRONGFUL DEATH

224.    Plaintiffs repeat and reiterate the allegations previously set forth herein.

225.    Survival and Wrongful Death Plaintiffs are the surviving heirs, statutory beneficiaries and/or Legal/Personal Representatives of their Decedents and are authorized to bring an action for survival/wrongful death of their respective Decedent, who used Defendants' Roundup product and was injured and/or died as a result.

226.    The injuries and damages of Plaintiffs and Decedents were caused by the wrongful acts, omissions, and fraudulent misrepresentations of Defendants.

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

227.    As a result of the conduct of Defendants and exposure to Defendants' product, the Decedents suffered fatal injuries.

228.    As a result of the death of their Decedent, the respective Plaintiffs are entitled to recovery for loss of love, companionship, comfort, support, affection, society, solace, and moral support of their Decedent, full value of the Decedent's life, and as further provided under applicable state law.

229.    Plaintiffs are entitled to survival damages including lost earnings, loss of earning capacity, medical and funeral expenses, punitive damages, Decedent's physical, mental and emotional pain and suffering, and as further provided under applicable state law. Plaintiffs are entitled to recover economic and non-economic damages against all Defendants for wrongful death directly and legally caused by the defects in Defendants' product and the negligent conduct, acts, errors, omissions and intentional and negligent misrepresentations of Defendants, and each of them.

**LIMITATION ON ALLEGATIONS**

230.    The allegations in this pleading are made pursuant to the laws of the Plaintiffs' home states. To the extent state law imposes a duty or obligation on the Defendants that exceeds those required by federal law, Plaintiffs do not assert such claims.  All claims asserted herein run parallel to federal law, i.e., the Defendants' violations of state law were also violations of federal law. Had Defendants honestly complied with state law, they would also have complied with federal law.

231.    Additionally, Plaintiffs' claims do not seek to enforce federal law. These claims are brought under Missouri law, notwithstanding the fact that such claims run parallel to federal law.

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

232. As alleged in this pleading, Monsanto violated U.S.C. § 136j and 40 C.F.R. § 10(a) (5) by distributing Roundup, which was misbranded pursuant to 7 U.S.C. § 136(g). Federal law specifically prohibits the distribution of a misbranded herbicide.

WHEREFORE, Plaintiffs pray for judgment against Defendants for compensatory damages as set forth above and for exemplary damages for the in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00) to punish Defendants, and to deter Defendants and other businesses from like conduct, and such other and further relief as this Court deems just, proper, and equitable.

<div style="margin-left: 40%;">

**ONDER, SHELTON, O'LEARY &PETERSON, LLC**

*/s/ James T. Corrigan*
James T. Corrigan      #45127
James D. O'Leary      #45964
110 E. Lockwood, 2nd Floor
St. Louis, MO 63119
corrigan@onderlaw.com
oleary@onderlaw.com
(314) 963-9000 telephone
(314) 963-1700 facsimile

and

(to be admitted pro hac vice)

**BAUM HEDLUND ARISTEI & GOLDMAN, P.C.**
R. Brent Wisner (CA #276023)
rbwisner@baumhedlundlaw.com
Michael L. Baum (CA #119511)
mbaum@baumhedlundlaw.com
Frances M. Phares (LA #10388)
fphares@baumhedlundlaw.com
12100 Wilshire Blvd., Suite 950
Los Angeles, CA 90025
Telephone:  (310) 207-3233
Facsimile:  (310) 820-7444

</div>

Electronically Filed - City of St. Louis - March 17, 2017 - 11:23 AM

**PENDLEY, BAUDIN & COFFIN, L.L.P.**
Nicholas R. Rockforte (LA #31305)
Christopher L. Coffin (LA #27902)
Jonathan E. Chatwin (LA #36410)
1515 Poydras Street, Suite 1400
New Orleans, LA 70112
Telephone: (504) 355-0086
Fax: (504) 523-0699
nrockforte@pbclawfirm.com
ccoffin@pbclawfirm.com
jchatwin@pbclawfirm.com

*Attorneys for Plaintiffs*