# U.S. District Court
## Eastern District of Missouri (St. Louis)
## CIVIL DOCKET FOR CASE #: 4:17-cv-01192-CEJ

O'Brien et al v. Monsanto Company
Assigned to: District Judge Carol E. Jackson
Demand: $10,000,000
Case in other court: Circuit Court of the City of St. Louis, 1722-
                CC00819
Cause: 28:1331 Fed. Question: Personal Injury

Date Filed: 03/29/2017
Jury Demand: Both
Nature of Suit: 365 Personal Inj. Prod.
Liability
Jurisdiction: Federal Question

### Plaintiff

**Mark O'Brien**

represented by **Eric D. Holland**
HOLLAND LAW FIRM LLC
300 N. Tucker Blvd.
Suite 801
St. Louis, MO 63101
314-241-8111
Fax: 314-241-5554
Email: eholland@allfela.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
HOLLAND LAW FIRM LLC
300 N. Tucker Blvd.
Suite 801
St. Louis, MO 63101
314-244-2005
Fax: 314-241-5554
Email: pdowd@allfela.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
HOLLAND LAW FIRM LLC
300 N. Tucker Blvd.
Suite 801
St. Louis, MO 63101
314-241-8111
Fax: 314-241-5554
Email: scrompton@allfela.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

### Plaintiff

**Stephen Anderson**

represented by **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Steven F. Belcher**                    represented by   **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Mark S. Boeh**                         represented by   **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Johnny Bowen**                         represented by   **Eric D. Holland**
*on behalf of his minor child Q.B.*
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Shawni Bowen**                              represented by   **Eric D. Holland**
*on behalf of her minor child Q.B.*                            (See above for address)
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Patrick R Dowd**
                                                               (See above for address)
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Randall S. Crompton**
                                                               (See above for address)
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Bernard Brown**                             represented by   **Eric D. Holland**
                                                               (See above for address)
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Patrick R Dowd**
                                                               (See above for address)
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Randall S. Crompton**
                                                               (See above for address)
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ann Brownell**                              represented by   **Eric D. Holland**
*individually and for decedent James*                          (See above for address)
*Brownell*                                                     *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Patrick R Dowd**
                                                               (See above for address)
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Randall S. Crompton**
                                                               (See above for address)
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rebekah Susanne Bryant**                          represented by    **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

**Jason Campbell**                                 represented by    **Eric D. Holland**
*on behalf of Jimme Campbell*                                        (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

**Mark S. Campbell**                               represented by    **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>Plaintiff</u>

**William C. Chandler**                            represented by    **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Philip Chiera**                                    represented by    **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Patrick Coleman**                                  represented by    **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Kevin Cunningham**                                 represented by    **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Joyce Doss**                  represented by **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**William B. Drey**             represented by **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Dale Engel**                  represented by **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

Joshua D. Feldman                          represented by  **Eric D. Holland**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Patrick R Dowd**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Randall S. Crompton**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

Dino Fiorello                              represented by  **Eric D. Holland**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Patrick R Dowd**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Randall S. Crompton**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

Kenneth Forest                             represented by  **Eric D. Holland**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Patrick R Dowd**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Randall S. Crompton**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

Patricia L. Fricke                         represented by  **Eric D. Holland**
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**William A. Haight**        represented by   **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Bradley Hermes**        represented by   **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Robert Homola**        represented by   **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

                                                               **Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Penka Hristova**                    represented by    **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

                                                                **Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

                                                                **Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Kevin Hutto**                       represented by    **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

                                                                 **Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

                                                                 **Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jennifer Jackson**                    represented by    **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

                                                                 **Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

                                                                 **Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Pamela Jevotovsky**                              represented by    **Eric D. Holland**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Patrick R Dowd**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Randall S. Crompton**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Atlas Jones**                                   represented by    **Eric D. Holland**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Patrick R Dowd**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Randall S. Crompton**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Barbara R. Jones**                              represented by    **Eric D. Holland**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Patrick R Dowd**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

                                                                    **Randall S. Crompton**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Marie Juarez-Wood**                             represented by    **Eric D. Holland**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Billy R. Kendricks**                represented by   **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Mark Koehler**                represented by   **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Michael Kostuk, Jr.**                represented by   **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**James Krauser**        represented by   **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Elizabeth R. Maselli**       represented by   **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Richard McCombs**        represented by   **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jack E. McKarson, II**
                            represented by  **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Joan Meyer**
                            represented by  **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Nancy A. Miller**
                            represented by  **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**David A. Motl**
                            represented by  **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**John Mulligan**                          represented by   **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Edward J. Paley, Jr.**                    represented by   **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Max Rae**                                 represented by   **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Randall S. Crompton
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Richard Roberto**                                  represented by  **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Elena Roditis**                                    represented by  **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Millicent R. Royston**                             represented by  **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Curtis Schumacher**                              represented by **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Dale E. Shipley**                              represented by **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Dennis Siewert**                              represented by **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Marvin G. Smith**                              represented by **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Rene St. Laurent**                                   represented by   **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Delores Stahl**                                      represented by   **Eric D. Holland**
*on behalf of Marshall Stahl*                                          (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Glenn Standiford**                                   represented by   **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Harold Stewart**        represented by   **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Sheila A. Thompson Noland**      represented by   **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Shanika Turner**        represented by   **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Russell B. Vader**                                            represented by **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Frederick V. Vaughn**                                         represented by **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**John A. Vicory**                                              represented by **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Louie B. Webb, Jr.**                                          represented by **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Johnny L. Wimberly**      represented by   **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jose Quintero Felix**      represented by   **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**      represented by   **Ann E. Sternhell Blackwell**
THOMPSON COBURN, LLP
One US Bank Plaza
505 N. 7th Street
St. Louis, MO 63101
314-552-6420
Fax: 314-552-7420
Email: eblackwell@thompsoncoburn.com

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joe Gregory Hollingsworth**
HOLLINGSWORTH, L.L.P.
1350 I Street, N.W.
9th Floor
Washington, DC 20005
202-898-5800
Fax: 202-682-1639
Email:
jhollingsworth@hollingsworthllp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/29/2017 | 1 | NOTICE OF REMOVAL from Circuit Court of the City of St. Louis, case number 1722-CC00819, with receipt number 0865-5883630, in the amount of $400 Jury Demand,, filed by Monsanto Company. (Attachments: # 1 Exhibit A - State Court File, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Civil Cover Sheet, # 8 Original Filing Form)(Sternhell Blackwell, Ann) Modified on 3/30/2017 (JWD). **Clerk's note: Attachment #1 has been sealed pursuant to Local Rule 2.17 because it contains the full name of a minor.** (Entered: 03/29/2017) |
| 03/29/2017 | 2 | NOTICE OF FILING NOTICE OF REMOVAL filed by Defendant Monsanto Company Sent To: Plaintiff (Attachments: # 1 Exhibit A)(Sternhell Blackwell, Ann) (Entered: 03/29/2017) |
| 03/29/2017 | 3 | DISCLOSURE OF ORGANIZATIONAL INTERESTS CERTIFICATE by Defendant Monsanto Company. Parent companies: None, Subsidiaries: Agroeste Sementes Paraguay S.A., Deltapine de Mexico, S. de R.L. de C.V., Dido, LLC, Hebei Ji Dai Cotton Seed Technology Company, Ltd., Liaoning Tuanhua Seeds Co., Ltd., Monsanto Korea, Inc., Publicly held company: None,. (Sternhell Blackwell, Ann) (Entered: 03/29/2017) |
| 03/29/2017 | 4 | ANSWER to Complaint by Monsanto Company.(Sternhell Blackwell, Ann) (Entered: 03/29/2017) |
| 03/29/2017 | 5 | MOTION for Leave to File Sealed Document by Defendant Monsanto Company. (Sternhell Blackwell, Ann) (Entered: 03/29/2017) |
| 03/29/2017 | 6 | SEALED DOCUMENT re 1 Notice of Removal Petition, by Defendant Monsanto Company. (Sternhell Blackwell, Ann) (Entered: 03/29/2017) |
| 03/29/2017 | 7 | ENTRY of Appearance by Eric D. Holland for Plaintiffs Stephen Anderson, Steven F. Belcher, Mark S. Boeh, Johnny Bowen, Shawni Bowen, Bernard Brown, Ann Brownell, Rebekah Susanne Bryant, Jason Campbell, Mark S. Campbell, William C. Chandler, Philip Chiera, Patrick Coleman, Kevin Cunningham, Joyce Doss, William B. Drey, Dale Engel, Joshua D. Feldman, Jose Quintero Felix, Dino Fiorello, Kenneth Forest, Patricia L. Fricke, William A. Haight, Bradley Hermes, Robert Homola, Penka Hristova, Kevin Hutto, Jennifer Jackson, Pamela Jevotovsky, Atlas Jones, Barbara R. Jones, Marie Juarez-Wood, Billy R. Kendricks, Mark Koehler, Michael Kostuk, Jr, James Krauser, Elizabeth R. Maselli, Richard McCombs, Jack E. McKarson, II, Joan Meyer, Nancy A. Miller, David A. Motl, John Mulligan, Mark O'Brien, Edward J. Paley, Jr, Max Rae, Richard Roberto, Elena Roditis, Millicent R. Royston, Curtis Schumacher, Dale E. Shipley, Dennis Siewert, |

| | | |
|---|---|---|
| | | Marvin G. Smith, Rene St. Laurent, Delores Stahl, Glenn Standiford, Harold Stewart, Sheila A. Thompson Noland, Shanika Turner, Russell B. Vader, Frederick V. Vaughn, John A. Vicory, Louie B. Webb, Jr, Johnny L. Wimberly. (Holland, Eric) (Entered: 03/29/2017) |
| 03/29/2017 | 8 | ENTRY of Appearance by Randall S. Crompton for Plaintiffs Stephen Anderson, Steven F. Belcher, Mark S. Boeh, Johnny Bowen, Shawni Bowen, Bernard Brown, Ann Brownell, Rebekah Susanne Bryant, Jason Campbell, Mark S. Campbell, William C. Chandler, Philip Chiera, Patrick Coleman, Kevin Cunningham, Joyce Doss, William B. Drey, Dale Engel, Joshua D. Feldman, Jose Quintero Felix, Dino Fiorello, Kenneth Forest, Patricia L. Fricke, William A. Haight, Bradley Hermes, Robert Homola, Penka Hristova, Kevin Hutto, Jennifer Jackson, Pamela Jevotovsky, Atlas Jones, Barbara R. Jones, Marie Juarez-Wood, Billy R. Kendricks, Mark Koehler, Michael Kostuk, Jr, James Krauser, Elizabeth R. Maselli, Richard McCombs, Jack E. McKarson, II, Joan Meyer, Nancy A. Miller, David A. Motl, John Mulligan, Mark O'Brien, Edward J. Paley, Jr, Max Rae, Richard Roberto, Elena Roditis, Millicent R. Royston, Curtis Schumacher, Dale E. Shipley, Dennis Siewert, Marvin G. Smith, Rene St. Laurent, Delores Stahl, Glenn Standiford, Harold Stewart, Sheila A. Thompson Noland, Shanika Turner, Russell B. Vader, Frederick V. Vaughn, John A. Vicory, Louie B. Webb, Jr, Johnny L. Wimberly. (Crompton, Randall) (Entered: 03/29/2017) |
| 03/29/2017 | 9 | ENTRY of Appearance by Patrick R Dowd for Plaintiffs Stephen Anderson, Steven F. Belcher, Mark S. Boeh, Johnny Bowen, Shawni Bowen, Bernard Brown, Ann Brownell, Rebekah Susanne Bryant, Jason Campbell, Mark S. Campbell, William C. Chandler, Philip Chiera, Patrick Coleman, Kevin Cunningham, Joyce Doss, William B. Drey, Dale Engel, Joshua D. Feldman, Jose Quintero Felix, Dino Fiorello, Kenneth Forest, Patricia L. Fricke, William A. Haight, Bradley Hermes, Robert Homola, Penka Hristova, Kevin Hutto, Jennifer Jackson, Pamela Jevotovsky, Atlas Jones, Barbara R. Jones, Marie Juarez-Wood, Billy R. Kendricks, Mark Koehler, Michael Kostuk, Jr, James Krauser, Elizabeth R. Maselli, Richard McCombs, Jack E. McKarson, II, Joan Meyer, Nancy A. Miller, David A. Motl, John Mulligan, Mark O'Brien, Edward J. Paley, Jr, Max Rae, Richard Roberto, Elena Roditis, Millicent R. Royston, Curtis Schumacher, Dale E. Shipley, Dennis Siewert, Marvin G. Smith, Rene St. Laurent, Delores Stahl, Glenn Standiford, Harold Stewart, Sheila A. Thompson Noland, Shanika Turner, Russell B. Vader, Frederick V. Vaughn, John A. Vicory, Louie B. Webb, Jr, Johnny L. Wimberly. (Dowd, Patrick) (Entered: 03/29/2017) |
| 03/29/2017 | 10 | SEALED DOCUMENT Petition (Removal/Transfer) Received From: Circuit Court of St. Louis City by Plaintiffs Stephen Anderson, Steven F. Belcher, Mark S. Boeh, Johnny Bowen, Shawni Bowen, Bernard Brown, Ann Brownell, Rebekah Susanne Bryant, Jason Campbell, Mark S. Campbell, William C. Chandler, Philip Chiera, Patrick Coleman, Kevin Cunningham, Joyce Doss, William B. Drey, Dale Engel, Joshua D. Feldman, Jose Quintero Felix, Dino Fiorello, Kenneth Forest, Patricia L. Fricke, William A. Haight, Bradley Hermes, Robert Homola, Penka Hristova, Kevin Hutto, Jennifer Jackson, Pamela Jevotovsky, Atlas Jones, Barbara R. Jones, Marie Juarez-Wood, Billy R. Kendricks, Mark Koehler, Michael Kostuk, Jr, James Krauser, Elizabeth R. Maselli, Richard McCombs, Jack E. McKarson, II, Joan Meyer, Nancy A. Miller, David A. Motl, John Mulligan, Mark O'Brien, Edward J. Paley, Jr, Max Rae, Richard Roberto, Elena Roditis, Millicent R. Royston, Curtis Schumacher, Dale E. Shipley, Dennis Siewert, Marvin G. Smith, Rene St. Laurent, Delores Stahl, Glenn Standiford, Harold Stewart, Sheila A. Thompson Noland, Shanika Turner, Russell B. Vader, Frederick V. Vaughn, John A. Vicory, Louie B. Webb, Jr, Johnny L. Wimberly. (JWD) **Filed under seal pursuant to Local Rule 2.17 because the petition contains the full name of a minor.** (Entered: 03/30/2017) |
| 03/30/2017 | | Case Opening Notification: All parties must file the Notice Regarding Magistrate Judge Jurisdiction Form consenting to or opting out of the Magistrate Judge jurisdiction. Click |

| | | |
|---|---|---|
| | | here for the instructions. Judge Assigned: Honorable John M. Bodenhausen. (JWD) (Entered: 03/30/2017) |
| 03/30/2017 | 11 | NOTICE OF FILING NOTICE OF REMOVAL filed by Defendant Monsanto Company Sent To: State Court - Executed (Sternhell Blackwell, Ann) (Entered: 03/30/2017) |
| 03/30/2017 | 12 | MOTION for Leave to Appear Pro Hac Vice Joe G. Hollingsworth. The Certificate of Good Standing was attached.(Filing fee $100 receipt number 0865-5886626) by Defendant Monsanto Company. (Attachments: # 1 Attachment List of Bar Admissions, # 2 Certificate of Good Standing, # 3 Attachment Certificate of Service)(Hollingsworth, Joe) (Entered: 03/30/2017) |
| 03/30/2017 | 13 | CJRA ORDER (GJL). Magistrate Judge John M. Bodenhausen termed. Case reassigned to District Judge Carol E. Jackson for all further proceedings. (CAR) (Entered: 03/30/2017) |
| 04/04/2017 | 14 | MOTION for Leave to File in Excess of Page Limitation by Plaintiffs Stephen Anderson, Steven F. Belcher, Mark S. Boeh, Johnny Bowen, Shawni Bowen, Bernard Brown, Ann Brownell, Rebekah Susanne Bryant, Jason Campbell, Mark S. Campbell, William C. Chandler, Philip Chiera, Patrick Coleman, Kevin Cunningham, Joyce Doss, William B. Drey, Dale Engel, Joshua D. Feldman, Jose Quintero Felix, Dino Fiorello, Kenneth Forest, Patricia L. Fricke, William A. Haight, Bradley Hermes, Robert Homola, Penka Hristova, Kevin Hutto, Jennifer Jackson, Pamela Jevotovsky, Atlas Jones, Barbara R. Jones, Marie Juarez-Wood, Billy R. Kendricks, Mark Koehler, Michael Kostuk, Jr, James Krauser, Elizabeth R. Maselli, Richard McCombs, Jack E. McKarson, II, Joan Meyer, Nancy A. Miller, David A. Motl, John Mulligan, Mark O'Brien, Edward J. Paley, Jr, Max Rae, Richard Roberto, Elena Roditis, Millicent R. Royston, Curtis Schumacher, Dale E. Shipley, Dennis Siewert, Marvin G. Smith, Rene St. Laurent, Delores Stahl, Glenn Standiford, Harold Stewart, Sheila A. Thompson Noland, Shanika Turner, Russell B. Vader, Frederick V. Vaughn, John A. Vicory, Louie B. Webb, Jr, Johnny L. Wimberly. (Attachments: # 1 Text of Proposed Order Proposed Order)(Holland, Eric) (Entered: 04/04/2017) |
| 04/04/2017 | 15 | MOTION to Remand Case to State Court to St. Louis City by Plaintiffs Stephen Anderson, Steven F. Belcher, Mark S. Boeh, Johnny Bowen, Shawni Bowen, Bernard Brown, Ann Brownell, Rebekah Susanne Bryant, Jason Campbell, Mark S. Campbell, William C. Chandler, Philip Chiera, Patrick Coleman, Kevin Cunningham, Joyce Doss, William B. Drey, Dale Engel, Joshua D. Feldman, Jose Quintero Felix, Dino Fiorello, Kenneth Forest, Patricia L. Fricke, William A. Haight, Bradley Hermes, Robert Homola, Penka Hristova, Kevin Hutto, Jennifer Jackson, Pamela Jevotovsky, Atlas Jones, Barbara R. Jones, Marie Juarez-Wood, Billy R. Kendricks, Mark Koehler, Michael Kostuk, Jr, James Krauser, Elizabeth R. Maselli, Richard McCombs, Jack E. McKarson, II, Joan Meyer, Nancy A. Miller, David A. Motl, John Mulligan, Mark O'Brien, Edward J. Paley, Jr, Max Rae, Richard Roberto, Elena Roditis, Millicent R. Royston, Curtis Schumacher, Dale E. Shipley, Dennis Siewert, Marvin G. Smith, Rene St. Laurent, Delores Stahl, Glenn Standiford, Harold Stewart, Sheila A. Thompson Noland, Shanika Turner, Russell B. Vader, Frederick V. Vaughn, John A. Vicory, Louie B. Webb, Jr, Johnny L. Wimberly. (Holland, Eric) (Entered: 04/04/2017) |
| 04/04/2017 | 16 | MEMORANDUM in Support of Motion re 15 MOTION to Remand Case to State Court to St. Louis City filed by Plaintiffs Stephen Anderson, Steven F. Belcher, Mark S. Boeh, Johnny Bowen, Shawni Bowen, Bernard Brown, Ann Brownell, Rebekah Susanne Bryant, Jason Campbell, Mark S. Campbell, William C. Chandler, Philip Chiera, Patrick Coleman, Kevin Cunningham, Joyce Doss, William B. Drey, Dale Engel, Joshua D. Feldman, Jose Quintero Felix, Dino Fiorello, Kenneth Forest, Patricia L. Fricke, William A. Haight, Bradley Hermes, Robert Homola, Penka Hristova, Kevin Hutto, Jennifer Jackson, Pamela Jevotovsky, Atlas Jones, Barbara R. Jones, Marie Juarez-Wood, Billy R. Kendricks, Mark |

| | | |
|---|---|---|
| | | Koehler, Michael Kostuk, Jr, James Krauser, Elizabeth R. Maselli, Richard McCombs, Jack E. McKarson, II, Joan Meyer, Nancy A. Miller, David A. Motl, John Mulligan, Mark O'Brien, Edward J. Paley, Jr, Max Rae, Richard Roberto, Elena Roditis, Millicent R. Royston, Curtis Schumacher, Dale E. Shipley, Dennis Siewert, Marvin G. Smith, Rene St. Laurent, Delores Stahl, Glenn Standiford, Harold Stewart, Sheila A. Thompson Noland, Shanika Turner, Russell B. Vader, Frederick V. Vaughn, John A. Vicory, Louie B. Webb, Jr, Johnny L. Wimberly. (Holland, Eric) (Entered: 04/04/2017) |
| 04/05/2017 | 17 | Docket Text ORDER: 14 GRANTING MOTION for Leave to File in Excess of Page Limitation by Plaintiffs. Signed by District Judge Carol E. Jackson on 4/5/17. (KKS) (Entered: 04/05/2017) |

### PACER Service Center

#### Transaction Receipt

04/05/2017 17:08:40

| PACER Login: | hllp1982:2634105:4722683 | Client Code: | 1417.0005 |
|---|---|---|---|
| Description: | Docket Report | Search Criteria: | 4:17-cv-01192-CEJ |
| Billable Pages: | 27 | Cost: | 2.70 |

**1722-CC00819**

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
STATE OF MISSOURI

| | |
|---|---|
| MARK O'BRIEN; STEPHEN ANDERSON; STEVEN F. BELCHER; MARK S. BOEH; JOHNNY BOWEN and SHAWNI BOWEN on behalf of their minor child Q████ B████; BERNARD BROWN; ANN BROWNELL, individually and for decedent JAMES BROWNELL; REBEKAH SUSANNE BRYANT; JASON CAMPBELL, on behalf of JIMME CAMPBELL; MARK S. CAMPBELL; WILLIAM C. CHANDLER; PHILIP CHIERA; PATRICK COLEMAN; KEVIN CUNNINGHAM; JOYCE DOSS; WILLIAM B. DREY; DALE ENGEL; JOSHUA D. FELDMAN; DINO FIORELLO; KENNETH FOREST; PATRICIA L. FRICKE; WILLIAM A. HAIGHT; BRADLEY HERMES; ROBERT HOMOLA; PENKA HRISTOVA; KEVIN HUTTO; JENNIFER JACKSON; PAMELA JEVOTOVSKY; ATLAS JONES; BARBARA R. JONES; MARIE JUAREZ-WOOD; BILLY R. KENDRICKS; MARK KOEHLER; MICHEAL KOSTUK, JR.; JAMES KRAUSER; ELIZABETH R. MASELLI; RICHARD MCCOMBS; JACK E. MCKARSON II; JOAN MEYER; NANCY A. MILLER; DAVID A. MOTL; JOHN MULLIGAN; EDWARD J. PALEY, JR.; JOSE QUINTERO FELIX; MAX RAE; RICHARD ROBERTO; ELENA RODITIS; MILLICENT R. ROYSTON; CURTIS SCHUMACHER; DALE E. SHIPLEY; DENNIS SIEWERT; MARVIN G. SMITH; RENE ST. LAURENT; DOLORES STAHL, on behalf of MARSHALL STAHL; GLENN STANDIFORD; HAROLD STEWART; SHEILA A. THOMPSON NOLAND; SHANIKA TURNER; RUSSELL B. VADER; FREDERICK V. VAUGHN; JOHN A. VICORY; LOUIE B. WEBB, JR.; and JOHNNY L. WIMBERLY, | **PETITION AND JURY DEMAND**<br><br>**Case No.:** _____<br><br>**Division:** |
| Plaintiffs, | |

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

v.

MONSANTO COMPANY

Serve:

         Defendant.

## PETITION

COME NOW Plaintiffs, by and through their undersigned counsel, and for their causes of action against Defendant Monsanto Company, alleging the following upon information and belief (including investigation made by and through Plaintiffs' counsel), except those allegations that pertain to Plaintiffs, which are based on personal knowledge:

## INTRODUCTION

Plaintiffs bring this cause of action against Defendant pursuant to Rule 52.05(a) of the Missouri Rules of Civil Procedure, as their claims arise out of the same series of transactions and occurrences, and their claims involve common questions of law and/or fact. All claims in this action are a direct and proximate result of Defendants' negligent, willful, and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, and/or sale of the products as Roundup®. All Plaintiffs in this action seek recovery for damages as a result of developing Non-Hodgkin's Lymphoma ("NHL"), which was directly and proximately caused by such wrongful conduct by Defendant, the unreasonably dangerous and defective nature of Roundup®, and its active ingredient, glyphosate, and the attendant effects of developing NHL. No Plaintiff knew of an association between exposure to Roundup® and the increased risk of developing NHL until well after July 29, 2015, when the International Agency for Research on Cancer ("IARC"), an agency of the World Health

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

Organization ("WHO"), first published its evaluation of glyphosate.  All of the claims involve common questions of law and fact and share legal and medical issues that arise out of all of the Plaintiffs' exposures to Roundup®.

## THE PARTIES

### PLAINTIFFS

### *Mark O'Brien*

1.      Plaintiff Mark O'Brien is a citizen of St. Louis, Missouri.

2.      At all relevant times, including from approximately 1995 to and including 2012, Plaintiff O'Brien was exposed to Roundup® in St. Louis, Missouri, first in the City of St. Louis and thereafter in St. Louis County where he used Roundup® on his residences to control weeds. From approximately 1995 through 2002, Plaintiff O'Brien used Roundup® at his residence located at 4143 Davis Street, St. Louis, MO 63123, in the City of St. Louis, to spray the patio of the house and sidewalks.  During this time, Plaintiff O'Brien sprayed every year from approximately May through September, spraying every few weeks, as needed.  Each application took approximately an hour, and Plaintiff wore no protective gear while applying Roundup®. Thereafter, from approximately 2002 through 2012, Plaintiff O'Brien used Roundup® at 9836 Lenor Dr., St. Louis, MO 63123 to spray his driveway and back patio.  During this time, Plaintiff sprayed every year from approximately May through September, spraying Roundup® approximately two to three times per month, as needed.  Each application took approximately an hour to an hour-and-a-half, and Plaintiff wore no protective gear while applying Roundup®.

3.      On or about June 5, 2015, Plaintiff O'Brien was diagnosed with Chronic Lymphocytic Leukemia (CLL), a subtype of NHL, at St. Anthony's Medical Center in St. Louis, Missouri, and suffered the effects attendant thereto, as a direct and proximate result of the

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

4.      As a direct and proximate result of these injuries, Plaintiff O'Brien has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff O'Brien has otherwise been damaged in a personal and pecuniary nature.

5.      During the entire time that Plaintiff O'Brien was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

6.      At all relevant times, Plaintiff O'Brien was exposed to Roundup® in the State of Missouri.  Plaintiff O'Brien was first injured as that term is defined in 508.010 Mo. Rev. Stat. in the 22nd Judicial District, City of St. Louis.

### Stephen Anderson

7.      Plaintiff Stephen Anderson is a citizen of the State of North Dakota and was born on November 10, 1951.  Plaintiff Anderson resides in the City of Kindred, County of Richland.

8.      Plaintiff Anderson was exposed to Roundup® in Kindred, ND, from 1986 through 2017 while spraying Roundup® around his home and on the Stephen B. Anderson Farm, a farm he owned and operated.  He sprayed Roundup® every year from May through August and approximately once a month.  Each application took about three hours.  For the fields, Plaintiff Anderson used a farm sprayer pulled by a tractor and for smaller work in the yard, he used a hand sprayer.  Plaintiff wore gloves and a mask while spraying.  Plaintiff Anderson purchased Roundup® for use on his property at a grain elevator.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

9.      In or about April 2005, Plaintiff Anderson was diagnosed with follicular lymphoma in Fargo, ND, at the Sanford Roger Maris Cancer Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

10.     As a direct and proximate result of these injuries, Plaintiff Anderson has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Anderson has otherwise been damaged in a personal and pecuniary nature.

11.     During the entire time that Plaintiff Anderson was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Steven F. Belcher

12.     Plaintiff Steven F. Belcher is a citizen of the State of Florida and was born on August 1, 1961.  Plaintiff Belcher resides in the City of Fort Myers, County of Lee.

13.     Plaintiff Belcher was exposed to Roundup® in Fort Myers, Florida from approximately 1994 through 2016 where he used Roundup® to kill weeds at his personal residence. Plaintiff Belcher used Roundup® every year throughout the year.  Plaintiff Belcher would spray Roundup® using a hand sprayer one or two times each month for about thirty minutes each time.  Plaintiff Belcher purchased concentrated Roundup® by the gallon from the local hardware store.  When using and mixing Roundup®, Plaintiff did not wear protective gear such as boots, glove, or facemask.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

14.    In or about November 6, 2006, Plaintiff Belcher was diagnosed with large B-cell lymphoma, a sub-type of NHL, in Fort Myers, Florida and sought treatment at the Florida Cancer Specialists in Fort Myers, Florida.  In or about April 2011, a mass was noted in Plaintiff Belcher's neck at the Moffitt Cancer Center in Tampa, Florida and he was again diagnosed with NHL.  Plaintiff Belcher has suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

15.    As a direct and proximate result of these injuries, Plaintiff Belcher has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Belcher has otherwise been damaged in a personal and pecuniary nature.

16.    During the entire time that Plaintiff Belcher was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Mark S. Boeh

17.    Plaintiff Mark S. Boeh is a citizen of the State of Missouri and was born on June 18, 1953.  Plaintiff Boeh resides in the City of Independence, County of Jackson.

18.    Plaintiff Boeh was exposed to Roundup® in Independence, Missouri from approximately 1985 through 2015 where he owned a home on three-quarters of an acre. Plaintiff applied Roundup® on and around his property annually, during the months of April through August.  Plaintiff sprayed Roundup® throughout the spring, and every other month in the months of June, July, and August.  Each application by Plaintiff would take around three hours in order to fully apply Roundup® throughout his property.  Plaintiff purchased premixed, read-to-use

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

Roundup® at his local hardware store.  Plaintiff's Roundup® was purchased as a kit that included a hand-held sprayer, pump and canister.  Plaintiff wore no protective gear, such as gloves, mask, or a suit.

19.     In or about October 2008, Plaintiff Boeh was diagnosed with Non-Hodgkin's Lymphoma, in Independence, MO, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

20.     As a direct and proximate result of these injuries, Plaintiff Boeh has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Boeh has otherwise been damaged in a personal and pecuniary nature.

21.     During the entire time that Plaintiff Boeh was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

***Johnny Bowen and Shawni Bowen on behalf of their minor child Q██ B██***

22.     Johnny Bowen and Shawni Bowen are citizens of the State of Utah and are the parents of minor child and Plaintiff, Q██ B██ who was born on November 4, 2003. Plaintiff B████ resides with his parents in the City of Ballard, County of Uintah.

23.     Plaintiff B███ was exposed to Roundup® in Roosevelt, Utah from approximately 2007 through 2015.  Plaintiff B████ lived with his parents on the family farm in Utah, where we often participated in farm-related chores.  Plaintiff B████'s Roundup® exposure occurred during the spring and summer months where he would often ride the tractor and tend the fields with his father.  The farm applied Roundup® to alfalfa and hay fields using a 4-wheeler

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

with a spray tank.  On some occasions, Plaintiff B█████ would hold the sprayer wand to kill the weeds.  Plaintiff B█████ was exposed to Roundup® as a result of his participation in farming duties.  The farm used Roundup® concentrate purchased form the local supply store.

24.     In or about November 26, 2014, Plaintiff B█████ was diagnosed with Non-Hodgkin's Lymphoma, in Salt Lake City Utah, at Childrens Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

25.     As a direct and proximate result of these injuries, Plaintiff B█████ has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff B█████ has otherwise been damaged in a personal and pecuniary nature.

26.     During the entire time that Plaintiff B█████ was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### *Bernard Brown*

27.     Plaintiff Bernard Brown is a citizen of the State of California and was born on August 29, 1965.  Plaintiff Brown resides in the City of El Cajon, County of San Diego.

28.     Plaintiff Brown was exposed to Roundup® in El Cajon, CA from in or around 1985 through 1990 while operating his landscaping company.  Plaintiff used Roundup® on a daily basis at clients' homes and he sprayed all year.  Each application of Roundup® to a client's property took approximately 45 minutes to an hour, and Plaintiff often had multiple jobs in a

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

day.  Plaintiff used hand-held sprayers and 2-gallon and 6-gallon backpack sprayers.  Plaintiff purchased Roundup® for use in his business from local landscaping stores.

29.     Plaintiff Brown was further exposed to Roundup® in El Cajon, CA from in or around 2002 through 2013 while working for his daughter-in-law's landscaping company.  Plaintiff used Roundup® on a daily basis at clients' homes and he sprayed all year.  Each application took approximately two to three hours.

30.     On or about December 1, 2016, Plaintiff Brown was diagnosed with Stage II NHL in La Mesa, CA, at Cancer Center Oncology Medical Group, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

31.     As a direct and proximate result of these injuries, Plaintiff Brown has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Brown has otherwise been damaged in a personal and pecuniary nature.

32.     During the entire time that Plaintiff Brown was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

*Ann Brownell, individually and for decedent James Brownell*

33.     Plaintiff Ann Brownell is an adult whose principal place of residence is the City of Carbondale, State of Pennsylvania, brings this action in her capacity as the surviving spouse of James Brownell.  Plaintiff is pursuing this action due to the wrongfully caused premature death of James Brownell on behalf of that decedent's estate.  The premature death of James Brownell was the direct and proximate result of his use of Defendant's Roundup® product and

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

subsequent Non-Hodgkin's Lymphoma diagnosis.  Plaintiff seeks damages for decedent's loss of future earnings, loss of decedent's value to her estate, and other damages as allowed by law. This claim is brought pursuant to 42 Pa. C.S. § 8301 *et seq.*

34.      James Brownell was a resident of the State of Pennsylvania at the time of his injury and at the time of his death on February 9, 2017.  Mr. Brownell was born on September 22, 1955.  Lymphoma is one of the listed causes of death on Mr. Brownell's death certificate.

35.      James Brownell was exposed to Roundup® in and around Carbondale, Pennsylvania from approximately 1985 through approximately 2015.  Mr. Brownell would spray Roundup® around his property in an effort to control Japanese knotweed.  Mr. Brownell's heaviest Roundup® application occurred between 1986 and 1993 where he would hand spray the Roundup® two or three times each year for about one-half hour each time.  After 1993, he would spray Roundup® as needed to control the Japanese knotweed.  Mr. Brownell wore no protective gear, such as gloves, mask, or a suit.

36.      On or about November 10, 2000, Mr. Brownell was diagnosed with Non-Hodgkin's Lymphoma at Scranton Hematology and Oncology.  Shortly thereafter, Mr. Brownell sought stem cell replacement therapy at Sloan Kettering in New York, New York.  Mr. Brownell continued to seek treatment for his NHL until his death on February 9, 2017.  Mr. Brownell suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

37.      As a direct and proximate result of these injuries, Plaintiff Ann Brownell on the behalf of James Brownell incurred medical expenses and endured pain and suffering and loss of

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

enjoyment of life.  Plaintiff Ann Brownell, individually, and on the behalf of, James Brownell

has otherwise been damaged in a personal and pecuniary nature.

38.     During the entire time that James Brownell was exposed to Roundup®, he did not

know that exposure to Roundup® was injurious to his health or the health of others.

### *Rebekah Susanne Bryant*

39.     Plaintiff Rebekah Susanne Bryant is a citizen of the State of Virginia and was

born on June 2, 1954.  Plaintiff Bryant resides in the City of Henry, County of Franklin.

40.     Plaintiff Bryant was exposed to Roundup® in Ridgeway, VA, from approximately

1979 through 1991 while spraying Roundup® on her 6.5-acre farm.  Plaintiff sprayed every year

from approximately the end of March through about October or November.  Plaintiff applied

Roundup® on a daily basis, primarily around vegetables and flowers beds.  Each application took

approximately three-and-a-half hours.  Plaintiff wore no protection while mixing or spraying

Roundup except, on occasion, a mask.  Plaintiff's ex-husband purchased Roundup® for use at her

farm.

41.     Plaintiff Bryant was further exposed to Roundup® in Henry, VA, from

approximately 2003 through 2015 while spraying Roundup® on her 45-acre farm.  Plaintiff

sprayed every year from approximately the end of March through about October or November.

Plaintiff applied Roundup® on a daily basis, primarily around vegetables and flowers beds.  Each

application took approximately three hours.  To apply Roundup®, Plaintiff used either a 15-

gallon or 60-gallon tanks, which had motorized automatic sprayers and a wand to direct the

Roundup.  Plaintiff wore no protection while mixing or spraying Roundup except, on occasion, a

mask.  Plaintiff's husband purchased Roundup® in concentrate form for use at her farm.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

42.     In or about September 2, 2010, Plaintiff Bryant was diagnosed with Stage IV diffuse large B-cell lymphoma, a subtype of NHL, in Winston-Salem, NC, at the Wake Forest Medical Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

43.     As a direct and proximate result of these injuries, Plaintiff Bryant has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Bryant has otherwise been damaged in a personal and pecuniary nature.

44.     During the entire time that Plaintiff Bryant was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

### *Jason Campbell*

45.     Plaintiff Jason Campbell is an adult whose principal place of residence is the City of Cyprus, State of Texas, brings this action in his capacity as the surviving son of Jimmie Campbell.  Plaintiff is pursuing this action due to the personal injury suffered by Jimmie Campbell in his representative capacity as surviving heir.  Jimmie Campbell's injury was the direct and proximate result of his exposure to Roundup® and subsequent diffuse large B-cell lymphoma diagnosis.

46.     Jimmie Campbell was exposed to Roundup® in and around Fresno, California from approximately 1977 through approximately 2007.  Jimmie Campbell worked at an irrigation company is Fresno, California where one of his primary duties was to spray Roundup® along the water canals in an effort to keep weeds and other foliage from blocking the water flow

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

of the canals.  Jimmie Campbell sprayed Roundup® as an employee of the irrigation company using both a tractor and a backpack with spray nozzle to apply the Roundup®, and applying the pesticide 4-6 months in each calendar year.  Throughout Jimmie Campbell's employment with the Fresno irrigation company, he was supplied with gloves and a paper mask.

47.    On or about May 4, 2009, Jimmie Campbell was diagnosed with diffuse large B-cell lymphoma, a sub-type of NHL, at Fresno Community Hospital in Fresno, California.  Plaintiff sought immediate treatment at California Cancer Care Associates in Fresno, California, which was continued until his death on June 16, 2009.  Jimmie Campbell suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

48.    As a direct and proximate result of these injuries, Plaintiff Jason Campbell as survivor on the behalf of Jimmie Campbell incurred medical expenses and endured pain and suffering and loss of enjoyment of life, and Plaintiff Jason Campbell on the behalf of Jimmie Campbell has otherwise been damaged in a personal and pecuniary nature.

49.    During the entire time that Jimmie Campbell was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Mark S. Campbell

50.    Plaintiff Mark S. Campbell is a citizen of the State of Texas and was born on August 6, 1949.  Plaintiff Campbell resides in the City of Cypress, County of Harris.

51.    Plaintiff Campbell was exposed to Roundup® in Harris County, State of Texas, from 1990 through approximately 2004 as part of his employment.  Plaintiff Campbell owned a

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

mowing business called Mohawk Maintenance and worked under contract for various municipal utility districts in and around Harris County.  As part of his mowing services, Plaintiff Campbell killed weeds in and along the fence lines throughout Harris County.  Plaintiff applied Roundup® using both a tractor affixed with a fifteen-gallon tank of Roundup® and a spray applicator affixed to a backpack filled with Roundup®.  Plaintiff purchased Roundup® from a local supply store.

52.     In or about July 21, 2003, Plaintiff Campbell was diagnosed with CLL, a subtype of NHL, at MD Anderson Cancer Center in Houston, Texas.  Most recently, in August 2016, Plaintiff Campbell was diagnosed with follicular b-cell lymphoma, a sub-type of NHL.  Plaintiff Campbell has suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

53.     As a direct and proximate result of these injuries, Plaintiff Campbell has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Campbell has otherwise been damaged in a personal and pecuniary nature.

54.     During the entire time that Plaintiff Campbell was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### William C. Chandler

55.     Plaintiff William C. Chandler is a citizen of the State of New Hampshire and was born on November 21, 1955.  Plaintiff Chandler resides in the City of Stratham, County of Rockingham.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

56.     Plaintiff Chandler was exposed to Roundup® in Stratham, NH from in or around the late 1990's through 2012 while spraying Roundup® around his home.  Plaintiff sprayed every year from June through August, and each application took approximately an hour.  Plaintiff wore no gloves, mask, goggles, or other protective gear while spraying.  Plaintiff purchased commercial grade Roundup® for use at home from his local Home Depot.

57.     On or about January 15, 2013, Plaintiff Chandler was diagnosed with diffuse large B-cell lymphoma in Boston, MA at Massachusetts General Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

58.     As a direct and proximate result of these injuries, Plaintiff Chandler has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Chandler has otherwise been damaged in a personal and pecuniary nature.

59.     During the entire time that Plaintiff Chandler was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Philip Chiera

60.     Plaintiff Phillip Chiera is a citizen of the State of New Jersey and was born on November 3, 1950.  Plaintiff Chiera resides in the City of Brick, County of Ocean.

61.     Plaintiff Chiera was exposed to Roundup® in the Township of Woodbridge, NJ from approximately 1990 through 2014 while spraying Roundup® at two properties on which he lived during this time.  Plaintiff sprayed every year from April through September,

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

approximately every two to three weeks.  Each application took approximately 30 minutes.

Plaintiff wore no protective gear while spraying, and Roundup® often ran down his skin because

the spray bottle he used had a leaky nozzle.  Plaintiff purchased concentrated Roundup® for use

at home at his local Home Depot.

62.     Plaintiff Chiera was further exposed to Roundup® in Point Pleasant, NJ, from

approximately 2005 through 2014, while applying Roundup® to weeds around his property and

lawn.  Plaintiff sprayed every year from April through September, approximately two or three

times per month.  Each application took approximately 30 minutes.  Plaintiff wore no protective

gear while spraying.  Plaintiff Chiera purchased Roundup® for use at home at his local Home

Depot.

63.     In or about February 2011, Plaintiff Chiera was diagnosed with diffuse large B-

cell lymphoma, a subtype of NHL, in Brick, NJ, at Ocean Medical Center, and suffered the

effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and

defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research,

development, testing, manufacture, production, promotion, distribution, marketing, and sale of

Roundup®.

64.     As a direct and proximate result of these injuries, Plaintiff Chiera has incurred and

will incur medical expenses in the future and has endured and will endure pain and suffering and

loss of enjoyment of life, and Plaintiff Chiera has otherwise been damaged in a personal and

pecuniary nature.

65.     During the entire time that Plaintiff Chiera was exposed to Roundup®, he did not

know that exposure to Roundup® was injurious to his health or the health of others.

*Patrick Coleman*

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

66.     Plaintiff Patrick Coleman is a citizen of the State of Oklahoma and was born on October 1, 1996.  Plaintiff Coleman resides in the City of Antlers, County of Pushmataha.

67.     Plaintiff Coleman was exposed to Roundup® in Tulsa, OK, from in or around 2002 through 2007, while spraying Roundup® along the fence-line at his home.  Plaintiff Coleman sprayed Roundup® every year from April through October.  He sprayed his fence-line approximately weekly, and each application took about an hour to an hour and a half.  Plaintiff wore no protective gear while spraying.  Plaintiff purchased Roundup® for use at home in three-gallon pre-mixed containers that had a nozzle attached.

68.     In or about September 2, 2009, Plaintiff Coleman was diagnosed with Marginal Zone Lymphoma, a subtype of NHL, in Tulsa, OK, at Saint Francis Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

69.     As a direct and proximate result of these injuries, Plaintiff Coleman has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Coleman has otherwise been damaged in a personal and pecuniary nature.

70.     During the entire time that Plaintiff Coleman was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Kevin Cunningham

71.     Plaintiff Kevin Cunningham is a citizen of the State of Missouri and was born on October 9, 1962.  Plaintiff Cunningham resides in the City of Holcomb, County of Dunklin.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

72.     Plaintiff Cunningham was exposed to Roundup® in Holcomb MO, from 1989 through 2015 while spraying Roundup® at Kevin Cunningham Farms, the farm he owned and operated, where he grew wheat, Roundup Ready® cotton, Roundup Ready® soybean, beans, and sorghum grain (milo).  Plaintiff sprayed every year from spring into fall, several times throughout the growing season, and each application would take several days.  Plaintiff purchased Roundup® for use on his farm from Ken-Mo Agriculture Center, AG Distributors Inc. in Kenneth, MO.

73.     Plaintiff Cunningham was additionally exposed to Roundup® in Clay County, AR, from approximately the early 2000s through 2015 while spraying Roundup® on rented farmland where he predominantly grew beans and cotton.   Because Holcomb, MO, is on the border between Missouri and Arkansas, Plaintiff began renting land in Clay County, AR, in the early 2000s, eventually farming on 3000 acres.  Plaintiff sprayed every year from spring into fall but the frequency and length of application varied based on crop and growing season.  For wheat crops and sorghum, Plaintiff used Roundup® to clear the fields before planting and again at the end of the season to dry the crop for harvesting.  For cotton crops, Plaintiff sprayed Roundup® three to five times during the growing seasons.  For soybean crops, Plaintiff sprayed Roundup® two to three times during the growing season.  Each application could take anywhere from one to five or six full working days.  Plaintiff Cunningham purchased Roundup® for use on his farm from Ag Chem Direct.

74.     Plaintiff Cunningham was further exposed to Roundup® in Holcomb, MO, from 1989 through 2015 while spraying Roundup® on overgrowth near his home, buildings, and fence line.  Plaintiff applied Roundup® twice a year and each application would take about an hour.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

For use around his home, Plaintiff used the same Roundup® that he purchased for agricultural use.

75.     In or about March 25, 2014, Plaintiff Cunningham was diagnosed with diffuse large B-cell lymphoma, a subtype of NHL, in Houston, Texas at University of Texas MD Anderson Cancer Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

76.     As a direct and proximate result of these injuries, Plaintiff Cunningham has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Cunningham has otherwise been damaged in a personal and pecuniary nature.

77.     During the entire time that Plaintiff Cunningham was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### *Joyce Doss*

78.     Plaintiff Joyce Doss is a citizen of the State of Illinois and was born on June 12, 1942.  Plaintiff Doss resides in the City of Taylorsville, County of Christian.

79.     Plaintiff Doss was exposed to Roundup® in Springfield and New Berlin, IL, from in or around 1994 through 2015 while using Roundup® at home in her garden to kill weeds in her yard and garden.  Plaintiff Doss lived at a residence in Taylorsville, IL from 1994 through June 2005, where she used Roundup® to kill weeds in and around her yard and garden during the spring and summer months.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

80.      Plaintiff Doss lived in New Berlin, IL from approximately June 2005 through 2014.  She used Roundup® to kill weeds in and around her yard and garden as needed throughout spring and early summer.  Plaintiff's applied Roundup® by using a hand-spray bottle.  Plaintiff did not wear any protective gear, such as gloves, mask or suit, while spraying Roundup®.  Plaintiff purchased her bottles of ready-mix Roundup®, as well as concentrated Roundup® at her local supermarket and hardware store.

81.      In or about the latter half of 2008, Plaintiff Doss was diagnosed with chronic Lymphocytic Leukemia, a subtype of NHL, in Springfield, Illinois, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

82.      As a direct and proximate result of these injuries, Plaintiff Doss has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Doss has otherwise been damaged in a personal and pecuniary nature.

83.      During the entire time that Plaintiff Doss was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

### William B. Drey

84.      Plaintiff William B. Drey is a citizen of the State of North Carolina and was born on February 9, 1957.  Plaintiff Drey resides in the City of Southport, County of Brunswick.

85.      Plaintiff Drey was exposed to Roundup® in Southport, NC, from in or around the mid-1970's through 2011 while spraying Roundup® around his home.  Plaintiff Drey's property

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

is located in a rural part of North Carolina with heavy brush, weeds, and vines.  Plaintiff sprayed Roundup® every spring and summer, either weekly or monthly, depending on growth.  Plaintiff used a hand pump or loaded mixed Roundup®  concentrate into a 2-gallon sprayer, and each application took anywhere from approximately 20 minutes to about an hour.  Plaintiff wore gloves while mixing and spraying some of the time but not consistently and he wore no other protective gear.  Plaintiff purchased Roundup® for use at home from his local hardware store.

86.     On or about January 31, 2006, Plaintiff Drey was diagnosed with B-cell NHL with follicular center in Myrtle Beach, SC, at Grand Stand Regional Medical Center and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

87.     As a direct and proximate result of these injuries, Plaintiff Drey has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Drey has otherwise been damaged in a personal and pecuniary nature.

88.     During the entire time that Plaintiff Drey was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### *Dale Engel*

89.     Plaintiff Dale Engel is a citizen of the State of Illinois and was born on September 5, 1946.  Plaintiff Engel resides in the City of Sycamore, County of Dekalb.

90.     Plaintiff Engel was exposed to Roundup® in Hampshire, IL, from approximately the late 1970s through 1986 while spraying Roundup on his 2500-acre farm.  Plaintiff used

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

Roundup to spray weeds in the soybean fields and among other crops.   For two weeks in June every year, Plaintiff used a tractor and wick applicator to apply Roundup®.   As Plaintiff drove the tractor, he inhaled the fumes that came from the wick applicator.  Plaintiff also spot-sprayed Roundup® as needed to control weeds around the farm.  Each application took approximately an hour.  Plaintiff wore no protective gear while spraying other than gloves.  Plaintiff purchased agricultural-grade Roundup® for use on his farm.

91.      Plaintiff Engel was further exposed to Roundup® in Ozarks, MO from approximately 1986 through 2007 while spraying Roundup® at home around his stone garden. Plaintiff sprayed Roundup® ever summer from approximately June through August, spraying every three weeks to kill weeds, and each application took about an hour.  Plaintiff used a hand pump to spray Roundup®, and he used no protective gear while spraying other than gloves. Plaintiff purchased Roundup® for use at home from a local store.

92.      In or about October 2007, Plaintiff Engel was diagnosed with Chronic Lymphocytic Leukemia in Osage Beach, MO, at Lake Regional Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

93.      As a direct and proximate result of these injuries, Plaintiff Engel has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Engel has otherwise been damaged in a personal and pecuniary nature.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

94.     During the entire time that Plaintiff Engel was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### *Joshua D. Feldman*

95.     Plaintiff Joshua Feldman is a citizen of the State of California and was born on October 27, 1961.  Plaintiff Feldman resides in the City of West Hills, County of Los Angeles.

96.     Plaintiff Feldman was exposed to Roundup® in Woodland Hills, CA from in or around 1975 through 2000 while applying Roundup® at his multiple properties.  Plaintiff used Roundup® on his lawns all year, as well as in his garden.  Every few years, Plaintiff used Roundup® to kill off his lawns so that he could re-sod them.  Plaintiff Feldman typically used a canister with a pump to apply the Roundup® and he wore no protective gear while spraying. Plaintiff purchased professional grade Roundup® for use at home from a local store.

97.     In or about December 9, 2010, Plaintiff Feldman was diagnosed with follicular center cell lymphoma, a type of NHL, in Los Angeles California, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

98.     As a direct and proximate result of these injuries, Plaintiff Feldman has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Feldman has otherwise been damaged in a personal and pecuniary nature.

99.     During the entire time that Plaintiff Feldman was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

### *Dino Fiorello*

100.    Plaintiff Dino Fiorello is a citizen of the State of Nevada and was born on March 26, 1950.  Plaintiff Fiorello resides in the City of Las Vegas, County of Clark.

101.    Plaintiff Fiorello was exposed to Roundup® in San Martin, California from approximately 1996 through 1998 where he owned a three acre walnut orchard. Plaintiff applied Roundup® on and around the rows of walnut trees several times each month during the months of April through August.  Each application of Roundup® would take Plaintiff several hours, as he would tend to the entirety of his three acre orchard, using a backpack and spray applicator to distribute the Roundup®.

102.    From approximately 2000 through 2004, Plaintiff owned a home in Prunedale, California where he used Roundup® to kill weeds among grape vines and trees.  Plaintiff applied Roundup® to the rows of grape fines from early spring until the end of fall, at least once each week using a backpack and spray applicator to distribute the Roundup®.  Plaintiff purchased high-concentration Roundup® at his local supermarket or hardware store.  Plaintiff wore no protective gear, such as gloves, mask, or a suit because his understanding of the label warnings spoke only to eye irritation resulting from direct contact with the eye.

103.    In or about May 2011, Plaintiff Fiorello was diagnosed with marginal low grade B-cell lymphoma, a sub-type of NHL, in Loma Linda, CA, at the Loma Linda University Health Care.  On June 10, 2011, Plaintiff Fiorello began treatment for the cancer, including surgery and chemotherapy.  Despite this treatment, the cancer reappeared in June 2015.  Plaintiff Fiorello has suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

104.    As a direct and proximate result of these injuries, Plaintiff Fiorello has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Fiorello has otherwise been damaged in a personal and pecuniary nature.

105.    During the entire time that Plaintiff Fiorello was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Kenneth Forest

106.    Plaintiff Kenneth Forest is a citizen of the State of North Dakota and was born on May 10, 1948.  Plaintiff Forest resides in the City of Wales, County of Cavalier.

107.    Plaintiff Forest was exposed to Roundup® in Wales, ND from in or around 1976 through 2015 while spraying on his family wheat farm.  Plaintiff and his family sprayed Roundup® at the end of every growing season to kill the wheat and speed up the drying process of the grain to harvest.   In the early 2000s, Plaintiff introduced Roundup Ready® canola, corn, and soybean crops.  Plaintiff sprayed wheat every year from August through September.  He sprayed canola, soybean, and corn crops twice during the growing season every year.  In addition, he sprayed Roundup® in early April every year, as needed, if there were weeds in the ground.  Plaintiff used a John Deere Sprayer to apply Roundup® and each application took approximately a full day to spray his property.  Plaintiff also aerially sprayed his fields.

108.    Plaintiff Forest was further exposed to Roundup® in Wales, ND, from in or around 1976 through 2015 while using Roundup® to spray weeds around his home and farm buildings.  Plaintiff used a pull behind a 30-gallon sprayer with an extendable wand or,

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

alternatively, a 1-gallon or 3-gallon hand pump to spray areas difficult to reach.  Plaintiff sprayed twice a summer and each application took approximately half a day.

109.    Plaintiff Forest was further exposed to Roundup® in Wales, ND, and surrounding areas, from in or around 1976 through 2014 while operating his aerial spraying company, Forest Flying Service, Inc., and spraying Roundup® for farmers in the region.  Plaintiff used his aerial spraying income to supplement income from the farm.  He sprayed his own farm and other farms in the area.  Plaintiff typically flew out of his own farm or out of the local airport and thereafter, he sprayed in a 25-mile radius of his takeoff location.  Plaintiff sprayed approximately 40,000 to 50,000 acres every year, though this varied, and at least 8000 acres of spraying per year consisted of Roundup®.  Plaintiff sprayed from May through September, and a typical flying day began at 5 a.m. and ended around 10 p.m. during the busy season.  Plaintiff Forest purchased Roundup® for aerial spraying from JR Simplot Co. (formerly Simplot Soil Builders), Wilbur-Ellis, and Cenex Harvest States (CHS Inc.).

110.    In or about June 16, 2015, Plaintiff Forest was diagnosed with B-cell lymphoma follicular center, a subtype of NHL, in Grand Forks, ND, at Altru Health System, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

111.    As a direct and proximate result of these injuries, Plaintiff Forest has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Forest has otherwise been damaged in a personal and pecuniary nature.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

112.    During the entire time that Plaintiff Forest was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### *Patricia L. Fricke*

113.    Plaintiff Patricia L. Fricke is a citizen of the State of Michigan and was born on March 25, 1955.  Plaintiff Fricke resides in the City of Scottville, County of Mason.

114.    Plaintiff Fricke was exposed to Roundup® in Scottville, MI, from in or around 1998 through 2014 while spraying Roundup® around her home, driveway, and yard.  Plaintiff sprayed Roundup® approximately three times a year.  When she sprayed around her home, each application took about two hours, and when she sprayed her driveway, application took approximately thirty to forty-five minutes.  Plaintiff wore no protective gear while spraying.  Plaintiff purchased pre-mixed Roundup® for use at home from her local Wal-Mart and Home Depot.

115.    In or about September 21, 2012, Plaintiff Fricke was diagnosed with mature B-cell follicular lymphoma, a subtype of NHL, in Ludington, MI at West Michigan E.N.T. (ears, nose, throat) & Allergy, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

116.    As a direct and proximate result of these injuries, Plaintiff Fricke has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Fricke has otherwise been damaged in a personal and pecuniary nature.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

117.    During the entire time that Plaintiff Fricke was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

### *William A. Haight*

118.    Plaintiff William A. Haight is a citizen of the State of Florida and was born on April 20, 1940.  Plaintiff Haight resides in the City of Deland, County of Volusia.

119.    Plaintiff Haight was exposed to Roundup® in DeLand, FL, from in or around 2002 through 2013 while spraying Roundup® on his one-and-a-half-acre property.  Plaintiff used Roundup® to kill weeds around his trees, along his property, and along sidewalks and the driveway.  Plaintiff sprayed year-round, spraying the trees approximately four times a year, and each application took about two to three hours.  Plaintiff wore no protective gear while spraying or mixing Roundup®.  Plaintiff purchased Roundup® for use at home at his local Lowe's, Home Depot, or Wal-Mart.

120.    In or about August 1, 2014, Plaintiff Haight was diagnosed with NHL in Orange City, FL, at Mid-Florida Hematology Oncology, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

121.    As a direct and proximate result of these injuries, Plaintiff Haight has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Haight has otherwise been damaged in a personal and pecuniary nature.

122.    During the entire time that Plaintiff Haight was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

### Bradley Hermes

123.    Plaintiff Bradley Hermes is a citizen of the State of Illinois and was born on November 18, 1968.  Plaintiff Hermes resides in the City of Pleasant Plains, County of Sangamon.

124.    Plaintiff Hermes was exposed to Roundup® in Morgan, Sangamon, and Macoupin counties in Illinois from approximately 1986 through 2004 where he worked as an independent farmer at Hermes Farm.  Plaintiff applied Roundup® on and around the farm each year, during the months of April through July.  Roundup® was used by Plaintiff to control weeds in and around farm buildings and stored farm equipment, which required Roundup® application between three and four times during each summer, lasting 3 hours for each application. Additionally, Plaintiff would apply Roundup® to various crops depending on the type – corn crops required a one-time annual spray of Roundup® each June, the application of which would take approximately one and one-half weeks; bean crops required about three applications of Roundup® in each growing season, and would take approximately one and one-half weeks.

Plaintiff purchased concentrated and pre-mixed Roundup® from the local farm-supply feed stores.  Plaintiff's purchase type depended on whether Plaintiff needed to hand apply Roundup® between the corn rows, farm buildings or farm equipment using a backpack and spray nozzle; or, if there was a need to apply Roundup® using a spray tractor.  Plaintiff occasionally wore gloves while driving the tractor and while loading Roundup® in the tractor's tank.  Plaintiff wore no other protective gear, such as a mask or a suit.

125.    In or about February 24, 2012, Plaintiff Hermes was diagnosed with Non-Hodgkin's Lymphoma, in Springfield, IL, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

126.    As a direct and proximate result of these injuries, Plaintiff Hermes has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Hermes has otherwise been damaged in a personal and pecuniary nature.

127.    During the entire time that Plaintiff Hermes was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### *Robert Homola*

128.    Plaintiff Robert Homola is a citizen of the State of Pennsylvania and was born on November 4, 1934.  Plaintiff Homola resides in the City of South Fork, County of Cambria.

129.    Plaintiff Homola was exposed to Roundup® in South Fork, Pennsylvania from approximately 1985 through 2016 where he owned a home on one acre. Plaintiff applied Roundup® on and around his property annually, during the months of June through September.  . Each application by Plaintiff would take around two hours in order to fully apply Roundup® throughout his property.  Plaintiff purchased concentrated Roundup® that he would mix into a two-gallon container that included an affixed hand pump for application purposes.  Plaintiff purchased Roundup® at his local hardware store.  Plaintiff wore no protective gear, such as gloves, mask, or a suit.

130.    In or about April 1, 1994, Plaintiff Homola was diagnosed with Non-Hodgkin's Lymphoma, diffuse large cell type, stage II in Johnstown, PA, at Memorial Medical Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

131.     As a direct and proximate result of these injuries, Plaintiff Homola has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Homola has otherwise been damaged in a personal and pecuniary nature.

132.     During the entire time that Plaintiff Homola was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### *Penka Hristova*

133.     Plaintiff Penka M. Hristova is a citizen of the State of Georgia and was born on September 18, 1978.  Plaintiff Hristova resides in the City of Cumming, County of Forsyth.

134.     Plaintiff Hristova was exposed to Roundup® in Cumming, GA from in or around 2007 through 2015 while gardening and spraying Roundup® around her home.  Plaintiff sprayed around her house, the gravel, sidewalks, and kudzu vines on her property.  Plaintiff sprayed every year from February through November or December, approximately once per month, though in the summer months, she sprayed every week.  Each application took approximately 40 minutes, and Plaintiff wore no protective gear while spraying.  Plaintiff purchased Roundup® for use at home at her local Home Depot or Lowe's.

135.     In or about December 31, 2015, Plaintiff Hristova was diagnosed with diffuse large B-cell lymphoma, a subtype of NHL, in Cumming, GA at Northside Hospital Forsyth, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

136.    As a direct and proximate result of these injuries, Plaintiff Hristova has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Hristova has otherwise been damaged in a personal and pecuniary nature.

137.    During the entire time that Plaintiff Hristova was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

### *Kevin Hutto*

138.    Plaintiff Kevin Hutto is a citizen of the State of South Carolina and was born on December 27, 1962.  Plaintiff Hutto resides in the City of Denmark, County of Bamberg.

139.    Plaintiff Hutto was exposed to Roundup® in Denmark, SC from approximately 1997 through 2-14.  On average, Plaintiff annually sprayed Roundup® in March and April each year in advance of the growing season for weed control.  At the end of each growing season, usually in September, Plaintiff Hutto would spray Roundup® as part of his end-of-season weed control routine.  Plaintiff Hutto's Roundup® application time would last around four hours with each use.

140.    In addition to using the Roundup® product for weed control, Plaintiff Hutto also repaired tractors and sprayers that were used for Roundup® application at various local farms. This work ranged from small repairs to intensive repairs that included rebuilding pumps and sprayer parts when necessary.  Plaintiff often wore boots, protective glasses, and leather gloves when applying Roundup®.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

141.    In or about February 17, 2015, Plaintiff Hutto was diagnosed with mantle cell lymphoma, a sub-type of NHL, in Orangeburg, SC at Regional Medical Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

142.    As a direct and proximate result of these injuries, Plaintiff Hutto has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Hutto has otherwise been damaged in a personal and pecuniary nature.

143.    During the entire time that Plaintiff Hutto was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### *Jennifer Jackson*

144.    Plaintiff Jennifer Jackson is a citizen of the State of Wisconsin and was born on October 2, 1975.  Plaintiff Jackson resides in the City of Madison, County of Dane.

145.    Plaintiff Jackson was exposed to Roundup® in DeKalb County, Illinois from approximately 1983 through 2010.  On average, Plaintiff annually sprayed Roundup® from April through September every other weekend for 15-20 minutes as part of her house-hold/ personal landscaping routine.  On the whole, Plaintiff purchased pre-mixed or ready-to-use Roundup® spray bottles from her local supermarket.  While mixing or spraying Roundup®, Plaintiff wore no protective gear, such as gloves, mask, or a suit.

146.    In or about January 25, 2011, Plaintiff Jackson was diagnosed with B-Cell Lymphoma, a sub-type of NHL, in DeKalb County, IL, and suffered the effects attendant thereto,

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup®
and Defendant's wrongful and negligent conduct in the research, development, testing,
manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

147.    As a direct and proximate result of these injuries, Plaintiff Jackson has incurred
and will incur medical expenses in the future and has endured and will endure pain and suffering
and loss of enjoyment of life, and Plaintiff Jackson has otherwise been damaged in a personal
and pecuniary nature.

148.    During the entire time that Plaintiff Jackson was exposed to Roundup®, she did
not know that exposure to Roundup® was injurious to her health or the health of others.

### Pamela Jevotovsky

149.    Plaintiff Pamela Jevotovsky is a citizen of the State of Florida and was born on
February 25, 1950.  Plaintiff Jevotovsky resides in the City of West Palm Beach, County of Palm
Beach.

150.    Plaintiff Jevotovsky was exposed to Roundup® in Howell, NJ, from
approximately 1991 through 2005 while applying Roundup® on her quarter-acre property.  She
sprayed Roundup® from April through October, approximately once per week.  Each application
took about a half an hour.  Plaintiff wore no protective gear while spraying.  Plaintiff Jevotovsky
purchased Roundup® for use at home at her local garden center.

151.    Plaintiff Jevotovsky was further exposed to Roundup® in West Palm Beach, FL,
from approximately 2005 through 2015 while applying Roundup® to sidewalks, flower beds, and
the garden on her property.  Plaintiff sprayed Roundup year-round, approximately once every
two to three weeks with heavier use in the summer.  Each application took about one to one-and-

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

a-half hours.  Plaintiff wore no protective gear while spraying.  Plaintiff Jevotovsky purchased Roundup® at her local Home Depot.

152.    In or about March 26, 2009, Plaintiff Jevotovsky was diagnosed with Waldenström's macroglobulinemia, a subtype of NHL, in West Palm Beach, FL, at Florida Cancer Specialists and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

153.    As a direct and proximate result of these injuries, Plaintiff Jevotovsky has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Jevotovsky has otherwise been damaged in a personal and pecuniary nature.

154.    During the entire time that Plaintiff Jevotovsky was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

### Atlas Jones

155.    Plaintiff Atlas Jones is a citizen of the State of California and was born on June 6, 1939.  Plaintiff Jones resides in the City of Sun City, County of Riverside.

156.    Plaintiff Jones was exposed to Roundup® in Los Angeles, California from approximately 1975 through approximately 1987 where he owned a home on one-third of an acre, and used Roundup® to rid his landscaping of weeds.  During these applications, Plaintiff wore thin cotton gloves from the dollar store in the event he needed to physically remove any weeds.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

Plaintiff was further exposed to Roundup® in Marino Valley, CA, from in or around 1987 through 1996, where he again used Roundup® to kill weeds in and along his property.  He used Roundup® throughout his residency at this location.

Plaintiff was further exposed to Roundup® in Spanish Fork, Utah, from in or around 2003 through 2006, where he again used Roundup® to kill weeds in and along his property.

Overall, Plaintiff applied Roundup® on and around his various properties for about thirty (30) years.  Plaintiff sprayed Roundup® for about one hour each month.  Plaintiff purchased premixed, read-to-use Roundup® at his local hardware store.  Plaintiff purchased Roundup® by the gallon and sprayed directly from the gallon tub using a spray nozzle.  Plaintiff wore no protective gear, such as gloves, mask, or a suit.

157.     In or about 2000, Plaintiff Jones was diagnosed with chronic lymphocytic lymphoma (CLL) during routine blood work but later pathology revises this diagnosis.  On or about October 15, 2012, Plaintiff Jones was diagnosed with B-Cell Lymphoproliferative Disorder and Favor Marginal Zone Type-B Lymphoma at Kaiser Permanente, Woodland Hills Medical Center in Woodland Hills California.  Plaintiff suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

158.     As a direct and proximate result of these injuries, Plaintiff Jones has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Jones has otherwise been damaged in a personal and pecuniary nature.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

159.    During the entire time that Plaintiff Jones was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### *Barbara R. Jones*

160.    Plaintiff Barbara R. Jones is a citizen of the State of Alabama and was born on April 24, 1965.  Plaintiff Jones resides in the City of Newbern, County of Hale.

161.    Plaintiff Jones was exposed to Roundup® in Newbern, AL, from in or around the early 1990's through 2016 while spraying Roundup® on her property, around her home, along the fence line, the driveway, and the gates.  Plaintiff sprayed Roundup® on a weekly basis from April to November and each application took about two hours.  Plaintiff used hand pump sprayers and ready-to-use bottles of Roundup®.  Plaintiff purchased Roundup® for use at home from her local Wal-Mart.

162.    On or about August 30, 2016, Plaintiff Jones was diagnosed with follicular lymphoma, a subtype of NHL, in Birmingham, AL, at Cunningham Pathology, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

163.    As a direct and proximate result of these injuries, Plaintiff Jones has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Jones has otherwise been damaged in a personal and pecuniary nature.

164.    During the entire time that Plaintiff Jones was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

### *Marie Juarez-Wood*

165.     Plaintiff Marie Juarez-Wood is a citizen of the State of California and was born on September 22, 1949.  Plaintiff Juarez-Wood resides in the City of Highland, County of San Bernardino.

166.     Plaintiff Juarez-Wood was exposed to Roundup® in Grand Terrace, CA, from in or around 1995 through 2010 while using Roundup® at home in her garden to kill weeds and to spray the sidewalk.  Plaintiff sprayed from June through October, approximately twice per week. Each application took about an hour.  Plaintiff wore no gloves, mask, suit, or other protective gear while spraying Roundup®.  Since her illness, however, Plaintiff now uses vinegar and salt to kill weeds.  Plaintiff purchased Roundup® for use at home at her local Wal-Mart.

167.     On or about September 13, 2010, Plaintiff Juarez-Wood was diagnosed with diffuse large B-cell lymphoma, a subtype of NHL, in Pasadena, CA at Huntington Hospital Department of Laboratory Medicine, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

168.     As a direct and proximate result of these injuries, Plaintiff Juarez-Wood has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Juarez-Wood has otherwise been damaged in a personal and pecuniary nature.

169.     During the entire time that Plaintiff Juarez-Wood was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

### *Billy R. Kendricks*

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

170.    Plaintiff Billy R. Kendricks is a citizen of the State of Georgia and was born on January 8, 1954.  Plaintiff Kendricks resides in the City of Statesboro, County of Bulloch.

171.    Plaintiff Kendricks was exposed to Roundup® in Savannah, GA, from in and around the early 1980's through 1992 while spraying around his home, the trees on his property, and around the perimeter of his pool.  Plaintiff purchased Roundup® for use at home in 1-gallon pre-mixed jugs, which he would pump and then spray.  He sprayed Roundup between April and August, and approximately three to four times a year.  Each application took approximately 45 minutes.  In every instance, he did not wear protective gear while applying Roundup®.

172.    Plaintiff Kendricks was further exposed to Roundup® in Statesboro, GA, from about 1992 through 2005, while using Roundup® on his property.  Plaintiff Kendricks owned a 25-acre property.  He applied Roundup® to the 5-acre parcel on which he lived, and rented out the remaining 20 acres of land to farmers who farmed peanuts and cotton and sprayed a variety of pesticides, fungicides, and other chemicals, including Roundup®, on the land.

173.    Plaintiff Kendricks was continually exposed to Roundup® in Statesboro, GA, from about 2005 through 2017 while using Roundup® around his house, albeit on a smaller property.  He sprays approximately three to four times per year, and each application takes about 45 minutes.  While spraying, he wears no protective gear.  Plaintiff Kendricks purchased Roundup® for use at home at his local Lowe's.

174.    In or about March 30, 2006, Plaintiff Kendricks was first diagnosed with B-cell lymphocytic lymphoma, a subtype of NHL, in Savannah, GA, at Savannah Surgical Associates, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing,

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

and sale of Roundup®. Subsequently, on or about November 29, 2015, Plaintiff Kendricks was diagnosed with chronic lymphocytic leukemia (CLL) in Savannah, GA, at St. Joseph's/Candler Health System.

175. As a direct and proximate result of these injuries, Plaintiff Kendricks has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Kendricks has otherwise been damaged in a personal and pecuniary nature.

176. During the entire time that Plaintiff Kendricks was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Mark Koehler

177. Plaintiff Mark Koehler is a citizen of the State of California and was born on February 16, 1962. Plaintiff Koehler resides in the City of Los Banos, County of Merced.

178. Plaintiff Koehler was exposed to Roundup® in California from in or around 1986 through 2015 where he worked as a landscaper. During the years of 1986 until approximately 1997, Plaintiff Koehler worked as a supervisor for Down to Earth Landscaping in and around Santa Barbara, California. As part of his job duties, he would spray Roundup® at various locations using a backpack sprayer. On average, Plaintiff Koehler sprayed Roundup® one time each week in early Spring, and each application period would last about four hours.

179. From approximately 1997 thorough 2003, Plaintiff Koehler worked at Pebble Beach Golf Course Resort as a manager of landscaping. As part of his job duties, he would work with teams of employees to spray Roundup® on, in, and around the golf course. Roundup® was applied using both backpack sprayers and tractors affixed with tanks of Roundup®. Plaintiff sprayed Roundup® throughout the year, multiple times each week, as instructed by his

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

employer(s).    Pursuant to California guidelines, Plaintiff Koehler wore protective gear supplied by his employers, including tie-back suits, gloves, rubber booties, and a face mask.

180.    From approximately 2003 through 2008, Plaintiff Koehler worked at Bernardus Lodge & Spa in Carmel Valley, California.  The spa sat on twenty (20) acres of land and Plaintiff was asked to apply Roundup® to the vast acreage in order to kill weeds and other overgrowth on the property.  Plaintiff Koehler carried a backpack with Roundup® and applied the product via a spray nozzle.  Plaintiff Koehler does not recall receiving personal protective gear, and instead recalls that some equipment was in disrepair because the tanks would leak Roundup® while Plaintiff applied the chemical to the grounds.  Plaintiff Koehler sprayed Roundup® three times each week, and applications would take most of the day to complete.

181.    In 2008 Plaintiff Koehler returned to work at Down to Earth Landscaping, where he used Roundup® similar to his previous work with the company.  He remained with the company until 2015 when he fell ill.

182.    On or about March 2015, Plaintiff Koehler was diagnosed with Non-Hodgkin's Lymphoma in Santa Barbara, CA at Cottage Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

183.    As a direct and proximate result of these injuries, Plaintiff Koehler has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Koehler has otherwise been damaged in a personal and pecuniary nature.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

184.    During the entire time that Plaintiff Koehler was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### *Micheal Kostuk, Jr.*

185.    Plaintiff Micheal Kostuk, Jr. is a citizen of the State of New Jersey and was born on May 12, 1953.  Plaintiff Kostuk, Jr. resides in the Township of Colts Neck, County of Monmouth.

186.    Plaintiff Kostuk, Jr. was exposed to Roundup® in Freehold, NJ, from approximately the mid-1970's through in or about 2003 while spraying Roundup® with his father on their 127-acre family farm, of which 50 acres were tillable.  Plaintiff and his father sprayed during the summer months primarily.  They checked for weeds on a weekly basis and sprayed as needed.  Plaintiff used a hand-held sprayer or a tractor to apply the Roundup®, and he wore no protective gear while mixing or spraying.  Plaintiff's father purchased concentrated Roundup® for use on the family farm.

187.    Plaintiff Kostuk, Jr. was further exposed to Roundup® in Rumson, NJ, from in or about 1997 through 2010 while applying Roundup® to his five-acre property, including his tomato gardens.  Plaintiff sprayed Roundup® on a monthly basis, but more often in the spring, and used a hand pump to spray around his property.  Each application took approximately two to four hours to cover the entire area.  He wore no protective gear while mixing the Roundup® or while spraying.  Plaintiff Kostuk, Jr. purchased concentrated Roundup® for use at home at his local hardware store.

188.    Plaintiff Kostuk, Jr. was further exposed to Roundup® in Colts Neck, NJ, from in or about 2010 through 2015 where he sprayed on his property.  Plaintiff sprayed Roundup® by hand on a monthly basis, and each application would take approximately thirty to sixty minutes.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

189.    In or about October 16, 2009, Plaintiff Kostuk, Jr. was diagnosed with anaplastic large T-cell lymphoma, a subtype of NHL, in Little Silver, NJ, at Regional Cancer Care Associates, LLC, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

190.    As a direct and proximate result of these injuries, Plaintiff Kostuk, Jr. has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Kostuk, Jr. has otherwise been damaged in a personal and pecuniary nature.

191.    During the entire time that Plaintiff Kostuk, Jr. was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### James Krauser

192.    Plaintiff Krauser is a citizen of the State of Florida and was born on November 21, 1940.  Plaintiff resides in the City of Naples, County of Collier.

193.    Plaintiff Krauser was exposed to Roundup® in Connecticut and Florida from approximately 1979 through approximately 2014.  Beginning in 1979, Plaintiff sprayed Roundup® on his 2.6 acres of property as needed from May through October each year.  Plaintiff purchased the Roundup® from his local hardware store in hand-sized squirt bottles.  Plaintiff would use these bottles on his property and apply the pesticide every two-three weeks, spending around twenty (20) minutes to complete each application.  Beginning in 1990 Plaintiff Krauser maintained two residences – his Connecticut home and a winter home in Florida.  Plaintiff's Florida home was in a gated, golf community that used Roundup® for landscaping and golf

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

course maintenance.  Also, between October and June, Plaintiff applied Roundup® to his Florida home using a hand-held squirt bottle to kill weeds.  At no time while applying Roundup® did Plaintiff wear protective gear, such as gloves, mask, or a suit.

194.    On or about May 7, 2014, Plaintiff Krauser was diagnosed with diffuse large B cell lymphoma, Non-Hodgkin Lymphoma, at Sloan Kettering in New York, New York.  Plaintiff Krauser suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

195.    As a direct and proximate result of these injuries, Plaintiff Krauser has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Krauser has otherwise been damaged in a personal and pecuniary nature.

196.    During the entire time that Plaintiff Krauser was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Elizabeth R. Maselli

197.    Plaintiff Elizabeth R. Maselli is a citizen of the State of Hawaii and was born on December 1, 1958.  Plaintiff Maselli resides in the City of Kihei, County of Maui.

198.    Plaintiff Maselli was exposed to Roundup® in Fresno, CA from in or around the early 1970s through approximately 1976 while helping her father spray on their 25-acre family farm.  Plaintiff's father used a 100-gallon tank on a tractor to spray the almond orchard; Plaintiff either sprayed or drove the tractor.  Plaintiff helped her father spray the orchard every March and

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

each application took several days.  Plaintiff did not wear a mask or other protective gear other than occasionally gloves.

199.    Plaintiff Maselli was further exposed to Roundup® in Rohnert Park, CA from in or around 1983 through 2006 while using Roundup® around her yard at home.  Plaintiff sprayed around the yard to control weed overgrowth in the driveway and along the street.  She applied Roundup® three to five times a year and each application took less than an hour.

200.    In or about June 17, 1991, Plaintiff Maselli was diagnosed with intermediate-grade lymphoma (diffuse large cell type), a subtype of NHL, in Santa Rosa, CA at the Santa Rosa Hematology Oncology Medical Group, Inc., and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

201.    As a direct and proximate result of these injuries, Plaintiff Maselli has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Maselli has otherwise been damaged in a personal and pecuniary nature.

202.    During the entire time that Plaintiff Maselli was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

### Richard McCombs

203.    Plaintiff Richard McCombs is a citizen of the State of Georgia and was born on September 2, 1962.  Plaintiff McCombs resides in the City of Screven, County of Wayne.

204.    Plaintiff McCombs was exposed to Roundup® in Screven, GA from approximately 1993 through 2016 while spraying Roundup® on his nine-acre farm along fences

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

and in between rows to kill weeds.  Plaintiff sprayed every year from April to August, approximately twice a month.  Each application took an entire day.  While mixing or spraying Roundup®, Plaintiff wore no protective gear, such as gloves, mask, or a suit.  Plaintiff purchased Roundup® for use on his farm from local stores.

205.    In or about August 1997, Plaintiff McCombs was diagnosed with splenic marginal zone B-cell lymphoma, a subtype of NHL, in Brunswick, GA, at the Southeast Georgia Regional Medical Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

206.    As a direct and proximate result of these injuries, Plaintiff McCombs has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff McCombs has otherwise been damaged in a personal and pecuniary nature.

207.    During the entire time that Plaintiff McCombs was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Jack E. McKarson II

208.    Plaintiff Jack E. McKarson II is a citizen of the State of California and was born on November 14, 1977.  Plaintiff McKarson resides in the City of Oroville, County of Butte.

209.    Plaintiff McKarson was exposed to Roundup® in Elverta, CA from approximately 1985 through 1996 while using Roundup® as a child at his father's 25-acre ranch, including along the fence line, in the pastures, and wherever else weeds cropped up.  Plaintiff sprayed every year from April through September or October, a few times per week, and each application

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

took about two to three hours.  Plaintiff wore no protective gear while mixing or spraying the Roundup®.  Plaintiff's father supplied the Roundup® for use on the ranch.

210.    Plaintiff McKarson was further exposed to Roundup® in Oroville, CA from in or around 1996 through 2013 while spraying Roundup® at his home.  Plaintiff sprayed every year from April through September, a few times per week, and each application would take approximately two to three hours.  Plaintiff wore no protective gear while mixing or spraying Roundup®.  Plaintiff McKarson purchased Roundup® for use at home at his local Home Depot.

211.    On or about May 2, 2013, Plaintiff McKarson was diagnosed with B-cell NHL in Oroville, CA, at Oroville Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

212.    As a direct and proximate result of these injuries, Plaintiff McKarson has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff McKarson has otherwise been damaged in a personal and pecuniary nature.

213.    During the entire time that Plaintiff McKarson was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### *Joan Meyer*

214.    Plaintiff Joan Meyer is a citizen of the State of Texas and was born on June 20, 1959.  Plaintiff Meyer resides in the City of Pittsburg, County of Camp.

215.    Plaintiff Meyer was exposed to Roundup® in St. Charles, MO, from approximately 1977 through 2012 while spraying Roundup® around her parents' home.  Plaintiff

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

sprayed once a week in spring and summer, and each application would take approximately 30 to 40 minutes.

216.   Plaintiff Meyer was further exposed to Roundup® in Center, MO from approximately 1997 through 2012 while spraying Roundup® at her family's country home. Plaintiff sprayed once a week in spring and summer, and each application would take approximately two-and-a-half hours.  Plaintiff wore no protective gear while spraying.

217.   In or about July 31, 2013, Plaintiff Meyer was diagnosed with low-grade follicular lymphoma, a subtype of NHL, in St. Louis, MO, at Christian Hospital, and in January 2017, her doctors uncovered two new lumps that are consistent with NHL.  She has suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

218.   As a direct and proximate result of these injuries, Plaintiff Meyer has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Meyer has otherwise been damaged in a personal and pecuniary nature.

219.   During the entire time that Plaintiff Meyer was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

### Nancy A. Miller

220.   Plaintiff Nancy A. Miller is a citizen of the State of Alabama and was born on June 26, 1949.  Plaintiff Miller resides in the City of Sipsey, County of Walker.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

221.    Plaintiff Miller was exposed to Roundup® in Griffithsville, WV, from in or around 1987 through 1997 while she used Roundup® around her house, flowerbeds, and garden. Plaintiff sprayed every three to four weeks, and each application took a few hours.  During this time, Plaintiff also lived on a tobacco farm where her husband and the workers sprayed pesticides a few times per month.  Plaintiff purchased Roundup® for use at home.

222.    Plaintiff Miller was further exposed to Roundup® in West Hamlin, WV, from in or around 1997 through 2006 while spraying Roundup® around her house, her yard, and the rest of her property, including approximately 900 acres of flowerbeds.  Each application took approximately two to three hours.  During this time, Plaintiff also lived on a farm and her husband sprayed the fields two to three times per month, approximately two hours per application.  When he came home, Plaintiff Miller laundered her husband's clothing, which was drenched in chemicals and she did not wear gloves while doing laundry.  Plaintiff Miller purchased Roundup® for use at home.

223.    In or about June 5, 2009, Plaintiff Miller was diagnosed with Chronic Lymphocytic Leukemia/Small Lymphocytic Leukemia, a subtype of NHL, in South Charleston, WV, at Thomas Memorial Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

224.    As a direct and proximate result of these injuries, Plaintiff Miller has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Miller has otherwise been damaged in a personal and pecuniary nature.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

225.    During the entire time that Plaintiff Miller was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

### David A. Motl

226.    Plaintiff David A. Motl is a citizen of the State of Virginia and was born on February 19, 1964.  Plaintiff Motl resides in the City of Partlow, County of Spotsylvania.

227.    Plaintiff Motl was exposed to Roundup® in Partlow, VA from 2004 through 2017 while spraying Roundup® at his home.  Plaintiff sprayed on his property from April through October every year, approximately 2 to 3 times per month.  Each application would take about 1 to 11/2 hours.  Plaintiff Motl purchased Roundup® for use at home from his local hardware store.

228.    In or about July 29, 2014, Plaintiff Motl was diagnosed with follicular lymphoma, a subtype of NHL, at the Mary Washington Hospital in Fredericksburg, VA, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

229.    As a direct and proximate result of these injuries, Plaintiff Motl has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Motl has otherwise been damaged in a personal and pecuniary nature.

230.    During the entire time that Plaintiff Motl was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### John Mulligan

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

231.    Plaintiff Mulligan is a citizen of the State of New Jersey and was born on March 9, 1970.  Plaintiff resides in the City of Haddonfield, County of Camden.

232.    Plaintiff Mulligan was exposed to Roundup® in Camden and Gloucester Counties, New Jersey from approximately 1982 through approximately 2005.  Beginning in 1982, at the age of twelve (12) Plaintiff started working in the family landscaping business, Mulligan Landscaping, located in Blackwood, New Jersey offering service to Camden County.  Plaintiff used Roundup® concentrate purchased by his father at the local store in Blackwood, NJ.  Plaintiff would spray Roundup® in connection with his work at the landscaping business from June through October each year, averaging three days of work each week and applying Roundup® approximately three hours each day of work.  Plaintiff would use backpacks and hand-held sprayers to apply the pesticide.  At no time while applying Roundup® did Plaintiff wear protective gear, such as gloves, mask, or a suit.

233.    On or about October 2006, Plaintiff Mulligan was diagnosed with Stage II Follicular lymphoma.  Plaintiff Mulligan suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

234.    As a direct and proximate result of these injuries, Plaintiff Mulligan has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Mulligan has otherwise been damaged in a personal and pecuniary nature.

235.    During the entire time that Plaintiff Mulligan was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

### Edward J. Paley, Jr.

236.    Plaintiff Edward Paley, Jr. is a citizen of the State of Pennsylvania and was born on November 14, 1969.  Plaintiff Paley, Jr. resides in the City of Abington, County of Montgomery.

237.    Plaintiff Paley, Jr. was exposed to Roundup® in Abington, PA, from approximately 1999 through 2015 while spraying Roundup® near his home.  He applied Roundup® every year from March through September or October.  He sprayed at least once a month or more depending on weed growth, and each application would take approximately 30 minutes.  Plaintiff purchased Roundup® for use at home at his local Lowe's or Home Depot.

238.    In or about March 27, 2015, Plaintiff Paley, Jr. was diagnosed with follicular B-cell lymphoma, a subtype of NHL, in Philadelphia, PA, at the Fox Chase Cancer Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

239.    As a direct and proximate result of these injuries, Plaintiff Paley, Jr. has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Paley, Jr. has otherwise been damaged in a personal and pecuniary nature.

240.    During the entire time that Plaintiff Paley, Jr. was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Jose Quintero Felix

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

241.    Plaintiff Jose Quintero Felix is a citizen of the State of California and was born on October 5, 1947.  Plaintiff Quinter Felix resides in the City of Winton, County of Merced.

242.    Plaintiff Quintero Felix was exposed to Roundup® in and around the San Joaquin and Central Valley areas of California from approximately 1976 through approximately 2008. Plaintiff worked as a farmworker tending primarily to cotton fields, grape vines, and almond crops.  While working in the cotton fields, Plaintiff was exposed to Roundup® as a result of aerial spraying from pesticide dusters flying above the cotton fields.  Beginning in the late 1980s, Plaintiff worked mostly in grape vines where he was exposed to Roundup® both directly and indirectly.  Plaintiff's direct exposure was the result of carrying Roundup® in a backpack and spraying the weeds along the base of the grape vines. Plaintiff's indirect exposure resulted from aerial spraying over the grape fields. Plaintiff's work on the grape farms continued through the 1990s.  By 2003, Plaintiff had moved to Waterford, California and worked in the almond orchards, specifically at Mansfield Orchard.  While there, he would directly follow an almond harvester clearing debris and brushing the almonds into the rows for an almond sweeper. While working in the almond fields, Plaintiff was exposed to Roundup® as a result of a tractor-mounted air blast sprayer. Plaintiff worked fulltime as a farmer in the almond orchards from 2003 through 2008.  Throughout Plaintiff's work as a farmer, he wore no protective gear, such as gloves, mask, or a suit.

243.    In or about January 27, 2009, Plaintiff Quintero Felix was diagnosed with Diffuse Large B Cell Lymphoma, in the state of Sinaloa, Mexico.  Plaintiff subsequently sought treatment at Stanford Health Care in Redwood City, California.  Plaintiff suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research,

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

244.    As a direct and proximate result of these injuries, Plaintiff Quintero Felix has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Quintero Felix has otherwise been damaged in a personal and pecuniary nature.

245.    During the entire time that Plaintiff Quintero Felix was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

***Max Rae***

246.    Plaintiff Max Rae is a citizen of the State of California and was born on July 27, 1951.  Plaintiff Rae resides in the City of San Diego, County of San Diego.

247.    Plaintiff Rae was exposed to Roundup® in Marcus, Iowa from approximately 1974 through 1985 where he worked as a farmer tending to soybean, corn, alfalfa, and oat crops. Part of his work consisted of driving a tractor mounted with a 300-gallon herbicide tank to apply Roundup® at the beginning of each growing season.  After the initial application, Plaintiff Rae would use five gallon cans of Roundup® to fill a spray bottle and would walk through the soy crops and hand spray weeds growing within the rows.  Each application took an entire day, and could stretch for multiple days depending on the year's crop size.  Plaintiff worked full-time as a farmer until 1985.  While mixing or spraying Roundup®, Plaintiff wore no protective gear, such as gloves, mask, or a suit.  Plaintiff purchased Roundup® at a local farm supply dealer.

248.    In or about April 23, 2015, Plaintiff Rae was diagnosed with Lymphoma, Diffuse Large B Cell, a subtype of NHL, in San Diego, CA, at the Kaiser Permanente San Diego Medical Center, and suffered the effects attendant thereto, as a direct and proximate result of the

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

249.    As a direct and proximate result of these injuries, Plaintiff Rae has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Rae has otherwise been damaged in a personal and pecuniary nature.

250.    During the entire time that Plaintiff Rae was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Richard Roberto

251.    Plaintiff Richard Roberto is a citizen of the State of New York and was born on April 19, 1959.  Plaintiff Roberto resides in the City of Carmel, County of Putnam.

252.    Plaintiff Roberto was exposed to Roundup® in Carmel, NY from in or about 1996 through 2016 while spraying Roundup® at home around his walkway, driveway, deck, and swimming pool.  Plaintiff sprayed Roundup® every year from April through October, approximately once per month, and each application took approximately an hour to an hour and a half.  While spraying, Plaintiff wore no protective gear such as gloves, mask, or a suit.  Plaintiff purchased pre-mixed Roundup® with a hand pump for use at home.

253.    On or about June 2, 2014, Plaintiff Roberto was diagnosed with diffuse large B-cell lymphoma, a subtype of NHL, in New York, NY at Memorial Sloan Kettering, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research,

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

254.    As a direct and proximate result of these injuries, Plaintiff Roberto has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Roberto has otherwise been damaged in a personal and pecuniary nature.

255.    During the entire time that Plaintiff Roberto was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### *Elena Roditis*

256.    Plaintiff Elena Roditis is a citizen of the State of Illinois and was born on January 26, 1950.  Plaintiff Roditis resides in the City of Palos Hills, County of Cook.

257.    Plaintiff Roditis was exposed to Roundup® at her long-time residence in Palos Hills, IL from approximately 1989 through 2014.  Plaintiff applied Roundup® on and around her property to kill weeds in and among her yard and gardens.  Plaintiff Roditis used Roundup® for nearly fifteen (15) years.  She sprayed from spring through fall every year, approximately two to three times per week, and each application took about an hour.  On occasions when she was scheduled to host an event in her garden, she sprayed Roundup® for up to five hours.  Plaintiff Roditis bought and used pre-mixed—or occasionally, concentrated—Roundup® from her local Sid's Greenhouse, ACE Hardware, and Home Depot.  Plaintiff wore gloves while gardening, but no other protective gear while using Roundup® such as a mask or a suit because her understanding of the label warnings was that Roundup® was a safe product.

258.    On or about February 14, 2014, Plaintiff Roditis was diagnosed with follicular lymphoma, a sub-type of NHL, in Palos Hills, IL, at the Palos Community Hospital.  This

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

diagnosis was confirmed on February 13, 2014, in Chicago, IL, at the University of Chicago Medical Center, and has suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

259.    As a direct and proximate result of these injuries, Plaintiff Roditis has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Roditis has otherwise been damaged in a personal and pecuniary nature.

260.    During the entire time that Plaintiff Roditis was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

### *Millicent R. Royston*

261.    Plaintiff Millicent R. Royston is a citizen of the State of Tennessee and was born on March 3, 1957.  Plaintiff Royston resides in the City of Memphis, County of Shelby.

262.    Plaintiff Royston was exposed to Roundup® in Memphis, TN from in or around 1989 through 2016 while spraying weeds and tree overgrowth on her property.  Plaintiff sprayed from spring through summer, and she wore no protective gear while spraying other than occasionally gloves.  Plaintiff purchased the premixed version of Roundup for use at home.

263.    In or about March 22, 2016, Plaintiff Royston was diagnosed with NHL in Bartlett, TN at Saint Francis Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

264.     As a direct and proximate result of these injuries, Plaintiff Royston has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Royston has otherwise been damaged in a personal and pecuniary nature.

265.     During the entire time that Plaintiff Royston was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

### *Curtis Schumacher*

266.     Plaintiff Curtis Schumacher is a citizen of the State of Minnesota and was born on November 21, 1962.  Plaintiff Schumacher resides in the City of Waseca, County of Waseca.

267.     Plaintiff Schumacher was exposed to Roundup® in Minnesota from approximately 2011 through 2014 at his residence.  Plaintiff applied Roundup® on and around his house, lawn and garden throughout the summer months as needed to control weed growth.  Plaintiff's applied pre-mixed Roundup® using a pump and hand-spray.   Plaintiff wore no protective gear, such as gloves, mask, or a suit.

268.     In or about October 6, 2014, Plaintiff Schumacher was diagnosed with follicle center cell lymphoma, a sub-type of NHL, in Minnesota, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

269.     As a direct and proximate result of these injuries, Plaintiff Schumacher has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Schumacher has otherwise been damaged in a personal and pecuniary nature.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

270.    During the entire time that Plaintiff Schumacher was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Dale E. Shipley

271.    Plaintiff Dale E. Shipley is a citizen of the State of Missouri and was born on October 15, 1953.  Plaintiff Shipley resides in the City of Sheridan, County of Worth.

272.    Plaintiff Shipley was exposed to Roundup® in Worth, MO, from in or about 1975 through 1976 while spraying Roundup® on his family's 1,100-acre farm.  Also during this time, from approximately June through August 1975, Plaintiff Shipley worked for Sur-Gro Plant Food Company in Sheridan, Missouri.  As part of his job duties, Plaintiff Shipley regularly sprayed Roundup® on the crops and pasture land to kill weeds as instructed by his employer.  Plaintiff wore no personal protective gear, such as a mask or gloves.

273.    Plaintiff Shipley was further exposed to Roundup® in Warsaw, MO, from in or around 2001through 2015 while spraying Roundup® around his house, deck, property, and along a 200-yard driveway.  He sprayed every year from April through September, approximately once per month, and each application took about an hour to an hour and a half.  Plaintiff wore no protection while spraying.  Plaintiff purchased Roundup® for use at home from his local Wal-Mart.

274.    In or about February 22, 2016, Plaintiff Shipley was diagnosed with Stage IV NHL in Kansas City, MO, at Saint Luke's Plaza Cancer Specialists, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

275.     As a direct and proximate result of these injuries, Plaintiff Shipley has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Shipley has otherwise been damaged in a personal and pecuniary nature.

276.     During the entire time that Plaintiff Shipley was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### *Dennis Siewert*

277.     Plaintiff Dennis Siewert is a citizen of the State of Wisconsin and was born on March 5, 1941.  Plaintiff Siewert resides in the City of Markesan, County of Green Lake.

278.     Plaintiff Siewert was exposed to Roundup® in Dodge and Green Lake Counties, WI from approximately 1974 through 2012 where he worked and maintained a farm spanning around 1,000 total acres.   Plaintiff annually sprayed Roundup® to kill weeds as part of his maintenance of corn, wheat, soybeans and alfalfa crops.  Each year, Plaintiff Siewert applied Roundup® to the crops as needed, starting in early spring through approximately the first week in June; and again in September and October of each year.  Plaintiff Siewert applied Roundup® using an open-cabin tractor with a tank and extendable boom.  Each application would take several hours to complete as he worked across the large farmland.

279.     Plaintiff Siewert also used Roundup® for personal use at various rental properties in Dodge and Green Lake counties, WI to control the weeds and brush growing in and along the property.  For the most part, Plaintiff would apply Roundup® while driving a 4-wheel ATV mounted with a tank.  He would spray these properties on average around four times each year, with application periods enduring for several hours.  Plaintiff Siewert purchased concentrated

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

Roundup® from the local store and mix the solution himself.  When using and mixing Roundup®

Plaintiff would wear boots, long pants, gloves, glasses and occasionally a facemask.

280.    In or about August 19, 2013, Plaintiff Siewert was diagnosed with small

lymphocytic lymphoma (SLL), a sub-type of NHL, in Oshkosh, WI at Fox Valley Hematology

and Oncology, and suffered the effects attendant thereto, as a direct and proximate result of the

unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and

negligent conduct in the research, development, testing, manufacture, production, promotion,

distribution, marketing, and sale of Roundup®.

281.    As a direct and proximate result of these injuries, Plaintiff Siewert has incurred

and will incur medical expenses in the future and has endured and will endure pain and suffering

and loss of enjoyment of life, and Plaintiff Siewert has otherwise been damaged in a personal

and pecuniary nature.

282.    During the entire time that Plaintiff Siewert was exposed to Roundup®, he did not

know that exposure to Roundup® was injurious to his health or the health of others.

### Marvin G. Smith

283.    Plaintiff Marvin G. Smith is a citizen of the State of Arizona and was born on

November 5, 1948.  Plaintiff Smith resides in the City of Sun City, County of Maricopa.

284.    Plaintiff Smith was exposed to Roundup® in Queen Creek, AZ, from in or around

1993 through 2000 while applying Roundup® in the desert plant nursery he owned and operated,

which consisted of 15 acres of land and tens of thousands of plants and trees.  Plaintiff sprayed

Roundup® once a week to keep weeds out of the plant containers and to keep the ground clear.

Each application could take several hours.  Plaintiff wore no protective gear while spraying.

Plaintiff Smith purchased Roundup® for use at his business.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

285.    Plaintiff Smith was further exposed to Roundup® in Coolidge, AZ from in or around 1996 through 1998 while spraying Roundup® in the retail nursery he owned and operated.  Each application could take several hours.  Plaintiff wore no protective gear while spraying.  Plaintiff Smith purchased Roundup® for use at his business.

286.    Plaintiff was further exposed to Roundup® in Apache Junction, AZ, from approximately 2001 through 2004 where he operated a restaurant and did the desert landscaping there.  Plaintiff sprayed the landscaping, parking lot, and road on a monthly basis.  Each application took approximately an hour and a half to spray.  Plaintiff was also exposed to Roundup® at his custom-built home in Apache Junction, AZ from approximately 2001 through 2004.  Plaintiff sprayed Roundup® near his home and on his property on a monthly basis, and each application typically took approximately half a day.

287.    Plaintiff was further exposed to Roundup® in Miami, FL from approximately 2004 through 2005 where he worked as an administrator in the Miami School District.  Because the School District was short-staffed, Plaintiff assumed other duties such as custodial work, maintenance, and transportation.  Plaintiff sprayed Roundup® to get rid of weeds and during the course of the 2004-2005 school year, he spent approximately 10 hours applying Roundup® to school grounds.

288.    Plaintiff Smith was further exposed to Roundup® in Bagdad, AZ, from approximately 2005 through 2008, while working as the superintendent of schools for the Bagdad Unified School District.  Because the School District was short-staffed, Plaintiff assumed landscaping duties, which included spraying Roundup® on various school grounds in the school district.  Plaintiff sprayed around the school buildings, in the playground, on the

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

gravel, and other places where weeds cropped up. Plaintiff sprayed on a monthly basis, and each application took approximately six hours.

289.    Plaintiff Smith was further exposed to Roundup® in Sun City, AZ, from 2008 through 2016 while applying Roundup® around his own yard and his neighbor's yard. The initial application of Roundup took approximately two hours. Plaintiff subsequently applied Roundup on a monthly basis and each application took about an hour.

290.    In or about March 23, 2016, Plaintiff Smith was diagnosed with diffuse large B-cell NHL in Glendale, AZ at the Arizona Center For Cancer Care – Glendale, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

291.    As a direct and proximate result of these injuries, Plaintiff Smith has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Smith has otherwise been damaged in a personal and pecuniary nature.

292.    During the entire time that Plaintiff Smith was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Rene St. Laurent

293.    Plaintiff Rene St. Laurent is a citizen of the State of Rhode Island and was born on May 24, 1948. Plaintiff St. Laurent resides in the City of Tiverton, County of Newport.

294.    Plaintiff St. Laurent was exposed to Roundup® in Tiverton, Rhode Island from approximately 1982 through 2016 at his residence that sits on a two acre land parcel. Each year,

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

plaintiff applied Roundup® on and around his house, lawn and garden in late April, the month of June, and in late September as part of routine weed control.  Plaintiff applied Roundup® to his gardens by using a 4-gallon backpack sprayer, with each application lasting three hours.  Plaintiff used no other pesticide other than Roundup®.  Plaintiff wore gloves to while he gardened, but he does not recall utilizing any other protective gear, such as a mask or suit.  Plaintiff purchased his Roundup® products at the local hardware store.

295.    In or about February 23, 2016, Plaintiff St. Laurent was diagnosed with diffuse large B-Cell Lymphoma, a subtype of NHL, at Newport Hospital in Newport, Rhode Island, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

296.    As a direct and proximate result of these injuries, Plaintiff St. Laurent has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff St. Laurent has otherwise been damaged in a personal and pecuniary nature.

297.    During the entire time that Plaintiff St. Laurent was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Dolores Stahl

298.    Plaintiff Dolores Stahl is an adult whose principal place of residence is the City of Niantic, State of Illinois, brings this action in her capacity as the surviving spouse of Marshall Stahl.  Plaintiff is pursuing this action due to the personal injury suffered by Marshall Stahl on

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

behalf of that decedent's estate.  Marshall Stahl's injury was the direct and proximate result of his exposure to Roundup® and subsequent follicular lymphoma diagnosis.

299.    Plaintiff Marshall Stahl was exposed to Roundup® in and around Niantic, Illinois from approximately 1980 through approximately 1995.  Plaintiff Marshall Stahl worked on a 400+ acre farm that yielded corn and beans.  Annually, Marshall Stahl would apply Roundup® to the crops by using a tractor to spray the crops to kill weeds, as well as the perimeter of the farms for weed control in the Spring and Autumn seasons.  Additionally, a hand sprayer was utilized on a regular basis (each month if necessary) around the home and farm buildings for weed control as well.  Plaintiff worked fulltime as a farmer until retirement in 1995.  Throughout Plaintiff's work as a farmer, he wore no protective gear, such as gloves, mask, or a suit.

300.    On or about May 2, 2005, Plaintiff Marshall Stahl was diagnosed with follicular lymphoma, a sub-type of NHL, at Decatur Memorial Hospital in Decatur, Illinois.  Plaintiff sought immediate treatment at Cancer Care Specialists of Illinois, which was continued until his death on August 12, 2009.  Plaintiff Marshall Stahl suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

301.    As a direct and proximate result of these injuries, Plaintiff Dolores Stahl on the behalf of Marshall Stahl incurred medical expenses and endured pain and suffering and loss of enjoyment of life, and Plaintiff Dolores Stahl on the behalf of Marshall Stahl has otherwise been damaged in a personal and pecuniary nature.

302.    During the entire time that Marshall Stahl was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

### *Glenn Standiford*

303.   Plaintiff Glenn Standiford is a citizen of the State of Florida and was born on May 20, 1951.  Plaintiff Standiford resides in the City of Ormond Beach, County of Volusia.

304.   Plaintiff Standiford was exposed to Roundup® in New Smyrna Beach, Florida from approximately 1982 through 2005.  During the years of 1988 through 1991, Plaintiff Standiford worked at the local airport where he was tasked with spraying Roundup® around the premises, including along the runway, yard areas, and along fence lines.  Each application would depend on need, though Plaintiff used and sprayed Roundup® on a consistent basis, year round. For work along the runway and fence lines, Plaintiff Standiford would use a backpack sprayer. For the larger applications, plaintiff would drive a truck affixed with an approximately 200 gallon tank that would spray the Roundup® to larger areas.

305.   From approximately September 1991 through February 1994, Plaintiff Standiford worked for the parks and recreation department of New Smyrna Beach, Florida.  He used a Roundup® hand sprayer to kill weeds in and around city parks and city sidewalks once every two months.  Each application would take about one hour.

306.   In addition to using Roundup® as part of his employment duties, Plaintiff Standiford also used Roundup® to kill weeds at his personal residence from approximately 1999 through 2005.  Plaintiff applied Roundup® to his driveway and throughout his property using a 4-5 gallon hand pump.  While mixing or spraying Roundup®, Plaintiff wore no protective gear, such as gloves, mask, or a suit.

307.   In or about July 17, 2015, Plaintiff Standiford was diagnosed with diffuse B-cell lymphoma, a subtype of NHL, at the University of Florida, in Miami Florida, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

308.    As a direct and proximate result of these injuries, Plaintiff Standiford has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Standiford has otherwise been damaged in a personal and pecuniary nature.

309.    During the entire time that Plaintiff Standiford was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Harold Stewart

310.    Plaintiff Harold Stewart is a citizen of the State of West Virginia and was born on September 3, 1951.  Plaintiff Stewart resides in the City of Vienna, County of Wood.

311.    Plaintiff Stewart was exposed to Roundup® in Vienna, West Virginia, from approximately 2012 through 2015 while spraying Roundup® around his house and driveway. Plaintiff sprayed Roundup® every year from April through October, approximately every two months, in addition to spot spraying weeds, as needed.   Each application took about 15 minutes. Plaintiff purchased concentrated Roundup® for use at home at his local Lowe's.

312.    Plaintiff Stewart was further exposed to Roundup® in Parkersburg, West Virginia, from approximately 2012 through 2015 while spraying Roundup® around his mother-in-law's house and property.  Plaintiff sprayed every year from April through October, approximately once a month.  Each application took about 30 minutes.  Plaintiff Stewart purchased Roundup® for use at home.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

313.    Plaintiff Stewart was further exposed to Roundup® in Belpre, Ohio, from approximately 2012 through 2015 while applying Roundup® around his mother's house. Plaintiff sprayed every year from April through October, approximately two times per season. Each application took about 15 minutes.  Plaintiff Stewart purchased Roundup® for use at his mother's home.

314.    In or about April 21 2016, Plaintiff Stewart was diagnosed with marginal zone B-cell lymphoma, a subtype of NHL, in Marietta, OH, at Strecker Cancer Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

315.    As a direct and proximate result of these injuries, Plaintiff Stewart has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Stewart has otherwise been damaged in a personal and pecuniary nature.

316.    During the entire time that Plaintiff Stewart was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### *Sheila A. Thompson Noland*

317.    Plaintiff Sheila A. Thompson Noland is a citizen of the State of Missouri and was born on February 14, 1975.  Plaintiff Thompson Noland resides in the City of Unionville, County of Putnam.

318.    Plaintiff Thompson Noland was exposed to Roundup® in Unionville, MO from in or around 2002 through 2015 while spraying Roundup® around her 155-acre property and

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

garden.  Plaintiff sprayed every year from May through July.  She sprayed her garden approximately three times each summer; each application took approximately one and a half hours.  She sprayed the thistles on her property once or twice each season; each application took approximately two hours.  While mixing and spraying Roundup®, Plaintiff wore no protection such as suit, mask, or gloves.  Plaintiff purchased Roundup® for use at home from her local hardware store.

319.   On or about February 1, 2016, Plaintiff Thompson Noland was diagnosed with follicular lymphoma, a subtype of NHL, in West Des Moines, IA, at The Iowa Clinic, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

320.   As a direct and proximate result of these injuries, Plaintiff Thompson Noland has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Thompson Noland has otherwise been damaged in a personal and pecuniary nature.

321.   During the entire time that Plaintiff Thompson Noland was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

### Shanika Turner

322.   Plaintiff Shanika Turner is a citizen of the State of Georgia and was born on May 22, 1987.  Plaintiff Turner resides in the City of Hephzibah, County of Richmond.

323.   Plaintiff Turner was exposed to Roundup® in Hephzibah, GA, from in or around 1999 through 2005 while using Roundup® at home in her garden to kill weeds in her yard and

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

garden.  Plaintiff sprayed her yard and garden as needed, though the majority of Plaintiffs' Roundup® use occurred in the spring and summer months.  Plaintiff used a hand-spray bottle to apply the Roundup®, and each application would take thirty-five to forty-five minutes.  Plaintiff occasionally wore gloves, but she does not recall using any other protective gear, such as a mask or suit, while spraying Roundup®.  Plaintiff purchased large jugs of ready-mix Roundup® for use at home at her local supermarket and hardware store.

324.    On or about January 30, 2006, Plaintiff Turner was diagnosed with diffuse large B-cell lymphoma, a subtype of NHL, in Augusta, GA at Augusta Oncology Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

325.    As a direct and proximate result of these injuries, Plaintiff Turner has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Turner has otherwise been damaged in a personal and pecuniary nature.

326.    During the entire time that Plaintiff Turner was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

### Russell B. Vader

327.    Plaintiff Russell B. Vader is a citizen of the State of Washington and was born on November 18, 1963.  Plaintiff Vader resides in the City of Fox Island, County of Pierce.

328.    Plaintiff Vader was exposed to Roundup® in Beaverton, Oregon, from 2001 through approximately 2005 while working for A&J Landscaping Maintenance, a landscaping

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

company.  His employer provided the Roundup®, which he would mix with water and Crossbow, and then place in a spraying backpack.  Plaintiff sprayed approximately six to ten hours a week during the growing season.

329.    Plaintiff was further exposed to Roundup® in Gig Harbor, Washington, from about 2005 through 2008, where he worked at Parsons Landscaping.  Plaintiff applied Roundup® during the growing season, approximately three to five hours per week.

330.    Plaintiff Vader was further exposed to Roundup® in Fox Island, Washington, from approximately 2008 through 2016 where he became a licensed pesticide applicator and managed his own landscaping business called Vader Outside Services.  Plaintiff sprayed Roundup® on an almost daily basis during the growing season.  Each application would take approximately one hour.  Plaintiff still owns the landscaping company but no longer uses Roundup®.

331.    In or about April 9, 2014, Plaintiff Vader was diagnosed with Anaplastic Large Cell Lymphoma in Gig Harbor, Washington at the Multicare Regional Cancer Center and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

332.    As a direct and proximate result of these injuries, Plaintiff Vader has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Vader has otherwise been damaged in a personal and pecuniary nature.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

333.     During the entire time that Plaintiff Vader was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### *Frederick V. Vaughn*

334.     Plaintiff Frederick V. Vaughn is a citizen of the State of Michigan and was born on March 31, 1941.  Plaintiff Vaughn resides in the City of Vestaburg, County of Montcalm.

335.     Plaintiff Vaughn was exposed to Roundup® in Vestaburg, MI, from in or around the late 1970's through to the late 1990's while spraying Roundup® on Fred Vaughn Farm, the farm he owned and operated.  Plaintiff is a licensed pesticide applicator who grew wheat, beans, corn, and potatoes in rotation.  Plaintiff spot sprayed Roundup® in August and September after planting wheat to kill crabgrass before could plan potatoes in April of the following year.  Plaintiff operated a tractor with a 12-row boom to spray his fields, and each application took approximately two to three hours.  Plaintiff wore no protective gear while mixing or spraying the Roundup®.  Plaintiff purchased Roundup® for use on his farm from a local pesticide distributor.

336.     Plaintiff was further exposed to Roundup in Richland Township, MI, in or around the mid-1980s when he used Roundup® to clear the field on 40 acres of farmland he rented and on which the owner had previously grown alfalfa for several years.  Plaintiff sprayed Roundup® to clear the alfalfa, quack grass, and weeds in preparation for planting potato crops.

337.     Plaintiff Vaughn was further exposed to Roundup® in Vestaburg, MI, from in or around the late 1970's through 1998 while using Roundup® around his home for flower beds, trees, weeds, brush, outbuildings, and storage.  Plaintiff sprayed sporadically with either a tractor-pulled sprayer or a hand sprayer, and each application took approximately 30 minutes.  Plaintiff Vaughn purchased Roundup® for use at home from his local hardware and farm suppliers.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

338.    In or about August 9, 2012, Plaintiff Vaughn was diagnosed with follicular lymphoma, a subtype of NHL, in Alma, MI, at MidMichigan Medical Center – Gratiot, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

339.    As a direct and proximate result of these injuries, Plaintiff Vaughn has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Vaughn has otherwise been damaged in a personal and pecuniary nature.

340.    During the entire time that Plaintiff Vaughn was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### John A. Vicory

341.    Plaintiff John A. Vicory is a citizen of the State of Florida and was born on December 13, 1958.  Plaintiff Vicory resides in the City of Cape Coral, County of Lee.

342.    Plaintiff Vicory was exposed to Roundup® in Hamilton, Ohio, from approximately November 1978 through July 2009, from when he first began working for the City of Hamilton Public Utilities Department until his retirement.  While working for the City of Hamilton, Plaintiff Vicory initially sprayed Roundup® a few times per month around the City of Hamilton Municipal Garage.  From 1987, after obtaining an engineering certificate, Plaintiff Vicory was transferred to the city-owned power plant system.  There, he sprayed Roundup® along roads, buildings, fields, and along water canals.  He sprayed Roundup® at least two to three times per week, and each application took anywhere from 15 minutes to a full day, as needed.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

The City of Hamilton did not require him to wear any protective gear while mixing or spraying Roundup®.  The City of Hamilton provided both pre-mixed and concentrated formulas of Roundup® for use, which it obtained either through a distributor or, occasionally, by sending an employee to the hardware store to purchase Roundup®.

343.    In or about March 28, 2007, Plaintiff Vicory was diagnosed with marginal zone B-cell lymphoma, a subtype of NHL, in Cincinnati, OH, at University of Cincinnati Surgeons, Inc., and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

344.    As a direct and proximate result of these injuries, Plaintiff Vicory has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Vicory has otherwise been damaged in a personal and pecuniary nature.

345.    During the entire time that Plaintiff Vicory was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Louie B. Webb, Jr.

346.    Plaintiff Louie B. Webb, Jr. is a citizen of the State of South Carolina and was born on September 28, 1957.  Plaintiff Webb, Jr. resides in the City of Liberty, County of Pickens.

347.    Plaintiff Webb, Jr. was exposed to Roundup® in Liberty, South Carolina from approximately 2003 through 2016 while applying Roundup® to control the growth of kudzu, an invasive climbing vine, in his neighborhood.  Plaintiff sprayed around his house and around his

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

neighbors' homes.  Plaintiff applied Roundup® once a month, and each application took anywhere from 20 minutes to an hour.  Plaintiff purchased concentrated Roundup® for use in his neighborhood.

348.    In or about August 21, 2013, Plaintiff Webb, Jr. was diagnosed with Waldenström macroglobulinemia, a subtype of NHL, in Easley, SC, at Greenville Health System Cancer Institute and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

349.    As a direct and proximate result of these injuries, Plaintiff Webb, Jr. has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Webb, Jr. has otherwise been damaged in a personal and pecuniary nature.

350.    During the entire time that Plaintiff Webb, Jr. was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Johnny L. Wimberly

351.    Plaintiff Johnny L. Wimberly is a citizen of the State of Oklahoma and was born on January 13, 1952.  Plaintiff Wimberly resides in the City of Wynnewood, County of Murray.

352.    Plaintiff Wimberly was exposed to Roundup® in Davis, Oklahoma from approximately 1992 through 2005 while working as a cemetery sexton for the City of Davis.  As part of his job, Plaintiff applied Roundup® to weeds in the cemetery.  Plaintiff was also supervisor of parks and grounds and sprayed Roundup® around fence lines, ditches, and around the cemetery.  He sprayed the cemetery once a month and each application took approximately

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

three to four full days of work.  To spray the cemetery grounds, Plaintiff worked with a crew of workers.  While mixing and applying Roundup®, Plaintiff wore no protective gear, and Roundup® often ended up on his skin and clothing.  The City of Davis provided Roundup® to Plaintiff in concentrate form for use in the cemetery and surrounding grounds.

353.    On or about January 28, 2014, Plaintiff Wimberly was diagnosed with Hodgkin's Lymphoma in Ardmore, OK, at Mercy Cancer Center–Ardmore, and on May 18, 2015, Plaintiff Wimberly was diagnosed with NHL in Ardmore, OK and again at Mercy Cancer Center–Ardmore, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

354.    As a direct and proximate result of these injuries, Plaintiff Wimberly has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Wimberly has otherwise been damaged in a personal and pecuniary nature.

355.    During the entire time that Plaintiff Wimberly was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### DEFENDANT MONSANTO

356.    Defendant Monsanto is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.   At all relevant times, Monsanto also regularly conducted, transacted, and solicited business in St. Louis, Missouri, as well as in all States of the United States.  Monsanto's world headquarters are located at 800 Lindbergh Boulevard in St. Louis County, Missouri.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

357.    At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®, which contains the active ingredient glyphosate and the surfactant POEA, as well as adjuvants and other "inert" ingredients.  On information and belief, important scientific, manufacturing, marketing, sales, and other business decisions regarding Roundup® were made from and in the State of Missouri.

358.    At all times relevant to this complaint, Monsanto was engaged in the business of manufacturing, marketing, testing, promoting, selling, and/or distributing Roundup® in the State of Missouri.

359.    At all relevant times, Monsanto had, and continues to have, regular and systematic contact with and conducts business in and from the State of Missouri, such that it has purposefully availed itself of the laws of the State and expects to both sue and be sued in Missouri.  In the alternative, Monsanto's presence in the State of Missouri satisfies the due process requirements for Missouri courts to exercise jurisdiction over it.  In the alternative, Monsanto's domicile in the State of Missouri satisfies the due process requirements for Missouri courts to exercise jurisdiction over it.  In the alternative, Monsanto has consented to the exercise of jurisdiction over it by Missouri courts by registering to and conducting business from the State of Missouri.

## VENUE

360.    Mo. Rev. Stat. § 508.010.4, Missouri's general venue statute, provides:

> Notwithstanding any other provisions of law, in all actions in which there is any count alleging a tort and in which the plaintiff was first injured in the state of Missouri, venue shall be in the county where the plaintiff was first injured by the wrongful acts or negligent conduct alleged in the action

361.    Plaintiff Mark O'Brien was residing and working in the city of St. Louis, Missouri when he was first exposed to and injured by Roundup®, and therefore was "first injured

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

by the wrongful acts or negligent conduct alleged" in this action in the city of St. Louis, Missouri. Therefore, venue is proper pursuant to Mo. Rev. Stat. § 508.010.4.

362.     Venue is further proper in this Court pursuant to Mo. Rev. Stat. § 508.010.4 because Plaintiff Mark O'Brien, at all relevant times, was exposed to and used Roundup® in the city of St. Louis, Missouri.

## ALLEGATIONS COMMON TO ALL COUNTS

363.     In 1970, Defendant Monsanto Company, Inc. ("Monsanto") discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®.  Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops.  In addition to the active ingredient glyphosate, Roundup® contains the surfactant Polyethoxylated tallow amine (POEA) and/or adjuvants and other so-called "inert" ingredients.  In 2001, glyphosate was the most-used pesticide active ingredient in American agriculture with 85–90 million pounds used annually.  That number grew to 185 million pounds in 2007.[1]  As of 2013, glyphosate was the world's most widely used herbicide.

364.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri, and incorporated in Delaware.  It is the world's leading producer of glyphosate.  As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market.[2]  The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, because glyphosate can be sprayed in the fields during the growing

---

[1] Arthur Grube et al., U.S. Envtl. Prot. Agency, *Pesticides Industry Sales and Usage, 2006–2007 Market Estimates* 14 (2011), *available at* http://www.epa.gov/pesticides/pestsales/07pestsales/market_estimates2007.pdf.

[2] ETC Group, *Who Will Control the Green Economy?* 22 (2011), *available at* http://www.etcgroup.org/files/publication/pdf_file/ETC_wwctge_4web_Dec2011.pdf.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

season without harming the crops.  In 2010, an estimated 70% of corn and cotton and 90% of soybean fields in the United States were Roundup Ready®.[3]

365.    Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops.[4]  They are ubiquitous in the environment.  Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used.[5]  It has been found in food,[6] in the urine of agricultural workers,[7] and even in the urine of urban dwellers who are not in direct contact with glyphosate.[8]

366.    On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate.  That evaluation was based, in part, on studies of exposures to

---

[3] William Neuman & Andrew Pollack, *Farmers Cope With Roundup-Resistant Weeds*, N.Y. TIMES, May 3, 2010, *available at* http://www.nytimes.com/2010/05/04/business/energy-environment/04weed.html?pagewan.

[4] Monsanto, *Backgrounder-History of Monsanto's Glyphosate Herbicides* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/back_history.pdf.

[5] *See* U.S. Geological Survey, *USGS Technical Announcement: Widely Used Herbicide Commonly Found in Rain and Streams in the Mississippi River Basin* (2011), *available at* http://www.usgs.gov/newsroom/article.asp?ID=2909; *see also* U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate*, *available at* http://www.epa.gov/safewater/pdfs/factsheets/soc/tech/glyphosa.pdf.

[6] Thomas Bohn et al., *Compositional Differences in Soybeans on the Market: Glyphosate Accumulates in Roundup Ready GM Soybeans*, 153 FOOD CHEMISTRY 207 (2013), *available at* http://www.sciencedirect.com/science/article/pii/S0308814613019201.

[7] John F. Acquavella et al., *Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study*, 112(3) ENVTL. HEALTH PERSPECTIVES 321 (2004), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241861/; Kathryn Z. Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, 112 IARC Monographs 76, section 5.4 (2015), *available at* http://dx.doi.org/10.1016/S1470-2045(15)70134-8.

[8] Dirk Brändli & Sandra Reinacher, *Herbicides found in Human Urine*, 1 ITHAKA JOURNAL 270 (2012), *available at* http://www.ithaka-journal.net/druckversionen/e052012-herbicides-urine.pdf.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

367.    On July 29, 2015, IARC issued the formal monograph relating to glyphosate.  In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

368.    The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is *probably carcinogenic to humans*.  The IARC Working Group concluded that the cancers most associated with glyphosate exposure are NHL and other haematopoietic cancers, including lymphocytic lymphoma / chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.[9]

369.    The IARC evaluation is significant.  It confirms what has been believed for years: that glyphosate is toxic to humans.

370.    Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment.  Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

## FACTS

371.    Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

---

[9] *See* Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, *supra.*

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

372.    Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis.  Treated plants generally die within two to three days.  Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

373.    For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses.  That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment.  Of course, history has shown that not to be true.  According to the WHO, the main chemical ingredient of Roundup®—glyphosate—is a probable cause of cancer.  Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as garden center workers, nursery workers, and landscapers.  Agricultural workers are, once again, victims of corporate greed.  Monsanto assured the public that Roundup® was harmless.  In order to prove this, Monsanto has championed falsified data and has attacked legitimate studies that revealed Roundup®'s dangers.  Monsanto has led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® is safe.

### *The Discovery of Glyphosate and Development of Roundup®*

374.    The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®.[10]  From the outset, Monsanto marketed Roundup®

---

[10] Monsanto, *Backgrounder, History of Monsanto's Glyphosate Herbicide* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/back_history.pdf.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

as a "safe" general-purpose herbicide for widespread commercial and consumer use.  It still markets Roundup® as safe today.[11]

375.    In addition to the active ingredient glyphosate, Roundup® formulations also contain adjuvants and other chemicals, such as the surfactant POEA, which are considered "inert" and therefore protected as "trade secrets" in manufacturing.  Growing evidence suggests that these adjuvants and additional components of Roundup® formulations are not, in fact, inert and are toxic in their own right.

### Registration of Herbicides under Federal Law

376.    The manufacture, formulation, and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.*  FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act.  7 U.S.C. § 136a(a).

377.    Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.  Registration by the EPA, however, is not an assurance or finding of safety.  The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment."  7 U.S.C. § 136a(c)(5)(D).

---

[11] Monsanto, *What is Glyphosate?* (Sep. 2, 2015), http://www.monsanto.com/sitecollectiondocuments/glyphosate-safety-health.pdf.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

378.    FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or a pesticide allowed to continue to be sold in commerce.

379.    The EPA and the State of California registered Roundup® for distribution, sale, and manufacture in the United States and the State of California.

380.    FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

381.    The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's recent review and evaluation.

382.    In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment—in relation to the reregistration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

releasing the risk assessment pending further review in light of the WHO's health-related findings.

### *Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®*

383.    Based on early studies showing that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985.  After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991.  In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer:  "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."[12]

384.    On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

385.    In the first instance, Monsanto, in seeking initial registration of Roundup® by the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®.[13]  IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

---

[12]  U.S. Envtl. Prot. Agency, *Memorandum, Subject: SECOND Peer Review of Glyphosate* 1 (1991), *available at* http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_30-Oct-91_265.pdf.

[13]  Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/ibt_craven_bkg.pdf.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

386.    In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate.  The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid.[14]  An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[15]

387.    Three top executives of IBT were convicted of fraud in 1983.

388.    In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®.  In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.[16]

389.    Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

---

[14] U.S. Envtl. Prot. Agency, *Summary of the IBT Review Program Office of Pesticide Programs* (1983), *available at* http://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA&Index=1981+Thru+1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&QFieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles%5CIndex%20Data%5C81thru85%5CTxt%5C00000022%5C91014ULV.txt&User=ANONYMOUS&Password=anonymous&SortMethod=h%7C-&MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=p%7Cf&DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page&MaximumPages=1&ZyEntry=1&SeekPage=x&ZyPURL.

[15] Marie-Monique Robin, *The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply* (2011) (citing U.S. Envtl. Prot. Agency, *Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch. Washington, D.C.* (August 9, 1978)).

[16] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories*, *supra.*

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

### *The Importance of Roundup® to Monsanto's Market Dominance Profits*

390.    The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace.  Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly.  But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

391.    In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996.  Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop.  This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds.  It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

392.    Through a three-pronged strategy of increasing production, decreasing prices, and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product.  In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue.[17] Today, glyphosate remains one of the world's largest herbicides by sales volume.

---

[17] David Barboza, *The Power of Roundup; A Weed Killer Is A Block for Monsanto to Build On*, N.Y. TIMES, Aug. 2, 2001, *available at* http://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weed-killer-is-a-block-for-monsanto-to-build-on.html.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

*Monsanto has known for decades that it falsely advertises the safety of Roundup*®

393.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products.  Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "**safer than table salt**" and "**practically non-toxic**" to mammals, birds, and fish.  Among the representations the NYAG found deceptive and misleading about the human and environmental safety of glyphosate and/or Roundup® are the following:

> a) "Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ..."

> b) "And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem."

> c) "Roundup biodegrades into naturally occurring elements."

> d) "Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

> e) "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it."

> f) "You can apply Accord with 'confidence because it will stay where you put it' it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products."

> g) "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

h) "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

i) "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[18]

394.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

*        *        *

b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

*        *        *

c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

*        *        *

d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

---

[18] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

\*       \*       \*

e)   glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

395.    Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief it still has not done so today.

396.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®.  The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[19]

### *Classifications and Assessments of Glyphosate*

397.    The IARC process for the classification of glyphosate followed IARC's stringent procedures for the evaluation of a chemical agent.  Over time, the IARC Monograph program has reviewed 980 agents.  Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

398.    The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.[20]  Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

---

[19] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.

[20] World Health Org., *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble* (2006), available at http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

399.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts.  Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members.  One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment.  Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in *The Lancet Oncology*, and within a year after the meeting, the finalized Monograph is published.

400.     In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data.  The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

401.     In March 2015, IARC reassessed glyphosate.  The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

402.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph Volume 112.  For Volume 112, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015 to assess the carcinogenicity of certain herbicides, including glyphosate.  The March meeting culminated a nearly one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

available scientific evidence.  According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

403.    The studies considered the following exposure groups: (1) occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and (2) para-occupational exposure in farming families.

404.    Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

405.    Exposure pathways are identified as air (especially during spraying), water, and food.  Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

406.    The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden.  These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

407.    The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

408.    The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells.  One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

409.    In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor: renal tubule carcinoma.   A second study reported a positive trend for haemangiosarcoma in male mice.  Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies.  A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

410.    The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption.  Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA).  Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

411.    The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

412.    The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.[21]  Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

413.    The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.[22]  While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and multiple

---

[21] Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, *supra* at 77.

[22] Anneclare J. De Roos et al., *Cancer Incidence Among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study*, 113 Envt'l Health Perspectives 49–54 (2005), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1253709/pdf/ehp0113-000049.pdf.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

myeloma, hairy cell leukemia (HCL), and chronic lymphocytic leukemia (CLL), in addition to several other cancers.

### *Other Earlier Findings About Glyphosate's Dangers to Human Health*

414.     The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate.  This technical fact sheet predates IARC's March 20, 2015 evaluation.  The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.[23]

415.     In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused

---

[23] U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate*, *supra*.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.[24]

### The Toxicity of Other Ingredients in Roundup®

416.    In addition to the toxicity of the active ingredient, glyphosate, several studies support the hypothesis that the glyphosate-based formulation in Defendant's Roundup® products is more dangerous and toxic than glyphosate alone.  Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.[25]

417.    In 2002, a study by Julie Marc, entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation," revealed that Roundup® causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cell cycles.[26]

418.    A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.  The researchers noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer.  Failure in the cell-cycle checkpoints leads genomic instability and subsequent development of cancers from the initial affected cell."  Further, "[s]ince cell

---

[24] Caroline Cox, *Glyphosate, Part 2: Human Exposure and Ecological Effects*, 15 J. PESTICIDE REFORM 4 (1995); W.S. Peas et al., *Preventing pesticide-related illness in California agriculture: Strategies and priorities. Environmental Health Policy Program Report*, Univ. of Cal. School of Public Health, Calif. Policy Seminar (1993).

[25] Martinez, T.T. and K. Brown, *Oral and pulmonary toxicology of the surfactant used in Roundup herbicide*, PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991).

[26] Julie Marc, et al., *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation*, 15 CHEM. RES. TOXICOL. 326–331 (2002), *available at* http://pubs.acs.org/doi/full/10.1021/tx015543g.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

cycle disorders such as cancer result from dysfunction of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."[27]

419.    In 2005, a study by Francisco Peixoto, entitled "Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup®'s effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone.  The Peixoto study further suggested that the harmful effects of Roundup® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant POEA, or in the alternative, due to a potential synergic effect between glyphosate and other ingredients in the Roundup® formulation.[28]

420.    In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup® and glyphosate on human umbilical, embryonic, and placental cells. The study tested dilution levels of Roundup® and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food.  The researchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability and amplify toxicity of glyphosate alone.  The researchers further suggested that assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide.  The study confirmed that the adjuvants present in

---

[27] Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation*, 96 BIOLOGY OF THE CELL 245, 245-249 (2004), *available at* http://onlinelibrary.wiley.com/doi/10.1016/j.biolcel.2003.11.010/epdf.

[28] Francisco Peixoto, *Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation*, 61 CHEMOSPHERE 1115, 1122 (2005), *available at* https://www.researchgate.net/publication/7504567_Comparative_effects_of_the_Roundup_and_glyphosate_on_mitochondrial_oxidative_phosphorylation.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

Roundup® are not, in fact, inert and that Roundup® is potentially far more toxic than its active ingredient glyphosate alone.[29]

421.    The results of these studies were at all times available to Defendant.

422.    Monsanto's chief toxicologist Donna Farmer has admitted that she cannot say that Roundup® does not cause cancer because Monsanto has not performed carcinogenicity studies with the formulated product Roundup®, the very product that caused Plaintiffs' NHL.[30]  Indeed, she further admitted that in the 35 years that Monsanto has marketed Roundup® to the public, Monsanto has conducted no chronic carcinogenicity studies on the formulated Roundup® product merely because EPA did not require that such a study be performed for registration of glyphosate.[31]

423.    Defendant thus knew or should have known that Roundup® is more toxic than glyphosate alone and that safety studies of Roundup®, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiffs from Roundup®.

424.    Despite its knowledge that Roundup® is considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup® as safe.

### The EPA's Review of Glyphosate

425.    In April 2016, personnel within the EPA's Office of Pesticides Program (OPP) leaked and posted on the internet a draft report on glyphosate carcinogenicity, entitled Cancer Assessment Review Committee (CARC) report, dated October 2015.  The EPA removed the

---

[29] Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic, and Placental Cells*, 22 CHEM. RES. TOXICOL. 97-105 (2008), *available at* http://big.assets.huffingtonpost.com/france.pdf.

[30] *See* Plaintiffs' Submission in Response to Pretrial Order No. 8, Ex. 7, *In re: Roundup Products Liability Litigation*, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 187-7.

[31] *See id*.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

documents by May 2, 2016, within days of initially posting it online.  An EPA spokesperson

subsequently issued a statement on the agency's glyphosate review:

> Glyphosate documents were inadvertently posted to the Agency's docket. These documents have now been taken down because our assessment is not final. EPA has not completed our cancer review. We will look at the work of other governments as well as work by HHS's Agricultural Health Study as we move to make a decision on glyphosate. Our assessment will be peer reviewed and completed by end of 2016.[32]

426.    On September 12, 2016, EPA's OPP submitted a report on the carcinogenic

potential of glyphosate, wherein it issued a "proposed conclusion" that glyphosate is "'not likely

to be carcinogenic to humans' at doses relevant to human health risk assessment."[33]   There are

no authors listed on this issue paper, which reiterates and adopts the conclusions of the October

2015 leaked assessment.   The issue paper is based upon a review of industry-sponsored articles

and studies.  The OPP acknowledged that it rejected all studies that considered Roundup®—the

formulated product—instead of studies that isolated glyphosate because "[g]lyphosate

formulations contain various components other than glyphosate and it has been hypothesized

these components are more toxic than glyphosate alone."[34]

427.    Thus, the OPP notes dozens of studies considered by IARC were not reviewed by

the OPP because the OPP's "evaluation focused on studies on the active ingredient glyphosate"

---

[32] Carey Gillam, *What Is Going On With Glyphosate? EPA's Odd Handling of Controversial Chemical*, HUFFINGTON POST, May 2, 2016, *available at* http://www.huffingtonpost.com/carey-gillam/what-is-going-on-with-gly_b_9825326.html; *see also* P.J. Huffstutter, *EPA takes offline report that says glyphosate not likely carcinogenic*, REUTERS, May 2, 2016, available at http://www.reuters.com/article/us-usa-glyphosate-epa-idUSKCN0XU01K.

[33] See EPA's Office of Pesticide Programs, Glyphosate Issue Paper: Evaluation of Carcinogenic Potential (Sept. 12, 2016), *available at* https://www.epa.gov/sites/production/files/2016-09/documents/glyphosate_issue_paper_evaluation_of_carcincogenic_potential.pdf.

[34] *Id.*

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

and "additional research could also be performed to determine whether formulation components, such as surfactants, influence the toxicity of glyphosate formulations."[35]

428.   From December 13 to 16, 2016, the EPA held FIFRA Scientific Advisory Panel ("SAP") meetings to consider issues raised by the OPP's evaluation of glyphosate.  Again, OPP only allowed the SAP to consider studies of glyphosate alone, and not any study of the formulated product.  In its Charge to the FIFRA SAP, the OPP noted that "[a]lthough there are studies available on glyphosate-based pesticide formulations, the agency is soliciting advice from the FIFRA Scientific Advisory Panel (SAP) on this evaluation of human carcinogenic potential for the active ingredient glyphosate only at this time."[36]

429.   The OPP draft assessment therefore does not actually consider the product at issue in this litigation or, more importantly, how glyphosate, in conjunction with surfactants and other chemicals, affects carcinogenicity.

430.   On March 16, 2017, the final SAP meeting minutes and report were released, revealing disagreement and lack of consensus among the scientists on whether there was a positive association between *glyphosate* exposure and NHL.[37]

### *Monsanto's Industry Ties*

---

[35] *Id.*

[36] EPA OPP, Glyphosate: Evaluation of Carcinogenic Potential, Charge to the FIFRA SAP for the October 18-21, 2016 Meeting, available at, https://www.epa.gov/sites/production/files/2016-11/documents/glyphosate_sap_charge_questions_-final.pdf.

[37] FIFRA Scientific Advisory Panel Meeting Minutes and Final Report No. 2017-01, A Set of Scientific Issues Being Considered by the Environmental Protection Agency Regarding: EPA's Evaluation of the Carcinogenic Potential of Glyphosate, *available at* https://www.epa.gov/sites/production/files/2017-03/documents/december_13-16_2016_final_report_03162017.pdf.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

431.    Recently unsealed documents in the federal Roundup® MDL litigation reveal the extent to which Monsanto has been able to leverage its contacts within the EPA to protect glyphosate and Roundup® from scrutiny and review.

432.    Internal Monsanto documents, including email communications, demonstrate that Jess Rowland, former Deputy Division Director, Health Effects Division of the EPA's OPP, and formerly the chair of the CARC (the same committee that inadvertently leaked the EPA's glyphosate report in April 2016), repeatedly and directly intervened on Monsanto's behalf. These same documents reveal that Monsanto was secure in the knowledge that it had allies within the EPA.

433.    To begin, in the months following IARC's initial March 2015 announcement that it had classified glyphosate as a probable carcinogen, Monsanto turned its attention to the EPA's review of glyphosate.  In one April 27, 2015 email, Monsanto official Bill Heydens wrote to colleagues to suggest "approaching EPA and…. ask if there is anything that would help them defend the situation?"  His colleague Dan Jenkins responded: "I think you and I could get on the phone w Jess Rowland and discuss this pretty openly. He'll give us straight talk."[38]

434.    The following day, Mr. Jenkins spoke to Mr. Rowland by telephone and then relayed the substance of the conversation for his colleagues in an April 28, 2015 email. Specifically, he reported back that with respect to the CARC investigation, Mr. Rowland had stated: "We have enough to sustain our conclusions. Don't need gene tox or epi . . . . I am the chair of the CARC and my folks are running this process for glyphosate in reg review. I have called a CARC meeting in June."[39]  Thus, even though the ostensible purpose of the CARC

---

[38] *See* Plaintiffs' Motion to Compel the Deposition of Jess Rowland, Ex. D, In re: Roundup Products Liability Litigation, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-4.
[39] *Id.*

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

review was to evaluate the exhaustive IARC assessment on glyphosate, and even though the full IARC monograph on glyphosate would not be completed until July 2015, Mr. Rowland had already formed his conclusion months earlier—in April 2015.

435.   Mr. Rowland also intervened to halt another agency's review of glyphosate. When the Agency for Toxic Substances and Disease Registry (ATSDR), a federal public health agency of the U.S. Department of Health and Human Services, announced in February 2015 that it planned to publish a toxicological review of glyphosate, it was Mr. Rowland who helped Monsanto stop the ATSDR's investigation.  In the same April 28, 2015, email discussed above, Mr. Jenkins explained that Mr. Rowland wanted to help Monsanto stop an investigation concerning the carcinogenicity of glyphosate being conducted by ATSDR.[40]  Since ATSDR is not controlled by the EPA, according to Mr. Jenkins, Mr. Rowland had bragged: "If I can kill this I should get a medal."[41]  Jenkins cautioned, however, that Monsanto should not "get your hopes up, I doubt EPA and Jess can kill this; but it's good to know they are going to actually make the effort now to coordinate due to our pressing and their shared concern that ATSDR is consistent in its conclusions with the EPA."[42]  The ATSDR never published its toxicological profile of glyphosate.

436.   Further, the released documents reveal Monsanto's confidence that its allies within the EPA would continue to support glyphosate.  In an internal memo on glyphosate, Monsanto executives wrote: "We know, *but cannot say*, that EPA's Office of Pesticide Program scientists strongly feel that glyphosate does not cause cancer and have defended their written

---

[40] See id.

[41] Id.

[42] *Id*.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

determination internally for months."[43]  Notably, when Mr. Rowland attended the IARC

glyphosate meetings as an observed for the EPA, internal communications indicate Monsanto

was not displeased with his attendance since, "we all know Jess."[44]

### *Recent Worldwide Bans on Roundup®/Glyphosate*

437.    Several countries around the world have instituted bans on the sale of Roundup®

and other glyphosate-containing herbicides, both before and since IARC first announced its

assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as

the dangers of the use of Roundup® become more widely known.   The Netherlands issued a

ban on all glyphosate-based herbicides in April 2014, including Roundup®, which will take

effect by the end of 2015.  In issuing the ban, the Dutch Parliament member who introduced the

successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in

abundance to private persons.  In garden centers, Roundup® is promoted as harmless, but

unsuspecting customers have no idea what the risks of this product are.  Especially children are

sensitive to toxic substances and should therefore not be exposed to it."[45]

438.    The Brazilian Public Prosecutor in the Federal District requested that the

Brazilian Justice Department suspend the use of glyphosate.[46]

---

[43] See Plaintiffs' Motion to Compel the Deposition of Jess Rowland, Ex. E, In re: Roundup Products Liability Litigation, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-5 (emphasis original).

[44] *See* Plaintiffs' Motion to Compel the Deposition of Jess Rowland, Ex. G, *In re: Roundup Products Liability Litigation*, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-7.

[45] *Holland's Parliament Bans Glyphosate Herbicides*, The Real Agenda, April 14, 2014, *available at* http://real-agenda.com/hollands-parliament-bans-glyphosate-herbicides/.

[46] Christina Sarich, *Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals Following Recent Glyphosate-Cancer Link*, GLOBAL RESEARCH, May 14, 2015, *available at* http://www.globalresearch.ca/brazils-public-prosecutor-wants-to-ban-monsantos-chemicals-following-recent-glyphosate-cancer-link/5449440; *see* Ministério Público Federal, *MPF/DF reforça pedido para que glifosato seja banido do mercado nacional*, April, 14, 2015, *available at*

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

439.     France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.[47]

440.     Bermuda banned both the private and commercial sale of glyphosates, including Roundup®.  The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."[48]

441.     The Sri Lankan government banned the private and commercial use of glyphosate, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.[49]

442.     The government of Colombia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.[50]

### Proposition 65 Listing

443.     On September 4, 2015, California's Office of Environmental Health Hazard Assessment ("OEHHA") published a notice of intent to include glyphosate on the state's list of

---

http://noticias.pgr.mpf.mp.br/noticias/noticias-do-site/copy_of_meio-ambiente-e-patrimonio-cultural/mpf-df-reforca-pedido-para-que-glifosato-seja-banido-do-mercado-nacional.

[47] Zoe Schlanger, *France Bans Sales of Monsanto's Roundup in Garden Centers, 3 Months After U.N. Calls it 'Probable Carcinogen'*, NEWSWEEK, June 15, 2015, *available at* http://www.newsweek.com/france-bans-sale-monsantos-roundup-garden-centers-after-un-names-it-probable-343311.

[48] *Health Minister: Importation of Roundup Weed Spray Suspended*, Today in Bermuda, May, 11 2015, *available at* http://www.todayinbermuda.com/news/health/item/1471-health-minister-importation-of-roundup-weed-spray-suspended.

[49] *Sri Lanka's New President Puts Immediate Ban on Glyphosate Herbicides*, Sustainable Pulse, May 25, 2015, *available at* http://sustainablepulse.com/2015/05/25/sri-lankas-new-president-puts-immediate-ban-on-glyphosate-herbicides/#.VeduYk3bKAw.

[50] *Columbia to ban coca spraying herbicide glyphosate*, BBC, May 10, 2015, *available at* http://www.bbc.com/news/world-latin-america-32677411.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

known carcinogens under Proposition 65.[51]  California's Safe Drinking Water and Toxic

Enforcement Act of 1986 (informally known as "Proposition 65"), requires the state to

maintain and, at least once a year, revise and republish a list of chemicals "known to the State

of California to cause cancer or reproductive toxicity."[52]  The OEHHA determined that

glyphosate met the criteria for the listing mechanism under the Labor Code following IARC's

assessment of the chemical.[53]

444.    The listing process under the Labor Code is essentially automatic.  The list of

known carcinogens, at a minimum, must include substances identified by reference in Labor

Code § 6382(b)(1).  That section of the Labor Code identifies "[s]ubstances listed as human or

animal carcinogens by the International Agency for Research on Cancer (IARC)."  IARC's

classification of glyphosate as a Group 2A chemical ("probably carcinogenic to humans")

therefore triggered the listing.

445.    A business that deploys a listed chemical in its products must provide "clear and

reasonable warnings" to the public prior to exposure to the chemical.  To be clear and

reasonable, a warning must "(1) clearly communicate that the chemical is known to cause

cancer, and/or birth defects or other reproductive harm; and (2) effectively reach the person

---

[51] Cal. Envtl. Prot. Agency Office of Envtl. Health Hazard Assessment, Notice of Intent to List Chemicals by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion, Glyphosate (Sept. 4, 2015), http://oehha.ca.gov/prop65/CRNR_notices/admin_listing/intent_to_list/pdf_zip/090415NOIL_LCSet27.pdf.

[52] *Frequently Asked Questions*, STATE OF CAL. DEP'T OF JUSTICE, OFFICE OF THE ATTORNEY GENERAL, http://oag.ca.gov/prop65/faq (last visited April 19, 2016).

[53] Cal. Envtl. Prot. Agency Office of Envtl. Health Hazard Assessment, Notice of Intent to List Chemicals by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion, Glyphosate (Sept. 4, 2015), http://oehha.ca.gov/prop65/CRNR_notices/admin_listing/intent_to_list/pdf_zip/090415NOIL_LCSet27.pdf.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

before exposure."[54]  The law also prohibits the discharge of listed chemicals into drinking water.

446.    Monsanto disputed the listing decision and, in January 2016, filed a lawsuit against OEHHA and the agency's acting director, Lauren Zeise, in California state court, seeking declaratory and injunctive relief to prevent OEHHA from listing glyphosate.[55]

447.    Monsanto alleged that OEHHA's exclusive reliance on the IARC decision signified that "OEHHA effectively elevated the determination of an ad hoc committee of an unelected, foreign body, which answers to no United States official (let alone any California state official), over the conclusions of its own scientific experts."[56]  Monsanto further alleged that the Labor Code listing mechanism presented various constitutional violations because it "effectively empowers an unelected, undemocratic, unaccountable, and foreign body to make laws applicable in California.[57]"  Among other things, Monsanto argued that Proposition 65's requirement to provide a "clear and reasonable warning" to consumers that the chemical is a known carcinogen would damage its reputation and violate its First Amendment rights.[58]

448.    On January 27, 2017, the Superior Court of California – Fresno issued a tentative ruling granting, among other things, OEHHA's motion for judgment on the pleadings,

---

[54] *Frequently Asked Questions*, STATE OF CAL. DEPARTMENT OF JUSTICE, OFFICE OF THE ATTORNEY GENERAL, *supra*.

[55] Monsanto Company's Verified Petition for Writ of Mandate and Complaint for Preliminary and Permanent Injunctive and Declaratory Relief, Monsanto Co. v. Office of the Envt'l Health Hazard Assessment, et al., No. 16-CECG-00183 (Cal. Super. Ct.) *available at* http://www.monsanto.com/files/documents/monvoehha.pdf.

[56] *Id*. at 2.

[57] *Id*. at 3.

[58] *Id*.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

thus rejecting Monsanto's arguments.  On March 10, 2017, the Court issued a final order adopting in full the earlier tentative ruling.[59]

### EFSA Report on Glyphosate

449.    On November 12, 2015, the European Food Safety Authority (EFSA), the European Union's primary agency for food safety, reported on its evaluation of the Renewal Assessment Report (RAR) on glyphosate.[60]  The Rapporteur Member State assigned to glyphosate, the German Federal Institute for Risk Assessment (BfR), had produced the RAR as part of the renewal process for glyphosate in the EU.

450.    BfR sent its draft RAR to EFSA and the RAR underwent a peer review process by EFSA, other member states, and industry groups.  As part of the on-going peer review of Germany's reevaluation of glyphosate, EFSA had also received a second mandate from the European Commission to consider IARC's findings regarding the potential carcinogenicity of glyphosate and glyphosate-containing products.

451.    Based on a review of the RAR, which included data from industry-submitted unpublished studies, EFSA sent its own report ("Conclusion") to the European Commission, finding that "glyphosate is unlikely to pose a carcinogenic hazard to humans and the evidence does not support classification with regard to its carcinogenic potential according to Regulation (EC) No 1272/2008."[61]  EFSA therefore disagreed with IARC: glyphosate was not genotoxic and did not present a carcinogenic threat to humans.

---

[59] *See* Notice of Supplemental Authority, In re: Roundup Products Liability Litigation, MDL No. 2741 (N.D. Cal., Mar. 13, 2017), ECF No. 185.

[60] European Food Safety Auth., Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate, *available at* http://www.efsa.europa.eu/sites/default/files/scientific_output/files/main_documents/4302.pdf.

[61] *Id.*

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

452.     In explaining why its results departed from IARC's conclusion, EFSA drew a distinction between the EU and IARC approaches to the study and classification of chemicals.[62] Although IARC examined "both glyphosate—an active substance—and glyphosate-based formulations, grouping all formulations regardless of their composition," EFSA explained that it considered only glyphosate and that its assessment focuses on "each individual chemical, and each marketed mixture separately."[63]  IARC, on the other hand, "assesses generic agents, including groups of related chemicals, as well as occupational or environmental exposure, and cultural or behavioural practices."[64]  EFSA accorded greater weight to studies conducted with glyphosate alone than studies of formulated products.[65]

453.     EFSA went further and noted:

> [A]lthough some studies suggest that certain glyphosate-based formulations may be genotoxic (i.e. damaging to DNA), others that look solely at the active substance glyphosate do not show this effect. It is likely, therefore, that *the genotoxic effects observed in some glyphosate-based formulations are related to the other constituents or "co-formulants"*. Similarly, certain glyphosate-based formulations display higher toxicity than that of the active ingredient, presumably because of the presence of co-formulants. In its assessment, *EFSA proposes that the toxicity of each pesticide formulation and in particular its genotoxic potential should be further considered and addressed by Member State authorities while they re-assess uses of glyphosate-based formulations in their own territories*.[66]

---

[62] EFSA Fact Sheet: Glyphosate, EFSA http://www.efsa.europa.eu/sites/default/files/corporate_publications/files/efsaexplainsglyphosate151112 en.pdf.

[63] *Id.*

[64] *Id.*

[65] *Id.*

[66] *Id.*

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

454.   Notwithstanding its conclusion, EFSA did set exposure levels for glyphosate. Specifically, EFSA proposed an acceptable daily intake (ADI) of 0.5 mg/kg of body weight per day; an acute reference dose (ARfD) of 0.5 mg/kg of body weight; and an acceptable operator exposure level (AOEL) of 0.1 mg/kg bw per day.[67]

### *Leading Scientists Dispute EFSA's Conclusion*

455.   On November 27, 2015, 96 independent academic and governmental scientists from around the world submitted an open letter to the EU health commissioner, Vytenis Andriukaitis.[68]  The scientists expressed their strong concerns and urged the commissioner to disregard the "flawed" EFSA report, arguing that "the BfR decision is not credible because it is not supported by the evidence and it was not reached in an open and transparent manner."[69]

456.   Signatories to the letter included Dr. Christopher J. Portier, Ph.D., and other renowned international experts in the field, some of whom were part of the IARC Working Group assigned to glyphosate.

457.   In an exhaustive and careful examination, the scientists scrutinized EFSA's conclusions and outlined why the IARC Working Group decision was "by far the more credible":

> The IARC WG decision was reached relying on open and transparent procedures by independent scientists who completed thorough conflict-of-interest statements and were not affiliated or financially supported in any way by the chemical manufacturing industry. It is fully referenced and depends entirely on reports

---

[67] European Food Safety Auth., Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate, *supra.*

[68] Letter from Christopher J. Portier et al. to Commission Vytenis Andriukaitis, Open letter: Review of the Carcinogenicity of Glyphosate by EFSA and BfR (Nov. 27, 2015), http://www.zeit.de/wissen/umwelt/2015-11/glyphosat-offener-brief.pdf; http://www.theguardian.com/environment/2016/jan/13/eu-scientists-in-row-over-safety-of-glyphosate-weedkiller.

[69] *Id.*

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

> published in the open, peer-reviewed biomedical literature. It is part of a long tradition of deeply researched and highly credible reports on the carcinogenicity of hundreds of chemicals issued over the past four decades by IARC and used today by international agencies and regulatory bodies around the world as a basis for risk assessment, regulation and public health policy.[70]

458.    With respect to human data, the scientists pointed out that EFSA agreed with IARC that there was "*limited evidence* of carcinogenicity" for NHL, but EFSA nonetheless dismissed an association between glyphosate exposure and carcinogenicity.  IARC applies three levels of evidence in its analyses of human data, including sufficient evidence and limited evidence.  EFSA's ultimate conclusion that "there was no unequivocal evidence for a clear and strong association of NHL with glyphosate" was misleading because it was tantamount to IARC's highest level of evidence: "sufficient evidence," which means that a causal relationship has been established.  However, the scientists argued, "[l]egitimate public health concerns arise when 'causality is credible,' i.e., when there is *limited evidence*."[71]

459.    Among its many other deficiencies, EFSA's conclusions regarding animal carcinogenicity data were "scientifically unacceptable," particularly in BfR's use of historical control data and in its trend analysis.  Indeed, BfR's analysis directly contradicted the Organisation for Economic Co-operation and Development ("OECD") testing guidelines while citing and purporting to follow those same guidelines.  For instance, the EFSA report dismisses observed trends in tumor incidence "because there are no individual treatment groups that are significantly different from controls and because the maximum observed response is reportedly within the range of the historical control data."  However, according to the scientists, concurrent controls are recommended over historical controls in all guidelines, scientific

---

[70] *Id.*

[71] *Id.*

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

reports, and publications, and, if it is employed, historical control data "should be from studies in the same timeframe, for the same exact animal strain, preferably from the same laboratory or the same supplier and preferably reviewed by the same pathologist."  BfR's use of historical control data violated these precautions: "only a single study used the same mouse strain as the historical controls, but was reported more than 10 years after the historical control dataset was developed."  Further deviating from sound scientific practices, the data used by the BfR came from studies in seven different laboratories.  The scientists concluded:

> BfR reported seven positive mouse studies with three studies showing increases in renal tumors, two with positive findings for hemangiosarcomas, and two with positive findings for malignant lymphomas. BfR additionally reported two positive findings for tumors in rats. Eliminating the inappropriate use of historical data, the unequivocal conclusion is that these are not negative studies, but in fact document the carcinogenicity of glyphosate in laboratory animals.[72]

460.    The letter also critiqued the EFSA report's lack of transparency and the opacity surrounding the data cited in the report: "citations for almost all of the references, even those from the open scientific literature, have been redacted from the document" and "there are no authors or contributors listed for either document, a requirement for publication in virtually all scientific journals."  Because BfR relied on unpublished, confidential industry-provided studies, it is "impossible for any scientist not associated with BfR to review this conclusion with scientific confidence."[73]

461.    On March 3, 2016, the letter was published in the Journal of Epidemiology & Community Health.[74]

---

[72] Id.

[73] Id.

[74] Christopher J. Portier, et al., *Differences in the carcinogenic evaluation of glyphosate between the International Agency for Research on Cancer (IARC) and the European Food Safety Authority*

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

## *Statement of Concern Regarding Glyphosate-Based Herbicides*

462.    On February 17, 2016, a consensus statement published in the journal *Environmental Health*, entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement," assessed the safety of glyphosate-based herbicides (GBHs).[75]  The paper's "focus is on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with recent discoveries about the toxicity and human health risks stemming from use of GBHs."[76]  The researchers drew seven factual conclusions about GBHs:

1.    GBHs are the most heavily applied herbicide in the world and usage continues to rise;

2.    Worldwide, GBHs often contaminate drinking water sources, precipitation, and air, especially in agricultural regions;

3.    The half-life of glyphosate in water and soil is longer than previously recognized;

4.    Glyphosate and its metabolites are widely present in the global soybean supply;

5.    Human exposures to GBHs are rising;

6.    Glyphosate is now authoritatively classified as a probable human carcinogen; and

7.    Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science.[77]

---

*(EFSA)*, JOURNAL OF EPIDEMIOLOGY & CMTY. HEALTH, Mar. 3, 2016, *available at* http://jech.bmj.com/content/early/2016/03/03/jech-2015-207005.full.

[75] John P. Myers, et al, *Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement*, Environmental Health (2016), *available at* http://ehjournal.biomedcentral.com/articles/10.1186/s12940-016-0117-0.

[76] *Id.*

[77] *Id.*

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

463.    The researchers noted that GBH use has increased approximately 100-fold since the 1970s.  Further, far from posing a limited hazard to vertebrates, as previously believed, two decades of evidence demonstrated that "several vertebrate pathways are likely targets of action, including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."[78]

464.    The paper attributes uncertainties in current assessments of glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations."  Further, the researchers argue, "[t]he distinction in regulatory review and decision processes between 'active' and 'inert' ingredients has no toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in their own right."[79]

465.    Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe."  Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish."  Accordingly, "risk assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone underestimate both toxicity and exposure, and thus risk."  The paper concludes that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."[80]

---

[78] *Id.*

[79] *Id.*

[80] *Id.*

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

466.     The researchers also critique the current practice of regulators who largely rely on "unpublished, non-peer reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."[81]

467.     The researchers also call for greater inclusion of GBHs in government-led toxicology testing programs:

> [A] fresh and independent examination of GBH toxicity should be undertaken, and . . . this re-examination be accompanied by systematic efforts by relevant agencies to monitor GBH levels in people and in the food supply, none of which are occurring today. The U.S. National Toxicology Program should prioritize a thorough toxicological assessment of the multiple pathways now identified as potentially vulnerable to GBHs.[82]

468.     The researchers suggest that, in order to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which manufacturers fund the registration process and the necessary testing:

> "[W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part of routine registration actions and fees. Such funds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would be made available to independent scientists to conduct the appropriate long-term (minimum 2 years) safety studies in recognized animal model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption, impacts on the gut microbiome,

---

[81] *Id.*

[82] *Id.*

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

carcinogenicity, and multigenerational effects looking at reproductive capability and frequency of birth defects."[83]

### *European Union Vote on Glyphosate Renewal*

469.    The license for glyphosate in the European Union (EU) was set to expire on June 30, 2016.

470.    Without an extension of the license, Monsanto's Roundup® and other glyphosate-based herbicides faced a general phase out in EU markets.[84]

471.    In the months leading up to the license expiration date, protracted meetings and votes among national experts from the 28 EU Member States failed to produce agreement on an extension.

472.    For instance, on March 4, 2016, *The Guardian* reported that France, the Netherlands, and Sweden did not support EFSA's assessment that glyphosate was harmless.[85] The paper quoted the Swedish environment minister, Åsa Romson, as stating: "We won't take risks with glyphosate and we don't think that the analysis done so far is good enough. We will propose that no decision is taken until further analysis has been done and the Efsa scientists have been more transparent about their considerations."[86]

---

[83] *Id.*

[84] Philip Blenkinsop, Alissa de Carbonnel & Barbara Lewis European, *Commission to extend glyphosate license for 18 months*, REUTERS, June 28, 2016, *available at* http://www.reuters.com/article/us-health-eu-glyphosate-idUSKCN0ZE25B.

[85] Arthur Neslen, *EU states rebel against plans to relicense weedkiller glyphosate*, THE GUARDIAN, Mar. 4, 2016, *available at* http://www.theguardian.com/environment/2016/mar/04/eu-states-rebel-against-plans-to-relicense-weedkiller-glyphosate.

[86] *Id.*

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

473.    The Netherlands argued that relicensing should be placed on hold until after a separate evaluation of glyphosate's toxicity can be conducted.[87]   Leading up to the vote, Italy joined the other EU states in opposing the license renewal, citing health concerns.[88]

474.    On June 6, 2016, Member States voted but failed to reach a qualified majority in favor or against the re-authorization of glyphosate.[89]

475.    On June 29, 2016, the EU Commission extended the European license for glyphosate for 18 months to allow the European Chemical Agency to rule on the safety of the chemical, which is expected by the end of 2017.[90]

476.    On July 11, 2016, the EU voted in favor of a proposal to restrict the conditions of use of glyphosate in the EU, including a ban on common co-formulant POE-tallowamine (POEA) from all glyphosate-based herbicides, including Roundup®.[91]

477.    These restrictions, which are non-binding on the EU states, are expected to apply until the European Chemicals Agency issues an opinion on the chemical's safety.[92]

---

[87] Arthur Neslen, *Vote on Controversial weedkiller's European licence postponed*, THE GUARDIAN, Mar. 8, 2016, *available at* http://www.theguardian.com/environment/2016/mar/08/eu-vote-on-controversial-weedkiller-licence-postponed-glyphosate.

[88] *Id.*

[89] Manon Flausch, *Commission prolongs glyphosate license by 18 months*, EURACTIV, June 29, 2016, *available at* http://www.euractiv.com/section/agriculture-food/news/commission-prolongs-glyphosate-licence-by-18-months/

[90] Arthur Neslen, *Controversial chemical in Roundup weedkiller escapes immediate ban*, THE GUARDIAN, June 29, 2016, *available at* https://www.theguardian.com/business/2016/jun/29/controversial-chemical-roundup-weedkiller-escapes-immediate-ban

[91] Sarantis Michalopoulos, *EU agrees ban on glyphosate co-formulant*, EURACTIV, July 11, 2016, *available at* http://www.euractiv.com/section/agriculture-food/news/eu-agrees-ban-on-glyphosate-co-formulant/?nl_ref=16562829

[92] *See* Arthur Neslen, *Controversial chemical in Roundup weedkiller escapes immediate ban*, THE GUARDIAN, June 29, 2016.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

## TOLLING OF THE STATUTE OF LIMITATIONS

### *Discovery Rule Tolling*

478.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

479.    Plaintiffs have suffered an illness that has a latency period and does not arise until years after exposure.  Plaintiffs had no way of knowing about the risks of serious illness associated with the use of and/or exposure to Roundup® and glyphosate until they were made aware that their NHL could be caused by their use of and/or exposure to Roundup®. Consequently, the discovery rule applies to these cases, and the statute of limitations has been tolled until the day that Plaintiffs knew or had reason to know that their NHL was linked to their use of and/or exposure to Roundup®.

480.    Within the time period of any applicable statutes of limitations, Plaintiffs could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup® and glyphosate is injurious to human health.

481.    Plaintiffs did not discover, and did not know of facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup® and glyphosate; nor would a reasonable and diligent investigation by them have disclosed that Roundup® and glyphosate would cause their NHL.

482.    Furthermore, the running of the statute of limitations has been equitably tolled by reason of Defendant's fraudulent concealment and conduct, as alleged above.  Through its affirmative misrepresentations and omissions, Defendant actively concealed from Plaintiffs the true risks associated with use of or exposure to Roundup®.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

483.   As a result of Defendant's actions, Plaintiffs were unaware, and could not reasonably know or have learned through reasonable diligence, that Plaintiffs had been exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

484.   Furthermore, Defendant is estopped from relying on any statute of limitations because of its concealment of the truth regarding the safety of Roundup®.  Defendant was under a duty to disclose the true character, quality and nature of Roundup® because this was non-public information over which it continues to have exclusive control.  Defendant knew that this information was not available to Plaintiffs, their medical providers and/or their health facilities, yet it failed to disclose the information to the public.

485.   Defendant had the ability to and did spend enormous amounts of money in furtherance of its purposes of marketing and promoting a profitable product, notwithstanding the known or reasonably knowable risks.  Plaintiffs and medical professionals could not have afforded to and could not have possibly conducted studies to determine the nature, extent and identity of related health risks, and they were forced to rely on Defendant's representations.

486.   For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiffs' claims.

### *Estoppel*

487.   Monsanto was under a continuous duty to disclose to consumers, users and other persons coming into contact with its products, including Plaintiffs, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

488.     Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

489.     Based on the foregoing, Monsanto is estopped from relying on any statutes of limitations in defense of this action.

## COUNT ONE: STRICT LIABILITY FOR DEFECTIVE MANUFACUTRE AND DESIGN

490.     Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

491.     Plaintiffs bring this strict liability claim against Defendant for defective manufacture and design.

492.     At all relevant times, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, users, and other persons coming into contact with them, including Plaintiffs, thereby placing Roundup® products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendant.

493.     At all times relevant to this litigation, Defendant designed, researched, developed, formulated, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by the Plaintiffs, and/or to which the Plaintiffs were exposed, as described above.

494.     At all times relevant to this litigation, Defendant's Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiffs.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

495.     At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Missouri and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

496.     Defendant's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant, were defectively manufactured and designed by Defendant in that when they left the hands of the Defendant's manufacturers and/or suppliers, they were unreasonably dangerous because they were not as safe as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

497.     Defendant's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant, were defective in manufacture, design, and formulation in that when they left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks associated with these products' reasonably foreseeable uses exceeded the alleged benefits associated with their design and formulation.

498.     At all relevant times, Defendant's Roundup® products created significant risks to the health and safety of consumers and others who were exposed to the products that far outweigh the risks posed by other products on the market used for the same or similar purpose.

499.     Therefore, at all relevant times to this litigation, Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled,

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

distributed, sold and marketed by Defendant, were defective in design and formulation, in one or more of the following ways:

      a.      When placed in the stream of commerce, Defendant's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would expect.

      b.      When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

      c.      When placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

      d.      Defendant did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate.

      e.      Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweighs any potential utility stemming from the use of the herbicide.

      f.      Defendant knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

      g.      Defendant did not conduct adequate post-marketing surveillance of its Roundup® products.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

> h.    Defendant could have employed safer alternative designs and formulations.

500.    At all times relevant to this litigation, Plaintiffs used and/or were exposed to Defendant's Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

501.    Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

502.    The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate.  Defendant's Roundup® products were and are more dangerous than alternative products and Defendant could have designed its Roundup® products to make them less dangerous.  Indeed, at the time that Defendant designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

503.    Defendant's defective design of Roundup® amounts to willful, wanton, and/or reckless conduct by Defendant.

504.    As a direct and proximate result of the defective design and manufacture of Roundup® products, Plaintiffs developed NHL and have been injured catastrophically and have been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort and economic damages.

505.    Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendant is strictly liable to Plaintiffs.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

506.     The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiffs' grave injuries, and, but for Defendant's misconduct and omissions, Plaintiffs would not have sustained their injuries.

507.     As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Plaintiffs have suffered and continue to suffer grave injuries, and they have endured pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.  Plaintiffs will continue to incur these expenses in the future.

508.     WHEREFORE, Plaintiffs pray for judgment against Defendant Monsanto in a fair and reasonable sum in excess of $10,000,000, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT TWO: STRICT LIABILITY FOR FAILURE TO WARN

509.     Plaintiffs incorporate by reference every other paragraph of this Complaint as if each were set forth fully and completely herein.

510.     Plaintiffs bring this strict liability claim against Defendant for failure to warn.

511.     At all relevant times, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate.  These actions were under the ultimate control and supervision of Defendant.

512.     Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiffs, Plaintiffs' employers, Plaintiffs' co-workers, and persons responsible for consumers (such as employers), and Defendant therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of Roundup® and glyphosate-containing products and a duty to instruct on the proper, safe use of these products.

513.    At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn Plaintiffs of the dangers associated with Roundup® use and exposure, and a continuing duty to instruct on the proper, safe use of these products. Defendant, as manufacturer, seller, or distributor of chemical herbicides, is held to the knowledge of an expert in the field.

514.    At the time of manufacture, Defendant could have provided warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to these products.

515.    At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety of its Roundup® products. Defendant also failed to minimize the dangers to users and consumers of its Roundup® products and to those who would foreseeably use or be harmed by Defendant's herbicides, including Plaintiffs.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

516.    Despite the fact that Defendant knew or should have known that Roundup® products posed a grave risk of harm, it failed to warn of the dangerous risks associated with their use and exposure.  The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied, or sold the product, and not known to end users and consumers, such as Plaintiffs and Plaintiffs' employers.

517.    Defendant knew or should have known that its Roundup® and glyphosate-containing products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products.  Defendant has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

518.    At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

519.    At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

520.    Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of Plaintiffs' exposure. Plaintiffs relied upon the skill, superior knowledge, and judgment of Defendant.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

521.    Defendant knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, but it failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and horticultural applications.

522.    The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled agricultural workers, horticultural workers and/or at-home users such as Plaintiffs to utilize the products safely and with adequate protection.  Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

523.    To this day, Defendant has failed to adequately and accurately warn of the true risks of Plaintiffs' injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

524.    As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiffs.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

525.     Defendant is liable to Plaintiffs for injuries caused by its failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its Roundup® products and the risks associated with the use of or exposure to Roundup® and glyphosate.

526.     The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiffs' injuries, and, but for Defendant's misconduct and omissions, Plaintiffs would not have sustained their injuries.

527.     Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup® products, Plaintiffs could have avoided the risk of developing injuries as alleged herein and Plaintiffs and Plaintiffs' employers could have obtained alternative herbicides.

528.     As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce and failing to warn Plaintiffs of the increased risk of NHL associated with the use of and/or exposure to Roundup® products as described herein, Plaintiffs have developed NHL and have been injured catastrophically and have been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort and economic damages, including for medical care and treatment.  Plaintiffs will continue to incur these expenses in the future.

529.     WHEREFORE, Plaintiffs pray for judgment against Defendant Monsanto in a fair and reasonable sum in excess of $10,000,000, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT THREE: VIOLATION OF MISSOURI MERCHANDIZING PRACTICE ACT, § 407.020 et seq.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

530.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein.

531.    At all relevant times, Defendant knew or should have known of the unreasonably dangerous and carcinogenic nature of the use of and/or exposure to Roundup®.

532.    At all relevant times, Defendant, through its labeling, advertisements, public representations and marketing of Roundup®, intentionally used deception, fraud, false pretenses, false promises, misrepresentations and unfair trade practices in order to mislead consumers that Roundup® products are safe for use.

533.    At all relevant times, Defendant also engaged in the concealment, suppression and/or omission of material facts in connection with the sale and/or advertisement of Roundup® products in trade or commerce.  In particular, Defendant failed to disclose to the public that Roundup® is unsafe and poses serious health hazards, particularly NHL.  Defendant was aware of the hazardous risks posed by Roundup® and yet failed to inform the public of these risks through their advertisements, labeling, or other means available to them.  Defendant's failure to state material facts about Roundup® constitutes a violation of V.A.M.S. § 407.020.

534.    At all relevant times, Plaintiffs were deceived by Defendant's intentional misrepresentations and omissions, including by the orchestrated claims made on or in television commercials, advertising materials, websites, and on product labels and packaging regarding the usage and safety of Roundup®.

535.    At all relevant times, Plaintiffs acted in reasonable reliance upon Defendant's unlawful trade practices, and had the Defendant not engaged in the deceptive conduct described herein, Plaintiffs would not have purchased Roundup® and/or would have protected themselves from exposure to Roundup®.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

536.     As a direct and proximate result of Defendant's unlawful trade practices, Plaintiffs developed NHL and have been injured catastrophically and have been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort and economic damages.

537.     WHEREFORE, Plaintiffs pray for judgment against Defendant in a fair and reasonable sum in excess of $10,000,000 together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT FOUR: NEGLIGENCE

538.     Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

539.     At all relevant times, Defendant breached its duty to Plaintiffs and were otherwise negligent in marketing, designing, manufacturing, producing, supplying, inspecting, testing, selling and/or distributing Roundup® products.

540.     Defendant, directly or indirectly, caused Roundup® products to be purchased and/or used by Plaintiffs.

541.     At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

542.     At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of its Roundup® products.  Defendant's duty of

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup® and, in particular, its active ingredient glyphosate.

543.    At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

544.    Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause Plaintiffs' injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiffs.

545.    Defendant knew or, in the exercise of reasonable care, should have known that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiffs from Roundup®.

546.    Defendant knew or, in the exercise of reasonable care, should have known that tests limited to Roundup®'s active ingredient glyphosate were insufficient to prove the safety of Roundup®.

547.    Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup® and glyphosate-containing products.

548.    As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply,

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

549.    Defendant failed to appropriately and adequately test Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiffs from Roundup®.

550.    Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant has failed to do so.  Indeed, Defendant has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

551.    Defendant's negligence included:

a.    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

b.    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

c.      Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture, horticulture, and at-home use;

d.      Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup®, and the propensity of these ingredients to render Roundup® toxic, increase the toxicity of Roundup®, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup®, and whether or not "inert" ingredients and/or adjuvants were safe for use;

e.      Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

f.      Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

g.      Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and/or be exposed to its Roundup® products;

h.      Failing to disclose to Plaintiffs, users, consumers, and the general public that the use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

i.      Failing to warn Plaintiffs, users, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiffs and other users or consumers;

j.      Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

k.      Representing that its Roundup® products were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended use;

l.      Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

m.      Advertising, marketing, and recommending the use of Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

n.      Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup® products are not unsafe for use in the agricultural, horticultural industries, and/or home use; and

o.      Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

552.    Defendant knew and/or should have known that it was foreseeable that consumers and/or users, such as Plaintiffs, would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

553.    Plaintiffs did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

554.    Defendant's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiffs suffered, and will continue to suffer, as described herein.

555.    Defendant's conduct, as described above, was reckless.  Defendant regularly risks the lives of consumers and users of its products, including Plaintiffs, with full knowledge of the dangers of its products.  Defendant has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiffs.  Defendant's reckless conduct therefore warrants an award of punitive damages.

556.    As a proximate result of Defendant's wrongful acts and omissions in placing its defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiffs developed NHL and have been injured catastrophically and have been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort and economic damages, including significant expenses for medical care and treatment, and will continue to incur these expenses in the future.

557.    WHEREFORE, Plaintiffs pray for judgment against Defendant Monsanto in a fair and reasonable sum in excess of $10,000,000, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

### COUNT FIVE: BREACH OF EXPRESS WARRANTIES

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

558.     Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

559.     At all relevant times, Defendant engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to users, consumers and those in proximity to users, including Plaintiffs, thereby placing Roundup® products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendant.

560.     Before the time that Plaintiffs were exposed to the use of the aforementioned Roundup® products, Defendant expressly warranted to its consumers and users—including Plaintiffs and Plaintiffs' employers—that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

561.     Defendant, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiffs' injuries.

562.      The representations, as set forth above, contained or constituted affirmations of fact or promises made by the seller to the buyer which related to the goods and became part of the basis of the bargain creating an express warranty that the goods shall conform to the affirmations of fact or promises.

563.     Roundup® did not conform to the representations made by Monsanto as Roundup® was not safe for use by individuals such as Plaintiffs.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

564.    At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

565.    Neither Plaintiffs nor Plaintiffs' employers could have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

566.    Defendant's breaches constitute violations of state common laws, including but not limited to, the following statutory provisions as applicable:

- Ala. Code §§ 7-2-313, 7-2-314 (2017);

- Alaska St. § 45.02.313 (effective 2016);

- Ariz. Rev. Stat. Ann. § 47-2313 (2016);

- Ark. Code Ann. § 4-2-313 (2016);

- Cal. U. Com. Code § 2313(1) (2017); Cal. Civ. Code §1791.2(a) (2017).

- Co. Rev. St. § 4-2-316 (2017);

- Conn. Gen. Stat. Ann. § 42a-2-313 (effective 2017);

- 6 Del. C. § 2-313 (2017);

- D.C. Code Ann. § 28:2-313 (2017);

- Fla. Stat. Ann. § 672.313 (2017);

- O.C.G.A. § 11-2-318 (2017);

- Haw. Rev. Stat. § 490:2-313 (2016);

- Id. Code § 28-2-314(2)(c) (2017).

- Ill. Comp. Stat. Ann. Ch. 810, 5/2-313 (2016);

- Ind. Code Ann. § 26-1-2-313 (2016);

- Iowa Code Ann. § 554.2313 (2016);

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

- Kans. Stat. Ann. § 84-2-313 (2017); KRS § 355.2-318 (2017); Kan. Stat. Ann. § 60-3302(c) (2017).

- Ky. Rev. Stat. § 355.2-318 (2017);

- La. Rev. Stat. §§ 9:2800.54, 9:2800.58 (2016);

- Me. Rev. Stat. Ann. tit. 11, § 2-314 and 2-315 (2017); 14 M.R.S. § 221 (2017).

- Md. Code Ann., Com. Law § 2-318 (2017);

- Mass. Gen. Laws c. 106, § 2-313 (2017);

- Mich. Comp. Laws Ann. § 440.2313 (2016);

- Minn. Stat. Ann. § 336.2-313 through 315 (2016);

- Miss. Code Ann. § 11-1-63(i)(3) and 75-2-313 (2017);

- Mo. Rev. Stat. Ann. § 400.2-313 (2016);

- Mont. Code Ann. § 30-2-313 (2017);

- Neb. Rev. Stat. U.C.C. § 2-313 et seq. (2017)

- Nev. Rev. Stat. U.C.C. § 104.2313, et seq. (2016); Nev. Rev. Stat. §§ 104.2312-104.2318 (2016).

- N.H. Rev. Stat. Ann. § 382-A:2-313, et seq. (2017);

- N.M. Stat. Ann. §§ 55-2-313 to -318 (2017); *see also* UJI 13-1428 to 1433 NRMA (2016).

- N.Y. U.C.C. Law 2-313, et seq. (2017);

- N.C. Gen. Stat. Ann. § 25-2-313, et seq. (2017);

- N.D. Cent. Code § 41-02-30, et seq. (2017);

- Ohio Rev. Code Ann. § 1302.26, et seq. (2016);

- Okla. Stat. tit. 12A, § 2-313 et seq. (2017);

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

- Or. Rev. Stat. § 72.3130, et seq. (2016);

- 13 Pa. Stat. Ann. § 2313, et seq. (2016);

- R.I. Gen. Laws § 6A-2-313 (2016);

- S.C. Code. Ann. § 36-2-313, et seq. (2016);

- S.D. Stat. 57A-2-313, et seq. (2017);

- Tenn. Code Ann. § 47-2-313, et seq. (2016);

- Tex. Bus. & Com. Code Ann. § 2.313, et seq. (2015);

- Ut. Code Ann. § 70A-2-313, et seq. (2016);

- Va. Code Ann. § 8.2-318, et seq. (2016);

- Vt. Stat. Ann. tit. 9A, § 2-313, et seq. (2016);

- Wa. Rev. Code § 62A.2-313, et seq. (2016); § 7.72.030(2) (2016);

- W.Va. Code § 46A-6-108, et seq. (2016);

- Wis. Stat. Ann. § 402.313, et seq. (2017); and

- Wyo. Stat. § 34.1-2-313 through 315 (2017).

567.    The breach of the warranty was a substantial factor in bringing about Plaintiffs' injuries.  As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce and failing to warn Plaintiffs of the increased risk of NHL associated with the use of and/or exposure to Roundup® products as described herein, Plaintiffs have developed NHL and have been injured catastrophically and have been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort and economic damages, including for medical care and treatment.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

568.    The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

569.    As a direct and proximate result of Defendant's wrongful acts and omissions Plaintiffs have suffered severe and permanent physical and emotional injuries.  Plaintiffs have endured pain and suffering, have suffered economic loss, including significant expenses for medical care and treatment, and will continue to incur these expenses in the future.

570.    WHEREFORE, Plaintiffs pray for judgment against Defendant Monsanto in a fair and reasonable sum in excess of $10,000,000, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT SIX: BREACH OF IMPLIED WARRANTIES

571.    Plaintiffs incorporate by reference each of the preceding paragraphs as if fully set forth herein.

572.    At all relevant times, Defendant engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to users, consumers and those in proximity to users, including Plaintiffs, thereby placing Roundup® products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendant.

573.    Before the time that Plaintiffs were exposed to the use of the aforementioned Roundup® products, Defendant impliedly warranted to its consumers and users—including Plaintiffs and Plaintiffs' employers—that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

574.    Defendant, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiffs' injuries.

575.    Upon information and belief, Plaintiffs and Plaintiffs' employers reasonably relied upon the skill, superior knowledge and judgment of Defendant and upon its implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

576.    Upon information and belief, Plaintiffs and Plaintiffs' employers reasonably relied upon the skill, superior knowledge and judgment of Defendant and upon its implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

577.    The Roundup® products were expected to reach and did in fact reach consumers, users and those in proximity to users, including Plaintiffs, without substantial change in the condition in which they were manufactured and sold by Defendant.

578.    At all relevant times, Defendant was aware that consumers, users, and those in proximity of users of its products, including Plaintiffs, would use Roundup® products as marketed by Defendant, which is to say that Plaintiffs were the foreseeable users of Roundup®.

579.    Defendant intended that its Roundup® products be used in the manner in which Plaintiffs in fact used or were exposed to them and Defendant impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

580.    In reliance upon Defendant's implied warranty, Plaintiffs used or were in proximity to the use of Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendant.

581.    Neither Plaintiffs nor Plaintiffs' employers could have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

582.    Defendant breached its implied warranty to Plaintiffs in that its Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested.  Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

583.    The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

584.    As a direct and proximate result of Defendant's wrongful acts and omissions Plaintiffs have suffered severe and permanent physical and emotional injuries.  Plaintiffs have endured pain and suffering, have suffered economic loss, including significant expenses for medical care and treatment, and will continue to incur these expenses in the future.

585.    WHEREFORE, Plaintiffs pray for judgment against Defendant Monsanto in a fair and reasonable sum in excess of $10,000,000, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## **COUNT SEVEN: WRONGFUL DEATH**

### **(Plaintiff Ann Brownell)**

586.    Plaintiff incorporates by reference every other paragraph of this Complaint as if each were set forth herein.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

587.    As a direct and proximate result of the acts and/or omissions of Defendant, as set forth herein, the Decedent named in this action used and/or was exposed to Roundup®.

588.    Subsequent to such use, Decedent developed NHL, suffered substantial pain and suffering, both physical and emotional in nature, and subsequently died.

589.    Plaintiff Ann Brownell, on behalf of herself and all of the next of kin of Decedent, is entitled to recover damages as Decedent would have if he were living, as a result of acts and/or omissions of Defendant.

590.    Plaintiff Ann Brownell, on behalf of herself and all of Decedent's next of kin is also entitled to recover punitive damages and damages for substantial pain and suffering caused to Decedent from the acts and/or omissions of Defendant as fully set forth herein, including without limitations, punitive damages.

591.    As a direct and proximate result of Defendant's conduct, Plaintiff Ann Brownell and Decedent James Brownell have been injured and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care and comfort, and economic damages.

592.    WHEREFORE, Plaintiff demands judgment against Defendant and for damages in excess of $25,000.00, punitive damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## COUNT EIGHT – PUNITIVE DAMAGES

593.    Plaintiffs incorporate by reference every other paragraph of this Complaint as if each were set forth herein.

594.    Defendant has acted willfully, wantonly, maliciously, with an evil motive, and recklessly in one or more of the following ways:

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

a. Defendants knew of the unreasonably high risk of NHL posed by the Roundup® products before manufacturing, marketing, distributing and/or selling the Roundup® products, yet purposefully proceeded with such action;

b. Despite their knowledge of the high risk of NHL associated with use and/or exposure to Roundup® products, Defendant affirmatively minimized this risk through marketing and promotional efforts and product labeling;

c. Through the actions outlined above, Defendant expressed a reckless indifference to the safety of users of Roundup® products, including Plaintiffs.

595.    Defendant knew of the dangers and risks of Roundup® products, yet it concealed and/or omitted this information from labels and warnings contained on Roundup® products in furtherance of its knowing and willful actions.

596.    These actions were outrageous because of Defendant's evil motive or a reckless indifference to the safety of users of Roundup® products and/or those who became exposed to it.

597.    As a direct and proximate result of the willful, wanton, malicious, evilly motivated and/or reckless conduct of Defendant, the Plaintiffs have sustained damages as set forth above.

598.    WHEREFORE, Plaintiffs pray for a judgment for punitive damages against Defendant, jointly and severally, in a fair and reasonable amount sufficient to punish Defendant and deter it and others from engaging in similar conduct in the future, costs expended herein, and such further and other relief as the Court deems just and appropriate.

## COUNT NINE – DAMAGES

599.    Plaintiffs incorporate by reference every other paragraph of this Complaint as if each were set forth fully and completely herein.

Electronically Filed - City of St. Louis - March 20, 2017 - 03:01 PM

600.    Defendant knew of the dangerous condition of Roundup® products, including that they posed a danger to their consumers and non-consumers exposed to Roundup® products, including Plaintiffs, but chose not to include any warnings or information regarding the dangerous condition of Roundup® products.

601.    Defendant showed complete indifference to or conscious disregard of the safety of Plaintiffs by their conduct described herein.  Defendant knew or should have known failure to include a warning for Roundup® products would result in women using and/or being exposed to Roundup® products and subsequently developing NHL.

602.    Plaintiffs are entitled to exemplary damages to punish Defendant and to deter Defendant and others in similar situations from like conduct.

603.    WHEREFORE, Plaintiffs pray for judgment against Defendant for

a.    compensatory damages in an amount to be proven at trial;

b.    exemplary damages;

c.    costs, including reasonable attorneys' fees, court costs, and other litigation expenses; and

d.    any other relief the Court may deem just and proper.

Dated: March 20, 2017

s/ Eric D. Holland
Eric D. Holland - *(Mo. Bar # 39935)*
R. Seth Crompton – *(Mo. Bar #57448)*
**HOLLAND LAW FIRM, LLC**
300 N Tucker, Suite 801
St. Louis, MO 63101
TEL: (314) 241-8111
FAX: (314) 241-5554
Email: eholland@allfela.com

*One of the Attorneys for Plaintiffs*