Jury Trial,USMJ Gates

# U.S. District Court
# EASTERN DISTRICT OF NORTH CAROLINA (Southern Division)
# CIVIL DOCKET FOR CASE #: 7:17-cv-00088-D

Strickland v. Monsanto Company
Assigned to: Chief Judge James C. Dever, III
Demand: $75,000
Cause: 28:1332 Diversity-Product Liability

Date Filed: 05/02/2017
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Johnny Hick Strickland**

represented by **James L. Ward , Jr.**
McGowan Hood & Felder LLC
321 Wingo Way
Suite 103
Mt. Pleasant, SC 29465
843-388-7202
Fax: 843-388-3194
Email: jward@mcgowanhood.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 05/02/2017 | 1 | COMPLAINT against Monsanto Company ( Filing fee $ 400 receipt number 0417-4075425.), filed by Johnny Hick Strickland. (Attachments: # 1 Civil Cover Sheet, # 2 Proposed Summons) (Ward, James) (Entered: 05/02/2017) |
| 05/02/2017 | 2 | Financial Disclosure Statement by Johnny Hick Strickland (Ward, James) (Entered: 05/02/2017) |
| 05/03/2017 | | Notice to Counsel - Counsel should file a Notice of Appearance pursuant to Local Civil Rule 5.2(a). (Rudd, D.) (Entered: 05/03/2017) |
| 05/03/2017 | | Notice to Counsel regarding: 2 Financial Disclosure Statement. Counsel is reminded that the court prefers flattened pdf fillable forms. Counsel should flatten the document prior to attaching it in accordance with Section IV.B of the CM/ECF Policies and Procedures Manual. (Rudd, D.) (Entered: 05/03/2017) |
| 05/03/2017 | 3 | Summons Issued as to Monsanto Company. Counsel is reminded to print summons and effect service. (Briggeman, N.) (Entered: 05/03/2017) |
| 05/03/2017 | 4 | Notice of Appearance filed by James L. Ward, Jr on behalf of Johnny Hick Strickland. (Ward, James) (Entered: 05/03/2017) |

## PACER Service Center

### Transaction Receipt

| 05/23/2017 09:11:03 | | | |
|---|---|---|---|
| **PACER Login:** | hllp1982:2634105:4722683 | **Client Code:** | 1417.0005 |
| **Description:** | Docket Report | **Search Criteria:** | 7:17-cv-00088-D |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**SOUTHERN DIVISION**

| | |
|---|---|
| Johnny Hick Strickland, | Civil Action No. 7:17-cv-00088 |
| Plaintiff, | |
| vs. | |
| Monsanto Company, | **COMPLAINT** |
| Defendants. | **(Jury Trial Requested)** |

Plaintiff, Johnny Hick Strickland ("Plaintiff"), by and through his undersigned attorneys, hereby brings this Complaint for damages against Defendant Monsanto Company ("Monsanto" or "Defendant") and alleges the following.

## NATURE OF THE CASE

1.     This is an action for damages suffered by Plaintiff as a direct and proximate result of Defendant's negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup®, containing the active ingredient glyphosate.

2.     Plaintiff maintains that Roundup® and/or glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper warnings and directions as to the dangers associated with its use.

3.     Plaintiff's injuries, like those striking thousands of similarly situated victims across the country, were avoidable.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over Defendant and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendant. Defendant is either incorporated and/or has its principal place of business outside of the state in which the Plaintiff resides.

5.     The amount in controversy between Plaintiff and Defendant exceeds $75,000, exclusive of interest and cost.

6.     The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

7.     Venue is proper within this district pursuant to 28 U.S.C. § 1391 in that Defendant conducts business here and is subject to personal jurisdiction in this district. Furthermore, Defendant sells, markets, and/or distributes Roundup® within the Eastern District of North Carolina.  Also, a substantial part of the acts and/or omissions giving rise to these claims occurred within this district.

## PARTIES

8.     Plaintiff is a natural person and at all relevant times a resident and citizen of Cerro Gordo, Columbus County, North Carolina. Plaintiff brings this action for personal injuries sustained by exposure to Roundup® ("Roundup") containing the active ingredient glyphosate and the surfactant POEA. As a direct and proximate result of being exposed to Roundup, Plaintiff developed non-Hodgkin's Lymphoma.

9.     "Roundup" refers to all formulations of Defendant's Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak Herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass

and Weed Killer, Roundup Herbicide, Roundup Original 2k Herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass Killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer 1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

10.     Defendant is a Delaware corporation with a principal place of business in St. Louis, Missouri.

11.     Defendant advertises and sells goods, specifically Roundup, in Columbus County, North Carolina.

12.     Defendant transacted and conducted business within the State of North Carolina that relates to the allegations in this Complaint.

13.     Defendant derived substantial revenue from goods and products used in the State of North Carolina.

14.     Defendant expected or should have expected its acts to have consequences within the State of North Carolina and derived substantial revenue from interstate commerce.

3

15.     Defendant engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup with full knowledge of its dangerous and defective nature.

16.     Defendant is authorized to do business in North Carolina and derives substantial income from doing business in this state.

17.     Defendant purposefully availed itself of the privilege of conducting activities with the State of North Carolina, thus invoking the benefits and protections of its laws.

## FACTUAL ALLEGATIONS

18.     At all relevant times, Defendant was in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or had acquired and was responsible for those who designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed Roundup.

19.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate.

20.     Defendant discovered the herbicidal properties of glyphosate during the 1970s and subsequently began to design, research, manufacture, sell, and distribute glyphosate based Roundup as a broad-spectrum herbicide.

21.     Glyphosate is the active ingredient in Roundup.

22.     Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

23.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

4

24.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

25.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

26.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

27.     Defendant is intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup, *i.e.,* "Roundup Ready®." As of 2009, Defendant was the world's leading producer of seeds designed to be Roundup Ready®. In 2010, an estimated 70% of corn and cotton and 90% of soybean fields in the United States contained Roundup Ready® seeds.

28.     The original Roundup, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the world's most widely used herbicides.  Defendant's glyphosate products are registered in more than 130 countries and are approved for weed control in more than 100 crops.  No other herbicide active ingredient compares in terms of number of approved uses.[1]

------

[1] *Backgrounder*, History of Monsanto's Glyphosate Herbicides, June 2005.

29.     For nearly 40 years, consumers, farmers, and the public have used Roundup, unaware of its carcinogenic properties.

## REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

30.     The manufacture, formulation, and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136, *et seq*. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA, 7 U.S.C. § 136a(a).

31.     The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

32.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

33.     The EPA and the State of North Carolina registered Roundup for distribution, sale, and manufacture in the United States and the State of North Carolina.

34.     FIFRA generally requires that the registrant conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

35.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. To reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

36.     In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment – in relation to the registration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of the World Health Organization's findings.

### MONSANTO'S FALSE REPRESENTATIONS REGARDING THE SAFETY OF ROUNDUP

37.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer **than table salt**" and "practically **non-toxic**" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

a)   Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences …

b)  And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c)  Roundup biodegrades into naturally occurring elements.

d)  Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e)  This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f)  You can apply Accord with "confidence because it will stay where you put it" – it bonds tightly to soil particles, preventing leaching.  Then,  soon after  application,  soil  microorganisms biodegrade Accord into natural products.

g)  Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h)  Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i)  You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j)  "Roundup can be used where kids and pets will play and breaks down into natural material."  This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[2]

38.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a)  its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

---

[2] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

b)  its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;

c)  its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

d)  its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics";

e)  glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and

f)  its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

39.    Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

40.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[3]

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP

41.    As early as the 1980s, Monsanto was aware of glyphosate's carcinogenic properties.

42.    On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[4] Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

---

[3] *Monsanto Guilty in 'False Ad' Row,* BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.
[4] Consensus Review of Glyphosate, Casewell No. 661A. March 4, 1985. United States

43.     In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All the data required was submitted and reviewed and/or waived.[5]

44.     In October 1991, the EPA published a memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee, and one member refused to sign.[6]

45.     In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendant's Roundup products are more dangerous and toxic than glyphosate alone.[7] As early as 1991, evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.[8]

46.     In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

47.     The study found that Defendant's Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

---

Environmental Protection Agency.

[5] http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheets/0178fact.pdf.

[6] Second Peer Review of Glyphosate, CAS No. 1071-83-6. October 30, 1991. United States Environmental Protection Agency.

dangerous and toxic than glyphosate alone.

[7] Martinez, *et al.*, 2007; Benachour, 2009; Gasnier, *et al.*, 2010; Peixoto, 2005; Marc, 2004.

[8] Martinez, *et al.*, 1991.

48.     In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

49.     The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[9]

50.     In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

51.     The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

52.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

53.     The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate

---

[9] Molinari, 2000; Stewart, *et al.*, 2003).

toxicity should consider the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

54.     The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendant.

55.     Defendant knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup.

56.     Defendant knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

57.     Defendant failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup.

58.     Rather than performing appropriate tests, Defendant relied upon flawed industry-supported studies designed to protect Defendant's economic interests rather than Plaintiff and the consuming public.

59.     Despite its knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup as safe.

**IARC CLASSIFICATION OF GLYPHOSATE**

60.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

61.     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015–2019 met in April 2014. Though nominations for the review were solicited, a

substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

62.     IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

63.     On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendant's possession since as early as 1985, the IARC Working Group published its conclusion that the glyphosate contained in Defendant's Roundup herbicide is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

64.     The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a Class 2A *probable* carcinogen to humans. According to the authors, glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

65.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

66. The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

## EARLIER EVIDENCE OF GLYPHOSATE'S DANGER

67. Despite the new classification by the IARC, Defendant has had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

68. Genotoxicity refers to chemical agents that can damage the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

69. In 1997, Chris Clements published "Genotoxicity of select herbicides in *Rana catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

70. The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

71. Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

72. Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

73. The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

74. In 2006 César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

75. The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

76.     The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

77.     Despite knowledge to the contrary, Defendant maintains that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts agree that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

78.     In addition to glyphosate and Roundup's genotoxic properties, Defendant has long been aware of glyphosate's carcinogenic properties.

79.     Glyphosate and Roundup have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

80.     Defendant has known of this association since the early to mid-1980s, and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

81.     In 1985, the EPA studied the effects of glyphosate in mice and found a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

82.     In 2003, Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

83.     The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studied, with an increased odds ratio of 3:11.

84.     In 2003, AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

85.     The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

86.     In 2008, Mikael Eriksson published a population based case-control study of exposure to various pesticides as a risk factor for NHL.

87.     This strengthened previous associations between glyphosate and NHL.

88.     Despite this knowledge, Defendant continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

89.     Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiff, the agricultural community, and the public at large to purchase, and increase the use of, Defendant's Roundup for Defendant's pecuniary gain, and in fact did induce Plaintiff to use Roundup.

90.     Defendant made these statements with complete disregard and reckless indifference to the safety of Plaintiff and the public.

91.     Notwithstanding Defendant's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, multiple myeloma, and soft tissue sarcoma.

92.     Defendant knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, multiple myeloma, and soft tissue sarcomas.

93.     Defendant failed to appropriately and adequately inform and warn Plaintiff of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or

Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring, and/or medications.

94.    Despite the IARC's classification of glyphosate as a Class 2A probable carcinogen, Defendant continues to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-genotoxic, and falsely warrant to users and the public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

95.    Defendant has claimed and continues to claim that Roundup is safe, non-carcinogenic, and non-genotoxic.

96.    Defendant claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic".[10]

97.    Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

98.    Glyphosate and Roundup have long been associated with serious side effects, and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

---

[10] *Backgrounder*, Glyphosate: No Evidence of Carcinogenicity, November 2014, available at http://www.monsanto.com/glyphosate/documents/no-evidence-of-carcinogenicity.pdf          (last visited April 26, 2017).

99.    Defendant's statements proclaiming the safety of Roundup and disregarding its dangers misled Plaintiff.

100.    Despite Defendant's knowledge that Roundup was associated with an elevated risk of developing cancer, Defendant's promotional campaigns focused on Roundup's purported "safety profile."

101.    Defendant's failure to adequately warn Plaintiff resulted in (1) Plaintiff using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

102.    Defendant failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

103.    The failure of Defendant to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

104.    The failure of Defendant to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

105.    The failure of Defendant to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

106.    Because of the foregoing acts and omissions, Plaintiff seeks compensatory damages resulting from his use of, and exposure to, Roundup, which caused or was a substantial contributing factor in causing Plaintiff to suffer from cancer, specifically NHL, and to suffer severe and personal injuries that are permanent and lasting in nature, physical pain and mental anguish, and diminished enjoyment of life.

107.    Because of the foregoing, Plaintiff is severely and permanently injured.

108.    Because of the foregoing acts and omissions, Plaintiff has endured and, in some categories continues to suffer, emotional and mental anguish, medical expenses, and other economic and non-economic damages caused by Defendant's actions and inactions.

## PLAINTIFF'S EXPOSURE TO ROUNDUP

109.    Plaintiff used Roundup throughout the 1970s and 1980s in farming operations spraying agricultural fields in and around Columbus County.

110.    For many years, Plaintiff sprayed Roundup on a regular basis. Plaintiff followed all safety and precautionary warnings while using Roundup.

111.    Plaintiff was subsequently diagnosed with non-Hodgkin's Lymphoma in February 2017.

112.    Because of his injury, Plaintiff has incurred significant economic and non-economic damages.

## EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

113.    Plaintiff incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

114.    The running of any statute of limitations has been tolled because of Defendant's fraudulent concealment. Defendant, through affirmative misrepresentations and omissions, actively concealed from Plaintiff the true risks associated with Roundup and glyphosate.

115.    At all relevant times, Defendant has maintained that Roundup is safe, non-toxic, and non-carcinogenic.

116.    Defendant continues to represent to the public that "Regulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity

and genotoxicity studies and *agree* that there is *no evidence* that glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic." (emphasis added)[11]

117.   Because of Defendant's actions, Plaintiff was unaware, and could not reasonably know or have learned through reasonable diligence that Roundup and/or glyphosate contact exposed Plaintiff to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

118.   Furthermore, Defendant is estopped from relying on any statute of limitations because of its fraudulent concealment of the true character, quality, and nature of Roundup. Defendant was under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Defendant had and continues to have exclusive control, and because Defendant knew that this information was not available to Plaintiff or to distributors of Roundup. In addition, Defendant is estopped from relying on any statute of limitations because of its intentional concealment of these facts.

119.   Plaintiff had no knowledge that Defendant was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendant, Plaintiff could not have reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud should be considered. Defendant had the ability to and did spend enormous amounts of money in furtherance of its purpose of marketing, promoting, and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Plaintiff and medical professionals could not have afforded and could not have possibly

---

[11] *Backgrounder*, Glyphosate: No Evidence of Carcinogenicity, November 2014, available at http://www.monsanto.com/glyphosate/documents/no-evidence-of-carcinogenicity.pdf        (last visited April 26, 2017).

conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendant's representations. Accordingly, Defendant is precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

**FIRST CAUSE OF ACTION**
**(NEGLIGENCE)**

120.    Plaintiff re-alleges and incorporates herein by reference the allegations of the preceding paragraphs.

121.    Defendant designed, manufactured, distributed, and sold Roundup with the intent and knowledge that it would ultimately be sold to and/or used by a class of persons of which Plaintiff is a member, and expected the product to reach consumers and ultimate users in the same condition in which it was manufactured and sold.

122.    Defendant's Roundup reached the usual consumers and ultimate users without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by Defendant.

123.    At the time of the Plaintiff's use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

124.    The Plaintiff could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

125.    Defendant had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

126.     Defendant failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup into interstate commerce in that Defendant knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of NHL, as well as other severe and personal injuries that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

127.     Defendant was negligent, grossly negligent, willful, wanton, and reckless in the design and manufacture of Roundup in the following respects:

a.     Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly testing it;

b.     Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup;

c.     Not conducting sufficient testing programs to determine whether Roundup was safe for use, in that Defendant herein knew or should have known that Roundup was unsafe and unfit for use because of the dangers to its users;

d.     Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Defendant had knowledge that Roundup is, was, or could be carcinogenic;

e.     Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained in Roundup and the propensity of these ingredients to render Roundup toxic or increase the toxicity of Roundup, to determine whether these ingredients are carcinogenic or magnify the carcinogenic properties of Roundup, and to determine whether "inert" ingredients and/or adjuvants were safe for use;

f.     Failing to adequately and correctly warn the Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

g.     Failing to petition the EPA to strength the warnings associated with Roundup;

h.      Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

i.      Marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

j.      Representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

k.      Representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

l.      Designing Roundup in a manner that was dangerous to its users;

m.      Manufacturing Roundup in a manner that was dangerous to its users;

n.      Producing Roundup in a manner that was dangerous to its users;

o.      Formulating Roundup in a manner that was dangerous to its users;

p.      Concealing information from the Plaintiff while knowing that Roundup  was unsafe, dangerous, and/or non-conforming with EPA regulations;

q.      Concealing from and/or misrepresenting information to the Plaintiff, scientific and medical professionals, and/or the EPA concerning the severity of risks and dangers of Roundup compared to other forms of herbicides; and

r.      Selling Roundup with a false and misleading label.

128.      Defendant under-reported, underestimated, and downplayed the serious dangers of Roundup.

129.      Defendant negligently and deceptively compared the safety risks and/or dangers of Roundup with common everyday foods such as table salt, and other forms of herbicides.

130.      Defendant was negligent, grossly negligent, willful, wanton, and reckless in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising,  warning, marketing, and selling of Roundup in that it:

a.      Failed to use ordinary care in designing and manufacturing Roundup to avoid the risks to individuals when Roundup was used as an herbicide;

b.      Failed to accompany its product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

c.      Failed to accompany its product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

d.      Failed to accompany its product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;

e.      Failed to warn Plaintiff of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms or severity of the side effects including, but not limited to, the development of NHL;

f.      Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup;

g.      Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants;

h.      Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity;

i.      Was otherwise careless and/or negligent.

131.    Even though Defendant knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Defendant continued and continues to market, manufacture, distribute, and/or sell Roundup to consumers, including the Plaintiff.

132.    Defendant knew or should have known that consumers such as the Plaintiff would foreseeably suffer injury because of Defendant's failure to exercise ordinary care, as set forth above.

133.    Because of Defendant's negligent, grossly negligent, willful, wanton, and reckless conduct alleged herein, Roundup was unreasonably dangerous and so defective that a reasonable person, aware of the hidden dangers, would not have used the product.

134.     Defendant's negligent, grossly negligent, willful, wanton, and reckless conduct was the proximate cause of the injuries, harm, and economic loss that Plaintiff suffered and/or will continue to suffer.

135.     As a direct and proximate result of Defendant's negligent, grossly negligent, willful, wanton, and reckless conduct alleged herein, Plaintiff suffered from serious and dangerous side effects including, but not limited to, NHL, as well as other severe and personal injuries that are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care.

136.     Defendant consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others.  Alternatively, Defendant acted to serve its own interests, having reason to know and consciously disregarding a substantial risk that its conduct might significantly injure the rights of others.

137.     Defendant's conduct was willful, wanton, reckless, and so outrageous as to justify an award of punitive damages to punish Defendant and deter similar misconduct by Defendant and by others in the future.

## SECOND CAUSE OF ACTION
### (PRODUCTS LIABILITY – FAILURE TO WARN – N.C. Gen. Stat. § 99B-5)

138.     Plaintiff re-alleges and incorporates herein by reference the allegations of the preceding paragraphs.

139.     Defendant has engaged in the development, testing, manufacturing, marketing, distribution, and sale of Roundup,  and  through  that  conduct  has knowingly and intentionally  placed  Roundup  into  the  stream  of  commerce  with  full knowledge that it reaches consumers such as Plaintiff who are exposed to it through ordinary and reasonably foreseeable uses as directed by the product labeling.

140.    Defendant distributed and sold Roundup in the condition in which it left its place of manufacture, in its original form of manufacture, which included the dangers and defects described herein.  Roundup was expected to and did reach Plaintiff without substantial change or adjustment in its condition as manufactured and sold by Defendant.

141.    Plaintiff did not alter, modify, or misuse Roundup in any respect.

142.    Plaintiff used Roundup for its intended purpose, in a reasonably foreseeable manner, and as directed by the product's labeling and directions.

143.    Roundup, while being put to its intended use, proximately caused the injuries to Plaintiff described herein.

144.    Defendant acted unreasonably in failing to provide foreseeable users, such as Plaintiff, with adequate warnings or instructions regarding the  full  and  complete  risks  of Roundup  and  glyphosate-containing products.

145.    Defendant acted unreasonably in that at the time it left Defendant's control, Roundup, without adequate warnings or instructions, created an unreasonably dangerous condition that Defendant knew, or in the exercise of ordinary care should have known, posed a substantial risk of harm to foreseeable users, such as Plaintiff, in violation of N.C. Gen. Stat. § 99B-5.

146.    The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing non-Hodgkin's lymphoma as a result of exposure and use.

147.     Defendant's failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. § 136j(a)(1)(E).

148.     After Roundup left Defendant's control, Defendant became aware of or in the exercise of ordinary care should have known that Roundup posed a substantial risk of harm to reasonably foreseeable users, such as Plaintiff, and failed to take reasonable steps to give adequate warnings or instructions, strengthen existing inadequate warnings and instructions, or take other reasonable action under the circumstances described herein in violation of N.C. Gen. Stat. § 99B-5.

149.     Because of Defendant's failure to provide adequate warnings and instructions, Roundup was unreasonably dangerous and so defective that a reasonable person, aware of the hidden dangers, would not have used the product.

150.     Plaintiff could not have discovered and did not discover the defect or defects in Roundup through the exercise of reasonable care.

151.     Had Defendant properly disclosed the risks associated with Roundup, Plaintiff would have avoided the risk of NHL by not using Roundup.

152.     Defendant's failure to provide adequate warnings and instructions regarding the dangers and risks associated with Roundup was a proximate cause of Plaintiff's injuries.

153.     As a direct and proximate result of his use of Roundup, Plaintiff suffered from serious and dangerous side effects including, but not limited to, NHL, as well as other severe and personal injuries that are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care.

154.     Defendant consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others.  Alternatively, Defendant acted to serve its own interests, having reason to know and consciously disregarding a substantial risk that its conduct might significantly injure the rights of others.

155.     Defendant's conduct was willful, wanton, reckless, and so outrageous as to justify an award of punitive damages to punish Defendant and deter similar misconduct by Defendant and by others in the future.

### THIRD CAUSE OF ACTION
### (PRODUCTS LIABILITY – INADEQUATE DESIGN – N.C. Gen. Stat. § 99B-6)

156.     Plaintiff re-alleges and incorporates herein by reference the allegations of the preceding paragraphs.

157.     Defendant, at all times relevant hereto, was engaged in the development, testing, manufacturing, marketing, and sale of Roundup.  Defendant designed, manufactured, marketed, and sold Roundup to the public with the expectation that it would be used a directed by the product labeling.

158.     Defendant, at all times relevant hereto, distributed and sold Roundup in the condition in which it left its place of manufacture, in its original form of manufacture, which included the dangers and defects described herein.  Roundup was expected to and did reach Plaintiff without substantial change or adjustment in its condition as manufactured and sold by Defendant.

159.     Defendants acted unreasonably in designing or formulating Roundup, because the foreseeable risks of using Roundup exceeded the benefits associated with the design or formulation.

160.    Roundup was defectively designed because at the time it left Defendant's control, Defendant unreasonably failed to adopt a safer, practical, feasible, and otherwise reasonable alternative design or formulation of Roundup, which would have prevented or substantially reduced the risk of harm to consumers, such as Plaintiff, without substantially impairing the usefulness, practicality, or desirability of the product.

161.    At the time Roundup left Defendant's control and also at the time Plaintiff used Roundup in a manner intended by Defendant, Plaintiff was unaware of the dangers and risks of using Roundup.  Plaintiff could not have discovered and did not discover the dangers or risks of using Roundup through the exercise of reasonable care.

162.    Had Plaintiff been aware of the dangers or risks associated with Roundup, he would have avoided the risk of NHL by not using Roundup.

163.    At the time Roundup left Defendant's control, the defective design was so unreasonably dangerous that a reasonable person, aware of the relevant facts, would not have used it.

164.    Defendant's failure to adequately design or formulate Roundup was a proximate cause of Plaintiff's injuries.

165.    As a direct and proximate result of his use of Roundup, Plaintiff suffered from serious and dangerous side effects including, but not limited to, NHL, as well as other severe and personal injuries that are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care.

166.    Defendant consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others.  Alternatively, Defendant acted to serve its own

interests, having reason to know and consciously disregarding a substantial risk that its conduct might significantly injure the rights of others.

167.    Defendant's conduct was willful, wanton, reckless, and so outrageous as to justify an award of punitive damages to punish Defendant and deter similar misconduct by Defendant and by others in the future.

## FOURTH CAUSE OF ACTION
## (BREACH OF EXPRESS WARRANTIES)

168.    Plaintiff re-alleges and incorporates herein by reference the allegations of the preceding paragraphs.

169.    At all times herein mentioned, the Defendant manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold Roundup, and/or had recently acquired the entity who manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold Roundup, as a broad-spectrum herbicide. These actions were under Defendant's ultimate control and supervision.

170.    At the time Defendant marketed, sold, and distributed Roundup for use by Plaintiff, Defendant knew of Roundup's intended use and expressly warranted to Plaintiff and users of Roundup, the agricultural community, and/or the EPA that Roundup was safe, of merchantable quality, and fit for the ordinary purposes for which it was to be used.

171.    Plaintiff reasonably relied upon Defendant's skill and judgment as to whether Roundup was safe, of merchantable quality, and fit for its intended use.

172.    Defendant breached the aforesaid express warranties, because the warranties were false, misleading, and inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and unfit for its intended purposes and uses.

173.     As a direct and proximate result of Defendant's breach of express warranties, Plaintiff suffered from NHL and Plaintiff suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic, and non-economic damages.

174.     Defendant consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others.  Alternatively, Defendant acted to serve its own interests, having reason to know and consciously disregarding a substantial risk that its conduct might significantly injure the rights of others.

175.     Defendant's conduct was willful, wanton, reckless, and so outrageous as to justify an award of punitive damages to punish Defendant and deter similar misconduct by Defendant and by others in the future.

## FIFTH CAUSE OF ACTION
## (BREACH OF IMPLIED WARRANTIES)

176.     Plaintiff re-alleges and incorporates herein by reference the allegations of the preceding paragraphs.

177.     At all times herein mentioned, the Defendant manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold Roundup, and/or had recently acquired the entity who manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold Roundup, as a broad-spectrum herbicide. These actions were under Defendant's ultimate control and supervision.

178.     At the time Defendant marketed, sold, and distributed Roundup for use by Plaintiff, Defendant knew of Roundup's intended use and impliedly warranted to Plaintiff and

users of Roundup, the agricultural community, and/or the EPA that Roundup was safe, of merchantable quality, and fit for the ordinary purposes for which it was to be used.

179.    Plaintiff reasonably relied upon Defendant's skill and judgment as to whether Roundup was safe, of merchantable quality, and fit for its intended use.

180.    Defendant's warranties were false, misleading, and inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

181.    Defendant breached the aforesaid implied warranties, as Roundup was not safe, of merchantable quality, or fit for its intended purposes and uses.

182.    As a direct and proximate result of Defendant's breach of implied warranties, Plaintiff suffered from NHL and Plaintiff suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic, and non-economic damages.

183.    Defendant consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others.  Alternatively, Defendant acted to serve its own interests, having reason to know and consciously disregarding a substantial risk that its conduct might significantly injure the rights of others.

184.    Defendant's conduct was willful, wanton, reckless, and so outrageous as to justify an award of punitive damages to punish Defendant and deter similar misconduct by Defendant and by others in the future.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff demands judgment against Defendant on each of the above-referenced claims and causes of action as follows:

      a.     Compensatory damages to Plaintiff in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, other non-economic damages, past and future medical expenses, out of pocket expenses, lost earnings, lost earning capacity, and other economic damages in an amount to be determined at trial of this action;

      b.     Punitive and/or exemplary damages for the willful, wanton, and reckless acts of the Defendant that demonstrated a complete disregard and reckless indifference for the safety and welfare of Plaintiff and the public in an amount sufficient to punish Defendant and deter future similar conduct, to the extent allowed by applicable law;

      c.     Pre-judgment interest;

      d.     Post-judgment interest;

      e.     Reasonable attorneys' fees;

      f.     Costs of these proceedings; and

      g.     Such other and further relief as this Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands trial by jury as to all issues.

Respectfully submitted,

**McGowan Hood & Felder, LLC**

<u>/s/ *James L. Ward, Jr.*</u>
James L. Ward, Jr.
N.C. State Bar No. 24595
321 Wingo Way, Suite 103
Mt. Pleasant, SC 29464
Tel. 843-388-7202
Fax 843-388-3194
jward@mcgowanhood.com

**ATTORNEYS FOR PLAINTIFF**

May 2, 2017