# U.S. District Court
## District of Delaware (Wilmington)
## CIVIL DOCKET FOR CASE #: 1:17-cv-01254-RGA

Baker et al v. Monsanto Company
Assigned to: Judge Richard G. Andrews
Related Cases: 1:17-cv-00783-RGA
　　　　　　　　1:17-cv-00860-RGA
Case in other court: DE Superior Ct., N17C-08-00348 VLM
Cause: 28:1441 Notice of Removal

Date Filed: 09/01/2017
Jury Demand: Both
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Thomas Baker**
*Husband*

represented by **James D. Heisman**
Napoli Shkolnik, LLC
919 North Market Street, Suite 1801
Wilmington, DE 19801
(302) 330-8025
Fax: (302) 658-5614
Email: JHeisman@NapoliLaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Marcia Baker**
*Wife*

represented by **James D. Heisman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

represented by **Kelly E. Farnan**
Richards, Layton & Finger, PA
One Rodney Square
Suite 600
920 N. King Street
Wilmington, DE 19801
(302) 651-7705
Email: farnan@rlf.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Katharine Lester Mowery**
Richards, Layton & Finger, PA
One Rodney Square
Suite 600
920 N. King Street
Wilmington, DE 19801
302-651-7623
Email: mowery@rlf.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/01/2017 | 1 | NOTICE OF REMOVAL and copies of documents from DE Superior Ct., Case Number N17C-08-348 VLM (Filing fee $400, receipt number 0311-2215869)- filed by Monsanto Company. (Attachments: # 1 Exhibit A - E, # 2 Civil Cover Sheet)(crb) (Entered: 09/01/2017) |
| 09/01/2017 | 2 | Notice, Consent and Referral forms re: U.S. Magistrate Judge jurisdiction. (crb) (Entered: 09/01/2017) |
| 09/01/2017 | 3 | ANSWER to Complaint with Jury Demand by Monsanto Company.(crb) (Entered: 09/01/2017) |
| 09/05/2017 | | Summons Issued with Magistrate Consent Notice attached as to Monsanto Company on 9/5/2017. (sar) (Entered: 09/05/2017) |
| 09/05/2017 | 4 | Disclosure Statement pursuant to Rule 7.1: No Parents or Affiliates Listed filed by Monsanto Company. (Mowery, Katharine) (Entered: 09/05/2017) |
| 09/05/2017 | 5 | SUMMONS Returned Executed by Thomas Baker, Marcia Baker. Monsanto Company served on 9/5/2017, answer due 9/26/2017. (Heisman, James) (Entered: 09/05/2017) |
| 09/06/2017 | | Case Assigned to Judge Richard G. Andrews. Please include the initials of the Judge (RGA) after the case number on all documents filed. (rjb) (Entered: 09/06/2017) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 09/06/2017 14:32:30 | | | |
| **PACER Login:** | hllp1982:2634105:4722683 | **Client Code:** | 1417.0005 |
| **Description:** | Docket Report | **Search Criteria:** | 1:17-cv-01254-RGA Start date: 1/1/1970 End date: 9/6/2017 |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

EFiled:  Aug 29 2017 03:17PM EDT
Transaction ID 61045043
Case No. N17C-08-348 VLM

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| THOMAS BAKER and MARCIA BAKER, Husband and Wife, | ) |
| | ) |
| | )   C.A. No.:_____ |
| *Plaintiffs*, | ) |
| | )   JURY TRIAL DEMANDED |
| v. | ) |
| | ) |
| MONSANTO COMPANY, | ) |
| | ) |
| *Defendant*. | ) |

## COMPLAINT

COMES NOW, Plaintiffs, Thomas Baker and Marcia Baker (hereinafter "Plaintiffs") by and through undersigned counsel, and files this Complaint against the Defendant, Monsanto Company ("Monsanto"), and in support thereof alleges as follows:

### I. INTRODUCTION

1.      This matter arises from Monsanto's negligent and wrongful conduct in connection with the design, research, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, producing, supplying, warning, and/or sale of the herbicide Roundup, containing the active ingredient glyphosate.

2.      Plaintiffs allege that Roundup and/or glyphosate is defective, dangerous to human health and has been found to be carcinogenic, linked to causing various forms of cancer, and in particular non-Hodgkin's Lymphoma.

3.      As a result, Roundup and/or glyphosate is unfit and unsuitable to be marketed and sold in commerce, and lacked proper warnings and directions as to the dangers associated with its use.

4.      Plaintiff Thomas Baker's injuries, non-Hodgkin's Lymphoma (hereinafter

"NHL"), like those striking thousands of similarly situated victims across the country, was avoidable.

## II. PARTIES

### Plaintiffs

5.     Plaintiff Thomas Baker is 62 years old.

6.     At all times relevant herein, Plaintiff Marcia Baker was the lawful spouse of Thomas Baker.

7.     Plaintiffs at all times relevant herein resided at 16748 Hurie Avenue, in the Village of Tallula, County of Menard, and State of Illinois.

8.     Plaintiff Thomas Baker has lived in the United States since he was 16 years old and worked for several farmers where he used Roundup regularly during the entire time to control weeds on the farms.

9.     Plaintiff Thomas Baker also sprayed Roundup on fields while installing field drainage tile.

10.     Plaintiff Thomas Baker followed all safety and precautionary warnings during the course of use.

11.     Plaintiff Thomas Baker purchased the Roundup at wholesaler suppliers, local farm stores, tractor supply stores, etc. over many years.

12.     Plaintiff Thomas Baker was diagnosed with Non-Hodgkin's Lymphoma on or about December 24, 2015.

13.     During Plaintiff Thomas Baker's exposure to Roundup, he did not know that exposure to Roundup was injurious to his health.

14.     Plaintiff Thomas Baker's Non-Hodgkin Lymphoma was proximately and actually

caused by exposure to Defendant's Roundup products.

15.     Plaintiff Thomas Baker became aware that exposure to Roundup can cause non-Hodgkin's Lymphoma in 2017.

16.     Plaintiffs have incurred significant pain and suffering, economic and non-economic damages.

**Defendant**

17.     Defendant Monsanto Company is Delaware Corporation, with its headquarters and principle place of business in St. Louis, Missouri.

18.     Defendant Monsanto Company is referred to as "Monsanto" or "Defendant."

19.     At all times relevant to this Complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup, which contains the active ingredient glyphosate and the surfactant POEA, as well as adjuvants and other "inert" ingredients.

20.     Defendant advertises, distributes, markets, promotes and/or sells goods, specifically Roundup, across the country, including in the State of Illinois.

21.     Defendant transacted and conducted business within the State of Illinois that relates to the allegations in this Complaint.

22.     Defendant derived substantial revenue from goods and products purchased and/or used in the State of Illinois.

23.     Defendant expected or should have expected its act to have consequences within the State of Illinois, and derived substantial revenue from interstate commerce.

24.     Defendant engaged in the business of designing, researching, developing, manufacturing, testing, packaging, promoting, marketing, advertising, distributing, labeling,

producing, supplying, warning, and/or selling Roundup.

25.     Defendant is authorized to do business in and derive substantial income from doing business in the State of Illinois.

26.     Upon informaon and belief, Defendant did design, sell, advertise, manufacture and/or distribute roundup, with full knowledge of its dangerous and defective nature.

### III. JURISDICTION AND VENUE

27.     Venue in this action properly lies in Delaware because, *inter alia*, Defendant MONSANTO COMPANY is a Delaware corporation and/or entity.

28.     Further, upon information and belief, at all times relevant hereto, Defendant transacted, solicited, conducted business in the State of Delaware and derived substantial revenue from such business.

### IV. FACTUAL BACKGROUND

29.     At all relevant times, Defendant designed, researched, developed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, labeled, produced, supplying, warning, sold, and/or had acquired the commercial herbicide Roundup.

30.     "Roundup" refers to all formulations of Defendant's Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup  Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass

Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer 1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation containing the active ingredient glyphosate.

31.     Defendant is a multinational agricultural biotechnology corporation based in St. Louis, Missouri.

32.     In 1974, the original Roundup herbicide was introduced, containing the active ingredient glyphosate and is one of the most widely used herbicide.[1]

33.     Defendant is the world's leading producer of glyphosate.

34.     Glyphosate is the active ingredient in Roundup.

35.     Defendant discovered the herbicidal properties of glyphosate during the 1970's and developed it as a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

36.     Glyphosate is a non-selective herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

37.     Glyphosate inhibits the enzyme, EPSP synthase, which interferes with the shikimate pathway in plants.

38.     As a result, the plant accumulates shikimic acid and cannot produce the essential amino acids and other shikimic acid based chemicals and the plant dies within two to three days.

---

[1] *Backgrounder*, History of Monsanto's Glyphosate Herbicides, June 2005. (Downloaded June 27, 2017).

39.     The shikimate pathway is not found in humans or animals.

40.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots; and detectable quantities accumulate in the plant tissues.

41.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and fruit and it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

42.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses.

43.     This increase in use in glyphosate has been driven largely by the proliferation of "Roundup Ready" crops, which have been genetically engineered to resist the activity of glyphosate.

44.     The success of Roundup Ready Seeds was key to Defendant's continued reputation and dominance in the marketplace.

45.     In the year 2000, Defendant's patent for glyphosate expired and Defendant needed a strategy to maintain its Roundup market dominance and to ward off impending competition.

46.     In 1996, Defendant began the development and sale of genetically engineered Roundup Ready Seeds that were resistant to glyphosate due to the impending glyphosate patent expiration.

47.     Since Roundup Ready crops are resistant to glyphosate, farmers can spray Roundup onto their fields during the growing season without harming the crop and killing the

weeds.[2]

48.     This allowed Monsanto to expand its market for Roundup even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready seeds.

49.     Largely due to the success of Roundup Ready Seeds sales, Defendant's agriculture division was out-performing its chemicals division's operating income, and that gap increased every year.

50.     It also secured Monsanto's dominant share of the glyphosate/Roundup market through a marketing strategy that coupled proprietary Roundup Ready seeds with continued sales of its Roundup herbicide.

51.     Defendant is responsible for the design, research, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and sale of Roundup Ready seeds.

52.     By 2009, Monsanto was the world's leading producer of Roundup Ready seeds. In 2010, roughly 70% of corn and cotton and 90% of soybean fields in the United States were grown with Roundup Ready seeds.

53.     Through a three-pronged strategy of increasing production, decreasing prices, and by coupling with Roundup Ready seeds, Roundup became Monsanto's most profitable product.

54.     In 2000, Roundup accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue.[3]

---

[2] David Barboza, *The power of Roundup; A Weed Killer Is A Block for Monsanto to Build On*, N.Y. Times, Aug. 2, 2001, available at http://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weed-killer-is-a-block-for-monsanto-to-build-on.html.
[3] David Barboza, *The power of Roundup; A Weed Killer Is A Block for Monsanto to Build On*, N.Y. Times, Aug. 2, 2001, available at http://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weed-killer-is-a-block-for-monsanto-to-built-on.html.

Today, glyphosate remains one of the world's largest herbicides by sales volume.

55.     Defendant's glyphosate products are registered in more than 130 countries and are approved for weed control in more than 100 crops. No other herbicide active ingredient compares in terms of number of uses.[4]

56.     In addition to the active ingredient glyphosate, Roundup formulations also contain adjuvants and other chemicals, which are considered "inert" and therefore protected as "trade secrets" in manufacturing.

57.     Growing evidence suggests that these adjuvants and additional components of Roundup formulations are not, in fact, inert and are toxic in their own right.

58.     In all this time, consumers, farmers, and the public have used Roundup, unaware of its carcinogenic properties.

## Registration of Herbicides under Federal Law

59.     The manufacture, formulation, and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 et seq.

60.     FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. § 136a(a).

61.     The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential risks for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment because at least to some degree, pesticides are toxic to plants, animals, and humans.

62.     The determination the EPA makes in registering or re-registering a product is not

---

[4] *Backgrounder, History of Monsanto's Glyphosate Herbicides*, June 2005.

that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment" and not an assurance of safety. 7 U.S.C. § 136a(c)(5)(D).

63.    FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb).

64.    Therefore, the EPA must perform a risk/benefit analysis in determining whether a registration should be granted and allowed to continue to be sold in commerce.

65.    The EPA registered Roundup for distribution, sale, and manufacture in the United States.

66.    The registrant conducts health and safety testing, following the protocols for the conduct of tests and the laboratory practices set by EPA, and then reviewed by the EPA for evaluation.

67.    The government is not required, nor is it able, to perform the products tests that are required of the manufacturer.

68.    The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered, but the data necessary for registration of a pesticide has changed over time.

69.    The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

70.    In the case of glyphosate and Roundup, the EPA had planned on releasing its

preliminary risk assessment – in relation to the registration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of the World Health Organization's March 24, 2015 finding that glyphosate is a "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

### IARC Classification of Glyphosate

71.    The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental agency that the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

72.    The IARC process for the classification of glyphosate followed IARC's stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

73.    The established procedure for IARC Monograph evaluation is described in the IARC Programme's Preamble.[5] Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

74.    One year before the Monograph meeting, the meeting was announced and there was a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership was selected and the sections of the Monograph were developed by the Working Group members. One month prior to the Monograph meeting, the call for data was

---

[5] World Health Org., IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble (2006), available at http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

closed and the various draft sections were distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalized review of all literature, evaluated the evidence in each category, and completed the overall evaluation. Within two weeks after the Monograph meting, the summary of the Working Group findings were published in The Lancet Oncology, and within a year after the meeting, the finalized Monograph was published.

75.     In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

76.     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015-2019 met in April 2014. Though nominations for the review by the IARC Monographs; there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

77.     IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; and related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

78.     On March 24, 2015, after its cumulative review of human, animal, and DNA

studies for more than one (1) year, many of which have been in Defendant's possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Defendant's Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

79.     The IARC's full Monograph was published on July 29, 2015, and established glyphosate as a class 2A probable carcinogen to humans. According to the authors, glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

80.     The studies considered the following exposure groups: (1) occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and (2) para-occupational exposure in farming families.

81.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's Lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

82.     The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

83.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

84.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and

groundwater, as well as in food.

85.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

86.     The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

87.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

88.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor: renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

89.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethyplosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

90.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

91.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects

13

in mammals exposed to glyphosate.[6] Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

92.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.[7] While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and multiple myeloma, hairy cell leukemia (HCL), and chronic lymphocytic leukemia (CLL), in addition to several other cancers.

### Early Evidence of Glyphosate's Danger

93.     Despite the new classification by the IARC, Defendant has had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

94.     The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates IARC's March 20, 2015 evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

> Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.
> It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

---

[6] Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra* at 77.
[7] Anneclare J. De Roos et al., *Cancer Incidence Among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study*, 113 Envt'l Health Perspectives 49-54 (2005), available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1253709/pdf/ehp0113-000049.pdf.

> Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.[8]

95. In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.[9]

96. Genotoxicity refers to chemical agents capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

97. In 1997, Chris Clements published "Genotoxicity of select herbicides in *Rana catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

98. The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

99. Both human and animal studies have shown that glyphosate and glyphosate-base formulations such as Roundup can induce oxidative stress.

100. Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

101. The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

102. In 2006, César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

---

[8] U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate, supra.*
[9] Caroline Cox, *Glyphosate, Part 2: Human Exposure and Ecological Effects,* 15 J. Pesticide Reform 4 (1995); W.S. Peas et al.*, Preventing pesticide-related illness in California agriculture: Strategies and priorities. Environmental Health Policy Program Report*, Univ. of Cal. School of Public Health, Calif. Policy Seminar (1993).

103.   The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

104.   The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

105.   Despite knowledge to the contrary, Defendant maintains that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

106.   In addition to glyphosate and Roundup's genotoxic properties, Defendant has long been aware of glyphosate's carcinogenic properties.

107.   Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

108.   Defendant has known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

109.   In 1985, the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

110.   In 2003, Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

111.   The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studies with an increased odds ratio of 3.11.

112.   In 2003, AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

113.   The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

114.   In 2008, Mikael Eriksson published a population based case-control study of exposure to various pesticides as a risk factor for NHL.

115.   This strengthened previous associations between glyphosate and NHL.

116.   In spite of this knowledge, Defendant continued to issue broad and sweeping statements suggesting that Roundup was, and is safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

117.   Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiff, the agricultural community, and the public at large to purchase and increase the use of Defendant's Roundup for Defendant's pecuniary gain, and in fact, did induce Plaintiff to use Roundup.

118.   Defendant made these statements with complete disregard and reckless indifference to the safety of Plaintiff and the general public.

119.   Notwithstanding Defendant's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

120.   Defendant knew or should have known that glyphosate is associated with an

increased risk of developing cancer, including but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

121.    Defendant failed to appropriately and adequately inform and warn Plaintiff of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

122.    Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendant continues to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-genotoxic, and falsely warrant to users and the general publish that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

123.    Defendant has claimed and continues to claim that Roundup is safe, non-carcinogenic, and non-genotoxic. These misrepresentations are consistent with Defendant's cavalier approach to investigating and ensuring the safety of its products, the safety of the public at large, and the safety of Plaintiff.

**<u>Monsanto's False Representations Regarding The Safety of Roundup</u>**

124.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products.

125.    Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish.

126.     Among the representations the NYAG found deceptive and misleading about the

human and environmental safety of Roundup are the following:

    a.   Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customer's driveways, sidewalks and fences.

    b.   And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

    c.   Roundup biodegrades into naturally occurring elements.

    d.   Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

    e.   This non-residual herbicide will not wash or leach in the soil. It … stays where you apply it.

    f.   You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

    g.   Glyphosate is less toxic to rats than table salt following acute oral ingestion.

    h.   Glyphosate's safety margin is much greater than required. It has over a 1,000-fold margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

    i.   You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic" as it pertains to mammals, birds and fish.

    j.   "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[10]

127.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance

with the NYAG, in which Monsanto agreed, among other things, "to cease and desist from

publishing and broadcasting any advertisements [in New York] that represent, directly or by

implication" that:

    a.   its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

---

[10] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

    b.  its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;

    c.  its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

    d.  its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics;"

    e.  glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and

    f.  its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."[11]

128.    On information and belief, Defendant did not alter its advertising in the same manner in any state other than New York and still has not done so today.

129.    Several counties around the world have instituted bans on the sale of Roundup and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup become more widely known.

130.    The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup, which took effect in 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."[12]

131.    The Brazilian Public Prosecutor in the Federal District requested that the

---

[11] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

[12] Holland's Parliament Bans Glyphosate Herbicides, The Real Agenda, April 14, 2014, available at http://real-agenda.com/hollands-parliament-bans-glyphosate-herbicides.

Brazilian Justice Department suspend the use of glyphosate.[13]

132.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup and affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[14]

133.    France banned the private sale of Roundup and glyphosate following the IARC assessment for glyphosate.[15]

134.    Bermuda banned both the private and commercial sale of glyphosates, including Roundup. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."[16]

135.    The Sri Lankan government banned the private and commercial use of glyphosate, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.[17]

136.    The government of Colombia banned using Roundup and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that

---

[13] Christina Sarich, Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals Following Recent Glyphosate-Cancer Link, GLOBAL RESEARCH, May 14, 2015, available at http://www.globalresearch.ca/brazils-public-prosecutor-wants-to-ban-monsantos-chemicals-following-recent-glyphosate-cancer-link/5449440; see Ministerio Publico Federal, MPF/DF reforca pedido para que glifosato seja banido do Mercado nacional, April 14, 2015, available at http://noticias.pgr.mpf.mp.br/noticias/noticias-do-site/copy_of_meio-ambiente-e-patrimonio-cultural/mpf-df-reforca-pedido-para-que-glifosato-seja-banido-do-mercado-nacional.
[14] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, available at http://news.bbc.co.uk/2/hi/europe/8308903.stm
[15] Zoe Schlanger, *France Bans Sales of Monsanto's Roundup in Garden Centers, 3 Months After U.N. Calls it 'Probable Carcinogen,'* NEWSWEEK, June 15, 2015, available at http://www.newsweek.com/france-bans-sale-monsantos-roundup-garden-centers-after-un-names-it-probable-343311.
[16] *Health Minister: Importation of Roundup Weed Spray Suspended*, Today in Bermuda, May 11, 2015, available at http://www.todayinbermuda.com/news/health/item/1471-health-minister-importation-of-roundup-weed-spray-suspended.
[17] *Sri Lanka's New President Puts Immediate Ban on Glyphosate Herbicides*, Sustainable Pulse, May 25, 2015, available at http://sustainablepulse.com/2015/05/25/sri-lankas-new-president-puts-immediate-ban-on-glyphosate-herbicides/#.VeduYk3bKAw.

glyphosate is probably carcinogenic.[18]

## Evidence of Carcinogenicity in Roundup

137.    As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties.

138.    On March 4, 1985, a group of the EPA's Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[19] Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

139.    In 1986, when the EPA first issued a Registration Standard for glyphosate (NTIS PB87-103214), the Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies, which was submitted and reviewed, and/or waived.[20]

140.    In October 1991, the EPA published a Memorandum entitled "Second Peer Review of Glyphosate" where it changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans).[21]

141.    Three peer review committee members refused to sign the Memorandum, with two of them did not concur with the conclusions of the committee.[22]

142.    As early as 1991, many studies have supported the hypothesis that glyphosate formulations found in Roundup products are more dangerous and toxic as glyphosate alone.[23]

---

[18] *Columbia to ban coca spraying herbicide glyphosate*, BBC, May 10, 2015, available at http://www.bbc.com/news/world-latin-america-32677411.
[19] Consensus Review of Glyphosate, Caswell No. 661A. March 4, 1985. United States Environmental Protection Agency.
[20] http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheets/0178fact.pdf.
[21] U.S. EPA, Memorandum, Subject: SECOND Peer Review of Glyphosate 1 (1991), available at http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_30-Oct-91_625.pdf.
[22] U.S. EPA, Memorandum, Subject: SECOND Peer Review of Glyphosate 1 (1991), available at http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_30-Oct-91_625.pdf.
[23] See Martinez, et al. *Oral and pulmonary toxicology of the surfactant used in Roundup herbicide*, PROC. WEST> PHARMACOL. SOC. 34:43-46 (1991); Nora Benachour, et al., *Glyphosate Formulations Induce Aprptosis and*

143.    In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."[24]

144.    The study found that Monsanto's Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

145.    In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.[25]

146.    The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[26]

147.    In 2005, Francisco Peixoto published a study, entitled "Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation," showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

148.    The    Peixoto    study    suggested    that    the    harmful    effects    of    Roundup    on

---

Necrosis in Human Umbilical, Embryotic, and Placental Cells, 22 CHEM. RES> Roxicol. 97-105 (2209), available at http://big.assets.huffington.com/france.pdf; Gasnier et al. 2010; Francisco Peixoto, *Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation*, 61 CHEMOSPERE 1115, 1112 (2005), available at https://www.researchgate.net/publication/7504567_Comparative_effects_of_the_Roundup_and_glyphosate_on_mitochondrial_oxidative_phosphorylation; March 2004.
[24] Julie Marc, et al., Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation, 15 CHEM. RES. TOXICOL. 326-331 (2002), available at http://pubs.acs.org/doi/full/10.1021/tx015543g.
[25] Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation*, 96 BIOLOGY OF THE CELLS 245, 245-249 (2004), available at http://onlinelibrary.wiley.com/doi/10.1016/j.biolcel.2003.11.010/pdf.
[26] Molinari, 2000; Stewart et al., 2003.

mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

149.    In 2009, Nora Benachour and Gilles-Eric Seralini published a study named "Glyphosate formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic, and Placental Cells."

150.    The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

151.    These studies and the results and/or conclusions were published and confirmed in peer-reviewed studies that were known to Defendant.

152.    Defendant knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

153.    Defendant failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup.

154.    Rather than performing appropriate tests, Defendant relied on flawed industry-supported studies designed to protect Defendant's economic interests rather than Plaintiff and the consuming public.

155.    Despite its knowledge that Roundup was considerably more dangerous than

glyphosate alone, Defendant continued to promote Roundup as safe.

**Scientific Fraud Underlying the Safety Determinations, Marketing and Sale of Glyphosate**

156.    Based on early studies showing that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985.

157.    After the EPA's 1985 classification of glyphosate as possibly carcinogenic to humans (Group C), Defendant exerted pressure upon the EPA to change its classification.

158.    This culminated in the EPA's reclassification of glyphosate to Group E, which was based upon evidence of non-carcinogenicity in humans.

159.    In so classifying, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."[27]

160.    On two occasions, the EPA found that laboratories hired by Defendant to test the toxicity of its Roundup products for registration purposes committed scientific fraud.

161.    In the first instance, Defendant hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup. IBT performed approximately 30 tests on glyphosate and glyphosate-containing products, including 11 of the 19 chronic toxicology studies needed to register Roundup with the EPA.

162.    In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to toxicological impacts of glyphosate. The EPA subsequently audited IBT and determined that the

---

[27] U.S. Envtl. Prot. Agency, Memorandum, Subject: SECOND Peer Review of Glyphosate 1 (1191), available at http://www.epa.gov/pesticides/chem_searc/cleared_review/csr_PC-103601_30-Oct-91_265.pdf.

toxicology studies conducted for Roundup were invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

163.    Three top executives of IBT were convicted of fraud in 1983.

164.    In the second incident, Defendant hired Craven Laboratories ("Craven") in 1990 to perform pesticide and herbicide studies, including several studies on Roundup.

165.    In March of 1991, the EPA announced that it was investigating Craven for "allegedly falsifying test data used by chemical firms to win EPA approval of pesticides."

166.    The investigation lead to the indictments of the laboratory owner and a handful of employees of fraudulent laboratory practices in the testing of pesticides and herbicides.

167.    Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup in 115 countries.

**Monsanto's Continuing Disregard for the Safety of Plaintiff and the Public**

168.    Defendant claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic.[28]

169.    Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

170.    Glyphosate, and Defendant's Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned

---

[28] Backgrounder – Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9 2015).

or are currently banning the use of glyphosate herbicide products.

171.   Defendant's statements proclaiming the safety of Roundup and disregarding its dangers misled Plaintiff.

172.   Despite Defendant's knowledge that Roundup was associated with an elevated risk of developing cancer, Defendant's promotional campaigns focused on Roundup's purported "safety profile."

173.   Defendant's failure to adequately warn Plaintiff resulted in (1) Plaintiff using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including but limited to NHL, and other injuries associated with Roundup.

174.   Defendant failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

175.   The failure of Defendant to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

176.   The failure of Defendant to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

177.   The failure of Defendant to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

178.   By reason of the foregoing acts and omissions, Plaintiff seek compensatory damages as a result of Plaintiff's use of, and exposure to, Roundup which caused or was a substantial contributing factor in causing Plaintiff to suffer from cancer, specifically NHL, and

Plaintiff suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

179.    As a direct result of Defendant's acts and omissions, Plaintiff is severely and permanently injured.

180.    As a direct result of Defendant's acts and omissions, Plaintiff has endured and, in some categories continues to suffer, emotional and mental anguish, medical expenses, and other economic and non-economic damages.

### California Classification of Glyphosate

181.    The state of California maintains a list of carcinogenic chemicals under the law known as "Proposition 65" which requires businesses to provide warnings to Californians about significant exposures to chemicals that cause cancer, birth defects or other reproductive harm.

182.    In 2017, the California Office of Environmental Health Hazard Assessment determined that Glyphosate will be added to California's list of chemicals that cause cancer.

183.    In 2017, the state of California added Glyphosate to the state's Prop 65 list, a list of chemicals known to cause cancer.

### Equitable Tolling of Applicable Statute of Limitations

184.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as it fully stated herein.

185.    The running of any statute of limitations has been tolled by reason of Defendant's fraudulent concealment. Defendant, through its affirmative misrepresentations and omissions, actively concealed from Plaintiff the true risks associated with Roundup and glyphosate.

186.    At all relevant times, Defendant has maintained that Roundup is safe, non-toxic, and non-carcinogenic.

187.    Indeed, even as of July 2016, Defendant continues to represent to the public that "Regulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and *agree* that there is *no evidence* that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic" (emphasis added.)[29]

188.    As a result of Defendant's actions, Plaintiff was unaware, and could not reasonably know or have learned through reasonable diligence that Roundup and/or glyphosate contact, exposed Plaintiff to the risks alleged herein and that those risks were the direct and proximate result of Defendant's act and omissions.

189.    Furthermore, Defendant is estopped from relying on any statute of limitations because of its fraudulent concealment of the true character, quality, and nature of Roundup.

190.     Defendant was under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Defendant had and continues to have exclusive control, and because Defendant knew that this information was not available to Plaintiff or to distributors of Roundup.

191.    In addition, Defendant is estopped from relying on any statute of limitations because of its intentional concealment of these facts.

192.    Plaintiff had no knowledge that Defendant was engaged in the wrongdoing alleged herein because of the fraudulent acts of concealment of wrongdoing by Defendant, Plaintiff could not have reasonably discovered the wrongdoing at any time prior.

193.    Also, the economics of this fraud should be considered because Defendant had the

---

[29] *Backgrounder – Glyphosate: No Evidence of Carcinogenicity*. Updated November 2014. (downloaded October 9, 2015).

ability to and did spend enormous amounts of money in furtherance of its purpose of advertising, distributing, marketing, promoting and/or selling a profitable herbicide, notwithstanding the known or reasonably known risks.

194.    Plaintiff and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendant's representations.

195.    Accordingly, Defendant is precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

### CAUSES OF ACTION - THEORIES OF RECOVERY
### COUNT ONE –NEGLIGENCE

196.    Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as it fully stated herein.

197.    Defendant had a duty to exercise reasonable care in the designing, researching, development, manufacturing, testing, packaging, promoting, marketing, advertising, distribution, labeling, supplying, quality assurance, quality control and/or sale of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

198.    Defendant failed to exercise ordinary care in the designing, researching, development, manufacturing, testing, packaging, promoting, marketing, advertising, distribution, labeling, supplying, quality assurance, quality control and/or sale of Roundup into interstate commerce in that Defendant knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects, including but not limited to, the development of NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish. Including diminished enjoyment of life, as well as need for lifelong

medical treatment, monitoring, and/or medications.

199.  The negligence by the Defendant, its agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

    a.  Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly testing it;

    b.  Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup;

    c.  Not conducting sufficient testing programs to determine whether or not Roundup was safe for use; in that Defendant herein knew or should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users;

    d.  Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Defendant had knowledge that Roundup is, was, or could be carcinogenic;

    e.  Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

    f.  Negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

    g.  Negligently failing to petition the EPA to strengthen the warnings associated with Roundup;

    h.  Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

    i.  Negligently marking, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

    j.  Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when , in fact, it was unsafe;

    k.  Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

    l.  Negligently designing Roundup in a manner, which was dangerous to its users;

    m.  Negligently manufacturing Roundup in a manner, which was dangerous to its users;

    n.  Negligently producing Roundup in a manner, which was dangerous to its users;

    o.  Negligently formulating Roundup in a manner, which was dangerous

to its users;

p. Concealing information from the Plaintiff while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations;

q. Improperly concealing and/or misrepresenting information from the Plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides; and

r. Negligently selling Roundup with a false and misleading label.

200.    Defendant under-reported, underestimated, and downplayed the serious dangers of Roundup.

201.    Defendant negligently and deceptively compared the safety risks and/or dangers of Roundup with common everyday foods such as table salt, and other forms of herbicides.

202.    Defendant was negligent and/or violated State law in the designing, researching, developing, manufacturing, testing, packaging, promoting, marketing, advertising, distributing, testing, labeling, warning, supplying, quality assurance, quality control, and selling of Roundup in that they:

a. Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide;

b. Failed to accompany its product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

c. Failed to accompany its product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

d. Failed to accompany its product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;

e. Failed to warn Plaintiff of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of NHL;

f. Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup;

g. Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants;

h.   Was otherwise careless and/or negligent.

203.   Despite the fact that Defendant knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Defendant continued and continues to market, manufacture, distribute, and/or sell Roundup to consumers, including the Plaintiff.

204.   Defendant knew or should have known that consumers such as the Plaintiff would foreseeably suffer injury as a result of Defendant's failure to exercise ordinary care, as set forth above.

205.   Defendant's violations of law and/or negligence were the proximate cause of Plaintiff's injuries, harm and economic loss, which Plaintiff suffered and/or will continue to suffer.

206.   As a result of the Defendant's acts and omissions, the Plaintiff suffered from serious and dangerous side effects including, but not limited to, NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care.

207.   Further, Plaintiff suffered life-threatening NHL, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

208.   Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory damages, together with interest, costs herein incurred, attorney's fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury trial on all issues contained herein.

## <u>COUNT TWO: STRICT PRODUCTS LIABILITY – DESIGN DEFECT</u>

209.   Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding

paragraphs as it fully stated herein.

210.    At all times herein mentioned, the Defendant designed, researched, developed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, labeled, warned, supplied, and/or sold Roundup as hereinabove described that was used by the Plaintiff.

211.    Defendant's Roundup was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was designed, researched, developed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, labeled, warned, supplied, produced, and/or sold by the Defendant.

212.    At those times, Roundup was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, the Plaintiff herein.

213.    The Roundup designed, researched, developed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, labeled, warned, supplied, produced, and/or sold by Defendants was defective in design or formulation in that, when it left the hands of the Defendant manufacturers and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup.

214.    The Roundup designed, researched, developed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, labeled, warned, supplied, produced, and/or sold by Defendant was defective in design and/or formulation, in that, when it left the hands of the Defendant manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

215.    At all times herein mentioned, Roundup was in a defective condition and unsafe, and Defendant knew or had reason to know that said product was defective and unsafe,

especially when used in the form and manner as provided by the Defendant. In particular, Defendant's Roundup was defective in the following ways:

    a. When placed in the stream of commerce, Defendant's Roundup products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate.

    b. When placed in the stream of commerce, Defendant's Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illness when used in a reasonably anticipated manner.

    c. When placed in the stream of commerce, Defendant's Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

    d. Defendant did not sufficiently test, investigate, or study its Roundup products.

    e. Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

    f. Defendant new or should have known at the time of marketing its Roundup products that exposure to Roundup and could result in cancer and other severe illness and injuries.

    g. Defendant did not conduct adequate post-making surveillance of its Roundup products.

216. Defendant knew, or should have known that at all times herein mentioned its Roundup was in a defective condition, and was and is inherently dangerous and unsafe.

217. Plaintiff was exposed to Defendant's Roundup, as described above, without knowledge of Roundup's dangerous characteristics.

218. At the time of the Plaintiff's use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

219. Defendant with this knowledge voluntarily designed its Roundup with a dangerous condition for use by the public, and in particular the Plaintiff.

220. Defendant had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

221. Defendant created a product that was and is unreasonably dangerous for its

normal, intended use.

222.    Defendant marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

223.    The Roundup designed, researched, developed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, labeled, warned, supplied, produced, and/or sold by Defendant was manufactured defectively in that Roundup left the hands of Defendant in a defective condition and was unreasonably dangerous to its intended users.

224.    The Roundup designed, researched, developed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, labeled, warned, supplied, produced, and/or sold by Defendant reached its intended users in the same defective and unreasonably dangerous condition in which the Defendant's Roundup was manufactured.

225.    Defendant designed, researched, developed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, labeled, warned, supplied, produced, and/or sold a defective product, which created an unreasonable risk to the health of consumers and to the Plaintiff in particular, and Defendant is therefore strictly liable for the injuries sustained by the Plaintiff.

226.    The plaintiff could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

227.    By reason of the foregoing, the Defendant has become strictly liable to the Plaintiff for the designing, researching, developing, manufacturing, testing, packaging, promoting, marketing, advertising, distributing, labeling, warning, suppling, producing, and/or selling of a defective product, Roundup.

228.     Defendant's defective design, of Roundup amounts to willful, wanton, and/or reckless conduct by Defendant.

229.     Defects in Defendant's Roundup were the cause or a substantial factor in causing Plaintiff's injuries.

230.     As a result of the foregoing acts and omission, the Plaintiff developed NHL, and suffered severe and personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

231.     Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory, together with interest, costs herein incurred attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury trial on all issues contained herein.

## COUNT THREE: STRICT PRODUCTS LIABILITY – FAILURE TO WARN

232.     Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as it fully stated herein.

233.     Defendant has engaged in the business of designing, researching, developing, manufacturing, testing, packaging, promoting, marketing, advertising, distributing, labeling, warning, suppling, producing, and/or selling Roundup, and through that conduct have knowingly and intentionally placed Roundup into the stream of commerce with full knowledge that it reaches consumers such as Plaintiff who are exposed to it through ordinary and reasonably foreseeable uses.

234.     Defendant did in fact sell, distribute, supply, manufacture, and/or promote Roundup to Plaintiff. Additionally, Defendant expected the Roundup that it was designing,

researching, developing, manufacturing, testing, packaging, promoting, marketing, advertising, distributing, labeling, warning, suppling, producing, and/or selling to reach – and Roundup did in fact reach – consumers, including Plaintiff, without any substantial change in the condition of the product from when it was initially distributed by Defendant.

235.    At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

236.    At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Defendant and at the time Plaintiff was exposed to and/or ingested the product. The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including but not limited to, developing non-Hodgkin's lymphoma as a result of exposure and use.

237.    Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect the health of those exposed in violation of 7 U.S.C. § 136j(a)(1)(E) and 415 ILCS 60/14(2)(E).

238.    Defendant's failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. §136j(a)(1)(E) and 415 ILCS 60/14(2)(E).

239.    Defendant could have amended the label of Roundup to provide additional warnings.

240.    This defect caused serious injury to Plaintiff, who used Roundup in its intended

and foreseeable manner.

241.    At all times herein mentioned, Defendant had a duty to properly design, research, develop, manufacture, compound, test, inspect, package, promote, market, advertise, distribute, label, examine, warn, produce, sell, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

242.    Defendant labeled, distributed, and promoted the aforesaid product that it was dangerous and unsafe for the use and purpose for which it was intended.

243.    Defendant failed to warn of the nature and scope of the side effects associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of NHL.

244.    Defendant was aware of the probable consequences of the aforesaid conduct. Despite the fact that Defendant knew or should have known that Roundup caused serious injuries, Defendant failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of developing NHL from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution. Defendant willfully and deliberately failed to avoid the consequences associated with its failure to warn, and in doing so, Defendant acted with a conscious disregard for the safety of Plaintiff.

245.    At the time of exposure, Plaintiff could not have reasonably discovered any defect in Roundup prior through the exercise of reasonable care.

246.    Defendant, as the manufacturer and/or distributor of the subject product, is held to the level of knowledge of an expert in the field.

247.    Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of

Defendant.

248.   Had Defendant properly disclosed the risks associated with Roundup products, Plaintiff would have avoided the risk of NHL by not using Roundup products.

249.   The information that Defendant did provide or communicate failed to contain adequate warnings and precautions that would have enabled Plaintiff, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

250.   To this day, Defendant has failed to adequately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup.

251.   As a result of its inadequate warnings, Defendant's Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiff.

252.   As a direct and proximate result of Defendant's actions as alleged herein, and in such other ways to be later shown, the subject product caused Plaintiff to sustain injuries as herein alleged.

253.   Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's

fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury trial on all issues contained herein.

## COUNT FOUR: BREACH OF IMPLIED WARRANTY

254.    Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as it fully stated herein.

255.    At all times herein mentioned, the Defendant designed, researched, developed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, compounded, recommended, merchandized, labeled, produced, warned, supplied, and sold Roundup as a broad spectrum herbicide. These actions were under the ultimate control and supervision of Defendant.

256.    At all times herein mentioned, Defendant marketed, sold, and distributed Roundup for use by Plaintiff, Defendant knew of Roundup's intended use and impliedly warranted the product to be or merchantable quality and safe and fit for this use.

257.    The Defendant impliedly represented and warranted to Plaintiff and users of Roundup, the agricultural community, and/or the EPA that Roundup was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.

258.    These representations and warranties were false, misleading, and inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

259.    Plaintiff and/or the EPA did rely on said implied warranty of merchantability of fitness for particular use and purpose.

260.    Plaintiff reasonably relied upon the skill and judgment of Defendant as to whether Roundup was of merchantable quality and safe and fit for its intended use.

261.    Roundup was injected into the stream of commerce by the Defendant in a defective, unsafe, and inherently dangerous condition, and the products' materials were expected

to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

262.    The Defendant breached the aforesaid implied warranties, as its herbicide Roundup was not fit for its intended purposes and uses.

263.    As a result of the foregoing acts and omissions, Plaintiff suffered from NHL and Plaintiff suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic, and non-economic damages.

264.    Plaintiffs respectfully requests that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury trial on all issues contained herein.

## <u>COUNT FIVE: BREACH OF EXPRESSED WARRANTY</u>

265.    Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as it fully stated herein.

266.    Roundup which was designed, researched, developed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, compounded, recommended, merchandized, labeled, produced, warned, supplied, and sold by Defendant, was expected to, and did reach Plaintiff without any substantial change in its condition.

267.    Defendant, through its advertising and promotional materials, expressly warranted that Roundup was safe for its intended use and was not unreasonably dangerous for its intended purpose.

268.    Defendant breached its express warranties in that Roundup was not safe for its intended use in light of the unreasonably high risk of cancer associated with its use, including but not limited to the risk of NHL.

269.    Plaintiff reasonably relied to his detriment on Defendant's express warranties that the product was safe.

270.    As a direct result of Defendant's wrongful acts and omissions in placing its defective Roundup products into the stream of commerce, Plaintiffs have suffered and continue to suffer severe and permanent physical and emotional injuries. Plaintiffs has endured pain and suffering, have suffered economic losses (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

## COUNT SIX: NEGLIGENT MISREPRESENTATION AND/OR FRAUD

271.    Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as it fully stated herein.

272.    Defendant is the designer, researcher, developer, manufacturer, tester, packager, promoter, marketer, advertiser, distributor, labeler, supplier, and/or seller of Roundup and, while engaged in the course of such business, made representations to Plaintiff regarding the character and/or quality of for guidance in his decision to select Roundup for use.

273.    Defendant had a duty to disclose material information about serious health effects to consumers such as Plaintiff. Defendant intentionally failed to disclose this information for the purpose of inducing consumers, including Plaintiff, to purchase Defendant's dangerous products.

274.    Specifically, Defendant's advertisement regarding Roundup made material misrepresentations to the effect that Roundup was a safe, which misrepresentations Defendant knew to be false, for the purpose of fraudulently inducing consumers, such as Plaintiff, to

purchase said product. Defendant further misrepresented that its products were just as safe, and just as effective or more effective, than other weed control products on the market.

275.    Defendant's representations regarding the character or quality of Roundup were untrue. In addition, Defendant fraudulently suppressed material information regarding the safety of Roundup, including the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup and glyphosate.

276.    Defendant had actual knowledge based on the results of trials, tests, and studies of exposure to glyphosate, of the risk of serious harm associated with human use of and exposure to Roundup.

277.    Defendant negligently and/or intentionally misrepresented or omitted this information in its product labeling, promotions and advertisements and instead labeled, promoted and advertised its products as safe and effective in order to avoid losses and sustain profits in its sales to consumers.

278.    In supplying the false information, Defendant failed to exercise reasonable care or competence in obtaining or communicating information to their intended recipients, including Plaintiff.

279.    Plaintiff reasonably relied to his detriment upon Defendant's misrepresentations and/or omissions in its labeling, advertisements, and promotions concerning the serious risks posed by the product. Plaintiff reasonably relied upon Defendant's representations to him that Roundup was safe for use and that Defendant's labeling, advertisements and promotions fully described all known risks of the product.

280.    Defendant is estopped from relying on any statute of limitations defenses because Defendant actively concealed the defects from consumers, such as Plaintiff. Instead of revealing

the defects, Defendant continued to represent its product as safe for its intended use.

281.   As a direct and proximate result of Plaintiff's use of Roundup as manufactured, designed, sold, supplied and introduced into the stream of commerce by Defendant, Plaintiffs suffered personal injury, non-economic damages, and will continue to suffer such harm and damages in the future.

## COUNT SEVEN: VIOLATION OF THE DELAWARE DECEPTIVE TRADE PRACTICES LAW, DEL. CODE ANN. TIT. 6, § 2531 et seq.

282.   Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as it fully stated herein.

283.   Plaintiffs plead this Count in the broadest sense available under law to include pleading same pursuant to all substantive law that applies to this case as may be determined by choice of law principles, regardless of whether arising under statute and/or common law.

284.   Plaintiff Thomas Baker used Defendant's Roundup and suffered ascertainable losses as a result of the Defendants' actions in violation of the aforementioned consumer protection laws.

285.   The Defendant violated Title 6 of the Delaware Code, section 2531 et seq, through their use of false and misleading misrepresentations or omissions of material fact relating to the safety of Roundup.

286.   The Defendants uniformly communicated the purported benefits of Roundup while failing to disclose the serious and dangerous side effects related to the use of Roundup and of the true state of Roundup's regulatory status and safety. The Defendants made these representations to the public at large, including the Plaintiff, in the marketing and advertising campaigns described herein.

287.   The Defendants used unfair methods of competition or deceptive acts or practices

that were proscribed by law, including the following:

    a. Engaging in unfair or deceptive trade practices as defined in this statute by making false and misleading oral and written statements that had the capacity, tendency, or effect of deceiving or misleading consumers.

    b. Engaging in unfair or deceptive trade practices as defined in this statute by making representations that its products has an approval, characteristic, ingredient, use or benefit which they did not have, including but not limited to statements concerning the health consequences of the use of Roundup.

    c. Engaging in unfair or deceptive trade practices as defined in this statute by failing to state material facts the omission of which deceived or tended to deceive, including but not limited to facts relating to the health consequences of the use of Roundup.

    d. Engaging in unfair and deceptive trade practices as defined in this statute through deception, fraud, misrepresentation and knowing concealment, suppression and omission of material facts with the intent that consumers rely upon the same in connection with the use and continued use of Roundup.

288. The Defendant had a statutory duty to refrain from unfair trade practices in the design, development, manufacture, promotion and sale of Roundup.

289. Had the Defendants not engaged in the deceptive conduct described herein, the Plaintiff would not have purchased and/or used Roundup and would not have incurred related medical costs. Specifically, the Plaintiffs were misled by the deceptive conduct described herein.

290. The Defendant's deceptive, unconscionable, false, misleading and/or fraudulent representations and material omissions to the public at large, including the Plaintiff, of material facts relating to the safety of Roundup constituted unfair trade practices in violation of the state consumer protection statutes listed above.

291. The Defendant uniformly communicated the purported benefits of Roundup while failing to disclose the serious and dangerous side effects related to the use of Roundup and the true state of Roundup's regulatory status and its safety. The

Defendant made these representations to the public at large, such as the Plaintiff, in the marketing and advertising campaign described herein.

292.     The Defendant's conduct in connection with Roundup was also impermissible and illegal in that it created a likelihood of confusion and misunderstanding because the Defendant misleadingly, falsely and/or deceptively misrepresented and omitted numerous material facts regarding, among other things, the safety of Roundup.

293.     By reason of wrongful acts engaged in by the Defendant, the Plaintiffs suffered ascertainable loss and damages for which the Plaintiffs are now entitled to recover.

294.     As a direct and proximate result of the Defendant's wrongful conduct, the Plaintiff was damaged getting NHL and for the Plaintiff's medical treatment. Plaintiffs are now entitled to recover those damages.

295.     As a direct and proximate result of the Defendant's violations of unfair trade practices, the Plaintiffs sustained economic losses and other damages for which the Plaintiffs are entitled to statutory and compensatory damages and attorneys' fees, in an amount to be proven at trial.

## COUNT EIGHT- LOSS OF CONSORTIUM

296.     Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as it fully stated herein.

297.     Spouse Plaintiff, Marcia Baker, was at all times relevant hereto the spouse of Thomas Baker.

298.     For the reasons set forth herein, spouse Plaintiff has been caused, presently and in

the future, to suffer from the loss of Thomas Baker's companionship, services and society, and accordingly, the Spouse Plaintiff has been caused great mental anguish. F

## COUNT NINE: PUNITIVE DAMAGES

299.    Plaintiffs repeat, reiterate and re-allege each and every allegation of this Complaint contained in the paragraphs above, with the same force and effect as if fully set forth herein.

300.    The acts, conduct, and omissions of Defendant, as alleged throughout this Complaint, were willful and malicious. Defendant committed these acts with a conscious disregard for the rights of Plaintiff and other Roundup users and for the primary purpose of increasing Defendant's profits from the sale and distribution of Roundup. Defendant's outrageous and unconscionable conduct warrants an award of exemplary and punitive damages against Defendant in an amount appropriate to punish and make an example of Defendant.

301.    Prior to the manufacturing, sale, and distribution of Roundup, Defendant knew that said product was in a defective condition as previously described herein and knew that those who used Roundup would experience and did experience severe physical, mental, and emotional injuries. Further, Defendant, through their officers, directors, managers, and agents, knew that Roundup presented a substantial and unreasonable risk of harm to the public, including Plaintiff and as such, Defendant unreasonably subjected consumers of said product to risk of serious and permanent injury in the form of NHL, from its use.

302.    Despite their knowledge, Defendant, acting through its officers, directors and managing agents for the purpose of enhancing Defendant's profits, knowingly and

deliberately failed to remedy the known defects in Roundup and failed to warn the public, including Plaintiff, of the extreme risk of contracting NHL occasioned by said defects inherent in Roundup. Defendant and its agents, officers, and directors intentionally proceeded with the manufacturing, sale, and distribution and marketing of Roundup knowing these actions would expose persons to serious danger in order to advance Defendant's pecuniary interest and monetary profits.

303.   Defendant's conduct was despicable and so contemptible that it would be looked down upon and despised by ordinary decent people, and was carried on by Defendant with willful and conscious disregard for the safety of Plaintiff, entitling Plaintiff to exemplary damages.

## **DAMAGES**

304.   Plaintiffs respectfully request the following damages be considered separately and individually for the purpose of determining the sum of money that will fairly and reasonably compensate plaintiffs:

    a.    Medical Expenses;

    b.    Pain and Suffering;

    c.    Mental Anguish, Anxiety, and Discomfort;

    d.    Physical Impairment;

    e.    Loss of Enjoyment of Life;

    f.    Pre and post judgment interest;

    g.    Exemplary and Punitive Damages;

    h.    Treble damages and

    i.    Reasonable and necessary attorney's fees.

**WHEREFORE**, Plaintiffs demand judgment against the Defendant for such sums, including, but not limited to prejudgment and post-judgment interest, as would be necessary to compensate the Plaintiffs for the injuries suffered or will suffer.  Plaintiffs further demand judgment against the Defendant for punitive damages.  Plaintiffs further demand payment by the Defendant of the costs and attorney fees of this action.  Plaintiffs further demand payment by Defendant of interest on the above and such other relief as the Court deems just.

<u>**DEMAND FOR JURY TRIAL**</u>

The Plaintiffs hereby demand a trial by jury on all counts and as to all issues.

**NAPOLI SHKOLNIK, LLC**

**By:**  */s/ James D. Heisman*
    James D. Heisman (#2746)
    919 North Market Street, Suite 1801
    Wilmington, DE 19801
    (302) 330-8025
    JHeisman@NapoliLaw.com
    *Attorney for Plaintiffs*

Dated: August 29, 2017