# U.S. District Court
## Alabama Middle District (Montgomery)
## CIVIL DOCKET FOR CASE #: 2:17-cv-00795-SRW
## Internal Use Only

| | |
|---|---|
| Green et al v. Monsanto Company | Date Filed: 11/20/2017 |
| Assigned to: Honorable Judge Susan Russ Walker | Jury Demand: Plaintiff |
| Cause: 28:1332 Diversity-Product Liability | Nature of Suit: 365 Personal Inj. Prod. Liability |
| | Jurisdiction: Diversity |

**Plaintiff**

**Larry Edwin Green**                    represented by **Sherri Lee Mazur**
Mazur & Phillips LLC
1777 Taliaferro Trail
Montgomery, AL 36117
334-694-9339
Fax: 334-467-9476
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
**Bar Status: Active**

**Wesley Shawn Walterscheid**
Mazur Law
1777 Taliaferro Trail
Montgomery, AL 36117-7758
334-694-9339
Fax: 334-694-9310
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
**Bar Status: Active**

**Plaintiff**

**Sue Ellen Green**                    represented by **Sherri Lee Mazur**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
**Bar Status: Active**

**Wesley Shawn Walterscheid**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
**Bar Status: Active**

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 11/20/2017 | 1 | COMPLAINT against Monsanto Company ( Filing fee $ 400.00 receipt number 4602047542.), filed by Sue Ellen Green, Larry Edwin Green. (Attachments: # 1 fee receipt)(djy, ) (Entered: 11/21/2017) |
| 11/20/2017 | 2 | Corporate/Conflict Disclosure Statement by Larry Edwin Green, Sue Ellen Green. (djy, ) (Entered: 11/21/2017) |

ATTEST: A True Copy.

Certified to November 21, 2017.

Clerk, US District Court,

Middle District of Alabama

By:  /s/ Debbie Yates

         Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

RECEIVED

2017 NOV 20  A 11: 35

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

Larry Edwin Green, )
)
Sue Ellen Green, )
)
    Plaintiffs, )
)
vs. )
)
Monsanto Company, )
)
    Defendant. )

Civil Action No:

2:17-CV-795-SRW

Jury Trial Demanded

ATTEST: A True Copy.
Certified to November 21, 2017.
Clerk, US District Court,
Middle District of Alabama
By: /s/ Debbie Yates
Deputy Clerk

## COMPLAINT

COMES NOW, Larry Green and Sue Ellen Green, by and through their attorneys, and

shows unto the Court the following:

### INTRODUCTION

1.    In 1970, Defendant Monsanto Company ("Monsanto") discovered the herbicidal

properties of glyphosate and began marketing it in products in 1974, under the brand name

Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete

with the growing of crops. In addition to the active ingredient glyphosate, Roundup® contains

the surfactant Polyethoxylated tallow amine (POEA) and/or adjuvants and other so-called

"inert" ingredients. In 2001, glyphosate was the most-used pesticide active ingredient in

American agriculture with 85–90 millions of pounds used annually. That number grew to

185 million pounds by 2007.[1] As of 2013, glyphosate was the world's most widely used

herbicide.

2.    Monsanto is a multinational agricultural biotechnology corporation based in St.

---

[1] Arthur Grube et al., U.S. Envtl. Prot. Agency, *Pesticides Industry Sales and Usage, 2006-2007 Market Estimates* 1-41 (2011), *available at* https://www.epa.gov/sites/production/files/2015-10/documents/market_estimates2007.pdf.

Louis, Missouri, and incorporated in Delaware. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market.[2] The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming the crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.[3]

3.    Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops.[4] They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams and groundwater in agricultural areas where Roundup® is used.[5] It is found in food,[6] in the urine of agricultural workers[7, 8] and even in the urine of urban dwellers who are not in direct contact with glyphosate.[9]

4.    On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an

---

[2] ETC Group, *Who Will Control the Green Economy?* 22 (2011), *available at* http://www.etcgroup.org/files/publication/pdf_file/ETC_wwctge_4web_Dec2011.pdf.

[3] William Neuman and Andrew Pollack, *Farmers Cope with Roundup-Resistant Weeds*, N.Y. TIMES, May 3, 2010, *available at* http://www.nytimes.com/2010/05/04/business/energy-environment/04weed.html?pagewanted=all.

[4] Monsanto, *Backgrounder-History of Monsanto's Glyphosate Herbicides* (Sept. 2, 2015), *available at* https://monsanto.com/app/uploads/2017/06/back_history.pdf.

[5] *See* U. S. Geological Survey, *USGS Technical Announcement: Widely Used Herbicide Commonly Found in Rain and Streams in the Mississippi River Basin* (2011), https://archive.usgs.gov/archive/sites/www.usgs.gov/newsroom/article.asp-ID=2909.html; *see* also U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate*, *available at* http://www.epa.gov/safewater/pdfs/factsheets/soc/tech/glyphosa.pdf.

[6] Thomas Bohn et al., *Compositional Differences in Soybeans on the Market: Glyphosate Accumulates in Roundup Ready GM Soybeans*, 153 FOOD CHEMISTRY 207, 207-15 (2014), *available at* http://www.sciencedirect.com/science/article/pii/S0308814613019201.

[7] John F. Acquavella et al., *Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study*, 112(3) ENVIRONMENTAL HEALTH PERSPECTIVES 321, 321-326 (2004), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241961/.

[8] Kathryn Z. Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon and Glyphosate*, 112 IARC Monographs 76, section 5.4 (2015), *available at* http://monographs.iarc.fr/ENG/Monographs/vol112/mono112-10.pdf.

[9] Dirk Brändli & Sandra Reinacher , *Herbicides found in Human Urine*, 1 ITHAKA JOURNAL 270, 270-72 (2012), *available at* http://www.ithaka-journal.net/druckversionen/e052012-herbicides-urine.pdf.

2

agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

5.      On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

6.      The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other hematopoietic cancers, including lymphocytic lymphoma, chronic lymphocytic leukemia, B-cell lymphoma and multiple myeloma.[10]

7.      The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

8.      Nevertheless, Monsanto, since it began selling Roundup®, represented it as safe to humans and the environment.  Indeed, Monsanto repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

JURISDICTION & VENUE

9.      This Court has diversity jurisdiction over the claims in this complaint because the aggregate amount in controversy exceeds the sum of $75,000.00 and is between citizens of

---

[10] Kathryn Z. Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon and Glyphosate, supra* at 8.

3

different states. 28 U.S.C. § 1332(a)(1).

10.     Venue is proper within this District under 28 U.S.C. § 1391(b)(2) because Plaintiff lives in this District. Additionally, venue is proper in this Court as injuries sustained by Plaintiff, as described herein, occurred in Montgomery County, Alabama, and were committed within the Middle District of Alabama. 28 U.S.C. § 1391.

THE PARTIES

11.     Plaintiff Larry Green is an individual over the age of twenty-one (21) and is a citizen of Montgomery County, Alabama, residing in Montgomery County, Alabama. He was exposed to Roundup® beginning in 1997 and been diagnosed with Non-Hodgkin Lymphoma.

12.     Plaintiff Sue Ellen Green is an individual over the age of twenty-one (21) and is a citizen of Montgomery County, Alabama, residing in Montgomery County, Alabama.  She was lawfully married to Plaintiff Larry Green on April 29, 1988 and that marriage continues today.

13.     Defendant Monsanto is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri, and is licensed to do and does business in the State of Alabama. Defendant Monsanto Company is in the business of researching, testing, developing, designing, formulating, manufacturing, producing, assembling, packaging, labeling, advertising, promoting, marketing, selling, supplying and distributing herbicides, including Roundup® products.

14.     At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup® products, which contain the active ingredient glyphosate and the surfactant POEA, as well as adjuvants and other "inert" ingredients.

## STATEMENT OF THE FACTS

15.    Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

16.    Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking or brewing grains.

17.    For nearly 40 years, farms across the world used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®—glyphosate—is a probable cause of cancer. Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® is safe.

### The Discovery of Glyphosate and Development of Roundup®

18.    The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®.[11] From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use. It still

---

[11] Monsanto, *Backgrounder-History of Monsanto's Glyphosate Herbicide, supra* at 4.

markets Roundup® as safe today.[12]

### *Registration of Herbicides under Federal Law*

19.    The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale or use, except as described by the Act. 7 U.S.C. § 136a(a).

20.    Because pesticides are toxic to plants, animals and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

21.    FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

22.    The EPA and the State of Alabama registered Roundup® for distribution, sale, and manufacture in the United States and the State of Alabama.

---

[12] Monsanto, *What is Glyphosate?* (Sept. 2, 2015), *available at*
http://www.monsanto.com/sitecollectiondocuments/glyphosate-safety-health.pdf.

6

23.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

24.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation. In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment —in relation to the reregistration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the World Health Organization's health-related findings. In September of 2015, Cancer Assessment Review Committee classified glyphosate as "Not Likely to be Carcinogenic to Humans."

## *Scientific Fraud Underlying the Marketing and Sale of Glyphosate/ Roundup®*

25.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean

7

the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."[13]

26.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

27.     In the first instance, Monsanto, in seeking initial registration of Roundup® by the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®.[14] IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine (9) of the 15 residue studies needed to register Roundup®.

28.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid.[15] An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they

---

[13] U.S. Envtl. Prot. Agency, *Memorandum, Subject: SECOND Peer Review of Glyphosate* 1 (1991), *available a*t https://www3.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_30-Oct-91_265.pdf.
[14] Monsanto, *Backgrounder-Testing Fraud: IBT and Craven Laboratories* (Sept. 2, 2015), https://monsanto.com/app/uploads/2017/06/ibt_craven_bkg.pdf.
[15] U.S. Envtl. Prot. Agency, *Summary of the IBT Review Program Office of Pesticide Programs* (1983), *available at* http://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA&Index=1 981+Thru+1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocE ntry=&QField=&QFieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQ uery=&File=D%3A%5Czyfiles%5CIndex%20Data%5C81thru85%5CTxt%5C00000022%5C91014ULV. txt&User=ANONYMOUS&Password=anonymous&SortMethod=h%7C- &MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=p%7Cf&De fSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page&Ma ximumPages=1&ZyEntry=1&SeekPage=x&ZyPURL.

took specimens of the uterus from male rabbits."[16]

29.    Three top executives of IBT were convicted of fraud in 1983.

30.    In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.[17]

31.    Despite the falsity of the tests that underlie its registration, within a few years of its launch, Roundup® was being marketed in 115 countries.

32.    The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

33.    In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured

---

[16] Marie-Monique Robin, *The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply* (2011) (citing U.S. Envtl. Prot. Agency, *Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch. Washington, D.C.* (August 9, 1978.)).

[17] Monsanto, *Backgrounder-Testing Fraud: IBT and Craven Laboratories, supra* at 14.

Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

34.     Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue.[18] Today, glyphosate remains one of the world's largest herbicides by sales volume.

35.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on, glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

    a)      "Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ..."

    b)      "And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem."

    c)      "Roundup biodegrades into naturally occurring elements."

---

[18] David Barboza, *The Power of Roundup; A Weed Killer Is a Block for Monsanto to Build On*, N.Y. TIMES, Aug. 2, 2001, *available at* http://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weed-killer-is-a-block-for-monsanto-to-build-on.html.

d) "Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e) "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it." . . .

f) "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

g) "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

h) "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non- toxic' as it pertains to mammals, birds, and fish."

i) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[19]

36. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with the NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk . . ..

b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable . . ..

c) its glyphosate-containing pesticide products or any component thereof stay

---

[19] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

where they are applied under all circumstances and will not move through the environment by any means . . ..

d)     its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics.". . .

e)     glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides.

f)     its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

37.     Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief, still failed to do so today.

38.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[20]

### Classifications and Assessments of Glyphosate

39.     The IARC process for the classification of glyphosate followed the IARC's stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program reviewed 980 agents. Of those reviewed, it determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

40.     The established procedure for the IARC Monograph evaluations is described in the

---

[20] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.

IARC Programme's Preamble.[21] Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

41.      One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group's findings is published in The Lancet Oncology, and within one year after the meeting, the finalized Monograph is published.

42.      In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review.

43.      In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

44.      On July 29, 2015, the IARC issued its Monograph for glyphosate, Monograph Volume 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at the IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year

---

[21] World Health Org., IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble (2006), *available at* http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

45. The studies considered the following exposure groups: (1) occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and (2) para-occupational exposure in farming families.

46. Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007, and the most heavily used herbicide in the world in 2012.

47. Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water and groundwater, as well as in food.

48. The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

49. The IARC Working Group found an increased risk between exposure to glyphosate and (Non-Hodgkin Lymphoma) NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

50. The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

14

51.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor: renal tubule carcinoma. A second study reported a positive trend for hemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

52.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

53.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

54.     The IARC Working Group also noted genotoxic, hormonal and enzymatic effects in mammals exposed to glyphosate.[22] Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

55.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and multiple myeloma, hairy cell leukemia (HCL) and chronic lymphocytic leukemia (CLL), in addition to several other cancers.

### *Other Earlier Findings About Glyphosate's Dangers to Human Health*

56.     The EPA has a technical fact sheet, as part of its Drinking Water and Health, National

---

[22] Kathryn Z. Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, *supra* at 8.

Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

### Release Patterns

Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport, storage, and disposal.[23]

57.     In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.[24]

---

[23] U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate*, *supra* at 5.
[24] Caroline Cox, *Glyphosate, Part 2: Human Exposure and Ecological Effects*, 15 J. PESTICIDE REFORM 4 (1995); William S. Peas et al., *Preventing Pesticide-Related Illness in California Agriculture Strategies and*

## *The Toxicity of Other Ingredients in Roundup®*

58.     In addition to the toxicity of the active ingredient, glyphosate, several studies support the hypothesis that the glyphosate-based formulation in Defendant's Roundup® products is more dangerous and toxic than glyphosate alone. Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.

59.     In 2002, a study by Julie Marc, entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation, revealed that Roundup® causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cell cycles.[25]

60.     A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation. The researchers noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."[26]

61.     In 2005, a study by Francisco Peixoto, entitled "Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup®'s effects on rat liver mitochondria are far more toxic than equal concentrations of

---

*Priorities. Environmental Health Policy Program Report*, Univ. of Calif. School of Public Health, Calif. Policy Seminar (1993).

[25] Julie Marc et al., *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation*, 15(3) CHEM. RES. TOXICOL. 326-331 (2002), *available at* http://pubs.acs.org/doi/full/10.1021/tx015543g.

[26] Julie Marc et al., *Glyphosate-Based Pesticides Affect Cell Cycle Regulation*, 96 BIOLOGY OF THE CELL 245, 245-249 (2004), *available at* http://onlinelibrary.wiley.com/doi/10.1016/j.biolcel.2003.11.010/epdf.

17

glyphosate alone. The Peixoto study further suggested that the harmful effects of Roundup® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant POEA, or in the alternative, due to the potential synergistic effect between glyphosate and other ingredients in the Roundup® formulation.[27]

62.    In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup® and glyphosate on human umbilical, embryonic and placental cells. The study tested dilution levels of Roundup® and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food. The researchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability and amplify toxicity of glyphosate alone. The researchers further suggested that assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants present in Roundup® are not, in fact, inert and that Roundup® is potentially far more toxic than its active ingredient glyphosate alone.[28]

63.    The results of these studies were at all times available to Defendant. Defendant thus knew or should have known that Roundup® is more toxic than glyphosate alone and that safety studies of Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup® products.

---

[27] Francisco Peixoto, *Comparative Effects of the Roundup and Glyphosate on Mitochondrial Oxidative Phosphorylation*, 61 CHEMOSPHERE 1115, 1122 (2005), *available at*
https://www.researchgate.net/publication/7504567_Comparative_effects_of_the_Roundup_and_glyphosa te_on_mitochondrial_oxidative_phosphorylation
[28] Nora Benachour et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic and Placental Cells*, 22(1) CHEM. RES. TOXICOL. 97-105 (2008), *available at*
http://big.assets.huffingtonpost.com/france.pdf.

18

64.     Despite its knowledge that Roundup® is considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup® as safe.

## *Recent Worldwide Bans on Roundup®/Glyphosate*

65.     Several countries around the world instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since the IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup® become more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which took effect at the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."[29]

66.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.[30]

67.     France banned the private sale of Roundup® and glyphosate following the IARC assessment for glyphosate.[31]

68.     Bermuda banned both the private and commercial sale of glyphosate, including

---

[29] *Holland's Parliament Bans Glyphosate Herbicides*, THE REAL AGENDA, April 14, 2014, *available at* http://real-agenda.com/hollands-parliament-bans-glyphosate-herbicides/.

[30] Christina Sarich, *Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals Following Recent Glyphosate-Cancer Link*, GLOBAL RESEARCH, May 14, 2015, *available at* http://www.globalresearch.ca/brazils-public-prosecutor-wants-to-ban-monsantos-chemicals-following- recent-glyphosate-cancer-link/5449440.

[31] Zoe Schlanger, *France Bans Sales of Monsanto's Roundup in Garden Centers, 3 Months After U.N. Calls it "Probable Carcinogen,"* NEWSWEEK, June 15, 2015, *available at* http://www.newsweek.com/france-bans-sale-monsantos-roundup-garden-centers-after-un-names-it-probable-343311.

19

Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."[32]

69.     The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.[33]

70.     The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.[34]

### *EFSA Report on Glyphosate*

71.     On November 12, 2015, the European Food Safety Authority (EFSA), the European Union's primary agency for food safety, reported on its evaluation of the Renewal Assessment Report (RAR) on glyphosate.[35] The Rapporteur Member State assigned to glyphosate, the German Federal Institute for Risk Assessment (BfR), had produced the RAR as part of the renewal process for glyphosate in the EU.

72.     The BfR sent its draft RAR to the EFSA and the RAR underwent a peer review process by the EFSA, other member states and industry groups. As part of the on-going peer review of Germany's reevaluation of glyphosate, the EFSA had also received a second mandate from the European Commission to consider the IARC's findings regarding the potential

---

[32] *Health Minister: Importation of Roundup Weed Spray Suspended*, BERNEWS, May 11, 2015, *available at* http://bernews.com/2015/05/importation-weed-spray-round-suspended/.

[33] *Sri Lanka's New President Puts Immediate Ban on Glyphosate Herbicides*, SUSTAINABLE PULSE, May 25, 2015, *available at* https://sustainablepulse.com/2015/05/25/sri-lankas-new-president-puts-immediate-ban-on-glyphosate-herbicides/#.WgnRSItSzIU.

[34] *Columbia to Ban Coca Spraying Herbicide Glyphosate*, BBC, May 10, 2015, *available at* http://www.bbc.com/news/world-latin-america-32677411.

[35] European Food Safety Auth., *Conclusion on the Peer Review of the Pesticide Risk Assessment of the Active Substance Glyphosate*, 13(11) EFSA JOURNAL (2015), *available at* http://www.efsa.europa.eu/sites/default/files/scientific_output/files/main_documents/4302.pdf.

carcinogenicity of glyphosate and glyphosate-containing products.

73.     Based on a review of the RAR, which included data from industry-submitted, unpublished studies, the EFSA sent its own report ("Conclusion") to the European Commission, finding that "glyphosate is unlikely to pose a carcinogenic hazard to humans and the evidence does not support classification with regard to its carcinogenic potential according to Regulation (EC) No. 1272/2008."[36] The EFSA therefore disagreed with the IARC: glyphosate was not genotoxic and did not present a carcinogenic threat to humans.

74.     In explaining why its results departed from the IARC's conclusion, the EFSA drew a distinction between the EU and the IARC approaches to the study and classification of chemicals.[37] Although the IARC examined "both glyphosate—an active substance—and glyphosate-based formulations, grouping all formulations regardless of their composition," the EFSA explained that it considered only glyphosate and that its assessment focuses on "each individual chemical, and each marketed mixture separately."[38] The IARC, on the other hand, "assesses generic agents, including groups of related chemicals, as well as occupational or environmental exposure, and cultural or behavioural practices."[39] The EFSA accorded greater weight to studies conducted with glyphosate alone than studies of formulated products.[40]

75.     The EFSA went further and noted:

> Although some studies suggest that certain glyphosate-based formulations
> may be genotoxic (i.e. damaging to DNA), others that look solely at the active
> substance glyphosate do not show this effect. It is likely, therefore, that the

---

[36] Id.

[37] European Food Safety Auth., *The EFSA Fact Sheet: Glyphosate*, *available at*
https://www.efsa.europa.eu/sites/default/files/corporate_publications/files/efsaexplainsglyphosate151112en.pdf.
[38] Id.
[39] Id.
[40] Id.

genotoxic effects observed in some glyphosate-based formulations are related to the other constituents or "co-formulants". Similarly, certain glyphosate-based formulations display higher toxicity than that of the active ingredient, presumably because of the presence of co-formulants. In its assessment, EFSA proposes that the toxicity of each pesticide formulation and in particular its genotoxic potential should be further considered and addressed by Member State authorities while they reassess uses of glyphosate-based formulations in their own territories.[41]

76. Notwithstanding its conclusion, the EFSA did set exposure levels for glyphosate. Specifically, the EFSA proposed an acceptable daily intake (ADI) of 0.5 mg/kg of body weight per day; an acute reference dose (ARfD) of 0.5 mg/kg of body weight; and an acceptable operator exposure level (AOEL) of 0.1 mg/kg of body weight per day.[42]

77. Dozens of pages of the RAR were taken from applications submitted by Monsanto on behalf of the Glyphosate Task Force (GTF).[43] The RAR parrots the GFT's 2012 review, copying its description and analyses verbatim, including an analysis challenging the results of a study which found an association between pesticide use and non-Hodgkin lymphoma. Other sections were changed only by altering the headings, references, or capitalization. Most paragraphs that dealt with peer-reviewed papers were copied word for word from GTF's review. Two of the authors of that review have ties to Monsanto: one a former employee and one a current employee. This level of delegation calls into questions the independence of the EFSA and whether their conclusions are their own or that of the industry.

---

[41] *Id.*

[42] European Food Safety Auth., *Conclusion on the Peer Review of the Pesticide Risk Assessment of the Active Substance Glyphosate, supra* at 35.

[43] Arthur Neslen, *EU Report on Weedkiller Safety Copied Text from Monsanto Study, available at* https://www.theguardian.com/environment/2017/sep/15/eu-report-on-weedkiller-safety-copied-text-from-monsanto-study.

Case MDL No. 2741 Document 378-1 Filed 11/27/17 Page 23 of 83

*Leading Scientists Dispute EFSA's Conclusion*

78.    On November 27, 2015, 96 independent academic and governmental scientists from around the world submitted an open letter to the EU health commissioner, Vytenis Andriukaitis.[44] The scientists expressed their strong concerns and urged the commissioner to disregard the "flawed" EFSA report, arguing that "the BfR decision is not credible because it is not supported by the evidence and it was not reached in an open and transparent manner."[45]

79.    Signatories to the letter included Dr. Christopher J. Portier, Ph.D., and other renowned international experts, some of whom were part of the IARC Working Group assigned to glyphosate.

80.    In an exhaustive and careful examination, the scientists scrutinized the EFSA's conclusions and outlined why the IARC Working Group decision was "by far the more credible":

> The IARC WG decision was reached relying on open and transparent procedures by independent scientists who completed thorough conflict-of-interest statements and were not affiliated or financially supported in any way by the chemical manufacturing industry. It is fully referenced and depends entirely on reports published in the open, peer-reviewed biomedical literature. It is part of a long tradition of deeply researched and highly credible reports on the carcinogenicity of hundreds of chemicals issued over the past four decades by IARC and used today by international agencies and regulatory bodies

---

[44] Letter from Christopher J. Portier et al. to Commissioner Vytenis Andriukaitis, *Open Letter: Review of the Carcinogenicity of Glyphosate by EFSA and BfR* (Nov. 27, 2015), *available at* https://www.efsa.europa.eu/sites/default/files/Prof_Portier_letter.pdf.
[45] *Id.*

around the world as a basis for risk assessment, regulation and public health policy.[46]

81.     With respect to human data, the scientists pointed out that the EFSA agreed with the IARC that there was "limited evidence of carcinogenicity for non-Hodgkin lymphoma, but the EFSA nonetheless dismissed an association between glyphosate exposure and carcinogenicity. The IARC applies three (3) levels of evidence in its analyses of human data, including sufficient evidence and limited evidence. The EFSA's ultimate conclusion that "there was no unequivocal evidence for a clear and strong association of NHL with glyphosate" was misleading because it was tantamount to IARC's highest level of evidence: "sufficient evidence," which means that a causal relationship has been established. However, the scientists argued, "[l]egitimate public health concerns arise when 'causality is credible,' i.e., when there is limited evidence."[47]

82.     Among its many other deficiencies, the EFSA's conclusions regarding animal carcinogenicity data were "scientifically unacceptable," particularly in BfR's use of historical control data and in its trend analysis. Indeed, BfR's analysis directly contradicted the Organization for Economic Co-operation and Development ("OECD") testing guidelines while citing and purporting to follow those same guidelines. For instance, the EFSA report dismisses observed trends in tumor incidence "because there are no individual treatment groups that are significantly different from controls and because the maximum observed response is reportedly within the range of the historical control data." However, according to the scientists, concurrent controls are recommended over historical controls in all guidelines, scientific reports and publications, and, if it is employed, historical control data "should be from studies in the same timeframe, for the same exact animal strain, preferably from the

---

[46] *Id.*
[47] *Id.*

24

same laboratory or the same supplier and preferably reviewed by the same pathologist." BfR's use of historical control data violated the precautions: "only a single study used the same mouse strain as the historical controls, but was reported more than 10 years after the historical control dataset was developed." Further deviating from sound scientific practices, the data used by the BfR came from studies in seven different laboratories. The scientists concluded:

> BfR reported seven positive mouse studies with three studies showing increases in renal tumors, two with positive findings for hemangiosarcomas, and two with positive findings for malignant lymphomas. BfR additionally reported two positive findings for tumors in rats. Eliminating the inappropriate use of historical data, the unequivocal conclusion is that these are not negative studies, but in fact document the carcinogenicity of glyphosate in laboratory animals.[48]

83. The letter also critiqued the EFSA report's lack of transparency and the opacity surrounding the data cited in the report: "citations for almost all of the references, even those from the open scientific literature, have been redacted from the document" and "there are no authors or contributors listed for either document, a requirement for publication in virtually all scientific journals." Because the BfR relied on unpublished, confidential industry-provided studies, it is "impossible for any scientist not associated with the BfR to review this conclusion with scientific confidence."[49]

84. On March 3, 2016, the letter was published in the Journal of Epidemiology & Community Health.[50]

---

[48] *Id.*

[49] *Id.*

[50] Christopher J. Portier et al., *Differences in the Carcinogenic Evaluation of Glyphosate Between the International*

### Statement of Concern Regarding Glyphosate-Based Herbicides

85.    On February 17, 2016, a consensus statement published in the journal Environmental Health, entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement," assessed the safety of glyphosate-based herbicides (GBHs).[51]

1.    GBHs are the most heavily applied herbicide in the world and usage continues to rise;

2.    Worldwide, GBHs often contaminate drinking water sources, precipitation and air, especially in agricultural regions;

3.    The half-life of glyphosate in water and soil is longer than previously recognized;

4.    Glyphosate and its metabolites are widely present in the global soybean supply;

5.    Human exposures to GBHs are rising;

6.    Glyphosate is now authoritatively classified as a probable human carcinogen; and

7.    Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science.

86.    The researchers noted that GBH use increased approximately 100-fold since the 1970s. Further, far from posing a limited hazard to vertebrates, as previously believed, two

---

*Agency for Research on Cancer (IARC) and the European Food Safety Authority* (EFSA), 70(8) J. EPIDEMIAL COMMUNITY HEALTH 741, 741-46 (Mar. 3, 2016), *available at* http://jech.bmj.com/content/jech/70/8/741.full.pdf.

[51] John P. Myers et al., *Concerns Over Use of Glyphosate-Based Herbicides and Risks Associated with Exposures: A Consensus Statement*, 15(19) ENVIRONMENTAL HEALTH (2016), *available at* http://ehjournal.biomedcentral.com/articles/10.1186/s12940-016-0117-0.

decades of evidence demonstrated that "several vertebrate pathways are likely targets of action, including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."[52]

87.    The paper attributes uncertainties in current assessments of glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations." Further, the researchers argue, "[t]he distinction in regulatory review and decision processes between 'active' and 'inert' ingredients has no toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in their own right."[53]

88.    Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish." Accordingly, "risk assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone underestimate both toxicity and exposure, and thus risk." The paper concludes that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."[54]

89.    The researchers also critique the current practice of regulators who largely rely on "unpublished, non-peer reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different

---

[52] *Id.*
[53] *Id.*
[54] *Id.*

27

from those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."[55]

90.   The researchers also call for greater inclusion of GBHs in government-led toxicology testing programs:

> A fresh and independent examination of GBH toxicity should be undertaken, and . . . this re-examination be accompanied by systematic efforts by relevant agencies to monitor GBH levels in people and in the food supply, none of which are occurring today. The U.S. National Toxicology Program should prioritize a thorough toxicological assessment of the multiple pathways now identified as potentially vulnerable to GBHs.

91.   The researchers suggest that, in order to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which manufacturers fund the registration process and the necessary testing:

> [W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part of routine registration actions and fees. Such funds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would be made available to independent scientists to conduct the appropriate long-term (minimum 2 years) safety studies in recognized animal model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine

---

[55] *Id.*

disruption, impacts on the gut microbiome, carcinogenicity and multigenerational effects looking at reproductive capability and frequency of birth defects.

### *FDA Announces Testing of Glyphosate Residue in Foods*

92.     On February 17, 2016, the U.S. Food and Drug Administration ("FDA") announced that, for the first time in its history, the agency planned to start testing certain foods for glyphosate residues. FDA spokeswoman Lauren Sucher explained: "The agency is now considering assignments for Fiscal Year 2016 to measure glyphosate in soybeans, corn, milk and eggs, among other potential foods."[56]

93.     In 2014, the U.S. Government Accountability Office (GAO) had severely rebuked the FDA for its failures to both monitor for pesticide residue, including that of glyphosate, and to disclose the limitations of its monitoring and testing efforts to the public.[57] The GAO had cited numerous undisclosed deficiencies in the FDA's process, specifically highlighting its omission of glyphosate testing.

94.     Indeed, in the past, both the FDA and the U.S. Department of Agriculture ("USDA") had routinely excluded glyphosate from their testing for the residues of hundreds of other pesticides, on the rationale that it was too expensive and unnecessary to protect public health. Mrs. Sucher, the FDA spokeswoman, however, now states that "the agency has developed 'streamlined methods' for testing for the weed killer."[58]

95.     The FDA's move is significant as the agency possesses enforcement authority and can

---

[56] Carey Gillam, *FDA to Start Testing for Glyphosate in Food*, TIME, Feb. 17, 2016, *available at* http://time.com/4227500/fda-glyphosate-testing/?xid=tcoshare.

[57] U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-15-38, *FDA and USDA Should Strengthen Pesticide Residue Monitoring Programs and Further Disclose Monitoring Limitations* (2014), *available at* http://www.gao.gov/products/GAO-15-38.

[58] Carey Gillam, *FDA to Start Testing for Glyphosate in Food, supra* note 56.

29

seek action if pesticide residues exceed enforcement guidelines.[59]

### *EU Delays Vote on Glyphosate Renewal*

96.     On March 7 and 8, 2016, experts from the 28 European Union member states met to vote on reapproving a 15-year license for glyphosate. The current license for glyphosate is scheduled to expire at the end of June 2016.[60] This deadline has been extended yet again, and a vote is expected by the member states by the end of the year.[61]

97.     On March 4, 2016, The Guardian reported that France, the Netherlands and Sweden did not support the EFSA's assessment that glyphosate was harmless.[62] The paper reported the Swedish environment minister, Åsa Romson, as stating:

> We won't take risks with glyphosate and we don't think that the analysis
>
> done so far is good enough. We will propose that no decision is taken until
>
> further analysis has been done and the EFSA scientists have been more
>
> transparent about their considerations.[63]

98.     The Netherlands, in particular, argued that the relicensing should be put on hold until after a separate evaluation of glyphosate's toxicity can be conducted.[64]

99.     Leading up to the vote, Italy joined the other EU states in opposing the license renewal, citing health concerns.[65]

100.    On March 8, 2016, the EU ultimately decided to delay its vote and was scheduled to

---

[59] Id.; U.S. FOOD AND DRUG ADMINISTRATION, Pesticide Q&A, *available at*
http://www.fda.gov/Food/FoodborneIllnessContaminants/Pesticides/ucm114958.htm (last visited April 19, 2016).
[60] Arthur Neslen, *Vote on Controversial Weedkiller's European Licence Postponed*, THE GUARDIAN, Mar. 8,
2016, *available at* https://www.theguardian.com/environment/2016/mar/08/eu-vote-on-controversial-weedkiller-licence-postponed-glyphosate.
[61] https://ec.europa.eu/food/plant/pesticides/glyphosate_en.
[62] Arthur Neslen, *EU States Rebel Against Plans to Relicense Weedkiller Glyphosate*, THE GUARDIAN, Mar. 4,
2016, *available at* https://www.theguardian.com/environment/2016/mar/04/eu-states-rebel-against-plans-to-relicense-weedkiller-glyphosate.
[63] Id.
[64] Arthur Neslen, *Vote on Controversial Weedkiller's European Licence Postponed*, *supra* at 62.
[65] Id.

meet again on May 18-19, 2016.[66]

101.    The Guardian quoted a commission spokesperson as stating: "We would like a solid majority to take a decision on this kind of issue and some member states had skeptical [sic] observations that we will have to answer, so it [a postponement] was the wise thing to do."[67]

102.    Growing public awareness and concern over the chemical "led 1.4 million people to sign a petition against glyphosate in the biggest online campaign since neonicotinoid pesticides were banned during the last commission."[68]

103.    On June 6, 2016, a proposal to temporarily extend glyphosate's EU sales license by 12 to 18 months to allow the European Chemicals Agency time to provide an opinion on the health impact of glyphosate failed to garner the necessary majority.[69]  In March of 2017 the European Chemical Agency issued a finding that there was no evidence to link glyphosate to cancer in humans.[70]

104.    On November 9, 2017, the European Commission failed to garner a majority of votes needed to extend the license for glyphosate, resulting in a vote of "no opinion."[71]  Only half of the 28 member states would vote in favor of extending the license for 5 more years, which is currently set to expire on December 15, 2017.[72]  Meanwhile, members of the European Parliament are calling for a panel to investigate the influence Monsanto exerted over the

---

[66] *Id.*

[67] *Id.*

[68] *Id.*

[69] Gabriele Steinhauser, EU Fails to Get Sufficient Majority in Vote to Extend Glyphosate Use, THE WALL STREET JOURNAL, June 6, 2016, *available at* https://www.wsj.com/articles/eu-fails-to-get-sufficient-majority-in-vote-to-extend-glyphosate-use-1465211358.

[70] Philip Blenkinsop, *EU Delays Decision on Herbicide Glyphosate*, REUTERS, October 25, 2017, *available at* https://www.reuters.com/article/us-eu-health-glyphosate/eu-delays-decision-on-herbicide-glyphosate-idUSKBN1CU160.

[71] *EU Fails to Agree License Renewal for Controversial Glyphosate Weedkiller*, FRANCE 24, Nov. 9, 2017, *available at* http://www.france24.com/en/20171109-european-union-glyphosate-fails-agree-licence-renewal-controversial-weedkiller.

[72] *EU Split Over Use of Major Weedkiller Glyphosate*, BBC, Nov. 9, 2017, *available at* http://www.bbc.com/news/world-europe-41928007.

research.

### *Fraud in Concealment of the Dangers posed by Glyphosate and Roundup®*

105.     Monsanto has known about the dangers of glyphosate, and the dangers of glyphosate when mixed with surfactants, before it was approved by the EPA for use, after approval when it began manufacturing Roundup, when it continued to sell Roundup, when it began selling Roundup® Ready seeds, and when the IRAC issued its findings. It engaged in a sophisticated and expansive operation to conceal the dangers of glyphosate and suppress any dissenting voices. This strategy has multiple facets.

106.     Monsanto first ghost writes articles and then gives them to authors to publish under their own name, without any mention of Monsanto's drafting for funding. Thereafter, Monsanto cites to these articles and authors as authoritative and controlling. All the while, no one discloses Monsanto's involvement. Specifically, Monsanto provided Henry Miller with a "quality draft" to later be published in Forbes, in their efforts to dispel growing concerns regarding the safety of glyphosate after the IRAC issued its findings. [73, 74]

107.     Initially a study by Professor GE Seralini found glyphosate to potentially be carcinogenic.[75] He wrote a report detailing his findings, and had it published in journal Food and Chemical Toxicology. Wallace Hayes, the editor in chief of the journal, was under contract with Monsanto and his contractually obligated services started just 12 days before the publication of the study. Later, Wallace Hayes, as editor in chief, oversaw the review and ultimately the retracted of the study.

---

[73] Danny Hakim, *Monsanto Emails Raise Issue of Influencing Research on Roundup Weed Killer*, N.Y. TIMES, Aug. 1, 2017, *available at* https://www.nytimes.com/2017/08/01/business/monsantos-sway-over-research-is-seen-in-disclosed-emails.html.

[74] Jacob Bunge, *Monsanto Employee Emails Show Efforts to Marshal Scientists*, FOX BUSINESS, Aug. 3, 2017, *available at* http://www.foxbusiness.com/features/2017/08/03/monsanto-employee-emails-show-efforts-to-marshal-scientists.html.

[75] Danny Hakim, *Monsanto Emails Raise Issue of Influencing Research on Roundup Weed Killer*, *supra* at 73.

108. Monsanto has strong ties to government officials. When the ties to Jess Rowland, an EPA official at the time became public, he resigned his office to avoid scrutiny.[76] In June of 2015, Monsanto was emailing Jack Housenger about the possibility of the Department of Health and Human Services conducting a study on the safety of glyphosate.[77] Another Monsanto employee, Eric Sachs texted Mary Manibusan, an EPA toxicologist, that "[Monsanto was] trying to do everything [it] can to keep from having a domestic IARC occur w [sic] this group." Internally, Monsanto was worried because the Department was "VERY conservative and IARC like . . .." Mr. Housenger reassured Monsanto executives that the study was postponed and it was unlikely that HHS would not come to the same conclusion as the EPA.

109. Monsanto's own scientists expressed concerns regarding the safety of Roundup. In 2001, a Monsanto scientist wrote "If somebody came to me and said they wanted to test Roundup I know how I would react – with serious concern." Knowing that there are concerns regarding the safety of Roundup® lead one executive to write "You cannot say that Roundup is not a carcinogen ... we have not done the necessary testing on the formulation to make that statement." Instead, she added, that "we can make that statement about glyphosate and can infer that there is no reason to believe that Roundup would cause cancer."

110. Monsanto ensured studies found that glyphosate was not carcinogenic. Furthermore, they made sure to never study glyphosate with surfactants. When the IRAC considered studies that looked at these combinations, their tactic was to smear, discredit, and counter with contrary ghost-written articles.

---

[76] *EPA Officially Accused of Helping Monsanto 'Kill' Cancer Study*, BLOOMBERG NEWS, Mar. 14, 2017, *available at* http://www.fooddemocracynow.org/blog/2017/mar/14.
[77] Carey Giliam, *Collusion or Coincidence? Records Show EPA Efforts to Slow Herbicide Review Came In Coordination with Monsanto*, HUFFPOST, Aug. 17, 2017, *available at* https://www.huffingtonpost.com/entry/collusion-or-coincidence-records-show-epa-efforts_us_5994dad4e4b056a2b0ef02f1.

33

111.     Monsanto knows glyphosate is dangerous, especially when coupled with surfactants. In 2002, a Monsanto executive wrote "What I've been hearing from you is that this continues to be the case with these studies — Glyphosate is O.K. but the formulated product (and thus the surfactant) does the damage." Yet all the while, Monsanto marketed Roundup® as safe for use.

### *Plaintiff Larry Green's Exposure to Roundup®*

112.     Plaintiff Larry Green is 69 years old and used Roundup® regularly beginning in 1978 in his work as a peanut farmer and hobby farmer.

113.     From 1997 through 2005, Mr. Green owned a 15 acre farm in Montgomery County. Mr. Green sprayed a five-gallon drum containing Roundup® on the weeds at the base of the trees, fence line, and around his farm weekly.

114.     During the entire time that Mr. Green was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others. Because Mr. Green did not know that Roundup® was injurious to his health, he did not wear any protective gear while mixing, loading, and/or spraying.

115.     Mr. Green was diagnosed with stage IV large B-cell Lymphoma, a type of Non-Hodgkin Lymphoma. Mr. Green was treated with an intensive regime of chemotherapy commonly referred to as "CHOP" in 2007. Currently, he is receiving infusions of gammaglobulin IV therapy every three weeks because his immune system was destroyed by the NHL and chemotherapy.

116.     Mr. Green was forced to take substantial leave from work because of his illness.

### *Mr. and Mrs. Green's New Reality*

117.     Prior to being diagnosed with NHL, Mr. Green had an active and full life. He was

34

happily married, went out to eat often, visited friends and family, went fishing. He was always busy on some project, he enjoyed his projects. He and his wife, Mrs. Green, went to Gulf Shores, where they had a condominium. They also purchased a house boat on Lake Martin for a get-away vacation.

118.     After Mr. Green was diagnosed with NHL, his quality of life rapidly deteriorated. He lost all of his teeth and now wears dentures. He has no appetite to speak of, and lives off Ensure drinks. He has no immune system, and must take medicine constantly for the rest of his life. He contracted persistent Methicillin-resistant Staphylococcus aureus (MRSA) and has to take antibiotics regularly or risk dying from the infection spreading. He has lost all hope of the MRSA being eradicated, he can only hope to prevent the spread.

119.     The once active man, barely has the energy to sit up on the sofa. If he attempts to go fishing, he can't make it back up the ramp after putting his boat in the water. He has been diagnosed with chronic depression, and takes yet another set of pills to help with that. But there is no cure for it, because he wants to be outside, to be healthy and that can't happen because there is no cure for NHL.

120.     Meanwhile, Mrs. Green must sit by and watch her beloved husband drift away, slowly, day by day. It pains her to see him in this state. She knows he loved the outdoors and being active. She wakes up at night when he has bad fevers, he is delirious, incoherent, and moans from the pain. She does the best she can to comfort him and stays up all night with him because, this might just be the last time she ever sees him alive. After the fever breaks in the morning, she has to get up, shower, get dressed, and go into work like it's just another day because she is the sole income provider now. She works hard to make sure everything on her job is always caught up because there are mornings where she unexpectedly can't go to work that morning because Mr. Green required her help that day.

35

121.    She cannot go out to eat with her husband at night. That used to be a staple of their relationship and social life. They used to have a relationship of mutual care and attention, but Mr. Green is so weak, sick, and frail, he cannot provide the attention he did in the past. Helping around the house. Aiding Mrs. Green when she is sick. Having intimate relations. Going on vacation. Attending a wedding together, celebrating life. Mr. Green loves his wife, but can no longer outwardly, physically show the affection and love he used to because the NHL and treatments take all of his energy and stamina.

122.    They enjoyed time out and with friends. Now anytime someone visits, it is carefully regulated and rare. The holidays, once a joyous reunion of family, are now hated and dreaded. The family comes from far away to see their brother, uncle, father, grandfather one last time because they all know it might just very well be the last time they ever see him. The pain on their faces makes Mrs. Green sick and heartbroken. Mr. Green can't have the grandchildren sit on his lap or play with them like he used to. He doesn't have the energy or stamina, and even if he did, he can't risk them giving him an illness.

123.    This is not how Mr. and Mrs. Green planned to spend their 60's; they planned to retire, travel, and see friends and family. Instead, they are spending their 60's going from one round of chemotherapy, to another doctor's appointment, to the sofa, while Mrs. Green then goes to work.

124.    And the farm sits there. The apple trees. The plum trees. The peach trees. The persimmon trees. The grape vines. The fences.    The farm was Mr. Green's dream and the grandchildren's playground. Now it haunts Mrs. Green with the constant reminder as to what caused this.

36

## COUNT ONE

### STRICT LIABILITY (DESIGN DEFECT)

125.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

126.   Plaintiff brings this strict liability claim against Defendant for defective design.

127.   At all times relevant to this litigation, Defendant engaged in the business of researching, testing, developing, designing, licensing, formulating, manufacturing, producing, assembling, packaging, labeling, advertising, promoting, marketing, selling, supplying, and/or distributing Roundup® products throughout the United States, including the State of Alabama, which are defective and unreasonably dangerous to consumers and users and other persons coming into contact with them, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant. At all times relevant to this litigation, Defendant researched, tested, developed, designed, licensed, formulated, manufactured, produced, assembled, packaged, labeled, advertised, promoted, marketed, sold, supplied and distributed the Roundup® products used by Plaintiff and/or to which Plaintiff was exposed, as described above.

128.   At all times relevant to this litigation, Defendant's Roundup® products were manufactured, designed and labeled in an unsafe, defective and unreasonably dangerous manner that was unreasonably dangerous for use by or exposure to the public, and, in particular, to Plaintiff, making it unreasonably dangerous to the human body when being used in a foreseeable manner.

129.   At all times relevant to this litigation, Defendant's Roundup® products, including their component parts and/or ingredients, reached the intended consumers, handlers and users or

37

other persons coming into contact with these products in Alabama and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled and marketed by Defendant.

130. Defendant's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, produced, assembled, packaged, labeled, advertised, promoted, marketed, sold, supplied and distributed by Defendant, were defective in design and formulation in that when they left the hands of the Defendant's manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

131. Defendant's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, advertised, promoted, marketed, sold, supplied and distributed by Defendant were defective in design and formulation in that when they left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risk associated with these products' reasonably foreseeable uses exceeded the alleged benefits associated with their design and formulation.

132. Therefore, at all times relevant to this litigation, Defendant's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, produced, assembled, packaged, labeled, advertised, promoted, marketed, sold, supplied and distributed by Defendant were defective in design and formulation, in one or more of the following ways:

a. When placed in the stream of commerce, Defendant's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b. When placed in the stream of commerce, Defendant's Roundup® products were

38

unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c.      When placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d.      Defendant did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate.

e.      Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweighs any potential utility stemming from the use of the herbicide.

f.      Defendant knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g.      Defendant did not conduct adequate post-marketing surveillance of its Roundup® products.

h.      Defendant could have employed safer alternative designs and formulations.

133.    At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

134.    Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

135.    The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendant's Roundup® products were and are more dangerous

39

than alternative products and Defendant could have designed its Roundup® products to make them less dangerous. Indeed, at the time that Defendant designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

136. At the time Roundup® products left Defendant's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant's herbicides.

137. Defendant's defective design of its Roundup® products amounts to willful, wanton, and/or reckless conduct by Defendant.

138. Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendant is strictly liable to Plaintiff.

139. The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiff's grave injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained his injuries.

140. The unreasonably and defective nature of the Roundup® products and component parts and/or ingredients, as described herein, created a high probability that when being used in a foreseeable manner and for the purpose for which they were designed and manufactured, would result in severe and permanent personal injuries. The aforesaid defects were not known to Plaintiff and were not discoverable through reasonable inspection.

141. The defective condition of Defendants' Roundup® products and component parts and/or ingredients was the proximate cause of Plaintiff's injuries, and renders Defendant liable to Defendant pursuant to Ala. Code Ann. § 6-5-501 (1975).

40

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

COUNT TWO

STRICT LIABILITY (FAILURE TO WARN)

142.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

143.    Plaintiff brings this strict liability claim against Defendant for failure to warn.

144.    At all times relevant to this litigation, Defendant engaged in the business of researching, testing, developing, designing, licensing, formulating, manufacturing, producing, assembling, packaging, labeling, advertising, promoting, marketing, selling, supplying and distributing Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

145.    Defendant researched, tested, developed, designed, licensed, formulated, manufactured, produced, assembled, assembled, packaged, labeled, advertised, promoted, marketed, sold, supplied, distributed and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiff, and Defendant therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of Roundup® and glyphosate-containing products.

41

146.    At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings and take such steps as necessary to ensure that its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn Plaintiff of the dangers associated with Roundup® use and exposure. Defendant, as manufacturer, seller or distributor of chemical herbicides is held to the knowledge of an expert in the field.

147.    At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

148.    At all times relevant to this litigation, Defendant failed to investigate, study, test or promote the safety or to minimize the dangers to users and consumers of its Roundup® products and to those who would foreseeably use or be harmed by Defendant's herbicides, including Plaintiff.

149.    Despite the fact that Defendant knew or should have known that Roundup® products posed a grave risk of harm, it failed to warn of the dangerous risks associated with their use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant, through appropriate research and testing by known methods, at the time it distributed, supplied or sold the product, and not known to end users and consumers, such as Plaintiff.

150.    Defendant knew or should have known that its Roundup® and glyphosate- containing

42

products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products. Defendant wrongfully concealed information concerning the dangerous nature of Roundup® products and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® products and glyphosate.

151.    At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers and users or other persons coming into contact with these products in Alabama and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled and marketed by Defendant.

152.    At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

153.    Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge and judgment of Defendant.

154.    Defendant knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, but they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural, horticultural, and at-home use applications.

43

155.    The information that Defendant did provide or communicate failed to contain relevant warnings, hazards and precautions that would have enabled and at-home users such as Plaintiff to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false and misleading and which failed to communicate accurately or adequately the comparative severity, duration and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

156.    To this day, Defendant failed to adequately and accurately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup® products and the products' active ingredient glyphosate, a probable carcinogen.

157.    As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiff in the course of his and at-home use.

158.    Defendant is liable to Plaintiff for injuries caused by its failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its Roundup® products and the risks associated with its use of or exposure to Roundup® products and glyphosate.

159.    The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiff's injuries, and, but for Defendant's misconduct and omissions,

44

Plaintiff would not have sustained his injuries.

160.     Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup® products, Plaintiff could have avoided the risk of developing injuries as alleged herein and could have obtained alternative herbicides.

161.     The defective condition of Defendant's Roundup® products and component parts and/or ingredients was the proximate cause of Plaintiff's injuries, and renders Defendant liable to Plaintiff pursuant to Ala. Code Ann. § 6-5-501 (1975).

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

COUNT THREE

NEGLIGENCE

162.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

163.     Defendant, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted and/or used by Plaintiff.

164.     At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the research, testing, development, design, licensing, formulation, manufacturing, production, assembly, packaging, labeling, advertisement, promotion, marketing, sale, supply and distribution of its Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote and/or sell a product that was not unreasonably dangerous to consumers, users and other persons coming into contact with the product.

165. At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement and sale of its Roundup® products. Defendant's duty of care owed to consumers and the general public included providing accurate, true and correct information concerning the risks of using Roundup® products and appropriate, complete and accurate warnings concerning the potential adverse effects of exposure to Roundup® products, and, in particular, its active ingredient glyphosate.

166. At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® products, and specifically, the carcinogenic properties of the chemical glyphosate.

167. Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

168. Defendant knew or, in the exercise of reasonable care, should have known that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup®'s adjuvants and "inert" ingredients and/or the surfactant POEA were necessary to protect Plaintiff from Roundup® products.

169. Defendant knew or, in the exercise of reasonable care, should have known that tests limited to Roundup®'s active ingredient glyphosate were insufficient to prove the safety or Roundup® products.

170. Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® products were unaware of the risks and the magnitude of

the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

171.    As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the research, testing, development, design, licensing, formulation, manufacture, production, assembly, packaging, labeling, advertisement, promotion, marketing, sale, supply and distribution of its Roundup® products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects and failed to prevent or adequately warn of these risks and injuries.

172.    Defendant failed to appropriately and adequately test Roundup®, Roundup®'s adjuvants and "inert" ingredients and/or the surfactant POEA to protect Plaintiff from Roundup® products.

173.    Despite its ability and means to investigate, study and test its products and to provide adequate warnings, Defendant failed to do so. Defendant wrongfully concealed information and further made false and/or misleading statements concerning the safety and/or exposure to Roundup® products and glyphosate.

174.    Defendant's negligence included:

a.    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

b.    Manufacturing, producing, promoting, formulating, creating, developing,

47

designing, selling and/or distributing Roundup® products while negligently and/or intentionally concealing and failing to disclose the results of trials, tests and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c.      Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture, horticulture and at-home use;

d.      Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup®, and the propensity of these ingredients to render Roundup® toxic, increase the toxicity of Roundup®, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup®, and whether or not "inert" ingredients and/or adjuvants were safe for use;

e.      Failing to use reasonable and prudent care in the design, research, manufacture and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

f.      Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

g.      Failing to provide adequate instructions, guidelines and safety precautions to those persons who Defendant could reasonably foresee would use and be exposed to its Roundup® products;

h.      Failing to disclose to Plaintiffs, users/consumers and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

48

i.      Failing to warn Plaintiff, consumers and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other consumers;

j.      Systematically suppressing or downplaying contrary evidence about the risks, incidence and prevalence of the side effects of Roundup® and glyphosate-containing products;

k.      Representing that its Roundup® products were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended use;

l.      Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

m.      Advertising, marketing and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® products and glyphosate;

n.      Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup® products are not unsafe for use in the agricultural and horticultural industries and/or at-home use; and

o.      Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

175.      Defendant knew and/or should have known that it was foreseeable that consumers and/or users, such as Plaintiff, would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution and sale of

49

Roundup® products.

176.   Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® products or its active ingredient glyphosate.

177.   Defendant's negligence was the proximate cause of the injuries, harm and economic losses that Plaintiff suffered and will continue to suffer, as described herein.

178.   Defendant's conduct, as described above, was reckless. Defendant regularly risks the lives of consumers and users of its products, including Plaintiff, with full knowledge of the dangers of its products. Defendant made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff. Defendant's reckless conduct therefore warrants an award of punitive damages.

179.   As a proximate result of Defendant's wrongful acts and omissions in placing its defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff suffered and continues to suffer severe and permanent physical and emotional injuries. Plaintiff endured pain and suffering, suffered economic losses (including significant expenses for medical care and treatment) and will continue to incur such expenses in the future.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## COUNT FOUR

### GROSS NEGLIGENCE AND WANTONNESS

180.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

181.    Defendant, wantonly researched or failed to research, tested or failed to test, developed, designed, licensed, formulated, manufactured, assembled, packaged, labeled, advertised, promoted, marketed, sold, supplied and distributed the Roundup® products used by Plaintiff, and said wanton conduct was a proximate cause of the injuries to Plaintiff.

182.    At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the researching, testing, development, design, licensing, formulation, manufacturing, production, assembly, packaging, labeling, advertisement, promotion, marketing, sale, supply and distribution of its Roundup® products in order to provide a safe product, and to take steps necessary to research, test, develop, design, license, formulate, manufacture, produce, assemble, package, label, advertise, promote, market, sell, supply and/or distribute its Roundup® products so as not to subject the users to an unreasonable risk of injury, harm or death. Further, Defendant had a duty to foreseeable consumers and/or users of Roundup® products to exercise the same degree of care, diligence and skill in researching, testing, developing, designing, licensing, formulating, manufacturing, producing, assembling, packaging, labeling, advertising, promoting, marketing, selling, supplying and distributing its Roundup® products as other similar entities would have exercised.

183.    At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the advertisement, promotion, marketing and sale of its Roundup® products. Defendant's duty of care owed to consumers and the general public included providing accurate, true and correct information concerning the risks of using Roundup® products and appropriate, complete and accurate warnings concerning the potential adverse effects of exposure to Roundup® products, and, in particular, its active ingredient glyphosate.

184.    At all times relevant to this litigation, Defendant knew or, in the exercise of

51

reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

185.     Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

186.     Defendant knew or, in the exercise of reasonable care, should have known that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup®'s adjuvants and "inert" ingredients and/or the surfactant POEA were necessary to protect Plaintiff from Roundup® products.

187.     Defendant knew or, in the exercise of reasonable care, should have known that tests limited to Roundup®'s active ingredient glyphosate were insufficient to prove the safety of Roundup® products.

188.     Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® products were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

189.     As such, Defendant breached its duty of reasonable care and failed to exercise reasonable care in the research, testing, development, design, licensing, manufacture, production, assembly, packaging, labeling, advertisement, promotion, marketing, sale, supply and distribution of its Roundup® products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or

52

consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects and failed to prevent or adequately warn of these risks and injuries.

190. Defendant failed to appropriately and adequately test Roundup®, Roundup®'s adjuvants and "inert" ingredients and/or the surfactant POEA to protect Plaintiff from Roundup® products.

191. Despite Defendant's ability and means to investigate, study and test its products and to provide adequate warnings, Defendant failed to do so. Defendant wrongfully concealed information and further made false and/or misleading statements concerning the safety and/or exposure to Roundup® products and glyphosate.

192. Defendant gross negligently and/or wantonly researched, tested, developed, designed, licensed, formulated, manufactured, produced, assembled, packaged, labeled, advertised, promoted, marketed, sold, supplied and distributed Roundup® products and Roundup® products' component parts and/or ingredients in an unreasonably dangerous and defective condition. Specifically, Defendant's gross negligence and/or wantonness included:

a. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, supplying and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

b. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, supplying and/or distributing Roundup® products while negligently and/or intentionally concealing and failing to disclose the results of trials, tests and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products

53

were safe for their intended use in agriculture, horticulture and at-home use;

d.      Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup®, and the propensity of these ingredients to render Roundup® toxic, increase the toxicity of Roundup®, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup®, and whether or not "inert" ingredients and/or adjuvants were safe for use;

e.      Failing to use reasonable and prudent care in the design, research, manufacture and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

f.      Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

g.      Failing to provide adequate instructions, guidelines and safety precautions to those persons who Defendant could reasonably foresee would use and be exposed to its Roundup® products;

h.      Failing to disclose to Plaintiffs, users/consumers and the general public that use of and exposure to Roundup® products presented severe risks of cancer and other grave illnesses;

i.      Failing to warn Plaintiff, consumers and the general public that the products' risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other consumers;

j.      Systematically suppressing or downplaying contrary evidence about the risks, incidence and prevalence of the side effects of Roundup® and glyphosate- containing products;

k.      Representing that its Roundup® products were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended use;

l.      Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

m.      Advertising, marketing and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® products and glyphosate;

n.      Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup® products are not unsafe for use in the agricultural and horticultural industries and/or at-home use; and

o.      Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

193.    Defendant knew and/or should have known that it was foreseeable that consumers and/or users, such as Plaintiff, would suffer injuries as a result of Defendant's failure to exercise reasonable care in the manufacturing, marketing, labeling, distribution, supply and sale of Roundup® products.

194.    By grossly and wantonly researching or failing to research, testing or failing to test, developing, designing, licensing, formulating, manufacturing, producing, assembling, packaging, labeling, advertising, promoting, marketing, selling and distributing Roundup® products, Defendant failed to use that degree of care, diligence and skill as other similar entities in that it failed to conduct adequate testing to adopt safer, practical, feasible and

55

otherwise reasonable alternative designs that could have been reasonably adopted and would have prevented Plaintiff's purchasing these Roundup® products and/or prevented his illness. Said wanton conduct of Defendant was a proximate cause of Plaintiff's injuries.

195.    Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® products or its active ingredient glyphosate.

196.    Defendant's gross negligence and/or wantonness was the proximate cause of the injuries, harm and economic losses that Plaintiff suffered and will continue to suffer, as described herein.

197.    Defendant's conduct, as described above, was grossly negligent and/or wanton. Defendant regularly risks the lives of consumers and users of its products, including Plaintiff, with full knowledge of the dangers of its products. Defendant made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff. Defendant's grossly negligent and/or wanton conduct therefore warrants an award of punitive damages.

198.    By consciously doing (and not doing) the acts set forth above, Defendant knew that from doing the acts (or not doing the acts) that injury would likely or probably result.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## COUNT FIVE

## NEGLIGENT FAILURE TO WARN

199.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

200.    Defendant, as the designer, manufacturer, seller and/or distributor of Roundup®

products had a duty to foreseeable consumers and Plaintiff of the subject Roundup® products

to exercise that same degree of care, diligence and skill to adequately warn and/or instruct

them about the hazards and dangerous conditions related to the use of Roundup® products

in their intended manner as other manufacturers and distributors would have exercised.

Defendant negligently failed to warn foreseeable users, including Plaintiff, of the dangers

associated with the use of Roundup® products, due to their defective and unsafe condition as

described herein, and such negligent failure to warn was a proximate cause of Plaintiff's

injuries.

201.    Defendant was in a superior position to Plaintiff to be aware of the dangerous and

defective condition of the Roundup® products and the component parts and/or ingredients,

specifically in that Defendant knew or should have known that:

    a.    Defendant manufactured, produced, promoted, formulated, created, developed,

    designed, sold and/or distributed its Roundup® products without thorough and

    adequate pre- and post-market testing;

    b.    Defendant manufactured, produced, promoted, formulated, created, developed,

    designed, sold and/or distributed Roundup® products while negligently and/or

    intentionally concealing and failing to disclose the results of trials, tests and studies

    of exposure to glyphosate, and, consequently, the risk of serious harm associated with

    human use of and exposure to Roundup® products;

    c.    Defendant failed to undertake sufficient studies and conduct necessary tests

    to determine whether or not Roundup® products and glyphosate-containing products

    were safe for their intended use in agriculture, horticulture and at-home use;

d.      Defendant failed to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup®, and the propensity of these ingredients to render Roundup® toxic, increase the toxicity of Roundup®, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup®, and whether or not "inert" ingredients and/or adjuvants were safe for use;

e.      Defendant failed to use reasonable and prudent care in the design, research, manufacture and development of Roundup® products so as to avoid the risk of serious harm and injury associated with the prevalent use of Roundup®/glyphosate as an herbicide;

f.      Defendant failed to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

g.      Defendant failed to provide adequate instructions, guidelines and safety precautions to those persons who Defendant could reasonably foresee would use and be exposed to its Roundup® products;

h.      Defendant failed to disclose to Plaintiff, users/consumers and the general public that use of and exposure to Roundup® products presented severe risks of cancer and other grave illnesses;

i.      Defendant failed to warn Plaintiff, consumers and the general public that the products' risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other consumers;

j.      Defendant systematically suppressed or downplayed contrary evidence about the risks, incidence and prevalence of the side effects of Roundup® and glyphosate-containing products;

58

k. Defendant represented that its Roundup® products were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended use;

l. Defendant declined to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

m. Defendant was advertising, marketing and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® products and glyphosate;

n. Defendant continued to disseminate information to its consumers, which indicated or implied that Defendant's Roundup® products are not unsafe for use in the agricultural and horticultural industries and/or at-home use; and

o. Defendant continued the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

202. Defendant researched or failed to research, tested or failed to test, developed, designed, licensed, formulated, manufactured, assembled, packaged, labeled, advertised, promoted, marketed, sold, supplied and distributed the Roundup® products used by Plaintiff, and said negligent conduct and failure to warn of the same was a proximate cause of the injury to Plaintiff.

203. At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the researching, testing, development, design, licensing, formulation, manufacturing, production, assembly, packaging, labeling, advertisement, promotion, marketing, sale, supply and distribution of its Roundup® products in order to provide a safe product, and to

take steps necessary to research, test, develop, design, license, formulate, manufacture, produce, assemble, package, label, advertise, promote, market, sell, supply and/or distribute its Roundup® products so as not to subject the users to an unreasonable risk of injury, harm or death. Further, Defendant had a duty to foreseeable consumers and/or users of Roundup® products to exercise the same degree of care, diligence and skill in researching, testing, developing, designing, licensing, formulating, manufacturing, producing, assembling, packaging, labeling, advertising, promoting, marketing, selling, supplying and distributing its Roundup® products as other similar entities would have exercised.

204.    At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the advertisement, promotion, marketing and sale of its Roundup® products. Defendant's duty of care owed to consumers and the general public included providing accurate, true and correct information concerning the risks of using Roundup® products and appropriate, complete and accurate warnings concerning the potential adverse effects of exposure to Roundup® products, and, in particular, its active ingredient glyphosate.

205.    At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

206.    Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff, by failing to warn of the defective condition of the Roundup® products.

207.    Defendant knew or, in the exercise of reasonable care, should have known that

60

Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup®'s adjuvants and "inert" ingredients and/or the surfactant POEA were necessary to protect Plaintiff from Roundup® products.

208. Defendant knew or, in the exercise of reasonable care, should have known that tests limited to Roundup®'s active ingredient glyphosate were insufficient to prove the safety of Roundup® products.

209. Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® products were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

210. As such, Defendant breached its duty of reasonable care and failed to exercise reasonable care in the research, testing, development, design, licensing, manufacture, production, assembly, packaging, labeling, advertisement, promotion, marketing, sale, supply and distribution of its Roundup® products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects and failed to prevent or adequately warn of these risks and injuries.

211. Defendant failed to appropriately and adequately test Roundup®, Roundup®'s adjuvants and "inert" ingredients and/or the surfactant POEA to protect Plaintiff from Roundup® products.

212. Despite Defendant's ability and means to investigate, study and test its products and to provide adequate warnings, Defendant failed to do so. Defendant wrongfully concealed

61

information and further made false and/or misleading statements concerning the safety and/or exposure to Roundup® products and glyphosate.

213.     Defendant negligently researched, tested, developed, designed, licensed, formulated, manufactured, produced, assembled, packaged, labeled, advertised, promoted, marketed, sold, and distributed Roundup® products and Roundup® products' component parts and/or ingredients in an unreasonably dangerous and defective condition.

214.     Defendant knew and/or should have known that it was foreseeable that consumers and/or users, such as Plaintiff, would suffer injuries as a result of Defendant's failure to exercise reasonable care in the manufacturing, marketing, labeling, distribution and sale of Roundup® products.

215.     Defendant had an obligation to inform consumers and/or users, such as Plaintiff of these defects. Further, Defendant had a superior opportunity to inspect, test and research the Roundup® products and become aware of these defects over and above Plaintiff. The absence of adequate warnings and instructions created an unreasonably dangerous condition and the risk to foreseeable consumers and users of Roundup® products that Defendant knew or should have known about in the exercise of ordinary care. Defendant breached said duty, and negligently failed to warn Plaintiff of the defective condition of its Roundup® products.

216.     Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® products or its active ingredient glyphosate.

217.     Defendant's wrongful conduct in failing to warn of the defective condition of its Roundup® products, as set out herein, was the proximate cause of the injuries, harm and economic losses that Plaintiff suffered and will continue to suffer, as described herein.

218.     Defendant's conduct, as described above, was negligent. Defendant regularly risks the

62

lives of consumers and users of its products, including Plaintiff, with full knowledge of the dangers of its products. Defendant made conscious decisions not to redesign, re- label, warn, or inform the unsuspecting public, including Plaintiff. Defendant's negligent conduct therefore warrants an award of punitive damages.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

COUNT SIX

GROSS NEGLIGENCE AND WANTON FAILURE TO WARN

219. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

220. Defendant, as the designer, manufacturer, seller and/or distributor of Roundup® products had a duty to foreseeable consumers and Plaintiff of the subject Roundup® products to exercise that same degree of care, diligence and skill to adequately warn and/or instruct them about the hazards and dangerous conditions related to the use of Roundup® products in their intended manner as other manufacturers and distributors would have exercised. Defendant gross negligently and wantonly failed to warn foreseeable users, including Plaintiff, of the dangers associated with the use of Roundup® products, due to their defective and unsafe condition as described herein, and such gross negligent and wanton failure to warn was a proximate cause of Plaintiff's injuries.

221. Defendant was in a superior position to Plaintiff to be aware of the dangerous and defective condition of its Roundup® products and the component parts and/or ingredients, specifically in that Defendant knew or should have known that:

63

a.      Defendant manufactured, produced, promoted, formulated, created, developed, designed, sold and/or distributed its Roundup® products without thorough and adequate pre- and post-market testing;

b.      Defendant manufactured, produced, promoted, formulated, created, developed, designed, sold and/or distributed Roundup® products while negligently and/or intentionally concealing and failing to disclose the results of trials, tests and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup® products;

c.      Defendant failed to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture, horticulture and at-home use;

d.      Defendant failed to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup®, and the propensity of these ingredients to render Roundup® toxic, increase the toxicity of Roundup®, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup®, and whether or not "inert" ingredients and/or adjuvants were safe for use;

e.      Defendant failed to use reasonable and prudent care in the design, research, manufacture and development of Roundup® products so as to avoid the risk of serious harm and injury associated with the prevalent use of Roundup®/glyphosate as an herbicide;

f.      Defendant failed to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

g.      Defendant failed to provide adequate instructions, guidelines and safety

precautions to those persons who Defendant could reasonably foresee would use and be exposed to its Roundup® products;

h.      Defendant failed to disclose to Plaintiff, users/consumers and the general public that use of and exposure to Roundup® products presented severe risks of cancer and other grave illnesses;

i.      Defendant failed to warn Plaintiff, consumers and the general public that the products' risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other consumers;

j.      Defendant systematically suppressed or downplayed contrary evidence about the risks, incidence and prevalence of the side effects of Roundup® and glyphosate-containing products;

k.      Defendant represented that its Roundup® products were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended use;

l.      Defendant declined to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

m.      Defendant was advertising, marketing and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® products and glyphosate;

n.      Defendant continued to disseminate information to its consumers, which indicated or implied that Defendant's Roundup® products are not unsafe for use in the agricultural and horticultural industries and/or at-home use; and

65

o.      Defendant continued the manufacture and sale of its products with the
knowledge that the products were unreasonably unsafe and dangerous.

222.    Defendant researched or failed to research, tested or failed to test, developed,
designed, licensed, formulated, manufactured, assembled, packaged, labeled, advertised,
promoted, marketed, sold, supplied and distributed the Roundup® products used by Plaintiff,
and said gross negligent and wanton conduct and failure to warn of the same was a proximate
cause of the injury to Plaintiff.

223.    At all times relevant to this litigation, Defendant had a duty to exercise reasonable
care in the researching, testing, development, design, licensing, formulation, manufacturing,
production, assembly, packaging, labeling, advertisement, promotion, marketing, sale,
supply and distribution of its Roundup® products in order to provide a safe product, and to
take steps necessary to research, test, develop, design, license, formulate, manufacture,
produce, assemble, package, label, advertise, promote, market, sell, supply and/or distribute
its Roundup® products so as not to subject the users to an unreasonable risk of injury, harm
or death. Further, Defendant had a duty to foreseeable consumers and/or users of Roundup®
products to exercise the same degree of care, diligence and skill in researching, testing,
developing, designing, licensing, formulating, manufacturing, producing, assembling,
packaging, labeling, advertising, promoting, marketing, selling, supplying and distributing
its Roundup® products as other similar entities would have exercised.

224.    At all times relevant to this litigation, Defendant had a duty to exercise reasonable
care in the advertisement, promotion, marketing and sale of its Roundup® products.
Defendant's duty of care owed to consumers and the general public included providing
accurate, true and correct information concerning the risks of using Roundup® products and

appropriate, complete and accurate warnings concerning the potential adverse effects of exposure to Roundup® products, and, in particular, its active ingredient glyphosate.

225.     At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

226.     Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff, by failing to warn of the defective condition of the Roundup® products.

227.     Defendant knew or, in the exercise of reasonable care, should have known that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup®'s adjuvants and "inert" ingredients and/or the surfactant POEA were necessary to protect Plaintiff from Roundup® products.

228. .    Defendant knew or, in the exercise of reasonable care, should have known that tests limited to Roundup®'s active ingredient glyphosate were insufficient to prove the safety of Roundup® products.

229.     Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® products were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

230.     As such, Defendant breached its duty of reasonable care and failed to exercise reasonable care in the research, testing, development, design, licensing, manufacture,

67

production, assembly, packaging, labeling, advertisement, promotion, marketing, sale, supply and distribution of its Roundup® products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects and failed to prevent or adequately warn of these risks and injuries.

231.    Defendant failed to appropriately and adequately test Roundup®, Roundup®'s adjuvants and "inert" ingredients and/or the surfactant POEA to protect Plaintiff from Roundup® products.

232.    Despite Defendant's ability and means to investigate, study and test its products and to provide adequate warnings, Defendant failed to do so. Defendant wrongfully concealed information and further made false and/or misleading statements concerning the safety and/or exposure to Roundup® products and glyphosate.

233.    Defendant gross negligently and wantonly researched, tested, developed, designed, licensed, formulated, manufactured, produced, assembled, packaged, labeled, advertised, promoted, marketed, sold, supplied and distributed Roundup® products and Roundup® products' component parts and/or ingredients in an unreasonably dangerous and defective condition.

234.    Defendant knew and/or should have known that it was foreseeable that consumers and/or users, such as Plaintiff, would suffer injuries as a result of Defendant's failure to exercise reasonable care in the manufacturing, marketing, labeling, distribution and sale of Roundup® products.

235.    Defendant had an obligation to inform consumers and/or users, such as Plaintiff of

68

these defects. Further, Defendant had a superior opportunity to inspect, test and research the Roundup® products and become aware of these defects over and above Plaintiff. The absence of adequate warnings and instructions created an unreasonably dangerous condition and the risk to foreseeable consumers and users of Roundup® products that Defendant knew or should have known about in the exercise of ordinary care. Thus, by consciously doing (and not doing) the acts set forth above, Defendant knew that from doing the acts (or not doing the acts) that injury would likely or probably result.

236.    Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® products or its active ingredient glyphosate.

237.    Defendant's wrongful conduct in failing to warn of the defective condition of its Roundup® products, as set out herein, was the proximate cause of the injuries, harm and economic losses that Plaintiff suffered and will continue to suffer, as described herein.

238.    Defendant's conduct, as described above, was negligent. Defendant regularly risks the lives of consumers and users of its products, including Plaintiff, with full knowledge of the dangers of its products. Defendant made conscious decisions not to redesign, re- label, warn or inform the unsuspecting public, including Plaintiff. Defendant's negligent conduct therefore warrants an award of punitive damages.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

COUNT SEVEN

BREACH OF EXPRESS WARRANTY

239.    Plaintiff incorporates by reference each and every allegation set forth in the preceding

69

paragraphs as if fully stated herein.

240. At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

241. Defendant had a duty to exercise reasonable care in the research, testing, development, design, licensing, formulation, manufacture, inspection, production, assembly, packaging, labeling, advertising, promotion, marketing, selling, supply, distribution and release of its Roundup® products, including a duty to:

    a.     ensure that its products did not cause the user unreasonably dangerous side effects;

    b.     warn of dangerous and potentially fatal side effects; and

    c.     disclose adverse material facts, such as the true risks associated with the use of and exposure to Roundup® and glyphosate-containing products, when making representations to consumers and the general public, including Plaintiff.

242. At all times relevant to this litigation, Defendant expressly represented and warranted to the purchasers of its products, by and through statements made by Defendant in labels, publications, package inserts and other written materials intended for consumers and the general public, that its Roundup® products were safe to human health and the environment, effective, fit and proper for their intended use. Defendant advertised, labeled, marketed and promoted Roundup® products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty

70

that its Roundup® products would conform to the representations.

243.    These express representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with the use of and/or exposure to Roundup® products and glyphosate. Defendant knew and/or should have known that the risks expressly included in Roundup® warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendant expressly represented that its Roundup® products were safe and effective, that they were safe and effective for use by individuals such as Plaintiff and/or that they were safe and effective as agricultural herbicides.

244.    The representations about Roundup®, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

245.    Defendant placed its Roundup® products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup® products and their active ingredient glyphosate.

246.    Defendant breached these warranties because, among other things, its Roundup® products were defective, dangerous and unfit for use, did not contain labels representing the true and adequate nature of the risks associated with their use and were not merchantable or safe for their intended, ordinary and foreseeable use and purpose. Specifically, Defendant breached the warranties in the following ways:

      a.    Defendant represented through its labeling, advertising and marketing

71

materials that its Roundup® products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated with use of and/or exposure to Roundup® products and glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings and labels; and

b.      Defendant represented that its Roundup® products were safe for use and fraudulently concealed information that demonstrated that glyphosate, the active ingredient in Roundup® products, had carcinogenic properties, and that its Roundup® products, therefore, were not safer than alternatives available on the market.

247.    On information and belief, Plaintiff justifiably and detrimentally relied on the express warranties and representations of Defendant in the purchase and/or use of its Roundup® products. When Plaintiff made the decision to purchase Roundup®, he reasonably relied upon Defendant to disclose known defects, risks, dangers and side effects of Roundup® products and glyphosate.

248.    Defendant had sole access to material facts concerning the nature of the risks associated with its Roundup® products as expressly stated within its warnings and labels, and Defendant knew that consumers and users such as Plaintiff could not have reasonably discovered that the risks expressly included in Roundup® warnings and labels were inadequate and inaccurate.

249.    Plaintiff had no knowledge of the falsity or incompleteness of Defendant's statements and representations concerning Roundup®.

250.    Plaintiff used and/or was exposed to the use of Roundup® as researched, developed, designed, tested, formulated, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold or otherwise released into the stream of commerce by Defendant.

72

251.    Had the warnings and labels for Roundup® products accurately and adequately set forth the true risks associated with the use of such products, including Plaintiff's injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Plaintiff could have avoided the injuries complained of herein.

252.    As a direct and proximate result of Defendant's wrongful acts and omissions, Plaintiff suffered severe injuries. Plaintiff endured pain and suffering, suffered economic losses (including significant expenses for medical care and treatment), and will continue to incur these expenses in the future.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## COUNT EIGHT

### BREACH OF IMPLIED WARRANTY

253.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

254.    At all times relevant to this litigation, Defendant engaged in the business of researching, testing, developing, designing, licensing, formulating, manufacturing, producing, assembling, packaging, labeling, advertising, promoting, marketing, selling, supplying and distributing its Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce.    These    actions    were    under    the    ultimate    control    and supervision of Defendant.

255.    Before the time Plaintiff used and/or was exposed to the use of the aforementioned

Roundup® products, Defendant impliedly warranted to its consumers— including Plaintiff— that its Roundup® products were of merchantable quality and reasonably safe and fit and suitable for the purposes and/or uses for which they were intended, specifically, as horticultural herbicides.

256. Defendant, however, failed to disclose that Roundup® products have dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries. Roundup® products were and are provided to consumers/users, such as Plaintiff, in a dangerously defective and unsafe condition.

257. Plaintiff is the intended third-party beneficiary of implied warranties made by Defendant to the purchasers of its horticultural herbicides, and as such Plaintiff is entitled to assert this claim.

258. Upon information and belief, Plaintiff reasonably relied upon the skill, superior knowledge and judgment of Defendant and upon its implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose of use.

259. The Roundup® products were expected to reach and did in fact reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendant.

260. At all times relevant to this litigation, Defendant was aware that consumers and users of its products, including Plaintiff, would use Roundup® products as marketed by Defendant, which is to say that Plaintiff was a foreseeable user of Roundup®.

261. Defendant intended that its Roundup® products be used in the manner in which Plaintiff in fact used them and Defendant impliedly warranted each product to be of

74

merchantable quality, safe and fit for such use, despite the fact that Roundup® was not adequately tested or researched.

262.    In reliance upon Defendant's implied warranty, Plaintiff used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendant.

263.    Neither Plaintiff could have reasonably discovered or known of the risks of serious injury associated with Roundup® products or glyphosate.

264.    Defendant breached its implied warranty to Plaintiff in that its Roundup® products were not of merchantable quality, reasonably safe and/or fit for their intended purposes and/or uses for which they were intended; nor were they adequately tested. Instead, the Roundup® products were in a dangerously defective and unsafe condition. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

265.    The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

266.    As a direct and proximate result of Defendant's wrongful acts and omissions Plaintiff suffered severe and permanent physical and emotional injuries.   Plaintiff endured pain and suffering, suffered economic loss (including significant expenses for medical care and treatment) and will continue to incur such expenses in the future.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

Plaintiff also demands a jury trial on the issues contained herein.

COUNT NINE

FRAUD

267.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

268.     Defendant, fraudulently labeled, advertised, promoted, marketed, sold, supplied and distributed the Roundup® products used by Plaintiff, and said fraudulent conduct was a proximate cause of the injuries to Plaintiff.

269.     At all times relevant to this litigation, Defendant had a duty to prevent false statements in the advertisement, promotion, marketing and sale of its Roundup® products. Defendant's duty owed to consumers and the general public included providing accurate, true and correct information concerning the risks of using Roundup® products and appropriate, complete and accurate warnings concerning the potential adverse effects of exposure to Roundup® products, and, in particular, its active ingredient glyphosate.

270.     At all times relevant to this litigation, Defendant knew of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

271.     Accordingly, at all times relevant to this litigation, Defendant knew that use of or exposure to its Roundup® products could cause Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

272.     Defendant knew that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup®'s adjuvants and "inert" ingredients and/or the surfactant POEA were necessary to protect Plaintiff from Roundup® products.

273.     Defendant knew that tests limited to Roundup®'s active ingredient glyphosate were

76

insufficient to prove the safety of Roundup® products.

274. Defendant also knew that users and consumers of Roundup® products were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

275. As such, Defendant intentionally presented false and misleading statements in the research, testing, development, design, licensing, manufacture, production, assembly, packaging, labeling, advertisement, promotion, marketing, sale, supply and distribution of its Roundup® products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew of the defects inherent in its products, knew that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects and failed to prevent or adequately warn of these risks and injuries.

276. Defendant failed to appropriately and adequately test Roundup®, Roundup®'s adjuvants and "inert" ingredients and/or the surfactant POEA to protect Plaintiff from Roundup® products.

277. Despite Defendant's ability and means to investigate, study and test its products and to provide adequate warnings, Defendant failed to do so. Defendant wrongfully concealed information and further made false and/or misleading statements concerning the safety and/or exposure to Roundup® products and glyphosate.

278. Defendant intentionally presented false or misleading statements when it researched, tested, developed, designed, licensed, formulated, manufactured, produced, assembled, packaged, labeled, advertised, promoted, marketed, sold, supplied and distributed Roundup® products and Roundup® products' component parts and/or ingredients in an unreasonably

77

dangerous and defective condition. Specifically, Defendant's intentionally false statements included:

    a.    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, supplying and/or distributing Roundup® products while intentionally concealing and failing to disclose the results of trials, tests and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

    b.    Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup®, and the propensity of these ingredients to render Roundup® toxic, increase the toxicity of Roundup®, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup®, and whether or not "inert" ingredients and/or adjuvants were safe for use;

    c.    Failing to disclose to Plaintiffs, users/consumers and the general public that use of and exposure to Roundup® products presented severe risks of cancer and other grave illnesses;

    d.    Failing to disclose to Plaintiff, consumers and the general public that the products' risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other consumers;

    e.    Systematically suppressing or downplaying contrary evidence about the risks, incidence and prevalence of the side effects of Roundup® and glyphosate- containing products;

    f.    Representing that its Roundup® products were safe for their intended use when, in fact, Defendant knew that the products were not safe for their intended use;

78

g.    Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

h.    Advertising, marketing and recommending the use of the Roundup® products, while concealing and failing to disclose of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® products and glyphosate;

i.    Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup® products are not unsafe for use in the agricultural and horticultural industries and/or at-home use; and

279.    Defendant knew that it was foreseeable that consumers and/or users, such as Plaintiff, would suffer injuries as a result of Defendant's failure to disclose material information in the manufacturing, marketing, labeling, distribution, supply and sale of Roundup® products.

280.    Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® products or its active ingredient glyphosate—Defendant did but chose to conceal this information.

281.    Defendant's fraudulent statements were the proximate cause of the injuries, harm and economic losses that Plaintiff suffered and will continue to suffer, as described herein.

282.    Defendant's conduct, as described above, was misleading and intentional. Defendant regularly risks the lives of consumers and users of its products, including Plaintiff, with full knowledge of the dangers of its products. Defendant made conscious decisions not to re-label, warn, or inform the unsuspecting public, including Plaintiff. Defendant's fraudulent conduct therefore warrants an award of punitive damages.

79

283.   By consciously doing the acts set forth above, Defendant knew that from doing the acts complained of herein that injury would likely or probably result.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

<h2 style="text-align:center">COUNT TEN</h2>

<h2 style="text-align:center">LOSS OF CONSORTIUM</h2>

284.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

285.   As a consequence of the Defendant's defective and unsafe product, Roundup®, as further described above, Mr. Green developed Non-Hodgkin Lymphoma.

286.   Before suffering the injuries resulting from the use of Roundup®, Mr. Green was able to and did perform all the duties of a husband and did perform these duties, including but not limited to maintaining the home, providing love, companionship, affection, society, sexual relations, moral support, and solace to his wife, Mrs. Green.

287.   Mrs. Green suffered from loss of society and consortium as a result of the injuries to her husband.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## PRAYER FOR RELIEF

As a direct and proximate result of the aforesaid acts or failure to act by Monsanto, Plaintiff Larry Green has been damaged, inter alia as follows:

    A.    Economic damages;

    B.    Conscious pain, suffering and mental anguish;

    C.    Loss of future earnings;

    D.    Emotional distress;

    E.    Medical expenses;

    F.    Punitive damages; and

    G.    Other damages as may be shown upon the trial of this civil action.

WHEREFORE, PREMISES CONSIDERED, Plaintiff requests that the jury selected to hear this case render a verdict for Plaintiff, and against Defendant, in an amount which will adequately compensate Plaintiff for the injuries and damages he sustained, and punitive damages consistent with the culpability of Defendant's conduct. Further, Plaintiff requests that the Court enter judgment consistent with the jury's verdict, and that it also award Plaintiff's costs and attorneys' fees, plus interest from the date of judgment.

Respectfully submitted,

BY:

Sherri Lee Mazur
Attorney for Plaintiff

Of Counsel
Mazur Law LLC
1777 Taliaferro Trail
Montgomery, AL 36117
Phone: 334-694-9339
E-Mail: Sherri@SMazurLaw.com

81

BY:

Wesley Walterscheid
Attorney for Plaintiff

Of Counsel
Mazur Law LLC
1777 Taliaferro Trail
Montgomery, AL 36117
Phone: 334-694-9339
E-Mail: Wesley@SMazurLaw.com

## JURY DEMAND

Plaintiff hereby demand a trial by jury on all issues of this cause.

/s/ Sherri Mazur

Sherri Mazur

Wesley Walterscheid

```
Court Name: U S DISTRICT COURT - AL/M
Division: 2
Receipt Number: 4602047542
Cashier ID: mmitchel
Transaction Date: 11/20/2017
Payer Name: WESLEY WALTERSCHEID
-----------------------------------
CIVIL FILING FEE
 For: WESLEY WALTERSCHEID
 Case/Party: D-ALM-2-17-CV-000795-001
 Amount:        $400.00
-----------------------------------
CHECK
 Check/Money Order Num: 5051
 Amt Tendered:  $400.00
-----------------------------------
Total Due:      $400.00
Total Tendered: $400.00
Change Amt:     $0.00

2:17-CV-00795

GREEN, ET AL V. MONSANTO COMPANY
```