PLR2

# Live Database
# U.S. District Court - Eastern District of Tennessee (Greeneville)
# CIVIL DOCKET FOR CASE #: 2:17-cv-00223-PLR-MCLC

Ahrent et al v. Monsanto Company (PLR2)
Assigned to: District Judge Pamela L Reeves
Referred to: Magistrate Judge Clifton L Corker
Cause: 28:1332 Diversity-Personal Injury

Date Filed: 12/11/2017
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Warren Ahrent** represented by **Thomas V Ayala**
Grant & Eisenhofer P.A. (DE)
123 Justison Street
Wilimington, DE 19801
302-622-7000
Fax: 302-622-7100
Email: tayala@gelaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Vicki Ahrent** represented by **Thomas V Ayala**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 12/11/2017 | 1 | COMPLAINT against Monsanto Company (Filing fee $ 400 Receipt Number G2010473), filed by Warren Ahrent, Vicki Ahrent. (Attachments: # 1 Civil Cover Sheet, # 2 Cover Letter, # 3 Envelope) (CAT) (Entered: 12/11/2017) |
| 12/11/2017 | 2 | MOTION for Leave to Appear Pro Hac Vice for Thomas V. Ayala (Filing fee $ 90 Receipt No. G2010472) by Vicki Ahrent, Warren Ahrent. (Attachments: # 1 Certificate of Good Standing, # 2 Envelope) (CAT) (Entered: 12/11/2017) |
| 12/11/2017 | | Clerk's Verification of PHV Requirements is complete for Thomas V. Ayala *regarding document: 2 MOTION for Leave to Appear Pro Hac Vice (Filing fee $ 90 Receipt No. G2010472) filed by Warren Ahrent, Vicki Ahrent* (CAT) (Entered: 12/11/2017) |
| 12/11/2017 | | No summons received with initiating documents. Therefore, summons not issued as to |

| | | |
|---|---|---|
| | | Monsanto Company. (CAT) (Entered: 12/11/2017) |
| 12/11/2017 | 3 | Order Governing Sealing Confidential Information. Signed by District Judge Pamela L Reeves on 12/11/2017. (Copy of Order mailed to Thomas V. Ayala) (CAT) (Entered: 12/11/2017) |
| 12/11/2017 | 4 | Order Governing Depositions. Signed by District Judge Pamela L Reeves on 12/11/2017. (Copy of Order mailed to Thomas V. Ayala) (CAT) (Entered: 12/11/2017) |
| 12/11/2017 | 5 | Order Governing Motions To Dismiss. Signed by District Judge Pamela L Reeves on 12/11/2017. (Copy of Order mailed to Thomas V. Ayala) (CAT) (Entered: 12/11/2017) |
| 12/12/2017 | 6 | ORDER granting 2 Motion for Leave to Appear Pro Hac Vice. Plaintiffs have filed a Motion for admission of Thomas V. Ayala, Esq., pro hac vice in this action [Doc. 2]. The Motion is GRANTED. Counsel MUST register immediately as an CM/ECF user in this district. The registration form can be found at the Court's website, www.tned.uscourts.gov, under Attorney and Electronic Case Filing. Signed by Magistrate Judge Clifton L Corker on 12/12/2017. (Copy of Order mailed to Thomas V. Ayala) (CAT) (Entered: 12/12/2017) |

---

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 12/14/2017 15:01:58 | | | |
| **PACER Login:** | Gran0_559:2553715:4861255 | **Client Code:** | 23540 |
| **Description:** | Docket Report | **Search Criteria:** | 2:17-cv-00223-PLR-MCLC |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| WARREN AHRENT AND VICKI AHRENT, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No.: |
| | § | JURY TRIAL DEMANDED |
| MONSANTO COMPANY, | § | |
| | § | |
| Defendant. | § | |
| | § | |

## I. INTRODUCTION

1. In 1974, Defendant Monsanto began using glyphosate as an herbicide selling glyphosate-containing products under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds. By 2001, 85–90 million pounds of glyphosate was being used annually in American agricultural operations. By 2007, that number grew to 185 million pounds. As of 2013, glyphosate was the world's most widely used herbicide.

2. In 2015, however, the International Agency for Research on Cancer (IARC), an organization within the World Health Organization (WHO), completed an analysis on the toxicity of glyphosate. The IARC convened a panel of seventeen scientists to review publically available information about glyphosate. The study resulted in the publication of an IARC Monograph—the authoritative standard for cancer hazard assessment around the world. The IARC classified glyphosate as a Group 2A hazard,

meaning it is a probable human carcinogen. Additionally, the IARC concluded that there was a positive association between glyphosate exposure and non-Hodgkin's lymphoma and other cancers, such as lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma. In addition, the State of California's Office of Environmental Health Hazard Assessment (OEHHA) listed glyphosate as an agent "known to the state to cause cancer."

3. Since Monsanto began selling Roundup®, the company has misrepresented its safety. Monsanto has proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health. This is untrue. Before glyphosate was approved by the Environmental Protection Agency (EPA), Monsanto knew that glyphosate could pose significant risks to human health, including a risk of causing cancer. This lawsuit seeks to hold Monsanto accountable for this misconduct.

## II. PARTIES

4. Plaintiffs, Warren Ahrent ("Plaintiff") and Vicki Ahrent ("Spouse Plaintiff"), are husband and wife, and are residents and citizens of Washington County, Tennessee. Mr. Ahrent was exposed to Roundup® for approximately 13 years while working on his farm in Tennessee. Mr. Ahrent used Roundup® on a regular basis. As a result of his exposure to Roundup®, he developed diffuse large B-cell lymphoma. He brings this action for personal injuries sustained by exposure to Roundup®.

5. Defendant, Monsanto Company ("Monsanto") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri. Monsanto is

a multinational agrochemical and agricultural biotechnology corporation, and conducts business throughout the United States, including the State of Tennessee.

6. At all times relevant to this complaint, Monsanto manufacture and sold the Roundup® at issue.

7. "Roundup" refers to all formulations of Defendant's Roundup® products.

## III. JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. There is complete diversity of citizenship between the parties. In addition, Plaintiff seeks damages in excess of $75,000, exclusive of interest and costs.

9. This Court has personal jurisdiction over Monsanto because it purposefully availed itself of the benefits of doing business here, and the claims arise from and relate to its business activities here.

10. Venue is proper before this Court pursuant to 28 U.S.C. § 1391 because Plaintiff resides in this district and a substantial part of the events or omissions giving rise to this claim occurred within this judicial district.

## IV. FACTUAL ALLEGATIONS

11. For nearly 40 years, farmers around the world have used Roundup® without knowing the dangers its use poses. That is because, when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. However, history has demonstrated otherwise. According to the World Health Organization ("WHO"), the main chemical ingredient of Roundup®—glyphosate—is a probable carcinogen. Those most at risk are farm workers and other individuals with substantial exposure to Roundup®, such as workers in garden centers, nurseries, and

landscapers. Meanwhile, Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto reported misleading data and attacked legitimate studies exposing glyphosate's dangers. As a result of this misleading conduct, consumers have been exposed to a carcinogen, while Monsanto has made billions in profits.

### A. THE DISCOVERY OF GLYPHOSATE AND DEVELOPMENT OF ROUNDUP®.

12. Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world, including the popular herbicide Roundup®. As a systemic herbicide, glyphosate is absorbed by the plant's roots, stems, or foliage and is translocated throughout the plant. Glyphosate prevents the plant's ability to form aromatic amino acids necessary for protein synthesis and therefore results in plant death. Plants treated with glyphosate generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce, or by milling, baking, or brewing grains.

13. The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup® and was marketed as a safe general-purpose herbicide for commercial and consumer use.

### B. REGISTRATION OF HERBICIDES

14. The manufacture, formulation, and distribution of herbicides, such as Roundup®, is regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. §§ 136 *et seq.* FIFRA requires that all pesticides be registered with the EPA prior to distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

15. Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The EPA does not deem certain products "safe," but only that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment," and such an observation is based only on the information available at that time. 7 U.S.C. § 136a(c)(5)(D).

16. FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

17. FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conduct the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting those tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, to perform the tests that are required of the manufacturer.

18. The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data

necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a process called "re-registration." 7 U.S.C. § 136a-1. To reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

19. In the case of glyphosate, the EPA planned on releasing its preliminary risk assessment—in relation to the re-registration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it has delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

### C. The Importance of Roundup® To Monsanto's Market Dominance

20. Sales of Roundup® were essential to Monsanto's continued dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in 2000, Monsanto needed a strategy to maintain its Roundup® market dominance.

21. In response, Monsanto began the development and sale of genetically engineered "Roundup® Ready" seeds in 1996. Roundup® Ready crops are resistant to glyphosate, so farmers can spray Roundup® onto their fields during the growing season to kill weeds without harming the crops. This product enabled Monsanto to expand its market for Roundup® even further. By 2000, Monsanto's engineered seeds were planted in more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup® Ready seeds.

22. Through a three-pronged strategy of increased production, decreased prices, and by coupling with Roundup® Ready seeds, Roundup® became Monsanto's

most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate-containing products remain one of the world's most frequently sold herbicides.

### D. THE ASSESSMENT AND CLASSIFICATION OF GLYPHOSATE

23. The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

24. The procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of conflicts of interest.

25. A year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of available literature, evaluates the evidence in each category, and completes the evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in The Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

26. In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

27. In March 2015, the IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

28. On July 29, 2015, the IARC issued its Monograph for glyphosate, Monograph Volume 112. For Volume 112, the Working Group consisted of 17 experts from 11 countries who met from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated after a nearly one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

29. The studies considered the various exposure groups, including exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland, municipal weed-control workers in the United Kingdom, and exposures among farming families.

30. Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most widely used herbicide in the world in 2012.

31. Human exposure pathways were identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

32. The assessment of the IARC Working Group identified several case control studies of exposure in the United States, Canada, and Sweden. These studies showed a human health concern from agricultural and other work-related exposure to glyphosate.

33. The IARC Working Group conducted a systematic review of over 15 studies designed to assess whether there was an association between Roundup® exposure in agricultural workers and Non-Hodgkin Lymphoma (NHL). The researchers reviewed each study, identified the results and assessed each study's strengths and weaknesses. The IARC Working Group concluded that a "positive association has been observed for non-Hodgkin lymphoma."

34. Also, in male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. In two other studies, glyphosate increased pancreatic islet-cell adenoma in male rats. In an initiation-promotion study in mice, a glyphosate formulation promoted skin tumors.

35. The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported

increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed. In assessing the genotoxicity of glyphosate (the property of chemical agents that damages the genetic information within a cell causing mutations, which may lead to cancer), the IARC Working Group concluded "[t]here is strong evidence that glyphosate causes genotoxicity."

36. Additionally, the IARC assessed whether glyphosate exposure can induce oxidative stress, which is thought to be involved in the development of numerous conditions, including cancer. The IARC concluded that "strong evidence exists that glyphosate . . . can induce oxidative stress." This could be an important mechanism by which Roundup® causes cancer.

37. The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers. The IARC Working Group specifically evaluated farm workers in the United States, and found that, within the days following the application of Roundup® to a crop, approximately 60% of farm workers tested positive for glyphosate in their urine. Additionally, the IARC Working Group noted that soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

38. The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

39. In addition to the IARC's assessment, in 2014, scientists published a systematic review and meta-analysis on the relationship between non-Hodgkin lymphoma and occupational exposure to agricultural pesticides, including glyphosate, in the International Journal of Environmental Research and Public Health. The study showed a statistically significant association between farm workers exposed to Roundup® and non-Hodgkin lymphoma. The study confirmed two smaller studies from 2002 and 2008, published in the journal Leukemia & Lymphoma (2002) and the International Journal on Cancer (2008), both of which also reported statistically significant increases in the incidence of non-Hodgkin lymphoma among agricultural workers exposed to glyphosate.

### E. MULTIPLE BANS ON GLYPHOSATE AND ROUNDUP®

40. Several countries, such as the Netherlands, France, Bermuda and Columbia, have banned the sale of Roundup® and other glyphosate-containing herbicides, both before and since the IARC first announced its assessment for glyphosate in March 2015.

41. In late 2015, following a public comment period, the State of California's Office of Environmental Health Hazard Assessment (OEHHA) listed glyphosate as an agent known to the State to cause cancer.

## V. PLAINTIFF'S EXPOSURE TO ROUNDUP®

42. Plaintiff Warren Ahrent is 53 years old and lives in Limestone, Tennessee. From 1998 through 2011, Mr. Ahrent worked as a soybean and rice farmer on his approximately 2,200-acre farm. Mr. Ahrent sprayed Monsanto's Roundup® on his farm.

43. In or around mid-December 2016, Mr. Ahrent was admitted to Johnson City Medical Center in Johnson City, Tennessee, accompanied by his wife, complaining

of disorientation. Medical Imaging revealed a left frontal brain mass. Mr. Ahrent underwent a brain biopsy and was subsequently diagnosed with diffuse large B-cell lymphoma (a fast-growing type of non-Hodgkin lymphoma).

44. Over the next several months, Mr. Ahrent underwent aggressive treatment for his cancer, including multiple rounds of chemotherapy.

45. Mr. Ahrent is currently retired.

46. Mr. Ahrent was recently notified that his cancer has returned.

47. During the time Mr. Ahrent was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to human health.

48. Mr. Ahrent first made a connection that his injuries were possibly related to Roundup® and glyphosate through a relative who saw an advertisement on television in or around October 2017.

49. Defendant's wrongful concealment of the relevant facts deprived Plaintiff and his physicians of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part. Plaintiff relied on Defendant's misrepresentations and omissions and therefore could not reasonably have known or become aware of facts that would lead a reasonable, prudent person to make an inquiry to discover Defendant's tortious conduct. Plaintiff diligently filed suit once he discovered the actual facts. Defendant's wrongful concealment of the relevant facts tolls any relevant statute of limitations.

## VI. COUNT I: STRICT LIABILITY (DESIGN DEFECT)

50. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

51. Plaintiff brings this strict liability claim against Defendant for defective design.

52. At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including the Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant. At all times relevant to this litigation, Defendant designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by Plaintiff, as described above.

53. At all times relevant to this litigation, Defendant's Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff.

54. At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Tennessee and throughout the United States, including the Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

55. Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that, when they left the hands of

the Defendant's manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

56. Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that, when they left the hands of Defendant's manufacturers and/or suppliers.

57. At all times relevant to this action, Defendant knew or had reason to know that its Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendant.

58. Therefore, at all times relevant to this litigation, Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendant were defective in design and formulation, in one or more of the following ways:

a. When placed in the stream of commerce, Defendant's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b. When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were hazardous and posed an unreasonable risk of cancer when used in a reasonably anticipated manner.

c. Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

d. Defendant knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® could result in cancer.

e. Defendant could have employed safer alternative designs and formulations.

59. The Plaintiff was exposed to Defendant's Roundup® products in the course of his work as a farmer, as described above, without knowledge of Roundup®'s dangerous characteristics.

60. At all times relevant to this litigation, the Plaintiff used and/or was exposed to the use of Defendant's Roundup® products in an intended or reasonably foreseeable manner, i.e., as a farmer, without knowledge of Roundup®'s dangerous characteristics.

61. The Plaintiff could not reasonably have discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure due to the Defendant's suppression of scientific information linking glyphosate to cancer.

62. Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendant is strictly liable to Plaintiff.

63. The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiff's injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained his injuries.

64. Defendant's conduct, as described above, was reckless. Defendant risked the lives of consumers and users of its products, including Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and

suppressed this knowledge from the general public. Defendant made conscious decisions not to redesign, warn or inform the unsuspecting public. Defendant's reckless conduct warrants an award of punitive damages.

65. As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Plaintiff developed diffuse large B-cell lymphoma and has suffered and continues to suffer severe injuries, physical pain and mental anguish, including diminished enjoyment of life, as well as economic hardship, including considerable financial expenses for medical care and treatment.

66. Plaintiff continues to endure these injuries and expenses.

67. WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## VII. COUNT II: STRICT LIABILITY (FAILURE TO WARN)

68. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

69. Plaintiff brings this strict liability claim against Defendant for failure to warn.

70. At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the

active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

71. Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiff, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

72. At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn Plaintiff of the dangers associated with Roundup® use and exposure. Defendant, as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

73. At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

74. At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its

product and to those who would foreseeably use or be harmed by Defendant's herbicides, including Plaintiff.

75. Despite the fact that Defendant knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied or sold the product, and not known to end users and consumers, such as Plaintiff.

76. Defendant knew or should have known that its products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers, i.e., the reasonably foreseeable users, of the risks of exposure to its products. Defendant has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

77. At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Tennessee and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

78. Plaintiff was exposed to Defendant's Roundup® products in the course of his work as a farmer, as described above, without knowledge of their dangerous characteristics.

79. At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup® products while using them for their intended or reasonably foreseeable purposes, without knowledge of their dangerous characteristics.

80. Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendant to know about and disclose serious health risks associated with using the products.

81. Defendant knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, failed to communicate adequate information on the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

82. The information that Defendant did provide failed to contain relevant warnings, hazards, and precautions that would have enabled farmers such as Plaintiff to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false and misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or

otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

83. As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant.

84. Defendant is liable to Plaintiff for injuries caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its products and the risks associated with the use of or exposure to Roundup® and glyphosate.

85. Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup® products, Plaintiff could have avoided the risk of developing injuries and could have obtained or used alternative herbicides.

86. As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Plaintiff developed diffuse large B-cell lymphoma and has suffered and continues to suffer severe injuries, physical pain and mental anguish, including diminished enjoyment of life, as well as economic hardship, including considerable financial expenses for medical care and treatment, and general damages in a sum in excess of the jurisdictional minimum of this Court.

87. Plaintiff continues to endure these injuries and expenses because his cancer has returned.

88. WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with

interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## VIII. COUNT III: NEGLIGENCE

89. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

90. Defendant, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

91. At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

92. At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

93. At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

94. Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with Plaintiff's injuries, and thus,

created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

95. Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

96. As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

97. Defendant was negligent in its promotion of Roundup®, outside of the labeling context, by failing to disclose material risk information as part of its promotion and marketing of Roundup®, including the Internet, television, print advertisements, etc. Nothing prevented Defendant from being honest in its promotional activities, and in fact, Defendant had a duty to disclose the truth about the risks associated with Roundup® in its promotional efforts, outside of the of the context of labeling.

98. Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant has failed to do so. Indeed, Defendant has

wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

99. Defendant's negligence included:

a. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

b. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d. Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

e. Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f. Failing to provide adequate instructions, guidelines, and safety precautions to those persons Defendant could reasonably foresee would use and be exposed to its Roundup® products;

g. Failing to disclose to Plaintiff, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer;

h. Failing to warn Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to the Plaintiff and other consumers;

i. Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

j. Representing that its Roundup® products were safe for their intended use when, in fact, Defendant knew or should have known the products were not safe for their intended purpose;

k. Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert consumers and the general public of the risks of Roundup® and glyphosate;

l. Advertising, marketing, and recommending the use of the Roundup® products, while failing to disclose or warn of the dangers known (by Defendant) to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m. Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

n. Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

100. Defendant knew and/or should have known that it was foreseeable consumers such as the Plaintiff would suffer injuries as a result of Defendant's failure to exercise ordinary care in the designing, manufacturing, marketing, labeling, distribution, and sale of Roundup®.

101. The Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

102. Defendant's negligence was the proximate cause of Plaintiff's injuries, i.e., absent Defendant's negligence, Plaintiff would not have developed diffuse large B-cell lymphoma.

103. Defendant's conduct, as described above, was grossly negligent. Defendant regularly risks the lives of consumers and users of its products, including Plaintiff, with full knowledge of the dangers of its products. Defendant has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff. Defendant's gross negligence therefore warrants an award of punitive damages.

104. As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Plaintiff developed diffuse large B-cell lymphoma and has suffered and continues to suffer severe injuries, physical pain and mental anguish, including diminished enjoyment of life, as well as economic hardship,

including considerable financial expenses for medical care and treatment, and general damages in a sum in excess of the jurisdictional minimum of this Court.

105. Plaintiff continues to endure these injuries and expenses because his cancer has returned.

106. WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## IX. COUNT IV: LOSS OF CONSORTIUM

107. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

108. At all relevant times, Spouse Plaintiff Vicki Ahrent was and is the lawful spouse of Plaintiff Warren Ahrent.

109. At all relevant times, where applicable, Spouse Plaintiff suffered injuries and losses as a result of Plaintiff's injuries from Roundup®.

110. For the reasons set forth herein, Spouse Plaintiff has suffered and will continue to suffer the loss of her loved one's support, companionship, services, society, love, and affection.

111. Spouse Plaintiff alleges that their marital relationship was impaired and depreciated, and the marital association between husband and wife has been altered.

112. Spouse Plaintiff has suffered great emotional pain and mental anguish.

113. As a direct and proximate result of Defendant's wrongful conduct, Spouse Plaintiff has sustained and will continue to sustain emotional distress, economic losses, and other damages for which they are entitled to compensatory and equitable damages.

114. WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## X. JURY TRIAL DEMAND

115. Plaintiff demands a trial by jury on all of the triable issues within this pleading.

## XI. PRAYER FOR RELIEF

116. WHEREFORE, Plaintiff requests that the Court enter judgment in his favor and against the Defendant, awarding the Plaintiff:

a. actual or compensatory damages in such amount to be determined at trial and as provided by applicable law;

b. punitive damages sufficient to punish and deter the Defendant and others from future fraudulent practices;

c. pre-judgment and post-judgment interest;

d. costs including reasonable attorneys' fees, court costs, and other litigation expenses;

e. any other relief the Court may deem just and proper.

Dated: December 8, 2017

Respectfully Submitted,

By: /s/ Thomas V. Ayala

Thomas V. Ayala (pro hac vice motion pending)
GRANT & EISENHOFER, P.A.
123 Justison Street
Wilmington, DE 19801
Tel: 302-622-7000
Fax: 302- 622-7100
tayala@gelaw.com

*Attorney for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 11, 2017, a true and correct copy of the foregoing Complaint and Jury Demand was filed with the Court through the UPS overnight mail, and paper copies will be sent via electronic email to the below:

Martin C Calhoun
Hollingsworth LLP
1350 I Street NW
Washington , DC 20005
Email:Mcalhoun@hollingsworthllp.Com

ATTORNEY FOR DEFENDANT

/s/ Thomas V. Ayala
Thomas V. Ayala, Esquire
*Attorney for Plaintiff*

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

WARREN AHRENT AND VICKI AHRENT

**(b)** County of Residence of First Listed Plaintiff: Washington
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Thomas V. Ayala, Esquire, Grant & Eisenhofer, P.A, 123 Justison Street, Wilmington, DE 19801, (302) 622-7000

## DEFENDANTS

MONSANTO COMPANY

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*

*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- ☒ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

Other:
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing ***(Do not cite jurisdictional statutes unless diversity)***: 28 U.S.C. 1332

Brief description of cause: Personal Injury - Product Liability

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):* JUDGE Not yet assigned DOCKET NUMBER

DATE: 12/08/2017

SIGNATURE OF ATTORNEY OF RECORD: /s/ Thomas V. Ayala

**FOR OFFICE USE ONLY**

RECEIPT # AMOUNT APPLYING IFP JUDGE MAG. JUDGE