# U.S. District Court
## Western District of Kentucky (Louisville)
## CIVIL DOCKET FOR CASE #: 3:18-cv-00039-GNS

Masters v. Monsanto Company
Assigned to: Judge Greg N. Stivers
Cause: 28:1332 Diversity-Product Liability

Date Filed: 01/17/2018
Jury Demand: Plaintiff
Nature of Suit: 367 Personal Injury: Health Care/Pharmaceutical Personal Injury Product Liability
Jurisdiction: Diversity

### Plaintiff

**Beneda F. Masters**
*Individually and as Administratrix for the Estate of Mark D. Masters*

represented by **Alex C. Davis**
Jones Ward PLC
The Pointe
1205 E. Washington Street, Suite 111
Louisville, KY 40206
502-882-6000
Fax: 502-587-2007
Email: alex@jonesward.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jasper D. Ward , IV**
Jones Ward PLC
The Pointe
1205 E. Washington Street, Suite 111
Louisville, KY 40206
502-882-6000
Fax: 502-587-2007
Email: jasper@jonesward.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

### Defendant

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 01/17/2018 | 1 | COMPLAINT against Monsanto Company, filed by Beneda F. Masters. Filing fee $ 400, Receipt Number 0644-2575214. (Attachments: # 1 Cover Sheet) (JWM) (Entered: 01/18/2018) |
| 01/17/2018 | 2 | Case Assignment (Random Selection): Case Assigned to Judge Greg N. Stivers. Magistrate Judge designation: Magistrate Judge Dave Whalin. (JWM) (Entered: 01/18/2018) |
| 01/18/2018 | 3 | CLERK'S NOTICE ON SUMMONS re 1 Complaint. No summonses were tendered with your document. **See Notice for instructions.** (JWM) (Entered: 01/18/2018) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 02/05/2018 14:57:41 | | |
| **PACER Login:** | hllp1982:2634105:4722683 | **Client Code:** | 1417.0005 |
| **Description:** | Docket Report | **Search Criteria:** | 3:18-cv-00039-GNS |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| BENEDA F. MASTERS, Individually<br>And as Administratrix for the<br>ESTATE OF MARK D. MASTERS,<br><br>Plaintiff<br><br>vs.<br><br>MONSANTO COMPANY,<br><br>*Serve:* Corporation Service Company<br>421 West Main Street<br>Frankfort, KY 40601<br><br>Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL CASE NO.:  3:18-cv-39-GNS |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Beneda F. Masters ("Plaintiff), Individually and as Administratrix for the Estate of Mark

D. Masters, brings this Complaint for damages against defendant Monsanto Company

("Monsanto"), and alleges as follows:

## NATURE OF THE CASE

1.      This case arises out of Monsanto's wrongful conduct in connection with the

design, development, manufacture, testing, packaging, promoting, marketing, advertising,

distribution, labeling, and sale of the herbicide Roundup®, containing the active ingredient

glyphosate. Glyphosate has been found to be carcinogenic, linked to causing various forms of

cancer, and in particular non-Hodgkin's Lymphoma. As such, Roundup® is dangerous to human

health and unfit to be marketed and sold in commerce, particularly without proper warnings and

directions as to the dangers associated with its use. Plaintiff, Beneda F. Masters, is the wife of

Mark D. Masters, deceased ("Decedent"), who used Roundup extensively, and was subsequently diagnosed with a rare and aggressive form of non-Hodgkin's Lymphoma. Despite surgical treatment and multiple rounds of high-dose chemotherapy, Mr. Masters suffered acute respiratory failure with hypoxia and passed away on January 29, 2017 as a result of complications associated with Roundup®-induced cancer.

## JURISDICTION AND VENUE

2.      This Court has personal jurisdiction over Monsanto under 28 U.S.C. 1332, because Monsanto transactions business in this state and is a corporation doing business within this state. Monsanto knows that its Roundup® products are and were sold throughout this state, and more specifically, caused Roundup to be sold to Plaintiff in Kentucky. In addition, Monsanto maintains sufficient contacts with this state such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

3.      Monsanto advertises and sells goods, specifically Roundup®, throughout Kentucky. It derived substantial revenue from goods and products used in Kentucky. Therefore, it expected its acts to have consequences within Kentucky, and derived substantial revenue from interstate commerce. Specific to this case, Monsanto engaged in the business of developing, manufacturing, testing, packaging, marketing, distributing, labeling, and selling Roundup®. Monsanto purposefully availed itself of the privilege of conducting activities within Kentucky, thus invoking the benefits and protections of its laws.

4.      This Court has subject matter jurisdiction over this action under 28 U.S.C. 1332 because there is complete diversity of citizenship between Plaintiff and Defendant. Monsanto is a citizen of Delaware (where it is incorporated) and Missouri (where it has its principal place of

business). Plaintiff is a citizen and resident of Kentucky, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.      Venue is proper in this District under 28 U.S.C. 1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred within this judicial district.

## PARTIES

6.      Plaintiff, Beneda F. Masters, is the wife of Decedent, Mark D. Masters, and at all relevant times was a resident and citizen of Jefferson County, Louisville, Kentucky. Plaintiff is the Administratrix of the Estate of Mark D. Masters, having been duly appointed by the Jefferson County District Court of Louisville, Kentucky. At the time of his death, Decedent, Mark D. Masters, was a resident of Jefferson County, Louisville, Kentucky. Plaintiff brings this action as Administratrix of the estate of the Decedent for personal injuries to and the wrongful death of Decedent, which were sustained by exposure to Roundup®, and its active ingredient glyphosate and the surfactant POEA. As a direct and proximate result of being exposed to Roundup®, Decedent developed blastoid variant mantle cell lymphoma, considered to be a very aggressive subtype of non-Hodgkin's Lymphoma. Decedent died less than four months after being diagnosed with the disease.

7.      Defendant, Monsanto Company is a Delaware corporation, Kentucky Secretary of State Organization Number 0502433 in active status, with a principle place of business in St. Louis, Missouri.

## FACTUAL ALLEGATIONS

8.      At all relevant times, Monsanto designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the commercial herbicide Roundup®.

9.      "Roundup" refers to all formulations of Monsanto's Roundup® products, including but not limited to, Roundup® Concentrate Poison Ivy and Tough Brush Killer1, Roundup® Custom Herbicide, Roundup® D-Pak herbicide, Roundup® Dry Concentrate, Roundup® Export Herbicide, Roundup® Fence & Hard Edger 1, Roundup® Garden Foam Weed & Grass Killer, Roundup® Grass and Weed Killer, Roundup® Herbicide, Roundup® Original 2k herbicide, Roundup® Original II Herbicide, Roundup® Pro Concentrate, Roundup® Prodry Herbicide, Roundup® Promax, Roundup® Quik Stik Grass and Weed Killer, Roundup® Quikpro Herbicide, Roundup® Rainfast Concentrate Weed & Grass Killer, Roundup® Rainfast Super Concentrate Weed & Grass Killer, Roundup® Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup® Ready-to-Use Weed & Grass Killer, Roundup® Ready-to-Use Weed and Grass Killer 2, Roundup® Ultra Dry, Roundup® Ultra Herbicide, Roundup® Ultramax, Roundup® VM Herbicide, Roundup® Weed & Grass Killer Concentrate, Roundup® Weed & Grass Killer Concentrate Plus, Roundup® Weed & Grass Killer Ready-to-Use Plus, Roundup® Weed and Grass Killer Super Concentrate, Roundup® Weed & Grass Killer1 Ready-to-Use, Roundup® WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation containing the active ingredient glyphosate.

10.      Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate.

11.      Monsanto discovered the herbicidal properties of glyphosate during the 1970s and developed it as a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

12.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

13.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

14.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots; and detectable quantities accumulate in the plant tissues.

15.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban laws, parks, and golf courses. This increase in use has been driven largely by the proliferation of Roundup® Ready crops, which have been genetically engineered to resist the activity of glyphosate.

16.     Monsanto is responsible for the development, manufacture, marketing, sale, and distribution of Roundup® Ready seeds. By 2009, Monsanto was the world's leading producer of Roundup® Ready seeds. In 2010, roughly 70% of corn and cotton and 90% of soybean fields in the United States were grown with Roundup® Ready seeds.

17.     Roundup® was introduced in 1974 and is today one of the world's most widely-used herbicides. Monsanto's glyphosate products are registered in more than 130 countries and are approved for weed control in more than 100 crops. No other herbicide active ingredient compares in terms of number of uses.[1]

18.     In all this time, farmers have used Roundup® unaware it is a carcinogen.

**<u>Registration of Herbicides Under Federal Law</u>**

---

[1] *Backgrounder,* History of Monsanto's Glyphosate Herbicides, June 2005, available at www.monsanto.com/products/documents/glyphosate-background-materials/back_ground.pdf

19.     The manufacture, formulation, and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. 136, *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. 136a(a).

20.     The EPA requires a variety of tests as part of the registration process to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions, "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. 136(a)(c)(5)(D).

21.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

22.     The EPA and the State of Kentucky, registered Roundup® for distribution, sale, and manufacture in the United States, and in the state of Kentucky.

23.     FIFRA generally requires that the registrant, here Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

24.    Each pesticide product distributed, sold, or manufactured is evaluated at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticides through a Congressionally-mandated process called "re-registration." 7 U.S.C. 136a-1. To reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

25.    The EPA had planned to release its preliminary risk assessment of glyphosate and Roundup® – in relation to the registration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015 but delayed releasing the assessment pending further review in light of the World Health Organization's findings.

### Monsanto's False Representations Regarding the Safety of Roundup®

26.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

    a.    Remember that environmentally friendly Roundup® herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks, and fences.

    b.    And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got a weed, brush, edging, or trimming problem.

    c.   Roundup® biodegrades into naturally occurring elements.

    d.   Remember that versatile Roundup® herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

    e.   This non-residual herbicide will not wash or leach in the soil. It … stays where you apply it.

    f.   You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

    g.   Glyphosate is less toxic to rats than table salt following oral ingestion.

    h.   Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

    i.   You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

    j.   "Roundup® can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup®.[2]

27.    Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

---

[2] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law 63(15) (Nov. 1996).

28.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup® and affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[3]

### Evidence of Carcinogenicity in Roundup®

29.     As early as the 1980s Monsanto was aware of glyphosate's carcinogenic properties.

30.     On March 4, 1985, a group of the EPA's Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[4] Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

31.     In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.[5]

32.     In October 1991, the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer reviewed committee members did not concur with the conclusions of the committee and one member refused to sign.[6]

33.     In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Monsanto's Roundup® products are more

---

[3] *Monsanto Guilty in 'False Ad' Row,* BBC, Oct. 15, 2009, available at
http://news/bbc/co/uk/2/hi/europe/8308903.stm.
[4] Consensus Review of Glyphosate, Casewell No. 661A. March 4, 1985. United States Environmental Protection Agency.
[5] http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheets/0178fact.pdf
[6] U.S. EPA, *Memorandum, Subject: SECOND Peer Review of Glyphosate* 1 (1991), available at
http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_30-Oct-91_265.pdf.

dangerous and toxic than glyphosate alone.[7] As early as 1991, evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.

34.     In 2002, Julie Marc published a study entitled, "Pesticide Roundup® Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."[8] The study found that Monsanto's Roundup® caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

35.     In 2004, Julie Marc published a study entitled, "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.[9]

36.     The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[10]

37.     In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

---

[7] See Martinez, et al., *Oral and pulmonary toxicology of the surfactant used in Roundup herbicide,* PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991); Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryotic, and Placental Cells,* 22 CHEM. RES. TOXICOL. 97-105 (2009), available at http://big.assets.huffington.com/france.pdf; Gasnier et al., 2010; Francisco Peixoto, *Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation,* 61 CHEMOSPHERE 1115, 1122 (2005), available at: https://www.researchgate.net/publication/7504567_Comparative_effects_of_the_Roundup_and_glyphosate_on_mitochondrial_osidative_phosphorylation; March 2004.

[8] Julie Marc, et al., *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation,* 15 CHEM. RES. TOXICOL. 326-331 (2002), available at http://pubs.acs.org/doi/full/10.1021/tx015543g.

[9] Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation,* 96 BILIOGY OF THE CELLS 245, 245-249 (2004), available at http://onlinelibrary.wiley.com/doi/10.1016/j.biolcel.2003.11/010/epdf.

[10] Molinari, 2000; Stewart et al., 2003.

38.     The Peixoto study suggested that the harmful effects of Roundup® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possibly synergy between glyphosate and Roundup® formulation products.

39.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study of the effects of Roundup® and glyphosate on human umbilical, embryonic, and placental cells.

40.     The study used dilution levels of Roundup® and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup® are not inert and that Roundup® is always more toxic than its active ingredient, glyphosate.

41.     The results of these studies were confirmed in peer-reviewed studies that were known to Monsanto.

42.     Monsanto knew or should have known that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup's® adjuvants and "inert" ingredients and/or the surfactant POEA were necessary to protect Plaintiff from Roundup®.

43.     Monsanto knew or should have known that tests limited to Roundup's® active ingredient glyphosate were insufficient to prove the safety of Roundup®.

44.     Monsanto failed to appropriately and adequately test Roundup®, Roundup's® adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup®.

45.     Rather than performing appropriate tests, Monsanto relied on flawed industry-supported studies designed to protect Monsanto's economic interests rather than Plaintiff's and the consuming public.

46.     Despite its knowledge that Roundup® was considerably more dangerous than glyphosate alone, Monsanto continued to promote Roundup® as safe.

## IARC Classification of Glyphosate

47.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental agency that the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

48.     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015-2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

49.     IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; and related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

50.     On March 24, 2015, after its cumulative review of human, animal and DNA studies for more than one (1) year, many of which have been in Monsanto's possession since as

early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Monsanto's Roundup® herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

51.     The IARC's full Monograph was published on July 29, 2015, and established glyphosate as a class 2A probable carcinogen to humans. According to the authors, glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

52.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's Lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

53.     The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

## Earlier Evidence of Glyphosate's Danger

54.     Despite the new classification by the IARC, Monsanto has had ample evidence of glyphosate and Roundup's® genotoxic properties for decades.

55.     Genotoxicity refers to chemical agents capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

56.     In 1997, Chris Clements published "Genotoxicity of select herbicides in Rana catesbeiana tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

57.     The study found that tadpoles exposed to Roundup® showed significant DNA damage when compared with unexposed control animals.

13

58.     Both human and animal studies have shown that glyphosate and glyphosate-base formulations such as Roundup® can induce oxidative stress.

59.     Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

60.     The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

61.     In 2006, Cesar Paz-y-Mino published a study examining DNA damage in human subjects exposed to glyphosate.

62.     The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that glyphosate formulation used during aerial spraying a genotoxic effect on exposed individuals.

63.     The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

64.     Despite knowledge to the contrary, Monsanto denies that Roundup® is genotoxic.

65.     In addition to glyphosate and Roundup's® genotoxic properties, Monsanto has long been aware of glyphosate's carcinogenic properties.

66.     Glyphosate and Roundup® in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to NHL, Hodgkin's Lymphoma, Multiple Myeloma, and soft tissue sarcoma.

67.     Monsanto knew of this association since the mid-1980s and numerous human and animal studies evidence the carcinogenicity of glyphosate and/or Roundup®.

68.     In 1985, the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

69.     In 2003, Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

70.     The study concluded that glyphosate had the most significant relationship to NHL among all herbicide studies with an increased odds ratio of 3.11.

71.     In 2003, AJ De Ross published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

72.     The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

73.     In 2008, Mikael Eriksson published a population based case-control study of exposure to various pesticides as a risk factor for NHL.

74.     This strengthened previous association between glyphosate and NHL.

75.     In spite of this knowledge, Monsanto continued to issue broad and sweeping statements suggesting that Roundup® was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

76.     On information and belief, these statements and representations have been made with the intent of inducing Decedent, the agricultural community, and the public at large to purchase, and increase the use of Roundup®, for Monsanto's pecuniary gain, and in fact, did induce Decedent to use Roundup®.

77.     Monsanto made these statements with complete disregard and reckless indifference to the safety of Decedent and the general public.

78.     Notwithstanding Monsanto's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

79.     Monsanto knew or should have known glyphosate is associated with an increased risk of developing cancer, including but not limited to NHL, Multiple Myeloma, and soft tissue sarcomas.

80.     Monsanto failed to appropriately and adequately inform and warn Decedent of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup®, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring, and/or medications.

81.     Despite the IARC's classification of glyphosate as a class 2A possible carcinogen, Monsanto continues to maintain the glyphosate and/or Roundup® is safe, non-carcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup®.

82.     Monsanto has claimed and continues to claim that Roundup® is safe, non-carcinogenic and non-genotoxic.

83.     Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity

studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."[11]

84.     Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

85.     Glyphosate and Monsanto's Roundup® products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

86.     Monsanto's statements proclaiming the safety of Roundup® and disregarding dangers misled Decedent.

87.     Despite Monsanto's knowledge that Roundup® was associated with an elevated risk of developing cancer, Monsanto's promotional campaigns focused on Roundup's® purported "safety profile."

88.     Monsanto's failure to adequately warn Plaintiff resulted in (1) Decedent using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup®.

89.     Monsanto failed to seek modification of the labeling of Roundup® to include relevant information regarding the risks and dangers associated with Roundup® exposure.

90.     Monsanto's failure to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

---

[11] *Backgrounder* – Glyphosate: No Evidence of Carcinogenicity, updated November 2014, available at www.monsanto.com/glyphosate/documents/no-evidence-of-carcinogenicity.pdf

91.     Monsanto's failure to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

92.     Monsanto's failure to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

93.     By reason of the foregoing acts and omissions, Plaintiff seeks compensatory damages as a result of Decedent's use of, and exposure to Roundup®, which caused or was a substantial contributing factor in causing Decedent to suffer from cancer, specifically blastoid variant mantle cell lymphoma, considered to be a very aggressive subtype of non-Hodgkin's Lymphoma, and Decedent suffered bodily injury resulting in pain and suffering, disability, mental anguish, loss of capacity of the enjoyment of life, shortened life expectancy, expenses for hospitalization, medical and nursing treatment, loss of earnings, loss of ability to earn, and death.

94.     By reason of the foregoing acts and omissions, Plaintiff has endured and continues to suffer, emotional and mental anguish and other economic and non-economic damages, including expenses for funeral burial and other related costs pertaining to Decedent's death, as a result of Monsanto's actions and inactions.

### Decedent's Exposure to Roundup®

95.     Decedent, Mark D. Masters, began using Roundup® in approximately 2012 to control insects and weeds around his residence and garden. Mr. Masters became exposed to Roundup® over the course of the next four years.

96.     Mr. Masters followed all safety and precautionary warnings during the course of use of Roundup®.

97.     In October 2016, Mr. Masters self-admitted to Baptist East Hospital in Louisville, Kentucky after noticing the enlargement of a lymph node below his chin. During that visit, the treating physicians conducted a biopsy and tested for cancer. Following the biopsy, Mr. Masters noticed several more lymph nodes increasing in size along the posterior of his neck. Thereafter, Mr. Masters underwent a Positron Emission Tomography which revealed intensely hypermetabolic lymphadenopathy throughout his neck, chest, abdomen, and pelvis as well as subcutaneous nodules at the neck and chest wall thought to represent lymphomatous lesions. Mr. Masters was subsequently diagnosed with blastoid variant mantle cell lymphoma, considered to be a very aggressive and rare subtype of non-Hodgkin's Lymphoma.

98.     Over the course of the next four months, doctors initiates an aggressive course of treatment for Mr. Masters, including multiple rounds of high-dose chemotherapy. During treatment, Mr. Masters suffered from a number of complications, including agranulocytosis secondary to cancer chemotherapy, thrombocytopenia, and pancytopenia, further weakening his immune system.

99.     Having his immune system suppressed with the cancer treatment, on January 28, 2017, Mr. Masters was admitted to Baptist East Hospital suffering from acute respiratory failure with hypoxia and neutropenic sepsis. The following day, January 29, 2017, Mr. Masters passed away from sepsis with septic shock as a result of complications associated with Roundup®-induced cancer.

100.    Decedent incurred severe and personal injuries resulting in pain and suffering, disability, mental anguish, loss of capacity of the enjoyment of life, shortened life expectancy, and other economic and non-economic damages before his death.

101.    During the entire time that Decedent was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

102.    Decedent first learned that exposure to Roundup can cause NHL and other serious illnesses sometime after July 29, 2015, when IARC first published its evaluation of glyphosate.

## Tolling of Applicable Statute of Limitations

### Discovery Rule Tolling

103.    Plaintiff had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup® and glyphosate until after IARC released its formal assessment of glyphosate in July 2015. This is a quintessential case for tolling.

104.    Within the time period of any applicable statutes of limitations, Plaintiff could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup® and glyphosate is injurious to human health.

105.    Plaintiff did not discovery, and did not know the facts that would cause a reasonable person to suspect the risks associated with the use of and/or exposure to Roundup® and glyphosate; nor would a reasonable and diligent investigation have disclosed that Roundup® and glyphosate would cause his cancer.

106.    For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff's claims.

### Fraudulent Concealment Tolling

107.    All applicable statutes of limitations have also been tolled by Monsanto's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

108.   Instead of disclosing critical safety information about Roundup® and glyphosate, Monsanto has consistently and falsely represented the safety of its Roundup® products.

**Estoppel**

109.   Monsanto was under a continuous duty to disclose to consumers, users, and other persons coming into contact with its products, including Plaintiff, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate.

110.   Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

111.   Based on the foregoing, Monsanto is estopped from relying on any statutes of limitations in defense of this action.

**Count I – Negligence**

112.   Plaintiff re-alleges each paragraph above as if fully set forth herein.

113.   Monsanto had a duty to exercise reasonable care in designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, selling, and/or distributing Roundup® into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

114.   Monsanto failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, selling, testing, quality assurance, quality control, and/or distribution of Roundup® into interstate commerce in that Monsanto knew or should have known that using Roundup® created a high risk of unreasonable, dangerous side effects, including but not limited to, the development of NHL, as well as other severe and

personal injuries that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

115.   The negligence by Monsanto, its agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

a.   Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup® without thoroughly testing it;

b.   Failing to test Roundup® and/or failing to adequately, sufficiently, and properly test Roundup®;

c.   Not conducting sufficient testing programs to determine whether or not Roundup® was safe for use; in that Monsanto knew or should have known that Roundup® was unsafe and unfit for use by reason of the dangers to its users;

d.   Not conducting sufficient testing programs and studies to determine Roundup's® carcinogenic properties even after Monsanto had knowledge that Roundup® is, was, or could be carcinogenic;

e.   Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup®, and the propensity of these ingredients to render Roundup® toxic, increase the toxicity of Roundup®, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup®, and whether or not the "inert" ingredients and/or adjuvants were safe for use;

f.   Negligently failing to adequately and correctly warn Decedent, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup®;

g. Negligently failing to petition the EPA to strengthen the warnings associated with Roundup®;

h. Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup®;

i. Negligently marketing, advertising, and recommending the use of Roundup® without sufficient knowledge as to its dangerous propensities;

j. Negligently representing that Roundup® was safe for use for its intended purpose and/or that Roundup® was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

k. Negligently representing that Roundup® had equivalent safety and efficacy as other forms of herbicide;

l. Negligently designing Roundup® in a manner that was dangerous to its users;

m. Negligently manufacturing Roundup® in a manner that was dangerous to its users;

n. Negligent producing Roundup® in a manner that was dangerous to is users;

o. Negligently formulating Roundup® in a manner that was dangerous to its users;

p. Concealing information from the Plaintiff while knowing that Roundup® was unsafe, dangerous and/or non-conforming with EPA regulations;

q. Improperly concealing and/or misrepresenting information from Plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangerous of Roundup® compared to other forms of herbicides; and,

r. Negligently selling Roundup® with a false and misleading label.

116. Monsanto under-reported, underestimated, and downplayed the serious dangerous of Roundup®.

117. Monsanto negligently and deceptively compared the safety risks and/or dangerous of Roundup® with common everyday foods such as table salt, and other forms of herbicides.

118. Monsanto was negligent and/or violated Kentucky law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup® in that it:

    a.   Failed to use the ordinary care in designing and manufacturing Roundup® so as to avoid the aforementioned risks to individuals when Roundup® was used as an herbicide;

    b.   Failed to accompany its products with proper and/or adequate warnings regarding all possible adverse side effects associated with the use of Roundup®;

    c.   Failed to accompany its product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup®;

    d.   Failed to accompany its product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup®;

    e.   Failed to warn Plaintiff of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects, including but not limited to, the development of NHL;

    f.   Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup®;

g. Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's® "inert" ingredients and/or adjuvants;

h. Negligently misrepresented the evidence of Roundup's® genotoxicity and carcinogenicity; and,

i. Was otherwise carless and/or negligent.

119. Despite the fact that Monsanto knew or should have known that Roundup® caused or could cause, unreasonably dangerous side effects, Monsanto continues to market, manufacture, distribute, and/or sell Roundup to consumers, including Plaintiff.

120. Monsanto knew or should have known that consumers such as Plaintiff would foreseeably suffer injury as a result of Monsanto's failure to exercise ordinary care.

121. As a result of the foregoing acts and omissions, Decedent suffered bodily injury resulting in pain and suffering, disability, mental anguish, loss of capacity of the enjoyment of life, shortened life expectancy, expenses for hospitalization, medical and nursing treatment, loss of earnings, loss of ability to earn, and death.

122. Monsanto's violations of law and/or negligence were the proximate cause of Plaintiff's harms, injuries, emotional and mental anguish and other economic and non-economic damages, including expenses for funeral burial and other related costs pertaining to Decedent's death, as a result of Monsanto's actions and inactions.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interests, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

### Count II – Strict Products Liability (Design Defect)

123.    Plaintiff re-alleges each paragraph above as if fully set forth herein.

124.    At all times herein mentioned, Monsanto designed, researched, manufactured, tested, advertised, promoted, sold and distributed Roundup® as hereinabove described that was used by Decedent.

125.    Roundup® was expected to and did reach the usual consumers, handlers, and persons coming into contact with it without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by Monsanto.

126.    At those times, Roundup® was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, Decedent.

127.    The Roundup® designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Monsanto was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup®.

128.    The Roundup® designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Monsanto was defective in design and/or formulation, in that, when it left the hands of Monsanto or its manufacturers, and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than ordinary consumers would expect.

129.    At all times mentioned herein, Roundup® was in a defective condition and unsafe, and Monsanto knew or had reason to know that it was defective and unsafe, especially when used in the form and manner as provided by Monsanto. In particular, Roundup® was defective in the following ways:

a.  When placed in the stream of commerce, Monsanto's Roundup® products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate;

b.  When placed in the stream of commerce, Monsanto's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c.  When placed in the stream of commerce, Monsanto's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner;

d.  Monsanto did not sufficiently test, investigate, or study its Roundup® products;

e.  Exposure to Roundup® presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide;

f.  Monsanto knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® could result in cancer and other severe illnesses and injuries;

g.  Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products;

130.   Monsanto knew or should have known that at all times herein mentioned its Roundup® was in a defective condition and was and is inherently dangerous and unsafe.

131.   Decedent was exposed to Monsanto's Roundup® without knowledge of Roundup's® dangerous characteristics.

132.   At the time of Decedent's use of and exposure to Roundup®, Roundup® was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

133. Armed with this knowledge, Monsanto voluntarily designed its Roundup® with a dangerous condition for use by the public, and in particular Decedent.

134. Monsanto had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

135. Monsanto created a product that was and is unreasonably dangerous for its normal, intended use.

136. Monsanto marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable and established health risks inherent with its normal, intended use, and known to Monsanto.

137. The Roundup® designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Monsanto was manufactured defectively in that Roundup® left the hands of Monsanto in a defective condition and was unreasonably dangerous to its intended users.

138. The Roundup® designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Monsanto reached its intended users in the same defective and unreasonably dangerous condition in which Monsanto's Roundup® was manufactured.

139. Monsanto designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to Decedent in particular, and Monsanto is therefore strictly liable for the injuries sustained by Decedent.

140. Plaintiff could not, by the exercise of reasonable care, have discovered Roundup's® defects herein mentioned or perceived its danger.

141.     Monsanto is thus strictly liable to Plaintiff for the manufacturing, marketing, promoting, distributing and selling of a defective product, Roundup®.

142.     Monsanto's defective design of Roundup® amounts to willful, wanton and/or reckless conduct.

143.     Defects in Monsanto's Roundup® were the cause or a substantial factor in causing Plaintiff's injuries.

144.     As a result of the foregoing acts and omissions, Decedent suffered bodily injury resulting in pain and suffering, disability, mental anguish, loss of capacity of the enjoyment of life, shortened life expectancy, expenses for hospitalization, medical and nursing treatment, loss of earnings, loss of ability to earn, and death.

145.     As a result of the foregoing acts or omissions, Plaintiff suffered harms, injuries, emotional and mental anguish and other economic and non-economic damages, including expenses for funeral burial and other related costs pertaining to Decedent's death, as a result of Monsanto's actions and inactions.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages together with interest, costs herein incurred, attorneys' fees, and all relief as this Court deems just and proper.

### Count III – Strict Products Liability (Failure to Warn)

146.     Plaintiff re-alleges each paragraph above as if fully set forth herein.

147.     Monsanto has engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing and/or promoting Roundup®, and through that conduct has knowingly and intentionally placed Roundup® into the stream of commerce with full knowledge that it

reaches consumers such as Plaintiff, who are exposed to it through ordinary and reasonably foreseeable use.

148.    Monsanto did in fact sell, distribute, supply, manufacture, and/or promote Roundup® to Plaintiff. Additionally, Monsanto expected Roundup® that it was selling, distributing, supplying, manufacturing, and/or promoting to reach – and Roundup® did in fact reach – consumers, including Plaintiff, without any substantial change in the condition of the product from when it was initially distributed by Monsanto.

149.    At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

150.    At all relevant times, Roundup® was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Monsanto and at the time Decedent was exposed to and/or ingested the product. The defective condition of the Roundup® was due in part to the fact that it was not accompanies by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to developing NHL as a result of exposure and use.

151.    Roundup® did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect the health of those exposed in violation of 7 U.S.C. 136j(a)(1)(E).

152.    Monsanto's failure to include a warning or caution statement that was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. 136j(a)(1)(E) as well as the laws of the state of Kentucky.

153.    Monsanto could have revised Roundup's® label to provide additional warnings.

154.    This defect caused serious injury to Decedent, who used Roundup® in its intended and foreseeable manner, and relied upon the insufficient label provided by Monsanto.

155.    At all relevant times, Monsanto had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

156.    Monsanto labeled, distributed, and promoted a product that was dangerous and unsafe for the use and purpose for which it was intended.

157.    Monsanto failed to warn of the nature and scope of the health risks associated with Roundup®, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of NHL.

158.    Monsanto knew of the probable consequences of Roundup®. Despite this fact, Monsanto failed to exercise reasonable care to warn of the dangerous carcinogenic properties and risks of developing NHL from Roundup® exposure, even though these risks were known or reasonably scientifically knowable and available at the time of distribution. Monsanto's conduct associated with its failure to warn was willful and deliberate, and Monsanto acted with conscious disregard for Decedent's safety.

159.    At the time of exposure, Plaintiff could not have reasonably discovered any defect in Roundup through the exercise of reasonable care.

160.    Monsanto, as the manufacturer and/or distributor of Roundup®, is held to the level of knowledge of an expert in the field.

161.    Decedent reasonably relied on the skill, superior knowledge and judgement of Monsanto.

162.    Had Monsanto properly disclosed the risks associated with Roundup®, Decedent would have avoided the risk of NHL by not using Roundup®.

163.    The information that Monsanto provided failed to contain adequate warnings and precautions that would have enabled Decedent to utilize the product safely and with adequate protection. Instead, Monsanto disseminated information that was inaccurate, false, and misleading and that failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup® and glyphosate; continued to promote the efficacy of Roundup®, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangerous of exposure to Roundup® and glyphosate.

164.    To this day, Monsanto has failed to adequately warn of the true risks of Decedent's injuries associated with the use of and exposure to Roundup®.

165.    As a result of its inadequate warnings, Monsanto's Roundup® products were defective and unreasonably dangerous when they left Monsanto's possession and/or control, were distributed by Monsanto, and used by Decedent.

166.    As a direct and proximate result of Monsanto's actions as alleged herein, Decedent suffered bodily injury resulting in pain and suffering, disability, mental anguish, loss of capacity of the enjoyment of life, shortened life expectancy, expenses for hospitalization, medical and nursing treatment, loss of earnings, loss of ability to earn, and death.

167.    As a direct and proximate result of Monsanto's actions, Plaintiff suffered harms, injuries, emotional and mental anguish and other economic and non-economic damages, including expenses for funeral burial and other related costs pertaining to Decedent's death, as a result of Monsanto's actions and inactions.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## Count IV – Breach of Warranties

168.    Plaintiff re-alleges each paragraph above as if fully stated herein.

169.    At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under Monsanto's ultimate control and supervision.

170.    At all relevant times, Monsanto expressly and impliedly represented and warranted to the purchasers of its Roundup® products, by and through statements made in labels, publications, package inserts, and other written materials intended for consumers and the general public, that its Roundup® products were safe to human health and the environment, effective, fit and proper for their intended use. Monsanto advertised, labeled, marketed, and promoted Roundup® products, representing the quality to consumers and the public so as to induce their purchase or use, thereby making an express and implied warranty that Roundup® products would conform to the representations.

171. These express and implied representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Roundup® and glyphosate. Monsanto knew and/or should have known that the risks expressly included in Roundup® warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Monsanto expressly and impliedly represented that its Roundup® products were safe and effective including for use as agricultural herbicides.

172. The representations about Roundup®, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express and implied warranty that the goods would conform to the representations.

173. Monsanto placed its Roundup® products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate.

174. Monsanto breached these warranties because, among other things, its Roundup® products were defective, dangerous, unfit for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary and foreseeable use and purpose. Specifically, Monsanto breached the warranties in the following ways:

    a. Monsanto represented through its labeling, advertising, and marketing materials that its Roundup® products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated with use of and/or

exposure to Roundup® and glyphosate by expressly limiting the risks associated

with use and/or exposure to Roundup® and glyphosate by expressly limiting the

risks associated with use and/or exposure within its warnings and labels; and

b. Monsanto represented that its Roundup® products were safe for use and

fraudulently concealed information demonstrating that glyphosate, the active

ingredient in Roundup®, had carcinogenic properties, and that its Roundup®

products, therefore, were not safer than alternatives available on the market.

175.   Decedent was exposed to the labels on the Roundup® products that he mixed and

applied.

176.   Monsanto had sole access to material facts concerning the nature of the risks

associated with its Roundup® products as expressly stated within its warnings and labels, and

Monsanto knew that consumers and users such as Decedent could not have reasonably

discovered that the risks expressly included in Roundup® warnings and labels were inadequate

and inaccurate.

177.   Plaintiff had no knowledge of the falsity or incompleteness of Monsanto's

statements and representations concerning Roundup®.

178.   Decedent used and/or was exposed to the use of Roundup® as researched,

developed, designed, tested, formulated, manufactured, inspected, labeled, distributed, packaged,

marketed, promoted, sold or otherwise released into the stream of commerce by Monsanto.

179.   Had the warnings and labels for Roundup® products accurately and adequately

set forth the true risks associated with its use, including Decedent's injuries, rather than expressly

excluding such information and warranting that the products were safe for their intended use,

Plaintiff could have avoided the injuries complained of herein.

180.    As a direct and proximate result of Monsanto's wrongful acts and omissions, Decedent suffered from cancer, specifically blastoid variant mantle cell lymphoma, considered to be a very aggressive subtype of non-Hodgkin's Lymphoma, and Decedent suffered bodily injury resulting in pain and suffering, disability, mental anguish, loss of capacity of the enjoyment of life, shortened life expectancy, expenses for hospitalization, medical and nursing treatment, loss of earnings, loss of ability to earn, and death.

181.    As a direct and proximate result of Monsanto's wrongful acts and omissions, Plaintiff suffered harms, injuries, emotional and mental anguish and other economic and non-economic damages, including expenses for funeral burial and other related costs pertaining to Decedent's death, as a result of Monsanto's actions and inactions.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## Count V – Breach of Implied Warranty of Merchantability

## KRS 355.2-314

182.    Plaintiff re-alleges the paragraphs above as if fully stated herein.

183.    At all times relevant, Monsanto engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to users and consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under Monsanto's ultimate control and supervision.

184.    Before Decedent was exposed to the use of Roundup® products, Monsanto impliedly warranted to its consumers and users – including Plaintiff – that Roundup® products

were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticulture herbicides.

185.    Monsanto, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Decedent's injuries.

186.    Plaintiff reasonably relied on the skill, superior knowledge and judgement of Monsanto and on its implied warranties that Roundup® products were of merchantable quality and fit for their intended purpose or use.

187.    Roundup® products were expected to reach and in fact reached consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Monsanto.

188.    At all relevant times, Monsanto was aware that consumers and users of its products, including Plaintiff, would use Roundup® products as marketed by Monsanto, which is to say that Plaintiff was a foreseeable user of Roundup®.

189.    Monsanto intended that its Roundup® products be used in the manner in which Decedent in fact used them and Monsanto impliedly warranted each product to be merchantable quality, safe and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

190.    In reliance on Monsanto's implied warranty, Decedent used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Monsanto.

191.     Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

192.     Monsanto breached its implied warranty to Plaintiff in that its Roundup® products were not of merchantable quality, safe or fit for their intended use. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

193.     The harm caused by Roundup® products far outweighed their benefit, rendering the products more dangerous than ordinary consumer or user would expect and more dangerous than alternative products.

194.     As a direct and proximate result of Monsanto's wrongful acts and omissions, Decedent suffered from cancer, specifically blastoid variant mantle cell lymphoma, considered to be a very aggressive subtype of non-Hodgkin's Lymphoma, and Decedent suffered bodily injury resulting in pain and suffering, disability, mental anguish, loss of capacity of the enjoyment of life, shortened life expectancy, expenses for hospitalization, medical and nursing treatment, loss of earnings, loss of ability to earn, and death.

195.     As a direct and proximate result of Monsanto's wrongful acts and omissions, Plaintiff suffered harms, injuries, emotional and mental anguish and other economic and non-economic damages, including expenses for funeral burial and other related costs pertaining to Decedent's death, as a result of Monsanto's actions and inactions.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

### Count VI – Wrongful Death

196.     Plaintiff re-alleges the paragraphs above as if fully stated herein.

197.     Plaintiff brings this claim on behalf of Mark D. Masters' estate and his wrongful death beneficiaries, wife Beneda F. Masters, daughter Amy Henderson, son Andrew Masters, and son  Ronald Masters.

198.     As a direct and proximate result of the conduct of Monsanto and the defective nature of Roundup® as outlined above, Decedent suffered bodily injury resulting in pain and suffering, disability, mental anguish, loss of capacity of the enjoyment of life, shortened life expectancy, expenses for hospitalization, medical and nursing treatment, loss of earnings, loss of ability to earn, and death.

199.     As a direct and proximate result of the conduct of Monsanto, Decedent Mark D. Masters' beneficiaries have incurred hospital, medical and nursing expenses, funeral expenses and estate administering expenses as a result of Decedent's death. Plaintiff brings this claim on behalf of Mark D. Masters' estate and his wrongful death beneficiaries for these damages and for all pecuniary losses under all applicable state statutory and/or common laws.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all issues.

Dated: January 17, 2018

Respectfully submitted,


**JONES WARD PLC**

/s/ Alex C. Davis
Alex C. Davis
Jasper D. Ward IV
1205 E. Washington Street, Suite 111
Louisville, KY 40206
T: (502) 882-6000
F: (502) 587-2007
alex@jonesward.com
jasper@jonesward.com
*Attorneys for the Plaintiff*