LR16.2 TR4

# U.S. District Court
## Western District of Tennessee (Memphis)
## CIVIL DOCKET FOR CASE #: 2:18-cv-02128-SHL-dkv

Watson v. Monsanto Company
Assigned to: Judge Sheryl H. Lipman
Referred to: Chief Magistrate Judge Diane K. Vescovo
Cause: 28:1332 Diversity-Personal Injury

Date Filed: 02/26/2018
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod.
Liability
Jurisdiction: Diversity

**Plaintiff**

**Walter J. Watson**

represented by **Michael P. McGartland**
MCGARTLAND & BORCHARDT LLP
1300 South University
Ste. 500
Fort Worth, TX 76107
817-332-9300
Email: Mike@mcgartland.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 02/26/2018 | 1 | COMPLAINT against Monsanto Company (Filing fee $ 400 receipt number 0651-2732644), filed by Walter J. Watson. (Attachments: # 1 Civil Cover Sheet)(McGartland, Michael) (Entered: 02/26/2018) |
| 02/26/2018 | 2 | NOTICE of Summons by Michael P. McGartland on behalf of Walter J. Watson. (McGartland, Michael) (Entered: 02/26/2018) |
| 02/26/2018 | 3 | Judge Sheryl H. Lipman and Chief Magistrate Judge Diane K. Vescovo added. (jld) (Entered: 02/26/2018) |
| 02/26/2018 | 4 | NOTICE OF CASE TRACKING ASSIGNMENT PURSUANT TO LOCAL RULE 16.2: Pursuant to Local Rule 16.2, this case has been assigned to the Standard track. http://www.tnwd.uscourts.gov/pdf/content/LocalRules.pdf (jld) (Entered: 02/26/2018) |
| 02/26/2018 | 5 | NOTICE TO COMPLY WITH PLAN FOR ALTERNATE DISPUTE RESOLUTION (ADR): Pursuant to Section to 2.1 of the ADR Plan, all civil cases filed on or after Sept. 1, 2014, shall be referred automatically for ADR. For compliance requirements, refer to the ADR Plan at: http://www.tnwd.uscourts.gov/pdf/content/ADRPlan.pdf (jld) (Entered: 02/26/2018) |
| 02/26/2018 | 6 | NOTICE OF RIGHT TO CONSENT TO THE EXERCISE OF CIVIL JURISDICTION BY A MAGISTRATE JUDGE Pursuant to 28 U.S.C. 636(c), Fed.R.Civ.P.73, and Local Rule 72.1, this Court has designated the Magistrate Judges of this District to conduct trials and |

|  |  | otherwise dispose of any civil case that is filed in this Court. Your decision to consent, or not consent, to the referral of your case to a United States Magistrate Judge for trial and entry of a final judgment must be entirely voluntary. The judge or magistrate judge to whom the case has been assigned will not be informed of your decision unless all parties agree that the case may be referred to a magistrate judge for these specific purposes. A less than unanimous decision will not be communicated by this office to either the judge or magistrate judge. The consent form is available on the courts website at https://www.tnwd.uscourts.gov/forms-and-applications.php (jld) (Entered: 02/26/2018) |
| 02/26/2018 | [7] | Summons Issued as to Monsanto Company. The filer has been notified electronically that the summons has been issued, and the new docket entry reflects this. Upon notification of the new docket entry, the filer is to print the issued summons in order to effect service. (jld) (Entered: 02/26/2018) |

| PACER Service Center | | |
|---|---|---|
| Transaction Receipt | | |
| 03/26/2018 09:55:49 | | |
| PACER Login: | hllp1982:2634105:4722683 | Client Code: | 1417.0005 |
| Description: | Docket Report | Search Criteria: | 2:18-cv-02128-SHL-dkv |
| Billable Pages: | 2 | Cost: | 0.20 |

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE**

| | |
|---|---|
| WALTER J. WATSON, | Case No. |
| Plaintiff, | COMPLAINT |
| v. | DEMAND FOR JURY TRIAL |
| MONSANTO COMPANY, | |
| Defendant. | |

## INTRODUCTION

1.      In 1970, the Monsanto Company discovered the herbicidal properties of glyphosate and began using it in its products by 1974, marketing it under the brand name herbicide Roundup.  Roundup is a non-selective herbicide used to kill weeds.  By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 million pounds used annually. That number grew to 185 million pounds by 2007.

2.      Walter J. Watson used the weed killer Roundup, an herbicide created and manufactured by the Monsanto Company, for approximately nine (9) years from 1998 through 2007.  Roundup was supposed to be safe, after all, Monsanto promoted Roundup as being harmless to humans for over thirty years.   In truth, the active chemical in Roundup—glyphosate—is a carcinogen, and Monsanto has known this fact for decades.

3.      In July of 2005, Mr. Watson was evaluated and diagnosed with Non-Hodgkin lymphoma.

4.      The International Agency for Research on Cancer (IARC), an organization within the World Health Organization (WHO), conducted an exhaustive analysis on the toxicity of glyphosate.  The IARC, which has already reviewed hundreds of other chemical agents, convened a panel of seventeen renowned scientists from eleven countries, specifically screened to avoid potential conflicts of interest, to conduct a systematic review of all publically available information about glyphosate.  The year-long study resulted in the publication of an IARC

1

Monograph—the authoritative standard for cancer hazard assessment around the world. The IARC classified glyphosate as a Group 2A hazard, meaning it is a probable human carcinogen— the second highest hazard rating. Additionally, the IARC concluded there was a positive association between glyphosate exposure and non-Hodgkin lymphoma.

5.      Monsanto has represented Roundup as being safe to humans and the environment since it began selling the herbicide. Monsanto has proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup, create no unreasonable risks to human health or to the environment. This is untrue. Before glyphosate was first approved by the Environmental Protection Agency (EPA), Monsanto knew that glyphosate could pose significant risks to human health, including a risk of causing cancer. This lawsuit seeks to hold Monsanto accountable for this misconduct.

## PARTIES

6.      Plaintiff Walter J. Walton is a citizen of the State of Tennessee and resides in Memphis, Tennessee in Shelby County.

7.      Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri. Monsanto is a citizen of Missouri and Delaware and is not a citizen of Tennessee. At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and was the manufacturer of the Roundup at issue.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. There is complete diversity of citizenship between the parties. In addition, Plaintiff seeks damages in excess of $75,000, exclusive of interest and costs.

9.      This Court has personal jurisdiction over Monsanto insofar as Monsanto is authorized and licensed to conduct business in the State of Tennessee, maintains and carries on systematic and continuous contacts in this judicial district, regularly transacts business within this judicial district, and regularly avails itself of the benefits of this judicial district.

10.     Additionally, Monsanto caused tortious injury by acts and omissions in this judicial district and caused tortious injury in this district by acts and omissions outside this district while regularly doing and soliciting business, engaging in a persistent course of conduct, and deriving substantial revenue from goods used or consumed and services rendered in this judicial district.

11.     Venue is proper before this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred within this judicial district.

## FACTUAL ALLEGATIONS

12.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world, including the popular herbicide Roundup.

13.     Glyphosate interferes with a plant's ability to form aromatic amino acids necessary for protein synthesis.  Plants treated with glyphosate generally die within two to three days.  Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce, or by milling, baking, or brewing grains.

14.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup.

15.     For about 40 years, farmers and the general population around the world have used Roundup containing glyphosate, without knowing of the dangers its use poses. That is because, when Monsanto first introduced Roundup, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment.  History, however, has demonstrated otherwise. According to the WHO, the main chemical ingredient of Roundup—glyphosate—is a probable carcinogen.

16.     Monsanto assured the public that Roundup was harmless.  In order to prove this, Monsanto championed falsified data and attacked legitimate studies exposing glyphosate's dangers. Monsanto orchestrated a prolonged campaign of misinformation to convince

3

government agencies, farmers, and the general population that Roundup was safe.  As a result of this deception the general public has been exposed to a carcinogen, while Monsanto has made billions.

## I.    Registration of Herbicides

17.    The manufacture, formulation, and distribution of herbicides, such as Roundup, is regulated under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. §§ 136 *et seq.* FIFRA requires that all pesticides be registered with the EPA prior to distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

18.    Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The EPA does not deem certain products "safe," but only that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

19.    FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb).  FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

20.    FIFRA generally requires that the registrant, Monsanto in the case of Roundup, conduct the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting those tests. The data produced by the registrant must be submitted to the EPA for review and evaluation.  The government is not required, nor is it able, to perform the tests that are required of the manufacturer.

21.    The evaluation of each pesticide product distributed, sold, or manufactured is

4

completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

22.    In the case of glyphosate, the EPA planned on releasing its preliminary risk assessment—in relation to the re-registration process—no later than July 2015.  The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

23.    In April 2016, the EPA posted a risk assessment of glyphosate on its website and then immediately retracted it.  The EPA subsequently indicated that the posting was inadvertent, that the document posted was not the EPA's final assessment or even a preliminary one, and that the EPA intended to issue a final report by the end of 2016.

## II.    Scientific Fraud Underlying the Marketing and Sale of Roundup

24.    Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991.  In so classifying glyphosate, however, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

25.    On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed fraud.

26.    In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup. IBT performed approximately 30 tests on glyphosate and glyphosate-containing-products, including 9 of the 15

residue studies needed to register Roundup with the EPA..  The EPA subsequently audited IBT and determined that the toxicology studies conducted for Roundup were invalid.

27.    Three top executives of IBT were convicted of fraud in 1983.

28.    In the second incident, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including several studies on Roundup. That same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

**III.  Monsanto Falsely Advertised Roundup as Being Safe for Decades**

29.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products.  Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish.  Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are:

a.    "Remember that environmentally friendly Roundup herbicide is biodegradable.  It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences."

b.    "And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem."

c.    "Roundup biodegrades into naturally occurring elements."

d.    "Remember that versatile Roundup herbicide stays where you put it.  That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e.    "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it."

f.    You can apply Roundup with "confidence because it will stay where you put it,"

6

it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Roundup into natural products.

g. "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

h. "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

i. "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

j. "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area that has been treated with Roundup.

30.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a. glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

b. glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;

c. glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

d. glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics";

e. glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and,

f.  glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

31.  Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

## IV.  Assessments of Glyphosate and Roundup

32.  IARC was created in 1965 as the specialized cancer agency of the World Health Organization with support of the United States.  IARC promotes international collaboration in cancer research, "bringing together skills in epidemiology, laboratory sciences, and biostatistics to identify the causes of cancer[.]"

33.  IARC is transparent.  The minutes and documents presented at its council meetings are publicly available and, thus, are subject to scientific scrutiny.  Starting in 1971, IARC began assessing whether chemicals were carcinogenic through the Monograph program.

34.  The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent.  Over time, the IARC Monograph program has reviewed 980 agents.  Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

35.  The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.  Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

36.  A year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts.  Eight months before the Monograph meeting, the Working Group membership is selected, and the sections of the Monograph are developed by the Working Group members.  One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature,

evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

37.     In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

38.     In March 2015, IARC reassessed glyphosate.  The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

39.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, the Working Group consisted of 17 experts from 11 countries who met from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate.  Among the members were Lauren Zeise, Ph.D., of the California Environmental Protection Agency, Matthew T. Martin, Ph.D, a scientist with the U.S. Environmental Protection Agency, and Gloria D. Jahnke, D.V.M., D.A.B.T. of the National Institute of Environmental Health Sciences.

40.     The March meeting culminated after a nearly one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

41.     The studies considered the various exposure groups, including occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland, municipal weed-control workers in the United Kingdom, and para-occupational

9

exposure in farming families.

42.    Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

43.    Exposure pathways are identified as air (especially during spraying), water, and food.  Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

44.    The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies showed a human health concern from agricultural and other work-related exposure to glyphosate.

45.    The IARC Working Group conducted a systematic review of over 15 studies designed to assess whether there was an association between Roundup exposure in agricultural workers and Non-Hodgkin Lymphoma (NHL).  The researchers reviewed each study, identified the results and assessed each study's strengths and weaknesses.  The IARC Working Group concluded that, despite the limited evidence concerning the carcinogenicity of glyphosate in humans, a "positive association has been observed for non-Hodgkin lymphoma."

46.    Overall, nine epidemiological studies showed positive associations between glyphosate and NHL, with several studies showing statistically significant relative risks of NHL exceeding 2.0 and even 3.0.

47.    In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma.  A second study reported a positive trend for haemangiosarcoma in male mice.  Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies.  A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

48.    The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells.  One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.  In assessing the genotoxicity of glyphosate (the property of chemical agents that

damages the genetic information within a cell causing mutations, which may lead to cancer), the IARC Working Group concluded "[t]here is strong evidence that glyphosate causes genotoxicity."

49.     Additionally, the IARC assessed whether glyphosate exposure can induce oxidative stress, which is thought to be involved in the development of numerous conditions, including cancer, autism, and Parkinson's disease.  The IARC concluded that "strong evidence exists that glyphosate . . . can induce oxidative stress."  This could be an important mechanism by which Roundup causes cancer.[1]

50.     In the IARC monograph for glyphosate, there is an entire section devoted to exposure to humans, looking at studies examining glyphosate exposures in various settings including agricultural ones.  The IARC Working Group noted that glyphosate has been detected in urine of agricultural workers, indicating absorption.  The IARC Working Group specifically evaluated farm workers in the United States, and found that, within the days following the application of Roundup to a crop, approximately 60% of farm workers tested positive for glyphosate in the urine.     Additionally, the IARC Working Group noted that soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA).  Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

51.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

_____

[1] In addition to DNA damage and oxidative stress, scientists have suggested Roundup's association with various serious health conditions is linked to the effect Roundup has on the digestive system.  Specifically, scientists believe the same mechanism that makes Roundup toxic to weeds also makes it toxic to the microbes within the human gut. When humans are exposed to Roundup, it leads to a chronic inflammatory state in the gut, as well an impaired gut barrier, which can lead to many long-term health effects, including an increased risk of cancer.

52.     In addition to the IARC's assessment, in 2014, scientists published a systematic review and meta-analysis on the relationship between non-Hodgkin lymphoma and occupational exposure to agricultural pesticides, including glyphosate, in the International Journal of Environmental Research and Public Health. The study showed a statistically significant association between farm workers exposed to Roundup and non-Hodgkin lymphoma.  The study confirmed two smaller studies from 2002 and 2008, published in the journal Leukemia & Lymphoma (2002) and the International Journal on Cancer (2008), both of which also showed a statistically significant increase in non-Hodgkin lymphoma among agricultural workers exposed to glyphosate.

53.     Recent studies, including a glyphosate residue study published in the Journal of Environmental & Analytical Toxicology in 2014, indicate that "chronically ill humans showed significantly higher glyphosate residues in urine than healthy population."  Glyphosate has been detected in the blood and urine of agricultural workers, indicating that agricultural use of Roundup leads to its absorption.

54.     In addition to the studies examining glyphosate, research also suggests that the carcinogenic properties of Roundup are magnified by the addition of adjuvants in the Roundup formulation.  Adjuvants are chemicals that are designed to modify or enhance the effects of other agents.  Monsanto has been including adjuvants with glyphosate in its Roundup products, which are designed to increase the effectiveness of the herbicide.  Studies show, however, that the addition of adjuvants also greatly increases the carcinogenic properties of Roundup.  Notably, Monsanto has systematically tested glyphosate without the adjuvents and used those tests to lobby the EPA that Roundup is safe.

55.     Several countries around the world have instituted bans on the sale of Roundup and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup are more widely known.

56.     The Netherlands issued a ban on all glyphosate-based herbicides in April 2014,

including Roundup, which takes effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

57.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

58.     France banned the private sale of Roundup and glyphosate following the IARC assessment.

59.     Bermuda banned both the private and commercial sale of glyphosate, including Roundup. The Bermuda government explained: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

60.     The Sri Lankan government banned the private and commercial use of glyphosate out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

61.     The government of Columbia announced a ban on using Roundup and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine in response to the IARC's assessment.

62.     In November 2015, 96 prominent experts, including almost the whole IARC team, reiterated IARC's assessment that Roundup is probably a human carcinogen.

63.     In late February 2016, another 14 scientists signed a consensus statement in the Environmental Health journal, saying regulatory estimates of tolerable exposure levels for glyphosate were based on outdated science.

64.     In June 2016, the European Union refused to re-register glyphosate containing herbicides due to safety concerns and will, in all likelihood, begin recalling all glyphosate-containing products within the European Union. Indeed, in June 2016, the EU did not vote to extend the registration of glyphosate due to safety concerns. The fate of the product in Europe is

now in question.

**V.    Plaintiff Walter J. Watson's Exposure to Roundup**

65.    Mr. Watson purchased Roundup at Home Depot and Lowe's in Memphis, Tennessee and Southaven, Mississippi.

66.    When Mr. Watson purchased Roundup, he believed that it was not a carcinogen, and he specifically relied on the labeling and promotion of Roundup as being safe to humans in making his decision to purchase and use the product.

67.    From approximately 1998 to 2007, in Tennessee, Mississippi, and Alabama, Mr. Watson regularly sprayed Roundup around railroad tracks to manage weeds, for several hours daily, for approximately six months out of each year.

68.    In July of 2005, Mr. Watson was diagnosed with Non-Hodgkin lymphoma.

69.    Mr. Watson subsequently started cancer treatment and is still undergoing treatment today.

70.    Mr. Watson did not learn of the link between Roundup exposure and Non-Hodgkin Lymphoma until March of 2017.

<u>LIMITATION ON ALLEGATIONS</u>

71.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

72.    The allegations in this pleading are made pursuant to Tennessee law.  To the extent Tennessee law imposes a duty or obligation on Monsanto that exceeds those required by federal law, Plaintiff does not assert such claims.

73.     As alleged in this pleading, in addition to violating Tennessee law, Monsanto violated U.S.C. § 136j and 40 C.F.R. § 156.10(a)(5) by distributing Roundup, which was misbranded pursuant to 7 U.S.C. § 136(g).  Federal law specifically prohibits the distribution of a misbranded herbicide.

<u>COUNT I: STRICT LIABILITY (DESIGN DEFECT)</u>

74.    Plaintiff incorporates by reference each and every allegation set forth in the

preceding paragraphs as if fully stated herein.

75.     Plaintiff brings this strict liability claim against Defendant for defective design.

76.     At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, including the Plaintiff, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant. At all times relevant to this litigation, Defendant designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup products used by Plaintiff, as described above.

77.     At all times relevant to this litigation, Defendant's Roundup products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff.

78.     At all times relevant to this litigation, Defendant's Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Tennessee and throughout the United States, including the Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

79.     Defendant's Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that, when they left the hands of the Defendant's manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

80.     At all times relevant to this action, Defendant knew or had reason to know that its Roundup products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendant.

81.     Therefore, at all times relevant to this litigation, Defendant's Roundup products,

as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendant were defective in design and formulation, in one or more of the following ways:

    a.    When placed in the stream of commerce, Defendant's Roundup products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

    b.    When placed in the stream of commerce, Defendant's Roundup products were unreasonably dangerous in that they were hazardous and posed an unreasonable risk of cancer when used in a reasonably anticipated manner.

    c.    Exposure to Roundup and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

    d.    Defendant knew or should have known at the time of marketing its Roundup products that exposure to Roundup could result in cancer.

    e.    Defendant could have employed safer alternative designs and formulations.

82.    The Plaintiff was exposed to Defendant's Roundup products, as described above, without knowledge of Roundup's dangerous characteristics.

83.    At all times relevant to this litigation, the Plaintiff used and/or was exposed to the use of Defendant's Roundup products in an intended or reasonably foreseeable manner, without knowledge of Roundup's dangerous characteristics.

84.    The Plaintiff could not reasonably have discovered the defects and risks associated with Roundup or glyphosate-containing products before or at the time of exposure due to the Defendant's suppression of scientific information linking glyphosate to cancer.

85.    Therefore, as a result of the unreasonably dangerous condition of its Roundup products, Defendant is strictly liable to Plaintiff.

86.    The defects in Defendant's Roundup products were substantial and contributing

factors in causing Plaintiff's injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained his injuries.

87.     Defendant's conduct, as described above, was reckless. Defendant risked the lives of consumers and users of its products, including Plaintiff, with knowledge of the safety problems associated with Roundup and glyphosate-containing products, and suppressed this knowledge from the general public. Defendant made conscious decisions not to redesign, warn, or inform the unsuspecting public. Defendant's reckless conduct warrants an award of punitive damages.

88.     As a direct and proximate result of Defendant placing its defective Roundup products into the stream of commerce, Plaintiff developed Non-Hodgkin lymphoma and has suffered and continues to suffer severe injuries, physical pain and mental anguish, including diminished enjoyment of life, as well as economic hardship, including considerable financial expenses for medical care and treatment.

89.     Plaintiff continues to endure these injuries and expenses.

90.     WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees and all such other and further relief as this Court deems just and proper.

## COUNT II: STRICT LIABILITY (FAILURE TO WARN)

91.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

92.     Plaintiff brings this strict liability claim against Defendant for failure to warn.

93.     At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

94.     Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiff, and therefore had a duty to warn of the risks associated with the use of Roundup and glyphosate-containing products.

95.     At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure its Roundup products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn Plaintiff of the dangers associated with Roundup use and exposure. Defendant, as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

96.     At the time of the manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

97.     At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by Defendant's herbicides, including Plaintiff.

98.     Despite the fact that Defendant knew or should have known that Roundup posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied or sold the product, and not known to end users and consumers, such as Plaintiff.

99.     Defendant knew or should have known that its products created significant risks

of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers, i.e., the reasonably foreseeable users, of the risks of exposure to its products. Defendant has wrongfully concealed information concerning the dangerous nature of Roundup and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup and glyphosate.

100.    At all times relevant to this litigation, Defendant's Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Tennessee and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

101.    Plaintiff was exposed to Defendant's Roundup products, as described above, without knowledge of their dangerous characteristics.

102.    At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup products while using them for their intended or reasonably foreseeable purposes, without knowledge of their dangerous characteristics.

103.    Plaintiff could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products prior to or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendant to know about and disclose serious health risks associated with using the products.

104.    Defendant knew or should have known that minimal warnings disseminated with its Roundup products were inadequate, failed to communicate adequate information on the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

105.    The information that Defendant did provide failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiff to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that

was inaccurate, false and misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

106.   As a result of their inadequate warnings, Defendant's Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendant.

107.   Defendant is liable to Plaintiff for injuries caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its products and the risks associated with the use of or exposure to Roundup and glyphosate.

108.   Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup products, Plaintiff could have avoided the risk of developing injuries and could have obtained or used alternative herbicides.

109.   As a direct and proximate result of Defendant placing its defective Roundup products into the stream of commerce, Plaintiff developed Non-Hodgkin lymphoma and has suffered and continues to suffer severe injuries, physical pain and mental anguish, including diminished enjoyment of life, as well as economic hardship, including considerable financial expenses for medical care and treatment, and general damages in a sum in excess of the jurisdictional minimum of this Court.

110.   Plaintiff continues to endure these injuries and expenses as his cancer is still present, and Plaintiff is still undergoing treatment.

111.   WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees and all such other and further relief as this Court deems just and proper.

## COUNT III: NEGLIGENCE

112.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

113.    Defendant, directly or indirectly, caused Roundup products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

114.    At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

115.    At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup products. Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup, and, in particular, its active ingredient glyphosate.

116.    At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup and specifically, the carcinogenic properties of the chemical glyphosate.

117.    Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup products could cause or be associated with Plaintiff's injuries, and thus, created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

118.    Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup and glyphosate-containing products.

119.    As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply,

promotion, advertisement, packaging, sale, and distribution of its Roundup products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

120.   Defendant was negligent in its promotion of Roundup, outside of the labeling context, by failing to disclose material risk information as part of its promotion and marketing of Roundup, including the Internet, television, print advertisements, etc. Nothing prevented Defendant from being honest in its promotional activities, and in fact, Defendant had a duty to disclose the truth about the risks associated with Roundup in its promotional efforts, outside of the context of labeling.

121.   Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant has failed to do so. Indeed, Defendant has wrongfully concealed information and has further made false and/or misleading statements concerning the safety of and/or exposure to Roundup and glyphosate.

121.   Defendant's negligence included:

a.     Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup products without thorough and adequate pre- and post-market testing;

b.     Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup while failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup;

c.     Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup products and glyphosate-containing

products were safe for their intended use in agriculture and horticulture;

d.　　Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup products so as to avoid the risk of serious harm associated with the prevalent use of Roundup/glyphosate as an herbicide;

e.　　Failing to design and manufacture Roundup products so as to ensure they were at least as safe and effective as other herbicides on the market;

f.　　Failing to provide adequate instructions, guidelines, and safety precautions to those persons Defendant could reasonably foresee would use and be exposed to its Roundup products;

g.　　Failing to disclose to Plaintiff, users/consumers, and the general public that use of and exposure to Roundup presented severe risks of cancer;

h.　　Failing to warn Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to the Plaintiff and other consumers;

i.　　Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup and glyphosate-containing products;

j.　　Representing that its Roundup products were safe for their intended use when, in fact, Defendant knew or should have known the products were not safe for their intended purpose;

k.　　Declining to make or propose any changes to Roundup products' labeling or other promotional materials that would alert consumers and the general public of the risks of Roundup and glyphosate;

l.　　Advertising, marketing, and recommending the use of the Roundup products, while failing to disclose or warn of the dangers known (by

Defendant) to be associated with or caused by the use of or exposure to Roundup and glyphosate;

m.    Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup products are not unsafe for use in the agricultural and horticultural industries; and

n.    Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

122.    Defendant knew and/or should have known that it was foreseeable consumers such as the Plaintiff would suffer injuries as a result of Defendant's failure to exercise ordinary care in the designing, manufacturing, marketing, labeling, distribution, and sale of Roundup.

123.    The Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup or its active ingredient glyphosate.

124.    Defendant's negligence was the proximate cause of Plaintiff's injuries, i.e., absent Defendant's negligence, Plaintiff would not have developed Non-Hodgkin lymphoma.

125.    Defendant's conduct, as described above, was grossly negligent. Defendant regularly risks the lives of consumers and users of its products, including Plaintiff, with full knowledge of the danger of its products. Defendant has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff. Defendant's gross negligence therefore warrants an award of punitive damages.

126.    As a direct and proximate result of Defendant placing its defective Roundup products into the stream of commerce, Plaintiff developed Non-Hodgkin lymphoma and has suffered and continues to suffer severe injuries, physical pain and mental anguish, including diminished enjoyment of life, as well as economic hardship, including considerable financial expenses for medical care and treatment, and general damages in a sum in excess of the jurisdictional minimum of this Court.

127.    Plaintiff continues to endure these injuries and expenses as his cancer is still prevalent, and his treatment is still ongoing.

128.    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees and all such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMAND

129.    Plaintiff demands a trial by jury on all of the triable issues within this pleading.

## PRAYER FOR RELIEF

130.    WHEREFORE, Plaintiff requests that the Court enter judgment in his favor and against the Defendant, awarding the Plaintiff:

a.      actual or compensatory damages in such amount to be determined at trial an as provided by applicable law;

b.      punitive damages sufficient to punish and deter the Defendant and others from future fraudulent practices;

c.      pre-judgment and post-judgment interest;

d.      costs including reasonable attorney's fees, court costs, and other litigation expenses;

e.      any other relief the Court may deem just and proper.

Dated: February 26, 2018

**RESPECTFULLY SUBMITTED:**

  /s/ Michael P. McGartland
Michael P. McGartland
TN Bar No. 024038
**McGartland Law Firm, PLLC**
University Centre I, Suite 500
1300 South University Drive
Fort Worth, Texas 76107
Telephone: (817) 332-9300
Facsimile: (817) 332-9301
mike@mcgartland.com

**PENDLEY, BAUDIN & COFFIN, L.L.P.**
Nicholas R. Rockforte, LA Bar No. 3130
Christopher L. Coffin, LA Bar No.  27902
Evan P. Fontenot, LA Bar No. 37685

P. O. Drawer 71
24110 Eden Street
Plaquemine, Louisiana 70765
Phone: 225/687-6396
Fax: 225/687-6398
**nrockforte@pbclawfirm.com**