ACCO,NORMERN,(Ex),DISCOVERY,MANADR

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
# CIVIL DOCKET FOR CASE #: 2:18-cv-05970-FMO-E

Armando Vargas Chavez v. Monsanto Company et al

Assigned to: Judge Fernando M. Olguin

Referred to: Magistrate Judge Charles F. Eick

Case in other court: Ventura County Superior Court, 56-02018-
00514163-CU-PO-VTA

Cause: 28:1441 Notice of Removal - Product Liability

Date Filed: 07/09/2018

Jury Demand: Defendant

Nature of Suit: 365 Personal Inj. Prod.
Liability

Jurisdiction: Diversity

**Plaintiff**

**Armando Vargas Chavez**                    represented by    **Jonathan L Nielsen**
Nielsen Peterson and Nielsen LLP
4015 Mission Oaks Boulevard Suite B
Camarillo, CA 93012
805-639-8600
Fax: 805-228-4669
Email: jonathan@npnlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kirt J Peterson**
Nielsen Peterson and Nielsen LLP
4015 Mission Oaks Boulevard Suite B
Camarillo, CA 93012
805-639-8600
Fax: 805-228-4669
Email: kirt@npnlaw.com
*ATTORNEY TO BE NOTICED*

**Tanner R Nielsen**
Nielsen Peterson and Nielsen LLP
4015 Mission Oaks Boulevard Suite B
Camarillo, CA 93012
805-639-8600
Fax: 805-228-4669
Email: tanner@npnlaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**                         represented by    **Steven Robert Platt**
Parker Milliken Clark OHara and Samuelian
APC
555 South Flower Street 30th Floor
Los Angeles, CA 90071
213-683-6500

Fax: 213-683-6669
Email: splatt@pmcos.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard A Clark**
Parker Milliken Clark O'Hara and
Samuelian PC
555 South Flower Street 30th Floor
Los Angeles, CA 90071-2440
213-683-6500
Fax: 213-683-6669
Email: rclark@pmcos.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Does**
*1 through 100, Inclusive*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/09/2018 | 1 | NOTICE OF REMOVAL from Ventura County Superior Court, case number 56-2018-00514163-CU-PO-VTA Receipt No: 0973-22059914 - Fee: $400, filed by defendant Monsanto Company. (Attachments: # 1 Exhibit Exhibit 1 State Court Summons, # 2 Exhibit Exhibit 2 Complaint, # 3 Exhibit Exhibit 3 State Court Civil Case Cover Sheet, # 4 Exhibit Exhibit 4 Notice of Case Assignment, # 5 Exhibit Exhibit 5 Tax Assessor Record, # 6 Exhibit Exhibit 6 People Finder Tracker Record, # 7 Exhibit Exhibit 7 Notice of Filing of Notice of Removal, # 8 Proof of Service of Notice of Removal) (Attorney Steven Robert Platt added to party Monsanto Company(pty:dft))(Platt, Steven) (Entered: 07/09/2018) |
| 07/09/2018 | 2 | CIVIL COVER SHEET filed by Defendant Monsanto Company. (Platt, Steven) (Entered: 07/09/2018) |
| 07/09/2018 | 3 | *Certification and* NOTICE of Interested Parties filed by defendant Monsanto Company, identifying Bayer AG, Armando Vargas Chavez. (Platt, Steven) (Entered: 07/09/2018) |
| 07/09/2018 | 4 | CORPORATE DISCLOSURE STATEMENT filed by Defendant Monsanto Company identifying Bayer AG as Corporate Parent. (Platt, Steven) (Entered: 07/09/2018) |
| 07/09/2018 | 5 | Notice of Appearance or Withdrawal of Counsel: for attorney Steven Robert Platt counsel for Defendant Monsanto Company. Adding Steven R. Platt as counsel of record for Monsanto Company for the reason indicated in the G-123 Notice. Filed by defendant Monsanto Company. (Platt, Steven) (Entered: 07/09/2018) |
| 07/09/2018 | 6 | ANSWER to Notice of Removal (Attorney Civil Case Opening,,, 1 JURY DEMAND. *Monsanto Company's Answer to Plaintiff's Complaint (Complaint is Exhibit 2 to Notice of Removal)* filed by Defendant Monsanto Company.(Platt, Steven) (Entered: 07/09/2018) |
| 07/09/2018 | 7 | Notice of Appearance or Withdrawal of Counsel: for attorney Richard A Clark counsel for Defendant Monsanto Company. Adding Richard A. Clark as counsel of record for Monsanto Company for the reason indicated in the G-123 Notice. Filed by defendant Monsanto Company. (Attorney Richard A Clark added to party Monsanto Company(pty:dft))(Clark, Richard) (Entered: 07/09/2018) |
| 07/09/2018 | | CONFORMED FILED COPY OF COMPLAINT against Defendant Does 1 through 100, |

| | | Inclusive, Monsanto Company. Jury Demanded., filed by plaintiff Armando Vargas Chavez. (FILED IN STATE COURT ON 6/28/2018 SUBMITTED ATTACHED EXHIBIT 2) (ghap) (Entered: 07/11/2018) |
|---|---|---|
| 07/11/2018 | 8 | NOTICE OF ASSIGNMENT to District Judge Fernando M. Olguin and Magistrate Judge Charles F. Eick. (ghap) (Entered: 07/11/2018) |
| 07/11/2018 | 9 | NOTICE TO PARTIES OF COURT-DIRECTED ADR PROGRAM filed. (ghap) (Entered: 07/11/2018) |
| 07/11/2018 | 10 | PROOF OF SERVICE filed by defendant Monsanto Company, re Notice of Assignment to United States Judges(CV-18) - optional html form 8 served on July 11, 2018. (Platt, Steven) (Entered: 07/11/2018) |
| 07/13/2018 | 11 | TEXT ONLY ENTRY by Chambers of Judge Fernando M. Olguin. This matter has been assigned to District Judge Fernando M. Olguin. The Court refers counsel to the Court's Initial Standing Order found on the Court's Website under Judge Olguin's Procedures and Schedules. Please read this Order carefully.THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (vdr) TEXT ONLY ENTRY (Entered: 07/13/2018) |
| 07/13/2018 | 12 | ORDER SETTING SCHEDULING CONFERENCE by Judge Fernando M. Olguin. Scheduling Conference set for 8/23/2018 at 10:00 AM before Judge Fernando M. Olguin. (vdr) (Entered: 07/13/2018) |
| 07/13/2018 | 13 | PROOF OF SERVICE filed by defendant Monsanto Company, *Monsanto Company's Proof of Service of Initial Standing Order* served on 07/13/2018. (Platt, Steven) (Entered: 07/13/2018) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 07/23/2018 10:57:01 | | |
| **PACER Login:** | hllp1982:2634105:4722683 | **Client Code:** | 1417.0018 |
| **Description:** | Docket Report | **Search Criteria:** | 2:18-cv-05970-FMO-E End date: 7/23/2018 |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

1  NIELSEN, PETERSON & NIELSEN LLP
   Jonathan Nielsen (SBN: 239416)
2  *jonathan@npnlaw.com*
   Kirt J. Peterson (SBN: 245071)
3  *kirt@npnlaw.com*
   Tanner Nielsen (SBN: 294525)
4  *tanner@npnlaw.com*
   4015 Mission Oaks Blvd., Suite B
5  Camarillo, CA 93012

6  Telephone: (805) 639-8600
   Facsimile: (805) 228-4669
7
   Attorneys for Plaintiff(s),
8  ARMANDO VARGAS CHAVEZ

VENTURA
SUPERIOR COURT
FILED

JUN 2 8 2018

MICHAEL D. PLANET
Executive Officer and Clerk
BY:_____, Deputy

ALBERT VILLEGAS JR.

9

10              SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                    FOR THE COUNTY OF VENTURA

12

13  ARMANDO VARGAS CHAVEZ      ) Case No  56-2018-00514163-CU-PO-VTA
                               )
14         Plaintiffs          ) **COMPLAINT FOR DAMAGES**
                               ) **(Unlimited Jurisdiction)**
15  v.                         )
                               )    1.  **STRICT PRODUCTS LIABILITY**
16                             )        **(DESIGN DEFECT**
    MONSANTO COMPANY and DOES 1)    2.  **STRICT PRODUCTS LIABILITY**
17  through 100, Inclusive     )        **(FAILURE TO WARN)**
                               )    3.  **NEGLIGENCE**
18         Defendants.         )    4.  **BREACH OF EXPRESS**
                               )        **WARRANTIES**
19                             )    5.  **BREACH OF IMPLIED**
                               )        **WARRANTIES**
20                             )
                               )
21                             )
                               )
22                             )
                               )
23                             )
                               )
24                             )
                               )
25                             )
                               )
26                             )
                               )
27                             )
                               )
28                             )

**PARTIES**

1.  Plaintiff ARMANDO VARGAS CHAVEZ (hereinafter referred to as "CHAVEZ" and/or "PLAINTIFF") is an individual who at all times mentioned herein resided in the State of California, County of Ventura.

2.  Defendant MONSANTO COMPANY is a Delaware Corporation, who at all times mentioned herein sold and distributed its weed killer Roundup in the State of California, County of Ventura and regularly transacts business within Ventura County and the farming community.

3.  DOES 1 through 100 are persons or entities that are unknown to PLAINTIFF. Their capacities are unknown. PLAINTIFF alleges that they are in some way involved in the actions complained of herein as either independent actors, or as agents, assignees or principals of the other named DEFENDANTS. PLAINTIFF will amend this complaint to allege their true identities, capacities and roles as and when they are ascertained.

**INTORDUCTION**

4.  Through 2016, PLAINTIFF CHAVEZ worked for eleven years on a farm where he constantly worked with Roundup, an herbicide created and manufactured by the Monsanto Company. Roundup was supposed to be safe. After all, Monsanto promoted Roundup as being harmless to humans for over thirty years, going so far as to proclaim the product safe as table salt. The truth however, is far more troubling. The active chemical in Roundup, glyphosate, is a carcinogen, and Monsanto has known this for decades.

5.  On or about 2017 CHAVEZ was diagnosed with Leukemia. After being diagnosed with Leukemia CHAVEZ learned of the potential link between Roundup and cancer.

6.  Last year, the International Agency for Research on Cancer (IARC), an organization within the World Health Organization (WHO), conducted an exhaustive analysis on the toxicity of glyphosate. The IARC, which has already reviewed hundreds of other chemical agents, convened a panel of seventeen renowned scientists from eleven countries, specifically screened to avoid potential conflicts of interest, to conduct a systematic review of all publically available information about glyphosate. The year-long study resulted in the

1  publication of an IARC Monograph—the authoritative standard for cancer hazard

2  assessment around the world. The IARC classified glyphosate as a Group 2A hazard,

3  meaning it is a probable human carcinogen—the second highest hazard rating. Additionally,

4  the IARC concluded there was a positive association between glyphosate exposure and non-

5  Hodgkin lymphoma. As a result of the IARC's study of glyphosate, the State of California's

6  Office of Environmental Health Hazard Assessment (OEHHA) has decided to list

7  glyphosate as an agent "known to the state to cause cancer" under Proposition 65.

8  7.  In 1970, Defendant Monsanto discovered the herbicidal properties of glyphosate and began

9  using it in its products in 1974, and marketing it under the brand name Roundup. Roundup

10  is a non-selective herbicide used to kill weeds that commonly compete with the growing of

11  crops. By 2001, glyphosate had become the most-used active ingredient in American

12  agriculture with 85–90 million pounds used annually. That number grew to 185 million

13  pounds by 2007.

14  8.  Monsanto has represented Roundup as being safe to humans and the environment since it

15  began selling the herbicide. Indeed, Monsanto has proclaimed and continues to proclaim to

16  the world, and particularly to United States consumers, that glyphosate-based herbicides,

17  including Roundup, create no unreasonable risks to human health or to the environment.

18  This is untrue. Before glyphosate was first approved by the Environmental Protection

19  Agency (EPA), Monsanto knew that glyphosate could pose significant risks to human health,

20  including a risk of causing cancer. This lawsuit seeks to hold Monsanto accountable for this

21  misconduct.

22  9.  Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal

23  products around the world, including the popular herbicide Roundup.

24  10. Glyphosate interferes with a plant's ability to form aromatic amino acids necessary for

25  protein synthesis. Plants treated with glyphosate generally die within two to three days.

26  Because plants absorb glyphosate, it cannot be completely removed by washing or peeling

27  produce, or by milling, baking, or brewing grains.

28

11. The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup.

12. For about 40 years, farmers around the world have used Roundup, containing glyphosate, without knowing of the dangers its use poses. That is because, when Monsanto first introduced Roundup, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. History, however, has demonstrated otherwise. According to the WHO, the main chemical ingredient of Roundup—glyphosate—is a probable carcinogen. Those most at risk are farm workers and other individuals with workplace exposure to Roundup, such as workers in garden centers, nurseries, and landscapers. Monsanto assured the public that Roundup was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies exposing glyphosate's dangers. Monsanto orchestrated a prolonged campaign of misinformation to convince government agencies, farmers, and the general population that Roundup was safe. As a result of this deception, agricultural workers and farmers have been exposed to a carcinogen, while Monsanto has made billions.

13. Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

14. On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed fraud.

15. In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup. IBT performed approximately

1 30 tests on glyphosate and glyphosate-containing-products, including 9 of the 15 residue

2 studies needed to register Roundup with the EPA.

16. In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT and determined that the toxicology studies conducted for the Roundup were invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

17. Three top executives of IBT were convicted of fraud in 1983.

18. In the second incident, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including several studies on Roundup. That same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

19. The success of Roundup was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup market dominance and to ward off impending competition.

20. In response, Monsanto began the development and sale of genetically engineered "Roundup Ready" seeds in 1996. Since Roundup Ready crops are resistant to glyphosate, farmers can spray Roundup onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup even further. By 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup market through a marketing strategy that coupled proprietary Roundup Ready seeds with continued sales of its Roundup herbicide.

21. Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready seeds, Roundup became Monsanto's most profitable product. In 2000, Roundup accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

22. In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are:

a. "Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences."

b. "And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem."

c. "Roundup biodegrades into naturally occurring elements."

d. "Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e. "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it."

f. You can apply Roundup with "confidence because it will stay where you put it," it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Roundup into natural products.

g. "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

h. "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

i. "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

j. "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area that has been treated with Roundup.

23. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a. glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

b. glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;

c. glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

d. glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics";

e. glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and,

f. glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

24. Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

25. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."

26. The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed

1     980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human

2     Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be

3     Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and

4     one agent to be Probably Not Carcinogenic.

5     27. The established procedure for IARC Monograph evaluations is described in the IARC

6     Programme's Preamble.  Evaluations are performed by panels of international experts,

7     selected on the basis of their expertise and the absence of actual or apparent conflicts of

8     interest.

9     28. A year before the Monograph meeting, the meeting is announced and there is a call both for

10     data and for experts. Eight months before the Monograph meeting, the Working Group

11     membership is selected and the sections of the Monograph are developed by the Working

12     Group members. One month prior to the Monograph meeting, the call for data is closed and

13     the various draft sections are distributed among Working Group members for review and

14     comment. Finally, at the Monograph meeting, the Working Group finalizes review of all

15     literature, evaluates the evidence in each category, and completes the overall evaluation.

16     Within two weeks after the Monograph meeting, the summary of the Working Group

17     findings are published in Lancet Oncology, and within a year after the meeting, the final

18     Monograph is finalized and published.

19     29. In assessing an agent, the IARC Working Group reviews the following information: (a)

20     human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and

21     cancer bioassays; and (c) representative mechanistic data. The studies must be publicly

22     available and have sufficient detail for meaningful review, and reviewers cannot be associated

23     with the underlying study.

24     30.  In March 2015, IARC reassessed glyphosate. The summary published in The Lancet

25     Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in

26     humans.

27     31. On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume

28     112, the volume that assessed glyphosate, the Working Group consisted of 17 experts from

1   11 countries who met from March 3–10, 2015, to assess the carcinogenicity of certain

2   herbicides, including glyphosate. The March meeting culminated after a nearly one-year

3   review and preparation by the IARC Secretariat and the Working Group, including a

4   comprehensive review of the latest available scientific evidence. According to published

5   procedures, the Working Group considered "reports that have been published or accepted

6   for publication in the openly available scientific literature" as well as "data from

7   governmental reports that are publicly available."

8   32. The studies considered the various exposure groups, including occupational exposure of

9   farmers and tree nursery workers in the United States, forestry workers in Canada and

10  Finland, municipal weed-control workers in the United Kingdom, and para-occupational

11  exposure in farming families.

12  33. Glyphosate was identified as the second-most used household herbicide in the United States

13  for weed control between 2001 and 2007 and the most heavily used herbicide in the world in

14  2012.

15  34. Exposure pathways are identified as air (especially during spraying), water, and food.

16  Community exposure to glyphosate is widespread and found in soil, air, surface water, and

17  groundwater, as well as in food.

18  35. The assessment of the IARC Working Group identified several case control studies of

19  occupational exposure in the United States, Canada, and Sweden. These studies showed a

20  human health concern from agricultural and other work-related exposure to glyphosate.

21  36. The IARC Working Group conducted a systematic review of over 15 studies designed to

22  assess whether there was an association between Roundup exposure in agricultural workers

23  and Non-Hodgkin Lymphoma (NHL). The researchers reviewed each study, identified the

24  results and assessed each study's strengths and weaknesses. The IARC Working Group

25  concluded that, despite the limited evidence concerning the carcinogenicity of glyphosate in

26  humans, a "positive association has been observed for non-Hodgkin lymphoma."

27  37. In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor,

28  renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in

male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

38. The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed. In assessing the genotoxicity of glyphosate (the property of chemical agents that damages the genetic information within a cell causing mutations, which may lead to cancer), the IARC Working Group concluded "[t]here is strong evidence that glyphosate causes genotoxicity."

39. Additionally, the IARC assessed whether glyphosate exposure can induce oxidative stress, which is thought to be involved in the development of numerous conditions, including cancer, autism, and Parkinson's disease. The IARC concluded that "strong evidence exists that glyphosate . . . can induce oxidative stress." This could be an important mechanism by which Roundup causes cancer.

40. The IARC Working Group also noted that glyphosate has been detected in urine of agricultural workers, indicating absorption. The IARC Working Group specifically evaluated farm workers in the United States, and found that, within the days following the application of Roundup to a crop, approximately 60% of farm workers tested positive for glyphosate in the urine. Additionally, the IARC Working Group noted that soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

41. The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

42. In addition to the IARC's assessment, in 2014, scientists published a systematic review and meta-analysis on the relationship between non-Hodgkin lymphoma and occupational

exposure to agricultural pesticides, including glyphosate, in the International Journal of Environmental Research and Public Health. The study showed a statistically significant association between farm workers exposed to Roundup and non-Hodgkin lymphoma. The study confirmed two smaller studies from 2002 and 2008, published in the journal Leukemia & Lymphoma (2002) and the International Journal on Cancer (2008), both of which also showed a statistically significant increase in non-Hodgkin lymphoma among agricultural workers exposed to glyphosate.

43. Recent studies, including a glyphosate residue study published in the Journal of Environmental & Analytical Toxicology in 2014, indicate that "chronically ill humans showed significantly higher glyphosate residues in urine than healthy population." Glyphosate has been detected in the blood and urine of agricultural workers, indicating that agricultural use of Roundup leads to its absorption.

44. In 1995, the Northwest Coalition for Alternatives to Pesticides reported that, in California, which has the most comprehensive program for reporting pesticide-caused illness, glyphosate was the third-most reported cause of pesticide illness among agricultural workers.

45. Several countries around the world have instituted bans on the sale of Roundup and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup are more widely known.

46. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup, which takes effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

47. The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

48. France banned the private sale of Roundup and glyphosate following the IARC assessment.

49. Bermuda banned both the private and commercial sale of glyphosate, including Roundup. The Bermuda government explained: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

50. The Sri Lankan government banned the private and commercial use of glyphosate out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

51. The government of Columbia announced a ban on using Roundup and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine in response to the IARC's assessment.

52. In late 2015, following a public comment period, the State of California's Office of Environmental Health Hazard Assessment (OEHHA) has determined to list glyphosate as an agent "known to the state to cause cancer" pursuant to Proposition 65.

53. In November 2015, 96 prominent experts, including almost the whole IARC team, reiterated IARC's assessment that Roundup is probably a human carcinogen.

54. In late February 2016, another 14 scientists signed a consensus statement in the Environmental Health journal, saying regulatory estimates of tolerable exposure levels for glyphosate were based on outdated science.

55. For over eleven years CHAVEZ worked with chemicals and specifically Roundup for the Hiji Brothers farms in Ventura County.   While working on the farms, CHAVEZ regularly worked with Monsanto's Roundup as an herbicide.

56. In or around 2017 CHAVEZ was diagnosed with Leukemia.  Ever since CHAVEZ has been in aggressive treatment of the cancer.

57. CHAVEZ recently became aware of the potential link between glyphosate and cancer.

## FIRST CAUSE OF ACTION

## STRICT PRODUCTS LIABILITY (DESIGN DEFECT)

58. Plaintiff hereby alleges and incorporates by reference each and every allegation stated in the preceding paragraphs of the complaint as though set forth fully herein.

59. Plaintiff brings this strict liability claim against Defendant for defective design.

60. At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, including the Plaintiff, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant. At all times relevant to this litigation, Defendant designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup products used by Plaintiff, as described above.

61. At all times relevant to this litigation, Defendant's Roundup products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff.

62. At all times relevant to this litigation, Defendant's Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in California and throughout the United States, including the Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

63. Defendant's Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that, when they left the hands of the Defendant's manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

64. Defendant's Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that, when they left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

65. At all times relevant to this action, Defendant knew or had reason to know that its Roundup products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendant.

66. Therefore, at all times relevant to this litigation, Defendant's Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendant were defective in design and formulation, in one or more of the following ways:

   a.  When placed in the stream of commerce, Defendant's Roundup products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

   b.  When placed in the stream of commerce, Defendant's Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

   c.  When placed in the stream of commerce, Defendant's Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

   d.  Defendant did not sufficiently test, investigate, or study its Roundup products and, specifically, the active ingredient glyphosate.

   e.  Exposure to Roundup and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

   f.  Defendant knew or should have known at the time of marketing its Roundup products that exposure to Roundup and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

   g.  Defendant did not conduct adequate post-marketing surveillance of its Roundup products.

   h.  Defendant could have employed safer alternative designs and formulations.

67. The Plaintiff was exposed to Defendant's Roundup products in the course of his work as a farmer, as described above, without knowledge of Roundup's dangerous characteristics.

68. At all times relevant to this litigation, the Plaintiff used and/or was exposed to the use of Defendant's Roundup products in an intended or reasonably foreseeable manner, i.e., as a farmer, without knowledge of Roundup's dangerous characteristics.

69. The Plaintiff could not reasonably have discovered the defects and risks associated with Roundup or glyphosate-containing products before or at the time of exposure due to the Defendant's suppression of scientific information linking glyphosate to cancer.

70. The harm caused by Defendant's Roundup products far outweighed their benefit, rendering Defendant's product dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendant's Roundup products were and are more dangerous than alternative products and Defendant could have designed its Roundup products to make them less dangerous. Indeed, at the time Defendant designed its Roundup products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

71. At the time Roundup products left Defendant's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant's herbicides.

72. Defendant's defective design of its Roundup products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup products, including Plaintiff herein.

73. Therefore, as a result of the unreasonably dangerous condition of its Roundup products, Defendant is strictly liable to Plaintiff.

74. The defects in Defendant's Roundup products were substantial and contributing factors in causing Plaintiff's injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained his injuries.

75. Defendant's conduct, as described above, was reckless. Defendant risked the lives of consumers and users of its products, including Plaintiff, with knowledge of the safety problems associated with Roundup and glyphosate-containing products, and suppressed this

1    knowledge from the general public. Defendant made conscious decisions not to redesign,

2    warn or inform the unsuspecting public. Defendant's reckless conduct warrants an award of

3    punitive damages.

4    76. As a direct and proximate result of Defendant placing its defective Roundup products into

5    the stream of commerce, Plaintiff has sustained pecuniary loss and general damages in a sum

6    in excess of the jurisdictional minimum of this Court.

7    77. Wherefore, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor

8    for compensatory, general and punitive damages, together with interest, costs herein

9    incurred, attorneys' fees and all such other and further relief as this Court deems just and

10   proper.

## SECOND CAUSE OF ACTION

## STRICT PRODUCT LIABILITY (FAILURE TO WARN)

13   78. Plaintiff hereby alleges and incorporate by reference each and every allegation stated in the

14   preceding paragraphs of the complaint as though set forth fully herein.

15   79. Plaintiff brings this strict liability claim against Defendant for failure to warn.

16   80. At all times relevant to this litigation, Defendant engaged in the business of testing,

17   developing, designing, manufacturing, marketing, selling, distributing, and promoting

18   Roundup products, which are defective and unreasonably dangerous to consumers, including

19   Plaintiff, because they do not contain adequate warnings or instructions concerning the

20   dangerous characteristics of Roundup and specifically, the active ingredient glyphosate.

21   These actions were under the ultimate control and supervision of Defendant.

22   81. Defendant researched, developed, designed, tested, manufactured, inspected, labeled,

23   distributed, marketed, promoted, sold, and otherwise released into the stream of commerce

24   its Roundup products, and in the course of same, directly advertised or marketed the

25   products to consumers and end users, including Plaintiff and therefore had a duty to warn of

26   the risks associated with the use of Roundup and glyphosate-containing products.

27   82. At all times relevant to this litigation, Defendant had a duty to properly test, develop, design,

28   manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply,

provide proper warnings, and take such steps as necessary to ensure its Roundup products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn Plaintiff of the dangers associated with Roundup use and exposure. Defendant, as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

83. At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

84. At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by Defendant's herbicides, including Plaintiff.

85. Despite the fact that Defendant knew or should have known that Roundup posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied or sold the product, and not known to end users and consumers, such as Plaintiff.

86. Defendant knew or should have known that its products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers, i.e., the reasonably foreseeable users, of the risks of exposure to its products. Defendant has wrongfully concealed information concerning the dangerous nature of Roundup and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup and glyphosate.

87. At all times relevant to this litigation, Defendant's Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in California and throughout the United States, including Plaintiff, without substantial change

1   in their condition as designed, manufactured, sold, distributed, labeled, and marketed by

2   Defendant.

3   88. Plaintiff was exposed to Defendant's Roundup products in the course of his work as a

4   farmer, as described above, without knowledge of their dangerous characteristics.

5   89. At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of

6   Defendant's Roundup products while using them for their intended or reasonably

7   foreseeable purposes, without knowledge of their dangerous characteristics.

8   90. Plaintiff could not have reasonably discovered the defects and risks associated with Roundup

9   or glyphosate-containing products prior to or at the time of Plaintiff's exposure. Plaintiff

10   relied upon the skill, superior knowledge, and judgment of Defendant to know about and

11   disclose serious health risks associated with using the products.

12   91. Defendant knew or should have known that the minimal warnings disseminated with its

13   Roundup products were inadequate, failed to communicate adequate information on the

14   dangers and safe use/exposure, and failed to communicate warnings and instructions that

15   were appropriate and adequate to render the products safe for their ordinary, intended and

16   reasonably foreseeable uses, including agricultural and horticultural applications.

17   92. The information that Defendant did provide or communicate failed to contain relevant

18   warnings, hazards, and precautions that would have enabled farmers such as Plaintiff to

19   utilize the products safely and with adequate protection. Instead, Defendant disseminated

20   information that was inaccurate, false and misleading, and which failed to communicate

21   accurately or adequately the comparative severity, duration, and extent of the risk of injuries

22   with use of and/or exposure to Roundup and glyphosate; continued to aggressively promote

23   the efficacy of its products, even after it knew or should have known of the unreasonable

24   risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through

25   aggressive marketing and promotion, any information or research about the risks and

26   dangers of exposure to Roundup and glyphosate.

27   93. This alleged failure to warn is not limited to the information contained on Roundup's

28   labeling. The Defendant was able, in accord with federal law, to comply with California law

1   by disclosing the known risks associated with Roundup through other non-labeling

2   mediums, i.e., promotion, advertisements, public service announcements, and/or public

3   information sources. The Defendant, however, did not disclose these known risks through

4   any medium.

5   94. To this day, Defendant has failed to adequately and accurately warn of the risks of cancer

6   associated with the use of and exposure to Roundup and its active ingredient glyphosate.

7   95. As a result of their inadequate warnings, Defendant's Roundup products were defective and

8   unreasonably dangerous when they left the possession and/or control of Defendant, were

9   distributed by Defendant, and used by Plaintiff in the course of work as a farmer.

10   96. Defendant is liable to Plaintiff for injuries caused by its negligent or willful failure, as

11   described above, to provide adequate warnings or other clinically relevant information and

12   data regarding the appropriate use of its products and the risks associated with the use of or

13   exposure to Roundup and glyphosate.

14   97. Had Defendant provided adequate warnings and instructions and properly disclosed and

15   disseminated the risks associated with its Roundup products, Plaintiff could have avoided

16   the risk of developing injuries and could have obtained or used alternative herbicides.

17   98. As a direct and proximate result of Defendant placing its defective Roundup products into

18   the stream of commerce, Plaintiff was injured and sustained pecuniary loss and general

19   damages in a sum in excess of the jurisdictional minimum of this Court.

20   99. Wherefore, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor

21   for compensatory, general and punitive damages, together with interest, costs herein

22   incurred, attorneys' fees and all such other and further relief as this Court deems just and

23   proper.

### THIRD CAUSE OF ACTION

### NEGLIGENCE

26   100. The Plaintiff hereby alleges and incorporates by reference each and every allegation stated in

27   the preceding paragraphs of the complaint as though set forth fully herein.

28

101. Defendant, directly or indirectly, caused Roundup products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

102. At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

103. At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup products.

104. Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup, and, in particular, its active ingredient glyphosate.

105. At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup and specifically, the carcinogenic properties of the chemical glyphosate.

106. Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup products could cause or be associated with Plaintiff's injuries, and thus, created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

107. Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup and glyphosate-containing products.

108. As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know

1    that a user's or consumer's exposure to the products created a significant risk of harm and

2    unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks

3    and injuries.

4  109. Defendant was negligent in its promotion of Roundup, outside of the labeling context, by

5    failing to disclose material risk information as part of its promotion and marketing of

6    Roundup, including the Internet, television, print advertisements, etc. Nothing prevented

7    Defendant from being honest in its promotional activities, and in fact, Defendant had a duty

8    to disclose the truth about the risks associated with Roundup in its promotional efforts,

9    outside of the of the context of labeling.

10  110. Despite its ability and means to investigate, study, and test its products and to provide

11    adequate warnings, Defendant has failed to do so. Indeed, Defendant has wrongfully

12    concealed information and has further made false and/or misleading statements concerning

13    the safety and/or exposure to Roundup and glyphosate.

14  111. Defendant's negligence included:

15    a.  Manufacturing, producing, promoting, formulating, creating, developing, designing,

16       selling, and/or distributing its Roundup products without thorough and adequate pre-

17       and post-market testing;

18    b.  Manufacturing, producing, promoting, formulating, creating, developing, designing,

19       selling, and/or distributing Roundup while negligently and/or intentionally concealing

20       and failing to disclose the results of trials, tests, and studies of exposure to glyphosate,

21       and, consequently, the risk of serious harm associated with human use of and exposure

22       to Roundup;

23    c.  Failing to undertake sufficient studies and conduct necessary tests to determine whether

24       or not Roundup products and glyphosate-containing products were safe for their

25       intended use in agriculture and horticulture;

26    d.  Failing to use reasonable and prudent care in the design, research, manufacture, and

27       development of Roundup products so as to avoid the risk of serious harm associated

28       with the prevalent use of Roundup/glyphosate as an herbicide;

e.   Failing to design and manufacture Roundup products so as to ensure they were at least as safe and effective as other herbicides on the market;

f.   Failing to provide adequate instructions, guidelines, and safety precautions to those persons Defendant could reasonably foresee would use and be exposed to its Roundup products;

g.   Failing to disclose to Plaintiff, users/consumers, and the general public that use of and exposure to Roundup presented severe risks of cancer and other grave illnesses;

h.   Failing to warn Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to the Plaintiff and other consumers;

i.   Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup and glyphosate-containing products;

j.   Representing that its Roundup products were safe for their intended use when, in fact, Defendant knew or should have known the products were not safe for their intended purpose;

k.   Declining to make or propose any changes to Roundup products' labeling or other promotional materials that would alert consumers and the general public of the risks of Roundup and glyphosate;

l.   Advertising, marketing, and recommending the use of the Roundup products, while concealing and failing to disclose or warn of the dangers known (by Defendant) to be associated with or caused by the use of or exposure to Roundup and glyphosate;

m.   Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup products are not unsafe for use in the agricultural and horticultural industries; and

n.   Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

112. Defendant knew and/or should have known that it was foreseeable consumers such as the Plaintiff would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup.

113. The Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup or its active ingredient glyphosate.

114. Defendant's negligence was the proximate cause of Plaintiff's injuries, i.e., absent Defendant's negligence, Plaintiff would not have developed cancer.

115. Defendant's conduct, as described above, was reckless. Defendant regularly risks the lives of consumers and users of its products, including Plaintiff, with full knowledge of the dangers of its products. Defendant has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff. Defendant's reckless conduct therefore warrants an award of punitive damages.

116. As a direct and proximate result of Defendant placing its defective Roundup products into the stream of commerce, Plaintiff has sustained pecuniary loss and general damages in a sum in excess of the jurisdictional minimum of this Court.

117. Wherefore, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory, general and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## FOURTH CAUSE OF ACTION

## BREACH OF EXPRESS WARRANTIES

118. Plaintiff hereby alleges and incorporates by reference each and every allegation stated in the preceding paragraphs of the complaint as though set forth fully herein.

119. At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

120. Defendant had a duty to exercise reasonable care in the research, development, design, testing, packaging, manufacture, inspection, labeling, distributing, marketing, promotion, sale, and release of its Roundup products, including a duty to:

a. ensure that its products did not cause the user unreasonably dangerous side effects;

b. warn of dangerous and potentially fatal side effects; and

c. disclose adverse material facts, such as the true risks associated with the use of and exposure to Roundup and glyphosate-containing products, when making representations to consumers and the general public, including Plaintiff.

121. As alleged throughout this pleading, the ability of Defendant to properly disclose those risks associated with Roundup is not limited representations made on the labeling.

122. At all times relevant to this litigation, Defendant expressly represented and warranted to the purchasers of its products, by and through statements made by Defendant in labels, publications, package inserts, and other written materials intended for consumers and the general public, that its Roundup products were safe to human health and the environment, effective, fit, and proper for their intended use. Defendant advertised, labeled, marketed, and promoted Roundup products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that its Roundup products would conform to the representations.

123. These express representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Roundup and glyphosate. Defendant knew and/or should have known that the risks expressly included in Roundup warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendant expressly represented that its Roundup products were safe and effective, that they were safe and effective for use by individuals such as the Plaintiff, and/or that they were safe and effective as agricultural herbicides.

124. The representations about Roundup, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods

1 and became part of the basis of the bargain, creating an express warranty that the goods
2 would conform to the representations.

3 125. Defendant placed its Roundup products into the stream of commerce for sale and
4 recommended their use to consumers and the public without adequately warning of the true
5 risks of developing the injuries associated with the use of and exposure to Roundup and its
6 active ingredient glyphosate.

7 126. Defendant breached these warranties because, among other things, its Roundup products
8 were defective, dangerous, unfit for use, did not contain labels representing the true and
9 adequate nature of the risks associated with their use, and were not merchantable or safe for
10 their intended, ordinary, and foreseeable use and purpose. Specifically, Defendant breached
11 the warranties in the following ways:

12 a. Defendant represented through its labeling, advertising, and marketing materials that its
13 Roundup products were safe, and fraudulently withheld and concealed information about
14 the risks of serious injury associated with use of and/or exposure to Roundup and
15 glyphosate by expressly limiting the risks associated with use and/or exposure within its
16 warnings and labels; and

17 b. Defendant represented that its Roundup products were safe for use and fraudulently
18 concealed information that demonstrated that glyphosate, the active ingredient in Roundup,
19 had carcinogenic properties, and that its Roundup products, therefore, were not safer than
20 alternatives available on the market.

21 127. The Plaintiff detrimentally relied on the express warranties and representations of Defendant
22 concerning the safety and/or risk profile of Roundup in making a decision to purchase the
23 product. Plaintiff reasonably relied upon Defendant to disclose known defects, risks,
24 dangers, and side effects of Roundup and glyphosate. He would not have used Roundup had
25 the Defendant properly disclose the risks associated with the product, either through
26 advertising, labeling, or any other form of disclosure.

27 128. Defendant had sole access to material facts concerning the nature of the risks associated
28 with its Roundup products as expressly stated within its warnings and labels, and Defendant

1    knew that consumers and users such as Plaintiff could not have reasonably discovered that

2    the risks expressly included in Roundup warnings and labels were inadequate and inaccurate.

3    129. Plaintiff had no knowledge of the falsity or incompleteness of Defendant's statements and

4    representations concerning Roundup.

5    130. Plaintiff used and/or was exposed to the use of Roundup as researched, developed,

6    designed, tested, manufactured, inspected, labeled, distributed, packaged, marketed,

7    promoted, sold, or otherwise released into the stream of commerce by Defendant.

8    131. Had the warnings, labels, advertisements, or promotional material for Roundup products

9    accurately and adequately set forth the true risks associated with the use of such products,

10   including Plaintiff's injuries, rather than expressly excluding such information and warranting

11   that the products were safe for their intended use, Plaintiff could have avoided the injuries

12   complained of herein.

13   132. As a direct and proximate result of Defendant breach of express warranty, the Plaintiff has

14   sustained pecuniary loss and general damages in a sum in excess of the jurisdictional

15   minimum of this Court.

16   133. Wherefore, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor

17   for compensatory, general and punitive damages, together with interest, costs herein

18   incurred, attorneys' fees, and all such other and further relief as this Court deems just and

19   proper.

20                          **FIFTH CAUSE OF ACTION**

21                    **BREACH OF IMPLIED WARRANTIES**

22   134. Plaintiff hereby alleges and incorporates by reference each and every allegation stated in the

23   preceding paragraphs of the complaint as though set forth fully herein.

24   135. At all times relevant to this litigation, Defendant engaged in the business of testing,

25   developing, designing, manufacturing, marketing, selling, distributing, and promoting its

26   Roundup products, which are defective and unreasonably dangerous to consumers,

27   including the Plaintiff, thereby placing Roundup products into the stream of commerce.

28   These actions were under the ultimate control and supervision of Defendant.

136. Before the time Plaintiff was exposed to the aforementioned Roundup products, Defendant impliedly warranted to its consumers—including Plaintiff's employer—that its Roundup products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as agricultural herbicides.

137. Defendant, however, failed to disclose that Roundup has dangerous propensities when used as intended and that use of and/or exposure to Roundup and glyphosate-containing products carries an increased risk of developing severe injuries and death, including Plaintiff's injuries.

138. Plaintiff was the intended beneficiary of the implied warranties made by Defendant to the purchasers of its herbicides.

139. The Roundup products were expected to reach and did in fact reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendant.

140. At all times relevant to this litigation, Defendant was aware that consumers and users of its products, including Plaintiff would use Roundup products as marketed by Defendant, which is to say that Plaintiff was a foreseeable user of Roundup.

141. Defendant intended that its Roundup products be used in the manner in which Plaintiff in fact used them and which Defendant impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup was not adequately tested or researched.

142. In reliance upon Defendant's implied warranty, Plaintiff used Roundup as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendant.

143. Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup or glyphosate.

144. Defendant breached its implied warranty to the Plaintiff in that its Roundup products were not of merchantable quality, safe, or fit for their intended use, or adequately tested.

1    Roundup has dangerous propensities when used as intended and can cause serious injuries,

2    including those injuries complained of herein.

3    145. The harm caused by Defendant's Roundup products far outweighed their benefit, rendering

4    the products more dangerous than an ordinary consumer or user would expect and more

5    dangerous than alternative products.

6    146. As a direct and proximate result of Defendant's breach of implied warranty, Plaintiff has

7    sustained pecuniary loss and general damages in a sum in excess of the jurisdictional

8    minimum of this Court.

9    147. Wherefore, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor

10   for compensatory and punitive damages, together with interest, costs herein incurred,

11   attorneys' fees and all such other and further relief as this Court deems just and proper.

12

13   WHEREFORE, Plaintiff prays for judgment as follows:

14   1.   For general damages in an amount according to proof;

15   2.   For actual or compensatory in an amount according to proof;

16   3.   For punitive damages in an amount according to proof;

17   4.   For pre- and post-judgment interest;

18   5.   For reasonable attorney's fees and costs;

19   6.   For such other and further relief as the Court deems just and proper.

20                          NIELSEN, PETERSON & NIELSEN LLP

21

22   Dated: June 27, 2018          By _____

23                          Jonathan Nielsen, Attorney for Plaintiff

24

25

26

27

28