JURY

# U.S. District Court
## Northern District of Mississippi (Aberdeen Division)
## CIVIL DOCKET FOR CASE #: 1:18-cv-00135-SA-RP

Billingsley et al v. Monsanto Company
Assigned to: District Judge Sharion Aycock
Referred to: Magistrate Judge Roy Percy
Cause: 28:1332 Diversity-Product Liability

Date Filed: 07/13/2018
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod.
Liability
Jurisdiction: Diversity

**Plaintiff**

**Timothy Ray Billingsley**
*(Deceased) by and through his mother, Sue Billingsley*

represented by **John Arthur Eaves , Jr.**
EAVES LAW FIRM, LLC
101 North State Street
Jackson, MS 39201
(601) 355-7961
Fax: (601) 355-0530
Email: johnjr@eaveslawmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Timothy Lee Enis**

represented by **John Arthur Eaves , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Kristin Leigh Heath**

represented by **John Arthur Eaves , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Michael Jamison**

represented by **John Arthur Eaves , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Edna Dianne Jenkins**
*(deceased), by and through her widower, Charles Jenkins*

represented by **John Arthur Eaves , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Tommy Jones**
*(deceased), by and through his daughter, Dianne Jones Morris*

represented by **John Arthur Eaves , Jr.**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Stacy Allen King**                          represented by   **John Arthur Eaves , Jr.**
                                                               (See above for address)
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

**Plaintiff**

**John Franklin Lumsden**                     represented by   **John Arthur Eaves , Jr.**
*(deceased), by and through his daughter,*                     (See above for address)
*Lisa Holloway*                                                *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Terry Dean Moore**                          represented by   **John Arthur Eaves , Jr.**
                                                               (See above for address)
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Marsha Mundinger**                          represented by   **John Arthur Eaves , Jr.**
                                                               (See above for address)
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Norman Mundinger**                          represented by   **John Arthur Eaves , Jr.**
                                                               (See above for address)
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Debra Ann Pharr**                           represented by   **John Arthur Eaves , Jr.**
                                                               (See above for address)
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Margaret H. Ricks**                         represented by   **John Arthur Eaves , Jr.**
                                                               (See above for address)
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Danny Threet**                              represented by   **John Arthur Eaves , Jr.**
*(deceased), by and through his widow, Lisa*                   (See above for address)
*Threet*                                                       *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Paul Daniel Warren**                          represented by **John Arthur Eaves , Jr.**
                                                (See above for address)
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ruth Ann Amanda Weaver**                      represented by **John Arthur Eaves , Jr.**
                                                (See above for address)
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Mary Kathryn Keene Williams**                 represented by **John Arthur Eaves , Jr.**
                                                (See above for address)
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Michael R. Williams**                         represented by **John Arthur Eaves , Jr.**
                                                (See above for address)
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Bobby Joe Wooten**                            represented by **John Arthur Eaves , Jr.**
                                                (See above for address)
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 07/13/2018 | 1 | COMPLAINT, Jury Demand, Filing fee $ 400, receipt number 0537-22330, filed by Mary Kathryn Keene Williams, Ruth Ann Amanda Weaver, Charles Jenkins, Marsha Mundinger, Michael Jamison, John Franklin Lumsden, Timothy Ray Billingsley, Norman Mundinger, Tommy Jones, Danny Threet, Debra Ann Pharr, Margaret H. Ricks, Bobby Joe Wooten, Timothy Lee Enis, Edna Dianne Jenkins, Stacy Allen King, Michael R. Williams, Terry Dean Moore, Paul Daniel Warren, Kristin Leigh Heath. (Attachments: # 1 Civil Cover Sheet) (tab) |
| 07/13/2018 | | NOTICE OF ASSIGNMENT. Case assigned to Judge Sharion Aycock and Magistrate Judge Roy Percy. (tab) |
| 07/13/2018 | 2 | Summons Issued as to Monsanto Company. Returned to attorney for service. (tab) |
| 08/02/2018 | 3 | WAIVER OF SERVICE Returned Executed; Monsanto Company waiver sent 7/27/2018. (Eaves, John) Modified on 8/6/2018 (jla). |

## PACER Service Center

### Transaction Receipt

08/15/2018 12:50:38

| PACER Login: | hllp1982:2634105:4722683 | Client Code: | 1417.0055 |
|---|---|---|---|
| Description: | Docket Report | Search Criteria: | 1:18-cv-00135-SA-RP |
| Billable Pages: | 3 | Cost: | 0.30 |

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
### ABERDEEN DIVISION

**TIMOTHY RAY BILLINGSLEY (deceased),**
**by and through his mother, SUE BILLINGSLEY,**
**TIMOTHY LEE ENIS,**
**KRISTIN LEIGH HEATH,**
**MICHAEL JAMISON,**
**EDNA DIANNE JENKINS (deceased),**
**by and through her widower, CHARLES JENKINS,**
**TOMMY JONES (deceased), by and**
**through his daughter, DIANNE JONES MORRIS,**
**STACY ALLEN KING,**
**JOHN FRANKLIN LUMSDEN (deceased),**
**by and through his daughter, LISA HOLLOWAY,**
**TERRY DEAN MOORE,**
**MARSHA MUNDINGER,**
**NORMAN MUNDINGER,**
**DEBRA ANN PHARR,**
**MARGARET H. RICKS,**
**DANNY THREET (deceased), by and**
**through his widow, LISA THREET,**
**PAUL DANIEL WARREN,**
**RUTH ANN AMANDA WEAVER,**
**MARY KATHRYN KEENE WILLIAMS,**
**MICHAEL R. WILLIAMS, and**
**BOBBY JOE WOOTEN**

**PLAINTIFFS**

**vs.**                    **CIVIL ACTION NO.** _1:18-CV-135-SA-RP_

**MONSANTO COMPANY**                              **DEFENDANT**

## COMPLAINT
### JURY TRIAL DEMANDED

### INTRODUCTION
### JURISDICTION AND VENUE

1.    Federal diversity jurisdiction in this Court is proper under 28 U.S.C. § 1332

because Plaintiffs are citizens of Mississippi, a different state than the Defendant's states of

citizenship, and the aggregate amount in controversy exceeds $75,000, exclusive of interest and

costs.

2.      This Court has personal jurisdiction over Monsanto Company ("Monsanto") because Monsanto knows or should have known that its Roundup® products are sold throughout the State of Mississippi, and, more specifically, caused Roundup® to be sold to Plaintiffs and/or Plaintiffs' employers in the State of Mississippi.

3.      In addition, Monsanto maintains sufficient contacts with the State of Mississippi such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

4.      Venue is proper within this District under 28 U.S.C. § 1391(b)(2) because Plaintiffs' injuries occurred in this District. Further, Monsanto, as a corporate entity, is deemed to reside in any judicial district in which it is subject to personal jurisdiction.

## THE PARTIES

### The Plaintiffs

5.      Plaintiff, Timothy Ray Billingsley (deceased), by and through his mother, Sue Billingsley, was a citizen of Mississippi and resided in City of Southaven, County of DeSoto. Based upon Ms. Billingsley's best recollection and belief, Plaintiff Billingsley (deceased) was exposed to Roundup® in and around DeSoto County, Mississippi, from approximately April, 1992 to sometime in 2017. Plaintiff Billingsley (deceased) was diagnosed with Follicular Lymphoma ("FL"), in Southaven, Mississippi in November, 2004.

6.      Plaintiff, Timothy Lee Enis, is a citizen of Mississippi and resides in City of Pontotoc, County of Pontotoc.  Plaintiff Enis was exposed to Roundup® in and around Pontotoc Counsel, Mississippi, from approximately July, 1992 to sometime in 2015. Plaintiff Enis was diagnosed with B-cell Lymphoma ("BCell"), in Tupelo, Mississippi on September 28, 2015.

2

7.    Plaintiff, Kristin Leigh Heath, is a citizen of Mississippi and resides in City of Olive Branch, County of DeSoto.  Plaintiff Heath was exposed to Roundup® in and around DeSoto County, Mississippi, from approximately March, 2003 to sometime in 2016. Plaintiff Heath was diagnosed with Follicular Lymphoma ("FL"), in Memphis, Tennessee on December 14, 2016.

8.    Plaintiff, Michael Jamison, is a citizen of Mississippi and resides in City of Southaven, County of DeSoto.  Plaintiff Jamison was exposed to Roundup® in and around DeSoto County, Mississippi, from approximately November, 2012 to sometime in 2015. Plaintiff Jamison was diagnosed with B-cell Lymphoma ("BCell"), in Memphis, Tennessee on January 27, 2016.

9.    Plaintiff, Edna Dianne Jenkins (deceased), by and through her husband, Charles Jenkins, was a citizen of Mississippi and resided in City of Sardis, County of Panola.  Based upon Mr. Jenkins's best recollection and belief, Plaintiff Jenkins (deceased) was exposed to Roundup® in and around Panola County, Mississippi, for several years before her death and after moving to farming property in 1970. Plaintiff Jenkins (deceased) was diagnosed with B-cell Lymphoma ("BCell"), in Oxford, Mississippi on April 3, 2011.

10.    Plaintiff, Tommy Jones (deceased), by and through his daughter, Dianne Jones Morris, was a citizen of Mississippi and resided in City of Greenville, County of Washington, Mississippi.  Based upon Ms. Morris's best recollection and belief, Plaintiff Jones (deceased) was exposed to Roundup® in and around Washington County, Mississippi and Tunica County, Mississippi, for years prior to his diagnosis of non-Hodgkin lymphoma ("NHL"), in Memphis, Tennessee in May, 1991.

3

11.     Plaintiff, Stacy Allen King, is a citizen of Mississippi and resides in City of Lambert, County of Quitman. Plaintiff King was exposed to Roundup® in and around Quitman County, Mississippi, from approximately May, 1980 to sometime in 2012. Plaintiff King was diagnosed with T-cell Lymphoma ("TCell"), in Memphis, Tennessee in February, 2017.

12.     Plaintiff, John Franklin Lumsden (deceased), by and through his daughter, Lisa Holloway, was a citizen of Mississippi and resided in City of Columbus, County of Lowndes, Mississippi. Based upon Ms. Holloway's best recollection and belief, Plaintiff Lumsden (deceased) was exposed to Roundup® in and around Lowndes and Noxabee Counties, Mississippi, from approximately the mid-1970s to sometime in 2015. Plaintiff Lumsden (deceased) was diagnosed with B-cell Lymphoma ("BCell"), in Columbus, Mississippi on June 12, 2015.

13.     Plaintiff, Terry Dean Moore, is a citizen of Mississippi and resides in City of Greenwood, County of Leflore. Plaintiff McRaney was exposed to Roundup® in and around Leflore County and Sunflower County, Mississippi, from August 4, 1994 to sometime in 2014. Plaintiff Moore was diagnosed with non-Hodgkin lymphoma ("NHL"), in Jackson, Mississippi in December, 2014.

14.     Plaintiff, Marsha Mundinger (wife), is a citizen of Mississippi and resides in City of Olive Branch, County of DeSoto. Plaintiff Mundinger (wife) was exposed to Roundup® in and around DeSoto County, Mississippi, from approximately May, 2005 to sometime in 2017. Plaintiff Mundinger (wife) was diagnosed with Chronic Lymphocytic Leukemia ("CLL"), in Collierville, Tennessee on August 24, 2017.

15.     Plaintiff, Norman Mundinger (husband), is a citizen of Mississippi and resides in City of Olive Branch, County of DeSoto. Plaintiff Mundinger (husband) was exposed to

4

Roundup® in and around DeSoto County, Mississippi, from approximately May, 2005 to present. Plaintiff Mundinger (husband) was diagnosed with Chronic Lymphocytic Leukemia ("CLL"), in Southaven, Mississippi in December, 2008.

16.     Plaintiff, Debra Ann Pharr, is a citizen of Mississippi and resides in City of Belmont, County of Tishomingo. Plaintiff Pharr was exposed to Roundup® in and around Tishomingo County, Mississippi, from sometime in 1990 to sometime in 2017. Plaintiff Pharr was diagnosed with B-cell Lymphoma ("BCell"), in Corinth, Mississippi on August 15, 2009.

17.     Plaintiff, Margaret H. Ricks, is a citizen of Mississippi and resides in City of Coldwater, County of Tate. Plaintiff Ricks was exposed to Roundup® in and around Tate County, Mississippi, from approximately June, 2009 to sometime in either 2015 or 2016. Plaintiff Ricks was diagnosed with B-cell Lymphoma ("BCell"), in Memphis, Tennessee in June, 2016.

18.     Plaintiff, Danny Threet (deceased), by and through his widow, Lisa Threet, was a citizen of Mississippi and resided in City of Eupora, County of Webster. Based upon Mrs. Threet's best recollection and belief, Plaintiff Threet (deceased) was exposed to Roundup® in and around Webster County, Mississippi, beginning sometime in the early 1980s and until sometime in 1997. Plaintiff Threet (deceased) was diagnosed with non-Hodgkin lymphoma ("NHL"), in Tupelo, Mississippi in June, 1997.

19.     Plaintiff, Paul Daniel Warren, is a citizen of Mississippi and resides in City of Pontotoc, County of Pontotoc. Plaintiff Warren was exposed to Roundup® in and around Pontotoc County, Mississippi, from sometime in 1996 to sometime in 2016. Plaintiff Warren was diagnosed with B-cell Lymphoma ("BCell"), in Tupelo, Mississippi in August, 2007.

20.     Plaintiff, Ruth Ann Amanda Weaver, is a citizen of Mississippi and resides in City of Houston, County of Chickasaw.  Plaintiff Weaver was exposed to Roundup® in and around Chickasaw County, Mississippi, from sometime in the mid-1970s to present.  Plaintiff Weaver was diagnosed with non-Hodgkin lymphoma ("NHL"), in Tupelo, Mississippi in December, 1994.

21.     Plaintiff, Mary Kathryn Keene Williams, is a citizen of Mississippi and resides in City of Pontotoc, County of Pontotoc.  Plaintiff Williams (Mary) was exposed to Roundup® in and around Pontotoc County, Mississippi, since the early 1980s to sometime in 2014.  Plaintiff Williams (Mary) was diagnosed with Chronic Lymphocytic Leukemia ("CLL"), in Tupelo, Mississippi in June, 2011.

22.     Plaintiff, Mitchell R. Williams, is a citizen of Mississippi and resides in City of Saltillo, County of Lee.  Plaintiff Williams (Mitchell) was exposed to Roundup® in and around Lee County, Mississippi, from sometime in 1992 to sometime in 2004.  Plaintiff Williams (Mitchell) was diagnosed with Follicular Lymphoma ("FL"), in Tupelo, Mississippi on June 12, 2000.

23.     Plaintiff, Bobby Joe Wooten, is a citizen of Mississippi and resides in City of Calhoun City, County of Calhoun.  Plaintiff Wooten was exposed to Roundup® in and around the State of Mississippi, from March 10, 2003 to present.  Plaintiff Wooten was diagnosed with T Lymphoblastic Lymphoma ("TLL"), in Jackson, Mississippi on July 19, 2012.

**Defendant**

24.     Defendant Monsanto Company is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.

25.     At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®, which contains the active ingredient glyphosate and the surfactant POEA, as well as adjuvants and other "inert" ingredients.

**FACTS**

26.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

27.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis.  Treated plants generally die within two to three days. Because plants absorb glyphosate, washing or peeling produce or grain does not entirely remove the chemical.

28.     For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®—glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as garden center workers, nursery

7

workers, and landscapers. Agricultural workers are, once again, victims of corporate greed.
Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto has
championed falsified data and has attacked legitimate studies that revealed Roundup®'s dangers.
Monsanto has led a prolonged campaign of misinformation to convince government agencies,
farmers and the general population that Roundup® is safe.

### The Discovery of Glyphosate and Development of Roundup®

29. The herbicidal properties of glyphosate were discovered in 1970 by Monsanto
chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the
mid-1970s under the brand name Roundup®.[1] From the outset, Monsanto marketed Roundup®
as a "safe" general-purpose herbicide for widespread commercial and consumer use. It still
markets Roundup® as safe today.[2]

30. In addition to the active ingredient glyphosate, Roundup® formulations also
contain adjuvants and other chemicals, such as the surfactant POEA, which are considered
"inert" and therefore protected as "trade secrets" in manufacturing. Growing evidence suggests
that these adjuvants and additional components of Roundup® formulations are not, in fact, inert
and are toxic in their own right.

### Registration of Herbicides under Federal Law

31. The manufacture, formulation, and distribution of herbicides, such as Roundup®,
are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"),

---

[1] Monsanto, *Backgrounder, History of Monsanto's Glyphosate Herbicide* (Sep. 2, 2015),
http://www.monsanto.com/products/documents/glyphosate-background-materials/back_history.pdf.
[2] Monsanto, *What is Glyphosate?* (Sep. 2, 2015), http://www.monsanto.com/sitecollectiondocuments/glyphosate-safety-health.pdf.

7 U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

32.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

33.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or a pesticide allowed to continue to be sold in commerce.

34.     The EPA and the State of Mississippi registered Roundup® for distribution, sale, and manufacture in the United States and the State of Mississippi.

35.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the

product tests that are required of the manufacturer.

36.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's recent review and evaluation.

37.     In the case of glyphosate, and therefore Roundup®, the EPA intended to release its preliminary risk assessment—in relation to the reregistration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

### Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®

38.     Based on early carcinogenicity studies showing that glyphosate caused cancer in mice and rats, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Monsanto, including self-commissioned review studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991. However, the EPA made clear that the 1991 designation did not mean that glyphosate does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."[3]

---

[3] U.S. Envtl. Prot. Agency, *Memorandum, Subject: SECOND Peer Review of Glyphosate* 1 (1991), *available at* http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_30-Oct-91_265.pdf.

39.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

40.     In the first instance, Monsanto, in seeking initial registration of Roundup® by the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®.[4] IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

41.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid.[5] An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[6]

42.     Three top IBT executives were convicted of fraud in 1983.

---

[4] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/ibt_craven_bkg.pdf.
[5] U.S. Envtl. Prot. Agency, *Summary of the IBT Review Program Office of Pesticide Programs* (1983), *available at* http://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA&Index=1981 +Thru+1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=& QField=&QFieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File =D%3A%5Czyfiles%5CIndex%20Data%5C81thru85%5CTxt%5C00000022%5C91014ULV.txt&User=ANO NYMOUS&Password=anonymous&SortMethod=h%7C- &MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=p%7 Cf&DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page&MaximumP ages=1&ZyEntry=1&SeekPage=x&ZyPURL.
[6] Marie-Monique Robin, *The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply* (2011) (citing U.S. Envtl. Prot. Agency, *Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch. Washington, D.C.* (August 9, 1978)).

43.     In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted and convicted of fraudulent laboratory practices in the testing of pesticides and herbicides.[7]

44.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

### The Importance of Roundup® to Monsanto's Market Dominance Profits

45.     The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

46.     In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy

---

[7] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories, supra.*

that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

47.     Through a three-pronged strategy of increasing production, decreasing prices, and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue.[8] Today, glyphosate remains one of the world's largest herbicides by sales volume.

### Monsanto has known for decades that it falsely advertises the safety of Roundup®

48.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were **"safer than table salt"** and **"practically non-toxic"** to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of glyphosate and/or Roundup® are the following:

a.      "Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...";

b.      "And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.";

---

[8] David Barboza, *The Power of Roundup; A Weed Killer Is A Block for Monsanto to Build On*, N.Y. TIMES, Aug. 2, 2001, *available at* http://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a- weed-killer-is-a-block-for-monsanto-to-build-on.html.

c.      "Roundup biodegrades into naturally occurring elements.";

d.      "Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.";

e.      "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.";

f.      "You can apply Accord with 'confidence because it will stay where you put it' it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.";

g.      "Glyphosate is less toxic to rats than table salt following acute oral ingestion.";

h.      "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.";

i.      "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."; and

j.      "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[9]

49.      On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by

---

[9] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

14

implication" that:

a.  its glyphosate-containing pesticide products or any component thereof are safe,
    non-toxic, harmless or free from risk;

    *       *       *

b.  its glyphosate-containing pesticide products or any component thereof
    manufactured, formulated, distributed or sold by Monsanto are biodegradable;

    *       *       *

c.  its glyphosate-containing pesticide products or any component thereof stay where
    they are applied under all circumstances and will not move through the
    environment by any means;

    *       *       *

d.  its glyphosate-containing pesticide products or any component thereof are "good"
    for the environment or are "known for their environmental characteristics.";

    *       *       *

e.  glyphosate-containing pesticide products or any component thereof are safer or
    less toxic than common consumer products other than herbicides; and

f.  its glyphosate-containing products or any component thereof might be classified
    as "practically non-toxic."

50.     Monsanto did not alter its advertising in the same manner in any state other than
New York, and on information and belief it still has not done so today.

51.     In 2009, France's highest court ruled that Monsanto had not told the truth about
the safety of Roundup®. The French court affirmed an earlier judgment that Monsanto had

falsely advertised its herbicide Roundup[®] as "biodegradable" and that it "left the soil clean."[10]

**Classifications and Assessments of Glyphosate**

52.     The IARC process for the classification of glyphosate followed IARC's stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

53.     The established procedure for IARC Monograph evaluations is described in the IARC Preamble.[11] Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

54.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in *The Lancet Oncology*, and within a year after the meeting, the finalized Monograph is published.

---

[10] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.
[11] World Health Org., *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble* (2006), available at http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

55.     In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

56.     In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

57.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph Volume 112. For Volume 112, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015 to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated a nearly one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

58.     The studies considered the following exposure groups: (1) occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and (2) para-occupational exposure in farming families.

59.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

60.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

61.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

62.     The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

63.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

64.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor: renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation- promotion study in mice.

65.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

66.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal

cells in utero.

67.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.[12] Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

68.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.[13] While this study differed from others in that it was based on a self- administered questionnaire, the results support an association between glyphosate exposure and multiple myeloma, hairy cell leukemia (HCL), and chronic lymphocytic leukemia (CLL), in addition to several other cancers.

### Other Earlier Findings About Glyphosate's Dangers to Human Health

69.     The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates IARC's March 20, 2015 evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

> Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

> It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

> Occupational workers and home gardeners may be exposed to glyphosate by

---

[12] Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra* at 77.
[13] Anneclare J. De Roos et al., *Cancer Incidence Among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study*, 113 Envt'l Health Perspectives 49–54 (2005), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1253709/pdf/ehp0113-000049.pdf.

19

inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.[14]

70.    In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide- caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.[15]

### The Toxicity of Other Ingredients in Roundup[®]

71.    In addition to the toxicity of the active ingredient, glyphosate, several studies support the hypothesis that the glyphosate-based formulation in Defendant's Roundup[®] products is more dangerous and toxic than glyphosate alone. Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.[16]

72.    In 2002, a study by Julie Marc, entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation," revealed that Roundup[®] causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cell cycles.[17]

73.    A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation. The researchers noted that "cell-cycle dysregulation is a hallmark of tumor

---

[14] U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate, supra.*
[15] Caroline Cox, *Glyphosate, Part 2: Human Exposure and Ecological Effects*, 15 J. PESTICIDE REFORM 4 (1995); W.S. Peas et al., *Preventing pesticide-related illness in California agriculture: Strategies and priorities. Environmental Health Policy Program Report*, Univ. of Cal. School of Public Health, Calif. Policy Seminar (1993).
[16] Martinez, T.T. and K. Brown, *Oral and pulmonary toxicology of the surfactant used in Roundup herbicide*, PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991).
[17] Julie Marc, et al., *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation*, 15 CHEM. RES. TOXICOL. 326–331 (2002), *available at* http://pubs.acs.org/doi/full/10.1021/tx015543g.

cells and human cancer. Failure in the cell-cycle checkpoints leads genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."[18]

74.     In 2005, a study by Francisco Peixoto, entitled "Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup[®]'s effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone. The Peixoto study further suggested that the harmful effects of Roundup[®] on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant POEA, or in the alternative, due to a potential synergic effect between glyphosate and other ingredients in the Roundup[®] formulation.[19]

75.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup[®] and glyphosate on human umbilical, embryonic, and placental cells. The study tested dilution levels of Roundup[®] and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food. The researchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability and amplify toxicity of glyphosate alone. The researchers further suggested that assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants present in

---

[18] Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation*, 96 BIOLOGY OF THE CELL 245, 245-249 (2004), *available at* http://onlinelibrary.wiley.com/doi/10.1016/j.biolcel.2003.11.010/epdf.
[19] Francisco Peixoto, *Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation*, 61 CHEMOSPHERE 1115, 1122 (2005), *available at* https://www.researchgate.net/publication/7504567_Comparative_effects_of_the_Roundup_and_glyphosate_o n_mitochondrial_oxidative_phosphorylation.

Roundup® are not, in fact, inert and that Roundup® is potentially far more toxic than its active

ingredient glyphosate alone.[20]

76.     The results of these studies were at all times available to Defendant. Defendant

thus knew or should have known that Roundup® is more toxic than glyphosate alone and that

safety studies of Roundup®, Roundup's adjuvants and "inert" ingredients, and/or the surfactant

POEA were necessary to protect Plaintiffs from Roundup®.

77.     Despite its knowledge that Roundup® is considerably more dangerous than

glyphosate alone, Defendant continued to promote Roundup® as safe.

### Recent Worldwide Bans on Roundup®/Glyphosate

78.     Several countries around the world have instituted bans on the sale of Roundup®

and other glyphosate-containing herbicides, both before and since IARC first announced its

assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the

dangers of the use of Roundup® become more widely known. The Netherlands issued a ban on

all glyphosate-based herbicides in April 2014, including Roundup®, which will take effect by

the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful

legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to

private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting

customers have no idea what the risks of this product are. Especially children are sensitive to

toxic substances and should therefore not be exposed to it."[21]

---

[20] Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic, and Placental Cells*, 22 CHEM. RES. TOXICOL. 97-105 (2008), *available at* http://big.assets.huffingtonpost.com/france.pdf.
[21] *Holland's Parliament Bans Glyphosate Herbicides*, The Real Agenda, April 14, 2014, *available at* http://real-agenda.com/hollands-parliament-bans-glyphosate-herbicides/.

79.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.[22]

80.     France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.[23]

81.     Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."[24]

82.     The Sri Lankan government banned the private and commercial use of glyphosate, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.[25]

83.     The government of Colombia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.[26]

---

[22] Christina Sarich, *Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals Following Recent Glyphosate-Cancer Link*, GLOBAL RESEARCH, May 14, 2015, *available at* http://www.globalresearch.ca/brazils-public-prosecutor-wants-to-ban-monsantos-chemicals-following-recent- glyphosate-cancer-link/5449440; *see* Ministério Público Federal, *MPF/DF reforça pedido para que glifosato seja banido do mercado nacional*, April, 14, 2015, *available at* http://noticias.pgr.mpf.mp.br/noticias/noticias- do-site/copy_of_meio-ambiente-e-patrimonio-cultural/mpf-df-reforca-pedido-para-que-glifosato-seja-banido- do-mercado-nacional.
[23] Zoe Schlanger, *France Bans Sales of Monsanto's Roundup in Garden Centers, 3 Months After U.N. Calls it 'Probable Carcinogen"*, NEWSWEEK, June 15, 2015, *available at* http://www.newsweek.com/france-bans-sale-monsantos-roundup-garden-centers-after-un-names-it-probable- 343311.
[24] *Health Minister: Importation of Roundup Weed Spray Suspended*, Today in Bermuda, May, 11 2015, *available at* http://www.todayinbermuda.com/news/health/item/1471-health-minister-importation-of- roundup-weed-spray-suspended.
[25] *Sri Lanka's New President Puts Immediate Ban on Glyphosate Herbicides*, Sustainable Pulse, May 25, 2015, *available at* http://sustainablepulse.com/2015/05/25/sri-lankas-new-president-puts-immediate-ban- on-glyphosate-herbicides/#.VeduYk3bKAw.
[26] *Columbia to ban coca spraying herbicide glyphosate*, BBC, May 10, 2015, *available at* http://www.bbc.com/news/world-latin-america-32677411.

**Proposition 65 Listing**

84.     On September 4, 2015, California's Office of Environmental Health Hazard
Assessment ("OEHHA") published a notice of intent to include glyphosate on the state's list of
known carcinogens under Proposition 65.[27] California's Safe Drinking Water and Toxic
Enforcement Act of 1986 (informally known as "Proposition 65"), requires the state to maintain
and, at least once a year, revise and republish a list of chemicals "known to the State of
California to cause cancer or reproductive toxicity."[28] The OEHHA determined that glyphosate
met the criteria for the listing mechanism under the Labor Code following IARC's assessment of
the chemical.[29]

85.     The listing process under the Labor Code is essentially automatic. The list of
known carcinogens, at a minimum, must include substances identified by reference in Labor
Code § 6382(b)(1). That section of the Labor Code identifies "[s]ubstances listed as human or
animal carcinogens by the International Agency for Research on Cancer (IARC)." IARC's
classification of glyphosate as a Group 2A chemical ("probably carcinogenic to humans")
therefore triggered the listing.

86.     A business that deploys a listed chemical in its products must provide "clear and
reasonable warnings" to the public prior to exposure to the chemical. To be clear and reasonable,
a warning must "(1) clearly communicate that the chemical is known to cause cancer, and/or
birth defects or other reproductive harm; and (2) effectively reach the person before exposure."[30]

---

[27] Cal. Envtl. Prot. Agency Office of Envtl. Health Hazard Assessment, Notice of Intent to List Chemicals by the
Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion, Glyphosate (Sept. 4, 2015),
http://oehha.ca.gov/prop65/CRNR_notices/admin_listing/intent_to_list/pdf_zip/090415NOIL_LCSet27.pdf.
[28] *Frequently Asked Questions*, STATE OF CAL. DEP'T OF JUSTICE, OFFICE OF THE ATTORNEY
GENERAL, http://oag.ca.gov/prop65/faq (last visited April 19, 2016).
[29] Cal. Envtl. Prot. Agency Office of Envtl. Health Hazard Assessment, Notice of Intent to List Chemicals by the
Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion, Glyphosate (Sept. 4, 2015),
http://oehha.ca.gov/prop65/CRNR_notices/admin_listing/intent_to_list/pdf_zip/090415NOIL_LCSet27.pdf.
[30] *Frequently Asked Questions*, STATE OF CAL. DEPARTMENT OF JUSTICE, OFFICE OF THE ATTORNEY

24

The law also prohibits the discharge of listed chemicals into drinking water.

87.     Monsanto disputed the listing decision and, in January 2016, filed a lawsuit

against OEHHA and the agency's acting director, Lauren Zeise, in California state court, seeking

declaratory and injunctive relief to prevent OEHHA from listing glyphosate.[31]

88.     Monsanto alleged that OEHHA's exclusive reliance on the IARC decision

signified that "OEHHA effectively elevated the determination of an ad hoc committee of an

unelected, foreign body, which answers to no United States official (let alone any California state

official), over the conclusions of its own scientific experts."[32] Monsanto further alleged that the

Labor Code listing mechanism presented various constitutional violations because it "effectively

empowers an unelected, undemocratic, unaccountable, and foreign body to make laws applicable

in California."[33] Among other things, Monsanto argued that Proposition 65's requirement to

provide a "clear and reasonable warning" to consumers that the chemical is a known carcinogen

would damage its reputation and violate its First Amendment rights.[34]

89.     The case remains pending.

**EFSA Report on Glyphosate**

90.     On November 12, 2015, the European Food Safety Authority (EFSA), the

European Union's primary agency for food safety, reported on its evaluation of the Renewal

Assessment Report (RAR) on glyphosate.[35] The Rapporteur Member State assigned to

---

GENERAL, *supra*.
[31] Monsanto Company's Verified Petition for Writ of Mandate and Complaint for Preliminary and Permanent Injunctive and Declaratory Relief, Monsanto Co. v. Office of the Envt'l Health Hazard Assessment, et al., No. 16-CECG-00183 (Cal. Super. Ct.) *available at* http://www.monsanto.com/files/documents/monvoehha.pdf.
[32] *Id.* at 2.
[33] *Id.* at 3.
[34] *Id.*
[35] European Food Safety Auth., Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate, *available at* http://www.efsa.europa.eu/sites/default/files/scientific_output/files/main_documents/4302.pdf.

glyphosate, the German Federal Institute for Risk Assessment (BfR), had produced the RAR as part of the renewal process for glyphosate in the EU.

91.     BfR sent its draft RAR to EFSA and the RAR underwent a peer review process by EFSA, other member states, and industry groups. As part of the on-going peer review of Germany's reevaluation of glyphosate, EFSA had also received a second mandate from the European Commission to consider IARC's findings regarding the potential carcinogenicity of glyphosate and glyphosate-containing products.

92.     Based on a review of the RAR, which included data from industry-submitted unpublished studies, EFSA sent its own report ("Conclusion") to the European Commission, finding that "glyphosate is unlikely to pose a carcinogenic hazard to humans and the evidence does not support classification with regard to its carcinogenic potential according to Regulation (EC) No 1272/2008."[36] EFSA therefore disagreed with IARC: glyphosate was not genotoxic and did not present a carcinogenic threat to humans.

93.     In explaining why its results departed from IARC's conclusion, EFSA drew a distinction between the EU and IARC approaches to the study and classification of chemicals.[37] Although IARC examined "both glyphosate—an active substance—and glyphosate-based formulations, grouping all formulations regardless of their composition," EFSA explained that it considered only glyphosate and that its assessment focuses on "each individual chemical, and each marketed mixture separately."[38] IARC, on the other hand, "assesses generic agents, including groups of related chemicals, as well as occupational or environmental exposure, and

---

[36] Id.
[37] EFSA Fact Sheet: Glyphosate, EFSA
http://www.efsa.europa.eu/sites/default/files/corporate_publications/files/efsaexplainsglyphosate151112en.pdf.
[38] Id.

26

cultural or behavioral practices."[39] EFSA accorded greater weight to studies conducted with glyphosate alone than studies of formulated products.[40]

94. EFSA went further and noted:

[A]lthough some studies suggest that certain glyphosate-based formulations may be genotoxic (i.e. damaging to DNA), others that look solely at the active substance glyphosate do not show this effect. It is likely, therefore, that *the genotoxic effects observed in some glyphosate-based formulations are related to the other constituents or "co-formulants"*. Similarly, certain glyphosate-based formulations display higher toxicity than that of the active ingredient, presumably because of the presence of co-formulants. In its assessment, *EFSA proposes that the toxicity of each pesticide formulation and in particular its genotoxic potential should be further considered and addressed by Member State authorities while they re-assess uses of glyphosate-based formulations in their own territories.*[41]

95. Notwithstanding its conclusion, EFSA did set exposure levels for glyphosate. Specifically, EFSA proposed an acceptable daily intake (ADI) of 0.5 mg/kg of body weight per day; an acute reference dose (ARfD) of 0.5 mg/kg of body weight; and an acceptable operator exposure level (AOEL) of 0.1 mg/kg bw per day.[42]

## Leading Scientists Dispute EFSA's Conclusion

96. On November 27, 2015, 96 independent academic and governmental scientists from around the world submitted an open letter to the EU health commissioner, Vytenis Andriukaitis.[43] The scientists expressed their strong concerns and urged the commissioner to disregard the "flawed" EFSA report, arguing that "the BfR decision is not credible because it is not

---

[39] *Id.*
[40] *Id.*
[41] *Id.*
[42] European Food Safety Auth., Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate, *supra.*
[43] Letter from Christopher J. Portier et al. to Commission Vytenis Andriukaitis, Open letter: Review of the Carcinogenicity of Glyphosate by EFSA and BfR (Nov. 27, 2015), http://www.zeit.de/wissen/umwelt/2015-11/glyphosat-offener-brief.pdf; http://www.theguardian.com/environment/2016/jan/13/eu-scientists-in-row-over-safety-of-glyphosate- weedkiller.

supported by the evidence and it was not reached in an open and transparent manner."[44]

97.     Signatories to the letter included Dr. Christopher J. Portier, Ph.D., and other renowned international experts in the field, some of whom were part of the IARC Working Group assigned to glyphosate.

98.     In an exhaustive and careful examination, the scientists scrutinized EFSA's conclusions and outlined why the IARC Working Group decision was "by far the more credible":

> The IARC WG decision was reached relying on open and transparent procedures by independent scientists who completed thorough conflict-of-interest statements and were not affiliated or financially supported in any way by the chemical manufacturing industry. It is fully referenced and depends entirely on reports published in the open, peer-reviewed biomedical literature. It is part of a long tradition of deeply researched and highly credible reports on the carcinogenicity of hundreds of chemicals issued over the past four decades by IARC and used today by international agencies and regulatory bodies around the world as a basis for risk assessment, regulation and public health policy.[45]

99.     With respect to human data, the scientists pointed out that EFSA agreed with IARC that there was "*limited evidence* of carcinogenicity" for non-Hodgkin lymphoma, but EFSA nonetheless dismissed an association between glyphosate exposure and carcinogenicity. IARC applies three levels of evidence in its analyses of human data, including sufficient evidence and limited evidence. EFSA's ultimate conclusion that "there was no unequivocal evidence for a clear and strong association of NHL with glyphosate" was misleading because it was tantamount to IARC's highest level of evidence: "sufficient evidence," which means that a causal relationship has been established. However, the scientists argued, "[l]egitimate public health concerns arise when 'causality is credible,' i.e., when there is *limited evidence*." [46]

---

[44] *Id.*
[45] *Id.*
[46] *Id.*

100.    Among its many other deficiencies, EFSA's conclusions regarding animal carcinogenicity data were "scientifically unacceptable," particularly in BfR's use of historical control data and in its trend analysis. Indeed, BfR's analysis directly contradicted the Organization for Economic Co-operation and Development ("OECD") testing guidelines while citing and purporting to follow those same guidelines. For instance, the EFSA report dismisses observed trends in tumor incidence "because there are no individual treatment groups that are significantly different from controls and because the maximum observed response is reportedly within the range of the historical control data." However, according to the scientists, concurrent controls are recommended over historical controls in all guidelines, scientific reports, and publications, and, if it is employed, historical control data "should be from studies in the same timeframe, for the same exact animal strain, preferably from the same laboratory or the same supplier and preferably reviewed by the same pathologist." BfR's use of historical control data violated these precautions: "only a single study used the same mouse strain as the historical controls, but was reported more than 10 years after the historical control dataset was developed." Further deviating from sound scientific practices, the data used by the BfR came from studies in seven different laboratories. The scientists concluded:

> BfR reported seven positive mouse studies with three studies showing increases in renal tumors, two with positive findings for hemangiosarcomas, and two with positive findings for malignant lymphomas. BfR additionally reported two positive findings for tumors in rats. Eliminating the inappropriate use of historical data, the unequivocal conclusion is that these are not negative studies, but in fact document the carcinogenicity of glyphosate in laboratory animals.[47]

101.    The letter also critiqued the EFSA report's lack of transparency and the opacity surrounding the data cited in the report: "citations for almost all of the references, even those from the open scientific literature, have been redacted from the document" and "there are no

---

[47] *Id.*

29

authors or contributors listed for either document, a requirement for publication in virtually all scientific journals." Because BfR relied on unpublished, confidential industry-provided studies, it is "impossible for any scientist not associated with BfR to review this conclusion with scientific confidence."[48]

102.    On March 3, 2016, the letter was published in the Journal of Epidemiology & Community Health.[49]

### Statement of Concern Regarding Glyphosate-Based Herbicides

103.    On February 17, 2016, a consensus statement published in the journal *Environmental Health*, entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement," assessed the safety of glyphosate- based herbicides (GBHs).[50] The paper's "focus is on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with recent discoveries about the toxicity and human health risks stemming from use of GBHs."[51] The researchers drew seven factual conclusions about GBHs:

a.    GBHs are the most heavily applied herbicide in the world and usage continues to rise;

b.    Worldwide, GBHs often contaminate drinking water sources, precipitation, and air, especially in agricultural regions;

c.    The half-life of glyphosate in water and soil is longer than previously recognized;

---

[48] *Id.*

[49] 49 Christopher J. Portier, et al., *Differences in the carcinogenic evaluation of glyphosate between the International Agency for Research on Cancer (IARC) and the European Food Safety Authority (EFSA)*, JOURNAL OF EPIDEMIOLOGY & CMTY. HEALTH, Mar. 3, 2016, *available at* http://jech.bmj.com/content/early/2016/03/03/jech-2015-207005.full.

[50] John P. Myers, et al, *Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement*, Environmental Health (2016), *available at* http://ehjournal.biomedcentral.com/articles/10.1186/s12940-016-0117-0.

[51] *Id.*

    d.     Glyphosate and its metabolites are widely present in the global soybean supply;

    e.     Human exposures to GBHs are rising;

    f.     Glyphosate is now authoritatively classified as a probable human carcinogen; and

    g.     Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science.[52]

104.    The researchers noted that GBH use has increased approximately 100-fold since the 1970s. Further, far from posing a limited hazard to vertebrates, as previously believed, two decades of evidence demonstrated that "several vertebrate pathways are likely targets of action, including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."[53]

105.    The paper attributes uncertainties in current assessments of glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations." Further, the researchers argue, "[t]he distinction in regulatory review and decision processes between 'active' and 'inert' ingredients has no toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in their own right."[54]

106.    Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish." Accordingly, "risk

---

[52] *Id.*
[53] *Id.*
[54] *Id.*

assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone underestimate both toxicity and exposure, and thus risk." The paper concludes that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."[55]

107.     The researchers also critique the current practice of regulators who largely rely on "unpublished, non-peer reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH- product formulations."[56]

108.     The researchers also call for greater inclusion of GBHs in government-led toxicology testing programs:

> [A] fresh and independent examination of GBH toxicity should be undertaken, and . . . this re-examination be accompanied by systematic efforts by relevant agencies to monitor GBH levels in people and in the food supply, none of which are occurring today. The U.S. National Toxicology Program should prioritize a thorough toxicological assessment of the multiple pathways now identified as potentially vulnerable to GBHs.[57]

109.     The researchers suggest that, in order to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which manufacturers fund the registration process and the necessary testing:

> "[W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part of routine registration actions and fees.
>
> Such funds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would be made available to independent scientists to conduct the appropriate long-term (minimum 2 years) safety studies in recognized animal

---

[55] *Id.*

[56] *Id.*

[57] *Id.*

32

model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption, impacts on the gut microbiome, carcinogenicity, and multigenerational effects looking at reproductive capability and frequency of birth defects."[58]

## **FDA Announces Testing of Glyphosate Residue in Foods**

110.    On February 17, 2016, the U.S. Food and Drug Administration ("FDA") announced that, for the first time in its history, the agency planned to start testing certain foods for glyphosate residues. FDA spokeswoman Lauren Sucher explained: "The agency is now considering assignments for Fiscal Year 2016 to measure glyphosate in soybeans, corn, milk, and eggs, among other potential foods."[59]

111.    In 2014, the U.S. Government Accountability Office (GAO) had severely rebuked the FDA for its failures to both monitor for pesticide residue, including that of glyphosate, and to disclose the limitations of its monitoring and testing efforts to the public.[60] The GAO had cited numerous undisclosed deficiencies in the FDA's process, specifically highlighting its omission of glyphosate testing.

112.    Indeed, in the past, both the FDA and the U.S. Department of Agriculture (USDA) had routinely excluded glyphosate from their testing for the residues of hundreds of other pesticides, on the rationale that it was too expensive and unnecessary to protect public health. Ms. Sucher, the FDA spokeswoman, however, now states that "the agency has developed 'streamlined methods' for testing for the weed killer."[61]

---

[58] *Id.*

[59] Carey Gillam, *FDA to Start Testing for Glyphosate in Food*, TIME, Feb. 17, 2016, *available at* http://time.com/4227500/fda-glyphosate-testing/?xid=tcoshare.

[60] U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-15-38, FDA AND USDA SHOULD STRENGTHEN PESTICIDE RESIDUE MONITORING PROGRAMS AND FURTHER DISCLOSE MONITORING LIMITATIONS (2014), *available at* http://www.gao.gov/products/GAO-15-38.

[61] Gillam, *supra* note 46.

113.    The FDA's move is significant as the agency possesses enforcement authority and can seek action if pesticide residues exceed enforcement guidelines.[62]

## EU Vote on Glyphosate Renewal

114.    The license for glyphosate in the European Union (EU) was set to expire on June 30, 2016.

115.    Without an extension of the license, Monsanto's Roundup® and other glyphosate-based herbicides faced a general phase out in EU markets.[63]

116.    In the months leading up to the license expiration date, protracted meetings and votes among national experts from the 28 EU Member States failed to produce agreement on an extension.

117.    For instance, on March 4, 2016, *The Guardian* reported that France, the Netherlands, and Sweden did not support EFSA's assessment that glyphosate was harmless.[64] The paper quoted the Swedish environment minister, Åsa Romson, as stating: "We won't take risks with glyphosate and we don't think that the analysis done so far is good enough. We will propose that no decision is taken until further analysis has been done and the Efsa scientists have been more transparent about their considerations."[65]

118.    The Netherlands argued that relicensing should be placed on hold until after a separate evaluation of glyphosate's toxicity can be conducted.[66] Leading up to the vote, Italy

---

[62] *Id.*; Pesticide Q&A, U.S. FOOD AND DRUG ADMINISTRATION, http://www.fda.gov/Food/FoodborneIllnessContaminants/Pesticides/ucm114958.htm (last visited April 19, 2016).
[63] Philip Blenkinsop, Alissa de Carbonnel & Barbara Lewis European, *Commission to extend glyphosate license for 18 months*, REUTERS, June 28, 2016, *available at* http://www.reuters.com/article/us- health-eu-glyphosate-idUSKCN0ZE25B.
[64] Arthur Neslen, *EU states rebel against plans to relicense weedkiller glyphosate*, THE GUARDIAN, Mar. 4, 2016, *available at* http://www.theguardian.com/environment/2016/mar/04/eu-states-rebel-against- plans-to-relicense-weedkiller-glyphosate.
[65] *Id.*
[66] Arthur Neslen, *Vote on Controversial weedkiller's European licence postponed*, THE GUARDIAN, Mar. 8, 2016, *available at* http://www.theguardian.com/environment/2016/mar/08/eu-vote-on-controversial- weedkiller-licence-

joined the other EU states in opposing the license renewal, citing health concerns.[67]

119.   On June 6, 2016, Member States voted but failed to reach a qualified majority in favor or against the re-authorization of glyphosate.[68]

120.   On June 29, 2016, the EU Commission extended the European license for glyphosate for 18 months to allow the European Chemical Agency to rule on the safety of the chemical, which is expected by the end of 2017.[69]

121.   On July 11, 2016, the EU voted in favor of a proposal to restrict the conditions of use of glyphosate in the EU, including a ban on common co-formulant POE-tallowamine (POEA) from all glyphosate-based herbicides, including Roundup.[70]

122.   These restrictions, which are non-binding on the EU states, are expected to apply until the European Chemicals Agency issues an opinion on the chemical's safety.[71]

### Plaintiffs' Exposure to Roundup®

123.   Plaintiff Billingsley (deceased) was 56 years old when he passed away from his exposure to Roundup®. He had been exposed to Roundup® in DeSoto County, Mississippi from approximately April, 1992 to sometime in 2017 while spraying Roundup® around his residence for residential and/or gardening purposes and during the course of his employment. Plaintiff Billingsley (deceased) used Roundup® as purchased from various stores; and on

---

postponed-glyphosate.
[67] *Id.*
[68] Manon Flausch, *Commission prolongs glyphosate license by 18 months*, EURACTIV, June 29, 2016, *available at* http://www.euractiv.com/section/agriculture-food/news/commission-prolongs-glyphosate- licence-by-18-months/
[69] Arthur Neslen, *Controversial chemical in Roundup weedkiller escapes immediate ban*, THE GUARDIAN, June 29, 2016, *available at* https://www.theguardian.com/business/2016/jun/29/controversial- chemical-roundup-weedkiller-escapes-immediate-ban
[70] Sarantis Michalopoulos, *EU agrees ban on glyphosate co-formulant*, EURACTIV, July 11, 2016, *available at* http://www.euractiv.com/section/agriculture-food/news/eu-agrees-ban-on-glyphosate-co-formulant/?nl_ref=16562829
[71] *See* Arthur Neslen, *Controversial chemical in Roundup weedkiller escapes immediate ban*, THE GUARDIAN, June 29, 2016.

occasion would mix Roundup® himself.

124.    In November, 2004, Plaintiff Billingsley (deceased) was diagnosed with FL, a subtype of NHL, in Southaven, Mississippi, Family Cancer Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

1256    As a direct and proximate result of these injuries, Plaintiff Billingsley (deceased) incurred medical expenses, pain and suffering, loss of enjoyment of life, and ultimately, he lost his life. Plaintiff Billingsley (deceased) was damaged in a personal and pecuniary nature.

126.    During the entire time that Plaintiff Billingsley (deceased) was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others. Plaintiff Billingsley's (deceased) mother first learned that exposure to Roundup® can cause FL sometime after March, 2017 after viewing legal advertisements on social media.

127.    Plaintiff Enis is 54 years old and was exposed to Roundup® in Pontotoc County, Mississippi from approximately July, 1992 to sometime in 2015 while spraying Roundup® around his residence for residential and/or gardening purposes and during the course of his employment. Plaintiff Enis wore protective equipment when applying Roundup®. He used Roundup® as purchased from farm and feed stores; and on occasion would mix Roundup® himself.

128.    On September 28, 2015, Plaintiff Enis was diagnosed with BCell, a subtype of NHL, in Tupelo, Mississippi at North MS Hematology and Oncology Associates, and suffered

36

the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

129.    As a direct and proximate result of these injuries, Plaintiff Enis has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Enis has otherwise been damaged in a personal and pecuniary nature.

130.    During the entire time that Plaintiff Enis was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.  Plaintiff Enis first learned that exposure to Roundup® can cause BCell sometime after March, 2017 after viewing legal advertisements on social media.

131.    Plaintiff Heath is 47 years old and was exposed to Roundup® in DeSoto County, Mississippi from approximately March, 2003 to sometime in 2016 while spraying Roundup® around her residence for residential and/or gardening purposes.  Plaintiff Heath wore protective equipment when applying Roundup®.  She used Roundup® as purchased from home department stores, such as Lowe's and Walmart; and on rare occasions would mix Roundup® herself.

132.    On December 14, 2016, Plaintiff Heath was diagnosed with FL, a subtype of NHL, in Memphis, Tennessee at West Cancer Clinic, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

37

133.    As a direct and proximate result of these injuries, Plaintiff Heath has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Heath has otherwise been damaged in a personal and pecuniary nature.

134.    During the entire time that Plaintiff Heath was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.  Plaintiff Heath first learned that exposure to Roundup® can cause FL sometime after March, 2017 after viewing legal advertisements on social media.

135.    Plaintiff Jamison is 37 years old and was exposed to Roundup® in DeSoto County, Mississippi, from approximately November, 2012 to sometime in 2015 while spraying Roundup® around his residence for residential and/or gardening purposes.  Plaintiff Jamison used Roundup® as purchased from home department stores, such as Home Depot.

136.    On January 27, 2016, Plaintiff Jamison was diagnosed with BCell, a subtype of NHL, in Memphis, Tennessee at Methodist University Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

137.    As a direct and proximate result of these injuries, Plaintiff Jamison has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Jamison has otherwise been damaged in a personal and pecuniary nature.

38

138.     During the entire time that Plaintiff Jamison was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.  Plaintiff Jamison first learned that exposure to Roundup® can cause BCell sometime after March, 2017 after viewing legal advertisements on social media.

139.     Plaintiff Jenkins (deceased) was 63 years old when she passed away from her exposure to Roundup®.  She had been exposed to Roundup® in Panola County, Mississippi since moving to property in the 1970s that was surrounded by land, farmed and saturated with Roundup® via tractor or crop duster airplanes.

140.     On April 3, 2011, Plaintiff Jenkins (deceased) was diagnosed with BCell, a subtype of NHL, in Oxford, Mississippi, Baptist Memorial Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

141.     As a direct and proximate result of these injuries, Plaintiff Jenkins (deceased) incurred medical expenses, pain and suffering, loss of enjoyment of life, and ultimately, she lost her life.  Plaintiff Jenkins (deceased) was damaged in a personal and pecuniary nature.

142.     During the entire time that Plaintiff Jenkins (deceased) was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.  Plaintiff Jenkins's (deceased) husband first learned that exposure to Roundup® can cause BCell sometime after March, 2017 after viewing legal advertisements on social media.

143.    Plaintiff Jones (deceased) was 74 years old when he passed away from his exposure to Roundup®.  He had been exposed to Roundup® in Washington and Tunica Counties, Mississippi for years prior to his diagnosis while spraying Roundup® around his residence for residential and/or gardening purposes in Greenville, Mississippi, and during the course of his employment on a plantation/farm in Dundee, Mississippi.  Plaintiff Jones (deceased) would sometimes wear protective equipment when applying Roundup®.  He used Roundup® as purchased from various hardware stores.

144.    In May, 1991, Plaintiff Jones (deceased) was diagnosed with NHL in Memphis, Tennessee, Baptist Memorial Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

145.    As a direct and proximate result of these injuries, Plaintiff Jones (deceased) incurred medical expenses, pain and suffering, loss of enjoyment of life, and ultimately, he lost his life.  Plaintiff Jones (deceased) was damaged in a personal and pecuniary nature.

146.    During the entire time that Plaintiff Jones (deceased) was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.  Plaintiff Jones's (deceased) daughter first learned that exposure to Roundup® can cause NHL sometime after March, 2017 after viewing legal advertisements on social media.

147.    Plaintiff King is 52 years old and was exposed to Roundup® in Quitman County, Mississippi from approximately May, 1980 to sometime in 2012 while spraying Roundup® around her residence for residential and/or gardening purposes and during her employment as a

40

farm hand. Plaintiff King used Roundup® as purchased from farm supply stores and co-operatives; and on occasion would mix Roundup® herself.

148. In February, 2017, Plaintiff King was diagnosed with TCell, a subtype of NHL, in Memphis, Tennessee at Baptist Family Cancer Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

149. As a direct and proximate result of these injuries, Plaintiff King has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff King has otherwise been damaged in a personal and pecuniary nature.

150. During the entire time that Plaintiff King was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others. Plaintiff King first learned that exposure to Roundup® can cause TCell sometime after March, 2017 after viewing legal advertisements on social media.

151. Plaintiff Lumsden (deceased) was 81 years old when he was diagnosed with BCell and subsequently passed away from his exposure to Roundup®. He had been exposed to Roundup® in Lowndes and Noxabee Counties, Mississippi from approximately the mid-1970s to sometime in 2015 while spraying Roundup® around his residence for residential and/or gardening purposes and during the course of his employment as a farmer. Plaintiff Lumsden (deceased) used Roundup® as purchased from home department stores, such as Lowe's and from co-operative stores.

152.    On June 12, 2015, Plaintiff Lumsden (deceased) was diagnosed with BCell, a subtype of NHL, in Tupelo, Mississippi at North MS Hematology and Oncology Associates, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

153.    As a direct and proximate result of these injuries, Plaintiff Lumsden (deceased) incurred medical expenses, pain and suffering, loss of enjoyment of life, and ultimately, he lost his life.  Plaintiff Lumsden (deceased) was damaged in a personal and pecuniary nature.

154.    During the entire time that Plaintiff Lumsden (deceased) was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.  Plaintiff Lumsden's (deceased) daughter first learned that exposure to Roundup® can cause BCell sometime after March, 2017 after viewing legal advertisements on social media.

155.    Plaintiff Moore is 69 years old and was exposed to Roundup® in Leflore and Sunflower Counties, Mississippi from August 4, 1994 to sometime in 2014 while spraying Roundup® around his residence for residential and/or gardening purposes and during the course of his employment.  Plaintiff Moore wore protective equipment when applying Roundup®.  He used Roundup® as purchased by his employer.

156.    In December, 2014, Plaintiff Moore was diagnosed with NHL in Jackson, Mississippi at Hederman Cancer Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture,

42

production, promotion, distribution, marketing, and sale of Roundup®.

157.     As a direct and proximate result of these injuries, Plaintiff Moore has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Moore has otherwise been damaged in a personal and pecuniary nature.

158.     During the entire time that Plaintiff Moore was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.  Plaintiff Moore first learned that exposure to Roundup® can cause NHL sometime after March, 2017 after viewing legal advertisements on social media.

159.     Plaintiff Mundinger (wife) is 65 years old and was exposed to Roundup® in DeSoto County, Mississippi from approximately May, 2005 to sometime in 2017 while spraying Roundup® around her residence for residential and/or gardening purposes.  Plaintiff Mundinger (wife) wore protective equipment when applying Roundup®.  She used Roundup® as purchased from home department stores, such as Home Depot; and on occasion would mix Roundup® herself.

160.     On August 24, 2017, Plaintiff Mundinger (wife) was diagnosed with CLL, a subtype of NHL, in Collierville, Tennessee at The University of Tennessee West Cancer Clinic, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

43

161.    As a direct and proximate result of these injuries, Plaintiff Mundinger (wife) has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Mundinger (wife) has otherwise been damaged in a personal and pecuniary nature.

162.    During the entire time that Plaintiff Mundinger (wife) was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others. Plaintiff Mundinger (wife) first learned that exposure to Roundup® can cause CLL sometime after March, 2017 after viewing legal advertisements on social media.

163.    Plaintiff Mundinger (husband) is 67 years old and was exposed to Roundup® in DeSoto County, Mississippi from approximately May, 2005 to the present while spraying Roundup® around his residence for residential and/or gardening purposes. Plaintiff Mundinger (husband) wore protective equipment when applying Roundup®. He used Roundup® as purchased from home department stores, such as Home Depot and co-operatives; and on occasion would mix Roundup® himself.

164.    In December, 2008, Plaintiff Mundinger (husband) was diagnosed with CLL, a subtype of NHL, in Southaven, Mississippi at The West Clinic, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

165.    As a direct and proximate result of these injuries, Plaintiff Mundinger (husband) has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Mundinger (husband) has otherwise

been damaged in a personal and pecuniary nature.

166.   During the entire time that Plaintiff Mundinger (husband) was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.  Plaintiff Mundinger (husband) first learned that exposure to Roundup® can cause CLL sometime after March, 2017 after viewing legal advertisements on social media.

167.   Plaintiff Pharr is 58 years old and was exposed to Roundup® in Tishomingo County, Mississippi from sometime in 1990 to sometime in 2017 while spraying Roundup® around her residence for residential and/or gardening purposes.  Plaintiff Pharr wore protective equipment when applying Roundup®.  She used Roundup® as purchased from farm supply stores and local farmers; and on occasion would mix Roundup® herself.

168.   On August 15, 2009, Plaintiff Pharr was diagnosed with BCell, a subtype of NHL, in Corinth, Mississippi at the West Clinic Cancer Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

169.   As a direct and proximate result of these injuries, Plaintiff Pharr has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Pharr has otherwise been damaged in a personal and pecuniary nature.

170`.   During the entire time that Plaintiff Pharr was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.  Plaintiff Pharr first learned that exposure to Roundup® can cause BCell sometime after March, 2017 after

viewing legal advertisements on social media.

171.     Plaintiff Ricks is 52 years old and was exposed to Roundup® in Tate County, Mississippi from approximately June, 2009 to sometime in either 2015 or 2016 while spraying Roundup® around her residence for residential and/or gardening purposes.  Plaintiff Pharr used Roundup® as purchased from home department stores, such as Lowe's and Walmart, and from Tractor Supply Company in Coldwater, MS; and on occasion would mix Roundup® herself.

172.     In June, 2016, Plaintiff Ricks was diagnosed with BCell, a subtype of NHL, in Memphis, Tennessee at Baptist Cancer Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

173.     As a direct and proximate result of these injuries, Plaintiff Ricks has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Ricks has otherwise been damaged in a personal and pecuniary nature.

174.     During the entire time that Plaintiff Ricks was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.  Plaintiff Ricks first learned that exposure to Roundup® can cause BCell sometime after March, 2017 after viewing legal advertisements on social media.

175.     Plaintiff Threet (deceased) was 46 years old when he was diagnosed with NHL and subsequently passed away from his exposure to Roundup®.  He had been exposed to Roundup® in Webster County beginning sometime in the early 1980s and until sometime in

46

1997 while spraying Roundup® around his residence for residential and/or gardening purposes. Plaintiff Threet (deceased) used Roundup® as purchased from co-operatives.

176.    In June, 1997, Plaintiff Threet (deceased) was diagnosed with NHL in Tupelo, Mississippi, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

177.    As a direct and proximate result of these injuries, Plaintiff Threet (deceased) incurred medical expenses, pain and suffering, loss of enjoyment of life, and ultimately, he lost his life.  Plaintiff Threet (deceased) was damaged in a personal and pecuniary nature.

178.    During the entire time that Plaintiff Threet (deceased) was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others. Plaintiff Threet's (deceased) wife first learned that exposure to Roundup® can cause NHL sometime after March, 2017 after viewing legal advertisements on social media.

179.    Plaintiff Warren is 62 years old and was exposed to Roundup® in Pontotoc County, Mississippi from sometime in 1996 to sometime in 2016 while spraying Roundup® around his residence for residential and/or gardening purposes.  Plaintiff Warren used Roundup® as purchased from home department stores, such as Lowe's; and on occasion would mix Roundup® himself.

180.    In August, 2007, Plaintiff Warren was diagnosed with BCell, a subtype of NHL, in Tupelo, Mississippi at North MS Hematology and Oncology Associates, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and

47

defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

181.     As a direct and proximate result of these injuries, Plaintiff Warren has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Warren has otherwise been damaged in a personal and pecuniary nature.

182.     During the entire time that Plaintiff Warren was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.  Plaintiff Warren first learned that exposure to Roundup® can cause BCell sometime after March, 2017 after viewing legal advertisements on social media.

183.     Plaintiff Weaver is 62 years old and was exposed to Roundup® in Chickasaw County, Mississippi from sometime in the mid-1970s to present while spraying Roundup® around her residence for residential and/or gardening purposes and her father-in-law's garden. Plaintiff Weaver used Roundup® as purchased from home department stores, such as Walmart and from co-operatives; and on occasion would mix Roundup® herself.

184.     In December, 1994, Plaintiff Weaver was diagnosed with NHL in Tupelo, Mississippi at North MS Medical Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

48

185.    As a direct and proximate result of these injuries, Plaintiff Weaver has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Weaver has otherwise been damaged in a personal and pecuniary nature.

186.    During the entire time that Plaintiff Weaver was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.  Plaintiff Weaver first learned that exposure to Roundup® can cause NHL sometime after March, 2017 after viewing legal advertisements on social media.

187.    Plaintiff Williams (Mary) is 61 years old and was exposed to Roundup® in Pontotoc County, Mississippi since the early 1980s to sometime in 2014 while spraying Roundup® around her residence for residential and/or gardening purposes.  Plaintiff Williams (Mary) used Roundup® as purchased from home department stores, such as Lowe's and Walmart.

188.    In June, 2011, Plaintiff Williams (Mary) was diagnosed with CLL, a subtype of NHL, in Tupelo, Mississippi at North MS Hematology and Oncology Associates, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

189.    As a direct and proximate result of these injuries, Plaintiff Williams (Mary) has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Williams (Mary) has otherwise been

49

damaged in a personal and pecuniary nature.

190.    During the entire time that Plaintiff Williams (Mary) was exposed to Roundup®,

she did not know that exposure to Roundup® was injurious to her health or the health of others.

Plaintiff Williams (Mary) first learned that exposure to Roundup® can cause NHL sometime

after March, 2017 after viewing legal advertisements on social media.

191.    Plaintiff Williams (Mitchell) is 57 years old and was exposed to Roundup® in

Lee County, Mississippi from sometime in 1992 to sometime in 2004 while spraying Roundup®

around his residence for residential and/or gardening purposes.  Plaintiff Williams (Mitchell)

used Roundup® as purchased from home department stores, such as Lowe's and Home Depot;

and on occasion would mix Roundup® himself.

192.    On June 12, 2000, Plaintiff Williams (Mitchell) was diagnosed with FL, a subtype

of NHL, in Tupelo, Mississippi at North MS Hematology and Oncology Associates, and suffered

the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and

defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research,

development, testing, manufacture, production, promotion, distribution, marketing, and sale of

Roundup®.

193.    As a direct and proximate result of these injuries, Plaintiff Williams (Mitchell)

has incurred and will incur medical expenses in the future and has endured and will endure pain

and suffering and loss of enjoyment of life, and Plaintiff Williams (Mitchell) has otherwise been

damaged in a personal and pecuniary nature.

194.    During the entire time that Plaintiff Williams (Mitchell) was exposed to

Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health

of others. Plaintiff Williams (Mitchell) first learned that exposure to Roundup® can cause NHL
sometime after March, 2017 after viewing legal advertisements on social media.

195.   Plaintiff Wooten 51 years old and was exposed to Roundup® in Calhoun County,
Mississippi, as well as in other counties in the State of Mississippi from March 10, 2003 to
present while spraying Roundup® around his residence for residential and/or gardening purposes
and during the course of his employment as logger.  Plaintiff Wooten used Roundup® as
purchased from co-operatives; and on occasion would mix Roundup® himself.

196.   On July 19, 2012, Plaintiff Wooten was diagnosed with TLL, a subtype of NHL,
in Jackson, Mississippi at The University of MS Medical Center, and suffered the effects
attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective
nature of Roundup® and Defendant's wrongful and negligent conduct in the research,
development, testing, manufacture, production, promotion, distribution, marketing, and sale of
Roundup®.

197.   As a direct and proximate result of these injuries, Plaintiff Wooten has incurred
and will incur medical expenses in the future and has endured and will endure pain and suffering
and loss of enjoyment of life, and Plaintiff Wooten has otherwise been damaged in a personal
and pecuniary nature.

198.   During the entire time that Plaintiff Wooten was exposed to Roundup®, he did
not know that exposure to Roundup® was injurious to his health or the health of others.  Plaintiff
Wooten first learned that exposure to Roundup® can cause TLL sometime after March, 2017
after his mother advised him of such after her employer told her.

## TOLLING OF THE STATUTE OF LIMITATIONS

### Discovery Rule Tolling

199.     Plaintiffs had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup® and glyphosate until well after IARC released its formal assessment of glyphosate in July 2015. This is the quintessential case for tolling.

200.     Within the time period of any applicable statutes of limitations, Plaintiffs could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup® and glyphosate is injurious to human health.

201.     Plaintiffs did not discover and did not know of facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup® and glyphosate; nor would a reasonable and diligent investigation by them have disclosed that Roundup® and glyphosate would cause their illness.

202.     For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiffs' claims.

### Fraudulent Concealment Tolling

203.     All applicable statutes of limitations have also been tolled by Monsanto's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

204.     Instead of disclosing critical safety information about Roundup® and glyphosate, Monsanto has consistently and falsely represented the safety of its Roundup® products.

**Estoppel**

205.    Monsanto was under a continuous duty to disclose to consumers, users and other persons coming into contact with its products, including Plaintiffs, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup®️ and glyphosate.

206.    Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup®️ and glyphosate and the serious risks associated with the use of and/or exposure to its products.

207.    Based on the foregoing, Monsanto is estopped from relying on any statutes of limitations in defense of this action.

## CLAIM ONE
## STRICT LIABILITY (DESIGN DEFECT)

208.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

209.    Plaintiffs bring this strict liability claim against Defendant for defective design.

210.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup®️ products, which are defective and unreasonably dangerous to consumers and users and other persons coming into contact them, including Plaintiffs, thereby placing Roundup®️ products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendant. At all times relevant to this litigation, Defendant designed, researched, developed, formulated, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup®️ products used by Plaintiffs, and/or to

which Plaintiffs were exposed, as described above.

211.    At all times relevant to this litigation, Defendant's Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiffs.

212.    At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Mississippi and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

213.    Defendant's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of the Defendant's manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

214.    Defendant's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks associated with these products' reasonably foreseeable uses exceeded the alleged benefits associated with their design and formulation.

215.    Therefore, at all times relevant to this litigation, Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendant, were defective in design and formulation, in one or

more of the following ways:

a.   When placed in the stream of commerce, Defendant's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate;

b.   When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;

c.   When placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

d.   Defendant did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate;

e.   Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweighs any potential utility stemming from the use of the herbicide;

f.   Defendant knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries;

g.   Defendant did not conduct adequate post-marketing surveillance of its Roundup® products; and

h.    Defendant could have employed safer alternative designs and

formulations.

216.    At all times relevant to this litigation, Plaintiffs used and/or was exposed to the

use of Defendant's Roundup® products in an intended or reasonably foreseeable manner without

knowledge of their dangerous characteristics.

217.    Plaintiffs could not have reasonably discovered the defects and risks associated

with Roundup® or glyphosate-containing products before or at the time of exposure.

218.    The harm caused by Defendant's Roundup® products far outweighed their

benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary

consumer would contemplate. Defendant's Roundup® products were and are more dangerous

than alternative products and Defendant could have designed its Roundup® products to make

them less dangerous. Indeed, at the time that Defendant designed its Roundup® products, the

state of the industry's scientific knowledge was such that a less risky design or formulation was

attainable.

219.    At the time Roundup® products left Defendant's control, there was a practical,

technically feasible, and safer alternative design that would have prevented the harm without

substantially impairing the reasonably anticipated or intended function of Defendant's

Roundup® herbicides.

220.    Defendant's defective design of Roundup® amounts to willful, wanton, and/or

reckless conduct by Defendant.

221.    Therefore, as a result of the unreasonably dangerous condition of its Roundup®

products, Defendant is strictly liable to Plaintiffs.

222. The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiffs' grave injuries, and, but for Defendant's misconduct and omissions, Plaintiffs would not have sustained their injuries.

223. As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Plaintiffs have suffered and continues to suffer grave injuries, and have endured pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiffs will continue to incur these expenses in the future.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demands a jury trial on the issues contained herein.

## CLAIM TWO
### STRICT LIABILITY (FAILURE TO WARN)

224. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

225. Plaintiffs bring this strict liability claim against Defendant for failure to warn.

226. At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

227.     Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiffs, Plaintiffs' employers, Plaintiffs' co-workers, and persons responsible for consumers (such as employers), and Defendant therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of Roundup® and glyphosate-containing products.

228.     At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn Plaintiffs of the dangers associated with Roundup® use and exposure. Defendant, as manufacturer, seller, or distributor of chemical herbicides, is held to the knowledge of an expert in the field.

229.     At the time of manufacture, Defendant could have provided warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to these products.

230.     At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its Roundup® products and to those who would foreseeably use or be harmed by Defendant's herbicides, including Plaintiffs.

58

231. Despite the fact that Defendant knew or should have known that Roundup®
products posed a grave risk of harm, it failed to warn of the dangerous risks associated with their
use and exposure. The dangerous propensities of its products and the carcinogenic characteristics
of glyphosate, as described above, were known to Defendant, or scientifically knowable to
Defendant through appropriate research and testing by known methods, at the time it distributed,
supplied, or sold the product, and not known to end users and consumers, such as Plaintiffs'
employers.

232. Defendant knew or should have known that its Roundup® and glyphosate-
containing products created significant risks of serious bodily harm to consumers, as alleged
herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of
the risks of exposure to these products. Defendant has wrongfully concealed information
concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further
made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

233. At all times relevant to this litigation, Defendant's Roundup® products reached
the intended consumers, handlers, and users or other persons coming into contact with these
products throughout the United States, including Plaintiffs, without substantial change in their
condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

234. At all times relevant to this litigation, Plaintiffs used and/or was exposed to the
use of Defendant's Roundup® products in their intended or reasonably foreseeable manner
without knowledge of their dangerous characteristics.

235. Plaintiffs could not have reasonably discovered the defects and risks associated
with Roundup® or glyphosate-containing products before or at the time of Plaintiffs' exposure.

59

Plaintiffs relied upon the skill, superior knowledge, and judgment of Defendant.

236. Defendant knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, but it failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and horticultural applications.

237. The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled agricultural workers, horticultural workers and/or at-home users such as Plaintiffs to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

238. To this day, Defendant has failed to adequately and accurately warn of the true risks of Plaintiffs' injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

239. As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiffs.

240.    Defendant is liable to Plaintiffs for injuries caused by its failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its Roundup® products and the risks associated with the use of or exposure to Roundup® and glyphosate.

241.    The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiffs' injuries, and, but for Defendant's misconduct and omissions, Plaintiffs would not have sustained their injuries.

242.    Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup® products, Plaintiffs could have avoided the risk of developing injuries as alleged herein and Plaintiffs' employers could have obtained alternative herbicides.

243.    As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Plaintiffs have suffered and continues to suffer severe injuries, and have endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiffs will continue to incur these expenses in the future.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## CLAIM THREE
### NEGLIGENCE

244.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

245.    Defendant, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiffs.

246.    At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

247.    At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of its Roundup® products. Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup® and, in particular, its active ingredient glyphosate.

248.    At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

249.    Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup®

62

products could cause Plaintiffs' injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiffs.

250. Defendant knew or, in the exercise of reasonable care, should have known that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiffs from Roundup®.

251. Defendant knew or, in the exercise of reasonable care, should have known that tests limited to Roundup®'s active ingredient glyphosate were insufficient to prove the safety of Roundup®.

252. Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup® and glyphosate- containing products.

253. As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

254. Defendant failed to appropriately and adequately test Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiffs from

Roundup®.

255.    Despite its ability and means to investigate, study, and test its products and to
provide adequate warnings, Defendant has failed to do so. Indeed, Defendant has wrongfully
concealed information and has further made false and/or misleading statements concerning the
safety and/or exposure to Roundup® and glyphosate.

256.    Defendant's negligence included:

     a.    Manufacturing, producing, promoting, formulating, creating, developing,
designing, selling, and/or distributing its Roundup® products without
thorough and adequate pre- and post-market testing;

     b.    Manufacturing, producing, promoting, formulating, creating, developing,
designing, selling, and/or distributing Roundup® while negligently and/or
intentionally concealing and failing to disclose the results of trials, tests,
and studies of exposure to glyphosate, and, consequently, the risk of
serious harm associated with human use of and exposure to Roundup®;

     c.    Failing to undertake sufficient studies and conduct necessary tests to
determine whether or not Roundup® products and glyphosate- containing
products were safe for their intended use in agriculture, horticulture, and
at-home use;

     d.    Failing to undertake sufficient studies and conduct necessary tests to
determine the safety of "inert" ingredients and/or adjuvants contained
within Roundup®, and the propensity of these ingredients to render
Roundup® toxic, increase the toxicity of Roundup®, whether these

64

ingredients are carcinogenic, magnify the carcinogenic properties of Roundup®, and whether or not "inert" ingredients and/or adjuvants were safe for use;

e.    Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

f.    Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

g.    Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and/or be exposed to its Roundup® products;

h.    Failing to disclose to Plaintiffs, users, consumers, and the general public that the use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

i.    Failing to warn Plaintiffs, users, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiffs and other users or consumers;

j.    Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

65

k. Representing that its Roundup® products were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended use;

l. Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

m. Advertising, marketing, and recommending the use of Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

n. Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup® products are not unsafe for use in the agricultural, horticultural industries, and/or home use; and

o. Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

257. Defendant knew and/or should have known that it was foreseeable that consumers and/or users, such as Plaintiffs, would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

258. Plaintiffs did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

259. Defendant's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiffs suffered, and will continue to suffer, as described herein.

260.    Defendant's conduct, as described above, was reckless. Defendant regularly risks the lives of consumers and users of its products, including Plaintiffs, with full knowledge of the dangers of its products. Defendant has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiffs. Defendant's reckless conduct therefore warrants an award of punitive damages.

261.    As a proximate result of Defendant's wrongful acts and omissions in placing its defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiffs have suffered and continues to suffer severe and permanent physical and emotional injuries. Plaintiffs have endured pain and suffering, have suffered economic losses (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demands a jury trial on the issues contained herein.

## JURY TRIAL DEMAND

262.    Plaintiffs demand a trial by jury on all of the triable issues within this pleading.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court enter judgment in their favor and against Monsanto, awarding as follows:

a.      compensatory damages in an amount to be proven at trial;

b.      punitive damages;

c.      costs including reasonable attorneys' fees, court costs, and other litigation

expenses; and

     d.     any other relief the Court may deem just and proper.

Respectfully submitted this the _____ day of July, 2018.

          John Arthur Eaves, Jr. (MS Bar #8843)
          Eaves Law Firm, LLC
          101 North State Street
          Jackson, MS 39201
          (601) 355-7961 – Telephone
          (601) 355-0530 -- Facsimile
          johnjr@eaveslawmail.com
          Attorney for Plaintiffs