JCG,JURY,PRO_SE_NON-PRISONER,REMOVAL

# U.S. District Court
# Southern District of Mississippi (Southern)
# CIVIL DOCKET FOR CASE #: 1:18-cv-00377-HSO-JCG
# Internal Use Only

| | |
|---|---|
| Aden v. Monsanto Company | Date Filed: 11/29/2018 |
| Assigned to: District Judge Halil S. Ozerden | Jury Demand: Plaintiff |
| Referred to: Magistrate Judge John C. Gargiulo | Nature of Suit: 365 Personal Inj. Prod. Liability |
| Case in other court: Circuit Court of Pearl River County, Mississippi, 55CI1:18cv106 | Jurisdiction: Diversity |
| Cause: 28:1332 Diversity-Product Liability | |

**Plaintiff**

**Aubrey R. Aden**      represented by      **Aubrey R. Aden**
108 Aubrey Aden Road
Carriere, MS 39426
PRO SE

V.

**Defendant**

**Monsanto Company**      represented by      **James W Shelson**
PHELPS DUNBAR, LLP - Jackson
P. O. Box 16114
4270 I-55 North (39211)
Jackson, MS 39236-6114
601/360-9724
Fax: 601/360-9777
Email: shelsonj@phelps.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/29/2018 | 1 | NOTICE OF REMOVAL by Monsanto Company from Circuit Court of Pearl River County, Mississippi, case number 55CI1:18cv106. ( Filing fee $ 400 receipt number 0538-3865081)<br><br><span style="color:red">If the complete state court record is not attached as an Exhibit to the Petition for Removal, pursuant to Rule L.U.Civ.R. 5(b): within 14 days</span> |

| | | |
|---|---|---|
| | | removing party must electronically file the entire state court record as a single filing; and all parties shall, within fourteen days after the Case Management Conference, file as **separate docket items** any unresolved motions that were filed in state court which they wish to advance. (Attachments: # 1 Exhibit 1-State Court Record, # 2 Exhibit 2-Declaration, # 3 Civil Cover Sheet)(wld) (Entered: 11/29/2018) |
| 11/29/2018 | 🔒 | (Court only) ***Set JCG and Pro Se Flags (wld) (Entered: 11/29/2018) |
| 11/29/2018 | 2 | Letter sent to MDL Clerk with docket entries and complaint/notice of removal. (wld) (Entered: 11/29/2018) |

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| Aubrey R. Aden, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No: __1:18-cv-377-HSO__-JCG |
| Monsanto Company, | ) ) | |
| Defendant. | ) ) | |

## MONSANTO COMPANY'S NOTICE OF REMOVAL

Defendant Monsanto Company ("Monsanto"), by filing this Notice of Removal and related papers, removes this lawsuit from the Circuit Court of Pearl River County, Mississippi to this Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446.

### Introduction

In this products liability lawsuit, plaintiff Aubrey R. Aden brings suit against Monsanto Company ("Monsanto") for injuries allegedly caused by Monsanto's Roundup®-branded herbicides, which have glyphosate as their active ingredient. Farmers have used glyphosate-based herbicides for decades to increase crop yields. Glyphosate is one of the most thoroughly studied herbicides in the world, and glyphosate-based herbicides have received regulatory approval in more than 160 countries. Since 1974, when Monsanto first introduced a Roundup®-branded herbicide to the marketplace, the United States Environmental Protection Agency repeatedly has concluded that glyphosate does not cause cancer. Nevertheless, plaintiff alleges that he developed cancer – non-Hodgkin's lymphoma ("NHL") – caused by exposure to Roundup®-branded herbicides. Numerous federal lawsuits filed by other plaintiffs alleging that

they developed NHL due to exposure to Roundup®-branded herbicides have been transferred for coordinated multidistrict litigation ("MDL") proceedings to U.S. District Court Judge Vince Chhabria in the Northern District of California. *See In re Roundup Prods. Liab. Litig.*, No. 3:16-md-02741-VC (N.D. Cal.).

As discussed in more detail below, Monsanto removes this lawsuit because this Court has subject matter jurisdiction based on diversity of citizenship. Monsanto is a citizen of Missouri (where its principal place of business is located) and Delaware (Monsanto's state of incorporation). Plaintiff is a citizen of Mississippi. Accordingly, complete diversity of citizenship exists in this case as required by 28 U.S.C. § 1332. The statutory amount-in-controversy requirement is also satisfied because plaintiff seeks damages for cancer (NHL) allegedly caused by exposure to Monsanto's Roundup®-branded herbicides.

## Basis For Removal

1.       Plaintiff commenced this action in the Circuit Court of Pearl River County, Mississippi on or about October 3, 2018 (the "State Court Action"). A copy of the State Court Complaint and any other papers filed in the State Court Action are attached collectively as Exhibit 1.

2.       Plaintiff seeks damages related to his diagnosis of NHL allegedly caused by exposure to Monsanto's Roundup®-branded herbicides. *See* Complaint ¶¶ 96, 121, 122, 143, 158, 160.

3.       The Circuit Court of Pearl River County, Mississippi is located within the Southern District of Mississippi. As such, removal to this Court satisfies the venue requirements of 28 U.S.C. § 1446(a).

4.       Plaintiff is, and has been at all relevant times, a citizen and resident of the State of

2

Mississippi. *See* Complaint ¶¶ 1, 65-95.

5.      Monsanto is, and has been at all relevant times, a corporation incorporated under the laws of the State of Delaware with its principal place of business in the State of Missouri. *See* Declaration of Christopher A. Martin ¶ 2 ("Martin Declaration") (attached as Exhibit 2). Accordingly, Monsanto is a citizen of Missouri and Delaware. The Complaint alleges that Monsanto has its principal place of business in Mississippi. Complaint ¶ 2. However, that is incorrect. *See* Martin Declaration ¶ 3 ("Monsanto does not have its principal place of business in Mississippi.").

6.      Plaintiff seeks compensatory and punitive damages, together with costs, attorneys' fees, and other relief. Complaint ¶ 160 and subsequent "Wherefore" clause. Given those allegations and the allegations that Monsanto's Roundup®-branded herbicides caused plaintiff to develop cancer, it is plausible that plaintiff seeks damages in excess of the jurisdictional amount-in-controversy set forth in 28 U.S.C. § 1332(a). *See Dart Cherokee Basin Operating Co. v. Owens*, 135 S. Ct. 547, 554 (2014) ("[A] defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold."). Numerous other lawsuits seeking damages for NHL allegedly caused by Roundup®-branded herbicides have been filed against Monsanto in other federal courts asserting jurisdiction under § 1332(a) and alleging damages in excess of $75,000, exclusive of interest and costs. As discussed above, those cases have been transferred to the Northern District of California for coordinated MDL proceedings. *See In re Roundup Prods. Liab. Litig.*, No. 3:16-md-02741-VC (N.D. Cal.).

7.      In sum, this Court has original subject matter jurisdiction over this action based on § 1332(a) because there is complete diversity of citizenship between all parties (plaintiff and

3

Monsanto) and the amount in controversy exceeds $75,000, exclusive of costs and interest.

      8.    On October 31, 2018, Monsanto was served with the summons and complaint in this case. Therefore, this Notice of Removal is timely, pursuant to 28 U.S.C. § 1446(b).

      9.    For the reasons set forth above, this lawsuit is properly removed to this Court.

      10.    The written notice required by 28 U.S.C. § 1446(d) will be promptly filed in the Circuit Court of Pearl River County, Mississippi and promptly served on plaintiff.

Dated: November 29, 2018          Respectfully submitted,

                         PHELPS DUNBAR LLP

                         BY:   */s/ James W. Shelson*
                                James W. Shelson, MB 9693
                                Nash E. Gilmore, MB 105554
                                4270 I-55 North
                                Jackson, Mississippi 39211-6391
                                Post Office Box 16114
                                Jackson, Mississippi 39236-6114
                                Telephone: 601-352-2300
                                Telecopier: 601-360-9777
                                Email: jim.shelson@phelps.com
                                         nash.gilmore@phelps.com

                         Attorneys for Defendant Monsanto Company

## CERTIFICATE OF SERVICE

      I certify that on November 29, 2018, I served a copy of this document by first class mail, postage prepaid, on Plaintiff as follows:

      Aubrey R. Aden
      108 Aubrey Aden Road
      Carriere, MS 39426
      Pro Se

                                */s/ James W. Shelson*
                                JAMES W. SHELSON

)/03/18 03:11PM CDT The Law Offices of David A -> Clerk of Court of
7 Pg 2/2                                                                    6014032
Case: 55CI1:18-cv-00106-AM   Document #: 1   Filed: 12/04/18   Page 7 of 51
Case: 55CI1:18-cv-00106-AM   Document #: 1   Filed: 10/03/2018   Page 1 of 1

# COVER SHEET
## Civil Case Filing Form

*(To be completed by Attorney/Party Prior to Filing of Pleading)*

Mississippi Supreme Court
Administrative Office of Courts

Form AOC/01
(Rev 2016)

**Court Identification Docket #**

| Court Identification Docket # | | | |
|---|---|---|---|
| County # | Judicial District | Court ID (CH, CI, CO) | |

5 5 1 | C I 1

**Case Year**
2 0 1 8

**Docket Number**
C V 0 1 0 6
AM
Local Docket ID

| Month | Date | Year |
|---|---|---|
| 1 6 | 0 3 | 1 8 |

This area to be completed by clerk

Case Number if filed prior to 1/3/94

In the CIRCUIT [✔] Court of PEARL RIVER [✔] County ___ [✔] Judicial District

**Origin of Suit (Place an "X" in one box only)**

| [X] Initial Filing | [ ] Reinstated | [ ] Foreign Judgment Enrolled | [ ] Transfer from Other court | [ ] Other |
| [ ] Remanded | [ ] Reopened | [ ] Joining Suit/Action | [ ] Appeal | |

**Plaintiff - Party(ies) Initially Bringing Suit Should be Entered First - Enter Additional Plaintiffs on Separate Form**

Individual  ADEN (Last Name)   AUBREY (First Name)   Maiden Name, if applicable   R (M.I.)   Jr/Sr/III/IV

___ Check (x) if Individual Plaintiff is acting in capacity as Executor(trix) or Administrator(trix) of an Estate, and enter style:
Estate of ___

___ Check (x) if Individual Plaintiff is acting in capacity as Business Owner/Operator (d/b/a) or State Agency, and enter entity
D/B/A or Agency ___

Business ___
Enter legal name of business, corporation, partnership, agency - If Corporation, indicate the state where incorporated

___ Check (x) if Business Plaintiff is filing suit in the name of an entity other than the above, and enter below:
D/B/A ___

Address of Plaintiff   108 AUBREY ADEN RD. CARRIERE, MS 39426                  MS Bar No. ___

Attorney (Name & Address)
X  Check (x) if Individual Filing Initial Pleading is NOT an attorney
Signature of Individual Filing: *[signature]*

**Defendant - Name of Defendant - Enter Additional Defendants on Separate Form**

Individual ___ (Last Name)   ___ (First Name)   Maiden Name, if applicable   M.I.   Jr/Sr/III/IV

___ Check (x) if Individual Defendant is acting in capacity as Executor(trix) or Administrator(trix) of an Estate, and enter style:
Estate of ___

X  Check (x) if Individual Defendant is acting in capacity as Business Owner/Operator (d/b/a) or State Agency, and enter entity:
D/B/A or Agency  MONSANTO COMPANY

Business  MONSANTO COMPANY INCORPORATED in DELAWARE
Enter legal name of business, corporation, partnership, agency - If Corporation, indicate the state where incorporated

___ Check (x) if Business Defendant is acting in the name of an entity other than the above, and enter below:
D/B/A ___                                                                      MS Bar No. ___

Attorney (Name & Address) - If Known

___ Check (x) if child support is contemplated as an issue in this suit.*
*If checked, please submit completed Child Support Information Sheet with this Cover Sheet

**Nature of Suit (Place an "X" in one box only)**

| Domestic Relations | Business/Commercial | Children/Minors - Non-Domestic | Real Property |
|---|---|---|---|
| [ ] Child Custody/Visitation | [ ] Accounting (Business) | [ ] Adoption - Contested | [ ] Adverse Possession |
| [ ] Child Support | [ ] Business Dissolution | [ ] Adoption - Uncontested | [ ] Ejectment |
| [ ] Contempt | [ ] Debt Collection | [ ] Consent to Abortion | [ ] Eminent Domain |
| [ ] Divorce:Fault | [ ] Employment | [ ] Minor Removal of Minority | [ ] Eviction |
| [ ] Divorce: Irreconcilable Diff. | [ ] Foreign Judgment | [ ] Other | [ ] Judicial Foreclosure |
| [ ] Domestic Abuse | [ ] Garnishment | **Civil Rights** | [ ] Lien Assertion |
| [ ] Emancipation | [ ] Replevin | [ ] Elections | [ ] Partition |
| [ ] Modification | [ ] Other | [ ] Expungement | [ ] Tax Sale: Confirm/Cancel |
| [ ] Paternity | **Probate** | [ ] Habeas Corpus | [ ] Title Boundary or Easement |
| [ ] Property Division | [ ] Accounting (Probate) | [ ] Post Conviction Relief/Prisoner | [ ] Other |
| [ ] Separate Maintenance | [ ] Birth Certificate Correction | [ ] Other | **Torts** |
| [ ] Term. of Parental Rights-Chancery | [ ] Mental Health Commitment | **Contract** | [ ] Bad Faith |
| [ ] UIFSA (eff 7/1/97; formerly URESA) | [ ] Conservatorship | [ ] Breach of Contract | [ ] Fraud |
| [ ] Other | [ ] Guardianship | [ ] Installment Contract | [ ] Intentional Tort |
| **Appeals** | [ ] Heirship | [ ] Insurance | [ ] Loss of Consortium |
| [ ] Administrative Agency | [ ] Intestate Estate | [ ] Specific Performance | [ ] Malpractice - Legal |
| [ ] County Court | [ ] Minor's Settlement | [ ] Other | [ ] Malpractice - Medical |
| [ ] Hardship Petition (Driver License) | [ ] Muniment of Title | **Statutes/Rules** | [ ] Mass Tort |
| [ ] Justice Court | [ ] Name Change | [ ] Bond Validation | [ ] Negligence - General |
| [ ] MS Dept Employment Security | [ ] Testate Estate | [ ] Civil Forfeiture | [ ] Negligence - Motor Vehicle |
| [ ] Municipal Court | [ ] Will Contest | [ ] ___ Judgment | [ ] Premises Liability |
| [ ] Other | [ ] Alcohol/Drug Comm. | [ ] ___ or Restraining Order | [X] Product Liability |
| | | | [ ] Subrogation |
| | | | [ ] Wrongful Death |
| | | | [ ] Other |

[ ] Alcohol/Drug Commitment *(Marital)*
[ ] Other

**EXHIBIT 1**

## IN THE CIRCUIT COURT OF PEARL RIVER COUNTY, MISSISSIPPI

# FILED

**AUBREY R. ADEN**    NANCE FITZPATRICK STOKES CIRCUIT CLERK    **PLAINTIFF**

OCT -3 2018

**VS.**    CAUSE NO.: 55:18-CV-0106Am

BY: _____
DEPUTY CLERK

**MONSANTO COMPANY**    **DEFENDANT**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### COMPLAINT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### <u>Jury Trial Demanded</u>

**NOW COMES PLAINTIFF** Aubrey R. Aden, who avers as follows:

1.

Plaintiff Aubrey R. Aden ("Aden") is of majority age and domiciled in the County of Pearl River, State of Mississippi.

2.

Made defendant herein is Monsanto Company ("Monsanto"), a Delaware corporation with its headquarters and principal place of business in Leland, Mississippi. At all times relevant to this complaint, Monsanto sold and distributed Monsanto products including Roundup®, within the State of Mississippi.

### <u>STATEMENT OF THE FACTS</u>

3.

In 1970, Defendant Monsanto Company; Inc. discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®.

Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85—90 millions of pounds used annually. 'That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

4.

Monsanto is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

5.

Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

6.

On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

7.

On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

8.

The ARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other haematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

9.

The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

10.

Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

11.

Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

12.

Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

13.

For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup® Glyphosate is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Agricultural workers are, once again, victims or corporate greed.

14.

Monsanto assured the public that Roundup® was harmless. In order to prove this, LL Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® was safe.

15.

. The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use. It still markets Roundup® as safe today.

16.

The manufactures formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C, 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. S. 136a(a)

17.

Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process; other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity.to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 13a(c)(5)(D).

18.

FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, considering the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

19.

The EPA and the State of Mississippi registered Roundup® for distribution, sale, and manufacture in the United States and the State of Mississippi.

20.

FIFRA generally requires that the registrant, Monsanto in the ease of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not {required, nor is it able, however, to perform the product tests that are required of the manufacturer.

21.

The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. L36a-l. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

22.

In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment —in relation to the reregistration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

### *Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup*

23.

Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

24.

On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

25.

In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies

relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®,

26.

In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT', it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

27.

Three top executives of IBT were convicted of fraud in 1983.

28.

In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

29.

Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 1 15 countries.

## *The Importance of Roundup® to Monsanto's Market Dominance Profits*

30.

The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

31.

In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996, Since Roundup Ready® crops are resistant to glyphosate; farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology oecd3 were planted On more than 80 anilliuii worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

32.

Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

***Monsanto has known for decades that it falsely advertises the safety of Roundup®***

33.

In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto

based on its false and misleading advertising of ® products. Specifically, the lawsuit challenged

Monsanto's general representations that its spray-on glyphosate-based herbicides,

including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds,

and fish. Among the representations the NYAG found deceptive and misleading about the human

and environmental safety of Roundup® are the following:

1. Remember that environmentally friendly Roundup herbicide is biodegradable and won't build up in the soil so you can use Roundup with confidence along customers driveways, sidewalks and fences.

2. And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

3. Roundup biodegrades into naturally occurring elements.

4. Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

5. This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

6. You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil micro organisms biodegrade Accord into natural products.

7. Glyphosate is less toxic to rats than table salt following acute oral ingestion.

8. Glyphosate's safety margin is much required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

9. You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

10.  "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

34.

On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with

NYAG, in which Monsanto agreed, among or the+ things, "to cease and desist from publishing

or broadcasting any advertisements [in New York] that represent, directly or by implication"

that:

a)  its glyphosate-containing pesticide products or any component thereof are safe, nontoxic, harmless or free from risk;
b)  its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable
c)  its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.
d)  its glyphosate-containing pesticide products or any component thereof are 'good' for the environment or are "known for their environmental characteristics."
e)  glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;
f)  its glyphosate-containing products or any component thereof might be classified as "practically non-toxic.

35.

Monsanto did not alter its advertising in the same manner in any state other than

New York, and on information and belief still has not done so today.

36.

In 2009, France's highest court ruled that Monsanto had not told the truth about the safety

of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely

advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

***Classifications and Assessments of Glyphosate***

37.

The IARC process for the classification pf glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 1 16 agents to be Group I (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

38.

The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

39.

One year before the Monograph meeting; the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

40.

In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

41.

In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 24 agent and probably carcinogenic in humans.

42.

On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from I I countries met at IARC from March 3—10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

43.

The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

44.

Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

45.

Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

46.

The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

47.

The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

48.

The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

49.

In male CD-I mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study repo a positive trend for haemangiosarcoma in male mice.

Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

50.

The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil 'microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

51.

The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

52.

The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

53.

The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (ACL), and Chronic Lymphocytic Leukemia (CLL.), in addition to several other cancers.

### Other Earlier Findings about Glyphosate's Dangers to Human Health

54.

The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

### Release Patterns

55.

Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites, These sites may be around water and in wetlands.

56.

It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

57.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

58.

In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness,

glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

### *Recent Worldwide Bans on Roundup®/Glyphosate*

59.

Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in light of the as the. dangers of the use of Roundup® are more widely known, The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which takes effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers; Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

60.

The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

61.

France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate. Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

62.

The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that Glyphosate has been linked to fatal kidney disease in agricultural workers.

63.

The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic. On information and belief, Monsanto was, at all relevant times, engaged in the distribution of Roundup, Roundup-ready crops and other glyphosate-containing products to retailers and commercial/agricultural users in Louisiana.

64.

Monsanto had superior knowledge compared to Roundup users and consumers, including regarding the carcinogenic properties of the product, yet failed to accompany its sales and/or marketing of Roundup with any warnings or precautions for that grave danger. On information and belief, Monsanto was one of the distributors providing Roundup and other glyphosate containing products actually used by the Plaintiff.

## *Plaintiff's Exposure to Roundup®: Commercial Application of Roundup® 1987 to 1994*
## *ADEN HORTICULTURAL SERVICES*

65.

At or around the year 1987, Mr. Aubrey Aden and Mr. Michael Aden formed a Horticultural Service named, Aden Horticulture Services. This was a commercial business that required a commercial license for application of various pesticides, including, but not limited to, insecticides, herbicides, fungicides, for both residential and commercial accounts.

66.

Plaintiff was employed initially with Aden Horticulture Service with an employee identification card and worked directly in the course and scope of employment under Michael Aden's Pesticide Applicator License bearing Certificate No. 4219. This Certified Commercial Pesticide Applicator Certificate allowed the Horticulture Service to operate throughout the State of Mississippi, in particular the Mississippi Gulf Coast area and surrounding areas of Pearl River and Hancock County.

67.

Mr. Aden was constantly exposed to Roundup® within his regular course and scope of his employment with Aden Horticultural Services as a result of residential contracts where the herbicide Roundup® was applied to residential accounts for weed control in the cracks of driveways, walkways, client lawns and shrubs.

68.

Mr. Aden was constantly exposed to Roundup® within his regular course and scope of his employment with Aden Horticultural Services as a result of commercial contracts and Roundup® was consistently applied to commercial accounts in areas such as high school football fields, weed control for driveways and parking lots and the shrubs located in and around various restaurants.

69.

While employed with Aden Horticulture Service, Mr. Aubrey Aden would routinely purchase Roundup® from local distributors located in and around the Mississippi and Louisiana area.[1]

---

[1] The commercial distributors were located in and around the Pearl River County Areas, in the State of Mississippi.

70.

Aden Horticulture Services secured contracts in predominantly in Hancock County and Pearl River County in and for the State of Mississippi.

71.

Many of these accounts were located in close proximity to and around beach areas where the Roundup® would often be carried back into his face in which the Roundup® would often be inhaled.

72.

While employed with Aden Horticulture Services it was not uncommon for Mr. Aden to be exposed to Roundup® by such methods such as clothing exposure, hand to mouth exposure, skin absorption, and respiratory exposure.[2]

73.

State Inspections were often performed at the location of Aubrey Aden Horticultural Services ensuring that Mr. Aden adhered to State maintained standards of practice.

74.

Mr. Aubrey Aden was licensed by the Bureau of Plant Industry in 1994, earning a certificate in Commercial Pesticide Application.

---

[2] Commercial application of the product Roundup® required Mr. Aden to be licensed by the State of Mississippi and to follow the Monsanto Material Safety Data Sheet (MSDS) guidelines for Protective Personal Equipment. The Material Safety Data Sheet (MSDS) set forth guidelines on the standards of practice for the application of the commercial herbicide product Roundup®. It should be noted that the Monsanto MSDS commercial guidelines did not require Mr. Aden to wear any protective equipment such as a requirement that he wear a respiratory mask which would cover his nose and mouth and prevent inhalation of the herbicide. Roundup® is also known as a non-restricted pesticide that has no restrictions on its purchase. Mr. Aubrey R. Aden would refer to safety precautions through the MDMS guidelines as set forth by Monsanto, Company and, in the alternative, by referring to the label on the Roundup® product itself for safety and use precautions.

## *Plaintiff's Exposure to Roundup®: Commercial Application of Roundup® 1994 to 2005*
### *AUBREY ADEN HORTICULTURAL SERVICES*

75.

In 1994, Mr. Aubrey R. Aden applied for and sat for his Commercial Applicator License that allowed for a Commercial Pesticide Application License.

76.

In order to successfully qualify and be awarded a Commercial Applicator License, Mr. Aubrey R. Aden was required to sit for and pass a written examination which set forth standards of practice of laws on proper application of the pesticides in a commercial setting that allowed him to solicit business upon successful completion of the examination.

77.

The Commercial Applicator License consisted to two parts:

    1.) The application of pesticides of Commercial Pesticides; and

    2.) A second examination allowing the Mr. Aden for a certificate in a particular area of specialty of horticulture.

78.

Mr. Aubrey R. Aden was certified on safety techniques for the application of Roundup® for commercial use techniques set forth in the Material Safety Data Sheet which always deferred to the Roundup® label for proper use and application of Roundup® on commercial accounts.

79.

In 1994, Mr. Aubrey R. Aden acquired this Application Certificate Holder that allowed him to purchase broad leaf herbicides primarily used to kill woody brush and small trees.

80.

Mr. Aubrey Aden was licensed as a Bureau of Plant Industry on 1994, Bureau of Plant Industry bearing certificate for certified Commercial Pesticide Application Certificate.

81.

Mr. Aubrey Aden obtained a commercial license with the Mississippi Department of Agriculture and Commerce Bureau of Plant Industry for Certified Commercial Pesticide Applicator Certificate.

82.

While employed with Aubrey Aden Horticulture Services it was not uncommon for Mr. Aden to be exposed to Roundup® by such methods such as clothing exposure, hand to mouth exposure, skin absorption, and respiratory exposure.

83.

At all times during the course and scope of his employment with Aubrey Aden Horticulture Services Mr. Aden maintained his active license with the Mississippi Department of Agriculture and Commerce Bureau of Plant Industry for Certified Commercial Pesticide Applicator Certificate adhering to commercial standards of care for appropriate storage and handling of the Commercial Concentrate Herbicide Roundup® product.

84.

At all times during the course and scope of his employment with Aubrey Aden Horticulture Services Mr. Aden maintained his active license with the Mississippi Department of Agriculture and Commerce Bureau of Plant Industry for Certified Commercial Pesticide Applicator Certificate adhering to commercial standards of care for appropriate exposure control/personal protection of the Commercial Concentrate Herbicide Roundup® product.

85.

At all times during the course and scope of his employment with Aubrey Aden Horticulture Services Mr. Aden maintained his active license with the Mississippi Department of Agriculture and Commerce Bureau of Plant Industry for Certified Commercial Pesticide Applicator Certificate adhering to commercial standards of care for appropriate knowledge of the physical and chemical properties of the Commercial Concentrate Herbicide Roundup® product.

86.

At all times during the course and scope of his employment with Aubrey Aden Horticulture Services Mr. Aden maintained his active license with the Mississippi Department of Agriculture and Commerce Bureau of Plant Industry for Certified Commercial Pesticide Applicator Certificate adhering to commercial standards of care for appropriate of knowledge of the toxicological information of the Commercial Concentrate Herbicide Roundup® product.

87.

At all times during the course and scope of his employment with Aubrey Aden Horticulture Services Mr. Aden maintained his active license with the Mississippi Department of Agriculture and Commerce Bureau of Plant Industry for Certified Commercial Pesticide Applicator Certificate

adhering to commercial standards of care for appropriate ecological information of the Commercial Concentrate Herbicide Roundup® product.

88.

At all times during the course and scope of his employment with Aubrey Aden Horticulture Services Mr. Aden maintained his active license with the Mississippi Department of Agriculture and Commerce Bureau of Plant Industry for Certified Commercial Pesticide Applicator Certificate adhering to commercial standards of care for appropriate disposal considerations of the Commercial Concentrate Herbicide Roundup® product.

89.

At all times during the course and scope of his employment with Aubrey Aden Horticulture Services Mr. Aden maintained his active license with the Mississippi Department of Agriculture and Commerce Bureau of Plant Industry for Certified Commercial Pesticide Applicator Certificate adhering to commercial standards of care for appropriate transport information of the Commercial Concentrate Herbicide Roundup® product.

90.

At all times during the course and scope of his employment with Aubrey Aden Horticulture Services Mr. Aden followed the Material Safety Data Sheet Commercial Product guidelines for application of the Commercial Concentrate Herbicide Roundup® product.

91.

At all times during the course and scope of his employment with Aubrey Aden Horticulture Services Mr. Aden maintained his active license with the Mississippi Department of Agriculture and Commerce Bureau of Plant Industry for Certified Commercial Pesticide Applicator Certificate

adhering to commercial standards of care for appropriate application and handling of the Commercial Concentrate Herbicide Roundup® product.

### *Plaintiff's Exposure to Roundup® Through Farm Application of Roundup® 1970 to 2015 ADEN RANCH/FARM*

92.

In 1970, Mr. Aubrey Aden bought a farm and implemented agricultural non-solicitation services for his Roundup®.

93.

Mr. Aden was exposed to Roundup® regularly by routine and regular use of Roundup® on his farm where he would use the product to kill the weeds located under farm fences and other locations on his farm for weed control. Often, the Roundup® would often splash all over his bare skin, whereupon he tried to immediately remove the product from his skin and clothes.

94.

Mr. Aden kept bottles of Roundup® at all times in a secure cabinet and maintained these bottles in locations to where he would have easy access to the regular use of Roundup® at any occasion. Basically, there was almost never a time when Mr. Aden was not in close proximity of Roundup® and or using Roundup® since the early 1970's.

95.

At all times, Mr. Aubrey R. Aden maintained the same commercial standards for transportation, ecological considerations, disposal, first aid measures, firefighting measures, accidental release measures, handling and storage considerations, exposure controls/personal protection considerations, stability and reactivity considerations, toxicological information considerations, ecological considerations, disposal considerations, transport considerations, and

regulatory consideration for farm related application of the Roundup® product, despite potential variances for the farm application Roundup®.

96.

At or around 2013, Mr. Aden was diagnosed with Non-Hodgkin's Follicular Lymphoma. From 2013 until 2017, Mr. Aden had approximately 20 treatments, to which he suffered discomfort from the treatments. The treatments were long induration and would often exhaust Mr. Aden rendering him close to homebound status to the point of extreme exhaustion.

97.

After the diagnosis of Non-Hodgkin's Lymphoma he was more depressed giving up all his hobbies.

98.

To date, Mr. Aubrey R. Aden remains at a stage two diagnosis of Non-Hodgkin's Follicular Lymphoma.

99.

Mr. Aubrey Aden continues to undergo routine tests to monitor Mr. Aden's cancer COMPUTERIZED AXIAL TOMOGRAPHY (CAT) and POSITRON EMISSION TOMOGRAPHY (PET) tests to monitor his cancer progress.

100.

Mr. Aubrey R. Aden continues to live in fear of his cancer progressing.

### *CONTRA NON VALENTEM*

101.

Upon information and belief, Monsanto has known of the defects in Roundup® and concealed from consumers for years and/or failed to alert consumers of the defective nature of the Roundup®.

102.

Plaintiff could not have reasonably known that the Roundup® was defective, Defendants are stopped from relying and should not be able to rely on any exception regarding any period of liberative prescription that might otherwise be applicable to the claims asserted herein.

103.

Pursuant to the doctrine of Contra nom *Valentem Agere Nulla Currit Praescriptio,* the period of the statute of limitations for plaintiffs' claims "commences on the date the injured party discovers or should have discovered the facts upon which his cause of action is based." Accordingly, as Plaintiff had no knowledge of the defect with the Roundup® until the verdict rendered in this action is brought within one year of that recall, Plaintiffs claim is timely.

### MISSISSIPPI PRODUCTS LIABILTIY ACT
### CLAIM ONE
### DESIGN DEFECT (MS Code § 11-1-63, et seq.)

104.

Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

105.

Plaintiff asserts a claim against Defendant for defective design pursuant to MS Code § 11-1-63, et seq.

106.

At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant. At all times relevant to this litigation, Defendant designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products that Plaintiff was exposed to, as described above.

107.

At all times relevant to this litigation, Defendant' Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff.

108.

At all times relevant to this litigation, Defendant' Roundup® products reached the intended consumers, and users or other persons coming into contact with these products in Mississippi and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

109.

Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in

design and formulation in that when they left the hands of the Defendant' manufacturers and/or

suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an

ordinary consumer would contemplate.

110.

Defendant's Roundup® products, as researched, tested, developed, designed, licensed,

manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in

design and formulation in that when they left the hands of Defendant's manufacturers and/or

suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and

formulation.

111.

At all times relevant to this action, Defendant knew or had reason to know that the

Roundup® products were defective and were inherently dangerous and unsafe when used in the

manner instructed and provided by Defendant.

112.

At all times relevant to this litigation, Defendant' Roundup® products, as researched,

tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and

marketed by Defendant were defective in design and formulation, in one or more of the following

ways:

a.    When placed in the stream of commerce, Defendant' Roundup® products were defective
      in design and formulation, and, consequently, dangerous to an extent beyond that which an
      ordinary consumer would contemplate.
b.    When placed in the stream of commerce, Defendant' Roundup® products were
      unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and
      other serious illnesses when used in a reasonably anticipated manner.
c.    When placed in the stream of commerce, Defendant' Roundup® products contained
      unreasonably dangerous design defects and were not reasonably safe when used in a
      reasonably anticipated or intended manner.

d.   Defendant did not sufficiently test, investigate, or study its Roundup® products and, specifically the active ingredient glyphosate.

e.   Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f.   Defendant knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g.   Defendant did not conduct adequate post-marketing surveillance of its Roundup® products. Defendant could have employed safer alternative designs and formulations.

h.   Defendant could have employed safer alternative designs and formulations.


113.

Plaintiff was exposed to Defendant' Roundup® products while living in the County of Pearl

River and the County of Hancock county, Mississippi, as described above, without knowledge of

its dangerous characteristics.

114.

At all times relevant to this litigation, Plaintiff was exposed to the use of Defendant'

Roundup® products in an intended or reasonably foreseeable manner without knowledge of their

dangerous characteristics.

115.

Plaintiff could not have reasonably discovered the defects and risks associated with

Roundup® or glyphosate-containing products before or at the time of exposure.

116.

The harm caused by Defendant' Roundup® products far outweighed their benefit,

rendering Defendant' products dangerous to an extent beyond that which an ordinary consumer

would contemplate. Defendant' Roundup® products were and are more dangerous than alternative

products and Defendant could have designed its Roundup® products to make them less dangerous.

Indeed, at the time that Defendant designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

117.

At the time Roundup® products left Defendant' control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant' herbicides.

118.

Defendant' defective design of its Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundups products, including the Plaintiff's herein.

119.

Therefore, as a result of the unreasonably' dangerous condition of its Roundup® products, Defendant are strictly liable to Plaintiff.

120.

The defects in Defendant' Roundup® products were substantial and contributing factors in causing Plaintiff grave injuries, and, but for Defendant' misconduct and omissions, Plaintiff would not have sustained his injuries.

121.

Defendant' conduct, as described above, was reckless. Defendant risked the lives of consumers and users of its products, including Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Defendant made conscious decisions not to redesign, warn or inform the unsuspecting public. Defendant' reckless conduct warrants an award of punitive damages.

122.

As a direct and proximate result of Defendant placing defective Roundup® products into the stream Of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

### CLAIM TWO
### INADEQUATE WARNING
**Mississippi Products Liability Act Pursuant to MS Code § 11-1-63, et al**

123.

Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

124.

Plaintiff asserts a claim against Defendant for inadequate warning pursuant to MS Code § 11-1-63(a)(i)(2).

125.

At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, promoting and applying Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate Warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

126.

Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiff, and persons responsible for consumers (such as employers), and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

127.

At all times relevant to this litigation, Defendant had a duty to properly test, develops design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps at necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn the Plaintiff of the dangers associated with Roundup® use and exposure. Defendant, as manufacturer, seller, ok distributor of chemical herbicides, are held to the knowledge of an expert in the field.

128.

At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

129.

At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of this product and to those who would foreseeably use or be harmed by Roundup®, including Plaintiff.

130.

Despite the fact that Defendant knew or should have known that Roundup® posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied or sold the product, and not known to end users and consumers, such as Plaintiff.

131.

Defendant knew or should have known that these products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Defendant have wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

132.

At all times relevant to this litigation, Defendant' Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Mississippi and throughout the United States, including Plaintiff, without substantial change in

their condition as designed, manufactured, sold, distributed, labeled, marketed and sprayed/applied by Defendant.

133.

Plaintiff was exposed to Roundup® products, as described above, without knowledge of their dangerous characteristics.

134.

At all times relevant to this litigation, Plaintiff was exposed to the use of Defendant' Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

135.

Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiffs exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendant.

136.

Defendant knew or should have known that the minimal warnings disseminated with or accompanying the application of Roundup® products were inadequate, but they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

137.

The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled those exposed such as Plaintiff to

utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or: otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

138.

To this day, Defendant have failed to adequately and accurately warn of the true risks of Plaintiffs injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

139.

As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were sold or distributed by Defendant, were applied by Defendant, and when Plaintiff became exposed.

140.

Defendants are liable to Plaintiff for injuries caused by negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of their products and the risks associated with the use of or exposure to Roundup® and glyphosate.

141.

The defects in these Roundup® products were substantial and contributing factors in causing Plaintiff' injuries, and, but for Defendant' misconduct and omissions, Plaintiff would not have sustained their injuries.

142.

Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products and application, Plaintiff could have avoided the risk of developing injuries as alleged herein and the company who employed Plaintiff could have obtained alternative herbicides.

143.

As a direct and proximate result of Defendant placing defective Roundup® products into the stream of commerce and exposing Plaintiff them, Plaintiff has suffered and continues to suffer severe injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

## CLAIM THREE
## BREACH OF EXPRESS WARRANTY (MS Code § 11-1-63(a)(i)(4)
144.

Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

145.

Plaintiff asserts a claim against Defendant for breach of express warranty pursuant to MS Code § 11-1-63(a)(i)(4).

146.

At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of the Defendant.

147.

Before the time that Plaintiff was exposed to the use of the aforementioned Roundup® products, Defendant expressly warranted to consumers and those exposed—including Plaintiff— that Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

148.

Defendant, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing Severe injuries, including Plaintiffs injuries.

149.

Plaintiff reasonably relied upon the skill, superior knowledge and judgment of Defendant and upon their implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

150.

Plaintiff is the intended third-party beneficiaries of express warranties made by Defendant to the purchasers of their horticultural herbicides, and as such Plaintiff is entitled to assert this claim.

151.

The Roundup® products were expected to reach and did in fact reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendant.

152.

At all times relevant to this litigation, Defendant were aware that consumers and users of their products, including Plaintiff, would use Roundup® products as marketed by Defendant, which is to say that Plaintiff was a foreseeable user of Roundup®.

153.

Defendant intended that Roundup® products be used in the manner in which Plaintiff was exposed to them and Defendant expressly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

154.

In reliance upon Defendant' express warranty, Plaintiff used or was exposed to Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendant.

155.

Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

156.

Defendant breached their express warranty to Plaintiff in that Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has

dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

157.

The harm caused by Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

158.

As a direct and proximate result of Defendant' wrongful acts and omissions Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, has suffered economic loss (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

160.

Defendant's actions were willful and reckless acts and subjects them to punitive damages above and beyond general compensatory damages.

**WHEREFORE,** plaintiff, Aubrey R. Aden, prays that after due proceedings are had, there be judgment in his favor and against defendant Monsanto Company, for damages, including but not limited to punitive damages, costs, attorneys' fees and all other relief to which this Court deems just through the request of trial by jury.

Respectfully submitted:

Aubrey R. Aden
Petitioner Pro Se
108 Aubrey Aden Road
Carriere, Ms. 39426
(T) 601-916-1980
elaine39426@gmail.com
adencatahoulas@yahoo.com

Please Serve:
Service Instructions to Follow

# ADEN RANCH

108 Aubrey Aden Road
Carriere, Mississippi 39426
(T): 601-916-1980
Elaineaden39426@gmail.com

55:18-CV-0106 Am

October 2, 2018

**Via Federal Express Overnight**
**Delivery**

Pearl River County Courthouse
200 South Main Street
P.O. Box 530
Poplarville, Mississippi 39470-0530
(601) 403-2328

FILED
NANCE FITZPATRICK STOKES CIRCUIT CLERK

OCT - 3 2018

BY: _____
DEPUTY CLERK.

*Re: Aubrey R. Aden v. Monsanto Company*

Dear Sir or Madam:

Please find enclosed an original and two copies of my complaint against Monsanto Company. Kindly file the original and two copies into the record and mail my copy to my home at the above address. I have enclosed a money order in the amount of $160.00 to cover the filing cost. Kindly contact me at the above number to further discuss this case at your earliest convenience.

With kind regards, I am

Sincerely,

*s/Aubrey R. Aden*
Aubrey R. Aden

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
### SOUTHERN DIVISION

| | | |
|---|---|---|
| Aubrey R. Aden, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No: _____ |
| | ) | |
| Monsanto Company, | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF CHRISTOPHER A. MARTIN

Christopher A. Martin hereby declares as follows:

1. I am currently employed as Assistant Secretary, Monsanto Company ("Monsanto"). The statements set forth below are based on my personal knowledge and Monsanto's corporate records.

2. Monsanto is incorporated in Delaware and has its principal place of business in St. Louis, Missouri.

3. Monsanto does not have its principal place of business in Mississippi.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 27, 2018.

Christopher A. Martin

**EXHIBIT**

2

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Aubrey R. Aden | Monsanto Company |

**(b)** County of Residence of First Listed Plaintiff  Pearl River
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Pro Se

Attorneys *(If Known)*
James W. Shelson, Phelps Dunbar LLP
P.O. Box 16114, Jackson, MS 39236-6114
(601) 352-2300

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
Plaintiff

☐ 3  Federal Question
*(U.S. Government Not a Party)*

☐ 2  U.S. Government
Defendant

☒ 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☒ 365 Personal Injury - | of Property 21 USC 881 | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | ☐ 690 Other | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | | ☐ 893 Environmental Matters |
| | Medical Malpractice | | Leave Act | | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | Agency Decision |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | State Statutes |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☐ 1 Original
Proceeding

☒ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
Another District
*(specify)*

☐ 6 Multidistrict
Litigation -
Transfer

☐ 8 Multidistrict
Litigation -
Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. §§ 1332, 1441, and 1446
Brief description of cause:
Product liability/personal injury for exposure to herbicide

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE Hon. Vince Chhabria

DOCKET NUMBER MDL 2741

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 11/29/2018 | /s/ James W. Shelson |

**FOR OFFICE USE ONLY**

| RECEIPT # | AMOUNT $400.00 | APPLYING IFP | JUDGE | MAG. JUDGE |
|---|---|---|---|---|

#0538-3865081