# Live Database
## U.S. District Court - Eastern District of Tennessee (Chattanooga)
## CIVIL DOCKET FOR CASE #: 1:18-cv-00293-PLR-SKL

Petty et al v. Monsanto Company (PLR1)
Assigned to: District Judge Pamela L Reeves
Referred to: Magistrate Judge Susan K Lee
Demand: $75,000
Cause: 28:1332 Diversity-Product Liability

Date Filed: 12/03/2018
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod.
Liability
Jurisdiction: Diversity

**Plaintiff**

**Patrick A. Petty**                          represented by **Tim L. Bowden**
Law Offices of Tim Bowden
306 North Creek Blvd.
Suite 200
Goodlettsville, TN 37072
615-859-1996
Email: bowden_law@bellsouth.net
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Sharon Petty**                          represented by **Tim L. Bowden**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 12/03/2018 | 1 | COMPLAINT against Monsanto Company (Filing fee $ 400 paid, Receipt No. C1016186), filed by Patrick A. Petty, Sharon Petty. (Attachments: # 1 Civil Case Cover Sheet)(AML, ) (Entered: 12/03/2018) |
| 12/03/2018 | 2 | Summons Issued as to Monsanto Company. (AML, ) Mailed to Tim Bowden (Entered: 12/03/2018) |
| 12/03/2018 | 3 | NOTICE of Deficiency (Pro Hac) mailed to Attorney Tim Bowden. Registration deadline 12/21/2018 (AML, ) (Entered: 12/03/2018) |
| 12/03/2018 | 4 | Order Governing Depositions. Signed by District Judge Pamela L Reeves on 12/3/2018. (AML, ) (Entered: 12/03/2018) |
| 12/03/2018 | 5 | Order Governing Motions To Dismiss. Signed by District Judge Pamela L Reeves on |

| | | |
|---|---|---|
| | | 12/3/2018. (AML, ) (Entered: 12/03/2018) |
| 12/03/2018 | 6 | Order Governing Sealing Confidential Information. Signed by District Judge Pamela L Reeves on 12/3/2018. (AML, ) (Entered: 12/03/2018) |
| 12/03/2018 | | Documents 4,5,6 mailed to Attorney Tim Bowden. (AML, ) (Entered: 12/03/2018) |
| 12/06/2018 | 7 | MOTION for Leave to Appear Pro Hac Vice (Filing fee $ 90 paid, receipt No. 1016207). (AML, ) (Entered: 12/06/2018) |
| 12/06/2018 | | Clerk's Verification of PHV Requirements is complete *regarding document: 7 MOTION for Leave to Appear Pro Hac Vice* (AML, ) (Entered: 12/06/2018) |
| 12/07/2018 | 8 | ORDER granting 7 Motion for Leave to Appear Pro Hac Vice by Attorney Tim L. Bowden on behalf of Plaintiffs Patrick A. Petty and Sharon Petty. This entry constitutes the complete Order of the Court. There is no document attached to this entry. You MUST register as a CM/ECF user here: http://www.tned.uscourts.gov/content/attorney-ecf-registration-form. Signed by Magistrate Judge Susan K Lee on 12/07/2018. (KRS, ) Regenerated and emailed to Attorney Bowden (Entered: 12/07/2018) |

| PACER Service Center | | | | |
|---|---|---|---|---|
| **Transaction Receipt** | | | | |
| 12/20/2018 15:49:30 | | | | |
| **PACER Login:** | hllp1982:2634105:4722683 | **Client Code:** | 1417.0049 | |
| **Description:** | Docket Report | **Search Criteria:** | 1:18-cv-00293-PLR-SKL | |
| **Billable Pages:** | 2 | **Cost:** | 0.20 | |

IN THE DISTRCT COURT FOR THE EASTERN DISTRICT
OF TENNESSEE AT CHATANOOGA

**FILED**

DEC 0 3 2018

Clerk, U. S. District Court
Eastern District of Tennessee
At Chattanooga

| | |
|---|---|
| PATRICK ARNOLD PETTY, and<br>his wife, SHARON PETTY,<br>Plaintiffs, | )<br>)<br>)<br>) |
| vs. | )<br>) |
| MONSANTO COMPANY,<br>Defendant, | )<br>)<br>)<br>) |

CASE NO.
JURY TRIAL DEMANDED

## **COMPLAINT**

Plaintiffs, Patrick Arnold Petty, (Plaintiff), and his wife, Sharon Petty, by and through his

undersigned attorneys, hereby bring this Complaint for damages against Defendant, Monsanto

Company, and allege the following:

### **NATURE OF THE CASE**

1. This is an action for damages suffered by Plaintiff as a direct and proximate result of Defendant's
   negligent and wrongful conduct in connection with the design, development, manufacture,
   testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the
   herbicide Roundup®, containing the active ingredient glyphosate.  This action is additionally
   brought by Plaintiffs for the loss of consortium suffered by Plaintiff's wife, Sharon Petty.

2. Plaintiff maintains that Roundup® and/or glyphosate is defective, dangerous to human health,
   unfit and unsuitable to be marketed and sold in commerce, and lacked proper warnings and
   directions as to the dangers associated with its use.

3. Plaintiff's injuries are substantially similar to those suffered by thousands of similarly situated
   victims across the country and were avoidable.

1

## JURISDICTION AND VENUE

4.    This Court has jurisdiction over Defendant and this action pursuant to 28 U.S.C. 1332 because there is complete diversity of citizenship between Plaintiff and Defendant.  Defendant is either incorporated and/or has its principal place of business outside of the state in which the Plaintiff resides.

5. The amount in controversy between Plaintiff and Defendant exceeds $75,000, exclusive of interest and costs.

6. The Court also has supplemental jurisdiction pursuant to 28 U.S.C. 1367.

7. Venue is proper within this district pursuant to 28 U.S.C. 1391 in that Defendant conducts business in the State of Tennessee and within this district and is subject to personal jurisdiction in this district.  Furthermore, Defendant sells, markets, and/or distributes Roundup® within the State of Tennessee.   Also, a substantial part of the acts and/or omissions giving rise to these claims occurred within this district.

## PARTIES

8.   Plaintiff Patrick Petty, is a natural person and at all relevant times a resident and citizen of Jasper, Tennessee. Plaintiff has been a farmer for most of his adult life and has used and been exposed to the damaging effects of the Defendant's product for many years.  Plaintiff brings this action for personal injuries sustained by his exposure to Roundup® (hereafter "Roundup"), which contains the active ingredient glyphosate and the surfactant polyethoxylated tallow amine ("POEA").  As a direct and proximate result of being exposed to Roundup, Plaintiff has developed non-Hodgkin's lymphoma.  Plaintiff, Sharon Petty, is at all times material the wife of Patrick Petty and brings her action for loss of consortium.

2

9.    Defendant Monsanto Company ("Monsanto" or "Defendant") is a Delaware corporation in "active" status, with a principal place of business in St. Louis, Missouri.

10. Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate, whose herbicidal properties were discovered by the Defendant in 1970 and which the Defendant began marketing in 1974 under the product name Roundup.[1]   In addition to the active ingredient, glyphosate, Roundup also contains the surfactant Polyethoxylated tallow amine (POEA) and/or adjuvants or other so-called "inert ingredients." The use of glyphosate grew widely and rapidly in the United States and, by 2013, it was reported as the most widely-used pesticide active ingredient in American agriculture and had grown to be the most widely-used herbicide in the world. [2]

11. "Roundup" refers to all formulations of Monsanto's Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup® Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k Herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Pro Dry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer,

---

[1] Monsanto, *Backgrounder, History of Monsanto's Glyphosate Herbicide* (Sept. 2, 2015), http://www.monsanto.com/products/glyphosate-background-materials/back_history.pdf.

[2] *Id., see also* Arthur Grube et al., U.S. Envtl. Prot. Agency, *Pesticides Industry Sales and Usage, 2006-2007 Market Estimates, 1-41, (2011),* available at https://www.epa.gov/sites/production/files/2015-10/documents/market_estimates2007.pdf.

Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass Killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer 1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

12. Monsanto advertises and sells goods, specifically Roundup, in the State of Tennessee.

13. Monsanto transacted and conducted business within the State of Tennessee that relates to the allegations of this Complaint.

14. Monsanto is authorized to do business in Tennessee and derives substantial revenue from goods and products used in the State of Tennessee.

15. Monsanto expected or should have expected its acts to have consequences within the State of Tennessee and derived substantial revenue from interstate commerce.

16. Monsanto engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup.

17. Upon information and belief, Monsanto purposefully availed itself of the privilege of conducting activities with the State of Tennessee, thus invoking the benefits and protections of its laws.

18. Upon information and belief, Monsanto did design, sell, advertise, manufacture and/or distribute Roundup, with full knowledge of its dangerous and defective nature.

4

## FACTUAL ALLEGATIONS

19.    At all relevant times, Monsanto was in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or has acquired and is responsible for the commercial herbicide Roundup.

20. Monsanto discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate-based "Roundup" as a broad-spectrum herbicide.

21. Glyphosate is the active ingredient in Roundup.

22.   Glyphosate is a broad-spectrum herbicide used in a wide variety of products around the world to kill weeds and grasses known to compete with commercial crops grown around the globe.

23. Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3- phosphate synthase, known as EPSP synthase.

24. Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

25.  Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.  Glyphosate interferes with the plants' abilities to form aromatic amino acids necessary for protein synthesis.  Treated plants typically

5

die within two or three days of application. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking or brewing grains.

26.    Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

27. Monsanto is intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup, i.e., "Roundup Ready®." As of 2009, Monsanto was the world's leading producer of seeds designed to be Roundup Ready®. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready® seeds.

28. The original Roundup, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the world's most widely used herbicides.[3]

29. For nearly 40 years, consumers, farmers, and the public have used Roundup, unaware of its carcinogenic properties and unaware of the dangers inherent in its use. That is because when Monsanto first introduced Roundup, it touted glyphosate as a technological breakthrough which could kill virtually every weed without causing harm to either people or to the environment. History, however, has proven this claim to be untrue. According to the World Health Organization ("WHO"), the main chemical ingredient in Roundup – glyphosate – is a probable cause of cancer. Persons most at risk are farmers, such as the Plaintiff, and other individuals regularly exposed to Roundup in their workplace, such as workers in garden centers or nurseries,

---

[3] Backgrounder, *History of Monsanto's Glyphosate Herbicides*, June 2005

and landscapers. Monsanto at all times material, assured the public that Roundup was harmless and, in that effort, Monsanto has used falsified data, attacked legitimate studies that exposed the dangers of Roundup, and has championed a prolonged campaign of misinformation in order to convince government agencies, farmers, and the general public that Roundup is safe. Monsanto has continued to maintain that Roundup is safe.[4]

## REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

30.   The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA. 7 U,S,C. 136a(a).

31. As part of the registration process, among other requirements, the EPA requires a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe, but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U. S. C. 136a(c)(5)(D).

32.   FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. 136(bb). FIFRA thus

---

[4] *See, e.g.*, Monsanto, *What is Glyphosate?* (Sep. 2, 2015),
http://www.monsanto.com/sitecollectiondocuments/glyphosate-safety-health.pdf.

requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

33.   The EPA and the State of Tennessee has registered Roundup for distribution, sale, and/or manufacture in the United States and the State of Tennessee and Monsanto has provided Roundup for distribution, sale and/or manufacture in Tennessee.

34.   FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

35.   The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. 136a-1.   In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

36.   In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment in relation to the registration process no later than July 2015. The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of the International Agency for Research on Cancer's March 24, 2015 finding that glyphosate is a "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

37.    The International Agency for Research on Cancer ("IARC") is a specialized intergovernmental cancer agency tasked with conducting and coordinating research into the causes of cancer by the World Health Organization ("WHO") of the United Nations.

38.  Numerous countries have banned or restricted the sale and use of glyphosate containing products since IARC's assessment.

39. On April 29, 2016, the EPA's Cancer Assessment Review Committee posted a report evaluating the carcinogenic potential of glyphosate. However, the report was quickly removed from its website on or about May 2, 2016 as it was in direct contradiction to IARC's March 2015 analysis finding that glyphosate is probably carcinogenic.

## MONSANTO'S FALSE REPRESENTATIONS
## REGARDING THE SAFETY OF ROUNDUP®

40. In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish.

41. Among the representations of the Defendant that the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

a) Remember that environmentally friendly
Roundup herbicide is biodegradable. It won't
build up in the soil so you can use Roundup with
confidence along customers' driveways,
sidewalks and fences;

b) And remember that Roundup is biodegradable

9

and won't build up in the soil. That will give
you the environmental confidence you need to
use Roundup everywhere you've got a weed,
brush, edging or trimming problem;

c) Roundup biodegrades into naturally occurring elements;

d) Remember that versatile Roundup herbicide
stays where you put it. That means there's no
washing or leaching to harm customers' shrubs
or other desirable vegetation;

e) This non-residual herbicide will not wash or
leach in the soil. It... stays where you apply
it;

f) You can apply Accord with "confidence
because it will stay where you put it" it
bonds tightly to soil particles, preventing
leaching. Then, soon after application, soil
microorganisms biodegrade Accord into
natural products;

g) Glyphosate is less toxic to rats than table salt
following acute oral ingestion;

h) Glyphosates safety margin is much greater
than required. It has over a 1,000-fold safety
margin in food and over a 700-fold safety
margin for workers who manufacture it or use
it;

10

i) You can feel good about using herbicides by
Monsanto. They carry a toxicity category rating
of 'practically non-toxic' as it pertains
to mammals, birds and fish;

j) "Roundup can be used where kids and pets will
play and breaks down into natural material."
This ad depicts a person with his head in the
ground and a pet dog standing in an area which
has been treated with Roundup.[5]

42. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with the
NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or
broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a) Its glyphosate-containing pesticide
products or any component thereof
are safe, non-toxic, harmless or free
from risk;

b) its glyphosate-containing pesticide
products or any component thereof
manufactured, formulated, distributed
or sold by Monsanto are
biodegradable;

c) its glyphosate-containing pesticide
products or any component thereof

_____

[5] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of
Discontinuance Pursuant to Executive Law See. 63(15) (Nov. 1996).

11

stay where they are applied under all
circumstances and will not move
through the environment by any
means;

d) its glyphosate-containing pesticide
products or any component thereof
are "good" for the environment or are
"known for their environmental
characteristics.";

e) glyphosate-containing pesticide
products or any component thereof are
safer or less toxic than common consumer
products other than herbicides; or

f) its glyphosate-containing products or
any component thereof might be
classified as practically non-toxic.

43.  Monsanto did not alter its advertising in the same manner in any state other than New York,

and, on information and belief, still has not done so today.

44.  In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of

Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its

herbicide Roundup as "biodegradable" and that it "left the soil clean."[6]

---

[6] Monsanto Guilty in 'False Ad' Row, BBC, Oct. 15, 2009, available at
http://news.bbc.co.uk/2/hi/europe/8308903.stm.

12

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP

45.  As early as the 1980's, Monsanto was aware of glyphosate's carcinogenic properties.

46.  On March 4, 1985, the EPA's Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[7]   Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

47.  In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.[8]

48.  In October 1991, the EPA published a Memorandum entitled "Second Peer Review of Glyphosate."[9]   The Memorandum set forth the conclusions of the Health Effects Division Carcinogenicity Peer Review Committee, which had convened in June 1991 to "discuss and evaluate the weight of the evidence on Glysophate with particular emphasis on its carcinogenic potential."

49. The Memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans).

50.  However, two peer review committee members refused to sign and another committee member did not concur with the conclusions of the committee.

---

[7] Consensus Review of Glyphosate, Casewell No. 661A. March 4, 1985. United States Environmental Protection Agency.

[8] http://www.epa.gov/oppsndl/reregistration/REDs/factsheets/0178fact.pdf.

[9] Second Peer Review of Glyphosate, CAS No. 1071-83-6. October 30, 1991. United States Environmental Protection Agency.

13

51.  In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Monsanto's Roundup products are more dangerous and toxic than glyphosate alone].[10] As early as 1991, evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.[11]

52. In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDKI/Cyclin B Activation."

53. The study found that Monsanto's Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

54.  In 2004, Julie Marc published a study entitled "Glyphosate-based Pesticides Affect Cell Cycle Regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

55. The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells. "[12]

56.  In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

---

[10] Martinez et al. 2007; Benachour 2009; Gasnier et al. 2010; Peixoto 2005; Marc 2004.

[11] Martinez et al. 1991.

[12] Molinari, 2000; Stewart et al., 2003.

14

57. The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

58. In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

59. The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate alone.

60. The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and or known to Monsanto.

61. Monsanto knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup.

62. Monsanto knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

63. Monsanto failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and or the surfactant POEA to in a manner sufficient or adequate to protect Plaintiff and other users or the product from the harmful effects of Roundup.

15

64. Rather than performing appropriate tests, Monsanto relied upon flawed industry-supported studies designed to protect Defendant's own economic interests rather than protecting the health and safety of its customers to whom the Defendant was marketing and providing its product, such as the Plaintiff and the consuming public.

65. Despite its knowledge that Roundup was considerably more dangerous than glyphosate alone, Monsanto continued to promote Roundup as safe.

## IARC'S CLASSIFCATION OF GLYPHOSATE

66. As mentioned above, the IARC is a specialized intergovernmental cancer agency tasked with conducting and coordinating research into the causes of cancer by the WHO.

67. In April 2014, an IARC Advisory Group met to Recommend Priorities for IARC Monographs during 2015-2019.

68. Though nominations for the review were solicited, in order to be eligible for review by the IARC Monographs, a substance must meet two criteria: first, there must already be some evidence of carcinogenicity of the substance, and second, there must be evidence that humans are exposed to the substance.

69. IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have 1) a potential for direct impact on public health; 2) scientific literature to support suspicion of carcinogenicity; 3) evidence of significant human exposure; 4) high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; and 5) related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

70. On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one year, many of which had been in Monsanto's possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Roundup herbicide is a Group 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

71. The 1ARC's full Monograph was published on July 29, 2015 and established glyphosate as a Group 2A probable carcinogen to humans. According to the authors, glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

72. The IARC found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

73. The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

**EARLIER EVIDENCE OF GLYPHOSATE'S DANGER**

74. Despite the new classification by IARC, Monsanto has had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

75. Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

76. In 1997, Chris Clements published "Genotoxicity of select herbicides in rana catesbeiana tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

77. The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

78. Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

79. Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

80. The 1ARC Monograph notes that "strong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

81. In 2006, Cesar Paz-y-Mino published a study examining DNA damage in human subjects exposed to glyphosate.

82. The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

83. The 1ARC Monograph also reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

84. Despite knowledge to the contrary, Monsanto maintains that there is no evidence that Roundup is genotoxic; that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic; and that there is no evidence that Roundup is genotoxic.

85. In addition to glyphosate and Roundup's genotoxic properties, Monsanto has long been aware of glyphosate's carcinogenic properties.

18

86.   Glyphosate, and Roundup in particular, have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma (NHL), Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

87.   Monsanto has known of this association since the early to mid-1980s and numerous human and animal studies since that time have evidenced the carcinogenicity of glyphosate and/or Roundup.

88.   In 2002, eminent Swedish oncologists Lennaii Hardell, M.D., Ph.D., and Mika l Eriksson, M.D., Ph.D., published the results of two case-controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.   The study concluded that glyphosate had the most significant relationship to NHL among all herbicide studies with an increased odds ratio ("OR") of 3. 1 1.

89.   A previous study by Dr. Hardell and Dr. Eriksson revealed clear links between glyphosate to NHL. This study, which was published in the March 1999 Journal of American Cancer Society, maintained that exposure to glyphosate "yielded increased risks for NHL." The authors stressed that because of the rapidly increasing use of glyphosate, "glyphosate deserves further epidemiologic studies."

90.   In 2003, AI De Roos, Ph.D., MPH, was the lead author on a study examining the pooled data of Midwestern farmers, examining pesticides and herbicides as risk factors for NHL.

91.   The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

92.   In 2008, Dr. Eriksson published a population-based case-control study of exposure to various pesticides as a risk factor for NHL.

93.   The results of Dr. Eriksson's 2008 study "considerably strengthened" previous associations between glyphosate and NHL.

19

94.   In spite of this knowledge, Monsanto continued to issue broad and sweeping statements stating that Roundup® was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

95. Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiff, the agricultural community, and the public at large to purchase and increase the use of Monsanto's Roundup® for Defendant's pecuniary gain, and in fact, did induce Plaintiff to use Roundup®.

96.   Monsanto made these statements with complete disregard and reckless indifference to the safety of Plaintiff and the general public.

97.   Notwithstanding Monsanto's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, multiple myeloma, and soft tissue sarcoma.

98. Monsanto knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NEIL, multiple myeloma, and soft tissue sarcomas.

99.   Monsanto failed to appropriately and adequately inform and warn Plaintiff of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup®, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

100. Despite the IARC's classification of glyphosate as a Group 2A probable carcinogen, Monsanto continues to maintain that glyphosate and/or Roundup® is safe, noncarcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

101. Monsanto has claimed and continues to claim that Roundup is safe, non-carcinogenic, and non-genotoxic. These representations are consistent with Defendant's cavalier approach to investigating and ensuring the safety of its products, the safety of the public at large, and the safety of Plaintiff.

## SCIENTIFIC FRAUD UNDERLYING THE SAFETY
## DETERMINATION OF GLYPHOSATE

102.    After the EPA's 1985 classification of glyphosate as possibly carcinogenic to humans (Group C), Monsanto exerted pressure upon the EPA to change its classification.

103. This culminated in the EPA's reclassification of glyphosate to Group E, which was based upon evidence of non-carcinogenicity in humans.

104. In so classifying, the EPA stated that "it should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."[13]

105.    On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed scientific fraud.

---

[13] Second Peer Review of Glyphosate, CAS No. 1071-83-6. October 30, 1981. United States Environmental Protection Agency.

106.   In the first instance, Monsanto hired Industrial Bia-Test Laboratories ("1BT") to perform and evaluate pesticide toxicology studies relating to Roundup.  IBT performed approximately 30 tests on glyphosate and glyphosate-containing products, including 11 of the 19 chronic toxicology studies needed to register Roundup® with the EPA.

107.   In 1976, the Food and Drug Administration ('FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to toxicological impacts of glyphosate. The EPA subsequently audited IBT and determined that the toxicology studies conducted for Roundup were invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

108.   Three top executives of IBT were convicted of fraud in 1983.

109.   In the second incident, Monsanto hired Craven Laboratories ("Craven") in 1990 to perform pesticide and herbicide studies, including several studies on Roundup.

110.     In March 1991, the EPA announced that it was investigating Craven for "allegedly falsifying test data used by chemical firms to win EPA approval of pesticides.

111.   The investigation led to the indictments of the laboratory owner and several Craven employees.

## MONSANTO'S CONTINUING DISREGARD FOR
### THE SAFETY OF THE PLAINTIFF AND THE PUBLIC

112.   Monsanto claims on its website that "regulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and

other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."[14]

113. Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

114. Glyphosate, and Monsanto's Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

115. Monsanto's statements proclaiming the safety of Roundup and disregarding its dangers misled Plaintiff.

116. Despite Monsanto's knowledge that Roundup was associated with an elevated risk of developing cancer, Monsanto's promotional campaigns focused on Roundup's purported "safety profile."

117. Monsanto's failure to adequately warn Plaintiff resulted in (1) Plaintiff using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup®.

118. Monsanto failed to seek modification of the labeling of Roundup® to include relevant information regarding the risks and dangers associated with Roundup® exposure.

119. The failure of Monsanto to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

---

[14] "Backgrounder Glyphosate: No Evidence of Carcinogenicity (Updated November 2014)" (hereinafter "Backgrounder Glyphosate"), available at http://www.monsanto.com/glyphosate/documents/no-evidence-ofcareinogenicity.pdf.

120.   The failure of Monsanto to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

121.   The failure of Monsanto to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

122.   By reason of the foregoing acts and omissions, Plaintiff, Patrick Petty, seeks compensatory damages as a result of Plaintiff's use of, and exposure to, Roundup which caused or was a substantial contributing factor in causing Plaintiff to suffer from cancer, specifically NHL, the result of which has caused Plaintiff to suffer severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

123.   Plaintiff's wife, Sharon Petty, has suffered and continues to suffer damages from her loss of consortium suffered as the result of her husband's condition and severe ongoing injuries as set forth herein.

124.   By reason of the foregoing, Plaintiff is severely and permanently injured and his wife, Sharon Petty has suffered and will continue to suffer damages from her loss of consortium.

125.   By reason of the foregoing acts and omissions, Plaintiff has suffered and continues to suffer, physical pain and suffering, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of the actions and inactions of Monsanto. Plaintiff, Sharon Petty, has similarly suffered and will continue to suffer, compensable damages resulting from her loss of consortium.

## PLAINTIFF, PATRICK PETTY'S, EXPOSURE TO ROUNDUP

126. Plaintiff Patrick Petty is a 65-year old native of Tennessee who has owned and worked on farms as either a primary or secondary occupation for virtually his entire life. During the course of his career and occupation as a farmer and in conjunction with performing work on his farms over the years to control weeds, Plaintiff regularly and consistently used Roundup in his farming work beginning from approximately 1980 and continuing until his diagnosis with Mantle Cell Lymphoma in 2018.

127. For those many years, Plaintiff Patrick Petty, used and sprayed Roundup on his farms on a regular basis as a primary means of weed control and eradication. Plaintiff followed all safety and precautionary warnings provided with the product(s) during his use of the Defendant's products and had no knowledge or reason to know of the dangers associated with the use of Roundup.

128. Plaintiff has recently been diagnosed with non-Hodgkin's Mantle Cell Lymphoma in 2018. The development of Plaintiff's non-Hodgkin lymphoma was proximately and actually caused by his use of and exposure to Monsanto's Roundup products.

129. As a result of his illness, injury and condition, Plaintiff is no longer able to keep and maintain the family's farm and Plaintiff has incurred significant economic and non-economic damages as the result of his injuries.

130. Plaintiff and his wife, Sharon Petty, were married in 1970 and have resided and lived together as husband and wife without interruption since that time. As the direct and proximate result of the illness, injuries and condition suffered by her husband, Patrick Petty, Sharon Petty has suffered and incurred significant damages for her loss of consortium, which are continuing and expected to continue into the future.

25

## FIRST CAUSE OF ACTION
## (NEGLIGENCE)

131. Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

132. Defendant had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

133. Defendant failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup into interstate commerce and in the State of Tennessee in that Defendant knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

134. The negligence by the Defendant, its agents, servants, and/or employees, included but was not limited to one or more of the following acts and/or omissions:

  a. Manufacturing, producing, promoting, formulating,

creating, and/or designing Roundup without thoroughly testing it;

b. Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup or to determine its dangers to consumers of it's products;

c. Not conducting sufficient testing programs to determine whether or not Roundup was safe for use; in that Defendant herein knew or should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users;

d. Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Defendant had knowledge that Roundup is, was, or could be carcinogenic;

e. Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic; to increase the toxicity of Roundup; to determine whether these ingredients are carcinogenic or magnify the carcinogenic properties of Roundup; and to determine whether or not the so-called "inert" ingredients and/or adjuvants incorporated in Roundup were safe for use;

f. Negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

g. Negligently failing to petition the EPA to strengthen the warnings associated with Roundup;

27

h. Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

i. Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

j. Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

k. Negligently representing that Roundup was equivalent in terms of safety and efficacy as other forms of herbicides;

l. Negligently designing Roundup in a manner which was dangerous to its users;

m. Negligently manufacturing Roundup in a manner which was dangerous to its users;

n. Negligently producing Roundup in a manner which was dangerous to its users;

o. Negligently formulating Roundup in a manner which was dangerous to its users;

P. Concealing information from the Plaintiff while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations;

28

q. Improperly concealing and/or misrepresenting
information from the Plaintiff, scientific and
medical professionals, and/or the EPA, concerning
the severity of risks and dangers of Roundup compared
to other forms of herbicides; and

r. Negligently selling Roundup with false and misleading labels.

135. Defendant under-reported, underestimated, and downplayed the serious dangers known to the Defendant of the use and exposure to Roundup by consumers and users of its products.

136. Defendant negligently and deceptively downplayed and analogized the safety risks and/or dangers of Roundup with the safety risks associated with common everyday foods such as table salt, and other forms of herbicides.

137. Defendant was negligent and/or violated Tennessee law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that they:

a. Failed to use ordinary care in designing and manufacturing Roundup
so as to avoid the aforementioned risks to individuals when
Roundup was used as an herbicide;

b. Failed to accompany its product with proper and/or accurate
warnings regarding all possible adverse side effects associated with
the use of Roundup;

c. Failed to accompany its product with proper warnings regarding all
possible adverse side effects concerning the failure and/or
malfunction of Roundup;

29

d. Failed to accompany its product with accurate warnings regarding
the risks of all possible adverse side effects concerning Roundup;

e. Failed to warn Plaintiff of the severity and duration of such adverse
effects, as the warnings given did not accurately reflect the
symptoms, or severity of the side effects including, but not limited
to, the development of NHL;

f. Failed to conduct adequate testing, clinical testing and post-marketing
surveillance to determine the safety of Roundup;

g. Failed to conduct adequate testing, clinical testing, and post-marketing
surveillance to determine the safety of Roundup's "inert" ingredients
and/or adjuvants;

h. Negligently misrepresented the evidence of Roundup's genotoxicity
and carcinogenicity;

138. Despite the fact that Defendant knew or should have known that Roundup caused, or could
cause, unreasonably dangerous side effects, Defendant continued and continues to market,
manufacture, distribute, and/or sell Roundup to consumers, including the Plaintiff.

139. Defendant knew or should have known that consumers such as the Plaintiff would
foreseeably suffer injury as a result of Defendant's failure to exercise ordinary care, as set forth
above.

140. Defendant's violations of law and/or negligence were the proximate cause of Plaintiff s
injuries, harm and economic loss, which Plaintiff has suffered and/or will continue to suffer.

141. As a result of the foregoing acts and omissions, the Plaintiff suffers from serious and
dangerous side effects including, but not limited to, NHL, as well as other severe and personal

30

injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, Plaintiff suffers life-threatening NHL, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff s favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## SECOND CAUSE OF ACTION
## STRICT PRODUCTS LIABILITY DESIGN DEFECT

142. Plaintiff repeats, reiterates and, re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

143. At all times herein mentioned, the Defendant designed, researched, manufactured, tested, advertised, promoted, sold, distributed Roundup as hereinabove described that as used by the Plaintiff.

144. Monsanto's Roundup was expected to and did reach the usual consumers, handlers, and persons coining into contact with said product, including the Plaintiff, without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendant.

145. At all of those times, Roundup was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, the Plaintiff herein.

31

146. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup.

147. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective in design and/or formulation, in that, when it left the hands of the Defendant manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

148. At all times herein mentioned, Roundup was in a defective condition and unsafe, and Defendant knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendant.  In particular, Monsanto's Roundup was defective in the following ways:

a. When placed in the stream of commerce, Monsanto's Roundup
products were defective in design and formulation and,
consequently, dangerous to an extent beyond that which an
ordinary consumer would anticipate;

b. When placed in the stream of commerce, Monsanto's Roundup
products were unreasonably dangerous in that they were
hazardous and posed a grave risk of cancer and other serious
illnesses when used in a reasonably anticipated manner;

c. When placed in the stream of commerce, Monsanto's Roundup
products contained unreasonably dangerous design defects and
were not reasonably safe when used in a reasonably anticipated
manner;

32

d. Defendant did not sufficiently test, investigate, or study its Roundup products;

e. Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide;

f. Defendant knew or should have known at the time of marketing its Roundup products that exposure to Roundup and could result in cancer and other severe illnesses and injuries; and

g. Defendant did not conduct adequate post-marketing surveillance of its Roundup products.

149.  Defendant knew, or should have known that at all times herein mentioned its Roundup was in a defective condition, and that Roundup was and is inherently dangerous and unsafe.

150.  Plaintiff used and was exposed to Monsanto's Roundup, as described above, without knowledge of Roundup's dangerous characteristics.

151.  At the time of the Plaintiffs use of and exposure, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

152.  Defendant with this knowledge voluntarily designed its Roundup with a dangerous condition for use by the public, and in particular the Plaintiff.

153.  Defendant had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

154.  Defendant breached this duty and created a product that was and is unreasonably dangerous for its normal, intended use.

155.  Defendant marketed and promoted a product in such a manner so as to make it inherently defective, in that the Defendant's marketing and promotions of its product purposely

downplayed, minimized, and/or misrepresented its suspected, probable, and established health risks inherent with its normal, intended use.

156. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was manufactured defectively in that Roundup left the hands of Defendant in a defective condition and in a condition that was unreasonably dangerous to its intended users.

157. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant reached its intended users in the same defective and unreasonably dangerous condition in which it was manufactured by Monsanto.

158. Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to the Plaintiff in particular, and Defendant is therefore strictly liable for the injuries sustained by the Plaintiff.

159. The Plaintiff could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

160. By reason of the foregoing, the Defendant has become strictly liable to the Plaintiff for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup.

161. Defendant's defective design of Roundup and its conduct in connection with the manufacture, distribution and sale of the product as set forth herein amounts to willful, wanton, and/or reckless conduct by Defendant.

162. The defects in Monsanto's Roundup were the cause or a substantial factor in causing Plaintiff's injuries and his development of NHL.

34

163. As a result of the foregoing acts and omissions of the Defendant, the Plaintiff developed NHL, and suffered severe and personal injuries, which are permanent and lasting in nature, including physical pain and mental anguish, emotional pain and suffering, diminished enjoyment of life, and financial expenses for hospitalization and medical care.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## THIRD CAUSE OF ACTION
## (STRICT PRODUCTS LIABILITY FAILURE TO WARN)

164. Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

165. Defendant has engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting Roundup, and through that conduct has knowingly and intentionally placed Roundup into the stream of commerce with full knowledge and expectation that it reaches consumers such as the Plaintiff, who are exposed to it through ordinary and reasonably foreseeable uses.

166. Defendant did in fact sell, distribute, supply, manufacture, and/or promote Roundup to Plaintiff. Additionally, Defendant expected the Roundup that it was selling, distributing, supplying, manufacturing, and/or promoting to reach and Roundup did in fact reach consumers,

including Plaintiff, without any substantial change in the condition of the product from when it was initially distributed by Defendant.

167. At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because the Defendant knew of the unreasonable risks of harm associated with the use of and/or exposure to such products.

168. At all times herein mentioned, Roundup was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Defendant and at the times Plaintiff used and was exposed to the product. The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing non-Hodgkin's lymphoma as a result of exposure and use.

169. Roundup did not contain a warning or caution statement, which was necessary and, if complied with, would have been adequate to protect the health of those exposed in violation of 7 U.S.C, 136j(a)(1)(E).

170. Defendant's failure to include a warning or caution statement which was necessary and, if complied with, would have been adequate to protect the health of those exposed, violated 7 U.S.C. 136j (a)(1)(E), as well as laws of the State of Tennessee.

171. Defendant could have amended the label of Roundup to provide additional warnings at virtually any time, but failed and refused to do so.

172. This defect created by the failure to warn caused serious injury to Plaintiff, who used Roundup in its intended and foreseeable manner.

36

173. At all times herein mentioned, Defendant had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

174. Defendant labeled, distributed, and promoted the aforesaid product knowing that it was dangerous and unsafe for the use and purpose for which it was intended.

175. Defendant failed to warn consumers, including the Plaintiff, of the nature and scope of the side effects associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of NHL, which dangers were known to the Defendant.

176. Defendant was aware of the probable consequences that would result from the use of Roundup and the aforesaid conduct. Despite the fact that Defendant knew that Roundup caused serious injuries, Defendant failed to exercise reasonable care to warn consumers and intended users of Roundup of the dangerous carcinogenic properties and side effect of developing NHL from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution. Defendant willfully and deliberately ignored the consequences associated with its failure to warn, and in doing so, Defendant acted with a conscious disregard for the safety of Plaintiff.

177. At the time of his use and exposure to Roundup, Plaintiff could not have reasonably discovered any defect in Roundup prior through the exercise of reasonable care.

178. Defendant, as the manufacturer and/or distributor of the subject product, is held to the level of knowledge of an expert in the field.

179.   Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Defendant in foreseeably purchasing and using Roundup as directed by the Defendant.

180.   Had Defendant properly disclosed the risks associated with Roundup products, Plaintiff would have avoided the risk of NHL by not using Roundup products.

181.   The information that Defendant did provide or communicate failed to contain adequate warnings and precautions that would have enabled Plaintiff and similarly situated individuals to utilize the product safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate.  Defendant continued to promote the efficacy of Roundup even after it knew of the unreasonable risks from use or exposure and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

182.   To this day, Defendant has failed to adequately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup.

183.   As a result of its inadequate warnings, Monsanto's Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiff.

184.   As a direct and proximate result of his use and exposure to Roundup and from the Defendant's actions as alleged herein, Plaintiff developed and suffers from NHL, and has suffered from severe and personal injuries which are permanent and lasting in nature, including physical pain and mental anguish, diminished enjoyment of life, financial expenses for

38

hospitalization and medical care, including medical expenses and other economic and non-economic damages.

sustain injuries as herein alleged.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff s favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## FOURTH CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY

185.  Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further allege:

186.  At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

187.  At all times relevant to this litigation, Defendant expressly represented and warranted to the purchasers of its Roundup products, by and through statements made by Defendant in labels, publications, package inserts, and other written materials intended for consumers and the general public, that its Roundup products were safe to human health and the environment, and that Roundup products were effective, fit, and proper for their intended use. Defendant advertised, labeled, marketed, and promoted Roundup products, representing the quality to consumers and

39

the public in such a way as to induce their purchase or use, thereby making an express warranty that its Roundup products would conform to the representations made by the Defendant.

188.    These express representations by the Defendant include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Roundup and glyphosate.   Defendant knew and/or should have known that the risks expressly included in Roundup warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendant expressly represented that its Roundup products were safe and effective, that they were safe and effective for use by individuals such as Plaintiff, and/or that they were safe and effective for use as agricultural herbicides.

189.   The representations by the Defendant about Roundup, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, the Plaintiff, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

190. Defendant placed its Roundup products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup and its active ingredient glyphosate.

191. Defendant breached these warranties as set forth herein because its Roundup products were defective, dangerous, unfit for use, did not contain label representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose.  Specifically, Defendant breached these warranties in the ways that included, but are not necessarily limited to, the following:

a) Defendant represented through its labeling, advertising, and
marketing materials that its Roundup products were safe, and
fraudulently withheld and concealed information about the
risks of serious injury associated with use of and/or exposure to
Roundup and glyphosate by expressly limiting the risks
associated with use and/or exposure within its warnings and
labels; and

b) Defendant represented that its Roundup products were safe for
use and fraudulently concealed information that demonstrated
that glyphosate, the active ingredient in Roundup, had
carcinogenic properties and that the carcinogenic dangers of Roundup
were enhanced by the effects of the inclusion and incorporation of other
so-called "inert" ingredients, and that its Roundup products, therefore,
were not safer than alternatives available on the market.

192. Defendant had sole access to material facts concerning the nature of the risks associated
with its Roundup products as expressly stated within its warnings and labels, and Defendant
knew that consumers and users such as Plaintiff could not have reasonably discovered that the
risks expressly included Roundup warnings and labels that were inadequate and inaccurate.

193. Plaintiff had no knowledge of the falsity or incompleteness of Defendant's statements and
representations concerning Roundup.

194. Plaintiff used and/or was exposed to the use of Roundup as researched, developed,
designed, tested, formulated, manufactured, inspected, labeled, distributed, packaged, marketed,
promoted, sold, or otherwise released into the stream of commerce by Defendant.

195. Had the warnings and labels for Roundup products accurately and adequately set forth the
true risks associated with the use of such products, including Plaintiff's injuries and the

41

development of NHL, rather than expressly excluding such information and warranting that the products were safe for their intended use, Plaintiff could have avoided the injuries complained of herein.

196.   As a direct and proximate result of Defendant's wrongful acts and omissions, Plaintiff has developed and suffers from NHL, and has suffered from severe and personal injuries which are permanent and lasting in nature, including physical pain and mental anguish, diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic and non-economic damages.

suffered severe injuries, including physical pain and suffering, emotional pain and suffering, and economic losses (including significant expenses for medical care and treatment), and will continue to incur these expenses in the future.

WHEREFORE, Plaintiff requests that the Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees, and all other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

<h3 style="text-align:center">FIFTH CAUSE OF ACTION</h3>
<h3 style="text-align:center">BREACH OF IMPLIED WARRANTIES</h3>

197. Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all as if more fully set forth herein.

198. At all times herein mentioned, the Defendant manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold Roundup as a broad-spectrum herbicide. These actions were under the ultimate control and supervision of Defendant.

199.   At the time Defendant marketed, sold, and distributed Roundup® for use by Plaintiff, Defendant knew of Roundup's® intended use and impliedly warranted the product to be of merchantable quality and safe and fit for this use.

200.   The Defendant impliedly represented and warranted to Plaintiff and users of Roundup, the agricultural community, and/or the EPA that Roundup was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.

201.   These representations and warranties were false, misleading, and inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

202.   Plaintiff and/or the EPA did rely on said implied warranty of merchantability of fitness for particular use and purpose.

202.   Plaintiff reasonably r and foreseeably relied upon the skill and judgment of Defendant as to whether Roundup was of merchantable quality and safe and fit for its intended use.

203.   Roundup was injected into the stream of commerce by the Defendant in a defective, unsafe, and inherently dangerous condition, and the products' materials were expected to and did reach users, handlers, and persons coming into contact with said products, including the Plaintiff, without substantial change in the condition in which they were sold.

204.   The Defendant breached the aforesaid implied warranties, as its herbicide Roundup was not fit for its intended purposes and uses.

205.   As a result of the foregoing acts and omissions, Plaintiff developed and suffers from NHL, and has suffered from severe and personal injuries which are permanent and lasting in nature, including physical pain and mental anguish, diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic and non-economic damages.

WHEREFORE, Plaintiff requests that the Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees, and all other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## SIXTH CAUSE OF ACTION
## LOSS OF CONSORTIUM

206. Plaintiff and his wife, Sharon Petty, repeat, reiterate, and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all as if more fully set forth herein.

207. As a consequence of Plaintiff's use of the Defendant's dangerous and unsafe product, Roundup, as set forth herein, Plaintiff Patrick Petty, developed non-Hodgkin's Mantle Cell Lymphoma.

208. Before suffering from his illness and disease caused by his use of Roundup, Mr. Petty was able to and did perform all of the duties of a husband with, to and on behalf of his wife, Sharon Petty, including, but not limited to, maintaining their home and farm, and providing her with the love, companionship, affection, society, sexual relations, moral support, and solace of a husband.

209. As the result of his injuries, illness and condition caused by his use of Roundup as set forth herein, Plaintiff, Patrick Petty, his ability to provide those services of a husband to his wife, Sharon Petty, have been substantially diminished.

210. As the direct and proximate result of the injuries, illness and condition suffered by her husband as set forth herein, Sharon Petty, has suffered and will continue to suffer the loss of her

44

husband's society and consortium as the result of his illness and disease incurred from his use of the Defendant's Roundup products.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for Sharon Petty's compensatory damages for loss of consortium, as well as for punitive damages, together with interest, costs, attorneys' fees, and such further relief as the Court deems appropriate. Plaintiffs demand trial by jury as to all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against the Defendant, Monsanto, on each of the foregoing claims and causes of action and as follows:

1. Awarding compensatory damages in excess of the jurisdictional amount and in such amounts to be determined by a jury at trial for compensatory damages including, but not limited to pain, suffering, emotional distress, loss or diminution of the enjoyment of life, and other non-economic damages;

2. Awarding compensatory damages for past and future damages, including, but not limited to, pain and suffering and for severe and permanent personal injuries, including health care costs and economic loss in amounts to be determined by a jury at trial of this action;

3. Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determined by jury at trial of this action;

4. Awarding damages for loss of consortium in an amount to be determined by jury at trial of this action;

5. Awarding punitive and/or exemplary damages for the wanton, willful, fraudulent, and reckless acts of the Defendant for its complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiff in an amount determined by jury at trial of this action and sufficient to

punish the Defendant and deter future similar conduct, to the extent allowed by applicable law;

6.  Awarding pre-judgment interest;

7.  Awarding post-judgment interest;

8.  Awarding Plaintiff reasonable attorneys' fees;

9.  Awarding Plaintiff the costs of these proceedings; and

10. Awarding such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all issues.

Dated this _____ day of November, 2018.

Respectfully submitted

TIM BOWDEN
TN BPR 15379
Law Offices of Tim Bowden
306 Northcreek Blvd.
Suite 200
Goodlettsville TN 37072
(615) 859-1996 tel | (615) 859-1921 fax
Email: bowden_law@bellsouth.net

Attorney for Plaintiff