# U.S. District Court
## District of New Jersey [LIVE] (Camden)
## CIVIL DOCKET FOR CASE #: 1:18-cv-17391-JBS-AMD

GALOSI et al v. MONSANTO COMPANY
Assigned to: Judge Jerome B. Simandle
Referred to: Magistrate Judge Ann Marie Donio
Cause: 28:1332 Diversity-Product Liability

Date Filed: 12/19/2018
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**PETER GALOSI**     represented by **BRIAN J. MCCORMICK , JR.**
Ross Feller Casey LLP
1650 Market Street
Suite 3450
Philadelphia, PA 19103
215-574-2000
Fax: 215-574-3080
Email: bmccormick@rossfellercasey.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**DENA RACHEL YOUNG**
ROSS FELLER CASEY, LLP
ONE LIBERY PLACE
1650 MARKET ST., SUITE 3450
PHILADELPHIA, PA 19103
267-515-6686
Email: dyoung@rossfellercasey.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**NORMA GALOSI**
*h/w*     represented by **BRIAN J. MCCORMICK , JR.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**DENA RACHEL YOUNG**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**MONSANTO COMPANY**

| Date Filed | # | Docket Text |
|---|---|---|
| 12/19/2018 | 1 | COMPLAINT against MONSANTO COMPANY ( Filing and Admin fee $ 400 receipt number 0312-9255497) with JURY DEMAND, filed by PETER GALOSI, NORMA |

| | | |
|---|---|---|
| | | GALOSI. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit A)(YOUNG, DENA) (Entered: 12/19/2018) |
| 12/19/2018 | | Judge Renee Marie Bumb and Magistrate Judge Ann Marie Donio added. (dd, ) (Entered: 12/19/2018) |
| 12/19/2018 | | Notice of Judicial Preferences. Click here for the Judge's Individual Procedure Requirements. (ssp, ) (Entered: 12/19/2018) |
| 12/19/2018 | 2 | SUMMONS ISSUED as to MONSANTO COMPANY. Attached is the official court Summons, please fill out Defendant and Plaintiffs attorney information and serve. (ssp, ) (Entered: 12/19/2018) |
| 12/20/2018 | | Judge Jerome B. Simandle added. Judge Renee Marie Bumb no longer assigned to case. (dd, ) (Entered: 12/20/2018) |
| 12/20/2018 | 3 | WAIVER OF SERVICE Returned Executed by PETER GALOSI, NORMA GALOSI. MONSANTO COMPANY waiver sent on 12/19/2018, answer due 2/19/2019. (YOUNG, DENA) (Entered: 12/20/2018) |
| 12/20/2018 | 4 | NOTICE of Appearance by BRIAN J. MCCORMICK, JR on behalf of NORMA GALOSI, PETER GALOSI (MCCORMICK, BRIAN) (Entered: 12/20/2018) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 12/21/2018 15:50:33 | | |
| **PACER Login:** | hllp1982:2634105:4722683 | **Client Code:** 1417.0049 |
| **Description:** Docket Report | | **Search Criteria:** 1:18-cv-17391-JBS-AMD Start date: 1/1/1970 End date: 12/21/2018 |
| **Billable Pages:** 2 | | **Cost:** 0.20 |

**ROSS FELLER CASEY, LLP**
By:    Brian J. McCormick, Jr., Esquire
        Dena R. Young, Esquire One Liberty Place
1650 Market Street, 34th Floor
Philadelphia, PA 19103
Telephone: 215.574.2000
Fax: 215.574.3080
*Attorneys for Plaintiffs Renee and Richard Cashen*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| PETER GALOSI and<br>NORMA GALOSI , h/w<br>103 Wayne Dr.<br>Cinnaminson, NJ 08077<br>           Plaintiffs,<br>    v.<br><br><br>MONSANTO COMPANY<br>800 N. Lindbergh Blvd.<br>St. Louis, MO 63167,<br>           Defendant. | Civil Action No.<br><br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

## <u>INTRODUCTION</u>

1.      Peter Galosi began using Roundup in the spring of 1999 during his employment with the Cinnaminson Township School System wherein he regularly sprayed Roundup for weed prevention on multiple schools' football fields, baseball fields, soccer fields, sidewalks, curb lines, among many other places. After all, Monsanto promoted Roundup as being harmless to humans for over thirty years—going so far as to proclaim the product as being as safe as table salt. The truth, however, is far more insidious. The active chemical in Roundup, glyphosate, is a carcinogen, and Monsanto has known this fact for decades.

2.      In December of 2016 Mr. Galosi was diagnosed with non-Hodgkin's lymphoma.

3. Mr. Galosi would not have used Roundup if he knew it could cause cancer.

4. The International Agency for Research on Cancer (IARC), an organization within the World Health Organization (WHO), conducted an exhaustive analysis on the toxicity of glyphosate. The IARC has already reviewed hundreds of other chemical agents and has convened a panel of seventeen renowned scientists from eleven countries. The year-long study resulted in the publication of an IARC Monograph, the authoritative standard for cancer hazard assessment around the world. The IARC classified glyphosate as a Group 2A hazard, which is the second highest hazard rating and means that glyphosate is a probable human carcinogen. Additionally, the IARC concluded there was a positive association between glyphosate exposure and non-Hodgkin lymphoma. As a result of the IARC's study of glyphosate, the State of California's Office of Environmental Health Hazard Assessment (OEHHA) has decided to list glyphosate as an agent "known to the state to cause cancer" under Proposition 65.

5. In 1970, Defendant Monsanto discovered the herbicidal properties of glyphosate and began using it in its products in 1974 and marketing it under the brand name, Roundup. Roundup is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most used active ingredient in American agriculture with 85–90 million pounds used annually. That number grew to 185 million pounds by 2007.

6. Monsanto has represented Roundup as being safe to humans and the environment since it began selling the herbicide. Indeed, Monsanto has proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup, create no unreasonable risks to human health or to the environment. This is untrue. Before glyphosate was first approved by the Environmental Protection Agency

(EPA), Monsanto knew that glyphosate could pose significant risks to human health, including a risk of causing cancer.  This lawsuit seeks to hold Monsanto accountable for this misconduct.

## PARTIES

7.      Plaintiff Peter Galosi is an individual who resides in Burlington County, New Jersey. Mr. Galosi began using Roundup in 1999 and continued using it through approximately 2016 when he retired.  Burlington County was the jurisdiction in which a substantial part of the events or omissions giving rise to Plaintiff's claim occurred, pursuant to 28 U.S.C. § 1391(b)(2).

8.      Plaintiff Norma Galosi, wife of Peter Galosi, is an individual who resides in Burlington County which is the jurisdiction in which a substantial part of the events or omissions giving rise to Plaintiffs' claim occurred, pursuant to 28 U.S.C. § 1391(b)(2).

9.      Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.  Monsanto is a citizen of the State of Missouri and Delaware and is not a citizen of the State of New Jersey.  At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and was the manufacturer of the Roundup at issue.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) because there is complete diversity of citizenship between the parties.  In addition, Plaintiffs seek damages in excess of $75,000, exclusive of interest and costs.

11.      This Court has personal jurisdiction over Monsanto insofar as Monsanto is authorized and licensed to conduct business in the State of New Jersey, maintains and carries on systematic and continuous contacts in this judicial district, regularly transacts business within this judicial district, and regularly avails itself of the benefits of this judicial district.

12.      The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

13.     Additionally, Monsanto caused tortious injury by acts and omissions in this judicial district and caused tortious injury in this district by acts and omissions outside this district while regularly doing and soliciting business, engaging in a persistent course of conduct, and deriving substantial revenue from goods used or consumed and services rendered in this judicial district.

14.     Venue is proper before this Court pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to this claim occurred within this judicial district.

## FACTUAL ALLEGATIONS

15.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world, including the popular herbicide, Roundup.

16.     Glyphosate interferes with a plant's ability to form aromatic amino acids necessary for protein synthesis.  Plants treated with glyphosate generally die within two to three days.  Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce, or by milling, baking, or brewing grains.

17.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist, John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup.

18.     For about 40 years, consumers around the world have used Roundup, containing glyphosate, without knowing of the dangers its use poses. That is because, when Monsanto first introduced Roundup, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment.  History, however, has demonstrated otherwise. According to WHO, the main chemical ingredient of Roundup—glyphosate—is a probable carcinogen.  Monsanto assured the public that Roundup was harmless.

4

In order to prove this, Monsanto championed falsified data and attacked legitimate studies exposing glyphosate's dangers. Monsanto orchestrated a prolonged campaign of misinformation to convince government agencies and the general population that Roundup was safe. As a result of this deception, the public has been exposed to a carcinogen, while Monsanto has made billions.

## I.      Registration of Herbicides

19.      The manufacture, formulation, and distribution of herbicides, such as Roundup, is regulated under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. §§ 136 *et seq.* FIFRA requires that all pesticides be registered with the EPA prior to distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non- target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The EPA does not deem certain products "safe," but only that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

20.      FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to conduct a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

21.      FIFRA generally requires that the registrant, Monsanto in the case of Roundup, conduct the health and safety testing of pesticide products. The EPA has protocols governing the conducting of tests required for registration and the laboratory practices that must be followed in

conducting those tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, to perform the tests that are required of the manufacturer.

22.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

23.     In the case of glyphosate, the EPA planned on releasing its preliminary risk assessment—in relation to the re-registration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

24.     In April 2016, the EPA posted a risk assessment of glyphosate on its website and then immediately retracted it. The EPA subsequently indicated that the posting was inadvertent, that the document posted was not the EPA's final assessment or even a preliminary one, and that the EPA intended to issue a final report by the end of 2016.

**II.     Scientific Fraud Underlying the Marketing and Sale of Glyphosate**

25.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA stated that "[i]t should be emphasized, however, that designation of

an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

26.     On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed fraud.

27.     In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup.  IBT performed approximately 30 tests on glyphosate and glyphosate-containing-products, including 9 of the 15 residue studies needed to register Roundup with the EPA.

28.     In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate.  The EPA subsequently audited IBT and determined that the toxicology studies conducted for the Roundup were invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

29.     Three top executives of IBT were convicted of fraud in 1983

30.     In the second incident, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including several studies on Roundup. That same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

**III.     Monsanto's Market Dominance**

31.     The success of Roundup was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap

increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup market dominance and to ward off impending competition.

32.     In response, Monsanto began the development and sale of genetically engineered "Roundup Ready" seeds in 1996. Since Roundup Ready crops are resistant to glyphosate, farmers can spray Roundup onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup even further. By 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup market through a marketing strategy that coupled proprietary Roundup Ready seeds with continued sales of its Roundup herbicide.

33.     Through a three-pronged strategy of increased production, decreased prices, and by coupling with Roundup Ready seeds, Roundup became Monsanto's most profitable product. In 2000, Roundup accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

## IV.    Monsanto Falsely Advertised Roundup as Being Safe for Decades

34.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are:

a.  "Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences."

b.  "And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem."

c.  "Roundup biodegrades into naturally occurring elements."

d.  "Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e.  "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it."

f.  You can apply Roundup with "confidence because it will stay where you put it," it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Roundup into natural products.

g.  "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

h.  "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

i.  "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

j.  "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area that has been treated with Roundup.

35.  On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a.  glyphosate-containing pesticide products or any component thereof are safe, non- toxic, harmless or free from risk;

b.  glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;

c.  glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

d.  glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics";

    e.     glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and,

    f.     glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

36.     Monsanto did not alter its advertising in the same manner in any state other than New York and, based on information and belief, still has not done so today.

37.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."

**V.    Assessments of Glyphosate and Roundup**

38.     IARC was created in 1965 as the specialized cancer agency of the World Health Organization with support of the United States. IARC promotes international collaboration in cancer research, "bringing together skills in epidemiology, laboratory sciences, and biostatistics to identify the causes of cancer[.]"

39.     IARC is transparent. The minutes and documents presented at its council meetings are publicly available and, thus, are subject to scientific scrutiny. Starting in 1971, IARC began assessing whether chemicals were carcinogenic through the Monograph program.

40.     The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

41.     The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.  Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

42.     A year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts.  Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members.  One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment.  Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation.  Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

43.     In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

44.     In March 2015, IARC reassessed glyphosate.  The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

45.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, the Working Group consisted of 17 experts from 11 countries who met from March 3–10, 2015, to assess the carcinogenicity of certain

herbicides, including glyphosate. Among the members were Lauren Zeise, Ph.D., of the California Environmental Protection Agency, Matthew T. Martin, Ph.D, a scientist with the U.S. Environmental Protection Agency, and Gloria D. Jahnke, D.V.M., D.A.B.T. of the National Institute of Environmental Health Sciences.

46. The March meeting culminated after a nearly one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

47. The studies considered the various exposure groups, including occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland, municipal weed-control workers in the United Kingdom, and para-occupational exposure in farming families.

48. Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

49. Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

50. The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies showed a human health concern from agricultural and other work-related exposure to glyphosate.

51. The IARC Working Group conducted a systematic review of over 15 studies designed to assess whether there was an association between Roundup exposure in agricultural workers and Non-Hodgkin Lymphoma (NHL). The researchers reviewed each study, identified the results and assessed each study's strengths and weaknesses. The IARC Working Group concluded that, despite the limited evidence concerning the carcinogenicity of glyphosate in humans, a "positive association has been observed for non-Hodgkin lymphoma."

52. Overall, nine epidemiological studies showed positive associations between glyphosate and NHL, with several studies showing statistically significant relative risks of NHL exceeding 2.0 and even 3.0.

53. In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

54. The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed. In assessing the genotoxicity of glyphosate (the property of chemical agents that damages the genetic information within a cell causing mutations, which may lead to cancer), the IARC Working Group concluded "[t]here is strong evidence that glyphosate causes genotoxicity."

55. Additionally, the IARC assessed whether glyphosate exposure can induce oxidative stress, which is thought to be involved in the development of numerous conditions, including cancer, autism, and Parkinson's disease. The IARC concluded that "strong evidence exists that

glyphosate . . . can induce oxidative stress." This could be an important mechanism by which Roundup causes cancer.[1]

56.    In the IARC monograph for glyphosate, there is an entire section devoted to exposure to humans, looking at studies examining glyphosate exposures in various settings including agricultural ones. The IARC Working Group noted that glyphosate has been detected in urine of agricultural workers, indicating absorption. The IARC Working Group specifically evaluated farm workers in the United States, and found that, within the days following the application of Roundup to a crop, approximately 60% of farm workers tested positive for glyphosate in the urine. Additionally, the IARC Working Group noted that soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

57.    In addition to the IARC's assessment, in 2014, scientists published a systematic review and meta-analysis on the relationship between non-Hodgkin lymphoma and occupational exposure to agricultural pesticides, including glyphosate, in the International Journal of

---

[1] In addition to DNA damage and oxidative stress, scientists have suggested Roundup's association with various serious health conditions is linked to the effect Roundup has on the digestive system. Specifically, scientists believe the same mechanism that makes Roundup toxic to weeds also makes it toxic to the microbes within the human gut. When humans are exposed to Roundup, it leads to a chronic inflammatory state in the gut, as well an impaired gut barrier, which can lead to many long-term health effects, including an increased risk of cancer. statistically significant increase in non-Hodgkin lymphoma among agricultural workers exposed to glyphosate.

Environmental Research and Public Health. The study showed a statistically significant association between farm workers exposed to Roundup and non- Hodgkin lymphoma. The study confirmed two smaller studies from 2002 and 2008, published in the journal Leukemia & Lymphoma (2002) and the International Journal on Cancer (2008).

58.     Recent studies, including a glyphosate residue study published in the Journal of Environmental & Analytical Toxicology in 2014, indicate that "chronically ill humans showed significantly higher glyphosate residues in urine than healthy population." Glyphosate has been detected in the blood and urine of agricultural workers, indicating that agricultural use of Roundup leads to its absorption.

59.     In addition to the studies examining glyphosate, research also suggests that the carcinogenic properties of Roundup are magnified by the addition of adjuvants in the Roundup formulation. Adjuvants are chemicals that are designed to modify or enhance the effects of other agents. Monsanto has been including adjuvants with glyphosate in its Roundup products, which are designed to increase the effectiveness of the herbicide. Studies show, however, that the addition of adjuvants also greatly increases the carcinogenic properties of Roundup. Notably, Monsanto has systematically tested glyphosate without the adjuvants and used those tests to lobby the EPA that Roundup is safe.

60.     Several countries around the world have instituted bans on the sale of Roundup and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup are more widely known.

61.     The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup, which takes effect by the end of 2015. In issuing the ban, the Dutch Parliament

15

member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

62. The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

63. France banned the private sale of Roundup and glyphosate following the IARC assessment.

64. Bermuda banned both the private and commercial sale of glyphosate, including Roundup. The Bermuda government explained: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

65. The Sri Lankan government banned the private and commercial use of glyphosate out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

66. The government of Columbia announced a ban on using Roundup and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine in response to the IARC's assessment.

67. In November 2015, 96 prominent experts, including almost the whole IARC team, reiterated IARC's assessment that Roundup is probably a human carcinogen.

68. In late February 2016, another 14 scientists signed a consensus statement in the Environmental Health journal, saying regulatory estimates of tolerable exposure levels for glyphosate were based on outdated science.

69. In June 2016, the European Union parliament refused to re-register glyphosate containing herbicides due to safety concerns.

## VI. Plaintiff's Exposure to Glyphosate and Discovery Rule; Equitable Estoppel

70.     Mr. Galosi used Roundup regularly from 1999 through 2016 in the scope of his employment as director of facilities for the Cinnaminson Township Public Schools.  During these years, Mr. Galosi regularly sprayed Roundup for weed prevention on football fields, baseball fields, soccer fields, sidewalks, curb lines, and other place on the properties of five schools.   Mr. Galosi would not have used the product if he knew it could cause cancer.

71.     In 2016, Mr. Galosi was diagnosed with non-Hodgkin's lymphoma at the MD Anderson Center at Cooper Hospital in Camden, NJ.

72.     It was not until recently that Mr. Galosi learned that his non-Hodgkin's lymphoma was caused by his exposure to Roundup.  Prior to this knowledge, Mr. Galosi was unaware of any connection between Roundup exposure and cancer.

73.     Monsanto engaged in two separate but parallel actions including:

    a.  Monsanto affirmatively claimed and claims that Roundup and glyphosate
        are safe to human users like Plaintiff. It affirmatively denied the
        probability that Roundup and glyphosate are probably carcinogenic to
        humans and are linked to blood born cancers including non-Hodgkin's
        lymphoma.

    b.  Monsanto continues its campaign of denial of the scientific data amassed
        by the WHO. This continuing denial is designed to cause confusion,
        create credibility concerns, and cause users to continue to use Roundup.

74.     Monsanto is equitably estopped to assert a statute of limitations defense.  It made, and continues to make, statements intended to be relied upon by the public that Roundup is safe and harmless to humans.  Plaintiff relied on these statements.

75.     Plaintiff did not discover, and did not know of facts that would cause a reasonable person to suspect,  the risks associated with the use of and/or exposure to Roundup and glyphosate, nor would a reasonable and diligent investigation by him have

disclosed that Roundup and glyphosate would cause his illnesses. For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule and its invocation is estopped by Monsanto's actions.

76. Monsanto was under a continuous duty to disclose to consumers, users and other persons coming into contact with its products, including Plaintiff, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup and glyphosate. Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup and glyphosate and the risks associated with the use of and/or exposure to its products.

77. As a proximate result of Monsanto's wrongful acts and omissions in placing its defective Roundup products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, and in breach of its warranties, negligence and strict liability, Plaintiff has suffered and continues to suffer severe and permanent physical and emotional injuries. Plaintiff has endured the anguish of a cancer diagnosis, pain and suffering, and economic losses and special damages, which are accruing and not now known.

## LIMITATION ON ALLEGATIONS

78. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

79. The allegations in this pleading are made pursuant to New Jersey law. To the extent New Jersey law imposes a duty or obligation on Monsanto that exceeds those required by federal law, Plaintiffs do not assert such claims. All claims asserted herein run parallel to federal law, i.e., Monsanto's violations of New Jersey law were also violations of federal law. Had Monsanto honestly complied with New Jersey law, it would also have complied with federal law.

80. Additionally, Plaintiffs' claims do not seek to enforce federal law. These claims are brought under New Jersey law, notwithstanding the fact that such claims run parallel to federal law.

81. As alleged in this pleading, Monsanto violated U.S.C. § 136j and 40 C.F.R. § 156.10(a)(5) by distributing Roundup, which was misbranded pursuant to 7 U.S.C. §136(g). Federal law specifically prohibits the distribution of a misbranded herbicide

## COUNT I:  STRICT LIABILITY (DESIGN DEFECT)

82. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

83. Plaintiffs bring this strict liability claim against Monsanto for defective design.

84. At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, including the Plaintiff, thereby placing Roundup products into the stream of commerce.  These actions were under the ultimate control and supervision of Monsanto.  At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup products used by Plaintiff, as described above.

85. At all times relevant to this litigation, Monsanto's Roundup products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff.

86. At all times relevant to this litigation, Monsanto's Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in New Jersey and throughout the United States, including the Plaintiff, without substantial change

in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

87.    Monsanto's Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that, when they left the hands of Monsanto's manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

88.    Monsanto's Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that, when they left the hands of Monsanto's manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

89.    At all times relevant to this action, Monsanto knew or had reason to know that its Roundup products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

90.    Therefore, at all times relevant to this litigation, Monsanto's Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Monsanto were defective in design and formulation, in one or more of the following ways:

91.    When placed in the stream of commerce, Monsanto's Roundup products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

92.     When placed in the stream of commerce, Monsanto's Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

93.     When placed in the stream of commerce, Monsanto's Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

94.     Monsanto did not sufficiently test, investigate, or study its Roundup products and, specifically, the active ingredient glyphosate.

95.     Exposure to Roundup and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

96.     Monsanto knew or should have known at the time of marketing its Roundup products that exposure to Roundup and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

97.     Monsanto did not conduct adequate post-marketing surveillance of its Roundup products.

98.     Monsanto could have employed safer alternative designs and formulations.

99.     The Plaintiff was exposed to Monsanto's Roundup products in the course of spraying his properties, as described above, without knowledge of Roundup's dangerous characteristics.

100.     At all times relevant to this litigation, the Plaintiff used and/or was exposed to the use of Monsanto's Roundup products in an intended or reasonably foreseeable manner, i.e., as a consumer, without knowledge of Roundup's dangerous characteristics.

101.   The Plaintiff could not reasonably have discovered the defects and risks associated with Roundup or glyphosate-containing products before or at the time of exposure due to Monsanto's suppression of scientific information linking glyphosate to cancer.

102.   The harm caused by Monsanto's Roundup products far outweighed their benefit, rendering Monsanto's product dangerous to an extent beyond that which an ordinary consumer would contemplate.  Monsanto's Roundup products were and are more dangerous than alternative products and Monsanto could have designed its Roundup products to make them less dangerous. Indeed, at the time Monsanto designed its Roundup products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

103.   At the time Roundup products left Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Monsanto's herbicides.

104.   Monsanto's defective design of its Roundup products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup products, including Plaintiff herein.

105.   Therefore, as a result of the unreasonably dangerous condition of its Roundup products, Monsanto is strictly liable to Plaintiffs.

106.   The defects in Monsanto's Roundup products were substantial and contributing factors in causing Plaintiff's injuries and, but for Monsanto's misconduct and omissions, Plaintiff would not have sustained his injuries.

107.   Monsanto's conduct, as described above, was reckless.  Monsanto risked the lives of consumers and users of its products, including Plaintiff, with knowledge of the safety problems associated with Roundup and glyphosate-containing products, and suppressed this knowledge

from the general public. Monsanto made conscious decisions not to redesign, warn or inform the unsuspecting public. Monsanto's reckless conduct warrants an award of punitive damages.

108.    As a direct and proximate result of Monsanto placing its defective Roundup products into the stream of commerce, Plaintiff developed Non-Hodgkin's lymphoma.

109.    As a proximate result of Monsanto placing its defective Roundup products into the stream of commerce, as alleged herein, there was a measurable and significant interval of time during which Plaintiff suffered personal injury.

110.    As a proximate result of Monsanto placing its defective Roundup products into the stream of commerce, as alleged herein, Plaintiff sustained a loss of income, loss of earning capacity and property damage

111.    WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT II:  STRICT LIABILITY (FAILURE TO WARN)

112.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

113.    Plaintiffs bring this strict liability claim against Monsanto for failure to warn.

114.    At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Monsanto.

115.     Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiff, and therefore had a duty to warn of the risks associated with the use of Roundup and glyphosate-containing products.

116.     At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure its Roundup products did not cause users and consumers to suffer from unreasonable and dangerous risks.  Monsanto had a continuing duty to warn Plaintiff of the dangers associated with Roundup use and exposure. Monsanto, as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

117.     At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

118.     At all times relevant to this litigation, Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by Monsanto's herbicides, including Plaintiff.

119.     Despite the fact that Monsanto knew or should have known that Roundup posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure.  The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to, or scientifically knowable to

Monsanto through appropriate research and testing by known methods, at the time it distributed, supplied or sold the product, and not known to end users and consumers, such as Plaintiff.

120.    Monsanto knew or should have known that its products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers, i.e., the reasonably foreseeable users, of the risks of exposure to its products. Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup and glyphosate

121.    At all times relevant to this litigation, Monsanto's Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in New Jersey and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

122.    Plaintiff was exposed to Monsanto's Roundup products in the course of spraying his property, as described above, without knowledge of their dangerous characteristics.

123.    At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Monsanto's Roundup products while using them for their intended or reasonably foreseeable purposes, without knowledge of their dangerous characteristics.

124.    Plaintiff could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products prior to or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Monsanto to know about and disclose serious health risks associated with using the products.

125.    Monsanto knew or should have known that the minimal warnings disseminated with its Roundup products were inadequate, failed to communicate adequate information on the

dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

126. The information that Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiff to utilize the products safely and with adequate protection. Instead, Monsanto disseminated information that was inaccurate, false and misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate

127. This alleged failure to warn is not limited to the information contained on Roundup's labeling. Monsanto was able, in accord with federal law, to comply with New Jersey law by disclosing the known risks associated with Roundup through other non-labeling mediums, i.e., promotion, advertisements, public service announcements, and/or public information sources. Monsanto, however, did not disclose these known risks through any medium.

128. To this day, Monsanto has failed to adequately and accurately warn of the risks of cancer associated with the use of and exposure to Roundup and its active ingredient glyphosate.

129. As a result of their inadequate warnings, Monsanto's Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed by Monsanto, and used by Plaintiff in the spraying of his properties.

130.    Monsanto is liable to Plaintiffs for injuries caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its products and the risks associated with the use of or exposure to Roundup and glyphosate.

131.    Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup products, Plaintiff could have avoided the risk of developing injuries and could have obtained or used alternative herbicides.

132.    As a direct and proximate result of Monsanto placing its defective Roundup products into the stream of commerce, Plaintiff developed Non-Hodgkin Lymphoma and sustained a loss of income, loss of earning capacity and property damage

133.    As a proximate result of Monsanto placing its defective Roundup products into the stream of commerce, as alleged herein, there was a measurable and significant interval of time during which Plaintiff suffered great mental anguish and other personal injury.

134.    WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT III: NEGLIGENCE

135.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

136.    Monsanto, directly or indirectly, caused Roundup products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

137.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup products, including the duty to take all reasonable

steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

138.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup products. Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup, and, in particular, its active ingredient glyphosate.

139.    At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup and specifically, the carcinogenic properties of the chemical glyphosate

140.    Accordingly, at all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup products could cause or be associated with Plaintiff's injuries and thus, created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

141.    Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup and glyphosate-containing products.

142.    As such, Monsanto breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup products, in that Monsanto manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know

that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

143.    Monsanto was negligent in its promotion of Roundup, outside of the labeling context, by failing to disclose material risk information as part of its promotion and marketing of Roundup, including the Internet, television, print advertisements, etc.   Nothing prevented Monsanto from being honest in its promotional activities, and in fact, Monsanto had a duty to disclose the truth about the risks associated with Roundup in its promotional efforts, outside of the of the context of labeling.

144.    Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Monsanto has failed to do so.   Indeed, Monsanto has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup and glyphosate.

145.    Monsanto's negligence included:

    a.    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup products without thorough and adequate pre- and post-market testing

    b.    manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup;

    c.    Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

    d.    Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup products so as to avoid the risk of serious harm associated with the prevalent use of Roundup/glyphosate as an herbicide;

    e.    Failing to design and manufacture Roundup products so as to ensure they were at least as safe and effective as other herbicides on the market;

     f.     Failing to provide adequate instructions, guidelines, and safety precautions to those persons Monsanto could reasonably foresee would use and be exposed to its Roundup products;

     g.     Failing to disclose to Plaintiff, users/consumers, and the general public that use of and exposure to Roundup presented severe risks of cancer and other grave illnesses;

     h.     Failing to warn Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to the Plaintiff and other consumers;

     i.     Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup and glyphosate- containing products;

     j.     Representing that its Roundup products were safe for their intended use when, in fact, Monsanto knew or should have known the products were not safe for their intended purpose;

     k.     Declining to make or propose any changes to Roundup products' labeling or other promotional materials that would alert consumers and the general public of the risks of Roundup and glyphosate;

     l.     Advertising, marketing, and recommending the use of the Roundup products, while concealing and failing to disclose or warn of the dangers known (by Monsanto) to be associated with or caused by the use of or exposure to Roundup and glyphosate;

     m.     Continuing to disseminate information to its consumers, which indicate or imply that Monsanto's Roundup products are not unsafe for use in the agricultural and

     n.     horticultural industries; and

     o.     Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

146.    Monsanto knew and/or should have known that it was foreseeable consumers such as the Plaintiff would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup.

147.    Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup or its active ingredient glyphosate.

148.    Monsanto's negligence was the proximate cause of Plaintiff's injuries, i.e., absent Monsanto's negligence, Plaintiff would not have developed cancer.

149.    Monsanto's conduct, as described above, was reckless.  Monsanto regularly risks the lives of consumers and users of its products, including Plaintiff, with full knowledge of the dangers of its products.  Monsanto has made conscious decisions not to redesign, re- label, warn, or inform the unsuspecting public, including Plaintiff.  Monsanto's reckless conduct therefore warrants an award of punitive damages.

150.    As a proximate result of Monsanto's negligence, as alleged herein, there was a measurable and significant interval of time during which Plaintiff suffered great mental anguish and other personal injury and damages.

151.    As a proximate result of Monsanto's negligence, as alleged herein, Plaintiff sustained a loss of income, loss of earning capacity and property damage.

152.    WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT IV:  BREACH OF IMPLIED WARRANTIES

153.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

154.    At all times relevant to this litigation, Monsanto engaged in the business of testing developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup products, which are defective and unreasonably dangerous to consumers, including the Plaintiff, thereby placing Roundup products into the stream of commerce.  These actions were under the ultimate control and supervision of Monsanto.

155.     Before the time Plaintiff was exposed to the aforementioned Roundup products, Monsanto impliedly warranted to its consumers—including Plaintiff—that its Roundup products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as agricultural herbicides.

156.     Monsanto, however, failed to disclose that Roundup has dangerous propensities when used as intended and that use of and/or exposure to Roundup and glyphosate-containing products carries an increased risk of developing severe injuries and death, including Plaintiff's cancer.

157.     Plaintiff was the intended beneficiary of the implied warranties made by Monsanto to the purchasers of its herbicides.

158.     The Roundup products were expected to reach and did in fact reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Monsanto.

159.     At all times relevant to this litigation, Monsanto was aware that consumers and users of its products, including Plaintiff, would use Roundup products as marketed by Monsanto, which is to say that Plaintiff was a foreseeable user of Roundup.

160.     Monsanto intended that its Roundup products be used in the manner in which Plaintiff in fact used them and which Monsanto impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup was not adequately tested or researched.

161.     In reliance upon Monsanto's implied warranty, Plaintiff used Roundup as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Monsanto.

162.     Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup or glyphosate.

163.     Monsanto breached its implied warranty to the Plaintiff in that its Roundup products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

164.     The harm caused by Monsanto's Roundup products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

165.     As a direct and proximate result of Monsanto's breech of implied warranty, Plaintiff sustained a loss of income, loss of earning capacity and property damage.

166.     WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT V:  BREACH OF EXPRESS WARRANTIES

167.     Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.  Monsanto has special knowledge skill and expertise germane to herbicides and their design, manufacture testing, and marketing.    At all times relevant, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto. Plaintiffs assert his breach of express warranty claims.

168.    Monsanto had a duty to exercise reasonable care in the research, development, design, testing, packaging, manufacture, inspection, labeling, distributing, marketing, promotion, sale, and release of its Roundup products, including a duty to:

   a.    Reasonable assure that its products did not cause the user unreasonably dangerous side effects;

   b.    Warn of dangerous and potentially fatal side effects; and

   c.    Disclose adverse material facts, such as the true risks associated with use of Roundup and glyphosate-containing products, when making representations to consumers and the general public, including Plaintiff.

169.    Monsanto expressly represented and warranted matters to Plaintiff and other consumers and users, and through statements made by Monsanto in labels, publications, package inserts, and other written materials. These representations included assurances that its Roundup products were safe to human health and the environment, effective, fit, and proper for their intended use and posed on risks of harm to humans. Monsanto advertised, labeled, marketed, and promoted Roundup products, representing the quality to consumers and the public in such a way as to induce purchase or use, thereby making an express warranty that its Roundup products would conform to the representations.

170.    These express representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Roundup and glyphosate. Monsanto knew and/or should have known that the risks expressly included in Roundup warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Monsanto expressly represented that its Roundup products were safe and effective, that they were safe and effective for use by individuals such as Plaintiff, and/or that they were safe and effective as agricultural herbicides.

171.    The representations about Roundup, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations. Monsanto placed its Roundup products into the stream of commerce for sale and recommended use without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate.

172.    Monsanto breached these warranties. Its Roundup products were defective, dangerous, unfit for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose.  Monsanto breached the warranties as follows:

a.      Monsanto represented through its labeling, advertising, and marketing materials that its Roundup products were safe, and intentionally withheld and concealed information about the risks of serious injury and disease  associated with use of and/or exposure to Roundup  and glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings and labels; and

b.      Monsanto represented that its Roundup products were safe for use and fraudulently concealed information that demonstrated that glyphosate, the active ingredient in Roundup, had carcinogenic properties, and that its Roundup products, therefore, were not safer than alternatives available on the market.

173.    Plaintiff justifiably and detrimentally relied on the express warranties and representations of Monsanto in the purchase and use of its Roundup products.  When Plaintiff made the decision to purchase Roundup, he reasonably relied upon Monsanto to disclose known risks, dangers, and effects of Roundup and glyphosate and he relied on Monsanto's continuing representations that the product is safe.

174.    Plaintiff had no knowledge of the falsity or incompleteness of Monsanto's statements and representations concerning Roundup.

175.     As a direct and proximate result of Monsanto's breech of implied warranty, Plaintiff sustained a loss of income, loss of earning capacity and property damage.

176.     WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT VI – LOSS OF CONSORTIUM

177.     Plaintiffs re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

178.     As a result of the injuries and damages caused to Plaintiff Peter Galosi by Defendants' tortious conduct, Peter Galosi was unable to perform activities he had previously commonly performed for the household, for the family, and for his own support. Consequently, Plaintiff Norma Galosi was required to:

    a.     Perform all activities and upkeep around the house;

    b.     Support Peter Galosi by performing activities he previously performed for his own needs and maintenance;

    c.     Take over many of the activities which Peter Galosi previously commonly performed as a parent to their children.

179.     As a result of Defendants' tortious conduct and Peter Galosi's development of non-Hodgkin's lymphoma, Plaintiff Norma Galosi effectively lost the companionship and accompaniment of her husband for a period of time.

180.     As a further result of Defendants' defective product and the injuries they caused to Peter Galosi and the resulting demands placed upon Norma Galosi, Plaintiffs have suffered lost wages and income.

181.     As a direct and proximate result of the injuries caused to Plaintiff Peter Galosi by

Defendants' tortious conduct, Plaintiff Norma Galosi suffered the loss of her husband's consortium, companionship, society, intimacy, affection, services and support, and suffered and will continue to suffer economic damages, including lost wages and income.

**WHEREFORE**, Plaintiff Norma Galosi demands judgment against Defendant individually, jointly and/or severally for all such compensatory, statutory and punitive damages available under applicable law, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper and appropriate.

## EXEMPLARY AND PUNITIVE DAMAGES ALLEGATIONS

182.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

183.    Monsanto's conduct as alleged herein was done with oppression and malice. Monsanto was fully aware of Roundup's safety risks. Nonetheless, Monsanto deliberately crafted its label, marketing, and promotion to mislead consumers.

184.    This was not done by accident or through some justifiable negligence. Rather, Monsanto knew that it could turn a profit by convincing the agricultural industry that Roundup was harmless to humans, and that full disclosure of Roundup's true risks would limit the amount of money Monsanto would make selling Roundup in New Jersey.

185.    This was accomplished not only through its misleading labeling, but through a comprehensive scheme of selective fraudulent research and testing, misleading advertising, and deceptive omissions as more fully alleged throughout this pleading. Plaintiff, like all other consumers of New Jersey, was robbed of his right to make an informed decision about whether to purchase and use an herbicide on his property, knowing the full risks attendant to that use. Such conduct was done with conscious disregard of the Plaintiff's rights.

186.    There is no indication that Monsanto will stop its deceptive and unlawful marketing practices unless it is punished and deterred.  Accordingly, Plaintiff requests punitive damages against Monsanto for the harms caused to the Plaintiff.

## JURY DEMAND

187.    Plaintiffs demand a trial by jury on all of the triable issues within this pleading.

## TRANSFER TO MASTER DOCKET

188.    Plaintiffs request for this case to be transferred to the UNITED STATES JUDICIAL PANEL on MULTIDISTRICT LITIGATION Master Docket, under the style "In Re: Roundup Products Liability Litigation" and the identification MDL No. 2741, within the Northern District of California as so ordered in the Transfer Order attached hereto as Exhibit A.

## PRAYER FOR RELIEF

189.    WHEREFORE, Plaintiffs request that the Court enter judgment in their favor and against Monsanto, awarding Plaintiffs:

a.    actual or compensatory damages in such amount to be determined at trial and as provided by applicable law;

b.    exemplary and punitive damages sufficient to punish and deter Monsanto and others from future fraudulent practices;

c.    pre-judgment and post-judgment interest;

d.    costs including reasonable attorneys' fees, court costs, and other litigation expenses; and

e.    any other relief the Court may deem just and proper.

f.    transfer to the UNITED STATES JUDICIAL PANEL, on MULTIDISTRICT LITIGATION Master Docket, under the style "In Re: Roundup Products Liability Litigation" and the identification MDL No. 2741, within the Northern District of California as so ordered in the Transfer Order attached hereto.

**ROSS FELLER CASEY, LLP**

Dated:  December 19, 2018

_____

Dena R. Young, Esquire
Brian J. McCormick, Jr., Esquire
One Liberty Place
1650 Market St., 34TH Floor
Philadelphia, PA 19103
Telephone: 215.574.2000
Fax: 215.574.3080
bmccormick@rossfellercasey.com
dyoung@rossfellercasey.com

39