# U.S. District Court
## Eastern District of Missouri (St. Louis)
## CIVIL DOCKET FOR CASE #: 4:18-cv-02076-SPM

Bargy et al v. Monsanto Company
Assigned to: Magistrate Judge Shirley Padmore Mensah
Cause: 28:1332 Diversity-Product Liability

Date Filed: 12/13/2018
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Paul Bargy**                         represented by   **Seth S. Webb**
BROWN AND CROUPPEN P.C.
One Metropolitan Square
211 N. Broadway
Suite 1600
St. Louis, MO 63102
314-222-2222
Fax: 314-421-0359
Email: sethw@getbc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Debra Bargy**                        represented by   **Seth S. Webb**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 12/13/2018 | 1 | COMPLAINT against defendant Monsanto Company with receipt number 0865-6923608, in the amount of $400 Jury Demand,, filed by Paul Bargy, Debra Bargy. (Attachments: # 1 Civil Cover Sheet, # 2 Original Filing Form)(Webb, Seth) (Entered: 12/13/2018) |
| 12/13/2018 | 2 | NOTICE OF PROCESS SERVER by Plaintiffs Debra Bargy, Paul Bargy (Attachments: # 1 Summons)(Webb, Seth) (Entered: 12/13/2018) |
| 12/13/2018 | | Case Opening Notification: 1 Summons(es) issued. The summons was emailed to attorney Seth Webb. All parties must file the Notice Regarding Magistrate Judge Jurisdiction Form consenting to or opting out of the Magistrate Judge jurisdiction. Click here for the instructions. and all non-governmental organizational parties (corporations, limited liability companies, limited liability partnerships) must file Disclosure of Organizational Interests Certificate (moed-0001.pdf). Judge Assigned: U.S. Magistrate Judge Shirley P. Mensah. (BAK) (Entered: 12/13/2018) |
| 12/13/2018 | 3 | Pursuant to Local Rule 2.08, the assigned/referred magistrate judge is designated and |

authorized by the court to exercise full authority in this assigned/referred action or matter under 28 U.S.C. Sec. 636 and 18 U.S.C Sec. 3401, including any case budgeting matters. (CSAW) (Entered: 12/13/2018)

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 01/03/2019 11:56:41 | | | |
| PACER Login: | hllp1982:2634105:4722683 | Client Code: | 1417.0049 |
| Description: | Docket Report | Search Criteria: | 4:18-cv-02076-SPM |
| Billable Pages: | 2 | Cost: | 0.20 |

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MISSOURI, EASTERN DIVISION

| | |
|---|---|
| PAUL BARGY and DEBRA BARGY, | CASE NO. |
| *Plaintiffs,* | |
| v. | |
| MONSANTO COMPANY, | JURY TRIAL DEMANDED |
| *Defendant.* | |

## COMPLAINT

COME NOW Plaintiffs, by and through their counsel, Brown & Crouppen, P.C., and for their cause of action against Defendant Monsanto Company, state to the Court as follows:

### NATURE OF THE CASE

1.      This is an action for damages suffered by Plaintiff as a direct and proximate result of Defendant negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup®, containing the active ingredient glyphosate.

2.      Plaintiff maintains that Roundup® and/or glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper warnings and directions as to the dangers associated with its use.

3.      Plaintiff's injuries, like those striking thousands of similarly situated victims across the country, were avoidable.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over Defendant and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendant. Defendant is either incorporated and/or has its principal place of business outside of the state in which the Plaintiff resides.

5.      The amount in controversy between Plaintiff and Defendant exceeds $75,000, exclusive of interest and cost.

6.      The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

7.      Venue is proper within this district pursuant to 28 U.S.C. § 1391 in that Defendant conducts business here and is subject to personal jurisdiction in this district. Furthermore, Defendant sells, markets, and/or distributes Roundup® within the District of Missouri. Also, a substantial part of the acts and/or omissions giving rise to these claims occurred within this district.

## PARTIES

8.      Plaintiff Paul Bargy is a resident and citizen of Sevier County, Tennessee. Plaintiff brings this action for personal injuries sustained by exposure to Roundup ("Roundup®") containing the active ingredient glyphosate and the surfactant polyethoxylated tallow amine ("POEA"). As a direct and proximate result of being exposed to Roundup®, Plaintiff developed Non-Hodgkin's Lymphoma in 2018. Plaintiff Debra Bargy has a claim for loss of consortium related to the injuries of her husband.

9.      "Roundup" refers to all formulations of Defendant Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide,

Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup   Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

10.     Defendant MONSANTO COMPANY is a Delaware corporation, Missouri Secretary of State Charter No. F00488018, with a principle place of business in St. Louis, Missouri.

11.     Defendant MONSANTO COMPANY is collectively referred to as "Monsanto" or "Defendant."

12.     Defendant advertises and sells goods, specifically Roundup, in the State of Missouri.

13.     Defendant transacted and conducted business within the State of Missouri that relates to the allegations in this Complaint.

14.     Defendant derived substantial revenue from goods and products used in the State of Missouri.

15.     Defendant expected or should have expected its acts to have consequences within the State of Missouri, and derived substantial revenue from interstate commerce.

16.     Defendant engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup.

17.     Defendant is authorized to do business in Missouri and derive substantial income from doing business in this state.

18.     Upon information and belief, Defendant purposefully availed itself of the privilege of conducting activities with the State of Missouri, thus invoking the benefits and protections of its laws.

19.     Upon information and belief, Defendant did design, sell, advertise, manufacture and/or distribute Roundup, with full knowledge of its dangerous and defective nature.

**FACTUAL ALLEGATIONS**

20.     At all relevant times, Defendant was in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or has acquired and is responsible for the commercial herbicide Roundup.

21.     Monsanto is a multinational agricultural biotechnology corporation based in St.

Louis, Missouri. It is the world's leading producer of glyphosate.

22.     Defendant discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate based "Roundup" as a broad-spectrum herbicide.

23.     Glyphosate is the active ingredient in Roundup.

24.     Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

25.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

26.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

27.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

28.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

29.     Defendant is intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup *i.e.,* "Roundup Ready®." As of 2009, Defendant was the world's leading producer of seeds designed to be Roundup Ready®. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready® seeds.

30.     The original Roundup, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the worlds most widely used herbicides.[1]For nearly 40 years, consumers, farmers, and the public have used Roundup, unaware of its carcinogenic properties.

### REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

31.    The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7. U.S.C. § 136 *et seq*. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA) prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. 136a(a).

32.    The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

33.    FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

34.    The EPA and the State of Missouri registered Roundup for distribution, sale, and manufacture in the United States and the State of Missouri.

35.    FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

36.    The evaluation of each pesticide product distributed, sold, or manufactured is

completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

37.    In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment – in relation to the registration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of the World Health Organization's March 24, 2015 finding that glyphosate is a "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

## MONSANTO'S FALSE REPRESENTATIONS REGARDING THE SAFTEY OF ROUNDUP

38.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer **than table salt**" and "practically **non-toxic**" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

   a)  Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

   b)  And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

   c)  Roundup biodegrades into naturally occurring elements.

    d)    Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

    e)    This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

    f)    You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

    g)    Glyphosate is less toxic to rats than table salt following acute oral ingestion.

    h)    h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

    i)    You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

    j)    j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[2]

39.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

    a)    its glyphosate-containing pesticide products or any

---

[2] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

component thereof are safe, non-toxic, harmless or free
from risk.

b) its glyphosate-containing pesticide products or any
component thereof manufactured, formulated, distributed
or sold by Monsanto are biodegradable

c) its glyphosate-containing pesticide products or any
component thereof stay where they are applied under all
circumstances and will not move through the environment
by any means.

d) its glyphosate-containing pesticide products or any
component thereof are "good" for the environment or are
"known for their environmental characteristics."

e) glyphosate-containing pesticide products or any
component thereof are safer or less toxic than common
consumer products other than herbicides;

f) its glyphosate-containing products or any component
thereof might be classified as "practically non-toxic.

40.     Monsanto did not alter its advertising in the same manner in any state other than
New York, and on information and belief still has not done so today.

41.     In 2009, France's highest court ruled that Monsanto had not told the truth about the
safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely
advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[3]

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP

42.     As early as the 1980's Monsanto was aware of glyphosate's carcinogenic
properties.

43.     On March 4, 1985, a group of the Environmental Protection Agency's ("EPA")
Toxicology Branch published a memorandum classifying glyphosate as a Category C

---

[3] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at*
http://news.bbc.co.uk/2/hi/europe/8308903.stm.

oncogene.[4] Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

44.    In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.[5]

45.    In October 1991 the EPA published a Memorandum entitled "Second   Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.[6]

46.    In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendant Roundup products are more dangerous and toxic than glyphosate alone.[7] As early as 1991 evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone. [8]

47.    In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

48.    The study found that Defendant Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

49.    In 2004, Julie Marc published a study entitled "Glyphosate-based  pesticides

---

[4] Consensus Review of Glyphosate, Casewell No. 661A. March 4, 1985. United States Environmental Protection Agency.
[5]    http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheets/0178fact.pdf
[6] Second Peer Review of Glyphosate, CAS No. 1071-83-6. October 30, 1881. United States Environmental Protection Agency.
[7] Martinez et al. 2007; Benachour 2009; Gasnier et al. 2010; Peixoto 2005; Marc 2004
[8] Martinez et al 1991

affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

50.     The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[9]

51.     In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

52.     The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

53.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

54.     The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

---

[9] (Molinari, 2000; Stewart et al., 2003)

55.     The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendant.

56.     Defendant knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup.

57.     Defendant knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

58.     Defendant failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup.

59.     Rather than performing appropriate tests, Defendant relied upon flawed industry-supported studies designed to protect Defendant economic interests rather than Plaintiff and the consuming public.

60.     Despite its knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup as safe.

**IARC CLASSIFICATION OF GLYPHOSATE**

61.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

62.     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015–2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

63.     IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

64.     On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendant possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Defendant Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

65.     The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A *probable* carcinogen to humans. According to the authors glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

66.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

67.     The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

**EARLIER EVIDENCE OF GLYPHOSATE'S DANGER**

68.     Despite the new classification by the IARC, Defendant has had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

69.     Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

70.     In 1997, Chris Clements published "Genotoxicity of select herbicides in *Rana catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

71.     The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

72.     Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

73.     Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

74.     The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

75.     In 2006 César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

76.     The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

77.     The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

78.     Despite knowledge to the contrary, Defendant maintains that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

79.     In addition to glyphosate and Roundup's genotoxic properties, Defendant has long been aware of glyphosate's carcinogenic properties.

80.     Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

81.     Defendant has known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

82.     In 1985 the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

83.     In 2003 Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

84.     The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studies with an increased odds ratio of 3.11.

85.     In 2003 AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

86.     The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

87.     In 2008 Mikael Eriksson published a population based case-control study of

exposure to various pesticides as a risk factor for NHL.

88.   This strengthened previous associations between glyphosate and NHL.

89.   In spite of this knowledge, Defendant continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

90.   Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiff, the agricultural community, and the public at large to purchase and increase the use of Defendant Roundup for Defendant pecuniary gain, and in fact, did induce Plaintiff to use Roundup.

91.   Defendant made these statements with complete disregard and reckless indifference to the safety of Plaintiff and the general public.

92.   Notwithstanding Defendant representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

93.   Defendant knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

94.   Defendant failed to appropriately and adequately inform and warn Plaintiff of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment,

monitoring and/or medications.

95.    Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendant continues to maintain that glyphosate and/or Roundup is safe, non- carcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

96.    Defendant has claimed and continue to claim that Roundup is safe, non-carcinogenic, and non-genotoxic. These misrepresentations are consistent with Defendant cavalier approach to investigating and ensuring the safety of its products, the safety of the public at large, and the safety of Plaintiff.

## SCIENTIFIC FRAUD UNDERLYING THE SAFETY DETERMINATIONS OF GLYPHOSATE

97.    After the EPA's 1985 classification of glyphosate as possibly carcinogenic to humans (Group C), Monsanto exerted pressure upon the EPA to change its classification.

98.    This culminated in the EPA's reclassification of glyphosate to Group E, which was based upon evidence of non-carcinogenicity in humans.

99.    In so classifying, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

100.    On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed scientific fraud.

101.    In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup. IBT performed

approximately 30 tests on glyphosate and glyphosate-containing products, including 11 of the 19 chronic toxicology studies needed to register Roundup with the EPA.

102.    In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to toxicological impacts of glyphosate. The EPA subsequently audited IBT and determined that the toxicology studies conducted for Roundup were invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

103.    Three top executives of IBT were convicted of fraud in 1983.

104.    In the second incident, Monsanto hired Craven Laboratories ("Craven") in 1990 to perform pesticide and herbicide studies, including several studies on Roundup.

105.    In March of 1991, the EPA announced that it was investigating Craven for "allegedly falsifying test data used by chemical firms to win EPA approval of pesticides."

106.    The investigation lead to the indictments of the laboratory owner and a handful of employees.

### MONSANTO'S CONTINUING DISREGARD FOR THE SAFETY OF PLAINTIFF AND THE PUBLIC

107.    Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."[10]

108.    Ironically, the primary source for this statement is a 1986 report by the WHO, the

---

[10] Backgrounder - Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9 2015)

same organization that now considers glyphosate to be a probable carcinogen.

109.    Glyphosate, and Defendant Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

110.    Defendant statements proclaiming the safety of Roundup and disregarding its dangers misled Plaintiff.

111.    Despite Defendant knowledge that Roundup was associated with an elevated risk of developing cancer, Defendant promotional campaigns focused on Roundup's purported "safety profile."

112.    Defendant failure to adequately warn Plaintiff resulted in (1) Plaintiff using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

113.    Defendant failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

114.    The failure of Defendant to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

115.    The failure of Defendant to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

116.    The failure of Defendant to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

117.    By reason of the foregoing acts and omissions, Plaintiff seeks compensatory

damages as a result of Plaintiff's use of, and exposure to, Roundup which caused or was a substantial contributing factor in causing Plaintiff to suffer from cancer, specifically NHL, and Plaintiff suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

118. By reason of the foregoing, Plaintiff is severely and permanently injured.

119. By reason of the foregoing acts and omissions, Plaintiff has endured and, in some categories continues to suffer, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of the actions and inactions of the Defendant.

### PLAINTIFF'S EXPOSURE TO ROUNDUP

120. Plaintiff used Roundup beginning in approximately 1990 and continued to use it use it until 2017.

121. For years, Plaintiff sprayed Roundup on a regular basis. Plaintiff followed all safety and precautionary warnings during the course of use.

122. Plaintiff was subsequently diagnosed with Non-Hodgkin's Lymphoma. The development of Plaintiff's Non-Hodgkin Lymphoma was proximately and actually caused by exposure to Defendant Roundup products.

123. As a result of his injury, Plaintiff has incurred significant economic and non-economic damages.

### EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

124. Plaintiff incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

125. The running of any statute of limitations has been tolled by reason of Defendant fraudulent concealment. Defendant, through its affirmative misrepresentations and omissions, actively concealed from Plaintiff the true risks associated with Roundup and glyphosate.

126.     At all relevant times, Defendant has maintained that Roundup is safe, non-toxic, and non-carcinogenic.

127.     Indeed, even as of July 2016, Defendant continues to represent to the public that "Regulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and *agree* that there is *no evidence* that glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic" (emphasis added).[11]

128.     As a result of Defendant actions, Plaintiff was unaware, and could not reasonably know or have learned through reasonable diligence that Roundup and/or glyphosate contact, exposed Plaintiff to the risks alleged herein and that those risks were the direct and proximate result of Defendant acts and omissions.

129.     Furthermore, Defendant is estopped from relying on any statute of limitations because of its fraudulent concealment of the true character, quality and nature of Roundup. Defendant was under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Defendant had and continues to have exclusive control, and because Defendant knew that this information was not available to Plaintiff or to distributors of Roundup. In addition, Defendant is estopped from relying on any statute of limitations because of its intentional concealment of these facts.

130.     Plaintiff had no knowledge that Defendant was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendant, Plaintiff could not have reasonably discovered the wrongdoing at any time prior. Also, the

---

[11] Backgrounder - Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9 2015)

economics of this fraud should be considered. Defendant had the ability to and did spend enormous amounts of money in furtherance of its purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Plaintiff and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendant representations. Accordingly, Defendant is precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

**FIRST CAUSE OF ACTION**
**STRICT LIABILITY (DESIGN DEFECT)**

131.   Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

132.   Plaintiffs bring this strict liability claim against Monsanto for defective design.

133.   At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, manufacturing, selling, distributing, and Monsanto a engaged in the marketing, packaging design, and promotion of Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto. At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by the Plaintiff, as described above.

134.   At all times relevant to this litigation, Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff.

135.   At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Missouri

22

and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

136.    Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

137.    Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

138.    At all times relevant to this action, Monsanto knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

139.    Therefore, at all times relevant to this litigation, Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Monsanto were defective in design and formulation, in one or more of the following ways:

> (a)    When placed in the stream of commerce, Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

> (b)    When placed in the stream of commerce, Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

> (c)    When placed in the stream of commerce, Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a

reasonably anticipated or intended manner.

(d)    Monsanto did not sufficiently test, investigate, or study Roundup® products and, specifically, the active ingredient glyphosate.

(e)    .   Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

(f)    At the time of marketing its Roundup® products, Roundup® was defective in that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

(g)    Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products.

(h)    Monsanto could have employed safer alternative designs and formulations.

140.    Plaintiffs were exposed to Roundup® products in the course of their work, as described above, without knowledge of their dangerous characteristics.

141.    At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

142.    Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

143.    The harm caused by Roundup® products far outweighed their benefit, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate. Roundup® products were and are more dangerous than alternative products and Monsanto could have designed Roundup® products (including their packaging and sales aids) to make them less dangerous. Indeed, at the time that Monsanto designed Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

144.    At the time Roundup® products left Monsanto's control, there was a practical,

technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of those herbicides.

145.    Monsanto's defective design of Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including the Plaintiffs herein.

146.    Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Monsanto is strictly liable to Plaintiffs.

147.    The defects in Roundup® products caused or contributed to cause Plaintiffs' grave injuries, and, but for Monsanto's misconduct and omissions, Plaintiffs would not have sustained their injuries.

148.    Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including Plaintiffs, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Monsanto made conscious decisions not to redesign, warn or inform the unsuspecting public. Monsanto's reckless conduct warrants an award of aggravated damages.

149.    As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiffs have suffered and continue to suffer grave injuries, and have endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## SECOND CAUSE OF ACTION
## STRICT LIABILITY (FAILURE TO WARN)

150.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding

paragraphs as if fully stated herein.

151.    Plaintiffs bring this strict liability claim against Monsanto for failure to warn.

152.    At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, , which are defective and unreasonably dangerous to consumers, including Plaintiffs, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Monsanto.

152.    Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiffs, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

153.    At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn the Plaintiffs of the dangers associated with Roundup® use and exposure. Monsanto, as manufacturer, seller, promoter, marketer, or distributor of chemical herbicides are held to the knowledge of an expert in the field.

154.    At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

155.    At all times relevant to this litigation, Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who

would foreseeably use or be harmed by these herbicides, including Plaintiffs.

156.    Despite the fact that Monsanto knew or should have known that Roundup® posed a

grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with

use and exposure. The dangerous propensities of these products and the carcinogenic characteristics

of glyphosate, as described above, were known to Monsanto, or scientifically knowable to Monsanto

through appropriate research and testing by known methods, at the time they distributed, marketed,

promoted, supplied or sold the product, and not known to end users and consumers, such as Plaintiffs.

157.    These products created significant risks of serious bodily harm to consumers, as

alleged herein, and Monsanto failed to adequately warn consumers and reasonably foreseeable users

of the risks of exposure to its products. Monsanto has wrongfully concealed information concerning

the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or

misleading statements concerning the safety of Roundup® and glyphosate.

158.    At all times relevant to this litigation, Roundup® products reached the intended

consumers, handlers, and users or other persons coming into contact with these products in Missouri

and throughout the United States, including Plaintiffs, without substantial change in

their condition as designed, manufactured, sold, distributed, labeled, promoted and marketed by

Monsanto.

159.    Plaintiffs were exposed to Roundup® products in the course of their personal use on

his garden and lawn, without knowledge of their dangerous characteristics.

160.    At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use

of Roundup® products in their intended or reasonably foreseeable manner without knowledge of

their dangerous characteristics.

161.    Plaintiffs could not have reasonably discovered the defects and risks associated with

Roundup® or glyphosate-containing products prior to or at the time of Plaintiffs' exposure. Plaintiffs

relied upon the skill, superior knowledge, and judgment of Monsanto.

162.    These product were defective because the minimal warnings disseminated with

27

Roundup® products were inadequate, and they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and landscaping applications.

163.   The information that Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiffs to utilize the products safely and with adequate protection. Instead, Monsanto disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

164.   To this day, Monsanto has failed to adequately and accurately warn of the true risks of Plaintiffs' injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

165.   As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed, marketed, and promoted by Monsanto, and used by Plaintiffs in their work.

166.   Monsanto is liable to Plaintiff for injuries caused by their negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of these products and the risks associated with the use of or exposure to Roundup® and glyphosate.

166.   The defects in Roundup® products caused or contributed to cause Plaintiffs' injuries, and, but for this misconduct and omissions, Plaintiffs would not have sustained their injuries.

167.   Had Monsanto provided adequate warnings and instructions and properly disclosed

and disseminated the risks associated with Roundup® products, Plaintiffs could have avoided the risk of developing injuries as alleged herein.

168.    As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiffs have suffered severe injuries and have endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

### THIRD CAUSE OF ACTION
### NEGLIGENCE

169.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

170.    Monsanto, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiffs.

171.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

172.    At all times relevant to this litigation, Monsanto s had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active

ingredient glyphosate.

173.    At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

174.    Accordingly, at all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with Plaintiffs' injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiffs.

175.    Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

176.    As such, Monsanto breached the duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Monsanto manufactured, marketed, promoted, and sold defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

177.    Despite an ability and means to investigate, study, and test these products and to provide adequate warnings, Monsanto has failed to do so. Indeed, Monsanto has wrongfully concealed information and have further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

178.    Monsanto was negligent in the following respects:

(a)    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and

adequate pre- and post-market testing;

(b)     Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

(c)     Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

(d)     Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

(e)     Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

(f)     Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Monsanto could reasonably foresee would use and be exposed to its Roundup® products;

(g)     Failing to disclose to Plaintiffs, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

(h)     Failing to warn Plaintiffs, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other consumers;

(i)     Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate- containing

products;

     (j)   Representing that its Roundup® products were safe for their intended use when, in fact, Monsanto knew or should have known that the products were not safe for their intended purpose;

     (k)   Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

     (l)   Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

     (m)   Continuing to disseminate information to its consumers, which indicate or imply that Monsanto's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

     (n)   Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

     179.   Monsanto knew and/or should have known that it was foreseeable that consumers such as Plaintiff would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup®.

     180.   Plaintiffs did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

     181.   Monsanto's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiffs suffered, as described herein.

     182.   Monsanto's conduct, as described above, was reckless. Monsanto regularly risked the lives of consumers and users of their products, including Plaintiffs, with full knowledge of the dangers of these products. Monsanto has made conscious decisions not to redesign, re-label, warn,

or inform the unsuspecting public, including Plaintiffs. Monsanto's reckless conduct therefore

warrants an award of aggravated or punitive damages.

183.    As a proximate result of Monsanto's wrongful acts and omissions in placing defective

Roundup® products into the stream of commerce without adequate warnings of the hazardous and

carcinogenic nature of glyphosate, Plaintiffs have suffered severe and permanent physical and

emotional injuries.    Plaintiffs have endured pain and suffering, has suffered economic losses

(including significant expenses for medical care and treatment) in an amount to be determined.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's

favor for compensatory and punitive damages, together with interest, costs herein incurred,

attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands

a jury trial on all issues contained herein.

### FOURTH CAUSE OF ACTION
### FRAUD, MISREPRESENTATION, AND SUPPRESION

184.    Plaintiffs incorporate by reference all of the above paragraphs as if set forth in full

herein, particularly Paragraphs 99-122 which detail fraud with specificity.

185.    Defendant fraudulently, intentionally, and/or negligently misrepresented to the public,

and to the Plaintiffs, both directly and by and through the media, the scientific literature and purported

"community outreach" programs, the safety of Roundup products, and/or fraudulently, intentionally,

and/or negligently concealed, suppressed, or omitted material, adverse information regarding the

safety of Roundup.

186.    The intentional and/or negligent misrepresentations and omissions of Defendant

regarding the safety of Roundup products were communicated to Plaintiffs directly through

ghostwritten articles, editorials, national and regional advertising, marketing and promotion efforts,

as well as the packaging and sales aids. The safety of Roundup products was also intentionally and/or

negligently misrepresented to Plaintiffs and the public with the intent that such misrepresentations

would cause Plaintiffs and other potential consumers to purchase and use or continue to purchase and

33

use Roundup products.

187.     Defendant either knew or should have known of the material representations they were making regarding the safety and relative utility of Roundup products.

188.     Defendant fraudulently, intentionally, and/or negligently made the misrepresentations and/or actively concealed, suppressed, or omitted this material information with the specific desire to induce Plaintiffs, and the consuming public to purchase and use Roundup products. Defendant fraudulently, intentionally, and/or negligently, knew or should have known that Plaintiffs and the consuming public would rely on such material misrepresentations and/or omissions in selecting and applying Roundup products. Defendant knew or should have known that Plaintiffs would rely on their false representations and omissions.

189.     Defendant made these misrepresentations and actively concealed adverse information including the risk of non-Hodgkin lymphoma, at a time when, their agents and/or employees knew or should have known, the product had defects, dangers, and characteristics that were other than what was represented to the consuming public. Specifically, Osborn & Barr misrepresented and actively concealed, suppressed, and omitted that there had been inadequate testing of the safety and efficacy of Roundup, and that prior studies, research, reports, and/or testing had been conducted linking the use of the drug with serious health events, including non-Hodgkin lymphoma.

190.     Despite the fact that Defendant knew or should have known of reports of severe risks including non-Hodgkin lymphoma, with Roundup use and exposure, this information was strategically minimized, understated, or omitted in order to create the impression that the human dangers of Roundup were nonexistent, particularly in light of its purported utility.

191.     The fraudulent, intentional and/or negligent material misrepresentations and/or active concealment, suppression, and omissions by Defendant were perpetuated directly and/or indirectly through the advertisements, packaging, sales aids, furtive public relations efforts, and other marketing and promotional pieces authored, analyzed, created, compiled, designed, drafted, disseminated, distributed, edited, evaluated, marketed, published, and supplied by Osborn & Barr.

34

192.    If Plaintiffs had known the true facts concerning the risks associated with Roundup exposure, Plaintiffs would have used a safer alternative.

193.    Plaintiffs reliance upon the material misrepresentations and omissions was justified, among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Roundup while Plaintiffs were not in a position to know the true facts because Defendant overstated the benefits and safety of Roundup and downplayed the risk of lymphoma, thereby inducing Plaintiffs to use the herbicide rather than safer alternatives.

194.    As a direct and proximate result of Defendant' actions and inactions, Plaintiffs were exposed to Roundup and suffered and will continue to suffer injuries and damages, as set forth herein.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## FIFTH CAUSE OF ACTION
## VIOLATION OF THE CONSUMER FRAUD ACTS

195.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

196.    Plaintiff brings this cause of action pursuant to California Business & Professions Code § 17500, California Civil Code §§ 1750 et. seq., and Tennessee Consumer Protection Act, Tenn. Code. Ann. §§ 47-18-101, et seq.

197.    Defendant fraudulently, intentionally, negligently, and/or innocently misrepresented to the public, and to the Plaintiffs, both directly and by and through the media and purported "community outreach" programs, the safety of Roundup products, and/or fraudulently, intentionally, negligently and/or innocently concealed, suppressed, or omitted material, adverse information regarding the safety of Roundup. This deception caused injury to Plaintiff in violation of the

Consumer Fraud Act of the Plaintiffs' home states which create private rights of action by the Plaintiffs.

198.    The intentional, negligent, and/or innocent misrepresentations and omissions of Defendant regarding the safety of Roundup products were communicated to Plaintiffs directly through national and regional advertising, marketing and promotion efforts, as well as the packaging and sales aids. The safety of Roundup products was also intentionally, negligently, and/or innocently misrepresented to Plaintiffs and the public with the intent that such misrepresentations would cause Plaintiffs and other potential consumers to purchase and use or continue to purchase and use Roundup products.

199.    Defendant either knew or should have known of the material representations they were making regarding the safety and relative utility of Roundup products.

200.    Defendant fraudulently, intentionally, negligently, and/or innocently made the misrepresentations and/or actively concealed, suppressed, or omitted this material information with the specific desire to induce Plaintiffs, and the consuming public to purchase and use Roundup products. Defendant fraudulently, intentionally, negligently, and/or innocently, knew or should have known that Plaintiffs and the consuming public would rely on such material misrepresentations and/or omissions in selecting and applying Roundup products. Defendant knew or should have known that Plaintiffs would rely on their false representations and omissions.

201.    Defendant made these misrepresentations and actively concealed adverse information including the risk of non-Hodgkin lymphoma, at a time when, their agents and/or employees knew or should have known, the product had defects, dangers, and characteristics that were other than what was represented to the consuming public. Specifically, Defendant misrepresented and actively concealed, suppressed, and omitted that there had been inadequate testing of the safety and efficacy of Roundup, and that prior studies, research, reports, and/or testing had been conducted linking the use of the drug with serious health events, including non- Hodgkin lymphoma.

202.    Despite the fact that Defendant knew or should have known of reports of severe risks

including non-Hodgkin lymphoma, with Roundup use and exposure, this information was strategically minimized, understated, or omitted in order to create the impression that the human dangers of Roundup were nonexistent, particularly in light of its purported utility.

203.    The fraudulent, intentional, negligent and/or innocent material misrepresentations and/or active concealment, suppression, and omissions by Defendant were perpetuated directly and/or indirectly through the advertisements, packaging, sales aids, furtive public relations efforts, and other marketing and promotional pieces authored, analyzed, created, compiled, designed, drafted, disseminated, distributed, edited, evaluated, marketed, published, and supplied by Defendant.

204.    If Plaintiffs had known the true facts concerning the risks associated with Roundup exposure, Plaintiffs would have used a safer alternative.

205.    Plaintiffs reliance upon the material misrepresentations and omissions was justified, among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Roundup while Plaintiffs were not in a position to know the true facts because Defendant overstated the benefits and safety of Roundup and downplayed the risk of lymphoma, thereby inducing Plaintiffs to use the herbicide rather than safer alternatives.

206.    Federal law and the EPA do not authorize and specifically prohibit the deceptions, misrepresentations and omissions made by Defendant.

207.    As a direct and proximate result of Defendant' actions and inactions, Plaintiffs were exposed to Roundup and suffered and will continue to suffer injuries and damages, as set forth herein.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## SIXTH CAUSE OF ACTION
## LOSS OF CONSORTIUM

208.   Plaintiffs repeat and reiterate the allegations previously set forth herein.

209.   Plaintiffs spouses were entitled to the comfort, care, affection, companionship, services, society, advice, guidance, counsel, and consortium of their spouses.

210.   As a direct and proximate result of one or more of those wrongful acts or omissions of the Defendant described above, Plaintiffs have been and will be deprived of the comfort, care, affection, companionship, services, society, advice, guidance, counsel and consortium.

WHEREFORE, Plaintiffs demand judgment against Defendant for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

WHEREFORE, Plaintiffs pray for judgment against Defendant as hereinafter set forth.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against the Defendant on each of the above-referenced claims and causes of action and as follows:

1.   Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

2.   Awarding compensatory damages to Plaintiff for past and future damages, including, but not limited to, Plaintiff's pain and suffering and for severe and permanent personal injuries sustained by the Plaintiff including health care costs and economic loss;

3.   Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action;

4.   Pre-judgment interest;

5.   Post-judgment interest;

6.   Awarding Plaintiff reasonable attorneys' fees;

7.        Awarding Plaintiff the costs of these proceedings; and

8.        Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all issues.

Dated:  12-13-2018

Respectfully submitted,

**BROWN & CROUPPEN, P.C.**
*/s/ Seth S. Webb*
Seth S. Webb #51236
211 North Broadway, Suite 1600
St. Louis, MO 63102
sethw@getbc.com
(314) 222-2222 telephone
(314) 421-0359 facsimile
Attorneys for Plaintiffs