# EXHIBIT 1

19SL-CC00092

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

**IN THE CIRCUIT COURT OF ST. LOUIS COUNTY**
**STATE OF MISSOURI**

**RONALD BERNARD BROMLEY;**
**BRUCE WANYE BUDROW; SAMUEL**
**LOUIS CRACCHIOLA; NATHAN LEE**
**DAVIS; MICHAEL WALTER**
**DEVEREUAX; KATHLEEN ANN**
**DICKENSON; MARIA MARGARETE**
**HOWARD; WENDY JEAN ISBELL;**
**SABRINA LYNN KEENE; WALTER**
**HENRY LEE; ROBERT MENARD**
**LYNCH; MICHAEL JOSPEH**
**MCALOON; TRON CHRISTOPHER**
**PAGE; AND ERNEST LEROY**
**SHARPE,**

      **Plaintiffs,**

**v.**

**MONSANTO COMPANY,**
      **Defendant.**
**Serve:  Registered Agent**
**CSC of St. Louis County, Inc.**
**130 South Bemiston Avenue Suite 700**
**Clayton, MO  63105**

**Case No.:** _____

**JURY TRIAL DEMANDED**

**PETITION**

COME NOW, Plaintiffs, by and through their undersigned counsel, and for their causes of

action against Defendant Monsanto Company, alleging the following upon information and belief

(including investigation made by and through Plaintiffs' counsel), except those allegations that

pertain to Plaintiffs, which are based on personal knowledge:

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

## INTRODUCTION

Plaintiffs bring this cause of action against Defendant pursuant to Rule 52.05(a) of the Missouri Rules of Civil Procedure, as their claims arise out of the same series of transactions and occurrences, and their claims involve common questions of law and/or fact.  All claims in this action are a direct and proximate result of Defendant's negligent, willful, and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, and/or sale of the products known as Roundup®.  All Plaintiffs in this action seek recovery for damages as a result of developing a form of Non-Hodgkin's Lymphoma ("NHL"), which was directly and proximately caused by such wrongful conduct by Defendant, the unreasonably dangerous and defective nature of Roundup®, and its active ingredient, glyphosate, and/or its surfactant(s) or other ingredients and the attendant effects of developing NHL.  All of the claims involve common questions of law and fact and share legal and medical issues that arise out of all of the Plaintiffs' exposure to Roundup®.

## THE PARTIES

### PLAINTIFFS

### *Roland Bernard Bromley*

1.      Plaintiff Roland B. Bromley is a citizen of the State of North Dakota and was born on September 18, 1951.  Plaintiff Bromley resides in the City of Drake, County of McHenry.

2.      Plaintiff Bromley was exposed to Roundup® in McHenry County, North Dakota beginning in 1979 through 1987 while applying Roundup® in the tree rows in his fields.  Plaintiff Bromley sprayed Roundup® once a year, one to two days every year.  Each application took approximately eight to ten hours each day.  Plaintiff Bromley sprayed concentrate Roundup®

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

which he mixed himself in a 200-gallon tank.  Plaintiff Bromley purchased Roundup® at the local farm supply store.

3.      Plaintiff Bromley was further exposed to Roundup® in McHenry County, North Dakota beginning in 1994 through 2006 while applying Roundup® on his crops.  Plaintiff Bromley sprayed Roundup® two times each year.  Each application took approximately four to five days, five hours each day.  Plaintiff Bromley used concentrate Roundup® which he mixed himself in a spray coupe.  Plaintiff Bromley purchased Roundup® at the local farm supply store.

4.      On or about January 17, 2017, Plaintiff Bromley was diagnosed with large B-cell lymphoma in Bismarck, North Dakota at St. Alexius Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

5.      As a direct and proximate result of these injuries, Plaintiff Bromley has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Bromley has otherwise been damaged in a personal and pecuniary nature.

6.      During the entire time that Plaintiff Bromley was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Bruce Wayne Budrow

7.      Plaintiff Bruce W. Budrow is a citizen of the State of Utah and was born on December 24, 1952.  Plaintiff Budrow resides in the City of Riverdale, County of Weber.

8.      Plaintiff Budrow was exposed to Roundup® in Ogden, Utah beginning in 1976 through 1997 while applying Roundup® around his residence, fences, walkways, landscaping and

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

outbuildings.   Plaintiff Budrow sprayed Roundup® every year beginning in March through September, two times each month.  Each application took approximately one hour.  Plaintiff Budrow sprayed concentrate and premixed ready to use Roundup® which he purchased at Home Depot and Lowe's.

9.     Plaintiff Budrow was further exposed to Roundup® in Riverdale, Utah beginning in the fall of 1997 through 2017 while applying Roundup® around his residence, landscaping and walkways. Plaintiff Budrow sprayed Roundup® every year beginning in March through September, approximately one time each week. Each application took approximately one to two hours.  Plaintiff Budrow used concentrate and premixed ready to use Roundup® which he purchased at Lowe's and Home Depot.

10.     On or about July 10, 2008, Plaintiff Budrow was diagnosed with large B-cell lymphoma in Salt Lake City, Utah at University of Utah Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

11.     As a direct and proximate result of these injuries, Plaintiff Budrow has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Budrow has otherwise been damaged in a personal and pecuniary nature.

12.     During the entire time that Plaintiff Budrow was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

### Samuel Louis Cracchiola

13.     Plaintiff Samuel L. Cracchiola is a citizen of the State of Nevada and was born on March 14, 1958.  Plaintiff Cracchiola resides in the City of Henderson, County of Clark.

14.     Plaintiff Cracchiola was exposed to Roundup® in Clark County, Nevada beginning in 1995 through 2017 applying Roundup® while working in his lawn maintenance business. Plaintiff Cracchiola sprayed Roundup® every year beginning in March through September, approximately every other week.  Each application took approximately thirty to forty minutes. Plaintiff Cracchiola used concentrate and granular Roundup® which he mixed himself in a backpack sprayer.  Plaintiff Cracchiola purchased Roundup® at the local irrigation company.

15.     On or about December 11, 2008, Plaintiff Cracchiola was diagnosed with B-cell lymphoma in Henderson, Nevada at the Las Vegas Cancer Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

16.     As a direct and proximate result of these injuries, Plaintiff Cracchiola has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Cracchiola has otherwise been damaged in a personal and pecuniary nature.

17.     During the entire time that Plaintiff Cracchiola was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

*Nathan Lee Davis*

18.     Plaintiff Nathan L. Davis is a citizen of the State of Montana and was born on April 26, 1954.  Plaintiff Davis resides in the City of Harlowton, County of Wheatland.

19.     Plaintiff Davis was exposed to Roundup® in Two Dot, Montana beginning in 1974 through 1976 applying Roundup® while working on a ranch.  Plaintiff Davis sprayed Roundup® along seven miles of river bank and spot sprayed hayfields approximately fifteen days each year, eight to ten hours each day.  Plaintiff Davis used concentrate Roundup® which he mixed in a 100-gallon tank mounted on a trailer supplied by his employer.

20.     Plaintiff Davis was further exposed to Roundup® in Harlowton, Montana beginning in 1977 through 1987 during the summer of each year.  Plaintiff Davis repaired hoses and equipment used to spray Roundup® in Wheatland County getting Roundup® on his skin and clothes on a regular basis.

21.     Plaintiff Davis was further exposed to Roundup® in Harlowton, Montana beginning in 1978 through 2016 while applying Roundup® around his residence, driveways, walkways and gravel.  Plaintiff Davis sprayed Roundup® every year one to two times each summer.  Each application took approximately thirty minutes.  Plaintiff Davis used premixed ready to use Roundup® which he purchased at the local hardware store.

22.     On or about December 27, 1985, Plaintiff Davis was diagnosed with large non-cleaved lymphoma in Billings, Montana at Saint Vincent Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

23.     As a direct and proximate result of these injuries, Plaintiff Davis has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Davis has otherwise been damaged in a personal and pecuniary nature.

24.     During the entire time that Plaintiff Davis was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Michael Walter Devereaux

25.     Plaintiff Michael W. Devereaux is a citizen of the State of Michigan and was born on November 27, 1948.  Plaintiff Devereaux resides in the City of Greenville, County of Montcalm.

26.     Plaintiff Devereaux was exposed to Roundup® in Stanton, Michigan beginning in 1980 through 1992 while working on a tree farm.  Plaintiff Devereaux applied Roundup® around sixty acres of trees.  Plaintiff Devereaux sprayed Roundup® every year beginning in April through October, approximately five to six days each month, eight hours each day.  Plaintiff Devereaux sprayed concentrate Roundup® with a backpack sprayer supplied by his employer.

27.     Plaintiff Devereaux was further exposed to Roundup® in Greenville, Michigan beginning in 1980 through 2018 while applying Roundup® around his residence, walkway, driveway, landscaping and outbuildings. Plaintiff Devereaux sprayed Roundup® every year beginning in April through October, once each month. Each application took approximately forty-five minutes to one hour.  Plaintiff Devereaux sprayed premixed ready to use Roundup® purchased at a local retailer.

28.     On or about April 15, 2013, Plaintiff Devereaux was diagnosed with follicular lymphoma in Grand Rapids, Michigan at Mercy Health Saint Mary's, and suffered the effects

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

29.     As a direct and proximate result of these injuries, Plaintiff Devereaux has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Devereaux has otherwise been damaged in a personal and pecuniary nature.

30.     During the entire time that Plaintiff Devereaux was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### *Kathleen Ann Dickenson*

31.     Plaintiff Kathleen A. Dickenson is a citizen of the State of Washington and was born on August 22, 1940.  Plaintiff Dickenson resides in the City of Lacey, County of Thurston.

32.     Plaintiff Dickenson was exposed to Roundup® in Edmonds, Washington beginning in 1985 through 2003 while applying Roundup® around her residence, walkways, driveway, patios and landscaping.  Plaintiff Dickenson sprayed Roundup® every year beginning in May through September each week. Each application took approximately one and ½ hours.  Plaintiff Dickenson used concentrate Roundup® which she mixed in a handheld pump sprayer and premixed ready-to-use Roundup®.  Plaintiff Dickenson purchased Roundup® at Lowe's and Home Depot.

33.     On or about July 28, 1997, Plaintiff Dickenson was diagnosed with marginal zone B-cell lymphoma in Seattle, Washington at Fred Hutchinson Research Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research,

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

34.     As a direct and proximate result of these injuries, Plaintiff Dickenson has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Dickenson has otherwise been damaged in a personal and pecuniary nature.

35.     During the entire time that Plaintiff Dickenson was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

### *Maria Margarete Howard*

36.     Plaintiff Maria M. Howard is a citizen of the State of Ohio and was born on January 24, 1955.  Plaintiff Howard resides in the City of Hamilton, County of Butler.

37.     Plaintiff Howard was exposed to Roundup® in Hamilton, Ohio beginning in 1982 through 2013 while applying Roundup® around her residence, landscaping, garden, walkways, driveway and outbuilding.  Plaintiff Howard sprayed Roundup® every year beginning in May through September, one to two times each month.  Each application took approximately forty-five minutes to one hour.  Plaintiff Howard sprayed concentrate Roundup® which she mixed in a handheld pump sprayer.  Plaintiff Howard purchased Roundup® at Lowe's and Wal-Mart.

38.     On or about May 20, 2014, Plaintiff Howard was diagnosed with follicular lymphoma in Fairfield, Ohio at Mercy Health Fairfield, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

39.     As a direct and proximate result of these injuries, Plaintiff Howard has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Howard has otherwise been damaged in a personal and pecuniary nature.

40.     During the entire time that Plaintiff Howard was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

*Wendy Jean Isbell*

41.     Plaintiff Wendy J. Isbell is a citizen of the State of Alaska and was born on October 24, 1964.  Plaintiff Isbell resides in the City of Anchorage, Borough of Anchorage.

42.     Plaintiff Isbell was exposed to Roundup® in Anchorage, Alaska, beginning in 1995 through 2007 while applying Roundup® around her residence, landscaping, sidewalk and driveway.  Plaintiff Isbell sprayed Roundup® every year typically two times during the summer. Each application took approximately thirty minutes.  Plaintiff Isbell sprayed premixed, ready to use Roundup®.  Plaintiff purchased Roundup® at the local hardware store and Lowe's.

43.     Plaintiff Isbell was further exposed to Roundup® in Forsyth, Montana beginning in 1995 through 2013 while applying Roundup® around her parents' residence, outbuildings, landscaping, flowerbeds and driveway. Plaintiff Isbell sprayed Roundup® every year approximately four times each summer. Each application took approximately one hour.  Plaintiff Isbell sprayed concentrate Roundup® which she mixed in a hand-held pump sprayer. Plaintiff Isbell's parents purchased Roundup® at the local hardware store.

44.     On or about September 6, 2006, Plaintiff Isbell was diagnosed with follicular lymphoma in Anchorage, Alaska at Anchorage Alaska Regional Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

45.     As a direct and proximate result of these injuries, Plaintiff Isbell has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Isbell has otherwise been damaged in a personal and pecuniary nature.

46.     During the entire time that Plaintiff last name was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

### Sabrina Lynn Keene

47.     Plaintiff Sabrina L. Keene is a citizen of the State of Oregon and was born on April 22, 1963.  Plaintiff Keene resides in the City of Eugene, County of Lane.

48.     Plaintiff Keene was exposed to Roundup® in Eugene, Oregon beginning in 2000 through 2016 while applying Roundup® around her residence, gardens, fruit trees, walkway and outbuilding.  Plaintiff Keene sprayed Roundup® every year beginning in May through August, each week.  Each application took approximately twenty to thirty minutes.  Plaintiff Keene used concentrate Roundup® which she mixed in a handheld pump sprayer.  Plaintiff Keene purchased Roundup® at Walmart and the local home improvement center.

49.     On or about June 14, 2011, Plaintiff Keene was diagnosed with non-Hodgkin's B-cell lymphoma in Eugene, Oregon at Riverbend Sacred Heart Medical Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research,

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

50.    As a direct and proximate result of these injuries, Plaintiff Keene has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Keene has otherwise been damaged in a personal and pecuniary nature.

51.    During the entire time that Plaintiff Keene was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

### *Walter Henry Lee*

52.    Plaintiff Walter H. Lee is a citizen of the State of Nebraska and was born on March 23, 1952.  Plaintiff Lee resides in the City of Omaha, County of Douglas.

53.    Plaintiff Lee was exposed to Roundup® in Omaha, Nebraska beginning in 1987 through 2000 while applying Roundup® around his residence, walkways, driveway and landscaping.  Plaintiff Lee sprayed Roundup® every year beginning in May through August, approximately one to two times each month. Each application took approximately two hours. Plaintiff Lee used concentrate Roundup® which he mixed in a handheld pump sprayer and premixed ready to use Roundup®.  Plaintiff Lee purchased Roundup® at Home Depot and the local hardware store.

54.    Plaintiff Lee was further exposed to Roundup® in Omaha, Nebraska beginning in 1996 through 1998 while applying Roundup® around a retirement center, walkways, driveway and landscaping. Plaintiff Lee sprayed Roundup® beginning in May through August, approximately every two weeks. Each application took approximately three hours.  Plaintiff Lee sprayed concentrate Roundup® which he mixed in a handheld pump sprayer supplied by his employer.

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

55.     Plaintiff Lee was further exposed to Roundup® in Tulsa, Oklahoma beginning in 1998 through 2001 while applying Roundup® around a hotel, landscaping and parking lot. Plaintiff Lee sprayed Roundup® beginning in May through August, approximately every two weeks. Each application took two to three hours.  Plaintiff Lee sprayed premixed ready to use Roundup® supplied by his employer.

56.     Plaintiff Lee was further exposed to Roundup® in Omaha, Nebraska beginning in 2005 through 2014 while applying Roundup® around his residence, walkways, driveway, landscaping and outbuilding. Plaintiff Lee sprayed Roundup® beginning in May through August, approximately two times each month. Each application took approximately two hours.  Plaintiff Lee sprayed concentrate Roundup® which he mixed in a handheld pump sprayer.  Plaintiff Lee purchased Roundup® at Home Depot and the local hardware store.

57.     On or about March 16, 2016, Plaintiff Lee was diagnosed with diffuse large B-cell lymphoma / follicular lymphoma in Omaha, Nebraska at VA NWIHC's Omaha Division, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

58.     As a direct and proximate result of these injuries, Plaintiff Lee has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Lee has otherwise been damaged in a personal and pecuniary nature.

59.     During the entire time that Plaintiff Lee was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

### Robert Menard Lynch

60.     Plaintiff Robert M. Lynch is a citizen of the State of Connecticut and was born on May 27, 1952.  Plaintiff Lynch resides in the City of New Milford, County of Litchfield.

61.     Plaintiff Lynch was exposed to Roundup® in New Milford, Connecticut beginning in 1987 through 2017 while applying Roundup® around his residence, walkways, driveway and landscaping.  Plaintiff Lynch sprayed Roundup® each year beginning in May through August, approximately once each month. Each application took thirty minutes.  Plaintiff Lynch used concentrate Roundup® which he mixed himself in a handheld pump sprayer.  Plaintiff Lynch purchased Roundup® at Home Depot and the local hardware store.

62.     On or about September 28, 2016, Plaintiff Lynch was diagnosed with small lymphocyte lymphoma in New York City, New York at Memorial Hospital for Cancer & Allied Diseases, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

63.     As a direct and proximate result of these injuries, Plaintiff Lynch has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Lynch has otherwise been damaged in a personal and pecuniary nature.

64.     During the entire time that Plaintiff Lynch was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

### Michael Joseph McAloon

65.     Plaintiff Michael J. McAloon is a citizen of the State of Rhode Island and was born on August 21, 1946.  Plaintiff McAloon resides in the City of Warwick, County of Kent.

66.     Plaintiff McAloon was exposed to Roundup® in Warwick, Rhode Island beginning in 1976 through the spring of 2018 while applying Roundup® around his residence, walkways, driveway, gutters, landscaping, and outbuilding.  Plaintiff McAloon sprayed Roundup® every year beginning in May through October, approximately every two weeks.  Each application took approximately thirty minutes.  Plaintiff McAloon used premixed, ready-to-use Roundup® which he purchased at Lowe's.

67.     On or about May 25, 2006, Plaintiff McAloon was diagnosed with non-Hodgkin's large cell lymphoma in Warwick, Rhode Island at Kent Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

68.     As a direct and proximate result of these injuries, Plaintiff McAloon has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff McAloon has otherwise been damaged in a personal and pecuniary nature.

69.     During the entire time that Plaintiff McAloon was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Tron Christopher Page

70.     Plaintiff Tron C. Page is a citizen of the State of South Carolina and was born on November 4, 1971.  Plaintiff Page resides in the City of Lake View, County of Dillon.

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

71.     Plaintiff Page was exposed to Roundup® in Lakeview, South Carolina beginning in 1981 through 1990 while applying Roundup® on his family's 300-acre farm with a tractor and 300-gallon tank sprayer/drip sprayer.  Plaintiff Page applied Roundup® two times each year. Each application took approximately fifteen to twenty days, 8 hours each day.  Plaintiff Page used concentrate Roundup® which he mixed himself under the direction of his father.  Plaintiff Page's father purchased Roundup® at the local farm supply store.

72.     Plaintiff Page was further exposed to Roundup® in Lakeview, South Carolina beginning in 1997 through 2016 while applying Roundup® around his residence, walkway, driveway and landscaping.  Plaintiff Page applied Roundup® every year beginning in April through September, once each month.  Each application took approximately one hour.  Plaintiff Page used concentrate Roundup® which he mixed himself in a handheld pump sprayer.   Plaintiff Page purchased Roundup® at Lowe's and Walmart.

73.     On or about April 4, 2012, Plaintiff Page was diagnosed with diffuse large B-cell lymphoma in Florence, South Carolina at McLeod Regional Medical Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

74.     As a direct and proximate result of these injuries, Plaintiff Page has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Page has otherwise been damaged in a personal and pecuniary nature.

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

75.     During the entire time that Plaintiff Page was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### *Ernest Leroy Sharpe*

76.     Plaintiff Ernest L. Sharpe is a citizen of the State of North Carolina and was born on February 17, 1955.  Plaintiff Sharpe resides in the City of Fayetteville, County of Cumberland.

77.     Plaintiff Sharpe was exposed to Roundup® in St. Paul, North Carolina   beginning in 1994 through 1995 while applying Roundup® around his residence, walkways, driveway, landscaping and outbuilding.  Plaintiff Sharpe sprayed Roundup® every year beginning in March through September, one to two times each month. Each application took approximately one to one and ½ hours.  Plaintiff Sharpe used concentrated Roundup® which he mixed himself in a backpack sprayer.  Plaintiff Sharpe purchased Roundup® at Lowe's and the local farm supply store.

78.     Plaintiff Sharpe was further exposed to Roundup® in Fayetteville, North Carolina from 1996 through 2017 while applying Roundup® around his residence, walkways, driveway, landscaping and outbuilding. Plaintiff Sharpe sprayed Roundup® every year beginning in March through September, one to two times each month. Each application took approximately 45 minutes.  Plaintiff Sharpe used concentrated Roundup® which he mixed himself in a backpack sprayer.  Plaintiff Sharpe purchased Roundup® at Lowe's and the local farm supply store.

79.     Plaintiff Sharpe was exposed to Roundup® in Sanford, North Carolina   beginning in 2006 through 2016 while applying Roundup® around his residence, walkways, driveway, landscaping, outbuilding, carport and pool.   Plaintiff Sharpe sprayed Roundup® every year beginning in March through September, one to two times each month. Each application took approximately 30 minutes.  Plaintiff Sharpe used concentrated Roundup® which he mixed himself in a backpack sprayer.  Plaintiff Sharpe purchased Roundup® at Lowe's.

Electronically Filed - St. Louis County - January 08, 2019 - 02:33 PM

80.     Plaintiff Sharpe was exposed to Roundup® in Fayetteville, North Carolina beginning in 2012 through 2016 while applying Roundup® around a funeral home and cemetery. Plaintiff Sharpe sprayed Roundup® every year, once each month. Each application took approximately 5 days, 7 hours each day.  Plaintiff Sharpe used concentrated Roundup® which he mixed himself in a backpack sprayer.  Plaintiff Sharpe's employer purchased Roundup® at the local farm supply store.

81.     On or about July 26, 2001, Plaintiff Sharpe was diagnosed with follicular lymphoma in Durham, North Carolina at Durham VA Medical Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

82.     As a direct and proximate result of these injuries, Plaintiff Sharpe has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Sharpe has otherwise been damaged in a personal and pecuniary nature.

83.     During the entire time that Plaintiff Sharpe was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### DEFENDANT MONSANTO

84.     Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.  At all relevant times, Monsanto also regularly conducted, transacted, and solicited business in St. Louis, Missouri, as

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

well as in all States of the United States. Monsanto's world headquarters are located at 800 Lindbergh Boulevard in St. Louis, Missouri, County of St. Louis.

85.     At all times relevant to this Petition, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup® products, which contains the active ingredient glyphosate and surfactants including Polyethoxylated tallow amine (POEA), as well as adjuvants and other "inert" ingredients.  On information and belief, important scientific, manufacturing, marketing, sales and other business decisions regarding Roundup® were made from and in the State of Missouri and contributed to Defendant's wrongdoing as to each plaintiff herein.

86.     At all times relevant to this Petition, Monsanto was engaged in the business of manufacturing, marketing, testing, promoting, selling, and/or distributing Roundup® in the State of Missouri.

87.     At all relevant times, Monsanto had, and continues to have, regular and systematic contact with and conducts business in and from the State of Missouri, such that it has purposefully availed itself of the laws of the State and expects to both sue and be sued in Missouri.  Further, Monsanto's agent for services of process is located in St. Louis County.   In the alternative, Monsanto's presence in the State of Missouri satisfies the due process requirements for Missouri courts to exercise jurisdiction over it.   In the alternative, Monsanto's domicile in the State of Missouri satisfies the due process requirements for Missouri courts to exercise jurisdiction over it.

88.     Moreover, Defendant is further subject to the personal jurisdiction of this state and court in that Defendant has purposefully and systematically selected the State of Missouri as its venue of choice when suing its own customers or seeking relief for its own interests, having filed over 100 cases in the State of Missouri.

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

89.     Defendant's development, marketing, promotion, labeling, and packaging analyses and decisions for its Roundup® occurred in and came from St. Louis, Missouri, which is also the location where Defendant worked on the regulatory approval for Roundup®.  The cause of action for each plaintiff herein related to or arose from Defendant's Missouri-based conduct.

## VENUE

90.     Plaintiffs were first injured outside the state of Missouri.  Therefore, venue is proper in this Court pursuant to Mo. Rev. Stat. § 508.010.5, which provides:

> Notwithstanding any other provisions of law, in all actions in which there is any count alleging a tort and in which the plaintiff was first injured outside the state of Missouri, venue shall be determined as follows:
>
> (1) If the defendant is a corporation, then venue shall be in any county where a defendant corporation's registered agent is located or, if the plaintiff's principal place of residence was in the state of Missouri on the date the plaintiff was first injured, then venue may be in the county of the plaintiff's principal place of residence on the date the plaintiff was first injured;

## ALLEGATIONS COMMON TO ALL COUNTS

91.     In 1970, Defendant Monsanto discovered the herbicidal properties of glyphosate and began marketing it in products in 1974, under the brand name Roundup®.  Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. In addition to the active ingredient glyphosate, Roundup® contains surfactants including POEA and/or adjuvants and other so-called "inert" ingredients.  In 2001, glyphosate was the most-used pesticide active ingredient in American agriculture with 85–90 million pounds used annually. That number grew to 185 million pounds by 2007.[1]  As of 2013, glyphosate was the world's most widely used herbicide.

---

[1] Arthur Grube, et al., U.S. Envtl. Prot. Agency, *Pesticides Industry Sales and Usage, 2006-2007 Market Estimates*,

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

92.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri, and incorporated in Delaware. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market.[2] The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming the crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.[3]

93.     Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops.[4] They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams and groundwater in agricultural areas where Roundup® is used.[5]  It has been found in food,[6] in the urine of agricultural workers[7] and even in the urine of urban dwellers who are not in direct contact with glyphosate.[8]

---

14, (2011) *available at* http://www.epa.gov/pesticides/pestsales/07pestsales/market_estimates2007.pdf.

[2] ETC Group, *Who Will Control the Green Economy?*, 22, (2011) *available at* http://www.etcgroup.org/files/publication/pdf_file/ETC_wwctge_4web_Dec2011.pdf.

[3] William Neuman and Andrew Pollack, *Farmers Cope with Roundup-Resistant Weeds*, N.Y. TIMES, May 3, 2010, *available at* http://www.nytimes.com/2010/05/04/business/energy-environment/04weed.html?pagewan.

[4] Monsanto, *Backgrounder-History of Monsanto's Glyphosate Herbicides*, (Sept. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/back_history.pdf.

[5] *See*: U.S. Geological Survey, *USGS Technical Announcement: Widely Used Herbicide Commonly Found in Rain and Streams in the Mississippi River Basin*, 2011, *available at* http://www.usgs.gov/newsroom/article.asp?ID=2909; *see also*: U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate, available at* http://www.epa.gov/safewater/pdfs/factsheets/soc/tech/glyphosa.pdf.

[6] Thomas Bohn, et al., *Compositional Differences in Soybeans on the Market: Glyphosate Accumulates in Roundup Ready GM Soybeans*, 153 FOOD CHEMISTRY, 207, (2013), *available at* http://www.sciencedirect.com/science/article/pii/S0308814613019201.

[7] John F. Acquavella, et al., *Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study*, 112(3) ENVIRONMENTAL HEALTH PERSPECTIVE, 321, (2004) *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241861/; Guyton, et al. *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon and Glyphosate*, 112 IARC Monographs , 76, section 5.4 (2015) *available at* http://dx.doi.org/10.1016/S1470-2045(15)70134-8.

[8] Dirk Brändli & Sandra Reinacher, *Herbicides found in Human Urine*, 1 ITHAKA JOURNAL, 270 (2012), *available at* http://www.ithaka-journal.net/druckversionen/e052012-herbicides-urine.pdf.

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

94.     On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

95.     On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

96.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is *probably carcinogenic to humans*. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other hematopoietic cancers, including lymphocytic lymphoma, chronic lymphocytic leukemia, B-cell lymphoma and multiple myeloma.[9]

97.     The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

98.     Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

---

[9] *See* Guyton, et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon and Glyphosate, supra.*

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

## FACTS

99.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

100.    Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking or brewing grains.

101.    For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. According to the WHO, the main chemical ingredient of Roundup®—glyphosate—is a probable cause of cancer. Those at risk include farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries and landscapers.  Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed Roundup®'s dangers. Monsanto has led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® is safe.

### The Discovery of Glyphosate and Development of Roundup®

102.    The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®.[10] From the outset, Monsanto marketed Roundup® as a

---

[10] Monsanto, *Backgrounder-History of Monsanto's Glyphosate Herbicide*, Monsanto, (Sept. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background- materials/back_history.pdf.

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

"safe" general-purpose herbicide for widespread commercial and consumer use. It still markets Roundup® as safe today.[11]

103.     In addition to the active ingredient glyphosate, Roundup® formulations also contain adjuvants and other chemicals, such as the surfactant POEA, which are considered "inert" and therefore protected as "trade secrets" in manufacturing.   Growing evidence suggests that these adjuvants and additional components of Roundup® formulations are not, in fact, inert and are toxic in their own right.

*Registration of Herbicides under Federal Law*

104.     The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale or use, except as described by the Act. 7 U.S.C. § 136a(a).

105.     Because pesticides are toxic to plants, animals and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

---

[11] Monsanto, *What is Glyphosate?* (Sept. 2, 2015),
http://www.monsanto.com/sitecollectiondocuments/glyphosate-safety-health.pdf.

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

106.    FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

107.    The EPA and the State of Missouri registered Roundup® for distribution, sale and manufacture in the United States and the State of Missouri.

108.    FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conduct the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able to perform the product tests that are required of the manufacturer.

109.    The evaluation of each pesticide product distributed, sold or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

110.    In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment —in relation to the reregistration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the World Health Organization's health-related

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

findings.  In December 2017, the EPA released a draft risk assessment for glyphosate, allowing a comment period through April 30, 2018.  The EPA is scheduled to publish the interim registration review decision for glyphosate in 2019.

### Scientific Fraud Underlying the Marketing and Sale of Glyphosate/ Roundup®

111.   Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."[12]

112.   On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

113.   In the first instance, Monsanto, in seeking initial registration of Roundup® by the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®.[13] IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

114.   In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the

---

[12] U.S. Envtl. Prot. Agency, *Memorandum, Subject: SECOND Peer Review of Glyphosate*, 1, (1991) *available at* http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_30-Oct-91_265.pdf.
[13] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories* (Sept. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/ibt_craven_bkg.pdf.

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

toxicology studies conducted for the Roundup® herbicide to be invalid.[14]  An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[15]

115.    Three top executives of IBT were convicted of fraud in 1983.

116.    In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.[16]

117.    Despite the falsity of the tests that underlie its registration, within a few years of its launch, Roundup® was being marketed in 115 countries.

### The Importance of Roundup® to Monsanto's Market Dominance and Profits

118.    The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

---

[14] U.S. Envtl. Prot. Agency, *Summary of the IBT Review Program Office of Pesticide Programs* (1983), *available at* http://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA&Index=1981+Thru +1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&QF ieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles %5CIndex%20Data%5C81thru85%5CTxt%5C00000022%5C91014ULV.txt&User=ANONYMOUS&Password=an onymous&SortMethod=h%7CMaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g1 6/i425&Display=p%7Cf&DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20pa ge&MaximumPages=1&ZyEntry=1&SeekPage=x&ZyPURL.
[15] Marie-Monique Robin, *The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply* (2011) (citing U.S. Envtl. Prot. Agency, *Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch. Washington, D.C.* (August 9, 1978).).
[16] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories*, *supra*.

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

119.    In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

120.    Through a three-pronged strategy of increasing production, decreasing prices and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue.[17] Today, glyphosate remains one of the world's largest herbicides by sales volume.

### *Monsanto Has Known for Decades That It Falsely Advertised the Safety of Roundup®*

121.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on, glyphosate-based herbicides, including Roundup®, were "**safer than table salt"** and "**practically non-toxic**" to mammals, birds and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

    a)    "Remember that environmentally friendly Roundup
          herbicide is biodegradable. It won't build up in the soil so you can

---

[17]  David Barboza, *The Power of Roundup; A Weed Killer Is a Block for Monsanto to Build On*, N.Y. TIMES, Aug. 2, 2001, *available at* http://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weed-killer-is-a-block-for-monsanto-to-build-on.html.

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

use Roundup with confidence along customers' driveways, sidewalks and fences ...”

b)      “And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.”

c)      “Roundup biodegrades into naturally occurring elements.”

d)      “Remember that versatile Roundup herbicide stay where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.”

e)      “This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.”

f)      “Glyphosate is less toxic to rats than table salt following acute oral ingestion.”

g)      “Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.”

h)      “You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non- toxic' as it pertains to mammals, birds and fish.”

i)      “Roundup can be used where kids and pets will play and breaks down into natural material.” This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[18]

122.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with the NYAG, in which Monsanto agreed, among other things, “to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication” that:

a)      Its glyphosate-containing pesticide products or any

---

[18] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

component thereof are safe, non-toxic, harmless or free from risk

…

b)      Its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

…

c)      Its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means

…

d)      Its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics".

…

e)      Glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides.

f)      Its glyphosate-containing products or any component thereof might be classified as "practically non-toxic".

123.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[19]

### *Classifications and Assessments of Glyphosate*

124.    The IARC process for the classification of glyphosate followed the IARC's stringent procedures for the evaluation of a chemical agent.  Over time, the IARC Monograph program has reviewed 1,013 agents. Of those reviewed, it has determined 120 agents to be Group 1 (Known Human Carcinogens); 82 agents to be Group 2A (Probable Human Carcinogens); 311 agents to be Group 2B (Possible Human Carcinogens); 499 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

---

[19] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

125.    The established procedure for the IARC Monograph evaluations is described in the IARC Programme's Preamble.[20] Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

126.    One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in *The Lancet Oncology*, and within one year after the meeting, the finalized Monograph is published.

127.    In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review.

128.    In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent, probably carcinogenic in humans.

129.    On July 29, 2015, the IARC issued its Monograph for glyphosate, Monograph Volume 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at the IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year

---

[20] World Health Org., *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble*, (2006), *available at* http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

130.    The studies considered the following exposure groups: (1) occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and (2) para-occupational exposure in farming families.

131.    Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007, and the most heavily used herbicide in the world in 2012.

132.    Exposure pathways are identified as air (especially during spraying), dermal, water and food. Community exposure to glyphosate is widespread and found in soil, air, surface water and groundwater, as well as in food.

133.    The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

134.    The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

135.    The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

136.    In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor: renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

137.    The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

138.    The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

139.    The IARC Working Group also noted genotoxic, hormonal and enzymatic effects in mammals exposed to glyphosate.[21] Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

140.    The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.[22]

---

[21] Guyton, et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra* at 77.

[22] Anneclare J. DeRoos, et al., *Cancer Incidence Among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study*, 113 ENVTL. HEALTH PERSPECTIVES 49-54 (2005), *available at* hhtp://www.ncbi.nlm.nih.gov/pmc/articles/PMC1253709/pdf/ehp0113-000049.pdf.

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and multiple myeloma, hairy cell leukemia (HCL) and chronic lymphocytic leukemia (CLL), in addition to several other cancers.

### *Other Earlier Findings About Glyphosate's Dangers to Human Health*

141.    The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport, storage, and disposal.[23]

142.    In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.[24]

---

[23] U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate, supra.*
[24] Caroline Cox, *Glyphosate, Part 2: Human Exposure and Ecological Effects*, 15 J. PESTICIDE REFORM 4 (1995); W.S. Peas, et al., *Preventing pesticide-related illness in California agriculture: Strategies and priorities.*

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

### The Toxicity of Other Ingredients in Roundup®

143.    In addition to the toxicity of the active ingredient, glyphosate, several studies support the hypothesis that the glyphosate-based formulation in Defendant's Roundup® products is more dangerous and toxic than glyphosate alone. Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.[25]

144.    In 2002, a study by Julie Marc, entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation", revealed that Roundup® causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cell cycles.[26]

145.    A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation. The researchers noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."[27]

146.    In 2005, a study by Francisco Peixoto, entitled "Comparative effects of the Roundup® and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup®'s effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone. The Peixoto study further suggested that the harmful effects of Roundup® on

---

*Environmental Health Policy Program Report,* Univ. of Cal. School of Public Health, Calif. Policy Seminar (1993).
[25] T.T. Martinez and K. Brown, *Oral and pulmonary toxicology of the surfactant used in Roundup herbicide*, PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991).
[26] Julie Marc, et al., *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation*, 15 CHEM. RES. TOXICOL. 326-331 (2002), *available at* http://pubs.acs.org/doi/full/10.1021/tx015543g.
[27] Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation*, 96 BIOLOGY OF THE CELL 245, 245-249 (2004), *available at* http://onlinelibrary.wiley.com/doi/10.1016/j.biolcel.2003.11.010/epdf.

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant POEA, or in the alternative, due to the potential synergistic effect between glyphosate and other ingredients in the Roundup® formulation.[28]

147.    In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup® and glyphosate on human umbilical, embryonic and placental cells. The study tested dilution levels of Roundup® and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food. The researchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability and amplify toxicity of glyphosate alone. The researchers further suggested that assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants present in Roundup® are not, in fact, "inert" and that Roundup® is potentially far more toxic than its active ingredient glyphosate alone.[29]

148.    The results of these studies were at all times available to Defendant.

149.    Monsanto's chief toxicologist Donna Farmer has admitted that she cannot say that Roundup® does not cause cancer because Monsanto has not performed carcinogenicity studies with the formulated product Roundup®, the very product that caused Plaintiffs' NHL.[30] She further admitted that in the 35 years that Monsanto has marketed Roundup® to the public, Monsanto has

---

[28] Francisco Peixoto, *Comparative effects of the Roundup and Glyphosate on mitochondrial oxidative phosphorylation*, 61 CHEMOSPHERE 1115, 1122 (2005), *available at* https://www.researchgate.net/publication/7504567_Comparative_effects_of_the_Roundup_and_glyphosate_on_mit ochondrial_oxidative_phosphorylation.

[29] Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic and Placental Cells*, 22 Chem. Res. Toxicol. 97-105 (2008), *available at* http://big.assets.huffingtonpost.com/france.pdf.

[30] *See* Plaintiffs' Submission in Response to Pretrial Order No. 8, Ex. 7, *In re: Roundup Products Liability Litigation*, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 187-7.

conducted no chronic carcinogenicity studies on the formulated Roundup® product merely because EPA did not require that such a study be performed for registration of glyphosate.[31]

150.    Defendant thus knew or should have known that Roundup® is more toxic than glyphosate alone and that safety studies of Roundup® and Roundup®'s adjuvants, "inert" ingredients, and/or surfactant(s) including POEA were necessary to protect Plaintiff from Roundup® products.

151.    Despite its knowledge that Roundup® is considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup® as safe.

### The EPA's Review of Glyphosate

152.    In April 2016, personnel within the EPA's Office of Pesticides Program (OPP) leaked and posted on the internet a draft report on glyphosate carcinogenicity, entitled Cancer Assessment Review Committee (CARC) report, dated October 2015.   The EPA removed the documents by May 2, 2016, within days of initially posting it online.   An EPA spokesperson subsequently issued a statement on the agency's glyphosate review:

> Glyphosate documents were inadvertently posted to the Agency's docket. These documents have now been taken down because our assessment is not final.   EPA has not completed our cancer review.   We will look at the work of other governments as well as work by HHS's Agricultural Health Study as we move to make a decision on glyphosate.   Our assessment will be peer reviewed and completed by end of 2016.[32]

153.    On September 12, 2016, EPA's OPP submitted a report on the carcinogenic potential of glyphosate, wherein it issued a "proposed conclusion" that glyphosate is "'not likely

---

[31] *See id.*

[32] Carey Gillam, *What Is Going On With Glyphosate? EPA's Odd Handling of Controversial Chemical*, HUFFINGTON POST, May 2, 2016 *available at* http://www.huffingtonpost.com/care-gilliam/what-is-going-on-with-gly_b_9825326.html; *see also* P.J. Huffstutter, *EPA takes offline report that says glyphosate not likely carcinogenic*, REUTERS, May 2, 2016, *available at* http://www.reuters.com/article/us-usa-glyphosate-epa-idUSKCN0XU01K.

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

to be carcinogenic to humans at doses relevant to human health risk assessment."[33]  There are no authors listed on this issue paper, which reiterates and adopts the conclusions of the October 2015 leaked assessment.  The issue paper is based upon a review of industry-sponsored articles and studies. The OPP acknowledged that it rejected all studies that considered Roundup®—the formulated product—instead of studies that isolated glyphosate because "[g]lyphosate formulations contain various components other than glyphosate and it has been hypothesized these components are more toxic than glyphosate alone.[34]

154.    Thus, the OPP notes dozens of studies considered by the IARC were not reviewed by the OPP because the OPP's "evaluation focused on studies on the active ingredient glyphosate" and "additional research could also be performed to determine whether formulation components, such as surfactants, influence the toxicity of glyphosate formulations."[35]

155.    From December 13 to 16, 2016, the EPA held the FIFRA Scientific Advisory Panel ("SAP") meetings to consider issues raised by the OPP's evaluation of glyphosate.  Again, the OPP allowed the SAP to consider studies of glyphosate alone, and not any study of the formulated product.  In its charge to the FIFRA SAP, the OPP noted that "[a]lthough there are studies available on glyphosate-based pesticide formulations, the agency is soliciting advice from the FIFRA SAP on this evaluation of human carcinogenic potential for the active ingredient glyphosate only at this time."[36]

---

[33] *See* EPA's Office of Pesticide Programs, Glyphosate Issue Paper: Evaluation of Carcinogenic Potential (Sept. 12, 2016), *available at* https://www.epa.gov/sites/production/files/2016-09/documents/glyphosate_issue_paper_evaluation_of_carcincogenic_potential.pdf
[34] *Id.*
[35] *Id*
[36] EPA OPP, Glyphosate: Evaluation of Carcinogenic Potential, Charge to the FIFRA SAP for the October 18-21, 2016 Meeting, *available at* https://www.epa.gov/sites/production/files/2016-11/documents/glyphosate_sap_charge_questions_-final.pdf.

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

156.    The OPP draft assessment therefore does not actually consider the product at issue in this litigation or, more importantly, how glyphosate, in conjunction with surfactants and other chemicals, affects carcinogenicity.

157.    On March 16, 2017, the final SAP meeting minutes and report were released, revealing disagreement and lack of consensus among the scientists on whether there was a positive association between **glyphosate** exposure and NHL.[37]

### *Recent Worldwide Bans on Roundup®/Glyphosate*

158.    Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since the IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup® become more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which took effect at the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."[38]

159.    The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.[39]

---

[37] FIFRA Scientific Advisory Panel Meeting Minutes and Final Report No. 2017-01, A Set of Scientific Issues Being Considered by the Environmental Protection Agency Regarding: EPA's Evaluation of the Carcinogenic Potential of Glyphosate, *available at* https://www.epa.gov/sites/production/files/2017-03/documents/december_13-16_2016_final_report_03162017.pdf.

[38] *Holland's Parliament Bans Glyphosate Herbicides*, THE REAL AGENDA, 14 April 2014, *available at* http://real-agenda.com/hollands-parliament-bans-glyphosate-herbicides/.

[39] Christina Sarich, *Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals Following Recent Glyphosate-Cancer Link*, Global Research, May 14, 2015, *available at* http://www.globalresearch.ca/brazils-public-prosecutor-wants-to-ban-monsantos-chemicals-following-recent-

160.    France banned the private sale of Roundup® and glyphosate following the IARC assessment for glyphosate.[40]

161.    In 2017, Bermuda banned both the private and commercial sale of glyphosate, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."[41]

### Proposition 65 Listing

162.    On September 4, 2015, California's Office of Environmental Health Hazard Assessment ("OEHHA") published a notice of intent to include glyphosate on the state's list of known carcinogens under Proposition 65.[42]   California's Safe Drinking Water and Toxic Enforcement Act of 1986 (informally known as "Proposition 65") requires the state to maintain and, at least once a year, revise and republish a list of chemicals "known to the State of California to cause cancer or reproductive toxicity."[43]   The OEHHA determined that glyphosate met the criteria for the listing mechanism under the Labor Code following IARC's assessment of the chemical.[44]

---

glyphosate-cancer-link/5449440; *see* Ministério Público Federal, MPF/DF *reforça pedido para que glifosato seja banido do mercado naciona*, April, 14, 2015, *available at*
http://noticias.pgr.mpf.mp.br/noticias/noticias-do-site/copy_of_meio-ambiente-e-patrimonio-cultural/mpf-df-reforca-pedido-para-que-glifosato-seja-banido-do-mercado-nacional.
[40] Zoe Schlanger, *France Bans Sales of Monsanto's Roundup in Garden Centers, 3 Months After U.N. Calls it "Probable Carcinogen,"* NEWSWEEK, June 15, 2015, *available at* http://www.newsweek.com/france-bans-sale-monsantos-roundup-garden-centers-after-un-names-it- probable-343311.
[41] *Health Minister: Importation of Roundup Weed Spray Suspended,* TODAY IN BERMUDA, May 11, 2015, *available at* http://www.todayinbermuda.com/news/health/item/1471-health-minister-importation-of-roundup-weed-spray-suspended.
[42] Cal. Envtl. Prot. Agency Office of Envtl. Health Hazard Assessment, Notice of Intent to List Chemicals by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion, Glyphosate (Sept. 4, 2015), http://oehha.ca.gov/prop65/CRNR_notices/admin_listing/intent_to_list/pdf_zip/090415NOIL_LCSet27.pdf.
[43] *Frequently Asked Questions,* STATE OF CAL. DEP'T OF JUSTICE, OFFICE OF THE ATTORNEY GENERAL, http://oag.ca.gov/prop65/faq (last visited April 19, 2016).
[44] Cal. Envtl. Prot. Agency Office of Envtl. Health Hazard Assessment, Notice of Intent to List Chemicals by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion, Glyphosate (Sept. 4, 2015), http://oehha.ca.gov/prop65/CRNR_notices/admin_listing/intent_to_list/pdf_zip/090415NOIL_LCSet27.pdf.

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

163.    The listing process under the Labor Code is essentially automatic.  The list of known carcinogens, at a minimum, must include substances identified by reference in Labor Code § 6382(b)(1).  That section of the Labor Code identifies "[s]ubstances listed as human or animal carcinogens by the International Agency for Research on Cancer (IARC)."  IARC's classification of glyphosate as a Group 2A chemical ("probably carcinogenic to humans") therefore triggered the listing.

164.    A business that deploys a listed chemical in its products must provide "clear and reasonable warnings" to the public prior to exposure to the chemical. To be clear and reasonable, a warning must "(1) clearly communicate that the chemical is known to cause cancer, and/or birth defects or other reproductive harm; and (2) effectively reach the person before exposure."[45]  The law also prohibits the discharge of listed chemicals into drinking water.

165.    Monsanto disputed the listing decision and, in January 2016, filed a lawsuit against OEHHA and the agency's acting director, Lauren Zeise, in California state court, seeking declaratory and injunctive relief to prevent OEHHA from listing glyphosate.[46]

166.    Monsanto alleged that OEHHA's exclusive reliance on the IARC decision signified that "OEHHA effectively elevated the determination of an ad hoc committee of an unelected, foreign body, which answers to no United States official (let alone any California state official), over the conclusions of its own scientific experts."[47]  Monsanto further alleged that the Labor Code listing mechanism presented various constitutional violations because it "effectively empowers an unelected, undemocratic, unaccountable, and foreign body to make laws applicable in

---

[45] *Frequently Asked Questions*, STATE OF CAL. DEPARTMENT OF JUSTICE, OFFICE OF THE ATTORNEY GENERAL, *supra*.
[46] Monsanto Company's Verified Petition for Writ of Mandate and Complaint for Preliminary and Permanent Injunctive Relief, Monsanto Co. v. Office of the Envt'l Health Hazard Assessment, et al., No. 16-CECG-00183 (Cal. Super. Ct.) *available at* http://www.monsanto.com/files/documents/monvoehha.pdf.
[47] *Id.* at 2.

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

California."[48]  Among other things, Monsanto argued that Proposition 65's requirement to provide a "clear and reasonable warning" to consumers that the chemical is a known carcinogen would damage its reputation and violate its First Amendment rights.[49]

167.    On January 27, 2017, the Superior Court of California – Fresno issued a tentative ruling granting, among other things, OEHHA's motion for judgment on the pleadings, thus rejecting Monsanto's arguments.  On March 10, 2017, the Court issued a final order adopting in full the earlier tentative ruling.[50]  On July 7, 2017, the listing of glyphosate "as known to the state to cause cancer" became effective under Proposition 65.

### *EFSA Report on Glyphosate*

168.    On November 12, 2015, the European Food Safety Authority (EFSA), the European Union's primary agency for food safety, reported on its evaluation of the Renewal Assessment Report (RAR) on glyphosate.[51] The Rapporteur Member State assigned to glyphosate, the German Federal Institute for Risk Assessment (BfR), had produced the RAR as part of the renewal process for glyphosate in the EU.

169.    The BfR sent its draft RAR to the EFSA and the RAR underwent a peer review process by the EFSA, other member states and industry groups. As part of the on-going peer review of Germany's reevaluation of glyphosate, the EFSA had also received a second mandate from the European Commission to consider the IARC's findings regarding the potential carcinogenicity of glyphosate and glyphosate-containing products.

---

[48] *Id.* at 3.
[49] *Id.*
[50] *See* Notice of Supplemental Authority, In re: Roundup Products Liability Litigation, MDL No. 2741 (N.D. Cal., Mar. 13, 2017), ECF No. 185.
[51] European Food Safety Auth., *Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate*, EFSA Journal (2015), *available at*
http://www.efsa.europa.eu/sites/default/files/scientific_output/files/main_documents/4302.pdf.

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

170.    Based on a review of the RAR, which included data from industry-submitted, unpublished studies, the EFSA sent its own report ("Conclusion") to the European Commission, finding that "glyphosate is unlikely to pose a carcinogenic hazard to humans and the evidence does not support classification with regard to its carcinogenic potential according to Regulation (EC) No. 1272/2008."[52] The EFSA therefore disagreed with the IARC: glyphosate was not genotoxic and did not present a carcinogenic threat to humans.

171.    In explaining why its results departed from the IARC's conclusion, the EFSA drew a distinction between the EU and the IARC approaches to the study and classification of chemicals.[53] Although the IARC examined "both glyphosate—an active substance—and glyphosate-based formulations, grouping all formulations regardless of their composition," the EFSA explained that it considered only glyphosate and that its assessment focuses on "each individual chemical, and each marketed mixture separately."[54] The IARC, on the other hand, "assesses generic agents, including groups of related chemicals, as well as occupational or environmental exposure, and cultural or behavioral practices."[55] The EFSA accorded greater weight to studies conducted with glyphosate alone than studies of formulated products.[56]

172.    The EFSA went further and noted:

> [A]lthough some studies suggest that certain glyphosate-based formulations may be genotoxic (i.e. damaging to DNA), others that look solely at the active substance glyphosate do not show this effect. It is likely, therefore, that *the genotoxic effects observed in some glyphosate-based formulations are related to the other constituents or "co-formulants"*. Similarly, certain glyphosate-based formulations display higher toxicity than that of the active ingredient, presumably because of the presence of co-formulants, In its assessment, *EFSA*

---

[52] *Id.*
[53] European Food Safety Auth., *The EFSA Fact Sheet: Glyphosate*, *available at* http://www.efsa.europa.eu/sites/default/files/corporate_publications/files/efsaexplainsglyphosate15112en.pdf.
[54] *Id.*
[55] *Id.*
[56] *Id.*

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

> *proposes that the toxicity of each pesticide formulation and in particular its genotoxic potential should be further considered and addressed by Member State authorities while they reassess uses of glyphosate-based formulations in their own territories.*[57]

173.    Notwithstanding its conclusion, the EFSA did set exposure levels for glyphosate. Specifically, the EFSA proposed an acceptable daily intake (ADI) of 0.5 mg/kg of body weight per day; an acute reference dose (ARfD) of 0.5 mg/kg of body weight; and an acceptable operator exposure level (AOEL) of 0.1 mg/kg of body weight per day.[58]

### Leading Scientists Dispute EFSA's Conclusion

174.    On November 27, 2015, 96 independent academic and governmental scientists from around the world submitted an open letter to the EU health commissioner, Vytenis Andriukaitis.[59] The scientists expressed their strong concerns and urged the commissioner to disregard the "flawed" EFSA report, arguing that "the BfR decision is not credible because it is not supported by the evidence and it was not reached in an open and transparent manner."[60]

175.    Signatories to the letter included Dr. Christopher J. Portier, Ph.D., and other renowned international experts, some of whom were part of the IARC Working Group assigned to glyphosate.

176.    In an exhaustive and careful examination, the scientists scrutinized the EFSA's conclusions and outlined why the IARC Working Group decision was "by far the more credible":

> The IARC WG decision was reached relying on open and transparent procedures by independent scientists who completed thorough conflict-of-interest statements and were not affiliated or financially supported in any way by the chemical manufacturing industry. It is fully referenced and depends entirely on reports published in the open, peer-reviewed

---

[57] *Id.*
[58] European Food Safety Auth., *Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate*, EFSA JOURNAL (2015), *supra.*
[59] Letter from Christopher J. Portier, et al. to Commissioner Vytenis Andriukaitis, Open Letter: Review of the Carcinogenicity of Glyphosate by EFSA and BfR (Nov. 27, 2015), *available at* http://www.zeit.de/wissen/umwelt/2015-11/glyphosat-scientists-in-row-over-safety-of=glyphosate-weedkiller.
[60] *Id.*

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

biomedical literature. It is part of a long tradition of deeply researched and highly credible reports on the carcinogenicity of hundreds of chemicals issued over the past four decades by IARC and used today by international agencies and regulatory bodies around the world as a basis for risk assessment, regulation and public health policy.[61]

177.   With respect to human data, the scientists pointed out that the EFSA agreed with the IARC that there was "*limited evidence* of carcinogenicity for non- Hodgkin lymphoma, but the EFSA nonetheless dismissed an association between glyphosate exposure and carcinogenicity. The IARC applies three levels of evidence in its analyses of human data, including sufficient evidence and limited evidence. The EFSA's ultimate conclusion that "there was no unequivocal evidence for a clear and strong association of NHL with glyphosate" was misleading because it was tantamount to IARC's highest level of evidence: "sufficient evidence," which means that a causal relationship has been established. However, the scientists argued, "[legitimate public health concerns arise when 'causality is credible,' i.e., when there is *limited evidence*."[62]

178.   Among its many other deficiencies, the EFSA's conclusions regarding animal carcinogenicity data were "scientifically unacceptable," particularly in BfR's use of historical control data and in its trend analysis. Indeed, BfR's analysis directly contradicted the Organization for Economic Co-operation and Development ("OECD") testing guidelines while citing and purporting to follow those same guidelines. For instance, the EFSA report dismisses observed trends in tumor incidence "because there are no individual treatment groups that are significantly different from controls and because the maximum observed response is reportedly within the range of the historical control data." However, according to the scientists, concurrent controls are recommended over historical controls in all guidelines, scientific reports and publications, and, if it is employed, historical control data "should be from studies in the same timeframe, for the same

---

[61] *Id.*
[62] *Id.*

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

exact animal strain, preferably from the same laboratory or the same supplier and preferably reviewed by the same pathologist." BfR's use of historical control data violated the precautions: "only a single study used the same mouse strain as the historical controls, but was reported more than 10 years after the historical control dataset was developed." Further deviating from sound scientific practices, the data used by the BfR came from studies in seven different laboratories. The scientists concluded:

> BfR reported seven positive mouse studies with three studies showing increases in renal tumors, two with positive findings for hemangiosarcomas, and two with positive findings for malignant lymphomas. BfR additionally reported two positive findings for tumors in rats. Eliminating the inappropriate use of historical data, the unequivocal conclusion is that these are not negative studies, but in fact document the carcinogenicity of glyphosate in laboratory animals.[63]

179.   The letter also critiqued the EFSA report's lack of transparency and the opacity surrounding the data cited in the report: "citations for almost all of the references, even those from the open scientific literature, have been redacted from the document" and "there are no authors or contributors listed for either document, a requirement for publication in virtually all scientific journals." Because the BfR relied on unpublished, confidential industry-provided studies, it is "impossible for any scientist not associated with the BfR to review this conclusion with scientific confidence."[64]

180.   On March 3, 2016, the letter was published in the *Journal of Epidemiology & Community Health*.[65]

---

[63] *Id.*
[64] *Id.*
[65] Christopher J. Portier, et al., *Differences in the carcinogenic evaluation of glyphosate between the International Agency for Research on Cancer (IARC) and the European Food Safety Authority (EFSA),* JOURNAL OF EPIDEMIOLOGY & CMTY. HEALTH, Mar. 3, 2016, *available at* http://jech.bmj.com/content/early/2016/03/03/jech-2015-207005.full.

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

***Statement of Concern Regarding Glyphosate-Based Herbicides***

181.   On February 17, 2016, a consensus statement published in the journal *Environmental Health*, entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement," assessed the safety of glyphosate-based herbicides (GBHs).[66]   The paper's "focus is on the unanticipated effects arising from the worldwide increase in the use of GBHs, coupled with recent discoveries about the toxicity and human health risks stemming from use of GBHs", including the following:

a)   GBHs are the most heavily applied herbicide in the world and usage continues to rise;

b)   Worldwide, GBHs often contaminate drinking water sources, precipitation and air, especially in agricultural regions;

c)   The half-life of glyphosate in water and soil is longer than previously recognized;

d)   Glyphosate and its metabolites are widely present in the global soybean supply;

e)   Human exposures to GBHs are rising;

f)   Glyphosate is now authoritatively classified as a probable human carcinogen; and

g)   Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science.[67]

182.   The researchers noted that GBH use has increased approximately 100-fold since the 1970s. Further, far from posing a limited hazard to vertebrates, as previously believed, two decades of evidence demonstrated that "several vertebrate pathways are likely targets of action,

---

[66] John P. Myers, et al., *Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement*, ENVIRONMENTAL HEALTH (2016), *available at* http://ehjournal.biomedcentral.com/articles/10.1186/s12940-016-0117-0.
[67] *Id.*

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."[68]

183.     The  paper  attributes  uncertainties  in  current  assessments  of  glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations." Further, the researchers argue, "[t]he distinction in regulatory review and decision processes between 'active' and 'inert' ingredients has no toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in their own right."[69]

184.     Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target  organisms  including  mammals,  aquatic  insects,  and  fish."  Accordingly,  "risk assessments  of  GBHs  that  are  based  on  studies  quantifying  the  impacts  of  glyphosate  alone underestimate  both  toxicity  and  exposure,  and  thus  risk."  The  paper  concludes  that  this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."[70]

185.     The researchers also critique the current practice of regulators who largely rely on "unpublished, non-peer reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the

---

[68] *Id.*
[69] *Id.*
[70] *Id.*

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."[71]

186.    The researchers also call for greater inclusion of GBHs in government-led toxicology testing programs:

> A fresh and independent examination of GBH toxicity should be undertaken, and . . . this re-examination be accompanied by systematic efforts by relevant agencies to monitor GBH levels in people and in the food supply, none of which are occurring today. The U.S. National Toxicology Program should prioritize a thorough toxicological assessment of the multiple pathways now identified as potentially vulnerable to GBHs.

187.    The researchers suggest that, in order to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which manufacturers fund the registration process and the necessary testing:

> [W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part of routine registration actions and fees. Such funds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would be made available to independent scientists to conduct the appropriate long-term (minimum 2 years) safety studies in recognized animal model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption, impacts on the gut microbiome, carcinogenicity and multigenerational effects looking at reproductive capability and frequency of birth defects.

### European Union Vote on Glyphosate Renewal

188.    The license for glyphosate in the European Union (EU) was set to expire on June 30, 2016.

---

[71] *Id.*

189.    Without an extension of the license, Monsanto's Roundup® and other glyphosate-based herbicides faced a general phase out in EU markets.[72]

190.    In the months leading up to the license expiration date, protracted meetings and votes among national experts from the 28 EU Member States failed to produce agreement on an extension.

191.    For instance, on March 4, 2016, The Guardian reported that France, the Netherlands, and Sweden did not support the EFSA's assessment that glyphosate was harmless.[73] The paper quoted the Swedish environment minister, Åsa Romson, as stating: "We won't take risks with glyphosate and we don't think that the analysis done so far is good enough. We will propose that no decision is taken until further analysis has been done and the EFSA scientists have been more transparent about their considerations."[74]

192.    The Netherlands argued that relicensing should be placed on hold until after a separate evaluation of glyphosate's toxicity can be conducted.[75]    Leading up to the vote, Italy joined the other EU states in opposing the license renewal, citing health concerns.[76]

193.    On June 6, 2016, Member States voted but failed to reach a qualified majority in favor or against the re-authorization of glyphosate.[77]

---

[72] Philip Blenkinsop, Alissa de Carbonnel & Barbara Lewis European, *Commission to extend glyphosate license for 18 months*, REUTERS, June 28, 2016, *available at* http://www.reuters.com/article/us-health-eu-glyphosate-idUSKCN0ZE25B.
[73] Arthur Neslen, *EU states rebel against plans to relicense weedkiller glyphosate*, THE GUARDIAN, Mar. 4, 2016, *available at* http://www.theguardian.com/environment/2016/mar/04/eu-states-rebel-against-plans-to-relicense-weedkiller-glyphosate.
[74] *Id.*
[75] Arthur Neslen, *Vote on Controversial weedkiller's European licence postponed*, THE GUARDIAN, Mar. 8, 2016, *available at* http://www.theguardian.com/environment/2016/mar/08/eu-vote-on-controversial-weedkiller-licence-postponed-glyphosate
[76] *Id.*
[77] Manon Flausch, *Commission prolongs glyphosate license by 18 months*, EURACTIV, June 29, 2016, *available at* http://www.euractiv.com/section/agriculture-food/news/commission-prolongs-glyphosate-licence-by-18-months/

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

194.   On June 29, 2016, the EU Commission extended the European license for glyphosate for 18 months to allow the European Chemical Agency to rule on the safety of the chemical.

195.   On July 11, 2016, the EU voted in favor of a proposal to restrict the conditions of use of glyphosate in the EU, including a ban on the common co-formulant or surfactant, POEA, from all glyphosate-based herbicides, including Roundup®[78]

196.   These restrictions, which are non-binding on the EU states, are expected to apply until the European Chemicals Agency issues an opinion on the chemical's safety.[79]

197.   In November 2017, the EU countries renewed the license for glyphosate for five years rather than the requested ten years.

## TOLLING OF THE STATUTE OF LIMITIATIONS

### *Discovery Rule Tolling*

198.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

199.   Plaintiffs have suffered an illness that has a latency period and does not arise until years after exposure.  Plaintiffs had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup® and glyphosate until they were made aware that their NHL could be caused by their use and/or exposure to Roundup®.  Consequently, the discovery rule applies to these cases, and the statute of limitations has been tolled until the day that Plaintiffs

---

[78] Sarantis Michalopoulos, *EU agrees ban on glyphosate co-formulant*, EURACTIV, July 11, 2016, *available at* http://www.euractiv.com/section/agriculture-food/news/eu-agrees-ban-on-glyphosate-co-formulant/?nl_ref=16562829

[79] *See* Arthur Neslen, *Controversial chemical in Roundup weedkiller escapes immediate ban*, THE GUARDIAN, June 29, 2016.

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

knew or had reason to know that their NHL was linked to their use of and/or exposure to Roundup®.

200.    Within the time period of any applicable statutes of limitations, Plaintiffs could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup® and glyphosate is injurious to human health.

201.    Plaintiffs did not discover, and did not know of facts that would cause a reasonable person to suspect the risks associated with the use of and/or exposure to Roundup® and glyphosate; nor would a reasonable and diligent investigation by them have disclosed that Roundup® and glyphosate would cause their NHL.

202.    Furthermore, the running of the statute of limitations has been equitably tolled by reason of Defendant's fraudulent concealment and conduct.   Through its affirmative misrepresentations and omissions, Defendant actively concealed from Plaintiffs the true risks associated with use of or exposure to Roundup®.

203.    As a result of Defendant's actions, Plaintiffs were unaware, and could not reasonably know or have learned through reasonable diligence, that Plaintiffs had been exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

204.    Furthermore, Defendant is estopped from relying on any statute of limitations because of its fraudulent concealment of the truth regarding the safety of Roundup®.  Defendant was under a duty to disclose the true character, quality and nature of Roundup® because this was non-public information over which it continues to have exclusive control.  Defendant knew that this information was not available to Plaintiffs, their medical providers and/or their health facilities, yet it failed to disclose the information to the public.

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

205.    Defendant had the ability to and did spend enormous amounts of money in furtherance of their purposes of marketing and promoting a profitable product, notwithstanding the known or reasonably knowable risks.  Plaintiffs and medical professionals could not have afforded to and could not have possibly conducted studies to determine the nature, extent and identity of related health risks, and they were forced to rely on Defendant's representations.

206.    For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiffs' claims.

### *Estoppel*

207.    Monsanto was under a continuous duty to disclose to consumers, users and other persons coming into contact with its products, including Plaintiffs, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate.

208.    Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

209.    Based on the foregoing, Monsanto is estopped from relying on any statutes of limitations in defense of this action.

### COUNT ONE: STRICT LIABILITY FOR
### DEFECTIVE MANUFACTURE AND DESIGN

210.    Plaintiffs incorporate by reference each and every other paragraph of this Petition as if each were set forth fully and completely herein.

211.    Plaintiffs brings this strict liability claim against Defendant for defective manufacture and design.

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

212.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, users and other persons coming into contact with them, including Plaintiffs, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

213.    At all times relevant to this litigation, Defendant designed, researched, developed, formulated, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by Plaintiffs and/or to which Plaintiffs were exposed, as described above.

214.    At all times relevant to this litigation, Defendant's Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and in particular, Plaintiffs.

215.    At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Missouri and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

216.    Defendant's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold and marketed by Defendant, were defectively manufactured and designed by Defendant in that when they left the hands of Defendant's manufacturers and/or suppliers, they were unreasonably dangerous because they were not as safe as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

217.    Defendant's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant, were defective in manufacture, design, and formulation in that when they left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks associated with these products' reasonably foreseeable uses exceeded the alleged benefits associated with their design and formulation.

218.    At all relevant times, Defendant's Roundup® products created significant risks to the health and safety of consumers and others who were exposed to the products that far outweigh the risks posed by other products on the market used for the same or similar purpose.

219.    Therefore, at all times relevant to this litigation, Defendant's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, produced, assembled, packaged, labeled, advertised, promoted, marketed, sold, supplied and distributed by Defendant were defective in design and formulation, in one or more of the following ways:

a)      When placed in the stream of commerce, Defendant's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would expect.

b)      When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c)      When placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d)      Defendant did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate.

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

e)    Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweighs any potential utility stemming from the use of the herbicide.

f)    Defendant knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g)    Defendant did not conduct adequate post-marketing surveillance of its Roundup® products.

h)    Defendant could have employed safer alternative designs and formulations.

220.    At all times relevant to this litigation, Plaintiffs used and/or were exposed to Defendant's Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

221.    Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

222.    The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate.    Defendant's Roundup® products were and are more dangerous than alternative products and Defendant could have designed its Roundup® products to make them less dangerous.    Indeed, at the time that Defendant designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

223.    Defendant's defective design of Roundup® amounts to willful, wanton, and/or reckless conduct by Defendant.

224.    As a direct and proximate result of the defective design and manufacture of Roundup® products, Plaintiffs developed NHL and have been injured catastrophically and have

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care and comfort, and economic damages.

225.    Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendant is strictly liable to Plaintiffs.

226.    The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiffs' grave injuries, and, but for Defendant's misconduct and omissions, Plaintiffs would not have sustained their injuries.

227.    As a direct and proximate result of Defendant's placing its defective Roundup® products into the stream of commerce, Plaintiffs have suffered and continue to suffer grave injuries, and they have endured pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.  Plaintiffs will continue to incur these expenses in the future.

WHEREFORE, Plaintiffs pray for judgment against Defendant Monsanto in a fair and reasonable sum in excess of $25,000, together with interest and costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT TWO: STRICT LIABILITY FOR FAILURE TO WARN

228.    Plaintiffs incorporate by reference each and every other paragraph of this Petition as if each were set forth fully and completely herein.

229.    Plaintiffs bring this strict liability claim against Defendant for failure to warn.

230.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, because they do not contain adequate warnings or instructions concerning the dangerous

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

231.    Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiffs, Plaintiffs' employers, Plaintiffs' co-workers, and persons responsible for consumers (such as employers), and Defendant therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of Roundup® and glyphosate-containing products and a duty to instruct on the proper, safe use of these products.

232.    At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn Plaintiffs of the dangers associated with Roundup® use and exposure, and a continuing duty to instruct on the proper, safe use of these products. Defendant, as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

233.    At the time of manufacture, Defendant could have provided warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to these products.

234.    At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety of its Roundup® products. Defendant also failed to minimize the dangers to

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

users and consumers of its Roundup® product and to those who would foreseeably use or be harmed by Defendant's herbicides, including Plaintiffs.

235.    Despite the fact that Defendant knew or should have known that Roundup® products posed a grave risk of harm, it failed to warn of the dangerous risks associated with their use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied, or sold the product, and not known to end users and consumers, such as Plaintiffs and Plaintiffs' employers.

236.    Defendant knew or should have known that its Roundup® and glyphosate-containing products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products. Defendant has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

237.    At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Missouri and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

238.    At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Roundup® products in their intended or reasonably foreseeable manner, without knowledge of their dangerous characteristics.

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

239.   Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiffs' exposure. Plaintiffs relied upon the skill, superior knowledge, and judgment of Defendant.

240.   Defendant knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, but it failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and horticultural applications.

241.   The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled agricultural workers, horticultural workers and/or at-home users such as Plaintiffs to utilize the products safely and with adequate protection.  Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup®  and glyphosate.

242.   To this day, Defendant has failed to adequately and accurately warn of the true risks of Plaintiffs' injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

243.   As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiffs.

244.   Defendant is liable to Plaintiffs for injuries caused by its failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its Roundup® products and the risks associated with the use of or exposure to Roundup® and glyphosate.

245.   The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiffs' injuries, and, but for Defendant's misconduct and omissions, Plaintiffs would not have sustained their injuries.

246.   Had Defendant provided warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup® products, Plaintiffs could have avoided the risk of developing injuries as alleged herein and Plaintiffs and Plaintiffs' employers could have obtained alternative herbicides.

247.   As a direct and proximate result of Defendant's placing its defective Roundup® products into the stream of commerce and failing to warn Plaintiffs of the increased risk of NHL associated with the use of and/or exposure to Roundup® products as described herein, Plaintiffs have developed NHL and have been injured catastrophically and have been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care and comfort, and economic damages, including for medical care and treatment. Plaintiffs will continue to incur these expenses in the future.

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

WHEREFORE, Plaintiffs pray for judgment against Defendant Monsanto in a fair and reasonable sum in excess of $25,000, together with interest and costs expended herein and such further and other relief as the Court deems just and appropriate.

### COUNT THREE: VIOLATION OF MISSOURI MERCHANDIZING PRACTICE ACT, § 407.020 et seq.

248.    Plaintiffs incorporate by reference each and every other paragraphs of this Petition as if each were set forth fully and completely herein.

249.    At all relevant times, Defendant knew or should have known of the unreasonably dangerous and carcinogenic nature of the use of and/or exposure to Roundup®.

250.    At all relevant times, Defendant, through its labeling, advertisements, public representations and marketing of Roundup®, intentionally used deception, fraud, false pretenses, false promises, misrepresentations and unfair trade practices in order to mislead consumers that Roundup® products are safe for use.

251.    At all relevant times, Defendant also engaged in the concealment, suppression and/or omission of material facts in connection with the sale and/or advertisement of Roundup® products in trade or commerce.  In particular, Defendant failed to disclose to the public that Roundup® is unsafe and poses serious health hazards, particularly NHL.  Defendant was aware of the hazardous risks posed by Roundup® and yet failed to inform the public of these risks through their advertisements, labeling, or other means available to them.  Defendant's failure to state material facts about Roundup® constitutes a violation of Mo. Rev. Stat. § 407.020.

252.    At all relevant times, Plaintiffs were deceived by Defendant's intentional misrepresentations and omissions, including by the orchestrated claims made on or in television commercials, advertising materials, websites, and on product labels and packaging regarding the usage and safety of Roundup®.

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

253.    At all relevant times, Plaintiffs acted in reasonable reliance upon Defendant's unlawful trade practices, and had the Defendant not engaged in the deceptive conduct described herein, Plaintiffs would not have purchased Roundup® and/or would have protected themselves from exposure to Roundup®.

254.    As a direct and proximate result of Defendant's unlawful trade practices, Plaintiffs developed NHL and have been injured catastrophically and have been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care and comfort, and economic damages.

WHEREFORE, Plaintiffs pray for judgment against Defendant in a fair and reasonable sum in excess of $25,000, together with interest and costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT FOUR: NEGLIGENCE

255.    Plaintiffs incorporate by reference each and every other paragraph of this Petition as if each were set forth fully and completely herein.

256.    At all relevant times, Defendant breached its duty to Plaintiffs and was otherwise negligent in marketing, designing, manufacturing, producing, supplying, inspecting, testing, selling, and/or distributing Roundup® products.

257.    Defendant, directly or indirectly, caused Roundup® products to be purchased and/or used by Plaintiffs

258.    At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products, including the duty to take all reasonable

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

259.     At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of its Roundup® products. Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

260.     At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

261.     Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause Plaintiffs' injuries, and thus, created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiffs.

262.     Defendant knew or, in the exercise of reasonable care, should have known that Roundup® is more toxic than glyphosate alone and that the safety studies on Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiffs from Roundup®.

263.     Defendant knew or, in the exercise of reasonable care, should have known that tests limited to Roundup®'s active ingredient glyphosate were insufficient to prove the safety of Roundup®.

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

264.    Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup® and glyphosate-containing products.

265.    As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

266.    Defendant failed to appropriately and adequately test Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiffs from Roundup®.

267.    Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant has failed to do so. Indeed, Defendant has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

268.    Defendant's negligence included:

269.    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

270.    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

271.    Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture, horticulture, and at-home use;

272.    Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup®, and the propensity of these ingredients to render Roundup® toxic, increase the toxicity of Roundup®, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup®, and whether or not "inert" ingredients and/or adjuvants were safe for use;

273.    Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

274.    Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

275.    Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and/or be exposed to its Roundup® products;

276.    Failing to disclose to Plaintiffs, users, consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

277.    Failing to warn Plaintiffs, users, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiffs and other users or consumers;

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

278.    Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate- containing products;

279.    Representing that its Roundup® products were safe for their intended use when, in fact, Defendant knew or should have known the products were not safe for their intended purpose;

280.    Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert consumers and the general public of the risks of Roundup® and glyphosate;

281.    Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

282.    Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup® products are safe for use in the agricultural and horticultural industries and/or home use; and

283.    Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

284.    Defendant knew and/or should have known that it was foreseeable that consumers and/or users, such as Plaintiffs, would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

285.    Plaintiffs did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

286.    Defendant's negligence was the proximate cause of the injuries, harm, and economic losses Plaintiffs suffered, and will continue to suffer, as described herein.

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

287.     Defendant's conduct, as described herein, was reckless. Defendant regularly risks the lives of consumers and users of its products, including Plaintiffs, with full knowledge of the dangers of its products. Defendant has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiffs. Defendant's reckless conduct therefore warrants an award of punitive damages.

288.     As a proximate result of Defendant's wrongful acts and omissions in placing its defective Roundup products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiffs developed NHL and have been injured catastrophically and have been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care and comfort, and economic damages, including significant expenses for medical care and treatment and will continue to incur these expenses in the future.

WHEREFORE, Plaintiffs pray for judgment against Defendant Monsanto in a fair and reasonable sum in excess of $25,000, together with interest and costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT FIVE: BREACH OF EXPRESS WARRANTIES

289.     Plaintiffs incorporate by reference each and every other paragraph of this petition as if each were set forth fully and completely herein.

290.     At all relevant times, Defendant engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing and promoting its Roundup® products, which are defective and unreasonably dangerous to users, consumers, and those in proximity to users, including Plaintiffs, thereby placing Roundup® products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendant.

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

291.   Before the time that Plaintiffs were exposed to the use of the aforementioned Roundup® products, Defendant expressly warranted to its consumers and users—including Plaintiffs and Plaintiffs' employers—that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

292.   Defendant, however, failed to disclose that Roundup® had dangerous propensities when used as intended and that the use of and/or exposure to roundup and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiffs' injuries.

293.   The representations, as set forth above, contained or constituted affirmations of fact or promises made by the seller to the buyer which related to the goods and became part of the basis of the bargain creating an express warranty that the goods shall conform to the affirmations of fact or promises.

294.   Roundup® did not conform to the representations made by Monsanto as Roundup® was not safe for use by individuals such as Plaintiffs.

295.   At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Defendant's Roundup products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

296.   Neither Plaintiffs nor Plaintiffs' employers could have reasonably discovered or known of the risks of serious injury associated with Roundup or glyphosate.

297.   Defendant's breaches constitute violations of state common laws, including, but not limited to, the following statutory provisions as applicable:

- Ala. Code §§ 7-2-313, 7-2-314 (2017);

- Alaska St. § 45.02.313 (effective 2016);

- Ariz. Rev. Stat. Ann. § 47-2313 (2016);

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

- Ark. Code Ann. § 4-2-313 (2016);

- Cal. U. Com. Code § 2313(1) (2017); Cal. Civ. Code §1791.2(a) (2017);

- Co. Rev. St. § 4-2-316 (2017);

- Conn. Gen. Stat. Ann. § 42a-2-313 (effective 2017);

- 6 Del. C. § 2-313 (2017);

- D.C. Code Ann. § 28.2-313 (2017);

- Fla. Stat. Ann. § 672.313 (2017);

- O.C.G.A. § 11-2-318 (2017);

- Haw. Rev. Stat. § 490:2-313 (2016);

- Id. Code § 28-2-314(2)(c) (2017);

- Ill. Comp. Stat. Ann. Ch. 810, 5/2-313 (2016);

- Ind. Code Ann. § 26-1-2-313 (2016);

- Iowa Code Ann. § 554.2313 (2016);

- Kans. Stat. Ann. § 84-2-313 (2017); KRS § 355.2-318 (2017); Kan. Stat. Ann. § 60-3302 (c)  (2017);

- Ky. Rev. Stat. § 355.2-318 (2017);

- La. Rev. Stat. § 9:2800.58 (2016);

- Me. Rev. Stat. Ann. tit. 11, § 2-314 and 2-315 (2017); 14 M.R.S. § 221 (2017);

- Md. Code Ann. Com. Law § 2-318 (2017);

- Mass. Gen. Laws c. 106, § 2-313 (2017);

- Mich. Comp. Laws Ann. § 440.2313 (2016);

- Minn. Stat. Ann. § 336.2-313 Through 315 (2016);

- Miss. Code Ann. § 11-1-63(i)(3) and 75-2-313 (2017);

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

- Mo. Rev. Stat. Ann. § 400.2-313 (2016);

- Mont. Code Ann. § 30-2-313 (2017);

- Neb. Rev. Stat. U.C.C. § 2-313 et seq. (2017);

- Nev. Rev. Stat. U.C.C. § 104.2313, et seq. (2016); Nev. Rev. Stat. §§ 104.2312-104.2318 (2016);

- N.H. Rev. Stat. Ann. § 382-A:2-313. et seq. (2017);

- N.M. Stat. Ann. §§ 55-2-313 to -318 (2017); see also UJI 13-1428 to 1433 NRMA (2016);

- N.Y. U. C.C. Law 2-313, et seq. (2017);

- N.C. Gen. Stat. Ann. § 25-2-313, et seq. (2017);

- N.D. Cent. Code § 41-02-30, et seq. (2017);

- Ohio Rev. Code Ann. 1302.26, et seq. (2016);

- Okla. Stat. tit. 12A, § 2-313 et seq. (2017);

- Or. Rev. Stat. § 72.3130, et seq. (2016);

- 13 Pa. Stat. Ann. § 2313, et seq. (2016);

- R. I. Gen. Laws § 6A-2-313 (2016);

- S.C. Code Ann. § 36-2-313, et seq. (2016);

- S.D. Stat. 57A-2-313, et seq. (2017);

- Tenn. Code Ann. § 47-2-313, et seq. (2016);

- Tex. Bus. & Com. Code Ann. § 2.313, et seq. (2015);

- Ut. Code Ann. § 70A-2-313, et seq. (2016);

- Va. Code Ann. § 8.2-318, et seq. (2016);

- Vt. Stat, Ann. tit. 9A, § 2-313, et seq. (2016);

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

- Wa. Rev. Code § 62A.2-313, et seq. (2016); § 7.72.030(2) (2016);

- W.Va. Code § 46A-6-108, et seq. (2016);

- Wis. Stat. Ann. § 402.313, et seq. (2017); and

- Wyo. Stat. § 34.1-2-313 through 315 (2017).

298.     The breach of the warranty was a substantial factor in bringing about Plaintiffs' injuries. As a direct and proximate result of Defendant's placing its defective Roundup® products into the stream of commerce and failing to warn Plaintiffs of the increased risk of NHL associated with the use of and/or exposure to Roundup® products as described herein, Plaintiffs have developed NHL and have been injured catastrophically and have been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care and comfort, and economic damages, including for medical care and treatment.

299.     The harm caused by Defendant's Roundup® products far outweigh their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

300.     As a direct and proximate result of Defendant's wrongful acts and omissions Plaintiffs have suffered severe and permanent physical and emotional injuries.  Plaintiffs have endured pain and suffering, have suffered economic loss, including significant expenses for medical care and treatment, and will continue to incur these expenses in the future.

WHEREFORE, Plaintiffs pray for judgment against Defendant Monsanto in a fair and reasonable sum in excess of $25,000, together with interest and costs expended herein and such further and other relief as the Court deems just and appropriate.

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

## COUNT SIX: IMPLIED WARRANTIES

301.    Plaintiffs incorporate by reference each and every other paragraph of this Petition as if each were set forth fully and completely herein.

302.    At all times relevant, Defendant engaged in the business of testing, developing, designing, formulating, manufacturing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to users, consumers, and those in proximity to users, including Plaintiffs, thereby placing Roundup® products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendant.

303.    Before the time Plaintiffs were exposed to the use of the aforementioned Roundup® products, Defendant impliedly warranted to its consumers and users—including Plaintiffs and Plaintiffs' employers—that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

304.    Defendant, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiffs' injuries.

305.    Upon information and belief, Plaintiffs and/or Plaintiffs' employers reasonably relied upon the skill, superior knowledge and judgment of Defendant and upon its implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

306.    The Roundup® products were expected to reach and did in fact reach consumers, users, and those in proximity to users, including Plaintiffs, without substantial change in the condition in which they were manufactured and sold by Defendant.

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

307.    At all relevant times, Defendant was aware that consumers, users, and those in proximity of users of its products, including Plaintiffs, would use Roundup® products as marketed by Defendant, which is to say that Plaintiffs were the foreseeable users of Roundup®.

308.    Defendant intended that its Roundup® products be used in the manner in which Plaintiffs in fact used or were exposed to them and Defendant impliedly warranted each product to be of merchantable quality, safe and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

309.    In reliance upon Defendant's implied warranty, Plaintiffs used or were in proximity to the use of Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendant.

310.    Neither Plaintiffs nor Plaintiffs' employers could have reasonably discovered or known of the risks of serious injury associated with Roundup® products or glyphosate.

311.    Defendant breached its implied warranty to Plaintiffs in that its Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

312.    The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

313.    As a direct and proximate result of Defendant's wrongful acts and omissions Plaintiffs have suffered severe and permanent physical and emotional injuries.  Plaintiffs have endured pain and suffering, have suffered economic loss, including significant expenses for medical care and treatment, and will continue to incur these expenses in the future.

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

WHEREFORE, Plaintiffs pray for judgment against Defendant Monsanto in a fair and reasonable sum in excess of $25,000, together with interest and costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT SEVEN: PUNITIVE DAMAGES

314.    Plaintiffs incorporate by reference each and every other paragraph of this Petition as if each were set forth fully and completely herein.

315.    Defendant has acted willfully, wantonly, maliciously, with an evil motive, and recklessly in one or more of the following ways:

a.    Defendants knew of the unreasonably high risk of NHL posed by the Roundup® products before manufacturing, marketing, distributing and/or selling its Roundup® products, yet purposefully proceeded with such action;

b.    Defendant knew of the dangers and risks of Roundup® products, yet it concealed and/or omitted this information from labels and warnings contained on Roundup® products in furtherance of its knowing and willful actions;

c.    Despite its knowledge of the high risk of NHL associated with use and/or exposure to Roundup® products, Defendant affirmatively minimized this risk through marketing and promotional efforts and product labeling.

316.    Through the actions outlined above, Defendant expressed a reckless indifference to the safety of users of Roundup® products, including Plaintiffs.

317.    These actions were outrageous because of Defendant's evil motive or a reckless indifference to the safety of users of Roundup® products and/or those who became exposed to it.

318.    As a direct and proximate result of the willful, wanton, malicious, evilly motivated and/or reckless conduct of Defendant, Plaintiffs have sustained damages set forth above.

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

WHEREFORE, Plaintiffs pray for a judgment for punitive damages against Defendant, in a fair and reasonable amount sufficient to punish Defendant and deter it and others from engaging in similar conduct in the future, costs expended herein, and such further and other relief as the Court deems just and appropriate.

## COUNT EIGHT: DAMAGES

319.     Plaintiffs incorporate by reference each and every other paragraph of this Petition as if each were set forth fully and completely herein.

320.     Defendant knew of the dangerous condition of Roundup® products, including that they posed a danger to their consumers and non-consumers exposed to Roundup® products, including Plaintiffs, but chose not to include any warnings or information regarding the dangerous condition of Roundup® products.

321.     Defendant showed complete indifference to or conscious disregard of the safety of Plaintiffs by its conduct described herein.  Defendant knew or should have known failure to include a warning for Roundup® products would result in people's using and/or being exposed to Roundup® products and subsequently developing NHL.

322.     Plaintiffs are entitled to exemplary damages to punish Defendant and to deter Defendant and others in similar situations from like conduct.

WHEREFORE, Plaintiffs pray for judgment against Defendant for:

 i.   compensatory damages in an amount to be proven at trial;

 ii.  exemplary damages;

 iii. costs, including reasonable attorneys' fees, court costs, and other litigation expenses; and

 iv.  any other relief the Court may deem just and proper.

Electronically Filed - St Louis County - January 08, 2019 - 02:33 PM

Respectfully Submitted,


/s/ Eric D. Holland
Eric D. Holland (Mo. Bar # 39935)
R. Seth Crompton (Mo. Bar #57448)
Patrick R. Dowd (Mo. Bar #64820)
**HOLLAND LAW FIRM, LLC**
300 N. Tucker, Suite 801
St. Louis, MO 63101
Tel: (315) 241-8111
Fax: (314) 241-5554
Email: eholland@allfela.com
Email:  scrompton@allfela.com
Email:  pdowd@allfela.com

And

Jackey W. South
Lundy, Lundy, Soileau & South, LLP
501 Broad Street
Lake Charles, LA 70602
Tel: (337)439-0707
Fax: (337)439-1029
Email: jsouth@lundylawllp.com

*Attorneys for Plaintiffs*

*Attorneys for Plaintiffs*