# U.S. District Court
# Eastern District of Louisiana (New Orleans)
# CIVIL DOCKET FOR CASE #: 2:19-cv-00860-JCZ-JVM

Nettles v. Monsanto Company
Assigned to: Judge Jay C. Zainey
Referred to: Magistrate Judge Janis van Meerveld
Case in other court: 24th JDC, Jefferson Parish, 791-065 "P"
Cause: 28:1332 Diversity-Product Liability

Date Filed: 02/04/2019
Jury Demand: Both
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Jerry Nettles**

represented by **Walter John Leger , III**
Leger & Shaw (New Orleans)
935 Gravier Street
Suite 2150
New Orleans, LA 70112
504-588-9043
Email: wleger3@legershaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brigid E. Collins**
Leger & Shaw (New Orleans)
935 Gravier Street
Suite 2150
New Orleans, LA 70112
504-588-9043
Email: bcollins@legershaw.com
*ATTORNEY TO BE NOTICED*

**Marcus Adam Green**
Green Law Firm
931 Westwood Dr.
Suite B
Marrero, LA 70072
504-328-3990
Email: mag@greenlawfirmla.com
*ATTORNEY TO BE NOTICED*

**Walter John Leger , Jr.**
Leger & Shaw (New Orleans)
935 Gravier Street
Suite 2150
New Orleans, LA 70112
504-588-9043
Fax: 504-588-9980
Email: wleger@legershaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**             represented by    **T. Jay Seale , III**
Seale & Ross, APLC (Hammond)
200 N. Cate St.
P. O. Drawer 699
Hammond, LA 70404
985-542-8500
Email: tjseale@sealeross.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Glen Ray Galbraith**
Seale & Ross, APLC (Hammond)
200 N. Cate St.
P. O. Drawer 699
Hammond, LA 70404
985-542-8500
Email: galbraith@sealeross.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/04/2019 | 1 | NOTICE OF REMOVAL from 24th JDC, Jefferson Parish, case number 791-065 "P" (Filing fee $400 receipt number 053L-7404359) filed by Monsanto Company. (Attachments: # 1 State Court Pleadings, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Civil Cover Sheet)Attorney Glen Ray Galbraith added to party Monsanto Company(pty:dft).(Galbraith, Glen) (Attachment 1 replaced on 2/5/2019) (sbs). Modified text on 2/5/2019 (sbs). (Entered: 02/04/2019) |
| 02/04/2019 | 2 | Statement of Corporate Disclosure by Monsanto Company identifying Corporate Parent Bayer AG for Monsanto Company (Galbraith, Glen) (Entered: 02/04/2019) |
| 02/05/2019 | 3 | Initial Case Assignment to Judge Lance M Africk and Magistrate Judge Janis van Meerveld. (cc) (Entered: 02/05/2019) |
| 02/05/2019 | 4 | Directive of the Clerk regarding compliance with 28:1447(b) re 1 Notice of Removal, filed by Monsanto Company. By the Clerk.(sbs) (Entered: 02/05/2019) |
| 02/05/2019 | 5 | Correction of Docket Entry by Clerk re 1 Notice of Removal. **Exhibit 1 was imaged as 8-1/2" x 14". All documents should be 8-1/2" x 11". Clerk has corrected the image.** (sbs) (Entered: 02/05/2019) |
| 02/05/2019 | 6 | ANSWER to 1 Notice of Removal, with Jury Demand by Monsanto Company.(Galbraith, Glen) (Entered: 02/05/2019) |
| 02/05/2019 | 7 | ORDER TRANSFERRING CASE. Case transferred to Judge Jay C. Zainey. Judge Lance M Africk no longer assigned to case. Signed by Judge Lance M Africk on 2/5/19.(sbs) (Entered: 02/05/2019) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 02/05/2019 13:44:06 | | |
| **PACER Login:** | hllp1982:2634105:4722683 | **Client Code:** | 1417.0049 |

FILED FOR RECORD 01 /09/2019 12:30:39
Shelley M. Mauterer, DY CLERK
JEFFERSON PARISH, LA

**24th JUDICIAL DISTRICT COURT FOR THE PARISH OF JEFFERSON**

**STATE OF LOUISIANA**

CASE NO. 7 9 1 0 6 5                                    DIV:

**JERRY NETTLES**

**Versus**

**MONSANTO COMPANY**

FILED:_____

                                        _____
                                             **DEPUTY CLERK**

**PETITION FOR DAMAGES**

NOW COMES PLAINTIFF Jerry Nettles, who avers as follows:

1.

Plaintiff Jerry Nettles ("Nettles") is of majority age and domiciled in the Parish of Jefferson, State of Louisiana.

2.

Made defendant herein is Monsanto Company ("Monsanto"), a Delaware corporation with its principal business establishment in Luling, Louisiana.

At all times relevant to this complaint, Monsanto sold and distributed Monsanto products including Roundup, within the State of Louisiana.

**FACTS**

3.

In 1970, Defendant Monsanto Company, Inc. discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85-90 million pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

1

4.

Monsanto is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since Monsanto alleges glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

5.

Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

6.

On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency pf the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

7.

On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

8.

The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin's lymphoma and other haematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

9.

The IARC evaluation is significant in that it confirms what has been believed for years: That glyphosate is toxic to humans.

10.

Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

11.

Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

12.

Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

13.

For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®-glyphosate-is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers.

14.

Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® was safe.

3

15.

The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use. It still markets Roundup® as safe today.

16.

The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

17.

Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

18.

FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

19.

The EPA and the State of Louisiana registered Roundup® for distribution, sale, and manufacture in the United States and the State of Louisiana.

20.

FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

21.

The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-l. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA' s review and evaluation.

22.

In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment-in relation to the re-registration process-no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

*Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup*

23.

Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Monsanto, including contrary studies. it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

24.

On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

25.

In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing product, including nine of the 15 residue studies needed to register Roundup®.

26.

In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

27.

Three top executives of IBT were convicted of fraud in 1983.

28.

In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

29.

Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

### *The Importance of Roundup® to Monsanto's Market Dominance Profits*

30.

The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division

was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

31.

In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate; farmers can spray Roundup® onto their fields during the growing season without "harming" the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

32.

Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

***Monsanto has known for decades that it falsely advertises the safety of Roundup®***

33.

In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

1. Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences.

2. And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a

7

weed, brush, edging or trimming problem.

3. Roundup biodegrades into naturally occurring elements.

4. Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

5. This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

6. You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

7. Glyphosate is less toxic to rats than table salt following acute oral ingestion.

8. Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

9. You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

10. "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

34.

On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with

NYAG in which Monsanto agreed, among other things, "to cease and desist from publishing or

broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a)   its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.
     ***
b)   its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable
     ***
c)   its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.
     ***
d)   its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."
     ***
e)   glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;
     ***
f)   its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

35.

Monsanto did not alter its advertising in the same manner in any state other than New

York, and on information and belief still has not done so today.

36.

In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

### Classifications and Assessments of Glyphosate

37.

The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

38.

The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.  Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

39.

One year before the Monograph meeting, the meeting was announced and there was a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership was selected and the sections of the Monograph were developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections were distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalized review of all literature, evaluated the evidence in each category, and completed the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings were published in Lancet Oncology, and within a year after the meeting, the final Monograph was finalized and published.

40.

In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer

bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

41.

In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

42.

On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3-10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

43.

The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

44.

Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

45.

Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

46.

The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

47.

The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

48.

The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

49.

In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

50.

The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

51.

The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

52.

The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

11

53.

The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

### Other Earlier Findings About Glyphosate's Dangers to Human Health

54.

The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

### Release Patterns

55.

Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

56.

It may also be released to the environment during its manufacture, formulation, transport, Storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

57.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

58.

In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers

### Recent Worldwide Bans on Roundup®/Glyphosate

59.

Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which takes effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

60.

The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

61.

France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

62.

Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

13

63.

The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that Glyphosate has been linked to fatal kidney disease in agricultural workers.

64.

The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

65.

On information and belief, Monsanto was, at all relevant times, engaged in the distribution of Roundup, Roundup-ready crops and other glyphosate-containing products to retailers and commercial/agricultural users in Louisiana.

66.

Monsanto had superior knowledge compared to Roundup users and consumers, including regarding the carcinogenic properties of the product, yet failed to accompany its sales and/or marketing of Roundup with any warnings or precautions for that grave danger. On information and belief, Monsanto was one of the distributors providing Roundup and other glyphosate-containing products actually used by the Plaintiff.

### *Plaintiff's Exposure to Roundup®*

67.

Jerry Nettles routinely used Roundup in his lawncare efforts since the early 1990's. He was personally responsible for his lawncare as well as the lawncare of neighbors and family for many years. He enjoyed spending time in his garden and was known for keeping impeccable landscaping over the years. He also enjoyed sharing his gardening talents with family and friends.

68.

On at least one occasion during his routine use of Roundup for lawncare, the product splashed over his bare skin, whereupon he made an effort to remove the product from his skin and clothes. Over the years, Jerry Nettles routinely kept Roundup in his truck and in his garage for easy access to the product.

69.

In 2017, and at the age of 67, Jerry Nettles was diagnosed with non-Hodgkin's lymphoma. He has been engaged in active treatment and is currently undergoing a second round of chemotherapy.

### *CONTRA NON VALENTEM*

70.

Upon information and belief, Monsanto has known of the defects in RoundUp and concealed from consumers for years and/or failed to alert consumers of the defective nature of the RoundUp.

71.

Given Monsanto's failure to disclose this known but non-public information about the defective nature of the defect - information over which it had exclusive control - and because Plaintiff could not have reasonably known that the RoundUp was defective, Defendants are stopped from relying on nor should defendants be able to rely on any exception regarding any period of liberative prescription that might otherwise be applicable to the claims asserted herein.

72.

Pursuant to the doctrine of Contra non Valentem Agere Nulla Currit Praescriptio, the Period of liberative prescription for plaintiffs' claims "commences on the date the injured party discovers or should have discovered the facts upon which his cause of action is based."[1] Accordingly, as Plaintiff had no knowledge of the defect with the RoundUp until the verdict rendered in this action is brought within one year of that recall, Plaintiff s claim is timely.

### LOUISIANA PRODUCTS LIABILTIY ACT

### CLAIM ONE

### DESIGN DEFECT (La. Rev. Stat. 9:2800.56)

73.

Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

---

[1] *Eastin v. Entergy Corp., 865 So. 2d 49, 55 (La 2004).*

74.

Plaintiff asserts a claim against Defendant for defective design pursuant to La. Rev. Stat. 9:2800.56.

75.

At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant. At all times relevant to this litigation, Defendant designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products that Plaintiff was exposed to, as described above.

76.

At all times relevant to this litigation, Defendant Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff.

77.

At all times relevant to this litigation, Defendant' Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Louisiana and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

78.

Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of the Defendant' manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

79.

Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

80.

At all times relevant to this action, Defendant knew or had reason to know that the Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendant.

81.

At all times relevant to this litigation, Defendant' Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendant were defective in design and formulation, in one or more of the following ways:

a)  When placed in the stream of commerce, Defendant' Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b)  When placed in the stream of commerce, Defendant' Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c)  When placed in the stream of commerce, Defendant' Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d)  Defendant did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate.

e)  Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f)  Defendant knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g)  Defendant did not conduct adequate post-marketing surveillance of its Roundup®
products.

h)  Defendant could have employed safer alternative designs and formulations.

82.

Plaintiff was exposed to Defendant' Roundup® products while living in the Parish of
Jefferson, as described above, without knowledge of its dangerous characteristics.

83.

At all times relevant to this litigation, Plaintiff was exposed to the use of Defendant'
Roundup® products in an intended or reasonably foreseeable manner without knowledge of their
dangerous characteristics.

84.

Plaintiff could not have reasonably discovered the defects and risks associated with
Roundup® or glyphosate-containing products before or at the time of exposure.

85.

The harm caused by Defendant' Roundup® products far outweighed their benefit,
rendering Defendant' products dangerous to an extent beyond that which an ordinary consumer
would contemplate. Defendant's Roundup® products were and are more dangerous than
alternative products and Defendant could have designed its Roundup® products to make them
less dangerous. Indeed, at the time that Defendant designed its Roundup® products, the state of
the industry's scientific knowledge was such that a less risky design or formulation was
attainable.

86.

At the time Roundup® products left Defendant's control, there was a practical,
technically feasible and safer alternative design that would have prevented the harm without
substantially impairing the reasonably anticipated or intended function of Defendant's herbicides.

87.

Defendant's defective design of its Roundup® products was willful, wanton, fraudulent,
malicious, and conducted with reckless disregard for the health and safety of users of the
Roundup® products, including the Plaintiff herein.

88.

Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendant is strictly liable to Plaintiff.

89.

The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiff grave injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained his injuries.

90.

Defendant's conduct, as described above, was reckless. Defendant risked the lives of consumers and users of its products, including Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Defendant made conscious decisions not to re-design, warn or inform the unsuspecting public. Defendant's reckless conduct warrants an award of punitive damages.

91.

As a direct and proximate result of Defendant placing defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

**CLAIM TWO**
**INADEQUATE WARNING (La. Rev Stat. 9:2800.57)**

92.

Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

93.

Plaintiff asserts a claim against Defendant for inadequate warning pursuant to La. Rev. Stat. 9:2800.57.

94.

At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, promoting and applying

Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

95.

Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiff, and persons responsible for consumers (such as employers), and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

96.

At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn the Plaintiff of the dangers associated with Roundup® use and exposure. Defendant, as manufacturer, seller, or distributor of chemical herbicides, is held to the knowledge of an expert in the field.

97.

At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

98.

At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of this product and to those who would foreseeably use or be harmed by Roundup, including Plaintiff.

99.

Despite the fact that Defendant knew or should have known that Roundup® posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks

associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied or sold the product, and not known to end users and consumers, such as Plaintiff.

100.

Defendant knew or should have known that these products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Defendant have wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

101.

At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Louisiana and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, marketed and sprayed/applied by Defendant.

102.

Plaintiff was exposed to Roundup® products, as described above, without knowledge of their dangerous characteristics.

103.

At all times relevant to this litigation, Plaintiff was exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

104.

Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiff s exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendant.

105.

Defendant knew or should have known that the minimal warnings disseminated with or accompanying the application of Roundup® products were inadequate, but they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the product safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

106.

The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled those exposed such as Plaintiff to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

107.

To this day, Defendant have failed to adequately and accurately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

108.

As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were sold or distributed by Defendant, were applied by Defendant, and when Plaintiff became exposed.

109.

Defendant is liable to Plaintiff for injuries caused by negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of their products and the risks associated with the use of or exposure to Roundup® and glyphosate.

110.

The defects in these Roundup® products were substantial and contributing factors in causing Plaintiff' injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained his injuries.

111.

Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products and application, Plaintiff could have avoided the risk of developing injuries as alleged herein and/or Plaintiff could have obtained alternative herbicides.

112.

As a direct and proximate result of Defendant placing defective Roundup® products into the stream of commerce and exposing Plaintiff to them, Plaintiff has suffered and continues to suffer severe injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

## CLAIM THREE
## BREACH OF EXPRESS WARRANTY (La. Rev. Stat. 9:2800.58)

113.

Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

114.

Plaintiff asserts a claim against Defendant for breach of express warranty pursuant to La. Rev. Stat. 9:2800.58.

115.

At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

116.

Before the time that Plaintiff was exposed to the use of the aforementioned Roundup® product, Defendant expressly warranted to consumers and those exposed-including Plaintiff-that Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

117.

Defendant, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

118.

Plaintiff reasonably relied upon the skill, superior knowledge and judgment of Defendant and upon their implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

119.

Plaintiff is the intended third-party beneficiaries of express warranties made by Defendant to the purchasers of their horticultural herbicides, and as such Plaintiff is entitled to assert this claim.

120.

The Roundup® products were expected to reach and did in fact reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendant.

121.

At all times relevant to this litigation, Defendant was aware that consumers and users of their products, including Plaintiff, would use Roundup® products as marketed by Defendant, which is to say that Plaintiff was a foreseeable user of Roundup®.

122.

Defendant intended that Roundup® products be used in the manner in which Plaintiff was exposed to them and Defendant expressly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

24

123.

In reliance upon Defendant' express warranty, Plaintiff used or was exposed to Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendant.

124.

Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

125.

Defendant breached their express warranty to Plaintiff in that Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

126.

The harm caused by Roundup® products far outweighed their benefit, rendering the product more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

127.

As a direct and proximate result of Defendant' wrongful acts and omissions Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, has suffered economic loss including significant expenses for medical care and treatment and will continue to incur these expenses in the future.

WHEREFORE, plaintiff Jerry Nettles prays that after due proceedings are had, there be judgment in his favor and against defendant Monsanto Company, all damages, costs, expenses, attorneys' fees, including but not limited to, special damages, general damages, punitive damages, as well as all other relief to which Plaintiff may be entitled to under the circumstances at law or in equal. Plaintiff requests a trial by jury.

Respectfully submitted:

***LEGER & SHAW***

Walter J. Leger, Jr. La Bar No. 8278
Walter J. Leger III, La. Bar No. 28656 (T.A.)
Brigid Collins, La. Bar No. 28538
935 GRAVIER STREET, SUITE 2150
NEW ORLEANS, LA 70112
TELEPHONE: (504) 588-9043
FACSIMILE: (504) 588-9980
wleger3@legershaw.com

*and*

***THE GREEN LAW FIRM***
Marcus A. Green
931 Westwood Drive, Suite B
Marrero, Louisiana 70072
Telephone: (504) 328-3990
Facsimile: (504) 328-3992
mag@greenlawfirmla.com

**PLEASE SERVE:**

1)  **MONSANTO COMPANY**
    Through its Registered Agent, Corporation Service Company
    501 Louisiana Avenue
    Baton Rouge, LA 70802

A TRUE COPY OF THE ORIGINAL
ON FILE IN THIS OFFICE.

Masie Comeaux
DEPUTY CLERK
24TH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, LA.