JURYDEMAND

# U.S. District Court
# United States District Court for the Western District of Washington (Seattle)
# CIVIL DOCKET FOR CASE #: 2:19-cv-00187-RAJ

Ayon v. Monsanto Company et al
Assigned to: Judge Richard A. Jones
Cause: 28:1332 Diversity-Product Liability

Date Filed: 02/07/2019
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod.
Liability
Jurisdiction: Diversity

**Plaintiff**

**Ceceilia Ayon**
*as Personal Representative of the
estate of*
John Troy Ayon

represented by **Elizabeth Jean McLafferty**
SCHROETER GOLDMARK & BENDER
810 3RD AVE
STE 500
SEATTLE, WA 98104
206-621-8525
Email: mclafferty@sgb-law.com
*ATTORNEY TO BE NOTICED*

**Sims G Weymuller**
SCHROETER GOLDMARK & BENDER
810 3RD AVE
STE 500
SEATTLE, WA 98104
206-622-8000
Email: Sims@sgb-law.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

**Defendant**

**Bayer Corporation**

**Defendant**

**Bayer AG**

| Date Filed | # | Docket Text |
|---|---|---|
| 02/07/2019 | 1 | COMPLAINT against All Defendants with JURY DEMAND (Receipt # 0981-5644127) Attorney Sims G Weymuller added to party Ceceilia Ayon(pty:pla), filed by Ceceilia Ayon. (Attachments: # 1 Civil Cover Sheet, # 2 Summons Monsanto Company, # 3 Summons Bayer Corporation)(Weymuller, Sims) (Entered: 02/07/2019) |
| 02/08/2019 | | Judge Richard A. Jones added. (GT) (Entered: 02/08/2019) |

| 02/08/2019 | 2 | Summonses Electronically Issued as to defendants Monsanto Company and Bayer Corporation. (Attachments: # 1 Summons)(GT) (Entered: 02/08/2019) |
| 02/08/2019 | 3 | NOTICE TO FILER: re 1 Complaint,. **Notice of Filing Deficiency** ** Action Required ** See Attached Letter for More Information and Instructions. (GT) (Entered: 02/08/2019) |
| 02/08/2019 | 4 | NOTICE of Appearance by attorney Elizabeth Jean McLafferty on behalf of Plaintiff Ceceilia Ayon. (McLafferty, Elizabeth) (Entered: 02/08/2019) |
| 02/14/2019 | 5 | STANDING ORDER for Civil Cases Assigned to Judge Richard A. Jones. (VE) (Entered: 02/14/2019) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 02/22/2019 13:10:09 | | | |
| **PACER Login:** | hllp1982:2634105:4722683 | **Client Code:** | 1417.0049 |
| **Description:** | Docket Report | **Search Criteria:** | 2:19-cv-00187-RAJ |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CECEILIA AYON, as Personal
Representative of the ESTATE OF JOHN
TROY AYON,

                    Plaintiff(s),

        v.

MONSANTO COMPANY; BAYER
CORPORATION; and BAYER AG,

                    Defendants.

No.

COMPLAINT FOR DAMAGES

JURY DEMAND

        COMES NOW Plaintiff CECEILIA AYON, who was the spouse of decedent John

Troy Ayon until the time of his death, through her attorneys of record, Schroeter, Goldmark

& Bender, PS, and Sims Weymuller and Elizabeth McLafferty, for causes of action against

the above-named Defendants, and hereby allege as follows:

## I.    PARTIES

**Plaintiff**

        1.1.    Plaintiff resides in Yakima, Washington. On information and belief, plaintiff's

COMPLAINT FOR DAMAGES – 1

husband John Troy Ayon ("Decedent") was exposed to Roundup® containing the active ingredient glyphosate and the surfactant polyethoxylated tallow amine ("POEA") in Washington from approximately 1976 to 2015.

    1.2.    As a direct and proximate result of long-term exposure to Roundup®, Decedent was diagnosed with diffuse large B-cell non-Hodgkin's lymphoma in or around November 2015.

**Defendants**

    1.3.    Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its headquarters in St. Louis, Missouri.

    1.4.    Defendant advertises and sells goods, specifically Roundup®, in the State of Washington.

    1.5.    Defendant transacted and conducted business within the State of Washington that relates to the allegations in this complaint.

    1.6.    Defendant derived substantial revenue from goods and products used in the State of Washington.

    1.7.    Defendant expected or should have expected its acts to have consequences within the State of Washington.

    1.8.    Defendant engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup®.

    1.9.    Defendant Bayer Corporation ("Bayer Corp.") is an Indiana corporation with its headquarters in New Jersey.

    1.10.    Defendant Bayer Corp. has derived substantial revenue from goods and products used in the State of Washington.

COMPLAINT FOR DAMAGES – 2

SCHROETER, GOLDMARK & BENDER
500 Central Building • 810 Third Avenue • Seattle, WA 98104
Phone (206) 622-8000 • Fax (206) 682-2305

1.11.   Upon information and belief, Defendant Bayer AG is a publicly held corporation headquartered in Leverkusen, Germany.

1.12.   Upon information and belief, Bayer AG is the parent/holding company of Defendants Bayer Corp. and Monsanto.

1.13.   Bayer AG acquired Monsanto on or about June 7, 2018.

1.14.   Upon information and belief, Monsanto is an indirect, wholly owned subsidiary of Bayer AG.

1.15.   Monsanto, Bayer Corp., and Bayer AG are collectively referred to herein as "Defendants."

## II.   JURISDICTION AND VENUE

2.1.   This Court has jurisdiction over Defendants and this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs and, because there is complete diversity of citizenship between Plaintiff and Defendants.

2.2.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391; at all times material, Plaintiff was a resident of Washington State and Defendants at all times material transacted business in Washington selling, marketing, and/or distributing Roundup®.

## III.   FACTS

3.1.   In 1970, Defendant Monsanto Company discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 millions of pounds used annually. That number grew to 185

COMPLAINT FOR DAMAGES – 3

SCHROETER, GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA 98104
Phone (206) 622-8000 ● Fax (206) 682-2305

million pounds by 2007.[1] As of 2013, glyphosate was the world's most widely used herbicide.

3.2.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market.[2] The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.[3]

3.3.     Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops.[4] They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used.[5] It has been found in food,[6] in the urine of agricultural

---

[1] Arthur Grube et al., U.S. Envtl. Prot. Agency, *Pesticides Industry Sales and Usage, 2006-2007 Market Estimates* 14 (2011), available at https://www.epa.gov/sites/production/files/2015-10/documents/market_estimates2007.pdf.

[2] ETC Group, *Who Will Control the Green Economy?* 22 (2011), available at http://www.etcgroup.org/files/publication/pdf_file/ETC_wwctge_4web_Dec2011.pdf.

[3] William Neuman & Andrew Pollack, *Farmers Cope With Roundup-Resistant Weeds*, N.Y. TIMES, May 3, 2010, available at https://www.nytimes.com/2010/05/04/business/energy-environment/04weed.html?pagewan.

[4] Monsanto, Backgrounder-History of Monsanto's Glyphosate Herbicides (Sep. 2, 2015), available at http://www.monsantoglobal.com/global/au/products/pages/roundup.aspx

[5] See U.S. Geological Survey, *USGS Technical Announcement: Widely Used Herbicide Commonly Found in Rain and Streams in the Mississippi River Basin* (2011), available at https://archive.usgs.gov/archive/sites/www.usgs.gov/newsroom/article.asp-ID=2909.html ; *see also* U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate*, available at http://www.epa.gov/safewater/pdfs/factsheets/soc/tech/glyphosa.pdf.

[6] Thomas Bohn et al., *Compositional Differences in Soybeans on the Market: Glyphosate Accumulates in Roundup Ready GM Soybeans*, 153 FOOD CHEMISTRY 207 (2013), available at http://www.sciencedirect.com/science/article/pii/S0308814613019201.

COMPLAINT FOR DAMAGES – 4

SCHROETER, GOLDMARK & BENDER
500 Central Building • 810 Third Avenue • Seattle, WA 98104
Phone (206) 622-8000 • Fax (206) 682-2305

workers,[7] and even in the urine of urban dwellers that are not in direct contact with glyphosate.[8] On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

3.4.    On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

3.5.    The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin's lymphoma and other hematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.[9]

3.6.    The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

3.7.    Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and

---

[7] John F. Acquavella et al., *Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study*, 112(3) ENVTL. HEALTH PERSPECTIVES 321 (2004), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241861/pdf/ehp0112-000321.pdf; Kathryn Z. Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, 112 IARC Monographs 76, section 5.4 (2015), available at http://dx.doi.org/10.1016/S1470-2045(15)70134-8.

[8] Dirk Brändli & Sandra Reinacher, *Herbicides found in Human Urine*, 1 ITHAKA JOURNAL 270 (2012), available at http://www.ithaka-journal.net/druckversionen/e052012-herbicides-urine.pdf.

[9] See Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra.*

COMPLAINT FOR DAMAGES – 5

continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

**Registration of Herbicides under Federal Law**

3.8.    The manufacture, formulation, and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq*. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

3.9.    Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

3.10.    FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

3.11.    The EPA and the State of Washington registered Roundup® for distribution,

COMPLAINT FOR DAMAGES – 6

sale, and manufacture in the United States and the State of Washington.

3.12.   FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conduct the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

3.13.   The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

3.14.   In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment —in relation to the registration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

**Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®**

3.15.   Based on early studies showing that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Monsanto, including contrary studies it

COMPLAINT FOR DAMAGES – 7

SCHROETER, GOLDMARK & BENDER
500 Central Building • 810 Third Avenue • Seattle, WA 98104
Phone (206) 622-8000 • Fax (206) 682-2305

1   provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity

2   in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear

3   that the designation did not mean the chemical does not cause cancer: "It should be

4   emphasized, however, that designation of an agent in Group E is based on the available

5   evidence at the time of evaluation and should not be interpreted as a definitive conclusion

6   that the agent will not be a carcinogen under any circumstances."[10]

7

8   3.16.   On two occasions, the EPA found that the laboratories hired by Monsanto to

9   test the toxicity of its Roundup® products for registration purposes committed fraud.

10   3.17.   In the first instance, Monsanto, in seeking initial registration of Roundup® by

11   the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide

12   toxicology studies relating to Roundup®.[11] IBT performed about thirty tests on glyphosate

13   and glyphosate-containing products, including nine of the fifteen residue studies needed to

14   register Roundup®.

15

16   3.18.   In 1976, the United States Food and Drug Administration ("FDA") performed

17   an inspection of IBT that revealed discrepancies between the raw data and the final report

18   relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too

19   found the toxicology studies conducted for the Roundup® herbicide to be invalid.[12] An EPA

20

21   _____

[10] U.S. Envtl. Prot. Agency, *Memorandum, Subject: SECOND Peer Review of Glyphosate 1* (1991), available at
22   https://archive.org/stream/SecondPeerReviewOfGlyphosateEPAOct301991/Second%20Peer%20Review%20
   of%20Glyphosate%20-%20EPA%20-%20%20Oct%2030,%201991_djvu.txt.

23   [11] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories* (June, 2005), available at
   https://monsanto.com/app/uploads/2017/06/ibt_craven_bkg.pdf.

24   [12] U.S. Envtl. Prot. Agency, *Summary of the IBT Review Program Office of Pesticide Programs*
   (1983), available at

25   https://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA&Index=1981
   +Thru+1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=&

26   QField=&QFieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File
   =D%3A%5Czyfiles%5CIndex%20Data%5C81thru85%5CTxt%5C00000022%5C91014ULV.txt&User=ANO

SCHROETER, GOLDMARK & BENDER
500 Central Building • 810 Third Avenue • Seattle, WA 98104
Phone (206) 622-8000 • Fax (206) 682-2305

1  reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to

2  believe the scientific integrity of the studies when they said they took specimens of the uterus

3  from male rabbits."[13]

4      3.19.   Three top executives of IBT were convicted of fraud in 1983.

5
6      3.20.   In the second incident of data falsification, Monsanto hired Craven

7  Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In

8  that same year, the owner of Craven Laboratories and three of its employees were indicted,

9  and later convicted, of fraudulent laboratory practices in the testing of pesticides and

10 herbicides.[14]

11
12      3.21.   Despite the falsity of the tests that underlie its registration, within a few years

13 of its launch, Monsanto was marketing Roundup® in 115 countries.

**The Importance of Roundup® to Monsanto's Market Dominance Profits**

14
15      3.22.   The success of Roundup® was key to Monsanto's continued reputation and

16 dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's

17 agriculture division was out-performing its chemicals division's operating income, and that

18 gap increased yearly. But with its patent for glyphosate expiring in the United States in the

19 year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to

20 ward off impending competition.

21
22  _____

23  NYMOUS&Password=anonymous&SortMethod=h%7C-
&MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=hpfr&
DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page&MaximumPages

24  =1&ZyEntry=1&SeekPage=x&ZyPURL.

[13] Marie-Monique Robin, *The World According to Monsanto: Pollution, Corruption and the Control of the*

25  *World's Food Supply* (2011) (*citing* U.S. Envtl. Prot. Agency, *Data Validation, Memo from K. Locke,
Toxicology Branch, to R. Taylor, Registration Branch*. Washington, D.C. (August 9, 1978)).

26  [14] Dr. Roger A. Novak, *The Long Arm of the Lab Laws*, (November, 2001) available at
https://pubs.acs.org/subscribe/archive/tcaw/10/i11/html/11regs.html.

COMPLAINT FOR DAMAGES – 9

SCHROETER, GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA 98104
Phone (206) 622-8000 ● Fax (206) 682-2305

3.23. In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate; farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

3.24. Through a three-pronged strategy of increased production, decreased prices, and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue.[15] Today, glyphosate remains one of the world's largest herbicides by sales volume.

**Monsanto has known for decades that it falsely advertises the safety of Roundup®**

3.25. In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer **than table salt"** and "practically **non-toxic"** to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

---

[15] David Barboza, *The Power of Roundup; A Weed Killer Is A Block for Monsanto to Build On*, N.Y. Times, Aug. 2, 2001, *available at* http://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weed-killeris-a-block-for-monsanto-to-build-on.html.

COMPLAINT FOR DAMAGES – 10

SCHROETER, GOLDMARK & BENDER
500 Central Building • 810 Third Avenue • Seattle, WA 98104
Phone (206) 622-8000 • Fax (206) 682-2305

a) Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

b) And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c) Roundup biodegrades into naturally occurring elements.

d) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e) This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f) You can apply Roundup with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganism's biodegrade Roundup into natural products.

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup®.[16]

3.26. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and

---

[16] Attorney General of the State of New York, in the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

COMPLAINT FOR DAMAGES – 11

SCHROETER, GOLDMARK & BENDER
500 Central Building • 810 Third Avenue • Seattle, WA 98104
Phone (206) 622-8000 • Fax (206) 682-2305

1   desist from publishing or broadcasting any advertisements [in New York] that represent,

2   directly or by implication" that:

3       a) its glyphosate-containing pesticide products or any component thereof are
4          safe, non-toxic, harmless or free from risk.

5       b) its glyphosate-containing pesticide products or any component thereof
6          manufactured, formulated, distributed or sold by Monsanto are biodegradable.

7       c) its glyphosate-containing pesticide products or any component thereof stay
           where they are applied under all circumstances and will not move through the
8          environment by any means.

9       d) its glyphosate-containing pesticide products or any component thereof are
           "good" for the environment or are "known for their environmental
10         characteristics."

11      e) glyphosate-containing pesticide products or any component thereof are
12         safer or less toxic than common consumer products other than herbicides.

13      f) its glyphosate-containing products or any component thereof might be
           classified as "practically non-toxic."
14

15      3.27.    Monsanto did not alter its advertising in the same manner in any state other

16   than New York, and on information and belief still has not done so today.

17      3.28.    In 2009, France's highest court ruled that Monsanto had not told the truth

18   about the safety of Roundup®. The French court affirmed an earlier judgment that Monsanto

19   had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil

20   clean." [17]

21

22   **Classifications and Assessments of Glyphosate**

23      3.29.    The IARC process for the classification of glyphosate followed the stringent

24   procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program

25

26   [17] Monsanto Guilty in 'False Ad' Row, BBC, Oct. 15, 2009, available at
        http://news.bbc.co.uk/2/hi/europe/8308903.stm.

SCHROETER, GOLDMARK & BENDER
500 Central Building • 810 Third Avenue • Seattle, WA 98104
Phone (206) 622-8000 • Fax (206) 682-2305

has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

3.30.   The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.[18] Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

3.31.   One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in *The Lancet Oncology*, and within a year after the meeting, the final Monograph is finalized and published.

3.32.   In assessing an agent, the IARC Working Group reviews the following information:   (a) human, experimental, and mechanistic data;   (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The

---

[18] World Health Org., *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble* (2006), available at http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

COMPLAINT FOR DAMAGES – 13

SCHROETER, GOLDMARK & BENDER
500 Central Building • 810 Third Avenue • Seattle, WA 98104
Phone (206) 622-8000 • Fax (206) 682-2305

studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

3.33. In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

3.34. On July 29, 2015, IARC issued its Monograph for glyphosate in Volume 112. For the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

3.35. The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland, and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

3.36. Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

3.37. Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface

SCHROETER, GOLDMARK & BENDER
500 Central Building • 810 Third Avenue • Seattle, WA 98104
Phone (206) 622-8000 • Fax (206) 682-2305

water, and groundwater, as well as in food.

3.38.    The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

3.39.    The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

3.40.    The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

3.41.    In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

3.42.    The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

3.43.    The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal

COMPLAINT FOR DAMAGES – 15

SCHROETER, GOLDMARK & BENDER
500 Central Building • 810 Third Avenue • Seattle, WA 98104
Phone (206) 622-8000 • Fax (206) 682-2305

cells in utero.

3.44.   The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.[19] Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

3.45.   The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.[20] While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

**Other Earlier Findings about Glyphosate's Dangers to Human Health**

3.46.   The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

---

[19] Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra* at 77.
[20] Anneclare J. De Roos et al., *Cancer Incidence Among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study,* 113 Env't Health Perspectives 49-54 (2005), available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1253709/pdf/ehp0113-000049.pdf.

COMPLAINT FOR DAMAGES – 16

SCHROETER, GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA 98104
Phone (206) 622-8000 ● Fax (206) 682-2305

It may also be released to the environment during its manufacture, formulation, transport, storage, disposal, and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.[21]

3.47.   In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.[22]

**The Toxicity of Other Ingredients in Roundup®**

3.48.   In addition to the toxicity of the active ingredient, glyphosate, several studies support the hypothesis that the glyphosate-based formulation in Defendants' Roundup® products is more dangerous and toxic than glyphosate alone. Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.[23]

3.49.   In 2002, a study by Julie Marc entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK 1/ Cyclin B Activation," revealed Roundup® causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate

---

[21] U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate, supra.*

[22] Caroline Cox, *Glyphosate, Part 2: Human Exposure and Ecological Effects,* 15 J. PESTICIDE REFORM 4 (1995); W.S. Peas et al., *Preventing pesticide-related illness in California agriculture: Strategies and priorities. Environmental Health Policy Program Report,* Univ. of Cal. School of Public Health, Calif. Policy Seminar (1993).

[23] Martinez, T.T. and K. Brown, *Oral and pulmonary toxicology of the surfactant used in Roundup herbicide,* PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991).

COMPLAINT FOR DAMAGES – 17

SCHROETER, GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA 98104
Phone (206) 622-8000 ● Fax (206) 682-2305

1    alone were ineffective and did not alter cell cycles.[24]

2       3.50.   A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect

3    cell cycle regulation," demonstrated a molecular link between glyphosate-based products and

4    cell cycle dysregulation. The researchers noted that "[c]ell cycle dysregulation is a hallmark

5    of tumor cells and human cancer. Failure in the cell cycle checkpoints leads genomic

6    instability and subsequent development of cancer from the initial affected cell." Further,

7    "[s]ince cell cycle disorders such as cancer result from dysfunction of a unique cell, it was of

8

9    interest to evaluate the threshold dose of glyphosate affecting the cells."[25]

10      3.51.   In 2005, a study by Francisco Peixoto, entitled "Comparative effects of the

11   Roundup and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that

12   Roundup®'s effects on rat liver mitochondria are far more toxic than equal concentrations of

13
     glyphosate alone. The Peixoto study further suggested that the harmful effects of Roundup®
14
     on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be
15
16   the result of result of other chemicals, such as the surfactant POEA, or the alternative, due to

17   potential synergic effect between glyphosate and other ingredients in the Roundup®

18   formulation.[26]

19      3.52.   In 2009, Nora Benachour and Gilles-Eric Seralini published a study

20
     examining the effects of Roundup® and glyphosate that were far below agricultural
21

22   _____

     [24] Julie Marc, et al., *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B*
23     *Activation*, 15 CHEM. RES. TOXICOL. 326-331 (2002), available at
       http://pubs.acs.org/doi/full/10.1021/tx015543g.
24   [25] Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation*, 96 BIOLOGY OF
       THE CELL 245, 245-249 (2004), available at
25       http://onlinelibrary.wiley.com/doi/10.1016/j.biolcel.2003.11.010/epdf.
     [26] Francisco Peixoto, *Comparative effects of the Roundup and glyphosate on mitochondrial oxidative*
26     *phosphorylation*, 61 CHEMOSPHERE 1115, 1122 (2005), available at http://www.ask-
       force.org/web/Seralini/Peixoto-Comparative-Effects-RR-Glyphosate-2006.pdf.

COMPLAINT FOR DAMAGES – 18                          SCHROETER, GOLDMARK & BENDER
                                                    500 Central Building • 810 Third Avenue • Seattle, WA 98104
                                                    Phone (206) 622-8000 • Fax (206) 682-2305

recommendations, corresponding with low levels of residue in food. The researchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability and amplify toxicity of glyphosate alone. The researchers further suggested that assessments of the glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants present in Roundup® are not, in fact, inert and that Roundup® is potentially far more toxic than its active ingredient glyphosate alone.[27]

**Recent Worldwide Bans on Roundup®/Glyphosate**

3.53.   Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which took effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."[28]

3.54.   The Brazilian Public Prosecutor in the Federal District requested that the

---

[27] Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic, and Placental Cells*, 22 CHEM. RES. TOXICOL. 97-105 (2008), available at https://big.assets.huffingtonpost.com/france.pdf.

[28] Holland's Parliament Bans Glyphosate Herbicides, The Real Agenda, April 14, 2014, available at https://real-agenda.com/hollands-parliament-bans-glyphosate-herbicides/.

COMPLAINT FOR DAMAGES – 19

SCHROETER, GOLDMARK & BENDER
500 Central Building • 810 Third Avenue • Seattle, WA 98104
Phone (206) 622-8000 • Fax (206) 682-2305

Brazilian Justice Department suspend the use of glyphosate.[29]

3.55.   France banned the private sale of Roundup® and glyphosate following the IARC assessment for glyphosate.[30]

3.56.   Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."[31]

3.57.   The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.[32]

3.58.   The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.[33]

**Plaintiff's Exposure to Roundup®**

3.59.   John Troy Ayon used Roundup® for approximately 40 years on the job at

---

[29] Christina Sarich, *Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals Following Recent Glyphosate-Cancer Link*, GLOBAL RESEARCH, MAY 14, 2015, available at https://www.globalresearch.ca/brazils-public-prosecutor-wants-to-ban-monsantos-chemicals-following-recent-glyphosate-cancer-link/5449440 ; *see* Ministério Público Federal, *MPF/DF reforça pedido para que glifosato seja banido do Mercado nacional*, April 14, 2015, available at http://noticias.pgr.mpf.mp.br/noticias/noticias-do-site/copy_of_meio-ambiente-e-patrimonio-cultural/mpf-df-reforca-pedido-para-que-glifosato-seja-banido-do-mercado-nacional.

[30] Zoe Schlanger, *France Bans Sales of Monsanto's Roundup in Garden Centers, 3 Months After U.N. Calls it 'Probable Carcinogen'*, Newsweek, June 15, 2015, available at https://www.newsweek.com/france-bans-sale-monsantos-roundup-garden-centers-after-un-names-it-probable-343311.

[31] *Minister: Importation of Roundup Suspended*, Bernews, May 11, 2015, available at http://bernews.com/2015/05/importation-weed-spray-round-suspended/.

[32] *Sri Lanka's New President Puts Immediate Ban on Glyphosate Herbicides*, Sustainable Pulse, May 25, 2015, available at https://sustainablepulse.com/2015/05/25/sri-lankas-new-president-puts-immediate-ban-on-glyphosate-herbicides/#.XBgQlNtKgc0.

[33] *Columbia to ban coca spraying herbicide glyphosate*, BBC, May 10, 2015, available at http://www.bbc.com/news/world-latin-america-32677411.

COMPLAINT FOR DAMAGES – 20

SCHROETER, GOLDMARK & BENDER
500 Central Building • 810 Third Avenue • Seattle, WA 98104
Phone (206) 622-8000 • Fax (206) 682-2305

Gilbert Mullens Construction and Boise Cascade as well as at his personal residence.

3.60.   In or around November 2015, doctors diagnosed Mr. Ayon with diffuse large B-cell lymphoma. As a result of his injury, Mr. Ayon died February 19, 2016.

3.61.   During the entire time in which Mr. Ayon was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

## IV.   TOLLING OF THE STATUTE OF LIMITATIONS
### DISCOVERY RULE TOLLING

4.1.   The running of any statute of limitations has been tolled by reason of Defendants' fraudulent concealment. Defendants, through their affirmative misrepresentations and omissions, actively concealed from Decedent the true risks associated with Roundup® and glyphosate.

4.2.   At all relevant times, Defendants have maintained that Roundup® is safe, non-toxic, and non-carcinogenic.

4.3.   Even as of July 2016, Defendants continued to represent to the public that "Regulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic.[34]

4.4.   As a result of Defendants' actions, Decedent was unaware, and could not reasonably know or have learned through reasonable diligence that Roundup® and/or glyphosate contact, exposed him to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

---

[34] Backgrounder – Glyphosate: No Evidence of Carcinogenicity, Updated November 2014, available at https://www.monsantoglobal.com/global/jp/products/Documents/no-evidence-of-carcinogenicity.pdf.

COMPLAINT FOR DAMAGES – 21

SCHROETER, GOLDMARK & BENDER
500 Central Building • 810 Third Avenue • Seattle, WA 98104
Phone (206) 622-8000 • Fax (206) 682-2305

4.5.     Furthermore, Defendants are estopped from relying on any statute of limitations because of their fraudulent concealment of the true character, quality and nature of Roundup®.  Defendants were under a duty to disclose the true character, quality, and nature of Roundup® because this was non-public information over which Defendants had and continue to have exclusive control, and because Defendants knew that this information was not available to Decedent or to distributors of Roundup®. In addition, Defendants are estopped from relying on any statute of limitations because of their intentional concealment of these facts.

4.6.     Decedent had no knowledge that Defendants were engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendants, Decedent could not have reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud should be considered. Defendants had the ability to and did spend enormous amounts of money in furtherance of their purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Decedent and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendants' representations. Accordingly, Defendants are precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

## V.      CAUSE OF ACTION

### CLAIM ONE
### WASHINGTON PRODUCT LIABILITY ACT

5.1.     Plaintiff hereby incorporates by reference the allegations of this Complaint contained in each of the preceding paragraphs as if fully stated herein.

COMPLAINT FOR DAMAGES – 22

SCHROETER, GOLDMARK & BENDER
500 Central Building • 810 Third Avenue • Seattle, WA 98104
Phone (206) 622-8000 • Fax (206) 682-2305

5.2.    At all times relevant to this litigation, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products.

5.3.    At all times relevant to this litigation, Defendants designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by Decedent as described above.

5.4.    At all times relevant to this litigation, Defendants' Roundup® products were expected to reach and did reach the intended consumers, handlers, and users or other persons coming into contact with these products in Washington and throughout the United States, including Decedent, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

5.5.    In violation of the Washington Products Liability Act ("WPLA"), RCW 7.72, et seq., at all times relevant to this action, at the time Defendants' Roundup® products left control of Defendants, they were defective and not reasonably safe. These defects include, but are not limited to, the following:

      i.    Defendants are strictly liable for Plaintiff's injuries and damages because at the time of manufacture, and at the time Defendants' Roundup® products left control of Defendants, the likelihood that Defendants' Roundup® products would cause injury or damage similar to that suffered by Decedent, and the seriousness of such injury or damage had been known by Defendants and outweighed the burden on Defendants to design a product that would have prevented Decedent's injuries and damages and outweighed

COMPLAINT FOR DAMAGES – 23

SCHROETER, GOLDMARK & BENDER
500 Central Building • 810 Third Avenue • Seattle, WA 98104
Phone (206) 622-8000 • Fax (206) 682-2305

the adverse effect that an alternative design that was practical and feasible would have on the usefulness of the subject product.

ii.   Defendants' Roundup® products were unsafe to an extent beyond that which would be contemplated by an ordinary consumer, in one or more of the following particulars: exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries, making Roundup® not reasonably safe when used in the way it is ordinarily used and is dangerous to an extent beyond that which would be contemplated by the ordinary consumer.

iii.   The Roundup® products manufactured and/or supplied by Defendants were defective in design in that, an alternative design and/or formulation exists that would prevent severe and permanent injury. Indeed, at the time that Defendants designed their Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

iv.   The Roundup® products were not reasonably safe in design under the WPLA.

v.   The Roundup® products manufactured and/or supplied by Defendants were not reasonably safe because Defendants did not provide an adequate warning or instruction about the product. At the time the Roundup® products left Defendants' control, they possessed dangerous characteristics, and Defendants failed to use reasonable care to provide an adequate warning of such characteristics and their danger to users and handlers of the product.

COMPLAINT FOR DAMAGES – 24

SCHROETER, GOLDMARK & BENDER
500 Central Building • 810 Third Avenue • Seattle, WA 98104
Phone (206) 622-8000 • Fax (206) 682-2305

The Roundup® products are not safe and cause severe and permanent injuries. The Roundup® products were not reasonably safe because the warning was inadequate and Defendants could have provided adequate warnings or instructions.

vi.   The Roundup® products manufactured and/or supplied by Defendants were not reasonably safe because adequate warnings or manufacturer instructions were not provided after the Roundup® products were manufactured and when Defendants learned of, or should have learned of, the dangers connected with the Roundup® products.

vii.   The Roundup® products manufactured and/or supplied by Defendants were not reasonably safe because they did not conform to an express warranty made by Defendants regarding the product's safety and fitness for use. Defendants expressly warranted that the Roundup® products were safe and fit for their intended purposes, that they were of merchantable quality, that they did not produce any dangerous side effects, that they were adequately tested, and that their Roundup® products were safe to human health and the environment, and effective, fit, and proper for their intended use. Defendants did not disclose the material risks that Defendants' Roundup® products could cause severe and permanent injury. Defendants' express warranty regarding the Roundup® products induced Decedent to use the products, and Plaintiff's damages were proximately caused because Defendants' express warranty was untrue. The Roundup® products were not reasonably safe because of nonconformity to express warranty under the

SCHROETER, GOLDMARK & BENDER
500 Central Building • 810 Third Avenue • Seattle, WA  98104
Phone (206) 622-8000 • Fax (206) 682-2305

WPLA.

5.6.    As a direct and proximate result of Defendants placing their defective Roundup® products into the stream of commerce, Plaintiff suffered grave injuries, and endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment, along with other damages further discussed in Section VII.

### CLAIM TWO
### BREACH OF IMPLIED WARRANTIES

5.7.    Plaintiff hereby incorporates by reference the allegations of this Complaint contained in each of the preceding paragraphs as if fully stated herein.

5.8.    At all times relevant to this litigation, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including Decedent, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendants.

5.9.    Before the time that Decedent was exposed to the use of the aforementioned Roundup® products, Defendants impliedly warranted to their consumers—including Decedent's employers—that their Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as agricultural and horticultural herbicides.

5.10.    Defendants, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries,

COMPLAINT FOR DAMAGES – 26

SCHROETER, GOLDMARK & BENDER
500 Central Building • 810 Third Avenue • Seattle, WA  98104
Phone (206) 622-8000 • Fax (206) 682-2305

including Decedent's injuries.

5.11.   Upon information and belief, Decedent and/or Decedent's employers reasonably relied upon the skill, superior knowledge and judgment of Defendants and upon its implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

5.12.   Upon information and belief, Decedent and/or Decedent's employers were at all relevant times in privity with Defendants.

5.13.   Decedent is the intended third-party beneficiary of implied warranties made by Defendants to the purchasers of their agricultural and horticultural herbicides, including the company that employed Decedent, and as such he is entitled to assert this claim.

5.14.   The Roundup® products were expected to reach and did in fact reach consumers and users, including Decedent, without substantial change in the condition in which they were manufactured and sold by Defendants.

5.15.   At all times relevant to this litigation, Defendants were aware that consumers and users of its products, including Decedent, would use Roundup® products as marketed by Defendants, which is to say that Decedent was a foreseeable user of Roundup®.

5.16.   Defendants intended that their Roundup® products be used in the manner in which Decedent in fact used them and Defendants impliedly warranted each product to be merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

5.17.   In reliance upon Defendants' implied warranty, Decedent used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted, and marketed by Defendants.

COMPLAINT FOR DAMAGES – 27

SCHROETER, GOLDMARK & BENDER
500 Central Building • 810 Third Avenue • Seattle, WA 98104
Phone (206) 622-8000 • Fax (206) 682-2305

5.18. Neither Decedent nor Decedent's employers could have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

5.19. Defendants breached its implied warranty to Decedent in that their Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

5.20. The harm caused by Defendants' Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

5.21. As a direct and proximate result of Defendants' placing their defective Roundup® products into the stream of commerce, Plaintiff suffered grave injuries, and endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment, along with other damages further discussed in Section VII.

## CLAIM THREE
### VIOLATION OF WASHINGTON CONSUMER PROTECTION ACT

5.22. Plaintiff hereby incorporates by reference the allegations of this Complaint contained in each of the preceding paragraphs as if fully stated herein.

5.23. Defendants violated the Washington Consumer Protection Act ("CPA").

5.24. Defendants engaged in unfair or deceptive acts or practices including, but not limited to, the following:

a) engaging in acts and practices by willfully failing and refusing to timely report information that reasonably suggested Roundup®, like that used by

COMPLAINT FOR DAMAGES – 28

SCHROETER, GOLDMARK & BENDER
500 Central Building • 810 Third Avenue • Seattle, WA 98104
Phone (206) 622-8000 • Fax (206) 682-2305

Decedent, may cause or contribute to cause cancer and other serious illnesses;

b)   representing knowingly or with reason to know that Roundup® has approval, characteristics, uses, or benefits that it does not have;

c) representing knowingly or with reason to know that Roundup® is of a particular standard, quality, or grade when it differs materially from that representation; and/or

d) representing knowingly or with reason to know that Roundup® has uses, benefits, or characteristics that have been otherwise proven incorrect;

5.25.   Defendants' unfair and deceptive acts or practices described above were committed in the course of Defendants' trade or commerce.

5.26.   Defendants' unfair and deceptive acts or practices described above affected public interest.

5.27.   Defendants' violation of the Washington CPA, whether individually or in combination, caused Plaintiff's injuries and damages set forth herein.

## VI.   PUNITIVE DAMAGES

6.1.   Plaintiff incorporates herein by reference, as though fully set forth at length, each and every allegation and statement contained in the foregoing paragraphs.

6.2.   Defendants are liable for punitive and/or exemplary damages under choice of law principles. Defendants acted with willful disregard of the rights of the Decedent and the public. Defendants' conduct was outrageous and reckless toward the safety of the Decedent and the public.

## VII.   DAMAGES

7.1.   Plaintiff incorporates herein by reference, as though fully set forth at length,

COMPLAINT FOR DAMAGES – 29

SCHROETER, GOLDMARK & BENDER
500 Central Building • 810 Third Avenue • Seattle, WA 98104
Phone (206) 622-8000 • Fax (206) 682-2305

1    each and every allegation and statement contained in the foregoing paragraphs.

2        7.2.    As a direct and proximate result of Defendants' tortious conduct and breach of

3    duties as set forth herein, Plaintiff is entitled to be compensated for the following damages:

4

5            A.    All damages suffered by John Troy Ayon which survived his death,

6    including: medical expenses, disability, conscious pain and suffering, loss of enjoyment of

7    life, and death;

8            B.    All damages suffered by Ceceilia Ayon including:    loss of

9    companionship, services, and consortium;

10

11           C.    All damages suffered by the statutory beneficiaries of this wrongful

12   death claim, namely Plaintiff and those provided by law, including: all damages related to the

13   suffering and death of the decedent, and for the loss of love, care, affection, companionship,

14   guidance and society, of the Decedent. Claims for loss of consortium on behalf of Decedent's

15   children, are specifically included within the damages claimed; and

16           D.    All damages suffered by the Estate of John Troy Ayon, including the

17   loss of future earnings and other economic losses.

18       7.3.    Plaintiff further reserves and hereby claims all other rights and remedies

19   arising from the Decedent's injuries.

20

21       7.4.    All of the above damages are in an amount which will be proved at trial.

22       7.5.    WHEREFORE, Plaintiff prays for judgment against Defendants, and each of

23   them as hereinafter set forth.

24                    **VIII.   PRAYER FOR RELIEF**

25       WHEREFORE, Plaintiff prays for judgment and relief against the Defendants as

26   follows:

COMPLAINT FOR DAMAGES – 30

1  8.1.  General damages, in an amount to be proven at the time of trial;

2  8.2.  Special damages to be shown at the time of trial, including all pre-judgment

3  interest allowed by law;

4  8.3.  Punitive damages according to proof at the time of trial;

5

6  8.4.  Treble damages in the maximum amounts permitted by RCW 19.86.090;

7  8.5.  Costs including reasonable attorney's fees court costs and other litigation

8  expenses; and

9  8.6.  Any other further relief as the Court deems just and proper.

10  **JURY TRIAL DEMAND**

11  Plaintiff demands a trial by jury on all of the triable issues within this Complaint.

12

13

14  DATED this 7th day of February, 2019.

15  SCHROETER, GOLDMARK & BENDER

16

17  s/ Sims Weymuller
   SIMS WEYMULLER, WSBA #33026
   ELIZABETH MCLAFFERTY, WSBA #45291

18  Counsel for Plaintiff
   SCHROETER GOLDMARK & BENDER

19  810 Third Avenue, Suite 500
   Seattle, WA  98104

20  Phone:  (206) 622-8000

21  Fax:  (206) 682-2305
   Email: sims@sgb-law.com

22      mclafferty@sgb-law.com

23

24

25

26

COMPLAINT FOR DAMAGES – 31

SCHROETER, GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
Phone (206) 622-8000 ● Fax (206) 682-2305