JURYDEMAND

# U.S. District Court
## United States District Court for the Western District of Washington (Tacoma)
## CIVIL DOCKET FOR CASE #: 3:19-cv-05128-RBL

Rhodes v. Monsanto Company                    Date Filed: 02/15/2019
Assigned to: Judge Ronald B. Leighton         Jury Demand: Plaintiff
Cause: 28:1332 Diversity-Product Liability    Nature of Suit: 365 Personal Inj. Prod.
                                              Liability
                                              Jurisdiction: Diversity

**Plaintiff**

**Brandy Rhodes**                represented by  **Kevin Coluccio**
                                                 COLUCCIO LAW
                                                 2025 FIRST AVENUE
                                                 STE 1130
                                                 SEATTLE, WA 98121
                                                 206-826-8200
                                                 Fax: 206-623-8286
                                                 Email: kc@coluccio-law.com
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 02/15/2019 | 1 | COMPLAINT *FOR PERSONAL INJURIES* against All Defendants with JURY DEMAND (Receipt # 0981-5654015), filed by Brandy Rhodes. (Attachments: # 1 Civil Cover Sheet, # 2 Summons)(Coluccio, Kevin) (Entered: 02/15/2019) |
| 02/21/2019 |   | Judge Ronald B. Leighton added. (GMR) (Entered: 02/21/2019) |
| 02/21/2019 | 2 | Summons(es) Electronically Issued as to defendant(s) Monsanto Company. (GMR) (Entered: 02/21/2019) |
| 02/22/2019 | 3 | NOTICE TO FILER: re 1 Complaint. **Notice of Filing Deficiency** ** Action Required ** See Attached Letter for More Information and Instructions. (MET) (Entered: 02/22/2019) |
| 02/25/2019 | 4 | AFFIDAVIT of Service of Summons and Complaint on Registered Agent for Monsanto Company on 2/21/2019, filed by Plaintiff Brandy Rhodes. (Coluccio, Kevin) (Entered: 02/25/2019) |
| 02/26/2019 | 5 | DEMAND for JURY TRIAL by Plaintiff Brandy Rhodes (Coluccio, Kevin) |

| | | (Entered: 02/26/2019) |
|---|---|---|
| 02/27/2019 | 6 | APPLICATION OF ATTORNEY Jeffrey A. Bowersox FOR LEAVE TO APPEAR PRO HAC VICE for Plaintiff Brandy Rhodes (Fee Paid) Receipt No. 0981-5668071 (Coluccio, Kevin) (Entered: 02/27/2019) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 02/28/2019 08:44:02 | | | |
| **PACER Login:** | cdorsey12:5189134:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:19-cv-05128-RBL |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

1

2

3

4

5

6

7          UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF WASHINGTON
8                    TACOMA DIVISION

9   BRANDY RHODES,
                                              NO.
10                  Plaintiff,

11         v.                                 **COMPLAINT FOR PERSONAL
                                              INJURIES**
12  MONSANTO COMPANY,

13                  Defendant.

14

15       Plaintiff, Brandy Rhodes, for her causes of action against the above-named Defendant,

16  alleges and states on information and belief as follows:

17                            **INTRODUCTION**

18       1.      In 1970, Defendant Monsanto Company, Inc. ("Monsanto") discovered the

19  herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand

20  name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly

21  compete with the growing of crops. In addition to the active ingredient glyphosate, Roundup®

22  contains the surfactant Polyethoxylated tallow amine ("POEA") and/or adjuvants and other so-

23  called "inert" ingredients. In 2001, glyphosate was the most-used pesticide active ingredient in

24

Complaint for Personal Injuries-1

| Bowersox Law Firm, P.C. | Coluccio Law |
|---|---|
| 3 Centerpointe Drive, Suite 190 | 2025 First Ave. Suite 1130 |
| Lake Oswego, OR 97035 | Seattle, WA 98121 |
| (503) 452-5858 | 206-826-8200 |
| Fax: (503) 345-6893 | Fax: 206-673-8286 |

American agriculture with 85-90 million pounds used annually. That number grew to 185 million pounds in 2007.1 As of 2013, glyphosate was the world's most widely used herbicide.

2.      Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri, and incorporated in Delaware. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market2. The majority of these seeds are of the Roundup Ready® brand.  The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, because glyphosate can be sprayed in the fields during the growing season without harming the crops. In 2010, an estimated 70% of corn and cotton and 90% of soybean fields in the United States were Roundup Ready®.3

3.      Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops4. They are ubiquitous in the environment.  Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used5. It has been found in food6, in the urine of agricultural workers7, and even in the urine of urban dwellers who are not in direct contact with glyphosate8.

---

1 Arthur Grube et al., U.S. Envtl. Prot. Agency, *Pesticides Industry Sales and Usage, 2006–2007 Market Estimates* 14 (2011), *available at* https://www.epa.gov/sites/production/files/2015-10/documents/market_estimates2007.pdf

2 ETC Group, *Who Will Control the Green Economy?* 22 (2011), *available at* http://www.etcgroup.org/files/publication/pdf_file/ETC_wwctge_4web_Dec2011.pdf

3 William Neuman & Andrew Pollack, *Farmers Cope With Roundup- Resistant Weeds*, N.Y. TIMES, May 3, 2010, *available at* http://www.nytimes.com/2010/05/04/business/energy-environment/04weed.html?pagewanted=all

4 Monsanto, *Backgrounder-History of Monsanto's Glyphosate Herbicides* (June 2015), https://monsanto.com/app/uploads/2017/06/back_history.pdf

5 *See* U.S. Geological Survey, *USGS Technical Announcement: Widely Used Herbicide Commonly Found in Rain and Streams in the Mississippi River Basin* (2011), *available at* http://www.infiniteunknown.net/2015/07/26/usgs-technical-announcement-widely-used-herbicide-commonly-found-in-rain-and-streams-in-the-mississippi-river-basin/; *see also* U.S.

---

Complaint for Personal Injuries-2

Bowersox Law Firm, P.C.
3 Centerpointe Drive, Suite 190
Lake Oswego, OR 97035
(503) 452-5858
Fax: (503) 345-6893

Coluccio Law
2025 First Ave. Suite 1130
Seattle, WA 98121
206-826-8200
Fax: 206-673-8286

4.      On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

5.      On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

6.      The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is *probably carcinogenic to humans*. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other haematopoietic cancers, including lymphocytic lymphoma / chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma[9]

---

Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate*, available at https://www.beyondpesticides.org/assets/media/documents/EPAglyphosate.pdf

[6] Thomas Bohn et al., *Compositional Differences in Soybeans on the Market: Glyphosate Accumulates in Roundup Ready GM Soybeans*, 153 FOOD CHEMISTRY 207 (2013), *available at* http://www.sciencedirect.com/science/article/pii/S0308814613019201

[7] John F. Acquavella et al., *Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study*, 112(3) ENVTL. HEALTH PERSPECTIVES 321 (2004), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241861/; Kathryn Z. Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, 112 IARC Monographs 76, section 5.4 (2015), *available at* http://dx.doi.org/10.1016/S1470-2045(15)70134-8

[8] Dirk Brändli & Sandra Reinacher, *Herbicides found in Human Urine*, 1 ITHAKA JOURNAL 270 (2012), *available at* http://www.ithaka-journal.net/druckversionen/e052012-herbicides-urine.pdf.

[9] *See* Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, *supra*.

Complaint for Personal Injuries-3

| Bowersox Law Firm, P.C.<br>3 Centerpointe Drive, Suite 190<br>Lake Oswego, OR 97035<br>(503) 452-5858<br>Fax: (503) 345-6893 | Coluccio Law<br>2025 First Ave. Suite 1130<br>Seattle, WA 98121<br>206-826-8200<br>Fax: 206-673-8286 |

7.     The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

8.     Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment.  Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

## JURISDICTION AND VENUE

9.     Federal diversity jurisdiction in this Court is proper under 28 U.S.C. § 1332 because Plaintiff is a citizen of Washington, a different state than the Defendant's state of citizenship, and the aggregate amount in controversy exceeds $75,000, exclusive of interest and costs.

10.     This Court has personal jurisdiction over Monsanto because Monsanto knows or should have known that its Roundup® products are sold throughout the State of Washington, and, more specifically, caused Roundup® to be sold to applicators of Roundup® in the State of Washington.

11.      In addition, Monsanto maintains sufficient contacts with the State of Washington such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

12.     Venue is proper within this District under 28 U.S.C. § 1391(b)(2) because Plaintiff was injured and diagnosed in this District.  Further, Monsanto, as a corporate entity, is deemed to reside in any judicial district in which it is subject to personal jurisdiction.

Complaint for Personal Injuries-4

Bowersox Law Firm, P.C.
3 Centerpointe Drive, Suite 190
Lake Oswego, OR 97035
(503) 452-5858
Fax: (503) 345-6893

Coluccio Law
2025 First Ave. Suite 1130
Seattle, WA 98121
206-826-8200
Fax: 206-673-8286

**THE PARTIES**

13.    Plaintiff, Brandy Rhodes, is a resident of Vancouver, Washington. Ms. Rhodes was exposed to Roundup® from approximately six years while residing in La Center, Washington. The city of La Center routinely applied Roundup® to the parks and greenery near Ms. Rhodes' residence and the parks she visited with her children. In or about December, 2005, Ms. Rhodes was diagnosed with Stage IIA Nodular Sclerosing Hodgkin's Lymphoma.

14.    Defendant Monsanto Company is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.

15.    At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®, which contains the active ingredient glyphosate and the surfactant POEA, as well as adjuvants and other "inert" ingredients.

**FACTS**

16.    Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

17.    Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

18.    For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed

Complaint for Personal Injuries-5

Bowersox Law Firm, P.C.
3 Centerpointe Drive, Suite 190
Lake Oswego, OR 97035
(503) 452-5858
Fax: (503) 345-6893

Coluccio Law
2025 First Ave. Suite 1130
Seattle, WA 98121
206-826-8200
Fax: 206-673-8286

1    without causing harm either to people or to the environment. Of course, history has shown that

2    not to be true. According to the WHO, the main chemical ingredient of Roundup® – glyphosate

3    – is a probable cause of cancer. Those most at risk are farm workers and other individuals with

4    workplace exposure to Roundup®, such as garden center workers, nursery workers, and

5    landscapers. Monsanto assured the public that Roundup® was harmless. In order to prove this,

6    Monsanto has championed falsified data and has attacked legitimate studies that revealed the

7    dangers of Roundup®. Monsanto has led a prolonged campaign of misinformation to convince

8    government agencies, farmers and the general population that Roundup® is safe.

9                    *The Discovery of Glyphosate and Development of Roundup®*

10           19.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto

11   chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the

12   mid-1970s under the brand name Roundup®.[10] From the outset, Monsanto marketed Roundup®

13   as a "safe" general-purpose herbicide for widespread commercial and consumer use. It still

14   markets Roundup® as safe today.[11]

15           20.     In addition to the active ingredient glyphosate, Roundup[®] formulations also

16   contain adjuvants and other chemicals, such as the surfactant POEA, which are considered

17   "inert" and therefore protected as "trade secrets" in manufacturing. Growing evidence suggests

18   that these adjuvants and additional components of Roundup® formulations are not, in fact, inert

19   but are toxic in their own right.

20   _____

21   10 Monsanto, *Backgrounder, History of Monsanto's Glyphosate Herbicide* (June 2015),
     https://monsanto.com/app/uploads/2017/06/back_history.pdf

22   11   Monsanto, *What is Glyphosate?* (Sep. 2, 2015),
     http://www.monsantoglobal.com/global/au/products/pages/what-is-glyphosate-and-what-makes-
     it-safe.aspx

23

24

Complaint for Personal Injuries-6

| Bowersox Law Firm, P.C. | Coluccio Law |
|---|---|
| 3 Centerpointe Drive, Suite 190 | 2025 First Ave. Suite 1130 |
| Lake Oswego, OR 97035 | Seattle, WA 98121 |
| (503) 452-5858 | 206-826-8200 |
| Fax: (503) 345-6893 | Fax: 206-673-8286 |

1

### *Registration of Herbicides under Federal Law*

2      21.     The manufacture, formulation, and distribution of herbicides, such as Roundup®,

3   are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"),

4   7 U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental

5   Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as

6   described by the Act. 7 U.S.C. § 136a(a).

7      22.     Because pesticides are toxic to plants, animals, and humans, at least to some

8   degree, the EPA requires as part of the registration process, among other things, a variety of tests

9   to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-

10  target organisms, and other adverse effects on the environment. Registration by the EPA,

11  however, is not an assurance or finding of safety. The determination the Agency must make in

12  registering or re-registering a product is not that the product is "safe," but rather that use of the

13  product in accordance with its label directions "will not generally cause unreasonable adverse

14  effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

15     23.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any

16  unreasonable risk to man or the environment, taking into account the economic, social, and

17  environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus

18  requires the EPA to make a risk/benefit analysis in determining whether a registration should be

19  granted or a pesticide allowed to continue to be sold in commerce.

20     24.     The EPA and the State of California registered Roundup distribution, sale, and

21  manufacture in the United States and the State of California.

22     25.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®,

23  conducts the health and safety testing of pesticide products. The EPA has protocols governing

24

Complaint for Personal Injuries-7

| Bowersox Law Firm, P.C. | Coluccio Law |
|---|---|
| 3 Centerpointe Drive, Suite 190 | 2025 First Ave. Suite 1130 |
| Lake Oswego, OR 97035 | Seattle, WA 98121 |
| (503) 452-5858 | 206-826-8200 |
| Fax: (503) 345-6893 | Fax: 206-673-8286 |

the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

26.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's recent review and evaluation.

27.     In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment -- in relation to the reregistration process -- no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

### Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®

28.     Based on early studies showing that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be

Complaint for Personal Injuries-8

Bowersox Law Firm, P.C.
3 Centerpointe Drive, Suite 190
Lake Oswego, OR 97035
(503) 452-5858
Fax: (503) 345-6893

Coluccio Law
2025 First Ave. Suite 1130
Seattle, WA 98121
206-826-8200
Fax: 206-673-8286

interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."12

29.  On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

30.  In the first instance, Monsanto, in seeking initial registration of Roundup® by the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®.13 IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

31.  In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid.14 An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the

---

12 U.S. Envtl. Prot. Agency, *Memorandum, Subject: SECOND Peer Review of Glyphosate* 1 (1991), *available at* http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_30-Oct-91_265.pdf.

13 Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories*, https://monsanto.com/app/uploads/2017/06/ibt_craven_bkg.pdf

14 U.S. Envtl. Prot. Agency, *Summary of the IBT Review Program Office of Pesticide Programs* (1983), *available at* https://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA&Index=1981+Thru+1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&QFieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles%5CIndex%20Data%5C81thru85%5CTxt%5C00000022%5C91014ULV.txt&User=ANONYMOUS&Password=anonymous&SortMethod=h%7C-&MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=hpfr&DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page&MaximumPages=1&ZyEntry=1&SeekPage=x&ZyPURL

Complaint for Personal Injuries-9

Bowersox Law Firm, P.C.
3 Centerpointe Drive, Suite 190
Lake Oswego, OR 97035
(503) 452-5858
Fax: (503) 345-6893

Coluccio Law
2025 First Ave. Suite 1130
Seattle, WA 98121
206-826-8200
Fax: 206-673-8286

1  scientific integrity of the studies when they said they took specimens of the uterus from male

2  rabbits."15

3      32.    Three top executives of IBT were convicted of fraud in 1983.

4      33.    In the second incident of data falsification, Monsanto hired Craven Laboratories

5  in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year,

6  the owner of Craven Laboratories and three of its employees were indicted, and later convicted,

7  of fraudulent laboratory practices in the testing of pesticides and herbicides.16

8      34.    Despite the falsity of the tests that underlie its registration, within a few years of

9  its launch, Monsanto was marketing Roundup® in 115 countries.

10  ***The Importance of Roundup® to Monsanto's Market Dominance Profits***

11      35.    The success of Roundup® was key to Monsanto's continued reputation and

12  dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's

13  agriculture division was out-performing its chemicals division's operating income, and that gap

14  increased yearly. But with its patent for glyphosate expiring in the United States in the year

15  2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off

16  impending competition.

17      36.    In response, Monsanto began the development and sale of genetically engineered

18  Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate,

19  farmers can spray Roundup® onto their fields during the growing season without harming the

20

21  ---

15 Marie-Monique Robin, *The World According to Monsanto: Pollution, Corruption and the*

22  *Control of the World's Food Supply* (2011) (citing U.S. Envtl. Prot. Agency, *Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch. Washington, D.C.* (August 9, 1978)).

23

24  16 Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories*, *supra.*

Complaint for Personal Injuries-10

| Bowersox Law Firm, P.C. | Coluccio Law |
| --- | --- |
| 3 Centerpointe Drive, Suite 190 | 2025 First Ave. Suite 1130 |
| Lake Oswego, OR 97035 | Seattle, WA 98121 |
| (503) 452-5858 | 206-826-8200 |
| Fax: (503) 345-6893 | Fax: 206-673-8286 |

Case 3:19-cv-03741-RDL Document 1 Filed 02/26/19 Page 13 of 57

crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

37.     Through a three-pronged strategy of increasing production, decreasing prices, and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue.[17] Today, glyphosate remains one of the world's largest herbicides by sales volume.

### *Monsanto has known for decades that it falsely advertises the safety of Roundup®*

38.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "**safer than table salt**" and "**practically non-toxic**" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of glyphosate and/or Roundup® are the following:

a) "Remember that environmentally  friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ..."

---

[17] David Barboza, *The Power of Roundup; A Weed Killer Is A Block for Monsanto to Build On*, N.Y. TIMES, Aug. 2, 2001, *available at* http://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weed-killer-is-a-block-for-monsanto-to-build-on.html.

Bowersox Law Firm, P.C.
3 Centerpointe Drive, Suite 190
Lake Oswego, OR 97035
(503) 452-5858
Fax: (503) 345-6893

Coluccio Law
2025 First Ave. Suite 1130
Seattle, WA 98121
206-826-8200
Fax: 206-673-8286

b) "And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem."

c) "Roundup biodegrades into naturally occurring elements."

d) "Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e) "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it."

f) "You can apply Accord with 'confidence because it will stay where you put it' it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products."

g) "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

h) "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i) "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[18]

39. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

---

18 Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

Bowersox Law Firm, P.C.
3 Centerpointe Drive, Suite 190
Lake Oswego, OR 97035
(503) 452-5858
Fax: (503) 345-6893

Coluccio Law
2025 First Ave. Suite 1130
Seattle, WA 98121
206-826-8200
Fax: 206-673-8286

a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

\* \* \*

b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

\* \* \*

c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

\* \* \*

d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

\* \* \*

e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

40.     Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief it still has not done so today.

41.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean." 19

---

19 *Monsanto Guilty in 'False Ad' Row,* BC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.

Complaint for Personal Injuries-13

| Bowersox Law Firm, P.C. | Coluccio Law |
|---|---|
| 3 Centerpointe Drive, Suite 190 | 2025 First Ave. Suite 1130 |
| Lake Oswego, OR 97035 | Seattle, WA 98121 |
| (503) 452-5858 | 206-826-8200 |
| Fax: (503) 345-6893 | Fax: 206-673-8286 |

1

*Classifications and Assessments of Glyphosate*

2  42. The IARC process for the classification of glyphosate followed IARC's stringent

3 procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has

4 reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known

5 Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to

6 be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one

7 agent to be Probably Not Carcinogenic.

8  43. The established procedure for IARC Monograph evaluations is described in the

9 IARC Programme's Preamble.[20] Evaluations are performed by panels of international experts,

10 selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

11  44. One year before the Monograph meeting, the meeting is announced and there is a

12 call both for data and for experts. Eight months before the Monograph meeting, the Working

13 Group membership is selected and the sections of the Monograph are developed by the Working

14 Group members. One month prior to the Monograph meeting, the call for data is closed and the

15 various draft sections are distributed among Working Group members for review and comment.

16 Finally, at the Monograph meeting, the Working Group finalizes review of all literature,

17 evaluates the evidence in each category, and completes the overall evaluation. Within two weeks

18 after the Monograph meeting, the summary of the Working Group findings are published in *The*

19 *Lancet Oncology*, and within a year after the meeting, the finalized Monograph is published.

20  45. In assessing an agent, the IARC Working Group reviews the following

21 information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological

22

23
20 World Health Org., *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble* (2006), available at http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

24

Complaint for Personal Injuries-14

| Bowersox Law Firm, P.C.<br>3 Centerpointe Drive, Suite 190<br>Lake Oswego, OR 97035<br>(503) 452-5858<br>Fax: (503) 345-6893 | Coluccio Law<br>2025 First Ave. Suite 1130<br>Seattle, WA 98121<br>206-826-8200<br>Fax: 206-673-8286 |

studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

46.    In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

47.    On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph Volume 112. For Volume 112, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015 to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated a nearly one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

48.    The studies considered the following exposure groups: (1) occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and (2) para-occupational exposure in farming families.

49.    Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

Complaint for Personal Injuries-15

Bowersox Law Firm, P.C.
3 Centerpointe Drive, Suite 190
Lake Oswego, OR 97035
(503) 452-5858
Fax: (503) 345-6893

Coluccio Law
2025 First Ave. Suite 1130
Seattle, WA 98121
206-826-8200
Fax: 206-673-8286

50.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

51.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

52.     The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

53.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

54.      In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor: renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

55.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

Complaint for Personal Injuries-16

Bowersox Law Firm, P.C.
3 Centerpointe Drive, Suite 190
Lake Oswego, OR 97035
(503) 452-5858
Fax: (503) 345-6893

Coluccio Law
2025 First Ave. Suite 1130
Seattle, WA 98121
206-826-8200
Fax: 206-673-8286

56. The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

57. The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.21 Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

58. The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.22 While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and multiple myeloma, hairy cell leukemia (HCL), and chronic lymphocytic leukemia (CLL), in addition to several other cancers.

### *Other Earlier Findings About Glyphosate's Dangers to Human Health*

59. The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates IARC's March 20, 2015 evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry,

---

21 Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, *supra* at 77.

22 Anneclare J. De Roos et al., *Cancer Incidence Among Glyphosate- Exposed Pesticide Applicators in the Agricultural Health Study*, 113 Envt'l Health Perspectives 49–54 (2005), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1253709/pdf/ehp0113-000049.pdf.

Complaint for Personal Injuries-17

| Bowersox Law Firm, P.C. | Coluccio Law |
|---|---|
| 3 Centerpointe Drive, Suite 190 | 2025 First Ave. Suite 1130 |
| Lake Oswego, OR 97035 | Seattle, WA 98121 |
| (503) 452-5858 | 206-826-8200 |
| Fax: (503) 345-6893 | Fax: 206-673-8286 |

right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal. 23

60.    In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.24

### The Toxicity of Other Ingredients in Roundup®

61.    In addition to the toxicity of the active ingredient, glyphosate, several studies support the hypothesis that the glyphosate-based formulation in Defendant's Roundup® products is more dangerous and toxic than glyphosate alone. Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.25

---

23    U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate*, *supra*.

24 Caroline Cox, *Glyphosate, Part 2: Human Exposure and Ecological Effects*, 15 J. PESTICIDE REFORM 4 (1995); W.S. Peas et al., *Preventing pesticide- related illness in California agriculture: Strategies and priorities. Environmental Health Policy Program Report*, Univ. of Cal. School of Public Health, Calif. Policy Seminar (1993).
25 Martinez, T.T. and K. Brown, *Oral and pulmonary toxicology of the surfactant used in Roundup herbicide*, PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991).

Complaint for Personal Injuries-18

Bowersox Law Firm, P.C.
3 Centerpointe Drive, Suite 190
Lake Oswego, OR 97035
(503) 452-5858
Fax: (503) 345-6893

Coluccio Law
2025 First Ave. Suite 1130
Seattle, WA 98121
206-826-8200
Fax: 206-673-8286

62.     In 2002, a study by Julie Marc, entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation," revealed that Roundup® causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cell cycles.[26]

63.     A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation. The researchers noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer.  Failure in the cell-cycle checkpoints leads genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of a unique cell; it was of interest to evaluate the threshold dose of glyphosate affecting the cells."[27]

64.     In 2005, a study by Francisco Peixoto, entitled "Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup®'s effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone. The Peixoto study further suggested that the harmful effects of Roundup® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the

---

26 Julie Marc, et al., *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation*, 15 CHEM. RES. TOXICOL. 326–331 (2002), *available at* http://pubs.acs.org/doi/full/10.1021/tx015543g.

27   Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation*, 96 BIOLOGY OF THE CELL 245, 245-249 (2004), *available at* http://onlinelibrary.wiley.com/doi/10.1016/j.biolcel.2003.11.010/epdf.

Complaint for Personal Injuries-19

Bowersox Law Firm, P.C.
3 Centerpointe Drive, Suite 190
Lake Oswego, OR 97035
(503) 452-5858
Fax: (503) 345-6893

Coluccio Law
2025 First Ave. Suite 1130
Seattle, WA 98121
206-826-8200
Fax: 206-673-8286

result of other chemicals, such as the surfactant POEA, or in the alternative, due to a potential

synergic effect between glyphosate and other ingredients in the Roundup® formulation.28

65.    In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining

the effects of Roundup® and glyphosate on human umbilical, embryonic, and placental cells.

The study tested dilution levels of Roundup® and glyphosate that were far below agricultural

recommendations, corresponding with low levels of residue in food. The researchers ultimately

concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability

and amplify toxicity of glyphosate alone. The researchers further suggested that assessments of

glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in

the formulation of the complete pesticide. The study confirmed that the adjuvants present in

Roundup® are not, in fact, inert and that Roundup® is potentially far more toxic than its active

ingredient glyphosate alone.29

66.    The results of these studies were at all times available to Defendant. Defendant

thus knew or should have known that Roundup® is more toxic than glyphosate alone and that

safety studies of Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant

POEA were necessary to protect Plaintiff from Roundup®.

67.    Despite its knowledge that Roundup® is considerably more dangerous than

glyphosate alone, Defendant continued to promote Roundup® as safe.

---

28 Francisco Peixoto, *Comparative effects of the Roundup and glyphosate on mitochondrial
oxidative phosphorylation*, 61 CHEMOSPHERE 1115, 1122 (2005), *available at*
https://www.researchgate.net/publication/7504567_Comparative_effects_of_the_Roundup_and_
glyphosate_on_mitochondrial_oxidative_phosphorylation

29 Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human
Umbilical, Embryonic, and Placental Cells*, 22 CHEM. RES. TOXICOL. 97-105 (2008),
*available at* http://big.assets.huffingtonpost.com/france.pdf.

Complaint for Personal Injuries-20

<table>
<tr><td>Bowersox Law Firm, P.C.<br>3 Centerpointe Drive, Suite 190<br>Lake Oswego, OR 97035<br>(503) 452-5858<br>Fax: (503) 345-6893</td><td>Coluccio Law<br>2025 First Ave. Suite 1130<br>Seattle, WA 98121<br>206-826-8200<br>Fax: 206-673-8286</td></tr>
</table>

*Recent Worldwide Bans on Roundup®/Glyphosate*

68.     Several countries around the world have instituted bans on the sale of Roundup®

and other glyphosate-containing herbicides, both before and since IARC first announced its

assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the

dangers of the use of Roundup® become more widely known. The Netherlands issued a ban on

all glyphosate-based herbicides in April 2014, including Roundup®, which took effect at the end

of 2016. In issuing the ban, the Dutch Parliament member who introduced the successful

legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to

private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting

customers have no idea what the risks of this product are. Especially children are sensitive to

toxic substances and should therefore not be exposed to it."30

69.     The Brazilian Public Prosecutor in the Federal District requested that the

Brazilian Justice Department suspend the use of glyphosate.31

70.     France banned the private sale of Roundup® and glyphosate following the IARC

assessment for Glyphosate.32

---

30 *Holland's Parliament Bans Glyphosate Herbicides*, The Real Agenda, April 14, 2014, *available at* http://real-agenda.com/hollands-parliament-bans- glyphosate-herbicides/.

31 Christina Sarich, *Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals Following Recent Glyphosate-Cancer Link*, GLOBAL RESEARCH, May 14, 2015, *available at* http://naturalsociety.com/brazils-public-prosecutor-wants-to-ban-monsantos-chemicals/; *see* Ministério Público Federal, *MPF/DF reforça pedido para que glifosato seja banido do mercado nacional*, April, 14, 2015, *available at* http://noticias.pgr.mpf.mp.br/noticias/noticias-do-site/copy_of_meio-ambiente-e-patrimonio-cultural/mpf-df-reforca-pedido-para-que-glifosato-seja-banido-do- mercado-nacional.

32 Zoe Schlanger, *France Bans Sales of Monsanto's Roundup in Garden Centers, 3 Months After U.N. Calls it 'Probable Carcinogen'*, NEWSWEEK, June 15, 2015, *available at* http://www.newsweek.com/france-bans-sale-monsantos-roundup-garden-centers-after-un-names-it-probable-343311.

Complaint for Personal Injuries-21

Bowersox Law Firm, P.C.
3 Centerpointe Drive, Suite 190
Lake Oswego, OR 97035
(503) 452-5858
Fax: (503) 345-6893

Coluccio Law
2025 First Ave. Suite 1130
Seattle, WA 98121
206-826-8200
Fax: 206-673-8286

71.    Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."33

72.    The Sri Lankan government banned the private and commercial use of glyphosate, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.34

73.    The government of Colombia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.35

### *Proposition 65 Listing*

74.    On September 4, 2015, California's Office of Environmental Health Hazard Assessment ("OEHHA") published a notice of intent to include glyphosate on the state's list of known carcinogens under Proposition 65.36 California's Safe Drinking Water and Toxic Enforcement Act of 1986 (informally known as "Proposition 65"), requires the state to maintain and, at least once a year, revise and republish a list of chemicals "known to the State of

---

33 *Health Minister: Importation of Roundup Weed Spray Suspended*, Today in Bermuda, May, 11 2015, *available at* http://bernews.com/2015/05/importation-weed-spray-round-suspended/
34 *Sri Lanka's New President Puts Immediate Ban on Glyphosate Herbicides*, Sustainable Pulse, May 25, 2015, *available at* http://sustainablepulse.com/2015/05/25/sri-lankas-new-president-puts-immediate- ban-on-glyphosate-herbicides/#.VeduYk3bKAw.
35 *Columbia to ban coca spraying herbicide glyphosate*, BBC, May 10, 2015, *available at* http://www.bbc.com/news/world-latin-america-32677411.
36 Cal. Envtl. Prot. Agency Office of Envtl. Health Hazard Assessment, Notice of Intent to List Chemicals by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion, Glyphosate (Sept. 4, 2015), https://oehha.ca.gov/proposition-65/crnr/notice-intent-list-tetrachlorvinphos-parathion-malathion-glyphosate

Complaint for Personal Injuries-22

Bowersox Law Firm, P.C.
3 Centerpointe Drive, Suite 190
Lake Oswego, OR 97035
(503) 452-5858
Fax: (503) 345-6893

Coluccio Law
2025 First Ave. Suite 1130
Seattle, WA 98121
206-826-8200
Fax: 206-673-8286

California to cause cancer or reproductive toxicity."37 The OEHHA determined that glyphosate met the criteria for the listing mechanism under the Labor Code following IARC's assessment of the chemical.38

75.    The listing process under the Labor Code is essentially automatic.  The list of known carcinogens, at a minimum, must include substances identified by reference in Labor Code § 6382(b)(1). That section of the Labor Code identifies "[s]ubstances listed as human or animal carcinogens by the International Agency for Research on Cancer (IARC)." IARC's classification of glyphosate as a Group 2A chemical ("probably carcinogenic to humans") therefore triggered the listing.

76.    A business that deploys a listed chemical in its products must provide "clear and reasonable warnings" to the public prior to exposure to the chemical. To be clear and reasonable, a warning must "(1) clearly communicate that the chemical is known to cause cancer, and/or birth defects or other reproductive harm; and (2) effectively reach the person before exposure."39 The law also prohibits the discharge of listed chemicals into drinking water.

---

37 *Frequently Asked Questions*, STATE OF CAL. DEP'T OF JUSTICE, OFFICE OF THE ATTORNEY GENERAL, http://oag.ca.gov/prop65/faq (last visited April 19, 2016).

38 Cal. Envtl. Prot. Agency Office of Envtl. Health Hazard Assessment, Notice of Intent to List Chemicals by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion, Glyphosate (Sept. 4, 2015), https://oehha.ca.gov/proposition-65/crnr/notice-intent-list-tetrachlorvinphos-parathion-malathion-glyphosate

39 *Frequently Asked Questions*, STATE OF CAL. DEPARTMENT OF JUSTICE, OFFICE OF THE ATTORNEY GENERAL, *supra*.

Complaint for Personal Injuries-23

| Bowersox Law Firm, P.C. | Coluccio Law |
|---|---|
| 3 Centerpointe Drive, Suite 190 | 2025 First Ave. Suite 1130 |
| Lake Oswego, OR 97035 | Seattle, WA 98121 |
| (503) 452-5858 | 206-826-8200 |
| Fax: (503) 345-6893 | Fax: 206-673-8286 |

77.    Monsanto disputed the listing decision and, in January 2016, filed a lawsuit against OEHHA and the agency's acting director, Lauren Zeise, in California state court, seeking declaratory and injunctive relief to prevent OEHHA from listing glyphosate.[40]

78.    Monsanto alleged that OEHHA's exclusive reliance on the IARC decision signified that "OEHHA effectively elevated the determination of an ad hoc committee of an unelected, foreign body, which answers to no United States official (let alone any California state official), over the conclusions of its own scientific experts."[41] Monsanto further alleged that the Labor Code listing mechanism presented various constitutional violations because it "effectively empowers an unelected, undemocratic, unaccountable, and foreign body to make laws applicable in California."[42] Among other things, Monsanto argued that Proposition 65's requirement to provide a "clear and reasonable warning" to consumers that the chemical is a known carcinogen would damage its reputation and violate its First Amendment rights.[43]

79.    The case remains pending.

### EFSA Report on Glyphosate

80.    On November 12, 2015, the European Food Safety Authority ("EFSA"), the European Union's primary agency for food safety, reported on its evaluation of the Renewal Assessment Report ("RAR") on glyphosate.[44] The Rapporteur Member State assigned to

---

[40] Monsanto Company's Verified Petition for Writ of Mandate and Complaint for Preliminary and Permanent Injunctive and Declaratory Relief, Monsanto Co. v. Office of the Envt'l Health Hazard Assessment, et al., No. 16- CECG-00183 (Cal. Super. Ct.) *available at* http://www.monsanto.com/files/documents/monvoehha.pdf.
[41] *Id*. at 2.
[42] *Id*. at 3.
[43] *Id*.
[44] European Food Safety Auth., Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate, *available at* http://www.efsa.europa.eu/sites/default/files/scientific_output/files/main_documen ts/4302.pdf.

Complaint for Personal Injuries-24

Bowersox Law Firm, P.C.
3 Centerpointe Drive, Suite 190
Lake Oswego, OR 97035
(503) 452-5858
Fax: (503) 345-6893

Coluccio Law
2025 First Ave. Suite 1130
Seattle, WA 98121
206-826-8200
Fax: 206-673-8286

glyphosate, the German Federal Institute for Risk Assessment ("BfR"), had produced the RAR as part of the renewal process for glyphosate in the EU.

81.    BfR sent its draft RAR to EFSA and the RAR underwent a peer review process by EFSA, other member states, and industry groups. As part of the on-going peer review of Germany's reevaluation of glyphosate, EFSA had also received a second mandate from the European Commission to consider IARC's findings regarding the potential carcinogenicity of glyphosate and glyphosate-containing products.

82.    Based on a review of the RAR, which included data from industry- submitted unpublished studies, EFSA sent its own report ("Conclusion") to the European Commission, finding that "glyphosate is unlikely to pose a carcinogenic hazard to humans and the evidence does not support classification with regard to its carcinogenic potential according to Regulation (EC) No 1272/2008."45 EFSA therefore disagreed with IARC: glyphosate was not genotoxic and did not present    a carcinogenic threat to humans.

83.    In explaining why its results departed from IARC's conclusion, EFSA drew a distinction between the EU and IARC approaches to the study and classification of chemicals.46 Although IARC examined "both glyphosate -- an active substance -- and glyphosate-based formulations, grouping all formulations regardless of their composition," EFSA explained that it considered only glyphosate and that its assessment focuses on "each individual chemical, and each marketed mixture separately."47 IARC, on the other hand, "assesses generic agents, including groups of related chemicals, as well as occupational or environmental exposure, and

---

45 *Id*.
46 EFSA Fact Sheet: Glyphosate, EFSA
http://www.efsa.europa.eu/sites/default/files/corporate_publications/files/efsaexpl ainsglyphosate151112en.pdf.
47 *Id*.

Complaint for Personal Injuries-25

| Bowersox Law Firm, P.C. | Coluccio Law |
|---|---|
| 3 Centerpointe Drive, Suite 190 | 2025 First Ave. Suite 1130 |
| Lake Oswego, OR 97035 | Seattle, WA 98121 |
| (503) 452-5858 | 206-826-8200 |
| Fax: (503) 345-6893 | Fax: 206-673-8286 |

1    cultural or behavioral practices."48 EFSA accorded greater weight to studies conducted with

2    glyphosate alone than studies of formulated products.49

3        84.     EFSA went further and noted:

> [A]lthough some studies suggest that certain glyphosate-based formulations may be genotoxic (i.e. damaging to DNA), others that look solely at the active substance glyphosate do not show this effect. It is likely, therefore, that *the genotoxic effects observed in some glyphosate-based formulations are related to the other constituents or "co-formulants"*. Similarly, certain glyphosate-based formulations display higher toxicity than that of the active ingredient, presumably because of the presence of co-formulants. In its assessment, *EFSA proposes that the toxicity of each pesticide formulation and in particular its genotoxic potential should be further considered and addressed by Member State authorities while they re-assess uses of glyphosate-based formulations in their own territories.50*

11        85.     Notwithstanding its conclusion, EFSA did set exposure levels for glyphosate.

12    Specifically, EFSA proposed an acceptable daily intake (ADI) of 0.5 mg/kg of body weight per

13    day; an acute reference dose (ARfD) of 0.5 mg/kg of body weight; and an acceptable operator

14    exposure level (AOEL) of 0.1 mg/kg bw per day.51

*Leading Scientists Dispute EFSA's Conclusion*

16        86.     On November 27, 2015, 96 independent academic and governmental scientists

17    from around the world submitted an open letter to the EU health commissioner, Vytenis

18    Andriukaitis.52 The scientists expressed their strong concerns and urged the commissioner to

---

48 *Id.*

49 *Id.*

50 *Id.*

51 European Food Safety Auth., Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate, *supra.*

52 Letter from Christopher J. Portier et al. to Commission Vytenis Andriukaitis, Open letter: Review of the Carcinogenicity of Glyphosate by EFSA and BfR (Nov. 27, 2015), https://www.efsa.europa.eu/sites/default/files/Prof_Portier_letter.pdf

Bowersox Law Firm, P.C.
3 Centerpointe Drive, Suite 190
Lake Oswego, OR 97035
(503) 452-5858
Fax: (503) 345-6893

Coluccio Law
2025 First Ave. Suite 1130
Seattle, WA 98121
206-826-8200
Fax: 206-673-8286

disregard the "flawed" EFSA report, arguing that "the BfR decision is not credible because it is not supported by the evidence and it was not reached in an open and transparent manner."[53]

87.    Signatories to the letter included Dr. Christopher J. Portier, Ph.D., and other renowned international experts in the field, some of whom were part of the IARC Working Group assigned to glyphosate.

88.     In an exhaustive and careful examination, the scientists scrutinized EFSA's conclusions and outlined why the IARC Working Group decision was "by far the more credible":

> The IARC WG decision was reached relying on open and transparent procedures by independent scientists who completed thorough conflict-of-interest statements and were not affiliated or financially supported in any way by the chemical manufacturing industry. It is fully referenced and depends entirely on reports published in the open, peer-reviewed biomedical literature. It is part of a long tradition of deeply researched and highly credible reports on the carcinogenicity of hundreds of chemicals issued over the past four decades by IARC and used today by international agencies and regulatory bodies around the world as a basis for risk assessment, regulation and public health policy.[54]

89.    With respect to human data, the scientists pointed out that EFSA agreed with IARC that there was "*limited evidence* of carcinogenicity" for non- Hodgkin lymphoma, but EFSA nonetheless dismissed an association between glyphosate exposure and carcinogenicity. IARC applies three levels of evidence in its analyses of human data, including sufficient evidence and limited evidence. EFSA's ultimate conclusion that "there was no unequivocal evidence for a clear and strong association of NHL with glyphosate" was misleading because it was tantamount to IARC's highest level of evidence: "sufficient evidence," which means that a

---

53 *Id.*
54 *Id*.

Complaint for Personal Injuries-27

Bowersox Law Firm, P.C.
3 Centerpointe Drive, Suite 190
Lake Oswego, OR 97035
(503) 452-5858
Fax: (503) 345-6893

Coluccio Law
2025 First Ave. Suite 1130
Seattle, WA 98121
206-826-8200
Fax: 206-673-8286

causal relationship has been established. However, the scientists argued, "[l]egitimate public health concerns arise when 'causality is credible,' i.e., when there is *limited evidence*." 55

90.    Among its many other deficiencies, EFSA's conclusions regarding animal carcinogenicity data were "scientifically unacceptable," particularly in BfR's use of historical control data and in its trend analysis. Indeed, BfR's analysis directly contradicted the Organization for Economic Co-operation and Development ("OECD") testing guidelines while citing and purporting to follow those same guidelines. For instance, the EFSA report dismisses observed trends in tumor incidence "because there are no individual treatment groups that are significantly different from controls and because the maximum observed response is reportedly within the range of the historical control data." However, according to the scientists, concurrent controls are recommended over historical controls in all guidelines, scientific reports, and publications, and, if it is employed, historical control data "should be from studies in the same timeframe, for the same exact animal strain, preferably from the same laboratory or the same supplier and preferably reviewed by the same pathologist." BfR's use of historical control data violated these precautions: "only a single study used the same mouse strain as the historical controls but was reported more than 10 years after the historical control dataset was developed." Further deviating from sound scientific practices, the data used by the BfR came from studies in seven different laboratories. The scientists concluded:

> BfR reported seven positive mouse studies with three studies showing increases in renal tumors, two with positive findings for hemangiosarcomas, and two with positive findings for malignant lymphomas. BfR additionally reported two positive findings for tumors in rats. Eliminating the inappropriate use of historical data the unequivocal conclusion is that these are not negative studies,

---

55 *Id.*

Complaint for Personal Injuries-28

<table>
<tr><td>Bowersox Law Firm, P.C.<br>3 Centerpointe Drive, Suite 190<br>Lake Oswego, OR 97035<br>(503) 452-5858<br>Fax: (503) 345-6893</td><td>Coluccio Law<br>2025 First Ave. Suite 1130<br>Seattle, WA 98121<br>206-826-8200<br>Fax: 206-673-8286</td></tr>
</table>

but in fact document the carcinogenicity of glyphosate in laboratory animals.[56]

91.     The letter also critiqued the EFSA report's lack of transparency and the opacity surrounding the data cited in the report: "citations for almost all of the references, even those from the open scientific literature, have been redacted from the document" and "there are no authors or contributors listed for either document, a requirement for publication in virtually all scientific journals." Because BfR relied on unpublished, confidential industry-provided studies, it is "impossible for any scientist not associated with BfR to review this conclusion with scientific confidence."[57]

92.     On March 3, 2016, the letter was published in the Journal of Epidemiology & Community Health.[58]

### Statement of Concern Regarding Glyphosate-Based Herbicides

93.     On February 17, 2016, a consensus statement published in the journal *Environmental Health*, entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement," assessed the safety of glyphosate-based herbicides (GBHs).[59] The paper's "focus is on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with recent discoveries about the toxicity and

---

56 *Id.*
57 *Id.*

58 Christopher J. Portier, et al., *Differences in the carcinogenic evaluation of glyphosate between the International Agency for Research on Cancer (IARC) and the European Food Safety Authority (EFSA)*, JOURNAL OF EPIDEMIOLOGY & CMTY. HEALTH, Mar. 3, 2016, *available at* http://jech.bmj.com/content/early/2016/03/03/jech-2015-207005.full.

59 John P. Myers, et al, *Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement*, Environmental Health (2016), *available at* http://ehjournal.biomedcentral.com/articles/10.1186/s12940- 016-0117-0.

Complaint for Personal Injuries-29

Bowersox Law Firm, P.C.
3 Centerpointe Drive, Suite 190
Lake Oswego, OR 97035
(503) 452-5858
Fax: (503) 345-6893

Coluccio Law
2025 First Ave. Suite 1130
Seattle, WA 98121
206-826-8200
Fax: 206-673-8286

human health risks stemming from use of GBHs."60 The researchers drew seven factual conclusions about GBHs:

1. GBHs are the most heavily applied herbicide in the world and usage continues to rise;

2. Worldwide, GBHs often contaminate drinking water sources, precipitation, and air, especially in agricultural regions;

3. The half-life of glyphosate in water and soil is longer than previously recognized;

4. Glyphosate and its metabolites are widely present in the global soybean supply;

5. Human exposures to GBHs are rising;

6. Glyphosate is now authoritatively classified as a probable human carcinogen; and

7. Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science. 61

94. The researchers noted that GBH use has increased approximately 100-fold since the 1970s. Further, far from posing a limited hazard to vertebrates, as previously believed, two decades of evidence demonstrated that "several vertebrate pathways are likely targets of action, including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."62

95. The paper attributes uncertainties in current assessments of glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide

---

60 *Id.*
61*Id*.
62 *Id*.

Complaint for Personal Injuries-30

Bowersox Law Firm, P.C.
3 Centerpointe Drive, Suite 190
Lake Oswego, OR 97035
(503) 452-5858
Fax: (503) 345-6893

Coluccio Law
2025 First Ave. Suite 1130
Seattle, WA 98121
206-826-8200
Fax: 206-673-8286

formulations." Further, the researchers argue, "[t]he distinction in regulatory review and decision processes between 'active' and 'inert' ingredients has no toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in their own right."[63]

96.     Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish." Accordingly, "risk assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone underestimate both toxicity and exposure, and thus risk." The paper concludes that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."[64]

97.     The researchers also critique the current practice of regulators who largely rely on "unpublished, non-peer reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."[65]

98.     The researchers also call for greater inclusion of GBHs in government-led toxicology testing programs:

> [A] fresh and independent examination of GBH toxicity should be undertaken, and . . . this re-examination be accompanied by systematic efforts by relevant agencies to monitor GBH levels in people and in the food supply, none of which are occurring today. The U.S. National Toxicology Program should prioritize a thorough toxicological assessment of the

---

63 *Id.*
64 *Id.*
65 *Id.*

Complaint for Personal Injuries-31

Bowersox Law Firm, P.C.
3 Centerpointe Drive, Suite 190
Lake Oswego, OR 97035
(503) 452-5858
Fax: (503) 345-6893

Coluccio Law
2025 First Ave. Suite 1130
Seattle, WA 98121
206-826-8200
Fax: 206-673-8286

multiple pathways now identified as potentially vulnerable to GBHs.66

99. The researchers suggest that, in order to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which manufacturers fund the registration process and the necessary testing:

> "[W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part of routine registration actions and fees. Such funds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would be made available to independent scientists to conduct the appropriate long-term (minimum 2 years) safety studies in recognized animal model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption, impacts on the gut microbiome, carcinogenicity, and multigenerational effects looking at reproductive capability and frequency of birth defects."67

### EU Vote on Glyphosate Renewal

100. The license for glyphosate in the European Union (EU) was set to expire on June 30, 2016.

101. Without an extension of the license, Monsanto's Roundup® and other glyphosate-based herbicides faced a general phase out in EU markets.68

102. In the months leading up to the license expiration date, protracted meetings and votes among national experts from the 28 EU Member States failed to produce agreement on an extension.

---

66 *Id.*
67 *Id.*
68 Philip Blenkinsop, Alissa de Carbonnel & Barbara Lewis, *European Commission to extend glyphosate license for 18 months*, REUTERS, June 28, 2016, *available at* *http://www.sej.org/headlines/european-commission-extend-glyphosate-license-18-months*

Complaint for Personal Injuries-32

Bowersox Law Firm, P.C.
3 Centerpointe Drive, Suite 190
Lake Oswego, OR 97035
(503) 452-5858
Fax: (503) 345-6893

Coluccio Law
2025 First Ave. Suite 1130
Seattle, WA 98121
206-826-8200
Fax: 206-673-8286

103.    For instance, on March 4, 2016, *The Guardian* reported that France, the Netherlands, and Sweden did not support EFSA's assessment that glyphosate was harmless.69 The paper quoted the Swedish environment minister, Åsa Romson, as stating: "We won't take risks with glyphosate and we don't think that the analysis done so far is good enough. We will propose that no decision is taken until further analysis has been done and the EFSA scientists have been more transparent about their considerations."70

104.    The Netherlands argued that relicensing should be placed on hold until after a separate evaluation of glyphosate's toxicity can be conducted.71 Leading up to the vote, Italy joined the other EU states in opposing the license renewal, citing health concerns.72

105.    On June 6, 2016, Member States voted but failed to reach a qualified majority in favor or against the re-authorization of glyphosate.73

106.    On June 29, 2016, the EU Commission extended the European license for glyphosate for 18 months to allow the European Chemical Agency to rule on the safety of the chemical, which is expected by the end of 2017.74

---

69 Arthur Neslen, *EU states rebel against plans to relicense weedkiller glyphosate*, THE GUARDIAN, Mar. 4, 2016, *available at* http://www.theguardian.com/environment/2016/mar/04/eu-states-rebel-against- plans-to-relicense-weedkiller-glyphosate.

70 *Id.*

71 Arthur Neslen, *Vote on Controversial weedkiller's European licence postponed*, THE GUARDIAN, Mar. 8, 2016, *available at* http://www.theguardian.com/environment/2016/mar/08/eu-vote-on-controversial- weedkiller-licence-postponed-glyphosate.

72 *Id.*

73 Manon Flausch, *Commission prolongs glyphosate license by 18 months*, EURACTIV, June 29, 2016, *available at* http://www.euractiv.com/section/agriculture-food/news/commission-prolongs-glyphosate-licence-by-18-months/

74 Arthur Neslen, *Controversial chemical in Roundup weedkiller escapes immediate ban*, THE GUARDIAN, June 29, 2016, *available at*

Bowersox Law Firm, P.C.
3 Centerpointe Drive, Suite 190
Lake Oswego, OR 97035
(503) 452-5858
Fax: (503) 345-6893

Coluccio Law
2025 First Ave. Suite 1130
Seattle, WA 98121
206-826-8200
Fax: 206-673-8286

107.    On July 11, 2016, the EU voted in favor of a proposal to restrict the conditions of use of glyphosate in the EU, including a ban on common co-formulant POE-tallowamine ("POEA") from all glyphosate-based herbicides, including Roundup®.75

108.    These restrictions, which are non-binding on the EU states, are expected to apply until the European Chemicals Agency issues an opinion on the chemical's safety.76

### Plaintiff's Exposure to Roundup ®

109.    Plaintiff Brandy Rhodes is 43 years of age and lives in Vancouver, Washington.

110.    Roundup® was routinely applied to the city parks by City employees near Ms. Rhodes' residence at 880 Aspen Avenue, La Center, Washington. From 2000 through part of 2005, Ms. Rhodes frequently visited the city parks with her children and on her daily runs. Ms. Rhodes thereafter moved to 1602 E. 4th Way, La Center, Washington in the Summer of 2005 and was exposed to Roundup® that was being sprayed at the city park near her residence. Ms. Rhodes was exposed to Roundup® while walking in parks and where she frequently went for runs. Ms. Rhodes resided in La Center until late Summer of 2008.

111.    In or about December, 2005, Plaintiff Brandy Rhodes was diagnosed with Stage IIA Nodular Sclerosing Non-Hodgkin's Lymphoma by Dr. Christine Katterhagen.    She underwent several cycles of chemotherapy and radiation.

112.    During the entire time that Ms. Rhodes was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

_https://www.theguardian.com/business/2016/jun/29/controversial-chemical-roundup-weedkiller-escapes-immediate-ban_
75 Sarantis Michalopoulos, _EU agrees ban on glyphosate co-formulant_, EURACTIV, July 11, 2016, _available at_ _https://www.euractiv.com/section/agriculture-food/news/eu-agrees-ban-on-glyphosate-co-formulant/_
76 _See_ Arthur Neslen, _Controversial chemical in Roundup weedkiller escapes immediate ban_, THE GUARDIAN, June 29, 2016.

Complaint for Personal Injuries-34

Bowersox Law Firm, P.C.
3 Centerpointe Drive, Suite 190
Lake Oswego, OR 97035
(503) 452-5858
Fax: (503) 345-6893

Coluccio Law
2025 First Ave. Suite 1130
Seattle, WA 98121
206-826-8200
Fax: 206-673-8286

113.     Ms. Rhodes first learned that exposure to Roundup® can cause non-Hodgkin lymphoma and other serious illnesses in January 2019, less than three months before filing this Complaint.

## TOLLING OF THE STATUTE OF LIMITATIONS

### *Discovery Rule Tolling*

114.     Plaintiff had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup® and glyphosate until well-after IARC released its formal assessment of glyphosate in July 2015.

115.     Within the time period of any applicable statutes of limitations, Plaintiff could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup® and glyphosate is injurious to human health.

116.     Plaintiff did not discover and did not know of facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup® and glyphosate; nor would a reasonable and diligent investigation by her have disclosed that Roundup® and glyphosate would cause her illness.

117.     For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff's claims.

### *Fraudulent Concealment Tolling*

118.     All applicable statutes of limitations have also been tolled by Monsanto's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

119.     Instead of disclosing critical safety information about Roundup® and glyphosate, Monsanto has consistently and falsely represented the safety of its Roundup® products.

Complaint for Personal Injuries-35

Bowersox Law Firm, P.C.
3 Centerpointe Drive, Suite 190
Lake Oswego, OR 97035
(503) 452-5858
Fax: (503) 345-6893

Coluccio Law
2025 First Ave. Suite 1130
Seattle, WA 98121
206-826-8200
Fax: 206-673-8286

*Estoppel*

120.     Monsanto was under a continuous duty to disclose to consumers, users and other persons coming into contact with its products, including Plaintiff, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate.

121.     Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

122.     Based on the foregoing, Monsanto is estopped from relying on any statutes of limitations in defense of this action.

## CLAIMS FOR RELIEF

## COUNT ONE

### STRICT LIABILITY (DESIGN DEFECT)

123.     Plaintiff incorporates by reference each and every allegation set-forth in the preceding paragraphs as if fully stated herein, and further state and allege as follows.

124.     Plaintiff brings this strict liability claim against Defendant for defective design.

125.     At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers and users and other persons coming into contact them, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant. At all times relevant to this litigation, Defendant designed, researched, developed, formulated, manufactured, produced, tested, assembled, labeled, advertised,

Complaint for Personal Injuries-36

Bowersox Law Firm, P.C.
3 Centerpointe Drive, Suite 190
Lake Oswego, OR 97035
(503) 452-5858
Fax: (503) 345-6893

Coluccio Law
2025 First Ave. Suite 1130
Seattle, WA 98121
206-826-8200
Fax: 206-673-8286

promoted, marketed, sold, and distributed the Roundup® products used by Plaintiff, and/or to which Plaintiff was exposed, as described above.

126.    At all times relevant to this litigation, Defendant's Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff.

127.    At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Iowa and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

128.    Defendant's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of the Defendant's manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

129.    Defendant's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks associated with these products' reasonably foreseeable uses exceeded the alleged benefits associated with their design and formulation.

130.    Therefore, at all times relevant to this litigation, Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled,

Complaint for Personal Injuries-37

Bowersox Law Firm, P.C.
3 Centerpointe Drive, Suite 190
Lake Oswego, OR 97035
(503) 452-5858
Fax: (503) 345-6893

Coluccio Law
2025 First Ave. Suite 1130
Seattle, WA 98121
206-826-8200
Fax: 206-673-8286

1  distributed, sold and marketed by Defendant, were defective in design and formulation, in one or

2  more of the following ways:

3       a.     When placed in the stream of commerce, Defendant's Roundup® products

4  were defective in design and formulation, and, consequently, dangerous to an extent

5  beyond that which an ordinary consumer would contemplate.

6       b.     When placed in the stream of commerce, Defendant's Roundup® products

7  were unreasonably dangerous in that they were hazardous and posed a grave risk of

8  cancer and other serious illnesses when used in a reasonably anticipated manner.

9       c.     When placed in the stream of commerce, Defendant's Roundup® products

10 contained unreasonably dangerous design defects and were not reasonably safe when

11 used in a reasonably anticipated or intended manner.

12      d.     Defendant did not sufficiently test, investigate, or study its Roundup®

13 products and, specifically, the active ingredient glyphosate.

14      e.     Exposure to Roundup® and glyphosate-containing products presents a risk

15 of harmful side effects that outweighs any potential utility stemming from the use of the

16 herbicide.

17      f.     Defendant knew or should have known at the time of marketing its

18 Roundup® products that exposure to Roundup® and specifically, its active ingredient

19 glyphosate, could result in cancer and other severe illnesses and injuries.

20      g.     Defendant did not conduct adequate post-marketing surveillance of its

21 Roundup® products.

22      h.     Defendant could have employed safer alternative designs and

23 formulations.

24

Complaint for Personal Injuries-38

| Bowersox Law Firm, P.C. | Coluccio Law |
| --- | --- |
| 3 Centerpointe Drive, Suite 190 | 2025 First Ave. Suite 1130 |
| Lake Oswego, OR 97035 | Seattle, WA 98121 |
| (503) 452-5858 | 206-826-8200 |
| Fax: (503) 345-6893 | Fax: 206-673-8286 |

131. At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

132. Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

133. The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendant's Roundup® products were and are more dangerous than alternative products and Defendant could have designed its Roundup® products to make them less dangerous. Indeed, at the time that Defendant designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

134. At the time Roundup® products left Defendant's control, there was a practical, technically feasible, and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant's Roundup® herbicides.

135. Defendant's defective design of Roundup® amounts to willful, wanton, and/or reckless conduct by Defendant.

136. Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendant is strictly liable to Plaintiff.

137. The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiff's grave injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained her injuries.

Bowersox Law Firm, P.C.
3 Centerpointe Drive, Suite 190
Lake Oswego, OR 97035
(503) 452-5858
Fax: (503) 345-6893

Coluccio Law
2025 First Ave. Suite 1130
Seattle, WA 98121
206-826-8200
Fax: 206-673-8286

138.    As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

139.    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and other damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## COUNT TWO

## STRICT LIABILITY (FAILURE TO WARN)

140.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein, and further state and allege as follows.

141.    Plaintiff brings this strict liability claim against Defendant for failure to warn.

142.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

143.    Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the

Complaint for Personal Injuries-40

Bowersox Law Firm, P.C.
3 Centerpointe Drive, Suite 190
Lake Oswego, OR 97035
(503) 452-5858
Fax: (503) 345-6893

Coluccio Law
2025 First Ave. Suite 1130
Seattle, WA 98121
206-826-8200
Fax: 206-673-8286

products to consumers and end users, including Plaintiff, and persons responsible for consumers (such as applicators of Roundup® in public venues), and Defendant therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of Roundup® and glyphosate-containing products.

144.    At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn Plaintiff of the dangers associated with Roundup® use and exposure. Defendant, as manufacturer, seller, or distributor of chemical herbicides, is held to the knowledge of an expert in the field.

145.    At the time of manufacture, Defendant could have provided warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to these products.

146.    At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its Roundup® products and to those who would foreseeably use or be harmed by Defendant's herbicides, including Plaintiff.

147.    Despite the fact that Defendant knew or should have known that Roundup® products posed a grave risk of harm, it failed to warn of the dangerous risks associated with their use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to

Complaint for Personal Injuries-41

Bowersox Law Firm, P.C.
3 Centerpointe Drive, Suite 190
Lake Oswego, OR 97035
(503) 452-5858
Fax: (503) 345-6893

Coluccio Law
2025 First Ave. Suite 1130
Seattle, WA 98121
206-826-8200
Fax: 206-673-8286

Defendant through appropriate research and testing by known methods, at the time it distributed, supplied, or sold the product, and not known to end users and consumers, such as Plaintiff and/or applicators of Roundup® in public venues.

148.  Defendant knew or should have known that its Roundup® and glyphosate-containing products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products. Defendant has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

149.  At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

150.  At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

151.  Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendant.

152.  Defendant knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, but it failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that

Complaint for Personal Injuries-42

Bowersox Law Firm, P.C.
3 Centerpointe Drive, Suite 190
Lake Oswego, OR 97035
(503) 452-5858
Fax: (503) 345-6893

Coluccio Law
2025 First Ave. Suite 1130
Seattle, WA 98121
206-826-8200
Fax: 206-673-8286

were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and horticultural applications.

153. The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled agricultural workers, horticultural workers and/or at-home users such as Plaintiff to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

154. To this day, Defendant has failed to adequately and accurately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

155. As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiff.

156. Defendant is liable to Plaintiff for injuries caused by its failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its Roundup® products and the risks associated with the use of or exposure to Roundup® and glyphosate.

Complaint for Personal Injuries-43

Bowersox Law Firm, P.C.
3 Centerpointe Drive, Suite 190
Lake Oswego, OR 97035
(503) 452-5858
Fax: (503) 345-6893

Coluccio Law
2025 First Ave. Suite 1130
Seattle, WA 98121
206-826-8200
Fax: 206-673-8286

157.    The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiff's injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained her injuries.

158.    Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup® products, Plaintiff could have avoided the risk of developing injuries as alleged herein and Plaintiff, and applicators of Roundup®, could have obtained alternative herbicides.

159.    As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer severe injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

160.    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and other damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

<u>**COUNT THREE**</u>

**NEGLIGENCE**

161.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein, and further state and allege as follows.

162.    Defendant, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

Complaint for Personal Injuries-44

| | |
|---|---|
| Bowersox Law Firm, P.C.<br>3 Centerpointe Drive, Suite 190<br>Lake Oswego, OR 97035<br>(503) 452-5858<br>Fax: (503) 345-6893 | Coluccio Law<br>2025 First Ave. Suite 1130<br>Seattle, WA 98121<br>206-826-8200<br>Fax: 206-673-8286 |

163.  At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

164.  At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of its Roundup® products. Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup® and, in particular, its active ingredient glyphosate.

165.  At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

166.  Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

167.  Defendant knew or, in the exercise of reasonable care, should have known that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup®.

Complaint for Personal Injuries-45

Bowersox Law Firm, P.C.
3 Centerpointe Drive, Suite 190
Lake Oswego, OR 97035
(503) 452-5858
Fax: (503) 345-6893

Coluccio Law
2025 First Ave. Suite 1130
Seattle, WA 98121
206-826-8200
Fax: 206-673-8286

168.    Defendant knew or, in the exercise of reasonable care, should have known that tests limited to Roundup®'s active ingredient glyphosate were insufficient to prove the safety of Roundup®.

169.    Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup® and glyphosate-containing products.

170.    As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of  its Roundup® products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

171.    Defendant failed to appropriately and adequately test Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup®.

172.    Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant has failed to do so. Indeed, Defendant has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

173.    Defendant's negligence included:

Complaint for Personal Injuries-46

Bowersox Law Firm, P.C.
3 Centerpointe Drive, Suite 190
Lake Oswego, OR 97035
(503) 452-5858
Fax: (503) 345-6893

Coluccio Law
2025 First Ave. Suite 1130
Seattle, WA 98121
206-826-8200
Fax: 206-673-8286

1    a.    Manufacturing, producing, promoting, formulating, creating, developing,

2  designing, selling, and/or distributing its Roundup® products without thorough and

3  adequate pre- and post- market testing;

4    b.    Manufacturing, producing, promoting, formulating, creating, developing,

5  designing, selling, and/or distributing Roundup® while negligently and/or intentionally

6  concealing and failing to disclose the results of trials, tests, and studies of exposure to

7  glyphosate, and, consequently, the risk of serious harm associated with human use of and

8  exposure to Roundup®;

9    c.    Failing to undertake sufficient studies and conduct necessary tests to

10  determine whether or not Roundup® products and glyphosate-containing products were

11  safe for their intended use in agriculture, horticulture, and at-home use;

12    d.    Failing to undertake sufficient studies and conduct necessary tests to

13  determine the safety of "inert" ingredients and/or adjuvants contained within Roundup®,

14  and the propensity of these ingredients to render Roundup® toxic, increase the toxicity of

15  Roundup®, whether these ingredients are carcinogenic, magnify the carcinogenic

16  properties of Roundup®, and whether or not "inert" ingredients and/or adjuvants were

17  safe for use;

18    e.    Failing to use reasonable and prudent care in the design, research,

19  manufacture, formulation, and development of Roundup® products so as to avoid the risk

20  of serious harm associated with the prevalent use of Roundup®/glyphosate as an

21  herbicide;

22    f.    Failing to design and manufacture Roundup® products so as to ensure

23  they were at least as safe and effective as other herbicides on the market;

24

Complaint for Personal Injuries-47

| Bowersox Law Firm, P.C. | Coluccio Law |
|---|---|
| 3 Centerpointe Drive, Suite 190 | 2025 First Ave. Suite 1130 |
| Lake Oswego, OR 97035 | Seattle, WA 98121 |
| (503) 452-5858 | 206-826-8200 |
| Fax: (503) 345-6893 | Fax: 206-673-8286 |

g.     Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and/or be exposed to its Roundup® products;

h.     Failing to disclose to Plaintiff, users, consumers, and the general public that the use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

i.     Failing to warn Plaintiff, users, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other users or consumers;

j.     Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

k.     Representing that its Roundup® products were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended use;

l.     Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

m.     Advertising, marketing, and recommending the use of Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

Complaint for Personal Injuries-48

Bowersox Law Firm, P.C.
3 Centerpointe Drive, Suite 190
Lake Oswego, OR 97035
(503) 452-5858
Fax: (503) 345-6893

Coluccio Law
2025 First Ave. Suite 1130
Seattle, WA 98121
206-826-8200
Fax: 206-673-8286

n. Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup® products are not unsafe for use in the agricultural, horticultural industries, and/or home use; and

o. Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

174. Defendant knew and/or should have known that it was foreseeable that consumers and/or users, such as Plaintiff, would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

175. Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

176. As a proximate result of Defendant's wrongful acts and omissions in placing its defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff has suffered and continues to suffer severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, has suffered economic losses (including significant expenses for medical care and treatment), and will continue to incur these expenses in the future.

177. WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and other damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

// // // //

Complaint for Personal Injuries-49

| Bowersox Law Firm, P.C. | Coluccio Law |
|---|---|
| 3 Centerpointe Drive, Suite 190 | 2025 First Ave. Suite 1130 |
| Lake Oswego, OR 97035 | Seattle, WA 98121 |
| (503) 452-5858 | 206-826-8200 |
| Fax: (503) 345-6893 | Fax: 206-673-8286 |

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment in her favor and against Monsanto on each of the above-referenced claims and causes of action, awarding as follows:

a.   compensatory damages in excess of the jurisdictional amount, including but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

b.   compensatory damages for past and future damages, including but not limited to Plaintiff's pain and suffering and for severe and permanent personal injuries sustained by Plaintiff, including health care costs and economic loss;

c.   economic damages in the form of medical expenses, out-of-pocket expenses, lost earnings and other economic damages in an amount to be determined at trial of this action;

d.   punitive damages, if the Court allows an Amended Complaint upon Plaintiff's motion;

e.   pre- and post-judgment interest;

f.   costs including reasonable attorneys' fees, court costs, and other litigation expenses; and

g.   any other relief the Court deems just and proper.

// // // //

Complaint for Personal Injuries-50

Bowersox Law Firm, P.C.
3 Centerpointe Drive, Suite 190
Lake Oswego, OR 97035
(503) 452-5858
Fax: (503) 345-6893

Coluccio Law
2025 First Ave. Suite 1130
Seattle, WA 98121
206-826-8200
Fax: 206-673-8286

1

## <u>JURY TRIAL DEMAND</u>

2    Plaintiff demands a trial by jury on all of the triable issues within this Complaint.

3  Dated: February 15, 2019

4

5                                    COLUCCIO LAW

6                                    s/ Kevin Coluccio
                                     Kevin Coluccio, WSBA# 16245
7                                    Coluccio Law
                                     2025 1st Avenue, Suite 1130
8                                    Seattle, WA 98121
                                     kc@coluccio-law.com
9                                    Co-Counsel for Plaintiff

10

11                                   BOWERSOX LAW FIRM, PC

12                                   s/ Jeffrey A. Bowersox
                                     Jeffrey A. Bowersox, Pro Hac Vice *Anticipated*
13                                   Bowersox Law Firm, P.C.
                                     3 Centerpointe Drive, Suite 190
14                                   Lake Oswego, OR 97035
                                     jeffrey@bowersoxlaw.com
15                                   Co-Counsel for Plaintiff

16

17

18

19

20

21

22

23

24

Complaint for Personal Injuries-51

Bowersox Law Firm, P.C.
3 Centerpointe Drive, Suite 190
Lake Oswego, OR 97035
(503) 452-5858
Fax: (503) 345-6893

Coluccio Law
2025 First Ave. Suite 1130
Seattle, WA 98121
206-826-8200
Fax: 206-673-8286

JS 44 (Rev. 02/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| BRANDY RHODES | MONSANTO COMPANY |

| (b) County of Residence of First Listed Plaintiff   Clark | County of Residence of First Listed Defendant |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)*<br>NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF<br>       THE TRACT OF LAND INVOLVED. |

| (c) Attorneys *(Firm Name, Address, and Telephone Number)*<br>Kevin Coluccio, Coluccio Law, 2025 1st Avenue, Suite 1130<br>Seattle, WA 98121; (206) 826-8200 | Attorneys *(If Known)* |
|---|---|

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government
  Plaintiff
- ☐ 2 U.S. Government
  Defendant
- ☐ 3 Federal Question
  *(U.S. Government Not a Party)*
- ☒ 4 Diversity
  *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                          *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place<br>of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place<br>of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a<br>Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment<br>   & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted<br>   Student Loans<br>   (Excludes Veterans)<br>☐ 153 Recovery of Overpayment<br>   of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product<br>   Liability<br>☐ 320 Assault, Libel &<br>   Slander<br>☐ 330 Federal Employers'<br>   Liability<br>☐ 340 Marine<br>☐ 345 Marine Product<br>   Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle<br>   Product Liability<br>☐ 360 Other Personal<br>   Injury<br>☐ 362 Personal Injury -<br>   Medical Malpractice | **PERSONAL INJURY**<br>☒ 365 Personal Injury -<br>   Product Liability<br>☐ 367 Health Care/<br>   Pharmaceutical<br>   Personal Injury<br>   Product Liability<br>☐ 368 Asbestos Personal<br>   Injury Product<br>   Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal<br>   Property Damage<br>☐ 385 Property Damage<br>   Product Liability | ☐ 625 Drug Related Seizure<br>   of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal<br>   28 USC 157<br><br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 835 Patent - Abbreviated<br>   New Drug Application<br>☐ 840 Trademark<br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC<br>   3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and<br>   Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 485 Telephone Consumer<br>   Protection Act<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/<br>   Exchange<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/<br>   Accommodations<br>☐ 445 Amer. w/Disabilities -<br>   Employment<br>☐ 446 Amer. w/Disabilities -<br>   Other<br>☐ 448 Education | **Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate<br>   Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee -<br>   Conditions of<br>   Confinement | ☐ 710 Fair Labor Standards<br>   Act<br>☐ 720 Labor/Management<br>   Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical<br>   Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement<br>   Income Security Act<br><br>**IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration<br>   Actions | ☐ 870 Taxes (U.S. Plaintiff<br>   or Defendant)<br>☐ 871 IRS—Third Party<br>   26 USC 7609 | ☐ 895 Freedom of Information<br>   Act<br>☐ 896 Arbitration<br>☐ 899 Administrative Procedure<br>   Act/Review or Appeal of<br>   Agency Decision<br>☐ 950 Constitutionality of<br>   State Statutes |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original
  Proceeding
- ☐ 2 Removed from
  State Court
- ☐ 3 Remanded from
  Appellate Court
- ☐ 4 Reinstated or
  Reopened
- ☐ 5 Transferred from
  Another District
  *(specify)*
- ☐ 6 Multidistrict
  Litigation -
  Transfer
- ☐ 8 Multidistrict
  Litigation -
  Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. Sec. 1332(a)(1)

Brief description of cause:
Product Liability; Toxic Tort

| VII. REQUESTED IN<br>COMPLAINT: | ☐ CHECK IF THIS IS A **CLASS ACTION**<br>UNDER RULE 23, F.R.Cv.P. | DEMAND $ | CHECK YES only if demanded in complaint:<br>JURY DEMAND:   ☒ Yes   ☐ No |
|---|---|---|---|

| VIII. RELATED CASE(S)<br>IF ANY | *(See instructions):* | JUDGE   Hon. Vince Chhabria | DOCKET NUMBER   3:16-md-02741-VC |
|---|---|---|---|

| DATE<br>02/15/2019 | SIGNATURE OF ATTORNEY OF RECORD<br>s/ Kevin Coluccio |
|---|---|

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

Case MDL No. 2741 Document 899-3 Filed 02/26/19 Page 55 of 57
Case 3:19-cv-00743-RDL Document 1-1 Filed 02/15/19 Page 2 of 2

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)   Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)   County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)   Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.   Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**.** (See Section III below**; NOTE: federal question actions take precedence over diversity cases.**)

**III.   Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.   Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.   Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket. **PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.   Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553   Brief Description: Unauthorized reception of cable service

**VII.   Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.   Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Western District of Washington

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| *Plaintiff(s)* | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| *Defendant(s)* | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   Monsanto Company
c/o Registered Agent
Corporation Service Company
300 Deschutes Way SW, Suite 304
Tumwater, WA 98501

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Kevin Coluccio
Coluccio Law
2025 1st Avenue, Suite 1130
Seattle, WA 98121

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____                    _____
                                                                        *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❒ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)*

_____ on *(date)* _____ ; or

❒ I returned the summons unexecuted because _____ ; or

❒ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc: