JURYDEMAND

# U.S. District Court
## United States District Court for the Western District of Washington (Seattle)
## CIVIL DOCKET FOR CASE #: 2:19-cv-00245-TSZ

Tierney et al v. Monsanto Company et al
Assigned to: Judge Thomas S. Zilly
Cause: 28:1332 Diversity-Product Liability

Date Filed: 02/20/2019
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**<u>Plaintiff</u>**

**Patrick Leonard Tierney**
*husband and wife and their marital*
*community comprised thereof*

represented by **Darrin E Bailey**
BAILEY GRANT ONSAGER, P.C.
600 UNIVERSITY STREET
SUITE 1020
SEATTLE, WA 98101-4107
206-667-8290
Email: dbailey@baileyonsager.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Corrie Johnson Yackulic**
CORRIE YACKULIC LAW FIRM, PLLC
705 2ND AVENUE
SUITE 1300
SEATTLE, WA 98104
206-787-1915
Fax: 206-299-9725
Email: corrie@cjylaw.com
*ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

**Christy Anna Tierney**
*husband and wife and their marital*
*community comprised thereof*

represented by **Darrin E Bailey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Corrie Johnson Yackulic**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**<u>Defendant</u>**

**Monsanto Company**

**<u>Defendant</u>**

**Bayer Corporation**

**Defendant**

**Bayer AG**

| Date Filed | # | Docket Text |
|---|---|---|
| 02/20/2019 | 1 | COMPLAINT against All Defendants with JURY DEMAND (Receipt # 0981-5657067) Attorney Corrie Johnson Yackulic added to party Christy Anna Tierney(pty:pla), Attorney Corrie Johnson Yackulic added to party Patrick Leonard Tierney(pty:pla), filed by Patrick Leonard Tierney, Christy Anna Tierney. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Summons)(Yackulic, Corrie) (Entered: 02/20/2019) |
| 02/21/2019 | | Judge Thomas S. Zilly added. (SNP) (Entered: 02/21/2019) |
| 02/21/2019 | 2 | Summons(es) Electronically Issued as to defendant(s) Bayer Corporation, Monsanto Company (Attachments: # 1 Summons)(SNP) (Entered: 02/21/2019) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 03/26/2019 14:03:06 | | |
| **PACER Login:** | hllp1982:2634105:4722683 | **Client Code:** | 1417.0049 |
| **Description:** | Docket Report | **Search Criteria:** | 2:19-cv-00245-TSZ |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

Corrie J. Yackulic
CORRIE YACKULIC LAW FIRM PLLC
705 Second Avenue, #1300
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725
Corrie@cjylaw.com

Darrin E. Bailey, WSBA No. 34955
BAILEY ONSAGER, P.C.
600 University St. Ste. 1020
Seattle, WA 98101
Tel. 206.623.9900
Fax. 206.624.6885
dbailey@baileyonsager.com

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| PATRICK LEONARD TIERNEY and CHRISTY ANNA TIERNEY, *husband and wife and their marital community comprised thereof*, <br><br> *Plaintiffs*, <br><br> v. <br><br> MONSANTO COMPANY, BAYER CORPORATION and BAYER AG, <br><br> *Defendants*. | Case No. <br><br><br> **COMPLAINT** <br><br> ***JURY DEMAND*** |

## I.   **CIVIL COMPLAINT**

Plaintiffs PATRICK LEONARD TIERNEY and CHRISTY ANNA TIERNEY ("Plaintiffs"), by and through their undersigned attorneys, hereby bring this Complaint for damages against Defendants Monsanto Company, Bayer Corporation and Bayer AG [collectively, "Defendants"] and allege the following:

COMPLAINT
PAGE 1

## II.    NATURE OF THE CASE

1.      This is an action for damages suffered by Plaintiffs as a direct and proximate result of Defendants' negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup® ("Roundup"), containing the active ingredient glyphosate.

2.      Plaintiffs maintain that Roundup and/or glyphosate are defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce and lacked proper warnings and directions as to the dangers associated with their use.

3.      Plaintiffs' injuries, like those striking thousands of similarly situated victims across the country, were avoidable.

## III.    JURISDICTION AND VENUE

4.      This Court has jurisdiction over Defendants and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiffs and Defendants. Defendants are either incorporated and/or have their principal place of business outside of Washington State, where the Plaintiffs reside.

5.      The amount in controversy between Plaintiffs and Defendants exceeds $75,000, exclusive of interest and cost.

6.      Venue is proper within this district pursuant to 28 U.S.C. § 1391 in that Defendants conduct business here and are subject to personal jurisdiction in this district. Furthermore, Defendants sell, market, and/or distribute Roundup within the Western District of Washington (Seattle).

COMPLAINT
PAGE 2

**Corrie Yackulic Law Firm PLLC**
705 Second Avenue, Ste. 1300
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

## IV. PARTIES

7.     Plaintiffs PATRICK LEONARD TIERNEY and CHRISTY ANNA TIERNEY are husband and wife and are residents and citizens of Duvall, King County, Washington.  At all times relevant to this action, Plaintiffs were residents of Duvall, King County, Washington. Plaintiffs bring this action for personal injuries sustained by exposure to Roundup containing the active ingredient glyphosate and the surfactant polyethoxylated tallow amine ("POEA"). As a direct and proximate result of being exposed to Roundup, Plaintiff PATRICK LEONARD TIERNEY developed non-Hodgkin's lymphoma, specifically, diffuse large B-cell lymphoma.

8.     "Roundup" refers to all formulations of Defendants' Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to- Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup-Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide

COMPLAINT
PAGE 3

Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

9.      Defendant     MONSANTO     COMPANY     ("Monsanto") is a Delaware corporation, with a principle place of business in St. Louis, Missouri.(Missouri Secretary of State Charter No. F00488018).  Monsanto has transacted and conducted business within Washington State and has derived substantial revenue from goods and products used in this State.

10.      Defendant BAYER CORPORATION ("Bayer Corp.") is an Indiana corporation that has its principal place of business at 100 Bayer Boulevard, Whippany, New Jersey 07981.

11.      Defendant Bayer Corp. has transacted and conducted business within Washington State.

12.      Defendant Bayer Corp. has derived substantial revenue from goods and products used in Washington State.

13.      Upon information and belief, Defendant BAYER AG ("Bayer AG") is a German chemical and pharmaceutical company that is headquartered in Leverkusen, North Rhine, Westphalia, Germany.

14.      Upon information and belief, Defendant Bayer AG is the parent/holding company of Defendants Bayer Corp. and Monsanto Company.

15.      Upon information and belief, Defendant Monsanto Company is an indirect, wholly owned subsidiary of Bayer AG.

16.      Bayer AG is a publicly held corporation.

17.      All references to the acts and omissions of Defendants in this Complaint shall mean and refer to the actions of Monsanto as well as any acts and omissions of Defendants Bayer Corp. and Bayer AG made during the acquisition process as well as all acts and omissions of

COMPLAINT
PAGE 4

**Corrie Yackulic Law Firm PLLC**
705 Second Avenue, Ste. 1300
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

Defendants Bayer Corp. and Bayer AG on and after the date they acquired Monsanto. Further, Defendants Bayer Corp. and Bayer AG are jointly and severally liable with Monsanto for all acts, omissions, and wrongdoing of Monsanto as set forth in this Complaint, among other reasons, as the parent of Monsanto, as an affiliate of Monsanto, and under the doctrine of successor liability by contract, the common law, or otherwise.

18.     Defendants advertise and sell goods, specifically Roundup, in the State of Washington.

19.     Defendants transacted and conducted business that relates to the allegations in this Complaint within the State of Washington.

20.     Defendants derived substantial revenue from goods and products used in the State of Washington.

21.     Defendants expected or should have expected their acts to have consequences within the State of Washington, and derived substantial revenue from interstate commerce.

22.     Defendants engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup.

23.     Upon information and belief, Defendants purposefully availed themselves of the privilege of conducting activities with the State of Washington, thus invoking the benefits and protections of its laws.

24.     Upon information and belief, Defendants did design, sell, advertise, manufacture and/or distribute Roundup, with full knowledge of its dangerous and defective nature.

## V.     FACTUAL ALLEGATIONS

25.     At all relevant times, Defendants were in the business of, and did, design,

COMPLAINT
PAGE 5

Corrie Yackulic Law Firm PLLC
705 Second Avenue, Ste. 1300
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

research, manufacture, test, advertise, promote, market, sell, distribute, and/or have acquired and are responsible for the commercial herbicide Roundup.

26.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate.

27.     Monsanto discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate based "Roundup" as a broad spectrum herbicide.

28.     Glyphosate is the active ingredient in Roundup.

29.     Glyphosate is a broad spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

30.     Glyphosate is a "non selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

31.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

32.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

33.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

COMPLAINT
PAGE 6

34.     Defendants are intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup i.e., "Roundup Ready®." As of 2009, Monsanto was the world's leading producer of seeds designed to be Roundup Ready®. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready® seeds.

35.     The original Roundup, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the world's most widely used herbicides.[1]

36.     For nearly 40 years, consumers, farmers, and the public have used Roundup, unaware of its carcinogenic properties.

## VI.     REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

37.     The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 et seq.  FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. 136a(a).

38.     The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential nontarget organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in

---

[1] *Backgrounder,* History of Monsanto's Glyphosate Herbicides, June 2005.

COMPLAINT
PAGE 7

**Corrie Yackulic Law Firm PLLC**
705 Second Avenue, Ste. 1300
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

registering or reregistering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

39.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

40.     The EPA and the State of Washington registered Roundup for distribution, sale, and manufacture in the United States, including the State of Washington.

41.     FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

42.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of reevaluating all pesticide products through a Congressionally mandated process called "reregistration." 7 U.S.C. § 136a-1.  In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

43.     In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment in relation to the registration process no later than July 2015. The EPA completed its review of glyphosate in early 2015 but delayed releasing the assessment

COMPLAINT
PAGE 8

**Corrie Yackulic Law Firm PLLC**
705 Second Avenue, Ste. 1300
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

pending further review in light of the World Health Organization's March 24, 2015 finding that glyphosate is a "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

## VII.   MONSANTO'S FALSE REPRESENTATIONS REGARDING THE SAFETY OF ROUNDUP

44.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations, the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

a) Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences.

b) And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c) Roundup biodegrades into naturally occurring elements.

d) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e) This nonresidual herbicide will not wash or leach in the soil. It... stays where you apply it.

f) You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h) Glyphosate's safety margin is much greater than required. It has over a 1,000 fold safety margin in food and over a 700 fold safety

COMPLAINT
PAGE 9

**Corrie Yackulic Law Firm PLLC**
705 Second Avenue, Ste. 1300
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

margin for workers who manufacture it or use it.

    i)    You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

    j)    "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[2]

45.    On November 19, 1996, Monsanto entered an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

    a)    its glyphosate containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

    b)    its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;

    c)    its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

    d)    its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics;"

    e)    glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and

    f)    its glyphosate-containing products or any component thereof might be classified as "practically non-toxic".

46.    Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so as of today.

47.    In 2009, France's highest court ruled that Monsanto had not told the truth about

---

[2] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63 (15) (Nov. 1996).

COMPLAINT
PAGE 10

**Corrie Yackulic Law Firm PLLC**
705 Second Avenue, Ste. 1300
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."3

## VIII.   EVIDENCE OF CARCINOGENICITY IN ROUNDUP

48.     As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties.

49.     On March 4, 1985, a group of the EPA's Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.4

50.     Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

51.     In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.5

52.     In October 1991, the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.6

---

3 *Monsanto Guilty in "False Ad" Row,* BBC, Oct 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm

4 Consensus Review of Glyphosate, Casewell No. 661A, March 4, 1985.  United States Environmental Protection Agency.

5 http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheet/0178fact.pdf

6 Second Peer Review of Glyphosate, CAS No. 1071-83-6.  October 30, 1881, United State Environmental Protection Agency.

COMPLAINT
PAGE 11

53.     In addition to the toxicity of the active molecule, many studies support  the hypothesis that glyphosate formulations found in Defendants' Roundup products are more dangerous and toxic than glyphosate alone.7 As early as 1991 evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.8

54.     In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDKl/Cyclin B Activation."

55.     The study found that Monsanto's Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

56.     In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

57.     The study noted that "cell-cycle dysregulation is a hallmark of tumor  cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."9

58.     In 2005, Francisco Peixoto published a study showing that Roundup's effects  on rat liver mitochondria are much more toxic and harmful than the same concentrations of

---

7 Martinez et al. 2007; Benachour 2009; Gasnier et al. 2010; Pexoto 2005; Marc 2004

8 Martinez et al. 1991.

9 Molinari, 2000; Stewart et al., 2003).

COMPLAINT
PAGE 12

**Corrie Yackulic Law Firm PLLC**
705 Second Avenue, Ste. 1300
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

glyphosate alone.

59.     The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

60.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

61.     The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

62.     The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendants.

63.     Defendants knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff PATRICK LEONARD TIERNEY from Roundup.

64.     Defendants knew or should have known that tests, limited to Roundup's active ingredient glyphosate, were insufficient to prove the safety of Roundup.

**Corrie Yackulic Law Firm PLLC**
705 Second Avenue, Ste. 1300
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

65.    Defendants failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup.

66.    Rather than performing appropriate tests, Defendants relied upon flawed industry- supported studies designed to protect Defendants' economic interests rather than Plaintiff PATRICK LEONARD TIERNEY and the consuming public.

67.    Despite its knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendants continued to promote Roundup as safe.

## IX.    IARC CLASSIFICATION OF GLYPHOSATE

68.    The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency tasked by the World Health Organization ("WHO") with conducting and coordinating research into the causes of cancer.

69.    An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015-2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

70.    IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-

COMPLAINT
PAGE 14

reviewed data.

71.     On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendants' possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Defendants' Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

72.     The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A probable carcinogen to humans. According to the authors glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

73.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma (''NHL'') and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

74.     The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

## X.     EARLIER EVIDENCE OF GLYPHOSATE'S DANGER

75.     Despite the new classification by the IARC, Defendants have had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

76.     Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

77.     In 1997, Chris Clements published "Genotoxicity of select herbicides in Rana

COMPLAINT
PAGE 15

**Corrie Yackulic Law Firm PLLC**
705 Second Avenue, Ste. 1300
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

catesbeiana tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

78.     The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

79.     Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

80.     Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

81.     The IARC Monograph notes that"[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

82.     In 2006 Cesar Paz-y-Mifio published a study examining DNA damage in human subjects exposed to glyphosate.

83.     The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

84.     The IARC Monograph reflects the volume of evidence of glyphosate pesticides', genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

85.     Despite knowledge to the contrary, Defendants maintain that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts agree that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

86.     In addition to glyphosate and Roundup's genotoxic properties, Defendants have

COMPLAINT
PAGE 16

long been aware of glyphosate's carcinogenic properties.

87.     Glyphosate and Roundup, in particular, have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma ("NHL"), Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

88.     Defendants have known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

89.     In 1985, the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

90.     In 2003, Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

91.     The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studies with an increased odds ratio of 3.11.

92.     In 2003, AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

93.     The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

94.     In 2008, Mikael Eriksson published a population based case-control study of exposure to various pesticides as a risk factor for NHL.

95.     This strengthened previous associations between glyphosate and NHL.

COMPLAINT
PAGE 17

**Corrie Yackulic Law Firm PLLC**
705 Second Avenue, Ste. 1300
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

96.     In spite of this knowledge, Defendants continued to issue broad and sweeping statements that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

97.     Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiffs, the agricultural community, and the public at large to purchase and increase the use of Defendants' Roundup for Defendants' pecuniary gain, and in fact, did induce Plaintiff PATRICK LEONARD TIERNEY to use Roundup.

98.     Defendants made these statements maliciously and with complete disregard and reckless indifference to the safety of Plaintiff PATRICK LEONARD TIERNEY and the general public.

99.     Notwithstanding Defendants' representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

100.     Defendants knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

101.     Defendants failed to appropriately and adequately inform and warn Plaintiffs of these dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring

**Corrie Yackulic Law Firm PLLC**
705 Second Avenue, Ste. 1300
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

and/or medications.

102.    Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendants continue to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non- genotoxic; and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

103.    Defendants claimed and continue to claim that Roundup is safe, non-carcinogenic, and non-genotoxic. These misrepresentations are consistent with Defendants' cavalier approach to investigating and ensuring the safety of its products, the safety of the public at large, and the safety of Plaintiffs.

### XI.    SCIENTIFIC FRAUD UNDERLYING CERTAIN SAFETY DETERMINATIONS OF GLYPHOSATE

104.    After the EPA's 1985 classification of glyphosate as possibly carcinogenic to humans (Group C), Monsanto exerted pressure upon the EPA to change its classification.

105.    This culminated in the EPA's reclassification of glyphosate to Group E, which was based upon evidence of non-carcinogenicity in humans.

106.    In so classifying, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

107.    On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed scientific fraud.

108.    In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to

COMPLAINT
PAGE 19

perform and evaluate pesticide toxicology studies relating to Roundup. IBT performed approximately 30 tests on glyphosate and glyphosate-containing products, including 11 of the 19 chronic toxicology studies needed to register Roundup with the EPA.

109.     In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to toxicological impacts of glyphosate. The EPA subsequently audited IBT and determined that the toxicology studies conducted for Roundup were invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

110.     Three top executives of IBT were convicted of fraud in 1983.

111.     In the second incident, Monsanto hired Craven Laboratories ("Craven") in 1990 to perform pesticide and herbicide studies, including several studies on Roundup.

112.     In March of 1991, the EPA announced that it was investigating Craven for "allegedly falsifying test data used by chemical firms to win EPA approval of pesticides."

113.     The investigation lead to the indictments of the laboratory owner and a handful of employees.

## XII.   MONSANTO'S CONTINUING DISREGARD FOR THE SAFETY OF PLAINTIFFS AND THE PUBLIC

114.     Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate based herbicides, causes cancer, even at very high doses, and

COMPLAINT
PAGE 20

that it is not genotoxic."[10]

115.    Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

116.    Glyphosate, and Defendants' Roundup products in particular, has long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

117.    Defendants' statements proclaiming the safety of Roundup and disregarding its dangers misled Plaintiff PATRICK LEONARD TIERNEY.

118.    Despite Defendants' knowledge that Roundup was associated with an elevated risk of developing cancer, Defendants' promotional campaigns focused on Roundup's purported "safety profile."

119.    Defendants' failure to adequately warn Plaintiff PATRICK LEONARD TIERNEY resulted in (1) Plaintiff using and being exposed to glyphosate and Roundup instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

120.    Defendants failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

121.    The failure of Defendants to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

---

[10] Backgrounder-Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9 2015).

COMPLAINT
PAGE 21

Corrie Yackulic Law Firm PLLC
705 Second Avenue, Ste. 1300
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

122.     The failure of Defendants to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

123.     The failure of Defendants to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

124.     By reason of the foregoing acts and omissions, Plaintiffs seek compensatory damages as a result of Plaintiff PATRICK LEONARD TIERNEY's use of, and exposure to, Roundup which caused or was a substantial contributing factor in causing Plaintiff to suffer from cancer, specifically NHL, and Plaintiff suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

125.     By reason of the foregoing acts and omissions, Plaintiffs have sustained severe and permanent injuries and losses.

126.     By reason of the foregoing acts and omissions, Plaintiffs have endured and, in some categories, continue to suffer emotional and mental anguish, medical expenses, and other economic and non-economic damages as a result of the actions and inactions of the Defendants.

## XIII.   PLAINTIFF'S EXPOSURE TO ROUNDUP

127.     Plaintiff PATRICK LEONARD TIERNEY, a professional landscaper, used Roundup beginning in approximately August 1988 at work.

128.     For years, Plaintiff applied Roundup on a regular basis. Plaintiff followed all safety and precautionary warnings during the course of his use.

129.     Plaintiff was diagnosed with non-Hodgkin's lymphoma, specifically diffuse large B-cell lymphoma in May 2018. Plaintiff's non-Hodgkin's Lymphoma, specifically diffuse large

COMPLAINT
PAGE 22

Corrie Yackulic Law Firm PLLC
705 Second Avenue, Ste. 1300
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

B-cell lymphoma, was proximately and actually caused by his exposure to Defendants. Roundup products.

130.     As a result of his illness, Plaintiff PATRICK LEONARD TIERNEY has incurred significant economic and non- economic damages and his wife has suffered a loss of consortium.

### XIV.   FIRST CAUSE OF ACTION
### WASHINGTON PRODUCT LIABILITY ACT

131.     Plaintiffs incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

132.     At all times relevant to this litigation, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products.

133.     At all times relevant to this litigation, Defendants designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup products used by Plaintiffs as described above.

134.     At all times relevant to this litigation, Defendants' Roundup products were expected to reach and did reach the intended consumers, handlers, and users or other persons coming into contact with these products in Washington and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

135.     In violation of the Washington Products Liability Act ("WPLA"), RCW 7.72, et seq., at all times relevant to this action, at the time Defendants' Roundup products left control of Defendants, they were defective and not reasonably safe. These defects include, but are not limited to, the following:

COMPLAINT
PAGE 23

**Corrie Yackulic Law Firm PLLC**
705 Second Avenue, Ste. 1300
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

a) Defendants are strictly liable for Plaintiff's injuries and damages because at the time of manufacture, and at the time Defendants' Roundup products left control of Defendants, the likelihood that Defendants' Roundup products would cause injury or damage similar to that suffered by Plaintiffs, and the seriousness of such injury or damage had been known by Defendants and outweighed the burden on Defendants to design a product that would have prevented Plaintiffs' injuries and damages and outweighed the adverse effect that an alternative design that was practical and feasible would have on the usefulness of the subject product.

b) Defendants' Roundup products were unsafe to an extent beyond that which would be contemplated by an ordinary consumer, in one or more of the following particulars: exposure to Roundup and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries, making Roundup not reasonably safe when used in the way it is ordinarily used and is dangerous to an extent beyond that which would be contemplated by the ordinary consumer.

c) The Roundup products manufactured and/or supplied by Defendants were defective in design in that, an alternative design and/or formulation exists that would prevent severe and permanent injury. Indeed, at the time that Defendants designed their Roundup products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

d) The Roundup products were not reasonably safe in design under the WPLA.

e) The Roundup products manufactured and/or supplied by Defendants were not reasonably safe because Defendants did not provide an adequate warning or instruction about the product. At the time the Roundup products left Defendants' control, they possessed dangerous characteristics and Defendants failed to use reasonable care to provide an adequate warning of such characteristics and their danger to users and handlers of the product. The Roundup products are not safe and cause severe and permanent injuries. The Roundup products were not reasonably safe because the warning was inadequate, and Defendants could have provided adequate warnings or instructions.

f) The Roundup products manufactured and/or supplied by Defendants were not reasonably safe because adequate warnings or manufacturer instructions were not provided after the

COMPLAINT
PAGE 24

**Corrie Yackulic Law Firm PLLC**
705 Second Avenue, Ste. 1300
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

Roundup products were manufactured and when Defendants learned of, or should have learned of, the dangers connected with the Roundup products.

g) The Roundup products manufactured and/or supplied by Defendants were not reasonably safe because they did not conform to an express warranty made by Defendants regarding the product's safety and fitness for use. Defendants expressly warranted that the Roundup products were safe and fit for their intended purposes, that they were of merchantable quality, that they did not produce any dangerous side effects, that they were adequately tested, and that their Roundup products were safe to human health and the environment, and effective, fit, and proper for their intended use. Defendants did not disclose the material risks that Defendants' Roundup products could cause severe and permanent injury. Defendants' express warranty regarding the Roundup products induced Plaintiffs to use the products, and Plaintiffs' damages were proximately caused because Defendants' express warranty was untrue. The Roundup products were not reasonably safe because of nonconformity to express warranty under the WPLA.

136.    As a direct and proximate result of Defendants placing their defective Roundup products into the stream of commerce, Plaintiff PATRICK LEONARD TIERNEY suffered grave injuries, and endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment, along with other damages further discussed in herein.

## XV.    SECOND CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTIES

137.    Plaintiffs hereby incorporate by reference the allegations of this Complaint contained in each of the preceding paragraphs as if fully stated herein.

138.    At all times relevant to this litigation, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup products, which are defective and unreasonably dangerous to consumers, including

COMPLAINT
PAGE 25

**Corrie Yackulic Law Firm PLLC**
705 Second Avenue, Ste. 1300
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

Plaintiffs, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Defendants.

139. Before the time that Plaintiffs were exposed to the use of the aforementioned Roundup products, Defendants impliedly warranted to their consumers—including Plaintiffs—that their Roundup products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as agricultural and horticultural herbicides.

140. Defendants, however, failed to disclose that Roundup has dangerous propensities when used as intended and that the use of and/or exposure to Roundup and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiffs' injuries.

141. Upon information and belief, Plaintiff and/or Plaintiff's employers reasonably relied upon the skill, superior knowledge and judgment of Defendants and upon its implied warranties that the Roundup products were of merchantable quality and fit for their intended purpose or use.

142. Upon information and belief, Plaintiff PATRICK LEONARD TIERNEY and/or his employers were at all relevant times in privity with Defendants.

143. Plaintiffs are the intended third-party beneficiary of implied warranties made by Defendants to the purchasers of their agricultural and horticultural herbicides, including the company that employed Plaintiff PATRICK LEONARD TIERNEY, and as such he is entitled to assert this claim.

144. The Roundup products were expected to reach and did in fact reach consumers and users, including Plaintiff PATRICK LEONARD TIERNEY, without substantial change in the condition in which they were manufactured and sold by Defendants.

COMPLAINT
PAGE 26

145.    At all times relevant to this litigation, Defendants were aware that consumers and users of its products, including Plaintiff PATRICK LEONARD TIERNEY, would use Roundup products as marketed by Defendants, which is to say that Plaintiffs was a foreseeable user of Roundup.

146.    Defendants intended that their Roundup products be used in the manner in which Plaintiffs in fact used them and Defendants impliedly warranted each product to be merchantable quality, safe, and fit for this use, despite the fact that Roundup was not adequately tested or researched.

147.    In reliance upon Defendants' implied warranty, Plaintiffs  used Roundup as instructed and labeled and in the foreseeable manner intended, recommended, promoted, and marketed by Defendants.

148.    Plaintiff PATRICK LEONARD TIERNEY could not have reasonably discovered or known of the risks of serious injury associated with Roundup or glyphosate.

149.    Defendants breached their implied warranty to Plaintiff PATRICK LEONARD TIERNEY in that their Roundup products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

150.    The harm caused by Defendants' Roundup products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

151.    As a direct and proximate result of Defendants' placing their defective Roundup products into the stream of commerce, Plaintiffs suffered injuries, and endured physical pain and

COMPLAINT
PAGE 27

**Corrie Yackulic Law Firm PLLC**
705 Second Avenue, Ste. 1300
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment, along with other damages further discussed herein.

## XVI.   THIRD CAUSE OF ACTION
## VIOLATION OF WASHINGTON CONSUMER PROTECTION ACT

152.    Plaintiffs hereby incorporate by reference the allegations of this Complaint contained in each of the preceding paragraphs as if fully stated herein.

153.    Defendants violated the Washington Consumer Protection Act ("CPA").

154.    Defendants engaged in unfair or deceptive acts or practices including, but not limited to, the following:

    a)    engaging in acts and practices by willfully failing and refusing to timely report information that reasonably suggested Roundup, like that used by Plaintiffs, may cause or contribute to cause cancer and other serious illnesses;

    b)    representing knowingly or with reason to know that Roundup has approval, characteristics, uses, or benefits that it does not have;

    c)    representing knowingly or with reason to know that Roundup is of a particular standard, quality, or grade when it differs materially from that representation; and/or

    d)    representing knowingly or with reason to know that Roundup has uses, benefits, or characteristics that have been otherwise proven incorrect;

155.    Defendants' unfair and deceptive acts or practices described above were committed in the course of Defendants' trade or commerce.

156.    Defendants' unfair and deceptive acts or practices described above affected public interest.

157.    Defendants' violation of the Washington CPA, whether individually or in combination, caused Plaintiff's injuries and damages set forth herein.

COMPLAINT
PAGE 28

**Corrie Yackulic Law Firm PLLC**
705 Second Avenue, Ste. 1300
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

**XVII. FOURTH CAUSE OF ACTION**
**PUNITIVE DAMAGES**

158.     Plaintiffs incorporate herein by reference, as though fully set forth at length, each and every allegation and statement contained in the foregoing paragraphs.

159.     Defendants are liable for punitive and/or exemplary damages under choice of law principles. Defendants acted with willful disregard of the rights of the Plaintiffs and the public. Defendants' conduct was outrageous and reckless toward the safety of the Plaintiffs and the public.

**XVIII.     FIFTH CAUSE OF ACTION**
**LOSS OF CONSORTIUM**

160.     Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein, and further allege:

161.     Plaintiff CHRISTY ANN TIERNEY, at all times relevant, was and is the lawful wife of Plaintiff PATRICK LEONARD TIERNEY.

162.     As a direct, legal, and proximate result of the culpability and fault of Defendants, be such fault through strict liability, negligence or otherwise, Plaintiff CHRISTY ANN TIERNEY suffered the loss of support, services, love, companionship, affection, society, intimate relations, and other elements of consortium, all to her general damage in an amount in excess of the jurisdictional minimum of this Court.

163.     Plaintiffs demand judgment against Defendant for compensatory and punitive damages such as a jury may award, and such other relief as the Court deems just and proper in order to remedy Plaintiff CHRISTY ANN TIERNEY's loss of consortium.

COMPLAINT
PAGE 29

## XIX.  DAMAGES

164.     Plaintiffs incorporate herein by reference, as though fully set forth at length, each and every allegation and statement contained in the foregoing paragraphs.

165.     As a direct and proximate result of Defendants' tortious conduct and breach of duties as set forth herein, Plaintiffs are entitled to be compensated for their damages.

166.     Plaintiffs further reserve and hereby claim all other rights and remedies arising from the Plaintiffs' injuries.

167.     All of the above damages are in an amount which will be proved at trial.

168.     WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them as hereinafter set forth.

## XX.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demands judgment against the Defendants, jointly and severally, on each of the above- referenced claims and causes of action and as follows:

1.     Awarding Plaintiffs compensatory damages in excess of the jurisdictional amount, including, but not limited to past and future pain, suffering, emotional distress, disability, loss of enjoyment of life, loss of consortium, and other non-economic damages and losses;

2.     Awarding Plaintiffs' their economic damages and losses, including without limitation past and future medical expenses, out of pocket expenses, lost earnings and lost earning capacity, lost household services, and other economic damages in an amount to be determined at trial;

3.     Awarding punitive damages;

COMPLAINT
PAGE 30

**Corrie Yackulic Law Firm PLLC**
705 Second Avenue, Ste. 1300
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

4.  Awarding pre-judgment interest;

5.  Awarding post-judgment interest;

6.  Awarding Plaintiffs reasonable attorneys' fees;

7.  Awarding Plaintiffs the costs of these proceedings;

8.  Treble damages in the maximum amounts permitted by RCW 19.86.090; and

9.  Such other and further relief as this Court deems just and proper.

## XXI.   DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury as to all issues.

DATED this 19th day of February, 2019.        CORRIE YACKULIC LAW FIRM, PLLC

*/s/ Corrie J. Yackulic*
Corrie J. Yackulic, WSBA No. 16063
705 Second Avenue, #1300
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725
Corrie@cjylaw.com


BAILEY ONSAGER, P.C.

*/s/ Darrin E. Bailey*
Darrin E. Bailey, WSBA No. 34955
600 University St. Ste. 1020
Seattle, WA 98101
Tel. 206.623.9900
Fax. 206.624.6885
dbailey@baileyonsager.com

*Attorneys for Plaintiffs*

COMPLAINT
PAGE 31

Corrie Yackulic Law Firm PLLC
705 Second Avenue, Ste. 1300
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

JS 44 (Rev. 02/19)  **CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| PATRICK LEONARD TIERNEY and CHRISTY ANNA TIERNEY, husband and wife and their marital community thereof, | MONSANTO COMPANY, BAYER CORPORATION and BAYER AG, |

**(b)** County of Residence of First Listed Plaintiff  KING
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  Saint Louis (MO)
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Corrie Yackulic Law Firm, PLLC
705 Second Ave. Ste. 1300, Seattle, WA 98104
Tel. 206-787-1915

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☐ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 U.S. Government Defendant | ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*                     Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☒ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | **PERSONAL PROPERTY** | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| | | | | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from Another District *(specify)*  ☐ 6 Multidistrict Litigation - Transfer  ☐ 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USC 1332
Brief description of cause:
Diversity, Personal Injury, Products Liability

**VII. REQUESTED IN COMPLAINT:**  ☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.  DEMAND $  CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

**VIII. RELATED CASE(S) IF ANY**  *(See instructions):*  JUDGE  Chhabria  DOCKET NUMBER  MDL 2741 (California North)

DATE
02/20/2019
SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____