# United States District Court
## Western District of Michigan (Southern Division (1))
## CIVIL DOCKET FOR CASE #: 1:19-cv-00217-PLM-PJG

Bruinsma et al v. Monsanto Company
Assigned to: District Judge Paul L. Maloney
Referred to: Magistrate Judge Phillip J. Green
Cause: 28:1332 Diversity-Product Liability

Date Filed: 03/21/2019
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj.
Prod. Liability
Jurisdiction: Diversity

**plaintiff**

**Sjoerd Bruinsma**

represented by **Brion Bannon Doyle**
Varnum Riddering Schmidt &
Howlett LLP (Grand Rapids)
Bridgewater Place
333 Bridge St., NW
P.O. Box 352
Grand Rapids, MI 49501-0352
(616) 336-6000
Email: bbdoyle@varnumlaw.com
*ATTORNEY TO BE NOTICED*

**plaintiff**

**Brook Bruinsma**

represented by **Brion Bannon Doyle**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**defendant**

**Monsanto Company**
*corporation*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/21/2019 | 1 | COMPLAINT with jury demand against Monsanto Company filed by Sjoerd Bruinsma, Brook Bruinsma (Doyle, Brion) (Entered: 03/21/2019) |
| 03/21/2019 | 2 | PROPOSED SUMMONS to be issued re 1 (Doyle, Brion) (Entered: 03/21/2019) |
| 03/22/2019 | 3 | NOTICE that this case has been assigned Paul L. Maloney ; with NOTICE OF DEFICIENCY re filing fee (pjw) (Entered: 03/22/2019) |
| 03/22/2019 | | SUMMONS NOT ISSUED as to defendant Monsanto Company *(fee due)* (pjw) (Entered: 03/22/2019) |
| 03/22/2019 | | |

| | | FILING FEE PAID re 1 by plaintiffs Brook Bruinsma, Sjoerd Bruinsma in the amount of $400, receipt number 0646-4394604 (Doyle, Brion) (Entered: 03/22/2019) |
|---|---|---|
| 03/25/2019 | 4 | SUMMONS ISSUED as to defendant Monsanto Company (pjw) (Entered: 03/25/2019) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 03/28/2019 10:13:28 | | |
| **PACER Login:** | bbdoyle32:4462588:4461486 | **Client Code:** |
| **Description:** | Docket Report | **Search Criteria:** | 1:19-cv-00217-PLM-PJG |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

# SUMMONS IN A CIVIL ACTION
## UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN

SJOERD BRUINSMA and BROOK BRUINSMA

Case No. 1:19-cv-217

Hon. Paul L. Maloney

v.

MONSANTO COMPANY, a Corporation

TO: MONSANTO COMPANY
ADDRESS: C/O CORPORATION SERVICE COMPANY
251 LITTLE FALLS DRIVE
WILMINGTON, DE 19808

---

A lawsuit has been filed against you.

YOU ARE HEREBY SUMMONED and required to serve upon plaintiff, an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure within __21__ days after service of this summons on you (not counting the day you received it). If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You must also file your answer or motion with the Court.

The Court has offices in the following locations:

399 Federal Building, 110 Michigan St., NW, Grand Rapids, MI 49503
P.O. Box 698, 314 Federal Building, Marquette, MI 49855
107 Federal Building, 410 W. Michigan Ave., Kalamazoo, MI 49007
113 Federal Building, 315 W. Allegan, Lansing, MI 48933

PLAINTIFF OR PLAINTIFF'S ATTORNEY NAME AND ADDRESS

Brion B. Doyle (P67870)
Varnum LLP
P O Box 352
Grand Rapids, MI 49501-0352

CLERK OF COURT



March 25, 2019

By: Deputy Clerk                        Date

---

## PROOF OF SERVICE

This summons for _____ MONSANTO COMPANY _____ was received by me on _____.
(name of individual and title, if any)                                                    (date)

☐ I personally served the summons on the individual at _____
on _____.                                           (place where served)
(date)

☐ I left the summons at the individual's residence or usual place of abode with _____, a person
(name)
of suitable age and discretion who resides there, on _____, and mailed a copy to the individual's last known address.
(date)

☐ I served the summons on _____, who is designated by law to accept service
(name of individual)
of process on behalf of _____ on _____.
(name of organization)                                       (date)

☐ I returned the summons unexecuted because _____.

☐ Other (specify) _____.

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____.

I declare under the penalty of perjury that this information is true.

Date: _____

_____
Server's signature

Additional information regarding attempted service, etc.:

_____
Server's printed name and title

_____
Server's address

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SJOERD BRUINSMA and BROOK
BRUINSMA,

    Plaintiffs,

v.

MONSANTO COMPANY, Corporation,

    Defendant.

MDL No. _____

Case No.

**COMPLAINT AND JURY DEMAND**

---

Adam J. Brody (P62035)
Brion B. Doyle (P67870)
Seth B. Arthur (P82033)
VARNUM LLP
Attorneys for Plaintiff
Bridgewater Place, P.O. Box 352
Grand Rapids, MI 49501-0352
(616) 336-6000
ajbrody@varnumlaw.com
bbdoyle@varnumlaw.com
sbarthur@varnumlaw.com

---

Plaintiffs, Sjoerd Bruinsma and Brook Bruinsma ("Plaintiffs"), by and through their undersigned counsel, hereby brings this Complaint for damages against Defendant, Monsanto Company ("Defendant") and alleges the following:

**NATURE OF THE CASE**

1.     This is an action for damages suffered by Plaintiffs as a direct and proximate result of Defendant's negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup®, containing the active ingredient glyphosate.

1

2.      Plaintiffs maintain that Roundup® and/or glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper warnings and directions as to the dangers associated with its use.

3.      Plaintiffs' injuries, like those striking thousands of similarly situated victims across the country, were avoidable.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over Defendant and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiffs and Defendant. Defendant is either incorporated and/or has its principal place of business outside of the state in which the Plaintiffs reside.

5.      The amount in controversy between Plaintiffs and Defendant exceeds $75,000, exclusive of interest and cost.

6.      The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

7.      Venue is proper within this district pursuant to 28 U.S.C. § 1391 in that Defendant conducts business here and is subject to personal jurisdiction in this district. Furthermore, Defendant sells, markets, and/or distributes Roundup® within the Western District of Michigan. Also, a substantial part of the acts and/or omissions giving rise to these claims occurred within this district.

## PARTIES

8.      Plaintiffs, Sjoerd Bruinsma and Brook Bruinsma, are natural persons and at all relevant times are residents and citizens of Kent County, Michigan.  Plaintiffs bring this action for personal injuries sustained by exposure to Roundup® ("Roundup") containing the active ingredient glyphosate and the surfactant polyethoxylated tallow amine ("POEA"). As a direct and

2

proximate result of being exposed to Roundup, Plaintiff Sjored Bruinsma developed non-Hodgkin's Lymphoma.

9.      "Roundup" refers to all formulations of Defendant's Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer l Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

10.      Defendant MONSANTO COMPANY is a Delaware corporation, in "active" status, with a principal place of business in St. Louis, Missouri.

11.      Defendant MONSANTO COMPANY is collectively referred to as "Monsanto Defendant," "Monsanto" or "Defendant."

12.      Defendant advertises and sells goods, specifically Roundup, in Ottawa County, Michigan.

3

13.     Defendant transacted and conducted business within the State of Michigan that relates to the allegations in this Complaint.

14.     Defendant derived substantial revenue from goods and products used in the State of Michigan.

15.     Defendant expected or should have expected its acts to have consequences within the State of Michigan, and derived substantial revenue from interstate commerce.

16.     Defendant engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup.

17.     Defendant is authorized to do business in Michigan and derives substantial income from doing business in this state.

18.     Upon information and belief, Defendant did design, sell, advertise, manufacture, and/or distribute Roundup, with full knowledge of its dangerous and defective nature.

## FACTUAL ALLEGATIONS

19.     At all relevant times, Defendant was in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or has acquired and is responsible for the commercial herbicide, Roundup.

20.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate.

21.     Defendant discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate based "Roundup" as a broad spectrum herbicide.  Glyphosate is the active ingredient in Roundup.

22.     Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

4

23.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase ("EPSP").

24.     Glyphosate inhibits EPSP and interferes with the organic pathway in plants, resulting in the accumulation of organic acid in plant tissue and ultimately plant death.

25.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

26.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

27.     Defendant is intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup.

28.     The original Roundup, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the world's most widely used herbicide.

29.     For nearly 40 years, consumers, farmers, and the public have used Roundup, unaware of its carcinogenic properties.

## REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

30.     The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7. U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental

Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. 136a(a).

31.     The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe."

32.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

33.     The EPA and the State of Michigan registered Roundup for distribution, sale, and manufacture in the United States and the State of Michigan.

34.     FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

35.     In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment — in relation to the registration process — no later than July 2015. The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of the World Health Organization's March 24, 2015 finding that glyphosate is a "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

6

## MONSANTO'S FALSE REPRESENTATIONS REGARDING THE SAFETY OF ROUNDUP®

36.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish.

37.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with the NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:  a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk; b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable; c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.; d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics"; e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

38.     Monsanto did not alter its advertising in the same manner in any state other than the State of New York, *In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law* § 63(15) (Nov. 1996).

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP®

39.     As early as the 1980's, Monsanto was aware of glyphosate's carcinogenic properties.

40.     On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene. Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

41.     In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted.

42.     In October of 1991, the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.

43.     In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendant's Roundup products are more dangerous and toxic than glyphosate alone.

44.     In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

45.     The study found that Defendant's Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

46.     In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.  The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."

47.     In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone. The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

48.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.  The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

49.     The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendant.

50.     Defendant knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup.

51.     Defendant failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup. Rather than performing appropriate tests, Defendant relied upon flawed industry-supported studies designed to protect Defendant's economic interests rather than Plaintiff and the consuming public.

## IARC CLASSIFICATION OF GLYPHOSATE

52.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

53.     An IARC Advisory Group was formed in April 2014. To form this group, certain criteria must be met.  (1) There must already be some evidence of carcinogenicity of the substance, and (2) there must be evidence that humans are exposed to the substance.

54.     IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; and related agents similar to one given high priority by the above considerations.

55.     On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendant's possession since as

early as 1985, the IARC's working group published its conclusion that the glyphosate contained

in Defendant's Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the

mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in

animals.

56.     The IARC' s full Monograph was published on July 29, 2015 and established

glyphosate as a class 2A *probable* carcinogen to humans.  According to the authors, glyphosate

demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A

classification based on evidence of carcinogenicity in humans and animals.

57.     The IARC Working Group found an increased risk between exposure to

glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the

increased risk continued after adjustment for other pesticides.

### SCIENTIFIC FRAUD UNDERLYING THE SAFETY DETERMINATIONS OF GLYPHOSATE

58.     After the EPA's 1985 classification of glyphosate as possibly carcinogenic to

humans (Group C), Monsanto exerted pressure upon the EPA to change its classification.

59.     This culminated in the EPA's reclassification of glyphosate to Group E, which

was based upon evidence of non-carcinogenicity in humans.  In so classifying, the EPA stated

that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the

available evidence at the time of evaluation and should not be interpreted as a definitive

conclusion that the agent will not be a carcinogen under any circumstances."  On two occasions,

the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup products

for registration purposes committed scientific fraud.

60.     In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to

perform and evaluate pesticide toxicology studies relating to Roundup. IBT performed

approximately 30 tests on glyphosate and glyphosate-containing products, including 11 of the 19

chronic toxicology studies needed to register Roundup with the EPA.

61.     In 1976, the Food and Drug Administration ("FDA") performed an inspection of

IBT and discovered discrepancies between the raw data and the final report relating to

toxicological impacts of glyphosate. The EPA subsequently audited IBT and determined that the

toxicology studies conducted for Roundup were invalid. An EPA reviewer stated, after finding

"routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the

studies when they said they took specimens of the uterus from male rabbits."  Three top

executives of IBT were convicted of fraud in 1983.

62.     In the second incident, Monsanto hired Craven Laboratories ("Craven") in 1990 to

perform pesticide and herbicide studies, including several studies on Roundup.

63.     In March 1991, the EPA announced that it was investigating Craven for

"allegedly falsifying test data used by chemical firms to win EPA approval of pesticides."  The

investigation lead to the indictments of the laboratory owner and a handful of employees.

**MONSANTO'S CONTINUING DISREGARD FOR THE  SAFETY OF PLAINTIFF AND THE PUBLIC**

64.     Monsanto claims on its website that "[r]egulatory authorities and independent

experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity

studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup

brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses,

and that it is not genotoxic.

65.     Ironically, the primary source for this statement is a 1986 report by the WHO, the

same organization that now considers glyphosate to be a probable carcinogen.  Glyphosate, and

Defendant's Roundup products in particular, have long been associated with serious side effects

and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

66. Defendant's statements proclaiming the safety of Roundup and disregarding its dangers misled Plaintiff.

67. Despite Defendant's knowledge that Roundup was associated with an elevated risk of developing cancer, Defendant's promotional campaigns focused on Roundup's purported "safety profile."

68. Defendant's failure to adequately warn Plaintiff Sjoerd Bruinsma resulted in (1) Plaintiff Sjoerd Bruinsma using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

69. Defendant failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

70. The failure of Defendant to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

71. The failure of Defendant to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

72. By reason of the foregoing acts and omissions, Plaintiff Sjoerd Bruinsma seeks compensatory damages as a result of his use of, and exposure to, Roundup which caused or was a substantial contributing factor in causing him to suffer from cancer, specifically NHL, which is permanent and lasting in nature.

73. By reason of the foregoing acts and omissions, Plaintiff Sjoerd Bruinsma has endured and, in some categories continues to suffer, physical pain, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of the actions and inactions of the Defendant.

## PLAINTIFF'S EXPOSURE TO ROUNDUP®

74. Plaintiff Sjoerd Bruinsma-used Roundup beginning in approximately 1978 to control weeds in connection with his farming operation. For many years, Plaintiff Sjoerd Bruisma sprayed Roundup on a regular basis. Plaintiff Sjoerd Bruinsma followed all safety and precautionary warnings during the course of use.

75. Plaintiff Sjoerd Bruinsma was subsequently diagnosed with Non-Hodgkin Lymphoma in 1996. The development of Plaintiff's Non-Hodgkin Lymphoma was proximately and actually caused by exposure to Defendant's Roundup products.

76. As a result of his injury, Plaintiff Sjoerd Bruinsma has incurred significant economic and non-economic damages.

## EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

77. Plaintiffs incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

78. The running of any statute of limitations has been tolled by reason of Defendant's fraudulent concealment. Defendant, through its affirmative misrepresentations and omissions, actively concealed from Plaintiff Sjoerd Bruinsma the true risks associated with Roundup and glyphosate.

79. At all relevant times, Defendant has maintained that Roundup is safe, non-toxic, and non-carcinogenic.

80.     Indeed, even as of July 2016, Defendant continues to represent to the public that the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides is safe.

81.     As a result of Defendant's actions, Plaintiff Sjoerd Bruinsma was unaware, and could not reasonably know or have learned through reasonable diligence that Roundup and/or glyphosate contact, exposed Plaintiff to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

82.      Furthermore, Defendant is estopped from relying on any statute of limitations because of its fraudulent concealment of the true quality and nature of Roundup.  Defendant was under a duty to disclose the true quality and nature of Roundup because this was non-public information over which Defendant had and continues to have exclusive control.

83.     Plaintiff Sjored Bruinsma had no knowledge that Defendant was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendant, Plaintiff Sjoerd Bruinsma could not have reasonably discovered the wrongdoing at any time prior.

## FIRST CAUSE OF ACTION – NEGLIGENCE

84.     Plaintiffs incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

85.     Defendant had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

86.     Defendant failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance,

quality control, and/or distribution of Roundup into interstate commerce in that Defendant knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of NHL, as well as other severe personal injuries which are permanent and lasting in nature.

87.     The negligence by the Defendant, its agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

(a)     Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly testing it;

(b)     Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup;

(c)     Not conducting sufficient testing programs to determine whether or not Roundup was safe for use; in that Defendant herein knew or should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users;

(d)     Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Defendant had knowledge that Roundup is, was, or could be carcinogenic;

(e)     Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

(f)     Negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

(g)     Negligently failing to petition the EPA to strengthen the warnings associated with Roundup;

(h)     Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

      (i)      Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

      (j)      Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

      (k)      Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides; and

      (l)      Negligently designing, manufacturing, producing, and formulating Roundup in a manner, which was dangerous to its users;

      (m)      Concealing information from the Plaintiff while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations; and

      (n)      Improperly concealing and/or misrepresenting information from the Plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides.

88.    Defendant negligently and deceptively compared the safety risks and/or dangers of Roundup with common everyday foods such as table salt, and other forms of herbicides.

89.    Defendant was negligent and/or violated Michigan law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that they:

      (a)      Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide;

      (b)      Failed to accompany its product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

      (c)      Failed to accompany its product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

      (d)      Failed to accompany its product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;

      (e)     Failed to warn Plaintiff Sjoerd Bruinsma of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of NHL;

      (f)     Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup;

      (g)     Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants; and

      (h)     Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity.

90.    Despite the fact that Defendant knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Defendant continued and continues to market, manufacture, distribute, and/or sell Roundup to consumers, including the Plaintiff Sjoerd Bruinsma.

91.    Defendant knew or should have known that consumers such as the Plaintiff Sjoerd Bruinsma would foreseeably suffer injury as a result of Defendant's failure to exercise ordinary care, as set forth above.

92.    Defendant's violations of law and/or negligence were the proximate cause of Plaintiff's injuries, harm and economic loss, which Plaintiff Sjoerd Bruinsma suffered and/or will continue to suffer.

93.    As a result of the foregoing acts and omissions, the Plaintiff Sjoerd Bruinsma suffered from serious and dangerous side effects including, but not limited to, NHL, as well as other severe personal injuries which are permanent and lasting in nature.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for punitive and compensatory damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## SECOND CAUSE OF ACTION - STRICT PRODUCTS LIABILITY

94.    Plaintiffs incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

95.    At all times herein mentioned, the Defendant designed, researched, manufactured, tested, advertised, promoted, sold, distributed Roundup as hereinabove described that was used by Plaintiff Sjoerd Bruinsma.

96.    Defendant's Roundup was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendant.

97.    At those times, Roundup was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, Plaintiff Sjoerd Bruinsma herein.

98.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup.

99.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective in design and/or formulation, in that, when it left the hands of the Defendant manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

100.    At all times herein mentioned, Roundup was in a defective condition and unsafe, and Defendant knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendant.

101.    Defendant did not sufficiently test, investigate, or study its Roundup products. Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

102.    Defendant knew or should have known at the time of marketing its Roundup products that exposure to Roundup could result in cancer and other severe illnesses and injuries.

103.    Plaintiff Sjoerd Bruinsma was exposed to Defendant's Roundup, as described above, without knowledge of Roundup's dangerous characteristics.

104.    At the time of the Plaintiff Sjoerd Bruinsma's use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

105.    Defendant with this knowledge voluntarily designed its Roundup with a dangerous condition for use by the public, and in particular Plaintiff Sjoerd Bruinsma.

106.    Defendant had a duty to create a product that was not unreasonably dangerous for its normal, intended use.  Defendant created a product that was and is unreasonably dangerous for its normal, intended use.

107.    Defendant marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

108.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was manufactured defectively in that

Roundup left the hands of Defendant in a defective condition and was unreasonably dangerous to its intended users.

109. Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to Plaintiff Sjoerd Bruinsma in particular, and Defendant is therefore strictly liable for the injuries sustained by the Plaintiff Sjoerd Bruinsma.

110. The Plaintiff could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

111. By reason of the foregoing, the Defendant has become strictly liable to the Plaintiff Sjoerd Bruinsma for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup.

112. Defendant's defective design, of Roundup amounts to willful, wanton, and/or reckless conduct by Defendant.

113. As a result of the foregoing acts and omission, the Plaintiff Sjoerd Bruinsma developed NHL, and suffered severe personal injuries, which are permanent and lasting in nature.

WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in Plaintiffs' favor for punitive and compensatory damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## THIRD CAUSE OF ACTION - FAILURE TO WARN

114. Plaintiffs incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

115.    Defendant has engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting Roundup, and through that conduct have knowingly and intentionally placed Roundup into the stream of commerce with full knowledge that it reaches consumers such as Plaintiff Sjoerd Bruinsma who are exposed to it through ordinary and reasonably foreseeable uses.

116.    At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

117.    At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Defendant and at the time Plaintiff Sjoerd Bruinsma was exposed to and/or ingested the product. The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing non-Hodgkin's lymphoma as a result of exposure and use.

118.    Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect the health of those exposed in violation of 7 U.S.C. § 136j(a)(1)(E).

119.    Defendant's failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. § 136j(a)(1)(E) as well as the laws of the State of Michigan.

120. Defendant could have amended the label of Roundup to provide additional warnings. This defect caused serious injury to Plaintiff Sjoerd Bruinsma, who used Roundup in its intended and foreseeable manner.

121. At all times herein mentioned, Defendant had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

122. Defendant failed to warn of the nature and scope of the side effects associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of NHL.

123. Defendant failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of developing NHL from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution. Defendant acted with a conscious disregard for the safety of Plaintiff Sjoerd Bruinsma.

124. At the time of exposure, Plaintiff Sjoerd Bruinsma could not have reasonably discovered any defect in Roundup through the exercise of reasonable care.

125. Defendant, as the manufacturer and/or distributor of the subject product, is held to the level of knowledge of an expert in the field. Plaintiff Sjoerd Bruinsma reasonably relied upon the skill, superior knowledge, and judgment of Defendant.

126. Had Defendant properly disclosed the risks associated with Roundup products, Plaintiff Sjoerd Bruinsma would have avoided the risk of NHL by not using Roundup products. The information that Defendant did provide failed to contain adequate warnings and precautions that would have enabled Plaintiff Sjoerd Bruinsma, and similarly situated individuals, to utilize

the product safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

127.    As a result of its inadequate warnings, Defendant's Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiff Sjoerd Bruinsma.

128.    As a direct and proximate result of Defendant's actions as alleged herein, and in such other ways to be later shown, the subject product caused Plaintiff Sjoerd Bruinsma to sustain injuries as herein alleged.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## **FOURTH CAUSE OF ACTION - BREACH OF IMPLIED WARRANTIES**

129.    Plaintiffs incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

130.    At all times herein mentioned, the Defendant manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold Roundup as a broad spectrum herbicide.  These actions were under the ultimate control and supervision of Defendant.

131.    At the time Defendant marketed, sold, and distributed Roundup for use by Plaintiff Sjoerd Bruinsma, Defendant knew of Roundup's intended use and impliedly warranted the product to be of merchantable quality and safe and fit for this use.

132.    The Defendant impliedly represented and warranted to Plaintiff Sjoerd Bruinsma and users of Roundup, the agricultural community, and/or the EPA that Roundup was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.  These representations and warranties were false, misleading, and inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

133.    Plaintiff Sjoerd Bruinsma and/or the EPA did rely on said implied warranty of merchantability of fitness for particular use and purpose.

134.    Plaintiff Sjoerd Bruinsma reasonably relied upon the skill and judgment of Defendant as to whether Roundup was of merchantable quality and safe and fit for its intended use.

135.    Roundup was injected into the stream of commerce by the Defendant in a defective, unsafe, and inherently dangerous condition, and the products' materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

136.    The Defendant breached the aforesaid implied warranties, as its herbicide Roundup was not fit for its intended purposes and uses.

137.    As a result of the foregoing acts and omission, the Plaintiff Sjoerd Bruinsma developed NHL, and suffered severe personal injuries, which are permanent and lasting in nature.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## FIFTH CAUSE OF ACTION: LOSS OF CONSORTIUM

138.     Plaintiffs incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

139.     Plaintiff Brook Bruinsma is, and was at all relevant times, the lawful spouse of Plaintiff Sjoerd Bruinsma.

140.     As a direct and proximate result of the injuries to her husband and as a direct and proximate result of Defendant's tortious conduct, Plaintiff Brook Bruinsma suffered loss of consortium, society, affection, companionship, and other damages; the reasonable value of services that Sjoerd Bruinsma would have provided/performed; and the reasonable value for necessary medical care, treatment, and services provided to Sjoerd Bruinsma by Brook Bruinsma.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against the Defendant on each of the above-referenced claims and causes of action and as follows:

(a)     Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

(b)     Awarding compensatory damages to Plaintiffs for past and future damages, including, but not limited to, Plaintiffs' pain and suffering and for severe and permanent personal injuries sustained by the Plaintiff including health care costs and economic loss;

(c)     Awarding economic damages in the form of medical expenses, out-of-pocket expenses, and other economic damages in an amount to be determined at trial of this action;

(d)     Punitive and/or exemplary damages for the wanton, willful, fraudulent, and reckless acts of the Defendant who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiffs in an amount sufficient to punish Defendant and deter future similar conduct, to the extent allowed by applicable law;

(e)     Pre-judgment interest;

(f)     Post-judgment interest;

(g)     Awarding Plaintiffs reasonable attorneys' fees;

(h)     Awarding Plaintiffs the costs of these proceedings; and

(i)     Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury as to all issues.

Respectfully submitted,

VARNUM, LLP
Attorney for Plaintiffs

Dated: March 21, 2019                    By: _/s/Brion B. Doyle_____
                                              Adam J. Brody (P62035)
                                              Brion B. Doyle (P67870)
                                              Seth B. Arthur (P82033)
                                         Business Address, Telephone, and E-mail:
                                              Bridgewater Place, P.O. Box 352
                                              Grand Rapids, MI 49501-0352
                                              (616) 336-6000
                                              ajbrody@varnumlaw.com
                                              bbdoyle@varnumlaw.com
                                              sbarthur@varnumlaw.com

14597565_1.docx