JURY

# U.S. District Court
## District of South Carolina (Florence)
## CIVIL DOCKET FOR CASE #: 4:19-cv-01103-MDL

Smith v. Monsanto Company et al
Assigned to: Unassigned - MDL
Case in other court: Williamsburg County Common Pleas, 2018-
           CP-45-00446
Cause: 28:1332 Diversity-Personal Injury

Date Filed: 04/15/2019
Jury Demand: Both
Nature of Suit: 365 Personal Inj. Prod.
Liability
Jurisdiction: Diversity

**Plaintiff**

**Ronald Smith**                                      represented by    **Eric Poulin**
Anastopoulo Law Firm LLC
32 Ann Street
Charleston, SC 29403
843-614-8888
Fax: 843-494-5536
Email: eric@akimlawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kenneth Thomas David**
Anastopoulo Law Firm LLC
32 Ann Street
Unit B
Charleston, SC 29403
843-614-8888
Email: kenneth@akimlawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lane Douglas Jefferies**
Anastopoulo Law Firm LLC
32 Ann Street
Charleston, SC 29403
843.614-8888
Fax: 843-494-5536
Email: lane@akimlawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew L Nall**
Anastopoulo Law Firm LLC
32 Ann Street
Unit B
Charleston, SC 29403
843-614-8888
Fax: 843-494-5536
Email: matt@akimlawfirm.com
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Roy T Willey , IV**
Anastopoulo Law Firm LLC
32 Ann Street
Unit B
Charleston, SC 29403
843-614-8888
Email: roy@akimlawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

<u>**Defendant**</u>

**Monsanto Company**            represented by    **James Andrew Bradshaw**
Gallivan White and Boyd
55 Beattie Place
Suite 1200
Greenville, SC 29601
864-241-7003
Fax: 864-271-7502
Email: dbradshaw@gwblawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ronald K Wray , II**
Gallivan White and Boyd
55 Beattie Place
Suite 1200
Greenville, SC 29601
864-271-9580
Fax: 864-271-7502
Email: rwray@gwblawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**Monsanto Enviro-Chem Systems Inc**    represented by    **Joshua Hugh Umbarger**
Earhart Overstreet LLC
PO Box 22528
Charleston, SC 29413
843-628-3783
Email: josh@earhartoverstreet.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ryan Earhart**
Earhart Overstreet LLC
PO Box 22528
Charleston, SC 29413
843-972-9403
Fax: 843-972-9411

Email: ryan@earhartoverstreet.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Monsanto Production Supply LLC**

**Defendant**

**Helena Agri-Enterprises LLC**　　　represented by　**James Andrew Bradshaw**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ronald K Wray , II**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**NaturChem Inc**　　　represented by　**Mark Steven Barrow**
Sweeny Wingate and Barrow
PO Box 12129
Columbia, SC 29211
803-256-2233
Fax: 803-256-9095
Email: msb@swblaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard Edward McLawhorn , Jr**
Sweeny Wingate and Barrow
115 Cargill Way
Suite B
Hartsville, SC 29550
843-878-0390
Email: rem@swblaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**South Carolina Department of Transportation**　　　represented by　**Lisa Arlene Thomas**
Thompson and Henry
PO Box 1740
Conway, SC 29528
843-248-5741
Email: lthomas@thompsonlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/15/2019 | 1 | NOTICE OF REMOVAL from Williamsburg County Common Pleas, case number 2018-CP-45-00446. (Filing fee $ 400 receipt number 0420-8387563), filed by Monsanto |

| | | |
|---|---|---|
| | | Company. (Attachments: # 1 Exhibit 1 - State Court Documents, # 2 Exhibit 2 - State Court Notice of Dismissal as to Monsanto Production Supply LLC, # 3 Exhibit 3 - State Court Consent Order of Dismissal Without Prejudice, # 4 Exhibit 4 - State Court Consent Order of Dismissal Without Prejudice, # 5 Exhibit 5 - Consent to Removal)(prou, ) (Entered: 04/16/2019) |
| 04/15/2019 | 3 | Local Rule 26.01 Answers to Interrogatories with jury demand by Monsanto Company. (prou, ) (Entered: 04/16/2019) |
| 04/16/2019 | 4 | ***DOCUMENTS E-MAILED: 1 Notice of Removal and a certified copy of the docket sheet, to Judicial Panel on Multidistrict Litigation for a possible tag-a-long case In Re: Roundup Prod. Liab. Litg. No. 3:16-MD-02741-VC (N.D. Cal.). (prou, ) (Entered: 04/16/2019) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 04/16/2019 16:07:20 | | | |
| **PACER Login:** | hllp1982:2634105:4722683 | **Client Code:** | 1417.0049 |
| **Description:** | Docket Report | **Search Criteria:** | 4:19-cv-01103-MDL |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

IN THE STATE OF SOUTH CAROLINA )
COUNTY OF WILLIAMSBURG )

RONALD SMITH,
                        Plaintiff,
          v.
MONSANTO COMPANY; MONSANTO
ENVIRO-CHEM SYSTEMS, INC.;
MONSANTO PRODUCTION SUPPLY
LLC; HELENA AGRI-ENTERPRISES,
LLC; NATURCHEM, INC.; and SOUTH
CAROLINA DEPARTMENT OF
TRANSPORTATION,
                     Defendants.

IN THE COURT OF COMMON PLEAS
FOR THE 3RD JUDICIAL CIRCUIT
CASE NO: 2018-CP-45-____

**SUMMONS**
**(Jury Trial Demanded)**

**TO:   THE DEFENDANTS ABOVE NAMED:**

      **YOU ARE HEREBY SUMMONED** and required to Answer the Complaint in this action, a copy of which is herewith served upon you, and to serve a copy of your Answer to said Complaint upon the Plaintiff or his attorneys, Eric M. Poulin, Roy T. Willey, IV, Matthew L. Nall, Lane D. Jefferies, and Kenneth T. David, at their office, 32 Ann Street, Charleston, South Carolina, 29403, within thirty (30) days after the service hereof, exclusive of the day of such service and if you fail to Answer the Complaint within that time, Plaintiff will apply to the court for the relief demanded in the Complaint.

      Dated at Charleston, South Carolina on the 19th day of October, 2018.

*SIGNATURE ON FOLLOWING PAGE*

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

**ANASTOPOULO LAW FIRM, LLC**

*s/ Roy T. Willey, IV*
Eric M. Poulin, Esquire
S.C. Bar No.: 100209
Roy T. Willey, IV, Esquire
S.C. Bar No.: 101010
Matthew L. Nall, Esquire
S.C. Bar No.: 102329
Lane D. Jefferies, Esquire
S.C. Bar No.: 101764
Kenneth T. David, Esquire
S.C. Bar No.: 103434
Anastopoulo Law Firm, LLC
32 Ann Street
Charleston, SC 29418
(843) 614-8888

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

| | |
|---|---|
| IN THE STATE OF SOUTH CAROLINA )<br>COUNTY OF WILLIAMSBURG                  ) | IN THE COURT OF COMMON PLEAS<br>FOR THE 3RD JUDICIAL CIRCUIT<br>CASE NO: 2018-CP-45-____ |
| RONALD SMITH,<br>                                        Plaintiff,<br>            v.<br>MONSANTO COMPANY; MONSANTO<br>ENVIRO-CHEM SYSTEMS, INC.;<br>MONSANTO PRODUCTION SUPPLY<br>LLC; HELENA AGRI-ENTERPRISES,<br>LLC; NATURCHEM, INC.; and SOUTH<br>CAROLINA DEPARTMENT OF<br>TRANSPORTATION,<br>                                        Defendants. | **COMPLAINT**<br>**(Jury Trial Demanded)** |

Plaintiff Ronald Smith, complaining of the Defendants, alleges and says as follows:

## INTRODUCTION

This products liability and negligence complaint is brought by Plaintiff, a South Carolina resident diagnosed with cancer due to multinational, agri-giant Monsanto's knowing and willful dissemination of carcinogenic products throughout the stream of commerce. Plaintiff earned his living as a public servant, maintaining South Carolina's roadways with the Department of Transportation. After years of dutiful service, long-term use and exposure to Roundup®/ glyphosate distributed by Monsanto, SCDOT, Helena, and NaturChem caused Plaintiff to develop cancer and seek months of intensive, costly medical intervention.

## STATEMENT OF THE CASE

1. In 1970, Defendants Monsanto Company, Inc, discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85-90 million pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

2.  Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve the farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

3.  Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in contact with glyphosate.

4.  On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposure to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

5.  On July 29, 2015, IARC issued a formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

6.  The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

most associated with glyphosate exposure are non-Hodgkin lymphoma and other haematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

7. The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

8. Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this action pursuant to or S.C. Code Ann. § 15-5-150, which grants the Circuit Court jurisdiction over "[a]n action against a corporation created by or under the laws of any other state, government or country may be brought in the circuit court [b]y any resident of this State for any cause of action," and S.C. Code Ann. § 15-77-50, vesting Circuit Court jurisdiction in for all questions, actions and controversies involving agencies.

10. This Court has further jurisdiction over the Defendants because South Carolina Department of Transportation is a corporate body created by South Carolina Code of Laws § 57-3-10.

11. Monsanto Company, Monsanto Enviro-Chem Systems, Inc., and Monsanto Production Supply LLC, are foreign corporations or associations authorized to do business in South Carolina and registered with the South Carolina Secretary of State. Monsanto Company, Monsanto Enviro-Chem Systems, Inc., and Monsanto Production Supply LLC, have

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

sufficient minimum contacts in South Carolina, or otherwise intentionally avail themselves of the South Carolina market so as to render the exercise of jurisdiction over them by the South Carolina courts consistent with traditional notions of fair play and substantial justice.

12. Helena Agri-Enterprises, LLC is a limited liability company organized pursuant to the laws of Delaware, authorized to do business in South Carolina, and registered with the South Carolina Secretary of State. Helena Agri-Enterprises, LLC, has extensive physical office locations and distribution centers within the State of South Carolina and has sufficient minimum contacts in South Carolina, or otherwise intentionally availed itself of the South Carolina market so as to render the exercise of jurisdiction over them by the South Carolina courts consistent with traditional notions of fair play and substantial justice.

13. NaturChem, Inc. is a domestic South Carolina corporation, authorized to do business in South Carolina and currently in good standing with the Secretary of State.

14. Furthermore, Defendants have purposefully availed themselves of the benefits and the protections of the laws of the State of South Carolina. Monsanto Company, Monsanto Enviro-Chem Systems, Inc., Monsanto Production Supply LLC, and Helena Company all have sufficient contact such that the exercise of jurisdiction would be consistent with the traditional notions of fair play and substantial justice.

15. Venue is proper in this Court because the most substantial part of the alleged act or omission giving rise to the cause of action occurred in Williamsburg County through Plaintiff's employment with the Williamsburg branch of the South Carolina Department of Transportation, pursuant to S.C. Code Ann. §§ 15-7-30(F)(1) & (G)(1).

16. Plaintiff seeks relief that is in excess of the jurisdictional minimums of the Court.

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

## THE PARTIES

### Plaintiff

17. **Plaintiff Ronald Smith** is a competent individual over the age of 18, a resident and citizen of Florence County, South Carolina, and hereby submits to the jurisdiction of the Court and alleges that venue in this Court is proper.

### Defendants

18. **Defendant Monsanto Company** ("Monsanto") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri. Monsanto's South Carolina registered agent is Corporation Service Company, and can be served



at 1703 Laurel Street, Columbia South Carolina 29201. At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glysophate and the manufacturer of Roundup®. Monsanto has regularly transacted and conducted business within the State of South Carolina, including operating a facility in Hartsville, South Carolina. Monsanto has derived substantial revenue from goods and products, including Roundup, used in the State of South Carolina. Monsanto expected or should have expected their acts to have consequences within the State of South Carolina, and derived substantial revenue from interstate commerce.

19. **Defendant Monsanto Enviro-Chem Systems** ("MECS, Inc.") is a Delaware corporation. MECS, Inc.'s registered agent is CT Corporation System, and can be served at 2 Office Park Court, Suite 103, Columbia South Carolina 29223. MECS, Inc. has regularly transacted and conducted business within the State of South Carolina, derived substantial revenue from

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

goods and products, including Roundup, used in the State of South Carolina. MECS, Inc. expected or should have expected their acts to have consequences within the State of South Carolina, and derived substantial revenue from interstate commerce.

20. **Defendant Monsanto Production Supply LLC ("MPS")** is a Delaware corporation. MPS registered agent is CT Corporation System, and can be served at 2 Office Park Court, Suite 103, Columbia South Carolina 29223. MPS has regularly transacted and conducted business within the State of South Carolina, derived substantial revenue from goods and products, including Roundup, used in the State of South Carolina. MPS expected or should have expected their acts to have consequences within the State of South Carolina, and derived substantial revenue from interstate commerce.

21. **Defendant Helena Agri-Enterprises, LLC,** formerly Helena Chemical Co., ("Helena") is a Delaware limited liability company. Helena's registered agent is CT Corporation System, and can be served at 2 Office Park  Court Suite 103, Columbia, South Carolina 29223. Helena's Eastern Business Unit is located in West Columbia, South Carolina and is home to its EBU Regional Office, Southeast Division, Eastern Division, and Specialty Division. Helena also operates a distribution hub, located at 120 Settle Road, Inman, South Carolina 29349. At all times relevant to this Complaint, Helena contracted with the South Carolina Department of Transportation to sell, deliver, and/or distribute glyphosate products including, but not limited, to Roundup, for use in the State of South Carolina. Helena expected or should have expected their acts to have consequences within the State of South Carolina, and derived substantial revenue from interstate commerce.

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

22. **Defendant NaturChem, Inc.** ("NatureChem") is a South Carolina Corporation.   NatureChem's registered agent is Rom D. Kellis, III, and can be



served at 270 Bruner Road, Lexington, South Carolina 29072. At all times relevant to this Complaint, NaturecChem contracted with the South Carolina Department of Transportation to sell, deliver, and/or distribute glyphosate products including, but not limited, to Roundup, for use in the State of South Carolina.

23. **Defendant South Carolina Department of Transportation** ("SCDOT") is a corporate body created by South Carolina Code of Laws § 57-3-10 and its agent to accept service is Linda C.



McDonald, at 955 Park Street, Columbia, South Carolina 29201. At all times relevant to this complaint, Defendant Helena sold, delivered, and/or distributed glyphosate products to SCDOT, including but not limited to Roundup, for use in the State of South Carolina.

24. Plaintiff is informed and believes, and based thereon alleges, that in committing the acts alleged herein, each and every managing agent, agent, representative and/or employee of the collective Defendants was working within the course and scope of said agency, representation and/or employment with the knowledge, consent, ratification, and authorization of the Defendants and their directors, officers and/or managing agents.

### FACTS

25. Glyphosate is a broad-spectrum, non-selective herbicide used in a variety of herbicidal products around the world.

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

26. Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids.

27. For nearly 40 years, people across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®, glyphosate,  is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Agricultural workers are, once again, victims of corporate greed.

28. Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince governmental agencies, farmers, and the general population that Roundup® was safe.

### *The Discovery of Glyphosate and Development of Roundup®*

29. The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist, John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use. It still markets Roundup® as safe today.

### *Registration of Herbicides under Federal Law*

30. The manufacture, formulation, and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"),

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

7 U.S.C. § 136, *et seq*. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

31. Because pesticides are toxic to plants, animals, and humans, at least to some extent, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

32. FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

33. The EPA and the State of South Carolina registered Roundup® for distribution, sale, and manufacture in the United States and the State of South Carolina.

34. FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

### *Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup*

35. Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

36. On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

37. In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

38. In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer states, after finding "routine falsification of data" at IBT, that it was "hard to believe the

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

39. Three top executives of IBT were convicted of fraud in 1983.

40. In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

41. Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

### *The Importance of Roundup® to Monsanto's Market Dominance Profits*

42. The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

43. In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

44. Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

*Monsanto has known for decades that it falsely advertises the safety of Roundup®*

45. In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general reputations that its spray-on glyphosate-based herbicides, including Roundup®, were **"safer than table salt"** and **"practically non-toxic"** to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

    a. Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences...

    b. And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

    c. Roundup biodegrades into naturally occurring elements.

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

    d.  Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

    e.  This non-residual herbicide will not wash or leach into the soil. It . . . stays where you apply it.

    f.  You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

    g.  Glyphosate is less toxic to rats than table salt following acute oral ingestion.

    h.  Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

    i.  You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

    j.  "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

46. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

    a.  Its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

\*\*\*

   b.  Its glyphosate-containing pesticide products or any component thereof
       manufactured, formulated, distributed or sold by Monsanto are biodegradable.

\*\*\*

   c.  Its glyphosate-containing pesticide products or any component thereof stay where
       they are applied under all circumstances and will not move through the
       environment by any means.

\*\*\*

   d.  Its glyphosate-containing pesticide products or any component thereof are "good"
       for the environment or are "known for their environmental characteristics."

\*\*\*

   e.  Glyphosate-containing pesticide products or any component thereof are safer or
       less toxic than common consumer products other than herbicides;

   f.  Its glyphosate-containing products or any component thereof might be classified
       as "practically non-toxic."

47. Monsanto did not alter its advertising in the same manner in any state other than New York,
    and on information and belief still has not done so today.

48. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of
    Roundup®. The French court affirmed an earlier judgment that Monsanto had falsely
    advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

                    *Classifications and Assessments of Glyphosate*

49. The IARC process for the classification of glyphosate followed the stringent procedures for
    the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed

980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

50. The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

51. One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group are published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

52. In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

53. In March, 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic to humans.

54. On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3-10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

55. The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

56. Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

57. Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

58. The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

59. The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

60. The IARC Working Group also found that glyphosate cause DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

61. In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

62. The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

63. The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

64. The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

65. The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. while this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

### *Other Earlier Findings About Glyphosate's Dangers to Human Health*

66. The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

### *Release Patterns*

Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport, storage, and disposal.

### *Recent Worldwide Bans on Roundup®/Glyphosate*

67. Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in light of this as the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which was to take effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

68. The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

69. France banned the private sale of Roundup® and glyphosate following the IARC assessment for glyphosate.

70. Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

71. The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that Glyphosate has been linked to fatal kidney disease in agricultural workers.

72. The government of Colombia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

73. On information and belief, Helena and NaturChem distributed the Roundup/glyphosate used by Plaintiff, and are at all relevant times, engaged in the distribution of Roundup, Roundup-ready crops and other glyphosate-containing products from Monsanto to retailers and commercial/agricultural users in South Carolina, including SCDOT

74. Helena and NatureChem had superior knowledge compared to Roundup users and consumers, including regarding the carcinogenic properties of the product, yet failed to accompany their sales and/or marketing of Roundup with any warnings or precautions for that grave danger. Helena and NaturChem were the distributors that provided Roundup and other glyphosate-containing products to SCDOT, whereby SCDOT then distributed them to Plaintiff for his use..

### *Plaintiff's Exposure to Roundup®*

75. Plaintiff was at all relevant times employed by SCDOT, in Kingstree, South Carolina, where his responsibilities included direct application of Roundup and RangerPro, among other Monsanto glyphosate products, around road signs throughout the greater Williamsburg County area.

76. Plaintiff was diagnosed with non-Hodgkin's lymphoma in June 2011, at the age of 52.

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

77. Plaintiff first became aware of the probable carcinogenic properties of Glyphosate and its probable link to his non-Hodgkin's Lymphoma in August 2018.

### FOR A FIRST CAUSE OF ACTION
### Strict Liability (Design Defect)

78. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

79. Plaintiff brings this strict liability claim against Defendants for defective design.

80. At all times relevant to this litigation, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup®/glyphosate products in the stream of commerce. These actions were under the ultimate control and supervision of Defendants. At all times relevant to this litigation, Defendants designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup®/glyphosate products that Plaintiff was exposed to, as described above.

81. At all times relevant to this litigation, Defendants' Roundup®/glyphosate products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff.

82. At all times relevant to this litigation, Defendants' Roundup®/glyphosate products reached the intended consumers, handlers, and users or other persons coming into contact with these products in South Carolina and throughout the United States, including Plaintiff, without

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

83. Defendants' Roundup®/glyphosate products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in that when they left the hands of the Defendants' manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

84. Defendants' Roundup®/glyphosate products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in that when they left the hands of Defendants' manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

85. At all times relevant to this action, Defendants knew or had reason to know that Roundup®/glyphosate products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendants.

86. Therefore, at all times relevant to this litigation, Defendants' Roundup®/glyphosate products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in one or more of the following ways:

  a. When placed in the stream of commerce, Defendants' Roundup®/glyphosate products were unreasonably dangerous in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

b.  When placed in the stream of commerce, Defendants' Roundup®/glyphosate products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c.  When placed in the stream of commerce, Defendants' Roundup®/glyphosate products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d.  Defendants did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate.

e.  Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of herbicide.

f.  Defendants knew or should have known at the time of marketing its Roundup®/glyphosate products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g.  Defendants did not conduct adequate post-marketing surveillance of its Roundup®/glyphosate products.

h.  Defendants could have employed safer alternative design and formulations.

87. Plaintiff was exposed to Defendants' Roundup®/glyphosate products while working for the Department of Transportation, as described above, without knowledge of its dangerous characteristics.

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

88. At all times relevant to this litigation, Plaintiff was exposed to the use of Defendants' Roundup®/glyphosate products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

89. Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

90. The harm caused by Defendants' Roundup®/glyphosate products far outweighed their benefit, rendering Defendants' products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendants' Roundup®/glyphosate products were and are more dangerous than alternative products and Defendants could have designed its Roundup®/glyphosate products to make them less dangerous. Indeed, at the time that Defendants designed its Roundup®/glyphosate products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

91. At the time Roundup®/glyphosate products left Defendants' control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendants' herbicides.

92. Defendants' defective design of its Roundup®/glyphosate products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup®/glyphosate products, including the Plaintiff herein.

93. Therefore, as a result of the unreasonably dangerous condition of its Roundup®/glyphosate products, Defendants are strictly liable to Plaintiff.

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

94. The defects in Defendants' Roundup®/glyphosate products were substantial and contributing factors in causing Plaintiff's grave injuries, and, but for Defendants' misconduct and omissions, Plaintiff would not have sustained these injuries.

95. Defendants' conduct, as described above, was reckless. Defendants risked the lives of consumers and users of its products, including Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, warn, or inform the unsuspecting public. Defendants' reckless conduct warrants an award of punitive damages.

96. As a direct and proximate result of Defendants placing defective Roundup®/glyphosate products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

## FOR A SECOND CAUSE OF ACTION
### Strict Liability (Failure to Warn)

97. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

98. Plaintiff brings this strict liability claim against Defendants for failure to warn.

99. At all times relevant to this litigation, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, promoting, and applying Roundup®/glyphosate products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendants.

100.    Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup®/glyphosate products, and in the course of the same, directly advertised or marketed the products to consumers and end users, including the Plaintiff, and persons responsible for consumers (such as employers), and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

101.    At all times relevant to this litigation, Defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup®/glyphosate products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendants had a continuing duty to warn the Plaintiff of the dangers associated with Roundup®/glyphosate use and exposure. Defendants, as manufacturer, seller, or distributor of chemical herbicides, are held to the knowledge of an expert in the field.

102.    At the time of manufacture, Defendants could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

103.    At all times relevant to this litigation, Defendants failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of this product and to those who would foreseeably use or be harmed by Roundup®/glyphosate, including Plaintiff.

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

104.   Despite the fact that Defendants knew or should have known that Roundup®/glyphosate posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time it distributed, supplied, or sole the product, and not known to end users and consumers, such as Plaintiff.

105.   Defendants knew or should have known that these products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Defendants have wrongfully concealed information concerning the dangerous nature of the Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

106.   At all times relevant to this litigation, Defendants' Roundup®/glyphosate products reached the intended consumers, handlers, and users or other persons coming into contact with these products in South Carolina and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, marketed, and sprayed/applied by Defendants.

107.   Plaintiff was exposed to Roundup®/glyphosate products, as described above, without knowledge of their dangerous characteristics.

108.   At all times relevant to this litigation, Plaintiff was exposed to the use of Defendants' Roundup®/glyphosate products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

109.   Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendants.

110.   Defendants knew or should have known that the minimal warnings disseminated with or accompanying the application of Roundup®/glyphosate products were inadequate, but they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

111.   The information that Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled those exposed such as Plaintiff to utilize the products safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

112.   To this day, Defendants have failed to adequately and accurately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probably carcinogen.

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

113.   As a result of their inadequate warnings, Roundup®/glyphosate products were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were sold or distributed by Defendants, were applied by Defendants, and when Plaintiff became exposed.

114.   Defendants are liable to Plaintiff for injuries caused by negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of their products and the risks associated with the use of or exposure to Roundup®/glyphosate and glyphosate.

115.   The defects in these Roundup®/glyphosate products were substantial and contributing factors in causing Plaintiff's injuries, and, but for Defendants' misconduct and omissions, Plaintiff would not have sustained these injuries.

116.   Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup®/glyphosate products and application, Plaintiff could have avoided the risk of developing injuries as alleged herein and the company who employed Plaintiff could have obtained alternative herbicides.

117.   As a direct and proximate result of Defendants placing defective Roundup®/glyphosate products into the stream of commerce and exposing Plaintiff to them, Plaintiff has suffered and continues to suffer severe injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

## FOR A THIRD CAUSE OF ACTION
### Negligence/Gross Negligence

118.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

119.   Defendants, directly or indirectly, caused Roundup®/glyphosate products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

120.   At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup®/glyphosate products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

121.   At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup®/glyphosate products. Defendants' duty of care owed to consumers and the general public included providing accurate, true, and accurate information concerning the risks of using Roundup®/glyphosate and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®/glyphosate, and, in particular, its active ingredient glyphosate.

122.   At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup®/glyphosate and other herbicides, but specifically, the carcinogenic properties of the chemical glyphosate.

123.   Accordingly, at all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known that use of or exposure to Roundup®/glyphosate products could cause or be associated with Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

124.   Defendants also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup®/glyphosate were unaware of the risks and the magnitude

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

125.   As such, Defendants breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup®/glyphosate products, in that Defendants manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

126.   Despite ability and means to investigate, study, and test products and to provide adequate warnings, Defendants have failed to do so. Indeed, Defendants wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

127.   Defendants' negligence included:

     a.   Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup®/glyphosate products without thorough and adequate pre- and post-market testing;

     b.   Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup®/glyphosate while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®/glyphosate;

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d. Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup®/glyphosate products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

e. Failing to design and manufacture Roundup®/glyphosate products so as to ensure they were at least as safe and effective as other herbicides on the market;

f. Failing to provide adequate instruction, guidelines, and safety precautions to those persons who Defendants could reasonably foresee would use and be exposed to its Roundup®/glyphosate products;

g. Failing to disclose to Plaintiff, users/consumers, and the general public that use of and exposure to Roundup®/glyphosate presented severe risks of cancer and other grave illnesses;

h. Failing to warn Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other consumers;

i. Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

j.   Representing that its Roundup®/glyphosate products were safe for their intended use when, in fact, Defendants knew or should have known that the products were not safe for their intended purpose;

k.   Declining to make or propose any changes to Roundup®/glyphosate products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

l.   Advertising, marketing, and recommending the use of the Roundup®/glyphosate products, while concealing and failing to disclose or warn of the dangers known by Defendants to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m.   Continuing to disseminate information to its consumers, which indicate or imply that Defendants' Roundup®/glyphosate products are not unsafe.

n.   Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

128.   Defendants knew and/or should have known that it was foreseeable that consumers such as Plaintiff would suffer injuries as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®/glyphosate.

129.   Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

130.   Defendants' negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff suffered, and will continue to suffer, as described herein.

131.   Defendants' conduct, as described above, was reckless. Defendants regularly risk the lives of consumers and users of their products, including Plaintiff, with full knowledge of the

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

dangers of its product. Defendants made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff. Defendants' reckless conduct therefore warrants an award of punitive damages.

132.   As a proximate result of Defendants' wrongful acts and omissions in placing defective Roundup®/glyphosate products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff has suffered and continues to suffer severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, has suffered economic losses (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

## FOR A FOURTH CAUSE OF ACTION
### Breach of Implied Warranties

133.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

134.   At all times relevant to this litigation, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup®/glyphosate products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup®/glyphosate products into the stream of commerce. These actions were under the ultimate control and supervision of Defendants.

135.   Before the time that Plaintiff was exposed to the use of the aforementioned Roundup®/glyphosate products, Defendants impliedly warranted to consumers and those exposed – including Plaintiff – that Roundup®/glyphosate products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

136.    Defendants, however, failed to disclose that Roundup®/glyphosate has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

137.    Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Defendants and upon their implied warranties that the Roundup®/glyphosate products were of merchantable quality and fit for their intended purpose or use.

138.    Upon information and belief, Plaintiff was at all relevant times in privity with Defendants.

139.    Plaintiff is the intended third-party beneficiaries of implied warranties made by Defendants to the purchasers of their horticultural herbicides, and as such Plaintiff is entitled to assert this claim.

140.    The Roundup®/glyphosate products were expected to reach and did in fact reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendants.

141.    At all times relevant to this litigation, Defendants were aware that consumers and users of their products, including Plaintiff, would use Roundup®/glyphosate products as marketed by Defendants, which is to say that Plaintiff was a foreseeable user of Roundup®/glyphosate.

142.    Defendants intended that Roundup®/glyphosate products be used in the manner in which Plaintiff was exposed to them and Defendants impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup®/glyphosate was not adequately tested or researched.

143.   In reliance upon Defendants' implied warranty, Plaintiff used or was exposed to Roundup®/glyphosate as instructed and labeled and in the foreseeable manner intended, recommended, promoted, and marketed by Defendants.

144.   Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

145.   Defendants breached their implied warranty to Plaintiff in that Roundup®/glyphosate products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup®/glyphosate has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

146.   The harm caused by Roundup®/glyphosate products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

147.   As a direct and proximate result of Defendants' wrongful acts and omissions, Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, has suffered economic loss (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

### FOR A FIFTH CAUSE OF ACTION
**Punitive Damages**

148.   Plaintiff repeats and reiterates the allegations set forth herein.

149.   At all times material hereto, the Defendants knew or should have known that the subject product was inherently dangerous with respect to its health risks.

150.   At all times material hereto, the Defendants attempted to misrepresent and did misrepresent facts concerning the safety of the subject product.

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

151.    Defendants' misrepresentations included knowingly withholding material information from the public, including the Plaintiff herein, concerning the safety of the subject product.

152.    At all times material hereto, the Defendants knew and recklessly disregarded the fact that human exposure to Roundup®/glyphosate can and does cause health hazards, including non-Hodgkin lymphoma.

153.    Notwithstanding the foregoing, the Defendants continued to aggressively market and apply the subject product without disclosing the aforesaid risks.

154.    Defendants knew of the subject product's defective and unreasonably dangerous nature, as set forth herein, but continued to design, develop, manufacture, market, distribute, sell, and apply it so as to maximize sales and profits at the expense of the health and safety of the public, including the Plaintiff herein, in conscious and/or negligent disregard of the foreseeable harm caused by Roundup®/glyphosate.

155.    The Defendants intentionally concealed and/or recklessly failed to disclose to the public, including the Plaintiff herein, the potentially life-threatening hazards of Roundup®/glyphosate in order to ensure continued and increased sales.

156.    The Defendants' intentional and/or reckless failure to disclose information deprived the Plaintiff of necessary information to enable Plaintiff to weigh the true risks of using or being exposed to the subject product against its benefits.

157.    As a direct and proximate result of the Defendants' conscious and deliberate disregard for the rights and safety of consumers such as the Plaintiff, Plaintiff suffered severe and permanent physical injuries. The Plaintiff has endured substantial pain and suffering and has undergone extensive medical and surgical procedures. Plaintiff has incurred significant expenses for medical care and treatment, and will continue to incur such expenses in the

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

future. The Plaintiff has lost past earnings and has suffered a loss of earning capacity. The Plaintiff has suffered and will continue to suffer economic loss, and has otherwise been physically, emotionally, and economically injured. The Plaintiff's injuries and damages are permanent and will continue into the future.

158.    The aforesaid conduct of the Defendants was committed with knowing, conscious, and deliberate disregard for the rights and safety of consumers, including the Plaintiff herein, thereby entitling the Plaintiff to punitive damages in an amount appropriate to punish the Defendants and deter them from similar conduct in the future.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court enter judgment in their favor and against Defendants, awarding as follows:

A.    Compensatory damages in an amount to be proven at trial;

B.    Punitive damages;

C.    Costs including reasonable attorneys' fees, court costs, and other litigation expenses; and,

D.    Any other relief the Court may deem just and proper.

*SIGNATURE ON FOLLOWING PAGE*

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

Respectfully submitted,

**ANASTOPOULO LAW FIRM, LLC**

*s/ Roy T. Willey, IV*
Eric M. Poulin, Esquire
S.C. Bar No.: 100209
Roy T. Willey, IV, Esquire
S.C. Bar No.: 101010
Matthew L. Nall, Esquire
S.C. Bar No.: 102329
Lane D. Jefferies, Esquire
S.C. Bar No.: 101764
Kenneth T. David, Esquire
S.C. Bar No.: 103434
Anastopoulo Law Firm, LLC
32 Ann Street
Charleston, SC 29418
(843) 614-8888

**ATTORNEYS FOR PLAINTIFF**

Charleston, South Carolina
October 19, 2018

IN THE STATE OF SOUTH CAROLINA   )
COUNTY OF WILLIAMSBURG            )

RONALD SMITH,

                        Plaintiff,

          v.

MONSANTO COMPANY; MONSANTO
ENVIRO-CHEM SYSTEMS, INC.;
MONSANTO PRODUCTION SUPPLY
LLC; HELENA AGRI-ENTERPRISES,
LLC; NATURCHEM, INC.; and SOUTH
CAROLINA DEPARTMENT OF
TRANSPORTATION,

                      Defendants.

IN THE COURT OF COMMON PLEAS
FOR THE 3RD JUDICIAL CIRCUIT
CASE NO: 2018-CP-45-00446

**PLAINTIFF'S STANDARD AND FIRST
SUPPLEMENTAL
INTERROGATORIES TO DEFENDANT
MONSANTO COMPANY**

**TO:   DEFENDANT MONSANTO COMPANY:**

Plaintiff, Ronald Smith ("Plaintiff") requests that Defendant Monsanto Company

("Defendant") answer under oath, separately, and fully in writing, the following interrogatories

pursuant to Rules 26 and 33 of the South Carolina Rules of Civil Procedure.    These

interrogatories are deemed to be continuing, and if complete answers to any of these

interrogatories are presently unavailable, supplemental answers are required at the time the

information becomes available and prior to trial.

### DEFINITIONS AND INSTRUCTIONS

A.      These requests are deemed to be continuing such as to require Defendant to file
and serve supplemental answers should it learn of additional information called for by these
requests between the time of trial and the time its answers are filed. Said supplemental answers
are required to be served within a reasonable time after the discovery of such additional
information.

B.      You are under a duty to promptly amend prior answers to these interrogatories
if you obtain information upon the basis of which you know the response was incorrect when
made or you know the response, though correct when made, is no longer true.

C.      "You," "your," or "Defendant" means Defendant Monsanto Company, its
agents, partners, accountants, servants, employees, assignees, lessees, affiliates or anyone
acting on their behalf, and any affiliate, subsidiary, parent or related corporation, partnership or

entity, and anyone acting for or on behalf of any such subsidiary, related corporation, parent, partnership, entity, or natural person.

D.    "Person" means natural persons, corporations, partnerships, sole proprietorships, associations, federations, government agencies, or any other kind of entity.

E.    "Identify," when used with respect to an individual, means to state the person's full name and any aliases now or previously used by such person, to state and identify the person's present occupation and principal business affiliation and any other business affiliations; present home address and business address or addresses; and present and past business affiliations or relations including those (if any) with any of the parties to this civil action.

F.    "Identify," when used in reference to a person (as defined above) other than a natural person, means to state its full name; the nature of its organization including the name or the state under which it was organized; its address(es); the address(es) of its principal place(s) of business; its principal line(s) of business; and identify all known natural persons who serve as officers, directors, partners, owners, or in other supervisory or ownership capacity in said organization. If any of the above information is not available to Defendant, state any other available means of identifying such person.

## STANDARD INTERROGATORIES

1.    Give the names, addresses, and telephone numbers of persons who may be witnesses concerning the facts of this action or who have knowledge of relevant facts concerning the subject incident, and indicate whether or not written or recorded statements have been taken from the witnesses, and indicate who has possession of such statements.

2.    For each person listed in response to Interrogatory question number one above, set forth either a summary sufficient to inform Plaintiff of the important facts known to or observed by such witness or, if applicable, provide a copy of any written or recorded statements taken from such witness.

3.    Set forth a list of photographs, plans, sketches, or other prepared documents in possession of Defendant or counsel that relates to the claim or defense in this case.

4.      Set forth the names and addresses of all insurance companies which have liability insurance coverage or property damage coverage relating to the claim, and set forth the number or numbers of the policies involved and the amount or amounts of liability coverage provided in each policy.

5.      If Defendant was injured in the incident, that is the subject of this action, set forth the names and addresses of all physicians who have treated Defendant, all hospitals to which Defendant has been committed in connection with said injuries, and also set forth a statement of all medical costs involved.

6.      List the names, addresses, and telephone numbers of any individual whom you propose to use as an expert witness at the trial of this action, and for each state in detail his or her qualifications to testify, the substance of his or her opinions, and the basis for his or her opinions.

7.      If Defendant is improperly identified, give the proper identification and state whether Defendant's counsel will accept service of an Amended Summons and Complaint reflecting the correct information.

## SUPPLEMENTAL INTERROGATORIES

1.      As to each expert witness listed in response to Standard Interrogatory question number six above, please state:

a.      A complete statement of all opinions the witness will express and the basis and reasons for them;

b.      The data and other information considered by the witness in forming the opinions;

c.      A description of any exhibits the witness or counsel intends to introduce

3

to summarize or support these opinions (to be provided in response to Plaintiff's Requests for Production);

      d.     The witness's qualifications, including a list of all publications authored in the previous ten years;

      e.     A list of all other cases in which, during the previous five years, the witness testified as an expert at trial or by deposition; and

      f.     A statement of the compensation to be paid for the study and testimony in the case.

2.     For each affirmative defense that is raised in your Answer, please state with particularity each, and every fact or basis in law upon which you allege to have "good grounds," as defined in Rule 11 S.C. Rules Civ. Pro., to assert such a defense. A full and complete response should include, for each defense:

      a.     Identify all witnesses that support this contention;

      b.     Identify all writings that support this contention;

      c.     Identify all court cases upon which you base this contention; and

      d.     Identify all statutes that you rely on to support this contention.

3.     If Defendant is claiming lack of fault in this incident or claims that another person or entity was at fault in addition to Defendant, please state the name and address of the persons or entities Defendant believes were at fault and please state the reasons why they were at fault. A full and complete response should:

      a.     Identify all witnesses that support this contention;

      b.     Identify all writings that support this contention;

      c.     Identify all court cases upon which you base this contention; and

         d.       Identify all statutes that you rely on to support this contention.

4.      Set forth a list of any and all documents, and records, previously or non-published in any way, that show or state glyphosate to be hazardous in any way, that is or has been in the Defendant's control.

5. Provide an accounting of all Round Up and/or other glysophate products supplied to the South Carolina Department of Transportation for the last thirty (30) years, a complete answer will include:

    a.  Date of the transaction;

    b.  Product;

    c.  Product supplier name;

    d.  Quantity;

    e.  Price;

    f.  Shipment/delivery date;

    g.  Delivery location;

    h.  Purchaser name.

*SIGNATURE BLOCK ON FOLLOWING PAGE*

Respectfully submitted,

**ANASTOPOULO LAW FIRM, LLC**

Eric M. Poulin, Esquire
S.C. Bar No.: 100209
Roy T. Willey, IV, Esquire
S.C. Bar No.: 101010
Matthew L. Nall, Esquire
S.C. Bar No.: 102329
Lane D. Jefferies, Esquire
S.C. Bar No.: 101764
Kenneth T. David, Esquire
S.C. Bar No.: 103434
Anastopoulo Law Firm, LLC
32 Ann Street
Charleston, SC 29418
(843) 614-8888

**ATTORNEYS FOR PLAINTIFF**

Charleston, South Carolina
January 9, 2019

## CERTIFICATE OF SERVICE

By my signature below I hereby
certify that I am an employee of
the Anastopoulo Law Firm, LLC,
and that I served this document
on all parties and/or counsel-of-record
on this ___ day of _____, 2019.

IN THE STATE OF SOUTH CAROLINA   )
COUNTY OF WILLIAMSBURG         )

IN THE COURT OF COMMON PLEAS
FOR THE 3RD JUDICIAL CIRCUIT
CASE NO: 2018-CP-45-00446

RONALD SMITH,

                            Plaintiff,

       v.

MONSANTO COMPANY; MONSANTO
ENVIRO-CHEM SYSTEMS, INC.;
MONSANTO PRODUCTION SUPPLY
LLC; HELENA AGRI-ENTERPRISES,
LLC; NATURCHEM, INC.; and SOUTH
CAROLINA DEPARTMENT OF
TRANSPORTATION,

                        Defendants.

**PLAINTIFF'S FIRST REQUEST FOR
PRODUCTION TO DEFENDANT
MONSANTO COMPANY**

**TO:   DEFENDANT MONSANTO COMPANY:**

      Plaintiff Ronald Smith ("Plaintiff"), pursuant to Rule 34 of the South Carolina Rules of Civil Procedure, hereby requests that Defendant. The Monsanto Company ("Defendant") respond within thirty (30) days after the service hereof to the following requests for production, to wit, and that Defendant produce and permit Plaintiff to inspect, copy, and/or photograph each of the following documents or things which may be in the possession, custody, or control of Defendant or its attorney.

## DEFINITIONS AND INSTRUCTIONS

     A.     These requests are deemed to be continuing, such as to require Defendant to file and serve supplemental responses should it learn of additional information called for by these requests between the time of trial and the time its responses are served.  Said supplemental responses are required to be served within a reasonable time after the discovery of such additional information.

     B.     You are under a duty to promptly amend prior responses to these requests if you obtain information upon the basis of which you know the response was incorrect when made or you know the response, though correct when made, is no longer true

     C.     "You," "your," or "Defendant" means Defendant Monsanto Company, its agents, partners, accountants, servants, employees, assignees, lessees, affiliates, or anyone acting on their behalf, including any affiliate, subsidiary, parent, or related corporation, partnership or entity, and anyone acting for or on behalf of any such subsidiary, related corporation, parent, partnership, entity, or natural person.

D.     "Person" means natural persons, corporations, partnerships, sole proprietorships, associations, federations, government agencies, or any other kind of entity.

E.     "Identify," when used with respect to an individual, means to state the person's full name and any aliases now or previously used by such person, to state and identify the person's present occupation, principal business affiliation, and any other business affiliations; present home address, business address, or other applicable addresses; and present and past business affiliations or relations, including those (if any) with any of the parties to this civil action.

F.     "Identify," when used in reference to a person (as defined above) other than a natural person, means to state its full name; the nature of its organization, including the name of the state under which it was organized; its address(es); the address(es) of its principal place(s) of business; its principal line(s) of business; and identify all known natural persons who serve as officers, directors, partners, owners, or in other supervisory or ownership capacity in said organization.  If any of the above information is not available to Defendant, state any other available means of identifying such person.

## REQUESTS FOR PRODUCTION

1.     Provide all documents identified or referred to in Defendant's answers to Plaintiff's Standard and First Supplemental Interrogatories.

2.     Provide all photographs, videotapes, maps, plats, drawings, diagrams, measurements, surveys, or other descriptions related in any way to the subject matter of this action, made either before or after the incident that is the subject this action.

3.     Provide any and all documents or other tangible items, including books, records, reports, photographs, moving pictures, videotapes, drawings, charts, maps, diagrams, models, or other documentary materials, or tangible objects that Defendant intends to rely upon to support Defendant and/or which Defendant intends to offer into evidence as exhibits or use as demonstrative aids at the trial of this action.

4.     Provide all statements of any witnesses in the possession of Defendant or its attorney, whether written or recorded on a tape recorder or otherwise, that relate to the matters alleged in Plaintiff's Complaint or Defendant's Answer.

5.     Produce and provide all memoranda, notes, diagrams, reports, photographs, e-

2

mails, computer data or documents, videotapes, audiotapes, or other materials relating in any way to the matters alleged or referred to in the Complaint, any injuries or damages claimed, and any defenses raised or which could reasonably be raised.

6.      Produce or permit Plaintiff or his attorney to inspect, photograph, or otherwise copy all photographs, plats, or diagrams Defendant or Defendant's attorney may have which relate to the matter alleged herein.

7.      Produce and provide any documents (as defined in Rule 34(a), SCRCP) and tangible things of whatever nature and description which you intend to introduce into evidence or to use as impeachment or evidence at the trial of this case.

8.      Provide the most recent resume or curriculum vitae of any experts that Defendant intends to use at trial or in preparing documents in response to this or other inquiries by Plaintiff.

9.      Provide copies of any statutes relied upon by Defendant in its Answer, pre-trial motions, and trial.

10.     Provide results from any tests or evaluations ordered by Defendant, or any expert retained by the Defendant, that is used to support Defendant's position in this matter.

11.     Provide a complete copy of any insurance policies, including the declarations page(s), for any policies that may provide coverage to Defendant for the allegations contained in the Complaint.

12.     Provide returns to any subpoena or FOIA requests that you have served to date in this action, or any that are served in the future through the trial of this action.

13.     Produce and provide all receipts, notes, log entries, correspondence, internal memoranda, e-mails, and transcripts between any of Defendant's employees or agents that are related to Plaintiff's claim.

14.     Produce and provide any and all photographs, previously published or non-published in any way, associated with the event associated with the subject incident that are in the Defendant's control or have ever been in Defendant's control.

15.     Produce and provide any and all media of any other type, previously published or non-published in any way, associated with the event associated with the subject incident that are in the Defendant's control or have ever been in Defendant's control.

16.     Produce the names of any known persons who may be in control or had been in control of any media related to the event and/or the subject incident.

17.     Produce and provide any and all medical claims, documents, and records specific to any product defect claim

18.     Produce and provide any and all documents of any type, published or not published demonstrating glyphosate's hazardous nature.

19.     Produce all documents in anyway relating to the South Carolina Department of Transportation for the last 30 years.

## PRIVILEGE

For each document that would be required to be produced but for a privilege asserted against producing it, set forth:

a)     The date the document was generated;

b)     The type of document (e.g., letter, memorandum, record, etc.);

c)     The name of the person who prepared the original;

d)     The name and address of the person who received the original;

e)     The name and address of anyone who received a copy;

f)     A general description of the information recorded in the document;

4

g)      The ground on which production is objected to;

h)      The name of each person, in addition to those identified in (a) through (e) of this subpart, known to have seen or have access to the document; and

i)      The name of the person who now possesses the document.

## DOCUMENTS NO LONGER IN EXISTENCE OR NO LONGER CONTROLLED OR POSSESSED

If any requested document existed at one time in the possession, custody, or control of any party but has been lost, discarded or destroyed, or removed from the party's possession, custody or control, indicate for each such document:

a)      Its identity (i.e., a description of its contents its date, title, and type of document);

b)      When it was most recently in the possession, custody or control of the party;

c)      Identify any person who currently possesses the document;

d)      State whether the document was transferred or destroyed;

e)      State the person who transferred or destroyed the document and the person who authorized or knows of its transfer or destruction;

f)      State the reason the document was transferred or destroyed; and

g)      Identify, by providing name, address, and daytime telephone number, all persons having knowledge or the contents of each document.

*SIGNATURE ON FOLLOWING PAGE*

5

Respectfully submitted,

**ANASTOPOULO LAW FIRM, LLC**

Eric M. Poulin, Esquire
S.C. Bar No.: 100209
Roy T. Willey, IV, Esquire
S.C. Bar No.: 101010
Matthew L. Nall, Esquire
S.C. Bar No.: 102329
Lane D. Jefferies, Esquire
S.C. Bar No.: 101764
Kenneth T. David, Esquire
S.C. Bar No.: 103434
Anastopoulo Law Firm, LLC
32 Ann Street
Charleston, SC 29418
(843) 614-8888

**ATTORNEYS FOR PLAINTIFF**

Charleston, South Carolina
January 9, 2019

## CERTIFICATE OF SERVICE

By my signature below I hereby
certify that I am an employee of
the Anastopoulo Law Firm, LLC,
and that I served this document
on all parties and/or counsel-of-record
on this ____ day of _____, 2019.

_____

**IN THE STATE OF SOUTH CAROLINA**  **IN THE COURT OF COMMON PLEAS**

**COUNTY OF WILLIAMSBURG**  **CIVIL ACTION COVERSHEET**

**2018-CP-45-00446**

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

**RONALD SMITH,**

**Plaintiff,**

v.

**MONSANTO COMPANY; MONSANTO ENVIRO-CHEM SYSTEMS, INC.; MONSANTO PRODUCTION SUPPLY LLC;  HELENA AGRI-ENTERPRISES, LLC; NATURCHEM, INC.; and SOUTH CAROLINA DEPARTMENT OF TRANSPORTATION,**

**Defendants.**

| | |
|---|---|
| **SC Bar #:** | **100209; 101010; 102329; 101764; 103434** |
| **Telephone #:** | **(843)614-8888** |
| **Fax #:** | **(843)853-2291** |
| **Other:** | |
| **E-mail:** | eric@akimlawfirm.com, roy@akimlawfirm.com, matt@akimlawfirm.com, lane@akimlawfirm.com, kenneth@akimlawfirm.com. |

Submitted By: Eric M. Poulin; Roy T. Willey, IV; Matthew L. Nall, Lane D. Jefferies, Kenneth T. David.
Address: 32 Ann Street, Charleston, SC 29403

NOTE: The coversheet and information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law.  This form is required for the use of the Clerk of Court for the purpose of docketing cases that are NOT E-Filed.  It must be filled out completely, signed, and dated.  A copy of this coversheet must be served on the defendant(s) along with the Summons and Complaint. This form is NOT required to be filed in E-Filed Cases.

## DOCKETING INFORMATION  *(Check all that apply)*

*If Action is Judgment/Settlement do not complete*

☒ **JURY TRIAL** demanded in complaint.  ☐ **NON-JURY TRIAL** demanded in complaint.
☐ This case is subject to **ARBITRATION** pursuant to the Court Annexed Alternative Dispute Resolution Rules.
☒ This case is subject to **MEDIATION** pursuant to the Court Annexed Alternative Dispute Resolution Rules.
☐ This case is exempt from ADR. (Proof of ADR/Exemption Attached)

### NATURE OF ACTION *(Check One Box Below)*

**Contracts**
☐ Constructions (100)
☐ Debt Collection (110)
☐ Employment (120)
☐ General (130)
☐ Breach of Contract (140)
☐ Other (199)

**Torts - Professional Malpractice**
☐ Dental Malpractice (200)
☐ Legal Malpractice (210)
☐ Medical Malpractice (220)
Previous Notice of Intent Case #
20_____ -CP-_____-_____
☐ Notice/ File Med Mal (230)
☐ Other (299)

**Torts – Personal Injury**
☐ Assault/Slander/Libel (300)
☐ Conversion (310)
☐ Motor Vehicle Accident (320)
☐ Premises Liability (330)
☐ Products Liability (340)
☒ Personal Injury (350)
☐ Wrongful Death (360)
☐ Other (399)

**Real Property**
☐ Claim & Delivery (400)
☐ Condemnation (410)
☐ Foreclosure (420)
☐ Mechanic's Lien (430)
☐ Partition (440)
☐ Possession (450)
☐ Building Code Violation (460)
☐ Other (499)

**Inmate Petitions**
☐ PCR (500)
☐ Mandamus (520)
☐ Habeas Corpus (530)
☐ Other (599)

**Judgments/Settlements**
☐ Death Settlement (700)
☐ Foreign Judgment (710)
☐ Magistrate's Judgment (720)
☐ Minor Settlement (730)
☐ Transcript Judgment (740)
☐ Lis Pendens (750)
☐ Transfer of Structured Settlement Payment  Rights Application (760)
☐ Other (799)

**Administrative Law/Relief**
☐ Reinstate Driver's License (800)
☐ Judicial Review (810)
☐ Relief (820)
☐ Permanent Injunction (830)
☐ Forfeiture-Petition (840)
☐ Forfeiture—Consent Order (850)
☐ Other (899)

**Appeals**
☐ Arbitration (900)
☐ Magistrate-Civil (910)
☐ Magistrate-Criminal (920)
☐ Municipal (930)
☐ Probate Court (940)
☐ SCDOT (950)
☐ Worker's Comp (960)
☐ Zoning Board (970)

☐ Public Service Commission (990)
☐ Employment Security Comm (991)

**Special/Complex /Other**
☐ Environmental (600)  ☐ Pharmaceuticals (630)

| | | |
|---|---|---|
| ☐ Automobile Arb. (610) | ☐ Unfair Trade Practices (640) | ☐ Other (999) |
| ☐ Medical (620) | ☐ Out-of State Depositions (650) | |
| ☐ Other (699) | ☐ Motion to Quash Subpoena in an Out-of-County Action (660) | |
| | ☐ Sexual Predator (510) | |

**Submitting Party Signature:**   *s/ Roy T. Willey, IV*            **Date:**   **October 19, 2018**

**Note:** Frivolous civil proceedings  may be subject to sanctions pursuant to SCRCP, Rule 11, and the South Carolina Frivolous Civil Proceedings Sanctions Act, S.C. Code Ann. §15-36-10 et. seq.

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

**Effective January 1, 2016,** Alternative Dispute Resolution (ADR) is mandatory in all counties, pursuant to Supreme Court Order dated November 12, 2015.

SUPREME COURT RULES REQUIRE THE SUBMISSION OF ALL CIVIL CASES TO AN ALTERNATIVE DISPUTE RESOLUTION PROCESS, UNLESS OTHERWISE EXEMPT.

**Pursuant to the ADR Rules, you are required to take the following action(s):**

1. The parties shall select a neutral and file a "Proof of ADR" form on or by the 210th day of the filing of this action. If the parties have not selected a neutral within 210 days, the Clerk of Court shall then appoint a primary and secondary mediator from the current roster on a rotating basis from among those mediators agreeing to accept cases in the county in which the action has been filed.

2. The initial ADR conference must be held within 300 days after the filing of the action.

3. Pre-suit medical malpractice mediations required by S.C. Code §15-79-125 shall be held not later than 120 days after all defendants are served with the "Notice of Intent to File Suit" or as the court directs.

4. Cases are exempt from ADR only upon the following grounds:

    a. Special proceeding, or actions seeking extraordinary relief such as mandamus, habeas corpus, or prohibition;
    b. Requests for temporary relief;
    c. Appeals;
    d. Post Conviction relief matters;
    e. Contempt of Court proceedings;
    f. Forfeiture proceedings brought by governmental entities;
    g. Mortgage foreclosures; and
    h. Cases that have been previously subjected to an ADR conference, unless otherwise required by Rule 3 or by statute;

5. In cases not subject to ADR, the Chief Judge for Administrative Purposes, upon the motion of the court or of any party, may order a case to mediation.

6. Motion of a party to be exempt from payment of neutral fees due to indigency should be filed with the Court within ten (10) days after the ADR conference has been concluded.

**Please Note:  You must comply with the Supreme Court Rules regarding ADR. Failure to do so may affect your case or may result in sanctions.**

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

IN THE STATE OF SOUTH CAROLINA  )
COUNTY OF WILLIAMSBURG            )

RONALD SMITH,
                          Plaintiff,
            v.
MONSANTO COMPANY; MONSANTO
ENVIRO-CHEM SYSTEMS, INC.;
MONSANTO PRODUCTION SUPPLY
LLC; HELENA AGRI-ENTERPRISES,
LLC; NATURCHEM, INC.; and SOUTH
CAROLINA DEPARTMENT OF
TRANSPORTATION,
                          Defendants.

IN THE COURT OF COMMON PLEAS
FOR THE 3RD JUDICIAL CIRCUIT
CASE NO: 2018-CP-45-____

**SUMMONS**
**(Jury Trial Demanded)**

**TO:   THE DEFENDANTS ABOVE NAMED:**

   **YOU ARE HEREBY SUMMONED** and required to Answer the Complaint in this

action, a copy of which is herewith served upon you, and to serve a copy of your Answer to said

Complaint upon the Plaintiff or his attorneys, Eric M. Poulin, Roy T. Willey, IV, Matthew L.

Nall, Lane D. Jefferies, and Kenneth T. David, at their office, 32 Ann Street, Charleston, South

Carolina, 29403, within thirty (30) days after the service hereof, exclusive of the day of such

service and if you fail to Answer the Complaint within that time, Plaintiff will apply to the court

for the relief demanded in the Complaint.

   Dated at Charleston, South Carolina on the 19th day of October, 2018.

*SIGNATURE ON FOLLOWING PAGE*

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

**ANASTOPOULO LAW FIRM, LLC**

*s/ Roy T. Willey, IV*
Eric M. Poulin, Esquire
S.C. Bar No.: 100209
Roy T. Willey, IV, Esquire
S.C. Bar No.: 101010
Matthew L. Nall, Esquire
S.C. Bar No.: 102329
Lane D. Jefferies, Esquire
S.C. Bar No.: 101764
Kenneth T. David, Esquire
S.C. Bar No.: 103434
Anastopoulo Law Firm, LLC
32 Ann Street
Charleston, SC 29418
(843) 614-8888

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

IN THE STATE OF SOUTH CAROLINA )
COUNTY OF WILLIAMSBURG )

RONALD SMITH,

                         Plaintiff,

          v.

MONSANTO COMPANY; MONSANTO
ENVIRO-CHEM SYSTEMS, INC.;
MONSANTO PRODUCTION SUPPLY
LLC; HELENA AGRI-ENTERPRISES,
LLC; NATURCHEM, INC.; and SOUTH
CAROLINA DEPARTMENT OF
TRANSPORTATION,

                       Defendants.

IN THE COURT OF COMMON PLEAS
FOR THE 3RD JUDICIAL CIRCUIT
CASE NO: 2018-CP-45-____

**COMPLAINT**
**(Jury Trial Demanded)**

Plaintiff Ronald Smith, complaining of the Defendants, alleges and says as follows:

## INTRODUCTION

This products liability and negligence complaint is brought by Plaintiff, a South Carolina resident diagnosed with cancer due to multinational, agri-giant Monsanto's knowing and willful dissemination of carcinogenic products throughout the stream of commerce. Plaintiff earned his living as a public servant, maintaining South Carolina's roadways with the Department of Transportation. After years of dutiful service, long-term use and exposure to Roundup®/ glyphosate distributed by Monsanto, SCDOT, Helena, and NaturChem caused Plaintiff to develop cancer and seek months of intensive, costly medical intervention.

## STATEMENT OF THE CASE

1. In 1970, Defendants Monsanto Company, Inc, discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85-90 million pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

1

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

2. Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve the farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

3. Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in contact with glyphosate.

4. On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposure to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

5. On July 29, 2015, IARC issued a formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

6. The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

most associated with glyphosate exposure are non-Hodgkin lymphoma and other haematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

7. The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

8. Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this action pursuant to or S.C. Code Ann. § 15-5-150, which grants the Circuit Court jurisdiction over "[a]n action against a corporation created by or under the laws of any other state, government or country may be brought in the circuit court [b]y any resident of this State for any cause of action," and S.C. Code Ann. § 15-77-50, vesting Circuit Court jurisdiction in for all questions, actions and controversies involving agencies.

10. This Court has further jurisdiction over the Defendants because South Carolina Department of Transportation is a corporate body created by South Carolina Code of Laws § 57-3-10.

11. Monsanto Company, Monsanto Enviro-Chem Systems, Inc., and Monsanto Production Supply LLC, are foreign corporations or associations authorized to do business in South Carolina and registered with the South Carolina Secretary of State. Monsanto Company, Monsanto Enviro-Chem Systems, Inc., and Monsanto Production Supply LLC, have

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

sufficient minimum contacts in South Carolina, or otherwise intentionally avail themselves of the South Carolina market so as to render the exercise of jurisdiction over them by the South Carolina courts consistent with traditional notions of fair play and substantial justice.

12. Helena Agri-Enterprises, LLC is a limited liability company organized pursuant to the laws of Delaware, authorized to do business in South Carolina, and registered with the South Carolina Secretary of State. Helena Agri-Enterprises, LLC, has extensive physical office locations and distribution centers within the State of South Carolina and has sufficient minimum contacts in South Carolina, or otherwise intentionally availed itself of the South Carolina market so as to render the exercise of jurisdiction over them by the South Carolina courts consistent with traditional notions of fair play and substantial justice.

13. NaturChem, Inc. is a domestic South Carolina corporation, authorized to do business in South Carolina and currently in good standing with the Secretary of State.

14. Furthermore, Defendants have purposefully availed themselves of the benefits and the protections of the laws of the State of South Carolina.  Monsanto Company, Monsanto Enviro-Chem Systems, Inc., Monsanto Production Supply LLC, and Helena Company all have sufficient contact such that the exercise of jurisdiction would be consistent with the traditional notions of fair play and substantial justice.

15. Venue is proper in this Court because the most substantial part of the alleged act or omission giving rise to the cause of action occurred in Williamsburg County through Plaintiff's employment with the Williamsburg branch of the South Carolina Department of Transportation, pursuant to S.C. Code Ann. §§ 15-7-30(F)(1) & (G)(1).

16. Plaintiff seeks relief that is in excess of the jurisdictional minimums of the Court.

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

## THE PARTIES

### Plaintiff

17. **Plaintiff Ronald Smith** is a competent individual over the age of 18, a resident and citizen of Florence County, South Carolina, and hereby submits to the jurisdiction of the Court and alleges that venue in this Court is proper.

### Defendants

18. **Defendant Monsanto Company** ("Monsanto") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri. Monsanto's South Carolina registered agent is Corporation Service Company, and can be served  at 1703 Laurel Street, Columbia South Carolina 29201. At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glysophate and the manufacturer of Roundup®. Monsanto has regularly transacted and conducted business within the State of South Carolina, including operating a facility in Hartsville, South Carolina. Monstanto has derived substantial revenue from goods and products, including Roundup, used in the State of South Carolina. Monsanto expected or should have expected their acts to have consequences within the State of South Carolina, and derived substantial revenue from interstate commerce.

19. **Defendant Monsanto Enviro-Chem Systems** ("MECS, Inc.") is a Delaware corporation. MECS, Inc.'s registered agent is CT Corporation System, and can be served at 2 Office Park Court, Suite 103, Columbia South Carolina 29223. MECS, Inc. has regularly transacted and conducted business within the State of South Carolina, derived substantial revenue from

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

goods and products, including Roundup, used in the State of South Carolina. MECS, Inc. expected or should have expected their acts to have consequences within the State of South Carolina, and derived substantial revenue from interstate commerce.

20. **Defendant Monsanto Production Supply LLC ("MPS")** is a Delaware corporation. MPS registered agent is CT Corporation System, and can be served at 2 Office Park Court, Suite 103, Columbia South Carolina 29223. MPS has regularly transacted and conducted business within the State of South Carolina, derived substantial revenue from goods and products, including Roundup, used in the State of South Carolina. MPS expected or should have expected their acts to have consequences within the State of South Carolina, and derived substantial revenue from interstate commerce.

21. **Defendant Helena Agri-Enterprises, LLC,** formerly Helena Chemical Co., ("Helena") is a Delaware limited liability company. Helena's registered agent is CT Corporation System, and can be served at 2 Office Park  Court Suite 103, Columbia, South Carolina 29223. Helena's Eastern Business Unit is located in West Columbia, South Carolina and is home to its EBU Regional Office, Southeast Division, Eastern Division, and Specialty Division. Helena also operates a distribution hub, located at 120 Settle Road, Inman, South Carolina 29349. At all times relevant to this Complaint, Helena contracted with the South Carolina Department of Transportation to sell, deliver, and/or distribute glyphosate products including, but not limited, to Roundup, for use in the State of South Carolina. Helena expected or should have expected their acts to have consequences within the State of South Carolina, and derived substantial revenue from interstate commerce.

6

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

22. **Defendant NaturChem, Inc.** ("NatureChem") is a South Carolina Corporation. NatureChem's registered agent is Rom D. Kellis, III, and can be  served at 270 Bruner Road, Lexington, South Carolina 29072. At all times relevant to this Complaint, NaturecChem contracted with the South Carolina Department of Transportation to sell, deliver, and/or distribute glyphosate products including, but not limited, to Roundup, for use in the State of South Carolina.

23. **Defendant South Carolina Department of Transportation** ("SCDOT") is a corporate body created by South Carolina Code of Laws § 57-3-10 and its agent to accept service is Linda C.  McDonald, at 955 Park Street, Columbia, South Carolina 29201. At all times relevant to this complaint, Defendant Helena sold, delivered, and/or distributed glyphosate products to SCDOT, including but not limited to Roundup, for use in the State of South Carolina.

24. Plaintiff is informed and believes, and based thereon alleges, that in committing the acts alleged herein, each and every managing agent, agent, representative and/or employee of the collective Defendants was working within the course and scope of said agency, representation and/or employment with the knowledge, consent, ratification, and authorization of the Defendants and their directors, officers and/or managing agents.

## FACTS

25. Glyphosate is a broad-spectrum, non-selective herbicide used in a variety of herbicidal products around the world.

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

26. Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids.

27. For nearly 40 years, people across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®, glyphosate,  is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Agricultural workers are, once again, victims of corporate greed.

28. Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince governmental agencies, farmers, and the general population that Roundup® was safe.

### *The Discovery of Glyphosate and Development of Roundup®*

29. The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist, John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use. It still markets Roundup® as safe today.

### *Registration of Herbicides under Federal Law*

30. The manufacture, formulation, and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"),

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

7 U.S.C. § 136, *et seq*. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

31. Because pesticides are toxic to plants, animals, and humans, at least to some extent, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

32. FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

33. The EPA and the State of South Carolina registered Roundup® for distribution, sale, and manufacture in the United States and the State of South Carolina.

34. FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

### *Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup*

35. Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

36. On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

37. In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

38. In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer states, after finding "routine falsification of data" at IBT, that it was "hard to believe the

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

39. Three top executives of IBT were convicted of fraud in 1983.

40. In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

41. Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

### *The Importance of Roundup® to Monsanto's Market Dominance Profits*

42. The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

43. In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing

strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

44. Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

***Monsanto has known for decades that it falsely advertises the safety of Roundup®***

45. In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general reputations that its spray-on glyphosate-based herbicides, including Roundup®, were **"safer than table salt"** and **"practically non-toxic"** to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

    a.  Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences…

    b.  And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

    c.  Roundup biodegrades into naturally occurring elements.

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

    d.  Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

    e.  This non-residual herbicide will not wash or leach into the soil. It . . . stays where you apply it.

    f.  You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

    g.  Glyphosate is less toxic to rats than table salt following acute oral ingestion.

    h.  Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

    i.  You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

    j.  "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

46. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

    a.  Its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

\*\*\*

    b.  Its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable.

\*\*\*

    c.  Its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

\*\*\*

    d.  Its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

\*\*\*

    e.  Glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

    f.  Its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

47. Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

48. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

### Classifications and Assessments of Glyphosate

49. The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

50. The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

51. One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group are published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

52. In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

53. In March, 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic to humans.

54. On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3-10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

55. The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

56. Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

57. Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

58. The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

59. The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

60. The IARC Working Group also found that glyphosate cause DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

61. In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

62. The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

63. The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

64. The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

65. The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. while this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

### *Other Earlier Findings About Glyphosate's Dangers to Human Health*

66. The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

### *Release Patterns*

Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport, storage, and disposal.

### *Recent Worldwide Bans on Roundup®/Glyphosate*

67. Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in light of this as the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which was to take effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

68. The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

69. France banned the private sale of Roundup® and glyphosate following the IARC assessment for glyphosate.

70. Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

71. The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that Glyphosate has been linked to fatal kidney disease in agricultural workers.

72. The government of Colombia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

73. On information and belief, Helena and NaturChem distributed the Roundup/glyphosate used by Plaintiff, and are at all relevant times, engaged in the distribution of Roundup, Roundup-ready crops and other glyphosate-containing products from Monsanto to retailers and commercial/agricultural users in South Carolina, including SCDOT

74. Helena and NatureChem had superior knowledge compared to Roundup users and consumers, including regarding the carcinogenic properties of the product, yet failed to accompany their sales and/or marketing of Roundup with any warnings or precautions for that grave danger. Helena and NaturChem were the distributors that provided Roundup and other glyphosate-containing products to SCDOT, whereby SCDOT then distributed them to Plaintiff for his use..

### *Plaintiff's Exposure to Roundup®*

75. Plaintiff was at all relevant times employed by SCDOT, in Kingstree, South Carolina, where his responsibilities included direct application of Roundup and RangerPro, among other Monsanto glyphosate products, around road signs throughout the greater Williamsburg County area.

76. Plaintiff was diagnosed with non-Hodgkin's lymphoma in June 2011, at the age of 52.

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

77. Plaintiff first became aware of the probable carcinogenic properties of Glyphosate and its probable link to his non-Hodgkin's Lymphoma in August 2018.

## FOR A FIRST CAUSE OF ACTION
### Strict Liability (Design Defect)

78. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

79. Plaintiff brings this strict liability claim against Defendants for defective design.

80. At all times relevant to this litigation, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup®/glyphosate products in the stream of commerce. These actions were under the ultimate control and supervision of Defendants. At all times relevant to this litigation, Defendants designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup®/glyphosate products that Plaintiff was exposed to, as described above.

81. At all times relevant to this litigation, Defendants' Roundup®/glyphosate products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff.

82. At all times relevant to this litigation, Defendants' Roundup®/glyphosate products reached the intended consumers, handlers, and users or other persons coming into contact with these products in South Carolina and throughout the United States, including Plaintiff, without

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

83. Defendants' Roundup®/glyphosate products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in that when they left the hands of the Defendants' manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

84. Defendants' Roundup®/glyphosate products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in that when they left the hands of Defendants' manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

85. At all times relevant to this action, Defendants knew or had reason to know that Roundup®/glyphosate products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendants.

86. Therefore, at all times relevant to this litigation, Defendants' Roundup®/glyphosate products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in one or more of the following ways:

    a. When placed in the stream of commerce, Defendants' Roundup®/glyphosate products were unreasonably dangerous in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

b.  When placed in the stream of commerce, Defendants' Roundup®/glyphosate products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c.  When placed in the stream of commerce, Defendants' Roundup®/glyphosate products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d.  Defendants did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate.

e.  Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of herbicide.

f.  Defendants knew or should have known at the time of marketing its Roundup®/glyphosate products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g.  Defendants did not conduct adequate post-marketing surveillance of its Roundup®/glyphosate products.

h.  Defendants could have employed safer alternative design and formulations.

87. Plaintiff was exposed to Defendants' Roundup®/glyphosate products while working for the Department of Transportation, as described above, without knowledge of its dangerous characteristics.

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

88. At all times relevant to this litigation, Plaintiff was exposed to the use of Defendants' Roundup®/glyphosate products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

89. Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

90. The harm caused by Defendants' Roundup®/glyphosate products far outweighed their benefit, rendering Defendants' products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendants' Roundup®/glyphosate products were and are more dangerous than alternative products and Defendants could have designed its Roundup®/glyphosate products to make them less dangerous. Indeed, at the time that Defendants designed its Roundup®/glyphosate products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

91. At the time Roundup®/glyphosate products left Defendants' control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendants' herbicides.

92. Defendants' defective design of its Roundup®/glyphosate products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup®/glyphosate products, including the Plaintiff herein.

93. Therefore, as a result of the unreasonably dangerous condition of its Roundup®/glyphosate products, Defendants are strictly liable to Plaintiff.

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

94. The defects in Defendants' Roundup®/glyphosate products were substantial and contributing factors in causing Plaintiff's grave injuries, and, but for Defendants' misconduct and omissions, Plaintiff would not have sustained these injuries.

95. Defendants' conduct, as described above, was reckless. Defendants risked the lives of consumers and users of its products, including Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, warn, or inform the unsuspecting public. Defendants' reckless conduct warrants an award of punitive damages.

96. As a direct and proximate result of Defendants placing defective Roundup®/glyphosate products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

### FOR A SECOND CAUSE OF ACTION
### Strict Liability (Failure to Warn)

97. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

98. Plaintiff brings this strict liability claim against Defendants for failure to warn.

99. At all times relevant to this litigation, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, promoting, and applying Roundup®/glyphosate products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendants.

100.   Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup®/glyphosate products, and in the course of the same, directly advertised or marketed the products to consumers and end users, including the Plaintiff, and persons responsible for consumers (such as employers), and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

101.   At all times relevant to this litigation, Defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup®/glyphosate products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendants had a continuing duty to warn the Plaintiff of the dangers associated with Roundup®/glyphosate use and exposure. Defendants, as manufacturer, seller, or distributor of chemical herbicides, are held to the knowledge of an expert in the field.

102.   At the time of manufacture, Defendants could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

103.   At all times relevant to this litigation, Defendants failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of this product and to those who would foreseeably use or be harmed by Roundup®/glyphosate, including Plaintiff.

104.    Despite the fact that Defendants knew or should have known that Roundup®/glyphosate posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time it distributed, supplied, or sole the product, and not known to end users and consumers, such as Plaintiff.

105.    Defendants knew or should have known that these products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Defendants have wrongfully concealed information concerning the dangerous nature of the Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

106.    At all times relevant to this litigation, Defendants' Roundup®/glyphosate products reached the intended consumers, handlers, and users or other persons coming into contact with these products in South Carolina and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, marketed, and sprayed/applied by Defendants.

107.    Plaintiff was exposed to Roundup®/glyphosate products, as described above, without knowledge of their dangerous characteristics.

108.    At all times relevant to this litigation, Plaintiff was exposed to the use of Defendants' Roundup®/glyphosate products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

27

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

109.   Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendants.

110.   Defendants knew or should have known that the minimal warnings disseminated with or accompanying the application of Roundup®/glyphosate products were inadequate, but they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

111.   The information that Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled those exposed such as Plaintiff to utilize the products safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

112.   To this day, Defendants have failed to adequately and accurately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probably carcinogen.

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

113.   As a result of their inadequate warnings, Roundup®/glyphosate products were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were sold or distributed by Defendants, were applied by Defendants, and when Plaintiff became exposed.

114.   Defendants are liable to Plaintiff for injuries caused by negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of their products and the risks associated with the use of or exposure to Roundup®/glyphosate and glyphosate.

115.   The defects in these Roundup®/glyphosate products were substantial and contributing factors in causing Plaintiff's injuries, and, but for Defendants' misconduct and omissions, Plaintiff would not have sustained these injuries.

116.   Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup®/glyphosate products and application, Plaintiff could have avoided the risk of developing injuries as alleged herein and the company who employed Plaintiff could have obtained alternative herbicides.

117.   As a direct and proximate result of Defendants placing defective Roundup®/glyphosate products into the stream of commerce and exposing Plaintiff to them, Plaintiff has suffered and continues to suffer severe injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

### FOR A THIRD CAUSE OF ACTION
**Negligence/Gross Negligence**

118.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

119.   Defendants, directly or indirectly, caused Roundup®/glyphosate products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

120.   At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup®/glyphosate products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

121.   At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup®/glyphosate products. Defendants' duty of care owed to consumers and the general public included providing accurate, true, and accurate information concerning the risks of using Roundup®/glyphosate and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®/glyphosate, and, in particular, its active ingredient glyphosate.

122.   At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup®/glyphosate and other herbicides, but specifically, the carcinogenic properties of the chemical glyphosate.

123.   Accordingly, at all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known that use of or exposure to Roundup®/glyphosate products could cause or be associated with Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

124.   Defendants also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup®/glyphosate were unaware of the risks and the magnitude

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

125.   As such, Defendants breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup®/glyphosate products, in that Defendants manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

126.   Despite ability and means to investigate, study, and test products and to provide adequate warnings, Defendants have failed to do so. Indeed, Defendants wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

127.   Defendants' negligence included:

   a.   Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup®/glyphosate products without thorough and adequate pre- and post-market testing;

   b.   Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup®/glyphosate while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®/glyphosate;

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

c.  Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d.  Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup®/glyphosate products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

e.  Failing to design and manufacture Roundup®/glyphosate products so as to ensure they were at least as safe and effective as other herbicides on the market;

f.  Failing to provide adequate instruction, guidelines, and safety precautions to those persons who Defendants could reasonably foresee would use and be exposed to its Roundup®/glyphosate products;

g.  Failing to disclose to Plaintiff, users/consumers, and the general public that use of and exposure to Roundup®/glyphosate presented severe risks of cancer and other grave illnesses;

h.  Failing to warn Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other consumers;

i.  Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

j.  Representing that its Roundup®/glyphosate products were safe for their intended use when, in fact, Defendants knew or should have known that the products were not safe for their intended purpose;

k.  Declining to make or propose any changes to Roundup®/glyphosate products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

l.  Advertising, marketing, and recommending the use of the Roundup®/glyphosate products, while concealing and failing to disclose or warn of the dangers known by Defendants to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m.  Continuing to disseminate information to its consumers, which indicate or imply that Defendants' Roundup®/glyphosate products are not unsafe.

n.  Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

128.  Defendants knew and/or should have known that it was foreseeable that consumers such as Plaintiff would suffer injuries as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®/glyphosate.

129.  Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

130.  Defendants' negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff suffered, and will continue to suffer, as described herein.

131.  Defendants' conduct, as described above, was reckless. Defendants regularly risk the lives of consumers and users of their products, including Plaintiff, with full knowledge of the

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

dangers of its product. Defendants made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff. Defendants' reckless conduct therefore warrants an award of punitive damages.

132.    As a proximate result of Defendants' wrongful acts and omissions in placing defective Roundup®/glyphosate products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff has suffered and continues to suffer severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, has suffered economic losses (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

### FOR A FOURTH CAUSE OF ACTION
### Breach of Implied Warranties

133.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

134.    At all times relevant to this litigation, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup®/glyphosate products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup®/glyphosate products into the stream of commerce. These actions were under the ultimate control and supervision of Defendants.

135.    Before the time that Plaintiff was exposed to the use of the aforementioned Roundup®/glyphosate products, Defendants impliedly warranted to consumers and those exposed – including Plaintiff – that Roundup®/glyphosate products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

136.   Defendants, however, failed to disclose that Roundup®/glyphosate has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

137.   Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Defendants and upon their implied warranties that the Roundup®/glyphosate products were of merchantable quality and fit for their intended purpose or use.

138.   Upon information and belief, Plaintiff was at all relevant times in privity with Defendants.

139.   Plaintiff is the intended third-party beneficiaries of implied warranties made by Defendants to the purchasers of their horticultural herbicides, and as such Plaintiff is entitled to assert this claim.

140.   The Roundup®/glyphosate products were expected to reach and did in fact reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendants.

141.   At all times relevant to this litigation, Defendants were aware that consumers and users of their products, including Plaintiff, would use Roundup®/glyphosate products as marketed by Defendants, which is to say that Plaintiff was a foreseeable user of Roundup®/glyphosate.

142.   Defendants intended that Roundup®/glyphosate products be used in the manner in which Plaintiff was exposed to them and Defendants impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup®/glyphosate was not adequately tested or researched.

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

143.   In reliance upon Defendants' implied warranty, Plaintiff used or was exposed to Roundup®/glyphosate as instructed and labeled and in the foreseeable manner intended, recommended, promoted, and marketed by Defendants.

144.   Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

145.   Defendants breached their implied warranty to Plaintiff in that Roundup®/glyphosate products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup®/glyphosate has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

146.   The harm caused by Roundup®/glyphosate products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

147.   As a direct and proximate result of Defendants' wrongful acts and omissions, Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, has suffered economic loss (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

### FOR A FIFTH CAUSE OF ACTION
### Punitive Damages

148.   Plaintiff repeats and reiterates the allegations set forth herein.

149.   At all times material hereto, the Defendants knew or should have known that the subject product was inherently dangerous with respect to its health risks.

150.   At all times material hereto, the Defendants attempted to misrepresent and did misrepresent facts concerning the safety of the subject product.

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

151.   Defendants' misrepresentations included knowingly withholding material information from the public, including the Plaintiff herein, concerning the safety of the subject product.

152.   At all times material hereto, the Defendants knew and recklessly disregarded the fact that human exposure to Roundup®/glyphosate can and does cause health hazards, including non-Hodgkin lymphoma.

153.   Notwithstanding the foregoing, the Defendants continued to aggressively market and apply the subject product without disclosing the aforesaid risks.

154.   Defendants knew of the subject product's defective and unreasonably dangerous nature, as set forth herein, but continued to design, develop, manufacture, market, distribute, sell, and apply it so as to maximize sales and profits at the expense of the health and safety of the public, including the Plaintiff herein, in conscious and/or negligent disregard of the foreseeable harm caused by Roundup®/glyphosate.

155.   The Defendants intentionally concealed and/or recklessly failed to disclose to the public, including the Plaintiff herein, the potentially life-threatening hazards of Roundup®/glyphosate in order to ensure continued and increased sales.

156.   The Defendants' intentional and/or reckless failure to disclose information deprived the Plaintiff of necessary information to enable Plaintiff to weigh the true risks of using or being exposed to the subject product against its benefits.

157.   As a direct and proximate result of the Defendants' conscious and deliberate disregard for the rights and safety of consumers such as the Plaintiff, Plaintiff suffered severe and permanent physical injuries. The Plaintiff has endured substantial pain and suffering and has undergone extensive medical and surgical procedures. Plaintiff has incurred significant expenses for medical care and treatment, and will continue to incur such expenses in the

future. The Plaintiff has lost past earnings and has suffered a loss of earning capacity. The Plaintiff has suffered and will continue to suffer economic loss, and has otherwise been physically, emotionally, and economically injured. The Plaintiff's injuries and damages are permanent and will continue into the future.

158. The aforesaid conduct of the Defendants was committed with knowing, conscious, and deliberate disregard for the rights and safety of consumers, including the Plaintiff herein, thereby entitling the Plaintiff to punitive damages in an amount appropriate to punish the Defendants and deter them from similar conduct in the future.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court enter judgment in their favor and against Defendants, awarding as follows:

    A. Compensatory damages in an amount to be proven at trial;

    B. Punitive damages;

    C. Costs including reasonable attorneys' fees, court costs, and other litigation expenses; and,

    D. Any other relief the Court may deem just and proper.

*SIGNATURE ON FOLLOWING PAGE*

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

ELECTRONICALLY FILED - 2018 Oct 19 2:51 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2018CP4500446

Respectfully submitted,

**ANASTOPOULO LAW FIRM, LLC**

*s/ Roy T. Willey, IV*
Eric M. Poulin, Esquire
S.C. Bar No.: 100209
Roy T. Willey, IV, Esquire
S.C. Bar No.: 101010
Matthew L. Nall, Esquire
S.C. Bar No.: 102329
Lane D. Jefferies, Esquire
S.C. Bar No.: 101764
Kenneth T. David, Esquire
S.C. Bar No.: 103434
Anastopoulo Law Firm, LLC
32 Ann Street
Charleston, SC 29418
(843) 614-8888

**ATTORNEYS FOR PLAINTIFF**

Charleston, South Carolina
October 19, 2018

IN THE STATE OF SOUTH CAROLINA   )
COUNTY OF WILLIAMSBURG          )

RONALD SMITH,

                      Plaintiff,

        v.

MONSANTO COMPANY; MONSANTO
ENVIRO-CHEM SYSTEMS, INC.;
MONSANTO PRODUCTION SUPPLY
LLC; HELENA AGRI-ENTERPRISES,
LLC; NATURCHEM, INC.; and SOUTH
CAROLINA DEPARTMENT OF
TRANSPORTATION,

                      Defendants.

IN THE COURT OF COMMON PLEAS
FOR THE 3RD JUDICIAL CIRCUIT
CASE NO: 2018-CP-45-00446

**PLAINTIFF'S STANDARD AND FIRST
SUPPLEMENTAL
INTERROGATORIES TO DEFENDANT
MONSANTO COMPANY**

**TO:**    **DEFENDANT MONSANTO COMPANY:**

      Plaintiff, Ronald Smith ("Plaintiff") requests that Defendant Monsanto Company ("Defendant") answer under oath, separately, and fully in writing, the following interrogatories pursuant to Rules 26 and 33 of the South Carolina Rules of Civil Procedure. These interrogatories are deemed to be continuing, and if complete answers to any of these interrogatories are presently unavailable, supplemental answers are required at the time the information becomes available and prior to trial.

## DEFINITIONS AND INSTRUCTIONS

      A.    These requests are deemed to be continuing such as to require Defendant to file and serve supplemental answers should it learn of additional information called for by these requests between the time of trial and the time its answers are filed. Said supplemental answers are required to be served within a reasonable time after the discovery of such additional information.

      B.    You are under a duty to promptly amend prior answers to these interrogatories if you obtain information upon the basis of which you know the response was incorrect when made or you know the response, though correct when made, is no longer true.

      C.    "You," "your," or "Defendant" means Defendant Monsanto Company, its agents, partners, accountants, servants, employees, assignees, lessees, affiliates or anyone acting on their behalf, and any affiliate, subsidiary, parent or related corporation, partnership or

entity, and anyone acting for or on behalf of any such subsidiary, related corporation, parent, partnership, entity, or natural person.

D.      "Person" means natural persons, corporations, partnerships, sole proprietorships, associations, federations, government agencies, or any other kind of entity.

E.      "Identify," when used with respect to an individual, means to state the person's full name and any aliases now or previously used by such person, to state and identify the person's present occupation and principal business affiliation and any other business affiliations; present home address and business address or addresses; and present and past business affiliations or relations including those (if any) with any of the parties to this civil action.

F.      "Identify," when used in reference to a person (as defined above) other than a natural person, means to state its full name; the nature of its organization including the name or the state under which it was organized; its address(es); the address(es) of its principal place(s) of business; its principal line(s) of business; and identify all known natural persons who serve as officers, directors, partners, owners, or in other supervisory or ownership capacity in said organization. If any of the above information is not available to Defendant, state any other available means of identifying such person.

## STANDARD INTERROGATORIES

1.      Give the names, addresses, and telephone numbers of persons who may be witnesses concerning the facts of this action or who have knowledge of relevant facts concerning the subject incident, and indicate whether or not written or recorded statements have been taken from the witnesses, and indicate who has possession of such statements.

2.      For each person listed in response to Interrogatory question number one above, set forth either a summary sufficient to inform Plaintiff of the important facts known to or observed by such witness or, if applicable, provide a copy of any written or recorded statements taken from such witness.

3.      Set forth a list of photographs, plans, sketches, or other prepared documents in possession of Defendant or counsel that relates to the claim or defense in this case.

4.      Set forth the names and addresses of all insurance companies which have liability insurance coverage or property damage coverage relating to the claim, and set forth the number or numbers of the policies involved and the amount or amounts of liability coverage provided in each policy.

5.      If Defendant was injured in the incident, that is the subject of this action, set forth the names and addresses of all physicians who have treated Defendant, all hospitals to which Defendant has been committed in connection with said injuries, and also set forth a statement of all medical costs involved.

6.      List the names, addresses, and telephone numbers of any individual whom you propose to use as an expert witness at the trial of this action, and for each state in detail his or her qualifications to testify, the substance of his or her opinions, and the basis for his or her opinions.

7.      If Defendant is improperly identified, give the proper identification and state whether Defendant's counsel will accept service of an Amended Summons and Complaint reflecting the correct information.

## SUPPLEMENTAL INTERROGATORIES

1.      As to each expert witness listed in response to Standard Interrogatory question number six above, please state:

   a.      A complete statement of all opinions the witness will express and the basis and reasons for them;

   b.      The data and other information considered by the witness in forming the opinions;

   c.      A description of any exhibits the witness or counsel intends to introduce

to summarize or support these opinions (to be provided in response to Plaintiff's Requests for Production);

     d.    The witness's qualifications, including a list of all publications authored in the previous ten years;

     e.    A list of all other cases in which, during the previous five years, the witness testified as an expert at trial or by deposition; and

     f.    A statement of the compensation to be paid for the study and testimony in the case.

2.    For each affirmative defense that is raised in your Answer, please state with particularity each, and every fact or basis in law upon which you allege to have "good grounds," as defined in Rule 11 S.C. Rules Civ. Pro., to assert such a defense. A full and complete response should include, for each defense:

     a.    Identify all witnesses that support this contention;

     b.    Identify all writings that support this contention;

     c.    Identify all court cases upon which you base this contention; and

     d.    Identify all statutes that you rely on to support this contention.

3.    If Defendant is claiming lack of fault in this incident or claims that another person or entity was at fault in addition to Defendant, please state the name and address of the persons or entities Defendant believes were at fault and please state the reasons why they were at fault. A full and complete response should:

     a.    Identify all witnesses that support this contention;

     b.    Identify all writings that support this contention;

     c.    Identify all court cases upon which you base this contention; and

     d.     Identify all statutes that you rely on to support this contention.

4.     Set forth a list of any and all documents, and records, previously or non-published in any way, that show or state glyphosate to be hazardous in any way, that is or has been in the Defendant's control.

5.  Provide an accounting of all Round Up and/or other glysophate products supplied to the South Carolina Department of Transportation for the last thirty (30) years, a complete answer will include:

    a.  Date of the transaction;

    b.  Product;

    c.  Product supplier name;

    d.  Quantity;

    e.  Price;

    f.  Shipment/delivery date;

    g.  Delivery location;

    h.  Purchaser name.

*SIGNATURE BLOCK ON FOLLOWING PAGE*

Respectfully submitted,

**ANASTOPOULO LAW FIRM, LLC**

Eric M. Poulin, Esquire
S.C. Bar No.: 100209
Roy T. Willey, IV, Esquire
S.C. Bar No.: 101010
Matthew L. Nall, Esquire
S.C. Bar No.: 102329
Lane D. Jefferies, Esquire
S.C. Bar No.: 101764
Kenneth T. David, Esquire
S.C. Bar No.: 103434
Anastopoulo Law Firm, LLC
32 Ann Street
Charleston, SC 29418
(843) 614-8888

**ATTORNEYS FOR PLAINTIFF**

Charleston, South Carolina
January 9, 2019

## CERTIFICATE OF SERVICE

By my signature below I hereby
certify that I am an employee of
the Anastopoulo Law Firm, LLC,
and that I served this document
on all parties and/or counsel-of-record
on this ___ day of _____, 2019.

IN THE STATE OF SOUTH CAROLINA    )
COUNTY OF WILLIAMSBURG            )

RONALD SMITH,
                            Plaintiff,

            v.

MONSANTO COMPANY; MONSANTO
ENVIRO-CHEM SYSTEMS, INC.;
MONSANTO PRODUCTION SUPPLY
LLC;  HELENA AGRI-ENTERPRISES,
LLC; NATURCHEM, INC.; and SOUTH
CAROLINA DEPARTMENT OF
TRANSPORTATION,
                            Defendants.

IN THE COURT OF COMMON PLEAS
FOR THE 3RD JUDICIAL CIRCUIT
CASE NO: 2018-CP-45-00446

**PLAINTIFF'S FIRST REQUEST FOR
PRODUCTION TO DEFENDANT
MONSANTO COMPANY**

**TO:   DEFENDANT MONSANTO COMPANY:**

Plaintiff Ronald Smith ("Plaintiff"), pursuant to Rule 34 of the South Carolina Rules of

Civil Procedure, hereby requests that Defendant. The Monsanto Company ("Defendant") respond

within thirty (30) days after the service hereof to the following requests for production, to wit, and

that Defendant produce and permit Plaintiff to inspect, copy, and/or photograph each of the

following documents or things which may be in the possession, custody, or control of Defendant

or its attorney.

### DEFINITIONS AND INSTRUCTIONS

A.      These requests are deemed to be continuing, such as to require Defendant to file
and serve supplemental responses should it learn of additional information called for by these
requests between the time of trial and the time its responses are served.  Said supplemental
responses are required to be served within a reasonable time after the discovery of such additional
information.

B.      You are under a duty to promptly amend prior responses to these requests if you
obtain information upon the basis of which you know the response was incorrect when made or
you know the response, though correct when made, is no longer true

C.      "You," "your," or "Defendant" means Defendant Monsanto Company, its agents,
partners, accountants, servants, employees, assignees, lessees, affiliates, or anyone acting on their
behalf, including any affiliate, subsidiary, parent, or related corporation, partnership or entity, and
anyone acting for or on behalf of any such subsidiary, related corporation, parent, partnership,
entity, or natural person.

1

D.     "Person" means natural persons, corporations, partnerships, sole proprietorships, associations, federations, government agencies, or any other kind of entity.

E.     "Identify," when used with respect to an individual, means to state the person's full name and any aliases now or previously used by such person, to state and identify the person's present occupation, principal business affiliation, and any other business affiliations; present home address, business address, or other applicable addresses; and present and past business affiliations or relations, including those (if any) with any of the parties to this civil action.

F.     "Identify," when used in reference to a person (as defined above) other than a natural person, means to state its full name; the nature of its organization, including the name of the state under which it was organized; its address(es); the address(es) of its principal place(s) of business; its principal line(s) of business; and identify all known natural persons who serve as officers, directors, partners, owners, or in other supervisory or ownership capacity in said organization.  If any of the above information is not available to Defendant, state any other available means of identifying such person.

## REQUESTS FOR PRODUCTION

1.     Provide all documents identified or referred to in Defendant's answers to Plaintiff's Standard and First Supplemental Interrogatories.

2.     Provide all photographs, videotapes, maps, plats, drawings, diagrams, measurements, surveys, or other descriptions related in any way to the subject matter of this action, made either before or after the incident that is the subject of this action.

3.     Provide any and all documents or other tangible items, including books, records, reports, photographs, moving pictures, videotapes, drawings, charts, maps, diagrams, models, or other documentary materials, or tangible objects that Defendant intends to rely upon to support Defendant and/or which Defendant intends to offer into evidence as exhibits or use as demonstrative aids at the trial of this action.

4.     Provide all statements of any witnesses in the possession of Defendant or its attorney, whether written or recorded on a tape recorder or otherwise, that relate to the matters alleged in Plaintiff's Complaint or Defendant's Answer.

5.     Produce and provide all memoranda, notes, diagrams, reports, photographs, e-

mails, computer data or documents, videotapes, audiotapes, or other materials relating in any way to the matters alleged or referred to in the Complaint, any injuries or damages claimed, and any defenses raised or which could reasonably be raised.

      6.    Produce or permit Plaintiff or his attorney to inspect, photograph, or otherwise copy all photographs, plats, or diagrams Defendant or Defendant's attorney may have which relate to the matter alleged herein.

      7.    Produce and provide any documents (as defined in Rule 34(a), SCRCP) and tangible things of whatever nature and description which you intend to introduce into evidence or to use as impeachment or evidence at the trial of this case.

      8.    Provide the most recent resume or curriculum vitae of any experts that Defendant intends to use at trial or in preparing documents in response to this or other inquiries by Plaintiff.

      9.    Provide copies of any statutes relied upon by Defendant in its Answer, pre-trial motions, and trial.

      10.    Provide results from any tests or evaluations ordered by Defendant, or any expert retained by the Defendant, that is used to support Defendant's position in this matter.

      11.    Provide a complete copy of any insurance policies, including the declarations page(s), for any policies that may provide coverage to Defendant for the allegations contained in the Complaint.

      12.    Provide returns to any subpoena or FOIA requests that you have served to date in this action, or any that are served in the future through the trial of this action.

      13.    Produce and provide all receipts, notes, log entries, correspondence, internal memoranda, e-mails, and transcripts between any of Defendant's employees or agents that are related to Plaintiff's claim.

14.   Produce and provide any and all photographs, previously published or non-published in any way, associated with the event associated with the subject incident that are in the Defendant's control or have ever been in Defendant's control.

15.   Produce and provide any and all media of any other type, previously published or non-published in any way, associated with the event associated with the subject incident that are in the Defendant's control or have ever been in Defendant's control.

16.   Produce the names of any known persons who may be in control or had been in control of any media related to the event and/or the subject incident.

17.   Produce and provide any and all medical claims, documents, and records specific to any product defect claim

18.   Produce and provide any and all documents of any type, published or not published demonstrating glyphosate's hazardous nature.

19.   Produce all documents in anyway relating to the South Carolina Department of Transportation for the last 30 years.

## **PRIVILEGE**

For each document that would be required to be produced but for a privilege asserted against producing it, set forth:

a)   The date the document was generated;

b)   The type of document (e.g., letter, memorandum, record, etc.);

c)   The name of the person who prepared the original;

d)   The name and address of the person who received the original;

e)   The name and address of anyone who received a copy;

f)   A general description of the information recorded in the document;

g)   The ground on which production is objected to;

h)   The name of each person, in addition to those identified in (a) through (e) of this subpart, known to have seen or have access to the document; and

i)   The name of the person who now possesses the document.

## DOCUMENTS NO LONGER IN EXISTENCE OR NO LONGER CONTROLLED OR POSSESSED

If any requested document existed at one time in the possession, custody, or control of any party but has been lost, discarded or destroyed, or removed from the party's possession, custody or control, indicate for each such document:

a)   Its identity (i.e., a description of its contents its date, title, and type of document);

b)   When it was most recently in the possession, custody or control of the party;

c)   Identify any person who currently possesses the document;

d)   State whether the document was transferred or destroyed;

e)   State the person who transferred or destroyed the document and the person who authorized or knows of its transfer or destruction;

f)   State the reason the document was transferred or destroyed; and

g)   Identify, by providing name, address, and daytime telephone number, all persons having knowledge or the contents of each document.

*SIGNATURE ON FOLLOWING PAGE*

5

Respectfully submitted,

**ANASTOPOULO LAW FIRM, LLC**

Eric M. Poulin, Esquire
S.C. Bar No.: 100209
Roy T. Willey, IV, Esquire
S.C. Bar No.: 101010
Matthew L. Nall, Esquire
S.C. Bar No.: 102329
Lane D. Jefferies, Esquire
S.C. Bar No.: 101764
Kenneth T. David, Esquire
S.C. Bar No.: 103434
Anastopoulo Law Firm, LLC
32 Ann Street
Charleston, SC 29418
(843) 614-8888

**ATTORNEYS FOR PLAINTIFF**

Charleston, South Carolina
January 9, 2019

## **CERTIFICATE OF SERVICE**
By my signature below I hereby
certify that I am an employee of
the Anastopoulo Law Firm, LLC,
and that I served this document
on all parties and/or counsel-of-record
on this ___ day of _____, 2019.

_____