MIDP,SCHENKIER

# United States District Court
## Northern District of Illinois - CM/ECF LIVE, Ver 6.2.2 (Chicago)
## CIVIL DOCKET FOR CASE #: 1:19-cv-02548

Cichy v. Bayer Corporation et al
Assigned to: Honorable Jorge L. Alonso
Demand: $75,000
Case in other court: Circuit Court of Cook County, Illinois, 2019L002422
Cause: 28:1446 Petition for Removal

Date Filed: 04/15/2019
Jury Demand: Both
Nature of Suit: 367 Personal Injury: Health Care/Pharmaceutical Personal Injury Product Liability
Jurisdiction: Diversity

**Plaintiff**

**Keith Cichy**                    represented by    **David J. Gallagher**
Motherway & Napleton, LLP
140 S. Dearborn Street
Suite 1500
Chicago, IL 60603
312-726-2699
Email: dgallagher@mnlawoffice.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Bayer Corporation**              represented by    **Daniel M. Meyers**
*a foreign corporation*                              Arnold & Porter Kaye Scholer LLP
70 West Madison Street
Suite 4200
Chicago, IL 60602
(312) 583-2393
Email: daniel.meyers@apks.com
*ATTORNEY TO BE NOTICED*

**Dominique Savinelli**
Husch Blackwell Llp
120 South Riverside Plaza
Suite 2200
Chicago, IL 60606-3912
(312) 655-150
Email:
Dominique.Savinelli@huschblackwell.com
*ATTORNEY TO BE NOTICED*

**James Patrick O'shea , Ii**
Law Office Of William P. Murphy
53 W. Jackson
Ste. 1615
Chicago, IL 60604
(312) 697-0022

Email: James.OShea@huschblackwell.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Monsanto Company**                    represented by **Daniel M. Meyers**
*a foreign corporation*                                          (See above for address)
                                                                             *ATTORNEY TO BE NOTICED*

                                                                             **Dominique Savinelli**
                                                                             (See above for address)
                                                                             *ATTORNEY TO BE NOTICED*

                                                                             **James Patrick O'shea , Ii**
                                                                             (See above for address)
                                                                             *ATTORNEY TO BE NOTICED*

**Defendant**

**Northwestern Memorial Hospital**
*a domestic not-for-profit corporation*

**Defendant**

**Northwestern Medical Faculty Foundation**
*a domestic not-for-profit corporation*

**Defendant**

**Olga Frankfurt**
*M.D.*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 04/15/2019 | 1 | NOTICE of Removal from Circuit Court of Cook County, Illinois, case number (2019L002422) filed by MONSANTO COMPANY Filing fee $ 400, receipt number 0752-15719270. (Meyers, Daniel) (Entered: 04/15/2019) |
| 04/15/2019 | 2 | CIVIL Cover Sheet (Meyers, Daniel) (Entered: 04/15/2019) |
| 04/15/2019 | 3 | ATTORNEY Appearance for Defendant MONSANTO COMPANY by Daniel M. Meyers (Meyers, Daniel) (Entered: 04/15/2019) |
| 04/15/2019 | 4 | NOTIFICATION of Affiliates pursuant to Local Rule 3.2 by MONSANTO COMPANY (Meyers, Daniel) (Entered: 04/15/2019) |
| 04/15/2019 |   | CASE ASSIGNED to the Honorable Jorge L. Alonso. Designated as Magistrate Judge the Honorable Sidney I. Schenkier. Case assignment: Random assignment. (jjr, ) (Entered: 04/15/2019) |
| 04/16/2019 | 5 | MAILED Notice of Removal letter to all counsel on record. (kp, ) (Entered: 04/16/2019) |
| 04/16/2019 | 6 | NOTICE TO THE PARTIES - The Court is participating in the Mandatory Initial Discovery Pilot (MIDP). The key features and deadlines are set forth in this Notice which includes a link to the (MIDP) Standing Order and a Checklist for use by the parties. In cases subject to the pilot, all parties must respond to the mandatory initial discovery requests set forth in the Standing Order before initiating any further discovery in this case. Please note: The discovery obligations in the Standing Order supersede the disclosures required by Rule |

26(a)(1). Any party seeking affirmative relief must serve a copy of the following documents (Notice of Mandatory Initial Discovery and the Standing Order) on each new party when the Complaint, Counterclaim, Crossclaim, or Third-Party Complaint is served. (kp, ) (Entered: 04/16/2019)

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 04/16/2019 15:04:40 | | | |
| **PACER Login:** | hllp1982:2634105:4722683 | **Client Code:** | 1417.0049 |
| **Description:** | Docket Report | **Search Criteria:** | 1:19-cv-02548 |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

FILED
3/5/2019 1:32 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL

FILED DATE: 3/5/2019 1:32 PM   2019L002422

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

KEITH CICHY,                                       )
                                                   )
    Plaintiff,                  )
                                                   )
-vs-                                               )   Case No.: 2019L002422
                                                   )
BAYER CORPORATION, a foreign                       )   Amount: In Excess of Fifty Thousand
corporation, MONSANTO COMPANY, a                   )   Dollars ($50,000.00) plus costs.
foreign corporation, NORTHWESTERN                  )
MEMORIAL HOSPITAL, a domestic not-                 )
for-profit corporation, NORTHWESTERN               )
MEDICAL FACULTY FOUNDATION,                        )
a domestic not-for-profit corporation, and         )
OLGA FRANKFURT, M.D.,                              )
                                                   )
    Defendants.                 )

### PLAINTIFF'S COMPLAINT AT LAW

NOW COMES the Plaintiff, Keith Cichy, by and through his attorney, David J. Gallagher

of MOTHERWAY & NAPLETON, LLP., and complaining of the Defendants Bayer

Corporation, a foreign corporation, Monsanto Company, a foreign corporation, Northwestern

Memorial Hospital, a domestic not-for-profit corporation, Northwestern Medical Faculty

Foundation, a domestic not-for-profit corporation, and Olga Frankfurt, M.D., states as follows:

### I. THE PARTIES

#### Plaintiff

1.    Plaintiff Keith Cichy is and was at all relevant times a resident of Cook County, Illinois.

He started a landscaping company in 1996 and began purchasing and using Roundup and/or

other Monsanto glyphosate-containing products ("Roundup") in 1997. He continued to use

Roundup from approximately 1997 through 2018 throughout Cook County, Illinois.

#### Defendants

FILED DATE: 3/5/2019 1:32 PM   2019L002422

2.      Defendant Bayer Corporation ("Bayer") is a multinational corporation doing business throughout the United States, including Cook County, Illinois that is incorporated in Indiana, with its headquarters and principal place of business in Whippany, New Jersey.

3.      Defendant Monsanto Company ("Monsanto") is a multinational corporation doing business throughout the United States, including Cook County, Illinois that is incorporated in Delaware, with its headquarters and principal place of business in St. Louis, Missouri.

4.      On June 07, 2018 Bayer acquired Monsanto.

5.      Defendant Northwestern Memorial Hospital ("NMH") is an Illinois corporation, with its principal place of business in Chicago, Cook County, Illinois.

6.      Defendant Northwestern Medical Faculty Foundation ("NMFF") is an Illinois corporation, with its principal place of business in Chicago, Cook County, Illinois.

7.      Defendant Olga Frankfurt M.D. is an individual physician who on information and belief resides in Cook County, Illinois.

8.      At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and was the manufacturer of Roundup®.

## II. INTRODUCTION

9.      In 1970, Defendant Monsanto Company, Inc. discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 millions of pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

FILED DATE: 3/5/2019 1:32 PM   2019L002422

10.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

11.     Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers whom are not in direct contact with glyphosate.

12.     On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

13.     On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

14.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other haematopoietic

cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

15.     The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

16.     Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

### III. JURISDICTION AND VENUE

17.     Jurisdiction is proper pursuant to 735 ILCS 5/2-209 as at all times relevant hereto, Monsanto was in the business of researching, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, labeling, packaging, marketing, promoting, and/or advertising Roundup® products in the throughout the United States including in Cook County, Illinois.

18.     At all times relevant hereto, Monsanto was a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri, who routinely conducted business in Cook County, Illinois.

19.     NMH and NMFF are domestic corporations with their headquarters and principal place of business in Chicago, Illinois, making them residents of Cook County pursuant to 735 ILCS 5/2-102, who routinely conducts business in Cook County, Illinois.

20.     Defendant Olga Frankfurt M.D. on information and belief is a resident of Cook County.

4

FILED DATE: 3/5/2019 1:32 PM   2019L002422

21.     Plaintiff has timely filed this lawsuit less than two years from the time the Plaintiff knew

or reasonably should have known of the injury and that it may have been wrongfully caused.

22.     Pursuant to 735 ILCS 5/2-101, venue is proper within this Court because Defendants

NMH, NMFF, and Olga Frankfurt are residents of Cook County, and because Plaintiff was

diagnosed and treated for his cancer in Cook County, and the Defendants do business and

advertise in this county.

## IV. FACTS

23.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of

herbicidal products around the world.

24.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot

regions and fruit, where it interferes with the plant's ability to form aromatic amino acids

necessary for protein synthesis. Treated plants generally die within two to three days. Because

plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by

milling, baking, or brewing grains.

25.     For nearly 40 years, farms across the world have used Roundup® without knowing of the

dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted

glyphosate as a technological breakthrough: it could kill almost every weed without causing

harm either to people or to the environment. Of course, history has shown that not to be true.

According to the WHO, the main chemical ingredient of Roundup®— glyphosate—is a probable

cause of cancer. Those most at risk are farm workers and other individuals with workplace

exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers.

Agricultural workers are, once again, victims of corporate greed. Monsanto assured the public

that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and

FILED DATE: 3/5/2019 1:32 PM   2019L002422

attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® was safe.

### The Discovery of Glyphosate and Development of Roundup®

26.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use. Monsanto still markets Roundup® as safe today.

### Registration of Herbicides under Federal Law

27.     The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

28.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

FILED DATE: 3/5/2019 1:32 PM   2019L002422

29.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

30.     The EPA registered Roundup® for distribution, sale, and manufacture in the United States and the State of Illinois.

31.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

32.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

33.     In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment —in relation to the re-registration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

7

FILED DATE: 3/5/2019 1:32 PM    2019L002422

### *Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®*

34.    Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

35.    On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

36.    In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

37.    In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

38.    Three top executives of IBT were convicted of fraud in 1983.

FILED DATE: 3/5/2019 1:32 PM   2019L002422

39.     In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

40.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

**The Importance of Roundup® to Monsanto's Market Dominance and Profits**

41.     The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

42.     In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate; farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

43.     Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product.

9

FILED DATE: 3/5/2019 1:32 PM   2019L002422

In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

***Monsanto has known for decades that it falsely advertises the safety of Roundup®.***

44.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup ® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a)     Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

b)     And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c)     Roundup biodegrades into naturally occurring elements.

d)     Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e)     This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

FILED DATE: 3/5/2019 1:32 PM   2019L002422

f) You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

45. November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk. * * *

b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable * * *

c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means. * * *

11

FILED DATE: 3/5/2019 1:32 PM   2019L002422

    d)    its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics." * * *

    e)    glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

    f)    its glyphosate-containing products or any component thereof might be classified as "practically non-toxic.

46.    Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

47.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

*Classifications and Assessments of Glyphosate*

48.    The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

49.    The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

50.    One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group

FILED DATE: 3/5/2019 1:32 PM   2019L002422

membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

51.     In assessing an agent, the IARC Working Group reviews the following information:

    (a)     human, experimental, and mechanistic data;

    (b)     all pertinent epidemiological studies and cancer bioassays; and

    (c)     representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

52.     In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

53.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly

13

FILED DATE: 3/5/2019 1:32 PM   2019L002422

available scientific literature" as well as "data from governmental reports that are publicly available."

54.     The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

55.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012 .

56.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

57.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

58.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

59.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

60.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male

FILED DATE: 3/5/2019 1:32 PM   2019L002422

mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

61.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

62.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

63.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

64.     The IARC Working Group also reviewed an Agricultural Health Study (AHS), consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

65.     In an article published on November 09, 2017 in the Journal of the National Cancer Institute updating the results of Glyphosate use and cancer incidence in the Agricultural Health Study a link was determined to exist between Glyphosate exposure and AML.

***Other Earlier Findings About Glyphosate's Dangers to Human Health***

15

66.     The EPA has a technical fact sheet, as part of its Drinking Water and Health, National

Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet

predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for

glyphosate as follows:

**Release Patterns**

> Glyphosate is released to the environment in its use as a herbicide for controlling woody
>
> and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These
>
> sites may be around water and in wetlands. It may also be released to the environment
>
> during its manufacture, formulation, transport, storage, disposal and cleanup, and from
>
> spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on
>
> releases during its manufacture and handling are not available. Occupational workers and
>
> home gardeners may be exposed to glyphosate by inhalation and dermal contact during
>
> spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to
>
> which glyphosate was applied. Occupational exposure may also occur during
>
> glyphosate's manufacture, transport storage, and disposal.

67.     In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California,

the state with the most comprehensive program for reporting of pesticide-caused illness,

glyphosate was the third most commonly-reported cause of pesticide illness among agricultural

workers.

*Recent Worldwide Bans on Roundup®/Glyphosate*

68.     Several countries around the world have instituted bans on the sale of Roundup® and

other glyphosate-containing herbicides, both before and since IARC first announced its

assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in

FILED DATE: 3/5/2019 1:32 PM    2019L002422

light of the as the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which takes effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

69.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

70.     France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

71.     Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

72.     The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that Glyphosate has been linked to fatal kidney disease in agricultural workers.

73.     The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

*Plaintiffs' Exposure to Roundup®*

FILED DATE: 3/5/2019 1:32 PM   2019L002422

74.     Plaintiff Keith Cichy started his landscaping business in 1996. He used Roundup

extensively while performing his landscaping duties in the Chicagoland area from 1997 to 2018.

He typically applied the herbicide himself while riding a riding lawnmower with several 2-3

gallon pump sprayers attached to the side of the mower holding sprayers in each hand. Mr. Cichy

was unaware of Roundup's carcinogenic properties until it was far too late; he was diagnosed

with AML on July 24, 2008. He continued to use Roundup after his AML went into remission

not knowing of the connection between Roundup and cancer. It was not until Mr. Cichy found

the link between Roundup and AML online in 2018 that Mr. Cichy stopped using Roundup.

## V. CLAIMS

**COUNT I**
**STRICT LIABILITY (DESIGN DEFECT) (AGAINST BAYER)**

75.     Plaintiff incorporates by reference each and every allegation set forth in the preceding

paragraphs as if fully stated herein.

76.     Plaintiff brings this strict liability claim against Bayer as the parent company of

Monsanto for defective design

77.     At all times relevant to this litigation, Bayer by and through Monsanto engaged in the

business of testing, developing, manufacturing, selling, distributing, marketing, packaging

designing, and promoting Roundup® products, which are defective and unreasonably dangerous

to consumers, including Plaintiff, thereby placing Roundup® products into the stream of

commerce. These actions were under the ultimate control and supervision of Bayer by and

through its subsidiary Monsanto. At all times relevant to this litigation, Monsanto designed,

researched, developed, manufactured, produced, tested, assembled, labeled, advertised,

promoted, marketed, sold, and distributed the Roundup® products used by the Plaintiff, as

described above.

18

FILED DATE: 3/5/2019 1:32 PM   2019L002422

78.     At all times relevant to this litigation, Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff.

79.     At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Illinois and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

80.     Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

81.     Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

82.     At all times relevant to this action, Monsanto knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

83.     Therefore, at all times relevant to this litigation, Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Monsanto were defective in design and formulation, in one or more of the following ways:

19

FILED DATE: 3/5/2019 1:32 PM   2019L002422

(a)     When placed in the stream of commerce, Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

(b)     When placed in the stream of commerce, Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

(c)     When placed in the stream of commerce, Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

(d)     Monsanto did not sufficiently test, investigate, or study Roundup® products and, specifically, the active ingredient glyphosate.

(e)     Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

(f)     At the time of marketing its Roundup® products, Roundup® was defective in that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

(g)     Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products.

(h)     Monsanto could have employed safer alternative designs and formulations.

84.     Plaintiff was exposed to Roundup® products in the course of his work, as described above, without knowledge of their dangerous characteristics.

20

FILED DATE: 3/5/2019 1:32 PM   2019L002422

85.     At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

86.     Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

87.     The harm caused by Roundup® products far outweighed their benefit, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate. Roundup® products were and are more dangerous than alternative products and Monsanto could have designed Roundup® products (including their packaging and sales aids) to make them less dangerous. Indeed, at the time that Monsanto designed Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

88.     At the time Roundup® products left Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of those herbicides.

89.     Monsanto's defective design of Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including the Plaintiff.

90.     Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Bayer by and through its subsidiary Monsanto is strictly liable to the Plaintiff.

91.     The defects in Roundup® products caused or contributed to cause Plaintiff's grave injuries, and, but for Monsanto's misconduct and omissions, Plaintiff would not have sustained the AML which required him to receive treatment from multiple hospitals in Cook County, Illinois.

FILED DATE: 3/5/2019 1:32 PM   2019L002422

92.     Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including the Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Monsanto made conscious decisions not to redesign, warn or inform the unsuspecting public. Monsanto's reckless conduct warrants an award of aggravated damages.

93.     As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment and lost income.

WHEREFORE, the Plaintiff Keith Cichy respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Bayer for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT II
## STRICT LIABILITY (FAILURE TO WARN) (AGAINST BAYER)

94.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

95.     Plaintiff brings this strict liability claim against Bayer as the parent company of Monsanto for failure to warn.

96.     At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including

Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Monsanto.

97.     Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiff, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

98.     At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn the Plaintiff of the dangers associated with Roundup® use and exposure. Monsanto, as manufacturer, seller, promoter, marketer, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

99.     At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

100.     At all times relevant to this litigation, Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by these herbicides, including the Plaintiff.

FILED DATE: 3/5/2019 1:32 PM   2019L002422

101.    Despite the fact that Monsanto knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of these products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or scientifically knowable to Monsanto through appropriate research and testing by known methods, at the time they distributed, marketed, promoted, supplied or sold the product, and not known to end users and consumers, such as the Plaintiff.

102.    These products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

103.    At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Illinois and throughout the United States, including the Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, promoted and marketed by Monsanto.

104.    The Plaintiff was exposed to Roundup® products in the course of his personal use during the course of his work as a landscaper without knowledge of their dangerous characteristics.

105.    At all times relevant to this litigation, the Plaintiff used and/or was exposed to the use of Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

FILED DATE: 3/5/2019 1:32 PM   2019L002422

106.    The Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of the Plaintiff's exposure. The Plaintiff relied upon the skill, superior knowledge, and judgment of Monsanto.

107.    These products were defective because the minimal warnings disseminated with Roundup® products were inadequate, and they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and landscaping applications.

108.    The information that Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as the Plaintiff to utilize the products safely and with adequate protection. Instead, Monsanto disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

109.    To this day, Monsanto has failed to adequately and accurately warn of the true risks of the Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

110.    As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed, marketed, and promoted by Monsanto, and used by the Plaintiff in his work.

111.    Bayer as the parent company of Monsanto is liable to the Plaintiff for injuries caused by their negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of these products and the risks associated with the use of or exposure to Roundup® and glyphosate.

112.    The defects in Roundup® products caused or contributed to cause the Plaintiff's injuries, and, but for this misconduct and omissions, the Plaintiff would not have sustained his injuries.

113.    Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products, Plaintiff could have avoided the risk of developing injuries as alleged herein.

114.    As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment and lost income.

WHEREFORE, the Plaintiff Keith Cichy respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Bayer for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT III
## NEGLIGENCE (AGAINST BAYER)

26

FILED DATE: 3/5/2019 1:32 PM   2019L002422

115.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

116.    Monsanto, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by the Plaintiff.

117.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

118.    At all times relevant to this litigation, Monsanto s had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

119.    At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

120.    Accordingly, at all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with the Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including the Plaintiff.

27

121.   Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

122.   As such, Monsanto breached the duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Monsanto manufactured, marketed, promoted, and sold defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

123.   Despite an ability and means to investigate, study, and test these products and to provide adequate warnings, Monsanto has failed to do so. Indeed, Monsanto has wrongfully concealed information and has further made false and/or misleading statements concerning the safety of exposure to Roundup® and glyphosate.

124.   Monsanto was negligent in the following respects:

(a)   Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

(b)   Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to

FILED DATE: 3/5/2019 1:32 PM   2019L002422

glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

(c)     Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

(d)     Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

(e)     Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

(f)     Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Monsanto could reasonably foresee would use and be exposed to its Roundup® products;

(g)     Failing to disclose to the Plaintiff, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

(h)     Failing to warn the Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to the Plaintiff and other consumers;

(i)     Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

(j)     Representing that its Roundup® products were safe for their intended use when, in fact, Monsanto knew or should have known that the products were not safe for their intended purpose;

29

FILED DATE: 3/5/2019 1:32 PM   2019L002422

(k)     Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

(l)      Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

(m)     Continuing to disseminate information to its consumers, which indicate or imply that Monsanto's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

(n)     Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

125.    Monsanto knew and/or should have known that it was foreseeable that consumers such as the Plaintiff would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup®.

126.    The Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

127.    Monsanto's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiffs suffered, as described herein.

128.    Monsanto's conduct, as described above, was reckless. Monsanto regularly risked the lives of consumers and users of their products, including the Plaintiff's, with full knowledge of the dangers of these products. Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including the Plaintiff. Monsanto's reckless conduct therefore warrants an award of aggravated or punitive damages.

FILED DATE: 3/5/2019 1:32 PM   2019L002422

129.   As a proximate result of Monsanto's wrongful acts and omissions in placing defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff has suffered and continues to suffer grave injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment and lost income.

130.   On June 07, 2018 Bayer acquired Monsanto and as such is liable for the prior acts and omissions of Monsanto.

WHEREFORE, the Plaintiff Keith Cichy respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Bayer for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT IV
## STRICT LIABILITY (DESIGN DEFECT) (AGAINST MONSANTO)

131.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

132.   Plaintiff brings this strict liability claim Monsanto for defective design

133.   At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, manufacturing, selling, distributing, marketing, packaging designing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto. At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled,

FILED DATE: 3/5/2019 1:32 PM   2019L002422

advertised, promoted, marketed, sold, and distributed the Roundup® products used by the Plaintiff, as described above.

134. At all times relevant to this litigation, Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff.

135. At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Illinois and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

136. Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

137. Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

138. At all times relevant to this action, Monsanto knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

139. Therefore, at all times relevant to this litigation, Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and

marketed by Monsanto were defective in design and formulation, in one or more of the following ways:

(a)    When placed in the stream of commerce, Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

(b)    When placed in the stream of commerce, Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

(c)    When placed in the stream of commerce, Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

(d)    Monsanto did not sufficiently test, investigate, or study Roundup® products and, specifically, the active ingredient glyphosate.

(e)    Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

(f)    At the time of marketing its Roundup products, Roundup® was defective in that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

(g)    Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products.

(h)    Monsanto could have employed safer alternative designs and formulations.

140.    Plaintiff was exposed to Roundup® products in the course of his work, as described above, without knowledge of their dangerous characteristics.

33

141.  At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

142.  Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

143.  The harm caused by Roundup® products far outweighed their benefit, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate. Roundup® products were and are more dangerous than alternative products and Monsanto could have designed Roundup® products (including their packaging and sales aids) to make them less dangerous. Indeed, at the time that Monsanto designed Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

144.  At the time Roundup® products left Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of those herbicides.

145.  Monsanto's defective design of Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including the Plaintiff.

146.  Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Monsanto is strictly liable to the Plaintiff.

147.  The defects in Roundup® products caused or contributed to cause Plaintiff's grave injuries, and, but for Monsanto's misconduct and omissions, Plaintiff would not have sustained the AML which required him to receive treatment from multiple hospitals in Cook County, Illinois.

34

FILED DATE: 3/5/2019 1:32 PM   2019L002422

148.    Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including the Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Monsanto made conscious decisions not to redesign, warn or inform the unsuspecting public. Monsanto's reckless conduct warrants an award of aggravated damages.

149.    As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment and lost income.

        WHEREFORE, the Plaintiff Keith Cichy respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Monsanto for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT V
## STRICT LIABILITY (FAILURE TO WARN) (AGAINST MONSANTO)

150.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

151.    Plaintiff brings this strict liability claim against Monsanto for failure to warn.

152.    At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the

FILED DATE: 3/5/2019 1:32 PM 2019L002422

dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Monsanto.

153. Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiff, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

154. At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn the Plaintiff of the dangers associated with Roundup® use and exposure. Monsanto, as manufacturer, seller, promoter, marketer, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

155. At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

156. At all times relevant to this litigation, Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by these herbicides, including the Plaintiff.

157. Despite the fact that Monsanto knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with

FILED DATE: 3/5/2019 1:32 PM   2019L002422

use and exposure. The dangerous propensities of these products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or scientifically knowable to Monsanto through appropriate research and testing by known methods, at the time they distributed, marketed, promoted, supplied or sold the product, and not known to end users and consumers, such as the Plaintiff.

158.    These products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

159.    At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Illinois and throughout the United States, including the Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, promoted and marketed by Monsanto.

160.    The Plaintiff was exposed to Roundup® products in the course of his personal use during the course of his work as a landscaper without knowledge of their dangerous characteristics.

161.    At all times relevant to this litigation, the Plaintiff used and/or was exposed to the use of Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

162.    The Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of the Plaintiff's exposure. The Plaintiff relied upon the skill, superior knowledge, and judgment of Monsanto.

FILED DATE: 3/5/2019 1:32 PM   2019L002422

163.   These products were defective because the minimal warnings disseminated with Roundup® products were inadequate, and they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and landscaping applications.

164.   The information that Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as the Plaintiff to utilize the products safely and with adequate protection. Instead, Monsanto disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

165.   To this day, Monsanto has failed to adequately and accurately warn of the true risks of the Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

166.   As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed, marketed, and promoted by Monsanto, and used by the Plaintiff in his work.

167.   Monsanto is liable to the Plaintiff for injuries caused by their negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and

FILED DATE: 3/5/2019 1:32 PM   2019L002442

data regarding the appropriate use of these products and the risks associated with the use of or exposure to Roundup® and glyphosate.

168.    The defects in Roundup® products caused or contributed to cause the Plaintiff's injuries, and, but for this misconduct and omissions, the Plaintiff would not have sustained his injuries.

169.    Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products, Plaintiff could have avoided the risk of developing injuries as alleged herein.

170.    As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment and lost income.

WHEREFORE, the Plaintiff Keith Cichy respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Monsanto for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT VI
## NEGLIGENCE (AGAINST MONSANTO)

171.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

172.    Monsanto, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by the Plaintiff.

173.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale,

FILED DATE: 3/5/2019 1:32 PM   2019L002422

and distribution of Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

174.    At all times relevant to this litigation, Monsanto s had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

175.    At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

176.    Accordingly, at all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with the Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including the Plaintiff.

177.    Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

178.    As such, Monsanto breached the duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Monsanto manufactured, marketed, promoted, and sold defective herbicides containing the chemical

FILED DATE: 3/5/2019 1:32 PM   2019L002422

glyphosate, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

179.    Despite an ability and means to investigate, study, and test these products and to provide adequate warnings, Monsanto has failed to do so. Indeed, Monsanto has wrongfully concealed information and has further made false and/or misleading statements concerning the safety of exposure to Roundup® and glyphosate.

180.    Monsanto was negligent in the following respects:

(a)    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

(b)    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

(c)    Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

(d)    Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

FILED DATE: 3/5/2019 1:32 PM   2019L002422

(e)     Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

(f)     Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Monsanto could reasonably foresee would use and be exposed to its Roundup® products;

(g)     Failing to disclose to the Plaintiff, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

(h)     Failing to warn the Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to the Plaintiff and other consumers;

(i)     Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

(j)     Representing that its Roundup® products were safe for their intended use when, in fact, Monsanto knew or should have known that the products were not safe for their intended purpose;

(k)     Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

(l)     Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

FILED DATE: 3/5/2019 1:32 PM   2019L002422

(m)    Continuing to disseminate information to its consumers, which indicate or imply that Monsanto's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

(n)    Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

181.    Monsanto knew and/or should have known that it was foreseeable that consumers such as the Plaintiff would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup®.

182.    The Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

183.    Monsanto's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiffs suffered, as described herein.

184.    Monsanto's conduct, as described above, was reckless. Monsanto regularly risked the lives of consumers and users of their products, including the Plaintiff's, with full knowledge of the dangers of these products. Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including the Plaintiff. Monsanto's reckless conduct therefore warrants an award of aggravated or punitive damages.

185.    As a proximate result of Monsanto's wrongful acts and omissions in placing defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff has suffered and continues to suffer grave injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment and lost income.

43

FILED DATE: 3/5/2019 1:32 PM   2019L002422

WHEREFORE, the Plaintiff Keith Cichy respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Monsanto for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT VII

## NEGLIGENCE NORTHWESTERN MEMORIAL HOSPITAL

186.     On and before July 17, 2018, and at all times relevant herein, the Defendant, Northwestern Memorial Hospital, was a domestic not-for-profit corporation organized and existing pursuant to the laws of the State of Illinois, that employed physicians, nurses, technicians, and other healthcare professionals to operate, manage, maintain, and control a certain hospital, located at 251 E. Huron Street, Chicago, Illinois, at which place it provided medical care and services to patients.

187.     On and before July 17, 2018, and at all times relevant herein, the Defendant, Northwestern Medical Faculty Foundation, was a domestic not-for-profit corporation organized and existing pursuant to the laws of the State of Illinois, that employed physicians, nurses, technicians, and other healthcare professionals to provide health care services to patients at Northwestern Memorial Hospital at its principal place of business located at 251 E. Huron Street, Chicago, Illinois.

188.     On and before July 17, 2018, and at all times relevant herein, the Defendant, Olga Frankfurt, M.D., was a licensed physician duly licensed to practice medicine in the State of Illinois, engaged in the practice of internal medicine, and was on the staff of, and had privileges for the care and treatment of patients at Northwestern Memorial Hospital.

FILED DATE: 3/5/2019 1:32 PM   2019L002422

189.   At all relevant times herein, Olga Frankfurt, M.D., was the actual or apparent agent, servant or employee of Northwestern Memorial Hospital, acting within the scope of her employment.

190.   At all relevant times herein, Olga Frankfurt, M.D., was the actual or apparent agent, servant or employee of Northwestern Medical Faculty Foundation, acting within the scope of her employment.

191.   On July 24, 2008, the Plaintiff Keith Cichy was diagnosed with AML

192.   On December 24, 2008, the Plaintiff Keith Cichy underwent an allogeneic 9/10 MUD transplant.

193.   The Plaintiff Keith Cichy was discharged from Northwestern Memorial Hospital on prophylactic antibiotics including Voriconazole on January 12, 2009.

194.   On June 03, 2009 Mr. Cichy presented to Northwestern Memorial Hospital with complaints of increased outside activity with increased redness on his hands and face.

195.   On June 03, 2009 there were concerns that Mr. Cichy was suffering from graft versus host disease (GVHD).

196   On June 03, 2009 it was noted that Mr. Cichy was receiving 200 mg of Voriconazole PO BID.

197.   On June 17, 2009 Mr. Cichy had a punch biopsy performed.

198.   The result of the June 17, 2009 punch biopsy came back on June 22, 2009 as being consistent with grade 2 GVHD showing Lichenoid GVHD and skin cutaneous GVHD.

199.   Mr. Cichy was followed by Dr. Olga Frankfurt for management of his GVHD.

200.   Dr. Olga Frankfurt kept Mr. Cichy on Voriconazole from January 12, 2009 until July 17, 2018.

FILED DATE: 3/5/2019 1:32 PM   2019L002422

201.    On April 08, 2015 Mr. Cichy was diagnosed with Bowen's disease from the site of a persistent lesion on his right check.

202.    On June 05, 2015 Mr. Cichy was noted to have several hypopigment lesions on his face demonstrating Bowen's disease. He was again to resume his Voriconazole BID when working in the field.

203.    On November 11, 2015 Mr. Cichy was started on ECP for his GVHD. He was to be off the Voriconazole for the winter and return to taking it during the summer months.

204.     On March 09, 2016, June 01, 2016, July 07, 2016, and February 03, 2017 Mr. Cichy was instructed to be off the Voriconazole during the winter months and to take it BID during the summer months.

205.    On August 30, 2017 Mr. Cichy underwent his first Mohs procedure.

206.    On September 11, 2017 Dr. Frankfurt instructed Mr. Cichy to continue the Voriconazole BID during the summer months.

207.    On September 14, 2017 Mr. Cichy had a biopsy done of the persistent lesion on his right check. The biopsy was positive for Squamous Cell Carcinoma.

208.    On February 28, 2018 Mr. Cichy had his second Mohs procedure.

209.    During an office visit with Dr. Jennifer Choi on June 18, 2018 Mr. Cichy reported blistering on his fact that occurred only during the summer months.  Dr. Choi indicated that Mr. Cichy's complaints were consistent with photosensitivity/phototoxicity due to the prolonged exposure to Voriconazole, and noted that she planned to discuss this with Dr. Frankfurt to see if Mr. Cichy could be switched to Fluconazole.

210.    On July 17, 2018 Mr. Cichy was seen be Dr. Frankfurt who noted that when Mr. Cichy was taking Voriconazole he had sun exposure which led to vori light sensitivity and significant

FILED DATE: 3/5/2019 1:32 PM   2019L002422

erythema and blistering of the skin. Dr. Frankfurt discontinued Voriconazole. Dr. Frankfurt noted that Mr. Cichy's GVHD was stable and that the flairs were more likely vori photosensitivities.

211.    At no point in time did Dr. Frankfurt discuss the risks of prolonged exposure to Voriconazole with Mr. Cichy.

212.    As a result of the prolonged exposure to Voriconazole Mr. Cichy suffered Bowen's disease, vori light sensitivity and significant erythema and blistering of the skin which required additional medical treatment and surgery and shortened his life expectancy.

213.    As a result of the prolonged exposure to Voriconazole, Mr. Cichy suffered bodily harm, required additional medical care and treatment, required additional surgical procedures, suffered additional pain, suffered an additional loss of a normal life, and suffered a reduction of his life expectancy.

214.    That at all times relevant herein, it became and was the duty of Defendant Northwestern Memorial Hospital, by and through its agents, servants, staff, and employees including but not limited to those other Defendant(s) named in this action, to render medical care and treatment in accordance with the accepted standards of prevailing medical practice and opinion existing in the community at that time and to exercise that degree of care and skill commonly exercised by other hospitals in the community.

215.    That after assuming the care and treatment of the Plaintiff, Defendant Northwestern Memorial Hospital, by and through its agents and employees was guilty of one or more of the following negligent acts and/or omissions:

        a.    Defendant failed to advise the Plaintiff of the risks of prolonged exposure
           to Voriconazole;

FILED DATE: 3/5/2019 1:32 PM   2019L002422

b.    Defendant prescribed Voriconazole for longer than was reasonably necessary;

c.    Defendant failed to consider less harmful antifungal medications;

d.    Defendant failed to properly manage the Plaintiff's GVHD; and/or

e.    Defendant failed to have proper procedures in place to ensure that harmful medications are not prescribed for a longer period of time than necessary.

216.    As a direct and proximate result of one or more of the foregoing negligent acts and/or omissions of the Defendant Northwestern Memorial Hospital, by and through its agents or employees, the Plaintiff, Keith Cichy has suffered, and will continue to suffer personal injuries and damages of a personal, pecuniary, and permanent nature.

WHEREFORE, the Plaintiff, Keith Cichy, prays judgment against the Defendant Northwestern Memorial Hospital in an amount greater than Fifty Thousand ($50,000.00) Dollars plus costs of this suit.

## COUNT VIII

## NEGLIGENCE NORTHWESTERN MEDICAL FACULTY FOUNDATION

217-244.    Plaintiff hereby adopts and incorporates paragraphs 186-213 of Count VII as paragraphs 217-244 of this Count VII as if they were fully stated herein.

245.    That at all times relevant herein, it became and was the duty of Defendant Northwestern Medical Faculty Foundation, by and through its agents, servants, staff, and employees including but not limited to those other Defendant(s) named in this action, to render medical care and treatment in accordance with the accepted standards of prevailing medical practice and opinion existing in the community at that time and to exercise that degree of care and skill commonly exercised by other hospitals in the community.

FILED DATE: 3/5/2019 1:32 PM   2019L002422

246.    That after assuming the care and treatment of the Plaintiff, Defendant Northwestern Medical Faculty Foundation, by and through its agents and employees was guilty of one or more of the following negligent acts and/or omissions:

      a.    Defendant failed to advise the Plaintiff of the risks of prolonged exposure to Voriconazole;

      b.    Defendant prescribed Voriconazole for longer than was reasonably necessary;

      c.    Defendant failed to consider less harmful antifungal medications;

      d.    Defendant failed to properly manage the Plaintiff's GVHD; and/or

      e.    Defendant failed to have proper procedures in place to ensure that harmful medications are not prescribed for a longer period of time than necessary.

247.    As a direct and proximate result of one or more of the foregoing negligent acts and/or omissions of the Defendant Northwestern Medical Faculty Foundation, by and through its agents or employees, the Plaintiff, Keith Cichy has suffered, and will continue to suffer personal injuries and damages of a personal, pecuniary, and permanent nature.

WHEREFORE, the Plaintiff, Keith Cichy, prays judgment against the Defendant Northwestern Medical Faculty Foundation in an amount greater than Fifty Thousand ($50,000.00) Dollars plus costs of this suit.

## COUNT IX

## NEGLIGENCE OLGA FRANKFURT, M.D.

248-275.    Plaintiff hereby adopts and incorporates paragraphs 217-244 of Count VIII as paragraphs 248-275 of this Count IX as if they were fully stated herein.

276.    That at all times relevant herein, it became and was the duty of Defendant Olga Frankfurt, M.D. to render medical care and treatment in accordance with the accepted standards

FILED DATE: 3/5/2019 1:32 PM   2019L002422

of prevailing medical practice and opinion existing in the community at that time and to exercise that degree of care and skill commonly exercised by other physicians in the community.

277.   That after assuming the care and treatment of the Plaintiff, Defendant Olga Frankfurt, M.D., was guilty of one or more of the following negligent acts and/or omissions:

a.   Defendant failed to advise the Plaintiff of the risks of prolonged exposure to Voriconazole;

b.   Defendant prescribed Voriconazole for longer than was reasonably necessary;

c.   Defendant failed to consider less harmful antifungal medications;

d.   Defendant failed to properly manage the Plaintiff's GVHD; and/or

e.   Defendant failed to have proper procedures in place to ensure that harmful medications are not prescribed for a longer period of time than necessary.

278.   As a direct and proximate result of one or more of the foregoing negligent acts and/or omissions of the Defendant Olga Frankfurt, M.D., the Plaintiff, Keith Cichy has suffered, and will continue to suffer personal injuries and damages of a personal, pecuniary, and permanent nature.

WHEREFORE, the Plaintiff, Keith Cichy, prays judgment against the Defendant Olga Frankfurt, M.D. in an amount greater than Fifty Thousand ($50,000.00) Dollars plus costs of this suit.

By: _____

David J. Gallagher

**MOTHERWAY & NAPLETON, LLP.**
Attorneys for Plaintiff
140 S. Dearborn, Suite 1500
Chicago, IL 60603
(312) 726-2699 - PHONE
(312) 726-6851 - FAX
Atty. No. 56421
dgallagher@mnlawoffice.com

FILED DATE: 3/5/2019 1:32 PM   2019L002422

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| KEITH CICHY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | Case No.: |
| | ) | |
| BAYER CORPORATION, a foreign | ) | Amount: In Excess of Fifty Thousand |
| corporation, MONSANTO COMPANY, a | ) | Dollars ($50,000.00) plus costs. |
| foreign corporation, NORTHWESTERN | ) | |
| MEMORIAL HOSPITAL, a domestic not- | ) | |
| for-profit corporation, NORTHWESTERN | ) | |
| MEDICAL FACULTY FOUNDATION, | ) | |
| a domestic not-for-profit corporation, and | ) | |
| OLGA FRANKFURT, M.D., | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT PURSUANT TO ILLINOIS SUPREME COURT RULE 222(b)

I, David J. Gallagher, attorney for the Plaintiff, Keith Cichy, state that the damages sought in this matter as to each Defendant are in excess of Fifty Thousand Dollars ($50,000.00).

Under penalties as provided by law pursuant to 735 ILCS 5/1-109, I certify that the statements set forth herein are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that I verily believe the same to be true.

David J. Gallagher
Attorney for Plaintiff

Sworn and subscribed to before
me this 5th day of
March, 2019.

Notary Public

OFFICIAL SEAL
MEGAN L SHORE
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:11/28/22

51

FILED DATE: 3/5/2019 1:32 PM   2019L002422

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

KEITH CICHY,                                      )
                                                  )
    Plaintiff,                  )
                                                  )
-vs-                                              )     Case No.:
                                                  )
BAYER CORPORATION, a foreign                      )
corporation, MONSANTO COMPANY, a                  )
foreign corporation, NORTHWESTERN                 )
MEMORIAL HOSPITAL, a domestic not-                )
for-profit corporation, NORTHWESTERN              )
MEDICAL FACULTY FOUNDATION,                       )
a domestic not-for-profit corporation, and        )
OLGA FRANKFURT, M.D.,                             )
                                                  )
    Defendants.                 )

## 735 ILCS 5/2-622 AFFIDAVIT CONCERNING NORTHWESTERN MEMORIAL HOSPTIAL AND NORTHWESTERN MEDICAL FACULTY FOUNDATION

This affidavit is prepared pursuant to 735 ILCS 5/2-622.

Affiant has consulted with a Board Certified Physician Board Certified in Internal Medicine and Fellowship trained in Hematology Oncology whom affiant reasonably believes is knowledgeable in the relevant issues involved in this case and who has practiced in this area of health care within the last six years, and is qualified by experience and has demonstrated competence in the subject of the case.

The reviewing board certified physician has concluded in a written report attached hereto and made a part hereof, after reviewing the medical records and other relevant materials involved in this case, that a reasonable health care professional would have informed Mr. Cichy of the consequences of prolonged use of Voriconazole.

FILED DATE: 3/5/2019 1:32 PM   2019L002422

The reviewing board certified physician has determined in a written report attached hereto and made a part hereof, after a review of the medical record and relevant facts of this case, that there is a reasonable and meritorious cause for the filing of this action.

Affiant concludes, on the basis of the reviewing board certified physician's review and consultation, that there is a reasonable and meritorious cause for filing this action against Northwestern Memorial Hospital and Northwestern Medical Faculty Foundation.

Further Affiant Sayeth Not.

I, David J. Gallagher, attorney for Plaintiff, Keith Cichy, state and certify under penalties as provided by law pursuant to 735 ILCS 5/1-109 of the Illinois Code of Civil Procedure, that the statements set forth in the foregoing Affidavit are true and correct, except as to matters therein stated to be on information and belief and as to such matters, the undersigned certifies as aforesaid that I verily believe the same to be true.

By: _____
David J. Gallagher

**MOTHERWAY & NAPLETON, LLP.**
Attorneys for Plaintiff
140 S. Dearborn, Suite 1500
Chicago, IL 60603
(312) 726-2699 - PHONE
(312) 726-6851 - FAX
Atty. No. 56421
dgallagher@mnlawoffice.com

Subscribed and Sworn to before me on this

5th day of March 2019

_____
Notary Public

OFFICIAL SEAL
MEGAN L SHORE
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:11/28/22

FILED DATE: 3/5/2019 1:32 PM   2019L002422

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

KEITH CICHY,                                             )
                                                        )
          Plaintiff,                                    )
                                                        )
-vs-                                                    )          Case No.:
                                                        )
BAYER CORPORATION, a foreign                            )
corporation, MONSANTO COMPANY, a                        )
foreign corporation, NORTHWESTERN                       )
MEMORIAL HOSPITAL, a domestic not-                      )
for-profit corporation, NORTHWESTERN                    )
MEDICAL FACULTY FOUNDATION,                             )
a domestic not-for-profit corporation, and             )
OLGA FRANKFURT, M.D.,                                   )
                                                        )
          Defendants.                                   )

### 735 ILCS 5/2-622 AFFIDAVIT CONCERNING OLGA FRANKFURT, M.D.

This affidavit is prepared pursuant to 735 ILCS 5/2-622.

Affiant has consulted with a Board Certified Physician Board Certified in Internal

Medicine and Fellowship trained in Hematology Oncology whom affiant reasonably believes is

knowledgeable in the relevant issues involved in this case and who has practiced in this area of

health care within the last six years, and is qualified by experience and has demonstrated

competence in the subject of the case.

The reviewing board certified physician has concluded in a written report attached hereto

and made a part hereof, after reviewing the medical records and other relevant materials involved

in this case, that a reasonable health care professional would have informed Mr. Cichy of the

consequences of prolonged use of Voriconazole.

FILED DATE: 3/5/2019 1:32 PM   2019L002422

The reviewing board certified physician has determined in a written report attached hereto and made a part hereof, after a review of the medical record and relevant facts of this case, that there is a reasonable and meritorious cause for the filing of this action.

Affiant concludes, on the basis of the reviewing board certified physician's review and consultation, that there is a reasonable and meritorious cause for filing this action against Olga Frankfurt, M.D.

Further Affiant Sayeth Not.

I, David J. Gallagher, attorney for Plaintiff, Keith Cichy, state and certify under penalties as provided by law pursuant to 735 ILCS 5/1-109 of the Illinois Code of Civil Procedure, that the statements set forth in the foregoing Affidavit are true and correct, except as to matters therein stated to be on information and belief and as to such matters, the undersigned certifies as aforesaid that I verily believe the same to be true.

By: _____
David J. Gallagher

**MOTHERWAY & NAPLETON, LLP.**
Attorneys for Plaintiff
140 S. Dearborn, Suite 1500
Chicago, IL 60603
(312) 726-2699 - PHONE
(312) 726-6851 - FAX
Atty. No. 56421
dgallagher@mnlawoffice.com

Subscribed and Sworn to before me on this

5th day of March 2019

_____
Notary Public

OFFICIAL SEAL
MEGAN L SHORE
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES

FILED DATE: 3/5/2019 1:32 PM   2019L002422

## REPORT OF REVIEWING HEALTH CARE PROFESSIONAL CONCERNING OLGA FRANKFURT M.D., NORTHWESTERN MEMORIAL HOSPITAL, AND NORTHWESTERN MEDICAL FACULTY FOUNDATION

I am a physician Board Certified in Internal Medicine and Medical Oncology, fellowship trained in Hematology-Oncology. I have practiced in this area within the last 6 years. I have reviewed the following medical records of Keith Cichy:

| | |
|---|---|
| Northwest Community Hospital | 7-22-08 to 7-29-15 |
| Lutheran General Hospital | 7-25-08 to 9-25-08 |
| Northwestern Memorial Hospital | 09-15-08 to 1-12-19 |
| Children's Memorial Hospital | 09-26-08 to 12-04-08 |
| University of Illinois Hospital | 12-15-08 to 1-30-15 |
| Lake Shore Medical Associates | 12-15-09 |
| University of Chicago Hospital | 02-15-10 to 4-25-16 |
| Northwestern Lake Forest Hospital | 04-16-10 to 1-26-17 |

I have the expertise to evaluate the reliability of these records. These records are the type usually relied upon by reviewers such as myself. The records appear, in fact to be reliable. I have specifically reviewed these records to determine whether within a reasonable degree of medical certainty the standard of care was met.

The reviewed records have led me to the following conclusions:

On or about July 22, 2008, Keith Cichy then 33 years old was seen at Northwest Community Hospital for labs done by Dr. Richard Gallup which showed abnormal lymphocytes with nucleoli present. On July 22, 2008 Mr. Cichy was diagnosed with acute myeloid leukemia (6,9 chromosome translocation). It is likely that Mr. Cichy's AML was caused to due prolonged exposure to Roundup during his career as a landscaper. Mr. Cichy received two rounds of chemotherapy that put his AML into remission.

On December 24, 2008, Mr. Cichy underwent an allogeneic 9/10 Matched Unrelated Donor (MUD) transplant. He was discharged from Northwestern Memorial Hospital on

FILED DATE: 3/5/2019 1:32 PM   2019L002422

prophylactic antibiotics including Voriconazole on January 12, 2009. In his early post-transplant follow ups there was no evidence of graft-versus-host disease.

On June 03, 2009 Mr. Cichy presented to Northwestern Memorial Hospital complaining of right shoulder pain and neck pain that began 2 weeks prior. He had noted increased outside activity with increased redness on his hands and face since discontinuing his immunosuppressants. Mr. Cichy was noted to be receiving 200 mg of Voriconazole PO BID. The concern at that time was for GVHD. On June 17, 2009 Mr. Cichy had a punch biopsy performed. The result of the punch biopsy came back on June 22, 2009 as being consistent with grade 2 GVHD showing Lichenoid GVHD and skin cutaneous GVHD.

Mr. Cichy was followed by Dr. Olga Frankfurt for management of the complications of his MUD, including GVHD. She kept Mr. Cichy on his dosage of Voriconazole on September 16, 2010, and April 04, 2011. On October 10, 2011 she noted that Mr. Cichy should continue his antifungal coverage due to his being a landscaper. The Voriconazole was continued by Dr. Frankfurt on January 06, 2012, July 24, 2012, July 25, 2012, September 17, 2012, January 07, 2013, and July 30, 2013. On May 15, 2014, Dr. Frankfurt allowed for the discontinuation of the Voriconazole during the winter months but prescribed that it be resumed when Mr. Cichy returned to working in the fields.

On April 08, 2015 Mr. Cichy was diagnosed with Bowen's disease from the site of persistent lesions on his right cheek and abdomen. On June 05, 2015 Mr. Cichy was noted to have several hypopigment lesions on his face demonstrating Bowen's disease. He was again to resume his Voriconazole BID when working in the field. On November 11, 2015 Mr. Cichy was started on ECP for his Bowen's disease. He was to be off the Voriconazole for the winter and return to taking it during the summer months. On March 09, 2016, June 01, 2016, July 07, 2016,

FILED DATE: 3/5/2019 1:32 PM   2019L002422

and February 03, 2017 Mr. Cichy was instructed to be off the Voriconazole during the winter months and to take it BID during the summer months.

On August 30, 2017 Mr. Cichy underwent his first Mohs procedure. On September 11, 2017 Dr. Frankfurt instructed Mr. Cichy to continue the Voriconazole BID during the summer months. On September 14, 2017 Mr. Cichy had a biopsy done of the persistent lesion on his right check. The biopsy was positive for Squamous Cell Carcinoma.  On February 28, 2018 Mr. Cichy had his second Mohs procedure.

During an office visit with Dr. Jennifer Choi on June 18, 2018 Mr. Cichy reported blistering on his fact that occurred only during the summer months.  Dr. Choi indicated that Mr. Cichy's complaints were consistent with photosensitivity/phototoxicity due to the prolonged exposure to Voriconazole, and noted that she planned to discuss this with Dr. Frankfurt to see if Mr. Cichy could be switched to Fluconazole.

On July 17, 2018 Mr. Cichy was seen be Dr. Frankfurt who noted that when Mr. Cichy was taking Voriconazole he would develop significant erythema and blistering of the skin, which was attributed to Voriconazole sun sensitivity.  Dr. Frankfurt discontinued Voriconazole. Dr. Frankfurt noted that Mr. Cichy's GVHD was stable and that the skin flairs were more likely Voriconazole photosensitivity than worsening GVHD. It is my professional opinion, to a reasonable degree of medical certainty that Dr. Olga Frankfurt breached the standard of care in her treatment of Mr. Cichy. Standard of care in the initial post-transplant period requires anti-fungal prophylaxis because the risk of fungal infection is high, and Voriconazole was preferred because it was the only one effective against aspergillus infection at the time. Voriconazole is generally given in the first 1 - 2 years after transplant.  Beyond 2 - 3 years the risk of infection is lower, and current standards do not recommend Voriconazole be routinely continued beyond this

FILED DATE: 3/5/2019 1:32 PM   2019L002422

time because of the high risk of serious side effects from prolonged Voriconazole. Voriconazole is recommended to be continued beyond that time if the GVHD is considered high grade, that is, with 3 or more organ systems involved. Other risk factors include low neutrophil count, high immunosuppression medications, or prednisone. None of these applied to Mr. Cichy by 2012, at which time GVHD was mild, his blood counts were normal, and he was off all immunosuppressive medications. The only relative risk factor for aspergillus was seasonal exposure to soil, though aspergillus exposure is present in indoor environments as well. Thus, voriconazole was neither required nor recommended for Mr. Cichy at this time, and the minimal benefit of long-term use had to be balanced against the risks.

Squamous cell carcinoma of the skin is a known but rare side effect from long-term use Voriconazole. Prolonged exposure to this drug is known to increase the risk of Squamous cell carcinoma. Mr. Cichy did, in fact, develop this serious side effect. There is no documentation in the record indicating that Mr. Cichy was advised of the risk associated with the prolonged use of Voriconazole. There is no documentation in the record indicating that Mr. Cichy was counseled to consider another line of work, or taking a role in his landscaping business that did not involve him being in close contact with soil to avoid exposure to aspergillus. It is my opinion that a reasonable hematologist oncologist would have informed Mr. Cichy of the risks of the prolonged use of Voriconazole. It is my opinion that a reasonable hematologist oncologist would have discontinued the continual use of Voriconazole on October 10, 2011. If the need arose for specific antifungal coverage at a later date and time those concerns could have been addressed on an as needed basis.

Voriconazole was recognized to be the major factor in the development of Mr. Cichy's actinic keratoses (pre-cancerous lesions) and squamous cell carcinoma. Only after Dr. Choi

4

brought the prolonged exposure to Voriconazole to Dr. Frankfurt's attention was the Voriconazole discontinued.

It is my opinion that just and reasonable cause exists to file a complaint against Dr. Olga Frankfurt and her employers Northwestern Memorial Hospital and Northwestern Medical Faculty Foundation for the reasons stated herein. I specifically reserve the right to add too, amend or subtract from this report as new evidence is reviewed or as new opinions are formulated.

FILED
3/5/2019 1:32 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL

FILED DATE: 3/5/2019 1:32 PM   2019L002422

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| KEITH CICHY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | Case No.: 2019L002422 |
| | ) | |
| BAYER CORPORATION, a foreign | ) | Amount: In Excess of Fifty Thousand |
| corporation, MONSANTO COMPANY, a | ) | Dollars ($50,000.00) plus costs. |
| foreign corporation, NORTHWESTERN | ) | |
| MEMORIAL HOSPITAL, a domestic not- | ) | |
| for-profit corporation, NORTHWESTERN | ) | |
| MEDICAL FACULTY FOUNDATION, | ) | |
| a domestic not-for-profit corporation, and | ) | |
| OLGA FRANKFURT, M.D., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S COMPLAINT AT LAW

NOW COMES the Plaintiff, Keith Cichy, by and through his attorney, David J. Gallagher

of MOTHERWAY & NAPLETON, LLP., and complaining of the Defendants Bayer

Corporation, a foreign corporation, Monsanto Company, a foreign corporation, Northwestern

Memorial Hospital, a domestic not-for-profit corporation, Northwestern Medical Faculty

Foundation, a domestic not-for-profit corporation, and Olga Frankfurt, M.D., states as follows:

## I. THE PARTIES

### Plaintiff

1.     Plaintiff Keith Cichy is and was at all relevant times a resident of Cook County, Illinois.

He started a landscaping company in 1996 and began purchasing and using Roundup and/or

other Monsanto glyphosate-containing products ("Roundup") in 1997. He continued to use

Roundup from approximately 1997 through 2018 throughout Cook County, Illinois.

### Defendants

1

FILED DATE: 3/5/2019 1:32 PM   2019L002422

2.      Defendant Bayer Corporation ("Bayer") is a multinational corporation doing business throughout the United States, including Cook County, Illinois that is incorporated in Indiana, with its headquarters and principal place of business in Whippany, New Jersey.

3.      Defendant Monsanto Company ("Monsanto") is a multinational corporation doing business throughout the United States, including Cook County, Illinois that is incorporated in Delaware, with its headquarters and principal place of business in St. Louis, Missouri.

4.      On June 07, 2018 Bayer acquired Monsanto.

5.      Defendant Northwestern Memorial Hospital ("NMH") is an Illinois corporation, with its principal place of business in Chicago, Cook County, Illinois.

6.      Defendant Northwestern Medical Faculty Foundation ("NMFF") is an Illinois corporation, with its principal place of business in Chicago, Cook County, Illinois.

7.      Defendant Olga Frankfurt M.D. is an individual physician who on information and belief resides in Cook County, Illinois.

8.      At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and was the manufacturer of Roundup®.

**II. INTRODUCTION**

9.      In 1970, Defendant Monsanto Company, Inc. discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 millions of pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

FILED DATE: 3/5/2019 1:32 PM   2019L002422

10.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

11.     Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers whom are not in direct contact with glyphosate.

12.     On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

13.     On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

14.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other haematopoietic

3

cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

15.     The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

16.     Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

### III. JURISDICTION AND VENUE

17.     Jurisdiction is proper pursuant to 735 ILCS 5/2-209 as at all times relevant hereto, Monsanto was in the business of researching, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, labeling, packaging, marketing, promoting, and/or advertising Roundup® products in the throughout the United States including in Cook County, Illinois.

18.     At all times relevant hereto, Monsanto was a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri, who routinely conducted business in Cook County, Illinois.

19.     NMH and NMFF are domestic corporations with their headquarters and principal place of business in Chicago, Illinois, making them residents of Cook County pursuant to 735 ILCS 5/2-102, who routinely conducts business in Cook County, Illinois.

20.     Defendant Olga Frankfurt M.D. on information and belief is a resident of Cook County.

4

FILED DATE: 3/5/2019 1:32 PM   2019L002422

FILED DATE: 3/5/2019 1:32 PM   2019L002422

21.     Plaintiff has timely filed this lawsuit less than two years from the time the Plaintiff knew or reasonably should have known of the injury and that it may have been wrongfully caused.

22.     Pursuant to 735 ILCS 5/2-101, venue is proper within this Court because Defendants NMH, NMFF, and Olga Frankfurt are residents of Cook County, and because Plaintiff was diagnosed and treated for his cancer in Cook County, and the Defendants do business and advertise in this county.

## IV. FACTS

23.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

24.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

25.     For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®— glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Agricultural workers are, once again, victims of corporate greed. Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and

5

attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® was safe.

*The Discovery of Glyphosate and Development of Roundup®*

26.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use. Monsanto still markets Roundup® as safe today.

*Registration of Herbicides under Federal Law*

27.     The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

28.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

FILED DATE: 3/5/2019 1:32 PM   2019L002422

29.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

30.     The EPA registered Roundup® for distribution, sale, and manufacture in the United States and the State of Illinois.

31.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

32.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

33.     In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment —in relation to the re-registration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

7

FILED DATE: 3/5/2019 1:32 PM   2019L002422

*Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®*

34.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

35.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

36.     In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

37.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

38.     Three top executives of IBT were convicted of fraud in 1983.

FILED DATE: 3/5/2019 1:32 PM   2019L002422

39.     In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

40.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

### *The Importance of Roundup® to Monsanto's Market Dominance and Profits*

41.     The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

42.     In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate; farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

43.     Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product.

In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

***Monsanto has known for decades that it falsely advertises the safety of Roundup®.***

44.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup ® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a)      Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

b)      And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c)      Roundup biodegrades into naturally occurring elements.

d)      Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e)      This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

FILED DATE: 3/5/2019 1:32 PM   2019L002422

f)      You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g)      Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h)      Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i)      You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j)      "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

45.   November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a)      its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk. * * *

b)      its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable * * *

c)      its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means. * * *

FILED DATE: 3/5/2019 1:32 PM   2019L002422

d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics." * * *

e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic.

46. Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

47. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

***Classifications and Assessments of Glyphosate***

48. The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

49. The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

50. One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group

membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

51.     In assessing an agent, the IARC Working Group reviews the following information:

     (a)     human, experimental, and mechanistic data;

     (b)     all pertinent epidemiological studies and cancer bioassays; and

     (c)     representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

52.     In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

53.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly

FILED DATE: 3/5/2019 1:32 PM   2019L002422

FILED DATE: 3/5/2019 1:32 PM    2019L002422

available scientific literature" as well as "data from governmental reports that are publicly available."

54.    The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

55.    Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012 .

56.    Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

57.    The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

58.    The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

59.    The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

60.    In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male

14

FILED DATE: 3/5/2019 1:32 PM   2019L002422

mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

61.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

62.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

63.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

64.     The IARC Working Group also reviewed an Agricultural Health Study (AHS), consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

65.     In an article published on November 09, 2017 in the Journal of the National Cancer Institute updating the results of Glyphosate use and cancer incidence in the Agricultural Health Study a link was determined to exist between Glyphosate exposure and AML.

*Other Earlier Findings About Glyphosate's Dangers to Human Health*

FILED DATE: 3/5/2019 1:32 PM   2019L002422

66. The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available. Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

67. In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

*Recent Worldwide Bans on Roundup®/Glyphosate*

68. Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in

light of the as the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which takes effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

69.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

70.     France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

71.     Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

72.     The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that Glyphosate has been linked to fatal kidney disease in agricultural workers.

73.     The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

***Plaintiffs' Exposure to Roundup®***

74.     Plaintiff Keith Cichy started his landscaping business in 1996. He used Roundup

extensively while performing his landscaping duties in the Chicagoland area from 1997 to 2018.

He typically applied the herbicide himself while riding a riding lawnmower with several 2-3

gallon pump sprayers attached to the side of the mower holding sprayers in each hand. Mr. Cichy

was unaware of Roundup's carcinogenic properties until it was far too late; he was diagnosed

with AML on July 24, 2008. He continued to use Roundup after his AML went into remission

not knowing of the connection between Roundup and cancer. It was not until Mr. Cichy found

the link between Roundup and AML online in 2018 that Mr. Cichy stopped using Roundup.

## V. CLAIMS

### COUNT I
### STRICT LIABILITY (DESIGN DEFECT) (AGAINST BAYER)

75.     Plaintiff incorporates by reference each and every allegation set forth in the preceding

paragraphs as if fully stated herein.

76.     Plaintiff brings this strict liability claim against Bayer as the parent company of

Monsanto for defective design

77.     At all times relevant to this litigation, Bayer by and through Monsanto engaged in the

business of testing, developing, manufacturing, selling, distributing, marketing, packaging

designing, and promoting Roundup® products, which are defective and unreasonably dangerous

to consumers, including Plaintiff, thereby placing Roundup® products into the stream of

commerce. These actions were under the ultimate control and supervision of Bayer by and

through its subsidiary Monsanto. At all times relevant to this litigation, Monsanto designed,

researched, developed, manufactured, produced, tested, assembled, labeled, advertised,

promoted, marketed, sold, and distributed the Roundup® products used by the Plaintiff, as

described above.

78.    At all times relevant to this litigation, Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff.

79.    At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Illinois and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

80.    Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

81.    Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

82.    At all times relevant to this action, Monsanto knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

83.    Therefore, at all times relevant to this litigation, Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Monsanto were defective in design and formulation, in one or more of the following ways:

FILED DATE: 3/5/2019 1:32 PM   2019L002422

FILED DATE: 3/5/2019 1:32 PM   2019L002422

(a)     When placed in the stream of commerce, Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

(b)     When placed in the stream of commerce, Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

(c)     When placed in the stream of commerce, Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

(d)     Monsanto did not sufficiently test, investigate, or study Roundup® products and, specifically, the active ingredient glyphosate.

(e)     Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

(f)     At the time of marketing its Roundup® products, Roundup® was defective in that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

(g)     Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products.

(h)     Monsanto could have employed safer alternative designs and formulations.

84.     Plaintiff was exposed to Roundup® products in the course of his work, as described above, without knowledge of their dangerous characteristics.

FILED DATE: 3/5/2019 1:32 PM   2019L002422

85.     At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

86.     Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

87.     The harm caused by Roundup® products far outweighed their benefit, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate. Roundup® products were and are more dangerous than alternative products and Monsanto could have designed Roundup® products (including their packaging and sales aids) to make them less dangerous. Indeed, at the time that Monsanto designed Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

88.     At the time Roundup® products left Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of those herbicides.

89.     Monsanto's defective design of Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including the Plaintiff.

90.     Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Bayer by and through its subsidiary Monsanto is strictly liable to the Plaintiff.

91.     The defects in Roundup® products caused or contributed to cause Plaintiff's grave injuries, and, but for Monsanto's misconduct and omissions, Plaintiff would not have sustained the AML which required him to receive treatment from multiple hospitals in Cook County, Illinois.

FILED DATE: 3/5/2019 1:32 PM   2019L002422

92.     Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including the Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Monsanto made conscious decisions not to redesign, warn or inform the unsuspecting public. Monsanto's reckless conduct warrants an award of aggravated damages.

93.     As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment and lost income.

WHEREFORE, the Plaintiff Keith Cichy respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Bayer for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT II
## STRICT LIABILITY (FAILURE TO WARN) (AGAINST BAYER)

94.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

95.     Plaintiff brings this strict liability claim against Bayer as the parent company of Monsanto for failure to warn.

96.     At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including

Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Monsanto.

97.    Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiff, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

98.    At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn the Plaintiff of the dangers associated with Roundup® use and exposure. Monsanto, as manufacturer, seller, promoter, marketer, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

99.    At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

100.    At all times relevant to this litigation, Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by these herbicides, including the Plaintiff.

FILED DATE: 3/5/2019 1:32 PM   2019L002422

FILED DATE: 3/5/2019 1:32 PM   2019L002422

101.    Despite the fact that Monsanto knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of these products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or scientifically knowable to Monsanto through appropriate research and testing by known methods, at the time they distributed, marketed, promoted, supplied or sold the product, and not known to end users and consumers, such as the Plaintiff.

102.    These products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

103.    At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Illinois and throughout the United States, including the Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, promoted and marketed by Monsanto.

104.    The Plaintiff was exposed to Roundup® products in the course of his personal use during the course of his work as a landscaper without knowledge of their dangerous characteristics.

105.    At all times relevant to this litigation, the Plaintiff used and/or was exposed to the use of Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

FILED DATE: 3/5/2019 1:32 PM   2019L002422

106.    The Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of the Plaintiff's exposure. The Plaintiff relied upon the skill, superior knowledge, and judgment of Monsanto.

107.    These products were defective because the minimal warnings disseminated with Roundup® products were inadequate, and they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and landscaping applications.

108.    The information that Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as the Plaintiff to utilize the products safely and with adequate protection. Instead, Monsanto disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

109.    To this day, Monsanto has failed to adequately and accurately warn of the true risks of the Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

FILED DATE: 3/5/2019 1:32 PM   2019L002422

110.    As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed, marketed, and promoted by Monsanto, and used by the Plaintiff in his work.

111.    Bayer as the parent company of Monsanto is liable to the Plaintiff for injuries caused by their negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of these products and the risks associated with the use of or exposure to Roundup® and glyphosate.

112.    The defects in Roundup® products caused or contributed to cause the Plaintiff's injuries, and, but for this misconduct and omissions, the Plaintiff would not have sustained his injuries.

113.    Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products, Plaintiff could have avoided the risk of developing injuries as alleged herein.

114.    As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment and lost income.

WHEREFORE, the Plaintiff Keith Cichy respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Bayer for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT III
## NEGLIGENCE (AGAINST BAYER)

26

FILED DATE: 3/5/2019 1:32 PM   2019L002422

115.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

116.    Monsanto, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by the Plaintiff.

117.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

118.    At all times relevant to this litigation, Monsanto s had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

119.    At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

120.    Accordingly, at all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with the Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including the Plaintiff.

FILED DATE: 3/5/2019 1:32 PM   2019L002422

121.    Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

122.    As such, Monsanto breached the duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Monsanto manufactured, marketed, promoted, and sold defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

123.    Despite an ability and means to investigate, study, and test these products and to provide adequate warnings, Monsanto has failed to do so. Indeed, Monsanto has wrongfully concealed information and has further made false and/or misleading statements concerning the safety of exposure to Roundup® and glyphosate.

124.    Monsanto was negligent in the following respects:

        (a)    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

        (b)    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to

FILED DATE: 3/5/2019 1:32 PM   2019L002422

glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

(c)     Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

(d)     Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

(e)     Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

(f)     Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Monsanto could reasonably foresee would use and be exposed to its Roundup® products;

(g)     Failing to disclose to the Plaintiff, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

(h)     Failing to warn the Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to the Plaintiff and other consumers;

(i)     Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

(j)     Representing that its Roundup® products were safe for their intended use when, in fact, Monsanto knew or should have known that the products were not safe for their intended purpose;

FILED DATE: 3/5/2019 1:32 PM   2019L002422

(k)     Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

(l)     Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

(m)     Continuing to disseminate information to its consumers, which indicate or imply that Monsanto's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

(n)     Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

125.     Monsanto knew and/or should have known that it was foreseeable that consumers such as the Plaintiff would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup®.

126.     The Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

127.     Monsanto's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiffs suffered, as described herein.

128.     Monsanto's conduct, as described above, was reckless. Monsanto regularly risked the lives of consumers and users of their products, including the Plaintiff's, with full knowledge of the dangers of these products. Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including the Plaintiff. Monsanto's reckless conduct therefore warrants an award of aggravated or punitive damages.

FILED DATE: 3/5/2019 1:32 PM   2019L002422

129.    As a proximate result of Monsanto's wrongful acts and omissions in placing defective

Roundup® products into the stream of commerce without adequate warnings of the hazardous

and carcinogenic nature of glyphosate, Plaintiff has suffered and continues to suffer grave

injuries, and has endured and continues to endure physical pain and discomfort, as well as

economic hardship, including considerable financial expenses for medical care, and treatment

and lost income.

130.    On June 07, 2018 Bayer acquired Monsanto and as such is liable for the prior acts and

omissions of Monsanto.

WHEREFORE, the Plaintiff Keith Cichy respectfully requests that this Honorable Court

enter judgment in his favor and against Defendant Bayer for compensatory and punitive damages

in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs

herein incurred, and all such other and further relief as this Court deems just and proper.

Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT IV
## STRICT LIABILITY (DESIGN DEFECT) (AGAINST MONSANTO)

131.    Plaintiff incorporates by reference each and every allegation set forth in the preceding

paragraphs as if fully stated herein.

132.    Plaintiff brings this strict liability claim Monsanto for defective design

133.    At all times relevant to this litigation, Monsanto engaged in the business of testing,

developing, manufacturing, selling, distributing, marketing, packaging designing, and promoting

Roundup® products, which are defective and unreasonably dangerous to consumers, including

Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were

under the ultimate control and supervision of Monsanto. At all times relevant to this litigation,

Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled,

31

FILED DATE: 3/5/2019 1:32 PM   2019L002422

advertised, promoted, marketed, sold, and distributed the Roundup® products used by the Plaintiff, as described above.

134.     At all times relevant to this litigation, Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff.

135.     At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Illinois and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

136.     Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

137.     Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

138.     At all times relevant to this action, Monsanto knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

139.     Therefore, at all times relevant to this litigation, Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and

FILED DATE: 3/5/2019 1:32 PM   2019L002422

marketed by Monsanto were defective in design and formulation, in one or more of the following ways:

(a)     When placed in the stream of commerce, Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

(b)     When placed in the stream of commerce, Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

(c)     When placed in the stream of commerce, Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

(d)     Monsanto did not sufficiently test, investigate, or study Roundup® products and, specifically, the active ingredient glyphosate.

(e)     Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

(f)     At the time of marketing its Roundup® products, Roundup® was defective in that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

(g)     Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products.

(h)     Monsanto could have employed safer alternative designs and formulations.

140.    Plaintiff was exposed to Roundup® products in the course of his work, as described above, without knowledge of their dangerous characteristics.

33

FILED DATE: 3/5/2019 1:32 PM   2019L002422

141.    At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

142.    Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

143.    The harm caused by Roundup® products far outweighed their benefit, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate. Roundup® products were and are more dangerous than alternative products and Monsanto could have designed Roundup® products (including their packaging and sales aids) to make them less dangerous. Indeed, at the time that Monsanto designed Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

144.    At the time Roundup® products left Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of those herbicides.

145.    Monsanto's defective design of Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including the Plaintiff.

146.    Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Monsanto is strictly liable to the Plaintiff.

147.    The defects in Roundup® products caused or contributed to cause Plaintiff's grave injuries, and, but for Monsanto's misconduct and omissions, Plaintiff would not have sustained the AML which required him to receive treatment from multiple hospitals in Cook County, Illinois.

FILED DATE: 3/5/2019 1:32 PM   2019L002422

148.     Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including the Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Monsanto made conscious decisions not to redesign, warn or inform the unsuspecting public. Monsanto's reckless conduct warrants an award of aggravated damages.

149.     As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment and lost income.

WHEREFORE, the Plaintiff Keith Cichy respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Monsanto for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT V
## STRICT LIABILITY (FAILURE TO WARN) (AGAINST MONSANTO)

150.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

151.     Plaintiff brings this strict liability claim against Monsanto for failure to warn.

152.     At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the

FILED DATE: 3/5/2019 1:32 PM   2019L002422

dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Monsanto.

153.   Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiff, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

154.   At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn the Plaintiff of the dangers associated with Roundup® use and exposure. Monsanto, as manufacturer, seller, promoter, marketer, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

155.   At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

156.   At all times relevant to this litigation, Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by these herbicides, including the Plaintiff.

157.   Despite the fact that Monsanto knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with

FILED DATE: 3/5/2019 1:32 PM   2019L002422

use and exposure. The dangerous propensities of these products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or scientifically knowable to Monsanto through appropriate research and testing by known methods, at the time they distributed, marketed, promoted, supplied or sold the product, and not known to end users and consumers, such as the Plaintiff.

158.   These products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

159.   At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Illinois and throughout the United States, including the Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, promoted and marketed by Monsanto.

160.   The Plaintiff was exposed to Roundup® products in the course of his personal use during the course of his work as a landscaper without knowledge of their dangerous characteristics.

161.   At all times relevant to this litigation, the Plaintiff used and/or was exposed to the use of Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

162.   The Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of the Plaintiff's exposure. The Plaintiff relied upon the skill, superior knowledge, and judgment of Monsanto.

163.    These products were defective because the minimal warnings disseminated with

Roundup® products were inadequate, and they failed to communicate adequate information on

the dangers and safe use/exposure and failed to communicate warnings and instructions that were

appropriate and adequate to render the products safe for their ordinary, intended and reasonably

foreseeable uses, including agricultural and landscaping applications.

164.    The information that Monsanto did provide or communicate failed to contain relevant

warnings, hazards, and precautions that would have enabled consumers such as the Plaintiff to

utilize the products safely and with adequate protection. Instead, Monsanto disseminated

information that was inaccurate, false, and misleading and which failed to communicate

accurately or adequately the comparative severity, duration, and extent of the risk of injuries with

use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the

efficacy of its products, even after it knew or should have known of the unreasonable risks from

use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive

marketing and promotion, any information or research about the risks and dangers of exposure to

Roundup® and glyphosate.

165.    To this day, Monsanto has failed to adequately and accurately warn of the true risks of

the Plaintiff's injuries associated with the use of and exposure to Roundup® and its active

ingredient glyphosate, a probable carcinogen.

166.    As a result of their inadequate warnings, Roundup® products were defective and

unreasonably dangerous when they left the possession and/or control of Monsanto, were

distributed, marketed, and promoted by Monsanto, and used by the Plaintiff in his work.

167.    Monsanto is liable to the Plaintiff for injuries caused by their negligent or willful failure,

as described above, to provide adequate warnings or other clinically relevant information and

data regarding the appropriate use of these products and the risks associated with the use of or exposure to Roundup® and glyphosate.

168.    The defects in Roundup® products caused or contributed to cause the Plaintiff's injuries, and, but for this misconduct and omissions, the Plaintiff would not have sustained his injuries.

169.    Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products, Plaintiff could have avoided the risk of developing injuries as alleged herein.

170.    As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment and lost income.

WHEREFORE, the Plaintiff Keith Cichy respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Monsanto for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT VI
## NEGLIGENCE (AGAINST MONSANTO)

171.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

172.    Monsanto, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by the Plaintiff.

173.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale,

FILED DATE: 3/5/2019 1:32 PM   2019L002422

39

and distribution of Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

174.    At all times relevant to this litigation, Monsanto s had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

175.    At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

176.    Accordingly, at all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with the Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including the Plaintiff.

177.    Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

178.    As such, Monsanto breached the duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Monsanto manufactured, marketed, promoted, and sold defective herbicides containing the chemical

glyphosate, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

179.    Despite an ability and means to investigate, study, and test these products and to provide adequate warnings, Monsanto has failed to do so. Indeed, Monsanto has wrongfully concealed information and has further made false and/or misleading statements concerning the safety of exposure to Roundup® and glyphosate.

180.    Monsanto was negligent in the following respects:

(a)    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

(b)    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

(c)    Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

(d)    Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

FILED DATE: 3/5/2019 1:32 PM   2019L002422

FILED DATE: 3/5/2019 1:32 PM    2019L002422

(e)      Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

(f)      Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Monsanto could reasonably foresee would use and be exposed to its Roundup® products;

(g)      Failing to disclose to the Plaintiff, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

(h)      Failing to warn the Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to the Plaintiff and other consumers;

(i)      Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

(j)      Representing that its Roundup® products were safe for their intended use when, in fact, Monsanto knew or should have known that the products were not safe for their intended purpose;

(k)      Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

(l)      Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

(m)    Continuing to disseminate information to its consumers, which indicate or imply that Monsanto's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

(n)    Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

181.    Monsanto knew and/or should have known that it was foreseeable that consumers such as the Plaintiff would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup®.

182.    The Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

183.    Monsanto's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiffs suffered, as described herein.

184.    Monsanto's conduct, as described above, was reckless. Monsanto regularly risked the lives of consumers and users of their products, including the Plaintiff's, with full knowledge of the dangers of these products. Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including the Plaintiff. Monsanto's reckless conduct therefore warrants an award of aggravated or punitive damages.

185.    As a proximate result of Monsanto's wrongful acts and omissions in placing defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff has suffered and continues to suffer grave injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment and lost income.

FILED DATE: 3/5/2019 1:32 PM   2019L002422

FILED DATE: 3/5/2019 1:32 PM   2019L002422

WHEREFORE, the Plaintiff Keith Cichy respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Monsanto for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT VII

## NEGLIGENCE NORTHWESTERN MEMORIAL HOSPITAL

186.    On and before July 17, 2018, and at all times relevant herein, the Defendant, Northwestern Memorial Hospital, was a domestic not-for-profit corporation organized and existing pursuant to the laws of the State of Illinois, that employed physicians, nurses, technicians, and other healthcare professionals to operate, manage, maintain, and control a certain hospital, located at 251 E. Huron Street, Chicago, Illinois, at which place it provided medical care and services to patients.

187.    On and before July 17, 2018, and at all times relevant herein, the Defendant, Northwestern Medical Faculty Foundation, was a domestic not-for-profit corporation organized and existing pursuant to the laws of the State of Illinois, that employed physicians, nurses, technicians, and other healthcare professionals to provide health care services to patients at Northwestern Memorial Hospital at its principal place of business located at 251 E. Huron Street, Chicago, Illinois.

188.    On and before July 17, 2018, and at all times relevant herein, the Defendant, Olga Frankfurt, M.D., was a licensed physician duly licensed to practice medicine in the State of Illinois, engaged in the practice of internal medicine, and was on the staff of, and had privileges for the care and treatment of patients at Northwestern Memorial Hospital.

FILED DATE: 3/5/2019 1:32 PM   2019L002422

189.    At all relevant times herein, Olga Frankfurt, M.D., was the actual or apparent agent, servant or employee of Northwestern Memorial Hospital, acting within the scope of her employment.

190.    At all relevant times herein, Olga Frankfurt, M.D., was the actual or apparent agent, servant or employee of Northwestern Medical Faculty Foundation, acting within the scope of her employment.

191.    On July 24, 2008, the Plaintiff Keith Cichy was diagnosed with AML

192.    On December 24, 2008, the Plaintiff Keith Cichy underwent an allogeneic 9/10 MUD transplant.

193.    The Plaintiff Keith Cichy was discharged from Northwestern Memorial Hospital on prophylactic antibiotics including Voriconazole on January 12, 2009.

194.    On June 03, 2009 Mr. Cichy presented to Northwestern Memorial Hospital with complaints of increased outside activity with increased redness on his hands and face.

195.    On June 03, 2009 there were concerns that Mr. Cichy was suffering from graft versus host disease (GVHD).

196     On June 03, 2009 it was noted that Mr. Cichy was receiving 200 mg of Voriconazole PO BID.

197.    On June 17, 2009 Mr. Cichy had a punch biopsy performed.

198.    The result of the June 17, 2009 punch biopsy came back on June 22, 2009 as being consistent with grade 2 GVHD showing Lichenoid GVHD and skin cutaneous GVHD.

199.    Mr. Cichy was followed by Dr. Olga Frankfurt for management of his GVHD.

200.    Dr. Olga Frankfurt kept Mr. Cichy on Voriconazole from January 12, 2009 until July 17, 2018.

FILED DATE: 3/5/2019 1:32 PM   2019L002422

201.    On April 08, 2015 Mr. Cichy was diagnosed with Bowen's disease from the site of a persistent lesion on his right check.

202.    On June 05, 2015 Mr. Cichy was noted to have several hypopigment lesions on his face demonstrating Bowen's disease. He was again to resume his Voriconazole BID when working in the field.

203.    On November 11, 2015 Mr. Cichy was started on ECP for his GVHD. He was to be off the Voriconazole for the winter and return to taking it during the summer months.

204.    On March 09, 2016, June 01, 2016, July 07, 2016, and February 03, 2017 Mr. Cichy was instructed to be off the Voriconazole during the winter months and to take it BID during the summer months.

205.    On August 30, 2017 Mr. Cichy underwent his first Mohs procedure.

206.    On September 11, 2017 Dr. Frankfurt instructed Mr. Cichy to continue the Voriconazole BID during the summer months.

207.    On September 14, 2017 Mr. Cichy had a biopsy done of the persistent lesion on his right check. The biopsy was positive for Squamous Cell Carcinoma.

208.    On February 28, 2018 Mr. Cichy had his second Mohs procedure.

209.    During an office visit with Dr. Jennifer Choi on June 18, 2018 Mr. Cichy reported blistering on his fact that occurred only during the summer months.  Dr. Choi indicated that Mr. Cichy's complaints were consistent with photosensitivity/phototoxicity due to the prolonged exposure to Voriconazole, and noted that she planned to discuss this with Dr. Frankfurt to see if Mr. Cichy could be switched to Fluconazole.

210.    On July 17, 2018 Mr. Cichy was seen be Dr. Frankfurt who noted that when Mr. Cichy was taking Voriconazole he had sun exposure which led to vori light sensitivity and significant

FILED DATE: 3/5/2019 1:32 PM   2019L002422

erythema and blistering of the skin. Dr. Frankfurt discontinued Voriconazole. Dr. Frankfurt noted that Mr. Cichy's GVHD was stable and that the flairs were more likely vori photosensitivities.

211.    At no point in time did Dr. Frankfurt discuss the risks of prolonged exposure to Voriconazole with Mr. Cichy.

212.    As a result of the prolonged exposure to Voriconazole Mr. Cichy suffered Bowen's disease, vori light sensitivity and significant erythema and blistering of the skin which required additional medical treatment and surgery and shortened his life expectancy.

213.    As a result of the prolonged exposure to Voriconazole, Mr. Cichy suffered bodily harm, required additional medical care and treatment, required additional surgical procedures, suffered additional pain, suffered an additional loss of a normal life, and suffered a reduction of his life expectancy.

214.    That at all times relevant herein, it became and was the duty of Defendant Northwestern Memorial Hospital, by and through its agents, servants, staff, and employees including but not limited to those other Defendant(s) named in this action, to render medical care and treatment in accordance with the accepted standards of prevailing medical practice and opinion existing in the community at that time and to exercise that degree of care and skill commonly exercised by other hospitals in the community.

215.    That after assuming the care and treatment of the Plaintiff, Defendant Northwestern Memorial Hospital, by and through its agents and employees was guilty of one or more of the following negligent acts and/or omissions:

      a.      Defendant failed to advise the Plaintiff of the risks of prolonged exposure to Voriconazole;

FILED DATE: 3/5/2019 1:32 PM   2019L002422

b.     Defendant prescribed Voriconazole for longer than was reasonably necessary;

c.     Defendant failed to consider less harmful antifungal medications;

d.     Defendant failed to properly manage the Plaintiff's GVHD; and/or

e.     Defendant failed to have proper procedures in place to ensure that harmful medications are not prescribed for a longer period of time than necessary.

216.    As a direct and proximate result of one or more of the foregoing negligent acts and/or omissions of the Defendant Northwestern Memorial Hospital, by and through its agents or employees, the Plaintiff, Keith Cichy has suffered, and will continue to suffer personal injuries and damages of a personal, pecuniary, and permanent nature.

WHEREFORE, the Plaintiff, Keith Cichy, prays judgment against the Defendant Northwestern Memorial Hospital in an amount greater than Fifty Thousand ($50,000.00) Dollars plus costs of this suit.

## COUNT VIII

## NEGLIGENCE NORTHWESTERN MEDICAL FACULTY FOUNDATION

217-244.     Plaintiff hereby adopts and incorporates paragraphs 186-213 of Count VII as paragraphs 217-244 of this Count VII as if they were fully stated herein.

245.    That at all times relevant herein, it became and was the duty of Defendant Northwestern Medical Faculty Foundation, by and through its agents, servants, staff, and employees including but not limited to those other Defendant(s) named in this action, to render medical care and treatment in accordance with the accepted standards of prevailing medical practice and opinion existing in the community at that time and to exercise that degree of care and skill commonly exercised by other hospitals in the community.

FILED DATE: 3/5/2019 1:32 PM   2019L002422

246.     That after assuming the care and treatment of the Plaintiff, Defendant Northwestern

Medical Faculty Foundation, by and through its agents and employees was guilty of one or more

of the following negligent acts and/or omissions:

  a.  Defendant failed to advise the Plaintiff of the risks of prolonged exposure
     to Voriconazole;

  b.  Defendant prescribed Voriconazole for longer than was reasonably
     necessary;

  c.  Defendant failed to consider less harmful antifungal medications;

  d.  Defendant failed to properly manage the Plaintiff's GVHD; and/or

  e.  Defendant failed to have proper procedures in place to ensure that harmful
     medications are not prescribed for a longer period of time than necessary.

247.     As a direct and proximate result of one or more of the foregoing negligent acts and/or

omissions of the Defendant Northwestern Medical Faculty Foundation, by and through its agents

or employees, the Plaintiff, Keith Cichy has suffered, and will continue to suffer personal

injuries and damages of a personal, pecuniary, and permanent nature.

  WHEREFORE, the Plaintiff, Keith Cichy, prays judgment against the Defendant

Northwestern Medical Faculty Foundation in an amount greater than Fifty Thousand

($50,000.00) Dollars plus costs of this suit.

## COUNT IX

### NEGLIGENCE OLGA FRANKFURT, M.D.

248-275.     Plaintiff hereby adopts and incorporates paragraphs 217-244 of Count VIII as

paragraphs 248-275 of this Count IX as if they were fully stated herein.

276.     That at all times relevant herein, it became and was the duty of Defendant Olga

Frankfurt, M.D. to render medical care and treatment in accordance with the accepted standards

of prevailing medical practice and opinion existing in the community at that time and to exercise that degree of care and skill commonly exercised by other physicians in the community.

277.    That after assuming the care and treatment of the Plaintiff, Defendant Olga Frankfurt, M.D., was guilty of one or more of the following negligent acts and/or omissions:

   a.    Defendant failed to advise the Plaintiff of the risks of prolonged exposure to Voriconazole;

   b.    Defendant prescribed Voriconazole for longer than was reasonably necessary;

   c.    Defendant failed to consider less harmful antifungal medications;

   d.    Defendant failed to properly manage the Plaintiff's GVHD; and/or

   e.    Defendant failed to have proper procedures in place to ensure that harmful medications are not prescribed for a longer period of time than necessary.

278.    As a direct and proximate result of one or more of the foregoing negligent acts and/or omissions of the Defendant Olga Frankfurt, M.D., the Plaintiff, Keith Cichy has suffered, and will continue to suffer personal injuries and damages of a personal, pecuniary, and permanent nature.

   WHEREFORE, the Plaintiff, Keith Cichy, prays judgment against the Defendant Olga Frankfurt, M.D. in an amount greater than Fifty Thousand ($50,000.00) Dollars plus costs of this suit.

By: _____
David J. Gallagher

MOTHERWAY & NAPLETON, LLP.
Attorneys for Plaintiff
140 S. Dearborn, Suite 1500
Chicago, IL 60603
(312) 726-2699 - PHONE
(312) 726-6851 - FAX
Atty. No. 56421
dgallagher@mnlawoffice.com

50

FILED DATE: 3/5/2019 1:32 PM    2019L002422