# U.S. District Court
# California Northern District (Oakland)
# CIVIL DOCKET FOR CASE #: 4:19-cv-02224-DMR

| | |
|---|---|
| Ramirez v. Monsanto Company | Date Filed: 04/24/2019 |
| Assigned to: Magistrate Judge Donna M. Ryu | Jury Demand: Plaintiff |
| Demand: $130,000,000 | Nature of Suit: 365 Personal Inj. Prod. |
| Cause: 28:1332 Diversity-Motor Vehicle Product Liability | Liability |
| | Jurisdiction: Diversity |

**Plaintiff**

**Robert Ramirez**                    represented by  **William M. Audet**
                                                      Audet & Partners, LLP
                                                      711 Van Ness Avenue
                                                      Suite 500
                                                      San Francisco, CA 94102-3229
                                                      415-568-2555
                                                      Fax: 415.568-2556
                                                      Email: waudet@audetlaw.com
                                                      *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 04/24/2019 | 1 | COMPLAINT against Monsanto Company ( Filing fee $ 400, receipt number 0971-13286431.). Filed byRobert Ramirez. (Attachments: # 1 Civil Cover Sheet) (Audet, William) (Filed on 4/24/2019) (Entered: 04/24/2019) |
| 04/24/2019 | 2 | Proposed Summons. (Audet, William) (Filed on 4/24/2019) (Entered: 04/24/2019) |
| 04/24/2019 | 3 | Case assigned to Magistrate Judge Donna M. Ryu. Counsel for plaintiff or the removing party is responsible for serving the Complaint or Notice of Removal, Summons and the assigned judge's standing orders and all other new case documents upon the opposing parties. For information, visit *E-Filing A New Civil Case* at http://cand.uscourts.gov/ecf/caseopening. Standing orders can be downloaded from the court's web page at www.cand.uscourts.gov/judges. Upon receipt, the summons will be issued and returned electronically. Counsel is required to send chambers a copy of the initiating documents pursuant to L.R. 5-1(e)(7). A scheduling order will be sent by Notice of Electronic Filing (NEF) within two business days. |

| | | Consent/Declination due by 5/8/2019. (bwS, COURT STAFF) (Filed on 4/24/2019) (Entered: 04/24/2019) |
|---|---|---|

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 04/25/2019 06:55:33 | | | |
| **PACER Login:** | cdorsey12:5189134:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 4:19-cv-02224-DMR |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

William M. Audet (SBN 117456)
Ling Y. Kuang (SBN 296873)
AUDET & PARTNERS, LLP
711 Van Ness, Suite 500
San Francisco, CA 94102-3229
Tel: 415.568.2555
Fax: 415.568.2556
waudet@audetlaw.com
lkuang@audetlaw.com

*Counsel for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT RAMIREZ, individually and on behalf of all others similarly situated individuals, | Case No.: |
| Plaintiff, | **CLASS ACTION COMPLAINT UNDER FED. R. CIV. P. 23 (c)(4) AND FED. R. CIV. P. 23 (b)(2)** |
| v. | **<u>JURY DEMAND</u>** |
| MONSANTO COMPANY, | **Related to: MDL No: 2471** |
| Defendant. | |

CLASS ACTION COMPLAINT

Case 3:19-cv-02124 Document 967-3 Filed 04/24/19 Page 4 of 38

ROBERT RAMIREZ ("Plaintiff or Plaintiff Ramirez"), individually on behalf of all others similarly situated, by and through undersigned class counsel, allege as follows.

**INTRODUCTION**

1.      By and through the filing of this class action complaint, the Plaintiff seeks to obtain, in one proceeding, before one trier of fact, a ruling on the issue of the relationship between the active chemical glyphosate, contained in Monsanto Company's ("Monsanto" or "Defendant") Roundup® weed killer products (collectively, "Roundup"), and the carcinogenic effects on humans. In seeking to resolve this common question in one forum, the Plaintiff expects to save millions of dollars for the class members and hundreds of thousands of hours of judicial time and resources. The Plaintiff believes that the facts outlined below and the facts discovered to date establish, beyond dispute, that human exposure to glyphosate is a direct link to human cancer, specifically, the deadly cancer virus known as Non-Hodgkin's Lymphoma ("NHL"). Under Fed. R. Civ. P. 23(c)(4) and Fed. R. Civ. P. 23 (b)(2), the Plaintiff intends to present facts, studies and evidence to the jury for it to conclude that glyphosate causes NHL.

2.      Applying Rule 23(c)(4) as well as Rule 23(b)(2), Plaintiff will focus on the general issue of the link between NHL and Roundup's active ingredient, glyphosate. In so seeking resolution of this narrow issue, the Plaintiff and the counsel in this case intend to obtain a general causation verdict that would apply to each and every class member.

3.      In seeking resolution of the general causation component contained in almost every state's product liability laws, the only remaining issue that all class members and the Plaintiff will need to show is that they have NHL due to exposure to Roundup and the amount of damages due to that plaintiff. Under the Plaintiff's plan, the only issue that those with NHL and proof of exposure to Roundup will have to prove is the specific link and the specific damages suffered by the class member. If allowed to proceed in this fashion, the Plaintiff will have provided significant and meaningful benefit to the class members in one proceeding.

//

//

//

CLASS ACTION COMPLAINT

**JURISDICTION AND VENUE**

4.     This Court has subject-matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332 (a) and (d), because the amount in controversy exceeds $5,000,000.00 exclusive of interest and costs, and more than two-thirds of the members of the proposed class (hereinafter "Class") are citizens of states different from that of Defendant.

5.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant's improper conduct alleged in this Complaint occurred in, was directed from, and/or emanated from this judicial district. Defendant is a Missouri corporation with sales of the product at issue in all states of the United States. The Judicial Panel of Multidistrict Litigation panel transferred similar complaints pending in other jurisdictions to this Court for pretrial adjudication.

**PARTIES**

6.     Plaintiff ROBERT RAMIREZ is a natural person currently residing in Soledad, California.  Plaintiff ROBERT RAMIREZ worked for Roto-Rooter in Salinas, California from 1999 to 2013 where he utilized a concentrated mix of Roundup in the maintenance yard.   In 2018, Plaintiff was diagnosed with Double Expressor Large B-Cell non-Hodgkin's Lymphomas (NHL) at the Salinas Valley Memorial Hospital in Salinas and underwent chemo treatment at Stanford University Hospital. Plaintiff was found to be in remission in 2018, but continues to require a colostomy bag and cancer screening.   Plaintiff ROBERT RAMIREZ only became aware that his injuries were caused by Roundup, a Monsanto's product, within the applicable limitations period of filing this complaint.

7.     Defendant Monsanto Company ("Monsanto") is a Delaware corporation, with its headquarters and principal place of business in St. Louis, Missouri. At all times relevant to this complaint, Monsanto was the entity that discovered and sold the herbicidal properties of glyphosate and the manufacturer of Roundup. Monsanto has regularly transacted and conducted business within this District, and has derived substantial revenue from its goods and products sold in this District. By regularly marketing and selling their products within this District, Monsanto expected its acts to have consequences within this District and derived substantial revenue from interstate commerce.

**UNDERLYING FACTS**

**(Roundup and Roundup Ready)**

CLASS ACTION COMPLAINT

8.      Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world. Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. As plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

9.      The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup. From the outset, Monsanto marketed Roundup as a "safe" general-purpose herbicide for widespread commercial and consumer use. It still markets Roundup as safe today.

10.      The success of Roundup was key to Monsanto's continued brand recognition and dominance in the marketplace. Largely due to the success of Roundup sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its market dominance and to ward off impending competition.

11.      In response, Monsanto commenced the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup weed killer herbicide.

## SUBMISSION OF FALSE DATA BY MONSANTO

12.      The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency

CLASS ACTION COMPLAINT

("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

13. Pesticides are toxic to plants, animals, and humans. As such, the EPA requires as part of the registration process, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

14. FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a pesticide registration should be granted or allowed to continue to be sold in commerce.

15. FIFRA generally requires that the registrant (Monsanto in the case of Roundup) conducts health and safety testing of their pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer under FIFRA.

16. Based on early studies showing that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C). After pressure from Monsanto, which includes contrary studies it provided to the EPA, the EPA changed the classification of glyphosate to a finding of *evidence of non-carcinogenicity in humans* (Group E) in 1991.

17. The EPA made clear that the designation did not equate to a finding that the product was cancer free; "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive

CLASS ACTION COMPLAINT

1    conclusion that the agent will not be a carcinogen under any circumstances."

2    18.    On two occasions, the EPA found that the laboratories hired by Monsanto to test the

3    toxicity of its Roundup products for registration purposes had committed fraud, by falsifying results.

4    19.    In the first occasion, Monsanto was seeking initial registration of Roundup by EPA and

5    hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies

6    relating to Roundup. IBT performed about 30 tests on glyphosate and glyphosate-containing products,

7    including 9 of the 15 residue studies needed to register Roundup.

8    20.    Then in 1976, the United States Food and Drug Administration ("FDA") performed an

9    inspection of IBT that revealed discrepancies between the raw data and the final report relating to the

10   toxicological impacts of glyphosate. The EPA subsequently audited IBT and found the toxicology

11   studies conducted for the Roundup herbicide were invalid. An EPA reviewer stated, after finding

12   "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies

13   when they said they took specimens of the uterus from male rabbits." Three top executives of IBT were

14   convicted of fraud in 1983.

15   21.    In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991

16   to perform pesticide and herbicide studies, including studies for Roundup. In that same year, the owner

17   of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent

18   laboratory practices in the testing of pesticides and herbicides.

19   22.    The evaluation of each pesticide product distributed, sold, or manufactured is completed

20   at the time the product is initially registered. The data necessary for registration of a pesticide has

21   changed over time. The EPA is now in the process of re-evaluating all pesticide products through a

22   Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate

23   these pesticides, the EPA is demanding the completion of additional tests and the submission of data

24   for the EPA's review and evaluation.

25   23.    In the case of glyphosate, and therefore Roundup, the EPA had planned on releasing its

26   preliminary risk assessment —in relation to the reregistration process—no later than July 2015. The

27   EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment

28   pending further review in light of the World Health Organization ("WHO") health-related findings.

CLASS ACTION COMPLAINT

1                     **ACTION BY GOVERNMENTAL ENTITIES**

2         24.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto

3 based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged

4 Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup,

5 were "**safer than table salt"** and "**practically non-toxic**" to mammals, birds, and fish. The NYAG

6 found that Monsanto had made the following deceptive and misleading claims about Roundup:

7           i.      Remember that environmentally friendly Roundup herbicide is

8         biodegradable. It won't build up in the soil so you can use Roundup with confidence

9         along customers' driveways, sidewalks and fences;

10           ii.     And remember that Roundup is biodegradable and won't build up in the

11         soil. That will give you the environmental confidence you need to use Roundup

12         everywhere you've got a weed, brush, edging or trimming problem;

13           iii.    Roundup biodegrades into naturally occurring elements;

14           iv.    Remember that versatile Roundup herbicide stays where you put it. That

15         means there's no washing or leaching to harm customers' shrubs or other desirable

16         vegetation;

17           v.     This non-residual herbicide will not wash or leach in the soil. It ... stays

18         where you apply it;

19           vi.    You can apply Roundup with "confidence because it will stay where you

20         put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application,

21         soil micro-organisms biodegrade Roundup into natural products;

22           vii.    Glyphosate is less toxic to rats than table salt following acute oral

23         ingestion;

24           viii.    Glyphosate's safety margin is much greater than required. It has over a

25         1,000-fold safety margin in food and over a 700-fold safety margin for workers who

26         manufacture it or use it;

27

28

CLASS ACTION COMPLAINT

ix.     You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish;

x.     "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

25.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG. Monsanto agreed, *interalia* "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

(a)     Monsanto's glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

(b)     Monsanto's glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

(c)     Monsanto's glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics.";

(d)     Monsanto's glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

(e)     Monsanto's glyphosate-containing products or any component thereof might be classified as "practically non-toxic.

26.     Several countries around the world have instituted bans on the sale and use of Roundup and other glyphosate-containing herbicides.

27.     The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup, which was in effect by the end of 2015.

28.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate. France banned the private sale of Roundup and glyphosate following the International Agency for Research on Cancer's ("IARC") assessment for Glyphosate. Bermuda banned both the private and commercial sale of glyphosates, including Roundup.

CLASS ACTION COMPLAINT

The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended." The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that Glyphosate has been linked to fatal kidney disease in agricultural workers. Columbia announced its ban on using Roundup and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

## IARC FINDINGS

29.     The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined that 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic. The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

30.     In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study. In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent (Probable Human Carcinogens).

31.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from

8

1   governmental reports that are publicly available."

2       32.     The studies considered the following exposure groups: occupational exposure of

3   farmers and tree nursery workers in the United States forestry workers in Canada and Finland and

4   municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming

5   families.

6       33.     Glyphosate was identified as the second-most used household herbicide in the United

7   States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in

8   2012. Exposure pathways are identified as air (especially during spraying), water, and food.

9   Community exposure to glyphosate is widespread and found in soil, air, surface water, and

10  groundwater, as well as in food.

11      34.     The assessment of the IARC Working Group identified several case control studies of

12  occupational exposure in the United States, Canada, and Sweden. These studies show a human health

13  concern from agricultural and other work-related exposure to glyphosate.

14      35.     The IARC Working Group found an increased risk between exposure to glyphosate and

15  non-Hodgkin's lymphoma and several subtypes of NHL, and the increased risk persisted after

16  adjustment for other pesticides. The IARC Working Group also found that glyphosate caused DNA

17  and chromosomal damage in human cells. One study in community residents reported increases in

18  blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

19      36.     In male CD-1 mice, glyphosate induced an increasing trend in the incidence of a rare

20  tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male

21  mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate

22  formulation promoted skin tumors in an initiation-promotion study in mice.

23      37.     The IARC Working Group noted that glyphosate has been detected in the urine of

24  agricultural    workers,    indicating    absorption.    Soil    microbes    degrade    glyphosate    to

25  aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal

26  microbial metabolism in humans. The IARC Working Group further found that glyphosate and

27  glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and

28  animal cells in utero. The IARC Working Group noted genotoxic, hormonal, and enzymatic effects in

9

CLASS ACTION COMPLAINT

1  mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino

2  acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary

3  product biosynthesis and general metabolic disruption.

4        38.    The IARC Working Group also reviewed an Agricultural Health Study, consisting of a

5  prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this

6  study differed from others (in that it was based on a self-administered questionnaire), the results support

7  an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia ("HCL"),

8  and Chronic Lymphocytic Leukemia ("CLL"), in addition to several other cancers.

9  
**ESTOPPEL FROM PLEADING AND
TOLLING OF APPLICABLE STATUTES OF LIMITATIONS**

10  

11        39.    Plaintiff and members of the Class are within the applicable statute of limitation for the

12  claims presented here. Defendant had non-public information (e.g., internal audits, field test results,

13  and other evidence) relating the NHL and Roundup for many years, but failed to release this to the

14  public.

15                                **CLASS ACTION ALLEGATIONS**

16        40.    This action is brought and may be maintained under Fed. R. Civ. P. 23 as a class action.

17  Plaintiff seeks nationwide and multi-state certification under Fed R. Civ. P. 23(c)(4) and Fed R. Civ.

18  P. 23(b)(2).

19        41.    Consistent with the underlying purpose and goals of Fed R. Civ. P. 23(c)(4), the Plaintiff

20  for the Class seeks to certify an 'issue' only class. Once certification is granted by the Court, the

21  Plaintiff intends to convene a trial to advance the litigation for all class members by way of issue

22  resolution, with focus on establishing for all class members the link between exposure to Roundup

23  (glyphosate) and NHL. The findings on this issue by the Jury and/or the Court will significantly reduce

24  the cost of litigation for the class members and significantly increase judicial efficiency by reducing

25  the need for each and every case to prove the 'link' between Roundup and NHL

26        42.    At this juncture, subject to modification prior to class proceedings to trial, the named

27  Plaintiff seeks the following Class under Fed R. Civ. P. 23(c)(4):

28                  "All residents of the United States and its Territories who have been

CLASS ACTION COMPLAINT

1 exposed to Roundup and have been diagnosed with NHL"

2 43. The issues for the trier of fact to consider include, but are not limited to, the following:

3   (a) Whether exposure to Roundup causes NHL;

4   (b) Whether Monsanto knew that exposure to Roundup causes cancer/NHL;

5   (c) What minimal level of exposure to Roundup causes NHL; and/or

6   (d) Whether Monsanto made material misstatements regarding the link

7 between Roundup and NHL.

8 44. Upon resolution of the above issues by the trier of fact, the class members only need to

9 prove 'specific' causation and damages suffered as a result of the exposure to Roundup. This "second

10 phase" of the Class Member's case could be conducted by Special Masters and/or Magistrate Judge's

11 assigned to this matter. The Plaintiff shall present to the Court a constitutionally sound methodology

12 for consideration of Phase 2 in a manner that significantly reduces the burden on all parties and

13 increases the efficiency of the judicial resources necessary to proceed under Fed R. Civ. P. 23(c)(4).

14 45. The proposed nationwide declaratory and injunctive relief Class under Fed R. Civ. P.

15 23(b)(2) is defined as follows: "All individuals and entities that have been exposed to Roundup

16 products in the states and the territories of the United States".

17 46. Under Fed R. Civ. P. 23(b)(2), in addition to the nationwide class, Plaintiff also seek to

18 represent the following multistate Class as defined as follows:

19
20
21
22
23
24
25
26

   All individuals and entities that have been exposed to Roundup products
   in the territories of the United States are residents of the following states:
   Alabama, Alaska, Arizona, Arkansas, California, Colorado,
   Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois,
   Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland,
   Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana,
   Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New
   York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon,
   Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee,
   Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin,
   Wyoming, and the District of Columbia.

27 47. Excluded from the Class are: (1) Defendant, and any entity in which Defendant has a

28 controlling interest in or which has a controlling interest in Defendant; (2) Defendant's legal

CLASS ACTION COMPLAINT

1 | representatives, assigns and successors; and (3) the judge(s) or magistrate judge to whom this case is

2 | assigned and any member of the judge's immediate family.

3 | 48.    Plaintiff and the Class reserves the right to redefine the Class(es), and/or requests for

4 | relief.

5 | 49.    The members of the proposed Class are so numerous that joinder of all members is

6 | impracticable.

7 | 50.    The exact number of Class members is unknown.

8 | 51.    A common relief by way of trial under Fed R. Civ. P. 23(b)(2) and Fed R. Civ. P. 23(c)(4)

9 | is sought for Plaintiff and Class members.

10 | 52.    Numerous common questions of law and fact impact all of the class members.

11 | 53.    The claims and defenses of the Plaintiff are typical of the claims and defenses of the

12 | Class. Plaintiff and the Class have been exposed to Roundup and have been or shall be injured as a

13 | result.

14 | 54.     Plaintiff, like all Class members, have been damaged by Defendant's conduct in

15 | distributing and marketing a product that Defendant knew or should have known would cause NHL.

16 | Additionally, the factual basis of Defendant's conduct is common to all Class members and represents

17 | a common thread of deliberate and negligent misconduct resulting in injury and damages to all

18 | members of the Class.

19 | 55.    The Plaintiff will fairly and adequately assert and protect the interests of the Class.

20 | Specifically, they have retained attorneys, including William M. Audet and the firm of Audet &

21 | Partners, LLP, that are experienced in prosecuting class action claims and will adequately represent the

22 | interests of the Class. Neither the Plaintiff, nor the Attorneys, have any conflict of interests that will

23 | interfere with the maintenance of this class action.

24 | 56.    A class action provides a fair, efficient, and superior method for the adjudication of this

25 | controversy.

26 | 57.    Alternatively, the Class satisfies all applicable factors under Rule 23(b)(3), and as such,

27 | the Class may be certified as a 'damage' based class action.

28 |

CLASS ACTION COMPLAINT

**CAUSES OF ACTION**

**COUNT I**

**Claim for Declaratory and Injunctive and Equitable Relief**

**(On Behalf of Residents of the United States and its Territories)**

58.     Plaintiff and the Class incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

59.     An actual controversy exists between Defendant and Plaintiff concerning:

      a.     Whether Defendant marketed Roundup but omitted material health information regarding use of the products;

      b.     Whether Defendant's marketing of Roundup was false, deceptive, and/or misleading;

      c.     Whether Roundup is unfit for its ordinary purpose;

      d.     Whether Roundup is unfit for its particular purpose of providing weed control;

      e.     When did Defendant discover that Roundup was linked to NHL;

      f.     Whether Defendant had obligation to disclose the link between NHL and Roundup;

      g.     Whether Defendant was unjustly enriched by the sale of Roundup;

      h.     Whether Defendant breached its express and implied warranties;

      i.     Whether Defendant engaged in fraudulent, unfair, or deceptive conduct that should subject Defendant to punitive damages; and

      j.     Whether Defendant should be declared financially responsible for notifying all Class members about Roundup's link to NHL.

60.     Under the Declaratory Judgment Act, 28 U.S.C. § 2201, this Court may "declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." The declaratory relief sought here does not fall within any of the exemptions set forth in that Act.

61.     Accordingly, Plaintiff and the Class pray this Court declare that:

      a.     Roundup can cause NHL if the Class Member is exposed to Roundup;

CLASS ACTION COMPLAINT

      b.     Defendant knew Roundup exposure could cause NHL; and

      c.     Defendant is required to disclose to the class, at its own cost, that Roundup's propensity has been linked to NHL.

62.    The requested declaratory relief will generate common answers that will resolve controversies that lie at the heart of this litigation and will allow Plaintiff and the Class to obtain relief that directly redresses the injury suffered.

## COUNT II

### Strict Liability - Design Defect

### (On Behalf of Residents of the United States and its Territories)

63.    Plaintiff and the Class incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

64.    Plaintiff and the Class brings this strict liability claim against Defendant for defective design.

65.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, including Plaintiff and the Class, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant. At all times relevant to this litigation, Defendant designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup products that Plaintiff was exposed to.

66.    At all times relevant to this litigation, Defendant's Roundup products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff and the Class.

67.    At all times relevant to this litigation, Defendant's Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products throughout the United States, including Plaintiff, without the substantial change in the condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

68.    Defendant's Roundup products, as researched, tested, developed, designed, licensed,

14

1  manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in

2  design and formulation in that when they left the hands of the Defendant's manufacturers and/or

3  suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary

4  consumer would contemplate.

5        69.   Defendant's Roundup products, as researched, tested, developed, designed, licensed,

6  manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in

7  design and formulation in that when they left the hands of Defendant's manufacturers and/or suppliers,

8  the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

9        70.   At all times relevant to this action, Defendant knew or had reason to know that its

10  Roundup products were defective and were inherently dangerous and unsafe when used in the manner

11  instructed and provided by Defendant.

12        71.   Therefore, at all times relevant to this litigation, Defendant' Roundup products, as

13  researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold

14  and marketed by Defendant were defective in design and formulation, in one or more of the following

15  ways:

16         a.   When placed in the stream of commerce, Defendant's Roundup products

17            were defective in design and formulation, and, consequently, dangerous to

18            an extent beyond that which an ordinary consumer would contemplate.

19         b.   When placed in the stream of commerce, Defendant's Roundup products

20            were unreasonably dangerous in that they were hazardous and posed a grave

21            risk of cancer and other serious illnesses when used in a reasonably

22            anticipated manner.

23         c.   When placed in the stream of commerce, Defendant's Roundup products

24            contained unreasonably dangerous design defects and were not reasonably

25            safe when used in a reasonably anticipated or intended manner.

26         d.   Defendant did not sufficiently test, investigate, or study its Roundup

27            products and, specifically, the active ingredient glyphosate.

28

15

CLASS ACTION COMPLAINT

e.   Exposure to Roundup and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f.   Defendant knew or should have known at the time of marketing its Roundup products that exposure to Roundup and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g.   Defendant did not conduct adequate post-marketing surveillance of its Roundup products.

h.   Defendant could have employed safer alternative designs and formulations.

72.   Plaintiff was exposed to Defendant's Roundup products without knowledge of its dangerous characteristics.

73.   At all times relevant to this litigation, Plaintiff were exposed to Defendant's Roundup products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

74.   Plaintiff and the Class could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

75.   The harm caused by Defendant's Roundup products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendant's Roundup products were and are more dangerous than alternative products and Defendant could have designed its Roundup products to make them less dangerous. Indeed, at the time that Defendant designed its Roundup the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

76.   At the time Roundup products left Defendant's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant' herbicides.

77.   Defendant's defective design of its Roundup products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup products, including the Plaintiff and the Class herein.

CLASS ACTION COMPLAINT

78.     Therefore, as a result of the unreasonably dangerous condition of its Roundup products, Defendant are strictly liable to Plaintiff and the Class.

79.     The defects in Defendant's Roundup products were substantial and contributing factors in causing Plaintiff and the Class grave injuries, specifically NHL, and, but for Defendant' misconduct and omissions, Plaintiff and the Class would not have sustained their injuries.

80.     Defendant's conduct, as described above, was reckless. Defendant risked the lives of consumers and users of its products, including Plaintiff and the Class with knowledge of the safety problems associated with Roundup and glyphosate-containing products, and suppressed this knowledge from the general public. Defendant made conscious decisions not to redesign, warn or inform the unsuspecting public. Defendant's reckless conduct warrants an award of punitive damages.

81.     As a direct and proximate result of Defendant placing defective Roundup products into the stream of commerce, Plaintiff and the Class suffered damages and continue to suffer grave injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff and the Class will continue to incur these expenses in the future.

82.     WHEREFORE, Plaintiff and the Class respectfully request that this Court enter judgment in Plaintiff' and the Class favor and all such other and further relief as this Court deems just and proper.

### COUNT  III

### Strict Liability - Failure to Warn

### (On Behalf of Residents of the United States and its Territories)

83.     Plaintiff and the Class incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

84.     Plaintiff and the Class bring this strict liability claim against Defendant for failure to warn.

85.     At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, promoting and applying Roundup products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics

CLASS ACTION COMPLAINT

1   of Roundup and specifically, the active ingredient glyphosate. These actions were under the ultimate
2   control and supervision of Defendant.

3       86.    Monsanto researched, developed, designed, tested, manufactured, inspected, labeled,
4   distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup
5   products, and in the course of same, directly advertised or marketed the products to consumers and end
6   users, including the Plaintiff, and persons responsible for consumers (such as employers), and therefore
7   had a duty to warn of the risks associated with the use of Roundup and glyphosate-containing products.

8       87.    At all times relevant to this litigation, Defendant had a duty to properly test, develop,
9   design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide
10  proper warnings, and take such steps as necessary to ensure that Roundup products did not cause users
11  and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to
12  warn the Plaintiff of the dangers associated with Roundup use and exposure. Defendant, as
13  manufacturer, seller, or distributor of chemical herbicides, are held to the knowledge of an expert in
14  the field.

15      88.    At the time of manufacture, Defendant could have provided the warnings or instructions
16  regarding the full and complete risks of Roundup and glyphosate-containing products because they
17  knew or should have known of the unreasonable risks of harm associated with the use of and/or
18  exposure to such products.

19      89.    At all times relevant to this litigation, Defendant failed to investigate, study, test, or
20  promote the safety or to minimize the dangers to users and consumers of this product and to those who
21  would foreseeably use or be harmed by Roundup, including Plaintiff.

22      90.    Despite the fact that Defendant knew or should have known that Roundup posed a grave
23  risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use
24  and exposure. The dangerous propensities of its products and the carcinogenic characteristics of
25  glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant
26  through appropriate research and testing by known methods, at the time it distributed, supplied or sold
27  the product, and not known to end users and consumers, such as Plaintiff.

28      91.    Defendant knew or should have known that these products created significant risks of

---

18

CLASS ACTION COMPLAINT

serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Defendant have wrongfully concealed information concerning the dangerous nature of Roundup and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup and glyphosate.

92.    At all times relevant to this litigation, Defendant' Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in California and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, marketed and sprayed/applied by Defendant.

93.    Plaintiff and the Class were exposed to Roundup products, as described above, without knowledge of their dangerous characteristics.

94.    At all times relevant to this litigation, Plaintiff and the Class were exposed to the use of Defendant' Roundup products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

95.    Plaintiff and the Class could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products prior to or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendant.

96.    Defendant knew or should have known that the minimal warnings disseminated with or accompanying the application of Roundup products were inadequate, and they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

97.    The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled those exposed such as Plaintiff to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or

1  should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or

2  otherwise suppressed, through aggressive marketing and promotion, any information or research about

3  the risks and dangers of exposure to Roundup and glyphosate.

4        98.    To this day, Defendants' have failed to adequately and accurately warn of the true risks

5  of Plaintiff's injuries associated with the use of and exposure to Roundup and its active ingredient

6  glyphosate, a probable human carcinogen.

7        99.    As a result of their inadequate warnings, Roundup products were defective and

8  unreasonably dangerous when they left the possession and/or control of Defendant, were sold or

9  distributed by Defendant, were applied by Defendant, and when Plaintiff used or became exposed.

10       100.   Defendant are liable to Plaintiff for injuries caused by negligent or willful failure, as

11  described above, to provide adequate warnings or other clinically relevant information and data

12  regarding the appropriate use of their products and the risks associated with the use of or exposure to

13  Roundup and glyphosate.

14       101.   The defects in these Roundup products were substantial and contributing factors in

15  causing Plaintiff and the Class injuries, and, but for Defendants' misconduct and omissions, Plaintiff

16  would not have sustained their injuries.

17       102.   Had Defendant provided adequate warnings and instructions and properly disclosed and

18  disseminated the risks associated with Roundup products and application, Plaintiff could have avoided

19  the risk of developing injuries as alleged herein and the company who employed Plaintiff could have

20  obtained alternative herbicides.

21       103.   As a direct and proximate result of Defendants' placing defective Roundup products into

22  the stream of commerce and exposing Plaintiff to them, Plaintiff have suffered and continue to suffer

23  severe injuries, and has endured physical pain and discomfort, as well as economic hardship, including

24  considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these

25  expenses in the future.

### COUNT IV

**Negligent Misrepresentation**

**(On Behalf of Residents of the United States and its Territories)**

CLASS ACTION COMPLAINT

104.   Plaintiff and the Class re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Class Action Complaint, as though set forth fully herein.

105.   Defendant manufactured, marketed, advertised, and sold, Roundup as a 'weed killer.'

106.   Among other things, Defendant omitted to disclose to users of material information regarding the link between exposure to human relevant doses and the likelihood of NHL after minimal usages and exposure per year.

107.   Defendant knew or should have known about Roundup's propensity to cause NHL.

108.   Defendant also failed to disclose, concealed, suppressed and omitted material information concerning Roundup and the truth regarding the various studies that Roundup would cite to support its false claim that Roundup did not cause NHL.

109.   Defendant intended that Plaintiff rely upon its material misrepresentations and omissions to purchase more Roundup.

### COUNT V

**Breach of Express Warranty**

**(On Behalf of Residents of the United States and its Territories)**

110.   Plaintiff and the Class re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Class Action Complaint, as though set forth fully herein.

111.   Defendant made several express warranties regarding Roundup,

112.   These representations and promises became part of the basis of the bargain between the parties and created a collective "express warranty" that Roundup would conform to Defendant's affirmations and promises.

113.   Defendant knew or should have known that Roundup was susceptible to causing cancer for those exposed to Roundup.

114.   Defendant has breached the express warranty.

115.   Defendant's conduct described in this Complaint constitutes a breach of express warranties under the following state statutes:

       a.     Ala. Code § 7-2-313, *et seq.*;

       b.     Alaska Stat. § 45.02.313, *et seq.*;

21

CLASS ACTION COMPLAINT

1        c.      Ariz. Rev. Stat. § 47-2313, *et seq.*;

2        d.      Ark. Code § 4-2-313, *et seq.*;

3        e.      Cal. Com. Code § 2313, *et seq.*;

4        f.      Colo. Rev. Stat. § 4-2-313, *et seq.*;

5        g.      Conn. Gen. Stat. § 42a-2-313, *et seq.*;

6        h.      6 Del. C. § 2-313, *et seq.*;

7        i.      D.C. Code § 28:2-313, *et seq.*;

8        j.      Fla. Code § 672.313, *et seq.*;

9        k.      O.C.G.A. § 11-2-313, *et seq.*;

10        l.      Haw. Rev. Stat. § 490:2-313, *et seq.*;

11        m.      Idaho Code § 28-2-313, *et seq.*;

12        n.      810 Ill. Comp. Stat. 5/2-313, *et seq.*;

13        o.      Ind. Code § 26-1-2-313, *et seq.*;

14        p.      Iowa Code § 554.2313, *et seq.*;

15        q.      Kan. Stat. § 84-2-313, *et seq.*;

16        r.      Ky. Rev. Stat. § 355.2-313, *et seq.*;

17        s.      La. Rev. Stat § 9:2800.53(6) , *et seq.*;

18        t.      11 M.R.S.A. § 2-313, *et seq.*;

19        u.      Md. Code Ann., Com. Law § 2-313, *et seq.*;

20        v.      Mass. Code 106, § 2-313, *et seq.*;

21        w.      Mich. Comp. Laws 440.2313, *et seq.*;

22        x.      Minn. Stat. § 336.2-313, *et seq.*;

23        y.      Miss. Code § 75-2-313, *et seq.*;

24        z.      Mo. Rev. Stat. § 400.2-313, *et seq.*;

25        aa.      Mont. Code § 30-2-313, *et seq.*;

26        bb.      Neb. U.C.C. § 2-313, *et seq.*;

27        cc.      Nev. Rev. Stat. § 104.2313, *et seq.*;

28        dd.      N.H. Rev. Stat. § 382-A:2-313, *et seq.*;

| | ee. | N.J. Stat. § 12A:2-313, *et seq*.; |
| | ff. | N.M. Stat. § 55-2-313, *et seq*.; |
| | gg. | N.Y. U.C.C. § 2-313, *et seq*.; |
| | hh. | N.C. Gen. Stat. § 25-2-313, *et seq*.; |
| | ii. | N.D. Cent. Code § 41-02-30, *et seq*.; |
| | jj. | Ohio Rev. Code § 1302.26, *et seq*.; |
| | kk. | Okla. Stat. Tit. 12A, § 2-313, *et seq*.; |
| | ll. | Or. Rev. Stat. § 72.3130, *et seq*.; |
| | mm. | 13 Pa. Cons. Stat. § 2313, *et seq*.; |
| | nn. | R.I. Gen. Laws § 6A-2-313, *et seq*.; |
| | oo. | S.C. Code § 36-2-313, *et seq*.; |
| | pp. | S.D. Codified Laws § 57A-2-313, *et seq*.; |
| | qq. | Tenn. Code § 47-2-313, *et seq*.; |
| | rr. | V.T.C.A., Bus. & C. § 2.313, *et seq*.; |
| | ss. | Utah Code § 70A-2-313, *et seq*.; |
| | tt. | Vt. Stat. Tit. 9A, § 2-313, *et seq*.; |
| | uu. | Va. Code § 8.2-313, *et seq*.; |
| | vv. | Wash. Rev. Code § 62A.2-313, *et seq*.; |
| | ww. | W. Va. Code § 46-2-313, *et seq*.; |
| | xx. | Wis. Stat. § 402.313, *et seq*.; and |
| | yy. | Wyo. Stat. § 34.1-2-313, *et seq*. |

116. Plaintiff and the Class have complied with the warranty terms, including application instructions and maintaining residence in their homes.

117. As a direct and proximate result of the breach of the express warranty, Plaintiff and the Class suffered damages, injury in fact and/or ascertainable loss in an amount to be determined at trial, including repair and replacement costs and/or damages to other property.

CLASS ACTION COMPLAINT

## COUNT VI

**Breach of Implied Warranty (Non-Privity)**

**(On Behalf of Residents of the Following States: Alaska; Arkansas; California; Colorado; Connecticut; Delaware; District of Columbia; Florida; Hawaii; Indiana; Kansas; Louisiana; Maine; Maryland; Massachusetts; Michigan; Minnesota; Mississippi; Missouri; Montana; Nebraska; Nevada; New Hampshire; New Jersey; New Mexico; North Dakota; Ohio; Oklahoma; Pennsylvania; Rhode Island; South Carolina; South Dakota; Texas; Utah; Vermont; Virginia; Washington; West Virginia; and Wyoming)**

118.   Plaintiff and the class re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Class Action Complaint, as though set forth fully herein

119.   Defendant is in the business of manufacturing, designing, supplying, marketing, advertising, warranting, and selling Roundup. Defendant impliedly warranted to Plaintiff and the class that Roundup was of a certain quality, was free from defects, was fit for its ordinary purpose of killing 'weeds' and was fit for use without causing material harm to the class..

120.   Roundup was unfit for its ordinary use and was not of merchantable quality, as warranted by Defendant, because it was defective and had caused NHL. Prior to purchase, Plaintiff and the class could not have readily discovered that the product was not fit for its ordinary purpose.

121.   Roundup was similarly unfit for its particular purpose. However, Defendant's product was not suitable for this purpose at the point of sale because it had the propensity to cause cancer, specifically NHL.

122.   Defendant has failed to provide adequate remedies under its written express warranty, which has caused the express warranty to fail its essential purpose, thereby permitting remedies under implied warranties.

123.   Defendant has not sufficiently disclaimed the implied warranty of merchantability (specifically and conspicuously) or the implied warranty of fitness (in writing and conspicuously). Defendant knew or should have known that Roundup causes NHL to those exposed to the product.

124.   Defendant's conduct described in this Complaint constitutes a breach of implied warranties under the following state statutes:

       a.     Alaska Stat. §§ 45.02.314 and 45.02.315, *et seq.*;

CLASS ACTION COMPLAINT

| | | |
|---|---|---|
| 1 | b. | Ark. Code Ann. §§ 4-2-314 and 4-2-315, *et seq.*; |
| 2 | c. | Cal. Com. Code §§ 2314-2315, *et seq.*, and Cal. Civ. Code § 1790, *et seq.*; |
| 3 | d. | Colo. Rev. Stat. Ann. §§ 4-2-314 and 4-2-315, *et seq.*; |
| 4 | e. | Conn. Gen. Stat. §§ 42a-2-314 and 42a-2-315, *et seq.*; |
| 5 | f. | Del. Code Ann. Tit. 6, §§ 2-314 and 2-315, *et seq.*; |
| 6 | g. | D.C. Code §§ 28:2-314 and 28:2-315, *et seq.*; |
| 7 | h. | Fla. Stat. Ann. §§ 672.314 and 672.315, *et seq.*; |
| 8 | i. | Haw. Rev. Stat. §§ 490:2-314 and 490:2-315, *et seq.*; |
| 9 | j. | Ind. Code §§ 26-1-2-314 and 26-1-315, *et seq.*; |
| 10 | k. | Kan. Stat. Ann. §§ 84-2-314 and 84-2-315, *et seq.*; |
| 11 | l. | La. Civ. Code Ann. Art. 2520, *et seq.*; |
| 12 | m. | Me. Rev. Stat. Ann. Tit. 11, §§ 2-314 and 2-315, *et seq.*; |
| 13 | n. | Md. Code Ann., Com. Law §§ 2-314 and 2-315, *et seq.*; |
| 14 | o. | Mass. Gen. Laws ch. 106, §§ 2-314 and 2-315, *et seq.*; |
| 15 | p. | Mich. Comp. Laws Ann. §§ 440.2314 and 440.2315, *et seq.*; |
| 16 | q. | Minn. Stat. §§ 336.2-314 and 336.2-315, *et seq.*; |
| 17 | r. | Miss. Code Ann. §§ 75-2-314 and 75-2-315, *et seq.*; |
| 18 | s. | Mo. Rev. Stat. §§ 400.2-314 and 400.2-315, *et seq.*; |
| 19 | t. | Mont. Code Ann. §§ 30-2-314 and 30-2-315, *et seq.*; |
| 20 | u. | Neb. Rev. Stat. Ann. §§ 2-314 and 2-315, *et seq.*; |
| 21 | v. | Nev. Rev. Stat. §§ 104.2314 and 104.2315, *et seq.*; |
| 22 | w. | N.H. Rev. Stat. Ann. §§ 382-A:2-314 and 382-A:2-315, *et seq.*; |
| 23 | x. | N.J. Stat. Ann. §§ 12A:2-314 and 12A-315, *et seq.*; |
| 24 | y. | N.M. Stat. Ann. §§ 55-2-314 and 55-2-315, *et seq.*; |
| 25 | z. | N.D. Cent. Code §§ 41-02-31 and 41-02-32, *et seq.*; |
| 26 | aa. | Ohio Rev. Code Ann. §§ 1302.27 and 1302.28, *et seq.*; |
| 27 | bb. | Okla. Stat. Tit. 12A, §§ 2-314 and 2-315, *et seq.*; |
| 28 | cc. | 13 Pa. Stat. Ann. §§ 2314 and 2315, *et seq.*; |

25

| | | |
|---|---|---|
| 1 | dd. | R.I. Gen. Laws §§ 6A-2-314 and 6A-2-315, *et seq.*; |
| 2 | ee. | S.C. Code Ann. §§ 36-2-314 and 36-2-315, *et seq.*; |
| 3 | ff. | S.D. Codified Laws §§ 57A-2-314 and 57A-2-315, *et seq.*; |
| 4 | gg. | Tex. Bus. & Com. Code Ann. §§ 2.314 and 2.315, *et seq.*; |
| 5 | hh. | Utah Code Ann. §§ 70A-2-314 and 70A-2-315, *et seq.*; |
| 6 | ii. | Vt. Stat. Ann. Tit. 9A, §§ 2-314 and 2-315, *et seq.*; |
| 7 | jj. | Va. Code Ann. §§ 8.2-314 and 8.2-315, *et seq.*; |
| 8 | kk. | Wash. Rev. Code §§ 62A.2-314 and 62A.2-315, *et seq.*; |
| 9 | ll. | W. Va. Code §§ 46-2-314 and 46-2-315, *et seq.*; and |
| 10 | mm. | Wyo. Stat. Ann. §§ 34.1-2-314 and 34.1-2-315, *et seq.* |

125.   Constructive notice was duly given to Defendant of the breaches of these warranties, and Defendant has failed to cure.

126.   As a direct and proximate result of the breaches of these warranties, Plaintiff and the Class suffered damages, injury in fact and/or ascertainable loss in an amount to be determined at trial, including repair and replacement costs and/or damages to other property.

127.   Plaintiff demand judgment against Defendant for compensatory damages for themselves and each member of the Class, for the establishment of a common fund, plus additional remedies as this Court deems fit.

## <u>COUNT VII</u>

### Breach of Implied Warranty (Privity)

### (On Behalf of Residents of the Following States: Alabama; Arizona; Georgia; Idaho; Illinois; Iowa; Kentucky; New York; North Carolina; Oregon; Tennessee; and Wisconsin)

128.   Plaintiff re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Class Action Complaint, as though set forth fully herein.

129.   Defendant is in the business of manufacturing, designing, supplying, marketing, advertising, warranting, and selling Roundup, which has been used as a weed killer. Defendant impliedly warranted to Plaintiff (and to Plaintiff' agents) that Roundup was of a certain quality, was free from defects, and was fit for its ordinary purpose.

CLASS ACTION COMPLAINT

130.     Roundup was unfit for its ordinary use and was not of merchantable quality, as warranted by Defendant, because it was defective and studies show that it causes cancer. Prior to purchase, Plaintiff could not have readily discovered that the product was not fit for its ordinary purpose and would potentially cause NHL.

131.     Roundup was similarly unfit for its particular purpose.

132.     Defendant has not sufficiently disclaimed the implied warranty of merchantability (specifically and conspicuously) or the implied warranty of fitness (in writing and conspicuously). Further, the purported limitations in the warranty, including limiting the "exclusive remedy" to a refund or replacement, are procedurally and substantively unconscionable.

133.     Defendant was and is in privity with each of the Plaintiff and Class members by law and/or by fact. First, Plaintiff have had sufficient direct dealings with Defendant and/or its authorized dealers, franchisees, representatives, and agents to establish privity of contract. Alternatively, Plaintiff and Class members are intended third-party beneficiaries of contracts, including express warranties, amongst Defendant and its dealers, franchisees, representatives and agents; Defendant's advertisements were aimed at Plaintiff and Class members, and Defendant's warranties were expressly written for the benefit of Plaintiff and Class members as end users of Roundup. Defendant's authorized dealers, franchisees, representatives, and agents, on the other hand, were not intended to be the ultimate consumers of Roundup and have no rights under the warranty agreements provided by Defendant; these intermediary entities made no changes to Defendant's product, nor made any additions to the warranties issued by Defendant. Further, Defendant is estopped from limiting claims for common law and statutory violations based on a defense of lack of privity.

134.     Defendant's conduct described in this Complaint constitutes a breach of implied warranties under the following state statutes:

       a.     Ala. Code §§ 7-2-314, 7-2-315 and 7-2-318, *et seq.*;

       b.     Ariz. Rev. Stat. Ann. §§ 47-2314, 47-2315 and 47-2318, *et seq.*;

       c.     Ga. Code Ann. §§ 11-2-314, 11-2-315 and 11-2-318, *et seq.*;

       d.     Idaho Code Ann. §§ 28:2-314, 28:2-315 and 28:2-318, *et seq.*;

       e.     810 Ill. Comp. Stat. 5/2-314, 5/2-315 and 5/2-318, *et seq.*;

f.      Iowa Code §§ 554.2314, 554.2315 and 554.2318, *et seq.*;

g.      Ky. Rev. Stat. Ann. §§ 355.2-314, 355.2-315 and 355.2-318, *et seq.*;

h.      N.Y. U.C.C. Law §§ 2-314, 2-315 and 2-318, *et seq.*;

i.      N.C. Gen. Stat. §§ 25-2-314, 25-2-315 and 25-2-318, *et seq.*;

j.      Ore. Rev. Stat. §§ 72.3140, 72.3150 and 72.3180, *et seq.*;

k.      Tenn. Code Ann. §§ 47-2-314, 47-2-315 and 47-2-318, *et seq.*; and

l.      Wis. Stat. §§ 402.314, 402.315 and 402.318, *et seq.*

135.     Actual and/or constructive notice was duly given to Defendant of the breaches of these warranties, and Defendant has failed to cure.

136.     As a direct and proximate result of the breaches of these warranties, Plaintiff have suffered damages, injury in fact and/or ascertainable loss in an amount to be determined at trial.

137.     Plaintiff demand judgment against Defendant for compensatory damages for each member of the Class, for the establishment of a common fund, plus additional remedies as this Court deems fit.

## <u>COUNT VIII</u>

### Violation of State Consumer Laws

**(On Behalf of Residents of the Following States: Alaska; Arizona; Arkansas; California; Colorado; Connecticut; Delaware; District of Columbia; Florida; Hawaii; Idaho; Illinois; Indiana; Iowa; Kansas; Maine; Maryland; Massachusetts; Michigan; Minnesota; Missouri; Nebraska; Nevada; New Hampshire; New Jersey; New Mexico; New York; North Carolina; North Dakota; Ohio; Oklahoma; Oregon; Pennsylvania; Rhode Island; South Dakota; Texas; Utah; Vermont; Virginia; Washington; West Virginia; Wisconsin; and Wyoming)**

138.     Plaintiff re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Class Action Complaint, as though set forth fully herein.

139.     Defendant markets and sells goods, including Roundup, to consumers throughout the United States and its Territories, including to Plaintiff and the Class. Defendant's acts and omissions

regarding Roundup affect trade and commerce across all the United States and its Territories.

140. Plaintiff and statewide Class members are consumers who purchased and used Roundup primarily for personal, family and/or household purposes.

141. Defendant has violated state consumer protection laws by engaging in unfair methods of competition and unfair, deceptive, fraudulent, unconscionable and/or unlawful acts or practices, including without limitation, by defective design and manufacture of Roundup as well as misleading marketing, advertising, selling, and warranting of Roundup to consumers. In connection with these sales, Defendant omitted material information about Roundup that it was legally obligated to disclose. Defendant never informed Plaintiff or Class members, at the point of sale or otherwise, that Roundup was linked to NHL, and failed to disclose this information in a timely manner.

142. Among other things, Defendant made numerous deceptive statements regarding Roundup.

143. Through its conduct, Defendant has violated the following state consumer laws prohibiting unfair methods of competition and unfair, deceptive, unconscionable, fraudulent and/or unlawful acts or practices:

    a. The Alaska Unfair Trade Practices and Consumer Protection Act, Alaska Stat. §§ 45.50.471 through 45.50.561, *et seq.*;

    b. The Arizona Consumer Fraud Act, A.R.S. § 44-1522, *et seq.*;

    c. The Arkansas Deceptive Trade Practices Act, Ark. Code Ann. §§ 4-88-107(a)(1)(10) and 4-88-108(1)(2), *et seq.*;

    d. The California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code, § 17200, *et seq.* ;

    e. The Colorado Consumer Protection Act, Col. Rev. Stat. Ann. §§ 6-1-105(1)(b), (c), (e) and (g), *et seq.*;

    f. The Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110(b), *et seq.*;

    g. The Delaware Consumer Fraud Act, Del. Code Ann. Title 6 § 2513, *et seq.*;

CLASS ACTION COMPLAINT

| | | |
|---|---|---|
| 1 | h. | The District of Columbia Consumer Protection Act, D.C. Code §§ 28-3904(a), |
| 2 | | (d), (e), (f) and (r), *et seq.*; |
| 3 | i. | The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § |
| 4 | | 501.204(1), *et seq.*; |
| 5 | j. | The Hawaii Deceptive Trade Practices Act, Haw. Rev. Stat. Ann. §§ 481A- |
| 6 | | 3(a)(5), (7) and (12), *et seq.*, and the Hawaii Consumer Protection Act, Haw. |
| 7 | | Rev. Stat. Ann. § 480-2(a), *et seq.*; |
| 8 | k. | The Idaho Consumer Protection Act, Idaho Code §§ 48-603(5), (7), (17) and |
| 9 | | (18), *et seq.*, and Idaho Code § 48-603C, *et seq.*; |
| 10 | l. | The Illinois Consumer Fraud and Deceptive Trade Practices Act, 815 Ill. Stat. § |
| 11 | | 505/2, *et seq.*, and the Illinois Uniform Deceptive Trades Practices Act, 815 Ill. |
| 12 | | Stat. § 510/2(a)(5), (7) and (12), *et seq.*; |
| 13 | m. | The Indiana Deceptive Consumer Sales Act, Ind. Code §§ 24-5-0.5-3(a) and |
| 14 | | (b)(1) and (2), *et seq.*; |
| 15 | n. | The Iowa Consumer Fraud Act, I.C.A. §§ 714H.3 and 714H.5, *et seq.* Plaintiff |
| 16 | | have obtained the approval of the Iowa Attorney General for filing this class |
| 17 | | action lawsuit as provided under I.C.A § 714H.7; |
| 18 | o. | The Kansas Consumer Protection Act, Kan. Stat. §§ 50-626(a) and (b)(1)(A)(D) |
| 19 | | and (b)(3), *et seq.*; |
| 20 | p. | The Maine Uniform Deceptive Trade Practices Act, 10 M.R.S.A. §§ 1212(1)(E) |
| 21 | | and (G), *et seq.*, and the Maine Unfair Trade Practices Act, 5 M.R.S.A. § 207, |
| 22 | | *et seq.*; |
| 23 | q. | The Maryland Consumer Protection Act, Md. Code Commercial Law, § 13- |
| 24 | | 301(1) and (2)(i), and (iv) and (9)(i), *et seq.*; |
| 25 | r. | The Massachusetts Consumer Protection Act, Ma. Gen. Laws Ann. Ch. 93A § |
| 26 | | 2(a), *et seq.*; |
| 27 | s. | The Michigan Consumer Protection Act, M.C.P.L.A. § 445.903(1)(c)(e), (s) and |
| 28 | | (cc), *et seq.*; |

CLASS ACTION COMPLAINT

t.  The Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.44, subd. 1(5), (7) and (13), *et seq.*, the Minnesota Consumer Fraud Act, Minn. Stat. § 325F.69, subd. 1, and Minn. Stat. § 8.31, subd. 3(a), *et seq.*;

u.  The Missouri Merchandising Practices Act, Mo. Ann. Stat. § 407.020(1), *et seq.*;

v.  The Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1602, and the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. § 87-302(a)(5) and (7), *et seq.*;

w.  The Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. Ann. § 598.0915(5) and (7), *et seq.*;

x.  The New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A:2(v) and (vii), *et seq.*;

y.  The New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-2, *et seq.*;

z.  The New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12- 2(D)(5)(7) and (14) and 57-12-3, *et seq.*;

aa. New York Business Law, N.Y. Gen. Bus. Law § 349(a), *et seq.*;

bb. The North Carolina Unfair Trade Practices Act, N.C.G.S.A. § 75-1.1(a), *et seq.*;

cc. The North Dakota Unlawful Sales or Advertising Practices Act, N.D. Cent. Code § 51-15-02, *et seq.*;

dd. The Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. § 1345.02(A), (B)(1) and (2), *et seq.* Pursuant to Ohio Rev. Code Ann. § 1345.09(B), Defendant's alleged acts must have been previously declared to be deceptive or unconscionable under Ohio Rev. Code Ann. §§ 1345.02 or 1345.03. Defendant systematically made misrepresentations and material omissions regarding Roundup. Ohio courts have previously declared such actions to be deceptive or unconscionable. *See, e.g., Arales v. Furs by Weiss, Inc.*, No. 81603, 2003 WL 21469131, at *1-4 (Ohio Ct. App. June 26, 2003) (retailer's omission to consumer was unfair or deceptive); *Lump v. Best Door & Window, Inc.*, Nos. 8-01-09, 8-01-10, 2002 WL 462863, at *4-5 (Ohio Ct. App. Mar. 27, 2002) (failure

31

CLASS ACTION COMPLAINT

1      to perform obligations to consumers in a timely and competent manner is a

2      deceptive and unconscionable);

3    ee.    The Oklahoma Consumer Protection Act, 15 Okl. Stat. Ann. § 753(5), (7) and

4      (20), *et seq.*;

5    ff.    The Oregon Unfair Trade Practices Act, Or. Rev. Stat. §§ 646.608(1)(e)(g) and

6      (u), *et seq.*;

7    gg.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S.

8      §§ 201-2(4)(v)(vii) and (xxi), and 201-3, *et seq.*;

9    hh.    The Rhode Island Deceptive Trade Practices Act, R.I. Gen. Laws § 6-13.1-

10      1(6)(v), (vii), (xii), (xiii) and (xiv), *et seq.*;

11    ii.    The South Dakota Deceptive Trade Practices Act and Consumer Protection Act,

12      S.D. Codified Laws § 37-24-6(1), *et seq.*;

13    jj.    The Texas Deceptive Trade Practices- Consumer Protection Act, V.T.C.A., Bus.

14      & C. § 17.46(a), (b)(5) and (7), *et seq.*;

15    kk.    The Utah Consumer Sales Practices Act, Utah Code Ann. §§ 13-11-4(1) and

16      (2)(a) and (b);

17    ll.    The Vermont Consumer Fraud Act, 9 V.S.A. § 2453(a), *et seq.*;

18    mm.    The Virginia Consumer Protection Act, Va. Code Ann. § 59.1- 200(A)(5)(6) and

19      (14), *et seq.*;

20    nn.    The Washington Consumer Protection Act, Wash. Rev. Code § 19.86.020, *et*

21      *seq.*;

22    oo.    The West Virginia Consumer Credit and Protection Act, W.V.A. Code § 46A-

23      6-104, *et seq.*;

24    pp.    The Wisconsin Deceptive Trade Practices Act, W.S.A. §100.20(1), *et seq.*; and

25    qq.    The Wyoming Consumer Protection Act, Wyo. Stat. Ann. § 40-12-105(a), (i),

26      (iii) and (xv), *et seq.*

27    144.  As a direct and proximate result of Defendant's unfair methods of competition and

28  unfair, deceptive, fraudulent, unconscionable and/or unlawful acts or practices, Plaintiff and the Class

32

have suffered ascertainable losses and injuries

145.   Plaintiff bring this action on behalf of themselves and all similarly situated persons for the relief requested and to promote the public interests in the provision of truthful, non-deceptive information to allow consumers to make informed purchasing decisions and to protect Plaintiff, the Class, and the public from Defendant's unfair methods of competition and unfair, deceptive, fraudulent, unconscionable and/or unlawful practices. Defendant's wrongful conduct has had widespread impact on the public at large and caused serious injuries to the class members.

146.   Defendant has long had notice of Plaintiff' allegations, claims and demands, including from internal audits, field testing, online complaints, and direct complaints regarding Roundup.

## COUNT IX

### Violation of State False Advertising Laws

**(On Behalf of Residents of the those States and Territories with False Advertising Law Claims)**

147.   Plaintiff re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Class Action Complaint, as though set forth fully herein. Plaintiff has standing to pursue this cause of action on behalf of the Class.

148.   Plaintiff bring this claim pursuant to applicable False Advertising Laws which prohibit deceptive, misleading and/or false advertising.

149.   Defendant violated False Advertising Laws by advertising and representing – on product labels, advertisements, and warranties – that Roundup was dependable and reliable when in fact it was not. Defendant's violations include, but are not limited to, advertising and representing to Plaintiff. As alleged, these representations were false, misleading, and likely to deceive Plaintiff, members of the Class, and other reasonable consumers.

150.   In connection with these sales, Defendant also omitted material information about Roundup that it was legally obligated to disclose. Defendant never informed Plaintiff or the Class, at the point of sale or otherwise, that Roundup would and could cause NHL if exposed to the active ingredient. Defendant has also failed or refused to pay for resulting expenses and medical that consumers have incurred.

151.   At the time of sale, Defendant knew, or by the exercise of reasonable care should have

33

CLASS ACTION COMPLAINT

known – given internal data– that its representations and omissions were false and misleading.

152. Defendant made these representations and omissions for the purpose of inducing, and did induce, Plaintiff consumers to purchase Roundup.

153. Plaintiff reviewed and reasonably relied on Defendant's representations and omissions regarding Roundup and incurred damages as a direct and proximate result.

154. As a direct and proximate result of Defendant's violation of False Advertising Laws, Plaintiff and the Class have suffered ascertainable losses and injuries.

## COUNT X

### Fraudulent Concealment

### (On Behalf of Residents of the United States and its Territories)

155. Plaintiff re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Class Action Complaint, as though set forth fully herein.

156. Defendant knowingly and intentionally concealed material facts regarding Roundup.

157. Defendant knew it was omitting material facts at the time it sold Roundup to Plaintiff and at a time it had a duty to disclose these facts.

158. In omitting these facts, Defendant had the intent to defraud Plaintiff and the intent for Plaintiff to rely upon its omissions to purchase more Roundup.

159. Plaintiff reviewed and reasonably relied on Defendant's representations and omissions regarding Roundup and incurred damages as a direct and proximate result, in an amount to be determined at trial, including repair and replacement costs and/or damages to other property. Any limitation on economic loss is precluded by Defendant's fraudulent misrepresentations.

160. Plaintiff in reasonable reliance of those statements made by Defendant, incurred out of pocket costs.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff pray that this case be certified and maintained as a class action and for judgment to be entered upon Defendant as follows:

A.      Enter an order certifying the proposed Class (and subclasses, if applicable), designating Plaintiff ROBERT RAMIREZ as the Class Representative, and designating William M.

34

CLASS ACTION COMPLAINT

1 | Audet as Lead Class Counsel and certification of a Rule 23(c)4 class and a Rule 23(b)2
2 | class;

3 | B. | Declare that Defendant is financially responsible for notifying all Class members of the
4 | link between Roundup and NHL;

5 | C. | Declare that Defendant must disgorge, for the benefit of the Class, all or part of the ill-
6 | gotten profits it received from the sale of Roundup, or order Defendant to make full
7 | restitution to Plaintiff and the members of the Class;

8 | D. | Present to the trier of fact the issue of 'general causation' and 'liability" to be applied to
9 | all class members and present to the trier of fact the question of whether a link exists
10 | with exposure to Roundup and NHL;

11 | E. | For punitive or exemplary damages;

12 | F. | For injunctive and declaratory relief as noted in the complaint;

13 | G. | For reasonable attorneys' fees and reimbursement of all costs for the prosecution of this
14 | action; and

15 | H. | For such other and further relief as this Court deems just and appropriate.

## JURY DEMAND

Plaintiff hereby demand a trial by jury on all issues so properly triable thereby.

April 24, 2019        By:    /s      William M. Audet

William M. Audet (SBN 117456)
Ling Y. Kuang (SBN 296873)
AUDET & PARTNERS, LLP
711 Van Ness, Suite 500
San Francisco, CA 94102-3229
Tel: 415.568.2555
Fax: 415.568.2556
waudet@audetlaw.com
lkuang@audetlaw.com

*Counsel for Plaintiff and the Proposed Class*

CLASS ACTION COMPLAINT