# U.S. District Court
## Eastern District of Missouri (St. Louis)
### CIVIL DOCKET FOR CASE #: 4:19-cv-00983-SNLJ

Hudson v. Monsanto Company et al
Assigned to: District Judge Stephen N. Limbaugh, Jr
Cause: 28:1332 Diversity-Product Liability

Date Filed: 04/24/2019
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Janet B. Hudson**
*Individually and as Anticipated Representative of the Estate of Benjamin E. Hudson*

represented by **Eric D. Holland**
HOLLAND LAW FIRM LLC
300 N. Tucker Blvd.
Suite 801
St. Louis, MO 63101
314-241-8111
Fax: 314-241-5554
Email: eholland@allfela.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

**Defendant**

**John Does 1-50**

| Date Filed | # | Docket Text |
|---|---|---|
| 04/24/2019 | 1 | COMPLAINT against defendant John Does 1-50, Monsanto Company with receipt number 0865-7170906, in the amount of $400 Jury Demand,, filed by Janet B. Hudson, Individually and as Anticipated Representative of the Estate of Benjamin E. Hudson. (Attachments: # 1 Civil Cover Sheet, # 2 Original Filing Form, # 3 Attachment Disclosure of Organizational Interests, # 4 Attachment Notice of Intent to Use Process Server, # 5 Summons)(Holland, Eric) (Entered: 04/24/2019) |
| 04/24/2019 | 2 | NOTICE OF PROCESS SERVER by Plaintiff Janet B. Hudson Process Server: Metro One/Bob Thomure (MFG) (Entered: 04/25/2019) |
| 04/25/2019 | | Case Opening Notification: 1 Summons(es) issued. The summons was emailed to Eric D. Holland. All non-governmental organizational parties (corporations, limited liability companies, limited liability partnerships) must file Disclosure of Organizational Interests Certificate (moed-0001.pdf). Judge Assigned: Honorable Stephen N. Limbaugh Jr.. (MFG) (Entered: 04/25/2019) |

**PACER Service Center**

| Transaction Receipt | | | |
|---|---|---|---|
| 05/06/2019 10:19:28 | | | |
| **PACER Login:** | hllp1982:2634105:4722683 | **Client Code:** | 1417.0049 |
| **Description:** | Docket Report | **Search Criteria:** | 4:19-cv-00983-SNLJ |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| **JANET B. HUDSON, Individually and as ANTICIPATED REPRESENTATIVE of the Estate of BENJAMIN E. HUDSON,** | **Civil Action No. 4:19-cv-983** |
| **Plaintiffs,** | |
| v. | |
| **MONSANTO COMPANY and JOHN DOES 1-50.** | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| **Defendants.** | |

## COMPLAINT

Plaintiff, Janet B. Hudson, Individually ("Plaintiff") and as Anticipated Representative of the Estate of Benjamin E. Hudson ("Plaintiff-Decedent"), (hereinafter collectively, "Plaintiffs") by and through the undersigned attorneys, hereby brings this Complaint for damages against Defendants Monsanto Company and John Does 1-50, and allege the following:

### NATURE OF THE CASE

1.      This is an action for damages suffered by Plaintiffs as a direct and proximate result of Defendants' negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or dale of the herbicide Roundup®, containing the active ingredient glyphosate.

1

2.      Plaintiffs maintain that Roundup® and/or its active ingredient glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce and lacked proper warnings and directions as to the dangers associated with its use.

3.      Plaintiffs' injuries, like those striking thousands of similarly situated victims across the country, were avoidable.

## JURISDICTION AND VENUE

4.      The Court has jurisdiction over Defendants and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiffs and Defendants. Defendants are all either incorporated and/or have their principal place of business outside of the state in which the Plaintiffs reside.

5.      The amount in controversy between Plaintiffs and Defendants exceeds $75,000, exclusive of interest and cost.

6.      The Court has also supplemental jurisdiction pursuant to 28 U.S.C.§ 1367.

7.      Venue is proper within this district pursuant to 28 U.S.C. § 1391 in that Defendants' principal place of business is St. Louis, Missouri, and Plaintiffs' injuries arise, in whole or in part, out of Defendants' activities in Missouri, and therefore, Defendants are subject to personal jurisdiction in this district.

8.      In addition, Defendants have consented to personal jurisdiction in the State of Missouri by residing and registering to do business here and designating a registered agent for service of process within the State of Missouri.

## PARTIES

9.      Plaintiff-Decedent, BENJAMIN E. HUDSON, was a natural person and at all relevant times a resident and citizen of Barnstable County, Massachusetts. Plaintiffs bring this

action for personal injuries sustained by exposure to Roundup® ("Roundup") containing the active ingredient glyphosate and surfactant POEA, to which Plaintiff-Decedent was exposed while working as a contractor/home-builder. As a direct and proximate result of being exposed to Roundup, Plaintiff-Decedent developed non-Hodgkin's Lymphoma ("NHL"), which was diagnosed for the first time on or about May 13, 2016, and from which disease Plaintiff-Decedent died on February 20, 2017.

10.     "Roundup" Refers to all formulations of Defendants' Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prody Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Grass & Weed Killer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed & Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation containing the active ingredient glyphosate.

11.     Defendant Monsanto Company ("Monsanto") is incorporated in the State of Delaware, and is a Foreign For Profit Corporation registered with the Corporations Unit of the

3

State of Missouri under Charter Number F00488018, in active, "Good Standing" status, with a principal place of business in St. Louis, Missouri.

12.     Upon best information and belief, Defendants, John Does 1-50 are subsidiaries, partners, or other entities that were involved in the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup, containing the active ingredient glyphosate. The identities of John Does 1-50 are unknown to Plaintiffs at this time. Plaintiffs will move the Court to specifically name John Does 1-50 as their identities become known to Plaintiffs through discovery.

13.     Defendant Monsanto Company and John Does 1-50 are collectively referred to as "Monsanto Defendants" or "Defendants."

14.     Defendants engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup.

15.     Upon information and belief, Defendants did act together to design, sell, advertise, manufacture and/or distribute Roundup, with full knowledge of its dangerous and defective nature.

16.     Defendants transacted and conducted business both within the State of Missouri and the State of Massachusetts that relates to the allegations in this Complaint.

17.     Defendants advertise and sell goods, specifically Roundup, in Barnstable County, Massachusetts.

18.     Upon best information and belief, Defendants derived substantial revenue from goods and products designed, developed, manufactured, tested, packaged, marketed, distributed, labeled, and sold in the State of Missouri.

19.     Upon best information and belief, Defendants derived substantial revenue from goods and products marketed, distributed, sold and/or used in the State of Massachusetts.

4

20.     Defendants expected or should have expected their acts to have consequences within the State of Massachusetts, and derived substantial revenue from interstate commerce.

## FACTUAL ALLEGATIONS

21.     At all relevant times, Defendants were in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or have acquired and are responsible for Defendants who have designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the commercial herbicide Roundup.

22.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate.

23.     Defendants discovered the herbicidal properties in glyphosate during the 1970's and subsequently began to design, research, manufacture, sell, and distribute glyphosate based "Roundup" as a broad-spectrum herbicide.

24.     Glyphosate is the active ingredient in Roundup.

25.     Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

26.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid 3-phosphate synthase, known as EPSP synthase.

27.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid 3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plants and tissue and ultimately plant death.

28.     When sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

5

29.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has been driven largely by proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

30.     Defendants are intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup *i.e.,* "Roundup Ready®." As of 2009, Defendants were the world's leading producer of seeds designed to be Roundup Ready®. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready® seeds.

31.     The original Roundup, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the world's most widely used herbicides. Monsanto's glyphosate products are registered in more than 130 countries and are approved for weed control in more than 100 crops. No other herbicide active ingredient compares in terms of number of approved uses.[1]

32.     For nearly 40 years, farmers across the globe have used Roundup, unaware of its carcinogenic properties.

## REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

33.     The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA"), 7. U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection

---

[1] *Backgrounder*, History of Monsanto's Glyphosate Herbicides, June 2005.

Agency ("EPA) prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. 136a(a).

34.     The EPA requires as a part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

35.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136 (bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

36.     The EPA and the State of Massachusetts registered Roundup for distribution, sale, and manufacture in the United States and the State of Massachusetts.

37.     FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing or pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

38.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The date necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1.

7

In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

     39.    In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment- in relation to the registration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of the World Health Organization's findings.

### MONSANTO'S FALSE REPRESENTATIONS REGARDING THE SAFETY OF ROUNDUP ®

     40.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were **"safer than table salt"** and **"practically non-toxic"** to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

a) Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks, and fences…

b) And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging, or trimming problem.

c) Roundup biodegrades into naturally occurring elements.

d) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e) This non-residual herbicide will not wash or leach in the soil. It … stays where you apply it.

f) You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds, and fish.

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in the area which has been treated with Roundup.[2]

41.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance

with NYAG, in which Monsanto agreed, amount other things, "to cease and desist from publishing

or broadcasting any advertisements [in New York] that represent, directly, or by implication that:

a.   its glyphosate-containing pesticide products or any component thereof are sage, non-toxic, harmless or free from risk.

***

b.   its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed, or sold by Monsanto are biodegradable.

***

c.   its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

***

d.   its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics"

***

e.   glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

***

---

[2] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

    f.  its glyphosate- containing products or any component thereof might be classified as "practically non-toxic."

42.    Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

43.    In 2009, France's highest court ruled that Monsanto had not told the truth about Safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean." [3]

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP

44.    As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties.

45.    On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[4] Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

46.    In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived. [5]

47.    In October 1991 the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of

---

[3] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at*
http://news.bbc.co.uk/2/hi/europe/8308903.stm.
[4] Consensus Review of Glyphosate, Casewell No. 661A. March 4, 1985 United States Environmental Protection Agency.
[5] http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheets/0178fact.pdf

non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.[6]

48.    In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendants' Roundup products are more dangerous and toxic than glyphosate alone.[7] As early as 1991, evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.[8]

49.    In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

50.    The study found that the Defendants' Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

51.    In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

52.    The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as a cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[9]

---

[6] Second Peer Review of Glyphosate, CAS No. 1071-83-6. October 30, 1991. United States Environmental Protection Agency.

[7] Martinez et al. 2007; Benachour 2009; Gasnier et al. 2010; Peixoto 2005; Marc 2004

[8] Martinez et al 1991

[9] (Molinari, 2000; Stewart et al., 2003)

53.     In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

54.     The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, name the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

55.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

56.     The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

57.     The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendants.

58.     Defendants knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff-Decedent from Roundup.

59.     Defendants knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

12

60.     Defendants failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff-Decedent from Roundup.

61.     Rather than performing appropriate tests, Defendants relied upon flawed industry-supported studies designed to protect Defendants' economic interests rather than Plaintiff-Decedent and the consuming public.

62.     Despite their knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendants continued to promote Roundup as safe.

## IARC CLASSIFICATION OF GLYPHOSATE

63.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

64.     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015-2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already by some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

65.     IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by

13

the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

66.    On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendants' possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Defendants' Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

67.    The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A probable carcinogen to humans. According to the authors, glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

68.    The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

69.    The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

## EARLIER EVIDENCE OF GLYPHOSATE'S DANGER

70.    Despite the new classification by the IARC, Defendants have had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

71.    Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

14

72.     In 1997, Chris Clements published "Genotoxicity of select herbicides in *Rana catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

73.     The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

74.     Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

75.     Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

76.     The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

77.     In 2006 Cesar Paz-y-Miño published a study examining DNA damages in human subjects exposed to glyphosate.

78.     The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

79.     The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence of genotoxicity caused by glyphosate-based formulations in strong."

80.     Despite knowledge to the contrary, Defendants maintain that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

81.     In addition to glyphosate and Roundup's genotoxic properties, Defendants have long been aware of glyphosate's carcinogenic properties.

82.     Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

83.     Defendants have known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

84.     In 1985 the EPA studied the effects of glyphosate in mice, finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded that glyphosate was oncogenic.

85.     In 2003 Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

86.     The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studied with an increased odds ratio of 3.11.

87.     In 2003 AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

88.     The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

89.     In 2008 Mikael Eriksson published a study a population-based case-control study of exposure to various pesticides as a risk factor for NHL.

90.     This strengthened previous associations between glyphosate and NHL.

16

91.     In spite of this knowledge, Defendants continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

92.     Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiff-Decedent, the agricultural community, and the public at large to purchase, and increase the use of, Defendants' Roundup for Defendants' pecuniary gain, and in fact did induce Plaintiff-Decedent and/or Plaintiff-Decedent 's employer to use Roundup.

93.     Defendants made these statements with complete disregard and reckless indifference to the safety of Plaintiff-Decedent and the general public.

94.     Notwithstanding Defendants' representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

95.     Defendants knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

96.     Defendants failed to appropriately and adequately inform and warn Plaintiff-Decedent on the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

17

97.     Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendants continue to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity in glyphosate and Roundup.

98.     Defendants have claimed and continue to claim that Roundup is safe, non-carcinogenic, and non-genotoxic.

99.     Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."[10]

100.     Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

101.     Glyphosate, and Defendants' Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

102.     Defendants' statements proclaiming the safety of Roundup and disregarding its dangers misled Plaintiff-Decedent.

103.     Despite Defendants' knowledge that Roundup was associated with an elevated risk of developing cancer, Defendants' promotional campaigns focused on Roundup's purported "safety profile."

---

[10] Backgrounder- Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded April 23, 2019)

18

104. Defendants' failure to adequately warn Plaintiff-Decedent resulted in (1) Plaintiff-Decedent using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup exposure.

105. Defendants failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

106. The failure of Defendants to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

107. The failure of Defendants to appropriately warn and inform the EPA has resulted in the absence of warnings or caution statements that are adequate to protect health and the environment.

108. The failure of Defendants to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

109. By reasons of the foregoing acts and omissions, Plaintiffs seek compensatory damages as a result of Plaintiff-Decedent's use of, and exposure to, Roundup which caused or was a substantial contributing factor in causing him to suffer and die from cancer, specifically NHL, and Plaintiffs have suffered and will continue to suffer severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including loss of life, and loss of the comfort and enjoyment of the services and society formerly provided by Plaintiff-Decedent to his wife.

110. By reasons of the foregoing, Plaintiffs were and are severely and permanently injured.

19

111.   By reason of the foregoing acts and omissions, Plaintiffs have endured and, in some categories continued to suffer, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of the actions and inactions of the Defendants.

## PLAINTIFF- DECEDENT'S EXPOSURE TO ROUNDUP

112.   Plaintiff-Decedent used Roundup while working as a self-employed landscaper in Barnstable County, Massachusetts.

113.   Plaintiff-Decedent mixed and sprayed Roundup in a landscaping application to his clients' properties on a regular basis beginning in the 1970's and continuing through at least 2014. Plaintiff-Decedent followed all safety and precautionary warnings during the course of his use of Roundup.

114.   Plaintiff-Decedent was subsequently diagnosed with NHL on or about May 13, 2016, disease from which he later died on February 20, 2017.

115.   As a result of his injury, both prior to and following Plaintiff-Decedent's death, Plaintiffs also incurred significant economic and non-economic damages.

## EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

116.   Plaintiffs incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

117.   The running of any statute of limitations has been tolled by reason of the Defendants' fraudulent concealment. Defendants, through their affirmative misrepresentations and omissions, actively concealed from Plaintiffs the true risks associated with Roundup and glyphosate. Indeed, even as of November 2014, Defendants continued to represent to the public

that "*Scientists are in agreement* that there is *no evidence* glyphosate causes cancer." (emphasis added)[11]

118.    As of April 2019, Defendants continue to represent to the public that "Regulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup ® brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic." (emphasis added) [12]

119.    As a result of Defendants' actions, Plaintiffs were unaware, and could not reasonably know or have learned through reasonable diligence that Roundup and/or glyphosate contact, exposed Plaintiff-Decedent to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

120.    Furthermore, Defendants are estopped from relying on any statute of limitation because of their fraudulent concealment of the true character, quality, and nature of Roundup. Defendants were under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Defendants had and continue to have exclusive control, and because Defendants knew that this information was not available to Plaintiff-Decedent or to distributors of Roundup. In addition, Defendants are estopped from relying on any statute of limitations because of their intentional concealment of these facts.

121.    Plaintiff-Decedent had no knowledge that Defendants were engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment and wrongdoing by Defendants, Plaintiffs could not have reasonably discovered the wrongdoing at any time prior.

---

[11] *Backgrounder – Glyphosate: No Evidence of Carcinogenicity*. Updated November 2014. (downloaded October 9, 2015).

[12] *Backgrounder – Glyphosate: No Evidence of Carcinogenicity*. Updated November 2014. (downloaded April 23, 2019).

Also, the economics of this fraud should be considered. Defendants had the ability to and did spend enormous amounts of money in furtherance of their purpose of marketing, promoting, and/or distributing a profitable herbicide, notwithstanding the known or reasonable known risks. Plaintiff-Decedent and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendants' representations. Accordingly, Defendants are precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

## FIRST CAUSE OF ACTION
## (NEGLIGENCE)

122.   Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

123.   Defendants had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

124.   Defendants failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup into interstate commerce in that Defendants knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including

22

diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications up until Plaintiff-Decedent's death.

125.    The negligence by the Defendants, and their agents, servants, and/or employees, included by was not limited to the following acts and/or omissions:

      a.  Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly testing it;

      b.  Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup;

      c.  Not conducting sufficient testing programs to determine whether or not Roundup was safe for use; in that Defendants herein knew or should have known that Roundup was unsafe and unfit for use by reasons of the dangers to its users;

      d.  Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Defendants had knowledge that Roundup is, was, or could be carcinogenic;

      e.  Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

      f.  Negligently failing to adequately and correctly warn the Plaintiff-Decedent, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

      g.  Negligently failing to petition the EPA to strength the warnings associated with Roundup;

      h.  Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

      i.  Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

      j.  Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

      k.  Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

l.  Negligently designing Roundup in a manner which was dangerous to its users;

m.  Negligently manufacturing Roundup in a manner which was dangerous to its users;

n.  Negligently producing Roundup in a manner which was dangerous to its users;

o.  Negligently formulating Roundup in a manner which was dangerous to its users;

p.  Concealing information from the Plaintiff-Decedent while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations;

q.  Improperly concealing and/or misrepresenting information from the Plaintiff-Decedent, scientific and medical professionals, and/or the EPA, concerning the severity risks and dangers of Roundup compared to other forms of herbicides; and

r.  Negligently selling Roundup with a false and misleading label.

126.  Defendants under-reported, underestimated, and downplayed the serious dangers of Roundup.

127.  Defendants negligently and deceptively compared the safety risks and/or dangers of Roundup with common everyday foods such as table salt, and with other forms of herbicides.

128.  Defendants were negligent and/or violated Missouri and Massachusetts law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that they:

a.  Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide;

b.  Failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

c.  Failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

d.  Failed to accompany their product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;

e.  Failed to warn Plaintiff-Decedent of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of NHL;

24

    f.  Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup;

    g.  Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants;

    h.  Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity; and

    i.  Were otherwise careless and/or negligent.

129.    Despite the fact that Defendants knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Defendants continued and continue to market, manufacture, distribute, and/or sell Roundup to consumers, including the Plaintiff-Decedent.

130.    Defendants knew or should have known that consumers such as Plaintiff-Decedent would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care, as set forth above.

131.    Defendants' violations of law and/or negligence were the proximate cause of Plaintiffs' injuries, harm and economic loss, which resulted in Plaintiff-Decedent's death, and which Plaintiffs suffered and/ or will continue to suffer.

132.    As a result of the foregoing acts and omissions, the Plaintiff-Decedent suffered from serious and dangerous side effects including, but not limited to, Plaintiff-Decedent's NHL and death, as well as other severe and personal injuries, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care.

133.    WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury trial on all issues contained herein.

## SECOND CAUSE OF ACTION
### (STRICT PRODUCTS LIABILITY – DESIGN DEFECT)

134.    Plaintiffs repeat, reiterate and, re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

135.    At all times herein mentioned, the Defendants designed, researched, manufactured, tested, advertised, promoted, sold, distributed, and/or have acquired the Defendants who have designed, researched, tested, advertised, promoted, marketed, sold, and distributed Roundup as hereinabove described that was used by the Plaintiff-Decedent.

136.    Defendants' Roundup was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendants.

137.    At those times, Roundup was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, the Plaintiff-Decedent herein.

138.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup.

139.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective in design and/or formulation, in that, when it left the hands of the Defendant manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

26

140.    At all times herein mentioned, Roundup was in a defective condition and unsafe, and Defendants knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendants. In particular, Defendants' Roundup was defective in the following ways.

      a.    When placed in the stream of commerce, Defendants' Roundup products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate.

      b.    When placed in the stream of commerce, Defendants' Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

      c.    When placed in the stream of commerce, Defendants' Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in reasonably anticipated manner.

      d.    Defendants did not sufficiently test, investigate, or study its Roundup products.

      e.    Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

      f.    Defendants knew or should have known at the time of marketing its Roundup products that exposure to Roundup and could result in cancer and other severe illnesses and injuries.

      g.    Defendants did not conduct adequate post-marketing surveillance of its Roundup products.

141.    Defendants knew, or should have known, that at all times herein mentioned its Roundup was in a defective condition, and was and is inherently dangerous and unsafe.

142.    Plaintiff-Decedent was exposed to Defendants' Roundup in the course of his use as described above, without knowledge of Roundup's dangerous characteristics.

143.    At the time of Plaintiff-Decedent 's use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

144.    Defendants with this knowledge voluntarily designed its Roundup with a dangerous condition for use by the public, and in particular the Plaintiff-Decedent.

27

145. Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

146. Defendants created a product that was and is unreasonably dangerous for its normal, intended use.

147. Defendants marketed and promoted their Roundup product in such a manner so as to make it inherently defective, as the product downplayed the suspected, probable, and established health risks inherent with its normal, intended use.

148. The Roundup product designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was manufactured defectively in that Roundup left the hands of Defendants in a defective condition and was unreasonably dangerous to its intended users.

149. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants reached their intended users in the same defective and unreasonably dangerous condition in which the Defendants' Roundup was manufactured.

150. Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to the Plaintiff-Decedent in particular, and Defendants are therefore strictly liable for the injuries sustained by Plaintiffs.

151. Plaintiffs could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

152. By reason of the foregoing, the Defendants have become strictly liable to Plaintiffs for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup.

28

153.    Defendants' defective design, of Roundup amounts to willful, wanton, and/or reckless conduct by the Defendants.

154.    Defects in Defendants' Roundup were the cause or a substantial factor in causing Plaintiffs' injuries.

155.    As a result of the foregoing acts and omissions, the Plaintiff-Decedent developed NHL, and suffered severe and personal injuries and death, which were permanent and lasting in nature until Plaintiff-Decedent's death, physical pain and mental anguish, including diminished enjoyment of life until his death, and financial expenses for hospitalization, medical care, and funeral and burial services.

156.    WHEREFORE, Plaintiffs respectfully request that this Court enter a judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury trial on all issues contained herein.

### THIRD CAUSE OF ACTION
### (STRICT PRODUCTS LIABILITY – FAILURE TO WARN)

157.    Plaintiffs repeat, reiterate and, re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

158.    Defendants have engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting Roundup, and through that conduct have knowingly and intentionally placed Roundup into the stream of commerce with full knowledge that it reaches consumers such as Plaintiff-Decedent who was exposed to it through ordinary and reasonably foreseeable uses.

159. Defendants did in fact sell, distribute, supply, manufacture, and/or promote Roundup to Plaintiff-Decedent. Additionally, Defendants expected the Roundup that they were selling, distributing, supplying, manufacturing, and/or promoting to reach – and Roundup did in fact reach – consumers, including Plaintiff-Decedent, without any substantial change in the condition of the product from when it was initially distributed by Defendants.

160. At the time of manufacture, Defendants could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known the unreasonable risks of harm associated with the use of and/or exposure to such products.

161. At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Defendants and at the time Plaintiff-Decedent was exposed to and/or ingested the product. The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing and dying from NHL as a result of exposure and use.

162. Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect health those exposed, in violation of 7 U.S. §136j(a)(1)(E).

163. Defendants' failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed violated 7 U.S. §136j(a)(1)(E) as well as the laws of the States of Missouri and Massachusetts.

164. Defendants could have amended the label of Roundup to provide additional warnings.

30

165.   This defect caused serious injury to and the death of Plaintiff-Decedent, who used Roundup in its intended and foreseeable manner.

166.   At all times herein mentioned, Defendants had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain, supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

167.   Defendants labeled, distributed, and promoted the aforesaid product such that it was dangerous and unsafe for the use and purpose for which it was intended.

168.   Defendants failed to warn of the nature and scope of the side effects associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of NHL.

169.   Defendants were aware of the probable consequences of the aforesaid conduct. Despite the fact that Defendants knew or should have known that Roundup causes serious injuries, Defendants failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of developing NHL from Roundup exposure, even though these properties and side effect were known or reasonably scientifically knowable at the time of distribution. Defendants willfully and deliberately failed to avoid the consequences associated with their failure to warn, and in doing so, Defendants acted with a conscious disregard for the safety of Plaintiff-Decedent.

170.   At the time of exposure, Plaintiff-Decedent could not have reasonably discovered any defect in Roundup prior through the exercise of reasonable care.

171.   Defendants, as the manufacturers and/or distributors of the subject product, are held to the level of knowledge of an expert in the field.

172.    Plaintiff-Decedent reasonably relied upon the skill, superior knowledge, and judgment of Defendants.

173.    Had Defendants properly disclosed the risks associated with Roundup, Plaintiff-Decedent would have avoided the risk of NHL by not using Roundup.

174.    The information that Defendants did provide or communicate failed to contain adequate warnings and precautions that would have enabled Plaintiff-Decedent, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

175.    To this day, Defendants have failed to adequately warn of the true risks of Plaintiff-Decedent's injuries associated with the use of and exposure to Roundup.

176.    As a result of their inadequate warnings, Defendants' Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were distributed by Defendants, and used by Plaintiff-Decedent.

177.    As a direct and proximate result of Defendants' actions as alleged herein, and in such other ways to be later shown, the subject product caused Plaintiff-Decedent to sustain injuries as herein alleged.

32

178.     WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury trial on all issues contained herein.

## FOURTH CAUSE OF ACTION
## (BREACH OF IMPLED WARRANTIES)

179.     Plaintiffs repeat, reiterate and, re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

180.     At all times herein mentioned, the Defendants manufactured, distributed, compounded, portrayed, distributed, recommended, merchandized, advertised, promoted, and sold Roundup and/or have recently acquired the Defendants who have manufactured, compounded, portrayed, distributed, recommended, merchandized, advertised, promoted, and sold Roundup, as a broad-spectrum herbicide. These actions were under the ultimate control and supervision of Defendants.

181.     At the time Defendants marketed, sold, and distributed Roundup for use by Plaintiff-Decedent, Defendants knew of Roundup's intended use and impliedly warranted the product to be of merchantable quality and safe and fit for this use.

182.     The Defendants impliedly represented and warranted to Plaintiff-Decedent and users of Roundup, the agricultural community, and/or the EPA that Roundup was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.

183.     These representations and warranties were false, misleading, and inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

33

184.   Plaintiff-Decedent and/or the EPA did rely on said implied warranty of merchantability of fitness for use and purpose.

185.   Plaintiff-Decedent reasonably relied upon the skill and judgment of Defendants as to whether Roundup was of merchantable quality and safe and fit for its intended used.

186.   Roundup was injected into the stream of commerce by Defendants in a defective, unsafe, and inherently dangerous condition, and the products' materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

187.   The Defendants breached the aforesaid implied warranties, as their herbicide Roundup was not fit for its intended purposes and uses.

188.   As a result of the foregoing acts and omissions, Plaintiff-Decedent suffered from NHL and Plaintiff-Decedent suffered severe personal injuries and death, physical pain and mental anguish, including diminished enjoyment of life, prior to his death, and financial expenses for hospitalization, medical care, including other medical expenses, and funeral and related expenses, as well as other economic and non-economic damages.

189.   WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury trial on all issues contained herein.

## FIFTH CAUSE OF ACTION
## WRONGFUL DEATH

190.   Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

191.    Plaintiff-Decedent was supplied with, and used said products as tested, studied, researched, evaluated, endorsed, designed, formulated, compounded, manufactured, produced, processed, assembled, inspected, distributed, marketed, labeled, promoted, packaged, advertised for sale, prescribed, sold or otherwise placed in the stream of interstate commerce by Defendants.

192.    The injuries and damages of Plaintiff and Plaintiff-Decedent were caused by the wrongful acts, omissions, and fraudulent misrepresentations of Defendants.

193.    As a direct and proximate result of the acts and/or omissions of Defendants as set forth herein and the exposure to and/or ingestion of Defendants' product, Plaintiff-Decedent suffered fatal injuries, physical pain, mental anguish, and diminished enjoyment of life until his death, and financial harm due to hospitalization, medical care, and funeral and burial services.

194.    Plaintiff Janet B. Hudson is the surviving spouse and anticipated estate representative of Plaintiff-Decedent Benjamin E. Hudson, who used Defendants' product and was injured, endured pain, suffering, and loss of enjoyment of life from those persistent and debilitating injuries and died as a result of the negligence, and willful, wanton, and reckless acts and breaches of warranties of Defendants. As such, Plaintiff Janet B. Hudson is authorized to bring an action for the wrongful death of Plaintiff-Decedent and recover damages upon that action pursuant to M.G.L.A. 229 § 2 (West).

195.    As a result of the death of Plaintiff-Decedent, Plaintiff and decedents' family members were deprived of love, income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice of Plaintiff-Decedent.

196.    Plaintiff is entitled to recover economic and non-economic damages against all Defendants for wrongful death directly and legally caused by the defects in Defendants' product and the negligence, and willful, wanton, and reckless acts and breaches of warranties and

intentional and negligent misrepresentations of Defendants pursuant to M.G.L.A. 229 § 2 (West).

## SIXTH CAUSE OF ACTION
## LOSS OF CONSORTIUM ON BEHALF OF PLAINTIFF JANET B. HUDSON

197.    Plaintiffs repeat, reiterate and, re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

198.    Plaintiff, Janet B. Hudson, was the lawful spouse of Plaintiff-Decedent Benjamin E. Hudson, and as such, not only lived and cohabitated with him but was entitled to the comfort, enjoyment, society, and services of her spouse.

199.    As set forth above, Plaintiff-Decedent Benjamin E. Hudson was injured, endured pain, suffering, and loss of enjoyment of life from those persistent and debilitating injuries and died as a result.  As a direct and proximate result of the foregoing, Plaintiff Janet B. Hudson was deprived of the comfort and enjoyment of the services and society of her spouse, has suffered and will continue to suffer economic loss, and has otherwise been emotionally and economically injured, including by having necessarily paid and having become liable to pay for medical aid, treatment and for medications, and will necessarily incur further expenses of a similar nature in the future.

200.    For the reasons set forth herein, Plaintiff Janet B. Hudson has been caused, presently and in the future, to suffer the permanent loss of her spouse's companionship, services, society; the ability of the Plaintiff-Decedent Benjamin E. Hudson to provide this companionship, services, and society has been impaired and depreciated, the marital association between husband and wife was altered, causing both great mental anguish while Plaintiff-Decedent Benjamin E. Hudson was still living.

201.    WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in

36

Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury trial on all issues contained herein.

## DEMAND FOR JURY TRIAL

202.     Plaintiffs hereby demand trial by jury as to all issues within this pleading.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against the Defendants on each of the above-referenced claims and causes of actions and as follows:

1. Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

2. Awarding compensatory damages to Plaintiffs for past and future damages, including, but not limited to, Plaintiffs' pain and suffering and for severe and permanent personal injuries sustained by the Plaintiffs including health care costs and economic loss;

3. Awarding economic damages to Plaintiffs in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determined at trial of this action;

4. Punitive and/or exemplary damages for the wanton, willful, fraudulent, and reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiffs in an amount sufficient to punish Defendants and deter future similar conduct, to the extent allowed by applicable law;

5. Pre-judgment interest;

6. Post-judgment interest;

7. Awarding Plaintiffs reasonable attorneys' fees;

8. Awarding Plaintiffs the costs of these proceedings; and

9. Such other and further relief as this Court deems just and proper.

37

Dated: April 24, 2019

Respectfully submitted,

/s/ Eric D. Holland

**HOLLAND LAW FIRM**
ERIC D. HOLLAND #39935-MO
300 North Tucker, Suite 801
St. Louis, MO  63101
Tel. 314-241-8111
Fax 314-241-5554
Email:  eholland@allfela.com

**PARKER WAICHMAN LLP**

Michael S. Werner
Parker Waichman LLP
(*pro hac vice* anticipated)
6 Harbor Park Drive
Port Washington, NY 11050
Tel. (516) 723-4631
Fax (516) 723-4731
Email: mwerner@yourlawyer.com

*Attorneys for Plaintiff*