# U.S. District Court
## District of Montana (Great Falls)
## CIVIL DOCKET FOR CASE #: 4:19-cv-00036-BMM

Knox et al v. Monsanto Company et al
Assigned to: Judge Brian Morris
Cause: 28:1332 Diversity-Personal Injury

Date Filed: 05/13/2019
Jury Demand: Both
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Terry Knox**                            represented by  **A. Christopher Edwards**
EDWARDS FRICKLE & CULVER
1648 Poly Drive
Suite 206
Billings, MT 59102
406-256-8155
Fax: 406-256-8157
Email: chris@edwardslawfirm.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**A. Clifford Edwards**
EDWARDS FRICKLE & CULVER
1648 Poly Drive
Suite 206
Billings, MT 59102
406-256-8155
Fax: 406-256-8159
Email: jenny@edwardslawfirm.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Triel D. Culver**
EDWARDS FRICKLE & CULVER
1648 Poly Drive
Suite 206
Billings, MT 59102
406-256-8155
Fax: 406-256-8159
Email: triel@edwardslawfirm.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Carolyn "Coke" Knox**                   represented by  **A. Christopher Edwards**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**A. Clifford Edwards**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Triel D. Culver**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**                    represented by **Randy J. Cox**
                                        BOONE KARLBERG, P.C.
                                        201 West Main Street, Suite 300
                                        PO Box 9199
                                        Missoula, MT 59807-9199
                                        406-543-6646
                                        Fax: 549-6804
                                        Email: rcox@boonekarlberg.com
                                        *LEAD ATTORNEY*
                                        *ATTORNEY TO BE NOTICED*

                                        **Robert E. Johnston**
                                        HOLLINGSWORTH LLP
                                        1350 I Street, NW
                                        Washington, DC 20005
                                        202-898-5800
                                        Fax: 202-682-1639
                                        Email: rjohnston@hollingsworthllp.com
                                        *LEAD ATTORNEY*
                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**Kerry Yates**                         represented by **Randy J. Cox**
                                        (See above for address)
                                        *LEAD ATTORNEY*
                                        *ATTORNEY TO BE NOTICED*

                                        **Robert E. Johnston**
                                        (See above for address)
                                        *LEAD ATTORNEY*
                                        *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/13/2019 | 1 | NOTICE OF REMOVAL from Montana Eighth Judicial District Court, Cascade County, Case Number DDV-19-0211. (Attachments: # 1 Exhibit 1 - Summons and Complaint, # 2 Exhibit 2 - Declaration of Kerry Yates, # 3 Civil Cover Sheet) (MMS) (Entered: 05/13/2019) |
| 05/13/2019 | | Filing fee: $ 400.00, receipt number 0977-2308717 (MMS) (Entered: 05/13/2019) |
| 05/13/2019 | 2 | ANSWER to Complaint with Jury Demand by Monsanto Company. (Cox, Randy) (Entered: |

| | | 05/13/2019) |
|---|---|---|
| 05/13/2019 | 3 | Corporate Disclosure Statement by Monsanto Company identifying Corporate Parent Bayer AG for Monsanto Company.. (Cox, Randy) (Entered: 05/13/2019) |
| 05/13/2019 | 4 | PRELIMINARY PRETRIAL CONFERENCE ORDER: Preliminary Pretrial Statement due by 6/5/2019. Joint Discovery Plan due by 6/5/2019. Statement of Stipulated Facts due by 6/5/2019. Pretrial Conference set for 6/12/2019 at 01:30 PM in Great Falls, MT before Judge Brian Morris. Signed by Judge Brian Morris on 5/13/2019. (MMS) (Entered: 05/13/2019) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 05/14/2019 07:55:32 | | | |
| **PACER Login:** | hllp1982:2634105:4722683 | **Client Code:** | 1417.0049 |
| **Description:** | Docket Report | **Search Criteria:** | 4:19-cv-00036-BMM |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

A. Clifford Edwards
Triel D. Culver
A. Christopher Edwards
John W. Edwards
EDWARDS, FRICKLE & CULVER
1648 Poly Drive, Suite 206
Billings, Montana 59102
Telephone: (406) 256-8155
Facsimile: (406) 256-8159
triel@edwardslawfirm.org
chris@edwardslawfirm.org
john.edwards@edwardslawfirm.org

*Attorneys for Plaintiffs*

## MONTANA EIGHTH JUDICIAL DISTRICT COURT
### CASCADE COUNTY

| | |
|---|---|
| TERRY KNOX and CAROLYN "COKE" KNOX, | Cause No.  DDV-19-0211 |
| Plaintiffs, | JOHN W. PARKER |
| | Judge: |
| vs. | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| MONSANTO COMPANY and KERRY YATES, | |
| Defendants. | |

COME NOW Plaintiffs, Terry Knox and Carolyn "Coke" Knox, by and through their attorneys of record, Edwards, Frickle & Culver, and for their Complaint against Defendants Monsanto Company and Kerry Yates, complain and allege as follows:

### PARTIES, JURISDICTION, AND VENUE

1.    Plaintiffs Terry and Coke Knox are husband and wife and are residents of Denton, Fergus County, Montana.  Plaintiffs bring this action for personal injuries sustained by exposure

to Roundup containing the active ingredient glyphosate and other adjuvants including the surfactant polyethoxylated tallow amine ("POEA"). Plaintiffs maintain that Roundup is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce and lacked the proper warnings and directions as to the dangers associated with their use. As a direct and proximate result of being exposed to Roundup, Terry Knox developed Non-Hodgkin Lymphoma (NHL).

2.     Defendant Monsanto Company is a Delaware corporation with its principal place of business in St. Louis, Missouri. Monsanto sells its products throughout the United States, including in Montana and has derived substantial revenue from products used in this State. Monsanto Company is registered with the Montana Secretary of State and its registered agent is located at 26 W. Sixth Ave, Helena, MT 59624.

3.     Defendant Kerry Yates is a resident of Great Falls, Cascade County, Montana. At times relevant to this action, Kerry Yates was Monsanto's sales representative in Montana and promoted its commercial herbicide Roundup and other products. Kerry Yates knew that Terry Knox used thousands of gallons of Monsanto's Roundup products but failed to warn him of any dangers.

4.     Defendants designed, researched, manufactured, tested, labeled, advertised, promoted, warrantied, marketed, sold, and distributed the commercial herbicide Roundup.

5.     This Court has personal jurisdiction over Defendants because Defendants transact business in Montana; Monsanto is a corporation doing business within Montana; and Kerry Yates is an individual resident of Montana doing business for Monsanto in Montana. Defendants know that Roundup products are and were sold throughout Montana, and, more specifically, caused Roundup to be promoted and sold to Plaintiff Terry Knox in Montana.

2

6.     Monsanto advertises and sells goods, specifically Roundup, throughout Montana. It derived substantial revenue from goods and products used in Montana. It expected its acts to have consequences within Montana and derived substantial revenue from interstate commerce. Specific to this case, Monsanto engaged in the business of developing, manufacturing, testing, packaging, marketing, distributing, labeling, and selling Roundup. Monsanto purposefully availed itself of the privilege of conducting activities within Montana, thus invoking the benefits and protections of its laws. Monsanto maintains sufficient contacts with the State of Montana such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

7.     Subject matter jurisdiction is proper under Article VII, Section 4 of the Montana Constitution and MCA § 3-5-302.

8.     Venue properly lies in the Montana Eighth Judicial District under MCA § 25-2-122(a) because at least one Defendant resides in Cascade County.

## GENERAL ALLEGATIONS

9.     Glyphosate, which is an active ingredient in Roundup, is a carcinogen. It has been identified as causing various forms of cancer and, in particular, Non-Hodgkin Lymphoma (NHL).

10.     Terry Knox, who used Roundup extensively for decades, now suffers from the effects of Non-Hodgkin Lymphoma.

11.     "Roundup" refers to all formulations of Monsanto's Roundup products including, but not limited to, those used by Terry Knox: Roundup Original, Roundup Ultra RT, Roundup Ultra Max, Roundup RT Bulk, RT Master, RT Master II, RT II, RT 3, or any other formulation

3

containing the active ingredient glyphosate including those that may be identified during discovery.

12.     Monsanto is the world's leading producer of glyphosate.

13.     Monsanto discovered the herbicidal properties of glyphosate during the 1970's and developed it as a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

14.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots; and detectable quantities accumulate in the plant tissues.

15.     Roundup was introduced in 1974 and is today one of the world's most widely used herbicides.

16.     Polyethoxylated tallow amine (POEA) is a surfactant that enhances the activity of herbicides such as glyphosate by improving solubility and penetration into plants.

17.     Roundup contains POEA.

18.     Since 1974, farmers, ranchers and consumers, including Terry Knox, have used Roundup unaware it is a carcinogen.

**Defendants' False Representations Regarding The Safety Of Roundup**

19.     Monsanto represented to farmers, ranchers and consumers that its spray-on glyphosate-based herbicides, including Roundup, was safe enough to drink, "safer than table salt", and "practically non-toxic" to mammals, birds, and fish.

20.     Monsanto also represented to farmers, ranchers and consumers:

a.     Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences.

4

b.   And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c.   Roundup biodegrades into naturally occurring elements.

d.   You can apply Roundup with "confidence because it will stay where you put it". It bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Roundup into natural products.

e.   Glyphosate is less toxic to rats than table salt following acute oral ingestion.

f.   Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

g.   You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

h.   Roundup can be used where kids and pets will play and breaks down into natural material.

21.   In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products.

22.   On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with the New York Attorney General, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a.   its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

b.   its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;

c.   its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

d.   its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics;"

5

e.     glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and

f.     its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

23.     However, Monsanto did not alter its advertising in the same manner in any state other than New York, and, on information and belief, still has not done so today.

### IARC Classification of Glyphosate As A Probable Carcinogen

24.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental agency that the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

25.     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015-2019 met in April 2014. IARC set glyphosate for review in 2015-2016.

26.     On March 24, 2015, after IARC reviewed numerous studies, many of which had been in Monsanto's possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Monsanto's Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence (genotoxicity and oxidative stress) of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

27.     The IARC's full Monograph was published on July 29, 2015, and established glyphosate as a class 2A probable carcinogen to humans. According to the authors, glyphosate demonstrated sufficient mechanistic evidence to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

28.     The IARC Working Group found an increased risk between exposure to glyphosate and Non-Hodgkin Lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

29.    The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

**Earlier Evidence of Roundup's Danger**

30.    Despite the new classification by the IARC, Monsanto has had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

31.    Genotoxicity refers to chemical agents capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

32.    In 1997, Chris Clements published "Genotoxicity of select herbicides in Rana catesbeiana tadpoles  using  the alkaline single-cell  gel DNA electrophoresis (comet) assay." The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

33.    In 2003, Lennart Hardell and Mikael Eriksson published the results of two case-controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia. The study concluded that glyphosate had the most significant relationship to NHL among all herbicide studies with an increased odds ratio of 3:11.

34.    In 2003, AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.  The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

35.    In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

7

36.     The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."

37.     In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate along.

38.     The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

39.     In 2006, César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate. The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

40.     In 2008, Mikael Eriksson published a population-based case-control study of exposure to various pesticides as a risk factor for NHL. This strengthened previous associations between glyphosate and NHL.

41.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

42. The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

43. The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendants.

44. Defendants knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants, and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiffs from Roundup.

45. Defendants knew or should have known that tests, limited to Roundup's active ingredient glyphosate, were insufficient to prove the safety of Roundup.

46. Defendants failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup.

47. Rather than performing appropriate tests, Defendants relied upon flawed industry-supported studies designed to protect Defendants' economic interests rather than Plaintiffs and the consuming public.

48. Despite its knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendants continued to promote Roundup as safe.

49. Monsanto continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of

9

scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

50. These statements and representations have been made with the intent of inducing Plaintiffs, the agricultural community, and the public at large to purchase, and increase the use of, Roundup for Monsanto's pecuniary gain, and in fact did induce Plaintiff to use Roundup.

## Plaintiff's Exposure to Roundup

51. Plaintiff Terry Knox, a farmer, has been using Roundup since 1982.

52. For years, Terry Knox applied Roundup on a regular basis. He followed all safety and precautionary warnings, if any, during the course of his use.

53. During the time that Terry Knox was exposed to Roundup, he did not know that exposure to Roundup was injurious to his health or the health of others.

54. In 2018, after using and being exposed to Roundup for years, Plaintiff Terry Knox was diagnosed with Non-Hodgkin Lymphoma. This cancer was caused by his exposure to Defendants' Roundup products.

55. As a result of Terry Knox's illness, Plaintiffs have incurred considerable medical expenses, significant economic and non-economic damages and his wife has suffered a loss of consortium.

56. Defendants failed to appropriately and adequately inform and warn Plaintiffs of the serious and dangerous risks associated with the use of and exposure to Roundup, including, but not limited to, the risk of developing NHL.

57. By reason of the foregoing acts and omissions, Plaintiffs seek compensatory damages as a result of Terry Knox's use of, and exposure to, Roundup, which caused or was a substantial contributing factor in causing Terry Knox to suffer from cancer. Plaintiffs have

endured and continue to suffer pain, emotional and mental anguish, diminished enjoyment of live, medical treatment, medical monitoring, loss of consortium and other economic and non-economic damages.

58.    Defendants knew or should have known about the risks posed by Roundup, but recklessly failed to warn consumers. Instead, as alleged above, Defendants promoted Roundup without regard for its toxic effects. Defendants deliberately proceeded to act in conscious disregard or indifference to a high probability of injury. Defendant's acts demonstrate indifference to the health and well-being of consumers, including Plaintiffs. By their actions and/or omissions, Defendants committed actual fraud or actual malice as those terms are defined by Mont. Code. Ann. § 27-1-221.

## COUNT I - Strict Products Liability (Design Defect)

59.    Plaintiffs re-allege each paragraph above as if fully set forth herein.

60.    The dangerous propensities of Roundup were known to Defendants or were reasonably and scientifically knowable to Defendants through appropriate research and testing by known methods at the time they marketed, promoted, distributed, supplied and sold the product.

61.    At all times relevant, Defendants designed, researched, manufactured, tested, advertised, promoted, sold, and distributed Roundup as hereinabove described that was used by Plaintiff Terry Knox.

62.    At all times relevant, Defendant Kerry Yates marketed, promoted and warrantied Roundup that was used by Terry Knox.

11

63.    Roundup was expected to and did reach consumers and persons coming into contact with it without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed.

64.    Roundup was and is defective because it was and is dangerous to an extent beyond that which an ordinary consumer would anticipate.

65.    Terry Knox was exposed to Roundup without knowledge of Roundup's dangerous characteristics.

66.    At the time of Terry Knox's use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

67.    Terry Knox's use of, and exposure to, Roundup caused or was a substantial contributing factor in causing him to suffer from cancer. As a result, Plaintiffs have endured and continue to suffer pain, emotional and mental anguish, medical expenses, loss of consortium and other economic and non-economic damages.

## COUNT II - Strict Products Liability (Failure to Warn)

68.    Plaintiffs re-allege each paragraph above as if fully set forth herein.

69.    At all times relevant, Defendants designed, researched, manufactured, tested, advertised, promoted, sold, and distributed Roundup as hereinabove described that was used by Plaintiff Terry Knox.

70.    At all times relevant, Defendant Kerry Yates marketed, promoted, and warrantied Roundup that was used by Plaintiff.

71.    Warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products should have been prominently included with Roundup because of the risks of harm associated with the use of and/or exposure to such products.

72.     At all relevant times, Roundup was defective because it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing NHL as a result of exposure and use.

73.     Had Terry Knox been appropriately warned by Defendants, he would not have used Roundup or would have taken additional precautions to limit Roundup exposure.

74.     Terry Knox's use of, and exposure to, Roundup caused or was a substantial contributing factor in causing him to suffer from cancer. As a result, Plaintiffs have endured and continue to suffer pain, emotional and mental anguish, medical expenses, loss of consortium and other economic and non-economic damages.

### COUNT III – Negligence

75.     Plaintiffs re-allege each paragraph above as if fully set forth herein.

76.     Defendants, directly or indirectly, caused Roundup products to be sold distributed, packaged, labeled, marketed, promoted and/or used by Plaintiff Terry Knox.

77.     Defendants had a duty to Plaintiffs to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonable dangerous to consumers, users, and other persons coming into contact with the product.

78.     Defendants had a duty to Plaintiffs to exercise reasonable care in the marketing, advertisement, promotion, and sale of Roundup products. Defendants' duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup.

13

79.    Defendants knew, or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup and, specifically, the carcinogenic properties of the chemical glyphosate.

80.    Defendants knew, or, in the exercise of reasonable care, should have known that use of or exposure to Roundup products could cause Plaintiffs' injuries and, thus, created a dangerous and unreasonable risk of injury to the users of these products, including Terry Knox.

81.    Defendants knew, or, in the exercise of reasonable care, should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Terry Knox from Roundup.

82.    Defendants knew, or, in the exercise of reasonable care, should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

83.    Defendants also knew, or, in the exercise of reasonable care, should have known that users and consumers of Roundup were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup and glyphosate-containing products.

84.    As such, Defendants breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of Roundup products, in that Defendants knew or had reason to know that a user's or consumer's exposure to the Roundup products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

85.     Defendants failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff Terry Knox from Roundup.

86.     Despite the ability and means to investigate, study, and test its products and to provide adequate warnings, Defendants have failed to do so. Indeed, Defendants have wrongfully concealed information and have further made false and/or misleading statements concerning the safety and/or exposure to Roundup and glyphosate.

87.     Defendants' negligence includes but is not limited to:

a.      Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup products without thorough and adequate pre- and post-market testing;

b.      Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup;

c.      Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup products and glyphosate-containing products were safe for their intended use in agriculture, horticulture, and at-home use;

d.      Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity

of Roundup, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

e.  Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of Roundup products so as to avoid the risk of serious harm associated with the prevalent use of Roundup/glyphosate as an herbicide;

f.  Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendants could reasonably foresee would use and/or be exposed to Roundup products;

g.  Failing to disclose to Plaintiff Terry Knox, users, consumers, and the general public that the use of and exposure to Roundup presented severe risks of cancer and other grave illnesses;

h.  Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup and glyphosate-containing products;

i.  Representing that Roundup products were safe for their intended use when, in fact, Defendants knew or should have known that the products were not safe for their intended use;

j.  Declining to make or propose any changes to Roundup products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup and glyphosate;

k.  Advertising, marketing, promoting, and recommending the use of Roundup products, while concealing and failing to disclose or warn of the dangers known

16

by Defendants to be associated with or caused by the use of or exposure to Roundup and glyphosate;

l.      Continuing to disseminate information to its consumers, which indicate or imply that Defendants' Roundup products are not unsafe for use in the agricultural, horticultural industries, and/or home use; and

m.      Continuing the manufacture, promotion and sale of Roundup products with the knowledge that the products were unreasonably unsafe and dangerous.

88.    Defendants knew and/or should have known that it was foreseeable that consumers and/or users, such as Terry Knox, would suffer injuries as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup.

89.    Plaintiffs did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup or its active ingredient glyphosate.

90.    As a proximate result of Defendants' wrongful acts and omissions in placing its defective Roundup products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiffs have suffered and continue to suffer severe and permanent physical and emotional injuries. Plaintiffs have endured pain and suffering, have suffered economic losses (including significant expenses for medical care and treatment), and will continue to incur these expenses in the future.

## COUNT IV – Breach of Express Warranty

91.    Plaintiffs re-allege each paragraph above as if fully set forth herein.

92.    At all times relevant to this litigation, Defendants expressly represented and warranted to the purchasers of Roundup products, by and through statements made by

17

Defendants in labels, publications, package inserts, and other written materials intended for consumers and the general public, that Roundup products were safe to human health and the environment, effective, fit, and proper for their intended use. Defendants advertised, labeled, marketed, and promoted Roundup products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that its Roundup® products would conform to the representations.

93. These express representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Roundup and glyphosate. Defendants knew and/or should have known that the risks expressly included in Roundup warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendants expressly represented that its Roundup products were safe and effective, that they were safe and effective for use by individuals such as Plaintiff Terry Knox, and/or that they were safe and effective as agricultural herbicides.

94. The representations about Roundup, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

95. Defendants placed Roundup products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup and its active ingredient glyphosate.

96.    Defendants breached these warranties because, among other things, Roundup products were defective, dangerous, unfit for use, did not contain label representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically, Defendants breached the warranties in the following ways:

a.    Defendants represented through labeling, advertising, and marketing materials that Roundup products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated with use of and/or exposure to Roundup and glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings and labels; and

b.    Defendants represented that Roundup® products were safe for use and fraudulently concealed information that demonstrated that glyphosate, the active ingredient in Roundup, had carcinogenic properties, and that Roundup products, therefore, were not safer than alternatives available on the market.

97.    Defendants had sole access to material facts concerning the nature of the risks associated with Roundup products as expressly stated within its warnings and labels, and Defendants knew that consumers and users such as Plaintiff Terry Knox could not have reasonably discovered that the risks expressly included in Roundup warnings and labels were inadequate and inaccurate.

98.    Plaintiffs had no knowledge of the falsity or incompleteness of Defendants' statements and representations concerning Roundup.

99.    Plaintiff Terry Knox used and/or was exposed to the use of Roundup as researched, developed, designed, tested, formulated, manufactured, inspected, labeled,

19

distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by Defendants.

100.    Had the warnings and labels for Roundup products accurately and adequately set forth the true risks associated with the use of such products, including Plaintiff Terry Knox's injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Plaintiffs could have avoided the injuries complained of herein.

101.    As a direct and proximate result of Defendants' wrongful acts and omissions, Plaintiffs have suffered severe injuries. Plaintiffs have endured pain and suffering, have suffered economic losses (including significant expenses for medical care and treatment), and will continue to incur these expenses in the future.

### COUNT V – Breach of Implied Warranty of Merchantability

102.    Plaintiffs re-allege each paragraph above as if fully set forth herein.

103.    At all times relevant to this litigation, Defendants engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to users and consumers, including Plaintiff Terry Knox, thereby placing Roundup® products into the stream of commerce.

104.    These actions were under the ultimate control and supervision of Defendants.

105.    Before the time that Plaintiff Terry Knox was exposed to the use of the aforementioned Roundup products, Defendants impliedly warranted to consumers and users, including Plaintiff Terry Knox, that its Roundup® products were of merchantable

quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

106.    Defendants, however, failed to disclose that Roundup has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff Terry Knox's injuries.

107.    Plaintiff Terry Knox reasonably relied upon the skill, superior knowledge and judgment of Defendants and upon their implied warranties that the Roundup products were of merchantable quality and fit for their intended purpose or use.

108.    The Roundup products were expected to reach and did in fact reach consumers and users, including Plaintiff Terry Knox, without substantial change in the condition in which they were manufactured and sold by Defendants.

109.    At all times relevant to this litigation, Defendants were aware that consumers and users, including Plaintiff, would use Roundup products as marketed by Defendants, which is to say that Plaintiff Terry Knox was the foreseeable user of Roundup.

110.    Defendants intended that Roundup products be used in the manner in which Plaintiff Terry Knox in fact used them and Defendants impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup was not adequately tested or researched.

21

111.    In reliance upon Defendants' implied warranty, Plaintiff Terry Knox used Roundup as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendants.

112.    Plaintiff Terry Knox could not have reasonably discovered or known of the risks of serious injury associated with Roundup or glyphosate.

113.    Defendants breached their implied warranty to Plaintiff Terry Knox in that Roundup products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

114.    The harm caused by Defendants' Roundup products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

115.    As a direct and proximate result of Defendants' wrongful acts and omissions Plaintiffs have suffered severe and permanent physical and emotional injuries. Plaintiffs have endured pain and suffering, have suffered economic loss (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

## COUNT VI – Loss of Consortium

116.    Plaintiffs re-allege each paragraph above as if fully set forth herein.

117.    Plaintiff Coke Knox was and is the lawful wife of Plaintiff Terry Knox. As such, she is entitled to the services, society, companionship, consortium and support of Terry Knox.

118.   As a direct, legal, and proximate result of the culpability and fault of Defendants, Plaintiff Coke Knox suffered a loss of consortium as that claim is defined under Montana law and is entitled to recover damages available, including damages for a loss of support, services, love, companionship, affection, society and other elements of consortium.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants jointly and severally for all the damages allowed by law, including but not limited to:

1.   All damages, special and general, recoverable under Montana law, including but not limited to all economic and non-economic damages such as past and future pain, suffering, emotional distress, disability, loss of enjoyment of life, and loss of consortium in a reasonable sum to be proven at trial;

2.   Punitive damages pursuant to Mont. Code Ann. § 27-1-221 in an amount sufficient to discourage Defendants and others from engaging in like conduct in the future;

3.   Costs including court costs, litigation expenses and attorneys' fees if allowed by law;

4.   Pre- and post-judgment interest; and

5.   Such other relief as the Court deems just and proper under the circumstances, or that is appropriate under law or equity.

## DEMAND FOR JURY TRIAL

Plaintiffs request that all issues of fact be determined by a twelve-person jury.

23

DATED this ___4___ day of April, 2019.

EDWARDS, FRICKLE & CULVER

By: _____
    A. Clifford Edwards
    Triel D. Culver
    A. Christopher Edwards
    John W. Edwards
    *Attorneys for Plaintiffs*