# U.S. District Court
## Eastern District of Missouri (St. Louis)
## CIVIL DOCKET FOR CASE #: 4:19-cv-00989-JMB

Bradley et al v. Monsanto Company

Assigned to: Magistrate Judge John M. Bodenhausen

Cause: 28:1332 Diversity-Product Liability

Date Filed: 04/25/2019

Jury Demand: Plaintiff

Nature of Suit: 365 Personal Inj. Prod. Liability

Jurisdiction: Federal Question

**Plaintiff**

**Harley R. Bradley**

represented by **Christopher L. Schnieders**
NAPOLI SHKOLNIK PLLC
6731 W. 121st St.
Suite 201
Overland Park, KS 66209
(913) 246-3860
Email: cschnieders@napolilaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Betty Bradley**

represented by **Christopher L. Schnieders**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Lena G. Bradshaw**

represented by **Christopher L. Schnieders**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Robert E. Bradshaw**

represented by **Christopher L. Schnieders**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Hugh C. Brown**

represented by **Christopher L. Schnieders**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Melanie L. Clawson-Roberts**

represented by **Christopher L. Schnieders**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**John E. Roberts**                                  represented by   **Christopher L. Schnieders**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Mark Clinker**                                     represented by   **Christopher L. Schnieders**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**B. Gayle Clinker**                                 represented by   **Christopher L. Schnieders**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Mitchell B. Cooper**                               represented by   **Christopher L. Schnieders**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Adrien Lavoie**                                    represented by   **Christopher L. Schnieders**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Mike R. Frost**                                    represented by   **Christopher L. Schnieders**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Kenneth W. Johnson**                               represented by   **Christopher L. Schnieders**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Christina Johnson**                                represented by   **Christopher L. Schnieders**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Randy E. May**                                     represented by   **Christopher L. Schnieders**
                                                                    (See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Deanna May**
       represented by **Christopher L. Schnieders**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**James S. Olsen**
       represented by **Christopher L. Schnieders**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Robin Olsen**
       represented by **Christopher L. Schnieders**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Lillian J. Radanovich**
*on behalf of the estate of Daniel Radanovich*
       represented by **Christopher L. Schnieders**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Barbara Sipich**
       represented by **Christopher L. Schnieders**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**David Sipich**
       represented by **Christopher L. Schnieders**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ronald W. Steen**
       represented by **Christopher L. Schnieders**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Joan Steen**
       represented by **Christopher L. Schnieders**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Carl B. Tanner**

represented by **Christopher L. Schnieders**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Lillian J. Tanner**

represented by **Christopher L. Schnieders**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Glenn Yetter**

represented by **Christopher L. Schnieders**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Nicole Yetter**

represented by **Christopher L. Schnieders**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 04/25/2019 | 1 | COMPLAINT against defendant All Plaintiffs with receipt number 0865-7172697, in the amount of $400 Jury Demand,, filed by Mitchell B. Cooper, Barbara Sipich, Melanie L. Clawson-Roberts, Lillian J. Tanner, Deanna May, Harley R. Bradley, David Sipich, James S. Olsen, Ronald W. Steen, Randy E. May, Mike R. Frost, Glenn Yetter, Carl B. Tanner, Hugh C. Brown, Nicole Yetter, Betty Bradley, Mark Clinker, Adrien Lavoie, Lillian J. Radanovich, Christina Johnson, Kenneth W. Johnson, John E. Roberts, Lena G. Bradshaw, Joan Steen, B. Gayle Clinker, Robin Olsen, Robert E. Bradshaw. (Attachments: # 1 Form Original Filing Form, # 2 Civil Cover Sheet, # 3 Summons )(Schnieders, Christopher) (Entered: 04/25/2019) |
| 04/25/2019 | 2 | NOTICE OF PROCESS SERVER by Plaintiffs Betty Bradley, Harley R. Bradley, Lena G. Bradshaw, Robert E. Bradshaw, Hugh C. Brown, Melanie L. Clawson-Roberts, B. Gayle Clinker, Mark Clinker, Mitchell B. Cooper, Mike R. Frost, Christina Johnson, Kenneth W. Johnson, Adrien Lavoie, Deanna May, Randy E. May, James S. Olsen, Robin Olsen, Lillian J. Radanovich, John E. Roberts, Barbara Sipich, David Sipich, Joan Steen, Ronald W. Steen, Carl B. Tanner, Lillian J. Tanner, Glenn Yetter, Nicole Yetter Process Server: PM Legal LLC (Schnieders, Christopher) (Entered: 04/25/2019) |
| 04/25/2019 | | Case Opening Notification: 1 Summons(es) issued. The summons was emailed to attorney Christopher L. Schnieders. All parties must file the Notice Regarding Magistrate Judge Jurisdiction Form consenting to or opting out of the Magistrate Judge jurisdiction. Click here for the instructions. and all non-governmental organizational parties (corporations, limited liability companies, limited liability partnerships) must file Disclosure of |

| | | Organizational Interests Certificate (moed-0001.pdf). Judge Assigned: U.S. Magistrate Judge John M. Bodenhausen. (BAK) (Entered: 04/25/2019) |
|---|---|---|
| 04/25/2019 | 3 | Pursuant to Local Rule 2.08, the assigned/referred magistrate judge is designated and authorized by the court to exercise full authority in this assigned/referred action or matter under 28 U.S.C. Sec. 636 and 18 U.S.C Sec. 3401, including any case budgeting matters. (CSAW) (Entered: 04/25/2019) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 05/13/2019 08:38:18 | | | |
| **PACER Login:** | gran0_559:2553715:4861255 | **Client Code:** | 23540 |
| **Description:** | Docket Report | **Search Criteria:** | 4:19-cv-00989-JMB |
| **Billable Pages:** | 5 | **Cost:** | 0.50 |

**IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| HARLEY R. BRADLEY and BETTY BRADLEY (h.w), LENA G. BRADSHAW and ROBERT E. BRADSHAW (h/w), HUGH C. BROWN, MELANIE L. CLAWSON-ROBERTS and JOHN E. ROBERTS (h/w), MARK CLINKER and B. GAYLE CLINKER (h/w), MITCHELL B. COOPER and ADRIEN LAVOIE (h/h), MIKE R. FROST, KENNETH W. JOHNSON and CHRISTINA JOHNSON (h/w), RANDY E. MAY and DEANNA MAY (h/w), JAMES S. OLSEN and ROBIN OLSEN (h/w), LILLIAN J. RADANOVICH on behalf of the estate of DANIEL RADANOVICH, BARBARA SIPICH and DAVID SIPICH (h/w), RONALD W. STEEN and JOAN STEEN (h/w), CARL B. TANNER and LILLIAN J. TANNER (h/w), and GLENN YETTER and NICOLE YETTER (h/w), | CIVIL ACTION NO: _____ <br><br> **COMPLAINT FOR DAMAGES** <br><br> **JURY TRIAL DEMANDED** |
|     Plaintiffs, | |
| v. | |
| MONSANTO COMPANY, | |
|     Defendants | |

---

**COMPLAINT**

Plaintiffs HARLEY R. BRADLEY and BETTY BRADLEY (h.w), LENA G.

BRADSHAW and ROBERT E. BRADSHAW (h/w), HUGH C. BROWN, MELANIE L.

CLAWSON- ROBERTS and JOHN E. ROBERTS (h/w), MARK CLINKER and B. GAYLE

CLINKER (h/w), MITCHELL B. COOPER and ADRIEN LAVOIE (h/h), MIKE R. FROST,

KENNETH W. JOHNSON and CHRISTINA JOHNSON (h/w), RANDY E. MAY and DEANNA MAY (h/w), JAMES S. OLSEN and ROBIN OLSEN (h/w), LILLIAN J. RADANOVICH and behalf of the estate of  DANIEL RADANOVICH, deceased, BARBARA SIPICH and DAVID SIPICH (h/w), RONALD W. STEEN and JOAN STEEN (h/w), CARL B. TANNER and LILLIAN J. TANNER (h/w), GLENN YETTER and NICOLE YETTER (h/w),  bring this Complaint for damages against defendant Monsanto Company ("Monsanto"), and allege as follows:

## I.     NATURE OF THE CASE

1.     This case arises out of Monsanto's wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and sale of the herbicide Roundup®, containing the active ingredient glyphosate. "Roundup®" refers to all formulations of Defendant's Roundup® products. Glyphosate has been found to be carcinogenic, linked to causing various forms of cancer, and in particular non-Hodgkins Lymphoma. As such, Roundup® is dangerous to human health and unfit to be marketed and sold in commerce, particularly without proper warnings and directions as to the dangers associated with its use. Plaintiffs, who used Roundup® extensively, now suffer from non-Hodgkins Lymphoma and bring this action for the harm they have incurred.

2.     In 1974, Defendant Monsanto began using glyphosate as an herbicide selling glyphosate-containing products under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds. By 2001, 85-90 million pounds of glyphosate was being used annually in American agricultural operations. By 2007, that number grew to 185 million pounds. As of 2013, glyphosate was the world's most widely used herbicide.

3.      On March 20, 2015, the International Agency for Research on Cancer (IARC), an organization within the World Health Organization (WHO), completed an analysis on the toxicity of glyphosate. The IARC convened a panel of seventeen scientists to review publically available information about glyphosate. The study resulted in the publication of an IARC Monograph—the authoritative standard for cancer hazard assessment around the world. The IARC classified glyphosate as a Group 2A hazard, meaning it is a probable human carcinogen. Additionally, the IARC concluded that there was a positive association between glyphosate exposure and non-Hodgkin's lymphoma and other cancers, such as lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma. In addition, the State of California's Office of Environmental Health Hazard Assessment (OEHHA) listed glyphosate as an agent "known to the state to cause cancer."

4.      Since Monsanto began selling Roundup®, the company has misrepresented its safety. Monsanto has proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health. This is untrue. Before glyphosate was approved by the Environmental Protection Agency (EPA), Monsanto knew that glyphosate could pose significant risks to human health, including a risk of causing cancer. This lawsuit seeks to hold Monsanto accountable for this misconduct.

## II.      JURISDICTION AND VENUE

5.      This Court has jurisdiction over Defendant and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendant. Defendant is either incorporated and/or has its principal place of business outside of the state in which the Plaintiff is a citizen.

6.      The amount in controversy between Plaintiff and Defendant exceeds $75,000, exclusive of interest and cost.

7.      The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

8.      Venue is proper within this district pursuant to 28 U.S.C. § 1391 in that Defendant conducts business here and is subject to personal jurisdiction in this District. Furthermore, Defendant sells, markets, and/or distributes Roundup® within Missouri. Also, a substantial part of the acts and/or omissions giving rise to these claims occurred within this District.

### III.    PARTIES

9.      Defendant, Monsanto Company ("Monsanto"), is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.  Monsanto is a multinational agrochemical and agricultural biotechnology corporation, and conducts business throughout the United States. At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and manufactured and sold the Roundup® at issue.

10.     Plaintiffs, Harley R. Bradley ("Plaintiff") and Betty Bradley ("Spouse Plaintiff") are lawfully married and are residents and citizens of Minnesota.

11.     Plaintiffs, Lena G. Bradshaw ("Plaintiff") and Robert F. Bradshaw ("Spouse Plaintiff") are lawfully married and are residents and citizens of Florida.

12.     Plaintiff, Hugh C. Brown ("Plaintiff") is a resident and citizen of Oklahoma.

13.     Plaintiffs, Melanie L. Clawson-Roberts ("Plaintiff") and John E. Roberts ("Spouse Plaintiff") are lawfully married and are residents and citizens of Montana.

14.     Plaintiffs, Mark Clinker ("Plaintiff") and B. Gayle Clinker ("Spouse Plaintiff") are lawfully married and are residents and citizens of Nevada.  Plaintiff brings this action for personal injuries sustained by exposure to Roundup®, and its active ingredient glyphosate and the surfactant POEA.

15.     Plaintiffs, Mitchell B. Cooper ("Plaintiff") and Adrien Lavoie ("Spouse Plaintiff") are lawfully married and are residents and citizens of Delaware.  Plaintiff brings this action for personal injuries sustained by exposure to Roundup®, and its active ingredient glyphosate and the surfactant POEA.

16.     Plaintiff, Mike R. Frost ("Plaintiff") is a resident and citizen of Arizona. Plaintiff brings this action for personal injuries sustained by exposure to Roundup®, and its active ingredient glyphosate and the surfactant POEA.

17.     Plaintiffs, Kenneth W. Johnson ("Plaintiff") and Christina Johnson ("Spouse Plaintiff") are lawfully married and are residents and citizens of Colorado.  Plaintiff brings this action for personal injuries sustained by exposure to Roundup®, and its active ingredient glyphosate and the surfactant POEA.

18.     Plaintiffs, Randy E. May ("Plaintiff") and Deanna A. May ("Spouse Plaintiff") are lawfully married and are residents and citizens of Pennsylvania.  Plaintiff brings this action for personal injuries sustained by exposure to Roundup®, and its active ingredient glyphosate and the surfactant POEA.

19.     Plaintiffs, James S. Olsen ("Plaintiff") and Robin Olsen ("Spouse Plaintiff") are lawfully married and are residents and citizens of Illinois.  Plaintiff brings this action for personal injuries sustained by exposure to Roundup®, and its active ingredient glyphosate and the surfactant POEA.

20.     Plaintiff, Lillian J. Radanovich ("Spouse Plaintiff") brings this action on behalf of decedent Daniel Radanovich ("Plaintiff"), her lawfully married spouse, who was a resident and citizen of Ohio. Plaintiff brings this action for personal injuries sustained by exposure to Roundup®, and its active ingredient glyphosate and the surfactant POEA.

21. Plaintiffs, Barbara Sipich ("Plaintiff") and David Sipich ("Spouse Plaintiff") are lawfully married and are residents and citizens of Indiana. Plaintiff brings this action for personal injuries sustained by exposure to Roundup®, and its active ingredient glyphosate and the surfactant POEA.

22. Plaintiffs, Ronald W. Steen ("Plaintiff") and Marianne Joan Steen ("Spouse Plaintiff") are lawfully married and are residents and citizens of Washington. Plaintiff brings this action for personal injuries sustained by exposure to Roundup®, and its active ingredient glyphosate and the surfactant POEA.

23. Plaintiff, Carl B. Tanner III ("Plaintiff") is a resident and citizen of Oregon. Plaintiff brings this action for personal injuries sustained by exposure to Roundup®, and its active ingredient glyphosate and the surfactant POEA.

24. Plaintiffs, Glenn Yetter ("Plaintiff") and Nicole Yetter ("Spouse Plaintiff") are lawfully married and are residents and citizens of Pennsylvania. Plaintiff brings this action for personal injuries sustained by exposure to Roundup®, and its active ingredient glyphosate and the surfactant POEA.

## IV.   FACTUAL ALLEGATIONS

25. For nearly 40 years, farmers around the world have used Roundup® without knowing the dangers its use poses. That is because, when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. However, history has demonstrated otherwise. According to the World Health Organization ("WHO"), the main chemical ingredient of Roundup® glyphosate—is a probable carcinogen. Those most at risk are farm workers and other individuals with substantial exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Meanwhile, Monsanto assured the public that Roundup® was harmless. In order

to prove this, Monsanto reported misleading data and attacked legitimate studies exposing glyphosate's dangers. As a result of this misleading conduct, consumers have been exposed to a carcinogen, while Monsanto has made billions in profits.

## THE DISCOVERY OF GLYPHOSATE AND DEVELOPMENT OF ROUNDUP®

26.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world, including the popular herbicide Roundup®. As a systemic herbicide, glyphosate is absorbed by the plant's roots, stems, or foliage and is translocated throughout the plant. Glyphosate prevents the plant's ability to form aromatic amino acids necessary for protein synthesis and therefore results in plant death. Plants treated with glyphosate generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce, or by milling, baking, or brewing grains.

27.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup® and was marketed as a safe general-purpose herbicide for commercial and consumer use.

## REGISTRATION OF HERBICIDES

28.     The manufacture, formulation, and distribution of herbicides, such as Roundup®, is regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. §§ 136 et seq. FIFRA requires that all pesticides be registered with the EPA prior to distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

29.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not

an assurance or finding of safety. The EPA does not deem certain products "safe," but only that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment," and such an observation is based only on the information available at that time. 7 U.S.C. § 136a(c)(5)(D).

30.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

31.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conduct the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting those tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, to perform the tests that are required of the manufacturer.

32.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a process called "re-registration." 7 U.S.C. § 136a-1. To reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

33.     In the case of glyphosate, the EPA planned on releasing its preliminary risk assessment—in relation to the re-registration process—no later than July 2015. The EPA

completed its review of glyphosate in early 2015, but it has delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

## THE IMPORTANCE OF ROUNDUP® TO MONSANTO'S MARKET DOMINANCE

34.     Sales of Roundup® were essential to Monsanto's continued dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in 2000, Monsanto needed a strategy to maintain its Roundup® market dominance.

35.     In response, Monsanto began the development and sale of genetically engineered "Roundup® Ready" seeds in 1996. Roundup® Ready crops are resistant to glyphosate, so farmers can spray Roundup® onto their fields during the growing season to kill weeds without harming the crops. This product enabled Monsanto to expand its market for Roundup® even further. By 2000, Monsanto's engineered seeds were planted in more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup® Ready seeds.

36.     Through a three-pronged strategy of increased production, decreased prices, and by coupling with Roundup® Ready seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate-containing products remain one of the world's most frequently sold herbicides.

## THE ASSESSMENT AND CLASSIFICATION OF GLYPHOSATE

37.     The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known

Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

38.     The procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of conflicts of interest.

39.     A year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of available literature, evaluates the evidence in each category, and completes the evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in The Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

40.     In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

41.     In March 2015, the IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

42.     On July 29, 2015, the IARC issued its Monograph for glyphosate, Monograph Volume 112. For Volume 112, the Working Group consisted of 17 experts from 11 countries who met from March 3-10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated after a nearly one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

43.     The studies considered the various exposure groups, including exposure of fainters and tree nursery workers in the United States, forestry workers in Canada and Finland, municipal weed-control workers in the United Kingdom, and exposures among farming families.

44.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most widely used herbicide in the world in 2012.

45.     Human exposure pathways were identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

46.     The assessment of the IARC Working Group identified several case control studies of exposure in the United States, Canada, and Sweden. These studies showed a human health concern from agricultural and other work-related exposure to glyphosate.

47.     The IARC Working Group conducted a systematic review of over 15 studies designed to assess whether there was an association between Roundup® exposure in agricultural workers and Non-Hodgkin Lymphoma (NHL). The researchers reviewed each study, identified

the results and assessed each study's strengths and weaknesses.  The IARC Working Group concluded that a "positive association has been observed for non-Hodgkin lymphoma."

48.    Also, in male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for aemangiosarcoma in male mice. In two other studies, glyphosate increased pancreatic islet-cell adenoma in male rats. In an initiation-promotion study in mice, a glyphosate formulation promoted skin tumors.

49.    The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed. In assessing the genotoxicity of glyphosate (the property of chemical agents that damages the genetic information within a cell causing mutations, which may lead to cancer), the IARC Working Group concluded "[t]here is strong evidence that glyphosate causes enotoxicity."

50.    Additionally, the IARC assessed whether glyphosate exposure can induce oxidative stress, which is thought to be involved in the development of numerous conditions, including cancer. The IARC concluded that "strong evidence exists that glyphosate . . . can induce oxidative stress." This could be an important mechanism by which Roundup® causes cancer.

51.    The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers. The IARC Working Group specifically evaluated farm workers in the United States, and found that, within the days following the application of Roundup® to a crop, approximately 60% of farm workers tested positive for glyphosate in their urine. Additionally, the IARC Working Group noted that soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

52.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self- administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

53.     In addition to the IARC's assessment, in 2014, scientists published a systematic review and meta-analysis on the relationship between non-Hodgkin lymphoma and occupational exposure to agricultural pesticides, including glyphosate, in the International Journal of Environmental Research and Public Health. The study showed a statistically significant association between farm workers exposed to Roundup® and non-Hodgkin lymphoma. The study confirmed two smaller studies from 2002 and 2008, published in the journal Leukemia & Lymphoma (2002) and the International Journal on Cancer (2008), both of which also reported statistically significant increases in the incidence of non-Hodgkin lymphoma among agricultural workers exposed to glyphosate.

## FALSE REPRESENTATIONS REGARDING THE SAFETY OF ROUNDUP®

54.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish.

55.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with the NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

    a. its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk; ***

    b. its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable; ***

    c. its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means; ***

    d. its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics;" ***

    e. glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and f. its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

56.    Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

57.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup® and affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

58.    In late 2015, following a public comment period, the State of California's Office of Environmental Health Hazard Assessment (OEHHA) listed glyphosate as an agent known to the State to cause cancer.

59.     Several countries, such as the Netherlands, France, Bermuda and Columbia, have banned the sale of Roundup® and other glyphosate-containing herbicides, both before and since the IARC first announced its assessment for glyphosate in March 2015.

60.     Monsanto has had ample evidence of glyphosate and Roundup®'s genotoxic properties for decades.

61.     In spite of this knowledge, Monsanto continued to issue broad and sweeping statements suggesting that Roundup® was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

62.     On information and belief, these statements and representations have been made with the intent of inducing Plaintiff, the agricultural community, and the public at large to purchase, and increase the use of, Roundup® for Monsanto's pecuniary gain, and in fact did induce Plaintiffs to use Roundup®.

63.     Monsanto made these statements with complete disregard and reckless indifference to the safety of Plaintiffs and the general public. 80. Notwithstanding Monsanto's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

64.     Monsanto failed to appropriately and adequately inform and warn Plaintiffs of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup®, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical

pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring, and/or medications.

65.     Monsanto has claimed, and continues to claim despite the IARC's classification of glyphosate as a class 2A probable carcinogen, that Roundup® is safe, noncarcinogenic, and non-genotoxic. Monsanto falsely warrants to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup®.

66.     Despite Monsanto's knowledge that Roundup® was associated with an elevated risk of developing cancer, Monsanto's promotional campaigns focused on Roundup®'s purported "safety profile."

67.     Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosat's manufacture, transport, storage and disposal.

68.     Monsanto's failure to adequately warn Plaintiffs resulted in (1) Plaintiffs using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup®.

69.     By reason of the foregoing acts and omissions, Plaintiffs seek compensatory damages as a result of Plaintiffs' use of, and exposure to, Roundup®, which caused or was a substantial contributing factor in causing Plaintiffs to suffer from cancer, specifically NHL, and Plaintiffs suffered severe and personal injuries that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

### V.     PLAINTIFF'S EXPOSURE TO ROUNDUP®

### HARLEY R. BRADLEY

70.     From 1974 through 2017, Mr. Bradley used Roundup® while landscaping on his residential property. Mr. Bradley was exposed to Roundup® and glyphosate containing products on a regular basis for approximately 43 years.

71.      Mr. Bradley followed all safety and precautionary warnings during the course of use.

72.     In or around February 2008, Mr. Bradley was diagnosed with Diffuse Large B-Cell Non Hodgkins Lymphoma and was subsequently treated with chemotherapy.

73.     During the time Mr. Bradley was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to human health.

74.     Mr. Bradley first made a connection that his injuries were possibly related to Roundup® and glyphosate in approximately August of 2017.  Mr. Bradley only made the connection after seeing a television commercial indicating that Roundup® may be linked to causing various forms of cancer.

75.     Plaintiff exercised reasonable diligence in investigating potential causes of his cancer by discussing his injuries with healthcare providers. None of Plaintiff's conversations with his healthcare providers gave Plaintiff a reason to suspect, or reasonably should have given Plaintiff a reason to suspect, that Roundup® was the cause of his Non- Hodgkin's Lymphoma. For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiffs' claims.

76.     Monsanto was under a continuous duty to disclose to consumers, users, and other persons coming into contact with its products, including Plaintiffs, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and

glyphosate. Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

77.     Defendant's wrongful concealment of the relevant facts deprived Plaintiff and his physicians of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part. Plaintiff relied on Defendant's misrepresentations and omissions and therefore could not reasonably have known or become aware of facts that would lead a reasonable, prudent person to make an inquiry to discover Defendant's tortious conduct.  Plaintiff diligently filed suit once he discovered the actual facts, thus Plaintiffs' suite is filed will within the applicable statutory limitations period.

78.     Defendants' misconduct and fraudulent concealment of the relevant facts, as described *infra*, tolls any relevant statute of limitations. Because of Defendants' misconduct and fraudulent concealment of the true character, quality, and nature of its product, Defendants are estopped from relying on any statute of limitations defense.

79.     As a result of his exposure to Roundup® and glyphosate, Mr. Bradley developed Diffuse Large B-Cell Non Hodgkins Lymphoma.  As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and incurred harm including severe pain and suffering, medical expenses and other economic and noneconomic damages.

### LENA G. BRADSHAW

80.     From 1990 through 2016, Mrs. Bradshaw used Roundup® while landscaping on her residential property. Mrs. Bradshaw was exposed to Roundup® and glyphosate-containing products on a regular basis for approximately 26 years.

81.     Mrs. Bradshaw followed all safety and precautionary warnings during the course of use.

82.     In or around February 2017 Ms. Bradshaw was diagnosed with Grade 1 follicular Non Hodgkins lymphoma. Mrs. Bradshaw underwent aggressive treatment for her cancer, including chemotherapy.

83.     During the time Mrs. Bradshaw was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to human health. Mrs. Bradshaw first made a connection that her injuries were possibly related to Roundup® and glyphosate in approximately January of 2018 after seeing a news segment on television.

84.     Plaintiff exercised reasonable diligence in investigating potential causes of her cancer by discussing his injuries with healthcare providers. None of Plaintiff's conversations with her healthcare providers gave Plaintiff a reason to suspect, or reasonably should have given Plaintiff a reason to suspect, that Roundup® was the cause of her Non- Hodgkin's Lymphoma. For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiffs' claims.

85.     Monsanto was under a continuous duty to disclose to consumers, users, and other persons coming into contact with its products, including Plaintiffs, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate. Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

86.     Defendant's wrongful concealment of the relevant facts deprived Plaintiff and her physicians of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part. Plaintiff relied on Defendant's misrepresentations and omissions and therefore could not reasonably have known or become aware of facts that would lead a reasonable,

prudent person to make an inquiry to discover Defendant's tortious conduct.  Plaintiff diligently filed suit once she discovered the actual facts, thus Plaintiffs' suite is filed will within the applicable statutory limitations period.

87.    Defendants' misconduct and fraudulent concealment of the relevant facts, as described *infra*, tolls any relevant statute of limitations. Because of Defendants' misconduct and fraudulent concealment of the true character, quality, and nature of its product, Defendants are estopped from relying on any statute of limitations defense.

88.    As a result of her exposure to Roundup® and glyphosate, Ms. Bradshaw developed Diffuse Large B-Cell Non Hodgkins Lymphoma.  As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and incurred harm including severe pain and suffering, medical expenses and other economic and noneconomic damages.

## HUGH C. BROWN

89.    From 1983 through 2017, Mr. Brown used Roundup® while landscaping on his farm. Mr. Brown was exposed to Roundup® and glyphosate-containing products on a regular basis for 34 years.

90.    Mr. Brown followed all safety and precautionary warnings during the course of use.

91.    In or around August 2016, Mr. Brown was diagnosed with Non-Hodgkins Lymphoma. He subsequently underwent multiple rounds of chemotherapy.

92.    During the time Mr. Brown was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to human health. Mr. Brown first made a connection that his injuries were possibly related to Roundup® and glyphosate in approximately October of 2018, after seeing a website indicating that Roundup® may be linked to causing various forms of cancer.

93.    Plaintiff exercised reasonable diligence in investigating potential causes of his cancer by discussing his injuries with healthcare providers. None of Plaintiff's conversations with

his healthcare providers gave Plaintiff a reason to suspect, or reasonably should have given Plaintiff a reason to suspect, that Roundup® was the cause of his Non- Hodgkin's Lymphoma. For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiffs' claims.

94.     Monsanto was under a continuous duty to disclose to consumers, users, and other persons coming into contact with its products, including Plaintiffs, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate. Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

95.     Defendant's wrongful concealment of the relevant facts deprived Plaintiff and his physicians of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part. Plaintiff relied on Defendant's misrepresentations and omissions and therefore could not reasonably have known or become aware of facts that would lead a reasonable, prudent person to make an inquiry to discover Defendant's tortious conduct.  Plaintiff diligently filed suit once he discovered the actual facts, thus Plaintiffs' suite is filed will within the applicable statutory limitations period.

96.     Defendants' misconduct and fraudulent concealment of the relevant facts, as described infra, tolls any relevant statute of limitations. Because of Defendants' misconduct and fraudulent concealment of the true character, quality, and nature of its product, Defendants are estopped from relying on any statute of limitations defense.

97.     As a result of his exposure to Roundup® and glyphosate, Mr. Brown developed Non- Hodgkins Lymphoma. As a direct and proximate result of Defendants' conduct, Plaintiff has

suffered and incurred harm including severe pain and suffering, medical expenses and other economic and noneconomic damages.

## MELANIE L. CLAWSON-ROBERTS

98.     From 2000 through 2014, Mrs. Clawson-Roberts used Roundup® while landscaping on her home and 22.5 acre residential property. Mrs. Clawson-Roberts was exposed to Roundup® and glyphosate-containing products on a regular basis for 14 years.

99.     Ms. Clawson-Roberts followed all safety and precautionary warnings during the course of use.

100.    In or around February 2018 Ms. Clawson-Roberts was diagnosed with Non Hodgkins B-Cell lymphoma. Mrs. Clawson-Roberts underwent aggressive treatment for her cancer, including chemotherapy.

101.    During the time Mrs. Bradshaw was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to human health. Mrs. Bradshaw first made a connection that her injuries were possibly related to Roundup® and glyphosate in approximately January of 2018.

102.    Plaintiff exercised reasonable diligence in investigating potential causes of her cancer by discussing his injuries with healthcare providers. None of Plaintiff's conversations with her healthcare providers gave Plaintiff a reason to suspect, or reasonably should have given Plaintiff a reason to suspect, that Roundup® was the cause of her Non- Hodgkin's Lymphoma. For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiffs' claims.

103.    Monsanto was under a continuous duty to disclose to consumers, users, and other persons coming into contact with its products, including Plaintiffs, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate. Instead, Monsanto knowingly, affirmatively, and actively concealed safety

information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

104. Defendant's wrongful concealment of the relevant facts deprived Plaintiff and her physicians of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part. Plaintiff relied on Defendant's misrepresentations and omissions and therefore could not reasonably have known or become aware of facts that would lead a reasonable, prudent person to make an inquiry to discover Defendant's tortious conduct. Plaintiff diligently filed suit once she discovered the actual facts, thus Plaintiffs' suite is filed will within the applicable statutory limitations period.

105. Defendants' misconduct and fraudulent concealment of the relevant facts, as described infra, tolls any relevant statute of limitations. Because of Defendants' misconduct and fraudulent concealment of the true character, quality, and nature of its product, Defendants are estopped from relying on any statute of limitations defense.

106. As a result of her exposure to Roundup® and glyphosate, Mrs. Clawson-Roberts developed Non Hodgkins B-Cell lymphoma. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and incurred harm including severe pain and suffering, medical expenses and other economic and noneconomic damages.

### MARK CLINKER

107. From 2008 through 2016, Mr. Clinker used Roundup® while landscaping on his residential property. Mr. Clinker was exposed to Roundup® and glyphosate-containing products on a regular basis for approximately 8 years.

108. Mr. Clinker followed all safety and precautionary warnings during the course of use.

109.   In or around May of 2016, Mr. Clinker was diagnosed with Follicular Non Hodgkins Lymphoma. Mr. Clinker subsequently underwent treatment with chemotherapy.

110.   During the time Mr. Clinker was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to human health. Mr. Clinker first made a connection that his injuries were possibly related to Roundup® and glyphosate in approximately June of 2017 after seeing a television news piece indicating that Roundup® may be linked to causing various forms of cancer.

111.   Plaintiff exercised reasonable diligence in investigating potential causes of his cancer by discussing his injuries with healthcare providers. None of Plaintiff's conversations with his healthcare providers gave Plaintiff a reason to suspect, or reasonably should have given Plaintiff a reason to suspect, that Roundup® was the cause of his Non- Hodgkin's Lymphoma. For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiffs' claims.

112.   Monsanto was under a continuous duty to disclose to consumers, users, and other persons coming into contact with its products, including Plaintiffs, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate. Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

113.   Defendant's wrongful concealment of the relevant facts deprived Plaintiff and his physicians of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part. Plaintiff relied on Defendant's misrepresentations and omissions and therefore could not reasonably have known or become aware of facts that would lead a reasonable,

prudent person to make an inquiry to discover Defendant's tortious conduct.  Plaintiff diligently filed suit once he discovered the actual facts, thus Plaintiffs' suite is filed will within the applicable statutory limitations period.

114.    Defendants' misconduct and fraudulent concealment of the relevant facts, as described *infra*, tolls any relevant statute of limitations. Because of Defendants' misconduct and fraudulent concealment of the true character, quality, and nature of its product, Defendants are estopped from relying on any statute of limitations defense.

115.    As a result of his exposure to Roundup® and glyphosate, Mr. Clinker developed Follicular Non Hodgkins Lymphoma.  As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and incurred harm including severe pain and suffering, medical expenses and other economic and noneconomic damages.

### MITCHELL B. COOPER

116.    From 2007 through 2014, Mr. Cooper used Roundup® while landscaping on his residential property. Mr. Cooper was exposed to Roundup® and glyphosate-containing products on a regular basis for approximately 7.5 years.

117.    Mr. Cooper followed all safety and precautionary warnings during the course of use.

118.    In or around December of 2014, Mr. Cooper was diagnosed with Follicular Non Hodgkins Lymphoma. Mr. Cooper subsequently underwent treatment with chemotherapy.

119.    During the time Mr. Cooper was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to human health. Mr. Cooper first made a connection that his injuries were possibly related to Roundup® and glyphosate in approximately November of 2017 after seeing a television program indicating that Roundup® may be linked to causing various forms of cancer.

120.     Plaintiff exercised reasonable diligence in investigating potential causes of his cancer by discussing his injuries with healthcare providers. None of Plaintiff's conversations with his healthcare providers gave Plaintiff a reason to suspect, or reasonably should have given Plaintiff a reason to suspect, that Roundup® was the cause of his Non- Hodgkin's Lymphoma. For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiffs' claims.

121.     Monsanto was under a continuous duty to disclose to consumers, users, and other persons coming into contact with its products, including Plaintiffs, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate. Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

122.     Defendant's wrongful concealment of the relevant facts deprived Plaintiff and his physicians of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part. Plaintiff relied on Defendant's misrepresentations and omissions and therefore could not reasonably have known or become aware of facts that would lead a reasonable, prudent person to make an inquiry to discover Defendant's tortious conduct.  Plaintiff diligently filed suit once he discovered the actual facts, thus Plaintiffs' suite is filed will within the applicable statutory limitations period.

123.     Defendants' misconduct and fraudulent concealment of the relevant facts, as described *infra*, tolls any relevant statute of limitations. Because of Defendants' misconduct and fraudulent concealment of the true character, quality, and nature of its product, Defendants are estopped from relying on any statute of limitations defense.

124.     As a result of his exposure to Roundup® and glyphosate, Mr. Cooper developed Follicular Non Hodgkins Lymphoma.  As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and incurred harm including severe pain and suffering, medical expenses and other economic and noneconomic damages.

### MIKE R. FROST

125.     From 1997 through 2014, Mr. Frost used Roundup® while landscaping on his residential property. Mr. Frost  was exposed to Roundup® and glyphosate-containing products on a regular basis for approximately 17 years.

126.     Mr. Frost followed all safety and precautionary warnings during the course of use.

127.     In or around December of 2012, Mr. Frost was diagnosed with Follicular Non Hodgkins Lymphoma. Mr. Frost subsequently underwent surgery and treatment with chemotherapy.

128.     During the time Mr. Frost was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to human health. Mr. Frost first made a connection that his injuries were possibly related to Roundup® and glyphosate in approximately November of 2017 after seeing a website indicating that Roundup® may be linked to causing various forms of cancer.

129.     Plaintiff exercised reasonable diligence in investigating potential causes of his cancer by discussing his injuries with healthcare providers. None of Plaintiff's conversations with his healthcare providers gave Plaintiff a reason to suspect, or reasonably should have given Plaintiff a reason to suspect, that Roundup® was the cause of his Non- Hodgkin's Lymphoma. For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiffs' claims.

130.     Monsanto was under a continuous duty to disclose to consumers, users, and other persons coming into contact with its products, including Plaintiffs, accurate safety information

concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate. Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

131.    Defendant's wrongful concealment of the relevant facts deprived Plaintiff and his physicians of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part. Plaintiff relied on Defendant's misrepresentations and omissions and therefore could not reasonably have known or become aware of facts that would lead a reasonable, prudent person to make an inquiry to discover Defendant's tortious conduct.  Plaintiff diligently filed suit once he discovered the actual facts, thus Plaintiffs' suite is filed will within the applicable statutory limitations period.

132.    Defendants' misconduct and fraudulent concealment of the relevant facts, as described *infra*, tolls any relevant statute of limitations. Because of Defendants' misconduct and fraudulent concealment of the true character, quality, and nature of its product, Defendants are estopped from relying on any statute of limitations defense.

133.    As a result of his exposure to Roundup® and glyphosate, Mr. Frost developed Follicular Non Hodgkins Lymphoma.  As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and incurred harm including severe pain and suffering, medical expenses and other economic and noneconomic damages.

### KENNETH W. JOHNSON

134.    From 1984 through 2002, Mr. Johnson used Roundup® during the course of his employment at the Pueblo Memorial Airport. Mr. Johnson was exposed to Roundup® and glyphosate-containing products on a regular basis for approximately 18 years.

135. Mr. Johnson followed all safety and precautionary warnings during the course of use.

136. In or around February of 2002, Mr. Johnson was diagnosed with Diffuse Large B-Cell Non Hodgkins Lymphoma. Mr. Johnson subsequently underwent treatment with radiation and chemotherapy.

137. During the time Mr. Johnson was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to human health. Mr. Johnson first made a connection that his injuries were possibly related to Roundup® and glyphosate in approximately August of 2017 after seeing a television program indicating that Roundup® may be linked to causing various forms of cancer.

138. Plaintiff exercised reasonable diligence in investigating potential causes of his cancer by discussing his injuries with healthcare providers. None of Plaintiff's conversations with his healthcare providers gave Plaintiff a reason to suspect, or reasonably should have given Plaintiff a reason to suspect, that Roundup® was the cause of his Non- Hodgkin's Lymphoma. For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiffs' claims.

139. Monsanto was under a continuous duty to disclose to consumers, users, and other persons coming into contact with its products, including Plaintiffs, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate. Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

140.     Defendant's wrongful concealment of the relevant facts deprived Plaintiff and his physicians of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part. Plaintiff relied on Defendant's misrepresentations and omissions and therefore could not reasonably have known or become aware of facts that would lead a reasonable, prudent person to make an inquiry to discover Defendant's tortious conduct.  Plaintiff diligently filed suit once he discovered the actual facts, thus Plaintiffs' suite is filed will within the applicable statutory limitations period.

141.     Defendants' misconduct and fraudulent concealment of the relevant facts, as described *infra*, tolls any relevant statute of limitations. Because of Defendants' misconduct and fraudulent concealment of the true character, quality, and nature of its product, Defendants are estopped from relying on any statute of limitations defense.

142.     As a result of his exposure to Roundup® and glyphosate, Mr. Johnson developed Diffuse Large B-Cell Non Hodgkins Lymphoma.  As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and incurred harm including severe pain and suffering, medical expenses and other economic and noneconomic damages.

### RANDY E. MAY

143.     From 1989 through 2008, Mr. May used Roundup® during the course of his employment at AG-Way and Feed Mill as well as while landscaping his residential property. Mr. May  was exposed to Roundup® and glyphosate-containing products on a regular basis for approximately 19 years.

144.     Mr. May followed all safety and precautionary warnings during the course of use.

145.     In or around May of 2001, Mr. May was diagnosed with Diffuse Large B-Cell Non Hodgkins Lymphoma. Mr. May subsequently underwent treatment with radiation and chemotherapy.

146.    During the time Mr. May was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to human health. Mr. May first made a connection that his injuries were possibly related to Roundup® and glyphosate in approximately October of 2017 after seeing a television program indicating that Roundup® may be linked to causing various forms of cancer.

147.    Plaintiff exercised reasonable diligence in investigating potential causes of his cancer by discussing his injuries with healthcare providers. None of Plaintiff's conversations with his healthcare providers gave Plaintiff a reason to suspect, or reasonably should have given Plaintiff a reason to suspect, that Roundup® was the cause of his Non- Hodgkin's Lymphoma. For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiffs' claims.

148.    Monsanto was under a continuous duty to disclose to consumers, users, and other persons coming into contact with its products, including Plaintiffs, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate. Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

149.    Defendant's wrongful concealment of the relevant facts deprived Plaintiff and his physicians of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part. Plaintiff relied on Defendant's misrepresentations and omissions and therefore could not reasonably have known or become aware of facts that would lead a reasonable, prudent person to make an inquiry to discover Defendant's tortious conduct.  Plaintiff diligently filed suit once he discovered the actual facts, thus Plaintiffs' suite is filed will within the applicable statutory limitations period.

150.    Defendants' misconduct and fraudulent concealment of the relevant facts, as described *infra*, tolls any relevant statute of limitations. Because of Defendants' misconduct and fraudulent concealment of the true character, quality, and nature of its product, Defendants are estopped from relying on any statute of limitations defense.

151.    As a result of his exposure to Roundup® and glyphosate, Mr. May developed Diffuse Large B-Cell Non Hodgkins Lymphoma.  As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and incurred harm including severe pain and suffering, medical expenses and other economic and noneconomic damages.

### JAMES S. OLSEN

152.    From 1998 through 2018, Mr. Olsen used Roundup® while landscaping on his residential property and four rental properties. Mr. Olsen was exposed to Roundup® and glyphosate containing products on a regular basis for approximately 20 years.

153.    Mr. Olsen followed all safety and precautionary warnings during the course of use..

154.    In or around April of 2013,  Mr. Olsen was diagnosed with Follicular Non Hodgkins Lymphoma. Mr. Olsen subsequently underwent Surgery and treatment with Hormone Therapy.

155.    During the time Mr. Olsen was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to human health. Mr. Olsen first made a connection that his injuries were possibly related to Roundup® and glyphosate in approximately August of 2018 after seeing a website indicating that Roundup® may be linked to causing various forms of cancer.

156.    Plaintiff exercised reasonable diligence in investigating potential causes of his cancer by discussing his injuries with healthcare providers. None of Plaintiff's conversations with his healthcare providers gave Plaintiff a reason to suspect, or reasonably should have given Plaintiff a reason to suspect, that Roundup® was the cause of his Non- Hodgkin's Lymphoma. For

these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiffs' claims.

157.   Monsanto was under a continuous duty to disclose to consumers, users, and other persons coming into contact with its products, including Plaintiffs, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate. Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

158.   Defendant's wrongful concealment of the relevant facts deprived Plaintiff and his physicians of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part. Plaintiff relied on Defendant's misrepresentations and omissions and therefore could not reasonably have known or become aware of facts that would lead a reasonable, prudent person to make an inquiry to discover Defendant's tortious conduct.  Plaintiff diligently filed suit once he discovered the actual facts, thus Plaintiffs' suite is filed will within the applicable statutory limitations period.

159.   Defendants' misconduct and fraudulent concealment of the relevant facts, as described *infra*, tolls any relevant statute of limitations. Because of Defendants' misconduct and fraudulent concealment of the true character, quality, and nature of its product, Defendants are estopped from relying on any statute of limitations defense.

160.   As a result of his exposure to Roundup® and glyphosate, Mr. Olsen developed Follicular Non Hodgkins Lymphoma.  As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and incurred harm including severe pain and suffering, medical expenses and other economic and noneconomic damages.

## DANIEL RADANOVICH

161.    From 1978 through 2017, Mr. Radanovich used Roundup® while landscaping on his residential property and during the course of his employment. Mr. Radanovich was exposed to Roundup® and glyphosate-containing products on a regular basis for approximately 39 years.

162.    Mr. Radanovich followed all safety and precautionary warnings during the course of use.

163.    In or around February of 2006, Mr. Radanovich was diagnosed with Small B-Cell Non Hodgkins Lymphoma. Mr. Radanovich subsequently underwent treatment with chemotherapy and radiation.

164.    Mr. Radanovich passed away from Small B-Cell Non Hodgkins Lymphoma in October of 2017, and is herein represented by Lillian J. Radanovich, the executor of his estate.

165.    During the time Mr. Radanovich was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to human health. Mr. Radanovich first made a connection that his injuries were possibly related to Roundup® and glyphosate in approximately July of 2017 after seeing a television program indicating that Roundup® may be linked to causing various forms of cancer.

166.    Mr. Radanovich exercised reasonable diligence in investigating potential causes of his cancer by discussing his injuries with healthcare providers. None of Plaintiff's conversations with his healthcare providers gave Plaintiff a reason to suspect, or reasonably should have given Plaintiff a reason to suspect, that Roundup® was the cause of his Non- Hodgkin's Lymphoma. For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiffs' claims.

167.    Monsanto was under a continuous duty to disclose to consumers, users, and other persons coming into contact with its products, including Plaintiffs, accurate safety information

concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate. Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

168. Defendant's wrongful concealment of the relevant facts deprived Plaintiff and his physicians of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part. Plaintiff relied on Defendant's misrepresentations and omissions and therefore could not reasonably have known or become aware of facts that would lead a reasonable, prudent person to make an inquiry to discover Defendant's tortious conduct. Plaintiff diligently filed suit once he discovered the actual facts, thus Plaintiffs' suite is filed will within the applicable statutory limitations period.

169. Defendants' misconduct and fraudulent concealment of the relevant facts, as described *infra*, tolls any relevant statute of limitations. Because of Defendants' misconduct and fraudulent concealment of the true character, quality, and nature of its product, Defendants are estopped from relying on any statute of limitations defense.

170. As a result of his exposure to Roundup® and glyphosate, Mr. Radanovich developed Small B-Cell Non-Hodgkins Lymphoma. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and incurred harm including severe pain and suffering, medical expenses and other economic and noneconomic damages.

### BARBARA SIPICH

171. From 1973 through 2018, Ms. Sipich used Roundup® while landscaping on her residential property. Ms. Sipich was exposed to Roundup® and glyphosate-containing products on a regular basis for approximately 35 years.

172. Ms. Sipich followed all safety and precautionary warnings during the course of use.

173.     In or around August of 2018, Ms. Sipich was diagnosed with Follicular B-Cell Non Hodgkins Lymphoma. Ms. Sipich subsequently underwent treatment with chemotherapy.

174.     During the time Ms. Sipich was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to human health. Ms. Sipich first made a connection that her injuries were possibly related to Roundup® and glyphosate in approximately January of 2019 after seeing a website indicating that Roundup® may be linked to causing various forms of cancer.

175.     Plaintiff exercised reasonable diligence in investigating potential causes of her cancer by discussing his injuries with healthcare providers. None of Plaintiff's conversations with her healthcare providers gave Plaintiff a reason to suspect, or reasonably should have given Plaintiff a reason to suspect, that Roundup® was the cause of her Non- Hodgkin's Lymphoma. For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiffs' claims.

176.     Monsanto was under a continuous duty to disclose to consumers, users, and other persons coming into contact with its products, including Plaintiffs, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate. Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

177.     Defendant's wrongful concealment of the relevant facts deprived Plaintiff and her physicians of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part. Plaintiff relied on Defendant's misrepresentations and omissions and therefore could not reasonably have known or become aware of facts that would lead a reasonable, prudent person to make an inquiry to discover Defendant's tortious conduct.  Plaintiff diligently

filed suit once she discovered the actual facts, thus Plaintiffs' suite is filed will within the applicable statutory limitations period.

178.    Defendants' misconduct and fraudulent concealment of the relevant facts, as described *infra*, tolls any relevant statute of limitations. Because of Defendants' misconduct and fraudulent concealment of the true character, quality, and nature of its product, Defendants are estopped from relying on any statute of limitations defense.

179.    As a result of his exposure to Roundup® and glyphosate, Ms. Sipich developed Follicular B-Cell Non Hodgkins Lymphoma.  As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and incurred harm including severe pain and suffering, medical expenses and other economic and noneconomic damages.

### RONALD W. STEEN

180.    From 1999 through 2014, Mr. Steen used Roundup® while landscaping on his residential property. Mr. Steen  was exposed to Roundup® and glyphosate-containing products on a regular basis for approximately 15 years.

181.    Mr. Steen followed all safety and precautionary warnings during the course of use.

182.    In or around December of 2005, Mr. Steen was diagnosed with Non-Hodgkins Lymphoma. Mr. Steen subsequently underwent treatment with chemotherapy.

183.    During the time Mr. Steen was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to human health. Mr. Steen first made a connection that his injuries were possibly related to Roundup® and glyphosate in approximately October of 2017 after seeing a website indicating that Roundup® may be linked to causing various forms of cancer.

184.    Plaintiff exercised reasonable diligence in investigating potential causes of his cancer by discussing his injuries with healthcare providers. None of Plaintiff's conversations with his healthcare providers gave Plaintiff a reason to suspect, or reasonably should have given

Plaintiff a reason to suspect, that Roundup® was the cause of his Non- Hodgkin's Lymphoma. For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiffs' claims.

185.    Monsanto was under a continuous duty to disclose to consumers, users, and other persons coming into contact with its products, including Plaintiffs, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate. Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

186.    Defendant's wrongful concealment of the relevant facts deprived Plaintiff and his physicians of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part. Plaintiff relied on Defendant's misrepresentations and omissions and therefore could not reasonably have known or become aware of facts that would lead a reasonable, prudent person to make an inquiry to discover Defendant's tortious conduct.  Plaintiff diligently filed suit once he discovered the actual facts, thus Plaintiffs' suite is filed will within the applicable statutory limitations period.

187.    Defendants' misconduct and fraudulent concealment of the relevant facts, as described *infra*, tolls any relevant statute of limitations. Because of Defendants' misconduct and fraudulent concealment of the true character, quality, and nature of its product, Defendants are estopped from relying on any statute of limitations defense.

188.    As a result of his exposure to Roundup® and glyphosate, Mr. Steen developed Non Hodgkins Lymphoma.  As a direct and proximate result of Defendants' conduct, Plaintiff has

suffered and incurred harm including severe pain and suffering, medical expenses and other economic and noneconomic damages.

## CARL B. TANNER III

189. From 1983 through 2015, Mr. Tanner used Roundup® while landscaping on his residential property and on a 50-60 acre commercial property. Mr. Tanner  was exposed to Roundup® and glyphosate-containing products on a regular basis for approximately 32 years.

190. Mr. Tanner followed all safety and precautionary warnings during the course of use.

191. In or around March of 2015, Mr. Tanner was diagnosed with B-Cell Non-Hodgkins Lymphoma with extensive bulky disease. Mr. Tanner subsequently underwent treatment with chemotherapy.

192. During the time Mr. Tanner was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to human health. Mr. Tanner first made a connection that his injuries were possibly related to Roundup® and glyphosate in approximately December of 2018 after seeing a news article on the internet indicating that Roundup® may be linked to causing various forms of cancer.

193. Plaintiff exercised reasonable diligence in investigating potential causes of his cancer by discussing his injuries with healthcare providers. None of Plaintiff's conversations with his healthcare providers gave Plaintiff a reason to suspect, or reasonably should have given Plaintiff a reason to suspect, that Roundup® was the cause of his Non- Hodgkin's Lymphoma. For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiffs' claims.

194. Monsanto was under a continuous duty to disclose to consumers, users, and other persons coming into contact with its products, including Plaintiffs, accurate safety information

concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate. Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

195.    Defendant's wrongful concealment of the relevant facts deprived Plaintiff and his physicians of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part. Plaintiff relied on Defendant's misrepresentations and omissions and therefore could not reasonably have known or become aware of facts that would lead a reasonable, prudent person to make an inquiry to discover Defendant's tortious conduct. Plaintiff diligently filed suit once he discovered the actual facts, thus Plaintiffs' suite is filed will within the applicable statutory limitations period.

196.    Defendants' misconduct and fraudulent concealment of the relevant facts, as described *infra*, tolls any relevant statute of limitations. Because of Defendants' misconduct and fraudulent concealment of the true character, quality, and nature of its product, Defendants are estopped from relying on any statute of limitations defense.

197.    As a result of his exposure to Roundup® and glyphosate, Mr. Tanner developed B-Cell Non Hodgkins Lymphoma with extensive bulky disease. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and incurred harm including severe pain and suffering, medical expenses and other economic and noneconomic damages.

## GLENN YETTER

198.    From 2002 through 2014, Mr. Yetter used Roundup® while landscaping on his residential property. Mr. Yetter was exposed to Roundup® and glyphosate-containing products on a regular basis for approximately 12 years.

199.    Mr. Yetter followed all safety and precautionary warnings during the course of use.

200.    In or around September of 2014, Mr. Yetter was diagnosed with Hairy Cell Leukimia/ Non Hodgkins Lymphoma. Mr. Yetter subsequently underwent treatment with chemotherapy.

201.    During the time Mr. Yetter was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to human health. Mr. Yetter first made a connection that his injuries were possibly related to Roundup® and glyphosate in approximately August of 2017 after seeing a website indicating that Roundup® may be linked to causing various forms of cancer.

202.    Plaintiff exercised reasonable diligence in investigating potential causes of his cancer by discussing his injuries with healthcare providers. None of Plaintiff's conversations with his healthcare providers gave Plaintiff a reason to suspect, or reasonably should have given Plaintiff a reason to suspect, that Roundup® was the cause of his Non- Hodgkin's Lymphoma. For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiffs' claims.

203.    Monsanto was under a continuous duty to disclose to consumers, users, and other persons coming into contact with its products, including Plaintiffs, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate. Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

204.    Defendant's wrongful concealment of the relevant facts deprived Plaintiff and his physicians of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part. Plaintiff relied on Defendant's misrepresentations and omissions and therefore could not reasonably have known or become aware of facts that would lead a reasonable,

prudent person to make an inquiry to discover Defendant's tortious conduct. Plaintiff diligently filed suit once he discovered the actual facts, thus Plaintiffs' suite is filed will within the applicable statutory limitations period.

205. Defendants' misconduct and fraudulent concealment of the relevant facts, as described *infra*, tolls any relevant statute of limitations. Because of Defendants' misconduct and fraudulent concealment of the true character, quality, and nature of its product, Defendants are estopped from relying on any statute of limitations defense.

206. As a result of his exposure to Roundup® and glyphosate, Mr. Yetter developed Hairy Cell Leukemia/Non Hodgkins Lymphoma. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and incurred harm including severe pain and suffering, medical expenses and other economic and noneconomic damages.

## VI. COUNTS

## COUNT I - NEGLIGENCE

207. Plaintiffs re-allege each paragraph above as if fully set forth herein.

208. Monsanto had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup® into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

209. Monsanto failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup® into interstate commerce in that Monsanto knew or should have known that using Roundup® created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of NHL, as well as other severe and personal injuries

that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

210.    The negligence by Monsanto, its agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

a.  Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup® without thoroughly testing it;

b.  Failing to test Roundup® and/or failing to adequately, sufficiently, and properly test Roundup®;

c.  Not conducting sufficient testing programs to determine whether or not Roundup® was safe for use; in that Monsanto knew or should have known that Roundup® was unsafe and unfit for use by reason of the dangers to its users;

d.  Not conducting sufficient testing programs and studies to determine Roundup®'s carcinogenic properties even after Monsanto had knowledge that Roundup® is, was, or could be carcinogenic;

e.  Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup®, and the propensity of these ingredients to render Roundup® toxic, increase the toxicity of Roundup®, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup®, and whether or not "inert" ingredients and/or adjuvants were safe for use;

f.  Negligently failing to adequately and correctly warn the Plaintiffs, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup®;

g. Negligently failing to petition the EPA to strengthen the warnings associated with Roundup®;

h. Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup®;

i. Negligently marketing, advertising, and recommending the use of Roundup® without sufficient knowledge as to its dangerous propensities;

j. Negligently representing that Roundup® was safe for use for its intended purpose, and/or that Roundup® was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

k. Negligently representing that Roundup® had equivalent safety and efficacy as other forms of herbicides;

l. Negligently designing Roundup® in a manner that was dangerous to its users;

m. Negligently manufacturing Roundup® in a manner that was dangerous to its users;

n. Negligently producing Roundup® in a manner that was dangerous to its users;

o. Negligently formulating Roundup® in a manner that was dangerous to its users;

p. Concealing information from the Plaintiffs while knowing that Roundup® was unsafe, dangerous, and/or non-conforming with EPA regulations;

q. Improperly concealing and/or misrepresenting information from the Plaintiffs, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup® compared to other forms of herbicides; and

r. Negligently selling Roundup® with a false and misleading label.

211.    Monsanto under-reported, underestimated, and downplayed the serious dangers of Roundup®.

212.    Monsanto negligently and deceptively compared the safety risks and/or dangers of Roundup® with common everyday foods such as table salt, and other forms of herbicides.

213.    Monsanto was negligent and/or violated Illinois law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup® in that it:

a.    Failed to use ordinary care in designing and manufacturing Roundup® so as to avoid the aforementioned risks to individuals when Roundup® was used as an herbicide;

b.    Failed to accompany its product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup®;

c.    Failed to accompany its product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup®;

d.    Failed to accompany its product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup®;

e.    Failed to warn Plaintiffs of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of NHL;

f.    Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup®;

g.    Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup®'s "inert" ingredients and/or adjuvants;

h.  Negligently misrepresented the evidence of Roundup®'s genotoxicity and carcinogenicity; and

i.  Was otherwise careless and/or negligent.

214.  Despite the fact that Monsanto knew or should have known that Roundup® caused, or could cause, unreasonably dangerous side effects, Monsanto continues to market, manufacture, distribute, and/or sell Roundup® to consumers, including Plaintiffs.

215.  Monsanto knew or should have known that consumers such as Plaintiffs would foreseeably suffer injury as a result of Monsanto's failure to exercise ordinary care.

216.  Monsanto's violations of law and/or negligence were the proximate cause of Plaintiffs' injuries, harm and economic loss, which Plaintiffs suffered and will continue to suffer.

217.  As a result of the foregoing acts and omissions, Plaintiffs suffered life-threatening NHL, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as financial expenses for hospitalization and medical care.

WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## COUNT II - STRICT PRODUCTS LIABILITY (DESIGN DEFECT)

218.  Plaintiffs re-allege each paragraph above as if fully set forth herein.

219.  At all times herein mentioned, Monsanto designed, researched, manufactured, tested, advertised, promoted, sold, and distributed Roundup® as hereinabove described that was used by Plaintiffs.

220.    Roundup® was expected to and did reach the usual consumers, handlers, and persons coming into contact with it without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by Monsanto.

221.    At those times, Roundup® was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, Plaintiffs herein.

222.    The Roundup® designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Monsanto was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup®.

223.    The Roundup® designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Monsanto was defective in design and/or formulation, in that, when it left the hands of Monsanto or its manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

224.    At all times herein mentioned, Roundup® was in a defective condition and unsafe, and Monsanto knew or had reason to know that it was defective and unsafe, especially when used in the form and manner as provided by Monsanto. In particular, Roundup® was defective in the following ways:

    a.  When placed in the stream of commerce, Monsanto's Roundup® products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate.

b. When placed in the stream of commerce, Monsanto's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c. When placed in the stream of commerce, Monsanto's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

d. Monsanto did not sufficiently test, investigate, or study its Roundup® products.

e. Exposure to Roundup® presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f. Monsanto new or should have known at the time of marketing its Roundup® products that exposure to Roundup® could result in cancer and other severe illnesses and injuries.

g. Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products.

225. Monsanto knew, or should have known that at all times herein mentioned its Roundup® was in a defective condition and was and is inherently dangerous and unsafe.

226. . Plaintiffs were exposed to Monsanto's Roundup® without knowledge of Roundup®'s dangerous characteristics.

227. At the time of Plaintiffs' use of and exposure to Roundup®, Roundup® was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

228. Armed with this knowledge, Monsanto voluntarily designed its Roundup® with a dangerous condition for use by the public, and in particular Plaintiffs.

229.    Monsanto had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

230.    Monsanto created a product that was and is unreasonably dangerous for its normal, intended use.

231.    Monsanto marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

232.    The Roundup® designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Monsanto was manufactured defectively in that Roundup® left the hands of Monsanto in a defective condition and was unreasonably dangerous to its intended users.

233.    The Roundup® designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Monsanto reached its intended users in the same defective and unreasonably dangerous condition in which Monsanto's Roundup® was manufactured. Monsanto designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to Plaintiffs in particular, and Monsanto is therefore strictly liable for the injuries sustained by Plaintiffs.

234.    Plaintiffs could not, by the exercise of reasonable care, have discovered Roundup®'s defects herein mentioned or perceived its danger.

235.    Monsanto is thus strictly liable to Plaintiffs for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup®.

236.    Monsanto's defective design of Roundup® amounts to willful, wanton, and/or reckless conduct.

237.     Defects in Monsanto's Roundup® were the cause or a substantial factor in causing Plaintiffs' injuries.

238.     As a result of the foregoing acts and omission, Plaintiffs developed NHL, and suffered severe and personal injuries that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## COUNT III - STRICT PRODUCTS LIABILITY (FAILURE TO WARN)

239.     Plaintiffs re-allege each paragraph above as if fully set forth herein.

240.     Monsanto has engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting Roundup®, and through that conduct has knowingly and intentionally placed Roundup® into the stream of commerce with full knowledge that it reaches consumers such as Plaintiffs who are exposed to it through ordinary and reasonably foreseeable uses.

241.     Monsanto did in fact sell, distribute, supply, manufacture, and/or promote Roundup® to Plaintiffs. Additionally, Monsanto expected Roundup® that it was selling, distributing, supplying, manufacturing, and/or promoting to reach – and Roundup® did in fact reach – consumers, including Plaintiffs, without any substantial change in the condition of the product from when it was initially distributed by Monsanto.

242.     At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing

products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

243.    At all relevant times, Roundup® was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Monsanto and at the time Plaintiffs were exposed to and/or ingested the product. The defective condition of Roundup® was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing NHL as a result of exposure and use.

244.    Roundup® did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect the health of those exposed in violation of 7 U.S.C. § 136j(a)(1)(E).

245.    Monsanto's failure to include a warning or caution statement that was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. § 136j(a)(1)(E) as well as the laws of the State of Illinois.

246.    Monsanto could have revised Roundup®'s label to provide additional warnings.

247.    This defect caused serious injury to Plaintiffs, who used Roundup® in its intended and foreseeable manner.

248.    At all relevant times, Monsanto had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

249.    Monsanto labeled, distributed, and promoted a product that was dangerous and unsafe for the use and purpose for which it was intended.

250.    Monsanto failed to warn of the nature and scope of the health risks associated with Roundup®, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of NHL.

251.    Monsanto knew of the probable consequences of Roundup®. Despite this fact, Monsanto failed to exercise reasonable care to warn of the dangerous carcinogenic properties and risks of developing NHL from Roundup® exposure, even though these risks were known or reasonably scientifically knowable at the time of distribution. Monsanto willfully and deliberately failed to avoid the consequences associated with its failure to warn, and in doing so, acted with conscious disregard for Plaintiffs' safety.

252.    At the time of exposure, Plaintiffs could not have reasonably discovered any defect in Roundup® through the exercise of reasonable care.

253.    Monsanto, as the manufacturer and/or distributor of Roundup®, is held to the level of knowledge of an expert in the field.

254.    Plaintiffs reasonably relied on the skill, superior knowledge, and judgment of Monsanto.

255.    Had Monsanto properly disclosed the risks associated with Roundup®, Plaintiffs would have avoided the risk of NHL by not using Roundup®.

256.    The information that Monsanto provided failed to contain adequate warnings and precautions that would have enabled Plaintiffs, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, Monsanto disseminated information that was inaccurate, false, and misleading and that failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup® and glyphosate; continued to promote the efficacy of Roundup®, even after

it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

257.    To this day, Monsanto has failed to adequately warn of the true risks of Plaintiffs' injuries associated with the use of and exposure to Roundup®.

258.    As a result of its inadequate warnings, Monsanto's Roundup® products were defective and unreasonably dangerous when they left Monsanto's possession and/or control, were distributed by Monsanto, and used by Plaintiffs.

259.    As a direct and proximate result of Monsanto's actions as alleged herein, and in such other ways to be later shown, the subject product caused Plaintiffs to sustain injuries as herein alleged.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## COUNT IV - BREACH OF WARRANTIES

260.    Plaintiffs re-allege each paragraph above as if fully stated herein.

261.    At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, thereby placing Roundup® products into the stream of commerce. These actions were under Monsanto's ultimate control and supervision.

262.    At all relevant times, Monsanto expressly and impliedly represented and warranted to the purchasers of its Roundup® products, by and through statements made in labels, publications, package inserts, and other written materials intended for consumers and the general public, that its Roundup® products were safe to human health and the environment, effective, fit, and proper for their intended use. Monsanto advertised, labeled, marketed, and promoted Roundup® products, representing the quality to consumers and the public so as to induce their purchase or use, thereby making an express and implied warranty that Roundup® products would conform to the representations.

263.    These express and implied representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Roundup® and glyphosate. Monsanto knew and/or should have known that the risks expressly included in Roundup® warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Monsanto expressly and impliedly represented that its Roundup® products were safe and effective, including for use as agricultural herbicides.

264.    The representations about Roundup®, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express and implied warranty that the goods would conform to the representations.

265.    Monsanto placed its Roundup® products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate.

266.     Monsanto breached these warranties because, among other things, its Roundup®
products were defective, dangerous, unfit for use, did not contain labels representing the true and
adequate nature of the risks associated with their use, and were not merchantable or safe for their
intended, ordinary, and foreseeable use and purpose. Specifically, Monsanto breached the
warranties in the following ways:

    a.   Monsanto represented through its labeling, advertising, and marketing materials
that its Roundup® products were safe, and fraudulently withheld and concealed
information about the risks of serious injury associated with use of and/or exposure
to Roundup® and glyphosate by expressly limiting the risks associated with use
and/or exposure within its warnings and labels; and

    b.   Monsanto represented that its Roundup® products were safe for use and
fraudulently concealed information demonstrating that glyphosate, the active
ingredient in Roundup®, had carcinogenic properties, and that its Roundup®
products, therefore, were not safer than alternatives available on the market.

267.     123.     Plaintiffs were exposed to the labels on the Roundup® products that he
mixed and applied.

268.     124.     Monsanto had sole access to material facts concerning the nature of the risks
associated with its Roundup® products as expressly stated within its warnings and labels, and
Monsanto knew that consumers and users such as Plaintiffs could not have reasonably discovered
that the risks expressly included in Roundup® warnings and labels were inadequate and inaccurate.

269.     Plaintiffs had no knowledge of the falsity or incompleteness of Monsanto's
statements and representations concerning Roundup®.

270.     Plaintiffs used and/or were exposed to the use of Roundup® as researched, developed, designed, tested, formulated, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by Monsanto.

271.     Had the warnings and labels for Roundup® products accurately and adequately set forth the true risks associated with the use of such products, including Plaintiffs' injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Plaintiffs could have avoided the injuries complained of herein.

272.     As a direct and proximate result of Monsanto's wrongful acts and omissions, Plaintiffs have suffered severe injuries. Plaintiffs have endured pain and suffering, has suffered economic losses (including significant expenses for medical care and treatment), and will continue to incur these expenses in the future.

WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT V – FRAUDULENT MISREPRESENTATION

273.     Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

274.     Defendant fraudulently, intentionally, and/or negligently misrepresented to the public, and to the Plaintiffs, both directly and by and through the media, the scientific literature and purported "community outreach" programs, the safety of Roundup® products, and/or fraudulently, intentionally, and/or negligently concealed, suppressed, or omitted material, adverse information regarding the safety of Roundup®.

275.     The intentional and/or negligent misrepresentations and omissions of Defendant regarding the safety of Roundup® products was communicated to Plaintiffs directly through ghostwritten articles, editorials, national and regional advertising, marketing and promotion efforts, as well as the packaging and sales aids. The safety of Roundup® products was also intentionally and/or negligently misrepresented to Plaintiffs and the public with the intent that such misrepresentations would cause Plaintiff and other potential consumers to purchase and use or continue to purchase and use Roundup® products.

276.     Defendant either knew or should have known of the material representations it was making regarding the safety and relative utility of Roundup® products.

277.     Defendant   fraudulently,   intentionally,   and/or   negligently   made   the misrepresentations and/or actively concealed, suppressed, or omitted this material information with the specific desire to induce Plaintiffs, and the consuming public to purchase and use Roundup® products. Defendant fraudulently, intentionally, and/or negligently, knew or should have known that Plaintiffs and the consuming public would rely on such material misrepresentations and/or omissions in selecting and applying Roundup® products. Defendant knew or should have known that Plaintiffs would rely on their false representations and omissions.

278.     Defendant made these misrepresentations and actively concealed adverse information including the risk of non-Hodgkin lymphoma, at a time when, their agents and/or employees knew or should have known, the product had defects, dangers, and characteristics that were other than what was represented to the consuming public.

279.     Despite the fact that Defendant knew or should have known of reports of severe risks including non-Hodgkin lymphoma, with Roundup® use and exposure, this information was

strategically minimized, understated, or omitted in order to create the impression that the human dangers of Roundup® were nonexistent, particularly in light of its purported utility.

280.   The fraudulent, intentional and/or negligent material misrepresentations and/or active concealment, suppression, and omissions by Defendant were perpetuated directly and/or indirectly through the advertisements, packaging, sales aids, furtive public relations efforts, and other marketing and promotional pieces authored, analyzed, created, compiled, designed, drafted, disseminated, distributed, edited, evaluated, marketed, published, and supplied.

281.   If Plaintiffs had known the true facts concerning the risks associated with Roundup® exposure, Plaintiffs would have used a safer alternative.

282.   Plaintiffs' reliance upon the material misrepresentations and omissions was justified, among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Roundup® while Plaintiff was not in a position to know the true facts because Defendant overstated the benefits and safety of Roundup® and downplayed the risk of lymphoma, thereby inducing Plaintiffs to use the herbicide rather than safer alternatives.

283.   As a direct and proximate result of Defendant's actions and inactions, Plaintiffs were exposed to Roundup® and suffered and will continue to suffer injuries and damages, as set forth herein.

WHEREFORE, Plaintiffs demand judgment for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, in an amount greater than Seventy-Five Thousand Dollars ($75,000.00), and all such other relief as the Court deems proper.

## COUNT VI – LOSS OF CONSORTIUM

284.    Plaintiff incorporates by reference each and every allegation set forth, in the preceding paragraphs as if fully stated herein.

285.    At all relevant times, Spouse Plaintiffs were the lawful spouses of Plaintiffs.

286.    At all relevant times, where applicable, Spouse Plaintiffs suffered injuries and losses as a result of Plaintiffs' injuries from Roundup®.

287.    For the reasons set forth herein, Spouse Plaintiffs have suffered and will continue to suffer the loss of their loved one's support, companionship, services, society, love, and affection.

288.    Spouse Plaintiffs allege that their marital relationship was impaired and depreciated, and the marital association between husband and wife has been altered.

289.    Spouse Plaintiffs have suffered great emotional pain and mental anguish.

290.    As a direct and proximate result of Defendant's wrongful conduct, Spouse Plaintiffs have sustained and will continue to sustain emotional distress, economic losses, and other damages for which they are entitled to compensatory and equitable damages.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT VII – WRONGFUL DEATH

291.    Plaintiffs incorporate by reference each and every allegation set forth, in the preceding paragraphs as if fully stated herein.

292.    Plaintiff Lillian J. Radanovich brings this claim on behalf of and for the benefit of the Deceased Daniel Radanovich's lawful beneficiaries.

293.     As a direct and proximate result of the conduct of the Defendants and the defective nature of Roundup® as outlined above, Decedent Daniel Radanovich suffered bodily injury resulting in pain and suffering, disability, disfigurement, mental anguish, loss of capacity of the enjoyment of life, shortened life expectancy, expenses for hospitalization, medical and nursing treatment, loss of earnings, loss of ability to earn, funeral expenses and death.

294.     As a direct and proximate cause of the conduct of Defendant, Decedent Daniel Radanovich's beneficiaries have incurred hospital, nursing and medical expenses, and estate administration expenses as a result of Decedent Daniel Radanovich's death. Plaintiff Lillian J. Radanovich brings this claim on behalf of Decedent Daniel Radanovich's lawful beneficiaries for these damages and for all pecuniary losses under applicable state statutory and/or common laws.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## COUNT VIII – SURVIVAL ACTION

295.     Plaintiffs incorporate by reference each and every allegation set forth, in the preceding paragraphs as if fully stated herein.

296.     As a direct and proximate result of the conduct of Defendant, where appropriate, Daniel Radanovich, prior to his death, was obligated to spend various sums of money to treat his injuries, which debts have been assumed by the Estate.

297.     As a direct and proximate cause of the aforesaid, Daniel Radanovich endured pain and suffering, mental anguish and impairment of the enjoyment of life, until the date of his death; and, as a direct and proximate result of the aforesaid, Daniel Radanovich's lawful beneficiaries

suffered a loss of earnings and earning capacity. Plaintiff Lillian J. Radanovich brings this claim on behalf of Daniel Radanovich's estate under applicable state statutory and/or common laws.

298.   As a direct and proximate result of the conduct of Defendant, Daniel Radanovich and his spouse and heirs, until the time of his death, suffered a disintegration and deterioration of the family unit and the relationships existing therein, resulting in enhanced anguish, depression and other symptoms of psychological stress and disorder.

299.   As a direct and proximate result of the aforesaid, and including the observance of the suffering and physical deterioration of Daniel Radanovich until the date of his death, Plaintiff Lillian J. Radanovich has and will continue to suffer permanent and ongoing psychological damage which may require future psychological and medical treatment. Daniel Radanovich's spouse, Lillian J. Radanovich as Personal Representative of the estate of Daniel Radanovich, brings the claim on behalf of the estate for damages under applicable statutory and/or common laws, and in her own right.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court enter judgment in his favor and against the Defendant, awarding the Plaintiffs:

      a.    actual or compensatory damages in such amount to be determined at trial and as provided by applicable law;

      b.    punitive damages sufficient to punish and deter the Defendant and others from future fraudulent practices;

c.      pre judgment and post-judgment interest;

d.      costs including reasonable attorneys' fees, court costs, and other litigation

expenses;

e.      any other relief the Court may deem just and proper.

**<u>JURY TRIAL DEMAND</u>**

Plaintiffs demand a trial by jury on all of the triable issues within this pleading.

Dated:  April 25, 2019

Respectfully Submitted,

**NAPOLI SHKOLNIK, PLLC**

By: */s/ Chris Schnieders*
      Chris Schnieders, #57725
      6731 West 121st Street, Suite 201
      Overland Park, KS 66209
      Telephone: 212-397-1000
      **ATTORNEY FOR PLAINTIFFS**

Case: 4:19-cv-00939-JMB  Doc. #: 1-1  Filed: 04/25/19  Page: 19 of 23  PageID #: 63

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

|  |  |  |
|---|---|---|
| | ) | |
| , | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| , | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |

**ORIGINAL FILING FORM**

**THIS FORM MUST BE COMPLETED AND VERIFIED BY THE FILING PARTY
WHEN INITIATING A NEW CASE.**

☐　　THIS SAME CAUSE, OR A SUBSTANTIALLY EQUIVALENT COMPLAINT, WAS

PREVIOUSLY FILED IN THIS COURT AS CASE NUMBER _____

AND ASSIGNED TO THE HONORABLE JUDGE _____.

☐　　THIS CAUSE IS RELATED, BUT IS NOT SUBSTANTIALLY EQUIVALENT TO ANY

PREVIOUSLY FILED COMPLAINT.  THE RELATED CASE NUMBER IS _____ AND

THAT CASE WAS ASSIGNED TO THE HONORABLE _____. THIS CASE MAY,

THEREFORE, BE OPENED AS AN ORIGINAL PROCEEDING.

☐　　NEITHER THIS SAME CAUSE, NOR A SUBSTANTIALLY EQUIVALENT

COMPLAINT, HAS BEEN PREVIOUSLY FILED IN THIS COURT, AND THEREFORE

MAY BE OPENED AS AN ORIGINAL PROCEEDING.

**The undersigned affirms that the information provided above is true and correct.**

Date: _____          _____
                                                         Signature of Filing Party

JS 44 (Rev. 02/19)

Case: MDL No. 2741 Document 998-3 Filed 05/14/19 Page 69 of 72
Case: 4:15-cv-00989-AME Document: 1 Filed: Page: 1 of 2 PageID #: 64

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| **(b)**  County of Residence of First Listed Plaintiff _____<br>*(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant _____<br>*(IN U.S. PLAINTIFF CASES ONLY)*<br>NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF<br>THE TRACT OF LAND INVOLVED. |
| **(c)**  Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |

## II.  BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ❑ 1  U.S. Government Plaintiff
- ❑ 2  U.S. Government Defendant
- ❑ 3  Federal Question *(U.S. Government Not a Party)*
- ❑ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III.  CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❑ 1 | ❑ 1 | Incorporated *or* Principal Place of Business In This State | ❑ 4 | ❑ 4 |
| Citizen of Another State | ❑ 2 | ❑ 2 | Incorporated *and* Principal Place of Business In Another State | ❑ 5 | ❑ 5 |
| Citizen or Subject of a Foreign Country | ❑ 3 | ❑ 3 | Foreign Nation | ❑ 6 | ❑ 6 |

## IV.  NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❑ 110 Insurance<br>❑ 120 Marine<br>❑ 130 Miller Act<br>❑ 140 Negotiable Instrument<br>❑ 150 Recovery of Overpayment & Enforcement of Judgment<br>❑ 151 Medicare Act<br>❑ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>❑ 153 Recovery of Overpayment of Veteran's Benefits<br>❑ 160 Stockholders' Suits<br>❑ 190 Other Contract<br>❑ 195 Contract Product Liability<br>❑ 196 Franchise | **PERSONAL INJURY**<br>❑ 310 Airplane<br>❑ 315 Airplane Product Liability<br>❑ 320 Assault, Libel & Slander<br>❑ 330 Federal Employers' Liability<br>❑ 340 Marine<br>❑ 345 Marine Product Liability<br>❑ 350 Motor Vehicle<br>❑ 355 Motor Vehicle Product Liability<br>❑ 360 Other Personal Injury<br>❑ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>❑ 365 Personal Injury - Product Liability<br>❑ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>❑ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>❑ 370 Other Fraud<br>❑ 371 Truth in Lending<br>❑ 380 Other Personal Property Damage<br>❑ 385 Property Damage Product Liability | ❑ 625 Drug Related Seizure of Property 21 USC 881<br>❑ 690 Other | ❑ 422 Appeal 28 USC 158<br>❑ 423 Withdrawal 28 USC 157<br><br>**PROPERTY RIGHTS**<br>❑ 820 Copyrights<br>❑ 830 Patent<br>❑ 835 Patent - Abbreviated New Drug Application<br>❑ 840 Trademark | ❑ 375 False Claims Act<br>❑ 376 Qui Tam (31 USC 3729(a))<br>❑ 400 State Reapportionment<br>❑ 410 Antitrust<br>❑ 430 Banks and Banking<br>❑ 450 Commerce<br>❑ 460 Deportation<br>❑ 470 Racketeer Influenced and Corrupt Organizations<br>❑ 480 Consumer Credit<br>❑ 485 Telephone Consumer Protection Act<br>❑ 490 Cable/Sat TV<br>❑ 850 Securities/Commodities/ Exchange<br>❑ 890 Other Statutory Actions<br>❑ 891 Agricultural Acts<br>❑ 893 Environmental Matters<br>❑ 895 Freedom of Information Act<br>❑ 896 Arbitration<br>❑ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>❑ 950 Constitutionality of State Statutes |
| **REAL PROPERTY**<br>❑ 210 Land Condemnation<br>❑ 220 Foreclosure<br>❑ 230 Rent Lease & Ejectment<br>❑ 240 Torts to Land<br>❑ 245 Tort Product Liability<br>❑ 290 All Other Real Property | **CIVIL RIGHTS**<br>❑ 440 Other Civil Rights<br>❑ 441 Voting<br>❑ 442 Employment<br>❑ 443 Housing/ Accommodations<br>❑ 445 Amer. w/Disabilities - Employment<br>❑ 446 Amer. w/Disabilities - Other<br>❑ 448 Education | **PRISONER PETITIONS**<br>**Habeas Corpus:**<br>❑ 463 Alien Detainee<br>❑ 510 Motions to Vacate Sentence<br>❑ 530 General<br>❑ 535 Death Penalty<br>**Other:**<br>❑ 540 Mandamus & Other<br>❑ 550 Civil Rights<br>❑ 555 Prison Condition<br>❑ 560 Civil Detainee - Conditions of Confinement | **LABOR**<br>❑ 710 Fair Labor Standards Act<br>❑ 720 Labor/Management Relations<br>❑ 740 Railway Labor Act<br>❑ 751 Family and Medical Leave Act<br>❑ 790 Other Labor Litigation<br>❑ 791 Employee Retirement Income Security Act<br><br>**IMMIGRATION**<br>❑ 462 Naturalization Application<br>❑ 465 Other Immigration Actions | **SOCIAL SECURITY**<br>❑ 861 HIA (1395ff)<br>❑ 862 Black Lung (923)<br>❑ 863 DIWC/DIWW (405(g))<br>❑ 864 SSID Title XVI<br>❑ 865 RSI (405(g))<br><br>**FEDERAL TAX SUITS**<br>❑ 870 Taxes (U.S. Plaintiff or Defendant)<br>❑ 871 IRS—Third Party 26 USC 7609 | |

## V.  ORIGIN *(Place an "X" in One Box Only)*

- ❑ 1  Original Proceeding
- ❑ 2  Removed from State Court
- ❑ 3  Remanded from Appellate Court
- ❑ 4  Reinstated or Reopened
- ❑ 5  Transferred from Another District *(specify)*
- ❑ 6  Multidistrict Litigation - Transfer
- ❑ 8  Multidistrict Litigation - Direct File

## VI.  CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
_____

Brief description of cause:
_____

## VII.  REQUESTED IN COMPLAINT:

❑ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:   ❑ Yes   ❑ No

## VIII.  RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE _____

SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**  **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)**  **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)**  **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**  **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.**  **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**  **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**  **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket. **PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**  **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.**  **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**  **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

AO 440 (Rev. 12/09)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

| | | |
|---|---|---|
| _____ | ) | |
| *Plaintiff* | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| _____ | ) | |
| *Defendant* | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 12/09)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❐  I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❐  I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❐  I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❐  I returned the summons unexecuted because _____ ; or

❐  Other *(specify):*

.

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____            _____
                                                              *Server's signature*

                                                     _____
                                                              *Printed name and title*

                                                     _____
                                                              *Server's address*

Additional information regarding attempted service, etc: