Query   Reports   Utilities   Help   Log Out

# U.S. District Court
## Eastern District of New York (Central Islip)
## CIVIL DOCKET FOR CASE #: 2:19-cv-03004

Scotto et al v. Monsanto Company      Date Filed: 05/21/2019
Assigned to:      Jury Demand: Both
Cause: 28:1441 Petition for Removal- Product Liability      Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Ellen D. Scotto**      represented by   **Ellen D. Scotto**
*as Administrator of the Estate of Raymond Scotto, deceased*      PRO SE

**Plaintiff**

**Ellen D. Scotto**      represented by   **Ellen D. Scotto**
*individually*      (See above for address)
PRO SE

V.

**Defendant**

**Monsanto Company**      represented by   **Alan E. Rothman**
Kaye Scholer LLP
250 West 55th Street
New York, NY 10019
(212) 836-8000
Fax: (212) 836-8689
Email: alan.rothman@arnoldporter.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/21/2019 | 1 | NOTICE OF REMOVAL by Monsanto Company from Nassau County Supreme Court, case number 604661/2019. ( Filing fee $ 400 receipt number ANYEDC-11500475) (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit A - Summons and Complaint) (Rothman, Alan) (Entered: 05/21/2019) |
| 05/21/2019 | 2 | Corporate Disclosure Statement by Monsanto Company identifying Corporate Parent Bayer AG for Monsanto Company. (Rothman, Alan) (Entered: 05/21/2019) |
| 05/21/2019 | 3 | CERTIFICATE OF SERVICE by Monsanto Company re 2 Corporate Disclosure Statement, 1 Notice of Removal, (Rothman, Alan) (Entered: 05/21/2019) |
| 05/21/2019 | 4 | ANSWER to Complaint (Notice of Removal) by Monsanto Company. (Attachments: # 1 Certificate of Service) (Rothman, Alan) (Entered: 05/21/2019) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 05/22/2019 10:33:47 | | | |
| **PACER Login:** | hllp1982 | **Client Code:** | 1417.0005 |
| **Description:** | Docket Report | **Search Criteria:** | 2:19-cv-03004 |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

FILED: NASSAU COUNTY CLERK 04/04/2019 01:47 PM

NYSCEF DOC. NO. 1

INDEX NO. 604661/2019

RECEIVED NYSCEF: 04/04/2019

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
-----------------------------------------------------------------------X
ELLEN D. SCOTTO, as ADMINISTRATOR OF THE
ESTATE OF RAYMOND SCOTTO, DECEASED, and
ELLEN D. SCOTTO, INDIVIDUALLY,

**VERIFIED COMPLAINT**

Plaintiff,

-against-

Index No.: 604661/19

MONSANTO COMPANY,

Defendant.
-----------------------------------------------------------------------X

Plaintiff, ELLEN D. SCOTTO, as Administrator of the Estate of Raymond Scotto, and Individually, by her attorneys, SULLIVAN PAPAIN BLOCK McGRATH & CANNAVO, P.C., upon information and belief, at all times hereinafter mentioned, allege as follows:

### NATURE OF THE CASE

1.     This is an action for damages brought by Plaintiff for the harm caused to her husband, Decedent, as a direct and proximate result of Defendant's negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup® ("Roundup"), containing the active ingredient glyphosate.

2.     Plaintiff maintains that Roundup and/or glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper warnings and directions as to the dangers associated with its use.

3.     Decedent's injuries, like those striking thousands of similarly situated victims across the country, were avoidable.

FILED: NASSAU COUNTY CLERK 04/04/2019 01:47 PM

NYSCEF DOC. NO. 1

INDEX NO. 604661/2019

RECEIVED NYSCEF: 04/04/2019

## JURISDICTION AND VENUE

4.     This Court has jurisdiction of the subject matter of this action and the amount in controversy far exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction over this action.

5.     This Court has personal jurisdiction over the Defendant pursuant to N.Y. C.P.L.R. § 302.

6.     Venue is proper in the Nassau County Supreme Court pursuant to N.Y. C.P.L.R. § 503.

## PARTIES

7.     Plaintiff Ellen Scotto, is and at all relevant times was, a resident of Massapequa, Nassau County, New York, and brings this action as the surviving spouse of Raymond Scotto, deceased.

8.     Decedent, Raymond Scotto, was at all relevant times, a resident of Massapequa, Nassau County, New York at the time of his injuries and death.

9.     Plaintiff brings this action for personal injuries sustained by Decedent's exposure to Roundup, which contains the active ingredient glyphosate and the surfactant polyethoxylated tallow amine ("POEA"). As a direct and proximate result of being exposed to Roundup, Decedent Plaintiff developed Non-Hodgkin's Lymphoma in or around May of 2015, a disease which ultimately resulted in his death on May 17, 2017.

10.     Plaintiff Ellen Scotto was duly appointed Administrator of the Estate of Raymond Scotto on December 31, 2018.

11.     "Roundup" refers to all formulations of Defendant's Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1,

2

INDEX NO. 604661/2019
RECEIVED NYSCEF: 04/04/2019

Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k Herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Pro Dry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready- to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass Killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer 1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

12.     Defendant MONSANTO COMPANY is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri, and is licensed to do and does business in the State of New York. Defendant Monsanto Company is in the business of researching, testing, developing, designing, formulating, manufacturing, producing, assembling, packaging, labeling, advertising, promoting, marketing, selling, supplying and distributing herbicides, including Roundup products.

13.     Defendant MONSANTO COMPANY is collectively referred to as "Monsanto" or "Defendant."

3

FILED: NASSAU COUNTY CLERK 04/04/2019 01:47 PM

NYSCEF DOC. NO. 1

INDEX NO. 604661/2019

RECEIVED NYSCEF: 04/04/2019

14.    At all times relevant to this Complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup products, which contain the active ingredient glyphosate and the surfactant POEA, as well as adjuvants and other "inert" ingredients.

15.    Defendant advertises and sells goods, specifically Roundup, in Massapequa, New York.

16.    Defendant transacted and conducted business within the State of New York that relates to the allegations in this Complaint.

17.    Defendant derived substantial revenue from goods and products used in the State of New York.

18.    Defendant expected or should have expected its acts to have consequences within the State of New York, and derived substantial revenue from interstate commerce.

19.    Defendant engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup.

20.    Defendant is authorized to do business in New York and derives substantial income from doing business in this state.

21.    Upon information and belief, Defendant purposefully availed itself of the privilege of conducting activities with the State of New York, thus invoking the benefits and protections of its laws.

22.    Upon information and belief, Defendant did design, sell, advertise, manufacture and/or distribute Roundup, with full knowledge of its dangerous and defective nature.

4

FILED: NASSAU COUNTY CLERK 04/04/2019 01:47 PM   INDEX NO. 604661/2019
NYSCEF DOC. NO. 1   RECEIVED NYSCEF: 04/04/2019

## FACTS COMMON TO ALL COUNTS

23.    At all relevant times, Defendant was in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or has acquired and is responsible for the commercial herbicide Roundup.

24.    Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate.

25.    Defendant discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate based "Roundup" as a broad-spectrum herbicide.

26.    Glyphosate is the active ingredient in Roundup.  Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

27.    Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

28.    Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

29.    Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

30.    Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has been

5

INDEX NO. 604661/2019
RECEIVED NYSCEF: 04/04/2019

driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

31.     Defendant is intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup i.e., "Roundup Ready®." As of 2009, Defendant was the world's leading producer of seeds designed to be Roundup Ready®. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready® seeds.

32.     The original Roundup, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the world's most widely used herbicides.[1]

33.     For nearly 40 years, consumers, farmers, and the public have used Roundup, unaware of its carcinogenic properties.

### REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

34.     The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. §136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. § 136a(a).

35.     The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in

---

[1] Backgrounder, History of Monsanto's Glyphosate Herbicides, June 2005.

6

FILED: NASSAU COUNTY CLERK 04/04/2019 01:47 PM

NYSCEF DOC. NO. 1

INDEX NO. 604661/2019

RECEIVED NYSCEF: 04/04/2019

registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

36.   FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

37.   The EPA and the State of New York registered Roundup for distribution, sale, and manufacture in the United States and the State of New York.

38.   FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

39.   The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

40.   In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment – in relation to the registration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of the World Health Organization's March 24, 2015 finding that

7

FILED: NASSAU COUNTY CLERK 04/04/2019 01:47 PM

NYSCEF DOC. NO. 1

INDEX NO. 604661/2019

RECEIVED NYSCEF: 04/04/2019

glyphosate is a "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

## MONSANTO'S FALSE REPRESENTATIONS REGARDING THE SAFETY OF ROUNDUP

41.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

a)    Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

b)    And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c)    Roundup biodegrades into naturally occurring elements.

d)    Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e)    This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f)    You can apply Accord with "confidence because it will stay where you put it" [;] it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g)    Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h)    Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

8

FILED: NASSAU COUNTY CLERK 04/04/2019 01:47 PM

NYSCEF DOC. NO. 1

INDEX NO. 604661/2019

RECEIVED NYSCEF: 04/04/2019

i)   You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j)   "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[2]

42.   On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a)   its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b)   its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable.

c)   its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d)   its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e)   glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and

f)   its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

43.   Monsanto did not alter its advertising in the same manner in any state other state, and on information and belief still has not done so today.

44.   In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[3]

---

[2] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

9

FILED: NASSAU COUNTY CLERK 04/04/2019 01:47 PM          INDEX NO. 604661/2019
NYSCEF DOC. NO. 1                                                    RECEIVED NYSCEF: 04/04/2019

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP

45. As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties.

46. On March 4, 1985, a group of the EPA's Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[4] Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

47. In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.[5]

48. In October 1991 the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.[6]

49. In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendant's Roundup products are more dangerous and toxic than glyphosate alone.[7] As early as 1991, evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.[8]

---

[3]   Monsanto   Guilty   in   'False   Ad'   Row,   BBC,   Oct.   15,   2009,   available   at
http://news.bbc.co.uk/2/hi/europe/8308903.stm.
[4] Consensus Review of Glyphosate, Casewell No. 661A. March 4, 1985. United States Environmental Protection Agency.

[5] https://www3.epa.gov/pesticides/chem_search/reg_actions/reregistration/red_PC-417300_1-Sep-93.pdf
[6] Second Peer Review of Glyphosate, CAS No. 1071-83-6. October 30, 1881. United States Environmental Protection Agency.
[7] Martinez et al, 2007; Benachour 2009; Gasnier et al. 2010; Peixoto 2005; Marc 2004.
[8] Martinez et al 1991.

10

50.   In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

51.   The study found that Defendant's Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

52.   In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

53.   The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[9]

54.   In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

55.   The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

56.   In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

57.   The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that

[9] (Molinari, 2000; Stewart et al., 2003).

11

supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

58.    The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendant.

59.    Defendant knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Decedent Plaintiff from Roundup.

60.    Defendant knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

61.    Defendant failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Decedent Plaintiff from Roundup.

62.    Rather than performing appropriate tests, Defendant relied upon flawed industry supported studies designed to protect Defendant's economic interests rather than Decedent Plaintiff and the consuming public.

63.    Despite its knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup as safe.

FILED: NASSAU COUNTY CLERK 04/04/2019 01:47 PM
NYSCEF DOC. NO. 1

INDEX NO. 604661/2019
RECEIVED NYSCEF: 04/04/2019

## IARC CLASSIFICATION OF GLYPHOSATE

64.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

65.     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015–2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

66.     IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer- reviewed data.

67.     On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendant's possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Defendant's Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

13

FILED: NASSAU COUNTY CLERK 04/04/2019 01:47 PM

NYSCEF DOC. NO. 1

INDEX NO. 604661/2019

RECEIVED NYSCEF: 04/04/2019

68.    The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A probable carcinogen to humans. According to the authors glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

69.    The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

70.    The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

## EARLIER EVIDENCE OF GLYPHOSATE'S DANGER

71.    Despite the new classification by the IARC, Defendant has had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

72.    Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

73.    In 1997, Chris Clements published "Genotoxicity of select herbicides in Rana catesbeiana tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

74.    The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

75.    Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

76.    Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

14

FILED: NASSAU COUNTY CLERK 04/04/2019 01:47 PM

NYSCEF DOC. NO. 1

INDEX NO. 604661/2019

RECEIVED NYSCEF: 04/04/2019

77.    The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

78.    In 2006 César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

79.    The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

80.    The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

81.    Despite knowledge to the contrary, Defendant maintains that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

82.    In addition to glyphosate and Roundup's genotoxic properties, Defendant has long been aware of glyphosate's carcinogenic properties.

83.    Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

84.    Defendant has known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

15

NYSCEF DOC. NO. 1

INDEX NO. 604661/2019

RECEIVED NYSCEF: 04/04/2019

85.    In 1985 the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

86.    In 2003 Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

87.    The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studies with an increased odds ratio of 3.11.

88.    In 2003 AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

89.    The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

90.    In 2008 Mikael Eriksson published a population based case-control study of exposure to various pesticides as a risk factor for NHL.

91.    This strengthened previous associations between glyphosate and NHL.

92.    In spite of this knowledge, Defendant continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

93.    Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiff, the agricultural community, and the public at large to purchase and increase the use of Defendant's Roundup for Defendant's pecuniary gain, and in fact, did induce Decedent Plaintiff to use Roundup.

16

INDEX NO. 604661/2019

NYSCEF DOC. NO. 1

RECEIVED NYSCEF: 04/04/2019

94. Defendant made these statements with complete disregard and reckless indifference to the safety of Decedent Plaintiff and the general public.

95. Notwithstanding Defendant's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

96. Defendant knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

97. Defendant failed to appropriately and adequately inform and warn Decedent Plaintiff of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

98. Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendant continues to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

99. Defendant has claimed and continues to claim that Roundup is safe, non-carcinogenic, and non-genotoxic. These misrepresentations are consistent with Defendant's cavalier approach to investigating and ensuring the safety of its products, the safety of the public at large, and the safety of Plaintiff.

INDEX NO. 604661/2019

RECEIVED NYSCEF: 04/04/2019

100. Defendant has claimed and continue to claim that Roundup is safe, non-carcinogenic, and non-genotoxic. These misrepresentations are consistent with Defendant's cavalier approach to investigating and ensuring the safety of its products, the safety of the public at large, and the safety of Plaintiff.

## SCIENTIFIC FRAUD UNDERLYING THE SAFETY DETERMINATIONS OF GLYPHOSATE

101. After the EPA's 1985 classification of glyphosate as possibly carcinogenic to humans (Group C), Monsanto exerted pressure upon the EPA to change its classification.

102. This culminated in the EPA's reclassification of glyphosate to Group E, which was based upon evidence of non-carcinogenicity in humans.

103. In so classifying, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

104. On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed scientific fraud.

105. In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup. IBT performed approximately 30 tests on glyphosate and glyphosate-containing products, including 11 of the 19 chronic toxicology studies needed to register Roundup with the EPA.

106. In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to toxicological impacts of glyphosate. The EPA subsequently audited IBT and determined that the toxicology studies conducted for Roundup were invalid. An EPA reviewer stated, after finding

18

FILED: NASSAU COUNTY CLERK 04/04/2019 01:47 PM          INDEX NO. 604661/2019

NYSCEF DOC. NO. 1                                          RECEIVED NYSCEF: 04/04/2019

"routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

107.    Three top executives of IBT were convicted of fraud in 1983.

108.    In the second incident, Monsanto hired Craven Laboratories ("Craven") in 1990 to perform pesticide and herbicide studies, including several studies on Roundup.

109.    In March of 1991, the EPA announced that it was investigating Craven for "allegedly falsifying test data used by chemical firms to win EPA approval of pesticides."

110.    The investigation lead to the indictments of the laboratory owner and a handful of employees.

### MONSANTO'S CONTINUING DISREGARD FOR THE SAFETY OF DECEDENT PLAINTIFF AND THE PUBLIC

111.    Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."[10]

112.    Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

113.    Glyphosate, and Defendant's Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

114.    Defendant's statements proclaiming the safety of Roundup and disregarding its dangers misled Plaintiff.

---

[10] Backgrounder – Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9, 2015).

19

FILED: NASSAU COUNTY CLERK 04/04/2019 01:47 PM

NYSCEF DOC. NO. 1

INDEX NO. 604661/2019

RECEIVED NYSCEF: 04/04/2019

115.     Despite Defendant's knowledge that Roundup was associated with an elevated risk of developing cancer, Defendant's promotional campaigns focused on Roundup's purported "safety profile."

116.     Defendant's failure to adequately warn Decedent Plaintiff resulted in (1) Decedent Plaintiff using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

117.     Defendant failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

118.     The failure of Defendant to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

119.     The failure of Defendant to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

120.     The failure of Defendant to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

121.     By reason of the foregoing acts and omissions, Plaintiff seeks compensatory damages as a result of Decedent Plaintiff's use of, and exposure to, Roundup which caused or was a substantial contributing factor in causing Decedent Plaintiff to suffer from cancer, specifically NHL, and Decedent Plaintiff suffered severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, and which culminated in his death.

20

FILED: NASSAU COUNTY CLERK 04/04/2019 01:47 PM

NYSCEF DOC. NO. 1

INDEX NO. 604661/2019

RECEIVED NYSCEF: 04/04/2019

122.   By reason of the foregoing, Decedent Plaintiff was severely and permanently injured.

123.   By reason of the foregoing, Decedent Plaintiff suffered severe injuries resulted in his death.

124.   By reason of the foregoing acts and omissions, Decedent Plaintiff endured emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of the actions and inactions of the Defendant.

## DECEDENT PLAINTIFF'S EXPOSURE TO ROUNDUP

125.   Decedent Plaintiff used Roundup beginning in approximately 1980.

126.   For decades, Decedent Plaintiff mixed and sprayed Roundup on a regular basis at commercial properties during the course of his employment as a landscaper until in or around May, 2016.  Decedent Plaintiff followed all safety and precautionary warnings during the course of use.

127.   After decades of use and exposure to Roundup, Decedent Plaintiff was diagnosed with NHL in or around May, 2015.   The development of Decedent Plaintiff's NHL was proximately and actually caused by exposure to Defendant's Roundup products.

128.   As a result of his injury, Decedent Plaintiff has incurred significant economic and non-economic damages.

129.   Plaintiff's development of Non-Hodgkin Lymphoma resulted in his death on May 17, 2017.

## EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

130.   Plaintiff incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

21

FILED: NASSAU COUNTY CLERK 04/04/2019 01:47 PM   INDEX NO. 604661/2019

NYSCEF DOC. NO. 1   RECEIVED NYSCEF: 04/04/2019

131.   The running of any statute of limitations has been tolled by reason of Defendant's fraudulent concealment. Defendant, through its affirmative misrepresentations and omissions, actively concealed from Decedent Plaintiff the true risks associated with Roundup and glyphosate.

132.   At all relevant times, Defendant has maintained that Roundup is safe, non-toxic, and non-carcinogenic.

133.   Indeed, even as of July 2016, Defendant continues to represent to the public that "Regulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and *agree* that there is *no evidence* that glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic" (emphasis added).[11]

134.   As a result of Defendant's actions, Plaintiff and Decedent Plaintiff were unaware, and could not reasonably know or have learned through reasonable diligence that Roundup and/or glyphosate contact, exposed Decedent Plaintiff to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

135.   Furthermore, Defendant is estopped from relying on any statute of limitations because of its fraudulent concealment of the true character, quality and nature of Roundup. Defendant was under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Defendant had and continues to have exclusive control, and because Defendant knew that this information was not available to

---

[11] Backgrounder – Glyphosate: No Evidence of Carcinogenicity: Updated November 2014.

22

FILED: NASSAU COUNTY CLERK 04/04/2019 01:47 PM
NYSCEF DOC. NO. 1

INDEX NO. 604661/2019

RECEIVED NYSCEF: 04/04/2019

Decedent Plaintiff or to distributors of Roundup. In addition, Defendant is estopped from relying on any statute of limitations because of its intentional concealment of these facts.

136.   Neither Plaintiff nor Decedent Plaintiff had knowledge that Defendant was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendant, Plaintiff and Decedent Plaintiff could not have reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud should be considered. Defendant had the ability to and did spend enormous amounts of money in furtherance of its purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Plaintiff, Decedent Plaintiff, and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendant's representations. Accordingly, Defendant is precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

## FIRST CAUSE OF ACTION – STRICT LIABILITY (DESIGN DEFECT)

137.   Plaintiff repeats, reiterates and, re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

138.   Plaintiffs bring this strict liability claim against Monsanto for defective design.

139.   At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, manufacturing, selling, distributing, and Monsanto a engaged in the marketing, packaging design, and promotion of Roundup products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of

23

FILED: NASSAU COUNTY CLERK 04/04/2019 01:47 PM

NYSCEF DOC. NO. 1

INDEX NO. 604661/2019

RECEIVED NYSCEF: 04/04/2019

Monsanto. At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup products used by the Plaintiff, as described above.

140.    At all times relevant to this litigation, Roundup products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff.

141.    At all times relevant to this litigation, Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in New York and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

142.    Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

143.    Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

144.  At all times relevant to this action, Monsanto knew or had reason to know that Roundup products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

FILED: NASSAU COUNTY CLERK 04/04/2019 01:47 PM

NYSCEF DOC. NO. 1

INDEX NO. 604661/2019

RECEIVED NYSCEF: 04/04/2019

145.   Therefore, at all times relevant to this litigation, Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Monsanto were defective in design and formulation, in one or more of the following ways:

a)   When placed in the stream of commerce, Roundup products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b)   When placed in the stream of commerce, Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c)   When placed in the stream of commerce, Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d)   Monsanto did not sufficiently test, investigate, or study Roundup products and, specifically, the active ingredient glyphosate.

e)   Exposure to Roundup and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f)   At the time of marketing its Roundup products, Roundup was defective in that exposure to Roundup and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g)   Monsanto did not conduct adequate post-marketing surveillance of its Roundup products.

h)   Monsanto could have employed safer alternative designs and formulations.

146.   Decedent Plaintiff was exposed to Roundup products in the course of his work, as described above, without knowledge of their dangerous characteristics.

147.   At all times relevant to this litigation, Plaintiff's use of and exposure to Roundup products was for the purpose and manner normally intended and/or that which was reasonably foreseeable, without knowledge of the products' dangerous characteristics.

25

FILED: NASSAU COUNTY CLERK 04/04/2019 01:47 PM

NYSCEF DOC. NO. 1

INDEX NO. 604661/2019

RECEIVED NYSCEF: 04/04/2019

148.    Plaintiff could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products before or at the time of exposure.

149.    The harm caused by Roundup products far outweighed their benefit, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate. Roundup products were and are more dangerous than alternative products and Monsanto could have designed Roundup products (including their packaging and sales aids) to make them less dangerous. Indeed, at the time that Monsanto designed Roundup products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

150.    At the time Roundup products left Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of those herbicides.

151.    Monsanto's defective design of Roundup products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup products, including the Decedent Plaintiff herein.

152.    Therefore, as a result of the unreasonably dangerous condition of its Roundup products, Monsanto is strictly liable to Plaintiff.

153.    The defects in Roundup products caused or contributed to cause Plaintiff's grave injuries, and, but for Monsanto's misconduct and omissions, Decedent Plaintiff would not have sustained their injuries.

154.    Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including Plaintiff, with knowledge of the safety problems associated with Roundup and glyphosate-containing products, and suppressed this

FILED: NASSAU COUNTY CLERK 04/04/2019 01:47 PM

NYSCEF DOC. NO. 1

INDEX NO. 604661/2019

RECEIVED NYSCEF: 04/04/2019

knowledge from the general public. Monsanto made conscious decisions not to redesign, warn or inform the unsuspecting public. Monsanto's reckless conduct warrants an award of aggravated damages.

155. As a direct and proximate result of Monsanto placing defective Roundup products into the stream of commerce, Decedent Plaintiff suffered from NHL and suffered grave injuries culminating in death, and endured physical pain and mental anguish, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

156. By reason of the foregoing, Decedent Plaintiff has been damaged as against the Defendant in an amount in excess of the jurisdictional limits of all lower courts which would otherwise have jurisdiction over this action.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## SECOND CAUSE OF ACTION – STRICT LIABILITY (FAILURE TO WARN)

157. Plaintiff repeats, reiterates and, re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

158. Plaintiff brings this strict liability claim against Monsanto for failure to warn.

159. At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the

27

FILED: NASSAU COUNTY CLERK 04/04/2019 01:47 PM

NYSCEF DOC. NO. 1

INDEX NO. 604661/2019

RECEIVED NYSCEF: 04/04/2019

dangerous characteristics of Roundup and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Monsanto.

160.    Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce Roundup products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiff, and therefore had a duty to warn of the risks associated with the use of Roundup and glyphosate-containing products.

161.    At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn the Plaintiff of the dangers associated with Roundup use and exposure. Monsanto, as manufacturer, seller, promoter, marketer, or distributor of chemical herbicides are held to the knowledge of an expert in the field.

162.    At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

163.    At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Defendant and at the time Decedent Plaintiff was exposed to and/or ingested the product. The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects,

28

including, but not limited to, developing non-Hodgkin's lymphoma as a result of exposure and use.

164.    Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect the health of those exposed in violation of 7 U.S.C. § 136(a)(1)(E).

165.    Defendant's failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. § 136 (a)(1)(E) as well as the laws of the State of New York.

166.    Despite the fact that Monsanto knew or should have known that Roundup posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of these products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or scientifically knowable to Monsanto through appropriate research and testing by known methods, at the time it distributed, marketed, promoted, supplied or sold the product, and not known to end users and consumers, such as Plaintiff.

167.    Defendant Monsanto could have amended the label of Roundup to provide additional warnings.

168.    This defect caused serious injury to Decedent Plaintiff, who used Roundup in its intended and foreseeable manner.

169.    Decedent Plaintiff was exposed to Roundup products in the course of his work, without knowledge of the dangerous characteristics of Roundup.

170.    Defendant labeled, distributed, and promoted the aforesaid product that it was dangerous and unsafe for the use and purpose for which it was intended.

FILED: NASSAU COUNTY CLERK 04/04/2019 01:47 PM    INDEX NO. 604661/2019

NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 04/04/2019

171.    These products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup and glyphosate.

172.    Defendant failed to warn of the nature and scope of the side effects associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of NHL.

173.    Defendant was aware of the probable consequences of the aforesaid conduct.

174.    At all times relevant to this litigation, Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in New York and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, promoted and marketed by Monsanto.

175.    Despite the fact that Defendant knew or should have known that Roundup caused serious injuries, Defendant failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of developing NHL from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution. Defendant willfully and deliberately failed to avoid the consequences associated with its failure to warn, and in doing so, Defendant acted with a conscious disregard for the safety of Plaintiff.

176.    Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products prior to or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Monsanto.

FILED: NASSAU COUNTY CLERK 04/04/2019 01:47 PM

NYSCEF DOC. NO. 1

INDEX NO. 604661/2019

RECEIVED NYSCEF: 04/04/2019

177.    Defendant, as the manufacturer and/or distributor of the subject product, is held to the level of knowledge of an expert in the field.

178.    Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of the Defendant.

179.    Had Defendant properly disclosed the risks associated with Roundup products, Decedent Plaintiff would have avoided the risk of NHL by not using Roundup products.

180.    Roundup was defective because the minimal warnings disseminated with Roundup products were inadequate, and they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and landscaping applications.

181.    The information that Defendant did provide or communicate failed to contain adequate warnings and precautions that would have enabled Plaintiff, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

31

FILED: NASSAU COUNTY CLERK 04/04/2019 01:47 PM

NYSCEF DOC. NO. 1

INDEX NO. 604661/2019

RECEIVED NYSCEF: 04/04/2019

182.   To this day, Monsanto has failed to adequately and accurately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup and its active ingredient glyphosate, a probable carcinogen.

183.   As a result of their inadequate warnings, Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed, marketed, and promoted by Monsanto, and used by Plaintiffs in their work.

184.   Monsanto is liable to Plaintiff for injuries caused by their negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of these products and the risks associated with the use of or exposure to Roundup and glyphosate.

185.   The defects in Roundup products caused or contributed to cause Plaintiff's injuries, and, but for this misconduct and omissions, Plaintiff would not have sustained injuries.

186.   As a direct and proximate result of Monsanto placing defective Roundup products into the stream of commerce, Decedent Plaintiff suffered from NHL and suffered grave injuries culminating in death, and endured physical pain and mental anguish, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

187.   By reason of the foregoing, Decedent Plaintiff has been damaged as against the Defendant in an amount in excess of the jurisdictional limits of all lower courts which would otherwise have jurisdiction over this action.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

FILED: NASSAU COUNTY CLERK 04/04/2019 01:47 PM

NYSCEF DOC. NO. 1

INDEX NO. 604661/2019

RECEIVED NYSCEF: 04/04/2019

## THIRD CAUSE OF ACTION – NEGLIGENCE

188. Plaintiff repeats, reiterates and, re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

189. Monsanto, directly or indirectly, caused Roundup products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

190. Defendant had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

191. Defendant failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup into interstate commerce in that Defendant knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

192. The negligence by the Defendant, its agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

a)  Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly testing it;

b)  Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup;

33

FILED: NASSAU COUNTY CLERK 04/04/2019 01:47 PM

NYSCEF DOC. NO. 1

INDEX NO. 604661/2019

RECEIVED NYSCEF: 04/04/2019

c)   Not conducting sufficient testing programs to determine whether or not Roundup was safe for use; in that Defendant herein knew or should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users;

d)   Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Defendant had knowledge that Roundup is, was, or could be carcinogenic;

e)   Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

f)   Negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

g)   Negligently failing to petition the EPA to strengthen the warnings associated with Roundup;

h)   Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

i)   Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

j)   Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

k)   Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

l)   Negligently designing Roundup in a manner, which was dangerous to its users;

m)   Negligently manufacturing Roundup in a manner, which was dangerous to its users;

n)   Negligently producing Roundup in a manner, which was dangerous to its users;

o)   Negligently formulating Roundup in a manner, which was dangerous to its users;'

p)   Concealing information from the Decedent Plaintiff while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations;

34

FILED: NASSAU COUNTY CLERK 04/04/2019 01:47 PM

NYSCEF DOC. NO. 1

INDEX NO. 604661/2019

RECEIVED NYSCEF: 04/04/2019

q)    Improperly concealing and/or misrepresenting information from the Plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides; and

r)    Negligently selling Roundup with a false and misleading label.

193.    Defendant under-reported, underestimated, and downplayed the serious dangers of Roundup.

194.    Defendant negligently and deceptively compared the safety risks and/or dangers of Roundup with common everyday foods such as table salt, and other forms of herbicides.

195.    Defendant was negligent and/or violated New York law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that it:

a)    Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide

b)    Failed to accompany its product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

c)    Failed to accompany its product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

d)    Failed to accompany its product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;

e)    Failed to warn Decedent Plaintiff of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of NHL;

f)    Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup;

g)    Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants;

35

INDEX NO. 604661/2019
NYSCEF DOC. NO. 1                                                   RECEIVED NYSCEF: 04/04/2019

h)    Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity; and

i)    Was otherwise careless and/or negligent.

196.    Despite the fact that Defendant knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Defendant continued and continues to market, manufacture, distribute, and/or sell Roundup to consumers, including the Plaintiff.

197.    Defendant knew or should have known that consumers such as the Decedent Plaintiff would foreseeably suffer injury as a result of Defendant's failure to exercise ordinary care, as set forth above.

198.    Defendant's violations of law and/or negligence were the proximate cause of Plaintiff's injuries, harm and economic loss, which Plaintiff suffered.

199.    As a direct and proximate result of Monsanto's acts and omissions, Decedent Plaintiff suffered from NHL and suffered grave injuries culminating in death, and endured physical pain and mental anguish, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

200.    By reason of the foregoing, Decedent Plaintiff has been damaged as against the Defendant in an amount in excess of the jurisdictional limits of all lower courts which would otherwise have jurisdiction over this action.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

INDEX NO. 604661/2019

RECEIVED NYSCEF: 04/04/2019

## FOURTH CAUSE OF ACTION – BREACH OF EXPRESS WARRANTIES

201. Plaintiff repeats, reiterates and, re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

202. At all times herein mentioned, the Defendant manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold Roundup as a broad-spectrum herbicide. These actions were under the ultimate control and supervision of Defendant.

203. At the time Defendant marketed, sold, and distributed Roundup for use by Plaintiff, Defendant knew of Roundup's intended use and expressly warranted the product to be or merchantable quality and safe and fit for this use.

204. The Defendant expressly represented and warranted to Decedent Plaintiff and users of Roundup, the agricultural community, and/or the EPA that Roundup was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.

205. These representations and warranties were false, misleading, and inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

206. Defendants knew or should have known that, in fact, said representations and warranties were false, misleading and untrue.

207. Decedent Plaintiff and/or the EPA did rely on said express warranties of Defendant herein.

208. Decedent Plaintiff reasonably relied upon the skill and judgment of Defendant as to whether Roundup was of merchantable quality and safe and fit for its intended use.

209. Roundup was injected into the stream of commerce by the Defendant in a defective, unsafe, and inherently dangerous condition, and the products' materials were expected

37

FILED: NASSAU COUNTY CLERK 04/04/2019 01:47 PM INDEX NO. 604661/2019

NYSCEF DOC. NO. 1 RECEIVED NYSCEF: 04/04/2019

to and did reach users, handlers, and persons encountering said products without substantial change in the condition in which they were sold.

210. The Defendant breached the aforesaid express warranties, as its herbicide Roundup was not fit for its intended purposes and uses.

211. As a direct and proximate result of Monsanto's acts and omissions, Decedent Plaintiff suffered from NHL and suffered grave injuries culminating in death, and endured physical pain and mental anguish, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

212. By reason of the foregoing, Decedent Plaintiff has been damaged as against the Defendant in an amount in excess of the jurisdictional limits of all lower courts which would otherwise have jurisdiction over this action.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## FIFTH CAUSE OF ACTION – BREACH OF IMPLIED WARRANTIES

213. Plaintiff repeats, reiterates and, re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

214. At all times herein mentioned, the Defendant manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold Roundup as a broad-spectrum herbicide. These actions were under the ultimate control and supervision of Defendant.

38

INDEX NO. 604661/2019

RECEIVED NYSCEF: 04/04/2019

215.    At the time Defendant marketed, sold, and distributed Roundup for use by Plaintiff, Defendant knew of Roundup's intended use and impliedly warranted the product to be. or merchantable quality and safe and fit for this use.

216.    The Defendant impliedly represented and warranted to Decedent Plaintiff and users of Roundup, the agricultural community, and/or the EPA that Roundup was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.

217.    These representations and warranties were false, misleading, and inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

218.    Defendants knew or should have known that, in fact, said representations and warranties were false, misleading and untrue.

219.    Decedent Plaintiff and/or the EPA did rely on said implied warranties of Defendant herein.

220.    Decedent Plaintiff reasonably relied upon the skill and judgment of Defendant as to whether Roundup was of merchantable quality and safe and fit for its intended use.

221.    Roundup was injected into the stream of commerce by the Defendant in a defective, unsafe, and inherently dangerous condition, and the products' materials were expected to and did reach users, handlers, and persons encountering said products without substantial change in the condition in which they were sold.

222.    The Defendant breached the aforesaid implied warranties, as its herbicide Roundup was not fit for its intended purposes and uses.

223.    As a direct and proximate result of Monsanto's acts and omissions, Decedent Plaintiff suffered from NHL and suffered grave injuries culminating in death, and endured

FILED: NASSAU COUNTY CLERK 04/04/2019 01:47 PM

NYSCEF DOC. NO. 1

INDEX NO. 604661/2019

RECEIVED NYSCEF: 04/04/2019

physical pain and mental anguish, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

224. By reason of the foregoing, Decedent Plaintiff has been damaged as against the Defendant in an amount in excess of the jurisdictional limits of all lower courts which would otherwise have jurisdiction over this action.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## SIXTH CAUSE OF ACTION – FRAUD AND DECEIT

225. Plaintiff repeats, reiterates and, re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

226. Defendant fraudulently and intentionally misrepresented to the public, and to the Plaintiff, both directly and by and through the media, the scientific literature, and purported "community outreach" programs, the safety of Roundup products, and/or fraudulently and intentionally concealed, suppressed, and/or omitted material adverse information regarding the safety of Roundup.

227. The intentional and/or negligent misrepresentations and omissions of Defendant regarding the safety of Roundup products were communicated to Plaintiffs directly through ghostwritten articles, editorials, national and regional advertising, marketing and promotion efforts, as well as the packaging and sales aids. The safety of Roundup products was also intentionally and/or negligently misrepresented to Plaintiffs and the public with the intent that

40

FILED: NASSAU COUNTY CLERK 04/04/2019 01:47 PM

NYSCEF DOC. NO. 1

INDEX NO. 604661/2019

RECEIVED NYSCEF: 04/04/2019

such misrepresentations would cause Plaintiffs and other potential consumers to purchase and use or continue to purchase and use Roundup products.

228.    Defendant either knew or should have known of the material representations they were making regarding the safety and relative utility of Roundup products.

229.    Defendant fraudulently and intentionally made the misrepresentations and/or actively concealed, suppressed, or omitted this material information with the specific desire to induce Plaintiff, and the consuming public to purchase and use Roundup products. Defendant fraudulently and intentionally knew or should have known that Plaintiffs and the consuming public would rely on such material misrepresentations and/or omissions in selecting and applying Roundup products. Defendant knew or should have known that Plaintiffs would rely on their false representations and omissions.

230.    Defendant made these misrepresentations and actively concealed adverse information including the risk of non-Hodgkin lymphoma, at a time when, their agents and/or employees knew or should have known, the product had defects, dangers, and characteristics that were other than what was represented to the consuming public. Specifically, Osborn & Barr misrepresented and actively concealed, suppressed, and omitted that there had been inadequate testing of the safety and efficacy of Roundup, and that prior studies, research, reports, and/or testing had been conducted linking the use of the drug with serious health events, including non-Hodgkin lymphoma.

231.    Despite the fact that Defendant knew or should have known of reports of severe risks including non-Hodgkin lymphoma, with Roundup use and exposure, this information was strategically minimized, understated, or omitted in order to create the impression that the human dangers of Roundup were nonexistent, particularly in light of its purported utility.

41

232.    The fraudulent, intentional and/or negligent material misrepresentations and/or active concealment, suppression, and omissions by Defendant were perpetuated directly and/or indirectly through the advertisements, packaging, sales aids, furtive public relations efforts, and other marketing and promotional pieces authored, analyzed, created, compiled, designed, drafted, disseminated, distributed, edited, evaluated, marketed, published, and supplied by Osborn & Barr.

233.    If Plaintiff had known the true facts concerning the risks associated with Roundup exposure, Plaintiffs would have used a safer alternative.

234.    Plaintiff relied upon the foregoing material misrepresentations and omissions, and his reliance thereupon was justified, for among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Roundup while Plaintiff was not in a position to know the true facts because Defendant overstated the benefits and safety of Roundup and downplayed the risk of lymphoma, thereby inducing Plaintiff to use the herbicide rather than safer alternatives.

235.    As a direct and proximate result of Defendant's actions and inactions, Plaintiff was exposed to Roundup and suffered and will continue to suffer injuries and damages, as set forth herein.

236.    As a direct and proximate result of Monsanto's fraudulent misrepresentations and omissions, and affirmative acts of concealment, Decedent Plaintiff suffered from NHL and suffered grave injuries culminating in death, and endured physical pain and mental anguish, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

42

FILED: NASSAU COUNTY CLERK 04/04/2019 01:47 PM

NYSCEF DOC. NO. 1

INDEX NO. 604661/2019

RECEIVED NYSCEF: 04/04/2019

237.   By reason of the foregoing, Decedent Plaintiff has been damaged as against the Defendant in an amount in excess of the jurisdictional limits of all lower courts which would otherwise have jurisdiction over this action.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## EIGHTH CAUSE OF ACTION – VIOLATION OF NEW YORK'S CONSUMER PROTECTION ACT (N.Y. GEN. BUS. LAW § 349)

238.   Plaintiff repeats, reiterates and, re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

239.   The New York Consumer Protection Act, titled "Deceptive acts and practices unlawful," N.Y. Gen. Bus. Law §349 et. seq., applies to Monsanto's actions and conduct described herein because it extends to transactions which are intended to result, or which have resulted, in the sale of goods to consumers.

240.   Defendant fraudulently, intentionally, and/or negligently misrepresented to the public, and to the Plaintiffs, both directly and by and through the media and purported "community outreach" programs, the safety of Roundup products, and/or fraudulently, intentionally, or negligently concealed, suppressed, and/or omitted material adverse information regarding the safety of Roundup. This deception caused injury to Plaintiff in violation of N.Y. Gen. Bus. Law §349 et. Seq.

241.   The intentional and/or negligent misrepresentations and omissions of Defendant regarding the safety of Roundup products were communicated to Plaintiff directly through

43

FILED: NASSAU COUNTY CLERK 04/04/2019 01:47 PM          INDEX NO. 604661/2019

NYSCEF DOC. NO. 1                                                        RECEIVED NYSCEF: 04/04/2019

national and regional advertising, marketing and promotion efforts, as well as the packaging and sales aids. The safety of Roundup products was also intentionally and/or negligently misrepresented to Plaintiffs and the public with the intent that such misrepresentations would cause Plaintiff and other potential consumers to purchase and use or continue to purchase and use Roundup products.

242.    Defendant either knew or should have known of the material representations they were making regarding the safety and relative utility of Roundup products.

243.    Defendant    fraudulently,    intentionally,    and/or    negligently    made    the misrepresentations and/or actively concealed, suppressed, and/or omitted this material information with the specific desire to induce Plaintiff, and the consuming public to purchase and use Roundup products.

244.    Defendant fraudulently, intentionally, and/or negligently knew or should have known that Plaintiff and the consuming public would rely on such material misrepresentations and/or omissions in selecting and applying Roundup products.

245.    Defendant knew or should have known that Plaintiff would rely on its false representations and omissions.

246.    Defendant made these misrepresentations and actively concealed adverse information including the risk of non-Hodgkin lymphoma, at a time when, their agents and/or employees knew or should have known, the product had defects, dangers, and characteristics that were other than what was represented to the consuming public. Specifically, Defendant misrepresented and actively concealed, suppressed, and omitted that there had been inadequate testing of the safety and efficacy of Roundup, and that prior studies, research, reports, and/or

44

FILED: NASSAU COUNTY CLERK 04/04/2019 01:47 PM

NYSCEF DOC. NO. 1

INDEX NO. 604661/2019

RECEIVED NYSCEF: 04/04/2019

testing had been conducted linking the use of the drug with serious health events, including non-Hodgkin lymphoma.

247. Despite the fact that Defendant knew or should have known of reports of severe risks including non-Hodgkin lymphoma, with Roundup use and exposure, this information was strategically minimized, understated, or omitted in order to create the impression that the human dangers of Roundup were nonexistent, particularly in light of its purported utility.

248. The fraudulent, intentional, and/or negligent material misrepresentations and/or active concealment, suppression, and omissions by Defendant were perpetuated directly and/or indirectly through the advertisements, packaging, sales aids, furtive public relations efforts, and other marketing and promotional pieces authored, analyzed, created, compiled, designed, drafted, disseminated, distributed, edited, evaluated, marketed, published, and supplied by Defendant.

249. If Plaintiff had known the true facts concerning the risks associated with Roundup exposure, Plaintiff would have used a safer alternative.

250. Plaintiff relied upon the aforesaid material misrepresentations and/or omissions, and his reliance thereupon was justified, among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Roundup while Plaintiff was not in a position to know the true facts because Defendant overstated the benefits and safety of Roundup and downplayed the risk of lymphoma, thereby inducing Plaintiff to use the herbicide rather than safer alternatives.

251. Federal law and the EPA do not authorize and specifically prohibit the deceptions, misrepresentations and omissions made by Defendant.

252. As a direct and proximate result of Monsanto's acts and omissions, Decedent Plaintiff suffered from NHL and suffered grave injuries culminating in death, and endured

45

FILED: NASSAU COUNTY CLERK 04/04/2019 01:47 PM   INDEX NO. 604661/2019

NYSCEF DOC. NO. 1                                    RECEIVED NYSCEF: 04/04/2019

physical pain and mental anguish, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

253. By reason of the foregoing, Decedent Plaintiff has been damaged as against the Defendant in an amount in excess of the jurisdictional limits of all lower courts which would otherwise have jurisdiction over this action.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## NINTH CAUSE OF ACTION – WRONGFUL DEATH

254. Plaintiff repeats, reiterates and, re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

255. By reason of the foregoing statutory violations, carelessness, fraud and negligence of Defendant Monsanto, its agents, servants and/or employees, the Defendant caused, precipitated and/or hastened the death of Plaintiff's Decedent, Raymond Scotto, on May 17, 2017.

256. Plaintiff's decedent left surviving next of kin and distributees.

257. That as a result of the foregoing, Plaintiff's Decedent's estate became liable for and expended money for funeral and other expenses.

258. That as a result of the foregoing, Plaintiff's Decedent's estate suffered pecuniary damages.

259. That as a result of the foregoing, Plaintiff's Decedent's estate sustained all other

46

FILED: NASSAU COUNTY CLERK 04/04/2019 01:47 PM

NYSCEF DOC. NO. 1

INDEX NO. 604661/2019

RECEIVED NYSCEF: 04/04/2019

damages allowed by law.

260.    That as a result of the foregoing, Plaintiff's Decedent's next of kin have been damaged by Defendant in a sum which exceeds the jurisdictional limits of all lower Courts.

261.    The limitations on liability set forth in CPLR §1601 do not apply to this action by reason of one or more of the exemptions set forth in CPLR §1602.

## TENTH CAUSE OF ACTION – LOSS OF SERVICE

262.    Plaintiff repeats, reiterates and, re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

263.    Plaintiff, Ellen Scotto, is the lawfully wedded wife of Decedent Plaintiff, Raymond Scotto, and as such, was entitled to his services, society, affection, and consortium.

264.    As a result of the aforementioned occurrence, plaintiff, Ellen Scotto has been deprived of the services, society, affection, and consortium of her said husband, Plaintiff, Raymond Scotto.

265.    As a result of the foregoing, plaintiff, Ellen Scotto has been damaged in a sum which exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction in this matter.

266.    By reason of the foregoing, Plaintiff has been damaged as against the Defendant in an amount in excess of the jurisdictional limits of all lower courts which would otherwise have jurisdiction over this action.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred,

47

FILED: NASSAU COUNTY CLERK 04/04/2019 01:47 PM
NYSCEF DOC. NO. 1

INDEX NO. 604661/2019
RECEIVED NYSCEF: 04/04/2019

attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands

a jury trial on all issues contained herein.

Dated:    New York, New York          SULLIVAN PAPAIN BLOCK McGRATH
          April 5, 2019                & CANNAVO P.C.

          By: _____

          Craig M. Silverman
          Attorneys for Plaintiffs
          120 Broadway – 18th Floor
          New York, New York 10271
          (212) 732-9000

48

FILED: NASSAU COUNTY CLERK 04/04/2019 01:47 PM

NYSCEF DOC. NO. 1

INDEX NO. 604661/2019

RECEIVED NYSCEF: 04/04/2019

## VERIFICATION

STATE OF NEW YORK    )
                     ) SS.;
COUNTY OF NEW YORK   )

CRAIG M. SILVERMAN, being duly sworn, deposes and says:

I am a member of the law firm of SULLIVAN PAPAIN BLOCK MCGRATH & CANNAVO P.C., attorneys for the plaintiffs herein.

I have read the foregoing Complaint and know the contents thereof, and upon information and belief deponent believes the matters alleged therein to be true.

The source of deponent's information and the grounds of his/her belief are communications, papers, reports and investigations contained in the file.

CRAIG M. SILVERMAN

Sworn to before me this
4th day of April, 2019

Notary Public

ANNMARIE DELPIZZO
Notary Public. State of New York
No. 43-01DE4703432
Qualified in Richmond County
Commission Expires Oct. 31, 2021

49