JURYDEMAND

# U.S. District Court
# United States District Court for the Western District of Washington (Tacoma)
# CIVIL DOCKET FOR CASE #: 3:19-cv-05447-BAT

Merchant v. Monsanto Company
Assigned to: Hon. Brian A Tsuchida
Cause: 28:1332 Diversity-Product Liability

Date Filed: 05/22/2019
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Randolph J Merchant**
*an individual*

represented by **Corrie Johnson Yackulic**
CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH
STE 304
SEATTLE, WA 98104
206-787-1915
Fax: 206-299-9725
Email: corrie@cjylaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 05/22/2019 | 1 | COMPLAINT against defendant(s) Monsanto Company with JURY DEMAND (Receipt # 0981-5776930), filed by Randolph J Merchant. (Attachments: # 1 Civil Cover Sheet, # 2 Summons)(Yackulic, Corrie) (Entered: 05/22/2019) |
| 05/23/2019 | | Hon. Brian A Tsuchida added. (GMR) (Entered: 05/23/2019) |
| 05/23/2019 | 2 | Summons(es) Electronically Issued as to defendant(s) Monsanto Company (GMR) (Entered: 05/23/2019) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 05/28/2019 11:26:04 | | |
| **PACER Login:** | hllp1982:2634105:4722683 | **Client Code:** 1417.0049 |
| **Description:** | Docket Report | **Search Criteria:** 3:19-cv-05447-BAT |
| **Billable** | 1 | **Cost:** 0.10 |

**Pages:**

1
Corrie J. Yackulic
2
CORRIE YACKULIC LAW FIRM PLLC
110 Prefontaine Place South, Ste. 304
3
Seattle, Washington 98104
Tel. 206.787.1915
4
Fax. 206.299.9725
5
Corrie@cjylaw.com

6

7

8

9

10
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA
11

12
RANDOLPH J. MERCHANT, *an individual,*          Case No.

13
                              *Plaintiff,*
v.
14
                                                **COMPLAINT**
MONSANTO COMPANY
15
                                                ***JURY DEMAND***
16
                              *Defendant.*

17
## I.   CIVIL COMPLAINT
18
Plaintiff RANDOLPH J. MERCHANT("Plaintiff"), by and through his undersigned
19
attorneys, hereby brings this Complaint for damages against Defendant Monsanto Company and
20
alleges the following:
21

22
## II.   NATURE OF THE CASE
23
1.      This is an action for damages suffered by Plaintiff as a direct and proximate result
24
of Defendant's negligent and wrongful conduct in connection with the design, development,
25
manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or
26

27
COMPLAINT
PAGE 1

Corrie Yackulic Law Firm PLLC
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

1   sale of the herbicide Roundup® ("Roundup"), containing the active ingredient glyphosate.

2       2.      Plaintiff maintains that Roundup and/or glyphosate are defective, dangerous to

3   human health, unfit and unsuitable to be marketed and sold in commerce and lacked proper

4

5   warnings and directions as to the dangers associated with their use.

6       3.      Plaintiff's injuries, like those striking thousands of similarly situated victims

7   across the country, were avoidable.

8   ### III.    JURISDICTION AND VENUE

9       4.      This Court has jurisdiction over Defendant and this action pursuant to 28 U.S.C.

10

11   § 1332 because there is complete diversity of citizenship between Plaintiff and Defendant.

12   Defendant is incorporated and has its principal place of business outside of Washington State,

13   where the Plaintiff resides.

14       5.      The amount in controversy between Plaintiff and Defendant exceeds $75,000,

15   exclusive of interest and cost.

16       6.      Venue is proper within this district pursuant to 28 U.S.C. § 1391 in that Defendant

17   conducts business here and is subject to personal jurisdiction in this district. Furthermore,

18   Defendant sells, markets, and/or distributes Roundup within the  Western  District  of

19   Washington (Tacoma).

20   ### IV.    PARTIES

21

22       7.      Plaintiff RANDOLPH J. MERCHANT at all times relevant to this action, was a

23   resident of Bonney Lake, Pierce County, Washington. Plaintiff brings this action for personal

24   injuries sustained by exposure to Roundup containing the active ingredient glyphosate and the

25   surfactant polyethoxylated tallow amine ("POEA"). As a direct and proximate result of being

26

27   COMPLAINT
    PAGE 2

Corrie Yackulic Law Firm PLLC
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

1

2

3

exposed to Roundup, Plaintiff RANDOLPH J. MERCHANT developed non-Hodgkin's lymphoma, specifically, diffuse large B-cell lymphoma.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

8.      "Roundup" refers to all formulations of Defendant's Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to- Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup-Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

21

22

23

24

9.      Defendant    MONSANTO    COMPANY    ("Monsanto") is a Delaware corporation, with a principle place of business in St. Louis, Missouri.(Missouri Secretary of State Charter No. F00488018). Monsanto has transacted and conducted business within Washington State and has derived substantial revenue from goods and products used in this State.

25

26

10.      All references to the acts and omissions of Defendant in this Complaint shall

27

COMPLAINT
PAGE 3

Corrie Yackulic Law Firm PLLC
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

mean and refer to the actions of Monsanto by contract, the common law, or otherwise.

11.     Defendant advertises and sells goods, specifically Roundup, in the State of Washington.

12.     Defendant transacted and conducted business that relates to the allegations in this Complaint within the State of Washington.

13.     Defendant derived substantial revenue from goods and products used in the State of Washington.

14.     Defendant expected or should have expected its acts to have consequences within the State of Washington, and derived substantial revenue from interstate commerce.

15.     Defendant engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup.

16.     Upon information and belief, Defendant purposefully availed itself of the privilege of conducting activities with the State of Washington, thus invoking the benefits and protections of its laws.

17.     Upon information and belief, Defendant did design, sell, advertise, manufacture and/or distribute Roundup, with full knowledge of its dangerous and defective nature.

## V.     FACTUAL ALLEGATIONS

18.     At all relevant times, Defendant was in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or have acquired and are responsible for the commercial herbicide Roundup.

19.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate.

COMPLAINT
PAGE 4

Corrie Yackulic Law Firm PLLC
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

20.     Monsanto discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate based "Roundup" as a broad spectrum herbicide.

21.     Glyphosate is the active ingredient in Roundup.

22.     Glyphosate is a broad spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

23.     Glyphosate is a "non selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

24.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

25.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

26.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

27.     Defendant is intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup i.e., "Roundup Ready®." As of 2009, Monsanto was the world's leading producer of seeds designed to be Roundup Ready®. In 2010, an estimated 70%

COMPLAINT
PAGE 5

Corrie Yackulic Law Firm PLLC
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready®

seeds.

28.     The original Roundup, containing the active ingredient glyphosate, was

introduced in 1974. Today, glyphosate products are among the world's most widely used

herbicides.[1]

29.     For nearly 40 years, consumers, farmers, and the public have used Roundup,

unaware of its carcinogenic properties.

## VI.     REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

30.     The manufacture, formulation and distribution of herbicides, such as Roundup,

are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C.

§ 136 et seq.  FIFRA requires that all pesticides be registered with the Environmental Protection

Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C.

136a(a).

31.     The EPA requires as part of the registration process, among other requirements,

a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other

potential nontarget organisms, and other adverse effects on the environment. Registration by the

EPA, however, is not an assurance or finding of safety. The determination the EPA makes in

registering or reregistering a product is not that the product is "safe," but rather that use of the

product in accordance with its label directions "will not generally cause unreasonable adverse

effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

32.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any

---

[1] *Backgrounder,* History of Monsanto's Glyphosate Herbicides, June 2005.

COMPLAINT
PAGE 6

Corrie Yackulic Law Firm PLLC
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

33.     The EPA and the State of Washington registered Roundup for distribution, sale, and manufacture in the United States, including the State of Washington.

34.     FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

35.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of reevaluating all pesticide products through a Congressionally mandated process called "reregistration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

36.     In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment in relation to the registration process no later than July 2015. The EPA completed its review of glyphosate in early 2015 but delayed releasing the assessment pending further review in light of the World Health Organization's March 24, 2015 finding that glyphosate is a "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

Corrie Yackulic Law Firm PLLC
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

## VII.   MONSANTO'S FALSE REPRESENTATIONS REGARDING THE SAFETY OF ROUNDUP

37.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations, the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

a)    Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences.

b)    And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c)    Roundup biodegrades into naturally occurring elements.

d)    Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e)    This nonresidual herbicide will not wash or leach in the soil. It... stays where you apply it.

f)    You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g)    Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h)    Glyphosate's safety margin is much greater than required. It has over a 1,000 fold safety margin in food and over a 700 fold safety margin for workers who manufacture it or use it.

i)    You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j)    "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his

COMPLAINT
PAGE 8

Corrie Yackulic Law Firm PLLC
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

1    head in the ground and a pet dog standing in an area which has
2    been treated with Roundup.[2]

3    38.    On November 19, 1996, Monsanto entered an Assurance of Discontinuance with

4    NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or

5    broadcasting any advertisements [in New York] that represent, directly or by implication" that:

6
7    a)    its glyphosate containing pesticide products or any component
         thereof are safe, non-toxic, harmless or free from risk;
8    b)    its glyphosate-containing pesticide products or any component
         thereof manufactured, formulated, distributed or sold by
9         Monsanto are biodegradable;
10   c)    its glyphosate-containing pesticide products or any component
         thereof stay where they are applied under all circumstances and
         will not move through the environment by any means;
11   d)    its glyphosate-containing pesticide products or any component
         thereof are "good" for the environment or are "known for their
12         environmental characteristics;"
13   e)    glyphosate-containing pesticide products or any component
         thereof are safer or less toxic than common consumer products
14         other than herbicides; and
15   f)    its glyphosate-containing products or any component thereof
         might be classified as "practically non-toxic".

16   39.    Monsanto did not alter its advertising in the same manner in any state other than
17
18   New York, and on information and belief still has not done so as of today.

19   40.    In 2009, France's highest court ruled that Monsanto had not told the truth about
20   the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely

21   advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[3]

22

23

24   [2] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance
     Pursuant to Executive Law § 63 (15) (Nov. 1996).

25   [3] *Monsanto Guilty in "False Ad" Row*, BBC, Oct 15, 2009, *available at*
26   http://news.bbc.co.uk/2/hi/europe/8308903.stm

27   COMPLAINT
     PAGE 9

**Corrie Yackulic Law Firm PLLC**
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

## VIII.  **EVIDENCE OF CARCINOGENICITY IN ROUNDUP**

41.     As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties.

42.     On March 4, 1985, a group of the EPA's Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[4]

43.     Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

44.     In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.[5]

45.     In October 1991, the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.[6]

46.     In addition to the toxicity of the active molecule, many studies support  the hypothesis that glyphosate formulations found in Defendant's Roundup products are more

---

[4] Consensus Review of Glyphosate, Casewell No. 661A, March 4, 1985.  United States Environmental Protection Agency.

[5] http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheet/0178fact.pdf

[6] Second Peer Review of Glyphosate, CAS No. 1071-83-6.  October 30, 1881, United State Environmental Protection Agency.

COMPLAINT
PAGE 10

**Corrie Yackulic Law Firm PLLC**
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

1   dangerous and toxic than glyphosate alone.[7] As early as 1991 evidence existed demonstrating

2   that glyphosate formulations were significantly more toxic than glyphosate alone.[8]

3

4   47.    In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell

5   Division Dysfunction at the Level of CDKl/Cyclin B Activation."

6   48.    The study found that Monsanto's Roundup caused delays in the cell cycles of sea

7   urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter

8   cell cycles.

9   49.    In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides

10  affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based

11  products and cell cycle dysregulation.

12

13  50.    The study noted that "cell-cycle dysregulation is a hallmark of tumor  cells and

14  human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent

15  development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such

16  as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose

17  of glyphosate affecting cells."[9]

18  51.    In 2005, Francisco Peixoto published a study showing that Roundup's effects  on

19
    rat liver mitochondria are much more toxic and harmful than the same concentrations of
20
    glyphosate alone.
21

22  52.    The  Peixoto  study  suggested  that  the  harmful  effects  of  Roundup  on

23

24  _____

    [7] Martinez et al. 2007; Benachour 2009; Gasnier et al. 2010; Pexoto 2005; Marc 2004

25  [8] Martinez et al. 1991.

26  [9] Molinari, 2000; Stewart et al., 2003).

27  COMPLAINT
    PAGE 11

Corrie Yackulic Law Firm PLLC
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

53. In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

54. The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

55. The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendant.

56. Defendant knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff RANDOLPH J. MERCHANT from Roundup.

57. Defendant knew or should have known that tests, limited to Roundup's active ingredient glyphosate, were insufficient to prove the safety of Roundup.

58. Defendant failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup.

COMPLAINT
PAGE 12

Corrie Yackulic Law Firm PLLC
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

59.     Rather than performing appropriate tests, Defendant relied upon flawed industry-supported studies designed to protect Defendant's economic interests rather than Plaintiff RANDOLPH J. MERCHANT and the consuming public.

60.     Despite its knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup as safe.

## IX.     IARC CLASSIFICATION OF GLYPHOSATE

61.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency tasked by the World Health Organization ("WHO") with conducting and coordinating research into the causes of cancer.

62.     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015-2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

63.     IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

64.     On March 24, 2015, after its cumulative review of human, animal, and DNA

COMPLAINT
PAGE 13

Corrie Yackulic Law Firm PLLC
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

studies for more than one (1) year, many of which have been in Defendant's possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Defendant's Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

65.     The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A probable carcinogen to humans. According to the authors glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

66.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma (''NHL'') and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

67.     The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

## X.     EARLIER EVIDENCE OF GLYPHOSATE'S DANGER

68.     Despite the new classification by the IARC, Defendant has had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

69.     Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

70.     In 1997, Chris Clements published "Genotoxicity of select herbicides in Rana catesbeiana tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

71.     The study found that tadpoles exposed to Roundup showed significant DNA

COMPLAINT
PAGE 14

Corrie Yackulic Law Firm PLLC
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

damage when compared with unexposed control animals.

72.     Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

73.     Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

74.     The IARC Monograph notes that"[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

75.     In 2006 Cesar Paz-y-Mifio published a study examining DNA damage in human subjects exposed to glyphosate.

76.     The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

77.     The IARC Monograph reflects the volume of evidence of glyphosate pesticides', genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

78.     Despite knowledge to the contrary, Defendant maintains that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts agree that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

79.     In addition to glyphosate and Roundup's genotoxic properties, Defendant has long been aware of glyphosate's carcinogenic properties.

80.     Glyphosate and Roundup in particular, have long been associated with

COMPLAINT
PAGE 15

Corrie Yackulic Law Firm PLLC
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma ("NHL"), Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

81.    Defendant has known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

82.    In 1985, the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

83.    In 2003, Lennart Hardell and Mikael Eriksson published the results of two case-controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

84.    The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studies with an increased odds ratio of 3.11.

85.    In 2003, AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

86.    The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

87.    In 2008, Mikael Eriksson published a population-based case-control study of exposure to various pesticides as a risk factor for NHL.

88.    This strengthened previous associations between glyphosate and NHL.

89.    In spite of this knowledge, Defendant continued to issue broad and sweeping statements that Roundup was, and is, safer than ordinary household items such as table salt,

COMPLAINT
PAGE 16

Corrie Yackulic Law Firm PLLC
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

90.     Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiff, the agricultural community, and the public at large to purchase and increase the use of Defendant's Roundup for Defendant's pecuniary gain, and in fact, did induce Plaintiff RANDOLPH J. MERCHANT to use Roundup.

91.     Defendant made these statements maliciously and with complete disregard and reckless indifference to the safety of Plaintiff RANDOLPH J. MERCHANT and the general public.

92.     Notwithstanding Defendant's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

93.     Defendant knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

94.     Defendant failed to appropriately and adequately inform and warn Plaintiff of these dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

95.     Despite the IARC's classification of glyphosate as a class 2A probable

Corrie Yackulic Law Firm PLLC
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

carcinogen, Defendant continues to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non- genotoxic; and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

96.     Defendant claimed and continues to claim that Roundup is safe, non-carcinogenic, and non-genotoxic. These misrepresentations are consistent with Defendant's cavalier approach to investigating and ensuring the safety of its products, the safety of the public at large, and the safety of Plaintiff.

## XI.     SCIENTIFIC FRAUD UNDERLYING CERTAIN SAFETY DETERMINATIONS OF GLYPHOSATE

97.     After the EPA's 1985 classification of glyphosate as possibly carcinogenic to humans (Group C), Monsanto exerted pressure upon the EPA to change its classification.

98.     This culminated in the EPA's reclassification of glyphosate to Group E, which was based upon evidence of non-carcinogenicity in humans.

99.     In so classifying, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

100.     On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed scientific fraud.

101.     In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup. IBT performed approximately 30 tests on glyphosate and glyphosate-containing products, including 11 of the 19

COMPLAINT
PAGE 18

Corrie Yackulic Law Firm PLLC
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

1   chronic toxicology studies needed to register Roundup with the EPA.

2      102.    In 1976, the Food and Drug Administration ("FDA") performed an inspection of

3

4   IBT and discovered discrepancies between the raw data and the final report relating to

5   toxicological impacts of glyphosate. The EPA subsequently audited IBT and determined that the

6   toxicology studies conducted for Roundup were invalid. An EPA reviewer stated, after finding

7   "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the

8   studies when they said they took specimens of the uterus from male rabbits."

9      103.    Three top executives of IBT were convicted of fraud in 1983.

10

11      104.    In the second incident, Monsanto hired Craven Laboratories ("Craven") in 1990

to perform pesticide and herbicide studies, including several studies on Roundup.

12

13      105.    In March of 1991, the EPA announced that it was investigating Craven for

14   "allegedly falsifying test data used by chemical firms to win EPA approval of pesticides."

15      106.    The investigation lead to the indictments of the laboratory owner and a handful

16   of employees.

17   **XII.   MONSANTO'S CONTINUING DISREGARD FOR THE SAFETY OF
18             PLAINTIFF AND THE PUBLIC**

19      107.    Monsanto claims on its website that "[r]egulatory authorities and independent

20   experts around the world have reviewed numerous long term/carcinogenicity and genotoxicity

21   studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand

22   herbicides and other glyphosate based herbicides, causes cancer, even at very high doses, and

23   that it is not genotoxic."[10]

24

25   _____

26   [10] Backgrounder-Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9 2015).

27   COMPLAINT
     PAGE 19

                                                    **Corrie Yackulic Law Firm PLLC**
                                                    110 Prefontaine Place South, Ste. 304
                                                    Seattle, Washington 98104
                                                    Tel. 206.787.1915
                                                    Fax. 206.299.9725

1    108.    Ironically, the primary source for this statement is a 1986 report by the WHO, the

2    same organization that now considers glyphosate to be a probable carcinogen.

3
     109.    Glyphosate, and Defendant's Roundup products in particular, has long been
4
5    associated with serious side effects and many regulatory agencies around the globe have banned

6    or are currently banning the use of glyphosate herbicide products.

7    110.    Defendant's statements proclaiming the safety of Roundup and disregarding its

8    dangers misled Plaintiff RANDOLPH J. MERCHANT.

9    111.    Despite Defendant's knowledge that Roundup was associated with an elevated

10
     risk of developing cancer, Defendant's promotional campaigns focused on Roundup's purported
11
     "safety profile."
12

13   112.    Defendant's failure to adequately warn Plaintiff RANDOLPH J. MERCHANT

14   resulted in (1) Plaintiff using and being exposed to glyphosate and Roundup instead of using

15   another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists

16   and physicians failing to warn and instruct consumers about the risk of cancer, including NHL,

17   and other injuries associated with Roundup.

18
     113.    Defendant failed to seek modification of the labeling of Roundup to include
19
     relevant information regarding the risks and dangers associated with Roundup exposure.
20

21   114.    The failure of Defendant to appropriately warn and inform the EPA has resulted

22   in inadequate warnings in safety information presented directly to users and consumers.

23   115.    The failure of Defendant to appropriately warn and inform the EPA has resulted

24   in the absence of warning or caution statements that are adequate to protect health and the

25   environment.

26

27   COMPLAINT
     PAGE 20

Corrie Yackulic Law Firm PLLC
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

116.    The failure of Defendant to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

117.    By reason of the foregoing acts and omissions, Plaintiff RANDOLPH J. MERCHANT seeks compensatory damages as a result of his use of, and exposure to, Roundup which caused or was a substantial contributing factor in causing Plaintiff to suffer from cancer, specifically NHL, and Plaintiff suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

118.    By reason of the foregoing acts and omissions, Plaintiff has sustained severe and permanent injuries and losses.

119.    By reason of the foregoing acts and omissions, Plaintiff has endured and, in some categories, continue to suffer emotional and mental anguish, medical expenses, and other economic and non-economic damages as a result of the actions and inactions of the Defendant.

## XIII.   PLAINTIFF'S EXPOSURE TO ROUNDUP

120.    Plaintiff RANDOLPH J. MERCHANT used Roundup for approximately 44 years from approximately 1974 doing yard maintenance and landscaping for neighbors and family, and then since 1993 on his own large property, including a garden from which he sold plants and vegetables. From 2013 to 2017 he also used Roundup at Snyder Petroleum, where he worked as a ground maintenance technician.

121.    For years, Plaintiff applied Roundup on a regular basis. Plaintiff followed all safety and precautionary warnings during the course of his use.

122.    Plaintiff was diagnosed with non-Hodgkin's lymphoma, specifically diffuse large B-cell lymphoma in September, 2018. Plaintiff's non-Hodgkin's Lymphoma was proximately

COMPLAINT
PAGE 21

Corrie Yackulic Law Firm PLLC
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

and actually caused by his exposure to Defendant's Roundup products.

123.    As a result of his illness, Plaintiff RANDOLPH J. MERCHANT has incurred significant economic and non-economic damages.

## XIV.   FIRST CAUSE OF ACTION
## WASHINGTON PRODUCT LIABILITY ACT

124.    Plaintiff incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

125.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products.

126.    At all times relevant to this litigation, Defendant designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup products used by Plaintiff as described above.

127.    At all times relevant to this litigation, Defendant's Roundup products were expected to reach and did reach the intended consumers, handlers, and users or other persons coming into contact with these products in Washington and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

128.    In violation of the Washington Products Liability Act ("WPLA"), RCW 7.72, et seq., at all times relevant to this action, at the time Defendant's Roundup products left control of Defendant, they were defective and not reasonably safe. These defects include, but are not limited to, the following:

a)    Defendant is strictly liable for Plaintiff's injuries and damages

COMPLAINT
PAGE 22

**Corrie Yackulic Law Firm PLLC**
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

because at the time of manufacture, and at the time Defendant's Roundup products left control of Defendant, the likelihood that Roundup products would cause injury or damage similar to that suffered by Plaintiff, and the seriousness of such injury or damage had been known by Defendant and outweighed the burden on Defendant to design a product that would have prevented Plaintiff's injuries and damages and outweighed the adverse effect that an alternative design that was practical and feasible would have on the usefulness of the subject product.

b)     Defendant's Roundup products were unsafe to an extent beyond that which would be contemplated by an ordinary consumer, in one or more of the following particulars: exposure to Roundup and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries, making Roundup not reasonably safe when used in the way it is ordinarily used and is dangerous to an extent beyond that which would be contemplated by the ordinary consumer.

c)     The Roundup products manufactured and/or supplied by Defendant were defective in design in that, an alternative design and/or formulation exists that would prevent severe and permanent injury. Indeed, at the time that Defendant designed their Roundup products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

d)     The Roundup products were not reasonably safe in design under the WPLA.

e)     The Roundup products manufactured and/or supplied by Defendant were not reasonably safe because Defendant did not provide an adequate warning or instruction about the product. At the time the Roundup products left Defendant's control, they possessed dangerous characteristics and Defendant failed to use reasonable care to provide an adequate warning of such characteristics and their danger to users and handlers of the product. The Roundup products are not safe and cause severe and permanent injuries. The Roundup products were not reasonably safe because the warning was inadequate, and Defendant could have provided adequate warnings or instructions.

f)     The Roundup products manufactured and/or supplied by Defendant were not reasonably safe because adequate warnings or manufacturer instructions were not provided after the Roundup products were manufactured and when Defendant learned of, or should have learned of, the dangers connected with

Corrie Yackulic Law Firm PLLC
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

the Roundup products.

g)    The Roundup products manufactured and/or supplied by
Defendant was not reasonably safe because they did not conform
to an express warranty made by Defendant regarding the
product's safety and fitness for use. Defendant expressly
warranted that the Roundup products were safe and fit for their
intended purposes, that they were of merchantable quality, that
they did not produce any dangerous side effects, that they were
adequately tested, and that their Roundup products were safe to
human health and the environment, and effective, fit, and proper
for their intended use. Defendant did not disclose the material
risks that its Roundup products could cause severe and
permanent injury. Defendant's express warranty regarding the
Roundup products induced Plaintiff to use the products, and
Plaintiff's damages were proximately caused because
Defendant's express warranty was untrue. The Roundup
products were not reasonably safe because of nonconformity to
express warranty under the WPLA.

129.    As a direct and proximate result of Defendant placing its defective Roundup

products into the stream of commerce, Plaintiff RANDOLPH J. MERCHANT suffered grave

injuries, and endured physical and emotional pain and discomfort, as well as economic hardship,

including considerable financial expenses for medical care and treatment, along with other

damages further discussed in herein.

## XV.    SECOND CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTIES

130.    Plaintiff hereby incorporates by reference the allegations of this Complaint

contained in each of the preceding paragraphs as if fully stated herein.

131.    At all times relevant to this litigation, Defendant engaged in the business of

testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its

Roundup products, which are defective and unreasonably dangerous to consumers, including

Plaintiff, thereby placing Roundup products into the stream of commerce. These actions were

COMPLAINT
PAGE 24

Corrie Yackulic Law Firm PLLC
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

1

under the ultimate control and supervision of Defendant.

2

3

4

5

6

132.    Before the time that Plaintiff was exposed to the use of the aforementioned Roundup products, Defendant impliedly warranted to its consumers—including Plaintiff—that its Roundup products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as agricultural and horticultural herbicides.

7

8

9

133.    Defendant, however, failed to disclose that Roundup has dangerous propensities when used as intended and that the use of and/or exposure to Roundup and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

10

11

12

13

134.    Upon information and belief, Plaintiff reasonably relied upon the skill, superior knowledge and judgment of Defendant and upon its implied warranties that the Roundup products were of merchantable quality and fit for their intended purpose or use.

14

15

135.    Upon information and belief, Plaintiff RANDOLPH J. MERCHANT was at all relevant times in privity with Defendant.

16

17

18

19

136.    Plaintiff is the intended third-party beneficiary of implied warranties made by Defendant to the purchasers of their agricultural and horticultural herbicides and as such he is entitled to assert this claim.

20

21

22

137.    The Roundup products were expected to reach and did in fact reach consumers and users, including Plaintiff RANDOLPH J. MERCHANT, without substantial change in the condition in which they were manufactured and sold by Defendant

23

24

25

26

138.    At all times relevant to this litigation, Defendant was aware that consumers and users of its products, including Plaintiff RANDOLPH J. MERCHANT, would use Roundup products as marketed by Defendant, which is to say that Plaintiff was a foreseeable user of

27

COMPLAINT
PAGE 25

**Corrie Yackulic Law Firm PLLC**
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

1

Roundup.

2

139.    Defendant intended that its Roundup products be used in the manner in which

3

Plaintiff in fact used them and Defendant impliedly warranted each product to be merchantable

4

5    quality, safe, and fit for this use, despite the fact that Roundup was not adequately tested or

6    researched.

7

140.    In reliance upon Defendant's implied warranty, Plaintiff  used Roundup as

8    instructed and labeled and in the foreseeable manner intended, recommended, promoted, and

9    marketed by Defendant.

10

141.    Plaintiff RANDOLPH J. MERCHANT could not have reasonably discovered or

11

known of the risks of serious injury associated with Roundup or glyphosate.

12

13    142.    Defendant breached its implied warranty to Plaintiff RANDOLPH J.

14    MERCHANT in that its Roundup products were not of merchantable quality, safe, or fit for their

15    intended use, or adequately tested. Roundup has dangerous propensities when used as intended

16    and can cause serious injuries, including those injuries complained of herein.

17

143.    The harm caused by Defendant's Roundup products far outweighed their benefit,

18

rendering the products more dangerous than an ordinary consumer or user would expect and more

19

dangerous than alternative products.

20

21    144.    As a direct and proximate result of Defendant's placing its defective Roundup

22    products into the stream of commerce, Plaintiff suffered injuries, and endured physical pain and

23    discomfort, as well as economic hardship, including considerable financial expenses for medical

24    care and treatment, along with other damages further discussed herein.

25

## XVI.  THIRD CAUSE OF ACTION
## VIOLATION OF WASHINGTON CONSUMER PROTECTION ACT

26

27    COMPLAINT
PAGE 26

**Corrie Yackulic Law Firm PLLC**
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

145.   Plaintiff hereby incorporates by reference the allegations of this Complaint contained in each of the preceding paragraphs as if fully stated herein.

146.   Defendant violated the Washington Consumer Protection Act ("CPA").

147.   Defendant engaged in unfair or deceptive acts or practices including, but not limited to, the following:

a)   engaging in acts and practices by willfully failing and refusing to timely report information that reasonably suggested Roundup, like that used by Plaintiff, may cause or contribute to cause cancer and other serious illnesses;

b)   representing knowingly or with reason to know that Roundup has approval, characteristics, uses, or benefits that it does not have;

c)   representing knowingly or with reason to know that Roundup is of a particular standard, quality, or grade when it differs materially from that representation; and/or

d)   representing knowingly or with reason to know that Roundup has uses, benefits, or characteristics that have been otherwise proven incorrect;

148.   Defendant's unfair and deceptive acts or practices described above were committed in the course of Defendant's trade or commerce.

149.   Defendant's unfair and deceptive acts or practices described above affected public interest.

150.   Defendant's violation of the Washington CPA, whether individually or in combination, caused Plaintiff's injuries and damages set forth herein.

## XVII. FOURTH CAUSE OF ACTION
## PUNITIVE DAMAGES

151.   Plaintiff incorporates herein by reference, as though fully set forth at length, each and every allegation and statement contained in the foregoing paragraphs.

152.   Defendant is liable for punitive and/or exemplary damages under choice of law

COMPLAINT
PAGE 27

Corrie Yackulic Law Firm PLLC
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

principles. Defendant acted with willful disregard of the rights of the Plaintiff and the public.

Defendant's conduct was outrageous and reckless toward the safety of the Plaintiff and the public.

## XVIII.    DAMAGES

153.    Plaintiff incorporates herein by reference, as though fully set forth at length, each and every allegation and statement contained in the foregoing paragraphs.

154.    As a direct and proximate result of Defendant's tortious conduct and breach of duties as set forth herein, Plaintiff is entitled to be compensated for his damages.

155.    Plaintiff further reserves and hereby claims all other rights and remedies arising from his injuries and losses.

156.    Plaintiff's damages are in an amount which will be proved at trial.

## XIX.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendant on each of the above-referenced claims and causes of action and as follows:

1.    Awarding Plaintiff compensatory non-economic damages in excess of the jurisdictional amount, including, but not limited to past and future pain, suffering, emotional distress, disability, loss of enjoyment of life and other non-economic damages and losses;

2.    Awarding Plaintiff his economic damages and losses, including without limitation past and future medical expenses, out of pocket expenses, lost earnings and lost earning capacity, lost household services, and other economic damages in an amount to be determined at trial;

3.    Awarding punitive damages;

COMPLAINT
PAGE 28

Corrie Yackulic Law Firm PLLC
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

4.   Awarding pre-judgment interest;

5.   Awarding post-judgment interest;

6.   Awarding Plaintiff reasonable attorneys' fees;

7.   Awarding Plaintiff the costs of these proceedings;

8.   Treble damages in the maximum amounts permitted by RCW 19.86.090; and

9.   Such other and further relief as this Court deems just and proper.

## XX.   **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial by jury as to all issues.

DATED this 22nd day of May, 2019.          CORRIE YACKULIC LAW FIRM, PLLC

*/s/ Corrie J. Yackulic*
Corrie J. Yackulic, WSBA No. 16063
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725
Corrie@cjylaw.com

*Attorney for Plaintiff*

COMPLAINT
PAGE 29