# U.S. District Court
# Eastern District of Louisiana (New Orleans)
# CIVIL DOCKET FOR CASE #: 2:19-cv-02087-SSV-JCW

Wollfarth v. Monsanto Company
Assigned to: Judge Sarah S. Vance
Referred to: Magistrate Judge Joseph C. Wilkinson, Jr
Cause: 28:1332 Diversity-Product Liability

Date Filed: 03/06/2019
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod.
Liability
Jurisdiction: Diversity

**Plaintiff**

**Mark Wollfarth**

represented by **C. Mark Whitehead , III**
Whitehead Law Firm
3639 Ambassador Caffery Pkwy
Suite 303
Lafayette, LA 70503
337-740-6006
Email: cmw@whiteheadfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 03/06/2019 | 1 | COMPLAINT with jury demand against Monsanto Company (Filing fee $ 400 receipt number 053L-7460839) filed by Mark Wollfarth. (Attachments: # 1 Civil Cover Sheet, # 2 Summons)Attorney C. Mark Whitehead, III added to party Mark Wollfarth(pty:pla). (Whitehead, C.) (Attachment 1 replaced on 3/7/2019) (am). Modified text on 3/7/2019 (am). (Entered: 03/06/2019) |
| 03/06/2019 | 2 | Initial Case Assignment to Judge Sarah S. Vance and Magistrate Judge Joseph C. Wilkinson, Jr. (cc) (Entered: 03/06/2019) |
| 03/07/2019 | 3 | Summons Issued as to Monsanto Company. (am) (Entered: 03/07/2019) |
| 03/07/2019 | 4 | Correction of Docket Entry by Clerk re 1 Complaint>**Filing attorney did not properly format the pdf of Civil Cover Sheet. The pdf should not have the purple fillable boxes nor the 3 red buttons at the bottom. When using a FORM, fill in the applicable fields then click the red PRINT button at the bottom to print the document to pdf format. Clerk took corrective action.** (am) (Entered: 03/07/2019) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 06/03/2019 11:09:50 | | | |
| PACER | hllp1982:2634105:4722683 | Client | 1417.0049 |

| Login: | | Code: | |
|---|---|---|---|
| Description: | Docket Report | Search Criteria: | 2:19-cv-02087-SSV-JCW |
| Billable Pages: | 1 | Cost: | 0.10 |

## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF LOUISIANA

MARK WOLLFARTH,

                    Plaintiff,

        v.

MONSANTO COMPANY,

                    Defendant

Case No. 2:19-cv-2087

COMPLAINT

DEMAND FOR JURY TRIAL

## INTRODUCTION

1.      In 1970, the Monsanto Company discovered the herbicidal properties of glyphosate and began using it in its products by 1974, marketing it under the brand name herbicide Roundup.  Roundup is a non-selective herbicide used to kill weeds  By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 million pounds used annually. That number grew to 185 million pounds by 2007.

2       Mark Wollfarth used the weed killer Roundup, an herbicide created and manufactured by the Monsanto Company, on his property from 1997 through 2017   Roundup was supposed to be safe; after all, Monsanto promoted Roundup as being harmless to humans for over thirty years.  In truth, the active chemical in Roundup—glyphosate—is a carcinogen, and Monsanto has known this fact for decades.

3       In March of 2017, Mr  Wollfarth underwent a biopsy and was diagnosed with non-Hodgkin lymphoma ("NHL")

4       The International Agency for Research on Cancer (IARC), an organization within the World Health Organization (WHO), conducted an exhaustive analysis on the toxicity of glyphosate  The IARC, which has already reviewed hundreds of other chemical agents, convened a panel of seventeen renowned scientists from eleven countries, specifically screened to avoid potential conflicts of interest, to conduct a systematic review of all publicly available information about glyphosate  The year-long study resulted in the publication of an IARC Monograph—the authoritative standard for

2

cancer hazard assessment around the world  The IARC classified glyphosate as a Group 2A hazard, meaning it is a probable human carcinogen— the second highest hazard rating  Additionally, the IARC concluded there was a positive association between glyphosate exposure and non-Hodgkin lymphoma

5.      Monsanto has represented Roundup as being safe to humans and the environment since it began selling the herbicide. Monsanto has proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup, create no unreasonable risks to human health or to the environment. This is untrue  Before glyphosate was first approved by the Environmental Protection Agency (EPA), Monsanto knew that glyphosate could pose significant risks to human health, including a risk of causing cancer

This lawsuit seeks to hold Monsanto accountable for this misconduct.

## PARTIES

6.      Plaintiff Mark Wollfarth is a citizen of the State of Louisiana and resides in Folsom, Louisiana in St  Tammany Parish.

7.      Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri  Monsanto is a citizen of Missouri and Delaware and is not a citizen of Louisiana. At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and was the manufacturer of the Roundup at issue

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 28 U S.C. § 1332. There is complete diversity of citizenship between the parties  In addition, Plaintiff seeks damages in excess of $75,000, exclusive of interest and costs.

9      This Court has personal jurisdiction over Monsanto insofar as Monsanto is authorized and licensed to conduct business in the State of Louisiana, maintains and carries on systematic and continuous contacts in this judicial district, regularly transacts business within this judicial district, and regularly avails itself of the benefits of this judicial district.

10.     Additionally, Monsanto caused tortious injury by acts and omissions in this judicial district and caused tortious injury in this district by acts and omissions outside this district while regularly doing and soliciting business, engaging in a persistent course of conduct, and deriving substantial revenue from goods used or consumed and services rendered in this judicial district.

11      Venue is proper before this Court pursuant to 28 U.S.C § 1391 because a substantial part of the events or omissions giving rise to this claim occurred within this judicial district.

## FACTUAL ALLEGATIONS

12.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world, including the popular herbicide Roundup.

13      Glyphosate interferes with a plant's ability to form aromatic amino acids necessary for protein synthesis. Plants treated with glyphosate generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce, or by milling, baking, or brewing grains

14      The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup

15      For about 40 years, farmers and the general population around the world have used Roundup containing glyphosate, without knowing of the dangers its use poses. That is because, when Monsanto first introduced Roundup, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment History, however, has

4

demonstrated otherwise  According to the WHO, the main chemical ingredient of Roundup—glyphosate—is a probable carcinogen

16      Monsanto assured the public that Roundup was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies exposing glyphosate's dangers Monsanto orchestrated a prolonged campaign of misinformation to convince government agencies, farmers, and the general population that Roundup was safe  As a result of this deception the general public has been exposed to a carcinogen, while Monsanto has made billions.

### I. Registration of Herbicides

17.      The manufacture, formulation, and distribution of herbicides, such as Roundup, is regulated under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U S C. §§ 136 *et seq*  FIFRA requires that all pesticides be registered with the EPA prior to distribution, sale, or use, except as described by the Act  7 U.S C  § 136a(a)

18.      Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non- target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The EPA does not deem certain products "safe," but only that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U S C. § 136a(c)(5)(D)

19.      FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide " 7 U.S.C. § 136(bb)  FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

20.      FIFRA generally requires that the registrant, Monsanto in the case of Roundup, conduct the health and safety testing of pesticide products  The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting those tests.

The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, to perform the tests that are required of the manufacturer.

21    The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a congressionally-mandated process called "re-registration." 7 U S C § 136a-1  In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation

22.    In the case of glyphosate, the EPA planned on releasing its preliminary risk assessment— in relation to the re-registration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

23    In April 2016, the EPA posted a risk assessment of glyphosate on its website and then immediately retracted it. The EPA subsequently indicated that the posting was inadvertent, that the document posted was not the EPA's final assessment or even a preliminary one, and that the EPA intended to issue a final report by the end of 2016

## II. Scientific Fraud Underlying the Marketing and Sale of Roundup

24.    Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991  In so classifying glyphosate, however, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

25.    On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed fraud.

26    In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to

perform and evaluate pesticide toxicology studies relating to Roundup  IBT performed approximately 30 tests on glyphosate and glyphosate-containing-products, including 9 of the 15 residue studies needed to register Roundup with the EPA. The EPA subsequently audited IBT and determined that the toxicology studies conducted for Roundup were invalid

27.     Three top executives of IBT were convicted of fraud in 1983

28.     In the second incident, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including several studies on Roundup. That same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides

### III. Monsanto Falsely Advertised Roundup as Being Safe for Decades

29     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products  Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are:

    a   "Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences."

    b   "And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem."

    c.  "Roundup biodegrades into naturally occurring elements "

    d.  "Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

    e.  "This non-residual herbicide will not wash or leach in the soil  It  .  stays where you apply it "

    f   You can apply Roundup with "confidence because it will stay where you put it," it bonds tightly to soil particles, preventing leaching  Then, soon after application, soil microorganisms biodegrade Roundup into natural products.

    g   "Glyphosate is less toxic to rats than table salt following acute oral ingestion "

    h   "Glyphosate's safety margin is much greater than required  It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

    i.   "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish "

    j.   "Roundup can be used where kids and pets will play and breaks down into natural material " This ad depicts a person with his head in the ground and a pet dog standing in an area that has been treated with Roundup.

30.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

    a.   glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

    b.   glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;

    c.   glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means,

    d   glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics";

    e.   glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and,

    f.   glyphosate-containing products or any component thereof might be classified as "practically non-toxic "

31     Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today

### IV. Assessments of Glyphosate and Roundup

32.     IARC was created in 1965 as the specialized cancer agency of the World Health Organization with support of the United States. IARC promotes international collaboration in cancer research, "bringing together skills in epidemiology, laboratory sciences, and biostatistics to identify the causes of cancer[ ]"

33.     IARC is transparent. The minutes and documents presented at its council meetings are publicly available and, thus, are subject to scientific scrutiny  Starting in 1971, IARC began assessing whether chemicals were carcinogenic through the Monograph program.

34     The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent  Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens), 73 agents to be Group 2A (Probable Human Carcinogens), 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified), and one agent to be Probably Not Carcinogenic

35     The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

36     A year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected, and the sections of the Monograph are developed by the Working Group members  One month prior to the Monograph meeting, the call for data is closed and the various draft sections are

distributed among Working Group members for review and comment  Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published

37      In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data, (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data  The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

38      In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

39      On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112  For Volume 112, the volume that assessed glyphosate, the Working Group consisted of 17 experts from 11 countries who met from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate  Among the members were Lauren Zeise, Ph.D., of the California Environmental Protection Agency, Matthew T. Martin, Ph.D , a scientist with the U S. Environmental Protection Agency, and Gloria D. Jahnke, D V.M., D.A.B.T. of the National Institute of Environmental Health Sciences.

40.     The March meeting culminated after a nearly one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

41.     The studies considered the various exposure groups, including occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland, municipal weed-control workers in the United Kingdom, and para-occupational exposure in farming families

42.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012

43.     Exposure pathways are identified as air (especially during spraying), water, and food Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food

44      The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies showed a human health concern from agricultural and other work-related exposure to glyphosate

45      The IARC Working Group conducted a systematic review of over 15 studies designed to assess whether there was an association between Roundup exposure in agricultural workers and non-Hodgkin lymphoma (NHL). The researchers reviewed each study, identified the results and assessed each study's strengths and weaknesses. The IARC Working Group concluded that, despite the limited evidence concerning the carcinogenicity of glyphosate in humans, a "positive association has been observed for non-Hodgkin lymphoma."

46      Overall, nine epidemiological studies showed positive associations between glyphosate and NHL, with several studies showing statistically significant relative risks of NHL exceeding 2 0 and even 3.0.

47.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma  A second study reported a positive trend for hemangiosarcoma in male mice Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

48      The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed  In assessing the genotoxicity of glyphosate (the property of chemical agents that damages the genetic information within

11

a cell causing mutations, which may lead to cancer), the IARC Working Group concluded "[t]here is strong evidence that glyphosate causes genotoxicity."

49.     Additionally, the IARC assessed whether glyphosate exposure can induce oxidative stress, which is thought to be involved in the development of numerous conditions, including cancer, autism, and Parkinson's disease. The IARC concluded that "strong evidence exists that glyphosate can induce oxidative stress." This could be an important mechanism by which Roundup causes cancer.

50.     In the IARC monograph for glyphosate, there is an entire section devoted to exposure to humans, looking at studies examining glyphosate exposures in various settings including agricultural ones. The IARC Working Group noted that glyphosate has been detected in urine of agricultural workers, indicating absorption. The IARC Working Group specifically evaluated farm workers in the United States, and found that, within the days following the application of Roundup to a crop, approximately 60% of farm workers tested positive for glyphosate in the urine. Additionally, the IARC Working Group noted that soil microbes degrade glyphosate to aminomethylphosphonic acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

51.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

52.     In addition to the IARC's assessment, in 2014, scientists published a systematic review and meta-analysis on the relationship between non-Hodgkin lymphoma and occupational exposure to agricultural pesticides, including glyphosate, in the International Journal of Environmental Research and Public Health. The study showed a statistically significant association between farm workers exposed to Roundup and non-Hodgkin lymphoma. The study confirmed two smaller studies from 2002 and 2008, published in the journal Leukemia & Lymphoma (2002) and the International Journal on

Cancer (2008), both of which also showed a statistically significant increase in non-Hodgkin lymphoma among agricultural workers exposed to glyphosate.

53     Recent studies, including a glyphosate residue study published in the Journal of Environmental & Analytical Toxicology in 2014, indicate that "chronically ill humans showed significantly higher glyphosate residues in urine than healthy population " Glyphosate has been detected in the blood and urine of agricultural workers, indicating that agricultural use of Roundup leads to its absorption.

54.     In addition to the studies examining glyphosate, research also suggests that the carcinogenic properties of Roundup are magnified by the addition of adjuvants in the Roundup formulation. Adjuvants are chemicals that are designed to modify or enhance the effects of other agents. Monsanto has been including adjuvants with glyphosate in its Roundup products, which are designed to increase the effectiveness of the herbicide. Studies show, however, that the addition of adjuvants also greatly increases the carcinogenic properties of Roundup. Notably, Monsanto has systematically tested glyphosate without the adjuvants and used those tests to lobby the EPA that Roundup is safe.

55.     Several countries around the world have instituted bans on the sale of Roundup and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup are more widely known.

56.     The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup, which takes effect by the end of 2015  In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated  "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are  Especially children are sensitive to toxic substances and should therefore not be exposed to it."

57.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

13

58    France banned the private sale of Roundup and glyphosate following the IARC assessment.

59    Bermuda banned both the private and commercial sale of glyphosate, including Roundup  The Bermuda government explained  "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended "

60.    The Sri Lankan government banned the private and commercial use of glyphosate out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

61    The government of Columbia announced a ban on using Roundup and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine in response to the IARC's assessment.

62    In November 2015, 96 prominent experts, including almost the whole IARC team, reiterated IARC's assessment that Roundup is probably a human carcinogen.

63    In late February 2016, another 14 scientists signed a consensus statement in the Environmental Health journal, saying regulatory estimates of tolerable exposure levels for glyphosate were based on outdated science

64.    In June 2016, the European Union refused to re-register glyphosate containing herbicides due to safety concerns and will, in all likelihood, begin recalling all glyphosate- containing products within the European Union  Indeed, in June 2016, the EU did not vote to extend the registration of glyphosate due to safety concerns. The fate of the product in Europe is now in question

**V. Plaintiff Mark Wollfarth's Exposure to Roundup**

65    Mr  Wollfarth first purchased Roundup in St  Tammany Parish, Louisiana in 1997  Mr. Wollfarth frequently used Roundup around his 8-acre property along the fence line and to manage weeds and regularly used Roundup on his property from 1997 through 2018.

66.    When Mr. Wollfarth purchased Roundup, he believed that it was not a carcinogen, and he specifically relied on the labeling and promotion of Roundup as being safe to humans in making his decision to purchase and use the product.

14

67.    Mr. Wollfarth sprayed Roundup, regularly spraying Roundup around trees, driveways, sidewalks, and buildings

68.    In March of 2017, Mr. Wollfarth underwent a biopsy and was diagnosed with non-Hodgkin lymphoma.

69.    Mr. Wollfarth underwent aggressive treatment for his cancer, including chemotherapy.

70.    Mr. Wollfarth did not learn of the link between Roundup exposure and non-Hodgkin Lymphoma until recently

## LIMITATION ON ALLEGATIONS

71.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

72.    The allegations in this pleading are made pursuant to Louisiana law. To the extent Louisiana law imposes a duty or obligation on Monsanto that exceeds those required by federal law, Plaintiff does not assert such claims

73.    As alleged in this pleading, in addition to violating Louisiana law, Monsanto violated U S C. § 136j and 40 C F.R § 156 10(a)(5) by distributing Roundup, which was misbranded pursuant to 7 U S.C § 136(g). Federal law specifically prohibits the distribution of a misbranded herbicide.

## COUNT I
### (Design Defect under LSA-RS 9:2800.56)

74.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

75.    Plaintiff brings this strict liability claim against Monsanto for defective design.

76.    At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, including the Plaintiff, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto. At all times relevant to this litigation, Monsanto designed, researched,

developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup products used by Plaintiff, as described above

77.     At all times relevant to this litigation, Monsanto's Roundup products were defectively designed by causing an increased risk of cancer and by containing additives that, when combined with glyphosate, significantly increased the risk of developing cancer

78     These design defects rendered Roundup unreasonably dangerous

79     The dangers posed by Roundup go beyond that which would be contemplated by the ordinary consumer with ordinary knowledge common to the community as to its characteristics.

80     Additionally, the benefits of the Roundup design are outweighed by the design's inherent risk of danger in causing cancer.

81     At all times relevant to this litigation, Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Louisiana and throughout the United States, including the Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto

82     At all times relevant to this action, Monsanto knew or had reason to know that its Roundup products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

83     Monsanto could have employed a safer alternative design to render Roundup safe or, in the alternative, provided proper instructions for use on how to limit the potential risk associated with Roundup's defective design. Monsanto's Roundup products were and are more dangerous than alternative products and Monsanto could have designed its Roundup products to make them less dangerous. Indeed, at the time Monsanto designed its Roundup products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable  Thus, at the time Roundup products left Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Monsanto's herbicides

84     Mr. Wollfarth was exposed to Monsanto's Roundup products in the course of his activity to care for his property as described above, without knowledge of Roundup's dangerous characteristics

85     At all times relevant to this litigation, Mr. Wollfarth used and/or was exposed to the use of Monsanto's Roundup products in an intended or reasonably foreseeable manner, *i e*, as home landscaper, without knowledge of Roundup's dangerous characteristics

86     The Plaintiff could not reasonably have discovered the defects and risks associated with Roundup or glyphosate-containing products before or at the time of exposure due to Monsanto's suppression of scientific information linking glyphosate to cancer

87.     The defects in Monsanto's Roundup products were substantial and contributing factors in causing Plaintiff's injuries, and, but for Monsanto's misconduct and omissions, Plaintiff would not have sustained his injuries.

88.     Monsanto's defective design of its Roundup products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup products, including Plaintiff herein

89.     Monsanto's conduct, as described above, was reckless  Monsanto risked the lives of consumers and users of its products, including Plaintiff's, with knowledge of the safety problems associated with Roundup and glyphosate-containing products, and suppressed this knowledge from the general public  Monsanto made conscious decisions not to redesign, warn or inform the unsuspecting public. Monsanto's reckless conduct warrants an award of punitive damages

90     As a direct and proximate result of Monsanto placing its defective Roundup products into the stream of commerce, Plaintiff was injured and has sustained pecuniary loss and general damages in a sum in excess of the jurisdictional minimum of this Court.

91.     WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper

## COUNT II
### (Inadequate Warning under LSA-RS 9:2800.57)

92.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein

93     Plaintiff brings this strict liability claim against Monsanto for failure to warn.

94     At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup and specifically, the active ingredient glyphosate  These actions were under the ultimate control and supervision of Monsanto.

95.     Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiff, and therefore had a duty to warn of the risks associated with the use of Roundup and glyphosate-containing products

96     At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure its Roundup products did not cause users and consumers to suffer from unreasonable and dangerous risks  Monsanto had a continuing duty to warn Plaintiff of the dangers associated with Roundup use and exposure  Monsanto, as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

97.     At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products  Such warnings could have been disclosed in circumstances not limited to the Roundup labeling

98      At all times relevant to this litigation, Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by Monsanto's herbicides, including Plaintiff.

99      Despite the fact that Monsanto knew or should have known that Roundup posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or scientifically knowable to Monsanto through appropriate research and testing by known methods, at the time it distributed, supplied or sold the product, and not known to end users and consumers, such as Plaintiff.

100      Monsanto knew or should have known that its products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers, i.e., the reasonably foreseeable users, of the risks of exposure to its products  Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup and glyphosate.

101.      At all times relevant to this litigation, Monsanto's Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Louisiana and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto

102.      Mark Wollfarth was exposed to Monsanto's Roundup products in the course of his activity in caring for his property, as described above, without knowledge of their dangerous characteristics.

103.      At all times relevant to this litigation, Mr. Wollfarth used and/or was exposed to the use of Roundup products while using them for their intended or reasonably foreseeable purposes, without knowledge of their dangerous characteristics

104.      Plaintiff could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products prior to or at the time of Mr  Wollfarth's exposure. Mr  Wollfarth relied

upon the skill, superior knowledge, and judgment of Monsanto to know about and disclose serious health risks associated with using the products.

105.    Monsanto knew or should have known that the minimal warnings disseminated with its Roundup products were inadequate, failed to communicate adequate information on the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications

106    This alleged failure to warn is not limited to the information contained on Roundup's labeling  Monsanto was able, in accord with federal law, to comply with Louisiana law by disclosing the known risks associated with Roundup through other non-labeling mediums, i.e , promotion, advertisements, public service announcements, and/or public information sources  Monsanto, however, did not disclose these known risks through any medium

107    To this day, Monsanto has failed to adequately and accurately warn of the risks of cancer associated with the use of and exposure to Roundup and its active ingredient glyphosate

108    As a result of their inadequate warnings, Monsanto's Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed by Monsanto, and used by Plaintiff in the course of caring for his property

109    Monsanto is liable to Plaintiff for injuries caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its products and the risks associated with the use of or exposure to Roundup and glyphosate.

110    Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup products, Mr  Wollfarth could have avoided the risk of developing injuries and could have obtained or used alternative herbicides

111.    As a direct and proximate result of Monsanto placing its defective Roundup products into the stream of commerce, Plaintiff sustained pecuniary loss and general damages in a sum in excess of the jurisdictional minimum of this Court.

112.    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper

## COUNT III
### (Breach of Express Warranty under LSA-RS 9:2800.58)

113    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

114.    Defendants expressly warranted that Roundup was safe and well accepted by consumers.

115    Roundup does not conform to these express representations, because Roundup is not safe and carries with it an increased risk of cancer by containing additives that, when combined with glyphosate, significantly increased the risk of developing cancer.

116    As a direct and proximate result of the breach of these warranties, Plaintiff suffered and will continue to suffer severe and permanent personal injuries, losses, and damages.

117.    Plaintiff relied on Defendants' express warranties  Furthermore, the express warranties represented by Defendants were a part of the basis for Mark Wollfarth's use of Roundup and he relied upon these warranties in deciding to use Roundup

118.    At the time of the making of express warranties, Defendants had knowledge of the purpose for which Roundup was to be used, and warranted same to be in all respects safe, effective, and proper for such use

119.    Defendants expressly represented to Plaintiff that Roundup was safe and fit for use for the purposes intended, that it was of merchantable quality, that it did not produce any dangerous side effects in excess of those risks associated with other herbicides, that the side effects it did produce were accurately reflected in the warnings, and that it was adequately tested and fit for its intended use

21

120.     Defendants knew or should have known that, in fact, their representations and warranties were false, misleading, and untrue in that Roundup was not safe and fit for the use intended, and, in fact, Roundup produced serious injuries to the users that were not accurately identified and represented by Defendants.

121.     As a result of the foregoing acts and omissions, Defendants caused Plaintiff to suffer serious and dangerous side effects, severe and personal injuries that are permanent and lasting in nature, and economic and non-economic damages, harms, and losses, including, but not limited to: past and future medical expenses; past and future loss of earnings, past and future loss and impairment of earning capacity, mental anguish, severe and debilitating emotional distress; increased risk of future harm; past, present, and future physical and mental pain, suffering, and discomfort; and past, present, and future loss and impairment of the quality and enjoyment of life

## COUNT IV
### (Breach of Warranty in Redhibition)

122.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein

123     Roundup contains a vice or defect which renders it useless or its use so inconvenient that consumers would not have purchased it had they known about the vice or defect.

124.     Pursuant to Louisiana Civil code article 2520, a seller warrants the buyer against redhibitory defects, or vices, in the thing sold. Roundup, which was sold and promoted by Defendants, possesses a redhibitory defect because it is unreasonably dangerous, as described above, which renders Roundup useless or so inconvenient that it must be presumed that Plaintiff, Mark Wollfarth, would not have bought Roundup had he known of the defects

125     Defendants were aware of the substantial risks of associated with Roundup but failed to fully disclose those risks to Plaintiff.

126.    In accordance with Louisiana Civil Code article 2545, Defendants, as the manufacturers, distributors and sellers of Roundup, are deemed to be aware of its redhibitory defects

127    Had Plaintiff been made aware of the defects contained in Roundup, he would not have purchased Roundup  This characteristic rendered Roundup unfit for its intended purposes.

128.    Defendants are liable to Plaintiff under the theory of redhibition as a consequence of the sale to Plaintiff of a product unfit for its intended use.

129.    Plaintiff is entitled to the return of purchase price paid for Roundup, including, but not limited to, purchase price, interest on these amounts from the date of purchase, attorneys' fees and costs, pecuniary and non-pecuniary damages, as well as any other legal and equitable relief to which Plaintiff may be entitled

130.    As a result of the aforementioned breach of obligation by Defendants, Plaintiff, Mark Wollfarth, suffered and continues to suffer from the following items of damage, all past, present, and future, for which he is entitled to be compensated by Defendants, *in solido*, in an amount which is just and reasonable:

    a.    Medical and related expenses,

    b.    Physical injury and disability;

    c.    Physical pain and suffering,

    d    Mental anguish and distress,

    e.    Loss of earnings;

    f    Impairment to earning capacity,

    g.    Loss of enjoyment of life, and

    h.    Other items of damage which may be shown through discovery or at trial.

131.    By reason of the foregoing, Plaintiff demands judgment against each Defendant, individually, jointly and severally for compensatory damages in a sum in excess of $75,000.00, together with interest, costs of suit, and all such other and further relief as the Court deems proper

## COUNT V
### Negligence

132.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein

133.    Monsanto, directly or indirectly, caused Roundup products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

134.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

135.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup products  Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup, and, in particular, its active ingredient glyphosate.

136.    At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup and specifically, the carcinogenic properties of the chemical glyphosate

137.    Accordingly, at all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup products could cause or be associated with Plaintiff's injuries, and thus, created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff

138.    Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup and glyphosate-containing products.

24

139    As such, Monsanto breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup products, in that Monsanto manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

140    Monsanto was negligent in its promotion of Roundup, outside of the labeling context, by failing to disclose material risk information as part of its promotion and marketing of Roundup, including the Internet, television, print advertisements, etc. Nothing prevented Monsanto from being honest in its promotional activities, and in fact, Monsanto had a duty to disclose the truth about the risks associated with Roundup in its promotional efforts, outside of the of the context of labeling

141.    Monsanto its ability and means to investigate, study, and test its products and to provide adequate warnings, Monsanto has failed to do so  Indeed, Monsanto has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup and glyphosate

142.    Monsanto's negligence included

 a    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup products without thorough and adequate pre- and post-market testing,

 b.    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup,

 c    Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d       Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup products so as to avoid the risk of serious harm associated with the prevalent use of Roundup/glyphosate as an herbicide,

e.      Failing to design and manufacture Roundup products so as to ensure they were at least as safe and effective as other herbicides on the market,

f       Failing to provide adequate instructions, guidelines, and safety precautions to those persons Monsanto could reasonably foresee would use and be exposed to its Roundup products;

g.      Failing to disclose to Mr Wollfarth, users/consumers, and the general public that use of and exposure to Roundup presented severe risks of cancer and other grave illnesses,

h       Failing to warn Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to the Plaintiff and other consumers;

i.      Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup and glyphosate- containing products,

j       Representing that its Roundup products were safe for their intended use when, in fact, Monsanto knew or should have known the products were not safe for their intended purpose;

k.      Declining to make or propose any changes to Roundup products' labeling or other promotional materials that would alert consumers and the general public of the risks of Roundup and glyphosate,

l       Advertising, marketing, and recommending the use of the Roundup products, while concealing and failing to disclose or warn of the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup and glyphosate,

m       Continuing to disseminate information to its consumers, which indicate or imply that Monsanto's Roundup products are not unsafe for use in the agricultural and horticultural industries, and

n.      Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous

143.   Monsanto knew and/or should have known that it was foreseeable consumers such as the Plaintiff would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup

144.   The Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup or its active ingredient glyphosate

145.   Monsanto's negligence was the proximate cause of Plaintiff's injuries, i.e , absent Monsanto's negligence, Mr. Wollfarth would not have developed cancer

146.   Monsanto's conduct, as described above, was reckless  Monsanto regularly risks the lives of consumers and users of its products, including Plaintiff, with full knowledge of the dangers of its products. Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff  Monsanto's reckless conduct therefore warrants an award of punitive damages.

147   WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper

## COUNT VI
### Fraud

148   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein

149.   Monsanto has defrauded the agricultural community in general and Plaintiff in particular by misrepresenting the true safety of Roundup and by failing to disclose known risks of cancer.

150.   Monsanto misrepresented and/or failed to disclose, *inter alia*, that: glyphosate and its major metabolite aminomethylphosphonic acid (AMPA) could cause cancer; glyphosate and AMPA are known to be genotoxic in humans and laboratory animals because exposure is known to cause DNA strand breaks (a precursor to cancer), glyphosate and AMPA are known to induce oxidative stress in humans and laboratory animals (a precursor to cancer); glyphosate and AMPA interfere with the aromatic amino acids within the human gut, leading to downstream health conditions including cancer,

exposure to glyphosate and AMPA is causally associated with non- Hodgkin lymphoma, and the laboratory tests attesting to the safety of glyphosate were flawed and/or fraudulent.

151    Due to these misrepresentations and omissions, at all times relevant to this litigation, Roundup was misbranded under 7 U.S.C. § 136(g) and its distribution within Louisiana and around the United States was a violation of 7 U.S.C. § 136j and 40 C.F.R. § 156 10(a)(5).

152.    When Plaintiff Mark Wollfarth purchased Roundup Louisiana, between 1997 through 2018, neither the labeling on the product nor Monsanto's general promotion warned or disclosed the true safety risks of Roundup or that the product could cause cancer, as described above  Since the true risk information was known to Monsanto and was not reasonably knowable to reasonable consumers, Plaintiff was unaware of these material facts and/or omissions prior to purchasing the product  Plaintiff Mark Wollfarth paid for the product using his own money, money he would not have expended absent the Monsanto's misrepresentations and/or material omissions concern the fact that Roundup is a carcinogen

153.    Plaintiff Mark Wollfarth relied on Monsanto's misrepresentations and/or material omissions regarding the safety of Roundup and its active ingredient glyphosate in deciding whether to purchase and/or use the product on his property  Mr  Wollfarth did not know nor could he reasonably have known of the misrepresentations and/or material omissions by Monsanto concerning Roundup and its active ingredient glyphosate

154.    The misrepresentations and/or material omissions that form the basis of this fraud claim are not limited to statements made on the Roundup labeling, as defined under federal law, but also involve Monsanto's representations and omissions made as part of its promotion and marketing of Roundup, including on the Internet, television, in print advertisements, etc  Nothing prevented Monsanto from disclosing the truth about the risks associated with Roundup in its promotional efforts outside of the labeling context, using the forms of media and promotion Monsanto traditionally used to promote the product's efficacy and benefits

155.   When Monsanto made the misrepresentations and/or omissions as alleged in this pleading, it did so with the intent of defrauding and deceiving the public in general and with the intent of inducing the public to purchase and use Roundup

156.   Monsanto made these misrepresentations and/or material omissions with malicious, fraudulent and/or oppressive intent toward Plaintiff and the public generally  Monsanto's conduct was willful, wanton, and/or reckless  Monsanto deliberately recommended, manufactured, produced, marketed, sold, distributed, merchandized, packaged, promoted and advertised the dangerous and defective herbicide Roundup  This constitutes an utter, wanton, and conscious disregard of the rights and safety of a large segment of the public, and by reason thereof, Monsanto, is liable for reckless, willful, and wanton acts and omissions which evidence a total and conscious disregard for the safety of Plaintiff and others which proximately caused the injuries as set forth herein

157   As a proximate result of Monsanto's fraudulent and deceitful conduct and representations, Plaintiff sustained damages and other losses in an amount to be proven at trial

158   WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## EXEMPLARY DAMAGES ALLEGATIONS

159   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein

160   Monsanto's conduct as alleged herein was done with oppression, fraud, and malice. Monsanto was fully aware of Roundup's safety risks  Nonetheless, Monsanto deliberately crafted its label, marketing, and promotion to mislead farmers and consumers.

161.   This was not done by accident or through some justifiable negligence. Rather, Monsanto knew that it could turn a profit by convincing the agricultural industry and the general population that Roundup was harmless to humans, and that full disclosure of Roundup's true risks would limit the amount of money Monsanto would make selling Roundup in Louisiana  This was

accomplished not only through its misleading labeling, but through a comprehensive scheme of selective fraudulent research and testing, misleading advertising, and deceptive omissions as more fully alleged throughout this pleading  Plaintiff Mark Wollfarth was robbed of his right to make an informed decision about whether to purchase and use an herbicide on his property, knowing the full risks attendant to that use  Such conduct was done with conscious disregard of the Plaintiff's rights

162.    There is no indication that Monsanto will stop its deceptive and unlawful marketing practices unless it is punished and deterred. Accordingly, Plaintiff requests punitive damages against Monsanto for the harms caused to the Plaintiff

## JURY TRIAL DEMAND

163    Plaintiff demands a trial by jury on all of the triable issues within this pleading

## PRAYER FOR RELIEF

164.    WHEREFORE, Plaintiff requests that the Court enter judgment in his favor and against Monsanto, awarding the Plaintiff

 a. actual or compensatory damages in such amount to be determined at trial and as provided by applicable law,

 b. exemplary and punitive damages sufficient to punish and deter Monsanto and others from future fraudulent practices;

 c. pre-judgment and post-judgment interest;

 d costs including reasonable attorneys' fees, court costs, and other litigation expenses; and

 e. any other relief the Court may deem just and proper

Dated March 5, 2019    **RESPECTFULLY SUBMITTED:**

_____

C  Mark Whitehead III, M D , J D  (#27682)
**The Whitehead Law Firm, L.L.C.**
3639 Ambassador Caffery Pkwy , #303
Lafayette, LA  70503-5107
Tel  (337) 740-6006
Fax  (337) 205-7724

30