# U.S. District Court
# Eastern District of California - Live System (Sacramento)
# CIVIL DOCKET FOR CASE #: 2:19-cv-00953-TLN-EFB

| | |
|---|---|
| Jones-Basler et al v. Monsanto Company | Date Filed: 05/24/2019 |
| Assigned to: District Judge Troy L. Nunley | Jury Demand: Plaintiff |
| Referred to: Magistrate Judge Edmund F. Brennan | Nature of Suit: 365 Personal Inj. Prod. Liability |
| Cause: 28:1332 Diversity-Product Liability | Jurisdiction: Diversity |

**Plaintiff**

**Caitlin Jones-Basler**      represented by    **Gerald Blaine Singleton**
Singleton Law Firm, APC
450 A Street
5th Floor
San Diego, CA 92101
619-771-3473
Fax: 760-697-1329
Email: gerald@geraldsingleton.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Johnny Quinonez**      represented by    **Gerald Blaine Singleton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Vanessa Moore**      represented by    **Gerald Blaine Singleton**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**
*a Delaware Corporation*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/24/2019 | 1 | COMPLAINT against Monsanto Company by all plaintiffs. Attorney Singleton, Gerald Blaine added. (Filing fee $ 400, receipt number 0972-8280897) (Attachments: # 1 Civil Cover Sheet)(Singleton, Gerald) (Entered: 05/24/2019) |
| 05/24/2019 | 2 | SUMMONS ISSUED as to *Monsanto Company* with answer to complaint due within *21* days. Attorney *Gerald Blaine Singleton* *Singleton Law Firm, APC* *450 A Street, 5th Floor* *San Diego, CA 92101*. (Benson, A.) (Entered: 05/24/2019) |
| 05/24/2019 | 3 | CIVIL NEW CASE DOCUMENTS ISSUED; (Attachments: # 1 Consent Form, # 2 VDRP) (Benson, A.) (Entered: 05/24/2019) |

| 05/30/2019 | 4 | SUMMONS RETURNED EXECUTED: Monsanto Company served on 5/30/2019, answer due 6/20/2019. (Singleton, Gerald) (Entered: 05/30/2019) |
|---|---|---|

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 06/03/2019 09:13:49 | | | |
| **PACER Login:** | hllp1982:2634105:4722683 | **Client Code:** | 1417.0049 |
| **Description:** | Docket Report | **Search Criteria:** | 2:19-cv-00953-TLN-EFB |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

GERALD SINGLETON, SBN 208783
MARK F. FLEMING, SBN 165770
JOHN C. LEMON, SBN 175847
ERIKA L. VASQUEZ, SBN 268205
SINGLETON LAW FIRM, APC
450 A Street, 5th Floor
San Diego, CA 92101
Tel: (619) 771-3473
Fax: (619) 255-1515
Email: gerald@slffirm.com
       mark@slffirm.com
       john@slffirm.com
       erika@slffirm.com

TIMOTHY A. SCOTT, SBN 215074
NICOLAS O. JIMENEZ, SBN 295057
SCOTT TRIAL LAWYERS, APC
1350 Columbia Street, Suite 600
San Diego, California 92101
Telephone: (619) 794-0451
Facsimile: (619) 652-9964
Email: tas@scotttriallawyers.com
       noj@scotttriallawyers.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAITLIN JONES-BASLER, JOHNNY QUINONEZ, VANESSA MOORE,<br><br>Plaintiffs,<br><br>v.<br><br>MONSANTO COMPANY, a Delaware Corporation,<br><br>Defendant. | Case No: 19-at-00420<br><br>**COMPLAINT FOR DAMAGES**<br><br>**[DEMAND FOR JURY TRIAL]** |

1    Plaintiffs hereby bring this Complaint, by and through above-captioned counsel, and

2  allege upon information and belief the following.

3                          **NATURE OF THE CASE**

4    1.    This is an action for damages suffered by Plaintiffs as a direct and proximate

5  result of Defendant's negligent and wrongful conduct in connection with the design,

6  development, manufacture, testing, packaging, promoting, marketing, advertising, distribution,

7  labeling, and/or sale of the herbicide Roundup®, containing the active ingredient glyphosate.

8    2.    As Defendant Monsanto knew, or in the exercise of reasonable care should have

9  known, Roundup® and/or glyphosate is defective, dangerous to human health, unfit and

10  unsuitable to be marketed and sold in commerce, and lacked proper warnings and directions as to

11  the dangers associated with its use.

12    3.    Plaintiffs' injuries, like those striking thousands of similarly situated victims

13  across the country, were avoidable.

14                        **JURISDICTION AND VENUE**

15    4.    This Court has jurisdiction over Defendant and this action pursuant to 28 U.S.C. §

16  1332 because there is complete diversity of citizenship between Plaintiffs and Defendant.

17  Defendant is either incorporated and/or has its principal place of business outside of the state in

18  which the Plaintiffs reside and/or in which the exposure to Roundup® and/or glyphosate

19  occurred.

20    5.    The amount in controversy between Plaintiffs and Defendant exceeds $75,000,

21  exclusive of interest and cost.

22    6.    The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

23    7.    Venue is proper within this district pursuant to 28 U.S.C. § 1391 in that

24  Defendant conducts business here and is subject to personal jurisdiction in this district.

25  Furthermore, Defendant sells, markets, and/or distributes Roundup® within the Northern District

26  of California.  Also, a substantial part of the acts and/or omissions giving rise to these claims,

27  including at least some of Plaintiffs' exposure to Roundup,® occurred within this district.

28

## PARTIES

### Plaintiffs

8.      At all times relevant to this lawsuit, Plaintiff Caitlin Jones-Basler was a resident and citizen of Sacramento County, California.  Plaintiff brings this action for personal injuries sustained by exposure to Roundup® ("Roundup") containing the active ingredient glyphosate and the surfactant polyethoxylated tallow amine ("POEA"). As a direct and proximate result of being exposed to Roundup, Plaintiff Jones-Basler developed Non-Hodgkin's Lymphoma in approximately 2008 and suffered injuries and damages resulting from that diagnosis that continue today.

9.      At all times relevant to this lawsuit, Plaintiff Johnny Quinonez was a resident and citizen of Tulare County, California.  Plaintiff brings this action for personal injuries sustained by exposure to Roundup containing the active ingredient glyphosate and the surfactant POEA. As a direct and proximate result of being exposed to Roundup, Plaintiff Quinonez developed Non-Hodgkin's Lymphoma in approximately 2004, after a remission suffered a recurrence of Non-Hodgkin's Lymphoma in approximately 2018, and suffered injuries and damages resulting from that diagnosis that continue today.

10.      At all times relevant to this lawsuit, Plaintiff Vanessa Moore was a resident and citizen of Sacramento County.  Plaintiff brings this action for personal injuries sustained by exposure to Roundup containing the active ingredient glyphosate and the surfactant POEA. As a direct and proximate result of being exposed to Roundup, Plaintiff Moore developed Non-Hodgkin's Lymphoma in approximately 2017 and suffered injuries and damages resulting from that diagnosis that continue today.

### Defendant

11.      Defendant MONSANTO COMPANY is a Delaware corporation, with headquarters and a principle place of business in St. Louis, Missouri.

12.      Defendant MONSANTO COMPANY is herein referred to as "Monsanto" or "Defendant."

//

COMPLAINT FOR DAMAGES

13. "Roundup" refers to all formulations of Defendant Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation containing the active ingredient glyphosate.

14. Defendant advertises and sells goods, specifically Roundup, in the State of California.

15. Defendant transacted and conducted business within the State of California that relates to the allegations in this Complaint.

16. Defendant derived substantial revenue from goods and products used in the State of California.

17. Defendant expected or should have expected its acts to have consequences within the State of California and derived substantial revenue from interstate commerce.

18. Defendant engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup.

19. Defendant is authorized to do business in California and derives substantial income from doing business in this state.

//

1       20.    Upon information and belief, Defendant purposefully availed itself of the

2   privilege of conducting activities with the State of California, thus invoking the benefits and

3   protections of its laws.

4       21.    Upon information and belief, Defendant did design, sell, advertise, manufacture

5   and/or distribute Roundup, with full knowledge of its dangerous and defective nature. To this

6   date, Defendant continues to design, sell, advertise, manufacture, and/or distribute Roundup.

7   **FACTUAL ALLEGATIONS**

8       22.    At all relevant times, Defendant was in the business of, and did, design, research,

9   manufacture, test, advertise, promote, market, sell, and distribute the commercial herbicide

10  Roundup.

11      23.    Monsanto is a multinational agricultural biotechnology corporation based in St.

12  Louis, Missouri. It is the world's leading producer of glyphosate.

13      24.    Defendant discovered the herbicidal properties of glyphosate during the 1970's

14  and subsequently began to design, research, manufacture, sell and distribute glyphosate-based

15  "Roundup" as a broad-spectrum herbicide.

16      25.    Glyphosate is the active ingredient in Roundup.

17      26.    Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known

18  to compete with commercial crops grown around the globe.

19      27.    Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based

20  only on whether a given organism produces a specific enzyme: 5-enolpyruvylshikimic acid-3-

21  phosphate synthase, known as EPSP synthase.

22      28.    Glyphosate inhibits the EPSP synthase that interferes with the shikimic pathway

23  in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

24      29.    Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems,

25  and roots, and detectable quantities accumulate in the plant tissues.

26      30.    Each year, approximately 250 million pounds of glyphosate are sprayed on crops,

27  commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has been

28  driven largely by the proliferation of genetically engineered crops specifically tailored to resist

1   the activity of glyphosate.

2       31.     Defendant is intimately involved in the development, design, manufacture,

3   marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are

4   marketed as being resistant to Roundup e.g.., "Roundup Ready®." As of 2009, Defendant was the

5   world's leading producer of seeds designed to be Roundup Ready®. In 2010, an estimated 70%

6   of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready®

7   seeds.

8       32.     The original Roundup, containing the active ingredient glyphosate, was

9   introduced in 1974. Today, glyphosate products are among the world's most widely used

10  herbicides. For nearly 40 years, consumers, farmers, and the public have used Roundup, unaware

11  of its carcinogenic properties.

12                    **REGISTRATION OF HERBICIDES UNDER FEDERAL LAW**

13      33.     The manufacture, formulation and distribution of herbicides, such as Roundup,

14  are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C.

15  § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection

16  Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA. 7 U.S.C.

17  136a(a).

18      34.     The EPA requires as part of the registration process, among other requirements, a

19  variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other

20  potential non-target organisms, and other adverse effects on the environment. Registration by the

21  EPA, however, is not an assurance or finding of safety. The determination the EPA makes in

22  registering or re-registering a product is not that the product is "safe," but rather that use of the

23  product in accordance with its label directions "will not generally cause unreasonable adverse

24  effects on the environment."  7 U.S.C. § 136(a)(c)(5)(D).

25      35.     FIFRA defines "unreasonable adverse effects on the environment" as "any

26  unreasonable risk to man or the environment, taking into account the economic, social, and

27  environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus

28  requires the EPA to make a risk/benefit analysis in determining whether a registration should be

1    granted or allowed to continue to be sold in commerce.

2         36.    The EPA and the State of California registered Roundup for distribution, sale, and

3    manufacture in the United States and the State of California.

4         37.    FIFRA generally requires that the registrant, Monsanto, conduct health and safety

5    testing of pesticide products. The government is not required, nor is it able, to perform the

6    product tests that are required of the manufacturer.

7         38.    The evaluation of each pesticide product distributed, sold, or manufactured is

8    completed at the time the product is initially registered. The data necessary for registration of a

9    pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide

10   products through a Congressionally mandated process called "re-registration." 7 U.S.C. § 136a-

11   1. In order to reevaluate these pesticides, the EPA demands the completion of additional tests and

12   the submission of data for the EPA's review and evaluation.

13        39.    In the case of glyphosate and Roundup, the EPA had planned on releasing its

14   preliminary-risk assessment — in relation to the registration process — no later than July 2015. The

15   EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment

16   pending further review in light of the World Health Organization's March 24, 2015 finding that

17   glyphosate is a "probable carcinogen" as demonstrated by the mechanistic evidence of

18   carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

19   **MONSANTO'S FALSE REPRESENTATIONS REGARDING THE SAFETY OF**

20   **ROUNDUP**

21        40.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against

22   Monsanto based on its false and misleading advertising of Roundup products. Specifically, the

23   lawsuit challenged Monsanto's general representations that its spray-on, glyphosate-based

24   herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to

25   mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading

26   about the human and environmental safety of Roundup are the following:

27        a)    Remember that environmentally friendly Roundup herbicide is

28              biodegradable. It won't build up in the soil so you can use Roundup with

7

1  confidence along customers' driveways, sidewalks and fences . . .

2   b) And remember that Roundup is biodegradable and won't build up in the

3    soil. That will give you the environmental confidence you need to use

4    Roundup everywhere you've got a weed, brush, edging or trimming

5    problem.

6   c) Roundup biodegrades into naturally occurring elements.

7   d) Remember that versatile Roundup herbicide stays where you put it. That

8    means there's no washing or leaching to harm customers' shrubs or other

9    desirable vegetation.

10   e) This non-residual herbicide will not wash or leach in the soil.  It ... stays

11    where you apply it.

12   f) You can apply [Roundup] with 'confidence because it will stay where you

13    put it' it bonds tightly to soil particles, preventing leaching. Then, soon

14    after application, soil microorganism's biodegrade Accord into natural

15    products.

16   g) Glyphosate is less toxic to rats than table salt following acute oral

17    ingestion.

18   h) Glyphosate's safety margin is much greater than required. It has over a

19    1,000-fold safety margin in food and over a 700-fold safety margin for

20    workers who manufacture it or use it.

21   i) You can feel good about using herbicides by Monsanto. They carry a

22    toxicity category rating of 'practically non-toxic' as it pertains to

23    mammals, birds and fish.

24   j) Roundup can be used where kids and pets will play and breaks down into

25    natural material.[1]

26  41. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance

27

28 [1]  This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

    a)  its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

    b)  its glyphosate-containing pesticide products, or any component thereof manufactured, formulated, distributed or sold by Monsanto, are biodegradable

    c)  its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

    d)  its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

    e)  its glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

    f)  its glyphosate-containing products or any component thereof might be classified as "practically non-toxic".

42.    Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

43.    In 2009, France's highest court ruled that Monsanto had <u>not</u> told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[3]

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP

44.    As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties.

45.    On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.

1  Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

2      46.     In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-

3  103214). The Registration standard required additional phytotoxicity, environmental fate,

4  toxicology, product chemistry, and residue chemistry studies. All the required data was

5  submitted and reviewed.

6      47.     In October 1991 the EPA published a memorandum entitled "Second Peer Review

7  of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of

8  non-carcinogenicity for humans). Two peer review committee members did not concur with the

9  conclusions of the committee and one member refused to sign.

10     48.     In addition to the toxicity of the active molecule, many studies support the

11  hypothesis that glyphosate formulations found in Defendant Roundup products are more

12  dangerous and toxic than glyphosate alone.  As early as 1991 evidence existed demonstrating that

13  glyphosate formulations were significantly more toxic than glyphosate alone.

14     49.     In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell

15  Division Dysfunction at the Level of CDK1/Cyclin B Activation."

16     50.     The study found that Defendant Roundup caused delays in the cell cycles of sea

17  urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter

18  cell cycles.

19     51.     In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect

20  cell cycle regulation." The study demonstrated a molecular link between glyphosate-based

21  products and cell-cycle dysregulation.

22     52.     The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and

23  human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent

24  development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such

25  as cancer result from dysfunction of unique cell[s], it was of interest to evaluate the threshold

26  dose of glyphosate affecting cells."

27     53.     In 2005, Francisco Peixoto published a study showing that Roundup's effects on

28  rat liver mitochondria are much more toxic and harmful than the same concentrations of

glyphosate alone.

54.     The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

55.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

56.     The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

57.     The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendant.

58.     Defendant knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiffs from Roundup.

59.     Defendant knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

60.     Defendant failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiffs from Roundup.

61.     Rather than performing appropriate tests, Defendant relied upon flawed industry-supported studies designed to protect Defendant's economic interests rather than Plaintiffs and the consuming public.

62.     Despite its knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup as safe.

COMPLAINT FOR DAMAGES

## IARC CLASSIFICATION OF GLYPHOSATE

63.   The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency of the World Health Organization ("WHO") of the United Nations, which is tasked with conducting and coordinating research into the causes of cancer.

64.   An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015–2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: 1) there must already be some evidence of carcinogenicity of the substance; and 2) there must be evidence that humans are exposed to the substance.

65.   IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals: 1) a potential for direct impact on public health; 2) scientific literature to support suspicion of carcinogenicity; 3) evidence of significant human exposure; 4) high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; and 5) related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

66.   On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one year, many of which have been in Defendant's possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Defendant Roundup herbicide is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

67.   The IARC's full Monograph was published on July 29, 2015, and established glyphosate as a class 2A *probable* carcinogen to humans. According to the authors, glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

68.   The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk

1 continued after adjustment for other pesticides.

2     69.     The IARC also found that glyphosate caused DNA and chromosomal damage in

3 human cells.

4              **EARLIER EVIDENCE OF GLYPHOSATE'S DANGER**

5     70.     Despite the new classification by the IARC, Defendant has had ample evidence of

6 glyphosate and Roundup's genotoxic properties for decades.

7     71.     Genotoxicity refers to chemical agents that are capable of damaging the DNA

8 within a cell through genetic mutations, which is a process that causes cancer.

9     72.     In 1997, Chris Clements published "Genotoxicity of select herbicides in *Rana*

10 *catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

11     73.     The study found that tadpoles exposed to Roundup showed significant DNA

12 damage when compared with unexposed control animals.

13     74.     Both human and animal studies have shown that glyphosate and glyphosate-based

14 formulations such as Roundup can induce oxidative stress.

15     75.     Oxidative stress and associated chronic inflammation are believed to be involved

16 in carcinogenesis.

17     76.     The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA

18 and glyphosate-based formulations can induce oxidative stress."

19     77.     In 2006 César Paz-y-Miño published a study examining DNA damage in human

20 subjects exposed to glyphosate.

21     78.     The study produced evidence of chromosomal damage in blood cells showing

22 significantly greater damage after exposure to glyphosate than before in the same individuals,

23 suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on

24 exposed individuals.

25     79.     The IARC Monograph reflects the volume of evidence of glyphosate pesticides'

26 genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is

27 strong."

28     80.     Despite knowledge to the contrary, Defendant maintains that there is no evidence

1    that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement

2    that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

3        81.    In addition to glyphosate and Roundup's genotoxic properties, Defendant has long

4    been aware of glyphosate's carcinogenic properties.

5        82.    Glyphosate and Roundup, in particular, have long been associated with

6    carcinogenicity and the development of numerous forms of cancer, including, but not limited to,

7    non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

8        83.    Defendant has known of this association since the early to mid-1980s because

9    numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or

10    Roundup.

11        84.    In 1985 the EPA studied the effects of glyphosate in mice finding a dose related

12    response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded that

13    glyphosate was oncogenic.

14        85.    In 2003 Lennart Hardell and Mikael Eriksson published the results of two case-

15    controlled studies on pesticides as a risk factor for NHL and hairy-cell leukemia.

16        86.    The study concluded that glyphosate had the most significant relationship to NHL

17    among all herbicides studied with an increased odds ratio of 3.11.

18        87.    In 2003 AJ De Roos published a study examining the pooled data of mid-western

19    farmers, examining pesticides and herbicides as risk factors for NHL.

20        88.    The study, which controlled for potential confounders, found a relationship

21    between increased NHL incidence and glyphosate.

22        89.    In 2008 Mikael Eriksson published a population-based, case-control study of

23    exposure to various pesticides as a risk factor for NHL.

24        90.    This strengthened previous associations between glyphosate and NHL.

25        91.    In spite of this knowledge, Defendant continued to issue broad and sweeping

26    statements suggesting that Roundup was, and is, safer than ordinary household items such as table

27    salt, despite a lack of scientific support for the accuracy and validity of these statements and, in

28    fact, voluminous evidence to the contrary.

92. Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiffs, the agricultural community, and the public at large to purchase and increase the use of Roundup for Defendant's pecuniary gain, and in fact, did induce Plaintiffs to use Roundup.

93. Defendant made these statements with complete disregard and reckless indifference to the safety of Plaintiffs and the general public.

94. Notwithstanding Defendant's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

95. Defendant knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

96. Defendant failed to appropriately and adequately inform and warn Plaintiffs of the serious and dangerous risks associated with the use of, and exposure to, glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

97. Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendant continues to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, and non-genotoxic. And it falsely warrants to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

98. Defendant has claimed and continues to claim that Roundup is safe, non-carcinogenic, and non-genotoxic. These misrepresentations are consistent with Defendant's cavalier approach to investigating and ensuring the safety of its products, the safety of the public at large, and the safety of Plaintiffs.

## SCIENTIFIC FRAUD UNDERLYING THE SAFETY DETERMINATIONS OF GLYPHOSATE

99.   After the EPA's 1985 classification of glyphosate as possibly carcinogenic to humans (Group C), Monsanto exerted pressure upon the EPA to change its classification.

100.   This culminated in the EPA's reclassification of glyphosate to Group E, which was based upon evidence of non-carcinogenicity in humans.

101.   In so classifying, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

102.   On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed scientific fraud.

103.   In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup. IBT performed approximately 30 tests on glyphosate and glyphosate-containing products, including 11 of the 19 chronic toxicology studies needed to register Roundup with the EPA.

104.   In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to toxicological impacts of glyphosate. The EPA subsequently audited IBT and determined that the toxicology studies conducted for Roundup were invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

105.   Three top executives of IBT were convicted of fraud in 1983.

106.   In the second incident, Monsanto hired Craven Laboratories ("Craven") in 1990 to perform pesticide and herbicide studies, including several studies on Roundup.

107.   In March of 1991, the EPA announced that it was investigating Craven for "allegedly falsifying test data used by chemical firms to win EPA approval of pesticides."

//

108. The investigation lead to the indictments of the laboratory owner and a handful of employees.

## MONSANTO'S CONTINUING DISREGARD FOR THE SAFETY OF PLAINTIFFS AND THE PUBLIC

109. Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."

110. Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

111. Glyphosate, and Defendant Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

112. Defendant's statements proclaiming the safety of Roundup and disregarding its dangers misled Plaintiffs.

113. Despite Defendant's knowledge that Roundup was associated with an elevated risk of developing cancer, Defendant's promotional campaigns focused on Roundup's purported "safety profile."

114. Defendant's failure to adequately warn Plaintiffs resulted in: (1) Plaintiffs using and being exposed to glyphosate instead of using another acceptable and safe methods of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

115. Defendant failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

116. The failure of Defendant to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

1       117.    The failure of Defendant to appropriately warn and inform the EPA has resulted in

2  the absence of warning or caution statements that are adequate to protect health and the

3  environment.

4       118.    The failure of Defendant to appropriately warn and inform the EPA has resulted in

5  directions for use that are not adequate to protect health and the environment.

6       119.    By reason of the foregoing acts and omissions, Plaintiffs have endured and, in

7  some categories continue to suffer emotional and mental anguish, medical expenses, and other

8  economic and non-economic damages, as a result of the actions and inactions of the Defendant.

## **PLAINTIFFS' EXPOSURE TO ROUNDUP**

## **EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS**

11       120.    Plaintiffs incorporate by reference all prior paragraphs of this Complaint as if

12  fully set forth herein.

13       121.    The running of any statute of limitations has been tolled by reason of Defendant's

14  fraudulent concealment. Defendant, through its affirmative misrepresentations and omissions,

15  actively concealed from Plaintiffs the true risks associated with Roundup and glyphosate.

16       122.    At all relevant times, Defendant has maintained that Roundup is safe, non-toxic,

17  and non-carcinogenic.

18       123.    Indeed, even today, Defendant continues to represent to the public that Roundup

19  is safe and non-carcinogenic.

20       124.    As a result of Defendant's actions, Plaintiffs were unaware, and could not

21  reasonably know or have learned through reasonable diligence, that Roundup and/or glyphosate

22  contact exposed Plaintiffs to the risks alleged herein and that those risks were the direct and

23  proximate result of Defendant's acts and omissions.

24       125.    Furthermore, Defendant is estopped from relying on any statute of limitations

25  because of its fraudulent concealment of the true character, quality and nature of Roundup.

26  Defendant was under a duty to disclose the true character, quality, and nature of Roundup because

27  this was non-public information over which Defendant had and continues to have exclusive

28  control, and because Defendant knew that this information was not available to Plaintiffs or to

1  distributors of Roundup. In addition, Defendant is estopped from relying on any statute of

2  limitations because of its intentional concealment of these facts.

3       126.   Plaintiffs had no knowledge that Defendant was engaged in the wrongdoing

4  alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendant,

5  Plaintiffs could not have reasonably discovered the wrongdoing at any time prior. Also, the

6  economics of this fraud should be considered. Defendant had the ability to and did spend

7  enormous amounts of money in furtherance of its purpose of marketing, promoting and/or

8  distributing a profitable herbicide, notwithstanding the known or reasonably known risks.

9  Plaintiffs and medical professionals could not have afforded and could not have possibly

10  conducted studies to determine the nature, extent, and identity of related health risks, and were

11  forced to rely on only the Defendant's representations. Accordingly, Defendant is precluded by

12  the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of

13  limitations.

14                          **FIRST CAUSE OF ACTION**

15                **STRICT LIABILITY (DESIGN DEFECT)**

16       127.   Plaintiffs incorporate by reference every allegation set forth in the preceding

17  paragraphs.

18       128.   Plaintiffs bring this strict liability claim against Monsanto for defective design.

19       129.   At all times relevant to this litigation, Monsanto engaged in the business of

20  testing, developing, manufacturing, selling, and distributing Roundup products., Monsanto also

21  engaged in the marketing, packaging, design, and promotion of Roundup® products, thus

22  placing them in the stream of commerce. These products are defective and unreasonably

23  dangerous to consumers, including Plaintiffs. At all times relevant to this litigation, these actions

24  were under the control and supervision of Monsanto.

25       130.   At all times relevant to this litigation, Roundup products were manufactured,

26  designed, and labeled in an unsafe, defective, and inherently dangerous manner that was

27  dangerous to the public and to the Plaintiffs in particular,

28       131.   At all times relevant to this litigation, Roundup products reached the intended

COMPLAINT FOR DAMAGES

consumers, handlers, and users or other persons coming into contact with these products in California and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

132.     Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

133.     Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

134.     At all times relevant to this action, Monsanto knew or had reason to know that Roundup products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

135.     Therefore, at all times relevant to this litigation, Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Monsanto were defective in design and formulation, in one or more of the following ways:

  a)  When placed in the stream of commerce, Roundup products were defective in
      design and formulation, and, consequently, dangerous to an extent beyond that
      which an ordinary consumer would contemplate.

  b)  When placed in the stream of commerce, Roundup products were
      unreasonably dangerous in that they were hazardous and posed a grave risk of
      cancer and other serious illnesses when used in a reasonably anticipated
      manner.

  c)  When placed in the stream of commerce, Roundup products contained
      unreasonably dangerous design defects and were not reasonably safe when

used in a reasonably anticipated or intended manner.

d) Monsanto did not sufficiently test, investigate, or study Roundup products and, specifically, the active ingredient glyphosate.

e) Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f) At the time of marketing its Roundup products, Roundup was defective in that exposure to Roundup and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g) Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products.

h) Monsanto could have employed safer alternative designs and formulations.

136.   At all times relevant to this litigation, Plaintiffs used and/or were exposed to Roundup products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

137.   Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products before or at the time of exposure.

138.   The harm caused by Roundup products far outweighed their benefit, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate. Roundup products were and are more dangerous than alternative products and Monsanto could have designed Roundup products (including their packaging and sales aids) to make them less dangerous. Indeed, at the time that Monsanto designed Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

139.   At the time Roundup products left Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of those herbicides.

140.   Monsanto's defective design of Roundup products was willful, wanton,

1   fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of

2   the Roundup products, including the Plaintiffs herein.

3       141.    Therefore, as a result of the unreasonably dangerous condition of its Roundup

4   products, Monsanto is strictly liable to Plaintiffs.

5       142.    The defects in Roundup products caused or contributed to cause Plaintiffs' grave

6   injuries, and, but for Monsanto's misconduct and omissions, Plaintiffs would not have sustained

7   their injuries.

8       143.    Monsanto's conduct, as described above, was reckless. Monsanto risked the lives

9   of consumers and users of its products, including Plaintiffs, with knowledge of the safety

10   problems associated with Roundup and glyphosate-containing products, and suppressed this

11   knowledge from the general public. Monsanto made conscious decisions not to redesign, warn or

12   inform the unsuspecting public. Monsanto's reckless conduct warrants an award of aggravated

13   damages.

14       144.    As a direct and proximate result of Monsanto placing defective Roundup

15   products into the stream of commerce, Plaintiffs have suffered and continue to suffer grave

16   injuries, and have endured physical pain and discomfort, as well as economic hardship, including

17   considerable financial expenses for medical care, and treatment.

18       WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in

19   Plaintiffs' favor for compensatory and punitive damages, together with interest, costs, attorneys'

20   fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury

21   trial.

22   **SECOND CAUSE OF ACTION STRICT LIABILITY (FAILURE TO WARN)**

23       145.    Plaintiffs incorporate by reference every allegation set forth in the preceding

24   paragraphs.

25       146.    Plaintiffs bring this strict liability claim against Monsanto for failure to warn.

26       147.    At all times relevant to this litigation, Monsanto engaged in the business of

27   testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting

28   Roundup products, which are defective and unreasonably dangerous to consumers, including

1   Plaintiffs, because they do not contain adequate warnings or instructions concerning the

2   dangerous characteristics of Roundup and specifically, the active ingredient glyphosate. These

3   actions were under the ultimate control and supervision of Monsanto.

4        148.   Monsanto researched, developed, designed, tested, manufactured, inspected,

5   labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of

6   commerce Roundup products, and directly advertised or marketed the products to consumers and

7   end users, including the Plaintiffs, and therefore had a duty to warn of the risks associated with

8   the use of Roundup and glyphosate-containing products.

9        149.   At all times relevant to this litigation, Monsanto had a duty to properly test,

10  develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain

11  supply, provide proper warnings, and take such steps as necessary to ensure that Roundup

12  products did not cause users and consumers to suffer from unreasonable and dangerous risks.

13  Monsanto had a continuing duty to warn the Plaintiffs of the dangers associated with Roundup

14  use and exposure. Monsanto, as manufacturer, seller, promoter, marketer, or distributor of

15  chemical herbicides is held to the knowledge of an expert in the field.

16       150.   At the time of manufacture, Monsanto could have provided the warnings or

17  instructions regarding the risks of Roundup and glyphosate-containing products because they

18  knew or should have known of the unreasonable risks of harm associated with the use of and/or

19  exposure to such products.

20       151.   At all times relevant to this litigation, Monsanto failed to investigate, study, test,

21  or promote safety.   It failed to minimize the dangers to users and consumers of its product and to

22  those who would foreseeably use or be harmed by these herbicides, including Plaintiffs.

23       152.   Despite the fact that Monsanto knew or should have known that Roundup posed a

24  grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated

25  with use and exposure. The dangerous propensities of these products and the carcinogenic

26  characteristics of glyphosate, as described above, were known to Monsanto, or scientifically

27  knowable to Monsanto, through appropriate research and testing by known methods, at the time

28  Monsanto distributed, marketed, promoted, supplied or sold the product. These dangerous properties

1    were not known to end users and consumers, such as Plaintiffs.

2    153.    These products created significant risks of serious bodily harm to consumers, as

3    alleged herein, and Monsanto failed to adequately warn consumers and reasonably foreseeable

4    users of the risks of exposure to its products. Monsanto has wrongfully concealed information

5    concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further

6    made false and/or misleading statements concerning the safety of Roundup and glyphosate.

7    154.    At all times relevant to this litigation, Roundup products reached the intended

8    consumers, handlers, and users or other persons coming into contact with these products in

9    California and throughout the United States, including Plaintiffs, without substantial change in

10   their condition as designed, manufactured, sold, distributed, labeled, promoted and marketed by

11   Monsanto.

12   155.    At all times relevant to this litigation, Plaintiffs used and/or were exposed to the

13   use of Roundup products in their intended or reasonably foreseeable manner without knowledge

14   of their dangerous characteristics.

15   156.    Plaintiffs could not have reasonably discovered the defects and risks associated

16   with Roundup or glyphosate-containing products either before or at the time of exposure. Plaintiffs

17   relied upon the skill, superior knowledge, and judgment of Monsanto.

18   157.    These products were defective because the minimal warnings disseminated with

19   Roundup products were inadequate, and they failed to communicate adequate information on the

20   dangers and safe use/exposure and failed to communicate warnings and instructions that were

21   appropriate and adequate to render the products safe for their ordinary, intended and reasonably

22   foreseeable uses, including agricultural and landscaping applications.

23   158.    The information that Monsanto did provide or communicate failed to contain

24   relevant warnings, hazards, and precautions that would have enabled consumers such as

25   Plaintiffs to utilize the products safely and with adequate protection. Instead, Monsanto

26   disseminated information that was inaccurate, false, and misleading and which failed to

27   communicate accurately or adequately the comparative severity, duration, and extent of the risk

28   of injuries with use of and/or exposure to Roundup and glyphosate. Monsanto continued to

COMPLAINT FOR DAMAGES

1  aggressively promote the efficacy of its products, even after it knew or should have known of the

2  unreasonable risks from use or exposure. And it concealed, downplayed, or otherwise

3  suppressed, through aggressive marketing and promotion, any information or research about the

4  risks and dangers of exposure to Roundup and glyphosate.

5     159.   To this day, Monsanto has failed to adequately and accurately warn of the true

6  risks of Plaintiffs' injuries associated with the use of and exposure to Roundup and its active

7  ingredient glyphosate, a probable carcinogen.

8     160.   As a result of their inadequate warnings, Roundup products were defective

9  and unreasonably dangerous when they left the possession and/or control of Monsanto, were

10  distributed, marketed, and promoted by Monsanto, and used by Plaintiffs.

11     161.   Monsanto is liable to Plaintiffs for injuries caused by their negligent or willful

12  failure, as described above, to provide adequate warnings or other clinically relevant information

13  and data regarding the appropriate use of these products and the risks associated with the use of

14  or exposure to Roundup and glyphosate.

15     162.   The defects in Roundup products caused or contributed to cause Plaintiffs'

16  injuries, and, but for this misconduct and these omissions, Plaintiffs would not have been injured.

17     163.   Had Monsanto provided adequate warnings and instructions and properly

18  disclosed the risks associated with Roundup, Plaintiffs could have avoided getting cancer.

19     164.   As a direct and proximate result of Monsanto placing defective Roundup products

20  into the stream of commerce, Plaintiffs have suffered severe injuries and have endured physical

21  pain and discomfort, as well as economic hardship, including considerable financial expenses for

22  medical care and treatment.

23     WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs'

24  favor for compensatory and punitive damages, together with interest, costs, attorneys' fees and

25  all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury trial.

26  **THIRD CAUSE OF ACTION**

27  **NEGLIGENCE**

28     165.   Plaintiffs incorporate by reference every allegation set forth in the preceding

1   paragraphs.

2   166.   Monsanto, directly or indirectly, caused Roundup products to be sold, distributed,

3   packaged, labeled, marketed, promoted, and/or used by Plaintiffs.

4   167.   At all times relevant to this litigation, Monsanto had a duty to exercise reasonable

5   care in the design, research, manufacture, marketing, advertisement, supply, promotion,

6   packaging, sale, and distribution of Roundup products, including the duty to take all reasonable

7   steps necessary to manufacture, promote, and/or sell a product that was not unreasonably

8   dangerous to consumers and users of the product.

9   168.   At all times relevant to this litigation, Monsanto had a duty to exercise reasonable

10   care in the marketing, advertisement, and sale of the Roundup products. Monsanto's duty of care

11   owed to consumers and the general public included providing accurate, true, and correct

12   information concerning the risks of using Roundup and appropriate, complete, and accurate

13   warnings concerning the potential adverse effects of exposure to Roundup, and its active

14   ingredient, glyphosate.

15   169.   At all times relevant to this litigation, Monsanto knew or, in the exercise of

16   reasonable care should have known, of the hazards and dangers of Roundup and specifically, the

17   carcinogenic properties of the chemical glyphosate.

18   170.   Accordingly, at all times relevant to this litigation, Monsanto knew or, in the

19   exercise of reasonable care, should have known that use of or exposure to its Roundup products

20   could cause or be associated with Plaintiffs' injuries and thus created a dangerous and

21   unreasonable risk of injury to the users of these products, including Plaintiffs.

22   171.   Monsanto also knew or, in the exercise of reasonable care, should have known

23   that users and consumers of Roundup were unaware of the risks and the magnitude of the risks

24   associated with the use of, and/or exposure, to Roundup and glyphosate-containing products.

25   172.   As such, Monsanto breached the duty of reasonable care and failed to exercise

26   ordinary care in the design, research, development, manufacture, testing, marketing, supply,

27   promotion, advertisement, packaging, sale, and distribution of its Roundup products, in that

28   Monsanto manufactured, marketed, promoted, and sold defective herbicides containing the

chemical glyphosate, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

173.   Despite an ability and means to investigate, study, and test these products and to provide adequate warnings, Monsanto has failed to do so. Indeed, Monsanto has wrongfully concealed information and has made false and misleading statements concerning the safety of, and/or exposure to, Roundup and glyphosate.

174.   Monsanto was negligent in the following respects:

i)  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup products without thorough and adequate pre- and post-market testing;

j)  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup;

k)  Failing to undertake studies and conduct necessary tests to determine whether Roundup products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

l)  Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup products to avoid the risk of serious harm associated with the prevalent use of Roundup/glyphosate as an herbicide;

m) Failing to design and manufacture Roundup products to ensure they were at least as safe and effective as other herbicides on the market;

n)  Failing to provide adequate instructions, guidelines, and safety precautions to those persons whom Monsanto could reasonably foresee would use and be

1    exposed to Roundup products;

2    o)  Failing to disclose to Plaintiffs, users/consumers, and the general public that

3        use of, and exposure to, Roundup presented severe risks of cancer and other

4        grave illnesses;

5    p)  Failing to warn Plaintiffs, consumers, and the general public that the product's

6        risk of harm was unreasonable and that there were safer and effective

7        alternative herbicides available to Plaintiff and other consumers;

8    q)  Systematically suppressing or downplaying contrary evidence about the risks,

9        incidence, and prevalence of the side effects of Roundup and glyphosate-

10       containing products;

11    r)  Representing that its Roundup products were safe for their intended use when,

12       in fact, Monsanto knew or should have known that the products were not safe

13       for their intended purpose;

14    s)  Declining to make or propose any changes to Roundup products' labeling or

15       other promotional materials that would alert the consumers and the general

16       public of the risks of Roundup and glyphosate;

17    t)  Advertising, marketing, and recommending the use of the Roundup products,

18       while concealing and failing to disclose or warn of the dangers known by

19       Monsanto to be associated with, or caused by, exposure to Roundup and

20       glyphosate;

21    u)  Continuing to disseminate information to its consumers, which indicate or

22       imply that Monsanto's Roundup products are not unsafe for use in the

23       agricultural and horticultural industries; and

24    v)  Continuing the manufacture and sale of its products with the knowledge that

25       the products are unreasonably unsafe and dangerous.

26    175.    Monsanto knew and/or should have known that it was foreseeable that

27  consumers such as Plaintiff would suffer injuries as a result of Monsanto's failure to exercise

28  ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of

1   Roundup.

2      176.   Plaintiffs did not know the nature and extent of the injuries that could result from

3   the intended use of and/or exposure to Roundup or its active ingredient glyphosate.

4      177.   Monsanto's negligence was the proximate cause of the injuries, harm, and

5   economic losses to Plaintiffs.

6      178.   Monsanto's conduct, as described above, was reckless. Monsanto regularly risked

7   the lives of consumers and users of their products, including Plaintiffs, with full knowledge of

8   the dangers of these products. Monsanto has made conscious decisions not to redesign, re-label,

9   warn, or inform the unsuspecting public, including Plaintiffs. Monsanto's reckless conduct

10   therefore warrants an award of aggravated or punitive damages.

11      179.   As a proximate result of Monsanto's wrongful acts and omissions in placing

12   defective Roundup products into the stream of commerce without adequate warnings of the

13   hazardous and carcinogenic nature of glyphosate, Plaintiffs have suffered severe and permanent

14   physical and emotional injuries. Plaintiffs have endured pain and suffering, have suffered

15   economic losses (including significant expenses for medical care and treatment) in an amount to

16   be determined.

17      WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs'

18   favor for compensatory and punitive damages, together with interest, costs, attorneys' fees and

19   all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury trial.

## FOURTH CAUSE OF ACTION

## FRAUD, MISREPRESENTATION, AND SUPPRESION

22      180.   Plaintiffs incorporate by reference the above paragraphs, which detail fraud with

23   specificity.

24      181.   Defendant fraudulently, intentionally, and/or negligently misrepresented to the

25   public and the Plaintiffs, both directly and through the media, scientific literature, and purported

26   "community outreach" programs that Roundup was safe., It fraudulently, intentionally, and/or

27   negligently concealed, suppressed, or omitted material, adverse information (i.e., that Roundup

28   was unsafe).

182.   Monsanto falsely communicated to the public through direct advertising, product packaging, and ghostwritten articles and editorials that Roundup was safe.  When Monsanto misrepresented to the public and Plaintiffs that Roundup was safe, it specifically intended that its misrepresentations would cause Plaintiffs and other potential consumers to purchase and use Roundup.

183.   Defendant either knew or should have known of the material representations they were making regarding the safety and relative utility of Roundup products.

184.   Defendant fraudulently, intentionally, and/or negligently made the misrepresentations and/or actively concealed, suppressed, or omitted this material information with the specific desire to induce Plaintiff, and the consuming public to purchase and use Roundup products. Defendant fraudulently, intentionally, and/or negligently, knew or should have known that Plaintiffs and the consuming public would rely on such material misrepresentations and/or omissions in selecting and applying Roundup products. Defendant knew or should have known that Plaintiff would rely on their false representations and omissions.

185.   Defendant made these misrepresentations and actively concealed adverse information including the risk of non-Hodgkin lymphoma, at a time when its agents and employees knew or should have known that the product had defects, dangers, and characteristics that were other than what was represented to the consuming public. Specifically, Defendant misrepresented and actively concealed, suppressed, and omitted that there had been inadequate testing of the safety and efficacy of Roundup, and that prior studies, research, reports, and/or testing had been conducted linking the use of the drug with serious health problems, including non-Hodgkin's lymphoma.

186.   Despite the fact that Defendant knew or should have known of reports of severe risks including non-Hodgkin's lymphoma with Roundup use and exposure, this information was strategically minimized, understated, or omitted in order to create the impression that the human dangers of Roundup were nonexistent, particularly in light of its purported utility.

187.   The fraudulent, intentional and/or negligent material misrepresentations and/or

30

COMPLAINT FOR DAMAGES

active concealment, suppression, and omissions by Defendant were perpetuated directly and/or indirectly through the advertisements, packaging, sales aids, furtive public relations efforts, and other marketing and promotional pieces authored, analyzed, created, compiled, designed, drafted, disseminated, distributed, edited, evaluated, marketed, published, and supplied by Defendant.

188.    If Plaintiffs had known the true facts concerning the risks associated with Roundup exposure, then Plaintiffs would have used a safer alternative.

189.    Plaintiffs' reliance upon the material misrepresentations and omissions was justified, among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Roundup while Plaintiffs were not in a position to know the true facts because Defendant overstated the benefits and safety of Roundup and downplayed the risk of lymphoma, thereby inducing Plaintiffs to use the herbicide rather than safer alternatives.

190.    As a direct and proximate result of Defendant's acts and omissions, Plaintiffs were exposed to Roundup and suffered and will continue to suffer injuries and damages.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury trial.

## FIFTH CAUSE OF ACTION

## VIOLATION OF THE UNFAIR BUSINESS PRACTICES ACT

191.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint and further allege as follows:

192.    Plaintiffs bring this cause of action pursuant to California Business & Professions Code § 17500, California Civil Code §§ 1750 et. seq.

193.    Defendant fraudulently, intentionally, negligently, and/or innocently misrepresented to the public, and to the Plaintiffs, both directly and through the media and purported "community outreach" programs, the safety of Roundup products, and/or fraudulently, intentionally, negligently and/or innocently concealed, suppressed, or omitted material, adverse information regarding the safety of Roundup. This deception caused injury to Plaintiffs in

violation of California Business & Professions Code § 17500, California Civil Code §§ 1750 et. seq.

194.   The intentional, negligent, and/or innocent misrepresentations and omissions of Defendant regarding the safety of Roundup products were communicated to Plaintiffs directly through national and regional advertising, marketing and promotion efforts, as well as packaging and sales aids. The safety of Roundup products was also intentionally, negligently, and/or innocently misrepresented to Plaintiffs and the public with the intent that such misrepresentations would cause Plaintiffs and other potential consumers to purchase and use or continue to purchase and use Roundup products.

195.   Defendant either knew or should have known of the material misrepresentations they were making regarding the safety and relative utility of Roundup products.

196.   Defendant fraudulently, intentionally, negligently, and/or innocently made the misrepresentations and/or actively concealed, suppressed, or omitted this material information with the specific desire to induce Plaintiffs, and the consuming public to purchase and use Roundup products. Defendant fraudulently, intentionally, negligently, and/or innocently, knew or should have known that Plaintiffs and the consuming public would rely on such material misrepresentations and/or omissions in selecting and applying Roundup products. Defendant knew or should have known that Plaintiffs would rely on its false representations and omissions.

197.   Defendant made these misrepresentations and actively concealed adverse information including the risk of non-Hodgkin's lymphoma, at a time when its agents and employees knew or should have known that the product had defects, dangers, and characteristics that were other than what was represented to the consuming public. Specifically, Defendant misrepresented and actively concealed, suppressed, and omitted that there had been inadequate testing of the safety and efficacy of Roundup and that prior studies, research, reports, and/or testing had been conducted linking the use of the drug with serious health problems, including non-Hodgkin's lymphoma.

198.   Despite the fact that Defendant knew or should have known of reports of severe

32

risks – including non-Hodgkin's lymphoma – with Roundup use and exposure, this information was strategically minimized, understated, or omitted in order to create the impression that the human dangers of Roundup were nonexistent, particularly in light of its purported utility.

199.   The fraudulent, intentional, negligent and/or innocent material mis-representations and/or active concealment, suppression, and omissions by Defendant were perpetuated directly and/or indirectly through the advertisements, packaging, sales aids, furtive public relations efforts, and other marketing and promotional pieces authored, analyzed, created, compiled, designed, drafted, disseminated, distributed, edited, evaluated, marketed, published, and supplied by Defendant.

200.   If Plaintiffs had known the true facts concerning the risks associated with Roundup exposure, Plaintiffs would have used a safer alternative.

201.   Plaintiffs reliance upon the material misrepresentations and omissions was justified, among other reasons, because those misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Roundup. Plaintiffs were not in a position to know the true facts because Defendant overstated the benefits and safety of Roundup and downplayed the risk of lymphoma, thereby inducing Plaintiffs to use the herbicide rather than safer alternatives.

202.   Federal law and the EPA do not authorize and specifically prohibit the deceptions, misrepresentations, and omissions made by Defendant.

203.   As a direct and proximate result of Defendant's actions and inactions, Plaintiffs were exposed to Roundup and suffered and will continue to suffer injuries and damages.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury trial.

WHEREFORE, Plaintiffs pray for judgment against Defendant.

//

//

//

1

## PRAYER FOR RELIEF

2    Plaintiffs pray for judgment against the Defendant on each of the above-referenced

3    claims and causes of action as follows:

4    (1)    Compensatory damages in excess of the jurisdictional amount, including, but not

5            limited to, pain, suffering, emotional distress, loss of enjoyment of life, and other

6            non-economic damages in an amount to be determined at trial;

7    (2)    Compensatory damages to Plaintiffs for past and future damages, including, but

8            not limited to, Plaintiffs' pain and suffering and for severe and permanent personal

9            injuries sustained by Plaintiffs including health care costs and economic loss;

10   (3)    Economic damages in the form of medical expenses, out of pocket expenses, lost

11           earnings and other economic damages in an amount to be determines at trial;

12   (4)    Punitive damages based on Defendant's malicious, oppressive, fraudulent, wanton

13           and reckless behavior;

14   (5)    Pre-judgment interest;

15   (6)    Post-judgment interest;

16   (7)    Plaintiffs' reasonable attorney fees;

17   (8)    The costs of these proceedings; and

18   (9)    Any and all such other and further relief as this Court deems just and proper.

19

## DEMAND FOR JURY TRIAL

20   Plaintiffs hereby respectfully demand trial by jury as to all issues.

21   Dated:  May 23, 2019                    Respectfully submitted,

22                                            *s/ Gerald Singleton*
                                              GERALD SINGLETON
23                                            MARK F. FLEMING
                                              JOHN C. LEMON
24                                            TIMOTHY A. SCOTT
                                              ERIKA L. VASQUEZ
25                                            Attorneys for Plaintiff JONES, QUINONEZ, and
26                                            MOORE

27

28

COMPLAINT FOR DAMAGES