# U.S. District Court
## Eastern District of Missouri (St. Louis)
## CIVIL DOCKET FOR CASE #: 4:19-cv-01559-CDP

| | |
|---|---|
| Bittinger et al v. Monsanto Company | Date Filed: 06/03/2019 |
| Assigned to: District Judge Catherine D. Perry | Jury Demand: Plaintiff |
| Case in other court:  Circuit Court for the City of St. Louis, Missouri, 1922-CC00850 | Nature of Suit: 365 Personal Inj. Prod. Liability |
| Cause: 28:1331 Fed. Question | Jurisdiction: Federal Question |

**Plaintiff**

**Donald Bittinger, Jr.**                 represented by   **Mark R. Niemeyer**
                                                          NIEMEYER AND GREBEL
                                                          10 S. Broadway
                                                          Suite 1125
                                                          St. Louis, MO 63102
                                                          314-241-1919
                                                          Fax: 314-665-3017
                                                          Email: niemeyer@ngklawfirm.com
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Delmer Blankenship**                    represented by   **Mark R. Niemeyer**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Timothy Bodnar**                        represented by   **Mark R. Niemeyer**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Albert Bretz**                          represented by   **Mark R. Niemeyer**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Martin Brooks**                         represented by   **Mark R. Niemeyer**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Clyde Bruce**                           represented by   **Mark R. Niemeyer**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Cynthia Freeman**       represented by   **Mark R. Niemeyer**
*Individually And On Behalf Of Rosalie*                       (See above for address)
*Brumfield*                                         *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Paul Burkhart, Jr.**       represented by   **Mark R. Niemeyer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Patricia Cermak**       represented by   **Mark R. Niemeyer**
*Individually And On Behalf Of John*                       (See above for address)
*Cermak*                                       *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Linda Cheslow**       represented by   **Mark R. Niemeyer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Donald Cicconi**       represented by   **Mark R. Niemeyer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jody Clouse**       represented by   **Mark R. Niemeyer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Steven Coleman**       represented by   **Mark R. Niemeyer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Manuel Colon**       represented by   **Mark R. Niemeyer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Sherry Contrell**

represented by **Mark R. Niemeyer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ruth Danielson**
*Individually And On Behalf Of Henry*
*Danielson*

represented by **Mark R. Niemeyer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Scott Austin**
*Individually And On Behalf Of Arthur Davis*

represented by **Mark R. Niemeyer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Shaquona Davis**

represented by **Mark R. Niemeyer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Fred Deister**

represented by **Mark R. Niemeyer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**William Dutton**

represented by **Mark R. Niemeyer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Reid Fauntleroy**

represented by **Mark R. Niemeyer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**John Felder**

represented by **Mark R. Niemeyer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Charles Fenner, Jr.**
*Individually And On Behalf Of Wanda*
*Fenner*

represented by **Mark R. Niemeyer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Wilbur Galbraith**        represented by   **Mark R. Niemeyer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jase Geary**        represented by   **Mark R. Niemeyer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**George Gibb**        represented by   **Mark R. Niemeyer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Harry Goss**        represented by   **Mark R. Niemeyer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Kenneth Gregory**        represented by   **Mark R. Niemeyer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Peggy Griffey**        represented by   **Mark R. Niemeyer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Eric Hegrenes**        represented by   **Mark R. Niemeyer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Phillip Hovencamp**        represented by   **Mark R. Niemeyer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Judith Hughes**        represented by   **Mark R. Niemeyer**
*Individually And On Behalf Of John Hughes*        (See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Curt Hughlett**                                    represented by **Mark R. Niemeyer**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Steven Isaacson**                                  represented by **Mark R. Niemeyer**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Florence Jensen**                                  represented by **Mark R. Niemeyer**
*Individually And On Behalf Of Robert*                              (See above for address)
*Jensen*                                                            *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**John Johnson**                                     represented by **Mark R. Niemeyer**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Judith Johnson**                                   represented by **Mark R. Niemeyer**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Billy Keyes**                                      represented by **Mark R. Niemeyer**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**John Kinney, Jr.**                                 represented by **Mark R. Niemeyer**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Kyle Kreienbrink**                                 represented by **Mark R. Niemeyer**
                                                                    (See above for address)
                                                                    *LEAD ATTORNEY*
                                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Cecilia Kreplak**                            represented by **Mark R. Niemeyer**
                                               (See above for address)
                                               *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**John Kuemper**                               represented by **Mark R. Niemeyer**
                                               (See above for address)
                                               *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Matthew Kuglin**                             represented by **Mark R. Niemeyer**
                                               (See above for address)
                                               *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Brenda Langgin**                             represented by **Mark R. Niemeyer**
                                               (See above for address)
                                               *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Debra Lastoff**                              represented by **Mark R. Niemeyer**
                                               (See above for address)
                                               *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Linus Litowsky**                             represented by **Mark R. Niemeyer**
                                               (See above for address)
                                               *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Andrew Loguercio**                           represented by **Mark R. Niemeyer**
                                               (See above for address)
                                               *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Everett Maldonado**                          represented by **Mark R. Niemeyer**
                                               (See above for address)
                                               *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Travis Mallory**                             represented by **Mark R. Niemeyer**
                                               (See above for address)
                                               *LEAD ATTORNEY*
                                               *ATTORNEY TO BE NOTICED*

**Plaintiff**

Lee Mazza        represented by **Mark R. Niemeyer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

Ruby Mcfarland        represented by **Mark R. Niemeyer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

Kimberly Mcintos        represented by **Mark R. Niemeyer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

Douglas Mcintosh        represented by **Mark R. Niemeyer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

William Moore        represented by **Mark R. Niemeyer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

Andrew Namoski        represented by **Mark R. Niemeyer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

Tilden Natkin        represented by **Mark R. Niemeyer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

Bruce Oakley        represented by **Mark R. Niemeyer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

Michael Payne        represented by **Mark R. Niemeyer**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Gloria Peppers**                          represented by **Mark R. Niemeyer**
                                            (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Scott Peters**                            represented by **Mark R. Niemeyer**
                                            (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Michael Pickett**                         represented by **Mark R. Niemeyer**
                                            (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**James Ross**                              represented by **Mark R. Niemeyer**
                                            (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Michael Rowe**                            represented by **Mark R. Niemeyer**
                                            (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Richard Sanders**                         represented by **Mark R. Niemeyer**
                                            (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Kim Scott**                               represented by **Mark R. Niemeyer**
*Individually And On Behalf Of Lugene Sco*  (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Debra Shields**                           represented by **Mark R. Niemeyer**
                                            (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

Eric Sittner                          represented by  **Mark R. Niemeyer**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*


**Plaintiff**

**Suzanne Strauss**                   represented by  **Mark R. Niemeyer**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*


**Plaintiff**

**Kenneth Stuckey**                   represented by  **Mark R. Niemeyer**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*


**Plaintiff**

**Timothy Todd**                      represented by  **Mark R. Niemeyer**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*


**Plaintiff**

**Frank Todrick**                     represented by  **Mark R. Niemeyer**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*


**Plaintiff**

**John Tresher**                      represented by  **Mark R. Niemeyer**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*


**Plaintiff**

**Barbara Vale**                      represented by  **Mark R. Niemeyer**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*


**Plaintiff**

**Joyce Viviano**                     represented by  **Mark R. Niemeyer**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*


**Plaintiff**

**Donna Webster**                     represented by  **Mark R. Niemeyer**
*Individually And On Behalf Of Michael*               (See above for address)
*Webster*                                             *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

**Shirley Andrews**
*Individually And On Behalf Of Paul Wells*

represented by **Mark R. Niemeyer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

**Gregory Welp**

represented by **Mark R. Niemeyer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

**Walter Whittington**

represented by **Mark R. Niemeyer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

**Herbert Williams**

represented by **Mark R. Niemeyer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

**Bobbie Willis**

represented by **Mark R. Niemeyer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

**Ann Higingbotham**
*Individually And On Behalf Of Johnny Higingbotham*

represented by **Mark R. Niemeyer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**<u>Defendant</u>**

**Monsanto Company**

represented by **Christine F. Miller**
HUSCH BLACKWELL, LLP
190 Carondelet Plaza
Suite 600
St. Louis, MO 63105
314-480-1500
Fax: 314-480-1505
Email: chris.miller@huschblackwell.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|

| 06/03/2019 | 1 | NOTICE OF REMOVAL from Circuit Court of the City of St. Louis, MO, case number 1922-CC00850, with receipt number AMOEDC-7250357, in the amount of $400 Jury Demand,, filed by Monsanto Company. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Civil Cover Sheet, # 4 Original Filing Form)(Miller, Christine) (Entered: 06/03/2019) |
| --- | --- | --- |
| 06/03/2019 | 2 | NOTICE OF FILING NOTICE OF REMOVAL filed by Defendant Monsanto Company Sent To: Plaintiff (Miller, Christine) (Entered: 06/03/2019) |
| 06/03/2019 | 3 | Petition (Removal/Transfer) Received From: Circuit Court of the City of St. Louis, Missouri, filed by Curt Hughlett, Judith Hughes, Michael Rowe, Reid Fauntleroy, Frank Todrick, Cynthia Freeman, Bobbie Willis, George Gibb, Shaquona Davis, John Tresher, Ruth Danielson, Brenda Langgin, Andrew Namoski, Joyce Viviano, Harry Goss, Bruce Oakley, Michael Pickett, William Dutton, Linda Cheslow, Phillip Hovencamp, Florence Jensen, Donald Cicconi, Walter Whittington, Everett Maldonado, Gregory Welp, Kim Scott, Peggy Griffey, Lee Mazza, John Kinney, Jr, Richard Sanders, Michael Payne, Cecilia Kreplak, Jody Clouse, Sherry Contrell, Kimberly Mcintos, Ann Higingbotham, Scott Peters, Tilden Natkin, Barbara Vale, Debra Shields, Debra Lastoff, Shirley Andrews, Fred Deister, James Ross, William Moore, Eric Sittner, Timothy Todd, Suzanne Strauss, Scott Austin, Delmer Blankenship, Donald Bittinger, Jr, Eric Hegrenes, Jase Geary, Kenneth Gregory, Donna Webster, Kyle Kreienbrink, Manuel Colon, Kenneth Stuckey, Gloria Peppers, Travis Mallory, Wilbur Galbraith, Douglas Mcintosh, Herbert Williams, John Felder, John Kuemper, Linus Litowsky, Charles Fenner, Jr, Steven Coleman, Clyde Bruce, Timothy Bodnar, John Johnson, Patricia Cermak, Ruby Mcfarland, Andrew Loguercio, Paul Burkhart, Jr, Billy Keyes, Albert Bretz, Steven Isaacson, Judith Johnson, Matthew Kuglin, Martin Brooks.(JWD) (Entered: 06/04/2019) |
| 06/03/2019 | 4 | ANSWER to Complaint by Monsanto Company.(JWD) (Entered: 06/04/2019) |
| 06/03/2019 | 5 | MOTION to Sever and Transfer by Defendant Monsanto Company. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7)(JWD) (Entered: 06/04/2019) |
| 06/04/2019 | 6 | SUPPLEMENTAL State Court Docket Sheet re 1 Notice of Removal Petition. (JWD) (Entered: 06/04/2019) |
| 06/04/2019 | | Case Opening Notification: All non-governmental organizational parties (corporations, limited liability companies, limited liability partnerships) must file Disclosure of Organizational Interests Certificate (moed-0001.pdf). Judge Assigned: Honorable Catherine D. Perry. (JWD) (Entered: 06/04/2019) |

| PACER Service Center | | |
| --- | --- | --- |
| Transaction Receipt | | |
| 06/06/2019 14:09:50 | | |
| PACER Login: | hllp1982 | Client Code: | 1417.0049 |
| Description: | Docket Report | Search Criteria: | 4:19-cv-01559-CDP |
| Billable Pages: | 12 | Cost: | 1.20 |

**1922-CC00850**

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

## IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
## STATE OF MISSOURI

DONALD BITTINGER, JR.; DELMER
BLANKENSHIP; TIMOTHY BODNAR; ALBERT
BRETZ; MARTIN BROOKS; CLYDE BRUCE;
CYNTHIA FREEMAN, individually and on behalf
of, ROSALIE BRUMFIELD; PAUL BURKHART,
JR.; PATRICIA CERMAK, individually and on
behalf of, JOHN CERMAK; LINDA CHESLOW;
DONALD CICCONI; JODY CLOUSE; STEVEN
COLEMAN; MANUEL COLON; SHERRY
CONTRELL; RUTH DANIELSON, individually
and on behalf of, HENRY DANIELSON; SCOTT
AUSTIN, individually and on behalf of, ARTHUR
DAVIS; SHAQUONA DAVIS; FRED DEISTER;
WILLIAM DUTTON; REID FAUNTLEROY;
JOHN FELDER; CHARLES FENNER, JR.,
individually and on behalf of, WANDA FENNER;
WILBUR GALBRAITH; JASE GEARY; GEORGE
GIBB; HARRY GOSS; KENNETH GREGORY;
PEGGY GRIFFEY; ERIC HEGRENES; PHILLIP
HOVENCAMP; JUDITH HUGHES, individually
and on behalf of, JOHN HUGHES; CURT
HUGHLETT; STEVEN ISAACSON; FLORENCE
JENSEN, individually and on behalf of, ROBERT
JENSEN; JOHN JOHNSON; JUDITH JOHNSON;
BILLY KEYES; JOHN KINNEY, JR.; KYLE
KREIENBRINK; CECILIA KREPLAK; JOHN
KUEMPER; MATTHEW KUGLIN; BRENDA
LANGGIN; DEBRA LASTOFF; LINUS
LITOWSKY; ANDREW LoGUERCIO; EVERETT
MALDONADO; TRAVIS MALLORY; LEE
MAZZA; RUBY McFARLAND; KIMBERLY
McINTOSH; DOUGLAS MENARD; WILLIAM
MOORE; ANDREW NAMOSKI; TILDEN
NATKIN; BRUCE OAKLEY; MICHAEL PAYNE;
GLORIA PEPPERS; SCOTT PETERS; MICHELE
PICKETT; JAMES ROSS; MICHAEL ROWE;
RICHARD SANDERS; KIM SCOTT, individually
and on behalf of, LUGENE SCOTT; DEBRA
SHIELDS; ERIC SITTNER; SUZANNE
STRAUSS; KENNETH STUCKEY; TIMOTHY
TODD; FRANK TODRICK; JOHN TRESHER;
BARBARA VALE; JOYCE VIVIANO; DONNA
WEBSTER, individually and on behalf of,

Case No.:

**JURY TRIAL DEMANDED**

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

MICHAEL WEBSTER; SHIRLEY ANDREWS,
individually and on behalf of, PAUL WELLS;
GREGORY WELP; WALTER WHITTINGTON;
HERBERT WILLIAMS; BOBBIE WILLIS; and
ANN HIGINGBOTHAM, individually and on behalf
of JOHNNY HIGINGBOTHAM,

        Plaintiffs,

v.

MONSANTO COMPANY
Serve: Registered Agent
       CSC of St. Louis County, Inc.
       130 South Bemiston Ave., Suite 700
       Clayton, MO 63105

        Defendant.

## PETITION

COME NOW Plaintiffs, by and through their undersigned counsel, and for their causes of

action against Defendant Monsanto Company, alleging the following upon information and belief

(including investigation made by and through Plaintiffs' counsel), except those allegations that

pertain to Plaintiffs, which are based on personal knowledge:

## INTRODUCTION

Plaintiffs bring this cause of action against Defendant pursuant to Rule 52.05(a) of the

Missouri Rules of Civil Procedure, as their claims arise out of the same series of transactions and

occurrences, and their claims involve common questions of law and/or fact. All claims in this

action are a direct and proximate result of Defendants' negligent, willful, and wrongful conduct in

connection with the design, development, manufacture, testing, packaging, promoting, marketing,

distribution, and/or sale of the products as Roundup®, which was conducted without regard to

individual Plaintiff differences. All Plaintiffs in this action seek recovery for damages as a result

of developing Non-Hodgkin's Lymphoma ("NHL"), which was directly and proximately caused

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

by such wrongful conduct by Defendant, the unreasonably dangerous and defective nature of Roundup®, and its active ingredient, glyphosate, and the attendant effects of developing NHL. No Plaintiff knew of an association between exposure to Roundup® and the increased risk of developing NHL until well after the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), first published its evaluation of glyphosate. All of the claims involve common questions of law and fact and share legal and medical issues that arise out of all of the Plaintiffs' exposures to Roundup®.

## THE PARTIES

### PLAINTIFFS

### Donald Bittinger Jr.

1.      Plaintiff Donald Bittinger, Jr. is a citizen of the State of Utah and was born on September 14, 1951. Plaintiff Bittinger resides in the City of Tooele, County of Tooele.

2.      Plaintiff Bittinger was first exposed to Roundup® in Camarillo, California in 1998. He was exposed until approximately 2016.

3.      Plaintiff Bittinger was further exposed to Roundup® in Tooele, Utah from 2016 through 2018.

4.      In or about April 2012, Plaintiff Bittinger was diagnosed with NHL in Oxnard, California at St. John's Regional Medical Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

5.      As a direct and proximate result of these injuries, Plaintiff Bittinger has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

and loss of enjoyment of life, and Plaintiff Bittinger has otherwise been damaged in a personal and pecuniary nature.

6.      During the entire time that Plaintiff Bittinger was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**Delmer Blankenship**

7.      Plaintiff Delmer Blankenship is a citizen of the State of West Virginia and was born on October 3, 1954.  Plaintiff Blankenship resides in the City of Gilbert, County of Mingo.

8.      Plaintiff Blankenship was first exposed to Roundup® in Gilbert, West Virginia in 2012.  He was exposed until approximately 2016.

9.      Plaintiff Blankenship was also exposed to Roundup® in Verner, West Virginia in 2012.  He was exposed until approximately 2016.

10.     On or about March 29, 2018, Plaintiff Blankenship was diagnosed with NHL in Logan, West Virginia at Logan Regional Medical Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

11.     As a direct and proximate result of these injuries, Plaintiff Blankenship has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Blankenship has otherwise been damaged in a personal and pecuniary nature.

12.     During the entire time that Plaintiff Blankenship was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

**Timothy Bodnar**

13.     Plaintiff Timothy Bodnar is a citizen of the State of Ohio and was born on January 08, 1961.  Plaintiff Bodnar resides in the City of East Palestine, County of Columbiana.

14.     Plaintiff Bodnar was first exposed to Roundup® in East Palestine, Ohio in 1976. He was exposed until approximately 2016.

15.     Plaintiff Bodnar was further exposed to Roundup® in New Springfield, Ohio from 1996 through 2016.

16.     On or about May 16, 2016, Plaintiff Bodnar was diagnosed with NHL in Youngstown, Ohio at Hope Center for Cancer Care, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

17.     As a direct and proximate result of these injuries, Plaintiff Bodnar has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Bodnar has otherwise been damaged in a personal and pecuniary nature.

18.     During the entire time that Plaintiff Bodnar was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**Albert Bretz**

19.     Plaintiff Albert Bretz is a citizen of the State of Ohio and was born on August 30, 1950.  Plaintiff Bretz resides in the City of Hilliard, County of Franklin.

20.     Plaintiff Bretz was first exposed to Roundup® in Ohio (County of Franklin) in 1974.  He was exposed until approximately 1986.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

21.     Plaintiff Bretz was further exposed to Roundup® in Brown Township, Ohio from 1986 through 1991.

22.     Plaintiff Bretz was further exposed to Roundup® in Columbus, Ohio from 1994 through 1999.

23.     Plaintiff Bretz was further exposed to Roundup® in Hillard, Ohio from 1994 through 2003.

24.     In or about October 2003, Plaintiff Bretz was diagnosed with NHL in Columbus, Ohio at Mount Carmel Health, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

25.     As a direct and proximate result of these injuries, Plaintiff Bretz has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Bretz has otherwise been damaged in a personal and pecuniary nature.

26.     During the entire time that Plaintiff Bretz was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**Martin Brooks**

27.     Plaintiff Martin Brooks is a citizen of the State of Indiana and was born on August 12, 1963.  Plaintiff Brooks resides in the City of Marion, County of Grant.

28.     Plaintiff Brooks was first exposed to Roundup® in Marion, Indiana in 1991.  He was exposed until approximately 2017.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

29.     In or about January 2018, Plaintiff Brooks was diagnosed with NHL in Marion, Indiana at Marion General Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

30.     As a direct and proximate result of these injuries, Plaintiff Brooks has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Brooks has otherwise been damaged in a personal and pecuniary nature.

31.     During the entire time that Plaintiff Brooks was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**Clyde Bruce**

32.     Plaintiff Clyde Bruce is a citizen of the State of Georgia and was born on June 25, 1965. Plaintiff Bruce resides in the City of Austell, County of Cobb.

33.     Plaintiff Bruce was first exposed to Roundup® in Atlanta, Georgia in 1980. He was exposed until approximately 1998.

34.     Plaintiff Bruce was further exposed to Roundup® in Douglasville, Georgia from 1981 through 1998.

35.     Plaintiff Bruce was further exposed to Roundup® in Mableton, Georgia from 1998 through 2007.

36.     Plaintiff Bruce was further exposed to Roundup® in Austell, Georgia from 2007 through 2009.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

37.    In or about May 2009, Plaintiff Bruce was diagnosed with NHL in Austell, Georgia at WellStar Cobb Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

38.    As a direct and proximate result of these injuries, Plaintiff Bruce has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Bruce has otherwise been damaged in a personal and pecuniary nature.

39.    During the entire time that Plaintiff Bruce was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**Cynthia Freeman, individually and on behalf of, Rosalie Brumfield**

40.    Plaintiff Cynthia Freeman is an adult whose principal place of residence is the City of Amite, County of Tangipahoa, State of Louisiana, who brings this action in her capacity as the surviving heir of Rosalie Brumfield. Rosalie Brumfield died on May 11, 2018, in Kentwood, Louisiana, County of Tangipahoa.  Cynthia Freeman is pursuing this action due to the personal injury and resultant death suffered by Rosalie Brumfield in her representative capacity as surviving heir.  Rosalie Brumfield's injury was the direct and proximate result of her exposure to Roundup® and subsequent NHL diagnosis.

41.    Rosalie Brumfield was first exposed to Roundup® in Kentwood, Louisiana in 2005. She was exposed until approximately 2017.

42.    In or about November 2017, Rosalie Brumfield was diagnosed with NHL in Covington, LA at St. Tammany Parish Hospital, and suffered the effects attendant thereto, as a

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

43.    As a direct and proximate result of these injuries, Plaintiff Cynthia Freeman as survivor on the behalf of Rosalie Brumfield incurred medical expenses and endured pain and suffering and loss of enjoyment of life, and Plaintiff Cynthia Freeman as representative of Rosalie Brumfield has otherwise been damaged in a personal and pecuniary nature.

44.    During the entire time that Rosalie Brumfield was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

### Paul Burkhart, Jr.

45.    Plaintiff Paul Burkhart, Jr. is a citizen of the State of Florida and was born on July 14, 1949.  Plaintiff Burkhart resides in the City of Palm Coast, County of Flagler.

46.    Plaintiff Burkhart was first exposed to Roundup® in Johnstown, Pennsylvania in 1997. He was exposed until approximately 2007.

47.    Plaintiff Burkhart was further exposed to Roundup® in Palm Coast, Florida in 2007. He was exposed until approximately 2017.

48.    In or about January 2015, Plaintiff Burkhart was diagnosed with NHL in Palm Coast, Florida at Florida Cancer Specialists, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

49.    As a direct and proximate result of these injuries, Plaintiff Burkhart has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

and loss of enjoyment of life, and Plaintiff Burkhart has otherwise been damaged in a personal and pecuniary nature.

50.    During the entire time that Plaintiff Burkhart was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**Patricia Cermak, individually and on behalf of, John Cermak**

51.    Plaintiff Patricia Cermak is an adult whose principal place of residence is the City of Beaverton, County of Washington, State of Oregon, who brings this action in her capacity as the surviving heir of John Cermak.  John Cermak died on July 8, 2018, in Beaverton, Oregon, County of Washington.  Plaintiff is pursuing this action due to the personal injury and resultant death suffered by John Cermak in her representative capacity as surviving heir.  John Cermak's injury was the direct and proximate result of his exposure to Roundup® and subsequent NHL diagnosis.

52.    John Cermak was first exposed to Roundup® in Portland, Oregon in 1974.  He was exposed until approximately 1994.

53.    John Cermak was further exposed to Roundup® in Beaverton, Oregon from 1994 through 2016.

54.    In or about 2008, John Cermak was diagnosed with NHL in Portland, Oregon at Kaiser Permanente, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

55.    As a direct and proximate result of these injuries, Plaintiff Patricia Cermak as survivor on the behalf of John Cermak incurred medical expenses and endured pain and suffering

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

and loss of enjoyment of life, and Plaintiff Patricia Cermak as representative of John Cermak has otherwise been damaged in a personal and pecuniary nature.

56.    During the entire time that John Cermak was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Linda Cheslow

57.    Plaintiff Linda Cheslow is a citizen of the State of California and was born on March 15, 1953. Plaintiff Cheslow resides in the City of Santa Rosa, County of Sonoma.

58.    Plaintiff Cheslow was first exposed to Roundup® in Petaluma, California in 1984. She was exposed until approximately 1986.

59.    Plaintiff Cheslow was further exposed to Roundup® in Santa Rosa, California from 1986 through 2015.

60.    In or about December 2015, Plaintiff Cheslow was diagnosed with NHL in Santa Rosa, California at Kaiser Permanente Santa Rosa Medical Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

61.    As a direct and proximate result of these injuries, Plaintiff Cheslow has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Cheslow has otherwise been damaged in a personal and pecuniary nature.

62.    During the entire time that Plaintiff Cheslow was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

**Donald Cicconi**

63.     Plaintiff Donald Cicconi is a citizen of the State of Virginia and was born on March 12, 1947.  Plaintiff Cicconi resides in the City of Woodbridge, County of Prince William.

64.     Plaintiff Cicconi was first exposed to Roundup® in Woodbridge, Virginia in 1996. He was exposed until approximately 2018.

65.     On or about August 6, 2018, Plaintiff Cicconi was diagnosed with NHL in Woodbridge, Virginia at Sentara Northern Virginia Medical Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

66.     As a direct and proximate result of these injuries, Plaintiff Cicconi has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Cicconi has otherwise been damaged in a personal and pecuniary nature.

67.     During the entire time that Plaintiff Cicconi was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**Jody Clouse**

68.     Plaintiff Jody Clouse is a citizen of the State of Pennsylvania and was born on January 16, 1956.  Plaintiff Clouse resides in the City of Lebanon, County of Lebanon.

69.     Plaintiff Clouse was first exposed to Roundup® in Lebanon, Pennsylvania in 1989.  He was exposed until approximately 2016.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

70.     In or about September 2007, Plaintiff Clouse was diagnosed with NHL in Lebanon, Pennsylvania at WellSpan Good Samaritan Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

71.     As a direct and proximate result of these injuries, Plaintiff Clouse has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Clouse has otherwise been damaged in a personal and pecuniary nature.

72.     During the entire time that Plaintiff Clouse was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Steven Coleman

73.     Plaintiff Steven Coleman is a citizen of the State of Illinois and was born on November 16, 1958.  Plaintiff Coleman resides in the City of Belleville, County of St Clair.

74.     Plaintiff Coleman was first exposed to Roundup® in St. Louis, Missouri in 1994.  He was exposed until approximately 1997.

75.     Plaintiff Coleman was also exposed to Roundup® in Kirkwood, Missouri in 1994.  He was exposed until approximately 1997.

76.     Plaintiff Coleman was further exposed to Roundup® in Belleville, Illinois from 1996 through 2017.

77.     In or about March 2013, Plaintiff Coleman was diagnosed with NHL in Belleville, Illinois at Memorial Hospital Belleville, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

78.    As a direct and proximate result of these injuries, Plaintiff Coleman has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Coleman has otherwise been damaged in a personal and pecuniary nature.

79.    During the entire time that Plaintiff Coleman was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**Manuel Colon**

80.    Plaintiff Manuel Colon is a citizen of the State of Florida and was born on September 17, 1973.  Plaintiff Colon resides in the City of Orlando, County of Orange.

81.    Plaintiff Colon was first exposed to Roundup® in Oahu, Hawaii in 1996.  He was exposed until approximately 1998.

82.    Plaintiff Colon was further exposed to Roundup® in Fort Riley, Kansas from 1998 through 2000.

83.    Plaintiff Colon was further exposed to Roundup® in San Antonio, Texas from 2001 through 2004.

84.    Plaintiff Colon was further exposed to Roundup® in Oahu, Hawaii from 2004 through 2008.

85.    Plaintiff Colon was further exposed to Roundup® in Vilseck, Germany from 2008 through 2010.

86.    Plaintiff Colon was further exposed to Roundup® in Orlando, Florida from 2011 through 2018.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

87.    In or about February 2010, Plaintiff Colon was diagnosed with NHL in Landstuhl, Germany at Landstuhl Regional Medical Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

88.    As a direct and proximate result of these injuries, Plaintiff Colon has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Colon has otherwise been damaged in a personal and pecuniary nature.

89.    During the entire time that Plaintiff Colon was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Sherry Contrell

90.    Plaintiff Sherry Contrell is a citizen of the State of Missouri and was born on July 16, 1955. Plaintiff Contrell resides in the City of Independence, County of Jackson.

91.    Plaintiff Contrell was first exposed to Roundup® in Independence, Missouri in 2011. She was exposed until approximately 2015.

92.    In or about November 2016, Plaintiff Contrell was diagnosed with NHL in Independence, Missouri at Sarah Cannon Cancer Center at Centerpoint Medical Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

93.     As a direct and proximate result of these injuries, Plaintiff Contrell has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Contrell has otherwise been damaged in a personal and pecuniary nature.

94.     During the entire time that Plaintiff Contrell was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

**Ruth Danielson, individually and on behalf of, Henry Danielson**

95.     Plaintiff Ruth Danielson is an adult whose principal place of residence is the City of Murrieta, County of Riverside, State of California, who brings this action in her capacity as the surviving heir of Henry Danielson.  Henry Danielson died on August 28, 2001, in New Brunswick, New Jersey, County of Middlesex.  Ruth Danielson is pursuing this action due to the personal injury suffered by Henry Danielson in her representative capacity as surviving heir.  Henry Danielson's injury was the direct and proximate result of his exposure to Roundup® and subsequent NHL diagnosis.

96.     Henry Danielson was first exposed to Roundup® in Port Jefferson Station, New York in 1974.  He was exposed until approximately 2000.

97.     On or about October 5, 1998, Henry Danielson was diagnosed with NHL in Port Jefferson Station, New York at John T. Mather Memorial Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

98.     As a direct and proximate result of these injuries, Plaintiff Ruth Danielson as survivor on the behalf of Henry Danielson incurred medical expenses and endured pain and suffering and loss of enjoyment of life, and Ruth Danielson on the behalf of Henry Danielson has otherwise been damaged in a personal and pecuniary nature.

99.     During the entire time that Henry Danielson was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Scott Austin, individually and on behalf of, Arthur Davis

100.    Plaintiff Scott Austin is an adult whose principal place of residence is the City of Fleming Island, County of Clay, State of Florida, who brings this action in his capacity as the Power of Attorney of Arthur Davis.  Plaintiff Scott Austin is pursuing this action due to the personal injury suffered by Arthur Davis in his representative capacity as Power of Attorney. Arthur Davis' injury was the direct and proximate result of his exposure to Roundup® and subsequent NHL diagnosis.

101.    Plaintiff Davis was exposed to Roundup® in Fleming Island, Florida from 1996 through 2016.

102.    Plaintiff Davis was further exposed to Roundup® in Orange Park, Florida from 1996 through 2016.

103.    On or about June 25, 2008, Plaintiff Davis was diagnosed with NHL in Jacksonville, Florida at Mayo Clinic, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

104.    As a direct and proximate result of these injuries, Arthur Davis incurred medical expenses and endured pain and suffering and loss of enjoyment of life, and Arthur Davis has otherwise been damaged in a personal and pecuniary nature.

105.    During the entire time that Arthur Davis was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Shaquona Davis

106.    Plaintiff Shaquona Davis is a citizen of the State of North Carolina and was born on September 1, 1997.  Plaintiff Davis resides in the City of Princeton, County of Johnston.

107.    Plaintiff Davis was first exposed to Roundup® in Princeton, North Carolina in 2007. She was exposed until approximately 2018.

108.    In or about January 2018, Plaintiff Davis was diagnosed with NHL in Smithfield, North Carolina at Johnston Health, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

109.    As a direct and proximate result of these injuries, Plaintiff Davis has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Davis has otherwise been damaged in a personal and pecuniary nature.

110.    During the entire time that Plaintiff Davis was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

**Fred Deister**

111.     Plaintiff Fred Deister is a citizen of the State of Washington and was born on November 14, 1971.  Plaintiff Deister resides in the City of Vancouver, County of Clark.

112.     Plaintiff Deister was first exposed to Roundup® in Great Falls, Montana in 1991. He was exposed until approximately 1993.

113.     Plaintiff Deister was further exposed to Roundup® in Washougal, Washington from 1995 through 2018.

114.     In or about June 2018, Plaintiff Deister was diagnosed with NHL in Vancouver, Washington at Compass Oncology - Vancouver, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

115.     As a direct and proximate result of these injuries, Plaintiff Deister has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Deister has otherwise been damaged in a personal and pecuniary nature.

116.     During the entire time that Plaintiff Deister was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**William Dutton**

117.     Plaintiff William Dutton is a citizen of the State of Oregon and was born on June 1, 1941.  Plaintiff Dutton resides in the City of Klamath Falls, County of Klamath.

118.     Plaintiff Dutton was first exposed to Roundup® in Salem, Oregon in 1975.  He was exposed until approximately 1977.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

119.    Plaintiff Dutton was further exposed to Roundup® in Klamath Falls, Oregon from 1977 through 2018.

120.    In or about September 2001, Plaintiff Dutton was diagnosed with NHL in Medford, Oregon at Asante Rogue Regional Medical Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

121.    As a direct and proximate result of these injuries, Plaintiff Dutton has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Dutton has otherwise been damaged in a personal and pecuniary nature.

122.    During the entire time that Plaintiff Dutton was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Reid Fauntleroy

123.    Plaintiff Reid Fauntleroy is a citizen of the State of Maryland and was born on June 22, 1931.  Plaintiff Fauntleroy resides in the City of Westminster, County of Carroll.

124.    Plaintiff Fauntleroy was first exposed to Roundup® in Westminster, Maryland in 1978.  He was exposed until approximately 2017.

125.    In or about 1999, Plaintiff Fauntleroy was diagnosed with NHL in Westminster , Maryland at Carroll County Digestive Disease Center , and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

126.     As a direct and proximate result of these injuries, Plaintiff Fauntleroy has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Fauntleroy has otherwise been damaged in a personal and pecuniary nature.

127.     During the entire time that Plaintiff Fauntleroy was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### John Felder

128.     Plaintiff John Felder is a citizen of the State of Mississippi and was born on April 24, 1949.  Plaintiff Felder resides in the City of Bay St. Louis, County of Hancock.

129.     Plaintiff Felder was first exposed to Roundup® in Waveland, Mississippi in 1975. He was exposed until approximately 2018.

130.     In or about August 2003, Plaintiff Felder was diagnosed with NHL in Jefferson, Louisiana at The Gayle and Tom Benson Cancer Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

131.     As a direct and proximate result of these injuries, Plaintiff Felder has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Felder has otherwise been damaged in a personal and pecuniary nature.

132.     During the entire time that Plaintiff Felder was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

**Charles Fenner, Jr., individually and on behalf of, Wanda Fenner**

133.    Plaintiff Charles Fenner, Jr. is an adult whose principal place of residence is the City of Flint, County of Genesee, State of Michigan, who brings this action in his capacity as the surviving heir of Wanda Fenner.  Wanda Fenner died on February 9, 2017, in Flint, Michigan, County of Genesee. Charles Fenner, Jr. is pursuing this action due to the personal injury and resultant death suffered by Wanda Fenner in his representative capacity as surviving heir.  Wanda Fenner's injury was the direct and proximate result of her exposure to Roundup® and subsequent NHL diagnosis.

134.    Wanda Fenner was first exposed to Roundup® in Flint, Michigan in 1982.  She was exposed until approximately 2017.

135.    In or about March 2000, Wanda Fenner was diagnosed with NHL in Detroit, Michigan at Henry Ford Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

136.    As a direct and proximate result of these injuries, Plaintiff Charles Fenner, Jr. as survivor on the behalf of Wanda Fenner incurred medical expenses and endured pain and suffering and loss of enjoyment of life, and Plaintiff Charles Fenner, Jr. as representative of Wanda Fenner has otherwise been damaged in a personal and pecuniary nature.

137.    During the entire time that Wanda Fenner was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

**Wilbur Galbraith**

138.    Plaintiff Wilbur Galbraith is a citizen of the State of Ohio and was born on June 24,
1942.  Plaintiff Galbraith resides in the City of Newcomerstown, County of Guernsey.

139.    Plaintiff Galbraith was first exposed to Roundup® in Newcomerstown, Ohio from
1980 through 2018.

140.    In or about December 2012, Plaintiff Galbraith was diagnosed with NHL in
Columbus, Ohio at James Cancer Hospital Solove Research Institute, and suffered the effects
attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective
nature of Roundup® and Defendant's wrongful and negligent conduct in the research,
development, testing, manufacture, production, promotion, distribution, marketing, and sale of
Roundup®.

141.    As a direct and proximate result of these injuries, Plaintiff Galbraith has incurred
and will incur medical expenses in the future and has endured and will endure pain and suffering
and loss of enjoyment of life, and Plaintiff Galbraith has otherwise been damaged in a personal
and pecuniary nature.

142.    During the entire time that Plaintiff Galbraith was exposed to Roundup®, he did not
know that exposure to Roundup® was injurious to his health or the health of others.

**Jase Geary**

143.    Plaintiff Jase Geary is a citizen of the State of California and was born on May 2,
1967.  Plaintiff Geary resides in the City of Orange, County of Orange.

144.    Plaintiff Geary was first exposed to Roundup® in Bellevue, Nebraska in 1994.  He
was exposed until approximately 1996.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

145.   Plaintiff Geary was further exposed to Roundup® in Bellevue, Nebraska from 2001 through 2003.

146.   Plaintiff Geary was further exposed to Roundup® in Fort Worth, Texas from 2003 through 2015.

147.   In or about June 2011, Plaintiff Geary was diagnosed with NHL in Dallas, Texas at UT Southwestern Medical Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

148.   As a direct and proximate result of these injuries, Plaintiff Geary has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Geary has otherwise been damaged in a personal and pecuniary nature.

149.   During the entire time that Plaintiff Geary was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**George Gibb**

150.   Plaintiff George Gibb is a citizen of the State of Massachusetts and was born on April 9, 1960. Plaintiff Gibb resides in the City of Lowell, County of Middlesex.

151.   Plaintiff Gibb was first exposed to Roundup® in Lowell, Massachusetts in 2007. He was exposed until approximately 2014.

152.   In or about March 2016, Plaintiff Gibb was diagnosed with NHL in Nashua, New Hampshire at Southern New Hampshire Medical Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup®

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

153.    As a direct and proximate result of these injuries, Plaintiff Gibb has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Gibb has otherwise been damaged in a personal and pecuniary nature.

154.    During the entire time that Plaintiff Gibb was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**Harry Goss**

155.    Plaintiff Harry Goss is a citizen of the State of Texas and was born on October 18, 1938.  Plaintiff Goss resides in the City of White Oak, County of Gregg.

156.    Plaintiff Goss was first exposed to Roundup® in White Oak, Texas in 1996.  He was exposed until approximately 2010.

157.    Plaintiff was also exposed to Roundup® in Fannin Court, Texas from 1996 through 2010.

158.    In or about October, 2005, Plaintiff Goss was diagnosed with NHL in Longview, Texas at Texas Oncology – Longview Cancer Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

159.    As a direct and proximate result of these injuries, Plaintiff Goss has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

loss of enjoyment of life, and Plaintiff Goss has otherwise been damaged in a personal and pecuniary nature.

160.    During the entire time that Plaintiff Goss was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Kenneth Gregory

161.    Plaintiff Kenneth Gregory is a citizen of the State of Indiana and was born on August 17, 1946.  Plaintiff Gregory resides in the City of North Vernon, County of Jennings.

162.    Plaintiff Gregory was first exposed to Roundup® in North Vernon, Indiana in 2006. He was exposed until approximately 2017.

163.    In or about February 2018, Plaintiff Gregory was diagnosed with NHL in Indianapolis, Indiana at Franciscan Health Indianapolis, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

164.    As a direct and proximate result of these injuries, Plaintiff Gregory has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Gregory has otherwise been damaged in a personal and pecuniary nature.

165.    During the entire time that Plaintiff Gregory was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Peggy Griffey

166.    Plaintiff Penny Griffey is a citizen of the State of Kansas and was born on November 4, 1935.  Plaintiff Griffey resides in the City of Lenexa, County of Johnson.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

167.    Plaintiff Griffey was first exposed to Roundup® in Farragut, Iowa from 2008 through 2016.

168.    In or about September 2016, Plaintiff Griffey was diagnosed with NHL in Shawnee Mission, Kansas at AdventHealth Shawnee Mission, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

169.    As a direct and proximate result of these injuries, Plaintiff Griffey has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Griffey has otherwise been damaged in a personal and pecuniary nature.

170.    During the entire time that Plaintiff Griffey was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

### Eric Hegrenes

171.    Plaintiff Eric Hegrenes is a citizen of the State of Wisconsin and was born on February 28, 1957. Plaintiff Hegrenes resides in the City of River Falls, County of Pierce.

172.    Plaintiff Hegrenes was first exposed to Roundup® in Maplewood, Minnesota in 1982. He was exposed until approximately 1985.

173.    Plaintiff Hegrenes was also exposed to Roundup® in St. Paul, Minnesota in 1982. He was exposed until approximately 2014.

174.    Plaintiff Hegrenes was further exposed to Roundup® in River Falls, Wisconsin from 2006 through 2019.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

175.    Plaintiff Hegrenes was further exposed to Roundup® in Fort Myers, Florida from 2014 through 2019.

176.    In or about September 2000, Plaintiff Hegrenes was diagnosed with NHL in Maplewood, Minnesota at HealthEast St. John's Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

177.    As a direct and proximate result of these injuries, Plaintiff Hegrenes has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Hegrenes has otherwise been damaged in a personal and pecuniary nature.

178.    During the entire time that Plaintiff Hegrenes was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Phillip Hovencamp

179.    Plaintiff Phillip Hovencamp is a citizen of the State of Vermont and was born on March 1, 1961.  Plaintiff Hovencamp resides in the City of Underhill, County of Chittenden.

180.    Plaintiff Hovencamp was first exposed to Roundup® in Underhill, Vermont in 1974. He was exposed until approximately 2016.

181.    Plaintiff Hovencamp was further exposed to Roundup® in Essex Junction, Vermont from 1980 through 1981.

182.    Plaintiff Hovencamp was further exposed to Roundup® in Hanover, New Hampshire from 1985 through 1988.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

183.    Plaintiff Hovencamp was further exposed to Roundup® in Providence, Rhode Island from 1988 through 1990.

184.    Plaintiff Hovencamp was further exposed to Roundup® in Syracuse, New York from 1990 through 1992.

185.    On or about October 31, 2007, Plaintiff Hovencamp was diagnosed with NHL in Burlington, Vermont at The University of Vermont Medical Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

186.    As a direct and proximate result of these injuries, Plaintiff Hovencamp has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Hovencamp has otherwise been damaged in a personal and pecuniary nature.

187.    During the entire time that Plaintiff Hovencamp was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Judith Hughes, individually and on behalf of, John Hughes

188.    Plaintiff Judith Hughes is an adult whose principal place of residence is the City of Rutherfordton, County of Rutherford, State of North Carolina, who brings this action in her capacity as the surviving heir of John Hughes. John Hughes died on October 26, 2013, in Ashville, North Carolina, County of Buncombe. Plaintiff is pursuing this action due to the personal injury and resultant death suffered by John Hughes in her representative capacity as surviving heir. John

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

Hughes's injury was the direct and proximate result of his exposure to Roundup® and subsequent NHL diagnosis.

189.    John Hughes was first exposed to Roundup® in Rutherfordton, North Carolina in 2005.  He was exposed until approximately 2013.

190.    On or about January 7, 2013, John Hughes was diagnosed with NHL in Ashville, North Carolina at Charles George VA Medical Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

191.    As a direct and proximate result of these injuries, Plaintiff Judith Hughes as survivor on the behalf of John Hughes incurred medical expenses and endured pain and suffering and loss of enjoyment of life, and Plaintiff Judith Hughes as representative of John Hughes has otherwise been damaged in a personal and pecuniary nature.

192.    During the entire time that John Hughes was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**Curt Hughlett**

193.    Plaintiff Curt Hughlett is a citizen of the State of California and was born on August 25, 1959.  Plaintiff Hughlett resides in the City of Canoga Park, County of Los Angeles.

194.    Plaintiff Hughlett was first exposed to Roundup® in Chatsworth, California in 1978. He was exposed until approximately 1979.

195.    Plaintiff Hughlett was further exposed to Roundup® in Reseda, California from 1979 through 1980.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

196.     Plaintiff Hughlett was further exposed to Roundup® in Cucamonga, California from 1988 through 1990.

197.     Plaintiff Hughlett was further exposed to Roundup® in Reseda, California from 1994 through 1996.

198.     Plaintiff Hughlett was further exposed to Roundup® in Canoga Park, California from 1997 through 2018.

199.     In or about April 1997, Plaintiff Hughlett was diagnosed with NHL in Woodland Hills, California at Kaiser Permanente Woodland Hills Medical Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

200.     As a direct and proximate result of these injuries, Plaintiff Hughlett has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Hughlett has otherwise been damaged in a personal and pecuniary nature.

201.     During the entire time that Plaintiff Hughlett was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Steven Isaacson

202.     Plaintiff Steven Isaacson is a citizen of the State of New Jersey and was born on October 7, 1944.  Plaintiff Isaacson resides in the City of Mount Laurel, County of Burlington.

203.     Plaintiff Isaacson was first exposed to Roundup® in Mount Laurel, New Jersey in 1988.  He was exposed until approximately 2004.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

204.    In or about January 2011, Plaintiff Isaacson was diagnosed with NHL in Philadelphia, Pennsylvania at Fox Chase Cancer Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

205.    As a direct and proximate result of these injuries, Plaintiff Isaacson has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Isaacson has otherwise been damaged in a personal and pecuniary nature.

206.    During the entire time that Plaintiff Isaacson was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**Florence Jensen, individually and on behalf of, Robert Jensen**

207.    Plaintiff Florence Jensen is an adult whose principal place of residence is the City of Federal Way, County of King, State of Washington, who brings this action in her capacity as the surviving heir of Robert Jensen. Robert Jensen died on December 7, 2007, in Silverdale, Washington, County of Kitsap.  Plaintiff is pursuing this action due to the personal injury and resultant death suffered by Robert Jensen in her representative capacity as surviving heir.  Robert Jensen's injury was the direct and proximate result of his exposure to Roundup® and subsequent NHL diagnosis.

208.    Robert Jensen was first exposed to Roundup® in West Valley, Utah in 1975.  He was exposed until approximately 1995.

209.    Robert Jensen was further exposed to Roundup® in Bremerton, Washington from 2001 through 2007.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

210.    In or about October 2005, Robert Jensen was diagnosed with NHL in Silverdale, Washington at The Doctors Clinic – Ridgetop East, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

211.    As a direct and proximate result of these injuries, Plaintiff Florence Jensen as survivor on the behalf of Robert Jensen incurred medical expenses and endured pain and suffering and loss of enjoyment of life, and Plaintiff Florence Jensen as representative of Robert Jensen has otherwise been damaged in a personal and pecuniary nature.

212.    During the entire time that Robert Jensen was exposed to Roundup®, he did not know that exposure to Roundup® was injurious his health or the health of others.

### John Johnson

213.    Plaintiff John Johnson is a citizen of the State of Arizona and was born on May 25, 1965.  Plaintiff Johnson resides in the City of Lake Havasu City, County of Mohave.

214.    Plaintiff Johnson was first exposed to Roundup® in Lake Havasu City, Arizona in 1994.  He was exposed until approximately 2016.

215.    On or about September 15, 2017, Plaintiff Johnson was diagnosed with NHL in Lake Havasu City, Arizona by Michael Lyster, M.D., and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

216.    As a direct and proximate result of these injuries, Plaintiff Johnson has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

and loss of enjoyment of life, and Plaintiff Johnson has otherwise been damaged in a personal and pecuniary nature.

217.   During the entire time that Plaintiff Johnson was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Judith Johnson

218.   Plaintiff Judith Johnson is a citizen of the State of Florida and was born on March 25, 1942.  Plaintiff Johnson resides in the City of Okeechobee, County of Okeechobee.

219.   Plaintiff Johnson was first exposed to Roundup® in Runnelstown, Mississippi in 1975.  She was exposed until approximately 1980.

220.   Plaintiff Johnson was further exposed to Roundup® in Hattiesburg, Mississippi in 1983.

221.   Plaintiff Johnson was further exposed to Roundup® in Okeechobee, Florida from 2012 through 2017.

222.   On or about January 7, 2015, Plaintiff Johnson was diagnosed with NHL in Okeechobee, Florida by Vaseem Syed Akhtar M.D., and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

223.   As a direct and proximate result of these injuries, Plaintiff Johnson has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Johnson has otherwise been damaged in a personal and pecuniary nature.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

224.    During the entire time that Plaintiff Johnson was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

**Billy Keyes**

225.    Plaintiff Billy Keyes is a citizen of the State of Mississippi and was born on January 19, 1937. Plaintiff Keyes resides in the City of Flora, County of Madison.

226.    Plaintiff Keyes was first exposed to Roundup® in Flora, Mississippi from 1998 through 2015.

227.    In or about December 2005, Plaintiff Keyes was diagnosed with NHL in Jackson, Mississippi at St. Dominic Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

228.    As a direct and proximate result of these injuries, Plaintiff Keyes has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Keyes has otherwise been damaged in a personal and pecuniary nature.

229.    During the entire time that Plaintiff Keyes was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**John Kinney, Jr.**

230.    Plaintiff John Kinney, Jr. is a citizen of the State of Florida and was born on September 9, 1962. Plaintiff Kinney resides in the City of Bradenton, County of Manatee.

231.    Plaintiff Kinney was first exposed to Roundup® in Bradenton, Florida in 2007. He was exposed until approximately 2011.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

232.    On or about July 1, 2011, Plaintiff Kinney was diagnosed with NHL in Tampa, Florida at H. Lee Moffitt Cancer Center & Research Institute, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

233.    As a direct and proximate result of these injuries, Plaintiff Kinney has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Kinney has otherwise been damaged in a personal and pecuniary nature.

234.    During the entire time that Plaintiff Kinney was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Kyle Kreienbrink

235.    Plaintiff Kyle Kreienbrink is a citizen of the State of Wisconsin and was born on October 9, 1962. Plaintiff Kreienbrink resides in the City of Wabeno, County of Forest.

236.    Plaintiff Kreienbrink was first exposed to Roundup® in Mequon, Wisconsin from 1976 through 1988.

237.    Plaintiff Kreienbrink was further exposed to Roundup® in Wabeno, Wisconsin from 2007 through 2009.

238.    In or about November 2010, Plaintiff Kreienbrink was diagnosed with NHL in Rhinelander, Wisconsin at James Beck Cancer Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

239.     As a direct and proximate result of these injuries, Plaintiff Kreienbrink has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Kreienbrink has otherwise been damaged in a personal and pecuniary nature.

240.     During the entire time that Plaintiff Kreienbrink was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Cecilia Kreplak

241.     Plaintiff Cecilia Kreplak is a citizen of the State of North Carolina and was born on July 11, 1941.  Plaintiff Kreplak resides in the City of Greensboro, County of Guilford.

242.     Plaintiff Kreplak was first exposed to Roundup® in Miami, Florida in 1996.  She was exposed until approximately 2013.

243.     In or about August 2005, Plaintiff Kreplak was diagnosed with NHL in Miami, FL at Baptist Health South Florida, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

244.     As a direct and proximate result of these injuries, Plaintiff Kreplak has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Kreplak has otherwise been damaged in a personal and pecuniary nature.

245.     During the entire time that Plaintiff Kreplak was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

### John Kuemper

246.   Plaintiff John Kuemper is a citizen of the State of Minnesota and was born on January 20, 1953.  Plaintiff Kuemper resides in the City of Bird Island, County of Renville.

247.   Plaintiff Kuemper was first exposed to Roundup® in Bird Island, Minnesota in 1986.  He was exposed until approximately 2018.

248.   In or about September 2015, Plaintiff Kuemper was diagnosed with NHL in Hutchinson, Minnesota at Hutchinson Health Clinic, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

249.   As a direct and proximate result of these injuries, Plaintiff Kuemper has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Kuemper has otherwise been damaged in a personal and pecuniary nature.

250.   During the entire time that Plaintiff Kuemper was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Matthew Kuglin

251.   Plaintiff Matthew Kuglin is a citizen of the State of New Jersey and was born on September 12, 1968.  Plaintiff Kuglin resides in the City of Rockaway, County of Morris.

252.   Plaintiff Kuglin was first exposed to Roundup® in New Jersey (Counties of: Essex and Morris) in 1990.  He was exposed until approximately 2016.

253.    Plaintiff Kuglin was further exposed to Roundup® in Rockaway, New Jersey from 2000 through 2010.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

254.     In or about April 2005, Plaintiff Kuglin was diagnosed with NHL in Hackensack, New Jersey at Hackensack Medical Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

255.     As a direct and proximate result of these injuries, Plaintiff Kuglin has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Kuglin has otherwise been damaged in a personal and pecuniary nature.

256.     During the entire time that Plaintiff Kuglin was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Brenda Langgin

257.     Plaintiff Brenda Langgin is a citizen of the State of Oklahoma and was born on July 3, 1959.  Plaintiff Langgin resides in the City of Tulsa, County of Tulsa.

258.     Plaintiff Langgin was first exposed to Roundup® in Ottumwa, Iowa in 1981.

259.     Plaintiff Langgin was also exposed to Roundup® in El Reno, Oklahoma in 1981. She was exposed until approximately 1983.

260.     Plaintiff Langgin was further exposed to Roundup® in Muldrow, Oklahoma from 1983 through 1984.

261.     Plaintiff Langgin was further exposed to Roundup® in Ottumwa, Iowa from 1984 through 1985.

262.     Plaintiff Langgin was further exposed to Roundup® in Muldrow, Oklahoma from 1985 through 1986.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

263.    Plaintiff Langgin was further exposed to Roundup® in Springfield, Missouri from 1986 through 1990.

264.    Plaintiff Langgin was further exposed to Roundup® in Marion, Kansas from 1990 through 1991.

265.    Plaintiff Langgin was further exposed to Roundup® in Grandview, Missouri from 1991 through 1993.

266.    Plaintiff Langgin was further exposed to Roundup® in Marshalltown, Iowa from 1994 through 1996.

267.    Plaintiff Langgin was further exposed to Roundup® in Albion, Iowa from 1996 through 2001.

268.    Plaintiff Langgin was further exposed to Roundup® in Coweta, Oklahoma from 2002 through 2007.

269.    Plaintiff Langgin was further exposed to Roundup® in Tulsa, Oklahoma from 2008 through 2016.

270.    On or about July 17, 2017, Plaintiff Langgin was diagnosed with NHL in Tulsa, Oklahoma by Dr. Michael W. Tanner, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

271.    As a direct and proximate result of these injuries, Plaintiff Langgin has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Langgin has otherwise been damaged in a personal and pecuniary nature.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

272.   During the entire time that Plaintiff Langgin was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

**Debra Lastoff**

273.   Plaintiff Debra Lastoff is a citizen of the State of Maine and was born on July 7, 1949.  Plaintiff Lastoff resides in the City of Eliot, County of York.

274.   Plaintiff Lastoff was exposed to Roundup® in Eliot, Maine from 1997 through 2007.

275.   On or about September 28, 2016, Plaintiff Lastoff was diagnosed with NHL in Portsmouth, New Hampshire at Portsmouth Regional Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

276.   As a direct and proximate result of these injuries, Plaintiff Lastoff has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Lastoff has otherwise been damaged in a personal and pecuniary nature.

277.   During the entire time that Plaintiff Lastoff was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

**Linus Litowsky**

278.   Plaintiff Linus Litowsky is a citizen of the State of Nevada and was born on January 19, 1963.  Plaintiff Litowsky resides in the City of Las Vegas, County of Clark.

279.   Plaintiff Litowsky was first exposed to Roundup® in Las Vegas, Nevada in 1990.  He was exposed until approximately 2008.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

280.     In or about May 2009, Plaintiff Litowsky was diagnosed with NHL in Las Vegas, Nevada at Mountain View Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

281.     As a direct and proximate result of these injuries, Plaintiff Litowsky has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Litowsky has otherwise been damaged in a personal and pecuniary nature.

282.     During the entire time that Plaintiff Litowsky was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Andrew LoGuercio

283.     Plaintiff Andrew LoGuercio is a citizen of the State of New Jersey and was born on May 25, 1959.  Plaintiff LoGuercio resides in the City of River Edge, County of Bergen.

284.     Plaintiff LoGuercio was first exposed to Roundup® in Dumont, New Jersey in 1976. He was exposed until approximately 1986.

285.     Plaintiff LoGuercio was further exposed to Roundup® in Bergenfield, New Jersey from 1987 through 1991.

286.     Plaintiff LoGuercio was further exposed to Roundup® in River Edge, New Jersey from 1992 through 2019.

287.     Plaintiff LoGuercio was further exposed to Roundup® in Lower Township, New Jersey from 2009 through 2019.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

288.    In or about March 2004, Plaintiff LoGuercio was diagnosed with NHL in Paramus, New Jersey at Robert and Audrey Luckow Pavilion-Valley Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

289.    As a direct and proximate result of these injuries, Plaintiff LoGuercio has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff LoGuercio has otherwise been damaged in a personal and pecuniary nature.

290.    During the entire time that Plaintiff LoGuercio was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**Everett Maldonado**

291.    Plaintiff Everett Maldonado is a citizen of the State of New Jersey and was born on October 9, 1969.  Plaintiff Maldonado resides in the City of Lawrenceville, County of Mercer.

292.    Plaintiff Maldonado was first exposed to Roundup® in Lawrenceville, New Jersey in 1996.  He was exposed until approximately 2006.

293.    Plaintiff Maldonado was also exposed to Roundup® in Ewing, New Jersey in 1996.  He was exposed until approximately 2006.

294.    In or about April 2006, Plaintiff Maldonado was diagnosed with NHL in Trenton, New Jersey at Capital Health Regional Medical Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup®

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

295.    As a direct and proximate result of these injuries, Plaintiff Maldonado has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Maldonado has otherwise been damaged in a personal and pecuniary nature.

296.    During the entire time that Plaintiff Maldonado was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Travis Mallory

297.    Plaintiff Travis Mallory is a citizen of the State of Texas and was born on November 27, 1959.  Plaintiff Mallory resides in the City of Longview, County of Gregg.

298.    Plaintiff Mallory was first exposed to Roundup® in Marshall, Texas in 1984.  He was exposed until approximately 1998.

299.    Plaintiff Mallory was further exposed to Roundup® in Longview, Texas from 1994 through 2016.

300.    In or about December 2016, Plaintiff Mallory was diagnosed with NHL in Longview, Texas at Longview Regional Medical Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

301.    As a direct and proximate result of these injuries, Plaintiff Mallory has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

loss of enjoyment of life, and Plaintiff Mallory has otherwise been damaged in a personal and pecuniary nature.

302.    During the entire time that Plaintiff Mallory was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Lee Mazza

303.    Plaintiff Lee Mazza is a citizen of the State of Ohio and was born on February 8, 1965.  Plaintiff Mazza resides in the City of Sandusky, County of Erie.

304.    Plaintiff Mazza was first exposed to Roundup® in Sandusky, Ohio in 1992.  He was exposed until approximately 2007.

305.    In or about November 2006, Plaintiff Mazza was diagnosed with NHL in Castalia, Ohio at North Coast Cancer Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

306.    As a direct and proximate result of these injuries, Plaintiff Mazza has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Mazza has otherwise been damaged in a personal and pecuniary nature.

307.    During the entire time that Plaintiff Mazza was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Ruby McFarland

308.    Plaintiff Ruby McFarland is a citizen of the State of Mississippi and was born on September 6, 1943.  Plaintiff McFarland resides in the City of Meridian, County of Lauderdale.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

309.    Plaintiff McFarland was first exposed to Roundup® in Meridian, Mississippi in 1978. She was exposed until approximately 2017.

310.    In or about August 2014, Plaintiff McFarland was diagnosed with NHL in Meridian, Mississippi at Meridian Oncology Associates PLLC, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

311.    As a direct and proximate result of these injuries, Plaintiff McFarland has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff McFarland has otherwise been damaged in a personal and pecuniary nature.

312.    During the entire time that Plaintiff McFarland was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

**Kimberly McIntosh**

313.    Plaintiff Kimberly McIntosh is a citizen of the State of Ohio and was born on April 17, 1960. Plaintiff McIntosh resides in the City of Windham, County of Portage.

314.    Plaintiff McIntosh was first exposed to Roundup® in Windham, Ohio in 1993. She was exposed until approximately 2006.

315.    In or about September 2011, Plaintiff McIntosh was diagnosed with NHL in Akron, Ohio at Akron General Hematology & Oncology, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

316.    As a direct and proximate result of these injuries, Plaintiff McIntosh has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff McIntosh has otherwise been damaged in a personal and pecuniary nature.

317.    During the entire time that Plaintiff McIntosh was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

**Douglas Menard**

318.    Plaintiff Douglas Menard is a citizen of the State of Massachusetts and was born on October 3, 1946.  Plaintiff Menard resides in the City of Marion, County of Plymouth.

319.    Plaintiff Menard was first exposed to Roundup® in Massachusetts (Counties of: Bristol and Plymouth) in 1977.  He was exposed until approximately 2017.

320.    Plaintiff Menard was further exposed to Roundup® in Marion, Massachusetts from 1986 through 2017.

321.    In or about February 2011, Plaintiff Menard was diagnosed with NHL in Fairhaven, Massachusetts at Southcoast Centers for Cancer Care, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

322.    As a direct and proximate result of these injuries, Plaintiff Menard has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Menard has otherwise been damaged in a personal and pecuniary nature.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

323.    During the entire time that Plaintiff Menard was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**William Moore**

324.    Plaintiff William Moore is a citizen of the State of New York and was born on October 19, 1946.  Plaintiff Moore resides in the City of Getzville, County of Erie.

325.    Plaintiff Moore was first exposed to Roundup® in Snyder, New York in 1985.  He was exposed until approximately 2014.

326.    Plaintiff Moore was further exposed to Roundup® in Ridgeway, Ontario, Canada from 1986 through 2018.

327.    Plaintiff Moore was further exposed to Roundup® in Getzville, New York from 2015 through 2018.

328.    In or about March 2008, Plaintiff Moore was diagnosed with NHL in Buffalo, New York at Roswell Park Comprehensive Cancer Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

329.    As a direct and proximate result of these injuries, Plaintiff Moore has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Moore has otherwise been damaged in a personal and pecuniary nature.

330.    During the entire time that Plaintiff Moore was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

**Andrew Namoski**

331.    Plaintiff Andrew Namoski is a citizen of the State of Ohio and was born on November 3, 1962.  Plaintiff Namoski resides in the City of Hinckley, County of Medina.

332.    Plaintiff Namoski was first exposed to Roundup® in Akron, Ohio in 1985.  He was exposed until approximately 2015.

333.    Plaintiff Namoski was also exposed to Roundup® in Hinckley, Ohio in 1985.  He was exposed until approximately 2015.

334.    In or about August 2015, Plaintiff Namoski was diagnosed with NHL in Cleveland, Ohio at MetroHealth Medical Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

335.    As a direct and proximate result of these injuries, Plaintiff Namoski has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Namoski has otherwise been damaged in a personal and pecuniary nature.

336.    During the entire time that Plaintiff Namoski was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**Tilden Natkin**

337.    Plaintiff Tilden Natkin is a citizen of the State of Illinois and was born on June 14, 1942.  Plaintiff Natkin resides in the City of Riverwoods, County of Lake.

338.    Plaintiff Natkin was first exposed to Roundup® in Morton Grove, Illinois in 1974. He was exposed until approximately 1977.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

339.    Plaintiff Natkin was further exposed to Roundup® in Riverwoods, Illinois from 1977 through 2016.

340.    In or about October 2016, Plaintiff Natkin was diagnosed with NHL in Highland Park, Illinois at Highland Park Kellogg Cancer Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

341.    As a direct and proximate result of these injuries, Plaintiff Natkin has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Natkin has otherwise been damaged in a personal and pecuniary nature.

342.    During the entire time that Plaintiff Natkin was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**Bruce Oakley**

343.    Plaintiff Bruce Oakley is a citizen of the State of Arizona and was born on October 17, 1960.  Plaintiff Oakley resides in the City of Phoenix, County of Maricopa.

344.    Plaintiff Oakley was first exposed to Roundup® in Phoenix, Arizona in 2004.  He was exposed until approximately 2018.

345.    Plaintiff Oakley was further exposed to Roundup® in Salt Lake City, Utah from 2008 through 2011.

346.    Plaintiff Oakley was further exposed to Roundup® in Las Vegas, Nevada from 2008 through 2011.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

347.    Plaintiff Oakley was further exposed to Roundup® in Reno, Nevada from 2008 through 2011.

348.    Plaintiff Oakley was further exposed to Roundup® in San Diego, California from 2008 through 2011.

349.    On or about June 19, 2018, Plaintiff Oakley was diagnosed with NHL in Phoenix, Arizona at Banner Estrella Medical Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

350.    As a direct and proximate result of these injuries, Plaintiff Oakley has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Oakley has otherwise been damaged in a personal and pecuniary nature.

351.    During the entire time that Plaintiff Oakley was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Michael Payne

352.    Plaintiff Michael Payne is a citizen of the State of Minnesota and was born on March 15, 1980.  Plaintiff Payne resides in the City of Brainerd, County of Crow Wing.

353.    Plaintiff Payne was first exposed to Roundup® in Brainerd, Minnesota in 1996.  He was exposed until approximately 2013.

354.    In or about April 2013, Plaintiff Payne was diagnosed with NHL in St. Paul, Minnesota at HealthEast St. Joseph's Hospital and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

355.     As a direct and proximate result of these injuries, Plaintiff Payne has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Payne has otherwise been damaged in a personal and pecuniary nature.

356.     During the entire time that Plaintiff Payne was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**Gloria Peppers**

357.     Plaintiff Gloria Peppers is a citizen of the State of Texas and was born on August 4, 1942.  Plaintiff Peppers resides in the City of Spring, County of Harris.

358.     Plaintiff Peppers was first exposed to Roundup® in La Porte, Texas in 1985.  She was exposed until approximately 1996.

359.     Plaintiff Peppers was further exposed to Roundup® in Spring, Texas from 1999 through 2018.

360.     On or about July 16, 2017, Plaintiff Peppers was diagnosed with NHL in Houston, TX at Houston Methodist Willowbrook Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

361.     As a direct and proximate result of these injuries, Plaintiff Peppers has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

loss of enjoyment of life, and Plaintiff Peppers has otherwise been damaged in a personal and pecuniary nature.

362.    During the entire time that Plaintiff Peppers was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

### Scott Peters

363.    Plaintiff Scott Peters is a citizen of the State of Washington and was born on April 13, 1973. Plaintiff Peters resides in the City of Valleyford, County of Spokane.

364.    Plaintiff Peters was first exposed to Roundup® in Rockford, Washington in 1989.

365.    Plaintiff Peters was further exposed to Roundup® in Workley, Idaho from 1991 through 1992.

366.    In or about March 2012, Plaintiff Peters was diagnosed with NHL in Spokane, Washington at MultiCare Rockwood Center and Blood Specialty Center – Spokane Valley, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

367.    As a direct and proximate result of these injuries, Plaintiff Peters has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Peters has otherwise been damaged in a personal and pecuniary nature.

368.    During the entire time that Plaintiff Peters was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

**Michele Pickett**

369.     Plaintiff Michele Pickett is a citizen of the State of New Jersey and was born on December 27, 1968.  Plaintiff Pickett resides in the City of Union, County of Union.

370.     Plaintiff Pickett was first exposed to Roundup® in Patterson, New Jersey in 1995. She was exposed until approximately 2007.

371.     On or about October 16, 2012, Plaintiff Pickett was diagnosed with NHL in Summit, New Jersey at Overlook Medical Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

372.     As a direct and proximate result of these injuries, Plaintiff Pickett has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Pickett has otherwise been damaged in a personal and pecuniary nature.

373.     During the entire time that Plaintiff Pickett was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

**James Ross**

374.     Plaintiff James Ross is a citizen of the State of North Carolina and was born on September 25, 1957.  Plaintiff Ross resides in the City of Tuckasegee, County of Jackson.

375.     Plaintiff Ross was first exposed to Roundup® in Fort Lawn, South Carolina from 1990 through 2008.

376.     Plaintiff Ross was further exposed to Roundup® in Tuckasgee, North Carolina from 1998 through 2015.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

377.    In or about 2011, Plaintiff Ross was diagnosed with NHL in Waynesville, North Carolina at Cancer Care of Western North Carolina, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

378.    As a direct and proximate result of these injuries, Plaintiff Ross has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Ross has otherwise been damaged in a personal and pecuniary nature.

379.    During the entire time that Plaintiff Ross was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Michael Rowe

380.    Plaintiff Michael Rowe is a citizen of the State of Oklahoma and was born on July 4, 1949. Plaintiff Rowe resides in the City of Henryetta, County of McIntosh.

381.    Plaintiff Rowe was first exposed to Roundup® in Henryetta, Oklahoma in 1983. He was exposed until approximately 2018.

382.    In or about June 2007, Plaintiff Rowe was diagnosed with NHL in Oklahoma City, Oklahoma at Cancer Specialist of Oklahoma: Parker Gregory A. M.D., and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

383. As a direct and proximate result of these injuries, Plaintiff Rowe has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Rowe has otherwise been damaged in a personal and pecuniary nature.

384. During the entire time that Plaintiff Rowe was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Richard Sanders

385. Plaintiff Richard Sanders is a citizen of the State of Ohio and was born on April 2, 1947. Plaintiff Sanders resides in the City of Vermilion, County of Erie.

386. Plaintiff Sanders was first exposed to Roundup® in Bellevue, Ohio in 1989. He was exposed until approximately 2013.

387. In or about April 2017, Plaintiff Sanders was diagnosed with NHL in Sandusky, Ohio at UH Seidman Cancer Center at Firelands Regional Medical Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

388. As a direct and proximate result of these injuries, Plaintiff Sanders has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Sanders has otherwise been damaged in a personal and pecuniary nature.

389. During the entire time that Plaintiff Sanders was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

**Kim Scott, individually and on behalf of, Lugene Scott**

390.    Plaintiff Kim Scott is an adult whose principal place of residence is the City of Florence, County of Florence, State of South Carolina, who brings this action in his capacity as the surviving heir of Lugene Scott.   Lugene Scott died on July 11, 2017, in Florence, South Carolina, County of Florence.   Plaintiff is pursuing this action due to the personal injury and resultant death suffered by Lugene Scott in his representative capacity as surviving heir.   Lugene Scott's injury was the direct and proximate result of his exposure to Roundup® and subsequent NHL diagnosis.

391.    Lugene Scott was first exposed to Roundup® in Long Island, New York in 1974. He was exposed until approximately 1982.

392.    Lugene Scott was further exposed to Roundup® in Selma, Alabama from 1982 through 1997.

393.    Lugene Scott was further exposed to Roundup® in Florence, South Carolina from 1997 through 2014.

394.    In or about April 2024, Lugene Scott was diagnosed with NHL in Florence, South Carolina at McLeod Oncology and Hematology Associates, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

395.    As a direct and proximate result of these injuries, Plaintiff Kim Scott as survivor on the behalf of Lugene Scott incurred medical expenses and endured pain and suffering and loss of enjoyment of life, and Plaintiff Kim Scott as representative of Lugene Scott has otherwise been damaged in a personal and pecuniary nature.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

396.    During the entire time that Lugene Scott was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**Debra Shields**

397.    Plaintiff Debra Shields is a citizen of the State of Pennsylvania and was born on February 19, 1957.  Plaintiff Shields resides in the City of Hanover Township, County of Luzerne.

398.    Plaintiff Shields was first exposed to Roundup® in Hanover Township, Pennsylvania in 1989. She was exposed until approximately 2017.

399.    Plaintiff Shields was further exposed to Roundup® in Nanticoke, Pennsylvania from 1998 through 2006.

400.    On or about April 12, 2010, Plaintiff Shields was diagnosed with NHL in Kingston, Pennsylvania at Medical Oncology Associates, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

401.    As a direct and proximate result of these injuries, Plaintiff Shields has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Shields has otherwise been damaged in a personal and pecuniary nature.

402.    During the entire time that Plaintiff Shields was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

**Eric Sittner**

403.    Plaintiff Eric Sittner is a citizen of the State of Colorado and was born on October 21, 1955.  Plaintiff Sittner resides in the City of Englewood, County of Arapahoe.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

404.    Plaintiff Sittner was first exposed to Roundup® in Centennial, Colorado in 2010. He was exposed until approximately 2018.

405.    In or about November 2003, Plaintiff Sittner was diagnosed with NHL in Englewood, Colorado at David M. Schrier M.D., and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

406.    As a direct and proximate result of these injuries, Plaintiff Sittner has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Sittner has otherwise been damaged in a personal and pecuniary nature.

407.    During the entire time that Plaintiff Sittner was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Suzanne Strauss

408.    Plaintiff Suzanne Strauss is a citizen of the State of Pennsylvania and was born on June 19, 1952.  Plaintiff Strauss resides in the City of Philadelphia, County of Philadelphia.

409.    Plaintiff Strauss was first exposed to Roundup® in Hockessin, Delaware in 1994. She was exposed until approximately 2013.

410.    In or about June 2007, Plaintiff Strauss was diagnosed with NHL in Newark, Delaware at Medical Oncology Hematology Consultants, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

411.    As a direct and proximate result of these injuries, Plaintiff Strauss has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Strauss has otherwise been damaged in a personal and pecuniary nature.

412.    During the entire time that Plaintiff Strauss was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

### Kenneth Stuckey

413.    Plaintiff Kenneth Stuckey is a citizen of the State of Alabama and was born on April 6, 1960.  Plaintiff Stuckey resides in the City of Hoover, County of Shelby.

414.    Plaintiff Stuckey was first exposed to Roundup® in Birmingham, Alabama in 1986.  He was exposed until approximately 1989.

415.    Plaintiff Stuckey was further exposed to Roundup® in Castaic, California from 1989 through 1991.

416.     Plaintiff Stuckey was further exposed to Roundup® in Birmingham, Alabama from 1992 through 2018.

417.    In or about August, 2010, Plaintiff Stuckey was diagnosed with NHL in Birmingham, Hospital at UAB Medical Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

418.    As a direct and proximate result of these injuries, Plaintiff Stuckey has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

loss of enjoyment of life, and Plaintiff Stuckey has otherwise been damaged in a personal and pecuniary nature.

419.    During the entire time that Plaintiff Stuckey was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Timothy Todd

420.    Plaintiff Timothy Todd is a citizen of the State of Missouri and was born on September 5, 1964. Plaintiff Todd resides in the City of St. Louis, County of St. Louis.

421.    Plaintiff Todd was exposed to Roundup® in St. Louis, Missouri from 2002 through 2010 while spraying Roundup® at his home. Plaintiff sprayed Roundup® every year from April through June, twice a month. Plaintiff wore no protective gear while spraying Roundup®. Plaintiff used premixed Roundup®. Plaintiff purchased Roundup® for use at various local hardware stores.

422.    Plaintiff Todd was further exposed to Roundup® in St. Louis, Missouri from 2010 through 2017 while spraying Roundup® at his home. Plaintiff sprayed Roundup® every year from April through June, twice a month. Plaintiff wore no protective gear while spraying Roundup®. Plaintiff used premixed Roundup®. Plaintiff purchased Roundup® for use at various local hardware stores.

423.    In or about October 2017, Plaintiff Todd was diagnosed with NHL in St. Louis, Missouri at St. Mary's Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

424.    As a direct and proximate result of these injuries, Plaintiff Todd has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

loss of enjoyment of life, and Plaintiff Todd has otherwise been damaged in a personal and pecuniary nature.

425.    During the entire time that Plaintiff Todd was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Frank Todrick

426.    Plaintiff Frank Todrick is a citizen of the State of New York and was born on September 8, 1955. Plaintiff Todrick resides in the City of Mattituck, County of Suffolk.

427.    Plaintiff Todrick was first exposed to Roundup® in Mattituck, New York in 1985. He was exposed until approximately 2018.

428.    On or about August 2, 2017, Plaintiff Todrick was diagnosed with NHL in Riverhead, New York at New York Cancer and Blood Specialists, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

429.    As a direct and proximate result of these injuries, Plaintiff Todrick has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Todrick has otherwise been damaged in a personal and pecuniary nature.

430.    During the entire time that Plaintiff Todrick was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

**John Tresher**

431.    Plaintiff John Tresher is a citizen of the State of Georgia and was born on April 22, 1949. Plaintiff Tresher resides in the City of Savannah, County of Chatham.

432.    Plaintiff Tresher was first exposed to Roundup® in Savannah, Georgia in 1998. He was exposed until approximately 2012.

433.    In or about December 2012, Plaintiff Tresher was diagnosed with NHL in Savannah, Georgia at Summit Cancer Care, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

434.    As a direct and proximate result of these injuries, Plaintiff Tresher has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Tresher has otherwise been damaged in a personal and pecuniary nature.

435.    During the entire time that Plaintiff Tresher was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**Barbara Vale**

436.    Plaintiff Barbara Vale is a citizen of the State of Ohio and was born on April 19, 1943. Plaintiff Vale resides in the City of Brunswick, County of Medina.

437.    Plaintiff Vale was first exposed to Roundup® in Brunswick, Ohio in 2012. She was exposed until approximately 2013.

438.    In or about January 2014, Plaintiff Vale was diagnosed with NHL in Medina, Ohio at Cleveland Clinic - Medina Hospital, and suffered the effects attendant thereto, as a direct and

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

439.    As a direct and proximate result of these injuries, Plaintiff Vale has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Vale has otherwise been damaged in a personal and pecuniary nature.

440.    During the entire time that Plaintiff Vale was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

### Joyce Viviano

441.    Plaintiff Joyce Viviano is a citizen of the State of New York and was born on December 05, 1941.  Plaintiff Viviano resides in the City of Liverpool, County of Onondaga.

442.    Plaintiff Viviano was first exposed to Roundup® in Liverpool, New York in 1990. She was exposed until approximately 2018.

443.    In or about July 2017, Plaintiff Viviano was diagnosed with NHL in Syracuse, New York at Hematology-Oncology Associates of Central New York - Onondaga Hill, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

444.    As a direct and proximate result of these injuries, Plaintiff Viviano has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

loss of enjoyment of life, and Plaintiff Viviano has otherwise been damaged in a personal and pecuniary nature.

445.     During the entire time that Plaintiff Viviano was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

**Donna Webster, individually and on behalf of, Michael Webster**

446.     Plaintiff Donna Webster is an adult whose principal place of residence is the City of Madison, County of Rockingham, State of North Carolina, who brings this action in her capacity as the surviving heir of Michael Webster.  Michael Webster died on August 23, 2016, in Greensboro, North Carolina, County of Guilford.  Donna Webster is pursuing this action due to the personal injury suffered by Michael Webster in her representative capacity as surviving heir. Michael Webster's injury was the direct and proximate result of his exposure to Roundup® and subsequent NHL lymphoma diagnosis.

447.     Michael Webster was first exposed to Roundup® in Greensboro, North Carolina from 1980 through 1987.

448.     Michael Webster was further exposed to Roundup® in Walnut Cove, North Carolina from 1983 through 1993.

449.     Michael Webster was further exposed to Roundup® in Madison, North Carolina from 1987 through 2016.

450.     On or about April 26, 2013, Michael Webster was diagnosed with NHL in Greensboro, North Carolina at Cone Health Wesley Long Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research,

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

451.    As a direct and proximate result of these injuries, Plaintiff Donna Webster as survivor on the behalf of Michael Webster incurred medical expenses and endured pain and suffering and loss of enjoyment of life, and Donna Webster on the behalf of Michael Webster has otherwise been damaged in a personal and pecuniary nature.

452.    During the entire time that Michael Webster was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

**Shirley Andrews, individually and on behalf of, Paul Wells**

453.    Plaintiff Shirley Andrews is an adult whose principal place of residence is the City of Summit, County of Pike, State of Mississippi, who brings this action in her capacity as the surviving heir of Paul Wells. Paul Wells died on January 23, 2018, in Summit, Mississippi, County of Pike. Shirley Andrews is pursuing this action due to the personal injury suffered by Paul Wells in her representative capacity as surviving heir. Paul Wells' injury was the direct and proximate result of his exposure to Roundup® and subsequent NHL lymphoma diagnosis.

454.    Paul Wells was first exposed to Roundup® in McComb, Mississippi in 1984. He was exposed until approximately 2008.

455.    Paul Wells was further exposed to Roundup® in Summit, Mississippi from 1997 through 2018.

456.    On or about September 16, 2016, Paul Wells was diagnosed with NHL in Jackson, Mississippi at The University of Mississippi Medical Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

457.    As a direct and proximate result of these injuries, Plaintiff Shirley Andrews as survivor on the behalf of Paul Wells incurred medical expenses and endured pain and suffering and loss of enjoyment of life, and Shirley Andrews on the behalf of Paul Wells has otherwise been damaged in a personal and pecuniary nature.

458.    During the entire time that Paul Wells was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Gregory Welp

459.    Plaintiff Gregory Welp is a citizen of the State of Iowa and was born on June 7, 1962.  Plaintiff Welp resides in the City of Ventura, County of Cerro Gordo.

460.    Plaintiff Welp was first exposed to Roundup® in Mason City, Iowa in 1986.

461.    Plaintiff Welp was further exposed to Roundup® in Ventura, Iowa from 1991 through 2017.

462.    On or about May 1, 2017, Plaintiff Welp was diagnosed with NHL in Rochester, Minnesota at Mayo Clinic, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

463.    As a direct and proximate result of these injuries, Plaintiff Welp has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Welp has otherwise been damaged in a personal and pecuniary nature.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

464.    During the entire time that Plaintiff Welp was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Walter Whittington

465.    Plaintiff Walter Whittington is a citizen of the State of Mississippi and was born on January 31, 1947.  Plaintiff Whittington resides in the City of Pearl, County of Rankin.

466.    Plaintiff Whittington was first exposed to Roundup® in Tacoma, Washington in 1975.  He was exposed until approximately 1979.

467.    Plaintiff Whittington was also exposed to Roundup® in Salinas, California in 1980. He was exposed until approximately 1985.

468.    Plaintiff Whittington was also exposed to Roundup® in Jackson, Mississippi in 1985.  He was exposed until approximately 2014.

469.    On or about May 24, 2017, Plaintiff Whittington was diagnosed with NHL in Jackson, Mississippi at Baptist Health Systems Jackson, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

470.    As a direct and proximate result of these injuries, Plaintiff Whittington has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Whittington has otherwise been damaged in a personal and pecuniary nature.

471.    During the entire time that Plaintiff Whittington was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

### Herbert Williams

472.    Plaintiff Herbert Williams is a citizen of the State of Mississippi and was born on December 30, 1944.  Plaintiff Williams resides in the City of Redwood, County of Warren.

473.    Plaintiff Williams was first exposed to Roundup® in Redwood, Mississippi in 2000. He was exposed until approximately 2018.

474.    In or about October 2015, Plaintiff Williams was diagnosed with NHL in Vicksburg, Mississippi at River Regional Medical Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

475.    As a direct and proximate result of these injuries, Plaintiff Williams has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Williams has otherwise been damaged in a personal and pecuniary nature.

476.    During the entire time that Plaintiff Williams was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Bobbie Willis

477.    Plaintiff Bobbie Willis is a citizen of the State of Mississippi and was born on January 29, 1974.  Plaintiff Willis resides in the City of Grenada, County of Grenada.

478.    Plaintiff Willis was first exposed to Roundup® in Coffeeville, Mississippi in 1990. She was exposed until approximately 1995.

479.    Plaintiff Willis was further exposed to Roundup® in Grenada, Mississippi from 1998 through 2007.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

480.    In or about April, 2007, Plaintiff Willis was diagnosed with NHL in Grenada, Mississippi at The University of Mississippi Medical Center- Grenada, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

481.    As a direct and proximate result of these injuries, Plaintiff Willis has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Willis has otherwise been damaged in a personal and pecuniary nature.

482.    During the entire time that Plaintiff Willis was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

**Ann Higingbotham, individually and on behalf of, Johnny Higingbotham**

483.    Plaintiff Ann Higingbotham is an adult whose principal place of residence is in McRae-Helena, the County of Telfair, State of Georgia. Plaintiff Higingbotham brings this action in her capacities as the surviving spouse of Johnny Ray Higingbotham, and as the duly appointed Executrix of the Estate of Johnny Ray Higingbotham.

484.    Johnny Ray Higingbotham ("Decedent Higingbotham") was born on June 16, 1950 and died on September 27, 2016, in McRae, Georgia. Decedent Higingbotham was 66 years old at the time of his death.

485.    Decedent Higingbotham's cause of death was Diffuse Large B Cell Lymphoma.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

486.   Decedent Higingbotham was continuously exposed to Roundup® in Telfair County, Georgia, beginning in the 1970s until 2016. During that time period, Decedent Higingbotham was exposed to Roundup® via the following ways:

a.   while applying it at his residential property and his neighbor's residential property. He sprayed Roundup® several times annually on his residential property and his neighbor's residential property to control weed growth.

b.   while working for the City of Helena, Georgia, which job duties entailed checking water meters for water usage.  For two days of each month while Decedent Higingbotham had this job, he would check water meters.

c.   While checking water meters, Decedent Higingbotham was exposed to Roundup® when he sprayed the product on and around water meters to control weed growth.

d.   while volunteering or working for the County Recreational Department. Decedent Higingbotham was exposed to Roundup® when he sprayed the product on and around the recreational fields, fences, and facilities to control weed growth.

e.   while applying it at his hunting club, "White Tail Hunting Club," during the growing season each year.  Decedent Higingbotham was exposed to Roundup® when he applied it to the food plots, among other places, on the 1,800-acre hunting club to control weed growth.

487.   The Roundup® that Decedent Higingbotham used was purchased from Wal-Mart and local stores in McRae, Georgia.

488.   During the entire time that Decedent Higingbotham was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

489.    Decedent Higingbotham was diagnosed with Diffuse Large B Cell Lymphoma, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

490.    As a direct and proximate result of Defendant's wrongful acts, Decedent Higingbotham developed Diffuse Large B Cell Lymphoma, and suffered death, among other things.

491.    Plaintiff Higingbotham, as the surviving spouse of Decedent Higingbotham, is the proper party to bring this wrongful-death action pursuant to O.C.G.A. § 51-4-2(a).  As a direct and proximate result of the homicide and wrongful death of Decedent Higingbotham, as caused by the acts and omissions of the Defendant herein, Plaintiff Higingbotham is entitled to recover all damages allowed by Georgia law for the death of Decedent Higingbotham, including damages equal to the full value of his life, without deduction for expenses or necessaries had he lived, as determined by a fair and impartial jury. See O.C.G.A. § 51-4-2.

492.    Plaintiff Higingbotham, as the duly appointed Executrix of the Estate of Johnny Ray Higingbotham, is the proper party to bring this action for estate claims pursuant to O.C.G.A. § 51-4-5.  Plaintiff Higingbotham is entitled to an award of all damages allowed by Georgia law against the Defendant, including damages for Decedent Higingbotham's pain and suffering, funeral expenses, burial expenses, and medical and other actual expenses.

493.    In addition to the allegations regarding the tolling of the statute of limitations detailed infra, Plaintiff Higingbotham additionally alleges that all statutes of limitations are tolled pursuant to O.C.G.A. § 9-3-99. See 7 U.S.C. § 136l (criminal penalties available against any party

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

"who violates any provision of" FIFRA); O.C.G.A. § 2-7-73 (criminal penalties for violating Georgia Pesticide Control Act of 1976); Bates v. Dow Agrosciences LLC, 544 U.S. 431, 439, n. 11 (2005) ("manufacturers may be subjected to civil and criminal penalties for violating FIFRA's requirements."); O.C.G.A. § 16-9-50 (criminal penalties for deceptive business practices); O.C.G.A. § 16-2-22 (corporate liability). See also 7 U.S.C. §§ 136(q) and 136j; 40 C.F.R. § 156.10(a)(5); O.C.G.A. §§ 2-7-53, 2-7-62, 2-7-69, 2-7-114, and 2-7-102; and Ga. Comp. R. & Regs. 40-11-10-.01 and 40-11-9-.01. Accordingly, Defendant is precluded from relying upon any statute of limitations.

### JOINDER AND VENUE

494.    At all times relevant hereto, Monsanto was in the business of researching, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, labeling, and packaging and Monsanto was in the business of marketing, promoting, and/or advertising Roundup® products in the State of Missouri and the County of St. Louis.

495.    At all times relevant hereto, Monsanto was a Delaware corporation with its headquarters and principal place of business in St. Louis County, Missouri, and therefore is a local defendant for purposes of removal.

496.    All Plaintiffs herein are properly joined pursuant to Rule 52.05(a) of the Missouri rules of Civil Procedure as their claims all arise out of the same series of transactions or occurrences.  All claims in this action are a direct and proximate result of Defendants' negligent, willful, and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, and/or sale of the products as Roundup®, which was conducted without regard to individual Plaintiff differences.  All Plaintiffs in this action seek

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

recovery for damages as a result of developing NHL, which was directly and proximately caused by such wrongful conduct by Defendant, the unreasonably dangerous and defective nature of Roundup®, and its active ingredient, glyphosate, and the attendant effects of developing NHL. All of the claims involve common questions of law and fact and share legal and medical issues that arise out of all of the Plaintiffs' exposures to Roundup®.

497.    Further, Mo. Rev. Stat. § 508.010.5(1) and § 508.010.9 provide:

5. Notwithstanding any other provision of law, in all actions in which there is a count alleging a tort and in which the plaintiff was first injured outside the state of Missouri, venue shall be determined as follows:

(1)  If the defendant is a corporation, then venue shall be in any county where a defendant corporation's registered agent is located or, if the plaintiff's principal place of residence was in the state of Missouri on the date the plaintiff was first injured, then venue may be in the county of the plaintiff's principal place of residence on the date the plaintiff was first injured.

9. In all actions, venue shall be determined as of the date the plaintiff was first injured.

498.    Defendant Monsanto Company's registered agent from 1942 until 2004 was CT Corporation System.  From at least 1974 until April 20, 1998, CT Corporation System had its registered office and was located within the City of St. Louis.  From at least 1974 until 1988, CT Corporation System was located at 314 North Broadway, St. Louis, Missouri 63102.  From 1988 until April of 1998, CT Corporation System was located at 906 Olive Street, St. Louis, Missouri 63101.  Thus, from at least 1974 through April 20, 1998, service could only be effectuated in the City of St. Louis.

499.    Venue is further proper in the City of St. Louis pursuant to Mo. Rev. Stat. § 508.010.5(1) and § 508.010.9 because this is a tort case in which many of the Plaintiffs were first

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

injured outside the state of Missouri, and the registered agent for Defendant Monsanto was located in the City of St. Louis at the time of one or more of those Plaintiffs' first exposure to Roundup®.

## ALLEGATIONS COMMON TO ALL COUNTS

500.    In 1970, Defendant Monsanto Company, Inc. ("Monsanto") discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®.   Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops.   In addition to the active ingredient glyphosate, Roundup® contains the surfactant Polyethoxylated tallow amine (POEA) and/or adjuvants and other so-called "inert" ingredients.  In 2001, glyphosate was the most-used pesticide active ingredient in American agriculture with 85–90 million pounds used annually.   That number grew to 185 million pounds in 2007.[1]  As of 2013, glyphosate was the world's most widely used herbicide.

501.    Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri, and incorporated in Delaware.  It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market.[2]  The majority of these seeds are of the Roundup Ready® brand.  The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, because glyphosate can be sprayed in the fields during the growing season without harming the crops.  In 2010, an estimated 70% of corn and cotton and 90% of soybean fields in the United States were Roundup Ready®.[3]

---

[1] Arthur Grube et al., U.S. Envtl. Prot. Agency, *Pesticides Industry Sales and Usage, 2006–2007 Market Estimates* 14 (2011), *available at* http://www.epa.gov/pesticides/pestsales/07pestsales/market_estimates2007.pdf.

[2] ETC Group, *Who Will Control the Green Economy?* 22 (2011), *available at* http://www.etcgroup.org/files/publication/pdf_file/ETC_wwctge_4web_Dec2011.pdf.

[3] William Neuman & Andrew Pollack, *Farmers Cope With Roundup-Resistant Weeds*, N.Y. TIMES, May 3, 2010, *available at* http://www.nytimes.com/2010/05/04/business/energy-environment/04weed.html?pagewan.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

502.    Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops.[4]  They are ubiquitous in the environment.  Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used.[5]  It has been found in food,[6] in the urine of agricultural workers,[7] and even in the urine of urban dwellers who are not in direct contact with glyphosate.[8]

503.    On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate.  That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

504.    On July 29, 2015, IARC issued the formal monograph relating to glyphosate.  In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

505.    The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is *probably carcinogenic to humans*.  The IARC Working Group concluded that the

---

[4] Monsanto, *Backgrounder-History of Monsanto's Glyphosate Herbicides* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/back_history.pdf.

[5] *See* U.S. Geological Survey, *USGS Technical Announcement: Widely Used Herbicide Commonly Found in Rain and Streams in the Mississippi River Basin* (2011), *available at* http://www.usgs.gov/newsroom/article.asp?ID=2909; *see also* U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate, available at* http://www.epa.gov/safewater/pdfs/factsheets/soc/tech/glyphosa.pdf.

[6] Thomas Bohn et al., *Compositional Differences in Soybeans on the Market: Glyphosate Accumulates in Roundup Ready GM Soybeans*, 153 FOOD CHEMISTRY 207 (2013), *available at* http://www.sciencedirect.com/science/article/pii/S0308814613019201.

[7] John F. Acquavella et al., *Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study*, 112(3) ENVTL. HEALTH PERSPECTIVES 321 (2004), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241861/; Kathryn Z. Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, 112 IARC Monographs 76, section 5.4 (2015), *available at* http://dx.doi.org/10.1016/S1470-2045(15)70134-8.

[8] Dirk Brändli & Sandra Reinacher, *Herbicides found in Human Urine*, 1 ITHAKA JOURNAL 270 (2012), *available at* http://www.ithaka-journal.net/druckversionen/e052012-herbicides-urine.pdf.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

cancers most associated with glyphosate exposure are NHL and other haematopoietic cancers, including lymphocytic lymphoma / chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.[9]

506.   The IARC evaluation is significant.  It confirms what has been believed for years: that glyphosate is toxic to humans.

507.   Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment.  Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

## FACTS

508.   Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

509.   Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis.  Treated plants generally die within two to three days.  Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

510.   For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses.  That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment.  Of course, history has shown that not to be true.  According

---

[9] *See* Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra.*

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

to the WHO, the main chemical ingredient of Roundup®—glyphosate—is a probable cause of cancer.  Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as garden center workers, nursery workers, and landscapers.  Agricultural workers are, once again, victims of corporate greed.  Monsanto assured the public that Roundup® was harmless.  In order to prove this, Monsanto has championed falsified data and has attacked legitimate studies that revealed Roundup®'s dangers.  Monsanto has led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® is safe.

### *The Discovery of Glyphosate and Development of Roundup®*

511.    The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz.  The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®.[10]  From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use.  It still markets Roundup® as safe today.[11]

512.    In addition to the active ingredient glyphosate, Roundup® formulations also contain adjuvants and other chemicals, such as the surfactant POEA, which are considered "inert" and therefore protected as "trade secrets" in manufacturing.  Growing evidence suggests that these adjuvants and additional components of Roundup® formulations are not, in fact, inert and are toxic in their own right.

---

[10] Monsanto, *Backgrounder, History of Monsanto's Glyphosate Herbicide* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/back_history.pdf.

[11] Monsanto, *What is Glyphosate?* (Sep. 2, 2015), http://www.monsanto.com/sitecollectiondocuments/glyphosate-safety-health.pdf.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

### *Registration of Herbicides under Federal Law*

513.    The manufacture, formulation, and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.*  FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act.  7 U.S.C. § 136a(a).

514.    Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.  Registration by the EPA, however, is not an assurance or finding of safety.  The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment."  7 U.S.C. § 136a(c)(5)(D).

515.    FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide."  7 U.S.C. § 136(bb).  FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or a pesticide allowed to continue to be sold in commerce.

516.    The EPA and the State of California registered Roundup® for distribution, sale, and manufacture in the United States and the State of California.

517.    FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products.  The EPA has protocols governing the

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation.  The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

518.   The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time.  The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration."  7 U.S.C. § 136a-1.  In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's recent review and evaluation.

519.   In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment—in relation to the reregistration process—no later than July 2015.  The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

*Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®*

520.   Based on early studies showing that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985.  After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."[12]

521.    On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

522.    In the first instance, Monsanto, in seeking initial registration of Roundup® by the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®.[13]   IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

523.    In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate.   The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid.[14]   An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[15]

524.    Three top executives of IBT were convicted of fraud in 1983.

---

[12] U.S. Envtl. Prot. Agency, *Memorandum, Subject: SECOND Peer Review of Glyphosate* 1 (1991), *available at* http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_30-Oct-91_265.pdf.

[13] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/ibt_craven_bkg.pdf.

[14] U.S. Envtl. Prot. Agency, *Summary of the IBT Review Program Office of Pesticide Programs* (1983), *available at* http://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA&Index=1981+Thru +1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&QF ieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles %5CIndex%20Data%5C81thru85%5CTxt%5C00000022%5C91014ULV.txt&User=ANONYMOUS&Password=an onymous&SortMethod=h%7C- &MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=p%7Cf&De fSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page&MaximumPages=1&ZyE ntry=1&SeekPage=x&ZyPURL.

[15] Marie-Monique Robin, *The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply* (2011) (citing U.S. Envtl. Prot. Agency, *Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch. Washington, D.C.* (August 9, 1978)).

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

525.    In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.[16]

526.    Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

### *The Importance of Roundup® to Monsanto's Market Dominance Profits*

527.    The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

528.    In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

---

[16] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories, supra.*

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

529.    Through a three-pronged strategy of increasing production, decreasing prices, and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue.[17]  Today, glyphosate remains one of the world's largest herbicides by sales volume.

### *Monsanto has known for decades that it falsely advertises the safety of Roundup®*

530.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products.  Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were **"safer than table salt"** and **"practically non-toxic"** to mammals, birds, and fish.  Among the representations the NYAG found deceptive and misleading about the human and environmental safety of glyphosate and/or Roundup® are the following:

> a)  "Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ..."

> b)  "And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem."

> c)  "Roundup   biodegrades   into   naturally   occurring elements."

> d)  "Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

> e)  "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it."

---

[17] David Barboza, *The Power of Roundup; A Weed Killer Is A Block for Monsanto to Build On*, N.Y. TIMES, Aug. 2, 2001, *available at* http://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weed-killer-is-a-block-for-monsanto-to-build-on.html.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

f) "You can apply Accord with 'confidence because it will stay where you put it' it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products."

g) "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

h) "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

i) "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[18]

531.   On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

---

[18] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

532.    Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief it still has not done so today.

533.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[19]

### Classifications and Assessments of Glyphosate

534.    The IARC process for the classification of glyphosate followed IARC's stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

535.    The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.[20] Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

536.    One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working

---

[19] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.

[20] World Health Org., *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble* (2006), available at http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in *The Lancet Oncology*, and within a year after the meeting, the finalized Monograph is published.

537.    In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

538.    In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

539.    On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph Volume 112. For Volume 112, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015 to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated a nearly one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

540.    The studies considered the following exposure groups: (1) occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and (2) para-occupational exposure in farming families.

541.    Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

542.    Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

543.    The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

544.    The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

545.    The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

546.    In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor: renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

547.    The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption.   Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA).  Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

548.    The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

549.    The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.[21] Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

550.    The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.[22] While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and multiple myeloma, hairy cell leukemia (HCL), and chronic lymphocytic leukemia (CLL), in addition to several other cancers.

### Other Earlier Findings About Glyphosate's Dangers to Human Health

551.    The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate.  This technical

---

[21] Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, *supra* at 77.

[22] Anneclare J. De Roos et al., *Cancer Incidence Among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study*, 113 Envt'l Health Perspectives 49–54 (2005), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1253709/pdf/ehp0113-000049.pdf.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

fact sheet predates IARC's March 20, 2015 evaluation. The fact sheet describes the release patterns for glyphosate as follows:

> **Release Patterns**
>
> Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.
>
> It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.
>
> Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.[23]

552.    In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.[24]

### *The Toxicity of Other Ingredients in Roundup®*

553.    In addition to the toxicity of the active ingredient, glyphosate, several studies support the hypothesis that the glyphosate-based formulation in Defendant's Roundup® products

---

[23] U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate*, *supra*.

[24] Caroline Cox, *Glyphosate, Part 2: Human Exposure and Ecological Effects*, 15 J. PESTICIDE REFORM 4 (1995); W.S. Peas et al., *Preventing pesticide-related illness in California agriculture: Strategies and priorities. Environmental Health Policy Program Report*, Univ. of Cal. School of Public Health, Calif. Policy Seminar (1993).

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

is more dangerous and toxic than glyphosate alone. Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.[25]

554.   In 2002, a study by Julie Marc, entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation," revealed that Roundup® causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cell cycles.[26]

555.   A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation. The researchers noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."[27]

556.   In 2005, a study by Francisco Peixoto, entitled "Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup®'s effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone. The Peixoto study further suggested that the harmful effects of Roundup® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the

---

[25] Martinez, T.T. and K. Brown, *Oral and pulmonary toxicology of the surfactant used in Roundup herbicide*, PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991).

[26] Julie Marc, et al., *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation*, 15 CHEM. RES. TOXICOL. 326–331 (2002), *available at* http://pubs.acs.org/doi/full/10.1021/tx015543g.

[27] Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation*, 96 BIOLOGY OF THE CELL 245, 245-249 (2004), *available at* http://onlinelibrary.wiley.com/doi/10.1016/j.biolcel.2003.11.010/epdf.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

result of other chemicals, such as the surfactant POEA, or in the alternative, due to a potential synergic effect between glyphosate and other ingredients in the Roundup® formulation.[28]

557.    In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup® and glyphosate on human umbilical, embryonic, and placental cells.  The study tested dilution levels of Roundup® and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food.  The researchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability and amplify toxicity of glyphosate alone.  The researchers further suggested that assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide.  The study confirmed that the adjuvants present in Roundup® are not, in fact, inert and that Roundup® is potentially far more toxic than its active ingredient glyphosate alone.[29]

558.    The results of these studies were at all times available to Defendant.

559.    Monsanto's chief toxicologist Donna Farmer has admitted that she cannot say that Roundup® does not cause cancer because Monsanto has not performed carcinogenicity studies with the formulated product Roundup®, the very product that caused Plaintiffs' NHL.[30]  Indeed, she further admitted that in the 35 years that Monsanto has marketed Roundup® to the public, Monsanto has conducted no chronic carcinogenicity studies on the formulated Roundup® product

---

[28] Francisco Peixoto, *Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation*, 61 CHEMOSPHERE 1115, 1122 (2005), *available at* https://www.researchgate.net/publication/7504567_Comparative_effects_of_the_Roundup_and_glyphosate_on_mit ochondrial_oxidative_phosphorylation.

[29] Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic, and Placental Cells*, 22 CHEM. RES. TOXICOL. 97-105 (2008), *available at* http://big.assets.huffingtonpost.com/france.pdf.

[30] *See* Plaintiffs' Submission in Response to Pretrial Order No. 8, Ex. 7, *In re: Roundup Products Liability Litigation*, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 187-7.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

merely because EPA did not require that such a study be performed for registration of glyphosate.[31]

560.     Defendant thus knew or should have known that Roundup® is more toxic than glyphosate alone and that safety studies of Roundup®, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiffs from Roundup®.

561.     Despite its knowledge that Roundup® is considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup® as safe.

### The EPA's Review of Glyphosate

562.     In April 2016, personnel within the EPA's Office of Pesticides Program (OPP) leaked and posted on the internet a draft report on glyphosate carcinogenicity, entitled Cancer Assessment Review Committee (CARC) report, dated October 2015.   The EPA removed the documents by May 2, 2016, within days of initially posting it online.   An EPA spokesperson subsequently issued a statement on the agency's glyphosate review:

> Glyphosate documents were inadvertently posted to the Agency's docket. These documents have now been taken down because our assessment is not final. EPA has not completed our cancer review. We will look at the work of other governments as well as work by HHS's Agricultural Health Study as we move to make a decision on glyphosate. Our assessment will be peer reviewed and completed by end of 2016.[32]

563.     On September 12, 2016, EPA's OPP submitted a report on the carcinogenic potential of glyphosate, wherein it issued a "proposed conclusion" that glyphosate is "'not likely

---

[31] *See id.*

[32] Carey Gillam, *What Is Going On With Glyphosate? EPA's Odd Handling of Controversial Chemical*, HUFFINGTON POST, May 2, 2016, *available at* http://www.huffingtonpost.com/carey-gillam/what-is-going-on-with-gly_b_9825326.html; *see also* P.J. Huffstutter, *EPA takes offline report that says glyphosate not likely carcinogenic*, REUTERS, May 2, 2016, available at http://www.reuters.com/article/us-usa-glyphosate-epa-idUSKCN0XU01K.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

to be carcinogenic to humans' at doses relevant to human health risk assessment."[33]   There are no authors listed on this issue paper, which reiterates and adopts the conclusions of the October 2015 leaked assessment.   The issue paper is based upon a review of industry-sponsored articles and studies.   The OPP acknowledged that it rejected all studies that considered Roundup®—the formulated product—instead of studies that isolated glyphosate because "[g]lyphosate formulations contain various components other than glyphosate and it has been hypothesized these components are more toxic than glyphosate alone."[34]

564.   Thus, the OPP notes dozens of studies considered by IARC were not reviewed by the OPP because the OPP's "evaluation focused on studies on the active ingredient glyphosate" and "additional research could also be performed to determine whether formulation components, such as surfactants, influence the toxicity of glyphosate formulations."[35]

565.   From December 13 to 16, 2016, the EPA held FIFRA Scientific Advisory Panel ("SAP") meetings to consider issues raised by the OPP's evaluation of glyphosate.   Again, OPP only allowed the SAP to consider studies of glyphosate alone, and not any study of the formulated product.   In its Charge to the FIFRA SAP, the OPP noted that "[a]lthough there are studies available on glyphosate-based pesticide formulations, the agency is soliciting advice from the FIFRA Scientific Advisory Panel (SAP) on this evaluation of human carcinogenic potential for the active ingredient glyphosate only at this time."[36]

---

[33] See EPA's Office of Pesticide Programs, Glyphosate Issue Paper: Evaluation of Carcinogenic Potential (Sept. 12, 2016), *available at* https://www.epa.gov/sites/production/files/2016-09/documents/glyphosate_issue_paper_evaluation_of_carcincogenic_potential.pdf.

[34] *Id.*

[35] *Id.*

[36] EPA OPP, Glyphosate: Evaluation of Carcinogenic Potential, Charge to the FIFRA SAP for the October 18-21, 2016 Meeting, available at, https://www.epa.gov/sites/production/files/2016-11/documents/glyphosate_sap_charge_questions_-final.pdf.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

566.    The OPP draft assessment therefore does not actually consider the product at issue in this litigation or, more importantly, how glyphosate, in conjunction with surfactants and other chemicals, affects carcinogenicity.

567.    On March 16, 2017, the final SAP meeting minutes and report were released, revealing disagreement and lack of consensus among the scientists on whether there was a positive association between *glyphosate* exposure and NHL.[37]

### Monsanto's Industry Ties

568.    Recently unsealed documents in the federal Roundup® MDL litigation reveal the extent to which Monsanto has been able to leverage its contacts within the EPA to protect glyphosate and Roundup® from scrutiny and review.

569.    Internal Monsanto documents, including email communications, demonstrate that Jess Rowland, former Deputy Division Director, Health Effects Division of the EPA's OPP, and formerly the chair of the CARC (the same committee that inadvertently leaked the EPA's glyphosate report in April 2016), repeatedly and directly intervened on Monsanto's behalf. These same documents reveal that Monsanto was secure in the knowledge that it had allies within the EPA.

570.    To begin, in the months following IARC's initial March 2015 announcement that it had classified glyphosate as a probable carcinogen, Monsanto turned its attention to the EPA's

---

[37] FIFRA Scientific Advisory Panel Meeting Minutes and Final Report No. 2017-01, A Set of Scientific Issues Being Considered by the Environmental Protection Agency Regarding: EPA's Evaluation of the Carcinogenic Potential of Glyphosate, *available at* https://www.epa.gov/sites/production/files/2017-03/documents/december_13-16_2016_final_report_03162017.pdf.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

review of glyphosate. In one April 27, 2015 email, Monsanto official Bill Heydens wrote to colleagues to suggest "approaching EPA and…. ask if there is anything that would help them defend the situation?" His colleague Dan Jenkins responded: "I think you and I could get on the phone w Jess Rowland and discuss this pretty openly. He'll give us straight talk."[38]

571.     The following day, Mr. Jenkins spoke to Mr. Rowland by telephone and then relayed the substance of the conversation for his colleagues in an April 28, 2015 email. Specifically, he reported back that with respect to the CARC investigation, Mr. Rowland had stated: "We have enough to sustain our conclusions. Don't need gene tox or epi . . . . I am the chair of the CARC and my folks are running this process for glyphosate in reg review. I have called a CARC meeting in June."[39] Thus, even though the ostensible purpose of the CARC review was to evaluate the exhaustive IARC assessment on glyphosate, and even though the full IARC monograph on glyphosate would not be completed until July 2015, Mr. Rowland had already formed his conclusion months earlier—in April 2015.

572.     Mr. Rowland also intervened to halt another agency's review of glyphosate. When the Agency for Toxic Substances and Disease Registry (ATSDR), a federal public health agency of the U.S. Department of Health and Human Services, announced in February 2015 that it planned to publish a toxicological review of glyphosate, it was Mr. Rowland who helped Monsanto stop the ATSDR's investigation. In the same April 28, 2015, email discussed above, Mr. Jenkins explained that Mr. Rowland wanted to help Monsanto stop an investigation concerning the carcinogenicity of glyphosate being conducted by ATSDR.[40] Since ATSDR is not controlled by

---

[38] *See* Plaintiffs' Motion to Compel the Deposition of Jess Rowland, Ex. D, In re: Roundup Products Liability Litigation, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-4.
[39] *Id.*

[40] See id.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

the EPA, according to Mr. Jenkins, Mr. Rowland had bragged: "If I can kill this I should get a medal."[41]  Jenkins cautioned, however, that Monsanto should not "get your hopes up, I doubt EPA and Jess can kill this; but it's good to know they are going to actually make the effort now to coordinate due to our pressing and their shared concern that ATSDR is consistent in its conclusions with the EPA."[42]  The ATSDR never published its toxicological profile of glyphosate.

573.    Further, the released documents reveal Monsanto's confidence that its allies within the EPA would continue to support glyphosate.  In an internal memo on glyphosate, Monsanto executives wrote: "We know, *but cannot say*, that EPA's Office of Pesticide Program scientists strongly feel that glyphosate does not cause cancer and have defended their written determination internally for months."[43]  Notably, when Mr. Rowland attended the IARC glyphosate meetings as an observed for the EPA, internal communications indicate Monsanto was not displeased with his attendance since, "we all know Jess."[44]

### Recent Worldwide Bans on Roundup®/Glyphosate

574.    Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup® become more widely known.   The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which will take effect by the end of 2015.  In issuing the ban, the Dutch Parliament member who introduced the successful

---

[41] Id.

[42] *Id.*

[43] See Plaintiffs' Motion to Compel the Deposition of Jess Rowland, Ex. E, In re: Roundup Products Liability Litigation, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-5 (emphasis original).

[44] *See* Plaintiffs' Motion to Compel the Deposition of Jess Rowland, Ex. G, *In re: Roundup Products Liability Litigation*, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-7.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."[45]

575.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.[46]

576.     France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.[47]

577.     Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."[48]

---

[45] *Holland's Parliament Bans Glyphosate Herbicides*, The Real Agenda, April 14, 2014, *available at* http://real-agenda.com/hollands-parliament-bans-glyphosate-herbicides/.

[46] Christina Sarich, *Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals Following Recent Glyphosate-Cancer Link*, GLOBAL RESEARCH, May 14, 2015, *available at* http://www.globalresearch.ca/brazils-public-prosecutor-wants-to-ban-monsantos-chemicals-following-recent-glyphosate-cancer-link/5449440; *see* Ministério Público Federal, *MPF/DF reforça pedido para que glifosato seja banido do mercado nacional*, April, 14, 2015, *available at* http://noticias.pgr.mpf.mp.br/noticias/noticias-do-site/copy_of_meio-ambiente-e-patrimonio-cultural/mpf-df-reforca-pedido-para-que-glifosato-seja-banido-do-mercado-nacional.

[47] Zoe Schlanger, *France Bans Sales of Monsanto's Roundup in Garden Centers, 3 Months After U.N. Calls it 'Probable Carcinogen'*, NEWSWEEK, June 15, 2015, *available at* http://www.newsweek.com/france-bans-sale-monsantos-roundup-garden-centers-after-un-names-it-probable-343311.

[48] *Health Minister: Importation of Roundup Weed Spray Suspended,* Today in Bermuda, May, 11 2015, *available at* http://www.todayinbermuda.com/news/health/item/1471-health-minister-importation-of-roundup-weed-spray-suspended.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

578. The Sri Lankan government banned the private and commercial use of glyphosate, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.[49]

579. The government of Colombia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.[50]

### Proposition 65 Listing

580. On September 4, 2015, California's Office of Environmental Health Hazard Assessment ("OEHHA") published a notice of intent to include glyphosate on the state's list of known carcinogens under Proposition 65.[51] California's Safe Drinking Water and Toxic Enforcement Act of 1986 (informally known as "Proposition 65"), requires the state to maintain and, at least once a year, revise and republish a list of chemicals "known to the State of California to cause cancer or reproductive toxicity."[52] The OEHHA determined that glyphosate met the criteria for the listing mechanism under the Labor Code following IARC's assessment of the chemical.[53]

---

[49] *Sri Lanka's New President Puts Immediate Ban on Glyphosate Herbicides*, Sustainable Pulse, May 25, 2015, *available at* http://sustainablepulse.com/2015/05/25/sri-lankas-new-president-puts-immediate-ban-on-glyphosate-herbicides/#.VeduYk3bKAw.

[50] *Columbia to ban coca spraying herbicide glyphosate*, BBC, May 10, 2015, *available at* http://www.bbc.com/news/world-latin-america-32677411.

[51] Cal. Envtl. Prot. Agency Office of Envtl. Health Hazard Assessment, Notice of Intent to List Chemicals by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion, Glyphosate (Sept. 4, 2015), http://oehha.ca.gov/prop65/CRNR_notices/admin_listing/intent_to_list/pdf_zip/090415NOIL_LCSet27.pdf.

[52] *Frequently Asked Questions*, STATE OF CAL. DEP'T OF JUSTICE, OFFICE OF THE ATTORNEY GENERAL, http://oag.ca.gov/prop65/faq (last visited April 19, 2016).

[53] Cal. Envtl. Prot. Agency Office of Envtl. Health Hazard Assessment, Notice of Intent to List Chemicals by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion, Glyphosate (Sept. 4, 2015),

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

581.    The listing process under the Labor Code is essentially automatic.  The list of known carcinogens, at a minimum, must include substances identified by reference in Labor Code § 6382(b)(1).  That section of the Labor Code identifies "[s]ubstances listed as human or animal carcinogens by the International Agency for Research on Cancer (IARC)."  IARC's classification of glyphosate as a Group 2A chemical ("probably carcinogenic to humans") therefore triggered the listing.

582.    A business that deploys a listed chemical in its products must provide "clear and reasonable warnings" to the public prior to exposure to the chemical.  To be clear and reasonable, a warning must "(1) clearly communicate that the chemical is known to cause cancer, and/or birth defects or other reproductive harm; and (2) effectively reach the person before exposure."[54]  The law also prohibits the discharge of listed chemicals into drinking water.

583.    Monsanto disputed the listing decision and, in January 2016, filed a lawsuit against OEHHA and the agency's acting director, Lauren Zeise, in California state court, seeking declaratory and injunctive relief to prevent OEHHA from listing glyphosate.[55]

584.    Monsanto alleged that OEHHA's exclusive reliance on the IARC decision signified that "OEHHA effectively elevated the determination of an ad hoc committee of an unelected, foreign body, which answers to no United States official (let alone any California state official), over the conclusions of its own scientific experts."[56]  Monsanto further alleged that the Labor Code

---

http://oehha.ca.gov/prop65/CRNR_notices/admin_listing/intent_to_list/pdf_zip/090415NOIL_LCSet27.pdf.

[54] *Frequently Asked Questions*, STATE OF CAL. DEPARTMENT OF JUSTICE, OFFICE OF THE ATTORNEY GENERAL, *supra*.

[55] Monsanto Company's Verified Petition for Writ of Mandate and Complaint for Preliminary and Permanent Injunctive and Declaratory Relief, Monsanto Co. v. Office of the Envt'l Health Hazard Assessment, et al., No. 16-CECG-00183 (Cal. Super. Ct.) *available at* http://www.monsanto.com/files/documents/monvoehha.pdf.

[56] *Id.* at 2.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

listing mechanism presented various constitutional violations because it "effectively empowers an unelected, undemocratic, unaccountable, and foreign body to make laws applicable in California.[57]" Among other things, Monsanto argued that Proposition 65's requirement to provide a "clear and reasonable warning" to consumers that the chemical is a known carcinogen would damage its reputation and violate its First Amendment rights.[58]

585.   On January 27, 2017, the Superior Court of California -- Fresno issued a tentative ruling granting, among other things, OEHHA's motion for judgment on the pleadings, thus rejecting Monsanto's arguments.  On March 10, 2017, the Court issued a final order adopting in full the earlier tentative ruling.[59]

586.   On March 28, 2017 OEHHA posted Notice on its website that glyphosate would be added to the list of chemicals known to the state of California to cause cancer for purposes of Proposition 65.

587.   On November 15, 2017, Monsanto and various agricultural groups, including the National Association of Wheat Growers, the National Corn Growers Association, the Iowa Soybean Association, and others, filed a complaint against the OEHHA and California's Attorney General in the Eastern District of California seeking, among other things, to enjoin California's application of Prop 65 to glyphosate.[60] On January 3, 2018, Attorneys General in Idaho, Indiana,

---

[57] *Id.* at 3.

[58] *Id.*

[59] *See* Notice of Supplemental Authority, In re: Roundup Products Liability Litigation, MDL No. 2741 (N.D. Cal., Mar. 13, 2017), ECF No. 185.

[60] *See Nat'l Ass'n. of Wheat Growers, et al., v. Zeise, et al.,* No. 2:17-at-01224 (E.D. Cal), available at https://www.agri-pulse.com/ext/resources/pdfs/g/glyphosate-complaint-caed-nawg.pdf.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

Iowa, Kansas, Louisiana, Michigan, Missouri, North Dakota, Oklahoma, South Dakota and Wisconsin filed an amicus brief in support of injunctive relief.[61]

588. On February 26, 2018, the Eastern District of California denied Monsanto's motion for a preliminary injunction enjoining California from listing glyphosate as a chemical known to the State of California to cause cancer and granted the injunction enjoining California from requiring Monsanto provide a warning label on its products.[62]

### *EFSA Report on Glyphosate*

589. On November 12, 2015, the European Food Safety Authority (EFSA), the European Union's primary agency for food safety, reported on its evaluation of the Renewal Assessment Report (RAR) on glyphosate.[63] The Rapporteur Member State assigned to glyphosate, the German Federal Institute for Risk Assessment (BfR), had produced the RAR as part of the renewal process for glyphosate in the EU.

590. BfR sent its draft RAR to EFSA and the RAR underwent a peer review process by EFSA, other member states, and industry groups. As part of the on-going peer review of Germany's reevaluation of glyphosate, EFSA had also received a second mandate from the European Commission to consider IARC's findings regarding the potential carcinogenicity of glyphosate and glyphosate-containing products.

---

[61] *Attorneys General support Prop 65 injunction*, FarmFutures, Jan. 4, 2018, available at http://www.farmfutures.com/crop-protection/attorneys-general-support-prop-65-injunction.

[62] *See* Memorandum and Order Re: Motion For Preliminary Injunction, *Nat'l Assoc. of Wheat Growers, et al., v. Zeise, et al.*, No. 2:17-2401 WBS EFB (E.D. Cal., Feb. 26, 2018), ECF No. 75, *available at* https://www.courthousenews.com/wp-content/uploads/2018/02/217cv2401.pdf.

[63] European Food Safety Auth., Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate, *available at* http://www.efsa.europa.eu/sites/default/files/scientific_output/files/main_documents/4302.pdf.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

591.    Based on a review of the RAR, which included data from industry-submitted unpublished studies, EFSA sent its own report ("Conclusion") to the European Commission, finding that "glyphosate is unlikely to pose a carcinogenic hazard to humans and the evidence does not support classification with regard to its carcinogenic potential according to Regulation (EC) No 1272/2008."[64] EFSA therefore disagreed with IARC: glyphosate was not genotoxic and did not present a carcinogenic threat to humans.

592.    In explaining why its results departed from IARC's conclusion, EFSA drew a distinction between the EU and IARC approaches to the study and classification of chemicals.[65] Although IARC examined "both glyphosate—an active substance—and glyphosate-based formulations, grouping all formulations regardless of their composition," EFSA explained that it considered only glyphosate and that its assessment focuses on "each individual chemical, and each marketed mixture separately."[66] IARC, on the other hand, "assesses generic agents, including groups of related chemicals, as well as occupational or environmental exposure, and cultural or behavioural practices."[67] EFSA accorded greater weight to studies conducted with glyphosate alone than studies of formulated products.[68]

593.    EFSA went further and noted:

> [A]lthough some studies suggest that certain glyphosate-based formulations may be genotoxic (i.e. damaging to DNA), others that look solely at the active substance glyphosate do not show this effect. It is likely, therefore, that *the genotoxic effects observed in some glyphosate-based formulations are related to the other constituents or "co-formulants"*. Similarly, certain glyphosate-

---

[64] *Id.*

[65] EFSA Fact Sheet: Glyphosate, EFSA
http://www.efsa.europa.eu/sites/default/files/corporate_publications/files/efsaexplainsglyphosate151112en.pdf.

[66] *Id.*

[67] *Id.*

[68] *Id.*

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

based formulations display higher toxicity than that of the active ingredient, presumably because of the presence of co-formulants. In its assessment, *EFSA proposes that the toxicity of each pesticide formulation and in particular its genotoxic potential should be further considered and addressed by Member State authorities while they re-assess uses of glyphosate-based formulations in their own territories.*[69]

594.   Notwithstanding its conclusion, EFSA did set exposure levels for glyphosate. Specifically, EFSA proposed an acceptable daily intake (ADI) of 0.5 mg/kg of body weight per day; an acute reference dose (ARfD) of 0.5 mg/kg of body weight; and an acceptable operator exposure level (AOEL) of 0.1 mg/kg bw per day.[70]

### *Leading Scientists Dispute EFSA's Conclusion*

595.   On November 27, 2015, 96 independent academic and governmental scientists from around the world submitted an open letter to the EU health commissioner, Vytenis Andriukaitis.[71] The scientists expressed their strong concerns and urged the commissioner to disregard the "flawed" EFSA report, arguing that "the BfR decision is not credible because it is not supported by the evidence and it was not reached in an open and transparent manner."[72]

596.   Signatories to the letter included Dr. Christopher J. Portier, Ph.D., and other renowned international experts in the field, some of whom were part of the IARC Working Group assigned to glyphosate.

---

[69] *Id.*

[70] European Food Safety Auth., Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate, *supra.*

[71] Letter from Christopher J. Portier et al. to Commission Vytenis Andriukaitis, Open letter: Review of the Carcinogenicity of Glyphosate by EFSA and BfR (Nov. 27, 2015), http://www.zeit.de/wissen/umwelt/2015-11/glyphosat-offener-brief.pdf; http://www.theguardian.com/environment/2016/jan/13/eu-scientists-in-row-over-safety-of-glyphosate-weedkiller.

[72] *Id.*

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

597.    In an exhaustive and careful examination, the scientists scrutinized EFSA's conclusions and outlined why the IARC Working Group decision was "by far the more credible":

> The IARC WG decision was reached relying on open and transparent procedures by independent scientists who completed thorough conflict-of-interest statements and were not affiliated or financially supported in any way by the chemical manufacturing industry. It is fully referenced and depends entirely on reports published in the open, peer-reviewed biomedical literature. It is part of a long tradition of deeply researched and highly credible reports on the carcinogenicity of hundreds of chemicals issued over the past four decades by IARC and used today by international agencies and regulatory bodies around the world as a basis for risk assessment, regulation and public health policy.[73]

598.    With respect to human data, the scientists pointed out that EFSA agreed with IARC that there was "*limited evidence* of carcinogenicity" for NHL, but EFSA nonetheless dismissed an association between glyphosate exposure and carcinogenicity.  IARC applies three levels of evidence in its analyses of human data, including sufficient evidence and limited evidence. EFSA's ultimate conclusion that "there was no unequivocal evidence for a clear and strong association of NHL with glyphosate" was misleading because it was tantamount to IARC's highest level of evidence: "sufficient evidence," which means that a causal relationship has been established.  However, the scientists argued, "[l]egitimate public health concerns arise when 'causality is credible,' i.e., when there is *limited evidence*."[74]

599.    Among its many other deficiencies, EFSA's conclusions regarding animal carcinogenicity data were "scientifically unacceptable," particularly in BfR's use of historical control data and in its trend analysis.  Indeed, BfR's analysis directly contradicted the Organisation for Economic Co-operation and Development ("OECD") testing guidelines while citing and

---

[73] *Id.*

[74] *Id.*

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

purporting to follow those same guidelines. For instance, the EFSA report dismisses observed trends in tumor incidence "because there are no individual treatment groups that are significantly different from controls and because the maximum observed response is reportedly within the range of the historical control data." However, according to the scientists, concurrent controls are recommended over historical controls in all guidelines, scientific reports, and publications, and, if it is employed, historical control data "should be from studies in the same timeframe, for the same exact animal strain, preferably from the same laboratory or the same supplier and preferably reviewed by the same pathologist." BfR's use of historical control data violated these precautions: "only a single study used the same mouse strain as the historical controls, but was reported more than 10 years after the historical control dataset was developed." Further deviating from sound scientific practices, the data used by the BfR came from studies in seven different laboratories. The scientists concluded:

> BfR reported seven positive mouse studies with three studies showing increases in renal tumors, two with positive findings for hemangiosarcomas, and two with positive findings for malignant lymphomas. BfR additionally reported two positive findings for tumors in rats. Eliminating the inappropriate use of historical data, the unequivocal conclusion is that these are not negative studies, but in fact document the carcinogenicity of glyphosate in laboratory animals.[75]

600.    The letter also critiqued the EFSA report's lack of transparency and the opacity surrounding the data cited in the report: "citations for almost all of the references, even those from the open scientific literature, have been redacted from the document" and "there are no authors or contributors listed for either document, a requirement for publication in virtually all scientific journals." Because BfR relied on unpublished, confidential industry-provided studies, it is

---

[75] *Id.*

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

"impossible for any scientist not associated with BfR to review this conclusion with scientific confidence."[76]

601.    On March 3, 2016, the letter was published in the Journal of Epidemiology & Community Health.[77]

### Statement of Concern Regarding Glyphosate-Based Herbicides

602.    On February 17, 2016, a consensus statement published in the journal *Environmental Health*, entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement," assessed the safety of glyphosate-based herbicides (GBHs).[78]    The paper's "focus is on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with recent discoveries about the toxicity and human health risks stemming from use of GBHs."[79]    The researchers drew seven factual conclusions about GBHs:

1.    GBHs are the most heavily applied herbicide in the world and usage continues to rise;

2.    Worldwide, GBHs often contaminate drinking water sources, precipitation, and air, especially in agricultural regions;

3.    The half-life of glyphosate in water and soil is longer than previously recognized;

4.    Glyphosate and its metabolites are widely present in the global soybean supply;

---

[76] *Id.*

[77] Christopher J. Portier, et al., *Differences in the carcinogenic evaluation of glyphosate between the International Agency for Research on Cancer (IARC) and the European Food Safety Authority (EFSA)*, JOURNAL OF EPIDEMIOLOGY & CMTY. HEALTH, Mar. 3, 2016, *available at* http://jech.bmj.com/content/early/2016/03/03/jech-2015-207005.full.

[78] John P. Myers, et al, *Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement*, Environmental Health (2016), *available at* http://ehjournal.biomedcentral.com/articles/10.1186/s12940-016-0117-0.

[79] *Id.*

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

5.     Human exposures to GBHs are rising;

6.     Glyphosate is now authoritatively classified as a probable human carcinogen; and

7.     Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science.[80]

603.    The researchers noted that GBH use has increased approximately 100-fold since the 1970s. Further, far from posing a limited hazard to vertebrates, as previously believed, two decades of evidence demonstrated that "several vertebrate pathways are likely targets of action, including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."[81]

604.    The paper attributes uncertainties in current assessments of glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations." Further, the researchers argue, "[t]he distinction in regulatory review and decision processes between 'active' and 'inert' ingredients has no toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in their own right."[82]

605.    Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish." Accordingly, "risk assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone

---

[80] *Id.*

[81] *Id.*

[82] *Id.*

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

underestimate both toxicity and exposure, and thus risk." The paper concludes that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."[83]

606.    The researchers also critique the current practice of regulators who largely rely on "unpublished, non-peer reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."[84]

607.    The researchers also call for greater inclusion of GBHs in government-led toxicology testing programs:

> [A] fresh and independent examination of GBH toxicity should be undertaken, and . . . this re-examination be accompanied by systematic efforts by relevant agencies to monitor GBH levels in people and in the food supply, none of which are occurring today. The U.S. National Toxicology Program should prioritize a thorough toxicological assessment of the multiple pathways now identified as potentially vulnerable to GBHs.[85]

608.    The researchers suggest that, in order to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which manufacturers fund the registration process and the necessary testing:

> "[W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part of routine registration actions and fees. Such funds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would be made available to independent scientists to conduct the appropriate long-term (minimum 2 years) safety studies in recognized animal model systems. A thorough and

---

[83] *Id.*

[84] *Id.*

[85] *Id.*

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

modern assessment of GBH toxicity will encompass potential endocrine disruption, impacts on the gut microbiome, carcinogenicity, and multigenerational effects looking at reproductive capability and frequency of birth defects."[86]

609.    Despite these stated concerns, Monsanto, to date, has failed to test its formulated Roundup® products.

### *European Union Vote on Glyphosate Renewal*

610.    The license for glyphosate in the European Union (EU) was set to expire on June 30, 2016.

611.    Without an extension of the license, Monsanto's Roundup® and other glyphosate-based herbicides faced a general phase out in EU markets.[87]

612.    In the months leading up to the license expiration date, protracted meetings and votes among national experts from the 28 EU Member States failed to produce agreement on an extension.

613.    On June 29, 2016, the EU Commission extended the European license for glyphosate for 18 months to allow the European Chemical Agency (ECHA) to rule on the safety of the chemical, which was expected by the end of 2017.[88]

---

[86] *Id.*

[87] Philip Blenkinsop, Alissa de Carbonnel & Barbara Lewis European, *Commission to extend glyphosate license for 18 months*, REUTERS, June 28, 2016, *available at* http://www.reuters.com/article/us-health-eu-glyphosate-idUSKCN0ZE25B.

[88] Arthur Neslen, *Controversial chemical in Roundup weedkiller escapes immediate ban*, THE GUARDIAN, June 29, 2016, *available at* https://www.theguardian.com/business/2016/jun/29/controversial-chemical-roundup-weedkiller-escapes-immediate-ban

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

614.    On July 11, 2016, the EU voted in favor of a proposal to restrict the conditions of use of glyphosate in the EU, including a ban on common co-formulant POE-tallowamine (POEA) from all glyphosate-based herbicides, including Roundup®.[89]

615.    In March 2017, ECHA's Committee for Risk Assessment (RAC) concluded that the available scientific evidence did not meet the criteria to classify glyphosate as a carcinogen.[90]

616.    With the glyphosate license set to again expire on December 15, 2017, and after months of indecision among EU member states, on November 27, 2017, the EU voted to extend the glyphosate license for five more years.[91] Of the 28 EU members, 18 countries voted in favor of a European Commission proposal to extend the glyphosate license, 9 countries voted against, and 1 country abstained.[92]

## TOLLING OF THE STATUTE OF LIMITATIONS

### *Discovery Rule Tolling*

617.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

618.    Plaintiffs have suffered an illness that has a latency period and does not arise until years after exposure. Plaintiffs had no way of knowing about the risks of serious illness associated with the use of and/or exposure to Roundup® and glyphosate until they were made aware that their

---

[89] Sarantis Michalopoulos, *EU agrees ban on glyphosate co-formulant*, EURACTIV, July 11, 2016, *available at* http://www.euractiv.com/section/agriculture-food/news/eu-agrees-ban-on-glyphosate-co-formulant/?nl_ref=16562829

[90] https://echa.europa.eu/-/glyphosate-not-classified-as-a-carcinogen-by-echa.

[91] *See* Philip Blenkinsop, *Germany swings EU vote in favor of weed-killer glyphosate*, Reuters, Nov. 27, 2017, https://www.reuters.com/article/us-eu-health-glyphosate/germany-swings-eu-vote-in-favor-of-weed-killer-glyphosate-idUSKBN1DR1SG

[92] *See id.*

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

NHL could be caused by their use of and/or exposure to Roundup®.  Consequently, the discovery rule applies to these cases, and the statute of limitations has been tolled until the day that Plaintiffs knew or had reason to know that their NHL was linked to their use of and/or exposure to Roundup®.

619.    Within the time period of any applicable statutes of limitations, Plaintiffs could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup® and glyphosate is injurious to human health.

620.    Plaintiffs did not discover, and did not know of facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup® and glyphosate; nor would a reasonable and diligent investigation by them have disclosed that Roundup® and glyphosate would cause their NHL.

621.    For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiffs' claims.

### *Fraudulent Concealment*

622.    Furthermore, the running of the statute of limitations has been equitably tolled by reason of Defendant's fraudulent concealment and conduct, as alleged above.  Through its affirmative misrepresentations and omissions, Defendant actively concealed from Plaintiffs the true risks associated with use of or exposure to Roundup®.

623.    Furthermore, the running of the statute of limitations has been equitably tolled by reason of Defendant's fraudulent concealment and conduct, as alleged above.  Through its affirmative misrepresentations and omissions, Defendant actively concealed from Plaintiffs the true risks associated with use of or exposure to Roundup®.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

624.    As a result of Defendant's actions, Plaintiffs were unaware, and could not reasonably know or have learned through reasonable diligence, that Plaintiffs had been exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

625.    Defendant is estopped from relying on any statute of limitations because of its concealment of the truth regarding the safety of Roundup®.  Defendant was under a duty to disclose the true character, quality and nature of Roundup® because this was non-public information over which it continues to have exclusive control.  Defendant knew that this information was not available to Plaintiffs, their medical providers and/or their health facilities, yet it failed to disclose the information to the public.

626.    Defendant had the ability to and did spend enormous amounts of money in furtherance of its purposes of marketing and promoting a profitable product, notwithstanding the known or reasonably knowable risks.  Plaintiffs and medical professionals could not have afforded to and could not have possibly conducted studies to determine the nature, extent and identity of related health risks, and they were forced to rely on Defendant's representations.

### *Estoppel*

627.    Monsanto was under a continuous duty to disclose to consumers, users and other persons coming into contact with its products, including Plaintiffs, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

628.    Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

629.    Based on the foregoing, Monsanto is estopped from relying on any statutes of limitations in defense of this action.

## COUNT ONE:  STRICT LIABILITY FOR DEFECTIVE MANUFACTURE AND DESIGN

630.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

631.    Plaintiffs bring this strict liability claim against Defendant for defective manufacture and design.

632.    At all relevant times, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, users, and other persons coming into contact with them, including Plaintiffs, thereby placing Roundup® products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendant.

633.    At all times relevant to this litigation, Defendant designed, researched, developed, formulated, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by the Plaintiffs, and/or to which the Plaintiffs were exposed, as described above.

634.    At all times relevant to this litigation, Defendant's Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiffs.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

635.    At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Missouri and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

636.    Defendant's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant, were defectively manufactured and designed by Defendant in that when they left the hands of the Defendant's manufacturers and/or suppliers, they were unreasonably dangerous because they were not as safe as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

637.    Defendant's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant, were defective in manufacture, design, and formulation in that when they left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks associated with these products' reasonably foreseeable uses exceeded the alleged benefits associated with their design and formulation.

638.    At all relevant times, Defendant's Roundup® products created significant risks to the health and safety of consumers and others who were exposed to the products that far outweigh the risks posed by other products on the market used for the same or similar purpose.

639.    Therefore, at all relevant times to this litigation, Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendant, were defective in design and formulation, in one or more of the following ways:

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

a.      When placed in the stream of commerce, Defendant's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would expect.

b.      When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c.      When placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d.      Defendant did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate.

e.      Defendant failed to test, investigate, or study its formulated Roundup® products.

f.      Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweighs any potential utility stemming from the use of the herbicide.

g.      Defendant knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

h.      Defendant did not conduct adequate post-marketing surveillance of its Roundup® products.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

i.     Defendant could have employed safer alternative designs and formulations.

640.   At all times relevant to this litigation, Plaintiffs used and/or were exposed to Defendant's Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

641.   Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

642.   The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate.   Defendant's Roundup® products were and are more dangerous than alternative products and Defendant could have designed its Roundup® products to make them less dangerous.   Indeed, at the time that Defendant designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

643.   Defendant's defective design of Roundup® amounts to willful, wanton, and/or reckless conduct by Defendant.

644.   As a direct and proximate result of the defective design and manufacture of Roundup® products, Plaintiffs developed NHL and have been injured catastrophically and have been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort and economic damages.

645.   Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendant is strictly liable to Plaintiffs.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

646. The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiffs' grave injuries, and, but for Defendant's misconduct and omissions, Plaintiffs would not have sustained their injuries.

647. As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Plaintiffs have suffered and continue to suffer grave injuries, and they have endured pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiffs will continue to incur these expenses in the future.

648. WHEREFORE, Plaintiffs pray for judgment against Defendant Monsanto in a fair and reasonable sum in excess of $10,000,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT TWO:  STRICT LIABILITY FOR FAILURE TO WARN

649. Plaintiffs incorporate by reference every other paragraph of this Complaint as if each were set forth fully and completely herein.

650. Plaintiffs bring this strict liability claim against Defendant for failure to warn.

651. At all relevant times, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

652. Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiffs, Plaintiffs' employers, Plaintiffs' co-workers, and persons responsible for consumers (such as employers), and Defendant therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of Roundup® and glyphosate-containing products and a duty to instruct on the proper, safe use of these products.

653.   At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn Plaintiffs of the dangers associated with Roundup® use and exposure, and a continuing duty to instruct on the proper, safe use of these products. Defendant, as manufacturer, seller, or distributor of chemical herbicides, is held to the knowledge of an expert in the field.

654.   At the time of manufacture, Defendant could have provided warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to these products.

655.   At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety of its Roundup® products. Defendant also failed to minimize the dangers to users and consumers of its Roundup® products and to those who would foreseeably use or be harmed by Defendant's herbicides, including Plaintiffs.

656.   Despite the fact that Defendant knew or should have known that Roundup® products posed a grave risk of harm, it failed to warn of the dangerous risks associated with their

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied, or sold the product, and not known to end users and consumers, such as Plaintiffs and Plaintiffs' employers.

657.    Defendant knew or should have known that its Roundup® and glyphosate-containing products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products. Defendant has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

658.    At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

659.    At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

660.    Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of Plaintiffs' exposure. Plaintiffs relied upon the skill, superior knowledge, and judgment of Defendant.

661.    Defendant knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, but it failed to communicate adequate information

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and horticultural applications.

662.    The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled agricultural workers, horticultural workers and/or at-home users such as Plaintiffs to utilize the products safely and with adequate protection.  Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

663.    To this day, Defendant has failed to adequately and accurately warn of the true risks of Plaintiffs' injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

664.    To this day, Defendant has failed to test, investigate, or study its formulated Roundup® products.

665.    As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiffs.

666.    Defendant is liable to Plaintiffs for injuries caused by its failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

appropriate use of its Roundup® products and the risks associated with the use of or exposure to Roundup® and glyphosate.

667.    The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiffs' injuries, and, but for Defendant's misconduct and omissions, Plaintiffs would not have sustained their injuries.

668.    Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup® products, Plaintiffs could have avoided the risk of developing injuries as alleged herein and Plaintiffs and Plaintiffs' employers could have obtained alternative herbicides.

669.    As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce and failing to warn Plaintiffs of the increased risk of NHL associated with the use of and/or exposure to Roundup® products as described herein, Plaintiffs have developed NHL and have been injured catastrophically and have been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort and economic damages, including for medical care and treatment. Plaintiffs will continue to incur these expenses in the future.

670.    WHEREFORE, Plaintiffs pray for judgment against Defendant Monsanto in a fair and reasonable sum in excess of $10,000,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT THREE:  VIOLATION OF MISSOURI MERCHANDIZING PRACTICE ACT, § 407.020 et seq.

671.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

672.   At all relevant times, Defendant knew or should have known of the unreasonably dangerous and carcinogenic nature of the use of and/or exposure to Roundup®.

673.   At all relevant times, Defendant, through its labeling, advertisements, public representations and marketing of Roundup®, intentionally used deception, fraud, false pretenses, false promises, misrepresentations and unfair trade practices in order to mislead consumers that Roundup® products are safe for use.

674.   At all relevant times, Defendant also engaged in the concealment, suppression and/or omission of material facts in connection with the sale and/or advertisement of Roundup® products in trade or commerce.   In particular, Defendant failed to disclose to the public that Roundup® is unsafe and poses serious health hazards, particularly NHL.  Defendant was aware of the hazardous risks posed by Roundup® and yet failed to inform the public of these risks through their advertisements, labeling, or other means available to them.   Defendant's failure to state material facts about Roundup® constitutes a violation of V.A.M.S. § 407.020.

675.   At all relevant times, Plaintiffs were deceived by Defendant's intentional misrepresentations and omissions, including by the orchestrated claims made on or in television commercials, advertising materials, websites, and on product labels and packaging regarding the usage and safety of Roundup®.

676.   At all relevant times, Plaintiffs acted in reasonable reliance upon Defendant's unlawful trade practices, and had the Defendant not engaged in the deceptive conduct described herein, Plaintiffs would not have purchased Roundup® and/or would have protected themselves from exposure to Roundup®.

677.   As a direct and proximate result of Defendant's unlawful trade practices, Plaintiffs developed NHL and have been injured catastrophically and have been caused severe and

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort and economic damages.

678.    WHEREFORE, Plaintiffs pray for judgment against Defendant in a fair and reasonable sum in excess of $10,000,000.00 together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT FOUR:  NEGLIGENCE

679.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

680.    At all relevant times, Defendant breached its duty to Plaintiffs and were otherwise negligent in marketing, designing, manufacturing, producing, supplying, inspecting, testing, selling and/or distributing Roundup® products.

681.    Defendant, directly or indirectly, caused Roundup® products to be purchased and/or used by Plaintiffs.

682.    At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

683.    At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of its Roundup® products.  Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

warnings concerning the potential adverse effects of exposure to Roundup® and, in particular, its active ingredient glyphosate.

684.   At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

685.   Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause Plaintiffs' injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiffs.

686.   Defendant knew or, in the exercise of reasonable care, should have known that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiffs from Roundup®.

687.   Defendant knew or, in the exercise of reasonable care, should have known that tests limited to Roundup®'s active ingredient glyphosate were insufficient to prove the safety of Roundup®.

688.   Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup® and glyphosate-containing products.

689.   As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate,

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

690.    Defendant failed to appropriately and adequately test Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiffs from Roundup®.

691.    Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant has failed to do so.  Indeed, Defendant has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

692.    Defendant's negligence included:

a.       Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

b.       Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c.       Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture, horticulture, and at-home use;

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

d.      Failing to test, investigate, or study its formulated Roundup® products;

e.      Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup®, and the propensity of these ingredients to render Roundup® toxic, increase the toxicity of Roundup®, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup®, and whether or not "inert" ingredients and/or adjuvants were safe for use;

f.      Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

g.      Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

h.      Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and/or be exposed to its Roundup® products;

i.      Failing to disclose to Plaintiffs, users, consumers, and the general public that the use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

j.      Failing to warn Plaintiffs, users, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiffs and other users or consumers;

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

k.      Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

l.      Representing that its Roundup® products were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended use;

m.      Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

n.      Advertising, marketing, and recommending the use of Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

o.      Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup® products are not unsafe for use in the agricultural, horticultural industries, and/or home use; and

p.      Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

693.   Defendant knew and/or should have known that it was foreseeable that consumers and/or users, such as Plaintiffs, would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

694.   Plaintiffs did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

695.    Defendant's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiffs suffered, and will continue to suffer, as described herein.

696.    Defendant's conduct, as described above, was reckless.  Defendant regularly risks the lives of consumers and users of its products, including Plaintiffs, with full knowledge of the dangers of its products.  Defendant has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiffs.  Defendant's reckless conduct therefore warrants an award of punitive damages.

697.    As a proximate result of Defendant's wrongful acts and omissions in placing its defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiffs developed NHL and have been injured catastrophically and have been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort and economic damages, including significant expenses for medical care and treatment, and will continue to incur these expenses in the future.

698.    WHEREFORE, Plaintiffs pray for judgment against Defendant Monsanto in a fair and reasonable sum in excess of $10,000,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT FIVE:  BREACH OF EXPRESS WARRANTIES

699.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

700.    At all relevant times, Defendant engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to users, consumers and

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

those in proximity to users, including Plaintiffs, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

701.    Before the time that Plaintiffs were exposed to the use of the aforementioned Roundup® products, Defendant expressly warranted to its consumers and users—including Plaintiffs and Plaintiffs' employers—that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

702.    Defendant, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiffs' injuries.

703.    Defendant further failed to test, investigate, or study its formulated Roundup® products.

704.    The representations, as set forth above, contained or constituted affirmations of fact or promises made by the seller to the buyer which related to the goods and became part of the basis of the bargain creating an express warranty that the goods shall conform to the affirmations of fact or promises.

705.    Roundup® did not conform to the representations made by Monsanto as Roundup® was not safe for use by individuals such as Plaintiffs.

706.    At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

707.    Neither Plaintiffs nor Plaintiffs' employers could have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

708.    Defendant's breaches constitute violations of state common laws, including but not limited to, the following statutory provisions as applicable to the Plaintiffs in this Petition:

- Ala. Code §§ 7-2-313, 7-2-314 (2017);

- Alaska St. § 45.02.313 (effective 2016);

- Ariz. Rev. Stat. Ann. § 47-2313 (2016);

- Ark. Code Ann. § 4-2-313 (2016);

- Cal. U. Com. Code § 2313(1) (2017); Cal. Civ. Code §1791.2(a) (2017).

- Co. Rev. St. § 4-2-316 (2017);

- Conn. Gen. Stat. Ann. § 42a-2-313 (effective 2017);

- 6 Del. C. § 2-313 (2017);

- D.C. Code Ann. § 28:2-313 (2017);

- Fla. Stat. Ann. § 672.313 (2017);

- O.C.G.A. § 11-2-318 (2017);

- Haw. Rev. Stat. § 490:2-313 (2016);

- Id. Code § 28-2-314(2)(c) (2017).

- Ill. Comp. Stat. Ann. Ch. 810, 5/2-313 (2016);

- Ind. Code Ann. § 26-1-2-313 (2016);

- Iowa Code Ann. § 554.2313 (2016);

- Kans. Stat. Ann. § 84-2-313 (2017); KRS § 355.2-318 (2017); Kan. Stat. Ann. § 60-3302(c) (2017).

- Ky. Rev. Stat. § 355.2-318 (2017);

- La. Rev. Stat. §§ 9:2800.54, 9:2800.58 (2016);

- Me. Rev. Stat. Ann. tit. 11, § 2-314 and 2-315 (2017); 14 M.R.S. § 221 (2017).

- Md. Code Ann., Com. Law § 2-318 (2017);

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

- Mass. Gen. Laws c. 106, § 2-313 (2017);

- Mich. Comp. Laws Ann. § 440.2313 (2016);

- Minn. Stat. Ann. § 336.2-313 through 315 (2016);

- Miss. Code Ann. § 11-1-63(i)(3) and 75-2-313 (2017);

- Mo. Rev. Stat. Ann. § 400.2-313 (2016);

- Mont. Code Ann. § 30-2-313 (2017);

- Neb. Rev. Stat. U.C.C. § 2-313 et seq. (2017)

- Nev. Rev. Stat. U.C.C. § 104.2313, et seq. (2016); Nev. Rev. Stat. §§ 104.2312-104.2318 (2016).

- N.H. Rev. Stat. Ann. § 382-A:2-313, et seq. (2017);

- N.M. Stat. Ann. §§ 55-2-313 to -318 (2017); *see also* UJI 13-1428 to 1433 NRMA(2016).

- N.Y. U.C.C. Law 2-313, et seq. (2017);

- N.C. Gen. Stat. Ann. § 25-2-313, et seq. (2017);

- N.D. Cent. Code § 41-02-30, et seq. (2017);

- Ohio Rev. Code Ann. § 1302.26, et seq. (2016);

- Okla. Stat. tit. 12A, § 2-313 et seq. (2017);

- Or. Rev. Stat. § 72.3130, et seq. (2016);

- 13 Pa. Stat. Ann. § 2313, et seq. (2016);

- R.I. Gen. Laws § 6A-2-313 (2016);

- S.C. Code. Ann. § 36-2-313, et seq. (2016);

- S.D. Stat. 57A-2-313, et seq. (2017);

- Tenn. Code Ann. § 47-2-313, et seq. (2016);

- Tex. Bus. & Com. Code Ann. § 2.313, et seq. (2015);

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

- Ut. Code Ann. § 70A-2-313, et seq. (2016);

- Va. Code Ann. § 8.2-318, et seq. (2016);

- Vt. Stat. Ann. tit. 9A, § 2-313, et seq. (2016);

- Wa. Rev. Code § 62A.2-313, et seq. (2016); § 7.72.030(2) (2016);

- W.Va. Code § 46A-6-108, et seq. (2016);

- Wis. Stat. Ann. § 402.313, et seq. (2017); and

- Wyo. Stat. § 34.1-2-313 through 315 (2017).

709.    The breach of the warranty was a substantial factor in bringing about Plaintiffs' injuries.  As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce and failing to warn Plaintiffs of the increased risk of NHL associated with the use of and/or exposure to Roundup® products as described herein, Plaintiffs have developed NHL and have been injured catastrophically and have been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort and economic damages, including for medical care and treatment.

710.    The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

711.    As a direct and proximate result of Defendant's wrongful acts and omissions Plaintiffs have suffered severe and permanent physical and emotional injuries.  Plaintiffs have endured pain and suffering, have suffered economic loss, including significant expenses for medical care and treatment, and will continue to incur these expenses in the future.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

712.    WHEREFORE, Plaintiffs pray for judgment against Defendant Monsanto in a fair and reasonable sum in excess of $10,000,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT SIX:  BREACH OF IMPLIED WARRANTIES

713.    Plaintiffs incorporate by reference each of the preceding paragraphs as if fully set forth herein.

714.    At all relevant times, Defendant engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to users, consumers and those in proximity to users, including Plaintiffs, thereby placing Roundup® products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendant.

715.    Before the time that Plaintiffs were exposed to the use of the aforementioned Roundup® products, Defendant impliedly warranted to its consumers and users—including Plaintiffs and Plaintiffs' employers—that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

716.    Defendant, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiffs' injuries.

717.    Defendant further failed to test, investigate, or study its formulated Roundup® products.

718.    Upon information and belief, Plaintiffs and Plaintiffs' employers reasonably relied upon the skill, superior knowledge and judgment of Defendant and upon its implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

719.    Upon information and belief, Plaintiffs and Plaintiffs' employers reasonably relied upon the skill, superior knowledge and judgment of Defendant and upon its implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

720.    The Roundup® products were expected to reach and did in fact reach consumers, users and those in proximity to users, including Plaintiffs, without substantial change in the condition in which they were manufactured and sold by Defendant.

721.    At all relevant times, Defendant was aware that consumers, users, and those in proximity of users of its products, including Plaintiffs, would use Roundup® products as marketed by Defendant, which is to say that Plaintiffs were the foreseeable users of Roundup®.

722.    Defendant intended that its Roundup® products be used in the manner in which Plaintiffs in fact used or were exposed to them and Defendant impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

723.    In reliance upon Defendant's implied warranty, Plaintiffs used or were in proximity to the use of Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendant.

724.    Neither Plaintiffs nor Plaintiffs' employers could have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

725.    Defendant breached its implied warranty to Plaintiffs in that its Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

726.     The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

727.     As a direct and proximate result of Defendant's wrongful acts and omissions Plaintiffs have suffered severe and permanent physical and emotional injuries.  Plaintiffs have endured pain and suffering, have suffered economic loss, including significant expenses for medical care and treatment, and will continue to incur these expenses in the future.

728.     WHEREFORE, Plaintiffs pray for judgment against Defendant Monsanto in a fair and reasonable sum in excess of $10,000,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

### COUNT SEVEN:  WRONGFUL DEATH

**(Plaintiffs Cynthia Freeman, Patricia Cermak, Charles Fenner, Jr., Judith Hughes, Florence Jensen,  Kim Scott, and Ann Higingbotham)**

729.     Plaintiffs incorporate by reference every other paragraph of this Complaint as if each were set forth herein.

730.     As a direct and proximate result of the acts and/or omissions of Defendant, as set forth herein, the Decedent named in this action used and/or was exposed to Roundup®.

731.     Subsequent to such use, Decedents developed NHL, suffered substantial pain and suffering, both physical and emotional in nature, and subsequently died.

732.     Plaintiff Cynthia Freeman, on behalf of herself and all of the next of kin of Decedent, Rosalie Brumfield, is entitled to recover damages as Decedent would have if she were living, as a result of acts and/or omissions of Defendant.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

733.    Plaintiff Cynthia Freeman, on behalf of herself and all of Decedent's next of kin is also entitled to recover punitive damages and damages for substantial pain and suffering caused to Decedent from the acts and/or omissions of Defendant as fully set forth herein, including without limitations, punitive damages.

734.    As a direct and proximate result of Defendant's conduct, Plaintiff Cynthia Freeman and Decedent Rosalie Brumfield have been injured and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care and comfort, and economic damages.

735.    Plaintiff Patricia Cermak, on behalf of herself and all of the next of kin of Decedent, John Cermak, is entitled to recover damages as Decedent would have if he were living, as a result of acts and/or omissions of Defendant.

736.    Plaintiff Patricia Cermak, on behalf of herself and all of Decedent's next of kin is also entitled to recover punitive damages and damages for substantial pain and suffering caused to Decedent from the acts and/or omissions of Defendant as fully set forth herein, including without limitations, punitive damages.

737.    As a direct and proximate result of Defendant's conduct, Plaintiff Patricia Cermak and Decedent John Cermak have been injured and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care and comfort, and economic damages.

738.    Plaintiff Charles Fenner, Jr., on behalf of himself and all of the next of kin of Decedent, Wanda Fenner, is entitled to recover damages as Decedent would have if she were living, as a result of acts and/or omissions of Defendant.

739.    Plaintiff Charles Fenner, Jr., on behalf of himself and all of Decedent's next of kin is also entitled to recover punitive damages and damages for substantial pain and suffering caused

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

to Decedent from the acts and/or omissions of Defendant as fully set forth herein, including without limitations, punitive damages.

740.    As a direct and proximate result of Defendant's conduct, Plaintiff Charles Fenner, Jr. and Decedent Wanda Fenner have been injured and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care and comfort, and economic damages.

741.    Plaintiff Judith Hughes, on behalf of herself and all of the next of kin of Decedent, John Hughes, is entitled to recover damages as Decedent would have if he were living, as a result of acts and/or omissions of Defendant.

742.    Plaintiff Judith Hughes, on behalf of herself and all of Decedent's next of kin is also entitled to recover punitive damages and damages for substantial pain and suffering caused to Decedent from the acts and/or omissions of Defendant as fully set forth herein, including without limitations, punitive damages.

743.    As a direct and proximate result of Defendant's conduct, Plaintiff Judith Hughes and Decedent John Hughes have been injured and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care and comfort, and economic damages.

744.    Plaintiff Florence Jensen, on behalf of herself and all of the next of kin of Decedent, Robert Jensen, is entitled to recover damages as Decedent would have if he were living, as a result of acts and/or omissions of Defendant.

745.    Plaintiff Florence Jensen, on behalf of herself and all of Decedent's next of kin is also entitled to recover punitive damages and damages for substantial pain and suffering caused to Decedent from the acts and/or omissions of Defendant as fully set forth herein, including without limitations, punitive damages.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

746.   As a direct and proximate result of Defendant's conduct, Plaintiff Florence Jensen and Decedent Robert Jensen have been injured and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care and comfort, and economic damages.

747.   Plaintiff Kim Scott, on behalf of herself and all of the next of kin of Decedent, Lugene Scott, is entitled to recover damages as Decedent would have if he were living, as a result of acts and/or omissions of Defendant.

748.   Plaintiff Kim Scott, on behalf of herself and all of Decedent's next of kin is also entitled to recover punitive damages and damages for substantial pain and suffering caused to Decedent from the acts and/or omissions of Defendant as fully set forth herein, including without limitations, punitive damages.

749.   As a direct and proximate result of Defendant's conduct, Plaintiff Kim Scott and Decedent Lugene Scott have been injured and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care and comfort, and economic damages.

750.   Plaintiff Ann Higingbotham, on behalf of herself and all next of kin of Decedent Johnny Higingbotham, is also entitled to recover punitive damages and damages for substantial pain and suffering caused to Decedent from the acts and/or omissions of Defendant as fully set forth herein, including without limitations, punitive damages.

751.   As a direct and proximate result of Defendant's conduct, Plaintiff Ann Higingbotham and Decedent Johnny Higingbotham have been injured and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care and comfort, and economic damages.

752.   Plaintiff Ann Higingbotham, in all capacities, states her intentions to bring each and every claim permissible under Georgia law, including all individual, wrongful-death, and

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

estate claims. Plaintiff Higingbotham seeks all special damages, economic losses, medical expenses, funeral and burial expenses, necessary expenses, pain and suffering, and all compensatory, special, actual, economic, general, punitive, and all other damages permissible under Georgia law, including, but not limited to, personal injuries, pain and suffering, mental anguish, loss of enjoyment of life, wrongful death, estate-based, funeral and burial expenses, incidental expenses, medical expenses, punitive damages, and consequential damages to be proven at trial.

753.    As a direct and proximate result of the homicide and wrongful death of Johnny Ray Higingbotham, as caused by the acts and omissions of the Defendant herein, Plaintiff Higingbotham is entitled to recover all damages allowed by Georgia law for the death of Johnny Ray Higingbotham, including damages equal to the full value of his life, without deduction for expenses or necessaries had he lived, as determined by a fair and impartial jury. *See* O.C.G.A. § 51-4-2.

754.    The laws of Georgia also provide a civil remedy to the estate of a person whose life has been taken by the wrongful conduct of another, *i.e.,* money damages. Plaintiff Higingbotham is entitled to an award of all damages allowed by Georgia law against the Defendant, including damages for Decedent Higingbotham's pain and suffering that he experienced prior to his death, as well as all medical, funeral, burial, and other actual expenses, and any other relief which is authorized by Georgia law.

755.    WHEREFORE, the Plaintiff demands judgment against Defendant, and in the alternative, request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

## COUNT EIGHT: FRAUDULENT CONCEALMENT

756.   Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

757.   Monsanto is estopped from asserting a statute of limitations defense because it fraudulently concealed its wrongful conduct from Plaintiffs with the intent that Plaintiffs, their employers, and other consumers and users of Roundup® would rely on such material representations.

758.   Monsanto had actual knowledge that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries. Monsanto knew or should have known that Roundup® is more toxic than glyphosate alone and that safety studies of Roundup®, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiffs from Roundup®.

759.   Monsanto failed to conduct adequate testing of glyphosate and the Roundup® formulation.

760.   Monsanto had actual knowledge of its misrepresentations, negligence, breach of warranties, and false, misleading, deceptive, and unconscionable conduct.  Even so, Monsanto perpetuated its wrongful conduct with the intent and fixed purpose of concealing its wrongs from Plaintiffs and the public at large. Despite its knowledge that Roundup® is considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup® as safe.

761.   Plaintiffs and/or Plaintiffs' employers were unaware of the falsity of these representations, acted in actual and justifiable reliance on such material misrepresentations, and were injured as a direct and proximate result.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

762.    Additionally, Monsanto knowingly omitted material information and remained silent regarding said misrepresentations despite the fact that it had a duty to inform Plaintiffs, their employers, and the general public of the inaccuracy of said misrepresentations, which omission constitutes a positive misrepresentation of material fact, with the intent that Plaintiffs and the public would rely on Monsanto's misrepresentations.

763.    Plaintiffs did, in fact, act in actual and justifiable reliance on Monsanto's representations, and Plaintiffs were injured as a result.

764.    Monsanto, as the manufacturer of Roundup®, was in a position of superior knowledge and judgment regarding any potential risks associated with its products.

765.    Monsanto committed constructive fraud by breaching one or more legal or equitable duties owed to Plaintiffs relating to Roundup®, said breach or breaches constituting fraud because of its propensity to deceive others or constitute an injury to public interests or public policy.

766.    In breaching its duties to Plaintiffs, Monsanto used its position of trust as the manufacturer and/or distributor of Roundup® to increase sales of its products at the expense of informing Plaintiffs that use of or exposure to Roundup® carries the risk of serious illness, such as NHL.

767.    WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

## COUNT NINE:  PUNITIVE DAMAGES

768.    Plaintiffs incorporate by reference every other paragraph of this Complaint as if each were set forth herein.

769.    Defendant has acted willfully, wantonly, maliciously, with an evil motive, and recklessly in one or more of the following ways:

a.      Defendants knew of the unreasonably high risk of NHL posed by the Roundup® products before manufacturing, marketing, distributing and/or selling the Roundup® products, yet purposefully proceeded with such action;

b.      Despite their knowledge of the high risk of NHL associated with use and/or exposure to Roundup® products, Defendant affirmatively minimized this risk through marketing and promotional efforts and product labeling;

c.      Through the actions outlined above, Defendant expressed a reckless indifference to the safety of users of Roundup® products, including Plaintiffs.

770.    Defendant knew of the dangers and risks of Roundup® products, yet it concealed and/or omitted this information from labels and warnings contained on Roundup® products in furtherance of its knowing and willful actions.

771.    These actions were outrageous because of Defendant's evil motive or a reckless indifference to the safety of users of Roundup® products and/or those who became exposed to it.

772.    As a direct and proximate result of the willful, wanton, malicious, evilly motivated and/or reckless conduct of Defendant, the Plaintiffs have sustained damages as set forth above.

773.    WHEREFORE, Plaintiffs pray for a judgment for punitive damages against Defendant, jointly and severally, in a fair and reasonable amount sufficient to punish Defendant

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

and deter it and others from engaging in similar conduct in the future, costs expended herein, and such further and other relief as the Court deems just and appropriate.

## COUNT TEN: DAMAGES

774.    Plaintiffs incorporate by reference every other paragraph of this Complaint as if each were set forth fully and completely herein.

775.    Defendant knew of the dangerous condition of Roundup® products, including that they posed a danger to their consumers and non-consumers exposed to Roundup® products, including Plaintiffs, but chose not to include any warnings or information regarding the dangerous condition of Roundup® products.

776.    Defendant showed complete indifference to or conscious disregard of the safety of Plaintiffs by their conduct described herein.  Defendant knew or should have known failure to include a warning for Roundup® products would result in women using and/or being exposed to Roundup® products and subsequently developing NHL.

777.    Plaintiffs are entitled to exemplary damages to punish Defendant and to deter Defendant and others in similar situations from like conduct.

778.    WHEREFORE, Plaintiffs pray for judgment against Defendant for

        a.      compensatory damages in an amount to be proven at trial;

        b.      exemplary damages;

        c.      costs, including reasonable attorneys' fees, court costs, and other litigation expenses; and

        d.      any other relief the Court may deem just and proper.

Electronically Filed - City of St. Louis - April 26, 2019 - 02:57 PM

Respectfully submitted,

**NIEMEYER, GREBEL & KRUSE LLC**

By:    <u>/s/ Mark R. Niemeyer</u>
          Mark R. Niemeyer    #42437
          Michael S. Kruse     #57818
          10 S. Broadway, Suite 1125
          St. Louis, MO  63102
          314-241-1919 phone
          314-665-3017 fax
          <u>niemeyer@ngklawfirm.com</u>
          <u>kruse@ngklawfirm.com</u>

          *Attorneys for Plaintiffs*