# U.S. District Court
## Southern District of Florida (Miami)
## CIVIL DOCKET FOR CASE #: 1:19-cv-22291-FAM

Turnoff v. Monsanto Company
Assigned to: Judge Federico A. Moreno
Cause: 28:1332 Diversity-Product Liability

Date Filed: 06/04/2019
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**William C. Turnoff**

represented by **Alan H. Rolnick**
Rivero Mestre LLP
2525 Ponce de Leon Blvd.
Suite 1000
Coral Gables, FL 33134
305.445.2500
Fax: 305.445.2505
Email: arolnick@riveromestre.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles Edward Whorton**
Rivero Mestre LLP
2525 Ponce de Leon Boulevard
Suite 1000
Coral Gables, FL 33134
305-445-2500
Fax: 305-445-2505
Email: cwhorton@riveromestre.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David Lee DaPonte**
Rivero Mestre
2525 Ponce de Leon Blvd
Suite 1000
Miami, FL 33134
305-445-2500
Email: ddaponte@riveromestre.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jorge Alejandro Mestre**
Rivero Mestre LLP
2525 Ponce de Leon Blvd.
Suite 1000
Miami, FL 33134
305-445-2500
Fax: 305-445-2505

Email: jmestre@riveromestre.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andres Rivero**
Rivero Mestre LLP
2525 Ponce de Leon Boulevard
Suite 1000
Coral Gables, FL 33134
305-445-2500
Fax: (305) 445-2505
Email: arivero@riveromestre.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 06/04/2019 | 1 | COMPLAINT *for Damages* against Monsanto Company. Filing fees $ 400.00 receipt number 113C-11701482, filed by William C. Turnoff. (Attachments: # 1 Civil Cover Sheet, # 2 Summon(s))(Rivero, Andres) (Entered: 06/04/2019) |
| 06/04/2019 | 2 | Clerks Notice of Judge Assignment to Judge Federico A. Moreno.<br><br>Pursuant to 28 USC 636(c), the parties are hereby notified that the U.S. Magistrate Judge Lauren F. Louis is available to handle any or all proceedings in this case. If agreed, parties should complete and file the Consent form found on our website. It is not necessary to file a document indicating lack of consent.<br><br>Pro se (NON-PRISONER) litigants may receive Notices of Electronic Filings (NEFS) via email after filing a Consent by Pro Se Litigant (NON-PRISONER) to Receive Notices of Electronic Filing. The consent form is available under the forms section of our website. (amb) (Entered: 06/05/2019) |
| 06/05/2019 | 3 | Summons Issued as to Monsanto Company. (amb) (Entered: 06/05/2019) |

| PACER Service Center | | | | |
|---|---|---|---|---|
| **Transaction Receipt** | | | | |
| 06/10/2019 15:23:11 | | | | |
| **PACER Login:** | hllp1982:2634105:4722683 | **Client Code:** | 1417.0049 | |
| **Description:** | Docket Report | **Search Criteria:** | 1:19-cv-22291-FAM | |
| **Billable Pages:** | 2 | **Cost:** | 0.20 | |

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No.: _____

WILLIAM C. TURNOFF,

     Plaintiff,

v.

MONSANTO COMPANY,

     Defendant.

_____/

## PLAINTIFF'S COMPLAINT FOR DAMAGES

Plaintiff William C. Turnoff brings this action for damages against Defendant Monsanto Company ("Monsanto").

## INTRODUCTION

1.     In 1970, Monsanto discovered the herbicidal properties of glyphosate. It began marketing glyphosate in 1974, under the brand name Roundup. Roundup is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. In addition to the active ingredient glyphosate, Roundup contains the surfactant Polyethoxylated tallow amine (POEA) and/or adjuvants and other so-called "inert" ingredients. By 2001, glyphosate was the most widely used herbicidal active ingredient in American agriculture with 85 to 90 million pounds used annually. That number grew to 185 million pounds by 2007.[1] As of 2013, glyphosate was the world's most widely used herbicide.

---

[1] Grube, et al., on behalf of EPA, *Pesticides Industry Sales and Usage, 2006–07 Market Estimates* 14, (2011), https://www.epa.gov/sites/production/files/2015-10/documents/market_estimates2007.pdf, last visited May 22, 2019.

2.      Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri, and incorporated in Delaware. It is the world's leading producer of glyphosate. As of 2009, Monsanto also was the world's leading producer of crop seeds, accounting for 27% of the world crop seed market.[2] The majority of these seeds are of the "Roundup Ready" brand. The stated advantage of Roundup Ready seeds and crops is that they substantially improve a farmer's ability to control weeds, since glyphosate purportedly can be sprayed in the fields during the growing season without harming the crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready.[3]

3.      Monsanto's glyphosate products are registered in 130 countries and have been approved for use on over 100 different crops.[4] They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup is used.[5] It has been found in food,[6] in the urine of agricultural

---

[2] ETC GROUP, *Who Will Control the Green Economy?* 22 (2011), http://www.etcgroup.org/files/publication/pdf_file/ETC_wwctge_4web_Dec2011.pdf, last visited May 22, 2019.

[3] William Neuman and Andrew Pollack, *Farmers Cope With Roundup-Resistant Weeds*, N.Y. TIMES (May 3, 2010), https://www.nytimes.com/2010/05/04/business/energy-environment/04weed.html, last visited May 22, 2019.

[4] MONSANTO COMPANY, *Backgrounder, History of Monsanto's Glyphosate Herbicides* (June 2005), https://monsanto.com/app/uploads/2017/06/back_history.pdf, last visited May 22, 2019.

[5] *See* USGS, *USGS Technical Announcement: Widely Used Herbicide Commonly Found in Rain and Streams in the Mississippi River Basin* (2011), https://archive.usgs.gov/archive/sites/www.usgs.gov/newsroom/article.asp-ID=2909.html, last visited May 22, 2019.

[6] Bohn, et al., *Compositional Differences in Soybeans on the Market: Glyphosate Accumulates in Roundup Ready GM Soybeans*, 153 FOOD CHEMISTRY 207 (2013).

workers,[7] and even in the urine of urban dwellers who are not in direct contact with glyphosate.[8]

4.      On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

5.      On July 29, 2015, IARC issued a monograph relating to glyphosate. In that monograph, the IARC Working Group provided a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

6.      The IARC Working Group classified glyphosate as a Group 2A herbicide, which means it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma ("NHL") and other hematopoietic cancers, including lymphocytic lymphoma, chronic lymphocytic leukemia, B-cell lymphoma and multiple myeloma.[9]

7.      The IARC evaluation is significant because it confirms what has been believed for years: that glyphosate is toxic to humans.

---

[7] Acquavella, et al., *Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study*, 112(3) ENVIR. HEALTH PERSPECTIVE 321 (2004), http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241861/ (last visited May 22, 2019); Guyton, et al. *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon and Glyphosate*, 112 IARC Monographs, 76, section 5.4 (2015), https://www.thelancet.com/journals/lanonc/article/PIIS1470-2045(15)70134-8/fulltext, last visited May 22, 2019.

[8] Brändli D, Reinacher S, *Herbicides found in Human Urine*, 1 ITHAKA J. 270 (2012), http://www.ithaka-journal.net/druckversionen/e052012-herbicides-urine.pdf, last visited May 22, 2019.

[9] *See* Guyton et al., *supra* note 7.

3

8.      Nevertheless, Monsanto, since it began selling Roundup, has misrepresented it as safe to humans and the environment. Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup, create no unreasonable risks to human health or to the environment.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332 because there is complete diversity of citizenship between plaintiff and defendant. Defendant is incorporated in and has its principal place of business outside the state in which plaintiff resides.

10.      The amount in controversy between plaintiff and defendant exceeds $75,000, exclusive of costs and interest.

11.      The Court also has supplemental jurisdiction over plaintiff's state-law claims under 28 U.S.C. § 1367.

12.      Venue is proper in this district under 28 U.S.C. § 1391, because defendant conducts substantial business in this district and is subject to personal jurisdiction in this district.

13.      The Court has personal jurisdiction over defendant because it maintains and carries on continuous and systematic contacts with Florida and Miami-Dade County, regularly transacts business within Florida and Miami-Dade County, and regularly avails itself of the benefits of its presence in Florida and Miami-Dade County.

## THE PARTIES

14.      Plaintiff William C. Turnoff is a citizen and resident of Miami-Dade County, Florida. He is a retired federal magistrate judge for the Southern District of Florida, having

4

provided 32 years of judicial service. Before that, he was the chief of the major crimes section at the Miami U.S. Attorney's Office.

15.      Defendant Monsanto is a Delaware corporation with its principal place of business at 800 North Lindbergh Blvd., St. Louis, Missouri 63167. Defendant Monsanto is in the business of researching, testing, developing, designing, formulating, manufacturing, producing, assembling, packaging, labeling, advertising, promoting, marketing, selling, supplying and distributing herbicides, including Roundup products.

16.      At all times relevant to this Complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup products, which contain the active ingredient glyphosate and the surfactant POEA, as well as adjuvants and other purported "inert" ingredients.

17.      All conditions precedent to this action have occurred, been performed, or have been waived.

## FACTUAL ALLEGATIONS

18.      At all relevant times, defendant has been engaged in in the business of designing, researching, manufacturing, testing, advertising, promoting, marketing, selling and distributing the commercial herbicide Roundup.

19.      Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate.

20.      Monsanto discovered the herbicidal properties of glyphosate during the 1970s, and subsequently began to design, research, manufacture, sell and distribute glyphosate-based Roundup as a broad-spectrum herbicide. Roundup, containing the active ingredient glyphosate, was introduced in 1974.

21.     Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

22.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

23.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase, which interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately in plant death.

24.     Sprayed as a liquid, glyphosate is absorbed by plants directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

25.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses around the world. Its use has been driven largely by the proliferation of genetically engineered crops, which have been specifically engineered to resist the activity of glyphosate.

26.     Defendant is intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup *i.e.*, "Roundup Ready." As of 2009, Monsanto was the world's leading producer of seeds designed to be, and designated as, Roundup Ready. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready seeds.

27.     Today, glyphosate products are among the world's most widely used herbicides. Monsanto's glyphosate products are registered in more than 130 countries and are approved for

weed control in more than 100 crops.[10]

28.     For nearly 40 years, farmers and consumers across the globe have used Roundup, unaware of its carcinogenic properties.

## I.     The Discovery of Glyphosate and Development of Roundup

29.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup. From the outset, Monsanto marketed Roundup as a "safe" general-purpose herbicide for widespread commercial and consumer use. It continues to market Roundup as safe today.

30.     In addition to the active ingredient glyphosate, Roundup formulations also contain adjuvants and other chemicals, such as the surfactant POEA, which are considered "inert" and therefore protected as "trade secrets" in manufacturing. Growing evidence suggests that these adjuvants and additional components of Roundup formulations are not, in fact, inert and are themselves toxic.

## II.     Registration of Herbicides under Federal Law

31.     The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq*. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by 7 U.S.C. § 136a(a).

32.     As part of the registration process, the EPA requires, among other requirements, a

---

[10] *See* MONSANTO COMPANY, *supra* note 4.

variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other

potential non-target organisms, and other adverse effects on the environment. Registration by the

EPA, however, is not an assurance, or even a finding, of safety. The determination the EPA

makes in registering or re-registering a product is not that the product is "safe," but rather that

use of the product in accordance with its label directions "will not generally cause unreasonable

adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

33.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any

unreasonable risk to man or the environment, taking into account the economic, social, and

environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus

requires the EPA to make a risk/benefit analysis in determining whether a registration should be

granted or allowed to continue to be sold in commerce.

34.     In 1974, the EPA registered Roundup for manufacture, distribution and sale in the

United States, as required by FIFRA.

35.     FIFRA registration requires the registrant, in this case Monsanto, to conduct

health and safety testing of pesticide products. The federal government is not required, nor is it

able, to perform the product tests that are required of the manufacturer.

36.     Under FIFRA, the evaluation of each pesticide product manufactured, distributed

or sold is completed when the product is initially registered. The data necessary for registration

of a pesticide has changed over time. The EPA is now in the process of re-evaluating all

pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C.

§ 136a-1. In order to reevaluate these pesticides, the EPA demands the completion of additional

tests and the submission of data for the EPA's review and evaluation.

37.     With regard to the re-registration of glyphosate, i.e., Roundup, the EPA had

8

planned on releasing its preliminary risk assessment no later than July 2015. The EPA completed

its review of glyphosate in early 2015, but delayed releasing the risk assessment pending further

review in light of the WHO's health-related findings.

## II.   Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup

38.   Based on early studies that glyphosate could cause cancer in laboratory animals,

the EPA classified glyphosate as "possibly carcinogenic" to humans (Group C) in 1985. After

the classification, Monsanto submitted studies evidencing the opposite, which eventually

persuaded the EPA to change its classification of glyphosate to "evidence of non-

carcinogenicity" in humans (Group E) in 1991. In "re-classifying" glyphosate, however, the EPA

made clear that this designation did not mean that glyphosate doesn't cause cancer, stating: "It

should be emphasized, however, that designation of an agent in Group E is based on the

available evidence at the time of evaluation and should not be interpreted as a definitive

conclusion that the agent will not be a carcinogen under any circumstances."[11]

39.   On two occasions, in 1976 and 1990, the EPA found that fraud was committed by

the laboratories Monsanto used to test the toxicity of its Roundup products for registration

purposes.

40.   In the first instance, in 1976, when Monsanto was seeking initial registration of

Roundup by the EPA, it hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate

---

[11] ENVIR. PROTECTION AGENCY, *Memorandum, Subject: SECOND Peer Review of Glyphosate* 1 (1991), https://archive.epa.gov/pesticides/chemicalsearch/chemical/foia/web/pdf/103601/417300-1991-10-30a.pdf, last visited May 22, 2019.

pesticide toxicology studies relating to Roundup.[12] IBT performed about 30 tests on glyphosate

and glyphosate-containing products, including nine of the 15 residue studies needed to register

Roundup. In 1976, the United States Food and Drug Administration ("FDA") performed an

inspection of IBT that revealed discrepancies between the raw data and the final report regarding

the toxicological impacts of glyphosate. The EPA subsequently audited IBT in 1983, and it, too,

found the Roundup toxicology studies were invalid.[13] An EPA reviewer stated, after finding

"routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the

studies when they said they took specimens of the uterus from male rabbits."[14]

  41. Three top executives of IBT were convicted of fraud in 1983.

  42. In the second fraudulent incident, Monsanto hired Craven Laboratories in 1991 to

perform pesticide and herbicide studies, including studies of Roundup. That same year, the

owner of Craven Laboratories and three of its employees were indicted, and later convicted, of

---

[12] MONSANTO COMPANY, *Backgrounder, Testing Fraud: IBT and Craven Laboratories* (June 2005) https://monsanto.com/app/uploads/2017/06/ibt_craven_bkg.pdf, last visited May 22, 2019.

[13] ENVIR. PROTECTION AGENCY, *Summary of the IBT Review Program Office of Pesticide Programs* (1983), https://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA &Index=1981+Thru+1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestri ct=n&Toc=&TocEntry=&QField=&QFieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp =0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles%5CIndex%20Data%5C81thru85% 5CTxt%5C00000022%5C91014ULV.txt&User=ANONYMOUS&Password=anonymous&Sort Method=h%7C- &MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&D isplay=hpfr&DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results %20page&MaximumPages=1&ZyEntry=1&SeekPage=x&ZyPURL, last visited May 22, 2019.

[14] Marie-Monique Robin, THE WORLD ACCORDING TO MONSANTO: POLLUTION, CORRUPTION AND THE CONTROL OF THE WORLD'S FOOD SUPPLY 72 (2011) (citing ENVIR. PROTECTION AGENCY, *Data Validation*, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch. Washington, D.C. (Aug. 9, 1978)).

fraudulent laboratory practices in the testing of pesticides and herbicides.[15]

43.     Since 2000, Monsanto has ghostwritten and published multiple "studies" through companies such as Intertek and Exponent, Inc. These "studies" minimize safety concerns about the use of glyphosate, and are used to convince regulators to allow the sale of Roundup, and to convince customers to buy it and use it. All of these "studies" have been submitted to the EPA and relied on by the EPA and the public in assessing the safety of glyphosate. Through these means, Monsanto has fraudulently represented that "independent scientists" have concluded that glyphosate is safe. These "independent scientists" have been paid by Monsanto and have failed to disclose the significant role Monsanto had in creating the reports their names are on. Further, Monsanto has ghostwritten op-ed pieces for scientists such as Robert Tarone and Henry Miller to advocate glyphosate's supposed safety in newspapers and magazines. Monsanto also has ghostwritten letters for supposedly independent scientists, which were submitted to regulatory agencies reviewing the safety of glyphosate.

44.     Monsanto has also violated federal law in holding secret, collusive, *ex parte* meetings and conversations with EPA employees in furtherance of a strategy to re-register glyphosate and quash investigations into its carcinogenicity by other federal agencies, including the Agency for Toxic Substances and Disease Registry. On information and belief, Monsanto's unnaturally close connection with the EPA arises in part from its offering of lucrative consulting jobs to retiring EPA officials.

45.     In 2011, the German Federal Institute for Risk Assessment (BfR) began preparing a study on the safety of glyphosate. Monsanto used something called "The Joint Glyphosate Task Force" as a front to co-opt this study. The "task force" was solely responsible for preparing and

---

[15] *See* MONSANTO COMPANY, *supra* note 12.

submitting summaries of studies the BfR relied on. Through this "task force," Monsanto became the sole provider of data and ultimately wrote the report, which was rubber-stamped by the BfR and issued in January 2015.[16] Monsanto has since used this report, which it wrote, to falsely proclaim the safety of glyphosate.

46.     As noted in paragraphs 4 to 8, in March 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), concluded that glyphosate was probably carcinogenic to humans. Immediately thereafter, the Joint Glyphosate Task Force, at Monsanto's behest, issued a press release sharply criticizing IARC, stating that its conclusion was "baffling," and falsely claiming that "IARC did not consider any new or unique research findings when making its decision. It appears that only by deciding to exclude certain available scientific information and by adopting a different approach to interpreting the studies was this possible."[17]

III.     The Importance of Roundup to Monsanto's Market Dominance and Profits

47.     Despite the falsity of the tests submitted to support Roundup's registration, within a few years of its launch, Roundup was being marketed in 115 countries.

48.     The success of Roundup was key to Monsanto's continued relevance, reputation and dominance in the marketplace. Due largely to Roundup sales, Monsanto's agriculture

---

[16] Anabelle Timsit, *Killer? A Plagiarism Scandal Rocking the EU Centers on the Safety of the Weedkiller Glyphosate*, QUARTZ (Jan. 16, 2019), https://qz.com/1524049/monsanto-is-at-the-center-of-a-plagiarism-scandal-rocking-the-eu/, last visited May 22, 2019.

[17] JOINT GLYPHOSATE TASK FORCE, *IARC Misclassification of Glyphosate as Group 2A Probable Carcinogen*, https://www.prnewswire.com/news-releases/iarc-misclassification-of-glyphosate-as-group-2a-probable-carcinogen-300053762.html, last visited May 22, 2019.

division soon was out-performing its chemicals division in terms of operating income, and that gap increased yearly. However, with its patent on glyphosate in the U.S. set to expire in 2000, Monsanto needed a strategy to maintain market dominance and ward off impending competition.

49.     In response to this looming deadline, Monsanto began development and sale of genetically engineered Roundup Ready seeds in 1996. Since Roundup Ready crops supposedly are resistant to glyphosate, Monsanto told farmers they could spray Roundup on their fields during the growing season without harming their crops. This allowed Monsanto to further expand its market for Roundup. By 2000, Monsanto's Roundup Ready seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were grown from Roundup Ready seeds. Monsanto's genetic engineering gambit buttressed its dominant share of the glyphosate market through a tying strategy that provided Roundup Ready seeds with purchases of Roundup herbicide.

50.     Monsanto's three-pronged strategy of increasing production, lowering prices, and providing Roundup Ready seeds with Roundup purchases succeeded, and Roundup became Monsanto's most profitable product. In 2000, Roundup accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one and accounting for nearly half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

## IV.    Monsanto Knew for Decades that it Falsely Advertised the Safety of Roundup

51.     In 1996, following the New York Attorney General's ("NYAG") investigation of Monsanto based on its false and misleading advertising of Roundup products, Monsanto entered

into an Assurance of Discontinuance with the State of New York.[18] Specifically, the NYAG challenged Monsanto's general representations that its spray-on, glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

(A)   "Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences";

(B)   "And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem";

(C)   "Roundup biodegrades into naturally occurring elements";

(D)   "Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation";

(E)   "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it";

(F)   "Glyphosate is less toxic to rats than table salt following acute oral ingestion";

---

[18] Attorney General of the State of New York, *In the Matter of Monsanto Company*, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996), http://farmwars.info/wp-content/uploads/2013/09/MONSAN98.AOD-1.pdf, last visited May 22, 2019.

(G)   "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it";

(H)   "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non- toxic' as it pertains to mammals, birds and fish."[19]

52.   On November 19, 1996, Monsanto entered into a settlement with the NYAG that amounted to a voluntary cease and desist order, styled an "Assurance of Discontinuance." In it, Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

(A)   Monsanto's glyphosate-containing herbicide products and any components thereof are safe, nontoxic, harmless and free from risk;

(B)   Monsanto's glyphosate-containing herbicide products, and any components thereof that are manufactured, formulated, distributed or sold by Monsanto, are biodegradable;

(C)   Monsanto's glyphosate-containing herbicide products and any components thereof stay where they are applied under all circumstances and will not move through the environment by any means;

(D)   Monsanto's glyphosate-containing herbicide products and any components thereof are "good" for the environment or are "known for their environmental

---

[19] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996), https://big.assets.huffingtonpost.com/fraud.pdf, last visited May 22, 2019.

characteristics;"

(E)     Glyphosate-containing herbicide products and any components thereof are safer

or less toxic than many common consumer products that are not herbicides, such

as table salt;

(F)     Monsanto's glyphosate-containing herbicide products and any components

thereof might fairly be classified as "practically non-toxic."[20]

53.     Monsanto did not cure its false and fraudulent advertising claims in any

jurisdiction other than the State of New York, and on information and belief still has not done so,

and throughout the world continues to make the false representations that it ceased and desisted

from making in New York almost 23 years ago.

54.     In 2009, France's highest court ruled that Monsanto had not told the truth about

the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely

advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[21]

**V.      Classifications and Assessments of Glyphosate**

55.     The IARC process for the classification of glyphosate followed stringent

procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has

reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known

Human Carcinogens), 73 agents to be Group 2A (Probable Human Carcinogens), 287 agents to

be Group 2B (Possible Human Carcinogens), 503 agents to be Group 3 (Not Classified), and one

---

[20] *Id.*

[21] *Monsanto Guilty in 'False Ad' Row*, BBC NEWS (Oct. 15, 2009),
http://news.bbc.co.uk/2/hi/europe/8308903.stm, last visited on May 22, 2019.

agent to be Probably Not Carcinogenic.

56.     The established procedure for the IARC Monograph evaluations is described in the IARC Program Preamble.[22] Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

57.     One year before an IARC Monograph meeting, the meeting is announced and there is a call for data and experts. Eight months before the Monograph meeting, the Working Group membership is selected, and the sections of the Monograph are developed by the Working Group's members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in the Lancet Oncology, and within one year after the meeting, the finalized Monograph is published.[23]

58.     In determining the classification of a chemical agent, the IARC Working Group reviews the following information: (a) human, experimental and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review and

---

[22] WORLD HEALTH ORG., *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble*, (2006), http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf, last visited May 22, 2019.

[23] IARC, *IARC Monographs on the Evaluations of Carcinogenic Risks to Humans – Preamble*, https://monographs.iarc.fr/wp-content/uploads/2018/06/CurrentPreamble.pdf, last visited on May 22, 2019.

17

reviewers cannot be associated with the underlying studies.[24]

59.     In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.[25]

60.     On July 29, 2015, the IARC issued its Monograph for glyphosate, Monograph Volume 112.[26] In preparing this Monograph, a Working Group of 17 experts from 11 countries met at the IARC from March 3 to 10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. This meeting capped off a near one-year process of review and preparation by the IARC Secretariat and the Working Group. That process included a comprehensive review of the latest scientific evidence. According to IARC's published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature," as well as "data from governmental reports that are publicly available."[27]

61.     The reports considered by the Working Group assessed the following exposure groups: (1) occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland, and municipal weed-control workers in the United

---

[24] *Id.*

[25] IARC, *IARC Monographs Volume 112: Evaluation of Five Organophosphate Insecticides and Herbicides*, (Mar. 20, 2015). https://www.iarc.fr/wp-content/uploads/2018/07/MonographVolume112-1.pdf, last visited May 22, 2019.

[26] *Id.*

[27] *Id.*

18

Kingdom; and (2) para-occupational (second-hand or indirect) exposure in farming families.[28] Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007, and the most heavily used herbicide in the world in 2012.[29]

62.     The IARC Monograph identified exposure pathways for glyphosate as air (especially during spraying), water and food.[30] Community exposure to glyphosate is widespread, and it is found in soil, air, surface water and groundwater, as well as in food.[31]

63.     The IARC Monograph identified several reports of occupational exposure in the United States, Canada, and Sweden. Those reports showed a human health concern from agricultural and other work-related exposure to glyphosate.[32]

64.     The IARC Monograph identified studies that found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.[33]

65.     The IARC Monograph also identified studies finding that glyphosate caused DNA and chromosomal damage in human cells. One study of an Ecuadorian community reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations

---

[28] IARC, *Glyphosate Monograph* 7, https://monographs.iarc.fr/wp-content/uploads/2018/06/mono112-10.pdf, last visited on May 22, 2019.

[29] *Id.* at 4.

[30] *Id.* at 5–8.

[31] *Id.*

[32] *Id.* at 11.

[33] *Id.* at 16.

were sprayed.[34]

66.     The IARC Monograph cited several studies on glyphosate's effects on mice. The findings indicated that glyphosate caused an increased incidence of a rare tumor known as renal tubule carcinoma in male CD-1 mice; that glyphosate increased pancreatic islet-cell adenoma in male rats; that glyphosate increased incidence of haemangiosarcoma (a rapidly growing blood-vessel cancer) in male mice; and that that glyphosate formulations worsened skin tumors in mice.[35]

67.     The IARC Monograph also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggested intestinal microbial metabolism in humans.[36]

68.     The IARC Monograph found that glyphosate and glyphosate formulations induced oxidative stress and DNA and chromosomal damage in mammals, affecting human and animal cells in utero.[37]

69.     In addition to oxidative stress and DNA damage, scientists have suggested that Roundup's association with various serious health conditions is linked to the effect Roundup has

---

[34] *Id.* at 2.

[35] *Id.* at 76.

[36] *Id.* at 5–8.

[37] *Id.* at 46.

on the digestive system.[38] Specifically, scientists believe the same mechanism that makes Roundup toxic to weeds also makes it toxic to the microbes within the human gut and mucous membranes.[39] When humans are exposed to Roundup, it leads to a chronic inflammatory state in the gastrointestinal tract, as well an impaired intestinal barrier, which can lead to many long-term health effects, including an increased risk of cancer.[40]

70.     Many Roundup products bear a label that says (a) "glyphosate targets an enzyme found in plants but not in people or pets," or (b) "this Roundup formula targets an enzyme in plants but not in people or pets."[41] These statements are false. It has been established that the human body is host to microorganisms that have the enzyme Monsanto asserts is not found in humans. Thus, glyphosate targets microbes within the human body that have the enzyme, causing the reactions described in the studies mentioned above.

71.     The IARC Monograph also noted genotoxic, hormonal and enzymatic effects in mammals exposed to glyphosate.[42] Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

---

[38] HEALTH STATUS TEAM, *Will Glyphosate Affect Your Digestive System?*, HEALTH STATUS, https://www.healthstatus.com/health_blog/purium-reviews/will-glyphosate-affect-digestive-system/, last visited on May 22, 2019.

[39] *Id.*

[40] *Id.*

[41] ENVIR. PROTECTION AGENCY, *Letter to Dawn Fee-White* 10 (July 24, 2008), https://www3.epa.gov/pesticides/chem_search/ppls/071995-00040-20080724.pdf, last visited May 22, 2019.

[42] IARC, *supra* note 28, at 77.

72.     The IARC Working Group also reviewed an Agricultural Health Study, consisting

of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.[43]

This study differed from others in that it was based on a self-administered questionnaire, but the

results support an association between glyphosate exposure and multiple myeloma, hairy cell

leukemia (HCL) and chronic lymphocytic leukemia (CLL), in addition to several other cancers.[44]

## VI.     The Toxicity of Other Ingredients in Roundup

73.     In addition to the toxicity of the active ingredient, glyphosate, several studies

support the conclusion that the glyphosate-based formulation in defendant's Roundup products is

more dangerous and toxic than glyphosate alone. As early as 1991, available evidence

demonstrated that specific glyphosate formulations, such as Monsanto's, were significantly more

toxic than glyphosate alone.[45]

74.     In 2002, a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction

at the Level of CDK1/Cyclin B Activation," revealed that Roundup causes delays in the cell

cycles of sea urchins but that the same concentrations of glyphosate alone did not alter cell

cycles.[46]

75.     A 2004 study demonstrated a molecular link between glyphosate-based products

---

[43] *Id.* at 11.

[44] *Id.*

[45] Martinez, T.T. and K. Brown, *Oral and pulmonary toxicology of the surfactant used in Roundup herbicide*, 34 PROC. WEST. PHARMACOL. SOC. 43–46 (1991).

[46] Julie Marc, et al., *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation*, 15 CHEM. RES. TOXICAL. 326–31 (2002).

and cell cycle dysregulation.[47] The researchers noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."[48]

76.      In 2005, another study demonstrated that Roundup's effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone.[49] This study further suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of (1) other chemicals in the product, such as the surfactant POEA, or (2) the potential synergistic effect between glyphosate and other chemicals in the product.[50]

77.      In 2009, a study examined the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells. The study tested dilution levels of Roundup and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food. The study concluded that supposedly "inert" ingredients, and possibly POEA,

---

[47] Julie Marc, et al., *Glyphosate-Based Pesticides Affect Cell Cycle Regulation*, 96 BIOLOGY OF THE CELL 245, 245–49 (2004), http://onlinelibrary.wiley.com/doi/10.1016/j.biolcel.2003.11.010/epdf, last visited on May 22, 2019.

[48] *Id.*

[49] Francisco Peixoto, *Comparative Effects of the Roundup and Glyphosate on Mitochondrial Oxidative Phosphorylation*, 61 CHEMOSPHERE 1115, 1122 (2005), https://www.researchgate.net/publication/7504567_Comparative_effects_of_the_Roundup_and_glyphosate_on_mitochondrial_oxidative_phosphorylation, last visited May 22, 2019.

[50] *Id.*

alter human cell permeability and amplify the toxicity of glyphosate. The study further suggested

that assessments of glyphosate toxicity should account for the presence of adjuvants or additional

chemicals in Roundup, and not only glyphosate. This study confirmed that the adjuvants present

in Roundup are not, in fact, inert and that Roundup is potentially far more toxic than its active

ingredient glyphosate alone.[51]

78.     These studies were at all times available to defendant, which either knew or had

reason to know of them, and knew, had reason to know, or should have known that Roundup is

more toxic than glyphosate alone.

79.     Despite knowing that Roundup is more dangerous than glyphosate alone,

defendant continued to promote and misrepresent Roundup as safe.

**VII.     Recent Bans on Roundup and Glyphosate**

80.     Several countries have instituted bans on the sale of Roundup and other

glyphosate-containing herbicides, both before and after IARC announced its assessment for

glyphosate in March 2015. More countries undoubtedly will follow suit as the dangers of using

Roundup become more widely known.

81.     The Netherlands banned all glyphosate-based herbicides in April 2014, including

Roundup, which took effect in late 2015. The Dutch Parliament member who introduced the

legislation stated that: "Agricultural pesticides in user-friendly packaging are sold in abundance

to private persons. In garden centers, Roundup is promoted as harmless, but unsuspecting

customers have no idea what the risks of this product are. Especially children are sensitive to

---

[51] Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic and Placental Cells*, 22 CHEMICAL RES. TOXICOLOGY 97–105 (2008), http://big.assets.huffingtonpost.com/france.pdf, last visited on May 22, 2019.

toxic substances and should therefore not be exposed to it."[52]

82.     In 2014, Sri Lanka banned both the private and commercial use of glyphosates,

particularly out of a concern that glyphosate has been linked to fatal kidney disease in

agricultural workers.[53]

83.     In 2015, the Brazilian Public Prosecutor in Brazil's Federal District requested that

the Brazilian Justice Department suspend the use of glyphosate.[54]

84.     In 2015, Colombia banned the use of Roundup and glyphosate to destroy illegal

plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that

glyphosate is probably carcinogenic.[55]

85.     In 2017, Bermuda banned both the private and commercial sale of glyphosates,

including Roundup, stating as follows: "Following a recent scientific study carried out by a

leading cancer agency, the importation of weed spray 'Roundup' has been suspended."[56]

---

[52] SUSTAINABLE PULSE, *Dutch Parliament Bans Glyphosate Herbicides for Non-Commercial Use* (Apr. 4, 2014), https://sustainablepulse.com/2014/04/04/dutch-parliament-bans-glyphosate-herbicides-non-commercial-use/, last visited on May 22, 2019.

[53] Sasha Chavkin, *Sri Lanka Bans Monsanto Herbicide Citing Potential Link to Deadly Kidney Disease*, THE CTR. FOR PUB. INTEGRITY (Mar. 13, 2014), https://publicintegrity.org/health/sri-lanka-bans-monsanto-herbicide-citing-potential-link-to-deadly-kidney-disease/, last visited May 22, 2019.

[54] SUSTAINABLE PULSE, *Brazil's Public Prosecutor Requests Ban on Glyphosate Following WHO Report* (Apr. 28, 2015), https://sustainablepulse.com/2015/04/28/brazils-public-prosecutor-requests-ban-on-glyphosate-following-who-report/, last visited on May 22, 2019.

[55] BBC NEWS, *Colombia to Ban Coca Spraying Herbicide Glyphosate* (May 10, 2015), https://www.bbc.com/news/world-latin-america-32677411, last visited May 22, 2019.

[56] Christina Sarich, *Bermuda Suspends Glyphosate-Ridden Roundup Indefinitely*, NATURALSOCIETY.COM (May 13, 2015), http://naturalsociety.com/bermuda-suspends-glyphosate-ridden-roundup-indefinitely/, last visited May 22, 2019.

86.    In 2019, France banned the private sale of Roundup and glyphosate following a court ruling, which cited the IARC assessment for glyphosate.[57]

87.    On February 28, 2019, the city of Miami passed a resolution banning the use of herbicides containing glyphosate on city property.[58]

## VI.    Plaintiff's Exposure to Roundup

88.    Plaintiff was exposed to Roundup from approximately 1980 to 2000 at his home in Miami-Dade, Florida. For 20 years, plaintiff used a sprayer at least four times a month to apply Roundup to his garden. Plaintiff used pre-mixed Roundup, which was purchased from a local Home Depot.

89.    Plaintiff has been diagnosed with NHL. His suffering from this disease and its deleterious effects are a direct and proximate result of the unreasonably dangerous and defective nature of Roundup, and defendant's unlawful and wrongful conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup.

90.    The entire time that plaintiff was exposed to Roundup, he did not know that exposure to Roundup was hazardous and injurious to his health.

91.    By reason of defendant's unlawful conduct, plaintiff is now severely and permanently injured.

---

[57] Barbara Casassus, *French Court Bans Sale of Controversial Weedkiller*, INTERNATIONAL JOURNAL OF SCIENCE (Jan. 24, 2019), https://www.nature.com/articles/d41586-019-00259-x, last visited on May 22, 2019.

[58] Jessica Lipscomb, *Miami Bans Controversial Herbicides That Are Killing Biscayne Bay*, MIAMI NEW TIMES (Mar. 1, 2019), https://www.miaminewtimes.com/news/city-of-miami-bans-use-of-herbicides-containing-glyphosate-11100953, last visited May 22, 2019.

92.     Plaintiff has suffered and continues to suffer emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a direct and proximate result of defendant's unlawful conduct.

## EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

93.     The running of any applicable statute of limitations has been tolled by reason of defendant's fraudulent concealment of the toxicity, carcinogenicity, and unreasonably dangerous nature of glyphosate in general and Roundup in particular. Defendant, through its affirmative misrepresentations and omissions, actively concealed from plaintiff the true risks of using Roundup. Since October 2015, defendant has continued to falsely represent to the public that "Scientists are in agreement that there is *no evidence* glyphosate causes cancer." (emphasis added).[59]

94.     Because of defendant's material misrepresentations and omissions, plaintiff was unaware, and could not reasonably have known or learned through reasonable diligence, that contact with Roundup exposed him to the unreasonable risks alleged herein and that those risks were the direct and proximate result of defendant's unlawful conduct.

95.     Moreover, defendant is estopped from relying on any applicable statute of limitations because of its fraudulent concealment of the true character, quality and nature of Roundup. Defendant was under a duty to disclose the true character, quality, and nature of Roundup because (a) this was non-public information over which defendant had, and continues to have, exclusive control, and (b) defendant knew that this information was not available to

---

[59] MONSANTO COMPANY, *Backgrounder - Glyphosate: No Evidence of Carcinogenicity*, (Updated November 2014), https://www.monsantoglobal.com/global/jp/products/Documents/no-evidence-of-carcinogenicity.pdf, last visited May 22, 2019.

consumers, or even sellers, of Roundup. Further, defendant is estopped from relying on any

applicable statute of limitations because of its intentional concealment of these facts.

96.     Because of defendant's intentional, fraudulent concealment of the unreasonable

risks of using Roundup, plaintiff could not have reasonably discovered the wrongdoing.

Moreover, the economics of defendant's fraudulent concealment should be considered.

Defendant had the ability to, and did, spend enormous sums of money in furtherance of its

marketing and distributing a highly profitable herbicide, notwithstanding the unreasonable risks

of using it, of which defendant knew or had reason to know. Plaintiff could not have afforded to

conduct, and could not have conducted, studies to determine the nature, extent, and identity of

Roundup-related health risks, and reasonably relied on defendant's false representations of

safety. Accordingly, defendant is precluded by the discovery rule and the doctrine of fraudulent

concealment from relying upon any applicable statute of limitations.

## CAUSES OF ACTION

### COUNT I
### Negligence

97.     Plaintiff incorporates by reference paragraphs 1 to 96 of this Complaint.

98.     Defendant had a duty to exercise reasonable care in the designing, researching,

testing, manufacturing, marketing, supplying, promoting, packaging, sale, and distribution of

Roundup into the stream of commerce, including a duty to ensure that the product would not

cause users to suffer unreasonable, dangerous side effects.

99.     Defendant failed to exercise reasonable care in the designing, researching, testing,

manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance,

quality control, and distribution of Roundup into the stream of commerce because defendant

28

knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects, including but not limited to the development of NHL, as well as other severe, personal injuries that are permanent in nature, together with physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medication.

100.    The negligence of defendant, its agents, and its employees, included but was not limited to the following acts or omissions:

a.    Manufacturing, producing, promoting, formulating, creating, and designing Roundup without properly, adequately, thoroughly and sufficiently testing it;

b.    Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup;

c.    Failing to conduct proper, adequate, thorough, and sufficient testing to determine if Roundup was safe for use, even after defendant knew, had reason to know, or should have known that Roundup was unsafe and unfit for use because of its dangers to those who used or were exposed to it;

d.    Failing to conduct proper, adequate, thorough, and sufficient testing to determine Roundup's carcinogenic properties, even after defendant knew, had reason to know or should have known that Roundup was, is, or could be carcinogenic;

e.    Failing to conduct proper, adequate, thorough, and sufficient testing to determine the safety of Roundup's purportedly "inert" ingredients and/or adjuvants, including (1) the propensity of those ingredients and/or adjuvants to render Roundup toxic or increase its toxicity, (2) whether those ingredients and/or adjuvants are carcinogenic or magnify Roundup's carcinogenic properties, and (3) whether those ingredients and/or adjuvants were safe for use;

f.    Negligently failing to timely, properly, and adequately warn plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup use and exposure;

g.    Negligently failing to petition the EPA to strengthen the warnings associated with Roundup;

h.    Negligently failing to provide timely, proper and adequate cautions and

warnings to protect the health of users, handlers, applicators, and persons who reasonably and foreseeably would come into contact with Roundup;

i.      Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge of its dangerous properties and propensities;

j.      Negligently misrepresenting that Roundup was safe for use for its intended purpose, e.g., stating that Roundup was safer than ordinary, common items such as table salt, when, it was, in fact, unsafe;

k.      Negligently misrepresenting that Roundup's safety was equivalent to the safety and efficacy of other herbicides;

l.      Negligently designing Roundup in a manner that was unreasonably dangerous to its users and those exposed to it;

m.      Negligently formulating Roundup in a manner that was unreasonably dangerous to its users and those exposed to it;

n.      Negligently producing Roundup in a manner that was unreasonably dangerous to its users and those exposed to it;

o.      Negligently manufacturing Roundup in a manner that was unreasonably dangerous to its user users and those exposed to it;

p.      Unlawfully concealing from plaintiff, the public, the medical and agricultural professions the facts—which defendant knew, had reason to know or should have known—that Roundup was unsafe, unreasonably dangerous and/or non-conforming with EPA regulations;

q.      Unlawfully concealing from or misrepresenting to plaintiff, the public, the medical and agricultural professions, and/or the EPA, the severity of Roundup's risks and dangers in comparison to other herbicides; and

r.      Negligently selling Roundup with a false and misleading label.

101.     Defendant negligently under-reported, underestimated, downplayed, and minimized the serious and unreasonable dangers of Roundup use and exposure.

102.     Defendant negligently and deceptively analogized the safety risks and dangers of Roundup to common foods such as table salt, as well as to other herbicides.

103.     Despite the fact that defendant knew or should have known that Roundup can and

30

does cause unreasonably dangerous side effects, defendant continued, and continues, to market, manufacture, distribute, and/or sell Roundup to consumers, including plaintiff.

104.   Defendant knew or should have known that consumers such as plaintiff would foreseeably suffer injury as a result of its failure to exercise reasonable care, as set forth above.

105.   Defendant's acts of negligence proximately caused plaintiff's injuries, harm and economic loss, which he suffered and will continue to suffer.

106.   As a result of the foregoing acts and omissions, plaintiff now suffers from the serious and dangerous side effects of using Roundup, including but not limited to NHL, other severe and personal injuries that are permanent in nature, together with physical pain and mental anguish, diminished enjoyment of life, and financial expenses for medical care.

## COUNT II
### Strict Products Liability -- Design Defect

107.   Plaintiff incorporates by reference paragraphs 1 to 96 of this Complaint.

108.   At all times relevant to this Complaint, defendant researched, designed, manufactured, tested, marketed, distributed, and sold the Roundup that plaintiff purchased and used.

109.   Defendant's Roundup was expected to and did reach consumers, handlers, and persons coming into contact with it, including Plaintiff, without substantial change in the condition in which it was manufactured, marketed, distributed, and sold by defendant.

110.   At all times relevant to this Complaint, Roundup was unsafe, defective, and inherently dangerous to those who used or were exposed to it and, in particular, to Plaintiff.

111.   When it left the hands of defendant, the Roundup herbicide product that defendant researched, designed, manufactured, tested, marketed, distributed, and sold was defective in design or formulation, because the foreseeable risks of using or being exposed to it exceeded the

31

benefits.

112.    When it left the hands of defendant, the Roundup herbicide product that defendant researched, designed, manufactured, tested, marketed, distributed, and sold was defective in design or formulation, because it was unreasonably dangerous in normal use and more dangerous than an ordinary consumer would expect.

113.    At all times relevant to this Complaint, Roundup was defective and unsafe when used in the form and manner recommended by defendant. Roundup was defective in the following ways:

a.    when placed in the stream of commerce, Roundup was defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate;

b.    when placed in the stream of commerce, Roundup possessed unreasonably dangerous design defects and was not reasonably safe when used in a reasonably anticipated manner;

c.    when placed in the stream of commerce, Roundup was unreasonably dangerous because using it in a reasonably anticipated manner presented a grave risk of cancer and other serious illnesses;

d.    when placed in the stream of commerce, Roundup was unreasonably dangerous because exposure to Roundup presents a risk of seriously harmful side effects that outweigh any potential utility of using it;

e.    defendant knew or should have known at the time of marketing its Roundup products that use of or exposure to Roundup could result in cancer and other severe illnesses and injuries;

f.    defendant did not sufficiently test, investigate, or study its Roundup products; and

g.    defendant did not conduct adequate post-marketing surveillance or testing of its Roundup product.

114.    Plaintiff was exposed to Roundup without knowledge of its unreasonably dangerous characteristics.

115.    At all times during Plaintiff's use of and exposure to Roundup, the product was

being used for its normal purposes, in a manner normally intended, as a broad-spectrum

herbicide.

116.    Defendant had a duty to design, manufacture, distribute, and sell a product that

was not unreasonably dangerous for its normal, intended use.

117.    In breach of its duty, defendant designed, manufactured, distributed, and sold a

product that was, and is, unreasonably dangerous for its normal, intended use.

118.    Defendant marketed Roundup in a manner that made it inherently defective, by

downplaying and minimizing the suspected, probable, and established health risks inherent with

normal, intended use and exposure to it.

119.    Defendant's Roundup was manufactured defectively because it left defendant's

hands in a condition that was unreasonably dangerous for its intended use to its intended users.

120.    Because the Roundup products that defendant researched, designed,

manufactured, tested, marketed, distributed, and sold created an unreasonable risk to the health

of consumers and plaintiff, defendant is strictly liable for the injuries plaintiff has sustained.

121.    Plaintiff could not, in the exercise of reasonable care, have discovered Roundup's

defective nature and condition or perceived the danger of being exposed to it or using it in the

usual, intended manner.

122.    Defendant's misconduct makes it strictly liable to plaintiff for the manufacturing,

marketing, distribution, and selling of the defective product, Roundup.

123.    Defendant's misconduct was willful, wanton, or reckless.

124.    Defects in Roundup were the actual and proximate cause of plaintiff's injuries.

125.    As a result of defendant's misconduct, plaintiff developed NHL, and suffers

severe permanent personal injuries, physical pain and mental anguish, including diminished

enjoyment of life, and financial expenses for medical care, and other economic and non-
economic damages.

**COUNT III**
**Strict Products Liability – Failure to Warn**

126.    Plaintiff incorporates by reference paragraphs 1 to 96 of this Complaint.

127.    Defendant has engaged in the business of researching, designing, manufacturing,
testing, marketing, distributing and selling Roundup, and through that conduct has knowingly
and intentionally placed Roundup into the stream of commerce with full knowledge that it
reaches consumers who are exposed to its dangers through ordinary and reasonably foreseeable
uses.

128.    At all times relevant to this Complaint, defendant designed, researched,
manufactured, tested, marketed, promoted, supplied, distributed and sold the Roundup that
plaintiff purchased and used.

129.    Defendants' Roundup was expected to and did reach consumers, handlers, and
persons coming into contact with it, including plaintiff, without substantial change in the
condition in which it was designed, manufactured, marketed, distributed, and sold by defendant.

130.    At the time of manufacture, defendant could have provided the warnings or
instructions regarding the full and complete risks of Roundup and glyphosate-containing
products because it knew or had reason to know of the unreasonable risks of harm associated
with the use of or exposure to such products.

131.    Roundup was defective and unsafe in manufacture and unreasonably dangerous to
the user at the time it was distributed by defendant, at the time plaintiff was exposed to the
product and at all times relevant to this Complaint. The defective condition of Roundup was due
in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic

34

qualities and possible side effects, including, but not limited to, developing NHL as a result of exposure and use.

132.   Roundup did not contain a warning or caution statement, in violation of 7 U.S.C. § 136j(a)(1)(E) and the laws of the State of Florida.

133.   Defendant could have amended the label of Roundup to provide additional warnings.

134.   This defect caused serious injury to plaintiff, who used Roundup in its intended and foreseeable manner.

135.   At all times relevant to this Complaint, defendant had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

136.   Defendant labeled, distributed, and marketed Roundup, which was dangerous and unsafe for the use and purpose for which it was intended.

137.   Defendant failed to warn of the nature and scope of the side effects associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of NHL.

138.   Defendant was aware of the probable consequences of its conduct. Despite the fact that it knew or had reason to know that Roundup caused serious injuries, defendant failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of developing NHL from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution. Defendant willfully and deliberately failed to avoid the consequences associated with their failure to warn, and in doing

so, it acted with a conscious disregard for the safety of plaintiff.

139.    At the time of exposure, plaintiff could not have reasonably discovered any defect in Roundup prior through the exercise of reasonable care.

140.    Defendant, as the manufacturer and distributor of Roundup, is held to the level of knowledge of an expert in the field.

141.    Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of defendant.

142.    Had defendant properly disclosed the risks associated with Roundup, plaintiff would have avoided the risk of NHL by not using Roundup.

143.    The labels that defendant did provide on its Roundup products failed to contain adequate warnings and precautions that would have enabled plaintiff to utilize the product safely and with adequate protection. Instead, defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or had reason to know of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

144.    To this day, defendant has failed to adequately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup.

145.    As a result of their inadequate warnings, Roundup products were defective and unreasonably dangerous when they left the possession and control of defendant, were distributed by defendant, and used by plaintiff.

146.    As a direct and proximate result of defendant's acts and omissions, plaintiff developed NHL, and suffers severe permanent personal injuries, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care, and other economic and non-economic damages.

**COUNT IV**
**Breach of Implied Warranties of Merchantability and Fitness**

147.    Plaintiff incorporates by reference paragraphs 1 to 96 of this Complaint.

148.    Defendant is a "merchant" within the meaning of Florida Statute section 672.104(1).

149.    Roundup was and is a "good" within the meaning of Florida Statute section 672.105(1).

150.    The defendant was obligated to provide plaintiff reasonably fit Roundup products that were of merchantable quality, were reasonably fit for the purpose for which they were sold, conformed to the standards of the trade in which defendant is involved, were safe to use, and were free of defects, such that its Roundup was of fit and merchantable quality.

151.    The defendant knew, had reason to know, and should have known that its Roundup was being manufactured and sold for the intended purpose of serving as a broad-spectrum herbicide, and impliedly that it was of merchantable quality and fit for that purpose.

152.    The defendant breached its implied warranties because its Roundup was not of merchantable quality, nor fit for its ordinary purpose.

153.    Defendant's breaches of implied warranties were a direct and proximate cause of plaintiff's damages.

154.    As a direct and proximate result of defendant's breaches of implied warranties, plaintiff developed NHL, and suffers severe permanent personal injuries, physical pain and

mental anguish, including diminished enjoyment of life, and financial expenses for

hospitalization and medical care, and other economic and non-economic damages.

## **JURY TRIAL DEMAND**

155.   Plaintiff demands a trial by jury on all of the issues raised in this complaint.

## **PRAYER FOR RELIEF**

156.   WHEREFORE, plaintiff prays for a judgment against defendant that:

    a.   grants plaintiff compensatory damages, including, but not limited to, pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial;

    b.   grants plaintiff compensatory damages for past and future damages, including, but not limited to, his pain and suffering for severe and permanent personal injuries that plaintiff sustained including healthcare costs and economic loss;

    c.   grants plaintiff economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determined at trial;

    d.   grants plaintiff punitive and/or exemplary damages for the wanton, willful, fraudulent, and reckless acts of defendant, which demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public, in an amount sufficient to punish defendant and deter future similar conduct, to the extent allowed by applicable law;

    e.   grants plaintiff attorneys' fees, costs of these proceedings, pre-judgment and post-judgement interest; and

    f.   grants plaintiff such other and further relief as the Court deems just and proper under the circumstances.

Dated: June 4, 2019

**RIVERO MESTRE LLP**

*Counsel for Judge William C. Turnoff*
2525 Ponce de León Blvd., Suite 1000
Miami, Florida 33134
Telephone: (305) 445-2500
Facsimile: (305) 445-2505
E-mail: arivero@riveromestre.com

E-mail: jmestre@riveromestre.com
E-mail: arolnick@riveromestre.com
E-mail: cwhorton@riveromestre.com
E-mail: ddaponte@riveromestre.com
Secondary: palvarez@riveromestre.com

By:   /s/ Andrés Rivero
      ANDRÉS RIVERO
      Florida Bar No. 613819
      JORGE A. MESTRE
      Florida Bar No. 088145
      ALAN H. ROLNICK
      Florida Bar No. 715085
      CHARLES E. WHORTON
      Florida Bar No. 46894
      DAVID L. DAPONTE
      Florida Bar No. 1002724

## CERTIFICATE OF SERVICE

I certify that on June 4, 2019, I electronically filed this document with the Clerk of the Court using CM/ECF. I also certify that this document is being served today on all counsel of record either by transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ Andrés Rivero
ANDRÉS RIVERO

39