Query    Reports    Utilities    Help    Log Out

4months

# U.S. District Court
## Northern District of Georgia (Atlanta)
## CIVIL DOCKET FOR CASE #: 1:19-cv-02925-AT

Stewart v. Monsanto Company et al
Assigned to: Judge Amy Totenberg
Cause: 28:1332 Diversity-Product Liability

Date Filed: 06/26/2019
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Matthew Stewart**

represented by **Gary P. Bunch**
Gary Bunch, P.C.
208 Corporate Drive
Carrollton, GA 30117
770-836-0405
Email: pc257@bellsouth.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

**Defendant**

**Bayer U.S., LLC**

| Date Filed | # | Docket Text |
|---|---|---|
| 06/26/2019 | 1 | COMPLAINT with Jury Demand (Filing fee $400, receipt number AGANDC-8756247) filed by Matthew Stewart. (Attachments: # 1 Civil Cover Sheet)(rjs) Please visit our website at http://www.gand.uscourts.gov/commonly-used-forms to obtain Pretrial Instructions and Pretrial Associated Forms which includes the Consent To Proceed Before U.S. Magistrate form. (Entered: 06/27/2019) |
| 06/26/2019 | 2 | Electronic Summons Issued as to Monsanto Company. (rjs) (Entered: 06/27/2019) |
| 06/26/2019 | 3 | Electronic Summons Issued as to Bayer U.S., LLC. (rjs) (Entered: 06/27/2019) |
| 06/28/2019 | 4 | Notice for Leave of Absence for the following date(s): Sept 9-13, Sept 16-20, Sept 23-30, by Gary P. Bunch. (Bunch, Gary) (Entered: 06/28/2019) |
| 07/01/2019 | 5 | STANDING ORDER: GUIDELINES TO PARTIES AND COUNSEL PROCEEDING BEFORE THE HONORABLE AMY TOTENBERG. You are required to sign and file a Certificate of Compliance in a format consistent with the Certificate of Compliance attached hereto. To request to file material under seal, the Parties should follow the mechanism |

| | | described in Section II(J) of Appendix H to the Courts Local Civil Rules. Signed by Judge Amy Totenberg on 7/1/2019. (sap) (Entered: 07/01/2019) |
| 07/02/2019 | 6 | Return of Service Executed by Matthew Stewart. Monsanto Company served on 6/27/2019, answer due 7/18/2019. (Bunch, Gary) (Entered: 07/02/2019) |
| 07/02/2019 | 7 | Return of Service Executed by Matthew Stewart. Bayer U.S., LLC served on 6/27/2019, answer due 7/18/2019. (Bunch, Gary) (Entered: 07/02/2019) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 07/02/2019 15:48:07 | | | |
| PACER Login: | hllp1982 | Client Code: | 1417.0049 |
| Description: | Docket Report | Search Criteria: | 1:19-cv-02925-AT |
| Billable Pages: | 1 | Cost: | 0.10 |

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| MATTHEW STEWART, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION FILE NUMBER: |
| | ) | |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| MONSANTO COMPANY and | ) | |
| BAYER U.S., LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Matthew Stewart files his Complaint against Defendants Monsanto

Company ("Defendant Monsanto") and Bayer U.S., LLC ("Defendant Bayer").

## JURISDICTION AND VENUE

1.

Federal diversity jurisdiction in this Court is proper under 28 U.S.C. 1332

because the parties are citizens of different states and the aggregate amount in

controversy exceeds $75,000, exclusive of interest and costs.

2.

The Court has personal jurisdiction over Defendants because they knew or

should have known that their Roundup products are sold throughout the State of

Georgia. Defendants maintain sufficient contacts with the State of Georgia such

that this Court's exercise of personal jurisdiction over Defendants does not offend

traditional notions of fair play and substantial justice. Additionally, Defendants

caused Mr. Stewart's tortious injury by acts and omissions in this judicial district

and caused tortious injury in this judicial district by acts and omissions outside

this district while regularly doing and soliciting business, engaging in a persistent

course of conduct, and deriving substantial revenue from goods sold in this

judicial district.

3.

Venue, under 28 U.S.C. 1391, is proper in this District, because a

substantial part of the events or omissions giving rise to Mr. Stewart's claims

occurred within this judicial District, Defendants conducted business in this

judicial district and because Defendants are subject to personal jurisdiction within

Georgia.

## PARTIES

### 4.

Plaintiff Matthew Stewart ("Mr. Stewart"), at all material times, has been a citizen of the State of Alabama, but whose professional landscaping work primarily has been performed in the State of Georgia. Mr. Stewart is not a citizen of the States of Missouri, Delaware or Pennsylvania.

### 5.

Defendant Monsanto Company ("Defendant Monsanto"), at all material times, has been a multinational agricultural biotechnology corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 800 North Lindbergh Blvd., Saint Louis, Missouri 63167. Defendant Monsanto's registered agent in Georgia for service of process is: Corporation Service Company, 40 Technology Pkwy. South, # 300, Norcross, Georgia 30092. Defendant Monsanto is not a citizen of the States of Georgia or Alabama.

6.

Defendant Bayer U.S., LLC ("Defendant Bayer"), is a corporation organized

and existing under the laws of the State of Delaware, with its principal place of

business located at 100 Bayer Road, Pittsburgh, PA 15205. Defendant Bayer's

registered agent in Georgia for service of process is: Corporation Service

Company, 40 Technology Pkwy. South, # 300, Norcross, Georgia 30092.

## MR. STEWART'S USE OF AN EXPOSURE TO DEFENDANT'S ROUNDUP PRODUCT

7.

Mr. Stewart is 42 years old.

8.

Mr. Stewart is a professional landscaper.

9.

Mr. Stewart has been a professional landscaper for nearly 20 years.

10.

Mr. Stewart, as a professional landscaper, began using Roundup extensively

around 13 years ago during 2006.

11.

Mr. Stewart, during the first three to four years of being a professional landscaper, primarily used Roundup in the following four Georgia counties: Carroll, Douglas, Haralson and Paulding.

12.

Mr. Stewart, beginning during 2010, approximately 95% of the time primarily used Roundup in Carroll County, Georgia.

13.

Mr. Stewart, as a professional landscaper, would use Roundup nearly every work day for nine months a year.

14.

The overwhelming majority of Mr. Stewart's purchases of Defendants' Roundup products occurred in the State of Georgia.

15.

The overwhelming majority of Mr. Stewart's exposure to Defendants' Roundup products occurred in the State of Georgia.

16.

Mr. Stewart almost always applied Roundup using a backpack pump-sprayer.

5

17.

If the backpack sprayer was not functioning, Mr. Stewart would use a hand

sprayer.

18.

Mr. Stewart, unaware of the serious health risks posed by Roundup, did not

use personal protective gear or equipment while using Defendants' Roundup

products.

19.

Mr. Stewart never saw a health warning label on any Roundup container he

used.

20.

Mr. Stewart, after having applied Roundup, would often find himself

doused with Roundup.

21.

Mr. Stewart, following his substantial long-term exposure to Roundup as a

landscaper, during April 2019, was diagnosed with non-Hodgkin lymphoma.

22.

Mr. Stewart, as a result of his non-Hodgkin lymphoma, has undergone

significant medical treatment, including chemotherapy.

6

23.

Mr. Stewart, as a result of his non-Hodgkin lymphoma, will continue to undergo significant medical treatment, including chemotherapy.

24.

Mr. Stewart receives his medical care, including chemotherapy, for his non-Hodgkin lymphoma in Carrollton, Georgia.

25.

Mr. Stewart, as a result of his non-Hodgkin lymphoma, has had his life irreversibly altered.

## BACKGROUND

26.

Defendant Monsanto, during 1970, discovered glyphosate's herbicidal properties.

26.

Defendant Monsanto, during 1974, began marketing glyphosate in products under the brand name Roundup.

27.

Roundup is a non-selective herbicide used to kill weeds.

7

28.

By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 million pounds used annually. That number grew to 185 million pounds by 2007.

29.

As of 2013, glyphosate was the world's most widely used herbicide.

30.

Defendant Monsanto is the world's leading producer of glyphosate.

31.

The stated advantage of Roundup Ready crops is that they substantially improve a farmer's ability to control weeds, because glyphosate can be sprayed in the fields during the growing season without harming the crops.

32.

Defendant Monsanto's glyphosate products are registered in more than 100 countries.

33.

Glyphosate has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

34.

The International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), March 20, 2015, issued an evaluation ("Evaluation") of several herbicides, including glyphosate.

35.

The Evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces, since 2001, the health implications from exposure to glyphosate.

36.

IARC, July 29, 2015, issued a formal monograph relating to glyphosate, which provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

37.

The IARC Working Group classified glyphosate as a Group 2A herbicide, meaning it is probably carcinogenic to humans.

38.

The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other haematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma and multiple myeloma.

39.

The IARC significant evaluation confirms that glyphosate is toxic to humans.

40.

Defendant Monsanto, however, since it began selling Roundup, has represented Roundup to the public as safe to humans.

41.

Defendant Monsanto repeatedly has proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup, create no unreasonable risks to human health.

42.

Defendant Monsanto, during June 2016, agreed to be acquired by Defendant Bayer for $66 billion.

43.

Defendant Bayer's acquisition of Defendant Monsanto was completed during 2018.

44.

Mr. Stewart, during April 2019, was diagnosed with non-Hodgkin lymphoma after using Roundup for approximately 13 years.

**FACTUAL ALLEGATIONS**

45.

Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

46.

Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two or three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking or brewing grains.

47.

Defendant Monsanto, when first introducing its Roundup products to the marketing place, promoted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm to people. Of course, history has shown that not to be true.

48.

According to the WHO, the main chemical ingredient of Roundup - glyphosate - is a probable cause of cancer. Those most at risk are individuals with workplace exposure to Roundup, such as landscapers like Mr. Stewart.

49.

Monsanto assured the public that Roundup was harmless.

50.

Defendant Monsanto championed falsified data that falsely claims Roundup

is safe for humans.

51.

Defendant Monsanto attacked legitimate studies that revealed Roundup is

dangerous to humans.

52.

Monsanto led a prolonged campaign of misinformation to convince the

marketplace (government agencies, persons who used Roundup in connection with

their work and the general population) that Roundup was safe.

## THE DISCOVERY OF GLYPHOSATE
## AND DEVELOPMENT OF ROUNDUP

53.

Glyphosate's herbicidal properties were discovered, during 1970, by

Defendant Monsanto chemist John Franz.

54.

The first glyhosate-based herbicide was introduced to the market during the

mid-1970s under the brand name Roundup.

55.

From the outset, Defendant Monsanto marketed Roundup as a "safe" general-purpose herbicide for widespread commercial ad consumer use. It still today markets Roundup as safe.

## REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

56.

The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. 136a(a).

57.

Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.

58.

EPA registration is not an assurance or finding of safety for humans
exposed to a registered product.

59.

The EPA's determination is not that the product is "safe," but rather than
use of the product in accordance with its label directions "will not generally cause
unreasonable adverse effects on the environment." 7 U.S.C. 136a(c)(5)(D).

60.

FIFRA defines "unreasonable adverse effects on the environment" to mean
"any unreasonable risk to man or the environment, taking into account the
economic, social, and environmental costs and benefits of the use of any
pesticide." 7 U.S.C. 136(bb).

61.

FIFRA thus requires EPA to make a risk/benefit analysis in determining
whether a registration should be granted or allowed to continue to be sold in
commerce.

62.

The EPA and the State of Georgia registered Roundup for distribution, sale
and manufacture in the United States and the State of Georgia.

63.

FIFRA generally requires that the registrant, Defendant Monsanto in the case of Roundup, conduct the health and safety testing of pesticide products.

64.

The EPA has protocols governing the conduct of tests required for required for registration and the laboratory practices that must be followed in conducting these tests.

65.

The data produced by the registrant must be submitted to the EPA for review and evaluation.

66.

The government is neither required nor able to perform the product tests that manufacturers are required to perform.

## SCIENTIFIC FRAUD UNDERLYING THE MARKETING AND SALE OF GLYPHOSATE/ROUNDUP

67.

Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) during 1985.

15

68.

After Defendant Monsanto's pressure, including contrary studies it provided to the EPA, the EPA, during 1991, changed its classification to evidence of non-carcinogenicity in humans (Group E).

69.

In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances." (Emphasis supplied.)

70.

On two occasions, the EPA found that laboratories, hired by Defendant Monsanto to test the toxicity of its Roundup products for registration purposes, committed fraud.

71.

Defendant Monsanto, in seeking initial registration of Roundup by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform an devaluate pesticide toxicology studies relating to Roundup.

72.

IBT performed about 30 tests on glyphosate and glyphosate-containing

products, including nine of the 15 residue studies needed to register Roundup.

73.

The United States Food and Drug Administration ("FDA"), during 1976,

performed an inspection of IBT that revealed discrepancies between the raw data

and the final report relating to the toxicological impacts of glyphosate.

74.

The EPA subsequently audited IBT and found IBT's toxicology studies

conducted for Roundup to be invalid.

75.

An EPA reviewer stated, after finding "routine falsification of data" at IBT,

that it was "hard to believe the scientific integrity of the studies when they said

they took specimens of the uterus from male rabbits."

76.

Three IBT top executives, during 1983, were convicted of fraud.

77.

Defendant Monsanto hired Craven Laboratories, during 1991, to perform

pesticide and herbicide studies, including studies for Roundup.

78.

The owner of Craven Laboratories and three of its employees, during 1991,

were indicted, and later convicted, of fraudulent laboratory practices in the testing

of pesticides and herbicides.

79.

Despite the falsity of the tests that underlie its registration, within a few

years of its launch, Defendant Monsanto was marketing Roundup in 115 countries.

## THE IMPORTANCE OF ROUNDUP TO DEFENDANT MONSANTO'S MARKET DOMINANCE PROFITS

80.

Roundup's success was key to Defendant Monsanto's continued reputation

and dominance in the marketplace. Largely due to the success of Roundup sales,

Defendant Monsanto's agriculture division was out-performing its chemicals

division's operating income, and that gap increased yearly.

81.

With its patent for glyphosate expiring in the United States during 2000,

Defendant Monsanto needed a strategy to maintain its Roundup market dominance

and to ward off impending competition.

82.

Defendant Monsanto began the development and sale of genetically

engineered Roundup Ready seeds during 1996. Since Roundup Ready crops are

resistant to glyphosate, farmers can spray Roundup onto their fields during the

growing season without harming the crop. This allowed Defendant Monsanto to

expand its market for Roundup even further; by 2000, Defendant Monsanto's

biotechnology seeds were planted on more than 80 million acres worldwide and

nearly 70% of American soybeans were planted from Roundup Ready seeds. It

also secured Defendant Monsanto's dominant share of the glyphosate/Roundup

market through a marketing strategy that coupled proprietary Roundup Ready

seeds with continued sales of its Roundup herbicide.

83.

Through a three-pronged strategy of increased production, decreased prices

and by coupling with Roundup Ready seeds, Roundup became Monsanto's most

profitable product.

84.

During 2000, Roundup accounted for almost $2.8 billion in sales, outselling

other herbicides by a margin of five to one, and accounting for close to half of

Defendant Monsanto's revenue.

85.

Today, glyphosate remains one of the world's largest herbicides by sales

volume.

## MONSANTO HAS KNOWN FOR DECADES THAT
## IT FALSELY ADVERTISES THE SAFETY OF ROUNDUP

86.

The New York Attorney General ("NYAG"), during 1996, filed a lawsuit

against Defendant Monsanto alleging false and misleading advertising of Roundup

products.

87.

Specifically, the NYAG's lawsuit challenged Defendant Monsanto's general

representations that its spray-on glyphosate-based herbicides, including Roundup,

were "safer than table sale" and "practically non-toxic" to mammals, birds, and

fish.

88.

The NYAG found the following representations about human and

environmental safety deceptive and misleading:

a) Remember that environmentally friendly Roundup herbicide is
biodegradable. It won't build up in the soil so you can use Roundup
with confidence along customers' driveways, sidewalks, and fences.

b) And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c) Roundup biodegrades into naturally occurring elements.

d) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e) This non-residual herbicide will not wash or leach in the soil. It...stays where you apply it.

f) You can apply Accord with 'confidence because it will stay where you put it' it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

I) You can feel good about using herbicides by Defendant Monsanto. They carry a toxicity rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j) 'Roundup can be used where kids and pets will play and breaks down into natural material.' This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

89.

Defendant Monsanto, November 19, 1996, entered into an Assurance of

Discontinuance with the NYAG, in which Defendant Monsanto agreed, among

other things, "to cease and desist from publishing or broadcasting any

advertisements [in New York] that represent, directly or by implication" that:

a)      its glyphosate-containing pesticide products or any component
thereof are safe, non-toxic, harmless or free from risk;

b)      its glyphosate-containing pesticide products or any component
thereof manufactured, formulated, distributed or sold by Defendant
Monsanto are biodegradable;

c)      its glyphosate-containing pesticide products or any components
thereof stay where they are applied under all circumstances and will
not move through the environment by any means;

d)      its glyphosate-containing pesticide products or any component
thereof are "good" for the environment or are "known for their
environmental characteristics."

e)      glyphosate-containing pesticide products or any component thereof
are safer or less toxic than common consumer products other than
herbicides; and

f)      its glyphosate-containing products or any component thereof might be
classified as "practically non-toxic."

90.

Defendant Monsanto did not alter its advertising in the same manner in any

state other than New York, and on information and belief still has not done so.

91.

France's highest court, during 2009, ruled that Defendant Monsanto had been untruthful about the safety of Roundup.

92.

France's highest court affirmed an earlier judgment that Defendant Monsanto had advertised falsely its herbicide Roundup as "biodegradable" and that it "left the soil clean."

## CLASSIFICATIONS AND ASSESSMENTS OF GLYPHOSATE

93.

The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents.

94.

Of those reviewed, the IARC has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

95.

The established procedure for IARC Monograph evaluations is described in the IARC Programers Preamble.

96.

Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

97.

One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment.

98.

The Working Group, at the Monograph meeting, finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation.

99.

Within two weeks after the Monograph meeting, the summary of the
Working Group findings are published in Lancet Oncology, and within a year after
the meeting, the final Monograph is finalized and published.

100.

In assessing an agent, the IARC Working Group reviews: (a) human,
experimental and mechanistic data; (b) all pertinent epidemiological studies and
cancer bioassays; and (c) representative mechanistic data.

101.

The studies must be available publically and have sufficient detail for
meaningful review, and reviewers cannot be associated with the underlying study.

102.

IARC, during March 2015,  reassessed glyphosate.

103.

The summary published in *The Lancet Oncology* reported that glyphosate is
a Group 2A agent and probably carcinogenic in humans.

104.

IARC, July 29, 2015, issued its Monograph for glyphosate, Monograph 112.

105.

For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3 - 10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate.

106.

The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence.

107.

According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

108.

The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

109.

Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world during 2012.

110.

Exposure pathways are identified as air (especially during spraying), water and food.

111.

The IARC Working Group's  assessment identified several case control studies of occupational exposure in the United States, Canada and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

112.

The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

113.

The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells.

114.

One study, in community residents, reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

115.

In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma.

116.

A second study reported a positive trend for haemangiosarcoma in male mice.

117.

Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies.

118.

A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

119.

The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA).

28

120.

Blood AMPA detection after exposure suggests intestinal microbial

metabolism in humans.

121.

The IARC Working Group further found that glyphosate and glyphosate

formulations induced DNA and chromosomal damage in mammals, and in human

and animal cells in utero.

122.

The IARC Working Group also noted genotoxic, hormonal, and enzymatic

effects in mammals exposed to glyphosate.

123.

Glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to

several metabolic disturbances, including the inhibition of protein and secondary

product biosynthesis and general metabolic disruption.

124.

The IARC Working Group also reviewed an Agricultural Health Study,

consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa

and North Carolina.

125.

Although this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL) and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

## OTHER EARLIER FINDINGS ABOUT GLYPHOSATE'S DANGERS TO HUMAN HEALTH

126.

The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns of glyphosate as follows:

**Release Patterns**
"Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.
It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.
Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal."

(Emphasis supplied.)

30

127.

The Northwest Coalition for Alternatives to Pesticides, during 1995,

reported that in California, the state with the most comprehensive program for

reporting of pesticide-caused illness, glyphosate was the third most commonly -

reported cause of pesticide illness among agricultural workers.

## RECENT WORLDWIDE BANS ON ROUNDUP/GLYPHOSATE

128.

Several countries around the world have instituted bans on the sale of

Roundup and other glyphosate-containing herbicides, both before and since IARC

first announced, during March 2015, its assessment for glyphosate.

129.

The Netherlands issues a ban on all glyphosate-based herbicides during

April 2014, including Roundup, which took effect by the end of 2015. In issuing

the ban, the Dutch Parliament member who introduced the successful legislation

stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to

private persons. In garden centers, Roundup is promoted as harmless, but

unsuspecting customers have no idea what the risks of this product are. Especially

children are sensitive to toxic substances and should therefore not be exposed to

it." (Emphasis supplied.)

31

130.

The Brazilian Public Prosecutor in the Federal District requested that the

Brazilian Justice Department suspend the use of glyphosate.

131.

France banned the private sale of Roundup and glyphosate following the

IARC assessment for glyphosate.

132.

Bermuda banned both the private and commercial sale of glyphosates,

including Roundup.

133.

The Bermuda government explained its ban as follows: "Following a recent

scientific study carried out by a leading cancer agency, the importation of weed

spray 'Roundup' has been suspended." (Emphasis supplied.)

134.

The Sri Lankan government banned the private and commercial use of

glyphosates, particularly out of concern that Glyphosate has been linked to fatal

kidney disease in agricultural workers.

135.

The government of Columbia announced its ban on using Roundup and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

## CLAIMS FOR RELIEF

## COUNT ONE

## STRICT LIABILITY (DESIGN DEFECT)

136.

Mr. Stewart reincorporates paragraphs "1" through "135" as if stated fully herein.

137.

Mr. Stewart brings this strict liability claim against Defendants for defective design.

138.

At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, including Mr. Stewart, thereby placing Roundup produces into the stream of interstate commerce. These actions were under Defendants' ultimate control and supervision.

33

139.

At all relevant times, Defendants designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup products used by Mr. Stewart, as described above.

140.

At all relevant times, Defendants' Roundup products were manufactured, designed and labeled in an unsafe, defective and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular to, Mr. Stewart.

141.

At all relevant times, Defendants' Roundup products reached the intended consumers, handlers, and users of persons coming into contact with these products throughout the United States, including Mr. Stewart, without substantial change in their condition as designed, manufactured, sold, distributed, labeled and marketed by Defendants.

142.

Defendants' Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in that when they left the hands of the Defendants' manufactures and/or suppliers, the Roundup products were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

143.

Defendants' Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in that when they left the hands of Defendants' manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

144.

At all relevant times, Defendants knew or had reason to know that their Roundup products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendants.

145.

At all relevant times, Defendants' Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation, in one or more of the following ways:

a) When placed in the stream of commerce, Defendants' Roundup products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b) When placed in the stream of commerce, Defendants' Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c) When placed in the stream of commerce, Defendants' Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d) Defendants did not sufficiently test, investigate, or study their Roundup products and, specifically, the active ingredient glyphosate.

e) Exposure to Roundup and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f) Defendants knew or should have known at the time of marketing their Roundup products that exposure to Roundup and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g) Defendants did not conduct adequate post-marketing surveillance of its Roundup products.

h)   Defendants could have employed safer alternative designs and formulations.

146.

Mr. Stewart was exposed to Defendants' Roundup products by purchasing and using the Roundup in his landscaping profession, as described above, without knowledge of Roundup's dangerous characteristics.

147.

At all relevant times, Mr. Stewart used and/or was exposed to the use of Defendants' Roundup products in an intended or reasonably foreseeable manner without knowledge of the Roundup products' dangerous characteristics.

148.

Mr. Stewart, before or at the time of exposure, could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products.

149.

The harm caused by Defendants' Roundup products far outweighed their benefit, rendering Defendants' products dangerous to an extent beyond that which an ordinary consumer would contemplate.

150.

Defendants' Roundup products were and are more dangerous than alternative products.

151.

Defendants could have designed their Roundup products to make them less dangerous.

152.

When Defendants designed their Roundup products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

153.

When Defendants' Roundup products left Defendants' control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendants' herbicides.

154.

Defendants' defective design of its Roundup products was willful, wanton, fraudulent, malicious and conducted without reckless disregard for the health and safety of users of the Roundup products, including Mr. Stewart.

38

155.

Therefore, as a result of the unreasonably dangerous condition of its Roundup products, Defendants are strictly liable to Mr. Stewart.

156.

The defects in Defendants' Roundup products are substantial and contributing factors in causing Mr. Stewart's grave injuries.

157.

"But for" Defendants' misconduct and omissions, Mr. Stewart would not have gotten non-Hodgkin lymphoma.

158.

Defendants' conduct, as described above, was reckless to the extreme.

159.

Defendants, callously and out of pure greed, risked the lives and health of consumers and users of their products, including Mr. Stewart, with knowledge of the safety problems associated with Roundup and glyphosate-containing products, and suppressed this knowledge from the general public.

160.

Defendants made conscious decisions not to redesign, warn or inform the unsuspecting public that their Roundup products presented health dangers to humans.

161.

Defendants' reckless conduct makes an award of punitive damages appropriate and necessary.

162.

As a direct and proximate result of Defendants placing their defective Roundup products into the stream of commerce, Mr. Stewart has suffered and continues to suffer serious injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Mr. Stewart will continue to suffer and incur these expenses in the future.

163.

Mr. Stewart, because of Defendants' bad faith conduct, is entitled, pursuant to O.C.G.A. 13-6-11, to recover his costs of litigation including attorney's fees.

Wherefore, Mr. Stewart requests the Court to enter a judgment against Defendants:

(A) Awarding Mr. Stewart compensatory damages for his past, present and future pain and suffering in an amount in excess of $250,000, the exact amount to be determined by the jury;

(B) Awarding Mr. Stewart punitive damages in an amount to be determined by the jury;

(C) Awarding Mr. Stewart, under O.C.G.A. 13-6-11, his costs of litigation, including attorney's fees; and

(D)   Awarding Mr. Stewart whatever other and further relief the Court
deems just, proper or equitable under the circumstances.

## COUNT TWO

## STRICT LIABILITY (FAILURE TO WARN)

### 164.

Mr. Stewart reincorporates paragraphs "1" through "135" as if stated fully

herein.

### 165.

Mr. Stewart brings this strict liability claim against Defendants for failure to

warn.

### 166.

At all relevant times, Defendants engaged in the business of testing,

developing, designing, manufacturing, marketing, selling, distributing, and

promoting Roundup products, which are defective and unreasonably dangerous to

consumers, including Mr. Stewart, because they do not contain adequate warnings

or instructions concerning the dangerous characteristics of Roundup and

specifically, the active ingredient glyphosate. These actions were under

Defendants' ultimate control and supervision.

167.

Defendants researched, developed, designed, tested, manufactured, inspected, distributed, marketed, promoted, sold and otherwise released into the stream of commerce their Roundup products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Mr. Stewart, and therefore, had a duty to warn of the risks associated with the use of the Roundup and glyphosate-containing products.

168.

At all relevant times, Defendants' had a duty to properly test, develop, design, manufacture, inspect, package, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup products did not cause users and consumers to suffer from unreasonable and dangerous risks.

169.

Defendants had a continuing duty to warn Mr. Stewart of the dangers associated with Roundup use and exposure. Defendants, as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

170.

At the time of manufacture, Defendants could have provided the warnings

or instructions regarding the full and complete risks of Roundup and glyphosate-

containing products because Defendants knew or should have known of the

unreasonable risks of harm associated with the use of and/or exposure to such

products.

171.

At all times relevant to this litigation, Defendants failed to investigate,

study, test, or promote the safety or to minimize the dangers to users and

consumers of its product and to those who would foreseeably use or be harmed by

Defendants' herbicides, including Mr. Stewart.

172.

Despite the fact that Defendants knew or should have known that Roundup

posed a grave risk of harm, Defendant failed to exercise reasonable care to warn of

the dangerous risks associated with use of and exposure to Roundup products.

173.

The dangerous propensities of Roundup and the carcinogenic characteristics

of glyphosate, as described above, were known to Defendants, or scientifically

knowable to Defendants through appropriate research and testing by known

methods, at the time they distributed, supplied or sold the product, and not known

to end users and consumers, such as Mr. Stewart.

174.

Defendants knew or should have known that their products created

significant risks of serious bodily harm to consumers, as alleged herein, and

Defendants failed to adequately warn consumers and reasonably foreseeable users

of the risks of exposure to its products.

175.

Defendants have wrongfully concealed information concerning the

dangerous nature of Roundup and its active ingredient glyphosate.

176.

Defendants, further, have made false and/or misleading statements

concerning the safety of Roundup and glyphosate.

177.

At all relevant times, Defendants' Roundup products reached the intended

consumers, handlers, and users or other persons coming into contact with these

products throughout the Untied States, including Mr. Stewart, without substantial

change in their condition as designed, manufactured, sold, distributed, and

marketed by Defendants.

178.

Mr. Stewart was exposed to Defendants' Roundup products by purchasing

and using them in his landscaping profession, as described above, without

knowledge of their dangerous characteristics.

179.

At all times relevant to this litigation, Mr. Stewart used and/or was exposed

to the use of Defendants' Roundup products in their intended or reasonably

foreseeable manner without knowledge of their dangerous characteristics.

180.

Mr. Stewart reasonably could not have discovered the defects and risks

associated with Roundup or glyphosate-containing products prior to or at the time

of Mr. Stewart's exposure.

181.

Mr. Stewart relied upon Defendants' superior knowledge with regard to the danger that their Roundup products presented to humans.

182.

Defendants knew or should have known that the minimal warnings disseminated with its Roundup products were inadequate, but they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable landscaping applications.

183.

The information that Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled individuals such as Mr. Stewart to utilize the products safely and with adequate protection.

184.

Instead, Defendants disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup and glyphosate; continued to aggressively promote the

46

efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure.

185.

Defendants' concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

186.

To this day, Defendants have failed to adequately and accurately warn of the true risks of Mr. Stewart's injuries associated with the use of and exposure to Roundup and its active ingredient glyphosate, a probable carcinogen.

187.

As a result of their inadequate warnings, Defendants' Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were distributed by Defendants, and used by Mr. Stewart.

188.

Defendants are liable to Mr. Stewart for injuries caused by their negligent or willful failure, as described above, to provide adequate warning or other clinically relevant information and data regarding the appropriate use of its products and the risks associated with the use of or exposure to Roundup and glyphosate.

47

189.

The defects in Defendants' Roundup products were substantial and contributing facts in causing Mr. Stewart non-Hodgkin lymphoma.

190.

But for Defendants' misconduct and omissions, Mr. Stewart would not have non-Hodgkin lymphoma.

191.

Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup products, Mr. Stewart could have avoided the risk of developing non-Hodgkin lymphoma by using alternative herbicides.

192.

As a direct and proximate result of Defendants placing their defective Roundup products into the stream of commerce, Mr. Stewart has suffered and continues to suffer from non-Hodgkin lymphoma, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Mr. Stewart will continue to suffer and incur these expenses in the future.

193.

Mr. Stewart, because of Defendants' bad faith conduct, is entitled, pursuant

to O.C.G.A. 13-6-11, to recover his costs of litigation including attorney's fees.

Wherefore, Mr. Stewart requests the Court to enter a judgment against

Defendants:

(A) Awarding Mr. Stewart compensatory damages for past, present and future pain and suffering in an amount in excess of $250,000, the exact amount to be determined by the jury;

(B) Awarding Mr. Stewart punitive damages in an amount to be determined by the jury;

(C) Awarding Mr. Stewart his costs of litigation, including attorney's fees; and

(D) Awarding Mr. Stewart whatever other and further relief the Court deems just, proper or equitable under the circumstances.

## COUNT THREE

### DEFENDANTS' NEGLIGENCE, GROSS NEGLIGENCE AND RECKLESS CONDUCT

194.

Mr. Stewart reincorporates paragraphs "1" through "135" as if stated fully

herein.

195.

Defendants, directly or indirectly, caused Roundup products to be sold, distributed to, packaged, labeled, marketed to, promoted to, and/or used by Mr. Stewart.

196.

At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of their Roundup products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

197.

At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the marketing, advertisement, and sale of their Roundup products. Defendants' duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup, and, in particular, its active ingredient glyphosate.

198.

At all times relevant to this litigation, Defendants knew or, in the exercise of the

reasonable care, should have known of the hazards and dangers of Roundup and

specifically, the carcinogenic properties of the chemical glyphosate.

199.

Accordingly, at all times relevant to this litigation, Defendants knew or, in

the exercise of reasonable care, should have known that use of or exposure to their

Roundup products could cause or be associated with Mr. Stewart's injuries and

thus created a dangerous and unreasonable risk of injury to the users of these

products, including Mr. Stewart.

200.

Defendants also knew or, in the exercise of reasonable care, should have

known that users and consumers of Roundup were unaware of the risks and the

magnitude of the risks associated with use of and/or exposure to Roundup and

glyphosate-containing products.

201.

As such, Defendants breached their duty of reasonable care and failed to

exercise ordinary care in the design, research, development, manufacture, testing,

marketing, supply, promotion, advertisement, packaging, sale, and distribution of

its Roundup products, in that Defendants manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in their products, knew or had reason to know that a user's or consumer's exposure to their products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

202.

Despite their ability and means to investigate, study, and test their products and to provide adequate warnings, Defendants failed to do so.

203.

Defendants have wrongfully concealed information and further have made false and/or misleading statements that Roundup and glyphosate is safe to humans.

204.

Defendants' negligence, grossly negligent and reckless conduct includes:

a)   Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing their Roundup products without thorough and adequate pre- and post-market testing;

b)   Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies or exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup;

c)   Failing to undertake sufficient studies and conduct necessary tests to
     determine whether or not Roundup products and glyphosate-containing
     products were safe for their intended use in agriculture and horticulture;

d)   Failing to use reasonable and prudent care in the design, research,
     manufacture, and development of Roundup products so as to avoid the risk
     of serious harm associated with the prevalent use of Roundup/glyphosate as
     an herbicide;

e)   Failing to design and manufacture Roundup products so as to ensure they
     were at least as safe and effective as other herbicides on the market;

f)   Failing to provide adequate instructions, guidelines, and safety precautions
     to those persons who Defendants could reasonably foresee would use and be
     exposed to its Roundup products;

g)   Failing to disclose to Plaintiff, users/consumers, and the general public that
     use of and exposure to Roundup presented severe risks of cancer and other
     grave illnesses;

h)   Failing to warn Plaintiff, consumers, and the general public that the
     product's risk of harm was unreasonable and that there were safer and
     effective alternative herbicides available to Plaintiff and other consumers;

I)   Systematically suppressing or downplaying contrary evidence about the
     risks, incidence, and prevalence of the side effects of Roundup and
     glyphosate-containing products;

j)   Representing that their Roundup products were safe for their intended use
     when, in fact, Defendants knew or should have know that the products were
     not safe for their intended purpose;

k)   Declining to make or propose any changes to Roundup products'
     promotional materials that would alert the consumers and the general public
     of the risks of Roundup and glyphosate;

53

l)   Advertising, marketing, and recommending the use of the Roundup
     products, while concealing and failing to disclose or warn of the dangers
     known by Defendants to be associated with or caused by the use of or
     exposure to Roundup and glyphosate;

m)   Continuing to disseminate information to their consumers, which indicate or
     imply that Defendants' Roundup products are not unsafe for use in the
     agricultural and horticultural industries; and

n)   Continuing the manufacture and sale of their products with the knowledge
     that the products were unreasonably unsafe and dangerous.

205.

Defendants knew and/or should have known that it was foreseeable that

consumers such as Mr. Stewart would develop cancer as a result of Defendants'

failure to exercise ordinary care in the manufacturing, marketing, labeling,

distribution, and sale of Roundup.

206.

Mr. Stewart did not know the nature and extent of the injuries that could

result from the intended use of and/or exposure to Roundup or its active ingredient

glyphosate.

207.

Defendants' negligence was the proximate cause of the injuries, harm, and

economic losses that Mr. Stewart has suffered, and will continue to suffer, as

described herein.

208.

Defendants' conduct, as described above, was reckless. Defendants regularly risk the lives of consumers and users of their products, including Mr. Stewart, with full knowledge of the dangers of their products. Defendants have made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Mr. Stewart.

209.

Defendants' reckless conduct therefore makes an award of punitive damages appropriate and necessary.

210.

As a proximate result of Defendants' wrongful acts and omissions in placing their defective Roundup products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Mr. Stewart has suffered and continues to suffer severe and permanent physical and emotional injuries. Mr. Stewart has endured pain and suffering, has suffered economic losses (including significant expenses for medical care and treatment) and will continue to suffer and incur these expenses in the future.

211.

Mr. Stewart, because of Defendants' bad faith conduct, is entitled, pursuant to O.C.G.A. 13-6-11, to recover his costs of litigation including attorney's fees.

Wherefore, Mr. Stewart requests the Court to enter a judgment against

Defendant:

(A)   Awarding Mr. Stewart compensatory damages for past, present and
future pain and suffering in an amount in excess of $250,000, the
exact amount to be determined by the jury;

(B)   Awarding Mr. Stewart punitive damages in an amount to be
determined by the jury;

(C)   Awarding Mr. Stewart his costs of litigation, including attorney's
fees; and

(D)   Awarding Mr. Stewart whatever other and further relief the Court
deems just, proper or equitable under the circumstances.

## COUNT FOUR

## BREACH OF IMPLIED WARRANTIES

### 212.

Mr. Stewart reincorporates paragraphs "1" through "135" as if stated fully

herein.

### 213.

At all times relevant to this litigation, Defendants engaged in the business of

testing, developing, designing, manufacturing, marketing, selling, distributing, and

promoting their Roundup products, which are defective and unreasonably

dangerous to consumers, including Plaintiff, thereby placing Roundup products

into the stream of commerce. These actions were under Defendants' ultimate

control.

214.

Before the time that Mr. Stewart was exposed to the use of the
aforementioned Roundup products, Defendants impliedly warranted to their
consumers – including Mr. Stewart – that their Roundup products were of
merchantable quality and safe and fit for the use for which they were intended.

215.

Defendants, however, failed to disclose that Roundup has dangerous
propensities when used as intended and that the use of and/or exposure to
Roundup and glyphosate–containing products carries an increased risk of
developing severe injuries, including Mr. Stewart's injuries.

216.

Mr. Stewart reasonably relied upon the skill, superior knowledge and
judgment of Defendants and upon their implied warranties that the Roundup
products were to merchantable quality and fit for their intended purpose or use.

217.

Upon information and belief, Mr. Stewart was at all relevant times in privity
with Defendants.

57

218.

Mr. Stewart is the intended third-party beneficiary of implied warranties made by Defendants to the purchasers of its horticultural herbicides, and as such Mr. Stewart is entitled to assert this claim.

219.

The Roundup products were expected to reach and did in fact reach consumers and users, including Mr. Stewart, without substantial change in the condition in which they were manufactured and sold by Defendants.

220.

At all times relevant to this litigation, Defendants were aware that consumers and users of their products, including Mr. Stewart, would use Roundup products as marketed by Defendants, which is to say that Mr. Stewart was a foreseeable user of Roundup.

221.

Defendants intended that their Roundup products be used in the manner in which Mr. Stewart used them and Defendants impliedly warranted each product to be a merchantable quality, safe, and for this use, despite the fact that Roundup was not adequately tested or researched.

222.

In reliance upon Defendants' implied warranty, Mr. Stewart used Roundup as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendants.

223.

Mr. Stewart could not have reasonably discovered or known of the risks of serious injury associated with Roundup or glyphosate.

224.

Defendants breached their implied warranty to Mr. Stewart in that their Roundup products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

225.

The harm caused by Defendants' Roundup products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

226.

As a direct and proximate result of Defendants' wrongful acts and

omissions Mr. Stewart has suffered severe and permanent physical and emotional

injuries. Mr. Stewart endured pain and suffering, has suffered economic loss

(including significant expenses for medical care and treatment) and will continue

to suffer and incur these expenses in the future.

227.

Mr. Stewart, because of Defendants' bad faith conduct, is entitled, pursuant

to O.C.G.A. 13-6-11, to recover his costs of litigation including attorney's fees.

Wherefore, Mr. Stewart requests the Court to enter a judgment against

Defendant:

(A)    Awarding Mr. Stewart compensatory damages for past, present and
       future pain and suffering in an amount in excess of $250,000, the
       exact amount to be determined by the jury;

(B)    Awarding Mr. Stewart punitive damages in an amount to be
       determined by the jury;

©      Awarding Mr. Stewart his costs of litigation, including attorney's
       fees; and

(D)    Awarding Mr. Stewart whatever other and further relief the Court
       deems just, proper or equitable under the circumstances.

## COUNT FIVE

## BREACH OF EXPRESS WARRANTIES

### 228.

Mr. Stewart reincorporates paragraphs "1" through "135" as if stated fully herein.

### 229.

The law imposes a duty on Defendants to be responsible in the event the product sold, namely Roundup, is fit for the use and purposes intended.

### 230.

Defendants breached their contractually assumed implied warranty by supplying a product that caused Mr. Stewart to suffer from non-Hodgkin lymphoma and related injuries.

### 231.

Any warranty disclaimer or limitation of liability clause offered by Defendants for a product as dangerous as Roundup would be unconscionable and unenforceable by law.

### 232.

Mr. Stewart, because of Defendants' bad faith conduct, is entitled, pursuant to O.C.G.A. 13-6-11, to recover his costs of litigation including attorney's fees.

Wherefore, Mr. Stewart requests the Court to enter a judgment against Defendant:

(A)   Awarding Mr. Stewart compensatory damages for past, present and future pain and suffering in an amount in excess of $250,000, the exact amount to be determined by the jury;

(B)   Awarding Mr. Stewart punitive damages in an amount to be determined by the jury;

©     Awarding Mr. Stewart his costs of litigation, including attorney's fees; and

(D)   Awarding Mr. Stewart whatever other and further relief the Court deems just, proper or equitable under the circumstances.

## **COUNT SIX**

## **WANTONNESS**

### 233.

Mr. Stewart reincorporates paragraphs "1" through "135" as if stated fully herein.

### 234.

At all times material hereto, the Defendants knew or should have known that the subject product was inherently dangerous with respect to its health risks.

### 235.

At all times material hereto, the Defendants attempted to misrepresent, and did misrepresent facts concerning the safety of the subject product.

236.

Defendants' misrepresentations included knowingly withholding material information from the public, including Mr. Stewart, concerning the safety of the subject product.

237.

At all times material hereto, the Defendants knew and recklessly disregarded the fact that human exposure to Roundup can and does cause health hazard, including non-Hodgkin lymphoma.

238.

Notwithstanding the foregoing, the Defendants continued to aggressively market and apply the subject product without disclosing the aforesaid risks.

239.

Defendants' knew of the subject product's defective and unreasonably dangerous nature, as set forth herein, but continued to design, develop, manufacture, market, distribute, sell, and apply it so as to maximize sales and profits at the expense of the health and safety of the public, including the Mr. Stewart, in conscious and/or negligent disregard of the foreseeable harm caused by Roundup.

240.

Defendants intentionally concealed and/or recklessly failed to disclose to the public, including Mr. Stewart, the potentially life-threatening hazards of Roundup in order to ensure continued and increased sales.

241.

Defendants' intentional and/or reckless failure to disclose information deprived Mr. Stewart of necessary information to enable Mr. Stewart to weigh the true risks of using or being exposed to the subject product against its benefits.

242.

As a direct and proximate result of the Defendants' conscious and deliberate disregard for the rights and safety of consumers such as Mr. Stewart, Mr. Stewart suffered severe and permanent physical injuries. Mr. Stewart has endured substantial pain and suffering and have undergone extensive medical and surgical procedures. Mr. Stewart has incurred significant expenses for medical care and treatment, and will continue to incur such expenses in the future. Mr. Stewart has lost past earnings and has suffered a loss of earning capacity. Mr. Stewart has suffered and will continue to suffer economic loss, and has otherwise been physically, emotionally and economically injured. Mr. Stewart's injuries and damages are permanent and will continue into the future.

243.

Defendants' outrageous conduct was committed with knowing, conscious, and deliberate disregard for the rights and safety of consumers, including Mr. Stewart, thereby entitling Mr. Stewart to punitive damages in an amount appropriate to punish the Defendants and deter others from similar conduct in the future.

244.

Mr. Stewart, because of Defendants' bad faith conduct, is entitled, pursuant to O.C.G.A. 13-6-11, to recover his costs of litigation including attorney's fees.

Wherefore, Mr. Stewart requests the Court to enter a judgment against Defendants:

(A)   Awarding Mr. Stewart compensatory damages for past, present and future pain and suffering in an amount in excess of $250,000, the exact amount to be determined by the jury;

(B)   Awarding Mr. Stewart punitive damages in an amount to be determined by the jury;

(C)   Awarding Mr. Stewart his costs of litigation, including attorney's fees; and

(D)   Awarding Mr. Stewart whatever other and further relief the Court deems just, proper or equitable under the circumstances.

65

245.

Mr. Stewart, pursuant to Federal Rule of Civil Procedure 38, demands a jury

trial on his claims.

**GARY BUNCH, P.C.**

By: _____

Gary Bunch
Georgia Bar Number 094612
Attorney for Plaintiff
Matthew Stewart

208 Corporate Drive
Carrollton, Georgia 30117
(770) 836-0405

June 26, 2019