# U.S. District Court
## District of Hawaii (Hawaii)
## CIVIL DOCKET FOR CASE #: 1:19-cv-00330-JMS-KJM

Okamoto v. Monsanto Company
Assigned to: CHIEF JUDGE J. MICHAEL SEABRIGHT
Referred to: MAGISTRATE JUDGE KENNETH J. MANSFIELD
Demand: $2,000,000,000
Cause: 28:1332 Diversity-Product Liability

Date Filed: 06/27/2019
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Edward K. Okamoto**

represented by **Brian Keith Mackintosh**
Law Office of Brian K. Mackintosh, Ltd.
1003 Bishop Street, Suite 1990
Honolulu, HI 96813
808-781-7229
Fax: 888-627-6507
Email: brian@bkmlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Joanne F. Okamoto**

represented by **Brian Keith Mackintosh**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 06/27/2019 | 1 | COMPLAINT against Monsanto Company ( Filing fee $ 400 receipt number 0975-2224053.), filed by edward k okamoto. (Attachments: # 1 Jury Demand, # 2 Summons, # 3 Civil Cover Sheet)(Mackintosh, Brian) (Entered: 06/27/2019) |
| 06/27/2019 | 2 | NOTICE of Case Assignment: Please reflect Civil case number CV 19-00330 JMS-KJM on all further pleadings. (emt, ) (Entered: 06/27/2019) |
| 06/27/2019 | 3 | Order Setting Rule 16 Scheduling Conference is set for 09:30AM on 8/26/2019 before MAGISTRATE JUDGE KENNETH J. MANSFIELD - Signed by CHIEF JUDGE J. MICHAEL SEABRIGHT on 6/27/2019. (Attachments: # 1 Memo from Clerk Re: Corporate Disclosure Statements) <hr> **ATTACH THE SCHEDULING ORDER TO THE INITIATING DOCUMENT (COMPLAINT/NOTICE OF REMOVAL).** **THE SCHEDULING ORDER AND MEMO RE: CORPORATE DISCLOSURES MUST BE SERVED WITH THE DOCUMENT.** (emt, ) (Entered: 06/27/2019) |

| 06/27/2019 | 4 | CIVIL Waiver of Service Packet ~ Notice to Parties Regarding Service Pursuant to Rule 4 of the Federal Rules of Civil Procedure. (Attachments: # 1 AO 398 Notice of Lawsuit and Request to Waive Service of Summons, # 2 AO 399 Waiver of Service of Summons) (emt, ) (Entered: 06/27/2019) |
| 06/27/2019 | 5 | Summons (Proposed) (Mackintosh, Brian) (Entered: 06/27/2019) |
| 06/27/2019 | 6 | Summons Issued as to Monsanto Company. (emt, ) (Entered: 06/27/2019) |
| 07/05/2019 | 7 | SUMMONS Returned Executed by Joanne F. Okamoto, Edward K. Okamoto. Defendant Monsanto Company served on 7/5/2019. (jo) (Entered: 07/05/2019) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 07/09/2019 08:22:59 | | | |
| PACER Login: | hllp1982:2634105:4722683 | Client Code: | 1417.0049 |
| Description: | Docket Report | Search Criteria: | 1:19-cv-00330-JMS-KJM |
| Billable Pages: | 1 | Cost: | 0.10 |

**LAW OFFICE OF BRIAN K. MACKINTOSH**
BRIAN K. MACKINTOSH      9525
841 Bishop Street, Suite 2201
Honolulu, HI 96813
Telephone: (808) 781-7229
Facsimile: (888) 627-6507
brian@bkmlaw.com

*Attorney for Plaintiffs*
EDWARD K. OKAMOTO and
JOANNE F. OKAMOTO

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| EDWARD K. OKAMOTO and JOANNE F. OKAMOTO, | **CASE No.: 19-330** |
| Plaintiffs, | |
| v. | **COMPLAINT; DEMAND FOR JURY TRIAL; SUMMONS** |
| MONSANTO COMPANY, | |
| Defendant. | |

## <u>COMPLAINT</u>

Plaintiffs EDWARD K. OKAMOTO (hereinafter, "Plaintiff") and JOANNE

F. OKAMOTO (collectively referred to as "Plaintiffs"), by and through counsel

Brian K. Mackintosh of the Law Office of Brian K. Mackintosh allege upon

information and belief:

## STATEMENT OF THE CASE

1.      In 1970, Defendant Monsanto Company (hereinafter, "Defendant" or

"Monsanto") discovered the herbicidal properties of glyphosate and began

marketing it in products in 1974 under the brand name Roundup®. Roundup® is a

non-selective herbicide used to kill weeds that commonly compete with the growing

of crops. By 2001, glyphosate had become the most-used active ingredient in

American agriculture with 85–90 millions of pounds used annually. That number

grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most

widely used herbicide.

2.      Monsanto is a multinational agricultural biotechnology corporation

based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of

2009, Monsanto was the world's leading producer of seeds, accounting for 27% of

the world seed market. The majority of these seeds are of the Roundup Ready®

brand. The stated advantage of Roundup Ready® crops is that they substantially

improve a farmer's ability to control weeds, since glyphosate can be sprayed in the

fields during the growing season without harming their crops. In 2010, an estimated

70% of corn and cotton, and 90% of soybean fields in the United States were

Roundup Ready®.

3.      Monsanto's glyphosate products are registered in 130 countries and

approved for use on over 100 different crops. They are ubiquitous in the

environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

4.      On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world,  ⌐ and it traces the health implications from exposure to glyphosate since 2001.

5.      On July 29, 2015, the IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

6.      The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other hematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

7.      The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans. Nevertheless, Monsanto, since it began

selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

## JURISDICTION AND VENUE

8.      Federal diversity jurisdiction in this Court is proper under 28 U.S.C. § 1332 because Plaintiffs are citizens of a different state from Monsanto Company's states of citizenship, and the aggregate amount in  controversy exceeds $75,000, exclusive of interest and costs.

9.      This Court has personal jurisdiction over Monsanto under Hawaii Revised Statute ("HRS") § 634-35, because Monsanto knows or should have known that its Roundup® products are sold throughout the State of Hawaii.

10.     In addition, Monsanto maintains sufficient contacts with the State of Hawaii such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

11.     Venue is proper within this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred within this judicial District.

## PARTIES

12.    Plaintiff EDWARD K. OKAMOTO is a competent individual over the age of 18, resident and citizen of the State of Hawaii, who submits to the jurisdiction of this court and alleges venue in this Court is proper. As a result of Plaintiff's exposure to Roundup, which he purchased and used in the state of Hawaii from approximately 2000 to 2018, he suffered from severe physical, economic, and emotional injuries resulting from his use of Roundup, including but not limited to non-Hodgkin's lymphoma, diagnosed in December, 2018. JOANNE F. OKAMOTO is Mr. Okamoto's lawfully married wife and asserts a loss of consortium claim herein for damages and losses caused by Roundup.

13.    Plaintiffs are informed and believe and based thereon allege that as a direct and proximate result of Plaintiff's use of Roundup® and/or other Monsanto glyphosate-containing products ("Roundup"), supplied and/or distributed by Defendant herein, Plaintiff suffered significant harm, conscious pain and suffering, physical injury and bodily impairment including, but not limited to non-Hodgkin lymphoma and other cancers, other permanent physical deficits, permanent bodily impairment and other injury sequelae. Plaintiff's injuries required medical intervention to address the adverse physical effects and damage caused by Plaintiff's use of Roundup® and/or other Monsanto glyphosate-containing products ("Roundup").

5

14.     As a direct and proximate result of the wrongful conduct, acts, omissions, fraudulent concealments, fraudulent misrepresentations, and fraudulent business practices by Monsanto, Plaintiff used and/or was exposed to Roundup® and were diagnosed with serious health injuries including non-Hodgkin lymphoma.

15.     As a further direct and proximate result of defects in Roundup® and the wrongful  conduct, acts, omissions, and fraudulent misrepresentations of Defendant, Plaintiff suffered severe mental and physical pain and have and will sustain permanent injuries and emotional distress, along with economic loss due to medical expenses and living-related expenses as a result of lifestyle changes.

16.     As a further direct and proximate result of defects in Roundup® and the wrongful conduct, acts, omissions, and fraudulent misrepresentations of Defendant, Plaintiff required medical intervention in efforts to maintain and/or save Plaintiff from likely death.

17.     Plaintiff is an individual who suffered damages as a result of injuries resulting from Plaintiff's use and/or exposure to Roundup® and is authorized to bring an action for the causes of actions alleged herein including, but not limited to, injuries and damages sustained by Plaintiff resulting from Plaintiff's use of Roundup®. Said injuries and damages sustained by Plaintiff was caused or substantially contributed to by the wrongful conduct of Monsanto.

6

18.     The product warnings for Roundup® in effect during the time period

Plaintiff used and/or was exposed to Roundup® were vague, incomplete or

otherwise inadequate, both substantively and graphically, to alert consumers to the

severe health risks associated with Roundup® use and/or exposure.

19.     Monsanto did not provide adequate warnings to consumers including

Plaintiff and the general public about the increased risk of the serious adverse events

described herein.

20.     Had Plaintiff been adequately warned by Defendant of the potential

life-threatening side effects of Roundup®, Plaintiff would not have purchased, used,

or been exposed to Roundup®.

21.     By reason of the foregoing, Plaintiff developed serious and dangerous

side effects including non-Hodgkin lymphoma and other cancers, related injury

sequelae, physical pain and suffering, mental anguish, loss of enjoyment of life, and

death. By reason of the foregoing, Plaintiff suffered economic losses and special

damages including, but not limited to, loss of earning and medical expenses.

Plaintiff's general and special damages exceed the jurisdictional limits of this Court.

22.     Plaintiff has reviewed potential legal claims and causes of action

against Defendant and have intentionally chosen only to pursue claims based on

state law. Any reference to any federal agency, regulation or rule is stated solely as

background information, and Plaintiff is not making any claims which raise federal questions. Thus, jurisdiction in this Court is based solely on diversity jurisdiction.

## DEFENDANT

23.    Defendant Monsanto Company is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri. At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and manufactured Roundup®. Monsanto has regularly transacted and conducted business within the State of Hawaii and has derived substantial revenue from goods and products, including Roundup®, used in the State of Hawaii and employs sales representatives in the State of Hawaii. Monsanto expected or should have expected its acts to have consequences within the State of Hawaii because it derived substantial revenue from interstate commerce and invoked the benefits and protection of the State of Hawaii's laws.

24.    Plaintiff is informed and believes, and based thereon alleges, that in committing the acts alleged herein, each and every managing agent, agent, representative and/or employee of the Monsanto was working within the course and scope of said agency, representation and/or employment with the knowledge, consent, ratification, and authorization of the Defendant and its directors, officers and/or managing agents.

8

25.    Upon information and belief, at all relevant times, Monsanto was engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce and into the State of Hawaii, either directly or indirectly through third parties or related entities, Roundup® and/or other Monsanto glyphosate-containing products.

26.    At all relevant times, Monsanto conducted regular and sustained business and engaged in substantial commerce and business activity in the State of Hawaii, which included but was not limited to selling, marketing and distributing Roundup® and/or other Monsanto glyphosate-containing products in the State of Hawaii.

27.    At all relevant times, Monsanto expected or should have expected that its acts would have consequences within the United States of America including the State of Hawaii, and said Defendant derived and derive substantial revenue therefrom.

## EQUITABLE TOLLING

28.    Plaintiff has suffered an illness that has a latency period and does not arise until years after exposure. Plaintiff had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup® and glyphosate until made aware that Plaintiff's illness, including non-Hodgkin

9

lymphoma could be caused by use and/or exposure to Roundup®. The discovery rule applies, and the statute of limitations was tolled until the day Plaintiff knew or had reason to know that Plaintiff's illnesses, including non-Hodgkin lymphoma, were linked to Plaintiff's use and/or exposure to Roundup®.

29.     Within the time period of any applicable statute of limitations, Plaintiff could not have discovered through the exercise of reasonable diligence that exposure to Roundup® and glyphosate is injurious to human health.

30.     Plaintiff did not discover and did not know of facts that would cause a reasonable person to suspect the risk associated with the use of and/or exposure to Roundup® and glyphosate nor would a reasonable and diligent investigation by Plaintiff has disclosed that Roundup® and glyphosate would cause Plaintiff's illnesses.

31.     The expiration of any applicable statute of limitations has been equitably tolled by reason of Monsanto's fraudulent misrepresentations and fraudulent concealment and fraudulent conduct. Through affirmative misrepresentations and omissions, Defendant actively concealed from Plaintiff the true risks associated with use of and/or exposure to Roundup®.

32.     As a result of Defendant's actions, Plaintiff could not reasonably have known or learned through reasonable diligence that Plaintiff had been exposed to the risks alleged herein and that those risks were the direct and proximate result of

10

Defendant's acts and omissions.

33.     Monsanto is estopped from relying on any statute of limitations because of its concealment of the truth regarding the safety of Roundup®. Defendant had a duty to disclose the true character, quality and nature of Roundup® because this was non-public information over which Defendant continue to have exclusive control. Defendant knew that this information was not available to Plaintiff, Plaintiff's medical providers and/or health facilities, yet Defendant failed to disclose the information to the public, including Plaintiff.

34.     Defendant had the ability to and did spend enormous amounts of money in furtherance of the purposes of marketing and promoting a profitable product, notwithstanding the known or reasonably knowable risks. Plaintiff and medical professionals could not have afforded to and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks and were forced to rely on Defendant's representations.

## FACTS

35.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

36.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die

11

within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

37.     For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses.

38.     That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®—glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Agricultural workers are, once again, victims of corporate greed. Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® was safe.

### *The Discovery of Glyphosate and Development of Roundup®*

39.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset,

Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use; Osborn & Barr joined or took over these misleading marketing efforts in the early 1990s and continued through 2012. Monsanto still markets Roundup® as safe today.

### Registration of Herbicides under Federal Law

40.    The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.* FIFRA requires that all herbicides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a (a).

41.    Because herbicides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to herbicides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c) (5) (D).

13

42. FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration of a product should be granted or allowed so that the product may continue to be sold in commerce.

43. The EPA registered Roundup® for distribution, sale, and manufacture in the United States including the State of Hawaii.

44. FIFRA generally requires the registrant, Monsanto in the case of Roundup®, to conduct health and safety testing of herbicide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

45. The evaluation of each herbicide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a herbicide has changed over time. The EPA is now in the process of re-evaluating all herbicide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate

these herbicides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

46.     In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment —in relation to the re-registration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

### *Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®*

47.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, in 1991 the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E). In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

15

48.     On two occasions, the EPA found that the laboratories hired by

Monsanto to test the toxicity of its Roundup® products for registration purposes

committed fraud.

49.     In the first instance, Monsanto, in seeking initial registration of

Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and

evaluate herbicide toxicology studies relating to Roundup®. IBT performed about

30 tests on glyphosate and glyphosate-containing products, including nine of the 15

residue studies needed to register Roundup®.

50.     In 1976, the United States Food and Drug Administration ("FDA")

performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed

discrepancies between the raw data and the final report relating to the toxicological

impacts of glyphosate. The EPA subsequently audited IBT; it too found the

toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA

reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard

to believe the scientific integrity of the studies when they said they took specimens

of the uterus from male rabbits."

51.     Three top executives of IBT were convicted of fraud in 1983.

52.     In the second incident of data falsification, Monsanto hired Craven

Laboratories in 1991 to perform pesticide and herbicide studies, including for

Roundup®. In that same year, the owner of Craven Laboratories and three of its

employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

53.    Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

54.    Multiple studies have been ghostwritten in part and/or published by Monsanto through companies such as Intertek and Exponent, Inc., from 2000 through the present which minimize any safety concerns about the use of glyphosate. The studies are used to convince regulators to allow the sale of Roundup® and customers to use Roundup®. Such studies include, but are not limited to Williams (2000); Williams (2012); Kier & Kirkland (2013); Kier (2015); Bus (2016); Chang (2016); and the Intertek Expert Panel Manuscripts. All of these studies have been submitted to and relied upon by the public and the EPA in assessing the safety of glyphosate.  Through these means, Monsanto has fraudulently represented that independent scientists have concluded that Glyphosate is safe. In fact, Monsanto paid these so-called "independent experts," and Monsanto failed to disclose the significant role Monsanto had in creating the manuscripts produced by the "independent" experts. Further, Monsanto has ghostwritten editorials to advocate for the safety of glyphosate in newspapers and magazines for scientists such as Robert Tarone and Henry Miller. Monsanto has also ghostwritten

letters by supposedly independent scientists which have been submitted to regulatory agencies who are reviewing the safety of glyphosate.

55.   Monsanto has also violated federal regulations in holding secret *ex parte* meetings and conversations with certain EPA employees to collude in a strategy to re-register glyphosate and to quash investigations into the carcinogenicity of glyphosate by other federal agencies such as the Agency for Toxic Substances and Disease Registry. Monsanto's close connection with the EPA arises in part from its offering of lucrative consulting gigs to retiring EPA officials. In March 2015, The Joint Glyphosate Task Force, at Monsanto's behest, issued a press release sharply criticizing IARC, stating that IARC's conclusion was "baffling" and falsely claiming that "IARC did not consider any new or unique research findings when making its decision. It appears that only by deciding to exclude certain available scientific information and by adopting a different approach to interpreting the studies was this possible."

56.   Beginning in 2011, the Federal Institute for Risk Assessment (BfR) in Germany began preparing a study on the safety of glyphosate. Through the Glyphosate Task Force, Monsanto was able to co-opt this study, becoming the sole providers of data and ultimately writing the report, which was rubber-stamped by the BfR. The Glyphosate Task Force was solely responsible for preparing and submitting a summary of studies relied upon by the BfR. Monsanto then used this

18

self-serving report (which they, in fact, wrote) to falsely proclaim the safety of glyphosate. In October 2015, the Defendant, as members of the Joint Glyphosate Task Force, wrote to the state of California to try to stop California from warning the public about the carcinogenicity of glyphosate, arguing that the IARC classification was mistaken. In January of 2016, Monsanto filed a lawsuit to stop California from warning the public about the carcinogenicity of glyphosate.

### *The Importance of Roundup® to Monsanto's Market Dominance Profits*

57.     The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

58.     In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further. By 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide, and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's

dominant share of the glyphosate/Roundup® market through a marketing strategy
that coupled proprietary Roundup Ready® seeds with continued sales of its
Roundup® herbicide.

59.    Through a three-pronged strategy of increased production, decreased
prices, and by coupling Roundup Ready® seeds with Roundup® herbicide,
Roundup® became Monsanto's most profitable product. In 2000, Roundup®
accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of
five to one and accounting for close to half of Monsanto's revenue. Today,
glyphosate remains one of the world's largest herbicides by sales volume.

**Monsanto has known for decades that it falsely advertises the safety of
Roundup®.**

60.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit
against Monsanto based on its false and misleading advertising of Roundup ®
products. Specifically, the lawsuit challenged Monsanto's general representations
that its spray-on glyphosate-based herbicides, including Roundup®, were "**safer
than table salt**" and "**practically non-toxic**" to mammals, birds, and fish. Among
the representations the NYAG found deceptive and misleading about the human and
environmental safety of Roundup® are the following:

(a)     Remember that environmentally friendly Roundup® herbicide is

        biodegradable. It won't build up in the soil so you can use Roundup®

        with confidence along customers' driveways, sidewalks and fences...

(b)     And remember that Roundup® is biodegradable and won't build up in

        the soil. That will give you the environmental confidence you need to

        use Roundup® everywhere you've got a weed, brush, edging or

        trimming problem.

(c)     Roundup® biodegrades into naturally occurring elements.

(d)     Remember that versatile Roundup® herbicide stays where you put it.

        That means there's no washing or leaching to harm customers' shrubs

        or other desirable vegetation.

(e)     This non-residual herbicide will not wash or leach in the soil. It ... stays

        where you apply it.

(f)     You can apply Accord (glyphosate-containing herbicide) with

        "confidence because it will stay where you put it;" it bonds tightly to

        soil particles, preventing leaching. Then, soon after application, soil

        microorganisms biodegrade Accord into natural products.

(g)     Glyphosate is less toxic to rats than table salt following acute oral

        ingestion.

(h)  Glyphosate's safety margin is much greater than required. It has over a
1,000-fold safety margin in food and over a 700-fold safety margin for
workers who manufacture or use it.

(i)  You can feel good about using herbicides by Monsanto. They carry a
toxicity category rating of 'practically non-toxic' as it pertains to
mammals, birds and fish.

(j)  "Roundup can be used where kids and pets will play and breaks down
into natural material." This ad depicts a person with his head in the
ground and a pet dog standing in an area which has been treated with
Roundup.

61.  On November 19, 1996, Monsanto entered into an Assurance of
Discontinuance with NYAG, in which Monsanto agreed, among other things, "to
cease and desist from publishing or broadcasting any advertisements [in New York]
that represent, directly or by implication" that:

(a)  its glyphosate-containing herbicide products or any component thereof
are safe, non-toxic, harmless or free from risk. * * *

(b)  its glyphosate-containing herbicide products or any component thereof
manufactured, formulated, distributed or sold by Monsanto are
biodegradable * * *

22

(c)     its glyphosate-containing herbicide products or any component thereof

stay where they are applied under all circumstances and will not move

through the environment by any means.

* * *

(d)     its glyphosate-containing herbicide products or any component thereof

are "good" for the environment or are "known for their environmental

characteristics." * * *

(e)     glyphosate-containing herbicide products or any component thereof are

safer or less toxic than common consumer products other than

herbicides;

(f)     its glyphosate-containing products or any component thereof might be

classified as "practically non-toxic."

62.     Monsanto did not alter its advertising in the same manner in any state

other than New York, and, on information and belief, still has not done so today.

63.     In 2009, France's highest court ruled that Monsanto had not told the

truth about the safety of Roundup®. The French court affirmed an earlier judgement

that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable"

and that it "left the soil clean."

### *Classifications and Assessments of Glyphosate*

64.     The IARC process for the classification of glyphosate followed the

stringent procedures for the evaluation of a chemical agent. Over time, the IARC

Monograph program has reviewed 980 agents. Of those reviewed, it has determined

116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A

(Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human

Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be

Probably Not Carcinogenic.

65.     The established procedure for IARC Monograph evaluations is

described in the IARC Programme's Preamble. Evaluations are performed by panels

of international experts, selected on the basis of their expertise and the absence of

actual or apparent conflicts of interest.

66.     One year before the Monograph meeting, the meeting is announced and

there is a call both for data and for experts. Eight months before the Monograph

meeting, the Working Group membership is selected, and the sections of the

Monograph are developed by the Working Group members. One month prior to the

Monograph meeting, the call for data is closed, and the various draft sections are

distributed among Working Group members for review and comment. Finally, at the

Monograph meeting, the Working Group finalizes review of all literature, evaluates

the evidence in each category, and completes the overall evaluation. Within two

24

weeks after the Monograph meeting, the summary of the Working Group findings are published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

67.    In assessing a chemical agent, the IARC Working Group reviews the following information:

(a)    human, experimental, and mechanistic data;

(b)    all pertinent epidemiological studies and cancer bioassays; and

(c)    representative mechanistic data.

The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

68.    In March of 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent, that is, glyphosate is probably carcinogenic in humans.

69.    On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working

Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

70.    The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

71.    Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

72.    Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

73.    The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

74.    The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

75.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

76.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

77.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

78.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA, oxidative stress, and chromosomal damage in mammals and in human and animal cells in utero.

79.     In addition to DNA damage and oxidative stress, scientists have suggested that Roundup®'s association with various serious health conditions is linked to the effect Roundup® has on the digestive system. Specifically, scientists believe the same mechanism that makes Roundup® toxic to weeds also makes it

toxic to the microbes within the human gut and mucous membranes. When humans are exposed to Roundup®, this exposure leads to a chronic inflammatory state in the gut, as well an impaired gut barrier, which can lead to many long-term health effects, including an increased risk of cancer. Monsanto has deliberately refused to conduct tests on this aspect of Roundup®'s mechanism of action.

80.     Many Roundup® products bear a label which either reads: "glyphosate targets an enzyme found in plants but not in people or pets" or "this Roundup formula targets an enzyme in plants but not in people or pets." These statements are false because it has been established that the human body is host to microorganisms which contain the enzyme Monsanto asserts is not found in humans.

81.     Thus, glyphosate targets microbes within the human body which contain the enzyme affected by glyphosate, leading to a variety of adverse health effects. The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

82.     The IARC Working Group also reviewed an Agricultural Health Study consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a

self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

### *Other Earlier Findings about Glyphosate's Dangers to Human Health*

83.    The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

### Release Patterns

84.    Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

85.    It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

86.    Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was

applied. Occupational exposure may also occur during glyphosate's manufacture, transport, storage, and disposal.

87. In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

### *Recent Worldwide Bans on Roundup®/Glyphosate*

88. Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in light of this assessment as the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which takes effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

30

89.   The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

90.   France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

91.   Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

92.   The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

93.   The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

## LIMITATION ON ALLEGATIONS

94.   Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

95.   The allegations in this pleading are made pursuant to Hawaii law. To the extent Hawaii law imposes a duty or obligation on Defendant that exceeds those required by federal law, Plaintiff do not assert such claims. All claims asserted

31

herein run parallel to federal law, *i.e.*, Monsanto's violations of Hawaii law were also violations of federal law. Had Monsanto honestly complied with Hawaii law, it would also have complied with federal law.

96.     Additionally, Plaintiff's claims do not seek to enforce federal law. These claims are brought under Hawaii law, notwithstanding that such claims run parallel to federal law.

97.     As alleged herein, Defendant violated U.S.C. § 136j and 40 C.F.R. § 156.10(a)(5) by distributing Roundup®, which was misbranded pursuant to 7 U.S.C. § 136(g). Federal law specifically prohibits the distribution of a misbranded herbicide.

## CLAIM ONE

### STRICT LIABILITY - DESIGN DEFECT

98.     Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

99.     Plaintiffs bring this strict liability claim against Defendant for defective design.

100.    At all relevant times, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream

of commerce. These actions were under the ultimate control and supervision of

Defendant. At all relevant times, Defendant designed, researched, developed,

manufactured, produced, tested, assembled, labeled, advertised, promoted,

marketed, sold, and distributed the Roundup® products used by Plaintiff, as

described herein.

101.   At all relevant times, Defendant's Roundup® products were

manufactured, designed, and labeled in an unsafe, defective, and inherently

dangerous manner that was dangerous for use by or exposure to the public,

including Plaintiff.

102.   At all relevant times, Monsanto Roundup® products reached the

intended consumers, handlers, and users or other persons coming into contact with

these products in Hawaii and throughout the United States, including Plaintiff,

without substantial change in their condition as designed, manufactured, sold,

distributed, labeled, and marketed by Defendant.

103.   Defendant's Roundup® products, as researched, tested, developed,

designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed

by Defendant were defective in design and formulation in that, when they left the

control of Defendant's manufacturers and/or suppliers, they were unreasonably

dangerous and dangerous to an extent beyond that which an ordinary consumer

would contemplate.

104. Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that, when they left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

105. At all relevant times, Defendant knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendant.

106. Therefore, at all relevant times, Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendant were defective in design and formulation, in one or more of the following ways:

     a. When placed in the stream of commerce, Defendant's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate;

     b. When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;

34

c. When placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

d. Defendant did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate;

e. Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide;

f. Defendant knew or should have known at the time of marketing Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries;

g. Defendant did not conduct adequate post-marketing surveillance of its Roundup® products; and

h. Defendant could have employed safer alternative designs and formulations.

107.   Plaintiff was exposed to Defendant's Roundup® products without knowledge of Roundup®'s dangerous characteristics.

108.   At all times relevant to this litigation, Plaintiff used and/or was exposed

35

to the use of Defendant's Roundup® products in an intended or reasonably foreseeable manner without knowledge of Roundup®'s dangerous characteristics.

109. Plaintiff could not reasonably have discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure due to the Defendant's suppression of scientific information linking glyphosate to cancer.

110. The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering Defendant's product dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendant's Roundup® products were and are more dangerous than alternative products, and Defendant could have designed Roundup® products to make them less dangerous. Indeed, at the time Defendant designed Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

111. At the time Roundup® products left Defendant's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant's herbicides.

112. Defendant's defective design of Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including Plaintiff herein.

36

113.   Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendant is strictly liable to Plaintiffs.

114.   The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiff's injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained injuries.

115.   Defendant's conduct, as described above, was reckless. Defendant risked the lives of consumers and users of its products, including Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Defendant made conscious decisions not to redesign, warn or inform the unsuspecting public. Defendant's reckless conduct warrants an award of punitive damages.

116.   As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, and the resulting injuries, Plaintiff has sustained pecuniary loss including general damages in a sum which exceeds the jurisdictional minimum of this Court.

117.   As a proximate result of Defendant placing its defective Roundup® products into the stream of commerce, as alleged herein, there was a measurable and significant interval of time during which Plaintiff has suffered great mental anguish and other personal injury and damages.

118.   As a proximate result of the Defendant placing its defective Roundup® products into the stream of commerce, as alleged herein, Plaintiff sustained loss of income, loss of earning capacity and/or property damage.

119.   WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## CLAIM TWO

### STRICT LIABILITY - FAILURE TO WARN

120.   Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

121.   Plaintiffs bring this strict liability claim against Defendant for failure to warn.

122.   At all relevant times, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and

supervision of Defendant.

123.  Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiff, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

124.  At all relevant times, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn Plaintiff of dangers associated with Roundup use and exposure. Defendant, as manufacturer, seller, or distributor of chemical herbicides are held to the knowledge of an expert in the field.

125.  At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

39

126. At all relevant times, Defendant failed and deliberately refused to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by Defendant's herbicides, including Plaintiff.

127. Despite the fact that Defendant knew or should have known that Roundup® posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time they distributed, supplied or sold the product, and were not known to end users and consumers, such as Plaintiff.

128. Defendant knew or should have known that its products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers, *i.e.*, the reasonably foreseeable users, of the risks of exposure to its products. Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate and, further, have made false and/or misleading statements concerning the safety of Roundup® products and glyphosate.

129. At all relevant times, Defendant's Roundup® products reached the

40

intended consumers, handlers, and users or other persons coming into contact with these products in Hawaii and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

130.   Plaintiff was exposed to Defendant's Roundup® products without knowledge of their dangerous characteristics.

131.   At all relevant times, Plaintiff used and/or was exposed to the use of Defendant's Roundup® products while using them for their intended or reasonably foreseeable purposes, without knowledge of their dangerous characteristics.

132.   Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendant to know about and disclose serious health risks associated with using Defendant's products.

133.   Defendant knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, failed to communicate adequate information on the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

41

134.   The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiff to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false and misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after they knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

135.   This alleged failure to warn is not limited to the information contained on Roundup®'s labeling. Monsanto was able, in accord with federal law, to comply with Hawaii law by disclosing the known risks associated with Roundup® through other non-labeling mediums, *i.e.*, promotion, advertisements, public service announcements, and/or public information sources. But Monsanto did not disclose these known risks through any medium.

136.   To this day, Monsanto has failed to adequately and accurately warn of the risks of cancer associated with the use of and exposure to Roundup® and its active ingredient, glyphosate.

42

137.   As a result of its inadequate warnings, Defendant's Roundup®
products were defective and unreasonably dangerous when they left the possession
and/or control of Defendant, were distributed by Defendant, and used by Plaintiff.

138.   Defendant is liable to Plaintiff for injuries caused by its negligent or
willful failure, as described above, to provide adequate warnings or other clinically
relevant information and data regarding the appropriate use of its products and the
risks associated with the use of or exposure to Roundup® and glyphosate.

139.   Had Defendant provided adequate warnings and instructions and
properly disclosed and disseminated the risks associated with its Roundup®
products, Plaintiff could have avoided the risk of developing injuries and could have
obtained or used alternative herbicides.

140.   As a direct and proximate result of Defendant placing defective
Roundup® products into the stream of commerce, Plaintiff was injured and have
sustained pecuniary loss resulting and general damages in a sum exceeding the
jurisdictional minimum of this Court.

141.   As a proximate result of Defendant placing defective Roundup®
products into the stream of commerce, as alleged herein, there was a measurable and
significant interval of time during which Plaintiff suffered great mental anguish and
other personal injury and damages.

142.   As a proximate result of Defendant placing defective Roundup®

products into the stream of commerce, as alleged herein, Plaintiff sustained loss of income, loss of earning capacity and property damage.

143.   WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## CLAIM THREE

### NEGLIGENCE

144.   Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

145.   Defendant, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

146.   At all relevant times, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

147.   At all relevant times, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Defendant's

44

duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

148.   At all relevant times, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and, specifically, the carcinogenic properties of the chemical glyphosate.

149.   Accordingly, at all relevant times, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to Roundup® products could cause or be associated with Plaintiff's injuries, and thus, create a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

150.   Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

151.   As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of Roundup® products, in that Defendant manufactured and produced defective

45

herbicides containing the chemical glyphosate; knew or had reason to know of the defects inherent in its products; knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects; and failed to prevent or adequately warn of these risks and injuries. Indeed, Defendant deliberately refused to test Roundup® products because they knew that the chemical posed serious health risks to humans.

152.   Monsanto was negligent in its promotion of Roundup®, outside of the labeling context, by failing to disclose material risk information as part of its promotion and marketing of Roundup®, including the Internet, television, print advertisements, etc. Nothing prevented Defendant from being honest in its promotional activities, and, in fact, Defendant had a duty to disclose the truth about the risks associated with Roundup in its promotional efforts, outside of the context of labeling.

153.   Despite its ability and means to investigate, study, and test the products and to provide adequate warnings, Defendant has failed to do so. Indeed, Monsanto has wrongfully concealed information and have further made false and/or misleading statements concerning the safety and/or exposure to Roundup and glyphosate.

154.   Defendant's negligence included:

 a.  Manufacturing, producing, promoting, formulating, creating,

46

developing, designing, selling, and/or distributing Roundup® products without thorough and adequate pre- and post-market testing;

b. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup;

c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d. Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup/glyphosate as an herbicide;

e. Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f. Failing to provide adequate instructions, guidelines, and safety

47

precautions to those persons Defendant could reasonably foresee would use and be exposed to Roundup® products;

g. Failing to disclose to Plaintiff, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

h. Failing to warn Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other consumers;

i. Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

j. Representing that its Roundup® products were safe for their intended use when, in fact, Defendant knew or should have known the products were not safe for their intended purpose;

k. Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert consumers and the general public of the risks of Roundup® and glyphosate;

l. Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the

48

dangers known (by Defendant) to be associated with or caused by the
use of or exposure to Roundup® and glyphosate;

m. Continuing to disseminate information to its consumers, which indicate
or imply that Defendant's Roundup® products are not unsafe for use in
the agricultural and horticultural industries; and

n. Continuing the manufacture and sale of its products with the
knowledge that the products were unreasonably unsafe and dangerous.

155.   Defendant knew and/or should have known that it was foreseeable
consumers such as Plaintiff would suffer injuries as a result of Defendant's failure to
exercise ordinary care in the manufacturing, marketing, labeling, distribution, and
sale of Roundup®.

156.   Plaintiff did not know the nature and extent of the injuries that could
result from the intended use of and/or exposure to Roundup® or its active ingredient
glyphosate.

157.   Defendant's negligence was the proximate cause of Plaintiff'ss injuries,
*i.e.*, absent Defendant's negligence, Plaintiff would not have developed cancer.

158.   Defendant's conduct, as described above, was reckless. Defendant
regularly risked the lives of consumers and users of its products, including Plaintiff,
with full knowledge of the dangers of its products. Monsanto made conscious
decisions not to redesign, re-label, warn, or inform the unsuspecting public,

49

including Plaintiff. Monsanto's intentional and reckless conduct therefore warrants an award of punitive damages.

159. As a direct and proximate result of Defendant placing defective Roundup® products into the stream of commerce, Plaintiff was injured and have sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

160. As a proximate result of Defendant placing defective Roundup® products into the stream of commerce, as alleged herein, there was a measurable and significant interval of time during which Plaintiff suffered great mental anguish and other personal injury and damages.

161. As a proximate result of Defendant placing defective Roundup® products into the stream of commerce, as alleged herein, Plaintiff sustained a loss of income, loss of earning capacity and property damage.

162. WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## CLAIM FOUR

### FRAUD

163.   Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

164.   Defendant Monsanto has defrauded the agricultural community in general and Plaintiff in particular by misrepresenting the true safety of its Roundup® and by failing to disclose known risks of cancer.

165.   Defendant Monsanto misrepresented and/or failed to disclose, *inter alia*, that: glyphosate and its major metabolite aminomethylphosphonic acid (AMPA) could cause cancer; glyphosate and AMPA are known to be genotoxic in humans and laboratory animals because exposure is known to cause DNA strand breaks (a precursor to cancer); glyphosate and AMPA are known to induce oxidative stress in humans and laboratory animals (a precursor to cancer); glyphosate and AMPA interfere with the aromatic amino acids within the human gut, leading to downstream health conditions including cancer; exposure to glyphosate and AMPA is causally associated with non-Hodgkin lymphoma; and the laboratory tests attesting to the safety of glyphosate were flawed and/or fraudulent.

166.   Due to these misrepresentations and omissions, at all times relevant to this litigation, Defendant's Roundup® was misbranded under 7 U.S.C. § 136(g) and its distribution within Hawaii and around the United States was a violation of 7

51

U.S.C. § 136j and 40 C.F.R. § 156.10(a)(5).

167.   Plaintiff relied on the Defendant's misrepresentations and/or material omissions regarding the safety of Roundup® and its active ingredient glyphosate in deciding whether to purchase and/or use the product. Plaintiff did not know nor could they reasonably have known of the misrepresentations and/or material omissions by Defendant concerning Roundup® and its active ingredient glyphosate.

168.   The misrepresentations and/or material omissions that form the basis of this fraud claim are not limited to statements made on the Roundup® labeling, as defined under federal law, but also involve Defendant Monsanto's representations and omissions made as part of its promotion and marketing of Roundup®, including on the Internet, television, in print advertisements, etc. Nothing prevented Defendant Monsanto from disclosing the truth about the risks associated with Roundup® in its promotional efforts outside of the labeling context, using the forms of media and promotion Defendant Monsanto traditionally used to promote the product's efficacy and benefits.

169.   When Defendant Monsanto made the misrepresentations and/or omissions as alleged in this pleading, it did so with the intent of defrauding and deceiving the public in general and the agricultural community and with the intent of inducing the public and agricultural community to purchase and use Roundup®.

170.   Defendant Monsanto made these misrepresentations and/or material

omissions with malicious, fraudulent and/or oppressive intent toward Plaintiff and

the public generally. Defendant's conduct was willful, wanton, and/or reckless.

Defendant deliberately recommended, manufactured, produced, marketed, sold,

distributed, merchandized, packaged, promoted and advertised the dangerous and

defective herbicide Roundup®. This constitutes an utter, wanton, and conscious

disregard of the rights and safety of a large segment of the public, and by reason

thereof, Defendant is liable for reckless, willful, and wanton acts and omissions

which evidence a total and conscious disregard for the safety of Plaintiff and others

which proximately caused the injuries as set forth herein.

171. As a proximate result of Defendant Monsanto's fraudulent and deceitful

conduct and representations, Plaintiff has sustained damages and other losses in an

amount to be proven at trial.

172. As a proximate result of Defendant Monsanto's fraud, as alleged

herein, Plaintiff sustained a loss of income, loss of earning capacity and property

damage, including lost income.

173. WHEREFORE, Plaintiffs respectfully requests that this Court enter

judgment in Plaintiffs' favor for compensatory and punitive damages, together with

interest, costs herein incurred, attorneys' fees and all such other and further relief as

this Court deems just and proper. Plaintiffs also demand a jury trial on the issues

contained herein.

53

## CLAIM FIVE

## BREACH OF EXPRESS WARRANTIES

174.   Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

175.   At all relevant times, Defendant Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant Monsanto.

176.   Defendant Monsanto had a duty to exercise reasonable care in the research, development, design, testing, packaging, manufacture, inspection, labeling, distributing, marketing, promotion, sale, and release of Roundup® products, including a duty to:

      a.   ensure that its products did not cause the user unreasonably dangerous side effects;

      b.   warn of dangerous and potentially fatal side effects; and

      c.   disclose adverse material facts, such as the true risks associated with the use of and exposure to Roundup® and glyphosate-containing products, when making representations to consumers and the general

public, including Plaintiff.

177.  As alleged throughout this pleading, the ability of Defendant Monsanto to properly disclose those risks associated with Roundup® is not limited to representations made on the labeling.

178.  At all relevant times, Defendant Monsanto expressly represented and warranted to the purchasers of its products, by and through statements made by Defendant Monsanto in labels, publications, package inserts, and other written materials intended for consumers and the general public, that Roundup® products were safe to human health and the environment, effective, fit, and proper for their intended use. Defendant Monsanto advertised, labeled, marketed, and promoted Roundup® products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that Roundup® products would conform to the representations.

179.  These express representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Roundup® and glyphosate. Defendant Monsanto knew and/or should have known that the risks expressly included in Roundup® warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendant Monsanto expressly represented that Roundup® products were safe and effective,

55

that they were safe and effective for use by individuals such as the Plaintiff, and/or
that they were safe and effective as agricultural herbicides.

180. The representations about Roundup®, as set forth herein, contained or
constituted affirmations of fact or promises made by the seller to the buyer, which
related to the goods and became part of the basis of the bargain, creating an express
warranty that the goods would conform to the representations.

181. Defendant Monsanto placed Roundup® products into the stream of
commerce for sale and recommended their use to consumers and the public without
adequately warning of the true risks of developing the injuries associated with the use
of and exposure to Roundup® and its active ingredient glyphosate.

182. Defendant Monsanto breached these warranties because, among other
things, Roundup® products were defective, dangerous, and unfit for use, did not
contain labels representing the true and adequate nature of the risks associated with
their use, and were not merchantable or safe for their intended, ordinary, and
foreseeable use and purpose. Specifically, Defendant Monsanto breached the
warranties in the following ways:

a. Defendant Monsanto represented through its labeling, advertising, and
marketing materials that Roundup® products were safe, and fraudulently withheld
and concealed information about the risks of serious injury associated with use of
and/or exposure to Roundup® and glyphosate by expressly limiting the risks

associated with use and/or exposure within its warnings and labels; and

b. Defendant Monsanto represented that Roundup® products were safe for use and fraudulently concealed information that demonstrated that glyphosate, the active ingredient in Roundup®, had carcinogenic properties, and that Roundup® products, therefore, were not safer than alternatives available on the market.

183. Plaintiff detrimentally relied on the express warranties and representations of Defendant Monsanto concerning the safety and/or risk profile of Roundup® in making a decision to purchase the product. Plaintiff reasonably relied upon Defendant Monsanto to disclose known defects, risks, dangers, and side effects of Roundup® and glyphosate. Plaintiff would not have purchased or used Roundup® had Defendant Monsanto properly disclosed the risks associated with the product, either through advertising, labeling, or any other form of disclosure.

184. Defendant Monsanto had sole access to material facts concerning the nature of the risks associated with its Roundup® products, as expressly stated within their warnings and labels, and knew that consumers and users such as Plaintiff could not have reasonably discovered that the risks expressly included in Roundup® warnings and labels were inadequate and inaccurate.

185. Plaintiff had no knowledge of the falsity or incompleteness of Defendant Monsanto's statements and representations concerning Roundup.

186. Plaintiff used and/or was exposed to Roundup® as researched,

developed, designed, tested, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by Defendant Monsanto.

187.   Had the warnings, labels, advertisements, or promotional material for Roundup® products accurately and adequately set forth the true risks associated with the use of such products, including Plaintiff's injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Plaintiff could have avoided the injuries complained of herein.

188.   As a direct and proximate result of Defendant Monsanto's breach of express warranty, Plaintiff has sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

189.   As a proximate result of Defendant Monsanto's breach of express warranty, as alleged herein, there was a measurable and significant interval of time during which Plaintiff suffered great mental anguish and other personal injury and damages.

190.   As a proximate result of Defendant Monsanto's breach of express warranty, as alleged herein, Plaintiff sustained a loss of income, loss of earning capacity, and property damage.

191.   WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with

interest, costs herein incurred, attorneys' fees and all such other and further relief as

this Court deems just and proper. Plaintiffs also demand a jury trial on the issues

contained herein.

## CLAIM SIX

## BREACH OF IMPLIED WARRANTIES

192.   Plaintiffs incorporate by reference every allegation set forth in
preceding paragraphs as if fully stated herein.

193.   At all relevant times, Defendant Monsanto engaged in the business of
testing, developing, designing, manufacturing, marketing, selling, distributing, and
promoting Roundup® products, which were and are defective and unreasonably
dangerous to consumers, including Plaintiff, thereby placing Roundup® products
into the stream of commerce.

194.   Before the time Plaintiff was exposed to the aforementioned Roundup®
products, Defendant Monsanto impliedly warranted to its consumers, including
Plaintiff, that Roundup® products were of merchantable quality and safe and fit for
the use for which they were intended; specifically, as agricultural herbicides.

195.   But Defendant Monsanto failed to disclose that Roundup® has
dangerous propensities when used as intended and that use of and/or exposure to
Roundup® and glyphosate-containing products carries an increased risk of
developing severe injuries, including Plaintiff's injuries.

196.   Plaintiff was intended beneficiaries of the implied warranties made by Defendant Monsanto to purchasers of its herbicides.

197.   The Roundup® products were expected to reach and did in fact reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendant Monsanto.

198.   At all relevant times, Defendant Monsanto was aware that consumers and users of its products, including Plaintiff, would use Roundup® products as marketed by Defendant Monsanto, which is to say that Plaintiff was foreseeable users of Roundup®.

199.   Defendant Monsanto intended that Roundup® products be used in the manner in which Plaintiff, in fact, used them and which Defendant Monsanto impliedly warranted to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

200.   In reliance upon Defendant Monsanto's implied warranty, Plaintiff used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted, and marketed by Defendant Monsanto.

201.   Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

202.   Defendant Monsanto breached its implied warranty to Plaintiff in that Roundup® products were not of merchantable quality, safe, or fit for their intended

use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

203. The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

204. As a direct and proximate result of Defendant's breach of implied warranty, Plaintiff has sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

205. As a proximate result of the Defendant's breach of implied warranty, as alleged herein, there was a measurable and significant interval of time during which Plaintiff suffered great mental anguish and other personal injury and damages.

206. As a proximate result of Defendant's breach of implied warranty, as alleged herein, Plaintiff sustained a loss of income, loss of earning capacity, and property damage.

207. WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## CLAIM SEVEN

### LOSS OF CONSORTIUM

208.   Plaintiffs hereby incorporate by reference all other paragraphs in this Complaint as if set forth fully herein.

209.   Plaintiffs are married to one another and were married at the time of the injuries alleged herein.  Plaintiffs are entitled to one another's comfort, care, affection, companionship, services, society, advice, guidance, and consortium.

210.   As a direct and proximate result of Defendant's wrongful acts and omissions, Consortium Plaintiff has suffered the loss and/or impairment of Plaintiff's ability to perform services as a spouse, because of the injuries alleged herein.

211.   WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## CLAIM EIGHT

### PUNITIVE DAMAGES

212.   Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

213. Defendant's conduct as alleged herein was done with intentional oppression, fraud, and malice. Monsanto was fully aware of the safety risks of Roundup®. Nonetheless, Defendant deliberately crafted its label, marketing, and promotion to mislead farmers and consumers.

214. This was not done by accident or through some justifiable negligence. Rather, Monsanto knew that it could turn a profit by convincing the agricultural industry that Roundup was harmless to humans, and that full disclosure of the true risks of Roundup® would limit the amount of money Monsanto would make selling Roundup® in Hawaii. Defendant's objection was accomplished not only through its misleading labeling, but through a comprehensive scheme of selective fraudulent research and testing, misleading advertising, and deceptive omissions as more fully alleged throughout this pleading. Plaintiff was denied the right to make an informed decision about whether to purchase, use, or be exposed to an herbicide, knowing the full risks attendant to that use. Such conduct was done with conscious disregard of Plaintiff's rights.

215. There is no indication that Defendant will stop its deceptive and unlawful marketing practices unless it is punished and deterred. Accordingly, Plaintiff requests punitive damages against the Defendant for the harms caused to Plaintiff.

216. WHEREFORE, Plaintiffs respectfully requests that this Court enter

63

judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## PRAYER FOR RELIEF

217.   WHEREFORE, Plaintiffs request that this Court to enter judgment in their favor and against the Monsanto for:

a.   actual or compensatory damages in such amount to be determined at trial and as provided by applicable law;

b.   exemplary and punitive damages sufficient to punish and deter the Defendant and others from future fraudulent practices;

c.   pre-judgment and post-judgment interest;

d.   costs including reasonable attorneys' fees, court costs, and other litigation expenses; and

e.   any other relief the Court may deem just and proper.

DATED:  Honolulu, Hawaii this June 27, 2019.

/s/ Brian K. Mackintosh
BRIAN K. MACKINTOSH
*Attorney for Plaintiffs*
EDWARD K. OKAMOTO and JOANNE F.
OKAMOTO