# U.S. District Court
## Eastern District of Missouri (St. Louis)
## CIVIL DOCKET FOR CASE #: 4:19-cv-02026

Bronzini et al v. Monsanto Company

Assigned to:

Case in other court:  Circuit Court, St. Louis County, Missouri,
               19SL-CC002331

Cause: 28:1331 Fed. Question

Date Filed: 07/17/2019

Jury Demand: Both

Nature of Suit: 365 Personal Inj. Prod. Liability

Jurisdiction: Federal Question

**Plaintiff**

**Mike Bronzini**            represented by    **Eric D. Holland**
HOLLAND LAW FIRM LLC
300 N. Tucker Blvd.
Suite 801
St. Louis, MO 63101
314-241-8111
Fax: 314-241-5554
Email: eholland@allfela.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
HOLLAND LAW FIRM LLC
300 N. Tucker Blvd.
Suite 801
St. Louis, MO 63101
314-244-2005
Fax: 314-241-5554
Email: pdowd@allfela.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
HOLLAND LAW FIRM LLC
300 N. Tucker Blvd.
Suite 801
St. Louis, MO 63101
314-241-8111
Fax: 314-241-5554
Email: scrompton@allfela.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Howard Bulmer**            represented by    **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Jerry Burke**            represented by   **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Fred Burmeister**        represented by   **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Melinda Cloud**         represented by   **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*

|  |  |  |
|---|---|---|
|  |  | *ATTORNEY TO BE NOTICED* |
|  |  | **Randall S. Crompton**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| Charles Crutcher | represented by | **Eric D. Holland**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
|---|---|---|
|  |  | **Patrick R Dowd**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
|  |  | **Randall S. Crompton**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| Michael DeRobbio | represented by | **Eric D. Holland**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
|---|---|---|
|  |  | **Patrick R Dowd**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
|  |  | **Randall S. Crompton**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| Jeffrey Driscoll | represented by | **Eric D. Holland**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
|---|---|---|
|  |  | **Patrick R Dowd**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
|  |  | **Randall S. Crompton**<br>(See above for address) |

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Penny Baker**                                      represented by   **Eric D. Holland**
*individually and on behalf of decedent*                             (See above for address)
*Christine Eichenauer*                                               *LEAD ATTORNEY*
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Patrick R Dowd**
                                                                     (See above for address)
                                                                     *LEAD ATTORNEY*
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Randall S. Crompton**
                                                                     (See above for address)
                                                                     *LEAD ATTORNEY*
                                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Tim Eschbach**                                     represented by   **Eric D. Holland**
                                                                     (See above for address)
                                                                     *LEAD ATTORNEY*
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Patrick R Dowd**
                                                                     (See above for address)
                                                                     *LEAD ATTORNEY*
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Randall S. Crompton**
                                                                     (See above for address)
                                                                     *LEAD ATTORNEY*
                                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Anthony Evans**                                    represented by   **Eric D. Holland**
                                                                     (See above for address)
                                                                     *LEAD ATTORNEY*
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Patrick R Dowd**
                                                                     (See above for address)
                                                                     *LEAD ATTORNEY*
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Randall S. Crompton**
                                                                     (See above for address)
                                                                     *LEAD ATTORNEY*
                                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Carroll Fowler**                                   represented by   **Eric D. Holland**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Gregory Gordon**                     represented by **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Matthew Jacobson**                   represented by **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Kenneth Lemler**                     represented by **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Diane Niemi**                                    represented by    **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jarrett Papuneau**                               represented by    **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ronald Otis Petty**                              represented by    **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Diane B. Pesce**        represented by   **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Mary Rank**        represented by   **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Robert Rudolph**        represented by   **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**David Simmons**                    represented by **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jerry Skeem**                    represented by **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Robert Thackwray**                    represented by **Eric D. Holland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick R Dowd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randall S. Crompton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**                    represented by **Christine F. Miller**
HUSCH BLACKWELL, LLP
190 Carondelet Plaza

Suite 600
St. Louis, MO 63105
314-480-1500
Fax: 314-480-1505
Email: chris.miller@huschblackwell.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/17/2019 | 1 | NOTICE OF REMOVAL from Circuit Court of St. Louis County, case number 19SL-CC02331, with receipt number AMOEDC-7339321, in the amount of $400 Jury Demand,, filed by Monsanto Company. (Attachments: # 1 Exhibit 1 - State Court File, # 2 Civil Cover Sheet, # 3 Original Filing Form)(Miller, Christine) (Entered: 07/17/2019) |
| 07/17/2019 | 2 | NOTICE OF FILING NOTICE OF REMOVAL filed by Defendant Monsanto Company Sent To: Plaintiff (Miller, Christine) (Entered: 07/17/2019) |
| 07/18/2019 | 3 | Petition (Removal/Transfer) Received From: Circuit Court, St. Louis County, Missouri, filed by Anthony Evans, Robert Rudolph, Michael DeRobbio, Jarrett Papuneau, Howard Bulmer, David Simmons, Mike Bronzini, Ronald Otis Petty, Jerry Skeem, Diane Niemi, Gregory Gordon, Charles Crutcher, Jerry Burke, Penny Baker, Carroll Fowler, Mary Rank, Matthew Jacobson, Kenneth Lemler, Jeffrey Driscoll, Fred Burmeister, Robert Thackwray, Diane B. Pesce, Tim Eschbach, Melinda Cloud.(BAK) (Entered: 07/18/2019) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 07/18/2019 10:51:17 | | |
| **PACER Login:** | hllp1982 | **Client Code:** | 1417.0049 |
| **Description:** | Docket Report | **Search Criteria:** | 4:19-cv-02026 |
| **Billable Pages:** | 10 | **Cost:** | 1.00 |

IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
STATE OF MISSOURI

| | |
|---|---|
| **MIKE BRONZINI; HOWARD BULMER; JERRY BURKE; FRED BURMEISTER; MELINDA CLOUD; CHARLES CRUTCHER; MICHAEL DEROBBIO; JEFFERY DRISCOLL; PENNY BAKER, individually and on behalf of decedent, CHRISTINE EICHENAUER; TIM ESCHBACH; ANTHONY EVANS; CAROLL FOWLER; GREGORY GORDON; KENNETH LEMLER; RONALD OTIS PERRY; DIANE B. PESCE; MARY RANK; ROBERT RUDOLPH; DAVID SIMMONS; and JERRY SKEEM,**<br>          Plaintiffs,<br><br>v.<br><br>**MONSANTO COMPANY,**<br>          **Defendant.**<br>**Serve:  Registered Agent**<br>**CSC of St. Louis County, Inc.**<br>**130 South Bemiston Avenue Suite 700**<br>**Clayton, MO  63105** | Case No.: _____<br><br><br><br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

**PETITION**

COME NOW, Plaintiffs, by and through their undersigned counsel, and for their causes of

action against Defendant Monsanto Company, alleging the following upon information and belief

(including investigation made by and through Plaintiffs' counsel), except those allegations that

pertain to Plaintiffs, which are based on personal knowledge:

**INTRODUCTION**

Plaintiffs bring this cause of action against Defendant pursuant to Rule 52.05(a) of the Missouri Rules of Civil Procedure, as their claims arise out of the same series of transactions and occurrences, and their claims involve common questions of law and/or fact. All claims in this action are a direct and proximate result of Defendant's negligent, willful, and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, and/or sale of the products known as Roundup®. All Plaintiffs in this action seek recovery for damages as a result of developing a form of Non-Hodgkin's Lymphoma ("NHL"), which was directly and proximately caused by such wrongful conduct by Defendant, the unreasonably dangerous and defective nature of Roundup®, and its active ingredient, glyphosate, and/or its surfactant(s) or other ingredients and the attendant effects of developing NHL. All of the claims involve common questions of law and fact and share legal and medical issues that arise out of all of the Plaintiffs' exposure to Roundup®.

## THE PARTIES

### PLAINTIFFS

### *Mike Bronzini*

1.     Plaintiff Mike Bronzini is a citizen of the State of California and was born on September 25, 1970. Plaintiff Bronzini resides in the City of Redlands, County of San Bernardino.

2.     Plaintiff Bronzini was exposed to Roundup® in Grants Pass, Oregon beginning in approximately 1995 through approximately 2004 while applying Roundup® around his residence and surrounding property. Plaintiff Bronzini sprayed Roundup® which he purchased at the local hardware store and Home Depot.

3.     Plaintiff Bronzini was further exposed to Roundup® in Rochester, Washington beginning in approximately 2004 through approximately 2011 while applying Roundup® around

his residence and surrounding property. Plaintiff Bronzini sprayed Roundup®, which he purchased at Home Depot.

4.       On or about March 16, 2012, Plaintiff Bronzini was diagnosed with B-cell non-Hodgkin's lymphoma in Redlands, California at Beaver Medical Group - Redlands Main, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

5.       As a direct and proximate result of these injuries, Plaintiff Bronzini has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Bronzini has otherwise been damaged in a personal and pecuniary nature.

6.       During the entire time that Plaintiff Bronzini was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Howard Bulmer

7.       Plaintiff Howard Bulmer is a citizen of the State of Michigan and was born on February 19, 1958. Plaintiff Bulmer resides in the City of St. Louis, County of St. Louis.

8.       Plaintiff Bulmer was exposed to Roundup® in Belding, Michigan beginning in approximately 2013 through approximately 2017 while applying Roundup® around a raceway and his personal residence. Plaintiff Bulmer sprayed Roundup® which he purchased at the local hardware store.

9.       On or about November 2, 2016, Plaintiff Bulmer was diagnosed with diffuse large B-cell lymphoma, in Lansing, Michigan at Karmanos Cancer Institute, and suffered the effects

attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

10.     As a direct and proximate result of these injuries, Plaintiff Bulmer has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Bulmer has otherwise been damaged in a personal and pecuniary nature.

11.     During the entire time that Plaintiff Bulmer was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### *Jerry Burke*

12.     Plaintiff Jerry Burke is a citizen of the State of Texas and was born on October 5, 1950. Plaintiff Burke resides in the City of Arlington, County of Tarrant.

13.     Plaintiff Burke was exposed to Roundup® in Arlington, Texas beginning in approximately 2002 through approximately 2017 as the owner of a lawn care company and while applying Roundup® around his residence. Plaintiff Burke sprayed Roundup® which he purchased at Home Depot and a landscape supply store.

14.     On or about March 4, 2011, Plaintiff Burke was diagnosed with extranodal marginal zone B-cell lymphoma, in Arlington, Texas at the Medical Center of Arlington, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

15.    As a direct and proximate result of these injuries, Plaintiff Burke has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Burke has otherwise been damaged in a personal and pecuniary nature.

16.    During the entire time that Plaintiff Burke was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Fred Burmeister

17.    Plaintiff Fred Burmeister is a citizen of the State of Texas and was born on December 30, 1954.  Plaintiff Burmeister resides in the City of Houston, County of Harris.

18.    Plaintiff Burmeister was exposed to Roundup® in Houston, Texas beginning in approximately 1990 through approximately 1999 while applying Roundup® around his personal residence and surrounding property.   Plaintiff Burmeister sprayed Roundup® which he purchased at Walmart.

19.    Plaintiff Burmeister was further exposed to Roundup® in Houston, Texas beginning in approximately 1990 through approximately 1999 while applying Roundup® around commercial fence lines and parking lots while working as the groundskeeper for a manufacturing company. Plaintiff Burmeister sprayed Roundup® provided by his employer.

20.    On or about August 4, 2010, Plaintiff Burmeister was diagnosed with marginal zone B-cell lymphoma in Kingwood, Texas, at Greater Houston Cancer Clinic, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

21.     As a direct and proximate result of these injuries, Plaintiff Burmeister has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Burmeister has otherwise been damaged in a personal and pecuniary nature.

22.     During the entire time that Plaintiff Burmeister was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### *Melinda Cloud*

23.     Plaintiff Melinda Cloud is a citizen of the State of Michigan and was born on January 29, 1953.  Plaintiff Cloud resides in the City of Grand Rapids, County of Kent.

24.     Plaintiff Cloud was exposed to Roundup® in Grand Rapids, Michigan beginning in approximately 1976 through approximately 2011 while applying Roundup® around her residence and surrounding property.  Plaintiff Cloud sprayed Roundup® which she purchased at the local hardware store.

25.     On or about November 26, 2008, Plaintiff Cloud was diagnosed with diffuse large B-cell lymphoma in Grand Rapids, Michigan at the Cancer and Hematology Center of Western Michigan, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

26.     As a direct and proximate result of these injuries, Plaintiff Cloud has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Cloud has otherwise been damaged in a personal and pecuniary nature.

27. During the entire time that Plaintiff Cloud was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

### Charles Crutcher

28. Plaintiff Charles Crutcher is a citizen of the State of Texas and was born on September 12, 1964. Plaintiff Crutcher resides in the City of Terrell, County of Kaufman.

29. Plaintiff Crutcher was exposed to Roundup® in Terrell, Texas beginning in approximately 1982 through approximately 2017 while applying Roundup® around his residence and workplace. Plaintiff Crutcher sprayed Roundup® which he purchased at Walmart.

30. On or about August 21, 2015, Plaintiff Crutcher was diagnosed with chronic lymphocytic leukemia in Mesquite, Texas at Texas Oncology - Mesquite, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

31. As a direct and proximate result of these injuries, Plaintiff Crutcher has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Crutcher has otherwise been damaged in a personal and pecuniary nature.

32. During the entire time that Plaintiff Crutcher was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Michael DeRobbio

33. Plaintiff Michael DeRobbio is a citizen of the State of Rhode Island and was born on March 9, 1944. Plaintiff DeRobbio resides in the City of Johnston, County of Providence.

34.     Plaintiff DeRobbio was exposed to Roundup® in Cranston, Rhode Island beginning in approximately 1984 through approximately 1995 while applying Roundup® around his residence and surrounding property.  Plaintiff DeRobbio sprayed Roundup® which he purchased at Home Depot and Lowe's.

35.     Plaintiff DeRobbio was further exposed to Roundup® in West Warwick, Rhode Island beginning in approximately 1995 through approximately 2010 while applying Roundup® around his residence and surrounding property.  Plaintiff DeRobbio sprayed Roundup® which he purchased at Home Depot and Lowe's.

36.     On or about March 20, 2009, Plaintiff DeRobbio was diagnosed with diffuse large B-cell lymphoma in Providence, Rhode Island at The Miriam Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

37.     As a direct and proximate result of these injuries, Plaintiff DeRobbio has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff DeRobbio has otherwise been damaged in a personal and pecuniary nature.

38.     During the entire time that Plaintiff DeRobbio was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### *Jeffrey Driscoll*

39.     Plaintiff Jeffrey Driscoll is a citizen of the State of Wisconsin and was born on August 8, 1961.  Plaintiff Driscoll resides in the City of Middleton, County of Dane.

40.     Plaintiff Driscoll was exposed to Roundup® in Middleton, Wisconsin beginning in 2000 through 2017 while applying Roundup® around his residence and surrounding property. Plaintiff Driscoll sprayed Roundup® which he purchased at Home Depot.

41.     On or about June 21, 2017, Plaintiff Driscoll was diagnosed with diffuse large B-cell lymphoma in Madison, Wisconsin at the University of Wisconsin Hospital and Clinics, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

42.     As a direct and proximate result of these injuries, Plaintiff Driscoll has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Driscoll has otherwise been damaged in a personal and pecuniary nature.

43.     During the entire time that Plaintiff Driscoll was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Penny Baker on behalf of Christine Eichenauer

44.     Plaintiff Penny Baker, an adult whose principal place of residence is Sioux Falls, South Dakota, brings this action in her capacity as the surviving child and anticipated personal representative of the estate of Christine Eichenauer.  Plaintiff Baker is pursuing this action due to the wrongfully caused premature death of Christine Eichenauer on behalf of the decedent's estate. The premature death of Christine Eichenauer was the direct and proximate result of her use of Defendant's Roundup® product and subsequent non-Hodgkin's lymphoma diagnosis.  Plaintiff

Baker seeks damages for decedent's loss of future earnings, loss of support, loss of consortium and other damages as allowed by law.

45.    Christine Eichenauer was a resident of the State of South Dakota at the time of her injury and at the time of her death on October 11, 2016. Ms. Eichenauer was born on February 5, 1950.

46.    Ms. Eichenauer was exposed to Roundup® in Rapid City, South Dakota beginning in approximately 1995 through approximately 2006 while applying Roundup® around her residence and surrounding property. Ms. Eichenauer sprayed Roundup® which she purchased at her local farm supply store and Walmart stores.

47.    Ms. Eichenauer was further exposed to Roundup® in Sioux Falls, South Dakota beginning in approximately 2007 through approximately 2014 while applying Roundup® around her residence and surrounding property. Ms. Eichenauer sprayed Roundup® which she purchased at her local farm supply store and Walmart stores.

48.    On or about December 18, 2012, Ms. Eichenauer was diagnosed with mantle cell lymphoma in Sioux Falls, South Dakota at Avera McKennan Hospital & University Health Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

49.    As a direct and proximate result of these injuries, Plaintiff Penny Baker on behalf of Christine Eichenauer, incurred medical expenses and endured pain and suffering and loss of enjoyment of life. Plaintiff Penny Baker, individually, and on behalf of Christine Eichenauer has otherwise been damaged in a personal and pecuniary nature.

50.     During the entire time that Christine Eichenauer was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

### Tim Eschbach

51.     Plaintiff Tim Eschbach is a citizen of the State of Pennsylvania and was born on December 8, 1958. Plaintiff Eschbach resides in the City of Pennsburg, County of Montgomery.

52.     Plaintiff Eschbach was exposed to Roundup® in Pennsburg, Pennsylvania beginning in approximately 1980 through approximately 2017 while applying Roundup® around his residence and surrounding property. Plaintiff Eschbach sprayed Roundup® which he purchased at Lowe's.

53.     On or about July 17, 2015, Plaintiff Eschbach was diagnosed with follicular lymphoma in Philadelphia, Pennsylvania at Perelman Center for Advanced Medicine and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

54.     As a direct and proximate result of these injuries, Plaintiff Eschbach has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Eschbach has otherwise been damaged in a personal and pecuniary nature.

55.     During the entire time that Plaintiff Eschbach was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

*Anthony Evans*

56.     Plaintiff Anthony Evans is a citizen of the State of Texas and was born on February 26, 1984.  Plaintiff Evans resides in the City of Mesquite, County of Dallas.

57.     Plaintiff Evans was exposed to Roundup® in Alton, Illinois beginning in approximately 2001 through approximately 2014 while applying Roundup® around sidewalks, driveways, and fence lines as a landscaper.  Plaintiff Evans sprayed Roundup® supplied by his employer.

58.     On or about April 16, 2008, Plaintiff Evans was diagnosed with follicular large B-cell non-Hodgkin's lymphoma in St. Louis, Missouri at Barnes Jewish Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

59.     As a direct and proximate result of these injuries, Plaintiff Evans has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Evans has otherwise been damaged in a personal and pecuniary nature.

60.     During the entire time that Plaintiff Evans was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

*Carroll Fowler*

61.     Plaintiff Carroll Fowler is a citizen of the State of Texas and was born on January 20, 1951.  Plaintiff Fowler resides in the City of Texarkana, County of Bowie.

62.     Plaintiff Fowler was exposed to Roundup® in Texarkana, Texas beginning in approximately 1976 through approximately 2013 while applying Roundup® around her residence and surrounding property. Plaintiff Fowler sprayed Roundup® which she purchased at Kmart, Lowe's, and Sears.

63.     On or about May 10, 2010, Plaintiff Fowler was diagnosed with chronic lymphocytic leukemia in Texarkana, Texas at the office of Dr. Edward Eichler, Jr., and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

64.     As a direct and proximate result of these injuries, Plaintiff Fowler has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Fowler has otherwise been damaged in a personal and pecuniary nature.

65.     During the entire time that Plaintiff Fowler was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

### *Gregory Gordon*

66.     Plaintiff Gregory Gordon is a citizen of the State of Texas and was born on September 16, 1958.  Plaintiff Gordon resides in the City of Victoria, County of Victoria.

67.     Plaintiff Gordon was exposed to Roundup® in Victoria, Texas beginning in approximately 1980 through 2018 while applying Roundup® around his family's farm. Plaintiff Gordon sprayed concentrate Roundup® which he purchased at his local feed store.

68.     On or about September 10, 2010, Plaintiff Gordon was diagnosed with  B-cell lymphoma in Houston, Texas, at MD Anderson Cancer Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

69.     As a direct and proximate result of these injuries, Plaintiff Gordon has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Gordon has otherwise been damaged in a personal and pecuniary nature.

70.     During the entire time that Plaintiff Gordon was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### *Matthew Jacobson*

71.     Plaintiff Matthew Jacobson is a citizen of the State of Minnesota and was born on November 30, 1975.  Plaintiff Jacobson resides in the City of Inver Grove Heights, County of Dakota.

72.     Plaintiff Jacobson was exposed to Roundup® in Eagan, Minnesota beginning in approximately 1988 through approximately 1994 while applying Roundup® around his family home, under his parents' direction and supervision.  Plaintiff Jacobson sprayed Roundup® which his parents purchased at Home Depot.

73.     Plaintiff Jacobson was further exposed to Roundup® in Eagan, Minnesota beginning in approximately 1995 through approximately 2013 while applying Roundup® around his parents' residence.  Plaintiff Jacobson sprayed Roundup®, which he purchased at Home Depot.

74.     On or about September 22, 2017, Plaintiff Jacobson was diagnosed with anaplastic large cell lymphoma in St. Paul, Minnesota at Regions Hospital and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

75.     As a direct and proximate result of these injuries, Plaintiff Jacobson has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Jacobson has otherwise been damaged in a personal and pecuniary nature.

76.     During the entire time that Plaintiff Jacobson was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### *Kenneth Lemler*

77.     Plaintiff Kenneth Lemler is a citizen of the State of Michigan and was born on July 14, 1957.  Plaintiff Lemler resides in the City of St. Clair, County of St. Clair.

78.     Plaintiff Lemler was exposed to Roundup® in Clinton Township, Michigan beginning in approximately 2007 through approximately 2011 while applying Roundup® around curbsides, parking areas, and buildings in the course of his employment. Plaintiff Lemler sprayed Roundup®, which was supplied by his employer.

79.     On or about December 14, 2010, Plaintiff Lemler was diagnosed with large B-cell lymphoma in Allegan, Michigan at Allegan General Hospital, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

80.     As a direct and proximate result of these injuries, Plaintiff Lemler has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Lemler has otherwise been damaged in a personal and pecuniary nature.

81.     During the entire time that Plaintiff Lemler was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### *Diane Niemi*

82.     Plaintiff Diane Niemi is a citizen of the State of Michigan and was born on January 20, 1965.  Plaintiff Niemi resides in Clay Township, County of St. Clair.

83.     Plaintiff Niemi was exposed to Roundup® in Harrison Township, Michigan beginning in approximately 1988 through approximately 1992 while applying Roundup® around her residence and surrounding property.  Plaintiff Niemi sprayed Roundup®, which she purchased at her local hardware store.

84.     Plaintiff Niemi was further exposed to Roundup® in Warren, Michigan beginning in approximately 1992 through approximately 2001 while applying Roundup® around her residence and surrounding property. Plaintiff Niemi sprayed Roundup® which she purchased at her local hardware store.

85.     Plaintiff Niemi was further exposed to Roundup® in Cottrellville Township, Michigan beginning in approximately 2001 through approximately 2010 while applying Roundup® around her residence and surrounding property.  Plaintiff Niemi sprayed Roundup® which she purchased at her local hardware store.

86.     In or about March  2006, Plaintiff Niemi was diagnosed with follicular lymphoma in East Lansing, Michigan at Michigan State University Hospital, and suffered the effects attendant

thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

87.    As a direct and proximate result of these injuries, Plaintiff Niemi has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Niemi has otherwise been damaged in a personal and pecuniary nature.

88.    During the entire time that Plaintiff Niemi was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

### *Jarrett Papuneau*

89.    Plaintiff Jarrett Papuneau is a citizen of the State of Illinois and was born on September 16, 1959.  Plaintiff Papuneau resides in the City of Ottawa, County of Lasalle.

90.    Plaintiff Papuneau was exposed to Roundup® in Ottawa, Illinois beginning in the mid-1970s through 1980 while applying Roundup® around her family's farm.  Plaintiff Papuneau's sprayed Roundup® provided by her father.

91.    On or about June 1, 2010, Plaintiff Papuneau was diagnosed with large B-cell non-Hodgkin's lymphoma in Ottawa, Illinois at Fox River Cancer Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

92.    As a direct and proximate result of these injuries, Plaintiff Papuneau has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering

and loss of enjoyment of life, and Plaintiff Papuneau has otherwise been damaged in a personal and pecuniary nature.

93.     During the entire time that Plaintiff Papuneau was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

### *Ronald Otis Perry*

94.     Plaintiff Ronald Otis Perry is a citizen of the State of Texas and was born on May 30, 1957.  Plaintiff Perry resides in the City of Pearland, County of Brazoria.

95.     Plaintiff Perry was exposed to Roundup® in Houston, Texas beginning in approximately 1985 through approximately 2008 while applying Roundup® around his residence and on construction job sites in connection with his employment. Plaintiff Perry sprayed Roundup® which he purchased at Home Depot.

96.     Plaintiff Perry was further exposed to Roundup® in Pearland, Texas beginning in approximately 2008 through approximately 2017 while applying Roundup® around his residence and on construction job sites in connection with his employment. Plaintiff Perry sprayed Roundup® which he purchased at Home Depot.

97.     On or about December 9, 2005, Plaintiff Perry was diagnosed with low-grade B-cell lymphoma in Houston, Texas at MD Anderson Cancer Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

98.     As a direct and proximate result of these injuries, Plaintiff Perry has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and

loss of enjoyment of life, and Plaintiff Perry has otherwise been damaged in a personal and pecuniary nature.

99.     During the entire time that Plaintiff Perry was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Diane B. Pesce

100.     Plaintiff Diane B. Pesce is a citizen of the State of New Jersey and was born on January 8, 1957.  Plaintiff Pesce resides in the City of Dumont, County of Bergen.

101.     Plaintiff Pesce was exposed to Roundup® in Closter, New Jersey beginning in approximately 1985 through approximately 2016 while applying Roundup® around her front yard, back yard, driveway, and patio.  Plaintiff Pesce sprayed Roundup® which she purchased at her local hardware, Sears, Home Depot, and Lowe's stores.

102.     Plaintiff Pesce was further exposed to Roundup® in Dumont, New Jersey beginning in approximately 2016 through 2017 while applying Roundup® around her residence and surrounding property.  Plaintiff Pesce sprayed Roundup® which she purchased at Lowe's.

103.     On or about August 11, 2017, Plaintiff Pesce was diagnosed with non-Hodgkin's marginal lymphoma in Westwood, New Jersey at Quest Diagnostics, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

104.     As a direct and proximate result of these injuries, Plaintiff Pesce has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and

loss of enjoyment of life, and Plaintiff Pesce has otherwise been damaged in a personal and pecuniary nature.

105.   During the entire time that Plaintiff Pesce was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to her health or the health of others.

*Mary Rank*

106.   Plaintiff Mary Rank is a citizen of the State of Michigan and was born on July 14, 1957.   Plaintiff Rank resides in the City of St. Clair, County of St. Clair.

107.   Plaintiff Rank was exposed to Roundup® in Clinton Township, Michigan beginning in approximately 2007 through approximately 2011 while applying Roundup® around curbsides, parking areas, and buildings in connection with her employment. Plaintiff Rank sprayed Roundup® which was supplied to her by her employer.

108.   On or about January 17, 2017, Plaintiff Rank was diagnosed with diffuse large B-cell lymphoma in Detroit, Michigan at Karmanos Cancer Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

109.   As a direct and proximate result of these injuries, Plaintiff Rank has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Rank has otherwise been damaged in a personal and pecuniary nature.

110.   During the entire time that Plaintiff Rank was exposed to Roundup®, she did not know that exposure to Roundup® was injurious to his health or the health of others.

### Robert Rudolph

111.     Plaintiff Robert Rudolph is a citizen of the State of Indiana and was born on July 30, 1979.  Plaintiff Rudolph resides in the City of Booneville, County of Warrick.

112.     Plaintiff Rudolph was exposed to Roundup® in Aurora, Illinois beginning in approximately 1990 through approximately of 1999 while applying Roundup® around his residence, fence line, back yard, and front yard.  Plaintiff Rudolph sprayed concentrate Roundup® which he purchased at Walmart.

113.     In or about January, 2000, Plaintiff Rudolph was diagnosed with B-cell  non-Hodgkin's lymphoma in Indiana, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

114.     As a direct and proximate result of these injuries, Plaintiff Rudolph has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Rudolph has otherwise been damaged in a personal and pecuniary nature.

115.     During the entire time that Plaintiff Rudolph was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### David Simmons

116.     Plaintiff David Simmons is a citizen of the State of Iowa and was born on February 27, 1955.  Plaintiff Simmons resides in the City of Ankeny, County of Poke.

117.     Plaintiff Simmons was exposed to Roundup® in Ankeny, Iowa beginning in approximately 1988 through approximately 2018 while applying Roundup® around his residence,

fence line, backyard, and front yard.  Plaintiff Simmons sprayed concentrate Roundup® which he purchased at Walmart and Target.

118.   On or about November 23, 2005, Plaintiff Simmons was diagnosed with mantle cell lymphoma in Des Moines, Iowa at Mercy Medical Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

119.   As a direct and proximate result of these injuries, Plaintiff Simmons has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Simmons has otherwise been damaged in a personal and pecuniary nature.

120.   During the entire time that Plaintiff Simmons was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Jerry Skeem

121.   Plaintiff Jerry Skeem is a citizen of the State of Utah and was born on November 23, 1958.  Plaintiff Skeem resides in the City of Delta, County of Millard.

122.   Plaintiff Skeem was exposed to Roundup® in Delta, Utah beginning in the early 1980s through approximately 2016 while applying Roundup® around his residence and farm. Plaintiff Skeem sprayed Roundup® which he purchased at his local farm store.

123.   On or about March 13, 2017, Plaintiff Skeem was diagnosed with diffuse large B-cell lymphoma in St. George, Utah at Southwest Skin & Cancer, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of

Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

124.     As a direct and proximate result of these injuries, Plaintiff Skeem has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Skeem has otherwise been damaged in a personal and pecuniary nature.

125.     During the entire time that Plaintiff Skeem was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### *Robert Thackwray*

126.     Plaintiff Robert Thackwray is a citizen of the State of Texas and was born on July 21, 1957.  Plaintiff Thackwray resides in the City of Lampasas, County of Lampasas.

127.     Plaintiff Thackwray was exposed to Roundup® in Fort Campbell, Kentucky beginning in approximately 1985 through approximately 1987 while applying Roundup® around barracks, diner facilities, and lawns when he worked as a facilities manager for the U.S. Army. Plaintiff Thackwray sprayed Roundup® provided to him by the U.S. Army.

128.     Plaintiff Thackwray was further exposed to Roundup® in Fort Jackson, South Carolina beginning in approximately 1987 through approximately 1994 while applying Roundup® around barracks, diner facilities, and lawns when he worked as a facilities manager for the U.S. Army.  Plaintiff Thackwray sprayed Roundup® provided to him by the U.S. Army.

129.     Plaintiff Thackwray was further exposed to Roundup® in Fort Hood, TX beginning in approximately 1996 through approximately 1998 while applying Roundup® around barracks, diner facilities, and lawns when he worked as a facilities manager for the U.S. Army.  Plaintiff Thackwray sprayed Roundup® provided to him by the U.S. Army.

130.    Plaintiff Thackwray was further exposed to Roundup® in Cooper's Cove, Texas, beginning in approximately 2001 through approximately 2003 while applying Roundup® in his maintenance job in a mobile home park. Plaintiff Thackwray sprayed Roundup® provided to him by his employer.

131.    Plaintiff Thackwray was further exposed to Roundup® in Guantanamo Bay, Cuba beginning in approximately 2005 through approximately 2011 while applying Roundup® around diner facilities. Plaintiff Thackwray sprayed Roundup® provided to him by the U.S. Navy.

132.    On or about February 22, 2016, Plaintiff Thackwray was diagnosed with diffuse large B-cell lymphoma in Killeen, Texas at Metroplex Health System, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup®.

133.    As a direct and proximate result of these injuries, Plaintiff Thackwray has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Plaintiff Thackwray has otherwise been damaged in a personal and pecuniary nature.

134.    During the entire time that Plaintiff Thackwray was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### DEFENDANT MONSANTO

135.    Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.   At all relevant times, Monsanto also regularly conducted, transacted, and solicited business in St. Louis, Missouri, as

well as in all States of the United States. Monsanto's world headquarters are located at 800 Lindbergh Boulevard in St. Louis, Missouri, County of St. Louis.

136.    At all times relevant to this Petition, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup® products, which contains the active ingredient glyphosate and surfactants including Polyethoxylated tallow amine (POEA), as well as adjuvants and other "inert" ingredients.  On information and belief, important scientific, manufacturing, marketing, sales and other business decisions regarding Roundup® were made from and in the State of Missouri and contributed to Defendant's wrongdoing as to each plaintiff herein.

137.    At all times relevant to this Petition, Monsanto was engaged in the business of manufacturing, marketing, testing, promoting, selling, and/or distributing Roundup® in the State of Missouri.

138.    At all relevant times, Monsanto had, and continues to have, regular and systematic contact with and conducts business in and from the State of Missouri, such that it has purposefully availed itself of the laws of the State and expects to both sue and be sued in Missouri.  Further, Monsanto's agent for services of process is located in St. Louis County.   In the alternative, Monsanto's presence in the State of Missouri satisfies the due process requirements for Missouri courts to exercise jurisdiction over it.   In the alternative, Monsanto's domicile in the State of Missouri satisfies the due process requirements for Missouri courts to exercise jurisdiction over it.

139.    Moreover, Defendant is further subject to the personal jurisdiction of this state and court in that Defendant has purposefully and systematically selected the State of Missouri as its venue of choice when suing its own customers or seeking relief for its own interests, having filed over 100 cases in the State of Missouri.

140.    Defendant's development, marketing, promotion, labeling, and packaging analyses and decisions for its Roundup® occurred in and came from St. Louis, Missouri, which is also the location where Defendant worked on the regulatory approval for Roundup®. The cause of action for each plaintiff herein related to or arose from Defendant's Missouri-based conduct.

## VENUE

141.    Venue is proper in this Court pursuant to Mo. Rev. Stat. § 508.010.5, which provides:

> Notwithstanding any other provisions of law, in all actions in which there is any count alleging a tort and in which the plaintiff was first injured outside the state of Missouri, venue shall be determined as follows:
>
> (1) If the defendant is a corporation, then venue shall be in any county where a defendant corporation's registered agent is located or, if the plaintiff's principal place of residence was in the state of Missouri on the date the plaintiff was first injured, then venue may be in the county of the plaintiff's principal place of residence on the date the plaintiff was first injured;

## ALLEGATIONS COMMON TO ALL COUNTS

142.    In 1970, Defendant Monsanto discovered the herbicidal properties of glyphosate and began marketing it in products in 1974, under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. In addition to the active ingredient glyphosate, Roundup® contains surfactants including POEA and/or adjuvants and other so-called "inert" ingredients. In 2001, glyphosate was the most-used pesticide active ingredient in American agriculture with 85–90 million pounds used annually. That number grew to 185 million pounds by 2007.[1] As of 2013, glyphosate was the world's most widely used herbicide.

---

[1] Arthur Grube, et al., U.S. Envtl. Prot. Agency, *Pesticides Industry Sales and Usage, 2006-2007 Market Estimates,*

143. Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri, and incorporated in Delaware. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market.[2] The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming the crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.[3]

144. Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops.[4] They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams and groundwater in agricultural areas where Roundup® is used.[5] It has been found in food,[6] in the urine of agricultural workers[7] and even in the urine of urban dwellers who are not in direct contact with glyphosate.[8]

---

14, (2011) *available at* http://www.epa.gov/pesticides/pestsales/07pestsales/market_estimates2007.pdf.
[2] ETC Group, *Who Will Control the Green Economy?*, 22, (2011) *available at* http://www.etcgroup.org/files/publication/pdf_file/ETC_wwctge_4web_Dec2011.pdf.
[3] William Neuman and Andrew Pollack, *Farmers Cope with Roundup-Resistant Weeds*, N.Y. TIMES, May 3, 2010, *available at* http://www.nytimes.com/2010/05/04/business/energy-environment/04weed.html?pagewan.
[4] Monsanto, *Backgrounder-History of Monsanto's Glyphosate Herbicides*, (Sept. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/back_history.pdf.
[5] *See:* U.S. Geological Survey, *USGS Technical Announcement: Widely Used Herbicide Commonly Found in Rain and Streams in the Mississippi River Basin*, 2011, *available at* http://www.usgs.gov/newsroom/article.asp?ID=2909; *see also:* U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate, available at* http://www.epa.gov/safewater/pdfs/factsheets/soc/tech/glyphosa.pdf.
[6] Thomas Bohn, et al., *Compositional Differences in Soybeans on the Market: Glyphosate Accumulates in Roundup Ready GM Soybeans*, 153 FOOD CHEMISTRY, 207, (2013), *available at* http://www.sciencedirect.com/science/article/pii/S0308814613019201.
[7] John F. Acquavella, et al., *Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study*, 112(3) ENVIRONMENTAL HEALTH PERSPECTIVE, 321, (2004) *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241861/; Guyton, et al. *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon and Glyphosate*, 112 IARC Monographs , 76, section 5.4 (2015) *available at* http://dx.doi.org/10.1016/S1470-2045(15)70134-8.
[8] Dirk Brändli & Sandra Reinacher, *Herbicides found in Human Urine*, 1 ITHAKA JOURNAL, 270 (2012), *available at* http://www.ithaka-journal.net/druckversionen/e052012-herbicides-urine.pdf.

145.     On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

146.     On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

147.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is *probably carcinogenic to humans*. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other hematopoietic cancers, including lymphocytic lymphoma, chronic lymphocytic leukemia, B-cell lymphoma and multiple myeloma.[9]

148.     The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

149.     Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

---

[9] *See* Guyton, et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon and Glyphosate, supra.*

## FACTS

150.    Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

151.    Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking or brewing grains.

152.    For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. According to the WHO, the main chemical ingredient of Roundup®—glyphosate—is a probable cause of cancer. Those at risk include farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries and landscapers. Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed Roundup®'s dangers. Monsanto has led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® is safe.

### The Discovery of Glyphosate and Development of Roundup®

153.    The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®.[10] From the outset, Monsanto marketed Roundup® as a

---

[10] Monsanto, *Backgrounder-History of Monsanto's Glyphosate Herbicide*, Monsanto, (Sept. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background- materials/back_history.pdf.

"safe" general-purpose herbicide for widespread commercial and consumer use. It still markets Roundup® as safe today.[11]

154.    In addition to the active ingredient glyphosate, Roundup® formulations also contain adjuvants and other chemicals, such as the surfactant POEA, which are considered "inert" and therefore protected as "trade secrets" in manufacturing.   Growing evidence suggests that these adjuvants and additional components of Roundup® formulations are not, in fact, inert and are toxic in their own right.

### *Registration of Herbicides under Federal Law*

155.    The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale or use, except as described by the Act. 7 U.S.C. § 136a(a).

156.    Because pesticides are toxic to plants, animals and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

---

[11] Monsanto, *What is Glyphosate?* (Sept. 2, 2015),
http://www.monsanto.com/sitecollectiondocuments/glyphosate-safety-health.pdf.

157.    FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

158.    The EPA and the State of Missouri registered Roundup® for distribution, sale and manufacture in the United States and the State of Missouri.

159.    FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conduct the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able to perform the product tests that are required of the manufacturer.

160.    The evaluation of each pesticide product distributed, sold or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

161.    In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment —in relation to the reregistration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the World Health Organization's health-related

findings. In December 2017, the EPA released a draft risk assessment for glyphosate, allowing a comment period through April 30, 2018. The EPA is scheduled to publish the interim registration review decision for glyphosate in 2019.

### Scientific Fraud Underlying the Marketing and Sale of Glyphosate/ Roundup®

162.    Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."[12]

163.    On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

164.    In the first instance, Monsanto, in seeking initial registration of Roundup® by the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®.[13] IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

165.    In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the

---

[12] U.S. Envtl. Prot. Agency, *Memorandum, Subject: SECOND Peer Review of Glyphosate*, 1, (1991) *available at* http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_30-Oct-91_265.pdf.
[13] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories* (Sept. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/ibt_craven_bkg.pdf.

toxicology studies conducted for the Roundup® herbicide to be invalid.[14] An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[15]

166.    Three top executives of IBT were convicted of fraud in 1983.

167.    In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.[16]

168.    Despite the falsity of the tests that underlie its registration, within a few years of its launch, Roundup® was being marketed in 115 countries.

### The Importance of Roundup® to Monsanto's Market Dominance and Profits

169.    The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

---

[14] U.S. Envtl. Prot. Agency, *Summary of the IBT Review Program Office of Pesticide Programs* (1983), *available at* http://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA&Index=1981+Thru +1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&QF ieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5CZyfiles %5CIndex%20Data%5C81thru85%5CTxt%5C00000022%5C91014ULV.txt&User=ANONYMOUS&Password=an onymous&SortMethod=h%7CMaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g1 6/i425&Display=p%7Cf&DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20pa ge&MaximumPages=1&ZyEntry=1&SeekPage=x&ZyPURL.
[15] Marie-Monique Robin, *The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply* (2011) (citing U.S. Envtl. Prot. Agency, *Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch. Washington, D.C.* (August 9, 1978.)).
[16] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories, supra.*

170.    In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

171.    Through a three-pronged strategy of increasing production, decreasing prices and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue.[17] Today, glyphosate remains one of the world's largest herbicides by sales volume.

### *Monsanto Has Known for Decades That It Falsely Advertised the Safety of Roundup®*

172.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on, glyphosate-based herbicides, including Roundup®, were **"safer than table salt"** and **"practically non-toxic"** to mammals, birds and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

> a)      "Remember that environmentally friendly Roundup
> herbicide is biodegradable. It won't build up in the soil so you can

---

[17] David Barboza, *The Power of Roundup; A Weed Killer Is a Block for Monsanto to Build On*, N.Y. TIMES, Aug. 2, 2001, *available at* http://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weed-killer-is-a-block-for-monsanto-to-build-on.html.

use Roundup with confidence along customers' driveways, sidewalks and fences ..."

b)    "And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem."

c)    "Roundup biodegrades into naturally occurring elements."

d)    "Remember that versatile Roundup herbicide stay where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e)    "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it."

f)    "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

g)    "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

h)    "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non- toxic' as it pertains to mammals, birds and fish."

i)    "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[18]

173.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with the NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a)    Its glyphosate-containing pesticide products or any

---

[18] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

component thereof are safe, non-toxic, harmless or free from risk

...

    b)    Its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

...

    c)    Its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means

...

    d)    Its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics".

...

    e)    Glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides.

    f)    Its glyphosate-containing products or any component thereof might be classified as "practically non-toxic".

174.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[19]

### *Classifications and Assessments of Glyphosate*

175.    The IARC process for the classification of glyphosate followed the IARC's stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 1,013 agents. Of those reviewed, it has determined 120 agents to be Group 1 (Known Human Carcinogens); 82 agents to be Group 2A (Probable Human Carcinogens); 311 agents to be Group 2B (Possible Human Carcinogens); 499 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

---

[19] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.

176.    The established procedure for the IARC Monograph evaluations is described in the IARC Programme's Preamble.[20] Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

177.    One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in *The Lancet Oncology*, and within one year after the meeting, the finalized Monograph is published.

178.    In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review.

179.    In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent, probably carcinogenic in humans.

180.    On July 29, 2015, the IARC issued its Monograph for glyphosate, Monograph Volume 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at the IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year

---

[20] World Health Org., *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble,* (2006), *available at* http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

181.    The studies considered the following exposure groups: (1) occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and (2) para-occupational exposure in farming families.

182.    Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007, and the most heavily used herbicide in the world in 2012.

183.    Exposure pathways are identified as air (especially during spraying), dermal, water and food. Community exposure to glyphosate is widespread and found in soil, air, surface water and groundwater, as well as in food.

184.    The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

185.    The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

186.    The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

187.    In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor: renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

188.    The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

189.    The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

190.    The IARC Working Group also noted genotoxic, hormonal and enzymatic effects in mammals exposed to glyphosate.[21] Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

191.    The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.[22]

---

[21] Guyton, et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra* at 77.

[22] Anneclare J. DeRoos, et al., *Cancer Incidence Among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study*, 113 ENVTL HEALTH PERSPECTIVES 49-54 (2005), *available at* hhtp://www.ncbi.nlm.nih.gov/pmc/articles/PMC1253709/pdf/ehp0113-000049.pdf.

While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and multiple myeloma, hairy cell leukemia (HCL) and chronic lymphocytic leukemia (CLL), in addition to several other cancers.

### Other Earlier Findings About Glyphosate's Dangers to Human Health

192.    The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport, storage, and disposal.[23]

193.    In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.[24]

---

[23] U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate, supra.*
[24] Caroline Cox, *Glyphosate, Part 2: Human Exposure and Ecological Effects,* 15 J. PESTICIDE REFORM 4 (1995); W.S. Peas, et al., *Preventing pesticide-related illness in California agriculture: Strategies and priorities.*

### The Toxicity of Other Ingredients in Roundup®

194.    In addition to the toxicity of the active ingredient, glyphosate, several studies support the hypothesis that the glyphosate-based formulation in Defendant's Roundup® products is more dangerous and toxic than glyphosate alone. Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.[25]

195.    In 2002, a study by Julie Marc, entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation", revealed that Roundup® causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cell cycles.[26]

196.    A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation. The researchers noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."[27]

197.    In 2005, a study by Francisco Peixoto, entitled "Comparative effects of the Roundup® and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup®'s effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone. The Peixoto study further suggested that the harmful effects of Roundup® on

*Environmental Health Policy Program Report,* Univ. of Cal. School of Public Health, Calif. Policy Seminar (1993).
[25] T.T. Martinez and K. Brown, *Oral and pulmonary toxicology of the surfactant used in Roundup herbicide,* PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991).
[26] Julie Marc, et al., *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation,* 15 CHEM. RES. TOXICOL. 326-331 (2002), *available at* http://pubs.acs.org/doi/full/10.1021/tx015543g.
[27] Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation,* 96 BIOLOGY OF THE CELL 245, 245-249 (2004), *available at* http://onlinelibrary.wiley.com/doi/10.1016/j.biolcel.2003.11.010/epdf.

mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant POEA, or in the alternative, due to the potential synergistic effect between glyphosate and other ingredients in the Roundup® formulation.[28]

198.    In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup® and glyphosate on human umbilical, embryonic and placental cells. The study tested dilution levels of Roundup® and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food. The researchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability and amplify toxicity of glyphosate alone. The researchers further suggested that assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants present in Roundup® are not, in fact, "inert" and that Roundup® is potentially far more toxic than its active ingredient glyphosate alone.[29]

199.    The results of these studies were at all times available to Defendant.

200.    Monsanto's chief toxicologist Donna Farmer has admitted that she cannot say that Roundup® does not cause cancer because Monsanto has not performed carcinogenicity studies with the formulated product Roundup®, the very product that caused Plaintiffs' NHL.[30] She further admitted that in the 35 years that Monsanto has marketed Roundup® to the public, Monsanto has

---

[28] Francisco Peixoto, *Comparative effects of the Roundup and Glyphosate on mitochondrial oxidative phosphorylation*, 61 CHEMOSPHERE 1115, 1122 (2005), *available at*
https://www.researchgate.net/publication/7504567_Comparative_effects_of_the_Roundup_and_glyphosate_on_mit ochondrial_oxidative_phosphorylation.

[29] Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic and Placental Cells*, 22 Chem. Res. Toxicol. 97-105 (2008), *available at*
http://big.assets.huffingtonpost.com/france.pdf.

[30] *See* Plaintiffs' Submission in Response to Pretrial Order No. 8, Ex. 7, *In re: Roundup Products Liability Litigation*, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 187-7.

conducted no chronic carcinogenicity studies on the formulated Roundup® product merely because EPA did not require that such a study be performed for registration of glyphosate.[31]

201.    Defendant thus knew or should have known that Roundup® is more toxic than glyphosate alone and that safety studies of Roundup® and Roundup®'s adjuvants, "inert" ingredients, and/or surfactant(s) including POEA were necessary to protect Plaintiff from Roundup® products.

202.    Despite its knowledge that Roundup® is considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup® as safe.

### The EPA's Review of Glyphosate

203.    In April 2016, personnel within the EPA's Office of Pesticides Program (OPP) leaked and posted on the internet a draft report on glyphosate carcinogenicity, entitled Cancer Assessment Review Committee (CARC) report, dated October 2015. The EPA removed the documents by May 2, 2016, within days of initially posting it online. An EPA spokesperson subsequently issued a statement on the agency's glyphosate review:

> Glyphosate documents were inadvertently posted to the Agency's docket. These documents have now been taken down because our assessment is not final. EPA has not completed our cancer review. We will look at the work of other governments as well as work by HHS's Agricultural Health Study as we move to make a decision on glyphosate. Our assessment will be peer reviewed and completed by end of 2016.[32]

204.    On September 12, 2016, EPA's OPP submitted a report on the carcinogenic potential of glyphosate, wherein it issued a "proposed conclusion" that glyphosate is "'not likely

---

[31] See id.

[32] Carey Gillam, *What Is Going On With Glyphosate? EPA's Odd Handling of Controversial Chemical*, HUFFINGTON POST, May 2, 2016 *available at* http://www.huffingtonpost.com/care-gilliam/what-is-going-on-with-gly_b_9825326.html; *see also* P.J. Huffstutter, *EPA takes offline report that says glyphosate not likely carcinogenic*, REUTERS, May 2, 2016, *available at* http://www.reuters.com/article/us-usa-glyphosate-epa-idUSKCN0XU01K.

to be carcinogenic to humans at doses relevant to human health risk assessment."[33]  There are no authors listed on this issue paper, which reiterates and adopts the conclusions of the October 2015 leaked assessment.  The issue paper is based upon a review of industry-sponsored articles and studies. The OPP acknowledged that it rejected all studies that considered Roundup®—the formulated product—instead of studies that isolated glyphosate because "[g]lyphosate formulations contain various components other than glyphosate and it has been hypothesized these components are more toxic than glyphosate alone.[34]

205.    Thus, the OPP notes dozens of studies considered by the IARC were not reviewed by the OPP because the OPP's "evaluation focused on studies on the active ingredient glyphosate" and "additional research could also be performed to determine whether formulation components, such as surfactants, influence the toxicity of glyphosate formulations."[35]

206.    From December 13 to 16, 2016, the EPA held the FIFRA Scientific Advisory Panel ("SAP") meetings to consider issues raised by the OPP's evaluation of glyphosate.  Again, the OPP allowed the SAP to consider studies of glyphosate alone, and not any study of the formulated product.  In its charge to the FIFRA SAP, the OPP noted that "[a]lthough there are studies available on glyphosate-based pesticide formulations, the agency is soliciting advice from the FIFRA SAP on this evaluation of human carcinogenic potential for the active ingredient glyphosate only at this time."[36]

---

[33] *See* EPA's Office of Pesticide Programs, Glyphosate Issue Paper: Evaluation of Carcinogenic Potential (Sept. 12, 2016), *available at* https://www.epa.gov/sites/production/files/2016-09/documents/glyphosate_issue_paper_evaluation_of_carcincogenic_potential.pdf
[34] *Id.*
[35] *Id*
[36] EPA OPP, Glyphosate: Evaluation of Carcinogenic Potential, Charge to the FIFRA SAP for the October 18-21, 2016 Meeting, *available at* https://www.epa.gov/sites/production/files/2016-11/documents/glyphosate_sap_charge_questions_-final.pdf.

207.    The OPP draft assessment therefore does not actually consider the product at issue in this litigation or, more importantly, how glyphosate, in conjunction with surfactants and other chemicals, affects carcinogenicity.

208.    On March 16, 2017, the final SAP meeting minutes and report were released, revealing disagreement and lack of consensus among the scientists on whether there was a positive association between *glyphosate* exposure and NHL.[37]

### Recent Worldwide Bans on Roundup®/Glyphosate

209.    Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since the IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup® become more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which took effect at the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."[38]

210.    The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.[39]

---

[37] FIFRA Scientific Advisory Panel Meeting Minutes and Final Report No. 2017-01, A Set of Scientific Issues Being Considered by the Environmental Protection Agency Regarding: EPA's Evaluation of the Carcinogenic Potential of Glyphosate, *available at* https://www.epa.gov/sites/production/files/2017-03/documents/december_13-16_2016_final_report_03162017.pdf.

[38] *Holland's Parliament Bans Glyphosate Herbicides*, THE REAL AGENDA, 14 April 2014, *available at* http://real-agenda.com/hollands-parliament-bans-glyphosate-herbicides/.

[39] Christina Sarich, *Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals Following Recent Glyphosate-Cancer Link*, Global Research, May 14, 2015, *available at* http://www.globalresearch.ca/brazils-public-prosecutor-wants-to-ban-monsantos-chemicals-following-recent-

211.    France banned the private sale of Roundup® and glyphosate following the IARC assessment for glyphosate.[40]

212.    In 2017, Bermuda banned both the private and commercial sale of glyphosate, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."[41]

### *Proposition 65 Listing*

213.    On September 4, 2015, California's Office of Environmental Health Hazard Assessment ("OEHHA") published a notice of intent to include glyphosate on the state's list of known carcinogens under Proposition 65.[42]    California's Safe Drinking Water and Toxic Enforcement Act of 1986 (informally known as "Proposition 65") requires the state to maintain and, at least once a year, revise and republish a list of chemicals "known to the State of California to cause cancer or reproductive toxicity."[43]    The OEHHA determined that glyphosate met the criteria for the listing mechanism under the Labor Code following IARC's assessment of the chemical.[44]

---

glyphosate-cancer-link/5449440; *see* Ministério Público Federal, MPF/DF *reforça pedido para que glifosato seja banido do mercado naciona*, April, 14, 2015, *available at* http://noticias.pgr.mpf.mp.br/noticias/noticias-do-site/copy_of_meio-ambiente-e-patrimonio-cultural/mpf-df-reforca-pedido-para-que-glifosato-seja-banido-do-mercado-nacional.

[40] Zoe Schlanger, *France Bans Sales of Monsanto's Roundup in Garden Centers, 3 Months After U.N. Calls it "Probable Carcinogen,"* NEWSWEEK, June 15, 2015, *available at* http://www.newsweek.com/france-bans-sale-monsantos-roundup-garden-centers-after-un-names-it- probable-343311.

[41] *Health Minister: Importation of Roundup Weed Spray Suspended,* TODAY IN BERMUDA, May 11, 2015, *available at* http://www.todayinbermuda.com/news/health/item/1471-health-minister-importation-of-roundup-weed-spray-suspended.

[42] Cal. Envtl. Prot. Agency Office of Envtl. Health Hazard Assessment, Notice of Intent to List Chemicals by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion, Glyphosate (Sept. 4, 2015), http://oehha.ca.gov/prop65/CRNR_notices/admin_listing/intent_to_list/pdf_zip/090415NOIL_LCSet27.pdf.

[43] *Frequently Asked Questions,* STATE OF CAL. DEP'T OF JUSTICE, OFFICE OF THE ATTORNEY GENERAL, http://oag.ca.gov/prop65/faq (last visited April 19, 2016).

[44] Cal. Envtl. Prot. Agency Office of Envtl. Health Hazard Assessment, Notice of Intent to List Chemicals by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion, Glyphosate (Sept. 4, 2015), http://oehha.ca.gov/prop65/CRNR_notices/admin_listing/intent_to_list/pdf_zip/090415NOIL_LCSet27.pdf.

214. The listing process under the Labor Code is essentially automatic. The list of known carcinogens, at a minimum, must include substances identified by reference in Labor Code § 6382(b)(1). That section of the Labor Code identifies "[s]ubstances listed as human or animal carcinogens by the International Agency for Research on Cancer (IARC)." IARC's classification of glyphosate as a Group 2A chemical ("probably carcinogenic to humans") therefore triggered the listing.

215. A business that deploys a listed chemical in its products must provide "clear and reasonable warnings" to the public prior to exposure to the chemical. To be clear and reasonable, a warning must "(1) clearly communicate that the chemical is known to cause cancer, and/or birth defects or other reproductive harm; and (2) effectively reach the person before exposure."[45] The law also prohibits the discharge of listed chemicals into drinking water.

216. Monsanto disputed the listing decision and, in January 2016, filed a lawsuit against OEHHA and the agency's acting director, Lauren Zeise, in California state court, seeking declaratory and injunctive relief to prevent OEHHA from listing glyphosate.[46]

217. Monsanto alleged that OEHHA's exclusive reliance on the IARC decision signified that "OEHHA effectively elevated the determination of an ad hoc committee of an unelected, foreign body, which answers to no United States official (let alone any California state official), over the conclusions of its own scientific experts."[47] Monsanto further alleged that the Labor Code listing mechanism presented various constitutional violations because it "effectively empowers an unelected, undemocratic, unaccountable, and foreign body to make laws applicable in

---

[45] *Frequently Asked Questions*, STATE OF CAL. DEPARTMENT OF JUSTICE, OFFICE OF THE ATTORNEY GENERAL, *supra*.
[46] Monsanto Company's Verified Petition for Writ of Mandate and Complaint for Preliminary and Permanent Injunctive Relief, Monsanto Co. v. Office of the Envt'l Health Hazard Assessment, et al., No. 16-CECG-00183 (Cal. Super. Ct.) *available at* http://www.monsanto.com/files/documents/monvoehha.pdf.
[47] *Id.* at 2.

California."[48] Among other things, Monsanto argued that Proposition 65's requirement to provide a "clear and reasonable warning" to consumers that the chemical is a known carcinogen would damage its reputation and violate its First Amendment rights.[49]

218.    On January 27, 2017, the Superior Court of California – Fresno issued a tentative ruling granting, among other things, OEHHA's motion for judgment on the pleadings, thus rejecting Monsanto's arguments.  On March 10, 2017, the Court issued a final order adopting in full the earlier tentative ruling.[50]  On July 7, 2017, the listing of glyphosate "as known to the state to cause cancer" became effective under Proposition 65.

### *EFSA Report on Glyphosate*

219.    On November 12, 2015, the European Food Safety Authority (EFSA), the European Union's primary agency for food safety, reported on its evaluation of the Renewal Assessment Report (RAR) on glyphosate.[51] The Rapporteur Member State assigned to glyphosate, the German Federal Institute for Risk Assessment (BfR), had produced the RAR as part of the renewal process for glyphosate in the EU.

220.    The BfR sent its draft RAR to the EFSA and the RAR underwent a peer review process by the EFSA, other member states and industry groups. As part of the on-going peer review of Germany's reevaluation of glyphosate, the EFSA had also received a second mandate from the European Commission to consider the IARC's findings regarding the potential carcinogenicity of glyphosate and glyphosate-containing products.

---

[48] *Id.* at 3.
[49] *Id.*
[50] *See* Notice of Supplemental Authority, In re: Roundup Products Liability Litigation, MDL No. 2741 (N.D. Cal., Mar. 13, 2017), ECF No. 185.
[51] European Food Safety Auth., *Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate*, EFSA Journal (2015), *available at* http://www.efsa.europa.eu/sites/default/files/scientific_output/files/main_documents/4302.pdf.

221.    Based on a review of the RAR, which included data from industry-submitted, unpublished studies, the EFSA sent its own report ("Conclusion") to the European Commission, finding that "glyphosate is unlikely to pose a carcinogenic hazard to humans and the evidence does not support classification with regard to its carcinogenic potential according to Regulation (EC) No. 1272/2008."[52] The EFSA therefore disagreed with the IARC: glyphosate was not genotoxic and did not present a carcinogenic threat to humans.

222.    In explaining why its results departed from the IARC's conclusion, the EFSA drew a distinction between the EU and the IARC approaches to the study and classification of chemicals.[53] Although the IARC examined "both glyphosate—an active substance—and glyphosate-based formulations, grouping all formulations regardless of their composition," the EFSA explained that it considered only glyphosate and that its assessment focuses on "each individual chemical, and each marketed mixture separately."[54] The IARC, on the other hand, "assesses generic agents, including groups of related chemicals, as well as occupational or environmental exposure, and cultural or behavioral practices."[55] The EFSA accorded greater weight to studies conducted with glyphosate alone than studies of formulated products.[56]

223.    The EFSA went further and noted:

> [A]lthough some studies suggest that certain glyphosate-based formulations may be genotoxic (i.e. damaging to DNA), others that look solely at the active substance glyphosate do not show this effect. It is likely, therefore, that *the genotoxic effects observed in some glyphosate-based formulations are related to the other constituents or "co-formulants"*. Similarly, certain glyphosate-based formulations display higher toxicity than that of the active ingredient, presumably because of the presence of co-formulants, In its assessment, *EFSA*

---

[52] *Id.*
[53] European Food Safety Auth., *The EFSA Fact Sheet: Glyphosate, available at* http://www.efsa.europa.eu/sites/default/files/corporate_publications/files/efsaexplainsglyphosate15112en.pdf.
[54] *Id.*
[55] *Id.*
[56] *Id.*

*proposes that the toxicity of each pesticide formulation and in particular its genotoxic potential should be further considered and addressed by Member State authorities while they reassess uses of glyphosate-based formulations in their own territories.*[57]

224.    Notwithstanding its conclusion, the EFSA did set exposure levels for glyphosate. Specifically, the EFSA proposed an acceptable daily intake (ADI) of 0.5 mg/kg of body weight per day; an acute reference dose (ARfD) of 0.5 mg/kg of body weight; and an acceptable operator exposure level (AOEL) of 0.1 mg/kg of body weight per day.[58]

### Leading Scientists Dispute EFSA's Conclusion

225.    On November 27, 2015, 96 independent academic and governmental scientists from around the world submitted an open letter to the EU health commissioner, Vytenis Andriukaitis.[59] The scientists expressed their strong concerns and urged the commissioner to disregard the "flawed" EFSA report, arguing that "the BfR decision is not credible because it is not supported by the evidence and it was not reached in an open and transparent manner."[60]

226.    Signatories to the letter included Dr. Christopher J. Portier, Ph.D., and other renowned international experts, some of whom were part of the IARC Working Group assigned to glyphosate.

227.    In an exhaustive and careful examination, the scientists scrutinized the EFSA's conclusions and outlined why the IARC Working Group decision was "by far the more credible":

> The IARC WG decision was reached relying on open and transparent procedures by independent scientists who completed thorough conflict-of-interest statements and were not affiliated or financially supported in any way by the chemical manufacturing industry. It is fully referenced and depends entirely on reports published in the open, peer-reviewed

---

[57] *Id.*

[58] European Food Safety Auth., *Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate*, EFSA JOURNAL (2015), *supra*.

[59] Letter from Christopher J. Portier, et al. to Commissioner Vytenis Andriukaitis, Open Letter: Review of the Carcinogenicity of Glyphosate by EFSA and BfR (Nov. 27, 2015), *available at* http://www.zeit.de/wissen/umwelt/2015-11/glyphosat-scientists-in-row-over-safety-of=glyphosate-weedkiller.

[60] *Id.*

> biomedical literature. It is part of a long tradition of deeply researched and highly credible reports on the carcinogenicity of hundreds of chemicals issued over the past four decades by IARC and used today by international agencies and regulatory bodies around the world as a basis for risk assessment, regulation and public health policy.[61]

228.     With respect to human data, the scientists pointed out that the EFSA agreed with the IARC that there was "*limited evidence* of carcinogenicity for non- Hodgkin lymphoma, but the EFSA nonetheless dismissed an association between glyphosate exposure and carcinogenicity. The IARC applies three levels of evidence in its analyses of human data, including sufficient evidence and limited evidence. The EFSA's ultimate conclusion that "there was no unequivocal evidence for a clear and strong association of NHL with glyphosate" was misleading because it was tantamount to IARC's highest level of evidence: "sufficient evidence," which means that a causal relationship has been established. However, the scientists argued, "[legitimate public health concerns arise when 'causality is credible,' i.e., when there is *limited evidence*."[62]

229.     Among its many other deficiencies, the EFSA's conclusions regarding animal carcinogenicity data were "scientifically unacceptable," particularly in BfR's use of historical control data and in its trend analysis. Indeed, BfR's analysis directly contradicted the Organization for Economic Co-operation and Development ("OECD") testing guidelines while citing and purporting to follow those same guidelines. For instance, the EFSA report dismisses observed trends in tumor incidence "because there are no individual treatment groups that are significantly different from controls and because the maximum observed response is reportedly within the range of the historical control data." However, according to the scientists, concurrent controls are recommended over historical controls in all guidelines, scientific reports and publications, and, if it is employed, historical control data "should be from studies in the same timeframe, for the same

---

[61] *Id.*
[62] *Id.*

exact animal strain, preferably from the same laboratory or the same supplier and preferably reviewed by the same pathologist." BfR's use of historical control data violated the precautions: "only a single study used the same mouse strain as the historical controls, but was reported more than 10 years after the historical control dataset was developed." Further deviating from sound scientific practices, the data used by the BfR came from studies in seven different laboratories. The scientists concluded:

> BfR reported seven positive mouse studies with three studies showing increases in renal tumors, two with positive findings for hemangiosarcomas, and two with positive findings for malignant lymphomas. BfR additionally reported two positive findings for tumors in rats. Eliminating the inappropriate use of historical data, the unequivocal conclusion is that these are not negative studies, but in fact document the carcinogenicity of glyphosate in laboratory animals.[63]

230. The letter also critiqued the EFSA report's lack of transparency and the opacity surrounding the data cited in the report: "citations for almost all of the references, even those from the open scientific literature, have been redacted from the document" and "there are no authors or contributors listed for either document, a requirement for publication in virtually all scientific journals." Because the BfR relied on unpublished, confidential industry-provided studies, it is "impossible for any scientist not associated with the BfR to review this conclusion with scientific confidence."[64]

231. On March 3, 2016, the letter was published in the *Journal of Epidemiology & Community Health*.[65]

---

[63] *Id.*

[64] *Id.*

[65] Christopher J. Portier, et al., *Differences in the carcinogenic evaluation of glyphosate between the International Agency for Research on Cancer (IARC) and the European Food Safety Authority (EFSA),* JOURNAL OF EPIDEMIOLOGY & CMTY. HEALTH, Mar. 3, 2016, *available at* http://jech.bmj.com/content/early/2016/03/03/jech-2015-207005.full.

### Statement of Concern Regarding Glyphosate-Based Herbicides

232.   On February 17, 2016, a consensus statement published in the journal *Environmental Health*, entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement," assessed the safety of glyphosate-based herbicides (GBHs).[66]   The paper's "focus is on the unanticipated effects arising from the worldwide increase in the use of GBHs, coupled with recent discoveries about the toxicity and human health risks stemming from use of GBHs", including the following:

    a)   GBHs are the most heavily applied herbicide in the world and usage continues to rise;

    b)   Worldwide, GBHs often contaminate drinking water sources, precipitation and air, especially in agricultural regions;

    c)   The half-life of glyphosate in water and soil is longer than previously recognized;

    d)   Glyphosate and its metabolites are widely present in the global soybean supply;

    e)   Human exposures to GBHs are rising;

    f)   Glyphosate is now authoritatively classified as a probable human carcinogen; and

    g)   Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science.[67]

233.   The researchers noted that GBH use has increased approximately 100-fold since the 1970s. Further, far from posing a limited hazard to vertebrates, as previously believed, two decades of evidence demonstrated that "several vertebrate pathways are likely targets of action,

---

[66] John P. Myers, et al., *Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement*, ENVIRONMENTAL HEALTH (2016), *available at* http://ehjournal.biomedcentral.com/articles/10.1186/s12940-016-0117-0.
[67] *Id.*

including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."[68]

234.    The   paper  attributes  uncertainties  in  current  assessments  of  glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations." Further, the researchers argue, "[t]he distinction in regulatory review and decision processes between 'active' and 'inert' ingredients has no toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in their own right."[69]

235.    Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish." Accordingly, "risk assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone underestimate both toxicity and exposure, and thus risk." The paper concludes that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."[70]

236.    The researchers also critique the current practice of regulators who largely rely on "unpublished, non-peer reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the

---

[68] *Id.*
[69] *Id.*
[70] *Id.*

researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of

GBHs that include glyphosate alone, as well as GBH-product formulations."[71]

237.    The researchers also call for greater inclusion of GBHs in government-led

toxicology testing programs:

> A fresh and independent examination of GBH toxicity should be
> undertaken, and . . . this re-examination be accompanied by systematic
> efforts by relevant agencies to monitor GBH levels in people and in the food
> supply, none of which are occurring today. The U.S. National Toxicology
> Program should prioritize a thorough toxicological assessment of the
> multiple pathways now identified as potentially vulnerable to GBHs.

238.    The researchers suggest that, in order to fill the gap created by an absence of

government funds to support research on GBHs, regulators could adopt a system through which

manufacturers fund the registration process and the necessary testing:

> [W]e recommend that a system be put in place through which manufacturers
> of GBHs provide funds to the appropriate regulatory body as part of routine
> registration actions and fees. Such funds should then be transferred to
> appropriate government research institutes, or to an agency experienced in
> the award of competitive grants. In either case, funds would be made
> available to independent scientists to conduct the appropriate long-term
> (minimum 2 years) safety studies in recognized animal model systems. A
> thorough and modern assessment of GBH toxicity will encompass potential
> endocrine disruption, impacts on the gut microbiome, carcinogenicity and
> multigenerational effects looking at reproductive capability and frequency
> of birth defects.

### *European Union Vote on Glyphosate Renewal*

239.    The license for glyphosate in the European Union (EU) was set to expire on June

30, 2016.

---

[71] *Id.*

240.    Without an extension of the license, Monsanto's Roundup® and other glyphosate-based herbicides faced a general phase out in EU markets.[72]

241.    In the months leading up to the license expiration date, protracted meetings and votes among national experts from the 28 EU Member States failed to produce agreement on an extension.

242.    For instance, on March 4, 2016, The Guardian reported that France, the Netherlands, and Sweden did not support the EFSA's assessment that glyphosate was harmless.[73] The paper quoted the Swedish environment minister, Åsa Romson, as stating: "We won't take risks with glyphosate and we don't think that the analysis done so far is good enough. We will propose that no decision is taken until further analysis has been done and the EFSA scientists have been more transparent about their considerations."[74]

243.    The Netherlands argued that relicensing should be placed on hold until after a separate evaluation of glyphosate's toxicity can be conducted.[75]   Leading up to the vote, Italy joined the other EU states in opposing the license renewal, citing health concerns.[76]

244.    On June 6, 2016, Member States voted but failed to reach a qualified majority in favor or against the re-authorization of glyphosate.[77]

---

[72] Philip Blenkinsop, Alissa de Carbonnel & Barbara Lewis European, *Commission to extend glyphosate license for 18 months*, REUTERS, June 28, 2016, *available at* http://www.reuters.com/article/us-health-eu-glyphosate-idUSKCN0ZE25B.

[73] Arthur Neslen, *EU states rebel against plans to relicense weedkiller glyphosate*, THE GUARDIAN, Mar. 4, 2016, *available at* http://www.theguardian.com/environment/2016/mar/04/eu-states-rebel-against-plans-to-relicense-weedkiller-glyphosate.

[74] *Id.*

[75] Arthur Neslen, *Vote on Controversial weedkiller's European licence postponed*, THE GUARDIAN, Mar. 8, 2016, *available at* http://www.theguardian.com/environment/2016/mar/08/eu-vote-on-controversial-weedkiller-licence-postponed-glyphosate

[76] *Id.*

[77] Manon Flausch, *Commission prolongs glyphosate license by 18 months*, EURACTIV, June 29, 2016, *available at* http://www.euractiv.com/section/agriculture-food/news/commission-prolongs-glyphosate-licence-by-18-months/

245.    On June 29, 2016, the EU Commission extended the European license for glyphosate for 18 months to allow the European Chemical Agency to rule on the safety of the chemical.

246.    On July 11, 2016, the EU voted in favor of a proposal to restrict the conditions of use of glyphosate in the EU, including a ban on the common co-formulant or surfactant, POEA, from all glyphosate-based herbicides, including Roundup®[78]

247.    These restrictions, which are non-binding on the EU states, are expected to apply until the European Chemicals Agency issues an opinion on the chemical's safety.[79]

248.    In November 2017, the EU countries renewed the license for glyphosate for five years rather than the requested ten years.

## TOLLING OF THE STATUTE OF LIMITATIONS

### *Discovery Rule Tolling*

249.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

250.    Plaintiffs have suffered an illness that has a latency period and does not arise until years after exposure.  Plaintiffs had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup® and glyphosate until they were made aware that their NHL could be caused by their use and/or exposure to Roundup®.  Consequently, the discovery rule applies to these cases, and the statute of limitations has been tolled until the day that Plaintiffs

---

[78] Sarantis Michalopoulos, *EU agrees ban on glyphosate co-formulant*, EURACTIV, July 11, 2016, *available at* http://www.euractiv.com/section/agriculture-food/news/eu-agrees-ban-on-glyphosate-co-formulant/?nl_ref=16562829
[79] *See* Arthur Neslen, *Controversial chemical in Roundup weedkiller escapes immediate ban*, THE GUARDIAN, June 29, 2016.

knew or had reason to know that their NHL was linked to their use of and/or exposure to Roundup®.

251.    Within the time period of any applicable statutes of limitations, Plaintiffs could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup® and glyphosate is injurious to human health.

252.    Plaintiffs did not discover, and did not know of facts that would cause a reasonable person to suspect the risks associated with the use of and/or exposure to Roundup® and glyphosate; nor would a reasonable and diligent investigation by them have disclosed that Roundup® and glyphosate would cause their NHL.

253.    Furthermore, the running of the statute of limitations has been equitably tolled by reason of Defendant's fraudulent concealment and conduct.    Through its affirmative misrepresentations and omissions, Defendant actively concealed from Plaintiffs the true risks associated with use of or exposure to Roundup®.

254.    As a result of Defendant's actions, Plaintiffs were unaware, and could not reasonably know or have learned through reasonable diligence, that Plaintiffs had been exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

255.    Furthermore, Defendant is estopped from relying on any statute of limitations because of its fraudulent concealment of the truth regarding the safety of Roundup®.  Defendant was under a duty to disclose the true character, quality and nature of Roundup® because this was non-public information over which it continues to have exclusive control.  Defendant knew that this information was not available to Plaintiffs, their medical providers and/or their health facilities, yet it failed to disclose the information to the public.

256.    Defendant had the ability to and did spend enormous amounts of money in furtherance of their purposes of marketing and promoting a profitable product, notwithstanding the known or reasonably knowable risks. Plaintiffs and medical professionals could not have afforded to and could not have possibly conducted studies to determine the nature, extent and identity of related health risks, and they were forced to rely on Defendant's representations.

257.    For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiffs' claims.

### *Estoppel*

258.    Monsanto was under a continuous duty to disclose to consumers, users and other persons coming into contact with its products, including Plaintiffs, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate.

259.    Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

260.    Based on the foregoing, Monsanto is estopped from relying on any statutes of limitations in defense of this action.

### COUNT ONE: STRICT LIABILITY FOR
### DEFECTIVE MANUFACTURE AND DESIGN

261.    Plaintiffs incorporate by reference each and every other paragraph of their petition as if each were set forth fully and completely herein.

262.    Plaintiffs brings this strict liability claim against Defendant for defective manufacture and design.

263.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, users and other persons coming into contact with them, including Plaintiffs, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

264.    At all times relevant to this litigation, Defendant designed, researched, developed, formulated, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by Plaintiffs and/or to which Plaintiffs were exposed, as described above.

265.    At all times relevant to this litigation, Defendant's Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and in particular, Plaintiffs.

266.    At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Missouri and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

267.    Defendant's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold and marketed by Defendant, were defectively manufactured and designed by Defendant in that when they left the hands of Defendant's manufacturers and/or suppliers, they were unreasonably dangerous because they were not as safe as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

268.     Defendant's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant, were defective in manufacture, design, and formulation in that when they left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks associated with these products' reasonably foreseeable uses exceeded the alleged benefits associated with their design and formulation.

269.     At all relevant times, Defendant's Roundup® products created significant risks to the health and safety of consumers and others who were exposed to the products that far outweigh the risks posed by other products on the market used for the same or similar purpose.

270.     Therefore, at all times relevant to this litigation, Defendant's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, produced, assembled, packaged, labeled, advertised, promoted, marketed, sold, supplied and distributed by Defendant were defective in design and formulation, in one or more of the following ways:

> a)      When placed in the stream of commerce, Defendant's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would expect.
>
> b)      When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.
>
> c)      When placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.
>
> d)      Defendant did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate.

e)      Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweighs any potential utility stemming from the use of the herbicide.

f)      Defendant knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g)      Defendant did not conduct adequate post-marketing surveillance of its Roundup® products.

h)      Defendant could have employed safer alternative designs and formulations.

271.    At all times relevant to this litigation, Plaintiffs used and/or were exposed to Defendant's Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

272.    Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

273.    The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendant's Roundup® products were and are more dangerous than alternative products and Defendant could have designed its Roundup® products to make them less dangerous. Indeed, at the time that Defendant designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

274.    Defendant's defective design of Roundup® amounts to willful, wanton, and/or reckless conduct by Defendant.

275.    As a direct and proximate result of the defective design and manufacture of Roundup® products, Plaintiffs developed NHL and have been injured catastrophically and have

been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care and comfort, and economic damages.

276.    Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendant is strictly liable to Plaintiffs.

277.    The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiffs' grave injuries, and, but for Defendant's misconduct and omissions, Plaintiffs would not have sustained their injuries.

278.    As a direct and proximate result of Defendant's placing its defective Roundup® products into the stream of commerce, Plaintiffs have suffered and continue to suffer grave injuries, and they have endured pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.  Plaintiffs will continue to incur these expenses in the future.

WHEREFORE, Plaintiffs pray for judgment against Defendant Monsanto in a fair and reasonable sum in excess of $25,000, for punitive damages, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT TWO: STRICT LIABILITY FOR FAILURE TO WARN

279.    Plaintiffs incorporate by reference each and every other paragraph of this Petition as if each were set forth fully and completely herein.

280.    Plaintiffs bring this strict liability claim against Defendant for failure to warn.

281.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, because they do not contain adequate warnings or instructions concerning the dangerous

characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

282.    Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiffs, Plaintiffs' employers, Plaintiffs' co-workers, and persons responsible for consumers (such as employers), and Defendant therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of Roundup® and glyphosate-containing products and a duty to instruct on the proper, safe use of these products.

283.    At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn Plaintiffs of the dangers associated with Roundup® use and exposure, and a continuing duty to instruct on the proper, safe use of these products. Defendant, as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

284.    At the time of manufacture, Defendant could have provided warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to these products.

285.    At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety of its Roundup® products. Defendant also failed to minimize the dangers to

users and consumers of its Roundup® product and to those who would foreseeably use or be harmed by Defendant's herbicides, including Plaintiffs.

286.   Despite the fact that Defendant knew or should have known that Roundup® products posed a grave risk of harm, it failed to warn of the dangerous risks associated with their use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied, or sold the product, and not known to end users and consumers, such as Plaintiffs and Plaintiffs' employers.

287.   Defendant knew or should have known that its Roundup® and glyphosate-containing products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products. Defendant has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

288.   At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Missouri and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

289.   At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Roundup® products in their intended or reasonably foreseeable manner, without knowledge of their dangerous characteristics.

290.    Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiffs' exposure. Plaintiffs relied upon the skill, superior knowledge, and judgment of Defendant.

291.    Defendant knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, but it failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and horticultural applications.

292.    The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled agricultural workers, horticultural workers and/or at-home users such as Plaintiffs to utilize the products safely and with adequate protection.  Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

293.    To this day, Defendant has failed to adequately and accurately warn of the true risks of Plaintiffs' injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

294.    As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiffs.

295.    Defendant is liable to Plaintiffs for injuries caused by its failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its Roundup® products and the risks associated with the use of or exposure to Roundup® and glyphosate.

296.    The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiffs' injuries, and, but for Defendant's misconduct and omissions, Plaintiffs would not have sustained their injuries.

297.    Had Defendant provided warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup® products, Plaintiffs could have avoided the risk of developing injuries as alleged herein and Plaintiffs and Plaintiffs' employers could have obtained alternative herbicides.

298.    As a direct and proximate result of Defendant's placing its defective Roundup® products into the stream of commerce and failing to warn Plaintiffs of the increased risk of NHL associated with the use of and/or exposure to Roundup® products as described herein, Plaintiffs have developed NHL and have been injured catastrophically and have been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care and comfort, and economic damages, including for medical care and treatment. Plaintiffs will continue to incur these expenses in the future.

WHEREFORE, Plaintiffs pray for judgment against Defendant Monsanto in a fair and reasonable sum in excess of $25,000, for punitive damages, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT THREE: VIOLATION OF MISSOURI
## MERCHANDIZING PRACTICE ACT, § 407.020 et seq.

299.     Plaintiffs incorporate by reference each and every other paragraphs of this Petition as if each were set forth fully and completely herein.

300.     At all relevant times, Defendant knew or should have known of the unreasonably dangerous and carcinogenic nature of the use of and/or exposure to Roundup®.

301.     At all relevant times, Defendant, through its labeling, advertisements, public representations and marketing of Roundup®, intentionally used deception, fraud, false pretenses, false promises, misrepresentations and unfair trade practices in order to mislead consumers that Roundup® products are safe for use.

302.     At all relevant times, Defendant also engaged in the concealment, suppression and/or omission of material facts in connection with the sale and/or advertisement of Roundup® products in trade or commerce.  In particular, Defendant failed to disclose to the public that Roundup® is unsafe and poses serious health hazards, particularly NHL.  Defendant was aware of the hazardous risks posed by Roundup® and yet failed to inform the public of these risks through their advertisements, labeling, or other means available to them.  Defendant's failure to state material facts about Roundup® constitutes a violation of Mo. Rev. Stat. § 407.020.

303.     At all relevant times, Plaintiffs were deceived by Defendant's intentional misrepresentations and omissions, including by the orchestrated claims made on or in television commercials, advertising materials, websites, and on product labels and packaging regarding the usage and safety of Roundup®.

304.    At all relevant times, Plaintiffs acted in reasonable reliance upon Defendant's unlawful trade practices, and had the Defendant not engaged in the deceptive conduct described herein, Plaintiffs would not have purchased Roundup® and/or would have protected themselves from exposure to Roundup®.

305.    As a direct and proximate result of Defendant's unlawful trade practices, Plaintiffs developed NHL and have been injured catastrophically and have been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care and comfort, and economic damages.

WHEREFORE, Plaintiffs pray for judgment against Defendant in a fair and reasonable sum in excess of $25,000, for punitive damages, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

### COUNT FOUR: NEGLIGENCE

306.    Plaintiffs incorporate by reference each and every other paragraph of this Petition as if each were set forth fully and completely herein.

307.    At all relevant times, Defendant breached its duty to Plaintiffs and was otherwise negligent in marketing, designing, manufacturing, producing, supplying, inspecting, testing, selling, and/or distributing Roundup® products.

308.    Defendant, directly or indirectly, caused Roundup® products to be purchased and/or used by Plaintiffs

309.    At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products, including the duty to take all reasonable

steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

310.     At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of its Roundup® products. Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

311.     At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

312.     Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause Plaintiffs' injuries, and thus, created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiffs.

313.     Defendant knew or, in the exercise of reasonable care, should have known that Roundup® is more toxic than glyphosate alone and that the safety studies on Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiffs from Roundup®.

314.     Defendant knew or, in the exercise of reasonable care, should have known that tests limited to Roundup®'s active ingredient glyphosate were insufficient to prove the safety of Roundup®.

315.    Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup® and glyphosate-containing products.

316.    As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

317.    Defendant failed to appropriately and adequately test Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiffs from Roundup®.

318.    Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant has failed to do so. Indeed, Defendant has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

319.    Defendant's negligence included one or more of the following:

a.      Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

b.      Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally

concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c.        Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture, horticulture, and at-home use;

d.        Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup®, and the propensity of these ingredients to render Roundup® toxic, increase the toxicity of Roundup®, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup®, and whether or not "inert" ingredients and/or adjuvants were safe for use;

e.        Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

f.        Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

g.        Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and/or be exposed to its Roundup® products;

h.        Failing to disclose to Plaintiffs, users, consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

i.      Failing to warn Plaintiffs, users, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiffs and other users or consumers;

j.      Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate- containing products;

k.      Representing that its Roundup® products were safe for their intended use when, in fact, Defendant knew or should have known the products were not safe for their intended purpose;

l.      Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert consumers and the general public of the risks of Roundup® and glyphosate;

m.      Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

n.      Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup® products are safe for use in the agricultural and horticultural industries and/or home use; and/or

o.      Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

320.    Defendant knew and/or should have known that it was foreseeable that consumers and/or users, such as Plaintiffs, would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

321.    Plaintiffs did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

322.    Defendant's negligence was the proximate cause of the injuries, harm, and economic losses Plaintiffs suffered, and will continue to suffer, as described herein.

323.    Defendant's conduct, as described herein, was reckless. Defendant regularly risks the lives of consumers and users of its products, including Plaintiffs, with full knowledge of the dangers of its products. Defendant has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiffs. Defendant's reckless conduct therefore warrants an award of punitive damages.

324.    As a proximate result of Defendant's wrongful acts and omissions in placing its defective Roundup products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiffs developed NHL and have been injured catastrophically and have been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care and comfort, and economic damages, including significant expenses for medical care and treatment and will continue to incur these expenses in the future.

WHEREFORE, Plaintiffs pray for judgment against Defendant Monsanto in a fair and reasonable sum in excess of $25,000, for punitive damages, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

### COUNT FIVE: BREACH OF EXPRESS WARRANTIES

325.    Plaintiffs incorporate by reference each and every other paragraph of this Petition as if each were set forth fully and completely herein.

326.    At all relevant times, Defendant engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing and promoting its Roundup® products, which are defective and unreasonably dangerous to users, consumers, and those in proximity to users, including Plaintiffs, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

327.    Before the time that Plaintiffs were exposed to the use of the aforementioned Roundup® products, Defendant expressly warranted to its consumers and users—including Plaintiffs and Plaintiffs' employers—that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

328.    Defendant, however, failed to disclose that Roundup® had dangerous propensities when used as intended and that the use of and/or exposure to roundup and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiffs' injuries.

329.    The representations, as set forth above, contained or constituted affirmations of fact or promises made by the seller to the buyer which related to the goods and became part of the basis of the bargain creating an express warranty that the goods shall conform to the affirmations of fact or promises.

330.    Roundup® did not conform to the representations made by Monsanto as Roundup® was not safe for use by individuals such as Plaintiffs.

331.    At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Defendant's Roundup products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

332.    Neither Plaintiffs nor Plaintiffs' employers could have reasonably discovered or known of the risks of serious injury associated with Roundup or glyphosate.

333.   Defendant's breaches constitute violations of state common laws, including, but not limited to, the following statutory provisions as applicable:

- Ala. Code §§ 7-2-313, 7-2-314 (2017);

- Alaska St. § 45.02.313 (effective 2016);

- Ariz. Rev. Stat. Ann. § 47-2313 (2016);

- Ark. Code Ann. § 4-2-313 (2016);

- Cal. U. Com. Code § 2313(1) (2017); Cal. Civ. Code §1791.2(a) (2017);

- Co. Rev. St. § 4-2-316 (2017);

- Conn. Gen. Stat. Ann. § 42a-2-313 (effective 2017);

- 6 Del. C. § 2-313 (2017);

- D.C. Code Ann. § 28.2-313 (2017);

- Fla. Stat. Ann. § 672.313 (2017);

- O.C.G.A. § 11-2-318 (2017);

- Haw. Rev. Stat. § 490:2-313 (2016);

- Id. Code § 28-2-314(2)(c) (2017);

- Ill. Comp. Stat. Ann. Ch. 810, 5/2-313 (2016);

- Ind. Code Ann. § 26-1-2-313 (2016);

- Iowa Code Ann. § 554.2313 (2016);

- Kans. Stat. Ann. § 84-2-313 (2017); KRS § 355.2-318 (2017); Kan. Stat. Ann. § 60-3302 (c)  (2017);

- Ky. Rev. Stat. § 355.2-318 (2017);

- La. Rev. Stat. § 9:2800.58 (2016);

- Me. Rev. Stat. Ann. tit. 11, § 2-314 and 2-315 (2017); 14 M.R.S. § 221 (2017);

- Md. Code Ann. Com. Law § 2-318 (2017);

- Mass. Gen. Laws c. 106, § 2-313 (2017);

- Mich. Comp. Laws Ann. § 440.2313 (2016);

- Minn. Stat. Ann. § 336.2-313 Through 315 (2016);

- Miss. Code Ann. § 11-1-63(i)(3) and  75-2-313 (2017);

- Mo. Rev. Stat. Ann. § 400.2-313 (2016);

- Mont. Code Ann. § 30-2-313 ( 2017);

- Neb. Rev. Stat. U.C.C. § 2-313 et seq. (2017);

- Nev. Rev. Stat. U.C.C. § 104.2313, et seq. (2016); Nev. Rev. Stat. §§ 104.2312-104.2318 (2016);

- N.H. Rev. Stat. Ann. § 382-A:2-313. et seq. (2017);

- N.M. Stat. Ann. §§ 55-2-313 to -318 (2017); see also UJI 13-1428 to 1433 NRMA (2016);

- N.Y. U. C.C. Law 2-313, et seq. (2017);

- N.C. Gen. Stat. Ann. § 25-2-313, et seq. (2017);

- N.D. Cent. Code § 41-02-30, et seq. (2017);

- Ohio Rev. Code Ann. § 1302.26, et seq. (2016);

- Okla. Stat. tit. 12A, § 2-313 et seq. (2017);

- Or. Rev. Stat. § 72.3130, et seq. (2016);

- 13 Pa. Stat. Ann. § 2313, et seq. (2016);

- R. I. Gen. Laws § 6A-2-313 (2016);

- S.C. Code Ann. § 36-2-313, et seq. (2016);

- S.D. Stat. 57A-2-313, et seq. (2017);

- Tenn. Code Ann. § 47-2-313, et seq. (2016);

- Tex. Bus. & Com. Code Ann. § 2.313, et seq. (2015);

- Ut. Code Ann. § 70A-2-313, et seq. (2016);

- Va. Code Ann. § 8.2-318, et seq. (2016);

- Vt. Stat, Ann. tit. 9A, § 2-313, et seq. (2016);

- Wa. Rev. Code § 62A.2-313, et seq. (2016); § 7.72.030(2) (2016);

- W.Va. Code § 46A-6-108, et seq. (2016);

- Wis. Stat. Ann. § 402.313, et seq. (2017); and

- Wyo. Stat. § 34.1-2-313 through 315 (2017).

334.    The breach of the warranty was a substantial factor in bringing about Plaintiffs' injuries. As a direct and proximate result of Defendant's placing its defective Roundup® products into the stream of commerce and failing to warn Plaintiffs of the increased risk of NHL associated with the use of and/or exposure to Roundup® products as described herein, Plaintiffs have developed NHL and have been injured catastrophically and have been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care and comfort, and economic damages, including for medical care and treatment.

335.    The harm caused by Defendant's Roundup® products far outweigh their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

336.    As a direct and proximate result of Defendant's wrongful acts and omissions Plaintiffs have suffered severe and permanent physical and emotional injuries.  Plaintiffs have endured pain and suffering, have suffered economic loss, including significant expenses for medical care and treatment, and will continue to incur these expenses in the future.

WHEREFORE, Plaintiffs pray for judgment against Defendant Monsanto in a fair and reasonable sum in excess of $25,000, for punitive damages, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT SIX: IMPLIED WARRANTIES

337.    Plaintiffs incorporate by reference each and every other paragraph of this Petition as if each were set forth fully and completely herein.

338.    At all times relevant, Defendant engaged in the business of testing, developing, designing, formulating, manufacturing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to users, consumers, and those in proximity to users, including Plaintiffs, thereby placing Roundup® products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendant.

339.    Before the time Plaintiffs were exposed to the use of the aforementioned Roundup® products, Defendant impliedly warranted to its consumers and users—including Plaintiffs and Plaintiffs' employers—that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

340.    Defendant, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiffs' injuries.

341.    Upon information and belief, Plaintiffs and/or Plaintiffs' employers reasonably relied upon the skill, superior knowledge and judgment of Defendant and upon its implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

342.   The Roundup® products were expected to reach and did in fact reach consumers, users, and those in proximity to users, including Plaintiffs, without substantial change in the condition in which they were manufactured and sold by Defendant.

343.   At all relevant times, Defendant was aware that consumers, users, and those in proximity of users of its products, including Plaintiffs, would use Roundup® products as marketed by Defendant, which is to say that Plaintiffs were the foreseeable users of Roundup®.

344.   Defendant intended that its Roundup® products be used in the manner in which Plaintiffs in fact used or were exposed to them and Defendant impliedly warranted each product to be of merchantable quality, safe and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

345.   In reliance upon Defendant's implied warranty, Plaintiffs used or were in proximity to the use of Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendant.

346.   Neither Plaintiffs nor Plaintiffs' employers could have reasonably discovered or known of the risks of serious injury associated with Roundup® products or glyphosate.

347.   Defendant breached its implied warranty to Plaintiffs in that its Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

348.   The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

349.     As a direct and proximate result of Defendant's wrongful acts and omissions Plaintiffs have suffered severe and permanent physical and emotional injuries.  Plaintiffs have endured pain and suffering, have suffered economic loss, including significant expenses for medical care and treatment, and will continue to incur these expenses in the future.

WHEREFORE, Plaintiffs pray for judgment against Defendant Monsanto in a fair and reasonable sum in excess of $25,000, for punitive damages, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT SEVEN: WRONGFUL DEATH

### (Plaintiff Penny Baker)

350.     Plaintiffs incorporate by reference every other paragraph of this Petition as if each were set forth herein.

351.     As a direct and proximate result of the acts and/or omissions of Defendant, as set forth herein, decedent Christine Eichenauer ("Decedent Eichenauer") used and was exposed to Roundup®.

352.     Subsequent to such use, Decedent Eichenauer developed NHL, suffered substantial pain and suffering, both physical and emotional in nature, and subsequently died.

353.     Plaintiff Penny Baker, on behalf of herself as the surviving child and next of kin of Decedent Eichenauer, is entitled to recover damages allowable by law as Decedent Eichenauer would have if she were living, as a result of acts and/or omissions of Defendant.

354.     Plaintiff Penny Baker, on behalf of herself and Decedent Eichenauer's next of kin, is also entitled to recover punitive damages and damages for substantial pain and suffering caused to Decedent Eichenauer from the acts and/or omissions of Defendant as fully set forth herein, including without limitations, punitive damages.

355.     As a direct and proximate result of Defendant's conduct, Plaintiff Penny Baker and Decedent Christine Eichenauer have been injured and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care and comfort, and economic damages.  This includes but is not limited to the damages incurred by Plaintiff Penny Baker for loss of consortium after Decedent Eichenauer's injury but prior to death.

WHEREFORE, Plaintiffs demands judgment against Defendant and for damages in excess of $25,000.00, punitive damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## COUNT EIGHT: PUNITIVE DAMAGES

356.     Plaintiffs incorporate by reference each and every other paragraph of this Petition as if each were set forth fully and completely herein.

357.     Defendant has acted willfully, wantonly, maliciously, with an evil motive, and recklessly in one or more of the following ways:

358.     Defendants knew of the unreasonably high risk of NHL posed by the Roundup® products before manufacturing, marketing, distributing and/or selling its Roundup® products, yet purposefully proceeded with such action;

359.     Despite its knowledge of the high risk of NHL associated with use and/or exposure to Roundup® products, Defendant affirmatively minimized this risk through marketing and promotional efforts and product labeling; and

360.     Through the actions outlined above, Defendant expressed a reckless indifference to the safety of users of Roundup® products, including Plaintiffs.

361.    Defendant knew of the dangers and risks of Roundup® products, yet it concealed and/or omitted this information from labels and warnings contained on Roundup® products in furtherance of its knowing and willful actions.

362.    These actions were outrageous because of Defendant's evil motive or a reckless indifference to the safety of users of Roundup® products and/or those who became exposed to it.

363.    As a direct and proximate result of the willful, wanton, malicious, evilly motivated and/or reckless conduct of Defendant, Plaintiffs have sustained damages set forth above.

WHEREFORE, Plaintiffs pray for a judgment for punitive damages against Defendant, in a fair and reasonable amount sufficient to punish Defendant and deter it and others from engaging in similar conduct in the future, costs expended herein, and such further and other relief as the Court deems just and appropriate.

Respectfully Submitted,

/s/ Eric D. Holland
Eric D. Holland (Mo. Bar # 39935)
R. Seth Crompton (Mo. Bar #57448)
Patrick R. Dowd (Mo. Bar #64820)
HOLLAND LAW FIRM, LLC
300 N. Tucker, Suite 801
St. Louis, MO 63101
Tel: (315) 241-8111
Fax: (314) 241-5554
Email: eholland@allfela.com
Email: scrompton@allfela.com
Email: pdowd@allfela.com

*Attorneys for Plaintiffs*