# U.S. District Court
## SOUTHERN DISTRICT OF TEXAS (Houston)
## CIVIL DOCKET FOR CASE #: 4:19-cv-02497

Del-Sol Auten v. Monsanto Company
Assigned to: Chief Judge Lee H Rosenthal
Case in other court: Northern District of California, 16-MD-2741-VC
Cause: 28:1332 Diversity-Product Liability

Date Filed: 07/10/2019
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Marisol Del-Sol Auten**                    represented by    **Kimberly Jones Penepacker**
Simpson Simpson & Penepacker
1119 Halsell St
Bridgeport, TX 76426
940-683-4098
Email: kjones@simpsontriallawyers.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 07/10/2019 | 1 | COMPLAINT against Monsanto Company (Filing fee $ 400 receipt number 0541-22762140) filed by Marisol Del-Sol Auten.(Penepacker, Kimberly) (Entered: 07/10/2019) |
| 07/10/2019 | 2 | Plaintiff's Civil Cover Sheet by Marisol Del-Sol Auten, filed.(Penepacker, Kimberly) (Entered: 07/10/2019) |
| 07/10/2019 | 3 | NOTICE *of Related Litigation* by Marisol Del-Sol Auten, filed. (Penepacker, Kimberly) (Entered: 07/10/2019) |
| 07/10/2019 | 4 | Request for Issuance of Summons as to Monsanto Company, filed.(Penepacker, Kimberly) (Entered: 07/10/2019) |
| 07/11/2019 | 5 | ORDER Scheduling Rule 16 Conference With the Court and Setting Out the Requirements for Initial Pretrial Work. Initial Conference set for 10/22/2019 at 02:00 PM in Courtroom 11B before Chief Judge Lee H Rosenthal(Signed by Chief Judge Lee H Rosenthal) (Attachments: # 1 Judge's Procedures) Parties notified.(ckrus, 4) (Entered: 07/11/2019) |
| 07/11/2019 | 6 | Summons Issued as to Monsanto Company. Issued summons delivered to plaintiff by NEF, filed.(SarahShelby, 4) (Entered: 07/11/2019) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 07/18/2019 10:44:35 | | |
| PACER | hllp1982:2634105:4722683 | Client Code: | 1417.0049 |

| Login: | | | |
|---|---|---|---|
| **Description:** | Docket Report | **Search Criteria:** | 4:19-cv-02497 |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | |
|---|---|
| MARISOL DEL-SOL AUTEN,<br>Plaintiff,<br><br>v.<br><br>MONSANTO COMPANY,<br>Defendant. | Civil Case No. 19-2497<br><br><br>**COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

## I.    INTRODUCTION

1.     In 1970, Defendant Monsanto Company, Inc. ("Monsanto") discovered the
herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand
name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly
compete with the growing of crops. By 2001, glyphosate had become the most-used active
ingredient in American agriculture with 85–90 million pounds used annually. That number grew
to 185 million pounds used per year by 8 2007.[1]

2.     Monsanto is a multinational agriculture biotechnology corporation based in St.
Louis, Missouri. It is the world's leading producer of glyphosate-based herbicides. As of 2009,
Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed

---

[1] Arthur Grube et al., U.S. Environmental Protection Agency, *Pesticides Industry Sales and
Usage, 2006-2007 Market Estimates*, 14 (2011), available at
http://www.epa.gov/pesticides/pestsales/07pestsales/market_estimates2007.pdf.

market.[2] The majority of these seeds are of the Roundup Ready® brand. The stated advantage of

Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since

glyphosate-based herbicides can be sprayed in the fields during the growing season without

harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in

the United States were Roundup Ready®.[3] Forty percent of the world's genetically modified crops

are grown in the U.S., where Monsanto controls 80 percent of the genetically modified corn market

and 93 percent of the genetically modified soy market.[4]

3.    Monsanto's glyphosate-based products are registered in 130 countries and

approved for use on over 100 different crops.[5] They are ubiquitous in the environment. Numerous

studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas

---

[2] ETC Group, *Who Will Control the Green Economy?* 22 (2011), *available at*
   http://www.etcgroup.org/files/publication/pdf_file/ETC_wwctge_4web_Dec2011.pdf
[3] William Neuman & Andrew Pollack, *Farmers Cope With Roundup-Resistant Weeds*, N.Y.
   Times, May 3, 2010, *available at* http://www.nytimes.com/2010/05/04/business/energy-
   environment/04weed.html?pagewan.
[4] Zack Kaldveer, *U.S. and Monsanto Dominate Global Market for GM Seeds*, Organic
   Consumers Association, August 7, 2013, *available at*
   https://www.organicconsumers.org/essays/us-and-monsanto-dominate-global-market-gm-
   seeds
[5] Monsanto, *Backgrounder-History of Monsanto's Glyphosate Herbicides* (Sep. 2, 2015),
   *available at* http://www. Monsanto.com/products/documents/glyphosate-background-
   materials/back_history.pdf

where Roundup® is used.[6] It has been found in food,[7] in the urine of agricultural workers[8] [9], and even in the urine of urban dwellers who are not in direct contact with glyphosate.[10]

4.      On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including Monsanto's products, which contain glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

5.      On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

6.      The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other

---

[6] *See* U.S. Geological Survey, *USGS Technical Announcement: Widely Used Herbicide Commonly Found in Rain and Streams in the Mississippi River Basin* (2011), *available at* http://www.usgs.gov/newsroom/article.asp?ID=2909; *see also* U.S. Entl. Prot. Agency, *Technical Factsheet on: Glyphosate, available at* http://www.epa.gov/safewater/pdfs/factsheets/soc/tech/glyphosa.pdf

[7] Thomas Bohn et al., *Compositional Differences in Soybeans on the Market: Glyphosate Accumulates in Roundup Ready GM Soybeans*, 153 Food Chemistry 207 (2013), *available at* http://www.sciencedirect.com/article/pii/S0308814613019201.

[8] John F. Acquavella et al., *Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study*, 112(3) Environmental Health Perspectives 321 (2004), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241861/.

[9] Kathryn Z. Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, 112 IARC Monographs 76, section 5.4 (2015), *available at* http://dx.doi.org/10.1016/S1470-2045(15)70134-8.

[10] Dirk Brändli & Sandra Reinacher, *Herbicides found in Human Urine*, 1 Ithaka Journal 270 (2012), *available at* http://www.ithakajournal.net/druckversionen/e052012-herbicides-urine.pdf.

haematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.[11]

7.      The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

8.      Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment and require no protective masks or other protective equipment for safe use.

## II.      JURISDICTION AND VENUE

9.      Federal diversity jurisdiction in this Court is proper under 28 U.S.C. § 1332 because Plaintiff Marisol Del-Sol Autenis a citizen of Texas, a different state from Missouri, Defendant Monsanto Company's state of residence, and the aggregate amount in controversy exceeds $75,000, exclusive of interest and costs.

10.     This Court has personal jurisdiction over Monsanto under C.C.P. § 410, because Monsanto knew or should have known that its Roundup® products were sold throughout the State of Texas, and, more specifically, caused Roundup® to be sold to Plaintiff in the State of Texas.

11.     In addition, Monsanto maintains sufficient contacts with the State of Texas such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

---

[11] *See* Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra.*

12.     Venue is proper within this District under 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claims asserted in this Complaint, specifically, Plaintiff's use and exposure to Roundup®, occurred in this District. Further, Monsanto, as a corporate entity, is deemed to reside in any jurisdictional district in which it is subject to personal jurisdiction.

## III.   THE PARTIES

### Plaintiff

13.     Plaintiff Marisol Del-Sol Auten resides in Houston, Harris County, Texas. On information and belief, Ms. Del-Sol Auten was exposed to Roundup® in Miami, Florida from around 1995 to around 2010 and was then exposed in Houston, Texas when she used it biweekly, treating her home lawn and garden.

### Defendant

14.     Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.

15.     At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®.

## IV.   FACTS

16.     Plaintiff Marisol Del-Sol Auten is 49 years old and began using Roundup® products on her home's lawn and gardens in or around 1995 in Miami, Florida. Her use of Roundup® products continued on a weekly to biweekly basis for about 15 years.

17.     Ms. Del-Sol Auten utilized Roundup® in the form of a hand pump sprayer. During application, she did not use any form of facial protection but did occasionally wear gloves.

18.     In December of 2010, Ms. Del-Sol Auten was diagnosed with stage IV B-cell Non-Hodgkin's Lymphoma. Ms. Del-Sol Auten's treatment plan consisted of eight cycles of chemotherapy administered from December 29, 2010 to June 3, 2011.

19.     Ms. Del-Sol Auten is the wife of Jonathan Auten.

20.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

21.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milking, baking, or brewing grains.

22.     For nearly 40 years, homeowners have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, its touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. History has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®, glyphosate, is a probable cause of cancer. Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and ghost-written reports, while attacking legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies and the general population that Roundup® was safe.

### The Discovery of Glyphosate and Development of Roundup®

23.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-

1970s under the brand name Roundup®.[12] From the outset, Monsanto marketed Roundup® as a "safe," general-purpose herbicide for widespread commercial and consumer use. It still markets Roundup® as safe today.[13]

### *Registration of Herbicides Under Federal Law*

24.     The manufacture, formulation, and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

25.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance of finding of safety. The determination the Agency must make in registering or pre-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

26.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus

---

[12] Monsanto, *Backgrounder, History of Monsanto's Glyphosate Herbicide* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosatebackground-materials/back_history.pdf.
[13] Monsanto, *What is Glyphosate?* (Sep. 2, 2015), http://www.monsanto.com/sitecollectiondocuments/glyphosate-safety-health.pdf.

requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

27.     The EPA and the State of Texas registered Roundup® for distribution, sale, and manufacture in the United States and the State of Texas.

28.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

29.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

30.     In the case of glyphosate, and therefore Roundup ®, the EPA had planned on releasing its preliminary risk assessment – in relation to the reregistration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

### *Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup*

31.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985.

After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that the designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."[14]

32.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

33.     In the first instance, Monsanto, in seeking initial registration of Roundup® by the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®.[15] IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

34.     In 1976, The United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid.[16] An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was

---

[14] U.S. Envtl. Prot. Agency, *Memorandum, Subject: SECOND Peer Review of Glyphosate* 1 (1991), *available at* http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601-30-OCT-91_265.pdf.

[15] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/ibt_craven_bkg.pdf.

[16] U.S. Envtl. Prot. Agency, *Summary of the IBT Review Program Office of Pesticide Programs* (1983), *available at* http://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=E PA&Index=1981+Thru+1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&To cRestrict=n&Toc=TocEntry=&QField=&QFieldYear=&QFieldMonth=&QFieldDay=&IntQ

"hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[17]

35.     Three top executives of IBT were convicted of fraud in 1983.

36.     In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.[18]

37.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

### The Importance of Roundup® to Monsanto's Market Dominance Profits

38.     The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

---

FieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles%5CIndex%20Data%5C C81thru85%5CTxt%5C00000022%5C91014ULV.txt&User=ANONYMOUS&Password=an onymous&SortMethod=h%7C- &MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/x150y150g16/i425&Disp lay=p%7Cf&DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Res ults%20page&MaximumPages=1&ZyEntry=1&SeekPage=x&ZyPURL.

[17] Marie-Monique Robin, *The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply* (2011) (citing U.S. Envtl. Prot. Agency, *Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch. Washington, D.C.* (August 9, 1978)).

[18] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories, supra.*

39.     In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming their crops. This allowed Monsanto to expand its market for Roundup® even further. By 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

40.     Through a three-pronged strategy of increased production, decreased prices, and by coupling Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue.[19] Today, glyphosate/Roundup® remains one of the world's largest herbicides by sales volume.

### *Monsanto has known for decades that it falsely advertises the safety of Roundup®*

41.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

---

[19] David Barboza, *The Power of Roundup; A Weed Killer Is A Block for Monsanto to Build On*, N.Y. Times, Aug. 2, 2001, *available at* http://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weed-killer-is-a-block-for-monsanto-to-build-on.html.

a) Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences...

b) And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, bush, edging or trimming problem.

c) Roundup biodegrades into naturally occurring elements.

d) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e) This non-residual herbicide will not wash or leach in the soil. It... stays where you apply it.

f) You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area that has been treated with Roundup.[20]

---

[20] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

42.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

    a) Its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

    b) Its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable.

    c) Its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

    d) Its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

    e) Glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

    f) Its glyphosate-containing pesticide products or any component thereof might be classified as "practically non-toxic."

43.    Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

44.    In 2009, France's highest Court ruled that Monsanto had not told the truth about the safety of Roundup®. The French Court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[21]

### *Classifications and Assessments of Glyphosate*

---

[21] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.

45.     The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

46.     The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.[22] Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

47.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group members are selected, and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

48.     In assessing an agent, the IARC Working Group reviews the following information: (a) human experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have

---

[22] World Health Organization, *IARC Monographs on the Evaluation of Carcinogenic Risks to Humnas: Preamble* (2006), available at http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

49.     In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

50.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3-10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group consider "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

51.     The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

52.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

53.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

54.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

55.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

56.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

57.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

58.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

59.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

60.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.[23] Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis[24] and general metabolic disruption.[25]

61.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and several forms of cancers.

### *Other Earlier Findings About Glyphosate's Dangers to Human Health*

62.     The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

### *Release Patterns*

63.     Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

64.     It may also be released to the environment during its manufacture, formulation, transport, storage, disposal, and cleanup, and from spills. Since glyphosate is not a listed chemical

---

[23] Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra* at 77.
[24] *Id.*
[25] *Id.*

in the Texas Release Inventory, data on releases during its manufacture and handling are not available.

65.     Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.[26]

66.     In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.[27]

### Recent Worldwide Bans on Roundup®/Glyphosate

67.     Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow as the dangers of the use of Roundup® become more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is

---

[26] U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate, supra.*

[27] Caroline Cox, *Glyphosate, Part 2: Human Exposure and Ecological Effects,* 15 J. Pesticide Reform 4 (1995); W.S. Peas et al., *Preventing pesticide-related illness in California agriculture: Strategies and priorities. Environmental Health Policy Program Report*, Univ. of Cal. School of Public Health, Calif. Policy Seminar (1993).

promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."[28]

68.    The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.[29]

69.    France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.[30]

70.    Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."[31]

71.    The Sri Lankan government banned the private and commercial use of glyphosates.[32]

---

[28] *Holland's Parliament Bans Glyphosate Herbicides*, The Real Agenda, April 14, 2014, *available at* http://real-agenda.com/hollands-parliament-bans-glyphosate-herbicides/.
[29] Christina Sarich, *Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals Following Recent Glyphosate-Cancer Link*, Global Research, May 14, 2015, *available at* http://www.globalresearch.ca/brazils-public-prosecutor-wants-to-ban-monsantos-chemicals-following-recent-glyphosate-cancer-link/5449440; *see* Ministério Público Federal, *MPF/DF reforça pedido para que glifosato seja banido do Mercado naciona*, April 14, 2015, *available at* http://noticias.pgr.mpf.mp.br/noticias/noticias-do-site/copy_of_meio-ambiente-e-patrimonio-cultural/mpf-df-reforca-pedido-para-que-glifosato-seja-banido-do-mercado-nacional.
[30] Zoe Schlanger, *France Bans Sales of Monsanto's Roundup in Garden Centers, 3 Months After U.N. Calls it 'Probable Carcinogen'*, Newsweek, June 15, 2015, *available at* http://www.newsweek.com/france-bans-sale-monsantos-roundup-garden-centers-after-un-names-it-probable-343311.
[31] *Health Minister: Importation of Roundup Weed Spray Suspnded*, Today in Bermuda, May 11, 2015, *available at* http://www.todayinbermuda.com/news/health/item/1471-health-minister-importation-of-roundup-weed-spray-suspended.
[32] *Sri Lanka's New President Puts Immediate Ban on Glyphosate Herbicides*, Sustainable Pulse, May 25, 2015, *available at* http://sustainablepulse.com/2015/05/25/sri-lankas-new-president-puts-immediate-ban-on-glyphosate-herbicides/#.VeduYk3bKAw.

Plaintiff's Complaint – Page 19

72.     The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.[33]

73.     In 2015, California's Office of Environmental Health Hazard Assessment (OEHHA) announced that it intended to list glyphosate under California's Proposition 65 as a chemical known to cause cancer, birth defects, or other reproductive harm. While Monsanto challenged this decision, the Superior Court of Fresno County and the Fifth Appellate District found in favor of the OEHHA.[34]

74.     In the case of *Dewayne Johnson et al. v. Monsanto*, a San Francisco jury recently returned a verdict of approximately $290 million, finding the Monsanto's glyphosate-containing Roundup® products caused Mr. Johnson's terminal Non-Hodgkin's Lymphoma cancer.[35]

## V.     CLAIM ONE

### STRICT LIABILITY (DESIGN DEFECT)

75.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

76.     Plaintiff brings this strict liability claim against Monsanto for defective design.

77.     At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the

---

[33] *Columbia to ban coca spraying herbicide glyphosate*, BBC, May 10, 2015, *available at* http://www.bbc.com/news/world-latin-america-32677411.

[34] *Monsanto Company v. Office of Environmental Health Hazard Assessment et al.*, 22 Cal. App. 5th 534 (Apr. 19, 2018).

[35] *Dewayne Johnson v. Monsanto Company, et al.*, No. 3:2016cv01244 (N.D. Cal. 2016).

ultimate control and supervision of Monsanto. At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by the Plaintiff, as described above.

78.     At all times relevant to this litigation, Defendant Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff.

79.     At all times relevant to this litigation, Defendant Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in New York and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

80.     Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of Monsanto's manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

81.     Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of Monsanto's manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

Plaintiff's Complaint – Page 21

82.     At all times relevant to this action, Defendant knew or had reason to know that its Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

83.     Therefore, at all times relevant to this litigation, Monsanto's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Monsanto were defective in design and formulation, in one or more of the following ways:

a.     When placed in the stream of commerce, Monsanto's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b.     When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c.     When placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d.     Monsanto did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate.

e.     Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

     f.     Defendant knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

     g.     Defendant did not conduct adequate post-marketing surveillance of its Roundup® products.

     h.     Defendant could have employed safer alternative designs and formulations for its Roundup® products.

84.     Plaintiff was exposed to Monsanto's Roundup® products in the course of Plaintiff's routine use of Roundup® products, as described above, without knowledge of their dangerous characteristics.

85.     At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Monsanto's Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

86.     Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

87.     The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate. Monsanto's Roundup® products were and are more dangerous than alternative products and Defendant could have designed its Roundup® products to make them less dangerous. Indeed, at the time that Monsanto designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

88.    At the time Roundup® products left Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Monsanto's herbicides.

89.    Monsanto's defective design of its Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including the Plaintiff herein.

90.    Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Monsanto is strictly liable to Plaintiff.

91.    The defects in Monsanto's Roundup® products were substantial and contributing factors in causing Plaintiff's injuries, and, but for Monsanto's misconduct and omissions, Plaintiff would not have sustained Plaintiff's injuries.

92.    Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Monsanto made conscious decisions not to redesign, warn or inform the unsuspecting public. Monsanto's reckless conduct warrants an award of punitive damages.

93.    As a direct and proximate result of Monsanto placing its defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer serious injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

94.    THEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein

incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## VI.   CLAIM TWO

### STRICT LIABILITY (FAILURE TO WARN)

95.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

96.   Plaintiff brings this strict liability claim against Defendant for failure to warn.

97.   At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

98.   Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup products®, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiff, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

99.   At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn Plaintiff of the dangers associated with Roundup® and

glyphosate use and exposure. Monsanto, as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

100.    At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

101.    At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by Monsanto's herbicides, including Plaintiff.

102.    Despite the fact that Monsanto knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Monsanto through appropriate research and testing by known scientific methods, at the time Monsanto distributed, supplied, or sold the product, and not known to end users and consumers, such as Plaintiff.

103.    Monsanto knew or should have known that its products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient, glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

104.    At all times relevant to this litigation, Monsanto's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Texas and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

105.    Plaintiff was exposed to Monsanto's Roundup® products in the course of Plaintiff's routine use of Roundup® products, as described above, without knowledge of their dangerous characteristics.

106.    At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

107.    Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendant.

108.    Defendant knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, but they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

109.    The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled regular users of Roundup® products, such as Plaintiff, to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk

of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

110.    To this day, Defendant has failed to adequately and accurately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

111.    As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and were purchased and regularly used by Plaintiff.

112.    Defendant is liable to Plaintiff for injuries caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its products and the risks associated with the use of or exposure to Roundup® and glyphosate.

113.    The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiff's injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained their injuries.

114.    Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup® products, Plaintiff could have avoided the risk of developing injuries as alleged herein.

115.    As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer severe injuries,

and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

116.    THEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## VII.   CLAIM THREE

### NEGLIGENCE

117.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

118.    Defendant, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

119.    At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

120.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the marketing, advertisement, and sale of its Roundup® products. Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate

warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

121.   At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of glyphosate.

122.   Accordingly, at all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

123.   Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

124.   As such, Monsanto breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Monsanto manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

125.   Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Monsanto has failed to do so. Indeed, Monsanto has wrongfully

concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

126.    Monsanto's negligence included:

a.      Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

b.      Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c.      Failing to undertake sufficient studies and conduct necessary tests to determine whether Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d.      Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

e.      Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f.      Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Monsanto could reasonably foresee would use and be exposed to its Roundup® products;

g.      Failing to disclose to Plaintiffs, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer;

h.      Failing to warn Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other consumers;

i.      Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

j.      Representing that its Roundup® products were safe for their intended use when, in fact, Monsanto knew or should have known that the products were not safe for their intended purpose;

k.      Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

l.      Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m.      Continuing to disseminate information to its consumers, which indicate or imply that Monsanto's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

n.      Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

127.   Monsanto knew and/or should have known that it was foreseeable that consumers such as Plaintiff would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

128.   Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or glyphosate.

129.   Defendant's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff suffered, and will continue to suffer, as described herein.

130.   Monsanto's conduct, as described above, was reckless. Monsanto regularly risks the lives of consumers and users of their products, including Plaintiff, with full knowledge of the dangers of its products. Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff. Defendant's reckless conduct therefore warrants an award of punitive damages.

131.   As a proximate result of Monsanto's wrongful acts and omissions in placing its defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff has suffered and continues to suffer severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, has suffered economic losses (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

132.   THEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## VIII.   CLAIM FOUR

### BREACH OF IMPLIED WARRANTIES

133.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

134.   At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto.

135.   Before the time that Plaintiff was exposed to the use of Roundup® products, Monsanto impliedly warranted to its consumers, including Plaintiff, that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

136.   Monsanto, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiffs' injuries.

137.   Plaintiff reasonably relied upon the skill, superior knowledge and judgment of Monsanto and upon its implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

138.   Plaintiff is the intended third-party beneficiary of implied warranties made by Monsanto to the purchasers and users of its horticultural herbicides, and as such Plaintiff is entitled to assert this claim.

139.    The Roundup® products were expected to reach and did in fact reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendant.

140.    At all times relevant to this litigation, Monsanto was aware that consumers and users of its products, including Plaintiff, would use Roundup® products as marketed by Monsanto, which is to say that Plaintiff was a foreseeable user of Roundup®.

141.    Monsanto intended that its Roundup® products be used in the manner in which Plaintiff used them and Monsanto impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

142.    In reliance upon Monsanto's implied warranty, Plaintiff used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted, and marketed by Monsanto.

143.    Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

144.    Monsanto breached its implied warranty to Plaintiff in that its Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

145.    The harm caused by Monsanto's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

146.    As a direct and proximate result of Monsanto's wrongful acts and omissions, Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has endured

pain and suffering, has suffered economic loss (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

147.   THEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## IX.   **PRAYER FOR RELIEF**

148.   THEREFORE, Plaintiff requests that the Court enter judgement in Plaintiff's favor and against Monsanto, awarding as follows:

      a.   compensatory damages in an amount to be proven at trial;

      b.   punitive damages;

      c.   costs including reasonable attorneys' fees, court costs, and other litigation expenses; and

      d.   any other relief the Court may deem just and proper.

## X.   **JURY TRIAL DEMAND**

149.   Plaintiff demands a trial by jury on all of the triable issues within this Complaint.

Dated: July 10, 2019.

*/s/ Michael Simpson*
Michael A. Simpson
Attorney-In-Charge
Texas State Bar No. 18403650
Southern District of Texas Bar No. 103432
msimpson@simpsontriallawyers.com
Kim Jones Penepacker
Texas State Bar No. 24101976
Southern District of Texas Bar No. 3369154
kjones@simpsontriallawyers.com
**SIMPSON, SIMPSON & PENEPACKER**
P.O. Box 685
1119 Halsell Street

Bridgeport, Texas 76426
(940) 683-4098 (telephone)
(940) 683-3122 (facsimile)