# U.S. District Court
## District of Oregon (Portland (3))
## CIVIL DOCKET FOR CASE #: 3:19-cv-01078-YY

Weeder v. Monsanto Company
Assigned to: Magistrate Judge Youlee Yim You
Demand: $75,000
Cause: 28:1332 Diversity-Personal Injury

Date Filed: 07/11/2019
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Product Liability
Jurisdiction: Diversity

**Plaintiff**

**Tracie E. Weeder**

represented by **Leslie W. O'Leary**
Johnson Johnson Lucas & Middleton, P.C.
975 Oak St
Suite 1050
Eugene, OR 97401
(541) 484-2434
Fax: (541) 484-0882
Email: loleary@justicelawyers.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 07/11/2019 | 1 | Complaint. Filing fee in the amount of $400 collected. Agency Tracking ID: 0979-5922044 Jury Trial Requested: Yes. Filed by Tracie E. Weeder against Monsanto Company (Attachments: # 1 Civil Cover Sheet, # 2 Proposed Summons to Monsanto Company). (O'Leary, Leslie) (Entered: 07/11/2019) |
| 07/15/2019 | 2 | Notice of Case Assignment to Magistrate Judge Youlee Yim You and Discovery and Pretrial Scheduling Order. **NOTICE: Counsel shall print and serve the summonses and all documents issued by the Clerk at the time of filing upon all named parties in accordance with Local Rule 3-5.** Discovery is to be completed by 11/12/2019. Joint Alternate Dispute Resolution Report is due by 12/12/2019. Ordered by Magistrate Judge Youlee Yim You. (jtj) (Entered: 07/15/2019) |
| 07/15/2019 | 3 | Summons Issued Electronically as to Monsanto Company. **NOTICE: Counsel shall print and serve the summonses and all documents issued by the Clerk at the time of filing upon all named parties in accordance with Local Rule 3-5.** (jtj) (Entered: 07/15/2019) |
| 07/18/2019 | 4 | Affidavit of Service of Summons Issued 3 upon Monsanto Company served on 7/15/2019 Filed by Tracie E. Weeder. (O'Leary, Leslie) (Entered: 07/18/2019) |

**PACER Service Center**

**Transaction Receipt**

| 07/19/2019 11:15:00 | | | |
|---|---|---|---|
| **PACER Login:** | hllp1982:2634105:4722683 | **Client Code:** | 1417.0049 |
| **Description:** | Docket Report | **Search Criteria:** | 3:19-cv-01078-YY Start date: 1/1/1970 End date: 7/19/2019 |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

Leslie W. O'Leary, OSB No. 990908
loleary@justicelawyers.com
**JOHNSON, JOHNSON, LUCAS & MIDDLETON, P.C.**
975 Oak St., Suite 1050
Eugene, OR 97401
Telephone: (541) 484-2434
Facsimile: (541) 484-0882

Of Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**PORTLAND DIVISION**

| | |
|---|---|
| **TRACIE E. WEEDER,** ) | Case No.: 3:19-cv-1078 |
| ) | |
| Plaintiff, ) | |
| ) | **COMPLAINT** |
| vs. ) | |
| ) | **JURY TRIAL DEMAND** |
| ) | |
| **MONSANTO COMPANY,** ) | |
| ) | |
| Defendant. ) | |
| ) | |

Plaintiff alleges:

### I.    NATURE OF THE CASE

1.

This is an action for damages suffered by Plaintiff resulting from Defendant's negligence and strict liability in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup® ("Roundup"), which contains the active ingredient glyphosate.

Page 1 – **COMPLAINT**

2.

Plaintiff asserts that Roundup and/or glyphosate is defective, dangerous to human health, unsuitable for marketing and sale, and lacks proper warnings and directions as to the dangers associated with its use.

3.

Plaintiff's injuries, like those suffered by thousands of other similarly situated consumers throughout the United States, were avoidable.

## II.    JURISDICTION AND VENUE

4.

The Court has jurisdiction over Defendant and this action under 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendant.  Defendant is incorporated and/or has its principle place of business outside of Oregon, where Plaintiff resides.

5.

The amount in controversy exceeds $75,000, exclusive of interest and costs.

6.

Venue is proper within this district under 28 U.S.C. § 1391 because Defendant conducts business here and is subject to personal jurisdiction in this district.  Venue is also proper because Defendant sells, markets, and/or distributes Roundup within the District of Oregon, and Plaintiff purchased Defendant's product within this district.

## III.    PARTIES

7.

Plaintiff is a resident and citizen of Salem, Polk County, Oregon.  At all relevant times, plaintiff was a resident of Salem, Polk County, Oregon.  Plaintiff brings this action for personal injuries sustained by exposure to Roundup, whose active ingredients include glyphosate and the

Page 2 – **COMPLAINT**

surfactant polyethoxylated tallow amine ("POEA"). As a result of her exposure to Roundup, Plaintiff developed Non-Hodgkin's lymphoma, specifically, follicular lymphoma, a subtype of B-cell lymphoma.

8.

"Roundup" refers to all formulations of Defendant's Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to- Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup-Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

9.

Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its principal place of business in St. Louis, Missouri (Missouri Secretary of State Charter No. F00488018).

Monsanto has conducted business within Oregon and has derived substantial revenue from goods and products used in this state.

10.

Defendant advertises and sells goods, specifically Roundup, in Oregon.

11.

Defendant conducted business that relates to the allegations to this complaint within the state of Oregon and derived substantial revenue from goods and products used in Oregon.

12.

Defendant expected or should have expected its acts to have consequences within the state of Oregon, and Defendant derived substantial revenue from interstate commerce.

13.

Defendant engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup.

14.

Upon information and belief, Defendant purposefully availed itself of the privilege of conducting activities within the state of Oregon, thus invoking the benefits and protections of its laws.

15.

Upon information and belief, Defendant designed, sold, advertised, manufactured, and/or distributed Roundup with full knowledge of its dangerous and defective nature.

Page 4 – **COMPLAINT**

## IV. FACTUAL ALLEGATIONS

### 16.

At all relevant times, Defendant was in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or has acquired and is responsible for the commercial herbicide Roundup.

### 17.

Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate.

### 18.

Monsanto discovered the herbicidal properties of glyphosate during the 1970s and subsequently began to design, research, manufacture, sell and distribute glyphosate-based "Roundup" as a broad spectrum herbicide.

### 19.

Glyphosate is the active ingredient in Roundup. It is a broad spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the world.

### 20.

Glyphosate is a "non selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3- phosphate synthase, known as EPSP synthase.

### 21.

Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately, plant death.

Page 5 – **COMPLAINT**

22.

Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

23.

Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has been driven largely by the proliferation of genetically engineered crops, which are specifically tailored to resist the activity of glyphosate.

24.

Defendant is intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup i.e., "Roundup Ready®." As of 2009, Monsanto was the world's leading producer of seeds designed to be Roundup Ready®. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready® seeds.

25.

The original Roundup, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the world's most widely used herbicides.[1]

26.

For nearly 40 years, consumers, farmers, and the public have used Roundup, unaware of its carcinogenic properties.

---

[1] *Backgrounder*, History of Monsanto's Glyphosate Herbicides, June 2005.

Page 6 – **COMPLAINT**

## A. Registration of Herbicides Under Federal Law

27.

The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 et seq.  FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA) prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. 136a(a).

28.

The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential nontarget organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or reregistering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

29.

FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

30.

The EPA and the state of Oregon registered Roundup for distribution, sale, and manufacture in the United States, including Oregon.

Page 7 – **COMPLAINT**

31.

FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

32.

The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of reevaluating all pesticide products through a Congressionally mandated process called "reregistration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

33.

In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment in relation to the registration process no later than July 2015. The EPA completed its review of glyphosate in early 2015 but delayed releasing the assessment pending further review in light of the World Health Organization's March 24, 2015 finding that glyphosate is a "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

**B. Monsanto's False Representations Regarding the Safety of Roundup**

34.

In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds,

Page 8 – **COMPLAINT**

and fish. Among the representations, the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

A. Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences.

B. And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

C. Roundup biodegrades into naturally occurring elements.

D. Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

E. This nonresidual herbicide will not wash or leach in the soil. It... stays where you apply it.

F. You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

G. Glyphosate is less toxic to rats than table salt following acute oral ingestion.

H. Glyphosate's safety margin is much greater than required. It has over a 1,000 fold safety margin in food and over a 700 fold safety margin for workers who manufacture it or use it.

I.  You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

J.  "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area that has been treated with Roundup.[2]

35.

On November 19, 1996, Monsanto entered an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

A.  its glyphosate containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

B.  its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;

C.  its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

D.  its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics;"

E.  glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and

---

[2] Attorney General of the State of New York, *In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law*, § 63 (15) (Nov. 1996).

F. its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

36.

Monsanto did not alter its advertising in the same manner in any state other than in New York, and on information and belief, it still has not done so as of today.

37.

In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[3]

C. **Evidence of Carcinogenicity in Roundup**

38.

As early as the 1980s, Monsanto was aware of glyphosate's carcinogenic properties.

39.

On March 4, 1985, a group of the EPA's Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[4]

40.

Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

41.

In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87- 103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology,

---

[3] *Monsanto Guilty in "Fake Ad" Row*, BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk /2/hi/europe/8308903.stm

[4] Consensus Review of Glyphosate, Casewell No. 661A (U.S. Environmental Protection Agency, Mar. 4, 1985).

product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.[5]

42.

In October 1991, the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.[6]

43.

In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendant's Roundup products are more dangerous and toxic than glyphosate alone.[7] As early as 1991, evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.[8]

44.

In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDKl/Cyclin B Activation." The study found that Monsanto's Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

---

[5] http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheet/0178fact.pdf

[6] Second Peer Review of Glyphosate, CAS No. 1071-83-6 (U.S. Environmental Protection Agency Oct. 30, 1991).

[7] Martinez et al. (2007); Benachour (2009); Gasnier et al. (2010); Pexoto (2005; Marc (2004)

[8] Martinez et al. (1991)

45.

In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

46.

Studies also noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[9]

47.

In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

48.

The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

49.

In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

---

[9] Molinari (2000); Stewart et al. (2003)

Page 13 – **COMPLAINT**

50.

The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

51.

The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendant.

52.

Defendant knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup.

53.

Defendant knew or should have known that tests, limited to Roundup's active ingredient glyphosate, were insufficient to prove the safety of Roundup.

54.

Defendant failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup.

55.

Rather than perform appropriate tests, Defendant relied upon flawed industry-supported studies designed to protect Defendant's economic interests, rather than the health and safety of Plaintiff and the consuming public.

56.

Despite its knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup as safe.

### D. **IARC Classification of Glyphosate**

57.

The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency tasked by the World Health Organization ("WHO") with conducting and coordinating research into the causes of cancer.

58.

An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015-2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

59.

IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have: a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by the above

Page 15 – **COMPLAINT**

considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

60.

On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one year—many of which have been in Defendant's possession since as early as 1985—IARC's working group published its conclusion that the glyphosate contained in Defendant's Roundup herbicide is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

61.

IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A probable carcinogen to humans. According to the authors glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

62.

The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma (''NHL'') and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

63.

IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

**E.**  **Earlier Evidence of Glyphosate's Danger**

64.

Despite the new classification by IARC, Defendant has had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

Page 16 – **COMPLAINT**

65.

Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

66.

In 1997, Chris Clements published "Genotoxicity of select herbicides in Rana catesbeiana tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay." The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

67.

Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress. The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

68.

Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

69.

In 2006, Cesar Paz-y-Mifio published a study examining DNA damage in human subjects exposed to glyphosate. The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

70.

The IARC Monograph reflects the volume of evidence of glyphosate pesticides', genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

71.

Despite knowledge to the contrary, Defendant maintains that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts agree that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

72.

In addition knowing that glyphosate and Roundup are genotoxic, Defendant has long been aware of glyphosate's carcinogenic properties.

73.

Glyphosate and Roundup, in particular, have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma ("NHL"), Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

74.

Defendant has known of this association since the early to mid-1980s, and numerous human and animal studies have documented the carcinogenicity of glyphosate and/or Roundup.

75.

In 1985, the EPA studied the effects of glyphosate in mice, finding that a dose-related response in male mice was linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

76.

In 2003, Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides, finding they were a risk factor for NHL and hairy cell leukemia. The study concluded that glyphosate had the most significant relationship to NHL among all herbicide studies, with an increased odds ratio of 3.111.

77.

In 2003, AJ De Roos published a study examining the pooled data of Midwestern farmers, examining pesticides and herbicides as risk factors for NHL. The study, which controlled for potential confounders, found a relationship between glyphosate exposure and increased incidence of NHL.

78.

In 2008, Mikael Eriksson published a population based case-control study, which found that exposure to various pesticides was a risk factor for NHL and strengthened previous reported associations between glyphosate and NHL.

79.

Despite its awareness of these studies, Defendant continued to issue broad and sweeping statements that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and in the face of voluminous evidence to the contrary.

80.

Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiff, the agricultural community, and the consuming public to

purchase and increase the use of Defendant's Roundup for Defendant's pecuniary gain, and in fact, did induce Plaintiff to use Roundup.

81.

Notwithstanding Defendant's representations to the contrary, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

82.

Defendant knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

83.

Defendant failed to appropriately and adequately warn Plaintiff of these dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

84.

Despite IARC's classification of glyphosate as a class 2A probable carcinogen, Defendant continues to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-genotoxic; and falsely warrants to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

85.

Defendant claimed and continues to claim that Roundup is safe, non- carcinogenic, and non-genotoxic. These misrepresentations are consistent with Defendant's cavalier approach to investigating and ensuring the safety of its products to the public at large, including to Plaintiff.

**F. Scientific Fraud Underlying Certain Safety Determinations of Glyphosate**

86.

After the EPA's 1985 classification of glyphosate as possibly carcinogenic to humans (Group C), Monsanto exerted pressure upon the EPA to change its classification. Succumbing to this pressure, the EPA reclassified glyphosate to Group E, which was based upon evidence of non-carcinogenicity in humans. In so classifying, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

87.

On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed scientific fraud.

88.

In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup. IBT performed approximately 30 tests on glyphosate and glyphosate-containing products, including 11 of the 19 chronic toxicology studies needed to register Roundup with the EPA.

89.

In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to toxicological

Page 21 -- **COMPLAINT**

impacts of glyphosate. The EPA subsequently audited IBT and determined that the toxicology studies conducted for Roundup were invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

90.

Three top executives of IBT were convicted of fraud in 1983.

91.

In the second incident, Monsanto hired Craven Laboratories ("Craven") in 1990 to perform pesticide and herbicide studies, including several studies on Roundup.

92.

In March of 1991, the EPA announced that it was investigating Craven for "allegedly falsifying test data used by chemical firms to win EPA approval of pesticides." The investigation led to the indictments of the laboratory owner and a handful of employees.

### G. Monsanto's Continuing Disregard for the Safety of Plaintiffs and the Public

93.

Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."[10]

---

[10] *Backgrounder-Glyphosate: No Evidence of Carcinogenicity.* Updated November 2014. (downloaded October 9 2015).

Page 22 – **COMPLAINT**

94.

Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

95.

Glyphosate, and Defendant's Roundup products in particular, has long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

96.

Despite Defendant's knowledge that Roundup was associated with an elevated risk of developing cancer, Defendant's promotional campaigns focused on Roundup's purported "safety profile."

97.

As a result of Defendant's failure to adequately warn Plaintiff about Roundup's cancer risks, Plaintiff used glyphosate and Roundup instead of other acceptable and safer methods of controlling unwanted weeds and pests. In turn, uninformed scientists and physicians failed to warn consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

98.

Defendant failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

99.

The failure of Defendant to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers, and the

absence of warning or caution statements that are adequate to protect health and the environment.

100.

The failure of Defendant to appropriately warn and inform the EPA has resulted in directions for use that are not adequate to protect health and the environment.

101.

Due to the foregoing acts and omissions, Plaintiff seeks compensatory damages as a result of her use of, and exposure to, Roundup, which was a substantial contributing factor in causing Plaintiff's NHL. Plaintiff's injuries are permanent and lasting in nature, resulting in physical pain and anguish, including diminished enjoyment of life.

102.

Defendant's acts and omissions have caused Plaintiff to suffer losses in the form of medical expenses and other economic and noneconomic damages.

**H. Plaintiff's Exposure to Roundup**

103.

Plaintiff, a homeowner, used Roundup on her 1.2 acre property beginning in 1994, when she and her husband moved to there.

104.

Plaintiff applied Roundup using a backpack sprayer on a regular basis for at least 20 years. Plaintiff followed all safety and precautionary instructions during the course of her use.

105.

On April 9, 2014, Plaintiff was diagnosed with NHL, specifically, grade 1 follicular center cell lymphoma (a subtype of large B-cell lymphoma) with extensive mesenteric lymphadenopathy.

Page 24 – **COMPLAINT**

106.

As a result of her illness, Plaintiff has incurred significant economic and noneconomic damages.

## V.   FIRST CLAIM FOR RELIEF: STRICT LIABILITY UNDER ORS § 30.900 – 30.920)

107.

Plaintiff realleges all previous paragraphs.

108.

At all relevant times, Defendant was engaged in the business of designing, testing, developing, manufacturing, marketing, promoting, distributing, and selling Roundup products.

109.

At all relevant times, Defendant designed, tested, developed, manufactured, marketed, promoted, distributed, and sold the Roundup products used by Plaintiff as described above.

110.

The Roundup products purchased and used by Plaintiff were in a defective condition that was unreasonably dangerous to Plaintiff when they left Defendant's hands.

111.

The Roundup products were expected to, and did, in fact, reach Plaintiff without substantial change in the condition in which they were sold by Defendant.

112.

Defendant's Roundup products were in a defective condition and unreasonably dangerous to Plaintiff in one or more of the following ways:

  A. Roundup, which contained glyphosate, was defectively designed in that its use could result in cancer and other serious injuries, making Roundup unreasonably dangerous to an extent beyond what would be contemplated by the ordinary consumer;

Page 25 – **COMPLAINT**

B. Roundup was defectively designed in that it was marketed without adequate safety testing of potential short-term and long-term risks to consumers who regularly used the product;

C. Roundup was defectively designed in that there were safer, feasible alternative formulations that existed that would have prevented or reduced the risk of cancer and other serious injury. Indeed, at the time that Defendant designed its Roundup products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable;

D. Roundup's label and instructions were defective in that they concealed and/or failed to adequately warn users about the product's dangerous characteristics, including the risk of cancer and other serious injury posed by the product when used as instructed;

E. Roundup's label and instructions were defective in that Defendant expressly represented to the public that Roundup products were safe and without any dangerous side effects despite contrary evidence known to Defendant that Roundup could cause serious and permanent injury, including cancer.

113.

The above defects were a substantial contributing factor in causing Plaintiff's cancer. As a result, Plaintiff has suffered physical pain and economic hardship, including considerable financial expenses for medical care and treatment injuries and other damages.

## VI.    SECOND CLAIM FOR RELIEF:   NEGLIGENCE

114.

Plaintiff realleges all previous paragraphs.

115.

Defendant owed a duty of care to consumers, including Plaintiff, to use reasonable care in the development, design, testing, manufacture, labeling, marketing, promotion, distribution, and sale of its Roundup products.

116.

Defendant breached its duty of care in one or more of the following ways:

A. Failing to undertake adequate safety testing of its Roundup products despite Defendant's knowledge as early as the 1980s that glyphosate was carcinogenic;

B. Upon notice of a growing body of studies finding that Roundup and/or its active ingredient glyphosate was associated with NHL, failing to warn the consuming public that Roundup products posed a risk of NHL and other cancers and serious diseases;

C. Representing to the consuming public that Roundup products were safe, had no side effects and posed no cancer risks despite significant evidence to the contrary, and despite being ordered to discontinue ad campaigns that misrepresented the safety of Roundup;

D. Suppressing scientific information from the consuming public about the risks of Roundup products;

E. Downplaying the risks of cancer and other side effects associated with Roundup products;

F. Improperly exerting influence on scientists and government agencies to alter or dilute their findings and conclusions regarding risks posed by Roundup products;

G. Engaging in efforts to falsify data underlying Roundup toxicity studies to make it appear that Roundup was safe; and

H. Failing to investigate and reformulate Roundup products with safer alternative ingredients to reduce the risk of cancer and other serious diseases.

117.

It was reasonably foreseeable to Defendant that its acts and/or omissions could cause serious injury to consumers who regularly used its Monsanto products, including Plaintiff.

118.

Defendant's acts and omissions were a substantial contributing factor in causing Plaintiff's injuries and damages as alleged above.

## VII. THIRD CLAIM FOR RELIEF: PUNITIVE DAMAGES

119.

Plaintiff realleges all previous paragraphs.

120.

Defendant is liable for punitive and/or exemplary damages under Oregon law. In designing, testing, manufacturing, marketing, promoting, distributing, and selling its Roundup Products, Defendant acted with a conscious indifference to the possibility that Roundup could cause serious injury to consumers during ordinary use, which implies a willful disregard of a known risk to consumer safety – the equivalent of legal malice.

## VIII. DAMAGES

121.

Plaintiff realleges all previous paragraphs.

122.

Plaintiff is entitled to compensation for her damages because Defendant's defective products, tortious conduct and breach of duties were a substantial contributing factor in causing her damages.

123.

As a result of her injury, Plaintiff seeks economic damages for past and future medical expenses, wage loss and diminished future earnings potential. In addition, Plaintiff seeks noneconomic damages for pain and suffering, as well as punitive damages.

124.

All of the above damages are in an amount which will be proved at trial.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendant on each of the above-referenced claims for relief and as follows:

1.  Awarding Plaintiff her economic damages and losses, including, without limitation: past and future medical expenses, out-of-pocket expenses, lost earnings and lost earning capacity, lost household services, and other economic damages in an amount to be determined at trial;

2.  Awarding Plaintiff compensatory damages in excess of the jurisdictional amount, including, but not limited to: past and future pain, suffering, emotional distress, disability, loss of enjoyment of life, and other noneconomic damages and losses in an amount to be determined by trial;

3.  Awarding punitive damages;

4.  Awarding pre-judgment and post-judgment interest;

5.  Awarding Plaintiff reasonable attorneys' fees;

6.  Awarding Plaintiff the costs of these proceedings; and

7.  Such other and further relief as this Court deems just and proper.

## X.    DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all issues.

Page 29 – **COMPLAINT**

DATED this 11th day of July, 2019.

JOHNSON JOHNSON LUCAS & MIDDLETON, P.C.

s/ Leslie W. O'Leary
Leslie W. O'Leary, OSB No. 990908
loleary@justicelawyers.com
975 Oak Street, Suite 1050
Eugene, OR 97401
Telephone: (541) 484-2434
Facsimile: (541) 484-0882

Attorney for Plaintiff

Page 30 – **COMPLAINT**