# United States District Court
## Eastern District of Pennsylvania (Philadelphia)
## CIVIL DOCKET FOR CASE #: 2:19-cv-02463-JS

HOLMEN et al v. MONSANTO COMPANY
Assigned to: CHIEF JUDGE JUAN R. SANCHEZ
Cause: 28:1332 Diversity-Product Liability

Date Filed: 06/06/2019
Jury Demand: Plaintiff
Nature of Suit: 365 P.I.: Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**DAVID HOLMEN**
*INDIVIDUALLY, AND AS EXECUTOR OF THE ESTATE OF PHILIP HOLMEN, DECEASED*

represented by **ROBERT W. SINK**
LAW OFFICES OF ROBERT W. SINK
1417 CROSBY DRIVE
FORT WASHINGTON, PA 19034
215-995-1000
Email: rsink@sinklawoffices.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JEANNINE HOLMEN**

represented by **ROBERT W. SINK**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**MONSANTO COMPANY**

| Date Filed | # | Docket Text |
|---|---|---|
| 06/06/2019 | 1 | COMPLAINT against MONSANTO COMPANY ( Filing fee $ 400 receipt number 198511.), filed by DAVID HOLMEN, JEANNINE HOLMEN.(jwl, ) (Entered: 06/06/2019) |
| 06/06/2019 | | Summons Issued as to MONSANTO COMPANY. One Forwarded To: Counsel on 6/6/19 (jwl, ) (Entered: 06/06/2019) |
| 06/06/2019 | | DEMAND for Trial by Jury by DAVID HOLMEN, JEANNINE HOLMEN. (jwl, ) (Entered: 06/06/2019) |
| 07/18/2019 | 2 | Letter to Issue Summons by DAVID HOLMEN, JEANNINE HOLMEN. (SINK, ROBERT) Modified on 7/18/2019 (nd, ). (Entered: 07/18/2019) |
| 07/18/2019 | | Summons Issued as to MONSANTO COMPANY. Forwarded To: Rob Sink on 7/18/19 (fdc, ) (Entered: 07/18/2019) |

## PACER Service Center

### Transaction Receipt

| 07/25/2019 15:29:26 | | | |
|---|---|---|---|
| **PACER Login:** | hllp1982:2634105:4722683 | **Client Code:** | 1417.0049 |
| **Description:** | Docket Report | **Search Criteria:** | 2:19-cv-02463-JS |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| David Holmen, individually, and as Executor of the Estate of Philip Holmen, *deceased* and Jeannine Holmen, <br>            Plaintiffs, | Civil Action <br><br> Case No.: |
| vs. | **JURY TRIAL DEMANDED** |
| MONSANTO COMPANY, <br>            Defendant. | |

### COMPLAINT

Plaintiffs allege against Monsanto Company as follows:

### INTRODUCTION

1.  In 1970, defendant Monsanto Company, Inc. discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 millions of pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

2.  Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of

corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

3.    Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

4.    On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

5.    On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

6.    The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other haematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

7.    The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

8.    Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to

proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

## PARTIES

9.   Plaintiff, David Holmen is the Executor of the Estate of Philip Holmen, deceased, having been duly appointed by the Register of Wills of Bucks County, Pennsylvania on May 29, 2019. David Holmen is a citizen of the Commonwealth of Pennsylvania and resides in Bucks County, Pennsylvania.

10.  Plaintiff, Jeannine Holmen at all relevant times was the spouse of Philip Holmen (Decedent) until his death on June 8, 2017.  Ms. Holmen is a citizen of the Commonwealth of Pennsylvania and resides in Bucks County, Pennsylvania.

11.  Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.

12.  Monsanto is registered to conduct business in the Commonwealth of Pennsylvania as a foreign business corporation.

13.  At all relevant times, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the sole or exclusive manufacturer of Roundup.

## JURISDICTION AND VENUE

14.  Federal diversity jurisdiction in this Court is proper under 28 U.S.C. §1332 because Plaintiffs are citizens of a different state, Pennsylvania, from Defendant Monsanto Company, which is a citizen of Delaware and Missouri, and the aggregate amount in controversy exceeds $75,000, exclusive of interest and costs.

15.  This Court has personal jurisdiction over Monsanto under the Pennsylvania Long-Arm Statute, because (a) Monsanto is registered to conduct business in Pennsylvania as a foreign corporation, (b) Monsanto knows or should have known that its Roundup® products are sold throughout Pennsylvania, and (c) Monsanto caused Roundup® to be sold to Philip Holmen in Pennsylvania.

16.  In addition, Monsanto maintains sufficient contacts with the Commonwealth of Pennsylvania such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

17.  Venue is proper within this District under 28 U.S.C. §1391 because a substantial part of the events and omissions giving rise to the claims asserted in this Complaint occurred in this District.  Further, Monsanto, as a corporate entity, is deemed to reside in any jurisdiction in which it is subject to personal jurisdiction.

18.  Plaintiffs are informed and believe, and based thereon allege, that in committing the acts alleged herein, each and every managing agent, agent, representative and/or employee of the Defendant was working within the course and scope of said agency, representation and/or employment with the knowledge, consent, ratification, and authorization of the Defendant and their directors, officers and/or managing agents.

## FACTS

19.  Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

20.  Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis.

21.   Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

22.   For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®—glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Agricultural workers are, once again, victims of corporate greed.

23.   Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® was safe.

**The Discovery of Glyphosate and Development of Roundup®**

24.   The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use. It still markets Roundup® as safe today.

**Registration of Herbicides under Federal Law**

25.   The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

26.   Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

27.   FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

28.   Roundup®-branded products are registered by the EPA for manufacture, sale, and distribution, and are registered by Pennsylvania for sale and distribution.

29.   FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in

conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

30.   The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

31.   In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment —in relation to the reregistration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

### Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup

32.   Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

7

33.   On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

34.   In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

35.   In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

36.   Three top executives of IBT were convicted of fraud in 1983.

37.   In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

38.   Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

### The Importance of Roundup® to Monsanto's Market Dominance Profits

39.   The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture

8

division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

40.   In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

41.   Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

**Monsanto has known for decades that it falsely advertises the safety of Roundup®**

42.   In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup ® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were **"safer than table salt"** and **"practically non-toxic"** to mammals,

birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a) Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

b) And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c) Roundup biodegrades into naturally occurring elements.

d) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e) This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f) You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

43. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

\* \* \*

b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

\* \* \*

c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

\* \* \*

d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

\* \* \*

e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic.

11

44.   Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

45.   In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

### Classifications and Assessments of Glyphosate

46.   The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

47.   The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.  Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

48.   One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the

Monograph meeting, the summary of the Working Group findings are published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

49.   In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

50.   In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

51.   On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

52.   The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

53.   Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

54.   Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

55.   The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

56.   The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

57.   The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

58.   In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

59.   The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

60.   The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

61.   The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

62.   IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

**Other Earlier Findings About Glyphosate's Dangers to Human Health**

63.   The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

Glyphosate is released to the environment in its use as a herbicide for controlling woody     and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These     sites may be around water and in wetlands.

It may also be released to the environment during its manufacture, formulation, transport,     storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are    not available.

15

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

64.   In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

65.   California maintains a list of carcinogenic chemicals under the law known as Proposition 65 which requires businesses to provide warnings to Californians about significant exposures to chemicals that cause cancer, birth defects and other reproductive harm.

66.   In 2017, the California Office of Environmental Health Hazardous Assessment determined that glyphosate will be added to California's list of chemicals that cause cancer.

67.   In 2017, the State of California added glyphosate to the Proposition 65 list, a list of chemicals known to cause cancer.

**Recent Worldwide Bans on Roundup®/Glyphosate**

68.   Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in light of the as the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which takes effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but

16

unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

69.   The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

70.   France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

71.   Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

72.   The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that Glyphosate has been linked to fatal kidney disease in agricultural workers.

73.   The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

**Decedent's Exposure to Roundup**

74.   From approximately 1975 until approximately 1985, decedent, Philip Holmen purchased, used, and was exposed to Roundup to control weeds at his nursery business and home.  Philip Holmen continued to use and be exposed to Roundup to control weeds at his home until at least 1990.

75. During the entire time Philip Holmen used Roundup, he did not know that exposure to Roundup could be injurious to his health or the health of others.

17

76.   As a direct result of the conduct of Monsanto and exposure to Roundup, Philip Holmen developed non-Hodgkin lymphoma (NHL) which caused his death on June 8, 2017.

77.   As a direct result of the conduct of Monsanto and exposure to Roundup, Philip Holmen was required to receive medical treatment and care and to expend various sums of money and incur various expenses.

78.   As a direct result of the conduct of Monsanto and exposure to Roundup, Philip Holmen suffered a loss of earnings and/or earning capacity.

79.   As a direct result of the conduct of Monsanto and exposure to Roundup, Philip Holmen suffered loss of life's pleasures, severe physical pain, mental anguish, emotional suffering and humiliation.

## EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

80.   Plaintiffs incorporate by reference each and every allegation of this Complaint set forth as if fully stated herein.

81.   The running of any statute of limitations has been tolled by reason of Defendant's fraudulent concealment.  Defendant through its affirmative misrepresentations and omissions, actively concealed from Decedent the true risks associated with Roundup and glyphosphate.

82.   At all relevant times, Defendant has maintained that Roundup is safe, nontoxic, and non-carcinogenic.

83. Through the date of filing this Complaint, Defendant continues to maintain that its Roundup brand herbicides do not cause cancer and are not genotoxic.

84.   As a result of Defendant's action, Decedent was unaware, and could not reasonably know or have learned through reasonable diligence, that Roundup contact exposed Decedent to

the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

85.   Defendant is estopped from relying on any statute of limitations because of its fraudulent concealment of the true character, quality, and nature of Roundup.

86.   Defendant was under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Defendant had and continues to have exclusive control, because Defendant knew that his information was not available to Decedent or to distributors of Roundup.

87.   In addition, Defendant is estopped from relying on any statute of limitations because of its intentional concealment if these facts.

88.   Decedent had no knowledge that Defendant was engaged in the wrongdoing alleged herein because of the fraudulent acts of concealment or wrongdoing by Defendant, which Decedent could not have reasonably discovered at any prior time.

89.   Also, the economics of this fraud should be considered because Defendant had the ability to and did spend enormous amounts of money in furtherance of its purpose of advertising, distributing, marketing, promoting and/or selling a profitable herbicide, notwithstanding the known or reasonably known risks.

90.   Decedent could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and was forced to and rely only on Defendant's representations regarding Roundup.

91.   Accordingly, Defendant is precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

**COUNT ONE**

## STRICT LIABILITY - DESIGN DEFECT

92.   Plaintiffs incorporate by reference each and every allegation set forth in all of the paragraphs of this Complaint as if fully stated herein.

93.   Plaintiffs brings this strict liability claim against Defendant for defective design.

94.   At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant. At all times relevant to this litigation, Defendants designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products that Decedent was exposed to, as described above.

95.   At all times relevant to this litigation, Defendant's Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Decedent.

96.   At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Pennsylvania and throughout the United States, including Decedent, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

97.   Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of the Defendant's manufacturers and/or

suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

98.   Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

99.   At all times relevant to this action, Defendant knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendant.

100.   Therefore, at all times relevant to this litigation, Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendant were defective in design and formulation, in one or more of the following ways:

a. When placed in the stream of commerce, Defendant's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b. When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c. When placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d. Defendant did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate.

e. Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f. Defendant knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g. Defendant did not conduct adequate post-marketing surveillance of its Roundup® products.

h. Defendant could have employed safer alternative designs and formulations.

90.   Decedent was exposed to Defendant's Roundup® products without knowledge of its dangerous characteristics.

91.   At all times relevant to this litigation, Decedent was exposed to the use of Defendant's Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

90.   Decedent could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

91.   The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendant's Roundup® products were and are more dangerous than alternative products and Defendant could have designed its Roundup® products to make them less dangerous. Indeed, at the time that Defendant designed its Roundup® products, the state of

the industry's scientific knowledge was such that a less risky design or formulation was attainable.

92.   At the time Roundup® products left Defendant's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant's herbicides.

93.   Defendant's defective design of its Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including the Plaintiffs and Decedent herein.

94.   Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendant is strictly liable to Plaintiffs.

95.   The defects in Defendant's Roundup® products were substantial and contributing factors in causing Decedent's grave injuries and death and, but for Defendant's misconduct and omissions, Decedent would not have sustained his injuries and would not have died.

96.   Defendant's conduct, as described above, was reckless. Defendant risked the lives of consumers and users of its products, including Decedent, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Defendant made conscious decisions not to redesign, warn or inform the unsuspecting public. Defendant's reckless conduct warrants an award of punitive damages.

97.   As a direct and proximate result of Defendant placing defective Roundup® products into the stream of commerce, Decedent suffered grave injuries and died, and endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment, and loss of earnings and earning capacity.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiffs also demands a jury trial on the issues contained herein.

## COUNT TWO

### STRICT LIABILITY - FAILURE TO WARN

98. Plaintiffs incorporate by reference each and every allegation set forth in all of the paragraphs of this Complaint as if fully stated herein.

99. Plaintiffs bring this strict liability claim against Defendant for failure to warn.

100. At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, promoting and applying Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

101. Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiffs, and persons responsible for consumers (such as employers), and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

102. At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply,

24

provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn Decedent of the dangers associated with Roundup® use and exposure. Defendant, as manufacturer, seller, or distributor of chemical herbicides, is held to the knowledge of an expert in the field.

103.   At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

104.   At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of this product and to those who would foreseeably use or be harmed by Roundup, including Plaintiffs and Decedent.

105.   Despite the fact that Defendant knew or should have known that Roundup® posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied or sold the product, and not known to end users and consumers, such as Decedent.

106.   Defendant knew or should have known that these products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Defendant has wrongfully concealed information concerning the dangerous nature of Roundup® and its

active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

107.  At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Pennsylvania and throughout the United States, including Decedent, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, marketed and sprayed/applied by Defendant.

108.  Decedent was exposed to Roundup® products, as described above, without knowledge of their dangerous characteristics.

109.  At all times relevant to this litigation, Decedent was exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

110.  Decedent could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of his exposure. Decedent relied upon the skill, superior knowledge, and judgment of Defendant.

111.  Defendant knew or should have known that the minimal warnings disseminated with or accompanying the application of Roundup® products were inadequate, but they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

112.  The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled those exposed such as Decedent to

utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

113.  To this day, Defendant has failed to adequately and accurately warn of the true risks of Decedent's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

114.  As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were sold or distributed by Defendant, and when Decedent became exposed.

115. Defendant is liable to Plaintiffs for injuries caused by negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of their products and the risks associated with the use of or exposure to Roundup® and glyphosate.

116.  The defects in these Roundup® products were substantial and contributing factors in causing Decedent's injuries, and, but for Defendant's misconduct and omissions, Decedent's would not have sustained his injuries.

117.  Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products and application, Decedent could have avoided the risk of developing injuries as alleged herein.

118.  As a direct and proximate result of Defendant placing defective Roundup® products into the stream of commerce and exposing Decedent to them, he suffered severe injuries and death and endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment, and loss of earnings and earning capacity.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT THREE

### NEGLIGENCE

119. Plaintiffs incorporate by reference each and every allegation set forth in all of the paragraphs of this Complaint as if fully stated herein.

120.  Defendant, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Decedent.

121.  At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

122. At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

123. At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

124. Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to Roundup® products could cause or be associated with Decedent's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Decedent.

125. Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

126. As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and

unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

127.   Despite ability and means to investigate, study, and test products and to provide adequate warnings, Defendant has failed to do so. Indeed, Defendant wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

128.   Defendant's negligence included, but are not limited to:

a. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® products without thorough and adequate pre- and post-market testing;

b. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d. Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

e. Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f. Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and be exposed to its Roundup® products;

g. Failing to disclose to Decedent, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

h. Failing to warn Decedent, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Decedent and other consumers;

i. Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

j. Representing that its Roundup® products were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended purpose;

k. Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

l. Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m. Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

n. Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

129. Defendant knew and/or should have known that it was foreseeable that consumers such as Decedent would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

130. Decedent did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

131. Defendant's negligence was the proximate cause of the injuries, harm, death, and economic losses that Decedent and Plaintiffs suffered, as described herein.

132. Defendant's conduct, as described above, was reckless. Defendant regularly risked the lives of consumers and users of their products, including Decedent, with full knowledge of the dangers of its products. Defendant made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Decedent. Defendant's reckless conduct therefore warrants an award of punitive damages.

133. As a direct and proximate result of Defendant's wrongful acts and omissions in placing defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Decedent suffered severe and permanent physical and emotional injuries and death. Decedent endured pain and suffering, has suffered economic losses (including significant expenses for medical care and treatment), and loss of earnings and earning capacity.

WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein

incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiffs also demands a jury trial on the issues contained herein.

**COUNT FOUR**

**BREACH OF IMPLIED WARRANTIES**

134. Plaintiffs incorporate by reference each and every allegation set forth in all of the paragraphs of this Complaint as if fully stated herein.

135. At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Decedent, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

136. Before the time that Decedent was exposed to the use of the aforementioned Roundup® products, Defendant impliedly warranted to consumers and those exposed—including Decedent—that Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

137. Defendant, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Decedent's injuries.

138. Decedent reasonably relied upon the skill, superior knowledge and judgment of Defendant and upon their implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

139. Decedent was at at all relevant times in contractual privity with Defendant.

140. Decedent was the intended third-party beneficiaries of implied warranties made by Defendant to the purchasers and/or users of their horticultural herbicides, and as such Plaintiffs are entitled to assert this claim.

141. The Roundup® products were expected to reach and did in fact reach consumers and/or users, including Decedent, without substantial change in the condition in which they were manufactured and sold by Defendant.

142. At all times relevant to this litigation, Defendant was aware that consumers and users of their products, including Decedent, would use Roundup® products as marketed by Defendant, which is to say that Decedent was a foreseeable user of Roundup®.

143. Defendant intended that Roundup® products be used in the manner in which Decedent was exposed to it and Defendant impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested and/or researched.

144. In reliance upon Defendant's implied warranty, Decedent was used or was exposed to Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendant.

145. Decedent could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

146. Defendant breached their implied warranty to Decedent in that Roundup® products were not of merchantable quality, safe, or fit for their intended use, and/or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

147.  The harm caused by Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

148.  As a direct and proximate result of Defendant's wrongful acts and omissions Decedent suffered severe and permanent physical and emotional injuries, including but not limited to his diagnoses of non-Hodgkin lymphoma and resulting death.  Decedent endured pain and suffering, suffered economic loss (including significant expenses for medical care and treatment), and loss of earnings and earning capacity.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT FIVE

### LOSS OF CONSORTIUM

149.  Plaintiffs incorporate by reference each and every allegation set forth in all of the paragraphs of this Complaint as if fully stated herein.

150.  Plaintiff Jeannine Holmen alleges a cause of action for Loss of Consortium herein.

151.  Plaintiff Jeannine Holmen at all relevant times was legally married to Decedent. Until his death.  Plaintiff Jeannine Holmen was entitled to Decedent's comfort, care, affection, companionship, services, society, advice, guidance, counsel, and consortium and was deprived of such due to Defendant's conduct.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred,

attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiffs also demands a jury trial on the issues contained herein.

## COUNT SIX

### WRONGFUL DEATH

152.  Plaintiffs incorporate by reference each and every allegation set forth in all of the paragraphs of this Complaint as if fully stated herein.

153. Plaintiffs, David Holmen, individually and as Executor of the Estate of Philip Holmen, deceased, brings the action on behalf of the beneficiaries under and by virtue of the Wrongful Death Act, 42 Pa.C.S.A. §8301, and the applicable Rules of Civil Procedure.

154. Decedent left surviving him, the following persons who are beneficiaries under the Wrongful Death Act:

      a.  Jeannine Holmen (wife)

      b.  David Holmen (son)

      c.  Deborah Holmen (daughter)

      d.  Cheryl Dean (daughter)

155. As a result of the conduct of Defendant, as set forth herein, Philip Holmen, deceased, was caused grave injuries and death resulting in the entitlement to damages by the beneficiaries under the Wrongful Death Act.

156. Plaintiffs, David Holmen, individually and as Executor of the Estate of Philip Holmen, deceased, claim all expenses recoverable under the Wrongful Death Act, including but not limited to damages for medical, funeral and burial expenses and expenses of administration necessitated by reason of the injuries causing Philip Holmen's death.

157. On behalf of the Wrongful Death Act beneficiaries, the Executor claims damages for monetary support that Decedent would have provided to the beneficiaries during his lifetime, including but not limited to, the support provided or which could have been expected to have been provided to the beneficiaries.

158. On behalf of the Wrongful Death Act beneficiaries, the Executor claims damages for services provided and which could have been expected to have been performed in the future.

159. On behalf of the Wrongful Death Act beneficiaries, the Executor claims damages for all pecuniary loss suffered by the beneficiaries.

160. On behalf of the Wrongful Death Act beneficiaries, the Executor claims damages for all loss of consortium, comfort, society, guidance, tutelage, and moral upbringing that the beneficiaries may have received from the Decedent by the beneficiaries as a result of Decedent's untimely death.

161. On behalf of the Wrongful Death Act beneficiaries, the Executor claims damages for the full measure of damages allowed under the Wrongful Death Act of Pennsylvania and the decisional law interpreting said Act.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT SEVEN

## SURVIVAL ACTION

162. Plaintiffs incorporate by reference each and every allegation set forth in all of the paragraphs of this Complaint as if fully stated herein.

163. Plaintiffs, David Holmen, individually and as Executor of the Estate of Philip Holmen, deceased, bring this Survival Action on behalf of the Estate of Philip Holmen under and by virtue of 42 Pa.C.S. §8302, and the applicable Rules of Civil Procedure and the decisional law interpreting said Act.

164. As a result of the negligence of Defendant as set forth herein, Decedent was caused grave injuries and death, resulting in the entitlement to damages by his Estate under the Survival Act.

165. As a result of the death of Philip Holmen, his Estate has been deprived of the economic value of her life expectancy, and Plaintiffs' claim under the Survival Act, damages for all pecuniary losses suffered by the Estate as a result of Decedent's death, including all loss of income, earnings, retirement income, benefits and Social Security income.

166. Executor further claims, under the Survival Act, the total amount that the Decedent would have earned in the future, minus the costs of personal maintenance.

167. Executor further claims, under the Survival Act, damages for the conscious pain and suffering endured by Decedent prior to her death, including physical pain and suffering and mental pain and suffering leading to decedent's death, inconvenience and loss of life's pleasures.

168. Executor further claims, under the Survival Act all damages recoverable pursuant to 42 Pa.C.S. §8302, and the decisional law interpreting said Act.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court enter judgment in their favor and against Defendant, awarding as follows:

1. All damages available for Wrongful Death and Survival Actions;

2. Compensatory damages;

3. Pain and suffering;

4. Lost earnings and earning capacity;

5. Loss of enjoyment of life;

6. Punitive damages;

7. For default judgment as a sanction for the bad faith destruction of evidence, if any, and according to proof, if any;

8. Costs and reasonable attorney's fees;

9. Medical expenses, funeral expenses, life care expenses, and other expenses and economic damages;

10. Loss of consortium;

11. Pre- and post-judgment interest; and

12. Any other relief the Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand a jury trial on all claims so triable in this action.

Dated: June 6, 2019

Respectfully submitted,

**LAW OFFICES OF ROBERT W. SINK**

Robert W. Sink, Esquire
Email: rsink@sinklawoffices.com
1800 J.F.K. Blvd., Suite 1402
Philadelphia, PA 19103
215-995-1000


*Attorney for Plaintiffs*