# U.S. District Court
## DISTRICT OF ARIZONA (Prescott Division)
## CIVIL DOCKET FOR CASE #: 3:19-cv-08228-ESW

Fennell v. Monsanto Company
Assigned to: Magistrate Judge Eileen S Willett
Demand: $5,000,000
Cause: 28:1332 Diversity-Product Liability

Date Filed: 07/31/2019
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Injury: Prod. Liability
Jurisdiction: Diversity

## Plaintiff

**Debra Fennell**
*a Statutory Plaintiff on Behalf of Herself
and All Statutory Beneficiaries of
deceased*
Darrell Fennell

represented by  **Ashley Crowell**
Dalimonte Rueb Stoller LLP - Phoenix, AZ
2425 E Camelback Rd., Ste. 500
Phoenix, AZ 85016
602-888-2807
Email: ashley@drlawllp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ben C Martin**
Martin Baughman PLLC
3710 Rawlins St., Ste. 1230
Dallas, TX 75219
214-761-6614
Fax: 214-744-7590
Email: bmartin@martinbaughman.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Laura J Baughman**
Martin Baughman PLLC
3710 Rawlins St., Ste. 1230
Dallas, TX 75219
214-761-6614
Fax: 214-744-7590
Email: lbaughman@martinbaughman.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paul Lincoln Stoller**
Dalimonte Rueb Stoller LLP - Phoenix, AZ
2425 E Camelback Rd., Ste. 500
Phoenix, AZ 85016
602-888-2807
Email: Paul@drlawllp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 07/31/2019 | 1 | COMPLAINT. Filing fee received: $ 400.00, receipt number 0970-17225109 filed by Debra Fennell. (Crowell, Ashley) (Attachments: # 1 Civil Cover Sheet)(MFR) (Entered: 08/01/2019) |
| 07/31/2019 | 2 | SUMMONS Submitted by Debra Fennell. (Crowell, Ashley) (MFR) (Entered: 08/01/2019) |
| 07/31/2019 | 3 | Filing fee paid, receipt number 0970-17225109. This case has been assigned to the Honorable Eileen S Willett. All future pleadings or documents should bear the correct case number: CV-19-8228-PCT-ESW. Magistrate Election form attached. (MFR) (Entered: 08/01/2019) |
| 08/01/2019 | 4 | Summons Issued as to Monsanto Company. (MFR). *** IMPORTANT: When printing the summons, select "Document and stamps" or "Document and comments" for the seal to appear on the document. (Entered: 08/01/2019) |
| 08/01/2019 | 5 | NOTICE TO FILER OF DEFICIENCY re: 1 Complaint filed by Debra Fennell. Pursuant to the Electronic Case Filing Administrative Policies and Procedures Manual Section II(B), attorneys are required to submit the automated Civil Cover Sheet when filing a new case. *FOLLOW-UP ACTION REQUIRED:* Please refile corrected document. Deficiency must be corrected within one business day of this notice. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MFR) (Entered: 08/01/2019) |
| 08/01/2019 | 6 | NOTICE TO FILER OF DEFICIENCY re: 1 Complaint filed by Debra Fennell. Document not in compliance with LRCiv 7.1(a)(3) - Party names must be capitalized using proper upper and lower case type. *No further action is required.* This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (MFR) (Entered: 08/01/2019) |
| 08/01/2019 | 7 | Additional Attachments to Main Document re: 1 Complaint *Civil Cover Sheet* by Plaintiff Debra Fennell. (Crowell, Ashley) (Entered: 08/01/2019) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 08/06/2019 09:35:54 | | | |
| **PACER Login:** | hllp1982:2634105:4722683 | **Client Code:** | 1417.0049 |
| **Description:** | Docket Report | **Search Criteria:** | 3:19-cv-08228-ESW |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

Paul L. Stoller (No. 016773)
Ashley Crowell (No. 027286)
**DALIMONTE RUEB STOLLER, LLP**
2425 E. Camelback Road, Suite 500
Phoenix, Arizona 85016
Tel: 602.888.2807
paul@drlawllp.com
ashley@drlawllp.com

**MARTIN BAUGHMAN, PLLC**
Laura J. Baughman, Esq. (*pro hac vice* anticipated)
Ben C. Martin, Esq. (*pro hac vice* anticipated)
3710 Rawlins St., Ste. 1230
Dallas, Texas 75219
P- 214.761.6614
F- 214.744.7590
lbaughman@martinbaughman.com
bmartin@martinbaughman.com

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Debra Fennell, a Statutory Plaintiff on Behalf of Herself and All Statutory Beneficiaries of Darrell Fennell, Deceased; | **Case No.** |
| Plaintiff, | **COMPLAINT** |
| v. | |
| MONSANTO COMPANY, | |
| Defendant. | |

COMES NOW Plaintiff, DEBRA FENNELL, a Statutory Plaintiff on Behalf of Herself and All Statutory Beneficiaries of DARRELL FENNELL, Deceased, by and through undersigned counsel, and for their causes of action against Defendant Monsanto Company, alleging the following upon information and belief (including investigation made by and through Plaintiff's counsel), except those allegations that pertain to Plaintiff, which are based on personal knowledge:

**INTRODUCTION**

1. All claims in this action are a direct and proximate result of Defendant's negligent, willful, and wrongful conduct in connection with the design, development, manufacturing, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of Roundup®, containing the active ingredient glyphosate. Plaintiff in this action seeks recovery for damages as a result of Decedent Darrell Fennell developing Non-Hodgkin's Lymphoma ("NHL"), which was directly and proximately caused by such wrongful conduct by Defendant, the unreasonably dangerous and defective nature of Roundup®, and its active ingredient, glyphosate, and the attendant effects of developing NHL. Plaintiff and Decedent Darrell Fennell were not aware of an association between exposure to Roundup® and the increased risk of developing NHL until well after the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), first published its evaluation of glyphosate. All of the claims involve common questions of law and fact and share legal and medical issues that arise out of all of the Decedent Darrell Fennell's exposures to Roundup®.

**THE PARTIES**

**PLAINTIFF DEBRA FENNELL, A STATUTORY PLAINTIFF ON BEHALF OF HERSELF AND ALL STATUTORY BENEFICIARIES OF DARRELL FENNELL, DECEASED**

2. Plaintiff Debra Fennell is the surviving spouse and heir to her late husband, Darrell Fennell, Deceased, is a citizen of the State of Arizona and resides in the Flagstaff, Coconino County, Arizona. She brings this action on behalf of herself and the other statutory beneficiaries pursuant to A.R.S. §12-612.

3. Decedent Darrell Fennell was first exposed to Roundup® in Flagstaff, AZ in 2005. He was exposed until approximately 2017.

4. In July 2017, Decedent Darrell Fennell was diagnosed with widespread mantle cell lymphoma, a type of NHL, in Flagstaff, AZ at North Arizona Healthcare Flagstaff Medical Center, and suffered the effects attendant thereto, as a direct and

1   proximate result of the unreasonably dangerous and defective nature of Roundup® and
2   Defendant's wrongful and negligent conduct in the research, development, testing,
3   manufacture, production, promotion, distribution, marketing, and sale of Roundup®.
4   Darrell Fennell passed away on July 31, 2017.  NHL was a contributing cause of this death.

5       5.      As a direct and proximate result of these injuries, Plaintiff DEBRA
6   FENNELL, a Statutory Plaintiff on Behalf of Herself and All Statutory Beneficiaries of
7   DARRELL FENNELL, Deceased, has incurred medical expenses in the past and has
8   endured and will endure pain and suffering and loss of enjoyment of life, as well as loss of
9   consortium, and Plaintiff has otherwise been damaged in a personal and pecuniary nature.

10      6.      During the entire time that Decedent Darrell Fennell was exposed to
11   Roundup®, he did not know that exposure to Roundup® was injurious to his health or the
12   health of others.

13   **DEFENDANT MONSANTO COMPANY**

14      7.      Defendant Monsanto is a Delaware corporation with its headquarters and
15   principal place of business in St. Louis, Missouri.  Defendant Monsanto may be served
16   with process by serving its Statutory Registered Agent, CSC 8825 N. 23rd Avenue, Suite
17   100, Phoenix, AZ.

18              **JURISDICTION AND VENUE**

19      8.      At all times relevant hereto, Monsanto was in the business of researching,
20   designing, formulating, compounding, testing, manufacturing, producing, processing,
21   assembling, inspecting, distributing, labeling, and packaging and Monsanto was in the
22   business of marketing, promoting, and/or advertising Roundup® products throughout the
23   US including Coconino County, Arizona.

24      9.      At all times relevant hereto, Monsanto was registered to do business in the
25   State of Arizona.

26      10.     Personal jurisdiction is proper pursuant to Ariz. R. Civ. Pro. 4.2(a).
27   Monsanto has conducted and continues to conduct substantial and systematic business

28

-3-

1 activities related to Roundup, which are not isolated activities, within the State of Arizona.

2 Such activities include, but are not limited to: (a) marketing and sale of Roundup, including

3 the Roundup at issue in this case, in this jurisdiction; (b) hiring, training and deploying

4 employees, including managers and sales representatives in this jurisdiction; (c)

5 advertising and marketing Roundup in this jurisdiction; (d) maintenance of company files

6 and equipment relating to Roundup in this jurisdiction; (e) payment of employee salaries

7 in this jurisdiction; and (f) maintenance of a website directed to all states, including

8 Arizona.

9      11.   In addition, personal jurisdiction is proper in that Defendant designed,

10 manufactured, marketed, and sold Roundup that was used by Decedent Darrell Fennell.

11 The marketing and sale of the Roundup in question occurred in Arizona. Decedent was

12 exposed to Roundup in Arizona. RoundUp caused Decedent's NHL in Arizona.

13      12.   Jurisdiction is proper based on diversity under 28 U.S.C. § 1332 because

14 Plaintiff is a citizen of Arizona, a different state than the Defendant's states of citizenship,

15 and the aggregate amount in controversy exceeds $75,000, exclusive of interest and costs.

16      13.   Venue is further proper in the District of Arizona because this is a tort case

17 in which the Plaintiff resides in Arizona and the cause of action arose in Arizona. *See*

18 A.R.S. § 12-401.

19 **FACTS**

20      14.   At all times relevant to this complaint, Monsanto was the entity that

21 discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®,

22 which contains the active ingredient glyphosate. Glyphosate is a broad-spectrum, non-

23 selective herbicide used in a wide variety of herbicidal products around the world.

24      15.   Plants treated with glyphosate translocate the systemic herbicide to their

25 roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic

26 amino acids necessary for protein synthesis. Treated plants generally die within two to

27

28

1 three days. Because plants absorb glyphosate, it cannot be completely removed by washing
2 or peeling produce or by milling, baking, or brewing grains.

3     16.    For nearly 40 years, farms across the world have used Roundup® without
4 knowing of the dangers its use poses. That is because when Monsanto first introduced
5 Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every
6 weed without causing harm either to people or to the environment. Of course, history has
7 shown that not to be true. According to the World Health Organization ("WHO"), the main
8 chemical ingredient of Roundup®—glyphosate—is a probable cause of cancer. Those most
9 at risk are farm workers and other individuals with workplace exposure to Roundup®, such
10 as garden center workers, nursery workers, and landscapers. Agricultural workers are,
11 once again, victims of corporate greed. Monsanto assured the public that Roundup® was
12 harmless. In order to prove this, Monsanto has championed falsified data and has attacked
13 legitimate studies that revealed Roundup®'s dangers. Monsanto has led a prolonged
14 campaign of misinformation to convince government agencies, farmers and the general
15 population that Roundup® is safe.

16 ***The Discovery of Glyphosate and Development of Roundup®***

17     17.    The herbicidal properties of glyphosate were discovered in 1970 by
18 Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the
19 market in the mid-1970s under the brand name Roundup®.[1] From the outset, Monsanto
20 marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and
21 consumer use. Roundup® is still marketed as safe today.[2]

22

23     [1] Bayer, *Backgrounder, History of Monsanto's Glyphosate Herbicide* (Sep. 2,
24 2015), http://www.monsanto.com/products/documents/glyphosate-background-
materials/back_history.pdf.

25     [2] Roundup®, *Learning The Basics: Learn how Roundup® Weed & Grass Killer*
26 *products work, how to use them safely, which weeds they work on, and where to use them*
(July 31, 2019), http://www.monsanto.com/sitecollectiondocuments/glyphosate-safety-
27 health.pdf; Bayer, *Glyphosate's Impact on Human Health and Safety* (July 31, 2019),
28 https://www.bayer.com/en/glyphosate-impact-on-human-health-and-

18.     In addition to the active ingredient glyphosate, Roundup® formulations also contain adjuvants and other chemicals, such as the surfactant POEA, which are considered "inert" and therefore protected as "trade secrets" in manufacturing.   Growing evidence suggests that these adjuvants and additional components of Roundup® formulations are not, in fact, inert and are toxic in their own right.

*Registration of Herbicides under Federal Law*

19.     The manufacture, formulation, and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.*  FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act.  7 U.S.C. § 136a(a).

20.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.  Registration by the EPA, however, is not an assurance or finding of safety.  The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment."  7 U.S.C. § 136a(c)(5)(D).

21.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide."   7 U.S.C. § 136(bb).  FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or a pesticide allowed to continue to be sold in commerce.

---

safety.aspx?gclsrc=aw.ds&&gclid=EAIaIQobChMIlOLCzKng4wIV3__jBx0p1QmoEA
MYASAAEgLi-_D_BwE.

1    22.   The EPA and the State of Arizona registered Roundup® for distribution, sale,
2  and manufacture in the United States and the State of Arizona.

3    23.   FIFRA generally requires that the registrant, Monsanto in the case of
4  Roundup®, conducts the health and safety testing of pesticide products.  The EPA has
5  protocols governing the conduct of tests required for registration and the laboratory
6  practices that must be followed in conducting these tests. The data produced by the
7  registrant must be submitted to the EPA for review and evaluation.  The government is not
8  required, nor is it able, however, to perform the product tests that are required of the
9  manufacturer.

10    24.   The evaluation of each pesticide product distributed, sold, or manufactured
11  is completed at the time the product is initially registered.  The data necessary for
12  registration of a pesticide has changed over time.  The EPA is now in the process of re-
13  evaluating all pesticide products through a Congressionally-mandated process called "re-
14  registration." 7 U.S.C. § 136a-1.  In order to reevaluate these pesticides, the EPA is
15  demanding the completion of additional tests and the submission of data for the EPA's
16  recent review and evaluation.

17    25.   In the case of glyphosate, and therefore Roundup®, the EPA had planned on
18  releasing its preliminary risk assessment—in relation to the reregistration process—no later
19  than July 2015.  The EPA completed its review of glyphosate in early 2015, but it delayed
20  releasing the risk assessment pending further review in light of the WHO's health-related
21  findings.

22  *Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®*

23    26.   Based on early studies showing that glyphosate could cause cancer in
24  laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to*
25  *humans* (Group C) in 1985.  After pressure from Monsanto, including contrary studies it
26  provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity*
27  *in humans* (Group E) in 1991.  In so classifying glyphosate, however, the EPA made clear

28

1   that the designation did not mean the chemical does not cause cancer: "It should be

2   emphasized, however, that designation of an agent in Group E is based on the available

3   evidence at the time of evaluation and should not be interpreted as a definitive conclusion

4   that the agent will not be a carcinogen under any circumstances."[3]

5      27.   On two occasions, the EPA found that the laboratories hired by Monsanto to

6   test the toxicity of its Roundup® products for registration purposes committed fraud.

7      28.   In the first instance, Monsanto, in seeking initial registration of Roundup®

8   by the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate

9   pesticide toxicology studies relating to Roundup®.[4]   IBT performed about 30 tests on

10  glyphosate and glyphosate-containing products, including nine of the 15 residue studies

11  needed to register Roundup®.

12     29.   In 1976, the United States Food and Drug Administration ("FDA")

13  performed an inspection of IBT that revealed discrepancies between the raw data and the

14  final report relating to the toxicological impacts of glyphosate.   The EPA subsequently

15  audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to

16  be invalid.[5]   An EPA reviewer stated, after finding "routine falsification of data" at IBT,

17

---

18   [3] U.S. Envtl. Prot. Agency, *Memorandum, Subject: SECOND Peer Review of

19   Glyphosate* 1 (1991), *available at*
     http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_30-Oct-

20   91_265.pdf.

21   [4] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories* (Sep. 2,
     2015), http://www.monsanto.com/products/documents/glyphosate-background-

22   materials/ibt_craven_bkg.pdf.

23   [5] U.S. Envtl. Prot. Agency, *Summary of the IBT Review Program Office of
     Pesticide Programs* (1983), *available at*

24   http://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client

25   =EPA&Index=1981+Thru+1985&Docs=&Query=&Time=&EndTime=&SearchMethod
     =1&TocRestrict=n&Toc=&TocEntry=&QField=&QFieldYear=&QFieldMonth=&QFiel

26   dDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles%5CIn
     dex%20Data%5C81thru85%5CTxt%5C00000022%5C91014ULV.txt&User=ANONYM

27   OUS&Password=anonymous&SortMethod=h%7C-

28   &MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i

1  that it was "hard to believe the scientific integrity of the studies when they said they took
2  specimens of the uterus from male rabbits."[6]

3       30.   Three top executives of IBT were convicted of fraud in 1983.

4       31.   In the second incident of data falsification, Monsanto hired Craven
5  Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®.
6  In that same year, the owner of Craven Laboratories and three of its employees were
7  indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides
8  and herbicides.[7]

9       32.   Despite the falsity of the tests that underlie its registration, within a few years
10 of its launch, Monsanto was marketing Roundup® in 115 countries.

11 *The Importance of Roundup® to Monsanto's Market Dominance Profits*

12      33.   The success of Roundup® was key to Monsanto's continued reputation and
13 dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's
14 agriculture division was out-performing its chemicals division's operating income, and that
15 gap increased yearly. But with its patent for glyphosate expiring in the United States in
16 the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance
17 and to ward off impending competition.

18      34.   In response, Monsanto began the development and sale of genetically
19 engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to
20 glyphosate, farmers can spray Roundup® onto their fields during the growing season
21 without harming the crop. This allowed Monsanto to expand its market for Roundup® even

22

23 ─────────────────────────────────────────────
   425&Display=p%7Cf&DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&B
24 ackDesc=Results%20page&MaximumPages=1&ZyEntry=1&SeekPage=x&ZyPURL.

25      [6] Marie-Monique Robin, *The World According to Monsanto: Pollution,*
   *Corruption and the Control of the World's Food Supply* (2011) (citing U.S. Envtl. Prot.
26 Agency, *Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor,*
   *Registration Branch. Washington, D.C.* (August 9, 1978)).
27
      [7] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories, supra.*
28

1 further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million
2 acres worldwide and nearly 70% of American soybeans were planted from Roundup
3 Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup®
4 market through a marketing strategy that coupled proprietary Roundup Ready® seeds with
5 continued sales of its Roundup® herbicide.

6    35.    Through a three-pronged strategy of increasing production, decreasing
7 prices, and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most
8 profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales,
9 outselling other herbicides by a margin of five to one, and accounting for close to half of
10 Monsanto's revenue.[8] Today, glyphosate remains one of the world's largest herbicides by
11 sales volume.

12 ***Monsanto has known for decades that it falsely advertises the safety of Roundup®***

13    36.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against
14 Monsanto based on its false and misleading advertising of Roundup® products.
15 Specifically, the lawsuit challenged Monsanto's general representations that its spray-on
16 glyphosate-based herbicides, including Roundup®, were **"safer than table salt"** and
17 **"practically non-toxic"** to mammals, birds, and fish. Among the representations the
18 NYAG found deceptive and misleading about the human and environmental safety of
19 glyphosate and/or Roundup® are the following:

20          a) "Remember that environmentally friendly Roundup
21     herbicide is biodegradable. It won't build up in the soil so you
       can use Roundup with confidence along customers' driveways,
22     sidewalks and fences ..."

23          b) "And remember that Roundup is biodegradable and
       won't build up in the soil. That will give you the environmental
24     confidence you need to use Roundup everywhere you've got a
       weed, brush, edging or trimming problem."

25 _____

26    [8] David Barboza, *The Power of Roundup; A Weed Killer Is A Block for Monsanto
    to Build On*, N.Y. TIMES, Aug. 2, 2001, *available at*
27 http://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weed-killer-is-a-
    block-for-monsanto-to-build-on.html.
28

c) "Roundup biodegrades into naturally occurring elements."

d) "Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e) "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it."

f) "You can apply Roundup with 'confidence because it will stay where you put it' it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Roundup into natural products."

g) "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

h) "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

i) "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[9]

37.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable.

---

[9] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

38.     Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief it still has not done so today.

39.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[10]

*Classifications and Assessments of Glyphosate*

40.     The IARC process for the classification of glyphosate followed IARC's stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

---

[10] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.

41.     The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.[11] Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

42.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in *The Lancet Oncology*, and within a year after the meeting, the finalized Monograph is published.

43.     In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

44.     In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

45.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph Volume 112. For Volume 112, a Working Group of 17 experts from 11 countries met at

---

[11] World Health Org., *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble* (2006), available at http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

-13-

1   IARC from March 3–10, 2015 to assess the carcinogenicity of certain herbicides, including
2   glyphosate.  The March meeting culminated a nearly one-year review and preparation by
3   the IARC Secretariat and the Working Group, including a comprehensive review of the
4   latest available scientific evidence.  According to published procedures, the Working
5   Group considered "reports that have been published or accepted for publication in the
6   openly available scientific literature" as well as "data from governmental reports that are
7   publicly available."

8       46.     The studies considered the following exposure groups: (1) occupational
9   exposure of farmers and tree nursery workers in the United States, forestry workers in
10  Canada and Finland and municipal weed-control workers in the United Kingdom; and (2)
11  para-occupational exposure in farming families.

12      47.     Glyphosate was identified as the second-most used household herbicide in
13  the United States for weed control between 2001 and 2007 and the most heavily used
14  herbicide in the world in 2012.

15      48.     Exposure pathways are identified as air (especially during spraying), water,
16  and food. Community exposure to glyphosate is widespread and found in soil, air, surface
17  water, and groundwater, as well as in food.

18      49.     The assessment of the IARC Working Group identified several case control
19  studies of occupational exposure in the United States, Canada, and Sweden. These studies
20  show a human health concern from agricultural and other work-related exposure to
21  glyphosate.

22      50.     The IARC Working Group found an increased risk between exposure to
23  glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after
24  adjustment for other pesticides.

25      51.     The IARC Working Group also found that glyphosate caused DNA and
26  chromosomal damage in human cells.  One study in community residents reported
27
28

-14-

1  increases in blood markers of chromosomal damage (micronuclei) after glyphosate
2  formulations were sprayed.

3      52.    In male CD-1 mice, glyphosate induced a positive trend in the incidence of
4  a rare tumor: renal tubule carcinoma.    A second study reported a positive trend for
5  haemangiosarcoma in male mice.  Glyphosate increased pancreatic islet-cell adenoma in
6  male rats in two studies.  A glyphosate formulation promoted skin tumors in an initiation-
7  promotion study in mice.

8      53.    The IARC Working Group also noted that glyphosate has been detected in
9  the urine of agricultural workers, indicating absorption.  Soil microbes degrade glyphosate
10  to aminomethylphosphoric acid (AMPA).  Blood AMPA detection after exposure suggests
11  intestinal microbial metabolism in humans.

12      54.    The IARC Working Group further found that glyphosate and glyphosate
13  formulations induced DNA and chromosomal damage in mammals, and in human and
14  animal cells in utero.

15      55.    The IARC Working Group also noted genotoxic, hormonal, and enzymatic
16  effects in mammals exposed to glyphosate.[12]    Essentially, glyphosate inhibits the
17  biosynthesis of aromatic amino acids, which leads to several metabolic disturbances,
18  including the inhibition of protein and secondary product biosynthesis and general
19  metabolic disruption.

20      56.    The IARC Working Group also reviewed an Agricultural Health Study,
21  consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and
22  North Carolina.[13]   While this study differed from others in that it was based on a self-

23

---

24      [12] Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion,*
25  *Diazinon & Glyphosate, supra* at 77.

26      [13] Anneclare J. De Roos et al., *Cancer Incidence Among Glyphosate-Exposed*
*Pesticide Applicators in the Agricultural Health Study*, 113 Envt'l Health Perspectives
27  49–54 (2005), *available at*
    http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1253709/pdf/ehp0113-000049.pdf.
28

1  administered questionnaire, the results support an association between glyphosate exposure

2  and multiple myeloma, hairy cell leukemia (HCL), and chronic lymphocytic leukemia

3  (CLL), in addition to several other cancers.

4  ***Other Earlier Findings About Glyphosate's Dangers to Human Health***

5        57.      The EPA has a technical fact sheet, as part of its Drinking Water and Health,

6  National Primary Drinking Water Regulations publication, relating to glyphosate.   This

7  technical fact sheet predates IARC's March 20, 2015 evaluation.   The fact sheet describes

8  the release patterns for glyphosate as follows:

9                          **Release Patterns**

10             Glyphosate is released to the environment in its use as
     an herbicide for controlling woody and herbaceous weeds on
11   forestry, right-of-way, cropped and non-cropped sites. These
     sites may be around water and in wetlands.
12

13             It may also be released to the environment during its
     manufacture, formulation, transport, storage, disposal and
14   cleanup, and from spills. Since glyphosate is not a listed
     chemical in the Toxics Release Inventory, data on releases
15   during its manufacture and handling are not available.

16             Occupational workers and home gardeners may be
     exposed to glyphosate by inhalation and dermal contact during
17   spraying, mixing, and cleanup. They may also be exposed by
     touching soil and plants to which glyphosate was applied.
18   Occupational exposure may also occur during glyphosate's
     manufacture, transport storage, and disposal.[14]

19

20       58.      In 1995, the Northwest Coalition for Alternatives to Pesticides reported that

21  in California, the state with the most comprehensive program for reporting of pesticide-

22  caused illness, glyphosate was the third most commonly reported cause of pesticide illness

23  among agricultural workers.[15]

24

25

26   _____

     [14] U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate*, *supra*.

27   [15] Caroline Cox, *Glyphosate, Part 2: Human Exposure and Ecological Effects*, 15 J.

28   PESTICIDE REFORM 4 (1995); W.S. Peas et al., *Preventing pesticide-related illness in*

                                    -16-

*The Toxicity of Other Ingredients in Roundup®*

59.     In addition to the toxicity of the active ingredient, glyphosate, several studies support the hypothesis that the glyphosate-based formulation in Defendant's Roundup® products is more dangerous and toxic than glyphosate alone.  Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.[16]

60.     In 2002, a study by Julie Marc, entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation," revealed that Roundup® causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cell cycles.[17]

61.     A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.  The researchers noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer.  Failure in the cell-cycle checkpoints leads genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."[18]

62.     In 2005, a study by Francisco Peixoto, entitled "Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that

---

*California agriculture: Strategies and priorities. Environmental Health Policy Program Report*, Univ. of Cal. School of Public Health, Calif. Policy Seminar (1993).

[16] Martinez, T.T. and K. Brown, *Oral and pulmonary toxicology of the surfactant used in Roundup herbicide*, PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991).

[17] Julie Marc, et al., *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation*, 15 CHEM. RES. TOXICOL. 326–331 (2002), *available at* http://pubs.acs.org/doi/full/10.1021/tx015543g.

[18] Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation*, 96 BIOLOGY OF THE CELL 245, 245-249 (2004), *available at* http://onlinelibrary.wiley.com/doi/10.1016/j.biolcel.2003.11.010/epdf.

1  Roundup®'s effects on rat liver mitochondria are far more toxic than equal concentrations
2  of glyphosate alone. The Peixoto study further suggested that the harmful effects of
3  Roundup® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate
4  but could be the result of other chemicals, such as the surfactant POEA, or in the
5  alternative, due to a potential synergic effect between glyphosate and other ingredients in
6  the Roundup® formulation.[19]

7        63.    In 2009, Nora Benachour and Gilles-Eric Seralini published a study
8  examining the effects of Roundup® and glyphosate on human umbilical, embryonic, and
9  placental cells. The study tested dilution levels of Roundup® and glyphosate that were far
10  below agricultural recommendations, corresponding with low levels of residue in food.
11  The researchers ultimately concluded that supposed "inert" ingredients, and possibly
12  POEA, alter human cell permeability and amplify toxicity of glyphosate alone. The
13  researchers further suggested that assessments of glyphosate toxicity should account for
14  the presence of adjuvants or additional chemicals used in the formulation of the complete
15  pesticide. The study confirmed that the adjuvants present in Roundup® are not, in fact,
16  inert and that Roundup® is potentially far more toxic than its active ingredient glyphosate
17  alone.[20]

18        64.    The results of these studies were at all times available to Defendant.

19        65.    Monsanto's chief toxicologist Donna Farmer has admitted that she cannot
20  say that Roundup® does not cause cancer because Monsanto has not performed
21  carcinogenicity studies with the formulated product Roundup®, the very product that

22

23        [19] Francisco Peixoto, *Comparative effects of the Roundup and glyphosate on
        mitochondrial oxidative phosphorylation*, 61 CHEMOSPHERE 1115, 1122 (2005),
24     *available at*
25     https://www.researchgate.net/publication/7504567_Comparative_effects_of_the_Roundu
        p_and_glyphosate_on_mitochondrial_oxidative_phosphorylation.

26        [20] Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and
27     Necrosis in Human Umbilical, Embryonic, and Placental Cells*, 22 CHEM. RES. TOXICOL.
        97-105 (2008), *available at* http://big.assets.huffingtonpost.com/france.pdf.
28

1   caused Plaintiffs' NHL.[21]  Indeed, she further admitted that in the 35 years that Monsanto

2   has marketed Roundup® to the public, Monsanto has conducted no chronic carcinogenicity

3   studies on the formulated Roundup® product merely because EPA did not require that such

4   a study be performed for registration of glyphosate.[22]

5        66.    Defendant thus knew or should have known that Roundup® is more toxic

6   than glyphosate alone and that safety studies of Roundup®, Roundup's adjuvants and

7   "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiffs from

8   Roundup®.

9        67.    Despite its knowledge that Roundup® is considerably more dangerous than

10  glyphosate alone, Defendant continued to promote Roundup® as safe.

11  ***The EPA's Review of Glyphosate***

12       68.    In April 2016, personnel within the EPA's Office of Pesticides Program

13  (OPP) leaked and posted on the internet a draft report on glyphosate carcinogenicity,

14  entitled Cancer Assessment Review Committee (CARC) report, dated October 2015.  The

15  EPA removed the documents by May 2, 2016, within days of initially posting it online.  An

16  EPA spokesperson subsequently issued a statement on the agency's glyphosate review:

17           Glyphosate documents were inadvertently posted to the
             Agency's docket. These documents have now been taken down
18           because our assessment is not final. EPA has not completed our
             cancer review. We will look at the work of other governments
19           as well as work by HHS's Agricultural Health Study as we
             move to make a decision on glyphosate. Our assessment will
20           be peer reviewed and completed by end of 2016.[23]

21  _____

        [21] *See* Plaintiffs' Submission in Response to Pretrial Order No. 8, Ex. 7, *In re:*
22  *Roundup Products Liability Litigation*, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF
23  No. 187-7.

        [22] *See id.*
24

        [23] Carey Gillam, *What Is Going On With Glyphosate? EPA's Odd Handling of*
25  *Controversial Chemical*, HUFFINGTON POST, May 2, 2016, *available at*
    http://www.huffingtonpost.com/carey-gillam/what-is-going-on-with-
26  gly_b_9825326.html; *see also* P.J. Huffstutter, *EPA takes offline report that says*
27  *glyphosate not likely carcinogenic*, REUTERS, May 2, 2016, available at
    http://www.reuters.com/article/us-usa-glyphosate-epa-idUSKCN0XU01K.
28

                                            -19-

69.     On September 12, 2016, EPA's OPP submitted a report on the carcinogenic potential of glyphosate, wherein it issued a "proposed conclusion" that glyphosate is "'not likely to be carcinogenic to humans' at doses relevant to human health risk assessment."[24] There are no authors listed on this issue paper, which reiterates and adopts the conclusions of the October 2015 leaked assessment.    The issue paper is based upon a review of industry-sponsored articles and studies.  The OPP acknowledged that it rejected all studies that considered Roundup®—the formulated product—instead of studies that isolated glyphosate because "[g]lyphosate formulations contain various components other than glyphosate and it has been hypothesized these components are more toxic than glyphosate alone."[25]

70.     Thus, the OPP notes dozens of studies considered by IARC were not reviewed by the OPP because the OPP's "evaluation focused on studies on the active ingredient glyphosate" and "additional research could also be performed to determine whether formulation components, such as surfactants, influence the toxicity of glyphosate formulations."[26]

71.     From December 13 to 16, 2016, the EPA held FIFRA Scientific Advisory Panel ("SAP") meetings to consider issues raised by the OPP's evaluation of glyphosate. Again, OPP only allowed the SAP to consider studies of glyphosate alone, and not any study of the formulated product.  In its Charge to the FIFRA SAP, the OPP noted that "[a]lthough there are studies available on glyphosate-based pesticide formulations, the agency is soliciting advice from the FIFRA Scientific Advisory Panel (SAP) on this

---

[24] *See* EPA's Office of Pesticide Programs, Glyphosate Issue Paper: Evaluation of Carcinogenic Potential (Sept. 12, 2016), *available at* https://www.epa.gov/sites/production/files/2016-09/documents/glyphosate_issue_paper_evaluation_of_carcincogenic_potential.pdf.

[25] *Id.*

[26] *Id.*

1  evaluation of human carcinogenic potential for the active ingredient glyphosate only at this
2  time."[27]

3       72.     The OPP draft assessment therefore does not actually consider the product at
4  issue in this litigation or, more importantly, how glyphosate, in conjunction with
5  surfactants and other chemicals, affects carcinogenicity.

6       73.     On March 16, 2017, the final SAP meeting minutes and report were released,
7  revealing disagreement and lack of consensus among the scientists on whether there was a
8  positive association between *glyphosate* exposure and NHL.[28]

9  ***Monsanto's Industry Ties***

10      74.     Recently unsealed documents in the federal Roundup® MDL litigation reveal
11  the extent to which Monsanto has been able to leverage its contacts within the EPA to
12  protect glyphosate and Roundup® from scrutiny and review.

13      75.     Internal   Monsanto   documents,   including   email   communications,
14  demonstrate that Jess Rowland, former Deputy Division Director, Health Effects Division
15  of the EPA's OPP, and formerly the chair of the CARC (the same committee that
16  inadvertently leaked the EPA's glyphosate report in April 2016), repeatedly and directly
17  intervened on Monsanto's behalf. These same documents reveal that Monsanto was secure
18  in the knowledge that it had allies within the EPA.

19      76.     To begin, in the months following IARC's initial March 2015 announcement
20  that it had classified glyphosate as a probable carcinogen, Monsanto turned its attention to

21

22       [27] EPA OPP, Glyphosate: Evaluation of Carcinogenic Potential, Charge to the
23  FIFRA SAP for the October 18-21, 2016 Meeting, available at,
     https://www.epa.gov/sites/production/files/2016-
24  11/documents/glyphosate_sap_charge_questions_-final.pdf.

25       [28] FIFRA Scientific Advisory Panel Meeting Minutes and Final Report No. 2017-
26  01, A Set of Scientific Issues Being Considered by the Environmental Protection Agency
     Regarding: EPA's Evaluation of the Carcinogenic Potential of Glyphosate, *available at*
27  https://www.epa.gov/sites/production/files/2017-03/documents/december_13-
     16_2016_final_report_03162017.pdf.
28

1   the EPA's review of glyphosate.  In one April 27, 2015 email, Monsanto official Bill

2   Heydens wrote to colleagues to suggest "approaching EPA and…. ask if there is anything

3   that would help them defend the situation?" His colleague Dan Jenkins responded: "I think

4   you and I could get on the phone w Jess Rowland and discuss this pretty openly. He'll give

5   us straight talk."[29]

6       77.    The following day, Mr. Jenkins spoke to Mr. Rowland by telephone and then

7   relayed the substance of the conversation for his colleagues in an April 28, 2015 email.

8   Specifically, he reported back that with respect to the CARC investigation, Mr. Rowland

9   had stated: "We have enough to sustain our conclusions. Don't need gene tox or epi . . . . I

10   am the chair of the CARC and my folks are running this process for glyphosate in reg

11   review. I have called a CARC meeting in June."[30]  Thus, even though the ostensible

12   purpose of the CARC review was to evaluate the exhaustive IARC assessment on

13   glyphosate, and even though the full IARC monograph on glyphosate would not be

14   completed until July 2015, Mr. Rowland had already formed his conclusion months

15   earlier—in April 2015.

16       78.    Mr. Rowland also intervened to halt another agency's review of glyphosate.

17   When the Agency for Toxic Substances and Disease Registry (ATSDR), a federal public

18   health agency of the U.S. Department of Health and Human Services, announced in

19   February 2015 that it planned to publish a toxicological review of glyphosate, it was Mr.

20   Rowland who helped Monsanto stop the ATSDR's investigation.  In the same April 28,

21   2015, email discussed above, Mr. Jenkins explained that Mr. Rowland wanted to help

22   Monsanto stop an investigation concerning the carcinogenicity of glyphosate being

23   conducted by ATSDR.[31]  Since ATSDR is not controlled by the EPA, according to Mr.

24

25       [29] *See* Plaintiffs' Motion to Compel the Deposition of Jess Rowland, Ex. D, In re:
      Roundup Products Liability Litigation, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF

26   No. 189-4.

       [30] *Id.*

27

       [31] *See id.*

28

1   Jenkins, Mr. Rowland had bragged: "If I can kill this I should get a medal."[32]   Jenkins

2   cautioned, however, that Monsanto should not "get your hopes up, I doubt EPA and Jess

3   can kill this; but it's good to know they are going to actually make the effort now to

4   coordinate due to our pressing and their shared concern that ATSDR is consistent in its

5   conclusions with the EPA."[33]   The ATSDR never published its toxicological profile of

6   glyphosate.

7       79.   Further, the released documents reveal Monsanto's confidence that its allies

8   within the EPA would continue to support glyphosate.   In an internal memo on glyphosate,

9   Monsanto executives wrote: "We know, *but cannot say*, that EPA's Office of Pesticide

10   Program scientists strongly feel that glyphosate does not cause cancer and have defended

11   their written determination internally for months."[34]   Notably, when Mr. Rowland attended

12   the IARC glyphosate meetings as an observed for the EPA, internal communications

13   indicate Monsanto was not displeased with his attendance since, "we all know Jess."[35]

14   ***Recent Worldwide Bans on Roundup®/Glyphosate***

15       80.   Several countries around the world have instituted bans on the sale of

16   Roundup® and other glyphosate-containing herbicides, both before and since IARC first

17   announced its assessment for glyphosate in March 2015, and more countries undoubtedly

18   will follow suit as the dangers of the use of Roundup® become more widely known.   The

19   Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including

20   Roundup®, which will take effect by the end of 2015.   In issuing the ban, the Dutch

21   Parliament member who introduced the successful legislation stated: "Agricultural

22

23   [32] *Id.*

24   [33] *Id.*

25   [34] See Plaintiffs' Motion to Compel the Deposition of Jess Rowland, Ex. E, In re:
Roundup Products Liability Litigation, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF

26   No. 189-5 (emphasis original).

27   [35] *See* Plaintiffs' Motion to Compel the Deposition of Jess Rowland, Ex. G, *In re: Roundup Products Liability Litigation*, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF

28   No. 189-7.

1  pesticides in user-friendly packaging are sold in abundance to private persons. In garden
2  centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what
3  the risks of this product are. Especially children are sensitive to toxic substances and
4  should therefore not be exposed to it."[36]

5      81.  The Brazilian Public Prosecutor in the Federal District requested that the
6  Brazilian Justice Department suspend the use of glyphosate.[37]

7      82.  France banned the private sale of Roundup® and glyphosate following the
8  IARC assessment for Glyphosate.[38]

9      83.  Bermuda banned both the private and commercial sale of glyphosates,
10  including Roundup®. The Bermuda government explained its ban as follows: "Following
11  a recent scientific study carried out by a leading cancer agency, the importation of weed
12  spray 'Roundup' has been suspended."[39]

13

14

15  _____

16  [36] *Holland's Parliament Bans Glyphosate Herbicides*, The Real Agenda, April 14,
17  2014, *available at* http://real-agenda.com/hollands-parliament-bans-glyphosate-herbicides/.

18  [37] Christina Sarich, *Brazil's Public Prosecutor Wants to Ban Monsanto's
    Chemicals Following Recent Glyphosate-Cancer Link*, GLOBAL RESEARCH, May 14,
19  2015, *available at* http://www.globalresearch.ca/brazils-public-prosecutor-wants-to-ban-monsantos-chemicals-following-recent-glyphosate-cancer-link/5449440; *see* Ministério
20  Público Federal, *MPF/DF reforça pedido para que glifosato seja banido do mercado
    nacional*, April, 14, 2015, *available at* http://noticias.pgr.mpf.mp.br/noticias/noticias-do-
21  site/copy_of_meio-ambiente-e-patrimonio-cultural/mpf-df-reforca-pedido-para-que-
22  glifosato-seja-banido-do-mercado-nacional.

23  [38] Zoe Schlanger, *France Bans Sales of Monsanto's Roundup in Garden Centers,
    3 Months After U.N. Calls it 'Probable Carcinogen'*, NEWSWEEK, June 15, 2015,
24  *available at* http://www.newsweek.com/france-bans-sale-monsantos-roundup-garden-
25  centers-after-un-names-it-probable-343311.

26  [39] *Health Minister: Importation of Roundup Weed Spray Suspended*, Today in
    Bermuda, May, 11 2015, *available at*
27  http://www.todayinbermuda.com/news/health/item/1471-health-minister-importation-of-
    roundup-weed-spray-suspended.
28

84.     The Sri Lankan government banned the private and commercial use of glyphosate, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.[40]

85.     The government of Colombia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.[41]

***Proposition 65 Listing***

86.     On September 4, 2015, California's Office of Environmental Health Hazard Assessment ("OEHHA") published a notice of intent to include glyphosate on the state's list of known carcinogens under Proposition 65.[42]   California's Safe Drinking Water and Toxic Enforcement Act of 1986 (informally known as "Proposition 65"), requires the state to maintain and, at least once a year, revise and republish a list of chemicals "known to the State of California to cause cancer or reproductive toxicity."[43]   The OEHHA determined that glyphosate met the criteria for the listing mechanism under the Labor Code following IARC's assessment of the chemical.[44]

---

[40] *Sri Lanka's New President Puts Immediate Ban on Glyphosate Herbicides*, Sustainable Pulse, May 25, 2015, *available at* http://sustainablepulse.com/2015/05/25/sri-lankas-new-president-puts-immediate-ban-on-glyphosate-herbicides/#.VeduYk3bKAw.

[41] *Columbia to ban coca spraying herbicide glyphosate*, BBC, May 10, 2015, *available at* http://www.bbc.com/news/world-latin-america-32677411.

[42] Cal. Envtl. Prot. Agency Office of Envtl. Health Hazard Assessment, Notice of Intent to List Chemicals by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion, Glyphosate (Sept. 4, 2015), http://oehha.ca.gov/prop65/CRNR_notices/admin_listing/intent_to_list/pdf_zip/090415N OIL_LCSet27.pdf.

[43] *Frequently Asked Questions*, STATE OF CAL. DEP'T OF JUSTICE, OFFICE OF THE ATTORNEY GENERAL, http://oag.ca.gov/prop65/faq (last visited April 19, 2016).

[44] Cal. Envtl. Prot. Agency Office of Envtl. Health Hazard Assessment, Notice of Intent to List Chemicals by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion, Glyphosate (Sept. 4, 2015), http://oehha.ca.gov/prop65/CRNR_notices/admin_listing/intent_to_list/pdf_zip/090415N OIL_LCSet27.pdf.

87.     The listing process under the Labor Code is essentially automatic. The list of known carcinogens, at a minimum, must include substances identified by reference in Labor Code § 6382(b)(1). That section of the Labor Code identifies "[s]ubstances listed as human or animal carcinogens by the International Agency for Research on Cancer (IARC)." IARC's classification of glyphosate as a Group 2A chemical ("probably carcinogenic to humans") therefore triggered the listing.

88.     A business that deploys a listed chemical in its products must provide "clear and reasonable warnings" to the public prior to exposure to the chemical. To be clear and reasonable, a warning must "(1) clearly communicate that the chemical is known to cause cancer, and/or birth defects or other reproductive harm; and (2) effectively reach the person before exposure."[45] The law also prohibits the discharge of listed chemicals into drinking water.

89.     Monsanto disputed the listing decision and, in January 2016, filed a lawsuit against OEHHA and the agency's acting director, Lauren Zeise, in California state court, seeking declaratory and injunctive relief to prevent OEHHA from listing glyphosate.[46]

90.     Monsanto alleged that OEHHA's exclusive reliance on the IARC decision signified that "OEHHA effectively elevated the determination of an ad hoc committee of an unelected, foreign body, which answers to no United States official (let alone any California state official), over the conclusions of its own scientific experts."[47] Monsanto further alleged that the Labor Code listing mechanism presented various constitutional violations because it "effectively empowers an unelected, undemocratic, unaccountable,

---

[45] *Frequently Asked Questions*, STATE OF CAL. DEPARTMENT OF JUSTICE, OFFICE OF THE ATTORNEY GENERAL, *supra*.

[46] Monsanto Company's Verified Petition for Writ of Mandate and Complaint for Preliminary and Permanent Injunctive and Declaratory Relief, Monsanto Co. v. Office of the Envt'l Health Hazard Assessment, et al., No. 16-CECG-00183 (Cal. Super. Ct.) *available at* http://www.monsanto.com/files/documents/monvoehha.pdf.

[47] *Id*. at 2.

1    and foreign body to make laws applicable in California.[48]" Among other things, Monsanto
2    argued that Proposition 65's requirement to provide a "clear and reasonable warning" to
3    consumers that the chemical is a known carcinogen would damage its reputation and
4    violate its First Amendment rights.[49]

5    91.    On January 27, 2017, the Superior Court of California – Fresno issued a
6    tentative ruling granting, among other things, OEHHA's motion for judgment on the
7    pleadings, thus rejecting Monsanto's arguments. On March 10, 2017, the Court issued a
8    final order adopting in full the earlier tentative ruling.[50]

9    92.    On March 28, 2017 OEHHA posted Notice on its website that glyphosate
10   would be added to the list of chemicals known to the state of California to cause cancer for
11   purposes of Proposition 65.

12   93.    On November 15, 2017, Monsanto and various agricultural groups, including
13   the National Association of Wheat Growers, the National Corn Growers Association, the
14   Iowa Soybean Association, and others, filed a complaint against the OEHHA and
15   California's Attorney General in the Eastern District of California seeking, among other
16   things, to enjoin California's application of Prop 65 to glyphosate.[51] On January 3, 2018,
17   Attorneys General in Idaho, Indiana, Iowa, Kansas, Louisiana, Michigan, Missouri, North
18   Dakota, Oklahoma, South Dakota and Wisconsin filed an amicus brief in support of
19   injunctive relief.[52]

20

21         [48] *Id.* at 3.

22         [49] *Id.*

23         [50] *See* Notice of Supplemental Authority, In re: Roundup Products Liability
     Litigation, MDL No. 2741 (N.D. Cal., Mar. 13, 2017), ECF No. 185.

24         [51] *See Nat'l Ass'n. of Wheat Growers, et al., v. Zeise, et al.,* No. 2:17-at-01224
25   (E.D. Cal), available at https://www.agri-pulse.com/ext/resources/pdfs/g/glyphosate-
     complaint-caed-nawg.pdf.

26         [52] *Attorneys General support Prop 65 injunction*, FarmFutures, Jan. 4, 2018,
27   available at http://www.farmfutures.com/crop-protection/attorneys-general-support-prop-
     65-injunction.
28
                                          -27-

94.     On February 26, 2018, the Eastern District of California denied Monsanto's motion for a preliminary injunction enjoining California from listing glyphosate as a chemical known to the State of California to cause cancer and granted the injunction enjoining California from requiring Monsanto provide a warning label on its products.[53]

**EFSA Report on Glyphosate**

95.     On November 12, 2015, the European Food Safety Authority (EFSA), the European Union's primary agency for food safety, reported on its evaluation of the Renewal Assessment Report (RAR) on glyphosate.[54]   The Rapporteur Member State assigned to glyphosate, the German Federal Institute for Risk Assessment (BfR), had produced the RAR as part of the renewal process for glyphosate in the EU.

96.     BfR sent its draft RAR to EFSA and the RAR underwent a peer review process by EFSA, other member states, and industry groups.  As part of the on-going peer review of Germany's reevaluation of glyphosate, EFSA had also received a second mandate from the European Commission to consider IARC's findings regarding the potential carcinogenicity of glyphosate and glyphosate-containing products.

97.     Based on a review of the RAR, which included data from industry-submitted unpublished studies, EFSA sent its own report ("Conclusion") to the European Commission, finding that "glyphosate is unlikely to pose a carcinogenic hazard to humans and the evidence does not support classification with regard to its carcinogenic potential

---

[53] *See* Memorandum and Order Re: Motion For Preliminary Injunction, *Nat'l Assoc. of Wheat Growers, et al., v. Zeise, et al.*, No. 2:17-2401 WBS EFB (E.D. Cal., Feb. 26, 2018), ECF No. 75, *available at* https://www.courthousenews.com/wp-content/uploads/2018/02/217cv2401.pdf.

[54] European Food Safety Auth., Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate, *available at* http://www.efsa.europa.eu/sites/default/files/scientific_output/files/main_documents/430 2.pdf.

1  according to Regulation (EC) No 1272/2008."[55]  EFSA therefore disagreed with IARC:

2  glyphosate was not genotoxic and did not present a carcinogenic threat to humans.

3      98.    In explaining why its results departed from IARC's conclusion, EFSA drew

4  a distinction between the EU and IARC approaches to the study and classification of

5  chemicals.[56]    Although IARC examined "both glyphosate—an active substance—and

6  glyphosate-based formulations, grouping all formulations regardless of their composition,"

7  EFSA explained that it considered only glyphosate and that its assessment focuses on "each

8  individual chemical, and each marketed mixture separately."[57]  IARC, on the other hand,

9  "assesses generic agents, including groups of related chemicals, as well as occupational or

10  environmental exposure, and cultural or behavioural practices."[58]  EFSA accorded greater

11  weight to studies conducted with glyphosate alone than studies of formulated products.[59]

12      99.    EFSA went further and noted:

13  [A]lthough some studies suggest that certain glyphosate-based
     formulations may be genotoxic (i.e. damaging to DNA), others
14   that look solely at the active substance glyphosate do not show
     this effect. It is likely, therefore, that *the genotoxic effects*
15   *observed in some glyphosate-based formulations are related*
     *to the other constituents or "co-formulants"*. Similarly,
16   certain glyphosate-based formulations display higher toxicity
     than that of the active ingredient, presumably because of the
17   presence of co-formulants. In its assessment, *EFSA proposes*
     *that the toxicity of each pesticide formulation and in*
18   *particular its genotoxic potential should be further*
     *considered and addressed by Member State authorities while*
19   *they re-assess uses of glyphosate-based formulations in their*
     *own territories*.[60] (Emphasis added).
20

21

22      [55] *Id.*

23      [56] EFSA Fact Sheet: Glyphosate, EFSA
     http://www.efsa.europa.eu/sites/default/files/corporate_publications/files/efsaexplainsgly
24   phosate151112en.pdf.

25      [57] *Id.*

26      [58] *Id.*

27      [59] *Id.*
        [60] *Id.*
28

1      100.   Notwithstanding its conclusion, EFSA did set exposure levels for glyphosate.

2   Specifically, EFSA proposed an acceptable daily intake (ADI) of 0.5 mg/kg of body weight

3   per day; an acute reference dose (ARfD) of 0.5 mg/kg of body weight; and an acceptable

4   operator exposure level (AOEL) of 0.1 mg/kg bw per day.[61]

5   ***Leading Scientists Dispute EFSA's Conclusion***

6      101.   On November 27, 2015, 96 independent academic and governmental

7   scientists from around the world submitted an open letter to the EU health commissioner,

8   Vytenis Andriukaitis.[62]   The scientists expressed their strong concerns and urged the

9   commissioner to disregard the "flawed" EFSA report, arguing that "the BfR decision is not

10  credible because it is not supported by the evidence and it was not reached in an open and

11  transparent manner."[63]

12     102.   Signatories to the letter included Dr. Christopher J. Portier, Ph.D., and other

13  renowned international experts in the field, some of whom were part of the IARC Working

14  Group assigned to glyphosate.

15     103.   In an exhaustive and careful examination, the scientists scrutinized EFSA's

16  conclusions and outlined why the IARC Working Group decision was "by far the more

17  credible":

18          The IARC WG decision was reached relying on open and
            transparent procedures by independent scientists who
19          completed thorough conflict-of-interest statements and were
            not affiliated or financially supported in any way by the
20          chemical manufacturing industry. It is fully referenced and
            depends entirely on reports published in the open, peer-
21          reviewed biomedical literature. It is part of a long tradition of
            deeply researched and highly credible reports on the
22          carcinogenicity of hundreds of chemicals issued over the past
            four decades by IARC and used today by international agencies

23  _____

24     [61] European Food Safety Auth., Conclusion on the peer review of the pesticide risk
    assessment of the active substance glyphosate, *supra.*

25     [62] Letter from Christopher J. Portier et al. to Commission Vytenis Andriukaitis,
    Open letter: Review of the Carcinogenicity of Glyphosate by EFSA and BfR (Nov. 27,
26  2015), http://www.zeit.de/wissen/umwelt/2015-11/glyphosat-offener-brief.pdf;
    http://www.theguardian.com/environment/2016/jan/13/eu-scientists-in-row-over-safety-
27  of-glyphosate-weedkiller.

       [63] *Id.*
28

and regulatory bodies around the world as a basis for risk assessment, regulation and public health policy.[64]

104.    With respect to human data, the scientists pointed out that EFSA agreed with IARC that there was "*limited evidence* of carcinogenicity" for NHL, but EFSA nonetheless dismissed an association between glyphosate exposure and carcinogenicity. IARC applies three levels of evidence in its analyses of human data, including sufficient evidence and limited evidence. EFSA's ultimate conclusion that "there was no unequivocal evidence for a clear and strong association of NHL with glyphosate" was misleading because it was tantamount to IARC's highest level of evidence: "sufficient evidence," which means that a causal relationship has been established. However, the scientists argued, "[l]egitimate public health concerns arise when 'causality is credible,' i.e., when there is *limited evidence*."[65]

105.    Among its many other deficiencies, EFSA's conclusions regarding animal carcinogenicity data were "scientifically unacceptable," particularly in BfR's use of historical control data and in its trend analysis. Indeed, BfR's analysis directly contradicted the Organisation for Economic Co-operation and Development ("OECD") testing guidelines while citing and purporting to follow those same guidelines. For instance, the EFSA report dismisses observed trends in tumor incidence "because there are no individual treatment groups that are significantly different from controls and because the maximum observed response is reportedly within the range of the historical control data." However, according to the scientists, concurrent controls are recommended over historical controls in all guidelines, scientific reports, and publications, and, if it is employed, historical control data "should be from studies in the same timeframe, for the same exact animal strain, preferably from the same laboratory or the same supplier and preferably reviewed by the same pathologist." BfR's use of historical control data violated these precautions: "only a single study used the same mouse strain as the historical controls, but was reported

---

[64] *Id.*

[65] *Id.*

1  more than 10 years after the historical control dataset was developed."  Further deviating

2  from sound scientific practices, the data used by the BfR came from studies in seven

3  different laboratories.  The scientists concluded:

> BfR reported seven positive mouse studies with three studies
> showing increases in renal tumors, two with positive findings
> for hemangiosarcomas, and two with positive findings for
> malignant lymphomas. BfR additionally reported two positive
> findings for tumors in rats. Eliminating the inappropriate use
> of historical data, the unequivocal conclusion is that these are
> not negative studies, but in fact document the carcinogenicity
> of glyphosate in laboratory animals.[66]

9       106.   The letter also critiqued the EFSA report's lack of transparency and the

10  opacity surrounding the data cited in the report: "citations for almost all of the references,

11  even those from the open scientific literature, have been redacted from the document" and

12  "there are no authors or contributors listed for either document, a requirement for

13  publication in virtually all scientific journals."   Because BfR relied on unpublished,

14  confidential industry-provided studies, it is "impossible for any scientist not associated

15  with BfR to review this conclusion with scientific confidence."[67]

16       107.   On March 3, 2016, the letter was published in the Journal of Epidemiology

17  & Community Health.[68]

18  ***Statement of Concern Regarding Glyphosate-Based Herbicides***

19       108.   On February 17, 2016, a consensus statement published in the journal

20  *Environmental Health*, entitled "Concerns over use of glyphosate-based herbicides and

21  risks associated with exposures: a consensus statement," assessed the safety of glyphosate-

22

23

24     [66] *Id.*

25     [67] *Id.*

26     [68] Christopher J. Portier, et al., *Differences in the carcinogenic evaluation of glyphosate between the International Agency for Research on Cancer (IARC) and the European Food Safety Authority (EFSA)*, JOURNAL OF EPIDEMIOLOGY & CMTY. HEALTH,

27  Mar. 3, 2016, *available at* http://jech.bmj.com/content/early/2016/03/03/jech-2015-207005.full.

28

based herbicides (GBHs).[69]  The paper's "focus is on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with recent discoveries about the toxicity and human health risks stemming from use of GBHs."[70]   The researchers drew seven factual conclusions about GBHs:

> 1.  GBHs are the most heavily applied herbicide in the world and usage continues to rise;
>
> 2.  Worldwide, GBHs often contaminate drinking water sources, precipitation, and air, especially in agricultural regions;
>
> 3.  The half-life of glyphosate in water and soil is longer than previously recognized;
>
> 4.  Glyphosate and its metabolites are widely present in the global soybean supply;
>
> 5.  Human exposures to GBHs are rising;
>
> 6.  Glyphosate is now authoritatively classified as a probable human carcinogen; and
>
> 7.  Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science.[71]

109.    The researchers noted that GBH use has increased approximately 100-fold since the 1970s. Further, far from posing a limited hazard to vertebrates, as previously believed, two decades of evidence demonstrated that "several vertebrate pathways are likely targets of action, including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."[72]

110.    The paper attributes uncertainties in current assessments of glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is

---

[69] John P. Myers, et al, *Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement*, Environmental Health (2016), *available at* http://ehjournal.biomedcentral.com/articles/10.1186/s12940-016-0117-0.

[70] *Id.*

[71] *Id.*

[72] *Id.*

1  protected as 'commercial business information,' despite the universally accepted relevance
2  of such information to scientists hoping to conduct an accurate risk assessment of these
3  herbicide formulations."  Further, the researchers argue, "[t]he distinction in regulatory
4  review and decision processes between 'active' and 'inert' ingredients has no toxicological
5  justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in
6  their own right."[73]

7      111.    Among   various   implications,   the   researchers   conclude   that   "existing
8  toxicological data and risk assessments are not sufficient to infer that GBHs, as currently
9  used, are safe."  Further, "GBH-product formulations are more potent, or toxic, than
10  glyphosate alone to a wide array of non-target organisms including mammals, aquatic
11  insects, and fish."  Accordingly, "risk assessments of GBHs that are based on studies
12  quantifying the impacts of glyphosate alone underestimate both toxicity and exposure, and
13  thus risk."  The paper concludes that this "shortcoming has repeatedly led regulators to set
14  inappropriately high exposure thresholds."[74]

15      112.    The researchers also critique the current practice of regulators who largely
16  rely on "unpublished, non-peer reviewed data generated by the registrants" but ignore
17  "published research because it often uses standards and procedures to assess quality that
18  are different from those codified in regulatory agency data requirements, which largely
19  focus on avoiding fraud."  In the researchers' view, "[s]cientists independent of the
20  registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well
21  as GBH-product formulations."[75]

22      113.    The researchers also call for greater inclusion of GBHs in government-led
23  toxicology testing programs:

24

25
_____

26      [73] Id.

27      [74] Id.
       [75] Id.

28

-34-

> [A] fresh and independent examination of GBH toxicity should be undertaken, and . . . this re-examination be accompanied by systematic efforts by relevant agencies to monitor GBH levels in people and in the food supply, none of which are occurring today. The U.S. National Toxicology Program should prioritize a thorough toxicological assessment of the multiple pathways now identified as potentially vulnerable to GBHs.[76]

114.  The researchers suggest that, in order to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which manufacturers fund the registration process and the necessary testing:

> "[W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part of routine registration actions and fees. Such funds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would be made available to independent scientists to conduct the appropriate long-term (minimum 2 years) safety studies in recognized animal model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption, impacts on the gut microbiome, carcinogenicity, and multigenerational effects looking at reproductive capability and frequency of birth defects."[77]

115.  Despite these stated concerns, Monsanto, to date, has failed to test its formulated Roundup® products.

***European Union Vote on Glyphosate Renewal***

116.  The license for glyphosate in the European Union (EU) was set to expire on June 30, 2016.

117.  Without an extension of the license, Monsanto's Roundup® and other glyphosate-based herbicides faced a general phase out in EU markets.[78]

---

[76] *Id.*

[77] *Id.*

[78] Philip Blenkinsop, Alissa de Carbonnel & Barbara Lewis European, *Commission to extend glyphosate license for 18 months*, REUTERS, June 28, 2016, *available at* http://www.reuters.com/article/us-health-eu-glyphosate-idUSKCN0ZE25B.

-35-

118.   In the months leading up to the license expiration date, protracted meetings and votes among national experts from the 28 EU Member States failed to produce agreement on an extension.

119.   On June 29, 2016, the EU Commission extended the European license for glyphosate for 18 months to allow the European Chemical Agency (ECHA) to rule on the safety of the chemical, which was expected by the end of 2017.[79]

120.   On July 11, 2016, the EU voted in favor of a proposal to restrict the conditions of use of glyphosate in the EU, including a ban on common co-formulant POE-tallowamine (POEA) from all glyphosate-based herbicides, including Roundup®.[80]

121.   In March 2017, ECHA's Committee for Risk Assessment (RAC) concluded that the available scientific evidence did not meet the criteria to classify glyphosate as a carcinogen.[81]

122.   With the glyphosate license set to again expire on December 15, 2017, and after months of indecision among EU member states, on November 27, 2017, the EU voted to extend the glyphosate license for five more years.[82] Of the 28 EU members, 18 countries voted in favor of a European Commission proposal to extend the glyphosate license, 9 countries voted against, and 1 country abstained.[83]

---

[79] Arthur Neslen, *Controversial chemical in Roundup weedkiller escapes immediate ban*, THE GUARDIAN, June 29, 2016, *available at* https://www.theguardian.com/business/2016/jun/29/controversial-chemical-roundup-weedkiller-escapes-immediate-ban

[80] Sarantis Michalopoulos, *EU agrees ban on glyphosate co-formulant*, EURACTIV, July 11, 2016, *available at* http://www.euractiv.com/section/agriculture-food/news/eu-agrees-ban-on-glyphosate-co-formulant/?nl_ref=16562829

[81] https://echa.europa.eu/-/glyphosate-not-classified-as-a-carcinogen-by-echa.

[82] *See* Philip Blenkinsop, *Germany swings EU vote in favor of weed-killer glyphosate*, Reuters, Nov. 27, 2017, https://www.reuters.com/article/us-eu-health-glyphosate/germany-swings-eu-vote-in-favor-of-weed-killer-glyphosate-idUSKBN1DR1SG

[83] *See id.*

-36-

## TOLLING OF THE STATUTE OF LIMITATIONS

***Discovery Rule Tolling***

123.   Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

124.   Decedent Darrell Fennell, has suffered an illness that has a latency period and does not arise until years after exposure. Plaintiff and Decedent had no way of knowing about the risks of serious illness associated with the use of and/or exposure to Roundup® and glyphosate until Plaintiff was made aware that Decedent's NHL could be caused by his use of and/or exposure to Roundup®. Consequently, the discovery rule applies to these cases, and the statute of limitations has been tolled until the day that Plaintiff knew or had reason to know that Decedent's NHL was linked to his use of and/or exposure to Roundup®.

125.   Within the time period of any applicable statutes of limitations, Plaintiff and Decedent could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup® and glyphosate is injurious to human health.

126.   Plaintiff and Decedent did not discover, and did not know of facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup® and glyphosate; nor would a reasonable and diligent investigation by them have disclosed that Roundup® and glyphosate would cause their NHL.

127.   For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff's claims.

***Fraudulent Concealment***

128.   Furthermore, the running of the statute of limitations has been equitably tolled by reason of Defendant's fraudulent concealment and conduct, as alleged above. Through its affirmative misrepresentations and omissions, Defendant actively concealed from Plaintiffs the true risks associated with use of or exposure to Roundup®.

129.   As a result of Defendant's actions, Plaintiff and Decedent were unaware, and could not reasonably know or have learned through reasonable diligence, that Darrell Fennell had been exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

130.   Defendant is estopped from relying on any statute of limitations because of its concealment of the truth regarding the safety of Roundup®. Defendant was under a continuous duty to disclose the true character, quality and nature of Roundup® because this was non-public information over which it continues to have exclusive control. Defendant knew that this information was not available to Plaintiffs, their medical providers and/or their health facilities, yet it failed to disclose the information to the public.

131.   Defendant had the ability to and did spend enormous amounts of money in furtherance of its purposes of marketing and promoting a profitable product, notwithstanding the known or reasonably knowable risks. Plaintiff and medical professionals could not have afforded to and could not have possibly conducted studies to determine the nature, extent and identity of related health risks, and they were forced to rely on Defendant's representations.

***Estoppel***

132.   Monsanto was under a continuous duty to disclose to consumers, users and other persons coming into contact with its products, including Plaintiff and Decedent, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate.

133.   Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

134.   Based on the foregoing, Monsanto is estopped from relying on any statutes of limitations in defense of this action.

-38-

## COUNT ONE: STRICT LIABILITY FOR DEFECTIVE MANUFACTURE AND DESIGN

135.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

136.   Plaintiff brings this strict liability claim against Defendant for defective manufacture and design.

137.   At all relevant times, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, users, and other persons coming into contact with them, including Decedent, Darrell Fennell, thereby placing Roundup® products into the stream of commerce.   These actions were under the ultimate control and supervision of Defendant.

138.   At all times relevant to this litigation, Defendant designed, researched, developed, formulated, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by the Decedent, and/or to which he was exposed, as described above.

139.   At all times relevant to this litigation, Defendant's Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Decedent.

140.   At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Missouri and throughout the United States, including Decedent, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

141.   Defendant's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by

-39-

1  Defendant, were defectively manufactured and designed by Defendant in that when they
2  left the hands of the Defendant's manufacturers and/or suppliers, they were unreasonably
3  dangerous because they were not as safe as an ordinary consumer would expect when used
4  in an intended or reasonably foreseeable manner.

5       142.   Defendant's Roundup® products, as researched, tested, developed, designed,
6  licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by
7  Defendant, were defective in manufacture, design, and formulation in that when they left
8  the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks associated
9  with these products' reasonably foreseeable uses exceeded the alleged benefits associated
10  with their design and formulation.

11      143.   At all relevant times, Defendant's Roundup® products created significant
12  risks to the health and safety of consumers and others who were exposed to the products
13  that far outweigh the risks posed by other products on the market used for the same or
14  similar purpose.

15      144.   Therefore, at all relevant times to this litigation, Defendant's Roundup®
16  products, as researched, tested, developed, designed, licensed, manufactured, packaged,
17  labeled, distributed, sold and marketed by Defendant, were defective in design and
18  formulation, in one or more of the following ways:

19          a.    When placed in the stream of commerce, Defendant's
20        Roundup® products were defective in design and formulation, and,
21        consequently, dangerous to an extent beyond that which an ordinary
22        consumer would expect.

23          b.    When placed in the stream of commerce, Defendant's
24        Roundup® products were unreasonably dangerous in that they were
25        hazardous and posed a grave risk of cancer and other serious illnesses when
26        used in a reasonably anticipated manner.

27

28

c.   When placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d.   Defendant did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate.

e.   Defendant failed to test, investigate, or study its formulated Roundup® products.

f.   Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweighs any potential utility stemming from the use of the herbicide.

g.   Defendant knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

h.   Defendant did not conduct adequate post-marketing surveillance of its Roundup® products.

i.   Defendant could have employed safer alternative designs and formulations.

145.   At all times relevant to this litigation, Plaintiff used and/or were exposed to Defendant's Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

146.   Plaintiff and the Decedent could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

147.   The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an

1  ordinary consumer would contemplate.  Defendant's Roundup® products were and are
2  more dangerous than alternative products and Defendant could have designed its Roundup®
3  products to make them less dangerous.  Indeed, at the time that Defendant designed its
4  Roundup® products, the state of the industry's scientific knowledge was such that a less
5  risky design or formulation was attainable.

6      148.   At the time Roundup® products left Defendant's control, there was a
7  practical, technically feasible, and safer alternative design that would have prevented the
8  harm without substantially impairing the reasonably anticipated or intended function of
9  Defendant's Roundup® herbicides.

10      149.   Defendant's defective design of Roundup® amounts to willful, wanton,
11  and/or reckless conduct by Defendant.

12      150.   As a direct and proximate result of the defective design and manufacture of
13  Roundup® products, Decedent developed NHL and was fatally injured and Plaintiff
14  DEBRA FENNELL, a Statutory Plaintiff on Behalf of Herself and All Statutory
15  Beneficiaries of DARRELL FENNELL, Deceased, has suffered damages from Decedent's
16  premature wrongful death.

17      151.   Therefore, as a result of the unreasonably dangerous condition of its
18  Roundup® products, Defendant is strictly liable to Plaintiff.

19      152.   The defects in Defendant's Roundup® products were substantial and
20  contributing factors in causing Decedent's fatal injuries, and, but for Defendant's
21  misconduct and omissions, Plaintiff would not have sustained her damages.

22      153.   As a direct and proximate result of Defendant placing its defective Roundup®
23  products into the stream of commerce, Plaintiff has suffered damages, past and future, and
24  incurred funeral expenses, medical and other expenses, the Plaintiff Estate lost income, lost
25  profits, and/or lost earning capacity.

26
27
28

154.   WHEREFORE, Plaintiff prays for judgment against Defendant Monsanto in a fair and reasonable sum in excess of $1,000,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

### COUNT TWO:  STRICT LIABILITY FOR FAILURE TO WARN

155.   Plaintiff incorporates by reference every other paragraph of this Complaint as if each were set forth fully and completely herein.

156.   Plaintiff brings this strict liability claim against Defendant for failure to warn.

157.   At all relevant times, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Decedent, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate.  These actions were under the ultimate control and supervision of Defendant.

158.   Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Decedent, Plaintiffs' employers, Plaintiffs' co-workers, and persons responsible for consumers (such as employers), and Defendant therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of Roundup® and glyphosate-containing products and a duty to instruct on the proper, safe use of these products.

159.   At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks.  Defendant had a continuing duty to warn Decedent of the dangers

-43-

1   associated with Roundup® use and exposure, and a continuing duty to instruct on the
2   proper, safe use of these products. Defendant, as manufacturer, seller, or distributor of
3   chemical herbicides, is held to the knowledge of an expert in the field.

4       160.   At the time of manufacture, Defendant could have provided warnings or
5   instructions regarding the full and complete risks of Roundup® and glyphosate-containing
6   products because it knew or should have known of the unreasonable risks of harm
7   associated with the use of and/or exposure to these products.

8       161.   At all times relevant to this litigation, Defendant failed to investigate, study,
9   test, or promote the safety of its Roundup® products. Defendant also failed to minimize
10   the dangers to users and consumers of its Roundup® products and to those who would
11   foreseeably use or be harmed by Defendant's herbicides, including Plaintiff and Decedent,
12   Darrell Fennell.

13       162.   Despite the fact that Defendant knew or should have known that Roundup®
14   products posed a grave risk of harm, it failed to warn of the dangerous risks associated with
15   their use and exposure. The dangerous propensities of its products and the carcinogenic
16   characteristics of glyphosate, as described above, were known to Defendant, or
17   scientifically knowable to Defendant through appropriate research and testing by known
18   methods, at the time it distributed, supplied, or sold the product, and not known to end
19   users and consumers, such as Decedent.

20       163.   Defendant knew or should have known that its Roundup® and glyphosate-
21   containing products created significant risks of serious bodily harm to consumers, as
22   alleged herein, and Defendant failed to adequately warn consumers and reasonably
23   foreseeable users of the risks of exposure to these products. Defendant has wrongfully
24   concealed information concerning the dangerous nature of Roundup® and its active
25   ingredient glyphosate, and further made false and/or misleading statements concerning the
26   safety of Roundup® and glyphosate.

27
28

164.   At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products throughout the United States, including Decedent, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

165.   At all times relevant to this litigation, Decedent used and/or was exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

166.   Plaintiff and Decedent could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of Decedent's exposure.  Plaintiff and Decedent relied upon the skill, superior knowledge, and judgment of Defendant.

167.   Defendant knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, but it failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and horticultural applications.

168.   The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled agricultural workers, horticultural workers and/or at-home users such as Decedent to utilize the products safely and with adequate protection.  Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through

1  aggressive marketing and promotion, any information or research about the risks and
2  dangers of exposure to Roundup® and glyphosate.

3      169.  To this day, Defendant has failed to adequately and accurately warn of the
4  true risks of Decedent's injuries associated with the use of and exposure to Roundup® and
5  its active ingredient glyphosate, a probable carcinogen.

6      170.  To this day, Defendant has failed to test, investigate, or study its formulated
7  Roundup® products.

8      171.  As a result of their inadequate warnings, Defendant's Roundup® products
9  were defective and unreasonably dangerous when they left the possession and/or control
10 of Defendant, were distributed by Defendant, and used by Decedent.

11     172.  Defendant is liable to Plaintiff for injuries caused by its failure, as described
12 above, to provide adequate warnings or other clinically relevant information and data
13 regarding the appropriate use of its Roundup® products and the risks associated with the
14 use of or exposure to Roundup® and glyphosate.

15     173.  The defects in Defendant's Roundup® products were substantial and
16 contributing factors in causing Decedent's fatal injuries, and, but for Defendant's
17 misconduct and omissions, Plaintiff would not have sustained her damages.

18     174.  Had Defendant provided adequate warnings and instructions and properly
19 disclosed and disseminated the risks associated with its Roundup® products, Decedent
20 could have avoided the risk of developing injuries as alleged herein and he could have
21 obtained alternative herbicides.

22     175.  As a direct and proximate result of Defendant placing its defective Roundup®
23 products into the stream of commerce and failing to warn Plaintiff and Decedent of the
24 increased risk of NHL associated with the use of and/or exposure to Roundup® products as
25 described herein, Decedent developed NHL and was fatally injured. Plaintiff DEBRA
26 FENNELL, a Statutory Plaintiff on Behalf of Herself and All Statutory Beneficiaries of
27 DARRELL FENNELL, Deceased, have suffered damages, past and future and incurred

28

1  funeral expenses, medical and other expenses, the Plaintiff Estate lost income, lost profits,
2  and/or lost earning capacity.

3      176.   WHEREFORE, Plaintiff prays for judgment against Defendant Monsanto in
4  a fair and reasonable sum in excess of $1,000,000.00, together with costs expended herein
5  and such further and other relief as the Court deems just and appropriate.

6                          **COUNT THREE: NEGLIGENCE**

7      177.   Plaintiff incorporates by reference each and every allegation set forth in the
8  preceding paragraphs as if fully stated herein.

9      178.   At all relevant times, Defendant breached its duty to Plaintiff and Decedent
10  and were otherwise negligent in marketing, designing, manufacturing, producing,
11  supplying, inspecting, testing, selling distributing, packaging, labeling and/or promoting
12  Roundup® products.

13      179.   Defendant, directly or indirectly, caused Roundup® products to be purchased
14  and/or used by Decedent.

15      180.   At all times relevant to this litigation, Defendant had a duty to exercise
16  reasonable care in the design, research, manufacture, marketing, advertisement, supply,
17  promotion, packaging, sale, and distribution of its Roundup® products, including the duty
18  to take all reasonable steps necessary to manufacture, promote, and/or sell a product that
19  was not unreasonably dangerous to consumers, users, and other persons coming into
20  contact with the product.

21      181.   At all times relevant to this litigation, Defendant had a duty to exercise
22  reasonable care in the marketing, advertisement, and sale of its Roundup® products.
23  Defendant's duty of care owed to consumers and the general public included providing
24  accurate, true, and correct information concerning the risks of using Roundup® and
25  appropriate, complete, and accurate warnings concerning the potential adverse effects of
26  exposure to Roundup® and, in particular, its active ingredient glyphosate.

27

28
                                   -47-

1      182.   At all times relevant to this litigation, Defendant knew or, in the exercise of

2 reasonable care, should have known of the hazards and dangers of Roundup® and

3 specifically, the carcinogenic properties of the chemical glyphosate.

4      183.   Accordingly, at all times relevant to this litigation, Defendant knew or, in the

5 exercise of reasonable care, should have known that use of or exposure to its Roundup®

6 products could cause Decedent's injuries and thus created a dangerous and unreasonable

7 risk of injury to the users of these products, including Decedent.

8      184.   Defendant knew or, in the exercise of reasonable care, should have known

9 that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®,

10 Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary

11 to protect Decedent from Roundup®.

12      185.   Defendant knew or, in the exercise of reasonable care, should have known

13 that tests limited to Roundup®'s active ingredient glyphosate were insufficient to prove the

14 safety of Roundup®.

15      186.   Defendant also knew or, in the exercise of reasonable care, should have

16 known that users and consumers of Roundup® were unaware of the risks and the magnitude

17 of the risks associated with the use of and/or exposure to Roundup® and glyphosate-

18 containing products.

19      187.   As such, Defendant breached its duty of reasonable care and failed to

20 exercise ordinary care in the design, research, development, manufacture, testing,

21 marketing, supply, promotion, advertisement, packaging, sale, and distribution of its

22 Roundup® products, in that Defendant manufactured and produced defective herbicides

23 containing the chemical glyphosate, knew or had reason to know of the defects inherent in

24 its products, knew or had reason to know that a user's or consumer's exposure to the

25 products created a significant risk of harm and unreasonably dangerous side effects, and

26 failed to prevent or adequately warn of these risks and injuries.

27

28

188.  Defendant failed to appropriately and adequately test Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff and Decedent from Roundup®.

189.  Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant has failed to do so.  Indeed, Defendant has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

190.  Defendant's negligence included:

a.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

b.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c.  Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture, horticulture, and at-home use;

d.  Failing to test, investigate, or study its formulated Roundup® products;

e.  Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup®, and the propensity of these ingredients to render Roundup® toxic, increase the toxicity of Roundup®, whether these

ingredients are carcinogenic, magnify the carcinogenic properties of Roundup®, and whether or not "inert" ingredients and/or adjuvants were safe for use;

f.      Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

g.      Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

h.      Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and/or be exposed to its Roundup® products;

i.      Failing to disclose to Decedent, users, consumers, and the general public that the use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

j.      Failing to warn Decedent, users, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Decedent and other users or consumers;

k.      Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

l.      Representing that its Roundup® products were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended use;

m.   Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

n.   Advertising, marketing, and recommending the use of Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

o.   Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup® products are not unsafe for use in the agricultural, horticultural industries, and/or home use; and

p.   Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

191.   Defendant knew and/or should have known that it was foreseeable that consumers and/or users, such as Decedent, would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

192.   Plaintiff and Decedent did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

193.   Defendant's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff and Decedent suffered, and will continue to suffer, as described herein.

194.   Defendant's conduct, as described above, was reckless. Defendant regularly risks the lives of consumers and users of its products, including Decedent, with full knowledge of the dangers of its products. Defendant has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Decedent. Defendant's reckless conduct therefore warrants an award of punitive damages.

1       195.   As a proximate result of Defendant's wrongful acts and omissions in placing

2  its defective Roundup® products into the stream of commerce without adequate warnings

3  of the hazardous and carcinogenic nature of glyphosate, Decedent developed NHL and was

4  fatally injured. Plaintiff DEBRA FENNELL, a Statutory Plaintiff on Behalf of Herself and

5  All Statutory Beneficiaries of DARRELL FENNELL, Deceased, have suffered damages,

6  past and future and incurred funeral expenses, medical and other expenses, the Plaintiff

7  Estate lost income, lost profits, and/or lost earning capacity.

8       196.   WHEREFORE, Plaintiff prays for judgment against Defendant Monsanto in

9  a fair and reasonable sum in excess of $1,000,000.00, together with costs expended herein

10  and such further and other relief as the Court deems just and appropriate.

11               **COUNT FOUR:  BREACH OF EXPRESS WARRANTIES**

12       197.   Plaintiff incorporate by reference each and every allegation set forth in the

13  preceding paragraphs as if fully stated herein.

14       198.   At all relevant times, Defendant engaged in the business of testing,

15  developing, designing, formulating, manufacturing, marketing, selling, distributing, and

16  promoting its Roundup® products, which are defective and unreasonably dangerous to

17  users, consumers and those in proximity to users, including Decedent, thereby placing

18  Roundup® products into the stream of commerce.  These actions were under the ultimate

19  control and supervision of Defendant.

20       199.   Before the time that Decedent was exposed to the use of the aforementioned

21  Roundup® products, Defendant expressly warranted to its consumers and users—including

22  Decedent—that its Roundup® products were of merchantable quality and safe and fit for

23  the use for which they were intended; specifically, as horticultural herbicides.

24       200.   Defendant, however, failed to disclose that Roundup® has dangerous

25  propensities when used as intended and that the use of and/or exposure to Roundup® and

26  glyphosate-containing products carries an increased risk of developing severe injuries,

27  including Decedent's fatal injuries.

28

1      201.    Defendant further failed to test, investigate, or study its formulated
2  Roundup® products.

3      202.    The representations, as set forth above, contained or constituted affirmations
4  of fact or promises made by the seller to the buyer which related to the goods and became
5  part of the basis of the bargain creating an express warranty that the goods shall conform
6  to the affirmations of fact or promises.

7      203.    Roundup® did not conform to the representations made by Monsanto as
8  Roundup® was not safe for use by individuals such as Decedent.

9      204.    At all times relevant to this litigation, Decedent used and/or was exposed to
10  the use of Defendant's Roundup® products in their intended or reasonably foreseeable
11  manner without knowledge of their dangerous characteristics.

12      205.    Neither Plaintiff nor Decedent could have reasonably discovered or known
13  of the risks of serious injury associated with Roundup® or glyphosate.

14      206.    Defendant's breaches constitute violations of the state common law,
15  including but not limited to, the statutory provisions of Ariz. Rev. Stat. Ann. § 47-2313
16  (2016) as applicable to the Plaintiff in this Petition.

17      207.    The breach of the warranty was a substantial factor in bringing about
18  Decedent's fatal injuries.  As a direct and proximate result of Defendant placing its
19  defective Roundup® products into the stream of commerce and failing to warn Decedent
20  of the increased risk of NHL associated with the use of and/or exposure to Roundup®
21  products as described herein, Decedent has developed NHL and was fatally injured.
22  Plaintiff DEBRA FENNELL, a Statutory Plaintiff on Behalf of Herself and All Statutory
23  Beneficiaries of DARRELL FENNELL, Deceased, have suffered damages, past and future
24  and incurred funeral expenses, medical and other expenses, the Plaintiff Estate lost income,
25  lost profits, and/or lost earning capacity.

26

27

28

208.   The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

209.   As a direct and proximate result of Defendant's wrongful acts and omissions Plaintiff DEBRA FENNELL, a Statutory Plaintiff on Behalf of Herself and All Statutory Beneficiaries of DARRELL FENNELL, Deceased, have suffered damages, past and future and incurred funeral expenses, medical and other expenses, the Plaintiff Estate lost income, lost profits, and/or lost earning capacity.

210.   WHEREFORE, Plaintiff prays for judgment against Defendant Monsanto in a fair and reasonable sum in excess of $1,000,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

## COUNT FIVE:  BREACH OF IMPLIED WARRANTIES

211.   Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

212.   At all relevant times, Defendant engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to users, consumers and those in proximity to users, including Decedent, thereby placing Roundup® products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendant.

213.   Before the time that Decedent was exposed to the use of the aforementioned Roundup® products, Defendant impliedly warranted to its consumers and users—including Decedent—that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

214.   Defendant, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and

1   glyphosate-containing products carries an increased risk of developing severe injuries,
2   including Decedent's injuries.

3        215.   Defendant further failed to test, investigate, or study its formulated
4   Roundup® products.

5        216.   Upon information and belief, Decedent reasonably relied upon the skill,
6   superior knowledge and judgment of Defendant and upon its implied warranties that the
7   Roundup® products were of merchantable quality and fit for their intended purpose or use.
8   Decedent reasonably relied upon the skill, superior knowledge and judgment of Defendant
9   and upon its implied warranties that the Roundup® products were of merchantable quality
10  and fit for their intended purpose or use.

11       217.   The Roundup® products were expected to reach and did in fact reach
12  consumers, users and those in proximity to users, including Decedent, without substantial
13  change in the condition in which they were manufactured and sold by Defendant.

14       218.   At all relevant times, Defendant was aware that consumers, users, and those
15  in proximity of users of its products, including Decedent, would use Roundup® products
16  as marketed by Defendant, which is to say that Decedent was the foreseeable users of
17  Roundup®.

18       219.   Defendant intended that its Roundup® products be used in the manner in
19  which Decedent in fact used or was exposed to them and Defendant impliedly warranted
20  each product to be of merchantable quality, safe, and fit for this use, despite the fact that
21  Roundup® was not adequately tested or researched.

22       220.   In reliance upon Defendant's implied warranty, Decedent used or was in
23  proximity to the use of Roundup® as instructed and labeled and in the foreseeable manner
24  intended, recommended, promoted and marketed by Defendant.

25       221.   Neither Plaintiff nor Decedent could have reasonably discovered or known
26  of the risks of serious injury associated with Roundup® or glyphosate.

27

28

222. Defendant breached its implied warranty to Decedent in that its Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

223. The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

224. As a direct and proximate result of Defendant's wrongful acts and omissions Plaintiff DEBRA FENNELL, a Statutory Plaintiff on Behalf of Herself and All Statutory Beneficiaries of DARRELL FENNELL, Deceased, have suffered damages, past and future and incurred funeral expenses, medical and other expenses, the Plaintiff Estate lost income, lost profits, and/or lost earning capacity.

225. WHEREFORE, Plaintiff prays for judgment against Defendant Monsanto in a fair and reasonable sum in excess of $1,000,000.00, together with costs expended herein and such further and other relief as the Court deems just and appropriate.

### COUNT SIX:  WRONGFUL DEATH

226. Plaintiff incorporates by reference every other paragraph of this Complaint as if each were set forth herein.

227. As a direct and proximate result of the acts and/or omissions of Defendant, as set forth herein, the Decedent named in this action used and/or was exposed to Roundup®.

228. Subsequent to such use, Decedent developed NHL, suffered substantial pain and suffering, both physical and emotional in nature, and subsequently died.

229. Plaintiff Debra Fennell, on behalf of herself and all of the statutory beneficiaries of Decedent, Darrell Fennell, is entitled to recover damages as Decedent would have if he were living, as a result of acts and/or omissions of Defendant.

230.   Plaintiff Debra Fennell, on behalf of herself and all of Decedent's statutory beneficiaries are also entitled to recover damages for the pain, grief, sorrow, anguish, stress, shock, and mental suffering already experienced and reasonably probable to be experienced for the remainder of their lives.

231.   As a further direct and proximate result of Defendant's conduct, Plaintiff Debra Fennell and all statutory beneficiaries of Decedent Darrell Fennel have incurred expenses for funeral and burial, medical care, and services for the injuries that resulted in his death, lost wages, and loss of earning capacity.

232.   As a further direct and proximate result of Defendant's conduct, Plaintiff Debra Fennell and all statutory beneficiaries of Decedent Darrell Fennel have incurred the loss of love, affection, compassion, care, protection, and guidance since the death of Darrell Fennell which will continue in the future.

233.   WHEREFORE, the Plaintiff demands judgment against Defendant, and in the alternative, request compensatory damages, punitive damages, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## COUNT SEVEN: FRAUDULENT CONCEALMENT - VIOLATION OF ARIZONA CONSUMER FRAUD ACT A.R.S. § 44-1521 et seq.

234.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

235.   Plaintiffs are persons within the meaning of the Arizona Consumer Fraud Act ("the Act").

236.   Defendant is a person within the meaning of the Act for all purposes herein.

237.   Monsanto is estopped from asserting a statute of limitations defense because it fraudulently concealed its wrongful conduct from Plaintiff and Decedent with the intent that Plaintiff, Decedent, and other consumers and users of Roundup® would rely on such material representations.

238. Monsanto had actual knowledge that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries. Monsanto knew or should have known that Roundup® is more toxic than glyphosate alone and that safety studies of Roundup®, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Decedent from Roundup®.

239. Monsanto failed to conduct adequate testing of glyphosate and the Roundup® formulation.

240. Monsanto had actual knowledge of its misrepresentations, negligence, breach of warranties, and false, misleading, deceptive, and unconscionable conduct, including statements and representations. Even so, Monsanto perpetuated its wrongful conduct with the intent and fixed purpose of concealing its wrongs from Plaintiff and Decedent and the public at large. Despite its knowledge that Roundup® is considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup® as safe.

241. Plaintiff and Decedent were unaware of the falsity of these representations, acted in actual and justifiable reliance on such material misrepresentations, and were injured as a direct and proximate result.

242. Additionally, Monsanto knowingly omitted material information and remained silent regarding said misrepresentations despite the fact that it had a duty to inform Decedent and the general public of the inaccuracy of said misrepresentations, which omission constitutes a positive misrepresentation of material fact, with the intent that Decedent and the public would rely on Monsanto's misrepresentations.

243. Plaintiff and Decedent did, in fact, act in actual and justifiable reliance on Monsanto's representations, and Decedent was fatally injured as a result.

244. Monsanto, as the manufacturer of Roundup®, was in a position of superior knowledge and judgment regarding any potential risks associated with its products.

245. Monsanto committed constructive fraud by breaching one or more legal or equitable duties owed to Plaintiff and Decedent relating to Roundup®, said breach or breaches constituting fraud because of its propensity to deceive others or constitute an injury to public interests or public policy.

246. In breaching its duties to Plaintiff and Decedent, Monsanto used its position of trust as the manufacturer and/or distributor of Roundup® to increase sales of its products at the expense of informing Plaintiff and Decedent that use of or exposure to Roundup® carries the risk of serious illness, such as NHL.

247. Plaintiffs are entitled to all damages permitted by the A.R.S. § 44-1528 and A.R.S. § 44-1534 of this Act, including actual damages sustained, civil penalties, attorneys' fees, and costs of this action. Also, the State of Arizona is entitled to statutory penalties from Defendant for each violation of the Act pursuant to A.R.S. § 44-1531.

248. WHEREFORE, Plaintiff respectfully request that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## COUNT EIGHT: PUNITIVE DAMAGES

249. Plaintiff incorporates by reference every other paragraph of this Complaint as if each were set forth herein.

250. Defendant has acted willfully, wantonly, maliciously, with an evil motive, and recklessly in one or more of the following ways:

a. Defendants knew of the unreasonably high risk of NHL posed by the Roundup® products before manufacturing, marketing, distributing and/or selling the Roundup® products, yet purposefully proceeded with such action;

b. Despite their knowledge of the high risk of NHL associated with use and/or exposure to Roundup® products, Defendant affirmatively minimized this risk through marketing and promotional efforts and product labeling;

c. Through the actions outlined above, Defendant expressed a reckless indifference to the safety of users of Roundup® products, including Plaintiff and Decedent.

251. Defendant knew of the dangers and risks of Roundup® products, yet it concealed and/or omitted this information from labels and warnings contained on Roundup® products in furtherance of its knowing and willful actions.

252. These actions were outrageous because of Defendant's evil motive or a reckless indifference to the safety of users of Roundup® products and/or those who became exposed to it.

253. As a direct and proximate result of the willful, wanton, malicious, evilly motivated and/or reckless conduct of Defendant, the Plaintiff has sustained damages as set forth above.

254. WHEREFORE, Plaintiff prays for a judgment for punitive damages against Defendant, jointly and severally, in a fair and reasonable amount sufficient to punish Defendant and deter it and others from engaging in similar conduct in the future, costs expended herein, and such further and other relief as the Court deems just and appropriate.

## COUNT NINE: DAMAGES

255. Plaintiff incorporates by reference every other paragraph of this Complaint as if each were set forth fully and completely herein.

256. Defendant knew of the dangerous condition of Roundup® products, including that they posed a danger to their consumers and non-consumers exposed to Roundup® products, including Plaintiff and Decedent, but chose not to include any warnings or information regarding the dangerous condition of Roundup® products.

257. Defendant showed complete indifference to or conscious disregard of the safety of Plaintiff and Decedent by their conduct described herein. Defendant knew or should have known failure to include a warning for Roundup® products would result in women using and/or being exposed to Roundup® products and subsequently developing NHL.

258. Plaintiff is entitled to exemplary damages to punish Defendant and to deter Defendant and others in similar situations from like conduct.

259.   WHEREFORE, Plaintiff prays for judgment against Defendant for

    a.   compensatory damages in an amount to be proven at trial;

    b.   exemplary damages;

    c.   costs, including reasonable attorneys' fees, court costs, and other litigation expenses; and

    d.   any other relief the Court may deem just and proper.

DATED this 31st day of July 2019.

DALIMONTE RUEB STOLLER, LLP

By:_/s/ Ashley Crowell_
Paul L. Stoller
Ashley Crowell

_Attorneys for Plaintiffs_