# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
## CIVIL DOCKET FOR CASE #: 2:19-cv-06241-SVW-JC

Cindy Weathers et al v. Monsanto Company
Assigned to: Judge Stephen V. Wilson
Referred to: Magistrate Judge Jacqueline Chooljian
Cause: 28:1332 Diversity-Product Liability

Date Filed: 07/19/2019
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Cindy Weathers**

represented by **Jennifer A Moore**
Moore Law Group PLLC
1473 South 4th Street
Louisville, KY 40208
502-717-4080
Fax: 502-717-4086
Email: jennifer@moorelawgroup.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Lawson Weathers**

represented by **Jennifer A Moore**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 07/19/2019 | 1 | COMPLAINT Receipt No: 0973-24114672 - Fee: $400, filed by Plaintiff Cindy Weathers, Lawson Weathers. (Attachments: # 1 Civil Cover Sheet) (Attorney Jennifer A Moore added to party Cindy Weathers(pty:pla), Attorney Jennifer A Moore added to party Lawson Weathers(pty:pla))(Moore, Jennifer) (Entered: 07/19/2019) |
| 07/19/2019 | 2 | Request for Clerk to Issue Summons on Complaint (Attorney Civil Case Opening), 1 filed by Plaintiff Cindy Weathers, Lawson Weathers. (Moore, Jennifer) (Entered: 07/19/2019) |
| 07/22/2019 | 3 | NOTICE OF ASSIGNMENT to District Judge Christina A. Snyder and Magistrate Judge Jacqueline Chooljian. (et) (Entered: 07/22/2019) |
| 07/22/2019 | 4 | NOTICE TO PARTIES OF COURT-DIRECTED ADR PROGRAM filed. (et) (Entered: 07/22/2019) |
| 07/22/2019 | 5 | 21 DAY Summons Issued re Complaint (Attorney Civil Case Opening) 1 as to Defendant Monsanto Company. (et) (Entered: 07/22/2019) |

| 07/22/2019 | 6 | NOTICE OF PRO HAC VICE APPLICATION DUE for Non-Resident Attorney Andrew T Kagan. A document recently filed in this case lists you as an out-of-state attorney of record. However, the Court has not been able to locate any record that you are admitted to the Bar of this Court, and you have not filed an application to appear Pro Hac Vice in this case. Accordingly, within 5 business days of the date of this notice, you must either (1) have your local counsel file an application to appear Pro Hac Vice (Form G-64) and pay the applicable fee, or (2) complete the next section of this form and return it to the court at cacd_attyadm@cacd.uscourts.gov. You have been removed as counsel of record from the docket in this case, and you will not be added back to the docket until your Pro Hac Vice status has been resolved. (et) (Entered: 07/22/2019) |
| 07/22/2019 | 7 | NOTICE OF PRO HAC VICE APPLICATION DUE for Non-Resident Attorney Elizabeth P Kagan. A document recently filed in this case lists you as an out-of-state attorney of record. However, the Court has not been able to locate any record that you are admitted to the Bar of this Court, and you have not filed an application to appear Pro Hac Vice in this case. Accordingly, within 5 business days of the date of this notice, you must either (1) have your local counsel file an application to appear Pro Hac Vice (Form G-64) and pay the applicable fee, or (2) complete the next section of this form and return it to the court at cacd_attyadm@cacd.uscourts.gov. You have been removed as counsel of record from the docket in this case, and you will not be added back to the docket until your Pro Hac Vice status has been resolved. (et) (Entered: 07/22/2019) |
| 07/22/2019 | 8 | NOTICE OF DEFICIENCIES in Attorney Case Opening RE: Complaint (Attorney Civil Case Opening) 1 . The following error(s) was found: No Notice of Interested Parties has been filed. A Notice of Interested Parties must be filed with every partys first appearance. See Local Rule 7.1-1. Counsel must file a Notice of Interested Parties immediately. Failure to do so may be addressed by judicial action, including sanctions. See Local Rule 83-7. Other error(s) with document(s): The Civil Cover Sheet is attached to the Notice of Removal. It should have been filed and entered separately under its proper event. (et) (Entered: 07/22/2019) |
| 07/23/2019 | 9 | Notice of Appearance or Withdrawal of Counsel: for attorney Jennifer A Moore counsel for Plaintiffs Cindy Weathers, Lawson Weathers. Elizabeth P. Kagan is no longer counsel of record for the aforementioned party in this case for the reason indicated in the G-123 Notice. Filed by Plaintiffs Cindy Weathers and Lawson Weathers. (Moore, Jennifer) (Entered: 07/23/2019) |
| 07/31/2019 | 10 | ORDER RETURNING CASE FOR REASSIGNMENT by Judge Christina A. Snyder. ORDER case returned to the Clerk for random reassignment pursuant to General Order 19-03. Case randomly reassigned from Judge Christina A. Snyder to Judge Stephen V. Wilson for all further proceedings. The case number will now reflect the initials of the transferee Judge 2:19-cv-06241 SVW(JCx). (rn) (Entered: 08/01/2019) |
| 08/02/2019 | 11 | NEW CASE ORDER upon filing of the complaint by Judge Stephen V. Wilson. (pc) (Entered: 08/02/2019) |
| 08/05/2019 | 12 | RESPONSE filed by Pro Hac Vice attorney on behalf of Plaintiffs Cindy Weathers, Lawson Weathers. RE: Notice of Filing Fee Due. PHV fee N/A. Case will be transferred by the JPML pursuant to 28 USC 1407 to the ND of CA for coordination with MDL 2741. (lt) Modified on 8/5/2019 (lt). (Entered: 08/05/2019) |

| **PACER Service Center** | | |
| --- | --- | --- |
| **Transaction Receipt** | | |
| 08/06/2019 09:37:34 | | |

| PACER Login: | hllp1982:2634105:4722683 | Client Code: | 1417.0049 |
|---|---|---|---|
| Description: | Docket Report | Search Criteria: | 2:19-cv-06241-SVW-JC End date: 8/6/2019 |
| Billable Pages: | 3 | Cost: | 0.30 |

Jennifer A. Moore, Esq. (State Bar No. 206779)
*jennifer@moorelawgroup.com*
**MOORE LAW GROUP, PLLC**
1473 South 4ᵗʰ Street
Louisville, KY 40208
Tel:    (502) 717-4080
Fax:    (502) 717-4086

Andrew T. Kagan *(Pro Hac Vice motion to be filed)*
andrew@kaganlegalgroup.com
**KAGAN LEGAL GROUP**
295 Palmas Inn Way, Suite 6 Palmanova Plaza
Humacao, Puerto Rico 00791
Tel:    (939) 220-2424
Fax:    (939) 220-2477

Elizabeth P. Kagan *(Pro Hac Vice motion to be filed)*
liz@kagan-law.com
**KAGAN LAW FIRM**
8191 College Pkwy., Suite 303
Fort Myers, FL 33919
Tel:    (239) 466-1161
Fax:    (239) 466-7226

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CINDY WEATHERS, and<br>LAWSON WEATHERS,<br><br>           Plaintiffs,<br><br>v.<br><br><br>MONSANTO COMPANY,<br><br>  Serve:  Corporation Service Company<br>          2710 Gateway Oaks Drive,<br>          Suite 150N<br>          Sacramento, CA 95833<br><br>        Defendant. | **Case No.: 2:19-cv-6241** |

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**
1

## COMPLAINT

Plaintiffs, Cindy Weathers and Lawson Weathers, ("Plaintiffs"), by counsel, hereby bring this Complaint for damages against Defendant, Monsanto Company, and alleges the following:

### NATURE OF THE CASE

1.     This is an action for damages suffered by Plaintiffs as a direct and proximate result of Defendant's negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup®, containing the active ingredient glyphosate.

2.     Plaintiffs maintain that Roundup® and/or glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper warnings and directions as to the dangers associated with its use.

3.     Plaintiff's injuries, like those striking thousands of similarly situated victims across the country, were avoidable.

4.     "Roundup®" refers to all formulations of Defendant's Roundup® products, including, but not limited to, Roundup® Concentrate Poison Ivy and Tough Brush Killer 1, Roundup® Custom Herbicide, Roundup® D-Pak herbicide, Roundup® Dry Concentrate, Roundup® Export Herbicide, Roundup® Fence & Hard Edger 1, Roundup® Garden Foam Weed & Grass Killer, Roundup® Grass and Weed Killer, Roundup® Herbicide, Roundup® Original 2k herbicide, Roundup® Original II Herbicide, Roundup® Pro Concentrate, Roundup® Prodry Herbicide, Roundup® Promax, Roundup® Quik Stik Grass and Weed Killer, Roundup® Quikpro Herbicide, Roundup® Rainfast Concentrate Weed & Grass Killer, Roundup® Rainfast Super Concentrate Weed & Grass Killer, Roundup® Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup® Ready-to-Use Weed & Grass Killer, Roundup® Ready-to-Use Weed and Grass Killer 2, Roundup® Ultra Dry, Roundup® Ultra Herbicide, Roundup®

Ultramax, Roundup® VM Herbicide, Roundup® Weed & Grass Killer Concentrate, Roundup® Weed & Grass Killer Concentrate Plus, Roundup® Weed & Grass killer Ready-to-Use Plus, Roundup® Weed & Grass Killer Super Concentrate, Roundup® Weed & Grass Killer1 Ready-to-Use, Roundup® WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over Defendant and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiffs and Defendant. Defendant is either incorporated and/or has its principal place of business outside of the state in which the Plaintiffs reside.

6.      The amount in controversy between Plaintiffs and Defendant exceeds $75,000, exclusive of interest and cost.

7.      The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

8.      Venue is proper within this district pursuant to 28 U.S.C. § 1391 in that Defendant conducts business here and is subject to personal jurisdiction in this district. Furthermore, Defendant sells, markets, and/or distributes Roundup® within the Central District of California. Also, a substantial part of the acts and/or omissions giving rise to these claims occurred within this district.

## PARTIES

9.      Plaintiff Cindy Weathers, is, and at all relevant times was a resident and citizen of Santa Barbara County, California. Plaintiff brings this action for personal injuries sustained by exposure to Roundup® ("Roundup®") containing the active ingredient glyphosate and surfactant such as polyethoxylated tallow amine ("POEA"). As a direct and proximate result of being exposed to Roundup®, Plaintiff, Cindy Weathers, developed a form of Non-Hodgkin's Lymphoma.

10.     Plaintiff, Lawson Weathers, is and at all relevant times as, a resident and citizen of Santa Barbara County, California. Plaintiff, Lawson Weathers, is the spouse of Plaintiff Cindy Weathers, and brings a claim for loss of consortium.

11.     Defendant, MONSANTO COMPANY ("Defendant" or "Monsanto"), is, and at all relevant times was, a Delaware corporation, with its principal place of business located at 800 North Lindbergh Avenue, St. Louis, Missouri 63167, and is authorized to do business in the state of California and is doing business in the state of California.  Defendant should be served at its registered agent for service of process, Corporation Service Company, 2710 Gateway Oaks Drive, Suite 150N, Sacramento, CA 95833.

12.     Defendant advertises and sells goods, specifically Roundup®, in the state of California.

13.     Defendant transacted and conducted business within the state of California that relates to the allegations in this Complaint.

14.     Defendant derived substantial revenue from goods and products used in the state of California.

15.     Defendant expected or should have expected its acts to have consequences within the state of California, and derived substantial revenue from interstate commerce.

16.     Defendant engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup®.

17.     Defendant is authorized to do business in California and derive substantial income from doing business in this state.

18.     Upon information and belief, Defendant purposefully availed itself of the privilege of conducting activities with the state of California, thus invoking the benefits and protections of its laws.

19.     Upon information and belief, Defendant did design, sell, advertise, manufacture and/or distribute Roundup®, with full knowledge of its dangerous and defective nature.

**FACTUAL ALLEGATIONS**

20.     At all relevant times, Defendant was in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or has acquired and is responsible for the commercial herbicide Roundup®.

21.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate.

22.     Defendant discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate based "Roundup®" as a broad spectrum herbicide.

23.     Glyphosate is the active ingredient in Roundup®.

24.     Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

25.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

26.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

27.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

28.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has been

driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

29.     Defendant is intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup® *i.e.,* "Roundup® Ready®." As of 2009, Defendant was the world's leading producer of seeds designed to be Roundup® Ready®. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup® Ready® seeds.

30.     The original Roundup®, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the world's most widely used herbicides.[1]

31.     For nearly 40 years, consumers, farmers, and the public have used Roundup®, unaware of its carcinogenic properties.

## REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

32.     The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7. U.S.C. § 136 *et seq*. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA) prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. 136a(a).

33.     The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in

---

[1] *Backgrounder*, History of Monsanto's Glyphosate Herbicides, June 2005.

registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

34.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

35.     The EPA and the State of Missouri registered Roundup® for distribution, sale, and manufacture in the United States and the State of Missouri.

36.     FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

37.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

38.     In the case of glyphosate and Roundup®, the EPA had planned on releasing its preliminary risk assessment – in relation to the registration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of the World Health Organization's March 24, 2015 finding that glyphosate is a "probable carcinogen" as demonstrated by the mechanistic evidence of

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

## MONSANTO'S FALSE REPRESENTATIONS REGARDING
## THE SAFETY OF ROUNDUP®

39.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer **than table salt**" and "practically **non-toxic**" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a)   Remember that environmentally friendly Roundup® herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks and fences ...

b)   And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got a weed, brush, edging or trimming problem.

c)   Roundup® biodegrades into naturally occurring elements.

d)   Remember that versatile Roundup® herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e)   This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f)   You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g)   Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h)   Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

8

       i)   You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

       j)   "Roundup® can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup®.[2]

40.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

     a)   its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

     b)   its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

     c)   its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

     d)   its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

     e)   glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

     f)   its glyphosate-containing products or any component thereof might be classified as "practically non-toxic.

41.     Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

42.     In 2009, France's highest court ruled that Monsanto had not told the truth about the

---

[2] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

9

safety of Roundup®. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[3]

## **EVIDENCE OF CARCINOGENICITY IN ROUNDUP®**

43.     As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties.

44.     On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[4] Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

45.     In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.[5]

46.     In October 1991 the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.[6]

47.     In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendant's Roundup® products are more dangerous and toxic than glyphosate alone.[7] As early as 1991 evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone. [8]

---

[3] *Monsanto Guilty in 'False Ad' Row,* BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.
[4] Consensus Review of Glyphosate, Casewell No. 661A. March 4, 1985. United States Environmental Protection Agency.
[5] http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheets/0178fact.pdf
[6] Second Peer Review of Glyphosate, CAS No. 1071-83-6. October 30, 1881. United States Environmental Protection Agency.
[7] Martinez et al. 2007; Benachour 2009; Gasnier et al. 2010; Peixoto 2005; Marc 2004
[8] Martinez et al 1991

48.     In 2002, Julie Marc published a study entitled "Pesticide Roundup® Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

49.     The study found that Defendant's Roundup® caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

50.     In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

51.     The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[9]

52.     In 2005, Francisco Peixoto published a study showing that Roundup®'s effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

53.     The Peixoto study suggested that the harmful effects of Roundup® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup® formulation products.

54.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup® and glyphosate on human umbilical, embryonic, and placental cells.

55.     The study used dilution levels of Roundup® and glyphosate far below agricultural

---

[9] (Molinari, 2000; Stewart et al., 2003)

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup® are not inert and that Roundup® is always more toxic than its active ingredient glyphosate.

56.    The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendant.

57.    Defendant knew or should have known that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant were necessary to protect Plaintiffs from Roundup®.

58.    Defendant knew or should have known that tests limited to Roundup®'s active ingredient glyphosate were insufficient to prove the safety of Roundup®.

59.    Defendant failed to appropriately and adequately test Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant to protect Plaintiffs from Roundup®.

60.    Rather than performing appropriate tests, Defendant relied upon flawed industry-supported studies designed to protect Defendant's economic interests rather than Plaintiffs and the consuming public.

61.    Despite its knowledge that Roundup® was considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup® as safe.

## IARC CLASSIFICATION OF GLYPHOSATE

62.    The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

63.     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015–2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

64.     IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

65.     On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendant's possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Defendant's Roundup® herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

66.     The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A *probable* carcinogen to humans. According to the authors glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

67.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk

continued after adjustment for other pesticides.

68.    The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

## EARLIER EVIDENCE OF GLYPHOSATE'S DANGER

69.    Despite the new classification by the IARC, Defendant has had ample evidence of glyphosate and Roundup®'s genotoxic properties for decades.

70.    Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

71.    In 1997, Chris Clements published "Genotoxicity of select herbicides in *Rana catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

72.    The study found that tadpoles exposed to Roundup® showed significant DNA damage when compared with unexposed control animals.

73.    Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup® can induce oxidative stress.

74.    Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

75.    The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

76.    In 2006 César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

77.    The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

78.     The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

79.     Despite knowledge to the contrary, Defendant maintains that there is no evidence that Roundup® is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup® is not genotoxic, and that there is no evidence that Roundup® is genotoxic.

80.     In addition to glyphosate and Roundup®'s genotoxic properties, Defendant has long been aware of glyphosate's carcinogenic properties.

81.     Glyphosate and Roundup® in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

82.     Defendant has known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup®.

83.     In 1985, the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

84.     In 2003, Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

85.     The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studies with an increased odds ratio of 3.11.

86.     In 2003, AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

87.     The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

88.     In 2008, Mikael Eriksson published a population based case-control study of exposure to various pesticides as a risk factor for NHL.

89.     This strengthened previous associations between glyphosate and NHL.

90.     In spite of this knowledge, Defendant continued to issue broad and sweeping statements suggesting that Roundup® was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

91.     Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiffs, the agricultural community, and the public at large to purchase and increase the use of Defendant's Roundup® for Defendant's pecuniary gain, and in fact, did induce Plaintiffs to use Roundup®.

92.     Defendant made these statements with complete disregard and reckless indifference to the safety of Plaintiffs and the general public.

93.     Notwithstanding Defendant's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

94.     Defendant knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

95.     Defendant failed to appropriately and adequately inform and warn Plaintiffs of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup®, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment,

monitoring and/or medications.

96.     Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendant continues to maintain that glyphosate and/or Roundup® is safe, non-carcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup®.

97.     Defendant has claimed and continue to claim that Roundup® is safe, non-carcinogenic, and non-genotoxic. These misrepresentations are consistent with Defendant's cavalier approach to investigating and ensuring the safety of its products, the safety of the public at large, and the safety of Plaintiffs.

## SCIENTIFIC FRAUD UNDERLYING THE SAFETY DETERMINATIONS OF GLYPHOSATE

98.     After the EPA's 1985 classification of glyphosate as possibly carcinogenic to humans (Group C), Monsanto exerted pressure upon the EPA to change its classification.

99.     This culminated in the EPA's reclassification of glyphosate to Group E, which was based upon evidence of non-carcinogenicity in humans.

100.    In so classifying, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

101.    On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed scientific fraud.

102.    In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed

approximately 30 tests on glyphosate and glyphosate-containing products, including 11 of the 19 chronic toxicology studies needed to register Roundup® with the EPA.

103.    In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to toxicological impacts of glyphosate. The EPA subsequently audited IBT and determined that the toxicology studies conducted for Roundup® were invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

104.    Three top executives of IBT were convicted of fraud in 1983.

105.    In the second incident, Monsanto hired Craven Laboratories ("Craven") in 1990 to perform pesticide and herbicide studies, including several studies on Roundup®.

106.    In March of 1991, the EPA announced that it was investigating Craven for "allegedly falsifying test data used by chemical firms to win EPA approval of pesticides."

107.    The investigation lead to the indictments of the laboratory owner and a handful of employees.

## MONSANTO'S CONTINUING DISREGARD FOR THE SAFETY OF PLAINTIFFS AND THE PUBLIC

108.    Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."[10]

109.    Ironically, the primary source for this statement is a 1986 report by the WHO, the

---

[10] Backgrounder - Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9 2015)

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

18

same organization that now considers glyphosate to be a probable carcinogen.

110.   Glyphosate, and Defendant's Roundup® products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

111.   Defendant's statements proclaiming the safety of Roundup® and disregarding its dangers misled Plaintiffs.

112.   Despite Defendant's knowledge that Roundup® was associated with an elevated risk of developing cancer, Defendant's promotional campaigns focused on Roundup®'s purported "safety profile."

113.   Defendant's failure to adequately warn Plaintiffs resulted in (1) Plaintiffs using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup®.

114.   Defendant failed to seek modification of the labeling of Roundup® to include relevant information regarding the risks and dangers associated with Roundup® exposure.

115.   The failure of Defendant to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

116.   The failure of Defendant to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

117.   The failure of Defendant to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

118.   By reason of the foregoing acts and omissions, Plaintiffs seek compensatory damages as a result of Plaintiff's use of, and exposure to, Roundup® which caused or was a

substantial contributing factor in causing Plaintiff Cindy Weathers to suffer from cancer, specifically NHL, and Plaintiff suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

119.   By reason of the foregoing, Plaintiffs are severely and permanently injured.

120.   By reason of the foregoing acts and omissions, Plaintiffs have endured and, in some categories continues to suffer, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of the actions and inactions of the Defendant.

## PLAINTIFF'S EXPOSURE TO ROUNDUP®

121.   Plaintiff, Cindy Weathers, used Roundup® beginning in approximately 1987.

122.   For years, Plaintiff, Cindy Weathers, sprayed Roundup® on a regular basis. Plaintiff, Cindy Weathers, followed all safety and precautionary warnings during the course of use.

123.   Plaintiff, Cindy Weathers, was subsequently diagnosed with a form of Non-Hodgkin's Lymphoma in or about July 2017. The development of Plaintiff's Non-Hodgkin's Lymphoma was proximately and actually caused by exposure to Defendant's Roundup® products.

124.   As a result of her injury, Plaintiff has incurred significant economic and non-economic damages.

125.   Plaintiff, Lawson Weathers, is the spouse of Plaintiff, Cindy Weathers, and brings a claim for loss of consortium.

## EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

126.   Plaintiffs incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

127.   The running of any statute of limitations has been tolled by reason of Defendant's fraudulent concealment. Defendant, through its affirmative misrepresentations and omissions,

actively concealed from Plaintiffs the true risks associated with Roundup® and glyphosate.

128.   At all relevant times, Defendant has maintained that Roundup® is safe, non-toxic, and non-carcinogenic.

129.   Indeed, even as of July 2016, Defendant continues to represent to the public that "Regulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and *agree* that there is *no evidence* that glyphosate, the active ingredient in Roundup®® brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic" (emphasis added).[11]

130.   As a result of Defendant's actions, Plaintiffs were unaware, and could not reasonably know or have learned through reasonable diligence that Roundup® and/or glyphosate contact, exposed Plaintiffs to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

131.   Furthermore, Defendant is estopped from relying on any statute of limitations because of its fraudulent concealment of the true character, quality and nature of Roundup®. Defendant was under a duty to disclose the true character, quality, and nature of Roundup® because this was non-public information over which Defendant had and continues to have exclusive control, and because Defendant knew that this information was not available to Plaintiffs or to distributors of Roundup®. In addition, Defendant is estopped from relying on any statute of limitations because of its intentional concealment of these facts.

132.   Plaintiffs had no knowledge that Defendant was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendant, Plaintiffs could not have reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud should be considered. Defendant had the ability to and did spend enormous amounts of

---

[11] <u>Backgrounder - Glyphosate: No Evidence of Carcinogenicity</u>. Updated November 2014. (downloaded October 9 2015)

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**
21

money in furtherance of its purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Plaintiffs and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendant's representations. Accordingly, Defendant is precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

## FIRST CAUSE OF ACTION
## (NEGLIGENCE)

133.    Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

134.    Defendant had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup® into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

135.    Defendant failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup® into interstate commerce in that Defendant knew or should have known that using Roundup® created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

136.    The negligence by the Defendant, its agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

a.     Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup® without thoroughly testing it;

b.     Failing to test Roundup® and/or failing to adequately, sufficiently, and properly test Roundup®;

c.     Not conducting sufficient testing programs to determine whether or not Roundup® was safe for use; in that Defendant herein knew or should have known that Roundup® was unsafe and unfit for use by reason of the dangers to its users;

d.     Not conducting sufficient testing programs and studies to determine Roundup®'s carcinogenic properties even after Defendant had knowledge that Roundup® is, was, or could be carcinogenic;

e.     Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup®, and the propensity of these ingredients to render Roundup® toxic, increase the toxicity of Roundup®, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup®, and whether or not "inert" ingredients and/or adjuvants were safe for use;

f.     Negligently failing to adequately and correctly warn the Plaintiffs, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup®;

g.     Negligently failing to petition the EPA to strengthen the warnings associated with Roundup®;

h.     Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup®;

i.     Negligently marketing, advertising, and recommending the use of Roundup® without sufficient knowledge as to its dangerous propensities;

j.     Negligently representing that Roundup® was safe for use for its intended purpose, and/or that Roundup® was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

k.     Negligently representing that Roundup® had equivalent safety and efficacy as other forms of herbicides;

l.     Negligently designing Roundup® in a manner, which was dangerous to its users;

m.     Negligently manufacturing Roundup® in a manner, which was dangerous

to its users;

n.   Negligently producing Roundup® in a manner, which was dangerous to its users;

o.   Negligently formulating Roundup® in a manner, which was dangerous to its users;

p.   Concealing information from the Plaintiffs while knowing that Roundup® was unsafe, dangerous, and/or non-conforming with EPA regulations; and

q.   Improperly concealing and/or misrepresenting information from the Plaintiffs, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup® compared to other forms of herbicides.

r.   Negligently selling Roundup® with a false and misleading label.

137.   Defendant under-reported, underestimated, and downplayed the serious dangers of Roundup®.

138.   Defendant negligently and deceptively compared the safety risks and/or dangers of Roundup® with common everyday foods such as table salt, and other forms of herbicides.

139.   At all times relevant, Defendant knew that Roundup® was dangerous and defective, concealed the dangers and risks from Plaintiffs, made misrepresentations to Plaintiffs and the public in general as to the safety of Roundup® and with full knowledge of the risks associated with Roundup®, without adequate warnings of same, manufactured, designed, packaged, labeled, marketed, advertised, distributed, and sold Roundup® to the general public, and to Plaintiffs. Defendant engaged in malicious, fraudulent and grossly negligent conduct toward Plaintiffs and the public, acted with willful and wanton and/or reckless disregard for the safety of the general public and Plaintiffs.

140.   Defendant was negligent and/or violated California law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup® in that they:

a. Failed to use ordinary care in designing and manufacturing Roundup® so as to avoid the aforementioned risks to individuals when Roundup® was used as an herbicide;

b. Failed to accompany its product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup®;

c. Failed to accompany its product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup®;

d. Failed to accompany its product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup®;

e. Failed to warn Plaintiffs of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of NHL;

f. Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup®;

g. Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup®'s "inert" ingredients and/or adjuvants;

h. Negligently misrepresented the evidence of Roundup®'s genotoxicity and carcinogenicity;

i. Was otherwise careless and/or negligent.

141.    Despite the fact that Defendant knew or should have known that Roundup® caused, or could cause, unreasonably dangerous side effects, Defendant continued and continues to market, manufacture, distribute, and/or sell Roundup® to consumers, including the Plaintiffs.

142.    Defendant knew or should have known that consumers such as the Plaintiffs would foreseeably suffer injury as a result of Defendant's failure to exercise ordinary care, as set forth above.

143.    Defendant's violations of law and/or negligence were the proximate cause of Plaintiffs' injuries, harm and economic loss, which Plaintiffs suffered and/or will continue to suffer.

144.    As a result of the foregoing acts and omissions, the Plaintiffs suffered from serious and dangerous side effects including, but not limited to, NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, Plaintiffs suffered life-threatening NHL, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury trial on all issues contained herein.

### SECOND CAUSE OF ACTION
### (STRICT PRODUCTS LIABILITY – DESIGN DEFECT)

145.    Plaintiffs repeat, reiterate and, re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

146.    At all times herein mentioned, the Defendant designed, researched, manufactured, tested, advertised, promoted, sold, and distributed Roundup® as hereinabove described that was used by the Plaintiffs.

147.    Defendant's Roundup® was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendant.

148.    At those times, Roundup® was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, the Plaintiffs herein.

149.    The Roundup® designed, researched, manufactured, tested, advertised, promoted,

marketed, sold, and distributed by Defendant was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup®.

150. The Roundup® designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective in design and/or formulation, in that, when it left the hands of the Defendant manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

151. At all times herein mentioned, Roundup® was in a defective condition and unsafe, and Defendant knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendant. In particular, Defendant's Roundup® was defective in the following ways:

    a.    When placed in the stream of commerce, Defendant's Roundup® products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate.

    b.    When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

    c.    When placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

    d.    Defendant did not sufficiently test, investigate, or study its Roundup® products.

    e.    Exposure to Roundup® presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

    f.    Defendant new or should have known at the time of marketing its Roundup® products that exposure to Roundup® and could result in cancer and other severe illnesses and injuries.

    g.    Defendant did not conduct adequate post-marketing surveillance of its

Roundup® products.

152.    Defendant knew, or should have known that at all times herein mentioned its Roundup® was in a defective condition, and was and is inherently dangerous and unsafe.

153.    Plaintiffs were exposed to Defendant's Roundup®, as described above, without knowledge of Roundup®'s dangerous characteristics.

154.    At the time of the Plaintiffs' use of and exposure to Roundup®, Roundup® was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

155.    Defendant with this knowledge voluntarily designed its Roundup® with a dangerous condition for use by the public, and in particular the Plaintiffs.

156.    Defendant had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

157.    Defendant created a product that was and is unreasonably dangerous for its normal, intended use.

158.    Defendant marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

159.    The Roundup® designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was manufactured defectively in that Roundup® left the hands of Defendant in a defective condition and was unreasonably dangerous to its intended users.

160.    The Roundup® designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant reached its intended users in the same defective and unreasonably dangerous condition in which the Defendant's Roundup® was manufactured.

161.    Defendant designed, researched, manufactured, tested, advertised, promoted,

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**
28

marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to the Plaintiffs in particular, and Defendant is therefore strictly liable for the injuries sustained by the Plaintiffs.

162.    The Plaintiffs could not, by the exercise of reasonable care, have discovered Roundup®'s defects herein mentioned or perceived its danger.

163.    By reason of the foregoing, the Defendant has become strictly liable to the Plaintiffs for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup®.

164.    Defendant's defective design, of Roundup® amounts to willful, wanton, and/or reckless conduct by Defendant.

165.    Defects in Defendant's Roundup® were the cause or a substantial factor in causing Plaintiffs' injuries.

166.    As a result of the foregoing acts and omission, the Plaintiff developed NHL, and suffered severe and personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury trial on all issues contained herein.

### THIRD CAUSE OF ACTION
### (STRICT PRODUCTS LIABILITY – FAILURE TO WARN)

167.    Plaintiffs repeat, reiterate and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

168.    Defendant has engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting Roundup®, and through that conduct have knowingly and intentionally placed Roundup® into the stream of commerce with full knowledge that it reaches consumers such as Plaintiffs who are exposed to it through ordinary and reasonably foreseeable uses.

169.    Defendant did in fact sell, distribute, supply, manufacture, and/or promote Roundup® to Plaintiffs. Additionally, Defendant expected the Roundup® that it was selling, distributing, supplying, manufacturing, and/or promoting to reach – and Roundup® did in fact reach – consumers, including Plaintiffs, without any substantial change in the condition of the product from when it was initially distributed by Defendant.

170.    At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

171.    At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Defendant and at the time Plaintiffs were exposed to and/or ingested the product. The defective condition of Roundup® was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing non-Hodgkin's lymphoma as a result of exposure and use.

172.    Roundup® did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect the health of those exposed in violation of 7 U.S.C. § 136j(a)(1)(E).

173.    Defendant's failure to include a warning or caution statement which was necessary

and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. § 136j(a)(1)(E) as well as the laws of the state of California.

174.   Defendant could have amended the label of Roundup® to provide additional warnings.

175.   This defect caused serious injury to Plaintiffs, who used Roundup® in its intended and foreseeable manner.

176.   At all times herein mentioned, Defendant had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

177.   Defendant labeled, distributed, and promoted the aforesaid product that it was dangerous and unsafe for the use and purpose for which it was intended.

178.   Defendant failed to warn of the nature and scope of the side effects associated with Roundup®, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of NHL.

179.   Defendant was aware of the probable consequences of the aforesaid conduct. Despite the fact that Defendant knew or should have known that Roundup® caused serious injuries, Defendant failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of developing NHL from Roundup® exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution. Defendant willfully and deliberately failed to avoid the consequences associated with its failure to warn, and in doing so, Defendant acted with a conscious disregard for the safety of Plaintiffs.

180.   At the time of exposure, Plaintiffs could not have reasonably discovered any defect in Roundup® prior through the exercise of reasonable care.

181.   Defendant, as the manufacturer and/or distributor of the subject product, is held to the level of knowledge of an expert in the field.

182.   Plaintiffs reasonably relied upon the skill, superior knowledge, and judgment of Defendant.

183.   Had Defendant properly disclosed the risks associated with Roundup® products, Plaintiffs would have avoided the risk of NHL by not using Roundup® products.

184.   The information that Defendant did provide or communicate failed to contain adequate warnings and precautions that would have enabled Plaintiffs, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup® and glyphosate; continued to promote the efficacy of Roundup®, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

185.   To this day, Defendant has failed to adequately warn of the true risks of Plaintiffs' injuries associated with the use of and exposure to Roundup®.

186.   As a result of its inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiffs.

187.   As a direct and proximate result of Defendant's actions as alleged herein, and in such other ways to be later shown, the subject product caused Plaintiffs to sustain injuries as herein alleged.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury trial on all issues contained herein.

## FOURTH CAUSE OF ACTION
## (BREACH OF IMPLIED WARRANTIES)

188.    Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

189.    At all times herein mentioned, the Defendant manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold Roundup® as a broad spectrum herbicide. These actions were under the ultimate control and supervision of Defendant.

190.    At the time Defendant marketed, sold, and distributed Roundup® for use by Plaintiffs, Defendant knew of Roundup®'s intended use and impliedly warranted the product to be or merchantable quality and safe and fit for this use.

191.    The Defendant impliedly represented and warranted to Plaintiffs and users of Roundup®, the agricultural community, and/or the EPA that Roundup® was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.

192.    These representations and warranties were false, misleading, and inaccurate in that Roundup® was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

193.    Plaintiffs and/or the EPA did rely on said implied warranty of merchantability of fitness for particular use and purpose.

194.    Plaintiffs reasonably relied upon the skill and judgment of Defendant as to whether Roundup® was of merchantable quality and safe and fit for its intended use.

195.    Roundup® was injected into the stream of commerce by the Defendant in a

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

defective, unsafe, and inherently dangerous condition, and the products' materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

196.   The Defendant breached the aforesaid implied warranties, as its herbicide Roundup® was not fit for its intended purposes and uses.

197.   As a result of the foregoing acts and omissions, Plaintiff suffered from NHL and Plaintiffs suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic, and non-economic damages.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury trial on all issues contained herein.

## FIFTH CAUSE OF ACTION
### (VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*)

198.   Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

199.   California Business and Professions Code Section 17200, *et. seq.* (the "UCL") prohibits "any unlawful, unfair, or fraudulent business act or practice." Defendants are liable to Plaintiffs pursuant to the UCL. Defendants were in the business of manufacturing and marketing Roundup®. Defendants and/or their agents designed, formulated, manufactured, assembled, prepared for sale, distributed and/or sold Roundup®, which was in a defective condition

unreasonably dangerous when applied to its intended to use in the usual and customary manner.

200.   Defendants engaged in unfair, deceptive, false, and/or fraudulent acts and/or practices in violation of the UCL through their false and misleading promotion of Roundup® designed to induce Plaintiffs to use Roundup®.

201.   Privity existed between Plaintiffs and Defendants.

202.   Plaintiffs, while using Roundup® in the usual and customary manner as it was intended to be used, suffered substantial injuries as a proximate result of Defendants placing the product on the market, which was unreasonably dangerous and defective at the time it was placed on the market by Defendants.

203.   As a direct and proximate result of Defendants' violations of the UCL, Plaintiffs have suffered significant and permanent damages, including, but not limited to, injury, expense, and economic loss as previously described, rendering Defendants liable for said damages. Additionally, Plaintiffs are entitled to recover attorney's fees and punitive damages. Plaintiffs demand a jury trial on all issues contained herein.

### SIXTH CAUSE OF ACTION
### (LOSS OF CONSORTIUM)

204.   Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

205.   Plaintiff, Lawson Weathers, is, and at all times relevant was, the spouse of Plaintiff, Cindy Weathers.

206.   As a result of the actions and/or omissions of the Defendant set forth above, Plaintiff, Lawson Weathers, has been deprived of the services, assistance, aid, society, love, affection, companionship, and conjugal relationship of his wife, Plaintiff, Cindy Weathers, and is

1   entitled to recover pursuant to Cal. Civ. Code 1431.2 for his loss of consortium in addition to his

2   rights at common law.

3        207.    The damages of Plaintiff, Lawson Weathers, exceed the minimum amount required

4   for the jurisdiction of this Court.

5        208.    Defendant's conduct was committed with knowing, reckless, conscious, wanton,

6   willful, and deliberate disregard for the value of human life and the rights and safety of consumers,

7   including Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so as to punish

8   and deter similar conduct in the future.

9   

10       WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs'

11   favor for compensatory and punitive damages, together with interest, costs herein incurred,

12   attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand

13   a jury trial on all issues contained herein.

### PRAYER FOR RELIEF

14   

15       WHEREFORE, Plaintiffs demand judgment against the Defendant on each of the above-

16   referenced claims and causes of action and as follows:

17           1.    Awarding compensatory damages in excess of the jurisdictional amount,

18           including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life,

19           and other non-economic damages in an amount to be determined at trial of this action;

20           2.    Awarding compensatory damages to Plaintiffs for past and future damages,

21           including, but not limited to, Plaintiffs' pain and suffering and for severe and permanent

22           personal injuries sustained by the Plaintiffs including health care costs and economic

23           loss;

24   

25           3.    Awarding economic damages in the form of medical expenses, out of

26           pocket expenses, lost earnings and other economic damages in an amount to be determine

27           at trial of this action;

28

1

    4.       Punitive damages;

2

    5.       Pre-judgment interest;

3

    6.       Post-judgment interest;

4

    7.       Awarding Plaintiffs' reasonable attorneys' fees;

5

    8.       Awarding Plaintiffs the costs of these proceedings; and

6

    9.       Such other and further relief as this Court deems just and proper.

7

8

9

10

DATED: July 19, 2019              **MOORE LAW GROUP, PLLC**

11

12

          By:   */s/Jennifer A. Moore*

13

                   Jennifer A. Moore (State Bar No. 206779)
                   jennifer@moorelawgroup.com
                   Ashton Rose Smith *(Pro Hac Vice to be filed)*

14

                   ashton@moorelawgroup.com
                   **MOORE LAW GROUP, PLLC**

15

                   1473 South 4th Street
                   Louisville, KY 40208

16

                   Tel:  (502) 717-4080
                   Fax:  (502) 717-4086

17

18

                   Andrew T. Kagan
                   *(Pro Hac Vice motion to be filed)*

19

                   andrew@kaganlegalgroup.com
                   **KAGAN LEGAL GROUP**

20

                   295 Palmas Inn Way, Suite 6 Palmanova Plaza
                   Humacao, Puerto Rico 00791

21

                   Tel:  (939) 220-2424
                   Fax:  (939) 220-2477

22

                   Elizabeth P. Kagan
                   *(Pro Hac Vice motion to be filed)*

23

                   liz@kagan-law.com
                   **KAGAN LAW FIRM**

24

                   8191 College Pkwy., Suite 303
                   Fort Myers, FL 33919

25

                   Tel:  (239) 466-1161
                   Fax:  (239) 466-7226

26

27

                   *Attorneys for Plaintiffs*

28

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**
37

1

## DEMAND FOR TRIAL BY JURY

2        Plaintiffs hereby demand a trial by jury to the full extent permitted by law.

3

DATED: July 19, 2019                     **MOORE LAW GROUP, PLLC**

4

5

                                 By:   */s/Jennifer A. Moore*
6                                        Jennifer A. Moore (State Bar No. 206779)
                                         jennifer@moorelawgroup.com
7                                        **MOORE LAW GROUP, PLLC**
                                         1473 South 4th Street
8                                        Louisville, KY 40208
                                         Tel:  (502) 717-4080
9                                        Fax:  (502) 717-4086

10                                       Andrew T. Kagan
                                         *(Pro Hac Vice motion to be filed)*
11                                       andrew@kaganlegalgroup.com
                                         **KAGAN LEGAL GROUP**
12                                       295 Palmas Inn Way, Suite 6 Palmanova Plaza
                                         Humacao, Puerto Rico 00791
13                                       Tel:  (939) 220-2424
                                         Fax:  (939) 220-2477
14

15                                       Elizabeth P. Kagan
                                         *(Pro Hac Vice motion to be filed)*
16                                       liz@kagan-law.com
                                         **KAGAN LAW FIRM**
17                                       8191 College Pkwy., Suite 303
                                         Fort Myers, FL 33919
18                                       Tel:  (239) 466-1161
                                         Fax:  (239) 466-7226

19                                       *Attorneys for Plaintiffs*

20

21

22

23

24

25

26

27

28