PMH

# U.S. District Court
## Southern District of Florida (Ft Lauderdale)
## CIVIL DOCKET FOR CASE #: 0:19-cv-61959-RKA

| | |
|---|---|
| Casale v. Monsanto Company | Date Filed: 08/05/2019 |
| Assigned to: Judge Roy K. Altman | Jury Demand: Defendant |
| Referred to: Magistrate Judge Patrick M. Hunt | Nature of Suit: 365 Personal Inj. Prod. |
| Case in other court:  Seventeenth Judicial Circuit, CACE-19- | Liability |
| 012611 | Jurisdiction: Diversity |
| Cause: 28:1332 Diversity-Notice of Removal | |

**Plaintiff**

**Patricia A Casale**　　　　　　　　represented by　**Loreen Ida Kreizinger**
Loreen I. Kreizinger, P.A.
2881 East Oakland Park Boulevard
Suite 315
Ft. Lauderdale, FL 33306
954-766-8875
Fax: 954-728-3485
Email: kreizingerlaw@aol.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**　　　　　　　represented by　**Melissa R. Alvarez**
McDermott Will & Emery
333 S.E. 2 Avenue
Suite 4500
Miami, FL 33131
305-347-6551
Fax: 305-468-6574
Email: malvarez@mwe.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Anthony Nolan Upshaw**
McDermott Will & Emery
333 SE 2 Avenue
Suite 4500
Miami, FL 33131
305-347-6540
Fax: 305-675-8031
Email: aupshaw@mwe.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|

| 08/05/2019 | 1 | NOTICE OF REMOVAL (STATE COURT COMPLAINT - Complaint) Filing fee $ 400.00 receipt number 113C-11874582, filed by Monsanto Company. (Attachments: # 1 Exhibit 1 Casale Patricia A. - Notice of Service of Process Summons Complaint, # 2 Civil Cover Sheet, # 3 Monsanto Company's Corporate Disclosure Statement)(Upshaw, Anthony) Text Modified on 8/5/2019 (cds). No Answer/Motion To Dismiss Filed. (Entered: 08/05/2019) |
|---|---|---|
| 08/05/2019 | 2 | Clerks Notice of Judge Assignment to Judge Roy K. Altman and Magistrate Judge Patrick M. Hunt.<br><br>Pursuant to 28 USC 636(c), the parties are hereby notified that the U.S. Magistrate Judge Patrick M. Hunt is available to handle any or all proceedings in this case. If agreed, parties should complete and file the Consent form found on our website. It is not necessary to file a document indicating lack of consent.<br><br>Pro se (NON-PRISONER) litigants may receive Notices of Electronic Filings (NEFS) via email after filing a Consent by Pro Se Litigant (NON-PRISONER) to Receive Notices of Electronic Filing. The consent form is available under the forms section of our website. (cds) (Entered: 08/05/2019) |
| 08/06/2019 | 3 | ANSWER and Affirmative Defenses to Complaint with Jury Demand by Monsanto Company. (Upshaw, Anthony) (Entered: 08/06/2019) |

<table>
<tr><td colspan="4" align="center"><strong>PACER Service Center</strong></td></tr>
<tr><td colspan="4" align="center"><strong>Transaction Receipt</strong></td></tr>
<tr><td colspan="4" align="center">08/06/2019 17:35:48</td></tr>
<tr><td><strong>PACER Login:</strong></td><td>hllp1982:2634105:4722683</td><td><strong>Client Code:</strong></td><td>1417.0049</td></tr>
<tr><td><strong>Description:</strong></td><td>Docket Report</td><td><strong>Search Criteria:</strong></td><td>0:19-cv-61959-RKA</td></tr>
<tr><td><strong>Billable Pages:</strong></td><td>2</td><td><strong>Cost:</strong></td><td>0.20</td></tr>
</table>

Filing # 91120773 E-Filed 06/14/2019 01:03:22 PM

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR BROWARD
COUNTY, FLORIDA

PATRICIA A. CASALE,

        Plaintiff,

v.

MONSANTO COMPANY, a foreign
Corporation,

        Defendant.

_____/

## COMPLAINT

Plaintiff, PATRICIA A. CASALE, through the undersigned counsel, brings this action against Defendant MONSANTO COMPANY, a foreign corporation, and states as follows:

### JURISTICTION AND VENUE

1.     This is a civil action for damages in excess of $15,000.00, exclusive of interest, costs and attorneys fees.

2.     At all times material, Plaintiff PATRICIA A. CASALE, a single woman, was a resident of Broward County, Florida.

3.     At all times material hereto, the Defendant, MONSANTO COMPANY, was a Florida foreign profit corporation with its principal place of business in Missouri.

4.     The Defendant, MONSANTO COMPANY, purposefully made continuous and systematic business contact with the state of Florida.

1

5.     At all times material hereto, the Defendant, MONSANTO COMPANY, maintained sufficient minimum contacts in Florida and, more specifically, Broward County, as it consistently sought financial gain from the sale of its product to-wit: Roundup®, which it directed into the stream of commerce into the State of Florida and, more specifically, Broward County, as an effort to target its product to be purchased by consumers in Broward County, Florida.

6.     At all times material hereto, the Defendant, MONSANTO COMPANY operated, conducted, engaged in, and/or carried on a business and/or business venture in the state of Florida, and/or had an office or agency in the state of Florida such that this Court has specific jurisdiction over the Defendant, MONSANTO COMPANY.

7.     The Defendant, MONSANTO COMPANY, has engaged in substantial and not isolated activities within the state of Florida.

8.     The Defendant, MONSANTO COMPANY, has consented to jurisdiction in Broward County, Florida, since this company has registered to do business in the State of Florida.

9.     At all times material hereto, the Plaintiff, PATRICIA CARFALE, purchased the product, Roundup®, which was manufactured by the Defendant, MONSANTO COMPANY, who distributed this product for sale at the Home Depot stores located in Broward County, Florida and caused the product to be sold to Plaintiff.

10.     In addition, venue is proper in Broward County, Florida because the Defendant committed tortious acts and sold/distributed a dangerous and defective product in Broward County, Florida.

2

11.    The Plaintiff, PATRICIA CARFALE, used the Defendant's product, Roundup®, at her residence for over twenty (20) years and was injured in Broward County, Florida, as a result of the Defendant's product and was diagnosed in December, 2018, with Non-Hodgkin's Lymphoma from the use of Roundup®.

### PARTIES

12.    The Plaintiff, PATRICIA A. CASALE, brings her action for personal injuries sustained by exposure to Roundup®, containing the active ingredient glyphosate. Plaintiff used and has been exposed to Roundup® in Broward County, Florida, since approximately 1999. As a direct and proximate result of being exposed to Roundup®, Plaintiff was first diagnosed with Non-Hodgkin's Lymphoma ("NHL") in December, 2018. The damages suffered by Plaintiff as a direct and proximate result of Defendant's negligent and wrongful conduct in connection with the design, development, manufacture, testing, packing, promoting, advertising, distribution, labeling, sale and/or application of glyphosate containing products are irreversible.

13.    The Defendant MONSANTO COMPANY is a multinational, agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate, a broad-spectrum herbicide used to kill weeds and grasses. Monsanto markets, distributes and sells glyphosade under the name Roundup®.

14.    Roundup® refers to all formulations of Defendants' Roundup® products, including, but not limited to, Roundup® Concentrate Poison Ivy and Tough Brush Killer 1, Roundup® Custom Herbicide, Roundup® D-Pak herbicide, Roundup® Dry Concentrate, Roundup® Export Herbicide, Roundup® Fence & Hard Edger 1, Roundup® Garden Foam

3

Weed & Grass Killer, Roundup® Grass and Weed Killer, Roundup® Herbicide, Roundup® Original 2k herbicide, Roundup® Original II Herbicide, Roundup® Pro Concentrate, Roundup® Prodry Herbicide, Roundup® Promax, Roundup® Quik Stik Grass and Weed Killer, Roundup® Quikpro Herbicide, Roundup® Rainfast Concentrate Weed & Grass Killer, Roundup® Rainfast Super Concentrate Weed & Grass Killer, Roundup® Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup® Ready-to-Use Weed & Grass Killer, Roundup® Ready-to-Use Weed and Grass Killer 2, Roundup® Ultra Dry, Roundup® Ultra Herbicide, Roundup® Ultramax, Roundup® VM Herbicide, Roundup® Weed & Grass Killer Concentrate, Roundup® Weed & Grass Killer Concentrate Plus, Roundup® Weed & Grass Killer Ready-to-Use Plus, Roundup® Weed & Grass Killer Super Concentrate, Roundup® Weed & Grass Killer Ready-to-Use, Roundup® WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, RangerPro Herbicide, or any other formulation containing the active ingredient glyphosate.

15. At all times material, Defendant Monsanto Company (hereinafter "Monsanto"), was a corporation organized under the laws of the State of Delaware with its principal place of business in St. Louis, Missouri. Monsanto was the entity that discovered the herbicidal properties of glyphosate and manufactured Roundup®, which contains the active ingredient glyphosate, as well as other "inert" ingredients.

## FACTUAL ALLEGATIONS

16. In 1970, Monsanto discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®.

17. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's

4

revenue. By 2001, glyphosate had become the most-used active ingredient in American agriculture.

18.     The success of Roundup® was key to Monsanto's dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. Today, glyphosate remains one of the world's largest herbicides by sales volume.

19.     Monsanto has always marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use. Monsanto still markets Roundup® as safe today.

### *Registration of Herbicides under Federal Law*

20.     The manufacture, formulation and distribution of herbicides, such as Roundup®, is regulated under the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale or use, except as described by the Act. 7 U.S.C. § 136a(a).

21.     Because pesticides are toxic to plants, animals, and humans, the EPA requires, as part of the registration process, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment."7 U.S.C. § 136a(c)(5)(D).

22.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

23.     The EPA registered Roundup® for distribution, sale, and manufacture in the United States in 1974.

24.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conduct the health and safety testing of pesticide and herbicide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required to perform the product tests that are required of the manufacturer.

25.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136 *et seq.*

26.     In order to reevaluate these pesticides pursuant to the re-registration process, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation. In the case of glyphosate the EPA had planned on releasing its preliminaryrisk assessment - in relation to the re-registration process-no later than July

6

2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the health-related findings that had been made by the United Nations World Health Organization.

### *Monsanto's False Representations Regarding the Safety of Roundup®*

27.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were **"safer than table salt"** and **"practically non-toxic"** to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a.  Remember that environmentally friendly Roundup® herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks and fences ...

b.  And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got a weed, brush, edging or trimming problem.

c.  Roundup® biodegrades into naturally occurring elements.

d.  Remember that versatile Roundup@) herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e.  This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f.  Glyphosate is less toxic to rats than table salt following acute oral ingestion.

g.  Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

h.  You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

7

"Roundup® can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup®.

28. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with the NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

    a. Its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

    b. Its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable.

    c. Its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

    d. Its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

    e. Glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides.

    f. Its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

29. Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

30. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

8

### *International Agency for Research of Cancer Findings*

31.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency of the United Nations World Health Organization ("WHO") tasked with conducting and coordinating research into the causes of cancer.

32.     An IARC Advisory Group to Recommend Priorities for IARC Monographs met in April 2014. A substance must meet two criteria to be eligible for review by the IARC Monographs: 1) there must already be some evidence of carcinogenicity of the substance, and 2) there must be evidence that humans are exposed to the substance.

33.     IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals: 1) the substance must have a potential for direct impact on public health; 2) scientific literature that supports suspicion of carcinogenicity; 3) evidence of significant human exposure; 4) high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; and 5) related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

34.     On March 24, 2015, after its cumulative review of human, animal, and DNA studies - many of which were in Monsanto's possession since as early as 1985 - the IARC's working group published its conclusion that the glyphosate contained in Roundup® is a Class 2A "probable carcinogen."

35.     The IARC's full Monograph was published on July 29, 2015. According to the authors, glyphosate demonstrated sufficient evidence of genotoxicity to warrant a 2A

classification (probable carcinogen) based on evidence of carcinogenicity in humans and animals.

36. The IARC identified glyphosate as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

37. The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate. The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL. The increased risk persisted after adjustment for other pesticides.

38. The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage after glyphosate formulations were sprayed.

39. In male research mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

40. The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to

aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

41.    The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

42.    The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

### *Early Evidence of Glyphosate's Dangers to Human Health*

43.    Even before the new classification by the IARC, Monsanto had ample evidence of glyphosate's genotoxic properties for decades.

44.    In 1985, the EPA studied the effects of glyphosate in mice finding a dose-related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

45.    In 1997, Chris Clements, a biologist at the University of Windsor in Canada, published "Genotoxicity of select herbicides in *Rana catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay." This study was published in "Environmental and Molecular Mutagenesis," the international journal of the Environmental Mutagenesis and Genomics Society. The study found that tadpoles exposed

11

to Roundup® showed significant DNA damage when compared with unexposed control animals.

46.    In 2003, Swedish oncologists Lennart Harden and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia. The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studies with an increased odds ratio of 3:11.

47.    Also in 2003, AnneClaire De Roos, a Ph.D. in environmental and occupational health at Drexel University, published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL. The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

48.    In 2006, Cesar Paz-y-Mifio, a genetics expert in Ecuador, published a study examining DNA damage in agricultural workers exposed to glyphosate. The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate.

49.    In 2008, Swedish oncologist Mikael Eriksson published a population based case- control study of exposure to various pesticides as a risk factor for NHL.

50.    In spite of these studies, Monsanto continued to issue broad and sweepmg statements suggesting that Roundup® was safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

12

### *Monsanto's Attempt to Cover Up the Danger of Roundup®*

51.     After the EPA's 1985 classification of glyphosate as possibly carcinogenic to humans, Monsanto exerted pressure upon the EPA to change its classification.

52.     As a result of Monsanto's pressure, the EPA reclassified glyphosate to Group E - evidence of non-carcinogenicity in humans. The EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

53.     The "available evidence" was circumspect. On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed scientific fraud.

54.     Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed approximately 30 tests on glyphosate and glyphosate-containing products, including 11 of the 19 chronic toxicology studies needed to register Roundup® with the EPA.

55.     In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to toxicological impacts of glyphosate. The EPA subsequently audited IBT and determined that the toxicology studies conducted for Roundup® were invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits." Three top executives of IBT were convicted of fraud in 1983.

13

56.     In 1990, Monsanto hired Craven Laboratories ("Craven") to perform pesticide and herbicide studies, including several studies on Roundup®. In March of 1991, the EPA announced that it was investigating Craven for "allegedly falsifying test data used by chemical firms to win EPA approval of pesticides." The investigation led to the indictments of the laboratory owner and a handful of employees.

### *Recent Worldwide Bans on Roundup®/Glyphosate*

57.     Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015. The Netherlands issued a ban on all glyphosate-based herbicides, including Roundup®, which took effect at the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are.  Especially children are sensitive to toxic substances and should therefore not be exposed to it."

58.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

59.     France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

60.     Bermuda banned both the private and commercial sale of glyphosate, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup®' has been suspended."

14

61.     The Sri Lankan government banned the private and commercial use of glyphosate, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

62.     The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

**COUNT I**
**STRICT LIABILITY AGAINST MONSANTO**

63.     Plaintiff re-alleges paragraphs 1 through 59 as set forth above.

64.     At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold and distributed Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing defective Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto.

65.     At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by the Plaintiff, as described above.

66.     At all times relevant to this litigation, Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff.

67. At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Florida and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

68. Roundup® products, as designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

69. Roundup® products, as designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

70. At all times relevant to this action, Monsanto knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

71. At all times relevant to this litigation, Roundup® products, as designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed by Monsanto were defective in design and formulation, in one or more of the following ways:

16

a. When placed in the stream of commerce, Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b. When placed in the stream of commerce, Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c. When placed in the stream of commerce, Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d. Monsanto did not sufficiently test, investigate, or study Roundup® products and, specifically, the active ingredient glyphosate.

e. Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f. At the time of marketing its Roundup® products, Roundup® was defective in that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g. Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products.

h. Monsanto could have employed safer alternative designs and formulations.

72.     Plaintiff was exposed to Roundup® products while taking care of her yard at her residence to rid her yard of weeds, as described above, without knowledge of their dangerous characteristics.

73.     At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

17

74.    Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

75.    The harm caused by Roundup® products far outweighed their benefit, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate. Roundup® products were and are more dangerous than alternative products and Monsanto could have designed Roundup® products (including their packaging and sales aids) to make them less dangerous. Indeed, at the time that Monsanto designed Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

76.    At the time Roundup® products left Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of those herbicides.

77.    Monsanto's defective design of Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including the Plaintiff.

78.    As a result of the unreasonably dangerous condition of its Roundup® products, Monsanto is strictly liable to Plaintiff.

79.    The defects in Roundup® products caused or contributed to cause Plaintiff's cancer and other injuries, and, but for Monsanto's misconduct and omissions, Plaintiff would not have sustained those injuries.

80.     As a direct and proximate result of Monsanto placing defective Roundup®
products into the stream of commerce, the Plaintiff, PATRICIA A. CASALE, sustained
actual, consequential and incidental damages including, but not limited to, bodily injury
that is permanent within a reasonable degree of medical probability and resulting pain and
suffering, disability, disfigurement, aggravation of pre-existing conditions, mental
anguish, loss of capacity for the enjoyment of life, medical expenses for hospitalization,
medical care and treatment, nursing care and treatment, various medical supplies and
equipment, home health care, housekeeping, loss earnings, and loss of ability to earn
money. PATRICIA A. CASALE has suffered these losses in the past and these losses are
either permanent or continuing and Plaintiff will suffer these losses in the future.

**WHEREFORE,** the Plaintiff, PATRICIA A. CASALE, demands judgment
against the Defendant Monsanto Company and seeks all damages available to her by law,
including compensatory damages, and such other relief as may be deemed just and
appropriate.

<u>**COUNT II**</u>
<u>**STRICT LIABILITY (FAILURE TO WARN) AGAINST MONSANTO**</u>

81.     Plaintiff re-alleges paragraphs 1 through 59 as set forth above.

82.     Plaintiff brings this strict liability claim against Monsanto for failure to warn.

83.     At all times relevant to this litigation, Monsanto designed, researched,
developed, manufactured, produced, tested, assembled, labeled, advertised, promoted,
marketed, sold, and distributed Roundup® products, which are defective and
unreasonably dangerous to consumers, including Plaintiff, because they do not contain
adequate warnings or instructions concerning the dangerous characteristics of Roundup®

and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Monsanto.

84.     Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, distributed, and otherwise released into the stream of commerce Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiff, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

85.     At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn the Plaintiff of the dangers associated with Roundup® use and exposure. Monsanto, as manufacturer, seller, promoter, marketer, or distributor of chemical herbicides are held to the knowledge of an expert in the field.

86.     At the time of manufacture, Monsanto could have provided the warnmgs or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

87.    At all times relevant to this litigation, Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by these herbicides, including Plaintiff.

88.    Despite the fact that Monsanto knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with its use and exposure. The dangerous propensities of these products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or scientifically knowable to Monsanto through appropriate research and testing by known methods, at the time they distributed, marketed, promoted, supplied or sold the product, and not known to end users and consumers, such as the Plaintiff.

89.    These products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

90.    At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons corning into contact with these products in Missouri and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, promoted and marketed by Monsanto.

21

91.    Plaintiff was exposed to Roundup® products without knowledge of their dangerous characteristics.

92.    Plaintiff was exposed to the use of Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

93.    Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Monsanto.

94.    These products were defective because the minimal warnings disseminated with Roundup® products were inadequate, and they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and landscaping applications.

95.    The information that Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiff to utilize the products safely and with adequate protection. Instead, Monsanto disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or

22

otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

96.     As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed, marketed, and promoted by Monsanto, and used by Plaintiff to care for her lawn at her residence, to rid her yard of weeds.

97.     Monsanto is liable to Plaintiff for injuries caused by their negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of these products and the risks associated with the use of or exposure to Roundup® and glyphosate.

98.     The defects in Roundup® products caused or contributed to cause Plaintiffs injuries, and, but for this misconduct and omissions, Plaintiff would not have sustained her injuries.

99.     Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products, Plaintiff could have avoided the risk of developing her injuries as alleged herein

100.     As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, the Plaintiff, PATRICIA A. CASALE, sustained actual, consequential and incidental damages including, but not limited to, bodily injury that is permanent within a reasonable degree of medical probability and resulting pain and suffering, disability, disfigurement, aggravation of pre-existing conditions, mental anguish, loss of capacity for the enjoyment of life, medical expenses for hospitalization, medical

care and treatment, nursing care and treatment, various medical supplies and equipment, home health care, housekeeping, lost earnings, and loss of the ability to earn money. PATRICIA A. CASALE has suffered these losses in the past and these losses are either permanent or continuing and Plaintiff will suffer these losses in the future.

**WHEREFORE,** the Plaintiff, PATRICIA A. CASALE, demands judgment against the Defendant Monsanto Company and seeks all damages available to her by law, including compensatory damages, and such other relief as may be deemed just and appropriate.

## COUNT III
## NEGLIGENCE OF MONSANTO

101.    Plaintiff re-alleges paragraphs 1 through 59 as set forth above.

102.    Monsanto, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

103.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care when it designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

104.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup@) and

24

appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

105.   At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

106.   Accordingly, at all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with Plaintiffs injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

107.   Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

108.   As such, Monsanto breached the duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Monsanto manufactured, marketed, promoted, and sold defective herbicides containing the chemical glyphosate; knew or had reason to know of the defects inherent in these products; knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably

dangerous side effects; and failed to prevent or adequately warn of these risks and injuries.

103.    Despite an ability and means to investigate, study, and test these products and to provide adequate warnings, Monsanto has failed to do so. Indeed, Monsanto has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

104.    Monsanto was negligent in the following respects:

a.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

b.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c.  Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d.  Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

e.  Failing to design and manufacture Roundup® products so as to ensure they were at least safe and effective as other herbicides on the market;

f.  Failing to provide adequate instructions, guidelines and safety precautions to those persons who Monsanto could reasonably foresee would use and be exposed to its Roundup® products;

g.  Failing to disclose to Plaintiff, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

26

h. Failing to warn Plaintiff, consumers and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other consumers;

i. Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

J. Representing that its Roundup® products were safe for their intended use when, in fact, Monsanto knew or should have known that the products were not safe for their intended purpose;

k. Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

l. Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m. Continuing to disseminate information to its consumers, which indicate or imply that Monsanto's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and/or

n. Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

105. Monsanto knew and/or should have known that it was foreseeable that consumers such as Plaintiff would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup®.

106. Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

107. As a direct and proximate result of Monsanto's negligence, the Plaintiff, PATRICIA A. CASALE, sustained actual, consequential and incidental damages

including, but not limited to, bodily injury that is permanent within a reasonable degree of medical probability and resulting pain and suffering, disability, disfigurement, aggravation of pre-existing conditions, mental anguish, loss of capacity for the enjoyment of life, medical expenses for hospitalization, medical care and treatment, nursing care and treatment, various medical supplies and equipment, home health care, housekeeping, lost earnings, and loss of the ability to earn money. PATRICIA A. CASALE has suffered these losses in the past and these losses are either permanent or continuing and Plaintiff will suffer these losses in the future.

**WHEREFORE,** the Plaintiff, PATRICIA A. CASALE, demands judgment against the Defendant Monsanto Company and seeks all damages available to her by law, including compensatory damages, and such other relief as may be deemed just and appropriate.

**COUNT IV**
**CLAIM OF FRAUD AGAINST MONSANTO**

108.   Plaintiff re-alleges paragraphs 1 through 59 as set forth above, which details fraud with specificity.

109.   Monsanto fraudulently, intentionally, and/or negligently misrepresented to the public, and to the Plaintiff, both directly and by and through the media, the scientific literature and purported "community outreach" programs, the safety of Roundup® products, and/or fraudulently, intentionally, and/or negligently concealed, suppressed, or omitted material and adverse information regarding the safety of Roundup®.

28

110.    The safety of Roundup® products was intentionally misrepresented to Plaintiff and the public with the intent that such misrepresentations would cause Plaintiff and other potential consumers to purchase and use or continue to purchase and/or use Roundup® products.

111.    Monsanto either knew or should have known of the material misrepresentations they were making regarding the safety and relative utility of Roundup® products.

112.    Monsanto fraudulently and/or intentionally made the misrepresentations and/or actively concealed, suppressed, or omitted this material information with the specific desire to induce Plaintiff and the consuming public to purchase and use Roundup® products. Monsanto knew or should have known that Plaintiff and the consuming public would rely on such material misrepresentations and/or omissions in selecting and applying Roundup® products. Monsanto knew or should have known that Plaintiff would rely on their false representations and omissions.

113.    Monsanto made these misrepresentations and actively concealed adverse information including the risk of non-Hodgkin lymphoma, at a time when, their agents and/or employees knew or should have known, the product had defects, dangers, and characteristics that were other than what was represented to the consuming public. Specifically, Monsanto misrepresented and actively concealed, suppressed, and omitted that there had been inadequate testing of the safety and efficacy of Roundup®, and that prior studies, research, reports, and/or testing had been conducted linking the use of the drug with serious health events, including non-Hodgkin lymphoma.

29

114. Despite the fact that Monsanto knew of reports of severe risks, including non- Hodgkin lymphoma, with Roundup® use and exposure, this information was strategically minimized, understated, or omitted in order to create the impression that the human dangers of Roundup® were nonexistent, particularly in light of its purported utility.

115. The fraudulent and intentional material misrepresentations and/or active concealment, suppression, and omissions by Monsanto were perpetuated directly and/or indirectly through the advertisements, packaging, sales aids, furtive public relations efforts, and other marketing and promotional pieces authored, analyzed, created, compiled, designed, drafted, disseminated, distributed, edited, evaluated, marketed, published, and supplied by Monsanto and its agents.

116. If Plaintiff had known the true facts concerning the risks associated with Roundup® exposure, Plaintiff would have used a safer alternative.

117. Plaintiffs reliance upon the material misrepresentations and om1ss10ns was justified, among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Roundup® while Plaintiff was not in a position to know the true facts because Monsanto overstated the benefits and safety of Roundup® and downplayed the risk of lymphoma, thereby inducing Plaintiff to use the herbicide rather than safer alternatives.

118. As a direct and proximate result of Monsanto's fraudulent conduct, the Plaintiff, PATRICIA A. CASALE, sustained actual, consequential and incidental damages including, but not limited to, bodily injury that is permanent within a reasonable degree of medical probability and resulting pain and suffering, disability, disfigurement, aggravation

of pre-existing conditions, mental anguish, loss of capacity for the enjoyment of life, medical expenses for hospitalization, medical care and treatment, nursing care and treatment, various medical supplies and equipment, home health care, housekeeping, lost earnings, and loss of the ability to earn money. PATRICIA A. CASALE has suffered these losses in the past and these losses are either permanent or continuing and Plaintiff will suffer these losses in the future.

**WHEREFORE,** the Plaintiff, PATRICIA A. CASALE, demands judgment against the Defendant Monsanto Company and seeks all damages available to her by law, including compensatory damages, and such other relief as may be deemed just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff, PATRICIA A. CASALE, hereby requests a trial by jury as guaranteed by the Seventh Amendment of the United States Constitution and the laws of the State of Florida.

LOREEN I. KREIZINGER, P.A.
*Attorney for Plaintiffs*
Crexent Business Center, Suite 315
2881 East Oakland Park Boulevard
Fort Lauderdale, FL 33306
(954) 766-8875
(954) 728-3485 (fax)
Email: kreizingerlaw@aol.com
           Sonia@kreizingerlaw.com
           brigitte@kreizingerlaw.com

By: /s/ Loreen I. Kreizinger
      LOREEN I. KREIZINGER
      FLA. BAR NO. 855588