# U.S. District Court
## Eastern District of Missouri (St. Louis)
## CIVIL DOCKET FOR CASE #: 4:19–cv–02287–CAS

Haggerty et al v. Monsanto Company
Assigned to: District Judge Charles A. Shaw
Cause: 28:1332 Diversity–Personal Injury

Date Filed: 08/02/2019
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Patrick S. Haggerty**

represented by **David Alan Domina**
DOMINA LAW GROUP PC
2425 S. 144th St.
Omaha, NE 68144
402–493–4100
Fax: 401–493–9782
Email: ddomina@dominalaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Phyllis N. Haggerty**
*Husband and Wife*

represented by **David Alan Domina**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**
*a Missouri Corporation*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/02/2019 | 1 | COMPLAINT against defendant Monsanto Company with receipt number AMOEDC–7374409, in the amount of $400 Jury Demand,, filed by Patrick S. Haggerty, Phyllis N. Haggerty. (Attachments: # 1 Civil Cover Sheet , # 2 Summons )(Domina, David) (Additional attachment(s) added on 8/2/2019: # 3 Original Filing Form) (BAK). (Entered: 08/02/2019) |
| 08/02/2019 | 2 | NOTICE OF PROCESS SERVER by Plaintiffs Patrick S. Haggerty, Phyllis N. Haggerty Process Server: St. Louis County Sheriff's Office (Domina, David) (Entered: 08/02/2019) |
| 08/02/2019 | | Case Opening Notification: 1 Summons(es) issued. The summons was emailed to attorney David Alan Domina. All non–governmental organizational parties (corporations, limited liability companies, limited liability partnerships) must file Disclosure of Organizational Interests Certificate  (moed–0001.pdf). Judge Assigned: U.S. District Judge Charles A. Shaw. (BAK) (Entered: 08/02/2019) |
| 08/22/2019 | 3 | SUMMONS Returned Executed filed by Patrick S. Haggerty, Phyllis N. Haggerty. Monsanto Company served on 8/18/2019, answer due 9/9/2019. (Domina, David) (Entered: 08/22/2019) |

**United States District Court, Eastern District of Missouri**

| | |
|---|---|
| Patrick S. Haggerty and Phyllis N. Haggerty, Husband and Wife, | Case No.: |
| Plaintiffs, | |
| v. | Complaint & Jury Demand |
| Monsanto Company, a Missouri Corporation, | Related to MDL No. 2741 |
| Defendant. | |

### Overview

1.    Patrick S. Haggerty is currently a resident of Horry County, South Carolina. When his principal exposures occurred, Mr. Haggerty was a resident of West Virginia where he used Monsanto's Roundup® products for decades.  He sues Monsanto Company for his personal injuries and because Roundup® caused his body to become afflicted by non-Hodgkin's lymphoma ("NHL"), a lethal cancer of the white blood cells called lymphocytes, a critical part of his body's immune system.

2.    Mr. Haggerty used Roundup® for weed control for decades; he did because he believed, and relied upon the false assurances of Monsanto, Monsanto's failure to warn, and its unsafe, negligent, and intentionally wrongful disregard for human safety in the design, formulation, testing, manufacturing, advertising, and promotion, and distribution of its Roundup® herbicide.  Throughout the years that Mr. Haggerty used Roundup®, Monsanto promoted it as safe and harmless to human beings.  In some representations, Roundup® was described as being a product as safe as table salt, and "safe enough to drink".

3.    Roundup®'s primary ingredient is glyphosate, a carcinogen.  Monsanto formulates its glyphosate to create Roundup® with surfactants and other elements that multiply the aggressive carcinogen quality of its product.  However, Monsanto failed to warn consumers about what it knew, and perpetuated the false representation of its products dangers even though it knew or had reason to know of them. Monsanto also consciously decided against areas of testing and investigation that were essential to fairly test the product, ascertain its risks, and formulate warnings about those risks, and instructions about what to do if the product was used.

When confronted with the facts, Monsanto persistently denied that its product was harmful and denied specifically that it causes non-Hodgkin's lymphoma. Even then it also failed to warn users of its product, including Mr. Haggerty. Within weeks of the commencement of this action, the local Home Depot retail store and other outlets including garden centers near Mr. and Mrs. Haggerty's served as outlets offering Roundup® by repeating Monsanto's assertions that the product does not cause NHL.

4.     Mr. Haggerty used Roundup® for domestic weed control purposes and estimates he made more than twenty (2) applications per year in at least twenty-nine (29) years beginning in approximately 1990. He used it in accord with labeled directions for weed control, mixed and applied the product and cleaned up the equipment each time, with applications requiring about 20 minutes per event including formulation and cleanup. Mr. Haggerty was never warned that Roundup® was a carcinogen or contained carcinogenic, or suspected carcinogenic components and was never alerted that Monsanto's testing protocols to gain and retain government product approval were false and incomplete.

5.     The principal locations where Mr. Haggerty used the project were in the State of West Virginia at his residential properties in Dunbar, Scott Depot, and Hurricane, West Virginia. In August, 2015 Mr. Haggerty was diagnosed with non-Hodgkin's lymphoma.

6.     Mr. Haggerty did not know and could not discover that Roundup® would cause non-Hodgkin's lymphoma ("NHL"). If he had known, or had been warned by defendant, he would not have used it. Mr. Haggerty seeks a money judgement for his general and special damages. Mrs. Phyllis N. Haggerty, his spouse of many years, seeks a money judgement for her general damages for consortium loss.

**Jurisdiction, Venue**

7.     This Court has subject matter jurisdiction pursuant to 28 U.S.C §1332. There is complete diversity of citizenship between the parties.  The Haggertys are residents of Horry County, South Carolina. Defendant has its headquarters and principle place of business in the Eastern District of Missouri.  The Haggertys seek damages in excess of $75,000, exclusive of interests and costs. This Court also has supplemental jurisdiction pursuant to 28 U.S.C § 1367.

8.     This Court has personal jurisdiction over Monsanto.  It conducts its business here. Monsanto caused tortious injury to Mr. Haggerty and others in the State of West Virginia and South Carolina by reasons of Monsanto's acts committed in Missouri's Eastern District.

2

9.     Venue is proper in this District to 28 U.S.C § 1391(b)(2) because a substantial part of the activity giving rise to this claim occurred here.  The Haggertys are aware that a Transfer Order was issued by the United States Judicial Panel on multi-district litigation on October 4, 2016 creating MDL No. 2741.  The Transfer Order requires that this case and all cases, be transferred to the United States District Court for the Northern District of California where MDL No. 2741 is pending as Case No. 3:16-MD-02741-VC.

### Facts Concerning Haggertys, Glyphosate, Roundup® & Monsanto

10.     Patrick S. Haggerty born in 1956, enjoyed good health, and had no predispositions, family history, or medical history that suggested he had any propensity to develop non-Hodgins Lymphoma ("NHL"). Mr. and Mrs. Haggerty were married in September, 1976.  Mr. Haggerty spent decades in civil public service of the people of the United States with the U.S. Post Office.  Mrs. Haggerty was career long accounting practice paraprofessional. She was compelled to depart from her employment prematurely to provide care for Mr. Haggerty while he was being actively treated for NHL.

11.     Mr. Haggerty used Roundup® beginning in approximately April 1990 and continued to use it regularly through 2018.  The frequency of his exposure in those years was three (3) times per month between the months of April and October annually, or approximately 20-25 uses annually. He sprayed his residential property with a portable handheld sprayer and spray device. Mr. Haggerty estimates his exposures at more than 625 exposures   (22 / yr x 29 yrs = 638)  of approximately 18 minutes each for a total of about 11,500 minutes (638 x 18 = 11,484 minutes) or more than 191 hours or the aggregate equivalent of nearly 24 full eight (8)t hour work days of exposure. Mr. Haggerty purchased  Roundup®  at multiple locations in the Charleston, West Virginia metropolitan area at retail.

12.     Roundup® was sold as safe and not posing lethal dangers to human users. Mr. and Mrs. Haggerty were not warned otherwise. Roundup® is formulated with glyphosate as a principal ingredient. Indeed, as late as 2019, in June, Monsanto purchased full-page advertisements in U.S. national newspapers advertising its Roundup® products as safe and as a product that cannot cause cancer despite the fact that the overwhelming evidence of the international scientific community, and the virtually universal judgments of courts in the United States and in international settings, is to the contrary. Monsanto gave no warning of these matters, even as late as June 2019.

3

13.     Glyphosate is a broad-spectrum, non-selective herbicide used in Monsanto's Roundup®. Glyphosate disrupts a plant's ability to form certain amino acids necessary for protein synthesis. Roundup® generally kills targeted plants within two to three days. Before they die, target and nontarget plants absorb Roundup® and glyphosate. The absorbed substance cannot be removed by washing, peeling, or even by milling, baking or brewing.

14.     The first glyphosate-based herbicide was introduced by Monsanto in the mid-1970s under the brand name Roundup®. Roundup® was not accurately portrayed though Monsanto did know, or should have known the truth about the dangers of its product. It gave no warnings in the beginning, or thereafter. Despite known and mounting evidence of the dangers of Roundup® Monsanto did not change its formulation, marketing or disclosure practices.

15.     Since then, Monsanto has promoted use of its Roundup® product containing glyphosate, touting it as a remarkable technological breakthrough that could kill weeds without causing harm to people or the environment. Monsanto has never warned foreseeable users like Mr. Haggerty of the risks of Roundup® or of Monsanto's deficiencies in testing, marketing, and alerting the public about Roundup®.

16.     Monsanto knew, for all the years of Mr. Haggerty's use that its statements were false or recklessly made. At Monsanto, Roundup® was so popular, and had so much profit potential for Monsanto that the company falsified data, sponsored, promoted, developed and distributed false studies masquerading as science, and vilified accurate studies all for the purpose of masking Monsanto's knowledge and Roundup®'s dangers from the unsuspecting public. Mr. Haggerty and his spouse are victims of this deception and failure to warn of the truth. .

17.     In the United States, Monsanto paid massive political campaign contributions, spent huge sums for "government relations", and expended large amounts of money on universities to influence and purchase their research and for university endorsements to disguise dangers of Roundup®.

18.     In 2015, the World Health Organization's International Agency for Research of Cancer (IARC), an organization of the United Nations World Health organization, announced that its research established that glyphosate, and Roundup® are probable carcinogens. Monsanto attacked the IARC and denied its findings. Since then, other studies have also revealed this fact, and evidence of the cancerous nature of the substance continues to grow. It is now established

DN1080

by objective scientific research that glyphosate and Roundup® cause NHL. Roundup® caused the NHL of Mr. Haggerty. This is why his wife and he now sue Monsanto.

19.     In the United States, the manufacture, formulation, and distribution of certain chemicals, including herbicides and specifically including Roundup® is regulated under federal law by 7 U.S.C. §§ 136 et. seq. The statute is known the *Federal Insecticide, Fungicide and Rodenticide Act* ("FIFRA").

20.     Under FIFRA, all pesticides must be registered with the Environmental Protection Agency before they may be distributed, sold, or used. This is because they are toxic to plants, and/or animals, and/or humans. The EPA requires that products be tested and evaluated, pass those tests, and that the results of the tests be submitted to the EPA for assessment before registration. Even after registration by the EPA, its decision is not an assurance of safety or government endorsement. EPA approval for marketing is not a regulatory decision about safety.

**Registration of Herbicides**

21.     The EPA does not declare products "safe," but only that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

22.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to conduct a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

23.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conduct the health and safety testing of pesticide products in accord with approved protocols. The data produced by the registrant must be submitted to the EPA for review and evaluation.

24.     Each product submitted to the EPA for evaluation undergoes initial registration. Singular registration is not an all-encompassing, or permanent status. Data necessary to achieve registration has changed from time to time. Re-registration is required by 7 U.S.C. § 136a-1. This requires additional tests and submissions. In Monsanto's case, it undertook those additional tests and performed them. The tests were falsified[1] and the laboratories that conducted them for

---

[1] U.S. EPA. Communications and Public Affairs. 1991. Note to correspondents. Washington, D.C. (March 1.);. U.S. EPA. Communications, Education, And Public Affairs. 1994. Press advisory. Craven Laboratories, owner, and 14

Monsanto were caught and punished.[2] Still, Monsanto concealed these events and used Roundup® profits to obscure and conceal adverse information with its marketing campaigns. It did so successfully for many years.

25.    Before Mr. Haggerty's diagnosis, but after his exposure to Roundup®, the EPA announced plans to release a preliminary risk assessment of Roundup®. This was to be done in relation to the re-registration process and to be completed not later than July 2015. The EPA is believed to have completed its review of glyphosate, Roundup®'s chief ingredient in early 2015. But it chose to delay releasing the results because of World Health Organization health-related findings. Those findings, by the WHO's International Agency for Research of Cancer (IARC) affirmatively found that Roundup® and its glyphosate component are probably carcinogenic agents that cause cancer, and specifically Non-Hodgkin's Lymphoma, in human beings.

26.    In April 2016, the EPA posted a risk assessment of glyphosate on its website and then immediately retracted it. The EPA subsequently indicated that the posting was inadvertent, that the document posted was not the EPA's final assessment or even a preliminary one, and that the EPA intended to issue a final report by the end of 2016.

### Scientific Falsehoods Re: Marketing and Sale of Roundup®

27.    Monsanto manipulated "scientific" data to market its Roundup® products.

28.    At least as early as 1985, studies existed demonstrating that the glyphosate component of Roundup® was believed to be an agent that caused cancer in laboratory animals and that it was possibly carcinogenic to humans. However, Monsanto flexed its political and government relations muscles, provided studies to the EPA, and the EPA changed its classification of the substance. When it did so in 1991, the EPA classified the glyphosate component of Roundup® as yielding evidence of non-carcinogenicity in humans.[3] The EPA announcement emphasized that the designation of Roundup® or glyphosate in what it called

---

employees sentenced for falsifying pesticide tests. Washington, D.C. (March 4.); U.S. EPA. Communications and Public Affairs. 1991. Press advisory. EPA lists crops associated with pesticides for which residue and environmental fate studies were allegedly manipulated. Washington, D.C. (March 29.); U.S. Dept. of Justice. United States Attorney. Western District of Texas. 1992. Texas laboratory, its president, 3 employees indicted on 20 felony counts in connection with pesticide testing. Austin, TX. (September 29.)

[2] For example, U.S. Congress. House of Representatives. Committee on Government Operations. 1984. Problems plague the Environmental Protection Agency's pesticide registration activities. House Report 98-1147. Washington, D.C.: U.S. Government Printing Office; False data, Journal of Pesticide Reform, Volume 15, Number 3, Fall 1995. Northwest Coalition for Alternatives to Pesticides, Eugene, OR. Glyphosate, Part 1: Toxicology, by Caroline Cox
[3] See Fn 1, 2.

DN1080

Group E, i.e., non-carcinogenicity in humans, was "based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen...." Monsanto, however, continued to sell its Roundup® products as safe, noncarcinogenic, and without warnings. It also aggressively denied any health hazard associated with the use of Roundup® products.

29.     The EPA, itself, however found that Monsanto, and laboratories it employed, manipulated tests of toxicity, misrepresented them, and affirmatively committed fraud. Monsanto's laboratories used for this purpose in committing these wrongful acts included Industrial Bio-Test ("IBT") Laboratories. The studies falsified included at least thirty (30) test runs on glyphosate and products containing it including residue studies required by the EPA to register Roundup® for sale.

30.     The U.S. Food & Drug Administration discovered in an inspection of IBT, significant discrepancies between raw data and final reports. This led to an EPA audit of IBT and a determination that its toxicology studies on Roundup® were invalid. The EPA found the firm engaged in routine falsification of data making it "hard to believe the scientific integrity of the studies when they said they took specimens from the uterus of male rabbits." Three (3) senior executives of IBT were convicted of criminal fraud.[4] Monsanto did not disclose its link to these events and did not disclose its impact on Roundup® testing.

31.     Monsanto also engaged Craven Laboratories to perform tests, including studies of Roundup®. During the same year  it was engaged by Monsanto, three (3) Craven Laboratories employees were indicted and convicted of fraudulent laboratory testing practices involving pesticides and herbicides.[5] While Monsanto denies that the laboratories acted at its direction, it did not disavow the results until it was forced to occur by the Federal Government through the prosecutions noted above. Monsanto has failed to explain why it did not aggressively and publicly disavow the occurrences and make its customers and the public aware of the testing results immediately. It continues to market Roundup® and continues, even on its website, to contend glyphosate is safe. It has made no new disclosures or warnings but marches on with its

---

[4] *Id.* Also, see U.S. EPA Summary of the IBT Review Program, Office of Pesticide Programs (July 1983). This report discloses that Monsanto used and relied on IBT to perform at least 41 suspect studies on rabbits, rats, mice, dogs, hens, quail, swine, cattle, and more than 30 studies on other Monsanto products including Lasso® and Machete® and Ramrod®  and others.
[5] *Id.*

DN1080

statements, undaunted by rejection from science, courts, juries and hundreds of national and local governments.[6] Monsanto dominates and controls the herbicide market.

32.     Monsanto refrained from disclosing what it knew or should have known about Roundup®. It is believed to have continued to perpetuate its conscious, deliberate disregard for the truth about Roundup® because the product was a key ingredient to Monsanto's dominance in the market place, its dramatically expanding market share, and its assumption of a position of influence, power and authority in the industry that was essentially unparalleled.

33.     Monsanto became so dominant in the marketplace that its product crowded out competitors, and it became virtually impossible in many markets to find or secure herbicides that were compatible with seeds and grasses that were not Monsanto products containing glyphosate marketed under the Roundup® label. Mr. Haggerty, and many others, faced this circumstance.[7]

34.     As a result of Roundup® sales, Monsanto's primary corporate focus shifted to its herbicide activities because Roundup® led the chemicals division in revenues and income by dramatic margins and with rapid growth. Monsanto then entered the home and garden market with Roundup® and reached foreseeable users like Mr. Haggerty.

35.     Monsanto developed genetically modified seeds which it called and labeled as "RoundupReady®". Defendant recognized its potential to secure even more market gains with control over seed for crops that could be made resistant to Roundup®. These were seeds resistant to glyphosate, and permitted farmers to use Roundup® on their fields during the growing season without harming the crop. This effort permitted Monsanto to expand the market for Roundup® to the nation's farmers and to use the income from those sales to further dominate the domestic market for commercial uses and residential uses akin to the uses experienced by Mr. Haggerty.

36.     Many years before Mr. Haggerty found he had no choice realistically but to use Roundup® due to its market dominance, Monsanto's biotechnology seeds became dominant worldwide. Roundup® was the odds-on, and virtually ubiquitous herbicide with what, through the company's marketing strategy, became a household term synonymous with weed killer or

---

[6]  R. Raman, the impact of Genetically Modified (GM) crops in modern agriculture: A review, 8, Biotechnology and Agriculture and the Food Chain, No. 4 (2017) available at
https://www.tandfonline.com/doi/full/10.1080/21645698.2017.1413522 Also see, Ashley Hutchinson et al., "Roundup® Ready":  the first widely used genetically modified crop, the environment and society portal http://www.environmentandsociety.org/tools/keywords/roundup-ready-first-widely-used-genetically-modified-crop

DN1080

herbicide. Roundup®, and weed killer, and herbicide, became indistinguishable in the minds of many Americans. The Haggertys were among these victims.

**Monsanto Promoted Roundup® as Safe Despite Contrary Acknowledgements**

37.     Monsanto has been investigated and forced to legally commit to discontinue its false statements about Roundup® but failed to keep its word, even after being compelled and promising to do so.

38.     In 1996, the New York Attorney General ("NYAG") sued Monsanto for false and misleading advertising of Roundup® products. The New York case challenged Monsanto's representations that its spray-on glyphosate-based herbicides, including Roundup®, were:

38.1 "Safer than table salt" and "practically non-toxic" to mammals, birds, and fish.

38.2 "Remember that environmentally friendly Roundup® herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks and fences."

38.3 "And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got a weed, brush, edging or trimming problem."

38.4 "Roundup® biodegrades into naturally occurring elements."

38.5 "Remember that versatile Roundup® herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

38.6 "This non-residual herbicide will not wash or leach in the soil. It … stays where you apply it."

38.7 You can apply Roundup® with "confidence because it will stay where you put it," it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Roundup® into natural products.

38.8 "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

38.9 "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

9

38.10   "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

38.11   "Roundup® can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area that has been treated with Roundup®.

39.   Monsanto either could not, or chose not to, defend these and similar hyperbolic false statements.   On November 19, 1996, Monsanto entered into an agreement called an *Assurance of Discontinuance* with the Attorney General of New York.[8] In it, Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that Monsanto glyphosate-containing pesticide products or any of them, possessed any of these features, advantages or elements described below.   These are assurances made by Monsanto to the Attorney General: Glyphosate-containing pesticide products or any component thereof of Monsanto:

39.1   Are safe, non- toxic, harmless or free from risk;

39.2   Are biodegradable;

39.3   Will stay where applied and will not move through the environment;

39.4   Are "good" for the environment or are "known for their environmentally friendly characteristics";

39.5   Are safer or less toxic than consumer products other than herbicides; and,

39.6   Might be classified as "practically non-toxic."

40.   Monsanto double crossed the Attorney General of New York, and the public because it did not alter its advertising in the same manner in any state other than New York and, based on information and belief, still has not done so today.

41.   Monsanto also double crossed and misled the people of the world. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean." Around the world, nations, cities, and counties

---

[8] *In the Matter of Monsanto Company, Respondent.* Assurance of Discontinuance pursuant to executive law § 63(15) (Attorney General of the State of New York, Consumer Frauds and Protection Bureau. Environmental Protection. November 1996. Available at https://big.assets.huffingtonpost.com/fraud.pdf. )

DN1080

have banned Roundup® and glyphosate herbicides. Countries with bans include Germany, France, Vietnam, Sri Lanka, Colombia, El Salvador, Saudi Arabia, Kuwait, Qatar, Bahrain, Oman, United Arab Emirates, Argentina and others. Warnings are also required, or other sales curbs are in place, in multiple U.S. States and local governments. This was not known to the Haggertys until weeks before the litigation commenced.

## Assessments of Glyphosate and Roundup®

42.     Monsanto concealed what it knew of glyphosate and Roundup® from the scientific community and the world for many years. The International Agency for Research of Cancer ("IARC") is the specialized cancer agency of the World Health Organization, and organization of the United Nations. IARC promotes international collaboration in cancer research, "bringing together skills in epidemiology, laboratory sciences, and biostatistics to identify the causes of cancer[.]" IARC assesses whether chemicals are carcinogenic through its Monograph issuance program and protocol.

43.     IARC Monographs identify environmental factors that are carcinogenic hazards to humans. These include chemicals, complex mixtures, occupational exposures, physical agents, biological agents, and lifestyle factors. National health agencies can use this information as scientific support for their actions to prevent exposure to potential carcinogens. Interdisciplinary working groups of expert scientists review the published studies and assess the strength of the available evidence that an agent can cause cancer in humans.

44.     The principles, procedures, and scientific criteria that guide the evaluations are described in the Preamble to the IARC Monographs. The preamble is a forty + page expression of one of the most sophisticated scientific processes used in the world to review and evaluate substances for their impact on human health. The procedure requires evaluations to be performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest. The studies considered the various exposure groups, including occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland, municipal weed-control workers in the United Kingdom, and para-occupational exposure in farming families.

45.     In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology journal reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

DN1080

11

46.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies showed a human health concern from agricultural and other work-related exposure to glyphosate. The IARC Working Group conducted a systematic review of over 15 studies designed to assess whether there was an association between Roundup® exposure in agricultural workers and Non-Hodgkin's Lymphoma (NHL). The researchers reviewed each study, identified the results and assessed each study's strengths and weaknesses. The IARC Working Group concluded that, despite the limited evidence concerning the carcinogenicity of glyphosate in humans, a "positive association has been observed for Non-Hodgkin's lymphoma."

47.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. It was authored with input of 17 experts from 11 countries who met from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. Among the members were Lauren Zeise, Ph.D., of the California Environmental Protection Agency, Matthew T. Martin, Ph.D, a scientist with the U.S. Environmental Protection Agency, and Gloria D. Jahnke, D.V.M., D.A.B.T. of the National Institute of Environmental Health Sciences. Mr. Haggerty did not learn of this information until much later.

48.     After adherence to its established procedures, the IARC Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

49.     Glyphosate was the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012. Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

50.     The IARC Working Group found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed. In assessing the genotoxicity of glyphosate (the property of chemical agents that damages the genetic information within a cell causing mutations, which may lead to cancer), the IARC Working Group concluded "[t]here is strong evidence that glyphosate causes genotoxicity."

51.    IARC also assessed whether glyphosate exposure can induce oxidative stress, which is thought to be involved in the development of numerous conditions, including cancer, autism, and Parkinson's disease.   IARC concluded that "strong evidence exists that glyphosate ... can induce oxidative stress." This could be an important mechanism by which Roundup® causes cancer.

52.    A    section of the IARC monograph for glyphosate is devoted to exposure to humans; it examines studies of glyphosate exposures in various settings including agricultural ones. The IARC Working Group noted that glyphosate has been detected in urine of agricultural workers, indicating absorption. The IARC Working Group specifically evaluated farm workers in the United States, and found that, within the days following the application of Roundup® to a crop, approximately 60% of farm workers tested positive for glyphosate in the urine. Additionally, the IARC Working Group noted that soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

53.    IARC reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. It found that results of this study support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), and several other cancers.

54.    In 2014 and before, scientists published a systematic review and meta-analysis on the relationship between non-Hodgkin lymphoma and occupational exposure to agricultural pesticides, including glyphosate, in the *International Journal of Environmental Research and Public Health*. The study showed a statistically significant association between farm workers exposed to Roundup® and non-Hodgkin lymphoma. The study confirmed two smaller studies from 2002 and 2008, published in the journal Leukemia & Lymphoma (2002) and the International Journal on Cancer (2008).

55.    Recent studies, including a glyphosate residue study published in the *Journal of Environmental & Analytical Toxicology* in 2014, concludes that "chronically ill humans showed significantly higher glyphosate residues in urine than healthy population." Glyphosate has been detected in the blood and urine of agricultural workers, indicating that agricultural use of Roundup® leads to its absorption. Monsanto continues to promote Roundup® as safe even in May 2019. During May, Monsanto ran newspaper advertisements, full-page in size, in the *Wall*

*Street Journal* and other widespread magazines, as well as in advertisements and promotions on television, radio, in other media, and multiple languages, across the United States. It did not acknowledge or change its actions after researchers at the University of Washington disclosed, on February 13, 2019, findings and a new study conducted there, including a comprehensive review of existing literature, that exposure to Roundup® increases the risks of certain cancers, including NHL, by more than 40%. The University of Washington studies, entitled *Mutation Research - Fundamental and Molecular Mechanisms of Mutagenesis* (2019) (ISSN:0027-5107, available at https://www.journals.elsevier.com/mutation-research-fundamental-and-molecular-mechanisms-of-mutagenesis).

56.     Scientific research also discloses that carcinogenic properties of Roundup® are magnified by the addition of adjuvants in the Roundup® formulation. Adjuvants are chemicals designed to modify or enhance the effects of other agents. Monsanto includes adjuvants with glyphosate in its Roundup® products; they are designed to increase the effectiveness of the herbicide. But the added adjuvants greatly increase the carcinogenic properties of Roundup®. Monsanto systematically tested glyphosate without adjuvants. The results are misleading. Yet, Monsanto used those tests and results to tout Roundup® as safe to U.S. federal regulators.

**VI. Mr. Haggerty's Exposure to Glyphosate & Discovery Rule; Equitable Estoppel**

57.     Mr. Haggerty's use of Roundup® commenced in 1990 and continued through 2019 as alleged above.  Before then he used the product intermittently and he continued its intermitted use thereafter until his diagnosis with NHL.

58.     Mr. Haggerty was diagnosed in August, 2015. It was much later that Mr. Haggerty discovered that his NHL was caused by exposure to Roundup®.  Before this, he was unaware of any connection between Roundup® and his cancer.  It was not until he learned of public controversy between Monsanto and the State of California in the public media of a controversy involving Roundup® and glyphosate, its key ingredient, as a cause of blood-borne cancer. He then realized he might be a victim of the carcinogenic properties of Roundup® and the coverup by Monsanto, including its failure to warn and its ongoing denials. It was also only then when Mr. Haggerty had reason to doubt Monsanto's repeated representations that its Roundup® products were safe and harmless to human users. But Monsanto continued to assure Mr. Haggerty and the public that Roundup® is safe and not harmful to humans.

DN1080

59.     Monsanto concealed the dangers of Roundup® and glyphosate from Mr. Haggerty and others. Many steps were taken by Monsanto to achieve this objective. Among others they included:

    59.1   Disregard by Monsanto of scientific studies drawing a link between Roundup® and glyphosates herbicides in general, and human illness including blood born cancers and NHL;

    59.2   Epidemiologic studies disclosing the link the between Roundup®, glyphosates and blood born cancers including NHL which Monsanto disputed..

    59.3   Internal scientific data, warnings and revelations from Monsanto's own personnel which were quashed by Monsanto internally.

    59.4   Influence practiced by Monsanto on politicians and government officials to paralyze, delay, or wholly prevent government action to protect the public from Roundup® and glyphosate.

    59.5   An aggressive Monsanto campaign, which continues to present, designed to teach the safety of Roundup® and to deny the scientific evidence linking it to cancers, including NHL, that are lethal to human beings.

    59.6   Assertions, despite overwhelming contrary evidence by objective scientific research not financed by Monsanto, disclosing that glyphosate causes changes in the human body that produce cancers because of cellular level damage to human tissue that these studies are wrong.

    59.7   Affirmative Monsanto sales activities masked as objective scientific studies, despite the lack of objectivity in the studies, in order to produce skewed results, further masquerading as research. These results were then used by Monsanto to promote, and advance use of its products despite the dangers posed by them.

60.     Monsanto's conduct induced members of the public, including Mr. Haggerty to rely upon it. Monsanto is by virtue of its conduct equitably estopped to assert certain defenses, including a) contributory fault, b) comparative fault, c) alternate causation, d) the statute of limitations, and e) promotion of use of its products without protective equipment. Monsanto's statements inducing reliance and action by users like Mr. Haggerty were false statements of material fact. They were intended to induce reliance and did so. These statements were made when Monsanto knew they were false or at a minimum knew that they were highly controverted

15

DN1080

and that substantial scientific evidence, denied by Monsanto, concluded that a causal connection exists between Roundup® and cancers including NHL.

61.     The Haggertys did not discover, and did not know of facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup® and glyphosate, nor would a reasonable and diligent investigation have disclosed that Roundup® and glyphosate would cause Mr. Haggerty's  illnesses. For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule and its invocation is estopped by Monsanto's actions.

62.     Monsanto was under a continuous duty to disclose to consumers, users and other persons coming into contact with its products, including Mr. Haggerty, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate. Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the risks associated with the use of and/or exposure to its products.  It also failed to warn the public of Roundup®;s dangers.

63.     As a proximate result of Monsanto's wrongful acts and omissions in placing its defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, and in breach of its warranties, negligence and strict liability, Mr. Haggerty has suffered and continues to suffer severe and permanent physical and emotional injuries. Mr. Haggerty endured the anguish of dangerous, potentially fatal cancer diagnosis, pain and suffering, and economic losses and special damages, which are accruing and not now known.

### Additional Facts

64.     All allegations above are renewed here.

65.     The Haggertys' claims are made under the law of the State of West Virginia where Mr. Haggerty's primary use of Roundup® and injuries occurred.  In the event West Virginia law imposes a duty or obligation on Monsanto in excess of those required by Federal Law, the Haggertys do not assert the State law claims. On the contrary, all claims asserted by the Haggertys here are claims parallel with Federal law and Federal legal duties. Accordingly Monsanto violations of state of West Virginia law, so limited, were also violations of Federal law. If Monsanto had honorably complied with the law, there likely would have been no Federal violations.

DN1080

66.     Plaintiffs do not seek, here to enforce Federal law. Instead, they invoke the law of West Virginia but limit their claim to the scope and extent to which West Virginia law is equal to, but not greater than, Federal law in its imposition of duties on Monsanto.   Plaintiffs claim that Monsanto violated 7 USC § 136, including subparts (g) & (j), and Federal regulations including 40 CFR § 156.10 (a) (5). They did so by distributing Roundup® when it was misbranded contrary to legal requirements. The distribution of a misbranded herbicide is a violation of law, and is a tort because it violates West Virginia and Missouri law when considered in parallel with Federal requirements.  These violations are evidence of negligence and support the Haggertys' claims of strict liability in tort, strict liability for failure to warn, negligence, and breaches of implied warranties and express warranties.

### First Theory: Strict Liability (Design Defect)

67.     All allegations above are renewed here.

68.     Haggertys respectfully assert that Monsanto is strictly liable in tort to them for defective design of its Roundup® products. A substantial part of the activity undertaken by Monsanto as described in this Complaint, putting in the allegations above and below, occurred in the District of West Virginia

69.     At relevant times, Monsanto was engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products. These products, including the ones used by Mr. Haggerty, were defective and unreasonably dangerous to foreseeable users like Mr. Haggerty and including him. The products were unreasonably dangerous when they were placed by Monsanto into the stream of commerce. Monsanto ultimately controlled and supervised these actions. At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by Mr. Haggerty as safe when they were not as described above.

70.     On the contrary, Monsanto's Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, Mr. Haggerty. These products left Monsanto's immediate control and were placed onto the market and reached intended consumers, handlers, and users coming into contact with these products in West Virginia, Missouri and throughout

17

the United States, including Mr. Haggerty, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.,

71.    Monsanto's Roundup® products including those to which Mr. Haggerty was exposed were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate. The risks and dangers of those products exceeded the benefits allegedly associated with them as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto.  Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

72.    Monsanto knew or had reason to know that its Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto in one or more of these ways when placed in the stream of commerce:

> 72.1  Monsanto's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

> 72.2  Monsanto's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

> 72.3  Monsanto did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate alone or with surfactants added by Monsanto.

> 72.4  Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products.

> 72.5  Monsanto could have employed safer alternative designs and formulations but did not do so.

73.    At all times relevant to this litigation, Mr. Haggerty used and/or was exposed to the use of Monsanto's Roundup® products in an intended or reasonably foreseeable manner, i.e., as a consumer, without knowledge of Roundup®'s dangerous characteristics and without knowledge of Roundup®'s dangerous characteristics..

74.    Monsanto's Roundup® products were and are more dangerous than alternative products and Monsanto could have designed its Roundup® products to make them less

DN1080

dangerous. Indeed, at the time Monsanto designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

75.   At the time Roundup® products left Monsanto's control, there were practical, feasible and safer alternative designs that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Monsanto's herbicides.

76.   As a result of the unreasonably dangerous condition of its Roundup® products, Monsanto is strictly liable to the Haggertys. The defects in Monsanto's Roundup® products were substantial and contributing factors in causing Mr. Haggerty's injuries and, but for Monsanto's misconduct and omissions, the Haggertys would not have sustained his injuries.

77.   Monsanto's defective design of its Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including Mr. Haggerty.

78.   Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including Mr. Haggerty, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Monsanto made conscious decisions not to redesign, warn or inform the public. Monsanto's reckless conduct warrants an award of punitive damages.

79.   As a direct and proximate result of Monsanto placing its defective Roundup® products into the stream of commerce, Mr. Haggerty developed Non-Hodgkin's lymphoma and personal injuries which are permanent in nature.

80.   As a proximate result of Monsanto placing its defective Roundup® products into the stream of commerce, as alleged herein, Mr. Haggerty sustained a past and future loss of income, loss of earning capacity and property damage.

**Second Theory:  Strict Liability (Failure to Warn)**

81.   All allegations above are renewed here.

82.   Haggertys contend that Monsanto had a duty to exercise reasonable care to avoid physical harm to Mr. Haggerty by preventing the recognizable and foreseeable harm it would cause by its marketing of Roundup® products.[9] They contend that Monsanto sold its Roundup®

---

[9] *McNair v. Johnson & Johnson,* 818 SE.2d 852 (W Va 2018). *Morris v. Crown Equip Corp,* 633 S.E.2d 292, 301 (W. Va. 2006. *Morningstar v. Black & Decker Mfg. Co.,* 253 SE2d 666 (W Va 1979) citing *Restatement (Second) of Torts* § 402A.

19

products in a defective condition unreasonably dangerous to consumers, including them. Monsanto was engaged in the business of selling the product which was expected to and did reach them without substantial change in condition from that in which it was sold, and that it was not misused by Haggertys. The Haggerty's damages are not subject to the economic loss rule.[10]

83.     Monsanto is strictly liable in tort to Haggertys for failure to warn of the dangers of its Roundup® products. At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Mr. Haggerty, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate either alone or with adjuvants and surfactants. These actions were under the ultimate control of Monsanto. It exercised control from its headquarters in St. Louis Missouri.

84.     Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products. While doing so, Monsanto advertised or marketed Roundup® to consumers including Mr. Haggerty. Monsanto had, but failed to discharge, a duty to warn Mr. Haggerty and the public of risks associated with use of Roundup®.

85.     Monsanto had a duty to reasonably test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn Mr. Haggerty of dangers associated with Roundup® use and exposure. Monsanto, as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.  It is a merchant with respect to Roundup® and crop chemicals.

86.     At the time of manufacture and at the time of distribution, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

---

[10] See *Aikens v. Debow*, 541 SE2d 576 (W Va 2000).

DN1080

87.    Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by Monsanto's herbicides, including Mr. Haggerty.

88.    Despite  knowing or having a duty to know, that Roundup® posed a grave risk of harm, Monsanto failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. Monsanto failed to adequately warn consumers, i.e., the reasonably foreseeable users, of the risks of exposure to its products. Monsanto wrongfully concealed information concerning the dangerous nature of Roundup® and glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

89.    At all times relevant to this litigation, Monsanto's Roundup® reached the intended consumers, handlers, and users or other persons coming into contact with these products, including Mr. Haggerty, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

90.    Mr. Haggerty was exposed to Monsanto's Roundup® products in the course of spraying his property without knowledge of their dangerous characteristics. Mr. Haggerty used the dangerous product for its intended purpose and without misuse.

91.    Mr. Haggerty could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to and at the time of Mr. Haggerty's exposure. Mr. Haggerty relied upon the skill, superior knowledge, and judgment of Monsanto to know about and disclose serious health risks associated with using the products.

92.    Monsanto knew or should have known that the minimal cautions disseminated with its Roundup® products were inadequate, failed to communicate adequate information on the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

93.    The information Monsanto did impart failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Mr. Haggerty to utilize the products safely and with adequate protection. Instead, Monsanto disseminated information that was inaccurate, false and misleading. This misleading information and denial of the danger of glyphosate has been ongoing and unremitting conduct of Monsanto to the present day.

94.     This alleged failure to warn is not limited to the information contained on Roundup®'s labeling. Monsanto was able, in accord with federal law, to comply with West Virginia, Missouri and South Carolina law by disclosing risks associated with Roundup® through non-labeling mediums, i.e., promotion, advertisements, public service announcements, and/or public information sources. Monsanto, however, deliberately did not do so.

95.     Monsanto is liable to the Haggertys for injuries caused by its negligent or willful failure, as described above, to provide adequate as alleged. As a direct and proximate result of Monsanto placing its defective Roundup® products into the stream of commerce, Mr. Haggerty developed non-Hodgkin Lymphoma and sustained a loss of income, loss of earning capacity and property damage, as well as non-economic damages. As a further proximate result of Monsanto placing its defective Roundup® products into the stream of commerce, as alleged herein, there was a measurable and significant interval of time during which Mr. Haggerty suffered great mental anguish and other personal injury. In addition to a dangerous, potentially fatal cancer diagnosis Mr. Haggerty suffers from depression, stress and mental anguish over his inestimable life and livelihood lost, with respect to his reduced earning power and the ability to support his family going forward.

### Third Theory: Negligence

96.     All allegations above are renewed here.

97.     Monsanto owed a duty of reasonable care to all foreseeable users, including the Haggertys, but it breached that duty is alleged below. The breach proximately caused damages to the Haggertys.[11]

98.     Monsanto, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Mr. Haggerty.

99.     Monsanto owed to Mr. Haggerty and the public the duties that follows:

99.1    To exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products. This included the duty to take all reasonable steps

---

[11] *McNair, Id.* "The ultimate test of the existence of a duty to use care is found in the foreseeability of the harm that may result if not exercised. The test is, would the ordinary man in the Defendant's position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result." *Eastern Steel Constructors v. The City of Salem,* 209 WVa 392, 549 SE2d 266 (2001); *Aiken v. Debow,* 541 SE2d 576 (2000).

DN1080

necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

99.2 To exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Monsanto's duty of care owed to consumers and the general public. This included the duty to provide accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate. Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate and its Roundup® products.

99.3 To warn of the risks.

99.4 To withhold the product from the market.

99.5 The duty to inform Mr. Haggerty of the risks.

99.6 The duty to exercise reasonable care in the marketing and representation of Roundup® to the public.

99.7 To refrain from falsifying, withholding or manipulating unfavorable research data, or feigning the favorable research data.

99.8 To label its product with complete disclosures of risks.

100. Monsanto breached each and all of its duties as alleged above. It was negligent in that:

100.1 It negligently designed and formulated its Roundup® products.

100.2 It negligently tested its Roundup® products and negligently failed to continue to test them.

100.3 It negligently mixed and batched its Roundup® products.

100.4 It negligently submitted and withheld information about its Roundup® products for governmental regulatory purposes.

100.5 It negligently failed to supplement its governmental submissions with new information about the dangers of Glyphosate and its Roundup® products.

100.6 It negligently manufactured its Roundup® products.

100.7 It negligently labeled its Roundup® products.

DN1080

100.8   It negligently marketed its Roundup® products.

100.9   It negligently packaged its Roundup® products.

100.10  It negligently advertised and commercialized its Roundup® products.

100.11  It negligently distributed its Roundup® products and placed them in commerce.

100.12  It continued to negligently advertise and commercialize its Roundup® products after agreeing with the New York Attorney General not to do so.

100.13  It negligently failed to disclose the truth about the risks associated with Roundup® in its promotional efforts, outside of the context of labeling.

100.14  It negligently disregarded scientific, medical and epidemiological studies and findings about the dangers of Roundup® .

100.15  It negligently caused or permitted its advertising inaccuracies to continue even after it knew exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and  it failed to prevent or adequately warn of these risks and injuries.

100.16  It negligently packaged its Roundup® products.

100.17  It negligently failed to provide adequate instructions, guidelines, and safety precautions to reasonable users including Mr. Haggerty.

100.18  It negligently failed to inform Mr. and Mrs. Haggerty and the public of safer alternatives though it knew they existed.

100.19  It negligently failed to disclose that its Roundup® products are probably carcinogens and do cause NHL in a population of foreseeable users including Mr. Haggerty after they use the product.

100.20  It negligently withheld information necessary to permit an informed user with an option to use something else to make an informed selection.

100.21  It negligently failed to comply with safe practices and standards, including federal regulations governing the design and formulation, testing, continuing testing, disclosure, approval procurement, labeling, advertising, promotion, and distribution of its product and thereby failed to inform both government regulators and foreseeable users, including Mr. Haggerty.

24

101.    These negligent acts and omissions occurred when and after Monsanto, knew or had reason to know of the defects inherent in its products, and knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

102.    Monsanto knew and/or should have known that it was foreseeable consumers such as and including Mr. Haggerty, would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®. He could not have known of his injuries until they were diagnosed in 2017.

103.    Mr. Haggerty did not know that injuries or illness could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

104.    Monsanto's conduct was negligent. But it was also reckless. Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Mr. Haggerty. Monsanto's reckless conduct therefore warrants an award of punitive damages.

105.    As a proximate result of Monsanto's negligence, Mr. Haggerty sustained temporary and permanent lost income, personal injuries, illness, medical and rehabilitation care and emotional distress. Mr. Haggerty remains in treatment. He also suffered permanent loss of his ability to enjoy life with confidence of good health, and a permanently impaired body. Monsanto's negligence was a proximate cause of the Haggerty's illness and injuries, i.e., absent Monsanto's negligence, Mr. Haggerty would not have developed cancer.

106.·    The amount of damages continues to accrue. Lost earnings and medical care expenses in medicine continue to be necessary and accrue. Mr. Haggerty's life expectancy is truncated. His full damages are not yet known. Leave of Court is requested to amend this Complaint at the time of the final pretrial conference and a trial to state the full amount.

### Fourth Theory: Implied Warranty

107.    All allegations above are renewed here.

108.    Monsanto engaged in the business of testing developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including Mr. Haggerty thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto. Monsanto impliedly warranted each product to

DN1080

be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

109.    Before Mr. Haggerty was exposed to the aforementioned Roundup® products, Monsanto impliedly warranted to its consumers—including Mr. Haggerty—that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as agricultural herbicides to kill weeds without harm to humans.

110.    Monsanto failed to disclose that Roundup® has dangerous propensities when used as intended and that use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries and death, including Mr. Haggerty's cancer. Mr. Haggerty was the intended beneficiary of the implied warranties made by Monsanto to the purchasers of its herbicides as a foreseeable human user. He used the Roundup® products as intended and without alteration.

111.    Mr. Haggerty used the Roundup® product as Monsanto intended that its Roundup® products be used. In reliance upon Monsanto's implied warranty, Mr. Haggerty used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Monsanto.

112.    The Haggertys could not have reasonably discovered or known of the risks of serious injury and death associated with Roundup® or glyphosate.

113.    Monsanto breached its implied warranty to the Haggertys in that its Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

114.    The harm caused by Monsanto's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

115.    As a direct and proximate result of Monsanto's breach of implied warranty, the Haggertys sustained a loss of income, loss of earning capacity and property damage.[12]

### Fifth Theory: Breach of Express Warranties

116.    All allegations above are renewed here.

---

[12]    *McNair*, fn 10 above. *Louk v. Isuzu Motors, Inc.* 479 SE2d 911 (W Va 1996).

DN1080

117.    The Haggertys contend Monsanto is liable to them for breach of express warranties. They assert this position because Monsanto made affirmative representations and warranties about its Roundup® products which were material parts the basis of the bargain whereby Mr. Haggerty purchased and used Roundup® products.[13] These affirmative representations effectively promised a specific result, i.e., that Roundup® products could be used by Mr. Haggerty without personal injury, illness, or cancer caused or induced by the products; Monsanto represented that the products were safe, but knew or should have known, they were not. Mr. Haggerty was a person whom Monsanto might reasonably expect to use, consume and be affected by the Roundup® products.[14]

118.    Monsanto has special knowledge skill and expertise germane to herbicides and their design, manufacture testing, and marketing and was a merchant with respect to Roundup. At all times relevant, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including the Haggertys, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto.

119.    Monsanto expressly represented and warranted matters to Haggertys and other consumers and users, and through statements made by Monsanto in labels, publications, package inserts, and other written materials that its Roundup® products were:

119.1   Safe to human health and the environment.

119.2   Effective, fit, and proper for their intended use and posed no risks of harm to humans.

119.3   Did not cause unreasonably dangerous side effects.

119.4   Is a product of Monsanto's "safety is a top priority for us" approach to its business.

119.5   Is safe enough to drink.

119.6   Monsanto Roundup® spray-on glyphosate-based herbicides, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish despite its agreement with the New York Attorney General to the contrary.

---

[13] W Va Code § 46-2-313
[14] W Va Code § 46-2-318. *Louk v. Isuzu Motors, Inc.* 479 SE2d 911 (W Va 1996).

DN1080

119.7   Roundup®'s Glyphosate is good for the environment.

120.   These representations about Roundup® were affirmations of fact or promises made by Monsanto to the public including Haggertys. The representations related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations. Monsanto placed its Roundup® products into the stream of commerce for sale and recommended use without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate.

121.   Monsanto breached these warranties because its affirmations were not true. Its Roundup® products were defective, dangerous, unfit for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose.

122.   Mr. Haggerty justifiably and detrimentally relied on the express warranties and representations of Monsanto in the purchase and use of its Roundup® products. When Mr. Haggerty decided to purchase Roundup®, he reasonably relied upon Monsanto to disclose known risks, dangers, and effects of Roundup® and glyphosate. He did not know the representations were false.

123.   As a direct and proximate result of Monsanto's breach of implied warranty, Mr. Haggerty's sustained personal injuries and illness, loss of income, loss of earning capacity and financial losses and their consequences.

### First Claim: Mr. Haggerty

### Personal Injuries; Economic and Non-Economic Damages

124.   All allegations above are renewed here and all theories above are invoked here.

125.   As a direct, proximate result of the acts and omissions of Monsanto, Mr. Haggerty contracted and suffers from non-Hodgkin Lymphoma ("NHL") and has been required to undergo extensive care, including life altering and debilitating chemical and other therapies. He continues to be under medical care battling his blood cancer which was caused by exposure to Monsanto's Roundup® products.

126.   Mr. Haggerty's noneconomic damages include emotional and physical pain and anguish; cancer treatment pain; anxiety, depression, uncertainty and fear associated with cancer diagnoses, treatment and uncertain outcomes; nausea and illness associated with medical care

for his condition; sleep disruption; loss of self-confidence and change of personality; emotional distress; loss of ability to engage in the activities of daily living including the daily joys of life. Mr. Haggerty has also incurred a probable loss of reasonable life expectancy. He also suffers from depression, stress and mental anguish over his inestimable life and livelihood lost, with respect to his reduced earning power and the ability to support his family going forward. These losses continue to accrue.

127.   Mr. Haggerty's economic damages include:  lost earnings; lost earning capacity; medical expenses and medical care costs; transportation and over-the-counter expenses; adaptations and accommodations to the household; lost retirement security; and related economic losses.  These losses continue to accrue.

### Second Claim: Mrs. Haggerty.

### Loss of Spousal Support & Services

128.   All allegations above are renewed here and all theories above are invoked here.

129.   At relevant times, Mrs. Phyllis N. Haggerty was the spouse of Mr. Patrick S. Haggerty. She had unique and intense dependency upon Mr. Haggerty for care, comfort, guidance, companionship, advice, support, services, love and affection. This is now lost because Monsanto caused Mr. Haggerty to suffer personal injury.[15]

130.   As a direct, proximate result of the acts and omissions of Monsanto, Mr. Haggerty contracted and suffers from non-Hodgkin Lymphoma ("NHL") and has been required to undergo extensive care, including life altering and debilitating chemical and other therapies. As a further direct, proximate result of the acts and omissions of Monsanto, Mrs. Haggerty has suffered the loss unique and intense dependency upon Mr. Haggerty for care, comfort, guidance, companionship, advice, support, services, love and affection.

131.   Mrs. Haggerty was employed for about four (4) decades in the accounting profession. She was compelled by Mr. Haggerty's NHL and Defendant's culpable conduct to depart from her vocation prematurely by about five (5) years and suffered an earnings loss and expected earnings loss of about $355,000 or more as a result.

132.   Mrs. Haggerty is jointly responsible for the financial expenses owed to 3rd parties for her husband's necessaries of life including medical care, the lost earnings of both spouses,

---

[15] *See generally, State ex rel. Small v. Clawges,* 745 SE2d 192, 201 (W Va 2013) (discussing derivative nature of loss of consortium claims.)

29

DN1080

and lost earning capacity of Mr. Haggerty, and all related noneconomic losses. These amounts are accruing and are not yet fully known. She seeks damages for these amounts.

133.    Mrs. Haggerty also seeks compensatory damages for noneconomic losses associated losses caused by her husband's illness and all elements of that loss.

### Exemplary and Punitive Damages

134.    All allegations above are renewed here. The Haggertys are aware that West Virginia law permits the recovery of punitive damages but provides limits on their recovery.[16] So does Missouri.[17]   Monsanto's willful, wanton, reckless and malicious conduct in pursuit of profit at the expense of human safety and well-being of foreseeable users of its Roundup® products was caused, effectuated, or directed from Missouri.

135.    Accordingly, Haggertys contend that whether West Virginia or Missouri law governs the punitive damages aspect of their case, they are entitled to, and do seek, punitive damages. The most significant contacts between Monsanto's products and Mr. Haggerty occurred in West Virginia, making West Virginia law the governing law on the Haggertys' claims. But, the reprehensible conduct justifying punitive damages occurred in Missouri, and may be policed and prevented only by judicial proceedings against Monsanto inflicting punishment for its wrongdoing.

136.    Haggerty's seek punitive damages against Monsanto under West Virginia law or alternatively under Missouri law, for this reason.

### MDL No. 2741

137.    The Haggertys request that this case be transferred to MDL number 2741 in the Northern District of California as ordered by the federal Judicial Panel on Multidistrict Litigation.

### Requests For Relief

138.    On the foregoing basis, Mr. & Mrs. Haggerty request judgment in their favor on their First and Second claims, and all their theories of recovery, for actual and compensatory

---

[16] *W.Va. Code* § 55-7-29 (2017).  The Supreme Court held this statute is remedial and does not impact substantive rights. The Court held that this statute applies to trials conducted after the effective date when the facts in the case occurred prior to the effective date.  *Martinez v. Asplundh Tree Expert Co.*, 803 SE2d 582 (W Va 2017).
[17] *Mo Stat Annot* § 510..256 et seq.

DN1080

damages, including economic and noneconomic damages, costs, prejudgment interest to the extent permitted by law, and attorney's fees to the extent permitted by law.

139.    The Haggertys also seek punitive damages under Missouri law and West Virginia law because the conduct of Monsanto's acts, omissions, and display of the requisite contempt for public health, self-serving greed motivation, and malice.

**Jury Demand**

140.    The Haggertys respectfully demand trial by jury.

**Patrick S. Haggerty and Phyllis N. Haggerty,**
Plaintiffs,

By: *David A. Domina*  11043NE
Domina Law Group pc llo
2425 South 144th St. Omaha NE 68144-3267
402 493 4100
ddomina@dominalaw.com

Plaintiffs' Lawyer

31
