JURY

# U.S. District Court
## Northern District of Mississippi (Greenville Division)
### CIVIL DOCKET FOR CASE #: 4:19–cv–00098–DMB–JMV

Brooks v. Monsanto Company
Assigned to: District Judge Debra M. Brown
Referred to: Magistrate Judge Jane M. Virden
Cause: 28:1332 Diversity–Personal Injury

Date Filed: 06/22/2019
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod.
Liability
Jurisdiction: Diversity

**Plaintiff**

**Jessie Brooks**

represented by **John Christian Enochs**
MORRIS BART, LLC
601 Poydras Street
#24 FL
New Orleans, LA 70130
504–526–1087
Fax: 833–277–4214
Email: jenochs@morrisbart.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 06/22/2019 | 1 | COMPLAINT, Jury Demand, Filing fee $ 400, receipt number 0537–1692687, filed by Jessie Brooks. (Attachments: # 1 Civil Cover Sheet) (jla) (Entered: 06/24/2019) |
| 06/24/2019 | 2 | Summons Issued as to Monsanto Company; forwarded to attorney for service. (jla) |
| 06/24/2019 | | NOTICE OF ASSIGNMENT. Case assigned to Judge Brown and Magistrate Judge Virden. (jla) |
| 07/24/2019 | 3 | CLERK'S NOTICE of Incomplete Process as to Monsanto Company (jla) |

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF MISSISSIPPI
## GREENVILLE DIVISION

JESSIE BROOKS,

|  |  |
|---|---|
| *Plaintiff,* | Case No:  4:19cv98-DMB-JMV |
| v. | |
| MONSANTO COMPANY, | COMPLAINT<br>JURY TRIAL DEMANDED |
| *Defendant* | |

### COMPLAINT

COMES NOW, Jessie Brooks ("Plaintiff"), by and through undersigned counsel, and for

Plaintiff's cause of action against Defendant Monsanto Company, states to the Court as follows:

### I. NATURE OF THE CASE

1.      This is an action for damages suffered by Plaintiff as a direct and proximate result of

Defendant's negligent and wrongful conduct in connection with the design, development,

manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or

sale of the herbicide Roundup®, containing the active ingredient glyphosate.

2.      Plaintiff maintains that Roundup® and/or glyphosate is defective, dangerous to human

health, unfit and unsuitable to be marketed and sold in commerce and lacked proper warnings and

directions as to the dangers associated with its use.

3.      Plaintiff's injuries, like those striking thousands of similarly situated victims across the

country, were avoidable.

1

## II. THE PARTIES

4.      Plaintiff, Jessie Brooks, is a citizen and resident of Lyon, (Coahoma County), Mississippi.

Plaintiff purchased and used Roundup and/or other Monsanto glyphosate-containing products

("Roundup") for over fifteen years in the state of Mississippi, and was diagnosed with Non-

Hodgkin's Lymphoma. Plaintiff finished chemotherapy at the age of 54.

5.      "Roundup" refers to all formulations of Defendant's Roundup products, including, but

not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom

Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide,

Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass

and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II

Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup

Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate

Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup

Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-

to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra

Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed &

Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed &

Grass Killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup

Weed & Grass Killer 1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry

Herbicide, or any other formulation of containing the active ingredient glyphosate.

6.      Defendant MONSANTO COMPANY is a Delaware corporation, Missouri Secretary of

State Charter No. F00488018, with a principle place of business in St. Louis, Missouri.

2

7.     Defendant MONSANTO COMPANY is collectively referred to as "Monsanto" or "Defendant."

8.     At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup.

9.     Defendant advertises and sells goods, specifically Roundup, in the State of Louisiana.

10.    Defendant derived substantial revenue from goods and products used in the State of Louisiana.

11.    Defendant expected or should have expected its acts to have consequences within the State of Louisiana, and derived substantial revenue from interstate commerce.

12.    Defendant engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup.

13.    Defendant is authorized to do business in Mississippi and derives substantial income from doing business in this state.

14.    Upon information and belief, Defendant purposefully availed itself of the privilege of conducting activities with the State of Louisiana, thus invoking the benefits and protections of its laws.

15.    Upon information and belief, Defendant did design, sell, advertise, manufacture and/or distribute Roundup, with full knowledge of its dangerous and defective nature.

16.    The expiration of any applicable statute of limitations is equitably tolled by reason of Monsanto's fraudulent misrepresentations and fraudulent concealment, detailed more fully below.

3

### III. BACKGROUND

17.     In 1970, Defendant Monsanto Company, Inc. discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 millions of pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

18.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

19.     Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

20.     On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate

4

in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

21.     On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

22.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are Non-Hodgkin's lymphoma and other haematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

23.     The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

24.     Nevertheless, Monsanto, since it began selling Roundup, has represented it as safe to humans and the environment. Indeed, Monsanto and has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup, create no unreasonable risks to human health or to the environment.

## IV. JURISDICTION AND VENUE

25.     This Court has jurisdiction over Defendant and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendant. Defendant is incorporated and has its principal place of business outside of the state in which the Plaintiff is a citizen.

5

26.     The amount in controversy between Plaintiff and Defendant exceeds $75,000, exclusive

of interest and cost.

27.     Venue is proper within this district pursuant to 28 U.S.C. § 1391 in that Defendant

conducts business here and is subject to personal jurisdiction in this district. Furthermore,

Defendant sells, markets, and/or distributes Roundup within Louisiana. Also, a substantial part of

the acts and/or omissions giving rise to these claims occurred within this District.

## V.  FACTS

28.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of

herbicidal products around the world.

29.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot

regions and fruit, where it interferes with the plant's ability to form aromatic amino acids

necessary for protein synthesis. Treated plants generally die within two to three days. Because

plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by

milling, baking, or brewing grains.

30.     For nearly 40 years, farms across the world have used Roundup without knowing of the

dangers its use poses. That is because when Monsanto first introduced Roundup, it touted

glyphosate as a technological breakthrough: it could kill almost every weed without causing

harm either to people or to the environment. Of course, history has shown that not to be true.

According to the WHO, the main chemical ingredient of Roundup—glyphosate—is a probable

cause of cancer. Those most at risk are farm workers and other individuals with workplace

exposure to Roundup, such as workers in garden centers, nurseries, and landscapers. Monsanto

assured the public that Roundup was harmless. In order to prove this, Monsanto championed

falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged

6

campaign of misinformation to convince government agencies, farmers and the general
population that Roundup was safe.

### The Discovery of Glyphosate and Development of Roundup®

31.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist
John Franz. The first glyphosate-based herbicide was introduced to the market in the mid- 1970s
under the brand name Roundup. From the outset, Monsanto marketed Roundup as a "safe"
general-purpose herbicide for widespread commercial and consumer use. Monsanto still markets
Roundup as safe today.

### Registration of Herbicides under Federal Law

32.     The manufacture, formulation and distribution of herbicides, such as Roundup, are
regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7
U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental
Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as
described by the Act. 7 U.S.C. § 136a(a).

33.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the
EPA requires as part of the registration process, among other things, a variety of tests to evaluate
the potential for exposure to pesticides, toxicity to people and other potential non-target
organisms, and other adverse effects on the environment. Registration by the EPA, however, is
not an assurance or finding of safety. The determination the Agency must make in registering or
reregistering a product is not that the product is "safe," but rather that use of the product in
accordance with its label directions "will not generally cause unreasonable adverse effects on the
environment." 7 U.S.C. § 136a(c)(5)(D).

7

34.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

35.     The EPA registered Roundup® for distribution, sale, and manufacture in the United States.

36.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

37.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to re-evaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

38.     In the case of glyphosate, and therefore Roundup, the EPA had planned on releasing its preliminary risk assessment —in relation to the re-registration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

8

*Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup*

39.    Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA

originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After

pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its

classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying

glyphosate, however, the EPA made clear that the designation did not mean the chemical does

not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is

based on the available evidence at the time of evaluation and should not be interpreted as a

definitive conclusion that the agent will not be a carcinogen under any circumstances."

40.    On two occasions, the EPA found that the laboratories hired by Monsanto to test the

toxicity of its Roundup products for registration purposes committed fraud.

41.    In the first instance, Monsanto, in seeking initial registration of Roundup by EPA, hired

Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies

relating to Roundup. IBT performed about 30 tests on glyphosate and glyphosate-containing

products, including nine of the 15 residue studies needed to register Roundup.

42.    In 1976, the United States Food and Drug Administration ("FDA") performed an

inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw

data and the final report relating to the toxicological impacts of glyphosate. The EPA

subsequently audited IBT; it too found the toxicology studies conducted for the Roundup

herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at

IBT, that it was "hard to believe the scientific integrity of the studies when they said they took

specimens of the uterus from male rabbits."

43.    Three top executives of IBT were convicted of fraud in 1983.

9

44.     In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup.  In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

45.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup in 115 countries.

46.     Multiple studies have been ghostwritten in part and/or published by Monsanto through companies such as Intertek and Exponent, Inc. from 2000-present which minimize any safety concerns about the use of glyphosate; are used to convince regulators to allow the sale of Roundup and are used to convince customers to use Roundup. Such studies include but are not limited to Williams (2000); Williams (2012); Kier & Kirkland (2013); Kier (2015); Bus (2016); Chang (2016); and the Intertek Expert Panel Manuscripts. All of these studies have been submitted to and relied upon the public and the EPA in assessing the safety of glyphosate. Through these means Monsanto has fraudulently represented that independent scientists have concluded that Glyphosate is safe. In fact, these independent experts have been paid by Monsanto and have failed to disclose the significant role Monsanto had in creating the manuscripts. Monsanto has further ghostwritten editorials for scientists such as Robert Tarone and Henry Miller to advocate for the safety of glyphosate in Newspapers and Magazines. Monsanto has also ghostwritten letters by supposed independent scientists submitted to regulatory agencies who are reviewing the safety of glyphosate.

47.     Monsanto has also violated federal regulations in holding secret ex parte meetings and conversations with certain EPA employees to collude in a strategy to re-register glyphosate and to quash investigations into the carcinogenicity of glyphosate by other federal agencies such as

the Agency for Toxic Substances and Disease Registry. Monsanto's close connection with the
EPA arises in part from its offering of lucrative consulting positions to retiring EPA officials.

48.     In March 2015, The Joint Glyphosate Task Force at Monsanto's behest issued a press
release sharply criticizing IARC, stating that IARC's conclusion was "baffling" and falsely
claiming that "IARC did not consider any new or unique research findings when making its
decision. It appears that only by deciding to exclude certain available scientific information and
by adopting a different approach to interpreting the studies was this possible."

49.     Beginning in 2011, the Federal Institute for Risk Assessment (BfR) in Germany began
preparing a study on the safety of glyphosate. Through the Glyphosate Task Force, Defendant
was able to co-opt this study becoming the sole providers of data and ultimately wrote the report
which was rubber-stamped by the BfR. The Glyphosate Task Force was solely responsible for
preparing and submitting summary of studies relied upon by the by the BfR. Defendant has used
this report, which it wrote, to falsely proclaim the safety of glyphosate.

50.     In October 2015, the Defendant, as a member of the Joint Glyphosate Task Force, wrote
to the state of California to try to stop California from warning the public about the
carcinogenicity of glyphosate arguing that the IARC classification is mistaken. In January of
2016 Monsanto filed a lawsuit to stop California from warning the public about the
carcinogenicity of glyphosate.

*The Importance of Roundup® to Monsanto's Market Dominance Profits*

51.     The success of Roundup was key to Monsanto's continued reputation and dominance in
the marketplace. Largely due to the success of Roundup sales, Monsanto's agriculture division
was out-performing its chemicals division's operating income, and that gap increased yearly. But

11

with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup market dominance and to ward off impending competition.

52.     In response, Monsanto began the development and sale of genetically engineered Roundup Ready seeds in 1996. Since Roundup Ready crops are resistant to glyphosate; farmers can spray Roundup onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup market through a marketing strategy that coupled proprietary Roundup Ready seeds with continued sales of its Roundup herbicide.

53.     Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready seeds, Roundup became Monsanto's most profitable product. In 2000, Roundup accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

***Monsanto has known for decades that it falsely advertises the safety of Roundup®.***

54.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "**safer than table salt**" and "**practically non-toxic**" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

a.   Remember that environmentally friendly Roundup herbicide is biodegradable. It
won't build up in the soil, so you can use Roundup with confidence along
customers' driveways, sidewalks and fences ...

b.   And remember that Roundup is biodegradable and won't build up in the soil. That
will give you the environmental confidence you need to use Roundup everywhere
you've got a weed, brush, edging or trimming problem.

c.   Roundup biodegrades into naturally occurring elements.

d.   Remember that versatile Roundup herbicide stays where you put it. That means
there's no washing or leaching to harm customers' shrubs or other desirable
vegetation.

e.   This non-residual herbicide will not wash or leach in the soil. It ... stays where
you apply it.

f.   You can apply Accord with "confidence because it will stay where you put it" it
bonds tightly to soil particles, preventing leaching. Then, soon after application,
soil microorganisms biodegrade Accord into natural products.

g.   Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h.   Glyphosate's safety margin is much greater than required. It has over a 1,000-fold
safety margin in food and over a 700-fold safety margin for workers who
manufacture it or use it.

i.   You can feel good about using herbicides by Monsanto. They carry a toxicity
category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

13

j.    "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

55.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a.    its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b.    its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

c.    its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d.    its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e.    glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f.    its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

56.    Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

57.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety

of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised

its herbicide Roundup as "biodegradable" and that it "left the soil clean."

*Classifications and Assessments of Glyphosate*

58.     The IARC process for the classification of glyphosate followed the stringent procedures

for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed

980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human

Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group

2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to

be Probably Not Carcinogenic.

59.     The established procedure for IARC Monograph evaluations is described in the IARC

Programme's Preamble. Evaluations are performed by panels of international experts, selected

on the basis of their expertise and the absence of actual or apparent conflicts of interest.

60.     One year before the Monograph meeting, the meeting is announced and there is a call

both for data and for experts. Eight months before the Monograph meeting, the Working Group

membership is selected, and the sections of the Monograph are developed by the Working Group

members. One month prior to the Monograph meeting, the call for data is closed and the various

draft sections are distributed among Working Group members for review and comment. Finally,

at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the

evidence in each category, and completes the overall evaluation. Within two weeks after the

Monograph meeting, the summary of the Working Group findings are published in Lancet

Oncology, and within a year after the meeting, the final Monograph is finalized and published.

61.     In assessing an agent, the IARC Working Group reviews the following information:

a.  human, experimental, and mechanistic data;

b.  all pertinent epidemiological studies and cancer bioassays; and

c.  representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

62.  In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

63.  On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

64.  The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

65.  Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

16

66.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

67.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

68.     The IARC Working Group found an increased risk between exposure to glyphosate and Non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

69.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

70.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

71.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

72.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

17

73.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in

mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic

amino acids, which leads to several metabolic disturbances, including the inhibition of protein

and secondary product biosynthesis and general metabolic disruption.

74.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a

prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While

this study differed from others in that it was based on a self-administered questionnaire, the

results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell

Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other

cancers.

### Other Earlier Findings About Glyphosate's Dangers to Human Health

75.     Despite the new classification by the IARC, Defendant previously had ample evidence of

glyphosate and Roundup's genotoxic properties for decades.

76.     Genotoxicity refers to chemical agents that are capable of damaging the DNA within a

cell through genetic mutations, which is a process that is believed to lead to cancer.

77.     In 1997, Chris Clements published "Genotoxicity of select herbicides in Rana catesbeiana

tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

78.     The study found that tadpoles exposed to Roundup showed significant DNA damage

when compared with unexposed control animals.

79.     Both human and animal studies have shown that glyphosate and glyphosate-based

formulations such as Roundup can induce oxidative stress.

80.     Oxidative stress and associated chronic inflammation are believed to be involved in

carcinogenesis.

81.    The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

82.    In 2006 César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

83.    The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

84.    The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

85.    Despite knowledge to the contrary, Defendant maintains that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

86.    In addition to glyphosate and Roundup's genotoxic properties, Defendant has long been aware of glyphosate's carcinogenic properties.

87.    Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, Non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

88.    Defendant has known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

19

89.     In 1985 the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

90.     In 2003 Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

91.     The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studies with an increased odds ratio of 3.11.

92.     In 2003 AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

93.     The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

94.     In 2008 Mikael Eriksson published a population based case-control study of exposure to various pesticides as a risk factor for NHL.

95.     This strengthened previous associations between glyphosate and NHL.

96.     In spite of this knowledge, Defendant continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

97.     Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiff, the agricultural community, and the public at large to purchase and increase the use of Defendant's Roundup for Defendant's pecuniary gain, and in fact, did induce Plaintiff to use Roundup.

98.     Defendant made these statements with complete disregard and reckless indifference to
the safety of Plaintiff and the general public.

99.     Notwithstanding Defendant's representations, scientific evidence has established a clear
association between glyphosate and genotoxicity, inflammation, and an increased risk of many
cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

100.    Defendant knew or should have known that glyphosate is associated with an increased
risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue
sarcomas.

101.    Defendant failed to appropriately and adequately inform and warn Plaintiff of the serious
and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup,
including, but not limited to, the risk of developing NHL, as well as other severe and personal
injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and
mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring
and/or medications.

102.    Despite the IARC's classification of glyphosate as a class 2A probable carcinogen,
Defendant continues to maintain that glyphosate and/or Roundup is safe, non-carcinogenic,
nongenotoxic, and falsely warrant to users and the general public that independent experts and
regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in
glyphosate and Roundup.

103.    Defendant has claimed and continues to claim that Roundup is safe, noncarcinogenic, and
non-genotoxic. These misrepresentations are consistent with Defendant's cavalier approach to
investigating and ensuring the safety of its products, the safety of the public at large, and the
safety of Plaintiff.

*Release Patterns*

104.    Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available. Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

105.    In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

*Recent Worldwide Bans on Roundup®/Glyphosate*

106.    Several countries around the world have instituted bans on the sale of Roundup and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in light of the as the dangers of the use of Roundup are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup, which takes effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation

stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private

persons. In garden centers, Roundup is promoted as harmless, but unsuspecting customers have

no idea what the risks of this product are. Especially children are sensitive to toxic substances

and should therefore not be exposed to it."

107.    The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice

Department suspend the use of glyphosate.

108.    France banned the private sale of Roundup and glyphosate following the IARC

assessment for Glyphosate.

109.    Bermuda banned both the private and commercial sale of glyphosates, including

Roundup. The Bermuda government explained its ban as follows: "Following a recent scientific

study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been

suspended."

110.    The Sri Lankan government banned the private and commercial use of glyphosates,

particularly out of concern that Glyphosate has been linked to fatal kidney disease in agricultural

workers.

111.    The government of Columbia announced its ban on using Roundup and glyphosate to

destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding

that glyphosate is probably carcinogenic.

## VI.  PLAINTIFF'S EXPOSURE TO ROUNDUP

112.    Plaintiff Maxine Walker used Roundup beginning in the late 1990's and continued to use

the product through 2018.

113.    For years, Plaintiff Maxine Walker sprayed Roundup on a regular basis. Plaintiff Maxine

Walker followed all safety and precautionary warnings during the course of use.

23

114.    Plaintiff Maxine Walker was subsequently diagnosed with a form of Non-Hodgkin's
lymphoma on or about February 15, 2014. The development of Plaintiff's Non-Hodgkin's
lymphoma was proximately and actually caused by exposure to Defendant's Roundup products.

115.    As a result of these injuries, Plaintiff has incurred significant economic and noneconomic
damages.

## VII.  CLAIMS
## COUNT I.  NEGLIGENCE

116.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint
contained in each of the foregoing paragraphs inclusive, with the same force and effect as if
more fully set forth herein.

117.    Defendant had a duty to exercise reasonable care in the designing, researching, testing,
manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of
Roundup into the stream of commerce, including a duty to assure that the product would not
cause users to suffer unreasonable, dangerous side effects.

118.    Defendant failed to exercise ordinary care in the designing, researching, testing,
manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance,
quality control, and/or distribution of Roundup into interstate commerce in that Defendant knew
or should have known that using Roundup created a high risk of unreasonable, dangerous side
effects, including, but not limited to, the development of NHL, as well as other severe and
personal injuries which are permanent and lasting in nature, physical pain and mental anguish,
including diminished enjoyment of life, as well as need for lifelong medical treatment,
monitoring, and/or medications.

119.    The negligence by the Defendant, its agents, servants, and/or employees, included but
was not limited to the following acts and/or omissions:

24

a.   Manufacturing, producing, promoting, formulating, creating, and/or designing
     Roundup without thoroughly testing it;

b.   Failing to test Roundup and/or failing to adequately, sufficiently, and properly test
     Roundup;

c.   Not conducting sufficient testing programs to determine whether or not Roundup
     was safe for use; in that Defendant herein knew or should have known that
     Roundup was unsafe and unfit for use by reason of the dangers to its users;

d.   Not conducting sufficient testing programs and studies to determine Roundup's
     carcinogenic properties even after Defendant had knowledge that Roundup is,
     was, or could be carcinogenic;

e.   Failing to conduct sufficient testing programs to determine the safety of "inert"
     ingredients and/or adjuvants contained within Roundup, and the propensity of
     these ingredients to render Roundup toxic, increase the toxicity of Roundup,
     whether these ingredients are carcinogenic, magnify the carcinogenic properties
     of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for
     use;

f.   Negligently failing to adequately and correctly warn the Plaintiff, the public, the
     medical and agricultural professions, and the EPA of the dangers of Roundup;

g.   Negligently failing to petition the EPA to strengthen the warnings associated with
     Roundup;

h.   Failing to provide adequate cautions and warnings to protect the health of users,
     handlers, applicators, and persons who would reasonably and foreseeably come
     into contact with Roundup;

25

    i.      Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

    j.      Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

    k.      Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

    l.      Negligently designing Roundup in a manner, which was dangerous to its users;

    m.      Negligently manufacturing Roundup in a manner, which was dangerous to its users;

    n.      Negligently producing Roundup in a manner, which was dangerous to its users;

    o.      Negligently formulating Roundup in a manner, which was dangerous to its users;

    p.      Concealing information from the Plaintiff while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations; and

    q.      Improperly concealing and/or misrepresenting information from the Plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides.

    r.      Negligently selling Roundup with a false and misleading label.

120.    Defendant under-reported, underestimated, and downplayed the serious dangers of Roundup.

121.    Defendant negligently and deceptively compared the safety risks and/or dangers of Roundup with common everyday foods such as table salt, and other forms of herbicides.

122.    Defendant was negligent and/or violated state law in the designing, researching,

supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning,

marketing, and selling of Roundup in that they:

      a.    Failed to use ordinary care in designing and manufacturing Roundup so as to

          avoid the aforementioned risks to individuals when Roundup was used as an

          herbicide;

      b.    Failed to accompany its product with proper and/or accurate warnings regarding

          all possible adverse side effects associated with the use of Roundup;

      c.    Failed to accompany its product with proper warnings regarding all possible

          adverse side effects concerning the failure and/or malfunction of Roundup;

      d.    Failed to accompany its product with accurate warnings regarding the risks of all

          possible adverse side effects concerning Roundup;

      e.    Failed to warn Plaintiff of the severity and duration of such adverse effects, as the

          warnings given did not accurately reflect the symptoms, or severity of the side

          effects including, but not limited to, the development of NHL;

      f.    Failed to conduct adequate testing, clinical testing and post-marketing

          surveillance to determine the safety of Roundup;

      g.    Failed to conduct adequate testing, clinical testing, and post-marketing

          surveillance to determine the safety of Roundup's "inert" ingredients and/or

          adjuvants;

      h.    Negligently misrepresented the evidence of Roundup's genotoxicity and

          carcinogenicity;

      i.    Was otherwise careless and/or negligent.

123.    Despite the fact that Defendant knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Defendant continued and continues to market, manufacture, distribute, and/or sell Roundup to consumers, including the Plaintiff.

124.    Defendant knew or should have known that consumers such as the Plaintiff would foreseeably suffer injury as a result of Defendant's failure to exercise ordinary care, as set forth above.

125.    As a result of the foregoing acts and omissions, the Plaintiff suffered from serious and dangerous side effects including, but not limited to, NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, Plaintiff suffered life-threatening NHL, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## COUNT II. BREACH OF DUTY IN THE MANUFACTURE UNDER THE MISSISSIPPI PRODUCTS LIABLITY ACT

126.    Plaintiff repeats, reiterates, incorporates, and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

127.    Monsanto had a duty to exercise reasonable care in the design, research, manufacture, marketing, testing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup including the duty to take all reasonable steps necessary to manufacture and sell a

28

product that was not defective and unreasonably dangerous to consumers and users of the product.

128.    Monsanto failed to exercise reasonable care in the design, formulation, manufacture, sale, testing, quality assurance, quality control, labeling, marketing, promotions, and distribution of Roundup because Monsanto knew, or should have known, that exposure to Roundup was linked to Non-Hodgkin's lymphoma, and was therefore not safe for use by consumers.

129.    Monsanto failed to exercise due care in the labeling of Roundup and failed to issue to purchasers and users adequate warnings as to the risk of serious bodily injury, including Non-Hodgkin's lymphoma, resulting from its use.

130.    Monsanto continued to manufacture and market its product despite the knowledge, whether direct or ascertained with reasonable care, that Roundup posed a serious risk of bodily harm to consumers, NHL being a potentially deadly cancer.

131.    Monsanto knew, or should have known, that consumers such as Plaintiff would foreseeably suffer injury as a result of Monsanto's failure to exercise ordinary care. The characteristic of the product that renders it unreasonably dangerous, the cancer causing glyphosate content, existed at the time the product left the control of Monsanto.

132.    The defective condition rendered the product unreasonably dangerous to the user or consumer, and the defective and unreasonably dangerous condition of the product proximately caused the damages for which recovery is sought.

133.    At the time the product left the control of the manufacturer or seller, the manufacturer or seller knew or in light of reasonably available knowledge should have known about the danger that caused the damage for which recovery is sought and that the ordinary user or consumer would not realize its dangerous condition.

134.     As a direct and proximate consequence of Monsanto's negligence, Plaintiff sustained serious personal injuries and related losses including, but not limited to, the following:

      a.      Plaintiff required and will continue to require healthcare and services;

      b.      Plaintiff incurred and will continue to incur medical and related expenses; and

      c.      Plaintiff suffered and will continue to suffer mental anguish, physical pain and suffering, diminished capacity for the enjoyment of life, a diminished quality of life, and other losses and damages, including Punitive Damages.

WHEREFORE, Plaintiff demands judgment against Defendant, and requests compensatory damages for past, present, and future pain and suffering, medical costs and expenses, lost wages; prejudgment and post-judgment interest as allowed by law, costs of suit and attorneys' fees, as allowed by law, punitive damages, and any and all such other relief as the Court deems just and proper; and further, demands a trial by jury of all issues so triable.

## COUNT III.  MANUFACTURING AND DESIGN DEFECT

135.     Plaintiff repeats, reiterates, incorporates, and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

136.     Monsanto designed, researched, developed, manufactured, tested, labeled, advertised, promoted, marketed, sold, supplied, and/or distributed Roundup.

137.     Roundup was expected to, and did, reach the intended consumers, handlers, and persons coming in contact with the product with no substantial change in the condition in which the product was designed, produced, manufactured, sold, distributed, labeled, and marketed by Monsanto.

138.   Roundup was manufactured, designed, marketed, labeled and sold in a defective condition, for use by Plaintiff and all other consumers of the product, making the product unreasonably dangerous.

139.   Roundup as designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Monsanto was defective in design and formulation in that when it left the hands of the manufacturers, suppliers, and distributors, the foreseeable risks of harm caused by the product exceeded the claimed benefits of the product.

140.   Roundup, as designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Monsanto was defective in design and formulation because when it left the hands of Monsanto, the product was unreasonably dangerous and was also more dangerous than expected by the ordinary consumer.

141.   At all times relevant to this action, Monsanto knew and had reason to know that Roundup was inherently defective and unreasonably dangerous as designed, formulated, and manufactured by Monsanto, and when used and administered in the form manufactured and distributed by Monsanto, and in the manner instructed by Monsanto to be used by Plaintiff and other consumers.

142.   Plaintiff used Roundup for the purpose intended by Monsanto, and in a manner normally intended to be used. Monsanto had a duty to design, create, and manufacture products that were reasonably safe and not unreasonably dangerous for their normal, common, and intended use. Monsanto's product was not reasonably fit, suitable, or safe for its anticipated use, and safer, reasonable alternative designs existed and could have been utilized. Reasonably prudent manufacturers would not have placed the product in the stream of commerce with knowledge of these design flaws.

31

143.    Monsanto designed, developed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product that created an unreasonable risk of serious harm to the health, safety, and well-being of Plaintiff and other consumers. Monsanto is therefore liable for Plaintiff's injuries and damages sustained proximately caused by Plaintiff's use of the product, as Monsanto's product unreasonably dangerous, and all damage arose from the reasonably anticipated use of the product by the Plaintiff

144.    Plaintiff could not, by the exercise of reasonable care, discover the defective condition of Monsanto's product and/or perceive its defective dangers prior to its use.

145.    Roundup was a substantial, proximate, and contributing factor in causing Plaintiff's injuries.

146.    As a proximate result of Monsanto's acts and omissions and Plaintiff's use of Monsanto's defective product, Plaintiff suffered serious physical injuries and incurred substantial medical costs and expenses to treat and care for his injuries described in this Complaint, including, but not limited to, the following:

    a.    Plaintiff required and will continue to require healthcare and services;

    b.    Plaintiff incurred and will continue to incur medical and related expenses; and

    c.    Plaintiff suffered and will continue to suffer mental anguish, physical pain and suffering, diminished capacity for the enjoyment of life, a diminished quality of life, and other losses and damages.

        WHEREFORE, Plaintiff demands judgment against Defendant, and requests compensatory damages for past, present, and future pain and suffering, medical costs and expenses, lost wages; prejudgment and post-judgment interest as allowed by law, costs of suit

32

and attorneys' fees, as allowed by law, punitive damages, and any and all such other relief as the
Court deems just and proper; and further, demands a trial by jury of all issues so triable.

## COUNT IV. INADEQUATE WARNING

147.   Plaintiff repeats, reiterates, incorporates, and realleges each and every allegation
contained in this Complaint with the same force and effect as if fully set forth herein.

148.   Monsanto designed, researched, developed, manufactured, tested, labeled, advertised,
promoted, marketed, sold, supplied, and/or distributed Roundup

149.   Roundup was expected to, and did, reach the intended consumers, handlers, and persons
coming in contact with the product with no substantial change in the condition in which the
product was designed, produced, manufactured, sold, distributed, labeled, and marketed by
Roundup.

150.   Roundup was manufactured, designed, marketed, labeled and sold in a defective
condition, for use by Plaintiff and all other consumers of the product, making the product
unreasonably dangerous.

151.   Monsanto researched, developed, designed, tested, manufactured, inspected, labeled,
distributed, marketed, promoted, sold, and otherwise released into the stream of commerce
Roundup and in the course of same, directly advertised or marketed the product to consumers or
persons responsible for consumers, and therefore had a duty to warn of the risks associated with
the use of its product.

152.   Roundup, as designed, researched, developed, manufactured, tested, advertised,
promoted, marketed, sold, labeled, and distributed by Monsanto, was defective due to the
product's inadequate warnings and instructions.  Monsanto knew, or should have known, and

33

adequately warned that its product created a risk of serious and dangerous side effects, including but not limited to, Non-Hodgkin's lymphoma.

153. The product was under the exclusive control of Monsanto and was unaccompanied by appropriate and adequate warnings regarding the risk of severe and permanent injuries associated with its use, including, but not limited to, the risk of developing Non-Hodgkin's lymphoma. The warnings given did not accurately reflect the risk, incidence, symptoms, scope or severity of such injuries to the consumer.

154. Notwithstanding Monsanto's knowledge of the defective condition of its product, Monsanto failed to adequately warn the medical community and consumers of the product, including Plaintiff and his healthcare providers, of the dangers and risk of harm associated with the use of Roundup.

155. Monsanto downplayed the serious and dangerous side effects of its product to encourage sales of the product, particularly without the use of protective equipment; consequently, Monsanto placed its profits above its customers' safety.

156. The product was defective when it left the possession of Monsanto in that it contained insufficient warnings to alert Plaintiff to the dangerous risks associated with it, including the risk of Non-Hodgkin's lymphoma.

157. Even though Monsanto knew or should have known of the risks and reactions associated with their product, it still failed to provide warnings that accurately reflected the signs, symptoms, incident, scope, or severity of the risks associated with the product.

158. Plaintiff used Roundup as intended or in a reasonably foreseeable manner.

159.    Monsanto, as a manufacturer of agricultural products, is held to the level of knowledge of
an expert in the field and, further, Monsanto had knowledge of the dangerous risks and side
effects of its product.

160.    Plaintiff did not have the same knowledge as Monsanto and no adequate warning was
communicated to Plaintiff or any other consumers.

161.    Monsanto had a continuing duty to warn consumers, including Plaintiff, of the dangers
associated with its product, and by negligently and/or wantonly failing to adequately warn of the
dangers of the use of its product, Monsanto breached its duty.

162.    Although Monsanto knew, or should have known, of the defective nature of Roundup it
continued and continues to design, manufacture, market, and sell its product without providing
adequate warnings and instructions concerning the use of its product so as to maximize sales and
profits at the expense of the public health and safety, in knowing, conscious, and deliberate
disregard of the foreseeable harm caused by Roundup.

163.    As a direct and proximate result of Monsanto's failure to adequately warn or other acts
and omissions of Monsanto described herein, Plaintiff suffered severe and permanent injuries,
pain, and mental anguish, including diminished enjoyment of life.

164.    Monsanto's failure to warn extended beyond the product's label and into other media
available to Monsanto, including but not limited to advertisements, person-to-person sales calls,
medical journal articles, and medical conference presentations.

165.    Roundup, upon information and belief, as manufactured by Monsanto, was further
defective due to inadequate post-market warnings or instructions because after Monsanto knew,
or should have known, of the risk of serious bodily harm from the use of Roundup, Monsanto

failed to provide adequate warnings to consumers about the product, knowing the product could cause serious injury.

166.    Roundup, upon information and belief, as manufactured and supplied by Monsanto, was unreasonably dangerous because an adequate warning about the product was not been provided if, as at the time the product left Monsanto's control, the product possessed the aforementioned characteristics that may cause damage users such as Plaintiff, and Monsanto failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.

167.    After Monsanto had started shipping product that had left its control, Monsanto acquired knowledge of characteristics of the product that might cause damage and the danger of such characteristic, and is liable for damage caused by a subsequent failure to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product since that knowledge of the characteristics and its danger to users was acquired.

168.    A reasonably prudent manufacturer would have warned of these characteristics and its danger to users, and Monsanto's failure to do so renders it liable for all damages caused by its subsequent failure to use reasonable care to provide adequate warning of the danger to Plaintiff and other users of the product.

169.    An adequate product warning or instruction is one that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger and that communicates sufficient information on the dangers and safe use of the product, taking into account the characteristics of, and the ordinary knowledge common to an ordinary consumer who purchases the product.

170.     As a proximate result of Monsanto's acts and omissions and Plaintiff's use of Roundup,

Monsanto's defective product, Plaintiff suffered serious physical injuries and incurred substantial

medical costs and expenses as set forth in this Complaint, including, but not limited to, the

following:

    a.     Plaintiff required and will continue to require healthcare and services;

    b.     Plaintiff incurred and will continue to incur medical and related expenses; and

    c.     Plaintiff suffered and will continue to suffer mental anguish, physical pain and

        suffering, diminished capacity for the enjoyment of life, a diminished quality of

        life, and other losses and damages.

WHEREFORE, Plaintiff demands judgment against the Defendant, and requests

compensatory damages for past, present, and future pain and suffering, medical costs and

expenses, lost wages; prejudgment and post-judgment interest as allowed by law, costs of suit

and attorneys' fees, as allowed by law, punitive damages, and any and all such other relief as the

Court deems just and proper; and further, demands a trial by jury of all issues so triable.

## COUNT V.  NON-CONFORMITY TO EXPRESS WARRANTY

171.     Plaintiff repeats, reiterates, incorporates, and realleges each and every allegation

contained in this Complaint with the same force and effect as if fully set forth herein.

172.     Monsanto, through its officers, directors, agents, representatives, and written literature

and packaging, and written and media advertisements, expressly warranted that Roundup was

safe and effective for use by consumers, was of merchantable quality, did not create the risk of or

produce dangerous side effects, including, but not limited to, Non-Hodgkin's lymphoma

("Roundup is a safe as table salt")and was adequately tested and fit for its intended use.

173.    Specifically, Monsanto made the representations as set forth above in paragraphs 54 and

55, as well as many others, via advertising, product labels, and information given to the public.

174.    At the time of making such express warranties, Monsanto knew and/or should have

known that Roundup did not conform to the express warranties and representations and that, in

fact, its product was not safe and had numerous serious side effects, including the possibility of

Non-Hodgkin's lymphoma, of which Monsanto had full knowledge and did not accurately or

adequately warn.

175.    Roundup, as manufactured and sold by Monsanto, did not conform to these

representations because it caused serious injury, including Non-Hodgkin's lymphoma, to

consumers such as Plaintiff, when used as directed by the product label.

176.    Monsanto breached its express warranties because its product was and is defective for its

intended purpose.

177.    Plaintiff did rely on Monsanto's express warranties regarding the safety and efficacy of

their product in purchasing and using the product, and induced Plaintiff to use the product, and

Plaintiff's damages were proximately caused by the untruthfulness of the express warranty.

178.    As a foreseeable, direct, and proximate result of the breach of the express warranties,

Plaintiff suffered severe and permanent personal injuries, harm, and economic loss.

    WHEREFORE, Plaintiff respectfully request that this Court enter judgment in Plaintiff's

favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees

and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on

all issues contained herein.

### COUNT VI.  FRAUD, MISREPRESENTATION,
### AND SUPPRESION

179.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

180.   Defendant fraudulently, intentionally, and/or negligently misrepresented to the public, and to the Plaintiff, both directly and by and through the media, the scientific literature and purported "community outreach" programs, the safety of Roundup products, and/or fraudulently, intentionally, and/or negligently concealed, suppressed, or omitted material, adverse information regarding the safety of Roundup.

181.   The intentional and/or negligent misrepresentations and omissions of Defendant regarding the safety of Roundup products was communicated to Plaintiff directly through ghostwritten articles, editorials, national and regional advertising, marketing and promotion efforts, as well as the packaging and sales aids. The safety of Roundup products was also intentionally and/or negligently misrepresented to Plaintiff and the public with the intent that such misrepresentations would cause Plaintiff and other potential consumers to purchase and use or continue to purchase and use Roundup products.

182.   Defendant either knew or should have known of the material representations it was making regarding the safety and relative utility of Roundup products.

183.   Defendant fraudulently, intentionally, and/or negligently made the misrepresentations and/or actively concealed, suppressed, or omitted this material information with the specific desire to induce Plaintiff, and the consuming public to purchase and use Roundup products. Defendant fraudulently, intentionally, and/or negligently, knew or should have known that Plaintiff and the consuming public would rely on such material misrepresentations and/or omissions in selecting and applying Roundup products. Defendant knew or should have known that Plaintiff would rely on their false representations and omissions.

39

184.    Defendant made these misrepresentations and actively concealed adverse information including the risk of Non-Hodgkin's lymphoma, at a time when, their agents and/or employees knew or should have known, the product had defects, dangers, and characteristics that were other than what was represented to the consuming public.

185.    Despite the fact that Defendant knew or should have known of reports of severe risks including Non-Hodgkin's lymphoma, with Roundup use and exposure, this information was strategically minimized, understated, or omitted in order to create the impression that the human dangers of Roundup were nonexistent, particularly in light of its purported utility.

186.    The fraudulent, intentional and/or negligent material misrepresentations and/or active concealment, suppression, and omissions by Defendant were perpetuated directly and/or indirectly through the advertisements, packaging, sales aids, furtive public relations efforts, and other marketing and promotional pieces authored, analyzed, created, compiled, designed, drafted, disseminated, distributed, edited, evaluated, marketed, published, and supplied.

187.    If Plaintiff had known the true facts concerning the risks associated with Roundup exposure, Plaintiff would have used a safer alternative.

188.    Plaintiff's reliance upon the material misrepresentations and omissions was justified, among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Roundup while Plaintiff was not in a position to know the true facts because Defendant overstated the benefits and safety of Roundup and downplayed the risk of lymphoma, thereby inducing Plaintiff to use the herbicide rather than safer alternatives.

189.   As a direct and proximate result of Defendant's actions and inactions, Plaintiff was

exposed to Roundup and suffered and will continue to suffer injuries and damages, as set forth

herein.

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in Plaintiff's

favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees

and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on

all issues contained herein.

### COUNT VII. VIOLATION OF THE UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW

190.   Plaintiff incorporates by reference each and every allegation set forth in the preceding

paragraphs as if fully stated herein.

191.   Defendant fraudulently, intentionally, negligently, and/or innocently misrepresented to

the public, and to the Plaintiff, both directly and by and through the media and purported

"community outreach" programs, the safety of Roundup products, and/or fraudulently,

intentionally, negligently and/or innocently concealed, suppressed, or omitted material, adverse

information regarding the safety of Roundup. This deception caused injury to Plaintiff in

violation of the Mississippi's Unfair Trade Practices and Consumer Protection Law.

192.   The intentional, negligent, and/or innocent misrepresentations and omissions of

Defendant regarding the safety of Roundup products were communicated to Plaintiff directly

through national and regional advertising, marketing and promotion efforts, as well as the

packaging and sales aids. The safety of Roundup products was also intentionally, negligently,

and/or innocently misrepresented to Plaintiff and the public with the intent that such

misrepresentations would cause Plaintiff and other potential consumers to purchase and use or

continue to purchase and use Roundup products.

193.     Defendant either knew or should have known of the material representations it was making regarding the safety and relative utility of Roundup products.

194.     Defendant fraudulently, intentionally, negligently, and/or innocently made the misrepresentations and/or actively concealed, suppressed, or omitted this material information with the specific desire to induce Plaintiff, and the consuming public to purchase and use Roundup products. Defendant fraudulently, intentionally, negligently, and/or innocently, knew or should have known that Plaintiff and the consuming public would rely on such material misrepresentations and/or omissions in selecting and applying Roundup products. Defendant knew or should have known that Plaintiff would rely on their false representations and omissions.

195.     188.     Defendant made these misrepresentations and actively concealed adverse information including the risk of Non-Hodgkin's lymphoma, at a time when, their agents and/or employees knew or should have known, the product had defects, dangers, and characteristics that were other than what was represented to the consuming public. Specifically, Defendant misrepresented and actively concealed, suppressed, and omitted that there had been inadequate testing of the safety and efficacy of Roundup, and that prior studies, research, reports, and/or testing had been conducted linking the use of the drug with serious health events, including Non-Hodgkin's lymphoma.

196.     Despite the fact that Defendant knew or should have known of reports of severe risks including Non-Hodgkin's lymphoma, with Roundup use and exposure, this information was strategically minimized, understated, or omitted in order to create the impression that the human dangers of Roundup were nonexistent, particularly in light of its purported utility.

197.   The fraudulent, intentional, negligent and/or innocent material misrepresentations and/or active concealment, suppression, and omissions by Defendant were perpetuated directly and/or indirectly through the advertisements, packaging, sales aids, furtive public relations efforts, and other marketing and promotional pieces authored, analyzed, created, compiled, designed, drafted, disseminated, distributed, edited, evaluated, marketed, published, and supplied by Defendant.

198.   If Plaintiff had known the true facts concerning the risks associated with Roundup exposure, Plaintiff would have used a safer alternative.

199.   Plaintiff's reliance upon the material misrepresentations and omissions was justified, among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Roundup while Plaintiff was not in a position to know the true facts because Defendant overstated the benefits and safety of Roundup and downplayed the risk of lymphoma, thereby inducing Plaintiff to use the herbicide rather than safer alternatives.

200.   Federal law and the EPA do not authorize and specifically prohibit the deceptions, misrepresentations and omissions made by Defendant.

201.   As a direct and proximate result of Defendant's actions and inactions, Plaintiff was exposed to Roundup and suffered and will continue to suffer injuries and damages, as set forth herein.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

### COUNT VIII.  PUNITIVE DAMAGES

Punitive damages should be awarded, as Monsanto's actions, as described in the preceding paragraphs, will be substantiated in the trial of this matter, and Plaintiff will prove by clear and convincing evidence that the defendant Monsanto acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, and includes the commission of actual fraud.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against the Defendant on each of the above-referenced claims and causes of action and as follows:

1.     Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other noneconomic damages in an amount to be determined at trial of this action;

2.     Awarding compensatory damages to Plaintiff for past and future damages, including, but not limited to, Plaintiff's pain and suffering and for severe and permanent personal injuries sustained by Plaintiff including health care costs and economic loss;

3.     Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action;

4.     Pre-judgment interest;

5.     Post-judgment interest;

6.     Awarding Plaintiff's reasonable attorneys' fees;

7.     Awarding Plaintiff the costs of these proceedings; and

8.   Punitive Damages for the willful, wanton and reckless disregard for the safety of
     others and for fraud;

9.   Such other and further relief as this Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all issues.

June 22, 2019

                                   Respectfully submitted,


                                   /s/ John C. Enochs
                                   John C. Enochs Ms Bar 9635
                                   Richard L. Root, La Bar 19988
                                   Betsy Barnes, La. Bar 19473
                                   Morris Bart LLC
                                   601 Poydras Street, 24th Floor
                                   New Orleans LA 70130
                                   P: (504) 525-8000
                                   F: (833) 277-4214
                                   bbarnes@morrisbart.com
                                   rroot@morrisbart.com
                                   jenochs@morrisbart.com