# U.S. District Court
## Southern District of California (San Diego)
## CIVIL DOCKET FOR CASE #: 3:19-cv-01646-JM-BLM

Krupinski v. Monsanto Company
Assigned to: Judge Jeffrey T. Miller
Referred to: Magistrate Judge Barbara Lynn Major
Cause: 28:1332pi Diversity-Personal Injury

Date Filed: 08/30/2019
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Lawrence Krupinski**

represented by **Devin Lynn Bolton**
Weitz & Luxenberg
700 Broadway
New York, NY 10003
212-558-5552
Email: dbolton@weitzlux.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 08/30/2019 | 1 | COMPLAINT with Jury Demand against Monsanto Company filed by Lawrence Krupinski (Filing fee $ 400 receipt number 0974-12887385). (Attachments: # 1 Civil Cover Sheet) <br><br> The new case number is 3:19-cv-1646-JM-BLM. Judge Jeffrey T. Miller and Magistrate Judge Barbara Lynn Major are assigned to the case. (Bolton, Devin)(smd) (sjt). (Entered: 08/30/2019) |
| 08/30/2019 | 2 | Summons Issued. <br> **Counsel receiving this notice electronically should print this summons and serve it in accordance with Rule 4, Fed.R.Civ.P and LR 4.1.** (smd) (Entered: 08/30/2019) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 09/03/2019 13:28:43 | | |
| **PACER Login:** | garyklein:2662648:0 | **Client Code:** |  |
| **Description:** | Docket Report | **Search Criteria:** | 3:19-cv-01646-JM-BLM |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

Devin Bolton, Esq.
dbolton@weitzlux.com
Robin L. Greenwald, Esq.
(*pro hac vice* to be filed)
rgreenwald@weitzlux.com
**WEITZ & LUXENBERG, P.C.**
700 Broadway
New York, NY 10003
Tel.: 212-558-5802
Fax: 212-344-5461

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

LAWRENCE KRUPINSKI,

                Plaintiff,

      v.

MONSANTO COMPANY,

                Defendant.

Case No. **'19CV1646 JM   BLM**

**<u>COMPLAINT</u>**

**JURY TRIAL DEMANDED**

## <u>INTRODUCTION</u>

1.     In 1970, Defendant Monsanto Company, Inc. ("Monsanto")

discovered the herbicidal properties of glyphosate and began marketing it in

products in 1974 under the brand name Roundup®.  Roundup® is a non-selective

herbicide used to kill weeds that commonly compete with the growing of crops.  In

1   addition to the active ingredient glyphosate, Roundup® contains the surfactant

2   Polyethoxylated tallow amine (POEA) and/or adjuvants and other so-called "inert"

3   ingredients. In 2001, glyphosate was the most-used pesticide active ingredient in

4   American agriculture with 85–90 million pounds used annually. That number grew

5   to 185 million pounds in 2007.[1] As of 2013, glyphosate was the world's most

6   widely used herbicide.

7        2.     Monsanto is a multinational agricultural biotechnology corporation

8   based in St. Louis, Missouri, and incorporated in Delaware. It is the world's

9   leading producer of glyphosate. As of 2009, Monsanto was the world's leading

10   producer of seeds, accounting for 27% of the world seed market.[2] The majority of

11   these seeds are of the Roundup Ready® brand. The stated advantage of Roundup

12   Ready® crops is that they substantially improve a farmer's ability to control

13   weeds, because glyphosate can be sprayed in the fields during the growing season

14

15

16   ————————————

17      [1] Arthur Grube et al., U.S. Envtl. Prot. Agency, *Pesticides Industry Sales and Usage, 2006–2007 Market Estimates* 14 (2011), *available at* http://www.epa.gov/pesticides/pestsales/07pestsales/market_estimates2007.pdf.

18      [2] ETC Group, *Who Will Control the Green Economy?* 22 (2011), *available at*

19   http://www.etcgroup.org/files/publication/pdf_file/ETC_wwctge_4web_Dec2011.pdf.

20

1  without harming the crops.  In 2010, an estimated 70% of corn and cotton and

2  90% of soybean fields in the United States were Roundup Ready®.[3]

3       3.    Monsanto's glyphosate products are registered in 130 countries and

4  approved for use on over 100 different crops.[4]  They are ubiquitous in the

5  environment.  Numerous studies confirm that glyphosate is found in rivers,

6  streams, and groundwater in agricultural areas where Roundup® is used.[5]  It has

7

8

9

10

11

12

13

14       [3] William Neuman & Andrew Pollack, *Farmers Cope With Roundup-Resistant Weeds*, N.Y. TIMES, May 3, 2010, *available at* http://www.nytimes.com/2010/05/04/business/energy-environment/04weed.html?pagewan.

15

16       [4] Monsanto, *Backgrounder-History of Monsanto's Glyphosate Herbicides* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/back_history.pdf.

17

18       [5] *See* U.S. Geological Survey, *USGS Technical Announcement: Widely Used Herbicide Commonly Found in Rain and Streams in the Mississippi River Basin* (2011), *available at* http://www.usgs.gov/newsroom/article.asp?ID=2909; *see also* U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate*, *available at* http://www.epa.gov/safewater/pdfs/factsheets/soc/tech/glyphosa.pdf.

19

20

1  been found in food,[6] in the urine of agricultural workers,[7] and even in the urine of

2  urban dwellers who are not in direct contact with glyphosate.[8]

3      4.    On March 20, 2015, the International Agency for Research on Cancer

4  ("IARC"), an agency of the World Health Organization ("WHO"), issued an

5  evaluation of several herbicides, including glyphosate.  That evaluation was based,

6  in part, on studies of exposures to glyphosate in several countries around the

7  world, and it traces the health implications from exposure to glyphosate since

8  2001.

9      5.    On July 29, 2015, IARC issued the formal monograph relating to

10  glyphosate.  In that monograph, the IARC Working Group provides a thorough

11

12  _____

13  [6] Thomas Bohn et al., *Compositional Differences in Soybeans on the Market: Glyphosate Accumulates in Roundup Ready GM Soybeans*, 153 FOOD CHEMISTRY 207 (2013), *available at*

14  http://www.sciencedirect.com/science/article/pii/S0308814613019201.

15  [7] John F. Acquavella et al., *Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study*, 112(3) ENVTL. HEALTH PERSPECTIVES 321 (2004), *available at*

16  http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241861/; Kathryn Z. Guyton et

17  al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, 112 IARC Monographs 76, section 5.4 (2015), *available at*

18  http://dx.doi.org/10.1016/S1470-2045(15)70134-8.

19  [8] Dirk Brändli & Sandra Reinacher, *Herbicides found in Human Urine*, 1 ITHAKA JOURNAL 270 (2012), *available at* http://www.ithaka-journal.net/druckversionen/e052012-herbicides-urine.pdf.

20

review of the numerous studies and data relating to glyphosate exposure in humans.

6.      The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is *probably carcinogenic to humans*.  The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other haematopoietic cancers, including lymphocytic lymphoma / chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.[9]

7.      The IARC evaluation is significant.  It confirms what has been believed for years: that glyphosate is toxic to humans.

8.      Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment.  Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

_____

[9] *See* Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, *supra.*

**JURISDICTION AND VENUE**

9.     Federal diversity jurisdiction in this Court is proper under 28 U.S.C. § 1332 because Plaintiff is a citizen of California, a different state than the Defendant's states of citizenship, and the aggregate amount in controversy exceeds $75,000, exclusive of interest and costs.

10.     This Court has personal jurisdiction over Monsanto Company ("Monsanto") because Monsanto knows or should have known that its Roundup® products are sold throughout the State of California, and, more specifically, caused Roundup® to be sold to Plaintiff in the State of California.

11.     In addition, Monsanto maintains sufficient contacts with the State of California such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

12.     Venue is proper within this District under 28 U.S.C. § 1391(b)(2) because Plaintiff was injured and diagnosed in this District.  Further, Monsanto, as a corporate entity, is deemed to reside in any judicial district in which it is subject to personal jurisdiction.

## THE PARTIES

### *Plaintiff Lawrence Krupinski*

13.     Plaintiff Lawrence Krupinski is a citizen of California and resides in San Diego, CA.  Plaintiff Krupinski was exposed to Roundup® in and around Oceanside, CA, and San Diego, CA, from approximately 1985 to 2017.  He was diagnosed with Follicular Lymphoma, a subtype of NHL, in San Diego, CA, on or around May 18, 2017.

14.     During the entire time that Plaintiff Krupinski was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

15.     Plaintiff Krupinski first learned that exposure to Roundup® can cause NHL and other serious illnesses sometime after July 29, 2015, when IARC first published its evaluation of glyphosate.

### *Defendant*

16.     Defendant Monsanto Company is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.

17.     At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of

Complaint  │  Page 7 of 93

1   Roundup®, which contains the active ingredient glyphosate and the surfactant

2   POEA, as well as adjuvants and other "inert" ingredients.

3                                           **FACTS**

4          18.    In 1970, Defendant Monsanto Company, Inc. ("Monsanto")

5   discovered the herbicidal properties of glyphosate and began marketing it in

6   products in 1974 under the brand name Roundup®.  Roundup® is a non-selective

7   herbicide used to kill weeds that commonly compete with the growing of crops.

8   In addition to the active ingredient glyphosate, Roundup® contains the surfactant

9   Polyethoxylated tallow amine (POEA) and/or adjuvants and other so-called

10  "inert" ingredients.  In 2001, glyphosate was the most-used pesticide active

11  ingredient in American agriculture with 85–90 million pounds used annually.

12  That number grew to 185 million pounds in 2007.[10]  As of 2013, glyphosate was

13  the world's most widely used herbicide.

14         19.    Monsanto is a multinational agricultural biotechnology corporation

15  based in St. Louis, Missouri, and incorporated in Delaware.  It is the world's leading

16  producer of glyphosate.  As of 2009, Monsanto was the world's leading producer of

17

18  _____

19         [10] Arthur Grube et al., U.S. Envtl. Prot. Agency, *Pesticides Industry Sales and Usage, 2006–2007 Market Estimates* 14 (2011), *available at* http://www.epa.gov/pesticides/pestsales/07pestsales/market_estimates2007.pdf.

20

seeds, accounting for 27% of the world seed market.[11]  The majority of these seeds are of the Roundup Ready® brand.  The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, because glyphosate can be sprayed in the fields during the growing season without harming the crops.  In 2010, an estimated 70% of corn and cotton and 90% of soybean fields in the United States were Roundup Ready®.[12]

20.    Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops.[13]  They are ubiquitous in the environment.  Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used.[14]  It has been found

[11] ETC Group, *Who Will Control the Green Economy?* 22 (2011), *available at* http://www.etcgroup.org/files/publication/pdf_file/ETC_wwctge_4web_Dec2011.pdf.

[12] William Neuman & Andrew Pollack, *Farmers Cope With Roundup-Resistant Weeds*, N.Y. TIMES, May 3, 2010, *available at* http://www.nytimes.com/2010/05/04/business/energy-environment/04weed.html?pagewan.

[13] Monsanto, *Backgrounder-History of Monsanto's Glyphosate Herbicides* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/back_history.pdf.

[14] *See* U.S. Geological Survey, *USGS Technical Announcement: Widely Used Herbicide Commonly Found in Rain and Streams in the Mississippi River Basin* (2011), *available at* http://www.usgs.gov/newsroom/article.asp?ID=2909; *see also* U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate*, *available at* http://www.epa.gov/safewater/pdfs/factsheets/soc/tech/glyphosa.pdf.

in food,[15] in the urine of agricultural workers,[16] and even in the urine of urban

dwellers who are not in direct contact with glyphosate.[17]

21.     On March 20, 2015, the International Agency for Research on Cancer

("IARC"), an agency of the World Health Organization ("WHO"), issued an

evaluation of several herbicides, including glyphosate.  That evaluation was based,

in part, on studies of exposures to glyphosate in several countries around the world,

and it traces the health implications from exposure to glyphosate since 2001.

22.     On July 29, 2015, IARC issued the formal monograph relating to

glyphosate.  In that monograph, the IARC Working Group provides a thorough

review of the numerous studies and data relating to glyphosate exposure in humans.

---

[15] Thomas Bohn et al., *Compositional Differences in Soybeans on the Market: Glyphosate Accumulates in Roundup Ready GM Soybeans*, 153 FOOD CHEMISTRY 207 (2013), *available at* http://www.sciencedirect.com/science/article/pii/S0308814613019201.

[16] John F. Acquavella et al., *Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study*, 112(3) ENVTL. HEALTH PERSPECTIVES 321 (2004), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241861/; Kathryn Z. Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, 112 IARC Monographs 76, section 5.4 (2015), *available at* http://dx.doi.org/10.1016/S1470-2045(15)70134-8.

[17] Dirk Brändli & Sandra Reinacher, *Herbicides found in Human Urine*, 1 ITHAKA JOURNAL 270 (2012), *available at* http://www.ithaka-journal.net/druckversionen/e052012-herbicides-urine.pdf.

23.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is *probably carcinogenic to humans*.   The IARC Working Group concluded that the cancers most associated with glyphosate exposure are NHL and other haematopoietic cancers, including lymphocytic lymphoma / chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.[18]

24.     The IARC evaluation is significant.   It confirms what has been believed for years:  that glyphosate is toxic to humans.

25.     Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment.   Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

26.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

27.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis.   Treated plants generally die

---

[18] *See* Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, *supra.*

within two to three days.  Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

28.    For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses.  That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment.  Of course, history has shown that not to be true.  According to the WHO, the main chemical ingredient of Roundup®—glyphosate—is a probable cause of cancer.  Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as garden center workers, nursery workers, and landscapers.  Agricultural workers are, once again, victims of corporate greed.  Monsanto assured the public that Roundup® was harmless.  In order to prove this, Monsanto has championed falsified data and has attacked legitimate studies that revealed Roundup®'s dangers.  Monsanto has led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® is safe.

### *The Discovery of Glyphosate and Development of Roundup®*

29.    The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced

to the market in the mid-1970s under the brand name Roundup®.[19]  From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use.  It still markets Roundup® as safe today.[20]

30.    In addition to the active ingredient glyphosate, Roundup® formulations also contain adjuvants and other chemicals, such as the surfactant POEA, which are considered "inert" and therefore protected as "trade secrets" in manufacturing. Growing evidence suggests that these adjuvants and additional components of Roundup® formulations are not, in fact, inert and are toxic in their own right.

### Registration of Herbicides under Federal Law

31.    The manufacture, formulation, and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.*  FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act.  7 U.S.C. § 136a(a).

---

[19] Monsanto*, Backgrounder, History of Monsanto's Glyphosate Herbicide* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/back_history.pdf.

[20] Monsanto, *What is Glyphosate?* (Sep. 2, 2015), http://www.monsanto.com/sitecollectiondocuments/glyphosate-safety-health.pdf.

32.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.  Registration by the EPA, however, is not an assurance or finding of safety.  The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

33.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb).  FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or a pesticide allowed to continue to be sold in commerce.

34.     The EPA and the State of California registered Roundup® for distribution, sale, and manufacture in the United States and the State of California.

35.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products.  The EPA has

protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

36.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's recent review and evaluation.

37.     In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment—in relation to the reregistration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

*Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®*

38.    Based on early studies showing that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985.  After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991.  In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer:  "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."[21]

39.    On two occasions, the EPA found that the laboratories hired by Monsanto, to test the toxicity of its Roundup® products for registration purposes, committed fraud.

40.    In the first instance, Monsanto, in seeking initial registration of Roundup® by the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform

---

[21] U.S. Envtl. Prot. Agency, *Memorandum, Subject: SECOND Peer Review of Glyphosate* 1 (1991), *available at* http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_30-Oct-91_265.pdf.

and evaluate pesticide toxicology studies relating to Roundup®.[22]  IBT performed

about 30 tests on glyphosate and glyphosate-containing products, including nine of

the 15 residue studies needed to register Roundup®.

41.    In 1976, the United States Food and Drug Administration ("FDA")

performed an inspection of IBT that revealed discrepancies between the raw data and

the final report relating to the toxicological impacts of glyphosate.  The EPA

subsequently audited IBT; it too found the toxicology studies conducted for the

Roundup® herbicide to be invalid.[23]  An EPA reviewer stated, after finding "routine

---

[22] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/ibt_craven_bkg.pdf.

[23] U.S. Envtl. Prot. Agency, *Summary of the IBT Review Program Office of Pesticide Programs* (1983), *available at* http://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument& Client=EPA&Index=1981+Thru+1985&Docs=&Query=&Time=&EndTime=&Sea rchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&QFieldYear=&QFiel dMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D %3A%5Czyfiles%5CIndex%20Data%5C81thru85%5CTxt%5C00000022%5C910 14ULV.txt&User=ANONYMOUS&Password=anonymous&SortMethod=h%7C- &MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y15 0g16/i425&Display=p%7Cf&DefSeekPage=x&SearchBack=ZyActionL&Back=Zy ActionS&BackDesc=Results%20page&MaximumPages=1&ZyEntry=1&SeekPage =x&ZyPURL.

falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[24]

42.    Three top executives of IBT were convicted of fraud in 1983.

43.    In the second incident of data falsification, Monsanto hired Craven Laboratories, in 1991, to perform pesticide and herbicide studies, including for Roundup®.  In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.[25]

44.    Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

### The Importance of Roundup® to Monsanto's Market Dominance Profits

45.    The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace.  Largely due to the success of Roundup® sales, Monsanto's agriculture division was outperforming its chemicals division's

---

[24] Marie-Monique Robin, *The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply* (2011) (citing U.S. Envtl. Prot. Agency, *Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch. Washington, D.C.* (August 9, 1978)).

[25] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories*, *supra.*

operating income, and that gap increased yearly.  But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

46.    In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996.  Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop.  This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds.  It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

47.    Through a three-pronged strategy of increasing production, decreasing prices, and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product.  In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close

to half of Monsanto's revenue.[26]   Today, glyphosate remains one of the world's largest herbicides by sales volume.

***Monsanto has known for decades that it falsely advertises the safety of Roundup®***

48.   In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products.  Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "**safer than table salt**" and "**practically non-toxic**" to mammals, birds, and fish.  Among the representations the NYAG found deceptive and misleading about the human and environmental safety of glyphosate and/or Roundup® are the following:

> a) "Remember that environmentally friendly Roundup herbicide is biodegradable.  It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ..."

> b) "And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem."

> c) "Roundup biodegrades into naturally occurring

---

[26] David Barboza, *The Power of Roundup; A Weed Killer Is A Block for Monsanto to Build On*, N.Y. TIMES, Aug. 2, 2001, *available at* http://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weed-killer-is-a-block-for-monsanto-to-build-on.html.

elements."

d) "Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e) "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it."

f) "You can apply Accord with 'confidence because it will stay where you put it' it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products."

g) "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

h) "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

i) "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[27]

---

[27] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

49. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

> a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.
>
> b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable
>
> c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.
>
> d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."
>
> e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;
>
> f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

50. Monsanto did not alter its advertising in the same manner in any state, other than New York, and on information and belief, it still has not done so today.

51. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement

that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[28]

### *Classifications and Assessments of Glyphosate*

52.     The IARC process for the classification of glyphosate followed IARC's stringent procedures for the evaluation of a chemical agent.  Over time, the IARC Monograph program has reviewed 980 agents.  Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

53.     The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.[29]  Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

---

[28] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.

[29] World Health Org., *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble* (2006), available at http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

54.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts.  Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members.  One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment.  Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation.  Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in *The Lancet Oncology*, and within a year after the meeting, the finalized Monograph is published.

55.     In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and, (c) representative mechanistic data.  The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

56.     In March 2015, IARC reassessed glyphosate.  The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

57.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph Volume 112.  For Volume 112, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015 to assess the carcinogenicity of certain herbicides, including glyphosate.  The March meeting culminated a nearly one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence.  According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

58.     The studies considered the following exposure groups: (1) occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and (2) para-occupational exposure in farming families.

59.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

60.     Exposure pathways are identified as air (especially during spraying), water, and food.  Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

61.    The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

62.    The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

63.    The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells.  One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

64.    In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor: renal tubule carcinoma.   A second study reported a positive trend for haemangiosarcoma in male mice.  Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies.  A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

65.    The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption.  Soil microbes degrade

glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

66. The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

67. The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.[30] Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

68. The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.[31] While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between

---

[30] Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, *supra* at 77.

[31] Anneclare J. De Roos et al., *Cancer Incidence Among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study*, 113 Envt'l Health Perspectives 49–54 (2005), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1253709/pdf/ehp0113-000049.pdf.

glyphosate exposure and multiple myeloma, hairy cell leukemia (HCL), and chronic lymphocytic leukemia (CLL), in addition to several other cancers.

### *Other Earlier Findings about Glyphosate's Dangers to Human Health*

69.    The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates IARC's March 20, 2015 evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**
Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.[32]

---

[32] U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate*, *supra*.

70.     In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.[33]

### The Toxicity of Other Ingredients in Roundup®

71.     In addition to the toxicity of the active ingredient, glyphosate, several studies support the hypothesis that the glyphosate-based formulation in Defendant's Roundup® products is more dangerous and toxic than glyphosate alone.  Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.[34]

72.     In 2002, a study by Julie Marc, entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation," revealed that

---

[33] Caroline Cox, *Glyphosate, Part 2: Human Exposure and Ecological Effects*, 15 J. PESTICIDE REFORM 4 (1995); W.S. Peas et al., *Preventing pesticide-related illness in California agriculture: Strategies and priorities. Environmental Health Policy Program Report*, Univ. of Cal. School of Public Health, Calif. Policy Seminar (1993).

[34] Martinez, T.T. and K. Brown, *Oral and pulmonary toxicology of the surfactant used in Roundup herbicide*, PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991).

Roundup® causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cell cycles.[35]

73.     A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.  The researchers noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer.  Failure in the cell-cycle checkpoints leads genomic instability and subsequent development of cancers from the initial affected cell."  Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."[36]

74.     In 2005, a study by Francisco Peixoto, entitled "Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup®'s effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone.  The Peixoto study further suggested that the harmful effects of Roundup® on mitochondrial bioenergetics could not be

---

[35] Julie Marc, et al., *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation*, 15 CHEM. RES. TOXICOL. 326–331 (2002), *available at* http://pubs.acs.org/doi/full/10.1021/tx015543g.

[36] Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation*, 96 BIOLOGY OF THE CELL 245, 245-249 (2004), *available at* http://onlinelibrary.wiley.com/doi/10.1016/j.biolcel.2003.11.010/epdf.

exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant POEA, or in the alternative, due to a potential synergic effect between glyphosate and other ingredients in the Roundup® formulation.[37]

75.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup® and glyphosate on human umbilical, embryonic, and placental cells.  The study tested dilution levels of Roundup® and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food.  The researchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability and amplify toxicity of glyphosate alone.  The researchers further suggested that assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide.  The study confirmed that the adjuvants present in Roundup® are not, in fact, inert and that Roundup® is potentially far more toxic than its active ingredient glyphosate alone.[38]

---

[37] Francisco Peixoto, *Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation*, 61 CHEMOSPHERE 1115, 1122 (2005), *available at* https://www.researchgate.net/publication/7504567_Comparative_effects_of_the_Roundup_and_glyphosate_on_mitochondrial_oxidative_phosphorylation.

[38] Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic, and Placental Cells*, 22 CHEM. RES.

76.    The results of these studies were, at all times, available to Defendant.

77.    Monsanto's chief toxicologist Donna Farmer has admitted that she cannot say that Roundup® does not cause cancer because Monsanto has not performed carcinogenicity studies with the formulated product Roundup®, the very product that caused Plaintiffs' NHL.[39]  Indeed, she further admitted that in the 35 years that Monsanto has marketed Roundup® to the public, Monsanto has conducted no chronic carcinogenicity studies on the formulated Roundup® product merely because EPA did not require that such a study be performed for registration of glyphosate.[40]

78.    Defendant thus knew or should have known that Roundup® is more toxic than glyphosate alone and that safety studies of Roundup®, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiffs from Roundup®.

79.    Despite its knowledge that Roundup® is considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup® as safe.

_____

TOXICOL. 97-105 (2008), *available at* http://big.assets.huffingtonpost.com/france.pdf.

[39] *See* Plaintiffs' Submission in Response to Pretrial Order No. 8, Ex. 7, *In re: Roundup Products Liability Litigation*, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 187-7.

[40] *See id.*

***The EPA's Review of Glyphosate***

80.     In April 2016, personnel within the EPA's Office of Pesticides Program (OPP) leaked and posted on the internet a draft report on glyphosate carcinogenicity, entitled Cancer Assessment Review Committee (CARC) report, dated October 2015. The EPA removed the documents by May 2, 2016, within days of initially posting it online.   An EPA spokesperson subsequently issued a statement on the agency's glyphosate review:

> Glyphosate documents were inadvertently posted to the Agency's docket. These documents have now been taken down because our assessment is not final. EPA has not completed our cancer review. We will look at the work of other governments as well as work by HHS's Agricultural Health Study as we move to make a decision on glyphosate. Our assessment will be peer reviewed and completed by end of 2016.[41]

81.     On September 12, 2016, EPA's OPP submitted a report on the carcinogenic potential of glyphosate, wherein it issued a "proposed conclusion" that glyphosate is "'not likely to be carcinogenic to humans' at doses relevant to human

---

[41] Carey Gillam, *What Is Going On With Glyphosate? EPA's Odd Handling of Controversial Chemical*, HUFFINGTON POST, May 2, 2016, *available at* http://www.huffingtonpost.com/carey-gillam/what-is-going-on-with-gly_b_9825326.html; *see also* P.J. Huffstutter, *EPA takes offline report that says glyphosate not likely carcinogenic*, REUTERS, May 2, 2016, available at http://www.reuters.com/article/us-usa-glyphosate-epa-idUSKCN0XU01K.

health risk assessment."[42]   There are no authors listed on this issue paper, which

reiterates and adopts the conclusions of the October 2015 leaked assessment.   The

issue paper is based upon a review of industry-sponsored articles and studies.   The

OPP acknowledged that it rejected all studies that considered Roundup®—the

formulated product—instead of studies that isolated glyphosate because

"[g]lyphosate formulations contain various components other than glyphosate and it

has been hypothesized these components are more toxic than glyphosate alone."[43]

82.   Thus, the OPP notes dozens of studies considered by IARC were not

reviewed by the OPP because the OPP's "evaluation focused on studies on the active

ingredient glyphosate" and "additional research could also be performed to determine

whether formulation components, such as surfactants, influence the toxicity of

glyphosate formulations."[44]

83.   From December 13 to 16, 2016, the EPA held FIFRA Scientific

Advisory Panel ("SAP") meetings to consider issues raised by the OPP's evaluation

of glyphosate.   Again, OPP only allowed the SAP to consider studies of glyphosate

---

[42] See EPA's Office of Pesticide Programs, Glyphosate Issue Paper:
Evaluation of Carcinogenic Potential (Sept. 12, 2016), *available at*
https://www.epa.gov/sites/production/files/2016-
09/documents/glyphosate_issue_paper_evaluation_of_carcincogenic_potential.pdf.

[43] *Id.*

[44] *Id.*

alone, and not any study of the formulated product. In its Charge to the FIFRA SAP, the OPP noted that "[a]lthough there are studies available on glyphosate-based pesticide formulations, the agency is soliciting advice from the FIFRA Scientific Advisory Panel (SAP) on this evaluation of human carcinogenic potential for the active ingredient glyphosate only at this time."[45]

84.     The OPP draft assessment therefore does not actually consider the product at issue in this litigation or, more importantly, how glyphosate, in conjunction with surfactants and other chemicals, affects carcinogenicity.

85.     On March 16, 2017, the final SAP meeting minutes and report were released, revealing disagreement and lack of consensus among the scientists on whether there was a positive association between *glyphosate* exposure and NHL.[46]

**Monsanto's Industry Ties**

---

[45] EPA OPP, Glyphosate: Evaluation of Carcinogenic Potential, Charge to the FIFRA SAP for the October 18-21, 2016 Meeting, available at, https://www.epa.gov/sites/production/files/2016-11/documents/glyphosate_sap_charge_questions_-final.pdf.

[46] FIFRA Scientific Advisory Panel Meeting Minutes and Final Report No. 2017-01, A Set of Scientific Issues Being Considered by the Environmental Protection Agency Regarding: EPA's Evaluation of the Carcinogenic Potential of Glyphosate, *available at* https://www.epa.gov/sites/production/files/2017-03/documents/december_13-16_2016_final_report_03162017.pdf.

86.     Recently unsealed documents in the federal Roundup® MDL litigation reveal the extent to which Monsanto has been able to leverage its contacts within the EPA to protect glyphosate and Roundup® from scrutiny and review.

87.     Internal Monsanto documents, including email communications, demonstrate that Jess Rowland, former Deputy Division Director, Health Effects Division of the EPA's OPP, and formerly the chair of the CARC (the same committee that inadvertently leaked the EPA's glyphosate report in April 2016), repeatedly and directly intervened on Monsanto's behalf.   These same documents reveal that Monsanto was secure in the knowledge that it had allies within the EPA.

88.     To begin, in the months following IARC's initial March 2015 announcement that it had classified glyphosate as a probable carcinogen, Monsanto turned its attention to the EPA's review of glyphosate.  In one April 27, 2015 email, Monsanto official Bill Heydens wrote to colleagues to suggest "approaching EPA and…. ask if there is anything that would help them defend the situation?"  His colleague Dan Jenkins responded: "I think you and I could get on the phone w Jess Rowland and discuss this pretty openly. He'll give us straight talk."[47]

---

[47] *See* Plaintiffs' Motion to Compel the Deposition of Jess Rowland, Ex. D, In re: Roundup Products Liability Litigation, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-4.

89.     The following day, Mr. Jenkins spoke to Mr. Rowland by telephone and then relayed the substance of the conversation for his colleagues in an April 28, 2015 email.  Specifically, he reported back that with respect to the CARC investigation, Mr. Rowland had stated: "We have enough to sustain our conclusions. Don't need gene tox or epi . . . . I am the chair of the CARC and my folks are running this process for glyphosate in reg review. I have called a CARC meeting in June."[48]  Thus, even though the ostensible purpose of the CARC review was to evaluate the exhaustive IARC assessment on glyphosate, and even though the full IARC monograph on glyphosate would not be completed until July 2015, Mr. Rowland had already formed his conclusion months earlier—in April 2015.

90.     Mr. Rowland also intervened to halt another agency's review of glyphosate.  When the Agency for Toxic Substances and Disease Registry (ATSDR), a federal public health agency of the U.S. Department of Health and Human Services, announced in February 2015 that it planned to publish a toxicological review of glyphosate, it was Mr. Rowland who helped Monsanto stop the ATSDR's investigation.  In the same April 28, 2015, email discussed above, Mr. Jenkins explained that Mr. Rowland wanted to help Monsanto stop an investigation

---

[48] *Id.*

concerning the carcinogenicity of glyphosate being conducted by ATSDR.[49]  Since

ATSDR is not controlled by the EPA, according to Mr. Jenkins, Mr. Rowland had

bragged: "If I can kill this I should get a medal."[50]  Jenkins cautioned, however, that

Monsanto should not "get your hopes up, I doubt EPA and Jess can kill this; but it's

good to know they are going to actually make the effort now to coordinate due to our

pressing and their shared concern that ATSDR is consistent in its conclusions with

the EPA."[51]  The ATSDR never published its toxicological profile of glyphosate.

91.    Further, the released documents reveal Monsanto's confidence that its

allies within the EPA would continue to support glyphosate.  In an internal memo on

glyphosate, Monsanto executives wrote: "We know, *but cannot say*, that EPA's

Office of Pesticide Program scientists strongly feel that glyphosate does not cause

cancer and have defended their written determination internally for months."[52]

Notably, when Mr. Rowland attended the IARC glyphosate meetings as an observed

for the EPA, internal communications indicate Monsanto was not displeased with his

attendance since, "we all know Jess."[53]

---

[49] See id.

[50] Id.

[51] *Id*.

[52] See Plaintiffs' Motion to Compel the Deposition of Jess Rowland, Ex. E, In re: Roundup Products Liability Litigation, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-5 (emphasis original).

[53] *See* Plaintiffs' Motion to Compel the Deposition of Jess Rowland, Ex. G, *In re: Roundup*

### *Recent Worldwide Bans on Roundup®/Glyphosate*

92.     Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup® become more widely known.   The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which will take effect by the end of 2015.   In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons.  In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."[54]

93.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.[55]

---

*Products Liability Litigation*, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 189-7.

[54] *Holland's Parliament Bans Glyphosate Herbicides*, The Real Agenda, April 14, 2014, *available at* http://real-agenda.com/hollands-parliament-bans-glyphosate-herbicides/.

[55] Christina Sarich, *Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals Following Recent Glyphosate-Cancer Link*, GLOBAL RESEARCH, May

94.    France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.[56]

95.    Bermuda banned both the private and commercial sale of glyphosates, including Roundup®.  The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."[57]

96.    The Sri Lankan government banned the private and commercial use of glyphosate, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.[58]

---

14, 2015, *available at* http://www.globalresearch.ca/brazils-public-prosecutor-wants-to-ban-monsantos-chemicals-following-recent-glyphosate-cancer-link/5449440; *see* Ministério Público Federal, *MPF/DF reforça pedido para que glifosato seja banido do mercado nacional*, April, 14, 2015, *available at* http://noticias.pgr.mpf.mp.br/noticias/noticias-do-site/copy_of_meio-ambiente-e-patrimonio-cultural/mpf-df-reforca-pedido-para-que-glifosato-seja-banido-do-mercado-nacional.

[56] Zoe Schlanger, *France Bans Sales of Monsanto's Roundup in Garden Centers, 3 Months After U.N. Calls it 'Probable Carcinogen'*, NEWSWEEK, June 15, 2015, *available at* http://www.newsweek.com/france-bans-sale-monsantos-roundup-garden-centers-after-un-names-it-probable-343311.

[57] *Health Minister: Importation of Roundup Weed Spray Suspended*, Today in Bermuda, May, 11 2015, *available at* http://www.todayinbermuda.com/news/health/item/1471-health-minister-importation-of-roundup-weed-spray-suspended.

[58] *Sri Lanka's New President Puts Immediate Ban on Glyphosate Herbicides*, Sustainable Pulse, May 25, 2015, *available at*

97.     The government of Colombia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.[59]

### Proposition 65 Listing

98.     On September 4, 2015, California's Office of Environmental Health Hazard Assessment ("OEHHA") published a notice of intent to include glyphosate on the state's list of known carcinogens under Proposition 65.[60]  California's Safe Drinking Water and Toxic Enforcement Act of 1986 (informally known as "Proposition 65"), requires the state to maintain and, at least once a year, revise and republish a list of chemicals "known to the State of California to cause cancer or reproductive toxicity."[61]  The OEHHA determined that glyphosate met the criteria

---

http://sustainablepulse.com/2015/05/25/sri-lankas-new-president-puts-immediate-ban-on-glyphosate-herbicides/#.VeduYk3bKAw.

[59] *Colombia to ban coca spraying herbicide glyphosate*, BBC, May 10, 2015, *available at* http://www.bbc.com/news/world-latin-america-32677411.

[60] Cal. Envtl. Prot. Agency Office of Envtl. Health Hazard Assessment, Notice of Intent to List Chemicals by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion, Glyphosate (Sept. 4, 2015), http://oehha.ca.gov/prop65/CRNR_notices/admin_listing/intent_to_list/pdf_zip/090415NOIL_LCSet27.pdf.

[61] *Frequently Asked Questions*, STATE OF CAL. DEP'T OF JUSTICE, OFFICE OF THE ATTORNEY GENERAL, http://oag.ca.gov/prop65/faq (last visited April 19, 2016).

for the listing mechanism under the Labor Code following IARC's assessment of the chemical.[62]

99.    The listing process under the Labor Code is essentially automatic.  The list of known carcinogens, at a minimum, must include substances identified by reference in Labor Code § 6382(b)(1).  That section of the Labor Code identifies "[s]ubstances listed as human or animal carcinogens by the International Agency for Research on Cancer (IARC)."  IARC's classification of glyphosate as a Group 2A chemical ("probably carcinogenic to humans") therefore triggered the listing.

100.   A business that deploys a listed chemical in its products must provide "clear and reasonable warnings" to the public prior to exposure to the chemical.  To be clear and reasonable, a warning must "(1) clearly communicate that the chemical is known to cause cancer, and/or birth defects or other reproductive harm; and (2) effectively reach the person before exposure."[63]  The law also prohibits the discharge of listed chemicals into drinking water.

---

[62] Cal. Envtl. Prot. Agency Office of Envtl. Health Hazard Assessment, Notice of Intent to List Chemicals by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion, Glyphosate (Sept. 4, 2015), http://oehha.ca.gov/prop65/CRNR_notices/admin_listing/intent_to_list/pdf_zip/090 415NOIL_LCSet27.pdf.

[63] *Frequently Asked Questions*, STATE OF CAL. DEPARTMENT OF JUSTICE, OFFICE OF THE ATTORNEY GENERAL, *supra*.

101.   Monsanto disputed the listing decision and, in January 2016, filed a lawsuit against OEHHA and the agency's acting director, Lauren Zeise, in California state court, seeking declaratory and injunctive relief to prevent OEHHA from listing glyphosate.[64]

102.   Monsanto alleged that OEHHA's exclusive reliance on the IARC decision signified that "OEHHA effectively elevated the determination of an ad hoc committee of an unelected, foreign body, which answers to no United States official (let alone any California state official), over the conclusions of its own scientific experts."[65]   Monsanto further alleged that the Labor Code listing mechanism presented various constitutional violations because it "effectively empowers an unelected, undemocratic, unaccountable, and foreign body to make laws applicable in California.[66]"   Among other things, Monsanto argued that Proposition 65's requirement to provide a "clear and reasonable warning" to consumers that the

---

[64] Monsanto Company's Verified Petition for Writ of Mandate and Complaint for Preliminary and Permanent Injunctive and Declaratory Relief, Monsanto Co. v. Office of the Envt'l Health Hazard Assessment, et al., No. 16-CECG-00183 (Cal. Super. Ct.) *available at* http://www.monsanto.com/files/documents/monvoehha.pdf.

[65] *Id.* at 2.

[66] *Id.* at 3.

chemical is a known carcinogen would damage its reputation and violate its First Amendment rights.[67]

103.   On January 27, 2017, the Superior Court of California – Fresno issued a tentative ruling granting, among other things, OEHHA's motion for judgment on the pleadings, thus rejecting Monsanto's arguments.  On March 10, 2017, the Court issued a final order adopting, in full, the earlier tentative ruling.[68]

104.   On March 28, 2017 OEHHA posted Notice on its website that glyphosate would be added to the list of chemicals known to the state of California to cause cancer for purposes of Proposition 65.

105.   On November 15, 2017, Monsanto and various agricultural groups, including the National Association of Wheat Growers, the National Corn Growers Association, the Iowa Soybean Association, and others, filed a complaint against the OEHHA and California's Attorney General in the Eastern District of California seeking, among other things, to enjoin California's application of Prop 65 to glyphosate.[69] On January 3, 2018, Attorneys General in Idaho, Indiana, Iowa, Kansas,

---

[67] *Id.*

[68] *See* Notice of Supplemental Authority, In re: Roundup Products Liability Litigation, MDL No. 2741 (N.D. Cal., Mar. 13, 2017), ECF No. 185.

[69] *See Nat'l Ass'n. of Wheat Growers, et al., v. Zeise, et al.,* No. 2:17-at-01224 (E.D. Cal), available at https://www.agri-pulse.com/ext/resources/pdfs/g/glyphosate-complaint-caed-nawg.pdf.

1   Louisiana, Michigan, Missouri, North Dakota, Oklahoma, South Dakota and

2   Wisconsin filed an amicus brief in support of injunctive relief.[70]

3   106.   On February 26, 2018, the Eastern District of California denied

4   Monsanto's motion for a preliminary injunction enjoining California from listing

5   glyphosate as a chemical known to the State of California to cause cancer and granted

6   the injunction enjoining California from requiring Monsanto provide a warning label

7   on its products.[71]

8   ***EFSA Report on Glyphosate***

9   107.   On November 12, 2015, the European Food Safety Authority (EFSA),

10   the European Union's primary agency for food safety, reported on its evaluation of

11   the Renewal Assessment Report (RAR) on glyphosate.[72]   The Rapporteur Member

12   State assigned to glyphosate, the German Federal Institute for Risk Assessment

13

14   [70] *Attorneys General support Prop 65 injunction*, FarmFutures, Jan. 4, 2018,

15   available at http://www.farmfutures.com/crop-protection/attorneys-general-support-prop-65-injunction.

16   [71] *See* Memorandum and Order Re: Motion For Preliminary Injunction, *Nat'l Assoc. of Wheat Growers, et al., v. Zeise, et al.*, No. 2:17-2401 WBS EFB (E.D. Cal., Feb. 26, 2018), ECF No. 75, *available at*

17   https://www.courthousenews.com/wp-content/uploads/2018/02/217cv2401.pdf.

18   [72] European Food Safety Auth., Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate, *available at*

19   http://www.efsa.europa.eu/sites/default/files/scientific_output/files/main_documents/4302.pdf.

20

(BfR), had produced the RAR as part of the renewal process for glyphosate in the EU.

108.   BfR sent its draft RAR to EFSA and the RAR underwent a peer review process by EFSA, other member states, and industry groups.  As part of the on-going peer review of Germany's reevaluation of glyphosate, EFSA had also received a second mandate from the European Commission to consider IARC's findings regarding the potential carcinogenicity of glyphosate and glyphosate-containing products.

109.   Based on a review of the RAR, which included data from industry-submitted unpublished studies, EFSA sent its own report ("Conclusion") to the European Commission, finding that "glyphosate is unlikely to pose a carcinogenic hazard to humans and the evidence does not support classification with regard to its carcinogenic potential according to Regulation (EC) No 1272/2008."[73]   EFSA therefore disagreed with IARC: glyphosate was not genotoxic and did not present a carcinogenic threat to humans.

110.   In explaining why its results departed from IARC's conclusion, EFSA drew a distinction between the EU and IARC approaches to the study and

---

[73] *Id.*

classification of chemicals.[74]  Although IARC examined "both glyphosate—an active

substance—and glyphosate-based formulations, grouping all formulations regardless

of their composition," EFSA explained that it considered only glyphosate and that its

assessment focuses on "each individual chemical, and each marketed mixture

separately."[75]  IARC, on the other hand, "assesses generic agents, including groups

of related chemicals, as well as occupational or environmental exposure, and cultural

or behavioural practices."[76]  EFSA accorded greater weight to studies conducted with

glyphosate alone than studies of formulated products.[77]

111.  EFSA went further and noted:

> [A]lthough some studies suggest that certain glyphosate-based formulations may be genotoxic (i.e. damaging to DNA), others that look solely at the active substance glyphosate do not show this effect. It is likely, therefore, that ***the genotoxic effects observed in some glyphosate-based formulations are related to the other constituents or "co-formulants"***. Similarly, certain glyphosate-based formulations display higher toxicity than that of the active ingredient, presumably because of the presence of co-formulants. In its assessment, ***EFSA proposes that the toxicity of each pesticide formulation and in particular its genotoxic potential should be further considered and***

---

[74] EFSA Fact Sheet: Glyphosate, EFSA http://www.efsa.europa.eu/sites/default/files/corporate_publications/files/efsaexplainsglyphosate151112en.pdf.

[75] *Id*.

[76] *Id*.

[77] *Id*.

*addressed by Member State authorities while they re-assess uses of glyphosate-based formulations in their own territories*.[78]

112. Notwithstanding its conclusion, EFSA did set exposure levels for glyphosate. Specifically, EFSA proposed an acceptable daily intake (ADI) of 0.5 mg/kg of body weight per day; an acute reference dose (ARfD) of 0.5 mg/kg of body weight; and an acceptable operator exposure level (AOEL) of 0.1 mg/kg bw per day.[79]

### Leading Scientists Dispute EFSA's Conclusion

113. On November 27, 2015, 96 independent academic and governmental scientists from around the world submitted an open letter to the EU health commissioner, Vytenis Andriukaitis.[80] The scientists expressed their strong concerns and urged the commissioner to disregard the "flawed" EFSA report, arguing that "the

---

[78] *Id*.

[79] European Food Safety Auth., Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate, *supra*.

[80] Letter from Christopher J. Portier et al. to Commission Vytenis Andriukaitis, Open letter: Review of the Carcinogenicity of Glyphosate by EFSA and BfR (Nov. 27, 2015), http://www.zeit.de/wissen/umwelt/2015-11/glyphosat-offener-brief.pdf; http://www.theguardian.com/environment/2016/jan/13/eu-scientists-in-row-over-safety-of-glyphosate-weedkiller.

1  BfR decision is not credible because it is not supported by the evidence and it was

2  not reached in an open and transparent manner."[81]

3      114.   Signatories to the letter included Dr. Christopher J. Portier, Ph.D., and

4  other renowned international experts in the field, some of whom were part of the

5  IARC Working Group assigned to glyphosate.

6      115.   In an exhaustive and careful examination, the scientists scrutinized

7  EFSA's conclusions and outlined why the IARC Working Group decision was "by

8  far the more credible":

9          The IARC WG decision was reached relying on open and
transparent procedures by independent scientists who

10          completed thorough conflict-of-interest statements and
were not affiliated or financially supported in any way by

11          the chemical manufacturing industry. It is fully referenced
and depends entirely on reports published in the open, peer-

12          reviewed biomedical literature. It is part of a long tradition
of deeply researched and highly credible reports on the

13          carcinogenicity of hundreds of chemicals issued over the
past four decades by IARC and used today by international

14          agencies and regulatory bodies around the world as a basis
for risk assessment, regulation and public health policy.[82]

15      116.   With respect to human data, the scientists pointed out that EFSA agreed

16  with IARC that there was "*limited evidence* of carcinogenicity" for NHL, but EFSA

17

18  _____

19  [81] *Id.*

20  [82] *Id.*

nonetheless dismissed an association between glyphosate exposure and carcinogenicity. IARC applies three levels of evidence in its analyses of human data, including sufficient evidence and limited evidence. EFSA's ultimate conclusion that "there was no unequivocal evidence for a clear and strong association of NHL with glyphosate" was misleading because it was tantamount to IARC's highest level of evidence: "sufficient evidence," which means that a causal relationship has been established. However, the scientists argued, "[l]egitimate public health concerns arise when 'causality is credible,' i.e., when there is *limited evidence*."[83]

117. Among its many other deficiencies, EFSA's conclusions regarding animal carcinogenicity data were "scientifically unacceptable," particularly in BfR's use of historical control data and in its trend analysis. Indeed, BfR's analysis directly contradicted the Organisation for Economic Co-operation and Development ("OECD") testing guidelines while citing and purporting to follow those same guidelines. For instance, the EFSA report dismisses observed trends in tumor incidence "because there are no individual treatment groups that are significantly different from controls and because the maximum observed response is reportedly within the range of the historical control data." However, according to the scientists, concurrent controls are recommended over historical controls in all guidelines,

[83] *Id.*

scientific reports, and publications, and, if it is employed, historical control data "should be from studies in the same timeframe, for the same exact animal strain, preferably from the same laboratory or the same supplier and preferably reviewed by the same pathologist." BfR's use of historical control data violated these precautions: "only a single study used the same mouse strain as the historical controls, but was reported more than 10 years after the historical control dataset was developed." Further deviating from sound scientific practices, the data used by the BfR came from studies in seven different laboratories. The scientists concluded:

> BfR reported seven positive mouse studies with three studies showing increases in renal tumors, two with positive findings for hemangiosarcomas, and two with positive findings for malignant lymphomas. BfR additionally reported two positive findings for tumors in rats. Eliminating the inappropriate use of historical data, the unequivocal conclusion is that these are not negative studies, but in fact document the carcinogenicity of glyphosate in laboratory animals.[84]

118. The letter also critiqued the EFSA report's lack of transparency and the opacity surrounding the data cited in the report: "citations for almost all of the references, even those from the open scientific literature, have been redacted from the document" and "there are no authors or contributors listed for either document, a requirement for publication in virtually all scientific journals." Because BfR relied

---

[84] *Id.*

on unpublished, confidential industry-provided studies, it is "impossible for any scientist not associated with BfR to review this conclusion with scientific confidence."[85]

119. On March 3, 2016, the letter was published in the Journal of Epidemiology & Community Health.[86]

### Statement of Concern Regarding Glyphosate-Based Herbicides

120. On February 17, 2016, a consensus statement published in the journal *Environmental Health*, entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement," assessed the safety of glyphosate-based herbicides (GBHs).[87] The paper's "focus is on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with recent

---

[85] *Id.*

[86] Christopher J. Portier, et al., *Differences in the carcinogenic evaluation of glyphosate between the International Agency for Research on Cancer (IARC) and the European Food Safety Authority (EFSA)*, JOURNAL OF EPIDEMIOLOGY & CMTY. HEALTH, Mar. 3, 2016, *available at* http://jech.bmj.com/content/early/2016/03/03/jech-2015-207005.full.

[87] John P. Myers, et al, *Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement*, Environmental Health (2016), *available at* http://ehjournal.biomedcentral.com/articles/10.1186/s12940-016-0117-0.

discoveries about the toxicity and human health risks stemming from use of GBHs."[88]

The researchers drew seven factual conclusions about GBHs:

1.     GBHs are the most heavily applied herbicide in the world and usage continues to rise;

2.     Worldwide, GBHs often contaminate drinking water sources, precipitation, and air, especially in agricultural regions;

3.     The half-life of glyphosate in water and soil is longer than previously recognized;

4.     Glyphosate and its metabolites are widely present in the global soybean supply;

5.     Human exposures to GBHs are rising;

6.     Glyphosate is now authoritatively classified as a probable human carcinogen; and

7.     Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science.[89]

121.   The researchers noted that GBH use has increased approximately 100-fold since the 1970s.  Further, far from posing a limited hazard to vertebrates, as previously believed, two decades of evidence demonstrated that "several vertebrate

---

[88] *Id.*

[89] *Id.*

pathways are likely targets of action, including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."[90]

122.  The paper attributes uncertainties in current assessments of glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations."  Further, the researchers argue, "[t]he distinction in regulatory review and decision processes between 'active' and 'inert' ingredients has no toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in their own right."[91]

123.  Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe."  Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish."  Accordingly, "risk assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone underestimate both

---

[90] *Id*.

[91] *Id*.

toxicity and exposure, and thus risk." The paper concludes that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."[92]

124. The researchers also critique the current practice of regulators who largely rely on "unpublished, non-peer reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."[93]

125. The researchers also call for greater inclusion of GBHs in government-led toxicology testing programs:

> [A] fresh and independent examination of GBH toxicity should be undertaken, and . . . this re-examination be accompanied by systematic efforts by relevant agencies to monitor GBH levels in people and in the food supply, none of which are occurring today. The U.S. National Toxicology Program should prioritize a thorough toxicological assessment of the multiple pathways now identified as potentially vulnerable to GBHs.[94]

---

[92] *Id.*

[93] *Id.*

[94] *Id.*

126.  The researchers suggest that, in order to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which manufacturers fund the registration process and the necessary testing:

> "[W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part of routine registration actions and fees. Such funds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would be made available to independent scientists to conduct the appropriate long-term (minimum 2 years) safety studies in recognized animal model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption, impacts on the gut microbiome, carcinogenicity, and multigenerational effects looking at reproductive capability and frequency of birth defects."[95]

127.  Despite these stated concerns, Monsanto, to date, has failed to test its formulated Roundup® products.

### *European Union Vote on Glyphosate Renewal*

128.  The license for glyphosate in the European Union (EU) was set to expire on June 30, 2016.

---

[95] *Id.*

129.   Without an extension of the license, Monsanto's Roundup® and other glyphosate-based herbicides faced a general phase out in EU markets.[96]

130.   In the months leading up to the license expiration date, protracted meetings and votes among national experts from the 28 EU Member States failed to produce agreement on an extension.

131.   On June 29, 2016, the EU Commission extended the European license for glyphosate for 18 months to allow the European Chemical Agency (ECHA) to rule on the safety of the chemical, which was expected by the end of 2017.[97]

132.   On July 11, 2016, the EU voted in favor of a proposal to restrict the conditions of use of glyphosate in the EU, including a ban on common co-formulant POE-tallowamine (POEA) from all glyphosate-based herbicides, including Roundup®.[98]

---

[96] Philip Blenkinsop, Alissa de Carbonnel & Barbara Lewis European, *Commission to extend glyphosate license for 18 months*, REUTERS, June 28, 2016, *available at* http://www.reuters.com/article/us-health-eu-glyphosate-idUSKCN0ZE25B.

[97] Arthur Neslen, *Controversial chemical in Roundup weedkiller escapes immediate ban*, THE GUARDIAN, June 29, 2016, *available at* https://www.theguardian.com/business/2016/jun/29/controversial-chemical-roundup-weedkiller-escapes-immediate-ban

[98] Sarantis Michalopoulos, *EU agrees ban on glyphosate co-formulant*, EURACTIV, July 11, 2016, *available at* http://www.euractiv.com/section/agriculture-food/news/eu-agrees-ban-on-glyphosate-co-formulant/?nl_ref=16562829

133.  In March 2017, ECHA's Committee for Risk Assessment (RAC) concluded that the available scientific evidence did not meet the criteria to classify glyphosate as a carcinogen.[99]

134.  With the glyphosate license set to again expire on December 15, 2017, and after months of indecision among EU member states, on November 27, 2017, the EU voted to extend the glyphosate license for five more years.[100] Of the 28 EU members, 18 countries voted in favor of a European Commission proposal to extend the glyphosate license, 9 countries voted against, and 1 country abstained.[101]

## **TOLLING OF THE STATUTE OF LIMITATIONS**

### ***Discovery Rule Tolling***

135.  Plaintiff had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup® and glyphosate until well after IARC released its formal assessment of glyphosate in July 2015.  This is the quintessential case for tolling.

---

[99] https://echa.europa.eu/-/glyphosate-not-classified-as-a-carcinogen-by-echa.

[100] *See* Philip Blenkinsop, *Germany swings EU vote in favor of weed-killer glyphosate*, Reuters, Nov. 27, 2017, https://www.reuters.com/article/us-eu-health-glyphosate/germany-swings-eu-vote-in-favor-of-weed-killer-glyphosate-idUSKBN1DR1SG

[101] *See id*.

136.   Within the time period of any applicable statutes of limitations, Plaintiff could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup® and glyphosate is injurious to human health.

137.   Plaintiff did not discover, and did not know of facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup® and glyphosate; nor would a reasonable and diligent investigation by him have disclosed that Roundup® and glyphosate would cause his illness.

138.   For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff's claims.

### *Fraudulent Concealment Tolling*

139.   All applicable statutes of limitations have also been tolled by Monsanto's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

140.   Instead of disclosing critical safety information about Roundup® and glyphosate, Monsanto has consistently and falsely represented the safety of its Roundup® products.

### *Estoppel*

141.   Monsanto was under a continuous duty to disclose to consumers, users and other persons coming into contact with its products, including Plaintiff,

accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate.

142. Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

143. Based on the foregoing, Monsanto is estopped from relying on any statutes of limitations in defense of this action.

## CLAIMS FOR RELIEF

### CLAIM ONE

### STRICT LIABILITY (DESIGN DEFECT)

144. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

145. Plaintiff brings this strict liability claim against Defendant for defective design.

146. At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers and users and other persons coming into contact them, including Plaintiff, thereby placing Roundup® products into the

stream of commerce.  These actions were under the ultimate control and

supervision of Defendant.  At all times relevant to this litigation, Defendant

designed, researched, developed, formulated, manufactured, produced, tested,

assembled, labeled, advertised, promoted, marketed, sold, and distributed the

Roundup® products used by Plaintiff, and/or to which Plaintiff was exposed, as

described above.

147.   At all times relevant to this litigation, Defendant's Roundup®

products were manufactured, designed, and labeled in an unsafe, defective, and

inherently dangerous manner that was dangerous for use by or exposure to the

public, and, in particular, the Plaintiff.

148.   At all times relevant to this litigation, Defendant's Roundup®

products reached the intended consumers, handlers, and users or other persons

coming into contact with these products in California and throughout the United

States, including Plaintiff, without substantial change in their condition as

designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

149.   Defendant's Roundup® products, as researched, tested, developed,

designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold,

and marketed by Defendant were defective in design and formulation in that when

they left the hands of the Defendant's manufacturers and/or suppliers, they were

unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

150.   Defendant's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks associated with these products' reasonably foreseeable uses exceeded the alleged benefits associated with their design and formulation.

151.   Therefore, at all times relevant to this litigation, Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendant, were defective in design and formulation, in one or more of the following ways:

a.   When placed in the stream of commerce, Defendant's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b.   When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were

hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

      c.    When placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

      d.    Defendant did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate.

      e.    Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweighs any potential utility stemming from the use of the herbicide.

      f.    Defendant knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

      g.    Defendant did not conduct adequate post-marketing surveillance of its Roundup® products.

h.     Defendant could have employed safer alternative designs and formulations.

152.   At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

153.   Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

154.   The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate.  Defendant's Roundup® products were and are more dangerous than alternative products and Defendant could have designed its Roundup® products to make them less dangerous.  Indeed, at the time that Defendant designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

155.   At the time Roundup® products left Defendant's control, there was a practical, technically feasible, and safer alternative design that would have

prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant's Roundup® herbicides.

156.   Defendant's defective design of Roundup® amounts to willful, wanton, and/or reckless conduct by Defendant.

157.   Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendant is strictly liable to Plaintiff.

158.   The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiff's grave injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained his injuries.

159.   As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.  Plaintiff will continue to incur these expenses in the future.

160.   WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.  Plaintiff also demands a jury trial on the issues contained herein.

## CLAIM TWO

### STRICT LIABILITY (FAILURE TO WARN)

161.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

162.   Plaintiff brings this strict liability claim against Defendant for failure to warn.

163.   At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate.  These actions were under the ultimate control and supervision of Defendant.

164.   Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiff, Plaintiff's employers, Plaintiff's co-workers, and persons responsible for consumers (such as employers), and Defendant therefore had a duty to warn of the

risks associated with the reasonably foreseeable uses (and misuses) of Roundup®
and glyphosate-containing products.

165. At all times relevant to this litigation, Defendant had a duty to
properly test, develop, design, manufacture, inspect, package, label, market,
promote, sell, distribute, maintain supply, provide proper warnings, and take such
steps as necessary to ensure that its Roundup® products did not cause users and
consumers to suffer from unreasonable and dangerous risks. Defendant had a
continuing duty to warn Plaintiff of the dangers associated with Roundup® use and
exposure. Defendant, as manufacturer, seller, or distributor of chemical
herbicides, is held to the knowledge of an expert in the field.

166. At the time of manufacture, Defendant could have provided warnings
or instructions regarding the full and complete risks of Roundup® and glyphosate-
containing products because it knew or should have known of the unreasonable
risks of harm associated with the use of and/or exposure to these products.

167. At all times relevant to this litigation, Defendant failed to investigate,
study, test, or promote the safety or to minimize the dangers to users and
consumers of its Roundup® products and to those who would foreseeably use or
be harmed by Defendant's herbicides, including Plaintiff.

168.   Despite the fact that Defendant knew or should have known that Roundup® products posed a grave risk of harm, it failed to warn of the dangerous risks associated with their use and exposure.  The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied, or sold the product, and not known to end users and consumers, such as Plaintiff's employers.

169.   Defendant knew or should have known that its Roundup® and glyphosate-containing products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products. Defendant has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

170.   At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products throughout the United States, including

Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

171.   At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

172.   Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of Plaintiff's exposure.  Plaintiff relied upon the skill, superior knowledge, and judgment of Defendant.

173.   Defendant knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, but it failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and horticultural applications.

174.   The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled agricultural workers, horticultural workers and/or at-home users such as Plaintiff

to utilize the products safely and with adequate protection.  Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

175.   To this day, Defendant has failed to adequately and accurately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

176.   As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiff.

177.   Defendant is liable to Plaintiff for injuries caused by its failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its Roundup® products and the risks associated with the use of or exposure to Roundup® and glyphosate.

178.   The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiff's injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained his injuries.

179.   Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup® products, Plaintiff could have avoided the risk of developing injuries as alleged herein and Plaintiff's employers could have obtained alternative herbicides.

180.   As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer severe injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.  Plaintiff will continue to incur these expenses in the future.

181.   WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.  Plaintiff also demands a jury trial on the issues contained herein.

# **CLAIM THREE**

## **NEGLIGENCE**

182.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

183.   Defendant, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

184.   At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

185.   At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of its Roundup® products.  Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup® and, in particular, its active ingredient glyphosate.

186. At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

187. Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

188. Defendant knew or, in the exercise of reasonable care, should have known that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup®.

189. Defendant knew or, in the exercise of reasonable care, should have known that tests limited to Roundup®'s active ingredient glyphosate were insufficient to prove the safety of Roundup®.

190. Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and

the magnitude of the risks associated with the use of and/or exposure to Roundup®
and glyphosate-containing products.

191.   As such, Defendant breached its duty of reasonable care and failed to
exercise ordinary care in the design, research, development, manufacture, testing,
marketing, supply, promotion, advertisement, packaging, sale, and distribution of
its Roundup® products, in that Defendant manufactured and produced defective
herbicides containing the chemical glyphosate, knew or had reason to know of the
defects inherent in its products, knew or had reason to know that a user's or
consumer's exposure to the products created a significant risk of harm and
unreasonably dangerous side effects, and failed to prevent or adequately warn of
these risks and injuries.

192.   Defendant failed to appropriately and adequately test Roundup®,
Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA to
protect Plaintiff from Roundup®.

193.   Despite its ability and means to investigate, study, and test its
products and to provide adequate warnings, Defendant has failed to do so.  Indeed,
Defendant has wrongfully concealed information and has further made false
and/or misleading statements concerning the safety and/or exposure to Roundup®
and glyphosate.

194. Defendant's negligence included:

a. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

b. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture, horticulture, and at-home use;

d. Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup®, and the propensity of these ingredients to render Roundup® toxic, increase the toxicity of

1  Roundup®, whether these ingredients are carcinogenic, magnify the

2  carcinogenic properties of Roundup®, and whether or not "inert"

3  ingredients and/or adjuvants were safe for use;

4         e.    Failing to use reasonable and prudent care in the design,

5  research, manufacture, formulation, and development of Roundup®

6  products so as to avoid the risk of serious harm associated with the

7  prevalent use of Roundup®/glyphosate as an herbicide;

8         f.    Failing to design and manufacture Roundup® products

9  so as to ensure they were at least as safe and effective as other

10  herbicides on the market;

11         g.    Failing to provide adequate instructions, guidelines, and

12  safety precautions to those persons who Defendant could reasonably

13  foresee would use and/or be exposed to its Roundup® products;

14         h.    Failing to disclose to Plaintiff, users, consumers, and the

15  general public that the use of and exposure to Roundup® presented

16  severe risks of cancer and other grave illnesses;

17         i.    Failing to warn Plaintiff, users, consumers, and the

18  general public that the product's risk of harm was unreasonable and

19

20

that there were safer and effective alternative herbicides available to

Plaintiff and other users or consumers;

     j.    Systematically suppressing or downplaying contrary

evidence about the risks, incidence, and prevalence of the side effects

of Roundup® and glyphosate-containing products;

     k.    Representing that its Roundup® products were safe for

their intended use when, in fact, Defendant knew or should have

known that the products were not safe for their intended use;

     l.    Declining to make or propose any changes to Roundup®

products' labeling or other promotional materials that would alert the

consumers and the general public of the risks of Roundup® and

glyphosate;

     m.    Advertising, marketing, and recommending the use of

Roundup® products, while concealing and failing to disclose or warn

of the dangers known by Defendant to be associated with or caused

by the use of or exposure to Roundup® and glyphosate;

     n.    Continuing to disseminate information to its consumers,

which indicate or imply that Defendant's Roundup® products are not

unsafe for use in the agricultural, horticultural industries, and/or home use; and

  o. Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

195. Defendant knew and/or should have known that it was foreseeable that consumers and/or users, such as Plaintiff, would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

196. Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

197. Defendant's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff suffered, and will continue to suffer, as described herein.

198. Defendant's conduct, as described above, was reckless. Defendant regularly risks the lives of consumers and users of its products, including Plaintiff, with full knowledge of the dangers of its products. Defendant has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public,

including Plaintiff.  Defendant's reckless conduct therefore warrants an award of

punitive damages.

199.   As a proximate result of Defendant's wrongful acts and omissions in

placing its defective Roundup® products into the stream of commerce without

adequate warnings of the hazardous and carcinogenic nature of glyphosate,

Plaintiff has suffered and continues to suffer severe and permanent physical and

emotional injuries.  Plaintiff has endured pain and suffering, has suffered

economic losses (including significant expenses for medical care and treatment),

and will continue to incur these expenses in the future.

200.   WHEREFORE, Plaintiff respectfully requests that this Court enter

judgment in Plaintiff's favor for compensatory and punitive damages, together

with interest, costs herein incurred, attorneys' fees, and all such other and further

relief as this Court deems just and proper.  Plaintiff also demands a jury trial on

the issues contained herein.

## CLAIM FOUR

### BREACH OF EXPRESS WARRANTY

201.   Plaintiff incorporates by reference each and every allegation set forth

in the preceding paragraphs as if fully stated herein.

202.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendant.

203.    Defendant had a duty to exercise reasonable care in the research, development, design, testing, packaging, manufacture, inspection, labeling, distributing, marketing, promotion, sale, and release of its Roundup® products, including a duty to:

     a.    ensure that its products did not cause the user unreasonably dangerous side effects;

     b.    warn of dangerous and potentially fatal side effects; and

     c.    disclose adverse material facts, such as the true risks associated with the use of and exposure to Roundup® and glyphosate-containing products, when making representations to consumers and the general public, including Plaintiff.

204.    At all times relevant to this litigation, Defendant expressly represented and warranted to the purchasers of its products, by and through

1   statements made by Defendant in labels, publications, package inserts, and other

2   written materials intended for consumers and the general public, that its

3   Roundup® products were safe to human health and the environment, effective, fit,

4   and proper for their intended use.  Defendant advertised, labeled, marketed, and

5   promoted Roundup® products, representing the quality to consumers and the

6   public in such a way as to induce their purchase or use, thereby making an express

7   warranty that its Roundup® products would conform to the representations.

8        205.   These express representations include incomplete warnings and

9   instructions that purport, but fail, to include the complete array of risks associated

10  with use of and/or exposure to Roundup® and glyphosate.  Defendant knew

11  and/or should have known that the risks expressly included in Roundup®

12  warnings and labels did not and do not accurately or adequately set forth the risks

13  of developing the serious injuries complained of herein.  Nevertheless, Defendant

14  expressly represented that its Roundup® products were safe and effective, that

15  they were safe and effective for use by individuals such as Plaintiff, and/or that

16  they were safe and effective as agricultural herbicides.

17       206.   The representations about Roundup®, as set forth herein, contained

18  or constituted affirmations of fact or promises made by the seller to the buyer,

19

20

which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

207.   Defendant placed its Roundup® products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate.

208.   Defendant breached these warranties because, among other things, its Roundup® products were defective, dangerous, unfit for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose.  Specifically, Defendant breached the warranties in the following ways:

    a.    Defendant represented through its labeling, advertising, and marketing materials that its Roundup® products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated with use of and/or exposure to Roundup® and glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings and labels; and

b.      Defendant represented that its Roundup® products were

safe for use and fraudulently concealed information that

demonstrated that glyphosate, the active ingredient in Roundup®, had

carcinogenic properties, and that its Roundup® products, therefore,

were not safer than alternatives available on the market.

209.   Upon information and belief, Plaintiff was in privity with Defendant,

and as such, Plaintiff is entitled to assert this claim.

210.   On information and belief, Plaintiff justifiably and detrimentally

relied on the express warranties and representations of Defendant in the purchase

and use of its Roundup® products.  When Plaintiff made the decision to purchase

Roundup®, they reasonably relied upon Defendant to disclose known defects,

risks, dangers, and side effects of Roundup® and glyphosate.

211.   Defendant had sole access to material facts concerning the nature of

the risks associated with its Roundup® products as expressly stated within its

warnings and labels, and Defendant knew that consumers and users such as

Plaintiff could not have reasonably discovered that the risks expressly included in

Roundup® warnings and labels were inadequate and inaccurate.

212.   Plaintiff had no knowledge of the falsity or incompleteness of

Defendant's statements and representations concerning Roundup®.

213. Plaintiff used and/or were exposed to the use of Roundup® as researched, developed, designed, tested, formulated, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by Defendant.

214. Had the warnings and labels for Roundup® products accurately and adequately set forth the true risks associated with the use of such products, including Plaintiff's injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Plaintiff could have avoided the injuries complained of herein.

215. As a direct and proximate result of Defendant's wrongful acts and omissions, Plaintiff has suffered severe injuries. Plaintiff has endured pain and suffering, has suffered economic losses (including significant expenses for medical care and treatment), and will continue to incur these expenses in the future.

216. WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

# CLAIM FIVE

## BREACH OF IMPLIED WARRANTIES

217.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

218.   At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to users and consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendant.

219.   Before the time that Plaintiff was exposed to the use of the aforementioned Roundup® products, Defendant impliedly warranted to its consumers and users that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

220.   Defendant, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

221.   Upon information and belief, Plaintiff reasonably relied upon the skill, superior knowledge and judgment of Defendant and upon its implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

222.   Upon information and belief, Plaintiff was at all relevant times in privity with Defendant, and as such, Plaintiff is entitled to assert this claim.

223.   Plaintiff is the intended third-party beneficiary of implied warranties made by Defendant to the purchasers of its horticultural herbicides, and as such, Plaintiff is entitled to assert this claim.

224.   Upon information and belief, Plaintiff reasonably relied upon the skill, superior knowledge and judgment of Defendant and upon its implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

225.   The Roundup® products were expected to reach and did in fact reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendant.

226.   At all times relevant to this litigation, Defendant was aware that consumers and users of its products, including Plaintiff, would use Roundup®

products as marketed by Defendant, which is to say that Plaintiff was the foreseeable users of Roundup®.

227.   Defendant intended that its Roundup® products be used in the manner in which Plaintiff in fact used them and Defendant impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

228.   In reliance upon Defendant's implied warranty, Plaintiff used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendant.

229.   Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

230.   Defendant breached its implied warranty to Plaintiff in that its Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested.  Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

231.   The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

232.   As a direct and proximate result of Defendant's wrongful acts and omissions Plaintiff has suffered severe and permanent physical and emotional injuries.  Plaintiff has endured pain and suffering, have suffered economic loss (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

233.   WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.  Plaintiff also demands a jury trial on the issues contained herein.

<u>**CLAIM SIX**</u>

**FRAUDULENT CONCEALMENT**

234.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

235.   Monsanto is estopped from asserting a statute of limitations defense because it fraudulently concealed its wrongful conduct from Plaintiff with the intent that Plaintiff and other consumers and users of Roundup® would rely on such material representations.

236.   Monsanto had actual knowledge that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.  Monsanto knew, or should have known, that Roundup® is more toxic than glyphosate alone and that safety studies of Roundup®, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup®.

237.   Monsanto failed to conduct adequate testing of glyphosate and the Roundup® formulation.

238.   Monsanto had actual knowledge of its misrepresentations, negligence, breach of warranties, and false, misleading, deceptive, and unconscionable conduct. Even so, Monsanto perpetuated its wrongful conduct with the intent and fixed purpose of concealing its wrongs from Plaintiff and the public at large. Despite its knowledge that Roundup® is considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup® as safe.

239.   Plaintiff was unaware of the falsity of these representations, acted in actual and justifiable reliance on such material misrepresentations, and were injured as a direct and proximate result.

240.   Additionally, Monsanto knowingly omitted material information and remained silent regarding said misrepresentations, despite the fact that it had a duty

to inform Plaintiff, their employers, and the general public of the inaccuracy of said misrepresentations, which omission constitutes a positive misrepresentation of material fact, with the intent that Plaintiff and the public would rely on Monsanto's misrepresentations.

241.    Plaintiff did, in fact, act in actual and justifiable reliance on Monsanto's representations, and Plaintiff was injured as a result.

242.    Monsanto, as the manufacturer of Roundup®, was in a position of superior knowledge and judgment regarding any potential risks associated with its products.

243.    Monsanto committed constructive fraud by breaching one or more legal or equitable duties owed to Plaintiff relating to Roundup®, said breach or breaches constituting fraud because of its propensity to deceive others or constitute an injury to public interests or public policy.

244.    In breaching its duties to Plaintiff, Monsanto used its position of trust as the manufacturer and/or distributor of Roundup® to increase sales of its products at the expense of informing Plaintiff that use of or exposure to Roundup® carries the risk of serious illness, such as NHL.

245.    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with

interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## JURY TRIAL DEMAND

246. Plaintiff demands a trial by jury on all of the triable issues within this pleading.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in his favor and against Monsanto on each of the above-referenced claims and causes of action, awarding as follows:

A. compensatory damages in excess of the jurisdictional amount, including but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

B. compensatory damages to Plaintiff for past and future damages, including but not limited to Plaintiff's pain and suffering and for severe and permanent personal injuries sustained by Plaintiff, including health care costs and economic loss;

C.     economic damages in the form of medical expenses, out-of-pocket expenses, lost earnings and other economic damages in an amount to be determined at trial of this action;

D.     punitive and/or exemplary damages for the wanton, willful, fraudulent, and reckless acts of the Defendant who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiff in an amount sufficient to punish Defendant and deter future similar conduct, to the extent allowed by applicable law;

E.     pre- and post-judgment interest;

F.     costs including reasonable attorneys' fees, court costs, and other litigation expenses; and

G.     any other relief the Court deems just and proper.

## **JURY TRIAL DEMAND**

Plaintiff demands a trial by jury on all of the triable issues within this Complaint.

Dated: August 29, 2019

**WEITZ & LUXENBERG, P.C.**

/s/ Devin Bolton

Devin Bolton, Esq.
dbolton@weitzlux.com
700 Broadway
New York, NY 10003
Tel.: 212-558-5802
Fax: 212-344-5461

/s/ Robin Greenwald

Robin Greenwald, Esq.
rgreenwald@weitzlux.com
700 Broadway
New York, NY 10003
Tel.: 212-558-5802
Fax: 212-344-5461

*Attorneys for Plaintiff*

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Lawrence Krupinski | Monsanto Company |

| **(b)** County of Residence of First Listed Plaintiff  San Diego | County of Residence of First Listed Defendant  St. Louis County, MO |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |
| | NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF<br>THE TRACT OF LAND INVOLVED. |

| **(c)** Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)*  **'19CV1646 JM BLM** |
|---|---|
| (See attachment) | (See attachment) |

| II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)* | | III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff* |
|---|---|---|

|  |  | *(For Diversity Cases Only)* | | *and One Box for Defendant)* |
|---|---|---|---|---|
| | | | PTF DEF | PTF DEF |
| ❏ 1  U.S. Government<br>     Plaintiff | ❏ 3  Federal Question<br>     *(U.S. Government Not a Party)* | Citizen of This State | ☒ 1   ❏ 1 | Incorporated *or* Principal Place  ❏ 4  ❏ 4<br>of Business In This State |
| ❏ 2  U.S. Government<br>     Defendant | ☒ 4  Diversity<br>     *(Indicate Citizenship of Parties in Item III)* | Citizen of Another State | ❏ 2   ❏ 2 | Incorporated *and* Principal Place  ❏ 5  ☒ 5<br>of Business In Another State |
| | | Citizen or Subject of a<br>Foreign Country | ❏ 3   ❏ 3 | Foreign Nation         ❏ 6  ❏ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❏ 625 Drug Related Seizure | ❏ 422 Appeal 28 USC 158 | ❏ 375 False Claims Act |
| ❏ 120 Marine | ❏ 310 Airplane | ☒ 365 Personal Injury - |     of Property 21 USC 881 | ❏ 423 Withdrawal | ❏ 376 Qui Tam (31 USC |
| ❏ 130 Miller Act | ❏ 315 Airplane Product |     Product Liability | ❏ 690 Other |     28 USC 157 |     3729(a)) |
| ❏ 140 Negotiable Instrument |     Liability | ❏ 367 Health Care/ | | | ❏ 400 State Reapportionment |
| ❏ 150 Recovery of Overpayment | ❏ 320 Assault, Libel & |     Pharmaceutical | | **PROPERTY RIGHTS** | ❏ 410 Antitrust |
|     & Enforcement of Judgment |     Slander |     Personal Injury | | ❏ 820 Copyrights | ❏ 430 Banks and Banking |
| ❏ 151 Medicare Act | ❏ 330 Federal Employers' |     Product Liability | | ❏ 830 Patent | ❏ 450 Commerce |
| ❏ 152 Recovery of Defaulted |     Liability | ❏ 368 Asbestos Personal | | ❏ 835 Patent - Abbreviated | ❏ 460 Deportation |
|     Student Loans | ❏ 340 Marine |     Injury Product | |     New Drug Application | ❏ 470 Racketeer Influenced and |
|     (Excludes Veterans) | ❏ 345 Marine Product |     Liability | | ❏ 840 Trademark |     Corrupt Organizations |
| ❏ 153 Recovery of Overpayment |     Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ❏ 480 Consumer Credit |
|     of Veteran's Benefits | ❏ 350 Motor Vehicle | ❏ 370 Other Fraud | ❏ 710 Fair Labor Standards | ❏ 861 HIA (1395ff) | ❏ 490 Cable/Sat TV |
| ❏ 160 Stockholders' Suits | ❏ 355 Motor Vehicle | ❏ 371 Truth in Lending |     Act | ❏ 862 Black Lung (923) | ❏ 850 Securities/Commodities/ |
| ❏ 190 Other Contract |     Product Liability | ❏ 380 Other Personal | ❏ 720 Labor/Management | ❏ 863 DIWC/DIWW (405(g)) |     Exchange |
| ❏ 195 Contract Product Liability | ❏ 360 Other Personal |     Property Damage |     Relations | ❏ 864 SSID Title XVI | ❏ 890 Other Statutory Actions |
| ❏ 196 Franchise |     Injury | ❏ 385 Property Damage | ❏ 740 Railway Labor Act | ❏ 865 RSI (405(g)) | ❏ 891 Agricultural Acts |
| | ❏ 362 Personal Injury - |     Product Liability | ❏ 751 Family and Medical | | ❏ 893 Environmental Matters |
| |     Medical Malpractice | |     Leave Act | | ❏ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❏ 790 Other Labor Litigation | **FEDERAL TAX SUITS** |     Act |
| ❏ 210 Land Condemnation | ❏ 440 Other Civil Rights | **Habeas Corpus:** | ❏ 791 Employee Retirement | ❏ 870 Taxes (U.S. Plaintiff | ❏ 896 Arbitration |
| ❏ 220 Foreclosure | ❏ 441 Voting | ❏ 463 Alien Detainee |     Income Security Act |     or Defendant) | ❏ 899 Administrative Procedure |
| ❏ 230 Rent Lease & Ejectment | ❏ 442 Employment | ❏ 510 Motions to Vacate | | ❏ 871 IRS—Third Party |     Act/Review or Appeal of |
| ❏ 240 Torts to Land | ❏ 443 Housing/ |     Sentence | |     26 USC 7609 |     Agency Decision |
| ❏ 245 Tort Product Liability |     Accommodations | ❏ 530 General | | | ❏ 950 Constitutionality of |
| ❏ 290 All Other Real Property | ❏ 445 Amer. w/Disabilities - | ❏ 535 Death Penalty | **IMMIGRATION** | |     State Statutes |
| |     Employment | **Other:** | ❏ 462 Naturalization Application | | |
| | ❏ 446 Amer. w/Disabilities - | ❏ 540 Mandamus & Other | ❏ 465 Other Immigration | | |
| |     Other | ❏ 550 Civil Rights |     Actions | | |
| | ❏ 448 Education | ❏ 555 Prison Condition | | | |
| | | ❏ 560 Civil Detainee - | | | |
| | |     Conditions of | | | |
| | |     Confinement | | | |

| V. ORIGIN *(Place an "X" in One Box Only)* | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☒ 1  Original<br>    Proceeding | ❏ 2  Removed from<br>    State Court | ❏ 3  Remanded from<br>    Appellate Court | ❏ 4  Reinstated or<br>    Reopened | ❏ 5  Transferred from<br>    Another District<br>    *(specify)* | ❏ 6  Multidistrict<br>    Litigation -<br>    Transfer | | ❏ 8  Multidistrict<br>    Litigation -<br>    Direct File |

| VI. CAUSE OF ACTION | Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:<br>28 U.S.C. 1332 |
|---|---|
| | Brief description of cause:<br>Product liability lawsuit for personal injuries caused by Roundup herbicide. |

| VII. REQUESTED IN<br>COMPLAINT: | ❏ CHECK IF THIS IS A **CLASS ACTION**<br>UNDER RULE 23, F.R.Cv.P. | **DEMAND $** | CHECK YES only if demanded in complaint:<br>JURY DEMAND:  ☒ Yes  ❏ No |
|---|---|---|---|

| VIII. RELATED CASE(S)<br>IF ANY | *(See instructions):* | JUDGE  Honorable Vince Chhabria | DOCKET NUMBER  3:16-md-02741 |
|---|---|---|---|

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 08/30/2019 | /s/ Devin Bolton |

**FOR OFFICE USE ONLY**

| RECEIPT # | AMOUNT | APPLYING IFP | JUDGE | MAG. JUDGE |
|---|---|---|---|---|

# CIVIL COVER SHEET
# ATTACHMENT

## Section I(c)- Attorneys of Record

### Plaintiffs' Attorney

Robin Greenwald
Weitz & Luxenberg, P.C.
700 Broadway
New York, NY 10003
Tel: (212) 558-5500
rgreenwald@weitzlux.com

Devin Bolton
Weitz & Luxenberg, P.C.
700 Broadway
New York, NY 10003
Tel: (212) 558-5552
dbolton@weitzlux.com

### Defendants' Attorneys

Eric G. Lasker
Hollingsworth LLP
1350 I Street, N.W.
Washington, D.C. 20005
Tel: (202) 898-5800
elasker@hollingsworthllp.com

Martin C Calhoun
Hollingsworth LLP
1350 I Street NW
Washington, DC 20005
202-898-5867
mcalhoun@hollingsworthllp.com

Gregory J. Minana
Husch Blackwell LLP
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105
Tel: (314) 480-1865
Greg.minana@huschblackwell.com

Christine F. Miller
Husch Blackwell LLP
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105
Tel: (314) 480-1500
chris.miller@huschblackwell.com

Anthony Rey Martinez
Shook, Hardy and Bacon L.L.P.
2555 Grand Blvd.
Kansas City, MO 64108
Tel: (816) 474-6550
amartinez@shb.com

Barbara R Light
Shook Hardy Bacon LLP
600 Travis Street, Suite 3400
Houston, TX 77002
Tel: (713) 546-5636
blight@shb.com