# U.S. District Court
## Eastern District of Louisiana (New Orleans)
## CIVIL DOCKET FOR CASE #: 2:19–cv–12294–WBV–DMD

| | |
|---|---|
| Trobona et al v. Monsanto Company et al | Date Filed: 08/26/2019 |
| Assigned to: Judge Wendy B Vitter | Jury Demand: Plaintiff |
| Referred to: Magistrate Judge Dana Douglas | Nature of Suit: 365 Personal Inj. Prod. |
| Cause: 28:1332 Diversity–Personal Injury | Liability |
| | Jurisdiction: Diversity |

**Plaintiff**

**Charles Trobona**                     represented by     **George W. Healy , IV**
George W. Healy, IV & Associates
1323 28th Avenue
Suite A
Gulfport, MS 39501
228–575–4005
Fax: 228–575–4006
Email: gwhealyiv@aol.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Debbie Trobona**                     represented by     **George W. Healy , IV**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

**Defendant**

**Bayer Corporation**

**Defendant**

**Bayer AG**

| Date Filed | # | Docket Text |
|---|---|---|
| 08/26/2019 | 1 | COMPLAINT with jury demand against Bayer AG, Bayer Corporation, Monsanto Company (Filing fee $ 400 receipt number 053L–7824443) filed by Charles Trobona, Debbie Trobona. (Attachments: # 1 Summons Monsanto Company, # 2 Summons Bayer Corporation, # 3 Summons Bayer AG, # 4 Civil Cover Sheet)Attorney George W. Healy, IV added to party Charles Trobona(pty:pla), Attorney George W. Healy, IV added to party Debbie Trobona(pty:pla).(Healy, George) (Entered: 08/26/2019) |
| 08/26/2019 | 2 | Initial Case Assignment to Judge Wendy B Vitter and Magistrate Judge Dana Douglas. (ess) (Entered: 08/26/2019) |
| 08/29/2019 | 3 | Summons Issued as to Bayer AG, Bayer Corporation, Monsanto Company. (Attachments: # 1 Summons, # 2 Summons)(jeg) (Entered: 08/29/2019) |

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

CHARLES TROBONA
and DEBBIE TROBONA

           Plaintiffs,

Case No.:_____

MONSANTO COMPANY,
BAYER CORPORATION,
and BAYER AG,

           Defendants.

**JURY TRIAL DEMAND**,

## COMPLAINT

Plaintiffs  CHARLES TROBONA  and DEBBIE TROBONA bring this Complaint for

damages against MONSANTO COMPANY,  BAYER CORPORATION, and BAYER AG.  As a

direct Plaintiffs allege as follows:

## PARTIES

1. Plaintiff Charles Trobona is a person of the age of majority who is now and at all time

relevant hereto was domiciled and residing in the Parish of Tangipahoa, State of Louisiana.

2. Plaintiff Debbie Trobona is a person of the age of majority who is now and at all time

relevant hereto was domiciled and residing in the Parish of Tangipahoa, State of Louisiana.

3. At all times referenced hereto, Charles Trobona and Debbie Trobona were, and

continue to be husband and wife.

4. Plaintiffs bring this action for personal injuries Charles Trobona sustained as a result

of exposure to Roundup ("Roundup®")  containing the active ingredient glyphosate and the

surfactant polyethoxylated tallow amine ("POEA").  As a direct and proximate result of being

exposed to Roundup ® , Charles Trobona developed Non-Hodgkin's Lymphoma in 2003.

Plaintiffs  have endured and continue to suffer pain, emotional and mental anguish, medical

expenses, loss of consortium and other economic and non-economic damages.

5. "Roundup" refers to all formulations of Defendants Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

6. Monsanto Company ("Monsanto") is a Delaware Corporation with its principal place of business in St. Louis, Missouri. Monsanto Company is registered with the Louisiana Secretary of State and its registered agent is Corporation Service Company, 501 Louisiana Avenue, Baton Rouge, LA 70802.

7. Defendant Monsanto advertises and sells goods, specifically Roundup, in the State of Louisiana.

8.  Defendant transacted and conducted business within the State of Louisiana that relates to the allegations in this Complaint.

9.  Defendant Monsanto derived substantial revenue from goods and products used in the State of Louisiana.

10.  Defendant Monsanto expected or should have expected its acts to have consequences within the State of Louisiana, and derived substantial revenue from interstate commerce.

11.  Defendant Monsanto engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup.

12.  Defendant Monsanto is authorized to do business in Louisiana and derive substantial income from doing business in this state.

13.  Upon information and belief, Defendant Monsanto purposefully availed itself of the privilege of conducting activities with the State of Louisiana, thus invoking the benefits and protections of its laws.

14.  Upon information and belief, Defendant Monsanto did design, sell, advertise, manufacture and/or distribute Roundup, with full knowledge of its dangerous and defective nature.

15.  BAYER CORPORATION (Bayer Corp) is a Delaware Corporation with its principal place of business in Whippany, NJ.  BAYER is registered with the Louisiana Secretary of State and its registered agent is Corporation Service Company, 501 Louisiana Avenue, Baton Rouge, LA 70802.

16.  Defendant Bayer Corp. has transacted and conducted business within the State of Louisiana.

3

17.  Defendant Bayer Corp. has derived substantial revenue from goods and products used in the State of Louisiana.

18.  Upon information and belief, Defendant BAYER AG (Bayer AG) is a German chemical and pharmaceutical company that is headquartered in Leverkusen, North Rhine-Wesphalia, Germany.

19.  Upon information and belief, Defendant AG is the parent/holding company of Defendants Bayer Corp. and Monsanto Company.

20.  Upon information and belief, Monsanto Company is an indirect, wholly owned subsidiary of Bayer AG.

21.  Bayer AG is publically held corporation.

22.  Plaintiffs are informed and believe, and based thereon allege, that in committing the acts  alleged herein, each and every managing agent, agent, representative and/or employee of the collective Defendants was working within the course and scope of said agency,  representation and/or employment with the knowledge, consent, ratification, and  authorization of the Defendants and their directors, officers and/or managing agents.

## JURISDICTION AND VENUE

23.  This Court has jurisdiction over Defendants and this action pursuant to 28 U.S.C.  § 1332 because there is complete diversity of citizenship between Plaintiffs and Defendants. Defendants are either incorporated and/or have their principal place of business outside of the state in which the Plaintiffs reside.

24.  The amount in controversy between Plaintiffs and Defendants exceeds $75,000.00 exclusive of interest and cost.

25. The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

26. Venue is proper within this district pursuant to 28 U.S.C. § 1391 in that Defendants conduct business here and are subject to personal jurisdiction in this district. Furthermore, Defendants sell, market, and/or distribute Roundup ® within the District of Louisiana. Also, a substantial part of the acts and/or omissions giving rise to these claims occurred within this district.

27. Glyphosate is a broad-spectrum, non-selective herbicide used in a variety of herbicide products around the world.

28. Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids.

29. For nearly 40 years, people across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the World Health Organization ("WHO") of the United Nations , the main chemical ingredient of Roundup®, glyphosate, is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Agricultural workers are, once again, victims of corporate greed.

30. Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince governmental agencies,

5

farmers, and the general population that Roundup® was safe.

### The Discovery of Glyphosate and Development of Roundup®

31. The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist, John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use. It still markets Roundup® as safe today.

### Registration of Herbicides under Federal Law

32. The manufacture, formulation, and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136, *et seq*. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

33. Because pesticides are toxic to plants, animals, and humans, at least to some extent, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

34. FIFRA defines "unreasonable adverse effects on the environment" to mean "any

6

unreasonable risk to man or the environment, taking into account the economic, social, and

environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus

requires EPA to make a risk/benefit analysis in determining whether a registration should be

granted or allowed to continue to be sold in commerce.

35.   The EPA registered Roundup® for distribution, sale, and manufacture in the United

States.

36.   FIFRA generally requires that the registrant, Monsanto in the case of Roundup®,

conducts the health and safety testing of pesticide products. The EPA has protocols governing the

conduct of tests required for registration and the laboratory practices that must be followed in

conducting these tests. The data produced by the registrant must be submitted to the EPA for

review and evaluation. The government is not required, nor is it able, however, to perform  the

product tests that are required of the manufacturer.

### *Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup*

37.   Based on early studies that glyphosate could cause cancer in laboratory animals, the

EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985.

After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA

changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so

classifying glyphosate, however, the EPA made clear that the designation did not mean the

chemical does not cause cancer: "It should be emphasized, however, that designation of an  agent

in Group E is based on the available evidence at the time of evaluation and should not be

interpreted as a definitive conclusion that the agent will not be a carcinogen under any

circumstances."

38. On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

39. In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

40. In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer states, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

41. Three top executives of IBT were convicted of fraud in 1983.

42. In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

43. Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

### *The Importance of Roundup® to Monsanto's Market Dominance Profits*

44. The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

45. In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

46. Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

9

*Monsanto has known for decades that it falsely advertises the safety of Roundup®*

47. In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general reputations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a.   Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences...

b.   And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c.   Roundup biodegrades into naturally occurring elements.

d.   Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e.   This non-residual herbicide will not wash or leach into the soil. It . . . stays where you apply it.

f.   You can apply Accord with "confidence because it will stay where you put it" bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

10

g.     Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h.     Glyphosate's safety margin is much greater than required. It has over a 1,000-fold

safety margin in food and over a 700-fold safety margin for workers who

manufacture it or use it.

i.     You can feel good about using herbicides by Monsanto. They carry a toxicity

category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j.     "Roundup can be used where kids and pets will play and breaks down into natural

material." This ad depicts a person with his head in the ground and a pet dog

standing in an area which has been treated with Roundup.

48.  On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with

NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or

broadcasting any advertisements [in New York] that represent, directly or by implication that:

a.     Its glyphosate-containing pesticide products or any component thereof are safe

non-toxic, harmless or free from risk.

***

b.     Its glyphosate-containing pesticide products or any component thereof

manufactured, formulated, distributed or sold by Monsanto are biodegradable.

***

c.     Its glyphosate-containing pesticide products or any component thereof stay where

they are applied under all circumstances and will not move through the

environment by any means.

***

d.     Its glyphosate-containing pesticide products or any component thereof are "good"

for the environment or are "known for their environmental characteristics."

***

e.     Glyphosate-containing pesticide products or any component thereof are safer or

less toxic than common consumer products other than herbicides;

f.     Its glyphosate-containing products or any component thereof might be classified

as "practically non-toxic."

49.  Monsanto did not alter its advertising in the same manner in any state other than New

York, and on information and belief still has not done so today.

50.  In 2009, France's highest court ruled that Monsanto had not told the truth about the

safety of Roundup®. The French court affirmed an earlier judgment that Monsanto had falsely

advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

### *Classifications and Assessments of Glyphosate*

51.  The IARC Monographs identify environmental factors that are carcinogenic hazards

to humans. These include chemicals, complex mixtures, occupational exposures, physical agents,

biological agents, and lifestyle factors.  The IARC process for the classification of glyphosate

followed the stringent procedures for  the evaluation of a chemical agent. Over time, the IARC

Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents

to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human

Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be

Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

52.  The established procedure for IARC Monograph evaluations is described in the

IARC Programme's Preamble. Evaluations are performed by panels of international experts,

selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

53.   One year before the Monograph meeting, the meeting is announced and there is a call

both  for data and for experts. Eight months before the Monograph meeting, the Working Group

membership is selected and the sections of the Monograph are developed by the Working  Group

members. One month prior to the Monograph meeting, the call for data is closed and the various

draft sections are distributed among Working Group members for review and comment. Finally,

at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the

evidence in each category, and completes the overall evaluation. Within two weeks after the

Monograph meeting, the summary of the Working Group are published in Lancet Oncology, and

within a year after the meeting, the final Monograph is finalized and published.

54.   In assessing an agent, the IARC Working Group reviews the following information:

(a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and

cancer bioassays; and © representative mechanistic data. The studies must be publicly available

and have sufficient detail for meaningful review, and reviewers cannot be associated with the

underlying study.

55.   In March, 2015, IARC reassessed glyphosate. The summary published in The Lancet

Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic to  humans.

56.   On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For

Volume  112, the volume that assessed glyphosate, a Working Group of 17 experts from 11

countries  met at IARC from March 3-10, 2015, to assess the carcinogenicity of certain

herbicides, including glyphosate. The March meeting culminated nearly a one-year review and

preparation by the IARC Secretariat and the Working Group, including a comprehensive review

of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

57.   The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

58.   Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

59.   Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

60.   The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

61.   The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

62.   The IARC Working Group also found that glyphosate cause DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers

of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

63.  In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

64.  The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

65.  The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

66.  The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

67.  The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina while this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

*Other Earlier Findings About Glyphosate's Dangers to Human Health*

68. The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

*Release Patterns*

69. Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

70. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

71. Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport, storage, and disposal.

*Recent Worldwide Bans on Roundup®/Glyphosate*

72. Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in light of this as the dangers of the use of Roundup® are more widely known. The Netherlands

16

issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which was to take effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

73.   The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

74.   France banned the private sale of Roundup® and glyphosate following the IARC assessment for glyphosate.

75.   Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

76.   The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that Glyphosate has been linked to fatal kidney disease in agricultural workers.

77.   The government of Colombia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

### *Plaintiff's Exposure to Roundup®*

78.  Charles Trobona was  employed by the State of Louisiana, through the Department of

Transportation and Development (La DOTD) from 1975-2006 (31 years). While with La DOTD

his responsibilities included direct application of Roundup, among other Monsanto glyphosate

products, through out Tangipahoa Parish, Louisiana.  He used a variety of different sprayers to

apply Roundup.  He changed the hoses, pumps, and anything pertaining to the spraying part of

the equipment.  As part of his job responsibilities, he was regularly around vegetation that had

been treated with Roundup. Charles Trobona during all relevant times raised produce. He has his

own farm.  During this time, he cared for and sprayed the produce with glyphosate containing

Roundup®.  He used a variety of different sprayers. He sprayed the fence rows and between the

rows to prevent the grass from growing.  He applied Roundup® according to the manufacturer's

specifications while following proper safety protocols.

79.  Charles Trobona was diagnosed with non-Hodgkin's lymphoma in September 2003,

at the age of 56.

80.  Plaintiffs first became aware of the probable carcinogenic properties of Glyphosate

and its probable line to Charles Trobona's non-Hodgkin's Lymphoma in approximately 2018.

81.  The running of the statute of limitations has been tolled by reason of Defendants'

fraudulent concealment.  Defendants, through its affirmative misrepresentations and omissions,

actively concealed from plaintiffs the true risks associated with Roundup and glyphosate.

82.  At all relevant times, Defendants have maintained that Roundup is safe, non-toxic,

and non-carcinogenic.

83.  Indeed, even as of July 2016, Defendants continue to represent to the public that

"regulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and *agree* that there is *no evidence* that glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic" (emphasis added).

84.  As a result of Defendants' actions, plaintiffs were unaware, and cannot reasonably know of have learned through reasonable diligence that Roundup and/or glyphosate contact, exposed Charles Trobona to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

85. Furthermore, Defendants are estopped from relying on any statute of limitations because of their fraudulent concealment of the true character, quality and nature of Roundup. Defendants were under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Defendants had and continue to have exclusive control, and because Defendants knew that this information was not available to Plaintiffs or to distributors of Roundup. In addition, Defendants are estopped from relying on any statute of limitations because of their intentional concealment of these facts.

86.  Plaintiffs had no knowledge that Defendants were engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendants, Plaintiffs could not have reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud should be considered. Defendants had the ability to and did spend enormous amounts of money in furtherance of their purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Plaintiffs and medical professionals could not have afforded and could not have possibly

conducted studies to determine the nature, extent, and identity of related health risks, and were

forced to rely on only the Defendants' representations. Accordingly, Defendants are precluded by

the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of

limitations.

## FIRST CAUSE OF ACTION
### Strict Liability (Design Defect)

87.  Plaintiffs incorporate by reference each and every allegation set forth in the

preceding paragraphs as if fully stated herein.

88.  Plaintiffs bring this strict liability claim against Monsanto for defective design.

89.  At all times relevant to this litigation, Monsanto engaged in the business of testing,

developing, manufacturing, selling, distributing, and Monsanto a engaged in the marketing,

packaging design, and promotion of Roundup® products, which are defective and unreasonably

dangerous to consumers, including Plaintiffs, thereby placing Roundup® products into the

stream of commerce. These actions were under the ultimate control and supervision of

Monsanto. At all times relevant to this litigation, Monsanto designed, researched, developed,

manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and

distributed the Roundup® products used by the Plaintiff, as described above.

90.  At all times relevant to this litigation, Roundup® products were manufactured,

designed, and labeled in an unsafe, defective, and inherently dangerous manner that was

dangerous for use by or exposure to the public, and, in particular, the Plaintiffs.

91.  At all times relevant to this litigation, Roundup® products reached the intended

consumers, handlers, and users or other persons coming into contact with these products in

Louisiana and throughout the United States, including Plaintiffs, without substantial change in

20

their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

92.  Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

93.  Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

94.  At all times relevant to this action, Monsanto knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

95.  Therefore, at all times relevant to this litigation, Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Monsanto were defective in design and formulation, in one or more of the following ways:

a.    When placed in the stream of commerce, Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b.    When placed in the stream of commerce, Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other

21

serious illnesses when used in a reasonably anticipated manner.

c.    When placed in the stream of commerce, Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d.    Monsanto did not sufficiently test, investigate, or study Roundup® products and, specifically, the active ingredient glyphosate.

e.    Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f.    At the time of marketing its Roundup® products, Roundup® was defective in that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g.    Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products.

h.    Monsanto could have employed safer alternative designs and formulations.

96.  Plaintiffs were exposed to Roundup® products in the course of their work, as described above, without knowledge of their dangerous characteristics.

97.  At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

98.  Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

99.  The harm caused by Roundup® products far outweighed their benefit, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate. Roundup® products were and are more dangerous than alternative products and Monsanto could have designed Roundup® products (including their packaging and sales aids) to make them less dangerous. Indeed, at the time that Monsanto designed Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

100.  At the time Roundup® products left Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of those herbicides.

101.   Monsanto's defective design of Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including the Plaintiffs herein.

102.  Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Monsanto is strictly liable to Plaintiffs.

103.  The defects in Roundup® products caused or contributed to cause Plaintiffs' grave injuries, and, but for Monsanto's misconduct and omissions, Plaintiffs would not have sustained their injuries.

104.  Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including Plaintiffs, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Monsanto made conscious decisions not to redesign, warn or inform the

23

unsuspecting public. Monsanto's reckless conduct warrants an award of aggravated damages.

105.   As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiffs have suffered and continue to suffer grave injuries, and have endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.  Additionally, Plaintiffs demand a jury trial on all issues contained herein.

## SECOND CAUSE OF ACTION
### STRICT LIABILITY (FAILURE TO WARN)

106.   Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

107.   Plaintiffs bring this strict liability claim against Monsanto for failure to warn.

108.   At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, , which are defective and unreasonably dangerous to consumers, including Plaintiffs, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Monsanto.

109.  Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce Roundup® products, and in the course of same, directly advertised or marketed the

24

products to consumers and end users, including the Plaintiffs, and therefore had a duty to warn of

the risks associated with the use of Roundup® and glyphosate-containing products.

110.  At all times relevant to this litigation, Monsanto had a duty to properly test,

develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain

supply, provide proper warnings, and take such steps as necessary to ensure that Roundup®

products did not cause users and consumers to suffer from unreasonable and dangerous risks.

Monsanto had a continuing duty to warn the Plaintiffs of the dangers associated with Roundup®

use and exposure. Monsanto, as manufacturer, seller, promoter, marketer, or distributor of

chemical herbicides are held to the knowledge of an expert in the field.

111.  At the time of manufacture, Monsanto could have provided the warnings or

instructions regarding the full and complete risks of Roundup® and glyphosate-containing

products because they knew or should have known of the unreasonable risks of harm associated

with the use of and/or exposure to such products.

112.  At all times relevant to this litigation, Monsanto failed to investigate, study, test, or

promote the safety or to minimize the dangers to users and consumers of its product and to those

who would foreseeably use or be harmed by these herbicides, including Plaintiffs.

113.  Despite the fact that Monsanto knew or should have known that Roundup® posed a

grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated

with use and exposure. The dangerous propensities of these products and the carcinogenic

characteristics of glyphosate, as described above, were known to Monsanto, or scientifically

knowable to Monsanto through appropriate research and testing by known methods, at the time

they distributed, marketed, promoted, supplied or sold the product, and not known to end users

and consumers, such as Plaintiffs.

114.   These products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

115.   At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Missouri and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, promoted and marketed by Monsanto.

116.   Plaintiffs were exposed to Roundup® products in the course of their personal use on his garden and lawn, without knowledge of their dangerous characteristics.

117.   At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Roundup® products in their intended or reasonably foreseeable manner without knowledge of  their dangerous characteristics.

118.   Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiffs' exposure. Plaintiffs relied upon the skill, superior knowledge, and judgment of Monsanto.

119.   These product were defective because the minimal warnings disseminated with Roundup® products were inadequate, and they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were

appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and landscaping applications.

120.   The information that Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiffs to utilize the products safely and with adequate protection. Instead, Monsanto disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

121.   To this day, Monsanto has failed to adequately and accurately warn of the true risks of Plaintiffs' injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

122.   As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed, marketed, and promoted by Monsanto, and used by Plaintiffs in their work.

123.   Monsanto is liable to Plaintiff for injuries caused by their negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of these products and the risks associated with the use of or exposure to Roundup® and glyphosate.

124.    The defects in Roundup® products caused or contributed to cause Plaintiffs' injuries, and, but for this misconduct and omissions, Plaintiffs would not have sustained their injuries.

125.    Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products, Plaintiffs could have avoided the risk of developing injuries as alleged herein.

126.    As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiffs have suffered severe injuries and have endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## THIRD CAUSE OF ACTION
### NEGLIGENCE

127.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

128.    Monsanto, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiffs.

129.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion,

packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable

steps necessary to manufacture, promote, and/or sell a product that was not unreasonably

dangerous to consumers and users of the product.

130.  At all times relevant to this litigation, Monsanto s had a duty to exercise reasonable

care in the marketing, advertisement, and sale of the Roundup® products. Monsanto's duty of

care owed to consumers and the general public included providing accurate, true, and correct

information concerning the risks of using Roundup® and appropriate, complete, and accurate

warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular,

its active ingredient glyphosate.

131.  At all times relevant to this litigation, Monsanto knew or, in the exercise of

reasonable care, should have known of the hazards and dangers of Roundup® and specifically,

the carcinogenic properties of the chemical glyphosate.

132.  Accordingly, at all times relevant to this litigation, Monsanto knew or, in the

exercise of reasonable care, should have known that use of or exposure to its Roundup® products

could cause or be associated with Plaintiffs' injuries and thus created a dangerous and

unreasonable risk of injury to the users of these products, including Plaintiffs.

133.  Monsanto also knew or, in the exercise of reasonable care, should have known that

users and consumers of Roundup® were unaware of the risks and the magnitude of the risks

associated with use of and/or exposure to Roundup® and glyphosate-containing products.

134.  As such, Monsanto breached the duty of reasonable care and failed to exercise

ordinary care in the design, research, development, manufacture, testing, marketing, supply,

promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that

Monsanto manufactured, marketed, promoted, and sold defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

135.   Despite an ability and means to investigate, study, and test these products and to provide adequate warnings, Monsanto has failed to do so. Indeed, Monsanto has wrongfully concealed information and have further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

136.  Monsanto was negligent in the following respects:

a.      Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

b.       Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c.      Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d.       Failing to use reasonable and prudent care in the design, research, manufacture,

and development of Roundup® products so as to avoid the risk of serious harm
associated with the prevalent use of Roundup®/glyphosate as an herbicide;

e.   Failing to design and manufacture Roundup® products so as to ensure they were
at least as safe and effective as other herbicides on the market;

f.   Failing to provide adequate instructions, guidelines, and safety precautions to
those persons who Monsanto could reasonably foresee would use and be exposed
to its Roundup® products;

g.   Failing to disclose to Plaintiffs, users/consumers, and the general public that use
of and exposure to Roundup® presented severe risks of cancer and other grave
illnesses;

h.   Failing to warn Plaintiffs, consumers, and the general public that the product's
risk of harm was unreasonable and that there were safer and effective  alternative
herbicides available to Plaintiff and other consumers;

i.   Systematically suppressing or downplaying contrary evidence about the risks,
incidence, and prevalence of the side effects of Roundup® and glyphosate-
containing products;

j.   Representing that its Roundup® products were safe for their intended use when,
in fact, Monsanto knew or should have known that the products were not safe for
their intended purpose;

k.    Declining to make or propose any changes to Roundup® products' labeling or
other promotional materials that would alert the consumers and the general public
of the risks of Roundup® and glyphosate;

31

l.      Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m.     Continuing to disseminate information to its consumers, which indicate or imply that Monsanto's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

n.      Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

137.   Monsanto knew and/or should have known that it was foreseeable that consumers such as Plaintiffs would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup®.

138.   Plaintiffs did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

139.   Monsanto's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiffs suffered, as described herein.

140.   Monsanto's conduct, as described above, was reckless. Monsanto regularly risked the lives of consumers and users of their products, including Plaintiffs, with full knowledge of dangers of these products. Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiffs. Monsanto's reckless conduct therefore warrants an award of aggravated or punitive damages.

141.   As a proximate result of Monsanto's wrongful acts and omissions in placing

32

defective Roundup® products into the stream of commerce without adequate warnings of the

hazardous and carcinogenic nature of glyphosate, Plaintiffs have suffered severe and permanent

physical and emotional injuries.  Plaintiffs have endured pain and suffering, has suffered

economic losses (including significant expenses for medical care and treatment) in an amount to

be determined.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs'

favor for compensatory and punitive damages, together with interest, costs herein incurred,

attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand

a jury trial on all issues contained herein.

## FOURTH CAUSE OF ACTION
### FRAUD, MISREPRESENTATION, AND SUPPRESSION

142.  Plaintiffs incorporate by reference all of the above paragraphs as if set forth in full

herein, particularly Paragraphs 31-43 which detail fraud with specificity.

143.  Defendants fraudulently, intentionally, and/or negligently misrepresented to the

public, and to the Plaintiffs, both directly and by and through the media, the scientific literature

and purported "community outreach" programs, the safety of Roundup products, and/or

fraudulently, intentionally, and/or negligently concealed, suppressed, or omitted material, adverse

information regarding the safety of Roundup.

144.  The intentional and/or negligent misrepresentations and omissions of Defendants

regarding the safety of Roundup products were communicated to Plaintiffs directly through

ghostwritten articles, editorials, national and regional advertising, marketing and promotion

efforts,  as well as the packaging and sales aids. The safety of Roundup products was also

33

intentionally and/or negligently misrepresented to Plaintiffs and the public with the intent that

such misrepresentations would cause Plaintiffs and other potential consumers to purchase and

use or continue to purchase and use Roundup products.

145.   Defendants either knew or should have known of the material representations they

were making regarding the safety and relative utility of Roundup products.

146.   Defendants fraudulently, intentionally, and/or negligently made the

misrepresentations and/or actively concealed, suppressed, or omitted this material information

with  the specific desire to induce Plaintiffs, and the consuming public to purchase and use

Roundup  products. Defendants fraudulently, intentionally, and/or negligently, knew or should

have known  that Plaintiffs and the consuming public would rely on such material

misrepresentations and/or  omissions in selecting and applying Roundup products.  Defendants

knew or should have known that Plaintiffs would rely on their false representations and

omissions.

147.  Defendants made these misrepresentations and actively concealed adverse

information including the risk of non-Hodgkin lymphoma, at a time when, their agents and/or

employees knew or should have known, the product had defects, dangers, and characteristics that

were other than what was represented to the consuming public. Specifically, Osborn & Barr

(advertising agency for Monsanto)[1] misrepresented and actively concealed, suppressed, and

omitted that there had been inadequate  testing of the safety and efficacy of Roundup, and that

prior studies, research, reports, and/or  testing had been conducted linking the use of the drug

---

[1]Monsanto is a client of  Osborn & Barr.  Osborn & Barr has created Roundup
campaigns.  Osborn & Barr falsely presented Roundup as posing no unreasonable risks to human
health or the environment.

with serious health events, including non- Hodgkin lymphoma.

148.   Despite the fact that Defendants knew or should have known of reports of severe risks including non-Hodgkin lymphoma, with Roundup use and exposure, this information was strategically minimized, understated, or omitted in order to create the impression that the human dangers of Roundup were nonexistent, particularly in light of its purported utility.

149.   The fraudulent, intentional and/or negligent material misrepresentations and/or active concealment, suppression, and omissions by Defendants were perpetuated directly and/or indirectly through the advertisements, packaging, sales aids, furtive public relations efforts, and other marketing and promotional pieces authored, analyzed, created, compiled, designed, drafted, disseminated, distributed, edited, evaluated, marketed, published, and supplied by Osborn & Barr.

150.   If Plaintiffs had known the true facts concerning the risks associated with Roundup exposure, Plaintiffs would have used a safer alternative.

151.   Plaintiffs reliance upon the material misrepresentations and omissions was justified, among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Roundup while Plaintiffs were not in a position to know the true facts because Defendants overstated the benefits and safety of Roundup and downplayed the risk of lymphoma, thereby inducing Plaintiffs to use the herbicide rather than safer alternatives.

152.   As a direct and proximate result of Defendants' actions and inactions, Plaintiffs were exposed to Roundup and suffered and will continue to suffer injuries and damages, as set forth herein.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury trial on all issues contained herein.

## FIFTH CAUSE OF ACTION
## VIOLATION OF THE CONSUMER FRAUD ACTS

153.  Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

154.  Plaintiffs bring this cause of action pursuant to Louisiana Revised Statutes 51:1401, et seq.: Unfair Trade Practices and Consumer Protection Law.

155.  Defendants fraudulently, intentionally, negligently, and/or innocently misrepresented to the public, and to the Plaintiffs, both directly and by and through the media and purported "community outreach" programs, the safety of Roundup products, and/or fraudulently, intentionally, negligently and/or innocently concealed, suppressed, or omitted material, adverse information regarding the safety of Roundup. This deception caused injury to Plaintiff in violation of the Consumer Fraud Act of Louisiana which create private rights of action by the Plaintiffs.

156.  The intentional, negligent, and/or innocent misrepresentations and omissions of Defendants regarding the safety of Roundup products were communicated to Plaintiffs directly through national and regional advertising, marketing and promotion efforts, as well as the packaging and sales aids. The safety of Roundup products was also intentionally, negligently, and/or innocently misrepresented to Plaintiffs and the public with the intent that such

36

misrepresentations would cause Plaintiffs and other potential consumers to purchase and use or continue to purchase and use Roundup products.

157.   Defendants either knew or should have known of the material representations they were making regarding the safety and relative utility of Roundup products.

158.   Defendants fraudulently, intentionally, negligently, and/or innocently made the misrepresentations and/or actively concealed, suppressed, or omitted this material information with  the specific desire to induce Plaintiffs, and the consuming public to purchase and use Roundup  products. Defendants fraudulently, intentionally, negligently, and/or innocently, knew or should  have known that Plaintiffs and the consuming public would rely on such material misrepresentations and/or omissions in selecting and applying Roundup products. Defendants knew  or should have known that Plaintiffs would rely on their false representations and omissions.

159.   Defendants made these misrepresentations and actively concealed adverse information including the risk of non-Hodgkin lymphoma, at a time when, their agents and/or employees knew or should have known, the product had defects, dangers, and characteristics that were other than what was represented to the consuming public. Specifically, Defendants misrepresented and actively concealed, suppressed, and omitted that there had been inadequate testing of the safety and efficacy of Roundup, and that prior studies, research, reports, and/or testing had been conducted linking the use of the drug with serious health events, including non-Hodgkin lymphoma.

160.   Despite the fact that Defendants knew or should have known of reports of severe risks including non-Hodgkin lymphoma, with Roundup use and exposure, this information was

strategically minimized, understated, or omitted in order to create the impression that the human

dangers of Roundup were nonexistent, particularly in light of its purported utility.

161.   The fraudulent, intentional, negligent and/or innocent material misrepresentations

and/or active concealment, suppression, and omissions by Defendants were perpetuated directly

and/or indirectly through the advertisements, packaging, sales aids, furtive public relations

efforts,  and other marketing and promotional pieces authored, analyzed, created, compiled,

designed,  drafted, disseminated, distributed, edited, evaluated, marketed, published, and

supplied by  Defendants.

162.   If Plaintiffs had known the true facts concerning the risks associated with Roundup

exposure, Plaintiffs would have used a safer alternative.

163.   Plaintiffs' reliance upon the material misrepresentations and omissions was

justified,  among other reasons, because said misrepresentations and omissions were made by

individuals and  entities who were in a position to know the true facts concerning Roundup while

Plaintiffs were not  in a position to know the true facts because Defendants overstated the

benefits and safety of  Roundup and downplayed the risk of lymphoma, thereby inducing

Plaintiffs to use the herbicide  rather than safer alternatives.

164.   Federal law and the EPA do not authorize and specifically prohibit the deceptions,

misrepresentations and omissions made by Defendants.

165.   As a direct and proximate result of Defendant's actions and inactions, Plaintiff

Charlie Trobona was exposed to Roundup and suffered and will continue to suffer injuries and

damages, as set forth   herein.

WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in

Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury trial on all issues contained herein.

## SIXTH CAUSE OF ACTION
## LOSS OF CONSORTIUM

166.   Plaintiffs repeat and reiterate the allegations previously set forth herein.

167.   Plaintiff Debbie Trobona is entitled to the comfort, care, affection, companionship, services, society, advice, guidance, counsel, and consortium of her spouse, Charlie Trobona.

168.   As a direct and proximate result of one or more of those wrongful acts or omissions of the Defendants described above, Debbie Trobona has been and will be deprived of the comfort, care, affection, companionship, services, society, advice, guidance, counsel and consortium.

WHEREFORE, Plaintiffs demand judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

WHEREFORE, Plaintiffs pray for judgment against Defendants as hereinafter set forth.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against the Defendants MONSANTO COMPANY, BAYER CORPORATION, and BAYER AG. on each of the above- referenced claims and causes of action and as follows:

a.       Awarding compensatory damages in excess of the jurisdictional amount,

39

including, but not limited to pain, suffering, emotional distress, loss of enjoyment

of life, and other non-economic damages in an amount to be determined at trial of

this action;

b.   Awarding compensatory damages to Plaintiff Charles Trobona for past and future

damages, including, but not limited to, Plaintiff's pain and suffering and for

severe and permanent personal injuries sustained by the Plaintiff including health

care costs and economic loss;

c.   Awarding compensatory, treble, and punitive damages, together with interest,

costs of suit, attorneys' fees, and all such other relief as the Court deems proper to

Plaintiff Debbie Trobona for Loss of Consortium;

d.   Awarding economic damages in the form of medical expenses, out of pocket

expenses, lost earnings and other economic damages in an amount to be determine

at trial of this action;

e.   Pre-judgment interest;

f.   Post-judgment interest;

g.   Awarding Plaintiffs reasonable attorneys' fees;

h.   Awarding Plaintiffs the costs of these proceedings; and

i.   Such other and further relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand trial by jury as to all issues.

Respectfully submitted this 26TH day of August, 2019.

BY:    CHARLES AND DEBBIE TROBONA

BY:    GEORGE W. HEALY, IV & ASSOCIATES


BY: /s/ George W. Healy IV
George W. Healy, IV (LA Bar No. 14991)
George W. Healy, IV & Associates
1323 28th Avenue, Suite A
Gulfport, MS 39501
(t) 228-575-4005
(f) 228-575-4006
gwhealyiv@aol.com

41