# U.S. District Court
## District of New Jersey [LIVE] (Trenton)
## CIVIL DOCKET FOR CASE #: 3:19-cv-16839-AET-TJB

TRUFOLO v. MONSANTO CO et al
Assigned to: Judge Anne E. Thompson
Referred to: Magistrate Judge Tonianne J. Bongiovanni
Cause: 28:1332 Diversity-Wrongful Death

Date Filed: 08/18/2019
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**SANTO TRUFOLO**

represented by **DEREK SCOTT FANCIULLO**
MATSIKOUDIS & FANCIULLO LLC
128 Monticello Avenue, STR 1
JERSEY CITY, NJ 07304
201-915-0407
Fax: 201-536-2026
Email: dfanciullo@mf-legal.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**MONSANTO COMPANY**

**Defendant**

**BAYER AG**

**Defendant**

**JOHN DOES 1-50**

| Date Filed | # | Docket Text |
|---|---|---|
| 08/18/2019 | 1 | COMPLAINT against All Defendants ( Filing and Admin fee $ 400 receipt number 0312-9901071) with JURY DEMAND, filed by SANTO TRUFOLO. (Attachments: # 1 Exhibit EXHIBIT A - JOANN TRUFOLO WILL, # 2 Civil Cover Sheet)(FANCIULLO, DEREK) (Entered: 08/18/2019) |
| 08/19/2019 | | CLERK'S QUALITY CONTROL MESSAGE - The case you electronically filed has been processed, however, the following deficiencies were found: In the future when choosing parties please choose each party individually. Do **NOT** select the **ALL PLAINTIFFS** or **ALL DEFENDANTS** button . The Clerk's Office has made the appropriate changes. Please refer to the Attorney Case Opening Guide for processing electronically filed cases. (jjc, ) (Entered: 08/19/2019) |
| 08/19/2019 | | Judge Anne E. Thompson and Magistrate Judge Tonianne J. Bongiovanni added. (abr) (Entered: 08/19/2019) |
| 08/19/2019 | | CLERK'S QUALITY CONTROL MESSAGE - DEREK S. FANCIULLO appears to have address information that does not match the court's records for this case. Please refer to the |

| | | court's website at www.njd.uscourts.gov for information and instructions on maintaining your account. (abr) (Entered: 08/19/2019) |
|---|---|---|
| 08/19/2019 | 2 | SUMMONS ISSUED as to BAYER AG, MONSANTO COMPANY. Attached is the official court Summons, please fill out Defendant and Plaintiffs attorney information and serve. (abr) (Entered: 08/19/2019) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 09/17/2019 11:14:01 | | |
| **PACER Login:** | hllp1982:2634105:4722683 | **Client Code:** | 1417.0049 |
| **Description:** | Docket Report | **Search Criteria:** | 3:19-cv-16839-AET-TJB Start date: 1/1/1970 End date: 9/17/2019 |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

WILLIAM C. MATSIKOUDIS
Bmatsikoudis@mf-legal.com
DEREK S. FANCIULLO
dfanciullo@mf-legal.com
**MATSIKOUDIS & FANCIULLO, LLC**
128 Monticello Avenue, STR 1
Jersey City, New Jersey 07304
(t) (201) 915-0407
(f) (201) 536-2026
*Attorneys for Plaintiffs*
*JoAnn Trufolo and Santo Trufolo*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SANTO TRUFOLO, <br><br> Plaintiff, <br><br> v. <br><br> MONSANTO COMPANY, BAYER AG and JOHN DOES 1-50, <br><br> Defendants. | Civil Action No.: <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Santo Trufolo, ("Santo" or "Plaintiff"), Executor of the Estate of JoAnn Trufolo ("JoAnn"), his spouse, by and through his undersigned attorneys, hereby brings this Complaint for damages against Defendants Monsanto Company ("Monsanto"), Bayer AG ("Bayer") and John Does 1-50, and alleges as follows:

### INTRODUCTION AND NATURE OF THE CASE

1.  This is a love story with the unhappiest of endings. JoAnn and Santo were married for

nearly three decades, and had known each other virtually forever. They went through thick and thin together. However, Roundup® destroyed everything they had.

2. In the early 1990s, as Plaintiff will set forth in detail below, JoAnn purchased her first bottle of Roundup®. It worked great. She ultimately purchased and used dozens more bottles. But, she and Santo could never have imagined the extreme pain and suffering they would endure as a result.

3. Indeed, Santo could only watch helplessly as JoAnn fought through *two* bouts with cancer and many more brushes with death – all because of Roundup®.

4. Alas, on July 28, 2019, Roundup® won. After more than a year-long battle – three rounds of chemotherapy, a devastating immunotherapy regime and even a last-ditch clinical trial – JoAnn lost her fight to the cancer Roundup® caused.

5. Santo was at JoAnn's side when she died. He brings this suit in his wife's memory.

6. In legal terms, this is an action for damages suffered by Plaintiffs as a direct and proximate result of Defendants' negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup®, containing the active ingredient glyphosate.

7. Plaintiffs allege and maintain that Roundup® and/or glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and/or sold in commerce, and lacked proper warnings and directions as to the dangers associated with its and/or their use.

8. Like those afflicting thousands of similarly-situated victims of Defendants across the

2

country and world, the harms Plaintiffs suffered were avoidable. JoAnn should never have gotten cancer the first time, let alone the second. She should still be alive today. Defendants killed her, and they must pay.

## JURISDICTION AND VENUE

9.    This Court has jurisdiction over Defendants and this action pursuant to 28 U.S.C. § 1332 because, as Plaintiff will articulate below, there is complete diversity of citizenship between Plaintiff and Defendants. Defendants are either all incorporated and/or have their principal places of business outside of the state in which Plaintiff resides. Additionally, the amount in controversy between Plaintiff and Defendants exceeds $75,000, exclusive of interest and costs.

10. The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

11. Venue is proper within this district pursuant to 28 U.S.C. § 1391 in that Defendants conduct regular business in and are subject to personal jurisdiction in this district. Furthermore, Defendants sell, market and/or distribute Roundup® within the District of New Jersey. Additionally, a substantial part of the acts and/or omissions giving rise to these claims occurred within this district.

## THE PARTIES

12. Plaintiff repeats and realleges the allegations of the preceding paragraphs as if same were more fully set forth herein.

13. JoAnn Trufolo was a natural person and, at all relevant times, a resident and citizen of the State of New Jersey. As intimated above, Santo brings this action on JoAnn's behalf for personal injuries sustained and her wrongful death caused by exposure to Roundup® ("Roundup"), containing the active ingredient glyphosate and the surfactant

3

POEA. As a direct and proximate result of being exposed to Roundup, JoAnn *twice* developed non-Hodgkin's Lymphoma and, as a consequence of necessary treatments for her cancer, a host of other life-threatening illnesses, diseases and conditions. Ultimately, the fight was too much: Though doctors tried everything during JoAnn's second fight with cancer, nothing worked. Approximately ten days after she was taken off a last-ditch experimental therapy, JoAnn died.

14. Plaintiff Santo Trufolo is a natural person and, at all times relevant, has been and is a resident and citizen of the State of New Jersey. Santo brings this action on his own behalf for loss of JoAnn's consortium, which Santo suffered as a direct and proximate result of JoAnn's exposure to Roundup.

15. "Roundup" refers to all formulation of Defendants' Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to- Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup

4

Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

16. Defendant Monsanto Company("Monsanto") was, at least at various times relevant, a Delaware corporation with a principal place of business of and in St. Louis, Missouri. At a minimum, Monsanto remains a subsidiary of Bayer, as same is defined immediately below.

17. Defendant Bayer AG ("Bayer," and, together with Monsanto and John Does 1-50, as defined immediately *infra*, the "Monsanto Defendants" and/or the "Defendants," and, each, a "Monsanto Defendant," and/or "Defendant") is a multinational pharmaceutical, health care, agricultural chemical and biological technology company headquartered in Leverkusen, Germany. On or about September 14, 2016, Bayer acquired Monsanto via a definitive merger agreement.

18. Upon information and belief, Defendants John Does 1-50 are subsidiaries, partners, or other entities or persons that and/or who were involved in the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of Roundup, containing the active ingredient glyphosate. The identities of Defendants John Does 1-50 are unknown to Plaintiffs at this time, and Plaintiff will seek leave from the Court to specifically name John Does 1-50 as their identities become known to Plaintiffs through discovery.

19. At all times mentioned herein, Defendants, and each of them, were authorized and empowered by each other to act, and did so act as agents of each other, and all of the claims herein alleged to have been done by them and/or each of them were thus done in the capacity of such agency. Upon information and belief, all Defendants were and are responsible in

5

some manner for the events described herein, and are liable to Plaintiff for the damages JoAnn and Santo have incurred.

20. At all times relevant, Defendants engaged in the business of developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup, and, upon information and belief, continue to engage in the business of developing, manufacturing, testing, packaging, marketing, distributing, labeling and/or selling Roundup.

21. Upon information and belief, Defendants did act together to design, sell, advertise, manufacture and/or distribute Roundup, with full knowledge of its dangerous and defective nature.

22. At all times relevant, Defendants have been and are still authorized to do business in New Jersey, and have derived and continue to derive substantial income from doing business in New Jersey.

23. Defendants have transacted and conducted business within the State of New Jersey that relates to the allegations in this Complaint.

24. To this end, at all times relevant, Defendants have advertised and sold goods, specifically including, but not necessarily limited to, Roundup, in New Jersey, and, upon information and belief, continue to sell goods, including, but not necessarily limited to, Roundup, in New Jersey. Indeed, on or about May 28, 2019, Defendants ran various television advertisements for Roundup in central New Jersey, which expressly stated that Roundup "has been trusted for more than forty years."

25. Defendants derived substantial revenue from goods and products used in the State of New Jersey, including, but not necessarily limited to, Roundup.

26. Defendants expected or should have expected their acts to have consequences within

6

the State of New Jersey, and they derived substantial revenue from interstate commerce.

27. Moreover, upon information and belief, Defendants have purposely availed themselves of the privilege of conducting activities and business in the State of New Jersey, thus invoking the benefits and protections of its laws.

**FACTUAL ALLEGATIONS**

28. Plaintiff repeats and realleges the allegations of the preceding paragraphs as if same were more fully set forth herein.

<u>MONSANTO AND ITS WEED KILLER</u>

29. As intimated above, at all relevant times, Defendants were and presently are in the business of, and did and still do, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or have acquired and are responsible for Defendants who and/or that have designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed the commercial herbicide Roundup.

30. Prior to its merger with Bayer, Monsanto was a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It was – and, even after the aforesaid merger, remains – the world's leading producer of glyphosate.

31. Defendants discovered the herbicidal properties of glyphosate during the 1970s, and subsequently began to design, research, manufacture, sell and distribute glyphosate-based Roundup as a broad-spectrum herbicide.

32. Glyphosate is the active ingredient in Roundup.

33. Not surprisingly, then, glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops and plants grown around the globe.

34. Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only

on whether a given organism produces a specific enzyme – 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

35. Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue, and ultimately plant death.

36. Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems and roots, and detectible quantities accumulate in the plant tissues.

37. Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban and other residential lawns and gardens, parks and golf courses. The increase in use has been driven largely by the proliferation of genetically-engineered crops – crops specifically tailored to resist the activity of glyphosate, as well as by the advertising and marketing activities of Defendants.

38. Defendants are intimately involved in the development, design, manufacture, marketing, sale and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup – i.e., "Roundup Ready®." As of 2009, Defendants were the world's leading producer of seeds designed to be Roundup Ready®. In 2010, an estimated Seventy Percent (70%) of corn and cotton fields, and Ninety Percent (90%) of soybean fields in the United States contained Roundup Ready® seeds.

39. The original Roundup, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the world's most widely-used herbicides. Defendants' glyphosate products are registered in more than 130 countries and are approved for weed control with respect to more than 100 crops. No other herbicide active ingredient compares in terms of number of use.

8

Registration Requirements of Herbicides Under Federal Law

40. The manufacture, formulation and distribution of herbicides such as Roundup are regulated under the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the United States Environmental Protection Agency ("EPA") prior to their distribution, sale or use, except as described by 7 U.S.C. § 136a(a).

41. The EPA requires, as part of the registration process, and among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of a product's safety. The determination the EPA makes in registering or re-registering a product is *not* that the product is "safe," but, rather, that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

42. FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to engage in a risk/benefit analysis as it determines whether a registration should be granted or allowed to continue to be sold in commerce.

43. The EPA and the State of New Jersey registered Roundup for distribution, sale and manufacture in the United States and the State of New Jersey.

44. FIFRA generally requires that a registrant (e.g., Monsanto and/or Bayer) conduct

9

health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

45. The evaluation of each pesticide product distributed, sold or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to re-evaluate these pesticides, the EPA has demanded and demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

46. In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment – in relation to the re-registration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in the light of certain findings by the World Health Organization, as same are described *infra*.

### Monsanto's False Representations Regarding Roundup's Safety

47. In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "**safer than table salt**" and "practically **non-toxic**" to mammals, birds, and fish. Representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup included, but were not necessarily limited to, the following:

a. Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

b. And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c. Roundup biodegrades into naturally occurring elements.

d. Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e. This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f. You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g. Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h. Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i. You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j.  "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

48. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, *inter alia*, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a.  its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

b.  its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;

c.  its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

d.  its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics";

e.  glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and

f.  its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

49. Monsanto did not alter its advertising in the same manner in any state other than

12

New York, and, on information and belief, still has not done so.

50. However, New York's was not the only legal system to target Monsanto's Roundup claims. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."

<u>Clear Evidence of Roundup's Carcinogenicity</u>

51. As early as the 1980s, Monsanto was aware of glyphosate's carcinogenic properties.

52. On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a "Category C oncogene." Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

53. In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.

54. In October 1991 the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.

55. In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendants' Roundup products are more dangerous and toxic than glyphosate alone. As early as 1991, evidence existed demonstrating that glyphosate formulations were significantly more toxic than

13

glyphosate alone.

56. In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

57. The study found that Defendants' Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

58. In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell-cycle dysregulation.

59. The 2004 Marc study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Moreover, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."

60. In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are significantly more toxic and harmful than those of the same concentrations of glyphosate alone.

61. The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be (i) the result of other chemicals, namely the surfactant POEA, or, (ii) alternatively, due to the possible synergy between glyphosate and Roundup formulation products.

62. In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

14

63. The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify the toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is *always* more toxic than its active ingredient glyphosate is alone.

64. The results of these studies were confirmed in recently-published peer-reviewed studies and were at all times available and/or known to Defendants.

65. Defendants knew or should have known that Roundup is more toxic than glyphosate alone, and that safety studies on Roundup, Roundup's adjuvants and allegedly "inert" ingredients, and/or the surfactant POEA were necessary to protect JoAnn, Santo and other consumers from Roundup.

66. Defendants knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

67. Defendants failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect JoAnn, Santo and other consumers from Roundup.

68. Rather than performing appropriate tests, Defendants relied upon flawed industry-supported studies designed to protect Defendants' economic interests rather than JoAnn, Santo and the consuming public.

69. Despite their knowledge that Roundup was considerably more dangerous than

15

glyphosate alone, Defendants continued to promote Roundup as safe – and still do.

WHO-IARC Classification of Glyphosate

70. The International Agency for Research on Cancer ("IARC") is an expert intergovernmental agency the World Health Organization ("WHO") of the United Nations. The IARC is tasked with conducting and coordinating research into the causes of cancer.

71. The IARC produces so-called "Monographs" – studies that "identify environmental factors that are carcinogenic hazards to humans."

72. An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015–2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: The substance must have already exhibited some evidence of carcinogenicity, and there must be evidence that humans are exposed to the substance.

73. IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

74. On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendants' possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Defendants' Roundup herbicide, is a Class 2A "probable carcinogen" as

16

demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

75. The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A *probable* carcinogen to humans. According to the authors glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

76. The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

77. The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

<u>The ATSDR Classification of Roundup as a Carcinogen –</u>

<u>And Monsanto's Coordination with the EPA to Try and Bury It</u>

78. The Agency for Toxic Substances Disease Registry (the "ATSDR") is a federal agency tasked with evaluating the potential adverse human health effects of exposures to hazardous substances in the environment.

79. In February 2015, the ATSDR announced plans to publish its toxicological profile of glyphosate (the "ATSDR Report") by no later than October 2015.

80. However, the ATSDR Report was not ready for release in October 2015. Indeed, it was nowhere near ready: Instead, by October 2015, the ATSDR Report had been shelved – put on hold indefinitely.

81. The indefinite hold placed on the ATSDR Report was hardly coincidence. It was, in

17

large part, Monsanto's handiwork. This said, Monsanto could not delay the ATSDR Report alone: Shockingly, **Monsanto conspired with EPA officials to kill the ATSDR Report.**

82. After WHO/IRAC classified glyphosate as a carcinogen, Monsanto was reeling. To make matters worse, its executives learned about the ATSDR Report, and worried it would reach the same conclusions as WHO/IRAC.

83. So, Monsanto went to work.

84. In April 2015, Dan Jenkins ("Jenkins"), Monsanto's lead United States regulatory liaison, suggested that the Company reach out to Jess Rowland ("Rowland"), the then-deputy director of the health effects division of the EPA's Office of Pesticide Programs (the "OPP"). The OPP administers and enforces FIFRA, and thereby "regulates the use of all pesticides in the United States and establishes maximum levels for pesticide residues in food, thereby safeguarding the nation's food supply." In short, the OPP was thus the EPA division in charge of regulating Roundup.

85. At the same time, internally, Monsanto discussed producing and providing to EPA in-house experiments and studies – ammunition to "help [the EPA] defend the [WHO/IRAC and ATSDR] situation."

86. At the time, the EPA was also performing an assessment of glyphosate.

87. Ultimately, Jenkins spoke with Rowland, who asked Jenkins and Monsanto for a "contact name at ATSDR."

88. Rowland told Jenkins and Monsanto that he would contact the ATSDR and "establish" "coordination" between the EPA and ATSDR – and expressly stated: "**If I can kill [the ATSDR Report] I should get a medal**." In an email to fellow Monsanto officials, including Monsanto's chief scientist, Jenkins relayed that, "it's good to know they [the

18

EPA] are going to actually make the effort to coordinate ..."

89. But, Monsanto was not done. It took its fight against the ATSDR Report up the ladder.

90. On May 19, 2015, Michael Dykes ("Dykes"), who was then Monsanto's long-time Vice President for Government Affairs directly emailed Jim Jones ("Jones"), the Assistant Administrator for the EPA's Office of Chemical Safety & Pollution Prevention. In effect, as Presidential appointee with oversight of the OPP, Jones was Rowland's boss. In the email, Dykes recounts a conversation he had with Jones about the ATSDR Report, and pressed Jones over whether he had "learn[ed] anything more about [the ATSDR's] efforts." In turn, Jones emailed his staff: "Monsanto thinks ATSDR is doing a glyphosate assessment. Could you guys run that down?"

91. Jones and his staff determined that Dr. Patrick Breyesse ("Breyesse") was in charge of the ATSDR Report's production. On May 20, 2015, at Jones' (and, effectively, Monsanto's) behest, OPP Director Jack Housenger ("Housenger") emailed Breyesse, and expressed concern whether there was a "need" for the ATSDR to do its review of glyphosate, given that the EPA was planning to release its assessment of glyphosate in July 2015. Housenger essentially demanded to speak expressly questioned "whether this is a good use of government resources."

92. While the ATSDR determined that the ATSDR Report and the EPA study would overlap, the two reviews would not be "totally duplicative."

93. Nonetheless, when Breyesse emailed back suggesting his staff would be in touch, Housenger persisted, again calling the potentially damaging ATSDR Report a "duplicative government effort."

19

94. However, at the same time, Monsanto also went to work on officials from United States Department of Health and Human Services ("HHS") – a more direct route for Monsanto to get what it wanted: The ATSDR is an agency within HHS. Dykes complained to HHS officials about the ATSDR Report, indicating that Monsanto was "concerned" ATSDR was "even reviewing glyphosate, as were the people we talked with at EPA." HHS officials suggested Monsanto *reach out directly to ATSDR staff*, and gave Monsanto direct contact information for the ATSDR officials working on the ATSDR report.

95. By late June 2015, Monsanto's efforts began to pay dividends. Jenkins emailed a host of Monsanto executives and relayed that ATSDR "promised" Housenger that it would put the ATSDR Report "on hold" until after the EPA released its "preliminary risk assessment" (a "PRA") for glyphosate.

96. However, while it had won a battle, Monsanto realized the war was far from over. The PRA was due out in August – so, at best, Monsanto had only won a temporary stay. Additionally, Jenkins lamented that ATSDR was still fighting:

> "ASTDR [believes its] process is distinguishable and not duplicative. They look at different endpoints and told EPA they don't 'make a call on cancer,' but, I think we should continue to be cautious."

97. William Heydens, Monsanto's chief scientist, replied:

> "'Distinguishable and not duplicative'? Seriously? And I will believe the not 'making a call on cancer' part when I see it. Anyway, at least they know they are being watched, and hopefully that keeps them from doing anything too stupid."

98. Jenkins responded that he "[c]ompletely agree[d]." He complained that the "EPA

has had several issues in the past with ATSDR coming to different conclusions," and that ATSDR was considered by EPA to be "VERY conservative and IARC-like in this regard as well as the fact that they are hazard-based." Jenkins concluded that the ATSDR still "[m]akes me nervous ..."

99. So, Monsanto kept pressing – and in October 2015, got the good news it had worked with the EPA to engineer: Per Housenger, ATSDR had put the ATSDR Report on indefinite hold – the agency would wait to release the report until the EPA released its risk assessment (which the EPA had delayed on multiple occasions by that point).

100.     Ultimately, the EPA released a mere *draft* risk assessment for glyphosate on December 18, 2017. Perhaps unsurprisingly, it concluded that glyphosate is not likely to be carcinogenic.

101.     On April 8, 2019, the ATSDR released its Draft ATSDR Report. While cautiously worded, the ATSDR Report cited several studies and linked glyphosate to various forms of cancer, including, but not limited to, non-Hodgkin's lymphoma.

102.     On April 30, 2019, the EPA proposed "management measures" for glyphosate-based weed-killers, to "help farmers target pesticide sprays on the intended pest, protect pollinators, and reduce the problem of weeds becoming resistant to glyphosate." Despite the ATSDR Report, the EPA maintained that glyphosate does not pose a carcinogenic risk to humans. However, the agency worried about glyphosate's impact on, *inter alia*, the monarch butterfly.

<u>Earlier Evidence of Glyphosate's Toxic Dangers</u>

103.     Undoubtedly, the major reason that Monsanto worked so hard to deflect the IARC's classification of glyphosate as a carcinogen and bury the ATSDR Report:

Monsanto had known about toxic health threats glyphosate and Roundup posed *for decades*.

104.     The term "genotoxicity" is used in reference chemicals that can damage a living cell's DNA. "Genotoxins" are mutagens – they can cause mutations, and, as such, cancer.

105.     In 1997, Chris Clements, of the University of Windsor in Ontario, Canada, published "Genotoxicity of select herbicides in *Rana catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay." The Clements study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

106.     Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress. Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

107.     For instance, he IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

108.     In 2006 César Paz-y-Miño, of the Centro de Investigación Genética y Genómica in Ecuador, published a study examining DNA damage in human subjects exposed to glyphosate. Paz-y-Miño The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

109.     The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-

22

based formulations is strong."

110.     Despite knowledge to the contrary, Defendants maintain that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

111.     In addition to glyphosate and Roundup's genotoxic properties, Defendants have long been aware of glyphosate's carcinogenic properties.

112.     Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

113.     Defendants have known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

114.     In 1985 the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

115.     In 2003 Lennart Hardell and Mikael Eriksson, of the Department of Oncology of the Orebro Medical Center in Sweden, published the results of two case-controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

116.     The studies concluded that glyphosate had the most significant relationship to NHL among all herbicides studies with an increased odds ratio of 3.11.

117.     In 2003 AJ De Roos published another study examining the pooled data of

midwestern farmers, examining pesticides and herbicides as risk factors for NHL. This De Roos study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

118.     In 2008, Mikael Eriksson published a study a population based case-control study of exposure to various pesticides as a risk factor for NHL. This strengthened previous associations between glyphosate and NHL.

<u>Defendants' Constant – and Continued - Denials</u>

119.     In spite of this knowledge, Defendants have continued to, and still do, issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

120.     Upon information and belief, these statements and representations have been made with the intent of inducing JoAnn, Santo, the agricultural community, and the public at large to purchase, and increase the use of, Defendants' Roundup for Defendants' pecuniary gain, and in fact did induce Joann and Saanto to use Roundup.

121.     Defendants made these statements with complete disregard and reckless indifference to not only the aforesaid objective scientific truth, but the safety of JoAnn, Santo and the general public.

122.     Notwithstanding Defendants' representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

123.     Defendants knew or should have known that glyphosate is associated with

an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

124.     Defendants failed to appropriately and adequately inform and warn consumers, including, but not limited to JoAnn and Santo, of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

125.     Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendants continue to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non- genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

126.     Indeed, Defendants have done the exact opposite: Defendants have claimed and continue to claim that Roundup is safe, non-carcinogenic, and non-genotoxic. In short, Defendants have persisted in selling the false narrative that Roundup is – and has always been – safe can thus be "trusted."

127.     Monsanto has claimed that that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic".

25

128.     Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

129.     Even today, Defendants claim on the Monsanto website that cite to regulatory studies conducted by various United States and worldwide regulatory agencies for "confirm[ation]" of the proposition that "glyphosate and our glyphosate-based formulated products can be used safely and are not carcinogenic."

130.     Glyphosate, and Defendants' Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

131.     Defendants' statements proclaiming the safety of Roundup and disregarding its dangers misled consumers, including JoAnn and Santo.

132.     Despite Defendants' knowledge that Roundup was associated with an elevated risk of developing cancer, Defendants' promotional campaigns focused on Roundup's purported "safety profile."

133.     Defendants' failure to adequately warn JoAnn and Santo resulted in (1) JoAnn using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

134.     Defendants failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

135.     Moreover, rather than conspiring with the EPA to cover up the health hazards Roundup poses, Defendants had – and failed in – their duty to appropriately

inform and warn the EPA of those risks.

136.     The failure of Defendants to appropriately inform and warn the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

137.     The failure of Defendants to appropriately inform and warn the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

138.     The failure of Defendants to appropriately inform and warn the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

139.     By reason of the foregoing acts and omissions, and as Plaintiff will further articulate below, Plaintiff seeks compensatory damages as a result of JoAnn's use of, and exposure to, Roundup, which caused or was a substantial contributing factor in causing JoAnn to suffer and die from cancer, specifically NHL, and Santo to suffer the loss of JoAnn's consortium and other psychological scars from being forced to bear witness to JoAnn's Roundup-induced, ultimately tragic life-or-death struggle. In short, JoAnn's life was wrongfully taken, JoAnn was wrongfully taken from Santo, and, while JoAnn was alive, JoAnn and Santo suffered severe and personal injuries that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

140.     By reason of the foregoing, and as they will further articulate below, JoAnn and Santo were and are severely and permanently injured.

141.     By reason of the foregoing acts and omissions, JoAnn was wrongfully

caused to die, JoAnn and Santo endured and/or have endured and, in some regards continue to suffer, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of the actions and inactions of the Defendants.

### PLAINTIFFS' EXPOSURE TO ROUNDUP'S HAZARDS AND ITS HORRORS

142.     In all, JoAnn used Roundup for more than two decades, to kill weeds at three different homes.  It cost her – and Santo – everything.

### Home #1: JoAnn is Introduced to Roundup

143.     In 1993, a year before she and Santo married, JoAnn moved in to Santo's suburban New Jersey home.

144.     As beautiful as Santo's house was, there was a problem: In the back corner of the property, near Santo's pool, Plaintiff's yard had been invaded by a neighbor's bamboo: Hundreds of stalks had spread into Plaintiffs' yard, and JoAnn and Santo had to get rid of it before it got entirely out of control.

145.     Alas, bamboo is notoriously bio-persistent, and, accordingly, nothing JoAnn tried would kill it.

146.     Nothing, that is, until JoAnn found Roundup.

147.     Sometime in 1994, after every other weed-killer had failed, JoAnn walked into a Home Depot, noticed a display touting Roundup's weed-killing prowess, and bought her first bottle.

148.     She immediately went home, marched to the back corner of the yard, leaned down over the bamboo, and began squirting Roundup into the stalks.

149.     Over the course of a couple of months, JoAnn went out and sprayed the bamboo with Roundup on at least fifty occasions, attacking it with countless squirts of

Roundup in the process.

150.    Indeed, JoAnn hammered the bamboo with a bottle or more of Roundup each week, until, lo and behold, it worked: Roundup killed all the bamboo.

151.    JoAnn was so impressed, she began using Roundup to kill weeds in a flower garden nearer the home.   It worked there, too.

152.    She also sprayed it countless times into cracks in concrete around outside of the house where weeds had a habit of growing. Roundup killed those.

153.    Over five years of living in this first home with Santo, JoAnn thus used Roundup religiously.

154.    Every time, Roundup killed every weed JoAnn could find – and it did it all while being as "safe as table salt."

155.    It never occurred to JoAnn or Santo what was to come.

    Home #2: Plaintiffs Move, Roundup Joins Them – and JoAnn Gets Sick

156.    Given that it was "all upside," Roundup became a powerful staple of JoAnn and Santo's home-care arsenal.

157.    So, when JoAnn and Santo moved from the first home to a townhome in Oakhurst, New Jersey, Roundup came with them.   The Oakhurst townhome was surrounded by concrete – and the weeds that grew up through its cracks.

158.    Those weeds were no match for JoAnn's Roundup – she sprayed countless squirts of Roundup to kill countless weeds around the townhome.

159.    But, in 2005, JoAnn was in the shower when she noticed a lump the size of half of a hotdog in her groin area - a lump that was not there the day before.

160.    JoAnn called a doctor she knew, who sternly told her to come in right away,

29

then recommended that she immediately visit a groin surgeon.

161.    So, JoAnn could not believe it – but, she also was not about to take any chances: JoAnn went to Weill Cornell hospital and the best groin surgeon in New York City..

162.    The "hotdog" lump was a swollen lymph node. JoAnn's surgeon removed it, ran some tests, and determined JoAnn had follicular lymphoma.

163.    JoAnn and Santo were stunned.

164.    JoAnn had always been, as she describes it, "as healthy a horse." There was no history of cancer in her family.  There was certainly no history of any form of lymphoma.

165.    JoAnn immediately started treatment.  For 17 straight days, she drove to Weill Cornell and received radiation.  Each time, she sat in the hospital's waiting room with cancer patients who had lost their hair, who all looked so ill.  It was almost impossible to believe she was there – let alone a patient, too.

166.    Meanwhile, Santo went into shock.  Indeed, he has blocked out much of JoAnn's bout with follicular lymphoma. But, Santo vividly recalls being advised to visit a lawyer to make sure he and JoAnn had everything in order in case JoAnn did not survive. He also remembers the guilt he felt: As a dentist, Santo had to go to work to see *his own* patients while JoAnn got radiation treatments from her doctor.   Finally, he cannot forget the tears - how he would stand in the shower and cry and pray JoAnn would be okay.

167.    Ultimately – thankfully - the radiation worked.  JoAnn's lymphoma went into remission.

168.    She was even spared some of the harsher side-effects of the treatment: As

JoAnn recalls, "Thank God I never got sick; thank God I was not bald, lying on a couch."

169.    Beyond grateful, JoAnn and Santo would return to life as usual – at least, for a short while.

### House #3: JoAnn Goes Right Back to Roundup – and Her Cancer Returns

170.    Almost as soon as she got better, JoAnn went back to the garden – and using Roundup to kill weeds.

171.    JoAnn had no reason to think Roundup had anything to do with her cancer. Frankly, due to the acts and omissions of Defendants, JoAnn and Santo had no reason to think Roundup caused *any* cancer.

172.    A short time later, JoAnn and Santo moved again, to their "forever home," in an upscale golf community in Jackson, New Jersey.

173.    For years, JoAnn continued to use Roundup at this third home – mainly, to kill weeds that crop up in between the stone around the yard..

174.    In all, JoAnn regularly used Roundup across a 25-year period pursuant to all safety and precautionary warnings.

175.    For more than 13 lucky years after JoAnn's cancer went into remission, her life with Santo was wonderful.  JoAnn believed she had beaten the toughest test life would give her, and she and Santo looked forward to their golden years together.

176.    But on or about March 4, 2018, JoAnn got cancer again.

177.    It started with a simple back ache.  JoAnn thought little of it: She had been in a car accident years before, and sometimes her back would still hurt.

178.    Nevertheless, she went to her back doctor, who checked her out and determined that everything with her back was fine.

179.     So, JoAnn and Santo went to Florida.

180.     But, when they returned, JoAnn looked in the mirror and saw a huge lump on her neck that was not there when she got on the plane home.  She immediately feared the worst.

181.     JoAnn visited her oncologist who sent her for a (PET)scan.  Her oncologist called her at 8:00 p.m. the night of the test. JoAnn will never forget the words: "You're loaded," her doctor said.

182.     It was lymphoma - again.

183.     But, this time, the cancer was far worse: Large B-Cell Diffuse Lymphoma.

184.     The reason her doctor called so late: The doctor had to talk to the doctors at Weill Cornell hospital, to get JoAnn set up with someone there *immediately*, because she needed urgent help.

185.     The doctor also explained that JoAnn's back ache was the result of a swollen lymph node pressing on a nerve.  That back pain started six or eight weeks prior to the discovery of JoAnn's cancer.

186.     Finally, the doctor told her what was to come: Intense chemotherapy, and explained to JoAnn that she would go bald and be essentially restricted to lying on the couch – the exact fate she feared and thanked God she did not suffer the first time lymphoma struck.

187.     JoAnn was in shock and afraid. She faced six rounds of chemo, the loss of her hair, the loss of her identity – and, if things did not go well, the loss of everything.

188.     JoAnn suffered through the chemotherapy – and, though she went bald and looked sick, her doctors assured her she would be ok.

189.     They were wrong. JoAnn got better for only three weeks.

190.     But, in July 2018, she called her doctor and said: "There's something wrong. I don't feel well. You have to check me out."

191.     Her oncologist saw JoAnn, tested her and found it: In less than a month, the Large B-Cell Diffuse Lymphoma returned.

192.     JoAnn was admitted into the hospital and was put through a second, different chemotherapy regimen.  It was more difficult on her body than the first, and came with more and worse side effects. But, it did not work either.

193.     So, doctors tried a *third* chemo therapy – and *it* did not work.

194.     JoAnn was told she was "resistant" to chemotherapy. The Large B-Cell Diffuse Lymphoma simply would not leave JoAnn's body.

195.     Worse still, to administer the chemo treatments to JoAnn, doctors had to install a port in her body, which caused JoAnn to go into septic shock.  For a month, Santo had to connect and disconnect JoAnn from a pump machine, in an effort to fight off the sepsis.

196.     It was all too much for JoAnn and Santo to bear. JoAnn began to see a therapist to help her handle what was happening. As she describes it: "There was a place I could not go.  There was a place I could not bring my thoughts to, because it was too devastating. When someone says, 'You've got six treatments and you're going to be fine … but, then, you're not – that gets the ball rolling.  And you think about tall these things, and about all the people in your life you love and who love you … and you cannot go there. I had to fight a fight – and I had to try and stay away from that place."

197.     JoAnn was out of options.   So, in early fall 2018, her doctors tried a last-

33

ditch therapy to save JoAnn's life – "Car-T" treatment. In simple terms, "Car-T" treatment – or, more scientifically stated, "Car T-Cell Therapy" - modifies certain cells in a patient's immune system and reprograms them to attack cancer cells. Alas, Car-T treatment was brand new and had not been fully tested.

198.      To have any hope of surviving, JoAnn would have to become a guinea pig. She had no idea how difficult it would be. Since the "Car-T" treatment had not been fully tested, its side-effects were unpredictable. To put it mildly, they were *serious*.

199.      The treatment caused JoAnn to go through what is best described as a "neurological storm" – the Car-T violently affected JoAnn's brain and caused her to, among other things, forget who or where she was and not have any idea who Santo was. JoAnn never fully recovered from this.

200.      Additionally, the "Car-T" devastated JoAnn's immune system, so she got sick over and over and over again. Since her immune system was so depressed, JoAnn developed pneumonia and blood illnesses. As the Car-T was fighting JoAnn's cancer, these serious diseases it caused threatened JoAnn life, and she had to be placed in a "bubble" – a stereotypical room free from germs.

201.      The Car-T also caused JoAnn to suffer a pulmonary embolism and to develop atrial fibrillation. JoAnn will thus permanently be on blood thinners, and she will permanently suffer from various heart issues.

202.      Despite the incredible toll it took, the Car-T has not worked as doctors had hoped: JoAnn's Large B-Cell Diffuse Lymphoma showed signs of shrinkage, but, it was not eliminated by the Car-T treatment.

203.      Thus, JoAnn, Santo and JoAnn's doctors scrambled to find a new means to

save JoAnn's life.

204.     They thought they had found one: JoAnn was entered into a last-ditch immunotherapy-based clinical trial. Alas, after some initially promising results, in late July, JoAnn's fever spiked. As Santo put it, JoAnn's cancer had "blown up" and was everywhere. JoAnn was taken to the hospital, where doctors determined they could do no more and gave JoAnn days to live.  After approximately thirty-six hours in hospital hospice, JoAnn lost her fight, and Santo lost the love of his life.

205.      Defendants and their Roundup monster caused JoAnn's death – and took everything from Santo.

### EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS

206.     Plaintiff repeats and realleges the allegations of the preceding paragraphs as if same were more fully set forth herein.

207.     As stated above, due to the actions and omissions of Defendants, JoAnn and Santo had no idea – indeed, they had no way to know – that Roundup caused cancer, let alone, that it caused JoAnn's cancer.

208.     It was not until approximately early September 2017 that JoAnn and Santo had even the first inkling that Roundup might cause cancer: They heard a news blurb about a lawsuit regarding Roundup, and called a family friend (who was a lawyer), who conducted research and discovered that various suits had linked Roundup and cancer. When the family friend had dinner with JoAnn and Santo a couple weeks later, he explained his findings.

209.     This said, the running of any statute of limitations has been and must be tolled by reason of Defendants' fraudulent concealment. Defendants, through their

affirmative misrepresentations and omissions, actively concealed from Plaintiffs the true risks associated with Roundup and glyphosate. Indeed, even as recently as March 2019, Defendants have asserted, "the science confirms glyphosate-based herbicides do not cause cancer."

210.     As a result of Defendants' actions, JoAnn and Santo were unaware, and could not reasonably know or have learned through reasonable diligence that Roundup and/or glyphosate contact, exposed them to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

211.     Furthermore, Defendants are estopped from relying on any statute of limitations because of their fraudulent concealment of the true character, quality and nature of Roundup. Defendants were under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Defendants had and continue to have exclusive control, and because Defendants knew that this information was not available to JoAnn and Santo or to distributors of Roundup. In addition, Defendants are estopped from relying on any statute of limitations because of their intentional concealment of these facts.

212.     JoAnn and Santo had no knowledge that Defendants were engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendants, JoAnn and Santo could not have reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud should be considered. Defendants had the ability to and did spend enormous amounts of money in furtherance of their purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. JoAnn and Santo and medical professionals could not

have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendants' representations. Accordingly, Defendants are precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

## FIRST CAUSE OF ACTION - WRONGFUL DEATH

213.   Plaintiff repeats and realleges the allegations of the preceding paragraphs as if same were more fully set forth herein.

214.   Plaintiff's decedent, JoAnn Trufolo, died testate as a resident of the Township of Jackson, County of Ocean, State of New Jersey on July 28, 2019.

215.   Plaintiff Santo Trufolo, the Decedent's spouse, has been duly appointed Executor of the Estate of JoAnn Trufolo. (See **EXHIBIT A** annexed to this Complaint, Letters Testementary.)

216.   Defendants had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

217.   Defendants failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup into interstate commerce in that Defendants knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of NHL, as well as other severe and personal injuries which are permanent and lasting in

37

nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

218.    The negligence by the Defendants, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

a.    Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly testing it;

b.    Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup;

c.    Not conducting sufficient testing programs to determine whether or not Roundup was safe for use; in that Defendants herein knew or should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users;

d.    Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Defendants had knowledge that Roundup is, was, or could be carcinogenic;

e.    Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

f.    Negligently failing to adequately and correctly warn JoAnn and Ssanto, the public, the medical and agricultural professions, and the EPA of the

38

dangers of Roundup;

g.  Negligently failing to petition the EPA to strength the warnings associated with Roundup;

h.  Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

i.  Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

j.  Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

k.  Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

l.  Negligently designing Roundup in a manner, which was dangerous to its users;

m.  Negligently manufacturing Roundup in a manner, which was dangerous to its users;

n.  Negligently producing Roundup in a manner, which was dangerous to its users;

o.  Negligently formulating Roundup in a manner, which was dangerous to its users;

p.  Concealing information from the JoAnn and Saanto while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA

regulations;

q.    Improperly concealing and/or misrepresenting information from JoAann
      and Santo, scientific and medical professionals, and/or the EPA,
      concerning the severity of risks and dangers of Roundup compared to
      other forms of herbicides;

r.    Improperly conspiring with the EPA and/or various members thereof, to
      bury, delay, and/or otherwise diminish the impact of other governmental
      studies and reports on Roundup's toxicity and hazards; and

s.    Negligently selling Roundup with a false and misleading label.

219.    As stated above, via a myriad of means, Defendants under-reported,
underestimated, and downplayed, and/or caused to be under-reported, underestimated and
downplayed, the serious dangers of Roundup.

220.    Defendants negligently and deceptively compared the safety risks and/or
dangers of Roundup with common everyday foods such as table salt, and other forms of
herbicides.

221.    Defendants were negligent and/or violated New Jersey law in the designing,
researching, supplying, manufacturing, promoting, packaging, distributing, testing,
advertising, warning, marketing, and selling of Roundup in that they:

a.    Failed to use ordinary care in designing and manufacturing Roundup so as
      to avoid the aforementioned risks to individuals when Roundup was used
      as an herbicide;

b.    Failed to accompany their product with proper and/or accurate warnings
      regarding all possible adverse side effects associated with the use of

Roundup;

c.     Failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

d.     Failed to accompany their product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;

e.     Failed to warn JoAnn and Santo of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of NHL;

f.     Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup;

g.     Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants;

h.     Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity;

i.     Were otherwise careless and/or negligent.

222.     Despite the fact that Defendants knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Defendants continued and continue to market, manufacture, distribute, and/or sell Roundup to consumers, including JoAnn and Santo – and have even frequently done and continue to do so while emphasizing that Roundup is "safe" and "trusted."

223.     Defendants knew or should have known that consumers such as JoAnn and Santo would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care, as set forth above.

224.     As the direct and proximate result of Defendants' violations of law and/or negligence, JoAnn was caused to die.

225.     Defendants are thus liable to Plaintiff for damages, interest, attorney's fees and costs of suit as provided by the New Jersey Wrongful Death Statute, N.J.S.A. 2A:31-1, et seq. and as otherwise provided by law.

## SECOND CAUSE OF ACTION - NEGLIGENCE

226.     Plaintiff repeats and realleges the allegations of the preceding paragraphs as if same were more fully set forth herein.

227.     As a result of the foregoing acts and omissions, the Plaintiff's Decedent, JoAnn, was caused to greatly suffer prior to her death.

228.     Defendants are thus liable to Plaintiff pursuant to N.J.S.A. 2A:15-3 and as otherwise provided by law.

## THIRD CAUSE OF ACTION: STRICT PRODUCTS LIABILITY – DESIGN DEFECT

229.     Plaintiff repeats and realleges the allegations of the preceding paragraphs as if same were more fully set forth herein.

230.     Pursuant to N.J.S.A. 2A:58C-1, et seq. and otherwise under New Jersey law, a manufacturer has an absolute duty to make sure that its manufactured products that are placed into the stream of commerce are suitably safe when used for their intended or reasonably foreseeable purposes.

231.     With regard to Roundup, Defendants catastrophically failed to live up to this absolute responsibility: In diplomatic, legal terms, Roundup – an indiscriminate plant-killer that doubles as a treacherously efficient carcinogen - was defectively designed.

232.     At all times relevant and herein mentioned, the Defendants designed, researched, manufactured, tested, advertised, promoted, sold, distributed, and/or have acquired the Defendants who have designed, researched, tested, advertised, promoted, marketed, sold, and distributed Roundup as hereinabove described that was used by JoAnn.

233.     Defendants' Roundup was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendants.

234.     At those times, Roundup was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, JoAnn and Santo.

235.     The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup.

236.     The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective in design and/or formulation, in that, when it left the hands of the Defendants manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it

43

was more dangerous than an ordinary consumer would expect.

237.     At all times herein mentioned, Roundup was in a defective condition and unsafe, and Defendants knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendants. In particular, Defendants' Roundup was defective in a myriad of ways, including, but not necessarily limited to the following:

a.  When placed in the stream of commerce, Defendants' Roundup Products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate.

b.  When placed in the stream of commerce, Defendants' Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c.  When placed in the stream of commerce, Defendants' Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

d.  Defendants did not sufficiently test, investigate, or study its Roundup products.

e.  Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f.  Defendants new or should have known at the time of marketing its Roundup products that exposure to Roundup and could result in

44

cancer and other severe illnesses and injuries.

    g.  Defendants did not conduct adequate post-marketing surveillance of its Roundup products.

238.    As intimated above, Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

239.    Given the aforesaid, Defendants created a product that was and is unreasonably dangerous for its normal, intended use.

240.    Defendants knew or should have known that, at all times herein mentioned, Roundup was in a defective condition, and was and is inherently dangerous and unsafe.

241.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was manufactured defectively in that Roundup left the hands of Defendants in a defective condition and was unreasonably dangerous to its intended users.

242.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants reached their intended users in the same defective and unreasonably dangerous condition in which the Defendants' Roundup was manufactured.

243.    In particular, JoAnn was exposed to Defendants' Roundup via her purchase of Roundup at Home Depot and/or other "big box" stores, her use of Roundup around her and Santo's homes to eradicate common yard and garden weeds, and without knowledge of Roundup's dangerous characteristics.

244.    At the time of the JoAnn's use of and exposure to Roundup, she was using

Roundup for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

245.     JoAnn was thus a reasonably foreseeable user of Roundup.

246.     Moreover, the various injuries JoAnn sustained, including, but not limited to *both* occasions JoAnn developed lymphoma, were directly and proximately caused by Roundup's defect(s), or, at a minimum, Roundup was a substantial factor in causing JoAnn's injuries.

247.     Defendants voluntarily designed Roundup with a dangerous condition for use by the public, and in particular JoAnn.

248.     Defendants marketed and promoted a product in such a manner so as to make it inherently defective, as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

249.     Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to the JoAnn in particular, and Defendants are therefore strictly liable for the injuries sustained by the JoAnn.

250.     JoAnn could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

251.     By reason of the foregoing, the Defendants have become strictly liable to Plaintiff for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup.

252.     Defendants' defective design, of Roundup amounts to willful, wanton, and/or reckless conduct by Defendants.

46

253.     As a result of Defendants' foregoing acts and omissions, JoAnn (i)
developed NHL, suffered severe and personal injuries, which were permanent and lasting
in nature, physical pain and mental anguish, including diminished enjoyment of life, and
financial expenses for hospitalization and medical care, and (ii) was caused to die.

254.     Defendants area thus liable to Plaintiff under N.J.S.A. 2A:58C-1 for the
conscious physical pain and suffering Plaintiff's Decedent, JoAnn, sustained from the date
of onset of JoAnn's first symptoms of NHL up to and through the date and time of the
premature, untimely, wrongful death of JoAnn on July 28, 2019, as well as for her wrongful
death on July 28, 2019, by reason of having assembled, formulated, processed, designed,
tested, inspected, manufactured, advertised, sold, distributed and placed into the stream
of commerce, a defective product which was not reasonable, safe, suitable and fit for its
intended purpose because it was dangerous, unreasonably dangerous, and was
intentionally altered, modified and/or not manufactured to the same manufacturing
standards, specifications and formulae that would have made the product less dangerous
and/or safe.

**FOURTH CAUSE OF ACTION: STRICT PRODUCTS LIABILITY – FAILURE TO WARN**

255.     Plaintiff repeats and realleges the allegations of the preceding paragraphs as
if same were more fully set forth herein.

256.     Defendants have engaged in the business of selling, testing, distributing,
supplying, manufacturing, marketing, and/or promoting Roundup, and through that
conduct have knowingly and intentionally placed Roundup into the stream of commerce
with full knowledge that it reaches consumers such as JoAnn and Santo who were and are

exposed to it through ordinary and reasonably foreseeable uses.

257.      Defendants did in fact sell, distribute, supply, manufacture, and/or promote Roundup to Santo and JoAnn. Additionally, Defendants expected the Roundup that they were selling, distributing, supplying, manufacturing, and/or promoting to reach – and Roundup did in fact reach – consumers, including JoAnn and Santo, without any substantial change in the condition of the product from when it was initially distributed by Defendants.

258.      At the time of manufacture, Defendants could have provided warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

259.      At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Defendants, and at the time Joann was exposed to and/or ingested the product. The defective condition of Roundup was due, in part, to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side-effects, including, but not limited to, developing non-Hodgkin's lymphoma as a result of exposure and use.

260.      Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect health those exposed in violation of 7 U.S.C. § 136j(a)(1)(E).

261.      Defendants' failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed,

violated 7 U.S.C. § 136j(a)(1)(E) as well as the laws of the State of New Jersey.

262.    At all times herein mentioned, Defendants had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side-effects.

263.    Defendants could have amended the label of Roundup to provide additional warnings.

264.    Indeed, Defendants could have easily labeled, distributed, and promoted the aforesaid product to alert consumers like JoAnn that it was (and is) dangerous and unsafe for the use and purpose for which it was intended.

265.    However, Defendants failed to warn of the nature and scope of the side-effects associated with Roundup, namely its carcinogenic properties and its propensity to cause and/or serve as a substantial contributing factor in the development of NHL.

266.    JoAnn used Roundup in its intended and foreseeable manner.

267.    Roundup caused serious injury to JoAnn and JoAnn's death.

268.    Defendants were aware of the probable consequences of the aforesaid conduct. Despite the fact that Defendants knew or should have known that Roundup caused serious injuries, Defendants failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of developing NHL from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution. Defendants willfully and deliberately failed to avoid the consequences associated with their failure to warn, and in doing so, Defendants acted with a conscious disregard for the safety of JoAnn and Santo.

269.     At the time of exposure, neither JoAnn nor Santo could not have reasonably discovered any defect in Roundup prior through the exercise of reasonable care.

270.     Defendants, as the manufacturers and/or distributors of the subject product, are held to the level of knowledge of an expert in the field.

271.     JoAnn and Santo thus reasonably relied upon the skill, superior knowledge, and judgment of Defendants.

272.     Had Defendants properly disclosed the risks associated with Roundup, JoAnn would have avoided the risk of NHL by not using Roundup.

273.     The information that Defendants did provide or communicate failed to contain adequate warnings and precautions that would have enabled JoAnn and Santo, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

274.     Moreover, in an egregious affront, rather than simply alter Roundup's labelling and/or marketing to alert consumers like JoAnn of the dangers it posed and poses, Defendants acted in concert with various directors, officials and staff members of the EPA to cover up of Roundup's catastrophic hazards.

275.     To this day, Defendants have failed to adequately warn of the true risks, including, but not limited to the conscious harms JoAnn suffered and JoAnn's death, associated with the use of and exposure to Roundup.

276.     Indeed, Defendants have refused and continued to refuse to warn of the true risks of Roundup, choosing instead to continue to market and advertise Roundup as "safe" and "trusted."

277.     As a result of Defendants' inadequate warnings, Defendants' Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by JoAnn.

278.     As a direct and proximate result of Defendants' actions as alleged herein, and in such other ways as to be later shown, Roundup caused JoAnn (i) to sustain the injuries herein alleged and (ii) to die.

## FIFTH CAUSE OF ACTION: BREACH OF IMPLIED WARRANTIES

279.     Plaintiff repeats and realleges the allegations of the preceding paragraphs as if same were more fully set forth herein.

280.     At all times herein mentioned, the Defendants manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold Roundup and/or have recently acquired the Defendants who have manufactured, compound portrayed, distributed, recommended, merchandized, advertised, promoted, and sold Roundup, as a broad-spectrum herbicide. These actions were under the ultimate control and supervision of Defendants.

281.     At the time Defendants marketed, sold, and distributed Roundup for use by consumers including JoAnn and Santo, Defendants knew of Roundup's intended use

and impliedly warranted the product to be or merchantable quality and safe and fit for this use.

282.     Accordingly, Defendants had reason to know JoAnn purchased and used Roundup to kill weeds around her and Santo's various homes.

283.     The Defendants impliedly represented and warranted to JoAnn, Santo and users of Roundup, the agricultural community, and/or the EPA that Roundup was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.

284.     These representations and warranties were false, misleading, and inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

285.     JoAnn, Santo, and/or the EPA did rely on said implied warranty of merchantability of fitness for particular use and purpose.

286.     JoAnn and Santo reasonably relied upon the skill and judgment of Defendants as to whether Roundup was of merchantable quality and safe and fit for its intended use.

287.     Roundup was injected into the stream of commerce by the Defendants in a defective, unsafe, and inherently dangerous condition, and the products' materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

288.     The Defendants breached the aforesaid implied warranties, as their herbicide Roundup was not fit for its intended purposes and uses.

289.     As a result of the foregoing acts and omissions, JoAnn (i) suffered died from NHL, and various suffered severe and personal injuries which were permanent and lasting

in nature, physical pain and mental anguish, including diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic, and non-economic damages, and (ii) died from NHL.

## SIXTH CAUSE OF ACTION: FRAUD

290.     Plaintiff repeats and realleges the allegations of the preceding paragraphs as if same were more fully set forth herein.

291.     Defendants made various material misrepresentations and/or omissions to consumers, and particularly to JoAnn and Santo, including, but not necessarily limited to, Defendants' repeated assertions that (i) Roundup was and is safe, (ii) Roundup was and is "trusted," and has been "trusted" for more than forty years, and (iii) more specifically, (a) Roundup does not cause cancer and (b) "glyphosate and [Defendants'] glyphosate-based formulated products can be used safely and are not carcinogenic."

292.     Despite a critical mass of evidence to the contrary, Defendants continue to make these material misrepresentations and omissions to this day, and currently broadcast them through a host of multimedia advertisements, via assertions and proclamations on their website(s), and through various public (and press relations) statements.

293.     Defendants made, have made and continue to make such misrepresentations and/or omissions knowingly, willfully and with the intent to induce consumers, including, but not limited to, JoAnn and Santo, to rely thereon.

294.     Simply, as Defendants have been in the business of selling – and making mountains of money off of – Roundup, they needed consumers like JoAnn and Santo to believe Roundup was and is safe and trustworthy. Put differently, had Defendants not lied about Roundup's "safety," and had they instead told JoAnn the truth – that Roundup would

cause her to fight for her life (twice) against cancer – JoAnn would not have purchased Roundup.

295.      JoAnn and Santo reasonably relied on the misrepresentations and/or omissions made by Defendants to their detriment. They had no way to know that Roundup caused cancer and was otherwise unsafe. They reasonably relied on Monsanto to tell the truth about Roundup and/or provide regulatory entities the information and latitude they needed to properly assess Roundup.

296.      As a direct and proximate result of the misrepresentations and/or omissions of Defendants, JoAnn and Santo suffered, are suffering and will continue to suffer damages.

## SEVENTH CAUSE OF ACTION: VIOLATION OF NEW JERSEY'S CONSUMER FRAUD ACT

297.      Plaintiff repeats and realleges the allegations of the preceding paragraphs as if same were more fully set forth herein.

298.      JoAnn and SAnto were "consumers" within the meaning prescribed by the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, et seq. (the "CFA").

299.      Defendants are "persons" within the meaning set forth in the CFA.

300.      In advertising, distributing, injecting into the stream of commerce, selling and/or otherwise causing to be sold Roundup, Defendants have engaged in the use of unconscionable commercial practices, deception, false pretenses, false promises, misrepresentations, and/or the knowing concealment, suppression and/or omission of material facts.

301.      Defendants have thus engaged in conduct that violates the CFA. Such violative conduct includes, but is not necessarily limited do, the following false promises and/or misrepresentations:

a. Misleading consumers regarding glyphosate's carcinogenic properties and/or nature;

b. Misleading consumers regarding Roundup's carcinogenic properties and/or nature;

c. Misleading consumers regarding the "safety" of Roundup; and

d. Misleading consumers regarding whether Roundup could and can be "trusted."

302.    Additionally, Defendants' conduct in violation of the CFA includes, but is not limited to, the following knowing omissions of material fact:

a. Failing to notify consumers that Defendants were barred by the State of New York from asserting that:

 i. Defendants' glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

 ii. Defendants' glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;

 iii. Defendants' glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

 iv. Defendants' glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics";

v. glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and

vi. Defendants' glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

b. Failing to notify consumers that France's highest court determined that Roundup was not biodegradable and did not "[leave] the soil clean";

c. Failing to notify consumers that, as early as the mid-1980s, the EPA classified glyphosate as possible human carcinogen;

d. Failing to notify consumers that various studies, including reports published as early as 1991, demonstrated that Roundup (and its glyphosate formulation) was significantly more toxic and/or carcinogenic than glyphosate alone;

e. Failing to notify consumers that the IARC, and, by extension, the WHO, classified glyphosate as a *probable* carcinogen to humans; and

f. Failing to notify consumers that the ATSDR planned to publish a toxicological profile of glyphosate in October 2015 that would have linked glyphosate and Roundup to certain cancers, including, but not limited to, NHL.

303.     In addition to the various critical, material misrepresentations and/or omissions Defendants made regarding Roundup and/or glyphosate, Defendants also violated the CFA via their engagement in unconscionable commercial practices, including, but not limited to, conspiring with, acting in concert with, influencing and/or otherwise causing the EPA and/or various officials in the EPA to "kill" the ATSDR report and otherwise downplay the adverse health effects of Roundup and/or glyphosate.

304.     Defendants acted knowingly and intentionally with respect to every misrepresentation, false promise, omission and unconscionable commercial practice related to Roundup and JoAnn and/or Santo's purchase thereof.

305.     Each false promise, misrepresentation, and/or knowing concealment, suppression or omission of material fact, and each engagement in an unconscionable commercial practice by Defendants constitutes a separate violation under the CFA.

306.     As a direct and proximate result of Defendants' actions in violation of the CFA, JoAnn and Santo suffered and/or will continue to suffer damages.

## EIGHTH CAUSE OF ACTION: LOSS OF CONSORTIUM

307.     Plaintiff repeats and realleges the allegations of the preceding paragraphs as if same were more fully set forth herein.

308.     At all times relevant, Plaintiff and JoAnn were married.

309.     The marriage between Plaintiff and JoAnn continued through both of JoAnn's aforesaid bouts with NHL and until JoAnn's death.

310.     As a direct and proximate result of, *inter alia*, the carelessness, negligence, intentional conduct, and other various acts and omissions of Defendants, as same have been set forth more fully above, Santo, as husband of and to JoAnn, has suffered, continues to suffer and will suffer consequential damages, and has been deprived of JoAnn's full society, care, comfort, and companionship, and has otherwise suffered a loss of consortium, and was required to and will be required to expend substantial sums of money for the medical treatment, death, burial and funeral expenses incurred by reason of the conscious physical pain of JoAnn and her premature, untimely and wrongful death.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against the above-captioned Defendants, jointly, severally, and/or alternatively, on each of the above-referenced claims and causes of action as follows:

1. Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to, damages for pain, suffering, emotional distress, loss of enjoyment of life, loss of consortium and other non-economic damages in an amount to be determined at trial of this action;

2. Awarding compensatory damages to Plaintiffs for past and future damages, including, but not limited to, JoAnn's pain and suffering and for severe and permanent personal injuries sustained by JoAnn, including health care costs and economic loss;

3. Awarding economic damages in the form of medical expenses, out-of-pocket expenses, lost earnings and other economic damages, in an amount to be determined at a trial of this action;

4. Punitive and/or exemplary damages for the wanton, willful, fraudulent and reckless acts of the Defendants, who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public, and, in particular, the Plaintiffs, in an amount sufficient to punish Defendants and deter future similar conduct, to the extent allowed by applicable law;

5. Pre-judgment interest;

6. Post-judgment interest;

7. Awarding reasonable attorneys' fees;

8. Awarding Plaintiffs the costs of these proceedings; and

9. Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to all issues.

Dated: August 13, 2019
Jersey City, NJ

Respectfully submitted,

MATSIKOUDIS & FANCIULLO, LLC
*Attorneys for Plaintiff*

/s/William C. Matsikoudis, Esq.
WILLIAM C. MATSIKOUDIS, ESQ.

/s/ Derek S. Fanciullo, Esq.
DEREK S. FANCIULLO, ESQ.