JURYDEMAND

# U.S. District Court
## United States District Court for the Western District of Washington (Seattle)
## CIVIL DOCKET FOR CASE #: 2:19-cv-01368-BJR

Axelson et al v. Monsanto Company
Assigned to: Judge Barbara J. Rothstein
Cause: 28:1332 Diversity-Product Liability

Date Filed: 08/29/2019
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod.
Liability
Jurisdiction: Diversity

**Plaintiff**

**Maynard Russell Axelson**
*individually and as personal representative of the estate of*
Kathleen Ann Axelson

represented by   **Corrie Johnson Yackulic**
CORRIE YACKULIC LAW FIRM, PLLC
110 PREFONTAINE PLACE SOUTH
STE 304
SEATTLE, WA 98104
206-787-1915
Fax: 206-299-9725
Email: corrie@cjylaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 08/29/2019 | 1 | COMPLAINT against defendant(s) Monsanto Company with JURY DEMAND (Receipt # 0981-5905368) Attorney Corrie Johnson Yackulic added to party Kathleen Ann Axelson(pty:pla), Attorney Corrie Johnson Yackulic added to party Maynard Russell Axelson(pty:pla), filed by Maynard Russell Axelson, Kathleen Ann Axelson. (Attachments: # 1 Civil Cover Sheet, # 2 Summons)(Yackulic, Corrie) (Entered: 08/29/2019) |
| 08/29/2019 | 2 | NOTICE of Pendency of Other Action in NDCA, case number in other court 16-md-02741-VC ; filed by Plaintiffs Kathleen Ann Axelson, Maynard Russell Axelson. (Yackulic, Corrie) (Entered: 08/29/2019) |
| 08/30/2019 | | Judge Barbara J. Rothstein added. (GT) (Entered: 08/30/2019) |
| 08/30/2019 | 3 | Summons Electronically Issued as to defendant Monsanto Company. (GT) (Entered: 08/30/2019) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 09/17/2019 08:56:17 | | |
| **PACER** | hllp1982:2634105:4722683 | **Client Code:** | 1417.0049 |

| Login: | | | |
|---|---|---|---|
| **Description:** | Docket Report | **Search Criteria:** | 2:19-cv-01368-BJR |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

Corrie J. Yackulic
CORRIE YACKULIC LAW FIRM PLLC
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725
Corrie@cjylaw.com

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MAYNARD RUSSELL AXELSON, *individually and as Personal Representative of the* ESTATE OF KATHLEEN ANN AXELSON, *deceased,* | Case No. |
| *Plaintiff,* | **COMPLAINT** |
| v. | *JURY DEMAND* |
| MONSANTO COMPANY | |
| *Defendant.* | |

## I.   **CIVIL COMPLAINT**

Plaintiff MAYNARD RUSSELL AXELSON, individually and as Personal

Representative of the ESTATE OF KATHLEEN ANN AXELSON, deceased, by and through

his undersigned attorneys, hereby brings this Complaint for damages against Defendant

Monsanto Company and alleges the following:

COMPLAINT
PAGE 1

## II.    **NATURE OF THE CASE**

1.      This is an action for damages suffered by Plaintiff and the Estate of KATHLEEN ANN AXELSON as a direct and proximate result of Defendant's negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup® ("Roundup"), containing the active ingredient glyphosate.

2.      Plaintiff maintains that Roundup and/or glyphosate are defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce and lacked proper warnings and directions as to the dangers associated with their use.

3.      Plaintiff's injuries and his wife's wrongful death, like those striking thousands of similarly situated victims across the country, were avoidable.

## III.    **JURISDICTION AND VENUE**

4.      This Court has jurisdiction over Defendant and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendant. Defendant is incorporated and has its principal place of business outside of Washington State, where the Plaintiff resides.

5.      The amount in controversy between Plaintiff and Defendant exceeds $75,000, exclusive of interest and cost.

6.      Venue is proper within this district pursuant to 28 U.S.C. § 1391 in that Defendant conducts business here and is subject to personal jurisdiction in this district. Furthermore, Defendant sells, markets, and/or distributes Roundup within the    Western    District    of Washington (Seattle).

COMPLAINT
PAGE 2

**Corrie Yackulic Law Firm PLLC**
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

## IV.    **PARTIES**

7.      Plaintiff MAYNARD RUSSELL AXELSON, *and his wife* KATHLEEN ANN AXELSON, *deceased*, at all times relevant to this action, were residents of their farm outside Mount Vernon, Skagit County, Washington. This action arises because of Mr. Axelson's wife's death due to her exposure to Roundup containing the active ingredient glyphosate and the surfactant polyethoxylated tallow amine ("POEA"). As a direct and proximate result of being exposed to Roundup, KATHLEEN ANN AXELSON developed non-Hodgkin's lymphoma.

8.      "Roundup" refers to all formulations of Defendant's Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to- Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup-Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

COMPLAINT
PAGE 3

9. Defendant MONSANTO COMPANY ("Monsanto") is a Delaware corporation, with a principle place of business in St. Louis, Missouri (Missouri Secretary of State Charter No. F00488018). Monsanto has transacted and conducted business within Washington State and has derived substantial revenue from goods and products used in this State.

10. All references to the acts and omissions of Defendant in this Complaint shall mean and refer to the actions of Monsanto by contract, the common law, or otherwise.

11. Defendant advertises and sells goods, specifically Roundup, in the State of Washington.

12. Defendant transacted and conducted business that relates to the allegations in this Complaint within the State of Washington.

13. Defendant derived substantial revenue from goods and products used in the State of Washington.

14. Defendant expected or should have expected its acts to have consequences within the State of Washington, and derived substantial revenue from interstate commerce.

15. Defendant engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup.

16. Upon information and belief, Defendant purposefully availed itself of the privilege of conducting activities with the State of Washington, thus invoking the benefits and protections of its laws.

17. Upon information and belief, Defendant did design, sell, advertise, manufacture and/or distribute Roundup, with full knowledge of its dangerous and defective nature.

COMPLAINT
PAGE 4

## V.     **FACTUAL ALLEGATIONS**

18.     At all relevant times, Defendant was in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or have acquired and are responsible for the commercial herbicide Roundup.

19.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate.

20.     Monsanto discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate based "Roundup" as a broad spectrum herbicide.

21.     Glyphosate is the active ingredient in Roundup.

22.     Glyphosate is a broad spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

23.     Glyphosate is a "non selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

24.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

25.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

26.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has been

COMPLAINT
PAGE 5

**Corrie Yackulic Law Firm PLLC**
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

27.     Defendant is intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup i.e., "Roundup Ready®." As of 2009, Monsanto was the world's leading producer of seeds designed to be Roundup Ready®. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready® seeds.

28.     The original Roundup, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the world's most widely used herbicides.[1]

29.     For nearly 40 years, consumers, farmers, and the public have used Roundup, unaware of its carcinogenic properties.

## VI.    REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

30.     The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 et seq.  FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA) prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. 136a(a).

31.     The EPA requires as part of the registration process, among other requirements,

---

[1] *Backgrounder,* History of Monsanto's Glyphosate Herbicides, June 2005.

COMPLAINT
PAGE 6

Corrie Yackulic Law Firm PLLC
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential nontarget organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or reregistering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

32.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

33.     The EPA and the State of Washington registered Roundup for distribution, sale, and manufacture in the United States, including the State of Washington.

34.     FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

35.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of reevaluating all pesticide products through a Congressionally mandated process called "reregistration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

COMPLAINT
PAGE 7

Corrie Yackulic Law Firm PLLC
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

36.     In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment in relation to the registration process no later than July 2015. The EPA completed its review of glyphosate in early 2015 but delayed releasing the assessment pending further review in light of the World Health Organization's March 24, 2015 finding that glyphosate is a "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

## VII.   MONSANTO'S FALSE REPRESENTATIONS REGARDING THE SAFETY OF ROUNDUP

37.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations, the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

    a)    Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences.

    b)    And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

    c)    Roundup biodegrades into naturally occurring elements.

    d)    Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

    e)    This nonresidual herbicide will not wash or leach in the soil. It... stays where you apply it.

    f)    You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing

Corrie Yackulic Law Firm PLLC
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g)    Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h)    Glyphosate's safety margin is much greater than required. It has over a 1,000 fold safety margin in food and over a 700 fold safety margin for workers who manufacture it or use it.

i)    You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j)    "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[2]

38.    On November 19, 1996, Monsanto entered an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a)    its glyphosate containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

b)    its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;

c)    its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

d)    its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics;"

e)    glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and

f)    its glyphosate-containing products or any component thereof might be classified as "practically non-toxic".

---

[2] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63 (15) (Nov. 1996).

COMPLAINT
PAGE 9

Corrie Yackulic Law Firm PLLC
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

39.     Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so as of today.

40.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[3]

## VIII.   EVIDENCE OF CARCINOGENICITY IN ROUNDUP

41.     As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties.

42.     On March 4, 1985, a group of the EPA's Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[4]

43.     Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

44.     In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.[5]

45.     In October 1991, the EPA published a Memorandum entitled "Second Peer

---

[3] *Monsanto Guilty in "False Ad" Row,* BBC, Oct 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm

[4] Consensus Review of Glyphosate, Casewell No. 661A, March 4, 1985.  United States Environmental Protection Agency.

[5] http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheet/0178fact.pdf

COMPLAINT
PAGE 10

Corrie Yackulic Law Firm PLLC
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

1
2
3
4

Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.[6]

5
6
7
8

46.     In addition to the toxicity of the active molecule, many studies support  the hypothesis that glyphosate formulations found in Defendant's Roundup products are more dangerous and toxic than glyphosate alone.[7] As early as 1991 evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.[8]

9
10
11

47.     In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDKl/Cyclin B Activation."

12
13
14

48.     The study found that Monsanto's Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

15
16
17

49.     In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

18
19
20
21

50.     The study noted that "cell-cycle dysregulation is a hallmark of tumor  cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such

22

23

[6] Second Peer Review of Glyphosate, CAS No. 1071-83-6.  October 30, 1881, United State Environmental Protection Agency.

24

[7] Martinez et al. 2007; Benachour 2009; Gasnier et al. 2010; Pexoto 2005; Marc 2004

25

[8] Martinez et al. 1991.

26

27

COMPLAINT
PAGE 11

Corrie Yackulic Law Firm PLLC
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[9]

51.     In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

52.     The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

53.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

54.     The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

55..    The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendant.

---

[9] Molinari, 2000; Stewart et al., 2003).

COMPLAINT
PAGE 12

Corrie Yackulic Law Firm PLLC
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

56.     Defendant knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff MAYNARD RUSSELL AXELSON, *individually and as Personal Representative of the* ESTATE OF KATHLEEN ANN AXELSON, *deceased,* from Roundup.

57.     Defendant knew or should have known that tests, limited to Roundup's active ingredient glyphosate, were insufficient to prove the safety of Roundup.

58.     Defendant failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff and her spouse from Roundup.

59.     Rather than performing appropriate tests, Defendant relied upon flawed industry-supported studies designed to protect Defendant's economic interests rather than Plaintiffs' and the consuming public.

60.     Despite its knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup as safe.

## IX.     IARC CLASSIFICATION OF GLYPHOSATE

61.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency tasked by the World Health Organization ("WHO") with conducting and coordinating research into the causes of cancer.

62.     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015-2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must

COMPLAINT
PAGE 13

Corrie Yackulic Law Firm PLLC
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

63.    IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

64.    On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendant's possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Defendant's Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

65.    The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A probable carcinogen to humans. According to the authors glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

66.    The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

COMPLAINT
PAGE 14

Corrie Yackulic Law Firm PLLC
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

67.     The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

## X.     EARLIER EVIDENCE OF GLYPHOSATE'S DANGER

68.     Despite the new classification by the IARC, Defendant has had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

69.     Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

70.     In 1997, Chris Clements published "Genotoxicity of select herbicides in Rana catesbeiana tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

71.     The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

72.     Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

73.     Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

74.     The IARC Monograph notes that"[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

75.     In 2006 Cesar Paz-y-Mifio published a study examining DNA damage in human subjects exposed to glyphosate.

76.     The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on

COMPLAINT
PAGE 15

exposed individuals.

77.     The IARC Monograph reflects the volume of evidence of glyphosate pesticides', genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

78.     Despite knowledge to the contrary, Defendant maintains that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts agree that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

79.     In addition to glyphosate and Roundup's genotoxic properties, Defendant has long been aware of glyphosate's carcinogenic properties.

80.     Glyphosate and Roundup in particular, have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma ("NHL"), Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

81.     Defendant has known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

82.     In 1985, the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

83.     In 2003, Lennart Hardell and Mikael Eriksson published the results of two case-controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

84.     The study concluded that glyphosate had the most significant relationship to NHL

**Corrie Yackulic Law Firm PLLC**
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

among all herbicides studies with an increased odds ratio of 3.11.

85.    In 2003, AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

86.    The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

87.    In 2008, Mikael Eriksson published a population-based case-control study of exposure to various pesticides as a risk factor for NHL.

88.    This strengthened previous associations between glyphosate and NHL.

89.    In spite of this knowledge, Defendant continued to issue broad and sweeping statements that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

90.    Upon information and belief, these statements and representations were made with the intent of inducing KATHLEEN ANN AXELSON, the agricultural community, and the public at large to purchase and increase the use of Defendant's Roundup for Defendant's pecuniary gain, and in fact, did induce KATHLEEN ANN AXELSON to use Roundup.

91.    Defendant made these statements maliciously and with complete disregard and reckless indifference to the safety of KATHLEEN ANN AXELSON and the general public.

92.    Notwithstanding Defendant's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

93.    Defendant knew or should have known that glyphosate is associated with an

COMPLAINT
PAGE 17

increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

94.     Defendant failed to appropriately and adequately inform and warn KATHLEEN ANN AXELSON of these dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

95.     Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendant continues to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non- genotoxic; and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

96.     Defendant claimed and continues to claim that Roundup is safe, non-carcinogenic, and non-genotoxic. These misrepresentations are consistent with Defendant's cavalier approach to investigating and ensuring the safety of its products, the safety of the public at large, and the safety of decedent KATHLEEN ANN AXELSON.

## XI.     SCIENTIFIC FRAUD UNDERLYING CERTAIN SAFETY DETERMINATIONS OF GLYPHOSATE

97.     After the EPA's 1985 classification of glyphosate as possibly carcinogenic to humans (Group C), Monsanto exerted pressure upon the EPA to change its classification.

98.     This culminated in the EPA's reclassification of glyphosate to Group E, which

COMPLAINT
PAGE 18

was based upon evidence of non-carcinogenicity in humans.

99.     In so classifying, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

100.    On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed scientific fraud.

101.    In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup. IBT performed approximately 30 tests on glyphosate and glyphosate-containing products, including 11 of the 19 chronic toxicology studies needed to register Roundup with the EPA.

102.    In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to toxicological impacts of glyphosate. The EPA subsequently audited IBT and determined that the toxicology studies conducted for Roundup were invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

103.    Three top executives of IBT were convicted of fraud in 1983.

104.    In the second incident, Monsanto hired Craven Laboratories ("Craven") in 1990 to perform pesticide and herbicide studies, including several studies on Roundup.

105.    In March of 1991, the EPA announced that it was investigating Craven for "allegedly falsifying test data used by chemical firms to win EPA approval of pesticides."

COMPLAINT
PAGE 19

Corrie Yackulic Law Firm PLLC
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

106. The investigation lead to the indictments of the laboratory owner and a handful of employees.

## XII. MONSANTO'S CONTINUING DISREGARD FOR THE SAFETY OF DECEDENT AND THE PUBLIC

107. Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."[10]

108. Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

109. Glyphosate, and Defendant's Roundup products in particular, has long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

110. Defendant's statements proclaiming the safety of Roundup and disregarding its dangers misled Decedent KATHLEEN ANN AXELSON.

111. Despite Defendant's knowledge that Roundup was associated with an elevated risk of developing cancer, Defendant's promotional campaigns focused on Roundup's purported "safety profile."

112. Defendant's failure to adequately warn Decedent KATHLEEN ANN AXELSON

---

[10] Backgrounder-Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9 2015).

COMPLAINT
PAGE 20

Corrie Yackulic Law Firm PLLC
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

resulted in (1) Decedent using and being exposed to glyphosate and Roundup instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

113. Defendant failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

114. The failure of Defendant to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

115. The failure of Defendant to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

116. The failure of Defendant to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

117. By reason of the foregoing acts and omissions, Plaintiffs seek compensatory and punitive damages as a result of Decedent KATHLEEN ANN AXELSON's use of, and exposure to, Roundup which caused or was a substantial contributing factor in causing Decedent KATHLEEN ANN AXELSON to die from cancer, specifically NHL, which ultimately caused his death, physical pain and mental anguish, including diminished enjoyment of life and loss of consortium.

118. By reason of the foregoing acts and omissions, Plaintiff has sustained severe and permanent injuries and losses.

119. By reason of the foregoing acts and omissions, Plaintiff individually and on

COMPLAINT
PAGE 21

Corrie Yackulic Law Firm PLLC
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

behalf of the Estate of KATHLEEN ANN AXELSON has endured and, in some categories, continues to suffer emotional and mental anguish, medical expenses, and other economic and non-economic damages as a result of the actions and inactions of the Defendant.

## XIII.   DECEDENT'S EXPOSURE TO ROUNDUP

120.    Decedent KATHLEEN ANN AXELSON used Roundup for approximately 32 years from approximately 1978-2010. Decedent KATHLEEN ANN AXELSON used Roundup on her 160-acre farm to control weeds around the garden, buildings and fields. The farm was commonly opened to the public during the Skagit Valley Tulip Festival and she maintained the grounds that were displayed, using Roundup to control weeds on that property.

121.    For years, Decedent KATHLEEN ANN AXELSON applied Roundup on a regular basis. She followed all safety and precautionary warnings during the course of her use.

122.    Decedent KATHLEEN ANN AXELSON was diagnosed with non-Hodgkin's lymphoma in the mid-1990's. KATHLEEN ANN AXELSON's non-Hodgkin's Lymphoma was proximately and actually caused by her exposure to Defendant's Roundup products.

123.    As a result of her illness, the Estate of KATHLEEN ANN AXELSON has incurred significant economic and non-economic damages, including death, and Plaintiff MAYNARD RUSSELL AXELSON has suffered loss of consortium.

124.    Decedent KATHLEEN ANN AXELSON died on in December, 2009, at the age of 55. Her death is the direct result of her non-Hodgkin's lymphoma, which was proximately and actually caused by his exposure to Defendant's Roundup products.

## XIV.   TOLLING OF STATUE OF LIMITATION

125.    The running of any statute of limitations has been tolled by reason of Defendant's

COMPLAINT
PAGE 22

Corrie Yackulic Law Firm PLLC
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

fraudulent concealment. Defendant, through its affirmative misrepresentations and omissions, actively concealed from Plaintiff the risks associated with Roundup and glyphosate.

126.    At all relevant times, Defendant has maintained that Roundup is safe, nontoxic, and non-carcinogenic.

127.    Even as of today, Defendant continues to represent to the public that "Regulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."[11]

128.    As a result of Defendant's actions, Plaintiff was unaware, and could not reasonably know or have learned through reasonable diligence that Roundup and/or glyphosate contact, exposed him to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

129.    Furthermore, Defendant is estopped from relying on any statute of limitations because of its fraudulent concealment of the true character, quality and nature of Roundup. Defendant was under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Defendant had and continue to have exclusive control, and because Defendant knew that this information was not available to Plaintiff or to distributors of Roundup. In addition, Defendant is estopped from relying on any statute of

---

[11] Backgrounder—Glyphosate: No Evidence of Carcinogenicity, Updated November 2014, available at https://www.monsantoglobal.com/global/jp/products/Documents/no-evidence-of-carcinogenicity.pdf.

COMPLAINT
PAGE 23

Corrie Yackulic Law Firm PLLC
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

limitations because of its intentional concealment of these facts.

130.    Plaintiff had no knowledge that Defendant was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendant, Plaintiff could not have reasonably discovered the wrongdoing at any time prior to this year. Moreover, Defendant had the ability to and did spend enormous amounts of money in furtherance of its marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Plaintiff and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendant's representations. Accordingly, Defendant is precluded by the discovery rule as well as the doctrine of fraudulent concealment from relying upon any statute of limitations.

## XV.    FIRST CAUSE OF ACTION
### WASHINGTON PRODUCT LIABILITY ACT

131.    Plaintiff incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

132.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products.

133.    At all times relevant to this litigation, Defendant designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup products used by Decedent KATHLEEN ANN AXELSON as described above.

COMPLAINT
PAGE 24

Corrie Yackulic Law Firm PLLC
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

134.    At all times relevant to this litigation, Defendant's Roundup products were expected to reach and did reach the intended consumers, handlers, and users or other persons coming into contact with these products in Washington and throughout the United States, including Decedent, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

135.    In violation of the Washington Products Liability Act ("WPLA"), RCW 7.72, et seq., at all times relevant to this action, at the time Defendant's Roundup products left control of Defendant, they were defective and not reasonably safe. These defects include, but are not limited to, the following:

    a)    Defendant is strictly liable for Plaintiff's injuries and damages because at the time of manufacture, and at the time Defendant's Roundup products left control of Defendant, the likelihood that Roundup products would cause injury or damage similar to that suffered by Plaintiff and Decedent KATHLEEN ANN AXELSON, and the seriousness of such injury or damage had been known by Defendant and outweighed the burden on Defendant to design a product that would have prevented KATHLEEN ANN AXELSON's illness and death and outweighed the adverse effect that an alternative design that was practical and feasible would have on the usefulness of the subject product.

    b)    Defendant's Roundup products were unsafe to an extent beyond that which would be contemplated by an ordinary consumer, in one or more of the following particulars: exposure to Roundup and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries, making Roundup not reasonably safe when used in the way it is ordinarily used and is dangerous to an extent beyond that which would be contemplated by the ordinary consumer.

    c)    The Roundup products manufactured and/or supplied by Defendant were defective in design in that, an alternative design and/or formulation exists that would prevent severe and permanent injury. Indeed, at the time that Defendant designed their Roundup products, the state of the industry's scientific knowledge was such that a less risky design or formulation was

COMPLAINT
PAGE 25

Corrie Yackulic Law Firm PLLC
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

attainable.

d) The Roundup products were not reasonably safe in design under the WPLA.

e) The Roundup products manufactured and/or supplied by Defendant were not reasonably safe because Defendant did not provide an adequate warning or instruction about the product. At the time the Roundup products left Defendant's control, they possessed dangerous characteristics and Defendant failed to use reasonable care to provide an adequate warning of such characteristics and their danger to users and handlers of the product. The Roundup products are not safe and cause severe and permanent injuries. The Roundup products were not reasonably safe because the warning was inadequate, and Defendant could have provided adequate warnings or instructions.

f) The Roundup products manufactured and/or supplied by Defendant were not reasonably safe because adequate warnings or manufacturer instructions were not provided after the Roundup products were manufactured and when Defendant learned of, or should have learned of, the dangers connected with the Roundup products.

g) The Roundup products manufactured and/or supplied by Defendant was not reasonably safe because they did not conform to an express warranty made by Defendant regarding the product's safety and fitness for use. Defendant expressly warranted that the Roundup products were safe and fit for their intended purposes, that they were of merchantable quality, that they did not produce any dangerous side effects, that they were adequately tested, and that their Roundup products were safe to human health and the environment, and effective, fit, and proper for their intended use. Defendant did not disclose the material risks that its Roundup products could cause severe and permanent injury. Defendant's express warranty regarding the Roundup products induced Decedent to use the products, and Plaintiff's losses and damages were proximately caused because Defendant's express warranty was untrue. The Roundup products were not reasonably safe because of nonconformity to express warranty under the WPLA.

136. As a direct and proximate result of Defendant placing its defective Roundup products into the stream of commerce, KATHLEEN ANN AXELSON suffered grave injuries

COMPLAINT
PAGE 26

Corrie Yackulic Law Firm PLLC
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

resulting in her death, and endured physical and emotional pain, discomfort, loss of consortium, as well as economic hardship, including considerable financial expenses for medical care and treatment, along with other damages further discussed in herein. Her estate and her widow seek compensation for these losses.

## XVI.  SECOND CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTIES

137.    Plaintiff hereby incorporates by reference the allegations of this Complaint contained in each of the preceding paragraphs as if fully stated herein.

138.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup products, which are defective and unreasonably dangerous to consumers, including Decedent KATHLEEN ANN AXELSON, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

139.    Before the time that Decedent KATHLEEN ANN AXELSON was exposed to the use of the aforementioned Roundup products, Defendant impliedly warranted to its consumers—including Decedent —that its Roundup products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as agricultural and horticultural herbicides.

140.    Defendant, however, failed to disclose that Roundup has dangerous propensities when used as intended and that the use of and/or exposure to Roundup and glyphosate-containing products carries an increased risk of developing severe injuries, including Decedent KATHLEEN ANN AXELSON's injuries and ultimately her death.

COMPLAINT
PAGE 27

**Corrie Yackulic Law Firm PLLC**
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

141.    Upon information and belief, Decedent reasonably relied upon the skill, superior knowledge and judgment of Defendant and upon its implied warranties that the Roundup products were of merchantable quality and fit for their intended purpose or use.

142.    Upon information and belief, Decedent KATHLEEN ANN AXELSON was at all relevant times in privity with Defendant.

143.    Decedent KATHLEEN ANN AXELSON, by and through her Estate, was the intended third-party beneficiary of implied warranties made by Defendant to the purchasers of their agricultural and horticultural herbicides and as such he is entitled to assert this claim.

144.    The Roundup products were expected to reach and did in fact reach consumers and users, including Decedent KATHLEEN ANN AXELSON, without substantial change in the condition in which they were manufactured and sold by Defendant

145.    At all times relevant to this litigation, Defendant was aware that consumers and users of its products, including Decedent KATHLEEN ANN AXELSON, would use Roundup products as marketed by Defendant, which is to say that Decedent was a foreseeable user of Roundup.

146.    Defendant intended that its Roundup products be used in the manner in which Decedent in fact used them and Defendant impliedly warranted each product to be merchantable quality, safe, and fit for this use, despite the fact that Roundup was not adequately tested or researched.

147.    In reliance upon Defendant's implied warranty, Decedent used Roundup as instructed and labeled and in the foreseeable manner intended, recommended, promoted, and marketed by Defendant.

COMPLAINT
PAGE 28

148.   Decedent KATHLEEN ANN AXELSON could not have reasonably discovered or known of the risks of serious injury associated with Roundup or glyphosate.

149.   Defendant breached its implied warranty to Decedent KATHLEEN ANN AXELSON in that its Roundup products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

150.   The harm caused by Defendant's Roundup products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

151.   As a direct and proximate result of Defendant placing its defective Roundup products into the stream of commerce, KATHLEEN ANN AXELSON suffered grave injuries resulting in his death, and endured physical and emotional pain, discomfort, loss of consortium, as well as economic hardship, including considerable financial expenses for medical care and treatment, along with other damages further discussed in herein.  His estate and his widow seek compensation for these losses.

## XVII. THIRD CAUSE OF ACTION
## VIOLATION OF WASHINGTON CONSUMER PROTECTION ACT

152.   Plaintiff hereby incorporates by reference the allegations of this Complaint contained in each of the preceding paragraphs as if fully stated herein.

153.   Defendant violated the Washington Consumer Protection Act ("CPA").

154.   Defendant engaged in unfair or deceptive acts or practices including, but not limited to, the following:

COMPLAINT
PAGE 29

Corrie Yackulic Law Firm PLLC
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

a)   engaging in acts and practices by willfully failing and refusing to timely report information that reasonably suggested Roundup, like that used by Decedent, may cause or contribute to cause cancer and other serious illnesses;

b)   representing knowingly or with reason to know that Roundup has approval, characteristics, uses, or benefits that it does not have;

c)   representing knowingly or with reason to know that Roundup is of a particular standard, quality, or grade when it differs materially from that representation; and/or

d)   representing knowingly or with reason to know that Roundup has uses, benefits, or characteristics that have been otherwise proven incorrect;

155.   Defendant's unfair and deceptive acts or practices described above were committed in the course of Defendant's trade or commerce.

156.   Defendant's unfair and deceptive acts or practices described above affected public interest.

157.   Defendant's violation of the Washington CPA caused KATHLEEN ANN AXELSON's death and Plaintiff's injuries and damages as set forth herein.

## XVIII.   FOURTH CAUSE OF ACTION
## PUNITIVE DAMAGES

158.   Plaintiff incorporates herein by reference, as though fully set forth at length, each and every allegation and statement contained in the foregoing paragraphs.

159.   Defendant is liable for punitive and/or exemplary damages under choice of law principles. Defendant acted with willful disregard of the rights of the Plaintiff, her husband, and the public. Defendant's conduct was outrageous and reckless toward the safety of the Plaintiff, his wife, and the public.

COMPLAINT
PAGE 30

Corrie Yackulic Law Firm PLLC
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

### XIX. FIFTH CAUSE OF ACTION
### LOSS OF CONSORTIUM

160.     Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further allege:

161.     Plaintiff MAYNARD RUSSELL AXELSON, at all times relevant, was the lawful husband of Decedent KATHLEEN ANN AXELSON.

162.     As a direct, legal, and proximate result of the culpability and fault of Defendant, be such fault through strict liability, negligence or otherwise, Plaintiff MAYNARD RUSSELL AXELSON has suffered the loss of support, services, love, companionship, affection, society, intimate relations, and other elements of consortium, all to her general damage in an amount in excess of the jurisdictional minimum of this Court.

163.     Plaintiff demands judgment against Defendant for compensatory and punitive damages such as a jury may award, and such other relief as the Court deems just and proper in order to remedy Plaintiff MAYNARD RUSSELL AXELSON's loss of consortium.

### XX. PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendant on each of the above-referenced claims and causes of action and as follows:

1.     Awarding Plaintiff compensatory damages in excess of the jurisdictional amount, including, but not limited to all damages allowed under Washington wrongful death survival statutes RCW 4.20.010, 4.20.020, 4.20.046, 4.20.060;

2.     Awarding punitive damages;

3.     Awarding pre-judgment interest;

COMPLAINT
PAGE 31

Corrie Yackulic Law Firm PLLC
110 Prefontaine Place South, Ste. 304
Seattle, Washington 98104
Tel. 206.787.1915
Fax. 206.299.9725

1    4.    Awarding post-judgment interest;

2    5.    Awarding Plaintiff reasonable attorneys' fees;

3    6.    Awarding Plaintiff the costs of these proceedings;

4
5    7.    Treble damages in the maximum amounts permitted by RCW
6    19.86.090; and

7    8.    Such other and further relief as this Court deems just and proper.

8                    XXI.  **DEMAND FOR JURY TRIAL**

9        Plaintiff hereby demands trial by jury as to all issues.

10
11   DATED this 29th day of August, 2019.        CORRIE YACKULIC LAW FIRM, PLLC

12                                               /s/ Corrie J. Yackulic
                                                 Corrie J. Yackulic, WSBA No. 16063
13                                               110 Prefontaine Place South, Ste. 304
                                                 Seattle, Washington 98104
14                                               Tel. 206.787.1915
                                                 Fax. 206.299.9725
15                                               Corrie@cjylaw.com
                                                 *Attorney for Plaintiff*
16

17

18

19

20

21

22

23

24

25

26

27   COMPLAINT                          **Corrie Yackulic Law Firm PLLC**
     PAGE 32                            110 Prefontaine Place South, Ste. 304
                                        Seattle, Washington 98104
                                        Tel. 206.787.1915
                                        Fax. 206.299.9725