25BE,LC–C

# United States District Court
## Southern District of West Virginia (Huntington)
## CIVIL DOCKET FOR CASE #: 3:19–cv–00602

| | |
|---|---|
| Bryant et al v. Monsanto Company et al | Date Filed: 08/19/2019 |
| Assigned to: Judge Robert C. Chambers | Jury Demand: Both |
| Case in other court:  Mason County Circuit, 19–C–33 | Nature of Suit: 365 Personal Inj. Prod. Liability |
| Cause: 28:1332 Diversity–Product Liability | Jurisdiction: Diversity |

**Plaintiff**

**Roger Bryant**
*and*

represented by **Aimee H. Wagstaff**
ANDRUS & WAGSTAFF
7171 West Alaska Drive
Lakewood, CO 80226
303/376–6360
Fax: 303/376–6361
Email: aimee.wagstaff@ahw–law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kelly Elswick–Hall**
THE MASTERS LAW FIRM
181 Summers Street
Charleston, WV 25301
304/342–3106
Fax: 304/342–3189
Email: keh@themasterslawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Marvin W. Masters**
THE MASTERS LAW FIRM
181 Summers Street
Charleston, WV 25301
304/342–3106
Fax: 304/342–3189
Email: mwm@themasterslawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Judy Bryant**

represented by **Aimee H. Wagstaff**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kelly Elswick–Hall**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Marvin W. Masters**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**
*a Delaware corporation*

represented by  **Charles M. Love , III**
BOWLES RICE
P. O. Box 1386
Charleston, WV 25325–1386
304/347–1100
Fax: 304/347–1756
Email: clove@bowlesrice.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Floyd E. Boone , Jr.**
BOWLES RICE
P. O. Box 1386
Charleston, WV 25325–1386
304/347–1100
Fax: 304/343–2867
Email: fboone@bowlesrice.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Montgomery Lorensen**
BOWLES RICE
P. O. Box 1386
Charleston, WV 25325–1386
304–347–1178
Email: wlorensen@bowlesrice.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**Monsanto Management Club–Nitro Plant**
*a West Virginia corporation*

<u>**Defendant**</u>

**Flexsys America Limited**
*a West Virginia General Partnership;*
*and*

represented by  **Charles M. Love , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Floyd E. Boone , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Montgomery Lorensen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**Does 1–50**

| Date Filed | # | Docket Text |
|---|---|---|
| 08/19/2019 | 1 | NOTICE OF REMOVAL by Monsanto Company with summons, complaint, declaration of David A. Woodmansee, declaration of Otto J. Drescher, docket sheet and other miscellaneous documents from Circuit Court of Mason County. Filing Fee $400.00. Receipt #AWVSDC–7355833. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Civil Cover Sheet) (jsa) (Entered: 08/20/2019) |

| 08/19/2019 | | CASE assigned to Judge Robert C. Chambers. (klc) (Entered: 08/20/2019) |
|---|---|---|
| 08/20/2019 | 2 | STANDING ORDER IN RE: ASSIGNMENT AND REFERRAL OF CIVIL ACTIONS AND MATTERS TO MAGISTRATE JUDGES ENTERED JANUARY 4, 2016. Discovery referred to Magistrate Judge Eifert. (cc: counsel of record; any unrepresented party) (jsa) |
| 08/20/2019 | 3 | DISCLOSURE STATEMENT PURSUANT TO RULE 7.1, Federal Rules of Civil Procedure, by Defendant Monsanto Company (Boone, Floyd) |
| 08/23/2019 | 4 | ANSWER TO COMPLAINT ATTACHED TO 1 NOTICE OF REMOVAL with Jury Demand by Monsanto Company.(Boone, Floyd) |
| 08/26/2019 | 5 | ANSWER TO COMPLAINT ATTACHED TO 1 NOTICE OF REMOVAL with Jury Demand by Flexsys America Limited.(Boone, Floyd) |
| 09/18/2019 | 6 | MOTION by Judy Bryant, Roger Bryant to Remand Case to Circuit Court of Mason County (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Elswick–Hall, Kelly) |
| 09/18/2019 | 7 | MEMORANDUM OF LAW by Judy Bryant, Roger Bryant in support of 6 MOTION by Judy Bryant, Roger Bryant to Remand Case to Circuit Court of Mason County (Elswick–Hall, Kelly) |

E-FILED | 5/30/2019 2:37 PM
CC-26-2019-C-33
Mason County Circuit Clerk
Elizabeth Jones

IN THE CIRCUIT COURT OF MASON COUNTY, WEST VIRGINIA

ROGER BRYANT and
JUDY BRYANT,

     Plaintiffs,

v.

MONSANTO COMPANY,
a Delaware corporation;
MONSANTO MANAGEMENT
CLUB-NITRO PLANT,
a West Virginia corporation;
FLEXSYS AMERICA LIMITED,
a West Virginia General Partnership;
and DOES 1-50,

     Defendants.

Civil Action No. _____
Hon. Judge_____

## COMPLAINT

  Plaintiffs, Roger Bryant and Judy Bryant ("Plaintiff" or collectively "Plaintiffs"), by and through their undersigned attorneys, hereby bring this Complaint for damages against Defendants Monsanto Company, Monsanto Management Club-Nitro Plant, Flexsys America Limited, and John Does 1-50, and upon information and belief allege the following:

## INTRODUCTION

  1. This is an action for damages suffered by Plaintiffs as a direct and proximate result of Defendants' negligent and/or willful and wrongful conduct in connection with the design, research, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide products Roundup®, containing the active ingredient glyphosate and the surfactant Polyethoxylated tallow amine ("POEA") and other so-called "inert" ingredients.

2.      Plaintiffs seek recovery for damages as a result of Plaintiff Roger Bryant

developing Non-Hodgkin's Lymphoma ("NHL") as a result of exposure to Roundup®, which

was directly and proximately caused by wrongful conduct by Defendants, the unreasonably

dangerous and defective nature of Roundup®, and its active ingredient, glyphosate, and the

attendant effects of developing NHL.

## THE PARTIES, JURISDICTION AND VENUE

### PLAINTIFFS

3.      Plaintiff, Roger Bryant and his wife, Plaintiff Judy Bryant are and at relevant

times were residents and citizens of Mason County, West Virginia.

4.      Plaintiff Roger Bryant used Roundup® beginning in the late 1970's to control

weeds on his property and on his father's farm property.

5.      Plaintiffs purchased Roundup® in various locations in and around Mason County,

West Virginia.

6.      For many years starting in the late 1970's, Plaintiff Roger Bryant sprayed

Roundup® on a regular basis.

7.      During the entire time that Plaintiff Roger Bryant was exposed to Roundup®, he

did not know that exposure to Roundup® was injurious to his health or the health of others.

8.      As a direct and proximate result of being exposed to Roundup®, Plaintiff Roger

Bryant developed non-Hodgkin's Lymphoma.

9.      Plaintiff Roger Bryant was diagnosed with Non-Hodgkin's Lymphoma ("NHL")

on or about April 27, 2015, and suffered the effects attendant thereto, as a direct and proximate

result of the unreasonably dangerous and defective Roundup®, and Defendants' wrongful and

negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing and sale of Roundup®.

10.     At the time of his diagnosis of NHL, Plaintiff did not know, nor had reason to know, that his diagnosis was caused by exposure to Roundup®. He continued to use Roundup® following his diagnosis because he did not know, nor had reason to know, that his diagnosis was caused by exposure to Roundup®. He last used Roundup® in or about August of 2017.

11.     Defendants have wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate, and downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate. The information that Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions. Plaintiffs relied upon the skill, superior knowledge, and judgment of Defendants. As such, Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of Plaintiff Roger Bryant's exposure.

12.     Plaintiffs have timely filed this civil action because the action was originally filed within less than two years from the time Plaintiffs knew or reasonably knew of the injury and that it may have been wrongfully caused.

13.     As a result of Plaintiff Roger Bryant's injuries, Plaintiffs have incurred and will incur medical expenses, and have endured and will endure pain and suffering, and loss of enjoyment of life, and significant economic and non-economic damages and have otherwise been damaged in a personal and pecuniary nature.

## DEFENDANTS

14. Defendant Monsanto is a Delaware corporation authorized to do business in West Virginia with its principal place of business in St. Louis, Missouri. At all relevant times, Monsanto also regularly conducted, transacted, and solicited business in West Virginia, as well as in all States of the United States.

15. Defendant Monsanto Management Club - Nitro Plant was and is a West Virginia Corporation, which Plaintiffs are informed and believe, during relevant times, managed a plant in Nitro, West Virginia.

16. Defendant Monsanto Company, through itself and its predecessor company and names, Plaintiffs are informed and believe operated a plant and premises in Nitro, West Virginia.

17. Defendant Flexsys America Limited, is a West Virginia General Partnership, with its partner listed as Flexsys America, LP, with an address of 5509 Big Tyler Road, Suite 1, Cross Lanes, West Virginia, [1] which Plaintiffs are informed and believe, at relevant times, operated a plant and premises in Nitro, West Virginia ( hereinafter "Nitro plant").

18. Upon best information and belief, Defendants JOHN DOES 1-50 are subsidiaries, partners, or other entities that were involved in the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup®, containing the active ingredient glyphosate and/or operation of the Nitro plant. The identities of JOHN DOES 1-50 are unknown to Plaintiffs at this time. Plaintiffs will move the Court to specifically name JOHN DOES 1- 50 as their identities becomes known to Plaintiffs through discovery.

19. Defendants Monsanto Company, Monsanto Management Company - Nitro Plant,

---

[1] West Virginia Secretary of State Online Data Services
https://apps.sos.wv.gov/business/corporations/organization.aspx?org=449522

Flexsys America Limited, and JOHN DOES 1-50 are collectively referred to as "Monsanto," "Monsanto Defendants" or "Defendants."

20.     Plaintiffs are informed and believe that, at relevant times, the Nitro Plant contained an herbicide division that participated in the design, research, development, production, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of herbicides.

21.     Plaintiffs are informed and believe that, at relevant times, the Nitro Plant contained a lab, which participated in the design, research, development, and testing of herbicides.

22.     Defendants, at relevant times, conducted, or are conducting, transacted or are transacting business in the State of West Virginia.

23.     Defendants transacted and conducted business within the State of West Virginia that relates to the allegations in this Complaint.

24.     Defendants, at relevant times, contracted or are contracting to supply services or things in the State of West Virginia.

25.     Defendants caused tortious injury in this State to the Plaintiffs.

26.     Defendants, at relevant times, regularly did or do business or did or do solicit business in the State of West Virginia.

27.     Defendants, at relevant times, derived or derive substantial revenue from goods and products used or consumed in the State of West Virginia.

28.     Defendants are authorized to do business in West Virginia and derived or derive substantial income from doing business in this state.

29.     Defendants expected or should have expected their acts to have consequences

within the State of West Virginia, and derived substantial revenue from interstate commerce.

30.     Defendants caused injury in this State to Plaintiffs by a breach of warranty expressly or impliedly made in the sale of goods inside and outside this state when Defendants might reasonably have expected such person to use, consume or be affected by the goods in this State.

31.     Defendants, at relevant times, have or had an interest in, used, and/or possessed or possess real property in this State.

32.     Defendants, at relevant times, made contracts to be performed, in whole or in part, by any party thereto in this State.

33.     Defendants sell or sold, marketed or market, and/or distributed or distribute Roundup® within the State of West Virginia and within Mason County, West Virginia.

34.     "Roundup" refers to all formulations of Defendants' roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Wee Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus,

Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dr Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

35.     Defendants, at relevant times, manufactured, sold, offered for sale or supplied their Roundup® product in a defective condition and that product caused injury to Plaintiffs within this State.

36.     Defendants advertise and sell goods, specifically Roundup®, in Mason County, West Virginia.

37.     Upon information, knowledge and belief, Defendants engaged in the business of designing, developing, researching, producing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup®.

38.     Upon information and belief, Defendants purposefully availed themselves of the privilege of conducting activities with the State of West Virginia, thus invoking the benefits and protections of its laws.

39.     At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and was a manufacturer of Roundup®, which contains the active ingredient glyphosate and the surfactant POEA, as well as adjuvants and other "inert" ingredients.

40.     Upon information and belief, Defendants did act together to design, develop, research, sell, advertise, manufacture and/or distribute Roundup®, with full knowledge of its dangerous and defective nature.

41.     That upon information, knowledge or belief, Defendants were acting as joint

venturers, or participating in a joint enterprise, one of the other, in the design, development, research, manufacturing, testing, packaging, marketing and distributing, labeling and/or selling herbicides, including Roundup® and other products.

42.     Prior to the injuries to the Plaintiffs and thereafter, the Defendants, acting as agents, servants and employees and as joint venturers, one of the other, set about to design, develop, research, manufacture, test, package, market and distribute, label and/or sell herbicides, including Roundup® and other products to persons, firms and corporations in the State of West Virginia and Mason County through distributors and retailers.

43.     The concerted actions of the Defendants, their agents and/or employees, as set forth in this Complaint, were done to accomplish the unlawful purpose of wrongfully exposing consumers and the Plaintiff Roger Bryant to their dangerous and unsafe Roundup®, and/or were done by unlawful means.

44.     Therefore, this Court has jurisdiction over Defendants and this action due to the residency of certain West Virginia Defendants and pursuant to, *inter alia,* W.Va. Code § 56–3–33(a); W.Va. Code § 31D–15–1501(d).

45.     In the alternative, Defendants have consented to the exercise of jurisdiction over them by West Virginia courts by registering to and conducting business in the State of West Virginia.

46.     Venue is proper in that Plaintiffs reside in Mason, County, West Virginia, were exposed to the Defendants' products in Mason County, West Virginia, Plaintiffs' injuries occurred in Mason County, West Virginia and Plaintiffs purchased Defendants' products at issue in Mason County, West Virginia.

## ALLEGATIONS COMMON TO ALL COUNTS

47.     In 1970, Defendant Monsanto Company, Inc. ("Monsanto") discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. In addition to the active ingredient glyphosate, Roundup® contains the surfactant Polyethoxylated tallow amine (POEA) and/or adjuvants and other so-called "inert" ingredients. In 2001, glyphosate was the most-used pesticide active ingredient in American agriculture with 85–90 million pounds used annually. That number grew to 185 million pounds in 2007.[2] As of 2013, glyphosate was the world's most widely used herbicide.

48.     Defendants are the world's leading producers of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market.[3] The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, because glyphosate can be sprayed in the fields during the growing season without harming the crops. In 2010, an estimated 70% of corn and cotton and 90% of soybean fields in the United States were Roundup Ready®.[4]

---

[2] Arthur Grube et al., U.S. Envtl. Prot. Agency, *Pesticides Industry Sales and Usage, 2006–2007 Market Estimates* 14 (2011), *available at* http://www.epa.gov/pesticides/pestsales/07pestsales/market_estimates2007.pdf.

[3] ETC Group, *Who Will Control the Green Economy?* 22 (2011), *available at* http://www.etcgroup.org/files/publication/pdf_file/ETC_wwctge_4web_Dec2011.pdf.

[4] William Neuman & Andrew Pollack, *Farmers Cope With Roundup-Resistant Weeds*, N.Y. TIMES, May 3, 2010, *available at* http://www.nytimes.com/2010/05/04/business/energy-environment/04weed.html?pagewan.

49. Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops.[5] They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used.[6] It has been found in food,[7] in the urine of agricultural workers,[8] and even in the urine of urban dwellers who are not in direct contact with glyphosate.[9]

50. On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

51. On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

---

[5] Monsanto, *Backgrounder-History of Monsanto's Glyphosate Herbicides* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/back_history.pdf.

[6] *See* U.S. Geological Survey, *USGS Technical Announcement: Widely Used Herbicide Commonly Found in Rain and Streams in the Mississippi River Basin* (2011), *available at* http://www.usgs.gov/newsroom/article.asp?ID=2909; *see also* U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate*, *available at* http://www.epa.gov/safewater/pdfs/factsheets/soc/tech/glyphosa.pdf.

[7] Thomas Bohn et al., *Compositional Differences in Soybeans on the Market: Glyphosate Accumulates in Roundup Ready GM Soybeans*, 153 FOOD CHEMISTRY 207 (2013), *available at* http://www.sciencedirect.com/science/article/pii/S0308814613019201.

[8] John F. Acquavella et al., *Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study*, 112(3) ENVTL. HEALTH PERSPECTIVES 321 (2004), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241861/; Kathryn Z. Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, 112 IARC Monographs 76, section 5.4 (2015), *available at* http://dx.doi.org/10.1016/S1470-2045(15)70134-8.

[9] Dirk Brändli & Sandra Reinacher, *Herbicides found in Human Urine*, 1 ITHAKA JOURNAL 270 (2012), *available at* http://www.ithaka-journal.net/druckversionen/e052012-herbicides-urine.pdf.

52.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is *probably carcinogenic to humans*. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are NHL and other haematopoietic cancers, including lymphocytic lymphoma / chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.[10]

53.     The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

54.     Nevertheless, Defendants, since they began selling Roundup®, have represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

55.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

56.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

57.     For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Defendants first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every

---

[10] *See* Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra.*

weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the World Health Organization, the main chemical ingredient of Roundup®—glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as garden center workers, nursery workers, and landscapers. Agricultural workers are, once again, victims of corporate greed. Defendants assured the public that Roundup® was harmless. In order to prove this, Monsanto has championed falsified data and has attacked legitimate studies that revealed the dangers of Roundup®. Defendants have led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® is safe.

### *The Discovery of Glyphosate and Development of Roundup®*

58. The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®.[11] From the outset, Defendants marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use. Monsanto still markets Roundup® as safe today.[12]

59. In addition to the active ingredient glyphosate, Roundup® formulations also contain adjuvants and other chemicals, such as the surfactant POEA, which Defendants claim are "inert" and therefore protected as "trade secrets" in manufacturing. Growing evidence suggests that these adjuvants and additional components of Roundup® formulations are not, in fact, inert and are toxic in their own right.

---

[11] Monsanto, *Backgrounder, History of Monsanto's Glyphosate Herbicide* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/back_history.pdf.

[12] Monsanto, *What is Glyphosate?* (Sep. 2, 2015), http://www.monsanto.com/sitecollectiondocuments/glyphosate-safety-health.pdf.

### *Registration of Herbicides under Federal Law*

60.     The manufacture, formulation, and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

61.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

62.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or a pesticide allowed to continue to be sold in commerce.

63.     The EPA and the State of California registered Roundup® for distribution, sale, and manufacture in the United States.

64.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing

the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able to perform the product tests that are required of the manufacturer.

65.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to re-evaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's recent review and evaluation.

66.     In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment—in relation to the reregistration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

### *Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®*

67.     Based on early studies showing that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Defendants, including contrary studies Monsanto provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time

of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."[13]

68.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

69.     In the first instance, Monsanto, in seeking initial registration of Roundup® by the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®.[14] IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

70.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid.[15] An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe

---

[13] U.S. Envtl. Prot. Agency, *Memorandum, Subject: SECOND Peer Review of Glyphosate* 1 (1991), *available at* http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_30-Oct-91_265.pdf.

[14] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/ibt_craven_bkg.pdf.

[15] U.S. Envtl. Prot. Agency, *Summary of the IBT Review Program Office of Pesticide Programs* (1983), *available at* http://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA&Index= 1981+Thru+1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&To cEntry=&QField=&QFieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&X mlQuery=&File=D%3A%5Czyfiles%5CIndex%20Data%5C81thru85%5CTxt%5C00000022%5C9101 4ULV.txt&User=ANONYMOUS&Password=anonymous&SortMethod=h%7C-&MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display= p%7Cf&DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page& MaximumPages=1&ZyEntry=1&SeekPage=x&ZyPURL.

the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[16]

71.   Three top executives of IBT were convicted of fraud in 1983.

72.   In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.[17]

73.   Despite the falsity of the tests that underlie its registration, within a few years of its launch, Defendants were marketing Roundup® in 115 countries.

### *The Importance of Roundup® to Monsanto's Market Dominance Profits*

74.   The success of Roundup® was key to Defendants' continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Defendants' agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Defendants needed a strategy to maintain their Roundup® market dominance and to ward off impending competition.

75.   In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Defendants to expand their market for Roundup® even further;

---

[16] Marie-Monique Robin, *The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply* (2011) (citing U.S. Envtl. Prot. Agency, *Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch. Washington, D.C.* (August 9, 1978)).

[17] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories, supra.*

by 2000, Defendants' biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Defendants' dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of their Roundup® herbicide.

76.     Through a three-pronged strategy of increasing production, decreasing prices, and by coupling with Roundup Ready® seeds, Roundup® became Defendants' most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue.[18] Today, glyphosate remains one of the world's largest herbicides by sales volume.

*Defendants have known for decades that they falsely advertises the safety of Roundup®*

77.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were **"safer than table salt"** and **"practically non-toxic"** to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of glyphosate and/or Roundup® are the following:

> a) "Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ..."

---

[18] David Barboza, *The Power of Roundup; A Weed Killer Is A Block for Monsanto to Build On*, N.Y. TIMES, Aug. 2, 2001, *available at* http://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weed-killer-is-a-block-for-monsanto-to-build-on.html.

b) "And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem."

c) "Roundup biodegrades into naturally occurring elements."

d) "Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e) "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it."

f) "You can apply Accord with 'confidence because it will stay where you put it' it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products."

g) "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

h) "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

i) "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[19]

78.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

---

[19] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

\* \* \*

b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

\* \* \*

c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

\* \* \*

d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

\* \* \*

e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

79.     Defendants did not alter their advertising in the same manner in any state other than New York, and on information and belief they still have not done so today.

80.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[20]

---

[20] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.

### *Classifications and Assessments of Glyphosate*

81.     The IARC process for the classification of glyphosate followed IARC's stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

82.     The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.[21] Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

83.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in *The Lancet Oncology*, and within a year after the meeting, the finalized Monograph is published.

---

[21] World Health Org., *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble* (2006), available at http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

84.     In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

85.     In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

86.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph Volume 112. For Volume 112, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015 to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated a nearly one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

87.     The studies considered the following exposure groups: (1) occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and (2) para-occupational exposure in farming families.

88.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

89.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

90.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

91.     The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

92.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

93.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor: renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

94.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

IN THE CIRCUIT COURT OF MASON COUNTY, WEST VIRGINIA

ROGER BRYANT, and
JUDY BRYANT,

              Plaintiffs,

v.

MONSANTO COMPANY,
a Delaware corporation;
MONSANTO MANAGEMENT
CLUB-NITRO PLANT,
a West Virginia corporation;
FLEXSYS AMERICA LIMITED,
a West Virginia General Partnership;
and DOES 1-50,

              Defendants.

Civil Action No. _____
Hon. Judge_____

## COMPLAINT

Plaintiffs, Roger Bryant and Judy Bryant ("Plaintiff" or collectively "Plaintiffs"), by and through their undersigned attorneys, hereby bring this Complaint for damages against Defendants Monsanto Company, Monsanto Management Club-Nitro Plant, Flexsys America Limited, and John Does 1-50, and upon information and belief allege the following:

## INTRODUCTION

1.    This is an action for damages suffered by Plaintiffs as a direct and proximate result of Defendants' negligent and/or willful and wrongful conduct in connection with the design, research, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide products Roundup®, containing the active ingredient glyphosate and the surfactant Polyethoxylated tallow amine ("POEA") and other so-called "inert" ingredients.

2.       Plaintiffs seek recovery for damages as a result of Plaintiff Roger Bryant developing Non-Hodgkin's Lymphoma ("NHL") as a result of exposure to Roundup®, which was directly and proximately caused by wrongful conduct by Defendants, the unreasonably dangerous and defective nature of Roundup®, and its active ingredient, glyphosate, and the attendant effects of developing NHL.

## THE PARTIES, JURISDICTION AND VENUE

### PLAINTIFFS

3.       Plaintiff, Roger Bryant and his wife, Plaintiff Judy Bryant are and at relevant times were residents and citizens of Mason County, West Virginia.

4.       Plaintiff Roger Bryant used Roundup® beginning in the late 1970's to control weeds on his property and on his father's farm property.

5.       Plaintiffs purchased Roundup® in various locations in and around Mason County, West Virginia.

6.       For many years starting in the late 1970's, Plaintiff Roger Bryant sprayed Roundup® on a regular basis.

7.       During the entire time that Plaintiff Roger Bryant was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

8.       As a direct and proximate result of being exposed to Roundup®, Plaintiff Roger Bryant developed non-Hodgkin's Lymphoma.

9.       Plaintiff Roger Bryant was diagnosed with Non-Hodgkin's Lymphoma ("NHL") on or about April 27, 2015, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective Roundup®, and Defendants' wrongful and

negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing and sale of Roundup®.

10. At the time of his diagnosis of NHL, Plaintiff did not know, nor had reason to know, that his diagnosis was caused by exposure to Roundup®. He continued to use Roundup® following his diagnosis because he did not know, nor had reason to know, that his diagnosis was caused by exposure to Roundup®. He last used Roundup® in or about August of 2017.

11. Defendants have wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate, and downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate. The information that Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions. Plaintiffs relied upon the skill, superior knowledge, and judgment of Defendants. As such, Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of Plaintiff Roger Bryant's exposure.

12. Plaintiffs have timely filed this civil action because the action was originally filed within less than two years from the time Plaintiffs knew or reasonably knew of the injury and that it may have been wrongfully caused.

13. As a result of Plaintiff Roger Bryant's injuries, Plaintiffs have incurred and will incur medical expenses, and have endured and will endure pain and suffering, and loss of enjoyment of life, and significant economic and non-economic damages and have otherwise been damaged in a personal and pecuniary nature.

## DEFENDANTS

14.     Defendant Monsanto is a Delaware corporation authorized to do business in West Virginia with its principal place of business in St. Louis, Missouri.   At all relevant times, Monsanto also regularly conducted, transacted, and solicited business in West Virginia, as well as in all States of the United States.

15.     Defendant Monsanto Management Club - Nitro Plant was and is a West Virginia Corporation, which Plaintiffs are informed and believe, during relevant times, managed a plant in Nitro, West Virginia.

16.     Defendant Monsanto Company, through itself and its predecessor company and names, Plaintiffs are informed and believe operated a plant and premises in Nitro, West Virginia.

17.     Defendant Flexsys America Limited, is a West Virginia General Partnership, with its partner listed as Flexsys America, LP, with an address of 5509 Big Tyler Road, Suite 1, Cross Lanes, West Virginia, [1] which Plaintiffs are informed and believe, at relevant times, operated a plant and premises in Nitro, West Virginia ( hereinafter "Nitro plant").

18.     Upon best information and belief, Defendants JOHN DOES 1-50 are subsidiaries, partners, or other entities that were involved in the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup®, containing the active ingredient glyphosate and/or operation of the Nitro plant.   The identities of JOHN DOES 1-50 are unknown to Plaintiffs at this time.  Plaintiffs will move the Court to specifically name JOHN DOES 1- 50 as their identities becomes known to Plaintiffs through discovery.

19.     Defendants Monsanto Company, Monsanto Management Company - Nitro Plant,

---

[1]  West Virginia Secretary of State Online Data Services
https://apps.sos.wv.gov/business/corporations/organization.aspx?org=449522

Flexsys America Limited, and JOHN DOES 1-50 are collectively referred to as "Monsanto," "Monsanto Defendants" or "Defendants."

20.     Plaintiffs are informed and believe that, at relevant times, the Nitro Plant contained an herbicide division that participated in the design, research, development, production, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of herbicides.

21.     Plaintiffs are informed and believe that, at relevant times, the Nitro Plant contained a lab, which participated in the design, research, development, and testing of herbicides.

22.     Defendants, at relevant times, conducted, or are conducting, transacted or are transacting business in the State of West Virginia.

23.     Defendants transacted and conducted business within the State of West Virginia that relates to the allegations in this Complaint.

24.     Defendants, at relevant times, contracted or are contracting to supply services or things in the State of West Virginia.

25.     Defendants caused tortious injury in this State to the Plaintiffs.

26.     Defendants, at relevant times, regularly did or do business or did or do solicit business in the State of West Virginia.

27.     Defendants, at relevant times, derived or derive substantial revenue from goods and products used or consumed in the State of West Virginia.

28.     Defendants are authorized to do business in West Virginia and derived or derive substantial income from doing business in this state.

29.     Defendants expected or should have expected their acts to have consequences

within the State of West Virginia, and derived substantial revenue from interstate commerce.

30.     Defendants caused injury in this State to Plaintiffs by a breach of warranty expressly or impliedly made in the sale of goods inside and outside this state when Defendants might reasonably have expected such person to use, consume or be affected by the goods in this State.

31.     Defendants, at relevant times, have or had an interest in, used, and/or possessed or possess real property in this State.

32.     Defendants, at relevant times, made contracts to be performed, in whole or in part, by any party thereto in this State.

33.     Defendants sell or sold, marketed or market, and/or distributed or distribute Roundup® within the State of West Virginia and within Mason County, West Virginia.

34.     "Roundup" refers to all formulations of Defendants' roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Wee Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus,

Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super

Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dr

Herbicide Deploy Dry Herbicide, or any other formulation of containing the active

ingredient glyphosate.

35.      Defendants, at relevant times, manufactured, sold, offered for sale or supplied

their Roundup® product in a defective condition and that product caused injury to Plaintiffs

within this State.

36.      Defendants advertise and sell goods, specifically Roundup®, in Mason County,

West Virginia.

37.      Upon information, knowledge and belief, Defendants engaged in the business of

designing, developing, researching, producing, manufacturing, testing, packaging, marketing,

distributing, labeling, and/or selling Roundup®.

38.      Upon information and belief, Defendants purposefully availed themselves of

the privilege of conducting activities with the State of West Virginia, thus invoking the

benefits and protections of its laws.

39.      At all times relevant to this complaint, Monsanto was the entity that discovered

the herbicidal properties of glyphosate and was a manufacturer of Roundup®, which contains the

active ingredient glyphosate and the surfactant POEA, as well as adjuvants and other "inert"

ingredients.

40.      Upon information and belief, Defendants did act together to design, develop,

research, sell, advertise, manufacture and/or distribute Roundup®, with full knowledge of its

dangerous and defective nature.

41.      That upon information, knowledge or belief, Defendants were acting as joint

venturers, or participating in a joint enterprise, one of the other, in the design, development, research, manufacturing, testing, packaging, marketing and distributing, labeling and/or selling herbicides, including Roundup® and other products.

42. Prior to the injuries to the Plaintiffs and thereafter, the Defendants, acting as agents, servants and employees and as joint venturers, one of the other, set about to design, develop, research, manufacture, test, package, market and distribute, label and/or sell herbicides, including Roundup® and other products to persons, firms and corporations in the State of West Virginia and Mason County through distributors and retailers.

43. The concerted actions of the Defendants, their agents and/or employees, as set forth in this Complaint, were done to accomplish the unlawful purpose of wrongfully exposing consumers and the Plaintiff Roger Bryant to their dangerous and unsafe Roundup®, and/or were done by unlawful means.

44. Therefore, this Court has jurisdiction over Defendants and this action due to the residency of certain West Virginia Defendants and pursuant to, *inter alia*, W.Va. Code § 56–3–33(a); W.Va. Code § 31D–15–1501(d).

45. In the alternative, Defendants have consented to the exercise of jurisdiction over them by West Virginia courts by registering to and conducting business in the State of West Virginia.

46. Venue is proper in that Plaintiffs reside in Mason, County, West Virginia, were exposed to the Defendants' products in Mason County, West Virginia, Plaintiffs' injuries occurred in Mason County, West Virginia and Plaintiffs purchased Defendants' products at issue in Mason County, West Virginia.

## ALLEGATIONS COMMON TO ALL COUNTS

47.     In 1970, Defendant Monsanto Company, Inc. ("Monsanto") discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®.  Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops.  In addition to the active ingredient glyphosate, Roundup® contains the surfactant Polyethoxylated tallow amine (POEA) and/or adjuvants and other so-called "inert" ingredients.  In 2001, glyphosate was the most-used pesticide active ingredient in American agriculture with 85–90 million pounds used annually.  That number grew to 185 million pounds in 2007.[2]  As of 2013, glyphosate was the world's most widely used herbicide.

48.     Defendants are the world's leading producers of glyphosate.  As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market.[3]  The majority of these seeds are of the Roundup Ready® brand.  The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, because glyphosate can be sprayed in the fields during the growing season without harming the crops.  In 2010, an estimated 70% of corn and cotton and 90% of soybean fields in the United States were Roundup Ready®.[4]

---

[2] Arthur Grube et al., U.S. Envtl. Prot. Agency, *Pesticides Industry Sales and Usage, 2006–2007 Market Estimates* 14 (2011), *available at* http://www.epa.gov/pesticides/pestsales/07pestsales/market_estimates2007.pdf.

[3] ETC Group, *Who Will Control the Green Economy?* 22 (2011), *available at* http://www.etcgroup.org/files/publication/pdf_file/ETC_wwctge_4web_Dec2011.pdf.

[4] William Neuman & Andrew Pollack, *Farmers Cope With Roundup-Resistant Weeds*, N.Y. TIMES, May 3, 2010, *available at* http://www.nytimes.com/2010/05/04/business/energy-environment/04weed.html?pagewan.

49.     Monsanto's glyphosate products are registered in 130 countries and approved

for use on over 100 different crops.[5] They are ubiquitous in the environment. Numerous

studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural

areas where Roundup® is used.[6] It has been found in food,[7] in the urine of agricultural

workers,[8] and even in the urine of urban dwellers who are not in direct contact with

glyphosate.[9]

50.     On March 20, 2015, the International Agency for Research on Cancer ("IARC"),

an agency of the World Health Organization ("WHO"), issued an evaluation of several

herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to

glyphosate in several countries around the world, and it traces the health implications from

exposure to glyphosate since 2001.

51.     On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In

that monograph, the IARC Working Group provides a thorough review of the numerous studies

and data relating to glyphosate exposure in humans.

---

[5] Monsanto, *Backgrounder-History of Monsanto's Glyphosate Herbicides* (Sep. 2, 2015),
http://www.monsanto.com/products/documents/glyphosate-background-materials/back_history.pdf.

[6] *See* U.S. Geological Survey, *USGS Technical Announcement: Widely Used Herbicide
Commonly Found in Rain and Streams in the Mississippi River Basin* (2011), *available at*
http://www.usgs.gov/newsroom/article.asp?ID=2909; *see also* U.S. Envtl. Prot. Agency, *Technical
Factsheet on: Glyphosate*, *available at*
http://www.epa.gov/safewater/pdfs/factsheets/soc/tech/glyphosa.pdf.

[7] Thomas Bohn et al., *Compositional Differences in Soybeans on the Market: Glyphosate
Accumulates in Roundup Ready GM Soybeans*, 153 FOOD CHEMISTRY 207 (2013), *available at*
http://www.sciencedirect.com/science/article/pii/S0308814613019201.

[8] John F. Acquavella et al., *Glyphosate Biomonitoring for Farmers and Their Families: Results
from the Farm Family Exposure Study*, 112(3) ENVTL. HEALTH PERSPECTIVES 321 (2004), *available at*
http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241861/; Kathryn Z. Guyton et al., *Carcinogenicity of
Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, 112 IARC Monographs 76, section
5.4 (2015), *available at* http://dx.doi.org/10.1016/S1470-2045(15)70134-8.

[9] Dirk Brändli & Sandra Reinacher, *Herbicides found in Human Urine*, 1 ITHAKA JOURNAL 270
(2012), *available at* http://www.ithaka-journal.net/druckversionen/e052012-herbicides-urine.pdf.

52. The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is *probably carcinogenic to humans*. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are NHL and other haematopoietic cancers, including lymphocytic lymphoma / chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.[10]

53. The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

54. Nevertheless, Defendants, since they began selling Roundup®, have represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

55. Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

56. Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

57. For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Defendants first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every

---

[10] *See* Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra.*

weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the World Health Organization, the main chemical ingredient of Roundup®—glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as garden center workers, nursery workers, and landscapers. Agricultural workers are, once again, victims of corporate greed. Defendants assured the public that Roundup® was harmless. In order to prove this, Monsanto has championed falsified data and has attacked legitimate studies that revealed the dangers of Roundup®. Defendants have led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® is safe.

### The Discovery of Glyphosate and Development of Roundup®

58.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®.[11] From the outset, Defendants marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use. Monsanto still markets Roundup® as safe today.[12]

59.     In addition to the active ingredient glyphosate, Roundup® formulations also contain adjuvants and other chemicals, such as the surfactant POEA, which Defendants claim are "inert" and therefore protected as "trade secrets" in manufacturing. Growing evidence suggests that these adjuvants and additional components of Roundup® formulations are not, in fact, inert and are toxic in their own right.

---

[11] Monsanto, *Backgrounder, History of Monsanto's Glyphosate Herbicide* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/back_history.pdf.

[12] Monsanto, *What is Glyphosate?* (Sep. 2, 2015), http://www.monsanto.com/sitecollectiondocuments/glyphosate-safety-health.pdf.

### Registration of Herbicides under Federal Law

60. The manufacture, formulation, and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

61. Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

62. FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or a pesticide allowed to continue to be sold in commerce.

63. The EPA and the State of California registered Roundup® for distribution, sale, and manufacture in the United States.

64. FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing

the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able to perform the product tests that are required of the manufacturer.

65. The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to re-evaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's recent review and evaluation.

66. In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment—in relation to the reregistration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

*Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®*

67. Based on early studies showing that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Defendants, including contrary studies Monsanto provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time

of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."[13]

68.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

69.     In the first instance, Monsanto, in seeking initial registration of Roundup® by the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®.[14] IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

70.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid.[15] An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe

---

[13] U.S. Envtl. Prot. Agency, *Memorandum, Subject: SECOND Peer Review of Glyphosate* 1 (1991), *available at* http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_30-Oct-91_265.pdf.

[14] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories* (Sep. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/ibt_craven_bkg.pdf.

[15] U.S. Envtl. Prot. Agency, *Summary of the IBT Review Program Office of Pesticide Programs* (1983), *available at* http://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA&Index= 1981+Thru+1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&To cEntry=&QField=&QFieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&X mlQuery=&File=D%3A%5Czyfiles%5CIndex%20Data%5C81thru85%5CTxt%5C00000022%5C9101 4ULV.txt&User=ANONYMOUS&Password=anonymous&SortMethod=h%7C- &MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display= p%7Cf&DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page& MaximumPages=1&ZyEntry=1&SeekPage=x&ZyPURL.

the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[16]

71.     Three top executives of IBT were convicted of fraud in 1983.

72.     In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.[17]

73.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Defendants were marketing Roundup® in 115 countries.

### The Importance of Roundup® to Monsanto's Market Dominance Profits

74.     The success of Roundup® was key to Defendants' continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Defendants' agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Defendants needed a strategy to maintain their Roundup® market dominance and to ward off impending competition.

75.     In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Defendants to expand their market for Roundup® even further;

---

[16] Marie-Monique Robin, *The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply* (2011) (citing U.S. Envtl. Prot. Agency, *Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch. Washington, D.C.* (August 9, 1978)).

[17] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories, supra.*

by 2000, Defendants' biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Defendants' dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of their Roundup® herbicide.

76.     Through a three-pronged strategy of increasing production, decreasing prices, and by coupling with Roundup Ready® seeds, Roundup® became Defendants' most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue.[18] Today, glyphosate remains one of the world's largest herbicides by sales volume.

*Defendants have known for decades that they falsely advertises the safety of Roundup®*

77.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were **"safer than table salt"** and **"practically non-toxic"** to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of glyphosate and/or Roundup® are the following:

> a) "Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ..."

---

[18] David Barboza, *The Power of Roundup; A Weed Killer Is A Block for Monsanto to Build On*, N.Y. TIMES, Aug. 2, 2001, *available at* http://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weed-killer-is-a-block-for-monsanto-to-build-on.html.

b) "And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem."

c) "Roundup biodegrades into naturally occurring elements."

d) "Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e) "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it."

f) "You can apply Accord with 'confidence because it will stay where you put it' it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products."

g) "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

h) "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

i) "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[19]

78.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

---

[19] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

\* \* \*

b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

\* \* \*

c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

\* \* \*

d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

\* \* \*

e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

79.     Defendants did not alter their advertising in the same manner in any state other than New York, and on information and belief they still have not done so today.

80.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[20]

---

[20] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.

## Classifications and Assessments of Glyphosate

81.     The IARC process for the classification of glyphosate followed IARC's stringent procedures for the evaluation of a chemical agent.  Over time, the IARC Monograph program has reviewed 980 agents.  Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

82.     The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.[21]  Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

83.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts.  Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members.  One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment.  Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation.  Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in *The Lancet Oncology*, and within a year after the meeting, the finalized Monograph is published.

---

[21] World Health Org., *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble* (2006), available at http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

84.     In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

85.     In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

86.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph Volume 112. For Volume 112, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015 to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated a nearly one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

87.     The studies considered the following exposure groups: (1) occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and (2) para-occupational exposure in farming families.

88.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

89.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

90.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

91.     The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

92.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

93.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor: renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

94.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

95.    The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

96.    The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.[22] Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

97.    The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.[23] While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and multiple myeloma, hairy cell leukemia (HCL), and chronic lymphocytic leukemia (CLL), in addition to several other cancers.

### Other Earlier Findings About Glyphosate's Dangers to Human Health

98.    The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates IARC's March 20, 2015 evaluation. The fact sheet describes the release patterns for glyphosate as follows:

#### Release Patterns

Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry,

---

[22] Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra* at 77.

[23] Anneclare J. De Roos et al., *Cancer Incidence Among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study,* 113 Envt'l Health Perspectives 49–54 (2005), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1253709/pdf/ehp0113-000049.pdf.

right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.[24]

99. In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.[25]

### The Toxicity of Other Ingredients in Roundup®

100. In addition to the toxicity of the active ingredient, glyphosate, several studies support the hypothesis that the glyphosate-based formulation in Defendants' Roundup® products is more dangerous and toxic than glyphosate alone. Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.[26]

---

[24] U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate, supra.*

[25] Caroline Cox, *Glyphosate, Part 2: Human Exposure and Ecological Effects*, 15 J. PESTICIDE REFORM 4 (1995); W.S. Peas et al., *Preventing pesticide-related illness in California agriculture: Strategies and priorities. Environmental Health Policy Program Report*, Univ. of Cal. School of Public Health, Calif. Policy Seminar (1993).

[26] Martinez, T.T. and K. Brown, *Oral and pulmonary toxicology of the surfactant used in Roundup herbicide*, PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991).

101. In 2002, a study by Julie Marc, entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation," revealed that Roundup® causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cell cycles.[27]

102. A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation. The researchers noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."[28]

103. In 2005, a study by Francisco Peixoto, entitled "Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup®'s effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone. The Peixoto study further suggested that the harmful effects of Roundup® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant POEA, or in the alternative, due to a potential synergic effect between glyphosate and other ingredients in the Roundup® formulation.[29]

---

[27] Julie Marc, et al., *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation*, 15 CHEM. RES. TOXICOL. 326–331 (2002), *available at* http://pubs.acs.org/doi/full/10.1021/tx015543g.

[28] Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation*, 96 BIOLOGY OF THE CELL 245, 245-249 (2004), *available at* http://onlinelibrary.wiley.com/doi/10.1016/j.biolcel.2003.11.010/epdf.

[29] Francisco Peixoto, *Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation*, 61 CHEMOSPHERE 1115, 1122 (2005), *available at*

104.    In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining

the effects of Roundup® and glyphosate on human umbilical, embryonic, and placental cells.

The study tested dilution levels of Roundup® and glyphosate that were far below agricultural

recommendations, corresponding with low levels of residue in food. The researchers ultimately

concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability

and amplify toxicity of glyphosate alone. The researchers further suggested that assessments of

glyphosate toxicity should account for the presence of adjuvants or additional chemicals used

in the formulation of the complete pesticide. The study confirmed that the adjuvants present in

Roundup® are not, in fact, inert and that Roundup® is potentially far more toxic than its active

ingredient glyphosate alone.[30]

105.    The results of these studies were at all relevant times available to Defendants.

Defendants thus knew or should have known that Roundup® is more toxic than glyphosate

alone and that safety studies of Roundup®, Roundup's adjuvants and "inert" ingredients, and/or

the surfactant POEA were necessary to protect Plaintiff Roger Bryant from Roundup®.

106.    Despite their knowledge that Roundup® is considerably more dangerous than

glyphosate alone, Defendants continued to promote Roundup® as safe.

### *Recent Worldwide Bans on Roundup®/Glyphosate*

107.    Several countries around the world have instituted bans on the sale of Roundup®

and other glyphosate-containing herbicides, both before and since IARC first announced its

assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as

---

https://www.researchgate.net/publication/7504567_Comparative_effects_of_the_Roundup_and_glyphos ate_on_mitochondrial_oxidative_phosphorylation.

[30] Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic, and Placental Cells*, 22 CHEM. RES. TOXICOL. 97-105 (2008), *available at* http://big.assets.huffingtonpost.com/france.pdf.

the dangers of the use of Roundup® become more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which was to take effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."[31]

108. The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.[32]

109. France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.[33]

110. Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent

---

[31] *Holland's Parliament Bans Glyphosate Herbicides*, The Real Agenda, April 14, 2014, *available at* http://real-agenda.com/hollands-parliament-bans-glyphosate-herbicides/.

[32] Christina Sarich, *Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals Following Recent Glyphosate-Cancer Link*, GLOBAL RESEARCH, May 14, 2015, *available at* http://www.globalresearch.ca/brazils-public-prosecutor-wants-to-ban-monsantos-chemicals-following-recent-glyphosate-cancer-link/5449440; *see* Ministério Público Federal, *MPF/DF reforça pedido para que glifosato seja banido do mercado nacional*, April, 14, 2015, *available at* http://noticias.pgr.mpf.mp.br/noticias/noticias-do-site/copy_of_meio-ambiente-e-patrimonio-cultural/mpf-df-reforca-pedido-para-que-glifosato-seja-banido-do-mercado-nacional.

[33] Zoe Schlanger, *France Bans Sales of Monsanto's Roundup in Garden Centers, 3 Months After U.N. Calls it 'Probable Carcinogen'*, NEWSWEEK, June 15, 2015, *available at* http://www.newsweek.com/france-bans-sale-monsantos-roundup-garden-centers-after-un-names-it-probable-343311.

scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."[34]

111.    The Sri Lankan government banned the private and commercial use of glyphosate, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.[35]

112.    The government of Colombia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.[36]

### *EFSA Report on Glyphosate*

113.    On November 12, 2015, the European Food Safety Authority (EFSA), the European Union's primary agency for food safety, reported on its evaluation of the Renewal Assessment Report (RAR) on glyphosate.[37]  The Rapporteur Member State assigned to glyphosate, the German Federal Institute for Risk Assessment (BfR), had produced the RAR as part of the renewal process for glyphosate in the EU.

114.    BfR sent its draft RAR to EFSA and the RAR underwent a peer review process by EFSA, other member states, and industry groups. As part of the on-going peer review of Germany's reevaluation of glyphosate, EFSA had also received a second mandate from the

---

[34] *Health Minister: Importation of Roundup Weed Spray Suspended*, Today in Bermuda, May, 11 2015, *available at* http://www.todayinbermuda.com/news/health/item/1471-health-minister-importation-of-roundup-weed-spray-suspended.

[35] *Sri Lanka's New President Puts Immediate Ban on Glyphosate Herbicides*, Sustainable Pulse, May 25, 2015, *available at* http://sustainablepulse.com/2015/05/25/sri-lankas-new-president-puts-immediate-ban-on-glyphosate-herbicides/#.VeduYk3bKAw.

[36] *Columbia to ban coca spraying herbicide glyphosate*, BBC, May 10, 2015, *available at* http://www.bbc.com/news/world-latin-america-32677411.

[37] European Food Safety Auth., Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate, *available at* http://www.efsa.europa.eu/sites/default/files/scientific_output/files/main_documents/4302.pdf.

European Commission to consider IARC's findings regarding the potential carcinogenicity of glyphosate and glyphosate-containing products.

115. Based on a review of the RAR, *which included data from industry-submitted unpublished studies*, EFSA sent its own report ("Conclusion") to the European Commission, finding that "glyphosate is unlikely to pose a carcinogenic hazard to humans and the evidence does not support classification with regard to its carcinogenic potential according to Regulation (EC) No 1272/2008."[38] EFSA therefore disagreed with IARC: glyphosate was not genotoxic and did not present a carcinogenic threat to humans.

116. In explaining why its results departed from IARC's conclusion, EFSA drew a distinction between the EU and IARC approaches to the study and classification of chemicals.[39] Although IARC examined "both glyphosate—an active substance—and glyphosate-based formulations, grouping all formulations regardless of their composition," EFSA explained that it considered only glyphosate and that its assessment focuses on "each individual chemical, and each marketed mixture separately."[40] IARC, on the other hand, "assesses generic agents, including groups of related chemicals, as well as occupational or environmental exposure, and cultural or behavioural practices."[41] EFSA accorded greater weight to studies conducted with glyphosate alone than studies of formulated products.[42]

117. EFSA went further and noted:

---

[38] *Id.*

[39] EFSA Fact Sheet: Glyphosate, EFSA
http://www.efsa.europa.eu/sites/default/files/corporate_publications/files/efsaexplainsglyphosate151112 en.pdf.

[40] *Id.*

[41] *Id.*

[42] *Id.*

[A]lthough some studies suggest that certain glyphosate-based formulations may be genotoxic (i.e. damaging to DNA), others that look solely at the active substance glyphosate do not show this effect. It is likely, therefore, that *the genotoxic effects observed in some glyphosate-based formulations are related to the other constituents or "co-formulants"*. Similarly, certain glyphosate-based formulations display higher toxicity than that of the active ingredient, presumably because of the presence of co-formulants. In its assessment, *EFSA proposes that the toxicity of each pesticide formulation and in particular its genotoxic potential should be further considered and addressed by Member State authorities while they re-assess uses of glyphosate-based formulations in their own territories.*[43]

118.    Notwithstanding its conclusion, EFSA did set exposure levels for glyphosate. Specifically, EFSA proposed an acceptable daily intake (ADI) of 0.5 mg/kg of body weight per day; an acute reference dose (ARfD) of 0.5 mg/kg of body weight; and an acceptable operator exposure level (AOEL) of 0.1 mg/kg bw per day.[44]

### *Leading Scientists Dispute EFSA's Conclusion*

119.    On November 27, 2015, 96 independent academic and governmental scientists from around the world submitted an open letter to the EU health commissioner, Vytenis Andriukaitis.[45] The scientists expressed their strong concerns and urged the commissioner to disregard the "flawed" EFSA report, arguing that "the BfR decision is not credible because it is not supported by the evidence and it was not reached in an open and transparent manner."[46]

---

[43] *Id.*

[44] European Food Safety Auth., Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate, *supra.*

[45] Letter from Christopher J. Portier et al. to Commission Vytenis Andriukaitis, Open letter: Review of the Carcinogenicity of Glyphosate by EFSA and BfR (Nov. 27, 2015), http://www.zeit.de/wissen/umwelt/2015-11/glyphosat-offener-brief.pdf; http://www.theguardian.com/environment/2016/jan/13/eu-scientists-in-row-over-safety-of-glyphosate-weedkiller.

[46] *Id.*

120.    Signatories to the letter included Dr. Christopher J. Portier, Ph.D., and other
renowned international experts in the field, some of whom were part of the IARC Working
Group assigned to glyphosate.

121.    In an exhaustive and careful examination, the scientists scrutinized EFSA's
conclusions and outlined why the IARC Working Group decision was "by far the more
credible":

> The IARC WG decision was reached relying on open and
> transparent procedures by independent scientists who completed
> thorough conflict-of-interest statements and were not affiliated or
> financially supported in any way by the chemical manufacturing
> industry. It is fully referenced and depends entirely on reports
> published in the open, peer-reviewed biomedical literature. It is
> part of a long tradition of deeply researched and highly credible
> reports on the carcinogenicity of hundreds of chemicals issued
> over the past four decades by IARC and used today by
> international agencies and regulatory bodies around the world as a
> basis for risk assessment, regulation and public health policy.[47]

122.    With respect to human data, the scientists pointed out that EFSA agreed with
IARC that there was "*limited evidence* of carcinogenicity" for NHL, but EFSA nonetheless
dismissed an association between glyphosate exposure and carcinogenicity. IARC applies
three levels of evidence in its analyses of human data, including sufficient evidence and limited
evidence. EFSA's ultimate conclusion that "there was no unequivocal evidence for a clear and
strong association of NHL with glyphosate" was misleading because it was tantamount to
IARC's highest level of evidence: "sufficient evidence," which means that a causal relationship
has been established. However, the scientists argued, "[l]egitimate public health concerns arise
when 'causality is credible,' i.e., when there is *limited evidence*."[48]

---

[47] *Id.*

[48] *Id.*

123.    Among its many other deficiencies, EFSA's conclusions regarding animal carcinogenicity data were "scientifically unacceptable," particularly in BfR's use of historical control data and in its trend analysis. Indeed, BfR's analysis directly contradicted the Organization for Economic Co-operation and Development ("OECD") testing guidelines while citing and purporting to follow those same guidelines. For instance, the EFSA report dismisses observed trends in tumor incidence "because there are no individual treatment groups that are significantly different from controls and because the maximum observed response is reportedly within the range of the historical control data." However, according to the scientists, concurrent controls are recommended over historical controls in all guidelines, scientific reports, and publications, and, if it is employed, historical control data "should be from studies in the same timeframe, for the same exact animal strain, preferably from the same laboratory or the same supplier and preferably reviewed by the same pathologist." BfR's use of historical control data violated these precautions: "only a single study used the same mouse strain as the historical controls, but was reported more than 10 years after the historical control dataset was developed." Further deviating from sound scientific practices, the data used by the BfR came from studies in seven different laboratories. The scientists concluded:

> BfR reported seven positive mouse studies with three studies showing increases in renal tumors, two with positive findings for hemangiosarcomas, and two with positive findings for malignant lymphomas. BfR additionally reported two positive findings for tumors in rats. Eliminating the inappropriate use of historical data, the unequivocal conclusion is that these are not negative studies, but in fact document the carcinogenicity of glyphosate in laboratory animals.[49]

124.    The letter also critiqued the EFSA report's lack of transparency and the opacity surrounding the data cited in the report: "citations for almost all of the references, even those

---

[49] *Id.*

from the open scientific literature, have been redacted from the document" and "there are no authors or contributors listed for either document, a requirement for publication in virtually all scientific journals." Because BfR relied on unpublished, confidential industry-provided studies, it is "impossible for any scientist not associated with BfR to review this conclusion with scientific confidence."[50]

125. On March 3, 2016, the letter was published in the Journal of Epidemiology & Community Health.[51]

### *Statement of Concern Regarding Glyphosate-Based Herbicides*

126. On February 17, 2016, a consensus statement published in the journal *Environmental Health*, entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement," assessed the safety of glyphosate-based herbicides (GBHs).[52] The paper's "focus is on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with recent discoveries about the toxicity and human health risks stemming from use of GBHs."[53] The researchers drew seven factual conclusions about GBHs:

      1.   GBHs are the most heavily applied herbicide in the world and usage continues to rise;

---

[50] *Id.*

[51] Christopher J. Portier, et al., *Differences in the carcinogenic evaluation of glyphosate between the International Agency for Research on Cancer (IARC) and the European Food Safety Authority (EFSA)*, JOURNAL OF EPIDEMIOLOGY & CMTY. HEALTH, Mar. 3, 2016, *available at* http://jech.bmj.com/content/early/2016/03/03/jech-2015-207005.full.

[52] John P. Myers, et al, *Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement*, Environmental Health (2016), *available at* http://ehjournal.biomedcentral.com/articles/10.1186/s12940-016-0117-0.

[53] *Id.*

2.    Worldwide, GBHs often contaminate drinking water sources, precipitation, and air, especially in agricultural regions;

3.    The half-life of glyphosate in water and soil is longer than previously recognized;

4.    Glyphosate and its metabolites are widely present in the global soybean supply;

5.    Human exposures to GBHs are rising;

6.    Glyphosate is now authoritatively classified as a probable human carcinogen; and

7.    Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science.[54]

127.    The researchers noted that GBH use has increased approximately 100-fold since the 1970s. Further, far from posing a limited hazard to vertebrates, as previously believed, two decades of evidence demonstrated that "several vertebrate pathways are likely targets of action, including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."[55]

128.    The paper attributes uncertainties in current assessments of glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations." Further, the researchers argue, "[t]he distinction in regulatory review and

---

[54] *Id.*

[55] *Id.*

decision processes between 'active' and 'inert' ingredients has no toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in their own right."[56]

129.    Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish." Accordingly, "risk assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone underestimate both toxicity and exposure, and thus risk." The paper concludes that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."[57]

130.    The researchers also critique the current practice of regulators who largely rely on "unpublished, non-peer reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."[58]

131.    The researchers also call for greater inclusion of GBHs in government-led toxicology testing programs:

> [A] fresh and independent examination of GBH toxicity should be undertaken, and . . . this re-examination be accompanied by systematic efforts by relevant agencies to monitor GBH levels in people and in the food supply, none of which are occurring today. The U.S. National Toxicology Program should prioritize a

---

[56] *Id.*

[57] *Id.*

[58] *Id.*

thorough toxicological assessment of the multiple pathways now identified as potentially vulnerable to GBHs.[59]

132.    The researchers suggest that, in order to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which manufacturers fund the registration process and the necessary testing:

> "[W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part of routine registration actions and fees. Such funds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would be made available to independent scientists to conduct the appropriate long-term (minimum 2 years) safety studies in recognized animal model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption, impacts on the gut microbiome, carcinogenicity, and multigenerational effects looking at reproductive capability and frequency of birth defects."[60]

### FDA Announces Testing of Glyphosate Residue in Foods

133.    On February 17, 2016, the U.S. Food and Drug Administration ("FDA") announced that, for the first time in its history, the agency planned to start testing certain foods for glyphosate residues. FDA spokeswoman Lauren Sucher explained: "The agency is now considering assignments for Fiscal Year 2016 to measure glyphosate in soybeans, corn, milk, and eggs, among other potential foods."[61]

134.    In 2014, the U.S. Government Accountability Office (GAO) had severely rebuked the FDA for its failures to both monitor for pesticide residue, including that of

---

[59] *Id.*

[60] *Id.*

[61] Carey Gillam, *FDA to Start Testing for Glyphosate in Food*, TIME, Feb. 17, 2016, *available at* http://time.com/4227500/fda-glyphosate-testing/?xid=tcoshare.

glyphosate, and to disclose the limitations of its monitoring and testing efforts to the public.[62]
The GAO had cited numerous undisclosed deficiencies in the FDA's process, specifically
highlighting its omission of glyphosate testing.

135.    Indeed, in the past, both the FDA and the U.S. Department of Agriculture
(USDA) had routinely excluded glyphosate from their testing for the residues of hundreds of
other pesticides, on the rationale that it was too expensive and unnecessary to protect public
health. Ms. Sucher, the FDA spokeswoman, however, now states that "the agency has
developed 'streamlined methods' for testing for the weed killer."[63]

136.    The FDA's move is significant as the agency possesses enforcement authority
and can seek action if pesticide residues exceed enforcement guidelines.[64]

### *European Union Vote on Glyphosate Renewal*

137.    The license for glyphosate in the European Union (EU) was set to expire on
June 30, 2016.

138.    Without an extension of the license, Monsanto's Roundup® and other
glyphosate-based herbicides faced a general phase out in EU markets.[65]

139.    In the months leading up to the license expiration date, protracted meetings and
votes among national experts from the 28 EU Member States failed to produce agreement on an
extension.

---

[62] U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-15-38, FDA AND USDA SHOULD STRENGTHEN
PESTICIDE RESIDUE MONITORING PROGRAMS AND FURTHER DISCLOSE MONITORING LIMITATIONS
(2014), *available at* http://www.gao.gov/products/GAO-15-38.

[63] Gillam, *supra* note 46.

[64] *Id.*; Pesticide Q&A, U.S. FOOD AND DRUG ADMINISTRATION,
http://www.fda.gov/Food/FoodborneIllnessContaminants/Pesticides/ucm114958.htm (last visited April
19, 2016).

[65] Philip Blenkinsop, Alissa de Carbonnel & Barbara Lewis European, *Commission to extend
glyphosate license for 18 months*, REUTERS, June 28, 2016, *available at*
http://www.reuters.com/article/us-health-eu-glyphosate-idUSKCN0ZE25B.

140.    For instance, on March 4, 2016, *The Guardian* reported that France, the Netherlands, and Sweden did not support EFSA's assessment that glyphosate was harmless.[66] The paper quoted the Swedish environment minister, Åsa Romson, as stating: "We won't take risks with glyphosate and we don't think that the analysis done so far is good enough. We will propose that no decision is taken until further analysis has been done and the EFSA scientists have been more transparent about their considerations."[67]

141.    The Netherlands argued that relicensing should be placed on hold until after a separate evaluation of glyphosate's toxicity can be conducted.[68]   Leading up to the vote, Italy joined the other EU states in opposing the license renewal, citing health concerns.[69]

142.    On June 6, 2016, Member States voted but failed to reach a qualified majority in favor or against the re-authorization of glyphosate.[70]

143.    On June 29, 2016, the EU Commission extended the European license for glyphosate for 18 months to allow the European Chemical Agency to rule on the safety of the chemical, which was expected by the end of 2017.[71]

---

[66] Arthur Neslen, *EU states rebel against plans to relicense weedkiller glyphosate*, THE GUARDIAN, Mar. 4, 2016, *available at* http://www.theguardian.com/environment/2016/mar/04/eu-states-rebel-against-plans-to-relicense-weedkiller-glyphosate.

[67] *Id.*

[68] Arthur Neslen, *Vote on Controversial weedkiller's European licence postponed*, THE GUARDIAN, Mar. 8, 2016, *available at* http://www.theguardian.com/environment/2016/mar/08/eu-vote-on-controversial-weedkiller-licence-postponed-glyphosate.

[69] *Id.*

[70] Manon Flausch, *Commission prolongs glyphosate license by 18 months*, EURACTIV, June 29, 2016, *available at* http://www.euractiv.com/section/agriculture-food/news/commission-prolongs-glyphosate-licence-by-18-months/

[71] Arthur Neslen, *Controversial chemical in Roundup weedkiller escapes immediate ban*, THE GUARDIAN, June 29, 2016, *available at* https://www.theguardian.com/business/2016/jun/29/controversial-chemical-roundup-weedkiller-escapes-immediate-ban

144.     On July 11, 2016, the EU voted in favor of a proposal to restrict the conditions of use of glyphosate in the EU, including a ban on common co-formulant POE-tallowamine (POEA) from all glyphosate-based herbicides, including Roundup®.[72]

145.     These restrictions, which are non-binding on the EU states, are expected to apply until the European Chemicals Agency issues an opinion on the chemical's safety.[73]

## TOLLING OF THE STATUTE OF LIMITATIONS

### *Discovery Rule Tolling*

146.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

147.     Plaintiff Roger Bryant has suffered an illness that has a latency period and does not arise until years after exposure. Plaintiffs had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup® and glyphosate until they were made aware that his NHL could be caused by their use and/or exposure to Roundup®. Consequently, the discovery rule applies to this case, and the statute of limitations has been tolled until the day that Plaintiffs knew or had reason to know that Roger Bryant's NHL was linked to his use of and/or exposure to Roundup®.

148.     Plaintiffs did not discover, and did not know of facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup® and glyphosate; nor would a reasonable and diligent investigation by him have disclosed that Roundup® and glyphosate would cause his NHL.

---

[72] Sarantis Michalopoulos, *EU agrees ban on glyphosate co-formulant*, EURACTIV, July 11, 2016, *available at* http://www.euractiv.com/section/agriculture-food/news/eu-agrees-ban-on-glyphosate-co-formulant/?nl_ref=16562829

[73] *See* Arthur Neslen, *Controversial chemical in Roundup weedkiller escapes immediate ban*, THE GUARDIAN, June 29, 2016.

149.    Furthermore, the running of the statute of limitations has been equitably tolled by reason of the Defendants' fraudulent concealment and conduct.  Through its affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiff the true risks associated with use of or exposure to Roundup®.

150.    As a result of Defendants' actions, Plaintiffs were unaware, and could not reasonably know or have learned through reasonable diligence, that Plaintiff Roger Bryant had been exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

151.    Furthermore, Defendants are estopped from relying on any statute of limitations because of their concealment of the truth regarding the safety of Roundup®.  Defendants were under a duty to disclose the true character, quality and nature of Roundup® because this was non-public information over which Defendants continue to have exclusive control. Defendants knew that this information was not available to Plaintiffs, his medical providers and/or health facilities, yet they failed to disclose the information to the public.

152.    Defendants had the ability to and did spend enormous amounts of money in furtherance of their purposes of marketing and promoting a profitable product, notwithstanding the known or reasonably knowable risks. Plaintiffs and medical professionals could not have afforded to and could not have possibly conducted studies to determine the nature, extent and identity of related health risks, and they were forced to rely on Defendants' representations.

153.    For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiffs' claims.

*Estoppel*

154.    Defendants were under a continuous duty to disclose to consumers, users and other persons coming into contact with their products, including Plaintiffs, accurate safety information concerning their products and the risks associated with the use of and/or exposure to Roundup® and glyphosate.

155.    Instead, Defendants knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

156.    Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

## COUNT ONE: STRICT LIABILITY FOR DEFECTIVE MANUFACTURE AND DESIGN

157.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

158.    Plaintiffs bring this strict liability claim against Defendants for defective manufacture and design.

159.    At all relevant times, Defendants engaged in the business of testing, researching, developing, designing, producing, manufacturing, marketing, selling, distributing, and/or promoting Roundup® products, which are defective and unreasonably dangerous to consumers, users, and other persons coming into contact with them, including Plaintiff Roger Bryant, thereby placing Roundup® products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendants.

160.    At all times relevant to this litigation, Defendants designed, researched, developed, formulated, manufactured, produced, tested, assembled, labeled, advertised,

promoted, marketed, sold, and/or distributed the Roundup® products used by Plaintiff, Roger Bryant and/or to which Plaintiff Roger Bryant was exposed, as described above.

161.    At all times relevant to this litigation, Defendants' Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, to Plaintiff Roger Bryant.

162.    At all times relevant to this litigation, Defendants' Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in West Virginia and throughout the United States, including Plaintiff Roger Bryant, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

163.    Defendants' Roundup® products, as researched, tested, developed, designed, licensed, formulated, produced, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants, were defectively manufactured and designed by Defendants in that when they left the hands of the Defendants' manufacturers and/or suppliers, they were unreasonably dangerous because they were not as safe as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

164.    Defendants' Roundup® products, as researched, tested, developed, designed, licensed, formulated, produced, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants, were defective in manufacture, design and formulation in that when they left the hands of Defendants' manufacturers and/or suppliers, the foreseeable risks associated with these products' reasonably foreseeable uses exceeded the alleged benefits associated with their design and formulation.

165.    At all relevant times, Defendants' Roundup® products created significant risks to the health and safety of consumers and others who were exposed to the products that far outweigh the risks posed by other products on the market used for the same or similar purpose.

166.    Therefore, at all relevant times to this litigation, Defendants' Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendants, were defective in design and formulation, in one or more of the following ways:

a.      When placed in the stream of commerce, Defendants' Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would expect.

b.      When placed in the stream of commerce, Defendants' Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c.      When placed in the stream of commerce, Defendants' Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d.      Defendants did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate.

e.      Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweighs any potential utility stemming from the use of the herbicide.

f. Defendants knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g. Defendants did not conduct adequate post-marketing surveillance of its Roundup® products.

h. Defendants could have employed safer alternative designs and formulations.

167. At all times relevant to this litigation, Plaintiff Roger Bryant used and/or was exposed to Defendants' Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

168. The harm caused by Defendants' Roundup® products far outweighed their benefit, rendering Defendants' products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendants' Roundup® products were and are more dangerous than alternative products and Defendants could have designed its Roundup® products to make them less dangerous. Indeed, at the time that Defendants designed their Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

169. Defendants' defective design of Roundup® amounts to willful, wanton, and/or reckless conduct by Defendants.

170. As a direct and proximate result of the defective design and manufacture of Roundup® products, Plaintiff Roger Bryant developed NHL and has been injured catastrophically and has been caused severe and permanent pain, suffering, disability,

impairment, loss of enjoyment of life, loss of care, comfort and economic damages. His wife,

Plaintiff Judy Bryant, has suffered a loss of her husband's services, society and consortium.

171. Therefore, as a result of the unreasonably dangerous condition of their Roundup®

products, Defendants are strictly liable to Plaintiffs.

172. The defects in Defendants' Roundup® products were substantial and contributing

factors in causing Plaintiffs' grave injuries, and, but for Defendants' misconduct and omissions,

Plaintiffs would not have sustained their injuries.

173. As a direct and proximate result of Defendants placing their defective Roundup®

products into the stream of commerce, Plaintiffs have suffered and continue to suffer grave

injuries, endured pain and discomfort, as well as economic hardship, including considerable

financial expenses for medical care and treatment. Plaintiffs will continue to incur these

expenses in the future.

174. WHEREFORE, Plaintiffs pray for judgment against Defendants in a fair and

reasonable sum, together with costs expended herein, attorney fees, punitive damages, and such

further and other relief as the Court deems just and appropriate.

## COUNT TWO: STRICT LIABILITY FOR FAILURE TO WARN

175. Plaintiffs incorporate by reference every other paragraph of this Complaint as if

each were set forth fully and completely herein.

176. Plaintiffs bring this strict liability claim against Defendants for failure to warn.

177. At all relevant times, Defendants engaged in the business of testing, researching,

developing, designing, producing, manufacturing, marketing, selling, distributing, and promoting

Roundup® products, which are defective and unreasonably dangerous to consumers, including

Plaintiffs, because they do not contain adequate warnings or instructions concerning the

dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendants.

178.    Defendants researched, developed, designed, tested, researched, produced, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce their Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiffs, Plaintiff's family members, and persons responsible for consumers (such as employers), and Defendants therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of Roundup® and glyphosate-containing products and a duty to instruct on the proper, safe use of these products.

179.    At all times relevant to this litigation, Defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that their Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendants had a continuing duty to warn Plaintiffs of the dangers associated with Roundup® use and exposure, and a continuing duty to instruct on the proper, safe use of these products. Defendants, as manufacturers, developers, producers, sellers, or distributors of chemical herbicides, are held to the knowledge of an expert in the field.

180.    At the time of manufacture, Defendants could have provided warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to these products.

181.    At all times relevant to this litigation, Defendants failed to properly investigate, study, test, or promote the safety of their Roundup® products.  Defendants also failed to minimize the dangers to users and consumers of their Roundup® products and to those who would foreseeably use or be harmed by Defendants' herbicides, including Plaintiff Roger Bryant.

182.    Despite the fact that Defendants knew or should have known that Roundup® products posed a grave risk of harm, they failed to properly warn of the dangerous risks associated with their use and exposure.  The dangerous propensities of their products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time they distributed, supplied, or sold the product, and not known to end users and consumers, such as Plaintiffs.

183.    Defendants knew or should have known that its Roundup® and glyphosate-containing products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products.  Defendants have wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

184.    At all times relevant to this litigation, Defendants' Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products throughout the United States, including Plaintiff Roger Bryant, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

185. At all times relevant to this litigation, Plaintiff Roger Bryant used and/or was exposed to the use of Defendants' Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

186. Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of Plaintiff Roger Bryant's exposure. Plaintiffs relied upon the skill, superior knowledge, and judgment of Defendants.

187. Defendants knew or should have known that the minimal warnings disseminated with their Roundup® products were inadequate, but they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and horticultural applications.

188. The information that Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled agricultural workers, horticultural workers and/or at-home users such as Plaintiff Roger Bryant to utilize the products safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of their products, even after they knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

189.    To this day, Defendants have failed to adequately and accurately warn of the true risks of Plaintiff Roger Bryant's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

190.    As a result of their inadequate warnings, Defendants' Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were distributed by Defendants, and used by Plaintiff Roger Bryant.

191.    Defendants are liable to Plaintiffs for injuries caused by their failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of their Roundup® products and the risks associated with the use of or exposure to Roundup® and glyphosate.

192.    The defects in Defendants' Roundup® products were substantial and contributing factors in causing Plaintiffs' injuries, and, but for Defendants' misconduct and omissions, Plaintiffs would not have sustained their injuries.

193.    Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with their Roundup® products, Plaintiffs could have avoided the risk of developing injuries as alleged herein and Plaintiff could have obtained alternative herbicides.

194.    As a direct and proximate result of Defendants placing their defective Roundup® products into the stream of commerce and failing to warn Plaintiffs of the increased risk of NHL associated with the use of and/or exposure to Roundup® products as described herein, Plaintiff Roger Bryant has developed NHL and has been injured catastrophically and has been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort and economic damages, including for medical care and treatment. His wife, Judy

Bryant has suffered a loss of her husband's services, society and consortium. Plaintiffs will continue to incur expenses in the future.

195.     WHEREFORE, Plaintiffs pray for judgment against Defendants in a fair and reasonable sum, together with costs expended herein, attorney fees, punitive damages, and such further and other relief as the Court deems just and appropriate.

### COUNT THREE: VIOLATION OF WEST VIRGINIA CONSUMER PROTECTION ACT

196.     Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein.

197.     At all relevant times, Defendants knew or should have known of the unreasonably dangerous and carcinogenic nature of the use of and/or exposure to Roundup®.

198.     At all relevant times, Defendants, through their labeling, advertisements, public representations and marketing of Roundup®, intentionally used deception, fraud, false pretenses, false promises, misrepresentations and unfair trade practices in order to mislead consumers that Roundup® products are safe for use.

199.     At all relevant times, Defendants also engaged in the concealment, suppression and/or omission of material facts in connection with the sale and/or advertisement of Roundup® products in trade or commerce.  In particular, Defendants failed to disclose to the public that the Roundup® is unsafe and poses serious health hazards, particularly NHL.  Defendants were aware of the hazardous risks posed by Roundup® and yet failed to inform the public of these risks through their advertisements, labeling, or other means available to them. The Defendants' failure to state material facts as described in this Complaint about Roundup® constitutes a violation of West Virginia Code § 46A-6-104, and through the above described omissions, concealment and deception, Defendants have engaged in repeated and numerous violations of

West Virginia Code § 46A-6-102 (7) (B) (C) (E) (G) (L) (M) and (N), as set forth herein and below by engaging in unfair and deceptive acts and practices in the conduct of a trade or commerce.

200.    At all relevant times, Plaintiffs were deceived by Defendants' intentional and/ or negligent misrepresentations and omissions, including by the orchestrated claims made on or in television commercials, advertising materials, websites, and on product labels and packaging regarding the usage and safety of Roundup®.

201.    At all relevant times, Plaintiffs acted in reasonable reliance upon the Defendants' unlawful trade practices, and had the Defendants not engaged in the deceptive conduct described herein, Plaintiff Roger Bryant would not have purchased or used Roundup® and/or would have protected himself from exposure to Roundup®.

202.    As a direct and proximate result of Defendants' unlawful trade practices, Plaintiff Roger Bryant developed NHL and has been injured catastrophically and has been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort and economic damages. His wife, Plaintiff Judy Bryant has lost the services, society and consortium of her husband.

203.    The Plaintiffs sent a 20 day notice to cure pursuant to West Virginia Code § 46A-6-106.

204.    WHEREFORE, Plaintiffs pray for judgment against Defendants in a fair and reasonable sum together with costs expended herein, attorney fees, punitive damages, and such further and other relief as the Court deems just and appropriate.

### COUNT FOUR: NEGLIGENCE

205.   Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

206.   At all relevant times, Defendants breached their duty to Plaintiffs and were otherwise negligent in marketing, designing, manufacturing, producing, supplying, inspecting, testing, researching, selling and/or distributing Roundup® products.

207.   Defendants, directly or indirectly, caused Roundup® products to be purchased and/or used by Plaintiff Roger Bryant.

208.   At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of their Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

209.   At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the marketing, advertisement, and sale of their Roundup® products. Defendants' duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup® and, in particular, its active ingredient glyphosate.

210.   At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

211. Accordingly, at all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known that use of or exposure to their Roundup® products could cause Plaintiffs' injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff Roger Bryant.

212. Defendants knew or, in the exercise of reasonable care, should have known that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff Roger Bryant and others from Roundup®.

213. Defendants knew or, in the exercise of reasonable care, should have known that tests limited to Roundup®'s active ingredient glyphosate were insufficient to prove the safety of Roundup®.

214. Defendants also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup® and glyphosate-containing products.

215. As such, Defendants breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of their Roundup® products, in that Defendants manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in their products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

216.   Defendants failed to appropriately and adequately test Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff Roger Bryant and others from Roundup®.

217.   Despite their ability and means to investigate, study, and test their products and to provide adequate warnings, Defendants have failed to do so.  Indeed, Defendants have wrongfully concealed information and have further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

218.   Defendants' negligence included, but is not limited to:

a.   Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing their Roundup® products without thorough and adequate pre- and post-market testing;

b.   Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c.   Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture, horticulture, and at-home use;

d.   Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup®, and the propensity of these ingredients to render Roundup® toxic,

increase the toxicity of Roundup®, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup®, and whether or not "inert" ingredients and/or adjuvants were safe for use;

       e.      Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

       f.      Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

       g.      Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendants could reasonably foresee would use and/or be exposed to its Roundup® products;

       h.      Failing to disclose to Plaintiffs, users, consumers, and the general public that the use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

       i.      Failing to warn Plaintiffs, users, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiffs and other users or consumers;

       j.      Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

       k.      Representing that its Roundup® products were safe for their intended use when, in fact, Defendants knew or should have known that the products were not safe for their intended use;

       l.      Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

       m.      Advertising, marketing, and recommending the use of Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendants to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

       n.      Continuing to disseminate information to their consumers, which indicate or imply that Defendants' Roundup® products are not unsafe for use in the agricultural, horticultural industries, and/or home use; and

       o.      Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

219.    Defendants knew and/or should have known that it was foreseeable that consumers and/or users, such as Plaintiffs would suffer injuries as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

220.    Plaintiffs did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

221. As a direct and proximate result of Defendants' negligence, Plaintiffs developed the injuries, harm, and economic losses that Plaintiffs suffered, and will continue to suffer, as described herein.

222. Defendants' conduct, as described above, was reckless. Defendants regularly risk the lives of consumers and users of their products, including Plaintiff Roger Bryant, with full knowledge of the dangers of their products. Defendants have made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiffs. Defendants' reckless conduct therefore warrants an award of punitive damages.

223. As a proximate result of Defendants' wrongful acts and omissions, including placing their defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff Roger Bryant developed NHL and has been injured catastrophically and has been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort and economic damages, including significant expenses for medical care and treatment, and will continue to incur these expenses in the future. His wife, Plaintiff Judy Bryant, suffered a loss of services, society and consortium of her husband.

224. WHEREFORE, Plaintiffs pray for judgment against Defendants in a fair and reasonable sum, together with costs expended herein, attorney fees, punitive damages, and such further and other relief as the Court deems just and appropriate.

## COUNT FIVE: BREACH OF IMPLIED WARRANTIES

225. Plaintiffs incorporate by reference each of the preceding paragraphs as if fully set forth herein.

226.    At all relevant times, Defendants engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting their Roundup® products, which are defective and unreasonably dangerous to users, consumers and those in proximity to users, including Plaintiff Roger Bryant, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendants.

227.    Before and during the time that Plaintiff Roger Bryant was exposed to the use of the aforementioned Roundup® products, Defendants impliedly warranted to its consumers and users—including Plaintiff and others—that their Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural and residential use herbicides.

228.    Defendants, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff Roger Bryant's injuries.

229.    Plaintiffs reasonably relied upon the skill, superior knowledge and judgment of Defendants and upon their implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

230.    Plaintiffs reasonably relied upon the skill, superior knowledge and judgment of Defendants and upon their implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

231.    The Roundup® products were expected to reach and did in fact reach consumers, users and those in proximity to users, including Plaintiff Roger Bryant, without substantial change in the condition in which they were manufactured and sold by Defendants.

232.    At all relevant times, Defendants were aware that consumers, users, and those in proximity of users of its products, including Plaintiff Roger Bryant, would use Roundup® products as marketed by Defendants, which is to say that Plaintiff Roger Bryant was a foreseeable user of Roundup®.

233.    Defendants intended that their Roundup® products be used in the manner in which Plaintiff Roger Bryant in fact used or was exposed to them and Defendants impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

234.    In reliance upon Defendants' implied warranty, Plaintiff Roger Bryant used or was in proximity to the use of Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendants.

235.    Because of the herein mentioned wrongful conduct of the Defendants, Plaintiffs could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

236.    Defendants breached their implied warranty to Plaintiffs in that its Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

237. The harm caused by Defendants' Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

238. As a direct and proximate result of Defendants' wrongful acts and omissions Plaintiff Roger Bryant has suffered severe and permanent physical and emotional injuries. Plaintiffs have endured pain and suffering, have suffered economic loss, including significant expenses for medical care and treatment, and will continue to incur these expenses in the future. His wife, Plaintiff Judy Bryant, has suffered a loss of services, society and consortium of her husband.

239. WHEREFORE, Plaintiff prays for judgment against Defendants in a fair and reasonable sum, together with costs expended herein, attorney fees, punitive damages, and such further and other relief as the Court deems just and appropriate.

## COUNT SIX – FRAUD AND CIVIL CONSPIRACY

240. Plaintiffs incorporate by reference each of the preceding paragraphs as if fully set forth herein.

241. As described above and incorporated herein, Defendants used deception, deceptive acts, made false statements and representations and/or concealed, suppressed or omitted material factual information in connection with their sale or advertisement of Roundup®.

242. Despite the falsity of the tests that underlie the registration with FIFRA of Roundup®, within a few years of its launch, Defendants were marketing Roundup® in 115 countries.

243.    Despite their ability and means to investigate, study, and test their products and to provide adequate warnings, Defendants have wrongfully concealed information and have further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

244.    Defendants' fraud included, but is not limited to:

a.    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

b.    Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture, horticulture, and at-home use, yet falsely representing that they were safe;

c.    Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup®, and the propensity of these ingredients to render Roundup® toxic, increase the toxicity of Roundup®, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup®, and whether or not "inert" ingredients and/or adjuvants were safe for use, yet falsely representing that they were safe;

      d.      Failing to disclose to Plaintiffs, users, consumers, and the general public that the use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

      e.      Failing to disclose to Plaintiffs, users, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiffs and other users or consumers;

      f.      Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

      g.      Despite Defendants' knowledge of the high risk of NHL associated with use and/or exposure to Roundup® products, Defendants affirmatively and misleadingly minimized this risk through marketing and promotional efforts and product labeling.

      h.      Falsely Representing that its Roundup® products were safe for their intended use when, in fact, Defendants knew or should have known that the products were not safe for their intended use;

      i.      Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

      j.      Advertising, marketing, and recommending the use of Roundup® products, while concealing and failing to disclose or warn of the dangers known

by Defendants to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

     k.    Continuing to disseminate information to their consumers, which falsely indicate or imply that Defendants' Roundup® products are not unsafe for use in the agricultural, horticultural industries, and/or home use;

     l.    While Defendants knew of the dangers and risks of Roundup® products, they concealed and/or omitted this information from labels and warnings contained on Roundup® products;

     m.    While Defendants knew of the dangerous condition of Roundup® products, including that they posed a danger to their consumers and non-consumers exposed to Roundup® products, including Plaintiff Roger Bryant, Defendants affirmatively chose not to include any warnings or information regarding the dangerous condition of Roundup® products.

245.    Defendants knew and/or should have known that it was foreseeable that consumers and/or users, such as Plaintiffs would suffer injuries as a result of Defendants' false representations in marketing, labeling, distribution, and sale of Roundup®.

246.    Plaintiffs did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

247.    As a direct and proximate result of Defendants' misrepresentations, including misrepresentations by omission, Plaintiffs developed the injuries, harm, and economic losses that Plaintiffs suffered, and will continue to suffer, as described herein.

248.    Defendants intended others rely upon such deceptive acts, practices, misrepresentations, concealment and/or omission of material facts.

249. The concerted actions of the Defendants, their agents and/or employees, as set forth in this Amended Complaint, were done to accomplish the unlawful purpose of wrongfully exposing consumers and the Plaintiff Roger Bryant to their dangerous and unsafe Roundup® and/or were done by unlawful means.

250. The concerted actions of the Defendants, their agents and/or employees constitute a civil conspiracy.

251. Defendants are directly liable for the actions of the other Defendants, their agents and/employees in carrying out the civil conspiracy of wrongful acts set forth in this Complaint.

252. As a direct and proximate result of the willful, wanton, malicious, reckless and/or negligent concerted actions in carrying out their civil conspiracy, the Plaintiffs suffered damages as stated in this Complaint.

253. Defendants' conduct, as described above, was reckless. Defendants regularly risk the lives of consumers and users of their products, including Plaintiff Roger Bryant, with full knowledge of the dangers of their products. Defendants have made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiffs. Defendants' reckless conduct therefore warrants an award of punitive damages.

254. Plaintiffs suffered damages as a result of reliance on Defendants' deceptive acts, practices, misrepresentations, concealment and/or omission of material facts as aforesaid.

255. As a direct and proximate result of Defendants' wrongful acts and omissions Plaintiff Roger Bryant has suffered severe and permanent physical and emotional injuries. Plaintiffs have endured pain and suffering, have suffered economic loss, including significant expenses for medical care and treatment, and will continue to incur these expenses in the future.

Plaintiff Judy Bryant, wife of Roger Bryant, has suffered a loss of the services, society and consortium of her husband.

256.    The conduct of Defendants was reckless and/or intentional and justifies an award of punitive damages.

257.    WHEREFORE, Plaintiffs pray for judgment against Defendants in a fair and reasonable sum, together with costs expended herein, attorney fees, punitive damages, and such further and other relief as the Court deems just and appropriate.

**COUNT SEVEN – RECKLESSNESS, TORT OF OUTRAGE
AND OTHER WRONGFUL CONDUCT**

258.    Plaintiffs incorporate by reference every other paragraph of this Complaint as if each were set forth herein.

259.    Defendants have acted willfully, wantonly, maliciously, with an evil motive, and/or recklessly in one or more of the following and other ways:

a. Defendants knew of the unreasonably high risk of NHL posed by the Roundup® products before manufacturing, marketing, distributing and/or selling the Roundup® products, yet purposefully proceeded with such action;

b. Despite Defendants' knowledge of the high risk of NHL associated with use and/or exposure to Roundup® products, Defendants affirmatively minimized this risk through marketing and promotional efforts and product labeling;

c. Through the actions outlined above, Defendants expressed a reckless indifference to the safety of users of Roundup® products, including Plaintiffs.

260.    Defendants knew of the dangers and risks of Roundup® products, yet they concealed and/or omitted this information from labels and warnings contained on Roundup® products in furtherance of its knowing and willful actions.

261.    These actions were outrageous because of Defendants' reckless indifference to the safety of users of Roundup® products and/or those who became exposed to it.

262.    Defendants knew of the dangerous condition of Roundup® products, including that they posed a danger to their consumers and non-consumers exposed to Roundup® products, including Plaintiff Roger Bryant, but chose not to include any warnings or information regarding the dangerous condition of Roundup® products.

263.    Defendants showed complete indifference to or conscious disregard of the safety of Plaintiff Roger Bryant by their conduct described herein. Defendants knew or should have known failure to include a warning for Roundup® products would result in consumers using and/or being exposed to Roundup® products and subsequently developing NHL.

264.    Defendants committed other wrongful conduct as may be revealed during the course of discovery.

265.    As a direct and proximate result of the willful, wanton, malicious, and/or reckless conduct of Defendants, Plaintiffs have sustained damages as set forth above.

266.    WHEREFORE, Plaintiffs pray for judgment against Defendants in a fair and reasonable sum, together with costs expended herein, attorney fees, punitive and exemplary damages against Defendants in a fair and reasonable amount sufficient to punish Defendants and deter them and others from engaging in similar conduct in the future, and such further and other relief as the Court deems just and appropriate.

## COUNT EIGHT – LOSS OF SERVICES

267.    Plaintiffs incorporate by reference every other paragraph of this Complaint as if each were set forth herein.

268.    Plaintiff Judy Bryant is the spouse of Plaintiff Roger Bryant.

269.     Because of the wrongful conduct of Defendants, as aforesaid, Plaintiff Judy Bryant has suffered a loss of the services, society, and consortium of her husband, Plaintiff Roger Bryant, and she has been required to perform services that she would not have been required to perform in absence of Defendants' said wrongful conduct.

270.     WHEREFORE, Plaintiffs pray for a judgment for damages against Defendants, jointly and severally, in a fair and reasonable amount, costs expended herein, attorney fees, punitive damages, and such further and other relief as the Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to all issues.

ROGER BRYANT and
JUDY BRYANT,

By Counsel

Marvin W. Masters
West Virginia State Bar No. 2359
Kelly Elswick-Hall
West Virginia State Bar No. 6578
The Masters Law Firm, l.c.
181 Summers Street
Charleston, West Virginia  25301

And

Aimee H. Wagstaff
*Pro hac vice to be filed*
Andrus Wagstaff, PC
7171 West Alaska Drive
Lakewood, Colorado 80226
Counsel for Plaintiffs
F:\4\360\p001.docx