A TRUE COPY I CERTIFY

James W. McCormack, Clerk

By: TammyDowns D.C. on
**Sep 20, 2019**
For the United States District Court
Eastern District of Arkansas

JTK,JURY

# U.S. District Court
## Eastern District of Arkansas (Jonesboro)
### CIVIL DOCKET FOR CASE #: 3:19-cv-00257-DPM
### Internal Use Only

Wallace et al v. Monsanto Company et al
Assigned to: Chief Judge D. P. Marshall Jr.
Cause: 28:1332 Diversity-Property Damage

Date Filed: 09/20/2019
Jury Demand: Plaintiff
Nature of Suit: 385 Prop. Damage Prod.
Liability
Jurisdiction: Diversity

**Plaintiff**

**Bradley Wallace**
*Individually and as Representative of
High Cotton Farms, Inc. and WMA
Farms Partnership*

represented by **Jerry Kelly**
Kelly Law Firm
Post Office Box 500
Lonoke, AR 72086
501-676-5770
Fax: 501-676-7807
Email: jkelly@kellylawfirm.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Paul Byrd**
Paul Byrd Law Firm, PLLC
415 North McKinley Street
Suite 210
Little Rock, AR 72205
501-420-3050
Fax: 501-420-3128
Email: paul@paulbyrdlawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph D. Gates**
Paul Byrd Law Firm, PLLC
415 North McKinley Street
Suite 210
Little Rock, AR 72205
501-420-3050
Fax: 501-420-3128
Email: joseph@paulbyrdlawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**High Cotton Farms Inc**                    represented by **Jerry Kelly**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Paul Byrd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph D. Gates**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**WMA Farms Partnership**                     represented by **Jerry Kelly**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Paul Byrd**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph D. Gates**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

**Defendant**

**BASF SE**

**Defendant**

**BASF Corporation**

| Date Filed | # | Docket Text |
|---|---|---|
| 09/20/2019 | 1 | COMPLAINT with Jury Demand against All Defendants, filed by Bradley Wallace, WMA Farms Partnership, and High Cotton Farms Inc. Fee of $400 paid. Receipt Number LIT073995. Summons issued. (Attachments: # 1 Civil Cover Sheet)(kdr) (Entered: 09/20/2019) |

Case MDL No. 2741   Document 1263-2   Filed 09/24/19   Page 3 of 101

A TRUE COPY I CERTIFY

James W. McCormack, Clerk

By: TammyDowns D.C. on
**Sep 20, 2019**

For the United States District Court
Eastern District of Arkansas

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

SEP 20 2019

JAMES W. McCORMACK, CLERK
By: _____
DEP CLERK

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**JONESBORO DIVISION**

BRADLEY WALLACE, Individually and as Representative of      **PLAINTIFFS**
HIGH COTTON FARMS, INC., and WMA FARMS PARNTERSHIP;
HIGH COTTON FARMS, INC.; and
WMA FARMS PARNTERSHIP

vs.      Civil Case No. 3:19-CV-257-DPM

MONSANTO COMPANY;      **DEFENDANTS**
BASF SE; and
BASF CORPORATION

This case **assigned to** District Judge _Marshall_
and to Magistrate Judge _KEARNEY_

## COMPLAINT

COMES NOW Plaintiffs, Brad Wallace, Individually and as Representative of High Cotton

Farms, Inc., and WMA Farms Partnership; High Cotton Farms, Inc.; and WMA Farms Partnership,

and for their first Complaint against the named Defendants herein, state as follows:

### NATURE OF THE ACTION

This action is brought by farmers who have suffered damage as a result of the design,

development, promotion, and sale of a genetically engineered trait conferring resistance to

dicamba expressly for the purpose of spraying dicamba herbicide over the top of growing plants

as part of a dicamba-based crop system. Defendants knew that dicamba, highly volatile and prone

to drift, is ruinous to susceptible non-dicamba resistant plants and crops. Not only did Defendants

release their dangerous system onto the market, creating high risk of harm, but everything they did

and failed to do increased that risk, all but ensuring damage to non-dicamba resistant plants and

crops. That damage in fact served Defendants' purpose of pressuring farmers to purchase

dicamba-resistant seed out of self-protection. Defendants created and carried out a scheme of

ecological disaster for their financial gain and to the detriment of the very persons they knew would be harmed.

## PARTIES

### *Plaintiffs*

1.      Brad Wallace is a citizen of Arkansas who farms in Craighead, Poinsett, and Mississippi County, AR. In 2016 and 2017, Mr. Wallace grew non-dicamba resistant soybeans in Arkansas damaged by dicamba.

2.      High Cotton Farms, Inc. is a corporation in Arkansas who farms in Craighead, Poinsett, and Mississippi County, AR. In 2016 and 2017, High Cotton Farms, Inc. grew non-dicamba resistant soybeans in Arkansas damaged by dicamba.

3.      WMA Farms Partnership is a partnership in Arkansas who farms in Craighead, Poinsett, and Mississippi County, AR. In 2016 and 2017, WMA Farms Partnership grew non-dicamba resistant soybeans in Arkansas damaged by dicamba.

### *Defendants*

4.      Monsanto Company ("Monsanto") is a corporation organized and existing under the laws of the State of Delaware with its corporate headquarters and principal place of business in St. Louis County, Missouri.

5.      Monsanto designs, develops, manufactures, licenses, and sells biotechnology, chemicals, and other agricultural products, including herbicides and seed genetically modified to produce crops resistant thereto. These include Roundup Ready 2 Xtend Soybean ("Xtend soybeans"), Bollgard II XtendFlex Cotton ("Xtend cotton") and a herbicide known as XtendiMax with VaporGrip Technology® ("XtendiMax").

6.    Along with BASF SE and BASF Corporation, Monsanto developed, and also licenses and sells a genetically engineered trait in soybean and cotton seed, and seed containing that trait, for intended use with dicamba herbicide, marketed and sold in states including those alleged in this action.

7.    BASF SE is a corporation organized and existing under the laws of Germany with its overall headquarters in Ludwigshafen, Germany. BASF SE describes itself as the largest chemical company in the world. In materials describing the company, BASF SE lists one of its "Country Headquarters" as BASF Corporation, 100 Park Avenue, Florham Park, NJ.

8.    BASF Corporation is a company organized and existing under the laws of the State of Delaware, with corporate headquarters at 100 Park Avenue, Florham Park, New Jersey and/or research headquarters at 26 Davis Drive, Research Triangle Park, NC. BASF Corporation is the largest affiliate of BASF SE and the second largest producer and marketer of chemicals and related products in North America. It is a subsidiary and North American agent for BASF SE.

9.    BASF Corporation is the entity whose name and address appears on labels of the the dicamba herbicide known as Engenia. Dr. Jeffrey Birk (BASF, 26 Davis Drive Research Triangle Park, NC), is listed as "registrant" on the EPA Notice of Pesticide Registration for Engenia (EPA Reg. No. 7969-345) dated December 20, 2016. On information and belief, Dr. Jeffrey Birk is a Regulatory Manager at BASF Corporation.

10.    Chemical manufacturers and importers are required to develop a Safety Data Sheet for each hazardous chemical they produce. *See* 29 CFR 1910.1200(g). A Safety Data Sheet for Engenia dated January 16, 2017 identifies BASF SE (67056 Ludwigshafen, Germany), as the supplier of the safety data, with a "Contact address" of BASF Corporation, 100 Park Avenue, Florham Park, NJ 07932.

11.     BASF SE is a global company that extensively integrates operational, managerial, and financial resources across entity lines.  BASF SE and its group of entities operate by business segments or "divisions." Employees have reporting relationships and carry on activities defined not by corporate relationships but by such business or operational segments.  "Agricultural Solutions" and/or "Crop Protection" is a business segment within and supported by this integrated organization.  For example, entities within the BASF organization share operational systems and services including finance, legal, taxes, intellectual property, investor relations, communications and government relations, human resources, engineering and site management, environmental protection, and health and safety.  BASF Website, "Organization of the BASF Group," https://www.basf.com/en/company/about-us/strategy-and-organization/ structure.html.

12.     "Within BASF Group, BASF SE takes a central position: Directly or indirectly, it holds the shares in the companies belonging to the BASF Group, and is also the largest operating company." BASF SE Webpage, "About Us," https://www.basf.com/de/en/company/about-us/strategy-and-organization.html.  The BASF SE Board of Executive Directors is responsible for overall management of the company, and BASF SE exercises authority and control over BASF Corporation and its operations.  BASF SE and BASF Corporation share one or more officers and/or directors.  On information and belief, at least two of the three current BASF Corporation directors are current or former director of BASF SE.  BASF Corporation does not function independently but under the BASF umbrella where the BASF group operates a unitary business.

13.     BASF SE coordinates crop protection activities from the BASF Agricultural Center in Limburgerhof, Germany.  *See* BASF Brochure (BASF SE/Global Communications Crop Protection, 2016), https://industries.basf.com/assets/global/corp/en/Agriculture/Crop%20Protection/Brochure%20Crop%20Protection%20Englisch.pdf.

14.     BASF SE and BASF Corporation regularly refer to themselves as "BASF" with no further description, and unless otherwise indicated, are herein referred to collectively as "BASF".

15.     As more fully described herein, Monsanto and BASF have since at least 2007 entered into one or more agreements in order to, and did, engage in a partnership, joint venture, joint enterprise, or similar relationship to develop technologies for a dicamba-based crop system, respecting which they jointly fund projects and share risks and profits. They jointly developed the dicamba-resistant trait, as well as dicamba formulations for application over the top of crops grown from that trait, entered into reciprocal licensing arrangements, engaged in joint field testing, jointly developed stewardship guidelines, and otherwise acted at all relevant times together in designing, developing, marketing, manufacturing, licensing and sale of the dicamba-based crop system. On information and belief, a substantial portion of these activities occurred in this district.

16.     Among other things, BASF provided Monsanto with the dicamba formulation that became XtendiMax. BASF markets and sells its own dicamba herbicide Engenia specifically for use with seed containing the dicamba-resistant trait.

17.     At all relevant times, Monsanto and BASF acted together and in concert as joint-venturers, joint enterprises, partners and co-conspirators who shared financial risks and benefits, proprietary dicamba formulations and bioengineered crop traits, collaborated in and jointly conducted field testing, marketing, promotion, training, and other shared activities all with the common interest and purpose of creating ever more demand for seed with the dicamba-resistant trait and further use of dicamba, each acting in its own right and as agent for the other.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over the subject matter of this lawsuit pursuant to U.S.C. § 1332(d) because there is complete diversity of parties. Plaintiffs individually also seek more than $75,000 for damages, punitive damages and also injunctive relief.

19.     Plaintiffs are residents and citizens of Arkansas who have property affected by Defendants' conduct and represent similarly situated injured persons and entities from various state injured by Defendants uniform corporate conduct and partnership in the release of an inherently dangerous and volatile crop-system on the market, which has directly impacted and severely damaged Plaintiffs' livelihood of growing crops.

20.     At all relevant times herein, Defendants have jointly researched, designed, formulated, compounded, developed, tested, manufactured, produced, processed, assembled, inspected, distributed, marketed, promoted, packaged, advertised and made representations regarding dicamba-resistant crops and dicamba herbicide.

21.     This Court has both specific and general personal jurisdiction over the parties. Defendants have engaged in such continuous, systematic and continually conduct business in the State of Arkansas that the Defendants are "at home" in the State of Arkansas. Defendants actively engaged in the promotion and use of their inherently dangerous and volatile crop-system in Arkansas, Missouri, Mississippi and other states, have distributed dicamba herbicide applicators and have performed training, education and information schools in Arkansas, Missouri and Mississippi and other states. Defendants have performed GMO crop and dicamba-resistant crops and dicamba herbicide testing on test plots in the State of Arkansas, avail themselves of the opportunity to conduct business in this State, sell crop products, make representations, market,

advertise, promote and distribute their crop products in this State and have committed tortious acts in the State of Arkansas.

22.     BASF SE wholly owns and exercises substantial and pervasive control over BASF Corporation, with and through which it carries out integrated and symbiotic operations including those relating to crop protection. BASF SE induced, directed, caused, and participated in the activities at issue. BASF Corporation is BASF's agent through which business in North America, including Iowa, is conducted. Jurisdictional contacts of BASF Corporation are attributable to BASF SE.

23.     In addition, and on information and belief, BASF SE and BASF Corporation each. has participated directly in the events alleged herein pertaining to the design, development, release, promotion, marketing, and sale of the dicamba-based crop system.

24.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because (1) Plaintiffs reside in this District; (2) Defendants have engaged in substantial conduct and business relevant to Plaintiffs' claims within this District; and (3) Plaintiffs have suffered substantial losses from dicamba herbicides due to Defendants' wrongful conduct within this District.

25.     Defendants have and continue, at minimum, to advertise, market, sell, or otherwise disseminate, the dicamba-resistant trait and seed containing it, dicamba herbicides, and the dicamba-based crop system in this district.

### FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

### A.     Monsanto, Glyphosate, and Super Weeds

26.     Monsanto was one of the first companies to utilize biotechnology in the field of agriculture and has become a leading producer of genetically modified seed and agro-chemicals.

27.     Biotechnology has made possible the introduction of genetic characteristics, or traits, into plant seeds.

28.     In the 1970s, Monsanto patented the glyphosate molecule, which became the active ingredient in Roundup herbicide.

29.     Glyphosate is a non-selective herbicide that causes severe injury or destruction to plants, including soybean and cotton, that have not been genetically modified to tolerate it.

30.     Introduced in 1974, Roundup became one of the world's most widely used herbicides.

31.     Monsanto also genetically engineered seed to withstand its glyphosate herbicide, sold under the brand name Roundup Ready ("RR").

32.     Monsanto's development and sale of the glyphosate-tolerant trait changed how farmers could apply glyphosate herbicide. Rather than being applied before the crop is planted (in "burndown" stage), Roundup can be sprayed over the top of growing crops genetically modified to withstand it. As a result, farmers planting glyphosate-tolerant crops can apply it over an entire field after the crop has emerged without damage to the crop itself. Over-the-top application of glyphosate is now commonplace.

33.     Monsanto began selling RR soybean seed in 1996 and RR corn seed in 1998. Other crops genetically altered to withstand Roundup herbicide include canola, cotton, alfalfa, and sugar beets.

34.     The Roundup Ready crop system became Monsanto's flagship. Monsanto's Roundup herbicide and RR seed each supported the other, becoming a blockbuster combination.

35.     The glyphosate-resistant trait is a technology that Monsanto patented, owns and licenses. A farmer cannot obtain that technology without buying the seed into which it has been inserted.

36.     Until 2015, Monsanto held the patent on its "first generation" Roundup Ready ("RR1") trait.

37.     Well before Monsanto's patent on its original RR technology expired in 2015, Monsanto patented a "second generation" Roundup Ready ("RR2") trait, which expresses the same enzyme that confers glyphosate resistance as before.

38.     Monsanto charges more for its RR2Yield soybean seed than its original RR1 soybean seed, marketing it as having better yield, which it does not as compared to RR1 and/or other varieties.

39.     More than 90% of soybeans and approximately 80% of corn and cotton are grown from seed containing Monsanto's RR trait.

40.     As of 2016, glyphosate had become the most-used agricultural chemical ever.

41.     Weeds, however, have evolved to become naturally resistant to glyphosate. These are known as "super weeds."

42.     Monsanto's sale and distribution of the RR trait and Roundup herbicide set in motion a dangerous cycle whereby weeds evolve to resist the chemicals designed to destroy them, forcing farmers to apply higher doses or use different herbicides.

43.     Monsanto's RR trait and Roundup herbicide directly contributed to this problem. All the while, Monsanto made massive profits.

**B.     Development of the Dicamba-based Crop System**

44.     Recognizing the opportunity to protect and enhance its dominance with RR, and to capitalize on and dominate the market with a new trait to address the weed problem Monsanto's

own Roundup products produced, Monsanto, along with BASF, set out to develop a crop system
featuring dicamba, an exceptionally volatile and damaging herbicide.

45.     *According to Monsanto President, Brett Begemann, this new crop system provides*
*Monsanto "a source of growth longer term."* Carey Gillam, *Monsanto to invest more than $1 bln*
*in dicamba herbicide production* (June 24, 2015), https://www.reuters.com/article/monsanto-
dicamba/monsanto-to-invest-more-than-1-bln-in-dicamba-herbicide-production-
idUSL1N0ZA1XN20150624.

46.     Originally invented by BASF, dicamba is a broad-spectrum systemic herbicide that
destroys broadleaf weeds and plants.

47.     Dicamba mimics the plant hormone auxin, causing uncontrolled cell division and
growth, causing the plant to grow so fast that it cannot retain the nutrients it requires, which kills
the plant.

48.     Certain plants are extremely sensitive to dicamba even in trace amounts, especially
soybeans.

49.     Other plants including fruit trees, ornamental trees, and vegetable crops also are
sensitive to dicamba and damaged by exposure to it.

50.     It is well known to agro-chemical companies like Monsanto and BASF that
dicamba has extreme negative effects on desirable broad-leaf plants, including trees, fruits,
vegetables, and various crops, especially soybeans.

51.     A healthy soybean plant will produce fully-developed pods and leaves throughout
the stem of the plant.

52.     Dicamba exposure to susceptible plants and crops, including soybeans, results in
unique and distinctive physical symptoms including leaf cupping, alone or together with other

symptoms such as curling, strapping, discoloration, leaf elongation, wrinkling, stunting, and twisting. A soybean plant damaged by dicamba will lose pods throughout the stem as well as number of beans per pod.

53.     It also is well known to companies like Monsanto and BASF that dicamba is extremely volatile, meaning that it has a high propensity to evaporate, or vaporize, from soil and/or plant surfaces and move as small particles through the air to deposit onto non-target plants and crops. Vaporized dicamba can travel great distances before falling onto and damaging susceptible off-target plants and crops not resistant to dicamba.

54.     In addition, dicamba's volatility is long-lived, meaning longer exposure for non-tolerant plants and increased risk of movement.

55.     Dicamba not only is very volatile but very prone to spray drift.

56.     Such drift, as opposed to volatilization, is movement of spray droplets to non-target areas. Such drift can be influenced by weather, wind speed and direction, droplet size and ground speed or spray pressure.

57.     Temperature inversions increase the likelihood of movement by drift as well as volatilization. A temperature inversion occurs where the air above the ground is warmer than the ground itself. An inversion layer forms where the warmer air is present, blocking atmospheric flow. This causes the air over the inversion layer to become stable, trapping everything inside of the layer and allowing it to move long distances.

58.     Dicamba (first sold by BASF under the brand name Banvel) has been on the market in various forms since the 1960s, but for all these reasons, historically has been used in pre-planting or post-harvest burndown. Because this application occurs in cooler parts of the year and typically,

there are no neighboring, growing crops to damage during burndown, there is less risk in applying dicamba during this stage.

59.     In order to apply dicamba over the top of growing plants so as to kill unwanted weeds but not the crop, a genetic modification for tolerance to dicamba would need to be developed.

60.     Monsanto entered into agreements with BASF to create, accelerate, promote, and commercialize a dicamba-based crop system.

61.     A genetically engineered trait for soybean and cotton seed to withstand dicamba was developed by Monsanto and BASF, marketed and sold expressly for in-crop use of dicamba herbicide. There is no reason for, or value in, genetic modification to tolerate dicamba herbicide except for in-crop use of such herbicide.

62.     At all relevant times, Monsanto and BASF acted together in the design, development, promotion, marketing and sale of such a system, consisting of the dicamba-resistant trait, seed containing that trait, and dicamba herbicide.

63.     Monsanto and BASF entered into one or more agreements to combine their property, money, efforts, skill and knowledge in partnership, joint venture or joint enterprise for their mutual benefit and profit, with common purpose and community of interest in that purpose, equal right to voice and control, and the sharing of profits and losses.

64.     These companies' history with dicamba-resistant technology traces back to 1993 when Sandoz Agro, Inc. ("Sandoz") contracted with the University of Nebraska to fund research being done by University researchers including Donald Weeks relating to dicamba resistance. BASF purchased Sandoz assets, including rights in know-how for dicamba-based products. In 2005, the University entered into another contract with Monsanto, which Monsanto claimed

granted it exclusive world-wide rights in dicamba-resistant technology. Both companies claimed entitlement to rights in a lawsuit in which Monsanto intervened in 2006.

65.     Ultimately, Monsanto obtained a number of patents covering genetic modification for resistance to dicamba.

66.     In 2007, Monsanto and BASF entered into one or more agreements to design, develop, and accelerate biotechnology traits and products, sharing proprietary information and a joint budget of some $1.5 billion. Biotechnology traits would be commercialized by Monsanto, with profits split 60% to Monsanto and 40% to BASF. Joint News Release (BASF from Limburgerhof, Germany and Monsanto from St. Louis, Missouri), *BASF Plant Science and Monsanto to Expand Their Collaboration in Maximizing Crop·Yield* (July 7, 2010), https:// monsanto.com/news-releases/basf-plant-science-and-monsanto-to-expand-their-collaboration-in-maximizing-crop-yield/.

67.     In a joint press release issued by BASF (from Germany) and Monsanto (from St. Louis), Robb Fraley, Monsanto's Chief Technology Officer and Executive Vice President, stated: "By broadening the pipeline of potential traits, exchanging technology and sharing risk, this collaboration can accelerate the discovery of next-generation. technologies for the farm and effectively double the risk-adjusted net present value of Monsanto's yield and stress trait technology pipeline." News Release, *BASF and Monsanto Announce R&D and Commercialization Collaboration Agreement in Plant Biotechnology* (March 21, 2007), https://monsanto.com/news-releases/basf-and-monsanto-announce-rd-and-commercialization-collaboration-agreement-in-plant-biotechnology/.

68.     Monsanto and BASF aggressively advertised and touted what became the Roundup Ready Xtend Crop System ("Xtend Crop System"), designed as and consisting of seed containing the dicamba-resistant trait and dicamba herbicide.

69.     Monsanto and BASF consider – and have always described and marketed – seed containing the dicamba-resistant trait and dicamba herbicide as an integrated weed control system.

70.     In January 2009, Monsanto (from St. Louis) and BASF (from Germany) announced a joint licensing agreement to accelerate use of dicamba-based weed control chemistry products, stating that Monsanto and BASF both "will participate in the development of innovative formulations for dicamba for use with herbicide-resistant cropping systems." News Release, *BASF and Monsanto Formalize Agreement to Develop Dicamba-Based Formulation Technologies* (Jan. 20, 2009), https://monsanto.com/news-releases/basf-and-monsanto-formalize-agreement-to-develop-dicamba-based-formulation-technologies/.

71.     Monsanto and BASF explained: "Crops that are resistant to both Roundup® agricultural herbicides and dicamba" would represent the next generation of herbicide-resistant crops and that "[i]mproved formulations of dicamba are being developed to complement this new combination of herbicide-resistant crops." *Id.*

72.     Emmanuel Butstraen, Group Vice President, Global Strategic Marketing, Herbicides, for BASF stated: "We are very excited to actively participate in developing innovative solutions for this next-generation cropping system for growers." *Id.*

73.     By 2010, Monsanto and BASF added a joint investment of more than $1 billion to their collaboration.

74.     In a joint press release on July 10, 2010, Monsanto (from St. Louis) and BASF (from Germany), Peter Eckes, President of BASF Plant Science (a subsidiary, "division," and

agent of BASF SE), stated: "The collaboration with Monsanto was not only the first agreement that we entered, it also represents our most significant partnership, covering several large row crops . . . The expansion of our partnership reflects the fit between the two companies." News Release, *BASF Plant Science and Monsanto to Expand Their Collaboration in Maximizing Crop Yield* (July 7, 2010), https://monsanto.com/news-releases/basf-plant-science-and-monsanto-to-expand-their-collaboration-in-maximizing-crop-yield/.

75.     In a joint press release on November 2, 2010, Monsanto (from St. Louis) and BASF (from Germany) announced "significant progress toward launching next-generation dicamba-based weed control systems for soybeans and cotton." Joint Press Release, *BASF and Monsanto Announce Progress in Dicamba Formulations* (Nov. 2, 2010), https://monsanto.com/news-releases/basf-and-monsanto-announce-progress-in-dicamba-formulations/.

76.     Kerry Preete, Monsanto Vice President of Crop Protection, stated: "Together the strength of the formulation expertise BASF has with dicamba and our team's biotech focus seeks to deliver another breakthrough product in weed control." *Id.*

77.     BASF made the decision early on that Engenia was being developed specifically for use in the dicamba-tolerant cropping system. *See* Ag Professional (April 30, 2014), https://www.agprofessional.com/article/engenia-specific-dicamba-resistant-crops.

78.     Markus Heldt, president of BASF's Crop Protection division, stated: "The dicamba tolerant system is designed [to] give growers pre- and post-emergence application flexibility, allowing them to better manage their resources and thus improving productivity." Joint Press Release (Monsanto from St. Louis and BASF from Germany), *BASF and Monsanto Announce Progress in Dicamba Formulations* (Nov. 2, 2010), https://monsanto.com/news-releases/basf-and-monsanto-announce-progress-in-dicamba-formulations/.

79.     In 2010, BASF SE told shareholders that it continuously invests in "pipeline" products, including "HT [Herbicide Tolerant] Project Dicamba." BASF SE 2010 Annual Report (Management Analysis) at 70 (https://www.basf.com/documents/corp/en/aboutus/publications/reports/2011/BASF_Report_2010.pdf).

80.     In a January 6, 2011 Press Release, Monsanto described collaborative "Agronomic Traits Projects," which included dicamba-tolerant soybeans. Peter Eckes from BASF stated: "The advances in development show that we chose the right path in our partnership with Monsanto . . . BASF is confident that our genes will result in crops that produce significantly higher yields and that we will be able to make these available to farmers in the future." Press Release, *Monsanto Announces Nine Project Advancements in Annual Research and Development Pipeline* (Jan. 6, 2011), https://monsanto.com/news-releases/monsanto-announces-nine-project-advancements-in-annual-research-and-development-pipeline-update/.

81.     In a March 14, 2011 joint press release, Monsanto (from St. Louis) and BASF (from Germany) described agreement to "collaborate on the advancement of dicamba tolerant cropping systems. The companies have granted reciprocal licenses and BASF has agreed to supply formulated dicamba herbicide products to Monsanto." Joint Press Release, *BASF and Monsanto Take Dicamba Tolerant Cropping System Collaboration to the Next Level* (March 14, 2011), https://monsanto.com/news-releases/basf-and-monsanto-take-dicamba-tolerant-cropping-system-collaboration-to-the-next-level/.

82.     Robb Fraley, Monsanto's Chief Technology Officer, stated: "Our work with BASF brings us one step closer to bringing more improved weed control offerings to farmers. We expect the formulations to be an excellent complement to Monsanto's dicamba tolerant seed technologies when they are brought to market." *Id.*

83.     In 2016, Monsanto described the Xtend Crop System as consisting of dicamba-resistant seed and generically, "Xtend herbicide," then "pending regulatory approvals" and said the system was "pending regulatory approvals for its component products."  Monsanto Website, *Roundup Ready 2 Xtend Soybeans Currently in Phase IV of Monsanto's R&D Pipeline*, http://web.archive.org/web/20160124141008/http://www.monsanto.com/products/pages/roundup -ready-2-xtend-soybeans.aspx.

84.     Monsanto also has described XtendiMax as "[a]n integral component of the Roundup Ready® Xtend Crop System."  Monsanto Website, *Roundup Ready Xtend Crop System Chemistry*, http://www.roundupreadyxtend.com/About/Chemistry/Pages/default.aspx (last visited Dec. 19, 2017).

85.     According to Monsanto, the "Xtend Crop System" is "comprised of both seed and herbicide solutions." *The Next Step in Weed Management*, https://www.roundupreadyplus. com/Content/assets/docs/forum/NeedToKnow_RoundupReadyXtendCropSystem.pdf          (last visited Dec. 19, 2017).

86.     Dan Westberg, regional tech service representative for BASF, said that "Engenia is that step change improvement that we've developed specifically for the dicamba-tolerant crops – cotton in 2015 and soybeans, hopefully, in 2016."  Forrest Laws, *Engenia to offer 'most advanced' formulation of dicamba available* (Aug. 25, 2014), http://www.deltafarmpress.com/ cotton/engenia-offer-most-advanced-formulation-dicamba-available.

87.     Monsanto and BASF conducted joint field testing of dicamba-based formulations applied over the top of dicamba-tolerant soybeans in development.  Their collaboration also includes joint development of stewardship, education programs, and best practices to "support long term sustainability" of a dicamba-tolerant system. *Monsanto and BASF Yield-and-Stress*

*Collaboration    Field    Tour    Monmouth    Research    Facility*    (Aug.    8,    2011),
https://www.basf.com/documents/corp/en/investor-relations/calendar-andpublications/calendar/
2011/roundtable_agricultural/110808_Agro_Roundtable_2011_Tour.pdf.; *see also* Joint Press
Release, *BASF and Monsanto Take Dicamba Tolerant Cropping System Collaboration to the Next
Level* (March 14, 2011), https://monsanto.com/news-releases/basf-and-monsanto-take-dicamba-
tolerant-cropping-system-collaboration-to-the-next-level/ (stating that Monsanto and BASF are
collaborating to facilitate further development work and subsequent commercialization of "a
dicamba tolerant system, which includes innovative dicamba formulations proprietary to BASF
and the dicamba tolerant trait for soybeans, which is proprietary to Monsanto" and "development
of stewardship guidelines and best management practices for the dicamba tolerant system.").

88.      E.I. DuPont de Nemours and Company ("Dupont") (itself and/or through affiliates
including DuPont Pioneer, formerly Pioneer Hi-Bred) is a leading developer, producer, and
marketer of soybean and corn seed, and historically, a competitor of Monsanto both as a developer
of seed varieties and genetic traits.

89.      Prior to 2013, Monsanto and DuPont were embroiled in litigation concerning
Pioneer's use of Monsanto's technology and claims by DuPont that Monsanto engaged in various
anti-competitive behavior.

90.      Shortly after a large jury award to Monsanto on its claims against DuPont for patent
infringement, and with DuPont's anti-trust claims still pending, Monsanto and DuPont announced
in 2013 that they would enter into a deal under which Monsanto would waive the verdict and
DuPont would dismiss its anti-trust claims and pay some $1.75 billion in royalties in exchange for
access to genetic technology including RR and dicamba resistance.

91.     Monsanto entered into technology licensing agreements with DuPont under which DuPont, for additional royalties, could market and sell soybean seed containing Monsanto's RR2Yield, as well as the trait for dicamba resistance.  Joint Press Release, *DuPont and Monsanto Reach Technology Licensing Agreements on Next-Generation Soybean Technologies* (March 26, 2013), https://www.pioneer.com/home/site/about/news-media/newsreleases/template.CONTENT /guid.EAB5E402-FECE-0123-144E-CBC62A6D8513.

92.     Brett Begemann, Monsanto President and Chief Commercial Officer, stated that the agreement "signals a new approach to our companies doing business together . . . ."  Andrew Pollack, *Monsanto and DuPont Settle Fight Over Patent Licensing* (March 26, 2013), http://www.nytimes.com/2013/03/27/business/monsanto-and-dupont-settle-fight-over-roundup-ready-technology.html.

93.     Licensing of bioengineered traits is one of Monsanto's "Key Metrics and Platform Drivers," the purpose of which is to ensure more sales and further solidify Monsanto's dominance in the market.  Monsanto Fourth-Quarter FY2017 Earnings Presentation "Fiscal Year 2017 Results and Outlook" (Oct. 4, 2017), https://monsanto.com/app/uploads/2017/10/MonsantoCo.Q4F17_ Earnings_Presentation_2017.10.04.pdf.

94.     Monsanto also entered into agreements with DuPont or its affiliates under which Monsanto supplies and DuPont markets and sells dicamba herbicide (originating with BASF and licensed to Monsanto who added "VaporGrip Technology") under its trade name FeXapan.

95.     DuPont, like Monsanto and BASF, refers to seed containing the dicamba-resistant trait and dicamba herbicide as an integrated system.  *See* DuPont website:  EPA Approval: FeXapan™ Dicamba Herbicide Plus VaporGrip® Technology (Feb. 16, 2017), http://www. dupont.com/products-and-services/crop-protection/soybean-protection/press-releases/dicamba-

herbicide.html ("The integrated seed [Pioneer brand soybeans with the Xtend trait] and herbicide program is designed to work together").

96.    The price of seed engineered for dicamba resistance is more than seed without it.

97.    The only meaningful difference between Xtend seed and other comparable RR seed is the trait for dicamba resistance. While Monsanto touts high yield of seed containing the dicamba-resistance trait, Monsanto describes that yield as "the same" as without the resistance. *See, e.g.*, Traits/Roundup Ready Xtend Crop System, http://www.roundupreadyxtend. com/About/Traits/Pages.default.aspx (from March 14, 2017 webpage from archive.org.) ("The same yield and quality potential farmers already know and trust from the Genuity® Roundup Ready 2 Yield Soybeans."). In a January 2016 earnings call, Monsanto's Fraley confirmed that the sole benefit of the Xtend seed is "superior weed control" as it has the "same high yield" as other RR2 varieties. Earnings Call Transcript, http://seekingalpha.com/article/3794576-monsanto-companys-mon-ceo-hugh-grant-q1-2016-results-earnings-call-transcript (last visited July 14, 2017).

98.    There is no benefit to the Xtend trait other than resistance to dicamba, and no benefit to dicamba resistance other than in-crop use of dicamba herbicide.

99.    The dicamba-based crop system designed, developed, accelerated, licensed and sold by Defendants poses unreasonable risk of harm to susceptible plants and crops not resistant to dicamba.

100.    Defendants designed, developed, marketed, promoted, distributed, licensed, and sold the dicamba-resistant trait, seed containing that trait, and dicamba herbicide as an integrated crop system, knowing that it would result in damage to susceptible non-resistant plants and crops

and with knowledge and intent that farmers would have no alternative but to purchase seed containing the trait as a defense, ever increasing demand and Defendants' profits.

## C.      Warnings from Scientists and Others

101.     A genetically engineered trait conferring resistance to dicamba for use with dicamba sprayed in-crop (over the top of crops after emergence from the ground) meant that dicamba would be sprayed later in the year than before – during hot summer months – and in the vicinity of susceptible non-resistant plants and crops also emerging and at high risk of damage by dicamba.

102.     Weed scientists and others warned of the danger in large-scale dicamba use in summer months, dicamba's high propensity to volatilize and move onto susceptible non-resistant plants and crops, and how dicamba will accelerate evolution of superweeds.

103.     Weather conditions, including high temperature, wind, rain, and temperature inversions all contribute to risk that dicamba will move from target to non-target plants and crops.

104.     The risk also increases based on the amount of dicamba sprayed, as it can and does remain suspended in the air, loading the atmosphere, and travels significant distances.

105.     Temperature inversions are difficult to predict, can form rapidly, and are a common, frequent occurrence in each state in which Plaintiffs and other members of their respective state classes grow soybeans. There also is a high level of glyphosate-resistant weeds, and high concentration of plants and crops very sensitive to and at risk of dicamba exposure, including soybeans.

106.     In 2010, for example, Steve Smith, Director of Agriculture for Red Gold (tomato processor) and Chairman of a coalition of farmers called Save Our Crops, testified before Congress that widespread use of dicamba presents "the single most serious threat to the future of the specialty

crop industry in the Midwest" and would be "incompatible with Midwestern agriculture." Steve Smith Testimony before Congress Sept. 20, 2010 Domestic Policy Subcommittee of Committee on Oversight and Government Reform at 2, 3 (http://oversight.house.gov/wp-content/uploads/2012/01/20100930Smith.pdf).

107. With introduction of a dicamba-tolerant soybean, Mr. Smith gave "a sure prediction that dicamba use will increase dramatically, followed by escalating crop losses." *Id.* at 2.

108. In October 2011, scientists from Ohio State University addressed a conference in Columbus focused on dicamba. Representatives of Monsanto and BASF were in attendance. Douglas Doohan, a conference organizer, and his colleagues outlined the risk that growers would spray older dicamba versions when dicamba-resistant seed became available and that damage to non-resistant crops would lead farmers to buy dicamba-resistant seed to protect themselves. Emily Flitter, *Special Report: The decisions behind Monsanto's weed-killer crisis* (Nov. 9, 2017), https://www.reuters.com/article/us-monsanto-dicamba-specialreport/special-report-the-decisions-behind-monsantos-weed-killer-crisis-idUSKBN1D91PZ.

109. David Mortenson and other scientists published an article in 2012 warning not only of high risk of drift and volatility, but the negative impacts on non-target crops and vegetation, noting that risk to plants from dicamba is 75 times greater than from glyphosate. David A. Mortenson, J. Franklin Egan, Bruce D. Maxwell, Matthew R. Ryan, Richard G. Smith, *Navigating a Critical Juncture for Sustainable Weed Management*, BioScience Vol. 62, Issue 1 (Jan. 2012), https://doi.org/10.1525/bio.2012.62.1.12.

110. In the same article, these scientists also warned that growers and commercial applicators do not always use recommended application practices, and that new resistant cultivars "will enable growers to apply synthetic auxin herbicides several weeks later into the growing

Page **22** of **97**

season, when higher temperatures may increase volatility and when more varieties of susceptible crops and nontarget vegetation are leafed out, further increasing the potential for nontarget drift damage." *Id*.

111.     They also warned about weed resistance and sustainability of a dicamba-based crop system, recognizing that "once an initial number of growers in a region adopts [seed with dicamba-resistance] the remaining growers may be compelled to follow suit in order to reduce the risk of crop injury and yield loss." *Id*.  In other words, damage to non-target plants "could create a strong incentive for growers to plant resistant seeds as insurance against crop damage from herbicide drift or applicator mistakes, even if they are not interested in applying synthetic auxin herbicides themselves.  This effect could further augment the portion of the seed market and of the landscape garnered by the resistant seed varieties, which would reduce genotypic diversity and restrict farmers' access to different crop varieties." *Id*.

112.     Weed scientists and others also have warned that in-crop use of dicamba will lead to evolution of dicamba-tolerant superweeds. Union of Concerned Scientists, *The Rise of Superweeds – and What to Do About It* (Dec. 2013), https://www.ucsusa.org/food_and-agriculture/our-failing-food-system/industrial-agriculture/the-rise-of-superweeds.html#. WxGrruSWyUk.

113.     Ford Baldwin asked Monsanto representatives at meetings at least as early as 2013 how Monsanto was going to manage the off-target issues with dicamba.  The answer was that "everyone will just have to plant Xtend crops, and then it won't be an issue." *Bader Farms, Inc. v. Monsanto Co*., No. 1:16-CV-00299 (E.D. Mo.) ("*Bader Farms*"), Baldwin Dep. Tr. (Oct. 31, 2017) at 19:23-20:6.  As Baldwin described it, the technology is all or nothing: "We're either going

to plant all the acres to dicamba crops, or none. And they've never really denied that." *Id.* at 20:6-12.

### D.     Requests for EPA Registration

114.     On April 29, 2010, Monsanto applied to the Environmental Protection Agency (EPA) for registration of M-1691 Herbicide, a diglycolamine (DGA) salt of dicamba – a formulation sold by BASF as Clarity herbicide – supposedly less volatile than older formulations.

115.     On July 30, 2012, Monsanto applied for EPA registration of M-1768 Herbicide, also the DGA dicamba salt (Clarity), with "VaporGrip Technology," supposedly further lowering volatility, for use over the top of soybean and cotton grown with seed containing the dicamba-resistant trait.

116.     BASF announced on April 10, 2012 that it had applied for EPA registration of Engenia herbicide, stating that it would be "an effective weed control system enabled by dicamba-tolerant crops currently in development."     Press Release, *BASF submits application for registration of new Engenia™ herbicide* (April 10, 2012), https://www.basf.com/us/en/ company/ news-and-media/news-releases/2012/04/p-12-079.html.

### E.     Inadequate Testing

117.     In early 2012, scientists from Pennsylvania State University warned that "[h]erbicide-resistance biotechnology may expand the risks of injury to nontarget crops and vegetation by enabling dicamba to be applied to new crops, over an expanded growing season, and over significantly larger areas" than before, and expressing the need for proactive research to determine environmental risks, including volatilization of dicamba. J. Franklin Egan and David A. Mortensen, Dept. of Crop and Soil Sciences, Penn. State Univ., *Quantifying Vapor Drift of*

*Dicamba Herbicides Applied to Soybean* (published online Feb. 23, 2012), https://monsanto.com/app/uploads/2017/09/03_-Egan_volatility_2012.pdf.

118.   Typically, when a company develops a new agricultural product, it conducts or commissions its own testing, shared with regulators, and also provides product samples to universities for additional review.   Monsanto, however, refused independent volatility testing of XtendiMax.  Monsanto repeatedly denied university requests to research volatility of the herbicide, including the University of Arkansas, the University of Missouri and the University of Illinois. Monsanto did provide samples of XtendiMax so researchers could test effectiveness, but expressly forbade testing for volatility.

119.   This kind of restriction is contrary to industry practice.   According to Jason Norsworthy, weed scientist from the University of Arkansas: "This is the first time I'm aware of [that] any herbicide [was] ever brought to market for which there were strict guidelines on what [he] could and could not do."  Emily Flitter, *Scant oversight, corporate secrecy preceded U.S. weed killer crisis* (Aug. 9, 2017), https://www.reuters.com/article/us-usa-pesticides-dicamba-insight/scant-oversight-corporate-secrecy-preceded-u-s-weed-killer-crisis-idUSKBN1AP0DN.

120.   The new dicamba formulations were not adequately tested for sufficient time or under real-world conditions in areas in which they would be sold.  Among other things, there was no or inadequate multiple-exposure testing or modeling of large-scale spraying as would occur in areas where usage would predictably be high and in accordance with soil, weather and inversion conditions in those areas.

121.   For example, and according to publicly available EPA documents, Monsanto field tested XtendiMax with "VaporGrip Technology" in only two locations – Texas and Georgia – involving specific soil types, only a few acres, and a limited time span.  It also relied on laboratory-

based testing in controlled environments (Humidome and Hoop House methods) that did not and does not replicate actual conditions under which the dicamba would be applied.

122.    Information to date also indicates that Monsanto limited many (if not most) of its tests to 24 hours. On a website page entitled "Dicamba-based Herbicide XtendiMax® with VaporGrip® Technology: Years in the Making," Monsanto outlined three volatility tests, two of which (Humidome and Hoop House methods) were expressly limited to 24 hours. Alison MacInnes, *Monsanto Research Chemist, Dicamba-based Herbicide XtendiMax® with VaporGrip® Technology: Years in the Making* (July 13, 2017), https://monsanto.com/products/ product-stewardship/articles/dicamba-xtendimax-vaporgrip-technology/. In addition, tests in the patent which appears to cover the VaporGrip Technology discussed test results limited to 24 hours. U.S. Patent No. 9,402,396 at Examples 31, 32 and 34 (filed Aug. 2, 2016) (available at http://patft.uspto.gov).

123.    Later independent testing, however, confirms that the new dicamba formulations can and do volatilize after 24 hours. At an Arkansas Plant Board meeting, even a Monsanto representative conceded that volatility occurs from 24-72 hours. *See* Arkansas Farm Bureau Federation Task Force Meeting (video), https://www.facebook.com/ArkansasFarmBureau/ videos/10159178698590321 (last visited Oct. 18, 2017).

124.    In January 2017, the Arkansas Joint Budget Committee met to discuss regulation of the new dicamba formulations. Discussion included Monsanto's repeated refusal to allow third-party testing of its VaporGrip Technology. Monsanto's Boyd Carey was on record as saying that neither the University of Arkansas nor any other university was allowed to test VaporGrip for fear that the results might jeopardize the federal label.

**F.    Defendants' Aggressive and Misleading Advertising**

125.    Well in advance of commercialization, Monsanto and BASF were aggressively promoting the Xtend Crop System, playing on farmers' concern over glyphosate resistance and offering the new dicamba-based system as the panacea.

126.    BASF ominously warned that "[f]armers have only a few post-applied options in soybeans" but reassured that "Engenia offers an additional site of action for post-emergence control, and can also be used preemergence . . . giving farmers maximum application flexibility to target key weeds."    Press Release, *BASF submits application for registration of new Engenia™ herbicide* (April 10, 2012), https://www.basf.com/us/en/company/news-and-media/news-releases/2012/04/p-12-079.html.

127.    Monsanto and BASF promoted the dicamba crop system as a "breakthrough" that would provide an "invaluable asset for weed resistance management and a cornerstone of sustainable agriculture" to combat "yield-robbing weeds."    Joint Press Release (BASF from Germany and Monsanto from St. Louis), *BASF and Monsanto Announce Progress in Dicamba Formulations* (Nov. 2, 2010), https://monsanto.com/news-releases/basf-and-monsanto-announce-progress-in-dicamba-formulations/.

128.    Even before USDA deregulation, Monsanto was marketing Xtend soybeans with an initiative it called "Follow-a-Field" which targeted farmers and focused on the benefits of over-the-top applications of dicamba: "The Follow-A-Field program will showcase three farmers who will tell the story of how the system works on their farm.    These farmers will share their own experience with the system and application requirements, as well as show the advantages of incorporating dicamba into their weed control plans."    Monsanto Press Release, *Monsanto Announces Follow-A-Field Initiative to Educate Growers on the Roundup Ready 2 Xtend Soybeans*

(Aug. 28, 2013), http://www.corn-states.com/News/Pages/Monsanto Announces-Follow-A-Field-Initiative-to-Educate-Growers-on-the-Roundup-Ready-2-Xtend Soybeans.aspx (quoting Michelle Vigna, Monsanto Roundup Ready Xtend launch manager).

129.    The purpose of all this pre-launch advertising was to escalate anticipation and entice and influence farmers to purchase the Xtend technology as soon as possible.

130.    Not only was the advertising aggressive in its purpose of convincing farmers that a dicamba-based system is the panacea for weed control, but in assuring farmers that the dicamba herbicides can be applied to stay on target without damaging non-resistant plants and crops.

131.    For example, in a November 2010 joint press release, Monsanto (from St. Louis) and BASF (from Germany) stated that the "dicamba tolerant system" would give growers pre- and post-emergence application flexibility and that new dicamba formulations would result "in better performance and safety to nearby crops." Joint Press Release, *BASF and Monsanto Announce Progress in Dicamba Formulations* (Nov. 2, 2010), https://monsanto.com/news-releases/basf-and-monsanto-announce-progress-in-dicamba-formulations/.

132.    In a March 14, 2011 joint press release, BASF's Markus Heldt represented that the new crop system "will ultimately deliver peace of mind for growers." Joint Press Release (from Germany and St. Louis), *BASF and Monsanto Take Dicamba Tolerant Cropping System Collaboration to the Next Level* (Mar. 14, 2011), https://www.prnewswire.com/news-releases/basf-and-monsanto-take-dicamba-tolerant-cropping-system-collaboration-to-the-next-level-117927054.html

133.    In an April 10, 2012 press release, Paul Rea, Vice President of BASF's Crop Protection Division, extolled Engenia as "an important new tool" in "fighting herbicide resistance" and represented that "field research shows [that Engenia] will offer excellent weed control and

crop safety, as well as low-volatility characteristics for improved on target application." News Release, *BASF submits application for registration of new Engenia™ herbicide* (April 10, 2012), https://www.basf.com/us/en/company/news-and-media/news-releases/2012/04/p-12-079.html.

134.    In 2012, BASF's Markus Heldt represented: "The newly formulated herbicide has minimized volatility . . . We are not playing with a chemistry that is dangerous." Carey Gillam, *INTERVIEW-BASF sees strong growth tied to GMO crop traits* (June 7, 2012), http://articles. chicagotribune.com/2012-06-07/news/sns-rt-basf-gmofood-interviewl1e8h6alf-20120607_1_ crop-traits-droughtgard.

135.    Also in 2012, BASF represented that Engenia "will offer excellent weed control and crop safety, as well as low-volatility characteristics for improved on-target application." Press Release, *BASF submits application for registration of new Engenia™ herbicide* (April 10, 2012), https://www.basf.com/us/en/company/news-and-media/news-releases/2012/04/p-12-079.html (quoting Paul Rea, BASF).

136.    Also in 2012, Monsanto was advertising that "LOW VOLATILITY FORMULATIONS [ARE] COMING SOON" to "maximize crop yield potential" and that the "Xtend Crop System is developed around application methods proven to increase on target applications." Monsanto Brochure (July 2012).

137.    Monsanto sent out a flyer in 2012 encouraging farmers to send comments supporting Xtend seed, telling them that they should be able to "use safe and valuable new agricultural technologies to increase yields and keep their farms profitable" and that farmers "have proven they are able to use different application techniques and equipment for different types of pesticides to ensure . . . on target application." Monsanto Flyer, *Support Farmers' Choice To Access New Technologies* (2012).

138.    In reality, however, application techniques *do not* prevent dicamba from volatilizing and moving distances to non-resistant fields, and application instructions for the new formulations are not the understandable, routine techniques implied.

139.    All such representations were false, misleading and deceptive as, among other things, portraying the new formulations as safe when they are not, omitting that even the new formulations of dicamba are still volatile, and as further detailed *infra*, Paragraphs 243-244, 247-48, 252-53.

### G.    Ineffective, Insufficient Stewardship

140.    Monsanto and BASF both recognize their role and responsibilities as self-professed innovators and promoters of herbicides and crops genetically modified to withstand them.

141.    Monsanto pledges that it "places the highest priority on the responsible development, manufacture and use of crop protection products." Product Stewardship and The Pledge, https://monsanto.com/products/product-stewardship/stewardship-pledge/ (last visited Dec. 19, 2017).

142.    Monsanto represents that it adheres to "the responsible development, management and use of technologies and products across our seeds, traits, and crop protection businesses through the entire product life cycle." Product Stewardship, https://monsanto.com/ products/product-stewardship/ (last visited Dec. 19, 2017).

143.    According to Monsanto, "[s]tewardship is the shared responsibility of Monsanto and those who provide, handle and use our products . . . We want to ensure our products continue to be used properly. By following product life cycle stewardship processes, we stand behind our products from research and discovery to discontinuation and disposal." Monsanto Website,

Product Stewardship Safety, https://monsanto.com/products/product-stewardship/product-stewardship-safety/ (last visited Dec. 19, 2017).

144.    Discussing concerns over dicamba damage in 2017, Monsanto described farmers as "the lifeblood of our company and our first priority." Brian Naber, *Dicamba Field Investigations: What Monsanto Has Learned So Far* (July 26, 2017), http://www. greatlakeshybrids.com/agronomy/agronomy/agronomy/2017/07/26/dicamba-field-investigations-what-monsanto-has-learned-so-far.

145.    BASF maintains that it "has a long heritage of being a reliable partner to farmers." BASF Website https://agriculture.basf.com/en/Crop-Protection.html (last visited May 22, 2018).

146.    BASF states that it is "committed to successfully support farmers with innovative and sustainable solutions.  BASF Website, https://www.basf.com/campaigns/en/the-biggest-job-on-earth.html (last visited May 22, 2018), and that it is "dedicated to continuously minimizing the negative influences of our products on safety, health and environment along the value chain – from development to disposal." BASF Product Stewardship and Global Product Strategy (https://www.basf.com/us/en/company/sustainability/management-and-instruments/responsible-care/product-stewardship-and-global-product-strategy.html) (last visited May 22, 2018).

147.    Monsanto understands that "[m]aking on-target applications and managing the potential for off-site movement are crucial when using an herbicide." Alison MacInnes, Monsanto Research Chemist, *Dicamba-based Herbicide XtendiMax® with VaporGrip® Technology: Years in the Making* (July 13, 2017), https://monsanto.com/products/product-stewardship/articles/dicamba-xtendimax-vaporgrip-technology/.

148.    BASF understands that crop protection products must not only be effective and not damage the target plant, but also "must not be harmful to health or to the environment."  BASF

Brochure, *Passion for Agriculture* (BASF SE/Global Communications, 2016), https://
industries.basf.com/assets/global/corp/en/Agriculture/Crop%20Protection/Brochure%20Crop%2
0Protection%20Englisch.pdf.

149. Luke Bozeman, BASF technical market manager with Engenia, stated: "[W]e want
to make sure [growers] have all the tools necessary and all the knowledge necessary to make an
application that does not allow any spray drift onto their neighbor's crops." Ag Professional,
*Engenia specific for dicamba-resistant crops* (April 30, 2014), https://www.agprofessional.com/
article/engenia-specific-for-dicamba-resistant-crops.

150. Monsanto represents and embraces its responsibility to "explain[] and promote[]
proper and responsible" use of its products. *Product Stewardship*, http://www.aganytime.
com/stewardship/Pages/default.aspx.

151. BASF represents and embraces a "long-standing stewardship responsibility to
growers," providing "one-of-a-kind" education. *BAPMA dicamba delivers unique chemistry to
soybean and cotton fields*, http://www.agweb.com/article/bapma-dicamba-delivers-unique-
chemistry-to-soybean-and-cotton-fields-naa-sponsored-content/.

152. Monsanto states that it is "committed to the success and safety of our growers. By
promoting proper and responsible uses of our technologies, we aim to ensure environmental
standards are met and the safety of our people and communities is protected." *Stewardship for
Roundup Ready® Xtend Crop System*, https://www.roundupreadyxtend.com/stewardship/
Approvals-Map/Pages/default.aspx.

153. Defendants did and do know that training and stewardship tools provided to users
of the Xtend Crop System is minimally necessary for protection of not just those growers (with

resistant and non-resistant fields) but of others with plants and crops not resistant to dicamba and significantly at risk by exposure to it.

154. Nevertheless, Defendants failed to provide adequate education, training, and stewardship tools, increasing the risk of dicamba damage.

155. Users of the Xtend Crop System do not appreciate and would not expect its risks, including the likelihood and dynamics of volatilization, or how little dicamba it takes to damage susceptible non-resistant plants and crops, especially soybeans.

156. Soybeans, for example, are some 200 times more sensitive to dicamba than corn is to glyphosate. Scales published by Dr. Stanley Culpepper indicate that even plants less sensitive to dicamba than soybeans can be injured by 1/75 of the labeled rate. Plants extremely sensitive, including soybeans, can be injured by 1/800X of the labeled rate. Testing from the University of Nebraska shows that injury can reduce yields at exposures of 1/500 and 1/1000 of the label rate. To illustrate such rates on a per-acre basis, one-tenth of the label rate is equivalent to 3 tablespoons, and one-hundredth of the label rate is equivalent to 1 teaspoon, applied over the size of a football field (1 acre). Recent research by Dr. Kevin Bradley, weed scientist at the University of Missouri, indicates symptoms at 1/20,000 of a 1x (0.5 lb. ae/acre) field use rate.

157. As articulated by Aaron G. Hager, professor of crop sciences at the University of Illinois: "When you say 'low volatility' five times fast you think there are no issues with volatility, but that is not correct . . . Soy is so sensitive to very small amounts of dicamba. It is an amount like the spray when you open a can of Coke - but spread over an acre." Melody Bomgardner, *Widespread crop damage from dicamba herbicide fuels controversy*, August 16, 2017 (Chem. and Engineering News, Vol. 95 Issue 33 (Aug. 21, 2017), https://cen.acs.org/articles/95/i33/Widespread-crop-damage-dicamba-herbicide.html

158. It has been estimated that while one-eighth of a quart of glyphosate "will cause 20 percent damage to susceptible vegetation . . . you get 20 percent damage at one-fifteen-hundredth of a pint of dicamba." According to University of Tennessee weed specialist Larry Steckel, "That's a game changing difference." Elton Robinson, *New Herbicide Tech Demands New Nozzle Thinking – 10 Quick Points*, http://agfaxweedsolutions.com/2017/01/12/new-herbicide-tech-demands-new-nozzle-thinking-10-quick-points/ (last visited Dec. 19, 2017).

159. Monsanto enters into a technology licensing agreement ("Stewardship Agreement") with every person or entity purchasing seed containing the dicamba-resistant trait. Monsanto could have made dicamba-specific application training a requirement of purchasing such seed but did not.

160. Neither was any special certification required for in-crop application of dicamba herbicides prior to the 2018 crop season.

161. Conditions ripe for dicamba movement such as temperature inversions are difficult to predict. Monsanto and BASF have now both introduced smart phone applications designed to assist in predicting weather conditions and when a temperature inversion will occur. They did not, however, offer that technology before 2018 (which even if reliable, does not stop movement through inversion as dicamba can volatilize over several days).

**H.    Dicamba Damage in 2015 and 2016**

162. Dicamba-resistant soybean and cotton seed were deregulated by the USDA on or about January 14, 2015, meaning that there would be no further regulation by that agency.

163. At that point, however, there was no registration from the EPA for any "low" volatility dicamba for use over the top of growing plants.

164.    Originally, Monsanto indicated that release of seed containing the dicamba-resistant trait would not occur until "regulatory approval" was obtained from the EPA for in-crop application of dicamba.    News Release, *Strong Harvest Results Demonstrate Monsanto Company's Position As Industry Yield Leader; Chief Technology Officer Robb Fraley Presents Final 2012 Product Performance Data* (Nov. 28, 2012) (http://news.monsanto.com/press-release/strong-harvest-results-demonstrate-monsanto-companys-position-industry-yield-leader-ch); Monsanto's Earnings Call Transcript by CEO, Hugh Grant on Q2 2015 Results (Apr. 1, 2015), at 7-8 (https://seekingalpha.com/article/3045726-monsantos-mon-ceo-hugh-grant-on-q2-2015-results-earnings-call-transcript?part=single); Michael J. Frank Presentation at Wells Fargo Industrial & Constr. Conf. (May 6, 2015), Slide #11 & fn. 1 (https://monsanto.com/app/uploads/2017/05/2015.05.06_wells-fargo-frank.pdf); Dr. Robb Fraley Presentation at 2015 Citi Basic Materials Conference (Dec. 2, 2015), Slide #13 & fn. 1 (https://monsanto.com/app/uploads/2017/05/citi_fraley_2015.12.02.pdf).

165.    Monsanto, however, commercialized Xtend cotton for the 2015 growing season, in what it described as a "limited introduction" of 500,000 acres, despite lack of EPA registration for in-crop application of dicamba.

166.    Monsanto and BASF entered into one or more agreements for the design, development, and commercialization of the dicamba-resistant trait and seed containing it.    BASF is a joint venture with Monsanto, and moreover, if not itself a seller thereof, Monsanto commercialized and sold the trait and seed on behalf of itself and as agent for BASF, which shared in profits therefrom.

167.     Because the EPA had not yet registered a supposed low-volatility version of dicamba herbicide, farmers were unable to buy corresponding dicamba herbicide registered for in-crop use on Xtend cotton.

168.     This situation was unprecedented and contrary to standard industry practice. *See* Marci Manley, *Illegal Chemical Use Damages Soybeans, Threat of Spread Outside Ag* (Aug. 1, 2016), http://www.kark.com/news/local-news/working-4-you-illegal-chemical-use-damages-soybeans-threat-of-spread-outside-ag/521534160 ("Many in the industry say they have never seen a company release a two-part system with only one component approved.").

169.     Dr. Bob Scott of the University of Arkansas explained: "It's an odd situation because we can't recall a technology like this being released without a corresponding herbicide. We had Roundup Ready, Liberty Link - none released without a herbicide." David Bennett, *Dicamba drift incidents have ripple effect* (July 21, 2016), http://www.deltafarmpress.com/print/27874.

170.     Monsanto and BASF knew that farmers were spraying older versions of dicamba over the top of Xtend cotton in 2015.

171.     Monsanto's public stance was that older, highly volatile and drift-prone dicamba herbicides were not to be used over the top of crops grown with dicamba-resistant seed. Monsanto representatives, however, advised farmers to do just the opposite – to spray existing dicamba products over the top of their Xtend cotton in 2015.

172.     For example, in testimony before the Arkansas State Plant Board, Donald E. Masters stated that a Monsanto representative told him to spray dicamba on his Xtend crops. In testimony given in *Bader Farms*, No. 1:16-CV-299 SNLJ (E.D. Mo.), Masters said that

Monsanto's representative knew he wanted Xtend seed so he could spray dicamba over the top and told him how much dicamba the seed would tolerate.

173.    BASF's sales of older versions of dicamba increased in time periods corresponding to commercialization of dicamba-resistant seed before any dicamba had been registered for in-crop use. In investor conference calls, BASF for the first time in February 2015 (one month after USDA deregulation of dicamba-resistant cotton and soybean in January 2015) began identifying dicamba as a high-demand, strong-selling herbicide. As of February 2015, BASF told investors that North American sales were "up strongly" and expressly identified dicamba as a particular herbicide with "high demand" driving the sales increase. As of October 2015, BASF stated that it "experienced a good business development for fungicides and herbicides, especially for Dicamba." BASF 3rd Quarter 2015 Analyst Conference Call Tr. (Oct. 27, 2015) at 25. As of October 2016, BASF stated: "We were able to raise volumes, especially of the herbicides Kixor® and dicamba." BASF 3rd Quarter 2016 Analyst Conference Call Tr. (Oct. 27, 2016) at 27.

174.    It otherwise was foreseeable, and predicted, that farmers purchasing Xtend seed would spray older versions of dicamba given, among other things, that the very purpose of that seed is in-crop use of dicamba herbicide.

175.    When asked whether releasing bioengineered seed without registered corresponding herbicide was normal practice, Dr. Kevin Bradley, Professor of Plant Sciences at University of Missouri, answered "No." He went on: "Many have said and I would agree that is part of the problem. We have a trait without [a] corresponding herbicide to go with it. Allegedly, a certain number of farmers have said, 'I'm gonna spray the old herbicide because I have this trait out here [in the fields] and you won't give me the new stuff.'" Aug. 31, 2016 Missouri House

Select Committee on Agriculture Special Hearing at Fisher Delta Research Center in Portageville, Mo. ("Missouri House Committee Hearing").

176. By releasing Xtend cotton seed in 2015, claiming greater yields, preying on farmers' worry over glyphosate-resistant weeds, and extolling dicamba, Monsanto, as well as BASF, were enticing farmers to not only purchase Xtend seed but to use older versions of dicamba.

177. As one farmer described it: "It's like putting ice cream in front of a kid and telling them they can't eat it . . . All these farmers heard when it came to this system appears to be 'higher yields' and 'dicamba-resistant.'" Marci Manley, *Illegal Chemical Use Damages Soybeans, Threat of Spread Outside Ag* (Aug. 1, 2016), http://www.kark.com/news/local-news/working-4-you-illegal-chemical-use-damages-soybeans-threat-of-spread-outside-ag/ 521534160.

178. Predictably, farmers did spray the older versions and damage to non-resistant crops occurred.

179. Defendants knew that crop damage was more than likely to occur as a direct result of the Xtend cotton release in 2015.

180. Farmers did experience dicamba damage in 2015.

181. Monsanto and BASF, however, continued full bore with their plans. In an interview, Monsanto's Vice President of Global Strategy, Scott Partridge, stated that Monsanto bred the dicamba-resistant trait into its entire stock of soybeans, and waiting meant that Monsanto would "not sell a single soybean in the United States" in 2016. Emily Flitter, *The decisions behind Monsanto's weed-killer crisis* (Nov. 9, 2017), https://uk.reuters.com/article/uk-monsanto-dicamba-specialreport/the-decisions-behind-monsantos-weed-killer-crisis-idUKKBN1D91Q9.

182. Defendants' focus was not on just the initial release of dicamba-resistant seed, but the escalation in demand of both seed and herbicide.

183.     As of 2015, Monsanto was anticipating enormous, rapid penetration.  It projected a

3 million-acre launch of Xtend seed that, by 2019, would reach 2/3 of U.S. acres.  *See* Monsanto

Fiscal Year 2015 Results and Fiscal Year 2016 Outlook (Oct. 7, 2015), Slides 7 & 15,

https://monsanto.com/app/uploads/2017/05/2015.10.06_mon_q4f15_earnings.pdf.

184.     Monsanto described the years ahead as "a period of rapid acceleration with new

[dicamba] technology penetration," *id.* at Slide 16, which included 80-100 million acres of

dicamba production capacity, and 200-250 million overall acres planted with Xtend traits by 2025.

*Id.* at Slide 10; *see also* Carey Gillam, *Monsanto to invest more than $1 bln in dicamba herbicide*

*production* (June 24, 2015), https://www.reuters.com/article/monsanto-dicamba/monsanto-to-

invest-more-than-1-bln-in-dicamba-herbicide-production-idUSL1N0ZA1XN20150624

(Monsanto predicting a 200 million-acre penetration of Xtend system for soybeans and cotton in

the Americas).

185.     BASF had, by June 2014, already announced plans to expand its herbicide

production capability in the U.S. and boost production of its dicamba weed killer by 50% to keep

pace with anticipated demand should Monsanto receive USDA deregulation of the new

bioengineered soybean and cotton traits.

186.     In 2014, BASF stated: "We foresee a peak sales potential of €2,300 million for

these products, which represents an increase of €200 million compared with the previous year."

BASF Online Report 2014, *Innovations in the segments – examples* (under Agricultural Solutions),

https://report.basf.com/2014/en/managements-report/innovation/innovations-in-the-segments.

html.

187. As of 2015, Monsanto already had announced plans for the direct and licensed release of some 70 varieties of soybeans with the dicamba-resistant trait, as well as plans to invest approximately \$1 billion in a new production facility for dicamba herbicide in Luling, Louisiana.

188. As with the 2015 release of Xtend cotton, there was no dicamba herbicide registered for in-crop use in 2016.

189. Monsanto had the ability to terminate the license of any grower violating terms and conditions of the Stewardship Agreement and addenda (including its Technology Use Guide), and can refuse further sale of seed.

190. Monsanto and BASF knew that growers were spraying dicamba unregistered for in-crop use over crops grown with dicamba-resistant seed.

191. Monsanto considered but took no action as to growers who did so. *See* Marci Manley, *Illegal Chemical Use Damages Soybeans, Threat of Spread Outside Ag* (Aug. 1, 2016), http://www.kark.com/news/local-news/working-4-you-illegal-chemical-use-damages-soybeans-threat-of-spread-outside-ag/521534160 ("Representatives from Monsanto at the meeting [with the Arkansas Plant Board] said the company wasn't taking enforcement action against growers who use the chemical illegally, though it was considering it.").

192. Donald Masters testified at deposition in *Bader Farms* that despite knowledge of his spraying, Monsanto made no effort to investigate, examine his records of spraying, or show any interest at all in his spraying. *See Bader Farms*, Masters Dep. Tr. (Sept. 20, 2017) at 145:16-149:3, 150:5-8, 151:18-152:8.

193. Monsanto did not cancel a single license with growers who used dicamba herbicide unregistered for in-crop use. *See* Chris Bennett, *Dicamba Questions Cloud 2017 Horizon* (Jan. 30, 2017), https://www.agweb.com/article/dicamba-questions-cloud-2017-horizon-naa-chris-

Page **40** of **97**

bennett/ ("Despite the rash of off-target incidents, Monsanto acknowledges no grower licenses were pulled due to illegal applications of dicamba in 2016."). Neither did it refuse to sell Xtend seed to such growers. Doing either would have undermined its scheme with BASF to corner the market, propelled by damage to off-target plants and crops.

194. Despite the prior year's damage from Xtend cotton, Monsanto released Xtend soybeans for the 2016 growing season, telling farmers that approval of new "low" volatility dicamba herbicide was "imminent." Monsanto Q1 2016 Results Earnings Call Transcript (Jan. 6, 2016), https://seekingalpha.com/article/3794576-monsanto-companys-mon-ceo-hugh-grant-q1-2016-results-earnings-call-transcript.

195. DuPont, through its subsidiary Pioneer and under license from Monsanto, also launched varieties of soybean with RR2 Xtend technology in 2016.

196. As in 2015, it was foreseeable and indeed expected and foreseen that farmers would spray older dicamba formulations over the top of dicamba-resistant crops, and that sale of dicamba-resistant soybean seed, together with continued sale of dicamba-resistant cotton seed in 2016, would lead to further dicamba damage to susceptible non-resistant crops.

197. Industry experts predicted that Xtend's premature release would result in such damage. University of Arkansas weed scientist Jason Norsworthy, who had warned of the danger for years, stated: "There was no blind-siding. We knew this was likely to be a major issue. We've been telling the Plant Board this for several years now. We've been saying it at all the winter meetings." David Bennett, *Dicamba drift expected, no 'blind-siding'* (Aug. 15, 2016), http://www.deltafarmpress.com/print/28005.

198. Not only did damage result in 2016, it was on a much larger scale with both dicamba-resistant cotton and soybeans on the market. The scale of damage to non-target plants

and crops in 2016 was a "huge issue," according to Kevin Bradley, University of Missouri. David Bennett, *Improper dicamba use leaves Mid-South a multitude of drift cases* (July 21, 2016), http://www.deltafarmpress.com/print/27867.

199.    According to Arkansas weed expert Dr. Ford Baldwin: "It looks like a bomb went off in some parts of the South." Pam Smith, *Dicamba: The 'Time Bomb' Went Off and No One Was Prepared – DTN* (Dec. 29, 2016), https://agfax.com/2016/12/29/dicamba-the-time-bomb-went-off-and-no-one-was-prepared-dtn/.

200.    In 2015 and 2016, there was no dicamba herbicide on the market that could be used safely over the top of growing plants.

201.    Even had the new formulations been available, they also are unsafe.

202.    Consequent harm to non-resistant crops, however, does not thwart Defendants' goals. To the contrary, it furthers them both short and long term.

203.    Monsanto and BASF profited from sale of the Xtend technology and seed containing it. BASF profited from sales of its older dicamba formulations like Banvel and Clarity, among others, used over the top of dicamba-resistant seed.

204.    BASF did not warn, remove or restrict its older dicamba formulations but rather, increased those sales. Both Banvel and Clarity were sprayed over the top of Xtend seed in at least 2016. *See* Pam Smith, *Dicamba: The 'Time Bomb' Went Off and No One Was Prepared – DTN* (Dec. 29, 2016), https://agfax.com/2016/12/29/dicamba-the-time-bomb-went-off-and-no-one-was-prepared-dtn/.

205.    Monsanto and BASF also gained from damage to non-resistant crops, which, as predicted, would and did pressure farmers to purchase dicamba-resistant seed for defensive reasons, leading to more sales of dicamba herbicides and so on.

206.     Monsanto and BASF were well aware of what would happen with a launch of the full Xtend Crop System.

**I.     Full Scale Dicamba-System Rollout in 2017**

207.     EPA registration for the new formulations of in-crop dicamba herbicides came after harvest in 2016.

208.     On August 31, 2016, the Missouri House Select Committee on Agriculture held a special hearing in an effort to gather information and assess the problem and ramifications of dicamba and its impact on sensitive crops.  Speakers included Duane Simpson, head of Monsanto's government affairs team.  Among other things, Mr. Simpson stated that training on XtendiMax would not begin until the label was finalized, even while recognizing "an urgency for training." Missouri House Committee Hearing.

209.     Dr. Kevin Bradley testified at the hearing, repeating warnings from several years earlier, that farmers would have no choice but to buy seed with the Xtend technology to protect themselves. *Id.*

210.     On July 25, 2016, the Arkansas Plant Board met in Little Rock, Arkansas to review policies on dicamba and 2,4-D.  It held a three-hour public hearing on November 21, 2016, at which the Board unanimously passed a rule to ban use of XtendiMax in the state.  This later was approved by Executive Order and a legislative panel.

211.     Notwithstanding continued warnings, and the crop damage that occurred in 2015 and 2016, the much-touted Xtend Crop System, consisting of seed containing the dicamba-resistant trait and in-crop dicamba herbicide became fully available for 2017.

212.     On November 9, 2016, Monsanto received a two-year conditional registration from the EPA for use of XtendiMax over the top of soybean and cotton crops grown from seed

containing the dicamba-resistant trait. This is BASF's formulation with addition of "VaporGrip Technology."

213. On or about December 20, 2016, BASF received a two-year conditional registration from the EPA for use of Engenia over the top of soybean and cotton crops grown from seed containing the dicamba-resistant trait.

214. Monsanto entered into agreements with DuPont under which Monsanto supplied Dupont with, and allowed it to market and sell XtendiMax with VaporGrip Technology under DuPont's trade name FeXapan.

215. Monsanto and DuPont issued a joint press release in July 2016 regarding their multi-year dicamba supply agreement, which Mike Frank, Monsanto vice president, said "represent[ed] continued commitment to the Roundup Ready® Xtend Crop System." Joint Press Release, *Monsanto and DuPont Sign Dicamba Supply Agreement* (July 7, 2016), http://www.dupont.com/corporate-functions/media-center/press-releases/monsanto-dupont-sign-dicamba-supply-agreement.html (last visited Dec. 19, 2017).

216. Monsanto's supply agreement with companies like DuPont also is one of Monsanto's "Key Metrics and Platform Drivers." Monsanto Fourth-Quarter FY2017 Earnings Presentation "Fiscal Year 2017 Results and Outlook" (Oct. 4, 2017), https://monsanto.com/app/uploads/2017/10/MonsantoCo._Q4F17_Earnings_Presentation_2017.10.04.pdf (at 12).

217. Monsanto's supply to DuPont, as well as its own and BASF's herbicide sales, were intended to and do further promote penetration of the market and increased sale of seed containing the dicamba-resistant trait, in turn encouraging more sales of the herbicide.

218.     On or about February 16, 2017, DuPont received a two-year conditional registration from EPA for use of FeXapan with VaporGrip Technology over the top of soybean and cotton crops grown from seed containing the dicamba-resistant trait.

219.     An EPA registration is not an endorsement of an herbicide. *See, e.g.*, Notice of Registration for Engenia dated Dec. 20, 2016 ("Registration is in no way to be construed as an endorsement or recommendation of this product by the Agency"), https://www3.epa.gov/ pesticides/chem_search/ppls/007969-00345-20161220.pdf.

220.     All these companies continued to market the in-crop dicamba as an integrated crop system with seed containing the dicamba-resistant trait.

221.     Monsanto in 2017 launched XtendiMax as a low-volatility dicamba formulation with VaporGrip Technology for use with seed containing the dicamba-resistant trait.

222.     BASF in 2017 launched Engenia as a low-volatility dicamba formulation for use with seed containing the dicamba-resistant trait, which BASF promotes in its own advertising as "Dicamba-tolerant soybean sold under the trait name Roundup Ready 2 Xtend Soybeans." BASF Website, *Introducing the Most Flexible and Advanced Dicamba for Dicamba-Tolerant Crops*, http://agproducts.basf.us/campaigns/engenia/assets/pdf/Engenia-Soybeans-National-TIB.pdf (last visited Dec. 19, 2017).

223.     DuPont in 2017 launched FeXapan as a low-volatility dicamba formulation with VaporGrip Technology for use with Xtend seed, which DuPont promotes as part of its own advertising as "part of the Roundup Ready 2 Xtend® Acre Solution." DuPont Website, *FeXapan™ Herbicide Plus Vaporgrip® Technology*, http://www.dupont.com/products-and-services/crop-protection/soybean-protection/products/fexapan.html (last visited Dec. 19, 2017).

**J.     Continuing Deceptive Advertising**

224.    All the while, before and during 2017, Defendants continued their aggressive and misleading advertising campaign.

225.    Defendants have done so in person through representatives as well as in written materials and outlets including websites, Facebook, Twitter, Instagram, UTube, Snapchat, Pinterest, and LinkedIn.

226.    Monsanto continuously has advertised and represented Xtend seed as high yield. For example, Miriam Paris, Monsanto's U.S. Soybean Marketing Manager, claimed in 2016 that the potential for greater yields, a two and one-half to seven bushel-per-acre yield advantage above RR2 Yield varieties, factored into the company's decision to commercialize Xtend soybeans in 2016.

227.    As another example, Monsanto advertised in September 2016 issues of the Delta Farm Press: "raise your yield potential with elite genetics." Delta Farm Press, The Answer to Resistant Weeds Is Here. Monsanto's campaign included slogans like "Xtend Your Yield." Monsanto Website *XtendYourYield 2017 contest promotion*, http://www.roundupreadyxtend. com/xtendyouryield/Pages/default.aspx.

228.    Independent university testing, however, has found yields with Xtend soybean were actually lower than with RR seed. Lisa Behnken, et al., *U of M SE Minnesota dicamba-tolerant soybean yield results now available* (Oct. 24, 2016) (http://blog-crop-news.extension. umn.edu/2016/10/u-of-m-se-minnesota-dicamba-tolerant.html); Shawn P. Conley, *New Traits Don't Automatically Translate to Highest Yield!* (Nov. 14, 2016) (http://ipcm.wisc.edu/ blog/2016/11/new-traits-dont-automatically-translate-to-highest-yield/); Emily Unglesbee, *New*

*Trait Data Available* (Nov. 16, 2016), https://www.dtnpf.com/agriculture/web/ag/
news/crops/article/2016/11/16/university-yield-data-emerging-xtend-2.

229. Defendants also continued playing on concerns over glyphosate resistance and
assuring growers that the new dicamba formulations would be low in volatility and could be
applied without off-target movement. Again, they promoted the dicamba-based crop system as
safe when it was not.

230. BASF continually stressed its theme of need and safety, representing among other
things:

- "Our innovative and expansive product portfolio is designed to provide you
with crop protection that gives you a business edge." BASF Webpage,
Grow Smart™ with BASF. Starting with a challenge (May 10, 2016),
https://web.                                                     archive.org/
web/20160510015445/http:/www.agproducts.basf.us.

- "Beyond protecting your crops, we help you get smarter about the risks you
face so you can protect your business and bottom line." Id.

- "Advanced formulation reduces loss from volatility." BASF Engenia
Herbicide U.S. Information Brochure, p. 1 (GL-7007A May 2016).

- "Field research demonstrates on-target herbicide application success with
low volatility and drift, so the herbicide remains in place." BASF website,
https://web.
archive.org/web/20161230202630/http://agproducts.basf.us/campaigns/en
genia.

- "Engenia has done great in all of our tests that we use to measure secondary
loss parameters . . . there is a significant reduction in any secondary loss
profile compared to other dicamba formulations." Ag Professional,
Engenia specific for dicamba-resistant crops (April 30, 2014),
https://www.agprofessional.com/          article/engenia-specific-dicamba-
resistant-crops (quoting Luke Bozeman, BASF technical market manager).

- "Engenia herbicide that BASF is bringing to the market is the most
advanced formulation of dicamba that's ever been available . . . Engenia is
that step change improvement that we've developed specifically for the
dicamba-tolerant crops – cotton in 2015 and soybeans, hopefully, in 2016."
Forrest Laws, Engenia to offer 'most advanced' formulation of dicamba

available (Aug. 25, 2014), http:// www.deltafarmpress.com/cotton/engenia-offer-most-advanced-formulation-dicamba-available.

- Volatility plays a small role in off-target dicamba incidents. See Pam Smith, EPA Registers BASF's Engenia, Dicamba-Tolerant Herbicide (Dec. 23, 2016), https:// agfax.com/2016/12/23/epa-registers-basfs-engenia-dicamba-tolerant-herbicide-dtn/ (quoting Gary Schmitz, BASF technical service regional manager: "I'd estimate 1% of the problems we see are related to volatility . . . Even going back to the early days of my career with Banvel . . . particle drift is the main reason for movement onto sensitive plants.").

- Engenia offers a 70% - 90% reduction in volatility as compared to older (Clarity) formulations. Pam Smith, EPA Registers BASF's Engenia, Dicamba-Tolerant Herbicide (Dec. 23, 2016), https://agfax.com/2016/12/23/epa-registers-basfs-engenia-dicamba-tolerant-herbicide-dtn/ (quoting Gary Schmitz, BASF Midwest technical service regional manager stating that BASF has a 70% volatility reduction); Gil Gullickson, Volatility From New Formulations Drives Some Dicamba Damage Say University Weed Scientists (Dec. 19, 2017), https:// www.agriculture.com/crops/pesticides/volatility-from-new-formulations-drives-some-dicamba-damage-say-university-weed (quoting Gary Smitz stating: "We brought Engenia in the marketplace as low volatile 90% less volatile than dicamba with DGA salt (Clarity)").

- "Although the potential for dicamba volatility is low, the Engenia herbicide formulation was developed to further minimize loss due to volatilization." BASF Engenia Herbicide U.S. Information Brochure, p. 3 (GL-7007A May 2016) at 3 (emphasis added). Also touting that "Volatility Concerns" have been "Addressed." Id. at 5.

231. Similarly, Monsanto represented, among other things:

- "With the emergence of glyphosate resistant weeds, the need for a new technology has never been more important. See how dicamba emerged as the right herbicide to fill that role" and XtendiMax "is designed to be the industry's lowest volatility dicamba formulation. An integral component of the Roundup Ready Xtend Crop System, it is an ideal dicamba option to help manage glyphosate-resistant and tough-to-control weeds." Monsanto Webpage, Roundup Ready Xtend Crop System Chemistry (Feb. 2017), https://web.archive.org/web/20170210071200/https://www.roundupreadyxtend.com/About/Chemistry/Pages/ default.aspx.

- The Xtend crop system will maximize crop yield potential and allow control of "tough glyphosate resistant weeds." Press Release, Farmers to Realize

The Benefits Of The Roundup Ready Xtend Crop System in 2017 (Nov. 9, 2016), http://news.monsanto.com/press-release/products/monsantos-xtenimaxtm-herbicide-vaporgriptm-technology-approved-epa-crop-use.

- "XtendiMax . . . introduces a step-change reduction in volatility potential compared to dicamba formulations currently on the market today." Monsanto News Release, Monsanto's XtendiMax Herbicide With VaporGrip Technology Approved By EPA For In-Crop Use (Nov. 9, 2016) (quoting Ryan Rubischko, North America dicamba portfolio lead).

- VaporGrip Technology provides a "[s]tep-change reduction in volatility . . . as compared to other commercially available dicamba formulations" and "[p]rovides applicators greater confidence in on-target application of dicamba." Monsanto Brochure, "The Next Step in Weed Control For Your Roundup Ready 2 Xtend Soybeans" (2016), http://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=6&cad=rja&uact=8&ved=0ahUKEwjX183fy5XcAhVq44MKHaciBQMQFghJMAU&url=http%3A%2F%2Fwww.roundup.ca%2F_upload s%2Fdocuments%2F16MST8068%2520RoundUp%2520Xtend%2520Bro chure_V15_LR.pdf&usg=AOvVaw2FxnVNhB2p7wDbvqctGBC0.

- Dicamba formulations have been developed over time to help reduce potential volatilization while delivering improved weed control and greater application flexibility. Dicamba "has a decades-long history of effective use in the U.S. . . ." Joint Press Release (St. Louis and Wilmington, DE), Monsanto and DuPont Sign Dicamba Supply Agreement (July 7, 2016), https://www.businesswire.com/news/home/20160707005223/en/Monsanto-DuPont-Sign-Dicamba-Supply-Agreement.

- XtendiMax has a "significant reduction in volatility potential," has "[l]ow volatility" and "[w]ill provide applicators confidence in on-target application of dicamba in combination with application requirements for successful on-target applications." Monsanto XtendiMax Tech Sheet, Effective Weed Control With XtendiMax™ Herbicide With VaporGrip™ Technology (Dec. 2, 2016), https://www.ilfb.org/media/2872071/XtendiMax-Tech-Sheet.pdf.

- VaporGrip Technology is a "[r]evolutionary [b]reakthrough" which "significantly minimizes dicamba's volatility potential after spraying – provides growers and applicators confidence in on target application of dicamba" and growers can "[a]pply [w]ith [c]onfidence." Monsanto Webpage, About Vaporgrip Technology (Feb. 2017), https://web.archive.org/web/20170210120320/https://www.Roundup readyxtend.com/About/vaporgriptechnology/Pages/default.aspx.

- Based on humidome testing, VaporGrip technology "provides a 90 percent reduction in volatility compared to Clarity, an older dicamba formulation." Alison MacInnes, Monsanto Research Chemist, Dicamba-based Herbicide XtendiMax® with VaporGrip® Technology: Years in the Making (July 13, 2017), https://monsanto.com/products/product-stewardship/articles/dicamba-xtendimax-vaporgrip-technology/.

- The new dicamba formulations have a 100-fold reduction in volatility compared to older versions. Indiana Prairie Farmer, Monsanto officials add their perspective on dicamba issues this season (July 13, 2017), http://www/indianaprairiefarmer.com/crop-protection/monsanto-officials-addtheir-perspective-dicamba-issues-season (citing Monsanto's Robb Fraley).

- VaporGrip technology "significantly minimizes dicamba's volatility potential after spraying – provid[ing] growers and applicators confidence in on-target application of dicamba." Monsanto Webpage, Significant Reduction in Volatility Potential, https://www.roundupreadyxtend.com/About/vaporgriptechnology/Pages/default.aspx (last visited Dec. 19, 2017).

- XtendiMax "[w]ill provide applicators confidence in on-target application of dicamba in combination with application requirements for successful on-target applications." XtendiMax-Tech-Sheet, https://www.ilfb.org/media/2872071/ XtendiMax-Tech-Sheet.pdf (Dec. 2016).

- Monsanto's testing was "historic," "comprehensive," and "extensive." See Monsanto News Release, Dicamba and the Roundup Xtend Crop System (Oct. 13, 2017), https://monsanto.com/company/media/statements/dicamba/.

232.    Similarly, Dupont did and does advertise that FeXapan "employs a new formulation of dicamba that offers a significant reduction in volatility potential than conventional dicamba herbicides, which helps minimize off-target movement when used according to label guidelines." DuPont Press Release, EPA Approval: FeXapan Herbicide Plus VaporGrip Technology (Feb. 16, 2017), http://www.dupont.com/products-and-services/crop-protection/soybean-protection/press-releases/dicamba-herbicide.html. It touts FeXapan as "Better Weed Management With Less Worry About Dicamba Volatility." FeXapan Herbicide Plus VaporGrip Technology webpage,

http://www.dupont.com/products-and-services/crop-protection/soybean-protection/products/
fexapan.html (last visited Aug. 23, 2017).

233.    Defendants made, and continue to make, such representations and omissions when
they knew, and intended, that dicamba would be sprayed extensively and multiple times, in hot
summer months, in areas of proximity to susceptible non-resistant plants and crops.

234.    Such representations and omissions, including those discussed in paragraphs 148-
155, 243-44, 247-48 above were made to the public and potential customers, with knowledge and
intent that others rely on them, in order to encourage, influence, and induce sales, and were false
and misleading.

235.    Such statements and omissions were made by Defendants with knowledge of or
reckless disregard for their falsity. Among other things:

> a.    Prior use of dicamba for pre-emergent and post-harvest burndown
> is different than over-the top application during hot summer months
> and poses risks, including volatility, not present in burndown;
>
> b.    Pre-release testing was insufficient. As weed scientists observed,
> even successful testing in one location does not accurately
> determine risk in another. And testing in controlled environments
> (such as humidome) does not replicate and is not an accurate
> indicator of volatility under real-world conditions;
>
> c.    The vast majority of Monsanto's testing was not on XtendiMax with
> VaporGrip Technology;
>
> d.    Even supposed "low" volatility dicamba is still volatile and
> dangerous to susceptible non-resistant plants and crops;
>
> e.    Following label instructions does not prevent volatilization;
>
> f.    Successful on-target application does not prevent volatilization;
>
> g.    The new formulations do not lower volatility to the extent claimed.
> According to studies by three universities comparing Banvel (an
> older version), Engenia, and XtendiMax, the reduction in volatility
> was only about 33 percent. Lyn Betts, *Measure dicamba risks*

Page **51** of **97**

(March 14, 2018), http:www.Cornandsoybean
digest.com/weeds/measure-dicamba-risks;

h.  In real-world conditions, the new formulations are not significantly
    "lower" in volatility than older versions at all. While they tend to
    have lower volatility than older versions immediately after
    application, they continue to volatilize up to 72 hours after
    application. Independent testing indicates that over time, the
    amount of volatility between old and new formulations is not
    meaningfully different. Horstmeier, *Dicamba: Arkansas Plant
    Board Unanimously Sets Mid-April Limit* (Sept. 22, 2017), https://
    agfax.com/2017/09/22/dicamba-arkansas-plant-board-
    unanimously-sets-mid-april-limit-dtn/;

i.  The Xtend Crop System entails spraying of dicamba during the
    growing season in multiple applications rather than once pre-
    emergent or post-harvest, increasing the overall volume of dicamba
    being loaded into the atmosphere and the risk of harm to non-
    resistant plants and crops;

j.  Whatever improvements were made to impart "low" volatility do
    not counteract, but rather are overcome by, scale of spraying in
    conditions increasing risk of volatilization and damage to
    susceptible non-resistant plants and crops.

236.  Defendants also did not disclose (or adequately educate) that, among other things:

a.  Volatility in the new formulations remains a substantial risk;

b.  Even minute levels of exposure injure susceptible, non-tolerant
    plants whether through volatilization and/or drift;

c.  Pre-release testing was insufficient and inadequate;

d.  Xtendimax with "VaporGrip Technology" was not independently
    tested by outside scientists contrary to industry practice;

e.  Following label instruction does not prevent volatilization;

f.  Successful on-target application does not prevent volatilization;

g.  The new formulations are not significantly lower in volatility than
    older versions when used in real-world conditions;

h.  Dicamba can and does move from target after application and over
    long distances;

        i.     The scale of spraying in given areas increases the risk of harm to non-resistant crops and plants.

237.    The product labels were (and are) inadequate to address the dangers associated with the Xtend Crop System. Defendants failed to adequately warn of these dangers by label or otherwise and failed to adequately train applicators how to avoid injury to non-resistant plants and crops.

## K.    Insufficient, Misleading, Deceptive, and Unworkable Labels in 2017

238.    The 2017 labels for XtendiMax and Engenia (as well as FeXapan) contain false and misleading statements and impressions, omissions, and lack warnings and instructions adequate to protect the environment and prevent injury to non-resistant plants and crops susceptible to dicamba.

239.    Directions for use are not stated in terms easily read and understood by the average person likely to use or to supervise use of these herbicides. The directions, when followed, also were not and are not adequate to prevent unreasonable adverse effects on the environment, including non-resistant plants and crops susceptible to dicamba.

240.    Among other things, the labels all state that the herbicides should not be used during a temperature inversion. Temperature inversions, however, are difficult to predict. For example, inversions are so difficult to predict that in 2017, Kansas State University expanded weather stations in several communities and posted inversion data on a website, cautioning, however, that this was not "something to look at and say 'there's an inversion in place so I shouldn't spray right now or that there's not an inversion in place so I can spray.'" Kansas University Extension Service, *New tool is available to farmers to help understand when temperature inversions occur* (Nov. 2, 2017), http://www.ksre.k-state.edu/news/stories/2017/11/mesonet-temp-inversions.html.

241.    The labels state that the herbicides should not be sprayed when wind speed is under 3 mph or over 10-15 mph.  Temperature inversions often occur, however, when wind speed is less than 10 mph.

242.    Wind speed also is difficult to predict, particularly wind gusts.

243.    In addition, XtendiMax and Engenia labels state that the herbicide should not be sprayed after sunset.  The FeXapan label states that temperature inversions can begin to form at sunset. However, temperature inversions often form, and indeed can be at their most intense, during hours prior to sunset.

244.    In addition, dicamba can and does volatilize *after* application for periods exceeding 24 hours and that risk continues regardless of conditions at the time of spraying.

245.    Even when sprayed properly, the in-crop dicamba herbicides still can and do volatilize (including in winds of 3 mph or lower).

246.    Also, field tests (independently undertaken in 2017) show that volatility of the new dicamba formulations occurred over at least a 2-3 day period after application.

247.    With inversions in summertime frequently occurring, the result is volatilized dicamba and fine droplets catching in the inversion layer and moving *en masse* to affect others' fields. This is a chemical effect that occurs even when application instructions are followed.

248.    The labels are inadequate, misleading, confusing and even contradictory in other ways as well.

249.    For example, the labels state that certain application requirements are to be followed in order to avoid off-target drift and/or will reduce or avoid off-target drift, but do not clearly warn or state that such techniques do not eliminate volatility.

250. The XtendiMax label stated that it should not be applied when wind speed exceeds 15 mph but also that it should not be applied if wind speed is 10 - 15 mph if blowing toward "non-target sensitive crops." The labels distinguished between "sensitive areas" and "non-target susceptible crops." The former contains buffer distances. The latter contains ambiguous statements to the effect that the applicator "not allow contact" of the herbicide with foliage, green stems, exposed non-woody roots of crops and desirable plants. The Xtendimax/FeXapan labels stated that the herbicide should not be applied when the wind is blowing toward "adjacent" commercially grown dicamba sensitive crops but do not define "adjacent".

251. Moreover, the labels stated that the herbicide should not be applied when the wind is blowing in the direction of "dicamba sensitive crops" (XtendiMax/FeXapan) or "specialty" crops (Engenia), but did not clearly identify soybeans as being within that restriction (despite the fact that soybeans are extremely sensitive to dicamba) and otherwise are confusing as to whether the up-wind restriction applies regardless of buffer.

252. In addition, the buffer zone of 110 feet on all the herbicide labels is insufficient for a chemical that volatilizes and moves over distances well in excess of that distance. Field experiments by independent scientists show that damage occurs at least 220 - 300 feet from the application site, and dicamba can move miles in a temperature inversion.

253. Jason Norsworthy commented that "when you have a product that picks up and moves [2-3 miles from the nearest Xtend] . . . I could not tell you what a buffer distance would need to be to prevent off target movement of a product like that. Can't do it." Report of the 2017 State of Arkansas Dicamba Task Force Meetings (Sept. 2017), http://www.aad.arkansas.gov/ Websites/aad/files/Content/6126295/Dicamba_Task_Force_Report,_sept_21_2017.pdf.

254. The labels also stated that the dicamba herbicide was to be sprayed in-crop "up to *and including* beginning bloom (R1 growth stage of soybeans)." Soybeans, however, are hypersensitive to dicamba at the reproductive stage. The most sensitive stages to lose yield from dicamba exposure include R1.

255. As described even by the EPA, the level of precaution necessary to prevent dicamba from moving off target is "extraordinary." Tom Polansek, *Monsanto, BASF weed killers strain U.S. states with damage complaints* (November 1, 2017), https://www.reuters.com/article/us-usa-pesticides-complaints/monsanto-basf-weed-killers-strain-u-s-states-with-damage-complaints-idUSKBN1D14N0.

256. Among other things, the labels contained onerous requirements for triple-rinse cleaning of equipment. Dicamba residue from a sprayer is not fully eliminated with water. And there are many areas where the herbicide escapes rinsing. Dicamba can even soak into rubber hoses used on most sprayers to a degree that will damage soybeans. Herbicides also can form deposits in the sprayer tank, screens, filters, nozzles, at the end caps or within other portions of the plumbing system. *See* Randy Pryor et al., *Removing Dicamba Residues from Your Sprayer: A Tricky Task* (Feb. 15, 2018), https://cropwatch.unl.edu/2018/removing-dicamba-residues-your-sprayer-tricky-task.

257. The instructions also directed the applicator to spray when weeds are no more than four (4) inches tall and only when winds are at least 3 mph, but no more than 15 (or 10) mph, both significantly narrowing the window for timely application, particularly problematic for farmers or commercial applicators with many and/or geographically disbursed acres to spray.

258. For example, accounting for rainfall data, wind speed, and time-of-day restrictions (imposed in Missouri in July 2017), researchers found just five (5) "safe" days to spray in June

and not a single June day with 8 consecutive "safe" spraying hours in Missouri during 2017. There were eleven (11) "safe" days in July, but by that time, weeds were too far along to effectively kill, and plants into the R1 growth stage. Emily Unglesbee, *Dicamba Questions, How Often Could Growers Legally Spray Dicamba in 2017?* (Sept. 15, 2017), https://www.dtnpf.com/agriculture/web/ag/news/crops/article/2017/09/15/often-growers-legally-spray-dicamba.

259.    One of the scientists who did this research, Bill Johnson, stated: "Growers need to understand how very hard it is to use this technology safely . . . We do not have the sprayer or sprayer operator capabilities in any of these states to spray all the necessary acres within these spray windows." *Id.*

260.    Many of the instructions also are contrary to typical user practices. At an August 8, 2016 Arkansas Pesticide Committee meeting, Boyd Carey from Monsanto acknowledged that "there are things [in the instructions] that are different than typical practices today." Arkansas Pesticide Committee Meeting (Aug. 8, 2016), https://monsanto.com/app/uploads/2017/11/Ex.-T.pdf.

261.    The herbicides are to be sprayed no higher than 24 inches above the crops, using nozzles designed to produce coarse/ultra-coarse droplets. There are restrictions on the pattern of the spray and the pounds per square inch of pressure.

262.    Course/ultra-course nozzles, producing larger droplet size, generally are understood as detrimental to coverage. The 24-inch boom height is lower than most farmers run their boom. Among other things, unevenness in the field risks damage to the boom. Speed of the sprayer, while affecting spray pressure, also affects the number of acres that can be covered in a given time span.

263.    As one person attending the August 8, 2016 Arkansas Pesticide Committee
Meeting said, with Monsanto and BASF representatives in attendance: "You're dealing with real,
people who have to fight the clock . . . We got guys with eight, 10,000 acres who have four planters,
30-foot long[,] 25 foot long because they have to plant it as quick as they can plant it because it's
limited. They either lose their moisture or it turns to mud. That's what we're dealing with. We're
not dealing with theory or drawing board things. That's why the problem with Dicamba is serious."
Arkansas Pesticide Committee Meeting Minutes (Aug. 8, 2016), https://monsanto.com/app/
uploads/2017/11/Ex.-T.pdf.

264.    These issues were echoed by Larry Steckel:

> "Following [the labels] . . . is a Herculean task. Talk about threading the
> needle – you can't spray when it's too windy. You can't spray under 3 miles
> per hour. You got to keep the boom down – there are so many things . . . It
> looks good on paper, but when a farmer or applicator is trying to actually
> execute that over thousands of acres covering several counties, it's almost
> impossible . . . I'm just not sure we can steward this technology as it
> currently exists."

Pam Smith, Tennessee Sets Dicamba Rules (July 12, 2017), https://www.dtnpf.com/agriculture/
web/ag/news/crops/article/2017/07/12/states-tack-herbicide-restrictions-2.

265.    Larry Steckel expressed these concerns directly to Monsanto at a conference when
he explained that following the label was "[n]early impossible" as, among other things, there is
only a "very small window of time" in which to spray, the low 24-inch boom height is "a joke,"
and in regard to spraying restrictions based on rain: "who is that accurate of a forecaster?" GM
Watch, *Will new restrictions on dicamba spraying save US food crops?* (Dec. 8, 2017),
https://gmwatch.org/en/news/latest-news/18022-will-new-restrictions-on-dicamba-spraying-save
-us-food-crops.

266.    Dr. Mike Owen, Iowa State University Professor and Agronomy Department and
Extension Weed Specialist stated that the label "is not useable by commercial and private

applicators and guarantees that applications will be off-label." Monsanto Extend Academic Summit (Iowa State Univ.) Slides presented in St. Louis, MO, September 27-29, 2017, *Smokey Alley Farm Partnership et al v. Monsanto Company et al.*, No. 4:17-CV-02031 (E.D. Mo.) ("*Smokey Alley*") Compl. Ex. 75.

267.    Ford Baldwin "said from the start [that] the label couldn't be followed and allow all the acres to be sprayed in a timely manner." Baldwin, *Dicamba drift issues move back into spotlight* (June 15, 2017), http://www.deltafarmpress.com/soybeans/dicamba-drift-issues-move-back-spotlight.

268.    Not only did Defendants recognize the difficulties in conditions and application, but the need for rigorous education and training on the risks of in-crop dicamba and proper manner of application.    At the August 8, 2016 Arkansas Pesticide Committee meeting, attended by Monsanto and BASF representatives, for example, Duane Simpson from Monsanto acknowledged that application instructions were "going to take a lot of training, understanding, and respect to do this correctly." Arkansas Pesticide Committee Meeting Minutes (Aug. 8, 2016), https://monsanto.com/app/uploads/2017/11/Ex.-T.pdf.

269.    Sufficient effective education and training, however, were not provided, increasing the risk of harm.

270.    Moreover, none of the labels provided complete, understandable and accurate information or warnings about the extreme toxicity of the dicamba herbicides, their volatilization properties, or capability of moving long distances and damaging sensitive crops with small levels of exposure.

271.    None contained warnings or directions for use that, if complied with, are adequate to protect the environment and prevent injury to susceptible non-dicamba resistant plants and crops.

272.    Using dicamba over the top of growing plants in areas with frequent inversions, significant levels of glyphosate-resistant weeds and cultivation of non-Xtend crops, trees and plants, increases the risk of damage to non-target plants and crops. The likelihood of such damage was foreseeable to, and indeed foreseen by, Defendants.

## L.    Dicamba Damage in 2017

273.    Farmers planted seed containing the dicamba-resistant trait on at least 25 million acres of soybean and cotton fields in 2017.

274.    The spike from one million acres of Xtend soybeans and three million acres of Xtend cotton in 2016 to 25 million or more acres in 2017 is a direct result of the dicamba disaster Defendants conspired to set in motion.

275.    Defendants knew that dicamba damage would again occur and would be even more widespread.

276.    The dramatic increase in damage during 2017 was a direct result of the proliferation of the dicamba-resistant trait and Xtend Crop System.

277.    The number of acres that can be damaged by dicamba is directly related to the amount applied in an area. As Defendants knew, use of dicamba in areas with prevalent glyphosate-resistant weeds would be high, increasing risk to susceptible non-resistant plants and crops. As Defendants also knew, the problem is compounded in areas with high-volume planting of plants and crops susceptible but not resistant to dicamba.

278.    In many areas, including those at issue, dicamba was predictably sprayed by so many people that the atmosphere was loaded with dicamba. Damage observed in 2017 included entire hundred-acre fields of soybeans with uniform cupped leaves throughout.

279.    In 2017, there were thousands of complaints of dicamba damage. According to the EPA, over 3.6 million acres – about 4 percent of all soybeans planted in the United States – were damaged by dicamba.

280.    Nationally, well over 2,000 investigations of dicamba damage were conducted in at least 22 states. States receiving complaints of soybean damage in large number include: Arkansas (986); Illinois (245); Indiana (128); Iowa (107); Kansas (125); Minnesota (250); Mississippi (78); Missouri (310); Nebraska (93); South Dakota (114); and Tennessee (132). The estimated number of soybean acres injured by dicamba are: Arkansas (900,000 acres); Illinois (600,000 acres); Indiana (55,000 acres); Iowa (150,000 acres); Kansas (100,000 acres); Minnesota (265,000 acres); Mississippi (250,000); Missouri (325,000 acres); Nebraska (50,000 acres); South Dakota (250,000 acres); and Tennessee (400,000 acres).

281.    These figures underestimate the number of producers affected as not everyone filed a complaint with their plant board or similar body. Reuben Baris, EPA's acting chief of herbicides, estimated that damage incidents could be five times greater than reported. Eric Lipton, *Crops in 25 States Damaged by Unintended Drift of Weed Killer*, (Nov. 1, 2017), https://www.nytimes.com/2017/11/01/business/soybeans-pesticide.html.

282.    Other plants including cotton, vegetable crops, fruit and trees also were damaged.

283.    Dr. Kevin Bradley stated: "I've been doing this for more than 20 years now and I was around when Roundup Ready was introduced . . . In my opinion, this is nothing like the introduction of any trait or technology as far as the scope and the significance of the injury that's

been observed across the U.S." He further stated: "I just don't think we know enough yet to apply [dicamba] safely." Eli Chen, *As harvest season begins, farmers worry how dicamba herbicide could affect next year's crop* (Sept. 19, 2017), http://news.stlpublicradio.org/post/harvest-season-begins-farmers-worry-how-dicamba-herbicide-could-affect-next-year-s-crop#stream/0.

284.    Symptomology of dicamba damage, including leaf cupping, is unique to dicamba. Cupping throughout a field is a typical pattern indicating volatilization, as opposed to spray drift, which displays a plume of damage that diminishes with distance from the spray source. Other symptoms include strapping, leaf elongation, stunting and/or stem twisting.

285.    Scientists and others involved in investigating report damage over significant distances. Jason Norsworthy reported "quite uniform" symptoms 2-3 miles from the nearest Xtend field. Report of the 2017 State of Arkansas Dicamba Task Force Meetings (Sept. 2017) at 139-40, http://www.aad.arkansas.gov/Websites/aad/files/Content/6126295/Dicamba_Task_Force_Report,_sept_21_2017.pdf. Others reported symptoms as far as 5 miles away. *See* Horstmeier, *Dicamba's PTFE Problem* (Aug. 29, 2017), https://www.dtnpf.com/agriculture/web/ag/perspectives/blogs/editors-notebook/blog-post/2017/08/29/dicambas-ptfe-problem ("we've talked to many farmers who did everything by the book, paid attention to all label requirements, and still damaged neighbors' crops, trees and lawns not just across the fence, but a mile, 3 miles, even 5 miles away.").

286.    Dr. Bradley explained that the pattern of damage and symptomology points to volatilization: "The majority of fields I've been in are injured from one end to the other with no discernable difference in soybean symptomology . . . This suggests problems with off-site movement through volatility." Michelle Cummings, *The Dicamba Dilemma*, Momentum, Fall 2017, at 13, https://view.joomag.com/momentum-fall-2017/0150973001508187562?page=13.

287. Dr. Norsworthy told a task force of the Arkansas State Plant Board that volatility was a "major cause of the issues" in 2017. Doug Rich, *Changes needed for dicamba formulations* (Sept. 25, 2017), http://www.hpj.com/crops/changes-needed-for-dicamba-formulations/article_ 61d06219-f796-5fbd-93e1-f789d923c541.html.

288. Dr. Norsworthy's own tests and by colleagues in Tennessee and Missouri support that belief. Stephen Steed, *No dicamba in '18, Arkansas weed expert urges* (Aug. 18, 2017), http://m.arkansasonline.com/news/2017/aug/18/no-dicamba-in-18-weed-expert-urges-2017/ (last revisited Aug. 23, 2017).

289. Tennessee's Larry Steckel explained: "This is landscape level redistribution of that herbicide" as opposed to physical drift which often injures in a pattern in the field. According to Steckel: "It's a 200-acre or larger fields covered pretty uniformly. I've never seen anything like it." Pam Smith, *Dicamba Debate Continues* (July 12, 2017), https://www.dtnpf.com/ agriculture/web/ag/news/crops/article/2017/07/12/states-contemplate-herbicide-2.

290. Other experts such as Dr. Mark Loux from the Department of Horticulture and Crop Science at Ohio State University, and Dr. Bill Johnson of Purdue University, agree that most of the damage was not due to spray drift but volatility:

> But particle drift does not result in the relative uniformity of dicamba injury over a large adjacent field that has occurred in some cases. This would be more indicative of movement via dicamba volatilization from leaf or soil surfaces, occurring sometime within several days after application. Vapors then move with prevailing air currents, with potential to move far greater distances than spray particles, upwards of a half mile. Movement of vapors does not require much wind. For example, volatilization of dicamba that occurs under relatively still inversion conditions can result in prolonged suspension and movement of vapors with gentle air currents. In one field we looked at, there appeared to be an initial volatilization event from the adjacent dicamba-treated soybeans, with some subsequent soybean recovery. This appeared to [be] followed by a second round of dicamba exposure and injury to the recovering soybeans several weeks later.

Mark Loux, Bill Johnson, Newsletter at Ohio State University Extension, *It's Beginning To Look A Lot Like – Off-Target Dicamba Movement – Our Favorite Time Of The Year!* (2017), https://agcrops.osu.edu/newsletter/corn-newsletter/2017-21/it%E2%80%99s-beginning-look-lot-%E2%80%93-target-dicamba-movement-%E2%80%93-our-favorite.

291. Field experiments conducted by university researchers in the summer of 2017 identified evaporating dicamba as consistent with the symptomology. Among other experiments, dicamba was sprayed into trays of soil at a remote location and then brought to and placed between rows of soybeans covered with plastic. The dicamba evaporated from the trays and caused damage to surrounding soybeans.

292. Citing research by Jason Norsworthy and Tom Barber in Arkansas, Kevin Bradley in Missouri, and Tom Mueller in Tennessee, weed scientist Ford Baldwin sees no question about whether the new dicamba herbicides volatilize in the field:

> Common logic along with our understanding about long distance transport of pesticides in stable air told us the only way we could be getting the landscape effect we are seeing with dicamba is through movement in temperature inversions. Common logic also told us there had to be more than just spray particles being trapped in inversions when the herbicides are restricted to ground application and ultra-coarse nozzles. The results from studies like these now confirms the logic that it is volatiles trapped in the inversions causing the landscape dicamba damage.
>
> As I have stated before[,] dicamba is just doing what dicamba does when it is sprayed in summertime temperatures. Additional application restrictions on the herbicide simply will not fix this problem . . . .

Ford Baldwin, *latest dicamba research and a new task force* (Aug. 17, 2017), http://www. deltafarmpress.com/weeds/baldwin-latest-dicamba-research-and-new-task-force.

293. Larry Steckel cited research from Purdue, the University of Arkansas, University of Missouri, University of Georgia, University of Tennessee, and even Monsanto's Texas data submitted to the Arkansas Plant Board, that "clearly showed volatility 54 to 65 hours after

application."  Monsanto Extend Academic Summit (Iowa State Univ.) Slides presented in St. Louis, MO, September 27-29, 2017 (*Smokey Alley* Compl. Ex. 78).

294.  Steve Smith, a former member of Monsanto's dicamba advisory committee, who had long tried to convince Monsanto to change course, said: "Even the best, the most conscientious farmers cannot control where this weed killer will end up."  Danny Hakim, *Monsanto's Weed Killer, Dicamba, Divides Farmers* (Sept. 21, 2017), https://www.nytimes.com/2017/09/21/business/monsanto-dicamba-weed-killer.html.

295.  Mr. Smith was removed from Monsanto's dicamba advisory committee due to what Monsanto characterized as a "conflict of interest."  *Id.*

296.  Damage to susceptible non-dicamba resistant plants and crops from volatilization was foreseeable to, and foreseen by, Defendants.

297.  Defendants also knew, and at minimum should have known, that even proper application does not prevent volatilization.

298.  To the extent attributable to physical drift, damage to susceptible non-dicamba resistant plants and crops also was foreseeable to, and foreseen by, Defendants.

299.  Defendants knew or at minimum should have known that even conscientious applicators would have significant difficulty with the instructions and restrictions for in-crop dicamba.

300.  Defendants also knew or at minimum should have known that even a very small amount of dicamba exposure can result in extensive damage to susceptible non-resistant crops, especially soybeans.

301.  Dr. Bradley has expressed his opinion that dicamba-based herbicides need to be kept "in the pre-plant, burndown, pre-emergence use pattern," and should not be used post-

emergence. He explained that "the risk is too great for off-target movement to be spraying this for Palmer amaranth [pigweed] and waterhemp in soybeans." David Bennett, *What's the latest on dicamba drift in Missouri?* (Sept. 1, 2017), http://www.deltafarmpress.com/soybeans/what-s-latest-dicamba-drift-missouri.

302. On August 2, 2017, Monsanto issued "An Open Letter to Our Farmer-Customers." Calling farmers the "heart and soul of our company," Monsanto stated that it was taking reports of crop injuries from dicamba "extremely seriously," and represented its "commit[ment] to supporting [farmers] at every stage of the season – every year." *An Open Letter to Our Farmer-Customers* (Aug. 2, 2017), https://monsanto.com/products/product-stewardship/articles/to-our-farmer-customers/. Monsanto represented to farmers with dicamba crop injury: "[W]e will stand by you throughout the growing season." *Id.*

303. Defendants, however, have strenuously and continuously extolled false narratives to mislead consumers into believing that if the herbicides are applied per label, damage will not occur to non-target plants and crops.

304. Monsanto and BASF (as well as DuPont) have gone on the offensive, vigorously denying volatility, which has been independently verified by multiple weed scientists, attacking scientists who question them, and blaming farmers along with everyone else but themselves.

305. Brian Nabor, Monsanto's U.S. commercial operations lead, for example, stated: "When farmers and applicators follow these instructions, they work," telling consumers that:

> We're in the early stages, for sure. But to this point, the indications are that volatility of the approved over-the-top products is not the major source of the off-target movement.

Brian Naber, *Dicamba Field Investigations: What Monsanto Has Learned So Far* (July 26, 2017), http://www.greatlakeshybrids.com/agronomy/agronomy/agronomy/2017/07/26/dicamba-field-investigations-what-monsanto-has-learned-so-far (emphasis original).

306. Monsanto's Scott Partridge claims that XtendiMax "will not move far, including through volatilization." Chemical & Engineering News, *Widespread crop damage from dicamba herbicide fuels controversy* (Aug 21, 2017), http://cen.acs.org/articles/95/i33/Widespread-crop-damage-dicamba-herbicide.html.

307. BASF also has denied that volatility was any kind of "driving factor" for the 2017 damage. Gill Gullickson, *Volatility Not To Blame For 2017 Off-Target Dicamba Movement, Says BASF* (Nov. 17, 2017), https://www.agriculture.com/crops/soybeans/volatility-not-to-blame-for-2017-off-target-dicamba-movement-says-basf.

308. These statements conflict with uniform findings of independent experts that there *was* volatility in 2017 and it was the major reason for the harm that occurred. As observed by Dr. Steckel, volatility is "[h]ard to address when registrants, despite evidence, will not consider it an issue." Monsanto Extend Academic Summit (Iowa State Univ.) Slides presented in St. Louis, MO, September 27-29, 2017 (*Smokey Alley* Compl. Ex. 78).

309. Defendants also put the blame on applicators who they say did not follow label instructions. Scott Partridge said: "Every one of those [mistakes] is fixable by education." Dan Charles, *Monsanto Attacks Scientists After Studies Show Trouble For Weedkiller Dicamba* (Oct. 26, 2017) https://www.npr.org/sections/thesalt/2017/10/26/559733837/monsanto-and-the-weed-scientists-not-a-love-story.

310. Education, however, does not fix the dicamba herbicide's volatility and propensity for off-target movement, especially in climate conditions when it can volatilize off soil and plants to move miles away to susceptible plants. Application methods also do not prevent volitalization. Ford Baldwin explains: "Additional application restrictions . . . simply will not fix this problem."

Ford Baldwin, *latest dicamba research and a new task force* (Aug. 17, 2017), http://www.
deltafarmpress.com/weeds/baldwin-latest-dicamba-research-and-new-task-force.

311.    Dr. Norsworthy agrees: "As a weed scientist, I can't solve a volatility issue . . .
Spraying a product that has a volatile component to it in June, July, and August in the State of
Arkansas where we have warm conditions will result in damage." Doug Rich, *Changes needed
for dicamba formulations* (Sept. 25, 2017), http://www.hpj.com/crops/changes-needed-for-
dicamba-formulations/article_61d06219-f796-5fbd-93e1-f789d923c541.html. In his opinion,
"[t]his is a product that is broken." Tiffany Stecker, *As Dicamba Dust Settles, Scientists and
Industry Spar* (Aug. 30, 2017), https://www.bna.com/dicamba-dust-settles-n73014463916/.

312.    Dr. Rick Cartwright, a plant pathologist, University of Arkansas Extension
administrator and Arkansas State Plant Board member, also agrees: "You apply [new dicamba
formulations] to soybeans, and 36 hours later the product gets up and goes somewhere else. I don't
know how you educate people to fix that." Greg D. Horstmeier, *Arkansas Sets Dicamba Limits*
(Sept. 22, 2017), https://www.dtnpf.com/agriculture/web/ag/news/crops/ article/2017/09/22/plant-
board-limits-herbicide-use-2.

313.    Defendants have denied dicamba damage altogether, pointing to other herbicides,
environmental factors, disease, calcium deficiency, and misdiagnosis. These claims have been
flatly refuted by weed scientists, who are well acquainted with the unique symptomology of
dicamba injury and personally observed thousands of acres of damaged fields.

314.    Monsanto and BASF attacked even the independent experts, attempting to discredit
and intimidate them. For example, Monsanto executives made repeated calls to Dr. Bradley's
supervisors. Monsanto also told regulators that they should disregard information from Jason
Norsworthy because he recommended use of a non-dicamba alternative from a rival company.

Bob Scott, weed scientist at the University of Arkansas, reads such tactics "as an attack on all of us, and anybody who dares to [gather] outside data." Dan Charles, *Monsanto Attacks Scientists After Studies Show Trouble For Weedkiller Dicamba* (Oct. 26, 2017), https://www.npr.org/sections/thesalt/2017/10/26/559733837/monsanto-and-the-weed-scientists-not-a-love-story.

**M.    Regulatory Aftermath of 2017 Dicamba Damage**

315.    In October 2017, the EPA announced that, by agreement with Monsanto, BASF and DuPont, it was re-classifying in-crop dicamba as a restricted use herbicide. Among other things, the restrictions required that only certified applicators with special training, and those under their supervision, could purchase and apply in-crop dicamba during the 2018 growing season. Other changes included: additional record-keeping requirements; limiting applications to when maximum wind speeds are below 10 mph (from 15 mph); reducing the times during the day when applications can occur; and additional tank clean-out instruction.

316.    This action confirmed that the prior labels and instructions were inadequate. As stated by Andrew Thostenson, Pesticide Program Specialist for North Dakota State University Extension Service: "With the new use rules for 2018, it is a fact that reading and following the label was NOT enough in 2017!" Oct. 13, 2017 Tweets from Andrew Thostenson. Certainly, mandatory dicamba-specific training might have been required for 2017 but was not.

317.    The Missouri Department of Agriculture, on November 16, 2017, issued a Special Local Need Label for Engenia, limiting application to only certified applicators, requiring special dicamba training (along with verification of training presented to the seller), and prohibiting spraying before 7:30 am and after 5:30 pm. In addition, use of Engenia is prohibited after June 1, 2018 in Dunklin, Pemiscot, New Madrid, Stoddard, Scott, Mississippi, Butler, Ripley, Bollinger

and Cape Girardeau counties, and prohibited after July 15, 2018 in all remaining counties. The Department issued the same restrictions for XtendiMax and FeXapan on December 11, 2017.

318. Such changes, however, did not and do not prevent volatility.

319. The revised labels continue to lack necessary and adequate warnings.

320. In September 2017, the Arkansas Plant Board voted to ban applications of dicamba after April 15 in Arkansas.

321. Other states that have imposed additional restrictions include Alabama, Iowa, Minnesota, Mississippi, North Dakota, and Tennessee.

## N.   Defensive Purchasing of Dicamba-Resistant Seed

322. Farmers have purchased and will continue to purchase seed containing the dicamba-resistant trait at higher prices for defensive purposes even if they are not otherwise interested in the base germplasm of the seed or dicamba resistance itself.

323. As one farmer put it: "[Monsanto] knew that people would buy [Xtend] just to protect themselves, . . . You're pretty well going to have to. It's a good marketing strategy, I guess. It kind of sucks for us." Jack Kaskey & Lydia Mulvany, Bloomberg, *Creating a Problem – And a Lucrative Solution* (Sept. 5, 2016), http://cehn-healthykids.org/wp-content/uploads/2017/07/Bloomberg-business-week-sept-5-112016.pdf.

324. As summed up by another farmer: "You either get on board or get hurt." Bryce Gray, St. Louis Post-Dispatch, *'Get on board or get hurt': Missouri farmers wrestle with widespread dicamba damage* (Oct. 22, 2017) http://www.theledger.com/news/20171022/get-on-board-or-get-hurt-missouri-farmers-wrestle-with-widespread-dicamba-damage.

325.    Dr. Bradley, in an audio interview after addressing the Missouri House Agriculture
Committee in 2016 stated that "every farmer" he had spoken with who had been injured expressed
the same thing - that they would purchase the Xtend technology defensively:

> Every farmer I've visited with that's been injured . . . Every single one of
> them has said the same thing, and that is that next year they will plant the
> new trait – the dicamba resistant trait – to protect themselves. I hear that
> terminology over and over and over and it just makes me cringe a little bit
> to think that farmers won't have choices. That they aren't able to plant
> whatever they want to plant. And that they've got to plant a dicamba
> resistant soybean in the future so they don't get injured.

Full audio available: http://cdn.brownfieldagnews.com/wp-content/uploads/2016/09/160831_
KevinBradley-1.mp3.

326.    Monsanto was so confident in expansion of the Xtend crop system that by 2015 it
already had announced that it would invest almost $1 billion investment in a dicamba production
facility.

327.    According to Monsanto's Kerry Preete, this expansion "represents the single largest
capital investment in Monsanto's self-manufacturing history."   Louise Poirier, *$975 Million
Expansion Underway at Monsanto's Luling Plant* (Feb. 28, 2017), https://www.enr.com/ articles/
41538-975-million-expansion-underway-at-monsantos-luling-plant.

328.    According to Monsanto's dicamba plant manager, when construction is completed,
in mid-2019, this facility is expected "to supply 50 million pounds of dicamba product, a key
component of the Roundup Ready Xtend Crop System."   Louise Poirier, *$975 Million Expansion
Underway at Monsanto's Luling Plant* (Feb. 28, 2017), https://www.enr.com/articles/41538-975-
million-expansion-underway-at-monsantos-luling-plant.

329.    Other estimates are that the new plant is targeting 80 - 100 million acres of capacity.
Monsanto Whistle Stop Tour "Accelerating the Future of Agriculture" Day 1 (Aug. 17, 2016),
https://monsanto.com/app/uploads/2017/05/whistle_stop_viii_day-1-session_materials. pdf.

330.     BASF was so confident of expansion of the Xtend Crop System that it had, by June 2014, announced plans to increase its dicamba production by fifty percent.

331.     Notwithstanding the risk, Defendants plan to further expand sales of the dicamba-resistant trait, increasing the level of dicamba spraying, which in turn damages non-resistant damages crops, resulting in further defensive purchases of seed with the dicamba-resistant trait and so on.

332.     Monsanto now has agreements not only with DuPont but also with Syngenta to sell dicamba herbicide with VaporGrip Technology.

333.     By some estimates, 20% of all U.S. soybean fields and 50% of all U.S. cotton fields were planted with Xtend seed in 2017, just two years after initial launch of Xtend cotton in 2015. *Latest Monsanto GMO seeds raises worries of monopoly* (Dec. 14, 2017), www.dailymail.co.uk/wires/afp/article-5178029/Latest-Monsanto-GMO-seeds-raises-worries-monopoly.html.

334.     Monsanto plans more than 300 Xtend soybean varieties in 2018 as compared to 120 in 2017.

335.     The increase in acres planted with the Xtend technology was and is expected to be astronomical. Monsanto projects that the "Industry's Largest Seed Technology Platform" with RR2 Xtend would reach 2/3 of all U.S. soybean acres by fiscal year 2019. Monsanto First Quarter 2016 Financial Results (Jan. 6, 2016), https://monsanto.com/app/uploads/2017/05/2016.01.06_mon_q1f16_financial.pdf. As of mid-2016, it was projecting penetration in soybeans of 15 million acres in 2017, 55 million acres in 2019, with an 80 million target thereafter. Brett Begemann Presentation BMO Farm to Market Conference (May 18, 2019), https://monsanto.com/app/uploads/2017/ 05/2016.05.18_bmo_conference _begemann.pdf.

336.    By mid-2017, Monsanto projected that soybeans with Xtend technology would reach 20 million acres in the first year of the full system launch. *See* Monsanto Third Quarter FY 2017 Earnings Conference Call Power Point Presentation (June 28, 2017), https://monsanto.com/ app/uploads/2017/06/FINAL-DRAFT-Q3F17-Earnings-Slides-6-26-17/pdf.

337.    The number of soybean acres planted with the dicamba-resistant trait alone rose from approximately 1 million acres in 2016 to more than 20 million acres in 2017. Monsanto projects that this will double to more than 40 million acres in 2018, and 55 million acres in 2019. Monsanto is targeting more than 80 million acres in the U.S. Monsanto Fourth-Quarter FY2017 Presentation "Fiscal Year 2017 Results and Outlook" (Oct. 4, 2017), https://monsanto.com/ app/uploads/2017/10/MonsantoCo._Q4F17_Earnings_Presentation_2017.10.04.pdf.

338.    In 2017, the USDA reported a "record high" of 89.5 million acres of soybeans planted in the United States. Even at that high level, Monsanto is projecting near 100% penetration of the entire United States soybean market.

339.    BASF benefits from all this increase from, at minimum, sales of Engenia, older versions of dicamba, and possibly other in-crop formulations as well.

340.    In addition to soybeans and cotton, Monsanto has petitioned the USDA for deregulation of a genetically engineered dicamba-resistant corn.

341.    The more crops planted with dicamba-resistant seed and the more dicamba sprayed after emergence of susceptible non-resistant crops, the more damage there will be and the more farmers will be forced to buy the seed to protect themselves at higher cost.

342.    As of June, university weed scientists already have estimated approximately 1.1 million acres of soybeans with dicamba injury in 2018.

343. Kevin Bradley has observed extensive injury to other plants as well. He is "convinced that the adoption of the Xtend trait in cotton and soybean is as high [in Missouri] as anywhere in the country. Many growers in this area have adopted the Xtend trait so they don't experience dicamba injury on their soybean crop for a third season in a row." Adoption of the Xtend trait means that fields planted with that trait are protected, but "just as in the past two seasons, there are still fields of non-Xtend soybean in this area showing injury from one end to the other." Kevin Bradley, Dicamba Injured Crops and Plants Becoming More Evident: June 15th Update (June 21, 2018), https://ipm.missouri.edu/IPCM/2018/6/dicambaInjuryUpdate/.

344. Farmers must either buy seed containing the dicamba-resistant trait or run the risk that their crops will be damaged by dicamba.

345. Defendants' attempt to force everyone into a dicamba-based system is not reasonable or in the public interest.

346. Even this course is unavailable to farmers who grow crops for which there is no dicamba-tolerant seed.

347. While dicamba is effective against weeds, it is highly dangerous to non-resistant plants and crops. And farmers should not be forced to purchase dicamba-resistant seed at higher cost for defensive purposes. Dicamba is dangerous not only to non-tolerant crops like soybeans, but fruits, vegetables, trees, and flowers that feed honeybees. Moreover, dicamba use is likely to produce the same tolerance as glyphosate. Researchers have shown that pigweed can develop dicamba resistance within as few as three years. Caitlin Dewey, *This miracle weed killer was supposed to save farms. Instead, it's devastating them* (Aug. 29, 2017), https://www. washingtonpost.com/business/economy/this-miracle-weed-killer-was-supposed-to-save-farms-

instead-its-devastating-them/2017/08/29/33a21a56-88e3-11e7-961d-2f373b3977ee_story.html?
utm_term=.5435b9e33dd3.

348. Persons growing plants and crops susceptible and not resistant to dicamba,
particularly soybeans, are those most foreseeably injured by the Xtend Crop System.

349. Plaintiffs grew soybeans, highly susceptible to and not resistant to dicamba, which
exhibited physical symptoms of dicamba damage and suffered injury not only to their possessory
and other interests but yield loss as a result of the dicamba-resistant seed and the Xtend Crop
System.

## CLAIMS FOR RELIEF

### COUNT I - STRICT PRODUCTS LIABILITY (Ark. Code § 4-86-102)

350. Plaintiffs re-allege and incorporate each paragraph above word-for-word as if fully
stated herein.

351. Pursuant to Ark. Code Ann. § 4-86-102 of the Arkansas Code, a supplier of a
product is liable for harm to another person or his property if: (1) The supplier is engaged in the
business of manufacturing, selling, or distributing the product; (2) The product was supplied
by him in a defective condition that rendered it unreasonably dangerous; and (3) The defective
condition was a proximate cause of the harm to person or to property.

352. Defendants have a partnership, joint-venture and joint-enterprise for the dicamba-
crop system for supplying to the marketplace in Arkansas, and other states, genetically modified
seeds represented as dicamba-tolerant, which require a compatible dicamba-tolerant herbicide
associated with the same genetic traits.

353. Each of the Defendants is engaged in the business of variously manufacturing,
selling, and distributing the dicamba-tolerant crop system and is a "supplier" the dicamba-tolerant
crop system for the purpose of Ark. Code Ann. § 4-86-102 of the Arkansas Code.

354.    The Defendants supplied defective seed and herbicide products in a dicamba-tolerant crop system that cannot be used in a safe manner, which prevents injury to non-target crops.

355.    The Defendants supplied defective dicamba-tolerant crop system in a defective condition that rendered their products unsafe and unreasonably dangerous and exposed innocent third parties' crops to an unsafe, inherently dangerous and volatile herbicide.

356.    The Defendants supplying defective dicamba-tolerant crop system was a direct result proximate cause of the harm to Plaintiffs.

357.    Each Defendant is strictly liable for all damages to each plaintiff proximately caused by their defective dicamba-tolerant crop system.

## COUNT II – STRICT LIABILITY (FAILURE TO WARN)

358.    Plaintiffs re-allege and incorporate each paragraph above word-for-word as if fully stated herein.

359.    As alleged, the dicamba-resistant trait, seed containing that trait, and the Xtend Crop System, as designed and used in anticipated and foreseeable manner were and are unreasonably dangerous and defective at the time of sale.

360.    Defendants failed to warn or to provide adequate warning of such defective condition, of which they knew or minimally should have known.

361.    In addition or in the alternative, the dicamba-resistant trait, seed containing that trait, and the Xtend Crop System were and are defective for lack of adequate warning and/or instruction on safe use, rendering them unreasonably dangerous for anticipated or foreseeable use (and misuse) at the time of sale.

362.   A product is defective under Ark Code Ann. § 16-116-101 if it lacks adequate warning of risks or hazards, and/or adequate instruction for safe use rendering the product unreasonably dangerous beyond that which would be contemplated by the ordinary buyer.

363.   Defendants failed to warn or provide adequate warning of the dangers, or adequate instruction on safe use, of the Xtend Crop System and its components.

364.   As alleged, ordinary users and consumers of the Xtend Crop System were unaware of such dangers, which by contrast, were foreseeable and foreseen by Defendants.

365.   Monsanto and BASF failed to provide adequate warning and instruction by label or otherwise.

366.   Moreover, the labels were false, misleading and failed to contain warnings or instructions adequate to protect or prevent harm to the environment, including susceptible non-resistant plants and crops, including soybeans.

367.   Plaintiffs foreseeably were damaged as a direct and proximate result of Defendants' failure to warn, adequately warn and/or provide adequate instruction for safe use.

368.   Each Defendant's conduct showed a complete indifference to or conscious disregard of the rights of others, including Plaintiffs.  Punitive damages are thus warranted.

## COUNT III – NEGLIGENCE

369.   Plaintiffs re-allege and incorporate each paragraph above word-for-word as if fully stated herein.

370.   Negligent Design and Formulation:  Each of the Defendants has a duty to use ordinary care in the design and in the selection of the materials used in its products to protect those who are in the area of its use from unreasonable risk of harm.  Given the toxicity of dicamba to certain crops, it was negligent to design, formulate, manufacture, and sell a dicamba-resistant seed

Page **77** of **97**

in the subject area. Each of the Defendants, therefore, failed to use ordinary care in the design and selection of materials and formulation in its products. The negligent design and selection of materials was a proximate cause of the harm to Plaintiffs. The dicamba products sold by Defendants were so inherently dangerous to neighboring non-dicamba tolerant or resistant crops as to be unsafe for distribution and use in Arkansas. Each of the Defendants is liable for all damages to each plaintiff proximately caused by its actions.

371. Negligent Testing: Each of the Defendants had an affirmative, non-delegable duty to test its products alone and in combination with dicamba-containing products that each of the Defendants recommended be used in order to determine the extent to which drift would injure off-target crops, and to provide such instructions and take other appropriate measures as are necessary to prevent such drift injuries. Each of the Defendants failed to adequately test its products or to take appropriate steps to prevent such damage. Each of the Defendants' negligent testing was a proximate cause of the harm to Plaintiffs. Each of the Defendants is liable for all damages to each plaintiff proximately caused by its actions.

372. Inadequate Warning, Instruction, and Training: Defendants have a non-delegable duty to give a reasonable and adequate warning of dangers inherent or reasonably foreseeable in the use of the product and to provide such instructions as are necessary to permit the reasonably safe use of the product.

373. Defendants sold their dicamba-tolerant crop system to farmers knowing that herbicides could not be safely used and there was a significant and imminent disastrous risk to neighbors' crops, which are not dicamba-tolerant.

374. Each of the Defendants jointly failed to provide adequate, warning, training and instruction of dangers inherent with its dicamba-tolerant crop system.

Page **78** of **97**

375.    Each of the Defendants violated its affirmative duty to give a reasonable and adequate warning of the dangers inherent and reasonably foreseeable in the use of their products, including the danger of causing significant and far-reaching off-target movement, migration and drift of dicamba-containing products in amounts that cause severe damage to crops other than those grown from dicamba seeds.

376.    Likewise, none of the product labels contain instruction for use that would, if followed, make it possible to use the dicamba seeds with a reasonable expectation that harm to collateral non-target crops would not be harmed.

377.    The inadequate warnings were a proximate cause of the harm to Plaintiffs.  Each of the Defendants is liable for all damages to each plaintiff proximately caused by its actions.

378.    In addition to the foregoing negligence, the Defendants were negligent in distributing and selling dicamba seeds to the other Defendants without warning them of the impropriety of suggesting the use of dicamba-containing products without limitations or modifications to make its use reasonably safe or without agreed restrictions on the products use so as to avoid it being sold into an area at a time where harm to sensitive crops would be likely to occur.

379.    Furthermore, Defendants were further negligent in their failure to provide adequate education, information, instruction and products for their dicamba-tolerant crop system knowing that it was released without adequate testing and knowing of the inherent danger and volatility of its product once released in the market and used by neighboring crops, such as Plaintiffs.

380.    The distributing Defendants were negligent in selling their dicamba-tolerant system in the subject area given that they knew or should have known that using dicamba-containing products posed an unreasonable risk of harm to nearby crops, given the physical proximity of the

two crops, time of use, and the history of crop damage occurring in the area from the use of dicamba-containing products.

381.   BASF and Monsanto had an affirmative obligation to properly and fully train, educate, inform, and instruct farmers, including full disclosure of the vast, expansive nature of the spraying operation and campaign waged on palmer amaranth ("pigweed").

382.   BASF and Monsanto were negligent in their training, supervision, education, curriculum, information, demonstrations, testing, instructions, omissions, actions, and conduct, in implementing their dicamba-tolerant crop system in Arkansas. Defendants' knowingly and negligently withheld or omitted critical information from consumers, which caused significant damage to innocent third-parties, including Plaintiffs.

383.   BASF and Monsanto negligently released a new formulated dicamba system without proper distribution, training, education, information, demonstration and teaching. BASF and Monsanto completely occupy the dicamba-tolerant crop system in Arkansas and the training for the safe and responsible use of their dicamba products.

384.   Farmers who purchased the BASF/Monsanto dicamba products "were conscientious about their responsibilities in connection with the use" of Defendants' products. According to Robb Fraley, the Chief Technology Officer of Monsanto, farmers "knew all about the application requirements to help minimize any risk of off-target movement, and many told me they'd attended one or more of the learning events where we've hosted nearly 50,000 custom applicators, grower applicators and other key stakeholders at venues across the country."

385.   However, BASF and Monsanto failed to properly teach, train, and instruct their application requirements to farmers regarding their dicamba training system at on-target application academies. The necessity for on-target application training for their dicamba-tolerant

products was magnified by the massive distribution and dispersion of their product in Arkansas without proper instruction and disclosure of the hazards of the new formula to farmers.

386. BASF and Monsanto have superior, intricate, proprietary knowledge of the dangers and risks associated with Defendants' products, which were unavailable to the public, consumers, and farmers. BASF and Monsanto have a non-delegable to duty to sell and distribute a safe crop system. BASF represents it has "a very knowledgeable and experienced staff of experts in on-target applications of dicamba."

387. BASF and Monsanto failed to conduct sufficient training, education, supervision and demonstrations to all farmers who purchased their dicamba-tolerant crop system, thus, imminently exposing nearby crops to damage regardless the degree of care.

388. BASF and Monsanto have a non-delegable duty owed to farmers who buy the dicamba system to prevent harm to neighbor's crops, including Plaintiffs. BASF and Monsanto have a non-delegable duty to properly distribute, train, educate, information, demonstration, supervise and teach the responsible use of their new dicamba formula.

389. BASF and Monsanto cannot delegate their knowledge and inherent risk with their product without proper distribution, training, education, information, demonstration and teaching. BASF and Monsanto must supply proper educators, education, curriculum, training education, demonstrations, teaching and full disclosure of volatility to nearby crops.

390. BASF and Monsanto breached these affirmative non-delegable duties, responsibilities and obligations owed to the farmers who purchased their dicamba-tolerant products directly resulting in damage to Plaintiffs' crops. BASF and Monsanto further knowingly misrepresented the safety of their dicamba-tolerant products to nearby crops in representations made to farmers in Arkansas.

## COUNT IV - BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE

391.    Plaintiffs re-allege and incorporate each paragraph above word-for-word as if fully stated herein.

392.    Each of the Plaintiffs has sustained damage due to Defendants' unsafe, defective, inherently dangerous and volatile dicamba-tolerant crop system.

393.    Each Defendant knew that dicamba seeds would be used for the particular purpose of providing protection against dicamba-based herbicides.

394.    Each Defendant knew that farmers and the applicators who apply herbicides on behalf of farmers rely on the Defendants' skill and judgment to encourage the use of a suitable herbicide for weed control that will not damage off-target crops northeastern Arkansas, including adequate instructions and limitations on use, thereby impliedly warranting the product to be safe and suitable for that particular purpose.

395.    Defendants' products as designed, manufactured and labeled, were unsafe, inherently dangerous, not fit for the particular purpose for which they were required in that the product as designed, formulated and labeled posed an inherent risk to crops being grown in the region and the product therefore breached the implied warranty for fitness for a particular purpose rendering Defendants liable to Plaintiffs for their damages arising from such harm.

396.    The unsafe, volatility, inherent danger and unfitness of Defendants' products were a proximate cause of Plaintiffs' damages.

397.    Plaintiffs are people whom Defendants would reasonably have expected to be affected by their unsafe, dangerous, volatile and inherently dangerous dicamba-tolerant crop system.

## COUNT V - BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

398.   Plaintiffs re-allege and incorporate each paragraph above word-for-word as if fully stated herein.

399.   A seller impliedly warrants that a product is merchantable at the time the product is sold. To be merchantable, a product must be fit for the ordinary purposes for which the product is used, and the product must be adequately labeled and must conform to any promises or affirmations of fact made on the container or label.

400.   Each of the Plaintiffs has sustained damage due to exposure to Defendants unsafe, defective, volatile and inherently dangerous dicamba-tolerant crop system.

401.   Defendants sold dicamba-tolerant crop systems, which were not merchantable in that the product as designed, formulated, and labeled posed an unsafe and inherent risk to crops being grown in the region.

402.   The unfitness of Defendants' products was a proximate cause of Plaintiffs' damages. Plaintiffs are people whom Defendants would reasonably have expected to be affected by Defendants unsafe, defective, volatile, and inherently dangerous dicamba-tolerant crop system.

## COUNT VI – FRAUDULENT CONCEALMENT

403.   Plaintiffs re-allege and incorporate each paragraph above word-for-word as if fully stated herein.

404.   Before Defendants sold dicamba seeds, Engenia herbicide and their dicamba-tolerant crop system, and during the entire time of the sale, Defendants knew the inherently, unreasonable risks to third parties of herbicide spraying on neighboring non-dicamba tolerant crops and crop fields. Further, Defendants were aware that by selling their dicamba-tolerant crop

system, they were creating a situation in which their volatile herbicide would create imminent risk and harm to non-dicamba tolerant crops, thus, creating serious harm and financial ruin.

405.     Defendants misled Arkansas farmers by representing dicamba-based herbicides are safe and provide safety to nearby crops when used for in-crop, over-the-top use. However, put simply, there is no safe way to apply Engenia or any type of dicamba herbicide over-the-top without causing collateral damage to nearby crops that are not dicamba-tolerant.

406.     Farmers relied on Defendants to produce a safe and approved, corresponding herbicide that would be sold on the market in Arkansas.

407.     Defendants were long aware and on notice of the damages that would result to third parties because of their unsafe, defective, inherently dangerous, hazardous and volatile crop system, yet despite this knowledge Defendants rushed their products to the marketplace knowing of the imminent harm Plaintiffs, and others similarly situated, faced with the introduction of their dangerous products to the marketplace.

408.     Moreover, despite the knowledge that its dicamba-tolerant crop products would cause imminent harm, Defendants affirmatively concealed these facts from farmers, federal and state regulatory bodies, farming associations, legislative bodies, the general public, and the Plaintiffs.

409.     The groups from which Defendants concealed these facts were unaware of the facts. Defendants also represented the safety of their products while knowing and suppressing the truth of the inherent volatility of their product and imminent danger to crops that were not tolerant to dicamba.

410.     The concealed information was material to all the groups described above.

411.    Defendants knew of the groups' ignorance of the truth and intentionally withheld the truth about dicamba-tolerant seeds, Engenia herbicide and their crop products' imminent risks to neighboring crops when released into the marketplace.

412.    As a result of the concealment of these facts, farmers purchased dicamba seeds and sprayed dicamba-containing herbicide, regulatory and legislative bodies were unable to protect the public, and Plaintiffs were harmed.

## COUNT VII - EXPRESS WARRANTY

413.    Plaintiffs re-allege and incorporate each paragraph above word-for-word as if fully stated herein.

414.    At all relevant times, Defendants engaged in the business of creating, testing, developing, designing, manufacturing, marketing, advertising, promoting, selling, wholesaling, distributing and representing its dicamba-tolerant crop products, which are unsafe, hazardous, defective and unreasonably dangerous to purchasers, consumers, end-users and persons reasonably expected to be affected, including Plaintiffs, thereby placing dicamba-tolerant crop products into the stream of commerce. These actions were under Defendants' ultimate direction, control and supervision.

415.    Defendants expressly and impliedly represented, warranted and made assurances to the general public, purchasers, consumers, end-users and persons reasonably expected to be affected of the safety of its dicamba-tolerant crop system, including Engenia® and dicamba-tolerant seeds, by and through statements made in labels, publications, package inserts, and other written materials intended for purchasers and public to induce reliance and generate interest in and mass sales of its products and control the overall market for a general purpose herbicide and herbicide that is formulated with genetically-modified seeds.

416.     Defendants made affirmative warranties, representations, assurances and guarantees of safety for human health and the environment, that its dicamba-tolerant crop products were effective for herbicide control, were safe and proper for their intended use and would not cause harm to crops. Defendants made these affirmative warranties, representations, assurances and guarantees of safety for human health while knowing that its dicamba-tolerant crop products could cause extensive harm and injury to non-dicamba-tolerant crops, fruits and nuts.

417.     Moreover, Defendants engaged in an aggressive and active campaign to suppress and conceal the harmful facts from the public so that its overall warranties, representations, assurances and guarantees of safety could generate a message to the public and purchasers that the dicamba-tolerant crop system was, in essence, a new, revolutionary, miracle type of herbicide that consumers and purchasers would feel compelled to purchase, but, not knowing that the herbicide was volatile and would harm non-dicamba-tolerant crops.

418.     Defendants' express and implied warranties including those made directly through their company and representatives, included false, deceptive and incomplete warnings and instructions that purport, but deceptively fail, to include the complete array of risks associated with use of and/or exposure to dicamba. Defendants knew that risks expressly included in their products warning labels did not and do not accurately or adequately set forth the risks of developing the serious and permanent injuries to crops directly experienced by Plaintiffs and others in the public.

419.     Defendants aggressively campaigned to market, promote, advertise and warrant its dicamba-tolerant crop system products as safe and effective for the public as a general purpose agricultural herbicide, particularly when paired with dicamba resistant seeds. These representations, warranties and assurances about the dicamba-tolerant products contained or constituted affirmations of material fact or promises made by Defendants to the buyer and general

public, which related to the goods and became part of the basis of the bargain, creating an express and implied warranty that the goods would conform to the representations, be safe for their intended purpose, and not cause serious and permanent harm to non-dicamba-tolerant crops.

420. Defendants placed its dicamba seeds and Engenia® products into the stream of commerce for sale and recommended their use to consumers and purchasers and the general public without adequately warning of and disclosing the true risks and dangers associated with exposure to the new formulations of dicamba used for GMO dicamba-tolerant crop seeds.

421. Defendants breached these warranties because, among other things, its dicamba-tolerant crop system, including Engenia®, was unsafe, hazardous, dangerous, unfit and unsafe for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose.

422. Defendants publicly represented that its dicamba-tolerant crop products were safe for use and made affirmative, fraudulent, misleading and deceptive statements to conceal the dangers and risks associated with their crop products and known to exist. However, as part of its overall scheme to conceal and hide this negative information about its herbicide products, Defendants fraudulently concealed the information from people to hide and cover up the risk of harm to non-dicamba-tolerant crops.

423. Defendants knew that the active ingredient in dicamba was harmful to non-dicamba-tolerant crops and due to the massive increase in the use of dicamba because of the aggressive, marketing, promotion and advertising campaign, and precluded safer alternatives from entering the marketplace.

424. Defendants also knew that there is no herbicide formulation available to reduce the volatility in dicamba. Defendants knew that the herbicide would be ineffective if the formula was reduced to a point where it is not volatile.

425. Defendants violated ordinary care and prudent corporate behavior and responsibility through its labeling, advertising, marketing, promotion, representations, assurances and warranties that its dicamba-tolerant crop producers were safe and fraudulently withheld, suppressed, omitted and concealed information about the risks of serious and permanent injury to crops associated with use of and/or exposure to dicamba formulations by expressly limiting the risks and hazards associated with use and/or exposure within its warning and labels.

426. Defendants had sole access to material facts and information concerning the nature of the risk and hazards associated with its dicamba-tolerant crop products. Defendants knew that purchasers, consumers and the general public would rely on labeling, advertising, marketing, promotion, its representations, assurances and warranties that its herbicides and dicamba-tolerant crop system was safe for its intended use and would not harm nearby neighbor's crops.

427. Defendants knew through its superior knowledge and dominant and superior position in the marketplace that it could conceal, hide, suppress and cover-up the facts, data and research about its dicamba-tolerant crop products. Therefore, in an effort to maximize its revenue, Defendants took affirmative steps to engage in such massive cover-up through the science and research of the dicamba-tolerant crop products and through regulatory agencies. Monsanto had knowledge that its labels and information were inadequate, inaccurate and false, yet perpetuated this suppression and concealment campaign to hide the truth from the general public, consumers and affected persons about the dangers associated with its dicamba-tolerant crop products.

428.    Plaintiffs are affected persons who had no knowledge of the falsity, fraud or incompleteness of Defendants' statements, representations, assurances and warranties concerning dicamba-tolerant crop products, Engenia® and the dicamb-tolerant crop system's safety and safety to nearby crops.

429.    Plaintiffs' crops were exposed to Defendants' dicamba products, and Defendants knew they would be exposed by their research, development, design, testing, formulation, manufacture, inspection, labeling, distribution, packaging, marketing, promotion, advertising, public representation, assurances and warranties made directly to the Plaintiffs and released into Arkansas, Missouri, Mississippi, the fifty states, the general marketplace and stream of commerce by Defendants.

430.    Defendants could have prevented the serious imminent harm suffered by Plaintiffs if (1) Defendants not engaged in a massive world-wide and campaign in the United States, including Arkansas, Mississippi and Missouri, to hide, conceal, omit and suppress the truth of the dangers and risks associated with its herbicide products and dicamba-tolerant crop system, and (2) had Defendants made truthful representations, warranties, assurances and statements of fact about the dangers associated with the use of and exposure to its herbicide products and dicamba-tolerant crop system.

431.    Defendants breached their express warranties to the Plaintiffs and implied warranties to Plaintiffs in that their dicamba-tolerant crop products were not of merchantable quality, safe, or fit for their intended use.  Defendants' dicamba-tolerant crop products have inherent, unsafe, hazardous, volatile and dangerous propensities, which directly resulted in and caused serious and permanent harm and injury to Plaintiffs' crops, which would not have occurred, but for the unsafe products and but for Defendants' statements, representations, warranties,

assurances and guarantees that its products conform to and are a safe product for public use and would not harm nearby crops.

432.    Defendants knew the dicamba-tolerant crop products would not conform to any label because Defendants hid, concealed and suppressed the truth about the danger of its products and made false representations of material fact directly resulting in and causing harm to the Plaintiffs for which Plaintiffs seek remedy under breach of express and implied warranties.

433.    Plaintiffs have provided notice by federal express and certified mail to Defendants of their breach of warranty claims prior to serving this lawsuit.

## **COUNT VIII – FRAUD**

434.    Plaintiffs re-allege and incorporate each paragraph above word-for-word as if fully stated herein.

435.    Defendants made a false representation of material fact when they represented, advertised and promoted the sale and use of dicamba seeds as a higher-yielding and safe soybean seed and that dicamba-tolerant crop system was safe for neighboring crops.

436.    Defendants made a false representation of material fact when they represented, advertised and promoted the use of dicamba seeds, knowing the dicamba-containing herbicide used in conjunction with the seeds would harm any crops that were not dicamba-resistant.

437.    Defendants made a false representation of material fact when they represented, advertised and promoted the sale and use of dicamba seeds for a higher yield, with the knowledge that the seeds would not produce a higher yield and that dicamba-containing herbicides were not safe for neighboring crops.

438.     Defendants made a false representation of material fact when they secretly promoted the use of dicamba-containing herbicide with the knowledge that it had not been approved by the EPA.

439.     Defendants made a false representation of material fact when they secretly promoted the use of dicamba-containing herbicide to farmers with the knowledge (1) that the herbicide was not approved by the Arkansas Plant Board for use in Arkansas and (2) that the herbicide approved by the Arkansas Plant Board's new formulation was unsafe, inherently dangerous, hazardous, defective and volatile for neighboring crops.

440.     The Plaintiffs, and others similarly situated, justifiably relied upon Defendants' misrepresentations.

441.     Defendants' misrepresentations substantially influenced the farmers to implement the Defendants' dicamba-tolerant crop system.

442.     The Plaintiffs' justifiable reliance on the misrepresentations by Defendants and the distributors resulted in damages to valuable property and monetary damages.

443.     The Plaintiffs spent more money implementing a dangerous crop system that did not produce a higher yield of crops, resulting in monetary damages.

444.     The misrepresentations, which amount to misrepresentation, fraud, deception and deceit, has resulted in detriment and damages to both the farmers who planted the seeds and unsuspecting third-party farmers who did not implement the Defendants' dicamba-tolerant crop system.

### COUNT IX – UNJUST ENRICHMENT

445.     Plaintiffs re-allege and incorporate each paragraph above word-for-word as if fully stated herein.

446. As a result of their illegal, deceptive, and tortious actions, Defendants have been enriched through the sale of dicamba seeds and Engenia® herbicide products.

447. By manipulating the public and marketing a product it knew to be unsafe for non-dicamba-resistant crops, Defendants chose to enrich themselves knowing such enrichment would result in the direct destruction of valuable property, including Plaintiffs'.

448. Defendants forced third parties to serve as an involuntary experimental testing ground for its new products. Defendants have enriched themselves by knowingly destroying the crops of innocent third parties, including Plaintiffs with unlawful gain based upon false, fraudulent and deceptive representations and trade practices to the harm and detriment of others.

449. Upon information and belief, Defendants have unfairly and unjustly benefited and retained hundreds of millions in profits from the negligent and premature sale of dicamba seeds and its corresponding dicamba-based herbicide, Engenia®, as a direct result of Defendants' unlawful and wrongful actions.

450. Defendants knew their products were prematurely released, not fully tested as to their inherent volatility and danger and knew they would reap profits at the expense of farmers and crop growers, such as Plaintiffs who did not purchase their products and would be damaged by the inherently volatile nature of their crop-system.

451. The acceptance and retention of these profits is unjust because the profits are a direct benefit to Defendants as a result of their unlawful tortious conduct resulting in money had and gained by Defendants while damaging and causing detrimental and unjust harm to Plaintiffs where equity and good conscience would require restitution and disgorgement.

452.     Defendants should pay and make restitution for damage experienced by Plaintiffs and be ordered to disgorge all unjust enrichment it has received to date and will receive for the next five (5) years from all sale of their dicamba-tolerant seed and herbicide products.

## COUNT X – CIVIL CONSPIRACY

453.     Plaintiffs re-allege and incorporate each paragraph above word-for-word as if fully stated herein.

454.     Defendants, in an unlawful, fraudulent, deceptive scheme and device to improperly market and expand the sales of its defective dicamba-tolerant crop system, conspired to place unsafe, defective, inherently dangerous, hazardous and volatile herbicides on the marketplace with GMO seeds that were dicamba-tolerant when Defendants knew that nearby neighboring crops which were not dicamba-tolerant would be harmed, injured or wiped out, causing financial harm and forcing those farmers to buy their dicamba-tolerant crop system to avoid crop failure and financial ruin.

455.     The object of the unlawful conspiracy and agreement was the unlawful marketing of Defendants' defective dicamba-tolerant crop system, the protection of its dicamba seeds and crops through the illegal spraying of dicamba-containing herbicides on those seeds and crops and a proliferation of its dicamba seeds through marketing to corner the market for genetically modified soybeans and cotton such that farmers in Arkansas would have no choice but to purchase Monsanto's dicamba seeds or risk destruction to their non-dicamba tolerant crops.

456.     Defendants, through their agents and representatives, encouraged and directed its purchasers to spray dicamba-based herbicides on the dicamba-tolerant seeds even though Defendants knew the volatile dicamba herbicide would drift to nearby crops and injure the crops.

457. Defendants' scheme to sell more dicamba seeds and dicamba-based herbicides by harming those farmers that did not originally purchase the dicamba-resistant seeds caused severe, imminent and irreversible harm to the Plaintiffs' land, crops, and livelihoods.

458. Defendants' unlawful and wrongful actions resulted in extensive damages to Plaintiffs for which the Defendants should be held liable.

## COUNT XI – TRESPASS

459. Plaintiffs re-allege and incorporate each paragraph above word-for-word as if fully stated herein.

460. Monsanto and BASF intentionally designed, developed, promoted, marketed and sold a genetically engineered trait for soybean and cotton for and with the express purpose of allowing and encouraging others to spray dicamba herbicide over the top of crops grown from seed containing that trait.

461. Monsanto and BASF intentionally and aggressively promoted and encouraged in-crop use of dicamba herbicide, including Engenia, as part of the Xtend Crop System with dicamba-resistant seed.

462. Monsanto and BASF or Monsanto, for itself and as agent for BASF, intentionally sold the dicamba-resistant trait and seed containing that trait, directly and through others, into areas they knew were planted with non-resistant crops highly sensitive to dicamba and with knowledge not only that dicamba would be sprayed over the top of emerging resistant crops, but that dicamba had and would move off target onto the land and growing crops without permission of rightful owners and possessors, including Plaintiffs.

463.     Whether by volatilization and/or drift, dicamba particles entered and were deposited upon property (including land and crops) of which Plaintiffs have possession and without their permission.

464.     Monsanto and BASF knew that such invasion would, to a substantial degree of certainty, result from their acts, and such invasion was caused by them.

465.     In addition, Monsanto and BASF promoted, aided, abetted, assisted, and contributed to the commission of a trespass.

466.     Monsanto and BASF intended such invasion, which benefitted them both by increasing demand for seed containing the dicamba-resistant trait through fear of injury to non-dicamba resistant plants and crops, which also encouraged use of dicamba herbicides.

467.     Such invasion interfered with Plaintiffs' right of possession and caused substantial damage to their property.

468.     As a direct and proximate result, Plaintiffs were damaged.

469.     Monsanto and BASF each knew or ought to have known, in light of the surrounding circumstances, that its conduct would naturally or probably result in injury and continued such conduct in reckless disregard of the consequences. Punitive damages thus are warranted.

**PUNITIVE DAMAGES**

470.     Plaintiffs re-allege and incorporate each paragraph above word-for-word as if fully stated herein.

471.     Defendants knew or should have known that their products are unsafe, volatile, defective, inherently dangerous and misbranded. Defendants knew or should have known that: (a) dicamba-containing products have a propensity to drift great distances in minute amounts, (b) that dicamba is severely phytotoxic to non-target crops, (c) that non-target are grown in the same

vicinity in northeastern Arkansas as dicamba seeds, and (d) that dicamba has caused damage to crops in northeastern Arkansas in the past. Despite this knowledge, each Defendant continued to manufacture, market, sell, supply, and distribute dicamba seeds, which constitutes a conscious disregard for the welfare of others and their property, from which malice and wanton or reckless disregard for public safety can be inferred.

472.    Defendants' campaign to market and rapidly commercialize the dicamba-tolerant crop system, including Engenia®, and other herbicides, was premised on its ability to influence data, omit information, direct and control data and information disseminated or not disseminated about the dicamba-tolerant crop system dangers and hazards to nearby non-dicamba tolerant crops. Defendants knowingly suppressed, concealed and omitted from the public the truth about the dangers and hazards of its herbicide products to non-dicamba tolerant crops. However, knowing that its herbicide and dicamba-tolerant crop products were unsafe and volatile to nearby crops, Defendants intentionally pursued a course and pattern of corporate conduct where it knew, or ought to have known, in light of the evidence and surrounding circumstances, that it was going to conceal, suppress and omit material information about the danger to humans its products, in order to reach billions in sales and control the marketplace for dicamba-based herbicide for their dicamba seeds. Defendants deliberately and consciously chose billions in profits over the safety and financial well-being of farmers who did not buy dicamba-tolerant crops.

## JURY TRIAL DEMANDED

473.    Plaintiffs respectfully demand a trial by jury on all issues so triable.

## DEMAND FOR JUDGMENT

WHEREFORE, Plaintiffs respectfully demand judgment from Defendants, jointly and severally, for: (a) all monetary and compensatory relief to which they are entitled and will be

entitled at the time of trial; (b) punitive damages; (c) attorneys' fees; (d) prejudgment and post-

judgment interest at the maximum rates allowed by law; (e) all allowable costs of this action; and

(f) such other and further relief as appropriate, just and proper.

Respectfully submitted,

By: _____

Paul Byrd, ABN #85020
Joseph Gates, ABN #2010239
**Paul Byrd Law Firm, PLLC**
415 N. McKinley St. Suite 210
Little Rock, Arkansas 72205
Telephone: 501-420-3050
Facsimile: 501-420-3128
paul@paulbyrdlawfirm.com
joseph@paulbyrdlawfirm.com

-and-

Jerry Kelly, ABN #84085
**Kelly Law Firm, P.A.**
P.O. Box 500
Lonoke, AR 72086
Telephone: 501-676-5770
jkelly@kellylawfirm.net

3:19-CV-00-257-DPM

JS 44 (Rev. 09/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Bradley Wallace et al

**(b)** County of Residence of First Listed Plaintiff    Craighead County, AR
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Joseph Gates, Paul Byrd Law Firm, PLLC, 415 N. McKinley St, Ste 210, Little Rock, AR 72205, 501-420-3050

## DEFENDANTS

Monsanto Company et al

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

❒ 1   U.S. Government
       Plaintiff

❒ 2   U.S. Government
       Defendant

❒ 3   Federal Question
       *(U.S. Government Not a Party)*

☒ 4   Diversity
       *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*            *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ❒ 1 | Incorporated *or* Principal Place of Business In This State | ❒ 4 | ❒ 4 |
| Citizen of Another State | ❒ 2 | ❒ 2 | Incorporated *and* Principal Place of Business In Another State | ❒ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ❒ 3 | ❒ 3 | Foreign Nation | ❒ 6 | ❒ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❒ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❒ 625 Drug Related Seizure | ❒ 422 Appeal 28 USC 158 | ❒ 375 False Claims Act |
| ❒ 120 Marine | ❒ 310 Airplane | ❒ 365 Personal Injury - |    of Property 21 USC 881 | ❒ 423 Withdrawal | ❒ 376 Qui Tam (31 USC |
| ❒ 130 Miller Act | ❒ 315 Airplane Product |    Product Liability | ❒ 690 Other |    28 USC 157 |    3729(a)) |
| ❒ 140 Negotiable Instrument |    Liability | ❒ 367 Health Care/ | | | ❒ 400 State Reapportionment |
| ❒ 150 Recovery of Overpayment | ❒ 320 Assault, Libel & |    Pharmaceutical | | **PROPERTY RIGHTS** | ❒ 410 Antitrust |
|    & Enforcement of Judgment |    Slander |    Personal Injury | | ❒ 820 Copyrights | ❒ 430 Banks and Banking |
| ❒ 151 Medicare Act | ❒ 330 Federal Employers' |    Product Liability | | ❒ 830 Patent | ❒ 450 Commerce |
| ❒ 152 Recovery of Defaulted |    Liability | ❒ 368 Asbestos Personal | | ❒ 835 Patent - Abbreviated | ❒ 460 Deportation |
|    Student Loans | ❒ 340 Marine |    Injury Product | |    New Drug Application | ❒ 470 Racketeer Influenced and |
|    (Excludes Veterans) | ❒ 345 Marine Product |    Liability | | ❒ 840 Trademark |    Corrupt Organizations |
| ❒ 153 Recovery of Overpayment |    Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ❒ 480 Consumer Credit |
|    of Veteran's Benefits | ❒ 350 Motor Vehicle | ❒ 370 Other Fraud | ❒ 710 Fair Labor Standards | ❒ 861 HIA (1395ff) |    (15 USC 1681 or 1692) |
| ❒ 160 Stockholders' Suits | ❒ 355 Motor Vehicle | ❒ 371 Truth in Lending |    Act | ❒ 862 Black Lung (923) | ❒ 485 Telephone Consumer |
| ❒ 190 Other Contract |    Product Liability | ❒ 380 Other Personal | ❒ 720 Labor/Management | ❒ 863 DIWC/DIWW (405(g)) |    Protection Act |
| ❒ 195 Contract Product Liability | ❒ 360 Other Personal |    Property Damage |    Relations | ❒ 864 SSID Title XVI | ❒ 490 Cable/Sat TV |
| ❒ 196 Franchise |    Injury | ☒ 385 Property Damage | ❒ 740 Railway Labor Act | ❒ 865 RSI (405(g)) | ❒ 850 Securities/Commodities/ |
| | ❒ 362 Personal Injury - |    Product Liability | ❒ 751 Family and Medical | |    Exchange |
| |    Medical Malpractice | |    Leave Act | | ❒ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❒ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ❒ 891 Agricultural Acts |
| ❒ 210 Land Condemnation | ❒ 440 Other Civil Rights | **Habeas Corpus:** | ❒ 791 Employee Retirement | ❒ 870 Taxes (U.S. Plaintiff | ❒ 893 Environmental Matters |
| ❒ 220 Foreclosure | ❒ 441 Voting | ❒ 463 Alien Detainee |    Income Security Act |    or Defendant) | ❒ 895 Freedom of Information |
| ❒ 230 Rent Lease & Ejectment | ❒ 442 Employment | ❒ 510 Motions to Vacate | | ❒ 871 IRS—Third Party |    Act |
| ❒ 240 Torts to Land | ❒ 443 Housing/ |    Sentence | |    26 USC 7609 | ❒ 896 Arbitration |
| ❒ 245 Tort Product Liability |    Accommodations | ❒ 530 General | | | ❒ 899 Administrative Procedure |
| ❒ 290 All Other Real Property | ❒ 445 Amer. w/Disabilities - | ❒ 535 Death Penalty | **IMMIGRATION** | |    Act/Review or Appeal of |
| |    Employment | **Other:** | ❒ 462 Naturalization Application | |    Agency Decision |
| | ❒ 446 Amer. w/Disabilities - | ❒ 540 Mandamus & Other | ❒ 465 Other Immigration | | ❒ 950 Constitutionality of |
| |    Other | ❒ 550 Civil Rights |    Actions | |    State Statutes |
| | ❒ 448 Education | ❒ 555 Prison Condition | | | |
| | | ❒ 560 Civil Detainee - | | | |
| | |    Conditions of | | | |
| | |    Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1   Original
      Proceeding

❒ 2   Removed from
      State Court

❒ 3   Remanded from
      Appellate Court

❒ 4   Reinstated or
      Reopened

❒ 5   Transferred from
      Another District
      *(specify)*

❒ 6   Multidistrict
      Litigation -
      Transfer

❒ 8   Multidistrict
      Litigation -
      Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USC 1332

Brief description of cause:
Property damage from dicamba herbicides

## VII. REQUESTED IN COMPLAINT:

❒   CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☒ Yes   ❒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____    DOCKET NUMBER _____

DATE
09/20/2019

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____