## U.S. District Court
## SOUTHERN DISTRICT OF ALABAMA (Selma)
## CIVIL DOCKET FOR CASE #: 2:19–cv–00707–KD–N

Moore v. Monsanto Company et al
Assigned to: Chief Judge Kristi K. DuBose
Referred to: Magistrate Judge Katherine P. Nelson
Cause: 28:1332 Diversity Action

Date Filed: 09/25/2019
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod.
Liability
Jurisdiction: Diversity

**Plaintiff**

| | | |
|---|---|---|
| **John Thomas Moore, Jr.** | represented by | **John Everett Tomlinson** |

**John Thomas Moore, Jr.**   represented by   **John Everett Tomlinson**
Beasley, Allen, Crow, Methvin,
Portis & Miles, P.C.
P.O. Box 4160
Montgomery, AL 36103–4160
334–269–2343
Email: john.tomlinson@beasleyallen.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jere L. Beasley**
Beasley, Allen, Crow, Methvin,
Portis & Miles, P.C.
P.O. Box 4160
Montgomery, AL 36103–4160
334–269–2343
Email: kathy.eckermann@beasleyallen.com
*ATTORNEY TO BE NOTICED*

**LaBarron N. Boone**
Beasley, Allen, Crow, Methvin,
Portis & Miles, P.C.
218 Commerce Street
Montgomery, AL 36104
334–495–1689
Email: labarron.boone@beasleyallen.com
*ATTORNEY TO BE NOTICED*

**Rhon E. Jones**
Beasley, Allen, Crow, Methvin,
Portis & Miles, P.C.
P.O. Box 4160
Montgomery, AL 36103–4160
334–269–2343
Email: rhon.jones@beasleyallen.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**   represented by   **Halron W. Turner**
Turner, Onderdonk, Kimbrough & Howell
P.O. Box 1389
13212 West Central Avenue
Chatom, AL 36518–1389
(251) 847–2237
Fax: 2518473115
Email: hwt@tokh.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Central Alabama Farmers
Cooperative, Inc.**

represented by **Stanley Dagnal Rowe , Jr.**
100 Washington St., Suite 200
Huntsville, AL 35801
256–533–0202
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Helena Agri–Enterprises, LLC.**

represented by **Jacqueline (Jana) Russell Garner**
101 Church Street
Selma, Al 36701
334–875–7236
Email: janagarner@hotmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 09/25/2019 | 1 | NOTICE by Monsanto Company *of Removal* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3) (Turner, Halron) (Entered: 09/25/2019) |

ELECTRONICALLY FILED
2/15/2019 10:18 AM
27-CV-2018-900242.00
CIRCUIT COURT OF
DALLAS COUNTY, ALABAMA
LYNNETHIA ROBINSON, CLERK

## IN THE CIRCUIT COURT OF DALLAS COUNTY, ALABAMA

| | |
|---|---|
| **JOHN THOMAS MOORE, JR.** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case Action No:18-900242** |
| | ) |
| **MONSANTO COMPANY, a corporation;** | ) |
| **HELENA AGRI-ENTERPRISES, LLC, a** | ) **JURY TRIAL DEMANDED** |
| **Limited liability corporation; CENTRAL** | ) |
| **ALABAMA FARMERS COOPERATIVE,** | ) |
| **INC., a corporation;** | ) |
| | ) |
| **Defendants.** | ) |

## FIRST AMENDED COMPLAINT

Plaintiff John Thomas Moore, Jr., by and through counsel, complains as follows:

## INTRODUCTION
## PARTIES

1.    Plaintiff is an Alabama citizen over the age of nineteen.

2.    Defendants Monsanto Company is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri. Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®, which contains the active ingredient glyphosate and the surfactant POEA, as well as adjuvants and other "inert" ingredients.

3.      Defendants Helena Agri-Enterprises, LLC, is a limited liability company located in Dallas County, Alabama. Defendant Helena Agri-Enterprises, LLC (sometimes hereinafter referred to as "Helena") markets itself as one of the foremost agronomic solutions providers in the United States. Helena advertises that it markets and sells inputs that improve agricultural productivity for greater customer returns, this includes seed and seed treatments, fertilizer and application services, crop protectants, financial services and precision ag services. Helena also has its own line of products which includes adjuvants, crop protection products, fertilizers, crop production products and seed treatments.

4.      Defendants Central Alabama Farmers Cooperative, Inc., is an Alabama corporation with a location in Dallas County, Alabama.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this matter as Plaintiff's purchase of and exposure to the subject Roundup® products took place in Dallas County, Alabama.

6.      Defendants Monsanto Company ("Monsanto") maintains sufficient contacts with the State of Alabama that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

7.      Defendants Central Alabama Farmers Co-Op, Inc. (sometimes herein referred to as the "Co-Op") is an Alabama corporation with a location in Dallas County, Alabama.

8.     Defendants Helena Agri-Enterprises, LLC ("Helena") ran and continues to operate a location in Dallas County, Alabama.

9.     Venue is proper within this Court because the purchase of and exposure to the Roundup® complained of herein took place in Dallas County, Alabama.

## FACTS

10.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

11.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking or brewing grains.

12.     For nearly forty years, farms across the world have used Roundup® without knowledge of the dangers its use poses. That is because when Monsanto first introduced Roundup® it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup® - glyphosate – is a probable cause of cancer. Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto has championed falsified data and has attacked legitimate studies that

3

revealed Roundup®'s dangers. Monsanto has led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® is safe.

13.     The herbicidal properties of glyphosate were discovered by Monsanto in 1970 through chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. Monsanto marketed it as a "safe" general purpose herbicide for widespread commercial and consumer use. It still markets it as safe today.

14.     In addition to the active ingredient glyphosate, Roundup® formulations also contain adjuvants and other chemicals, such as the POEA, which are considered "inert" and therefore protected as "trade secrets" in manufacturing. Growing evidence suggests that these adjuvants and additional components of Roundup® formulations are not, in fact, inert and are toxic in their own right.

15.     The manufacture, formulation and distribution of herbicides such as Roundup®, are regulated under the FIFRA, 7 U.S.C. 136 et seq. FIFRA requires that all pesticides be registered with the EPA prior to their distribution, sale or use except as described by the FIFRA.

16.     Because pesticides are toxic to plants, animals and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential exposure to pesticides, toxicity to people and

other potential non-target organisms and other adverse effects on the environment. Registration by the EPA, however is not an assurance or finding of safety.

17.     Based on early studies showing that glyphosate could cause cancer in lab animals, the EPA originally classified glyphosate as possibly carcinogenic to humans in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances.

18.     On two occasions, the EPA found that the labs hired by Monsanto to test the toxicity of Roundup® products for registration purposes committed fraud.

19.     In the first instance, Monsanto hired Industrial Bio-Test Laboratories (IBT) to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

20.     In 1976, the FDA performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of

5

glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

21.    Three top executives of IBT were convicted of fraud in 1983.

22.    In the second incident of data falsification, Monsanto hired Craven Labs in 1991 to perform pesticide and herbicide studies including for Roundup®. In that same year, the owner of Craven Labs and three of its employees were indicated, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

23.    Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

24.    The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

25.   In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup even further, by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70 percent of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market thought a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

26.   Through a three pronged strategy of increasing production, decreasing prices, and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, it accounted for $2.8 billion in sales, outselling other herbicides by a margin of five to one. Today, glyphosate remains one of the world's largest herbicides by sales volume.

27.   In 1996, the New York Attorney General filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Some of the comments upon which the suit was based included: "safer than table salt", "practically non-toxic", "environmentally friendly", "stays where you apply it",

"safety margin is much greater than required.", "you can feel good about using herbicides by Monsanto", and "can be used where kids and pets play".

28.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with the New York Attorney General in which Monsanto agreed, among other things, to stop publishing advertisements in New York that represent directly or by implication that the product was safe, non-toxic, harmless and risk-free.

29.    Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and believe, it still has not done so today.

30.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup® as biodegradable and that it left the soil clean.

31.    In addition to the toxicity of the active ingredient glyphosate several studies support the theory that the glyphosate-based formulation in Roundup® products is more dangerous and toxic than glyphosate alone. Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.

32.    Results of studies conducted in 2002 and 2004 by Julie Marc, and studies by Francisco Pexoto, Benachour, and Seralini all confirmed that the adjuvants present

in Roundup® are not in fact inert and that Roundup® is potentially far more toxic than its active ingredient glyphosate alone. Results of these studies were at all times available to Defendants. Defendants thus knew or should have known that Roundup® is more toxic than glyphosate alone and that safety studies of Roundup®, Roundup®'s adjuvants and "inert" ingredients and/or the surfactant POEA were necessary to protect Plaintiff from Roundup®.

33.     Several countries have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides.

34.     Plaintiff is fifty-three years old. From 1981 to approximately 1986 and again from 1989 and 1990, worked as a crop farm worker on his family farm located in Dallas County, Alabama. He used Roundup® regularly during this entire time on crops including cotton, soil beans and corn. He has continued to use Roundup® to treat patios and flower beds at his home.

35.     Specifically, he mixed and applied Roundup® on the subject crops located in Dallas County, Alabama by and through the assistance of Defendants Helena Agri-Enterprises, LLC and Central Alabama Farmers Co-Op.

36.     He purchased the Roundup® from Defendants Helena Agri-Enterprises, LLC and Central Alabama Farmers Coop who also had access to the safety studies and information described herein and who exercised substantial control over the design, application, use, marketing, distributing and mixing of the Roundup®. Defendants

Helena Agri-Enterprises, LLC and Central Alabama Farmers Coop provided Plaintiff instructions and assisted Plaintiff with the usage, handling, mixing, applying, and spreading of Roundup® and in doing so provided Plaintiff assurances of the safety of Roundup®. Defendants Helena Agri-Enterprises, LLC and Central Alabama Farmers Coop, along with Defendant Monsanto never provided any warning that Roundup® or Helena's own products provided to Plaintiff which included the ingredient glyphosate were injurious to Plaintiff's health, did not recommend safety gear, did not provide nor sell to Plaintiff protective gear and did not provide, recommend or sale to Plaintiff applicators, sprayers or other equipment or products which would have provided less exposure to Plaintiff to glyphosate.

37.    All three of these Defendants worked in concert with each other.

38.    All three of these Defendants worked together to promote the sale and distribution of the Roundup product and to conceal the fact that it was a true carinogenic.

39.    The local Defendants Co-Op and Helena undertook to select for Moore the product to be used. These Defendants had the opportunity to inspect and the superior knowledge of the product to that of Moore. The subject product was not displayed or sold in such a way to notify Moore that the Roundup was a carcinogenic and a hazardous substance that could and more than likely would lead to Non-Hodgkin's Lymphoma which Moore now suffers. Moore has stage 4 Non-Hodgkin's

Lymphoma due to his exposure to Roundup as manufactured, designed, advertised, sold, distributed and provided by these Defendants.

40.    Because Plaintiff did not know that Roundup® was injurious to his health and/or to the health of others Plaintiff did not wear any protective gear while mixing or applying Roundup® and used the Roundup® in the manner recommended by the Defendants. From the Defendants, Co-Op and Helena, who selected the product for Moore and gave him further instructions for using the same did not suggest that he should wear such gear. Defendant Monsanto did not recommend that such be worn. All three of these Defendants' knowledge of the fact the product caused cancer of the type now debilitating Moore's life was far superior to that of Moore and despite their knowledge did not revealed these crucial facts to Moore. These Defendants worked together all for their own betterment. They were all financially rewarded by the selling of the Roundup and all had vested interest in it being sold without warning of its hazardous components.

41.    On September 26, 2017, Plaintiff was diagnosed with Stage 4 Follicular Non-Hodgkin's Lymphoma.

42.    During the entire time that Plaintiff was exposed to Roundup® he did not know that exposure was injurious to his health or the health of others.

43.    Plaintiff had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup® and glyphosate until well after IARC

11

released its formal assessment of glyphosate in July 2015. This is the quintessential case for tolling.

44.     Within the time period of any applicable statute of limitations, Plaintiff could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup® and glyphosate is injurious to human health.

45.     Plaintiff did not discover, and did not know of facts that would cause a reasonable person to suspect the risks associated with the use of and/or exposure to Roundup® and glyphosate; nor would a reasonable and diligent investigation by him have disclosed that Roundup® and glyphosate would cause his illness.

46.     For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff's claims.

47.     All applicable statutes of limitations have also been tolled by Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

48.     Instead of disclosing critical safety information about Roundup® and glyphosate, Defendants have consistently and falsely represented the safety of their Roundup® products.

49.     Defendants were under a continuous duty to disclose to consumers, users and other persons coming into contact with its products, including Plaintiff, accurate

safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate.

50.    Instead, Defendants knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

51.    Defendants each worked in concert with the other to promote the sale and distribution of the Roundup and to downplay, hide and disguise the cancer causing component contained therein.

52.    Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

53.    The defendants, Co-Op and Helena sold Plaintiff the subject Roundup. These defendants, along with Defendant Monsanto, all had significantly greater knowledge of the product than did the consuming public, including Plaintiff, by virtue of the fact that these defendants worked in the agricultural industry. In fact, Helena promotes itself as one of the foremost agronomic solutions providers in the United States markets and sells products that improve greater productivity. Helena's theme is people..products..and knowledge. They promote themselves as knowledgeable on the products, their composition, and proper usage. Helena is part of one of the largest distribution networks of major world suppliers of agricultural inputs. Helena works together with Monsanto educating one another on the agricultural product utilized

here including the composition and proper use of the product. Helena provides agronomic consultation and advice to their customers. Similarly, the Co-Op is an agricultural specialist which held knowledge of the Roundup product, its ingredients, its proper usage, the fact it was a carcinogenic, and like the other Defendants failed to reveal their full source of information as set forth above. In fact, all of the Defendants in concert together, all with advanced levels of education on the product, worked to conceal the carcinogenic nature of the Roundup product and to promote it above others despite alternatives being available in order to effectuate a financial gain for them all. All to the detriment of Plaintiff who now faces a fatal diagnosis of stage 4 Non-Hodgkin's Lymphoma. All of the Defendants knew or reasonably should have known because of their knowledge and information that the Roundup sold would cause injury to persons such as Plaintiff and death to a large number of consumers, including Plaintiff. These Defendant have been educated in and aware of the carcinogenic nature of Roundup for many years, thus giving these Defendants superior knowledge of these facts by virtue of the knowledge, experience and training of their employees. They knew consumers, such as Plaintiff, would likely contract Non-Hodgkin's Lymphoma and similar cancers and would likely die as a result. Defendants Co-Op and Helena's positions with Monsanto and their own resources provided them with superior knowledge to that of the average consumer as it relates to the use of and the dangers and hazards involved in the use of Roundup.

14

54.     Defendants Helena and Co-Op worked together with Monsanto to promote the sale and distribution of Roundup, a product that when used as intended will likely injury and very likely kill the consumer, such as Plaintiff. All Defendants knew that their actions would result in the continued use of the product and enhanced sales of the product that would likely result in injury or death. The Defendants have gone to great lengths to conceal from the public the true carcinogenic nature of Roundup. Their motivation for doing so was a desire to gather in new customers and to increase the use of this dangerous product among farmers in particular. They all had an intent to keep from the public the carcinogenic nature of Roundup, as well as the intent to keep from the general public the extreme hazard of Roundup. The Defendants worked in concert with or individually with knowledge and ratification in such a way to control and manipulate the sales of the Roundup product and to quieten any concern about its carcinogenic nature.

55.     Plaintiff has suffered and continues to suffer tremendous physical pain as a result of his stage 4 cancer and suffered and continues to suffer mental anguish and emotional distress as a result of his cancer.

56.     Defendants all had an opportunity to inspect the Roundup that is superior to Plaintiff. Moreover, Defendants had more knowledge of the product that is superior to that of the Plaintiff. These Defendants concealed information about risks of Roundup and aggressively marketed the herbicide as safe for humans and the

environment. The Defendants championed falsified data while attacking legitimate research linking Roundup to cancer. Defendants made a conscious decision not to redesign or withdraw from the market Roundup so that it was less dangerous to humans and the environment. Defendants knew or should have known that Roundup caused cancer but failed to adequately warn. Defendants also failed to adequately monitor Roundup after bringing it to the market.

57.    Defendants undertook a concerted effort to disguise the information they had concerning Roundup being a carcinogenic, the actions they undertook were done negligently, wantonly and with reckless disregard for the lives and safety of the public and with knowledge that serious injury and death would likely result from continued use of Roundup by the public including Plaintiff.

### FIRST CAUSE OF ACTION
### (Product Liability Against All Defendants)

58.    Plaintiff adopts all preceding paragraphs of this Complaint as if fully set forth herein.

59.    Plaintiff brings this product liability claim against Defendants.

60.    At all times relevant, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing and promoting Roundup® products, which are defective and unreasonably dangerous to consumers and users and other persons coming into contact with them, including the Plaintiff, thereby placing Roundup® products in the stream of commerce. These

16

actions were under the ultimate control and supervision of Defendants. Defendants designed, researched, developed, formulated, manufactured, produced, tested, assembled, mixed, labeled, sold, promoted, marketed, advertised, and distributed the Roundup® products used by Plaintiff and/or to which Plaintiff was exposed, as described above.

61.     Defendants' Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and in particular, the Plaintiff.

62.     Defendants' Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Alabama and throughout the United States, including Plaintiff without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

63.     Defendants' Roundup products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold and marketed by Defendants were defective in design and formulation in that when they left the hands of the Defendants' manufacturers and/or suppliers and/or distributors they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

64.     Defendants Roundup® products as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold and marketed by Defendants were defective in that when they left the hands of the Defendants' manufacturers and/or suppliers, the foreseeable risks associated with these products' reasonably foreseeable uses exceeded the alleged benefits associated with their design and formulation.

65.     Therefore, at all relevant times, Defendants' Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in one or more of the following ways:

a.     When placed in the stream of commerce, Defendants Roundup® products were defective in design and formulation and consequently dangerous to an extent beyond that which an ordinary consumer would contemplate;

b.     When placed in the stream of commerce, Defendants' Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c.     When placed in the stream of commerce, Defendants' Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

d.    Defendants did not sufficiently test, investigate or study the Roundup products and specifically the active ingredient glyphosate.

e.    Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweighs any potential utility stemming from the use of the herbicide.

f.    Defendants working in concert together all knew or should have known at the time of marketing, selling, distributing, supplying, and promoting the Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate could result in cancer and other severe illnesses and injuries.

g.    Defendants did not conduct adequate post-marketing surveillance of its Roundup products.

h.    Defendants could have employed safer alternative designs and formulations;

i.    Defendants Co-Op and Helena could have and should have selected a different product for Plaintiff; these Defendants should have displayed and sold the subject product in such a way to notify Plaintiff as the customer that it is a hazardous substance;

j.    Defendants failed to provide, encourage, suggest or recommend the use of protective gear when using this dangerous product – a product the Defendants all knew was carcinogenic;

k.    Defendants all failed to deliver important product information to Plaintiff;

66.    Plaintiff used and/or was exposed to the use of Defendants' Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

67.    Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

68.    The harm caused by Defendants' Roundup® products far outweighed their benefit, rendering Defendants' products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendants' Roundup® products were and are more dangerous than alternative products and Defendants could have designed its Roundup® products to make them less dangerous. Indeed, at the time that Defendants designed its Roundup® products the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

69.    At the time Roundup® products left Defendants' control, there was a practical, technically feasible, and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendants' herbicides.

70.    Defendants' defective design of Roundup® amounts to willful, wanton and/or reckless conduct by Defendants.

71.     Therefore, as a result of the unreasonably dangerous condition of their Roundup® products each of these Defendants who acted in concert together are liable to Plaintiff.

72.     The defects in Defendants' products were substantial and contributing factors in causing Plaintiff's grave injuries, and, but for Defendants' misconduct and omissions, Plaintiff would not have sustained his injuries.

73.     As a direct and proximate result of Defendants placing their defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured pain and discomfort, financial hardship, emotional distress, worry, anxiety, and stress. Plaintiff will continue to incur these damages in the future.

## SECOND CAUSE OF ACTION
### (Failure to Warn Against All Defendants)

74.     Plaintiff adopts all preceding paragraphs of this Complaint as if fully set forth herein.

75.     Plaintiff brings this products liability claim against Defendants for failure to warn.

76.     At all times relevant to this litigation, Defendants engaged in the business for testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or

21

instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of the Defendants. The Defendants each had greater knowledge than that of Moore and worked together in concert to their own benefit to the detriment of Moore. They worked together to promote the sale and distribution of the subject product while they knew or should have known of the carcinogenic nature of the Roundup. They all worked to conceal it was a true carcinogenic. They failed to deliver important product information to Moore. Further, Defendants Co-Op and Helena undertook to select for Moore the product he used. They had far superior knowledge to that of Moore and rather than reveal the carcinogenic nature of Roundup they concealed it and in fact encouraged the Roundup's usage – all for each of their economic gain. Defendants combined efforts and worked together to promote the Roundup product.

77.    Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce their Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiff, and Defendants therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of Roundup® and glyphosate-containing products.

22

78.     At all times relevant to this litigation, Defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that their Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendants had a continuing duty to warn Plaintiff of the dangers associated with Roundup® use and exposure. Defendants, as manufacturer, seller, or distributor of chemical herbicides, is held to the knowledge of an expert in the field.

79.     At the time of manufacture, Defendants could have provided warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to these products.

80.     At all times relevant to this litigation, Defendants failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of the Roundup® products and to those who would foreseeably use or be harmed by Defendants' herbicides, including Plaintiff.

81.     Despite the fact that Defendants knew or should have known that Roundup® products posed a grave risk of harm, they failed to warn of the dangerous risks associated with their use and exposure. The dangerous propensities of their products and the carcinogenic characteristics of glyphosate, as described above, were known

to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time it distributed, supplied, or sold the product, and not known to end users and consumers, such as Plaintiff.

82.    Defendants knew or should have known that Roundup® and glyphosate-containing products created significant risks of seriously bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products. Defendants have wrongfully concealed information concerning the dangerous nature of Roundup and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

83.    At all times relevant to this litigation, Defendants' Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

84.    At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendants' Roundup® products in their intended or reasonable foreseeable manner without knowledge of their dangerous characteristics.

85.    Plaintiff could not have reasonable discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of Plaintiff's

exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendants.

86.   Defendants knew or should have known that the minimal warnings disseminated with their Roundup® products were inadequate, but they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonable foreseeable uses. The Defendants did not display or sell the product in such a way to notify Moore as the customer that the Roundup was a hazardous substance.

87.   The information that Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled at-home users such as Plaintiff to utilize the products safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of their products, even after they knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion; any information or research about the risks and dangers of exposure to Roundup® and glyphosate. Again, each of these Defendants

all had a combined vested interest in the selling of this product and worked together to get it sold.

88. To this day, Defendants have failed to adequately and accurately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

89. As a result of their inadequate warnings, Defendants' Roundup® products were defective and unreasonable dangerous when they left their possession and/or control of Defendants, were distributed by Defendants, and used by Plaintiff.

90. Defendants are liable to Plaintiff for injuries caused by their failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of Roundup® products and the risks associated with the use of or exposure to Roundup® and glyphosate. The Defendants Helena and Co-Op further selected this product for Moore yet they did not disclose the harmful nature of the product, did not display the product in such a way to reveal it as a true carcinogenic, failed to delivery important product information to Moore and failed to provide instructions with the product which included using safety protective gear, among other things.

91. The defects in Defendants' Roundup® products were substantial and contributing factors in causing Plaintiff's injuries, and, but for Defendants' misconduct and omissions, Plaintiff would not have sustained his injuries.

92.    Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products, Plaintiff could have avoided the risk of developing injuries as alleged herein and could have obtained alternative herbicides.

93.    As a direct and proximate result of Defendants placing the defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer severe injuries, and has endured physical pain and discomfit, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

## THIRD CAUSE OF ACTION
### Negligence
### (Against All Defendants)

94.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

95.    Defendants, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

96.    At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote,

and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

97.    At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the marketing, advertisement, and sale of Roundup® products. Defendants duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup® and, in particular, its active ingredient glyphosate.

98.    At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

99.    Accordingly, at all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known that use of or exposure to Roundup® products could cause Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

100.   Defendants knew or, in the exercise of reasonable care, should have known that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup®'s adjuvants, and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup®.

101.  Defendants know or, in the exercise of reasonable care, should have known that tests limited to Roundup®'s active ingredient glyphosate were insufficient to prove the safety of Roundup®.

102.  Defendants also knew, or in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup® and glyphosate-containing products.

103.  As such, Defendants breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of their Roundup® products, in that Defendants manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in their products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonable dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

104. Defendants failed to appropriately and adequately test Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup®.

105.   Despite their ability and means to investigate, study, and test their products and to provide adequate warnings, Defendants has failed to do so. Indeed, Defendants have wrongfully concealed information and have further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

106.   Defendants' negligence included:

a.     Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing their Roundup® products without thorough and adequate pre- and post-market testing;

b.     Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c.     Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture, horticulture, and at-home use;

d.     Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup®, and the propensity of these ingredients to render Roundup® toxic,

30

increase the toxicity of Roundup®, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup®, and whether or not "inert" ingredients and/or adjuvants were safe for use;

e.      Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/ glyphosate as an herbicide;

f.      Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

g.      Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendants could reasonably foresee would use and/or be exposed to Roundup® products;

h.      Failing to disclose to Plaintiff, users, consumers, and the general public that the use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

i.      Failing to warn Plaintiff, users, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other users or consumers;

j.      Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

k.      Representing that their Roundup® products were safe for their intended use when, in fact, Defendants knew or should have known that the products were not safe for their intended use;

l.      Declining to make or propose any changes to Roundup® products' labeling or other promotional material that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

m.      Advertising, marketing, and recommending the use of Roundup® products, while concealing and failing to disclose or warn the dangers known by Defendants to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

n.      Continuing to disseminate information to their consumers, which indicate or imply that Defendants Roundup® products are not unsafe for use in the agricultural, horticultural industries, and/or home use; and

o.      Continuing the manufacture and sale of their products with the knowledge that the products were unreasonably unsafe and dangerous.

107.   Defendants knew and/or should have known that it was foreseeable that consumers and/or users, such as Plaintiff, would suffer injuries as a result of

Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

108.    Plaintiff did not know the nature and extent of the injuries that could result from the intended use or and/or exposure to Roundup® or its active ingredient glyphosate.

100.    Defendants' negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff suffered, and will continue to suffer, as described herein.

101.    Defendants' conduct, as described above, was reckless. Defendants regularly risks the lives of consumers and users of their products, including Plaintiff, with full knowledge of the dangers of their products. Defendants have made conscious decisions not to redesign, relabel, warn, or inform the unsuspecting public, including Plaintiff. Defendants' reckless conduct therefore warrants an award of punitive damages.

102.    As a proximate result of Defendants' wrongful acts and omissions in placing defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff has suffered and continues to suffer severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, has suffered economic losses

(including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

### FOURTH CAUSE OF ACTION
### Breach of Express Warranty
### (Against All Defendants)

103.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

104.    Roundup® which was designed, tested, manufactured, distributed, promoted and sold by Defendants, was expected to, and did, reach Plaintiff without any substantial change in its condition.

105.    Defendants, through their advertising and promotional materials, expressly warranted that Roundup® was safe for its intended use and was not unreasonably dangerous for its intended purpose.

106.    Defendants breached their express warranties in that Roundup® was not safe for its intended use in light of the unreasonably high risk of cancer associated with its use, including the risk of NHL.

107.    Plaintiff reasonably relied to his detriment on Defendants' express warranties.

108.    As a proximate result of Defendants' wrongful acts and omissions in placing its defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer severe and permanent physical and emotional injuries.

Plaintiff has endured pain and suffered, has suffered economical losses (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

## FIFTH CAUSE OF ACTION
## Breach of Implied Warranty
## (Against All Defendants)

109.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

110.   Roundup® which was designed, tested, manufactured, distributed, promoted and sold by Defendants, was expected to, and did, reach Plaintiff without any substantial change in condition.

111.   At the time Defendants manufactured, marketed, sold, and distributed Roundup® Defendants knew of the use for which Roundup® was intended and impliedly warranted, through their advertising and promotional materials, that Roundup® was of merchantable quality, fitness, and safe for the use for which it was intended.

112.   Plaintiff reasonably relied upon the skill and judgment of Defendants as to whether Roundup® was of merchantable quality and safe for its intended use and upon Defendants' implied warranty as to such matters.

113.   Contrary to the implied warranty, Defendants' product Roundup® was not of merchantable quality of safe for its intended use because it was unreasonably dangerous as described herein.

114.   As a proximate result of Defendants' wrongful acts and omissions in placing their defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, has suffered economic loses (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

## SIXTH CAUSE OF ACTION
## Negligent Misrepresentation and/or Fraud
### (Against All Defendants)

115.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraph as if fully stated herein.

116.   Defendants is the manufacturer, designer, distributor, seller or supplier of Roundup® and, while engaged in the course of such business, made representations to Plaintiff regarding the character and/or quality of for guidance in his decision to select Roundup® for use.

117.   Defendants had a duty to disclose material information about serious health effects to consumers such as Plaintiff. Defendants intentionally failed to disclose this

information for the purpose of inducing consumers, including Plaintiff, to purchase Defendants' dangerous products.

118.    Specifically, Defendants' advertisement regarding Roundup made material misrepresentations to the effect that Roundup® was a safe, which misrepresentations Defendants knew to be false, for the purpose of fraudulently including consumers, such as Plaintiff to purchase said product. Defendants further misrepresented that their products were just as safe, and just as effective or more effective, than other weed control products on the market.

119.    Defendants' representations regarding the character of quality of Roundup® were untrue. In addition, Defendants fraudulently suppressed material information regarding the safety of Roundup®, including the dangers known by Defendants to be associated with or caused by the use of or exposure to Roundup® and glyphosate.

120.    Defendants had actual knowledge based on the results of trials, tests, and studies of exposure to glyphosate, of the risk of serious harm associated with human use of and exposure to Roundup®.

121.    Defendants negligently and/or intentionally misrepresented or omitted this information in their product labeling, promotions, and advertisements and instead labeled, promoted, and advertised their products as safe and effective in order to avoid losses and sustain profits in their sales to consumer.

122.   In supplying the false information, Defendants failed to exercise reasonable care or competence in obtaining or communicating information to their intended recipients, including Plaintiff.

123.   Plaintiff reasonably relied to his detriment upon Defendants' misrepresentations and/or omissions in their labeling, advertisements, and promotions concerning the serious risks posed by the product. Plaintiff reasonably relied upon Defendants' representations to him that Roundup was safe for use and that Defendants' labeling, advertisements, and promotions fully described all known risks of the product.

124.   Defendants is estopped from relying on any statute of limitations defenses because Defendants actively concealed the defects from consumers, such as Plaintiff. Instead of revealing the defects, Defendants continued to represent their product as safe for its intended use.

125.   As a direct and proximate result of Plaintiff's use of Roundup® as manufactured, designed, sold, supplied, and introduced into the stream of commerce by Defendants, Plaintiff suffered personal injury, non-economic damages, and will continue to suffer such harm and damages in the future.

## SEVENTH CAUSE OF ACTION
## Unfair and Deceptive Trade Practices
## (Against All Defendants)

126.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

127.    By reason of their conduct as alleged herein, Defendants violated the provisions of the Code of Alabama by inducing the Plaintiff to use Roundup® through the use of false and/or misleading, advertising, representations, and statements.

128.    By engaging in the conduct described herein, Defendants violated Code of Alabama by, among other things:

a.      Engaging in unfair or deceptive trade practices as defined in this statute by making false and misleading oral and written statements that had the capacity, tendency, or effect of deceiving or misleading consumers.

b.      Engaging in unfair or deceptive trade practices as defined in this statute by making representations that their products had an approval, characteristics, ingredient, use or benefit which they did not have, including but not limited to statements concerning the health consequences of the use of Roundup®.

c.      Engaging in unfair or deceptive trade practices as defined in this statute by failing to state material facts the omission of which deceived or tended to deceive, including but not limited to facts related to the health consequences of the use of Roundup®.

d.    Engaging in unfair or deceptive trade practices as defined in this statute through deception, fraud, misrepresentation and knowing concealment, suppression and mission of material facts with the intent that consumers rely upon the same in connection with the use and continued use of Roundup®.

## EIGHTH CAUSE OF ACTION
## COMBINED AND CONCURRING CONDUCT

129.   Plaintiff adopts all preceding paragraphs of this Complaint as if fully set forth herein.

130.   The tortious conduct of all Defendants as described in the foregoing paragraphs combined and concurred to cause the injurious sustained by Plaintiff. Moreover, the Defendants worked in concert to achieve financial gain to each of their own benefits.

## NINTH CAUSE OF ACTION
## CONSPIRACY

131.   Plaintiff adopts all preceding paragraphs of this Complaint as if fully set forth herein.

132.   Monsanto conspired with others in the industry, including Defendants Co-Op and Helena to intentionally deceive the public as to the true hazard of Roundup, to knowingly and intentionally sell Roundup so as to increase their profitability and insure a lucrative future market for Roundup; continued to promote Roundup despite the knowledge that it contained a known carcinogen.

133.   Plaintiff suffered and continues to suffer enormous pain and suffering, emotional distress and mental anguish as a result of the conduct of the Defendants.

## TENTH CAUSE OF ACTION
## WANTONNESS
## (Against All Defendants)

134.   Plaintiff adopts all preceding paragraphs of this Complaint as if fully set forth herein.

135.   Defendants consciously decided to design, manufacture, distribute, market and sell the product while knowing that injuries similar to those suffered by Plaintiff would likely result from the use of the Roundup.

136.   Defendants wantonly failed to address the risk in a timely manner.

137.   Defendants wantonly disregarded their knowledge and proceeded with manufacturing, selling, marketing, and distributing the dangerous product with the knowledge that it contained a carcinogenic and severe injury and death were likely.

138.   As a result of the Defendants' wanton conduct, Plaintiff suffers from Non-Hodgkin's Lymphoma (stage 4).

## Punitive Damages

139.   The conduct of Defendants described above was fraudulent, malicious, and willful or wanton in that it demonstrated a conscious and intentional disregard of and indifference to the safety of others, including Plaintiff, which Defendants knew or should have known was likely to result in serious injury or death to members of the

41

consuming public, including Plaintiff. The Defendants worked in concert with each other to effectuate their global purpose of economic gain.

140. As a direct and proximate result of the intentional, willful, and wanton misconduct of Defendants, Plaintiff was caused to suffer NHL, as well as the damages alleged herein. Plaintiff is entitled to recover punitive damages as a result of Defendants' concerted and combined conduct.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays that the Court enter judgement in his favor and against the Defendants, awarding as follows:

A.      Compensatory damages in in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

B.      Medical expenses and other economic damages in an amount to be determined at trial of this action;

C.      Punitive damages;

D.      Costs including reasonable attorneys' fees, court costs, and other litigation expenses;

E.      Any other relief the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

*/s/ Jamie A. Johnston*

_____

Jamie A. Johnston (JOH164)

**OF COUNSEL:**
Jamie A. Johnston, P.C.
509 Cloverdale Road, Suite 101
Montgomery, Alabama 36106
334.202.9228
334.265.8789  facsimile
jamie@jjohnstonpc.com

## CERTIFICATE OF SERVICE

I hereby certify that I have served the foregoing document upon the following via Alafile and/or by causing a true and complete copy of same via United States Mail, sufficient first-class postage prepaid, on this the 15th  day of February 2019 addressed as follows:

Halron Turner, Esq.
13212 West Central Avenue
PO Drawer 1389
Chatom, Alabama 36518

Lawrence Weaver, Esq.
Wilmer & Lee, PA
300 Market St. NE
Suite 201AB
PO Box 1429
Decatur, Alabama 35602

Jana Russell Garner, Esq.
JRG Law Offices, LLC PO
Box 364
Selma, Alabama 36702

/s/ Jamie A. Johnston
**OF COUNSEL**

43