# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT RAWSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | Case No.: 19-cv-06040 |
| | ) | |
| BAYER CORPORATION, a foreign | ) | |
| corporation, MONSANTO COMPANY, a | ) | |
| foreign corporation, and DUKE'S | ) | |
| HARDWARE, INC., a domestic | ) | |
| corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MOTION TO REMAND</u>

NOW COMES the Plaintiff, ROBERT RAWSON, by and through his attorneys, MOTHERWAY & NAPLETON, LLP, and hereby moves this Court, pursuant to 28 U.S.C. § 1447(c), to remand this case to state court on the basis of lack of subject matter jurisdiction and in support thereof states as follows:

1.     On March 5, 2019, the Plaintiff, Robert Rawson, a citizen of Illinois, filed his Complaint in the Circuit Court of Cook County, Illinois against Monsanto Company (hereinafter "Monsanto"), a citizen of Delaware and Missouri, and Duke's Hardware, Inc. (hereinafter "Duke's"), a citizen of Illinois. (*See* Plaintiff's Complaint, attached as Exhibit A.).

2.     On March 15, 2019, Defendants Monsanto was served with a summons and Plaintiff's State Law Complaint. On March 28, 2019, Duke's was served with a summons and Plaintiff's State Law Complaint.

**EXHIBIT 2**

3. Plaintiff alleges strict liability, negligence, and that he purchased the Roundup products at Duke's Hardware located at 7610 W. 111th Street in Palos Hills, Illinois.

4. On May 28, 2019, Defendant Duke's answered Plaintiff's Complaint and denied that it owned or operated Duke's Hardware on 7610 W. 111th Street in Palos Hills, Illinois.

5. On September 3, 2019, Defendant Duke's answered interrogatories and stated that it did not own or operate Duke's Hardware on 7610 W. 111th Street in Palos Hills, Illinois.

6. On September 9, 2019, Defendant Monsanto filed its Notice of Removal alleging that this controversy is subject to original federal court jurisdiction based on diversity of citizenship under 28 U.S.C. § 1332, which states in pertinent part that the "district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs and is between—(1) citizens of different states."

7. Although the amount in controversy exceeds $75,000, the Plaintiff and Duke's are citizens of Illinois, and therefore, original federal court diversity jurisdiction does not exist under 28 U.S.C. § 1332.

8. Defendant Monsanto's removal of Plaintiff's action from the jurisdiction of the Illinois Circuit Court constitutes a violation of 28 U.S.C. § 1441(b)(2), which provides:

> A civil action otherwise removable solely on the basis of the jurisdiction under section 1332(a) of this title **may *not* be removed** if any of the parties in interest properly joined

and served as defendants is a citizen of the State in which such action is brought. (Emphasis added).

9.     Defendant Monsanto's removal of Plaintiff's action from the jurisdiction of the Illinois Circuit Court also constitutes a violation of 28 U.S.C. § 1446(b)(3), which provides:

a notice of removal may be filed within **thirty days** after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable. (Emphasis added).

10.    Under Defendant Monsanto's theory of removal, it received notice on May 28, 2019 when Duke's filed its Answer to the Complaint denying ownership and/or operating the store at 7610 W. 111th St. in Palos Hills, Illinois. Defendant Monsanto filed its Notice of Removal on September 9, 2019, **109 days** after receiving this notice.

11.    Defendant Monsanto based its removal of this action to federal court on a theory that Duke's has been fraudulently mis-joined pursuant to *Tapscott vs. MS Dealer Serv. Corp.*, and should be severed and sent back to State Court pursuant to Rule 21. *See Tapscott vs. MS Dealer Serv. Corp.*, 77 F.3d 1353, 1359-60 (11th Cir. 1996).

12.    The party seeking removal bears the burden of establishing federal subject matter jurisdiction. *Doe v. Allied-Signal, Inc.,* 985 F.2d 908, 911 (7th Cir. 1993).

13.    The Seventh Circuit has held that courts "should interpret the removal statute narrowly and presume that the plaintiff may choose his or her forum." *Doe v. Allied-Signal, Inc.,* 985 F.2d 908, 911 (7th Cir. 1993). Additionally, "[a]ny doubt regarding jurisdiction should be resolved in favor of the states." *Id.; see also Mitchell v. Philip Morris USA Inc., et al.,* Case No. 18-CV-7739 (N.D. Ill. Judge Blakey, April 24, 2019) (rejecting defendant's fraudulent joinder argument that the distribution company's

3

citizenship should be ignored, and remanding the case to the Circuit Court of Cook County).

14.     The other Defendant in the instant matter is not diverse from the Plaintiff, and the presence of this non-diverse defendant defeats the complete diversity necessary to remove this case to this court. 28 U.S.C.A. §1332 (2012); *see Caterpillar Inc. v. Lewis,* 519 U.S. 61 (1996).

15.     The Seventh Circuit has held that "plaintiffs as master of their complaint may include (or omit) claims or parties in order to determine the forum." *Garbie v. DaimlerChrysler Corp.* 211 F.3d 407 (7th Cir. 2000).

16.     The issue of Rule 21 discretionary severance was addressed by this Court in *Livingston v. Hoffmann-La Roche, Inc.*, No. 09 C 2611, 2009 U.S. Dist. LEXIS 70242 (N.D. Ill. Aug. 6, 2009).

17.     Generally, "the plaintiff is the master of the complaint and has the option of naming only those parties the plaintiff chooses to sue, subject only to the rules of joinder of necessary parties." *Lincoln Property Co. v. Roche,* 546 U.S. 81, 91, 126 S. Ct. 606, 614 (2005) (quotations omitted); *see also Hyatt Int'l Corp. v. Coco,* 302 F.3d 707, 718 (7th Cir. 2002).

18.     Rule 21 provides that: "Misjoinder of parties is not a ground for dismissing an action. On motion or on its own, the court may at any time, *on just terms,* add or drop a party. The court may also sever any claim against a party." Fed. R. Civ. P. 21 (emphasis added).

19.     However, the Court may only drop claims against dispensable parties. *Newman-Green, Inc. v. Alfonzo-Larrain,*490 U.S.826, 832, 109 S. Ct. 2218, 2223

4

(1989) ("[I]t is well settled that Rule 21 invests district courts with authority to allow a dispensable non-diverse party to be dropped at any time, even after judgment has been rendered.").

20.     Before deciding whether or not Duke's is a dispensable party, however, the Court must consider whether they were mis-joined. *See, e.g., Elmore v. Henderson,* 227 F.3d 1009, 1012 (7th Cir. 2000) (observing that the district court's dismissal was erroneous because there was no misjoinder and, even if there were misjoinder, the remedy was not made on just terms as required by Rule 21).

21.     A party is mis-joined if it is not a proper party under Rule 20(a). *See Ramos v. Playtex Prods., Inc.,* No. 08 C 2703, 2008 WL 4066250, at *2 (N.D. Ill. Aug. 27, 2008); *Schwartz v. Graebel Van Lines, Inc.,* No. 05 C 4682, 2006 WL 1343533, at *1 (N.D. Ill. May 15, 2006) ("[b]ecause Rule 21 does not include a standard for proper joinder, courts use the permissive joinder standards contained in Federal Rule of Civil Procedure 20(a)."); *Stark v. Ind. School Dist. No. 640,* 163 F.R.D. 556, 563-64 (D. Minn. 1995).

22.     Rule 20(a) permits joinder of defendants if (1) the plaintiff asserts any "right to relief . . . against them . . . arising out of the same transaction, occurrence, or series of transactions or occurrences; and" (2) "any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a)(2).

23.     Monsanto, in its notice of removal asserts that Plaintiff's allegations against Duke's are baseless because Duke's purportedly "never owned or operated" the Duke's Hardware located at 7610 W. 111th Street in Palos Hills, Illinois. (Doc. 1 at ¶ XX.).

24.     Publications, newsletters, Illinois' Secretary of State, and Duke's own website show that Duke's owns and operates the store located at 7610 W. 111th St. in Palos Hills, Illinois. (Doc. 2 at XX).

25.     This creates serious doubt over Duke's statement that it does not own the facility at 7610 W. 111th St, for further support that this should be remanded. *See Doe v. Allied-Signal, Inc.,* 985 F.2d 908, 911 (7th Cir. 1993) (holding that "[a]ny doubt regarding jurisdiction should be resolved in favor of the states).

26.     Also, without Duke's as a distributor, Roundup would have never been advertised, marketed, distributed, sold, and available to the Plaintiff. Accordingly, Duke's role in this matter is directly related to Plaintiff's exposure to Roundup®, and as such they are part of the same series of transactions or occurrences and properly joined. *See Cadagin v. Johnson & Johnson,* No. 18-CV-1821-SMY-DGW, 2018 WL 5004716, at *3 (S.D. Ill. 2018) (finding that the plaintiff did not fraudulently join Walgreens, who plaintiff claimed negligently sold and marketed baby powder).

27.     Cases applying Rule 21 where there is no misjoinder do so because "'there are sufficient other reasons for ordering a severance.'" *Acevedo-Garcia v. Monroig,* 351 F.3d 547, 560 n.5 (1st Cir. 2003) (quoting *Wyndham Assoc. v. Bintliff,* 398 F.3d 614, 618 (2d Cir. 1968)).

28.     This case is not like others applying Rule 21 to removal actions, which generally involve a plaintiff who waits until after the case is removed to federal court to add a non-diverse defendant, in an attempt to avoid removal. *See, e.g., Smado,* 111 F.R.D. at 416. 26.     Here, Plaintiff initially chose to sue Duke's in state court. Because the non-diverse defendant was a party to the original complaint and Plaintiff has not

attempted to defeat removal by adding non-diverse defendants, there is no reason to use Rule 21 to retain jurisdiction.

29.     Plaintiff has incurred attorney's fees and costs in conjunction with the preparation of this Motion for Remand and related Memorandum. This Court has discretion under 28 U.S.C. § 1447(c) to require Defendant Monsanto to reimburse Plaintiff's costs and any actual expenses, including attorney fees, incurred as a result of the improper removal of this action from state court.

30.     Plaintiff's Memorandum in support of its Motion to Remand is filed concurrently herewith.

WHEREFORE, the Plaintiff respectfully requests that this Court enter an Order:

A.     That remands this case back to the Circuit Court of Cook County, Illinois; and,

B.     That awards Plaintiff his reasonable attorney's fees and costs incurred in conjunction with prosecuting the remand of this case.


Dated: September 17, 2019

Respectfully submitted,


/s/ David J. Gallagher
Attorney for Plaintiff

DAVID J. GALLAGHER
MOTHERWAY & NAPLETON, LLP
140 S. Dearborn, Suite 1500
Chicago, IL  60603
(312) 726-2699
ARDC#:  6294250
Dgallagher@mnlawoffice.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT RAWSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | Case No.: 19-CV-06040 |
| | ) | |
| BAYER CORPORATION, a foreign | ) | |
| corporation, MONSANTO COMPANY, a | ) | |
| foreign corporation, and DUKE'S | ) | |
| HARDWARE, INC., a domestic | ) | |
| corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO REMAND

Now comes the plaintiff, ROBERT RAWSON, by and through his attorneys, MOTHERWAY & NAPLETON, LLP, and hereby moves this Court, pursuant to 28 U.S.C. § 1447(c), to remand this case to state court on the basis of lack of subject matter jurisdiction and in support thereof states as follows:

### I.  INTRODUCTION

This matter should be remanded because MONSANTO COMPANY's ("Monsanto") removal is untimely, fails to meet its burden of proving fraudulent joinder, is based on false representations, and is not warranted under Illinois and Seventh Circuit law. The Plaintiff's Complaint sets forth personal injury claims founded on long established principals of Illinois tort law related to the defective product known as Roundup®, a glyphosate based herbicide, manufactured by Monsanto. Plaintiff has alleged claims of strict product liability, failure to warn, and negligence against Monsanto (*See* Plaintiff's Complaint, attached hereto as Exhibit A, Counts IV – VI ¶ 130-184.).  The Plaintiff's Complaint also sets forth personal injury claims

1

sounding in negligence and strict liability against Duke's Hardware Inc. ("Duke's"), a company incorporated and headquartered in Illinois, for distributing, marketing, promoting, and selling the Roundup®. (*See* Complaint, Counts VII – VIII ¶ 185-200.).

Defendant Monsanto has removed this action to federal court, asserting that original federal jurisdiction is established under 28 U.S.C. §1332, which requires complete diversity between the adverse parties. Recognizing that the Plaintiff and Duke's are citizens of Illinois, Defendant Monsanto urges that Duke's was fraudulently joined because "there is no reasonable possibility that a state court would rule against Duke's." (See Notice of Removal ¶ 13). As of the date of filing, Duke's has not joined in the motion to remove, moved to dismiss, nor otherwise challenged the legal sufficiency of the Plaintiff's Complaint.

## II. **ARGUMENT**

### A. **Defendant Monsanto Has Not Met Its Burden to Show That Plaintiff Improperly Joined Duke's.**

Defendant Monsanto, as the party seeking removal, has the burden of establishing federal jurisdiction. *See Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536, 540 (7th Cir. 2006). Also, "[c]ourts should interpret the removal statute narrowly and presume that the plaintiff may choose his or her forum." *Doe v. Allied-Signal, Inc.*, 985 F.2d 908, 911 (7th Cir. 1993). As articulated by the U.S. Supreme Court, the removability of a case is determined by examining the face of the complaint, without consideration of any defenses raised by the defendant. *See Louisville & Nashville R.R. Co. v. Mottley*, 211 U.S. 149, 152 (1908). A defendant "bear[s] a heavy burden to establish fraudulent joinder," and courts must "resolv[e] all issues of fact and law in favor of the plaintiff." *Poulos v Naas Foods, Inc.*, 959 F.2d 69, 73 (7th Cir. 1992). The Seventh Circuit has suggested that this "burden is even more favorable to the plaintiff than the standard that applies to a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)," in which all well pled

allegations of a complaint, as well as all reasonable inferences to be drawn there from, are taken as true. *Schur v. L.A. Weight Loss Ctrs., Inc.*, 577 F.3d 752, 764 (7th Cir.2009); *see also Indeck Power Equip. Co. v. Jefferson Smurfit Corp.*, 881 F. Supp. 338, 341 (N.D. Ill. 1995).

Monsanto based its removal of this action to federal court on a theory that no State Court would find against Duke's because it claims it "never owned or operated" the Palos Hills Store located at 7610 W. 111th St., Palos Hills, Illinois and therefore, Duke's was improperly joined. First, Duke's does own and operate the Duke's Hardware store located at 7610 W. 111th St., in Palos Hills, Illinois. Publications, newsletters, Illinois' Secretary of State, and Duke's own website show that Duke's owns and operates the store located at that location. (See attached Exhibit A). Duke's has been defending this action for over five months and has not filed a single dispositive motion, motion to dismiss, nor otherwise indicated it does not own nor operate the store at that location. Duke's disavowing ownership, control, and/or operational oversight is a farce.

However, even assuming Duke's assertion has some validity, this constitutes a genuine issue of material fact regarding diversity of parties, which requires remand. The Seventh Circuit has held that "[a]ny doubt regarding jurisdiction should be resolved in favor of the states. *Doe v. Allied-Signal, Inc.*, 985 F.2d 908, 911 (7th Cir. 1993); *see also Thornton v. Hamilton Sundstrand Corp.*, 121 F. Supp. 3d 819, 826 (N.D. Ill. 2014) (noting that the fraudulent standard is even more favorable to the plaintiff than the standard under Rule 12(b)(6)), *aff'd sub nom. Thornton v. M7 Aerospace LP*, 796 F.3d 757 (7th Cir. 2015).

Duke's is not diverse from the Plaintiff, and the presence of Duke's defeats the complete diversity necessary to remove this case to this court. 28 U.S.C.A. §1332 (2012); *see Caterpillar Inc. v. Lewis*, 519 U.S. 61 (1996). The Seventh Circuit has held that "plaintiffs as master of their

complaint may include (or omit) claims or parties in order to determine the forum." *Garbie v. DaimlerChrysler Corp.* 211 F.3d 407 (7th Cir. 2000). For the reasons stated above, this matter should be remanded to the Circuit Court of Cook County, Illinois. *See also Mitchell v. Philip Morris USA Inc., et al.,* Case No. 18-CV-7739 (N.D. Ill. Judge Blakey, April 24, 2019) (rejecting defendant's fraudulent joinder argument that the distribution company's citizenship should be ignored, and remanding the case to the Circuit Court of Cook County).

### B. Duke's is a Properly Joined Defendant and May Not Be Severed Nor Ignored.

Generally, "the plaintiff is the master of the complaint and has the option of naming only those parties the plaintiff chooses to sue, subject only to the rules of joinder of necessary parties." *Lincoln Property Co. v. Roche,* 546 U.S. 81, 91, 126 S. Ct. 606, 614 (2005) (quotations omitted); *see also Hyatt Int'l Corp. v. Coco,* 302 F.3d 707, 718 (7th Cir. 2002). Rule 21 provides that: "Misjoinder of parties is not a ground for dismissing an action. On motion or on its own, the court may at any time, *on just terms,* add or drop a party. The court may also sever any claim against a party." Fed. R. Civ. P. 21 (emphasis added). However, the Court may only drop claims against dispensable parties. *Newman-Green, Inc. v. Alfonzo-Larrain,* 490 U.S. 826, 832, 109 S. Ct. 2218, 2223 (1989) ("[I]t is well settled that Rule 21 invests district courts with authority to allow a dispensable non-diverse party to be dropped at any time, even after judgment has been rendered."). Interestingly, Defendants did not even invoke Rule 21.[1]

Before deciding whether or not the Duke's is a dispensable party, however, the Court must consider whether they were mis-joined. *See, e.g., Elmore v. Henderson,* 227 F.3d 1009,

---

[1] Monsanto does not, and cannot, invoke Federal Rule of Civil Procedure 21 to sever the claim because Monsanto knows Duke's is a necessary party. Rather, Monsanto simply asks that the court "disregard" Duke's as a defendant. (See Notice of Removal Par. 13). Accordingly, the relief sought by Monsanto would keep Duke's, an Illinois corporation, in the lawsuit, and therefore abrogates any purported federal jurisdiction.

1012 (7th Cir. 2000) (observing that the district court's dismissal was erroneous because there was no misjoinder and, even if there were misjoinder, the remedy was not made on just terms as required by Rule 21).

A party is mis-joined if it is not a proper party under Rule 20(a). *See Ramos v. Playtex Prods., Inc.,* No. 08 C 2703, 2008 WL 4066250, at *2 (N.D. Ill. Aug. 27, 2008); *Schwartz v. Graebel Van Lines, Inc.,* No. 05 C 4682, 2006 WL 1343533, at *1 (N.D. Ill. May 15, 2006) ("Because Rule 21 does not include a standard for proper joinder, courts use the permissive joinder standards contained in Federal Rule of Civil Procedure 20(a)."); *Stark v. Ind. School Dist. No. 640,* 163 F.R.D. 556, 563-64 (D. Minn. 1995). Rule 20(a) permits joinder of defendants if (1) the plaintiff asserts any "right to relief . . . against them . . . arising out of the same transaction, occurrence, or series of transactions or occurrences; and" (2) "any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a)(2).

As the Seventh Circuit has repeatedly held, "[f]raudulent joinder is difficult to establish—a defendant must demonstrate that, after resolving all issues of fact and law in favor of the plaintiff, the plaintiff cannot establish a cause of action against the in-state defendant. Framed a different way, the district court must ask whether there is any reasonable possibility that the plaintiff could prevail against the non-diverse defendant." *Schur v. L.A. Weight Loss Ctrs., Inc.,* 577 F.3d 752, 764 (7th Cir. 2009) (internal quotations and citations omitted); *see also Chesapeake & Ohio R.R. Co. v. Cockrell,* 232 U.S. 146, 152, 34 S.Ct. 278, 280 (1914).

As held by the Supreme Court in *Chesapeake,* the nonresident defendant must present a statement of proof that compels the court to find that the joinder was intended solely to defeat federal jurisdiction:

> So, when in such a case a resident defendant is joined with the nonresident, the joinder, even although fair upon its face, may be

5

shown by a petition for removal to be only a fraudulent device to prevent a removal; but the showing must consist of a statement of facts rightly engendering that conclusion. Merely to traverse the allegations upon which the liability of the resident defendant is rested, or to apply the epithet 'fraudulent' to the joinder will not suffice: the showing must be such as compels the conclusion that the joinder is without right and made in bad faith... *Id.* 232 U.S. at 152.

Stated differently, a defendant is fraudulently joined only when "there is **no possibility** that a plaintiff can state a cause of action against [the] non-diverse defendant in state court, or where there has been outright fraud in plaintiff's pleading of jurisdictional facts." *Gottlieb v. Westin Hotel Co.*, 990 F.2d 323, 327 (7th Cir. 1993) (emphasis added). A defendant seeking removal based on an alleged fraudulent joinder has the "heavy" burden of proving that, after the court resolves all issues of law and fact in the plaintiff's favor, there is no reasonable possibility the plaintiff can establish a cause of action against a diversity-defeating defendant. *Poulos v. Naas Foods, Inc.*, 959 F.2d 69, 73 (7th Cir. 1992).

There can be no dispute that Illinois law provides liability against Duke's. As a general matter, "Illinois law imposes a broad duty of care in the negligence context: every person or business owes a duty of ordinary care to all others to guard against injuries which naturally flow as a reasonably foreseeable consequence of an act, and such a duty does not depend upon contract, privity of interest or the proximity of relationship, but extends to remote and unknown persons." *See Mitchell,* Case No. 18-CV-7739; *citing Jones v. Live Nation Entm't, Inc.,* 63 N.E.3d 959, 971 (Ill. App. Ct. 2016). Those parties in the distributive chain of defective products, such as Duke's, may be liable for products liability claims and negligence. *See Skarski v. Ace-Chicago Great Dane Corp.,* 138 Ill. App. 3d 301, 305, 485 N.E.2d 1312, 1315 (1985); *see Hammond v. North American Asbestos Corp.* (1983), 97 Ill.2d 195, 73 Ill. Dec. 350, 454 N.E.2d 210 (holding that "all persons in the distributive chain are liable for injuries resulting from a

6

defective product, including suppliers, distributors, wholesalers and retailers."); *see also Cadagin v. Johnson & Johnson,* No. 18-CV-1821-SMY-DGW, 2018 WL 5004716, at *3 (S.D. Ill. 2018) (finding that the plaintiff did not fraudulently join Walgreens, who plaintiff claimed negligently sold and marketed baby powder).

Duke's was engaged in the business of promoting, marketing, distributing, selling, and otherwise placing the Roundup® into the stream of commerce. Duke's is therefore liable under the claims set forth in Plaintiff's complaint. At common law, in order to be subject to strict product liability, a defendant must be engaged in the business of placing such products in the stream of commerce. *See Torres v. Wilden Pump & Eng'g Co.,* 740 F.Supp. 1370 (1990); *Timm v. Indian Springs Recreation Ass'n,* 187 Ill.App.3d 508, 543 N.E.2d 538, 135 Ill.Dec. 155 (4th Dist. 1989) (used golf cart, isolated sale; no liability). Any person in the chain of distribution of a product, including manufacturers, suppliers, distributors, wholesalers, retailers, and commercial lessors, could be held strictly liable for any defect. *Cruz v. Midland--Ross Corp.,* 813 F.Supp. 628 (1993); *Crowe v. Pub. Bldg. Comm'n,* 74 Ill.2d 10, 383 N.E.2d 951, 23 Ill.Dec. 80 (1978). These claims and causes of actions have been upheld and reinforced by the Illinois Supreme Court, where it stated:

> "In a products liability action, all persons in the distributive chain are liable for injuries resulting from a defective product, including suppliers, distributors, wholesalers and retailers. Imposition of liability upon these parties is justified on the ground that their position in the marketing process enables them to exert pressure on the manufacturer to enhance the safety of the product. Regardless of the nature of the commercial transaction and even though he does not create the defect, a seller who puts a defective product into the stream of commerce may still be held strictly liable to an injured user." *See Hammond v. North American Asbestos Corp.* (1983), 97 Ill.2d 195, 206 (internal citations omitted).

Plaintiff has sufficiently alleged a cause of action for products liability against Duke's. As detailed in the Complaint, Duke's is an Illinois resident and was a distributor, marketer, and seller of Roundup to the general public, including Plaintiff from 1974 to 2018. (Complaint, ¶ 5-6). On February 1, 2013, Plaintiff, Robert Rawson, was diagnosed with extranodal marginal zone lymphoma (MALT) a type of non-Hodgkin Lymphoma (NHL). (Complaint, ¶ 73).

In pleading consistent with the Illinois Patter Jury Instructions, Plaintiff alleges there existed in the Roundup at the time it left the control of Duke's a condition which made the Roundup unreasonably dangerous because of the increased likelihood of NHL associated with exposure to the Roundup® products. Complaint, Count VIII ¶ 191-200; see also IPI Civil (2011) 400. Plaintiff also pleads negligence against Monsanto for at least nine separate theories of recovery, and Duke's did not challenge a single one of them on a motion to dismiss. (Complaint, Count VII ¶ 185-190).

Counts VII-VIII of Plaintiff's Complaint sufficiently alleges all of the necessary elements of a cause of action for negligence and strict product liability against Duke's. Monsanto cannot credibly claim that it is impossible for the Plaintiff to establish a cause of action against this diversity-defeating defendant, particularly in light of the fact that this Court must resolve all facts and legal issues in favor of the Plaintiff. *See Batoff v. State Farm Ins. Co.,* 977 f.2d 848, 853 (3d Cir. 1992) (courts should not find fraudulent joinder where they must conduct an "intricate analysis of state law" to find a claim non-actionable).

Moreover, in Illinois, plaintiffs are encouraged to join any causes of action, against any defendants. 735 ILCS 5/2-614(a) (2012); *see Boyd v. Travelers Ins. Co.*, 166 Ill. 2d 188, 199, 652 N.E.2d 267, 272 (1995). The joinder of defendants is governed by section 2-405 of the Code of Civil Procedure. 735 ILCS 5/2-405 (2012). The statute reads as follows:

(a) Any person may be made a defendant who, either jointly, severally or in the alternative, is alleged to have or claim an interest in the controversy, or in any part thereof, or in the transaction or series of transactions out of which the controversy arose, or whom it is necessary to make a party for the complete determination or settlement of any question involved therein, or against whom a liability is asserted either jointly, severally or in the alternative arising out of the same transaction or series of transactions, regardless of the number of causes of action joined.

(b) It is not necessary that each defendant be interested as to all the relief prayed for, or as to every cause of action included in any proceeding against him or her; but the court may make any order that may be just to prevent any defendant from being embarrassed or put to expense by being required to attend any proceedings in which such defendant may have no interest.

(c) If the plaintiff is in doubt as to the person from whom he or she is entitled to redress, he or she may join two or more defendants, and state his or her claim against them in the alternative in the same count or plead separate counts in the alternative against different defendants, to the intent that the question which, if any, of the defendants is liable, and to what extent, may be determined as between the parties. 735 ILCS 5/2-405.

The objective of joinder is the economy of actions and trial convenience. The determining factors are that the claims arise out of closely related "transactions" and that there is in the case a significant question of law or fact that is common to the parties. *Boyd*, 166 Ill. 2d at 199 (quoting *City of Nokomis v. Sullivan*, 14 Ill.2d 417, 420, 153 N.E.2d 48 (1958)).

These requirements have been met here. The claims against Defendants Monsanto and the Duke's arise out of the same closely related transactions: NHL caused by the sale and prolonged exposure to Roundup®. Monsanto manufactured the Roundup® and Duke's distributed, sold, promoted, and marketed it, and as such they are part of the same series of transactions or occurrences. *See Skarski v. Ace-Chicago Great Dane Corp.,* 138 Ill. App. 3d 301, 305 (1985) (concluding that a company may be held liable for marketing and distributing dangerous products). Cases applying Rule 21 where there is no misjoinder do so because "'there

9

are sufficient other reasons for ordering a severance.'" *Acevedo-Garcia v. Monroig*, 351 F.3d 547, 560 n.5 (1st Cir. 2003) (quoting *Wyndham Assoc. v. Bintliff*, 398 F.3d 614, 618 (2d Cir. 1968)).

This case is not like others applying Rule 21 to removal actions, which generally involve a plaintiff who waits until after the case is removed to federal court to add a non-diverse defendant, in an attempt to avoid removal. *See, e.g., Smado*, 111 F.R.D. at 416.

Here, Plaintiff initially chose to sue the Duke's and Monsanto in state court. Because the non-diverse defendant, Duke's, was a party to the original complaint and Plaintiff has not attempted to defeat removal by adding a non-diverse defendant, there is no reason to use Rule 21 to retain jurisdiction. It would be unjust to "ignore" Duke's for the sole purpose of maintaining diversity.

### C.   Monsanto's Theory of Removal Should Be Rejected as Untimely.

This court should also reject Monsanto's Notice of Removal as untimely. Under Seventh Circuit precedent, the 30–day removal clock begins to run when "the defendant receives a pleading or other paper that affirmatively and unambiguously reveals that the predicates for removal are present." *Walker v. Trailer Transit, Inc.*, 727 F.3d 819, 824 (7th Cir. 2013).  Notice of removal must be filed within 30 days after the defendant receives, through service or otherwise, a copy of the initial pleadings setting forth a claim for relief. 28 U.S.C. § 1446(b)(1). Duke's answered Plaintiff's Complaint on May 28, 2019.  In its Answer, Duke's denied Plaintiff's allegation that Duke's owned and operated the Duke's Hardware store at 7610 W. 111th Street in Palos Hills, IL. (See Deft's Answer Attached as Exhibit C).

Under Monsanto's theory of improper joinder, Duke's Answer would have adequately triggered Monsanto's notice that there's no reasonable possibility that a State Court would rule

10

against Duke's. However, Monsanto waited 109 days to file its Notice of Removal on September 9, 2019. Due to this delay, Monsanto failed to satisfy Section 1446(b)(1)'s 30 day requirement, and its notice was untimely. The Court should reject Monsanto's Notice of Removal as untimely. *See Green Tree Servicing, LLC v. Williams*, 2014 U.S. Dist. LEXIS 85306, at *6 (N.D. Ill. June 24, 2014) (rejecting defendant's notice of removal as untimely and remanding to the Circuit Court of Cook County, Illinois).

## D. Duke's Did Not Join Nor Consent to this Removal in Violation of 28 U.S.C. § 1446.

Plaintiff filed its Complaint in Cook County against Monsanto and Duke's. In spite of this fact, the Notice of Removal was only filed on behalf of Monsanto, and admittedly fails to include Duke's consent. As a general rule, valid removal from state to federal court requires the unanimous consent of all defendants. *See, e.g., Pettitt v. Boeing Co.*, 606 F.3d 340, 343 (7th Cir. 2010); *Doe v. GTE Corp.*, 347 F.3d 655, 657 (7th Cir. 2003). This general rule was explicitly codified in 28 U.S.C. § 1446, which reads, "[w]hen a civil action is removed solely under section 1441(a), all defendants who have been properly joined and served must join in or consent to the removal of the action." 28 U.S.C. § 1446(b)(2)(A) (West 2019). There are exceptions to this general rule that various courts in this district have set forth. *See, e.g., Willey v. Midwest Telecomm. Sys., Inc.*, No. 20220, 1991 U.S. Dist. LEXIS 12101, 1991 WL 166980, at *1 (N.D. Ill. Feb. 11, 1991) (exception for unknown defendants, nominal and formal parties, and defendants fraudulently joined); *Gallagher v. Max Madsen Mitsubishi*, No. 90-0508, 1990 U.S. Dist. LEXIS 11314, 1990 WL 129611, at *7 (N.D. Ill. Aug. 27, 1990) (exception where plaintiff's claim against removing defendant was separate and independent from the other claims in the suit); *Carver v. Sears Roebuck & Co.*, No. 86-7339, 1986 U.S. Dist. LEXIS 19586, 1986 WL 11380, at *1 (N.D. Ill. Oct. 6, 1986) (exception for defendant not yet served).

As stated previously, Monsanto failed to meet its burden of showing that Duke's was improperly joined. Accordingly, none of these exceptions saves Monsanto's Notice of Removal and this case should be remanded to the Circuit Court of Cook County. *See Green Tree Servicing, LLC*, 2014 U.S. Dist. LEXIS 85306, at *6 (N.D. Ill. June 24, 2014) (remanding to the Circuit Court of Cook County, Illinois where the movant failed to join all defendants or gain their consent).

E.   **Plaintiff is Entitled to Reimbursement of His Attorney Fees and Costs Incurred as a Result of Defendant Monsanto's Wrongful Removal of This Matter From State Court.**

Plaintiff has incurred attorney fees in conjunction with the remand of this case back to its proper forum. "[A]n order remanding the case may require the payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." 28 U.S.C. §1447(c). The intent of the statute is to reimburse a party, like the Plaintiff, who has incurred expenses in attacking an insufficient and ill-advised removal. A district court should award attorney fees to a plaintiff if, at the time a defendant filed the notice of removal, clearly established law demonstrated that defendant had no basis for removal. *Ortiz v. Menu Foods, Inc.*, 525 F. Supp. 2d 1220 (D. Hawai'i 2007); *see also Gibbs v. I-Flow*, 2009 WL 482285 (S.D. Ind. 2009) (district court ordered remand and retained jurisdiction solely to award plaintiff attorney fees and costs.).

Monsanto's removal is untimely, did not maintain the consent from all defendants, is based on flimsy factual assertions, is procedurally defective, and falls woefully short of established case law for improper joinder.  As a result of Defendant Monsanto's frivolous removal, Plaintiff has had to conduct extensive research and review of the law as well as draft and submit several carefully authored arguments in response. This required extra time and effort

on the part of Plaintiff's attorney, all of which should have been unnecessary given the unambiguous and firmly established pleading standard for claim against Duke's, and the clear and concise allegations set forth in Counts VII-VIII of the Complaint. For these reasons, an award of attorney fees and costs is appropriate in this instance, especially given the egregious factual claims based on the record.

### III.    CONCLUSION

A heavy burden rests upon the party seeking to prove fraudulent mis-joinder and thereby establish diversity of citizenship for federal jurisdictional purposes. Not only has Defendant Monsanto failed to meet this heavy burden, its proffered reason for claiming the Healthcare Defendants were fraudulently mis-joined lacks any basis in precedent and constitutes an abuse of the removal process. Accordingly, Plaintiff respectfully request that Defendant Monsanto's attempt to interpose federal jurisdiction be rejected and this case remanded with an appropriate award of attorney fees and costs to the Plaintiff.

Respectfully submitted,

/s/ David J. Gallagher
*Attorney for Plaintiff*

DAVID J. GALLAGHER
**MOTHERWAY & NAPLETON, LLP**
140 S. Dearborn, Suite 1500
Chicago, IL 60603
(312) 726-2699
Attorney No: 56421
dgallagher@mnlawoffice.com

FILED
3/5/2019 1:55 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL

FILED DATE: 3/5/2019 1:55 PM   2019L002426

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

ROBERT RAWSON,                           )
                                          )
    Plaintiff,                       )
                                          )
-vs-                                      )   Case No.: 2019L002426
                                          )
BAYER CORPORATION, a foreign              )   Amount: In Excess of Fifty Thousand
corporation, MONSANTO COMPANY, a          )   Dollars ($50,000.00) plus costs.
foreign corporation, and DUKE'S           )
HARDWARE, INC., a domestic                )
corporation,                              )
                                          )
    Defendants.                      )

## PLAINTIFF'S COMPLAINT AT LAW

NOW COMES the Plaintiff, Robert Rawson, by and through his attorney, David J.

Gallagher of MOTHERWAY & NAPLETON, LLP., and complaining of the Defendants Bayer

Corporation, a foreign corporation, Monsanto Company, a foreign corporation, and Duke's

Hardware, Inc., a domestic corporation, states as follows:

## I. THE PARTIES

### Plaintiff

1.    Plaintiff Robert Rawson is and was at all relevant times a resident of Cook County,

Illinois. He and his family purchased and used Roundup and/or other Monsanto glyphosate-

containing products ("Roundup") from approximately 1974 through 2018 on his one acre

property in Palos Park, Illinois.

### Defendants

2.    Defendant Bayer Corporation ("Bayer") is a multinational corporation doing business

throughout the United States, including Cook County, Illinois that is incorporated in Indiana,

with its headquarters and principal place of business in Whippany, New Jersey.

**EXHIBIT A**

FILED DATE: 3/5/2019 1:55 PM   2019L002426

3.     Defendant Monsanto Company ("Monsanto") is a multinational corporation doing business throughout the United States, including Cook County, Illinois that is incorporated in Delaware, with its headquarters and principal place of business in St. Louis, Missouri.

4.     On June 07, 2018 Bayer acquired Monsanto.

5.     Defendant Duke's Hardware, Inc., ("Duke's") is a domestic corporation, with its headquarters and principal place of business in Cook County, Illinois.

6.     At all times relevant to this complaint, Duke's operated a Duke's Ace Hardware store at 7610 W. 111th Street, Palos Hills, Illinois which sold Roundup® to the Plaintiff and his family from approximately 1974 to 2018.

7.     At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and was the manufacturer of Roundup®.

## II. INTRODUCTION

8.     In 1970, Defendant Monsanto Company, Inc. discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 millions of pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

9.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in

the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

10.    Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers whom are not in direct contact with glyphosate.

11.    On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

12.    On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

13.    The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other haematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

14.    The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

3

FILED DATE: 3/5/2019 1:55 PM    2019L002426

15.     Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

**III. JURISDICTION AND VENUE**

16.     Jurisdiction is proper pursuant to 735 ILCS 5/2-209 as at all times relevant hereto, Monsanto was in the business of researching, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, labeling, packaging, marketing, promoting, and/or advertising Roundup® products in the throughout the United States including in Cook County, Illinois.

17.     At all times relevant hereto, Monsanto was a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri, who routinely conducted business in Cook County, Illinois.

18.     Duke's is a domestic corporation with its headquarters and principal place of business in Cook County, Illinois, making it a resident of Cook County pursuant to 735 ILCS 5/2-102, who routinely conducts business in Cook County, Illinois.

19.     Plaintiff has timely filed this lawsuit less than two years from the time the Plaintiff knew or reasonably should have known of the injury and that it may have been wrongfully caused.

20.     Pursuant to 735 ILCS 5/2-101, venue is proper within this Court because Defendant Duke's is a resident of Cook County, and because Plaintiff was diagnosed and treated for his cancer in Cook County, and the Defendants do business and advertise in this county.

**IV. FACTS**

4

FILED DATE: 3/5/2019 1:55 PM   2019L002426

21.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

22.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

23.     For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®— glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Agricultural workers are, once again, victims of corporate greed. Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® was safe.

***The Discovery of Glyphosate and Development of Roundup®***

24.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a "safe"

5

FILED DATE: 3/5/2019 1:55 PM   2019L002426

FILED DATE: 3/5/2019 1:55 PM  2019L002426

general-purpose herbicide for widespread commercial and consumer use. Monsanto still markets Roundup® as safe today.

***Registration of Herbicides under Federal Law***

25.     The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

26.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

27.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

28.     The EPA registered Roundup® for distribution, sale, and manufacture in the United States and the State of Illinois.

6

FILED DATE: 3/5/2019 1:55 PM  2019L002426

29.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

30.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

31.     In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment —in relation to the re-registration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

***Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®***

32.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is

7

based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

33.    On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

34.    In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

35.    In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

36.    Three top executives of IBT were convicted of fraud in 1983.

37.    In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

38.    Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

*The Importance of Roundup® to Monsanto's Market Dominance and Profits*

8

FILED DATE: 3/5/2019 1:55 PM    2019L002426

FILED DATE: 3/5/2019 1:55 PM   2019L002426

39.     The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

40.     In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate; farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

41.     Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

***Monsanto has known for decades that it falsely advertises the safety of Roundup®.***

42.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup ® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides,

9

including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a)    Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

b)    And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c)    Roundup biodegrades into naturally occurring elements.

d)    Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e)    This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f)    You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g)    Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h)    Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i)    You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

10

FILED DATE: 3/5/2019 1:55 PM 2019L002426

j)     "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

43.     November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a)     its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk. * * *

b)     its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable * * *

c)     its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means. * * *

d)     its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics." * * *

e)     glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f)     its glyphosate-containing products or any component thereof might be classified as "practically non-toxic.

44.     Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

45.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely

11

FILED DATE: 3/5/2019 1:55 PM   2019L002426

advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

***Classifications and Assessments of Glyphosate***

46.     The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

47.     The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

48.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

49.     In assessing an agent, the IARC Working Group reviews the following information:

(a)     human, experimental, and mechanistic data;

(b)     all pertinent epidemiological studies and cancer bioassays; and

12

FILED DATE: 3/5/2019 1:55 PM   2019L002426

(c)    representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

50.    In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

51.    On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

52.    The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

53.    Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012 .

FILED DATE: 3/5/2019 1:55 PM   2019L002426

54.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

55.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

56.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

57.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

58.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

59.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

60.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

61.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in

14

mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

62.     The IARC Working Group also reviewed an Agricultural Health Study (AHS), consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

63.     In an article published on November 09, 2017 in the Journal of the National Cancer Institute updating the results of Glyphosate use and cancer incidence in the Agricultural Health Study a link was determined to exist between Glyphosate exposure and AML.

64.     In a review published on February 10, 2019 in Science Direct titled Exposure to Glyphosate-Based Herbicides and Risk for Non-Hodgkin Lymphoma: A Meta-Analysis and Supporting Evidence, a compelling link between exposures to GBHs and increased risk for NHL was noted.

***Other Earlier Findings About Glyphosate's Dangers to Human Health***

65.     The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

15

FILED DATE: 3/5/2019 1:55 PM    2019L002426

Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available. Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

66.    In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

### *Recent Worldwide Bans on Roundup®/Glyphosate*

67.    Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in light of the as the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which takes effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but

16

unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

68.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

69.     France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

70.     Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

71.     The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that Glyphosate has been linked to fatal kidney disease in agricultural workers.

72.     The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

*Plaintiffs' Exposure to Roundup®*

73.     Plaintiff Robert Rawson used Roundup extensively on his one acre property from approximately 1974 through 2018. He applied the herbicide himself on his grass and his driveway. Mr. Rawson was unaware of Roundup's carcinogenic properties until it was far too late; he was diagnosed with extranodal marginal zone lymphoma (MALT) a type of non-Hodgkin Lymphoma (NHL) on February 01, 2013. Mr. Rawson had no reason to believe or

FILED DATE: 3/5/2019 1:55 PM    2019L002426

17

suspect that his NHL was caused by his use of Roundup until he saw an advertisement on television in June of 2018 advertising the link between Roundup exposure and NHL.

## V. CLAIMS

### COUNT I
### STRICT LIABILITY (DESIGN DEFECT) (AGAINST BAYER)

74.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

75.     Plaintiff brings this strict liability claim against Bayer as the parent company of Monsanto for defective design

76.     At all times relevant to this litigation, Bayer by and through Monsanto engaged in the business of testing, developing, manufacturing, selling, distributing, marketing, packaging designing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Bayer by and through its subsidiary Monsanto. At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by the Plaintiff, as described above.

77.     At all times relevant to this litigation, Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff.

78.     At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in

FILED DATE: 3/5/2019 1:55 PM    2019L002426

FILED DATE: 3/5/2019 1:55 PM   2019L002426

Illinois and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

79.     Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

80.     Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

81.     At all times relevant to this action, Monsanto knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

82.     Therefore, at all times relevant to this litigation, Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Monsanto were defective in design and formulation, in one or more of the following ways:

        (a)     When placed in the stream of commerce, Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

19

(b)     When placed in the stream of commerce, Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

(c)     When placed in the stream of commerce, Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

(d)     Monsanto did not sufficiently test, investigate, or study Roundup® products and, specifically, the active ingredient glyphosate.

(e)     Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

(f)     At the time of marketing its Roundup® products, Roundup® was defective in that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

(g)     Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products.

(h)     Monsanto could have employed safer alternative designs and formulations.

83.     Plaintiff was exposed to Roundup® products in the course of his home maintenance, as described above, without knowledge of their dangerous characteristics.

84.     At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

85.     Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

20

86.     The harm caused by Roundup® products far outweighed their benefit, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate. Roundup® products were and are more dangerous than alternative products and Monsanto could have designed Roundup® products (including their packaging and sales aids) to make them less dangerous. Indeed, at the time that Monsanto designed Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

87.     At the time Roundup® products left Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of those herbicides.

88.     Monsanto's defective design of Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including the Plaintiff.

89.     Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Bayer by and through its subsidiary Monsanto is strictly liable to the Plaintiff.

90.     The defects in Roundup® products caused or contributed to cause Plaintiff's grave injuries, and, but for Monsanto's misconduct and omissions, Plaintiff would not have sustained the NHL which required him to receive treatment at several hospitals in Cook County, Illinois.

91.     Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including the Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Monsanto made conscious decisions not to redesign, warn or inform the unsuspecting public. Monsanto's reckless conduct warrants an award of aggravated damages.

FILED DATE: 3/5/2019 1:55 PM   2019L002426

FILED DATE: 3/5/2019 1:55 PM   2019L002426

92.     As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

WHEREFORE, the Plaintiff Robert Rawson respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Bayer for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT II
## STRICT LIABILITY (FAILURE TO WARN) (AGAINST BAYER)

93.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

94.     Plaintiff brings this strict liability claim against Bayer as the parent company of Monsanto for failure to warn.

95.     At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Monsanto.

96.     Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce

Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiff, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

97.     At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn the Plaintiff of the dangers associated with Roundup® use and exposure. Monsanto, as manufacturer, seller, promoter, marketer, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

98.     At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

99.     At all times relevant to this litigation, Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by these herbicides, including the Plaintiff.

100.    Despite the fact that Monsanto knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of these products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or scientifically knowable to Monsanto through appropriate research and testing by known methods, at the time

23

they distributed, marketed, promoted, supplied or sold the product, and not known to end users and consumers, such as the Plaintiff.

101.    These products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

102.    At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Illinois and throughout the United States, including the Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, promoted and marketed by Monsanto.

103.    The Plaintiff was exposed to Roundup® products in the course of his personal use on his one acre property, without knowledge of their dangerous characteristics.

104.    At all times relevant to this litigation, the Plaintiff used and/or was exposed to the use of Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

105.    The Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of the Plaintiff's exposure. The Plaintiff relied upon the skill, superior knowledge, and judgment of Monsanto.

106.    These products were defective because the minimal warnings disseminated with Roundup® products were inadequate, and they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were

24

appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and landscaping applications.

107. The information that Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as the Plaintiff to utilize the products safely and with adequate protection. Instead, Monsanto disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

108. To this day, Monsanto has failed to adequately and accurately warn of the true risks of the Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

109. As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed, marketed, and promoted by Monsanto, and used by the Plaintiff in his home maintenance.

110. Bayer as the parent company of Monsanto is liable to the Plaintiff for injuries caused by their negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of these products and the risks associated with the use of or exposure to Roundup® and glyphosate.

25

FILED DATE: 3/5/2019 1:55 PM   2019L002426

111.    The defects in Roundup® products caused or contributed to cause the Plaintiff's injuries, and, but for this misconduct and omissions, the Plaintiff would not have sustained his injuries.

112.    Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products, Plaintiff could have avoided the risk of developing injuries as alleged herein.

113.    As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

WHEREFORE, the Plaintiff Robert Rawson respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Bayer for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

### COUNT III
### NEGLIGENCE (AGAINST BAYER)

114.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

115.    Monsanto, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by the Plaintiff.

116.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary

26

FILED DATE: 3/5/2019 1:55 PM   2019L002426

to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

117.   At all times relevant to this litigation, Monsanto s had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

118.   At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

119.   Accordingly, at all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with the Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including the Plaintiff.

120.   Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

121.   As such, Monsanto breached the duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Monsanto manufactured, marketed, promoted, and sold defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in these products, knew or had

reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

122. Despite an ability and means to investigate, study, and test these products and to provide adequate warnings, Monsanto has failed to do so. Indeed, Monsanto has wrongfully concealed information and has further made false and/or misleading statements concerning the safety of exposure to Roundup® and glyphosate.

123. Monsanto was negligent in the following respects:

(a) Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

(b) Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

(c) Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

(d) Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

28

FILED DATE: 3/5/2019 1:55 PM    2019L002426

FILED DATE: 3/5/2019 1:55 PM    2019L002426

(e)      Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

(f)      Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Monsanto could reasonably foresee would use and be exposed to its Roundup® products;

(g)      Failing to disclose to the Plaintiff, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

(h)      Failing to warn the Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to the Plaintiff and other consumers;

(i)      Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

(j)      Representing that its Roundup® products were safe for their intended use when, in fact, Monsanto knew or should have known that the products were not safe for their intended purpose;

(k)      Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

(l)      Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

(m)     Continuing to disseminate information to its consumers, which indicate or imply that Monsanto's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

(n)     Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

124.    Monsanto knew and/or should have known that it was foreseeable that consumers such as the Plaintiff would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup®.

125.    The Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

126.    Monsanto's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiffs suffered, as described herein.

127.    Monsanto's conduct, as described above, was reckless. Monsanto regularly risked the lives of consumers and users of their products, including the Plaintiff's, with full knowledge of the dangers of these products. Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including the Plaintiff. Monsanto's reckless conduct therefore warrants an award of aggravated or punitive damages.

128.    As a proximate result of Monsanto's wrongful acts and omissions in placing defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff has suffered and continues to suffer grave injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

FILED DATE: 3/5/2019 1:55 PM   2019L002426

FILED DATE: 3/5/2019 1:55 PM    2019L002426

129.    On June 07, 2018 Bayer acquired Monsanto and as such is liable for the prior acts and omissions of Monsanto.

WHEREFORE, the Plaintiff Robert Rawson respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Bayer for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

**COUNT IV**
**STRICT LIABILITY (DESIGN DEFECT) (AGAINST MONSANTO)**

130.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

131.    Plaintiff brings this strict liability claim Monsanto for defective design

132.    At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, manufacturing, selling, distributing, marketing, packaging designing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto. At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by the Plaintiff, as described above.

133.    At all times relevant to this litigation, Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff.

134.    At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Illinois and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

135.    Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

136.    Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

137.    At all times relevant to this action, Monsanto knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

138.    Therefore, at all times relevant to this litigation, Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Monsanto were defective in design and formulation, in one or more of the following ways:

        (a)    When placed in the stream of commerce, Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

FILED DATE: 3/5/2019 1:55 PM   2019L002426

(b)    When placed in the stream of commerce, Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

(c)    When placed in the stream of commerce, Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

(d)    Monsanto did not sufficiently test, investigate, or study Roundup® products and, specifically, the active ingredient glyphosate.

(e)    Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

(f)    At the time of marketing its Roundup® products, Roundup® was defective in that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

(g)    Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products.

(h)    Monsanto could have employed safer alternative designs and formulations.

139.    Plaintiff was exposed to Roundup® products in the course of his home maintenance, as described above, without knowledge of their dangerous characteristics.

140.    At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

141.    Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

33

FILED DATE: 3/5/2019 1:55 PM  2019L002426

142.     The harm caused by Roundup® products far outweighed their benefit, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate. Roundup® products were and are more dangerous than alternative products and Monsanto could have designed Roundup® products (including their packaging and sales aids) to make them less dangerous. Indeed, at the time that Monsanto designed Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

143.     At the time Roundup® products left Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of those herbicides.

144.     Monsanto's defective design of Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including the Plaintiff.

145.     Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Monsanto is strictly liable to the Plaintiff.

146.     The defects in Roundup® products caused or contributed to cause Plaintiff's grave injuries, and, but for Monsanto's misconduct and omissions, Plaintiff would not have sustained the NHL which required him to receive treatment at several hospitals in Cook County, Illinois.

147.     Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including the Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Monsanto made conscious decisions not to redesign, warn or inform the unsuspecting public. Monsanto's reckless conduct warrants an award of aggravated damages.

FILED DATE: 3/5/2019 1:55 PM   2019L002426

148.    As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

WHEREFORE, the Plaintiff Robert Rawson respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Monsanto for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT V
### STRICT LIABILITY (FAILURE TO WARN) (AGAINST MONSANTO)

149.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

150.    Plaintiff brings this strict liability claim against Monsanto for failure to warn.

151.    At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Monsanto.

152.    Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce Roundup® products, and in the course of same, directly advertised or marketed the products to

FILED DATE: 3/5/2019 1:55 PM   2019L002426

consumers and end users, including the Plaintiff, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

153.    At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn the Plaintiff of the dangers associated with Roundup® use and exposure. Monsanto, as manufacturer, seller, promoter, marketer, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

154.    At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

155.    At all times relevant to this litigation, Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by these herbicides, including the Plaintiff.

156.    Despite the fact that Monsanto knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of these products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or scientifically knowable to Monsanto through appropriate research and testing by known methods, at the time they distributed, marketed, promoted, supplied or sold the product, and not known to end users and consumers, such as the Plaintiff.

36

FILED DATE: 3/5/2019 1:55 PM    2019L002426

157.   These products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

158.   At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Illinois and throughout the United States, including the Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, promoted and marketed by Monsanto.

159.   The Plaintiff was exposed to Roundup® products in the course of his personal use on his one acre property, without knowledge of their dangerous characteristics.

160.   At all times relevant to this litigation, the Plaintiff used and/or was exposed to the use of Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

161.   The Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of the Plaintiff's exposure. The Plaintiff relied upon the skill, superior knowledge, and judgment of Monsanto.

162.   These products were defective because the minimal warnings disseminated with Roundup® products were inadequate, and they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and landscaping applications.

FILED DATE: 3/5/2019 1:55 PM   2019L002426

163.    The information that Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as the Plaintiff to utilize the products safely and with adequate protection. Instead, Monsanto disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

164.    To this day, Monsanto has failed to adequately and accurately warn of the true risks of the Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

165.    As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed, marketed, and promoted by Monsanto, and used by the Plaintiff in his work.

166.    Monsanto is liable to the Plaintiff for injuries caused by their negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of these products and the risks associated with the use of or exposure to Roundup® and glyphosate.

167.    The defects in Roundup® products caused or contributed to cause the Plaintiff's injuries, and, but for this misconduct and omissions, the Plaintiff would not have sustained his injuries.

168.    Had Monsanto provided adequate warnings and instructions and properly disclosed and

38

FILED DATE: 3/5/2019 1:55 PM    2019L002426

FILED DATE: 3/5/2019 1:55 PM 2019L002426

disseminated the risks associated with Roundup® products, Plaintiff could have avoided the risk of developing injuries as alleged herein.

169.    As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

WHEREFORE, the Plaintiff Robert Rawson respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Monsanto for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT VI
## NEGLIGENCE (AGAINST MONSANTO)

170.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

171.    Monsanto, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by the Plaintiff.

172.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

173.   At all times relevant to this litigation, Monsanto s had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

174.   At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

175.   Accordingly, at all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with the Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including the Plaintiff.

176.   Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

177.   As such, Monsanto breached the duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Monsanto manufactured, marketed, promoted, and sold defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of

FILED DATE: 3/5/2019 1:55 PM   2019L002426

40

harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

178.    Despite an ability and means to investigate, study, and test these products and to provide adequate warnings, Monsanto has failed to do so. Indeed, Monsanto has wrongfully concealed information and has further made false and/or misleading statements concerning the safety of exposure to Roundup® and glyphosate.

179.    Monsanto was negligent in the following respects:

(a)    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

(b)    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

(c)    Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

(d)    Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

(e)    Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

41

FILED DATE: 3/5/2019 1:55 PM    2019L002426

(f)     Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Monsanto could reasonably foresee would use and be exposed to its Roundup® products;

(g)     Failing to disclose to the Plaintiff, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

(h)     Failing to warn the Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to the Plaintiff and other consumers;

(i)     Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

(j)     Representing that its Roundup® products were safe for their intended use when, in fact, Monsanto knew or should have known that the products were not safe for their intended purpose;

(k)     Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

(l)     Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

(m)     Continuing to disseminate information to its consumers, which indicate or imply that Monsanto's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

42

FILED DATE: 3/5/2019 1:55 PM    2019L002426

(n)      Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

180.    Monsanto knew and/or should have known that it was foreseeable that consumers such as the Plaintiff would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup®.

181.    The Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

182.    Monsanto's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiffs suffered, as described herein.

183.    Monsanto's conduct, as described above, was reckless. Monsanto regularly risked the lives of consumers and users of their products, including the Plaintiff's, with full knowledge of the dangers of these products. Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including the Plaintiff. Monsanto's reckless conduct therefore warrants an award of aggravated or punitive damages.

184.    As a proximate result of Monsanto's wrongful acts and omissions in placing defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff has suffered and continues to suffer grave injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

WHEREFORE, the Plaintiff Robert Rawson respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Monsanto for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with

FILED DATE: 3/5/2019 1:55 PM    2019L002426

interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

**COUNT VII**
**NEGLIGENCE (AGAINST DUKE'S)**

185.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

186.    Duke's promoted, marketed, distributed and sold, Roundup® products to the Plaintiff that were in fact used by the Plaintiff.

187.    At all times relevant herein the Roundup® products promoted, marketed, distributed and sold to the Plaintiff were defective.

188.    Duke's owed a duty to the Plaintiff to exercise ordinary care in the promotion, marketing, distribution, and sale, of the Roundup® products it sold to the Plaintiff between 1974 and 2018.

189.    Duke's breached the aforesaid duty and was negligent through one or more of the following acts and or omissions that was a proximate cause of damages to the Plaintiff:

a)    Failed to assure the Roundup® products complied with FDA standards;

b)    Failed to assure the Roundup® products complied with industry standards;

c)    Failed to assure the Roundup® products were non-carcinogenic;

d)    Marketed Roundup® products were safe when they were not;

e)    Sold Roundup® products that were defective;

f)    Sold Roundup® products that caused NHL;

g)    Sold Roundup® products that were unsafe;

h)    Distributed Roundup® products that were unsafe; and/o

FILED DATE: 3/5/2019 1:55 PM    2019L002426

FILED DATE: 3/5/2019 1:55 PM    2019L002426

j)      Promoted Roundup® products that were unsafe.

190.    As a direct and proximate cause of one or more of the aforesaid acts or omissions, Plaintiff has suffered and continues to suffer grave injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

WHEREFORE, the Plaintiff Robert Rawson respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Duke's Hardware, Inc., for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

<u>**COUNT VIII**</u>
<u>**STRICT LIABILTY (AGAINST DUKE'S)**</u>

191.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

192.    That the Defendant, Duke's marketed, sold, distributed, and placed into the market Roundup® products that existed in a defective condition at the time they left Duke's' possession and control.

193.    That the Roundup® products were defective in that they carcinogenic.

194.    That the Roundup® products sold to Plaintiff were used for the purpose and in the manner intended, at all times relevant to this Complaint.

195.     That the Roundup® products sold the Plaintiff, were in substantially the same condition as they were at the time they were promoted, distributed, marketed, and sold by the Defendant Duke's.

196.     That the Plaintiff Robert Rawson, could not, by the exercise of reasonable care, have discovered the defect in, nor perceived the danger of, the Roundup® products.

197.     That the Defendant Duke's owed a strict liability not to harm the Plaintiff through the intended use of the Roundup® products it sold to him.

198.     That the defective condition of the Roundup® products sold to Robert Rawson by the Defendant, caused Robert Rawson  to be injured and suffer damages of a personal, permanent, and pecuniary nature.

199.     That at the time the Defendant marketed, sold, distributed, delivered or made available the Roundup® products, Duke's failed to properly warn the Plaintiff of the danger posed by the Roundup® products, and the likelihood of NHL associated with exposure to the Roundup® products.

200.     That as a result of the injuries and damages caused by the defective Roundup® products marketed, sold, and distributed by Duke's, and as a result of the injuries and damages caused by Duke's' failure to warn of the dangers posed by the defect Roundup® products, Duke's is strictly liable to Robert Rawson for Duke's' failure to market, sell, distribute, deliver or make available a product, which would not cause injury or damage to the Plaintiff, and for its failure to warn of the dangers posed by the defective Roundup® products.

WHEREFORE, the Plaintiff Robert Rawson respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Duke's Hardware, Inc., for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars

46

FILED DATE: 3/5/2019 1:55 PM   2019L002426

FILED DATE: 3/5/2019 1:55 PM   2019L002426

($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

By: _____
David J. Gallagher

**MOTHERWAY & NAPLETON, LLP.**
Attorneys for Plaintiff
140 S. Dearborn, Suite 1500
Chicago, IL 60603
(312) 726-2699 - PHONE
(312) 726-6851 - FAX
Atty. No. 56421
dgallagher@mnlawoffice.com

47

FILED
3/5/2019 1:55 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL

FILED DATE: 3/5/2019 1:55 PM   2019L002426

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| ROBERT RAWSON, | ) |
| Plaintiff, | ) |
| -vs- | ) Case No.: 2019L002426 |
| BAYER CORPORATION, a foreign corporation, MONSANTO COMPANY, a foreign corporation, and DUKE'S HARDWARE, INC., a domestic corporation, | ) Amount: In Excess of Fifty Thousand Dollars ($50,000.00) plus costs. |
| Defendants. | ) |

### AFFIDAVIT PURSUANT TO ILLINOIS SUPREME COURT RULE 222(b)

I, David J. Gallagher, attorney for the Plaintiff, Robert Rawson, state that the damages sought in this matter as to each Defendant are in excess of Fifty Thousand Dollars ($50,000.00).

Under penalties as provided by law pursuant to 735 ILCS 5/1-109, I certify that the statements set forth herein are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that I verily believe the same to be true.

David J. Gallagher
Attorney for Plaintiff

Sworn and subscribed to before
me this 5th day of

March , 2019 .

Notary Public

OFFICIAL SEAL
MEGAN L SHORE
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:11/28/22

48

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ROBERT RAWSON,                        )
                                      )
                 Plaintiff,           )
                                      )
          v.                          )      No.  1:19-cv-06040
                                      )
BAYER CORPORATION, a foreign corporation; )
MONSANTO COMPANY, a foreign corporation; )
and DUKE'S HARDWARE, INC.,            )
a domestic corporation,               )
                                      )
                 Defendants.          )

## NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, Defendant Monsanto Company

("Monsanto"), hereby gives notice of removal of this action, captioned *Robert Rawson v.*

*Monsanto Company, et al.*, bearing case number 2019-L-002426, from the Circuit Court of Cook

County, State of Illinois Law Division, to the United States District Court for the Northern

District of Illinois.  Pursuant to 28 U.S.C. § 1446(a), Monsanto provides the following statement

of grounds for removal.

### INTRODUCTION

1.     This action arises out of Plaintiff's claims against out-of-state Defendant

Monsanto, and in-state Defendant Duke's Hardware, Inc. ("Duke's"), for strict liability for a

design defect, strict liability for failure to warn, and negligence arising from use of Roundup®

and the allegations that it caused non-Hodgkin's Lymphoma ("NHL").[1]

---

[1] Plaintiff also sued Bayer Corporation, *see* Compl., but voluntarily dismissed those claims on June 14, 2019.  *See* Ex. A.

**EXHIBIT B**

2.      Removal is proper because there is complete diversity of citizenship between Plaintiff and Monsanto, and the amount in controversy exceeds $75,000, exclusive of interest and costs.  The Court should disregard the presence of Duke's in determining whether complete diversity exists because Duke's was fraudulently joined.

## MULTIDISTRICT LITIGATION (MDL) PROCEEDING

3.      This is one of many cases that have been filed in both state and federal courts across the country against Monsanto involving Roundup®.  An MDL proceeding is pending in the United States District Court for the Northern District of California, before the Honorable Vince G. Chhabria, pursuant to 28 U.S.C. § 1407.  *In re Roundup Prods. Liab. Litig.*, MDL No. 2741, 214 F. Supp. 3d 1346 (J.P.M.L. 2016).  Monsanto intends to seek the transfer of this action to that MDL, and will provide the Judicial Panel on Multidistrict Litigation (JPML) with notice of this action pursuant to the procedure for "tag along" actions set forth in the Rules and Procedures of the JPML.

## VENUE AND JURISDICTION

4.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 112, 1391, 1441(a), and 1446(a), because the Circuit Court of Cook County, Law Division, is a court within the Northern District of Illinois.

5.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because: (1) there is complete diversity of citizenship between Plaintiff and all properly-joined Defendants; (2) the amount in controversy exceeds $75,000, exclusive of interests and costs; and, (3) all other requirements for removal have been satisfied.

**BASIS FOR REMOVAL – DIVERSITY JURISDICTION**

I.     **Complete Diversity of Citizenship**

    A.     **There is complete diversity between Plaintiff and Monsanto.**

    6.     Based on the allegations of the complaint, Plaintiff is, and was at the time of filing, a citizen of Illinois for purposes of federal diversity jurisdiction.  Compl. ¶ 1.

    7.     Monsanto is, and was at the time of filing, a corporation organized under the laws of the State of Delaware with its principal place of business in the State of Missouri.  *Id.* ¶ 3. Accordingly, Monsanto is deemed to be a citizen of Delaware and Missouri for purposes of federal diversity jurisdiction.

    8.     Thus, complete diversity exists with respect to Plaintiff and Monsanto.

    B.     **Duke's Hardware, Inc. was fraudulently joined, and should therefore be disregarded for purposes of assessing diversity of citizenship.**

    9.     Duke's Hardware, Inc. is, and was at the time of the filing, a corporation organized under the laws of the State of Illinois with its principal place of business in the State of Illinois.  *Id.* ¶ 5.  Accordingly, Duke's is deemed to be a citizen of Illinois for purposes of federal diversity jurisdiction.  However, as set forth below, the Court should disregard the presence of Duke's for purposes of assessing the propriety of removal because Duke's was fraudulently joined.

    10.     Fraudulent joinder cannot destroy diversity jurisdiction.  *Poulos v. Naas Foods, Inc.*, 959 F. 2d 69, 72-74 (7th Cir. 1992); *see also Schwartz v. State Farm Mutual Auto Insurance Co.*, 174 F.3d 875, 878-79 (7th Cir.1999) (affirming district court's decision to retain jurisdiction after fraudulent joinder).  A plaintiff has fraudulently joined a defendant when there is no "reasonable possibility that a state court would rule against the non-diverse defendant."  *Poulos*, 959 F. 2d at 73.  *Asperger v. Shop Vac Corp.*, 524 F. Supp. 2d 1088, 1092 (S.D. Ill. 2007)

(same).  "Although plaintiffs are normally free to choose their own forum, they may not join an in-state defendant solely for the purpose of defeating federal jurisdiction."  *Hill v. C.R. Bard, Inc.*, 582 F. Supp. 2d 1041, 1045 (C.D. Ill. 2008).  Otherwise, as the Seventh Circuit has recognized, a plaintiff "could defeat diversity jurisdiction by joining his grandmother as a defendant—surely some set of facts might make her liable."  *Poulos*, 959 F.2d at 74.

11.     Plaintiff's claims against Duke's are all linked to Duke's alleged sale of Roundup®-branded products to Plaintiff.  *See* Compl. ¶¶ 6, 185–200.  Specifically, Plaintiff alleges that for over thirty years he purchased Roundup®-branded products from a hardware store located at 7610 W. 111th St., Palos Hills, Illinois, which he alleges is owned by Duke's.  *Id.* ¶ 6.

12.     Plaintiff's allegation is incorrect.  In its September 3, 2019 responses to Plaintiff's discovery requests, Duke's stated that it: (1) "never owned or operated" the Palos Hills store and (2) "owns and operates a different store in a different town (not Palos Hills)."  *See* Ex. B, Duke's Resp. to Pl.'s Req. for Prod., at Gen. Obj. No. 1; Duke's Resp. to Pl.'s Interrog., at Gen. Obj. No. 1; Duke's Resp. to Pl.'s Rule 213 Interrog., at Gen. Obj. No. 1.

13.     Accordingly, there is no reasonable possibility that a state court would rule against Duke's.  The Court should therefore disregard Duke's and find that complete diversity exists.

14.     Moreover, the in-forum defendant rule does not preclude removal because Duke's, the only Illinois defendant, was not "properly joined."  *See* 28 U.S.C. § 1441(b)(2).

## II.     The Requisite Amount in Controversy Is Satisfied

15.     The Complaint seeks compensatory and punitive damages based on allegations that Monsanto's Roundup®-branded herbicides caused Plaintiff to develop NHL.  Therefore, it is plausible from the face of the Complaint that plaintiff seeks damages in excess of $75,000,

exclusive of interest and costs, which satisfies the jurisdictional amount-in-controversy requirement. 28 U.S.C. § 1332(a); *see also Dart Cherokee Basin Operating Co. v. Owens,* 135 S. Ct. 547, 554 (2014) ("[A] defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold."); *Ross v. First Family Fin. Servs., Inc.,* 2002 WL 31059582, at *8 (N.D. Miss. Aug. 29, 2002) ("[U]nspecified claims for punitive damage sufficiently serve to bring the amount in controversy over the requisite jurisdictional threshold set out in 28 U.S.C. § 1332."). In fact, other Roundup® lawsuits seeking damages for NHL allegedly caused by Roundup®-branded products have been filed against Monsanto in other federal courts asserting jurisdiction under § 1332(a) and alleging damages in excess of $75,000, exclusive of interest and costs.

16.     Thus, this Court has original subject matter jurisdiction over the claims of Plaintiff based on § 1332(a) because there is complete diversity of citizenship between plaintiff and the out-of-state Defendants (disregarding the citizenship of the fraudulently-joined hardware store), and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

## III.     Monsanto's Notice of Removal Is Timely

17.     Under 28 U.S.C. § 1446(b), a defendant must file a notice of removal either (1) "within thirty days after the receipt by the defendant . . . of a copy of the initial pleading," or (2) "[i]f the case stated by the initial pleading is not removable, . . . within thirty days after receipt by the defendant . . . of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable." 28 U.S.C. § 1446(b).

18.     Under Seventh Circuit precedent, "[t]he 30–day removal clock does not begin to run until the defendant receives a pleading or other paper that *affirmatively and unambiguously*

reveals that the predicates for removal are present." *Walker v. Trailer Transit, Inc.*, 727 F.3d 819, 824 (7th Cir. 2013) (emphasis added).

19.     "Assessing the timeliness of removal should not involve a fact-intensive inquiry about what the defendant subjectively knew or should have discovered through independent investigation." *Id.* at 825.

20.     Plaintiff filed his Complaint on March 5, 2019, in the Circuit Court of Cook County, Law Division. *See* Compl.  The Complaint alleged that Duke's was an Illinois corporation with its principal place of business in Illinois. *Id.* ¶ 5.  Thus, "the case stated by the initial pleading was not removable" when filed.  28 U.S.C. § 1446(b).

21.     Duke's made clear in its discovery responses that it: (1) "never owned or operated" the Palos Hills store and (2) "owns and operates a different store in a different town (not Palos Hills)." *See* Ex. B, Duke's Resp. to Pl.'s Req. for Prod., at Gen. Obj. No. 1; Duke's Resp. to Pl.'s Interrog., at Gen. Obj. No. 1; Duke's Resp. to Pl.'s Rule 213 Interrog., at Gen. Obj. No. 1.  Only when Duke's addressed its lack of ownership of the Palos Hills store in these responses did it become "affirmatively and unambiguously" clear that removal was appropriate. *Walker*, 727 F.3d at 824.

22.     These discovery responses constitute "other paper" sufficient to trigger the 30-day removal period under 28 U.S.C. § 1446(b). *See, e.g.*, *Chapman v. Powermatic, Inc.* 969 F.2d 160 (5th Cir. 1992) ("Clearly the answer to [the] interrogatory which triggered the filing of the notice of removal in this case is such an "other paper"); *Blake v. Wal-Mart Stores, Inc.*, 358 F. Supp. 3d 576, 580 (W.D. La. 2018) (holding that interrogatory responses constituted "other paper"); *Rider v. Sears Roebuck & Co.*, 2011 WL 2222171, at *4 (C.D. Cal. June 7, 2011) (a deposition answer constituted an "other paper").

6

23.     This Notice of Removal falls within the 30-day period set forth in 28 U.S.C. § 1446(b) and is timely because Monsanto is filing this Notice of Removal within 30 days of the date (September 3, 2019) when Duke's served the discovery responses discussed above.

## IV.     Other Procedural Requirements

24.     Pursuant to 28 U.S.C. § 1446(a), true and correct copies of the Summons and Complaint, as well as all other process, pleadings, and orders filed and served upon Monsanto are attached hereto as Exhibit C.

25.     This Notice of Removal is timely, in accordance with 28 U.S.C. § 1446(b), for the reasons set forth above.  The consent of the Duke's is not required because Duke's was not "properly joined." 28 U.S.C. § 1446(b)(2)(A).

26.     The written notice required by 28 U.S.C. § 1446(d) will be promptly filed in the Circuit Court of Cook County, State of Illinois Law Division and will be promptly served on Plaintiff.

27.     Monsanto does not waive any legal defenses, including but not limited to personal jurisdiction, and expressly reserves its right to raise any and all legal defenses in subsequent pleadings in this action.

28.     If any question arises as to the propriety of the removal of this action, Monsanto requests the opportunity to present a brief and request oral argument in support of removal.

## CONCLUSION

For the foregoing reasons, Monsanto removes this lawsuit to this Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 (and any other applicable laws).

Dated:  September 9, 2019

Respectfully submitted,

**MONSANTO COMPANY**

By: _/s/   Thomas J. Dammrich II_____
One of Its Attorneys

Thomas J. Dammrich II (#6292653)
Peter F. O'Neill (#6324429)
SHOOK, HARDY & BACON L.L.P.
111 South Wacker Drive, *Suite 4700*
Chicago, Illinois 60606
Telephone:  (312) 704-7700
Facsimile:   (312) 558-1195
Email:  tdammrich@shb.com
            pfoneill@shb.com

# CERTIFICATE OF SERVICE

I, Thomas J. Dammrich, an attorney, hereby certify that, on September 9, 2019, I caused

a true and complete copy of the foregoing **NOTICE OF REMOVAL** to be electronically filed

with the Court via the Court's ECF system.  I further certify that I emailed a copy of same upon

the following counsel of record:

David J. Gallagher
(dgallagher@mnlawoffice.com)
**Motherway & Napleton, LLP**
140 S. Dearborn Street, Suite 1500
Chicago, IL 60603
Telephone:     (312) 726-2699
Facsimile:     (312) 726-6851

*Attorneys for Plaintiff*

Dominique Savinelli
(Dominique.Savinelli@huschblackwell.com)
James P. O'Shea
(James.Oshea@huschblackwell.com)
**Husch Blackwell LLP**
120 South Riverside Plaza, Suite 2200
Chicago, IL 60606
Telephone:  (312) 655-1500

*Attorneys for Bayer Corporation and Monsanto Company*

Thomas J. Dammrich II
(tdammrich@shb.com)
Peter F. O'Neill
(pfoneill@shb.com)
**Shook, Hardy & Bacon L.L.P.**
111 South Wacker Drive, Suite 4700
Chicago, IL  60606
Telephone:  (312) 704-7700

*Attorneys for Duke's Hardware, Inc.*

   /s/   Thomas J. Dammrich II

# EXHIBIT A

DJG:jg                                                                    19-20

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

ROBERT RAWSON,                          )
                                        )
         Plaintiff,                     )
                                        )
-vs-                                    )     Case No.  19 L 002426
                                        )
BAYER CORPORATION, a foreign            )
corporation, MONSANTO COMPANY, a        )
foreign corporation, and DUKE'S         )
HARDWARE, INC., a domestic              )
corporation,                            )
                                        )
         Defendants.                    )

## ORDER

This matter coming on to be heard upon the routine motion of Plaintiff to voluntarily

dismiss Defendant, BAYER CORPORATION, pursuant to 735 ILCS 5/2-1009(a), Plaintiff

expressly reserving the right to re-file the above cause of action against Defendant, BAYER

CORPORATION, according to the terms of the parties' Tolling Agreement, due notice having

been given and the Court being fully advised in the premises;

IT IS HEREBY ORDERED THAT:    Defendant, BAYER CORPORATION, is

voluntarily dismissed without prejudice and without costs, *instanter* pursuant to 735 ILCS 5/2-

1009 with the right to re-file pursuant to the terms of the parties' Tolling Agreement.


**MOTHERWAY & NAPLETON. LLP**
140 South Dearborn Street, Suite 1500          ENTER:
Chicago, IL 60603                              _____
(312) 726-2699                                      Judge Brendan A. O'Brien
Attorney No:  56421
                                                         JUN 1 4 2019

                                                    Circuit  Court - 2175

# EXHIBIT B

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

ROBERT RAWSON,

                    Plaintiff,

    v.

MONSANTO COMPANY, a foreign
corporation; and DUKE'S HARDWARE,
INC., a domestic corporation,

                    Defendants.

No.    2019-L-002426

### DUKE'S HARDWARE, INC.'S OBJECTIONS AND
### RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

    Defendant Duke's Hardware, Inc. hereby submits its responses and objections to
Plaintiff's First Set of Interrogatories. The responses and objections set forth herein are based
upon the information presently available to Duke's Hardware, Inc., and Duke's Hardware, Inc.
expressly reserves the right to modify, supplement, or amend its objections and/or responses.
Each of Duke's Hardware, Inc.'s general objections is incorporated into its responses below,
whether expressly repeated or not.

### GENERAL OBJECTIONS

    1.    The hardware store where Plaintiff alleges that he purchased the product at issue
in this lawsuit is not Defendant Duke's Hardware, Inc.'s store. Plaintiff has alleged that he
purchased an unspecified Roundup®-branded product from Duke's Ace Hardware located at
7610 W. 111th St., Palos Hills, Illinois. *See* Compl. ¶ 6. Defendant Duke's Hardware, Inc. has
never owned or operated that store. Duke's Hardware, Inc. owns and operates a different store in
a different town (not Palos Hills), and does not have any records of purchases made by Plaintiff
at that store. Therefore, all discovery sought from Defendant Duke's Hardware, Inc. is
irrelevant, overly broad, and unduly and disproportionately burdensome.

2.      Duke's Hardware, Inc. has based these responses and objections on the assumption that Plaintiff, in propounding these Interrogatories, does not intend to seek information protected from discovery by the attorney-client privilege, the attorney work product doctrine, or information regarding or reflecting the impressions, conclusions, opinions, legal research or theories of Duke's Hardware, Inc.'s attorneys.  Duke's Hardware, Inc. objects to each Interrogatory to the extent it seeks documents or information protected by the attorney-client privilege, the work product doctrine, or any other applicable statutory or common law privilege.

3.      Duke's Hardware, Inc. objects to the extent these Interrogatories would require Duke's Hardware, Inc. to produce or search for information not within its possession, custody, or control, including information in the possession of other corporations or individuals not employed by the company.

4.      Duke's Hardware, Inc. objects to the Interrogatories to the extent they seek information or documentation that is publicly available and therefore readily available to Plaintiff, as the burden of obtaining such information is the same for Plaintiff as it would be for Duke's Hardware, Inc.

5.      Duke's Hardware, Inc. objects to the Interrogatories to the extent they seek information not relevant to any claims or defenses asserted in this case.

6.      Duke's Hardware, Inc. objects to these Interrogatories to the extent that they seek to impose a burden or requirements beyond what the Illinois Rules of Civil Procedure require.

7.      Duke's Hardware, Inc. objects to the Interrogatories to the extent they seek the identification of "all" documents or information in response.  It is a practical and legal impossibility that "all" facts, documents, or information for any specific subject could be found and identified for the more than forty years that glyphosate-containing products have been

2

manufactured and sold.

8.      Duke's Hardware, Inc. objects to the extent the Interrogatories seek the immediate attachment or production of documents because the hardware store where Plaintiff alleges that he purchased the product at issue in this lawsuit is not (and has never been) owned or operated by Duke's Hardware, Inc. To the extent Duke's Hardware, Inc. agrees to produce documents in accordance with its responses set forth below, the production will be made on a rolling basis.

9.      Duke's Hardware, Inc. objects to Plaintiff's request that Duke's Hardware, Inc. identify any statements, information and/or documents it may claim to be work product or subject to any common law or statutory privilege.  Duke's Hardware, Inc. is not at this time in a position to be able to identify all the privileged documents that may fall within its potential production set and reserves the right to make privilege claims at a later date.

10.      To the extent Duke's Hardware, Inc. agrees to produce documents or disclose information in accordance with its responses set forth below, the production or disclosure will be made following the negotiation and issuance of an appropriate Confidentiality and Protective Order and other agreements or orders including about the scope, format, and timing of privilege logging, and format of the parties' production of electronic and other kinds of responsive materials; Duke's Hardware, Inc. objects to production of documents prior to entry of such orders.

11.      Duke's Hardware, Inc. objects to the definition of "Identify" in the first paragraph of "Definitions," which defines the term as "When used with regard to a person, 'identify' shall mean to state the person's (a) full name; (b) title or position; (c) present or last known business and home address and telephone numbers; (d) present or last known employer; (e) Social Security Number; and (f) date of birth."  This definition is overbroad, unduly burdensome, and

3

seeks information that is neither relevant nor likely to lead to the discovery of admissible evidence, including because it seeks highly personal and/or confidential personally identifying information, e.g., home addresses, personal telephone numbers, social security numbers, and dates of birth. Duke's Hardware, Inc. will not provide the personal home address, personal phone number, social security number, or date of birth for any individual identified in responding to these Interrogatories.

12.     Duke's Hardware, Inc. objects to the definition of "You" and "Your" in the second paragraph of "Definitions," which defines the terms as "your attorneys, insurance carriers and its agents/employees, insurance broker, representatives, agents, assigns, partners, owners, shareholders, employees, agents, anyone acting on your behalf, and any other related persons or entities." This definition is overbroad and unduly burdensome because a number of related companies and individuals have nothing whatsoever to do with the manufacture or sale of the products at issue in Plaintiff's complaint.

13.     Duke's Hardware, Inc.'s Responses to the Interrogatories are made without waiving the right, at any time and for any reason, to revise, supplement, correct, add to, or clarify these Responses. These Responses also are provided without limiting or waiving Duke's Hardware, Inc.'s right to object to additional discovery that may be sought from Duke's Hardware, Inc. or from any of the custodians or production sources identified in these responses.

14.     These General Objections apply to all of the following Responses to specific Interrogatories and are incorporated by reference therein.

## RESPONSES AND OBJECTIONS TO INTERROGATORIES

**INTERROGATORY NO. 1:**     Identify the individual answering and signing these Answers to Interrogatories.

4

**RESPONSE:**  Duke's Hardware, Inc. incorporates by reference the foregoing General Objections here as if restated in full.  Duke's Hardware, Inc. objects to Interrogatory No. 1 because it seeks information that is not relevant to the subject matter involved in the pending action, and not important to or likely to resolve the issues in the litigation.

Subject to the general and specific objections set forth above, Duke's Hardware, Inc. responds as follows:  Duke's Hardware, Inc. employee Doug Gniadek has signed the verification page accompanying Duke's Hardware, Inc.'s objections and responses to these Interrogatory requests.

**INTERROGATORY NO. 2:**    Identify each person who prepared, consulted, or assisted in the preparation of the responses to these interrogatories.

**RESPONSE:**  Duke's Hardware, Inc. incorporates by reference the foregoing General Objections here as if restated in full.  Duke's Hardware, Inc. objects to Interrogatory No. 2 because it seeks information that is not relevant to the subject matter involved in the pending action, and not important to or likely to resolve the issues in the litigation.  Duke's Hardware, Inc. objects to Interrogatory No. 2 because it calls for the disclosure of information protected by attorney-client privilege and the work product doctrine.  Duke's Hardware, Inc. objects to the terms "prepared," "consulted," and "assisted" as vague and ambiguous.

Subject to the general and specific objections set forth above, Duke's Hardware, Inc. responds as follows:  Counsel for Duke's Hardware, Inc. prepared the objections and responses to these Interrogatories in collaboration with employees of Duke's Hardware, Inc. who were working at the direction of counsel for Duke's Hardware, Inc.

**INTERROGATORY NO. 3:**    Does DUKE'S HARDWARE, INC. presently sell, or has it sold in the past, Round-up or similar products?

**RESPONSE:**  Duke's Hardware, Inc. incorporates by reference the foregoing General Objections here as if restated in full.  Duke's Hardware, Inc. objects that Interrogatory No. 3 is

5

vague as to the word "Round-up" because it does not specify a product manufactured by Monsanto and/or alleged to have been used by Plaintiff. "Roundup" is not one product but is a brand name that encompasses many different products with distinct formulations, for use in different markets. Duke's Hardware, Inc. objects that Interrogatory No. 3 is vague as to the phrase "similar products" because it gives no guidance as to what makes a product similar to Roundup, which is itself not a product, but a brand name that encompasses many different products with distinct formulations, for use in different markets.

**INTERROGATORY NO. 4:** If the answer to the preceding interrogatory is in the affirmative, please: (a) indicate DUKE'S HARDWARE, INC.'s principal place of business, and all subsidiary or branch places of business, (b) give the address and store manager's name for all retail stores owned or controlled by DUKE'S HARDWARE, INC., (c) state the length of time for which DUKE'S HARDWARE, INC. has been selling similar products, (d) state the total sales volume of each of DUKE'S HARDWARE, INC.'s retail stores for similar products during the past three years, (e) indicate each identification feature of similar products, describing all trademarks, serial numbers, drawings, and all other features that specifically identify similar products that DUKE'S HARDWARE, INC. sells or has sold.

**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General Objections here as if restated in full. Duke's Hardware, Inc. objects that Interrogatory No. 4 is vague as to the word "similar products" because it gives no guidance as to what makes a product similar to Roundup, which is itself not a product, but a brand name that encompasses many different products with distinct formulations, for use in different markets. Duke's Hardware, Inc. objects that Interrogatory No. 4 is overbroad, unduly burdensome, and irrelevant to the subject matter involved in the pending action, including because a request for the "identification feature of similar products"—which includes trademarks, serial numbers, drawings, and all other features that specifically identify similar products—is not limited in time or scope, is not limited to the specific product(s) allegedly used by Plaintiff, and therefore the burden and expense of the discovery outweighs its likely benefit to Plaintiff.

6

**INTERROGATORY NO. 5:** Did DUKE'S HARDWARE, INC. sell Roundup that allegedly caused the injury to the Plaintiff?

**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General Objections here as if restated in full. Duke's Hardware, Inc. objects that Interrogatory No. 5 is vague as to the word "Roundup" because it does not specify a product manufactured by Monsanto and/or alleged to have been used by Plaintiff. "Roundup" is not one product but is a brand name that encompasses many different products with distinct formulations, for use in different markets.

**INTERROGATORY NO. 6:** If the answer to the preceding interrogatory is in the affirmative, please state: (a) the date of the sale, (b) the address of the store or outlet where the sale took place, (c) the name and address of the person who made the sale, (d) the substance of the conversation that took place between the purchaser and seller of Roundup at or about the time of the sale, and (e) the names and addresses of all persons who were present, or could have been present, at the time of the sale, including names of all of DUKE'S HARDWARE, INC.'s employees, agents, salesmen, and all other persons that were present at the time of the sale of Roundup.

**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General Objections here as if restated in full.

**INTERROGATORY NO. 7:** Does DUKE'S HARDWARE, INC. have any records of the sale of Roundup to the Plaintiff?

**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General Objections here as if restated in full. Duke's Hardware, Inc. objects that Interrogatory No. 7 is vague as to the word "Roundup" because it does not specify a product manufactured by Monsanto and/or alleged to have been used by Plaintiff. "Roundup" is not one product but is a brand name that encompasses many different products with distinct formulations, for use in different markets.

**INTERROGATORY NO. 8:** If the answer to the preceding interrogatory is in the affirmative, please state: (a) the invoice number and other identification of the record or records of the sale, (b) the date of the invoice or record, (c) specific identification of Roundup in the records, indicating quantity, color, weight, physical condition, serial number if any, and all other

7

distinctive features, (d) the terms and conditions of the alleged sale according to the record, including price, terms for payment, guarantees or warranties, installation services and repairs, and name of the purchaser, (e) the name, title, and address of the person who has custody of the invoice or record, and (f) if you will do so without a motion to produce, please attach a copy of the record of invoice to the answers to these interrogatories.

**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General

Objections here as if restated in full.

**INTERROGATORY NO. 9:** Does DUKE'S HARDWARE, INC. contend that Roundup was not purchased by the Plaintiff?

**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General

Objections here as if restated in full. Duke's Hardware, Inc. objects that Interrogatory No. 9 is

vague as to the word "Roundup" because it does not specify a product manufactured by

Monsanto and/or alleged to have been used by Plaintiff. "Roundup" is not one product but is a

brand name that encompasses many different products with distinct formulations, for use in

different markets. Duke's Hardware, Inc. objects to Interrogatory No. 9 as vague as to time and

location.

**INTERROGATORY NO. 10:** If the answer to the preceding interrogatory is in the affirmative, please state: (a) the name and address of the person that defendant alleges purchased Roundup, (b) DUKE'S HARDWARE, INC.'s knowledge at the time of the sale of any relationship between the purchaser and the Plaintiff, (c) DUKE'S HARDWARE, INC.'s knowledge at the time of sale of the intended user or users of Roundup.

**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General

Objections here as if restated in full.

**INTERROGATORY NO. 11:** Did DUKE'S HARDWARE, INC. make or cause to be made any alterations or changes in Roundup, the contents of Roundup, or the packaging surrounding or accompanying Roundup subsequent to delivery but before its sale?

**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General

Objections here as if restated in full. Duke's Hardware, Inc. objects that Interrogatory No. 11 is

vague as to the word "Roundup" because it does not specify a product manufactured by

8

Monsanto and/or alleged to have been used by Plaintiff. "Roundup" is not one product but is a brand name that encompasses many different products with distinct formulations, for use in different markets. Duke's Hardware, Inc. objects that Interrogatory No. 11 is vague as to the words "alterations" and "changes" as those words could mean different things to different people. Duke's Hardware, Inc. objects that Interrogatory No. 11 is overbroad, unduly burdensome, and irrelevant to the subject matter involved in the pending action, including because it is not limited in time and/or to the specific product(s) allegedly used by Plaintiff, and therefore the burden and expense of the discovery outweighs its likely benefit to Plaintiff.

**INTERROGATORY NO. 12:** If the answer to the preceding interrogatory is in the affirmative, please describe in detail each such change or alteration, including, for each such alteration or change: (a) the date on which the change or alteration was made, (b) an exact description of the change or alteration, including the procedure by which the change or alteration was accomplished, (c) the reason for making the change or alteration, (d) the name and address of each person who made the change or alteration, (e) the name and address of each person who authorized the change or alteration.

**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General Objections here as if restated in full.

**INTERROGATORY NO. 13:** Does DUKE'S HARDWARE, INC. claim or contend that any failure or defect in Roundup is due to alterations or changes in Roundup made by a person or party other than DUKE'S HARDWARE, INC. after Roundup left the control and ownership of Defendant, MONSANTO COMPANY?

**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General Objections here as if restated in full. Duke's Hardware, Inc. objects that Interrogatory No. 13 is vague as to the word "Roundup" because it does not specify a product manufactured by Monsanto and/or alleged to have been used by Plaintiff. "Roundup" is not one product but is a brand name that encompasses many different products with distinct formulations, for use in different markets. Duke's Hardware, Inc. objects that Interrogatory No. 13 is vague as to the words "alterations," "failure," "defect," and "changes" as those words could mean different

9

things to different people. Duke's Hardware, Inc. objects that Interrogatory No. 13 is overbroad,

unduly burdensome, and irrelevant to the subject matter involved in the pending action,

including because it is not limited in time and/or to the specific product(s) allegedly used by

Plaintiff or to the only injury alleged in this case, NHL, and therefore the burden and expense of

the discovery outweighs its likely benefit to Plaintiff. Duke's Hardware, Inc. objects to

Interrogatory No. 13 to the extent it requires Duke's Hardware, Inc. to speculate as to

information not within its possession, custody, or control. Duke's Hardware, Inc. objects to

Interrogatory No. 13 to the extent it assumes Duke's Hardware, Inc. knew of any alleged

"failure" or "defect" associated with Roundup®-branded products. Duke's Hardware, Inc.

objects that that Interrogatory No. 13 is premature.

**INTERROGATORY NO. 14:** If the answer to the preceding interrogatory is in the affirmative, please explain this claim or contention in complete detail, including such information as: (a) the name and address of the person or party who DUKE'S HARDWARE, INC. claims made the change or alteration, (b) the date of the change or alteration, (c) the address at which the change or alteration was made, (d) the nature of the change or alteration, (e) how the change or alteration caused or contributed to the failure or defect in Roundup, (f) the reason the change or alteration was made, (g) the nature of any contracts or agreements, whether written or oral, that exist between DUKE'S HARDWARE, INC. and the person or party cited in response to subsection (a) of this interrogatory.

**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General

Objections here as if restated in full.

**INTERROGATORY NO. 15:** Was the use to which Roundup was put, as described in the Plaintiff's pleadings, a use which DUKE'S HARDWARE, INC. had anticipated?

**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General

Objections here as if restated in full. Duke's Hardware, Inc. objects that Interrogatory No. 15 is

vague as to the word "Roundup" because it does not specify a product manufactured by

Monsanto and/or alleged to have been used by Plaintiff. "Roundup" is not one product but is a

brand name that encompasses many different products with distinct formulations, for use in

10

different markets. Duke's Hardware, Inc. objects that that Interrogatory No. 15 is premature.

Duke's Hardware, Inc. objects to Interrogatory No. 15 because it seeks information that is

readily available to Plaintiff, and the burden of obtaining such information is the same for

Plaintiff as it would be for Duke's Hardware, Inc.

**INTERROGATORY NO. 16:** Did DUKE'S HARDWARE, INC. or any agent or employee of DUKE'S HARDWARE, INC. have any knowledge of the existence of any alleged defect or defective condition in Roundup prior to the alleged occurrence?

**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General

Objections here as if restated in full. Duke's Hardware, Inc. objects that Interrogatory No. 16 is

vague as to the word "Roundup" because it does not specify a product manufactured by

Monsanto and/or alleged to have been used by Plaintiff. "Roundup" is not one product but is a

brand name that encompasses many different products with distinct formulations, for use in

different markets. Duke's Hardware, Inc. objects that Interrogatory No. 16 is overbroad, unduly

burdensome, and irrelevant to the subject matter involved in the pending action, including

because it is not limited in time and/or the specific product(s) allegedly used by Plaintiff or to the

only injury alleged in this case, NHL, and therefore the burden and expense of the discovery

outweighs its likely benefit to Plaintiff. Duke's Hardware, Inc. objects to Interrogatory No. 16 as

vague as to "defect" or "defective" condition, which could mean different things to different

people. Duke's Hardware, Inc. objects to Interrogatory No. 16 to the extent it requires Duke's

Hardware, Inc. to speculate as to information not within its possession, custody, or control.

**INTERROGATORY NO. 17:** If the answer to the preceding interrogatory is in the affirmative, please state: (a) when DUKE'S HARDWARE, INC. or any agent or employee of DUKE'S HARDWARE, INC. first learned of the existence of each such defect or defective condition, giving the date and time, (b) how DUKE'S HARDWARE, INC. or any agent or employee of DUKE'S HARDWARE, INC. learned of the existence of each such defect or defective condition, (c) what action or actions, if any, DUKE'S HARDWARE, INC. or any agent or employee ofDUKE'S HARDWARE, INC. took to remove, repair, or correct each such defect or defective condition so as to safeguard the Plaintiff.

11

**RESPONSE:**  Duke's Hardware, Inc. incorporates by reference the foregoing General

Objections here as if restated in full.

**INTERROGATORY NO. 18:**  What precautions, if any, were taken by DUKE'S
HARDWARE, INC. or any agent or employee of DUKE'S HARDWARE, INC. prior to the
alleged occurrence to prevent injuries or damage to the user of Roundup?

**RESPONSE:**  Duke's Hardware, Inc. incorporates by reference the foregoing General

Objections here as if restated in full.  Duke's Hardware, Inc. objects that Interrogatory No. 18 is

vague as to the word "Roundup" because it does not specify a product manufactured by

Monsanto and/or alleged to have been used by Plaintiff.  "Roundup" is not one product but is a

brand name that encompasses many different products with distinct formulations, for use in

different markets.  Duke's Hardware, Inc. objects that Interrogatory No. 18 is vague as to the

words "precautions," "injuries," and "damage" because those words could mean different things

to different people.  Duke's Hardware, Inc. objects that Interrogatory No. 18 is overbroad,

unduly burdensome, and irrelevant to the subject matter involved in the pending action,

including because it is not limited in time and/or the specific product(s) allegedly used by

Plaintiff or to the only injury alleged in this case, NHL, and therefore the burden and expense of

the discovery outweighs its likely benefit to Plaintiff.

**INTERROGATORY NO. 19:**  Did DUKE'S HARDWARE, INC., at any time prior to
the alleged occurrence, take any actions or precautions whatsoever to avert or warn against
possible damage or injuries that might have resulted from known or potential hazards, dangers,
defects, or defective conditions in Roundup?

**RESPONSE:**  Duke's Hardware, Inc. incorporates by reference the foregoing General

Objections here as if restated in full.  Duke's Hardware, Inc. objects that Interrogatory No. 19 is

vague as to the word "Roundup" because it does not specify a product manufactured by

Monsanto and/or alleged to have been used by Plaintiff.  "Roundup" is not one product but is a

brand name that encompasses many different products with distinct formulations, for use in

4841-3740-4322

different markets. Duke's Hardware, Inc. objects that Interrogatory No. 19 is vague as to the words "precautions," "hazards," "dangers," "defects," "damage," "injuries," or "defective conditions" because those words could mean different things to different people. Duke's Hardware, Inc. objects that Interrogatory No. 19 is overbroad, unduly burdensome, and irrelevant to the subject matter involved in the pending action, including because it is not limited in time and/or to the specific product(s) allegedly used by Plaintiff or to the only injury alleged in this case, NHL, and therefore the burden and expense of the discovery outweighs its likely benefit to Plaintiff.

**INTERROGATORY NO. 20:** Please describe in complete detail every warning or signal, either written or oral, given by DUKE'S HARDWARE, INC. to the Plaintiff prior to the date of the alleged occurrence.

**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General Objections here as if restated in full. Duke's Hardware, Inc. objects that Interrogatory No. 20 is vague as to the words "warning" and "signal" because those words could mean different things to different people. Duke's Hardware, Inc. objects that Interrogatory No. 20 is overbroad, unduly burdensome, and irrelevant to the subject matter involved in the pending action, including because it is not limited in time and/or to the specific product(s) allegedly used by Plaintiff or to the only injury alleged in this case, NHL, and therefore the burden and expense of the discovery outweighs its likely benefit to Plaintiff.

**INTERROGATORY NO. 21:** Please describe in complete detail all instruction booklets, brochures, manuals, or other printed matter distributed with, or in conjunction with the sale of Roundup.

**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General Objections here as if restated in full. Duke's Hardware, Inc. objects that Interrogatory No. 21 is vague as to the word "Roundup" because it does not specify a product manufactured by Monsanto and/or alleged to have been used by Plaintiff. "Roundup" is not one product but is a

13

brand name that encompasses many different products with distinct formulations, for use in different markets.  Duke's Hardware, Inc. objects that Interrogatory No. 21 is vague as to the words "instruction booklets," "brochures," "manuals" and "other printed matter" because those words could mean different things to different people.  Duke's Hardware, Inc. objects to Interrogatory No. 21 because it seeks information that is readily available to Plaintiff, and the burden of obtaining such information is the same for Plaintiff as it would be for Duke's Hardware, Inc.  Duke's Hardware, Inc. objects that Interrogatory No. 21 is overbroad, unduly burdensome, and irrelevant to the subject matter involved in the pending action, including because it is not limited in time and/or to the specific product(s) allegedly used by Plaintiff, and therefore the burden and expense of the discovery outweighs its likely benefit to Plaintiff.

**INTERROGATORY NO. 22:**  Please describe in complete detail all warnings, directions, instructions, or other printed matter, including labels affixed directly to Roundup or its container, distributed with, or in conjunction with the sale of Roundup.

**RESPONSE:**  Duke's Hardware, Inc. incorporates by reference the foregoing General Objections here as if restated in full.  Duke's Hardware, Inc. objects that Interrogatory No. 22 is vague as to the word "Roundup" because it does not specify a product manufactured by Monsanto and/or alleged to have been used by Plaintiff.  "Roundup" is not one product but is a brand name that encompasses many different products with distinct formulations, for use in different markets.  Duke's Hardware, Inc. objects that Interrogatory No. 22 is vague as to the words "warnings," "directions," "instructions," and "other printed matter" because those words could mean different things to different people.  Duke's Hardware, Inc. objects to Interrogatory No. 22 because it seeks information that is readily available to Plaintiff, and the burden of obtaining such information is the same for Plaintiff as it would be for Duke's Hardware, Inc. Duke's Hardware, Inc. objects to the extent Interrogatory No. 22 requires Duke's Hardware, Inc. to speculate as to information not within its possession, custody, or control.  Duke's Hardware,

14

Inc. objects that Interrogatory No. 22 is overbroad, unduly burdensome, and irrelevant to the subject matter involved in the pending action, including because it is not limited in time and/or to the specific product(s) allegedly used by Plaintiff, and therefore the burden and expense of the discovery outweighs its likely benefit to Plaintiff.

**INTERROGATORY NO. 23:**  Please describe in complete detail, including all labels, the package in which Roundup was when Roundup first came into the possession of DUKE'S HARDWARE, INC.

**RESPONSE:**  Duke's Hardware, Inc. incorporates by reference the foregoing General Objections here as if restated in full.  Duke's Hardware, Inc. objects that Interrogatory No. 23 is vague as to the word "Roundup" because it does not specify a product manufactured by Monsanto and/or alleged to have been used by Plaintiff.  "Roundup" is not one product but is a brand name that encompasses many different products with distinct formulations, for use in different markets.  Duke's Hardware, Inc. objects that Interrogatory No. 23 is overbroad, unduly burdensome, and irrelevant to the subject matter involved in the pending action, including because it is not limited in time and/or to the specific product(s) allegedly used by Plaintiff, and therefore the burden and expense of the discovery outweighs its likely benefit to Plaintiff.

**INTERROGATORY NO. 24:**  Please describe in complete detail, including all labels, the package in which Roundup was when Roundup was sold.

**RESPONSE:**  Duke's Hardware, Inc. incorporates by reference the foregoing General Objections here as if restated in full.  Duke's Hardware, Inc. objects that Interrogatory No. 24 is vague as to the word "Roundup" because it does not specify a product manufactured by Monsanto and/or alleged to have been used by Plaintiff.  "Roundup" is not one product but is a brand name that encompasses many different products with distinct formulations, for use in different markets.  Duke's Hardware, Inc. objections to Interrogatory No. 24 because it seeks information that is readily available to Plaintiff, and the burden of obtaining such information is

15

the same for Plaintiff as it would be for Duke's Hardware, Inc. Duke's Hardware, Inc. objects to

the extent Interrogatory No. 24 requires Duke's Hardware, Inc. to speculate as to information not

within its possession, custody, or control. Duke's Hardware, Inc. objects that Interrogatory No.

24 is overbroad, unduly burdensome, and irrelevant to the subject matter involved in the pending

action, including because it is not limited in time and/or to the specific product(s) allegedly used

by Plaintiff, and therefore the burden and expense of the discovery outweighs its likely benefit to

Plaintiff.

**INTERROGATORY NO. 25:** Did DUKE'S HARDWARE, INC. inspect Roundup
before it was sold?

**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General

Objections here as if restated in full. Duke's Hardware, Inc. objects that Interrogatory No. 25 is

vague as to the word "Roundup" because it does not specify a product manufactured by

Monsanto and/or alleged to have been used by Plaintiff. "Roundup" is not one product but is a

brand name that encompasses many different products with distinct formulations, for use in

different markets. Duke's Hardware, Inc. objects that Interrogatory No. 25 is overbroad, unduly

burdensome, and irrelevant to the subject matter involved in the pending action, including

because it is not limited in time and/or to the specific product(s) allegedly used by Plaintiff, and

therefore the burden and expense of the discovery outweighs its likely benefit to Plaintiff.

**INTERROGATORY NO. 26:** If the answer to the preceding interrogatory is in the
affirmative, please describe this inspection in detail, and state the frequency with which defects
are discovered in similar products.

**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General

Objections here as if restated in full.

**INTERROGATORY NO. 27:** With regard to the sale of Roundup, please describe: (a)
all inspections of Roundup made by you or your agents prior to sale, (b) all recommendations for
use of Roundup made to the buyer, (c) the full details of any demonstration of Roundup or
similar products, (d) all statements made by you or your agents concerning the specific use and

16

quality of Roundup and all warranties and guarantees whether oral or written given by you in connection with the sale of Roundup.

　　**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General

Objections here as if restated in full. Duke's Hardware, Inc. objects that Interrogatory No. 27 is

vague as to the word "Roundup" because it does not specify a product manufactured by

Monsanto and/or alleged to have been used by Plaintiff. "Roundup" is not one product but is a

brand name that encompasses many different products with distinct formulations, for use in

different markets. Duke's Hardware, Inc. objects that Interrogatory No. 27 is vague as to the

words "inspections," "demonstration," "similar products," "warranties," and "guarantees"

because those words could mean different things to different people. Duke's Hardware, Inc.

objections to Interrogatory No. 27 because it seeks information that is readily available to

Plaintiff, and the burden of obtaining such information is the same for Plaintiff as it would be for

Duke's Hardware, Inc. Duke's Hardware, Inc. objects to the extent Interrogatory No. 27 requires

Duke's Hardware, Inc. to speculate as to information not within its possession, custody, or

control. Duke's Hardware, Inc. objects that Interrogatory No. 27 is overbroad, unduly

burdensome, and irrelevant to the subject matter involved in the pending action, including

because it is not limited in time and/or to the specific product(s) allegedly used by Plaintiff, and

therefore the burden and expense of the discovery outweighs its likely benefit to Plaintiff.

　　**INTERROGATORY NO. 28:** Did DUKE'S HARDWARE, INC., at any time within the five years prior to the date of the alleged occurrence, advertise, promote, or cause to be advertised or promoted similar products?

　　**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General

Objections here as if restated in full. Duke's Hardware, Inc. objects that Interrogatory No. 28 is

vague as to the phrase "similar products" because it does not identify the product to which

comparison is intended. To the extent Plaintiff is referring to what Plaintiff has referenced

17

elsewhere as Roundup, Duke's Hardware, Inc. objects that this Request gives no guidance as to

what makes a product similar to Roundup, which is itself not a product, but a brand name that

encompasses many different products with distinct formulations, for use in different markets.

Duke's Hardware, Inc. objects to Interrogatory No. 28 because it seeks information that is

readily available to Plaintiff, and the burden of obtaining such information is the same for

Plaintiff as it would be for Duke's Hardware, Inc. Duke's Hardware, Inc. objects to the extent

Interrogatory No. 28 requires Duke's Hardware, Inc. to speculate as to information not within its

possession, custody, or control. Duke's Hardware, Inc. objects that Interrogatory No. 28 is

overbroad, unduly burdensome, and irrelevant to the subject matter involved in the pending

action, including because it is not limited to the specific product(s) allegedly used by Plaintiff,

and therefore the burden and expense of the discovery outweighs its likely benefit to Plaintiff.

**INTERROGATORY NO. 29:** If the answer to the preceding interrogatory is in the
affirmative, please state and describe in complete detail: (a) the various media and forms of
communication through which similar products were advertised, (b) the nature and content of
text, copy, pictures, animations, films, tapes, and other written and broadcast statements and
documents relating to similar products, (c) the amount of money and other resources involved in
such promotion or advertising, (d) the geographical areas in which such promotion or advertising
took place, (e) the dates between which each piece of copy or advertising was run, printed,
broadcast, or distributed.

**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General

Objections here as if restated in full.

**INTERROGATORY NO. 30:** Had DUKE'S HARDWARE, INC., within five years
prior to the date of the alleged occurrence or subsequent to the alleged occurrence, received or
become aware of any complaints of defective or wrongful operation of similar products or
comparable products, or of injuries, damages, or unusual occurrences similar to those alleged to
have been experienced by the Plaintiff?

**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General

Objections here as if restated in full. Duke's Hardware, Inc. objects that Interrogatory No. 30 is

vague as to the words "complaints," "defective or wrongful operation," "injuries," "damages,"

18

"similar to," "similar products," "comparable products," and "unusual" because those words/phrases could mean different things to different people. Duke's Hardware, Inc. objects that Interrogatory No. 30 is overbroad, unduly burdensome, and irrelevant to the subject matter involved in the pending action, including because it is not limited in time and/or the specific product(s) allegedly used by Plaintiff or to the only injury alleged in this case, NHL, and therefore the burden and expense of the discovery outweighs its likely benefit to Plaintiff.

**INTERROGATORY NO. 31:** Finally, please identify any statements, information and/or documents known to you and requested by any of the foregoing Interrogatories which you claim to be work product or subject to any common law or statutory privilege, and with respect to each such statement or document, specify the legal basis for the claim as required by Supreme Court Rule 201 (n). The requesting Plaintiff also calls upon the party to whom these interrogatories are directed to seasonably supplement the answers to interrogatories as additional information become available in accordance with Supreme Court Rule 213(i).

**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General Objections here as if restated in full. Duke's Hardware, Inc. objects to Plaintiff's request that Duke's Hardware, Inc. identify, at this juncture, any statements, information and/or documents it may claim to be work product or subject to any common law or statutory privilege. Duke's Hardware, Inc. is not at this time in a position to be able to identify all the privileged documents that may fall within its potential production set and reserves the right to make privilege claims at a later date. Duke's Hardware, Inc. will respond to this Interrogatory if necessary after the appropriate Confidentiality and Protective Order and other agreements or orders including about the scope, format, and timing of privilege logging, and format of the parties' production of electronic and other kinds of responsive materials; Duke's Hardware, Inc. objects to responding to this Interrogatory prior to entry of such orders.

Dated:  September 3, 2019

Respectfully submitted,

**DUKE'S HARDWARE, INC.**


By:  _/s/   Thomas J. Dammrich II_
          One of Its Attorneys

Thomas J. Dammrich II (#6292653)
Peter F. O'Neill
SHOOK, HARDY & BACON L.L.P.
111 South Wacker Drive, *Suite 4700*
Chicago, Illinois 60606
Telephone:  (312) 704-7700
Facsimile:   (312) 558-1195
Email:  tdammrich@shb.com
Firm ID No. 58950

20

Case: 1:19-cv-00402 Document #: 1-2 Filed: 09/04/19 Page 1 of 1 PageID #:117

## VERIFICATION BY DUKE'S HARDWARE, INC.

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct.

Doug Gniadek
President
Duke's Hardware, Inc.

Date: 9/3/2019

## <u>CERTIFICATE OF SERVICE</u>

I, Thomas J. Dammrich II, an attorney, hereby certify that, on **September 3, 2019**, I

caused a true and complete copy of the foregoing **DUKE'S HARDWARE, INC.'S**

**OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST SET OF**

**INTERROGATORIES** to be served upon the following counsel of record via United States

Mail, proper First Class postage prepaid thereon:

| | |
|---|---|
| David J. Gallagher | Dominique Savinelli |
| (dgallagher@mnlawoffice.com) | (Dominique.savinelli@huschblackwell.com) |
| **Motherway & Napleton, LLP** | James P. O'Shea |
| 140 S. Dearborn Street, Suite 1500 | (James.Oshea@huschblackwell.com) |
| Chicago, IL 60603 | **Husch Blackwell LLP** |
| Telephone:    (312) 726-2699 | 120 South Riverside Plaza |
| Facsimile:     (312) 726-6851 | Suite 2200 |
| | Chicago, IL 60606 |
| *Attorneys for Plaintiff* | Telephone:  (312) 655-1500 |
| | |
| | *Attorneys for Bayer Corporation and* |
| | *Monsanto Company* |

_/s/  Thomas J. Dammrich II_

# IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| ROBERT RAWSON, | | |
| | Plaintiff, | |
| | | No.   2019-L-002426 |
| v. | | |
| MONSANTO COMPANY, a foreign corporation; and DUKE'S HARDWARE, INC., a domestic corporation, | | |
| | Defendants. | |

## DUKE'S HARDWARE, INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S RULE 213 INTERROGATORIES

Defendant Duke's Hardware, Inc. hereby submits its responses and objections to Plaintiff's Illinois Supreme Court Rule 213 Interrogatories. The responses and objections set forth herein are based upon the information presently available to Duke's Hardware, Inc., and Duke's Hardware, Inc. expressly reserves the right to modify, supplement, or amend its objections and/or responses. Each of Duke's Hardware, Inc.'s general objections is incorporated into its responses below, whether expressly repeated or not.

## GENERAL OBJECTIONS

1.     The hardware store where Plaintiff alleges that he purchased the product at issue in this lawsuit is not Defendant Duke's Hardware, Inc.'s store. Plaintiff has alleged that he purchased an unspecified Roundup®-branded product from Duke's Ace Hardware located at 7610 W. 111th St., Palos Hills, Illinois. See Compl. ¶ 6. Defendant Duke's Hardware, Inc. has never owned or operated that store. Duke's Hardware, Inc. owns and operates a different store in a different town (not Palos Hills), and does not have any records of purchases made by Plaintiff at that store. Therefore, all discovery sought from Defendant Duke's Hardware, Inc. is irrelevant, overly broad, and unduly and disproportionately burdensome.

4830-1752-2082

2. Duke's Hardware, Inc. has based these responses and objections on the assumption that Plaintiff, in propounding these Interrogatories, does not intend to seek information protected from discovery by the attorney-client privilege, the attorney work product doctrine, or information regarding or reflecting the impressions, conclusions, opinions, legal research or theories of Duke's Hardware, Inc.'s attorneys. Duke's Hardware, Inc. objects to each Interrogatory to the extent it seeks documents or information protected by the attorney-client privilege, the work product doctrine, or any other applicable statutory or common law privilege.

3. Duke's Hardware, Inc. objects to the extent these Interrogatories would require Duke's Hardware, Inc. to produce or search for information not within its possession, custody, or control, including information in the possession of other corporations or individuals not employed by the company.

4. Duke's Hardware, Inc. objects to the Interrogatories to the extent they seek information or documentation that is publicly available and therefore readily available to Plaintiffs, as the burden of obtaining such information is the same for Plaintiffs as it would be for Duke's Hardware, Inc.

5. Duke's Hardware, Inc. objects to these Interrogatories to the extent that they seek to impose a burden or requirements beyond what the Illinois Rules of Civil Procedure require.

6. Duke's Hardware, Inc.'s Responses to these Interrogatories are made without waiving the right, at any time and for any reason, to revise, supplement, correct, add to, or clarify these Responses. These responses also are provided without limiting or waiving Duke's Hardware, Inc.'s right to object to additional discovery that may be sought from Duke's Hardware, Inc. or from any of the custodians or production sources identified in these responses.

7.      To the extent Duke's Hardware, Inc. agrees to produce documents or disclose information in accordance with its responses set forth below, the production or disclosure will be made following the negotiation and issuance of an appropriate Confidentiality and Protective Order and other agreements or orders including about the scope, format, and timing of privilege logging, and format of the parties' production of electronic and other kinds of responsive materials; Duke's Hardware, Inc. objects to production or disclosure prior to entry of such orders.

8.      These General Objections apply to all of the following Responses to specific Interrogatories and are incorporated by reference therein.

## RESPONSES AND OBJECTIONS TO INTERROGATORIES

**INTERROGATORY NO. 1:**    Please state the name, current address, and current phone numbers of each and every lay witness who will testify at trial, and for each such lay witness identified, provide the following: (a) the subject matter on which each lay witness will testify.

**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General Objections here as if restated in full.  Duke's Hardware, Inc. objects to the identification of "current address" and "current phone number" because the Interrogatory seeks personal and/or confidential information that is not relevant to the subject matter involved in the pending action, and not important to or likely to resolve the issues in the litigation.  Duke's Hardware, Inc. will not provide the personal home address or personal phone number of any individuals identified in responding to this Interrogatory.

**INTERROGATORY NO. 2:**    Please state the name, current address, and current phone numbers of each and every independent expert witness who will testify at trial, and for each such independent expert witness identified, provide the following: (a) the subject matter on which each *independent expert witness* will testify; and (b) the conclusions and opinions of each independent expert witness and the bases for each opinion and conclusion.

**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General Objections here as if restated in full.  Duke's Hardware, Inc. objects to the identification of

3

"current address" and "current phone number" because the Interrogatory seeks personal and/or confidential information that is not relevant to the subject matter involved in the pending action, and not important to or likely to resolve the issues in the litigation.  Duke's Hardware, Inc. will not provide the personal home address or personal phone number of any individuals identified in responding to this Interrogatory.  Duke's Hardware, Inc. objects that Interrogatory No. 2 is premature.

**INTERROGATORY NO. 3:**    Please state the name, current address, and current phone numbers of each and every controlled expert witness who will testify at trial, and for each such controlled expert witness identified, provide the following: (a) the subject matter on which each controlled expert witness will testify; and (b) the conclusions and opinions of each controlled expert witness and the bases for each opinion and conclusion; (c) the qualifications of each controlled expert witness; and (d) any reports prepared by the controlled expert witness.

**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General Objections here as if restated in full.  Duke's Hardware, Inc. objects to the identification of "current address" and "current phone number" because the Interrogatory seeks personal and/or confidential information that is not relevant to the subject matter involved in the pending action, and not important to or likely to resolve the issues in the litigation.  Duke's Hardware, Inc. will not provide the personal home address or personal phone number of any individuals identified in responding to this Interrogatory.  Duke's Hardware, Inc. objects that Interrogatory No. 3 is premature.

Dated:  September 3, 2019

Respectfully submitted,

**DUKE'S HARDWARE, INC.**

By: _/s/  Thomas J. Dammrich II_____
        One of Its Attorneys

Thomas J. Dammrich II (#6292653)
Peter F. O'Neill
SHOOK, HARDY & BACON L.L.P.
111 South Wacker Drive, *Suite 4700*
Chicago, Illinois 60606
Telephone:  (312) 704-7700
Facsimile:   (312) 558-1195
Email:  tdammrich@shb.com
Firm ID No. 58950

## <u>VERIFICATION BY DUKE'S HARDWARE, INC.</u>

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct.

Doug Gniadek
President
Duke's Hardware, Inc.

Date: 9/3/2019

## CERTIFICATE OF SERVICE

I, Thomas J. Dammrich II, an attorney, hereby certify that, on **September 3, 2019**, I caused a true and complete copy of the foregoing **DUKE'S HARDWARE, INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S RULE 213 INTERROGATORIES** to be served upon the following counsel of record via United States Mail, proper First Class postage prepaid thereon:

David J. Gallagher
(dgallagher@mnlawoffice.com)
**Motherway & Napleton, LLP**
140 S. Dearborn Street, Suite 1500
Chicago, IL 60603
Telephone:     (312) 726-2699
Facsimile:     (312) 726-6851

*Attorneys for Plaintiff*

Dominique Savinelli
(Dominique.savinelli@huschblackwell.com)
James P. O'Shea
(James.Oshea@huschblackwell.com)
**Husch Blackwell LLP**
120 South Riverside Plaza
Suite 2200
Chicago, IL 60606
Telephone:  (312) 655-1500

*Attorneys for Bayer Corporation and Monsanto Company*

_/s/  Thomas J. Dammrich II_

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| ROBERT RAWSON, | |
| Plaintiff, | |
| v. | No.    2019-L-002426 |
| MONSANTO COMPANY, a foreign corporation; and DUKE'S HARDWARE, INC., a domestic corporation, | |
| Defendants. | |

## DUKE'S HARDWARE, INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST SET OF SUPREME COURT RULE 214 REQUESTS FOR PRODUCTION

Defendant Duke's Hardware, Inc. hereby submits its responses and objections to Plaintiff's Illinois Supreme Court Rule 214 Requests for Production.  The responses and objections set forth herein are based upon the information presently available to Duke's Hardware, Inc., and Duke's Hardware, Inc. expressly reserves the right to modify, supplement, or amend its objections and/or responses.  Each of Duke's Hardware, Inc.'s general objections is incorporated into its responses below, whether expressly repeated or not.

### GENERAL OBJECTIONS

1.      The hardware store where Plaintiff alleges that he purchased the product at issue in this lawsuit is not (and has never been) owned or operated by Defendant Duke's Hardware, Inc.'s store.  Plaintiff has alleged that he purchased an unspecified Roundup®-branded product from Duke's Ace Hardware located at 7610 W. 111th St., Palos Hills, Illinois.  *See* Compl. ¶ 6. Defendant Duke's Hardware, Inc. has never owned or operated that store.  Duke's Hardware, Inc. owns and operates a different store in a different town (not Palos Hills), and does not have any records of purchases made by Plaintiff at that store.  Therefore, all discovery sought

from Defendant Duke's Hardware, Inc. is irrelevant, overly broad, and unduly and disproportionately burdensome.

2.    Duke's Hardware, Inc. objects to the Requests for production of "all" documents that relate to each identified subject in Plaintiff's Requests.  It is a practical and legal impossibility that "all" documents for any specific subject could be found for the more than forty years that glyphosate-containing products have been manufactured and sold.

3.    Duke's Hardware, Inc. has based these responses and objections on the assumption that Plaintiff, in propounding these Requests, does not intend to seek information protected from discovery by the attorney-client privilege, or the work product doctrine, or information regarding or reflecting the impressions, conclusions, opinions, legal research or theories of Duke's Hardware, Inc.'s attorneys.  Duke's Hardware, Inc. objects to each Request to the extent it seeks documents or information protected by the attorney-client privilege, the work product doctrine, or any other applicable statutory or common law privilege.  Duke's Hardware, Inc. is not at this time in a position to be able to identify all the privileged documents that may fall within its potential production set and reserves the right to make privilege claims at a later date.

4.    Duke's Hardware, Inc. objects to the extent the Requests seek the immediate production of documents because the hardware store where Plaintiff alleges that he purchased the product at issue in this lawsuit is not (and has never been) owned or operated by Defendant Duke's Hardware, Inc.To the extent Duke's Hardware, Inc. agrees to produce documents in accordance with its responses set forth below, the production will be made in a sequential manner following the negotiation and issuance of an appropriate Confidentiality and Protective Order and other agreements or orders including about the scope, format, and timing of privilege

logging, and format of the parties' production of electronic and other kinds of responsive materials; Duke's Hardware, Inc. objects to production prior to entry of such orders.

5.     Duke's Hardware, Inc. objects to Plaintiff's Requests to the extent they seek information duplicative of the more than two million documents (estimated to exceed twenty million pages) Monsanto already has produced in the federal multi-district litigation styled *In re Roundup Products Liability Litigation* (the "MDL") and other state court litigations where the Plaintiffs claim that exposure to Monsanto's glyphosate-based herbicides caused them to develop non-Hodgkin's lymphoma ("NHL").  The vast collections Monsanto already has produced include records from non-custodial collections containing labels and Material Safety Data Sheets from Monsanto's glyphosate-containing products; Monsanto's EPA registration and correspondence files; records of external corporate statements about the safety of Monsanto's glyphosate-containing products; and scientific studies and articles related to the safety of glyphosate and glyphosate-containing products to humans and to other mammals.  Monsanto also has produced records from the files of nearly 60 current or former Monsanto employees, including at least seven toxicologists who work or have worked with glyphosate and glyphosate-containing products.  These previous document productions were produced by Monsanto in keyword searchable format in other cases.  They are hosted in a central repository organized by the MDL Plaintiffs' co-lead counsel.  The MDL court entered orders to facilitate a process for coordination and sharing of discovery with state court cases, and Plaintiff may learn more regarding the terms of access to those materials through any of the MDL Plaintiffs' co-lead counsel, *see* MDL Pretrial Order Nos. 4 & 7, www.cand.uscourts.gov/VC/roundupmdl, after entry of substantially equivalent procedural orders, *see* MDL Pretrial Order No. 30 at ¶ 11.

6.      Duke's Hardware, Inc. objects to these Requests for Production to the extent they seek to impose a burden or requirement beyond what the Illinois Rules of Civil Procedure require.

7.      Duke's Hardware, Inc.'s Responses to the Requests are made without waiving the right, at any time and for any reason, to revise, supplement, correct, add to, or clarify these Responses.  These responses also are provided without limiting or waiving Duke's Hardware, Inc.'s right to object to additional discovery that may be sought from Duke's Hardware, Inc. or from any of the custodians or production sources identified in these responses.

8.      These General Objections apply to all of the following Responses to specific document requests.

### RESPONSES AND OBJECTIONS TO REQUESTS FOR PRODUCTION

**Request for Production No. 1:**    The recorded or transcribed statements of persons whose identity is called for in the Interrogatories propounded by this party and any such statement of the party propounding this discovery request.

**RESPONSE:**  Duke's Hardware, Inc. incorporates by reference the foregoing General Objections here as if restated in full.  Duke's Hardware, Inc. objects that the terms "statement" or "statements," "persons," and the phrase "the Interrogatories" are vague and ambiguous, including because the terms or phrases do not specify which persons, interrogatories or set of interrogatories this Request is referencing.[1]  Duke's Hardware, Inc. objects to the extent Request No. 1 seeks information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege.  To the extent Plaintiff is seeking deposition transcripts, Duke's Hardware, Inc. objects that depositions transcripts are created by the court reporter and

---

[1]       Plaintiff served two sets of interrogatories concurrently with these requests: Plaintiff's First Set of Interrogatories to Defendant Duke's Hardware, Inc., and Plaintiff's Rule 213 Interrogatories to Defendant Duke's Hardware, Inc.

4

purchased by the parties and Plaintiff is therefore seeking the fruits of Duke's Hardware, Inc.

litigation efforts and expense for free.  To the extent Plaintiff is seeking "recorded or transcribed

statements" of expert witnesses expected to testify at trial, Duke's Hardware, Inc. objects that

that this Request is premature, as discovery is ongoing in this case and Monsanto has not yet

determined which expert witnesses it expects to call at the trial of this matter.  To the extent

Plaintiff is seeking "any such statement" by himself, as Plaintiff is the "party propounding this

discovery request," Plaintiff is equally or better situated than Duke's Hardware, Inc. to acquire

the vague and undefined "statement" he seeks.  In addition, Plaintiff may confer with the MDL

co-lead counsel regarding what documents are available in the shared database, as described

more fully above in General Objection No. 5.

**Request for Production No. 2:**    The reports, letters or other documents prepared by any
expert witness you expect to call at the trial of this matter.

**RESPONSE:**  Duke's Hardware, Inc. incorporates by reference the foregoing General

Objections here as if restated in full.  Duke's Hardware, Inc. objects to the extent Request No. 2

seeks information protected by the attorney-client privilege, the work product doctrine, or any

other applicable privilege.  Duke's Hardware, Inc. objects that Request No. 2 is overbroad,

unduly burdensome, and irrelevant to the subject matter involved in the pending action,

including because a request for any "reports, letters or other documents prepared by any expert

witness" is not limited to documents connected to this case or the matters at issue in the expert's

testimony, and therefore the burden and expense of the discovery outweighs its likely benefit to

Plaintiff.  Duke's Hardware, Inc. objects to Request No. 2 to the extent it would require

collecting materials from third parties, including because searching for records outside Duke's

Hardware, Inc. possession would be unduly burdensome.  Duke's Hardware, Inc. objects that

Request No. 2 is premature, as discovery is ongoing in this case and Duke's Hardware, Inc. has

not yet determined which expert witnesses it expects to call at the trial of this matter. Duke's

Hardware, Inc. objects that Request No. 2 is an improper request for production of expert

discovery to the extent it seeks expert discovery beyond the scope of Illinois Rule 213(f)(3),

which provides that, when requested via interrogatories, "For each controlled expert witness, the

party must identify…(iv) any reports prepared by the witness about the case."

**Request for Production No. 3:**    The most recent curriculum vitae of any expert witness
you expect to call as a witness at the trial of this matter.

**RESPONSE:**  Duke's Hardware, Inc. incorporates by reference the foregoing General

Objections here as if restated in full.  Duke's Hardware, Inc. objects that Request No. 3 is

premature, as discovery is ongoing in this case and Duke's Hardware, Inc. has not yet

determined which expert witnesses it expects to call at the trial of this matter.

**Request for Production No. 4:**    The documents referring or relating to any criminal
convictions of any parties to this action or persons that may be called as witnesses at trial.

**RESPONSE:**  Duke's Hardware, Inc. incorporates by reference the foregoing General

Objections here as if restated in full.  Duke's Hardware, Inc. objects that Request No. 4 is

overbroad, unduly burdensome, and irrelevant to the subject matter involved in the pending

action, including because a request for "any criminal convictions" of "any parties" or witness

may include convictions that have no bearing on the claims or defenses at issue in this case, and

in fact are likely to be completely unrelated to the matter at issue: whether Monsanto's

glyphosate-containing herbicide caused Plaintiff to develop NHL and whether Duke's Hardware,

Inc. failed to adequately warn about that alleged risk.  The burden and expense of searching for

such minimally relevant documents – to the extent they exist – outweighs any likely benefit to

Plaintiff.  Duke's Hardware, Inc. objects that it is a corporation, and therefore not a party that

might have a criminal conviction.  To the extent this Request references any criminal convictions

relating to Plaintiff or to Plaintiff's own witnesses, Duke's Hardware, Inc. objects that these

documents are equally or even more available to Plaintiff. Duke's Hardware, Inc. objects that discovery is ongoing in this case and thus Request No. 2 is premature, including because Duke's Hardware, Inc. has not yet determined which witnesses it may call at the trial of this matter. Duke's Hardware, Inc. objects to the extent Plaintiff is seeking publicly available information, which is equally available to Plaintiff.

**Request for Production No. 5:** The pictures, diagrams, drawings, images, videos or mockups, which you contend contain information relating to the facts of this case.

**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General Objections here as if restated in full. Duke's Hardware, Inc. objects that the phrases "contain information" and "the facts of this case" are vague and ambiguous, and subject to varying interpretations. Duke's Hardware, Inc. objects to the extent Request No. 5 seeks information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege. Duke's Hardware, Inc. objects that Request No. 5 is overbroad, unduly burdensome, and irrelevant to the subject matter involved in the pending action, including because Duke's Hardware, Inc. has no way to search for all "pictures, diagrams, drawings, images, videos, or mockups" that "contain" any "information" relating in any way to the undefined facts of this case, many of which are not yet known. As written, for example, this request encompasses, without limit or time parameters, *all* such materials with *any* information about broad and sweeping topics such as non-Hodgkin's lymphoma and glyphosate-based herbicides generally; the burden and expense of the discovery therefore outweighs its likely benefit to Plaintiff. Duke's Hardware, Inc. objects that discovery is ongoing in this case and thus Request No. 5 is premature, including because Duke's Hardware, Inc. does not yet have all the information relating to the facts of this case. Duke's Hardware, Inc. objects that, due to the overbreadth of

7

the Request, it is unable to undertake a reasonable and proportional search for responsive documents.

**Request for Production No. 6:**  The documents referred to or identified by you in answering the Interrogatories served along with this Request for Production.

**RESPONSE:**  Duke's Hardware, Inc. incorporates by reference the foregoing General Objections here as if restated in full.  Duke's Hardware, Inc. objects that the term "Interrogatories" is vague and ambiguous, including because the term does not specify which "Interrogatories served along with this Request for Production" this Request is referencing.[2]  To the extent Plaintiff is seeking deposition transcripts, Duke's Hardware, Inc. objects that depositions transcripts are created by the court reporter and purchased by the parties and Plaintiff is therefore seeking the fruits of Duke's Hardware, Inc. litigation efforts and expense for free. To the extent Plaintiff is seeking documents pertaining to expert witnesses expected to testify at trial, Duke's Hardware, Inc. objects that that this Request is premature, including because Duke's Hardware, Inc. has not yet determined which expert witnesses it expects to call at the trial of this matter.  In addition, Plaintiff may confer with the MDL co-lead counsel regarding what documents are available in the shared database, as described more fully above in General Objection No. 5.  In addition, Duke's Hardware, Inc. incorporates by reference all objections included in its response to Plaintiff's First Set of Interrogatories to Defendant Duke's Hardware, Inc. and Plaintiff's Rule 213 Interrogatories to Defendant Duke's Hardware, Inc.

**Request for Production No. 7:**  The documents or things received by you in response to any Subpoena issued by you.

---

[2]  Plaintiff served two sets of interrogatories concurrently with these requests: Plaintiff's First Set of Interrogatories to Defendant Duke's Hardware, Inc., and Plaintiff's Rule 213 Interrogatories to Defendant Duke's Hardware, Inc.

**RESPONSE:**  Duke's Hardware, Inc. incorporates by reference the foregoing General Objections here as if restated in full.  Duke's Hardware, Inc. objects to the extent Request No. 7 seeks information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege, including because any compilation of documents would reveal the mental impressions, thought processes, and legal theories of Duke's Hardware, Inc. attorneys. Duke's Hardware, Inc. objects that Request No. 7 is overbroad, unduly burdensome, and irrelevant to the subject matter involved in the pending action, including because it is not limited to this case or to the claims or defenses at issue in this case.  Taken literally, the request seeks the results of "any" subpoena issued by Duke's Hardware, Inc. at any time and for any reason, and therefore the burden and expense of the discovery outweighs its likely benefit to Plaintiff. Duke's Hardware, Inc. objects that Plaintiff is seeking – for free – the fruits of Duke's Hardware, Inc. labors and expense in this litigation and, to the extent any production of documents in response to this request is required, Plaintiff should share the cost of obtaining such documents.

**Request for Production No. 8:**    The documents and things containing facts that the Plaintiff has not suffered/ incurred the damages/injuries alleged herein.

**RESPONSE:**  Duke's Hardware, Inc. incorporates by reference the foregoing General Objections here as if restated in full.  Duke's Hardware, Inc. objects to the extent Request No. 8 seeks information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege, including because any compilation of documents would reveal the mental impressions, thought processes, and legal theories of Duke's Hardware, Inc. attorneys. Duke's Hardware, Inc. objects that Request No. 8 is improperly and prematurely seeking the disclosure of expert testimony and/or the materials on which Duke's Hardware, Inc. experts will rely in reaching their expert opinions.  Duke's Hardware, Inc. objects that discovery is ongoing

in this case and thus Request No. 8 is premature, including because Duke's Hardware, Inc. does not yet have all the information relating to the facts of this case.

**Request for Production No. 9:**   The documents containing facts and/or opinions relied upon by any expert witness you expect to call at the trial/hearing of this matter. Statements made by Counsel containing opinions or impressions of Counsel may be excised.

**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General Objections here as if restated in full.  Duke's Hardware, Inc. objects to the extent Request No. 9 seeks information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege.  Duke's Hardware, Inc. objects that Request No. 9 is premature, as discovery is ongoing in this case and Duke's Hardware, Inc. has not yet determined which expert witnesses it expects to call at the trial of this matter.  Duke's Hardware, Inc. objects to the extent Request No. 9 requires expert discovery beyond that required by Ill. R. S. Ct. 213(f)(3).  Duke's Hardware, Inc. objects that Request No. 9 seeks information duplicative and/or cumulative of the more than two million documents (estimated to exceed twenty million pages) in keyword-searchable productions that Monsanto has already produced and to which Plaintiff will be able to gain access following the entry of appropriate orders governing discovery in this case.

**Request for Production No. 10:** The documents and things which contain facts as to how the incident in question occurred.

**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General Objections here as if restated in full.  Duke's Hardware, Inc. objects that the phrase "incident" is vague and ambiguous, including because Plaintiff's allegations do not focus on one discrete, isolated event.  Duke's Hardware, Inc. objects that there is no specific "incident" that is the subject of this action, as Plaintiff alleges that intermittent exposure to Monsanto glyphosate-containing products over the course of over forty years caused him to develop NHL.  Duke's Hardware, Inc. objects to the extent Request No. 10 seeks information protected by the attorney-

10

client privilege, the work product doctrine, or any other applicable privilege. Duke's Hardware, Inc. objects that Request No. 10 is overbroad and unduly burdensome, including because it encompasses any "documents" or "things" from any time and in any circumstance which may "contain" any unspecified, undefined "facts" about an undefined "incident." Duke's Hardware, Inc. objects to the extent Request No. 10 is duplicative and/or cumulative of the over two million documents (estimated to exceed twenty million pages) in keyword-searchable productions that Monsanto already has produced in the Roundup® products litigations, to which Plaintiff will be able to gain access after the entry in this case of an appropriate Confidentiality and Protective Order, order governing production formats, and order governing privilege logs. To the extent Request No. 10 is seeking information about an incident specific to Plaintiff, Duke's Hardware, Inc. objects that it is premature, as discovery is ongoing in this case and Duke's Hardware, Inc. is continuing to gather necessary case-specific information. Duke's Hardware, Inc. objects to the extent Request No. 10 seeks documents and "things" that are equally available to Plaintiff.

**Request for Production No. 11:** The policies of insurance providing coverage for you in regard to this incident, including the policy itself, the declaration sheet, and all endorsements thereto.

**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General Objections here as if restated in full. Duke's Hardware, Inc. objects that the phrase "incident" is vague and ambiguous, including because Plaintiff's allegations do not focus on one discrete, isolated event. Duke's Hardware, Inc. objects that there is no specific "incident" that is the subject of this action, as Plaintiff alleges that intermittent exposure to Monsanto glyphosate-containing products over the course of over forty years caused him to develop NHL. Duke's Hardware, Inc. objects to the extent Request No. 11 seeks information protected by any privilege including, but not limited to, the insurer-insured privilege, the attorney-client privilege, any settlement privilege, and/or the attorney work product doctrine. Duke's Hardware, Inc. objects

11

that Request No. 11 is overbroad, unduly burdensome, and irrelevant to the subject matter involved in the pending action, including because it seeks documents outside the immediate cause of action without temporal limitation to the time span encompassed by Plaintiff's claims, and therefore the burden and expense of the discovery outweighs its likely benefit to Plaintiff. Duke's Hardware, Inc. objects that discovery is ongoing in this case and Monsanto does not yet know which insurance policy, if any, will "provid[e] coverage" with respect to "this incident."

**Request for Production No. 12:**  The documents and things referring or relating to any investigation of the incident, conducted in the ordinary course of business.

**RESPONSE:**  Duke's Hardware, Inc. incorporates by reference the foregoing General Objections here as if restated in full.  Duke's Hardware, Inc. objects that the phrase "the incident" is vague and ambiguous, including because Plaintiff's allegations do not focus on one discrete, isolated event.  Duke's Hardware, Inc. objects that there is no specific "incident" that is the subject of this action, as Plaintiff alleges that intermittent exposure to Monsanto glyphosate-containing products over the course of over forty years caused him to develop NHL.  Duke's Hardware, Inc. objects to the extent Request No. 12 seeks information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege.  Duke's Hardware, Inc. objects that no investigation of "the incident" could have taken place "in the ordinary course of business" unless Plaintiff informed Duke's Hardware, Inc. of "the incident" prior to filing this lawsuit in March 2019.  If Plaintiff believes that he did contact Duke's Hardware, Inc. regarding his claims at issue in this case prior to filing this lawsuit in March 2019, knowing with whom he allegedly communicated would help Duke's Hardware, Inc. conduct a reasonable and targeted search.

12

**Request for Production No. 13:**  The reports or writings of any sort that you submitted to any governmental agency referring or relating to this incident.

**RESPONSE:**  Duke's Hardware, Inc. incorporates by reference the foregoing General

Objections here as if restated in full.  Duke's Hardware, Inc. objects that the phrase "this

incident" is vague and ambiguous, including because Plaintiff's allegations do not focus on one

discrete, isolated event.  Duke's Hardware, Inc. objects that there is no specific "incident" that is

the subject of this action, as Plaintiff alleges that intermittent exposure to Monsanto glyphosate-

containing products over the course of over forty years caused him to develop NHL.

**Request for Production No. 14:**  The documents or writings of any nature which were disseminated to the media (radio, television, newspapers, magazines, etc.) regarding the possible risks to users of Roundup.

**RESPONSE:**  Duke's Hardware, Inc. incorporates by reference the foregoing General

Objections here as if restated in full.  Duke's Hardware, Inc. objects that the term "risks" is

overbroad, vague, and ambiguous, including because it encompasses potential "risks" unrelated

to the alleged ability of Monsanto's glyphosate-based products to cause cancer.  Duke's

Hardware, Inc. objects that Request No. 14 is vague as to the word "Roundup" because it does

not specify a product manufactured by Monsanto and/or alleged to have been used by Plaintiff.

"Roundup" is not one product but is a brand name that encompasses many different products

with distinct formulations, for use in different markets.  Duke's Hardware, Inc. objects that

Request No. 14 seeks information duplicative and/or cumulative of the more than two million

documents (estimated to exceed twenty million pages) in keyword-searchable productions that

Monsanto has already produced and to which Plaintiff will be able to gain access following the

entry of appropriate orders governing discovery in this case.  Duke's Hardware, Inc. objects that

Request No. 14 is overbroad, unduly burdensome, and irrelevant to the subject matter involved

in the pending action, including because it is not limited to a relevant timeframe, to the specific

13

product(s) allegedly used by Plaintiff, or to the only injury alleged in this case, NHL, and

therefore the burden and expense of the discovery outweighs its likely benefit to Plaintiff.

Duke's Hardware, Inc. objects that any documents "disseminated to the media" are irrelevant

unless they are tied to specific information that Plaintiff allegedly read, saw, or heard and that led

to his alleged exposure to Monsanto's glyphosate-containing products. Duke's Hardware, Inc.

objects to the production of any documents in response to this Request that do not concern

whether exposure to glyphosate and/or glyphosate-based herbicides can cause cancer in a human

being. Duke's Hardware, Inc. objects to the production of documents that do not concern the

specific product(s) to which Plaintiff alleges exposure. Duke's Hardware, Inc. objects to the

production of documents in response to this Request that post-date Plaintiff's alleged last

exposure to Monsanto's glyphosate-based product(s), or his alleged cancer diagnosis, because

such materials cannot have impacted and thus are irrelevant to the claims at issue in this case.

Duke's Hardware, Inc. objects to the extent Request No. 14 seeks documents that are publicly

available and therefore readily available to Plaintiff, as the burden of obtaining such information

is the same for Plaintiff as it would be for Duke's Hardware, Inc.

**Request for Production No. 15:** The documents or writings of any nature which
evidence that Plaintiff knew of the possible risks, dangers, hazards, or possible adverse
experiences in using Roundup.

**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General

Objections here as if restated in full. Duke's Hardware, Inc. objects that the terms "risks,"

"dangers," and "hazards" and the phrase "adverse experiences" are vague, ambiguous, and

subject to varying interpretations. Duke's Hardware, Inc. objects that Request No. 15 is vague as

to the word "Roundup" because it does not specify a product manufactured by Monsanto and/or

alleged to have been used by Plaintiff. "Roundup" is not one product but is a brand name that

encompasses many different products with distinct formulations, for use in different markets.

14

Duke's Hardware, Inc. objects to the extent Request No. 15 seeks information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege. Duke's Hardware, Inc. objects that Request No. 15 seeks information duplicative and/or cumulative of the more than two million documents (estimated to exceed twenty million pages) in keyword-searchable productions that Monsanto has already produced and to which Plaintiff will be able to gain access following the entry of appropriate orders governing discovery in this case. Duke's Hardware, Inc. objects that Request No. 15 is overbroad, unduly burdensome, and irrelevant to the subject matter involved in the pending action, including because it is not limited to a relevant timeframe, to the specific product(s) allegedly used by Plaintiff, or to the only injury alleged in this case, NHL, and therefore the burden and expense of the discovery outweighs its likely benefit to Plaintiff. Duke's Hardware, Inc. objects that Request No. 15 is premature, as discovery is ongoing in this case and Duke's Hardware, Inc. does not have the information to assess what documents may "evidence" what Plaintiff "knew." Duke's Hardware, Inc. objects to the production of any documents in response to this Request that do not concern whether exposure to glyphosate and/or glyphosate-based herbicides can cause cancer in a human being. Duke's Hardware, Inc. objects to the production of documents that do not concern the specific product(s) to which Plaintiff alleges exposure. Duke's Hardware, Inc. objects to the production of documents in response to this Request that post-date Plaintiff's alleged last exposure to Monsanto's glyphosate-based product(s), or his alleged cancer diagnosis, because such materials cannot have impacted and thus are irrelevant to the claims at issue in this case.

**Request for Production No. 16:** The documents or writings of any nature from any source which was prepared by, for the benefit of, or provided to the defendant evidencing any study, research or investigation on the possible or actual adverse experiences in the use of Roundup.

15

**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General Objections here as if restated in full. Duke's Hardware, Inc. objects that the phrase "adverse experiences" is vague, ambiguous, and subject to varying interpretations. Duke's Hardware, Inc. objects that Request No. 16 is vague as to the word "Roundup" because it does not specify a product manufactured by Monsanto and/or alleged to have been used by Plaintiff. "Roundup" is not one product but is a brand name that encompasses many different products with distinct formulations, for use in different markets. Duke's Hardware, Inc. objects to the extent Request No. 16 seeks information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege. Duke's Hardware, Inc. objects that Request No. 16 seeks information duplicative and/or cumulative of the more than two million documents (estimated to exceed twenty million pages) in keyword-searchable productions that Monsanto has already produced and to which Plaintiff will be able to gain access following the entry of appropriate orders governing discovery in this case. Duke's Hardware, Inc. objects that Request No. 16 is overbroad, unduly burdensome, and irrelevant to the subject matter involved in the pending action, including because a request for documents "of any nature" "evidencing any study, research or investigation" on any possible or actual "adverse experiences" is not limited to a relevant timeframe, to the specific product(s) allegedly used by Plaintiff, or to the only injury alleged in this case, NHL, and therefore the burden and expense of the discovery outweighs its likely benefit to Plaintiff. Duke's Hardware, Inc. objects to the production of any documents in response to this Request that do not concern whether exposure to glyphosate and/or glyphosate-based herbicides can cause cancer in a human being. Duke's Hardware, Inc. objects to the production of documents that do not concern the specific product(s) to which Plaintiff alleges exposure. Duke's Hardware, Inc. objects to the production of documents in response to this

16

Request that post-date Plaintiff's alleged last exposure to Monsanto's glyphosate-based

product(s), or his alleged cancer diagnosis, because such materials cannot have impacted and

thus are irrelevant to the claims at issue in this case.

**Request for Production No. 17:** The documents or writings of any nature (including
warnings) which were provided or disseminated to educate the public or the ultimate user of the
product concerning any hazards or risks in using Roundup.

**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General

Objections here as if restated in full. Duke's Hardware, Inc. objects that the terms "hazards" and

"risks" are vague, ambiguous, and subject to varying interpretations. Duke's Hardware, Inc.

objects that Request No. 17 is vague as to the word "Roundup" because it does not specify a

product manufactured by Monsanto and/or alleged to have been used by Plaintiff. "Roundup" is

not one product but is a brand name that encompasses many different products with distinct

formulations, for use in different markets. Duke's Hardware, Inc. objects that Request No. 17

seeks information duplicative and/or cumulative of the more than two million documents

(estimated to exceed twenty million pages) in keyword-searchable productions that Monsanto

has already produced and to which Plaintiff will be able to gain access following the entry of

appropriate orders governing discovery in this case. Duke's Hardware, Inc. objects that Request

No. 17 is overbroad, unduly burdensome, and irrelevant to the subject matter involved in the

pending action, including because a request for documents "of any nature" concerning "any

hazards or risks" is not limited to a relevant timeframe, to the specific product(s) allegedly used

by Plaintiff, to a relevant geographical area, or to the only injury alleged in this case, NHL, and

therefore the burden and expense of the discovery outweighs its likely benefit to Plaintiff.

Duke's Hardware, Inc. objects to the production of any documents in response to this Request

that were not "disseminated" in the state of Illinois, the only state where Plaintiff claims

exposure to Monsanto's glyphosate-based products. Duke's Hardware, Inc. objects to the

17

production of any documents in response to this Request that do not concern whether exposure to glyphosate and/or glyphosate-based herbicides can cause cancer in a human being. Duke's Hardware, Inc. objects to the production of documents that do not concern the specific product(s) to which Plaintiff alleges exposure. Duke's Hardware, Inc. objects to the production of documents in response to this Request that post-date Plaintiff's alleged last exposure to Monsanto's glyphosate-based product(s), or his alleged cancer diagnosis, because such materials cannot have impacted and thus are irrelevant to the claims at issue in this case. Duke's Hardware, Inc. objects to the extent Request No. 17 seeks documents that are publicly available and therefore readily available to Plaintiff, as the burden of obtaining such information is the same for Plaintiff as it would be for Monsanto.

**Request for Production No. 18:** The reports or other documents or writings which have been submitted to any state or Federal agency reporting an alleged adverse experience by a user, associated with the use of Roundup from the date Roundup was first made available for use by the general public to the date of your response hereto.

**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General Objections here as if restated in full. Duke's Hardware, Inc. objects that the phrase "adverse experience" is vague, ambiguous, and subject to varying interpretations. Duke's Hardware, Inc. objects that Request No. 18 is vague as to the word "Roundup" because it does not specify a product manufactured by Monsanto and/or alleged to have been used by Plaintiff. "Roundup" is not one product but is a brand name that encompasses many different products with distinct formulations, for use in different markets. Duke's Hardware, Inc. objects that Request No. 18 seeks information duplicative and/or cumulative of the more than two million documents (estimated to exceed twenty million pages) in keyword-searchable productions that Monsanto has already produced and to which Plaintiff will be able to gain access following the entry of appropriate orders governing discovery in this case. Duke's Hardware, Inc. objects that Request

18

No. 18 is overbroad, unduly burdensome, and irrelevant to the subject matter involved in the

pending action, including because a request for documents reporting any "alleged adverse

experience" associated with any "Roundup" product at any time is not limited to a relevant

timeframe, to the specific product(s) allegedly used by Plaintiff, to a relevant geographical

region, or to the only injury alleged in this case, NHL, and therefore the burden and expense of

the discovery outweighs its likely benefit to Plaintiff. Duke's Hardware, Inc. objects to the

production of any documents in response to this Request that were submitted to a state other than

the state of Illinois, which is the only state where Plaintiff claims exposure to a Monsanto

glyphosate-based herbicide. Duke's Hardware, Inc. objects to the production of any documents

in response to this Request that do not concern whether exposure to glyphosate and/or

glyphosate-based herbicides can cause cancer in a human being. Duke's Hardware, Inc. objects

to the production of documents that do not concern the specific product(s) to which Plaintiff

alleges exposure. Duke's Hardware, Inc. objects to the production of documents in response to

this Request that post-date Plaintiff's alleged last exposure to Monsanto's glyphosate-based

product(s), or his alleged cancer diagnosis, because such materials cannot have impacted and

thus are irrelevant to the claims at issue in this case.

   **Request for Production No. 19:** The documents or writings of any nature which
evidence all steps taken by DUKE'S HARDWARE, INC. to alert or warn the ultimate user of
Roundup of any possible hazards, risks, and or adverse experiences with Roundup.

   **RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General

Objections here as if restated in full. Duke's Hardware, Inc. objects that the term "risks" and the

phrases "possible hazards," "adverse experiences," and "evidence all steps taken" are vague,

ambiguous, and subject to varying interpretations. Duke's Hardware, Inc. objects that Request

No. 19 is vague as to the word "Roundup" because it does not specify a product manufactured by

Monsanto and/or alleged to have been used by Plaintiff. "Roundup" is not one product but is a

brand name that encompasses many different products with distinct formulations, for use in different markets. Duke's Hardware, Inc. objects to the extent Request No. 19 seeks information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege. Duke's Hardware, Inc. objects that Request No. 19 seeks information duplicative and/or cumulative of the more than two million documents (estimated to exceed twenty million pages) in keyword-searchable productions that Monsanto has already produced and to which Plaintiff will be able to gain access following the entry of appropriate orders governing discovery in this case. Duke's Hardware, Inc. objects that Request No. 19 is overbroad, unduly burdensome, and irrelevant to the subject matter involved in the pending action, including because a request for documents "of any nature" that "evidence all steps taken" to warn "of any possible hazards, risks, and or adverse experiences" with any "Roundup" product is not limited to a relevant timeframe, to the specific product(s) allegedly used by Plaintiff, or to the only injury alleged in this case, NHL, and therefore the burden and expense of the discovery outweighs its likely benefit to Plaintiff. Duke's Hardware, Inc. objects to the production of any documents in response to this Request that do not concern whether exposure to glyphosate and/or glyphosate-based herbicides can cause cancer in a human being. Duke's Hardware, Inc. objects to the production of documents that do not concern the specific product(s) to which Plaintiff alleges exposure. Duke's Hardware, Inc. objects to the production of documents in response to this Request that post-date Plaintiff's alleged last exposure to Monsanto's glyphosate-based product(s), or his alleged cancer diagnosis, because such materials cannot have impacted and thus are irrelevant to the claims at issue in this case.

**Request for Production No. 20:** The newspaper, press releases, advertising material, or other documents or writings of any nature which were released for advertisement purposes informing the general public of the availability of Roundup and the uses to which Roundup could be put.

**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General Objections here as if restated in full. Duke's Hardware, Inc. objects that Request No. 20 is vague as to the word "Roundup" because it does not specify a product manufactured by Monsanto and/or alleged to have been used by Plaintiff. "Roundup" is not one product but is a brand name that encompasses many different products with distinct formulations, for use in different markets. Duke's Hardware, Inc. objects that Request No. 20 seeks information duplicative and/or cumulative of the more than two million documents (estimated to exceed twenty million pages) in keyword-searchable productions that Monsanto has already produced and to which Plaintiff will be able to gain access following the entry of appropriate orders governing discovery in this case. Duke's Hardware, Inc. objects that Request No. 20 is overbroad, unduly burdensome, and irrelevant to the subject matter involved in the pending action, including because it is not limited to a relevant timeframe, to the specific product(s) allegedly used by Plaintiff, or to the only injury alleged in this case, NHL, and therefore the burden and expense of the discovery outweighs its likely benefit to Plaintiff. Duke's Hardware, Inc. objects that no advertising materials are relevant unless they are tied to specific information that Plaintiff allegedly read, saw, or heard and that led to his alleged exposure to Monsanto's glyphosate-containing products. Duke's Hardware, Inc. objects to the production of documents that do not concern the specific product(s) to which Plaintiff alleges exposure. Duke's Hardware, Inc. objects to the production of documents in response to this Request that post-date Plaintiff's alleged last exposure to Monsanto's glyphosate-based product(s), or his alleged cancer diagnosis, because such materials cannot have impacted and thus are irrelevant to the claims at issue in this case. Duke's Hardware, Inc. objects to the extent Request No. 20 seeks documents that are

21

publicly available and therefore readily available to Plaintiff, as the burden of obtaining such information is the same for Plaintiff as it would be for Duke's Hardware, Inc.

**Request for Production No. 21:** The documents or writings of any nature which pertain in any way to DUKE'S HARDWARE, INC.'s decision to remove Roundup from the market.

**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General Objections here as if restated in full. Duke's Hardware, Inc. objects that Request No. 21 wrongly assumes that Duke's Hardware, Inc. has decided, in general, "to remove Roundup from the market" or that such a decision would be one for Duke's Hardware, Inc. to make. Duke's Hardware, Inc. objects that Request No. 21 is vague as to the word "Roundup" because it does not specify a product manufactured by Monsanto and/or alleged to have been used by Plaintiff. "Roundup" is not one product but is a brand name that encompasses many different products with distinct formulations, for use in different markets. Duke's Hardware, Inc. objects to the extent Request No. 21 seeks information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege. Duke's Hardware, Inc. objects to the extent Request No. 21 is duplicative and/or cumulative of the over two million documents (estimated to exceed twenty million pages) in keyword-searchable productions that Monsanto already has produced in the Roundup® products litigations, to which Plaintiff will be able to gain access after the entry in this case of an appropriate Confidentiality and Protective Order, order governing production formats, and order governing privilege logs. Duke's Hardware, Inc. objects that Request No. 21 is overbroad, unduly burdensome, and irrelevant to the subject matter involved in the pending action, including because it is not limited to a relevant timeframe, to the specific product(s) allegedly used by Plaintiff, or to the only injury alleged in this case, NHL, and therefore the burden and expense of the discovery outweighs its likely benefit to Plaintiff. Duke's Hardware, Inc. objects to the production of documents that do not concern the specific

product(s) to which Plaintiff alleges exposure. Duke's Hardware, Inc. objects to the production

of any documents in response to this Request that do not concern whether exposure to glyphosate

and/or glyphosate-based herbicides can cause cancer in a human being. Duke's Hardware, Inc.

objects to the production of documents in response to this Request that post-date Plaintiff's

alleged last exposure to Monsanto's glyphosate-based product(s), or his alleged cancer diagnosis,

because such materials cannot have impacted and thus are irrelevant to the claims at issue in this

case.

Subject to the foregoing general and specific objections, Duke's Hardware, Inc. will not

be producing any documents responsive to the above request as Plaintiff did not purchase a

Roundup®-branded product or any other product from Duke's Hardware, Inc. Answering

further, based on the information in the Complaint and otherwise available, Duke's Hardware,

Inc. does not have any records of purchases made by Plaintiff.

**Request for Production No. 22:** The documents or writings of any nature from every
person who notified DUKE'S HARDWARE, INC., by letter or otherwise, of any personal injury
in connection with the use of Roundup.

**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General

Objections here as if restated in full. Duke's Hardware, Inc. objects that Request No. 22 is vague

as to the word "Roundup" because it does not specify a product manufactured by Monsanto

and/or alleged to have been used by Plaintiff. "Roundup" is not one product but is a brand name

that encompasses many different products with distinct formulations, for use in different

markets. Duke's Hardware, Inc. objects that Request No. 22 seeks information duplicative

and/or cumulative of the more than two million documents (estimated to exceed twenty million

pages) in keyword-searchable productions that Monsanto has already produced and to which

Plaintiff will be able to gain access following the entry of appropriate orders governing discovery

in this case. Duke's Hardware, Inc. objects that Request No. 22 is overbroad, unduly

burdensome, and irrelevant to the subject matter involved in the pending action, including because a request for documents "of any nature" from "every" person who notified Duke's Hardware, Inc. of "any personal injury" in connection with the use of any Roundup product is not limited to a relevant timeframe, to the specific product(s) allegedly used by Plaintiff, or to the only injury alleged in this case, NHL, and therefore the burden and expense of the discovery outweighs its likely benefit to Plaintiff. Duke's Hardware, Inc. objects to the production of any documents in response to this Request that do not concern whether exposure to glyphosate and/or glyphosate-based herbicides can cause cancer in a human being. Duke's Hardware, Inc. objects to the production of documents that do not concern the specific product(s) to which Plaintiff alleges exposure. Duke's Hardware, Inc. objects to the production of documents in response to this Request that post-date Plaintiff's alleged last exposure to Monsanto's glyphosate-based product(s), or his alleged cancer diagnosis, because such materials cannot have impacted and thus are irrelevant to the claims at issue in this case.

**Request for Production No. 23:** The approval by any state or Federal agency of the use of Roundup for public use together with copies of any communications from such agencies regarding such approval, including any subsequent approvals for Roundup and any changes or modifications made thereto.

**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General Objections here as if restated in full. Duke's Hardware, Inc. objects that Request No. 23 is vague as to the word "Roundup" because it does not specify a product manufactured by Monsanto and/or alleged to have been used by Plaintiff. "Roundup" is not one product but is a brand name that encompasses many different products with distinct formulations, for use in different markets. Duke's Hardware, Inc. objects that Request No. 23 seeks information duplicative and/or cumulative of the more than two million documents (estimated to exceed twenty million pages) in keyword-searchable productions that Monsanto has already produced and to which

24

Plaintiff will be able to gain access following the entry of appropriate orders governing discovery in this case. Duke's Hardware, Inc. objects that Request No. 23 is overbroad, unduly burdensome, and irrelevant to the subject matter involved in the pending action, including because it is not limited to a relevant timeframe, to a relevant geographical region, to the specific product(s) allegedly used by Plaintiff, or to the only injury alleged in this case, NHL, and therefore the burden and expense of the discovery outweighs its likely benefit to Plaintiff. Duke's Hardware, Inc. objects to the production of any documents in response to this Request that involve communications with or approvals by states other than the state of Illinois, which is the only state where Plaintiff claims exposure to a Monsanto glyphosate-based herbicide. Duke's Hardware, Inc. objects to the production of any documents in response to this Request that do not concern whether exposure to glyphosate and/or glyphosate-based herbicides can cause cancer in a human being. Duke's Hardware, Inc. objects to the production of documents that do not concern the specific product(s) to which Plaintiff alleges exposure. Duke's Hardware, Inc. objects to the production of documents in response to this Request that post-date Plaintiff's alleged last exposure to Monsanto's glyphosate-based product(s), or his alleged cancer diagnosis, because such materials cannot have impacted and thus are irrelevant to the claims at issue in this case.

**Request for Production No. 24:** The documents or writings of any nature between the defendant and any state or Federal agency regarding the safety of Roundup.

**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General Objections here as if restated in full. Duke's Hardware, Inc. objects that the term "safety" is vague, ambiguous, and subject to differing interpretations. Duke's Hardware, Inc. objects that Request No. 24 is vague as to the word "Roundup" because it does not specify a product manufactured by Monsanto and/or alleged to have been used by Plaintiff. "Roundup" is not one

product but is a brand name that encompasses many different products with distinct formulations, for use in different markets. Duke's Hardware, Inc. objects that Request No. 24 seeks information duplicative and/or cumulative of the more than two million documents (estimated to exceed twenty million pages) in keyword-searchable productions that Monsanto has already produced and to which Plaintiff will be able to gain access following the entry of appropriate orders governing discovery in this case. Duke's Hardware, Inc. objects that Request No. 24 is overbroad, unduly burdensome, and irrelevant to the subject matter involved in the pending action, including because documents "of any nature" regarding the "safety" in general of any Roundup product at any time is not limited to a relevant timeframe, to the specific product(s) allegedly used by Plaintiff, or to the only injury alleged in this case, NHL, and therefore the burden and expense of the discovery outweighs its likely benefit to Plaintiff. Duke's Hardware, Inc. objects to the production of any documents in response to this Request that involve communications with states other than the state of Illinois, which is the only state where Plaintiff claims exposure to a Monsanto glyphosate-based herbicide. Duke's Hardware, Inc. objects to the production of any documents in response to this Request that do not concern whether exposure to glyphosate and/or glyphosate-based herbicides can cause cancer in a human being. Duke's Hardware, Inc. objects to the production of documents that do not concern the specific product(s) to which Plaintiff alleges exposure. Duke's Hardware, Inc. objects to the production of documents in response to this Request that post-date Plaintiff's alleged last exposure to Monsanto's glyphosate-based product(s), or his alleged cancer diagnosis, because such materials cannot have impacted and thus are irrelevant to the claims at issue in this case.

**Request for Production No. 25:** The marketing proposals for Roundup.

**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General Objections here as if restated in full. Duke's Hardware, Inc. objects that the term "marketing

proposals" is vague, ambiguous, and subject to varying interpretations. Duke's Hardware, Inc. objects that Request No. 25 is vague as to the word "Roundup" because it does not specify a product manufactured by Monsanto and/or alleged to have been used by Plaintiff. "Roundup" is not one product but is a brand name that encompasses many different products with distinct formulations, for use in different markets. Duke's Hardware, Inc. objects to the extent Request No. 25 seeks information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege. Duke's Hardware, Inc. objects that Request No. 25 seeks information duplicative and/or cumulative of the more than two million documents (estimated to exceed twenty million pages) in keyword-searchable productions that Monsanto has already produced and to which Plaintiff will be able to gain access following the entry of appropriate orders governing discovery in this case. Duke's Hardware, Inc. objects that Request No. 25 is overbroad, unduly burdensome, and irrelevant to the subject matter involved in the pending action, including because a request for "marketing proposals" for any Roundup product at any time is not limited to a relevant timeframe, to a relevant geographical region, or to the specific product(s) allegedly used by Plaintiff, and therefore the burden and expense of the discovery outweighs its likely benefit to Plaintiff. Duke's Hardware, Inc. objects that no marketing documents are relevant unless they are tied to specific information that Plaintiff allegedly read, saw, or heard and that led to his alleged exposure to Monsanto's glyphosate-containing products. Duke's Hardware, Inc. objects to the production of documents that do not concern the specific product(s) to which Plaintiff alleges exposure. Duke's Hardware, Inc. objects to the production of documents in response to this Request that post-date Plaintiff's alleged last exposure to Monsanto's glyphosate-based product(s), or his alleged cancer diagnosis, because such materials cannot have impacted and thus are irrelevant to the claims at issue in this case.

27

**Request for Production No. 26:** The warnings proposed or otherwise, which were prepared by the defendant or anyone acting on its behalf for possible or actual use on pamphlets, instructional material, packaging, etc. for dissemination to users of Roundup regarding the possible risks in using Roundup.

**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General Objections here as if restated in full. Duke's Hardware, Inc. objects that the terms "warnings" and "risks" and the phrase "or otherwise" are vague, ambiguous, and subject to varying interpretations. Duke's Hardware, Inc. objects that Request No. 36 is vague as to the word "Roundup" because it does not specify a product manufactured by Monsanto and/or alleged to have been used by Plaintiff. "Roundup" is not one product but is a brand name that encompasses many different products with distinct formulations, for use in different markets. Duke's Hardware, Inc. objects to the extent Request No. 26 seeks information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege. Duke's Hardware, Inc. objects that Request No. 26 seeks information duplicative and/or cumulative of the more than two million documents (estimated to exceed twenty million pages) in keyword-searchable productions that Monsanto has already produced and to which Plaintiff will be able to gain access following the entry of appropriate orders governing discovery in this case. Duke's Hardware, Inc. objects that Request No. 26 is overbroad, unduly burdensome, and irrelevant to the subject matter involved in the pending action, including because a request for "warnings" proposed "or otherwise" "for possible or actual use" regarding any "possible risks" in using any Roundup product is not limited to a relevant timeframe, to the specific product(s) allegedly used by Plaintiff, or to the only injury alleged in this case, NHL, and therefore the burden and expense of the discovery outweighs its likely benefit to Plaintiff. Duke's Hardware, Inc. objects to the production of any documents in response to this Request that do not concern whether exposure to glyphosate and/or glyphosate-based herbicides can cause cancer in a human being. Duke's

Hardware, Inc. objects to the production of documents that do not concern the specific product(s) to which Plaintiff alleges exposure. Duke's Hardware, Inc. objects to the production of documents in response to this Request that post-date Plaintiff's alleged last exposure to Monsanto's glyphosate-based product(s), or his alleged cancer diagnosis, because such materials cannot have impacted and thus are irrelevant to the claims at issue in this case.

**Request for Production No. 27:** All statement(s) a party has given to some person and/or entity other than their attorney and/or insurer.

**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General Objections here as if restated in full. Duke's Hardware, Inc. objects that the term "statement(s)" is vague, ambiguous, and subject to varying interpretations. Duke's Hardware, Inc. objects that Request No. 27 is overbroad, unduly burdensome, and irrelevant, including because, on its face, it is not at all tied to the claims at issue in this case, but instead could encompass any "statement" about any matter given at any time to any person or "entity," and therefore the burden and expense of the discovery outweighs its likely benefit to Plaintiff. Duke's Hardware, Inc. objects to the extent Request No. 27 seeks information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege. Duke's Hardware, Inc. objects to the extent Request No. 27 seeks information duplicative and/or cumulative of the more than two million documents (estimated to exceed twenty million pages) in keyword-searchable productions that Monsanto has already produced and to which Plaintiff will be able to gain access following the entry of appropriate orders governing discovery in this case. Duke's Hardware, Inc. objects to Request No. 27 to the extent it seeks "statement(s)" given by the Plaintiff, to which Plaintiff would have equal or even greater access as Duke's Hardware, Inc. Duke's Hardware, Inc. objects to the production of any documents in response to this Request that do not concern whether exposure to glyphosate and/or glyphosate-based herbicides can

cause cancer in a human being. Duke's Hardware, Inc. objects to the production of documents

that do not concern the specific product(s) to which Plaintiff alleges exposure. Duke's

Hardware, Inc. objects to the production of documents in response to this Request that post-date

Plaintiff's alleged last exposure to Monsanto's glyphosate-based product(s), or his alleged cancer

diagnosis, because such materials cannot have impacted and thus are irrelevant to the claims at

issue in this case.

**Request for Production No. 28:** All reports made as a result of any inspection,
examination, or investigation by any person acting on behalf of DUKE'S HARDWARE, INC.
prior to the occurrence with regard to the safety of Roundup.

**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General

Objections here as if restated in full. Duke's Hardware, Inc. objects that the term, "reports,"

"inspection," "examination," "investigation," and "safety" are vague, ambiguous, and subject to

differing interpretations. Duke's Hardware, Inc. objects that Request No. 28 is vague as to the

word "Roundup" because it does not specify a product manufactured by Monsanto and/or

alleged to have been used by Plaintiff. "Roundup" is not one product but is a brand name that

encompasses many different products with distinct formulations, for use in different markets.

Duke's Hardware, Inc. objects that Request No. 28 is overbroad, unduly burdensome, and

irrelevant to the subject matter involved in the pending action, including because "all reports"

regarding the "safety" in general of any Roundup product at any time is not limited to a relevant

timeframe, to the specific product(s) allegedly used by Plaintiff, or to the only injury alleged in

this case, NHL, and therefore the burden and expense of the discovery outweighs its likely

benefit to Plaintiff. Duke's Hardware, Inc. objects to the production of any documents in

response to this Request that do not concern whether exposure to glyphosate and/or glyphosate-

based herbicides can cause cancer in a human being. Duke's Hardware, Inc. objects to the

production of documents that do not concern the specific product(s) to which Plaintiff alleges

4841-3156-9570

exposure. Duke's Hardware, Inc. objects to the production of documents in response to this Request that post-date Plaintiff's alleged last exposure to Monsanto's glyphosate-based product(s), or his alleged cancer diagnosis, because such materials cannot have impacted and thus are irrelevant to the claims at issue in this case.

**Request for Production No. 29:** All owners manuals, instructions, placards, warning labels, care and use literature, or other similar materials that were furnished to consumer at the time of purchase.

**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General Objections here as if restated in full. Duke's Hardware, Inc. objects that the term "instructions" and the phrase "care and use literature" are vague, ambiguous, and subject to varying interpretations. Duke's Hardware, Inc. objects to the extent Request No. 29 seeks information duplicative and/or cumulative of the more than two million documents (estimated to exceed twenty million pages) in keyword-searchable productions that Monsanto has already produced and to which Plaintiff will be able to gain access following the entry of appropriate orders governing discovery in this case. Duke's Hardware, Inc. objects that Request No. 29 is irrelevant and overbroad on its face, including because, as written, it could encompass materials Plaintiff received "at the time of purchase" of any product at any time. Duke's Hardware, Inc. will construe Request No. 29 to refer to the purchase of the Monsanto glyphosate-containing herbicides at issue in Plaintiff's complaint. Unless and until Plaintiff identifies the specific product(s) he allegedly used and when they were purchased, Duke's Hardware, Inc. cannot point to the labels that accompanied any particular product(s) at any particular time. Duke's Hardware, Inc. objects to Request No. 29 to the extent it would require collecting materials from third parties, including because searching for records outside the possession of Duke's Hardware, Inc. would be unduly burdensome. Duke's Hardware, Inc. objects to the production of documents that do not concern the specific product(s) to which Plaintiff alleges exposure.

31

**Request for Production No. 30:**  All pleadings, depositions, interrogatories and answers, and all other discovery materials filed in any court where a claim was made that Roundup, or any predecessor, successor, or companion products, were involved in causing non-Hodgkin Lymphoma.

**RESPONSE:**  Duke's Hardware, Inc. incorporates by reference the foregoing General

Objections here as if restated in full.  Duke's Hardware, Inc. objects that Request No. 30 is vague

as to the word "Roundup" because it does not specify a product manufactured by Monsanto

and/or alleged to have been used by Plaintiff.  "Roundup" is not one product but is a brand name

that encompasses many different products with distinct formulations, for use in different

markets.  Duke's Hardware, Inc. objects that the phrase "any predecessor, successor, or

companion products" is vague, ambiguous, and subject to varying interpretations.  Duke's

Hardware, Inc. objects that Request No. 30 is overbroad, unduly burdensome, and irrelevant to

the subject matter involved in the pending action, including because a request for "all"

"discovery materials" filed in "any court" involving any Roundup® product or "any predecessor,

successor, or companion products" at any time is not limited to a relevant timeframe, to the

specific product(s) allegedly used by Plaintiff, or to the specific claims at issue in this matter, and

therefore the burden and expense of the discovery outweighs its likely benefit to Plaintiff.

Duke's Hardware, Inc. objects that Request No. 30 is irrelevant, oppressive, and unduly

burdensome, including because every case from "any court" in which any Plaintiff made similar

allegations hinges on specific facts unique to that case, and therefore "all" "discovery materials"

concerning distinct, unrelated claims are not material and relevant to the issue at hand.  *See*

*Leeson v. State Farm Mut. Auto. Ins. Co.*, 546 N.E.2d 782, 787 (Ill. App. Ct. 1989).  Duke's

Hardware, Inc. objects to the extent Request No. 30 seeks documents that are publicly available

and therefore readily available to Plaintiff, as the burden of obtaining such information is the

same for Plaintiff as it would be for Duke's Hardware, Inc.  Duke's Hardware, Inc. objects that

32

Plaintiff is seeking the fruit of Duke's Hardware, Inc. and other parties' litigation efforts and expense for free. For example, deposition transcripts are created by a court reporter and purchased by interested parties. Duke's Hardware, Inc. objects to the extent Request No. 30 seeks documents available to Plaintiff via the central repository organized by the MDL Plaintiffs' co-lead counsel, as detailed further in General Interrogatory No. 5.

**Request for Production No. 31:** All standards, rules, regulations, and recommendations published by any governmental, industry, or other safety organization regarding Roundup.

**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General Objections here as if restated in full. Duke's Hardware, Inc. objects that the phrases "other safety organization" and "regarding the use of Roundup" are vague, ambiguous, and subject to varying interpretations. Duke's Hardware, Inc. objects that Request No. 31 is vague as to the word "Roundup" because it does not specify a product manufactured by Monsanto and/or alleged to have been used by Plaintiff. "Roundup" is not one product but is a brand name that encompasses many different products with distinct formulations, for use in different markets. Duke's Hardware, Inc. objects that Request No. 31 is overbroad, unduly burdensome, and irrelevant to the subject matter involved in the pending action, including because it is not limited to a relevant timeframe, to the specific product(s) allegedly used by Plaintiff or the specific "use" alleged by Plaintiff, or to the subject matter at issue in this case, and therefore the burden and expense of the discovery outweighs its likely benefit to Plaintiff. For example, "the use of Roundup" could pertain to how to apply glyphosate-based herbicides intended for agricultural use to specific crops. Duke's Hardware, Inc. objects that Request No. 31 seeks "published" documents that are publicly available and therefore readily available to Plaintiff, as the burden of obtaining such information is the same for Plaintiff as it would be for Duke's Hardware, Inc. Duke's Hardware, Inc. objects to the production of documents that do not concern the specific

33

product(s) to which Plaintiff alleges exposure. Duke's Hardware, Inc. objects to the production

of any documents in response to this Request that do not concern whether exposure to glyphosate

and/or glyphosate-based herbicides can cause cancer in a human being. Duke's Hardware, Inc.

objects to the production of documents in response to this Request that post-date Plaintiff's

alleged last exposure to Monsanto's glyphosate-based product(s), or his alleged cancer diagnosis,

because such materials cannot have impacted and thus are irrelevant to the claims at issue in this

case.

**Request for Production No. 32:** Copies of all advertisements containing Roundup sent out or made available to the public at large in which Roundup was advertised for sale by Duke's Hardware, Inc. from 2009 to the present.

**RESPONSE:** Duke's Hardware, Inc. incorporates by reference the foregoing General

Objections here as if restated in full. Duke's Hardware, Inc. objects that Request No. 32 is vague

as to the word "Roundup" because it does not specify a product manufactured by Monsanto

and/or alleged to have been used by Plaintiff. "Roundup" is not one product but is a brand name

that encompasses many different products with distinct formulations, for use in different

markets. Duke's Hardware, Inc. objects that Request No. 32 seeks information duplicative

and/or cumulative of the more than two million documents (estimated to exceed twenty million

pages) in keyword-searchable productions that Monsanto has already produced and to which

Plaintiff will be able to gain access following the entry of appropriate orders governing discovery

in this case. Duke's Hardware, Inc. objects that Request No. 32 is overbroad, unduly

burdensome, and irrelevant to the subject matter involved in the pending action, including

because it is not limited to a relevant timeframe, to the specific product(s) allegedly used by

Plaintiff, or to the only injury alleged in this case, NHL, and therefore the burden and expense of

the discovery outweighs its likely benefit to Plaintiff. Duke's Hardware, Inc. objects that no

advertising materials are relevant unless they are tied to specific information that Plaintiff

4841-3156-9570

allegedly read, saw, or heard and that led to his alleged exposure to Monsanto's glyphosate-containing products. Duke's Hardware, Inc. objects to the production of documents that do not concern the specific product(s) to which Plaintiff alleges exposure. Duke's Hardware, Inc. objects to the production of documents in response to this Request that post-date Plaintiff's alleged last exposure to Monsanto's glyphosate-based product(s), or his alleged cancer diagnosis, because such materials cannot have impacted and thus are irrelevant to the claims at issue in this case.

Dated: September 3, 2019                                    Respectfully submitted,

                                                                **DUKE'S HARDWARE, INC.**

                                                                By:  _/s/  Thomas J. Dammrich II_
                                                                      One of Its Attorneys

Thomas J. Dammrich II (#6292653)
Peter F. O'Neill
SHOOK, HARDY & BACON L.L.P.
111 South Wacker Drive, *Suite 4700*
Chicago, Illinois 60606
Telephone:  (312) 704-7700
Facsimile:  (312) 558-1195
Email:  tdammrich@shb.com
Firm ID No. 58950

## AFFIDAVIT PURSUANT TO ILLINOIS SUPREME COURT RULE 214

In accordance with Illinois Supreme Court Rule 214, Defendant Duke's Hardware, Inc. ("Duke's Hardware, Inc.") hereby swears that its production in response to Plaintiff's Rule 214 Requests for Production of Documents is complete in accordance with Duke's Hardware, Inc. responses and objections thereto.

Under penalties as provided by law, pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this Affidavit, pursuant to Supreme Court Rule 214, are true and correct.

Doug Gniadek
President
Duke's Hardware, Inc.

Date: 9/3/2019

## CERTIFICATE OF SERVICE

I, Thomas J. Dammrich II, an attorney, hereby certify that, on **September 3, 2019**, I

caused a true and complete copy of the foregoing **DUKE'S HARDWARE, INC.'S**

**OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST SET OF SUPREME**

**COURT RULE 214 REQUESTS FOR PRODUCTION** to be served upon the following

counsel of record via United States Mail, proper First Class postage prepaid thereon:

David J. Gallagher
(dgallagher@mnlawoffice.com)
**Motherway & Napleton, LLP**
140 S. Dearborn Street, Suite 1500
Chicago, IL 60603
Telephone: (312) 726-2699
Facsimile: (312) 726-6851

*Attorneys for Plaintiff*

Dominique Savinelli
(Dominique.savinelli@huschblackwell.com)
James P. O'Shea
(James.Oshea@huschblackwell.com)
**Husch Blackwell LLP**
120 South Riverside Plaza
Suite 2200
Chicago, IL 60606
Telephone: (312) 655-1500

*Attorneys for Bayer Corporation and
Monsanto Company*

  /s/  Thomas J. Dammrich II

37

FILED
9/3/2019 6:06 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2019L002426

6426566

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

FILED DATE: 9/3/2019 6:06 PM    2019L002426

ROBERT RAWSON,

                Plaintiff,

    v.

MONSANTO COMPANY, a foreign
corporation; and DUKE'S HARDWARE,
INC., a domestic corporation,

                Defendants.

No.    2019-L-002426

## NOTICE OF SERVICE OF DISCOVERY

To:    Counsel of Record (*see* attached Certificate of Service)

**PLEASE TAKE NOTICE** that on **September 3, 2019**, the undersigned, an attorney,

states that the following documents were served via United States Mail, proper First Class

postage prepaid thereon upon all counsel of record listed on the attached Certificate of Service:

1.    DUKE'S HARDWARE, INC.'S OBJECTIONS AND RESPONSES TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES;

2.    DUKE'S HARDWARE, INC.'S OBJECTIONS AND RESPONSES TO
PLAINTIFF'S RULE 213 INTERROGATORIES;

3.    DUKE'S HARDWARE, INC.'S OBJECTIONS AND RESPONSES TO
PLAINTIFF'S FIRST SET OF SUPREME COURT RULE 214 REQUESTS
FOR PRODUCTION;

4.    MONSANTO COMPANY'S OBJECTIONS AND RESPONSES TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT
MONSANTO COMPANY;

5.    MONSANTO COMPANY'S OBJECTIONS AND RESPONSES TO
PLAINTIFF'S RULE 213 INTERROGATORIES TO DEFENDANT
MONSANTO COMPANY; and

4817-8016-5027

6.     MONSANTO COMPANY'S OBJECTIONS AND RESPONSES TO
       PLAINTIFF'S RULE 214 REQUESTS TO PRODUCE TO DEFENDANT
       MONSANTO COMPANY.

Dated:  September 3, 2019                    Respectfully submitted,

                                            **MONSANTO COMPANY and
                                            DUKE'S HARDWARE, INC.**

                                            By: _/s/  Thomas J. Dammrich II_____
                                                 One of Its Attorneys

Thomas J. Dammrich II (#6292653)
Peter F. O'Neill
SHOOK, HARDY & BACON L.L.P.
111 South Wacker Drive, *Suite 4700*
Chicago, Illinois 60606
Telephone:  (312) 704-7700
Facsimile:   (312) 558-1195
Email:  tdammrich@shb.com
Firm ID No. 58950

4817-8016-5027

FILED DATE: 9/3/2019 6:06 PM   2019L002426

FILED DATE: 9/3/2019 6:06 PM 2019L002426

## CERTIFICATE OF SERVICE

    I, Thomas J. Dammrich II, an attorney, hereby certify that, on **September 3, 2019**, I caused a true and complete copy of the foregoing **NOTICE OF SERVICE OF DISCOVERY** to be served upon the following counsel of record via United States Mail, proper First Class postage prepaid thereon:

David J. Gallagher
(dgallagher@mnlawoffice.com)
**Motherway & Napleton, LLP**
140 S. Dearborn Street, Suite 1500
Chicago, IL 60603
Telephone:    (312) 726-2699
Facsimile:    (312) 726-6851

*Attorneys for Plaintiff*

Dominique Savinelli
(Dominique.savinelli@huschblackwell.com)
James P. O'Shea
(James.Oshea@huschblackwell.com)
**Husch Blackwell LLP**
120 South Riverside Plaza
Suite 2200
Chicago, IL 60606
Telephone:  (312) 655-1500

*Attorneys for Bayer Corporation and*
*Monsanto Company*

       */s/  Thomas J. Dammrich II*

4817-8016-5027

# EXHIBIT C

Case 1:19-cv-00240-JJM Document #: 1-3 Filed 09/09/19 Page 151 of 409 PageID #:837

| | | |
|---|---|---|
| 2120 - Served | 2121 - Served | |
| 2220 - Not Served | 2221 - Not Served | |
| 2320 - Served By Mail | 2321 - Served By Mail | |
| 2420 - Served By Publication | 2421 - Served By Publication | |
| Summons - Alias Summons | | (06/28/18) CCG 0001 |

FILED
3/5/2019 1:55 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL

FILED DATE: 3/5/2019 1:55 PM 2019L002426

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

ROBERT RAWSON

(Name all parties)

v.

BAYER CORPORATION, MONSANTO COMPANY AND DUKE'S HARDWARE, INC.

Case No. 2019L002426

### ☑ SUMMONS    ☐ ALIAS SUMMONS

To each Defendant: **SEE ATTACHED SERVICE LIST.**

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance and pay the required fee **within thirty (30) days after service of this Summons**, not counting the day of service. To file your answer or appearance you need access to the internet. Please visit www.cookcountyclerkofcourt.org to initiate this process. Kiosks with internet access are available at all Clerk's Office locations. Please refer to the last page of this document for location information.

**If you fail to do so, a judgment by default may be entered against you for the relief requested in the complaint.**

To the Officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than thirty (30) days after its date.

**E-filing is now mandatory for documents in civil cases with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit https://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider. If you need additional help or have trouble e-filing, visit http://www.illinoiscourts.gov/FAQ/gethelp.asp.**

Witness: _____ 3/5/2019 1:55 PM DOROTHY BROWN

Atty. No.: 56421

Atty Name: David J. Gallagher/Motherway&Napleton

Atty. for: Plaintiff

Address: 140 S. Dearborn, Ste. 1500

City: Chicago          State: IL

Zip: 60603

Telephone: (312) 726-2699

Primary Email: dgallagher@mnlawoffice.com

Secondary Email: bgromska@mnlawoffice.com

Tertiary Email:

DOROTHY BROWN, Clerk of Court

Date of Service: _____
(To be inserted by officer on copy left with Defendant or other person):

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois    cookcountyclerkofcourt.org**

Case: 1:19-cv-00409 Document #: 13 Filed: 09/04/19 Page 152 of 409 PageID #:837

# CLERK OF THE CIRCUIT COURT OF COOK COUNTY OFFICE LOCATIONS

FILED DATE: 3/5/2019 1:55 PM 2019L002426

○ Richard J Daley Center
50 W Washington
Chicago, IL 60602

○ District 2 - Skokie
5600 Old Orchard Rd
Skokie, IL 60077

○ District 3 - Rolling Meadows
2121 Euclid
Rolling Meadows, IL 60008

○ District 4 - Maywood
1500 Maybrook Ave
Maywood, IL 60153

○ District 5 - Bridgeview
10220 S 76th Ave
Bridgeview, IL 60455

○ District 6 - Markham
16501 S Kedzie Pkwy
Markham, IL 60428

○ Domestic Violence Court
555 W Harrison
Chicago, IL 60607

○ Juvenile Center Building
2245 W Ogden Ave, Rm 13
Chicago, IL 60602

○ Criminal Court Building
2650 S California Ave, Rm 526
Chicago, IL 60608

## Daley Center Divisions/Departments

○ Civil Division
Richard J Daley Center
50 W Washington, Rm 601
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Chancery Division
Richard J Daley Center
50 W Washington, Rm 802
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Domestic Relations Division
Richard J Daley Center
50 W Washington, Rm 802
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Civil Appeals
Richard J Daley Center
50 W Washington, Rm 801
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Criminal Department
Richard J Daley Center
50 W Washington, Rm 1006
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ County Division
Richard J Daley Center
50 W Washington, Rm 1202
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Probate Division
Richard J Daley Center
50 W Washington, Rm 1202
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

● Law Division
Richard J Daley Center
50 W Washington, Rm 801
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

○ Traffic Division
Richard J Daley Center
50 W Washington, Lower Level
Chicago, IL 60602
Hours: 8:30 am - 4:30 pm

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**   cookcountyclerkofcourt.org

FILED DATE: 3/5/2019 1:55 PM   2019L002426

DJG:bg                                                                  8N-71

### SERVICE LIST
Rawson v. Monsanto Company, et al.

1. Bayer Corporation
   Agent: Illinois Corporation Service C
   801 Adlai Stevenson Drive
   Springfield, IL 62703

2. Monsanto Company
   Agent: Illinois Corporation Service C
   801 Adlai Stevenson Drive
   Springfield, IL 62703

**Civil Action Cover Sheet - Case Initiation** (11/06/13) CCL 0520

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

Robert Rawson

v.

Bayer Corporation, Monsanto Company and Duke's Hardware, Inc.

No. _____ 2019L002426

### CIVIL ACTION COVER SHEET - CASE INITIATION

A Civil Action Cover Sheet - Case Initiation shall be filed with the complaint in all civil actions. The information contained herein is for administrative purposes only and cannot be introduced into evidence. Please check the box in front of the appropriate case type which best characterizes your action. Only one (1) case type may be checked with this cover sheet.

Jury Demand ☑ Yes ☐ No

FILED
3/5/2019 1:55 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL

**(FILE STAMP)**

### PERSONAL INJURY/WRONGFUL DEATH
CASE TYPES:
- ☐ 027 Motor Vehicle
- ☐ 040 Medical Malpractice
- ☐ 047 Asbestos
- ☐ 048 Dram Shop
- ☑ 049 Product Liability
- ☐ 051 Construction Injuries
  (including Structural Work Act, Road
  Construction Injuries Act and negligence)
- ☐ 052 Railroad/FELA
- ☐ 053 Pediatric Lead Exposure
- ☐ 061 Other Personal Injury/Wrongful Death
- ☐ 063 Intentional Tort
- ☐ 064 Miscellaneous Statutory Action
  *(Please Specify Below**)*
- ☐ 065 Premises Liability
- ☐ 078 Fen-phen/Redux Litigation
- ☐ 199 Silicone Implant

### TAX & MISCELLANEOUS REMEDIES
CASE TYPES:
- ☐ 007 Confessions of Judgment
- ☐ 008 Replevin
- ☐ 009 Tax
- ☐ 015 Condemnation
- ☐ 017 Detinue
- ☐ 029 Unemployment Compensation
- ☐ 031 Foreign Transcript
- ☐ 036 Administrative Review Action
- ☐ 085 Petition to Register foreign Judgment
- ☐ 099 All Other Extraordinary Remedies

### COMMERCIAL LITIGATION
CASE TYPES:
- ☐ 002 Breach of Contract
- ☐ 070 Professional Malpractice
  (other than legal or medical)
- ☐ 071 Fraud (other than legal or medical)
- ☐ 072 Consumer Fraud
- ☐ 073 Breach of Warranty
- ☐ 074 Statutory Action
  *(Please specify below.**)*
- ☐ 075 Other Commercial Litigation
  *(Please specify below.**)*
- ☐ 076 Retaliatory Discharge

### OTHER ACTIONS
CASE TYPES:
- ☐ 062 Property Damage
- ☐ 066 Legal Malpractice
- ☐ 077 Libel/Slander
- ☐ 079 Petition for Qualified Orders
- ☐ 084 Petition to Issue Subpoena
- ☐ 100 Petition for Discovery

** _____

Service via email from opposing party/counsel will be accepted at:

By: David J. Gallagher/Motherway & Napleton    dgallagher@mnlawoffice.com

(Attorney)    (Pro Se)    by consent pursuant to Ill. Sup. Court Rules 11 and 131.

**Pro Se Only:** ☐ I have read and agree to the terms of the *Clerk's Office Electronic Notice Policy* and choose to opt in to electronic notice from the Clerk's office for this case at this email address: _____

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

CaseC1e9901L000420DDocumentd313Bded0911691197Eaged36Page55PagelD#:837

FILED
3/5/2019 1:55 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

ROBERT RAWSON,                          )
                                        )
    Plaintiff,                          )
                                        )
-vs-                                    )     Case No.: 2019L002426
                                        )
BAYER CORPORATION, a foreign            )     Amount: In Excess of Fifty Thousand
corporation, MONSANTO COMPANY, a        )     Dollars ($50,000.00) plus costs.
foreign corporation, and DUKE'S         )
HARDWARE, INC., a domestic              )
corporation,                            )
                                        )
    Defendants.                         )

## PLAINTIFF'S COMPLAINT AT LAW

NOW COMES the Plaintiff, Robert Rawson, by and through his attorney, David J. Gallagher of MOTHERWAY & NAPLETON, LLP., and complaining of the Defendants Bayer Corporation, a foreign corporation, Monsanto Company, a foreign corporation, and Duke's Hardware, Inc., a domestic corporation, states as follows:

### I. THE PARTIES

#### Plaintiff

1.    Plaintiff Robert Rawson is and was at all relevant times a resident of Cook County, Illinois. He and his family purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from approximately 1974 through 2018 on his one acre property in Palos Park, Illinois.

#### Defendants

2.    Defendant Bayer Corporation ("Bayer") is a multinational corporation doing business throughout the United States, including Cook County, Illinois that is incorporated in Indiana, with its headquarters and principal place of business in Whippany, New Jersey.

Case: 1:19-cv-01004 Document #: 1-3 Filed: 02/06/19 Page 157 of 409 PageID #:837

3. Defendant Monsanto Company ("Monsanto") is a multinational corporation doing business throughout the United States, including Cook County, Illinois that is incorporated in Delaware, with its headquarters and principal place of business in St. Louis, Missouri.

4. On June 07, 2018 Bayer acquired Monsanto.

5. Defendant Duke's Hardware, Inc., ("Duke's") is a domestic corporation, with its headquarters and principal place of business in Cook County, Illinois.

6. At all times relevant to this complaint, Duke's operated a Duke's Ace Hardware store at 7610 W. 111th Street, Palos Hills, Illinois which sold Roundup® to the Plaintiff and his family from approximately 1974 to 2018.

7. At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and was the manufacturer of Roundup®.

## II. INTRODUCTION

8. In 1970, Defendant Monsanto Company, Inc. discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 millions of pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

9. Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in

2

the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

10.     Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers whom are not in direct contact with glyphosate.

11.     On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

12.     On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

13.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other haematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

14.     The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

3

15.    Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

### III. JURISDICTION AND VENUE

16.    Jurisdiction is proper pursuant to 735 ILCS 5/2-209 as at all times relevant hereto, Monsanto was in the business of researching, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, labeling, packaging, marketing, promoting, and/or advertising Roundup® products in the throughout the United States including in Cook County, Illinois.

17.    At all times relevant hereto, Monsanto was a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri, who routinely conducted business in Cook County, Illinois.

18.    Duke's is a domestic corporation with its headquarters and principal place of business in Cook County, Illinois, making it a resident of Cook County pursuant to 735 ILCS 5/2-102, who routinely conducts business in Cook County, Illinois.

19.    Plaintiff has timely filed this lawsuit less than two years from the time the Plaintiff knew or reasonably should have known of the injury and that it may have been wrongfully caused.

20.    Pursuant to 735 ILCS 5/2-101, venue is proper within this Court because Defendant Duke's is a resident of Cook County, and because Plaintiff was diagnosed and treated for his cancer in Cook County, and the Defendants do business and advertise in this county.

### IV. FACTS

4

21.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

22.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

23.     For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®— glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Agricultural workers are, once again, victims of corporate greed. Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® was safe.

***The Discovery of Glyphosate and Development of Roundup®***

24.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a "safe"

5

general-purpose herbicide for widespread commercial and consumer use. Monsanto still markets Roundup® as safe today.

*Registration of Herbicides under Federal Law*

25. The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

26. Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

27. FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

28. The EPA registered Roundup® for distribution, sale, and manufacture in the United States and the State of Illinois.

6

29.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

30.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

31.     In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment —in relation to the re-registration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

*Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®*

32.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is

7

based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

33. On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

34. In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

35. In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

36. Three top executives of IBT were convicted of fraud in 1983.

37. In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

38. Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

*The Importance of Roundup® to Monsanto's Market Dominance and Profits*

8

39.    The success of Roundup® was key to Monsanto's continued reputation and dominance in

the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division

was out-performing its chemicals division's operating income, and that gap increased yearly. But

with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a

strategy to maintain its Roundup® market dominance and to ward off impending competition.

40.    In response, Monsanto began the development and sale of genetically engineered

Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate;

farmers can spray Roundup® onto their fields during the growing season without harming the

crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000,

Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and

nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured

Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy

that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup®

herbicide.

41.    Through a three-pronged strategy of increased production, decreased prices and by

coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product.

In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a

margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate

remains one of the world's largest herbicides by sales volume.

*Monsanto has known for decades that it falsely advertises the safety of Roundup®.*

42.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto

based on its false and misleading advertising of Roundup ® products. Specifically, the lawsuit

challenged Monsanto's general representations that its spray-on glyphosate-based herbicides,

9

including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a)       Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

b)       And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c)       Roundup biodegrades into naturally occurring elements.

d)       Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e)       This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f)       You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g)       Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h)       Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i)       You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

10

j)      "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

43.     November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a)      its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk. * * *

b)      its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable * * *

c)      its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means. * * *

d)      its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics." * * *

e)      glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f)      its glyphosate-containing products or any component thereof might be classified as "practically non-toxic.

44.     Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

45.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely

11

advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

## Classifications and Assessments of Glyphosate

46.    The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

47.    The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

48.    One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

49.    In assessing an agent, the IARC Working Group reviews the following information:

(a)    human, experimental, and mechanistic data;

(b)    all pertinent epidemiological studies and cancer bioassays; and

12

(c)     representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

50.     In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

51.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

52.     The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

53.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012 .

13

Case 3:16-md-02741-VC Document 843-30 Filed 09/19/19 Page 100 of 296 Page ID #:837

54.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

55.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

56.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

57.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

58.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

59.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

60.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

61.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in

14

mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

62.     The IARC Working Group also reviewed an Agricultural Health Study (AHS), consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

63.     In an article published on November 09, 2017 in the Journal of the National Cancer Institute updating the results of Glyphosate use and cancer incidence in the Agricultural Health Study a link was determined to exist between Glyphosate exposure and AML.

64.     In a review published on February 10, 2019 in Science Direct titled Exposure to Glyphosate-Based Herbicides and Risk for Non-Hodgkin Lymphoma: A Meta-Analysis and Supporting Evidence, a compelling link between exposures to GBHs and increased risk for NHL was noted.

## *Other Earlier Findings About Glyphosate's Dangers to Human Health*

65.     The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

15

Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available. Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

66. In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

### *Recent Worldwide Bans on Roundup®/Glyphosate*

67. Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in light of the as the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which takes effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but

16

Case 3:16-md-02741-VC Document 843-3 Filed 09/19/19 Page 102 of 297 Page ID #: 837

unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

68.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

69.     France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

70.     Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

71.     The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that Glyphosate has been linked to fatal kidney disease in agricultural workers.

72.     The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

*Plaintiffs' Exposure to Roundup®*

73.     Plaintiff Robert Rawson used Roundup extensively on his one acre property from approximately 1974 through 2018. He applied the herbicide himself on his grass and his driveway. Mr. Rawson was unaware of Roundup's carcinogenic properties until it was far too late; he was diagnosed with extranodal marginal zone lymphoma (MALT) a type of non-Hodgkin Lymphoma (NHL) on February 01, 2013. Mr. Rawson had no reason to believe or

17

Case 3:16-md-02741-VC Document 843-1 Filed 09/09/19 Page 104 of 297 Page ID #:837

suspect that his NHL was caused by his use of Roundup until he saw an advertisement on television in June of 2018 advertising the link between Roundup exposure and NHL.

## V. CLAIMS

### COUNT I
### STRICT LIABILITY (DESIGN DEFECT) (AGAINST BAYER)

74.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

75.     Plaintiff brings this strict liability claim against Bayer as the parent company of Monsanto for defective design

76.     At all times relevant to this litigation, Bayer by and through Monsanto engaged in the business of testing, developing, manufacturing, selling, distributing, marketing, packaging designing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Bayer by and through its subsidiary Monsanto. At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by the Plaintiff, as described above.

77.     At all times relevant to this litigation, Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff.

78.     At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in

18

Case 3:16-md-02741-VC Document 843-3 Filed 09/14/19 Page 194 of 297 Page ID #:837

Illinois and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

79.    Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

80.    Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

81.    At all times relevant to this action, Monsanto knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

82.    Therefore, at all times relevant to this litigation, Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Monsanto were defective in design and formulation, in one or more of the following ways:

    (a)    When placed in the stream of commerce, Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

19

Case 3:16-md-02741-VC Document 843-3 Filed 09/19/18 Page 206 of 974 age 174 D9#:837

(b)     When placed in the stream of commerce, Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

(c)     When placed in the stream of commerce, Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

(d)     Monsanto did not sufficiently test, investigate, or study Roundup® products and, specifically, the active ingredient glyphosate.

(e)     Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

(f)     At the time of marketing its Roundup® products, Roundup® was defective in that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

(g)     Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products.

(h)     Monsanto could have employed safer alternative designs and formulations.

83.     Plaintiff was exposed to Roundup® products in the course of his home maintenance, as described above, without knowledge of their dangerous characteristics.

84.     At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

85.     Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

Case: 1:19-md-02018-000-03 Document #: 843-3 Filed: 09/16/19 Page 1 of 29 PageID #:837

86.     The harm caused by Roundup® products far outweighed their benefit, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate. Roundup® products were and are more dangerous than alternative products and Monsanto could have designed Roundup® products (including their packaging and sales aids) to make them less dangerous. Indeed, at the time that Monsanto designed Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

87.     At the time Roundup® products left Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of those herbicides.

88.     Monsanto's defective design of Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including the Plaintiff.

89.     Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Bayer by and through its subsidiary Monsanto is strictly liable to the Plaintiff.

90.     The defects in Roundup® products caused or contributed to cause Plaintiff's grave injuries, and, but for Monsanto's misconduct and omissions, Plaintiff would not have sustained the NHL which required him to receive treatment at several hospitals in Cook County, Illinois.

91.     Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including the Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Monsanto made conscious decisions not to redesign, warn or inform the unsuspecting public. Monsanto's reckless conduct warrants an award of aggravated damages.

21

Case 3:16-md-02741-VC Document 843-3 Filed 09/16/19 Page 92 of 297 Page ID #: 837

92. As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

WHEREFORE, the Plaintiff Robert Rawson respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Bayer for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT II
## STRICT LIABILITY (FAILURE TO WARN) (AGAINST BAYER)

93. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

94. Plaintiff brings this strict liability claim against Bayer as the parent company of Monsanto for failure to warn.

95. At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Monsanto.

96. Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce

22

Case 3:16-md-02741-VC Document 845-3 Filed 09/17/18 Page 1 of 29 Page ID #:837

Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiff, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

97.     At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn the Plaintiff of the dangers associated with Roundup® use and exposure. Monsanto, as manufacturer, seller, promoter, marketer, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

98.     At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

99.     At all times relevant to this litigation, Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by these herbicides, including the Plaintiff.

100.    Despite the fact that Monsanto knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of these products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or scientifically knowable to Monsanto through appropriate research and testing by known methods, at the time

23

Case 3:16-md-02741-VC Document 843-3 Filed 12/09/19 Page 129 of 297 Page ID #:837

they distributed, marketed, promoted, supplied or sold the product, and not known to end users and consumers, such as the Plaintiff.

101.    These products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

102.    At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Illinois and throughout the United States, including the Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, promoted and marketed by Monsanto.

103.    The Plaintiff was exposed to Roundup® products in the course of his personal use on his one acre property, without knowledge of their dangerous characteristics.

104.    At all times relevant to this litigation, the Plaintiff used and/or was exposed to the use of Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

105.    The Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of the Plaintiff's exposure. The Plaintiff relied upon the skill, superior knowledge, and judgment of Monsanto.

106.    These products were defective because the minimal warnings disseminated with Roundup® products were inadequate, and they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were

24

Case 3:16-md-02741-VC Document 843-3 Filed 09/06/19 Page 180 of 297 Page ID #:837

appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and landscaping applications.

107. The information that Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as the Plaintiff to utilize the products safely and with adequate protection. Instead, Monsanto disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

108. To this day, Monsanto has failed to adequately and accurately warn of the true risks of the Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

109. As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed, marketed, and promoted by Monsanto, and used by the Plaintiff in his home maintenance.

110. Bayer as the parent company of Monsanto is liable to the Plaintiff for injuries caused by their negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of these products and the risks associated with the use of or exposure to Roundup® and glyphosate.

25

Case 3:16-md-02741-VC Document 843-3 Filed 09/06/19 Page 181 of 298 Page ID #: 837

111.    The defects in Roundup® products caused or contributed to cause the Plaintiff's injuries, and, but for this misconduct and omissions, the Plaintiff would not have sustained his injuries.

112.    Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products, Plaintiff could have avoided the risk of developing injuries as alleged herein.

113.    As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

WHEREFORE, the Plaintiff Robert Rawson respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Bayer for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT III
## NEGLIGENCE (AGAINST BAYER)

114.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

115.    Monsanto, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by the Plaintiff.

116.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary

26

Case 3:16-md-02741-VC Document 843-5 Filed 09/19/18 Page 183 of 298 Page ID #:837

to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

117. At all times relevant to this litigation, Monsanto s had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

118. At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

119. Accordingly, at all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with the Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including the Plaintiff.

120. Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

121. As such, Monsanto breached the duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Monsanto manufactured, marketed, promoted, and sold defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in these products, knew or had

27

Case 3:16-md-02741-VC Document 843-3 Filed 09/06/19 Page 184 of 288 Page ID #:887

reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

122. Despite an ability and means to investigate, study, and test these products and to provide adequate warnings, Monsanto has failed to do so. Indeed, Monsanto has wrongfully concealed information and has further made false and/or misleading statements concerning the safety of exposure to Roundup® and glyphosate.

123. Monsanto was negligent in the following respects:

(a) Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

(b) Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

(c) Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

(d) Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

28

Case 1:19-md-02875-RBK-JS Document 845-3 Filed 09/16/19 Page 4 of 9 PageID #: 837

(e) Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

(f) Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Monsanto could reasonably foresee would use and be exposed to its Roundup® products;

(g) Failing to disclose to the Plaintiff, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

(h) Failing to warn the Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to the Plaintiff and other consumers;

(i) Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

(j) Representing that its Roundup® products were safe for their intended use when, in fact, Monsanto knew or should have known that the products were not safe for their intended purpose;

(k) Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

(l) Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

29

Case 3:16-md-02741-VC Document 843-8 Filed 09/09/19 Page 185 of 409 Page ID #:837

(m)     Continuing to disseminate information to its consumers, which indicate or imply that Monsanto's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

(n)     Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

124.    Monsanto knew and/or should have known that it was foreseeable that consumers such as the Plaintiff would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup®.

125.    The Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

126.    Monsanto's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiffs suffered, as described herein.

127.    Monsanto's conduct, as described above, was reckless. Monsanto regularly risked the lives of consumers and users of their products, including the Plaintiff's, with full knowledge of the dangers of these products. Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including the Plaintiff. Monsanto's reckless conduct therefore warrants an award of aggravated or punitive damages.

128.    As a proximate result of Monsanto's wrongful acts and omissions in placing defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff has suffered and continues to suffer grave injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

30

Case 3:16-md-02741-VC Document 843 Filed 09/19/19 Page 36 of 88 Page ID #: 837

129. On June 07, 2018 Bayer acquired Monsanto and as such is liable for the prior acts and omissions of Monsanto.

WHEREFORE, the Plaintiff Robert Rawson respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Bayer for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT IV
## STRICT LIABILITY (DESIGN DEFECT) (AGAINST MONSANTO)

130. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

131. Plaintiff brings this strict liability claim Monsanto for defective design

132. At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, manufacturing, selling, distributing, marketing, packaging designing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto. At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by the Plaintiff, as described above.

133. At all times relevant to this litigation, Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff.

31

Case 3:16-md-02741-VC Document 843-3 Filed 09/19/19 Page 193 of 298 Page ID #:837

134. At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Illinois and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

135. Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

136. Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

137. At all times relevant to this action, Monsanto knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

138. Therefore, at all times relevant to this litigation, Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Monsanto were defective in design and formulation, in one or more of the following ways:

(a) When placed in the stream of commerce, Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

32

Case 3:16-md-02741-VC Document 843-3 Filed 01/09/18 Page 193 of 297 Page ID #:837

(b)     When placed in the stream of commerce, Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

(c)     When placed in the stream of commerce, Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

(d)     Monsanto did not sufficiently test, investigate, or study Roundup® products and, specifically, the active ingredient glyphosate.

(e)     Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

(f)     At the time of marketing its Roundup® products, Roundup® was defective in that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

(g)     Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products.

(h)     Monsanto could have employed safer alternative designs and formulations.

139.    Plaintiff was exposed to Roundup® products in the course of his home maintenance, as described above, without knowledge of their dangerous characteristics.

140.    At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

141.    Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

33

Case 1:19-cv-00027-DCN Document #: 43-3 Filed: 09/16/19 Page 30 of 98 PageID #: 837

142.    The harm caused by Roundup® products far outweighed their benefit, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate. Roundup® products were and are more dangerous than alternative products and Monsanto could have designed Roundup® products (including their packaging and sales aids) to make them less dangerous. Indeed, at the time that Monsanto designed Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

143.    At the time Roundup® products left Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of those herbicides.

144.    Monsanto's defective design of Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including the Plaintiff.

145.    Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Monsanto is strictly liable to the Plaintiff.

146.    The defects in Roundup® products caused or contributed to cause Plaintiff's grave injuries, and, but for Monsanto's misconduct and omissions, Plaintiff would not have sustained the NHL which required him to receive treatment at several hospitals in Cook County, Illinois.

147.    Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including the Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Monsanto made conscious decisions not to redesign, warn or inform the unsuspecting public. Monsanto's reckless conduct warrants an award of aggravated damages.

34

Case 3:16-md-02741-VC Document 843-3 Filed 10/09/19 Page 190 of 289 Page ID #: 837

148.    As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

WHEREFORE, the Plaintiff Robert Rawson respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Monsanto for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT V
## STRICT LIABILITY (FAILURE TO WARN) (AGAINST MONSANTO)

149.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

150.    Plaintiff brings this strict liability claim against Monsanto for failure to warn.

151.    At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Monsanto.

152.    Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce Roundup® products, and in the course of same, directly advertised or marketed the products to

35

Case 3:16-md-02741-VC Document 843-3 Filed 09/16/19 Page 191 of 409 Page ID #: 837

consumers and end users, including the Plaintiff, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

153.    At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn the Plaintiff of the dangers associated with Roundup® use and exposure. Monsanto, as manufacturer, seller, promoter, marketer, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

154.    At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

155.    At all times relevant to this litigation, Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by these herbicides, including the Plaintiff.

156.    Despite the fact that Monsanto knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of these products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or scientifically knowable to Monsanto through appropriate research and testing by known methods, at the time they distributed, marketed, promoted, supplied or sold the product, and not known to end users and consumers, such as the Plaintiff.

36

Case 3:19-cv-02070-D-Document #: 843-3 Filed: 10/01/19 Page 192 of 409 Page 4 D#: 837

157. These products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

158. At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Illinois and throughout the United States, including the Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, promoted and marketed by Monsanto.

159. The Plaintiff was exposed to Roundup® products in the course of his personal use on his one acre property, without knowledge of their dangerous characteristics.

160. At all times relevant to this litigation, the Plaintiff used and/or was exposed to the use of Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

161. The Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of the Plaintiff's exposure. The Plaintiff relied upon the skill, superior knowledge, and judgment of Monsanto.

162. These products were defective because the minimal warnings disseminated with Roundup® products were inadequate, and they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and landscaping applications.

37

Case 3:16-md-02741-VC Document 843 Filed 09/19/18 Page 192 of 409 Page ID #:837

163. The information that Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as the Plaintiff to utilize the products safely and with adequate protection. Instead, Monsanto disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

164. To this day, Monsanto has failed to adequately and accurately warn of the true risks of the Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

165. As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed, marketed, and promoted by Monsanto, and used by the Plaintiff in his work.

166. Monsanto is liable to the Plaintiff for injuries caused by their negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of these products and the risks associated with the use of or exposure to Roundup® and glyphosate.

167. The defects in Roundup® products caused or contributed to cause the Plaintiff's injuries, and, but for this misconduct and omissions, the Plaintiff would not have sustained his injuries.

168. Had Monsanto provided adequate warnings and instructions and properly disclosed and

38

Case 3:16-md-02741-VC Document 843-3 Filed 09/06/18 Page 194 of 298 Page ID #: 837

disseminated the risks associated with Roundup® products, Plaintiff could have avoided the risk of developing injuries as alleged herein.

169.    As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

WHEREFORE, the Plaintiff Robert Rawson respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Monsanto for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

**COUNT VI**
**NEGLIGENCE (AGAINST MONSANTO)**

170.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

171.    Monsanto, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by the Plaintiff.

172.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

39

173.    At all times relevant to this litigation, Monsanto s had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

174.    At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

175.    Accordingly, at all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with the Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including the Plaintiff.

176.    Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

177.    As such, Monsanto breached the duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Monsanto manufactured, marketed, promoted, and sold defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of

40

Case 3:16-md-02741-VC Document 843 Filed 07/16/19 Page 195 of 409 Page ID #:837

harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

178.    Despite an ability and means to investigate, study, and test these products and to provide adequate warnings, Monsanto has failed to do so. Indeed, Monsanto has wrongfully concealed information and has further made false and/or misleading statements concerning the safety of exposure to Roundup® and glyphosate.

179.    Monsanto was negligent in the following respects:

(a)     Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

(b)     Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

(c)     Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

(d)     Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

(e)     Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

41

Case 3:16-md-02741-VC Document 843-3 Filed 03/14/18 Page 197 of 299 Page ID #:837

(f) Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Monsanto could reasonably foresee would use and be exposed to its Roundup® products;

(g) Failing to disclose to the Plaintiff, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

(h) Failing to warn the Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to the Plaintiff and other consumers;

(i) Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

(j) Representing that its Roundup® products were safe for their intended use when, in fact, Monsanto knew or should have known that the products were not safe for their intended purpose;

(k) Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

(l) Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

(m) Continuing to disseminate information to its consumers, which indicate or imply that Monsanto's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

42

Case 3:16-md-02741-VC Document 843-3 Filed 09/30/19 Page 42 of 297 Page ID #: 827

(n)     Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

180.    Monsanto knew and/or should have known that it was foreseeable that consumers such as the Plaintiff would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup®.

181.    The Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

182.    Monsanto's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiffs suffered, as described herein.

183.    Monsanto's conduct, as described above, was reckless. Monsanto regularly risked the lives of consumers and users of their products, including the Plaintiff's, with full knowledge of the dangers of these products. Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including the Plaintiff. Monsanto's reckless conduct therefore warrants an award of aggravated or punitive damages.

184.    As a proximate result of Monsanto's wrongful acts and omissions in placing defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff has suffered and continues to suffer grave injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

WHEREFORE, the Plaintiff Robert Rawson respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Monsanto for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with

Case 3:16-md-02741-VC Document 843 Filed 09/19/19 Page 198 of 409 Page ID #: 827

interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT VII
## NEGLIGENCE (AGAINST DUKE'S)

185. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

186. Duke's promoted, marketed, distributed and sold, Roundup® products to the Plaintiff that were in fact used by the Plaintiff.

187. At all times relevant herein the Roundup® products promoted, marketed, distributed and sold to the Plaintiff were defective.

188. Duke's owed a duty to the Plaintiff to exercise ordinary care in the promotion, marketing, distribution, and sale, of the Roundup® products it sold to the Plaintiff between 1974 and 2018.

189. Duke's breached the aforesaid duty and was negligent through one or more of the following acts and or omissions that was a proximate cause of damages to the Plaintiff:

    a)    Failed to assure the Roundup® products complied with FDA standards;

    b)    Failed to assure the Roundup® products complied with industry standards;

    c)    Failed to assure the Roundup® products were non-carcinogenic;

    d)    Marketed Roundup® products were safe when they were not;

    e)    Sold Roundup® products that were defective;

    f)    Sold Roundup® products that caused NHL;

    g)    Sold Roundup® products that were unsafe;

    h)    Distributed Roundup® products that were unsafe; and/o

44

Case 3:19-cv-02710 Document 1 Filed 09/19 Page 199 of 409 Page ID #: 837

    j)      Promoted Roundup® products that were unsafe.

190.    As a direct and proximate cause of one or more of the aforesaid acts or omissions,

Plaintiff has suffered and continues to suffer grave injuries, and has endured and continues to

endure physical pain and discomfort, as well as economic hardship, including considerable

financial expenses for medical care, and treatment.

       WHEREFORE, the Plaintiff Robert Rawson respectfully requests that this Honorable

Court enter judgment in his favor and against Defendant Duke's Hardware, Inc., for

compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars

($50,000.00), together with interest, costs herein incurred, and all such other and further relief as

this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained

herein.

## COUNT VIII
## STRICT LIABILTY (AGAINST DUKE'S)

191.    Plaintiff incorporates by reference each and every allegation set forth in the preceding

paragraphs as if fully stated herein.

192.    That the Defendant, Duke's marketed, sold, distributed, and placed into the market

Roundup® products that existed in a defective condition at the time they left Duke's' possession

and control.

193.    That the Roundup® products were defective in that they carcinogenic.

194.    That the Roundup® products sold to Plaintiff were used for the purpose and in the

manner intended, at all times relevant to this Complaint.

Case 3:16-md-02741-VC Document 843-33 Filed 09/06/19 Page 201 of 270 Page ID #:837

195.   That the Roundup® products sold the Plaintiff, were in substantially the same condition as they were at the time they were promoted, distributed, marketed, and sold by the Defendant Duke's.

196.   That the Plaintiff Robert Rawson, could not, by the exercise of reasonable care, have discovered the defect in, nor perceived the danger of, the Roundup® products.

197.   That the Defendant Duke's owed a strict liability not to harm the Plaintiff through the intended use of the Roundup® products it sold to him.

198.   That the defective condition of the Roundup® products sold to Robert Rawson by the Defendant, caused Robert Rawson to be injured and suffer damages of a personal, permanent, and pecuniary nature.

199.   That at the time the Defendant marketed, sold, distributed, delivered or made available the Roundup® products, Duke's failed to properly warn the Plaintiff of the danger posed by the Roundup® products, and the likelihood of NHL associated with exposure to the Roundup® products.

200.   That as a result of the injuries and damages caused by the defective Roundup® products marketed, sold, and distributed by Duke's, and as a result of the injuries and damages caused by Duke's' failure to warn of the dangers posed by the defect Roundup® products, Duke's is strictly liable to Robert Rawson for Duke's' failure to market, sell, distribute, deliver or make available a product, which would not cause injury or damage to the Plaintiff, and for its failure to warn of the dangers posed by the defective Roundup® products.

WHEREFORE, the Plaintiff Robert Rawson respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Duke's Hardware, Inc., for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars

46

Case 1:18-cv-00902-JD Document #: 843-3 Filed: 09/17/19 Page 193 of 270 PageID #:837

($50,000.00), together with interest, costs herein incurred, and all such other and further relief as

this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained

herein.

By: David J. Gallagher

**MOTHERWAY & NAPLETON, LLP.**
Attorneys for Plaintiff
140 S. Dearborn, Suite 1500
Chicago, IL 60603
(312) 726-2699 - PHONE
(312) 726-6851 - FAX
Atty. No. 56421
dgallagher@mnlawoffice.com

47

FILED DATE: 5/28/2019 5:12 PM  2019L002426

FILED
5/28/2019 5:12 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2019L002426

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

ROBERT RAWSON,

        Plaintiff,

*v.*

BAYER CORPORATION; MONSANTO
COMPANY; and DUKE'S HARDWARE,
INC.,

        Defendants.

No.:  2019L002426

### DUKE'S HARDWARE, INC.'S ANSWER AND
### AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT AT LAW

Defendant Duke's Hardware, Inc. ("Duke's"), by and through its counsel, respectfully

responds by generally denying all allegations contained in plaintiff's Complaint, except as set

forth below.  Although many paragraphs in the Complaint refer to "Plaintiffs," Duke's

nevertheless responds to the allegations in those paragraphs as if brought by plaintiff Robert

Rawson.  Silence as to any allegations shall constitute a denial.

## I.    THE PARTIES

### Plaintiff

1.    Plaintiff Robert Rawson is and was at all relevant times a resident of Cook

County, Illinois.  He and his family purchased and used Roundup and/or other Monsanto

glyphosate-containing products ("Roundup") from approximately 1974 through 2018 on his one

acre property in Palos Park, Illinois.

    <u>ANSWER</u>:  Duke's lacks information or knowledge sufficient to form a belief as to the
truth of the allegations in paragraph 1 and therefore denies those allegations.

### Defendants

2.    Defendant Bayer Corporation ("Bayer") is a multinational corporation doing

FILED DATE: 5/28/2019 5:12 PM  2019L002426

business throughout the United States, including Cook County, Illinois that is incorporated in Indiana, with its headquarters and principal place of business in Whippany, New Jersey.

ANSWER:  The allegations in paragraph 2 do not require a response from Duke's because these allegations relate to Bayer Corporation, not Duke's.

3.      Defendant Monsanto Company ("Monsanto") is a multinational corporation doing business throughout the United States, including Cook County, Illinois that is incorporated in Delaware, with its headquarters and principal place of business in St. Louis, Missouri.

ANSWER:  The allegations in paragraph 3 do not require a response from Duke's because these allegations relate to Monsanto, not Duke's.

4.      On June 07, 2018 Bayer acquired Monsanto.

ANSWER:  The allegations in paragraph 4 do not require a response from Duke's because these allegations relate to other defendants, not Duke's.

5.      Defendant Duke's Hardware, Inc., ("Duke's") is a domestic corporation, with its headquarters and principal place of business in Cook County, Illinois.

ANSWER:  Duke's admits the allegations in paragraph 5.

6.      At all times relevant to this complaint, Duke's operated a Duke's Ace Hardware store at 7610 W. 11th Street, Palos Hills, Illinois which sold Roundup$^{®}$ to the Plaintiff and his family from approximately 1974 to 2018.

ANSWER:  Duke's denies the allegations in paragraph 6.

7.      At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and was the manufacturer of Roundup$^{®}$.

ANSWER:  The allegations in paragraph 7 do not require a response from Duke's because these allegations relate to Monsanto, not Duke's.

## II.    INTRODUCTION

8.      In 1970, Defendant Monsanto Company, Inc. discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under brand name Roundup$^{®}$.

FILED DATE: 5/28/2019 5:12 PM 2019L002426

Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in America agriculture with 85-90 millions of pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

ANSWER: The allegations in the first sentence of paragraph 8 do not require a response from Duke's because these allegations relate to Monsanto, not Duke's. Duke's admits the allegations in the second sentence of paragraph 8. Duke's lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 8 and therefore denies those allegations.

9. Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

ANSWER: The allegations in the first three sentences of paragraph 9 do not require a response from Duke's because these allegations relate to Monsanto, not Duke's. Duke's lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 9 and therefore denies those allegations.

10. Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agriculture workers, and even in the urine of urban dwellers whom are not in direct contact with glyphosate.

ANSWER: Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 10 and therefore denies those allegations.

FILED DATE: 5/28/2019 5:12 PM    2019L002426

11.     On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate.  That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces health implications from exposure to glyphosate since 2001.

ANSWER:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 11 and therefore denies those allegations.

12.     On July 29, 2015, IARC issued the formal monograph relating to glyphosate.  In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

ANSWER:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 12 and therefore denies those allegations.

13.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other haematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

ANSWER:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 13 and therefore denies those allegations.

14.     The IARC evaluation is significant.  It confirms what has been believed for years: that glyphosate is toxic to humans.

ANSWER:  Duke's denies the allegations in paragraph 14.

15.     Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment.  Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate based

FILED DATE: 5/28/2019 5:12 PM   2019L002426

herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

    <u>ANSWER</u>:   The allegations in paragraph 15 do not require a response from Duke's because these allegations relate to Monsanto, not Duke's.

## III.   <u>JURISDICTION AND VENUE</u>

    16.    Jurisdiction is proper pursuant to 735 ILCS 5/2-209 as at all times relevant hereto, Monsanto was in the business of researching, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, labeling, packaging, marketing, promoting, and/or advertising Roundup® products in the throughout the United States including in Cook County, Illinois.

    <u>ANSWER</u>:  The allegations in paragraph 16 set forth conclusions of law for which no response is required.

    17.    At all times relevant hereto, Monsanto was a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri, who routinely conducted business in Cook County, Illinois.

    <u>ANSWER</u>:   The allegations in paragraph 17 do not require a response from Duke's because these allegations relate to Monsanto, not Duke's.

    18.    Duke's is a domestic corporation with its headquarters and principal place of business in Cook County, Illinois, making it a resident of Cook County pursuant to 735 ILCS 5/2-102, who routinely conducts business in Cook County, Illinois.

    <u>ANSWER</u>:  Duke's admits the allegations in paragraph 18.

    19.    Plaintiff has timely filed this lawsuit less than two years from the time the Plaintiff knew or reasonably should have known of the injury and that it may have been wrongly caused.

    <u>ANSWER</u>:  In response to the allegations in paragraph 19, Duke's denies that plaintiff's injuries were caused by exposure to glyphosate-based herbicides and denies that Duke's

FILED DATE: 5/28/2019 5:12 PM    2019L002426

"wrongfully caused" those injuries. The remaining allegations in paragraph 19 set forth conclusions of law for which no response is required. To the extent that a response is deemed required, Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations regarding plaintiff's actual or potential knowledge and therefore denies those allegations.

20.     Pursuant to 735 ILCS 512-101, venue is proper within this Court because Defendant Duke's is a resident of Cook County, and because Plaintiff was diagnosed and treated for his cancer in Cook County, and the Defendants do business and advertise in this county.

<u>ANSWER</u>:  The allegations in paragraph 20 set forth conclusions of law for which no response is required.

## IV.    **FACTS**

21.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

<u>ANSWER</u>:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 21 and therefore denies those allegations.

22.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis.  Treated plants generally die within two to three days.  Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

<u>ANSWER</u>:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 22 and therefore denies those allegations.

23.     For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses.  That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment.  Of course, history has shown that not to be true.  According to the WHO, the main chemical ingredient of Roundup®—

FILED DATE: 5/28/2019 5:12 PM 2019L002426

glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Agricultural workers are, once again, victims of corporate greed. Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® was safe.

ANSWER: The allegations in the second, third, sixth, seventh, eighth, and last sentences of paragraph 23 do not require a response from Duke's because these allegations relate to Monsanto, not Duke's. Duke's denies the remaining allegations in paragraph 23.

**The Discovery of Glyphosate and Development of Roundup®**

24. The herbicidal properties of the glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use. Monsanto still markets Roundup® as safe today.

ANSWER: The allegations in paragraph 24 do not require a response from Duke's because these allegations relate to Monsanto, not Duke's.

**Registration of Herbicides under Federal Law**

25. The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § l36a(a).

ANSWER: The allegations in paragraph 25 set forth conclusions of law for which no response is required.

7

Case: 1:19-cv-00270 Document #: 43 Filed: 09/09/19 Page 4 of 9 PageID #:827

FILED DATE: 5/28/2019 5:12 PM   2019L002426

26. Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

ANSWER: The allegations in paragraph 26 set forth conclusions of law for which no response is required.

27. FIFRA defines "unreasonable adverse effects the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

ANSWER: The allegations in paragraph 27 set forth conclusions of law for which no response is required.

28. The EPA registered Roundup® for distribution, sale, and manufacture in the United States and the State of Illinois.

ANSWER: Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 28 and therefore denies those allegations.

29. FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for

8

FILED DATE: 5/28/2019 5:12 PM   2019L002426

review and evaluation.  The government is not required, not is it able, however, to perform the products tests that are required of the manufacturer.

<u>ANSWER</u>:  The allegations in paragraph 29 do not require a response from Duke's because these allegations relate to Monsanto, not Duke's.

30.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product initially registered.  The data necessary for registration of a pesticide has changed over time.  The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration" 7 U.S.C. § I 36al. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

<u>ANSWER</u>:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 30 and therefore denies those allegations.

31.     In the case of glyphosate, and therefore Roundup$^{®}$, the EPA has planned on releasing its preliminary risk assessment—in relation to the re-registration process—no later than July 2015.  The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

<u>ANSWER</u>:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 31 and therefore denies those allegations.

***Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup$^{®}$***

32.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer:  "It should be emphasized, however, that designation of an agent

9

in Group E is based on the available evidence at the time of elevation and should not be

interpreted as a definitive conclusion that the agent will not be a carcinogen under any

circumstances."

ANSWER: Certain allegations in paragraph 32 do not require a response from Duke's because these allegations relate to Monsanto, not Duke's. Duke's lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 32 and therefore denies those allegations.

33. On two occasions, the EPA found that the laboratories hired by Monsanto to test

the toxicity of its Roundup® products for registration proposes committed fraud.

ANSWER: The allegations in paragraph 33 do not require a response from Duke's because these allegations relate to Monsanto, not Duke's.

34. In the first instance, Monsanto, in seeking initial registration of Roundup® by

EPA, hired Industrial Bio-Test Laboratories (IBT) to perform and evaluate pesticide toxicology

studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-

containing products, including nine of the 15 residue studies to register Roundup®.

ANSWER: The allegations in paragraph 34 do not require a response from Duke's because these allegations relate to Monsanto, not Duke's.

35. In 1976, the United States Food and Drug Administration ("FDA") performed an

inspection of industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw

data and the final report relating to the toxicological impacts of glyphosate. The EPA

subsequently audited IBT; it too found the toxicology studies conducted for the Roundup®

herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at

IBT, that it was "hard to believe the scientific integrity of the studies when they said they took

specimens of the uterus from male rabbits."

ANSWER: Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 35 and therefore denies those allegations.

36. Three top executives of IBT were convicted of fraud in 1983.

10

Case 3:16-md-02741-VC Document 843-30 Filed 12/09/19 Page 213 of 291 Page ID #: 837

FILED DATE: 5/28/2019 5:12 PM    2019L002426

<u>ANSWER</u>:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 36 and therefore deny those allegations.

37.    In the second incident of dada falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including Roundup®.  In that same year, the owner of Craven laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

<u>ANSWER</u>:  The allegations in the first sentence of paragraph 37 do not require a response from Duke's because these allegations relate to Monsanto, not Duke's.  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 37 and therefore deny those allegations.

38.    Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

<u>ANSWER</u>:  The allegations in paragraph 38 do not require a response from Duke's because these allegations relate to Monsanto, not Duke's.

### The Importance of Roundup® to Monsanto's Market Dominance and Profits

39.    The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly.  But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

<u>ANSWER</u>:  The allegations in paragraph 39 do not require a response from Duke's because these allegations relate to Monsanto, not Duke's.

40.    In response, Monsanto began the development and sales of genetically engineered Roundup Ready® seeds in 1996.  Since Roundup Ready® crops are resistant to glyphosate; farmers can spray Roundup® onto their fields during the growing season without harming the crop.  This allowed Monsanto to expand its market for Roundup® even further; by 2000,

Case Case:3:19-cv-00042-20270uDocum#:813-7F4d 30PTi/e0419PaBgd9465 PafeR7313age4D9#:827

FILED DATE: 5/28/2019 5:12 PM  2019L002426

Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted for Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

ANSWER: The allegations in paragraph 40 do not require a response from Duke's because these allegations relate to Monsanto, not Duke's.

41. Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

ANSWER: The allegations in paragraph 41 do not require a response from Duke's because these allegations relate to Monsanto, not Duke's. To the extent a response is deemed required, Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 41 and therefore denies those allegations.

***Monsanto has known for decades that it falsely advertises the safety of Roundup®***

42. In 1996, the New York Attorney general ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a) Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences.

FILED DATE: 5/28/2019 5:12 PM   2019L002426

b)      And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c)      Roundup biodegrades into naturally occurring elements.

d)      Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e)      This non-residual herbicide will not wash or leach in the soil. It … stays where you apply it.

f)      You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g)      Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h)      Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i)      You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j)      "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

ANSWER:  The allegations in paragraph 42 do not require a response from Duke's because these allegations relate to Monsanto, not Duke's.

43. November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk. * * *

b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable * * *

c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means. * * *

d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics." * * *

e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic.

ANSWER: The allegations in paragraph 43 do not require a response from Duke's because these allegations relate to Monsanto, not Duke's.

44. Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

ANSWER: The allegations in paragraph 44 do not require a response from Duke's because these allegations relate to Monsanto, not Duke's.

45. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

14

FILED DATE: 5/28/2019 5:12 PM   2019L002426

FILED DATE: 5/28/2019 5:12 PM    2019L002426

ANSWER:  The allegations in paragraph 45 do not require a response from Duke's because these allegations relate to Monsanto, not Duke's.

### Classifications and Assessments of Glyphosate

46.     The IARC process for the classification of glyphosate followed the stringent procedures for the evaluations of a chemical agent.  Over time, the IARC Monograph program has reviewed 980 agents.  Of those reviewed, it has determined 116 agents to be Group I (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to the probably Not Carcinogenic.

ANSWER:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations asserted in paragraph 46 and therefore denies those allegations.

47.     The established procedure for IARC Monograph evaluations described in the IARC Programme's Preamble.  Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

ANSWER:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 47 and therefore denies those allegations.

48.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts.  Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members.  One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation.  Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in

Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

ANSWER:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 48 and therefore denies those allegations.

49.    In assessing an agent, the IARC Working Group reviews the following information:

(a)    human, experimental, and mechanistic data;

(b)    all pertinent epidemiological studies and cancer bioassays; and

(c)    representative mechanistic data.  The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

ANSWER:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 49 and therefore denies those allegations.

50.    In March 2015, IARC reassessed glyphosate.  The summary published in The Lancet Oncology reported that glyphosate is a group 2A agent and probably carcinogenic to humans.

ANSWER:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 50 and therefore denies those allegations.

51.    On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3-10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate.  The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence.  According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly

16

FILED DATE: 5/28/2019 5:12 PM    2019L002426

available scientific literature" as well as "data from governmental reports that are publicly available."

ANSWER:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 51 and therefore denies those allegations.

52.     The studies considered the following exposure groups: occupational exposure of farmers and tree nursey workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

ANSWER: Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 52 and therefore denies those allegations.

53.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

ANSWER:  Duke's lacks information or knowledge sufficient to forma  belief as to the truth of the allegations in paragraph 53 and therefore denies those allegations.

54.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to the glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

ANSWER:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 54 and therefore denies those allegations.

55.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden.  These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

ANSWER:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 55 and therefore denies those allegations.

FILED DATE: 5/28/2019 5:12 PM    2019L002426

56.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

ANSWER:   Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 56 and therefore denies those allegations.

57.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

ANSWER:   Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 57 and therefore denies those allegations.

58.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma.  A second study reported a positive trend for haemangiosarcoma in male mice.  Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies.  A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

ANSWER:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 58 and therefore deny those allegations.

59.     IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indication absorption.   Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

ANSWER:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 59 and therefore denies those allegations.

60.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

FILED DATE: 5/28/2019 5:12 PM   2019L002426

<u>ANSWER</u>:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 60 and therefore denies those allegations.

61.    The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

<u>ANSWER</u>:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 61 and therefore deny those allegations.

62.    The IARC Working Group also reviewed an Agricultural Health Study (AHS), consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.  While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

<u>ANSWER</u>:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 62 and therefore denies those allegations.

63.    In an article published on November 09, 2017 in the Journal of the National Cancer Institute updating the results of Glyphosate use and cancer incidence in the Agricultural Health Study a link was determined to exist between Glyphosate exposure and AML.

<u>ANSWER</u>:   Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 63 and therefore denies those allegations.

64.    In a review published on February 10, 2019 in Science Direct titled Exposure to Glyphosate-Based Herbicides and Risk for Non-Hodgkin Lymphoma:  A Meta-Analysis and Supporting Evidence, a compelling link between exposures to GBHs and increased risk for NHL was noted.

FILED DATE: 5/28/2019 5:12 PM   2019L002426

ANSWER:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 64 and therefore denies those allegations.

***Other Earlier Findings About Glyphosate's Dangers to Human Health***

65.     The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate.  This technical fact sheet predates the IARC March 20, 2015, evaluation.  The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites.  These sites may be around water and in wetlands.  It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills.  Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not are not available.  Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup.  They may also be exposed by touching soil and plants to which glyphosate was applied.  Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

ANSWER:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 65 and therefore denies those allegations.

66.     In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticides-caused illness, glyphosate was third most commonly-reported cause of pesticide illness among agricultural workers.

FILED DATE: 5/28/2019 5:12 PM    2019L002426

<u>ANSWER</u>:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 66 and therefore denies those allegations.

*Recent Worldwide Bans on Roundup®/Glyphosate*

67.    Several countries around the world have instituted bans the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in light of the as the dangers of use of Roundup® are more widely known.  The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which takes effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated:  "Agricultural pesticides in user-friendly packing are sold in abundance to private persons.  In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are.  Especially children are sensitive to toxic substances and should therefore not be exposed to it."

<u>ANSWER</u>:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 67 and therefore denies those allegations.

68.    The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

<u>ANSWER</u>:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 68 and therefore denies those allegations.

69.    France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

<u>ANSWER</u>:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 69 and therefore denies those allegations.

70.    Bermuda banned both the private and commercial sale of glyphosates, including Roundup®.  The Bermuda government explained its ban as follows:  "Following a recent

21

FILED DATE: 5/28/2019 5:12 PM    2019L002426

scientific study carried out by a leading cancer agency, they importation of weed spray 'Roundup' has been suspended."

<u>ANSWER</u>:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 70 and therefore denies those allegations.

71.    The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that Glycoside has been linked to fatal kidney disease in agricultural workers.

<u>ANSWER</u>:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 71 and therefore denies those allegations.

72.    The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

<u>ANSWER</u>:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 72 and therefore denies those allegations.

***Plaintiff's Exposure to Roundup®***

73.    Plaintiff Robert Rawson used Roundup extensively on his one acre property from approximately 1974 through 2018. He applied the herbicide himself on his grass and his driveway.  Mr. Rawson was unaware of Roundup's carcinogenic properties until it was far too late; he was diagnosed with extranodal marginal zone lymphoma (MALT) a type of non-Hodgkin Lymphoma (NHL) on February 01, 2013.  Mr. Rawson had no reason to believe or suspect that his NHL was caused by his use of Roundup until he saw an advertisement on television in June of 2018 advertising the link between Roundup exposure and NHL.

<u>ANSWER</u>:  In response to the allegations in paragraph 73, Duke's denies that any exposure to Roundup®-branded products can cause NHL and also denies that Roundup®-branded products have carcinogenic properties.  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 73 and therefore denies those allegations.

FILED DATE: 5/28/2019 5:12 PM   2019L002426

## V.  CLAIMS

### COUNT I
### STRICT LIABILITY (DESIGN DEFECT) (AGAINST BAYER)

74.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

ANSWER:  Count I (paragraphs 74-92) is directed at Bayer Corporation and does not require any responses from Duke's.

75.     Plaintiff brings this strict liability claim against Bayer as the parent company of Monsanto for defective design.

76.     At all times relevant to this litigation, Bayer by and through Monsanto engaged in the business of testing, developing, manufacturing, selling, distributing, marketing, packaging designing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce.  These actions were under the ultimate control and supervision of Bayer by and through its subsidiary Monsanto.  At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by the Plaintiff, as described above.

77.     At all times relevant to this litigation, Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff.

78.     At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Illinois and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

23

FILED DATE: 5/28/2019 5:12 PM   2019L002426

79. Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

80. Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

81. At all times relevant to this action, Monsanto knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

82. Therefore, at all times relevant to this litigation, Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Monsanto were defective in design and formulation, in one or more of the following ways:

(a) When placed in the stream of commerce, Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

(b) When placed in the stream of commerce, Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

FILED DATE: 5/28/2019 5:12 PM    2019L002426

(c)     When placed in the stream of commerce, Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

(d)     Monsanto did not sufficiently test, investigate, or study Roundup® products and, specifically, the active ingredient glyphosate.

(e)     Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

(f)     At the time of marketing its Roundup® products, Roundup® was defective in that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

(g)     Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products.

(h)     Monsanto could have employed safer alternative designs and formulations.

83.     Plaintiff was exposed to Roundup® products in the course of his home maintenance, as described above, without knowledge of their dangerous characteristics.

84.     At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

85.     Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

86.     The harm caused by Roundup® products far outweighed their benefit, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate.  Roundup® products were and are more dangerous than alternative products and

25

Monsanto could have designed Roundup® products (including their packaging and sales aids) to make them less dangerous. Indeed, at the time that Monsanto designed Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

87.     At the time Roundup® products left Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of those herbicides.

88.     Monsanto's defective design of Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including the Plaintiff.

89.     Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Bayer by and through its subsidiary Monsanto is strictly liable to the Plaintiff.

90.     The defects in Roundup® products caused or contributed to cause Plaintiff's grave injuries, and, but for Monsanto's misconduct and omissions, Plaintiff would not have sustained the NHL which required him to receive treatment at several hospitals in Cook County, Illinois.

91.     Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including the Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Monsanto made conscious decisions not to redesign, warn or inform the unsuspecting public. Monsanto's reckless conduct warrants an award of aggravated damages.

92.     As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave

FILED DATE: 5/28/2019 5:12 PM   2019L002426

injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

WHEREFORE, the Plaintiff Robert Rawson respectfully requests that this Honorable Court enter judgement in his favor and against Defendant Bayer for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## COUNT II
## STRICT LIABILITY (FAILURE TO WARN) (AGAINST BAYER)

93.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

ANSWER:  Count II (paragraphs 93-113) is directed at Bayer Corporation and does not require any responses from Duke's.

94.     Plaintiff brings this strict liability claim against Bayer as the parent company of Monsanto for failure to warn.

95.     At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate.  These actions were under the ultimate control and supervision of Monsanto.

96.     Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce Roundup® products, and in the course of same, directly advertised or marketed the

27

FILED DATE: 5/28/2019 5:12 PM  2019L002426

products to consumers and end users, including the Plaintiff, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

97. At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn the Plaintiff of the dangers associated with Roundup® use and exposure. Monsanto, as manufacturer, seller, promoter, marketer, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

98. At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

99. At all times relevant to this litigation, Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by these herbicides, including the Plaintiff.

100. Despite the fact that Monsanto knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of these products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or scientifically knowable to Monsanto through appropriate research and testing by known methods, at the time they distributed, marketed, promoted, supplied or sold the product, and not known to end users and consumers, such as the Plaintiff.

28

FILED DATE: 5/28/2019 5:12 PM   2019L002426

101. These products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

102. At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Illinois and throughout the United States, including the Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, promoted and marketed by Monsanto.

103. The Plaintiff was exposed to Roundup® products in the course of his personal use on his one acre property, without knowledge of their dangerous characteristics.

104. At all times relevant to this litigation, the Plaintiff used and/or was exposed to the use of Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

105. The Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of the Plaintiff's exposure. The Plaintiff relied upon the skill, superior knowledge, and judgment of Monsanto.

106. These products were defective because the minimal warnings disseminated with Roundup® products were inadequate, and they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were

29

FILED DATE: 5/28/2019 5:12 PM    2019L002426

appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and landscaping applications.

107.    The information that Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as the Plaintiff to utilize the products safely and with adequate protection.  Instead, Monsanto disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

108.    To this day, Monsanto has failed to adequately and accurately warn of the true risks of the Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

109.    As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed, marketed, and promoted by Monsanto, and used by the Plaintiff in his home maintenance.

110.    Bayer as the parent company of Monsanto is liable to the Plaintiff for injuries caused by their negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of these products and the risks associated with the use of or exposure to Roundup® and glyphosate.

111.    The defects in Roundup® products caused or contributed to cause the Plaintiff s injuries, and, but for this misconduct and omissions, the Plaintiff would not have sustained his injuries.

112.    Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products, Plaintiff could have avoided the risk of developing injuries as alleged herein.

113.    As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

WHEREFORE, the Plaintiff Robert Rawson respectfully requests that this Honorable Court enter judgement in his favor and against Defendant Bayer for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## COUNT III
## NEGLIGENCE (AGAINST BAYER)

114.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

ANSWER:  Count III (paragraphs 114-129) is directed at Bayer Corporation and does not require any responses from Duke's.

115.    Monsanto, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by the Plaintiff.

116.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion,

FILED DATE: 5/28/2019 5:12 PM    2019L002426

FILED DATE: 5/28/2019 5:12 PM   2019L002426

packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

117.    At all times relevant to this litigation, Monsanto s had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

118.    At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

119.    Accordingly, at all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with the Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including the Plaintiff.

120.    Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

121.    As such, Monsanto breached the duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Monsanto manufactured, marketed, promoted, and sold defective herbicides containing the

chemical glyphosate, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

122.    Despite an ability and means to investigate, study, and test these products and to provide adequate warnings, Monsanto has failed to do so. Indeed, Monsanto has wrongfully concealed information and has further made false and/or misleading statements concerning the safety of exposure to Roundup® and glyphosate.

123.    Monsanto was negligent in the following respects:

(a)    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

(b)    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

(c)    Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

(d)    Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

(e)     Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

(f)     Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Monsanto could reasonably foresee would use and be exposed to its Roundup® products;

(g)     Failing to disclose to the Plaintiff, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

(h)     Failing to warn the Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to the Plaintiff and other consumers;

(i)     Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

(j)     Representing that its Roundup® products were safe for their intended use when, in fact, Monsanto knew or should have known that the products were not safe for their intended purpose;

(k)     Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

(1)     Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

34

(m)     Continuing to disseminate information to its consumers, which indicate or imply that Monsanto's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

(n)     Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

124.    Monsanto knew and/or should have known that it was foreseeable that consumers such as the Plaintiff would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup®.

125.    The Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

126.    Monsanto's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiffs suffered, as described herein.

127.    Monsanto's conduct, as described above, was reckless. Monsanto regularly risked the lives of consumers and users of their products, including the Plaintiff's, with full knowledge of the dangers of these products.  Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including the Plaintiff. Monsanto's reckless conduct therefore warrants an award of aggravated or punitive damages.

128.    As a proximate result of Monsanto's wrongful acts and omissions in placing defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff has suffered and continues to suffer grave injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

FILED DATE: 5/28/2019 5:12 PM   2019L002426

FILED DATE: 5/28/2019 5:12 PM   2019L002426

129.    On June 07, 2018 Bayer acquired Monsanto and as such is liable for the prior acts and omissions of Monsanto.

WHEREFORE, the Plaintiff Robert Rawson respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Bayer for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

**COUNT IV**
**STRICT LIABILITY (DESIGN DEFECT) (AGAINST MONSANTO)**

74.    Plaintiff incorporates by reference each and every allegations set forth in the preceding paragraphs stated herein.

<u>ANSWER</u>:  Count IV (paragraphs 130-148) is directed at Monsanto Company and does not require any responses from Duke's.

75.    Plaintiff brings this strict liability claim Monsanto for defective design.

76.    At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, manufacturing, selling, distributing, marketing, packaging, designing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products, into the stream of commerce.  These actions were under the ultimate control and supervision of Monsanto. At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by the Plaintiff, as described above.

77.    At all times relevant to this litigation, Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or expose to the public, and in particular, the Plaintiff.

36

78.     At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and other persons coming into contact with these products in Illinois and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

79.     Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left hands of the manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

80.     Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufactures and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

81.     At times relevant to this action, Monsanto knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

82.     Therefore, at times relevant to this ligation, Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Monsanto were defective in design and formulation, in one or more of the following ways:

(a)     When placed in the stream of commerce, Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

37

FILED DATE: 5/28/2019 5:12 PM   2019L002426

Case 3:16-md-02741-VC Document 843-3 Filed 09/19/19 Page 990 of 2339 Page ID #: 837

(b)     When placed in the stream of commerce, Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

(c)     When placed in the stream of commerce, Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

(d)     Monsanto did not sufficiently test, investigate, or study Roundup® products and, specifically, the active ingredient glyphosate.

(e)     Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

(f)     At the time of marketing its Roundup® products, Roundup® was defective in that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

(g)     Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products.

(h)     Monsanto could have employed safer alternative designs and formulations.

83.     Plaintiff was exposed to Roundup® products in the course of his home maintenance, as described above, without knowledge of their dangerous characteristics.

84.     At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

85.     Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

38

FILED DATE: 5/28/2019 5:12 PM   2019L002426

86.    The harm caused by Roundup® products far outweighed their benefit, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate. Roundup® products were and are more dangerous than alternative products and Monsanto could have designed Roundup® products (including their packaging and sales aids) to make them less dangerous. Indeed, at the time that Monsanto designed Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

87.    At the time Roundup® products left Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of those herbicides.

88.    Monsanto's defective design of Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including the Plaintiff.

89.    Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Monsanto is strictly liable to the Plaintiff.

90.    The defects in Roundup® products caused or contributed to cause Plaintiff's grave injuries, and, but for Monsanto's misconduct and omissions, Plaintiff would not have sustained the NHL which required him to receive treatment at several hospitals in Cook County, Illinois.

91.    Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including the Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public.  Monsanto made conscious decisions not to redesign, warn

FILED DATE: 5/28/2019 5:12 PM   2019L002426

39

Case: 1:19-cv-00402 Document #: 43-1 Filed: 09/10/19 Page 41 of 294 PageID #:827

or inform the unsuspecting public. Monsanto's reckless conduct warrants an award of aggravated damages.

92. As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

WHEREFORE, the Plaintiff Robert Rawson respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Monsanto for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

**COUNT V**
**STRICT LIABILITY (FAILURE TO WARN) (AGAINST MONSANTO)**

93. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

ANSWER: Count V (paragraphs 149-169) is directed at Monsanto Company and does not require any responses from Duke's.

94. Plaintiff brings this strict liability claim against Monsanto for failure to warn.

95. At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Monsanto.

40

FILED DATE: 5/28/2019 5:12 PM   2019L002426

FILED DATE: 5/28/2019 5:12 PM   2019L002426

96. Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiff, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

97. At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn the Plaintiff of the dangers associated with Roundup® use and exposure. Monsanto, as manufacturer, seller, promoter, marketer, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

98. At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

99. At all times relevant to this litigation, Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by these herbicides, including the Plaintiff.

100. Despite the fact that Monsanto knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of these products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or

41

scientifically knowable to Monsanto through appropriate research and testing by known methods, at the time they distributed, marketed, promoted, supplied or sold the product, and not known to end users and consumers, such as the Plaintiff.

101.    These products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

102.    At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Illinois and throughout the United States, including the Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, promoted and marketed by Monsanto.

103.    The Plaintiff was exposed to Roundup® products in the course of his personal use on his one acre property, without knowledge of their dangerous characteristics.

104.    At all times relevant to this litigation, the Plaintiff used and/or was exposed to the use of Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

105.    The Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of the Plaintiff's exposure.  The Plaintiff relied upon the skill, superior knowledge, and judgment of Monsanto.

FILED DATE: 5/28/2019 5:12 PM    2019L002426

FILED DATE: 5/28/2019 5:12 PM    2019L002426

106.    These products were defective because the minimal warnings disseminated with Roundup® products were inadequate, and they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and landscaping applications.

107.    The information that Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as the Plaintiff to utilize the products safely and with adequate protection.   Instead, Monsanto disseminated information that was inaccurate, false, and misleading and which failed to communicate  accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

108.    To this day, Monsanto has failed to adequately and accurately warn of the true risks of the Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

109.    As a result of their inadequate warnings, Roundup® products were defective and unreasonably  dangerous  when  they  left  the  possession  and/or  control  of  Monsanto,  were distributed, marketed, and promoted by Monsanto, and used by the Plaintiff in his work.

110.    Monsanto is liable to the Plaintiff for injuries caused by their negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information

43

and data regarding the appropriate use of these products and the risks associated with the use of or exposure to Roundup® and glyphosate.

111.    The defects in Roundup® products caused or contributed to cause the Plaintiff's injuries, and, but for this misconduct and omissions, the Plaintiff would not have sustained his injuries.

112.    Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products, Plaintiff could have avoided the risk of developing injuries as alleged herein.

113.    As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

WHEREFORE, the Plaintiff Robert Rawson respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Monsanto for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper.  Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT VI
## NEGLIGENCE (AGAINST MONSANTO)

114.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

ANSWER:  Count VI (paragraphs 170-184) is directed at Monsanto Company and does not require any responses from Duke's.

115.    Monsanto, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by the Plaintiff.

FILED DATE: 5/28/2019 5:12 PM   2019L002426

FILED DATE: 5/28/2019 5:12 PM    2019L002426

116.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

117.    At all times relevant to this litigation, Monsanto s had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

118.    At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

119.    Accordingly, at all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with the Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including the Plaintiff.

120.    Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

121.    As such, Monsanto breached the duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply,

FILED DATE: 5/28/2019 5:12 PM    2019L002426

promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Monsanto manufactured, marketed, promoted, and sold defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

122.    Despite an ability and means to investigate, study, and test these products and to provide adequate warnings, Monsanto has failed to do so.  Indeed, Monsanto has wrongfully concealed information and has further made false and/or misleading statements concerning the safety of exposure to Roundup® and glyphosate.

123.    Monsanto was negligent in the following respects:

(a)     Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup®-products without thorough and adequate pre- and post-market testing;

(b)     Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

(c)     Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

FILED DATE: 5/28/2019 5:12 PM    2019L002426

(d)     Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

(e)     Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

(f)     Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Monsanto could reasonably foresee would use and be exposed to its Roundup® products;

(g)     Failing to disclose to the Plaintiff, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

(h)     Failing to warn the Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to the Plaintiff and other consumers;

(i)     Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

(j)     Representing that its Roundup® products were safe for their intended use when, in fact, Monsanto knew or should have known that the products were not safe for their intended purpose;

(k)     Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

(1)     Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

(m)     Continuing to disseminate information to its consumers, which indicate or imply that Monsanto's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

(n)     Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

124.    Monsanto knew and/or should have known that it was foreseeable that consumers such as the Plaintiff would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup®.

125.    The Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

126.    Monsanto's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiffs suffered, as described herein.

127.    Monsanto's conduct, as described above, was reckless. Monsanto regularly risked the lives of consumers and users of their products, including the Plaintiff's, with full knowledge of the dangers of these products. Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including the Plaintiff. Monsanto's reckless conduct therefore warrants an award of aggravated or punitive damages.

128.    As a proximate result of Monsanto's wrongful acts and omissions in placing defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff has suffered and continues to suffer

FILED DATE: 5/28/2019 5:12 PM   2019L002426

grave injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

WHEREFORE, the Plaintiff Robert Rawson respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Monsanto for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT VII
## NEGLIGENCE (AGAINST DUKE'S)

185.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

ANSWER:    Duke's incorporates by reference its responses to paragraphs 1 through 184 in response to paragraph 185 of plaintiff's Complaint.

186.    Duke's promoted, marketed, distributed and sold Roundup® products to the Plaintiff that were in fact used by the Plaintiff.

ANSWER:    Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 186 regarding the specific products allegedly used by plaintiff or any advertising or marketing allegedly seen or considered by plaintiff and therefore denies the allegations in paragraph 186.

187.    At all times relevant herein the Roundup® products promoted, marketed, distributed and sold to the Plaintiff were defective.

ANSWER:    Duke's denies the allegations in paragraph 187.

188.    Duke's owed a duty to the Plaintiff to exercise ordinary care in the promotion, marketing, distribution, and sale, of the Roundup® products it sold to the Plaintiff between 1974 and 2018.

ANSWER:    The allegations in paragraph 188 set forth conclusions of law for which no response is required.

FILED DATE: 5/28/2019 5:12 PM   2019L002426

189.    Duke's breached the aforesaid duty and was negligent through one or more of the following acts and or omission that was a proximate cause of damages to the Plaintiff:

a)      Failed to assure the Roundup® products complied with FDA standards;

b)      Failed to assure the Roundup® products complied with industry standards;

c)      Failed to assure the Roundup® products were non-carcinogenic;

d)      Marketed Roundup® products were safe when they were not;

e)      Sold Roundup® products that were defective;

f)      Sold Roundup® products that caused NHL;

g)      Sold Roundup® products that were unsafe;

h)      Distributed Roundup® products that were unsafe, and/o

j)      Promoted Roundup® products that were unsafe.

ANSWER:     Duke's denies the allegations in paragraph 189.

190.    As a direct and proximate cause of one or more of the aforesaid acts or omissions, Plaintiff has suffered and continues to suffer grave injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

ANSWER:     Duke's denies the allegations in paragraph 190.

WHEREFORE, the Plaintiff Robert Rawson respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Duke's Hardware, Inc., for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper.  Plaintiff also demands a jury trial on the issues contained herein.

50

In response to the "WHEREFORE" paragraph following paragraph 190, Duke's demands that judgment be entered in its favor and against plaintiff; that plaintiff's Complaint be dismissed, with prejudice; and that Duke's be awarded costs of suit and reasonable attorney's fees as allowed by law and such further and additional relief as this Court may deem just and proper.

## COUNT VIII
## STRICT LIABILITY (AGAINST DUKE'S)

191.  Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

ANSWER:  Duke's incorporates by reference its responses to paragraphs 1 through 190 in response to paragraph 191 of the plaintiff's Complaint.

192.  The that [*sic*] Defendant, Duke's marketed, sold, distributed, and placed into the market Roundup® products that existed in a defective condition at the time they left Duke's possession and control.

ANSWER:     Duke's denies the allegations in paragraph 192.

193.  That the Roundup® products were defective in that they carcinogenic.

ANSWER:     Duke's denies the allegations in paragraph 193.

194.  That the Roundup® products sold to Plaintiff were used for the purpose and in the manner intended, at all times relevant to this Complaint.

ANSWER:     Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 194 and therefore denies those allegations.

195.  That the Roundup® products sold the Plaintiff, were in substantially the same condition as they were at the time they were promoted, distributed, marketed, and sold by the Defendant Duke's.

ANSWER:     Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 195 and therefore denies those allegations.

196.  That the Plaintiff Robert Rawson, could not, by the exercise of reasonable care, have discovered the defect in, nor perceived the danger of, the Roundup® products.

FILED DATE: 5/28/2019 5:12 PM  2019L002426

ANSWER: Duke's denies the allegations in paragraph 196.

197. That the Defendant Duke's owed a strict liability not to harm the Plaintiff through the intended use of the Roundup® products it sold to him.

ANSWER: Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 197 regarding whether it sold any Roundup®-branded products to plaintiff and therefore denies the allegations in paragraph 186. To the extent that the allegations in paragraph 197 set forth conclusions of law, no response is required to those allegations.

198. That the defective condition of the Roundup® products sold to Robert Rawson by the Defendant, caused Robert Rawson to the injured and suffer damages of a personal, permanent, and pecuniary nature.

ANSWER: Duke's denies the allegations in paragraph 198.

199. That at the time the Defendant marketed, sold, distributed, delivered or made available the Roundup® products, Duke's failed to properly warn the Plaintiff of the danger posed by the Roundup® products, and the likelihood of NHL associated with exposure to the Roundup® products.

ANSWER: Duke's denies the allegations in paragraph 199.

200. That as a result of the injuries and damages caused by the defective Roundup® products marketed, sold, and distributed by Duke's, and as a result of the injurie and damages caused by Duke's' failure to warn of the dangers posed by the defect Roundup® products, Duke's is strictly liable to Robert Rawson for Duke's' failure to market, sell, distribute, deliver or make available a product, which would not cause injury or damage to the Plaintiff, and for its failure to warn of the dangers posed by the defective Roundup® products.

ANSWER: Duke's denies the allegations in paragraph 200.

WHEREFORE, the Plaintiff Robert Rawson respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Duke's hardware, Inc., for

52

FILED DATE: 5/28/2019 5:12 PM   2019L002426

FILED DATE: 5/28/2019 5:12 PM   2019L002426

compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

In response to the "WHEREFORE" paragraph following paragraph 200, Duke's demands that judgment be entered in its favor and against plaintiff; that plaintiff's Complaint be dismissed, with prejudice; and that Duke's be awarded costs of suit and reasonable attorney's fees as allowed by law and such further and additional relief as this Court may deem just and proper.

## GENERAL DENIAL

Every allegation in the Complaint that is not specifically and expressly admitted in this Answer is hereby specifically and expressly denied.

## ADDITIONAL AND AFFIRMATIVE DEFENSES

Plaintiff has filed the Complaint alleging that he was injured as a result of being exposed to Monsanto's glyphosate-containing herbicides sold by Duke's.  Plaintiff's Complaint is incorporated by reference as if the same were set forth in full herein.  Duke's denies the allegations against it.  Without admitting the truth of any part of such allegations by plaintiff, Duke's pleads, in the alternative, the following additional and affirmative defenses to plaintiff's claims:

## FIRST DEFENSE

1.      The Complaint, in whole or part, fails to state a claim or cause of action against Duke's upon which relief can be granted.

## SECOND DEFENSE

2.      If plaintiff has been injured or damaged, no injury or damages being admitted, such injuries were not caused by a product sold by Duke's.

53

FILED DATE: 5/28/2019 5:12 PM   2019L002426

### THIRD DEFENSE

3.      Plaintiff's claims against Duke's are barred because plaintiff cannot proffer any scientifically reliable evidence that the products at issue were defective or unreasonably dangerous.

### FOURTH DEFENSE

4.      Any alleged negligent or culpable conduct of Duke's, none being admitted, was so insubstantial as to be insufficient to be a proximate or substantial contributing cause of plaintiff's alleged injuries.

### FIFTH DEFENSE

5.      Plaintiff's claims against Duke's are barred, in whole or in part, because the products at issue were designed, manufactured, marketed and labeled with proper warnings, information, cautions and instructions, in accordance with the state of the art and the state of scientific and technological knowledge.

### SIXTH DEFENSE

6.      Plaintiff's claims against Duke's are barred, in whole or in part, because the products at issue were not defective or unreasonably dangerous in that they complied with, at all relevant times, all applicable government safety standards.

### SEVENTH DEFENSE

7.      Plaintiff's claims against Duke's are preempted, in whole or in part, by applicable federal law relating to the design, testing, producing, manufacturing, labeling, distributing, modeling, processing, and supply of Roundup®-branded products and/or glyphosate-containing products.

### EIGHTH DEFENSE

8.      Plaintiff's claims against Duke's are preempted, in whole or in part, because of

U.S. EPA findings that glyphosate does not cause cancer in humans and/or because of U.S. EPA approved product labeling.

### NINTH DEFENSE

9.      Plaintiff's claims against Duke's are barred, in whole or in part, by the doctrine of primary jurisdiction, including by the authority delegated by Congress to the U.S. EPA.

### TENTH DEFENSE

10.     Plaintiff's claims against Duke's are barred, in whole or in part, because plaintiff's injuries, if any, were the result of conduct of plaintiff, independent third parties, and/or events that were extraordinary under the circumstances, not foreseeable in the normal course of events, and/or independent, intervening and superseding causes of the alleged injuries, including but not limited to plaintiff's pre-existing medical conditions.

### ELEVENTH DEFENSE

11.     The doctrines contained in Restatement (Second) of Torts § 402A, comments j and k, bar plaintiff's claims against Duke's in whole or in part.

### TWELFTH DEFENSE

12.     All or part of plaintiff's claims asserted against Duke's herein are barred by the applicable statutes of limitations, statutes of repose, jurisdictional time limits, or any other limitations on the period of time within which to file suit, whether in this or any other state, including, without limitation, 735 ILCS 5/13-202, 5/13-203, 5/13-211, 5/13-213, 5/13-214, 5/13-215 and 740 ILCS 180/2.

### THIRTEENTH DEFENSE

13.     Plaintiff may not recover on the claims pleaded in the Complaint because the damages sought are too speculative and remote.

FILED DATE: 5/28/2019 5:12 PM   2019L002426

FILED DATE: 5/28/2019 5:12 PM   2019L002426

## FOURTEENTH DEFENSE

14.     Plaintiff's misuse or abnormal use of the product or failure to follow instructions bar plaintiff's claims against Duke's in whole or in part.

## FIFTEENTH DEFENSE

15.     If plaintiff suffered injuries or damages as alleged, which is denied, such injuries or damages resulted from: (a) acts or omissions of persons or entities for which Duke's is neither liable nor responsible or, in the alternative, Duke's is entitled to an assessment of the relative degree of fault of all such persons and entities; or (b) resulted from diseases and/or causes that are not related or connected with any product sold, distributed, or manufactured by Duke's. Such acts or omissions on the part of others or diseases or causes constitute an independent, intervening and sole proximate cause of plaintiff's alleged injuries or damages.

## SIXTEENTH DEFENSE

16.     Duke's had no legal relationship or privity with plaintiff and owed no duty to him by which liability could be attributed to it.

## SEVENTEENTH DEFENSE

17.     Plaintiff's claims against Duke's are preempted in whole or part by the Freedom of Speech Clause of the First Amendment of the U.S. Constitution.

## EIGHTEENTH DEFENSE

18.     Plaintiff's claims against Duke's are barred in whole or in part by plaintiff's own contributory/comparative negligence.  Pursuant to Section 2-1116 of the Illinois Code of Civil Procedure, plaintiff is barred from any recovery in this matter because plaintiff's comparative fault is more than 50% of the proximate cause of his alleged injuries and damages.

FILED DATE: 5/28/2019 5:12 PM 2019L002426

Alternatively, any judgment entered in favor of plaintiff should be reduced by an amount commensurate with his relative degree of fault in causing his own alleged injuries and damages.

### NINETEENTH DEFENSE

19.     Plaintiff's claims against Duke's for punitive and/or aggravated damages are barred because such an award would violate Duke's due process, equal protection and other rights under the United States Constitution, the Illinois Constitution, and/or other applicable state constitutions.

### TWENTIETH DEFENSE

20.     Plaintiff's claims against Duke's for punitive and/or aggravated damages are barred because plaintiff has failed to allege conduct warranting imposition of such damages under Illinois law, and/or other applicable state laws.

### TWENTY-FIRST DEFENSE

21.     Plaintiff's claims against Duke's for punitive and/or aggravated damages are barred and/or limited by operation of state and/or federal law.

### TWENTY-SECOND DEFENSE

22.     Duke's states that, at all times relevant, 735 ILCS 5/2-1117 was in full force and effect. In the event that the jury determines that there was some liability on the part of Duke's, which Duke's specifically denies, and further finds that its fault is less than 25% of the total fault attributable to the defendants sued by plaintiff, and any third party defendant who could have been sued by plaintiff, any judgment entered in favor of plaintiff and against Duke's must reflect joint and several liability for all past and future medical and medically related expenses, but only severally liable for any other damages.

## TWENTY-THIRD DEFENSE

23.     Plaintiff's claims against Duke's are barred in whole or in part by plaintiff's own failure to mitigate damages.

## TWENTY-FOURTH DEFENSE

24.     Plaintiff's claims against Duke's are barred in whole or in part by the sophisticated user doctrine.

## TWENTY-FIFTH DEFENSE

25.     In the event that plaintiff receives a settlement from any party or non-party for the injuries described in the Complaint, Duke's is entitled to a full set-off for the amount of each such settlement.

## TWENTY-SIXTH DEFENSE

26.     Plaintiff's claims against Duke's are barred or limited to the extent that plaintiff asserts claims that are governed by the laws of a state that does not recognize, or limits, such claims.

## TWENTY-SEVENTH DEFENSE

27.     Plaintiff's claims against Duke's are barred to the extent that plaintiff seeks relief under the laws of states that do not govern plaintiff's claims.

## TWENTY-EIGHTH DEFENSE

28.     Duke's hereby gives notice that it intends to rely upon such other defenses as may become available or apparent during the course of discovery and thus reserves its right to amend this Answer to assert such defenses.

FILED DATE: 5/28/2019 5:12 PM   2019L002426

FILED DATE: 5/28/2019 5:12 PM   2019L002426

**WHEREFORE**, Defendant Duke's demands judgment in its favor and against plaintiff, dismissing plaintiff's Complaint with prejudice, together with the costs of suit and such other relief as the Court deems equitable and just.

## JURY TRIAL DEMAND

Duke's demands a jury trial on all issues so triable.

DATED:  May 28, 2019

HUSCH BLACKWELL LLP (Firm #49807)

Respectfully submitted,


By: /s/ *Dominique Savinelli*
Dominique Savinelli #06323175
James P. O'Shea # 06309819
120 South Riverside Plaza, Suite 2200
Chicago, IL 60606-3912
Telephone: 312.526.1522
Facsimile: 312.655.1502
dominique.savinelli@huschblackwell.com
james.oshea@huschblackwell.com

Erik L. Hansell #06271229
The Plaza in Clayton
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105
Telephone: (314) 480-1500
Facsimile: (314) 480-1505
erik.hansell@huschblackwell.com

***Attorneys for Defendant Duke's
Hardware, Inc.***

FILED DATE: 5/28/2019 5:12 PM   2019L002426

STATE OF ILLINOIS )

) SS

COUNTY OF COOK )

## AFFIDAVIT OF INSUFFICIENT KNOWLEDGE

I, JAMES P. O'SHEA II, having been duly sworn upon my oath, depose and state that I am a member of the law office of HUSCH BLACKWELL LLP, attorneys for Defendant, Duke's Hardware, Inc., in the above-captioned cause, and the allegations of lack of knowledge sufficient to form a belief are true to the best of my information.

_____

JAMES P. O'SHEA II

SWORN AND SUBSCRIBED to before me this 28th day of ___May___, 2019.

_____

"OFFICIAL SEAL"
MARIA E. ROSILES
NOTARY PUBLIC — STATE OF ILLINOIS
MY COMMISSION EXPIRES OCT. 11, 2022

FILED DATE: 5/28/2019 5:12 PM    2019L002426

## CERTIFICATE OF SERVICE

I hereby certify that on May 28, 2019, pursuant to Section 1-109 of the Illinois Code of Civil Procedure and the in accordance with Supreme Court Rule 12(b)(2), the foregoing was electronically filed with the Cook Circuit Clerk's electronic filing system and served via mail and e-mail to the following:

David J. Gallagher
MOTHERWAY & NAPLETON, LLP.
140 S. Dearborn, Suite 1500
Chicago, IL 60603
(312) 726-2699 - PHONE
(312) 726-6851 - FAX
Atty. No. 56421
dgallagher@mnlawoffice.com

*Attorneys for Plaintiff Robert Rawson*

*/s/  Dominique Savinelli*

FILED
4/25/2019 3:57 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2019L002426

4828938

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

ROBERT RAWSON,

        Plaintiff,

*v.*

BAYER CORPORATION; MONSANTO
COMPANY; and DUKE'S HARDWARE,
INC.,

        Defendants.

No.: 2019L002426

## MONSANTO COMPANY'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT AT LAW

Defendant Monsanto Company ("Monsanto"), by and through its counsel, respectfully responds by generally denying all allegations contained in plaintiff's Complaint, except as set forth below. As defined in the Complaint and as used in this Answer, Monsanto refers to Monsanto Company, a United States based company incorporated in Delaware, and not to other Monsanto-affiliated companies. Although many paragraphs in the Complaint refer to "Plaintiffs," Monsanto nevertheless responds to the allegations in those paragraphs as if brought by plaintiff Robert Rawson. Silence as to any allegations shall constitute a denial.

## I.    THE PARTIES

### Plaintiff

1.    Plaintiff Robert Rawson is and was at all relevant times a resident of Cook County, Illinois. He and his family purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from approximately 1974 through 2018 on his one acre property in Palos Park, Illinois.

ANSWER:  Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 1 and therefore denies those allegations.

FILED DATE: 4/25/2019 3:57 PM 2019L002426

**Defendants**

2.      Defendant Bayer Corporation ("Bayer") is a multinational corporation doing business throughout the United States, including Cook County, Illinois that is incorporated in Indiana, with its headquarters and principal place of business in Whippany, New Jersey.

ANSWER:   The allegations in paragraph 2 are directed at a defendant other than Monsanto, so no response from Monsanto is required for these allegations.

3.      Defendant Monsanto Company ("Monsanto") is a multinational corporation doing business throughout the United States, including Cook County, Illinois that is incorporated in Delaware, with its headquarters and principal place of business in St. Louis, Missouri.

ANSWER:   In response to the allegations in paragraph 3, Monsanto admits that it is a Delaware corporation with its headquarters and principal place of business in St. Louis County, Missouri; that it does business throughout the United States, and that Monsanto and affiliated companies have operations and offices in countries around the world.

4.      On June 07, 2018 Bayer acquired Monsanto.

ANSWER:  Monsanto denies the allegations in paragraph 4.

5.      Defendant Duke's Hardware, Inc., ("Duke's") is a domestic corporation, with its headquarters and principal place of business in Cook County, Illinois.

ANSWER:   The allegations in paragraph 5 are directed at a defendant other than Monsanto, so no response from Monsanto is required for these allegations.

6.      At all times relevant to this complaint, Duke's operated a Duke's Ace Hardware store at 7610 W. 11th Street, Palos Hills, Illinois which sold Roundup® to the Plaintiff and his family from approximately 1974 to 2018.

ANSWER:   The allegations in paragraph 6 are directed at a defendant other than Monsanto, so no response from Monsanto is required for these allegations.

7.      At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and was the manufacturer of Roundup®.

2

ANSWER:  In response to the allegations in paragraph 7, Monsanto admits that it was the entity that discovered the herbicidal properties of glyphosate and that Monsanto manufactures Roundup®-branded products that have glyphosate as the active ingredient, but notes that Monsanto was and is not the only manufacturer of glyphosate-based herbicides.

## II.  INTRODUCTION

8.    In 1970, Defendant Monsanto Company, Inc. discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in America agriculture with 85-90 millions of pounds used annually.  That number grew to 185 million pounds by 2007.  As of 2013, glyphosate was the world's most widely used herbicide.

ANSWER:  Monsanto admits the allegations in the first and second sentences of paragraph 8.  Monsanto also admits that glyphosate was one of the world's most widely used herbicides in 2013, but notes that Monsanto was and is not the only manufacturer of glyphosate-based herbicides.  Monsanto lacks information or knowledge sufficient to form a belief as to the accuracy of the specific numbers and statistics cited in the remaining sentences of paragraph 8 and therefore denies those allegations.

9.    Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri.  It is the world's leading producer of glyphosate.  As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market.  The majority of these seeds are of the Roundup Ready® brand.  The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

ANSWER:  In response to the allegations in paragraph 9, Monsanto admits that its headquarters are in St. Louis County, Missouri.  Monsanto admits that it and affiliated companies have operations and offices in countries around the world.  Monsanto admits that it is a producer of glyphosate-based herbicides but lacks sufficient information regarding the business of other glyphosate producers to admit or deny the allegation as written in the second sentence of

FILED DATE: 4/25/2019 3:57 PM    2019L002426

paragraph 9. Monsanto admits that it is the leading producer of seeds that contain the Roundup Ready® trait and that use of crops with the Roundup Ready® trait substantially improves a farmer's ability to control weeds. Monsanto lacks information or knowledge sufficient to form a belief as to the accuracy of the specific numbers and statistics provided in the remaining sentences of paragraph 9 and therefore denies those allegations.

10. Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agriculture workers, and even in the urine of urban dwellers whom are not in direct contact with glyphosate.

ANSWER: In response to the allegations in paragraph 10, Monsanto admits that its glyphosate products are registered in at least 130 countries and approved for use on over 100 different crops. Monsanto admits that certain studies have reported that glyphosate is found at *de minimis* levels significantly below regulatory safety limits in various locations and media. Monsanto denies the remaining allegations in paragraph 10.

11. On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces health implications from exposure to glyphosate since 2001.

ANSWER: Monsanto admits the allegations in the first sentence of paragraph 11. Monsanto denies the allegations in the second sentence of paragraph 11 to the extent they suggest that the International Agency for Research on Cancer ("IARC") based its evaluation on a complete or accurate assessment of the scientific research regarding glyphosate.

12. On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

ANSWER: Monsanto admits the allegations in the first sentence of paragraph 12. Monsanto denies the allegations in the second sentence of paragraph 12.

FILED DATE: 4/25/2019 3:57 PM    2019L002426

13.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other haematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

ANSWER:  In response to the allegations in paragraph 13, Monsanto admits that the IARC working group classified glyphosate under Group 2A.  Monsanto denies the remaining allegations in paragraph 13.

14.     The IARC evaluation is significant.  It confirms what has been believed for years: that glyphosate is toxic to humans.

ANSWER:  Monsanto denies the allegations in paragraph 14.

15.     Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment.  Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

ANSWER:  In response to the allegations in paragraph 15, Monsanto admits that glyphosate repeatedly has been found to be safe to humans and the environment by regulators in the United States and around the world and further admits that it has labeled glyphosate products as approved by regulatory bodies consistent with those findings.  Monsanto also admits that the United States Environmental Protection Agency ("EPA") repeatedly has concluded pursuant to the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") that glyphosate-based herbicides create no unreasonable risk to human health or to the environment when used in accordance with the label.  To the extent that paragraph 15 alleges that Monsanto has labeled glyphosate or Roundup®-branded herbicides in any manner different or in addition to such regulatory approval, Monsanto denies such allegations.

## III.     JURISDICTION AND VENUE

16.     Jurisdiction is proper pursuant to 735 ILCS 5/2-209 as at all times relevant hereto, Monsanto was in the business of researching, designing, formulating, compounding, testing,

FILED DATE: 4/25/2019 3:57 PM   2019L002426

manufacturing, producing, processing, assembling, inspecting, distributing, labeling, packaging, marketing, promoting, and/or advertising Roundup® products in the throughout the United States including in Cook County, Illinois.

ANSWER:  The allegations in paragraph 16 set forth conclusions of law for which no response is required.

17.     At all times relevant hereto, Monsanto was a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri, who routinely conducted business in Cook County, Illinois.

ANSWER:  Monsanto admits that it is a Delaware corporation with its headquarters and principal place of business in St. Louis County, Missouri.  The remaining allegations in paragraph 17 are vague and conclusory and comprise attorney characterizations, and are accordingly denied.

18.     Duke's is a domestic corporation with its headquarters and principle place of business in Cook County, Illinois, making it a resident of Cook County pursuant to 735 ILCS 5/2-102, who routinely conducts business in Cook County, Illinois.

ANSWER:  The allegations in paragraph 18 are directed at a defendant other than Monsanto, so no response from Monsanto is required for these allegations.

19.     Plaintiff has timely filed this lawsuit less than two years from the time the Plaintiff knew or reasonably should have known of the injury and that it may have been wrongly caused.

ANSWER:  In response to the allegations in paragraph 19, Monsanto denies that plaintiff's injuries were caused by exposure to glyphosate-based herbicides and denies that Monsanto "wrongfully caused" those injuries.  The remaining allegations in paragraph 19 set forth conclusions of law for which no response is required.  To the extent that a response is deemed required, Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations regarding plaintiff's actual or potential knowledge and therefore denies those allegations.  Monsanto states that the scientific studies upon which the International Agency for Research on Cancer ("IARC") purported to base its evaluation of glyphosate were all publicly available before March 2015.

FILED DATE: 4/25/2019 3:57 PM   2019L002426

20.     Pursuant to 735 ILCS *512*-101, venue is proper within this Court because Defendant Duke's is a resident of Cook County, and because Plaintiff was diagnosed and treated for his cancer in Cook County, and the Defendant do business and advertise in this county.

ANSWER:  The allegations in paragraph 20 set forth conclusions of law for which no response

## IV.   FACTS

21.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

ANSWER:   In response to the allegations in paragraph 21, Monsanto admits that glyphosate is an herbicide that is used to kill invasive plants and weeds.  The remaining allegations in paragraph 21 are vague and ambiguous and Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 21 and therefore denies those allegations.

22.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis.  Treated plants generally die within two to three days.  Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

ANSWER:  Monsanto admits the first sentence of paragraph 22.  Monsanto denies the allegations in the second sentence of paragraph 22 because the impact of glyphosate on treated plants varies depending upon the amount of glyphosate applied and the type of plant.  Monsanto denies the allegations in the third sentence of paragraph 22 to the extent that they suggest that glyphosate is present in any plants at anything other than *de minimis* amounts well within regulatory safety levels, as determined by EPA.

23.     For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses.  That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment.  Of course, history has shown that not to be true.  According to the WHO, the main chemical ingredient of Roundup®—

FILED DATE: 4/25/2019 3:57 PM   2019L002426

glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Agricultural workers are, once again, victims of corporate greed. Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® was safe.

ANSWER: In response to the allegations in paragraph 23, Monsanto admits that farmers have safely used Roundup branded products since the 1970s. Monsanto denies the remaining allegations in paragraph 23.

### The Discovery of Glyphosate and Development of Roundup®

24. The herbicidal properties of the glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use. Monsanto still markets Roundup® as safe today.

ANSWER: Monsanto admits the allegations in the first two sentences of paragraph 24 and admits that at all relevant times it has marketed Roundup®-branded products in accord with EPA's regulatory determinations under FIFRA. Monsanto denies the remaining allegations in paragraph 24.

### Registration of Herbicides under Federal Law

25. The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § l36a(a).

FILED DATE: 4/25/2019 3:57 PM    2019L002426

ANSWER:  The allegations in paragraph 25 set forth conclusions of law for which no response is required.  To the extent that a response is deemed required, Monsanto admits the allegations in paragraph 25.

26.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.  Registration by the EPA, however, is not an assurance or finding of safety.  The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

ANSWER:  In response to the allegations in paragraph 26, Monsanto admits that EPA requires registrants of herbicides to submit extensive data in support of the human health and environmental safety of their products and further admits that EPA will not register or approve the labeling of herbicides that do not satisfy the requirements set forth in FIFRA.  The remaining allegations in paragraph 26 set forth conclusions of law for which no response is required.

27.     FIFA defines "unreasonable adverse effects the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb).  FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

ANSWER:  The allegations in paragraph 27 set forth conclusions of law for which no response is required.

28.     The EPA registered Roundup® for distribution, sale, and manufacture in the United States and the State of Illinois.

ANSWER:  In response to the allegations in paragraph 28, Monsanto admits that Roundup®-branded products are registered by EPA for manufacture, sale, and distribution in the United States, including in Illinois.

9

FILED DATE: 4/25/2019 3:57 PM    2019L002426

FILED DATE: 4/25/2019 3:57 PM   2019L002426

29.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products.  The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests.  The data produced by the registrant must be submitted to the EPA for review and evaluation.  The government is not required, nor is it able, however, to perform the products tests that are required of the manufacturer.

ANSWER:  In response to the allegations in paragraph 29, Monsanto admits that EPA requires registrants of herbicides to submit extensive data in support of the human health and environmental safety of their products and further admits that EPA will not register or approve the labeling of herbicides that do not satisfy the requirements set forth in FIFRA.  Monsanto states that the term "the product tests" in the final sentence of paragraph 29 is vague and ambiguous, and Monsanto therefore denies the same.  The remaining allegations in paragraph 29 set forth conclusions of law for which no response is required.

30.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product initially registered.  The data necessary for registration of a pesticide has changed over time.  The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration" 7 U.S.C. § I 36al. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

ANSWER:  Monsanto denies the allegations in paragraph 30 to the extent they suggest that EPA only evaluates the safety of pesticide products on the date of their initial registration. Monsanto admits that EPA is in the process of conducting regulatory review of various pesticide products, but Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 30 regarding such pesticide products generally.  The remaining allegations in paragraph 30 set forth conclusions of law for which no response is required.

31.     In the case of glyphosate, and therefore Roundup®, the EPA has planned on releasing its preliminary risk assessment—in relation to the re-registration process—no later than July 2015.  The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

ANSWER:  In response to the allegations in paragraph 31, Monsanto admits that EPA has undertaken a regulatory review of glyphosate and that EPA has not released its final findings. Monsanto states, however, that:  (a) in September 2016, EPA's Office of Pesticide Programs ("OPP") issued a 227-page evaluation of glyphosate's carcinogenic potential, concluding that "[t]he strongest support is for [the descriptor] 'not likely to be carcinogenic to humans' at doses relevant to human health risk assessment"[1]; and (b) at the same time, EPA posted an October 2015 final report by its standing Cancer Assessment Review Committee ("CARC"), in which CARC endorsed EPA's existing classification of glyphosate as "Not Likely to be Carcinogenic to Humans."[2]  Monsanto further states that, in December 2017, EPA's OPP issued a detailed, lengthy revised evaluation of glyphosate's carcinogenic potential that reiterated the conclusion that "[t]he strongest support is for [the descriptor] 'not likely to be carcinogenic to humans'."[3]  Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 31 and therefore denies those allegations.

### Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®

32.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer:  "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of elevation and should not be

---

[1] EPA's Office of Pesticide Programs, *Glyphosate Issue Paper: Evaluation of Carcinogenic Potential* at 141 (Sept. 12, 2016) ("EPA OPP Report"), https://www.regulations.gov/document?D=EPA-HQ-OPP-2016-0385-0094.  The EPA OPP Report was prepared in anticipation of an EPA Scientific Advisory Panel meeting on glyphosate's carcinogenic potential.

[2] Cancer Assessment Review Committee, Health Effects Division, Office of Pesticide Programs, U.S. Environmental Protection Agency, *Cancer Assessment Document – Evaluation of the Carcinogenic Potential of Glyphosate* at 10, 77 (Final Report, Oct. 1, 2015) ("EPA CARC Final Report"), https://www.regulations.gov/document?D=EPA-HQ-OPP-2016-0385-0014.

[3] EPA's Office of Pesticide Programs, *Revised Glyphosate Issue Paper: Evaluation of Carcinogenic Potential* at 143, 144 (Dec. 12, 2017), https://www.regulations.gov/document?D=EPA-HQ-OPP-2016-0385-0528.

FILED DATE: 4/25/2019 3:57 PM    2019L002426

interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

    <u>ANSWER</u>:  In response to the allegations in paragraph 32, Monsanto admits that an EPA review committee classified glyphosate as Class C in 1985 based on limited data and that EPA changed its classification of glyphosate to Group E based upon a full evaluation of the scientific evidence, including but not limited to three animal carcinogenicity studies.  Monsanto admits that plaintiff has accurately quoted from one passage in an EPA document in 1991 with respect to the designation of an agent as Group E, but states that EPA repeatedly has concluded that glyphosate does not pose any cancer risk to humans.  In addition to the conclusions in the two EPA OPP reports and the EPA CARC Final Report discussed above, specific findings of safety include:

- "In June 1991, EPA classified glyphosate as a Group E [carcinogen]—one that shows evidence of non-carcinogenicity for humans—based on the lack of convincing evidence of carcinogenicity in adequate studies."  EPA, *Glyphosate: Reregistration Eligibility Decision (RED) Facts*, 2 (Sept. 1993), http://archive.epa.gov/pesticides/reregistration/web/pdf/0178fact.pdf.

- "No evidence of carcinogenicity."  Glyphosate; Pesticide Tolerances, 67 Fed. Reg. 60,934, 60,943 (Sept. 27, 2002) (to be codified at 40 C.F.R. pt. 180).

- "Glyphosate has no carcinogenic potential."  Glyphosate; Pesticide Tolerance, 69 Fed. Reg. 65,081, 65,086 (Nov. 10, 2004) (to be codified at 40 C.F.R. pt. 180).

- "There is [an] extensive database available on glyphosate, which indicate[s] that glyphosate is not mutagenic, not a carcinogen, and not a developmental or reproductive toxicant."  Glyphosate; Pesticide Tolerances, 73 Fed. Reg. 73,586, 73,589 (Dec. 3, 2008) (to be codified at 40 C.F.R. pt. 180).

- "EPA has concluded that glyphosate does not pose a cancer risk to humans."  Glyphosate; Pesticide Tolerances, 78 Fed. Reg. 25,396, 25,398 (May 1, 2013) (to be codified at 40 C.F.R. pt. 180).

- "In 2014, EPA reviewed over 55 epidemiological studies conducted on the possible cancer and non-cancer effects of [g]lyphosate.  Our review concluded that this body of research does not provide evidence to show that [g]lyphosate causes cancer and does not warrant any change in the EPA's cancer classification for [g]lyphosate." *Agriculture Biotechnology:  A Look at Federal Regulation and Stakeholder Perspectives: Hearing Before the S. Comm. on Agr., Nutrition, & Forestry*, 114th Cong. (2015) (statement of Dr. William Jordan, Deputy Director of EPA's Office of Pesticide Programs), http://www.ag.senate.gov/templates/watch.cfm?id=74793e67-5056-a055-64af-0e55900753b4, at time stamp 55:05 – 56:20 ("EPA 2015 Desk Statement").

FILED DATE: 4/25/2019 3:57 PM   2019L002426

FILED DATE: 4/25/2019 3:57 PM   2019L002426

Monsanto denies the remaining allegations in paragraph 32.

33.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration proposes committed fraud.

ANSWER:  In response to the allegations in paragraph 33, Monsanto admits that it – along with a large number of other companies and governmental agencies – was defrauded by two chemical testing laboratories, and that Monsanto had hired both of these laboratories to conduct testing on glyphosate.  Monsanto states that only one of these laboratories was hired to conduct toxicity tests of glyphosate.  Monsanto denies that EPA's registration of glyphosate or any glyphosate-based herbicides is based upon any invalid Industrial Bio-Test ("IBT") studies.  To the extent that the allegations in paragraph 33 are intended to suggest that Monsanto was anything other than a victim of this fraud, such allegations are denied.

34.     In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories (IBT) to perform and evaluate pesticide toxicology studies relating to Roundup®.  IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies to register Roundup®.

ANSWER:  In response to the allegations in paragraph 34, Monsanto admits that IBT Laboratories was hired to conduct toxicity studies in connection with the registration of a Roundup®-branded product.  Monsanto denies that EPA's regulatory approval of such product is based upon any fraudulent or false IBT studies.

35.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate.  The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid.  An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

ANSWER:  Monsanto denies the allegations in paragraph 35 to the extent they suggest that EPA performed an inspection of IBT Laboratories solely or specifically in connection with studies conducted on glyphosate.  Monsanto admits that EPA performed an audit of IBT Laboratories to investigate that laboratory's fraudulent and/or improper testing procedures in connection with services provided to a broad number of private and governmental entities and

FILED DATE: 4/25/2019 3:57 PM   2019L002426

that this inspection included a review of studies IBT conducted on glyphosate. Monsanto was one of several pesticide manufacturers who had used IBT test results. The audit found some toxicology studies conducted with the original Roundup® herbicide to be invalid. As a result, Monsanto repeated all required studies in accordance with applicable EPA testing guidelines. Monsanto denies that EPA's registration of glyphosate or any glyphosate-based herbicides is based upon any invalid IBT studies. To the extent that the allegations in paragraph 35 are intended to suggest that Monsanto was anything other than a victim of this fraud, such allegations also are denied.

36.     Three top executives of IBT were convicted of fraud in 1983.

ANSWER: In response to the allegations in paragraph 36, Monsanto admits that three IBT employees were convicted of the charge of fraud, but Monsanto denies that any of the individuals were convicted based upon studies conducted on glyphosate or glyphosate-based herbicides.

37.     In the second incident of dada falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including Roundup®. In that same year, the owner of Craven laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

ANSWER: In response to the allegations in paragraph 37, Monsanto admits that it – along with numerous other private companies – hired Craven Laboratories as an independent laboratory to conduct residue studies for Monsanto agricultural products. Monsanto further admits that it was defrauded by Craven Laboratories and that, as a result, Monsanto repeated the studies conducted at Craven Laboratories at a substantial cost. To the extent that the allegations in paragraph 37 are intended to suggest that Monsanto was anything other than a victim of this fraud, Monsanto denies those allegations.

38.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

ANSWER: Monsanto denies the allegations in paragraph 38.

**The Importance of Roundup® to Monsanto's Market Dominance and Profits**

39.     The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year

14

FILED DATE: 4/25/2019 3:57 PM   2019L002426

2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

ANSWER:   In response to the allegations in paragraph 39, Monsanto admits that Roundup®-branded products are highly valued by its customers because of their efficacy and safety. Monsanto also admits that the patent for glyphosate expired in the United States in 2000. The remaining allegations in paragraph 39 are vague and conclusory and comprise attorney characterizations, and are accordingly denied.

40.      In response, Monsanto began the development and sales of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate; farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted for Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

ANSWER:   In response to the allegations in paragraph 40, Monsanto admits that, following the development of Roundup® Ready seeds, it began to sell them in the 1990s and that such seeds are now widely used by farmers in the United States and worldwide. Monsanto lacks information or knowledge sufficient to form a belief as to the accuracy of the specific numbers cited in paragraph 40 and accordingly denies those allegations. The remaining allegations in paragraph 40 are vague and conclusory and comprise attorney characterizations, and are accordingly denied.

41.      Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

ANSWER:   In response to the allegations in paragraph 41, Monsanto admits that glyphosate is one of the world's largest herbicides by sales volume, but Monsanto denies any suggestion that it is the only company that sells glyphosate or glyphosate-based herbicides.

FILED DATE: 4/25/2019 3:57 PM    2019L002426

Monsanto lacks information or knowledge sufficient to form a belief as to the accuracy of the specific numbers cited in paragraph 41 and accordingly denies the same. Monsanto denies the allegations in the last two sentences of paragraph 41. The remaining allegations in paragraph 41 are vague and conclusory and comprise attorney characterizations, and are accordingly denied.

***Monsanto has known for decades that it falsely advertises the safety of Roundup®***

42. In 1996, the New York Attorney general ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a)     Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences.

b)     And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c)     Roundup biodegrades into naturally occurring elements.

d)     Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e)     This non-residual herbicide will not wash or leach in the soil. It … stays where you apply it.

f)     You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

16

g)      Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h)      Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i)      You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j)      "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

ANSWER:  In response to the allegations in paragraph 42, Monsanto admits that the New York Attorney General filed a lawsuit against Monsanto in 1996 alleging false and misleading advertising of Roundup®-branded products.  This lawsuit was subsequently resolved without any admission of wrongdoing by Monsanto.  Monsanto states that none of the New York Attorney General's allegations related in any way to a purported or alleged risk of cancer.  To the extent the subparts purport to quote a document, the document speaks for itself and thus does not require any further answer.  The remaining allegations in paragraph 42 are vague and conclusory and comprise attorney characterizations, and are accordingly denied.

43.      November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a)      its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk. * * *

b)      its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable * * *

c)      its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means. * * *

17

FILED DATE: 4/25/2019 3:57 PM   2019L002426

d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics." * * *

e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic.

ANSWER:  In response to the allegations in paragraph 43, Monsanto admits it entered into an assurance of discontinuance with the New York Attorney General.  The assurance speaks for itself and thus does not require any further answer.  The remaining allegations in paragraph 43 are vague and conclusory and comprise attorney characterizations, and are accordingly denied.

44.  Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

ANSWER:  Monsanto denies the allegations in paragraph 44.

45.  In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®.  The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

ANSWER:  In response to the allegations in paragraph 45, Monsanto admits that the French court ruled that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean," but denies the allegations to the extent they suggest that this ruling was in any way related to plaintiff's claim here that glyphosate can cause cancer.  Monsanto denies the remaining allegations in paragraph 45.

### *Classifications and Assessments of Glyphosate*

46.  The IARC process for the classification of glyphosate followed the stringent procedures for the evaluations of a chemical agent.  Over time, the IARC Monograph program has reviewed 980 agents.  Of those reviewed, it has determined 116 agents to be Group I (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to

18

be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one

agent to the probably Not Carcinogenic.

ANSWER:  In response to the allegations in paragraph 46, Monsanto denies that IARC follows stringent procedures for the evaluation of a chemical agent.  Monsanto lacks information or knowledge sufficient to form a belief as to the accuracy of the specific numbers cited in paragraph 46, which are not limited as of any specified date, and accordingly denies the same.

47.    The established procedure for IARC Monograph evaluations described in the

IARC Programme's Preamble.  Evaluations are performed by panels of international experts,

selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

ANSWER:  In response to the allegations in paragraph 47, Monsanto admits that IARC sets forth in its Preamble the procedures that it claims to follow in its carcinogenicity evaluations.  Monsanto denies the remaining allegations in paragraph 47.

48.    One year before the Monograph meeting, the meeting is announced and there is a

call both for data and for experts.  Eight months before the Monograph meeting, the Working

Group membership is selected and the sections of the Monograph are developed by the Working

Group members.  One month prior to the Monograph meeting, the call for data is closed and the

various draft sections are distributed among Working Group members for review and comment.

Finally, at the Monograph meeting, the Working Group finalizes review of all literature,

evaluates the evidence in each category, and completes the overall evaluation.  Within two weeks

after the Monograph meeting, the summary of the Working Group findings are published in

Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and

published.

ANSWER:  Monsanto denies any suggestion that IARC reviewed the full body of scientific research in conducting its evaluation of glyphosate or that it reliably reviewed the studies that it cited in its glyphosate monograph.  Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 48 and therefore denies those allegations.

FILED DATE: 4/25/2019 3:57 PM   2019L002426

49.    In assessing an agent, the IARC Working Group reviews the following information:

(a)    human, experimental, and mechanistic data;

(b)    all pertinent epidemiological studies and cancer bioassays; and

(c)    representative mechanistic data.  The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

ANSWER:  Monsanto denies any suggestion that IARC reviewed the full body of scientific research in conducting its evaluation of glyphosate or that it reliably reviewed the studies that it cited in its glyphosate monograph.  Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 49 and therefore denies those allegations.

50.    In March 2015, IARC reassessed glyphosate.  The summary published in The Lancet Oncology reported that glyphosate is a group 2A agent and probably carcinogenic to humans.

ANSWER:  Monsanto denies the allegations in paragraph 50 to the extent that they suggest that IARC had previously assessed glyphosate.  Monsanto admits that IARC classified glyphosate as a Group 2A agent in March 2015.

51.    On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3-10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate.  The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence.  According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

20

FILED DATE: 4/25/2019 3:57 PM   2019L002426

ANSWER:  In response to the allegations in paragraph 51, Monsanto admits that IARC issued its monograph for glyphosate, Monograph 112, on July 29, 2015 and that a draft of the monograph was prepared by a "working group" of individuals selected by IARC who met over a one week period in March 2015 to consider glyphosate along with a number of other substances. Monsanto denies the allegation that all members of the working group are "experts."  Monsanto denies that the working group or anyone at IARC conducted a one-year review of the scientific evidence related to glyphosate or that the working group's findings reflected a comprehensive review of the latest available scientific evidence.  Monsanto also denies that the working group considered all information available in the scientific literature and all data from government reports that are publicly available.  Monsanto denies the remaining allegations in paragraph 51.

52.     The studies considered the following exposure groups: occupational exposure of farmers and tree nursey workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farmering families.

ANSWER:  In response to the allegations in paragraph 52, Monsanto denies that the IARC working group considered all of the data in the numerous studies that have been conducted looking at the safety of glyphosate and glyphosate-containing herbicides in human populations or that it reliably considered the studies that it purports to have reviewed, which frequently reach conclusions directly contrary to those espoused by the IARC working group.  To the extent the allegations purport to characterize statements made in the IARC monograph for glyphosate, the statements in that document stand for themselves, but Monsanto lacks information or knowledge sufficient to form a belief as to the accuracy of the source of said information and accordingly denies the allegations.

53.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

ANSWER:  The allegations in paragraph 53 are vague and conclusory.  To the extent they purport to characterize statements made in the IARC monograph for glyphosate, the statements in that document stand for themselves, but Monsanto lacks information or knowledge sufficient to form a belief as to the accuracy of the source of said information and accordingly denies the allegations.

54.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to the glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

21

FILED DATE: 4/25/2019 3:57 PM   2019L002426

ANSWER:  In response to the allegations in paragraph 54, to the extent the allegations purport to characterize statements made in the IARC monograph for glyphosate, the statements in that document stand for themselves, but to the extent that this paragraph means that more than *de minimis* amounts of exposure are present, the allegations in paragraph 54 are denied.

55.    The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden.  These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

ANSWER:  In response to the allegations in paragraph 55, Monsanto admits that the IARC working group identified a number of case control studies of populations with exposures to glyphosate, but Monsanto denies that any of these studies provide any evidence of a human health concern from such exposures.

56.    The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

ANSWER:  Monsanto denies the allegations in paragraph 56.  The IARC working group concluded that there was only limited evidence of carcinogenicity in epidemiologic studies, which, per IARC's guidelines, means that the working group could not rule out chance, bias or confounding so as to reach any conclusion of an increased risk.

57.    The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

ANSWER:  In response to the allegations in paragraph 57, Monsanto admits that the working group cited to a study that it concluded provided evidence of chromosomal damage in community residents reported to be exposed to glyphosate, but Monsanto denies that the study supports such a conclusion or that the authors of the study reached such a conclusion.

58.    In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma.  A second study reported a positive trend for haemangiosarcoma in male mice.  Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies.  A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

ANSWER:  In response to the allegations in paragraph 58, Monsanto admits that the IARC working group purported to make these findings, but denies that the animal carcinogenicity studies of glyphosate in the aggregate provide evidence of a positive trend for or increase in any of the identified tumors.  Monsanto further states that regulatory agencies around the world have reviewed the same animal studies and concluded that they do not provide evidence that glyphosate can cause cancer.  Monsanto denies the remaining allegations in paragraph 58.

59.     IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indication absorption.  Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

ANSWER:  In response to the allegations in paragraph 59, Monsanto admits that the IARC working group purported to make these findings but denies that the cited studies provide any reliable basis for a finding that any meaningful levels of glyphosate or AMPA is present or persists in human blood or urine.  Monsanto denies the remaining allegations in paragraph 59.

60.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

ANSWER:  In response to the allegations in paragraph 60, Monsanto admits that the IARC working group interpreted a selected number of experimental studies as evidence that glyphosate can cause genotoxicity, but Monsanto denies that the working group reliably considered the full body of scientific data on such alleged genotoxic endpoints and denies that the working group reliably interpreted the studies that it selected for consideration.  Regulators around the world repeatedly have concluded that glyphosate is not genotoxic.  Monsanto denies the remaining allegations in paragraph 60.

61.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

ANSWER:  In response to the allegations in paragraph 61, Monsanto admits that the IARC working group purported to find such effects, but denies that there is any reliable scientific basis for such conclusion.  Monsanto denies the remaining allegations in paragraph 61.

23

FILED DATE: 4/25/2019 3:57 PM   2019L002426

FILED DATE: 4/25/2019 3:57 PM    2019L002426

62.     The IARC Working Group also reviewed an Agricultural Health Study (AHS), consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.  While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

ANSWER:  In response to the allegations in paragraph 62, Monsanto admits that the working group reviewed the findings of an Agricultural Health Study ("AHS") published in 2005, but denies that the working group characterized that study as supporting an association between glyphosate and the specified cancers.  The AHS cohort study did not find a positive association between glyphosate and any type of cancer.  Monsanto denies all other allegations in paragraph 62.

63.     In an article published on November 09, 2017 in the Journal of the National Cancer Institute updating the results of Glyphosate use and cancer incidence in the Agricultural Health Study a link was determined to exist between Glyphosate exposure and AML.

ANSWER:  In response to the allegations in paragraph 63, Monsanto admits that the referenced article was published.  To the extent the allegations in paragraph 63 characterize but the meaning of the cited article, Monsanto denies the allegations in paragraph 63.

64.     In a review published on February 10, 2019 in Science Direct titled Exposure to Glyphosate-Based Herbicides and Risk for Non-Hodgkin Lymphoma:  A Meta-Analysis and Supporting Evidence, a compelling link between exposures to GBHs and increased risk for NHL was noted.

ANSWER:  In response to the allegations in paragraph 64, Monsanto admits that the referenced article was published.  To the extent the allegations in paragraph 64 characterize but the meaning of the cited article, Monsanto denies the allegations in paragraph 64.

***Other Earlier Findings About Glyphosate's Dangers to Human Health***

65.     The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate.  This technical

24

fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

> Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not are not available. Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

ANSWER: In response to the allegations in paragraph 65, Monsanto admits that EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations, relating to glyphosate that predates the IARC March 20, 2015 evaluation, which should be read in context of EPA's precautionary regulatory mandate and EPA's consistent finding that glyphosate does not pose any cancer risk to humans.

66. In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticides-caused illness, glyphosate was third most commonly-reported cause of pesticide illness among agricultural workers.

ANSWER: In response to the allegations in paragraph 66, Monsanto admits that the Northwest Coalition for Alternatives to Pesticides made the identified claims, but denies that the Coalition provides any reliable basis for any conclusions regarding potential health risks from glyphosate. Monsanto notes that a federal district court has characterized this same publication

25

FILED DATE: 4/25/2019 3:57 PM   2019L002426

as an "advocacy piece[] published in [a] non-peer-reviewed journal." *See Arias v. DynCorp*, 928 F. Supp. 2d 10, 24 (D.D.C. 2013).

*Recent Worldwide Bans on Roundup®/Glyphosate*

67.     Several countries around the world have instituted bans the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in light of the as the dangers of use of Roundup® are more widely known.  The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which takes effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated:  "Agricultural pesticides in user-friendly packing are sold in abundance to private persons.  In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are.  Especially children are sensitive to toxic substances and should therefore not be exposed to it."

ANSWER:  In response to the allegations in paragraph 67, Monsanto admits that the IARC working group's classification of glyphosate as a Class 2A carcinogen has resulted in ongoing discussions and/or restrictions in certain countries regarding the sale and/or use of glyphosate-based herbicides, including the Netherlands, but denies that there is any scientific basis for the concerns raised by the improper IARC classification.  Monsanto denies the remaining allegations in paragraph 67.

68.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

ANSWER:  In response to the allegations in paragraph 68, Monsanto admits that the IARC working group classification led an individual government attorney in Brazil to write a letter to the Brazilian regulatory authorities requesting a reevaluation of glyphosate.  Monsanto denies the remaining allegations in paragraph 68.

69.     France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

ANSWER:  Monsanto admits that, in France, the sale to and use by amateurs (*i.e.*, non-professionals) of all pesticides (with certain exceptions for biocontrol pesticides) are prohibited

26

FILED DATE: 4/25/2019 3:57 PM   2019L002426

as of January 1, 2019, with certain exceptions.  Monsanto denies the remaining allegations in paragraph 69.

70.    Bermuda banned both the private and commercial sale of glyphosates, including Roundup®.  The Bermuda government explained its ban as follows:  "Following a recent scientific study carried out by a leading cancer agency, they importation of weed spray 'Roundup' has been suspended."

ANSWER:  In response to the allegations in paragraph 70, Monsanto admits that some employees of Bermuda's government announced an intention to suspend the importation of glyphosate-based herbicides, but lacks information sufficient to form a belief as to the truth of the allegations about whether this suspension took effect and accordingly denies the same. Monsanto denies the remaining allegations in paragraph 70.

71.    The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that Glycoside has been linked to fatal kidney disease in agricultural workers.

ANSWER:  In response to the allegations in paragraph 71, Monsanto admits that the IARC monograph appears to be the alleged basis for the Sri Lankan government's actions, including the allegation that glyphosate can cause kidney disease.  Monsanto further states that the allegations regarding kidney disease found in Sri Lanka are unrelated to plaintiff's allegations regarding claimed carcinogenicity.  Monsanto denies the remaining allegations in paragraph 71.

72.    The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

ANSWER:  In response to the allegations in paragraph 72, Monsanto denies the alleged basis for Colombia's suspension of aerial spraying of glyphosate.  Colombia's attorney general has explained that the ban on aerial spraying of illicit coca plantations was a concession to the FARC ("Fuerzas Armadas Revolucionarias de Colombia"), and had nothing to do with alleged safety concerns.  As of April 2016, the government of Colombia has resumed manual application of glyphosate on illicit coca crops.  A federal district court in the United States excluded plaintiffs' expert testimony purporting to link these same aerial eradication operations with cancer as scientifically unreliable.  *See Arias v. DynCorp*, 928 F. Supp. 2d 10 (D.D.C. 2013). Monsanto denies the remaining allegations in paragraph 72.

27

FILED DATE: 4/25/2019 3:57 PM   2019L002426

*Plaintiff's Exposure to Roundup®*

73.     Plaintiff Robert Rawson used Roundup extensively on his one acre property from approximately 1974 through 2018. He applied the herbicide himself on his grass and his driveway.  Mr. Rawson was unaware of Roundup's carcinogenic properties until it was far too late; he was diagnosed with extranodal marginal zone lymphoma (MALT) a type of non-Hodgkin Lymphoma (NHL) on February 01, 2013.  Mr. Rawson had no reason to believe or suspect that his NHL was caused by his use of Roundup until he saw an advertisement on television in June of 2018 advertising the link between Roundup exposure and NHL.

ANSWER:  In response to the allegations in paragraph 73, Monsanto denies that any exposure to Roundup®-branded products can cause NHL and also denies that Roundup®-branded products have carcinogenic properties.  Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 73 and therefore denies those allegations.  Monsanto states, however, that the scientific studies upon which IARC purported to base its classification were all publicly available before March 2015.

## V.  CLAIMS

### COUNT I
### STRICT LIABILITY (DESIGN DEFECT) (AGAINST BAYER)

74.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

ANSWER:  Count I (paragraphs 74-92) is directed at Bayer Corporation and does not require any responses from Monsanto.  To the extent that responses from Monsanto are deemed required, Monsanto: (a) denies any and all allegations regarding defective design or other misconduct; (b) denies that Monsanto is liable to plaintiff based on a strict liability theory or any other legal theory; (c) denies that Roundup®-branded products cause cancer or are defective; (d) denies that Roundup®-branded products caused plaintiff's cancer; and (e) denies that Monsanto's conduct at issue in the Complaint was controlled by Bayer Corporation.

75.     Plaintiff brings this strict liability claim against Bayer as the parent company of Monsanto for defective design

76.     At all times relevant to this litigation, Bayer by and through Monsanto engaged in the business of testing, developing, manufacturing, selling, distributing, marketing, packaging

designing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Bayer by and through its subsidiary Monsanto. At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by the Plaintiff, as described above.

77. At all times relevant to this litigation, Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff.

78. At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Illinois and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

79. Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

80. Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

FILED DATE: 4/25/2019 3:57 PM 2019L002426

29

81. At all times relevant to this action, Monsanto knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

82. Therefore, at all times relevant to this litigation, Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Monsanto were defective in design and formulation, in one or more of the following ways:

(a) When placed in the stream of commerce, Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

(b) When placed in the stream of commerce, Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

(c) When placed in the stream of commerce, Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

(d) Monsanto did not sufficiently test, investigate, or study Roundup® products and, specifically, the active ingredient glyphosate.

(e) Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

(f) At the time of marketing its Roundup® products, Roundup® was defective in that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

FILED DATE: 4/25/2019 3:57 PM    2019L002426

(g)     Monsanto did not conduct adequate post-marketing surveillance of its Roundup®
products.

(h)     Monsanto could have employed safer alternative designs and formulations.

83.     Plaintiff was exposed to Roundup® products in the course of his home
maintenance, as described above, without knowledge of their dangerous characteristics.

84.     At all times relevant to this litigation, Plaintiff used and/or was exposed to the use
of Roundup® products in an intended or reasonably foreseeable manner without knowledge of
their dangerous characteristics.

85.     Plaintiff could not have reasonably discovered the defects and risks associated
with Roundup® or glyphosate-containing products before or at the time of exposure.

86.     The harm caused by Roundup® products far outweighed their benefit, rendering
these products dangerous to an extent beyond that which an ordinary consumer would
contemplate.  Roundup® products were and are more dangerous than alternative products and
Monsanto could have designed Roundup® products (including their packaging and sales aids) to
make them less dangerous. Indeed, at the time that Monsanto designed Roundup® products, the
state of the industry's scientific knowledge was such that a less risky design or formulation was
attainable.

87.     At the time Roundup® products left Monsanto's control, there was a practical,
technically feasible and safer alternative design that would have prevented the harm without
substantially impairing the reasonably anticipated or intended function of those herbicides.

88.     Monsanto's defective design of Roundup® products was willful, wanton,
fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of
the Roundup® products, including the Plaintiff.

31

FILED DATE: 4/25/2019 3:57 PM   2019L002426

FILED DATE: 4/25/2019 3:57 PM    2019L002426

89.     Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Bayer by and through its subsidiary Monsanto is strictly liable to the Plaintiff.

90.     The defects in Roundup® products caused or contributed to cause Plaintiff's grave injuries, and, but for Monsanto's misconduct and omissions, Plaintiff would not have sustained the NHL which required him to receive treatment at several hospitals in Cook County, Illinois.

91.     Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including the Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Monsanto made conscious decisions not to redesign, warn or inform the unsuspecting public. Monsanto's reckless conduct warrants an award of aggravated damages.

92.     As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

WHEREFORE, the Plaintiff Robert Rawson respectfully requests that this Honorable Court enter judgement in his favor and against Defendant Bayer for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT II
## STRICT LIABILITY (FAILURE TO WARN) (AGAINST BAYER)

93.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

ANSWER: Count II (paragraphs 93-113) is directed at Bayer Corporation and does not require any responses from Monsanto. To the extent that responses from Monsanto are deemed required, Monsanto: (a) denies any and all allegations regarding failure to warn or other misconduct; (b) denies that Monsanto is liable to plaintiff based on a strict liability theory or any other legal theory; (c) denies that Roundup®-branded products cause cancer or are defective; (d) denies that Roundup®-branded products caused plaintiff's cancer; and (e) denies that Monsanto's conduct at issue in the Complaint was controlled by Bayer Corporation.

94.     Plaintiff brings this strict liability claim against Bayer as the parent company of Monsanto for failure to warn.

95.     At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Monsanto.

96.     Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiff, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

97.     At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn the Plaintiff of the dangers associated with Roundup® use and exposure. Monsanto, as manufacturer, seller, promoter, marketer, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

FILED DATE: 4/25/2019 3:57 PM   2019L002426

98.     At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

99.     At all times relevant to this litigation, Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by these herbicides, including the Plaintiff.

100.    Despite the fact that Monsanto knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure.  The dangerous propensities of these products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or scientifically knowable to Monsanto through appropriate research and testing by known methods, at the time they distributed, marketed, promoted, supplied or sold the product, and not known to end users and consumers, such as the Plaintiff.

101.    These products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products.  Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

102.    At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Illinois and throughout the United States, including the Plaintiff, without substantial change in

34

FILED DATE: 4/25/2019 3:57 PM   2019L002426

their condition as designed, manufactured, sold, distributed, labeled, promoted and marketed by Monsanto.

103.    The Plaintiff was exposed to Roundup® products in the course of his personal use on his one acre property, without knowledge of their dangerous characteristics.

104.    At all times relevant to this litigation, the Plaintiff used and/or was exposed to the use of Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

105.    The Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of the Plaintiff's exposure.  The Plaintiff relied upon the skill, superior knowledge, and judgment of Monsanto.

106.    These products were defective because the minimal warnings disseminated with Roundup® products were inadequate, and they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and landscaping applications.

107.    The information that Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as the Plaintiff to utilize the products safely and with adequate protection.  Instead, Monsanto disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the

35

FILED DATE: 4/25/2019 3:57 PM   2019L002426

unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

108.    To this day, Monsanto has failed to adequately and accurately warn of the true risks of the Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

109.    As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed, marketed, and promoted by Monsanto, and used by the Plaintiff in his home maintenance.

110.    Bayer as the parent company of Monsanto is liable to the Plaintiff for injuries caused by their negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of these products and the risks associated with the use of or exposure to Roundup® and glyphosate.

111.    The defects in Roundup® products caused or contributed to cause the Plaintiff s injuries, and, but for this misconduct and omissions, the Plaintiff would not have sustained his injuries.

112.    Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products, Plaintiff could have avoided the risk of developing injuries as alleged herein.

113.    As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave

injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

WHEREFORE, the Plaintiff Robert Rawson respectfully requests that this Honorable Court enter judgement in his favor and against Defendant Bayer for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT III
## NEGLIGENCE (AGAINST BAYER)

114.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

ANSWER:  Count III (paragraphs 114-129) is directed at Bayer Corporation and does not require any responses from Monsanto.  To the extent that responses from Monsanto are deemed required, Monsanto:  (a) denies any and all allegations regarding negligence or other misconduct; (b) denies that Monsanto is liable to plaintiff based on a negligence theory or any other legal theory; (c) denies that Roundup®-branded products cause cancer or are defective; (d) denies that Roundup®-branded products caused plaintiff's cancer; and (e) denies that Monsanto's conduct at issue in the Complaint was controlled by Bayer Corporation..

115.    Monsanto, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by the Plaintiff.

116.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

117.    At all times relevant to this litigation, Monsanto s had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Monsanto's

FILED DATE: 4/25/2019 3:57 PM    2019L002426

duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

118.    At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

119.    Accordingly, at all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with the Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including the Plaintiff.

120.    Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

121.    As such, Monsanto breached the duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Monsanto manufactured, marketed, promoted, and sold defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

122. Despite an ability and means to investigate, study, and test these products and to provide adequate warnings, Monsanto has failed to do so. Indeed, Monsanto has wrongfully concealed information and has further made false and/or misleading statements concerning the safety of exposure to Roundup® and glyphosate.

123. Monsanto was negligent in the following respects:

(a) Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

(b) Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

(c) Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

(d) Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

(e) Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

FILED DATE: 4/25/2019 3:57 PM   2019L002426

(f)     Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Monsanto could reasonably foresee would use and be exposed to its Roundup® products;

(g)     Failing to disclose to the Plaintiff, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

(h)     Failing to warn the Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to the Plaintiff and other consumers;

(i)     Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

(j)     Representing that its Roundup® products were safe for their intended use when, in fact, Monsanto knew or should have known that the products were not safe for their intended purpose;

(k)     Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

(1)     Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

(m)     Continuing to disseminate information to its consumers, which indicate or imply that Monsanto's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

FILED DATE: 4/25/2019 3:57 PM   2019L002426

(n)     Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

124.     Monsanto knew and/or should have known that it was foreseeable that consumers such as the Plaintiff would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup®.

125.     The Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

126.     Monsanto's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiffs suffered, as described herein.

127.     Monsanto's conduct, as described above, was reckless. Monsanto regularly risked the lives of consumers and users of their products, including the Plaintiff's, with full knowledge of the dangers of these products.  Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including the Plaintiff. Monsanto's reckless conduct therefore warrants an award of aggravated or punitive damages.

128.     As a proximate result of Monsanto's wrongful acts and omissions in placing defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff has suffered and continues to suffer grave injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

129.     On June 07, 2018 Bayer acquired Monsanto and as such is liable for the prior acts and omissions of Monsanto.

WHEREFORE, the Plaintiff Robert Rawson respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Bayer for compensatory and punitive

FILED DATE: 4/25/2019 3:57 PM   2019L002426

FILED DATE: 4/25/2019 3:57 PM   2019L002426

damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

**COUNT IV**
**STRICT LIABILITY (DESIGN DEFECT) (AGAINST MONSANTO)**

130.    Plaintiff incorporates by reference each and every allegations set forth in the preceding paragraphs stated herein.

<u>ANSWER</u>:  Monsanto incorporates by reference its responses to paragraphs 1 through 129 in response to paragraph 130 of plaintiff's Complaint.

131.    Plaintiff brings this strict liability claim Monsanto for defective design.

<u>ANSWER</u>:  In response to the allegations in paragraph 131, Monsanto admits that plaintiff purports to bring a claim for strict liability design defect, but denies any liability as to that claim.

132.    At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, manufacturing, selling, distributing, marketing, packaging, designing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products, into the stream of commerce.  These actions were under the ultimate control and supervision of Monsanto. At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by the Plaintiff, as described above.

<u>ANSWER</u>:  In response to the allegations in paragraph 132, Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegation that plaintiff used Roundup®-branded products and therefore denies that allegation.  Monsanto denies the remaining allegations in paragraph 132.

42

133.    At all times relevant to this litigation, Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or expose to the public, and in particular, the Plaintiff.

ANSWER:  Monsanto denies the allegations in paragraph 133.

134.    At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and other persons coming into contact with these products in Illinois and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

ANSWER:  Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 134 and therefore denies those allegations.

135.    Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left hands of the manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

ANSWER:  Monsanto denies the allegations in paragraph 135.

136.    Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufactures and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

ANSWER:  Monsanto denies the allegations in paragraph 136.

137.    At times relevant to this action, Monsanto knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

43

FILED DATE: 4/25/2019 3:57 PM   2019L002426

ANSWER:  Monsanto denies the allegations in paragraph 137.

138.     Therefore, at times relevant to this ligation, Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Monsanto were defective in design and formulation, in one or more of the following ways:

(a)      When placed in the stream of commerce, Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

(b)      When placed in the stream of commerce, Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

(c)      When placed in the stream of commerce, Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

(d)      Monsanto did not sufficiently test, investigate, or study Roundup® products and, specifically, the active ingredient glyphosate.

(e)      Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

(f)      At the time of marketing its Roundup® products, Roundup® was defective in that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

(g)      Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products.

(h)      Monsanto could have employed safer alternative designs and formulations.

ANSWER:  Monsanto denies the allegations in paragraph 138 and each of its subparts.

139.    Plaintiff was exposed to Roundup® products in the course of his home maintenance, as described above, without knowledge of their dangerous characteristics.

ANSWER:  Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 139 concerning plaintiff claimed use of Roundup®-branded products and therefore denies those allegations.  Monsanto denies the remaining allegations in paragraph 139, including that Roundup®-branded products have "dangerous characteristics."

140.    At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

ANSWER:  Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 140 concerning plaintiff's claimed use of and/or exposure to Roundup®-branded products and therefore denies those allegations.  Monsanto denies the remaining allegations in paragraph 140, including that Roundup®-branded products have "dangerous characteristics."

141.    Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

ANSWER:  Monsanto denies the allegations in paragraph 141.

142.    The harm caused by Roundup® products far outweighed their benefit, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate. Roundup® products were and are more dangerous than alternative products and Monsanto could have designed Roundup® products (including their packaging and sales aids) to make them less dangerous. Indeed, at the time that Monsanto designed Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

ANSWER:  Monsanto denies the allegations in paragraph 142.

45

143. At the time Roundup® products left Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of those herbicides.

ANSWER: Monsanto denies the allegations in paragraph 143.

144. Monsanto's defective design of Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including the Plaintiff.

ANSWER: Monsanto denies the allegations in paragraph 144.

145. Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Monsanto is strictly liable to the Plaintiff.

ANSWER: Monsanto denies the allegations in paragraph 145.

146. The defects in Roundup® products caused or contributed to cause Plaintiff's grave injuries, and, but for Monsanto's misconduct and omissions, Plaintiff would not have sustained the NHL which required him to receive treatment at several hospitals in Cook County, Illinois.

ANSWER: Monsanto denies the allegations in paragraph 146.

147. Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including the Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Monsanto made conscious decisions not to redesign, warn or inform the unsuspecting public. Monsanto's reckless conduct warrants an award of aggravated damages.

ANSWER: Monsanto denies the allegations in paragraph 147.

148. As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave

FILED DATE: 4/25/2019 3:57 PM    2019L002426

injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

ANSWER:  Monsanto denies the allegations in paragraph 148.

WHEREFORE, the Plaintiff Robert Rawson respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Monsanto for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper.  Plaintiffs also demand a jury trial on the issues contained herein.

ANSWER:  In response to the "WHEREFORE" paragraph following paragraph 148, Monsanto demands that judgment be entered in its favor and against plaintiff; that plaintiff's Complaint be dismissed, with prejudice; and that Monsanto be awarded costs of suit and reasonable attorney's fees as allowed by law and such further and additional relief as this Court may deem just and proper.

## COUNT V
## STRICT LIABILITY (FAILURE TO WARN) (AGAINST MONSANTO)

149.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

ANSWER:  Monsanto incorporates by reference its responses to paragraphs 1 through 148 in response to paragraph 149 of plaintiff's Complaint.

150.    Plaintiff brings this strict liability claim against Monsanto for failure to warn.

ANSWER:   In response to the allegations in paragraph 150, Monsanto admits that plaintiff purports to bring a claim for strict liability failure to warn, but denies any liability as to that claim.

151.    At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the

FILED DATE: 4/25/2019 3:57 PM   2019L002426

dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Monsanto.

ANSWER: Monsanto denies the allegations in paragraph 151.

152. Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiff, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

ANSWER: Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegation that plaintiff or other entities identified purchased or used Roundup®-branded products and therefore denies that allegation. The allegations in paragraph 152 also set forth conclusions of law for which no response is required. Monsanto denies the remaining allegations in paragraph 152.

153. At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn the Plaintiff of the dangers associated with Roundup® use and exposure. Monsanto, as manufacturer, seller, promoter, marketer, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

ANSWER: The allegations in paragraph 153 set forth conclusions of law for which no response is required.

154. At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

48

ANSWER: Monsanto denies the allegations in paragraph 154. All labeling of Roundup®-branded products has been and remains EPA-approved and in compliance with all federal requirements under FIFRA.

155. At all times relevant to this litigation, Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by these herbicides, including the Plaintiff.

ANSWER: Monsanto denies the allegations in paragraph 155.

156. Despite the fact that Monsanto knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of these products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or scientifically knowable to Monsanto through appropriate research and testing by known methods, at the time they distributed, marketed, promoted, supplied or sold the product, and not known to end users and consumers, such as the Plaintiff.

ANSWER: Monsanto denies the allegations in paragraph 156.

157. These products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

ANSWER: Monsanto denies the allegations in paragraph 157.

158. At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Illinois and throughout the United States, including the Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, promoted and marketed by Monsanto.

FILED DATE: 4/25/2019 3:57 PM    2019L002426

ANSWER:  Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 158 and therefore denies those allegations.

159.    The Plaintiff was exposed to Roundup® products in the course of his personal use on his one acre property, without knowledge of their dangerous characteristics.

ANSWER:  Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 159 concerning plaintiff's alleged exposure to and/or use of Roundup®-branded products and therefore denies those allegations.  Monsanto denies the remaining allegations in paragraph 159, including that Roundup®-branded products have "dangerous characteristics."

160.    At all times relevant to this litigation, the Plaintiff used and/or was exposed to the use of Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

ANSWER:  Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 160 concerning plaintiff's alleged use of and/or and exposure to Roundup®-branded products and therefore denies those allegations.  Monsanto denies the remaining allegations in paragraph 160, including that Roundup®-branded products have "dangerous characteristics."

161.    The Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of the Plaintiff s exposure.  The Plaintiff relied upon the skill, superior knowledge, and judgment of Monsanto.

ANSWER:   Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 161 and therefore denies those allegations.  Monsanto denies the remaining allegations in paragraph 161.

162.    These products were defective because the minimal warnings disseminated with Roundup® products were inadequate, and they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and landscaping applications.

50

ANSWER: Monsanto denies the allegations in paragraph 162.

163. The information that Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as the Plaintiff to utilize the products safely and with adequate protection. Instead, Monsanto disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

ANSWER: Monsanto denies the allegations in paragraph 163.

164. To this day, Monsanto has failed to adequately and accurately warn of the true risks of the Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

ANSWER: Monsanto denies the allegations in paragraph 164.

165. As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed, marketed, and promoted by Monsanto, and used by the Plaintiff in his work.

ANSWER: Monsanto denies the allegations in paragraph 165.

166. Monsanto is liable to the Plaintiff for injuries caused by their negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of these products and the risks associated with the use of or exposure to Roundup® and glyphosate.

51

FILED DATE: 4/25/2019 3:57 PM    2019L002426

ANSWER:  Monsanto denies the allegations in paragraph 166.

167.    The defects in Roundup® products caused or contributed to cause the Plaintiff's injuries, and, but for this misconduct and omissions, the Plaintiff would not have sustained his injuries.

ANSWER:  Monsanto denies the allegations in paragraph 167.

168.    Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products, Plaintiff could have avoided the risk of developing injuries as alleged herein.

ANSWER:  Monsanto denies the allegations in paragraph 168.

169.    As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

ANSWER:  Monsanto denies the allegations in paragraph 169.

WHEREFORE, the Plaintiff Robert Rawson respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Monsanto for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper.  Plaintiffs also demand a jury trial on the issues contained herein.

ANSWER:   In response to the "WHEREFORE" paragraph following paragraph 169, Monsanto demands that judgment be entered in its favor and against plaintiff; that plaintiff's Complaint be dismissed, with prejudice; and that Monsanto be awarded costs of suit and reasonable attorney's fees as allowed by law and such further and additional relief as this Court may deem just and proper.

FILED DATE: 4/25/2019 3:57 PM  2019L002426

## COUNT VI
## NEGLIGENCE (AGAINST MONSANTO)

170.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

ANSWER:  Monsanto incorporates by reference its responses to paragraphs 1 through 169 in response to paragraph 170 of plaintiff's Complaint.

171.    Monsanto, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by the Plaintiff.

ANSWER:  In response to the allegations in paragraph 171, Monsanto states that the phrase "directly or indirectly" is vague and ambiguous and that Monsanto lacks information or knowledge sufficient to form a belief as to the truth of those allegations and therefore Monsanto denies those allegations in paragraph 171.

172.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

ANSWER:  The allegations in paragraph 172 set forth conclusions of law for which no response is required.

173.    At all times relevant to this litigation, Monsanto s had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

ANSWER:  The allegations in paragraph 173 set forth conclusions of law for which no response is required.

FILED DATE: 4/25/2019 3:57 PM  2019L002426

174. At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

ANSWER: Monsanto denies the allegations in paragraph 174.

175. Accordingly, at all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with the Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including the Plaintiff.

ANSWER: Monsanto denies the allegations in paragraph 175.

176. Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

ANSWER: Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 176 regarding users' and consumers' knowledge and therefore denies those allegations. Monsanto denies the remaining allegations in paragraph 176. All labeling of Roundup®-branded products has been and remains EPA-approved and in compliance with all federal requirements under FIFRA.

177. As such, Monsanto breached the duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Monsanto manufactured, marketed, promoted, and sold defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

ANSWER: Monsanto denies the allegations in paragraph 177.

54

FILED DATE: 4/25/2019 3:57 PM  2019L002426

178.     Despite an ability and means to investigate, study, and test these products and to provide adequate warnings, Monsanto has failed to do so.  Indeed, Monsanto has wrongfully concealed information and has further made false and/or misleading statements concerning the safety of exposure to Roundup® and glyphosate.

ANSWER:  Monsanto denies the allegations in paragraph 178.

179.     Monsanto was negligent in the following respects:

(a)     Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup®-products without thorough and adequate pre- and post-market testing;

(b)     Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

(c)     Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

(d)     Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

(e)     Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

FILED DATE: 4/25/2019 3:57 PM  2019L002426

(f)     Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Monsanto could reasonably foresee would use and be exposed to its Roundup® products;

(g)     Failing to disclose to the Plaintiff, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

(h)     Failing to warn the Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to the Plaintiff and other consumers;

(i)     Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

(j)     Representing that its Roundup® products were safe for their intended use when, in fact, Monsanto knew or should have known that the products were not safe for their intended purpose;

(k)     Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

(1)     Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

(m)     Continuing to disseminate information to its consumers, which indicate or imply that Monsanto' s Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

FILED DATE: 4/25/2019 3:57 PM   2019L002426

(n)    Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

ANSWER:  Monsanto denies the allegations in paragraph 179, including each of its subparts.

180.    Monsanto knew and/or should have known that it was foreseeable that consumers such as the Plaintiff would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup®.

ANSWER:  Monsanto denies the allegations in paragraph 180.

181.    The Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

ANSWER:  Monsanto lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 181 regarding plaintiff's knowledge and therefore denies those allegations.  Monsanto denies the remaining allegations in paragraph 181, including that intended use and/or exposure to Roundup®-branded products causes any injuries.

182.    Monsanto's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiffs suffered, as described herein.

ANSWER:  Monsanto denies the allegations in paragraph 182.

183.    Monsanto's conduct, as described above, was reckless. Monsanto regularly risked the lives of consumers and users of their products, including the Plaintiff's, with full knowledge of the dangers of these products.  Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including the Plaintiff.  Monsanto's reckless conduct therefore warrants an award of aggravated or punitive damages.

ANSWER:  Monsanto denies the allegations in paragraph 183.

184.    As a proximate result of Monsanto's wrongful acts and omissions in placing defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff has suffered and continues to suffer

FILED DATE: 4/25/2019 3:57 PM   2019L002426

grave injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

<u>ANSWER</u>: Monsanto denies the allegations in paragraph 184. All labeling of Roundup®-branded products has been and remains EPA-approved and in compliance with all federal requirements under FIFRA.

WHEREFORE, the Plaintiff Robert Rawson respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Monsanto for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

<u>ANSWER</u>: In response to the "WHEREFORE" paragraph following paragraph 184, Monsanto demands that judgment be entered in its favor and against plaintiff; that plaintiff's Complaint be dismissed, with prejudice; and that Monsanto be awarded costs of suit and reasonable attorney's fees as allowed by law and such further and additional relief as this Court may deem just and proper.

## COUNT VII
## NEGLIGENCE (AGAINST DUKE'S)

185. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

<u>ANSWER</u>: Count VII (paragraphs 185-190) is directed at another defendant and does not require any responses from Monsanto. To the extent that responses from Monsanto are deemed required, Monsanto denies that Roundup®-branded products cause cancer or are defective and denies that Roundup®-branded products caused plaintiff's cancer.

186. Duke's promoted, marketed, distributed and sold Roundup® products to the Plaintiff that were in fact used by the Plaintiff.

187. At all times relevant herein the Roundup® products promoted, marketed, distributed and sold to the Plaintiff were defective.

FILED DATE: 4/25/2019 3:57 PM   2019L002426

188.    Duke's owed a duty to the Plaintiff to exercise ordinary care in the promotion, marketing, distribution, and sale, of the Roundup® products it sold to the Plaintiff between 1974 and 2018.

189.    Duke's breached the aforesaid duty and was negligent through one or more of the following acts and or omission that was a proximate cause of damages to the Plaintiff:

a)      Failed to assure the Roundup® products complied with FDA standards;

b)      Failed to assure the Roundup® products complied with industry standards;

c)      Failed to assure the Roundup® products were non-carcinogenic;

d)      Marketed Roundup® products were safe when they were not;

e)      Sold Roundup® products that were defective;

f)      Sold Roundup® products that caused NHL;

g)      Sold Roundup® products that were unsafe;

h)      Distributed Roundup® products that were unsafe, and/o

j)      Promoted Roundup® products that were unsafe.

190.    As a direct and proximate cause of one or more of the aforesaid acts or omissions, Plaintiff has suffered and continues to suffer grave injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

WHEREFORE, the Plaintiff Robert Rawson respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Duke's Hardware, Inc., for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as

FILED DATE: 4/25/2019 3:57 PM   2019L002426

this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

**COUNT VIII**
**STRICT LIABILITY (AGAINST DUKE'S)**

191.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

ANSWER:  Count VIII (paragraphs 191-200) is directed at another defendant and does not require any responses from Monsanto.  To the extent that responses from Monsanto are deemed required, Monsanto denies that Roundup®-branded products cause cancer or are defective and denies that Roundup®-branded products caused plaintiff's cancer.

192.   The that Defendant, Duke's marketed, sold, distributed, and placed into the market Roundup® products that existed in a defective condition at the time they left Duke's possession and control.

193.   That the Roundup® products were defective in that they carcinogenic.

194.   That that Roundup® products sold to Plaintiff were used for the purpose and in the manner intended, at all times relevant to this Complaint.

195.   That the Roundup® products sold the Plaintiff, were in substantially the same condition as they were at the time they were promoted, distributed, marketed, and sold by the Defendant Duke's.

196.   That the Plaintiff Robert Rawson, could not, by the exercise of reasonable care, have discovered the defect in, nor perceived the danger of, the Roundup® products.

197.   That the Defendant Duke's owed a strict liability not to harm the Plaintiff through the intended use of the Roundup® products it sold to him.

198.   That the defective condition of the Roundup® products sold to Robert Rawson by the Defendant, caused Robert Rawson to the injured and suffer damages of a personal, permanent, and pecuniary nature.

FILED DATE: 4/25/2019 3:57 PM   2019L002426

199.    That at the time the Defendant marketed, sold, distributed, delivered or made available the Roundup® products, Duke's failed to properly warn the Plaintiff of the danger posed by the Roundup® products, and the likelihood of NHL associated with exposure to the Roundup® products.

200.    That as a result of the injuries and damages caused by the defective Roundup® products marketed, sold, and distributed by Duke's, and as a result of the injurie and damages caused by Duke's' failure to warn of the dangers posed by the defect Roundup® products, Duke's is strictly liable to Robert Rawson for Duke's' failure to market, sell, distribute, deliver or make available a product, which would not cause injury or damage to the Plaintiff, and for its failure to warn of the dangers posed by the defective Roundup® products.

WHEREFORE, the Plaintiff Robert Rawson respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Duke's hardware, Inc., for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## GENERAL DENIAL

Every allegation in the Complaint that is not specifically and expressly admitted in this Answer is hereby specifically and expressly denied.

## ADDITIONAL AND AFFIRMATIVE DEFENSES

Plaintiff has filed the Complaint alleging that Plaintiff was injured as a result of being exposed to glyphosate-containing herbicide manufactured and distributed by Monsanto. Plaintiff's Complaint is incorporated by reference as if the same were set forth in full herein.

FILED DATE: 4/25/2019 3:57 PM   2019L002426

61

FILED DATE: 4/25/2019 3:57 PM 2019L002426

Monsanto denies the allegations against it. Without admitting the truth of any part of such allegations by Plaintiff, Monsanto pleads, in the alternative, the following additional and affirmative defenses to Plaintiff's claims:

## FIRST DEFENSE

1. The Complaint, in whole or part, fails to state a claim or cause of action against Monsanto upon which relief can be granted.

## SECOND DEFENSE

2. If plaintiff has been injured or damaged, no injury or damages being admitted, such injuries were not caused by a Monsanto product.

## THIRD DEFENSE

3. Plaintiff's claims against Monsanto are barred because plaintiff cannot proffer any scientifically reliable evidence that the products at issue were defective or unreasonably dangerous.

## FOURTH DEFENSE

4. Any alleged negligent or culpable conduct of Monsanto, none being admitted, was so insubstantial as to be insufficient to be a proximate or substantial contributing cause of plaintiff's alleged injuries.

## FIFTH DEFENSE

5. Plaintiff's claims against Monsanto are barred, in whole or in part, because the products at issue were designed, manufactured, marketed and labeled with proper warnings, information, cautions and instructions, in accordance with the state of the art and the state of scientific and technological knowledge.

FILED DATE: 4/25/2019 3:57 PM    2019L002426

## SIXTH DEFENSE

6.     Plaintiff's claims against Monsanto are barred, in whole or in part, because the products at issue were not defective or unreasonably dangerous in that they complied with, at all relevant times, all applicable government safety standards.

## SEVENTH DEFENSE

7.     Plaintiff's claims against Monsanto are preempted, in whole or in part, by applicable federal law relating to the design, testing, producing, manufacturing, labeling, distributing, modeling, processing, and supply of Roundup®-branded products and/or glyphosate-containing products.

## EIGHTH DEFENSE

8.     Plaintiff's claims against Monsanto are preempted, in whole or in part, because of U.S. EPA findings that glyphosate does not cause cancer in humans and/or because of U.S. EPA approved product labeling.

## NINTH DEFENSE

9.     Plaintiff's claims against Monsanto are barred, in whole or in part, by the doctrine of primary jurisdiction, including by the authority delegated by Congress to the U.S. EPA.

## TENTH DEFENSE

10.     Plaintiff's claims against Monsanto are barred, in whole or in part, because plaintiff's injuries, if any, were the result of conduct of plaintiff, independent third parties, and/or events that were extraordinary under the circumstances, not foreseeable in the normal course of events, and/or independent, intervening and superseding causes of the alleged injuries, including but not limited to plaintiff's pre-existing medical conditions.

FILED DATE: 4/25/2019 3:57 PM    2019L002426

**ELEVENTH DEFENSE**

11.     The doctrines contained in Restatement (Second) of Torts § 402A, comments j and k, bar plaintiff's claims against Monsanto in whole or in part.

**TWELFTH DEFENSE**

12.     All or part of plaintiff's claims asserted against Monsanto herein are barred by the applicable statutes of limitations, statutes of repose, jurisdictional time limits, or any other limitations on the period of time within which to file suit, whether in this or any other state, including, without limitation, 735 ILCS 5/13-202, 5/13-203, 5/13-211, 5/13-213, 5/13-214, 5/13-215 and 740 ILCS 180/2.

**THIRTEENTH DEFENSE**

13.     Plaintiff may not recover on the claims pleaded in the Complaint because the damages sought are too speculative and remote.

**FOURTEENTH DEFENSE**

14.     Plaintiff's misuse or abnormal use of the product or failure to follow instructions bar plaintiff's claims against Monsanto in whole or in part.

**FIFTEENTH DEFENSE**

15.     If plaintiff suffered injuries or damages as alleged, which is denied, such injuries or damages resulted from: (a) acts or omissions of persons or entities for which Monsanto is neither liable nor responsible or, in the alternative, Monsanto is entitled to an assessment of the relative degree of fault of all such persons and entities; or (b) resulted from diseases and/or causes that are not related or connected with any product sold, distributed, or manufactured by Monsanto. Such acts or omissions on the part of others or diseases or causes constitute an independent, intervening and sole proximate cause of plaintiff's alleged injuries or damages.

FILED DATE: 4/25/2019 3:57 PM   2019L002426

### SIXTEENTH DEFENSE

16.    Monsanto had no legal relationship or privity with plaintiff and owed no duty to him by which liability could be attributed to it.

### SEVENTEENTH DEFENSE

17.    Plaintiff's claims against Monsanto are preempted in whole or part by the Freedom of Speech Clause of the First Amendment of the U.S. Constitution.

### EIGHTEENTH DEFENSE

18.    Plaintiff's claims against Monsanto are barred in whole or in part by plaintiff's own contributory/comparative negligence.  Pursuant to Section 2-1116 of the Illinois Code of Civil Procedure, plaintiff is barred from any recovery in this matter because plaintiff's comparative fault is more than 50% of the proximate cause of his alleged injuries and damages. Alternatively, any judgment entered in favor of plaintiff should be reduced by an amount commensurate with his relative degree of fault in causing his own alleged injuries and damages.

### NINETEENTH DEFENSE

19.    Plaintiff's claims against Monsanto for punitive and/or aggravated damages are barred because such an award would violate Monsanto's due process, equal protection and other rights under the United States Constitution, the Illinois Constitution, and/or other applicable state constitutions.

### TWENTIETH DEFENSE

20.    Plaintiff's claims against Monsanto for punitive and/or aggravated damages are barred because plaintiff has failed to allege conduct warranting imposition of such damages under Illinois law, and/or other applicable state laws.

FILED DATE: 4/25/2019 3:57 PM   2019L002426

### TWENTY-FIRST DEFENSE

21.     Plaintiff's claims against Monsanto for punitive and/or aggravated damages are barred and/or limited by operation of state and/or federal law.

### TWENTY-SECOND DEFENSE

22.     Monsanto states that, at all times relevant, 735 ILCS 5/2-1117 was in full force and effect. In the event that the jury determines that there was some liability on the part of Monsanto, which Monsanto specifically denies, and further finds that its fault is less than 25% of the total fault attributable to the defendants sued by plaintiff, and any third party defendant who could have been sued by plaintiff, any judgment entered in favor of plaintiff and against Monsanto must reflect joint and several liability for all past and future medical and medically related expenses, but only severally liable for any other damages.

### TWENTY-THIRD DEFENSE

23.     Plaintiff's claims against Monsanto are barred in whole or in part by plaintiff's own failure to mitigate damages.

### TWENTY-FOURTH DEFENSE

24.     Plaintiff's claims against Monsanto are barred in whole or in part by the sophisticated user doctrine.

### TWENTY-FIFTH DEFENSE

25.     In the event that plaintiff receives a settlement from any party or non-party for the injuries described in the Complaint, Monsanto is entitled to a full set-off for the amount of each such settlement.

## TWENTY-SIXTH DEFENSE

26.     Plaintiff's claims against Monsanto are barred or limited to the extent that plaintiff asserts claims that are governed by the laws of a state that does not recognize, or limits, such claims.

## TWENTY-SEVENTH DEFENSE

27.     Plaintiff's claims against Monsanto are barred to the extent that plaintiff seeks relief under the laws of states that do not govern plaintiff's claims.

## TWENTY-EIGHTH DEFENSE

28.     Monsanto hereby gives notice that it intends to rely upon such other defenses as may become available or apparent during the course of discovery and thus reserves its right to amend this Answer to assert such defenses.

**WHEREFORE**, Defendant Monsanto demands judgment in its favor and against plaintiff, dismissing plaintiff's Complaint with prejudice, together with the costs of suit and such other relief as the Court deems equitable and just.

## JURY TRIAL DEMAND

Monsanto demands a jury trial on all issues so triable.

DATED:  April 25, 2019                    HUSCH BLACKWELL LLP (Firm No #49807)

Respectfully submitted,


By: /s/    *Dominique Savinelli*
Dominique Savinelli  #06323175
James P. O'Shea # 06309819
120 South Riverside Plaza, Suite 2200
Chicago, IL 60606-3912
Telephone:     312.526.1522
Facsimile:     312.655.1502
dominique.savinelli@huschblackwell.com
james.oshea@huschblackwell.com

FILED DATE: 4/25/2019 3:57 PM  2019L002426

FILED DATE: 4/25/2019 3:57 PM    2019L002426

Erik L. Hansell  #06271229
The Plaza in Clayton
190 Carondelet Plaza, Suite 600
St. Louis, MO  63105
Telephone:  (314) 480-1500
Facsimile:    (314) 480-1505
erik.hansell@huschblackwell.com

***Attorneys for Defendant Monsanto Company***

STATE OF ILLINOIS )

) SS

COUNTY OF COOK )

## AFFIDAVIT OF INSUFFICIENT KNOWLEDGE

I, JAMES P. O'SHEA II, having been duly sworn upon my oath, depose and state that I am a member of the law office of HUSCH BLACKWELL LLP, attorneys for Defendant, Monsanto Company, improperly named Monsanto Company, Inc., in the above-captioned cause, and the allegations of lack of knowledge sufficient to form a belief are true to the best of my information.

_____

JAMES P. O'SHEA II

SWORN AND SUBSCRIBED to before me
this 25th day of _____April_____, 2019.

"OFFICIAL SEAL"
MARIA E. ROSILES
NOTARY PUBLIC — STATE OF ILLINOIS
MY COMMISSION EXPIRES OCT. 11, 2022

FILED DATE: 4/25/2019 3:57 PM 2019L002426

## CERTIFICATE OF SERVICE

I hereby certify that on April 25, 2019, pursuant to Section 1-109 of the Illinois Code of Civil Procedure and the in accordance with Supreme Court Rule 12(b)(2), the foregoing was electronically filed with the Cook Circuit Clerk's electronic filing system and served via mail and e-mail to the following:

David J. Gallagher
MOTHERWAY & NAPLETON, LLP.
140 S. Dearborn, Suite 1500
Chicago, IL 60603
(312) 726-2699 - PHONE
(312) 726-6851 - FAX
Atty. No. 56421
dgallagher@mnlawoffice.com

*Attorneys for Plaintiff Robert Rawson*

/s/  *Dominique Savinelli*

FILED DATE: 4/25/2019 3:57 PM    2019L002426

DJG:bg                                                                    19-20

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| ROBERT RAWSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| -vs- | ) Case No.: 19 L 002426 |
| | ) |
| BAYER CORPORATION, a foreign | ) |
| corporation, MONSANTO COMPANY, a | ) |
| foreign corporation, and DUKE'S | ) |
| HARDWARE, INC., a domestic | ) |
| corporation, | ) |
| | ) |
| Defendants. | ) |

## NOTICE OF FILING

TO:    Dominique Savinelli / James P. O'Shea
       Husch Blackwell LLP
       120 S. Riverside Plaza, Suite 2200, Chicago, IL 60606
       Email: HBService@huschblackwell.com; Dominique.Savinelli@huschblackwell.com;
       James.Oshea@huschblackwell.com

       Thomas J. Dammrich II
       Shook, Hardy & Bacon LLP
       111 S. Wacker Drive, Suite 4700, Chicago, IL 60606
       Email: docket@shb.com; tdammrich@shb.com; dbrehmer@shb.com

       YOU ARE HEREBY NOTIFIED that on **June 5, 2019**, there was e-filed with the Clerk
of the Circuit Court of Will County, Illinois, Law Division, **Plaintiff's Answers to Defendant
Duke's Hardware, Inc.'s Affirmative Defenses,** a copy of which is attached hereto.

                                    DAVID J. GALLAGHER
                                    **MOTHERWAY & NAPLETON, LLP**
                                    140 S. Dearborn Street, Suite 1500
                                    Chicago, Illinois 60603
                                    (312) 726-2699
                                    Attorney No: 56421
                                    dgallagher@mnlawoffice.com

### PROOF OF SERVICE

I, **Beata Gromska**, a non-attorney certify; that I served this notice by serving a copy to those above named at the
above address(es) on **June 5, 2019** by:
       [ ] depositing in the U.S. mail at 140 S. Dearborn at 5:00 p.m. with proper postage prepaid
       [ ] facsimile
       [X] e-mail
 [x] Under penalties as provided by law pursuant to IL.REV. STAT CHAP 110 SEC      1-109  I certify  that  the
statements set forth herein are true and correct.

                                    Date:  June 5, 2019

DJG:bg

19-20

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION**

ROBERT RAWSON,                          )
                                        )
    Plaintiff,                          )
                                        )
-vs-                                    )   Case No.: 19 L 002426
                                        )
BAYER CORPORATION, a foreign            )
corporation, MONSANTO COMPANY, a        )
foreign corporation, and DUKE'S         )
HARDWARE, INC., a domestic              )
corporation,                            )
                                        )
    Defendants.                         )

**PLAINTIFF'S ANSWERS TO DEFENDANT DUKE'S HARDWARE, INC.'S
AFFIRMATIVE DEFENSES**

Now comes the plaintiff, ROBERT RAWSON, by and through his attorneys, MOTHERWAY & NAPLETON, LLP, and in response to defendant, DUKE'S HARDWARE, INC.'s Affirmative Defenses, plaintiff states as follows:

**FIRST DEFENSE**

1. Plaintiff denies the allegations contained in paragraph 1.

**SECOND DEFENSE**

2. Plaintiff denies the allegations contained in paragraph 2.

**THIRD DEFENSE**

3. Plaintiff denies the allegations contained in paragraph 3.

**FOURTH DEFENSE**

4. Plaintiff denies the allegations contained in paragraph 4.

**FIFTH DEFENSE**

5. Plaintiff denies the allegations contained in paragraph 5.

### SIXTH DEFENSE

6.  Plaintiff denies the allegations contained in paragraph 6.

### SEVENTH DEFENSE

7.  Plaintiff denies the allegations contained in paragraph 7.

### EIGHT DEFENSE

8.  Plaintiff denies the allegations contained in paragraph 8.

### NINTH DEFENSE

9.  Plaintiff denies the allegations contained in paragraph 9.

### TENTH DEFENSE

10. Plaintiff denies the allegations contained in paragraph 10.

### ELEVENTH DEFENSE

11. Plaintiff denies the allegations contained in paragraph 11.

### TWELFTH DEFENSE

12. Plaintiff denies the allegations contained in paragraph 12.

### THIRTEENTH DEFENSE

13. Plaintiff denies the allegations contained in paragraph 13.

### FOURTEENTH DEFENSE

14. Plaintiff denies the allegations contained in paragraph 14.

### FIFTEENTH DEFENSE

15. Plaintiff denies the allegations contained in (a) and (b) of paragraph 15.

### SIXTEENTH DEFENSE

16. Plaintiff denies the allegations contained in paragraph 16.

## SEVENTEENTH DEFENSE

17. Plaintiff denies the allegations contained in paragraph 17.

## EIGHTEENTH DEFENSE

18. Plaintiff denies the allegations contained in paragraph 18.

## NINETEENTH DEFENSE

19. Plaintiff denies the allegations contained in paragraph 19.

## TWENTIETH DEFENSE

20. Plaintiff denies the allegations contained in paragraph 20.

## TWENTY-FIRST DEFENSE

21. Plaintiff denies the allegations contained in paragraph 21.

## TWENTY-SECOND DEFENSE

22. Plaintiff admits the existence of 735 ILCS 5/2-1117 but denies the Defendant has

properly stated its potential application to this case.

## TWENTY-THIRD DEFENSE

23. Plaintiff denies the allegations contained in paragraph 23.

## TWENTY-FOURTH DEFENSE

24. Plaintiff denies the allegations contained in paragraph 24.

## TWENTY-FIFTH DEFENSE

25. Plaintiff admits the allegations contained in paragraph 25.

## TWENTY-SIXTH DEFENSE

26. Plaintiff denies the allegations contained in paragraph 26.

## TWENTY-SEVENTH DEFENSE

27. Plaintiff denies the allegations contained in paragraph 27.

## TWENTY-EIGHT DEFENSE

28. Plaintiff reserves the right to answer any additional defenses raised.

Wherefore, plaintiff, ROBERT RAWSON, prays that this Honorable Court enter Judgement in his favor and against defendant, DUKE'S HARDWARE, INC., and deny the defendant any relief based on her affirmative defenses.

Respectfully submitted,

David J. Gallagher
*Attorney for plaintiff*

**MOTHERWAY & NAPLETON, LLP**
140 S. Dearborn, Suite 1500
Chicago, IL 60603
(312) 726-2699
Attorney No. 56421
dgallagher@mnlawoffice.com

4

Return Date: No return date scheduled
Hearing Date: No hearing scheduled
Courtroom Number: No hearing scheduled
Location: No hearing scheduled

FILED
5/2/2019 2:39 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2019L002426

4911355

DJG:bg

FILED DATE: 5/2/2019 2:39 PM   2019L002426

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

ROBERT RAWSON,                    )
                                  )
    Plaintiff,                    )
                                  )
-vs-                              )     Case No.: 19 L 002426
                                  )
BAYER CORPORATION, a foreign      )
corporation, MONSANTO COMPANY, a  )
foreign corporation, and DUKE'S   )
HARDWARE, INC., a domestic        )
corporation,                      )
                                  )
    Defendants.                   )

### PLAINTIFF'S ANSWERS TO DEFENDANT MONSANTO COMPANY'S AFFIRMATIVE DEFENSES

Now comes the plaintiff, ROBERT RAWSON, by and through his attorneys, MOTHERWAY & NAPLETON, LLP, and in response to defendant, MONSANTO COMPANY's Affirmative Defenses, plaintiff states as follows:

### FIRST DEFENSE

1. Plaintiff denies the allegations contained in paragraph 1.

### SECOND DEFENSE

2. Plaintiff denies the allegations contained in paragraph 2.

### THIRD DEFENSE

3. Plaintiff denies the allegations contained in paragraph 3.

### FOURTH DEFENSE

4. Plaintiff denies the allegations contained in paragraph 4.

### FIFTH DEFENSE

5. Plaintiff denies the allegations contained in paragraph 5.

FILED DATE: 5/2/2019 2:39 PM   2019L002426

## SIXTH DEFENSE

6. Plaintiff denies the allegations contained in paragraph 6.

## SEVENTH DEFENSE

7. Plaintiff denies the allegations contained in paragraph 7.

## EIGHT DEFENSE

8. Plaintiff denies the allegations contained in paragraph 8.

## NINTH DEFENSE

9. Plaintiff denies the allegations contained in paragraph 9.

## TENTH DEFENSE

10. Plaintiff denies the allegations contained in paragraph 10.

## ELEVENTH DEFENSE

11. Plaintiff denies the allegations contained in paragraph 11.

## TWELFTH DEFENSE

12. Plaintiff denies the allegations contained in paragraph 12.

## THIRTEENTH DEFENSE

13. Plaintiff denies the allegations contained in paragraph 13.

## FOURTEENTH DEFENSE

14. Plaintiff denies the allegations contained in paragraph 14.

## FIFTEENTH DEFENSE

15. Plaintiff denies the allegations contained in (a) and (b) of paragraph 15.

## SIXTEENTH DEFENSE

16. Plaintiff denies the allegations contained in paragraph 16.

FILED DATE: 5/2/2019 2:39 PM   2019L002426

## SEVENTEENTH DEFENSE

17. Plaintiff denies the allegations contained in paragraph 17.

## EIGHTEENTH DEFENSE

18. Plaintiff denies the allegations contained in paragraph 18.

## NINETEENTH DEFENSE

19. Plaintiff denies the allegations contained in paragraph 19.

## TWENTIETH DEFENSE

20. Plaintiff denies the allegations contained in paragraph 20.

## TWENTY-FIRST DEFENSE

21. Plaintiff denies the allegations contained in paragraph 21.

## TWENTY-SECOND DEFENSE

22. Plaintiff denies the allegations contained in paragraph 22.

## TWENTY-THIRD DEFENSE

23. Plaintiff denies the allegations contained in paragraph 23.

## TWENTY-FOURTH DEFENSE

24. Plaintiff denies the allegations contained in paragraph 24.

## TWENTY-FIFTH DEFENSE

25. Plaintiff denies the allegations contained in paragraph 25.

## TWENTY-SIXTH DEFENSE

26. Plaintiff denies the allegations contained in paragraph 26.

## TWENTY-SEVENTH DEFENSE

27. Plaintiff denies the allegations contained in paragraph 27.

## TWENTY-EIGHT DEFENSE

28. Plaintiff denies the allegations contained in paragraph 28.

Wherefore, plaintiff, ROBERT RAWSON, prays that this Honorable Court enter Judgement in his favor and against defendant, MONSANTO COMPANY, and deny the defendant any relief based on its affirmative defenses.

Respectfully submitted,

*Attorney for plaintiff*

DAVID J. GALLAGHER
**MOTHERWAY & NAPLETON, LLP**
140 S. Dearborn, Suite 1500
Chicago, IL 60603
(312) 726-2699
Attorney No: 56421
dgallagher@mnlawoffice.com

FILED DATE: 5/2/2019 2:39 PM   2019L002426

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

ROBERT RAWSON,                              )
                                            )
        Plaintiff,                          )
                                            )
-vs-                                        )        Case No.: 19 L 002426
                                            )
BAYER CORPORATION, a foreign                )
corporation, MONSANTO COMPANY, a            )
foreign corporation, and DUKE'S             )
HARDWARE, INC., a domestic                  )
corporation,                                )
                                            )
        Defendants.                         )

## HIPAA QUALIFIED PROTECTIVE ORDER

### Findings

This court explicitly finds that this court order is necessary to:

1.      Protect a party's right to privacy as guaranteed by article I, section 6 of the Illinois constitution for each party in this lawsuit;

2.      Ensure the parties' compliance with the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and its accompanying rules and regulations governing the disclosure, maintenance, use, and disposal of protected health information (PHI), see generally 45 C.F.R. §§ 160.103 & 164.501;

3.      Require covered entities, *see* 45 C.F.R. § 160.103, to disclose a party's PHI for use in this litigation without a separate disclosure authorization; however, nothing in the attached order relieves any covered entity, party, business associate, or their attorneys, attorneys' agents, representatives, or consultants, or various other witnesses, or other personnel who request, receive, or review documents containing PHI, from complying with the requirements of the following statutes and regulations:

        Mental Health and Developmental Disabilities Confidentiality Act, 740 ILCS 11011 - 17;

        AIDS Confidentiality Act, 410 ILCS 305/1 - 16;

        Alcoholism and Other Drug Abuse and Dependency Act, 20 ILCS 301/30-5 - 10;

Any federal statute or regulation protecting certain drug and alcohol records, *see*, *e.g.*, 42 U.S.C. §§ 290dd-3, 290ee-3; 42 C.F.R. Part 2;

Genetic Information Privacy Act, 410 ILCS 513/15 - 50; and

Any and all other applicable state and federal laws regulating or governing the disclosure, maintenance, use, and disposal of PHI.

4.      Permit insurance companies to receive PHI or what would otherwise be considered PHI from covered entities, business associates, and parties in litigation and to disclose, maintain, use, and dispose of PHI or what would otherwise be considered PHI in conformity with all applicable federal laws and regulations and the Illinois Insurance Code and its accompanying rules and regulations; and

5.      Further the interest of the State of Illinois in regulating the business of insurance.

## Stipulations

A party disclosing PHI explicitly stipulates that she or he:

1.      Read this court order before signing their name to be bound by it;

2.      Understands the contents of this court order;

3.      Stipulates to the entire contents of this court order;

4.      Understands that by refusing to consent to the contents of this court order, the court may impose sanctions up to and including the dismissal of the complaint.

## Order

BASED ON THESE FINDINGS, STIPULATIONS, AND THE SIGNATURE OF ANY PARTY CONSENTING TO THE LIMITED DISCLOSURE OF PHI AS STATED IN THIS DOCUMENT, THIS COURT ORDERS THE FOLLOWING:

1.      The PHI of any party in this lawsuit may not be disclosed for any reason without that party's prior written consent or an order of this court.

2.      A party who has disclosed PHI and agreed to the entry of this court order explicitly waives the right to privacy over the disclosed materials but only to the extent provided in this court order. The only disclosures explicitly waived and expressly permitted by this order are these:

A.      To insurance companies to disclose, maintain, use, and dispose of PHI or what would otherwise be considered PHI to comply and conform with current and future applicable federal and state statutes, rules, and regulations for these purposes:

2

1. Reporting; investigating; evaluating, adjusting, negotiating, arbitrating, litigating, or settling claims;

2. Compliance reporting or filing;

3. Conduct described in 215 ILCS 5/1014;

4. Required inspections and audits;

5. Legally required reporting to private, federal, or state governmental organizations, including health or medical insurance organizations, and to the Centers for Medicare and Medicaid Services (CMS);

6. Rate setting and regulation;

7. Statistical information gathering;

8. Underwriting, reserve, loss, and actuarial calculation;

9. Drafting policy language;

10. Workers' compensation; and

11. Determining the need for and procuring excess or umbrella coverage or reinsurance.

B. As ordered by this or another court or arbitral body or by subpoena with reasonable notice to the parties and their attorneys for purposes of subrogation, reimbursement, or payment of liens arising out of or related to this lawsuit;

C. To the parties to this lawsuit and their agents; and

D. As necessary to comply with any other federal or state laws, rules, or regulations, but only with the party's express consent and entry of an appropriate court order.

3. Any covered entity over which this court has jurisdiction that fails or refuses to disclose PHI in accordance with this court order may be subject to all sanctions authorized by the Code of Civil Procedure and the Illinois Supreme Court rules.

4. A party to this lawsuit may provide PHI to an undisclosed consulting expert or controlled expert witness as defined in Illinois Supreme Court Rule 213(f)(3) but only after receiving written acknowledgement that each such expert or witness agrees to be bound by the terms of this order.

3

5.    At the conclusion of this lawsuit, as indicated by a court entered order of dismissal, all parties and other persons or entities subject to this court order possessing PHI shall by agreement either return it to the party or non-party about whom it concerns or their attorney of record in this lawsuit or destroy it in compliance with 45 C.F.R. section § 164.512(e), such as by shredding, pulverizing, melting, incinerating, or degaussing. This provision does not apply to insurers that possess what would otherwise be considered PHI under HIPAA, but only to the extent as limited in paragraph 2, or to the party who disclosed PHI or her or his attorneys.

6.    Other than the party who disclosed PHI or that party's attorneys, no other parties or their agents are permitted to request, obtain, or disclose PHI or any other type of medical bills, records, or related information other than through the formal discovery procedures authorized by the Code of Civil Procedure, Illinois Supreme Court rules, and orders of this court.

7.    The parties are prohibited from including or attaching PHI to any document filed with the Clerk of the Circuit Court. PHI necessary for a court's consideration of any matter must be provided separately.

8.    This court retains jurisdiction to enforce the terms of this order after the conclusion of this litigation.

Dated: _5-13-19_                    _____
                                    Plaintiff or Legally Designated Representative

Dated: _05-16-19_                   _____
                                    Plaintiff's Attorney

Dated: _5-20-19_                    _____
                                    Defendant's Attorney  _For Monsanto_

                                    _____
                                    Circuit Court Judge

                                    _Associate Judge Moira S. Johnson_
                                    _MAY 21 2019_
                                    _Circuit Court - 1836_

MOTHERWAY & NAPLETON, LLP
140 S. Dearborn, Suite 1500
Chicago, IL 60603
(312) 726-2699
Attorney No. 56421

4

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT-LAW DIVISION

Rev. 5/14

Rawson
**Plaintiffs**

-v-

Monsanto Co, et al
**Defendants**

NO: 19 L 0426

Motion Call: "F" Time: 10:00 Line #: 10

2005 Trial Date: _____

## *CASE MANAGEMENT ORDER***

### **(Please check off all pertinent paragraphs and circle proper party name)****

**(4231)** X 2. Written, 213(f)(1), (f)(2) and 214 discovery to be **issued** by 7-15-19 *or deemed waived;*

**(4296)** _____ 3. Written, 213(f)(1), (f)(2) and 214 discovery to be **answered** by _____;

**(4218)** _____ 4. Party depositions, fact, 213(f)(1) and/or (2) depositions to be **completed** by _____;

**(4288)** _____ 5. Subpoenas for treating physicians' deps to be **issued** by _____ *or deemed waived;*

**(4218)** _____ 6. Treating physicians depositions to be **completed** by _____;

**(4206)** _____ 7. (Plaintiff) - (Defendant) - (Add. Party) shall **answer** 213 (f)(3) Interrogatories by _____

**(4218)** _____ 8. **Plaintiff's 213(f)(3)** witnesses' depositions to be **completed** by _____;

**(4218)** _____ 9. **Defendant's 213(f)(3)** witnesses' depositions to be **completed** by _____;

**(4218)** _____ 10. **Add. party's 213(f)(3)** witnesses' depositions to be **completed** by _____;

**(4295)** _____ 11. **All fact discovery, SCR 213(f)(1) and/or SCR 213(f)(2) discovery is closed.** *(Circle all applicable)*

**(4320)** X 12. The matter is continued for subsequent Case Management Conference on 8-19-19
**4619** at 10:00 AM/PM in Room 2208 for:

    (A)_____ Proper Service    (B)_____ Appearance of Defendants    (C)_____ Case Value
    (D)_____ Pleadings Status    (E)_____ Discovery Status    (F)_____ Pre-Trial/Settlement
    (G)_____ Mediation Status    (H)_____ Trial Certification    (I)_____ Other

Subpoena Medical records to be requested by 7-15-19
started to be

**(2005)** _____ 13. Case is DWP'd.    **(4040)** _____ The case is voluntarily dismissed pursuant to 735 ILCS 5/2-1009.

**(4331)** _____ 14. Case stricken from    **(4284)** _____ Motion Stricken or    **(4330)** _____ Case stricken from
     CMC Call                    Withdrawn from Call             Motion Call.

NAME: Motherway & Napleton
ADDRESS: 140 S Dearborn
PHONE: 726-0099
ATTY ID#: Scott
ATTY FOR PARTY: Plaintiff

**ENTER:**

JUL - 1 2019

Associate Judge John S. Jordan
Circuit Court - 1836

JUDGE

NOTICE:

COPIES OF ALL PRIOR CMC ORDERS MUST BE BROUGHT TO ALL CMC COURT DATES.

FAILURE OF ANY PARTY TO COMPLY WITH THIS CMC ORDER WILL BE A BASIS FOR SCR 219(C) SANCTIONS. FAILURE OF ANY PARTY TO ENFORCE THIS CMC ORDER WILL CONSTITUTE

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT-LAW DIVISION

Rev. 3/18

Dawson
_____ ,
**Plaintiffs**

-v-

Morento et al
_____ ,
**Defendants**

NO: 2019 L

Motion Call: "F  Time: _____  Line #: 10

2005 Trial Date: N/A

## **CASE MANAGEMENT ORDER**

### **(Please check off all pertinent paragraphs and circle proper party name)**

(4231) _____ 1. Written, 213(f)(1), (f)(2) and 214 discovery to be **issued** by _____ **or deemed waived;**

(4296) __X__ 2. Written, 213(f)(1), (f)(2) and 214 discovery to be **answered** by 9-3-19

(4218) _____ 3. Party depositions, fact, 213(f)(1) and/or (2) depositions to be **completed** by _____;

(4297) _____ 4. Plaintiff to send list & addresses of treaters and HIPAA order to Defendant(s) by _____;

(4288) _____ 5. Subpoenas for treating physicians' records/deps to be **issued** by _____ **or deemed waived;**

(4218) _____ 6. Treating physicians depositions to be **completed** by _____;

(4231) _____ 7. All dispositive motions shall be filed **no later than** _____;

(4296) _____ 8. All SCR 215 & 216 discovery **completed** by _____;

(4206) _____ 9. (Plaintiff) - (Defendant) - (Add. Party) shall **answer** 213 (f)(3) Interrogatories by _____;

(4218) _____ 10. **Plaintiff's 213(f)(3)** witnesses' depositions to be **completed** by _____;

(4218) _____ 11. **Defendant's 213(f)(3)** witnesses' depositions to be **completed** by _____;

(4218) _____ 12. **Add. party's 213(f)(3)** witnesses' depositions to be **completed** by _____;

(4295) _____ 13. **All fact discovery, SCR 213(f)(1), (f)(2), 215(a) and 216 discovery is closed.** *(Circle all applicable)*

(4619) __X__ 14. The matter is continued for subsequent Case Management Conference on 10-7-19
at 10:00 AM/PM in Room 2201
  (A)_____ Proper Service    (B)_____ Appearance of Defendants    (C)_____ Case Value
  (D)_____ Pleadings Status    (E)__X__ Discovery Status    (F)_____ Pre-Trial/Settlement
  (G)_____ Mediation Status    (H)_____ Trial Certification    (I)__X__ Other
  all served Subpoenas remain in effect

(4005) _____ 15. Case is DWP'd.    (4040) _____ The case is voluntarily dismissed pursuant to 735 ILCS 5/2-1009.

(4331) _____ 16. Case stricken from    (4284) _____ Motion Stricken or    (4330) _____ Case stricken from
    CMC Call        Withdrawn from Call       Motion Call.

NAME: _____
ADDRESS: _____
PHONE: _____
ATTY ID#: _____
ATTY FOR PARTY: _____
NOTICE: _____

**E N T E R :**

Associate Judge Moira S. Johnson NO:
AUG 19 2019
Circuit Court - 1830

**J U D G E**

★ **COPIES OF ALL PRIOR CMC ORDERS MUST
BE BROUGHT TO ALL CMC COURT DATES.**

★ **FAILURE OF ANY PARTY TO COMPLY WITH**

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

| | |
|---|---|
| ROBERT RAWSON,<br><br>                    Plaintiff,<br><br>*v.*<br><br>BAYER CORPORATION; MONSANTO COMPANY; and DUKE'S HARDWARE, INC.,<br><br>                    Defendants. | No.:  2019L002426 |

### DUKE'S HARDWARE, INC.'S ANSWER AND
### AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT AT LAW

Defendant Duke's Hardware, Inc. ("Duke's"), by and through its counsel, respectfully responds by generally denying all allegations contained in plaintiff's Complaint, except as set forth below.  Although many paragraphs in the Complaint refer to "Plaintiffs," Duke's nevertheless responds to the allegations in those paragraphs as if brought by plaintiff Robert Rawson.  Silence as to any allegations shall constitute a denial.

### I.    THE PARTIES

#### Plaintiff

1.      Plaintiff Robert Rawson is and was at all relevant times a resident of Cook County, Illinois.  He and his family purchased and used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") from approximately 1974 through 2018 on his one acre property in Palos Park, Illinois.

ANSWER:   Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 1 and therefore denies those allegations.

#### Defendants

2.      Defendant Bayer Corporation ("Bayer") is a multinational corporation doing

**EXHIBIT C**

business throughout the United States, including Cook County, Illinois that is incorporated in Indiana, with its headquarters and principal place of business in Whippany, New Jersey.

ANSWER:  The allegations in paragraph 2 do not require a response from Duke's because these allegations relate to Bayer Corporation, not Duke's.

3.      Defendant Monsanto Company ("Monsanto") is a multinational corporation doing business throughout the United States, including Cook County, Illinois that is incorporated in Delaware, with its headquarters and principal place of business in St. Louis, Missouri.

ANSWER:  The allegations in paragraph 3 do not require a response from Duke's because these allegations relate to Monsanto, not Duke's.

4.      On June 07, 2018 Bayer acquired Monsanto.

ANSWER:  The allegations in paragraph 4 do not require a response from Duke's because these allegations relate to other defendants, not Duke's.

5.      Defendant Duke's Hardware, Inc., ("Duke's") is a domestic corporation, with its headquarters and principal place of business in Cook County, Illinois.

ANSWER:  Duke's admits the allegations in paragraph 5.

6.      At all times relevant to this complaint, Duke's operated a Duke's Ace Hardware store at 7610 W. 11th Street, Palos Hills, Illinois which sold Roundup® to the Plaintiff and his family from approximately 1974 to 2018.

ANSWER:  Duke's denies the allegations in paragraph 6.

7.      At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and was the manufacturer of Roundup®.

ANSWER:  The allegations in paragraph 7 do not require a response from Duke's because these allegations relate to Monsanto, not Duke's.

II.   **INTRODUCTION**

8.      In 1970, Defendant Monsanto Company, Inc. discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under brand name Roundup®.

Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in America agriculture with 85-90 millions of pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

ANSWER: The allegations in the first sentence of paragraph 8 do not require a response from Duke's because these allegations relate to Monsanto, not Duke's. Duke's admits the allegations in the second sentence of paragraph 8. Duke's lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 8 and therefore denies those allegations.

9.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

ANSWER: The allegations in the first three sentences of paragraph 9 do not require a response from Duke's because these allegations relate to Monsanto, not Duke's. Duke's lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 9 and therefore denies those allegations.

10.     Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agriculture workers, and even in the urine of urban dwellers whom are not in direct contact with glyphosate.

ANSWER: Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 10 and therefore denies those allegations.

3

11.     On March 20, 2015, the International Agency for Research on Cancer ("IARC"),
an agency of the World Health Organization ("WHO"), issued an evaluation of several
herbicides, including glyphosate.  That evaluation was based, in part, on studies of exposures to
glyphosate in several countries around the world, and it traces health implications from exposure
to glyphosate since 2001.

ANSWER:  Duke's lacks information or knowledge sufficient to form a belief as to the
truth of the allegations in paragraph 11 and therefore denies those allegations.

12.     On July 29, 2015, IARC issued the formal monograph relating to glyphosate.  In
that monograph, the IARC Working Group provides a thorough review of the numerous studies
and data relating to glyphosate exposure in humans.

ANSWER:  Duke's lacks information or knowledge sufficient to form a belief as to the
truth of the allegations in paragraph 12 and therefore denies those allegations.

13.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which
means that it is probably carcinogenic to humans. The IARC Working Group concluded that the
cancers  most  associated  with  glyphosate  exposure  are  non-Hodgkin  lymphoma  and  other
haematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell
lymphoma, and multiple myeloma.

ANSWER:  Duke's lacks information or knowledge sufficient to form a belief as to the
truth of the allegations in paragraph 13 and therefore denies those allegations.

14.     The IARC evaluation is significant.  It confirms what has been believed for years:
that glyphosate is toxic to humans.

ANSWER:  Duke's denies the allegations in paragraph 14.

15.     Nevertheless, Monsanto, since it began selling Roundup®, has represented it as
safe to humans and the environment.  Indeed, Monsanto has repeatedly proclaimed and continues
to proclaim to the world, and particularly to United States consumers, that glyphosate based

4

herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

ANSWER: The allegations in paragraph 15 do not require a response from Duke's because these allegations relate to Monsanto, not Duke's.

## III.   JURISDICTION AND VENUE

16.     Jurisdiction is proper pursuant to 735 ILCS 5/2-209 as at all times relevant hereto, Monsanto was in the business of researching, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, labeling, packaging, marketing, promoting, and/or advertising Roundup® products in the throughout the United States including in Cook County, Illinois.

ANSWER: The allegations in paragraph 16 set forth conclusions of law for which no response is required.

17.     At all times relevant hereto, Monsanto was a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri, who routinely conducted business in Cook County, Illinois.

ANSWER: The allegations in paragraph 17 do not require a response from Duke's because these allegations relate to Monsanto, not Duke's.

18.     Duke's is a domestic corporation with its headquarters and principal place of business in Cook County, Illinois, making it a resident of Cook County pursuant to 735 ILCS 5/2-102, who routinely conducts business in Cook County, Illinois.

ANSWER: Duke's admits the allegations in paragraph 18.

19.     Plaintiff has timely filed this lawsuit less than two years from the time the Plaintiff knew or reasonably should have known of the injury and that it may have been wrongly caused.

ANSWER: In response to the allegations in paragraph 19, Duke's denies that plaintiff's injuries were caused by exposure to glyphosate-based herbicides and denies that Duke's

"wrongfully caused" those injuries.  The remaining allegations in paragraph 19 set forth conclusions of law for which no response is required.  To the extent that a response is deemed required, Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations regarding plaintiff's actual or potential knowledge and therefore denies those allegations.

20.     Pursuant to 735 ILCS 512-101, venue is proper within this Court because Defendant Duke's is a resident of Cook County, and because Plaintiff was diagnosed and treated for his cancer in Cook County, and the Defendants do business and advertise in this county.

ANSWER:  The allegations in paragraph 20 set forth conclusions of law for which no response is required.

## IV.    FACTS

21.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

ANSWER:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 21 and therefore denies those allegations.

22.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis.  Treated plants generally die within two to three days.  Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

ANSWER:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 22 and therefore denies those allegations.

23.     For nearly 40 years, farms across the world have used Roundup[®] without knowing of the dangers its use poses.  That is because when Monsanto first introduced Roundup[®], it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment.  Of course, history has shown that not to be true.  According to the WHO, the main chemical ingredient of Roundup[®]—

6

glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Agricultural workers are, once again, victims of corporate greed. Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® was safe.

ANSWER: The allegations in the second, third, sixth, seventh, eighth, and last sentences of paragraph 23 do not require a response from Duke's because these allegations relate to Monsanto, not Duke's. Duke's denies the remaining allegations in paragraph 23.

**The Discovery of Glyphosate and Development of Roundup®**

24.     The herbicidal properties of the glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use. Monsanto still markets Roundup® as safe today.

ANSWER:  The allegations in paragraph 24 do not require a response from Duke's because these allegations relate to Monsanto, not Duke's.

**Registration of Herbicides under Federal Law**

25.     The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § l36a(a).

ANSWER:  The allegations in paragraph 25 set forth conclusions of law for which no response is required.

26. Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

ANSWER: The allegations in paragraph 26 set forth conclusions of law for which no response is required.

27. FIFRA defines "unreasonable adverse effects the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

ANSWER: The allegations in paragraph 27 set forth conclusions of law for which no response is required.

28. The EPA registered Roundup® for distribution, sale, and manufacture in the United States and the State of Illinois.

ANSWER: Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 28 and therefore denies those allegations.

29. FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for

review and evaluation.  The government is not required, not is it able, however, to perform the products tests that are required of the manufacturer.

ANSWER:  The allegations in paragraph 29 do not require a response from Duke's because these allegations relate to Monsanto, not Duke's.

30.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product initially registered.  The data necessary for registration of a pesticide has changed over time.  The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration" 7 U.S.C. § I 36al.  In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

ANSWER:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 30 and therefore denies those allegations.

31.     In the case of glyphosate, and therefore Roundup®, the EPA has planned on releasing its preliminary risk assessment—in relation to the re-registration process—no later than July 2015.  The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

ANSWER:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 31 and therefore denies those allegations.

***Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®***

32.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985.  After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer:  "It should be emphasized, however, that designation of an agent

9

in Group E is based on the available evidence at the time of elevation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

ANSWER: Certain allegations in paragraph 32 do not require a response from Duke's because these allegations relate to Monsanto, not Duke's. Duke's lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 32 and therefore denies those allegations.

33. On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration proposes committed fraud.

ANSWER: The allegations in paragraph 33 do not require a response from Duke's because these allegations relate to Monsanto, not Duke's.

34. In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories (IBT) to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies to register Roundup®.

ANSWER: The allegations in paragraph 34 do not require a response from Duke's because these allegations relate to Monsanto, not Duke's.

35. In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

ANSWER: Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 35 and therefore denies those allegations.

36. Three top executives of IBT were convicted of fraud in 1983.

10

ANSWER:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 36 and therefore deny those allegations.

37.    In the second incident of dada falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including Roundup®.  In that same year, the owner of Craven laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

ANSWER:  The allegations in the first sentence of paragraph 37 do not require a response from Duke's because these allegations relate to Monsanto, not Duke's.  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 37 and therefore deny those allegations.

38.    Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

ANSWER:  The allegations in paragraph 38 do not require a response from Duke's because these allegations relate to Monsanto, not Duke's.

### The Importance of Roundup® to Monsanto's Market Dominance and Profits

39.    The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly.  But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

ANSWER:  The allegations in paragraph 39 do not require a response from Duke's because these allegations relate to Monsanto, not Duke's.

40.    In response, Monsanto began the development and sales of genetically engineered Roundup Ready® seeds in 1996.  Since Roundup Ready® crops are resistant to glyphosate; farmers can spray Roundup® onto their fields during the growing season without harming the crop.  This allowed Monsanto to expand its market for Roundup® even further; by 2000,

11

Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted for Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

ANSWER: The allegations in paragraph 40 do not require a response from Duke's because these allegations relate to Monsanto, not Duke's.

41. Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

ANSWER: The allegations in paragraph 41 do not require a response from Duke's because these allegations relate to Monsanto, not Duke's. To the extent a response is deemed required, Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 41 and therefore denies those allegations.

***Monsanto has known for decades that it falsely advertises the safety of Roundup®***

42. In 1996, the New York Attorney general ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a) Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences.

12

b)       And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c)       Roundup biodegrades into naturally occurring elements.

d)       Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e)       This non-residual herbicide will not wash or leach in the soil. It … stays where you apply it.

f)       You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g)       Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h)       Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i)       You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j)       "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

<u>ANSWER</u>:  The allegations in paragraph 42 do not require a response from Duke's because these allegations relate to Monsanto, not Duke's.

13

43. November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk. * * *

b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable * * *

c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means. * * *

d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics." * * *

e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic.

ANSWER:  The allegations in paragraph 43 do not require a response from Duke's because these allegations relate to Monsanto, not Duke's.

44. Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

ANSWER:  The allegations in paragraph 44 do not require a response from Duke's because these allegations relate to Monsanto, not Duke's.

45. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®.  The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

14

ANSWER:  The allegations in paragraph 45 do not require a response from Duke's because these allegations relate to Monsanto, not Duke's.

### Classifications and Assessments of Glyphosate

46.     The IARC process for the classification of glyphosate followed the stringent procedures for the evaluations of a chemical agent.  Over time, the IARC Monograph program has reviewed 980 agents.  Of those reviewed, it has determined 116 agents to be Group I (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to the probably Not Carcinogenic.

ANSWER:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations asserted in paragraph 46 and therefore denies those allegations.

47.     The established procedure for IARC Monograph evaluations described in the IARC Programme's Preamble.  Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

ANSWER:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 47 and therefore denies those allegations.

48.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts.  Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members.  One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment.  Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation.  Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in

Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

ANSWER: Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 48 and therefore denies those allegations.

49.     In assessing an agent, the IARC Working Group reviews the following information:

(a)     human, experimental, and mechanistic data;

(b)     all pertinent epidemiological studies and cancer bioassays; and

(c)     representative mechanistic data.  The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

ANSWER: Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 49 and therefore denies those allegations.

50.     In March 2015, IARC reassessed glyphosate.  The summary published in The Lancet Oncology reported that glyphosate is a group 2A agent and probably carcinogenic to humans.

ANSWER: Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 50 and therefore denies those allegations.

51.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3-10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate.  The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence.  According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly

16

available scientific literature" as well as "data from governmental reports that are publicly available."

ANSWER:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 51 and therefore denies those allegations.

52.    The studies considered the following exposure groups: occupational exposure of farmers and tree nursey workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

ANSWER: Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 52 and therefore denies those allegations.

53.    Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

ANSWER:  Duke's lacks information or knowledge sufficient to forma  belief as to the truth of the allegations in paragraph 53 and therefore denies those allegations.

54.    Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to the glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

ANSWER:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 54 and therefore denies those allegations.

55.    The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden.  These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

ANSWER:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 55 and therefore denies those allegations.

56.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

ANSWER:   Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 56 and therefore denies those allegations.

57.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

ANSWER:   Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 57 and therefore denies those allegations.

58.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma.  A second study reported a positive trend for haemangiosarcoma in male mice.  Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies.  A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

ANSWER:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 58 and therefore deny those allegations.

59.     IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indication absorption.  Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

ANSWER:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 59 and therefore denies those allegations.

60.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

18

ANSWER:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 60 and therefore denies those allegations.

61.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

ANSWER:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 61 and therefore deny those allegations.

62.     The IARC Working Group also reviewed an Agricultural Health Study (AHS), consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.  While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

ANSWER:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 62 and therefore denies those allegations.

63.     In an article published on November 09, 2017 in the Journal of the National Cancer Institute updating the results of Glyphosate use and cancer incidence in the Agricultural Health Study a link was determined to exist between Glyphosate exposure and AML.

ANSWER:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 63 and therefore denies those allegations.

64.     In a review published on February 10, 2019 in Science Direct titled Exposure to Glyphosate-Based Herbicides and Risk for Non-Hodgkin Lymphoma:  A Meta-Analysis and Supporting Evidence, a compelling link between exposures to GBHs and increased risk for NHL was noted.

ANSWER:   Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 64 and therefore denies those allegations.

***Other Earlier Findings About Glyphosate's Dangers to Human Health***

65.    The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate.  This technical fact sheet predates the IARC March 20, 2015, evaluation.  The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

> Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites.  These sites may be around water and in wetlands.  It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills.  Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not are not available.  Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup.  They may also be exposed by touching soil and plants to which glyphosate was applied.  Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

ANSWER:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 65 and therefore denies those allegations.

66.    In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticides-caused illness, glyphosate was third most commonly-reported cause of pesticide illness among agricultural workers.

20

<u>ANSWER</u>:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 66 and therefore denies those allegations.

*Recent Worldwide Bans on Roundup®/Glyphosate*

67.     Several countries around the world have instituted bans the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in light of the as the dangers of use of Roundup® are more widely known.  The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which takes effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated:  "Agricultural pesticides in user-friendly packing are sold in abundance to private persons.  In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are.  Especially children are sensitive to toxic substances and should therefore not be exposed to it."

<u>ANSWER</u>:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 67 and therefore denies those allegations.

68.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

<u>ANSWER</u>:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 68 and therefore denies those allegations.

69.     France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

<u>ANSWER</u>:  Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 69 and therefore denies those allegations.

70.     Bermuda banned both the private and commercial sale of glyphosates, including Roundup®.  The Bermuda government explained its ban as follows:  "Following a recent

21

scientific study carried out by a leading cancer agency, they importation of weed spray 'Roundup' has been suspended."

ANSWER: Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 70 and therefore denies those allegations.

71. The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that Glycoside has been linked to fatal kidney disease in agricultural workers.

ANSWER: Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 71 and therefore denies those allegations.

72. The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

ANSWER: Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 72 and therefore denies those allegations.

***Plaintiff's Exposure to Roundup®***

73. Plaintiff Robert Rawson used Roundup extensively on his one acre property from approximately 1974 through 2018. He applied the herbicide himself on his grass and his driveway. Mr. Rawson was unaware of Roundup's carcinogenic properties until it was far too late; he was diagnosed with extranodal marginal zone lymphoma (MALT) a type of non-Hodgkin Lymphoma (NHL) on February 01, 2013. Mr. Rawson had no reason to believe or suspect that his NHL was caused by his use of Roundup until he saw an advertisement on television in June of 2018 advertising the link between Roundup exposure and NHL.

ANSWER: In response to the allegations in paragraph 73, Duke's denies that any exposure to Roundup®-branded products can cause NHL and also denies that Roundup®-branded products have carcinogenic properties. Duke's lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 73 and therefore denies those allegations.

## V. CLAIMS

### COUNT I
### STRICT LIABILITY (DESIGN DEFECT) (AGAINST BAYER)

74.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

ANSWER:  Count I (paragraphs 74-92) is directed at Bayer Corporation and does not require any responses from Duke's.

75.     Plaintiff brings this strict liability claim against Bayer as the parent company of Monsanto for defective design.

76.     At all times relevant to this litigation, Bayer by and through Monsanto engaged in the business of testing, developing, manufacturing, selling, distributing, marketing, packaging designing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce.  These actions were under the ultimate control and supervision of Bayer by and through its subsidiary Monsanto.  At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by the Plaintiff, as described above.

77.     At all times relevant to this litigation, Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff.

78.     At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Illinois and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

23

79. Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

80. Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

81. At all times relevant to this action, Monsanto knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

82. Therefore, at all times relevant to this litigation, Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Monsanto were defective in design and formulation, in one or more of the following ways:

(a) When placed in the stream of commerce, Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

(b) When placed in the stream of commerce, Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

(c)     When placed in the stream of commerce, Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

(d)     Monsanto did not sufficiently test, investigate, or study Roundup® products and, specifically, the active ingredient glyphosate.

(e)     Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

(f)     At the time of marketing its Roundup® products, Roundup® was defective in that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

(g)     Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products.

(h)     Monsanto could have employed safer alternative designs and formulations.

83.     Plaintiff was exposed to Roundup® products in the course of his home maintenance, as described above, without knowledge of their dangerous characteristics.

84.     At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

85.     Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

86.     The harm caused by Roundup® products far outweighed their benefit, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate.  Roundup® products were and are more dangerous than alternative products and

Monsanto could have designed Roundup® products (including their packaging and sales aids) to make them less dangerous. Indeed, at the time that Monsanto designed Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

87.     At the time Roundup® products left Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of those herbicides.

88.     Monsanto's defective design of Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including the Plaintiff.

89.     Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Bayer by and through its subsidiary Monsanto is strictly liable to the Plaintiff.

90.     The defects in Roundup® products caused or contributed to cause Plaintiff's grave injuries, and, but for Monsanto's misconduct and omissions, Plaintiff would not have sustained the NHL which required him to receive treatment at several hospitals in Cook County, Illinois.

91.     Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including the Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public.  Monsanto made conscious decisions not to redesign, warn or inform the unsuspecting public.  Monsanto's reckless conduct warrants an award of aggravated damages.

92.     As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave

injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

WHEREFORE, the Plaintiff Robert Rawson respectfully requests that this Honorable Court enter judgement in his favor and against Defendant Bayer for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## COUNT II
## STRICT LIABILITY (FAILURE TO WARN) (AGAINST BAYER)

93.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

ANSWER:  Count II (paragraphs 93-113) is directed at Bayer Corporation and does not require any responses from Duke's.

94.     Plaintiff brings this strict liability claim against Bayer as the parent company of Monsanto for failure to warn.

95.     At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate.  These actions were under the ultimate control and supervision of Monsanto.

96.     Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce Roundup® products, and in the course of same, directly advertised or marketed the

27

products to consumers and end users, including the Plaintiff, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

97. At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn the Plaintiff of the dangers associated with Roundup® use and exposure. Monsanto, as manufacturer, seller, promoter, marketer, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

98. At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

99. At all times relevant to this litigation, Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by these herbicides, including the Plaintiff.

100. Despite the fact that Monsanto knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of these products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or scientifically knowable to Monsanto through appropriate research and testing by known methods, at the time they distributed, marketed, promoted, supplied or sold the product, and not known to end users and consumers, such as the Plaintiff.

101.    These products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products.  Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

102.    At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Illinois and throughout the United States, including the Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, promoted and marketed by Monsanto.

103.    The Plaintiff was exposed to Roundup® products in the course of his personal use on his one acre property, without knowledge of their dangerous characteristics.

104.    At all times relevant to this litigation, the Plaintiff used and/or was exposed to the use of Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

105.    The Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of the Plaintiff's exposure.  The Plaintiff relied upon the skill, superior knowledge, and judgment of Monsanto.

106.    These products were defective because the minimal warnings disseminated with Roundup® products were inadequate, and they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were

appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and landscaping applications.

107.    The information that Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as the Plaintiff to utilize the products safely and with adequate protection.  Instead, Monsanto disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

108.    To this day, Monsanto has failed to adequately and accurately warn of the true risks of the Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

109.    As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed, marketed, and promoted by Monsanto, and used by the Plaintiff in his home maintenance.

110.    Bayer as the parent company of Monsanto is liable to the Plaintiff for injuries caused by their negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of these products and the risks associated with the use of or exposure to Roundup® and glyphosate.

111.    The defects in Roundup® products caused or contributed to cause the Plaintiff s injuries, and, but for this misconduct and omissions, the Plaintiff would not have sustained his injuries.

112.    Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products, Plaintiff could have avoided the risk of developing injuries as alleged herein.

113.    As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

WHEREFORE, the Plaintiff Robert Rawson respectfully requests that this Honorable Court enter judgement in his favor and against Defendant Bayer for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## COUNT III
## NEGLIGENCE (AGAINST BAYER)

114.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

ANSWER:  Count III (paragraphs 114-129) is directed at Bayer Corporation and does not require any responses from Duke's.

115.    Monsanto, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by the Plaintiff.

116.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion,

packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

117. At all times relevant to this litigation, Monsanto s had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

118. At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

119. Accordingly, at all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with the Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including the Plaintiff.

120. Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

121. As such, Monsanto breached the duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Monsanto manufactured, marketed, promoted, and sold defective herbicides containing the

chemical glyphosate, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

122.    Despite an ability and means to investigate, study, and test these products and to provide adequate warnings, Monsanto has failed to do so. Indeed, Monsanto has wrongfully concealed information and has further made false and/or misleading statements concerning the safety of exposure to Roundup® and glyphosate.

123.    Monsanto was negligent in the following respects:

(a)    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

(b)    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

(c)    Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

(d)    Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

(e)     Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

(f)     Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Monsanto could reasonably foresee would use and be exposed to its Roundup® products;

(g)     Failing to disclose to the Plaintiff, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

(h)     Failing to warn the Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to the Plaintiff and other consumers;

(i)     Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

(j)     Representing that its Roundup® products were safe for their intended use when, in fact, Monsanto knew or should have known that the products were not safe for their intended purpose;

(k)     Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

(1)     Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

(m)     Continuing to disseminate information to its consumers, which indicate or imply that Monsanto's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

(n)     Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

124.    Monsanto knew and/or should have known that it was foreseeable that consumers such as the Plaintiff would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup®.

125.    The Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

126.    Monsanto's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiffs suffered, as described herein.

127.    Monsanto's conduct, as described above, was reckless. Monsanto regularly risked the lives of consumers and users of their products, including the Plaintiff's, with full knowledge of the dangers of these products.  Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including the Plaintiff. Monsanto's reckless conduct therefore warrants an award of aggravated or punitive damages.

128.    As a proximate result of Monsanto's wrongful acts and omissions in placing defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff has suffered and continues to suffer grave injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

129.    On June 07, 2018 Bayer acquired Monsanto and as such is liable for the prior acts and omissions of Monsanto.

WHEREFORE, the Plaintiff Robert Rawson respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Bayer for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

**COUNT IV**
**STRICT LIABILITY (DESIGN DEFECT) (AGAINST MONSANTO)**

74.    Plaintiff incorporates by reference each and every allegations set forth in the preceding paragraphs stated herein.

ANSWER:  Count IV (paragraphs 130-148) is directed at Monsanto Company and does not require any responses from Duke's.

75.    Plaintiff brings this strict liability claim Monsanto for defective design.

76.    At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, manufacturing, selling, distributing, marketing, packaging, designing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products, into the stream of commerce.  These actions were under the ultimate control and supervision of Monsanto. At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by the Plaintiff, as described above.

77.    At all times relevant to this litigation, Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or expose to the public, and in particular, the Plaintiff.

78.  At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and other persons coming into contact with these products in Illinois and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

79.  Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left hands of the manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

80.  Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufactures and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

81.  At times relevant to this action, Monsanto knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

82.  Therefore, at times relevant to this ligation, Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Monsanto were defective in design and formulation, in one or more of the following ways:

(a)  When placed in the stream of commerce, Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

(b)     When placed in the stream of commerce, Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

(c)     When placed in the stream of commerce, Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

(d)     Monsanto did not sufficiently test, investigate, or study Roundup® products and, specifically, the active ingredient glyphosate.

(e)     Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

(f)     At the time of marketing its Roundup® products, Roundup® was defective in that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

(g)     Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products.

(h)     Monsanto could have employed safer alternative designs and formulations.

83.     Plaintiff was exposed to Roundup® products in the course of his home maintenance, as described above, without knowledge of their dangerous characteristics.

84.     At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

85.     Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

86.     The harm caused by Roundup® products far outweighed their benefit, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate. Roundup® products were and are more dangerous than alternative products and Monsanto could have designed Roundup® products (including their packaging and sales aids) to make them less dangerous. Indeed, at the time that Monsanto designed Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

87.     At the time Roundup® products left Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of those herbicides.

88.     Monsanto's defective design of Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including the Plaintiff.

89.     Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Monsanto is strictly liable to the Plaintiff.

90.     The defects in Roundup® products caused or contributed to cause Plaintiff's grave injuries, and, but for Monsanto's misconduct and omissions, Plaintiff would not have sustained the NHL which required him to receive treatment at several hospitals in Cook County, Illinois.

91.     Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including the Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public.  Monsanto made conscious decisions not to redesign, warn

39

or inform the unsuspecting public. Monsanto's reckless conduct warrants an award of aggravated damages.

92. As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

WHEREFORE, the Plaintiff Robert Rawson respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Monsanto for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

**COUNT V**
**STRICT LIABILITY (FAILURE TO WARN) (AGAINST MONSANTO)**

93. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

<u>ANSWER</u>: Count V (paragraphs 149-169) is directed at Monsanto Company and does not require any responses from Duke's.

94. Plaintiff brings this strict liability claim against Monsanto for failure to warn.

95. At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Monsanto.

40

96.     Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiff, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

97.     At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn the Plaintiff of the dangers associated with Roundup® use and exposure.  Monsanto, as manufacturer, seller, promoter, marketer, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

98.     At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

99.     At all times relevant to this litigation, Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by these herbicides, including the Plaintiff.

100.     Despite the fact that Monsanto knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure.  The dangerous propensities of these products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or

scientifically knowable to Monsanto through appropriate research and testing by known methods, at the time they distributed, marketed, promoted, supplied or sold the product, and not known to end users and consumers, such as the Plaintiff.

101. These products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

102. At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Illinois and throughout the United States, including the Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, promoted and marketed by Monsanto.

103. The Plaintiff was exposed to Roundup® products in the course of his personal use on his one acre property, without knowledge of their dangerous characteristics.

104. At all times relevant to this litigation, the Plaintiff used and/or was exposed to the use of Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

105. The Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of the Plaintiff's exposure. The Plaintiff relied upon the skill, superior knowledge, and judgment of Monsanto.

106.     These products were defective because the minimal warnings disseminated with Roundup® products were inadequate, and they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and landscaping applications.

107.     The information that Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as the Plaintiff to utilize the products safely and with adequate protection.   Instead, Monsanto disseminated information that was inaccurate, false, and misleading and which failed to communicate  accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

108.     To this day, Monsanto has failed to adequately and accurately warn of the true risks of the Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

109.     As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed, marketed, and promoted by Monsanto, and used by the Plaintiff in his work.

110.     Monsanto is liable to the Plaintiff for injuries caused by their negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information

and data regarding the appropriate use of these products and the risks associated with the use of or exposure to Roundup® and glyphosate.

111. The defects in Roundup® products caused or contributed to cause the Plaintiff's injuries, and, but for this misconduct and omissions, the Plaintiff would not have sustained his injuries.

112. Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products, Plaintiff could have avoided the risk of developing injuries as alleged herein.

113. As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

WHEREFORE, the Plaintiff Robert Rawson respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Monsanto for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT VI
## NEGLIGENCE (AGAINST MONSANTO)

114. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

ANSWER: Count VI (paragraphs 170-184) is directed at Monsanto Company and does not require any responses from Duke's.

115. Monsanto, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by the Plaintiff.

116.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

117.    At all times relevant to this litigation, Monsanto s had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

118.    At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

119.    Accordingly, at all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with the Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including the Plaintiff.

120.    Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

121.    As such, Monsanto breached the duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply,

promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Monsanto manufactured, marketed, promoted, and sold defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

122.    Despite an ability and means to investigate, study, and test these products and to provide adequate warnings, Monsanto has failed to do so.  Indeed, Monsanto has wrongfully concealed information and has further made false and/or misleading statements concerning the safety of exposure to Roundup® and glyphosate.

123.    Monsanto was negligent in the following respects:

(a)    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup®-products without thorough and adequate pre- and post-market testing;

(b)    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

(c)    Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

46

(d)     Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

(e)     Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

(f)     Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Monsanto could reasonably foresee would use and be exposed to its Roundup® products;

(g)     Failing to disclose to the Plaintiff, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

(h)     Failing to warn the Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to the Plaintiff and other consumers;

(i)     Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

(j)     Representing that its Roundup® products were safe for their intended use when, in fact, Monsanto knew or should have known that the products were not safe for their intended purpose;

(k)     Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

(1)     Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

(m)     Continuing to disseminate information to its consumers, which indicate or imply that Monsanto' s Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

(n)     Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

124.     Monsanto knew and/or should have known that it was foreseeable that consumers such as the Plaintiff would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup®.

125.     The Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

126.     Monsanto's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiffs suffered, as described herein.

127.     Monsanto's conduct, as described above, was reckless. Monsanto regularly risked the lives of consumers and users of their products, including the Plaintiff's, with full knowledge of the dangers of these products.  Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including the Plaintiff.  Monsanto's reckless conduct therefore warrants an award of aggravated or punitive damages.

128.     As a proximate result of Monsanto's wrongful acts and omissions in placing defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff has suffered and continues to suffer

grave injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

WHEREFORE, the Plaintiff Robert Rawson respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Monsanto for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT VII
## NEGLIGENCE (AGAINST DUKE'S)

185.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

ANSWER:    Duke's incorporates by reference its responses to paragraphs 1 through 184 in response to paragraph 185 of plaintiff's Complaint.

186.    Duke's promoted, marketed, distributed and sold Roundup® products to the Plaintiff that were in fact used by the Plaintiff.

ANSWER:    Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 186 regarding the specific products allegedly used by plaintiff or any advertising or marketing allegedly seen or considered by plaintiff and therefore denies the allegations in paragraph 186.

187.    At all times relevant herein the Roundup® products promoted, marketed, distributed and sold to the Plaintiff were defective.

ANSWER:    Duke's denies the allegations in paragraph 187.

188.    Duke's owed a duty to the Plaintiff to exercise ordinary care in the promotion, marketing, distribution, and sale, of the Roundup® products it sold to the Plaintiff between 1974 and 2018.

ANSWER:    The allegations in paragraph 188 set forth conclusions of law for which no response is required.

189.    Duke's breached the aforesaid duty and was negligent through one or more of the following acts and or omission that was a proximate cause of damages to the Plaintiff:

a)      Failed to assure the Roundup® products complied with FDA standards;

b)      Failed to assure the Roundup® products complied with industry standards;

c)      Failed to assure the Roundup® products were non-carcinogenic;

d)      Marketed Roundup® products were safe when they were not;

e)      Sold Roundup® products that were defective;

f)      Sold Roundup® products that caused NHL;

g)      Sold Roundup® products that were unsafe;

h)      Distributed Roundup® products that were unsafe, and/o

j)      Promoted Roundup® products that were unsafe.

ANSWER:     Duke's denies the allegations in paragraph 189.

190.    As a direct and proximate cause of one or more of the aforesaid acts or omissions, Plaintiff has suffered and continues to suffer grave injuries, and has endured and continues to endure physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

ANSWER:     Duke's denies the allegations in paragraph 190.

WHEREFORE, the Plaintiff Robert Rawson respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Duke's Hardware, Inc., for compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper.  Plaintiff also demands a jury trial on the issues contained herein.

In response to the "WHEREFORE" paragraph following paragraph 190, Duke's demands that judgment be entered in its favor and against plaintiff; that plaintiff's Complaint be dismissed, with prejudice; and that Duke's be awarded costs of suit and reasonable attorney's fees as allowed by law and such further and additional relief as this Court may deem just and proper.

## COUNT VIII
## STRICT LIABILITY (AGAINST DUKE'S)

191.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

ANSWER:  Duke's incorporates by reference its responses to paragraphs 1 through 190 in response to paragraph 191 of the plaintiff's Complaint.

192.    The that [*sic*] Defendant, Duke's marketed, sold, distributed, and placed into the market Roundup® products that existed in a defective condition at the time they left Duke's possession and control.

ANSWER:    Duke's denies the allegations in paragraph 192.

193.    That the Roundup® products were defective in that they carcinogenic.

ANSWER:    Duke's denies the allegations in paragraph 193.

194.    That the Roundup® products sold to Plaintiff were used for the purpose and in the manner intended, at all times relevant to this Complaint.

ANSWER:    Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 194 and therefore denies those allegations.

195.    That the Roundup® products sold the Plaintiff, were in substantially the same condition as they were at the time they were promoted, distributed, marketed, and sold by the Defendant Duke's.

ANSWER:    Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 195 and therefore denies those allegations.

196.    That the Plaintiff Robert Rawson, could not, by the exercise of reasonable care, have discovered the defect in, nor perceived the danger of, the Roundup® products.

ANSWER:     Duke's denies the allegations in paragraph 196.

197.    That the Defendant Duke's owed a strict liability not to harm the Plaintiff through the intended use of the Roundup® products it sold to him.

ANSWER:     Duke's lacks information or knowledge sufficient to form a belief as to the truth of the allegations in paragraph 197 regarding whether it sold any Roundup®-branded products to plaintiff and therefore denies the allegations in paragraph 186.  To the extent that the allegations in paragraph 197 set forth conclusions of law, no response is required to those allegations.

198.    That the defective condition of the Roundup® products sold to Robert Rawson by the Defendant, caused Robert Rawson to the injured and suffer damages of a personal, permanent, and pecuniary nature.

ANSWER:     Duke's denies the allegations in paragraph 198.

199.    That at the time the Defendant marketed, sold, distributed, delivered or made available the Roundup® products, Duke's failed to properly warn the Plaintiff of the danger posed by the Roundup® products, and the likelihood of NHL associated with exposure to the Roundup® products.

ANSWER:     Duke's denies the allegations in paragraph 199.

200.    That as a result of the injuries and damages caused by the defective Roundup® products marketed, sold, and distributed by Duke's, and as a result of the injurie and damages caused by Duke's' failure to warn of the dangers posed by the defect Roundup® products, Duke's is strictly liable to Robert Rawson for Duke's' failure to market, sell, distribute, deliver or make available a product, which would not cause injury or damage to the Plaintiff, and for its failure to warn of the dangers posed by the defective Roundup® products.

ANSWER:     Duke's denies the allegations in paragraph 200.

WHEREFORE, the Plaintiff Robert Rawson respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Duke's hardware, Inc., for

compensatory and punitive damages in an amount in excess of Fifty Thousand Dollars ($50,000.00), together with interest, costs herein incurred, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

In response to the "WHEREFORE" paragraph following paragraph 200, Duke's demands that judgment be entered in its favor and against plaintiff; that plaintiff's Complaint be dismissed, with prejudice; and that Duke's be awarded costs of suit and reasonable attorney's fees as allowed by law and such further and additional relief as this Court may deem just and proper.

## GENERAL DENIAL

Every allegation in the Complaint that is not specifically and expressly admitted in this Answer is hereby specifically and expressly denied.

## ADDITIONAL AND AFFIRMATIVE DEFENSES

Plaintiff has filed the Complaint alleging that he was injured as a result of being exposed to Monsanto's glyphosate-containing herbicides sold by Duke's. Plaintiff's Complaint is incorporated by reference as if the same were set forth in full herein. Duke's denies the allegations against it. Without admitting the truth of any part of such allegations by plaintiff, Duke's pleads, in the alternative, the following additional and affirmative defenses to plaintiff's claims:

### FIRST DEFENSE

1. The Complaint, in whole or part, fails to state a claim or cause of action against Duke's upon which relief can be granted.

### SECOND DEFENSE

2. If plaintiff has been injured or damaged, no injury or damages being admitted, such injuries were not caused by a product sold by Duke's.

## THIRD DEFENSE

3.     Plaintiff's claims against Duke's are barred because plaintiff cannot proffer any scientifically reliable evidence that the products at issue were defective or unreasonably dangerous.

## FOURTH DEFENSE

4.     Any alleged negligent or culpable conduct of Duke's, none being admitted, was so insubstantial as to be insufficient to be a proximate or substantial contributing cause of plaintiff's alleged injuries.

## FIFTH DEFENSE

5.     Plaintiff's claims against Duke's are barred, in whole or in part, because the products at issue were designed, manufactured, marketed and labeled with proper warnings, information, cautions and instructions, in accordance with the state of the art and the state of scientific and technological knowledge.

## SIXTH DEFENSE

6.     Plaintiff's claims against Duke's are barred, in whole or in part, because the products at issue were not defective or unreasonably dangerous in that they complied with, at all relevant times, all applicable government safety standards.

## SEVENTH DEFENSE

7.     Plaintiff's claims against Duke's are preempted, in whole or in part, by applicable federal law relating to the design, testing, producing, manufacturing, labeling, distributing, modeling, processing, and supply of Roundup®-branded products and/or glyphosate-containing products.

## EIGHTH DEFENSE

8.     Plaintiff's claims against Duke's are preempted, in whole or in part, because of

U.S. EPA findings that glyphosate does not cause cancer in humans and/or because of U.S. EPA approved product labeling.

## NINTH DEFENSE

9.      Plaintiff's claims against Duke's are barred, in whole or in part, by the doctrine of primary jurisdiction, including by the authority delegated by Congress to the U.S. EPA.

## TENTH DEFENSE

10.      Plaintiff's claims against Duke's are barred, in whole or in part, because plaintiff's injuries, if any, were the result of conduct of plaintiff, independent third parties, and/or events that were extraordinary under the circumstances, not foreseeable in the normal course of events, and/or independent, intervening and superseding causes of the alleged injuries, including but not limited to plaintiff's pre-existing medical conditions.

## ELEVENTH DEFENSE

11.      The doctrines contained in Restatement (Second) of Torts § 402A, comments j and k, bar plaintiff's claims against Duke's in whole or in part.

## TWELFTH DEFENSE

12.      All or part of plaintiff's claims asserted against Duke's herein are barred by the applicable statutes of limitations, statutes of repose, jurisdictional time limits, or any other limitations on the period of time within which to file suit, whether in this or any other state, including, without limitation, 735 ILCS 5/13-202, 5/13-203, 5/13-211, 5/13-213, 5/13-214, 5/13-215 and 740 ILCS 180/2.

## THIRTEENTH DEFENSE

13.      Plaintiff may not recover on the claims pleaded in the Complaint because the damages sought are too speculative and remote.

## FOURTEENTH DEFENSE

14.     Plaintiff's misuse or abnormal use of the product or failure to follow instructions bar plaintiff's claims against Duke's in whole or in part.

## FIFTEENTH DEFENSE

15.     If plaintiff suffered injuries or damages as alleged, which is denied, such injuries or damages resulted from: (a) acts or omissions of persons or entities for which Duke's is neither liable nor responsible or, in the alternative, Duke's is entitled to an assessment of the relative degree of fault of all such persons and entities; or (b) resulted from diseases and/or causes that are not related or connected with any product sold, distributed, or manufactured by Duke's. Such acts or omissions on the part of others or diseases or causes constitute an independent, intervening and sole proximate cause of plaintiff's alleged injuries or damages.

## SIXTEENTH DEFENSE

16.     Duke's had no legal relationship or privity with plaintiff and owed no duty to him by which liability could be attributed to it.

## SEVENTEENTH DEFENSE

17.     Plaintiff's claims against Duke's are preempted in whole or part by the Freedom of Speech Clause of the First Amendment of the U.S. Constitution.

## EIGHTEENTH DEFENSE

18.     Plaintiff's claims against Duke's are barred in whole or in part by plaintiff's own contributory/comparative negligence.  Pursuant to Section 2-1116 of the Illinois Code of Civil Procedure, plaintiff is barred from any recovery in this matter because plaintiff's comparative fault is more than 50% of the proximate cause of his alleged injuries and damages.

Alternatively, any judgment entered in favor of plaintiff should be reduced by an amount commensurate with his relative degree of fault in causing his own alleged injuries and damages.

## NINETEENTH DEFENSE

19.     Plaintiff's claims against Duke's for punitive and/or aggravated damages are barred because such an award would violate Duke's due process, equal protection and other rights under the United States Constitution, the Illinois Constitution, and/or other applicable state constitutions.

## TWENTIETH DEFENSE

20.     Plaintiff's claims against Duke's for punitive and/or aggravated damages are barred because plaintiff has failed to allege conduct warranting imposition of such damages under Illinois law, and/or other applicable state laws.

## TWENTY-FIRST DEFENSE

21.     Plaintiff's claims against Duke's for punitive and/or aggravated damages are barred and/or limited by operation of state and/or federal law.

## TWENTY-SECOND DEFENSE

22.     Duke's states that, at all times relevant, 735 ILCS 5/2-1117 was in full force and effect. In the event that the jury determines that there was some liability on the part of Duke's, which Duke's specifically denies, and further finds that its fault is less than 25% of the total fault attributable to the defendants sued by plaintiff, and any third party defendant who could have been sued by plaintiff, any judgment entered in favor of plaintiff and against Duke's must reflect joint and several liability for all past and future medical and medically related expenses, but only severally liable for any other damages.

## TWENTY-THIRD DEFENSE

23.    Plaintiff's claims against Duke's are barred in whole or in part by plaintiff's own failure to mitigate damages.

## TWENTY-FOURTH DEFENSE

24.    Plaintiff's claims against Duke's are barred in whole or in part by the sophisticated user doctrine.

## TWENTY-FIFTH DEFENSE

25.    In the event that plaintiff receives a settlement from any party or non-party for the injuries described in the Complaint, Duke's is entitled to a full set-off for the amount of each such settlement.

## TWENTY-SIXTH DEFENSE

26.    Plaintiff's claims against Duke's are barred or limited to the extent that plaintiff asserts claims that are governed by the laws of a state that does not recognize, or limits, such claims.

## TWENTY-SEVENTH DEFENSE

27.    Plaintiff's claims against Duke's are barred to the extent that plaintiff seeks relief under the laws of states that do not govern plaintiff's claims.

## TWENTY-EIGHTH DEFENSE

28.    Duke's hereby gives notice that it intends to rely upon such other defenses as may become available or apparent during the course of discovery and thus reserves its right to amend this Answer to assert such defenses.

**WHEREFORE**, Defendant Duke's demands judgment in its favor and against plaintiff, dismissing plaintiff's Complaint with prejudice, together with the costs of suit and such other relief as the Court deems equitable and just.

<u>**JURY TRIAL DEMAND**</u>

Duke's demands a jury trial on all issues so triable.

DATED:  May 28, 2019                HUSCH BLACKWELL LLP (Firm #49807)

Respectfully submitted,


By: /s/ *Dominique Savinelli*
Dominique Savinelli #06323175
James P. O'Shea # 06309819
120 South Riverside Plaza, Suite 2200
Chicago, IL 60606-3912
Telephone: 312.526.1522
Facsimile: 312.655.1502
dominique.savinelli@huschblackwell.com
james.oshea@huschblackwell.com

Erik L. Hansell #06271229
The Plaza in Clayton
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105
Telephone: (314) 480-1500
Facsimile: (314) 480-1505
erik.hansell@huschblackwell.com

*Attorneys for Defendant Duke's Hardware, Inc.*

STATE OF ILLINOIS          )

                           ) SS
COUNTY OF COOK             )

## AFFIDAVIT OF INSUFFICIENT KNOWLEDGE

I, JAMES P. O'SHEA II, having been duly sworn upon my oath, depose and state that I am a member of the law office of HUSCH BLACKWELL LLP, attorneys for Defendant, Duke's Hardware, Inc., in the above-captioned cause, and the allegations of lack of knowledge sufficient to form a belief are true to the best of my information.

_____

JAMES P. O'SHEA II

SWORN AND SUBSCRIBED to before me
this 28th day of _____May_____, 2019.

_____

> "OFFICIAL SEAL"
> MARIA E. ROSILES
> NOTARY PUBLIC — STATE OF ILLINOIS
> MY COMMISSION EXPIRES OCT. 11, 2022

## CERTIFICATE OF SERVICE

I hereby certify that on May 28, 2019, pursuant to Section 1-109 of the Illinois Code of Civil Procedure and the in accordance with Supreme Court Rule 12(b)(2), the foregoing was electronically filed with the Cook Circuit Clerk's electronic filing system and served via mail and e-mail to the following:

David J. Gallagher
MOTHERWAY & NAPLETON, LLP.
140 S. Dearborn, Suite 1500
Chicago, IL 60603
(312) 726-2699 - PHONE
(312) 726-6851 - FAX
Atty. No. 56421
dgallagher@mnlawoffice.com

*Attorneys for Plaintiff Robert Rawson*

/s/  *Dominique Savinelli*

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of September, 2019, I electronically filed the foregoing, MOTION TO REMAND and MEMORANDUM OF LAW IN SUPPORT OF MOTION TO REMAND, with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel.

Dominique Savinelli
James P. O'Shea
Husch Blackwell LLP
120 S. Riverside Plaza, Suite 2200
Chicago, IL 60606
     Phone: (312) 655-1500
     Fax: (312) 655-1501
     Email: HBService@huschblackwell.com; Dominique.Savinelli@huschblackwell.com; James.Oshea@huschblackwell.com
     **Attorneys for defendants, Monsanto Company, Bayer Corporation and Duke's Hardware, Inc.**

Thomas J. Dammrich II
Peter F. O'Neill
Shook, Hardy & Bacon LLP
111 S. Wacker Drive, Suite 4700
Chicago, IL 60606
     Phone: (312) 704-7700
     Fax: (312) 558-1195
     Email: docket@shb.com; tdammrich@shb.com; pfoneill@shb.com; dbrehmer@shb.com
     **Attorney for defendants, Monsanto Company and Bayer Corporation**

                         */s/ David J. Gallagher*
                         MOTHERWAY & NAPLETON, LLP
                         140 S. Dearborn St. Suite 1500
                         Chicago, IL  60603
                         (312) 726-2699
                         (312) 726-6851 Fax
                         dgallagher@mnlawoffice.com
                         *Attorney for Plaintiff, ROBERT RAWSON*