# U.S. District Court
## Western District of Louisiana (Lafayette)
## CIVIL DOCKET FOR CASE #: 6:19–cv–01276–MJJ–PJH

Stanford v. Monsanto Co et al
Assigned to: Judge Michael J Juneau
Referred to: Magistrate Judge Patrick J Hanna
Demand: $0
Case in other court:  27th JDC (St. Landry), C–193842C
Cause: 28:1332 Diversity–Product Liability

Date Filed: 10/01/2019
Jury Demand: None
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Glenda G Stanford**                    represented by    **Kevin R Duck**
Duck Law Firm
5040 Ambassador Caffery Pkwy Ste 200
Lafayette, LA 70508
337–406–1144
Fax: 337–406–1050
Email: krd@ducklawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Co**                          represented by    **Judy Y Barrasso**
Barrasso Usdin et al (NO)
909 Poydras St Ste 2400
New Orleans, LA 70112
504–589–9700
Fax: 504–589–9701
Email: jbarrasso@barrassousdin.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Celeste R Coco–Ewing**
Barrasso Usdin et al (NO)
909 Poydras St Ste 2400
New Orleans, LA 70112
504–589–9700
Fax: 504–589–9701
Email: ccoco–ewing@barrassousdin.com
*ATTORNEY TO BE NOTICED*

**Shaun P McFall**
Barrasso Usdin et al (NO)
909 Poydras St Ste 2400
New Orleans, LA 70112
504–589–9700
Fax: 504–589–9701
Email: smcfall@barrassousdin.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Bayer Corp**                           represented by    **Judy Y Barrasso**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Celeste R Coco–Ewing**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Shaun P McFall**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/01/2019 | 1 | NOTICE of Removal from 27th JDC St. Landry Parish, Case Number C−193842C (Filing fee $400, receipt number 0536−4063543) filed by Monsanto Co. (Attachments: # 1 Civil cover sheet, # 2 Exhibit 1 State Court Record, # 3 Exhibit 2 Bayer Corporation's Consent to Removal, # 4 Proposed pleading Notice to Adverse Party)(Attorney Judy Y Barrasso added to party Monsanto Co(pty:dft))(aty,Barrasso, Judy) (Entered: 10/01/2019) |
| 10/01/2019 | | CONSENT TO REMOVAL by Bayer Corp. ADMINISTRATIVE ENTRY: (THE PDF IMAGE CAN BE FOUND IN ATTACHMENT #3 OF DOCUMENT 1 NOTICE OF REMOVAL). (crt,Thigpen, M) (Entered: 10/01/2019) |
| 10/01/2019 | | CASE Assigned to Judge Michael J Juneau and Magistrate Judge Patrick J Hanna. (crt,Thigpen, M) (Entered: 10/01/2019) |
| 10/01/2019 | 2 | NOTICE of Corporate Disclosure Statement Requirement re: 1 Notice of Removal, sent to Judy Y Barrasso, Celeste R Coco−Ewing, Shaun P McFall on behalf of Bayer Corp, Monsanto Co. Corporate Disclosure Statement due by 10/15/2019. (crt,Thigpen, M) (Entered: 10/01/2019) |
| 10/01/2019 | 3 | PROPOSED REMOVAL ORDER Referred to Magistrate Judge Patrick J Hanna. (Public entry, but no electronic notice). (crt,Thigpen, M) (Entered: 10/01/2019) |
| 10/01/2019 | 4 | CORPORATE DISCLOSURE STATEMENT by Monsanto Co identifying Corporate Parent Bayer A G for Monsanto Co. (aty,Barrasso, Judy) (Entered: 10/01/2019) |
| 10/02/2019 | 5 | REMOVAL ORDER regarding state court documents, pending motions, registry funds, and admission status of counsel. Signed by Magistrate Judge Patrick J Hanna on 10/2/2019. (crt,Alexander, E) (Entered: 10/02/2019) |

GLENDA G. STANFORD

VERSUS

MONSANTO COMPANY AND
BAYER CORPORATION

27TH JUDICIAL DISTRICT COURT

DOCKET NO.: _19-C-3842-C_

PARISH OF ST. LANDRY

STATE OF LOUISIANA

## PETITION FOR DAMAGES

NOW INTO COURT, through undersigned counsel, comes the Plaintiff, GLENDA G.

STANFORD (hereinafter "STANFORD"), a competent person of the age of majority domiciled and

residing in St. Landry Parish, Louisiana who represents the following:

1.

Made Defendants herein:

A.  **MONSANTO COMPANY** (hereinafter referred to as "MONSANTO"), a foreign
corporation licensed to do and doing business in the State of Louisiana whose
principal business office is located in St. Louis, Missouri whose principal business
establishment in Louisiana is located at Highway 18 River Road, Luling, Louisiana
70070 and whose agent for service of process is Corporation Service Company, 501
Louisiana Avenue, Baton Rouge, Louisiana 70802; and

B.  The defendant, **BAYER CORPORATION** (hereinafter referred to as "BAYER")
a foreign corporation licensed to do and doing business in the State of Louisiana
whose principal business office is located in St. Louis, Missouri whose principal
business establishment in Louisiana located at Highway 18 River Road, Luling,
Louisiana 70070 and whose agent for service of process is Corporation Service
Company, 501 Louisiana Avenue, Baton Rouge, Louisiana 70802 .

2.

At all times pertinent herein, MONSANTO was in the business of distributing, marketing,

labeling, advertising and selling products containing glyphosate, including the herbicide

ROUNDUP®, in the State of Louisiana, including but not limited to St. Landry Parish, Louisiana.

3.

This Honorable Court has personal jurisdiction over the defendants as the event that is the

subject of this lawsuit arises from one or more of the acts or activities listed in La. R.S. 13:3201,

performed directly or by an agent, servant or employee of the defendants, including, but not limited

to:

1)   Transacting business in the State of Louisiana;

2)   Contracting to supply services or things in the State of Louisiana;

3)   Causing injury or damage by an offense or quasi offense committed
through an act or omission in the State of Louisiana;

1

4)     Causing injury or damage in the State of Louisiana by an offense or quasi offense committed through an act or omission outside of the State of Louisiana by the defendants who regularly does and/or solicits business, or engages in any other persistent course of conduct, or derives revenue from goods used or consumed or services rendered in the St. Landry Parish, Louisiana;

5)     Manufacturing the product described hereinafter or components thereof, which caused damage or injury in the Parish of St. Landry, State of Louisiana and, at the time of placing the product into the stream of commerce, the defendants, could have foreseen, realized, expected, or anticipated that the product may eventually be found in the St. Landry Parish, Louisiana by reason of its nature and the marketing practices of the defendants.

4.

This is an action for damages which exceed fifty thousand dollars. ($50,000).

5.

Venue is proper in that this is an action for recovery of damages for an offense or quasi offense and the wrongful conduct occurred and the damages were sustained by STANFORD in St. Landry Parish, Louisiana.

6.

Roundup® is a non-selective herbicide that was manufactured, marketed, sold and distributed by MONSANTO. Roundup® is used to kill weeds that commonly compete with the growing of crops. In addition to the active ingredient glyphosate, Roundup® contains the surfactant Polyethoxylated tallow amine (POEA) and/or adjuvants and other so-called "inert" ingredients.

7.

MONSANTO is in the business of research, testing, developing, designing, formulating, manufacturing, producing, assembling, packaging, labeling, advertising, promoting, marketing, selling, supplying and distributing herbicides including Roundup® products.

8.

At all times relevant herein, MONSANTO was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup® products, which contain the active ingredient glyphosate and the surfactant POEA, as well as adjuvants and other "inert" ingredients.

9.

Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

10.

When Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Monsanto assured the public, including STANFORD, that Roundup® was harmless.

11.

Exposure pathways for humans are identified as air (especially during spraying), water and food.

12.

Glyphosate has been identified as a carcinogenic.

13.

The assessment of the International Agency for Research on Cancer ("IARC") Working Group identified several case control studies of occupational exposure in the United States, Canada and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

14.

The IARC Working Group found an increased risk between exposure to glyphosate and Non Hodgkins Lymphoma ("NHL") several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

15.

The IARC Working Group also found that Glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

16.

The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

17.

The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

3

18.

The IARC Working Group also noted genotoxic, hormonal and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

19.

The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and multiple myeloma, hairy cell leukemia (HCL) and chronic lymphocytic leukemia (CLL), in addition to several other cancers.

20.

In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.[1]

21.

In addition to the toxicity of the active ingredient, glyphosate, several studies support the hypothesis that the glyphosate-based formulation in Defendant's Roundup® products is more dangerous and toxic than glyphosate alone. Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.

22.

A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation. The researchers noted that "cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, '[s]ince cell cycle

---

[1] Caroline Cox, *Glyphosate, Part 2: Human Exposure and Ecological Effects*, 15 J. PESTICIDE REFORM 4 (1995); W.S. Peas, et al., *Preventing Pesticide-Related Illness in California Agriculture: Strategies and Priorities. Environmental Health Policy Program Report*, Univ. of Calif. School of Public Health, Calif. Policy Seminar (1993).

4

disorders such as cancer result from dysfunction of a unique cell, it was of interest to evaluate the

threshold does of glyphosate affecting the cells."[2]

23.

In 2005, a study by Francisco Peixoto, entitled "Comparative effects of the Roundup and

glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup® 's effects on

rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone. The Peixoto

study further suggested that the harmful effects of Roundup® on mitochondrial bioenergetics could

not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the

surfactant POEA, or in the alternative, due to the potential synergistic effect between glyphosate and

other ingredients in the Roundup® formulation.[3]

24.

In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects

of Roundup® and glyphosate on human umbilical, embryonic and placental cells. The study tested

dilution levels of Roundup® and glyphosate that were far below agricultural recommendations,

corresponding with low levels of residue in food. The researchers ultimately concluded that supposed

"inert" ingredients, and possibly POEA, alter human cell permeability and amplify toxicity of

glyphosate alone. The researchers further suggested that assessments of glyphosate toxicity should

account for the presence of adjuvants or additional chemicals used in the formulation of the complete

pesticide. The study confirmed that the adjuvants present in Roundup® are not, in fact, inert and that

Roundup® is potentially far more toxic than its active ingredients glyphosate alone.[4]

25.

The results of these studies were at all times available to defendant. Defendant thus knew or

should have known that Roundup® is more toxic than glyphosate alone and that safety studies of

---

[2] Julie Marc, et al., *Glyphosate-Based Pesticides Affect Cell Cycle Regulation*, 96 BIOLOGY OF THE CELL 245, 245-249 (2004), *available at* http://onlinelibrary.wiley.com/doi/10.1016/j.biolcel.2003.11.010/epdf.

[3] Francisco Peixoto, *Comparative Effects of the Roundup and Glyphosate on Mitochondrial Oxidative Phosphorylation*, 61 CHEMOSPHERE 1115, 1122 (2005), *available at* https://www.researchgate.net/publication/7504567_Comparative_effects_of_the_Roundup_and_glyphosa te_on_mitochondrial_oxidative_phosphorylation.

[4] Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic and Placental Cells*, 22 CHEM. RES. TOXICOL. 97-105 (2008), *available at* http://big.assets.huffingtonpost.com/france.pdf.

Roundup® , Roundup® adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup® products.

26.

Despite its knowledge that Roundup® is considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup® as safe.

27.

Several countries around the world, including the Netherlands, Brazil, France, Bermuda, Colombia, have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since the IARC first announced its assessment for glyphosate in March 2015.

28.

On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

29.

On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

30.

The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is *probably carcinogenic to humans*. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other hematopoietic cancers, including lymphocytic lymphoma, chronic lymphocytic leukemia, B-cell lymphoma and multiple myeloma.[5]

---

[5] *See* Guyton, et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon and Glyphosate, supra.*

31.

The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

32.

Nevertheless, Mosanto, since it began selling Roundup®, has represented to consumers, including STANFORD, that it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup® , create no unreasonable risks to human health or to the environment.

33.

STANFORD used the product Roundup®, which contained glyphosate and the surfactant POEA, as well as adjuvants and other "inert" ingredients, every three weeks at her home located in Port Barre, Louisiana to kill unwanted vegetation from 1976 through February of 2019.

34.

STANFORD was diagnosed with non-Hodgkins lymphoma on or about April of 2019.

35.

STANFORD's non-Hodgkins lymphoma was caused and/or caused in part by her repeated exposure to ROUNDUP® which was manufactured, marketed,  sold and distributed by the defendant, MONSANTO.

36.

According to the World Health Organization (WHO), the main chemical ingredient of Roundup® —glyphosate—is a probable cause of cancer.

## COUNT ONE
## PRODUCTS LIABILITY
### (DESIGN DEFECT AND INADEQUATE WARNING)

37.

STANFORD incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

38.

STANFORD brings this products liability claim against Defendant under the Louisiana Products Liability Act.

39.

MONSANTO designed, manufactured, produced, marketed and sold the Roundup® products to STANFORD at a substantial profit.

40.

Roundup® products used by STANFORD were defective in design, manufacture, and construction, and with regard to warnings, labeling and warranties both express and implied. As a consequence of those defects, the Roundup® products were defective, per se. MONSANTO is strictly liable for all damages caused by its defective product, pursuant to the Louisiana Products Liability Act ("LPLA") and Article 2315 et seq. Of the Louisiana Civil Code.

41.

MONSANTO has knowledge of the defects in the Roundup® they sold to STANFORD and failed to advise STANFORD of those defects. The defects existed at the time of the manufacture and at the time of delivery to STANFORD. If STANFORD had known that Roundup® by virtue of its defects would cause her to develop NHL, or if STANFORD had known the Roundup® was defective and unreasonably dangerous for its intended use, STANFORD would not have purchased it.

42.

As manufacturers of the defective product, Monsanto is presumed to have known of the defect(s) prior to the sale. MONSANTO is deemed to be a bad faith seller in accordance with La. C.C. Article 2545.

43.

STANFORD is entitled to judgement against MONSANTO for the return of the purchase price of the Roundup®; all hospital, surgical and medical costs related to STANFORD's NHL diagnosis; and all other economic losses occasioned by the sale. STANFORD is further entitled to an award of damages and attorney's fees from MONSANTO.

44.

MONSANTO is strictly liable for all of STANFORD's damages and for the cost of medical monitoring under the LPLA and La. C.C. Article 2315 et seq.

45.

The Roundup® used by STANFORD was defective in design, manufacture, composition or construction and with regard to labeling, warnings and warranties both express and implied.

Monsanto breached the express and implied warranties they conveyed concerning the safety, superiority and durability of its product.

46.

Because the defective Roundup® purchased by STANFORD has been proven to cause cancers and other serious conditions, STANFORD has required medical evaluation and monitoring and will continue to require monitoring and evaluation indefinitely.

47.

STANFORD's prolonged exposure to Roundup® poses a future health risk and requires medical evaluation and monitoring.

48.

MONSANTO could have employed safer alternative designs and formulations.

49.

At all times relevant to this litigation, STANFORD used and/or was exposed to the use of MONSANTO's Roundup® products in an intended and or reasonably foreseeable manner without knowledge of their dangerous characteristics.

50.

STANFORD could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

51.

The harm caused by MONSANTO's Roundup® products far outweighed their benefit, rendering MONSANTO's products dangerous to an extent beyond that which an ordinary consumer would contemplate. MONSANTO's Roundup® products were and are more dangerous than alternative products and MONSANTO could have designed its Roundup® products to make them less dangerous. Indeed, at the time that MONSANTO designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

52.

At the time Roundup® products left MONSANTO's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of MONSANTO's Roundup® herbicides.

53.

MONSANTO's defective design of its Roundup® products was willful, wanton, fraudulent and malicious and conducted with reckless disregard for the health and safety of users of its Roundup® products and of those exposed to these products, including STANFORD.

54.

Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, MONSANTO is strictly liable to STANFORD.

55.

The defects in MONSANTO's Roundup® products were substantial and contributing factors in causing STANFORD's grave injuries, and, but for MONSANTO's misconduct and omissions, STANFORD would not have sustained his injuries.

56.

MONSANTO's conduct, as described above, was reckless. MONSANTO risked the lives of consumers and users of its products, including STANFORD, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and MONSANTO suppressed this knowledge from the general public. MONSANTO made conscious decisions not to redesign, warn or inform the unsuspecting public.

57.

As a direct and proximate result of MONSANTO's placing its defective Roundup® products into the stream of commerce, STANFORD has suffered and continues to suffer grave injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. STANFORD will continue to incur these expenses in the future.

## COUNT TWO
## STRICT LIABILITY (FAILURE TO WARN)

58.

STANFORD incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

59.

STANFORD brings this strict liability claim against MONSANTO for failure to warn.

10

60.

At all times relevant to this litigation, MONSANTO engaged in the business of researching, testing, developing, designing, licensing, formulating, manufacturing, producing, assembling, packaging, labeling, advertising, promoting, marketing, selling, supplying and distributing Roundup® products, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of MONSANTO.

61.

MONSANTO researched, tested, developed, designed, licensed, formulated, manufactured, produced, assembled, assembled, packaged, labeled, advertised, promoted, marketed, sold, supplied, distributed and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including STANFORD and therefore MONSANTO had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of Roundup® and glyphosate-containing products.

62.

At all times relevant to this litigation, MONSANTO had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings and take such steps as necessary to ensure that its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. MONSANTO had a continuing duty to warn STANFORD of the dangers associated with Roundup® use and exposure. MONSANTO, as manufacturer, seller or distributor of chemical herbicides is held to the knowledge of an expert in the field.

63.

At the time of manufacture, MONSANTO could have provided warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

64.

At all times relevant to this litigation, MONSANTO failed to investigate, study, test or promote the safety or to minimize the dangers to users and consumers of its Roundup® products and

to those who would foreseeably use or be harmed by MONSANTO's herbicides, including STANFORD.

65.

Despite the fact that MONSANTO knew or should have known that Roundup® products posed a grave risk of harm, it failed to warn of the dangerous risks associated with their use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to MONSANTO, or scientifically knowable to MONSANTO, through appropriate research and testing by known methods, at the time it distributed, supplied or sold the product, and not known to end users and consumers, such as STANFORD.

66.

MONSANTO knew or should have known that its Roundup® and glyphosate-containing products created significant risks of serious bodily harm to consumers, as alleged herein, and MONSANTO failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products. MONSANTO has wrongfully concealed information concerning the dangerous nature of Roundup® products and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® products and glyphosate.

67.

At all times relevant to this litigation, MONSANTO's Roundup® products reached the intended consumers, handlers and users or other persons coming into contact with these products in Louisiana and throughout the United States, including STANFORD, without substantial change in their condition as designed, manufactured, sold distributed, labeled and marketed by MONSANTO.

68.

STANFORD was exposed to MONSANTO's Roundup® products without knowledge of their dangerous characteristics.

69.

At all times relevant to this litigation, STANFORD used and/or was exposed to the use of MONSANTO's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

12

70.

STANFORD could not have reasonably discovered the defects and risks associated with Roundup® glyphosate-containing products prior to or at the time of STANFORD's exposure. STANFORD relied upon the skill, superior knowledge and judgement of MONSANTO.

71.

MONSANTO knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, but they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

72.

The information that MONSANTO did provide or communicate failed to contain relevant warnings, hazards and precautions that would have enabled a consumer such as STANFORD to utilize the products safely and with adequate protection. Instead, MONSANTO disseminated information that was inaccurate, false and misleading and which failed to communicate accurately or adequately the comparative severity, duration and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

73.

MONSANTO fails to adequately and accurately warn of the true risks of STANFORD's injuries associated with the use of and exposure to Roundup® products and the products' active ingredient glyphosate, a probable carcinogen.

74.

As a result of their inadequate warnings, MONSANTO's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of MONSANTO, were distributed by MONSANTO, and used by STANFORD.

75.

MONSANTO is liable to STANFORD for injuries caused by its failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its Roundup® products and the risks associated with its use of or exposure to Roundup® products and glyphosate.

76.

The defects in MONSANTO's Roundup® products were substantial and contributing factors in causing STANFORD's injuries, and, but for MONSANTO's misconduct and omissions, STANFORD would not have sustained his injuries.

77.

Had MONSANTO provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup® products, STANFORD could have avoided the risk of developing injuries as alleged herein and STANFORD could have obtained alternative herbicides.

78.

As a direct and proximate result of MONSANTO's placing its defective Roundup® products into the stream of commerce, STANFORD has suffered and continues to suffer severe injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. STANFORD will continue to incur these expenses in the future.

## COUNT THREE
## NEGLIGENCE

79.

STANFORD incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

80.

MONSANTO, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted and/or used by STANFORD.

14

81.

At all times relevant to this litigation, MONSANTO had a duty to exercise reasonable care in the research, testing, development, design, licensing, formulation, manufacturing, production, assembly, packaging, labeling, advertisement, promotion, marketing, sale, supply and distribution of its Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote and/or sell a product that was not unreasonably dangerous to consumers, users and other persons coming into contact with the product.

82.

At all times relevant to this litigation, MONSANTO had a duty to exercise reasonable care in the marketing, advertisement and sale of its Roundup® products. MONSANTO's duty of care owed to consumers and the general public included providing accurate, true and correct information concerning the risks of using Roundup® products and appropriate, complete and accurate warnings concerning the potential adverse effects of exposure to Roundup® products, and, in particular, its active ingredient glyphosate.

83.

At all times relevant to this litigation, MONSANTO knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® products, and specifically, the carcinogenic properties of the chemical glyphosate.

84.

Accordingly, at all times relevant to this litigation, MONSANTO knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause STANFORD's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including STANFORD.

85.

MONSANTO knew or, in the exercise of reasonable care, should have known that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup®'s adjuvants and "inert" ingredients and/or the surfactant POEA were necessary to protect STANFORD from Roundup® products.

15

86.

MONSANTO knew or, in the exercise of reasonable care, should have known that tests limited to Roundup®'s active ingredient glyphosate were insufficient to prove the safety or Roundup® products.

87.

MONSANTO also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® products were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

88.

As such, MONSANTO breached its duty of reasonable care and failed to exercise ordinary care in the research, testing development, design, licensing, formulation, manufacture, production, assembly, packaging, labeling, advertisement, promotion, marketing, sale, supply and distribution of its Roundup® products, in that MONSANTO manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects and failed to prevent or adequately warn of these risks and injuries.

89.

MONSANTO failed to appropriately and adequately test Roundup®, Roundup®'s adjuvants and "inert" ingredients and/or surfactant POEA to protect STANFORD from Roundup® products.

90.

Despite its ability and means to investigate, study and adequately test its products and to provide adequate warnings, MONSANTO has failed to do so. MONSANTO has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® products and glyphosate.

91.

MONSANTO's negligence included:

    a.    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

16

b.    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling and/or distributing Roundup® products while negligently and/or intentionally concealing and failing to disclose the results of trials, tests and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®l

c.    Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture, horticulture and at-home use;

d.    Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup®, and the propensity of these ingredients to render Roundup® toxic, increase the toxicity of Roundup®, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup®, and whether or not "inert" ingredients and/or adjuvants were safe for use;

e.    Failing to use reasonable and prudent care in the design, research, manufacture and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

f.    Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

g.    Failing to provide adequate instruction, guidelines and safety precautions to those persons who MONSANTO could reasonably foresee would use and be exposed to its Roundup® products;

h.    Failing to disclose to STAFFORD, users/consumers and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

i.    Systematically suppressing or downplaying contrary evidence about the risks, incidence and prevalence of the side effects of Roundup® and glyphosate-containing products;

j.    Representing that its Roundup® products were safe for their intended use when, in fact, MONSANTO knew or should have known that the products were not safe for their intended use;

k.    Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

l.    Advertising, marketing and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by MONSANTO to be associated with or caused by the use of or exposure to Roundup® products and glyphosate;

m.    Continuing to disseminate information to its consumers, which indicate or imply that MONSANTO's Roundup® products are not unsafe for use in the agricultural and horticultural industries and/or at-home use; and

n.    Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

92.

MONSANTO knew and/or should have known that it was foreseeable that consumers and/or users, such as STANFORD, would suffer injuries as a result of MONSANTO's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution and sale of Roundup® products.

93.

STANFORD did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® products or its active ingredient glyphosate.

94.

MONSANTO's negligence was the proximate cause of the injuries, harm and economic losses that STANFORD suffered and will continue to suffer, as described herein.

95.

MONSANTO's conduct, as described above, was reckless. MONSANTO regularly risks the lives of consumers and users of its products, including STANFORD, with full knowledge of the dangers of its products. MONSANTO has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including STANFORD. MONSANTO's reckless conduct therefore warrants an award of punitive damages.

96.

As a proximate result of MONSANTO's wrongful acts and omissions in placing its defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, STANFORD has suffered and continues to suffer severe and permanent physical and emotional injuries. STANFORD has endured pain and suffering, has suffered economic losses (including significant expenses for medical care and treatment) and will continue to incur such expenses in the future.

## COUNT FOUR
## BREACH OF EXPRESS WARRANTY

97.

STANFORD incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

98.

At all times relevant to this litigation, MONSANTO engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including STANFORD, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of MONSANTO.

99.

MONSANTO had a duty to exercise reasonable care in the research, testing, development, design, licensing, formulation, manufacture, inspection, production, assembly, packaging, labeling, advertising, promotion, marketing, selling, supply, distribution and release of its Roundup® products, including a duty to:

a.   ensure that its products did not cause the user unreasonably dangerous side effects;

b.   warn of dangerous and potentially fatal side effects; and

c.   disclose adverse material facts, such as the true risks associated with the use of and exposure to Roundup® and glyphosate-containing products, when making representations to consumers and the general public, including Plaintiff.

100.

At all times relevant to this litigation, MONSANTO expressly represented and warranted to the purchasers of its products, including STANFORD by and through statements made by MONSANTO in labels, publications, package inserts and other written materials intended for consumers and the general public, that its Roundup® products were safe to human health and the environment, effective, fit and proper for their intended use. MONSANTO advertised, labeled, marketed and promoted Roundup® products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that its Roundup® products would conform to the representations.

101.

These express representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with the use of and/or exposure to Roundup® products and glyphosate. MONSANTO knew and/or should have known that the risks expressly included in Roundup® warnings and labels did not and do not accurately or adequately set forth the

risks of developing the serious injuries complained of herein. Nevertheless, MONSANTO expressly represented that its Roundup® products were safe and effective, that they were safe and effective for use by individuals such as STANFORD and/or that they were safe and effective as agricultural herbicides.

102.

The representations about Roundup®, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

103.

MONSANTO placed its Roundup® products into the stream of commerce for sale and recommended their use to consumers and the public, including STANFORD, without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup® products and their active ingredient glyphosate.

104.

MONSANTO breached these warranties to STANFORD because, among other things, its Roundup® products were defective, dangerous and unfit for use, did not contain labels representing the true and adequate nature of the risks associated with their use and were not merchantable or safe for their intended, ordinary and foreseeable use and purpose. Specifically, MONSANTO breached the warranties in the following ways:

    a.    MONSANTO represented through its labeling, advertising and marketing materials that its Roundup® products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated with use of and/or exposure to Roundup® products and glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings and labels; and

    b.    MONSANTO represented that its Roundup® products were safe for use and fraudulently concealed information that demonstrated that glyphosate, the active ingredient in Roundup® products, had carcinogenic properties, and that its Roundup® products, therefore, were not safer than alternatives available on the market.

105.

On information and belief, STANFORD justifiably and detrimentally relied on the express warranties and representations of MONSANTO. In the purchase and/or use of its Roundup®

products. When STANFORD made the decision to purchase Roundup®, he reasonably relied upon MONSANTO to disclose known defects, risks, dangers and side effects of Roundup® products and glyphosate.

106.

MONSANTO had sole access to material facts concerning the nature of the risks associated with its Roundup® products as expressly stated within its warnings and labels, and MONSANTO knew that consumers and users such as STANFORD could not have reasonably discovered that the risks expressly included in Roundup® warnings and labels were inadequate and inaccurate.

107.

STANFORD had no knowledge of the falsity or incompleteness of MONSANTO's statements and representations concerning Roundup®.

108.

STANFORD used and/or was exposed to the use of Roundup® as researched, developed, designed, tested, formulated, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold or otherwise released into the stream of commerce by MONSANTO.

109.

Had the warnings and labels for Roundup® products accurately and adequately set forth the true risks associated with the use of such products, including STANFORD's injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, STANFORD could have avoided the injuries complained of herein.

110.

As a direct and proximate result of MONSANTO's wrongful acts and omissions, STANFORD has suffered severe injuries. STANFORD has endured pain and suffering, has suffered economic losses (including significant expenses for medical care and treatment), and will continue to incur these expenses in the future.

## COUNT FIVE
## BREACH OF IMPLIED WARRANTY

111.

STANFORD incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

112.

At all times relevant to this litigation, MONSANTO engaged in the business of researching, testing, developing, designing, licensing, formulating, manufacturing, producing, assembling, packaging, labeling, advertising, promoting, marketing, selling, supplying and distributing its Roundup® products, which are defective and unreasonably dangerous to consumers, including STANFORD, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of MONSANTO.

113.

Before the time STANFORD used and/or was exposed to the use of the aforementioned Roundup® products, MONSANTO impliedly warranted to its consumers— including STANFORD that its Roundup® products were of merchantable quality and reasonably safe and fit and suitable for the purposes and/or uses for which they were intended, specifically, as horticultural herbicides.

114.

MONSANTO, however, failed to disclose that Roundup® products have dangerous propensities when use as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including STANFORD's injuries. Roundup® products were and are provided to consumers/users, such as STANFORD, in a dangerously defective and unsafe condition.

115.

STANFORD is the intended third-party beneficiary of implied warranties made by MONSANTO to the purchasers of its horticultural herbicides, including the company and/or companies that employed STANFORD, and as such STANFORD is entitled to assert this claim.

116.

Upon information and belief, STANFORD reasonably relied upon the skill, superior knowledge and judgement of MONSANTO and upon its implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose of use.

117.

The Roundup® products were expected to reach and did in fact reach consumers and users, including STANFORD, without substantial change in the condition in which they were manufactured and sold by MONSANTO.

118.

At all times relevant to this litigation, MONSANTO was aware that consumers and users of its products, including STANFORD, would use Roundup® products as marketed by MONSANTO, which is to say that STANFORD was a foreseeable user of Roundup®.

119.

MONSANTO intended that its Roundup® products to be used in the manner in which STANFORD in fact used them and MONSANTO impliedly warranted each product to be of merchantable quality, safe and fit for such use, despite the fact that Roundup® was not adequately tested or researched.

120.

In reliance upon MONSANTO's implied warranty, STANFORD used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by MONSANTO.

121.

STANFORD could not  have reasonably discovered or known of the risks of serious injury associated with Roundup® products or glyphosate.

122.

MONSANTO breached its implied warranty to STANFORD in that its Roundup® products were not of merchantable quality, reasonably safe and/or fit for their intended purposes and/or uses for which they were intended; nor were they adequately tested. Instead, the Roundup® products were in a dangerously defective and unsafe condition. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

123.

The harm caused by MONSANTO's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

124.

As a direct and proximate result of MONSANTO's wrongful acts and omissions STANFORD has suffered severe and permanent physical and emotional injuries. STANFORD has

endured pain and suffering, has suffered economic loss (including significant expenses for medical care and treatment) and will continue to incur such expenses in the future.

## COUNT SIX
## FRAUD

125.

STANFORD incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

126.

At all times pertinent herein, MONSANTO represented to consumers, including STANFORD, that its Roundup® products were safe for use.

127.

At all times pertinent herein, MONSANTO had a duty to consumers, including STANFORD, to disclose the carcinogenic properties of its product, Roundup®.

128.

MONSANTO intentionally and fraudulently concealed information from consumers, including STANFORD, that demonstrated that glyphosate, the active ingredient in Roundup® products combined with adjuvants and "inert" ingredients and/or surfactant POEA had carcinogenic properties, and that its Roundup® products, therefore, were not safer than alternatives available on the market.

129.

MONSANTO intentionally misrepresented and/or suppressed the truth of the carcinogenic properties of its product, Roundup® with the intention to obtain an unjust advantage and/or cause a loss or convenience to consumers, including STANFORD, namely to get them to purchase their Roundup® and absent the fraud they would have never obtained STANFORD's consent to purchase a product, Roundup® that caused and/or was a substantial factor in causing her to develop NHL and/or increase her chances of developing NHL.

130.

MONSANTO is liable unto STANFORD for damages and attorney fees.

24

## SEVENTH CAUSE OF ACTION
## UNFAIR TRADE PRACTICES ACT

131.

STANFORD incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

132.

At all times pertinent herein, STANFORD was a consumer.

133.

At all times pertinent herein, MONSANTO represented to consumers, including STANFORD, that its Roundup® products were safe for use and failed to disclose the carcinogenic properties of its product, Roundup®.

134.

MONSANTO intentionally and fraudulently concealed information from consumers, including STANFORD, that demonstrated that glyphosate, the active ingredient in Roundup® products combined with adjuvants and "inert" ingredients and/or surfactant POEA had carcinogenic properties, and that its Roundup® products, therefore, were not safer than alternatives available on the market.

135.

MONSANTO intentionally misrepresented and/or suppressed the truth of the carcinogenic properties of its product, Roundup® with the intention to obtain an unjust advantage and/or cause a loss or convenience to consumers, including STANFORD, namely to get them to purchase their Roundup® and absent the fraud they would have never obtained STANFORD's consent to purchase a product, Roundup® that caused and/or was a substantial factor in causing her to develop NHL and/or increase her chances of developing NHL.

136.

As described herein, MONSANTO used or employed deceptive methods, acts, or practices in the sale and marketing of its product, Roundup® to consumers, including STANFORD that caused them, including STANFORD to suffer an ascertainable loss of money.

25

137.

As a result of said deceptive trade practices, if the court finds the unfair or deceptive method, act, or practice was knowingly used, after being put on notice by the attorney general, the court shall award three times the actual damages sustained, reasonable attorney fees and costs.

## SOLIDARILY LIABLE

138.

Upon information and belief therein, on or about June 7, 2018 the defendant, BAYER acquired MONSANTO and the written terms and conditions of that acquisition required BAYER to assume the obligations of MONSANTO, including all legal liabilities for claims and/or lawsuits arising out of damages caused and/or allegedly caused by Roundup®.

139.

BAYER is solidarily liable with MONSANTO for any and all damages suffered by STANFORD.

WHEREFORE, STANFORD respectfully requests that the defendants be duly cited and served and that after all delays have run that this Court enter judgment in STANFORD's favor for compensatory damages, special damages, treble damages,  together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

Respectfully submitted:

DUCK LAW FIRM, LLC

KEVIN R. DUCK (23043)
5040 Ambassador Caffery Parkway, Suite 200
Lafayette, Louisiana 70508
Tele: (337) 406-1144
Fax: (337) 406-1050
Email: krd@ducklawfirm.com

St. Landry Parish Clerk of Court's Office.
Filed   9 - 6 - 20 19
By. Clerk

26