# U.S. District Court
## Middle District of Florida (Ft. Myers)
## CIVIL DOCKET FOR CASE #: 2:19-cv-00721-SPC-NPM
## Internal Use Only

Lamatrice v. Monsanto Company
Assigned to: Judge Sheri Polster Chappell
Referred to: Magistrate Judge Nicholas P. Mizell
Cause: 28:1332 Diversity-Product Liability

Date Filed: 10/04/2019
Jury Demand: Plaintiff
Nature of Suit: 367 Personal Injury: Health Care/Pharmaceutical Personal Injury Product Liability
Jurisdiction: Diversity

**Plaintiff**

**Ray Lamatrice**

represented by **Christopher D. Smith**
Christopher D. Smith, PA
Suite 203
5391 Lakewood Ranch Blvd
Sarasota, FL 34240
941/907-4774
Fax: 941/907-3040
Email: chris@chrissmith.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 10/04/2019 | 1 | COMPLAINT *against Monsanto Company* against Ray Lamatrice with Jury Demand (Filing fee $ 400 receipt number 113A-15995392) filed by Ray Lamatrice. (Attachments: # 1 Civil Cover Sheet, # 2 Proposed Summons)(Smith, Christopher) (Entered: 10/04/2019) |
| 10/04/2019 | 2 | NEW CASE ASSIGNED to Judge Sheri Polster Chappell and Magistrate Judge Nicholas P. Mizell. New case number: 2:19-cv-721-FtM-38NPM. (SJB) (Entered: 10/04/2019) |
| 10/07/2019 | 3 | SUMMONS issued as to Monsanto Company. (drn) (Entered: 10/07/2019) |
| 10/07/2019 | 4 | **STANDING ORDER: Filing of documents that exceed twenty-five pages. Signed by All Divisional Judges on 10/7/2019. (drn)** (Entered: 10/07/2019) |

# UNITED STATES DISTRICT COURT

## FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| RAY LAMATRICE,<br><br>     *Plaintiff*,<br><br>-vs-<br><br>MONSANTO COMPANY,<br><br>     *Defendant*. | Case No. 19-721<br><br>**COMPLAINT AND**<br>**DEMAND FOR JURY TRIAL** |

## <u>COMPLAINT</u>

COMES NOW, the Plaintiff, RAY LAMATRICE ("Lamatrice"), by and through his undersigned counsel, and hereby brings this Complaint against MONSANTO COMPANY ("Monsanto") and alleges as follows:

### <u>Jurisdiction and Venue</u>

1. Federal diversity jurisdiction in this Court is proper under 28 U.S.C. § 1332 because Lamatrice is a citizen of Florida, a different state than Monsanto's states of citizenship, and the aggregate amount in controversy exceeds $75,000, exclusive of interest and costs.

2. This Court has personal jurisdiction over Monsanto because Monsanto knows or should have known that its "Roundup" products are sold throughout the State of Florida, and, more specifically, caused Roundup to be sold to Lamatrice in the State of Florida.

3.      In addition, Monsanto maintains sufficient contacts with the State of Florida such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

4.      Venue is proper within this District under 28 U.S.C. § 1391(b)(2) because Lamatrice's injury occurred in and was diagnosed in this District. Further, Monsanto, as a corporate entity, is deemed to reside in any judicial district in which it is subject to personal jurisdiction.

<u>**The Parties**</u>

5.      Lamatrice is a citizen of Florida and resides in the city of Port Charlotte in Charlotte County, Florida. Lamatrice was exposed to Roundup in and around Charlotte County, Florida from approximately 1997 to 2018. He was diagnosed with non-Hodgkins lymphoma ("NHL") in Port Charlotte, Florida sometime in November of 2004.

6.      Monsanto is a Delaware corporation with its headquarters and principle place of business in St. Louis, Missouri.

7.      At all times relevant hereto, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup, which contains the active ingredient glyphosate and the surfactant POEA, as well as adjuvants and other "inert" ingredients.

<u>**Background**</u>

8.      Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

9.      Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic

amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, washing or peeling produce or grain does not entirely remove the chemical.

10.     For nearly 40 years, farms across the world have used Roundup without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup –glyphosate—is a probable cause of cancer. Monsanto assured the public that Roundup was harmless. In order to prove this, Monsanto has championed falsified data and has attacked legitimate studies that revealed Roundup's dangers. Monsanto has led a prolonged campaign of misinformation to convince government agencies, farmers, and the general population that Roundup is safe.

11.     The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup. From the outset, Monsanto marketed Roundup as a "safe" general-purpose herbicide for widespread commercial and consumer use. It still markets Roundup as safe today.

12.     In addition to the active ingredient glyphosate, Roundup formulations also contain adjuvants and other chemicals, such as the surfactant Polyethoxylated tallow amine (POEA), which are considered "inert" and therefore protected as "trade secrets" in manufacturing. Growing evidence suggests that these adjuvants and additional components of Roundup formulations are not, in fact, inert and are toxic in their own right.

13.      The manufacture, formulation, and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq*. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA. 7 U.S.C. § 136a(a).

14.      The EPA and the State of Florida registered Roundup for distribution, sale, and manufacture in the United States and the State of Florida.

15.      FIFRA generally requires that the registrant, Monsanto in the case of Roundup, conduct the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

16.      In the case of glyphosate, and therefore Roundup, the EPA intended to release its preliminary risk assessment—in relation to the reregistration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings, releasing the report, publicly, on September 12, 2016.

17.      Based on early carcinogenicity studies showing that glyphosate caused cancer in mice and rats, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Monsanto, including self-commissioned review studies it provided to the EPA, the EPA changed its classification

to *evidence of non-carcinogenicity in humans* (Group E) in 1991. However, the EPA made clear that the 1991 designation did not mean that glyphosate does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

18.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of Roundup products for registration purposes committed fraud.

19.     In the first instance, Monsanto, in seeking initial registration of Roundup by the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup.

20.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

21.     Three top IBT executives were convicted of fraud in 1983.

22.     In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup. In that same year, the owner of Craven Laboratories and three of its employees were

indicted and convicted of fraudulent laboratory practices in the testing of pesticides and herbicides.

23.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup in 115 countries.

24.     The success of Roundup was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly.

25.     In 1996, Monsanto began developing genetically engineered "Roundup Ready Seeds" which allowed farmers to spray Roundup onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup even further.

26.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. The NYAG pointed to several different deceptive and misleading representations made by Monsanto.

27.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

> a.  Its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b. Its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable.

c. Its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d. Its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e. Glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides.

f. Its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

28.     Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief it is still has not done so today.

29.     The International Agency for Research on Cancer ("IARC") process for the classification of glyphosate followed IARC's stringent procedures for the evaluation of a chemical agent. Over time, the IARC agents Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

30.     In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

31.     In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

32.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph Volume 112. For Volume 112, a Working Group of 17 experts from 11 countries met at IARC from March 3-10, 2015 to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated a nearly one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

33.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

34.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air surface, water, and groundwater, as well as in food.

35.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

36.     The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

37.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

38.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor: renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

39.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid ("AMPA"). Blood AMPA detection after exposure suggest intestinal microbial metabolism in humans.

40.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

41.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances,

including the inhibition of protein and secondary product biosynthesis and general
metabolic disruption.

42.     The IARC Working Group also reviewed an Agricultural Health Study,
consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and
North Carolina. While this study differed from others in that it was based on a self-
administered questionnaire, the results support an association between glyphosate
exposure and multiple myeloma, hairy cell leukemia ("HCL"), and chronic lymphocytic
leukemia ("CLL"), in addition to several other cancers.

43.     The EPA has a technical facts sheet, as part of its Drinking Water and
Health, National Primary Drinking Water Regulations publication, relating to glyphosate.
This technical facts sheet predates IARC's March 20, 2015 evaluation. The fact sheet
describes the release patterns for glyphosate as follows:

> Release Patterns
>
> Glyphosate is released to the environment in its use as a herbicide for
> controlling woody and herbaceous weeds on forestry, right-of-way, cropped and
> non-cropped sites. These sites may be around water and in wetlands.
>
> It may also be released to the environment during its manufacture,
> formulation, transport, storage, disposal and cleanup, and from spills. Since
> glyphosate is not a listed chemical in the Toxics Release Inventory, data on
> releases during its manufacture and handling are not available.
>
> Occupational workers and home gardeners may be exposed to glyphosate
> by inhalation and dermal contact during spraying, mixing, and cleanup. They may
> also be exposed by touching soil and plants to which glyphosate was applied.
> Occupational exposure may also occur during glyphosate's manufacture, transport
> storage, and disposal.

44.     In addition to the toxicity of the active ingredient, glyphosate, several
studies support the hypothesis that the glyphosate-based formulation in Roundup
products is more dangerous and toxic than glyphosate alone. Indeed, as early as 1991,

available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.

45.     In 2002, a study by Julie Marc, entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation," revealed that Roundup causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cell cycles.

46.     A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation. The researchers noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."

47.     In 2005, a study by Francisco Peixoto, entitled "Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup's effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone. The Peixoto study further suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant POEA, or in the alternative, due to a potential synergic effect between glyphosate and other ingredients in the Roundup formulation.

48.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells. The study tested dilution levels of Roundup and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food. The researchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability and amplify toxicity of glyphosate alone. The researchers further suggested that assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants present in Roundup are not, in fact, inert and that Roundup is potentially far more toxic than its active ingredient glyphosate alone.

49.     The results of these studies were at all times available to Defendant. Defendant thus knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies of Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Lamatrice from Roundup.

50.     Despite its knowledge that Roundup is considerably more dangerous than glyphosate alone, Defendant continue to promote Roundup as safe.

51.     Several countries around the world have instituted bans on the sale of Roundup and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup become more widely known.

52.     The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup, which will take effect by the end of 2015.

53.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

54.     France banned the private sale of Roundup and glyphosate following the IARC assessment for Glyphosate.

55.     Bermuda banned both the private and commercial sale of glyphosates, including Roundup. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended.

56.     The Sri Lankan government banned the private and commercial use of glyphosate, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

57.     The government of Colombia announced its ban on using Roundup and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

58.     On September 4, 2015, California's Office of Environmental Health Hazard Assessment ("OEHHA") published a notice of intent to include glyphosate on the state's list of known carcinogens under Proposition 65.

59.     On March 28, 2017 OEHHA posted Notice on its website that glyphosate would be added to the list of chemicals known to the State of California to cause cancer for purposes of Proposition 65.

60.     On November 12, 2015, the European Food Safety Authority ("EFSA"), the European Union's primary agency for food safety, reported on its evaluation of the Renewal Assessment Report ("RAR") on glyphosate. The Rapporteur Member State

assigned to glyphosate, the German Federal Institute for Risk Assessment ("BFR"), had

produced the RAR as part of the renewal process for glyphosate in the EU.

61.    Based on a review of the RAR, which included data from industry-

submitted unpublished studies, EFSA sent its own report ("Conclusion") to the European

Commission, finding that "glyphosate is unlikely to pose a carcinogenic hazard to

humans and the evidence does not support classification with regard to its carcinogenic

potential according to Regulation (EC) No 1272/2008." EFSA therefore disagreed with

IARC: glyphosate was not genotoxic and did not present a carcinogenic threat to humans.

62.    On November 27, 2015, 96 independent academic and governmental

scientists from around the world submitted an open letter to the EU health commissioner,

Vytenis Andriukaitis. The scientists expressed their strong concerns and urged the

commissioner to disregard the "flawed" EFSA report, arguing that "the BFR decision is

not credible because it is not supported by the evidence and it was not reached in an open

and transparent manner."

63.    Signatories to the letter included Dr. Christopher J. Portier, Ph.D., and

other renowned international experts in the field, some of whom were part of the IARC

Working Group assigned to glyphosate.

64.    In an exhaustive and careful examination, the scientists scrutinized

EFSA's conclusions and outlined why the IARC Working Group decision was "by far the

more credible":

> The IARC WG decision was reached relying on open and transparent
> procedures by independent scientists who completed thorough conflict-of-
> interest statements and were not affiliated or financially supported in any
> way by the chemical manufacturing industry. It is fully referenced and
> depends entirely on reports published in the open, peer-reviewed
> biomedical literature. It is part of a long tradition of deeply researched and

highly credible reports on the carcinogenicity of hundreds of chemicals issued over the past four decades by IARC and used today by international agencies and regulatory bodies around the world as a basis for risk assessment, regulation and public health policy.

65.     The letter also critiqued the EFSA report's lack of transparency and the opacity surrounding the data cited in the report: "citations for almost all of the references, even those from the open scientific literature, have been redacted from the document" and "there are no authors or contributors listed for either document, a requirement for publication in virtually all scientific journals." Because BFR relied on unpublished, confidential industry-provided studies, it is "impossible for any scientist not associated with BFR to review this conclusion with scientific confidence."

66.     On March 3, 2016, the letter was published in the Journal of Epidemiology & Community Health.

67.     On February 17, 2016, a consensus statement published in the journal *Environmental Health*, entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement," assessed the safety of glyphosate-based herbicides ("GBHs"). The paper's "focus is on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with recent discoveries about the toxicity and human health risks stemming from use of GBHs." The researchers drew seven factual conclusions about GBHs:

    a.    GBHs are the most heavily applied herbicide in the world and usage continues to rise;

    b.    Worldwide, GBHs often contaminate drinking water sources, precipitation, and air, especially in agricultural regions;

    c.    The half-life of glyphosate in water and soil is longer than previously recognized;

     d.   Glyphosate and its metabolites are widely present in the global soybean supply;

     e.   Human exposures to GBHs are rising;

     f.   Glyphosate is now authoritatively classified as a probable human carcinogen; and

     g.   Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science.

68.     The researchers also critique the current practice of regulators who largely rely on "unpublished, non-peer reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."

69.     Lamatrice is 66 years old.

70.     Lamatrice was exposed to Roundup in Port Charlotte, Florida from approximately 1997 to 2018 while spraying Roundup around his house. Lamatrice sprayed Roundup approximately every 10 to 14 days from 1997 to 2018. Each application would last about 30 minutes. Lamatrice used pre-mixed Roundup.

71.     On or about November 2004, Lamatrice was diagnosed with NHL in Port Charlotte, Florida at Florida Cancer Center, and suffered the effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup and Monsanto's wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing, and sale of Roundup.

72.     Lamatrice was treated with chemo-therapy for six months and radiation for three months following his diagnosis.

73.     As a direct and proximate result of these injuries, Lamatrice has incurred and will incur medical expenses in the future and has endured and will endure pain and suffering and loss of enjoyment of life, and Lamatrice has otherwise been damaged in a personal and pecuniary nature.

74.     During the time that Lamatrice was exposed to Roundup, he did not know that exposure to Roundup was injurious to his health or the health of others.

### Tolling of Statute of Limitations

75.     Lamatrice had no way of knowing about the risk of serious illness associated with the use and/or exposure to Roundup and glyphosate until well after IARC released its formal assessment of glyphosate in July 2015. This is the quintessential case for tolling.

76.     Within the time period of any applicable statutes of limitations, Lamatrice could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup and glyphosate is injurious to human health.

77.     Lamatrice did not discover, and did not know of facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup and glyphosate; nor would a reasonable and diligent investigation by him have disclosed that Roundup and glyphosate would cause illness.

78.     For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Lamatrice's claims.

79.     All applicable statutes of limitations have also been tolled by Monsanto's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

80.     Instead of disclosing critical safety information about Roundup and glyphosate, Monsanto has consistently falsely represented the safety of its Roundup products.

81.     Monsanto was under a continuous duty to disclose to consumers, users, and other persons coming into contact with its products, including Lamatrice, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup and glyphosate.

82.     Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup and glyphosate and the serious risks associated with the use of and/or exposure to its products.

83.     Based on the foregoing, Monsanto is estopped from relying on any statutes of limitations in defense of this action.

## COUNT I – STRICT LIABILITY (DESIGN DEFECT)

84.     Lamatrice re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1 – 83 as if fully set forth herein.

85.     Lamatrice brings this strict liability claim against Monsanto for defective design.

86.     At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to

consumers and users and other persons coming into contact with them, including Lamatrice, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto. At all times relevant to this litigation, Monsanto designed, researched, developed, formulated, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup products used by Lamatrice, and/or to which Lamatrice was exposed, as described above.

87.    At all times relevant to this litigation, Monsanto's Roundup products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, Lamatrice.

88.    At all times relevant to this litigation, Monsanto's Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Florida and throughout the United states, including Lamatrice, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

89.    Monsanto's Roundup products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defected in design and formulation in that when they left the hands of Monsanto's manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

90.    Monsanto's Roundup products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by

Monsanto were defective in design and formulation in that when they left the hands of

Monsanto's manufacturers and/or suppliers, the foreseeable risks associated with these

products' reasonable foreseeable uses exceeded the alleged benefits associated with their

design and formulation.

91.     Therefore, at all times relevant to this litigation, Monsanto's Roundup

products, as researched, tested, developed, designed, licensed, manufactured, packaged,

labeled, distributed, sold and marketed by Monsanto, were defective in design and

formulation, in one or more of the following ways:

a. When placed in the stream of commerce, Monsanto's Roundup products
   were defective in design and formulation, and, consequently, dangerous to
   an extent beyond that which an ordinary consumer would contemplate.

b. When placed in the stream of commerce, Monsanto's Roundup products
   were unreasonably dangerous in that they were hazardous and posed a
   grave risk of cancer and other serious illnesses when used in a reasonably
   anticipated manner.

c. When placed in the stream of commerce, Monsanto's Roundup products
   contained unreasonably dangerous design defects and were not reasonably
   safe when used in a reasonably anticipated or intended manner.

d. Monsanto did not sufficiently test, investigate, or study its Roundup
   products and, specifically, the active ingredient glyphosate.

e. Exposure to Roundup and glyphosate-containing products presents a risk
   of harmful side effects that outweighs any potential utility stemming from
   the use of the herbicide.

f. Monsanto knew or should have known at the time of marketing its Roundup products that exposure to Roundup and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g. Monsanto did not conduct adequate post-marketing surveillance of its Roundup products.

h. Monsanto could have employed safe alternative designs and formulations.

92.     At all times relevant to this litigation, Lamatrice used and/or was exposed to the use of Monsanto's Roundup products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

93.     Lamatrice could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products before or at the time of exposure.

94.     The harm caused by Monsanto's Roundup products far outweighed their benefit, rendering Monsanto's products dangerous to an extent beyond that which an ordinary consumer would contemplate. Monsanto's Roundup products were and are more dangerous than alternative products and Monsanto could have designed its Roundup products to make them less dangerous. Indeed, at the time that Monsanto designed its Roundup products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

95.     At the time Roundup products left Monsanto's control, there was a practical, technically feasible, and safer alternative design that would have prevented the

harm without substantially impairing the reasonably anticipated or intended function of Monsanto's Roundup herbicides.

96.     Monsanto's defective design of Roundup amounts to willful, wanton, and/or reckless conduct by Monsanto.

97.     Therefore, as a result of the unreasonably dangerous condition of its Roundup products, Monsanto is strictly liable to Lamatrice.

98.     The defects in Monsanto's Roundup products were substantial and contributing factors in causing Lamatrice grave injuries, and, but for Monsanto's misconduct and omissions, Lamatrice would not have sustained his injuries.

99.     As a direct and proximate result of Monsanto placing its defective Roundup products into the stream of commerce, Lamatrice has suffered and continues to suffer grave injuries, and has endured pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Lamatrice will continue to incur these expenses in the future.


    WHEREFORE, Lamatrice respectfully requests that this Court enter judgment in Lamatrice's favor for compensatory and punitive damages, together with interest, costs, attorney's fees, and all such other and further relief as this Court deems just and proper.

## COUNT II – STRICT LIABILITY (FAILURE TO WARN)

100.     Lamatrice re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1 – 83 as if fully set forth herein.

101.     Lamatrice brings this strict liability claim against Monsanto for failure to warn.

102. At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, including Lamatrice, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Monsanto.

103. Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Lamatrice, and Monsanto therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of Roundup and glyphosate-containing products.

104. At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps necessary to ensure that its Roundup prodcuts did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn Lamatrice of the dangers associated with Roundup use and exposure. Monsanto, as manufacturer, seller, or distributor of chemical herbicides, is held to the knowledge of an expert in the field.

105. At the time of manufacture, Monsanto could have provided warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing

products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to these products.

106.     At all times relevant to this litigation, Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its Roundup products and to those who would foreseeably use or be harmed by Monsanto's herbicides, including Lamatrice.

107.     Despite the fact that Monsanto knew or should have known that Roundup products posed a grave risk of harm, it failed to warn of the dangerous risks associated with their use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or scientifically knowable to Monsanto through appropriate research and testing by known methods, at the time it distributed, supplied, or sold the product, and not known to end users and consumers, such as Lamatrice.

108.     Monsanto knew or should have known that its Roundup and glyphosate-containing products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products. Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup and glyphosate.

109.     At all times relevant to this litigation, Monsanto's Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products throughout the United States, including Lamatrice, without

substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

110.     At all times relevant to this litigation, Lamatrice used and/or was exposed to the use of Monsanto's Roundup products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

111.     Lamatrice could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products before or at the time of Lamatrice's exposure. Lamatrice relied upon the skill, superior knowledge, and judgment of Monsanto.

112.     Monsanto knew or should have known that the minimal warnings disseminated with its Roundup products were inadequate, but it failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and horticultural applications.

113.     The information that Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled agricultural workers, horticultural workers, and/or at-home users such as Lamatrice to utilize the products safely and with adequate protection. Instead, Monsanto disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have

known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

114.     To this day, Monsanto has failed to adequately and accurately warn of the true risks of Lamatrice's injuries associated with the use of and exposure to Roundup and its active ingredient glyphosate, a probable carcinogen.

115.     As a result of their inadequate warnings, Monsanto's Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed by Monsanto, and used by Lamatrice.

116.     Monsanto is liable to Lamatrice for injuries caused by its failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its Roundup products and the risks associated with the use of or exposure to Roundup and glyphosate.

117.     The defects in Monsanto's Roundup products were substantial and contributing factors in causing Lamatrice's injuries, and, but for Monsanto's misconduct and omissions, Lamatrice would not have sustained his injuries.

118.     Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup products, Lamatrice could have avoided the risk of developing injuries as alleged herein.

119.     As a direct and proximate results of Monsanto placing its defective Roundup products into the stream of commerce, Lamatrice has suffered and continues to suffer severe injuries, and has endured physical pain and discomfort, as well as economic

hardship, including considerable financial expenses for medical care and treatment. Lamatrice will continue to incur these expenses in the future.

WHEREFORE, Lamatrice respectfully requests that this Court enter judgment in Lamatrice's favor for compensatory and punitive damages, together with interest, costs, attorney's fees, and all such other and further relief as this Court deems just and proper.

## COUNT III - NEGLIGENCE

120.    Lamatrice re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1 – 83 as if fully set forth herein.

121.    Monsanto, directly or indirectly, caused Roundup products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Lamatrice.

122.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

123.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the marketing, advertisement, and sale of its Roundup products. Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup and, in particular, its active ingredient glyphosate.

124.    At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup and specifically, the carcinogenic properties of the chemical glyphosate.

125.    Accordingly, at all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup products could cause Lamatrice injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Lamatrice.

126.    Monsanto knew or, in the exercise of reasonable care, should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Lamatrice from Roundup.

127.    Monsanto knew or, in the exercise of reasonable care, should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

128.    Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup and glyphosate-containing products.

129.    As such, Monsanto breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup products, in that Monsanto manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent

in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

130.　Monsanto failed to appropriately and adequately test Roundup, Roundup adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Lamatrice from Roundup.

131.　Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Monsanto has failed to do so. Indeed, Monsanto has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup and glyphosate.

132.　Monsanto's negligence included:

　　　a.　Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup products without thorough and adequate pre- and post-market testing;

　　　b.　Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serios harm associated with human use of and exposure to Roundup.

　　　c.　Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup products and glyphosate-containing products were safe for their intended use in agriculture, horticulture, and at-home use;

d. Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

e. Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of Roundup products so as to avoid the risk of serious harm associated with the prevalent use of Roundup/glyphosate as an herbicide.

f. Failing to design and manufacture Roundup prodcuts so as to ensure they were at least as safe and effective as other herbicides on the market;

g. Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Monsanto could reasonably foresee would use and/or be exposed to its Roundup products;

h. Failing to disclose to Lamatrice, users, consumers, and the general public that the use of and exposure to Roundup presented severe risks of cancer and other grave illnesses;

i. Failing to warn Lamatrice, users consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Lamatrice and other users or consumers.

Page **30** of 33

j.   Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup and glyphosate-containing products;

k.   Representing that its Roundup products were safe for their intended use when, in fact, Monsanto knew or should have known that the products were not safe for their intended use.

l.   Declining to make or propose any changes to Roundup products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup and glyphosate;

m.   Advertising, marketing, and recommending the use of Roundup products, while concealing and failing to disclose or warn of the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup and glyphosate;

n.   Continuing to disseminate information to its consumers, which indicate or imply that Monsanto's Roundup products are not unsafe for use in the agricultural, horticultural industries, and/or home use; and

o.   Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

133.   Monsanto knew and/or should have known that it was foreseeable that consumers and/or users, such as Lamatrice, would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, labeling, and distribution, and sale of Roundup.

134. Lamatrice did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup or its active ingredient glyphosate.

135. Monsanto's negligence was the proximate cause of the injuries, harm, and economic losses that Lamatrice suffered, and will continue to suffer, as described herein.

136. Monsanto's conduct, as described above, was reckless. Monsanto regularly risks the lives of consumers and users of its products, including Lamatrice, with full knowledge of the dangers of its products. Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Lamatrice. Monsanto's reckless conduct therefore warrants an award of punitive damages.

137. As a proximate result of Monsanto's wrongful acts and omissions in placing its defective Roundup products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Lamatrice has suffered and continues to suffer sever and permanent physical and emotional injuries. Lamatrice has endured pain and suffering, has suffered economic losses (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

WHEREFORE, Lamatrice respectfully requests that this Court enter judgment in Lamatrice's favor for compensatory and punitive damages, together with interest, costs, attorney's fees, and all such other and further relief as this Court deems just and proper.

**JURY TRIAL DEMAND**

138.    Lamatrice demands a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court enter judgment in his favor and against

Monsanto, awarding as follows:

   A.  compensatory damages in an amount to be proven at trial;

   B.  punitive damages;

   C.  costs including reasonable attorneys' fees, court costs, and other litigation

       expenses; and

   D.  any other relief the Court may deem just and proper.

Dated: October 4, 2019

                               CHRISTOPHER D. SMITH P.A.

                               */s/Christopher D. Smith*
                               Christopher D. Smith, Esq. FBN 0605433
                               5391 Lakewood Ranch Blvd. N. STE. 203
                               Sarasota, FL 34240-8617
                               P: 941-202-2222    F: 941-907-3040
                               Primary Email: smith@chrissmith.com
                               Secondary Email: john@chrissmith.com
                               Tertiary Email: marci@chrissmith.com

                               *Attorney for Plaintiff*