# U.S. District Court
## Southern District of Iowa (Davenport)
## CIVIL DOCKET FOR CASE #: 3:19-cv-00072-RGE-SBJ
### Internal Use Only

Skoronski v. Monsanto Company, Inc.  
Assigned to: Judge Rebecca Goodgame Ebinger  
Referred to: Magistrate Judge Stephen B. Jackson, Jr  
Cause: 28:1407md MDL: Multidistrict Litigation

Date Filed: 10/04/2019  
Jury Demand: Plaintiff  
Nature of Suit: 365 Personal Inj. Prod. Liability  
Jurisdiction: Diversity

**Plaintiff**

**Ron F Skoronski**　　　　　　　　　　represented by **A John Arenz**  
O'CONNOR & THOMAS, P.C.  
1000 MAIN STREET  
DUBUQUE, IA 52001  
563 557 8400  
Fax: 888-391-3056  
Email: jarenz@octhomaslaw.com  
*LEAD ATTORNEY*  
*ATTORNEY TO BE NOTICED*  
*Designation: Retained*

**Davin C Curtiss**  
O'CONNOR & THOMAS, P.C.  
1000 MAIN STREET  
DUBUQUE, IA 52001  
563 557 8400  
Fax: 1-888-391-3056  
Email: dcurtiss@octhomaslaw.com  
*LEAD ATTORNEY*  
*ATTORNEY TO BE NOTICED*  
*Designation: Retained*

V.

**Defendant**

**Monsanto Company, Inc.**

| Date Filed | # | Docket Text |
|---|---|---|
| 10/04/2019 | 1 | COMPLAINT *and Jury Demand* against Monsanto Company, Inc. Filing fee paid in the amount of $ 400, receipt number 0863-3941265., filed by Ron F Skoronski. Notice of Dismissal for lack of Service deadline set for 1/2/2020. Rule 16 Notice of Dismissal set for 1/2/2020.(Curtiss, Davin) (Entered: 10/04/2019) |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA

RON F. SKORONSKI, )
 )  Case No. _____
      Plaintiff, )
 )
vs. )
 )  (Tag-along to MDL 2741, U.S. District
MONSANTO COMPANY, INC., )  Court, Northern District of California)
 )
      Defendant. )

**COMPLAINT AND JURY DEMAND**

COMES NOW Plaintiff, Ron F. Skoronski (hereafter "Skoronski"), by and through his attorneys, O'Connor & Thomas, P.C., and for his Complaint against Defendant Monsanto Company, Inc. states:

**General Allegations**

1. Plaintiff Skoronski is a resident and citizen of Mount Pleasant, Henry County, Iowa.

2. Skoronski was exposed to Roundup from around May, 2000 to March, 2007 in Spring Green, Wisconsin and Garden Grove, Iowa.

3. Skoronski was diagnosed with non-Hodgkin's lymphoma in March, 2007.

4. Defendant Monsanto Company, Inc. (hereafter "Monsanto") is a Delaware Corporation whose home office is located at 800 N. Lindbergh Blvd., St. Louis, Missouri.

5. Monsanto is authorized to and presently does business in Iowa.

1

6. Diversity jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Skoronski and Monsanto and the aggregate amount in controversy in this action exceeds $75,000.00, exclusive of interest and court costs.

7. This Court has personal jurisdiction over Monsanto because Monsanto does business in Iowa and markets and sells its products to citizens of Iowa.

8. Monsanto has sufficient minimum contacts with the State of Iowa such that this Court's exercise of personal jurisdiction over Monsanto does not offend traditional notions of fair play and substantial justice.

9. Venue is proper within the Southern District of Iowa because Monsanto sells, markets, and/or distributes products in the Southern District of Iowa and is subject to personal jurisdiction in the Southern District of Iowa. In addition, some of the events giving rise to this action happened in or are related to this District.

## FACTUAL BACKGROUND

### Monsanto's Development of Roundup

10. Monsanto is a multinational agricultural biotechnology corporation.

11. In the 1970s, Monsanto discovered the herbicidal properties of glyphosate.

12. Glyphosate is a broad-spectrum herbicide that is used to kill weeds and grasses that compete with commercial crops.

13. Glyphosate is "non-selective"—it kills any organism that produces a specific enzyme known as 5-enolpyruvylshikimic acid-3-phosphate synthase ("EPSP synthase").

14. Glyphosate works by inhibiting EPSP synthase, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

15. Glyphosate is sprayed as a liquid and is absorbed by plants directly through their leaves, stems, and roots. Detectable quantities of glyphosate accumulate in the plant tissues.

16. Monsanto is the world's leading producer of glyphosate.

17. Since approximately 1974, Monsanto has designed, researched, manufactured, marketed, sold, and distributed a glyphosate-based herbicide under the name "Roundup."

18. When Monsanto introduced Roundup, it claimed it could kill almost every weed without causing harm to people or the environment.

19. From Roundup's inception, Monsanto has marketed Roundup as a "safe", general-purpose herbicide that is appropriate for both commercial and consumer use.

20. Monsanto is also involved in the research, development, design, manufacture, marketing, sale, and/or distribution of genetically modified crops which are marketed as being resistant to Roundup, or "Roundup Ready."

21. Roundup Ready crops are resistant to glyphosate, so farmers who use Roundup Ready seeds can spray Roundup onto their fields during the growing season without harming their crops.

22. Monsanto's development of Roundup Ready seeds has driven an increase in the use of Roundup.

23. Roundup has become Monsanto's most profitable product, accounting for nearly half of Monsanto's revenue in 2000.

**REGULATION OF HERBICIDES UNDER FEDERAL LAW**

24. Herbicides such as Roundup are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq.*

3

25. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") before their distribution, sale, or use, except as otherwise provided by FIFRA.

26. As part of the registration process for pesticides, the EPA requires a number of tests to evaluate the toxicity of a pesticide to people and other non-target organisms as well as other adverse effects on the environment.

27. FIFRA generally requires that the registrant conducts the health and safety testing of pesticide products according to specified protocols and submit the test data to the EPA for review and evaluation.

28. Registration of a product with the EPA does not mean that the product is safe, but that its use in accordance with label directions "will not generally cause unreasonable adverse effects on the environment." See 7 U.S.C. § 136(a)(c)(5)(D).

29. Under FIFRA, "unreasonable effects on the environment" means "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." See 7 U.S.C. § 136(bb).

30. The EPA and the State of Iowa registered Roundup for distribution, sale, and manufacture in the United States and the State of Iowa.

31. Under FIFRA, evaluation of a pesticide is completed at the time the product is initially registered, but the data necessary to register a pesticide has changed over time.

**EPA CLASSIFICATION OF GLYPHOSATE**

32. The EPA originally classified glyphosate as "possibly carcinogenic to humans" in 1985 after studies showed glyphosate could cause cancer in lab animals.

33. After Monsanto provided contrary studies to the EPA, the EPA changed glyphosate's classification to "evidence of non-carcinogenic in humans" in 1991.

4

34. On two different occasions, the EPA found that the laboratories Monsanto hired to test the toxicity of Roundup for registration purposes had committed fraud.

35. The first instance of fraud involved Industrial Bio-Test Laboratories ("IBT"), who Monsanto hired to conduct toxicology studies relating to Roundup.

36. IBT performed approximately 30 tests on glyphosate and products containing glyphosate, including nine of the 15 residue tests needed to register Roundup with the EPA.

37. A 1976 inspection of IBT by the U.S. Food and Drug Administration ("FDA") revealed discrepancies between the raw data and the final report on the toxicological impact of glyphosate.

38. A subsequent EPA audit of IBT determined that IBT's toxicology results for Roundup were invalid.

39. Three top executives of IBT were convicted of fraud in 1983.

40. In 1991, Monsanto hired Craven Laboratories to perform studies on pesticides and herbicides including Roundup.

41. The owner and three employees of Craven Laboratories were subsequently indicted and convicted of fraudulent laboratory practices in the testing of pesticides and herbicides.

42. The EPA is now in the process of re-evaluating all pesticide products through a process called "re-registration." See 7 U.S.C. § 136a-1.

43. As part of "re-registration", the EPA is requiring pesticide registrants to complete additional tests and submit additional data for review and evaluation.

5

44. The EPA completed its review of glyphosate in early 2015 but delayed releasing its findings pending further review in light of the World Health Organization's findings on glyphosate released in March, 2015, which labeled glyphosate as a "probable carcinogen."

## EVIDENCE OF ROUNDUP'S CARCINOGENITY

45. A 1997 study by Chris Clements entitled "Genotoxicity of select herbicides in *Rana catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay" found that tadpoles exposed to Roundup exhibited significant DNA damage when compared to unexposed control animals.

46. A 2002 study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation" by Julie Marc found that Roundup caused delays in the cell cycles of sea urchins while glyphosate alone did not.

47. A 2004 study by Julie Marc entitled "Glyphosate-based pesticides affect cell cycle regulation" showed a molecular link between glyphosate-based products and cell cycle dysregulation.

48. According to Marc's 2004 study, "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell."

49. A 2005 study published by Francisco Peixoto showed that Roundup was much more toxic and harmful to rat liver mitochondria than the same concentrations of glyphosate alone.

50. The Peixoto study theorized that the harmful effects of Roundup could not be exclusively attributed to glyphosate and may be the result of other chemicals, such as the surfactant POEA, or possible synergy between glyphosate and Roundup formulation procedures.

6

51. A 2009 study by Nora Benachour and Gilles-Eric Seralini looked at the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

52. The 2009 study concluded that supposedly inert ingredients of Roundup amplify the toxicity of glyphosate and change human cell permeability.

53. The 2009 study also suggested that the evaluation of glyphosate toxicity should consider the presence of all chemicals used in the formulation of the complete pesticide.

54. Finally, the 2009 study concluded that Roundup is always more toxic than it active ingredient glyphosate.

## IARC CLASSIFICATION OF GLYPHOSATE

55. On March 24, 2015, the World Health Organization's International Agency for Research on Cancer ("IARC") published its conclusion that the glyphosate contained in Roundup is a "probable carcinogen."

56. The IARC also found an increased risk of non-Hodgkin's lymphoma, as well as several subtypes of non-Hodgkin's lymphoma, for those exposed to glyphosate.

57. The IARC also concluded that glyphosate caused DNA and chromosomal damage in human cells.

58. The results of the studies discussed above were confirmed in published, peer-reviewed studies and were at all times available and/or known to Monsanto.

59. Monsanto knew or should have known that Roundup is more toxic than glyphosate alone, and that studies on Roundup, its adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Skoronski and others from Roundup.

60. Monsanto knew or should have known that tests limited to Monsanto's active ingredient glyphosate were insufficient to prove the safety of Roundup.

61. Defendant failed to adequately and appropriately test Round up, its adjuvants and inert ingredients, and/or the surfactant POEA and instead relied upon flawed studies designed to protect its own economic interests rather than the safety and well-being of Skoronski and other consumers.

62. Despite its knowledge that Roundup was more dangerous than glyphosate alone, Monsanto continued to market and promote Roundup as safe.

**SKORONSKI'S EXPOSURE TO ROUNDUP**

63. Skoronski has used Roundup since approximately May, 2000 on his properties in Iowa and Wisconsin.

64. Since May, 2000, Skoronski has sprayed Roundup two to three times per week during the months of May, June and July using a tractor and ATV sprayer to control weeds in his crop fields.

65. Skoronski was diagnosed with non-Hodgkin's lymphoma ("NHL") in March, 2007.

66. Since his diagnosis, Skoronski has been treated for his NHL.

67. While he was using Roundup, Skoronski did not know that exposure to Roundup was injurious to his health or the health of others.

68. Skoronski first learned that exposure to Roundup can cause NHL and other serious illnesses sometime after July 29, 2015 when the IARC first published its evaluation of glyphosate.

## TOLLING OF THE STATUTE OF LIMITATIONS

69. Skoronski had no way of knowing about the risks associated with the use of and/or exposure to Roundup and Glyphosate prior to the IARC releasing its assessment of glyphosate as a probable carcinogen in July, 2015.

70. Within the time period of any applicable statute of limitations, Skoronski could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup and glyphosate was injurious to human health or that it would cause Skoronski's non-Hodgkin's lymphoma.

71. For the above reasons, the discovery rule tolls all applicable statute of limitations on Skoronski's claims.

72. All applicable statutes of limitations have also been tolled by Monsanto's fraudulent concealment of the risks associated with the use of and exposure to Roundup and glyphosate.

73. At all relevant times, Monsanto has asserted that Roundup is safe, non-toxic, and non-carcinogenic.

74. As a result of Monsanto's actions, Skoronski did not know, and could not have reasonably known or learned through reasonable diligence, that his exposure to Roundup and glyphosate led to the injuries and damages Skoronski alleges herein.

75. Monsanto's fraudulent concealment estops it from relying on any statute of limitations as a defense to Skoronski's claims.

## COUNT I

## STRICT LIABILITY - DESIGN DEFECT

76. Skoronski hereby repleads and realleges paragraphs 1 through 75 as though fully set forth herein.

77. At all times relevant hereto, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, thereby placing Roundup products into the stream of commerce.

78. At all times material hereto, Monsanto designed, researched, developed, formulated, manufactured, produced, tested, labeled, promoted, marketed, sold, and distributed the Roundup products that Skoronski used and/or was exposed to.

79. At all times material hereto, Monsanto's Roundup products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, including Skoronski.

80. At all times material hereto, Monsanto's Roundup products reached the intended consumers and users, including Skoronski, without substantial change in their condition as designed, manufactured, marketed, and sold by Monsanto.

81. At all times material hereto, Monsanto's Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed, were defective in design and formulation in that, when they left the hands of Monsanto's manufacturers or suppliers, they were unreasonably dangerous because they were not as safe as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

82. At all times material hereto, Monsanto's Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed,

10

were defective in design and formulation in that, when they left the hands of Monsanto's manufacturers or suppliers, the foreseeable risks associated with the Roundup products reasonably foreseeable uses exceeded the alleged benefits associated with their design and formulation.

83. At all times material hereto, Monsanto's Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed, were defective in design and formulation in ways including, but not limited to, the following:

a. When placed in the stream of commerce, Monsanto's Roundup products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would expect;

b. When placed in the stream of commerce, Monsanto's Roundup products were unreasonably dangerous in that they were hazardous and posed a serious risk of cancer and other serious illnesses when used in a reasonably anticipated manner;

c. When placed in the stream of commerce, Monsanto's Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

d. Monsanto failed to sufficiently test, investigate, or study its Roundup products and their active ingredient, glyphosate;

e. Exposure to Roundup products and glyphosate presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the products.

f. Monsanto knew or should have known at the time it marketed its Roundup products that exposure to Roundup and its active ingredient glyphosate could result in cancer and/or other sever illnesses.

11

g.  Monsanto failed to conduct adequate post-marketing studies and surveillance of its Roundup products.

h.  Monsanto could have used safer alternative designs or formulations for its Roundup products.

84. At all times material hereto, Skoronski used and/or was exposed to Monsanto's Roundup products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

85. Skoronski could not have reasonably discovered the risks and defects associated with Monsanto's Roundup products or glyphosate before or at the time of his use and/or exposure.

86. The harm caused by Monsanto's Roundup products far outweighed their benefit, causing Monsanto's Roundup products to be more dangerous than an ordinary consumer would expect.

87. Monsanto's Roundup products are more dangerous than alternative products and Monsanto could have designed its Roundup Products to be safer.

88. At the time Monsanto designed its Roundup products, a safer design or formulation was available based on the state of the industry's scientific knowledge.

89. When Roundup products left Monsanto's control, there was a practical, technically feasible, and safer alternative design that would have prevented Skoronski's harm without substantially impairing the intended function of Monsanto's Roundup products.

90. Monsanto's defective design of Roundup products amounts to willful, wanton, reckless and/or unreasonably dangerous conduct.

91. As a result of Monsanto's unreasonably dangerous conduct, it is strictly liable to Skoronski.

92. The defects in Monsanto's Roundup products were substantial and contributing factors in causing Skoronski's NHL and injuries.

93. But for his exposure to Monsanto's defective Roundup products, Skoronski would not have sustained the injuries alleged herein.

94. As a direct and proximate result of Monsanto placing its defective Roundup products into the stream of commerce, Skoronski has suffered and continues to suffer injuries including, without limitation, past and future pain and suffering, past and future medical expenses, and past and future loss of full mind and body.

## COUNT TWO

## NEGLIGENCE - FAILURE TO WARN

95. Skoronski hereby repleads and realleges paragraphs 1 through 94 as though fully set forth herein.

96. At all times material hereto, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products.

97. At all times material hereto, Monsanto had a duty to warn Skoronski and other consumers of the risks associated with the reasonably foreseeable uses and misuses of Roundup.

98. At all times material hereto, Monsanto had a duty to instruct Skoronski and other consumers on the proper and safe use of Roundup.

99. At all times material hereto, Monsanto was negligent in its testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting of Roundup in one or more of the following ways:

   a. in failing to adequately warn consumers and reasonably foreseeable users of Roundup of the dangerous characteristics of Roundup and its active ingredient glyphosate;

   b. in failing to provide adequate instructions to consumers and reasonably foreseeable users of Roundup for the safe and proper use of the product;

   c. in concealing information concerning the dangerous characteristics of Roundup and its active ingredient glyphosate.

   d. in such other and further ways as may be identified through discovery in this matter.

100. Skoronski used and was exposed to Roundup in its reasonably intended or foreseeable manner without knowledge of Roundup's dangerous characteristics.

101. Skoronski could not have reasonably discovered the defects and risks associated with Roundup or its active ingredient glyphosate before or at the time of his exposure to Roundup.

102. Skoronski reasonably relied on Monsanto's superior knowledge, skill, and judgment when it came to the "safety" of Roundup.

103. As a direct and proximate result of Monsanto's negligence, Skoronski has sustained, and will sustain in the future personal injuries and damages including, but not limited to pain and suffering, medical expenses, and loss of full mind and body.

104. Skoronski's injuries and damages are within the scope of Monsanto's liability.

14

## COUNT III

## NEGLIGENCE

105. Skoronski hereby repleads and realleges paragraphs 1 through 104 as though fully set forth herein.

106. At all times material hereto, Monsanto had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup product.

107. Monsanto breached its duty of reasonable care in ways including, but not limited to, the following:

a. in failing to conduct adequate pre- and post-market testing on its Roundup products;

b. in failing to disclose the results of trials, tests, and/or studies on the exposure to glyphosate and consequent risk of serious harm associated with the use of and exposure to Roundup;

c. in failing to undertake sufficient studies and tests to determine whether Roundup products were safe for their reasonably intended and/or foreseeable uses;

d. in failing to determine the safety of inert ingredients and/or adjuvants contained within Roundup and the propensity for those ingredients to increase Roundup's toxicity;

e. in failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of Roundup so as to avoid the risk of serious harm associated with the use of and exposure to Roundup.

f. in failing to design and manufacture Roundup to ensure it was at least as safe and effective as other herbicides on the market;

15

g. in failing to provide adequate instructions, guidelines, and safety precautions to persons who would use or be exposed to Roundup;

h. in failing to disclose that the use of and exposure to Roundup presented a severe risk of cancer and/or other serious illnesses;

i. in failing to warn Skoronski and the public that Roundup's risk of harm was unreasonable and that there were safer, effective alternatives available;

j. in representing that Roundup was safe for its intended use when in fact, Monsanto knew or should have known Roundup was not safe for its intended use;

k. in continuing to manufacture and sell Roundup with the knowledge that it was unreasonably dangerous.

l. in such other and further ways as may be identified through discovery in this matter.

108. Monsanto's breach of its duty constitutes negligence.

109. As a direct and proximate result of Monsanto's negligence, Skoronski has sustained and will in the future sustain personal injuries and damages, including, but not limited to, pain and suffering, medical expenses, and loss of full mind and body.

110. Skoronski's injuries and damages are within the scope of Monsanto's liability.

111. Monsanto's conduct, as described above, was reckless, willful, and wanton and therefore warrants an award of punitive damages.

## COUNT IV

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

112. Skoronski hereby repleads and realleges paragraphs 1 through 111 as though fully set forth herein.

16

113. At all times material hereto, Monsanto impliedly warranted to consumers and users that Roundup was reasonably safe and fit for its intended use and purposes.

114. At all times material hereto, Monsanto impliedly warranted that Roundup would be free from defects creating an unreasonable risk of harm.

115. Monsanto breached its implied warranty in that Roundup was not reasonably safe nor fit for its intended use and purposes.

116. Monsanto breached its implied warranty in that Roundup was not free from defects, and such defects created an unreasonable risk of harm.

117. Skoronski relied on Monsanto's implied warranty of merchantability and used Roundup in its reasonably intended manner.

118. Monsanto's breach of its implied warranties was a proximate cause of injuries and damages to Skoronski.

119. As a direct and proximate result of Monsanto's breach of its implied warranties, Skoronski has sustained, and will sustain in the future, damages for pain and suffering, medical expenses, and loss of full mind and body.

WHEREFORE, Plaintiff Ron Skoronski prays that this Court enter judgment in his favor and against Monsanto for compensatory damages in an amount to be proven at trial, punitive damages, the costs of this action, including Skoronski's reasonable attorney fees and litigation expenses, and such other and further relief as the Court deems just and appropriate under the circumstances.

## JURY DEMAND

COMES NOW Plaintiff, Ron F. Skoronski, and hereby demands a jury trial.

RON F. SKORONSKI, Plaintiff

By  /s/ *A. John Arenz*
    A. John Arenz    AT0000547

By  /s/ *Davin C. Curtiss*
    Davin C. Curtiss    AT0001808

O'CONNOR & THOMAS, P.C.
1000 Main Street
Dubuque, IA 52001
Telephone: 563-557-8400
Facsimile: 888-391-3056
E-Mail: jarenz@octhomaslaw.com
       dcurtiss@octhomaslaw.com

ATTORNEYS FOR PLAINTIFF