JYTRL

# U.S. District Court
## Southern District of Georgia (Dublin)
### CIVIL DOCKET FOR CASE #: 3:19−cv−00062−DHB−BKE

Bradley v. Monsanto Company
Assigned to: Judge Dudley H. Bowen
Referred to: Magistrate Judge Brian K. Epps
Cause: 28:1332 Diversity−Personal Injury

Date Filed: 08/20/2019
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod.
Liability
Jurisdiction: Diversity

**Plaintiff**

**Angela Bradley**

represented by **Paul Michael Scott**
Brown, Readdick, Bumgartner, Carter,
Strickland
& Watkins, LLP
P.O. Box 220
5 Glynn Avenue
Brunswick, GA 31521−0220
912−264−8544
Fax: 912−264−9667
Email: pscott@brbcsw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 08/20/2019 | 1 | COMPLAINT against Monsanto Company, filed by Angela Bradley. (Attachments: # 1 Civil Cover Sheet)(thb) (Entered: 08/21/2019) |
| 08/20/2019 | | Filing fee: $ 400.00, receipt number 113J.2668899. (thb) (Entered: 08/21/2019) |
| 08/21/2019 | 2 | Summons Issued as to Monsanto Company. (thb) (Entered: 08/21/2019) |
| 08/21/2019 | 3 | RULE 26(f) ORDER. Signed by Magistrate Judge Brian K. Epps on 08/21/2019. (Attachments: # 1 Blank forms for new civil case filings) (thb) Modified on 8/21/2019 (jlh). (Entered: 08/21/2019) |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## DUBLIN DIVISION

ANGELA BRADLEY,              )
)
      Plaintiff,         )
)
v.                  )   Case Number:_____
)
MONSANTO COMPANY,        )
)
      Defendant.      )
)
)
)

## COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 4

PARTIES .............................................................................................................. 6

JURISDICTION AND VENUE ........................................................................... 8

FACTUAL ALLEGATIONS ................................................................................ 9

   A.   Registration of herbicides. ................................................................. 10

   B.   Scientific fraud underlying the marketing and sale of glyphosate. ................ 12

   C.   Monsanto's market dominance. ......................................................... 13

   D.   Monsanto falsely advertised roundup as being safe for decades..................... 14

   E.   Assessments of glyphosate and Roundup.......................................... 17

   F.   Monsanto's disregard for Mrs. Bradley's safety and the   public's safety........ 25

   G.   Mrs. Bradley's exposure to Roundup............................................... 27

TOLLING OF APPLICABLE STATUE OF LIMITATIONS .................................... 27

COUNT I: STRICT LIABILITY (DESIGN DEFECT) .................................... 30

COUNT II: STRICT LIABILITY (FAILURE TO WARN)........................... 35

COUNT III: NEGLIGENCE AND NEGLIGENCE *PER SE* ...................... 40

COUNT IV: FRAUD .......................................................................................... 45

COUNT V: BREACHES OF IMPLIED WARRANTIES .................................. 47

DAMAGES ......................................................................................................... 49

   Punitive damages .......................................................................... 50

   Attorney's fee pursuant to O.C.G.A. § 13-6-11 and pre-judgment interest........... 51

PRAYER FOR RELIEF .................................................................................. 51

DEMAND FOR JURY TRIAL ........................................................................................ 52

COMES NOW Plaintiff, Angela Bradley, ("Plaintiff") and hereby files her lawsuit against Defendant Monsanto Company and, in support thereof, shows the Court as follows:

## INTRODUCTION

1.      Plaintiff Angela Bradley brings this lawsuit for the injuries that she sustained as a result of her exposure to Roundup®, which contains the active ingredient glyphosate and the surfactant polyethoxylated tallow amine. As a direct and proximate result of being exposed to Roundup, Mrs. Bradley developed non-Hodgkin Lymphoma (sometimes referred to hereafter as "NHL").

2.      The International Agency for Research on Cancer ("IARC") is a World Health Organization agency devoted to cancer research. IARC was created in 1965 as the specialized cancer agency of the World Health Organization with the support of the United States. IARC promotes international collaboration in cancer research, "bringing together skills in epidemiology, laboratory sciences, and biostatistics to identify the causes of cancer[.]"

3.      Starting in 1971, IARC began assessing whether chemicals were carcinogenic through the Monograph program. IARC periodically publishes Monographs on environmental factors that may increase the risk of cancer. Interdisciplinary and international teams prepare the monographs on possible carcinogens after reviewing published studies and evaluating all publicly available information pertaining to evidence of cancer risk. An IARC Monograph is the authoritative standard for cancer hazard assessment around the world.

4.     IARC, which has already reviewed hundreds of other chemical agents, convened a panel of seventeen renowned scientists from eleven countries, specifically screened to avoid potential conflicts of interest, to conduct an exhaustive analysis on glyphosate. The year-long study resulted in the publication of an IARC Monograph on glyphosate.

5.     IARC classified glyphosate as a Group 2A hazard, meaning it is a probable human carcinogen—the second highest hazard rating. Additionally, IARC concluded there was a positive association between glyphosate exposure and non-Hodgkin lymphoma.

6.     As a result of IARC's study of glyphosate, the State of California's Office of Environmental Health Hazard Assessment ("OEHHA") has decided to list glyphosate as an agent "known to the state to cause cancer" under Proposition 65.

7.     In 1970, Defendant Monsanto Company ("Monsanto") discovered the herbicidal properties of glyphosate and began using it in its products in 1974, and marketing it under the brand name Roundup. Roundup is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 million pounds used annually. That number grew to 185 million pounds by 2007.

8.     Monsanto has represented Roundup as being safe to humans and the environment since it began selling the herbicide. Indeed, Monsanto has proclaimed, and continues to proclaim to the world, and particularly to United States

consumers, that glyphosate-based herbicides, including Roundup, create no unreasonable risks to human health or to the environment. This is untrue. Before glyphosate was first approved by the Environmental Protection Agency, Monsanto knew that glyphosate could pose significant risks to human health, including a risk of causing cancer. This lawsuit seeks to hold Monsanto accountable for this misconduct.

## PARTIES

9.      Plaintiff Angela Bradley is a citizen of the State of Georgia and resides in Dublin, Georgia.

10.     Plaintiff states her intention to bring each and every claim permissible under Georgia law and all other applicable law. Plaintiff seeks all special damages, economic losses, medical expenses, necessary expenses, pain and suffering, and all compensatory, special, actual, economic, general, punitive, and all other damages permissible under Georgia law, including, but not limited to, personal injuries, pain and suffering, mental anguish, loss of enjoyment of life, incidental expenses, medical expenses, and consequential damages to be proven at trial.

11.     Defendant Monsanto Company ("Monsanto") is a Delaware corporation, with its headquarters and principal place of business in St. Louis, Missouri. Monsanto is a citizen of the States of Missouri and Delaware. Monsanto is not a citizen of the State of Georgia. Monsanto maintains a registered agent for service of process in Gwinett County, Georgia: Corporation Service Company, who

can be served at 40 Technology Parkway South, #300, Norcross, Gwinett County, Georgia, 30092.

12.     At all times relevant to this Complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and was the manufacturer of the Roundup at issue.

13.     "Roundup" refers to all formulations of Monsanto's Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak Herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k Herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready- to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass Killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer 1 Ready-to-Use, Roundup WSD Water Soluble Dry

Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. There is complete diversity of citizenship between the parties. In addition, Plaintiff seeks damages in excess of $75,000, exclusive of interest and costs.

15.     This Court has personal jurisdiction over Monsanto since Monsanto is authorized and licensed to conduct business in the State of Georgia, maintains and carries on systematic and continuous contacts in the counties that make up the judicial Southern District of Georgia, regularly transacts business within this judicial district, and regularly avails itself of the benefits of this judicial district.

16.     Additionally, Monsanto caused tortious injury by acts and omissions in this judicial district, and also caused tortious injury in this judicial district by acts and omissions outside of this judicial district while regularly doing and soliciting business, engaging in a persistent course of conduct, and deriving substantial revenue from goods used or consumed and services rendered in this judicial district.

17.     Mrs. Bradley regularly used Roundup in this judicial district.

18.     Venue is proper before this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred within this judicial district.

19.     This Complaint is filed against the manufacturer, designer, marketer, and distributor of Roundup and is part of litigation that has been ordered into

Multi-District Litigation pursuant to 28 U.S.C. §1407 and is pending before the Honorable Vince Chhabria in the United States District Court for the Northern District of California, In re: Roundup Products Liability Litigation (MDL No. 2741). The mailing address for that Court is United States District Court, 450 Golden Gate Avenue, Box 36060, San Francisco, CA 94102-3489.

## FACTUAL ALLEGATIONS

20.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world, including the popular herbicide Roundup.

21.     Glyphosate interferes with a plant's ability to form aromatic amino acids necessary for protein synthesis. Plants treated with glyphosate generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce, or by milling, baking, or brewing grains.

22.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup.

23.     For about 40 years, consumers around the world have used Roundup, containing glyphosate, without knowing of the dangers its use poses. That is because, when Monsanto first introduced Roundup, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. History, however, has demonstrated otherwise. According to the WHO, the main chemical ingredient of Roundup—

glyphosate—is a "probable carcinogen." Monsanto assured the public that Roundup was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies exposing glyphosate's dangers. Monsanto orchestrated a prolonged campaign of misinformation to convince government agencies and the general population that Roundup was safe. As a result of this deception, the public has been exposed to a carcinogen, while Monsanto has made billions.

### A.    Registration of herbicides.

24.    The manufacture, formulation, and distribution of herbicides, such as Roundup, is regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. §§ 136 et seq.

25.    FIFRA requires that all pesticides be registered with the United States Environmental Protection Agency ("EPA") before distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

26.    Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The EPA does not deem certain products "safe," but only that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

27.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

28.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup, conduct the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting those tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, to perform the tests that are required of the manufacturer.

29.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

30.     In the case of glyphosate, the EPA planned on releasing its preliminary risk assessment—in relation to the re-registration process—no later

than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of IARC's findings that glyphosate is a "probable carcinogen."

31.     In April 2016, the EPA posted a risk assessment of glyphosate on its website and then immediately retracted it. The EPA subsequently indicated that the posting was inadvertent, that the document posted was not the EPA's final assessment or even a preliminary one, and that the EPA intended to issue a final report by the end of 2016.

## B. Scientific fraud underlying the marketing and sale of glyphosate.

32.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

33.     On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed frau

34.     In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup.

IBT performed approximately 30 tests on glyphosate and glyphosate-containing products, including 9 of the 15 residue studies needed to register Roundup with the EPA.

35. In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT and determined that the toxicology studies conducted for the Roundup were invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

36. Three top executives of IBT were convicted of fraud in 1983.

37. In the second incident, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including several studies on Roundup. That same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

### C. Monsanto's market dominance.

38. The success of Roundup was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate

expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup market dominance and to ward off impending competition.

39.     In response, Monsanto began the development and sale of genetically engineered "Roundup Ready" seeds in 1996. Since Roundup Ready crops are resistant to glyphosate, farmers can spray Roundup onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup even further. By 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup market through a marketing strategy that coupled proprietary Roundup Ready seeds with continued sales of its Roundup herbicide.

40.     Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready seeds, Roundup became Monsanto's most profitable product. In 2000, Roundup accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

**D.     Monsanto falsely advertised roundup as being safe for decades.**

41.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations

that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are:

a) "Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences."

b) "And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem."

c) "Roundup biodegrades into naturally occurring elements."

d) "Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e) "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it."

f) You can apply Roundup with "confidence because it will stay where you put it," it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Roundup into natural products.

g) "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

h) "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

i) "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with her head in the ground and a pet dog standing in an area that has been treated with Roundup.

42.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a)     glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

b)     glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;

c)     glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

d)     glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics";

e)     glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and,

f)     glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

43.     Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief, still has not done so today.

44.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."

### E. Assessments of glyphosate and Roundup

45.   IARC was created in 1965 as the specialized cancer agency of the World Health Organization with the support of the United States. IARC promotes international collaboration in cancer research, "bringing together skills in epidemiology, laboratory sciences, and biostatistics to identify the causes of cancer[.]"

46.   IARC is transparent. The minutes and documents presented at its council meetings are publicly available and, thus, are subject to scientific scrutiny. Starting in 1971, IARC began assessing whether chemicals were carcinogenic through the Monograph program.

47.   The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

48.   The established procedure for IARC Monograph evaluations is described in the IARC Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

49.     A year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected, and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

50.     In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

51.     In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

52.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, the Working Group consisted of 17 experts from 11 countries who met from March 3–10, 2015, to

assess the carcinogenicity of certain herbicides, including glyphosate. Among the members were Lauren Zeise, Ph.D., of the California Environmental Protection Agency, Matthew T. Martin, Ph.D., a scientist with the U.S. Environmental Protection Agency, and Gloria D. Jahnke, D.V.M., D.A.B.T. of the National Institute of Environmental Health Sciences.

53. The March meeting culminated after a nearly one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature," as well as "data from governmental reports that are publicly available."

54. The studies considered the various exposure groups, including occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland, municipal weed-control workers in the United Kingdom, and para-occupational exposure in farming families.

55. Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

56. Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

57.    The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies showed a human health concern from agricultural and other work-related exposure to glyphosate.

58.    The IARC Working Group conducted a systematic review of over 15 studies designed to assess whether there was an association between Roundup exposure in agricultural workers and Non-Hodgkin Lymphoma ("NHL"). The researchers reviewed each study, identified the results and assessed each study's strengths and weaknesses.

59.    The IARC Working Group concluded that, despite the limited evidence concerning the carcinogenicity of glyphosate in humans, a "positive association has been observed for non-Hodgkin lymphoma."

60.    Overall, nine epidemiological studies showed positive associations between glyphosate and NHL, with several studies showing statistically significant relative risks of NHL exceeding 2.0 and even 3.0.

61.    In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for hemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

62.    The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported

increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed. In assessing the genotoxicity of glyphosate (the property of chemical agents that damages the genetic information within a cell causing mutations, which may lead to cancer), the IARC Working Group concluded "[t]here is strong evidence that glyphosate causes genotoxicity."

63.     Additionally, IARC assessed whether glyphosate exposure can induce oxidative stress, which is thought to be involved in the development of numerous conditions, including cancer, autism, and Parkinson's disease. IARC concluded that "strong evidence exists that glyphosate . . . can induce oxidative stress." This could be an important mechanism by which Roundup causes cancer.[1]

64.     In the IARC monograph for glyphosate, there is an entire section devoted to exposure to humans, looking at studies examining glyphosate exposures in various settings including agricultural ones. The IARC Working Group noted that glyphosate has been detected in urine of agricultural workers, indicating absorption. The IARC Working Group specifically evaluated farm workers in the United States, and found that, within the days following the application of Roundup to a crop, approximately 60% of farm workers tested positive for glyphosate in the urine. Additionally, the IARC Working Group noted that soil microbes degrade

---

[1] In addition to DNA damage and oxidative stress, scientists have suggested Roundup's association with various serious health conditions is linked to the effect Roundup has on the digestive system. Specifically, scientists believe the same mechanism that makes Roundup toxic to weeds also makes it toxic to the microbes within the human gut. When humans are exposed to Roundup, it leads to a chronic inflammatory state in the gut, as well an impaired gut barrier, which can lead to many long-term health effects, including an increased risk of cancer.

glyphosate to aminomethylphosphonic acid ("AMPA"). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

65.    The IARC Working Group also reviewed an Agricultural Health Study consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia ("HCL"), and Chronic Lymphocytic Leukemia ("CLL"), in addition to several other cancers.

66.    In addition to the IARC's assessment, in 2014, scientists published a systematic review and meta-analysis on the relationship between non-Hodgkin lymphoma and occupational exposure to agricultural pesticides, including glyphosate, in the International Journal of Environmental Research and Public Health. The study showed a statistically significant association between farm workers exposed to Roundup and non-Hodgkin lymphoma. The study confirmed two smaller studies from 2002 and 2008, published in the journal Leukemia & Lymphoma (2002) and the International Journal on Cancer (2008), both of which also showed a statistically significant increase in non-Hodgkin lymphoma among agricultural workers exposed to glyphosate.

67.    More recent studies, including a glyphosate residue study published in the Journal of Environmental & Analytical Toxicology in 2014, indicate that "chronically ill humans showed significantly higher glyphosate residues in urine than healthy population." Glyphosate has been detected in the blood and urine of

agricultural workers, indicating that agricultural use of Roundup leads to its absorption.

68. In addition to the studies examining glyphosate, research also suggests that the carcinogenic properties of Roundup are magnified by the addition of adjuvants in the Roundup formulation. Adjuvants are chemicals that are designed to modify or enhance the effects of other agents. Monsanto has been including adjuvants with glyphosate in its Roundup products, which are designed to increase the effectiveness of the herbicide. Studies show, however, that the addition of adjuvants also greatly increases the carcinogenic properties of Roundup. Notably, Monsanto has systematically tested glyphosate without the adjuvants and used those tests to lobby the EPA that Roundup is safe.

69. Several countries around the world have instituted bans on the sale of Roundup and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup are more widely known.

70. The Netherlands issued a ban on all glyphosate-based herbicides. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are.

Especially children are sensitive to toxic substances and should therefore not be exposed to it."

71.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

72.     France banned the private sale of Roundup and glyphosate following the IARC assessment.

73.     Bermuda banned both the private and commercial sale of glyphosate, including Roundup. The Bermuda government explained: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

74.     The Sri Lankan government banned the private and commercial use of glyphosate out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

75.     The government of Columbia announced a ban on using Roundup and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine in response to the IARC's assessment.

76.     In November 2015, 96 prominent experts, including almost the whole IARC team, reiterated IARC's assessment that Roundup is probably a human carcinogen.

77.     In late February 2016, another 14 scientists signed a consensus statement in the Environmental Health journal, saying regulatory estimates of tolerable exposure levels for glyphosate were based on outdated science.

78.     In June 2016, the European Union refused to re-register glyphosate containing herbicides due to safety concerns and will, in all likelihood, begin recalling all glyphosate-containing products within the European Union. Indeed, in June 2016, the EU did not vote to extend the registration of glyphosate due to safety concerns. The fate of the product in Europe is now in question.

   **F.     Monsanto's disregard for Mrs. Bradley's safety and the public's safety.**

79.     Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."

80.     Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

81.     Glyphosate, and Defendant's Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

82.     Defendant's statements proclaiming the safety of Roundup and disregarding its dangers misled Mrs. Bradley.

83. Despite Monsanto's knowledge that Roundup was associated with an elevated risk of developing cancer, Monsanto's promotional campaigns focused on Roundup's purported "safety profile."

84. Monsanto's failure to adequately warn Mrs. Bradley resulted in: (a) Mrs. Bradley using, and being exposed to, glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (b) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

85. At all times relevant to this litigation, Monsanto's Roundup was misbranded under 7 U.S.C. § 136(q) and O.C.G.A. § 2-7-53, and its distribution within Georgia and around the United States was a violation of 7 U.S.C. § 136j, 40 C.F.R. § 156.10(a)(5); and O.C.G.A. § 2-7-62.

86. Defendant failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

87. The failure of Defendant to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

88. The failure of Defendant to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

89.     The failure of Defendant to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

**G.    Mrs. Bradley's exposure to Roundup.**

90.     Beginning in approximately 1998, Mrs. Bradley sprayed Roundup on a regular basis.

91.     Mrs. Bradley followed all safety and precautionary warnings while using Roundup.

92.     Mrs. Bradley was subsequently diagnosed with non-Hodgkin lymphoma.

93.     The development of Mrs. Bradley's non-Hodgkin lymphoma was proximately and actually caused by exposure to Monsanto's Roundup products.

94.     Plaintiff seeks all damages available as a result of Mrs. Bradley's use of, and exposure to, Roundup which caused or was a substantial contributing factor in causing Mrs. Bradley to suffer from non-Hodgkin Lymphoma. Mrs. Bradley suffered severe and personal injuries, physical pain and mental anguish, including diminished enjoyment of life, and other losses. Other damages, include, but are not limited to, medical expenses, and other economic and non-economic damages.

**TOLLING OF APPLICABLE STATUE OF LIMITATIONS**

95.     Plaintiff incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

96.     The running of any statute of limitations has been tolled by reason of Defendant's fraudulent concealment. Monsanto, through its affirmative misrepresentations and omissions, committed actual fraud and actively concealed from Plaintiff the true risks associated with Roundup and glyphosate, and also actively concealed information which deterred and prevented the Plaintiff, in the exercise of ordinary diligence, from discovering Defendant's wrongful conduct. O.C.G.A. § 9-3-96

97.     At all relevant times, Defendant has maintained that Roundup is safe, non-toxic, and non-carcinogenic.

98.     Indeed, even as of August 8, 2019, Monsanto continues to represent to the public via its website that "Regulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic." (emphasis added).[2]

99.     As a result of Defendant's actions, Plaintiff was unaware, and could not reasonably know or have learned through reasonable diligence that Roundup and/or glyphosate contact, exposed Plaintiff to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

---

[2] https://www.monsantoglobal.com/global/jp/products/Documents/no-evidence-of-carcinogenicity.pdf  (Accessed August 8, 2019.)

100.   Furthermore, Defendant is estopped from relying on any statute of limitations because of its fraudulent concealment of the true character, quality and nature of Roundup. Defendant was under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Defendant had and continues to have exclusive control, and because Defendant knew that this information was not available to Plaintiff or to distributors of Roundup. In addition, Defendant is estopped from relying on any statute of limitations because of its intentional concealment of these facts.

101.   Plaintiff did not know, nor through the exercise of reasonable diligence should have discovered, the causal connection between the Plaintiff's NHL and Monsanto's conduct.

102.   Plaintiff had no knowledge that Defendant was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendant, Plaintiff could not have reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud should be considered. Defendant had the ability to and did spend enormous amounts of money in furtherance of its purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Plaintiff and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendant's representations.

103.    Additionally, all statutes of limitations are tolled pursuant to O.C.G.A. § 9-3-99. *See* 7 U.S.C. § 136l (criminal penalties available against any party "who violates any provision of" FIFRA); O.C.G.A. § 2-7-73 (criminal penalties for violating Georgia Pesticide Control Act of 1976); <u>Bates v. Dow Agrosciences LLC</u>, 544 U.S. 431, 439, n. 11 (2005) ("manufacturers may be subjected to civil and criminal penalties for violating FIFRA's requirements."); O.C.G.A. § 16-9-50 (criminal penalties for deceptive business practices); O.C.G.A. § 16-2-22 (corporate liability). *See also* 7 U.S.C. §§ 136(q) and 136j; 40 C.F.R. § 156.10(a)(5); and O.C.G.A. §§ 2-7-53 and 2-7-62.

104.    Accordingly, Defendant is precluded from relying upon any statute of limitations.

## COUNT I: STRICT LIABILITY (DESIGN DEFECT)

105.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

106.    Plaintiff brings this strict liability claim against Monsanto for defective design.

107.    At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, including the Plaintiff, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto. At all times relevant to this

litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup products used by Plaintiff.

108.   At all times relevant to this litigation, Monsanto's Roundup products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff, and failed to warn Plaintiff.

109.   At all times relevant to this litigation, Monsanto's Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Georgia and throughout the United States, including the Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

110.  Monsanto's Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that, when they left the hands of Monsanto's manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

111.  Monsanto's Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design, warning, and formulation in that, when they left the hands of Monsanto's manufacturers and/or suppliers, the

foreseeable risks exceeded the alleged benefits associated with their design and formulation.

112.   At all times relevant to this action, Monsanto knew or had reason to know that its Roundup products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

113.   Therefore, at all times relevant to this litigation, Monsanto's Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Monsanto were defective in design and formulation, in one or more of the following ways:

a)   When placed in the stream of commerce, Monsanto's Roundup products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b)   When placed in the stream of commerce, Monsanto's Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c)   When placed in the stream of commerce, Monsanto's Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d)   Monsanto did not sufficiently test, investigate, or study its Roundup products and, specifically, the active ingredient glyphosate.

114.   Exposure to Roundup and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

115. Monsanto knew or should have known at the time of marketing its Roundup products that exposure to Roundup and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

116. Monsanto did not conduct adequate post-marketing surveillance of its Roundup products.

117. Monsanto could have employed safer alternative designs and formulations.

118. The Plaintiff was exposed to Monsanto's Roundup without knowledge of Roundup's dangerous characteristics.

119. At all times relevant to this litigation, the Plaintiff used and/or was exposed to the use of Monsanto's Roundup products in an intended or reasonably foreseeable manner, i.e., as a consumer, without knowledge of Roundup's dangerous characteristics.

120. The Plaintiff could not reasonably have discovered the defects and risks associated with Roundup or glyphosate-containing products before or at the time of exposure due to Monsanto's suppression of scientific information linking glyphosate to cancer.

121. The harm caused by Monsanto's Roundup products far outweighed their benefit, rendering Monsanto's product dangerous to an extent beyond that which an ordinary consumer would contemplate. Monsanto's Roundup products were and are more dangerous than alternative products and Monsanto could have designed its Roundup products to make them less dangerous. Indeed, at the time

Monsanto designed its Roundup products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

122.   At the time Roundup products left Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Monsanto's herbicides.

123.   Monsanto's defective design of its Roundup products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup products, including the Plaintiff.

124.   Therefore, as a result of the unreasonably dangerous condition of its Roundup products, Monsanto is strictly liable to Plaintiff.

125.   The defects in Monsanto's Roundup products were substantial and contributing factors in causing the injury sustained by the Plaintiff, and Plaintiff's damages and, but for Monsanto's misconduct and omissions, Plaintiff would not have cancer.

126.   Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including Plaintiff, with knowledge of the safety problems associated with Roundup and glyphosate-containing products, and suppressed this knowledge from the general public. Monsanto made conscious decisions not to redesign, warn or inform the unsuspecting public.

127.   As a direct and proximate result of Monsanto placing its defective Roundup products into the stream of commerce, Plaintiff developed NHL.

128.   As a proximate result of Monsanto placing its defective Roundup products into the stream of commerce, as alleged herein, there was a measurable and significant interval of time during which Plaintiff suffered personal injury, among other things.

## COUNT II: STRICT LIABILITY (FAILURE TO WARN)

129.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

130.   Plaintiff brings this strict liability claim against Monsanto.

131.   At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Monsanto.

132.   Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiff, and therefore had a duty to warn of the risks associated with the use of Roundup and glyphosate-containing products.

133. At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure its Roundup products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn Plaintiff of the dangers associated with Roundup use and exposure. Monsanto, as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

134. At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

135. At all times relevant to this litigation, Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by Monsanto's herbicides, including Plaintiff.

136. Despite the fact that Monsanto knew or should have known that Roundup posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to, or scientifically knowable to Monsanto through appropriate

research and testing by known methods, at the time it distributed, supplied or sold the product, and not known to end users and consumers, such as Plaintiff.

137. Monsanto knew or should have known that its products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers, i.e., the reasonably foreseeable users, of the risks of exposure to its products.

138. Monsanto failed to warn consumers, including the Plaintiff, that Roundup is carcinogenic. Further, Monsanto failed to include a warning regarding known carcinogenic properties of a pesticide, which constitutes misbranding under § 136(q)(G).

139. Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup and glyphosate.

140. At all times relevant to this litigation, Monsanto's Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Georgia and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

141. Plaintiff was exposed to Monsanto's Roundup products without knowledge of their dangerous characteristics.

142.   At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Monsanto's Roundup products while using them for their intended or reasonably foreseeable purposes, without knowledge of their dangerous characteristics.

143.   Plaintiff could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products prior to or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Monsanto to know about and disclose serious health risks associated with using the products.

144.   Monsanto knew or should have known that the minimal warnings disseminated with its Roundup products were inadequate, failed to communicate adequate information on the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

145.   The information that Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiff to utilize the products safely and with adequate protection. Instead, Monsanto disseminated information that was inaccurate, false and misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup and glyphosate; continued to aggressively promote the efficacy

of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

146. This alleged failure to warn is not limited to the information contained on Roundup's labeling. Monsanto was able, in accord with federal law, to comply with Georgia law by disclosing the known risks associated with Roundup through other non-labeling mediums, i.e., promotion, advertisements, public service announcements, and/or public information sources. Monsanto, however, did not disclose these known risks through any medium.

147. To this day, Monsanto has failed to adequately and accurately warn of the risks of cancer associated with the use of and exposure to Roundup and its active ingredient glyphosate.

148. As a result of their inadequate warnings, Monsanto's Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed by Monsanto, and used by Plaintiff in the spraying of her properties.

149. Monsanto is liable to Plaintiff for injuries caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its products and the risks associated with the use of or exposure to Roundup and glyphosate.

150.    Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup products, Plaintiff could have avoided the risk of developing Non-Hodgkin's Lymphoma and could have obtained or used alternative herbicides.

151.    As a direct and proximate result of Monsanto placing its defective Roundup products into the stream of commerce, Plaintiff developed NHL, among other things.

152.    As a proximate result of Monsanto placing its defective Roundup products into the stream of commerce, as alleged herein, Plaintiff suffered and continues to suffer great mental anguish and other personal injury.

### COUNT III: NEGLIGENCE AND NEGLIGENCE *PER SE*

153.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

154.    Monsanto, directly or indirectly, caused Roundup products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

155.    At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the design, research, testing, quality assurance, quality control, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

156. At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup products. Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup, and, in particular, its active ingredient glyphosate.

157. At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup and specifically, the carcinogenic properties of the chemical glyphosate.

158. Accordingly, at all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup products could cause or be associated with Plaintiff's injuries and thus, created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

159. Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup and glyphosate-containing products.

160. As such, Monsanto breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, warning, supply, promotion, advertisement, packaging, sale, and

distribution of its Roundup products, in that Monsanto manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

161.    Monsanto was negligent in its promotion of Roundup, outside of the labeling context, by failing to disclose material risk information as part of its promotion and marketing of Roundup, including the Internet, television, print advertisements, etc. Nothing prevented Monsanto from being honest in its promotional activities, and in fact, Monsanto had a duty to disclose the truth about the risks associated with Roundup in its promotional efforts, outside of the context of labeling.

162.    Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Monsanto has failed to do so. Indeed, Monsanto has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup and glyphosate.

163.    Monsanto's negligence and negligence per se includes:

a)      Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup products without thorough and adequate pre- and post-market testing;

b)      Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup while negligently

and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup;

c)      Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d)      Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup products so as to avoid the risk of serious harm associated with the prevalent use of Roundup/glyphosate as an herbicide;

e)      Failing to design and manufacture Roundup products so as to ensure they were at least as safe and effective as other herbicides on the market;

f)      Failing to provide adequate instructions, guidelines, and safety precautions to those persons Monsanto could reasonably foresee would use and be exposed to its Roundup products;

g)      Failing to disclose to Plaintiff, users/consumers, and the general public that use of and exposure to Roundup presented severe risks of cancer and other grave illnesses;

h)      Failing to warn Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to the Plaintiff and other consumers;

i)      Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup and glyphosate-containing products;

j)      Representing that its Roundup products were safe for their intended use when, in fact, Monsanto knew or should have known the products were not safe for their intended purpose;

k)      Declining to make or propose any changes to Roundup products' labeling or other promotional materials that would alert consumers and the general public of the risks of Roundup and glyphosate;

l)      Advertising, marketing, and recommending the use of the Roundup products, while concealing and failing to disclose or warn of the dangers

known (by Monsanto) to be associated with or caused by the use of or exposure to Roundup and glyphosate;

m)     Continuing to disseminate information to its consumers, which indicate or imply that Monsanto's Roundup products are not unsafe for use in the agricultural and horticultural industries;

n)     Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous;

o)     Failing to warn consumers that Roundup is carcinogenic;

p)     Failing to include a warning regarding known carcinogenic properties of a pesticide, which constitutes misbranding under § 136(q)(G); and

q)     Violating the statutes and regulations detailed herein, as well as O.C.G.A. § 51-1-23, and such other statutes and regulations as will be proven at trial, each of which constitutes negligence per se.

164.     Monsanto knew and/or should have known that it was foreseeable consumers such as the Plaintiff would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup.

165.     Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup or its active ingredient glyphosate.

166.     Monsanto's negligence and negligence per se were the proximate cause of Plaintiff's injuries *i.e.,* absent Monsanto's negligence, Plaintiff would not have developed NHL.

167.     Monsanto's conduct, as described above, was reckless. Monsanto regularly risks the lives of consumers and users of its products, including Plaintiff, with full knowledge of the dangers of its products. Monsanto has made conscious

decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff.

## COUNT IV: FRAUD

168.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

169.    Monsanto defrauded the agricultural community in general and Plaintiff in particular by misrepresenting the true safety of Roundup and by failing to disclose known risks of cancer.

170.    Monsanto misrepresented and/or failed to disclose, inter alia, that: (1) glyphosate and its major metabolite aminomethylphosphonic acid (AMPA) could cause cancer; (2) glyphosate and AMPA are known to be genotoxic in humans and laboratory animals because exposure is known to cause DNA strand breaks (a precursor to cancer);  (3) glyphosate and AMPA are known to induce oxidative stress in humans and laboratory animals (a precursor to cancer); (4) glyphosate and AMPA interfere with the aromatic amino acids within the human gut, leading to downstream health conditions including cancer; (5) exposure to glyphosate and AMPA is causally associated with non-Hodgkin lymphoma; and (6) the laboratory tests attesting to the safety of glyphosate were flawed and/or fraudulent. These representations and omissions occurred in the product labeling, in product advertising, and promotional materials. The exact wording of the misrepresentations and omissions exist within Monsanto's possession.

171.    Due to these misrepresentations and omissions, at all times relevant to this litigation, Monsanto's Roundup was misbranded under 7 U.S.C. § 136(q) and O.C.G.A. § 2-7-53, and its distribution within Georgia and around the United States was a violation of 7 U.S.C. § 136j, 40 C.F.R. § 156.10(a)(5); and O.C.G.A. § 2-7-62.

172.    Plaintiff relied on the Monsanto's misrepresentations and/or material omissions regarding the safety of Roundup and its active ingredient glyphosate in deciding whether to purchase and/or use the product on her properties. Plaintiff did not know, nor could she reasonably have known, of the misrepresentations and/or material omissions by Monsanto concerning Roundup and its active ingredient glyphosate.

173.    The misrepresentations and/or material omissions that form the basis of this fraud claim are not limited to statements made on the Roundup labeling, as defined under federal law, but also involve Monsanto's representations and omissions made as part of its promotion and marketing of Roundup, including on the Internet, television, in print advertisements, etc. Nothing prevented Monsanto from disclosing the truth about the risks associated with Roundup in its promotional efforts outside of the labeling context, using the forms of media and promotion Monsanto traditionally used to promote the product's efficacy and benefits.

174.    When Monsanto made the misrepresentations and/or omissions as alleged in this pleading, it did so with the intent of defrauding and deceiving the

public in general and the agricultural community and with the intent of inducing the public and agricultural community to purchase and use Roundup.

175.    Monsanto made these misrepresentations and/or material omissions with malicious, fraudulent and/or oppressive intent toward Plaintiff and the public generally. Monsanto's conduct was willful, wanton, and/or reckless. Monsanto deliberately recommended, manufactured, produced, marketed, sold, distributed, merchandized, packaged, promoted and advertised the dangerous and defective herbicide Roundup. This constitutes an utter, wanton, and conscious disregard of the rights and safety of a large segment of the public, and by reason thereof, Monsanto, is liable for reckless, willful, and wanton acts and omissions which evidence a total and conscious disregard for the safety of Plaintiff and others which proximately caused the injuries as set forth herein.

176.    As a proximate result of Monsanto's fraudulent and deceitful conduct and representations, Plaintiff developed NHL.

## COUNT V: BREACHES OF IMPLIED WARRANTIES

177.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

178.    At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup products, which are defective and unreasonably dangerous to consumers, including the Plaintiff, thereby placing

Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto.

179.    Before the time Plaintiff was exposed to the aforementioned Roundup products, Monsanto impliedly warranted to its consumers—including Plaintiff —that its Roundup products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as herbicides.

180.    Monsanto, however, failed to disclose that Roundup has dangerous propensities when used as intended and that use of and/or exposure to Roundup and glyphosate-containing products carries an increased risk of developing severe injuries including the Plaintiff's cancer.

181.    Plaintiff was the intended beneficiary of the implied warranties made by Monsanto to the purchasers of its herbicides.

182.    The Roundup products were expected to reach and did in fact reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Monsanto.

183.    At all times relevant to this litigation, Monsanto was aware that consumers and users of its products, including Plaintiff, would use Roundup products as marketed by Monsanto, which is to say that Plaintiff was a foreseeable user of Roundup.

184.    Monsanto intended that its Roundup products be used in the manner in which Plaintiff in fact used them and which Monsanto impliedly warranted each

product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup was not adequately tested or researched.

185.    In reliance upon Monsanto's implied warranty, Plaintiff used Roundup as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Monsanto.

186.    Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup or glyphosate.

187.    Monsanto breached its implied warranty to the Plaintiff in that its Roundup products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

188.    The harm caused by Monsanto's Roundup products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

189.    As a proximate result of Monsanto's breaches of the foregoing warranties, Plaintiff developed NHL.

## **DAMAGES**

190.    Plaintiff realleges and incorporates herein by reference the preceding paragraphs of her Complaint as if set forth fully herein.

191.    Plaintiff states her intention to bring each and every claim permissible under Georgia law and all other applicable laws. Plaintiff seeks all special damages,

economic losses, medical expenses, necessary expenses, pain and suffering, and all compensatory, special, actual, economic, general, punitive, and all other damages permissible under Georgia law and other applicable law, including, but not limited to, personal injuries, pain and suffering, mental anguish, loss of enjoyment of life, incidental expenses, medical expenses, and consequential damages to be proven at trial.

### Punitive damages

192.  Monsanto's conduct, as described above, was reckless. Monsanto regularly risks the lives of consumers and users of its products, including Plaintiff, with full knowledge of the dangers of its products. Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including the Plaintiff.

193.  Monsanto acted with conscious indifference to the safety and well-being of the public, and willfully and wantonly, as defined by O.C.G.A. § 51-12-5.1, in, among other things, designing, testing, manufacturing, inspecting, marketing, distributing, selling, and failing to warn about the dangers of Roundup. Monsanto knew, or should have known, of those dangers. Monsanto's misconduct warrants the imposition of punitive damages against Monsanto.

194.  Monsanto's actions are so egregious that they rise to the level of conscious indifference to the safety and well-being of the public under O.C.G.A. § 51-12-5.1. Such misconduct warrants the imposition of punitive damages against Monsanto.

**Attorney's fee pursuant to O.C.G.A. § 13-6-11 and pre-judgment
interest.**

195.   As detailed herein, Monsanto has acted in bad, and has also caused Plaintiff unnecessary trouble and expense.

196.   Accordingly, Plaintiff should recover her expenses of litigation, including her reasonable attorneys' fees, pursuant to O.C.G.A. § 13-6-11.

197.   Plaintiff is entitled to prejudgment interest on all damages.

**<u>PRAYER FOR RELIEF</u>**

198.   WHEREFORE, Plaintiff demands judgment against the Defendant on each of the above- referenced claims and causes of action and prays for the following relief:

    a)   she recover all special damages, economic losses, medical expenses, necessary expenses, pain and suffering, and all compensatory, special, actual, economic, general, punitive, and all other damages permissible under Georgia law and other applicable law, including, but not limited to, personal injuries, pain and suffering, mental anguish, loss of enjoyment of life, incidental expenses, medical expenses, and consequential damages;

    b)   that she recover punitive damages against Monsanto, pursuant to O.C.G.A. § 51-12-5.1, in an amount to be determined by the enlightened conscience of the jury to be sufficient to punish Monsanto for the harm caused by Monsanto's entire want of care, which raises the presumption of conscious indifference to consequences;

    c)   that she recover attorney's fees under O.C.G.A. § 13-6-11;

    d)   that she recover pre-judgment interest and post-judgment interest; and

    e)   that she recover such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

199. Plaintiff hereby demands trial by jury as to all issues.

RESPECTFULLY SUBMITTED, this 20th day of August, 2019.

s/ Paul M. Scott, Esq.
Paul Scott, Esq.
Georgia Bar No. 140960

BROWN, READDICK, BUMGARTNER,
CARTER, STRICKLAND & WATKINS, LLP
5 Glynn Avenue
Brunswick, Georgia 31521-0220

Telephone: 912-264-8544
Facsimile: 912-264-9667
pscott@brbcsw.com
**ATTORNEY FOR PLAINTIFF**
