# U.S. District Court
## Alabama Middle District (Montgomery)
## CIVIL DOCKET FOR CASE #: 2:19-cv-00776-MHT-SRW
## Internal Use Only

Clayton v. Monsanto Company Corporation et al
Assigned to: Honorable Judge Myron H. Thompson
Referred to: Honorable Judge Susan Russ Walker
Cause: 28:1332 Diversity-Product Liability

Date Filed: 10/11/2019
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod.
Liability
Jurisdiction: Diversity

### Plaintiff

**Linda D. Clayton**
*Individually and as Executrix of the Estate*
*of J. Frank Clayton*

represented by **Donald Patrick McKenna , Jr.**
Hare, Wynn, Newell & Newton LLP
2025 Third Avenue North; Suite 800
Birmingham, AL 35203
205-328-5330
Fax: 205-324-2165
Email: don@hwnn.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
**Bar Status: Active**

V.

### Defendant

**Monsanto Company Corporation**
*a Missouri Corporation*

### Defendant

**Bayer AG**
*a German Corporation*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/11/2019 | 1 | COMPLAINT against Bayer AG, Monsanto Company Corporation (Filing fee $ 400.00 receipt number 4602055256.), filed by Linda D. Clayton. (Attachments: # 1 Civil Cover Sheet, # 2 Receipt) (wcl, ) (Entered: 10/16/2019) |
| 10/11/2019 |  | DEMAND for Trial by Jury by Linda D. Clayton. (No pdf attached to this entry - See doc 1 for pdf) (wcl, ) (Entered: 10/16/2019) |
| 10/16/2019 | 2 | Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement sent to Linda D. Clayton; Corporate Disclosures due by 10/28/2019. (Attachments: # 1 Corporate/Conflict Disclosure Attachment)(wcl, ) (Entered: 10/16/2019) |

| 10/17/2019 | 3 | Summons Issued as to Bayer AG, Monsanto Company Corporation; mailed CMRRR with copy of 1 Complaint. (wcl, ) (Entered: 10/17/2019) |

*ATTEST: A True Copy.*
*Certified to October 17, 2019*
*Clerk, US District Court,*
*Middle District of Alabama*
*By: /s/ William C. Lewis*
*Assistant Operations Supervisor*

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

RECEIVED
2019 OCT 11 P 12: 32

DEBRA P. HACKETT. CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

| | |
|---|---|
| LINDA D. CLAYTON, INDIVIDUALLY *<br>And as EXECUTRIX OF THE ESTATE *<br>OF J. FRANK CLAYTON, *<br> * | |
| PLAINTIFFS, * | CIVIL ACTION NO. _____ |
| * | |
| VS. * | 2:19-cv-776-MHT-SRW |
| * | |
| MONSANTO COMPANY * | DEMAND FOR JURY TRIAL |
| CORPORATION, a Missouri * | |
| Corporation; BAYER AG, a German * | |
| Corporation, * | |
| * | |
| DEFENDANTS. * | |

## COMPLAINT

Plaintiffs, Estate of J. Frank Clayton, ("Plaintiff") by and through Linda D. Clayton, as personal representative and individually, ("Decedent" or "Mr. Clayton"), and by undersigned counsel, respectfully submits the following Complaint for damages and Jury Demand against Monsanto Company, ("Defendants") and Bayer AG ("Defendants"), and alleges the following:

## NATURE OF THE ACTION

1.     This action seeks to recover damages for the injuries sustained by Plaintiffs as the direct and proximate result of the wrongful conduct and negligence of the Defendant in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distributing, labeling, and selling of the herbicide Roundup®, containing the active ingredient glyphosate.

2. Plaintiffs maintain that Roundup® and/or glyphosate is defective, dangerous to human health, unfit and unsustainable to be marketed and sold in commerce and lacked proper warnings and directions as to the dangers associated with its use.

3. Plaintiffs' injuries, like those striking thousands of similarly situated victims across the country were unavoidable and not warned against by Defendants.

## JURISDICTION AND VENUE

4. The Court has jurisdiction on Defendant pursuant to 28 U.S.C. §1332 because there is complete diversity of citizenship between Plaintiffs and Defendants. Defendants are either incorporated and/or has their principal place of business outside of the state in which Plaintiffs reside.

5. The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

6. There is complete diversity of citizenship between Plaintiffs and Defendants. Plaintiffs are residents and citizens of Alabama and were domiciled in the State of Alabama. As set forth more fully below, Defendants are an entity organized in states other than the State of Alabama, Defendants' principal places of business are in states other than the State of Alabama, and Defendants are not citizens or residents of the State of Alabama.

7. In addition, Defendants maintain sufficient contacts with the State of Alabama such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

8. Venue is proper in this District pursuant to 28 U.S.C. §1391 (b)(2), because Defendants marketed, advertised, and distributed the dangerous products in this District; Plaintiff lives in this District and brings this action individually as the surviving spouse, and as the Executrix of the Estate of the Decedent J. Frank Clayton, was exposed in this district; Decedent's harms,

2

losses, and damages occurred in this District; Defendants do substantial business in the State of Alabama and within the District; and at all times relevant hereto, Defendants developed, manufactured, promoted, marketed, distributed, warranted, and sold Roundup®® in interstate commerce. Further, Defendants, as corporate entities, are deemed to reside in any judicial district in which it is subject to personal jurisdiction.

## PARTIES

9.      Plaintiff, Linda D. Clayton is a citizen of Alabama and resides in the city of Montgomery, County of Montgomery. Plaintiff brings this lawsuit individually as the surviving spouse and as Executrix of the Estate of J. Frank Clayton, deceased. Decedent was a citizen of Alabama and resided in Montgomery, Montgomery County Alabama. Decedent was exposed to Roundup®, which contained the active ingredient glyphosate and the surfactant polyethoxylated tallow amine ("POEA"). As a direct and proximate result of being exposed to Roundup®, Decedent J. Frank Clayton developed Non-Hodgkin's Lymphoma.

10.     "Roundup®" refers to all formulations of Defendant's Roundup® products that contain the active ingredient glyphosate.

11.     Defendant, Monsanto Company, is a Delaware corporation in "active" status with a principle place of business in St. Louis, Missouri.

12.     Defendant Bayer AG is a life sciences, pharmaceuticals and chemical company that is headquartered in Leverkusen, Germany and having the principal place of business in St. Louis, Missouri and in 2018 acquired the Monsanto Company.

13.     At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®, which contains the active ingredient glyphosate and the surfactant POEA, as well as adjuvants and other "inert" ingredients.

3

14.     Defendant, Monsanto Company, is referred to as "Monsanto" or "Defendants."

15.     Defendant, Bayer AG, is referred to as "Bayer" or "Defendants."

## FACTUAL ALLEGATIONS

16.     At all relevant times, Defendants were in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/ or has acquired and is responsible for the commercial herbicide Roundup®.

17.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis Missouri. It is the world's leading producer of glyphosate.

18.     Defendants discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate based "Roundup®" as a broad-spectrum herbicide.

17.     Glyphosate is the active ingredient in Roundup®.

18.     Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

19.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

20.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

21.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

22. Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

23. Defendants are intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup® i.e., "Roundup® Ready®." As of 2009, Defendant Monsanto was the world's leading producer of seeds designed to be Roundup® Ready®. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup® Ready® seeds.

24. The original Roundup®, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the world's most widely used herbicides. For nearly 40 years, consumers, farmers, and the public have used Roundup®, unaware of its carcinogenic properties.

## REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

25. The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7. U.S.C. §136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA) prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. 136a(a).

26. The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by

5

the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. §136(a)(c)(5)(D).

27.    FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. §136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

28.    The EPA and the State of Alabama registered Roundup® for distribution, sale, and manufacture in the United States and in the State of Alabama.

29.    FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

30.    The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. §136a-1. In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

31.    In the case of glyphosate and Roundup®, the EPA had planned on releasing its preliminary risk assessment — in relation to the registration process — no later than July 2015. The EPA completed its review of glyphosate in early 2015 but delayed releasing the assessment

pending further review in light of the World Health Organization's March 24, 2015 finding that glyphosate is a "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

### MONSANTO'S FALSE REPRESENTATIONS REGARDING

### THE SAFETY OF ROUNDUP®

32.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a.      Remember that environmentally friendly Roundup® herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence along customer's driveways, sidewalks, and fences ...

b.      And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got weed, brush, edging, or trimming problem.

c.      Roundup® biodegraded into naturally occurring elements.

d.      Remember that versatile Roundup® herbicide stays where you put it. That means there's no washing or leaching to harm customer's shrubs or other desirable vegetation.

e.      This non-residual herbicide will not wash or leach in the soil. It ... stays where you put it.

7

f.    You can apply Roundup® with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Roundup® into natural products.

g.    Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h.    Glyphosate's safety margin is much greater than required. It has over 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i.    You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j.    "Roundup® can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup®.

33.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a.    its glyphosate—containing pesticide products or any component thereof are safe, non-toxic, harmless, or free of risk.

b.    its glyphosate—containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable.

c.    its glyphosate—containing pesticide products or any component thereof stays where they are applied under all circumstances and will not move through the environment by any means.

8

d.      its glyphosate—containing pesticide products or any component thereof are

"good" for the environment or are "known for their environmental characteristics"

e.      its glyphosate—containing pesticide products or any component thereof are safer

or less toxic than common consumer products other than herbicides.

f.       its glyphosate —containing pesticide products or any component thereof might be

classified as "practically non-toxic."

34.     Monsanto did not alter its advertising in the same manner in any state other than

New York, and on information and belief still has not done so today.

35.     In 2009, France's highest court ruled that Monsanto had not told the truth about

the safety of Roundup®. The French court affirmed an earlier judgment that Monsanto had

falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

### EVIDENCE OF CARCINOGENCITY IN ROUNDUP®

36.     As early as the 1980's Monsanto was aware of glyphosate's carcinogenic

properties.

37.     On March 4, 1985, a group of the Environmental Protection Agency's ("EPA")

Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.

Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

38.     In 1986, the EPA issues a Registration Standard for glyphosate (NTIS PB87-

103214). The Registration standard required additional phytotoxicity, environmental fate,

toxicology, product chemistry, and residue chemistry studies. All of the data required was

submitted and reviewed and/or waived.

39.     In October 1991 the EPA published a Memorandum entitled "Second Peer Review

of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of

9

non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.

40.    In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in the Defendant Roundup® products are more dangerous and toxic than glyphosate alone. As early as 1991 evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.

41.    In 2002, Julie Marc published a study entitled "Pesticide Roundup® Provokes Cell Division Dysfunction at the Level of CDK1/CYclin B Activation."

42.    The study found that Defendant Roundup® caused delays in the cell cycles of sea urchin, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

43.    In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

44.    The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[9]

45.    In 2005, Francisco Peixoto published a study showing that Roundup®'s effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

10

46.     The Peixoto study suggested that the harmful effects of Roundup® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup® formulation products.

47.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup® and glyphosate on human umbilical, embryonic, and placental cells.

48.     The study used dilution levels of Roundup® and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup® are not inert and that Roundup® is always more toxic than its active ingredient glyphosate.

49.     The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendant Monsanto.

50.     Defendant Monsanto knew or should have known that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup's® adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup®.

51.     Defendants knew or should have known that tests limited to Roundup's® active ingredient glyphosate were insufficient to prove the safety of Roundup®.

52.     Defendants failed to appropriately and adequately test Roundup®, Roundup's® adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup®.

11

53.     Rather than performing appropriate tests, Defendants relied upon flawed industry-supported studies designed to protect Defendants' economic interests rather than Plaintiff and the consuming public.

54.     Despite its knowledge that Roundup® was considerably more dangerous than glyphosate alone, Defendants continued to promote Roundup® as safe.

### IARC CLASSIFICATION OF GLYPHOSATE

55.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

56.     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015-2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

57.     IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

58.     On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendant Monsanto's possession

12

since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Defendants Roundup® herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

59.     The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A probable carcinogen to humans. According to the authors glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

60.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

61.     The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

## EARLIER EVIDENCE OF GLYPHOSATE'S DANGER

62.     Despite the new classification by the IARC, Defendant Monsanto has had ample evidence of glyphosate and Roundup's® genotoxic properties for decades.

63.     Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

64.     In 1997, Chris Clements published "Genotoxicity of select herbicides in Rana catesbeiana tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

65.     The study found that tadpoles exposed to Roundup® showed significant DNA damage when compared with unexposed control animals.

13

66. Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup® can induce oxidative stress.

67. Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

68. The IARC Monograph notes that "[s]ong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

69. In 2006, Cesar Paz-y-Mifio published a study examining DNA damage in human subjects exposed to glyphosate.

70. The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

71. The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

72. Despite knowledge to the contrary, Defendants maintain that there is no evidence that Roundup® is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup® is not genotoxic, and that there is no evidence that Roundup® is genotoxic.

73. In addition to glyphosate and Roundup's® genotoxic properties, Defendants have long been aware of glyphosate's carcinogenic properties.

74. Glyphosate and Roundup® in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

14

75.     Defendant Monsanto has known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup®.

76.     In 1985, the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

77.     In 2003, Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

78.     The study concluded that glyphosate had the most significant relationship to NHL among all herbicide's studies with an increased odds ratio of 3.11.

79.     In 2003, AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

80.     The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

81.     In 2008, Mikael Eriksson published a population based case-control study of exposure to various pesticides as a risk factor for NHL.

82.     This strengthened previous associations between glyphosate and NHL.

83.     In spite of this knowledge, Defendants continued to issue broad and sweeping statements suggesting that Roundup® was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

84.     Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiffs, the agricultural community, and the public at large to

purchase and increase the use of Defendants' Roundup® for Defendants' pecuniary gain, and in fact, did induce Plaintiffs to use Roundup®.

85.     Defendants made these statements with complete disregard and reckless indifference to the safety of Plaintiff and the general public.

86.     Notwithstanding Defendants representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

87.     Defendants knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

88.     Defendants failed to appropriately and adequately inform and warn Decedent of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup®, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

89.     Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendants continue to maintain that glyphosate and/or Roundup® is safe, non- carcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup®.

90.     Defendants have claimed and continued to claim that Roundup® is safe, non-carcinogenic, and non-genotoxic. These misrepresentations are consistent with Defendants'

16

cavalier approach to investigating and ensuring the safety of its products, the safety of the public at large, and the safety of Plaintiffs.

## SCIENTIFIC FRAUD UNDERLYING

## THE SAFTEY DETERMINATION OF GLYPHOSATE

91.     After the EPA's 1985 classification of glyphosate as possibly carcinogenic to humans (Group C), Monsanto exerted pressure upon the EPA to change its classification.

92.     This culminated in the EPA's reclassification of glyphosate to Group E, which was based upon evidence of non-carcinogenicity in humans.

93.     In so classifying, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

94.     On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed scientific fraud.

95.     In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed approximately 30 tests on glyphosate and glyphosate-containing products, including 11 of the 19 chronic toxicology studies needed to register Roundup® with the EPA.

96.     In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to toxicological impacts of glyphosate. The EPA subsequently audited IBT and determined that the toxicology studies conducted for Roundup® were invalid. An EPA reviewer stated, after finding

17

"routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

97.    Three top executives of IBT were convicted of fraud in 1983.

98.    In the second incident, Monsanto hired Craven Laboratories ("Craven") in 1990 to perform pesticide and herbicide studies, including several studies on Roundup®.

99.    In March of 1991, the EPA announced that it was investigating Craven for "allegedly falsifying test data used by chemical firms to win EPA approval of pesticides."

100.    The investigation led to the indictments of the laboratory owner and a handful of employees.

## MONSANTO'S CONTINUING DISREGARD FOR THE
## SAFETY OF PLAINTIFF AND THE PUBLIC

101.    Monsanto claims on its website that "[r]regulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."

102.    Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

103.    Glyphosate, and Defendants' Roundup® products in particular, have long been associated with serious, side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

104.    Defendants' statements proclaiming the safety of Roundup® and disregarding its dangers misled Decedent.

18

105.    Despite Defendants' knowledge that Roundup® was associated with an elevated risk of developing cancer, Defendants' promotional campaigns focused on Roundup's® purported "safety profile."

106.    Defendants' failure to adequately warn Plaintiffs resulted in (1) Plaintiffs using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup®.

107.    Defendants failed to seek modification of the labeling of Roundup® to include relevant information regarding the risks and dangers associated with Roundup® exposure.

108.    The failure of Defendants to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

109.    The failure of Defendants to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

110.    The failure of Defendants to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

111.    By reason of the foregoing acts and omissions, Plaintiffs seek compensatory damages as a result of Decedent's use of, and exposure to, Roundup® which caused or was a substantial contributing factor in causing Decedent to suffer from cancer, specifically NHL, and Decedent suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

112.    By reason of the foregoing, Plaintiffs are severely and permanently injured.

19

113.    By reason of the foregoing acts and omissions, Plaintiffs have endured and, in some categories continues to suffer, emotional and mental anguish, medical expenses, and other economic and non-economic damages, including death, as a result of the actions and inactions of the Defendants.

## DECEDENT'S EXPOSURE TO ROUNDUP®

114.    Decedent passed away on October 26, 2017 of Mantle cell lymphoma at the age of 81.

115.    Decedent was exposed to Roundup® in Montgomery, Alabama. Decedent used Roundup® to clear land for food plots during hunting seasons at his camp. Decedent also used Roundup® personally at his home. Decedent purchased Roundup® for use at Walmart and Home Depot. Decedent wore no protective gear while spraying Roundup®. Decedent used concentrated Roundup®, which he mixed himself.

116.    On or about August 2015, Plaintiff J. Frank Clayton was diagnosed with Mantle cell lymphoma in Montgomery, Alabama at Montgomery Cancer Center.

117.    During the entire time that Decedent was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

118.    Mrs. Clayton first learned that exposure to Roundup® can cause NHL sometime around July/August 2019, after viewing a legal advertisement.

## TOLLING OF THE STATUTE OF LIMITATIONS

### *Discovery Rule Tolling*

119.    Plaintiffs had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup® and glyphosate until well after IARC released its formal assessment of glyphosate in July 2015. This is the quintessential case for tolling.

121. Within the time period of any applicable statutes of limitations, Plaintiffs could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup® and glyphosate is injurious and sometimes deadly to human health.

122. Decedent did not discover and did not know of facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup® and glyphosate; nor would a reasonable and diligent investigation by him have disclosed that Roundup® and glyphosate would cause his illness.

123. For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff's claims.

### *Fraudulent Concealment Tolling*

124. All applicable statutes of limitations have also been tolled by Monsanto's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

125. Instead of disclosing critical safety information about Roundup® and glyphosate, Defendants have consistently and falsely represented the safety of its Roundup® products.

### *Estoppel*

126. Monsanto was under a continuous duty to disclose to consumers, users and other persons coming into contact with its products, including Plaintiffs, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate.

127. Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

128.    Based on the foregoing, Monsanto is estopped from relying on any statutes of limitations in defense of this action.

## COUNT ONE

### STRICT LIABILITY (DESIGN DEFECT)

129.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

130.    Plaintiffs bring this strict liability claim against Defendants for defective design.

131.    At all times relevant to this litigation, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers and users and other persons coming into contact them, including Plaintiffs, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendants. At all times relevant to this litigation, Defendants designed, researched, developed, formulated, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by Plaintiffs, and/or to which Plaintiff was exposed, as described above.

132.    At all times relevant to this litigation, Defendants' Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff.

133.    At all times relevant to this litigation, Defendants' Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Alabama and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

22

134.    Defendants' Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in that when they left the hands of the Defendants' manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

135.    Defendants' Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in that when they left the hands of Defendants' manufacturers and/or suppliers, the foreseeable risks associated with these products' reasonably foreseeable uses exceeded the alleged benefits associated with their design and formulation.

136.    Therefore, at all times relevant to this litigation, Defendants' Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendants, were defective in design and formulation, in one or more of the following ways:

a.    When placed in the stream of commerce, Defendants' Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b.    When placed in the stream of commerce, Defendants' Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

      c.     When placed in the stream of commerce, Defendants' Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

      d.     Defendants did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate.

      e.     Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweighs any potential utility stemming from the use of the herbicide.

      f.     Defendants knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

      g.     Defendants did not conduct adequate post-marketing surveillance of its Roundup® products.

      h.     Defendants could have employed safer alternative designs and formulations.

137.     At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendants' Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

138.     Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

139.     The harm caused by Defendants' Roundup® products far outweighed their benefit, rendering Defendants' products dangerous to an extent beyond that which an ordinary consumer

24

would contemplate. Defendants' Roundup® products were and are more dangerous than alternative products and Defendants could have designed their Roundup® products to make them less dangerous. Indeed, at the time that Defendants designed their Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

140.   At the time Roundup® products left Defendants' control, there was a practical, technically feasible, and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendants' Roundup® herbicides.

141.   Defendants' defective design of Roundup® amounts to willful, wanton, and/or reckless conduct by Defendants.

142.   Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendants are strictly liable to Plaintiffs.

143.   The defects in Defendants' Roundup® products were substantial and contributing factors in causing Decedent's grave injuries, and, but for Defendants' misconduct and omissions, Decedent would not have sustained his injuries.

144.   As a direct and proximate result of Defendants placing their defective Roundup® products into the stream of commerce, Plaintiffs have suffered and continues to *suffer* grave injuries, and endured pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.

145.   **WHEREFORE,** Plaintiffs respectfully requests that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein

25

incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT TWO

## STRICT LIABILITY (FAILURE TO WARN)

146. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

147. Plaintiffs bring this strict liability claim against Defendants for failure to warn.

148. At all times relevant to this litigation, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendants.

149. Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiffs, Defendants therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of Roundup® and glyphosate-containing products.

150. At all times relevant to this litigation, Defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendants

26

had a continuing duty to warn Plaintiffs of the dangers associated with Roundup® use and exposure. Defendants, as manufacturer, seller, or distributor of chemical herbicides, is held to the knowledge of an expert in the field.

151. At the time of manufacture, Defendants could have provided warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to these products.

152. At all times relevant to this litigation, Defendants failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its Roundup® products and to those who would foreseeably use or be harmed by Defendants' herbicides, including Plaintiffs.

153. Despite the fact that Defendants knew or should have known that Roundup® products posed a grave risk of harm, it failed to warn of the dangerous risks associated with their use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time it distributed, supplied, or sold the product, and not known to end users and consumers, such as Plaintiffs.

154. Defendants knew or should have known that its Roundup® and glyphosate-containing products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products. Defendants have wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup®® and glyphosate.

27

155.     At all times relevant to this litigation, Defendants' Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

156.     At all times relevant to this litigation, Plaintiffs used and/or was exposed to the use of Defendants' Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

157.     Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of Decedent's exposure. Plaintiffs relied upon the skill, superior knowledge, and judgment of Defendants.

158.     Defendants knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, but it failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and horticultural applications.

159.     The information that Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled agricultural workers, horticultural workers and/or at-home users such as Decedent to utilize the products safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed,

28

or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

160.    To this day, Defendants have failed to adequately and accurately warn of the true risks of Decedent injuries and death associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

161.    As a result of their inadequate warnings, Defendants' Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were distributed by Defendants, and used by Decedent.

162.    Defendants are liable to Plaintiffs for injuries caused by its failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its Roundup® products and the risks associated with the use of or exposure to Roundup® and glyphosate.

163.    The defects in Defendants' Roundup® products were substantial and contributing factors in causing Decedent's injuries and death, and, but for Defendants' misconduct and omissions, Decedent would not have sustained his injuries and died.

164.    Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup® products, Decedent could have avoided the risk of developing injuries as alleged herein.

165.    As a direct and proximate result of Defendants placing its defective Roundup® products into the stream of commerce, the Plaintiffs have suffered and continue to suffer severe injuries and death, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.

166.  **WHEREFORE**, Plaintiffs respectfully requests that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT THREE

### NEGLIGENCE

167.  Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

168.  Defendants, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiffs.

169.  At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of their Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

170.  At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the marketing, advertisement, and sale of its Roundup® products. Defendants' duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup® and, in particular, its active ingredient glyphosate.

171. At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

172. Accordingly, at all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products caused Decedents death and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiffs.

173. Defendants knew or, in the exercise of reasonable care, should have known that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup's® adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiffs from Roundup®.

174. Defendants knew or, in the exercise of reasonable care, should have known that tests limited to Roundup's® active ingredient glyphosate were insufficient to prove the safety of Roundup®.

175. Defendants also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup® and glyphosate-containing products.

176. As such, Defendants breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Defendants manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and

unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

177. Defendants failed to appropriately and adequately test Roundup®, Roundup's® adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiffs from Roundup®.

178. Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Defendants have failed to do so. Indeed, Defendants have wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

179. Defendants' negligence included:

a. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

b. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture, horticulture, and at-home use;

d.      Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup®, and the propensity of these ingredients to render Roundup® toxic, increase the toxicity of Roundup®, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup®, and whether or not "inert" ingredients and/or adjuvants were safe for use;

e.      Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

f.      Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

g.      Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and/or be exposed to its Roundup® products;

h.      Failing to disclose to Plaintiffs, users, consumers, and the general public that the use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

i.      Failing to warn Plaintiffs, users, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiffs and other users or consumers;

      j.      Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

      k.      Representing that its Roundup® products were safe for their intended use when, in fact, Defendants knew or should have known that the products were not safe for their intended use;

      l.      Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate; Advertising, marketing, and recommending the use of Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendants to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

      m.      Continuing to disseminate information to its consumers, which indicate or imply that Defendants' Roundup® products are not unsafe for use in the agricultural, horticultural industries, and/or home use; and

      n.      Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

180.      Defendants knew and/or should have known that it was foreseeable that consumers and/or users, such as Plaintiffs, would suffer injuries as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

181.      Plaintiffs did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

182. Defendants' negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiffs suffered, and will continue to suffer, as described herein.

183. Defendants' conduct, as described above, was reckless. Defendants regularly risk the lives of consumers and users of their products, including Plaintiffs, with full knowledge of the dangers of its products. Defendants have made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiffs. Defendants' reckless conduct therefore warrants an award of punitive damages.

184. As a proximate result of Defendants' wrongful acts and omissions in placing its defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiffs have suffered and continue to suffer severe, and permanent physical and emotional injuries. Decedent endured pain and suffering, and ultimately died. Mrs. Clayton has suffered economic losses, (including significant expenses for medical care and treatment) and will continue to suffer emotional injuries and loss of consortium of her husband in the future.

185. **WHEREFORE**, Plaintiffs respectfully requests that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT FOUR

## **WRONGFUL DEATH**

186. Plaintiffs incorporate by reference all prior allegations contained in this Complaint.

187. Defendants' negligence caused the death of plaintiff, Mr. Clayton.

35

188. As a consequence of Decedent's death, his wife, Linda D. Clayton suffered pain, grief, sorrow, anguish, stress, shock and mental suffering already experienced and reasonably probable to be the experienced for the rest of her life.

189. As a further consequence of Decedent's death, Plaintiff Linda D. Clayton incurred expenses for funeral and burial, medical care and services for the injury that resulted in Decedent's death.

190. As a further consequence of Decedent's death caused by Defendants, Plaintiff Linda D. Clayton incurred the loss of love, affection, companionship, care, protection, and guidance since the death of her husband, Decedent and in the future.

191. **WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demands a jury trial on the issues contained herein.

## JURY TRIAL DEMAND

192. Plaintiffs demand a trial by jury on all of the triable issues within this pleading.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs requests that the Court enter judgment in his favor and against Monsanto, awarding as follows:

    a.    compensatory damages in an amount to be proven at trial;

    b.    punitive damages;

    c.    costs including reasonable attorneys' fees, court costs, and other litigation expenses; and

d. any other relief the Court may deem just and proper.

Dated: October 9, 2019          **HARE, WYNN, NEWELL & NEWTON LLP**

Don McKennaASB-6494-C66D
Hare, Wynn, Newell & Newton LLP
2025 Third Avenue North, Suite 800
Birmingham, AL 35203
Telephone: (205) 328-5330
Facsimile: (205) 324-2165
don@hwnn.com
Attorney for Plaintiffs

JS 44 (Rev. 02/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Linda D. Clayton, Ind and as Executrix of Estate of J. Frank Clayton

RECEIVED
2019 OCT 11 P 12: 32
DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Don McKenna
Hare, Wynn, Newell and Newton, LLP (205) 328-5330
2025 3rd Avenue North Ste 800, Birmingham, AL 35203

## DEFENDANTS

Monsanto Company Corporation; Bayer AG

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

❏ 1  U.S. Government Plaintiff
❏ 3  Federal Question *(U.S. Government Not a Party)*
❏ 2  U.S. Government Defendant
☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ❏ 1 | Incorporated *or* Principal Place of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated *and* Principal Place of Business In Another State | ❏ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ❏ 625 Drug Related Seizure of Property 21 USC 881 | ❏ 422 Appeal 28 USC 158 | ❏ 375 False Claims Act |
| ❏ 120 Marine | ❏ 310 Airplane / ☒ 365 Personal Injury - | ❏ 690 Other | ❏ 423 Withdrawal 28 USC 157 | ❏ 376 Qui Tam (31 USC 3729(a)) |
| ❏ 130 Miller Act | ❏ 315 Airplane Product Liability / Product Liability | | | ❏ 400 State Reapportionment |
| ❏ 140 Negotiable Instrument | ❏ 320 Assault, Libel & / ❏ 367 Health Care/ | | **PROPERTY RIGHTS** | ❏ 410 Antitrust |
| ❏ 150 Recovery of Overpayment & Enforcement of Judgment | Slander / Pharmaceutical Personal Injury | | ❏ 820 Copyrights | ❏ 430 Banks and Banking |
| ❏ 151 Medicare Act | ❏ 330 Federal Employers' / Product Liability | | ❏ 830 Patent | ❏ 450 Commerce |
| ❏ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | Liability / ❏ 368 Asbestos Personal | | ❏ 835 Patent - Abbreviated New Drug Application | ❏ 460 Deportation |
| | ❏ 340 Marine / Injury Product | | ❏ 840 Trademark | ❏ 470 Racketeer Influenced and Corrupt Organizations |
| ❏ 153 Recovery of Overpayment of Veteran's Benefits | ❏ 345 Marine Product Liability / Liability | **LABOR** | **SOCIAL SECURITY** | ❏ 480 Consumer Credit |
| ❏ 160 Stockholders' Suits | ❏ 350 Motor Vehicle / **PERSONAL PROPERTY** | ❏ 710 Fair Labor Standards Act | ❏ 861 HIA (1395ff) | ❏ 485 Telephone Consumer Protection Act |
| ❏ 190 Other Contract | ❏ 355 Motor Vehicle / ❏ 370 Other Fraud | ❏ 720 Labor/Management | ❏ 862 Black Lung (923) | ❏ 490 Cable/Sat TV |
| ❏ 195 Contract Product Liability | Product Liability / ❏ 371 Truth in Lending | Relations | ❏ 863 DIWC/DIWW (405(g)) | ❏ 850 Securities/Commodities/ |
| ❏ 196 Franchise | ❏ 360 Other Personal / ❏ 380 Other Personal | ❏ 740 Railway Labor Act | ❏ 864 SSID Title XVI | Exchange |
| | Injury / Property Damage | ❏ 751 Family and Medical | ❏ 865 RSI (405(g)) | ❏ 890 Other Statutory Actions |
| | ❏ 362 Personal Injury - / ❏ 385 Property Damage | Leave Act | | ❏ 891 Agricultural Acts |
| | Medical Malpractice / Product Liability | | | ❏ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ❏ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ❏ 895 Freedom of Information |
| ❏ 210 Land Condemnation | ❏ 440 Other Civil Rights / **Habeas Corpus:** | ❏ 791 Employee Retirement Income Security Act | ❏ 870 Taxes (U.S. Plaintiff or Defendant) | Act |
| ❏ 220 Foreclosure | ❏ 441 Voting / ❏ 463 Alien Detainee | | ❏ 871 IRS—Third Party 26 USC 7609 | ❏ 896 Arbitration |
| ❏ 230 Rent Lease & Ejectment | ❏ 442 Employment / ❏ 510 Motions to Vacate | | | ❏ 899 Administrative Procedure |
| ❏ 240 Torts to Land | ❏ 443 Housing/ / Sentence | | | Act/Review or Appeal of |
| ❏ 245 Tort Product Liability | Accommodations / ❏ 530 General | | | Agency Decision |
| ❏ 290 All Other Real Property | ❏ 445 Amer. w/Disabilities - / ❏ 535 Death Penalty | **IMMIGRATION** | | ❏ 950 Constitutionality of |
| | Employment / **Other:** | ❏ 462 Naturalization Application | | State Statutes |
| | ❏ 446 Amer. w/Disabilities - / ❏ 540 Mandamus & Other | ❏ 465 Other Immigration | | |
| | Other / ❏ 550 Civil Rights | Actions | | |
| | ❏ 448 Education / ❏ 555 Prison Condition | | | |
| | / ❏ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding
❏ 2 Removed from State Court
❏ 3 Remanded from Appellate Court
❏ 4 Reinstated or Reopened
❏ 5 Transferred from Another District *(specify)*
❏ 6 Multidistrict Litigation - Transfer
❏ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USC § 1332
Brief description of cause:
Injuries resulting in death from the glyphosate ingredient in Roundup

## VII. REQUESTED IN COMPLAINT:

❏ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ❏ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE
DOCKET NUMBER

DATE 10/09/19
SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**
RECEIPT # ___ AMOUNT ___ APPLYING IFP ___ JUDGE ___ MAG. JUDGE ___

```
Court Name: U S DISTRICT COURT - AL/M
Division: 2
Receipt Number: 4602055256
Cashier ID: imccullo
Transaction Date: 10/15/2019
Payer Name: HARE WYNN NEWELL AND NEWTON
------------------------------------
CIVIL FILING FEE
 For: HARE WYNN NEWELL AND NEWTON
 Case/Party: D-ALM-2-19-CV-000776-001
 Amount:      $400.00
------------------------------------
CHECK
 Check/Money Order Num: 120667
 Amt Tendered: $400.00
------------------------------------
Total Due:       $400.00
Total Tendered:  $400.00
Change Amt:      $0.00

2:19-cv-00776-MHT-SRW

Clayton v. Monsanto Company
Corporation et al
```