# U.S. District Court
## District of Hawaii (Hawaii)
## CIVIL DOCKET FOR CASE #: 1:19–cv–00510–WRP–NONE

Pullen et al v. Monsanto Company
Assigned to: MAGISTRATE JUDGE WES REBER PORTER
Referred to: UNASSIGNED
Cause: 28:1332 Diversity–Product Liability

Date Filed: 09/24/2019
Jury Demand: Plaintiff
Nature of Suit: 245 Tort Product Liability
Jurisdiction: Diversity

**Plaintiff**

**Howard Pullen**

represented by **Michael Jay Green**
841 Bishop Street, Suite 2201
Honolulu, Hi 96813
521–3336
Email: michaeljgreen@hawaii.rr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Denise M. Hevicon**
841 Bishop Street
Suite 2210
Honolulu, HI 96813
523–5751
Fax: 356–0628
Email: dmheviconlaw@hawaii.rr.com
*ATTORNEY TO BE NOTICED*

**Maria F. Penn**
Law Office of Maria F. Penn, AAL, ALC
841 Bishop Street Ste 2210
Honolulu, HI 96813
524–1730
Fax: (808) 532–2164
Email: mfpenn@hawaii.rr.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Elizabeth Pullen**

represented by **Denise M. Hevicon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Maria F. Penn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Jay Green**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 09/24/2019 | 1 | COMPLAINT *; Demand for Jury Trial; (Proposed) Summons* against Monsanto Company ( Filing fee $ 400 receipt number 0975–2266958.), filed by Howard Pullen, Elizabeth Pullen.(Green, Michael) Docket text modified on 9/24/2019 (emt, ). (Entered: 09/24/2019) |

| 09/24/2019 | 2 | NOTICE of Case Assignment: Please reflect Civil case number CV 19–00510 WRP on all further pleadings.<br>(emt, ) (Entered: 09/24/2019) |
|---|---|---|
| 09/24/2019 | 3 | Summons Issued as to Monsanto Company. (emt, ) (Entered: 09/24/2019) |
| 09/24/2019 | 4 | Order Setting Rule 16 Scheduling Conference is set for 09:00AM on 11/19/2019 before MAGISTRATE JUDGE WES REBER PORTER – Signed by CHIEF JUDGE J. MICHAEL SEABRIGHT on 9/24/2019.<br>(Attachments: # 1 Memo from Clerk Re: Corporate Disclosure Statements)<br><br>**ATTACH THE SCHEDULING ORDER TO THE INITIATING DOCUMENT (COMPLAINT/NOTICE OF REMOVAL).**<br>**THE SCHEDULING ORDER AND MEMO RE: CORPORATE DISCLOSURES MUST BE SERVED WITH THE DOCUMENT.**<br>(emt, ) (Entered: 09/24/2019) |
| 09/24/2019 | 5 | CIVIL Waiver of Service Packet ~ Notice to Parties Regarding Service Pursuant to Rule 4 of the Federal Rules of Civil Procedure.<br>(Attachments: # 1 AO 398 Notice of Lawsuit and Request to Waive Service of Summons, # 2 AO 399 Waiver of Service of Summons)<br>(emt, ) (Entered: 09/24/2019) |
| 09/24/2019 | 6 | NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE.<br>(Attachments: # 1 **Election Form:** Consent to Jurisdiction by United States Magistrate Judge)<br><br>**ATTACH THE NOTICE AND ELECTION FORM TO THE INITIATING DOCUMENT (COMPLAINT/NOTICE OF REMOVAL).**<br>**THE NOTICE AND ELECTION FORM MUST BE SERVED WITH THE DOCUMENT.**<br><br>While the decision to consent or not to consent to the exercise of jurisdiction by the magistrate judge is entirely voluntarily, **the duty to respond to this notice is mandatory**. Each party **must** indicate consent or decline to consent by completing the attached Election Form and filing it with the court no later than twenty–one (21) days after entry of appearance. In the event a dispositive motion is filed prior to the date on which the submission of the Election Form is required, the parties must return the completed Election Form within seven (7) calendar days after the motion is filed.<br>(emt, ) (Entered: 09/24/2019) |
| 10/08/2019 | 7 | SUMMONS Returned Executed by Howard Pullen, Elizabeth Pullen. Monsanto Company served on 10/8/2019. (Green, Michael)<br>Docket Text Modified on 10/10/2019 (jo)<br>(Entered: 10/08/2019) |

MICHAEL JAY GREEN        4451
841 Bishop Street, Suite 2201
Honolulu, Hawaii 96813
Telephone: (808) 521.3336
Facsimile: (808) 566.0347

DENISE M. HEVICON   7428
841 Bishop Street, Suite 2210
Honolulu, Hawaii 96813
Telephone: (808) 523.5751
Facsimile: (808) 356.0628

MARIA F. PENN        7870
841 Bishop Street, Suite 2210
Honolulu, Hawaii 96813
Telephone: (808) 523.5751
Facsimile: (808) 356.0628

Attorneys for Plaintiffs
HOWARD PULLEN and
ELIZABETH PULLEN

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF HAWAII

| | |
|---|---|
| HOWARD PULLEN and ELIZABETH PULLEN, | CIVIL NO.  CV _____ |
| Plaintiffs, | COMPLAINT; DEMAND FOR JURY TRIAL; SUMMONS |
| vs. | |
| MONSANTO COMPANY, | |
| Defendant. | |

## COMPLAINT

Plaintiffs HOWARD PULLEN and ELIZABETH PULLEN, by and through their undersigned counsel, for their Complaint against Defendant MONSANTO COMPANY, alleges and avers as follows:

### I.   PARTIES

1.     Plaintiff Howard Pullen ("Howard") is and was at all relevant times herein a resident of the County of Hawaii, State of Hawaii.

2.     Plaintiff Elizabeth Pullen ("Elizabeth") is and was at all relevant times herein a resident of the County of Hawaii, State of Hawaii.

3.     From on or around 1978 through late February/Early March 2019, Plaintiff Howard purchased and sprayed glyphosate- based herbicides (hereinafter referred to as "Roundup®") manufactured by Monsanto Company.  Mr. Pullen owned a ten (10) acre property in California where he lived until 2014.  He would routinely spray Roundup® to keep this property clear.

4.     In 2014, Plaintiffs moved to the Island of Hawaii and purchased property.  Plaintiff Howard increased his use of Roundup® to clear this property - using approximately eight to ten (8-10) gallons a month.

5.     Mr. Pullen was initially diagnosed with Non-Hodgkin's Lymphoma, Stage 3 in 2013 as a direct and proximate result of his exposure to

2

Roundup®.  He underwent chemotherapy twice a month for six (6) months.  His cancer went into remission.  The Non-Hodgkin's Lymphoma recurred in 2014 and again in 2015.  Each time he underwent treatments of intensive chemotherapy.  In August 2018 his Non-Hodgkin's Lymphoma recurred yet again.  He underwent a treatment of oral medication for a period of twelve (12) months.  As of August 2019, Mr. Pullen was found to be in remission again.

6.      Plaintiffs were unaware of the connection between glyphosate and Non-Hodgkin's Lymphoma until 2019.

7.      Defendant Monsanto Company (hereinafter "Monsanto") is a corporation created under the laws of the state of Delaware with its headdquarters and principal place of business in St. Louis, Missouri.

8.      At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate, marked, distributed and manufactured Roundup®.

9.      Defendant Monsanto derived substantial revenue from goods and products used in the States of California and Hawaii.

## II.      JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 in that the Plaintiffs and Defendant are citizens of different states and the

3

amount in controversy exceeds $75,000.00.

11.    Venue is proper pursuant to 28 U.S.C. § 1391 because the Defendant systematically and purposefully sells, markets and distributes Roundup® in the State of Hawaii and Plaintiffs' claims made in this case arose in this district.

12.    Defendant Monsanto purposefully availed itself of the privilege of conducting its activities in the State of Hawaii, thus invoking the benefits and protections of its laws.

## III.    FACTUAL ALLEGATIONS

13.    In 1970, Defendant Monsanto Company, Inc. discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85-90 millions of pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide. Glyphosate is the active ingredient in Roundup®.

14.    Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27%

4

of the world seed market. The majority of these seeds are of the Roundup Ready®

brand. The stated advantage of Roundup Ready® crops is that they substantially

improve a farmer's ability to control weeds, since glyphosate can be sprayed in the

fields during the growing season without harming their crops. In 2010, an

estimated 70% of corn and cotton, and 90% of soybean fields in the United States

were Roundup Ready®.

15.    Monsanto's glyphosate products are registered in 130 countries and

approved for use on over 100 different crops. They are ubiquitous in the

environment. Numerous studies confirm that glyphosate is found in rivers,

streams, and groundwater in agricultural areas where Roundup® is used. It has

been found in food, in the urine of agricultural workers, and even in the urine of

urban dwellers who are not in direct contact with glyphosate.

16.    On March 20, 2015, the International Agency for Research on Cancer

(hereinafter "IARC"), an agency of the World Health Organization (hereinafter

"WHO"), issued an evaluation of several herbicides, including glyphosate. That

evaluation was based, in part, on studies of exposures to glyphosate in several

countries around the world, and it traces the health implications from exposure to

glyphosate since 2001.

17.    On July 29, 2015, IARC issued the formal monograph relating to

5

glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

18.    The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are Non-Hodgkin's lymphoma and other haematopoietic cancers, including chronic lymphocytic leukemia/lymphocytic lymphoma, B-cell lymphoma, and multiple myeloma.

19.    The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

20.    Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate- based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

21.    Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world. Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and

6

fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

22.    For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. History has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup® - glyphosate-is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Agricultural workers are, once again, victims of corporate greed. Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® was safe.

### *The Discovery of Glyphosate and Development of Roundup®*

7

23.    The herbicidal properties of glyphosate were discovered in 1970 by

Monsanto chemist John Franz. The first glyphosate-based herbicide was

introduced to the market in the mid- 1970s under the brand name Roundup®.

From the beginning, Monsanto marketed Roundup® as a "safe" general-purpose

herbicide for widespread commercial and consumer use.  Defendant Monsanto still

markets Roundup® as safe today.

### *Registration of Herbicides under Federal Law*

24.    The manufacture, formulation and distribution of herbicides, such as

Roundup®,  are regulated under the Federal Insecticide, Fungicide, and

Rodenticide Act (hereinafter  "FIFRA" or "Act"), 7 U.S.C. § 136 et seq. FIFRA

requires that all pesticides be registered with the Environmental Protection

Agency (hereinafter "EPA" or "Agency") prior to their distribution, sale, or use,

except as described by the Act. 7 U.S.C. §136a(a).

25.    The EPA requires as part of the registration process, among other

things, a variety of tests to evaluate the potential for exposure to pesticides,

toxicity to people and other potential non- target organisms, and other adverse

effects on the environment. Registration by the EPA, however, is not an assurance

or finding of safety. The determination the Agency must make in registering or

re-registering a product is not that the product is "safe," but rather that use of the

8

product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. §136a(c)(5)(D).

26.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. §136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

27.     The EPA registered Roundup® for distribution, sale, and manufacture in the United States and the State of Hawaii.

28.     FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

29.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data

9

necessary for registration of a pesticide has changed over time. The EPA is now in

the process of re-evaluating all pesticide products through a Congressionally-

mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to

reevaluate these pesticides, the EPA is demanding the completion of additional

tests and the submission of data for the EPA's review and evaluation.

30.     In the case of glyphosate, and therefore Roundup®, the EPA had

planned on releasing its preliminary risk assessment -in relation to the

re-registration process-no later than July 2015. The EPA completed its review of

glyphosate in early 2015, but it delayed releasing the risk assessment pending

further review in light of the WHO's findings.

### *Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup*

31.     Based on early studies that glyphosate could cause cancer in

laboratory animals, the EPA originally classified glyphosate as possibly

carcinogenic to humans (Group C) in 1985. After pressure from Monsanto,

including contrary studies it provided to the EPA, the EPA changed its

classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In

so classifying glyphosate, however, the EPA made clear that the designation did

not mean the chemical does not cause cancer: "It should be emphasized, however,

that designation of an agent in Group E is based on the available evidence at the

time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

32.   On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

33.   In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

34.   In 1976, the United States Food and Drug Administration (hereinafter "FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits." Three top executives of IBT were convicted of fraud in 1983.

35.   In the second incident of data falsification, Monsanto hired Craven

Laboratories in 1991 to perform pesticide and herbicide studies, including for

Roundup®. In that same year, the owner of Craven Laboratories and three of its

employees were indicted, and later convicted, of fraudulent laboratory practices in

the testing of pesticides and herbicides.

36.    Despite the falsity of the tests that underlie its registration, within a

few years of its launch, Monsanto was marketing Roundup® in 115 countries.

### *The Importance of Roundup® to Monsanto's Market Dominance Profits*

37.    The success of Roundup® was key to Monsanto's continued

reputation and dominance in the marketplace.  Largely due to the success of

Roundup® sales, Monsanto's agriculture division was out-performing its

chemicals division's operating income, and that gap increased yearly.  But with its

patent for glyphosate expiring in the United States in the year 2000, Monsanto

needed a strategy to maintain its Roundup® market dominance and to ward off

impending competition.

38.    In response, Monsanto began the development and sale of genetically

engineered Roundup Ready® seeds in 1996.  Since Roundup Ready® crops are

resistant to glyphosate; farmers can spray Roundup® onto their fields during the

growing season without harming the crop.  This allowed Monsanto to expand its

market for Roundup® even further; by 2000, Monsanto's biotechnology seeds

were planted on more than 80 million acres worldwide and nearly 70% of

American soybeans were planted from Roundup Ready® seeds. It also secured

Monsanto's dominant share of the glyphosate/Roundup® market through a

marketing strategy that coupled proprietary Roundup Ready® seeds with

continued sales of its Roundup® herbicide.

39.    Through a three-pronged strategy of increased production, decreased

prices and by coupling with Roundup Ready® seeds, Roundup® became

Monsanto's most profitable product. In 2000, Roundup® accounted for almost

$2.8 billion in sales, outselling other herbicides by a margin of 5-1, and

accounting for a close to half of Monsanto's revenue. Today, glyphosate remains

one of the world's largest herbicides by sales volume.

### *Monsanto has known for decades that it falsely advertises the safety of Roundup®*

40.    In 1996, the New York Attorney General (hereinafter "NYAG") filed

a lawsuit against Monsanto based on its false and misleading advertising of

Roundup® products. Specifically, the lawsuit challenged Monsanto's general

representations that its spray-on glyphosate-based herbicides, including

Roundup®, were "safer than table salt" and "practically non-toxic" to mammals,

birds, and fish. Among the representations the NYAG found deceptive and

13

misleading about the human and environmental safety of Roundup® are the following:

a)   Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences...

b)   And remember that Roundup is biodegradable and won't build up the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c)   Roundup biodegrades into naturally occurring elements.

d)   Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e)   This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f)   You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms

14

biodegrade Accord into natural products.

g)   Glyphosate is less toxic to rats than table salt following acute

oral ingestion.

h)   Glyphosate's safety margin is much greater than required.  It

has over a 1,000-fold safety margin in food and over a 700-fold

safety margin for workers who manufacture it or use.

i)   You can feel good about using herbicides by Monsanto.  They

carry a toxicity category rating of 'practically non-toxic' as it

pertains to mammals, birds and fish.

j)   "Roundup can be used where kids and pets will play and breaks

down into natural material."  This ad depicts a person with his

head in the ground and pet dog standing in an area which has

been treated with Roundup.

41.   November 19, 1996, Monsanto entered into an Assurance of

Discontinuance with NYAG, in which Monsanto agreed, among other things, "to

cease and desist from publishing or broadcasting any advertisements [in New

York] that represent, directly or by implication" that:

a)   its glyphosate-containing pesticide products or any component

thereof are safe, non-toxic, harmless or free from risk;

b)    its glyphosate-containing pesticide products or any component

thereof manufactured, formulated, distributed or sold by

Monsanto are biodegradable ;

c)    its glyphosate-containing pesticide products or any component

thereof stay where they are applied under all circumstances and

will not move through the environment by any means;

d)    its glyphosate-containing pesticide products or any component

thereof are "good" for the environment or are "known for their

environmental characteristics." ;

e)    glyphosate-containing pesticide products or any component

thereof are safer or less toxic than common consumer products

other than herbicides;

f)    its glyphosate-containing products or any component thereof

might be classified as "practically non-toxic."

42.    Monsanto did not alter its advertising in the same manner in any state

other than New York, and on information and belief still has not done so today.

43.    In 2009, France's highest court ruled that Monsanto had not told the

truth about the safety of Roundup®. The French court affirmed an earlier

judgement that Monsanto had falsely advertised its herbicide Roundup® as

"biodegradable" and that it "left the soil clean."

## *Classifications and Assessments of Glyphosate*

44.    The IARC process for the classification of glyphosate followed the
stringent procedures for the evaluation of a chemical agent.  Over time, the IARC
Monograph program has reviewed 980 agents.  Of those reviewed, it has
deteremined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to
be Group 2A ( Probable Human Carcinogens); 287 agents to be Group 2B
(Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and
one agent to be Probably Not Carcinogenic.

45.    The established procedure for IARC Monograph evaluations is
described in the IARC Programme's Preamble.  Evaluations are performed by
panels of international experts, selected on the basis of their expertise and the
absence of actual or apparent conflicts of interest.

46.    One year before the Monograph meeting, the meeting is announced
and there is a call both for data and for experts. Eight months before the
Monograph meeting, the Working Group membership is selected and the sections
of the Monograph are developed by the Working Group members. One month
prior to the Monograph meeting, the call for data is closed and the various draft
sections are distributed among Working Group members for review and comment.

17

Finally, at the Monograph meeting, the Working Group finalizes review of all

literature, evaluates the evidence in each category, and completes the overall

evaluation. Within two weeks after the Monograph meeting, the summary of the

Working Group findings are published in Lancet Oncology, and within a year after

the meeting, the final Monograph is finalized and published.

47.     In assessing an agent, the IARC Working Group reviews the

following information: (a) human, experimental, and mechanistic data; (b) all

pertinent epidemiological studies and cancer bioassays; and ( c) representative

mechanistic data. The studies must be publicly available and have sufficient detail

for meaningful review, and reviewers cannot be associated with the underlying

study.

48.     In March 2015, IARC reassessed glyphosate. The summary published

in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and

probably carcinogenic in humans.

49.     On July 29, 2015, IARC issued its Monograph for glyphosate,

Monograph 112. For Volume 112, the volume that assessed glyphosate, a

Working Group of 17 experts from 11 countries met at IARC from March 3-10,

2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The

March meeting culminated nearly a one-year review and preparation by the IARC

18

Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

50.     The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

51.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

52.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

53.     The assessment of the IARC Working Group identified several case control  studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

19

54.     The IARC Working Group found an increased risk between exposure to glyphosate and Non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

55.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

56.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate fommlation promoted skin tumors in an initiation-promotion study in mice.

57.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

58.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

20

59. The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruptions.

60. The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

### *Other Earlier Findings About Glyphosate's Dangers to Human Health*

61. The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns:**

Glyphosate is released to the environment in its use as a herbicide for

21

controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available. Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

62.    In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

### The Toxicity of Other Ingredients in Roundup®

63.    In addition to the toxicity of the active ingredient glyphosate, several studies support the hypothesis that the glyphosate-based formulation in Defendant's Roundup® products is more dangerous and toxic than glyphosate alone. Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.

64.    In 2002, a study by Julie Marc, entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation," revealed that Roundup® causes delays in the cell cycles of sea urchins but that the same

concentrations of glyphosate alone were ineffective and did not alter cell cycles.

65.    A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation. The researchers noted that "cell cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell cycle checkpoints leads to genomic instability and subsequent development of cancer from the initial affect cell." Further, "[s]ince cell cycle disorder such as cancer result from dysfunctions of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells.

66.    In 2005, a study by Francisco Peixoto entitled "Comparative effects of Roundup® and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup®'s effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone. The Peixoto study further suggested that the harmful effects of Roundup® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant POEA, or in the alternative, due to a potential synergic effect between glyphosate and other ingredients in the Roundup® formulation.

67.    In 2009, Nora Benachour and Gilles-Eric Seralini published a study

23

examining the effects of Roundup® and glyphosate on human umbilical, embryonic, and placental cells. The study tested dilution levels of Roundup® and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food. The researchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability and amplify toxicity of glyphosate alone. The researchers further suggested that assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants present in Roundup® are not, in fact, inert and that Roundup® is potentially far more toxic than its active ingredient glyphosate alone.

68.     The results of these studies were at all times available to Monsanto. Monsanto thus knew or should have known that Roundup® was, and is more toxic than glyphosate alone and that safety studies of Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup®.

69.     Despite its knowledge that Roundup® is considerably more dangerous than glyphosate alone, Monsanto continued to promote Roundup® as safe.

### *Recent Worldwide Bans on Roundup®/Glyphosate*

24

70.     Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in light of the as the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which takes effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

71.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

72.     France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

73.     Bermuda banned both the private and commercial sale of glyphosates, including Roundup® . The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the

25

importation of weed spray 'Roundup' has been suspended."

74.     The Sri Lankan government banned the private and commercial use
of glyphosates, particularly out of concern that Glyphosate has been linked to fatal
kidney disease in agricultural workers.

75.     The government of Columbia announced its ban on using Roundup®
and glyphosate to destroy illegal plantations of coca, the raw ingredient for
cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

### *Plaintiff Howard Pullen's Exposure to Roundup®*

76.     From on or around 1978 through late February/Early March 2019,
Plaintiff Howard purchased and sprayed glyphosate- based herbicides (hereinafter
referred to as "Roundup®") manufactured by Monsanto Company.  Mr. Pullen
owned a ten (10) acre property in California where he lived until 2014.  He would
routinely spray Roundup® to keep this property clear.   He does not recall where
he purchased the product.

77.     In 2014, Plaintiffs moved to the Island of Hawaii and purchased
property.  Plaintiff Howard increased his use of Roundup® to clear this property -
using approximately eight to ten (8-10) gallons a month.  Plaintiff purchased the
product from CostCo and Home Depot.

78.     Mr. Pullen was initially diagnosed with Non-Hodgkin's

26

Lymphoma, Stage 3 in 2013 as a direct and proximate result of his exposure to

Roundup®. He underwent chemotherapy twice a month for six (6) months. His

cancer went into remission. The Non-Hodgkin's Lymphoma recurred in 2014 and

again in 2015. Each time he underwent treatments of intensive chemotherapy. In

August 2018 his Non-Hodgkin's Lymphoma recurred yet again. He underwent a

treatment of oral medication for a period of twelve (12) months. As of August

2019, Mr. Pullen was found to be in remission again.

79.    Plaintiffs were unaware of the connection between glyphosate and

Non-Hodgkin's Lymphoma until 2019.

## VI.    CAUSES OF ACTION

### COUNT I
### STRICT LIABILITY (DESIGN DEFECT)

80.    Plaintiffs incorporate by reference each and every allegation set forth

in the preceding paragraphs as if fully stated herein.

81.    At all times mentioned herein, Defendant engaged in the business of

testing, developing, manufacturing, selling, and/or distributing, marketing,

packaging design, and promotion of Roundup® products, which are defective and

unreasonably dangerous to consumers, including Plaintiff Howard, thereby placing

Roundup® products into the stream of commerce.

27

82.     These actions were under the ultimate control and supervision of

Defendant Monsanto.

83.     At all times relevant herein, Roundup® products were manufactured,

designed, and labeled in an unsafe, defective, and inherently dangerous manner

that was dangerous for use by or exposure to the public, and, in particular, Plaintiff

Howard.

84.     At all times relevant herein, Roundup® products reached the intended

consumers, handlers, and users or other persons coming into contact with these

products in Hawaii and throughout the United States, including Plaintiff Howard,

without substantial change in their condition as designed, manufactured, sold,

distributed, labeled, and marketed by Defendant Monsanto.

85.     Roundup® products, as researched, tested, developed, designed,

licensed, manufactured, packaged, labeled, distributed, sold, and marketed by

Defendant Monsanto were defective in design and formulation in that when they

left the hands of the manufacturers and/or suppliers, they were unreasonably

dangerous and dangerous to an extent beyond that which an ordinary consumer

would contemplate.

86.     Roundup® products, as researched, tested, developed, designed,

licensed, manufactured, packaged, labeled, distributed, sold, and/or marketed by

28

Defendant were defective in design formulation in that when they left the hands of the manufactures and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

87.    At all times relevant to this action, Defendant knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendant.

88.    Plaintiff Howard did, in fact, follow all directions for use provided by Defendant.

89.    Therefore, at all times relevant herein, Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and/or marketed by Defendant were defective in design and formulation, in one or more of the following ways:

> (a)    When placed in the stream of commerce, Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which as ordinary consumer would contemplate.
>
> (b)    When placed in the stream of commerce, Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when

29

used in a reasonably anticipated manner.

(c)     When placed in the stream of commerce, Roundup® products

contained unreasonably dangerous design defects and were not

reasonably safe when used in a reasonably anticipated or

intended manner.

(d)     Monsanto did not sufficiently test, investigate, or study

Roundup® products and, specifically, the active ingredient

glyphosate.

(e)     Exposure to Roundup® and glyphosate-containing products

presents a risk of harmful side effects that outweigh any

potential utility stemming from the use of the herbicide.

(f)     At the time of marketing its Roundup® products, Roundup®

was defective in that exposure to Roundup® and specifically,

its active ingredient glyphosate, could result in cancer and

other severe illness and injuries.

(g)     Monsanto did not conduct adequate post-marketing

surveillance of its  Roundup® products.

(h)     Monsanto could have employed safer alternative designs and

formulations.

30

90.     Plaintiff Howard was exposed to Roundup® products as described above, without knowledge of their dangerous characteristics.

91.     At all times relevant herein, Plaintiff Howard  used and/or was exposed to the use of Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

92.     Plaintiff Howard could not have and did not reasonably discover the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

93.     The harm caused by Roundup® products far outweighed their benefit, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate. Roundup® products were and are more dangerous than alternative products and Defendant could have designed Roundup® products (including their packaging and sales aids) to make them less dangerous. Indeed, at the time that Monsanto designed Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

94.     At the time Roundup® products left Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or

31

intended function of those herbicides.

95.     Monsanto's defective design of Roundup® products was willful,
wanton, fraudulent, malicious, and conducted with reckless disregard for the
health and safety of users of the Roundup® products, including Plaintiff Howard
herein.

96.     Therefore, as a result of the unreasonably dangerous condition of its
Roundup® products, Defendant is strictly liable to Plaintiffs.

97.     The defects in Roundup® products caused or contributed to cause
Plaintiff Howard's grave injuries, and, but for Defendant's misconduct and
omissions, Plaintiff Howard would not have sustained his injuries.

98.     Monsanto's conduct, as described above, was reckless. Monsanto
risked the lives of consumers and users of its products, including Plaintiff Howard,
with knowledge of the safety problems associated with Roundup® and
glyphosate- containing products, and suppressed this knowledge from the general
public. Monsanto made conscious decisions not to redesign, warn or inform the
unsuspecting public. Monsanto's reckless conduct warrants an award of
aggravated damages.

99.     As a direct and proximate result of Defendant placing defective
Roundup® products into the stream of commerce, Plaintiff Howard has suffered

and will continue to suffer grave injuries, including but not limited to, enduring

physical pain and discomfort, extreme emotional disturbance, as well as economic

hardship, including considerable financial expenses for medical care, and

treatment.

## COUNT II
## STRICT LIABILITY (FAILURE TO WARN)

100.   Plaintiffs incorporate by reference each and every allegation set forth

in the preceding paragraphs as if fully stated herein.

101.   At all times relevant to this litigation, Defendant engaged in the

business of testing, developing, designing, manufacturing, marketing, selling,

distributing, and/or promoting Roundup® products, which are defective and

unreasonably dangerous to consumers, including Plaintiff Howard, because they

do not contain adequate warnings or instructions concerning the dangerous

characteristics of Roundup® and specifically, the active ingredient glyphosate.

These actions were under the ultimate control and supervision of Defendant

Monsanto.

102.   Defendant researched, developed, designed, tested, manufactured,

inspected, labeled, distributed, marketed, promoted, sold, and/or otherwise

released into the stream of commerce Roundup® products, and in the course of

same, directly advertised or marketed the products to consumers and end users, including Plaintiff Howard, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

103.   At all times relevant herein, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks.   Defendant had a continuing duty to warn Plaintiff Howard of the dangers associated with Roundup® use and exposure. Defendant, as manufacturer, seller, promoter, marketer, and/or distributor of chemical herbicides is held to the knowledge of an expert in the field.

104.   At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

105.   At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety or to minimize the dangers to users and

34

consumers of its product and to those who would foreseeably use or be harmed by these herbicides, including Plaintiff Howard.

106.   Despite the fact that Defendant knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure.  The dangerous propensities of these products and they carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time they distributed, marketed, promoted, supplied or sold the product, and not known to end users an consumers, such as Plaintiff Howard.

107.   These products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Defendant Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

108.   At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact

35

with these products in Hawaii and throughout the United States, including Plaintiff

Howard, without substantial change in their condition as designed, manufactured,

sold, distributed, labeled, promoted and/or marketed by Defendant.

109.   Plaintiff Howard was  exposed to Roundup® products in the course

of his maintenance of his personal properties located in California and Hawaii

without knowledge of their dangerous characteristics.

110.   At all times relevant to this litigation, Plaintiff Howard used and/or

was exposed to the use of Roundup® products in their intended or reasonably

foreseeable manner without knowledge of their dangerous characteristics.

111.   Plaintiffs could not have reasonably discovered the defects and risks

associated with Roundup® or glyphosate-containing products prior to or at the

time of Plaintiffs' exposure.  Plaintiffs relied upon the skill, superior knowledge,

and judgment of Defendant.

112.   These product were defective because the minimal warnings

disseminated with Roundup® products were inadequate, and they failed to

communicate adequate information on the dangers and safe use/exposure and

failed to communicate warnings and instructions that were appropriate and

adequate to render the products safe for their ordinary, intended and reasonably

foreseeable uses, including agricultural and landscaping applications.

36

113.   The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiffs to utilize the products safely and with adequate protection.  Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

114.   To this day, Defendant has failed to adequately and accurately warn of the true risks of Plaintiff Howard's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

115.   As a result of the inadequate warnings, Roundup® products were defective and unreasonable dangerous when they left the possession and/or control of Defendant, were distributed, marketed, and/or promoted by Defendant, and used by Plaintiff Howard.

37

116.   Defendant is liable to Plaintiff Howard for injuries caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of products and the risks associated with the use of or exposure to Roundup® and glyphosate.

117.   The defects in Roundup® products caused or contributed to cause Plaintiff Howard's injuries, and, but for this misconduct and omissions, Plaintiff would not have sustained his injuries.

118.   Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products, Plaintiff Howard could have avoided the risk of developing injuries or the extreme apprehension thereof as alleged herein.

119.   As a direct and proximate result of Defendant placing defective Roundup® products into the stream of commerce, Plaintiff Howard has suffered and will continue to suffer grave injuries, including but not limited to, enduring physical pain and discomfort, extreme emotional disturbance, as well as economic hardship, including considerable financial expenses for medical care, and treatment.

## COUNT III
## NEGLIGENCE

120.   Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

121.   Defendant, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff Howard.

122.   At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

123.   At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products.  Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in

39

particular, its active ingredient glyphosate.

124.   At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

125.   Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with Plaintiff Howard's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

126.   Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

127.   As such, Defendant breached the duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Defendant manufacture, marketed, promoted, and/or sold defective herbicides containing the chemical glyphosate, knew or had

reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

128.   Despite an ability and means to investigate, study, and test these products and to provide adequate warnings, Defendant has failed to do so. Indeed, Monsanto has wrongfully concealed information and have further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

129.   Defendant was negligent in the following respects:

   (a)   Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

   (b)   Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm

associated with human use of and exposure to Roundup®;

(c)   Failing to undertake sufficient studies and conduct necessary

tests to determine whether or not Roundup® products and

glyphosate-containing products were safe for their intended use

in agriculture and horticulture;

(d)   Failing to use reasonable and prudent care in the design,

research, manufacture, and development of Roundup®

products so as to avoid the risk of serious harm associated with

the prevalent use of Roundup®/glyphosate as an herbicide;

(e)   Failing to design and manufacture Roundup® products so as to

ensure they were at least as safe and effective as other

herbicides on the market;

(f)   Failing to provide adequate instructions, guidelines, and safety

precautions to those persons who Monsanto could reasonably

foresee would use and be exposed to its Roundup® products;

(g)   Failing to disclose to Plaintiff, users/consumers, and the

general public that use of and exposure to Roundup® presented

severe risks of cancer and other grave illnesses;

(h)   Failing to warn Plaintiff, consumers, and the general public that

the product's risk of harm was unreasonable and that there were

safer and effective alternative herbicides available to Plaintiff

and other consumers;

(i)     Systematically suppressing or downplaying contrary evidence

about the risks, incidence, and prevalence of the side effects of

Roundup® and glyphosate- containing products;

(j)     Representing that its Roundup® products were safe for their

intended use when, in fact, Defendant knew or should have

known that the products were not safe for their intended

purpose;

(k)     Declining to make or propose any changes to Roundup®

products' labeling or other promotional materials that would

alert the consumers and the general public of the risks of

Roundup® and glyphosate;

(l)     Advertising, marketing, and recommending the use of

Roundup® products, while concealing and failing to disclose

or warn of the dangers known by Monsanto to be associated

with or caused by the use of or exposure to Roundup® and

glyphosate;

43

> (m)   Continuing to disseminate information to its consumers, which
> indicate or imply that Monsanto's Roundup® products are not
> unsafe for use in the agricultural and horticultural industries;
> and
>
> (n)   Continuing the manufacture and sale of its products with the
> knowledge that the products were unreasonably unsafe and
> dangerous.

130.   Defendant knew and/or should have known that it was foreseeable
that consumers such as Plaintiff Howard would suffer injuries as a result of
Monsanto's failure to exercise ordinary care in the manufacturing, marketing,
promotion, labeling, distribution, and sale of Roundup®.

131.   Plaintiffs did not know the nature and extent of the injuries that could
result from the intended use of and/or exposure to Roundup® or its active
ingredient glyphosate.

132.   Defendant' negligence was the proximate cause of the injuries, harm,
and economic losses that Plaintiff Howard suffered, as described herein.

133.   Monsanto's conduct, as described above, was reckless. Monsanto
regularly risked the lives of consumers and users of their products, including
Plaintiff Howard, with full knowledge of the dangers of these products.  Monsanto

44

has made conscious decisions not to redesign, re-label, warn, or inform the

unsuspecting public, including Plaintiff Howard. Monsanto's reckless conduct

therefore warrants an award of aggravated or punitive damages.

134.    As a proximate result of Defendant's wrongful acts and omissions in

placing defective Roundup® products into the stream of commerce without

adequate warnings of the hazardous and carcinogenic nature of glyphosate,

Plaintiff Howard has suffered severe and permanent physical and/or emotional

injuries. Plaintiff has endured pain and suffering, has suffered economic losses

(including significant expenses for medical care and treatment) in an amount to be

determined.

## COUNT IV
## FRAUD, MISREPRESENTATION, AND SUPPRESSION

135.    Plaintiffs incorporate by reference each and every allegation set forth

in the preceding paragraphs as if fully stated herein.

136.    Monsanto fraudulently, intentionally, and/or negligently

misrepresented to the public, and to the Plaintiffs, both directly and by and

through the media, the scientific literature and purported "community outreach"

programs, the safety of Roundup® products, and/or fraudulently, intentionally,

and/or negligently concealed, suppressed, or omitted material, adverse information

regarding the safety of Roundup® .

137.   The intentional and/or negligent misrepresentations and omissions of

Monsanto regarding the safety of Roundup®  products were communicated to

Plaintiffs directly through ghostwritten articles, editorials, national and regional

advertising, marketing and promotion efforts, as well as the packaging and sales

aids.  The safety of Roundup®  products was also intentionally and/or negligently

misrepresented to Plaintiffs and the public with the intent that such

misrepresentations would cause Plaintiffs and other potential consumers to

purchase and use or continue to purchase and use Roundup®  products.

138.   Monsanto either knew or should have known of the material

misrepresentations it was making regarding the safety and relative utility of

Roundup®  products.

139.   Monsanto fraudulently, intentionally, and/or negligently made the

misrepresentations  and/or actively concealed, suppressed, or omitted this material

information with the specific desire to induce Plaintiff Howard, and the consuming

public to purchase and use Roundup®  products. Monsanto fraudulently,

intentionally, and/or negligently, knew or should have known that Plaintiff

Howard and the consuming public would rely on such material misrepresentations

and/or omissions in selecting and applying Roundup®  products.  Monsanto knew

46

or should have known that Plaintiffs would rely on their false representations and omissions.

140.   Monsanto made these misrepresentations  and actively concealed adverse information including the risk of Non-Hodgkin's lymphoma, at a time when, its agents and/or employees knew or should have known, the product had defects, dangers, and characteristics that were other than what was represented to the consuming public.  Despite the fact that Monsanto knew or should have known of reports of severe risks including Non-Hodgkin's lymphoma, with Roundup® use and exposure, this information was strategically minimized, understated, or omitted in order to create the impression that the human dangers of Roundup® were nonexistent, particularly in light of its purported utility.

141.   The fraudulent, intentional and/or negligent material misrepresentations and/or  active concealment, suppression, and omissions by Monsanto were perpetuated directly and/or indirectly through the advertisements, packaging, sales aids, furtive public relations efforts, and other marketing and promotional pieces authored, analyzed, created, compiled, designed, drafted, disseminated, distributed, edited, evaluated, marketed, published, and supplied by Monsanto.

142.   If Plaintiffs had known the true facts concerning the risks associated

47

with Roundup® exposure, Plaintiff Howard would have used a safer alternative.

143.   Plaintiffs' reliance upon the material misrepresentations and omissions  was justified, among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Roundup® while Plaintiffs were not in a position to know the true facts because Monsanto overstated the benefits and safety of Roundup® and downplayed the risk of lymphoma, thereby inducing Plaintiff Howard to use the herbicide rather than safer alternatives.

144.   As a direct and proximate result of Monsanto's actions and inactions, Plaintiff Howard was exposed to Roundup® and suffered and will continue to suffer injuries and damages, as set forth herein.

## COUNT V
## BREACH OF IMPLIED WARRANTY

145.   Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

146.   The law imposes a duty on Defendant to be responsible in the event the product sold, namely Roundup®, is fit for use and purposes intended.

147.   Defendant breached its contractually assumed implied warranty by supplying a product that caused Plaintiff Howard to develop Non-Hodgkin's

48

Lymphoma.

## COUNT VI
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

148. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

149. Defendant owed a duty to consumers of their product to not cause mental distress as a result of using their product, Roundup®.

150. Defendant breached that duty when they supplied a dangerous product, Roundup®, to Plaintiff Howard intending for him to use it.

151. Plaintiff Howard's use of Roundup® and the resulting injuries that the use caused, resulted in serious mental distress of Plaintiff Howard.

## COUNT VII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

152. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

153. Monsanto recklessly designed, manufacture, marketed and sold Roundup®, an inherently dangerous product.

154. Monsanto acted outrageously in providing Roundup® to the public, in general and to Plaintiff Howard in particular.

155. Monsanto caused extreme emotional distress to Plaintiff Howard by

49

outrageously supplying him with Roundup®, an inherently dangerous product, all the while representing to them that it was safe to use and would flush from his system with no ill effects.

156.   Monsanto is liable for intentional infliction of the emotional distress that Plaintiff Howard suffered as a result of its conduct.

## COUNT VIII
## LOSS OF CONSORTIUM

157.   Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

158.   Plaintiff Elizabeth was and at all relevant times herein is the wife of Plaintiff Howard.  As a result of the injuries sustained by Plaintiff Howard, Plaintiff Elizabeth quit her job as a nurse in order to care for her husband.  Further, Plaintiff Elizabeyh has been deprived of the sex, society and services of her husband, thereby suffering from a loss of consortium.

WHEREFORE, Plaintiffs prays for judgment against Defendant, as follows:

A.     Special damages in an amount to be determined at a trial;

B.     General damages in an amount to be determined at a trial;

C.     Actual or compensatory damages in an amount to be determined at a trial;

D.     Punitive, exemplary, and/or treble damages in an amount to be

       determined at a trial;

E.     Future earnings of Mr. and Mrs. Pullen as provided by HRS § 663-8;

F.     Reasonable attorneys' fees and costs;

G.     Pre-judgment and post-judgment interest; and

H.     Any and all other relief as may be deemed just and equitable by the

       Court.

       DATED: Honolulu, Hawai`i, September 24, 2019.

                                   /s/ *Michael Jay Green*
                                   MICHAEL JAY GREEN
                                   DENISE M. HEVICON
                                   MARIA F. PENN

                                   Attorneys for Plaintiffs
                                   HOWARD PULLEN and
                                   ELIZABETH PULLEN