# U.S. District Court
## Western District of Louisiana (Lafayette)
## CIVIL DOCKET FOR CASE #: 6:19−cv−01228−MJJ−PJH

Landry v. Monsanto Co
Assigned to: Judge Michael J Juneau
Referred to: Magistrate Judge Patrick J Hanna
Demand: $1,000,000
Case in other court:  MDL, 2741
                            MDL, 2741
Cause: 28:1332 Diversity−Product Liability

Date Filed: 09/19/2019
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Stephen Landry**

represented by **Aaron W Guidry**
Porter & Guidry
100 Rue Iberville Ste 100
Lafayette, LA 70508
337−289−0626
Fax: 289−0625
Email: aaronguidry@cox−internet.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Co**

| Date Filed | # | Docket Text |
|---|---|---|
| 09/19/2019 | 1 | COMPLAINT against Monsanto Co with Jury Demand (Filing fee $400, receipt number 0536−4054027) filed by Stephen Landry. (Attachments: # 1 Civil cover sheet, # 2 Proposed summons/writ)(Attorney Aaron W Guidry added to party Stephen Landry(pty:pla))(aty,Guidry, Aaron) Modified on 9/20/2019 to modify docket text. (Crick, S). (Attachment 1 replaced on 9/20/2019 to correct fillable form) (Crick, S). (Entered: 09/19/2019) |
| 09/19/2019 |  | CASE Assigned to Judge Michael J Juneau and Magistrate Judge Patrick J Hanna. (crt,Crick, S) (Entered: 09/20/2019) |
| 09/20/2019 | 2 | SUMMONS ISSUED as to Monsanto Co (crt,Crick, S) (Entered: 09/20/2019) |
| 10/15/2019 | 3 | WAIVER OF SERVICE Returned Executed by Stephen Landry. Monsanto Co waiver sent on 9/20/2019, answer due 11/19/2019. (aty,Guidry, Aaron) Modified on 10/16/2019 to correct waiver sent and answer due dates (Dauterive, C). (Entered: 10/15/2019) |
| 10/15/2019 |  | NOTICE of Corrective Action to Aaron W Guidry on behalf of Stephen Landry regarding 3 Waiver of Service Executed. Action taken: Modified docket entry to correctly reflect *Monsanto Co waiver sent on 9/20/2019, answer due 11/19/2019.* (crt,Dauterive, C) (Entered: 10/16/2019) |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

| | |
|---|---|
| STEPHEN LANDRY, | Civil Action No.: |
| Plaintiff, | Judge: |
| v. | Magistrate Judge: |
| MONSANTO COMPANY, | JURY TRIAL DEMANDED |
| Defendant | |

## COMPLAINT

NOW COMES, Stephen Landry ("Plaintiff"), through undersigned counsel, who asserts the following causes of action against Defendant Monsanto Company:

### I. NATURE OF THE CASE

1. This is an action for damages brought by Plaintiff as a direct and proximate result of Defendant's negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distributing, labeling, and/or sale of the herbicide Roundup®, containing the active ingredient glyphosate.

2. As alleged herein, Plaintiff maintains that Roundup® and/or glyphosate is defective, dangerous to human health, unreasonably dangerous and lacked the proper warnings and directions as to the dangers associated with its use, resulting in injury to Plaintiff.

### II. THE PARTIES

3. Plaintiff, Stephen Landry, is a citizen and resident of Youngsville, Louisiana, who

1

purchased and/or used Roundup and/or other Monsanto glyphosate-containing products ("Roundup") beginning at the age of 10 at his family's property in Youngsville, Louisiana and through his adult life and was diagnosed with Non-Hodgkin's Lymphoma in July 2018.

4.      Defendant, Monsanto Company is a Delaware corporation with its headquarters and principle place of business in St. Louis, Missouri and advertises and sells goods, including Roundup and other glyphosate products in the State of Louisiana deriving substantial revenue from interstate commerce.

5.      The expiration of any applicable statute of limitations is equitably tolled by reason of Monsanto's fraudulent misrepresentations and fraudulent concealment, as more fully alleged herein.

### III. BACKGROUND

6.      In 1970, Defendant, Monsanto Company, discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85-90 millions of pounds used annually, which grew to 185 million pounds by 2007.[1] As of 2013, glyphosate was the world's most widely used herbicide.

7.      Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri and is the world's leading producer of glyphosate. As of 2009, Monsanto was the

---

[1] Grube, et al., on behalf of EPA, *Pesticides Industry Sales and Usage, 2006-2007 Market Estimates,* 14, (2011) *available at* http://www.epa.gov/pesticides/pestsales/07 pestsales/market_estimates2007.pdf.

world's leading producer of seeds, accounting for 27% of the world seed market.[2] The majority of

these seeds are of the Roundup® Ready® brand.  The stated advantage of Roundup® Ready® crops

is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed

in the fields during the growing season without harming the crops.  In 2010, an estimated 70% of

corn and cotton, and 90% of soybean fields in the United States were Roundup® Ready®.[3]

8.      Monsanto's glyphosate products are registered in 130 countries and approved for use

on over 100 different crops.[4]  They are ubiquitous in the environment.  Numerous studies confirm

that glyphosate is found in rivers, streams and groundwater in agricultural areas where Roundup®

is used[5].  It has been found in food,[6] in the urine of agricultural workers[7] [8] and even in the urine of

urban dwellers who are not in direct contact with glyphosate.[9]

---

[2] ETC Group, Who Will Control the Green Economy?, 22, (2011) available at
http://www.etcgroup.org/files/publication/pdf_file/ETC_wwctge_4web_Dec2011.pdf.

[3] William Neuman and Andrew pollack, *Farmers Cope With Roundup-Resistant Weeds,* N.Y. Times, May 3,
2010, *available at* http://www.nytimes.com/2010/05/04/business/energy-environment/04weed.html?pagewan.

[4] Monsanto, Backgrounder-History of Monsanto's Glyphosate Herbicides, (Sept. 2, 2015), available at
http://www.monsanto.com/products/documents/glyphosate-background-materials/back_history.pdf.

[5] See: USGS, USGS Technical Announcement: Widely Used Herbicide Commonly Found in Rain and
*Streams in the Mississippi River Basin,* 2011, http://www.usgs.gov/newsroom/article.asp?ID=2909; *see also:* U.S.
Envtl. Prot. Agency, *technical Factsheet on: Glyphosate, available at*
http://www.epa.gov/safewater/pdfs/factsheets/soc/tech/glyphosa.pdf.

[6] Bohn, et al., Compositional Differences in Soybeans on the Market: Glyphosate Accumulates in Roundup
Ready GM Soybeans, 153 Food Chemistry, 207, (2013), available at
http://www.sciencedirect.com/science/article/pii/S0308814613019201.

[7] Acquavella, et al., *Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm
Family Exposure Study,* 112(3) Environmental Health Perspective, 321, (2004) *available at*
http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241861/.

[8] Guyton, et al.  Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon and Glyphosate, 112
IARC Monographs, 76, section 5.4 (2015) *available at* http://dx.doi.org/10.1016?S1470-2045(15)70134-8.

[9] Brändli D, Reinacher S, *Herbicides found in Human Urine,* 1 Ithanka Journal, 270 (2012), available at
http://www.ithanka-journal.net/druckversionen/e052012-herbicides-urine.pdf.

9.      On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate.  That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

10.     On July 29, 2015, IARC issued the formal monograph relating to glyphosate, providing a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

11.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is *probably carcinogenic to humans*. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other haematopoietic cancers, including lymphocytic lymphoma, chronic lymphocytic leukemia, B-cell lymphoma and multiple myeloma.[10]

12.     The IARC evaluation is significant in that it confirms what has been believed for years: that glyphosate is toxic to humans.

13.     Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment, repeatedly proclaiming its customers that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

---

[10] See Guyton, et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon and Glyphosate,* surpa.

4

## IV. JURISDICTION AND VENUE

14.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1), as the claim involves citizens of different states and the aggregate amount in controversy exceeds the sum of $75,000.00.

15.     Venue is proper within this District under 28 U.S.C. § 1391 (b)(2) in that Plaintiff lives in the Western District of Louisiana.  Additionally, venue is proper in this Court as injuries sustained by the Plaintiff, as asserted herein, occurred in Youngsville, Louisiana, and were committed within the Lafayette Division of the Western District of Louisiana.

## V. STATEMENT OF FACTS

16.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

17.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis.  Treated plants generally die within two to three days.  Because the plants absorb the glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking or brewing grains.

18.     For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses, because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough claiming that it could kill almost every weed without causing harm either to people or to the environment, which has been shown to be untrue.  According to the WHO, the main chemical ingredient of Roundup®—glyphosate—is a probable cause of cancer.  Those most at risk of developing cancer are farm workers and other individuals with

workplace exposure to Roundup®, such as workers in garden centers, nurseries and landscapers. Monsanto assured the public that Roundup® was harmless.   In order to prove that, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers.  Monsanto lead a prolonged campaign of misinformation to convince government agencies, farmers and the general public that Roundup® was safe.

19.   The herbicidal properties of glyphosate were discovered in 1970 by a Monsanto chemist named John Franz.   The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. [11]  From the onset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use.  It still markets Roundup® as safe today.[12]

### *Registration of Herbicides Under Federal Law*

20.   The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.*   FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale or use, except as described by the Act. 7 U.S.C. § 136a(a).

21.   Because pesticides are toxic to plants, animals and humans, at least to some degree, the EPA requires as part of the registration process, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms and other adverse

---

[11] Monsanto, Backgrounder-History of Monsanto's Glyphosate Herbicide, Monsanto, (Sept. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/back_history.pdf.

[12] Monsanto, *What is Glyphosate?*, (Sept. 2, 2015), *available at* http://www.monsanto.com/sitecollectiondocuments/glyphosate-safety-health.pdf.

effects on the environment.    Registration by the EPA, however, is not an assurance or finding of

safety.  The determination the EPA must make in registering or re-registering a product is not that

the product is "safe," but rather that use of the product in accordance with its label directions "will

not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

22.    FIFRA defines "unreasonable adverse effects on the environment" to mean "any

unreasonable risk to man or the environment, taking into account the economic, social and

environmental costs and benefits of the use of any pesticide."   7 U.S.C. § 136(bb).   FIFR thus

requires the EPA to make a risk/benefit analysis in determining whether a registration should be

granted or allowed to continue to be sold in commerce.

23.    The EPA and the State of Louisiana registered Roundup® for distribution, sale and

manufacture in the United States and the State of Louisiana.

24.    FIFRA generally requires that the registrant, Monsanto in the case of Roundup®,

conduct the health and safety testing of pesticide products.   The EPA has protocols governing the

conduct of tests required for registration and the laboratory practices that must be followed in

conducting these tests.  The data produced by the registrant must be submitted to the EPA for review

and evaluation.  The government is not required, nor is it able to perform the product tests that are

required of the manufacturer.

25.    The evaluation of each pesticide product distributed, sold or manufactured is

completed at the time the product is initially registered.   The data necessary for registration of a

pesticide has changed over time.   The EPA is now in the process of re-evaluating all pesticide

products through a Congressionally-mandated process called "re-registration."   7 U.S.C. § 136a-1.

In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and

7

the submission of data for the EPA's review and evaluation.

26.     In the case of glyphosate, and Roundup®, the EPA had planned on releasing its preliminary risk assessment—in relation to the re-registration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

### *Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®*

27.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic in humans (Group C) in 1985.   After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991.   In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer, noting "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."[13]

28.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

29.     In the first instance, Monsanto, in seeking initial registration of Roundup® by the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®.[14]   IBT performed about 30 tests on glyphosate and glyphosate-

---

[13]U.S. Envtl. Prot. Agency, Memorandum, Subject: SECOND Peer Review of Glyphosate, 1, (1991) available at http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_30-Oct91_265.pdf.

[14]Monsanto, Backgrounder. Testing Fraud: IBT and Craven Laboratories, (Sept. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/ibt_craven_bkg.pdf.

containing products, including nine (9) of the 15 residue studies needed to register Roundup®.

30.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate.  The EPA subsequently audited IBT; it to found the toxicology studies conducted for the Roundup® herbicide to be invalid. [15]  An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits.[16]

31.     Three top executives of IBT were convicted of fraud in 1983.

32.     In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup.  In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted of fraudulent laboratory practices in the testing of pesticides and herbicides.[17]

33.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup in 115 countries.

34.     Multiple studies have been ghostwritten in part and/or published by Monsanto through companies such as Intertek and Exponent, Inc. from 2000-present which minimize any safety concerns about the use of glyphosate; are used to convince regulators to allow the sale of

---

[15]U.S. Envtl. Prot. Agency, Summary of the IBT Review Program Office of Pesticide Programs, (1983).

[16]Marie-Monique Robin, *The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply* (2011) (citing U.S. Envtl. Prot. Agency, Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch. Washington, D.C. (August 9, 1978.)).

[17]Monsanto, Backgrounder. *Testing Fraud: IBT and Craven Laboratories,* supra.

9

Roundup and are used to convince customers to use Roundup. Such studies include, but are not limited to Williams (2000); Williams (2012); Kier and Kirkland (2013); Kier (2015); Bus (2016); Chang (2016); and the Intertek Expert Panel Manuscripts. All of these studies have been submitted to and relied upon the public and the EPA in assessing the safety of glyphosate. Through these means Monsanto has fraudulently represented that independent scientists have concluded that glyphosate is safe when, in fact these independent experts have been paid by Monsanto and have failed to disclose the significant role Monsanto had in creating the manuscripts. Monsanto has further ghostwritten editorials for scientists such as Robert Tarone and Henry Miller to advocate for the safety of glyphosate in Newspapers and Magazines. Monsanto has also ghostwritten letters by supposed independent scientists submitted to regulatory agencies who are reviewing the safety of glyphosate.

35.    Monsanto has also violated federal regulations in holding secret ex parte meetings and conversations with certain EPA employees to collude in a strategy to re-register glyphosate and to quash investigations into the carcinogenicity of glyphosate by other federal agencies such as the Agency for Toxic Substances and Disease Registry. Monsanto's close connection with the EPA arises in part from its offering of lucrative consulting positions to retiring EPA officials.

36.    In March 2015, The Joint Glyphosate Task Force at Monsanto's behest issued a press release sharply criticizing IARC, stating that IARC's conclusion was "baffling" and falsely claiming that "IARC did not consider any new or unique research findings when making its decision. It appears that only by deciding to exclude certain available scientific information and by adopting a different approach to interpreting the studies was this possible."

37.    ·· Beginning in 2011, the Federal Institute for Risk Assessment (BfR) in Germany

began preparing a study on the safety of glyphosate. Through the Glyphosate Task Force, Defendant

was able to co-opt this study becoming the sole providers of data and ultimately wrote the report

which was rubber-stamped by the BfR. The Glyphosate Task Force was solely responsible for

preparing and submitting summary of studies relied upon by the BfR. Defendant has used this

report, which it wrote, to falsely proclaim the safety of glyphosate.

38.    In October 2015, the Defendant, as a member of the Joint Glyphosate Task Force,

wrote to the state of California to try to stop California from warning the public about the

carcinogenicity of glyphosate arguing that the IARC classification is mistaken. In January of 2016

Monsanto filed a lawsuit to stop California from warning the public about the carcinogenicity of

glyphosate.

### The Importance of Roundup® to Monsanto's Market Dominance Profits

39.    The success of Roundup was key to Monsanto's continued dominance in the

marketplace. Largely due to the success of Roundup sales, Monsanto's agriculture division was out-

performing its chemical division's operating income, and that gap increased yearly. However, with

the patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy

to maintain its roundup market dominance and to ward off impending competition.

40.    In response, Monsanto began the development and sale of genetically engineered

Roundup Ready® seeds in 1996 because Roundup Ready crops are resistant to glyphosate; farmers

can spray Roundup onto their fields during the growing season without harming the crop. This

allowed Monsanto to expand its market for Roundup even further and by 2000, Monsanto's

biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of

American soybeans were planted from Roundup ready seeds. It also secured Monsanto's dominant

11

share of the glyphosate/Roundup market through a marketing strategy that coupled proprietary Roundup Ready seeds with continued sales of its Roundup herbicide.

41.     Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready seeds, Roundup became Monsanto's most profitable product.  In 2000, Roundup accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue.[18] Today, glyphosate remains one of the world's largest herbicides by sales volume.

### *Monsanto has known for decades that it falsely advertised the safety of Roundup®*

42.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products.  Specifically, the lawsuit challenged Monsanto's general representations that its spray-on, glyphosate-based herbicides, including Roundup, were "**safer than table salt**" and "**practically non-toxic**" to mammals, birds and fish.  Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup or the following:

a)     "Remember that environmentally friendly Roundup® herbicide is biodegradable.  It won't build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks and fences..."

b)     "And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environment confidence you need to use Roundup® everywhere you've got a weed, brush, edging or trimming problem."

---

[18]David Barboza, *the Power of Roundup; A Weed Killer Is a Block for Monsanto to Build On,* N.Y. Times, Aug. 2, 2001, *available at* http://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weedkiller-is-a-block-for-monsanto-to-build-in.html.

c)   "Roundup® biodegrades into naturally occurring elements."

d)   "Remember that versatile Roundup® herbicide stays where you put it.  That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e)   "This non-residual herbicide will not wash or leach in the soil.  It ... stays where you apply it."

f)   "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

g)   "Glyphosate's safety margin is much greater than required.  It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

h)   "You can feel good about using herbicides by Monsanto.  They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

I)   "Roundup® can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup®.[19]

43.   On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with the NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a)   Its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk

---

[19]Attorney General of the State of New York, *In the Matter of Monsanto Company,* Assurance of Discontinuance Pursuant to Executive Law § 63(15). (Nov. 1996).

...

b)     Its glyphosate-containing pesticide products or any component thereof manufactured,

formulated, distributed or sold by Monsanto are biodegradable

...

c)     Its glyphosate-containing pesticide products or any component thereof stay where

they are applied under all circumstances and will not move through the environment

by any means

...

d)     Its glyphosate-containing pesticide products or any component thereof are "good" for

the environment or are "known for their environmental characteristics."

...

e)     Glyphosate-containing pesticide products or any component thereof are safer or less

toxic than common consumer products other than herbicides.

44.     Monsanto did not alter its advertising in the same manner in any state other than New

York, and on information and belief still has not done so today.

45.     In 2009, France's highest court ruled that Monsanto had not told the truth about the

safety of Roundup®.  The French court affirmed an earlier judgment that Monsanto had falsely

advertised its herbicide Roundup® as "biodegradable" and that it " left the soil clean."[20]

### Classifications and Assessments of Glyphosate

46.     The IARC process for the classification of glyphosate followed the IARC's stringent

---

[20] Monsanto Guilty in 'False Ad' Row, BBC, Oct. 15, 2009, available at
http://news.bbc.co.uk/2/hi/europe/8308903.stm.

14

procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

47.    The established procedure for the IARC Monograph evaluations is described in the IARC Programme's Preamble.[21]  Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

48.    One year prior, the Monograph meeting is announced and calls are made for both data and experts. Eight (8) months prior to the meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One (1) month prior to the meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category and completes the overall evaluation. Within two (2) weeks after the Monograph meeting, the summary of the Working Group findings are published in *The Lancet Oncology,* and within one (1) year after the meeting, the finalized Monograph is published.

49.    In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and © representative mechanistic data. The studies must be publicly available and have

---

[21] World Health Org., IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble, (2006), available at http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

sufficient detail for meaningful review and reviewers cannot be associated with the underlying studies.

50.      Pursuant to that process, In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

51.      On July 29, 2015, the IARC issued its Monograph for glyphosate, Monograph Volume 112, for which a Working Group of 17 experts from 11 countries met at the IARC from March 3-10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate.  The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as " data from governmental reports that are publicly available."

52.      The studies considered the following exposure groups: (1) occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and (2) para-occupational exposure in farming families.

53.      Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007, and the most heavily used herbicide in the world in 2012.

54.      Exposure pathways are identified as air (especially during spraying), water and food. Community exposure to glyphosate is widespread and found in soil, air, surface water and

16

groundwater, as well as in food.

55.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada and Sweden.  These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

56.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's Lymphoma ("NHL")  and several subtypes of NHL and the increased risk persisted after adjustment for other pesticides.

57.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells.  One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

58.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor: renal tubule carcinoma.  A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies.  A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

59.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption.  Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA).  Blood AMPA detection after exposure suggest intestinal microbial metabolism in humans.

60.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals and in human and animal cells in utero.

61.     The IARC Working Group also noted genotoxic, hormonal and enzymatic effects in

mammals exposed to glyphosate.[22] Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

62.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and multiple myeloma, hairy cell leukemia (HCL) and chronic lymphocytic leukemia (CLL), in addition to several other cancers.

### Other Earlier Findings About Glyphosate's Dangers to Human Health

63.     Despite the new classification by the IARC, Defendant previously had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

64.     Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

65.     In 1997, Chris Clements published "Genotoxicity of select herbicides in Rana catesbeiana tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

66.     The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

67.     Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

68.     Oxidative stress and associated chronic inflammation are believed to be involved in

---

[22]Guyton, et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate,* supra at 77.

carcinogenesis.

69.     The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

70.     In 2006 César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

71.     The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

72.     The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

73.     Despite knowledge to the contrary, Defendant maintains that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic and that there is no evidence that Roundup is genotoxic.

74.     In addition to glyphosate and Roundup's genotoxic properties, Defendant has long been aware of glyphosate's carcinogenic properties.

75.     Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, Non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma and soft tissue sarcoma.

76.     Defendant has known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

19

77.     In 1985 the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor.  The study concluded the glyphosate was oncogenic.

78.     In 2003 Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

79.     The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studies with an increased odds ratio of 3.11.

80.     In 2003 AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

81.     The study, which controlled for potential cofounders, found a relationship between increased NHL incidence and glyphosate.

82.     In 2008 Mikael Eriksson published a population based case-control study of exposure to various pesticides as a risk factor for NHL.

83.     This strengthened previous associations between glyphosate and NHL.

84.     In spite of this knowledge, Defendant continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

85.     Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiff, the agricultural community and the public at large to purchase and increase the use of Defendant's Roundup for Defendant's pecuniary gain, and in fact, did induce Plaintiff to use Roundup.

86.     Defendant made these statements with complete disregard and reckless indifference to the safety of Plaintiff and the general public.

87.     Notwithstanding Defendant's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma and soft tissue sarcoma.

88.     Defendant knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma and soft tissue sarcomas.

89.     Defendant failed to appropriately and adequately inform and warn Plaintiff of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life and the need for medical treatment, monitoring and/or medications.

90.     Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendant continues to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, nongenotoxic and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

### *Release Patterns*

91.     Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites

may be around water and in wetlands.  It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup and from spills.  Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.  Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing and cleanup.  They may also be exposed by touching soil and plants to which glyphosate was applied.[23]

92.     In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

### *Recent Worldwide Bans on Roundup®/Glyphosate*

93.     Several countries around the world have instituted bans on the sale of Roundup and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015 and more countries undoubtedly will follow suit in light of the as the dangers of the use of Roundup are more widely known.  The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup, which takes effect by the end of 2015.  In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are.  Especially children are sensitive to toxic substances and should

---

[23] U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate*, supra.

therefore not be exposed to it." [24]

94.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian

Justice Department suspend the use of glyphosate.

95.     France banned the private sale of Roundup® and glyphosate following the IARC

assessment for glyphosate.[25]

96.     Bermuda banned both the private and commercial sale of glyphosate, including

Roundup®.  The Bermuda government explained its ban as follows: "Following a recent scientific

study carried out by a leading cancer agency, the importation of weed spray 'Roundup®' has been

suspended."[26]

97.     The Sri Lankan government banned the private and commercial use of glyphosates,

particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural

workers.

98.     The government of Columbia announced its ban on using Roundup and glyphosate

to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding

that glyphosate is probably carcinogenic.

## VI. PLAINTIFF'S EXPOSURE TO ROUNDUP

99.     Plaintiff, Stephen Landry, grew up in Youngsville, Louisiana on 16 acres of property

---

[24] Holland's Parliament Bans Glyphosate Herbicides, The Real Agenda, 14 April 2014, available at
http://real-agenda. Com/hollands-parliament-bans-glyphosate-herbicides/.

[25] Zoe Schlanger, France Bans Sales of Monsanto's Roundup in Garden Centers, 3 Months After U.N. *Calls
it "Probable Carcinogen, "* Newsweek, June 15, 2015.

[26] Health Minister: Importation of Roundup Weed Spray Suspended, Today In Bermuda, May 11, 2015,
*available at* http://www.Todayinbermuda.com/news/health/item/1471-health-minister-importation-of-roundup-
weedspray-suspended.

that was surrounded by a fence line. Beginning at the age of 9, he began using Roundup throughout

most of the year to spray fence lines.  Additionally, the family property was surrounded by soybean

fields where upon information and belief crops were sprayed regularly by Roundup/Glyphosate.

100.    To this date, Plaintiff and his wife live on that same property in Youngsville,

Louisiana.

101.    As an adult, from 1990-1999, Plaintiff worked for Bowing Pretroleum, in Weeks

Island where his job duties included spraying Roundup/Glyphosate multiple times per month.

102.    Throughout that period and subsequent thereto, Plaintiff continued to use Roundup

at his property.

103. On or about July 25, 2018, biopsy confirmed that Plaintiff had non-Hodgkin's

lymphoma/defused large B-cell lymphoma and is currently receiving treatment for that condition.

Plaintiff has suffered and continues to suffer the effects associated with that condition, which is a

direct and proximate result of the unreasonably dangerous and defective nature of Roundup and

Defendant's wrongful and negligent conduct in the research, development, testing, manufacture,

production, promotion, distribution, marketing and sale of Roundup.

104.    Throughout his use of the product, Plaintiff was unaware that exposure to Roundup

was injurious to his health and health of others.

105.    As a result of these injuries, Plaintiff has incurred significant economic and non-

economic damages.

## VII. CLAIMS
### COUNT I
### (Negligence)

106.    Plaintiff incorporates by reference all allegations set forth if fully stated herein.

24

107.    Defendant had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, selling and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable and dangerous side effects.

108.    Defendant failed to exercise ordinary care in designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, selling, testing, quality assurance, quality control and/or distribution of Roundup into the interstate commerce in the Defendant knew or should have known that using Roundup created a high risk of unreasonable and dangerous side effects, including, but not limited to the development of NHL, as well as other severe and personal injuries which are permanent, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring and/or medications.

109.    At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazard and dangers of Roundup and specifically, the personagenic properties of the chemical glyphosate.

110.    Accordingly, at all times relevant to this litigation, Monsanto knew or in the exercise of reasonable care, should have known that use of or exposure to its Roundup products could cause or be associated with Stephen Landry's injuries and thus, created a dangerous and unreasonable risk of injury to the users of their product, including Mr. Landry.

111.    As a direct result of its promotion and advertisement of Roundup as a safe product, Monsanto knew or should have known that users and consumers of Roundup were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup and glyphosate-containing products.

25

112.    As such, Monsanto breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale and distribution of its Roundup® products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know the defects inherent in its products, knew or had reason to know that user's or a consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects and failed to prevent or adequately warn of these risks and injuries.

113.    Monsanto was negligent in its promotion of Roundup®, outside of the labeling context, by failing to disclose material risk information as part of its promotion and marketing of Roundup®, including the internet, television, print advertisements, etc.   Nothing prevented Monsanto from being honest in its promotional activities, and in fact, Monsanto had a duty to disclose the truth about the risks associated with Roundup® in its promotional efforts, outside of the context of labeling.

114.    Monsanto has/had the ability and means to investigate, study and test its products and to provide adequate warnings, but failed to do so.  Instead, Monsanto has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

115.    Monsanto's negligence included:

a)      Manufacturing, producing, promoting, formulating, creating, developing, designing, selling and/or distributing its Roundup® products without thorough and adequate pre- and post- market testing;

b)      Negligently and/or intentionally concealing and failing to disclose the results of trials,

26

tests, studies of exposure to glyphosate and, consequently, the risks of serious harm associated with human use of an exposure to Roundup®;

c)      Failing to accompany its product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup®;

d)      Negligently misrepresented the evidence of Roundup's genotoxicity and Carcinogenicity;

e)      Negligently designing Roundup® in a manner which was dangerous to its users;

f)      Negligently or intentionally under reported, underestimated and downplayed the serious dangers associated with the use of Roundup®;

g)      Negligently and deceptively compared the safety risks and/or dangers of Roundup® with common everyday food such as table salt and other forms of herbicides;

h)      Failing to provide adequate instructions, guidelines and safety precautions to those persons Monsanto could reasonably foresee would use and be exposed to its Roundup® products;

I)      Representing that its Roundup® products were safe for their intended use when, in fact, Monsanto knew or should have known the products were not safe for their intended purpose;

j)      Continuing to disseminate information to its customers, which indicated or implied that Monsanto's Roundup® products were safe for use in the agricultural and horticultural industries; and

k)      Continuing to manufacture and sale its product with the knowledge that the product was unreasonably dangerous and unsafe.

116.    Monsanto knew or should have known that it was foreseeable that consumers such as Mr. Landry would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, labeling distribution and sale of Roundup®.

117.    Stephen Landry did not know the nature and extent of injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.  Monsanto's negligence was the proximate cause of Mr. Landry's injuries, i.e., absent Monsanto's negligence, Mr. Landry would not have developed non-Hodgkin's Lymphoma.

118.    Monsanto's conduct, as described above, was reckless.  Monsanto regularly risks the lives of consumers and users of its products, including Mr. Landry, with full knowledge fo the dangers of its product.  Monsanto has made conscious decisions not to redesign re-label, warn or inform the unsuspecting public, including Mr. Landry.  Monsanto's reckless conduct therefore warrants an award of punitive damages.

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees and all such other and further relief as this Court deems just and proper.

## COUNT II
### (Design Defect under LSA-RS 9:2800.5)

119.    Plaintiff incorporates by reference all allegations set forth herein in the preceding paragraphs as if fully stated herein.

120.    Plaintiff brings this strict liability claim against Monsanto for defective design.

121.    At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing and promoting Roundup®

products, which are defective and unreasonably dangerous to consumers, including the Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto. At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold and distributed the Roundup® products used by Stephen Landry, as described above.

122. At all times relevant to this litigation, Monsanto's Roundup® products were defectively designed by causing an increased risk of cancer and by containing additives that, when combined with glyphosate, significantly increased the risk of developing cancer.

123. The design defects rendered Roundup® unreasonably dangerous.

124. The dangers posed by Roundup® go beyond that which would be contemplated by the ordinary consumer with ordinary knowledge common to the community as to its characteristics.

125. Additionally, the benefits of the Roundup® design are outweighed by the design's inherent risk of danger in causing cancer.

126. At all times relevant to this action, Monsanto knew or had reason to know that its Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

127. Monsanto could have employed a safer alternative design to render Roundup® safe or, in the alternative, provided proper instructions for use on how to limit the potential risk associated with Roundup®'s defective design. At the time Monsanto designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable. Therefore, at the time Roundup® products left Monsanto's control,

there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Monsanto's herbicides.

128.    Mr. Landry was exposed to Monsanto's Roundup® products in the course of caring for his families property and in the course of his employment duties, without knowledge of Roundup®'s dangerous characteristics.

129.    Mr. Landry could not reasonably have discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure due to Monsanto's suppression of scientific information linking glyphosate to cancer.

130.    Monsanto's defective design of its Roundup® products was willful, wanton, fraudulent, malicious and conducted with reckless disregard for the health and safety of users of its Roundup® products, including Mr. Landry.

131.    Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including Mr. Landry, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products and suppressed this knowledge from the general public. Monsanto made conscious decisions not to redesign, warn or inform the unsuspecting public. Monsanto's reckless conduct warrants an award of punitive damages.

132.    As a direct and proximate result of Monsanto placing its defective Roundup® products into the stream of commerce, Stephen Landry was injured and has sustained damages, both special and general in a sum that exceeds the jurisdictional minimum of this Court.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred,

attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT III
### (Inadequate Warning under LSA-RS 9:2800.57)

133.    Plaintiff incorporated by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

134.    Plaintiff brings this strict liability claim against Monsanto for failure to warn.

135.    At all times relevant to this litigation, Monsanto's Roundup® products were defective and unreasonably dangerous to consumers, including Stephen Landry in that they failed to contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate, rendering the product unreasonably dangerous in its failure to provide appropriate warnings.

136.    Monsanto directly advertised and marketed its products to consumers and, therefore, had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products. Despite that duty, Monsanto failed to provide warnings or instructions regarding the full and complete risk of Roundup® and glyphosate-containing products having known or should have known of the unreasonable risks of harm associated with the use of and/or exposure to its products.

137.    Despite the fact that Monsanto knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its product and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or scientifically knowable to Monsanto through appropriate research and testing by known methods at the time of its distribution, supply or sale.

138.     Monsanto knew or should have known that its products created significant risks of serious bodily harm to consumers, as alleged herein and Monsanto failed to adequately warn consumers, i.e., the reasonably foreseeable users, of the risks of exposure to its products. Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

139.     Monsanto knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

140.     Monsanto is liable to Plaintiff for his injuries caused by its negligent or willful failure to provide adequate warnings or other clinically relevant information and date regarding the appropriate use of its products and risks associated with the use of or exposure to Roundup® and glyphosate.

141.     Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup® products, Mr. Landry could have avoided the risk of developing injuries and/or could have obtained or used alternative herbicides.

142.     As a direct and proximate result of Monsanto placing its defective Roundup® products into the stream of commerce, Plaintiff sustained damages, both special and general in a sum in excess of the jurisdictional minimum of this Court.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor for

32

compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

**COUNT IV**
**(Breach of Express Warranty under LSA-RS 9:2800.58)**

143.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

144.    Defendant expressly warranted that Roundup® was safe and well accepted by consumers.

145.    Roundup® does not conform to these express representations because Roundup® is not safe and carries with it an increased risk of cancer by containing additives that, when combined with glyphosate, significantly increased the risk of developing cancer.

146.    Mr. Landry relied on Defendant express warranties.  Furthermore, the express warranties represented by Defendant were a part of the basis for Mr. Landry's use of Roundup® and he relied upon these warranties in deciding to use Roundup®.

147.    At the time of the making of express warranties, Defendant had knowledge of the purpose for which Roundup® was to be used and warranted same to be in all respects safe, effective and proper for such use.

148.    Defendant expressly represented to Mr. Landry that Roundup® was safe and fit for use for the purpose intended, that it was merchantable quality, that it did not produce any dangerous side effects in excess of those risks associated with other herbicides, that the side effects it did produce were accurately reflected in the warning and that it was adequately tested and fit for its intended use.

33

149.    Defendant knew or should have known that, in fact, their representations and warranties were false, misleading and untrue in that Roundup® was not safe and fit for the use intended and, in fact, Roundup® produced serious injuries to the users that were not accurately identified and represented by Defendant.

**COUNT V**
**(Breach of Warranty in Redhibition)**

150.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if full stated herein.

151.    Roundup® contains a vice or defect which renders it useless or its use so inconvenient that consumers would not have purchased it had they known about the vice or defect.

152.    Pursuant to Louisiana Civil Code article 2520, a seller warrants the buyer against redhibitory defects or vices in the thing sold.  Roundup® which was sold and promoted by Defendant, possesses a redhibitory defect because it is unreasonably dangerous, as described above, which renders Roundup® useless or so inconvenient that it must be presumed that Plaintiff, Stephen Landry, would not have bought Roundup® had he known of the defects.

153.    Defendant was aware of the substantial risks associated with Roundup® but failed to fully disclose that risk to Mr. Landry.

154.    In accordance with Louisiana Civil Code article 2545, Defendant, as the manufacturer, distributor and seller of Roundup® is deemed to be aware of its redhibitory defects.

155.    Had Mr. Landry been made aware of the defects contained in Roundup®, he would not have purchased the product.  This characteristic rendered Roundup® unfit for its intended purpose.

34

156.    Defendant is liable to Plaintiff under the theory of redhibition as a consequence of the sale to Plaintiff of a product unfit for its intended use.

157.    Plaintiff is entitled to the return of purchase price paid for Roundup®, including but not limited to purchase price, interest on these amounts from the date of purchase, attorneys' fees and costs, pecuniary and non-pecuniary damages, as well as any other legal and equitable relief to which Plaintiff may be entitled.

## COUNT VI
### (Fraud)

158.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

159.    Monsanto has defrauded the agricultural community in general and Mr. Landry in particular by misrepresenting the true safety of Roundup® and by failing to disclose known risks of cancer.

160.    Monsanto misrepresented and/or failed to disclose that: glyphosate and its major metabolic aminomethylphosphoric acid (AMPA) could cause cancer; glyphosate and AMPA are known to be genotoxic in humans and laboratory animals because exposure is known to cause DNA strand breaks (a precursor to cancer); glyphosate and AMPA are known to induce oxidative stress in humans and laboratory animals (a precursor to cancer); glyphosate and AMPA interfere with the aromatic amino acids within the human gut, leading the downstream health conditions including cancer; exposure to glyphosate and AMPA is causally associated with non-Hodgkin lymphoma; and the laboratory tests attesting to the safety of glyphosate were flawed and/or fraudulent.

161.    Due to these misrepresentations and omissions, at all times relevant to this litigation,

35

Roundup® was misbranded under 7 U.S.C. § 136(g) and its distribution within Louisiana and around the United States was a violation of 7 U.S.C. § 136j and 40 C.F.R. § 156.10(a)(5).

162.    When Stephen Landry purchased Roundup® for use by him on his family property and later his employer, neither the labeling on the product nor Monsanto's general promotion warned or disclosed the true safety risks of Roundup® or that the product could cause cancer, as described above.  Since the true risk information was known to Monsanto and was not reasonably knowable to reasonable consumers, Mr. Landry was unaware of these material facts and/or omissions prior to purchasing the product.

163.    Stephen Landry relied on Monsanto's misrepresentations and/or material omissions regarding the safety of Roundup® and is active ingredient glyphosate in deciding whether to purchase and/or use the product on his property and his place of employment.  Mr. Landry did not know nor could he reasonably have known of the misrepresentations and/or material omissions by Monsanto concerning Roundup® and its active ingredient glyphosate.

164.    The misrepresentations and/or material omissions by Monsanto concerning Roundup® and its active ingredient glyphosate. The misrepresentations and/or material omissions that form the basis of this fraud claim are not limited to statements made on the Roundup® labeling, as defined under federal law, but also involve Monsanto's representations and omissions made as part of its promotion and marketing of Roundup®, including on the internet, television, in print advertisements, etc.  Nothing prevented Monsanto from disclosing the truth about the risks associated with its product in its promotional efforts outside of the labeling context, using the forms of media and promotion Monsanto traditionally used to promote the product's efficacy and benefits.

165.    When Monsanto made the misrepresentations and/or omissions as alleged herein, it

36

did so with the intent of defrauding and deceiving the public in general and with the intent of inducing the public to purchase and use its product.

166.    Monsanto's conduct was willful, wonton and/or reckless.   Monsanto deliberately manufactured, produced, marketed, sold, distributed, packaged, promoted and advertised the dangerous and effective herbicide, Roundup®, constituting a wanton and conscious disregard for the safety of a large segment of the public including Steven Landry and therefore, Monsanto is liable for reckless, willful and wanton acts and omissions which evidence a total and conscious disregard for the safety of others, which proximately caused the injuries alleged herein.

167.    WHEREFORE, Plaintiff respectfully request that this Court enter judgment in his favor for compensatory and punitive damages, together with interest, costs herein incurred and attorney's fees and all such other and further relief as this Court deems just and proper.

## DISCOVERY RULE AND EQUITABLE TOLLING

168.    Plaintiff asserts all applicable state statutory and common law rights and theories related to the tolling or extension of any applicable statute of limitations, including the discovery rule, delayed discovery, equitable tolling and fraudulent concealment.

169.    The discovery rule should be applied to toll the running of the statute of limitations/prescription until Plaintiff knew or through the exercise of reasonable care and diligence should have known of the cause of his injury and the tortious nature of the wrongdoing that caused his injury.

170.    Despite diligent investigation by Plaintiff into the cause of his injury, he did not and could not have discovered the cause until recently.  Accordingly, his claim has been filed within the applicable statutory period.   In fact, Defendant continues to deny any causal connection between

Roundup® and Non-Hodgkin's Lymphoma and thus should be estopped from asserting a statute of limitations defense based on Plaintiff's failure to discover the cause of his injury until recently.

171.    As asserted herein, Plaintiff, Steven Landry, was diagnosed with Non-Hodgkin's Lymphoma in July 2018; however he was not made aware of the possible connection between his injury and the Defendant's product until some time in December 2018. As such, the claim is being filed timely.

172.    Additionally, the running of the statute of limitations/prescription in this case should also be tolled due to equitable tolling based on Defendant's fraudulent concealment. Defendant is estopped from asserting a statute of limitations defense due to its fraudulent concealment, through affirmative misrepresentations and deliberate omissions, regarding the true risks associated with Roundup®, which were known by Defendant.

173.    Because of the fraudulent acts of concealment of the true risks of Roundup® to users, Plaintiff was unaware and could not reasonably have known, ascertained or learned through the exercise of reasonable due diligence, the true cause of his injuries until recently.   Accordingly, Plaintiff's claim has been filed within the applicable statutory period.

## EXEMPLARY DAMAGES ALLEGATIONS

174.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

175.    Monsanto's conduct as alleged herein was done with oppression, fraud and malice. Monsanto was fully aware of the safety risks associated with its product, Roundup®, but deliberately crafted its label, marketing and promotional material to mislead consumers.

176.    Defendant knew that through its deception it could increase profits by convincing

the agricultural industry and the general public that Roundup® was harmless to humans and was well aware that full disclosure of its true risks would result in significant monetary losses to the company. Monsanto's fraud was committed not only through its marketing but through its comprehensive scheme of selective fraudulent research and testing and deceptive omissions as alleged herein. As a result thereof, Plaintiff was deprived of his right to make an informed decision about whether to purchase and use this herbicide on his property or at his place of employment.

175.    Plaintiff in an effort to force Monsanto to stop its deceptive and dangerous practices hereby requests punitive damages against Monsanto for the harm caused to him.

<u>**PRAYER FOR RELIEF**</u>

176.    WHEREFORE, Plaintiff demands judgment against the Defendant on each of the above referenced claims and causes of action and as follows:

1.    Awarding compensatory damages in excess of jurisdictional amount, including but not limited to pain, suffering, emotional distress, loss of enjoyment of life and other non-economic damages in an amount to be determined at the trial of this matter;

2.    Awarding compensatory damages to Plaintiff for past and future damages, including but not limited to Plaintiff's pain and suffering and severe and permanent personal injuries sustained by Plaintiff including healthcare costs and economic loss;

3.    Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determined at the trial of this case;

4.    Pre-judgment interest;

5.    Post-judgment interest;

6.      Awarding Plaintiff reasonable attorney's fees;

7.      Awarding Plaintiff costs of these proceedings;

8.      Awarding Plaintiff punitive damages; and

9.      Such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMAND

177.    Plaintiff demands a trial by jury on all issues plead herein.


Dated: September 9, 2019                                 Respectfully submitted,

                                                        /s/Aaron W. Guidry
                                                        Aaron W. Guidry, (21632)
                                                        PORTER & GUIDRY, LLC
                                                        100 Rue Iberville, Suite 100
                                                        Lafayette, LA 70508
                                                        Telephone:    (337) 289-0626
                                                        Fax:          (337) 289-0625