CIVIL

# U.S. District Court
## Eastern District of California – Live System (Fresno)
## CIVIL DOCKET FOR CASE #: 1:19–cv–01458–DAD–SAB

Minson et al v. Monsanto Company
Assigned to: District Judge Dale A. Drozd
Referred to: Magistrate Judge Stanley A. Boone
Cause: 28:1332 Diversity–Product Liability

Date Filed: 10/16/2019
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Gregory G. Minson**

represented by **Laurence Matthew Rosen**
The Rosen Law Firm
275 Madison Ave., 34th Floor
New York, NY 10016
212–686–1060
Fax: 212–202–3827
Email: lrosen@rosenlegal.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Margeliza Minson**

represented by **Laurence Matthew Rosen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 10/16/2019 | 1 | COMPLAINT against Monsanto Company by Gregory Minson, Margeliza Minson. Attorney Rosen, Laurence Matthew added. (Filing fee $ 400, receipt number 0972–8517295) (Attachments: # 1 Civil Cover Sheet Civil Cover Sheet)(Rosen, Laurence) (Entered: 10/16/2019) |
| 10/16/2019 | 2 | SUMMONS ISSUED as to *Monsanto Company* with answer to complaint due within *21* days. Attorney *Laurence Matthew Rosen* *The Rosen Law Firm* *275 Madison Ave., 34th Floor* *New York, NY 10016*. (Jessen, A) (Entered: 10/16/2019) |
| 10/16/2019 | 3 | CIVIL NEW CASE DOCUMENTS ISSUED: Initial Scheduling Conference set for 1/10/2020 at 09:30 AM in Courtroom 9 (SAB) before Magistrate Judge Stanley A. Boone. (Attachments: # 1 Standing Order, # 2 Consent Form, # 3 VDRP) (Jessen, A) (Entered: 10/16/2019) |

LAURENCE ROSEN
ROSEN INJURY LAWYERS
355 SOUTH GRAND AVE., SUITE 2450
LOS ANGELES, CA 90071
Tel: 213-785-2610
Fax: 213-226-4684
Email: lrosen@rosenlegal.com

*Attorneys for Plaintiffs*

# IN THE UNITED STATES COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREGORY G. MINSON & MARGELIZA MINSON, h/w 1376 San Miguel Way Merced, CA 95340 <br><br> Plaintiffs, <br><br> v. <br><br> MONSANTO COMPANY 800 N. Lindbergh Blvd. St. Louis, MO 63167 <br><br> Defendant. | Civil Action No. <br><br> **COMPLAINT AND DEMAND FOR JURY TRIAL** |

## COMPLAINT

Plaintiffs, Gregory Minson and Margeliza Minson, h/w, ("Plaintiffs"),

by and through their undersigned attorneys, hereby bring this Complaint for

damages against Defendant Monsanto Company, and allege the following:

COMPLAINT FOR DAMAGES

1

**INTRODUCTION**

1. In 1970, Defendant, Monsanto Company, Inc., ("Monsanto") discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. In addition to the active ingredient glyphosate, Roundup® contains the surfactant polyoxyethylene tallow amine ("POEA") and/or adjuvants and other so-called "inert" ingredients. In 2001, glyphosate was the most used pesticide active ingredient in American agriculture with 85-90 million pounds used annually. That number grew to 185 million pounds in 2007. [1] As of 2013, glyphosate was the world's most widely used herbicide.

2. Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri, and incorporated in Delaware. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market.[2] The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, because glyphosate can be sprayed in the fields during the growing season without harming the crops. In 2010, an

---

[1] Arthur Grube et al., U.S. Envtl. Prot. Agency, *Pesticides Industry Sales and Usage*, 2006-2007 Market Estimates 14 (2011), available at
http://www.epa.gov/pesticides/pestsales/07pestsales/market_estimates2007.pdf.
[2] ETC Group, *Who Will Control the Green Economy*? 22 (2011), available at
http://www.etcgroup.org/files/publication/pdf_file/ETC_wwctge_4web_Dec2011.pdf.

estimated 70% of corn and cotton and 90% of soybean fields in the United States were Roundup Ready®.[3]

3.    Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops.[4] They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used.[5] It has been found in food,[6] in the urine of agricultural workers,[7] and even in the urine of urban dwellers who are not in direct contact with glyphosate.[8]

4.    On March 20, 2015, the International Agency for Research on Cancer (hereinafter "IARC"), an agency of the World Health Organization (hereinafter "WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

---

[3] William Neuman & Andrew Pollack, *Farmers Cope With Roundup-Resistant Weeds*, N.Y.TIMES, May 3, 2010, available at http://www.nytimes.com/2010/05/04/business/energy-environment/04weed.html?pagewanted=all
[4] Monsanto, *Backgrounder-History of Monsanto's Glyphosate Herbicides* (June 2005), available at https://monsanto.com/app/uploads/2017/06/back_history.pdf.
[5] *See* U.S. Geological Survey, *USGS Technical Announcement: Widely Used Herbicide Commonly Found in Rain and Streams in the Mississippi River Basin* (2011), available at https://archive.usgs.gov/archive/sites/www.usgs.gov/newsroom/article.asp-ID=2909.html; *see also* U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate*, available at http://npic.orst.edu/factsheets/glyphogen.html.
[6] Thomas Bohn et al., *Compositional Differences in Soybeans on the Market: Glyphosate Accumulates in Roundup Ready GM Soybeans*, 153 FOOD CHEMISTRY 207 (2013), available at http://www.sciencedirect.com/science/article/pii/S0308814613019201.
[7] John F. Acquavella et al., *Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study*, 112(3) ENVTL. HEALTH PERSPECTIVES 321 (2004), available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241861/; Kathryn Z. Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate*, 112 IARC Monographs 76, section 5.4 (2015), available at http://weedcontrolfreaks.com/wp-content/uploads/2015/03/GlyphosateWHOIARC2ALancetOncology.pdf.
[8] Dirk Brändli & Sandra Reinacher, *Herbicides found in Human Urine*, 1 ITHAKA JOURNAL 270 (2012), available at http://www.ithaka-journal.net/druckversionen/e052012-herbicides-urine.pdf.

5.     On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

6.     The IARC working group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC working group concluded that the cancers most associated with glyphosate exposure are Non-Hodgkin Lymphoma (hereinafter "NHL") and other hematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.[9]

7.     The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

8.     Nevertheless, Monsanto has represented Roundup® as being safe to humans and the environment since it began selling the herbicide. Indeed, Monsanto has proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment. This is untrue. Before glyphosate was first approved by the Environmental Protection Agency (hereinafter "EPA"), Monsanto knew that glyphosate could pose significant risks to human health, including a risk of causing cancer. This lawsuit seeks to hold Monsanto accountable for this misconduct.

---

[9] See Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra.*

COMPLAINT FOR DAMAGES

4

## PARTIES

9.   Plaintiff, Gregory Minson, is a natural person and at all times relevant to this complaint was a citizen of the State of California and resided in Merced, California.

10.   Mr. Minson began using Roundup® in 1980 and continued using it through approximately 2019.

11.   Mr. Minson was diagnosed with mantle cell lymphoma, a type of NHL, on July 1, 2019.

12.   Mr. Minson brings this action for personal injuries sustained by exposure to Roundup® containing the active ingredient glyphosate and the surfactant POEA.

13.   Plaintiff, Margeliza Minson, is a natural person and at all times relevant to this complaint was a citizen of the State of California and resided in Merced, California.  Ms. Minson is and at all relevant times to this complaint was the wife of Plaintiff, Gregory Minson, and asserts a claim for loss of consortium related to the injuries of her husband.

14.   "Roundup" refers to all formulations of Monsanto's Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup

Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready- to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer! Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

15.    Defendant Monsanto is a Delaware corporation with  its headquarters and principal place of business in St. Louis, Missouri.

16.    Monsanto  is a citizen of the State of Missouri and Delaware and is not a citizen of the State of California. At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and was the manufacturer of the Roundup® at issue.

17.    Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate.

18.    Monsanto transacted  and conducted business within the State of California that relates to the allegations in this Complaint.

19.    Monsanto derived substantial revenue from goods and products used in the State of California.

20.   Monsanto expected or should have expected its acts to have consequences within the State of California, and derived substantial revenue from interstate commerce.

21.   Monsanto engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup®.

22.   Monsanto is authorized and is registered to do business in California and derives substantial income from doing business in this state.

23.   Upon information and belief, Monsanto purposefully availed itself of the privilege of conducting activities with the State of California, thus invoking the benefits and protections of its laws.

24.   Upon information and belief, Monsanto did design, develop, test, package, label, sell, advertise, manufacture and/or distribute Roundup®, with full knowledge of its dangerous and defective nature.

**JURISDICTION AND VENUE**

25.   Federal diversity in this Court is proper under 28 U.S.C. § 1332 because Plaintiffs are citizens of California, a different state than the Defendant's place of incorporation (Delaware) and Defendant's headquarters (Missouri), and the aggregate amount in controversy exceeds $75,000, exclusive of interest and costs.

26.   This Court has personal jurisdiction over Monsanto because Monsanto transacts business in California and is a corporation doing business within California. Monsanto knows or should have known that its Roundup® products are and were

COMPLAINT FOR DAMAGES

sold throughout the State of California, and, more specifically, caused Roundup® to be sold to Plaintiffs in California.

27.  The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

28.  Venue is proper before this Court pursuant to 28 U.S.C. § 1391(b)(2), because the events giving rise to this action happened in or are closely related to this District.

## FACTUAL ALLEGATIONS

29.  At all times relevant to this Complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®, which contains the active ingredient glyphosate and the surfactant POEA, as well as adjuvants and other "inert" ingredients. Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world, including the popular herbicide Roundup®.

30.  Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die with 2 to 3 days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

31.  For nearly 40 years, farms worldwide have used Roundup® without knowledge of the dangers linked to its various uses. That is because when Monsanto first commercially introduced Roundup®, it was touted glyphosate as a technological breakthrough in that it could kill almost every weed without causing harm either to

people or the environment. Of course, history has shown that not to be true. According to the WHO, the main ingredient of Roundup® – glyphosate – is a probable cause of cancer. Those most at risk are farm workers and other individuals with exposure to Roundup®, such as garden center workers, nursery workers, and landscapers. Agricultural workers are, once again, victims of corporate greed. Monsanto assured the public that Roundup® was harmless, and in order to bolster these claims, Monsanto championed falsified data and attacked legitimate studies that revealed Roundup®'s dangers. Succinctly put, Monsanto has led a prolonged campaign of misinformation to convince government agencies, farmers, and the general population that Roundup® is safe.

### The Discovery of Glyphosate and Development of Roundup®

32.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970's under the brand name Roundup®.[10]

33.     In addition to the active ingredient glyphosate, Roundup® formulations also contain adjuvants and other chemicals such as the surfactant POEA, which are considered "inert" and therefore protected as "trade secrets" in manufacturing. Growing evidence suggests that these adjuvants and additional components of Roundup® formulations are not, in fact, inert and are toxic in their own right.

34.     From the outset, Monsanto marketed Roundup® as a "safe" general purpose herbicide for widespread commercial and consumer use. It still markets

---

[10] Monsanto, *Backgrounder, History of Monsanto's Glyphosate Herbicide* (June 2005), available at https://monsanto.com/app/uploads/2017/06/back_history.pdf.

COMPLAINT FOR DAMAGES

9

1  Roundup® as safe today.[11]

2  ## Registration of Herbicides Under Federal Law

3  35.  The manufacture, formulation, and distribution of herbicides, such

4  as Roundup®, is regulated under the Federal Insecticide, Fungicide, and

5  Rodenticide Act (hereinafter alternatively "FIFRA" or "Act"), 7 U.S.C. §§ 136 *et*

6

7  *seq.* FIFRA requires that all pesticides be registered with the EPA prior to

8  distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

9  36.  Because pesticides are toxic to plants, animals, and humans, at least

10  to some degree, the EPA requires as part of the registration process, among other

11  things, a variety of tests to evaluate the potential for exposure to pesticides,

12

13  toxicity to people and other potential non- target organisms, and other adverse

14  effects on the environment. Registration by the EPA, however, is not an

15  assurance or finding of safety. The EPA does not deem certain products "safe,"

16  but only that use of the product in accordance with its label directions "will not

17

18  generally cause unreasonable adverse effects on the environment." 7 U.S.C. §

19  136a(c)(5)(D).

20  37.  FIFRA defines "unreasonable adverse effects on the environment" to

21  mean "any unreasonable risk to man or the environment, taking into account the

22

23  economic, social, and environmental costs and benefits of the use of any

24  pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to conduct a risk/benefit

25

26  _____

[11] Monsanto, *Glyphosate and Roundup Brand Herbicides* (May 16, 2017), available at

27  https://monsanto.com/company/media/statements/glyphosate-herbicide/.

28

analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

38.     The EPA and the State of California registered Roundup® for distribution, sale, and manufacture in the United States and the State of California.

39.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conduct the health and safety testing of pesticide products. The EPA has protocols governing the conducting of tests required for registration and the laboratory practices that must be followed in conducting those tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, to perform the tests that are required of the manufacturer.

40.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-l. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

41.     In the case of glyphosate, the EPA planned on releasing its preliminary risk assessment-in relation to the re-registration process-no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

COMPLAINT FOR DAMAGES

42.   In April 2016, the EPA posted a risk assessment of glyphosate on its website and then immediately retracted it. The EPA subsequently indicated that the posting was inadvertent, that the document posted was not the EPA's final assessment or even a preliminary one, and that the EPA intended to issue a final report by the end of 2016.

**Scientific Fraud Underlying the Marketing and Sale of Glyphosate/ Roundup®**

43.   Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991. In so classifying glyphosate, however, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."[12]

44.   On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

45.   In the first instance, Monsanto hired Industrial Bio-Test Laboratories (hereinafter "IBT") to perform and evaluate pesticide toxicology studies relating to

---

[12] U.S. Envtl. Prot. Agency, *Memorandum, Subject: SECOND Peer Review of Glyphosate 1* (1991), available at https://archive.epa.gov/pesticides/chemicalsearch/chemical/foia/web/pdf/103601/417300-1991-10-30a.pdf.

Roundup®.[13] IBT performed approximately 30 tests on glyphosate and glyphosate-containing-products, including 9 of the 15 residue studies needed to register Roundup® with the EPA.

46.   In 1976, the Food and Drug Administration (hereinafter "FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT and determined that the toxicology studies conducted for the Roundup® were invalid. [14] An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[15]

47.   In 1983, three top executives of IBT were convicted of fraud.

48.   In the second incident, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including several studies on Roundup®. Later that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices

---

[13] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories* (June 2005), available at https://monsanto.com/app/uploads/2017/06/ibt_craven_bkg.pdf
[14] U.S. Envtl. Prot. Agency, *Summary of the IBT Review Program Office of Pesticide Programs* (1983), available at https://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA&Index=1981+Thru+1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&QFieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5CZyfiles%5CIndex%20Data%5C81thru85%5CTxt%5C00000022%5C91014ULV.txt&User=ANONYMOUS&Password=anonymous&SortMethod=h%7C-&MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=hpfr&DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page&MaximumPages=1&ZyEntry=1&SeekPage=x&ZyPURL.
[15] Marie-Monique Robin, *The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply* (2011) (*citing* U.S. Envtl. Prot. Agency, *Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch*. Washington, D.C. (August 9, 1978)).

in the testing of pesticides and herbicides.[16]

## The Importance of RoundUp® to Monsanto's Market Dominance

49.   The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

50.   In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further. By 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

51.   Through a three-pronged strategy of increased production, decreased prices, and by coupling with Roundup Ready® seeds, Roundup® became

---

[16] https://pubs.acs.org/subscribe/archive/tcaw/10/i11/html/11regs.html

Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue.[17] Today, glyphosate remains one of the world's largest herbicides by sales volume.

**Monsanto Falsely Advertised Roundup® as Being Safe for Decades**

52.   In 1996, the New York Attorney General (hereinafter "NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are:

    a.   "Remember that environmentally friendly Roundup® herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks and fences."

    b.   "And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got a weed, brush, edging or trimming problem."

    c.   "Roundup® biodegrades into naturally occurring elements."

    d.   "Remember that versatile Roundup® herbicide stays where you put it. That means there's no washing or leaching to harm

---

[17] David Barboza, *The Power of Roundup; A Weed Killer Is a Block for Monsanto to Build On*, N.Y. TIMES, Aug. 2, 2001, available at http://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weed-killer-is-a-block-for-monsanto-to-build-on.html.

customers' shrubs or other desirable vegetation."

e.  "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it."

f.  You can apply Roundup® with "confidence because it will stay where you put it," it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Roundup® into natural products.

g.  "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

h.  "Glyphosate's safety margin is much greater than required. It has over a 1,000- fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

i.  "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

j.  "Roundup® can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup®.[18]

53.   On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a.  glyphosate-containing pesticide products or any component thereof are safe, non- toxic, harmless or free from risk;

---

[18] Attorney General of the State of New York, in the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

b.   glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;

c.   glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

d.   glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics";

e.   glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and,

f.   glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

54.   Monsanto did not alter its advertising in the same manner in any state other than New York and, based on information and belief, still has not done so as of today.

55.   In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[19]

**Classification and Assessments of Glyphosate**

56.   The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC

---

[19] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, available at http://news.bbc.co.uk/2/hi/europe/8308903.stm.

Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and 1 agent to be Probably Not Carcinogenic.

57.   The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.[20] Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

58.   A year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in The Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

59.   In assessing an agent, the IARC Working Group reviews the

---

[20] World Health Org., *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble* (2006), available at http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

60.    In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

61.    On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph Volume 112. For Volume 112, the Working Group consisted of 17 experts from 11 countries who met from March 3-10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. Among the members were Lauren Zeise, Ph.D., of the California Environmental Protection Agency, Matthew T. Martin, Ph.D, a scientist with the U.S. Environmental Protection Agency, and Gloria D. Jahnke, D.V.M., D.A.B.T. of the National Institute of Environmental Health Sciences.

62.    The March meeting culminated after an almost year-long review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

63.    The studies considered the following exposure groups: (1) occupational

exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and (2) para-occupational exposure in farming families.

64.    Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

65.    Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

66.    The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies showed a human health concern from agricultural and other work-related exposure to glyphosate.

67.    The IARC Working Group conducted a systematic review of over 15 studies designed to assess whether there was an association between Roundup® exposure in agricultural workers and NHL. The researchers reviewed each study, identified the results and assessed each study's strengths and weaknesses.

68.    The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides. The IARC Working Group concluded that, despite the limited evidence concerning the carcinogenicity of glyphosate in humans, a "positive association has been observed for non-Hodgkin lymphoma."

69.    The IARC Working Group also found that glyphosate caused DNA and

chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed. In assessing the genotoxicity of glyphosate (the property of chemical agents that damages the genetic information within a cell causing mutations, which may lead to cancer), the IARC Working Group concluded "[t]here is strong evidence that glyphosate causes genotoxicity."

70.    In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor: renal tubule carcinoma. A second study reported a positive trend for hemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation promotion study in mice.

71.    There is an entire section in the IARC monograph for glyphosate devoted to exposure to humans, looking at studies examining glyphosate exposures in various settings including agricultural ones. The IARC Working Group noted that glyphosate has been detected in urine of agricultural workers, indicating absorption. The IARC Working Group specifically evaluated farm workers in the United States, and found that, within the days following the application of Roundup® to a crop, approximately 60% of farm workers tested positive for glyphosate in the urine. Additionally, the IARC Working Group noted that soil microbes degrade glyphosate to aminomethylphosphonic acid ("AMPA"). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

72.    The IARC Working Group further found that glyphosate and glyphosate formations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

73.    The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.[21] Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

74.    The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.[22] While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

75.    Additionally, the IARC assessed whether glyphosate exposure can induce oxidative stress, which is thought to be involved in the development of numerous conditions, including cancer, autism, and Parkinson's disease. The IARC concluded that "strong evidence exists that glyphosate ... can induce

---

[21] Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate, supra* at 77.
[22] Anneclare J. De Roos et al., *Cancer Incidence Among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study*, 113 Envt'l Health Perspectives 49-54 (2005), available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1253709/pdf/ehp0113-000049.pdf.

1    oxidative stress." This could be an important mechanism by which Roundup®

2    causes cancer. [23]

### Other Earlier Findings About Glyphosate's Dangers to Human Health

76.    In addition to the IARC's assessment, in 2014, scientists published a systematic review and meta-analysis on the relationship between NHL and occupational exposure to agricultural pesticides, including glyphosate, in the International Journal of Environmental Research and Public Health. The study showed a statistically significant association between farm workers exposed to Roundup® and NHL. The study confirmed two smaller studies from 2002 and 2008, published in the Journal Leukemia & Lymphoma (2002) and the International Journal on Cancer (2008).

77.    Recent studies, including a glyphosate residue study published in the Journal of Environmental & Analytical Toxicology in 2014, indicate that "chronically ill humans showed significantly higher glyphosate residues in urine than healthy population." Glyphosate has been detected in the blood and urine of agricultural workers, indicating that agricultural use of Roundup® leads to its absorption.

78.    The EPA published a technical fact sheet as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication relating to

---

[23] In addition to DNA damage and oxidative stress, scientists have suggested Roundup's association with various serious health conditions is linked to the effect Roundup has on the digestive system. Specifically, scientists believe the same mechanism that makes Roundup toxic to weeds also makes it toxic to the microbes within the human gut. When humans are exposed to Roundup, it leads to a chronic inflammatory state in the gut, as well an impaired gut barrier, which can lead to many long-term health effects, including an increased risk of cancer, including statistically significant increase in non-Hodgkin lymphoma among agricultural workers exposed to glyphosate.

glyphosate. This technical fact sheet predates IARC's March 20, 2015 evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available. Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.[24]

In 1995, the Northwest Coalition for Alternatives to Pesticides reports that in California, that state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly reported cause of pesticide illness among agricultural workers.[25]

---

[24] U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate, supra.*
[25] Caroline Cox, *Glyphosate, Part 2: Human Exposure and Ecological Effects*, 15 J. PESTICIDE REFORM 4 (1995); W.S. Peas et al., *Preventing pesticide-related illness in California agriculture: Strategies and priorities. Environmental Health Policy Program Report*, Univ. of Cal. School of Public Health, Calif. Policy Seminar (1993).

### The Toxicity of Other Ingredients in RoundUp®

79.   In addition to the toxicity of the active ingredient glyphosate, several studies support the hypothesis that the glyphosate-based formulation in Defendant's Roundup® products is more dangerous and toxic than glyphosate alone. Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.[26]

80.   In 2002, a study by Julie Marc, entitled "Pesticide Roundup® Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation," revealed that Roundup® causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cell cycles.[27]

81.   A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation. The researchers noted that "cell cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell cycle checkpoints leads to genomic instability and subsequent development of cancer from the initial affect cell." Further, "[s]ince cell cycle disorder such as cancer result from dysfunctions of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."[28]

---

[26] Martinez, T.T. and K. Brown, *Oral and pulmonary toxicology of the surfactant used in Roundup herbicide*, PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991).
[27] Julie Marc, et al., *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation*, 15 CHEM. RES. TOXICOL. 326-331 (2002), available at http://pubs.acs.org/doi/full/10.1021/tx015543g.
[28] Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation*, 96 BIOLOGY OF THE CELL 245, 245-249 (2004), available at https://www.ncbi.nlm.nih.gov/pubmed/15182708.

COMPLAINT FOR DAMAGES

25

82. In 2005, a study by Francisco Peixoto entitled "Comparative effects of Roundup® and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup®'s effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone. The Peixoto study further suggested that the harmful effects of Roundup® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant POEA, or in the alternative, due to a potential synergic effect between glyphosate and other ingredients in the Roundup® formulation.[29]

83. In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup® and glyphosate on human umbilical, embryonic, and placental cells. The study tested dilution levels of Roundup® and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food. The researchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability and amplify toxicity of glyphosate alone. The researchers further suggested that assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants present in Roundup® are not, in fact, inert and that Roundup® is potentially far more toxic than its active ingredient glyphosate alone.[30]

---

[29] Francisco Peixoto, *Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation*, 61 CHEMOSPHERE 1115, 1122 (2005), available at https://www.ncbi.nlm.nih.gov/pubmed/16263381.
[30] Nora Benachour, et al., Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic, and Placental Cells, 22 CHEM. RES. TOXICOL. 97-105 (2008), available at http://big.assets.huffingtonpost.com/france.pdf.

84.   The results of these studies were at all times available to Monsanto. Monsanto thus knew or should have known that Roundup® was, and is more toxic than glyphosate alone and that safety studies of Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup®.

85.   Despite its knowledge that Roundup® is considerably more dangerous than glyphosate alone, Monsanto continued to promote Roundup® as safe. Notably, Monsanto has systematically tested glyphosate without the adjuvants and used those tests to lobby the EPA that Roundup® is safe.

### Recent Worldwide Bans on RoundUp®/Glyphosate

86.   Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup® are more widely known.

87.   The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which takes effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not

be exposed to it."[31]

88.    The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.[32]

89.    France banned the private sale of Roundup® and glyphosate following the IARC assessment.[33]

90.    Bermuda banned both the private and commercial sale of glyphosate, including Roundup®. The Bermuda government explained: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup®' has been suspended."[34]

91.    The Sri Lankan government banned the private and commercial use of glyphosate out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.[35]

92.    The government of Columbia announced a ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine in response to the IARC's assessment.[36]

---

[31] *Holland's Parliament Bans Glyphosate Herbicides, The Real Agenda*, April 14, 2014, available at http://real-agenda.com/hollands-parliament-bans-glyphosate-herbicides/.
[32] Christina Sarich, *Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals Following Recent Glyphosate-Cancer Link*, GLOBAL RESEARCH, MAY 14, 2015, available at https://www.globalresearch.ca/brazils-public-prosecutor-wants-to-ban-monsantos-chemicals-following-recent-glyphosate-cancer-link/5449440; *see* Ministério Público Federal, *MPF/DF reforça pedido para que glifosato seja banido do Mercado nacional*, April 14, 2015, available at http://www.mpf.mp.br/df/sala-de-imprensa/noticias-df/mpf-df-reforca-pedido-para-que-glifosato-seja-banido-do-mercado-nacional.
[33] Zoe Schlanger, *France Bans Sales of Monsanto's Roundup in Garden Centers, 3 Months After U.N. Calls it "Probable Carcinogen"*, NEWSWEEK, JUNE 15, 2015, available at http://www.newsweek.com/france-bans-sale-monsantos-roundup-garden-centers-after-un-names-it-probable-343311.
[34] *Health Minister: Importation of Roundup Weed Spray Suspended*, Today in Bermuda, May 11, 2015, available at http://bernews.com/2015/05/importation-weed-spray-round-suspended/.
[35] *Sri Lanka's New President Puts Immediate Ban on Glyphosate Herbicides, Sustainable Pulse*, May 25, 2015, available at https://sustainablepulse.com/2015/05/25/sri-lankas-new-president-puts-immediate-ban-on-glyphosate-herbicides/.
[36] *Columbia to ban coca spraying herbicide glyphosate*, BBC, May 10, 2015, available at http://www.bbc.com/news/world-latin-america-32677411.

## Proposition 65 Listing

93. On September 4, 2015, California's Office of Environmental Health Hazard Assessment ("OEHHA") published a notice of intent to include glyphosate on the state's list of known carcinogens under Proposition 65.[37] California's Safe Drinking Water and Toxic Enforcement Act of 1986 (informally known as "Proposition 65"), requires the state to maintain and, at least once a year, revise and republish a list of chemicals "known to the State of California to cause cancer or reproductive toxicity."[38] The OEHHA determined that glyphosate met the criteria for the listing mechanism under the Labor Code following the IARC's assessment of the chemical. [39]

94. The listing process under the Labor Code is essentially automatic. The list of known carcinogens, at a minimum, must include substances identified by reference in Labor Code § 6382(b)(1). That section of the Labor Code identifies "[s]ubstances listed as human or animal carcinogens by the International Agency for Research on Cancer (IARC)." The IARC's classification of glyphosate as a Group 2A chemical ("probably carcinogenic to humans") therefore triggered the listing.

95. A business that deploys a listed chemical in its products must provide "clear and reasonable warnings" to the public prior to exposure to the chemical. To be clear and reasonable, a warning must "(1) clearly communicate that the chemical is

---

[37] Cal. Envtl. Prot. Agency Office of Envtl. Health Hazard Assessment, *Notice of Intent to List Chemicals by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion, Glyphosate* (Sept. 4, 2015), available at https://oehha.ca.gov/proposition-65/crnr/notice-intent-list-tetrachlorvinphos-parathion-malathion-glyphosate.
[38] *Frequently Asked Questions*, STATE OF CAL. DEPT OF JUSTICE, OFFICE OF THE ATTORNEY GENERAL, available at http://oag.ca.gov/prop65/faq.
[39] Cal. Envtl. Prot. Agency Office of Envtl. Health Hazard Assessment, *Notice of Intent to List Chemicals by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion, Glyphosate* (Sept. 4, 2015), available at https://oehha.ca.gov/proposition-65/crnr/notice-intent-list-tetrachlorvinphos-parathion-malathion-glyphosate.

known to cause cancer, and/or birth defects or other reproductive harm; and (2) effectively reach the person before exposure."[40] The law also prohibits the discharge of listed chemicals into drinking water.

96.   Monsanto disputed the listing decision and, in January 2016, filed a lawsuit against OEHHA and the agency's acting director, Lauren Zeise, in California state court, seeking declaratory and injunctive relief to prevent OEHHA from listing glyphosate.[41]

97.   Monsanto alleged that OEHHA's exclusive reliance of the IARC decision signified that "OEHHA effectively elevated the determination of an ad hoc committee of an unelected, foreign body, which answers to no United States official (let alone any California state official), over the conclusions of its own scientific experts." Monsanto further alleged that the Labor Code listing mechanism presented various constitutional violations because it "effectively empowers an unelected, undemocratic, unaccountable, and foreign body to make laws applicable in California."  Among other things, Monsanto argued that Proposition 65's requirement to provide a "clear and reasonable warning" to consumers that the chemical is a known carcinogen would damage its reputation and violate First Amendment rights.

### The EFSA Report on Glyphosate

98.   On November 12, 2015, the European Food Safety Authority ("EFSA"), the European Union's primary agency for food safety, reported on its evaluation of the

---

[40] *Frequently Asked Questions*, STATE OF CAL. DEPARTMENT OF JUSTICE, OFFICE OF THE ATTORNEY GENERAL, *supra*.
[41] Monsanto Company's Verified Petition for Writ of Mandate and Complaint for Preliminary and Permanent Injunctive and Declaratory Relief, *Monsanto Co. v. Office of the Env'l Health Hazard Assessment, et al.*, No. 16-CECG-00183 (Cal. Super. Ct.), available at https://www.schiffhardin.com/Templates/media/files/Other%20PDFs/Monsanto_petition.pdf.

Renewal Assessment Report ("RAR") on glyphosate. The Rapporteur Member State assigned to glyphosate, the German Federal Institute for Risk Assessment ("BfR"), had produced the RAR as part of the renewal process for glyphosate in the EU.

99.   The BfR sent its draft RAR to the EFSA and the RAR underwent a peer review process by EFSA, other member states, and industry groups. As part of the on-going peer review of Germany's reevaluation of glyphosate, the EFSA had also received a second mandate from the European Commission to consider the IARC's findings regarding the potential carcinogenicity of glyphosate and glyphosate-containing products.

100.   Based on a review of the RAR, which included data from industry-submitted unpublished studies, the EFSA sent its own report ("Conclusion") to the European Commission, finding that "glyphosate is unlikely to pose a carcinogenic hazard to humans and the evidence does not support classification with regard to its carcinogenic potential according to Regulation ("EC") No. 1271/2008." The EFSA therefore disagreed with the IARC: glyphosate was not genotoxic and did not present a carcinogenic threat to humans.

101.   In explaining why its results departed from the IARC's conclusion, the EFSA drew a distinction between the EU and the IARC approaches to the study and classification of chemicals.[42] Although the IARC examined "both glyphosate – an active substance – and glyphosate-based formulations, grouping all formulations regardless of their composition," the EFSA explained that it considered only

---

[42] *EFSA Fact Sheet: Glyphosate*, EFSA, available at
http://www.efsa.europa.eu/sites/default/files/corporate_publications/files/efsaexplainsglyphosate151112en.pdf.

1   glyphosate and that its assessment focuses on "each individual chemical, and each

2   marketed mixture separately." The IARC, on the other hand, "assesses generic agents,

3   including groups of related chemicals, as well as occupational or environmental

4   exposure, and cultural or behavioral practices." The EFSA accorded greater weight to

5   studies conducted with glyphosate alone than studies of formulated products. The

6   EFSA went further and noted:

7

8   > [A]lthough some studies suggest that certain glyphosate-based formulations
9   > may be genotoxic (i.e. damaging to DNA), other that look solely at the active
10   > substance glyphosate do not show this effect. It is likely, therefore, that the
11   > ***genotoxic effects observed in some glyphosate-based formulations are***
12   > ***related to the other constituents or "co-formulants."*** Similarly, certain
13   > glyphosate-based formulations display higher toxicity than that of the active
14   > ingredient, presumably because of the presence of co-formulants. In its
15   > assessment, the ***EFSA proposes that the toxicity of each pesticide***
16   > ***formulation and in particular its genotoxic potential should be further***
17   > ***considered and addressed by Member State authorities while they re-assess***
18   > ***used of glyphosate-based formulations in their own territories.*** **(Emphasis**
19   > **added).**

20   102.   Notwithstanding its conclusion, the EFSA did set exposure levels for

21   glyphosate. Specifically, the EFSA proposed an acceptable daily intake ("ADI") of 0.5

22   mg/kg of body weight per day; an acute reference dose ("ARfD") of 0.5 mg/kg of body

23   weight; and an acceptable operator exposure level of ("AOEL") of 0.1 mg/kg of body

24   weight per day.[43]

25

26

27   ---

[43] European Food Safety Auth., Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate, *supra*.

28

## Leading Scientists Dispute the EFSA's Conclusion

103.  On November 27, 2015, 96 independent academic and governmental scientists from around the world submitted an open letter to the EU health commissioner, Vytenis Andriukaitis.[44] The scientists expressed their strong concerns and urged the commissioner to disregard the "flawed" EFSA report, arguing that "the BfR decision is not credible because it is not supported by the evidence and it was not reached in an open and transparent manner."

104.  Signatories to the letter included Dr. Christopher J. Portier, Ph.D., and other renowned international experts in the field, some of whom were part of the IARC Working Group assigned to glyphosate.

105.  In an exhaustive and careful examination, the scientists scrutinized the EFSA's conclusions and outlined why that IARC Working Group decision was "by far the more credible":

> The IARC WG decision was reached relying on open and transparent procedures by independent scientists who completed thorough conflict-of-interest statements and were not affiliated or financially supported in any way by the chemical manufacturing industry. It is fully referenced and depends entirely on reports published in the open, peer-reviewed biomedical literature. It is part of a long tradition of deeply researched and highly credible reports on the carcinogenicity of hundreds of chemicals issued over the past four decades by IARC and used today by international agencies and regulatory bodies around the world as a basis for risk assessment, regulation, and public health policy.

[44] Letter from Christopher J. Portier et al. to Commission Vytenis Andriukaitis, Open letter: Review of the Carcinogenicity of Glyphosate by EFSA and BfR (Nov. 27, 2015), available at https://www.nrdc.org/sites/default/files/open-letter-from-dr-christopher-portier.pdf and
https://www.theguardian.com/environment/2016/jan/13/eu-scientists-in-row-over-safety-of-glyphosate-weedkiller.

106.  With respect to human data, the scientists pointed out that the EFSA agreed with the IARC that there was *"limited evidence* of carcinogenicity" for non-Hodgkin lymphoma, but the EFSA nonetheless dismissed an association between glyphosate exposure and carcinogenicity. The IARC applied three levels of evidence in its analysis of human data, including sufficient evidence and limited evidence. The EFSA's ultimate conclusion that "there was no unequivocal evidence for a clear and strong association of NHL with glyphosate" was misleading because it was tantamount to the IARC's highest level of evidence: "sufficient evidence," which means that a causal relationship has been established. However, the scientist argued, '[l]egitimate public health concerns arise when 'causality is credible,' i.e. when there is limited evidence."

107.  Among its many other deficiencies, the EFSA's conclusions regarding animal carcinogenicity data were "scientifically unacceptable," particularly in BfR's use of historical control data and in its trend analysis. Indeed, the BfR's analysis directly contradicted the Organization for Economic Co-operation and Development ("OECD") testing guidelines while citing and purporting to follow those same guidelines. For instance, the EFSA report dismisses observed trends in tumor incidence "because there are no individual treatment groups that are significantly different from control and because the maximum observed response is reportedly within the range of the historical control data." However, according to the scientists, concurrent controls are recommended over historical control in all guidelines, scientific reports, and publications, and, if historical control data is employed, such

COMPLAINT FOR DAMAGES

34

1  data "should be from studies in the same timeframe, for the same exact animal strain,

2  preferably from the same laboratory or the same supplier and preferably reviewed by

3  the same pathologist." The BfR's use of historical control data violated these

4
5  precautions: "only single study used the same mouse strain as the historian controls,

6  but was reported more than 10 years after the historical control dataset was

7  developed." Further deviating from sound scientific practices, the data used by the

8  BfR came from studies in seven different laboratories. The scientists concluded:

9
10       BfR reported seven positive mouse studies with three studies showing
11       increases in renal tumors, two with positive findings for hemangiosarcomas,
12       and two with positive findings for malignant lymphomas. BfR additionally
13       reported two positive findings for tumors in rats. Eliminating the
14       inappropriate use of historical data, the unequivocal conclusion is that these
15       are not negative studies, but in fact document the carcinogenicity of
16       glyphosate in laboratory animals.

17       108.  The letter also critiques the EFSA's report's lack of transparency and the

18  opacity surrounding the data cited in the report: "citations for almost all of the

19  references, even those from the open scientific literature, have been redacted from the

20  document" and "there are no authors or contributors listed for either document, a

21  requirement for publication in virtually all scientific journals." Because the BfR relied

22  on unpublished, confidential industry provided studies, it is "impossible for any

23  scientist not associated with BfR to review this conclusion with scientific confidence."

24

25

26

27

28

109.  On March 3, 2016, the letter was published in the Journal of Epidemiology & Community Health.[45]

### Statement of Concern Regarding Glyphosate-Based Herbicides

110.  On February 17, 2016, a consensus statement published in the Journal of Environmental Health, entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement," assessed the safety of glyphosate-based herbicides ("GBHs").[46] The paper's "…focus is on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with recent discoveries about the toxicity and human health risks stemming from use of GBHs." The researchers drew seven factual conclusions about GBHs:

1. GBHs are the most heavily applied herbicide in the world and usage continues to rise;

2. Worldwide, GBHs often contaminate drinking water sources, precipitation, and air, especially in agricultural regions;

3. The half-life of glyphosate in water and soil is longer than previously recognized;

4. Glyphosate and its metabolics are widely present in the global soybean supply;

5. Human exposures to GBHs are rising;

---

[45] Christopher J. Portier, et al., *Differences in the carcinogenic evaluation of glyphosate between the International Agency for Research on Cancer (IARC) and the European Food Safety Authority (EFSA)*, JOURNAL OF EPIDEMIOLOGY & CMTY. HEALTH, Marc. 3, 2016, available at http://jech.bmj.com/content/early/2016/03/03/jech-2015-207005.
[46] John P. Myers, et al., *Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement*, Environmental Health (2016), available at http://ehjournal.biomedcentral.com/articles/10.1186/s12940-016-0117-0.

6. Glyphosate is now authoritatively classified as a probable human

carcinogen; and

7. Regulatory estimates of tolerable daily intakes for glyphosate in the United

States and European Union are based on outdated science.

111. The researchers noted that GBH use has increased approximately 100-fold since the 1970s. Further, far from posing a limited hazard to vertebrates, as previously believed, two decades of evidence demonstrated that "several vertebrate pathways are likely targets of action, including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."

112. The paper attributed uncertainties in current assessments of glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations." Further, the researchers argue, "[t]he distinction in regulatory review and decision processes between 'active' and 'inert' ingredients has no toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in their own right."

113. Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish." Accordingly, "risk assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone underestimate both

toxicity and exposure, and thus risk." The paper concludes that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."

114.   The researchers also critique the current practice of regulators who largely rely on "unpublished, non-peer-reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."

115.   The researchers also call for greater inclusion of GBHs in government-led toxicology testing programs:

> [A] fresh and independent examination of GBH toxicity should be
> undertaken, and … this reexamination be accompanied by systemic efforts
> by relevant agencies to monitor GBH levels in people and in the food supply,
> none of which are occurring today. The U.S. National Toxicology Program
> should prioritize a thorough toxicology assessment of the multiple pathways
> now identified as potentially vulnerable of GBHs.

116.   The researchers suggest that, in order to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which manufacturers fund the registration process and the necessary testing:

> [W]e recommend that a system be put in place through which manufacturers
> of GBHs provide funds to the appropriate regulatory body as part of routine
> registration actions and fees. Such finds should then be transferred to
> appropriate government research institutes, or to an agency experienced in
> the award of competitive grants. In either case, finds would be made

available to independent scientists to conduct the appropriate long-term
(minimum 2 years) safety studies in recognized animal model systems. A
thorough and modern assessment of GBH toxicity will encompass potential
endocrine disruption, impacts on the gut microbiome, carcinogenicity, and
multigenerational effects looking a reproductive capability and frequency of
birth defects.

**The FDA Announces Testing of Glyphosate Residue in Foods**

117. On February 17, 2016, the U.S. FDA announced that, for the first time in
its history, the agency planned to start testing certain foods for glyphosate residues.
FDA spokesperson Lauren Sucher explained: "The agency is now considering
assignments for Fiscal Year 2016 to measure glyphosate in soybeans, corn, milk, and
eggs, among other potential foods."[47]

118. In 2004, the U.S. Government Accountability Office ("GAO") had
severely rebuked the FDA for its failures to both monitor for pesticide residue,
including that of glyphosate, and to disclose the limitations of its monitoring and
testing efforts to the public.[48]

119. Indeed, in the past, both the FDA and the U.S. Department of Agriculture
("USDA") had routinely excluded glyphosate from their testing for the residues of
hundreds of other pesticides, on the rationale that it was too expensive and
unnecessary to protect public health. Ms. Sucher (the FDA spokesperson) now states,

---

[47] Carey Gillam, *FDA to Start Testing for Glyphosate in Food*, TIME, Feb. 17, 2016, available at
http://time.com/4227500/fda-glyphosate-testing/?xid=tcoshare.
[48] U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-15-38, *FDA AND USDA SHOULD STRENGTHEN PESTICIDE
RESIDUE MONITORING PROGRAMS AND FURTHER DISCLOSE MONITORING LIMITATIONS* (2014), available at
http://www.gao.gov/products/GAO-15-38.

however, that "the agency has developed 'streamlined methods' for testing for the weed killer."[49]

120.  The FDA's move is significant as the agency possesses enforcement authority and can seek action if pesticide residues exceed enforcement guidelines.[50]

### European Union Vote on Glyphosate Renewal

121.  The license for glyphosate in the European Union was set to expire in June 2016.

122.  Without extension of the license, Monsanto's Roundup® and other glyphosate-based herbicides faced a general phase out in EU markets.[51]

123.  In the months leading up to the license expiration date, protracted meetings and votes among national experts from the 28 EU Member States failed to produce agreement on an extension.

124.  For instance, on March 4, 2016, *The Guardian* reported that France, the Netherlands, and Sweden did not support the EFSA's assessment that glyphosate was harmless.[52] The paper quoted the Swedish Environmental Minister, Åsa Romson, as stating: "We won't take risks with glyphosate and we don't think that the analysis done so far is good enough. We will propose that no decision is taken until further

[49] Gilliam, *supra* note 68.
[50] *Id.*; Pesticide Q&A, U.S. FOOD AND DRUG ADMINISTRATION, available at https://www.fda.gov/food/foodborneillnesscontaminants/pesticides/ucm583711.htm
[51] Philip Blenkinsop, Alissa de Carbonnel & Barbara Lewis, *European Commission to extend glyphosate license for 18 months*, REUTERS, June 28, 2016, available at http://www.reuters.com/article/us-health-eu-glyphosate-idUSKCN0ZE25B.
[52] Arthur Neslen, *EU States rebel against plans to relicense weedkiller glyphosate*, THE GUARDIAN, Mar. 4, 2016, available at https://www.theguardian.com/environment/2016/mar/04/eu-states-rebel-against-plans-to-relicense-weedkiller-glyphosate.

analysis has been done and the EFSA scientists have been more transparent about their considerations."

125.  The Netherlands argued that relicensing should be placed on hold until after a separate evaluation of glyphosate's toxicity can be conducted.[53] Leading up to the vote, Italy joined the other EU states in opposing licensing renewal, citing health concerns.

126.  On June 6, 2016, the Member States voted but failed to reach a qualified majority in favor or against the re-authorization of glyphosate.[54]

127.  On June 29, 2016, the EU Commission extended the European license for glyphosate for 18 months to allow the European Chemical Agency to rule on the safety of the chemical, which is expected by the end of 2017.[55]

128.  On July 11, 2016, the EU voted in favor of a proposal to restrict the conditions of use of glyphosate in the EU, including a ban on common co-formulant POEA from all glyphosate-based herbicides, including Roundup®.[56]

129.  On November 13, 2017, after heated debate over whether it causes cancer, and in a very tight vote, the EU voted in favor of a limited (5-year) license for the use of glyphosate.[57]

---

[53] Arthur Neslen, *Vote on controversial weedkiller's European license postponed*, THE GUARDIAN, Mar. 8, 2016, available at https://www.theguardian.com/environment/2016/mar/08/eu-vote-on-controversial-weedkiller-licence-postponed-glyphosate.
[54] Manon Flausch, *Commission prolongs glyphosate license by 18 months*, EURACTIV, June 29, 2016, available at https://www.euractiv.com/section/agriculture-food/news/commission-prolongs-glyphosate-licence-by-18-months/.
[55] Arthur Neslen, *Controversial chemical in Roundup weedkiller escapes immediate ban*, THE GUARDIAN, June 29, 2016, available at https://www.theguardian.com/business/2016/jun/29/controversial-chemical-roundup-weedkiller-escapes-immediate-ban.
[56] Sarantis Michalopoulos, *EU agrees ban on glyphosate co-formulant*, EURACTIV, July 11, 2016, available at https://www.euractiv.com/section/agriculture-food/news/eu-agrees-ban-on-glyphosate-coformulant/
[57] Caterina Tano, *German vote swings EU decision on 5-year glyphosate renewal*, November 27, 2016, available at https://euobserver.com/environment/140042

**Plaintiff's Exposure to Glyphosate and RoundUp®**

130.  Plaintiff, Gregory Minson. regularly used Roundup® from approximately 1980 through 2019.

131.  Mr. Minson started using Roundup® regularly in 1980 while working on his step-grandfather's large walnut and grape ranch located in Kingsburg, California.

132.  Mr. Minson worked on this ranch from 1980-1990 and lived on the property from 1980-1983.

133.  During his time working on the ranch, Mr. Minson used Roundup® many times throughout the year.  During certain times of the year, Mr. Minson would mix and spray Roundup® multiple times a day.

134.  Mr. Minson continued to use Roundup® after he stopped regularly working on his step-grandfather's ranch in 1990.

135.  Mr. Minson's father owns a large plot of land in Fresno, California, which Mr. Minson would treat with Roundup® one to two times a year.

136.  Additionally, Mr. Minson has maintained his own property with Roundup® and sprayed his own property every one to two weeks.

137.  Mr. Minson continued to use Roundup® until the spring of 2019 when he received his cancer diagnosis and, through research, discovered the potential link between his diagnosis and his Roundup® use.

138.  Mr. Minson purchased Roundup® in California.

139.  In July 2019, doctors diagnosed Mr. Minson with mantle cell lymphoma, a form of NHL.

140.  During the entire time in which Mr. Minson was exposed to Roundup®, he did not know that Roundup® was injurious to his health or the health of others.

141.  As a result of Mr. Minson's injuries, he has incurred and will continue to incur significant economic and noneconomic damages.

## TOLLING OF THE STATUTE OF LIMITATIONS

### Discovery Rule Tolling

142.  Plaintiffs had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup® and glyphosate during the entire time he was using the product.

143.  Within the time period of any applicable statute of limitations, Plaintiffs could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup® and glyphosate is injurious to human health.

144.  Plaintiffs did not discover and did not know of facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup® and glyphosate; nor would a reasonable and diligent investigation by Plaintiffs have disclosed that Roundup® and glyphosate would have caused Plaintiff's illness.

145.  For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiffs' claims.

**Fraudulent Concealment**

146.  All applicable statutes of limitations have also been tolled by Monsanto's knowing and active fraudulent concealment and denial of the facts alleged herein through the time period relevant to this action.

147.  Instead of disclosing critical safety information about Roundup® and glyphosate, Monsanto has consistently and falsely represented the safety of its Roundup® products.

**Estoppel**

148.  Monsanto was under a continuous duty to disclose to consumer, users, and other persons coming into contact with its products, including Plaintiff, Gregory Minson, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate.

149.  Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks with the use of and/or exposure to its products.

150.  Based on the foregoing, Monsanto is estopped from relying on any statutes of limitations in defense of this action.

**COUNT I: STRICT LIABILITY (DESIGN DEFECT)**

151.  Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

152.  Plaintiffs bring this strict liability claim against Defendant Monsanto for defective design.

153. At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including the Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

154. At all times relevant to this litigation, Defendant designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by Plaintiff and/or to which Plaintiff was exposed, as described above.

155. At all times relevant to this litigation, Defendant's Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff.

156. At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in California and throughout the United States, including the Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

157. Defendant's Roundup® products, as researched tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that, when they left the hands of Defendant's manufacturers and/or suppliers, they were

1    unreasonably dangerous and dangerous to an extent beyond that which an ordinary

2    consumer would contemplate.

3         158.  Defendant's Roundup® products, as researched, tested, developed,

4    designed, licensed, manufactured, packaged, labeled, distributed, sold, and
5
     marketed by Defendant were defective in design and formulation in that, when
6
7    they left the hands of Defendant's manufacturers and/or suppliers, the

8    foreseeable risks associated with these products' reasonable foreseeable uses

9    exceeded the alleged benefits associated with their design and formulation.
10
          159.  At all times relevant to this action, Defendant knew or had reason to
11
12   know that its Roundup® products were defective and were inherently dangerous

13   and unsafe when used in the manner instructed and provided by Defendant.

14        160.  Therefore, at all times relevant to this litigation, Defendant's

15   Roundup® products, as researched, tested, developed, designed, licensed,
16
     manufactured, packaged, labeled, distributed, sold and marketed by Defendant
17
18   were defective in design and formulation, in one or more of the following ways:

19             a.  When placed in the stream of commerce, Defendant's Roundup®

20                  products were defective in design and formulation, and,

21                  consequently, dangerous to an extent beyond that which an ordinary
22
                    consumer would contemplate;
23
24             b.  When placed in the stream of commerce, Defendant's Roundup®

25                  products were unreasonably dangerous in that they were hazardous

26                  and posed a grave risk of cancer and other serious illnesses when

27                  used in a reasonably anticipated manner;

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

    c.  When placed in the stream of commerce, Defendant's Roundup® products  contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

    d.  Defendant did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate;

    e.  Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide;

    f.  Defendant knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries;

    g.  Defendant did not conduct adequate post-marketing surveillance of its Roundup® products; and

    h.  Defendant could have employed safer alternative designs and formulations.

161. At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup® products in an intended and reasonably foreseeable manner without knowledge of their dangerous characteristics.

162.  Plaintiff could have not reasonably discovered the defects and risk associated with Roundup® or glyphosate-containing products before or at time of exposure.

163.  The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendant's Roundup® products were and are more dangerous than alternative products and Defendant could have designed its Roundup® products to make them less dangerous. Indeed, at the time that Defendant designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

164.  At the time Roundup® products left Defendant's control, there was a practical, technically feasible, and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant's Roundup® herbicides.

165.  Defendant's defective design of Roundup® amounts to willful, wanton, and/or reckless conduct by Defendant. Therefore, as a result of unreasonably dangerous condition of its Roundup® products, Defendant is strictly liable to Plaintiff.

166.  The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiffs' grave injuries, and but for Defendant's misconduct and omissions, Plaintiffs would not have sustained their injuries.

167.  As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Plaintiff, Gregory Minson, developed NHL and suffered grave injuries that were permanent and lasting in nature,

COMPLAINT FOR DAMAGES

48

physical pain and mental anguish, including diminished enjoyment of life, as well as economic hardship, including considerable financial expenses for medical care and treatment.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other costs and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT II: STRICT LIABILITY (FAILURE TO WARN)

168. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

169. Plaintiffs bring this strict liability claim against Defendant for failure to warn.

170. At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup®, which are defective and unreasonably dangerous to consumers, including Plaintiffs, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

171. Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly

advertised or marketed the products to consumers and end users, including Plaintiff, and Defendant therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of Roundup® and glyphosate-containing products and a duty to instruct on the proper, safe use of these products.

172. At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup® products did not cause users and consumers to suffer from unreasonably and dangerous risks. Defendant had a continuing duty to instruct on the proper, safe use of these products. Defendant, as manufacturer, seller, or distributor of chemical herbicides, is held to the knowledge of an expert in the field.

173. At the time of manufacture, Defendant could have provided warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to these products.

174. At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety of its Roundup® products. Defendant also failed to minimize the dangers to users and consumers of its Roundup® products and to those who would foreseeably use or be harmed by Defendant's herbicides, including Plaintiff.

175. Despite the fact that Defendant knew or should have known that Roundup® products posed a grave risk of harm, it failed to warn of the dangerous

risks associated with their use and exposure. The dangerous propensities of its

products and the carcinogenic characteristics of glyphosate, as described above, were

known to Defendant, or scientifically knowable to Defendant through appropriate

research and testing by known methods, at the time it distributed, supplied, or sold

the product and not known to end users and consumers, such as Plaintiff.

176.  Defendant knew or should have known that its Roundup® and

glyphosate-containing products created significant risks of serious bodily harm to

consumers, as alleged herein, and Defendant failed to adequately warn consumers

and reasonably foreseeable users of the risks of exposure to these products.

Defendant has wrongfully concealed information concerning the dangerous nature of

Roundup® and its active ingredient glyphosate, and further made false and/or

misleading statements concerning the safety of Roundup® and glyphosate.

177.  At all times relevant to this litigation, Defendant's Roundup® products

reached the intended consumers, handlers, and users or other persons coming into

contact with the products thorough the United States, including Plaintiff without

substantial change in their condition as designed, manufactured, sold, distributed,

labeled, and marketed by Defendant.

178.  At all times relevant to this litigation, Plaintiff used and/or was exposed

to the use of Defendant's Roundup® products in their intended or reasonably

foreseeable manner without knowledge of their dangerous characteristics.

179.  Plaintiff could not have reasonably discovered the defects and risk

associated with Roundup® or glyphosate-containing products before or at the time of

his exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of

COMPLAINT FOR DAMAGES

Defendant.

180. Monsanto, as the manufacturer and/or distributor of Roundup®, is held to the level of knowledge of an expert in the field.

181. Defendant knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, but it failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and horticultural applications.

182. The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled agricultural workers, horticultural workers, and /or at-home users to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure of Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

183. To this day, Defendant has failed to adequately and accurately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to

Roundup® and its active ingredient glyphosate, a probable carcinogen.

184. As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiff.

185. Defendant is liable to Plaintiffs for injuries caused by its failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its Roundup® products and the risk associated with the use of or exposure to Roundup® and glyphosate.

186. The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiff's injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained his injuries.

187. Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risk associated with its Roundup® products, Plaintiff could have avoided the risk of developing injuries as alleged herein and Plaintiff could have obtained alternative herbicides.

188. As a direct and proximate result of Defendant placing its defective Roundup® products into the steam of commerce, Plaintiff, Gregory Minson, developed NHL and suffered grave injuries that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as economic hardship, including considerable financial expenses for medical care and treatment.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor for compensatory and punitive damages, together with interest, costs herein

incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

### COUNT III: NEGLIGENCE

189.  Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

190.  Defendant, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, and/or promoted.

191.  Defendant, directly or indirectly, caused Roundup® products to be purchased and/or used by Plaintiff.

192.  At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

193.  At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertising, and sale of its Roundup® products, Defendant's duty of care owed to consumer and the general public, including Plaintiffs, to provide accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup® and, in particular, its active ingredient glyphosate.

194. At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

195. Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use or exposure to its Roundup® products could cause Plaintiffs' injuries and thus, created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

196. Defendant knew or, in the exercise of reasonable care, should have known that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup®.

197. Defendant knew or, in the exercise of reasonable care, should have known that tests limited to Roundup®'s active ingredient glyphosate were insufficient to prove the safety of Roundup®.

198. Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup® and glyphosate-containing products.

199. As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Defendant manufacture and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects

inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

200.  Defendant failed to appropriately and adequately test Roundup®, Roundup® adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiffs from Roundup®.

201.  Despite the ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant has failed to do so. Indeed, Defendant has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

202.  Defendant's negligence included:

a. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

b. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing

products were safe for their intended use in agriculture, horticulture, and at-home use;

d. Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup®, and the propensity of these ingredients to render Roundup® toxic, increase the toxicity of Roundup®, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup®, and whether or not "inert" ingredients and/or adjuvants were safe for use;

c. Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

f. Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

g. Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and/or be exposed to its Roundup® products;

h. Failing to disclose to Plaintiff, users, consumers, and the general public that the use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

i. Failing to warn Plaintiff, users, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and

effective alternative herbicides available to Plaintiff and other users or

consumers;

j. Systemically suppressing or downplaying contrary evidence about the

risks, incidence, and prevalence of the side effects of Roundup® and

glyphosate-containing products;

k. Representing that its Roundup® products were safe for their intended use

when in fact, Defendant knew or should have known that the products were

nor safe for their intended use;

l. Declining to make or propose any changes to Roundup® products' labeling

or other promotional materials that would alert the consumers and the general

public of the risk of Roundup® and glyphosate;

m. Advertising, marketing, and recommending the use of Roundup®

products, whole concealing and failing to disclose or warn of the dangers

known by defendant to be associated with or caused by the use of and

exposure to Roundup® and glyphosate;

n. Continuing to disseminate information to its consumers, which indicate or

imply that Defendant's Roundup® products are not unsafe for use in the

agricultural, horticultural industries, and/or home use; and

o. Continuing the manufacture and sale of its products with the knowledge

that the products were unreasonably unsafe and dangerous.

203.  Further, Monsanto under-reported, underestimated, and downplayed the

serious dangers of its Roundup® products. Specifically, Monsanto negligently and

deceptively compared the safety risks and/or dangers of Roundup® with common everyday foods such as table salt and other available forms of herbicides.

204.  Defendant knew or should have known that it was foreseeable that consumers and/or users, such as Plaintiff, would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale from Roundup®.

205.  Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

206.  Defendant's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff suffered, as described herein.

207.  Defendant's conduct, as described above, was reckless. Defendant regularly risks the lives of consumers and users of its products, including Plaintiff, with full knowledge of the dangers of its products. Defendant has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff. Defendant's reckless conduct therefore warrants an award of punitive damages.

208.  As a proximate result of Defendant's wrongful acts and omission in placing its defective Roundup® products into the steam of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff developed NHL and suffered grave injuries that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as

economic hardship, including considerable financial expenses for medical care and treatment.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems proper and just. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT IV: BREACH OF IMPLIED WARRANTIES

209. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

210. At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to users and consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce.

211. These actions were under the ultimate control and supervision of Defendant.

212. Before the time that Plaintiff was exposed to the use of the aforementioned Roundup® products, Defendant impliedly warranted to its consumers and users, including Plaintiff, that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

213.  Defendant, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries. Roundup® products were and are provided to consumers/users, such as Plaintiff, in a dangerously defective and unsafe condition.

214.  Plaintiff was the intended third-party beneficiary of implied warranties made by Defendant to the purchasers of its horticultural herbicides, and as such, Plaintiff is entitled to assert this claim.

215.  Upon information and belief, Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Defendant and upon its implied warranties that the Roundup® products were of merchantable quality and for their intended purpose or use.

216.  The Roundup® products were expected to reach and did in fact reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendant.

217.  At all times relevant to this litigation, Defendant was aware that consumers and users of its products, including Plaintiff, would use Roundup® products as marketed by Defendant, which is to say that Plaintiff was the foreseeable user of Roundup®.

218.  Defendant intended that its Roundup® products be used in the manner in which Plaintiff in fact used them and Defendant impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

219. In reliance upon Defendant's implied warranty, Plaintiff used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended promoted, and marketed by Defendant.

220. Plaintiff could not have reasonably discovered or known of the risk of serious injury associated with Roundup® or glyphosate.

221. Defendant breached its implied warranty to Plaintiff in that its Roundup® products were not of merchantable quality, safe, or fit for their intended purposes and/or uses, nor adequately tested. Instead, the Roundup® products were in a dangerously defective and unsafe condition. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

222. The harm caused by Defendant's Roundup® products far outweighed their benefit, rending the products more dangerous than an ordinary customer or user would expect and more dangerous than alternative products.

223. As a direct and proximate result of Defendant's wrongful acts and omissions Plaintiff suffered severe physical and emotional injuries. Plaintiff developed NHL and suffered grave injuries that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as economic hardship, including considerable financial expenses for medical care and treatment.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems proper and just. Plaintiffs also demand a jury trial on the issues contained

1    herein.

2    ## COUNT V: BREACH OF EXPRESS WARRANTIES

3    224.  Plaintiffs incorporate by reference each and every allegation set

4    forth in the preceding paragraphs as if fully stated herein.

5    225.  At all times relevant to this litigation, Defendant engaged in the

6    business of testing, developing, designing manufacturing, marketing, selling,

7

8    distributing, and promoting its Roundup® products, which are defective and

9    unreasonably dangerous to consumers, including Plaintiff thereby placing Roundup®

10   products into the stream of commerce. These actions were under the ultimate control

11

12   and supervision of Defendant.

13   226.  Defendant had a duty to exercise reasonable care in the researching,

14   testing, development, design, licensing, formulation, manufacture, inspection,

15   production, assembly, packaging, labeling, advertising, promotion, marketing,

16   selling, supply, distribution, and release of its Roundup® products, including a duty

17   to:

18

19   a. Ensure that its products did not cause the user unreasonably dangerous side

20   effects;

21   b. Warn of dangerous and potentially fatal side effects; and

22   c. Disclose adverse material facts, such as the true risks associated with the

23   use of and exposure to Roundup® and glyphosate containing products, when

24   making representations to consumers and the general public, including

25   Plaintiff.

26

27

28

227.  At all times relevant to this litigation, Defendant expressly represented and warranted to the purchasers of its Roundup® products, by and through statements made by Defendant in labels, publications, package insert, and other written materials intended doe consumers and the general public, that is Roundup® products were safe to human health and the environment, effective, fit, and proper for their intended use. Defendant advertised, labeled, marketed, and promoted Roundup® products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that its Roundup® products would conform to the representations.

228.  These express representations included incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Roundup® and glyphosate. Defendant knew or should have known that the risks expressly included in Roundup® warnings and labels did not and do not accurately and adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendant expressly represented that its Roundup® products were safe and effective, that they were safe and effective for use by individuals such as Plaintiff, and/or that they were safe and effective as agricultural herbicides.

229.  The representations about Roundup®, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

230.   Defendant placed its Roundup® products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate.

231.   Defendant breached these warranties because, among other things, its Roundup® products were defective, dangerous, unfit for use, did not contain labels representing the true and adequate nature of the risk associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically, Defendant breached the warranties in the following ways:

a. Defendant represented through its labeling, advertising, and marketing materials that its Roundup® products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated with use of and/or exposure to Roundup® and glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings and labels; and

b. Defendant represented that its Roundup® products were safe for use and fraudulently concealed information that demonstrated that glyphosate, the active ingredient in Roundup®, had carcinogenic properties, and that its Roundup® products, therefore, were not safer than alternatives available on the market.

232.   Upon information and belief, Plaintiff justifiably and detrimentally relied on the express warranties and representations of Defendant in the purchase and/or use of its Roundup® products. When Plaintiff made the decision to purchase and/or use

Roundup®, he reasonably relied upon Defendant to disclose known defects, risks, dangers, and side effects of Roundup® products and glyphosate.

233. Defendant has sole access to material facts concerning the nature of risks associated with its Roundup® products as expressly stated within its warnings and labels, and Defendant knew that consumers and users such as Plaintiff could not have reasonably discovered that the risks expressly included in Roundup® warnings and labels were inadequate and inaccurate.

234. Plaintiff had no knowledge of the falsity or incompleteness of Defendant's statements and representations concerning Roundup®.

235. Plaintiff used and/or was exposed to the use of Roundup® as researched, developed, designed, tested, formulated, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by Defendant.

236. Had the warning and labels for Roundup® products accurately and adequately set forth the true risks associated with the use of such products, including Plaintiff's injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Plaintiffs could have avoided the injuries complained of herein.

237. As a direct and proximate result of Defendant's wrongful acts and omissions, Plaintiff suffered severe injuries. Plaintiff developed NHL and suffered grave injuries that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as economic hardship, including considerable financial expenses for medical care and treatment.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems proper and just. Plaintiffs also demand a jury trial on the issues contained herein

## COUNT VI: NEGLIGENT MISREPRESENTATION AND FRAUD

238. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

239. Defendant is the designer, researcher, developer, manufacturer, tester, packager, promoter, marketer, advertiser, distributor, labeler, supplier, and/or seller of Roundup® and, while engaged in the course of such business, made representations to consumers, including Plaintiff, regarding the character and/or quality for guidance in the decision to select Roundup® for use.

240. Defendant had a duty to disclose material information about serious health effects to consumers such as Plaintiff. Defendant negligently, recklessly, and/or intentionally failed to disclose this information for the purpose of inducing consumers, including Plaintiff, to purchase Defendant's dangerous products.

241. Specifically, Defendant's advertisement regarding Roundup® made material misrepresentations to the effect that Roundup® was safe, which misrepresentations Defendant knew to be false, for the purpose of fraudulently inducing customers, such as Plaintiff, to purchase said product. Defendant further misrepresented that its products were just as safe and just as effective or more effective, than other weed control products on the market.

242.  Defendant's representations regarding the character or quality of Roundup® were untrue. In addition, Defendant fraudulently suppressed material information regarding the safety of Roundup®, including the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate.

243.  Defendant had actual knowledge based on the results of trials, tests, and studies of exposure to glyphosate of the risk of serious harm associated with human use and exposure to Roundup®.

244.  Defendant negligently and/or intentionally misrepresented or omitted this information from its products labeling, promotions, and advertisements and instead labeled, promoted, and advertised its products as safe and effective in order to avoid losses an sustain profits in its sales to customers.

245.  In supplying the false information, Defendant failed to exercise a reasonable care or competence in obtaining or communicating information to their intended recipients, including Plaintiff.

246.  Plaintiff reasonably and justifiably relied to his detriment upon Defendant's misrepresentations and/or omissions in its labeling, advertisements, and promotions concerning the serious risks posed by the product. Plaintiff reasonably and justifiably relied upon Defendant's representations to him that Roundup® was safe for use and that Defendant's labeling, advertisements, and promotions fully described all known risk of the product.

247.  As a direct and proximate result Plaintiff's use of Roundup® as manufactured, sold, supplied, and introduced into the stream of commerce by

Defendant, Plaintiff suffered injuries, damages and losses resulting from the negligent and/or intentional acts or omissions of Defendant as well as the dangerous defects of its Roundup® products as more fully described herein. Plaintiff developed NHL and suffered grave injuries that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as economic hardship, including considerable financial expenses for medical care and treatment.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems proper and just. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT VII: VIOLATION OF CALIFORNIA'S BUSINESS AND PROFESSIONAL CODE

248. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

249. Plaintiffs plead this Count in the broadest sense available under the law to include pleading same pursuant to all substantive law that applies to this case as may be determined by choice of law principles, regardless of whether arising under statute and/or common law.

250. Defendant violated California Business & Professional Code Section 17000 *et seq.* through their use of false or misleading misrepresentations or omissions of material fact relating to the safety of Roundup®.

251. Defendant communicated the purported benefits of Roundup® while failing to disclose the serious and dangerous side effects related to the use of

Roundup® and of the true state of Roundup®'s regulatory status and safety. Defendant made these representations to the public at large, including Plaintiff, in the marketing and advertising campaigns described herein.

252.  Plaintiff justifiably relied upon said representations, purchased Defendant's products for personal, family, and/or household purposes, used Defendant's Roundup® products, and suffered ascertainable losses as a result of Defendant's actions in violation of the aforementioned consumer protection laws.

253.  Defendant used unfair methods of competition or deceptive acts or practices that were proscribed by law and violated Cal Bus & Prof Code §17000 *et seq.* and §17500 *et seq.*, such unlawful acts and practices include:

      a. engaging in unfair or deceptive trade practices by making false representations that Defendant's products have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have, including but not limited to, statements concerning the safety and the health consequences of the use of Roundup®;

      b. engaging in other fraudulent and/or deceptive conduct that creates a likelihood of confusion or misunderstanding, including but not limited to, deception, fraud, misrepresentation, knowing concealment, and/or suppression or omission of material facts about Defendant's products and their use or safety that consumers, including Plaintiff, relied upon, in connection with the purchase, use, and continued use of Roundup®;

      c. engaging in unfair or deceptive trade practices as defined in this statute by making false and misleading oral and written statements that had the

capacity, tendency, or effect of deceiving or misleading consumers about

the safety of its Roundup®

products; and

d. engaging in unfair or deceptive trade practices as defined in this statute

by failing to state material facts that omission of which deceived or

tended to deceive, including but not limited to, facts relating to the safety

and the health consequences of the use of Roundup®.

254.   Defendant had a statutory duty to refrain from engaging in unfair trade

practices and deceptive conduct in the design, development, manufacture, promotion,

and sale of Roundup®.

255.   Had the Defendants not engaged in the unfair trade practices and

deceptive conduct herein, Plaintiff would not have purchased and/or used Roundup®

products and would not have incurred ascertainable losses, including but not limited

to, substantial medical bills and costs.

256.   Specifically, Plaintiff was misled by the unfair trade practices and

deceptive conduct described herein.

257.   Defendant's deceptive, unconscionable, false, misleading and/or

fraudulent representations and material omissions to the public at large, including the

Plaintiff, of material facts relating to the safety of Roundup®, upon which Plaintiff

justifiably relied, constituted unfair trade practices or deceptive conduct in violation of

the state consumer protection statutes listed above.

258.   Defendant uniformly communicated the purported benefits of Roundup®

products while failing to disclose the serious and dangerous side effects related to the

COMPLAINT FOR DAMAGES

use of Roundup® and the true state of Roundup® products' regulatory status and its safety.

259.  Defendant made these representations to the public at large, including Plaintiff, in the marketing and advertising campaign described herein.

260.  Defendant's conduct in connection with Roundup® was also impermissible and illegal in that it created a likelihood of confusion and misunderstanding because Defendant misleadingly, falsely, and/or deceptively misrepresented and omitted numerous material facts regarding, among other things, the safety of Roundup® products.

261.  As a direct and proximate result of Defendant's wrongful conduct, Plaintiff was diagnosed with NHL has incurred and will incur in the future substantial expenses for necessary medical treatment and medication and other losses.  Plaintiffs are legally entitled to recover those losses.

262.  By reason of wrongful acts engaged in by the Defendant, Plaintiffs suffered ascertainable loss of money and/or property and other harm or damages for which Plaintiffs are legally entitled to recover.

263.  As a direct and proximate result Plaintiff's use of Roundup® as manufactured, sold, supplied, and introduced into the stream of commerce by Defendant, Plaintiffs suffered injuries, damages and losses resulting from the negligent and/or intentional acts or omissions of Defendant as well as the dangerous defects of its Roundup® products as more fully described herein. Plaintiff developed NHL and suffered grave injuries that are permanent and lasting in nature, physical pain and

mental anguish, including diminished enjoyment of life, as well as economic hardship, including considerable financial expenses for medical care and treatment.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems proper and just. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT VI: LOSS OF CONSORTIUM

264. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

265. At all times relevant hereto, Plaintiff, Margeliza Minson, was and is the wife and spouse of Plaintiff, Gregory Minson.

266. As a result of the injuries sustained by Plaintiff, Gregory Minson, which were the direct and proximate result of one or more of the wrongful acts or omissions of the Defendant as described above, Plaintiff, Margeliza Minson, has suffered loss of consortium, including but not limited to, mental anguish and the loss of her husband's support, services, society, companionship, comfort, affection, love and solace.

267. As a further result of the foregoing, Plaintiff, Margeliza Minson, has been obliged to expend various sums of money for medical attention and care, in an attempt to treat her husband's injuries, and she may be obliged to expend additional sums of money for the same purposes in the future.

268.  As a result of the injuries sustained by Plaintiff, Gregory Minson, as set forth above, Plaintiffs Gregory Minson and Margeliza Minson have sustained damage to their marital relationship.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems proper and just. Plaintiffs also demand a jury trial on the issues contained herein.

## EXEMPLARY AND PUNITIVE DAMAGES ALLEGATIONS

177.  Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

178.  Defendant's conduct as alleged herein was done with oppression and malice.

179.  Defendant was fully aware of Roundup®'s safety risks. Nonetheless, Defendant deliberately crafted its label, marketing, and promotion to mislead consumers.

180.  This was not done by accident or through some justifiable negligence. Rather, Defendant knew that it could turn a profit by convincing the agricultural industry that Roundup® was harmless to humans, and that full disclosure of Roundup®'s true risks would limit the amount of money Defendant would make selling Roundup® in California.

181.  This was accomplished not only through its misleading labeling, but through a comprehensive scheme of selective fraudulent research and testing, misleading advertising, and deceptive omissions as more fully alleged throughout

this pleading. Plaintiff, like all other consumers of California, was robbed of his right to make an informed decision about whether to purchase and use an herbicide on his property, knowing the full risks attendant to that use. Such conduct was done with conscious disregard of the Plaintiff's rights.

182. There is no indication that Defendant will stop its deceptive and unlawful marketing practices unless it is punished and deterred. Accordingly, Plaintiffs request punitive damages against Defendant for the harms caused to Plaintiffs.

## TRANSFER TO MASTER DOCKET

183.    Plaintiffs request for this case to be transferred to the UNITED STATES JUDICIAL PANEL on MULTIDISTRICT LITIGATION Master Docket, under the style "In Re: Roundup Products Liability Litigation" and the identification MDL No. 2741, within the Northern District of California.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Monsanto, awarding as follows:

A. Compensatory damages in the form of medical expenses, out-of-pocket expenses, lost earnings, and other economic damaged in an amount to be proven at trial;

B. Compensatory damages for pain and suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial;

C. Punitive damages for the wanton, willful, fraudulent, and reckless acts of the Defendant who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiffs in an amount sufficient to punish Defendant and deter future similar conduct, to the extent allowable by applicable law;

D. Pre- and post-judgment interest;

E. Costs including reasonable attorneys' fees, court costs, and other litigation expenses; and

F. Any other relief that Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury as to all issues.

Dated the 16th day of October 2019

Respectfully Submitted,

**ROSEN INJURY LAWYERS**

By: /s/ Laurence Rosen
Laurence Rosen (CA Bar No. SBN 219683)

*Attorneys for Plaintiffs*