JURY,LC3

# U.S. District Court
## Southern District of Ohio (Cincinnati)
## CIVIL DOCKET FOR CASE #: 1:19–cv–00844–TSB

McVey v. Monsanto Company
Assigned to: Judge Timothy S. Black
Cause: 28:1332 Diversity–Product Liability

Date Filed: 10/04/2019
Jury Demand: Plaintiff
Nature of Suit: 245 Tort Product Liability
Jurisdiction: Diversity

**Plaintiff**

**James T McVey**

represented by **William Henry Blessing**
119 East Court Street, Ste 500
Cincinnati, OH 45202
513–621–9191
Fax: 513–621–7086
Email: bill@blessing–attorneys.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 10/04/2019 | 1 | COMPLAINT with JURY DEMAND against Monsanto Company ( Filing fee $ 400 paid – receipt number: 0648–7141453), filed by James T McVey. (Blessing, William) Modified docket text on 10/7/2019 (eh). (Entered: 10/04/2019) |
| 10/07/2019 | | If this case is referred, it will be to Magistrate Judge Stephanie K. Bowman. (eh) (Entered: 10/07/2019) |
| 10/08/2019 | 2 | NOTICE by Plaintiff James T McVey *Civil Cover Sheet* (Blessing, William) (Entered: 10/08/2019) |
| 11/04/2019 | 3 | NOTICE by Plaintiff James T McVey *Civil Cover Sheet* (Blessing, William) (Entered: 11/04/2019) |
| 11/04/2019 | 4 | Summons Issued as to Monsanto Company. (eh) (Entered: 11/04/2019) |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

**JAMES T. MCVEY**
**7860 Hartford Hill Lane**
**Cincinnati OH 45242,**

       **Plaintiff**

**-vs-**

**MONSANTO COMPANY,**
 **c/o Corporation Service Company**
  **50 West Broad St., Suite 1330**
  **Columbus, Ohio 43215,**

     **Defendant.**

**Case No. _____**

---

## COMPLAINT WITH JURY DEMAND

Plaintiff James T. McVey brings this civil action for money damages against defendant Monsanto Company ("Monsanto" or "Monsanto"), alleging as follows:

### NATURE OF THE CASE

1. This is an action to recover money damages for the injuries suffered by Plaintiff as the direct and proximate result of the wrongful conduct and negligence of Monsanto in connection with the design, marketing, and selling of the herbicide known as Roundup, containing the active ingredient glyphosate.

2. James T. McVey owns and operates two farms and was exposed to Roundup's the active ingredient glyphosate and the surfactant polyethoxylated tallow amine ("POEA") for many years, as a result of farm as well as domestic use of the chemical. As a direct and

proximate result of being exposed to Roundup, Mr. McVey developed Non-Hodgkin Lymphoma ("NHL"), which was first diagnosed in January 2019.

3. Glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce. As marketed, Roundup lacked proper warning and directions as to the dangers associated with its use.

    a) James T. McVey's injuries, like those striking thousands of similarly situated victims across the country, were avoidable.

## JURISDICTION AND VENUE

4. This Court's jurisdiction rests on 28 U.S.C. § 1332, as the Plaintiff is a resident of Ohio, a different state than Monsanto's citizenship, and the aggregate amount in controversy exceeds $75,000, exclusive of interest and costs.

5. This Court has personal jurisdiction over Monsanto because Monsanto knows or should have known that its Roundup products are sold throughout Ohio, and, more specifically, it caused Roundup to be sold in Ohio.

6. The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

7. Venue is properly laid in this district under 28 U.S.C. § 1391(a) because Monsanto and its agents marketed, advertised, and distributed the dangerous product in this district; Plaintiff is a resident of this district, and his injuries and damages were suffered in this district. Monsanto does substantial business in Ohio and within this district; and at all times relevant hereto, Monsanto promoted, marketed, sold Roundup in interstate commerce and into the district.

8. Monsanto is authorized to do business in Ohio and derives substantial income from doing business in this state.

## THE PARTIES

9. At all times pertinent to this action Plaintiff has resided in Hamilton County, Ohio.

10. Monsanto is a Delaware corporation with its principal place of business at 800 North Lindbergh Avenue, St. Louis, Missouri 63167.

11. Monsanto advertises and sells goods, specifically Roundup, in each of the counties in this district and has received significant revenue from the sale of Roundup in Ohio.

## FACTS

12. Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri and is the world's leading producer of glyphosate.

13. Monsanto discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell, and distribute glyphosate-based Roundup as a broad-spectrum herbicide.

14. Glyphosate, the active ingredient in Roundup, is a "non-selective" herbicide, indiscriminately killing organisms determined by whether an organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

15. Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

16. Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

17. Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has

been driven largely by the proliferation of genetically engineered crops, crops specifically

tailored to resist the activity of glyphosate.

18. Monsanto distributes genetically modified ("GMO") crops, many of which are

marketed as being resistant to Roundup, *i.e.*, "RoundupReady."

19. The original Roundup, containing the active ingredient glyphosate, was introduced

in 1974. Currently, glyphosate products are among the world's most widely used herbicides.

20. The manufacture, formulation, and distribution of herbicides, such as Roundup®,

are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7.

U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental

Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by

FIFRA, 7 U.S.C. 136a(a).

21. The EPA requires as part of the registration process, among other requirements, a

variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and

other potential non-target organisms, and other adverse effects on the environment.

Registration by the EPA, however, is not an assurance or finding of safety. The

determination the EPA makes in registering or re-registering a product is not that the

product is "safe," but rather that use of the product in accordance with its label directions

"will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. §

136(a)(c)(5)(D).

22. FIFRA defines "unreasonable adverse effects on the environment" to mean "any

unreasonable risk to man or the environment, taking into account the economic, social, and

environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA

thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

23. The EPA registered Roundup for distribution, sale, and manufacture in the United States.

24. FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

25. The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

26. In the case of glyphosate and Roundup, the EPA planned on releasing its preliminary risk assessment – in relation to the registration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015 but delayed releasing the assessment pending further review considering the World Health Organization's March 24, 2015 finding that glyphosate is a "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

27. In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-

toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive

and misleading about the human and environmental safety of Roundup are the following:

> Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem. Roundup biodegrades into naturally occurring elements.
>
> Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.
>
> This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.
>
> You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.
>
> Glyphosate is less toxic to rats than table salt following acute oral ingestion.
>
> Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.
>
> You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.
>
> "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

On November 19, 1996, Monsanto entered an Assurance of Discontinuance with

NYAG, in which Monsanto agreed, among other things, "to cease and desist from

publishing or broadcasting any advertisements [in New York] that represent, directly or by

implication" that:

its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

its glyphosate-containing products or any component thereof might be classified as "practically non-toxic.

28. Monsanto did not alter its advertising in the same manner in any state other than New York, and still has not done so today.

29. As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties.

30. On March 4, 1985, a group of the EPA's Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene. Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

31. In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration Standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All the required data was submitted and reviewed and/or waived.

32. In October 1991 the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E

7

(evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.

33. In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Monsanto's Roundup products are more dangerous and toxic than glyphosate alone. As early as 1991 evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.

34. In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

35. The study found that Monsanto's Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

36. In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

37. The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."

38. In 2005, Francisco Peixoto published a study showing that Roundups effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

39. The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

40. In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

41. The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

42. The results of these studies were confirmed in recently published peer-reviewed studies and at all times were available and/or known to Monsanto.

43. Monsanto knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Mr. McVey from Roundup®.

44. Monsanto knew or should have known that tests limited to Roundup®'s active ingredient glyphosate were insufficient to prove the safety of Roundup®.

45. Monsanto failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Mr. McVey from Roundup®.

46. Rather than performing appropriate tests, Monsanto relied upon flawed industry-supported studies designed to protect Monsanto's economic interests rather than Mr. McVey and the consuming public.

47. Despite its knowledge that Roundup was considerably more dangerous than glyphosate alone, Monsanto continued to promote Roundup as safe.

48. The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

49. An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015–2019 met in April 2014. Although nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

50. IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

10

51. On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Monsanto's possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Monsanto's Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

52. The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A probable carcinogen to humans. According to the authors glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

53. The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and that the increased risk continued after adjustment for other pesticides.

54. The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

55. Despite the new classification by the IARC, Monsanto has had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

56. Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

57. In 1997, Chris Clements published "Genotoxicity of select herbicides in Rana catesbeiana tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

58. The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

11

59. Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

60. Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

61. The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

62. In 2006 César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

63. The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

64. The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

65. Despite knowledge to the contrary, Monsanto maintains that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

66. In addition to glyphosate and Roundup's genotoxic properties, Monsanto has long been aware of glyphosate's carcinogenic properties.

67. Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not

12

limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

68. Monsanto has known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

69. In 1985, the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

70. In 2003, Lennart Hardell and Mikael Eriksson published the results of two case-controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

71. The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studied with an increased odds ratio of 3.11.

72. In 2003, AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

73. The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

74. In 2008, Mikael Eriksson published a population-based case-controlled study of exposure to various pesticides as a risk factor for NHL.

75. This strengthened previous associations between glyphosate and NHL.

76. In spite of this knowledge, Monsanto continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

13

77. These statements and representations have been made with the intent of inducing consumers, such as Mr. McVey, the agricultural community, and the public at large to purchase and increase the use of Monsanto's Roundup for Monsanto's pecuniary gain, and in fact, did induce Plaintiff to use Roundup®.

78. Monsanto made these statements with complete disregard and reckless indifference to the safety of Mr. McVey and the general public.

79. Notwithstanding Monsanto's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

80. Monsanto knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

81. Monsanto failed to appropriately and adequately inform and warn Mr. McVey of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

82. Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Monsanto continues to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-genotoxic, and falsely warrants to users and the general public that independent experts

and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

83. Monsanto has claimed and continues to claim that Roundup is safe, non-carcinogenic, and non-genotoxic. These misrepresentations are consistent with Monsanto's cavalier approach to investigating and ensuring the safety of its products, the safety of the public at large, and the safety of Mr. McVey.

84. After the EPA's 1985 classification of glyphosate as possibly carcinogenic to humans (Group C), Monsanto exerted pressure upon the EPA to change its classification.

85. This culminated in the EPA's reclassification of glyphosate to Group E, which was based upon evidence of non-carcinogenicity in humans.

86. In so classifying, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

87. On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed scientific fraud.

88. In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup. IBT performed approximately 30 tests on glyphosate and glyphosate-containing products, including 11 of the 19 chronic toxicology studies needed to register Roundup with the EPA.

89. In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to toxicological impacts of glyphosate. The EPA subsequently audited IBT and determined

15

that the toxicology studies conducted for Roundup were invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

90. Three top executives of IBT were convicted of fraud in 1983.

91. In the second incident, Monsanto hired Craven Laboratories ("Craven") in 1990 to perform pesticide and herbicide studies, including several studies on Roundup.

92. In March of 1991, the EPA announced that it was investigating Craven for "allegedly falsifying test data used by chemical firms to win EPA approval of pesticides."

93. The investigation lead to the indictments of the laboratory owner and a handful of employees.

94. Several countries around the world have instituted bans on the sale of Roundup and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup become more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup, which took effect at the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

95. The Brazilian Public Prosecutor in the Federal district requested that the Brazilian Justice Department suspend the use of glyphosate.

16

96. France banned the private sale of Roundup and glyphosate following the IARC assessment for Glyphosate.

97. Bermuda banned both the private and commercial sale of glyphosates, including Roundup. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

98. The Sri Lankan government banned the private and commercial use of glyphosate, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

99. The government of Columbia announced its ban on using Roundup and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

100. On November 12, 2015, the European Food Safety Authority ("EFSA"), the European Union's primary agency for food safety, reported on its evaluation of the Renewal Assessment Report ("RAR") on glyphosate. The Rapporteur Member State assigned to glyphosate, the German Federal Institute for Risk Assessment ("BfR"), had produced the RAR as part of the renewal process for glyphosate in the EU.

101. BfR sent its draft RAR to EFSA and the RAR underwent a peer review process by EFSA, other member states, and industry groups. As part of the on-going peer review of Germany's reevaluation of glyphosate, EFSA also received a second mandate from the European Commission to consider IARC's findings regarding the potential carcinogenicity of glyphosate and glyphosate-containing products.

102. Based on a review of the RAR, which included data from industry-submitted

unpublished studies, EFSA sent its own report ("Conclusion") to the European
Commission, finding that "glyphosate is unlikely to pose a carcinogenic hazard to humans
and the evidence does not support classification with regard to its carcinogenic potential
according to Regulation (EC) No 1272/2008." EFSA therefore disagreed with IARC:
glyphosate was not genotoxic and did not present a carcinogenic threat to humans.

103.    In explaining why its results departed from IARC's conclusion, EFSA drew
a distinction between the EU and IARC approaches to the study and classification of
chemicals. Although IARC examined "both glyphosate—an active substance—and
glyphosate-based formulations, grouping all formulations regardless of their composition,"
EFSA explained that it considered only glyphosate and that its assessment focuses on "each
individual chemical, and each marketed mixture separately." IARC, on the other hand,
"assesses generic agents, including groups of related chemicals, as well as occupational or
environmental exposure, and cultural or behavioral practices." EFSA accorded greater
weight to studies conducted with glyphosate alone than studies of formulated products.

104.    EFSA went further and noted:

> [A]lthough some studies suggest that certain glyphosate-based formulations
> may be genotoxic (i.e. damaging to DNA), others that look solely at the
> active substance glyphosate do not show this effect. It is likely, therefore, that
> *the genotoxic effects observed in some glyphosate-based formulations are related to
> the other constituents or "co-formulants"*. Similarly, certain glyphosate- based
> formulations display higher toxicity than that of the active ingredient,
> presumably because of the presence of co-formulants. In its assessment, *EFSA
> proposes that the toxicity of each pesticide formulation and in particular its
> genotoxic potential should be further considered and addressed by Member State
> authorities while they re-assess uses of glyphosate-based formulations in their own
> territories*.

105.    Notwithstanding its conclusion, EFSA did set exposure levels for
glyphosate. Specifically, EFSA proposed an acceptable daily intake (ADI) of 0.5 mg/kg of

body weight per day; an acute reference dose (ARD) of 0.5 mg/kg of body weight; and an acceptable operator exposure level (AOEL) of 0.1 mg/kg body weight per day.

106.    On November 27, 2015, 96 independent academic and governmental scientists from around the world submitted an open letter to the EU health commissioner, Vytenis Andriukaitis. The scientists expressed their strong concerns and urged the commissioner to disregard the "flawed" EFSA report, arguing that "the BfR decision is not credible because it is not supported by the evidence and it was not reached in an open and transparent manner."

107.    Signatories to the letter included Dr. Christopher J. Portier, Ph.D., and other renowned international experts in the field, some of whom were part of the IARC Working Group assigned to glyphosate.

108.    In an exhaustive and careful examination, the scientists scrutinized EFSA's conclusions and outlined why the IARC Working Group decision was "by far the more credible":

> The IARC WG decision was reached relying on open and transparent procedures by independent scientists who completed thorough conflict-of-interest statements and were not affiliated or financially supported in any way by the chemical manufacturing industry. It is fully referenced and depends entirely on reports published in the open, peer-reviewed biomedical literature. It is part of a long tradition of deeply researched and highly credible reports on the carcinogenicity of hundreds of chemicals issued over the past four decades by IARC and used today by international agencies and regulatory bodies around the world as a basis for risk assessment, regulation and public health policy.

109.    With respect to human data, the scientists pointed out that EFSA agreed with IARC that there was "*limited evidence* of carcinogenicity" for NHL, but EFSA nonetheless dismissed an association between glyphosate exposure and carcinogenicity. IARC applies three levels of evidence in its analyses of human data, including sufficient

evidence and limited evidence. EFSA's conclusion that "there was no unequivocal evidence for a clear and strong association of NHL with glyphosate" was misleading because it was tantamount to IARC's highest level of evidence: "sufficient evidence," which means that a causal relationship has been established. However, the scientists argued, "[l]egitimate public health concerns arise when 'causality is credible,' i.e., when there is *limited evidence*."

110.     Among its many other deficiencies, EFSA's conclusions regarding animal carcinogenicity data were "scientifically unacceptable," particularly in BfR's use of historical control data and in its trend analysis. Indeed, BfR's analysis directly contradicted the Organisation for Economic Co-operation and Development ("OECD") testing guidelines while citing and purporting to follow those same guidelines. For instance, the EFSA report dismisses observed trends in tumor incidence "because there are no individual treatment groups that are significantly different from controls and because the maximum observed response is reportedly within the range of the historical control data." However, according to the scientists, concurrent controls are recommended over historical controls in all guidelines, scientific reports, and publications, and, if it is employed, historical control data "should be from studies in the same timeframe, for the same exact animal strain, preferably from the same laboratory or the same supplier and preferably reviewed by the same pathologist." BfR's use of historical control data violated these precautions: "only a single study used the same mouse strain as the historical controls but was reported more than 10 years after the historical control dataset was developed." Further deviating from sound scientific practices, the data used by the BfR came from studies in seven different laboratories.  The scientists concluded:

> BfR reported seven positive mouse studies with three studies showing
> increases in renal tumors, two with positive findings for hemangiosarcomas,

and two with positive findings for malignant lymphomas. BfR additionally reported two positive findings for tumors in rats. Eliminating the inappropriate use of historical data, the unequivocal conclusion is that these are not negative studies, but in fact document the carcinogenicity of glyphosate in laboratory animals.

111.     The letter also critiqued the EFSA report's lack of transparency and the opacity surrounding the data cited in the report: "citations for almost all of the references, even those from the open scientific literature, have been redacted from the document" and "there are no authors or contributors listed for either document, a requirement for publication in virtually all scientific journals." Because BfR relied on unpublished, confidential industry-provided studies, it is "impossible for any scientist not associated with BfR to review this conclusion with scientific confidence."

112.     On March 3, 2016, the letter was published in the Journal of Epidemiology & Community Health.

113.     On February 17, 2016, a consensus statement published in the journal *Environmental Health*, entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement," assessed the safety of glyphosate-based herbicides (GBHs). The paper's "focus is on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with recent discoveries about the toxicity and human health risks stemming from use of GBHs." The researchers drew seven factual conclusions about GBHs:

GBHs are the most heavily applied herbicide in the world and usage continues to rise;

Worldwide, GBHs often contaminate drinking water sources, precipitation, and air, especially in agricultural regions;

The half-life of glyphosate in water and soil is longer than previously recognized;

> Glyphosate and its metabolites are widely present in the global soybean supply;
>
> Human exposures to GBHs are rising;
>
> Glyphosate is now authoritatively classified as a probable human carcinogen; and
>
> Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science.

114.    The researchers noted that GBH use has increased approximately 100-fold since the 1970s.  Further, far from posing a limited hazard to vertebrates, as previously believed, two decades of evidence demonstrated that "several vertebrate pathways are likely targets of action, including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."

115.    The paper attributes uncertainties in current assessments of glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations."  Furthermore, the researchers argue, "[t]he distinction in regulatory review and decision processes between 'active' and 'inert' ingredients has no toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in their own right."

116.    Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic

insects, and fish." Accordingly, "risk assessments of GBHs that are based on studies

quantifying the impacts of glyphosate alone underestimate both toxicity and exposure, and

thus risk." The paper concludes that this "shortcoming has repeatedly led regulators to set

inappropriately high exposure thresholds."

117.     The researchers also critique the current practice of regulators who largely

rely on "unpublished, non-peer reviewed data generated by the registrants" but ignore

"published research because it often uses standards and procedures to assess quality that are

different from those codified in regulatory agency data requirements, which largely focus on

avoiding fraud." In the researchers' view, "[s]cientists independent of the registrants should

conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product

formulations."

118.     The researchers also call for greater inclusion of GBHs in government-led

toxicology testing programs:

> [A] fresh and independent examination of GBH toxicity should be
> undertaken, and . . . this re-examination be accompanied by systematic efforts
> by relevant agencies to monitor GBH levels in people and in the food supply,
> none of which are occurring today. The U.S. National Toxicology Program
> should prioritize a thorough toxicological assessment of the multiple
> pathways now identified as potentially vulnerable to GBHs.

119.     The researchers suggest that, in order to fill the gap created by an absence of

government funds to support research on GBHs, regulators could adopt a system through

which manufacturers fund the registration process and the necessary testing:

> [W]e recommend that a system be put in place through which manufacturers
> of GBHs provide funds to the appropriate regulatory body as part of routine
> registration actions and fees. Such funds should then be transferred to
> appropriate government research institutes, or to an agency experienced in the
> award of competitive grants. In either case, funds would be made available to
> independent scientists to conduct the appropriate long-term (minimum 2
> years) safety studies in recognized animal model systems. A thorough and

23

modern assessment of GBH toxicity will encompass potential endocrine disruption, impacts on the gut microbiome, carcinogenicity, and multigenerational effects looking at reproductive capability and frequency of birth defects.

120.    On February 17, 2016, the FDA announced that, for the first time in its history, the agency planned to start testing certain foods for glyphosate residues. FDA spokeswoman Lauren Sucher explained: "The agency is now considering assignments for Fiscal Year 2016 to measure glyphosate in soybeans, corn, milk, and eggs, among other potential foods.

121.    In 2014, the U.S. Government Accountability Office ("GAO") had severely rebuked the FDA for its failures to both monitor for pesticide residue, including that of glyphosate, and to disclose the limitations of its monitoring and testing efforts to the public. The GAO had cited numerous undisclosed deficiencies in the FDA's process, specifically highlighting its omission of glyphosate testing.

122.    Indeed, in the past, both the FDA and the U.S. Department of Agriculture ("USDA") routinely excluded glyphosate from their testing for the residues of hundreds of other pesticides, on the rationale that it was too expensive and unnecessary to protect public health. Ms. Sucher, however, now states that "the agency has developed 'streamlined methods' for testing for the weed killer."

123.    Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."

24

124.     Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

125.     Glyphosate, and Monsanto's Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

126.     Monsanto's statements proclaiming the safety of Roundup and disregarding its dangers misled Mr. McVey.

127.     Despite Monsanto's knowledge that Roundup was associated with an elevated risk of developing cancer, Monsanto's promotional campaigns focused on Roundup's purported "safety profile."

128.     Monsanto's failure to adequately warn Mr. McVey resulted in (1) Mr. McVey using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

129.     Monsanto failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

130.     The failure of Monsanto to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

131.     The failure of Monsanto to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

132.     The failure of Monsanto to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

133.     By reason of the foregoing acts and omissions, Plaintiff seeks compensatory damages as a result of Mr. McVey's use of, and exposure to, Roundup which caused or was a substantial contributing factor in causing Mr. McVey to suffer from cancer, specifically NHL, and Mr. McVey suffered, physical pain and mental anguish, including diminished enjoyment of life.

134.     By reason of the foregoing acts and omissions, Mr. McVey endured, suffered, and continues to suffer emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of the actions and inactions of the Monsanto.

135.     Mr. McVey's continuous exposure to Roundup centered on the use of Roundup on his farms and his domestic use.

136.     In or around late 2018, Mr. McVey noticed a protrusion on his neck, pain in his back, and experienced difficulty in swallowing.

137.     Mr. McVey reported the red spot to his primary care physician, who ordered a biopsy and, upon reading the biopsy results, referred him to oncologist Dr. Philip Leming.

138.     Dr. Leming carried out immediate, emergency treatment for the aggressive form of Non-Hodgkin's Lymphoma from which he suffered. Immediate surgery was carried out, and Mr. McVey underwent extensive chemical treatments during 2019.

139.     Mr. McVey had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup and glyphosate until 2019

26

140.     Within the time period of any applicable statutes of limitations, Mr. McVey could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup and glyphosate is injurious to human health.

141.     Mr. McVey did not discover and did not know of facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup and glyphosate; nor would a reasonable and diligent investigation by Plaintiff have disclosed that Roundup and glyphosate would cause his illness.

142.     For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff's claims

143.     All applicable statutes of limitations have also been tolled by Monsanto's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

## COUNT 1:  NEGLIGENCE

144.     Plaintiff restates and incorporates all other allegations in this Complaint as if fully set forth herein.

145.     Monsanto had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

146.     Monsanto failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup into interstate commerce in that Monsanto knew or should have known that using Roundup created a high risk of

27

unreasonable, dangerous side effects, including, but not limited to, the development of NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

147.     The negligence by the Monsanto, its agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

a)  Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly testing it;

b)  Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup;

c)  Conducting insufficient testing programs to determine whether or not Roundup was safe for use; in that Monsanto knew or should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users;

d)  Conducting insufficient testing programs and studies to determine Roundup's carcinogenic properties even after Monsanto had knowledge that Roundup is, was, or could be carcinogenic;

e)  Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

f)  Negligently failing to adequately and correctly warn Mr. McVey, the public, medical and agricultural professions, and the EPA of the dangers of Roundup;

28

g) Negligently failing to petition the EPA to strengthen the warnings associated with Roundup;

h) Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

i) Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

j) Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

k) Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

l) Negligently designing Roundup in a manner which was dangerous to its users;

m) Negligently manufacturing Roundup in a manner which was dangerous to its users;

n) Negligently producing Roundup in a manner which was dangerous to its users;

o) Negligently formulating Roundup in a manner which was dangerous to its users;

p) Negligently selling Roundup with a false and misleading label;

q) Concealing information from Mr. McVey, while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations; and

r) Improperly concealing and/or misrepresenting information from Mr. McVey, the scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides.

148.    Monsanto under-reported, underestimated, and downplayed the serious dangers of Roundup.

149.    Monsanto negligently and deceptively compared the safety risks and/or dangers of Roundup with common everyday foods such as table salt, and other forms of herbicides.

150.    At all times relevant, Monsanto knew that Roundup was dangerous and defective, concealed the dangers and risks from Mr. McVey, made misrepresentations to Mr. McVey and the public in general as to the safety of Roundup and with full knowledge of the risks associated with Roundup, without adequate warnings of the same, manufactured, designed, packaged, labeled, marketed, advertised, distributed, and sold Roundup to the general public, and to Mr. McVey. Monsanto engaged in malicious, fraudulent, and grossly negligent conduct toward Mr. McVey and the public, acted with willful and wanton and/or reckless disregard for the safety of the general public and Mr. McVey.

151.    Monsanto was negligent and/or violated Ohio law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that it:

a)   Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide;

b)   Failed to accompany its product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

c)   Failed to accompany its product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

d) Failed to accompany its product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;

e) Failed to warn Mr. McVey of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of NHL;

f) Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup;

g) Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants;

h) Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity; and,

i) Was otherwise careless and/or negligent.

152.     Despite the fact that Monsanto knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Monsanto continued and continues to market, manufacture, distribute, and/or sell Roundup.

153.     Monsanto knew or should have known that individuals such as Mr. McVey would foreseeably suffer injury as a result of Monsanto's failure to exercise ordinary care, as set forth above. Mr. McVey endured pain and suffering, as well as economic losses (including significant expenses for medical care and treatment).

154.     Monsanto's negligence was the proximate cause of Mr. McVey's severe physical and emotional injuries.

155.     As a result of the foregoing acts and omissions, Mr. McVey suffered from serious and dangerous side effects including, but not limited to, Non-Hodgkin's Lymphoma,

as well as other severe and personal injuries, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care.

156. WHEREFORE, Plaintiff demands judgment against Monsanto for compensatory and punitive damages together with interest, costs herein incurred, attorneys' fees, and all such other and further relief that fairly and fully compensate her in an amount in excess of the minimum jurisdiction of this Court.

## COUNT 2: DEFECTIVE DESIGN/FORMULATION

157. Plaintiff restates and incorporates all other allegations in this Complaint as if fully set forth herein.

158. Monsanto is a "manufacturer" within the meaning of Ohio Rev. Code § 2307.71(A)(9).

159. Pursuant to RC § 2307.75, Monsanto's Roundup had foreseeable design defects, which were capable of causing and, in fact, did cause serious bodily injuries to the users and consumers thereof, including James T. McVey, while being used in a reasonably foreseeable manner, thereby rendering Roundup defective and unreasonably dangerous to consumers, users, and other persons coming into contact with it.

160. At all times relevant, Monsanto's Roundup, as designed, researched, tested, developed, formulated, manufactured, licensed, packaged, labeled, distributed, sold, and marketed by Monsanto, was defective in design and formulation in that when it left the hands of Monsanto's manufacturers and/or suppliers, the foreseeable risks associated with its reasonably foreseeable uses exceeded the alleged benefits associated with its design and formulation.

161.    Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup and specifically, the carcinogenic properties of the chemical glyphosate.

162.    Accordingly, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup products could cause Mr. McVey's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Mr. McVey.

163.    Monsanto knew or, in the exercise of reasonable care, should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Mr. McVey from Roundup. Monsanto failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Mr. McVey from harm and unreasonably dangerous side effects. Monsanto knew or, in the exercise of reasonable care, should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

164.    Monsanto's Roundup was expected to and did reach the intended consumers, handlers, and users or other persons coming into contact with said product throughout the United States, including Mr. McVey, without substantial change in the condition in which it was designed, produced, sold, distributed, labeled, and marketed by Monsanto.

165.    Therefore, at all times relevant to this litigation, Monsanto's Roundup was defective, in one or more of the following ways:

> When placed in the stream of commerce, Monsanto's Roundup products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate;

When placed in the stream of commerce, Monsanto's Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;

When placed in the stream of commerce, Monsanto's Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner;

Monsanto did not sufficiently test, investigate, or study its Roundup products; Exposure to Roundup presents a risk of harmful side effects that outweighs any potential utility stemming from the use of the herbicide;

Monsanto knew or should have known at the time of marketing its Roundup products that exposure to Roundup could result in cancer and other severe illnesses and injuries;

Monsanto did not conduct adequate post-marketing surveillance of its Roundup products; and

Monsanto could have employed safer alternative designs and formulations.

166.     At all times relevant to this litigation, Mr. McVey used and/or was exposed to the use of Monsanto's Roundup products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

167.     Mr. McVey could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products before or at the time of exposure.

168.     The harm caused by Monsanto's Roundup products far outweighed their benefit. Monsanto's Roundup products were and are more dangerous than alternative products and Monsanto could have designed its Roundup products to make them less dangerous.  Indeed, at the time that Monsanto designed its Roundup products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

169.     At the time Roundup left Monsanto's control, there was a practical, technically feasible, and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Monsanto's Roundup herbicides.

170.      Defects in Monsanto's Roundup were the cause or a substantial factor in causing Mr. McVey's injuries.

171.     As a direct and proximate result of the Monsanto's acts and omissions, Mr. McVey developed Non-Hodgkin's Lymphoma, and suffered severe and personal injuries, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.  Mr. McVey's injuries constitute "harm" as defined under RC § 2307.71(A)(7).

172.     As a result of the acts and omissions, Plaintiff James T. McVey has experienced physical pain and suffering, mental anguish, economic damages, and any and all other damages recoverable under law.

173.     Furthermore, Monsanto's actions and omissions were in flagrant disregard of the safety of Mr. McVey and were oppressive, fraudulent or malicious, to warrant the imposition of punitive damages, in accordance with RC § 2307.80.

174.      WHEREFORE, Plaintiff James T. McVey demands judgment against Monsanto for compensatory and punitive damages together with interest, costs herein incurred, attorneys' fees, and all such other and further relief that fairly and fully compensate him in an amount in excess of the minimum jurisdiction of this Court.

## COUNT 3: INADEQUATE WARNING OR INSTRUCTION

175.     Plaintiff restates and incorporates all other allegations in this Complaint as if fully set forth herein.

176.     Monsanto is a "manufacturer" within the meaning of RC § 2307.71(A)(9).

177.     Monsanto knew or had reason to know of the defects inherent in Roundup; knew or had reason to know that a user's or consumer's exposure to Roundup created a significant risk of harm and unreasonably dangerous side effects, including but not limited to the development of NHL; and failed to prevent or adequately warn of these risks and injuries.

178.     Monsanto failed to provide accurate, true, and correct information concerning the risks of using Roundup and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to glyphosate, the surfactant POEA, and other adjuvants and "inert" ingredients in Roundup.

179.     Monsanto knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup.

180.     Monsanto has further wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup and glyphosate.

181.     Monsanto's conduct included but was not limited to the following acts and/or omissions:

a)  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup while negligently and/or intentionally concealing and

failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

b) Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Monsanto could reasonably foresee would use and/or be exposed to its Roundup products;

c) Failing to disclose to Mr. McVey, users, consumers, and the general public that the use of and exposure to Roundup presented severe risks of cancer and other grave illnesses;

d) Failing to warn Mr. McVey, users, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Mr. McVey and other users or consumers;

e) Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup and glyphosate-containing products;

f) Declining to make or propose any changes to Roundup products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup and glyphosate;

g) Advertising, marketing, and recommending the use of Roundup products, while concealing and failing to disclose or warn of the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup and glyphosate; and

h) Continuing to disseminate information to its consumers, which indicate or imply that Monsanto's Roundup is safe for use.

182.    Mr. McVey did not know the nature and extent of the injuries that could

result from the use of and/or exposure to Roundup or its active ingredient glyphosate. Mr. McVey relied upon the skill, superior knowledge, and judgment of Monsanto.

183.    Monsanto's conduct, as described above, was reckless. Monsanto regularly risks the lives of consumers and users of its products, including Mr. McVey, with full knowledge of the dangers of its products. Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Mr. McVey. Monsanto's reckless conduct therefore warrants an award of punitive damages in accordance with RC § 2307.80.

184.    As a direct and proximate result of the Monsanto's acts and omissions in placing Roundup into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Roundup and other co-formulants, Mr. McVey developed Non-Hodgkin's Lymphoma, and suffered severe and personal injuries, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care. Mr. McVey's injuries constitute "harm" as defined under RC § 2307.71(A)(7).

185.    Plaintiff is entitled to damages pursuant to RC §2307.71-.80. Furthermore, Monsanto's actions and omissions as identified in this Complaint were in flagrant disregard of the safety of Plaintiff, and were oppressive, fraudulent or malicious, to warrant the imposition of punitive damages, in accordance with RC § 2307.80.

186.    As a direct and proximate result of Monsanto's acts and omissions, Plaintiff James T. McVey has experienced physical pain and suffering, mental anguish, economic damages, and any and all other damages recoverable under law.

187.    WHEREFORE, Plaintiff James T. McVey demands judgment against

Monsanto for compensatory and punitive damages together with interest, costs herein incurred, attorneys' fees, and all such other and further relief that fairly and fully compensate him in an amount in excess of the minimum jurisdiction of this Court.

## COUNT 4: NONCONFORMANCE WITH REPRESENTATIONS

188.    Plaintiff restates and incorporates all other allegations in this Complaint as if fully set forth herein.

189.    Monsanto is a "manufacturer" within the meaning of RC § 2307.71(A)(9).

190.    Monsanto's Roundup was defective because it did not conform, when it left Monsanto's control, to Monsanto's representations that Roundup was safe and acceptable to users and consumers.

191.    Monsanto expressly represented to the purchasers of Roundup, by and through statements made by Monsanto in labels, publications, package inserts, and other written materials intended for consumers and the general public, that its Roundup products were safe to human health and the environment. Monsanto advertised, labeled, marketed, and promoted Roundup products, representing the quality to consumers and the public in such a way as to induce their purchase or use.

192.    These express representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Roundup and glyphosate.

193.    Monsanto knew and/or should have known that the risks expressly included in Roundup warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Thus, Monsanto knew that its Roundup products did not conform, when they left its control, to its representations that

39

Roundup is safe and acceptable.

194.     Nevertheless, Monsanto expressly represented that its Roundup products were safe and effective, that they were safe and effective for use by individuals such as Plaintiff, and/or that they were safe and effective as agricultural herbicides.

195.     Monsanto placed its Roundup products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup and its active ingredient glyphosate.

196.     Monsanto represented through its labeling, advertising, and marketing materials that its Roundup products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated with use of and/or exposure to Roundup and glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings and labels.

197.     Monsanto represented that its Roundup products were safe for use and fraudulently concealed information that demonstrated that glyphosate, the active ingredient in Roundup, had carcinogenic properties, and that its Roundup products, therefore, were not safer than alternatives available on the market.

198.     Monsanto had sole access to material facts concerning the nature of the risks associated with its Roundup products as expressly stated within its warnings and labels, and Monsanto knew that consumers and users such as Mr. McVey could not have reasonably discovered that the risks expressly included in Roundup warnings and labels were inadequate and inaccurate.

199.     Mr. McVey had no knowledge of the falsity or incompleteness of

Monsanto's statements and representations concerning Roundup.

200.     To this day, Monsanto has failed to adequately warn Plaintiff of the true risks are associated with the use of and exposure to Roundup and its active ingredient glyphosate, a probable carcinogen.

201.     As a direct and proximate result of Monsanto's wrongful acts and omissions, Mr. McVey developed non-Hodgkin's Lymphoma, and suffered severe and personal injuries, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.  Mr. McVey's injuries constitute "harm" as defined under RC § 2307.71(A)(7).

202.     Plaintiff is entitled to damages pursuant to RC § 2307.73. Furthermore, Monsanto's actions and omissions as identified in this Complaint were in flagrant disregard of the safety of Mr. McVey, and were oppressive, fraudulent or malicious, to warrant the imposition of punitive damages, in accordance with RC § 2307.80.

203.     WHEREFORE, Plaintiff James T. McVey demands judgment against Monsanto for compensatory and punitive damages together with interest, costs herein incurred, attorneys' fees, and all such other and further relief that fairly and fully compensate him in an amount in excess of the minimum jurisdiction of this Court.

## COUNT 5:  BREACH OF EXPRESS WARRANTY

204.     Plaintiff restates and incorporates all other allegations in this Complaint as if fully set forth herein.

205.     At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup products, which are defective and unreasonably dangerous to

consumers, including Mr. McVey, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto.

206.    At all times relevant to this litigation, Monsanto expressly represented and warranted to the purchasers of its Roundup products, by and through statements made by Monsanto in labels, publications, package inserts, and other written materials intended for consumers and the general public, that its Roundup products were safe to human health and the environment, effective, fit, and proper for their intended use. Monsanto advertised, labeled, marketed, and promoted Roundup products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that its Roundup products would conform to the representations.

207.    These express representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Roundup and glyphosate. Monsanto knew and/or should have known that the risks expressly included in Roundup warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Monsanto expressly represented that its Roundup products were safe and effective, that they were safe and effective for use by individuals, such as Mr. McVey, and/or that they were safe and effective as agricultural herbicides.

208.    The representations about Roundup, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

209.    Monsanto placed its Roundup products into the stream of commerce for sale

and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup and its active ingredient glyphosate.

210.    Monsanto breached these warranties because, among other things, its Roundup products were defective, dangerous, unfit for use, did not contain label representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically, Monsanto breached the warranties by representing through its labeling, advertising, and marketing materials that its Roundup products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated with use of and/or exposure to Roundup and glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings and labels.

211.    Monsanto represented that its Roundup products were safe for use and fraudulently concealed information that demonstrated that glyphosate, the active ingredient in Roundup, had carcinogenic properties, and that its Roundup products, therefore, were not safer than alternative products available on the market. Monsanto had sole access to material facts concerning the nature of the risks associated with its Roundup products as expressly stated within its warnings and labels, and Monsanto knew that consumers and users, such as Mr. McVey, could not have reasonably discovered that the risks expressly included in Roundup warnings and labels were inadequate and inaccurate.

212.    Plaintiff had no knowledge of the falsity or incompleteness of Monsanto's statements and representations concerning Roundup.

213.    Mr. McVey used and/or was exposed to the use of Roundup as researched,

developed, designed, tested, formulated, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by Monsanto.

214.    Had the warnings and labels for Roundup products accurately and adequately set forth the true risks associated with the use of such products, including Mr. McVey's injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Mr. McVey could have avoided the injuries complained of herein.

215.    As a direct and proximate result of Monsanto's wrongful acts and omissions, Mr. McVey developed NHL, and suffered severe and personal injuries, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

216.    WHEREFORE, Plaintiff James T. McVey demands judgment against Monsanto for compensatory and punitive damages together with interest, costs herein incurred, attorneys' fees, and all such other and further relief that fairly and fully compensate him in an amount in excess of the minimum jurisdiction of this Court.

## COUNT 6: BREACH OF IMPLIED WARRANTY

217.    Plaintiff restates and incorporates all other allegations in this Complaint as if fully set forth herein.

218.    At all times herein mentioned, Monsanto manufactured, distributed, compounded, recommended, merchandised, advertised, promoted, and sold Roundup as a broad-spectrum herbicide. These actions were under the ultimate control and supervision of Monsanto.

219.     At the time Monsanto marketed, sold, and distributed Roundup for use by Mr. McVey, Monsanto knew of Roundup's intended use and impliedly warranted the product to be of merchantable quality and safe and fit for this use.

220.     The Monsanto impliedly represented and warranted to Mr. McVey and users of Roundup, the agricultural community, and/or the EPA that Roundup was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.

221.     These representations and warranties were false, misleading, and inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

222.     Mr. McVey and/or the EPA did rely on said implied warranty of merchantability of fitness for particular use and purpose.

223.     Mr. McVey reasonably relied upon the skill and judgment of Monsanto as to whether Roundup was of merchantable quality and safe and fit for its intended use.

224.     Roundup was injected into the stream of commerce by the Monsanto in a defective, unsafe, and inherently dangerous condition, and the products' materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

225.     The Monsanto breached the aforesaid implied warranties, as its herbicide Roundup was not fit for its intended purposes and uses.

226.     As a direct and proximate result of Monsanto's wrongful acts and omissions, Mr. McVey developed NHL, and suffered severe and personal injuries, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

227.　　　　WHEREFORE, Plaintiff James T. McVey demands judgment against Monsanto for compensatory and punitive damages together with interest, costs herein incurred, attorneys' fees, and all such other and further relief that fairly and fully compensate him in an amount in excess of the minimum jurisdiction of this Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against the Monsanto on each of the above-referenced claims and causes of action and as follows:

A.  Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to past and future pain and suffering, emotional distress, loss of enjoyment of life, loss of consortium, and other non-economic damages in an amount to be determined at trial of this action;

B.  Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings, and other economic damages in an amount to be determined at trial of this action;

C.  Awarding punitive and/or exemplary damages for the wanton, willful, fraudulent, and reckless acts of the Monsanto who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and of Mr. McVey, in an amount sufficient to punish Monsanto and deter future similar conduct, to the extent allowed by applicable law; costs including reasonable attorneys' fees, court costs, and other litigation expenses;

D.  Awarding Plaintiff interest, reasonable attorney fees, and his costs; and

E.  Such other and further relief as this Court deems just and proper.

Respectfully submitted

*/s/ William H Blessing*  
William H Blessing (Ohio Bar # 0006848)  
THE BLESSING LAW FIRM  
119 East Court Street, Suite 500  
Cincinnati OH  45202  
Telephone:  513-621-9191  
bill@blessing-attorneys.com  
*Attorney for Plaintiff*

## JURY DEMAND

Plaintiff demand a trial by jury of all issues so triable.

*/s/ William H Blessing*