TRIAL–OMAHA

# U.S. District Court
## District of Nebraska (8 Omaha)
## CIVIL DOCKET FOR CASE #: 8:19–cv–00510–RFR–CRZ

Stiver et al v. Monsanto Company
Assigned to: Judge Robert F. Rossiter, Jr.
Referred to: Magistrate Judge Cheryl R. Zwart
Case in other court:  District Court of Frontier County,
                      Nebraska, 19–00033
Cause: 28:1332 Diversity–Product Liability

Date Filed: 11/20/2019
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod.
Liability
Jurisdiction: Diversity

**Plaintiff**

**Gary L. Stiver**                                   represented by   **David A. Domina**
                                                                     DOMINA LAW GROUP
                                                                     2425 South 144th Street
                                                                     Omaha, NE 68144–3267
                                                                     (402) 493–4100
                                                                     Fax: (402) 493–9782
                                                                     Email: ddomina@dominalaw.com
                                                                     *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Marilyn Stiver**                                   represented by   **David A. Domina**
*Husband and Wife*                                                   (See above for address)
                                                                     *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**                                 represented by   **Michael K. Huffer**
*a Missouri corporation*                                             CASSEM, TIERNEY LAW FIRM
                                                                     9290 West Dodge Road
                                                                     Suite 302
                                                                     Omaha, NE 68114–3320
                                                                     (402) 390–0300
                                                                     Fax: (402) 390–9676
                                                                     Email: mhuffer@ctagd.com
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Ronald F. Krause**
                                                                     CASSEM, TIERNEY LAW FIRM
                                                                     9290 West Dodge Road
                                                                     Suite 302
                                                                     Omaha, NE 68114–3320
                                                                     (402) 390–0300
                                                                     Fax: (402) 390–9676
                                                                     Email: rkrause@ctagd.com
                                                                     *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/20/2019 | 1 | NOTICE OF REMOVAL with jury demand against All Plaintiffs from District Court of Frontier County, Case number 19–33 ( Filing fee $ 400, receipt number ANEDC–4060794) with attached state court pleadings, by Attorney Michael K. Huffer on behalf of Monsanto Company (Attachments: # 1 Exhibit 1)(Huffer, Michael) (Entered: 11/20/2019) |
| 11/20/2019 | 2 | NOTICE of *Request for Location of Trial* by Attorney Michael K. Huffer on behalf of Defendant Monsanto Company (Huffer, Michael) (Entered: 11/20/2019) |

| 11/20/2019 | 3 | TEXT NOTICE OF JUDGES ASSIGNED: Judge Robert F. Rossiter, Jr. and Magistrate Judge Cheryl R. Zwart assigned. In accordance with 28 U.S.C. 636(c)(2), the parties are notified that, if all parties consent, a magistrate judge may conduct a civil action or proceeding, including a jury or nonjury trial, subject to the courts rules and policies governing the assignment of judges in civil cases. See Fed. R. Civ. P. 73; NEGenR 1.4. (KLF) (Entered: 11/20/2019) |
|---|---|---|
| 11/20/2019 | 4 | TEXT NOTICE REGARDING CORPORATE DISCLOSURE STATEMENT by Deputy Clerk as to Defendant Monsanto Company. Pursuant to Fed. R. Civ. P. 7.1, non−governmental corporate parties are required to file Corporate Disclosure Statements (Statements). The parties shall use the form Corporate Disclosure Statement, available on the Web site of the court at http://www.ned.uscourts.gov/forms/. If you have not filed your Statement, you must do so within 15 days of the date of this notice. If you have already filed your Statement in this case, you are reminded to file a Supplemental Statement within a reasonable time of any change in the information that the statement requires. (KLF) (Entered: 11/20/2019) |

Filed in Frontier District Court
*** EFILED ***
Case Number: D60CI190000033
Transaction ID: 0009523944
Filing Date: 10/15/2019 11:37:03 AM CDT

## District Court, Frontier County, Nebraska

| | |
|---|---|
| **Gary L. Stiver and Marilyn Stiver, Husband and Wife** | **Case No.: CI 19-_____** |
| **Plaintiffs,** | |
| **v.** | **Complaint and Jury Demand and Trial Location Designation** |
| **Monsanto Company, A Missouri corporation** | |
| **Defendant.** | |

Plaintiffs allege:

1.     Plaintiffs Gary L. Stiver and Marilyn Stiver are husband and wife.  They are residents of Curtis, Frontier County Nebraska.  They sue Monsanto for Mr. Stiver's personal injuries and the occurrence of non-Hodgkin's lymphoma. Mr. Stiver was diagnosed with non-Hodgkin's lymphoma in May 2016. His NHL was proximately caused by his reliance upon the false assurances of Monsanto, Monsanto's failure to warn, and its unsafe, negligent, and intentionally wrongful disregard for human safety in the design, formulation, testing, manufacturing, advertising, and promotion, and distribution of its Roundup® herbicide.  Monsanto concealed that is Roundup® products cause non-Hodgkin's lymphoma, a cancer.

2.     Monsanto's product is inherently dangerous to humans and was marketed in the same condition it reached Mr. Stiver. He used it as intended. Monsanto is strictly liable for the damages Roundup® causes. Mr. Stiver invokes seven (7) legal theories:  strict liability, strict liability failure to warn, negligence, intentional and negligent misrepresentation, breach of implied warranty, and breach of expressed warranty.

3.     Mr. Stiver's use of Roundup® occurred primarily in Lincoln and Frontier Counties, Nebraska and occurred nearly exclusively in Nebraska. He used Roundup® with this approximate frequency and under these circumstances based on his recollections and reasonable estimates:

| Years | Product | Use/Frequency Duration | Clothing |
|---|---|---|---|
| 1981 -2007, 26 yrs, at Sutherland, Nebraska | Round-Up® | 5.5 months<br> x two (2) uses per week<br>= 25 uses / yr<br>x 90 minutes/ use<br>= 2,250 min /yr<br>x 25 yrs<br>= 56,250 min<br>Div/ 60 min<br>937.25 hrs<br>div/ 8<br>= **equiv of 117.15- 8 hr work days of exposure** | Tennis Shoes and/or sandals at times.  Shorts or jeans.  Cotton shirt.  Cotton gloves part-time |
| Curtis, Nebraska Residence<br><br>2008-2018 | Round-Up® | 2 x /wk<br>x 45 minutes ea<br> = 90 min /wk<br>x 25 weeks / yr<br>= 2,250 min / yr<br>x 11 yrs<br>= 24,750 min.<br>Div / 60<br>= 412.5 hrs<br>Div/ 8<br>= **equiv of 51.5- 8 hr work days of exposure** | Tennis Shoes and/or sandals at times.  Shorts or jeans.  Cotton shirt.  Cotton gloves part-time. |
|  |  | **Total: 168.65 – equivalent of 8 hr days of continuous exposure time.** |  |

2

1014977

4.     For decades, including throughout the time Mr. Stiver used Roundup®, Monsanto promoted it as harmless to human beings.  In some representations, Roundup® was described as being a product as safe as table salt, and even as "safe enough to drink".

5.     Roundup®'s primary ingredient is glyphosate, a carcinogen. Monsanto formulates its glyphosate to create Roundup® with surfactants and other elements that multiply the aggressive carcinogen quality of its product.  However, Monsanto failed to warn consumers about what it knew, and perpetuated the false representation of its products dangers even though it knew or had reason to know of them.  Furthermore, when confronted with the facts, Monsanto persistently denied that its product was harmful and denied specifically that it causes non-Hodgkin's lymphoma.

6.     Within weeks of the date of the commencement of this action, Monsanto promoted Roundup® while maintaining it is safe and does not cause serious harm to human users as it offered Roundup® for sale at garden centers and other retail stores near Mr. Stiver's residence in Omaha, NE. Roundup® was advertised, promoted and sold by Monsanto, through its network of retailers, for agricultural, industrial or commercial, and residential use, and was promoted as safe.

7.     Mr. Stiver used and consumed the product in accord its label at all times.  It did not caution about personal protective equipment or other precautions and gave no indication of any health risks associated with it.  Monsanto has not acknowledged the carcinogenic properties of Round-Up®.

8.     As recently as the spring of 2019, and indeed continuing up to nearby the date of the commencement of this action, Monsanto has persistently denied that Roundup® has carcinogenic properties or is associated with an increase in incidence of cancers of any kind. Mr. Stiver did not know, and could not discover, that Roundup® was the proximate cause of his non-Hodgkin's lymphoma until spring 2019 when the evidence was summarized in information available to inform Mr. Stiver of a link between exposures to Roundup® and non-Hodgkin's lymphoma, including the specific bloodstream cancer Plaintiff suffers from.

9.     Mr. Stiver and his spouse seek a money judgment for their general damages and for all their special damages for medical expenses and expenses incidental to them, lost earnings and earning capacity, travel expenses, and all related out of pocket costs he

3

incurred. Mr. and Mrs. Stiver's special damages are accruing. They requests leave to amend this Complaint.

<strong>Jurisdiction, Venue</strong>

10.     The District Court has subject matter jurisdiction pursuant to its general grant of jurisdictional authority. *Neb Rev Stat* § 24-302.   The Nebraska judiciary has subject matter jurisdiction and personal jurisdiction over the Defendant because Monsanto maintains a business presence here, is registered to transact business here, contracts for sale of, and sells its products, including Roundup® herbicides in multiple presentations here, promotes the sale of Roundup® here, and caused tortious injury to Mr. and Mrs. Stiver by its failure to warn and misrepresentations of its product, all of which occurred here. *Neb Rev Stat* § 25-536.  Venue is proper in Frontier County where a substantial part of the activity giving rise to this claim occurred and where Defendant may be served with process, and where Plaintiff resides. *Neb Rev Stat* § 25-403.01.

11.     Mr. Stiver is not the only person in Nebraska whose bloodstream cancer disease was caused by Monsanto's Roundup®.

<strong>Facts Re: Gary Stiver, Glyphosate, Roundup® & Monsanto</strong>

12.     Gary Stiver, born in xxxx xx, 1944 in enjoyed good health, and had no predispositions, family history, or medical history that suggested he had any propensity to develop non-Hodgins lymphoma ("NHL").

13.     Mr. Stiver's spouse, Marilyn, became his caregiver and provider. Mrs. Stiver has an independent, derivative claim because of her husband's injuries and the demands on her to provide care.  She seeks judgment for her losses as well

14.     Roundup® was sold as safe and not posing lethal dangers to human users. Mr. Stiver was not warned otherwise. Roundup® is formulated with glyphosate as a principal ingredient. A recently as the summer of 2019,  Monsanto purchased full-page advertisements in U.S. national newspapers advertising its Roundup® products as safe and as a product that cannot cause cancer despite the fact that the overwhelming evidence of the international scientific community, and the virtually universal judgments of courts in the United States and in international settings, is to the contrary. Monsanto gave no warning of these matters, even as late as June 2019, and thereafter.

4

15.     Glyphosate is a broad-spectrum, non-selective herbicide used in Monsanto's Roundup®. Glyphosate disrupts a plant's ability to form certain amino acids necessary for protein synthesis. Roundup® generally kills targeted plants within two to three days. Before they die, target and non-target plants absorb Roundup® containing glyphosate. The absorbed substance cannot be removed from plants by washing, peeling, or even by milling, baking or brewing, or from the human body by washing or flushing or with any known antidote.

16.     The herbicidal properties of glyphosate were discovered in 1970 by a Monsanto chemist. The first glyphosate-based herbicide was introduced by Monsanto in the mid-1970s under the brand name Roundup®.  Roundup® was not truthfully portrayed though Monsanto did, or should have, known the truth at the outset about the dangers of its product. It gave no warnings in the beginning, or thereafter. Despite known and mounting evidence of the dangers of Roundup®, Monsanto did not change its formulation, marketing or disclosure practices.

17.     Since then, Monsanto has promoted use of its Roundup® product containing glyphosate, touting it as a remarkable technological breakthrough that could kill weeds without causing harm to people or the environment.

18.     Monsanto knew, for all or substantially all of those forty (40) years that its statements were false. Internally at Monsanto, Roundup® was so popular, and  had so much profit potential for Monsanto that the company falsified data, sponsored, promoted, developed and distributed false studies masquerading as science, and vilified accurate studies suggesting problems with the product. It did so for the purpose of masking Monsanto's knowledge of Roundup®'s dangers from the unsuspecting public and inducing the public to believe that Roundup® as safe and harmless to human beings, in order to maximize its continuing acceptance of the marketplace by foreseeable users who were targets of the Monsanto public relations campaign and who relied upon the statements made by Monsanto about the safety of the product.   Mr. Stiver is a victim of this deception.

19.     In the United States, Monsanto paid massive political campaign contributions, spent huge sums for "government relations", and expended large amounts of money on universities to influence and purchase their research, and for university endorsements to disguise dangers of Roundup®.

1014977

20.     The World Health Organization's International Agency for Research of Cancer (IARC), an organization of the United Nations World Health organization, announced in 2015 that its research established that glyphosate, and Roundup® are probable carcinogens. This was the first information of any significant public availability, and it informed only a small, select part of the public in the United States of the cancer-causing dangers of Roundup® products. Since then, other medical and scientific studies have also revealed this fact, and evidence of the cancerous nature of the substance continues to grow. It is now established by objective scientific research that glyphosate and Roundup® cause NHL. Roundup® was a proximate cause of the NHL developed by Mr. Stiver.

21.     In the United States, the manufacture, formulation, and distribution of certain chemicals, including herbicides and specifically including Roundup® is regulated under federal law by 7 USC §§ 136 et. seq.   The statute is known the *Federal Insecticide, Fungicide and Rodenticide Act* ("FIFRA").

22.     Under FIFRA, all pesticides must be registered with the Environmental Protection Agency before they may be distributed, sold, or used. This is because they are toxic to plants, animals, and humans. The EPA, as a part of the registration process, requires that products be tested and evaluated, pass those tests, and that the results of the tests be submitted to the EPA for assessment. Even after assessment by the EPA, its decision is not an assurance of safety or government endorsement. EPA approval for marketing is not a regulatory decision about safety.

### Registration of Herbicides

23.     The EPA does not deem products "safe," but only that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 USC § 136a(c)(5)(D).

24.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 USC § 136(bb). FIFRA thus requires EPA to conduct a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

6

25. FIFRA generally requires that a registrant, Monsanto in the case of Roundup®, conduct the health and safety testing of pesticide products in accord with approved protocols. The data produced by the registrant must be submitted to the EPA for review and evaluation. The submission must be full, complete, and truthful.

26. Each product submitted to the EPA for evaluation undergoes initial registration. Singular registration is not an all-encompassing, all-times, and non-changing event. Data necessary to achieve registration has changed from time to time. Re-registration is required by 7 USC § 136a-1. This requires additional tests and submissions. In Monsanto's case, it undertook those additional tests and performed them. The tests were falsified and the laboratories that conducted them for Monsanto were caught and punished. Still, Monsanto concealed these events and used Roundup® profits to obscure and conceal adverse information with its marketing campaigns. It did so successfully for many years.

27. Before Mr. Stiver's diagnosis, but after his exposure to Roundup®, the EPA announced plans to release a preliminary risk assessment of Roundup®. This was to be done in relation to the re-registration process and to be completed not later than July 2015. The EPA is believed to have completed its review of glyphosate, Roundup®'s chief ingredient in early 2015. But, it chose to delay releasing the results because of World Health Organization health-related findings. Those findings, by the WHO's International Agency for Research of Cancer (IARC) affirmatively found that Roundup® and its glyphosate component are probably carcinogenic agents that cause cancer, and specifically Non-Hodgkin's lymphoma, in human beings.

28. In April 2016, the EPA posted a risk assessment of glyphosate on its website and then immediately retracted it. The EPA subsequently indicated that the posting was inadvertent, that the document posted was not the EPA's final assessment or even a preliminary one, and that the EPA intended to issue a final report by the end of 2016.

### Scientific Falsehoods Re: Marketing and Sale of Roundup®

29. Monsanto manipulated "scientific" data to market its Roundup® products.

30. At least as early as 1985, studies existed demonstrating that the glyphosate component of Roundup® was believed to be an agent that caused cancer in laboratory animals and that it was possibly carcinogenic to humans. Monsanto knew of these studies.

7

However, Monsanto flexed its political and government relations muscles, provided studies to the EPA, and the EPA changed its classification of the substance. When it did so in 1991, the EPA classified the glyphosate component of Roundup® as yielding evidence of non-carcinogenicity in humans.[1] The EPA announcement, however, emphasized that the designation of Roundup® or glyphosate in what it called Group E, i.e., non-carcinogenicity in humans, was "based on the available evidence at the time of evaluation and should not be interrupted as a definitive conclusion that the agent will not be a carcinogen...." Monsanto, continued to sell its Roundup® products as safe, not carcinogenic, and without warnings. It also aggressively denied any health hazard associated with the use of Roundup® products.

31.     The EPA, itself, however found that Monsanto, and laboratories it employed, manipulated tests of toxicity, misrepresented them, and affirmatively committed fraud. Monsanto's laboratories used for this purpose in committing these wrongful acts included Industrial Bio-Test Laboratories. The studies falsified included at least thirty (30) test runs on glyphosate and products containing it including residue studies required by the EPA to register Roundup® for sale.

32.     The U.S. Food and Drug Administration discovered in an inspection of IBT, significant discrepancies between raw data and final reports. This led to an EPA audit of IBT and a determination that its toxicology studies on Roundup® were invalid. The EPA found the firm engaged in routine falsification of data making it "hard to believe the scientific integrity of the studies when they said they took specimens from the uterus of male rabbits." Three (3) senior executives of IBT were convicted of criminal fraud.[2]

33.     Separately, Monsanto engaged Craven Laboratories to preform tests, including studies of Roundup®. During the same year that they were engaged by Monsanto, Craven Laboratories had three (3) of its employees indicted and convicted of fraudulent laboratory testing practices involving pesticides and herbicides.[3] While Monsanto denies that the laboratories acted at its direction, it did not disavow the results until it was forced to by the Federal Government through the prosecutions noted above. Monsanto has failed to explain why it did not aggressively and publicly disavow the occurrences and make its customers and

---

[1] See Fn 1, 2.
[2] Id.
[3] Id.

the public aware of the testing results immediately. It continues to market Roundup® and continues, even on its website, to contend glyphosate is safe. It has made no new disclosures or warnings, but marches on with its statements, undaunted by rejection from science, courts, juries and hundreds of national and local governments.[4]

34.     Monsanto dominates and controls the market. Its RoundupReady® seed, became so dominant in row crop production, and production of many small grains and alfalfa that farmers across the United States were forced to use Roundup® and RoundupReady® seed and therefore to use Roundup® herbicides.

35.     Monsanto became so dominant in the marketplace that its product crowded out competitors, and it became virtually impossible in many markets to find or secure herbicides that were compatible with seeds and grasses that were not Monsanto products containing glyphosate marketed under the Roundup® label. Mr. Stiver and many others, faced this circumstance.[5]

36.     Monsanto continued to conceal what it knew or should have known about Roundup®. It is believed to have continued to perpetuate its conscious, deliberate disregard for the truth about Roundup® because the product was a key ingredient to Monsanto's dominance in the market place, its dramatically expanding market share, and its assumption of a position of influence, power, and authority in the industry that was essentially unparalleled.

37.     In addition, as a result of Roundup® sales, Monsanto's primary corporate focus shifted to its agricultural division, because it outperformed the chemicals division in revenues and income by dramatic margins and with rapid growth.

38.     Monsanto developed genetically modified seeds which it called and labeled as "Roundup® Ready". Defendant recognized its potential to secure even more market gains with control over seed for crops that could be made resistant to Roundup®. These were seeds

---

[4]   R. Raman, the impact of Genetically Modified (GM) crops in modern agriculture: A review, 8, Biotechnology and Agriculture and the Food Chain, No. 4 (2017) available at https://www.tandfonline.com/doi/full/10.1080/21645698.2017.1413522 Also see, Ashley Hutchinson et al., "Roundup® Ready":  the first widely used genetically modified crop, the environment and society portal http://www.environmentandsociety.org/tools/keywords/Roundup®-ready-first-widely-used-genetically-modified-crop

resistant to glyphosate, and permitted farmers to use Roundup® on their fields during the growing season without harming the crop. This effort permitted Monsanto to expand the market for Roundup® to the nation's farmers and to use the income from those sales to further dominate the domestic market for commercial uses and residential uses akin to the uses experienced by Mr. Stiver.

39.     Monsanto's biotechnology seeds became dominant worldwide. Roundup® was the odds-on, and virtually ubiquitous herbicide with what, through the company's marketing strategy, became a household term synonymous with weed killer or herbicide. Roundup®, and weed killer, and herbicide, became indistinguishable in the minds of many Americans. Mr. Stiver and Mrs. Stiver are among these victims. Mr. Stiver is a person who was a foreseeable human user of Defendant's Roundup®. Mr. Stiver used Roundup® in accord with manufacturer directions and for its intended purposes at all times.

**Monsanto Falsely Promoted Roundup®**

**as Safe Despite Contrary Acknowledgements**

40.     Monsanto has been taken to task by law enforcement, and promised to discontinue its false statements about Roundup® but failed to keep its word, even after being compelled in a Consent Agreement with a Chief State Law Enforcement Official to do so.

41.     In 1996, the New York Attorney General ("NYAG") sued Monsanto for false and misleading advertising of Roundup® products. The New York case challenged Monsanto's representations that its spray-on glyphosate-based herbicides, including Roundup®, were:

      41.1.  "Safer than table salt" and "practically non-toxic" to mammals, birds, and fish.

      41.2.  "Remember that environmentally friendly Roundup® herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks, and fences."

      41.3.  "And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got a weed, brush, edging or trimming problem."

10

41.4. "Roundup® biodegrades into naturally occurring elements."

41.5. "Remember that versatile Roundup® herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

41.6. "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it."

41.7. You can apply Roundup® with "confidence because it will stay where you put it," it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Roundup® into natural products.

41.8. "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

41.9. "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

41.10. "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds, and fish."

41.11. "Roundup® can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area that has been treated with Roundup®.

42.     Monsanto either could not, or chose not to, defend these and similar hyperbolic false statements. On November 19, 1996, Monsanto entered into an agreement called an Assurance of Discontinuance with the Attorney General of New York. In it, Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that Monsanto Glyphosate-containing pesticide products or any of them, possessed any of these features, advantages or elements described below. These are assurances were made by Monsanto to

11

the Attorney General: Monsanto would cease and desist in representing its glyphosate-containing pesticide products or any components thereof as:

    42.1.   Safe, non- toxic, harmless or free from risk;

    42.2.   Biodegradable;

    42.3.   Stable so they will stay where applied and will not move through the environment;

    42.4.   "Good" for the environment or are "known for their environmentally friendly characteristics";

    42.5.   Safer or less toxic than consumer products other than herbicides; and,

    42.6.   "Practically non-toxic."

43.      Monsanto double crossed the Attorney General of New York, and the public because it did not alter its advertising in the same manner in any State other than New York and, for the most part still has not done so today.

44.      Monsanto also double crossed and misled the people of the world. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean." Around the world, nations, cities, and counties have banned Roundup® and glyphosate herbicides. Countries with bans, or with major municipal and subdivision bans include France, Austria, Australia (urban and local bans), Belgium, Bermuda, Canada (8 of 10 provinces have some restrictions, and the cities of Montreal and Vancouver), Czech Republic, Denmark (restrictions, bans in some cities), Netherlands, Sri Lanka, Colombia, El Salvador, India (Punjab and Kerala States), Italy (restrictions), Luxembourg (restrictions and EU vote to ban), Netherlands, New Zealand (large urban bans), Portugal (in public places), Scotland (large urban bans), Spain (large urban bans), United Kingdom (bans in many boroughs and townships), Vietnam, Saudi Arabia, Kuwait, Qatar, Bahrain, Oman, United Arab Emirates, and others. Germany recently announced a ban by the end of 2023. In the United States, Roundup® has been banned in or its sale has been conditioned to require warnings or curbs on usage, in California, and communities in Colorado, Iowa, Florida, North Carolina, Virginia, Maryland, Illinois, California, Oregon, Massachusetts, New Mexico, Los Angeles County, CA

12

(moratorium), the U.S. cities of Seattle, Miami, Austin, Portland ME, Key West, and others.[6] This was not known to Mr. Stiver until days before the litigation commenced.

### Assessments of Glyphosate and Roundup®

45.     Monsanto concealed what it knew of glyphosate and Roundup® from the scientific community and the world for many years. The International Agency for Research of Cancer ("IARC") is the specialized cancer agency of the World Health Organization, and organization of the United Nations. IARC promotes international collaboration in cancer research, "bringing together skills in epidemiology, laboratory sciences, and biostatistics to identify the causes of cancer[.]" IARC assesses whether chemicals are carcinogenic through its Monograph issuance program and protocol.

46.     IARC Monographs identify environmental factors that are carcinogenic hazards to humans. These include chemicals, complex mixtures, occupational exposures, physical agents, biological agents, and lifestyle factors. National health agencies can use this information as scientific support for their actions to prevent exposure to potential carcinogens. Interdisciplinary working groups of expert scientists review the published studies and assess the strength of the available evidence that an agent can cause cancer in humans.

47.     The principles, procedures, and scientific criteria that guide the evaluations are described in the Preamble to the IARC Monographs. The preamble is a forty + page expression of one of the most sophisticated scientific processes used in the world to review and evaluate substances for their impact on human health.   The procedure requires evaluations to be performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest. The studies considered the various exposure groups, including occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland, municipal weed-control workers in the United Kingdom, and para-occupational exposure in farming families.

48.     In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology journal reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

---

[6] Sources: Public news agencies and compendiums deemed reasonably reliably by Plaintiff's counsel.

1014977

49.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies showed a human health concern from agricultural and other work-related exposure to glyphosate. The IARC Working Group conducted a systematic review of over 15 studies designed to assess whether there was an association between Roundup® exposure in agricultural workers and Non-Hodgkin's lymphoma (NHL). The researchers reviewed each study, identified the results and assessed each study's strengths and weaknesses. The IARC Working Group concluded that, despite the limited evidence concerning the carcinogenicity of glyphosate in humans, a "positive association has been observed for non-Hodgkin's lymphoma."

50.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. It was authored with input of 17 experts from 11 countries who met from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. Among the members were Lauren Zeise, Ph.D., of the California Environmental Protection Agency, Matthew T. Martin, Ph.D, a scientist with the U.S. Environmental Protection Agency, and Gloria D. Jahnke, D.V.M., D.A.B.T. of the National Institute of Environmental Health Sciences. The 2015 Monograph was updated in 2016.[7]  Mr. Stiver did not learn of this information until much later.

51.     After adherence to its established procedures, the IARC Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

52.     Glyphosate was the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012. Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

---

[7]  The 2016 updated Monograph can be seen at https://monographs.iarc.fr/wp-content/uploads/2018/06/mono112-10.pdf

14

53.     The IARC Working Group found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed. In assessing the genotoxicity of glyphosate (the property of chemical agents that damages the genetic information within a cell causing mutations, which may lead to cancer), the IARC Working Group concluded "[t]here is strong evidence that glyphosate causes genotoxicity."

54.     IARC also assessed whether glyphosate exposure can induce oxidative stress, which is thought to be involved in the development of numerous conditions, including cancer, autism, and Parkinson's disease.   IARC concluded that "strong evidence exists that glyphosate ... can induce oxidative stress." This could be an important mechanism by which Roundup® causes cancer.

55.     A   section of the IARC monograph for glyphosate is devoted to exposure to humans; it examines studies of glyphosate exposures in various settings including agricultural ones. The IARC Working Group noted that glyphosate has been detected in urine of agricultural workers, indicating absorption. The IARC Working Group specifically evaluated farm workers in the United States, and found that, within the days following the application of Roundup® to a crop, approximately 60% of farm workers tested positive for glyphosate in the urine. Additionally, the IARC Working Group noted that soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

56.     IARC reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. It found that results of this study support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic lymphocytic Leukemia (CLL), and several other cancers.

57.     In 2014 and before, scientists published a systematic review and meta-analysis on the relationship between non-Hodgkin lymphoma and occupational exposure to agricultural pesticides, including glyphosate, in the International Journal of Environmental Research and Public Health. The study showed a statistically significant association between

15

farm workers exposed to Roundup® and non- Hodgkin lymphoma. The study confirmed two smaller studies from 2002 and 2008, published in the journal Leukemia & Lymphoma (2002) and the International Journal on Cancer (2008).

58.     Recent studies, including a glyphosate residue study published in the Journal of Environmental & Analytical Toxicology in 2014, concludes that "chronically ill humans showed significantly higher glyphosate residues in urine than healthy population." Glyphosate has been detected in the blood and urine of agricultural workers, indicating that agricultural use of Roundup® leads to its absorption. Monsanto continues to promote Roundup® as safe even in May 2019. During May, Monsanto ran newspaper advertisements, full-page in size, in the Wall Street Journal and other widespread magazines, as well as in advertisements and promotions on television, radio, in other media, and multiple languages, across the United States. It did not acknowledge or change its actions after researchers at the University of Washington disclosed, on February 13, 2019, findings and a new study conducted there, including a comprehensive review of existing literature, that exposure to Roundup® increases the risks of certain cancers, including NHL, by more than 40%. The University of Washington studies, entitled Mutation Research - Fundamental and Molecular Mechanisms of Mutagenesis (2019) (ISSN:0027-5107, available at https://www.journals.elsevier.com/mutation-research-fundamental-and-molecular-mechanisms-of-mutagenesis).

59.     Scientific research also discloses that carcinogenic properties of Roundup® are magnified by the addition of adjuvants in the Roundup® formulation. Adjuvants are chemicals designed to modify or enhance the effects of other agents. Monsanto includes adjuvants with glyphosate in its Roundup® products; they are designed to increase the effectiveness of the herbicide. But the added adjuvants greatly increase the carcinogenic properties of Roundup®. Monsanto systematically tested glyphosate without adjuvants. The results are misleading. Yet, Monsanto used those tests and results to tout Roundup® as safe to U.S. federal regulators.

**Mr. Stiver's Exposure to Glyphosate and Discovery Rule; Equitable Estoppel**

60.     Mr. Stiver's intensive adult use of Roundup® commenced in approximately 1981, and continued until 2018.   Mr. Stiver was diagnosed with non-Hodgkin's

16

lymphoma in May 2016.  He suffers from follicular small b-cell lymphoma which was initially treated in 2016 and driven into remission, but has now reappeared and is aggressively attacking his body in 2019.  Mr. Stiver neither knew nor had reason to believe there was a link between the disease and his use of Roundup®.  He relied on Monsanto and its assurances to the public.  Mr. Stiver also relied on the absence of any warning, caution, or contrary findings disclosed on the label of the Roundup® products he purchased and used

61.    After his May 2016 diagnosis, Mr. Stiver underwent aggressive care. His care regimen bore consequences as best they could, and he became a watch and wait patient for a time.  His cancer recurred in 2019 in an aggressive form, and required immediate medical, including surgical, intervention.   His health is uncertain and dangerous circumstances as the date of this Complaint.

62.    Monsanto's effectively concealed the dangers of Roundup® and glyphosate. Many steps were taken by Monsanto to achieve this objective.  Among others they included:

62.1.  Disregarded scientific studies drawing a link between Roundup® and glyphosates herbicides in general, and human illness including blood born cancers and NHL.

62.2.  Epidemiologic studies disclosing the link the between Roundup®, glyphosates and blood born cancers including NHL.

62.3.  Internal scientific data, warnings, and revelations from its own personnel which were quashed by Monsanto internally.

62.4.  Influence practiced on politicians and government officials to paralyze, delay, or wholly prevent government action to protect the public from Roundup® and glyphosate.

62.5.  An aggressive campaign, which it continues to present, designed to teach the safety of Roundup® and to deny the scientific evidence linking it to cancers, including NHL, that are lethal to human beings.

62.6. Assertion, despite overwhelming contrary evidence by objective scientific research not financed by Monsanto, disclosing that glyphosate

17

causes changes in the human body that produce cancers because of cellular level damage to human tissue.

62.7.   Affirmative financing activities masked as objective scientific studies, despite the lack of objectivity in the studies, in order to produce skewed results, further masquerading as research.  These results were then used by Monsanto to promote, taught, and advance used of its products despite the dangers posed by them.

63.   Monsanto's conduct induced members of the public, including Mr. Stiver, to rely upon Monsanto's statements. Monsanto is by virtue of the its conduct equitably estopped to assert certain defenses, including a) contributory fault, b) comparative fault, c) alternate causation, d) the statute of limitations, and e) used of its products without wearing protective equipment.  Monsanto's statements inducing reliance and action by users like Mr. Stiver were false statements of material fact. They were intended to induce reliance and did so. These statements were made when Monsanto knew they were false or at a minimum knew that they were highly controverted and that substantial scientific evidence, denied Monsanto, concluded that a causal connection exists between Roundup® and cancers including NHL.

64.   Mr. Stiver did not discover, and did not know of facts that would cause a reasonable person to suspect the risks associated with the use of and/or exposure to Roundup® and glyphosate, nor would a reasonable and diligent investigation have disclosed that Roundup® and glyphosate would cause Mr. Stiver's illnesses. Monsanto also persistently denied the existence of any link between Roundup® and NHL or bloodstream cancers.

65.  ' Monsanto was under a continuous duty to disclose to consumers, users and other persons coming into contact with its products, including Mr. Stiver accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate. Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the risks associated with the use of and/or exposure to its products.

66.   As a proximate result of Monsanto's wrongful acts and omissions in placing its defective Roundup® products into the stream of commerce without adequate warnings of the

18

hazardous and carcinogenic nature of glyphosate, and in breach of its warranties, negligence and strict liability, Mr. Stiver used, and continued to use, Roundup®. The carcinogenic properties of Roundup® caused or acted as material, proximate causes of Plaintiff's disease. Mr. Stiver endures the anguish of life threatening non-Hodgkin's lymphoma.

### Claims and Allegations (Additional)

67.     All allegations above are renewed here.

68.     Mr. Stiver's claims are made under the law of Nebraska where Mr. Stiver's primary use of Roundup® and injuries occurred, where his injuries occurred and where he resides and used Defendant's product.   Nebraska is where the Defendant sold the products he used.  In the event Nebraska law imposes a duty or obligation on Monsanto in excess of those required by Federal Law, Mr. Stiver does not assert the state law claims.  On the contrary, all claims asserted by Plaintiffs are claims parallel with Federal Law and Federal Legal Duties.  Accordingly, Monsanto violations of Nebraska law so limited were also violations of Federal Law.

69.     Plaintiffs do not seek to enforce Federal Law, instead they invoke the law of Nebraska, but limit the scope and extent of their claims under Nebraska law so those claims assert duties against Monsanto equal to but no greater than Federal Law imposed on Monsanto.  Accordingly, Plaintiffs claim that Monsanto violated 7 USC § 136, including subparts (g) & (j), and Federal regulations including 40 CFR § 156.10 (a) (5). They did so by distributing Roundup® when it was misbranded contrary to legal requirements. The distribution of a misbranded herbicide is a violation of law and is a tort, because it violates Iowa law when considered in parallel with Federal requirements.   These violations are evidence of negligence and support Mr. and Mrs. Stiver's claims of strict liability in tort, strict liability for failure to warn, negligence, and breaches of implied warranties and express warranties.

### First Theory: Strict Liability (Design Defect)

70.     All allegations above are renewed here

71.     Mr. and Mrs. Stiver respectfully assert that Monsanto is strictly liable in tort to them for defective design of its Roundup® products.  A substantial part of the activity

19

undertaken by Monsanto as described in this Complaint, putting in the allegations above and below, occurred in Nebraska.

72.     At relevant times, Monsanto was engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products. These products, including the ones used by Mr. Stiver were defective and unreasonably dangerous to foreseeable users like Mr. Stiver and including him. The products were unreasonably dangerous when they were placed by Monsanto into the stream of commerce. Monsanto ultimately controlled and supervised these actions. At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by Mr. Stiver as safe when they were not as described above.

73.     On the contrary, Monsanto's Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, Mr. Stiver. These products left Monsanto's immediate control and were placed onto the market and reached intended consumers, handlers, and users coming into contact with these products in Nebraska and throughout the United States, including Mr. Stiver, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

74.     Monsanto's Roundup® products including those to which Mr. Stiver was exposed were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate. The risks and dangers of those products exceeded the benefits allegedly associated with them as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto. Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

75.     Monsanto knew or had reason to know that its Roundup® products when placed in the stream of commerce were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto in one or more of these ways:

75.1. Monsanto's Roundup® products were defective in design and formulation. Consequently, these products are dangerous to an extent beyond that which an ordinary consumer would contemplate.

75.2. Monsanto's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

75.3. Monsanto did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate alone or with surfactants added by Monsanto before or while marketing them.

75.4. Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products.

75.5. Monsanto could have employed safer alternative designs and formulations, but did not do so.

76.   At all times relevant to this litigation, Mr. Stiver used and/or was exposed to the use of Monsanto's Roundup® products in an intended or reasonably foreseeable manner, i.e., as a consumer, without knowledge of Roundup®'s dangerous characteristics.

77.   Monsanto's Roundup® products were and are more dangerous than alternative products. Monsanto could have designed its Roundup® products to make them less dangerous. Indeed, at the time Monsanto designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

78.   At the time Roundup® products left Monsanto's control, practical, feasible and safer alternative designs were available that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Monsanto's herbicides.

79.   As a result of the unreasonably dangerous condition of its Roundup® products, Monsanto is strictly liable to Mr. Stiver. The defects in Monsanto's Roundup® products were substantial and contributing factors in causing Mr. Stiver's injuries and, but for Monsanto's misconduct and omissions, Mr. Stiver would not have sustained his injuries.

21

80.   Monsanto's defective design of its Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including Mr. Stiver.

81.   Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including Mr. Stiver with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Monsanto made conscious decisions not to redesign, warn or inform the public. Monsanto's reckless conduct warrants an award of punitive damages.

82.   As a  proximate result of Monsanto placing its defective Roundup® products into the stream of commerce, Mr. Stiver developed Non-Hodgkin's lymphoma and personal injuries which are permanent in nature.

83.   As a proximate result of Monsanto placing its defective Roundup® products into the stream of commerce, as alleged herein, Mr. Stiver sustained a past and future loss of income, loss of earning capacity and property damage.

### Second Theory:  Strict Liability (Failure to Warn)

84.   All allegations above are renewed here.

85.   Monsanto had a duty to exercise reasonable care to avoid physical harm to Mr. Stiver by preventing the recognizable and foreseeable harm it would cause by its marketing of its Roundup® ® products.  Mr. Stiver contends that Monsanto sold its Roundup® products in a defective condition unreasonably dangerous to consumers, including him. Mr. Stiver contends Monsanto was engaged in the business of selling the product which was expected to and did reach him without substantial change in condition from that in which it was sold, and that it was not misused by Mr. Stiver. Mr. Stiver's damages are not subject to the economic loss rule.

86.   Mr. Stiver respectfully asserts that Monsanto is strictly liable in tort to him for failure to warn of the dangers of its Roundup® products. At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Mr. Stiver, because they

22

do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate either alone or with adjuvants and surfactants. These actions were under the ultimate control and supervision of Monsanto. It did so from its headquarters in St. Louis Missouri.

87. Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products. While doing so, Monsanto advertised or marketed Roundup® to consumers including Mr. Stiver, Monsanto had, but failed to discharge, a duty to warn Mr. Stiver and the public of risks associated with use of Roundup®.

88. Monsanto had a duty to reasonably test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn Mr. Stiver of dangers associated with Roundup® use and exposure. Monsanto, as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

89. At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

90. Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by Monsanto's herbicides, including Mr. Stiver.

91. Despite knowing or having a duty to know, that Roundup® posed a grave risk of harm, Monsanto failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. Monsanto failed to adequately warn consumers, i.e., the reasonably foreseeable users, of the risks of exposure to its products. Monsanto wrongfully concealed information concerning the dangerous nature of Roundup® and glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

23

92.     At all times relevant to this litigation, Monsanto's Roundup® reached the intended consumers, handlers, and users or other persons coming into contact with these products, including Mr. Stiver without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

93.     Mr. Stiver was exposed to Monsanto's Roundup® products in the course of spraying his property without knowledge of their dangerous characteristics. Mr. Stiver used the dangerous product for its intended purpose and without misuse.

94.     Mr. Stiver could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to and at the time of Mr. Stiver's exposure. Mr. Stiver relied upon the skill, superior knowledge, and judgment of Monsanto to know about and disclose serious health risks associated with using the products.

95.     Monsanto knew or should have known that the minimal cautions disseminated with its Roundup® products were inadequate, failed to communicate adequate information on the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural, and horticultural applications.

96.     The information Monsanto did impart failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Mr. Stiver to utilize the products safely and with adequate protection. Instead, Monsanto disseminated information that was inaccurate, false, and misleading. This misleading information and denial of the danger of glyphosate has been unremitting conduct of Monsanto to the present day.

97.     This alleged failure to warn is not limited to the information contained on Roundup®'s labeling. Monsanto was able, in accord with federal law, to comply with Nebraska law by disclosing the known risks associated with Roundup® through other non-labeling mediums, i.e., promotion, advertisements, public service announcements, and/or public information sources. Monsanto, however, deliberately did not do so.

98.     Monsanto is liable to Mr. Stiver for injuries caused by its negligent or willful failure, as described above, to provide adequate warning and precautions as alleged. As a proximate result of Monsanto placing its defective Roundup® products into the stream of commerce, Mr. Stiver developed chronic lymphocytic leukemia, a form of non-Hodgkin's

1014977

lymphoma, and sustained a loss of income, loss of earning capacity and property damage, as well as non-economic damages. As a further proximate result of Monsanto placing its defective Roundup® products into the stream of commerce, there was a measurable and significant interval of time during which Mr. Stiver suffered great mental anguish and other personal injury. In addition to blood cancer, Mr. Stiver continues to be aware of the presence of NHL disease in his body. He suffers ongoing emotional distress as a result. This distress is chronic and expected to be permanent.

**Third Theory: Negligence**

99.     All allegations above are renewed here.

100.    Monsanto owed a duty of reasonable care to all foreseeable users, including Mr. Stiver, but it breached that duty as alleged below. The breach proximately caused damages to Mr. Stiver.

101.    Monsanto, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Mr. Stiver.

102.    Monsanto owed to Mr. Stiver and the public the duties that follow:

    102.1.  To exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products. This included the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

    102.2.  To exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Monsanto's duty of care owed to consumers and the general public. This included the duty to provide accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®.  In particular, its active ingredient glyphosate. Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and

25

specifically, the carcinogenic properties of the chemical glyphosate and its Roundup® products.

102.3. To warn of the risks.

102.4. To withhold the product from the market.

102.5. To inform Mr. Stiver of the risks.

102.6. To exercise reasonable care in the marketing and representation of Roundup® to the public.

102.7. To refrain from falsifying, withholding or manipulating unfavorable research data, or feigning the favorable research data.

102.8. To label its product with complete disclosures of risks.

103.   Monsanto breached each and all of its duties as alleged above. It was negligent in that it:

103.1. Negligently designed and formulated its Roundup® products.

103.2. Negligently tested its Roundup® products and negligently failed to continue to test them.

103.3. Negligently mixed and batched its Roundup® products.

103.4. Negligently submitted and withheld information about its Roundup® products for governmental regulatory purposes.

103.5. Negligently failed to supplement its governmental submissions with new information about the dangers of Glyphosate and its Roundup® products.

103.6. Negligently manufactured its Roundup® products.

103.7. Negligently labeled its Roundup® products.

103.8. Negligently marketed its Roundup® products.

103.9. Negligently packaged its Roundup® products.

103.10. Negligently advertised & commercialized Roundup® products.

103.11. Negligently distributed Roundup® products in commerce.

103.12. Negligently advertised and commercialized  Roundup®

103.13. Negligently violated its agreement with New York's A.G..

103.14. Negligently failed to disclose the truth about the risks associated with Roundup® in its promotional efforts, outside of the context of labeling.

26

103.15. Negligently disregarded scientific, medical and epidemiological studies and findings about the dangers of Roundup®.

103.16. Negligently caused or permitted its advertising inaccuracies to continue even after it knew exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and it failed to prevent or adequately warn of these risks and injuries.

103.17. Negligently failed to provide adequate instructions, guidelines, and safety precautions to reasonable users including Mr. Stiver.

103.18. Negligently failed to inform Mr. Stiver and the public of safer alternatives though it knew they existed.

103.19. Negligently failed to disclose that its Roundup® products are probably carcinogens and do cause NHL in a population of foreseeable users including Mr. Stiver after they use the product.

103.20. Negligently withheld information necessary permit an informed user with an option to use something else to make an informed selection.

103.21. Negligently failed to comply with safe practices and standards, including federal regulations governing the design and formulation, testing, continuing testing, disclosure, approval procurement, labeling, advertising, promotion, and distribution of its product and thereby failed to inform both government regulators and foreseeable users, including Mr. Stiver.

104.    These negligent acts and omissions occurred when and after Monsanto, knew or had reason to know of the defects inherent in its products, and knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

105.    Monsanto knew and/or should have known that it was foreseeable consumers such as and including Mr. Stiver would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®. He could not have known of his injuries until he was diagnosed.

27

106.   Mr. Stiver did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

107.   Monsanto's conduct was negligent. But it was also reckless. Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Mr. Stiver. Monsanto's reckless conduct therefore warrants an award of punitive damages.

108.   As a proximate result of Monsanto's negligence, Mr. Stiver sustained temporary and permanent lost income personal injuries, illness, medical and rehabilitation care and emotional distress. Mr. Stiver remains under medical supervision and care. He also suffered permanent loss of his ability to enjoy life with confidence of good health, and a permanently impaired body. Monsanto's negligence was a proximate cause of the Mr. Stiver's injuries. Mrs. Stiver's damages were also proximately caused by Monsanto in this way.

109.   The amount of damages continues to accrue. Lost earnings and medical care expenses in medicine continue to be necessary and accrue. Mr. Stiver's life expectancy is truncated.  His full damages are not yet known. Leave of Court is requested to amend this Complaint at the time of the final pretrial conference and a trial to state the full amount.

### Fourth & Fifth Theories:

### Intentional and/ or Negligent Misrepresentation

110.   All allegations above are renewed here.

111.   Monsanto made the affirmative representations alleged in ¶¶ 1,4-5,8, 14, 16-19, 29-43, 45, 59-60, 62-65, 75, 80-83, 91, 94, 107 above, and 127 below.

112.   Monsanto's representations were false. These false claims included false affirmative statements and concealed facts that made affirmative statements, in the context in which they were made, false. They were made to induce reasonable, foreseeable members of the public including Plaintiff to rely upon them. Mr. Stiver did so rely and he did so reasonably. Monsanto knew its representations were false, or in the alternative it negligently made and repeated the representations without disclosing material information contradicting the representations or drawing them into serious question. This may discovery of Mr. Stiver's condition more complex. It also delayed discovery.

28

113.    Mr. Stiver sustained damages and contracted NHL as a proximate result of the misrepresentations of Monsanto. All damages described above and requested in the Request for relief below are sought.

### Sixth Theory: Implied Warranty

114.    All allegations above are renewed here.

115.    Monsanto engaged in the business of testing developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including Mr. Stiver thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto. Monsanto impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

116.    Monsanto is a merchant with respect to crop, lawn, and garden chemicals including herbicides and including its Roundup® products. It employs persons with special knowledge, skill, and experience in the products and plants.

117.    Before Mr. Stiver was exposed to the aforementioned Roundup® products, Monsanto impliedly warranted to its consumers—including Mr. Stiver—that its Roundup® products were of merchantable quality, safe and fit for the use for which they were intended; specifically, as agricultural herbicides to kill weeds without harm to humans.

118.    Monsanto failed to disclose that Roundup® has dangerous propensities when used as intended and that use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries and death, including Mr. Stiver's cancer. Mr. Stiver was the intended beneficiary of the implied warranties made by Monsanto to the purchasers of its herbicides as a foreseeable human user. He used the Roundup® products as intended and without alteration.

119.    Mr. Stiver used at the Roundup® product as Monsanto intended that its Roundup® products be used. In reliance upon Monsanto's implied warranty, Mr. Stiver used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Monsanto.

120.    Mr. Stiver could not have reasonably discovered or known of the risks of serious injury and death associated with Roundup® or glyphosate.

121.    Monsanto breached its implied warranty to Mr. Stiver in that its Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

122.    The harm caused by Monsanto's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

123.    As a proximate result of Monsanto's breach of implied warranty, Mr. Stiver sustained a loss of income, loss of earning capacity, and property damage.

### Seventh Theory: Breach of Express Warranties

124.    All allegations above are renewed here.

125.    Mr. Stiver contends Monsanto is liable to him for breach of express warranties. He asserts this position because Monsanto made   affirmative representations and warranties about its Roundup® products which were material parts the basis of the bargain whereby Mr. Stiver purchased and used Roundup® products.    These affirmative representations effectively promised a specific result, i.e., that Roundup® products could be used by Mr. Stiver without personal injury, illness, or cancer caused or induced by the products; Monsanto represented that the products were safe, but knew or should have known, they were not. Mr. Stiver was a person whom Monsanto might reasonably expect to use, consume and be affected by the Roundup® products.

126.    Monsanto has special knowledge skill and expertise germane to herbicides and their design, manufacture testing, and marketing. At all times relevant, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including Mr. Stiver, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto.

30

127.    Monsanto expressly represented and warranted matters to Mr. Stiver and other consumers and users, and through statements made by Monsanto in labels, publications, package inserts, and other written materials that its Roundup® products were:

127.1. Safe to human health and the environment.

127.2. Effective, fit, and proper for their intended use and posed no risks of harm to humans.

127.3. Did not cause unreasonably dangerous side effects.

127.4. Is a product of Monsanto's "safety is a top priority for us" approach to its business.

127.5. Safe enough to drink.

127.6. Monsanto Roundup® spray-on glyphosate-based herbicides, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish despite its agreement with the New York Attorney General to the contrary.

127.7. Roundup®'s Glyphosate is good for the environment.

128.    These representations about Roundup® were affirmations of fact or promises made by Monsanto to the public including Mr. Stiver. The representations related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations. Monsanto placed its Roundup® products into the stream of commerce for sale and recommended use without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate.

129.    Monsanto breached these warranties because its affirmations were not true. Its Roundup® products were defective, dangerous, unfit for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose.

130.    Mr. Stiver justifiably and detrimentally relied on the express warranties and representations of Monsanto in the purchase and use of its Roundup® products. When Mr. Stiver decided to purchase Roundup®, he reasonably relied upon Monsanto to disclose known risks, dangers, and effects of Roundup® and glyphosate. He did not know the representations were false.

131.   As a proximate result of Monsanto's breach of implied warranty, Mr. Stiver sustained personal injuries and illness, loss of income, loss of earning capacity and financial losses and their consequences.

### First Claim: Gary L. Stiver
### Personal Injuries; Economic and Non-Economic Damages

132.   All allegations above are renewed here and all theories above are invoked here.

133.   As a direct, proximate result of the acts and omissions of Monsanto, Mr. Stiver contracted and suffers from small b-cell aggressive follicular lymphoma, a form of non-Hodgkin's lymphoma, and has been required to undergo extensive care, including life altering and debilitating chemical and other therapies. He continues to be under medical care.

134.   Mr. Stiver's non-economic, general damages include emotional and physical pain and anguish; cancer treatment pain; anxiety, depression, uncertainty and fear associated with cancer diagnoses, treatment and uncertain outcomes; nausea and illness associated with medical care for his condition; sleep disruption; loss of self-confidence and change of personality; emotional distress; loss of ability to engage in the activities of daily living including the daily joys of life. Mr. Stiver has also incurred a probable loss of reasonable life expectancy.  He also suffers from depression, stress and mental anguish over his uncertain and threatening health circumstances.

135.   Mr. Stiver's economic, special damages include:  lost earnings; lost earning capacity; medical expenses and medical care costs; transportation and over-the-counter expenses; adaptations and accommodations to the household; lost retirement security; and related economic losses.

### Exemplary and Punitive Damages

136.   All allegations above are renewed here. Mr. Stiver is aware that Nebraska law permits the recovery of punitive damages but requires that they be paid to the State. However, Monsanto's willful, wanton, reckless and malicious conduct in pursuit of profit at the expense of human safety and well-being of foreseeable users of its Roundup® products

was caused, effectuated, or directed from Missouri. Missouri law permits Plaintiff to collect punitive damages.

137.   Accordingly, Mr. Stiver contends that Missouri law governs the punitive damages aspect of their case. The most significant contacts between Monsanto's products and Mr. Stiver occurred in Nebraska, making Nebraska law the governing law on compensatory claims. But, the reprehensible conduct justifying punitive damages occurred in Missouri, and may be policed and prevented only by judicial proceedings against Monsanto inflicting punishment for its wrongdoing in Missouri. Missouri's contact with an interest in this subject is governing.

138.   Mr. Stiver seeks punitive damages against Monsanto under Missouri law for this reason. In addition, and in the alternative in the event the Court concludes that Missouri law does not govern the punitive damages aspects of this case, Plaintiff seeks punitive damages under the law of Nebraska and request that the punitive damages recovery, subject to payment of proportionate fees and expenses, be awarded to the common school fund the for State of Nebraska.

## Second Claim: Marilyn Stiver
### General Damages

139.   Mrs. Marilyn Stiver, all allegations above are renewed here. All theories of recovery here.

140.   Mrs. Stiver is the caregiver and spouse of her husband, Gary L. Stiver. During the period of his illness, and a result of his cancer, Mrs. Stiver has been deprived of the care, comfort, companionship, society, support, services, advice, counsel, love and affection of her husband as given under normal circumstances. She has sustained general damages as a result. She has also shared the special damages of Mr. Stiver for medical and related expenses and suffered as a result of the lost income claimed by Mr. Stiver.

### Requests For Relief

141.   On the foregoing basis, Mr. and Mrs. Stiver as Plaintiffs, request judgment in their favor on their First Claim, and all their theories of recovery, and on their Second Claim and all their theories recovery as follows:

33

141.1. On their First Claim special damages as alleged, accruing special damages to be stated in full at the time of the final pretrial conference, and general damages, prejudgment interest, attorney's fees to the extent permitted by law, and costs.

141.2. On Mrs. Stiver's separate Second Claim, general damages for Mrs. Stiver, prejudgment interest to the extent permitted by law, attorney's fees and costs.

141.3. Under all claims prejudgment interest to the extent permitted by law, attorney's to the extent permitted by law and costs.

142.   Mr. and Mrs. Stiver also seek punitive damages under Missouri law and Nebraska law because the conduct of Monsanto and its acts and omissions display requisite contempt for public health, self-serving greed as its motivation, and malice. Mr. and Mrs. Stiver seek the maximum amount of punitive damages permissible.

### Jury Demand; Trial Location Designation

143.   Mr. and Mrs. Stiver demand trial by jury.   They designate Lincoln Nebraska as the place for trial if this case is not tried in Frontier County, Nebraska

October 15, 2019

**Gary L. Stiver and Marilyn Stiver, Husband and Wife**

By: */s/ David A. Domina*
David A. Domina, #11043NE
Domina Law Group pc llo
2425 S. 144th St. Omaha, NE 68144
(402) 493-4100
ddomina@dominalaw.com

*Plaintiff's Lawyers*

34

Filed in Frontier District Court
*** EFILED ***
Case Number: D60CI190000033
Transaction ID: 0009532974
Filing Date: 10/16/2019 10:41:00 AM CDT

**District Court, Frontier County, Nebraska**

| | |
|---|---|
| **Gary L. Stiver and Marilyn Stiver, Husband and Wife** | **Case No.: CI 19-0000033** |
| **Plaintiffs,** | **First Amended** |
| **v.** | **Complaint and Jury Demand** |
| **Monsanto Company, A Missouri corporation** | **and** |
| **Defendant.** | **Trial Location Designation** |

Plaintiffs allege:

1.       Plaintiffs Gary L. Stiver and Marilyn Stiver are husband and wife.  They are residents of Curtis, Frontier County, Nebraska.  They sue Monsanto for Mr. Stiver's personal injuries and the occurrence of non-Hodgkin's lymphoma. Mr. Stiver was diagnosed with non-Hodgkin's lymphoma in May 2016. His NHL was proximately caused by his reliance upon the false assurances of Monsanto, Monsanto's failure to warn, and its unsafe, negligent, and intentionally wrongful disregard for human safety in the design, formulation, testing, manufacturing, advertising, and promotion, and distribution of its Roundup® herbicide.  Monsanto concealed that is Roundup® products cause non-Hodgkin's lymphoma, a cancer.

2.       Monsanto's product is inherently dangerous to humans and was marketed in the same condition it reached Mr. Stiver. He used it as intended. Monsanto is strictly liable for the damages Roundup® causes. Mr. Stiver invokes seven (7) legal theories:   strict liability,   strict   liability   failure   to   warn,   negligence,   intentional   and   negligent misrepresentation, breach of implied warranty, and breach of expressed warranty.

3.       Mr. Stiver's use of Roundup® occurred primarily in Lincoln and Frontier Counties, Nebraska and occurred nearly exclusively in Nebraska. He used Roundup® with this approximate frequency and under these circumstances based on his recollections and reasonable estimates:

| Years | Product | Use/Frequency Duration | Clothing |
|---|---|---|---|
| 1981 -2007, 26 yrs, at Sutherland, Nebraska | Round-Up® | 5.5 months<br>x  two (2) uses per week<br>= 25 uses / yr<br>x 90 minutes/ use<br>= 2,250 min /yr<br>x 25 yrs<br>= 56,250 min<br>Div/ 60 min<br>937.25  hrs<br>div/ 8<br>**= equiv of  117.15- 8 hr work days of exposure** | Tennis Shoes and/or sandals at times.  Shorts or jeans.  Cotton shirt.  Cotton gloves part-time |
| Curtis, Nebraska Residence<br><br>2008-2018 | Round-Up® | 2 x /wk<br>x 45 minutes ea<br> = 90 min /wk<br>x 25 weeks / yr<br>= 2,250 min / yr<br>x 11 yrs<br>= 24,750 min.<br>Div / 60<br>= 412.5 hrs<br>Div/ 8<br>**= equiv of 51.5- 8 hr work days of exposure** | Tennis Shoes and/or sandals at times.  Shorts or jeans.  Cotton shirt.  Cotton gloves part-time. |
|  |  | **Total: 168.65 – equivalent of 8 hr days of continuous exposure time.** |  |

2

4.     For decades, including throughout the time Mr. Stiver used Roundup®, Monsanto promoted it as harmless to human beings. In some representations, Roundup® was described as being a product as safe as table salt, and even as "safe enough to drink".

5.     Roundup®'s primary ingredient is glyphosate, a carcinogen. Monsanto formulates its glyphosate to create Roundup® with surfactants and other elements that multiply the aggressive carcinogen quality of its product. However, Monsanto failed to warn consumers about what it knew, and perpetuated the false representation of its products dangers even though it knew or had reason to know of them. Furthermore, when confronted with the facts, Monsanto persistently denied that its product was harmful and denied specifically that it causes non-Hodgkin's lymphoma.

6.     Within weeks of the date of the commencement of this action, Monsanto promoted Roundup® while maintaining it is safe and does not cause serious harm to human users as it offered Roundup® for sale at garden centers and other retail stores near Mr. Stiver's residence, including stores in North Platte NE. Roundup® was advertised, promoted and sold by Monsanto, through its network of retailers, for agricultural, industrial or commercial, and residential use, and was promoted as safe.

7.     Mr. Stiver used and consumed the product in accord with its label at all times. The label did not caution about personal protective equipment or other precautions and gave no indication of any health risks associated with it. Monsanto has not acknowledged the carcinogenic properties of Round-Up®.

8.     As recently as the spring of 2019, and indeed continuing up to nearby the date of the commencement of this action, Monsanto has persistently denied that Roundup® has carcinogenic properties or is associated with an increase in incidence of cancers of any kind. Mr. Stiver did not know, and could not discover, that Roundup® was the proximate cause of his non-Hodgkin's lymphoma after he was diagnosed with the disease for the second time in 2019 and when the evidence was summarized in information available to inform Mr. Stiver of a link between exposures to Roundup® and non-Hodgkin's lymphoma, including the specific bloodstream cancer Plaintiff suffers from.

9.     Mr. Stiver and his spouse seek a money judgment for their general damages and for all their special damages for medical expenses and expenses incidental to them, lost

3

earnings and earning capacity, travel expenses, and all related out of pocket costs he incurred. Mr. and Mrs. Stiver's special damages are accruing. They requests leave to amend this Complaint.

## Jurisdiction, Venue

10.     The District Court has subject matter jurisdiction pursuant to its general grant of jurisdictional authority. *Neb Rev Stat* § 24-302. The Nebraska judiciary has subject matter jurisdiction and personal jurisdiction over the Defendant because Monsanto maintains a business presence here, is registered to transact business here, contracts for sale of, and sells its products, including Roundup® herbicides in multiple presentations here, promotes the sale of Roundup® here, and caused tortious injury to Mr. and Mrs. Stiver by its failure to warn and misrepresentations of its product, all of which occurred here. *Neb Rev Stat* § 25-536. Venue is proper in Frontier County where a substantial part of the activity giving rise to this claim occurred and where Defendant may be served with process, and where Plaintiffs reside. *Neb Rev Stat* § 25-403.01.

11.     Mr. Stiver is not the only person in Nebraska whose bloodstream cancer disease was caused by Monsanto's Roundup®.

## Facts Re: Gary Stiver, Glyphosate, Roundup® & Monsanto

12.     Gary Stiver, born in xxxx xx, 1944 enjoyed good health, and had no predispositions, family history, or medical history that suggested he had any propensity to develop non-Hodgins lymphoma ("NHL").

13.     Mr. Stiver's spouse, Marilyn, became his caregiver and provider. Mrs. Stiver has an independent, derivative claim because of her husband's injuries and the demands on her to provide care. She seeks judgment for her losses as well.

14.     Roundup® was sold as safe and not posing lethal dangers to human users. Mr. Stiver was not warned otherwise. Roundup® is formulated with glyphosate as a principal ingredient. A recently as the summer of 2019, Monsanto purchased full-page advertisements in U.S. national newspapers advertising its Roundup® products as safe and as a product that cannot cause cancer despite the fact that the overwhelming evidence of the international scientific community, and the virtually universal judgments of courts in the United States and

4

in international settings, is to the contrary. Monsanto gave no warning of these matters, even as late as June 2019, and thereafter.

15.     Glyphosate is a broad-spectrum, non-selective herbicide used in Monsanto's Roundup®. Glyphosate disrupts a plant's ability to form certain amino acids necessary for protein synthesis. Roundup® generally kills targeted plants within two to three days. Before they die, target and non-target plants absorb Roundup® containing glyphosate. The absorbed substance cannot be removed from plants by washing, peeling, or even by milling, baking or brewing, or from the human body by washing or flushing or with any known antidote.

16.     The herbicidal properties of glyphosate were discovered in 1970 by a Monsanto chemist. The first glyphosate-based herbicide was introduced by Monsanto in the mid-1970s under the brand name Roundup®.  Roundup® was not truthfully portrayed though Monsanto did, or should have, known the truth at the outset about the dangers of its product. It gave no warnings in the beginning, or thereafter. Despite known and mounting evidence of the dangers of Roundup®, Monsanto did not change its formulation, marketing or disclosure practices.

17.     Since then, Monsanto has promoted use of its Roundup® product containing glyphosate, touting it as a remarkable technological breakthrough that could kill weeds without causing harm to people or the environment.

18.     Monsanto knew, for all or substantially all of those forty (40) years that its statements were false. Internally at Monsanto, Roundup® was so popular, and had so much profit potential for Monsanto that the company falsified data, sponsored, promoted, developed and distributed false studies masquerading as science, and vilified accurate studies suggesting problems with the product. It did so for the purpose of masking Monsanto's knowledge of Roundup®'s dangers from the unsuspecting public and inducing the public to believe that Roundup® as safe and harmless to human beings, in order to maximize its continuing acceptance of the marketplace by foreseeable users who were targets of the Monsanto public relations campaign and who relied upon the statements made by Monsanto about the safety of the product.   Mr. Stiver is a victim of this deception.

19.     In the United States, Monsanto paid massive political campaign contributions, spent huge sums for "government relations", and expended large amounts of money on

5

universities to influence and purchase their research, and for university endorsements to disguise dangers of Roundup®.

20.     The World Health Organization's International Agency for Research of Cancer (IARC), an organization of the United Nations World Health organization, announced in 2015 that its research established that glyphosate, and Roundup® are probable carcinogens. This was the first information of any significant public availability, and it informed only a small, select part of the public in the United States of the cancer-causing dangers of Roundup® products. Since then, other medical and scientific studies have also revealed this fact, and evidence of the cancerous nature of the substance continues to grow. It is now established by objective scientific research that glyphosate and Roundup® cause NHL. Roundup® was a proximate cause of the NHL developed by Plaintiff.

21.     In the United States, the manufacture, formulation, and distribution of certain chemicals, including herbicides and specifically including Roundup® is regulated under federal law by 7 USC §§ 136 et. seq.  The statute is known the *Federal Insecticide, Fungicide and Rodenticide Act* ("FIFRA").

22.     Under FIFRA, all pesticides must be registered with the Environmental Protection Agency before they may be distributed, sold, or used. This is because they are toxic to plants, animals, and humans. The EPA, as a part of the registration process, requires that products be tested and evaluated, pass those tests, and that the results of the tests be submitted to the EPA for assessment. Even after assessment by the EPA, its decision is not an assurance of safety or government endorsement. EPA approval for marketing is not a regulatory decision about safety.

### Registration of Herbicides

23.     The EPA does not deem products "safe," but only that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 USC § 136a(c)(5)(D).

24.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 USC § 136(bb). FIFRA

6

thus requires EPA to conduct a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

25.     FIFRA generally requires that a registrant, Monsanto in the case of Roundup®, conduct the health and safety testing of pesticide products in accord with approved protocols. The data produced by the registrant must be submitted to the EPA for review and evaluation. The submission must be full, complete, and truthful.

26.     Each product submitted to the EPA for evaluation undergoes initial registration. Singular registration is not an all-encompassing, all-times, and non-changing event. Data necessary to achieve registration has changed from time to time. Re-registration is required by 7 USC § 136a-1. This requires additional tests and submissions. In Monsanto's case, it undertook those additional tests and performed them. The tests were falsified and the laboratories that conducted them for Monsanto were caught and punished. Still, Monsanto concealed these events and used Roundup® profits to obscure and conceal adverse information with its marketing campaigns. It did so successfully for many years.

27.     Before Plaintiff's diagnosis, but after exposure to Roundup®, the EPA announced plans to release a preliminary risk assessment of Roundup®. This was to be done in relation to the re-registration process and to be completed not later than July 2015. The EPA is believed to have completed its review of glyphosate, Roundup®'s chief ingredient in early 2015. But, it chose to delay releasing the results because of World Health Organization health-related findings. Those findings, by the WHO's International Agency for Research of Cancer (IARC) affirmatively found that Roundup® and its glyphosate component are probably carcinogenic agents that cause cancer, and specifically Non-Hodgkin's lymphoma, in human beings.

28.     In April 2016, the EPA posted a risk assessment of glyphosate on its website and then immediately retracted it. The EPA subsequently indicated that the posting was inadvertent, that the document posted was not the EPA's final assessment or even a preliminary one, and that the EPA intended to issue a final report by the end of 2016. However, Monsanto continue to deny all risks its Roundup® products were the cause or a substantial factor in causing any cancer or other serious health problems for human users.

7

101497702

**Scientific Falsehoods Re: Marketing and Sale of Roundup®**

29.     Monsanto manipulated "scientific" data to market its Roundup® products. It concealed risks to humans about which it had knowledge. Consumers, including Plaintiffs, relied on Monsanto to be truthful and transparent, but Monsanto was not.

30.     At least as early as 1985, studies existed demonstrating that the glyphosate component of Roundup® was believed to be an agent that caused cancer in laboratory animals and that it was possibly carcinogenic to humans. Monsanto knew of these studies. However, Monsanto flexed its political and government relations muscles, provided studies to the EPA, and the EPA changed its classification of the substance. When it did so in 1991, the EPA classified the glyphosate component of Roundup® as yielding evidence of non-carcinogenicity in humans.[1]   The EPA announcement, however, emphasized that the designation of Roundup® or glyphosate in what it called Group E, i.e., non-carcinogenicity in humans, was "based on the available evidence at the time of evaluation and should not be interrupted as a definitive conclusion that the agent will not be a carcinogen...." Monsanto, continued to sell its Roundup® products as safe, not carcinogenic, and without warnings. It also aggressively denied any health hazard associated with the use of Roundup® products.

31.     The EPA, itself, however found that Monsanto, and laboratories it employed, manipulated tests of toxicity, misrepresented them, and affirmatively committed fraud. Monsanto's laboratories used for this purpose in committing these wrongful acts included Industrial Bio-Test Laboratories. The studies falsified included at least thirty (30) test runs on glyphosate and products containing it including residue studies required by the EPA to register Roundup® for sale.

32.     The U.S. Food and Drug Administration discovered in an inspection of IBT, significant discrepancies between raw data and final reports. This led to an EPA audit of IBT and a determination that its toxicology studies on Roundup® were invalid. The EPA found the firm engaged in routine falsification of data making it "hard to believe the scientific integrity of the studies when they said they took specimens from the uterus of male rabbits." Three (3) senior executives of IBT were convicted of criminal fraud.[2]

---

[1]  See Fn 1, 2.
[2]  Id.

8

33.    Separately, Monsanto engaged Craven Laboratories to preform tests, including studies of Roundup®. During the same year that they were engaged by Monsanto, Craven Laboratories had three (3) of its employees indicted and convicted of fraudulent laboratory testing practices involving pesticides and herbicides.[3]    While Monsanto denies that the laboratories acted at its direction, it did not disavow the results until it was forced to by the Federal Government through the prosecutions noted above. Monsanto has failed to explain why it did not aggressively and publicly disavow the occurrences and make its customers and the public aware of the testing results immediately. It continues to market Roundup® and continues, even on its website, to contend glyphosate is safe. It has made no new disclosures or warnings, but marches on with its statements, undaunted by rejection from science, courts, juries and hundreds of national and local governments.[4]

34.    Monsanto dominates and controls the market. Its RoundupReady® seed, became so dominant in row crop production, and production of many small grains and alfalfa that farmers across the United States were forced to use Roundup® and RoundupReady® seed and therefore to use Roundup® herbicides.

35.    Monsanto became so dominant in the marketplace that its product crowded out competitors, and it became virtually impossible in many markets to find or secure herbicides that were compatible with seeds and grasses that were not Monsanto products containing glyphosate marketed under the Roundup® label. Plaintiffs and the public, faced this circumstance.[5]

36.    Monsanto continued to conceal what it knew or should have known about Roundup®. It is believed to have continued to perpetuate its conscious, deliberate disregard for the truth about Roundup® because the product was a key ingredient to Monsanto's dominance in the market place, its dramatically expanding market share, and its assumption

---

[3]  Id.
[4]  R. Raman, the impact of Genetically Modified (GM) crops in modern agriculture: A review, 8, Biotechnology and Agriculture and the Food Chain, No. 4 (2017) available at
https://www.tandfonline.com/doi/full/10.1080/21645698.2017.1413522 Also see, Ashley Hutchinson et al., "Roundup® Ready": the first widely used genetically modified crop, the environment and society portal http://www.environmentandsociety.org/tools/keywords/Roundup®-ready-first-widely-used-genetically-modified-crop

of a position of influence, power, and authority in the industry that was essentially unparalleled.

37.    In addition, as a result of Roundup® sales, Monsanto's primary corporate focus shifted to its agricultural division, because it outperformed the chemicals division in revenues and income by dramatic margins and with rapid growth.

38.    Monsanto developed genetically modified seeds which it called and labeled as "Roundup® Ready". Defendant recognized its potential to secure even more market gains with control over seed for crops that could be made resistant to Roundup®. These were seeds resistant to glyphosate, and permitted farmers to use Roundup® on their fields during the growing season without harming the crop. This effort permitted Monsanto to expand the market for Roundup® to the nation's farmers and to use the income from those sales to further dominate the domestic market for commercial uses and residential uses akin to the uses experienced by the sickened Plaintiff

39.    Monsanto's biotechnology seeds became dominant worldwide. Roundup® was the odds-on, and virtually ubiquitous herbicide with what, through the company's marketing strategy, became a household term synonymous with weed killer or herbicide. Roundup®, and weed killer, and herbicide, became indistinguishable in the minds of many Americans. Plaintiffs are among these victims. Mr. Stiver is a person who was a foreseeable human user of Defendant's Roundup®. Plaintiff used Roundup® in accord with manufacturer directions and for its intended purposes at all times.

**Monsanto Falsely Promoted Roundup®**

**as Safe Despite Contrary Acknowledgements**

40.    Monsanto has been taken to task by law enforcement, and promised to discontinue its false statements about Roundup® but failed to keep its word, even after being compelled in a Consent Agreement with a Chief State Law Enforcement Official to do so.

41.    In 1996, the New York Attorney General ("NYAG") sued Monsanto for false and misleading advertising of Roundup® products. The New York case challenged Monsanto's representations that its spray-on glyphosate-based herbicides, including Roundup®, were:

10

41.1.   "Safer than table salt" and "practically non-toxic" to mammals, birds, and fish.

41.2.   "Remember that environmentally friendly Roundup® herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks, and fences."

41.3.   "And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got a weed, brush, edging or trimming problem."

41.4.   "Roundup® biodegrades into naturally occurring elements."

41.5.   "Remember that versatile Roundup® herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

41.6.   "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it."

41.7.   You can apply Roundup® with "confidence because it will stay where you put it," it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Roundup® into natural products.

41.8.   "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

41.9.   "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

41.10.  "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds, and fish."

41.11.  "Roundup® can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the

11

ground and a pet dog standing in an area that has been treated with Roundup®.

42.     Monsanto either could not, or chose not to, defend these and similar hyperbolic false statements. On November 19, 1996, Monsanto entered into an agreement called an Assurance of Discontinuance with the Attorney General of New York. In it, Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that Monsanto Glyphosate-containing pesticide products or any of them, possessed any of these features, advantages or elements described below. These are assurances were made by Monsanto to the Attorney General: Monsanto would cease and desist in representing its glyphosate-containing pesticide products or any components thereof as:

    42.1.   Safe, non- toxic, harmless or free from risk;

    42.2.   Biodegradable;

    42.3.   Stable so they will stay where applied and will not
            move through the environment;

    42.4.   "Good" for the environment or are "known for their
            environmentally friendly characteristics";

    42.5.   Safer or less toxic than consumer products other than herbicides; and,

    42.6.   "Practically non-toxic."

43.     Monsanto double crossed the Attorney General of New York, and the public because it did not alter its advertising in the same manner in any State other than New York and, for the most part still has not done so today.

44.     Monsanto also double crossed and misled the people of the world. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean." Around the world, nations, cities, and counties have banned Roundup® and glyphosate herbicides. Countries with bans, or with major municipal and subdivision bans include France, Austria, Australia (urban and local bans), Belgium, Bermuda, Canada (8 of 10 provinces have some restrictions, and the cities of Montreal and Vancouver), Czech Republic, Denmark (restrictions, bans in some

12

cities), Netherlands, Sri Lanka, Colombia, El Salvador, India (Punjab and Kerala States), Italy (restrictions), Luxembourg (restrictions and EU vote to ban),  Netherlands, New Zealand (large urban bans), Portugal (in public places), Scotland (large urban bans), Spain (large urban bans), United Kingdom (bans in many boroughs and townships), Vietnam, Saudi Arabia, Kuwait, Qatar, Bahrain, Oman, United  Arab Emirates, and others. Germany recently announced a ban by the end of 2023. In the United States, Roundup® has been banned in or its sale has been conditioned to require warnings or curbs on usage, in California, and communities in Colorado, Iowa, Florida, North Carolina, Virginia, Maryland, Illinois, California, Oregon, Massachusetts, New Mexico, Los Angeles County, CA (moratorium), the U.S. cities of Seattle, Miami, Austin, Portland ME, Key West, and others.[6] This was not known to Mr. Stiver until days before the litigation commenced.

## Assessments of Glyphosate and Roundup®

45.     Monsanto concealed what it knew of glyphosate and Roundup® from the scientific community and the world for many years. The International Agency for Research of Cancer ("IARC") is the specialized cancer agency of the World Health Organization, and organization of the United Nations.  IARC promotes international collaboration in cancer research, "bringing together skills in epidemiology, laboratory sciences, and biostatistics to identify the causes of cancer[.]" IARC assesses whether chemicals are carcinogenic through its Monograph issuance program and protocol.

46.     IARC Monographs identify environmental factors that are carcinogenic hazards to humans. These include chemicals, complex mixtures, occupational exposures, physical agents, biological agents, and lifestyle factors. National health agencies can use this information as scientific support for their actions to prevent exposure to potential carcinogens. Interdisciplinary working groups of expert scientists review the published studies and assess the strength of the available evidence that an agent can cause cancer in humans.

47.     The principles, procedures, and scientific criteria that guide the evaluations are described in the Preamble to the IARC Monographs. The preamble is a forty + page expression of one of the most sophisticated scientific processes used in the world to review

---

[6] Sources: Public news agencies and compendiums deemed reasonably reliably by Plaintiff's counsel.

101497702

and evaluate substances for their impact on human health.   The procedure requires evaluations to be performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest. The studies considered the various exposure groups, including occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland, municipal weed-control workers in the United Kingdom, and para-occupational exposure in farming families.

48.     In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology journal reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

49.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies showed a human health concern from agricultural and other work-related exposure to glyphosate. The IARC Working Group conducted a systematic review of over 15 studies designed to assess whether there was an association between Roundup® exposure in agricultural workers and Non-Hodgkin's lymphoma (NHL). The researchers reviewed each study, identified the results and assessed each study's strengths and weaknesses. The IARC Working Group concluded that, despite the limited evidence concerning the carcinogenicity of glyphosate in humans, a "positive association has been observed for non-Hodgkin's lymphoma."

50.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. It was authored with input of 17 experts from 11 countries who met from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. Among the members were Lauren Zeise, Ph.D., of the California Environmental Protection Agency, Matthew T. Martin, Ph.D, a scientist with the U.S. Environmental Protection Agency, and Gloria D. Jahnke, D.V.M., D.A.B.T. of the National Institute of Environmental Health Sciences. The 2015 Monograph was updated in 2016.[7] Plaintiffs did not learn, and could not have learned, of this information until much later.

---

[7]   The 2016 updated Monograph can be seen at https://monographs.iarc.fr/wp-content/uploads/2018/06/mono112-10.pdf

14

51.    After adherence to its established procedures, the IARC Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

52.    Glyphosate was the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012. Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

53.    The IARC Working Group found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed. In assessing the genotoxicity of glyphosate (the property of chemical agents that damages the genetic information within a cell causing mutations, which may lead to cancer), the IARC Working Group concluded "[t]here is strong evidence that glyphosate causes genotoxicity."

54.    IARC also assessed whether glyphosate exposure can induce oxidative stress, which is thought to be involved in the development of numerous conditions, including cancer, autism, and Parkinson's disease.   IARC concluded that "strong evidence exists that glyphosate ... can induce oxidative stress." This could be an important mechanism by which Roundup® causes cancer.

55.    A   section of the IARC monograph for glyphosate is devoted to exposure to humans; it examines studies of glyphosate exposures in various settings including agricultural ones. The IARC Working Group noted that glyphosate has been detected in urine of agricultural workers, indicating absorption. The IARC Working Group specifically evaluated farm workers in the United States, and found that, within the days following the application of Roundup® to a crop, approximately 60% of farm workers tested positive for glyphosate in the urine. Additionally, the IARC Working Group noted that soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

15

56.     IARC reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. It found that results of this study support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic lymphocytic Leukemia (CLL), and several other cancers.

57.     In 2014 and before, scientists published a systematic review and meta-analysis on the relationship between non-Hodgkin lymphoma and occupational exposure to agricultural pesticides, including glyphosate, in the International Journal of Environmental Research and Public Health. The study showed a statistically significant association between farm workers exposed to Roundup® and non- Hodgkin lymphoma. The study confirmed two smaller studies from 2002 and 2008, published in the journal Leukemia & Lymphoma (2002) and the International Journal on Cancer (2008).

58.     Recent studies, including a glyphosate residue study published in the Journal of Environmental & Analytical Toxicology in 2014, concludes that "chronically ill humans showed significantly higher glyphosate residues in urine than healthy population." Glyphosate has been detected in the blood and urine of agricultural workers, indicating that agricultural use of Roundup® leads to its absorption. Monsanto continues to promote Roundup® as safe even in May 2019. During May, Monsanto ran newspaper advertisements, full-page in size, in the Wall Street Journal and other widespread magazines, as well as in advertisements and promotions on television, radio, in other media, and multiple languages, across the United States. It did not acknowledge or change its actions after researchers at the University of Washington disclosed, on February 13, 2019, findings and a new study conducted there, including a comprehensive review of existing literature, that exposure to Roundup® increases the risks of certain cancers, including NHL, by more than 40%. The University of Washington studies, entitled Mutation Research - Fundamental and Molecular Mechanisms of Mutagenesis (2019) (ISSN:0027-5107, available at https://www.journals.elsevier.com/mutation-research-fundamental-and-molecular-mechanisms-of-mutagenesis).

59.     Scientific research also discloses that carcinogenic properties of Roundup® are magnified by the addition of adjuvants in the Roundup® formulation. Adjuvants are

16

chemicals designed to modify or enhance the effects of other agents. Monsanto includes adjuvants with glyphosate in its Roundup® products; they are designed to increase the effectiveness of the herbicide. But the added adjuvants greatly increase the carcinogenic properties of Roundup®. Monsanto systematically tested glyphosate without adjuvants. The results are misleading. Yet, Monsanto used those tests and results to tout Roundup® as safe to U.S. federal regulators.

### Mr. Stiver's Exposure to Glyphosate and Discovery Rule; Equitable Estoppel

60.     Mr. Stiver's intensive adult use of Roundup® commenced in approximately 1981, and continued until 2018.    Mr. Stiver was diagnosed with non-Hodgkin's lymphoma in May 2016.   He suffers from follicular small b-cell lymphoma which was initially treated in 2016 and driven into remission, but has now reappeared and is aggressively attacking his body in 2019.   Mr. Stiver neither knew nor had reason to believe there was a link between the disease and his use of Roundup®.   He relied on Monsanto and its assurances to the public. Mr. Stiver also relied on the absence of any warning, caution, or contrary findings disclosed on the label of the Roundup® products he purchased and used

61.     After his May 2016 diagnosis, Mr. Stiver underwent aggressive care. His care regimen bore consequences as best they could, and he became a watch and wait patient for a time.  His cancer recurred in 2019 in an aggressive form, and required immediate medical, including surgical, intervention.    His health is uncertain and dangerous circumstances as the date of this Complaint.

62.     Monsanto's effectively concealed the dangers of Roundup® and glyphosate. Many steps were taken by Monsanto to achieve this objective.  Among others they included:

> 62.1.  Disregarded scientific studies drawing a link between Roundup® and glyphosates herbicides in general, and human illness including blood born cancers and NHL.
>
> 62.2.  Epidemiologic studies disclosing the link the between Roundup®, glyphosates and blood born cancers including NHL.

17

62.3.   Internal scientific data, warnings, and revelations from its own personnel which were quashed by Monsanto internally.

62.4.   Influence practiced on politicians and government officials to paralyze, delay, or wholly prevent government action to protect the public from Roundup® and glyphosate.

62.5.   An aggressive campaign, which it continues to present, designed to teach the safety of Roundup® and to deny the scientific evidence linking it to cancers, including NHL, that are lethal to human beings.

62.6.   Assertion, despite overwhelming contrary evidence by objective scientific research not financed by Monsanto, disclosing that glyphosate causes changes in the human body that produce cancers because of cellular level damage to human tissue.

62.7.   Affirmative financing activities masked as objective scientific studies, despite the lack of objectivity in the studies, in order to produce skewed results, further masquerading as research.  These results were then used by Monsanto to promote, taught, and advance used of its products despite the dangers posed by them.

63.   Monsanto's conduct induced members of the public, including Plaintiffs to rely upon Monsanto's statements. Monsanto is by virtue of the its conduct equitably estopped to assert certain defenses, including a) contributory fault, b) comparative fault, c) alternate causation, d) the statute of limitations, and e) used of its products without wearing protective equipment.  Monsanto's statements inducing reliance and action by users like Plaintiffs were false statements of material fact. They were intended to induce reliance and did so.  These statements were made when Monsanto knew they were false or at a minimum knew that they were highly controverted and that substantial scientific evidence, denied Monsanto, concluded that a causal connection exists between Roundup® and cancers including NHL.

64.   Plaintiffs did not discover, and did not know of facts that would cause a reasonable person to suspect the risks associated with the use of and/or exposure to Roundup® and glyphosate, nor would a reasonable and diligent investigation have disclosed that Roundup® and glyphosate would cause Mr. Stiver's illnesses. Monsanto also

18

persistently denied the existence of any link between Roundup® and NHL or bloodstream cancers.

65.     Monsanto was under a continuous duty to disclose to consumers, users and other persons coming into contact with its products, including Plaintiffs accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate. Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the risks associated with the use of and/or exposure to its products.

66.     As a proximate result of Monsanto's wrongful acts and omissions in placing its defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, and in breach of its warranties, negligence and strict liability, Mr. Stiver used, and continued to use, Roundup®. The carcinogenic properties of Roundup® caused or acted as material, proximate causes of Plaintiff's disease. Mr. Stiver endures the anguish of life threatening non-Hodgkin's lymphoma.

**Claims and Allegations (Additional)**

67.     All allegations above are renewed here.

68.     Plaintiffs' claims are made under the law of Nebraska where Plaintiffs' primary use of Roundup® and injuries occurred, where his injuries occurred and where he resides and used Defendant's product.   Nebraska is where the Defendant sold the products he used.  In the event Nebraska law imposes a duty or obligation on Monsanto in excess of those required by Federal Law, Plaintiffs do not assert the state law claims. On the contrary, all claims asserted by Plaintiffs are claims parallel with Federal Law and Federal Legal Duties. Accordingly, Monsanto violations of Nebraska law so limited were also violations of Federal Law.

69.     Plaintiffs do not seek to enforce Federal Law, instead they invoke the law of Nebraska, but limit the scope and extent of their claims under Nebraska law so those claims assert duties against Monsanto equal to but no greater than Federal Law imposed on Monsanto.  Accordingly, Plaintiffs claim that Monsanto violated 7 USC § 136, including subparts (g) & (j), and Federal regulations including 40 CFR § 156.10 (a) (5). They did so

19

by distributing Roundup® when it was misbranded contrary to legal requirements. The distribution of a misbranded herbicide is a violation of law and is a tort, because it violates Iowa law when considered in parallel with Federal requirements.   These violations are evidence of negligence and support Plaintiffs' claims of strict liability in tort, strict liability for failure to warn, negligence, and breaches of implied warranties and express warranties.

### First Theory: Strict Liability (Design Defect)

70.    All allegations above are renewed here

71.    Plaintiffs respectfully assert that Monsanto is strictly liable in tort to them for defective design of its Roundup® products. A substantial part of the activity undertaken by Monsanto as described in this Complaint, putting in the allegations above and below, occurred in Nebraska.

72.    At relevant times, Monsanto was engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products. These products, including the ones used by Mr. Stiver were defective and unreasonably dangerous to foreseeable users like Mr. Stiver and including him. The products were unreasonably dangerous when they were placed by Monsanto into the stream of commerce. Monsanto ultimately controlled and supervised these actions. At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by Mr. Stiver as safe when they were not as described above.

73.    On the contrary, Monsanto's Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, Mr. Stiver. These products left Monsanto's immediate control and were placed onto the market and reached intended consumers, handlers, and users coming into contact with these products in Nebraska and throughout the United States, including Mr. Stiver, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

74.    Monsanto's Roundup® products including those to which Mr. Stiver was exposed were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate. The risks and dangers of those products exceeded the

20

benefits allegedly associated with them as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto. Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

75.     Monsanto knew or had reason to know that its Roundup® products when placed in the stream of commerce were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto in one or more of these ways:

75.1.   Monsanto's Roundup® products were defective in design and formulation. Consequently, these products are dangerous to an extent beyond that which an ordinary consumer would contemplate.

75.2.   Monsanto's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

75.3.   Monsanto did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate alone or with surfactants added by Monsanto before or while marketing them.

75.4.   Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products.

75.5.   Monsanto could have employed safer alternative designs and formulations, but did not do so.

76.     At all times relevant to this litigation, Mr. Stiver used and/or was exposed to the use of Monsanto's Roundup® products in an intended or reasonably foreseeable manner, i.e., as a consumer, without knowledge of Roundup®'s dangerous characteristics.

77.     Monsanto's Roundup® products were and are more dangerous than alternative products.   Monsanto could have designed its Roundup® products to make them less dangerous. Indeed, at the time Monsanto designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

78.     At the time Roundup® products left Monsanto's control, practical, feasible and safer alternative designs were available that would have prevented the harm without

21

substantially impairing the reasonably anticipated or intended function of Monsanto's herbicides.

79.     As a result of the unreasonably dangerous condition of its Roundup® products, Monsanto is strictly liable to Mr. Stiver. The defects in Monsanto's Roundup® products were substantial and contributing factors in causing Mr. Stiver's injuries and, but for Monsanto's misconduct and omissions, Plaintiffs would not have sustained injuries.

80.     Monsanto's defective design of its Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including Mr. Stiver.

81.     Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including Mr. Stiver with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Monsanto made conscious decisions not to redesign, warn or inform the public. Monsanto's reckless conduct warrants an award of punitive damages.

82.     As a  proximate result of Monsanto placing its defective Roundup® products into the stream of commerce, Mr. Stiver developed Non-Hodgkin's lymphoma and personal injuries which are permanent in nature.

83.     As a proximate result of Monsanto placing its defective Roundup® products into the stream of commerce, as alleged herein, Mr. Stiver sustained a past and future loss of earning capacity and property damage.

### Second Theory:  Strict Liability (Failure to Warn)

84.     All allegations above are renewed here.

85.     Monsanto had a duty to exercise reasonable care to avoid physical harm to Mr. Stiver by preventing the recognizable and foreseeable harm it would cause by its marketing of its Roundup® ® products.  Plaintiffs contend that Monsanto sold its Roundup® products in a defective condition unreasonably dangerous to consumers, including him. Mr. Stiver contends Monsanto was engaged in the business of selling the product which was expected to and did reach him without substantial change in condition from that in which it was sold, and

22

that it was not misused by Mr. Stiver. Plaintiffs' damages are not subject to the economic loss rule.

86.     Plaintiffs respectfully assert that Monsanto is strictly liable in tort to him for failure to warn of the dangers of its Roundup® products. At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate either alone or with adjuvants and surfactants. These actions were under the ultimate control and supervision of Monsanto. It did so from its headquarters in St. Louis Missouri.

87.     Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products. While doing so, Monsanto advertised or marketed Roundup® to consumers including Plaintiffs, Monsanto had, but failed to discharge, a duty to warn Plaintiffs and the public of risks associated with use of Roundup®.

88.     Monsanto had a duty to reasonably test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn Plaintiffs of dangers associated with Roundup® use and exposure. Monsanto, as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

89.     At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

90.     Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by Monsanto's herbicides, including Plaintiffs.

23

91.     Despite knowing or having a duty to know, that Roundup® posed a grave risk of harm, Monsanto failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. Monsanto failed to adequately warn consumers, i.e., the reasonably foreseeable users, of the risks of exposure to its products. Monsanto wrongfully concealed information concerning the dangerous nature of Roundup® and glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

92.     At all times relevant to this litigation, Monsanto's Roundup® reached the intended consumers, handlers, and users or other persons coming into contact with these products, including Plaintiffs without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

93.     Plaintiff was exposed to Monsanto's Roundup® products in the course of spraying Roundup® without knowledge of their dangerous characteristics. Plaintiff used the dangerous product for its intended purpose and without misuse.

94.     Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to and at the time of Mr. Stiver's exposure. Plaintiffs relied upon the skill, superior knowledge, and judgment of Monsanto to know about and disclose serious health risks associated with using the products.

95.     Monsanto knew or should have known that the minimal cautions disseminated with its Roundup® products were inadequate, failed to communicate adequate information on the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural, and horticultural applications.

96.     The information Monsanto did impart failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiffs to utilize the products safely and with adequate protection. Instead, Monsanto disseminated information that was inaccurate, false, and misleading. This misleading information and denial of the danger of glyphosate has been unremitting conduct of Monsanto to the present day.

97.     This alleged failure to warn is not limited to the information contained on Roundup®'s labeling. Monsanto was able, in accord with federal law, to comply with

24

Nebraska law by disclosing the known risks associated with Roundup® through other non-labeling mediums, i.e., promotion, advertisements, public service announcements, and/or public information sources. Monsanto, however, deliberately did not do so.

98.     Monsanto is liable to Plaintiffs for injuries caused by its negligent or willful failure, as described above, to provide adequate warning and precautions as alleged. As a proximate result of Monsanto placing its defective Roundup® products into the stream of commerce, Mr. Stiver developed small B cell follicular lymphoma, a form of non-Hodgkin's lymphoma, and sustained a loss of income, loss of earning capacity and property damage, as well as non-economic damages. As a further proximate result of Monsanto placing its defective Roundup® products into the stream of commerce, there was a measurable and significant interval of time during which Plaintiffs suffered great mental anguish and other personal injury. In addition to blood cancer, Mr. Stiver continues to be aware of the presence of NHL disease in his body.  He suffers ongoing emotional distress as a result. This distress is chronic and expected to be permanent.

### Third Theory: Negligence

99.     All allegations above are renewed here.

100.     Monsanto owed a duty of reasonable care to all foreseeable users, including Plaintiffs, but it breached that duty as alleged below. The breach proximately caused damages to Plaintiffs.

101.     Monsanto, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiffs.

102.     Monsanto owed to Plaintiffs and the public the duties that follow:

102.1. To exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products. This included the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

102.2. To exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Monsanto's duty of care owed to consumers and

the general public. This included the duty to provide accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®. In particular, its active ingredient glyphosate. Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate and its Roundup® products.

102.3. To warn of the risks.

102.4. To withhold the product from the market.

102.5. To inform Mr. Stiver of the risks.

102.6. To exercise reasonable care in the marketing and representation of Roundup® to the public.

102.7. To refrain from falsifying, withholding or manipulating unfavorable research data, or feigning the favorable research data.

102.8. To label its product with complete disclosures of risks.

103. Monsanto breached each and all of its duties as alleged above. It was negligent in that it:

103.1. Negligently designed and formulated its Roundup® products.

103.2. Negligently tested its Roundup® products and negligently failed to continue to test them.

103.3. Negligently mixed and batched its Roundup® products.

103.4. Negligently submitted and withheld information about its Roundup® products for governmental regulatory purposes.

103.5. Negligently failed to supplement its governmental submissions with new information about the dangers of Glyphosate and its Roundup® products.

103.6. Negligently manufactured its Roundup® products.

103.7. Negligently labeled its Roundup® products.

103.8. Negligently marketed its Roundup® products.

103.9. Negligently packaged its Roundup® products.

26

103.10. Negligently advertised & commercialized Roundup® products.

103.11. Negligently distributed Roundup® products in commerce.

103.12. Negligently advertised and commercialized Roundup®

103.13. Negligently violated its agreement with New York's A.G..

103.14. Negligently failed to disclose the truth about the risks associated with Roundup® in its promotional efforts, outside of the context of labeling.

103.15. Negligently disregarded scientific, medical and epidemiological studies and findings about the dangers of Roundup®.

103.16. Negligently caused or permitted its advertising inaccuracies to continue even after it knew exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and it failed to prevent or adequately warn of these risks and injuries.

103.17. Negligently failed to provide adequate instructions, guidelines, and safety precautions to reasonable users including Plaintiffs..

103.18. Negligently failed to inform Plaintiffs and the public of safer alternatives though it knew they existed.

103.19. Negligently failed to disclose that its Roundup® products are probably carcinogens and do cause NHL in a population of foreseeable users including Plaintiffs after use of the product.

103.20. Negligently withheld information necessary permit an informed user with an option to use something else to make an informed selection.

103.21. Negligently failed to comply with safe practices and standards, including federal regulations governing the design and formulation, testing, continuing testing, disclosure, approval procurement, labeling, advertising, promotion, and distribution of its product and thereby failed to inform both government regulators and foreseeable users, including Plaintiffs.

104. These negligent acts and omissions occurred when and after Monsanto, knew or had reason to know of the defects inherent in its products, and knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm

27

and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

105.    Monsanto knew and/or should have known that it was foreseeable consumers such as and including Plaintiffs would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®. He could not have known of his injuries until he was diagnosed.

106.    Plaintiffs did not know and could not discover without full disclosure by Defendant, the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

107.    Monsanto's conduct was negligent. But it was also reckless. Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiffs. Monsanto's reckless conduct therefore warrants an award of punitive damages.

108.    As a proximate result of Monsanto's negligence, Mr. Stiver sustained temporary and permanent bodily impairments,  personal injuries, illness, medical and rehabilitation care and emotional distress. Mr. Stiver remains under medical supervision and care. He also suffered permanent loss of his ability to enjoy life with confidence of good health, and a permanently impaired body. Monsanto's negligence was a proximate cause of the Mr. Stiver's injuries. Plaintiffs' damages were also proximately caused by Monsanto in this way.

109.    The amount of damages continues to accrue. Medical care expenses in medicine continue to be necessary and accrue. Mr. Stiver's life expectancy is truncated.  His full damages are not yet known. Leave of Court is requested to amend this Complaint at the time of the final pretrial conference and a trial to state the full amount.

**Fourth & Fifth Theories:**

**Intentional and/ or Negligent Misrepresentation**

110.    All allegations above are renewed here.

111.    Monsanto made the affirmative representations alleged in ¶¶ 1,4-5,8, 14, 16-19, 29-43, 45, 59-60, 62-65, 75, 80-83, 91, 94, 107 above, and 127 below.

112.    Monsanto's representations were false. These false claims included false affirmative statements and concealed facts that made affirmative statements, in the context in which they were made, false. They were made to induce reasonable, foreseeable members of the public including Plaintiff to rely upon them. Plaintiffs did so rely and he did so reasonably. Monsanto knew its representations were false, or in the alternative it negligently made and repeated the representations without disclosing material information contradicting the representations or drawing them into serious question. This made discovery of Mr. Stiver's condition more complex. It also delayed discovery.

113.    Mr. Stiver sustained damages and contracted NHL as a proximate result of the misrepresentations of Monsanto. All damages described above and requested in the Request for relief below are sought.

### Sixth Theory: Implied Warranty

114.    All allegations above are renewed here.

115.    Monsanto engaged in the business of testing developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto. Monsanto impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

116.    Monsanto is a merchant with respect to herbicides, herbicide labeling and warnings, crop, lawn, and garden chemicals including herbicides and including its Roundup® products. It employs persons with special knowledge, skill, and experience in the products and plants.

117.    Before Mr. Stiver was exposed to the aforementioned Roundup® products, Monsanto impliedly warranted to its consumers—including Plaintiffs—that its Roundup® products were of merchantable quality, safe and fit for the use for which they were intended; specifically, as agricultural herbicides to kill weeds without harm to humans.

118.    Monsanto failed to disclose that Roundup® has dangerous propensities when used as intended and that use of and/or exposure to Roundup® and glyphosate-containing

29

products carries an increased risk of developing severe injuries and death, including Mr. Stiver's cancer. Mr. Stiver was the intended beneficiary of the implied warranties made by Monsanto to the purchasers of its herbicides as a foreseeable human user. He used the Roundup® products as intended and without alteration.

119.   Mr. Stiver used at the Roundup® product as Monsanto intended that its Roundup® products be used. In reliance upon Monsanto's implied warranty, Mr. Stiver used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Monsanto.

120.   Monsanto breached its implied warranty to Mr. Stiver in that its Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

121.   The harm caused by Monsanto's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

122.   As a proximate result of Monsanto's breach of implied warranty, Mr. Stiver sustained a loss of earning capacity, and property damage.

### Seventh Theory: Breach of Express Warranties

123.   All allegations above are renewed here.

124.   Mr. Stiver contends Monsanto is liable to him for breach of express warranties. He asserts this position because Monsanto made   affirmative representations and warranties about its Roundup® products which were material parts the basis of the bargain whereby Mr. Stiver purchased and used Roundup® products.   These affirmative representations effectively promised a specific result, i.e., that Roundup® products could be used by Mr. Stiver without personal injury, illness, or cancer caused or induced by the products; Monsanto represented that the products were safe, but knew or should have known, they were not. Mr. Stiver was a person whom Monsanto might reasonably expect to use, consume and be affected by the Roundup® products.

125.   Monsanto has special knowledge skill and expertise germane to herbicides and their design, manufacture testing, and marketing. At all times relevant, Monsanto engaged in

30

the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including Mr. Stiver, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto.

126. Monsanto expressly represented and warranted matters to Mr. Stiver and other consumers and users, and through statements made by Monsanto in labels, publications, package inserts, and other written materials that its Roundup® products were:

    126.1. Safe to human health and the environment.

    126.2. Effective, fit, and proper for their intended use and posed no risks of harm to humans.

    126.3. Did not cause unreasonably dangerous side effects.

    126.4. Is a product of Monsanto's "safety is a top priority for us" approach to its business.

    126.5. Safe enough to drink.

    126.6. Monsanto Roundup® spray-on glyphosate-based herbicides, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish despite its agreement with the New York Attorney General to the contrary.

    126.7. Roundup®'s Glyphosate is good for the environment.

127. These representations about Roundup® were affirmations of fact or promises made by Monsanto to the public including Mr. Stiver. The representations related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations. Monsanto placed its Roundup® products into the stream of commerce for sale and recommended use without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate.

128. Monsanto breached these warranties because its affirmations were not true. Its Roundup® products were defective, dangerous, unfit for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose.

31

129.    Plaintiffs justifiably and detrimentally relied on the express warranties and representations of Monsanto in the purchase and use of its Roundup® products. When Plaintiffs decided to purchase Roundup®, he reasonably relied upon Monsanto to disclose known risks, dangers, and effects of Roundup® and glyphosate. They did not know the representations were false.

130.    As a proximate result of Monsanto's breach of implied warranty, Plaintiffs sustained personal injuries and illness, loss of income, loss of earning capacity and financial losses and their consequences.

### First Claim: Gary L. Stiver

### Personal Injuries; Economic and Non-Economic Damages

131.    All allegations above are renewed here and all theories above are invoked here.

132.    As a direct, proximate result of the acts and omissions of Monsanto, Mr. Stiver contracted and suffers from small b-cell aggressive follicular lymphoma, a form of non-Hodgkin's lymphoma, and has been required to undergo extensive care, including life altering and debilitating chemical and other therapies. He continues to be under medical care.

133.    Mr. Stiver's non-economic, general damages include emotional and physical pain and anguish; cancer treatment pain; anxiety, depression, uncertainty and fear associated with cancer diagnoses, treatment and uncertain outcomes; nausea and illness associated with medical care for his condition; sleep disruption; loss of self-confidence and change of personality; emotional distress; loss of ability to engage in the activities of daily living including the daily joys of life. Mr. Stiver has also incurred a probable loss of reasonable life expectancy. He also suffers from depression, stress and mental anguish over his uncertain and threatening health circumstances.

134.    Mr. Stiver's economic, special damages include:   lost earning capacity; medical expenses and medical care costs; transportation and over-the-counter expenses; adaptations and accommodations to the household; lost retirement security; and related economic losses.

**Exemplary and Punitive Damages**

135.   All allegations above are renewed here. Mr. Stiver is aware that Nebraska law permits the recovery of punitive damages but requires that they be paid to the State. However, Monsanto's willful, wanton, reckless and malicious conduct in pursuit of profit at the expense of human safety and well-being of foreseeable users of its Roundup® products was caused, effectuated, or directed from Missouri. Missouri law permits Plaintiff to collect punitive damages.

136.   Accordingly, Plaintiffs contend that Missouri law governs the punitive damages aspect of their case. The most significant contacts between Monsanto's products and Plaintiff occurred in Nebraska, making Nebraska law the governing law on compensatory claims. But, the reprehensible conduct justifying punitive damages occurred in Missouri, and may be policed and prevented only by judicial proceedings against Monsanto inflicting punishment for its wrongdoing in Missouri. Missouri's contact with an interest in this subject is governing.

137.   Plaintiffs seeks punitive damages against Monsanto under Missouri law for this reason. In addition, and in the alternative in the event the Court concludes that Missouri law does not govern the punitive damages aspects of this case, Plaintiff seeks punitive damages under the law of Nebraska and request that the punitive damages recovery, subject to payment of proportionate fees and expenses, be awarded to the common school fund the for State of Nebraska.

**Second Claim: Marilyn Stiver**

**General Damages**

138.   All allegations above are renewed here.  All theories of recovery here.

139.   Mrs. Marilyn Stiver is the caregiver and spouse of her spouse.  During the period of his illness, and a result of his cancer, Mrs. Stiver has been deprived of the care, comfort, companionship, society, support, services, advice, counsel, love and affection of her husband as given under normal circumstances.  She has sustained general damages as a result.  She has also shared the special damages of Mr. Stiver for medical and related expenses and suffered as a result of the loss of her husband's care support and services.

## Requests For Relief

140.    On the foregoing basis, Plaintiffs, request judgment in their favor on their First Claim, and all their theories of recovery, and on their Second Claim and all their theories recovery as follows:

      140.1. On their First Claim special damages as alleged, accruing special damages to be stated in full at the time of the final pretrial conference, and general damages, prejudgment interest, attorney's fees to the extent permitted by law, and costs.

      140.2. On the separate Second Claim, general damages for Mrs. Stiver, prejudgment interest to the extent permitted by law, attorney's fees and costs.

      140.3. Under all claims prejudgment interest to the extent permitted by law, attorney's to the extent permitted by law and costs.

141.    Plaintiffs also seek punitive damages under Missouri law and Nebraska law because the conduct of Monsanto and its acts and omissions display requisite contempt for public health, self-serving greed as its motivation, and malice.  Plaintiffs  seek the maximum amount of punitive damages permissible.

## Jury Demand; Trial Location Designation

142.    Plaintiffs demand trial by jury.  They designate Lincoln Nebraska as the place for trial if this case is not tried in Frontier County, Nebraska

October 16, 2019

**Gary L. Stiver and Marilyn Stiver, Husband and Wife**

By: */s/ David A. Domina*
    David A. Domina, #11043NE
    Domina Law Group pc llo
    2425 S. 144th St. Omaha, NE 68144
    (402) 493-4100
    ddomina@dominalaw.com

*Plaintiff's Lawyers*

34

101497702