# U.S. District Court
## District of Montana (Missoula)
## CIVIL DOCKET FOR CASE #: 9:19–cv–00156–DLC

Anderson et al v. Monsanto Company
Assigned to: Judge Dana L. Christensen
Cause: 28:1332 Diversity–Personal Injury

Date Filed: 09/18/2019
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Gary Anderson**

represented by **Joseph Ray Casillas**
DATSOPOULOS MacDONALD & LIND
201 W Main
Central Square Building
Suite 201
Missoula, MT 59802
406–728–0810
Fax: 406–543–0134
Email: jrcasillas@dmllaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nathan G. Wagner**
DATSOPOULOS MacDONALD & LIND
201 W Main
Central Square Building
Suite 201
Missoula, MT 59802
406–728–0810
Email: nwagner@dmllaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Terance P Perry**
DATSOPOULOS MacDONALD & LIND
201 W Main
Central Square Building
Suite 201
Missoula, MT 59802
406–728–0810
Fax: 543–0134
Email: tperry@dmllaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Mary Anderson**

represented by **Joseph Ray Casillas**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nathan G. Wagner**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Terance P Perry**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 09/18/2019 | 1 | COMPLAINT against Monsanto Company, filed by Gary Anderson, Mary Anderson. (Attachments: # 1 Civil Cover Sheet) (APP) (Entered: 09/18/2019) |
| 09/18/2019 | | Filing fee paid: $ 400.00, receipt number 0977–2369447 (APP) (Entered: 09/18/2019) |
| 09/18/2019 | 2 | Summons Issued as to Monsanto Company. Original emailed to counsel (APP) (Entered: 09/18/2019) |
| 11/19/2019 | 3 | AFFIDAVIT of Service for Summons/Complaint served on Monsanto Company on 11/15/2019, filed by Gary Anderson, Mary Anderson. (Attachments: # 1 Affidavit of Service) (Perry, Terance) (Entered: 11/19/2019) |

**Terance P. Perry, Esq.**
**Nathan G. Wagner, Esq.**
**J.R. Casillas, Esq.**
Datsopoulos, MacDonald & Lind, P.C.
201 West Main Street, Suite 201
Missoula, Montana 59802
Telephone: 406-728-0810
Facsimile: 406-543-0134
E-Mail: tperry@dmllaw.com; nwagner@dmllaw.com; jrcasillas@dmllaw.com
        mdaley@dmllaw.com; d.umbel@dmllaw.com; areiber@dmllaw.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| GARY ANDERSON and MARY ANDERSON,<br><br>Plaintiffs,<br><br>v.<br><br>MONSANTO COMPANY,<br><br>Defendant. | Case No. _____<br><br><br>**COMPLAINT and**<br>**DEMAND FOR JURY TRIAL** |

## I.   **PARTIES**

1.   Plaintiff, Gary Anderson, is an individual who resides in Darby, Ravalli

County, Montana.

2.   Plaintiff, Mary Anderson, is an individual who resides in Darby, Ravalli

County, Montana and at all times relevant was married to Plaintiff, Gary

Anderson.

3.    Defendant, Monsanto Company ("Monsanto"), is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.

4.    Monsanto is a citizen of the State of Missouri and Delaware and is not a citizen of the State of Montana.

5.    At all times relevant Monsanto regularly conducted, transacted and solicited business in Montana.

6.    At all times relevant, Monsanto was the entity that discovered the herbicidal properties of glyphosate, the active ingredient in Roundup®, a product that it manufactured, marketed, distributed and sold into the State of Montana at all times relevant hereto.

## II.    JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 and supplemental jurisdiction pursuant to 28 U.S.C. § 1367. There is complete diversity of citizenship between the parties. In addition, Plaintiff seeks damages in excess of $75,000.00, exclusive of interest and costs.

8.    Venue is proper in this Court under 28 U.S.C. § 1391 because Plaintiff's injuries, as alleged in the within Complaint, occurred in Ravalli County, Montana, Monsanto conducts business here, a substantial portion of the acts and omissions giving rise to these claims occurred here and Monsanto is subject to the personal jurisdiction of this Court.

## III.   LIMITATION ON ALLEGATIONS

9.  Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

10.  Monsanto is equitably estopped to assert a statute of limitations defense. It made, and continues to make, statements intended to be relied upon by the public that Roundup® is safe and harmless to humans. Plaintiff, Gary Anderson, relied on these statements.

11.  Plaintiff, Gary Anderson, did not discover, and did not know of facts that would cause a reasonable person to suspect the risks associated with the use of and/or exposure to Roundup® and glyphosate, nor would a reasonable and diligent investigation by him have disclosed that Roundup® and glyphosate would cause his illnesses. For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule and its invocation is estopped by Monsanto's actions.

12.  The allegations in this pleading are made pursuant to Montana law. To the extent Montana law imposes a duty or obligation on Monsanto that exceeds those required by federal law, Plaintiff, Gary Anderson, does not assert such claims. All claims asserted herein run parallel to federal law, i.e., Monsanto's violations of Montana law were also violations of federal law. Had Monsanto

honestly complied with Montana law, it would also have complied with federal law.

13.    Additionally, Plaintiff's, Gary Anderson's, claims do not seek to enforce federal law. These claims are brought under Montana law, notwithstanding the fact that such claims run parallel to federal law.

14.    As alleged in this pleading, Monsanto violated U.S.C. § 136j and 40 C.F.R. § 156.10(a)(5) by distributing Roundup®, which was misbranded pursuant to 7 U.S.C. § 136(g). Federal law specifically prohibits the distribution of misbranded herbicide.

## IV.    FACTS COMMON TO ALL COUNTS

15.    Plaintiff, Gary Anderson, began using Roundup® in the 1980s to control weeds around his house and from 1988-2001 he regularly used Roundup® during his employment with the United States Forest Service ("USFS") in the course of performing grounds maintenance on 20 to 25 acres of land at the Sula Ranger Station located in Sula, Ravalli County, Montana.

16.    During his decades of purchases and use of Roundup® Plaintiff, Gary Anderson, was directly exposed to it during application as an herbicide both at his own residence and while performing grounds maintenance at the Sula Ranger Station.

17.   Plaintiff, Gary Anderson, would not have used Roundup® if he knew that it caused cancer. Monsanto provided no warning, or adequate warning, to him that Roundup® caused cancer.

18.   On or about February 2018, Gary was diagnosed with multiple myeloma.

19.   It was not until 2019 that Gary learned that it was more likely than not that his multiple myeloma had been caused by his exposure to Roundup®.

20.   Once Gary had been diagnosed with multiple myeloma he underwent extensive medical treatment that included, but was not limited to, chemotherapy that made him gravely ill, caused loss of appetite and weight loss and suffered other debilitating harms from prescribed medical treatment.

21.   In 1970, Defendant, Monsanto, discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most used active ingredient in American agriculture with 85-90 millions of pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

22.   Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for

27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

23. Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

24. On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

25.     On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provided a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

26.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other haematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

27.     The IARC evaluation is significant. It confirms what has been believed for years, that glyphosate is toxic to humans.

28.     Nevertheless, Monsanto, since it began selling Roundup®, has represented it to be safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

29.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

30.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form

aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

31.    For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough, it could kill almost every weed without causing harm either to people or to the environment. History has shown these representations to have been false. According to the WHO, the main chemical ingredient of Roundup® - glyphosate - is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Monsanto repeatedly assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® was safe.

32.    The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to

the market in the mid-1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use. Monsanto still markets Roundup® as safe today.

33.     The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq*. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as prescribed by the Act. 7 U.S.C. § 136a(a).

34.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, as part of the registration process the EPA requires a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

35.    FIFRA defines "unreasonable adverse effects on the environment" to mean
       "any unreasonable risk to man or the environment, taking into account the
       economic, social, and environmental costs and benefits of the use of any
       pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a
       risk/benefit analysis in determining whether a registration should be granted
       or allowed to continue to be sold in commerce.

36.    The EPA registered Roundup® for distribution, sale, and manufacture in the
       United States and the State of Montana.

37.    FIFRA generally requires that the registrant, Monsanto in the case of
       Roundup®, conduct the health and safety testing of pesticide products. The
       EPA has protocols governing the conduct of tests required for registration and
       the laboratory practices that must be followed in conducting these tests. The
       data produced by the registrant must be submitted to the EPA for review and
       evaluation. The government is not required, nor is it able, however, to perform
       the product tests that are required of the manufacturer.

38.    The evaluation of each pesticide product distributed, sold, or manufactured is
       completed at the time the product is initially registered. The data necessary
       for registration of a pesticide has changed over time. The EPA is now in the
       process of re-evaluating all pesticide products through a Congressionally-
       mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to

reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

39. In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment - in relation to the re-registration process - no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

40. Based on early studies that glyphosate could cause cancer in laboratory animals, in 1985 the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C). After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991. In so doing, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

41. On at least two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

42. In the first instance, Monsanto, in seeking initial registration of Roundup® by the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed approximately 30 tests on glyphosate and glyphosate-containing products, including nine 0f the 15 residue studies needed to register Roundup®.

43. In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report regarding the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

44. Three top executives of IBT were convicted of fraud in 1983.

45. In the second incident of data falsification, in 1991 Monsanto hired Craven Laboratories to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of

its employees were indicted, and later convicted, for fraudulent laboratory

practices in the testing of pesticides and herbicides.

46.     Despite the falsity of the tests that underlie its registration, within a few years

of its launch, Monsanto was marketing Roundup® in 115 countries.

47.     Multiple studies have been ghostwritten in part and/or published by Monsanto

through companies such as Intertek and Exponent, Inc. from 2000 to present

which minimize any safety concerns about the use of glyphosate; they are

used to convince regulators to allow the sale of Roundup® and to convince

customers to use Roundup®. Such studies include, but are not limited to,

Williams (2000); Williams (2012); Kier & Kirkland (2013); Kier (2015); Bus

(2016); Chang (2016); and the Intertek Expert Panel Manuscripts. All of these

studies have been submitted to and relied upon by the public and the EPA in

assessing the safety of glyphosate. Through these means Monsanto has

fraudulently represented that independent scientists have concluded that

glyphosate is safe. In fact, these "independent" experts were paid by

Monsanto and they failed to disclose the significant role Monsanto had in

creating the manuscripts. Monsanto has further ghostwritten editorials for

scientists such as Robert Tarone and Henry Miller to advocate for the safety

of glyphosate. Monsanto has also ghostwritten letters by supposed

independent scientists submitted to regulatory agencies who are reviewing the safety of glyphosate.

48.   Monsanto has also violated federal regulations in holding secret ex parte meetings and conversations with certain EPA employees to collude in a strategy to re-register glyphosate and to quash investigations into the carcinogenicity of glyphosate by other federal agencies such as the Agency for Toxic Substances and Disease Registry. Monsanto's close connection with the EPA arises in part from its offering of lucrative consulting positions to retiring EPA officials.

49.   In March 2015, The Joint Glyphosate Task Force at Monsanto's behest issued a press release sharply criticizing IARC, stating that IARC's conclusion was "baffling" and falsely claiming that "IARC did not consider any new or unique research findings when making its decision. It appears that only by deciding to exclude certain available scientific information and adopting a different approach to interpreting the studies was this possible."

50.   Beginning in 2011, the Federal Institute for Risk Assessment (BfR) in Germany began preparing a study on the safety of glyphosate. Through the Glyphosate Task Force, Defendant was able to co-opt this study becoming the sole provider of data and ultimately wrote the report which was rubber-stamped by the BfR. The Glyphosate Task Force was solely responsible for

preparing and submitting summary of studies relied upon by the BfR. Defendant has used this report, which it wrote, to falsely proclaim the safety of glyphosate.

51.    In October 2015, the Defendant, as a member of the Joint Glyphosate Task Force, wrote to the state of California to try to stop California from warning the public about the carcinogenicity of glyphosate arguing that the IARC classification is mistaken. In January of 2016 Monsanto filed a lawsuit to stop California from warning the public about the carcinogenicity of glyphosate.

52.    The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed to identify a strategy to maintain its Roundup® market dominance and to ward off impending competition.

53.    In response, in 1996 Monsanto began the development and sale of genetically engineered Roundup Ready® seeds. Since Roundup Ready® crops are resistant to glyphosate; farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's

biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

54.   Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

55.   In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were **"safer than table salt"** and **"practically non-toxic"** to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a.   Remember the environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences…

b.   And remember that Roundup is biodegradable and won't buildup in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c.   Roundup biodegrades into naturally occurring elements.

d.   Remember that versatile Roundup herbicide stays where you put it. That means there's no washing to leaching to harm customers' shrubs or other desirable vegetation.

e.   This non-residual herbicide will not wash or leach in the soil. It…stays where you apply it.

f.   You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g.   Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h.   Glyphosate's safety margin is much greater than required. It has over 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i.   You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j.   "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

56.   On or about November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a.   its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk. ***

b.   its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable. ***

c.   its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means. ***

d.   its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics." ***

e.   glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides.

f.   its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

57.   Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

58.   In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

59.   The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has

determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents

to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B

(Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified; and

one agent to be Probably Not Carcinogenic.

60. The established procedure for IARC Monograph evaluations is described in

the IARC Programme's Preamble. Evaluations are performed by panels of

international experts, selected on the basis of their expertise and the absence

of actual or apparent conflicts of interest.

61. One year before the Monograph meeting, the meeting is announced and there

is a call both for data and for experts. Eight months before the Monograph

meeting, the Working Group membership is selected and the sections of the

Monograph are developed by the Working Group members. One month prior

to the Monograph meeting, the call for data is closed and the various draft

sections are distributed among Working Group members for review and

comment. Finally, at the Monograph meeting, the Working Group finalizes

review of all literature, evaluates the evidence in each category, and completes

the overall evaluation. Within two weeks after the Monograph meeting, the

summary of the Working Group findings are published in Lancet Oncology,

and within a year after the meeting, the final Monograph is finalized and

published.

62.   In assessing an agent, the IARC Working Group reviews the following information;

    a.   human, experimental, and mechanistic data;

    b.   all pertinent epidemiological studies and cancer bioassays; and

    c.   representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

63.   In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

64.   On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3-10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

65. The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States; forestry workers in Canada and Finland; municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

66. Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

67. Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and it is found in soil, air, surface water, and groundwater, as well as in food.

68. The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

69. The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

70. The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents

reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

71.   In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

72.   The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

73.   The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

74.   The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

75.    The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

76.    The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

*Release Patterns*

77.    Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available. Occupational workers and

home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport, storage, and disposal.

78.   In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

### *Recent Worldwide Bans on Roundup®/Glyphosate*

79.   Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which took effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea

what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

80. The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

81. France banned the private sale of Roundup® and glyphosate following the IARC assessment for glyphosate.

82. Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

83. The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern the glyphosate has been linked to fatal kidney disease in agricultural workers.

84. The government of Colombia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

## COUNT I: STRICT LIABILITY (DESIGN DEFECT)
### (Plaintiff, Gary Anderson v. Defendant, Monsanto Company)

85. The Plaintiffs reallege and reaffirm the preceding paragraphs as if fully stated herein.

86.   Plaintiffs bring this strict liability claim against Monsanto for defective design.

87.   At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, manufacturing, selling, distributing, and Monsanto engaged in the marketing, packaging design, and promotion of Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, Gary Anderson, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto. At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by the Plaintiff, Gary Anderson, as described above.

88.   At all times relevant to this litigation, Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff, Gary Anderson.

89.   At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Montana and throughout the United States, including Plaintiff, Gary Anderson, without substantial change in their condition as

designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

90.   Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturer and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

91.   Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto, were defective in design and formulation in that when they left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

92.   At all times relevant to this action, Monsanto knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

93.   At all times relevant to this litigation, Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Monsanto were defective in design and formulation, in one or more of the following ways:

a.    When placed in the stream of commerce, Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate;

b.    When placed in the stream of commerce, Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;

c.    When placed in the stream of commerce, Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

d.    Monsanto did not sufficiently test, investigate, or study Roundup® products and, specifically, the active ingredient glyphosate;

e.    Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweighs any potential utility stemming from the use of the herbicide;

f.    At the time of marketing its Roundup® products, Roundup® was defective in that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries; and

g.    Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products.

94.   Plaintiff, Gary Anderson, was exposed to Roundup® products through his personal use of the products both at his job at the USFS and on his garden and lawn, as described above, without knowledge of their dangerous characteristics.

95.   At all times relevant to this litigation, Plaintiff, Gary Anderson, used and/or was exposed to the use of Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

96.   Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

97.   The harm caused by Roundup® products far outweighed their benefit, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate.

98.   Monsanto intended Roundup® to reach the users of it without substantial change in the condition in which it was sold, and it did, in fact, reach Plaintiff, Gary Anderson, a consumer, without substantial change in its condition.

99.    Monsanto knew or should have known that Roundup® would be used by consumers in the same manner that it was used by Plaintiff, Gary Anderson, for decades.

100.    Monsanto defectively designed Roundup®.

101.    The Roundup® used by Plaintiff, Gary Anderson, was defective in its design at the time it left Monsanto's hands, thereby posing an unreasonable risk of harm to Plaintiff, Gary Anderson, and it was wholly unsuitable for its intended and foreseeable purpose.

102.    Monsanto had no reason to believe the Plaintiff, Gary Anderson, would recognize the dangers posed by Roundup's® defective design, nor did he.

103.    Monsanto's defective design of Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of Roundup® products, including the Plaintiff herein.

104.    Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Monsanto is strictly liable to Plaintiff.

105.    The defects in Roundup® products caused or were a substantial contributing factor in causing Plaintiff's grave injuries, and, but for Monsanto's misconduct and omissions, Plaintiff would not have sustained his injuries.

106.    Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including Plaintiff, with

knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and concealed this knowledge from the general public. Monsanto made conscious decisions not to redesign, warn or inform the unsuspecting public. Monsanto's reckless conduct warrants an award of punitive damages.

107. As a direct and proximate consequence of Defendant's defective design of Roundup® Plaintiff, Gary Anderson, has sustained severe and permanent injuries to his mind and body and has suffered and will continue to suffer in the future from physical pain and mental and emotional anguish and has been compelled to employ and will in the future be compelled to employ the services of doctors, medical personnel and facilities to care for and treat him and has incurred and will in the future incur substantial medical and other direct and consequential damages and expenses all to his great detriment.

WHEREFORE, Plaintiff, Gary Anderson, demands judgment against Defendant, Monsanto Company, for:

A. General damages including, but not limited to, damages for pain and suffering and loss of an established course of life, in an amount to be determined at trial;

B. Punitive damages;

C. All past and future medical expenses;

D. Past and future mental anguish and emotional distress;

E. Plaintiff's out of pocket expenses;

F. Interest;

G. Costs;

H. Expenses;

I. Attorney's fees as allowed by law; and

J. For such other and further relief as this Honorable Court deems meet and just.

## COUNT II: STRICT LIABILITY (FAILURE TO WARN)
## (Plaintiff, Gary Anderson v. Defendant, Monsanto Company)

108.  Plaintiffs reallege and reaffirm the preceding paragraphs as if fully stated herein.

109.  Plaintiff, Gary Anderson, brings this strict liability claim against Monsanto for failure to warn.

110.  At all times relevant to this litigation, Monsanto was engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Monsanto.

111.   Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiff, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

112.   At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such other steps as reasonably necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn the Plaintiff of the dangers associated with Roundup® use and exposure. Monsanto, as manufacturer, seller, promoter, marketer, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

113.   At the time of manufacture, Monsanto could have provided the warnings or instructions disclosing the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products, yet it failed to do so.

114.   At all times relevant to this litigation, Monsanto failed to investigate, study, test, or promote the safety of or to minimize the dangers to users and consumers of Roundup® and to those who would foreseeably use or be harmed by it, including Plaintiff, Gary Anderson.

115.   Despite the fact that Monsanto knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use of and exposure to it. The dangerous propensities of these products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or scientifically knowable to Monsanto through appropriate research and testing by known methods, at the time it distributed, marketed, promoted, supplied or sold the product, and were not known to end users and consumers, such as Plaintiff, Gary Anderson.

116.   Roundup® created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to Roundup®. Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate and, further, made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

117. At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Montana and throughout the United States, including Plaintiff, Gary Anderson, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, promoted and marketed by Monsanto.

118. Plaintiff, Gary Anderson, was exposed to Roundup® products in the course of his personal use on his garden and lawn, as well as at his place of employment, without knowledge of their dangerous characteristics.

119. Plaintiff, Gary Anderson, could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Monsanto.

120. These products were defective because the minimal warnings disseminated with Roundup® products were inadequate, and they failed to communicate adequate information regarding the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and landscaping applications.

121. The information that Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiff, Gary Anderson, to make an informed decision as to whether or not to use the product at all and, if they chose to use it, how to do so safely and with adequate protection. Instead, Monsanto disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; it continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks of harm posed by the use of and exposure to it; and it concealed, minimized, or otherwise concealed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

122. To this day, Monsanto has failed to adequately and accurately warn of the true risks of Plaintiff's, Gary Anderson's, injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

123. As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of

Monsanto, were distributed, marketed, and promoted by Monsanto, and used by Plaintiff, Gary Anderson, at his work and at home.

124. Monsanto is liable to Plaintiff for injuries caused by its failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of these products and the risks associated with the use of or exposure to Roundup® and glyphosate.

125. The defects in Roundup® products caused or contributed to cause Plaintiff's injuries, and, but for Monsanto's misconduct and omissions, Plaintiff, Gary Anderson, would not have sustained his injuries.

126. Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products, Plaintiff, Gary Anderson, could have avoided the risk of developing injuries as alleged herein.

127. As a direct and proximate consequence of Defendant's failure to warn of the risks and defects associated with Roundup® products, Plaintiff, Gary Anderson, has sustained severe and permanent injuries to his mind and body and has suffered and will continue to suffer in the future from physical pain and mental and emotional anguish and has been compelled to employ and will in the future be compelled to employ the services of doctors, medical personnel and facilities to care for and treat him and has incurred and will in

the future incur substantial medical and other direct and consequential damages and expenses all to his great detriment.

WHEREFORE, Plaintiff, Gary Anderson, demands judgment against Defendant, Monsanto Company, for:

A. General damages including, but not limited to, damages for pain and suffering and loss of an established course of life, in an amount to be determined at trial;

B. Punitive damages;

C. All past and future medical expenses;

D. Past and future mental anguish and emotional distress;

E. Plaintiff's out of pocket expenses;

F. Interest;

G. Costs;

H. Expenses;

I. Attorney's fees as allowed by law; and

J. For such other and further relief as this Honorable Court deems meet and just.

## COUNT III: NEGLIGENCE
## (Plaintiff, Gary Anderson v. Defendant, Monsanto Company)

128. Plaintiffs reallege and reaffirm the preceding paragraphs as if fully stated herein.

129. At all times relevant Monsanto had a duty to exercise reasonable care in the design, manufacturing, testing, marketing, packaging, distribution and sale

into the stream of commerce of its herbicidal products and, specifically, Roundup®, including a duty to ensure that such products did not pose a significant risk of harm to Plaintiff, Gary Anderson.

130.  At all times relevant Monsanto had a duty to take all reasonable steps necessary to manufacture, promote, package and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

131.  At all times relevant to this litigation, Monsanto had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient, glyphosate.

132.  At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

133.  At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with Plaintiff's injuries and thus created

a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff, Gary Anderson.

134. Monsanto also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

135. Monsanto breached the duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Monsanto manufactured, marketed, promoted, and sold defective herbicides containing the chemical glyphosate, when it knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

136. Despite an ability and means to investigate, study, and test these products and to provide adequate warnings, Monsanto failed to do so. Indeed, Monsanto wrongfully concealed information and made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

137. Monsanto breached the duty of care it owed to Plaintiff, Gary Anderson, and was negligent in the following respects:

    a.    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

    b.    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

    c.    Failing to undertake sufficient studies and to conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

    d.    Failing to use reasonable and prudent care in the design, research, manufacture, packaging and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

e.   Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f.   Failing to provide adequate instructions, guidelines, warnings and safety precautions to those persons who Monsanto could reasonably foresee would use and be exposed to its Roundup® products;

g.   Failing to disclose to Plaintiff, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

h.   Failing to warn Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other consumers;

i.   Systematically suppressing, concealing or minimizing contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

j.   Representing that its Roundup® products were safe for their intended use when, in fact, Monsanto knew or should have known that the products were not safe for their intended purpose;

k.  Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert consumers and the general public to the risks of Roundup® and glyphosate;

l.  Advertising, marketing, and recommending the use of Roundup® products, while concealing and failing to disclose or warn of the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m.  Continuing to disseminate information to its consumers, which indicate or imply that Monsanto's Roundup® products are safe for use in the agricultural and horticultural industries; and

n.  Continuing the manufacture, packaging and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

138.  Monsanto knew and/or should have known that it was foreseeable that consumers such as Plaintiff, Gary Anderson, would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, packaging, distribution, and sale of Roundup®.

139.  Plaintiff, Gary Anderson, did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

140.   Monsanto's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff, Gary Anderson, has suffered, and will continue to suffer, as described herein.

141.   Monsanto's conduct, as described above, was reckless. Monsanto regularly risked the lives of consumers and users of its products, including Plaintiff, Gary Anderson, with full knowledge of the dangers of these products. Monsanto has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff. Monsanto's reckless conduct therefore warrants an award of punitive damages.

142.   As a proximate result of Monsanto's wrongful acts and omissions in placing defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff, Gary Anderson, has suffered severe and permanent physical and emotional injuries.

143.   As a direct and proximate consequence of Defendant's negligence, Plaintiff, Gary Anderson, has sustained severe and permanent injuries to his mind and body and has suffered and will continue to suffer in the future from physical pain and mental and emotional anguish and has been compelled to employ and will in the future be compelled to employ the services of doctors, medical personnel and facilities to care for and treat him and has incurred and will in

the future incur substantial medical and other direct and consequential damages and expenses all to his great detriment.

WHEREFORE, Plaintiff, Gary Anderson, demands judgment against Defendant, Monsanto Company, for:

A. General damages including, but not limited to, damages for pain and suffering and loss of an established course of life, in an amount to be determined at trial;

B. All past and future medical expenses;

C. Past and future mental anguish and emotional distress;

D. Plaintiff's out of pocket expenses;

E. Interest;

F. Costs;

G. Expenses;

H. Attorney's fees as allowed by law; and

I. For such other and further relief as this Honorable Court deems meet and just.

## COUNT IV: BREACH OF EXPRESS WARRANTY
### (Plaintiff, Gary Anderson v. Defendant, Monsanto Company)

144. Plaintiffs reallege and reaffirm the preceding paragraphs as if fully stated herein.

145. Monsanto designed, manufactured, tested, marketed, packaged, distributed, and sold Roundup® into the stream of commerce.

146. Monsanto represented to Plaintiff, Gary Anderson, that Roundup® was a safe and effective herbicide.

147. At no time relevant was Roundup® a safe herbicide.

148. Monsanto's express warranty that Roundup® was a safe and effective herbicidal product, which it provided to Plaintiff, Gary Anderson, induced Plaintiff to purchase and use Roundup® for decades and Monsanto's express warranty that Roundup® was a high-quality, safe and effective herbicidal product were material facts upon which Plaintiff, Gary Anderson, relied.

149. At all times relevant, Monsanto's express warranty that Roundup® was a safe, high quality and effective herbicidal product was false.

150. As a direct and proximate consequence of Monsanto's distribution and sale of Roundup®, an herbicidal product that was defective and unreasonably dangerous and which failed to conform to Defendant's express warranties, Plaintiff, Gary Anderson, has sustained severe and permanent injuries to his mind and body and has suffered and will continue to suffer in the future from physical pain and mental and emotional anguish and has been compelled to employ and will in the future be compelled to employ the services of doctors, medical personnel and facilities to care for and treat him and has incurred and will incur in the future substantial medical and other direct and consequential damages and expenses, all to his great damage.

WHEREFORE, Plaintiff, Gary Anderson, demands judgment against Defendant, Monsanto Company, for:

A. General damages including, but not limited to, damages for pain and suffering and loss of an established course of life, in an amount to be determined at trial;

B. Punitive damages;

C. All past and future medical expenses;

D. Past and future mental anguish and emotional distress;

E. Plaintiff's out of pocket expenses;

F. Interest;

G. Costs;

H. Expenses;

I. Attorney's fees as allowed by law; and

J. For such other and further relief as this Honorable Court deems meet and just.

## COUNT V: BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Plaintiff, Gary Anderson v. Defendant, Monsanto Company)

151. Plaintiffs reallege and reaffirm the preceding paragraphs as if fully stated herein.

152. Monsanto Company designed, manufactured, tested, marketed, packaged, distributed and sold Roundup® into the stream of commerce.

153. Monsanto Company impliedly warrantied to Plaintiff, Gary Anderson, that Roundup® was of merchantable quality and that it was safe for its intended purpose; to wit, as an herbicide.

154. Defendant, Monsanto Company, breached the implied warranty of merchantability since it caused Roundup® to be placed into the stream of commerce and/or sold to Plaintiff, Gary Anderson, when it, inter alia:

    a.    failed to pass without objection in the trade under the contract/warranty description;

    b.    was defective and in an unreasonably dangerous condition to Plaintiff, Gary Anderson;

    c.    caused increased levels of toxins in Plaintiff, Gary Anderson;

    d.    caused multiple myeloma;

    e.    foreseeably caused consumers such as Plaintiff, Gary Anderson, to endure pain and suffering, debilitating conditions and permanent injuries;

    f.    was not fit for the ordinary purposes for which such products were intended to be used; and which

    g.    failed to conform to the promises or affirmations of fact made by Defendant, Monsanto Company.

155. As a direct and proximate consequence of Defendant's, Monsanto Company's, breach of the implied warranty of merchantability, Plaintiff, Gary Anderson, has sustained severe and permanent injuries to his mind and body and has suffered and will continue to suffer in the future from physical pain

and mental and emotional anguish and has been compelled to employ and will in the future be compelled to employ the services of doctors, medical personnel and facilities to care for and treat him and has incurred and will incur in the future substantial medical and other direct and consequential damages and expenses, all to his great damage.

WHEREFORE, Plaintiff, Gary Anderson, demands judgment against Defendant, Monsanto Company, for:

A. General damages including, but not limited to, damages for pain and suffering and loss of an established course of life, in an amount to be determined at trial;

B. Punitive damages;

C. All past and future medical expenses;

D. Past and future mental anguish and emotional distress;

E. Plaintiff's out of pocket expenses;

F. Interest;

G. Costs;

H. Expenses;

I. Attorney's fees as allowed by law; and

J. For such other and further relief as this Honorable Court deems meet and just.

## COUNT VI: BREACH OF IMPLIED WARRANTY OF FITNESS
### (Plaintiff, Gary Anderson v. Defendant, Monsanto Company)

156.   Plaintiffs reallege and reaffirm the preceding paragraphs as if fully stated herein.

157.   Monsanto Company designed, manufactured, tested, marketed, packaged, distributed and sold Roundup® into the stream of commerce.

158.   Monsanto Company knew or should have known the particular purpose for which Roundup® was required by Plaintiff, Gary Anderson, and that Plaintiff was relying on Defendant's skill and judgment to select and furnish a suitable, safe and effective herbicide.

159.   In supplying Roundup®, Monsanto Company failed to select and supply an herbicide that was fit for the particular purpose for which Plaintiff, Gary Anderson, required such product, a purpose that was wholly foreseeable to Defendant.

160.   As a direct and proximate consequence of Defendant's, Monsanto Company's, breach of the implied warranty of fitness for a particular purpose, Plaintiff, Gary Anderson, has sustained severe and permanent injuries to his mind and body and has suffered and will continue to suffer in the future from physical pain and mental and emotional anguish and has been compelled to employ and will in the future be compelled to employ the services of doctors, medical personnel and facilities to care for and treat him and has incurred and

will incur in the future substantial medical and other direct and consequential damages and expenses, all to his great damage.

WHEREFORE, Plaintiff, Gary Anderson, demands judgment against Defendant, Monsanto Company, for:

A. General damages including, but not limited to, damages for pain and suffering and loss of an established course of life, in an amount to be determined at trial;

B. Punitive damages;

C. All past and future medical expenses;

D. Past and future mental anguish and emotional distress;

E. Plaintiff's out of pocket expenses;

F. Interest;

G. Costs;

H. Expenses;

I. Attorney's fees as allowed by law; and

J. For such other and further relief as this Honorable Court deems meet and just.

## COUNT VII: NEGLIGENT MISREPRESENTATION
### (Plaintiff, Gary Anderson v. Defendant, Monsanto Company)

161. Plaintiffs reallege and reaffirm the preceding paragraphs as if fully stated herein.

162. Monsanto Company designed, manufactured, tested, marketed, packaged, distributed and sold Roundup® into the stream of commerce.

163. At no time relevant was Roundup® a safe, effective or high-quality herbicide.

164. Defendant, Monsanto Company, supplied false information to the public and to Plaintiff, Gary Anderson, to wit, that Roundup® was a high-qualify, safe and effective herbicide ("representations").

165. The Defendant made such representations of material fact to the general public and to Plaintiff, Gary Anderson, by having provided each with such false information.

166. Defendant, Monsanto Company, provided this false information to induce the public in general and Plaintiff, Gary Anderson, in particular, to purchase and use Roundup® as a safe herbicide.

167. Defendant, Monsanto Company, knew or should have known that the false information it supplied to the general public and to Plaintiff, Gary Anderson, in particular, regarding the quality, safety and effectiveness of Roundup® were representations calculated to induce Plaintiff, Gary Anderson to purchase and/or use Roundup®.

168. Defendant, Monsanto Company, breached the duty of care it owed to Plaintiff, Gary Anderson, by having made such representations to him without reasonable grounds for believing them to be true.

169.  Plaintiff, Gary Anderson, was unaware of the falsity of the representations and relied on them to his detriment by, inter alia, having purchased and used Roundup®, believing it to be a safe herbicide.

170.  Plaintiff, Gary Anderson, was justified in his reliance on the false information supplied by Defendant, Monsanto Company, regarding the quality, safety and effectiveness of Roundup®.

171.  As a direct and proximate consequence of Defendant's, Monsanto Company's, negligent misrepresentations, Plaintiff, Gary Anderson, has sustained severe and permanent injuries to his mind and body and has suffered and will continue to suffer in the future from physical pain and mental and emotional anguish and has been compelled to employ and will in the future be compelled to employ the services of doctors, medical personnel and facilities to care for and treat him and has incurred and will incur in the future substantial medical and other direct and consequential damages and expenses, all to his great damage.

WHEREFORE, Plaintiff, Gary Anderson, demands judgment against Defendant, Monsanto Company, for:

A.  General damages including, but not limited to, damages for pain and suffering and loss of an established course of life, in an amount to be determined at trial;

B.  Punitive damages;

C.  All past and future medical expenses;

D. Past and future mental anguish and emotional distress;

E. Plaintiff's out of pocket expenses;

F. Interest;

G. Costs;

H. Expenses;

I. Attorney's fees as allowed by law; and

J. For such other and further relief as this Honorable Court deems meet and just.

## COUNT VIII: INTENTIONAL MISREPRESENTATION
## (Plaintiff, Gary Anderson v. Defendant, Monsanto Company)

172.   Plaintiffs realllege and reaffirm the preceding paragraphs as if fully stated herein.

173.   Defendant intentionally misrepresented to Plaintiff the material facts about Roundup®.

174.   The Defendant knew such representations to be false or made such representations recklessly without any knowledge of their truth.

175.   Defendant's representations were made with the intent to induce the Plaintiff to rely upon the same representations to purchase and use Roundup®, which he did to his detriment.

176.   Plaintiff was ignorant that the representations were false.

177. Because Plaintiff was ignorant of the falsity of Defendant's representations, Plaintiff reasonably relied upon such representations and purchased and used Roundup® for decades.

178. Plaintiff reasonably and foreseeably relied on the truth of the representations made by Defendant.

179. Such false representations were made by the Defendant with malice and with the intent to deceive the Plaintiff.

180. As a direct and proximate result of Defendant's actual malice and actual fraud, Plaintiff suffered damages and is entitled to punitive damages, pursuant to § 27-1-221, M.C.A.

181. As a direct and proximate result of Plaintiff's justifiable reliance on the false representations of the Defendant, which were intentionally or recklessly made without knowledge of their truth, Plaintiff has suffered damages, all to his detriment.

182. As a direct and proximate consequence of Plaintiff's, Gary Anderson's, having purchased and used Roundup® for decades, said Plaintiff, Gary Anderson, has sustained severe and permanent injuries to his mind and body and has suffered and will continue to suffer in the future from physical pain and mental and emotional anguish and has been compelled to employ and will in the future be compelled to employ the services of doctors, medical

personnel and facilities to care for and treat him and has incurred and will incur in the future substantial medical and other direct and consequential damages and expenses, all to his great damage.

WHEREFORE, Plaintiff, Gary Anderson, demands judgment against Defendant, Monsanto Company, for:

A. General damages including, but not limited to, damages for pain and suffering and loss of an established course of life, in an amount to be determined at trial;

B. Punitive damages;

C. All past and future medical expenses;

D. Past and future mental anguish and emotional distress;

E. Plaintiff's out of pocket expenses;

F. Interest;

G. Costs;

H. Expenses;

I. Attorney's fees as allowed by law; and

J. For such other and further relief as this Honorable Court deems meet and just.

## COUNT IX: ACTUAL FRAUD
## (Plaintiff, Gary Anderson v. Defendant, Monsanto Company)

183. Plaintiffs reallege and reaffirm the preceding paragraphs as if fully stated herein.

184. Defendant intentionally made representations to Plaintiff, <u>inter</u> <u>alia</u>, that Roundup® was a high-quality, safe and effective herbicide.

185. Defendant knew such representations to be false at the time they were made, and Defendant knew that Roundup® subjected consumers to an unreasonable risk of developing multiple myeloma and non-Hodgkin lymphoma, among other harms.

186. Defendant's representations were material, the Plaintiff relied upon same and was deceived thereby.

187. Defendant knew of the falsity of such representations at the time they were made.

188. Defendant's representations were made with the intent to induce the Plaintiff to rely upon the same, which he did to his detriment by purchasing and using Roundup® for decades.

189. Defendant concealed its knowledge of the unreasonable risks and dangers associated with the use of Roundup® in order to induce Plaintiff and thousands of other individuals to purchase and use it as an herbicide.

190. Plaintiff did not know of the falsity of Defendant's statements regarding Roundup®.

191. Plaintiff reasonably relied upon and accepted as truthful Defendant's representations regarding Roundup®.

192. Plaintiff had a right to rely on Defendant's representations and in fact did rely upon such representations. Had Plaintiff known that the use of Roundup® posed a significant risk of developing multiple myeloma he would never have purchased or used Roundup®.

193. Such false representations of the Defendant were made by it with malice and with the intent to deceive Plaintiff.

194. The Defendant had knowledge of facts or intentionally disregarded facts that created a high probability of injuring the Plaintiff and deliberately acted with conscious disregard or with indifference to the high probability of injury to Plaintiff.

195. The representations made by the Defendant were not warranted by the information in its possession.

196. As a direct and proximate result of Defendant's actual malice and actual fraud, Plaintiff suffered damages and is entitled to punitive damages, pursuant to § 27-1-221, M.C.A.

197. As a direct and proximate result of Plaintiff's justifiable reliance on Defendant's fraudulent representations, Plaintiff has suffered significant damages including, but not limited to, permanent physical injury, pain and suffering and the need for chemotherapy and other medical therapies.

198.   As a direct and proximate consequence of Plaintiff's, Gary Anderson's, having purchased and used Roundup® for decades, said Plaintiff, Gary Anderson, has sustained severe and permanent injuries to his mind and body and has suffered and will continue to suffer in the future from physical pain and mental and emotional anguish and has been compelled to employ and will in the future be compelled to employ the services of doctors, medical personnel and facilities to care for and treat him and has incurred and will incur in the future substantial medical and other direct and consequential damages and expenses, all to his great damage.

WHEREFORE, Plaintiff, Gary Anderson, demands judgment against Defendant, Monsanto Company, for:

A. General damages including, but not limited to, damages for pain and suffering and loss of an established course of life, in an amount to be determined at trial;

B. Punitive damages;

C. All past and future medical expenses;

D. Past and future mental anguish and emotional distress;

E. Plaintiff's out of pocket expenses;

F. Interest;

G. Costs;

H. Expenses;

I. Attorney's fees as allowed by law; and

J.  For such other and further relief as this Honorable Court deems meet and just.

## COUNT X: CONSTRUCTIVE FRAUD
### (Plaintiff, Gary Anderson v. Defendant, Monsanto Company)

199.  Plaintiffs reallege and reaffirm the preceding paragraphs as if fully stated herein.

200.  At all times relevant, the Defendant owed a duty to the Plaintiff to affirmatively disclose all adverse material facts regarding Roundup®.

201.  At all times relevant, the Defendant breached its duty to Plaintiff by failing to disclose any and all issues, potential or existing, which could and would cause harm to the Plaintiff.

202.  Defendant's failure to have disclosed adverse material facts misled the Plaintiff and induced him to purchase and use Roundup® at a time when Defendant knew that Plaintiff, along with tens of thousands of other consumers, was relying on Defendant's representations.

203.  The Defendant gained an advantage over Plaintiff by misleading him to his prejudice and the Defendant has profited from its failure to have disclosed such adverse material facts to the great damage of Plaintiff.

204.  As a direct, immediate and proximate consequence of Plaintiff's, Gary Anderson's, having purchased and used Roundup®, said Plaintiff, Gary Anderson, has sustained severe and permanent injuries to his mind and body

and has suffered and will continue to suffer in the future from physical pain and mental and emotional anguish and has been compelled to employ and will in the future be compelled to employ the services of doctors, medical personnel and facilities to care for and treat him and has incurred and will incur in the future substantial medical and other direct and consequential damages and expenses, all to his great damage.

WHEREFORE, Plaintiff, Gary Anderson, demands judgment against Defendant, Monsanto Company, for:

A. General damages including, but not limited to, damages for pain and suffering and loss of an established course of life, in an amount to be determined at trial;

B. Punitive damages;

C. All past and future medical expenses;

D. Past and future mental anguish and emotional distress;

E. Plaintiff's out of pocket expenses;

F. Interest;

G. Costs;

H. Expenses;

I. Attorney's fees as allowed by law; and

J. For such other and further relief as this Honorable Court deems meet and just.

## COUNT XI: MONTANA CONSUMER PROTECTION ACT
## (§ 30-14-101, M.C.A., et. seq.)
## (Plaintiff, Gary Anderson v. Defendant, Monsanto Company)

205.   Plaintiffs reallege and reaffirm the preceding paragraphs as if fully stated herein.

206.   As a consumer, Plaintiff purchased Roundup® for personal, family or household purposes.

207.   The acts and/or omissions of the Defendant including, but not limited to, its fraudulent misrepresentations, its failure to have disclosed any and all issues and/or adverse material facts regarding Roundup®, and concealment of its knowledge of the unreasonable risks and dangers associated with the use of Roundup® in order to induce Plaintiff and thousands of other individuals to purchase it as an herbicide, constitute unfair or deceptive acts or practices in violation of the Montana Consumer Protection Act (MCPA).

208.   As a direct, immediate and proximate consequence of Plaintiff's, Gary Anderson's, having purchased and used Roundup®, said Plaintiff, Gary Anderson, has sustained severe and permanent injuries to his mind and body and has suffered and will continue to suffer in the future from physical pain and mental and emotional anguish and has been compelled to employ and will in the future be compelled to employ the services of doctors, medical personnel and facilities to care for and treat him and has incurred and will

incur in the future substantial medical and other direct and consequential damages and expenses, all to his great damage.

WHEREFORE, Plaintiff, Gary Anderson, demands judgment against Defendant, Monsanto Company, for:

A.  General damages including, but not limited to, damages for pain and suffering and loss of an established course of life, in an amount to be determined at trial;

B.  Punitive damages;

C.  All past and future medical expenses;

D.  Past and future mental anguish and emotional distress;

E.  Plaintiff's out of pocket expenses;

F.  Interest;

G.  Costs;

H.  Expenses;

I.  Attorney's fees as allowed by law; and

J.  For such other and further relief as this Honorable Court deems meet and just.

## COUNT XII: DECEIT (§ 27-1-712, M.C.A.
## (Plaintiff, Gary Anderson v. Defendant, Monsanto Company)

209.  Plaintiffs reallege and reaffirm the preceding paragraphs as if fully stated herein.

210.  Defendant, Monsanto Company, willfully deceived Plaintiff by having stated as fact that Roundup® was a safe herbicide.

211.  Such representations were made with the intent to induce Plaintiff to alter his position which Plaintiff did, to his great detriment, by, inter alia, purchasing and using Roundup®.

212.  Defendant, Monsanto Company, made suggestions as a fact that Roundup® was a safe herbicide.

213.  Such suggestions as a fact were not true and were made by Defendant at times when it did not believe them to be true.

214.  Defendant made assertions as a fact that Roundup® was a safe herbicide.

215.  Such assertions as a fact were not true and were made by Defendant at times when it had no reasonable ground for believing them to be true.

216.  Defendant concealed facts from Plaintiff at times when it was bound to disclose them to Plaintiff.

217.  At the times that Defendant represented that Roundup® was a safe herbicide it knew that such representations were false.

218.  Plaintiff reasonably and foreseeably relied upon Defendant's false suggestions and assertions as a fact that Roundup® was a safe herbicide and such reliance proximately caused damage to the Plaintiff.

219.  Defendant acted with actual malice toward Plaintiff.

220.  As a direct, immediate and proximate consequence of Plaintiff's, Gary Anderson's, having purchased and used Roundup®, said Plaintiff, Gary

Anderson, has sustained severe and permanent injuries to his mind and body and has suffered and will continue to suffer in the future from physical pain and mental and emotional anguish and has been compelled to employ and will in the future be compelled to employ the services of doctors, medical personnel and facilities to care for and treat him and has incurred and will incur in the future substantial medical and other direct and consequential damages and expenses, all to his great damage.

WHEREFORE, Plaintiff, Gary Anderson, demands judgment against Defendant, Monsanto Company, for:

A. Compensatory damages;

B. Punitive damages;

C. Interest;

D. Costs;

E. Expenses;

F. Attorney's fees as allowed by law; and

G. For such other and further relief as this Honorable Court deems meet and just.

## COUNT XIII: PUNITIVE DAMAGES
## (§ 27-1-220, M.C.A. and § 27-1-221, M.C.A.)
## (Plaintiff, Gary Anderson v. Defendant, Monsanto Company)

221.   Plaintiffs reallege and reaffirm the preceding paragraphs as if fully stated herein.

222.  At all times relevant the Defendant had knowledge of facts or intentionally disregarded facts that created a high probability of injury to the Plaintiff, Gary Anderson.

223.  At all times relevant the Defendant proceeded to act in conscious or intentional disregard of the high probability of injury to the Plaintiff, Gary Anderson.

224.  At all times relevant the Defendant deliberately proceeded to act with indifference to the high probability of injury to Plaintiff, Gary Anderson.

225.  The Defendant is guilty of actual fraud and actual malice.

226.  As a matter of law the Plaintiff, Gary Anderson, is entitled to recover punitive damages from Defendant pursuant to § 27-1-220, M.C.A. and § 27-1-221, M.C.A.

WHEREFORE, Plaintiff, Gary Anderson, demands judgment against Defendant, Monsanto Company, for:

A. Punitive damages;

B. Interest;

C. Costs;

D. Expenses;

E. Attorney's fees as allowed by law; and

F. For such other and further relief as this Honorable Court deems meet and just.

## COUNT XIV: LOSS OF CONSORTIUM
### (Plaintiff, Mary Anderson v. Defendant, Monsanto Company)

227.   Plaintiffs reallege and reaffirm the preceding paragraphs as if fully stated herein.

228.   As a direct and proximate consequence of Defendant's, Monsanto Company's, conduct, Plaintiff, Gary Anderson, has been precluded from participating in normal life activities, to the extent he was able to before his injuries, and will continue to be precluded from doing so in the future.

229.   As a direct and proximate consequence of Defendant's, Monsanto Company's, conduct, Plaintiff, Mary Anderson, has in the past, and will in the future, be deprived of her husband's love, affection, support, services, companionship, aid, comfort, society and consortium, all to her great damage.

WHEREFORE, Plaintiff, Mary Anderson, demands judgment against Defendant, Monsanto Company, for:

   A.  Compensatory damages;

   B.  Interest;

   C.  Costs;

   D.  Expenses;

   E.  Attorney's fees as allowed by law; and

   F.  For such other and further relief as this Honorable Court deems meet and just.

## **JURY DEMAND**

The Plaintiffs, Gary Anderson and Mary Anderson demand a trial by jury on all issues so triable.

Respectfully submitted this 18th day of September, 2019.

DATSOPOULOS, MacDONALD & LIND, P.C.

By: /s/ Terance P. Perry
Terance P. Perry, Esq.
*Attorneys for Plaintiffs*