## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **YVETTER A. D'AUNOY,** | * | Civil Action No. 2:19-CV-13594 |
| | * | |
| **Plaintiff,** | * | |
| **Versus** | * | Judge:  Barry W. Ashe |
| | * | |
| **MONSTANTO COMPANY, et al.,** | * | |
| **Defendants.** | * | Magistrate: |
| | * | |

**************************************************************************

### PLAINTIFF'S EMERGENCY MOTION FOR REMAND

**MAY IT PLEASE THE COURT:**

Pursuant to 28 U.S.C. § 1447 and 28 U.S.C. § 1332, Plaintiff Yvette D'Aunoy files this Emergency Motion to Remand, and would respectfully show the Court that this case should be summarily remanded for the following reasons:

I.

On November 12,  2019, Plaintiff received notice of removal to the United States District Court for the Eastern District of Louisiana by defendant Monsanto Company.

II.

Plaintiff opposes removal and moves for remand back to the State Court on the basis that this Court does not have subject matter jurisdiction over this matter, as more fully set forth in the accompanying Memorandum in Support.

III.

Plaintiff requests emergency consideration because Monsanto will attempt to have this case transferred to the MDL established in the Northern District of California. There is no basis for federal jurisdiction in this case and a transfer to the MDL in California will only further delay this case. Moreover, Plaintiff suffers as a result of her diagnosis of Chronic Lymphocytic Leukemia

("CLL") a subset of Non-Hodgkin's Lymphoma ("NHL") NHL cancer and cannot afford a delay

in her case.

     **WHEREFORE**, Plaintiff respectfully requests that this matter be remanded to the Civil

District Court for the Parish of Orleans, State of Louisiana.

                                   Respectfully submitted,

                                   **LANDRY & SWARR, L.L.C.**

                                 /s/ *PHILIP C. HOFFMAN*
                                 FRANK J. SWARR (#23322)
                                 MICKEY P. LANDRY (#22817)
                                 PHILLIP C. HOFFMAN (#32277)
                                 MATTHEW CLARK (#31102)
                                 1010 Common Street, Suite 2050
                                 New Orleans, Louisiana 70112
                                 Telephone:  (504) 299-1214
                                 Facsimile:  (504) 299-1215
                                 COUNSEL FOR PLAINTIFF


                              **<u>CERTIFICATE OF SERVICE</u>**

     I hereby certify by my signature that on this 19th day of November 2019, a copy of the

foregoing has been filed with the Clerk of Court using CM/ECF system.  Notice of this filing will

be sent to all counsel of record by operation of the court's electronic filing system.

                               s/ *Philip C. Hoffman*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| YVETTER A. D'AUNOY, | * | Civil Action No. 2:19-CV-13594 |
| | * | |
| **Plaintiff,** | * | |
| Versus | * | Judge:  Barry W. Ashe |
| | * | |
| MONSTANTO COMPANY, et al., | * | |
| **Defendants.** | * | Magistrate: |
| | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S EMERGENCY MOTION FOR REMAND**

**MAY IT PLEASE THE COURT:**

Pursuant to 28 U.S.C. § 1447 and 28 U.S.C. § 1332, Plaintiff Yvette D'Aunoy files this

Memorandum in Support of Plaintiff's Motion to Remand, and would respectfully show the Court

that this case should be summarily remanded for the following reasons:

**I. INTRODUCTION**

This is a properly filed state court action that has been improperly removed by Defendant

Monsanto Company ("Monsanto"). In September of 2019, the original state court petition of Mrs.

D'Aunoy was filed in Orleans Parish as a result of her diagnosis of Chronic Lymphocytic

Leukemia ("CLL") a subset of Non-Hodgkin's Lymphoma ("NHL") NHL cancer, which was due

to and a consequence of her regular perineal application of Monsanto's Roundup® herbicide

("Roundup®"). In Plaintiff's Original Petition, she brought negligence and product liability claims

against the manufacturers, suppliers, and distributors of Roundup® to which she was exposed,

including removing defendants, Monsanto. As set out more fully in Plaintiff's Original Petition

(see attached Exhibit A – Plaintiff's Original Petition), Roundup® was manufactured by Monsanto

and were promoted, distributed, and sold by Harry's Hardware, Inc. ("Harry's Hardware"). The

principal place of business of Harry's Hardware is 3535 Magazine Street in Orleans Parish,

Louisiana. Ohio Security Insurance Company ("Ohio Security") was sued as the insurer of Harry's Hardware and as an insurer, its takes on the citizenship of its insured. Therefore, Ohio Security is also a Louisiana citizen for the purposes of diversity jurisdiction.

Despite the fact that Harry's Hardware and Ohio Security are both corporate citizens of Louisiana, on November 12, 2019, counsel for Monsanto filed a Notice of Removal removing this case from State court to this Federal Court on the basis of its specious argument that the two non-diverse defendants — Harry's Hardware and Ohio Security - were improperly joined, and thus complete diversity jurisdiction existed, and its removal to this court was proper.

Respectfully, we disagree.

It is respectfully requested that this Court determine that it does not have subject matter jurisdiction and summarily remand this case back to state court. A review of Plaintiff's Original Petition, (See - attached Exhibit A) as well as the Notice of Removal (Attached as Exhibit B) reveals that there is no federal jurisdiction in this matter because there is not complete diversity. Further, it is evident that the Procedural Jurisdiction of this Honorable Court is similarly in question.

Remand is required because Monsanto has failed to meet their heavy burden of showing improper joinder because: (1) Plaintiff's petition adequately states negligence claims under Louisiana law against two Louisiana Defendants, (2) Monsanto cannot meet its heavy burden of showing improper joinder by merely stating that the two Louisiana Defendants are non-manufacturers; (3) Louisiana Defendant Harry's Hardware was a distributor/seller of Roundup® and should have known about the dangers of Roundup®, and as such can be found liable under negligence theories alleged by Plaintiff in her Original Petition; and (4) The "Forum Defendant Rule" (28 U.S.C. § 1441(b)) simply prevents the Removal of the instant action considering the

forum Defendant herein was sued and served prior to the Notice of Removal filed on behalf of Monsanto.

In their Notice of Removal, Monsanto makes statements, supported by a self-serving affidavit from Harry's Hardware, in a weak, yet presumptive attempt to speak to the potential liability of the Louisiana Defendant before any Defendant has even answered Plaintiff's Original Petition, and before discovery has even commenced. Even though there is clearly no diversity which is required for removal, Monsanto has removed plaintiffs' case to this Court contending that the Louisiana Defendants have been improperly joined in this action, and, consequently, that the citizenship of those defendants should be ignored. As will be demonstrated below, Monsanto's contentions are completely frivolous and devoid of any sound reasoning in Louisiana jurisprudence. Monsanto's removal of this case is simply a part of its national scheme to keep legitimate local state cases from being pursued in any state courts.

## II.   THIS COURT LACKS SUBJECT MATTER JURISDICTION BECAUSE THERE IS NOT COMPLETE DIVERSITY.

### A.  Monsanto Has Not Met Its Heavy Burden of Demonstrating that Plaintiff Has No Reasonable Possibility of Recovery Against the Louisiana Defendants.

It is axiomatic that federal courts have limited jurisdiction, having power only over those cases authorized by the United States Constitution and federal statutes. *See Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375 (1994); *Coury v. Prot*, 85 F.3d 244, 248 (5th Cir. 1996). In remand proceedings, the removing defendants bear the initial burden of establishing original federal subject matter jurisdiction. *See Pullman Co. v. Jenkins*, 305 U.S. 534, 540 (1938); *Allen v. R. & H. Oil & Gas Co.*, 63 F.3d 1326, 1335 (5th Cir. 1995). The removal statute is strictly construed, requiring remand to state court if any doubt exists over whether removal was proper. *See Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 104 (1941). Therefore, in deciding whether Johnson &

Johnson has satisfied its burden, this Court must resolve any doubts in favor of remand. *See Acuna v. Brown & Root, Inc.*, 200 F.3d 335, 339 (5th Cir. 2000).

Defendants that remove on the basis of diversity of citizenship must demonstrate that complete diversity exists. *See Getty Oil*, 841 F.2d at 1259. In other words, they must demonstrate that "none of the parties in interest properly joined and served as defendants [are citizens] of the State in which such action is brought." 28 U.S.C. § 1441(b). The removing party further bears the burden of showing that any in-state defendants were not properly joined. *See Getty Oil*, 841 F.2d at 1259.

The burden of proving improper joinder is a "heavy one." *Griggs v. State Farm Lloyds*, 181 F.3d 694, 699 (5th Cir. 1999). A claim of fraudulent joinder must be stated with particularity, supported by clear and convincing evidence, and proven with "certainty." *Wilson v. Republic Iron & Steel Co*., 257 U.S. 92, 97 (1921). **If there is *any* doubt as to whether a plaintiff states a claim against the non-diverse defendant, the joinder is not fraudulen**t. *See Parks v. New York Times Co.*, 308 F.2d 474 (5th Cir. 1962).

There are two ways to establish improper joinder: "(1) actual fraud in the pleading of jurisdictional facts, or (2) inability of the plaintiff to establish a cause of action against the non-diverse party in state court." *Travis v. Irby*, 326 F.3d 644, 647 (5th Cir. 2003); *Mumfrey v. CVS Pharmacy, Inc*., 719 F.3d 392, 401 (5th Cir. 2013). Here, Monsanto does not dispute that Harry Hardware and Ohio Security are citizens of Louisiana (*See* Exhibit B – at p.4). Therefore, since there is no allegation that Plaintiff's jurisdictional facts were fraudulently pled, the second test for improper joinder is the only one at issue. *See id.* at 647.

The Fifth Circuit has held that "the test for fraudulent joinder is whether the defendant has demonstrated that there is no reasonable possibility of recovery by the plaintiff against an in-state

defendant, which stated differently means that there is no reasonable basis for the district court to predict that the plaintiff might be able to recover against an in-state defendant." *Smallwood v. Illinois Cent. R. Co.*, 385 F.3d 568, 573 (5th Cir. 2004) (citing *Travis*, 326 F.3d at 648) (emphasis added). The court must "take into account the 'status of discovery' and consider what opportunity the plaintiff has had to develop its claims against the non-diverse defendant." *McKee v. Kan. City S. Ry. Co.*, 358 F.3d 329, 334 (5th Cir. 2004). To determine whether there is any reasonable possibility of recovery against the in-state defendants, district courts may conduct a Rule 12(b)(6)-type analysis to determine whether the complaint states a claim against the in-state defendants under state law. *See id.*; *see also Travis*, 326 F.3d at 648 (noting that the test for improper joinder is adopted from the Rule 12(b)(6) standard). "Ordinarily, if a plaintiff can survive a Rule 12(b)(6) challenge, there is no improper joinder." *Smallwood*, 385 F.3d at 573 (emphasis added); *see also Bopp v. Westchester Surplus Lines Ins. Co.*, No. 09-6448, 2009 WL 3763921 (E.D. La. Nov. 9, 2009) (holding that the defendant failed to show improper joinder when the allegations in the plaintiff's complaint were sufficient to state a claim for relief against the non-diverse defendant).

Here, the detailed allegations in Plaintiff's complaint would easily defeat a Rule 12(b)(6) motion to dismiss, and therefore are sufficient to show that the Louisiana Defendants are properly joined in this case.

- As a result of Ms. D'Aunoy's significant use of Roundup®, she developed CLL. (*See* Exhibit A – at p. 2-3).

- Plaintiff's Petition for Damages alleges negligence claims against the non-diverse Defendants (*Id* at p.24-27).

- Plaintiff alleged that the non-diverse Defendants knew or should have known through industry and medical studies, that there were health hazards inherent in the

Roundup® herbicide they were selling, supplying and/or distributing. (*Id.* at 24-
27). (Count III).

- Harry's Hardware had a duty to sell a product that was not unreasonably dangerous
  to consumers and users of the product. *Id* at p. 24.

- Harry's Hardware had a duty to provide information regarding the risks of using
  Roundup® with appropriate and adequate warnings concerning the adverse effects
  of the active ingredient glyphosate. *Id*.

- Harry's Hardware, in the exercise of reasonable care, should have known about the
  hazards and dangers of Roundup® and specifically, the carcinogenic properties of
  the chemical glyphosate. *Id* at p. 25.

- Harry's Hardware knew or should have known that the users and consumers of
  Roundup® were unaware of the risks associated with its use. *Id*.

- Harry's Hardware had the ability and means to investigate the hazards associated
  with Roundup®, but Harry's Hardware failed to do so. *Id*.

The information regarding the hazards associated with the active ingredient glyphosate in
Roundup® was knowable to Harry's Hardware; yet, Harry's Hardware ignored that information.

- In 1985 the EPA classified glyphosate as a possible carcinogen to humans which
  was four years prior to Mrs. D'Aunoy's first use of Roundup®. *Id* at p. 7.  In 1991,
  despite the EPA reclassifying glyphosate, after pressure from Monsanto, the EPA
  specifically stated: "It should be emphasized, however, that the designation of an
  agent in Group E is based on the available evidence at the time of evaluation and
  should not be interpreted as a definitive conclusion that the agent will not be a
  carcinogen under any circumstance." *Id* at p. 7.

- In 1996, the New York Attorney General filed suit against Monsanto based on its false and misleading advertising of Roundup®, specifically Monsanto's claim Roundup® was safe. *Id* at p. 9. Harry's Hardware used, promoted and profited from Monsanto's false and misleading advertising.

- As a result of the New York Attorney General's lawsuit, Monsanto agreed to cease advertising that Roundup® was safe in the state of New York. *Id* at p. 7. Monsanto did not alter its advertising in Louisiana and Harry's Hardware used, promoted and profited off that misleading advertising.

There can be no serious question that Plaintiff has adequately alleged Louisiana negligence claims against the Louisiana Defendants as sellers, suppliers, and/or distributors of Roundup®. The factual allegations in Plaintiff's complaint must be taken in the light most favorable to Plaintiff. *Travis*, 326 F.3d at 649. As further detailed below, Plaintiff can very reasonably expect to recover from the Louisiana Defendants, and therefore, remand is warranted.

**B.    Monsanto Cannot Argue Improper Joinder on the Basis of an Absence of Evidence.**

Even though proper joinder is evident from the face of Plaintiff's complaint, Plaintiff anticipates that Monsanto will resort to arguing improper joinder on the basis of an absence of evidence. This strategy fails under the law of this Circuit. In rare cases, even if the plaintiff has adequately stated a claim for relief, the court may "pierce the pleadings and conduct a summary inquiry." *Smallwood*, 385 F.3d at 573. However, such a procedure should only be utilized if the plaintiff has "misstated or omitted discrete facts that would determine the propriety of joinder." *Id.* Therefore, the Fifth Circuit has cautioned that "a summary inquiry is appropriate only to identify the presence of discrete and undisputed facts that would preclude plaintiff's recovery

against the in-state defendant." *Id.* at 573-74 (emphasis added).[1] In other words, the removing party must point to evidence that would "negate the [in-state defendant's] fault as alleged in the complaint." *Travis*, 326 F.3d at 650 (emphasis added). Examples of such facts would include that "the in-state doctor defendant did not treat the plaintiff patient, the in-state pharmacist defendant did not fill a prescription for the plaintiff patient, a party's residence was not as alleged, or any other fact that easily can be disproved if not true." *Smallwood,* 385 So. 2d at 574, n.12.

Simply alleging an absence of evidence against the in-state defendant will not be sufficient to carry the removing party's burden. *See Travis*, 326 F.3d at 650. In the *Travis* case, the Fifth Circuit rejected an allegation of fraudulent joinder based on the plaintiff's discovery responses stating that she did not yet possess facts to support her allegations against the in-state defendant. *Id.* at 649. The court noted that such responses must be considered in the context of her additional discovery responses that provided lists of eyewitnesses that she expected to use to establish her claims, as well as the fact that discovery was ongoing. *Id.* at 649-50. Under those facts, the plaintiff's absence of evidence against the in-state defendant was not sufficient to establish fraudulent joinder:

> In this circumstance, in which the defendant has the burden of establishing fraudulent joinder and the plaintiff can clearly state a claim upon which relief can be granted as to the non-diverse defendant, the lack of substantive evidence as to the non-diverse defendant does not support a conclusion that he was fraudulently joined. In order to establish that [the in-state defendant] was fraudulently joined, the defendant must put forward evidence that would negate a possibility of liability on the part of [the in-state defendant]. As the defendants cannot do so, **simply pointing to the plaintiff's lack of evidence at this stage of the case is insufficient to show that there is no possibility for [the plaintiff] to establish [the in-state defendant's] liability at trial.**

---

[1] Since the purpose of the improper joinder inquiry is to determine whether or not the in-state defendant was properly joined, the focus of the inquiry must be on the joinder, not the merits of the plaintiff's case." *Smallwood*, 385 F.3d at 573. The Court must therefore take care not to move beyond the jurisdictional question and into a resolution of the merits. *Id.* at 574.

*Id.* at 650-51 (emphasis added).

Rather than meet its burden of pointing to evidence that would negate Plaintiff's claims against the Louisiana Defendants, Plaintiff anticipates that Monsanto will take the exact approach rejected in this Circuit—and will contend that Plaintiff lacks evidence against the Louisiana Defendants. Plaintiff must point out that discovery has not even begun in this case. Plaintiff submits that Monsanto cannot meet its burden of showing improper joinder by merely alleging a lack of evidence when Plaintiff is still developing the evidence against the Louisiana Defendants. *See Travis*, 326 F.3d at 650.

### C. Monsanto's Removal is Improper under 28 U.S.C. § 1441(b) as the Forum Defendants Have Been Sued and Served

In an abundance of caution, it should be noted that the Forum Defendants had been both sued and served in the underlying action *prior* to Defendant's initial removal in the instant matter. Therefore, absent some extraordinary basis for this Court to exert Federal Jurisdiction (as discussed more fully *supra*), Defendant's removal is procedurally defective. Clearly, this Court is well acquainted with the application of same based upon a fair reading the previously mentioned Opinion (on remand) in the *In Re Plavix Product Liability and Marketing Litigation*, [MDL No. 3:13-cv-2418-FLW (Rec. Doc. 27)] litigation. The so-called "Forum Defendant Rule" is clear and unambiguous in that once the local "Forum Defendant(s)" have been sued and served, 28 U.S.C. § 1441(b) attaches and a diversity removal becomes procedurally improper.

## III.   CONCLUSION

Despite all of the above, Monsanto contends that Plaintiff has "no reasonable possibility of recovery" against the Louisiana Defendants. In fact, as demonstrated above, Harry's Hardware was a seller, distributor and supplier of Roundup® herbicide throughout the State of Louisiana during the very years that Mrs. D'Aunoy purchased and used the product. Harry's Hardware

should have known about the hazards associated with Monsanto's product that it sold but chose to ignore that information and subjected Mrs. D'Aunoy to unnecessary exposures and subsequent damage. Plaintiff's good-faith claims against Harry's Hardware and it's insurer evidenced by her Petition must be considered in the diversity equation. As Mrs. D'Aunoy, Harry's Hardware and its insurer are all Louisiana citizens, diversity does not exist in this case and it must be remanded to state court.

A case should be removed only if it is properly removed from state court to federal court. Monsanto decided that they do not want this legitimate state court case to remain in state court and have disregarded all of the prior controlling jurisprudence of this U.S. District Court. Monsanto's removal of this case is a manipulative attempt to keep legitimate cases from being heard and tried in state court.[2] Monsanto's removal of this case is simply a feeble ploy to have this case, and many others, transferred to an MDL. In creating MDLs, Congress did not intend to provide large corporations, such as Monsanto, with an opportunity to prevent injured people from pursuing their claims in state court.

**WHEREFORE**, Plaintiff respectfully requests that this matter be remanded to the Civil District Court for the Parish of Orleans, State of Louisiana.

Respectfully submitted,

**LANDRY & SWARR, L.L.C.**

/s/ *PHILIP C. HOFFMAN*
FRANK J. SWARR (#23322)
MICKEY P. LANDRY (#22817)
PHILLIP C. HOFFMAN (#32277)
MATTHEW CLARK (#31102)
1010 Common Street, Suite 2050
New Orleans, Louisiana 70112

---

[2] Interestingly, today, November 19, 2019, the Northern District of California MDL established for Roundup® cases remanded a case on similar issues raised by Mrs. D'Aunoy. *Cichy v. Monsanto Co.*, 19-cv-4575, MDL No. 2741, 16-md-02741-VC, Document 7844.

Telephone:  (504) 299-1214
Facsimile:  (504) 299-1215
COUNSEL FOR PLAINTIFF


**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify by my signature that on this 19th day of November 2019, a copy of the

foregoing has been filed with the Clerk of Court using CM/ECF system.  Notice of this filing will

be sent to all counsel of record by operation of the court's electronic filing system.

<u>s/ *Philip C. Hoffman*</u>

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NO. 2019·10100                               DIVISION " B-5

YVETTE A. D'AUNOY

VERSUS

MONSANTO COMPANY, ET AL

FILED: _____        _____
                                              DEPUTY CLERK

## PETITION FOR DAMAGES

### I.

1.     Petitioner, Yvette A. D'Aunoy is an adult resident, citizen and domiciliary of the State of Louisiana.

2.     Made Defendants herein are the following, either foreign corporations licensed to do and doing business in the State of Louisiana or domestic corporations licensed to do and doing business in the State of Louisiana, or are individuals that are liable unto the Petitioner, for the claims asserted herein:

   A.  **MONSANTO COMPANY**

   B.  **HARRY'S HARDWARE, INC.**

   C.  **OHIO SECURITY INSURANCE COMPANY as the liability insurer of Harry's Hardware, Inc.**

3.     Orleans Parish is a proper venue pursuant to Louisiana Code of Civil Procedure Article 74 because Mrs. D'Aunoy was exposed to Roundup in Orleans Parish. Accordingly, the action on the offense is being brought in the parish where the wrongful conduct and injury was sustained.

4.     Orleans Parish is a proper venue for this matter pursuant to Louisiana Code of Civil Procedure Article 42(2) because Defendant Harry's Hardware, Inc. is a domestic corporation licensed to do business in this State and has designated as its primary business office and/or primary place of business in Louisiana as Orleans Parish.

5.     This action is within the jurisdiction of the court and Orleans Parish is a proper venue pursuant to Louisiana Code of Civil Procedure article 73 because each of the defendants listed above jointly contributed to Petitioner's exposure to roundup and subsequent contraction of

1

Chronic Lymphocytic Leukemia and therefore each is jointly liable to Petitioner with each of its co-defendants, and defendant Harry's Hardware and the insurer of Harry's Hardwar are domiciled in Orleans Parish.

## II.   INTRODUCTION

6.      Plaintiff brings this cause of action against the Defendants as their claims arise out of the same series of transactions and occurrences, and their claims involve common questions of law and/or fact. All claims in this action are a direct and proximate result of Defendants' negligent, willful, and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, and/or sale of Roundup and/or other Monsanto glyphosate-containing products ("Roundup"). Plaintiff in this action seeks recovery for damages as a result of developing Chronic Lymphocytic Leukemia ("CLL") a subset of Non-Hodgkin's Lymphoma ("NHL"), which was directly and proximately caused by such wrongful conduct by Defendants, the unreasonably dangerous and defective nature of Roundup, and its active ingredient, glyphosate, and the attendant effects of developing NHL. Plaintiff did not know of an association between exposure to Roundup® and the increased risk of developing CLL or NHL until well after July 29, 2015, when the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), first published its evaluation of glyphosate. All of the claims involve common questions of law and fact and share legal and medical issues that arise out of all of the Plaintiffs' exposures to Roundup.

## III.   THE PARTIES

### Plaintiff

7.      Plaintiff, Yvette D'Aunoy, is a resident of New Orleans, Louisiana. Mrs. D'Aunoy has a significant exposure history to Roundup. Mrs. D'Aunoy was a very avid gardener.  At her home, during the time period 1989-1993, Mrs. D'Aunoy used Roundup on her driveway and along the side of her house on a weekly basis. Mrs. D'Aunoy moved and continued to use Roundup. Between the years of 1994-2003, she used Round up on a weekly basis (a little less in the winter). Mrs. D'Aunoy used it to the kill the weeds in the alleyway of her house on and near the concrete of her house.  Mrs. D'Aunoy had large gardens with flower beds and little grass and believed the Roundup was easier to use that a weed whacker.   Mrs. D'Aunoy's use was more sporadic between 2003-2005 because by this time she had two young kids and not as much time to garden.  After her Katrina evacuation, Mrs. D'Aunoy's yard was like "a jungle" and she used a lot of Roundup

2

to get the weeds under control. Mrs. D'Aunoy continued to use Roundup on occasions and even used it after her diagnosed with CLL in 2016. Mrs. D'Aunoy used Roundup every spring to clear out her herb garden which she would replant each year.  Mrs. D'Aunoy purchased Roundup from the Harry's Ace Hardware on General Meyer in Algiers, Louisiana. Mrs. D'Aunoy is unable to continue to garden due to her CLL. Mrs. D'Aunoy suffers from significant fatigue and does not have the energy to garden after working a full day.

**Contra Non Valentum**

8.       The prescriptive period does not start until the plaintiff knew or should have known that her CLL was caused by Roundup. Here, the results of the plaintiff's exposures to glyphosate-containing products was inherently undiscoverable and there was no warning that such exposures could cause CLL. Mrs. D'Aunoy did not know the association between Roundup and CLL until less than one year from this date.

9.       In October 2016, Mrs. D'Aunoy was diagnosed with CLL. Mrs. D'Aunoy asked but was not provided an answer at to the cause of her CLL. In October 2016, Mrs. D'Aunoy was told that there is no cure for CLL and she would have to wait for symptoms to develop before treatments were an option. Between October and December of 2018, Mrs. D'Aunoy heard about a California lawsuit against the manufacturer of Roundup for causing Non-Hodgkin's Lymphoma. Mrs. D'Aunoy did some research and found an FDA opinion/statement from 2015 that said Roundup was not a carcinogen. In March 2019, Mrs. D'Aunoy saw an article that reported about the California verdict against Monsanto for Roundup causing the plaintiff's Non-Hodgkin's Lymphoma. In June 2019, Mrs. D'Aunoy learned about another California lawsuit against Monsanto for Roundup. In August 2019, Mrs. D'Aunoy found an article on a website for survivors of CLL written by a Medical Doctor from MD Anderson associating CLL with Roundup. On August 21, 2019, Mrs. D'Aunoy found an article that showed a 41% increased incidence of CLL in people who used Roundup. Mrs. D'Aunoy filed suit directly thereafter in September of 2019.

**Defendant**

10.       Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri and licensed to do business in Louisiana.

11.       At all times relevant to this petition, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®.

12.     Harry's Hardware, Inc. is Louisiana Corporation with its principle place of business in New Orleans, Louisiana.

13.     Ohio Security Insurance Company is an insurance company licensed to do business in the State of Louisiana.


## IV.     ROUND UP

14.     In 1970, Defendant Monsanto Company discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 millions of pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

15.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

16.     Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

17.     On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

4

18.     On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

19.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other hematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

20.     The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

21.     Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

## V.     FACTS

22.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

23.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

24.     For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®—glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Agricultural workers are, once again, victims of corporate greed. Monsanto assured the public that Roundup® was

harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers, and the general population that Roundup® was safe.

### The Discovery of Glyphosate and Development of Roundup®

25.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use; Monsanto still markets Roundup® as safe today.

### Registration of Herbicides under Federal Law

26.     The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

27.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

28.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

29.     The EPA registered Roundup® for distribution, sale, and manufacture in the United States.

30.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

31.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

32.     In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment —in relation to the re-registration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

*Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup*

33.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

34.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

35.     In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

36.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

37.     Three top executives of IBT were convicted of fraud in 1983.

38.     In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

39.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

### *The Importance of Roundup® to Monsanto's Market Dominance Profits*

40.     The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

41.     In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate; farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

42.     Through a three-pronged strategy of increased production, decreased prices, and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product.

8

In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

### *Monsanto has known for decades that it falsely advertises the safety of Roundup®.*

43.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup ® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a)    Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

b)    And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c)    Roundup biodegrades into naturally occurring elements.

d)    Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e)    This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f)    You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g)    Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h)    Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

    i)      You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

    j)      "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

44.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

    a)      its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk. ***

    b)      its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable ***

    c)      its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means. ***

    d)      its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics." * * *

    e)      glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

    f)      its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

45.    Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

46.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

*Classifications and Assessments of Glyphosate*

47.     The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

48.     The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

49.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

50.     In assessing an agent, the IARC Working Group reviews the following information:

      a)     human, experimental, and mechanistic data;

      b)     all pertinent epidemiological studies and cancer bioassays; and

      c)     representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

51.     In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

52.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides,

11

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NO.                                                        DIVISION "    "

YVETTE A. D'AUNOY

VERSUS

MONSANTO COMPANY, ET AL

FILED: _____          _____
                                                           DEPUTY CLERK

PETITION FOR DAMAGES

I.

1.    Petitioner, Yvette A. D'Aunoy is an adult resident, citizen and domiciliary of the State of Louisiana.

2.    Made Defendants herein are the following, either foreign corporations licensed to do and doing business in the State of Louisiana or domestic corporations licensed to do and doing business in the State of Louisiana, or are individuals that are liable unto the Petitioner, for the claims asserted herein:

   A.  **MONSANTO COMPANY**

   B.  **HARRY'S HARDWARE, INC.**

   C.  **OHIO SECURITY INSURANCE COMPANY as the liability insurer of Harry's Hardware, Inc.**

3.    Orleans Parish is a proper venue pursuant to Louisiana Code of Civil Procedure Article 74 because Mrs. D'Aunoy was exposed to Roundup in Orleans Parish. Accordingly, the action on the offense is being brought in the parish where the wrongful conduct and injury was sustained.

4.    Orleans Parish is a proper venue for this matter pursuant to Louisiana Code of Civil Procedure Article 42(2) because Defendant Harry's Hardware, Inc. is a domestic corporation licensed to do business in this State and has designated as its primary business office and/or primary place of business in Louisiana as Orleans Parish.

5.    This action is within the jurisdiction of the court and Orleans Parish is a proper venue pursuant to Louisiana Code of Civil Procedure article 73 because each of the defendants listed above jointly contributed to Petitioner's exposure to roundup and subsequent contraction of

1

Chronic Lymphocytic Leukemia and therefore each is jointly liable to Petitioner with each of its co-defendants, and defendant Harry's Hardware and the insurer of Harry's Hardwar are domiciled in Orleans Parish.

## II.   INTRODUCTION

6.      Plaintiff brings this cause of action against the Defendants as their claims arise out of the same series of transactions and occurrences, and their claims involve common questions of law and/or fact. All claims in this action are a direct and proximate result of Defendants' negligent, willful, and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, and/or sale of Roundup and/or other Monsanto glyphosate-containing products ("Roundup"). Plaintiff in this action seeks recovery for damages as a result of developing Chronic Lymphocytic Leukemia ("CLL") a subset of Non-Hodgkin's Lymphoma ("NHL"), which was directly and proximately caused by such wrongful conduct by Defendants, the unreasonably dangerous and defective nature of Roundup, and its active ingredient, glyphosate, and the attendant effects of developing NHL. Plaintiff did not know of an association between exposure to Roundup® and the increased risk of developing CLL or NHL until well after July 29, 2015, when the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), first published its evaluation of glyphosate. All of the claims involve common questions of law and fact and share legal and medical issues that arise out of all of the Plaintiffs' exposures to Roundup.

## III.   THE PARTIES

### Plaintiff

7.      Plaintiff, Yvette D'Aunoy, is a resident of New Orleans, Louisiana. Mrs. D'Aunoy has a significant exposure history to Roundup. Mrs. D'Aunoy was a very avid gardener.  At her home, during the time period 1989-1993, Mrs. D'Aunoy used Roundup on her driveway and along the side of her house on a weekly basis. Mrs. D'Aunoy moved and continued to use Roundup. Between the years of 1994-2003, she used Round up on a weekly basis (a little less in the winter). Mrs. D'Aunoy used it to the kill the weeds in the alleyway of her house on and near the concrete of her house.  Mrs. D'Aunoy had large gardens with flower beds and little grass and believed the Roundup was easier to use that a weed whacker.  Mrs. D'Aunoy's use was more sporadic between 2003-2005 because by this time she had two young kids and not as much time to garden.  After her Katrina evacuation, Mrs. D'Aunoy's yard was like "a jungle" and she used a lot of Roundup

2

to get the weeds under control. Mrs. D'Aunoy continued to use Roundup on occasions and even used it after her diagnosed with CLL in 2016. Mrs. D'Aunoy used Roundup every spring to clear out her herb garden which she would replant each year.  Mrs. D'Aunoy purchased Roundup from the Harry's Ace Hardware on General Meyer in Algiers, Louisiana. Mrs. D'Aunoy is unable to continue to garden due to her CLL. Mrs. D'Aunoy suffers from significant fatigue and does not have the energy to garden after working a full day.

**Contra Non Valentum**

8.      The prescriptive period does not start until the plaintiff knew or should have known that her CLL was caused by Roundup. Here, the results of the plaintiff's exposures to glyphosate-containing products was inherently undiscoverable and there was no warning that such exposures could cause CLL. Mrs. D'Aunoy did not know the association between Roundup and CLL until less than one year from this date.

9.      In October 2016, Mrs. D'Aunoy was diagnosed with CLL. Mrs. D'Aunoy asked but was not provided an answer at to the cause of her CLL. In October 2016, Mrs. D'Aunoy was told that there is no cure for CLL and she would have to wait for symptoms to develop before treatments were an option. Between October and December of 2018, Mrs. D'Aunoy heard about a California lawsuit against the manufacturer of Roundup for causing Non-Hodgkin's Lymphoma. Mrs. D'Aunoy did some research and found an FDA opinion/statement from 2015 that said Roundup was not a carcinogen. In March 2019, Mrs. D'Aunoy saw an article that reported about the California verdict against Monsanto for Roundup causing the plaintiff's Non-Hodgkin's Lymphoma. In June 2019, Mrs. D'Aunoy learned about another California lawsuit against Monsanto for Roundup. In August 2019, Mrs. D'Aunoy found an article on a website for survivors of CLL written by a Medical Doctor from MD Anderson associating CLL with Roundup. On August 21, 2019, Mrs. D'Aunoy found an article that showed a 41% increased incidence of CLL in people who used Roundup. Mrs. D'Aunoy filed suit directly thereafter in September of 2019.

**Defendant**

10.      Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri and licensed to do business in Louisiana.

11.      At all times relevant to this petition, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®.

3

12.     Harry's Hardware, Inc. is Louisiana Corporation with its principle place of business in New Orleans, Louisiana.

13.     Ohio Security Insurance Company is an insurance company licensed to do business in the State of Louisiana.

## IV.     ROUND UP

14.     In 1970, Defendant Monsanto Company discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 millions of pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

15.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

16.     Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

17.     On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

18.     On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

19.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other hematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

20.     The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

21.     Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

## V.     FACTS

22.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

23.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

24.     For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®—glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Agricultural workers are, once again, victims of corporate greed. Monsanto assured the public that Roundup® was

5

harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers, and the general population that Roundup® was safe.

### The Discovery of Glyphosate and Development of Roundup®

25.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use; Monsanto still markets Roundup® as safe today.

### Registration of Herbicides under Federal Law

26.     The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

27.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

28.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

29.     The EPA registered Roundup® for distribution, sale, and manufacture in the United States.

6

30.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

31.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

32.     In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment —in relation to the re-registration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

*Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup*

33.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

34.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

35.     In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

7

36.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

37.     Three top executives of IBT were convicted of fraud in 1983.

38.     In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

39.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

***The Importance of Roundup® to Monsanto's Market Dominance Profits***

40.     The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

41.     In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate; farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

42.     Through a three-pronged strategy of increased production, decreased prices, and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product.

In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

***Monsanto has known for decades that it falsely advertises the safety of Roundup®.***

43.      In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup ® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

    a)    Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

    b)    And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

    c)    Roundup biodegrades into naturally occurring elements.

    d)    Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

    e)    This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

    f)    You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

    g)    Glyphosate is less toxic to rats than table salt following acute oral ingestion.

    h)    Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i)   You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j)   "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

44.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a)   its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk. ***

b)   its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable ***

c)   its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means. ***

d)   its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics." * * *

e)   glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f)   its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

45.    Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

46.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

*Classifications and Assessments of Glyphosate*

47.   The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

48.   The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

49.   One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

50.   In assessing an agent, the IARC Working Group reviews the following information:

   a)   human, experimental, and mechanistic data;

   b)   all pertinent epidemiological studies and cancer bioassays; and

   c)   representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

51.   In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

52.   On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides,

11

including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

53.     The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland, and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

54.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

55.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

56.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

57.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

58.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

59.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for hemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

60.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to

12

aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

61.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

62.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

63.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

### Other Earlier Findings About Glyphosate's Dangers to Human Health

64.     The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

### Release Patterns

65.     Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal, and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available. Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

66.     In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

### *Recent Worldwide Bans on Roundup®/Glyphosate*

67.     Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which took effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

68.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

69.     France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

70.     Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

71.     The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

72.     The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

73.     The running of any statute of limitations has been tolled by reason of Defendant's fraudulent concealment. Defendant, through its affirmative misrepresentations and omissions,

14

actively concealed from Plaintiffs the true risks associated with Roundup and glyphosate.

74.     At all relevant times, Defendant has maintained that Roundup is safe, non-toxic, and non-carcinogenic.

75.     Indeed, even as of July 2016, Defendant continued to represent to the public that "Regulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and *agree* that there is *no evidence* that glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic" (emphasis added).[1]

76.     As a result of Defendant's actions, Plaintiffs were unaware, and could not reasonably know or have learned through reasonable diligence that Roundup and/or glyphosate contact, exposed Plaintiffs to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

77.     Furthermore, Defendant is estopped from relying on any statute of limitations because of its fraudulent concealment of the true character, quality and nature of Roundup. Defendant was under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Defendant had and continues to have exclusive control, and because Defendant knew that this information was not available to Plaintiffs or to distributors of Roundup. In addition, Defendant is estopped from relying on any statute of limitations because of its intentional concealment of these facts.

78.     Plaintiffs had no knowledge that Defendant was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendant, Plaintiffs could not have reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud should be considered. Defendant had the ability to and did spend enormous amounts of money in furtherance of its purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Plaintiff and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendant's representations. Accordingly, Defendant is precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

---

[1] Backgrounder - Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9, 2015)

15

**VI.    CLAIMS**

**LPLA UNREASONABLY DANGEROUS IN CONSTRUCITON, COMPOSITION,
DESIGN, AND FAILURE TO CONFORM TO EXPRESS WARRANTY
(AGAINST MONSANTO)**

79.     Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

80.     Plaintiffs bring this strict liability claim against Monsanto for unreasonably dangerous in construction, composition, design and failure to conform to express warrant.

81.     At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, manufacturing, selling, distributing, and Monsanto engaged in the marketing, packaging design, and promotion of Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto. At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by the Plaintiffs, as described above.

82.     At all times relevant to this litigation, Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiffs.

83.     At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Missouri and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

84.     Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

85.     Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of the manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

16

86.    At all times relevant to this action, Monsanto knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

87.    Therefore, at all times relevant to this litigation, Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation, in one or more of the following ways:

a)    When placed in the stream of commerce, Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b)    When placed in the stream of commerce, Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c)    When placed in the stream of commerce, Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d)    Monsanto did not sufficiently test, investigate, or study Roundup® products and, specifically, the active ingredient glyphosate.

e)    Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f)    At the time of marketing its Roundup® products, Roundup® was defective in that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g)    Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products.

h)    Monsanto could have employed safer alternative designs and formulations.

88.    Plaintiffs were exposed to Roundup® products in the course of their work, as described above, without knowledge of their dangerous characteristics.

89.     At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

90.     Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

91.     The harm caused by Roundup® products far outweighed their benefit, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate. Roundup® products were and are more dangerous than alternative products and Monsanto could have designed Roundup® products (including their packaging and sales aids) to make them less dangerous. Indeed, at the time that Monsanto designed Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

92.     At the time Roundup® products left Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of those herbicides.

93.     Monsanto's defective design of Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including the Plaintiffs herein.

94.     Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Monsanto is strictly liable to Plaintiffs.

95.     The defects in Roundup® products caused or contributed to cause Plaintiffs' grave injuries, and, but for Monsanto's misconduct and omissions, Plaintiffs would not have sustained their injuries.

96.     Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including Plaintiffs, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Monsanto made conscious decisions not to redesign, warn, or inform the unsuspecting public. Monsanto's reckless conduct warrants an award of aggravated damages.

97.     As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiffs have suffered and continue to suffer grave injuries, and have endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.

18

## LPLA FAILURE TO WARN
### (AGAINST MONSANTO)

98.     Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

99.     Plaintiffs bring this strict liability claim against Monsanto for failure to warn.

100.    At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and, specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Monsanto.

101.    Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiffs, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

102.    At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn the Plaintiffs of the dangers associated with Roundup® use and exposure. Monsanto, as manufacturer, seller, promoter, marketer, or distributor of chemical herbicides are held to the knowledge of an expert in the field.

103.    At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

104.    At all times relevant to this litigation, Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by these herbicides, including Plaintiffs.

105.    Despite the fact that Monsanto knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated

with use and exposure. The dangerous propensities of these products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or scientifically knowable to Monsanto through appropriate research and testing by known methods, at the time it distributed, marketed, promoted, supplied, or sold the product, and not known to end users and consumers, such as Plaintiffs.

106.   These products created significant risks of serious bodily harm to consumers, as alleged herein, and Monsanto failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

107.   At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Missouri and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, promoted, and marketed by Monsanto.

108.   Plaintiffs were exposed to Roundup® products in the course of their employment and/or personal use of Roundup, without knowledge of its dangerous characteristics.

109.   At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

110.   Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiffs' exposure. Plaintiffs relied upon the skill, superior knowledge, and judgment of Monsanto.

111.   These products were defective because the minimal warnings disseminated with Roundup® products were inadequate, and they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and landscaping applications.

112.   The information that Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiffs to utilize the products safely and with adequate protection. Instead, Monsanto disseminated

information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

113.   To this day, Monsanto has failed to adequately and accurately warn of the true risks of Plaintiffs' injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

114.   As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed, marketed, and promoted by Monsanto, and used by Plaintiffs in their work.

115.   Monsanto is liable to Plaintiffs for injuries caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of these products and the risks associated with the use of or exposure to Roundup® and glyphosate.

116.   The defects in Roundup® products caused or contributed to cause Plaintiffs' injuries, and, but for this misconduct and omissions, Plaintiffs would not have sustained their injuries.

117.   Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products, Plaintiffs could have avoided the risk of developing injuries as alleged herein.

118.   As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiffs have suffered severe injuries and have endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.

**LPLA FAILURE TO WARN**
**(AGAINST HARRY'S HARDWARE AND ITS INSURER)**

119.   Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

120.    Plaintiffs bring this claim against Harry's Hardware and its insurer for failure to warn.

121.    At all times relevant to this litigation, Harry's Hardware engaged in the business of marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and, specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Monsanto.

122.    Harry's Hardware marketed, promoted, sold, and otherwise released into the stream of commerce Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiffs, and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

123.    At all times relevant to this litigation, Harry's Hardware had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Harry's Hardware had a continuing duty to warn the Plaintiffs of the dangers associated with Roundup® use and exposure. Harry's Hardware as a seller, promoter, marketer, or distributor of chemical herbicides are held to the knowledge of an expert in the field.

124.    At all times relevant to this litigation, Harry's Hardware failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by these herbicides, including Plaintiffs.

125.    The dangerous propensities of these products and the carcinogenic characteristics of glyphosate, as described above, were known to Harry's Hardware, or scientifically knowable to Harry's Hardware through appropriate research and testing by known methods, at the time it distributed, marketed, promoted, supplied, or sold the product, and not known to end users and consumers, such as Plaintiffs.

126.    These products created significant risks of serious bodily harm to consumers, as alleged herein, and Harry's Hardware failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products.

22

127.   At all times relevant to this litigation, Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Louisiana and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, promoted, and marketed by Monsanto.

128.   Plaintiffs were exposed to Roundup® products in the course of their employment and/or personal use of Roundup, without knowledge of its dangerous characteristics.

129.   At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

130.   Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiffs' exposure. Plaintiffs relied upon the skill, superior knowledge, and judgment of Harry's Hardware.

131.   These products were defective because the minimal warnings disseminated with Roundup® products were inadequate, and they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and landscaping applications.

132.   Harry's Hardware continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

133.   To this day, Harry's Hardware has failed to adequately and accurately warn of the true risks of Plaintiffs' injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

134.   As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Harry's Hardware, were distributed, marketed, and promoted by Monsanto, and used by Plaintiffs in their work.

135.   Harry's Hardware is liable to Plaintiffs for injuries caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information

23

and data regarding the appropriate use of these products and the risks associated with the use of or exposure to Roundup® and glyphosate.

136.    The defects in Roundup® products caused or contributed to cause Plaintiffs' injuries, and, but for this misconduct and omissions, Plaintiffs would not have sustained their injuries.

137.    Had Harry's Hardware provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products, Plaintiffs could have avoided the risk of developing injuries as alleged herein.

138.    As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiffs have suffered severe injuries and have endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.

**COUNT III**
**NEGLIGENCE**
**(AGAINST MONSANTO and HARRY'S HARWARE)**

139.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

140.    Monsanto and Harry's Hardware, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiffs.

141.    At all times relevant to this litigation, Monsanto and Harry's Hardware had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

142.    At all times relevant to this litigation, Monsanto and Harry's Hardware had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Monsanto's and Harry's Hardware's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

143.    At all times relevant to this litigation, Monsanto and Harry's Hardware knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

144.    Accordingly, at all times relevant to this litigation, Monsanto and Harry's Hardware knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with Plaintiffs' injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiffs.

145.    Monsanto and Harry's Hardware also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

146.    As such, Monsanto and Harry's Hardware breached the duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Monsanto manufactured, marketed, promoted, and sold defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

147.    Despite an ability and means to investigate, study, and test these products and to provide adequate warnings, Monsanto and Harry's Hardware has failed to do so. Indeed, Monsanto and Harry's Hardware has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

148.    Monsanto and Harry's Hardware was negligent in the following respects:

a)    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

b)    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and

25

studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c)   Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d)   Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

e)   Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f)   Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Monsanto could reasonably foresee would use and be exposed to its Roundup® products;

g)   Failing to disclose to Plaintiffs, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

h)   Failing to warn Plaintiffs, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other consumers;

i)   Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

j)   Representing that its Roundup® products were safe for their intended use when, in fact, Monsanto and Harry's Hardware knew or should have known that the products were not safe for their intended purpose;

k)   Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

l)   Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers

26

known by Monsanto and Harry's Hardware to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m)   Continuing to disseminate information to its consumers, which indicate or imply that Monsanto's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

n)   Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

149.   Monsanto and Harry's Hardware knew and/or should have known that it was foreseeable that consumers such as Plaintiffs would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup®.

150.   Plaintiffs did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

151.   Monsanto's and Harry's Hardware's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiffs suffered, as described herein.

152.   Monsanto's and Harry's Hardware's conduct, as described above, was reckless. Monsanto and Harry's Hardware regularly risked the lives of consumers and users of its products, including Plaintiffs, with full knowledge of the dangers of these products. Monsanto and Harry's Hardware has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiffs. Monsanto's and Harry's Hardware's reckless conduct therefore warrants an award of aggravated or punitive damages.

153.   As a proximate result of Monsanto's and Harry's Hardware's wrongful acts and omissions in placing defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiffs have suffered severe and permanent physical and emotional injuries. Plaintiffs have endured pain and suffering and have suffered economic losses (including significant expenses for medical care and treatment) in an amount to be determined.

WHEREFORE, on the basis of all of the foregoing premises set out in paragraphs 1 through 153, Petitioner requests that defendants be served with this petition and that there be judgment against these defendants jointly, severally and in solido in a sum sufficient to compensate Petitioner for the following:

27

a.    all past, present and future medical costs or expenses related thereto;

b.    all past, present and future lost earnings;

c.    all past, present and future mental suffering, anguish and pain sustained by Petitioner;

d.    all past, present and future physical pain and suffering sustained by Petitioner;

e.    the disfigurement suffered by Petitioner;

f.    loss of quality of life;

g.    past, present, and future disability.

h.    all other forms of relief or categories of damages allowed by Louisiana law for survival claims, with interest from the date of injury until paid, plus costs of these proceedings.

**WHEREFORE** Petitioners pray that after due proceedings had, there be judgment herein in favor of Petitioner and against the defendants as prayed for.

Respectfully submitted,

**LANDRY & SWARR, LLC**

MICKEY P. LANDRY, Bar No. 22817
FRANK J. SWARR, Bar No. 23322
PHILIP HOFFMAN, Bar No. 32277
MATTHEW CLARK, Bar No. 31102
1010 Common Street, Suite 2050
New Orleans, Louisiana 70112
Telephone: (504) 299-1214
Facsimile: (504) 299-1215

**COUNSEL FOR PLAINTIFF**

**SERVICE INSTRUCTION ON FOLLOWING PAGE**

28

**PLEASE SERVE THE FOLLOWING WITH THE ORIGINAL PETITION FOR DAMAGES:**

1. **MONSANTO COMPANY**
   Through its Registered Agent:
   Corporation Service Company
   501 Louisiana Avenue
   Baton Rouge, LA 70802

2. **HARRY'S HARDWARE, INC.**
   Through its Registered Agent:
   Lehmann Norman & Marcus, LC
   400 Poydras St., Ste. 2050
   New Orleans, LA 70130-3251

3. **OHIO SECURITY INSURANCE COMPANY as the liability insurer of Harry's Hardware, Inc. , (via Service of Process via the Direct Action Stature L. R. S. 22:655) Through the Louisiana Secretary of State**
   8585 Archives Avenue
   Baton Rouge, LA 70809