JJO

# U.S. District Court
# Southern District of Florida (Miami)
# CIVIL DOCKET FOR CASE #: 1:19−cv−24721−UU

Anderson v. Monsanto Company, Inc.
Assigned to: Judge Ursula Ungaro
Cause: 28:1332 Diversity−Product Liability

Date Filed: 11/14/2019
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Jeffrey M. Anderson**

represented by **Cory D. Lapin**
Manning Gross + Massenburg LLP
600 Brickell Avenue
Suite 1400
Miami, FL 33131
3058152977
Email: clapin@mgmlaw.com
*ATTORNEY TO BE NOTICED*

**Sagi Shaked**
Shaked Law Firm, P.A.
2875 N.E 191st Street
Suite 905
Aventura, FL 33180
305−937−0191
Fax: 305−937−0193
Email: sagi@miamiattys.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company, Inc.**
*a Foreign For−Profit Corporation*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/14/2019 | 1 | COMPLAINT *AND DEMAND FOR JURY TRIAL* against Monsanto Company, Inc.. Filing fees $ 400.00 receipt number 113C−12147171, filed by Jeffrey M. Anderson. (Attachments: # 1 Civil Cover Sheet Civil Cover Sheet)(Shaked, Sagi) (Entered: 11/14/2019) |
| 11/14/2019 | 2 | Clerks Notice of Judge Assignment to Judge Ursula Ungaro.<br><br>Pursuant to 28 USC 636(c), the parties are hereby notified that the U.S. Magistrate Judge John J. O'Sullivan is available to handle any or all proceedings in this case. If agreed, parties should complete and file the Consent form found on our website. It is not necessary to file a document indicating lack of consent.<br><br>Pro se (NON−PRISONER) litigants may receive Notices of Electronic Filings (NEFS) via email after filing a Consent by Pro Se Litigant (NON−PRISONER) to Receive Notices of Electronic Filing. The consent form is available under the forms section of our website. (jao) (Entered: 11/14/2019) |
| 11/14/2019 | 3 | NOTICE of Filing Proposed Summons(es) by Jeffrey M. Anderson re 1 Complaint filed by Jeffrey M. Anderson (Shaked, Sagi) (Entered: 11/14/2019) |
| 11/15/2019 | 4 | Summons Issued as to Monsanto Company, Inc.. (ail) (Entered: 11/15/2019) |

| | | |
|---|---|---|
| 11/15/2019 | 5 | NOTICE of Filing Proposed Summons(es) by Jeffrey M. Anderson re 1 Complaint filed by Jeffrey M. Anderson (Shaked, Sagi) (Entered: 11/15/2019) |
| 11/18/2019 | 6 | Summons Issued as to Monsanto Company, Inc.. (ail) (Entered: 11/18/2019) |

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

JEFFREY MICHAEL ANDERSON,

Plaintiff,

CASE NO.:

v.

MONSANTO COMPANY, INC.,
a Foreign For-Profit Corporation,

**JURY TRIAL DEMANDED**

Defendant.

_______________________________________/

**COMPLAINT AND DEMAND FOR JURY TRIAL**

**Plaintiff, JEFFREY MICHAEL ANDERSON**, by and through undersigned counsel, hereby sues Defendant, **MONSANTO COMPANY** ("Monsanto"), and alleges as follows:

**STATEMENT OF THE CASE**

1. In 1970, Defendant, Monsanto, discovered the herbicidal properties of glyphosate and began incorporating glyphosate in products and marketing those products in 1974 under the brand name Roundup®. Roundup® is a nonselective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most used active ingredient in American agriculture with 85-90 millions of pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

2. Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was


SHAKED LAW FIRM, P.A.
2875 NE 191ST STREET, STE. 905, MIAMI, FL 33180 • TEL.: (305) 937-0191 • FAX: (305) 937-0193

Case MDL No. 2741 Document 1449-3 Filed 11/25/19 Page 4 of 37

also the world's leading producer of seeds, accounting for 27% of the world's seeds market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the field during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, 90% of soybean fields in the United States were Roundup Ready®.

3. Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies have found or confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dweller who are not in direct contact with glyphosate.

4. On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. The evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implication from exposure to glyphosate since 2001.

5. On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and date relating to glyphosate exposure in humans.

6. The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other


SHAKED LAW FIRM, P.A.
2875 NE 191ST STREET, STE. 905, MIAMI, FL 33180 • TEL.: (305) 937-0191 • FAX: (305) 937-0193

hematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

7. The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

8. Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

**JURISDICTION AND VENUE**

9. This Court has jurisdiction over Defendant and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendant. Defendant is incorporated and has its principal place of business outside of the state in which the Plaintiff resides.

10. The amount in controversy between Plaintiff and Defendants exceeds $75,000, exclusive of interest and cost.

11. The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

12. Venue is proper within this district pursuant to 28 U.S.C. § 1391 in that Defendant conducts business here and is subject to personal jurisdiction in this district. Furthermore, Defendant sells, markets, and/or distributes Roundup® within the Southern District of Florida. Also, a substantial part of the acts and/or omissions giving rise to these claims occurred within this district.

**THE PARTIES**


SHAKED LAW FIRM, P.A.
2875 NE 191ST STREET, STE. 905, MIAMI, FL 33180 ● TEL.: (305) 937-0191 ● FAX: (305) 937-0193

13. Plaintiff, JEFFREY MICHAEL ANDERSON, is over the age of 18, competent, a citizen of Miami-Dade County, Florida, and hereby submits to the jurisdiction of the Court and alleges that venue in this court is proper.

14. Defendant, Monsanto, is a Delaware corporation with its headquarters and principal place of business is St. Louis, Missouri. At all times material hereto, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®.

15. Plaintiff is informed and believes, and based thereon alleges, that in committing the acts alleged herein, each and every managing agent, agent, representative and/ or employee of the Defendant was working within the course and scope of said agency, representation and/or employment with the knowledge, consent, ratification, and authorization of the defendant and their directors, officer and/or managing agents.

**FACTS**

16. Glyphosate is a broad-spectrum, nonselective herbicide used in a wide variety of herbicidal products around the world.

17. Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plants ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days because plants absorb glyphosate.

18. For nearly 40 years, farmers across the world have used Roundup® without knowing of the dangers its use poses to humans. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm to people or to the environment. Of course, history has shown that to be false. According to the WHO, the main chemical ingredient of Roundup® –


SHAKED LAW FIRM, P.A.
2875 NE 191ST STREET, STE. 905, MIAMI, FL 33180 ● TEL.: (305) 937-0191 ● FAX: (305) 937-0193

glyphosate – is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Agricultural workers are, once again, victims of corporate greed.

19. Monsanto assured the public that Roundup® was harmless. In order to prove this assertion that Roundup® was harmless, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers, and the general population that Roundup® was safe.

***The Discovery of Glyphosate and Development of Roundup®***

20. The Herbicidal Properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use. It still markets roundup as a safe general-purpose herbicide.

***Registration of Herbicides under Federal Law***

21. The manufacture, formulation, and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA or "Agency") prior to their distribution, sale, or use, except as described by the act. 7 U.S.C § 136a(a).

22. Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests


SHAKED LAW FIRM, P.A.
2875 NE 191ST STREET, STE. 905, MIAMI, FL 33180 • TEL.: (305) 937-0191 • FAX: (305) 937-0193

to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety of the pesticide. The determination the Agency must make in registering or re-registering a product is not that product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C § 136a(c)(5)(D).

23. FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C § 136(bb). FIFRA requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

24. The EPA and the Florida Department of Agriculture and Consumer Services registered Roundup® for distribution, sale, and manufacture in the United States and the State of Florida.

25. FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of test required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the products tests that are required of the manufacturer.

26. The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide

products through a Congressionally-mandated process called "re-registration." 7 U.S.C § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

27. In the case of glyphosate, and therefore Roundup®, the EPA had planned to release its preliminary risk assessment – in relation to the reregistration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed its release of the risk assessment pending further review in light of WHO's health-related findings.

***Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®***

28. Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed it classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in group E is based on the available evidence at the time of the evaluation and should not be interpreted as a definitive conclusion that the agent will not be carcinogen under any circumstance."

29. On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

30. In the first instance, Monsanto, in seeking initial registration of Roundup® by the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and


SHAKED LAW FIRM, P.A.
2875 NE 191ST STREET, STE. 905, MIAMI, FL 33180 • TEL.: (305) 937-0191 • FAX: (305) 937-0193

glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

31. In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT and it also found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

32. Three top executives of IBT were convicted of fraud in 1983.

33. In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

34. Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup in 115 countries.

***The Importance of Roundup® to Monsanto's Market Dominance Profits***

35. The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemical division's operation income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.


SHAKED LAW FIRM, P.A.
2875 NE 191ST STREET, STE. 905, MIAMI, FL 33180 • TEL.: (305) 937-0191 • FAX: (305) 937-0193

36. To that aim, Monsanto began the developing and selling genetically engineered Roundup Ready® seeds in 1996. Because Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further, by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share to the glyphosate/Roundup® market through marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

37. Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000 Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

***Monsanto has known for decades that it falsely advertises the safety of Roundup®***

38. In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representation that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a) Remember that environmentally friendly Roundup herbicide is biodegradable it won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences…


SHAKED LAW FIRM, P.A.
2875 NE 191ST STREET, STE. 905, MIAMI, FL 33180 • TEL.: (305) 937-0191 • FAX: (305) 937-0193

b) And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got weed, brush edging or trimming problem.

c) Roundup biodegrades into naturally occurring elements.

d) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customer's shrubs or other desirable vegetation.

e) This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f) You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganism's biodegrade Accord into natural products.

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion

h) Glyphosates safety margin is much greater than required. It has over 1,000- fold safety margin in food over a 700-fold safety margins for workers who manufacture it or use it.

i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of practically non-toxic' as it pertain to mammals, birds and fish.

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

39. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisement [in New York] that represents, directly or by implication" that:


SHAKED LAW FIRM, P.A.
2875 NE 191ST STREET, STE. 905, MIAMI, FL 33180 • TEL.: (305) 937-0191 • FAX: (305) 937-0193

Case MDL No. 2741 Document 1449-3 Filed 11/25/19 Page 13 of 37

a) Its glyphosate-containing pesticide products or any component thereof are safe non-toxic, harmless or free of risk.

* * *

b) Its glyphosate- containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable.

* * *

c) Its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

* * *

d) Its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

* * *

e) Glyphosate-containing pesticide products or any component thereof are safe or less toxic than common consumer products other than herbicides;

f) Its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

40. Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief, still has not done so today.


SHAKED LAW FIRM, P.A.
2875 NE 191ST STREET, STE. 905, MIAMI, FL 33180 ● TEL.: (305) 937-0191 ● FAX: (305) 937-0193

41. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

***Classification and Assessments of Glyphosate***

42. The IARC process for the classification of glyphosate followed the stringent procedures for the evolution of a chemical agent. Over time, the IRAC monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to Group 2B (Possible Humans Carcinogens) 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

43. The established procedure for IARC Monograph evolution is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on basis of their expertise and the absence of actual or apparent conflicts of interest.

44. One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes reviews of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in


SHAKED LAW FIRM, P.A.
2875 NE 191ST STREET, STE. 905, MIAMI, FL 33180 • TEL.: (305) 937-0191 • FAX: (305) 937-0193

Lancet Oncology, and within a year after meeting, the final Monograph is finalized and published.

45. In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic date. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

46. In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a group 2A agent and probably carcinogenic in humans.

47. On July 29, 2015, IARC issued its Monograph of glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3-10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC secretariat and Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature," as well as "data from governmental reports are publicly available."

48. The studies considered the following exposure group: occupational exposure of farmer and tree nursery workers in the United States, forestry workers in Canada and Finland, and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.


SHAKED LAW FIRM, P.A.
2875 NE 191ST STREET, STE. 905, MIAMI, FL 33180 • TEL.: (305) 937-0191 • FAX: (305) 937-0193

49. Glyphosate was identified as the second-most used household herbicides in the United Sates for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

50. Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

51. The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show human health concern from agricultural and other work-related exposure to glyphosate.

52. The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ('NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

53. The IARC working group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers for chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

54. In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

55. The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to


SHAKED LAW FIRM, P.A.
2875 NE 191ST STREET, STE. 905, MIAMI, FL 33180 • TEL.: (305) 937-0191 • FAX: (305) 937-0193

aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggest intestinal microbial metabolism in humans.

56. The IRAC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in the human and animal cells utero.

57. The IARC Working Group also noted genotoxic, hormonal and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

58. The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applications in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition several other cancers.

***Other Earlier Findings about Glyphosate's Dangers to Human Health***

59. The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release patterns**


SHAKED LAW FIRM, P.A.
2875 NE 191ST STREET, STE. 905, MIAMI, FL 33180 • TEL.: (305) 937-0191 • FAX: (305) 937-0193

Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the toxics release inventory, data on releases during its manufacture and handling are not available.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate manufacture, transport, storage and disposal.

60. In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

***Recent Worldwide Bans on Roundup®/Glyphosate***

61. Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and after IARC first announced its assessment of glyphosate in March 2015, and more countries undoubtedly will follow suit in light of the assessment as the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which was to take effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly


SHAKED LAW FIRM, P.A.
2875 NE 191ST STREET, STE. 905, MIAMI, FL 33180 • TEL.: (305) 937-0191 • FAX: (305) 937-0193

packaging are sold in abundance to private persons. In garden centers Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

62. The Brazilian public prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

63. France banned the private sale of Roundup® and glyphosate following IARC assessment for Glyphosate.

64. Bermuda banned both the private and commercial sale of glyphosate including Roundup®. The Bermuda government explained its ban as follows: "following a recent scientific study carried out by a leading cancer agency, the importation of weed spray "roundup" has been suspended"

65. The Siri Lankan government banned the private and commercial use of glyphosate particularly out of concern that Glyphosate has been linked to fatal kidney disease in agricultural workers.

66. The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantation of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

67. Home Depot, at all relevant times, engaged in the distribution of Roundup® and other glyphosate-containing products from Monsanto to consumers in Florida, including Plaintiff, **JEFFREY MICHAEL ANDERSON**.

68. Home Depot had superior knowledge compared to Roundup® users and consumers, including regarding the carcinogenic properties of the product, yet failed to accompany its sales and/ or marketing of Roundup® with any warning or precautions for that


SHAKED LAW FIRM, P.A.
2875 NE 191ST STREET, STE. 905, MIAMI, FL 33180 ● TEL.: (305) 937-0191 ● FAX: (305) 937-0193

grave danger. Home Depot sold Roundup® to Plaintiff, **JEFFREY MICHAEL ANDERSON,** on numerous occasions and continues to stock and sell Roundup® to consumers in Florida.

***Plaintiff's Exposure to Roundup®***

69. Plaintiff, **JEFFREY MICHAEL ANDERSON,** purchased Roundup® on multiple occasions from 2008-2012, and used Roundup® routinely from 2008-2012 in an effort to kill weeds on the patio of his home in Broward County, Florida.

70. As a result of his exposure to Roundup®, Plaintiff, **JEFFREY MICHAEL ANDERSON,** developed non-Hodgkin lymphoma, which was diagnosed on July 12 2017.

## EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

71. Plaintiff incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

72. The running of any statute of limitations has been tolled by reason of Defendant's fraudulent concealment. Defendant, through their affirmative misrepresentations and omissions, actively concealed from Plaintiff the true risks associated with Roundup® and glyphosate. Indeed, even as of today, Defendant continues to represent to the public that "Scientists are in agreement that there is no evidence glyphosate causes cancer." (emphasis added)

73. As a result of Defendant's actions, Plaintiff was unaware, and could not reasonably know or have learned through reasonable diligence, that Roundup® and/or glyphosate contact exposed Plaintiff to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

74. Furthermore, Defendant is estopped from relying on any statute of limitations because of their fraudulent concealment of the true character, quality, and nature of Roundup®.


SHAKED LAW FIRM, P.A.
2875 NE 191ST STREET, STE. 905, MIAMI, FL 33180 • TEL.: (305) 937-0191 • FAX: (305) 937-0193

Defendants were under a duty to disclose the true character, quality, and nature of Roundup® because this was non-public information over which Defendant had and continues to have exclusive control, and because Defendant knew that this information was not available to Plaintiff or to distributors of Roundup®. In addition, Defendants are estopped from relying on any statute of limitations because of their intentional concealment of these facts.

75. Plaintiff had no knowledge that Defendant was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendant, Plaintiff could not have reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud should be considered. Defendant had the ability to and did spend enormous amounts of money in furtherance of their purpose of marketing, promoting, and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Plaintiff and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendants' representations. Accordingly, Defendant is precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

## COUNT I- STRICT LIABILITY (DESIGN DEFECT)

76. Plaintiff, **JEFFREY MICHAEL ANDERSON,** incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

77. At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were


SHAKED LAW FIRM, P.A.
2875 NE 191ST STREET, STE. 905, MIAMI, FL 33180 • TEL.: (305) 937-0191 • FAX: (305) 937-0193

under the ultimate control and supervision of Defendant. At all times relevant to this litigation, Defendant designed, researched, developed , manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products that Plaintiff was exposed to, as described above.

78. At all times material hereto, Defendant's Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and in particular, the Plaintiff.

79. At all times material hereto, Defendant's Roundup® products reached the intended consumers, handlers, and users or other person coming into contact with these products in Florida and throughout the United States, including Plaintiff, without substantial change in their conditions as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

80. Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of the Defendant manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

81. Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left hands of Defendant's manufacturers and/or suppliers the foreseeable risks exceeded the alleged benefits associated with their design and formulation.


SHAKED LAW FIRM, P.A.
2875 NE 191ST STREET, STE. 905, MIAMI, FL 33180 • TEL.: (305) 937-0191 • FAX: (305) 937-0193

82. At all times material hereto, Defendant knew or had reason to know that its Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed by Defendant.

83. Therefore, at all times material hereto, Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation, in one or more of the following ways:

a) When placed in the stream of commerce, Defendant's Roundup® products were defective in design and formulation, and consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate;

b) When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illness when used in a reasonably anticipated manner;

c) When place in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

d) Defendants did not sufficiently test, investigate, or study its Roundup® products and specially, the active ingredient glyphosate;

e) Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effect that outweigh any potential utility stemming from the use of herbicide;

f) Defendant knew or should have known at the time of the marketing its Roundup® products that exposure to Roundup®, and specifically its active ingredient glyphosate, could result in cancer and other severe illness and injuries;


SHAKED LAW FIRM, P.A.
2875 NE 191ST STREET, STE. 905, MIAMI, FL 33180 • TEL.: (305) 937-0191 • FAX: (305) 937-0193

g) Defendant did not conduct adequate post-marketing surveillance of its Roundup® products; and

h) Defendant could have employed safer alternative design and formulation;

84. Plaintiff was exposed to Defendant's Roundup® products while regularly killing weeds on the patio of his home, as described above, without knowledge of its dangerous characteristics.

85. At all times relevant to this litigation, Plaintiff was exposed to the use of Defendant's Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

86. Plaintiff could not have reasonably discovered the defects and risk associated with Roundup® or glyphosate-containing products before or at the time of exposure.

87. The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering Defendant's Products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendant's Roundup® products were and are more dangerous than alternative products and Defendant could have designed its Roundup® product to make them less dangerous. Indeed, at the time that Defendant designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

88. At the time Roundup® products lefts Defendant's control, there was a practical technically feasible and safer alternative design that would have prevented harm without substantially impairing the reasonably anticipated or intended function of Defendant's herbicides.


SHAKED LAW FIRM, P.A.
2875 NE 191ST STREET, STE. 905, MIAMI, FL 33180 ● TEL.: (305) 937-0191 ● FAX: (305) 937-0193

89. Defendant's defective design of its Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety users of the Roundup® products, including the Plaintiff herein.

90. Therefore, as a result of unreasonably dangerous condition of its Roundup® products, Defendant is strictly liable to Plaintiff.

91. The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiff's grave injuries, and, but-for Defendant's misconduct and omissions, Plaintiff would not have sustained his injuries.

92. Defendant's conduct, as described above, was reckless. Defendant risked the lives of consumers and users of its products, including Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Defendant made conscious decisions not to redesign, warn, or inform the unsuspecting public.

93. As a direct and proximate result of Defendant placing defective Roundup® products into the stream of commerce, Plaintiff has suffered, and continues to suffer, grave injuries, and had endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

**WHEREFORE,** Plaintiff respectfully requests that this Court enter judgement in Plaintiff's favor for compensatory damages, together with interest, cost herein incurred, attorney's fees, and all such other and further relief as this court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.


SHAKED LAW FIRM, P.A.
2875 NE 191ST STREET, STE. 905, MIAMI, FL 33180 ● TEL.: (305) 937-0191 ● FAX: (305) 937-0193

Case MDL No. 2741 Document 1449-3 Filed 11/25/19 Page 26 of 37

**COUNT II-STRICT LIABILITY (FAILURE TO WARN)**

94. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

95. At all times material hereto, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, promoting, and applying Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instruction concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

96. Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same directly advertised or marketed to products to consumers and end users, including the Plaintiff, and persons responsible for consumers (such as employers), and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate- containing products.

97. At all times material hereto, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote , sell, distribute, maintain, supply , provide proper warnings, and take such steps as a necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn the Plaintiff of the dangers associated with Roundup® use and exposure. Defendant, as manufacture, seller, or distributor of chemical herbicides, is held to the knowledge of an expert in the field.


SHAKED LAW FIRM, P.A.
2875 NE 191ST STREET, STE. 905, MIAMI, FL 33180 • TEL.: (305) 937-0191 • FAX: (305) 937-0193

98. At the time of the manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risk of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risk of harm associated with the use of and/or exposure to such products.

99. At all times material hereto, Defendant failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of this product and to those who would foreseeably use and be harmed by Roundup®, including Plaintiff.

100. Despite the fact that Defendant knew or should have known that Roundup® posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risk associated with use and exposure. The dangerous propensities of its product and the carcinogenic characteristic of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied, or sold the product, and not known to end users and consumers, such as Plaintiff.

101. Defendant knew or should have known that these products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of risks of exposure to its product. Defendant wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statement concerning the safety of Roundup® and glyphosate.

102. At all times relevant, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Florida and throughout the United States, including Plaintiff, without substantial change in their


SHAKED LAW FIRM, P.A.
2875 NE 191ST STREET, STE. 905, MIAMI, FL 33180 • TEL.: (305) 937-0191 • FAX: (305) 937-0193

condition as designed, manufactured, sold, distributed, labeled, marketed and sprayed/applied by Defendant.

103. Plaintiff was exposed to Roundup® products, as described above, without knowledge of their dangerous characteristics.

104. At all times material hereto, Plaintiff was exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

105. Plaintiff could not have reasonably discovered the defects and risk associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgement of Defendant.

106. Defendant knew or should have known that the minimal warning disseminated with or accompanying the application of Roundup® products were inadequate, but it failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural application.

107. The information that Defendant did provide or communicate failed to contain relevant warnings, hazards and precautions that would have enabled those expected, such as Plaintiff, to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the


SHAKED LAW FIRM, P.A.
2875 NE 191ST STREET, STE. 905, MIAMI, FL 33180 ● TEL.: (305) 937-0191 ● FAX: (305) 937-0193

unreasonable risks from use or exposure; and concealed, downplayed or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risk and danger of exposure to Roundup® and glyphosate.

108. To this day, Defendant has failed to adequately and accurately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

109. As a result their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/ or control of Defendant, were sold or distributed by Defendant, and when Plaintiff became exposed.

110. Defendant is liable to Plaintiff for injuries caused by negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of their products and the risk associated with the use of or exposure to Roundup® and glyphosate.

111. The defects in these Roundup® products were substantial and contributing factors in causing Plaintiff injuries, and but-for Defendant's misconduct and omissions, Plaintiff would not have sustained his injuries.

112. Had Defendant provided adequate warnings and instruction, and properly disclosed and disseminated the risks associated with Roundup® products and application, Plaintiff could have avoided the risk of developing injuries as alleged herein and could have obtained alternative herbicides.

113. As a direct and proximate result of Defendant's placement of defective Roundup® products into the stream of commerce and exposing Plaintiff to them, Plaintiff has suffered and continues to suffer severe injuries, and has endured physical pain and discomfort, as


SHAKED LAW FIRM, P.A.
2875 NE 191ST STREET, STE. 905, MIAMI, FL 33180 ● TEL.: (305) 937-0191 ● FAX: (305) 937-0193

well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

**WHEREFORE**, Plaintiff respectfully request that this court enter judgment in Plaintiff's favor for compensatory damages, together with interest, cost herein incurred, attorney fees and all such other further relief as this court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## COUNT III-NEGLIGENCE

114. Plaintiff incorporates by reference each and every allegation set forth in preceding paragraphs as if fully stated herein.

115. Defendant, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

116. At all times material hereto, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing advertisement, supply, promotion packaging, and sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell product that was not unreasonably dangerous to consumers and users of product.

117. At all times material hereto, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct in information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular its active ingredient glyphosate.

118. At all times material hereto, Defendant knew or, in the exercise of reasonable care, should have known of hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

119. Accordingly, at all times material hereto, Defendant knew or, in the exercise of reasonable care, should have known, that use of or exposure to Roundup® products could cause or be associated with Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

120. Defendant also knew or, in the exercise of reasonable care, should have known that users and consumer of Roundup® were unaware of the risk and the magnitude of the risks associated with the use of and/or exposure to Roundup® and glyphosate-containing products.

121. As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Defendant manufactured and produced defective herbicide containing the chemical glyphosate, knew or had reason to know of the defects inherent in it products, knew or had a reason to know that a user's or consumer's exposure to the product created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent adequately warn of these risks and injuries.

122. Despite ability and means to investigate, study, and test products and to provide adequate warnings, Defendant failed to do so. Indeed, Defendant wrongfully concealed information and has further made false and/or misleading statement concerning the safety and/or exposure to Roundup® and glyphosate.

123. Defendant's negligence included:


SHAKED LAW FIRM, P.A.
2875 NE 191ST STREET, STE. 905, MIAMI, FL 33180 • TEL.: (305) 937-0191 • FAX: (305) 937-0193

a. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® products without thorough and adequate pre- and post- marketing testing;

b. Manufacturing, producing, promoting, formulation, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and consequently, the risk of serious harm associated with human use of an exposure to Roundup®;

c. Failing to undertake sufficient studies and conduct necessary tests to determine whether Roundup® products glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d. Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

e. Failing to design and manufacture Roundup® products so as to ensure they were at least safe and effective as other herbicides on the market;

f. Failing to provide adequate instruction, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and be exposed to its Roundup® products;

g. Failing to disclose to Plaintiff, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;


SHAKED LAW FIRM, P.A.
2875 NE 191ST STREET, STE. 905, MIAMI, FL 33180 • TEL.: (305) 937-0191 • FAX: (305) 937-0193

h. Failing to warn Plaintiff, consumers and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other consumers;

i. Systematically suppressing or downplaying contrary evidence about the risks, incidence and prevalence of the side effects of Roundup® and glyphosate-containing products;

j. Representing that its Roundup® products were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended purpose;

k. Declining to make or propose any changes to Roundup® products labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

l. Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m. Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

n. Continuing the manufacture and sale of its products with knowledge that the products were unreasonably unsafe and dangerous.

124. Defendant knew and/or should have known that is was foreseeable that consumers such as Plaintiff would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing's, labeling, distribution, and sale of Roundup®.


SHAKED LAW FIRM, P.A.
2875 NE 191ST STREET, STE. 905, MIAMI, FL 33180 • TEL.: (305) 937-0191 • FAX: (305) 937-0193

125. Plaintiff did not know the nature and extent of the injuries that could result from the intended use of/ and or exposure to Roundup® or its active ingredient glyphosate.

126. Defendant's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff suffered, and will continue to suffer, as described herein.

127. Defendant's conduct, as describes above, was reckless. Defendant regularly risked the lives of consumers and users of their products, including Plaintiff, with full knowledge of the dangers of its products. Defendant made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff.

128. As a proximate result of Defendant's wrongful acts and omission in placing defective Roundup® product into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff has suffered and continues to suffer severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, has suffered economic losses (including significant expenses for medical care and treatment) and will continue to incur these expenses on the future.

**WHEREFORE**, Plaintiff respectfully requests that this court enter judgement in Plaintiff's favor for compensatory damages, together with interest, cost herein incurred, attorney fees and all such other and further relief as this Court deems just and proper, Plaintiff also demands a jury trial on the issues contained herein.

**COUNT IV-BREACH OF IMPLIED WARRANTIES**

129. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.


SHAKED LAW FIRM, P.A.
2875 NE 191ST STREET, STE. 905, MIAMI, FL 33180 • TEL.: (305) 937-0191 • FAX: (305) 937-0193

130. At all times material hereto, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distribution, and promoting, Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

131. Before Plaintiff was exposed to Roundup® products, Defendant impliedly warranted to consumers and those exposed, including Plaintiff, that Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

132. Defendant, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use if and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing risk of developing severe injuries, including Plaintiff's injuries.

133. Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Defendant upon its implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

134. Upon information and belief, Plaintiff was at all relevant times in privity with Defendant.

135. Plaintiff is the intended third-party beneficiaries of implied warranties made by Defendant to the purchasers of their horticultural herbicides, and as such Plaintiff is entitled to assert this claim.


SHAKED LAW FIRM, P.A.
2875 NE 191ST STREET, STE. 905, MIAMI, FL 33180 • TEL.: (305) 937-0191 • FAX: (305) 937-0193

136. The Roundup® products were expected to reach, and did in fact reach, consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendant.

137. At all times relevant to this litigation, Defendant was aware that consumers and users of its products, including Plaintiff, would use Roundup® products as marketed by Defendant, which is to say that Plaintiff was foreseeable user of Roundup®.

138. Defendant intended that Roundup® products be used in the manner in which Plaintiff was exposed to them and Defendant impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

139. In reliance upon Defendant's implied warranty, Plaintiff used or was exposed to Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendant.

140. Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

141. Defendant breached its implied warranty to Plaintiff in that Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

142. The harm caused by Roundup® products far outweighed their benefits, rendering the products more dangerous than the ordinary consumer or user would expect and more dangerous than alternative products.


SHAKED LAW FIRM, P.A.
2875 NE 191ST STREET, STE. 905, MIAMI, FL 33180 • TEL.: (305) 937-0191 • FAX: (305) 937-0193

143. As a direct and proximate result of Defendant's wrongful acts and omissions, Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, has suffered economic loss (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

**WHEREFORE**, Plaintiff respectfully requests that this court enter judgement in Plaintiff's favor for compensatory damages, together with interest, cost herein incurred, attorney's fees, and all such other further relief as this court deems just proper. Plaintiff also demands a jury trial on the issues contained herein.

**Shaked Law Firm, P.A.**
2875 N.E. 191st Street, Suite 905
Aventura, FL 33180
Telephone Number: (305) 937-0191
Facsimile Number: (305) 937-0193
Email: filingcourtdocuments@gmail.com
and shakedeservice@gmail.com

*// Cory D. Lapin//*
Sagi Shaked, Esq.
Florida Bar No.: 0195863
Cory D. Lapin, Esq.
Florida Bar No.: 0112588