# Eastern District of Washington
# U.S. District Court (Spokane)
# CIVIL DOCKET FOR CASE #: 2:19–cv–00408–SMJ

Gannon v. Monsanto Company
Assigned to: Judge Salvador Mendoza, Jr
Case in other court: Spokane County Superior Court, 19204587–32
Cause: 28:1332 Diversity

Date Filed: 11/25/2019
Jury Demand: None
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Jason Gannon**
*an individual*

represented by **Christopher Michael Hogue**
Hogue Law Firm
1106 N Washington St., Suite B
Spokane, WA 99201
509–252–5058
Email: chris@spokaneadvocate.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Marshall W Casey**
M Casey Law PLLC
1106 North Washington
Suite B
Spokane, WA 99201
509–368–9284
Email: marshall@spokanelawcenter.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**
*a foreign entity*

represented by **Jennifer Lynn Campbell**
Schwabe Williamson & Wyatt PC
1420 Fifth Avenue
Suite 3400
Seattle, WA 98101
206–622–1711
Fax: 206–292–0460
Email: jcampbell@schwabe.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/25/2019 | 1 | NOTICE OF REMOVAL Filing fee $400; Receipt #0980–3321188 Filed by Monsanto Company. (Attachments: # 1 Civil Cover Sheet, # 2 Complaint)(Campbell, Jennifer) (Entered: 11/25/2019) |
| 11/25/2019 | 2 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT by Monsanto Company. (Campbell, Jennifer) (Entered: 11/25/2019) |
| 11/25/2019 | 3 | State Court Documents received filed by Monsanto Company . (Campbell, Jennifer) (Entered: 11/25/2019) |
| 11/25/2019 | | Notice of Judge Assignment. Judge Salvador Mendoza, Jr assigned to case. (SG, Case Administrator) (Entered: 11/25/2019) |

FILED

OCT 3 0 2019

Timothy W. Fitzgerald
SPOKANE COUNTY CLERK

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR SPOKANE COUNTY

JASON GANNON, an individual,

Plaintiff,

v.

MONSANTO COMPANY, a foreign entity,

Defendant.

Case No. **19204587-32**

**COMPLAINT FOR DAMAGES**

Plaintiff Jason Gannon, by and through his attorneys of record, alleges as follows against Defendant Monsanto Company:

## I.   INTRODUCTION

1.      This is an action for damages suffered by Plaintiff Jason Gannon, as a direct and proximate result of Defendant's negligent, wrongful, and malicious, willful, or wanton conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup®, containing the active ingredient glyphosate.

2.      Plaintiff maintains that Roundup® and/or glyphosate is defective, dangerous to

COMPLAINT FOR DAMAGES
Page 1 of 57

♦ **HOGUE LAW FIRM** ♦
1106 N. Washington St., Ste. B
Spokane, WA 99201
509.252.5058

human health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper
warnings and directions as to the dangers associated with its use.

3.    Plaintiff's injuries, like those striking thousands of similarly situated victims
across the country, were avoidable.

## II.    PARTIES, JURISDICTION, AND VENUE

4.    Plaintiff Jason Gannon, at all times material hereto, was a resident of Spokane
County, Washington.

5.    Defendant Monsanto Company ("Monsanto" or "Defendant") is a corporation
created under the laws of the State of Delaware with its headquarters and principal place of
business in St. Louis, Missouri.

6.    At all times material hereto, Defendant Monsanto transacted business in
Washington and was a corporation doing business within Washington.

7.    Defendant Monsanto knew or should have known that its Roundup® products are
and were sold throughout the state of Washington, and, more specifically, caused Roundup® to
be sold to Plaintiff in Washington.

8.    "Roundup®" or "Roundup" refers to all formulations of Defendant's Roundup
products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer
1, Roundup Custom Herbicide, Roundup D-Pak Herbicide, Roundup Dry Concentrate, Roundup
Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass
Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k Herbicide,
Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Pro Dry Herbicide,

COMPLAINT FOR DAMAGES
Page 2 of 57

◆ **HOGUE LAW FIRM** ◆
1106 N. Washington St., Ste. B
Spokane, WA 99201
509.252.5058

Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide,

Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate

Weed & Grass Killer, Roundup Readyto-Use Extended Control Weed & Grass Killer 1 Plus

Weed Preventer, Roundup Ready-to- Use Weed & Grass Killer, Roundup Ready-to-Use Weed

and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup

VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer

Concentrate Plus, Roundup Weed & Grass Killer Ready-to-Use Plus, Roundup Weed & Grass

Killer Super Concentrate, Roundup Weed & Grass Killer 1 Ready-to-Use, Roundup WSD Water

Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active

ingredient glyphosate.

9. Defendant Monsanto is in the business of researching, testing, developing,

designing, formulating, manufacturing, producing, assembling, packaging, labeling, advertising,

promoting, marketing, selling, supplying and distributing herbicides, including Roundup

products.

10. Jurisdiction and venue are appropriate in the Spokane County Superior Court.

### III.   FACTS

#### Plaintiff Jason Gannon

11. Plaintiff Jason Gannon is a 48 year-old man who worked for years as a landscaper

and gardener in Spokane, Washington.

COMPLAINT FOR DAMAGES
Page 3 of 57

♦ HOGUE LAW FIRM ♦
1106 N. Washington St., Ste. B
Spokane, WA 99201
509.252.5058

12.     In his job as a landscaper and gardener over the years, Plaintiff was exposed to Roundup, which contains the active ingredient glyphosate and the surfactant polyethoxylated tallow amine ("POEA"), on a regular basis.

13.     At the age of 45, Mr. Gannon was diagnosed with Small Lymphocytic Lymphoma/Chronic Lymphocytic Leukemia (a "Non-Hodgkins Lymphoma"). Mr. Gannon's doctors have given him an estimated 10-15 years left in his life before he succumbs to his Roundup-induced personal injuries.

14.     Plaintiff brings this action for the Roundup-induced personal injuries that he sustained as a direct and proximate result of being exposed to Defendant's unsafe Roundup product(s).

### Defendant Monsanto Company

15.     At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®, which contains the active ingredient glyphosate and the surfactant POEA, as well as adjuvants and other "inert" ingredients. Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

16.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

COMPLAINT FOR DAMAGES
Page 4 of 57

♦ HOGUE LAW FIRM ♦
1106 N. Washington St., Ste. B
Spokane, WA 99201
509.252.5058

17.     For nearly 40 years, farms across the world have used Defendant's Roundup®
without knowing of the dangers its use poses. That is because when Monsanto first introduced
Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed
without causing harm either to people or to the environment. Of course, history has shown that
not to be true. According to WHO, the main ingredient of Roundup® – glyphosate – is a
probable cause of cancer. Those most at risk are farm workers and other individuals with
workplace exposure to Roundup®, such as garden center workers, nursery workers, and
landscapers. Monsanto assured the public that Roundup® was harmless. In order to prove this,
Monsanto has championed falsified data and has attacked legitimate studies that revealed
Roundup's dangers. Monsanto has led a prolonged campaign of misinformation to convince
government agencies, farmers, landscapers and the general population that Roundup® is safe.

### The Discovery of Glyphosate and Development of Roundup®

18.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto
chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the
mid-1970's under the brand name Roundup®.[1] From the outset, Monsanto marketed Roundup®
as a "safe" general purpose herbicide for widespread commercial and consumer use. It still
markets Roundup® as safe today.[2]

19.     In addition to the active ingredient glyphosate, Roundup® formulations also
contain adjuvants and other chemicals such as the surfactant POEA, which are considered "inert"
and therefore protected as "trade secrets" in manufacturing. Growing evidence suggests that

COMPLAINT FOR DAMAGES
Page 5 of 57

♦ HOGUE LAW FIRM ♦
1106 N. Washington St., Ste. B
Spokane, WA 99201
509.252.5058

these adjuvants and additional components of Roundup® formulations are not, in fact, inert and are toxic in their own right.

<u>**Registration of Herbicides under Federal Law**</u>

20.    The manufacture, formulation, and distribution of herbicides, such as Roundup® are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

21.    Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

22.    FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or a pesticide allowed to continue to be sold in commerce.

COMPLAINT FOR DAMAGES
Page 6 of 57

♦ **HOGUE LAW FIRM** ♦
1106 N. Washington St., Ste. B
Spokane, WA 99201
509.252.5058

23.     The EPA registered Roundup® for distribution, sale, and manufacture in the United States and the State of Washington.

24.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

25.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a congressionally mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's recent review and evaluation.

26.     In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment – in relation to the reregistration process – no later than July 2015. The EPA completed review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

### Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®

27.     Based on early studies showing that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C)

COMPLAINT FOR DAMAGES
Page 7 of 57

♦ HOGUE LAW FIRM ♦
1106 N. Washington St., Ste. B
Spokane, WA 99201
509.252.5058

1   in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the

2   EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991.

3   In so classifying glyphosate, however, the EPA made clear that the designation did not mean the

4   chemical does not cause cancer: "It should be emphasized, however, that designation of an agent

5   in Group E is based on the available evidence at the time of evaluation and should not be

6   interpreted as a definitive conclusion that the agent will not be a carcinogen under any

7   circumstances.[3]

8

9        28.    On two occasions, the EPA found that the laboratories hired by Monsanto to test

10   the toxicity of its Roundup® products for registration purposes committed fraud.

11       29.    In the first instance, in seeking initial registration of Roundup® by the EPA,

12   Monsanto, hired Industrial Bio-Test laboratories (hereinafter "IBT") to perform and evaluate

13   pesticide toxicology studies relating to Roundup®.[4] IBT performed about 30 tests on glyphosate

14   and glyphosate-containing products, including 9 of the 15 residue studies needed to register

15   Roundup®.

16       30.    In 1976, the United States Food and Drug Administration (hereinafter "FDA")

17   performed an inspection of IBT that revealed discrepancies between the raw data and the final

18   report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it

19   too found the toxicology too found the toxicology studies conducted for the Roundup® herbicide

20   to be invalid.[5] An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it

21   was "hard to believe the scientific integrity of the studies when they said they took specimens of

22   the uterus from male rabbits."[6]

23

24 COMPLAINT FOR DAMAGES         ◆ HOGUE LAW FIRM ◆
   Page 8 of 57                 1106 N. Washington St., Ste. B
25                                      Spokane, WA 99201
                                        509.252.5058

31.      Three top executives of IBT were convicted of fraud in 1983.

32.      In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.[7]

33.      Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

### The Importance of Roundup® to Monsanto's Market Dominance Profits

34.      The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agricultural division was out-performing its chemical division's operating income, and the gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

35.      In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. As Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further. By 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds, thereby securing Monsanto's

COMPLAINT FOR DAMAGES
Page 9 of 57

◆ HOGUE LAW FIRM ◆
1106 N. Washington St., Ste. B
Spokane, WA 99201
509.252.5058

1  dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled

2  proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

3      36.    Through a three-pronged strategy of increasing production, decreasing prices,

4  and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable

5  product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other

6  herbicides by a margin of 5 to 1, and accounting for close to half of Monsanto's revenue.[8] Today,

7  glyphosate remains one of the world's largest herbicides by sales volume.

8

9  **Monsanto Has Known for Decades That It Falsely Advertises the Safety of Roundup®**

10      37.    In 1996, the New York Attorney General (hereinafter "NYAG") filed a lawsuit

11  against Monsanto based on its false and misleading advertising of Roundup® products.

12  Specifically, the lawsuit challenged Monsanto' s general representations that its spray-on

13  glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically

14  non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive

15  and misleading about the human and environmental safety of glyphosate and/or Roundup® are

16  the following:

17      a.   "Remember that environmentally friendly Roundup herbicide is biodegradable. It won't

18          build up in the soil so you can use Roundup with confidence along customers' driveways,

19          sidewalks, and fences..."

20      b.   "And remember that Roundup is biodegradable and won't buildup in the soil. That will

21          give you the environmental confidence you need to use Roundup everywhere you've got

22          a weed, brush, edging, or trimming problem."

23      c.   "Roundup biodegrades into naturally occurring elements."

24  COMPLAINT FOR DAMAGES
   Page 10 of 57

25

♦ HOGUE LAW FIRM ♦
1106 N. Washington St., Ste. B
Spokane, WA 99201
509.252.5058

d. "Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e. "This non-residual herbicide will not wash or leach in the soil. It...stays where you apply it."

f. "You can apply Roundup with 'confidence because it will stay where you put it.' It binds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Roundup into natural products."

g. "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

h. "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

i. "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds, and fish."

j. "Roundup can be used where kids and pets will play and breaks down into natural material." "This ad depicts a person with his head in the ground and a pet dog in an area which has been treated with Roundup®."[9]

38.    On November 19, 1996 Monsanto entered into an Assurance of Discontinuance with the NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertising [in New York] that represent, directly or by implication" that:

a. its glyphosate containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

COMPLAINT FOR DAMAGES
Page 11 of 57

b.  its glyphosate containing pesticide products or any component thereof manufactured,

formulated, distributed by Monsanto are biodegradable.

c.  its glyphosate containing pesticide products or any component thereof stay where they

are applied under all circumstances and will not move through the environment by any

means.

d.  its glyphosate containing pesticides products or any component thereof are "good" for the

environment or are "known for their environmental characteristics."

e.  glyphosate containing pesticide products or any component thereof are safer or less toxic

than common consumer products other than herbicides.

f.  its glyphosate containing products or any component thereof might be classified as

"practically non-toxic."

39.     Monsanto did not alter its advertising in the same manner in any state other than

New York, and on information and belief it still has not done so as of today.

40.     In 2009, France's highest court ruled that Monsanto had not told the truth about

the safety of Roundup®. The French court affirmed an earlier judgment that Monsanto had

falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[10]

## Classification and Assessments of Glyphosate

41.     The IARC process for the classification of glyphosate followed IARC's stringent

procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has

reviewed 980 agents. Of those reviewed, it has determined that 116 agents to be Group 1

(Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287

COMPLAINT FOR DAMAGES
Page 12 of 57

◆ HOGUE LAW FIRM ◆
1106 N. Washington St., Ste. B
Spokane, WA 99201
509.252.5058

agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and 1 agent to be Probably Not Carcinogenic.

42. The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.[11] Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

43. One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in The Lance Oncology, and within a year after the meeting, the finalized Monograph is published.

44. In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publically available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

COMPLAINT FOR DAMAGES
Page 13 of 57

♦ HOGUE LAW FIRM ♦
1106 N. Washington St., Ste. B
Spokane, WA 99201
509.252.5058

45.    In March 2015, the IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

46.    On July 29, 2015, the IARC issued its Monograph for glyphosate, Monograph Volume 112. For Volume 112, a Working Group of 17 experts from 11 countries met at the IARC from March 3-10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated an almost year-long review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publically available."

47.    The studies considered the following exposure groups: (1) occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and (2) para-occupational exposure in farming families.

48.    Glyphosate was identified as the second most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

49.    Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater as well as food.

COMPLAINT FOR DAMAGES
Page 14 of 57

50.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

51.     The IARC Working Group found an increased risk between exposure to glyphosate and Non-Hodgkin's Lymphoma ("NHL"), and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

52.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

53.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor: renal tubule carcinoma. A second study reported a positive trend for hemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation promotion study in mice.

54.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphonic acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

55.     The IARC Working Group further found that glyphosate and glyphosate formations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

COMPLAINT FOR DAMAGES
Page 15 of 57

◆ HOGUE LAW FIRM ◆
1106 N. Washington St., Ste. B
Spokane, WA 99201
509.252.5058

56.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.[12] Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

57.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.[13] While this study differed from other in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and multiple myeloma, hairy cell leukemia (HCL), and chronic lymphocytic leukemia (CLL), in addition to several other cancers.

**Other Earlier Findings About Glyphosate's Dangers to Human Health**

58.     The EPA published a technical fact sheet as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication relating to glyphosate. This technical fact sheet predates IARC's March 2015 evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on

COMPLAINT FOR DAMAGES
Page 16 of 57

♦ HOGUE LAW FIRM ♦
1106 N. Washington St., Ste. B
Spokane, WA 99201
509.252.5058

releases during its manufacture and handling are not available. Occupational workers and

home gardeners may be exposed to glyphosate by inhalation and dermal contact during

spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to

which glyphosate was applied. Occupational exposure may also occur during

glyphosate's manufacture, transport storage, and disposal.[14]

59.     In 1995, the Northwest Coalition for Alternatives to Pesticides reports that in

California, the state with the most comprehensive program for reporting of pesticide-caused

illness, glyphosate was the third most commonly reported cause of pesticide illness among

agricultural workers.[15]

### The Toxicity of Other Ingredients in Roundup®

60.     In addition to the toxicity of the active ingredient glyphosate, several studies

support the hypothesis that the glyphosate-based formulation in Defendant's Roundup® products

is more dangerous and toxic than glyphosate alone. Indeed, as early as 1991, available evidence

demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.[16]

61.     In 2002, a study by Julie Marc, entitled "Pesticide Roundup Provokes Cell

Division Dysfunction at the Level of CDK1/Cyclin B Activation," revealed that Roundup®

causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate

alone were ineffective and did not alter cell cycles.[17]

62.     A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect

cell cycle regulation," demonstrated a molecular link between glyphosate-based products and

cell cycle dysregulation. The researchers noted that "cell cycle dysregulation is a hallmark of

COMPLAINT FOR DAMAGES
Page 17 of 57

tumor cells and human cancer. Failure in the cell cycle checkpoints leads to genomic instability and subsequent development of cancer from the initial affect cell." Further, "[s]ince cell cycle disorder such as cancer result from dysfunctions of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."[18]

63.     In 2005, a study by Francisco Peixoto entitled "Comparative effects of Roundup® and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup®'s effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone. The Peixoto study further suggested that the harmful effects of Roundup® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant POEA, or in the alternative, due to a potential synergic effect between glyphosate and other ingredients in the Roundup® formulation.[19]

64.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup® and glyphosate on human umbilical, embryonic, and placental cells. The study tested dilution levels of Roundup® and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food. The researchers ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability and amplify toxicity of glyphosate alone. The researchers further suggested that assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants present in Roundup® are not, in fact, inert and that Roundup® is potentially far more toxic than its active ingredient glyphosate alone.[20]

COMPLAINT FOR DAMAGES
Page 18 of 57

◆ HOGUE LAW FIRM ◆
1106 N. Washington St., Ste. B
Spokane, WA 99201
509.252.5058

65.     The results of these studies were at all times available to Monsanto. Monsanto thus knew or should have known that Roundup® was, and is more toxic than glyphosate alone and that safety studies of Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup®.

66.     Despite its knowledge that Roundup® is considerably more dangerous than glyphosate alone, Monsanto continued to promote Roundup® as safe.

### Recent Worldwide Bans on Roundup®/Glyphosate

67.     Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first published its monograph for glyphosate in July 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup® become more widely known. The Netherlands issued a ban on all glyphosate-based herbicides, including Roundup®, in April 2014 and which took effect at the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."[21]

68.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.[22]

69.     France banned the private sale of Roundup® and glyphosate following the IARC assessment for glyphosate. [23]

COMPLAINT FOR DAMAGES
Page 19 of 57

♦ HOGUE LAW FIRM ♦
1106 N. Washington St., Ste. B
Spokane, WA 99201
509.252.5058

70. Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out be a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."[24]

71. The Sri Lankan government banned the private and commercial use of glyphosate, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.[25]

72. The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.[26]

**Proposition 65 Listing**

73. On September 4, 2015, California's Office of Environmental Health Hazard Assessment ("OEHHA") published a notice of intent to include glyphosate on the state's list of known carcinogens under Proposition 65.[27] California's Safe Drinking Water and Toxic Enforcement Act of 1986 (informally known as "Proposition 65"), requires the state to maintain and, at least, once a year, revise and republish a list of chemicals "known to the State of California to cause cancer or reproductive toxicity."[28] The OEHHA determined that glyphosate met the criteria for the listing mechanism under the Labor Code following the IARC's assessment of the chemical.[29]

74. The listing process under the Labor Code is essentially automatic. The list of known carcinogens, at a minimum, must include substances identified by reference in Labor

COMPLAINT FOR DAMAGES
Page 20 of 57

◆ HOGUE LAW FIRM ◆
1106 N. Washington St., Ste. B
Spokane, WA 99201
509.252.5058

1  Code § 6382(b)(1). That section of the Labor Code identifies "[s]ubstances listed as human or

2  animal carcinogens by the International Agency for Research on Cancer (IARC)." The IARC's

3  classification of glyphosate as a Group 2A chemical ("probably carcinogenic to humans")

4  therefore triggered the listing.

5      75.    A business that deploys a listed chemical in its products must provide "clear and

6  reasonable warnings" to the public prior to exposure to the chemical. To be clear and reasonable,

7  a warning must "(1) clearly communicate that the chemical is known to cause cancer, and/or

8  birth defects or other reproductive harm; and (2) effectively reach the person before exposure."[30]

9  The law also prohibits the discharge of listed chemicals into drinking water.

10

11     76.    Monsanto disputed the listing decision and, in January 2016, filed a lawsuit

12  against OEHHA and the agency's acting director, Lauren Zeise, in California state court, seeking

13  declaratory and injunctive relief to prevent OEHHA from listing glyphosate.[31]

14     77.    Monsanto alleged that OEHHA's exclusive reliance of the IARC decision

15  signified that "OEHHA effectively elevated the determination of an ad hoc committee of an

16  unelected, foreign body, which answers to no United States official (let alone any California state

17  official), over the conclusions of its own scientific experts."[32] Monsanto further alleged that the

18  Labor Code listing mechanism presented various constitutional violations because it "effectively

19  empowers an unelected, undemocratic, unaccountable, and foreign body to make laws applicable

20  in California."[33] Among other things, Monsanto argued that Proposition 65's requirement to

21

22  provide a "clear and reasonable warning" to consumers that the chemical is a known carcinogen

23  would damage its reputation and violate First Amendment rights.[34]

24  COMPLAINT FOR DAMAGES
    Page 21 of 57

25

78.     On November 12, 2015, the European Food Safety Authority ("EFSA"), the European Union's primary agency for food safety, reported on its evaluation of the Renewal Assessment Report ("RAR") on glyphosate.[35] The Rapporteur Member State assigned to glyphosate, the German Federal Institute for Risk Assessment ("BfR"), had produced the RAR as part of the renewal process for glyphosate in the EU.

79.     The BfR sent its draft RAR to the EFSA and the RAR underwent a peer review process by EFSA, other member states, and industry groups. As part of the on-going peer review of Germany's reevaluation of glyphosate, the EFSA had also received a second mandate from the European Commission to consider the IARC's findings regarding the potential carcinogenicity of glyphosate and glyphosate-containing products.

80.     Based on a review of the RAR, which included data from industry-submitted unpublished studies, the EFSA sent its own report ("Conclusion") to the European Commission, finding that "glyphosate is unlikely to pose a carcinogenic hazard to humans and the evidence does not support classification with regard to its carcinogenic potential according to Regulation ("EC") No. 1271/2008."[36] The EFSA therefore disagreed with the IARC: glyphosate was not genotoxic and did not present a carcinogenic threat to humans.

81.     In explaining why its results departed from the IARC's conclusion, the EFSA drew a distinction between the EU and the IARC approaches to the study and classification of chemicals.[37] Although the IARC examined "both glyphosate – an active substance – and glyphosate-based formulations, grouping all formulations regardless of their composition," the

COMPLAINT FOR DAMAGES
Page 22 of 57

◆ HOGUE LAW FIRM ◆
1106 N. Washington St., Ste. B
Spokane, WA 99201
509.252.5058

EFSA explained that it considered only glyphosate and that its assessment focuses on "each individual chemical, and each marketed mixture separately."[38] The IARC, on the other hand, "assesses generic agents, including groups of related chemicals, as well as occupational or environmental exposure, and cultural or behavioral practices."[39] The EFSA accorded greater weight to studies conducted with glyphosate alone than studies of formulated products.[40]

82.     The EFSA went further and noted:

[A]lthough some studies suggest that certain glyphosate-based formulations may be genotoxic (i.e. damaging to DNA), other that look solely at the active substance glyphosate do not show this effect. It is likely, therefore, that the *genotoxic effects observed in some glyphosate-based formulations are related to the other constituents or "co-formulants."* Similarly, certain glyphosate-based formulations display higher toxicity than that of the active ingredient, presumably because of the presence of co-formulants. In its assessment, the *EFSA proposes that the toxicity of each pesticide formulation and in particular its genotoxic potential should be further considered and addressed by Member State authorities while they re-assess used of glyphosate-based formulations in their own territories.*[41] **(Emphasis added).**

83.     Notwithstanding its conclusion, the EFSA did set exposure levels for glyphosate. Specifically, the EFSA proposed an acceptable daily intake ("ADI") of 0.5 mg/kg of body weight per day; an acute reference dose ("ARfD") of 0.5 mg/kg of body weight; and an acceptable operator exposure level of ("AOEL") of 0.1 mg/kg of body weight per day.[42]

COMPLAINT FOR DAMAGES
Page 23 of 57

♦ HOGUE LAW FIRM ♦
1106 N. Washington St., Ste. B
Spokane, WA 99201
509.252.5058

**Leading Scientists Dispute the EFSA's Conclusion**

84.     On November 27, 2015, 96 independent academic and governmental scientists from around the world submitted an open letter to the EU health commissioner, Vytenis Andriukaitis.[43] The scientists expressed their strong concerns and urged the commissioner to disregard the "flawed" EFSA report, arguing that "the BfR decision is not credible because it is not supported by the evidence and it was not reached in an open and transparent manner."[44]

85.     Signatories to the letter included Dr. Christopher J. Portier, Ph.D., and other renowned international experts in the field, some of whom were part of the IARC Working Group assigned to glyphosate.

86.     In an exhaustive and careful examination, the scientists scrutinized the EFSA's conclusions and outlined why the IARC Working Group decision was "by far the more credible":

> The IARC WG decision was reached relying on open and transparent procedures by independent scientists who completed thorough conflict-of-interest statements and were not affiliated or financially supported in any way by the chemical manufacturing industry. It is fully referenced and depends entirely on reports published in the open, peer-reviewed biomedical literature. It is part of a long tradition of deeply researched and highly credible reports on the carcinogenicity of hundreds of chemicals issued over the past four decades by IARC and used today by international agencies and regulatory bodies around the world as a basis for risk assessment, regulation, and public health policy.[45]

♦ HOGUE LAW FIRM ♦
1106 N. Washington St., Ste. B
Spokane, WA 99201
509.252.5058

87.     With respect to human data, the scientists pointed out that the EFSA agreed with the IARC that there was "limited evidence of carcinogenicity" for non-Hodgkin lymphoma, but the EFSA nonetheless dismissed an association between glyphosate exposure and carcinogenicity. The IARC applied three levels of evidence in its analysis of human data, including sufficient evidence and limited evidence. The EFSA's ultimate conclusion that "there was no unequivocal evidence for a clear and strong association of NHL with glyphosate" was misleading because it was tantamount to the IARC's highest level of evidence: "sufficient evidence," which means that a causal relationship has been established. However, the scientist argued, '[l]egitimate public health concerns arise when 'causality is credible,' i.e. when there is limited evidence."[46]

88.     Among its many other deficiencies, the EFSA's conclusions regarding animal carcinogenicity data were "scientifically unacceptable," particularly in BfR's use of historical control data and in its trend analysis. Indeed, the BfR's analysis directly contradicted the Organization for Economic Co-operation and Development ("OECD") testing guidelines while citing and purporting to follow those same guidelines. For instance, the EFSA report dismisses observed trends in tumor incidence "because there are no individual treatment groups that are significantly different from control and because the maximum observed response is reportedly within the range of the historical control data." However, according to the scientists, concurrent controls are recommended over historical control in all guidelines, scientific reports, and publications, and, if historical control data is employed, such data "should be from studies in the same timeframe, for the same exact animal strain, preferably from the same laboratory or the

COMPLAINT FOR DAMAGES
Page 25 of 57

same supplier and preferably reviewed by the same pathologist." The BfR's use of historical

control data violated these precautions: "only single study used the same mouse strain as the

historian controls, but was reported more than 10 years after the historical control dataset was

developed." Further deviating from sound scientific practices, the data used by the BfR came

from studies in seven different laboratories. The scientists concluded:

> BfR reported seven positive mouse studies with three studies showing increases in renal
>
> tumors, two with positive findings for hemangiosarcomas, and two with positive findings
>
> for malignant lymphomas. BfR additionally reported two positive findings for tumors in
>
> rats. Eliminating the inappropriate use of historical data, the unequivocal conclusion is
>
> that these are not negative studies, but in fact document the carcinogenicity of glyphosate
>
> in laboratory animals.[47]

89.     The letter also critiques the EFSA's report's lack of transparency and the opacity

surrounding the data cited in the report: "citations for almost all of the references, even those

from the open scientific literature, have been redacted from the document" and "there are no

authors or contributors listed for either document, a requirement for publication in virtually all

scientific journals." Because the BfR relied on unpublished, confidential industry provided

studies, it is "impossible for any scientist not associated with BfR to review this conclusion with

scientific confidence."[48]

90.     On March 3, 2016, the letter was published in the Journal of Epidemiology &

Community Health.[49]

COMPLAINT FOR DAMAGES
Page 26 of 57

♦ HOGUE LAW FIRM ♦
1106 N. Washington St., Ste. B
Spokane, WA 99201
509.252.5058

## Statement of Concern Regarding Glyphosate-Based Herbicides

91.     On February 17, 2016, a consensus statement published in the Journal of Environmental Health, entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement, "assessed the safety of glyphosate-based herbicides ("GBHs").[50] The paper's "focus is on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with recent discoveries about the toxicity and human health risks stemming from use of GBHs."[51] The researchers drew seven factual conclusions about GBHs:

1.    GBHs are the most heavily applied herbicide in the world and usage continues to rise;

2.    Worldwide, GBHs often contaminate drinking water sources, precipitation, and air, especially in agricultural regions;

3.    The half-life of glyphosate in water and soil is longer than previously recognized;

4.    Glyphosate and its metabolics are widely present in the global soybean supply;

5.    Human exposures to GBHs are rising;

6.    Glyphosate is now authoritatively classified as a probable human carcinogen; and

7.    Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science.[52]

92.     The researchers noted that GBH use has increased approximately 100-fold since the 1970s. Further, far from posing a limited hazard to vertebrates, as previously believed, two decades of evidence demonstrated that "several vertebrate pathways are likely targets of action,

◆ HOGUE LAW FIRM ◆
1106 N. Washington St., Ste. B
Spokane, WA 99201
509.252.5058

including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."[53]

93.    The paper attributed uncertainties in current assessments of glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations." Further, the researchers argue, "[t]he distinction in regulatory review and decision processes between 'active' and 'inert' ingredients has no toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in their own right."[54]

94.    Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish." Accordingly, "risk assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone underestimate both toxicity and exposure, and thus risk." The paper concludes that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."[55]

95.    The researchers also critique the current practice of regulators who largely rely on "unpublished, non-peer-reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from

COMPLAINT FOR DAMAGES
Page 28 of 57

♦ HOGUE LAW FIRM ♦
1106 N. Washington St., Ste. B
Spokane, WA 99201
509.252.5058

those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."[56]

96.     The researchers also call for greater inclusion of GBHs in government-led toxicology testing programs:

> [A] fresh and independent examination of GBH toxicity should be undertaken, and ... this reexamination be accompanied by systemic efforts by relevant agencies to monitor GBH levels in people and in the food supply, none of which are occurring today. The U.S. National Toxicology Program should prioritize a thorough toxicology assessment of the multiple pathways now identified as potentially vulnerable of GBHs.[57]

97.     The researchers suggest that, in order to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which manufacturers fund the registration process and the necessary testing:

> [W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part of routine registration actions and fees. Such finds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would be made available to independent scientists to conduct the appropriate long-term (minimum 2 years) safety studies in recognized animal model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption,

COMPLAINT FOR DAMAGES
Page 29 of 57

♦ HOGUE LAW FIRM ♦
1106 N. Washington St., Ste. B
Spokane, WA 99201
509.252.5058

1    impacts on the gut microbiome, carcinogenicity, and multigenerational effects looking a

2    reproductive capability and frequency of birth defects.[58]

3    ### The FDA Announces Testing of Glyphosate Residue in Foods

4    98.    On February 17, 2016, the U.S. Food and Drug Administration ("FDA")

5    announced that, for the first time in its history, the agency planned to start testing certain foods

6    for glyphosate residues. FDA spokesperson Lauren Sucher explained: "The agency is now

7    considering assignments for Fiscal Year 2016 to measure glyphosate in soybeans, corn, milk, and

8    eggs, among other potential foods."[59]

9

10   99.    In 2004, the U.S. Government Accountability Office ("GAO") had severely

11   rebuked the FDA for its failures to both monitor for pesticide residue, including that of

12   glyphosate, and to disclose the limitations of its monitoring and testing efforts to the public.[60]

13   101. Indeed, in the past, both the FDA and the U.S. Department of Agriculture ("USDA") had

14   routinely excluded glyphosate from their testing for the residues of hundreds of other pesticides,

15   on the rationale that it was too expensive and unnecessary to protect public health. Ms. Sucher

16   (the FDA spokesperson) now states, however, that "the agency has developed 'streamlined

17   methods' for testing for the weed killer."[61]

18   100.    The FDA's move is significant as the agency possesses enforcement authority

19   and can seek action if pesticide residues exceed enforcement guidelines.[62]

20   ### European Union Vote on Glyphosate Renewal

21

22   101.    The license for glyphosate in the European Union was set to expire in June 2016.

23   102.    Without extension of the license, Monsanto's Roundup® and other glyphosate-

24   COMPLAINT FOR DAMAGES                          ◆ HOGUE LAW FIRM ◆
     Page 30 of 57                                  1106 N. Washington St., Ste. B
25                                                  Spokane, WA 99201
                                                    509.252.5058

1    based herbicides faced a general phase out in EU markets.[63]

2         103.    In the months leading up to the license expiration date, protracted meetings and

3    votes among national experts from the 28 EU Member States failed to produce agreement on an

4    extension.

5         104.    For instance, on March 4, 2016, *The Guardian* reported that France, the

6    Netherlands, and Sweden did not support the EFSA's assessment that glyphosate was harmless.[64]

7    The paper quoted the Swedish Environmental Minister, Åsa Romson, as stating: "We won't take

8    risks with glyphosate and we don't think that the analysis done so far is good enough. We will

9    propose that no decision is taken until further analysis has been done and the EFSA scientists

10   have been more transparent about their considerations."[65]

11

12        105.    The Netherlands argued that relicensing should be placed on hold until after a

13   separate evaluation of glyphosate's toxicity can be conducted.[66] Leading up to the vote, Italy

14   joined the other EU states in opposing licensing renewal, citing health concerns.[67]

15        106.    On June 6, 2016, the Member States voted but failed to reach a qualified majority

16   in favor or against the re-authorization of glyphosate.[68]

17        107.    On June 29, 2016, the EU Commission extended the European license for

18   glyphosate for 18 months to allow the European Chemical Agency to rule on the safety of the

19   chemical.[69]

20        108.    On July 11, 2016, the EU voted in favor of a proposal to restrict the conditions of

21   use of glyphosate in the EU, including a ban on common co-formulant POEA from all

22   glyphosate-based herbicides, including Roundup®.[70]

23

24   COMPLAINT FOR DAMAGES
     Page 31 of 57

25
♦ HOGUE LAW FIRM ♦
1106 N. Washington St., Ste. B
Spokane, WA 99201
509.252.5058

109.     On November 13, 2017, after heated debate over whether it causes cancer, and in a very tight vote, the EU voted in favor of a limited (5-year) license for the use of glyphosate.[71]

### Plaintiff and His Exposure to Roundup

110.     Plaintiff Jason Gannon regularly used Roundup® for years in the regular course of working as a landscaper and gardener in the Spokane, Washington area.

111.     Mr. Gannon frequently purchased Roundup® in Washington.

112.     In November 2016, doctors diagnosed Mr. Gannon with Small Lymphocytic Lymphoma/Chronic Lymphocytic Leukemia.

113.     During the entire time that Mr. Gannon was exposed to Roundup®, he did not know that Roundup® was injurious to his health or the health of others.

114.     Mr. Gannon is one of thousands of victims of Monsanto's fraud, deceit, and utter lack of care for consumers.

115.     As a result of his injuries, Mr. Gannon has incurred significant economic and non-economic damages.

### Tolling of the Statute of Limitations:

### Discovery Tolling

116.     Plaintiff had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup® and glyphosate during the entire time he was using the product.

COMPLAINT FOR DAMAGES
Page 32 of 57

◆ HOGUE LAW FIRM ◆
1106 N. Washington St., Ste. B
Spokane, WA 99201
509.252.5058

117.    If applicable, Plaintiff could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup® and glyphosate is injurious to human health within statutes of limitations.

118.    Plaintiff did not discover, and did not know of facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup® and glyphosate; nor would a reasonable and diligent investigation by Plaintiff have disclosed that Roundup® and glyphosate would have caused his illness.

119.    For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff's claims.

**Fraudulent Concealment Tolling**

120.    All applicable statutes of limitations have also been tolled by Monsanto's knowing and active fraudulent concealment and denial of the facts alleged herein through the time period relevant to this action.

121.    Instead of disclosing critical safety information about Roundup® and glyphosate, Monsanto has consistently and falsely represented the safety of its Roundup® products.

122.    Monsanto was under a continuous duty to disclose to consumer, users, and other persons coming into contact with its products, including Plaintiff, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate.

COMPLAINT FOR DAMAGES
Page 33 of 57

♦ HOGUE LAW FIRM ♦
1106 N. Washington St., Ste. B
Spokane, WA 99201
509.252.5058

123.    Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks with the use of and/or exposure to its products.

124.    Based on the foregoing, Monsanto is estopped from relying on any statutes of limitations in defense of this action.

## IV.    CAUSES OF ACTION

### First Cause of Action - Negligence

125.    Plaintiff re-alleges all previous allegations and incorporates them by reference as though fully set forth herein.

126.    Defendant had a duty to duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

127.    Defendant failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup into interstate commerce in that Defendant knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of Small Lymphocytic Lymphoma/CLL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications, and death.

COMPLAINT FOR DAMAGES
Page 34 of 57

◆ HOGUE LAW FIRM ◆
1106 N. Washington St., Ste. B
Spokane, WA 99201
509.252.5058

128.    The negligence by the Defendant, its agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

a.     Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly testing it;

b.     Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup;

c.     Not conducting sufficient testing programs to determine whether or not Roundup was safe for use; in that Defendant herein knew or should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users;

d.     Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Defendant had knowledge that Roundup is, was, or could be carcinogenic;

e.     Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

f.     Negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

g.     Negligently failing to petition the EPA to strengthen the warnings associated with Roundup;

h.     Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

i.     Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

j.     Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

COMPLAINT FOR DAMAGES
Page 35 of 57

♦ HOGUE LAW FIRM ♦
1106 N. Washington St., Ste. B
Spokane, WA 99201
509.252.5058

k.   Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

l.   Negligently designing Roundup in a manner, which was dangerous to its users;

m.   Negligently manufacturing Roundup in a manner, which was dangerous to its users;

n.   Negligently producing Roundup in a manner, which was dangerous to its users;

o.   Negligently formulating Roundup in a manner, which was dangerous to its users;

p.   Concealing information from the Plaintiff while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations;

q.   Improperly concealing and/or misrepresenting information from the Plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides; and

r.   Negligently selling Roundup with a false and misleading label.

129.   Defendant under-reported, underestimated, and downplayed the serious dangers of Roundup.

130.   Defendant acted unreasonably in its failure to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup.

131.   Defendant negligently and deceptively compared the safety risks and/or dangers of Roundup with common everyday foods such as table salt, and other forms of herbicides.

132.   Defendant was negligent and/or violated Washington law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising,

COMPLAINT FOR DAMAGES
Page 36 of 57

♦ HOGUE LAW FIRM ♦
1106 N. Washington St., Ste. B
Spokane, WA 99201
509.252.5058

warning, marketing, and selling of Roundup in that they:

a.  Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide;

b.  Failed to accompany its product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

c.  Failed to accompany its product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

d.  Failed to accompany its product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;

e.  Failed to warn Plaintiff of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of NHL;

f.  Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup;

g.  Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants;

h.  Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity; and

i.  Was otherwise careless and/or negligent.

133.  Despite the fact that Defendant knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Defendant continued and continues to market, manufacture, distribute, and/or sell Roundup to consumers, including the Plaintiff.

134.  Defendants actions were with malice or willful or wanton conduct.

135.  Defendant knew or should have known that consumers such as the Plaintiff would

COMPLAINT FOR DAMAGES
Page 37 of 57

♦ HOGUE LAW FIRM ♦
1106 N. Washington St., Ste. B
Spokane, WA 99201
509.252.5058

foreseeably suffer injury as a result of Defendant's failure to exercise ordinary care, as set forth above.

136. Defendant's violations of law and/or negligence were the proximate cause of Plaintiff's injuries, harm, and economic loss.

137. As a result of the foregoing acts and omissions, Plaintiff developed Small Lymphocytic Lymphoma/CLL and suffered severe and personal injuries which are permanent and lasting in nature, and included physical pain and mental anguish, diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic, and noneconomic damages.

## Second Cause of Action – Products Liability – Design Defect

138. Plaintiff re-alleges all previous allegations and incorporates them by reference as though fully set forth herein.

139. At all times herein mentioned, the Defendant designed, researched, manufactured, tested, advertised, promoted, sold, distributed Roundup as hereinabove described that was used by the Plaintiff.

140. When Defendant designed, researched, manufactured, tested, advertised, promoted, sold, distributed Roundup as hereinabove described that was used by the Plaintiff, Defendant acted unreasonably.

141. When Defendant designed, researched, manufactured, tested, advertised, promoted, sold, distributed Roundup as hereinabove described that was used by the Plaintiff, Defendant unreasonably failed to adopt a safer, practical, feasible, and otherwise reasonable

COMPLAINT FOR DAMAGES
Page 38 of 57

♦ HOGUE LAW FIRM ♦
1106 N. Washington St., Ste. B
Spokane, WA 99201
509.252.5058

alternative design or formulation that could then have been reasonably adopted and that would have prevented or substantially reduced the risk of harm without substantially impairing the usefulness, practicality, or desirability of the product.

142.    Defendant's Roundup was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendant.

143.    At those times, Roundup was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, the Plaintiff herein.

144.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup.

145.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective in design and/or formulation, in that, when it left the hands of the Defendant manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

146.    At all times herein mentioned, Roundup was in a defective condition and unsafe, and Defendant knew or had reason to know that said product was defective and unsafe,

COMPLAINT FOR DAMAGES
Page 39 of 57

WORKING COPY

especially when used in the form and manner as provided by the Defendant. In particular,

Defendant's Roundup was defective in the following ways:

   a.   When placed in the stream of commerce, Defendant's Roundup products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate.

   b.   When placed in the stream of commerce, Defendant's Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

   c.   When placed in the stream of commerce, Defendant's Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

   d.   Defendant did not sufficiently test, investigate, or study its Roundup products.

   e.   Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

   f.   Defendant new or should have known at the time of marketing its Roundup products that exposure to Roundup and could result in cancer and other severe illnesses and injuries.

   g.   Defendant did not conduct adequate post-marketing surveillance of its Roundup products.

   147.   Defendant knew or should have known that at all times herein mentioned its Roundup was in a defective condition, and was and is inherently dangerous and unsafe.

   148.   Plaintiff was exposed to Defendant's Roundup, as described above, without knowledge of Roundup's dangerous characteristics.

   149.   At the time of the Plaintiff's use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

COMPLAINT FOR DAMAGES
Page 40 of 57

♦ HOGUE LAW FIRM ♦
1106 N. Washington St., Ste. B
Spokane, WA 99201
509.252.5058

150.    Defendant with this knowledge voluntarily designed its Roundup with a dangerous condition for use by the public, and in particular the Plaintiff.

151.    Defendant had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

152.    Through Defendant's actions and inactions described herein, Defendant breached its duty to create a product that was not unreasonably dangerous for its normal, intended use.

153.    Defendant created a product that was and is unreasonably dangerous for its normal, intended use.

154.    Defendant marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

155.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was manufactured defectively in that Roundup left the hands of Defendant in a defective condition and was unreasonably dangerous to its intended users.

156.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant reached its intended users in the same defective and unreasonably dangerous condition in which the Defendant's Roundup was manufactured.

157.    Defendant negligently designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to the Plaintiff in particular, and Defendant is therefore liable

COMPLAINT FOR DAMAGES
Page 41 of 57

♦ HOGUE LAW FIRM ♦
1106 N. Washington St., Ste. B
Spokane, WA 99201
509.252.5058

for the injuries sustained by the Plaintiff.

158.     Monsanto could have employed a safer alternative design to render Roundup® safe or, in the alternative, provided proper instructions for use on how to limit the potential risk associated with Roundup®'s defective design. Monsanto's Roundup® products were and are more dangerous than alternative products and Monsanto could have designed its Roundup® products to make them less dangerous. At the time Monsanto designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable. Thus, at the time Roundup® products left Monsanto's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Monsanto's herbicides.

159.     The Plaintiff could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

160.     The formulation or design of Roundup was so unreasonable, due to Defendant's actions, that a reasonable person with knowledge of the relevant facts would not use Roundup.

161.     By reason of the foregoing negligence, the Defendant has become liable to the Plaintiff for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup.

162.     Defendant's defective design of Roundup amounts to willful, wanton, and/or reckless conduct by Defendant.

163.     Defects in Defendant's Roundup was the cause or a substantial factor in causing

COMPLAINT FOR DAMAGES
Page 42 of 57

◆ HOGUE LAW FIRM ◆
1106 N. Washington St., Ste. B
Spokane, WA 99201
509.252.5058

Plaintiff's injuries.

164. Defects in Defendant's Roundup was the direct and proximate cause of the harm suffered by Plaintiff.

165. As a result of the foregoing acts and omissions, Plaintiff developed Small Lymphocytic Lymphoma/CLL and suffered severe and personal injuries which are permanent and lasting in nature, and included physical pain and mental anguish, diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic, and noneconomic damages.

### Third Cause of Action – Products Liability – Failure to Warn

166. Plaintiff re-alleges all previous allegations and incorporates them by reference as though fully set forth herein.

167. Defendant has engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting Roundup, and through that conduct have knowingly and intentionally placed Roundup into the stream of commerce with full knowledge that it reaches consumers such as Plaintiff who are exposed to it through ordinary and reasonably foreseeable uses.

168. Defendant did in fact sell, distribute, supply, manufacture, and/or promote Roundup to Plaintiff. Additionally, Defendant expected supplying, manufacturing, and/or promoting to reach – and Roundup did in fact reach – consumers, including Plaintiff, without any substantial change in the condition of the product from when it was initially distributed by Defendant.

COMPLAINT FOR DAMAGES
Page 43 of 57

◆ HOGUE LAW FIRM ◆
1106 N. Washington St., Ste. B
Spokane, WA 99201
509.252.5058

169.   At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

170.   At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Defendant and at the time Plaintiff was exposed to and/or ingested the product. The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing Small Lymphocytic Lymphoma/CLL as a result of exposure and use.

171.   Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect the health of those exposed in violation of 7 U.S.C. § 136j(a)(1)(E) and Washington laws and regulations.

172.   Defendant's failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. § 136j(a)(1)(E) and Washington laws and regulations.

173.   Defendant could have amended the label of Roundup to provide additional warnings.

174.   This defect caused serious injury to Plaintiff, who used Roundup in its intended and foreseeable manner.

175.   At all times herein mentioned, Defendant had a duty to properly design,

COMPLAINT FOR DAMAGES
Page 44 of 57

♦ HOGUE LAW FIRM ♦
1106 N. Washington St., Ste. B
Spokane, WA 99201
509.252.5058

1 manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain

2 supply, provide proper warnings, and take such steps to assure that the product did not cause

3 users to suffer from unreasonable and dangerous side effects.

176. Through Defendant's actions and inactions described herein, Defendant breached

5 its duty to create a product that was not unreasonably dangerous for its normal, intended use.

177. Defendant labeled, distributed, and promoted the aforesaid product that it was

dangerous and unsafe for the use and purpose for which it was intended.

178. Defendant failed to warn of the nature and scope of the side effects associated

with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a

substantial contributing factor in the development of Small Lymphocytic Lymphoma/CLL.

179. Defendant was aware of the probable consequences of the aforesaid conduct.

180. Despite the fact that Defendant knew or should have known that Roundup caused

serious injuries, Defendant failed to exercise reasonable care to warn of the dangerous

carcinogenic properties and side effect of developing Small Lymphocytic Lymphoma/CLL from

Roundup exposure, even though these side effects were known or reasonably scientifically

knowable at the time of distribution. Defendant willfully and deliberately failed to avoid the

consequences associated with its failure to warn, and in doing so, Defendant acted with a

conscious disregard for the safety of Plaintiff.

181. At the time of exposure, Plaintiff could not have reasonably discovered any

defect in Roundup prior through the exercise of reasonable care.

182. Defendant, as the manufacturer and/or distributor of the subject product, is held

COMPLAINT FOR DAMAGES
Page 45 of 57

♦ HOGUE LAW FIRM ♦
1106 N. Washington St., Ste. B
Spokane, WA 99201
509.252.5058

to the level of knowledge of an expert in the field.

183.    Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Defendant.

184.    Had Defendant properly disclosed the risks associated with Roundup products, Plaintiff would have avoided the risk of Small Lymphocytic Lymphoma/CLL by not using Roundup products.

185.    The information that Defendant did provide or communicate failed to contain adequate warnings and precautions that would have enabled Plaintiff, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

186.    To this day, Defendant has failed to adequately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup.

187.    As a result of its inadequate warnings, Defendant's Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiff.

COMPLAINT FOR DAMAGES
Page 46 of 57

188.    As a direct and proximate result of Defendant's actions as alleged herein, and in such other ways to be later shown, the subject product caused Plaintiff to sustain injuries as herein alleged.

189.    As a result of the foregoing acts and omissions, Plaintiff developed Small Lymphocytic Lymphoma/CLL and suffered severe and personal injuries which are permanent and lasting in nature, and included physical pain and mental anguish, diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic, and noneconomic damages.

### Fourth Cause of Action – Breach of Express and Implied Warranties

190.    Plaintiff re-alleges all previous allegations and incorporates them by reference as though fully set forth herein.

191.    At all times herein mentioned, the Defendant manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold Roundup as a broad spectrum herbicide. These actions were under the ultimate control and supervision of Defendant.

192.    At the time Defendant marketed, sold, and distributed Roundup for use by Plaintiff, Defendant knew of Roundup's intended use and expressly and impliedly warranted the product to be of merchantable quality and safe and fit for this use.

193.    The Defendant expressly and impliedly represented and warranted to Plaintiff and users of Roundup, the agricultural community, and/or the EPA that Roundup was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.

COMPLAINT FOR DAMAGES
Page 47 of 57

◆ HOGUE LAW FIRM ◆
1106 N. Washington St., Ste. B
Spokane, WA 99201
509.252.5058

194. These representations and warranties were false, misleading, and inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

195. Plaintiff and/or the EPA did rely on said implied warranty of merchantability of fitness for particular use and purpose.

196. Plaintiff reasonably relied upon the skill and judgment of Defendant as to whether Roundup was of merchantable quality and safe and fit for its intended use.

197. Roundup was injected into the stream of commerce by the Defendant in a defective, unsafe, and inherently dangerous condition, and the products' materials were expected to and did reach users, handlers, and persons encountering said products without substantial change in the condition in which they were sold.

198. The Defendant breached the aforesaid express and implied warranties, as its herbicide Roundup was not fit for its intended purposes and uses.

199. As a result of the foregoing acts and omissions, Plaintiff developed Small Lymphocytic Lymphoma/CLL and suffered severe and personal injuries which are permanent and lasting in nature, and included physical pain and mental anguish, diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic, and noneconomic damages.

**Fifth Cause of Action – Violation of the Washington Consumer Protection Act**

200. Plaintiff re-alleges all previous allegations and incorporates them by reference as though fully set forth herein.

201. Defendant engaged in unfair or deceptive acts or practices by fraudulently,

COMPLAINT FOR DAMAGES
Page 48 of 57

♦ HOGUE LAW FIRM ♦
1106 N. Washington St., Ste. B
Spokane, WA 99201
509.252.5058

1  intentionally, negligently, and/or innocently misrepresenting to the public and to the Plaintiff in

2  trade or commerce, both directly and by and through the media and purported "community

3  outreach" programs, the safety of Roundup products, and/or fraudulently, intentionally,

4  negligently and/or innocently concealed, suppressed, or omitted material, adverse information

5  regarding the safety of Roundup. This deception caused injury to Plaintiff in violation of

6  Washington's Consumer Protection Act, RCW 19.86, *et seq.*

7      202.    The intentional, negligent, and/or innocent misrepresentations and omissions of

8  Defendant regarding the safety of Roundup products were communicated to Plaintiff directly

9  through national and regional advertising, marketing and promotion efforts, as well as the

10  packaging and sales aids. The safety of Roundup products was also intentionally, negligently,

11  and/or innocently misrepresented to Plaintiff and the public with the intent that such

12  misrepresentations would cause Plaintiff and other potential consumers to purchase and use or

13  continue to purchase and use Roundup products.

14

15      203.    Defendant either new or should have known of the material representations they

16  were making regarding the safety and relative utility of Roundup products.

17

18      204.    Defendant fraudulently, intentionally, negligently, and/or innocently made the

19  misrepresentations and/or actively concealed, suppressed, or omitted this material information

20  with the specific desire to induce Plaintiff, and the consuming public to purchase and use

21  Roundup products. Defendant fraudulently, intentionally, negligently, and/or innocently, knew

22  or should have known that Plaintiff and the consuming public would rely on such material

23  misrepresentations and/or omissions in selecting and applying Roundup products. Defendant

24  COMPLAINT FOR DAMAGES                   ◆ HOGUE LAW FIRM ◆
    Page 49 of 57                           1106 N. Washington St., Ste. B
25                                           Spokane, WA 99201
                                             509.252.5058

1  knew or should have known that Plaintiff would rely on their false representations and

2  omissions.

3      205.    Defendant made these misrepresentations and actively concealed adverse

4  information including the risk of Small Lymphocytic Lymphoma/CLL, at a time when, their

5  agents and/or employees knew or should have known, the product had defects, dangers, and

6  characteristics that were other than what was represented to the consuming public. Specifically,

7  Defendant misrepresented and actively concealed, suppressed, and omitted that there had been

8  inadequate testing of the safety and efficacy of Roundup, and that prior studies, research, reports,

9  and/or testing had been conducted linking the use of the drug with serious health events,

10  including Small Lymphocytic Lymphoma/CLL.

11

12      206.    If Plaintiff had known the true facts concerning the risks associated with Roundup

13  exposure, Plaintiff would have used a safer alternative.

14      207.    Plaintiff's reliance upon the material misrepresentations and omissions was

15  justified, among other reasons, because said misrepresentations and omissions were made by

16  individuals and entities who were in a position to know the true facts concerning Roundup while

17  Plaintiff was not in a position to know the true facts because Defendant overstated the benefits

18  and safety of Roundup and downplayed the risk of lymphoma, thereby inducing Plaintiff to use

19  the herbicide rather than safer alternatives.

20

21      208.    Washington law, federal law, and the EPA do not authorize and specifically

22  prohibit the deceptions, misrepresentations and omissions made by Defendant.

23      209.    As a direct and proximate result of Defendant's unfair or deceptive acts or

24  COMPLAINT FOR DAMAGES                ◆ HOGUE LAW FIRM ◆
   Page 50 of 57                      1106 N. Washington St., Ste. B
25                                      Spokane, WA 99201
                                          509.252.5058

WORKING COPY

practices, Plaintiff was exposed to the unsafe Roundup product(s) and suffered injuries and damages in an amount to be proven at trial.

210. Defendant's violations warrant treble damages as provided by RCW 19.86.090.

211. As a result of Defendant's violations of Washington's CPA, Plaintiff is entitled to an award of attorney's fees and costs incurred in bringing this action pursuant to RCW 19.86.090.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against the Defendant on each of the above-referenced claims and causes of action and as follows:

1. Awarding compensatory damages including, but not limited to, pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial;

2. Awarding compensatory damages including, but not limited to, medical expenses, out of pocket expenses, lost earnings, and other economic damages in an amount to be determined at trial;

3. Awarding punitive damages as a result of Defendant wrongfully causing Plaintiff's injuries through malice or willful or wanton conduct;

4. Awarding pre-judgment and post-judgment interest;

5. Awarding Plaintiff costs and reasonable attorney's fees under RCW 19.86, *et seq.* or as otherwise allowed by law; and

6. Awarding Plaintiff treble damages pursuant to RCW 19.86.090.

COMPLAINT FOR DAMAGES
Page 51 of 57

♦ HOGUE LAW FIRM ♦
1106 N. Washington St., Ste. B
Spokane, WA 99201
509.252.5058

7.    Such other relief as this Court deems just and proper.

DATED this _30th_ day of October 2019.

HOGUE LAW FIRM

CHRISTOPHER M. HOGUE, WSBA# 48041
Attorney for Plaintiff

M. CASEY LAW, PLLC

MARSHALL CASEY, WSBA# 42552
Attorney for Plaintiff

COMPLAINT FOR DAMAGES
Page 52 of 57

◆ HOGUE LAW FIRM ◆
1106 N. Washington St., Ste. B
Spokane, WA 99201
509.252.5058

1

2    [1] Monsanto, *Backgrounder-History of Monsanto's Glyphosate Herbicides* (June 2005), *supra*

3    [2] *See* Monsanto, *Crop Protection*, https://monsanto.com/innovations/crop-protection/ (last visited
Mar. 21, 2018).

4    [3] U.S. Envtl. Prot. Agency, *Memorandum, Subject: SECOND Peer Review of Glyphosate 1*
(1991), available at

5    https://archive.epa.gov/pesticides/chemicalsearch/chemical/foia/web/pdf/103601/417300-1991-
10-30a.pdf.

6    [4] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories* (June 2005), available
at https://monsanto.com/app/uploads/2017/06/ibt_craven_bkg.pdf.

7    [5] U.S. Envtl. Prot. Agency, *Summary of the IBT Review Program Office of Pesticide Programs*
(1983), available at

8    https://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA
&Index=1981+Thru +1985&Docs=&Quer y=&T ime=&En dT ime=&Sear ch Meth od=1&T

9    ocRestr ict=n &T oc=&T ocEn tr y=&QField=&QF ieldY

10   ear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%
3A%5Czyfiles %5CIndex%20Data%5C81thru85%5CTxt%5C00000022%5C91014UL V

11   .txt&User=ANONYMOUS&Password=an
onymous&SortMethod=h%7C&MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g

12   8/r75g8/x150y150g 16/i425&Display=hpfr&DefSeekPage=x&SearchBack=ZyA
ctionL&Back=ZyActionS&BackDesc=Results%20pag

13   e&MaximumPages=1&ZyEntry=1&SeekPage=x&ZyPURL.

[6] Marie-Monique Robin, *The World According to Monsanto: Pollution, Corruption and the

14   Control of the World's Food Supply* (2011) (*citing* U.S. Envtl. Prot. Agency, *Data Validation,
Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch.* Washington, D.C.

15   (August 9, 1978)).

[7] Monsanto, *Backgrounder, Testing Fraud: IBT and Craven Laboratories*, *supra*.

16   [8] David Barboza, *The Power of Roundup; A Weed Killer Is a Block for Monsanto to Build On,*

17   N.Y. TIMES, Aug. 2, 2001, available at http://www.nytimes.com/2001/08/02/business/the-
power-of-roundup-a-weed-killer-is-a-block- for-monsanto-to-build-on.html.

18   [9] Attorney General of the State of New York, in the Matter of Monsanto Company, Assurance of
Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

19   [10] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, available at
http://news.bbc.co.uk/2/hi/europe/8308903.stm.

20   [11] World Health Org., *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans:
Preamble* (2006), available at http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

21   [12] Guyton et al., Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon &

22   Glyphosate, supra at 77.

23

24   COMPLAINT FOR DAMAGES                              ◆ HOGUE LAW FIRM ◆
     Page 53 of 57                                       1106 N. Washington St., Ste. B
                                                              Spokane, WA 99201
25                                                              509.252.5058

1  ───────────────────────────────────────────────

2  [13] Anneclare J. De Roos et al., *Cancer Incidence Among Glyphosate-Exposed Pesticide
Applicators in the Agricultural Health Study*, 113 Envt'l Health Perspectives 49-54 (2005),

3  available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1253709/pdf/ehp0113-000049.pdf.
[14] Nat'l Pesticide Info. Center, *Glyphosate: General Fact Sheet*, supra.

4  [15] Caroline Cox, *Glyphosate, Part 2: Human Exposure and Ecological Effects*, 15 J. PESTICIDE

5  REFORM 4 (1995); W.S. Peas et al., *Preventing pesticide-related illness in California
agriculture: Strategies and priorities. Environmental Health Policy Program Report*, Univ. of

6  Cal. School of Public Health, Calif. Policy Seminar (1993).
[16] Martinez, T.T. and K. Brown, *Oral and pulmonary toxicology of the surfactant used in

7  Roundup herbicide*, PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991).
[17] Julie Marc, et al., *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of

8  CDK1/Cyclin B Activation*, 15 CHEM. RES. TOXICOL. 326-331 (2002), available at
http://pubs.acs.org/doi/full/10.1021/tx015543g.

9  [18] Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation*, 96 BIOLOGY OF
THE CELL 245, 245-249 (2004), available at https://www.ncbi.nlm.nih.gov/pubmed/15182708.

10  [19] Francisco Peixoto, *Comparative effects of the Roundup and glyphosate on mitochondrial

11  oxidative phosphorylation*, 61 CHEMOSPHERE 1115, 1122 (2005), available at
https://www.ncbi.nlm.nih.gov/pubmed/16263381.

12  [20] Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human
Umbilical, Embryonic, and Placental Cells*, 22 CHEM. RES. TOXICOL. 97-105 (2008),

13  available at http://big.assets.huffingtonpost.com/france.pdf.
[21] *Holland's Parliament Bans Glyphosate Herbicides*, The Real Agenda, April 14, 2014,

14  available at http://real- agenda.com/hollands-parliament-bans-glyphosate-herbicides/.
[22] Christina Sarich, *Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals Following*

15  *Recent Glyphosate- Cancer Link*, GLOBAL RESEARCH, MAY 14, 2015, available at
https://www.globalresearch.ca/brazils-public- prosecutor-wants-to-ban-monsantos-chemicals-

16  following-recent-glyphosate-cancer-link/5449440; see Ministério Público Federal, *MPF/DF

17  reforça pedido para que glifosato seja banido do Mercado nacional*, April 14, 2015, available at
http://www.mpf.mp.br/df/sala-de-imprensa/noticias-df/mpf-df-reforca-pedido-para-que-

18  glifosato-seja- banido-do-mercado-nacional.
[23] Zoe Schlanger, *France Bans Sales of Monsanto's Roundup in Garden Centers, 3 Months After*

19  *U.N. Calls it "Probable Carcinogen"*, NEWSWEEK, JUNE 15, 2015, available at
http://www.newsweek.com/france-bans-sale- monsantos-roundup-garden-centers-after-un-

20  names-it-probable-343311.
[24] *Health Minister: Importation of Roundup Weed Spray Suspended*, Today in Bermuda, May 11,

21  2015, available at http://bernews.com/2015/05/importation-weed-spray-round-suspended/.
[25] *Sri Lanka's New President Puts Immediate Ban on Glyphosate Herbicides*, Sustainable Pulse,

22  May 25, 2015, available at https://sustainablepulse.com/2015/05/25/sri-lankas-new-president-
puts-immediate-ban-on-glyphosate- herbicides/.

23

24  COMPLAINT FOR DAMAGES                                    ◆ **HOGUE LAW FIRM** ◆
Page 54 of 57                                            1106 N. Washington St., Ste. B

25                                                              Spokane, WA 99201
509.252.5058

1

2   [26] *Columbia to ban coca spraying herbicide glyphosate*, BBC, May 10, 2015, available at
    http://www.bbc.com/news/world-latin-america-32677411.

3   [27] Cal. Envtl. Prot. Agency Office of Envtl. Health Hazard Assessment, *Notice of Intent to List
    Chemicals by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion,*

4   *Glyphosate* (Sept. 4, 2015), available at https://oehha.ca.gov/proposition-65/crnr/notice-intent-
    list-tetrachlorvinphos-parathion-malathion-glyphosate.

5   [28] Frequently Asked Questions, STATE OF CAL. DEPT OF JUSTICE, OFFICE OF THE
    ATTORNEY GENERAL, available at http://oag.ca.gov/prop65/faq.

6   [29] Cal. Envtl. Prot. Agency Office of Envtl. Health Hazard Assessment, *Notice of Intent to List
    Chemicals by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion,*

7   *Glyphosate, supra.*

8   [30] *Frequently Asked Questions*, STATE OF CAL. DEPARTMENT OF JUSTICE, OFFICE OF
    THE ATTORNEY GENERAL, *supra.*

9   [31] Monsanto Company's Verified Petition for Writ of Mandate and Complaint for Preliminary
    and Permanent Injunctive and Declaratory Relief, *Monsanto Co. v. Office of the Envt'l Health*

10  *Hazard Assessment, et al.*, No. 16- CECG-00183 (Cal. Super. Ct.).

11  [32] *Id.* at 2.
    [33] *Id.* at 3.

12  [34] *Id.*
    [35] European Food Safety Auth., *Conclusion on the peer review of the pesticide risk assessment of*

13  *the active substance glyphosate*, available at
    http://www.efsa.europa.eu/sites/default/files/scientific_output/files/main_documents/4302.pdf.

14  [36] *Id.*
    [37] *EFSA Fact Sheet: Glyphosate, EFSA*, available at

15  http://www.efsa.europa.eu/sites/default/files/corporate_publications/files/efsaexplainsglyphosate
    151112en.pdf.

16  [38] *Id.*
    [39] *Id.*

17  [40] *Id.*
    [41] *Id.*

18  [42] European Food Safety Auth., *Conclusion on the peer review of the pesticide risk assessment of*

19  *the active substance glyphosate, supra.*
    [43] Letter from Christopher J. Portier et al. to Commission Vytenis Andriukaitis, Open letter:

20  Review of the Carcinogenicity of Glyphosate by EFSA and BfR (Nov. 27, 2015), available at
    https://www.nrdc.org/sites/default/files/open-letter-from-dr-christopher-portier.pdf and

21  https://www.theguardian.com/environment/2016/jan/13/eu-scientists-in-row-over-safety-of-
    glyphosate-weedkiller .

22  [44] *Id.*
    [45] *Id.*

23

24  COMPLAINT FOR DAMAGES                                    ♦ HOGUE LAW FIRM ♦
    Page 55 of 57                                        1106 N. Washington St., Ste. B
25                                                              Spokane, WA 99201
                                                                 509.252.5058

1 ───────────────────────────────────

2 [46] *Id.*

[47] *Id.*

3 [48] *Id.*

[49] Christopher J. Portier, et al., *Differences in the carcinogenic evaluation of glyphosate between*

4 *the International Agency for Research on Cancer (IARC) and the European Food Safety*

*Authority (EFSA)*, JOURNAL OF EPIDEMIOLOGY & CMTY. HEALTH, Marc. 3, 2016,

5 available at http://jech.bmj.com/content/early/2016/03/03/jech-2015-207005.

6 [50] John P. Myers, et al., *Concerns over use of glyphosate-based herbicides and risks associated*

*with exposures: a consensus statement*, Environmental Health (2016), available at

7 http://ehjournal.biomedcentral.com/articles/10.1186/s12940-016-0117-0.

[51] *Id.*

8 [52] *Id.*

[53] *Id.*

9 [54] *Id.*

[55] *Id.*

10 [56] *Id.*

[57] *Id.*

11 [58] *Id.*

12 [59] Carey Gillam, *FDA to Start Testing for Glyphosate in Food*, TIME, Feb. 17, 2016, available at

http://time.com/4227500/fda-glyphosate-testing/?xid=tcoshare.

13 [60] U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-15-38, *FDA AND USDA SHOULD*

*STRENGTHEN PESTICIDE RESIDUE MONITORING PROGRAMS AND FURTHER*

14 *DISCLOSE MONITORING LIMITATIONS* (2014), available at

http://www.gao.gov/products/GAO-15-38.

15 [61] Gilliam, *supra* note 68.

[62] *Id.*; Pesticide Q&A, U.S. FOOD AND DRUG ADMINISTRATION, available at

16 https://www.fda.gov/food/foodborneillnesscontaminants/pesticides/ucm583711.htm.

[63] Philip Blenkinsop, Alissa de Carbonnel & Barbara Lewis, *European Commission to extend*

17 *glyphosate license for 18 months*, REUTERS, June 28, 2016, available at

http://www.reuters.com/article/us-health-eu-glyphosate- idUSKCN0ZE25B.

18 [64] Arthur Neslen, *EU States rebel against plans to relicense weedkiller glyphosate*, THE

19 GUARDIAN, Mar. 4, 2016, available at

https://www.theguardian.com/environment/2016/mar/04/eu-states-rebel-against-plans-to-

20 relicense-weedkiller-glyphosate.

[65] *Id.*

21 [66] Arthur Neslen, *Vote on controversial weedkiller's European license postponed*, THE

GUARDIAN, Mar. 8, 2016, available at

22 https://www.theguardian.com/environment/2016/mar/08/eu-vote-on-controversial-weedkiller-

23 licence- postponed-glyphosate.

24 COMPLAINT FOR DAMAGES
Page 56 of 57

25

♦ HOGUE LAW FIRM ♦
1106 N. Washington St., Ste. B
Spokane, WA 99201
509.252.5058

1

2  [67] *Id.*

3  [68] Manon Flausch, *Commission prolongs glyphosate license by 18 months*, EURACTIV, June 29, 2016, available at https://www.euractiv.com/section/agriculture-food/news/commission-prolongs-glyphosate-licence-by-18-months/.

4  [69] Arthur Neslen, *Controversial chemical in Roundup weedkiller escapes immediate ban*, THE GUARDIAN, June 29, 2016, available at

5  https://www.theguardian.com/business/2016/jun/29/controversial-chemical-roundup- weedkiller-escapes-immediate-ban.

6  [70] Sarantis Michalopoulos, *EU agrees ban on glyphosate co-formulant*, EURACTIV, July 11, 2016, available at https://www.euractiv.com/section/agriculture-food/news/eu-agrees-ban-on-glyphosate-co-formulant/.

7

8  [71] Caterina Tano, *German vote swings EU decision on 5-year glyphosate renewal*, November 27, 2016, available at https://euobserver .com/environment/140042.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24  COMPLAINT FOR DAMAGES
Page 57 of 57

25

♦ HOGUE LAW FIRM ♦
1106 N. Washington St., Ste. B
Spokane, WA 99201
509.252.5058