# U.S. District Court
## North Carolina Middle District (NCMD)
## CIVIL DOCKET FOR CASE #: 1:19-cv-01153
## Internal Use Only

| | |
|---|---|
| COCKERHAM et al v. MONSANTO COMPANY et al | Date Filed: 11/21/2019 |
| Assigned to: | Jury Demand: Plaintiff |
| Cause: 28:1332 Diversity-Product Liability | Nature of Suit: 245 Tort Product Liability |
| | Jurisdiction: Diversity |

**Plaintiff**

**AMAJ COCKERHAM**          represented by  **JOEL M. BONDURANT , JR.**
BONDURANT LAW FIRM
11330 VANSTORY DRIVE
HUNTERSVILLE, NC 28078
864-240-3220
Fax: 864-240-3336
Email:
jmbondurant@bondurantlawfirm.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JUANITA COCKERHAM**          represented by  **JOEL M. BONDURANT , JR.**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**MONSANTO COMPANY**

**Defendant**

**BAYER AG**

**Defendant**

**BAYER CORPORATION**

| Date Filed | # | Docket Text |
|---|---|---|
| 11/21/2019 | 1 | COMPLAINT against All Defendants (Filing fee $ 400 receipt number 0418-2700793), filed by AMAJ COCKERHAM, JUANITA CICKERHAM. (BONDURANT, JOEL) (Entered: 11/21/2019) |

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| AMAJ COCKERHAM, and | ) | |
| JUANITA COCKERHAM, | ) | |
| | ) | |
| *Plaintiffs*, | ) | Case No. |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| MONSANTO COMPANY; | ) | |
| BAYER AG; BAYER | ) | |
| CORPORATION, | ) | |
| | ) | |
| *Defendants.* | ) | |

## **COMPLAINT**

Plaintiffs, Amaj "Joe" Cockerham and Juanita Cockerham, bring this action against Defendants Monsanto Company, Bayer AG, and Bayer Corporation (collectively "Monsanto" or "Defendants"), and allege as follows:

## **INTRODUCTION**

1.     This is a civil action for damages suffered by Plaintiffs as a direct and proximate result of Defendants' negligence and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, sale and/or application of glyphosate-containing products.

## JURISDICTION AND VENUE

2.     Federal diversity jurisdiction in this Court is proper under 28 U.S.C. § 1332 because Plaintiffs at all relevant times hereto were citizens of North Carolina, a different state than the Defendants' states of citizenship (Delaware, Missouri and Germany), and the aggregate amount in controversy exceeds $75,000, exclusive of interest of costs.

3.     This Court has personal jurisdiction over Defendants because Defendants know or should have known that its Roundup® products are sold throughout the State of North Carolina, and, more specifically, caused Roundup to be sold to consumers in the State of North Carolina, including but not limited to Plaintiff Joe Cockerham.

4.     In addition, Defendants maintain sufficient contacts with the State of North Carolina such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice and is otherwise consistent with the Constitution.

5.     Venue is proper within this District under 28 U.S.C. § 1391(b)(2) because Defendants, as corporate entities, are deemed to reside in any judicial district in which they are subject to personal jurisdiction, and a substantial part of the events or omissions giving rise to this claim occurred in this judicial District.

6.     A transfer order, pertaining to Roundup related actions, has been issued

by the United States Judicial Panel on Multidistrict Litigation. *In re: Roundup Products Liability Litigation*, MDL No. 2741. The Order transfers related/tag along actions pending outside the Northern District of California to the Northern District of California for coordinated or consolidated pretrial proceedings.

## PARTIES

7.    At all times material, Plaintiffs Joe and Juanita Cockerham were and are citizens of North Carolina. Plaintiffs currently reside in Elkin, North Carolina, which is in Surry County. After exposure to Roundup for a number of years beginning in or around 2000, Plaintiff Joe Cockerham was diagnosed with diffuse large B-cell lymphoma (a form of non-Hodgkin lymphoma ("NHL")).

8.    "Roundup" refers to all formulations of Defendants' roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak Herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k Herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quickpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup

Ready- to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Week & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, RangerPro Herbicide, or any other formulation containing the active ingredient glyphosate.

9.     At all times material hereto, Defendant Monsanto Company was a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri. Monsanto was the entity that discovered the herbicidal properties of glyphosate and manufactured Roundup, which contains the active ingredient glyphosate, as well as other "inert" ingredients.

10.     At all times material, Defendant Bayer AG was a corporation organized under the laws of Germany with its principal place of business in Leverkausen, Germany. At all times material, Defendant Bayer Corporation was the American subsidiary of Bayer AG. Bayer Corporation was a Delaware corporation with its headquarters and principal place of business in Pittsburgh, Pennsylvania. On June 7, 2018, Bayer announced that it had successfully completed its acquisition of Monsanto. Consequently, Bayer is potentially liable for Monsanto's misconduct, depending on how the deal is structured and how it is being implemented (all of which is beyond Plaintiffs' knowledge).  For purposes of this Complaint, Bayer AG, Bayer Corporation

and the Monsanto Company will be collectively referred to as "Monsanto" or "Defendants."

## FACTS

11.    Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

12.    Glyphosate is the active ingredient in Roundup.

13.    Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce, or by milling, baking or brewing grains.

14.    For nearly 40 years, farms across the world have used Roundup without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup, it touted glyphosate as a technological breakthrough that could kill almost every weed without causing harm to people or the environment. However, history has shown that not to be true. According to the WHO, the main chemical ingredient in Roundup - glyphosate – is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup, such as garden center workers, nursery workers, and landscapers. Agricultural works are, once again, victims of corporate greed. Monsanto assured the public that Roundup was harmless. In order to prove this, Monsanto has championed falsified data and has attacked

legitimate studies that revealed Roundup's dangers. Monsanto has led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup is safe.

### The Discovery of Glyphosate and the Development of Roundup

15.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup. From the outset, Monsanto marketed Roundup as a "safe" general-purpose herbicide for widespread commercial and consumer use. It still markets Roundup as safe today.[1]

16.     In addition to the active ingredient glyphosate, Roundup formulations also contain adjuvants and other chemicals, such as the surfactant POEA, which are considered "inert" and therefore protected as "trade secrets" in manufacturing. Growing evidence suggests that these adjuvants and additional components in Roundup formulations are not inert, and in fact are toxic in their own right.

### Registration of Herbicides Under Federal Law

17.     The manufacture, formulation, and distribution of herbicides such as Roundup are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq*. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to

---

[1] Monsanto/Bayer, *Is Glyphosate Safe?* (last updated June 10, 2019), https://www.bayer.com/en/is-glyphosate-safe.aspx.

their distribution, sale or use, except as described by the Act. 7 U.S.C. § 136a(a).

18.     Because pesticides are toxic to plants, animals and humans, at least to some degree, the EPA requires as part of the registration process a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that the use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

19.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or a pesticide be allowed to continue to be sold in commerce.

20.     The EPA and, on information and belief, the State of North Carolina registered Roundup for distribution, sale and manufacture in the United States and the State of North Carolina.

21.     FIFRA generally requires that the registrant, Monsanto in the case of

Roundup, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

22.     Based on early studies showing that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

23.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed fraud.

24.     In the first instance, Monsanto, in seeking initial registration of Roundup by the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate

pesticide toxicology studies relating to Roundup. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup.

25.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

26.     Three top executives at IBT were convicted of fraud in 1983.

27.     In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

28.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup in over 100 countries.

### *The Importance of Roundup to Monsanto's Market Dominance and Profits*

29.     The success of Roundup was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. Because Monsanto's patent for glyphosate was set to expire in the United States in the year 2020, Monsanto needed a strategy to maintain its Roundup market dominance and to ward off impending competition.

30.     In response, Monsanto began the development and sale of genetically-engineered Roundup Ready seeds in 1996. Since Roundup Ready crops are resistant to glyphosate, farmers can spray Roundup onto their fields during the growing season without banning the crop. This allowed Monsanto to expand its market for Roundup even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready seeds. It also secured Monsanto's dominant share of the glyphosate/ Roundup market through a marketing strategy that coupled proprietary Roundup Ready seeds with continued sales of its Roundup herbicide.

31.     Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready seeds, Roundup became Monsanto's most profitable product.  In 2000, Roundup accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half

of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

### *Monsanto's Knowledge About the Toxicity of Roundup*

32.     Since Roundup was introduced to the market, Monsanto has made broad claims through its advertising and promotional materials that its products are safe, non-toxic, and rigorously tested. But, in reality, the company hardly tested the real-world toxicity of its products, actively avoided pursuing studies which might show unwelcomed results, and ghostwrote studies of supposedly independent scientists.

33.     The first valid chronic oncogenicity study on glyphosate was submitted to the EPA in 1983 (the Bio/dynamic mouse study). It showed an increase in renal tubular adenomas in the male mice that Monsanto claimed was not treatment-related. The EPA disagreed and classified glyphosate as a "possible human oncogene" in 1985.

34.     Monsanto challenged the EPA's determination through multiple avenues for years, leading to an EPA request for Monsanto to do a new and better study. A Scientific Advisory Panel convened by the EPA to provide guidance in resolving the controversy over the 1983 Bio/dynamic study called for a repeat study. The EPA adopted the SAP's advice and required a repeat mouse study in its 1986 Registration Standard document on glyphosate. Monsanto refused to conduct it and, upon information and belief, has not done so to this day.

35.     The 1986 glyphosate Registration Standard document issued by the EPA

required Monsanto to add several commonsense worker-safety provisions onto Roundup product labels (e.g. wear gloves, chemical resistant shoes and goggles or a face shield when applying Roundup; discard clothes that are drenched; wash clothes separately from other laundry). Monsanto refused to add the majority of these provisions to their product labels.

36.     Monsanto has refused since the mid-1980s to conduct the studies needed to resolve uncertainty over the oncogenicity of Roundup, including studies specifically requested by the EPA. The failure of Monsanto to invest in new and better science, such as the more powerful mouse cancer replacement study requested by the EPA in 1986, has perpetuated scientific uncertainty and undermined the EPA's ability to understand and quantify the health risks of Roundup.

37.     Dr. Donna Farmer, a senior Monsanto scientist, wrote the following to a Monsanto communications professional: "You cannot say that Roundup is not a carcinogen . . . we have not done the necessary testing on the formulation to make that statement. The testing of the formulations are not anywhere near the level of the [testing on] the active ingredient."[2]

38.     In the same email, Dr. Farmer warned that Monsanto "cannot support the statement" that Roundup produces "no adverse effects whatsoever on flora, or

---

[2] Email dated November 22, 2003; available at http://baumhedlundlaw.com/pdf/monsanto- documents/27-Internal-Monsanto-Email-You-Cannot-Say-That-Roundup-is-not-a- Carcinogen.pdf.

fauna or on the human body.'" This is because, as Dr. Farmer explained, "[a]dverse effects are seen on flora (glyphosate is meant to kill vegetation), adverse effects on fauna – in studies with laboratory animals – even death is seen (LD50 studies for example) and in humans – mild reversible eye and skin irritation are seen with normal use and death can occur in suicide attempts."[3]

39.    In addition to the active ingredient glyphosate, surfactants are added to Roundup products to speed up the movement of glyphosate through weed leaf surfaces, and then into the cells of weeds. Roundup surfactants act roughly the same way when Roundup comes into contact with human skin. In other words, the formulation penetrates human skin, making Roundup markedly more toxic to exposed humans than glyphosate alone.

40.    Studies have shown that formulated Roundup is more toxic than pure, 100% technical glyphosate. Most of the surfactants in Roundup-brand herbicides are even more toxic, ounce for ounce, than glyphosate. Plus, pure glyphosate does not move as readily through the skin or into cells, whereas Roundup does.

---

[3] Email dated November 22, 2003; available at http://baumhedlundlaw.com/pdf/monsanto- documents/27-Internal-Monsanto-Email-You-Cannot-Say-That-Roundup-is-not-a- Carcinogen.pdf.

41.     Despite knowledge of the differences in toxicity and risks arising from exposures to formulated Roundup in contrast to pure glyphosate, Monsanto has not carried out critical, long-term cancer feeding studies with Roundup.

42.     Monsanto has refused to conduct state-of-the-art genotoxicity assays in mammals and in human populations exposed to formulated Roundup.

43.     In 1999, Monsanto hired Dr. James Parry, a world-renowned genotoxicity expert, to advise the company on what steps it should take to better understand and respond to public literature studies reporting evidence of a genotoxic response following exposures to glyphosate and/or a glyphosate-based herbicide. Dr. Parry identified several deficiencies in the available data on glyphosate. For one, he explained there is "[n]o adequate in vitro clastogenicity data available for glyphosate formulations." He thus recommended that Monsanto "provide comprehensive in vitro cytogenetic data on glyphosate formulations." He also concluded, "[m]y overall view is that if the reported genotoxicity of glyphosate and glyphosate formulations can be shown to be due to the production of oxidative damage then a case could be made that any genetic damage would be thresholded . . . it may be necessary to consider the possibility of susceptible groups within the human population."

44.     In total, Dr. Parry provided Monsanto with 11 specific recommendations for further genotoxicity research. Monsanto refused to conduct new studies in 9 of the 11 areas.  In a September 1999 email, Monsanto's chief of regulatory science, William

Heydens, wrote to his Monsanto colleagues after reading Dr. Parry's report on glyphosate. In his correspondence, Heydens stated: "We want to find/develop someone who is comfortable with the genetox profile of glyphosate/ Roundup and who can be influential with regulators and Scientific Outreach operations when genetox issues arise. My read is that Parry is not currently such a person, and it would take quite some time and $$$/studies to get him there. We simply aren't going to do the studies Parry suggests."

45..In another email the same month, Monsanto executive Stephen Wratten said he was "disappointed in the Parry report," asking "[h]as he ever worked with industry before on this sort of project?" Later in the same email, Wratten intoned that the Parry report is not useful for Monsanto: "I do not see that he has stuck his neck out on anything at all controversial, and therefore, there is little value in the write-up as written that could be useful. Hope it didn't cost much."

46.     Later on, in the same email chain, Monsanto toxicologist Donna Farmer discussed the fallout from Dr. Parry's report on glyphosate with her colleagues. She wrote: "right now the only person I think that can dig us out of this 'genetox hole' is the Good Dr. Kier… I am concerned about leaving Perry [sic] out there with this as the final projection/his final impressions."

47.     In correspondence, Monsanto personnel expressed reluctance to conduct studies on glyphosate, Roundup formulations, or surfactant ingredients, suggesting Monsanto was concerned about the results it would find if it did the tests. In a

September 1999 email, for example, Stephen Wratten criticized the Parry report by noting that "of course" Monsanto knew there was no data to support points it wanted to make relating to Roundup's genotoxicity, and Monsanto scientists "didn't need [Dr.Parry] to tell [them] that." What Monsanto wanted Dr. Parry to do (instead of suggesting additional independent and rigorous testing) was to argue against the reliability of independent studies that were bad for Monsanto's bottom line.

48.     In another email from 1999, Dr. Farmer resisted the suggestion that the company do additional studies on the genotoxicity of Roundup, including formulations or other surfactant ingredients.

49.     Other internal correspondence demonstrates that some of Monsanto's executives were concerned about the safety of Roundup and results that would be obtained if Roundup were rigorously tested according to Parry's recommendations. One Monsanto scientist wrote in 2001: "If someone came to me and said they wanted to test Roundup I know how I would react – with serious concern."

50.     Comments made by other Monsanto executives indicate their awareness that glyphosate becomes toxic when mixed with other ingredients. Thus the formulated product - Roundup - is more toxic than its active ingredient. In 2002, William Heydens and Donna Farmer discussed various studies observing adverse effects by the formulated Roundup product. Specifically, Farmer acknowledged: "[t]he interest point is glyphosate all basically had no effect the formulated product did – does this point

us to the coformulants – surfactants? [sic]" Heydens also admitted, after discussing with Monsanto consultant John DeSesso, that "we are in pretty good shape with glyphosate but vulnerable with surfactants ......................What I've been hearing from you is that this continues to be the case with these studies – Glyphosate is OK but the formulated product (and thus the surfactant) does the damage."

51.     Despite Monsanto's longstanding awareness of the danger of the formulated product, and the damage caused by the addition to Roundup of the surfactants in particular, Bayer-Monsanto's website continues to advertise, to this day, that "[t]here is an extensive body of research on glyphosate and Bayer's glyphosate-based herbicides . . . which confirms these products can be used safely and that glyphosate is not carcinogenic."[4]

52.     Rather than conduct the more sophisticated genotoxicity studies recommended by Dr. Parry and others, Monsanto instead commissioned members of its third-party network of glyphosate-friendly scientists to write and publish articles arguing that evidence of genotoxicity in public literature studies is the result of flawed study designs, excessive dose levels, inappropriate routes of administration, overt toxicity, or other technical problems. Many of these reviews were ghost-written by Monsanto scientists not listed among the co-authors. "Ghost-writing" refers to

---

[4] Glyphosate's Impact on Human Health and Safety, available at https://www.bayer.com/en/glyphosate-impact-on-human-health-and-safety.aspx (last visited August 16, 2019).

contributions to a written document by a person not listed as an author, or among the co-authors of the document. The practice is considered to be serious ethical misconduct.

53.     Monsanto made heavy use of supposedly independent scientists in its "Scientific Outreach" and PR campaigns in support of the safety of glyphosate and Roundup-brand herbicides. In some instances, such individuals were appointed to an ad hoc, or standing advisory committee or panel. In other cases, they simply worked on a fee-for-service basis on a defined task. Many of these glyphosate-friendly experts had once worked for Monsanto.  Many have authored or co-authored papers commissioned and paid for by Monsanto. Most of these papers contained passages ghost-written by Monsanto scientists, and some were largely ghost- written by Monsanto.

54.     As far back as 1999, Monsanto was operating behind the scenes to influence the science and bolster the public perception of the safety of glyphosate and Roundup.  William Heydens, the Monsanto executive who spearheaded Monsanto's manipulation of the scientific literature via ghostwriting, wrote in a May 1999 email that Monsanto's plan for scientific outreach planning involved maintaining a cohort of "outside scientific experts who are influential at driving science, regulators, public opinion, etc. We would have they [sic] people directly or indirectly/behind-the-scenes work on our behalf."

55.     Heydens succinctly summarized Monsanto's goal: to encourage "people to get up and shout Glyphosate is Non-toxic."

56.     The more formal statement of the "Overall purpose" of Monsanto's "Glyphosate Scientific Outreach Plan" (SO Plan) appears at the beginning of a June 1999 document: "Ensure that Monsanto's glyphosate-containing herbicides are widely viewed throughout the scientific community as posing no threat to human health or environment. This support [from third-party network experts] will be used to favorably influence current and future possible challenges in the regulatory and public arena."

57.     The unconditional statement in the above-quoted paragraph – "no threat to human health or the environment" – stands in sharp contrast to the more nuanced statements by scientists Monsanto itself commissioned to review the genotoxicity or oncogenicity literature, or by the EPA. No scientist has been willing to say that Roundup poses no threat to human health. For example, Kier and Kirkland, two Monsanto-commissioned scientists, concluded in a 2013 review of glyphosate genotoxicity that "Glyphosate and typical [glyphosate-based herbicides] do not appear to present a significant genotoxic risk under normal conditions of human or environmental exposures." The scientists do not rule out the possibility of some genotoxic risk from exposures to glyphosate-based herbicides under normal conditions, nor the possibility of significant genotoxic risk in the event of unusually high glyphosate-based herbicide exposure episodes.

58.     Over the years, Monsanto systematically attacked scientists whose

research threatened their profits. For example, in an April 2001 email, Heydens warned his colleagues that "[d]ata generated by academics has always been a major concern for us in the defense of our products."

59.   In an email from October 2008, Dean Nasser, a Monsanto employee, sent his colleagues a study published in Beyond Pesticides entitled "Study Shows Herbicides Increase Risk of Non-Hodgkin's Lymphoma," showing the link between glyphosate and non-Hodgkin's lymphoma.

60.   Dr. Farmer, one of the recipients, responded: "We have been aware of this paper for awhile [sic] now and knew it would only be a matter of time before the activists pick it up . . . how do we combat this?"

61.   In 2012, Monsanto executives discussed their efforts to retract a paper written by Professor Seralini in the journal Food and Chemical Toxicology, which pertained to the biological plausibility of glyphosate as a human carcinogen – a conclusion adverse to Monsanto's commercial agenda. Specifically, Monsanto executives galvanized scientists to send letters to the magazine's Editor-in-Chief seeking retraction of the Seralini study. In correspondence from September 2012, Monsanto employee Dr. Goldstein stated: "I was uncomfortable even letting shareholders know we are aware of this LET . . . it implies we had something to do with it- otherwise how do we have knowledge of it? I could add 'Aware of multiple letters to editor including one signed by 25 scientists from 14 countries' if you both

think this is OK." He added that he was being asked "to keep internal correspondence down on this subject."

62.    In response, Eric Sachs said: "We are 'connected' but did not write the letter or encourage anyone to sign it."

63.    In a document outlining the "Business Goals" of Monsanto employee David Saltmiras for the fiscal year 2013, Dr. Saltmiras wrote: "Throughout the late 2012 Seralini rat cancer publication and media campaign, I leveraged my relationship with Editor in Chief of the publishing journal, Food and Chemical Toxicology and was the single point of contact between Monsanto and the Journal." Moreover, Dr. Saltmiras acknowledged that he "[s]uccessfully facilitated numerous third party expert letters to the editor which were subsequently published, reflecting the numerous significant deficiencies, poor study design, biased reporting and selective statistics employed by Seralini."

64.    In multiple other letters and correspondence, Monsanto has expressed its intent to attack independent scientists who raised concerns about the toxicity of its products.

65.    In late 2014, the International Agency for Research on Cancer (IARC) announced that it was recommending dozens of pesticides for evaluation, including glyphosate. When the IARC review was announced, Monsanto's Donna Farmer wrote to former employee, John Acquavella, in an email dated September 19, 2014: "Just

wanted to let you know that what we have long been concerned about has happened. [sic] Glyphosate is on for an IARC review in March 2015." Farmer then wrote: "Glyphosate had been listed as a medium priority for 2015- 2016 but clearly something happened and it got *moved* up to ultra priority."

66.     Monsanto not only anticipated the carcinogenic classification for glyphosate and glyphosate-based formulations, but pro-actively sought to combat the expected result by engaging supposed third-party academics who acted on Monsanto's behalf as purportedly "independent" experts in signing onto Monsanto ghostwritten reports which were then published in leading toxicology journals and in the media.

67.     In an email dated February 19, 2015, one month prior to the release of the IARC report on glyphosate, Monsanto executive William Heydens proposed that the company "ghost- write" sections of a paper on Roundup's toxicity. In the email, Heydens wrote that they would "add Greim and Kier or Kirkland to have their names on the publication, but we would be keeping the cost down by us doing the writing and they would just edit & sign their names so to speak." Heydens also wrote that this is how Monsanto had "handled" an earlier paper on glyphosate's safety.

68.     As discussed more fully in the following section, the IARC released its findings in March 2015. The report classified Roundup as "probably carcinogenic." After the release of the IARC report, Monsanto set to work on a campaign to influence the press and public perception regarding the safety of its products. Again, the campaign involved ghostwriting drafts of articles that would appear in respected news

magazines.  In an email dated March 12, 2015, Eric Sachs of Monsanto asked Henry Miller, a Forbes contributor and fellow of the Standford Hoover Institute, to write about the IARC "process and controversial decision" to classify Roundup as probably carcinogenic. Mr. Miller responded that he would be willing to assist Monsanto if he "could start from a high-quality draft." In response, Monsanto informed Mr. Miller that Monsanto already had "a draft nearly done" that it would send to Mr. Miller by tomorrow.

69.     In another email dated May 11, 2015 and entitled "RE: Post-IARC Activities to Support Glyphosate," Heydens wrote that Monsanto would ghost-write a manuscript refuting the animal data cited by the IARC, noting that the manuscript "would be more powerful if authored by non-Monsanto scientists (e.g. Kirkland, Kier, Williams, Greim, and maybe Keith Solomon)."

70.     After the IARC report came out, Monsanto also organized an ostensibly independent "Expert Panel" for the purpose of conducting an evaluation of the IARC data. But the Expert Panel was anything but an independent collection of neutral scientists rendering an opinion on the toxicity of glyphosate. The conclusions of the Expert Panel were substantially edited and/or authored by Monsanto's own executives.

71.     The question of the ethical permissibility of ghostwriting arose when, in the course of assigning authorship, a member of the Expert Panel and former Monsanto employee, John Acquavella, was excluded from a poster planned for a 2015 Society for Risk Analysis meeting. In response, Heydens wrote in an email to Acquavella dated

November 3, 2015: "I thought we discussed previously that it was decided by our management that we would not be able to use you or Larry [Kier] as Panelists/authors because of your prior employment at Monsanto . . . ." Acquavella responded: "I didn't realize that Bill. Also, I don't think that will be okay with my panelists. We call that ghost writing and it is unethical." In another email to Heydens in the same chain, Acquavella wrote: "I can't be part of deceptive authorship on a presentation or publication. Please note the ICJME guidelines below that everyone goes by to determine what is honest/ethical regarding authorship."

72.     These concerns did not stop Monsanto from continuing to influence and author reviews on the safety of glyphosate, while advertising the work as independent. In July 2016, the journal Critical Reviews in Toxicology published, "A review of the carcinogenic potential of glyphosate by four independent expert panels and comparison to the IARC assessment." Sixteen scientists signed their names to the published work, declaring to readers that their conclusions were free of Monsanto's intervention. Underscoring the supposed independence of the work, the declaration of interest section of the published review stated: "Neither any Monsanto company employees nor any attorneys reviewed any of the Expert Panel's manuscripts prior to submission to the journal." This was false. Internal Monsanto documents reveal that Heydens not only reviewed the manuscripts but had a hand in drafting and editing them. The finished papers were aimed directly at discrediting IARC's classification. In one internal email, Heydens told the organizer of the panel: "I have gone through

the entire document and indicated what I think should stay, what can go, and in a couple spots I did a little editing."

73.     Internal Monsanto documents show that Heydens even argued over statements that he wanted included but that John Acquavella deemed "inflammatory" and "not necessary" criticisms of the IARC. Heydens' edits to draft documents contradicted Acquavella, even though Heydens was not supposed to have even reviewed the papers. Heydens went so far as to state: "I would ignore John's comment: and "I don't see a reason for deleting the text that John did below."

74.     The scientific literature is littered with ghostwritten papers declaring Roundup and glyphosate to be safe. Through its ghostwriting campaigns, Monsanto sought to hide or discredit independent research showing that its products were hazardous to human health. All the while, Monsanto advertised its products as completely safe and non-toxic to an unsuspecting public.

## **False Representations Regarding the Safety of Roundup**

75.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds and fish. Among the representations the NY AG found deceptive and misleading about the safety of glyphosate and/or Roundup to

humans and the environment are the following:

a. "Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences"

b. "And remember that Roundup is biodegradable and won't build up in soil. That will give you the environmental confidence you need to use Roundup everywhere you've got weed, brush, edging or trimming problem."

c. "Roundup biodegrades into naturally occurring elements."

d. "Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e. "This non-residual herbicide will not wash or leach in the soil. It…stays where you apply it."

f. "You can apply Accord with confidence because it will stay where you put it . . . it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products."

g. "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

h. "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

i. "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

j. "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

76.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

  a. Its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

  b. Its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed, or sold by Monsanto are biodegradable.

  c. Its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

  d. Its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristic."

  e. Glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides.

  f. Its glyphosate-containing pesticide products or any component thereof might be classified as "practically non-toxic."

77.    Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief it still has not done so today.

## IARC Classification of Glyphosate

78.    On March 15, 2015, the International Agency for Research on Cancer (IARC), an agency of the World Health Organization (WHO), issued an evaluation of

several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposure to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic to humans.

79.    On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and dates relating to glyphosate exposure in humans.

80.    The IARC process for the classification of glyphosate followed IARC's stringent procedures for the evaluation of a chemical agent. Evaluations are performed by panels of international experts, selected based on their expertise and the absence of actual or apparent conflicts of interest.

81.    In preparing its monograph, a Working Group of 17 experts from 11 countries met at IARC from March 3-10, 2015 to assess the carcinogenicity of certain herbicides, including glyphosate.

82.    The March meeting culminated a nearly one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence.

83.    Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily

used herbicide in the world in 2012.

84.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

85.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

86.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma and several subtypes of non-Hodgkin's lymphoma, and the increased risk persisted after adjustment for other pesticides.

87.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

88.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

89.     In addition, the IARC Working Group found that glyphosate and

glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

90.     The IARC Working Group noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

91.     Additionally, the IARC Working Group reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and Georgia. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and multiple myeloma, hairy cell leukemia (HCL), and chronic lymphocytic leukemia (CLL), in addition to several other cancers.

92.     The IARC evaluation confirms that glyphosate is toxic to humans.

93.     Nevertheless, since it began selling Roundup, Monsanto has represented it as safe to humans and the environment. Monsanto has repeatedly proclaimed, and continues to proclaim, that glyphosate-based herbicides, including Roundup, create no unreasonable risk to human health or to the environment.

94.     In a document titled "Glyphosate/ Roundup in the News, Safety Information" issued on March 27, 2017, Monsanto disputed the findings of the IARC

and stated the following: "All labeled uses of glyphosate are safe for human health and supported by one of the most extensive worldwide human health databases ever compiled on a pesticide."[5]

## The EPA's Review of Glyphosate

95.    On September 12, 2016, the EPA's Office of Pesticide Program ("OPP") submitted a report, titled "Glyphosate Issue Paper: Evaluation of Carcinogenic Potential," wherein it issued a "proposed conclusion" that glyphosate is "not likely to be carcinogenic to humans at doses relevant to human health risk assessment."[6]

96.    The report is based upon a review of industry-sponsored articles and studies. The OPP acknowledged that it rejected all studies that considered Roundup - the formulated product – instead of studies that isolated glyphosate because "[g]lyphosate formulations contain various components other than glyphosate and it has been hypothesized these components are more toxic than glyphosate alone."[7]

97.    Thus the OPP notes that dozens of studies considered by IARC were not reviewed by the OPP because the OPP's "evaluation focused on studies on the active

---

[5] Glyphosate/ Roundup in the News, Safety Information, available at http://www.monsantoito.com/docs/Glyphosate_IT_O_Briefing.pdf (last visited September 11, 2019).
[6] Glyphosate Issue Paper: Evaluation of Carcinogenic Potential, EPA's Office of Pesticide Program, September 12, 2016, available at https://www.epa.gov/sites/production/files/2016-09/documents/glyphosate_issue_paper_evaluation_of_carcincogenic_potential.pdf (last visited September 11, 2019).
[7] Id.

ingredient glyphosate" and "additional research could also be performed to determine whether formulation components, such as surfactants, influence the toxicity of glyphosate formulations."[8]

98.    The OPP draft assessment does not actually consider how glyphosate, in conjunction with other chemicals, affects not only carcinogenicity but other physical injuries and illnesses.

## Plaintiff's Exposure to Roundup

99.    Plaintiff Joe Cockerham is 83 years old.

100.    Plaintiff Joe Cockerham was exposed to Roundup in North Carolina for several years, beginning approximately in or around the year 2000.  Plaintiff Joe Cockerham suffered this exposure primarily while regularly spraying Roundup in his yard and his surrounding property or properties for residential and/or other personal purposes such as lawn care.

103.    In or around late November of 2018, Plaintiff Joe Cockerham was diagnosed with diffuse large B-cell lymphoma (a form of non-Hodgkin's lymphoma (NHL)).  He received all treatment and diagnosis from the VA Hospital and from Wake Forest Baptist Health.  He was required to undergo chemotherapy treatment and to endure all of the attendant physical, mental, and emotional pain and suffering that goes along with it.

---

[8] Id.

104.    Plaintiff Joe Cockerham has suffered the effects of NHL as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup and Defendants' wrongful and negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing and sale of Roundup.

105.    As a direct and proximate result of these injuries, Plaintiff Joe Cockerham has incurred medical expenses, will incur additional future expenses, and has endured and will continue to endure pain and suffering and loss of enjoyment of life, and Plaintiff Joe Cockerham has otherwise been damaged in a personal and pecuniary nature.

106.    During the entire time that Plaintiff Joe Cockerham was exposed to Roundup, he did not know that exposure to Roundup was injurious to his health or the health of others, nor could he have known that.  Defendant knew but did not disclose it to Plaintiffs or any of the rest of the consuming public.

## FIRST CAUSE OF ACTION
## PRODUCTS LIABILITY – CHAPTER 99B

107.    Plaintiffs incorporate by reference each and every allegation set forth in paragraphs 1 through 116 as if fully stated herein.

108.    Plaintiff brings this strict products liability claim against Defendants for design defect, manufacturing defect and failure to warn.  Specifically, as elaborated upon more fully herein, Defendants' failed to adhere to the applicable standard of care and to otherwise satisfy the legal obligations imposed on them under Chapter 99B of

the North Carolina General Statutes.  Specifically, and without limitation, Defendants violated Sections 99-5, and 99-6.

109.    Monsanto designed, developed, manufactured, marketed, tested, assembled, labeled, distributed, sold, advertised, promoted, and placed into the stream of commerce Roundup products, which are defective and unreasonably dangerous, and to which Plaintiff Joe Cockerham was exposed. Monsanto knew or reasonably should have foreseen that the ultimate users, customers, consumers, and persons exposed to Roundup products could not properly inspect for defects or dangers and that the detection of such defects or dangers could be beyond the capabilities of such persons.

110.    At all times relevant to this litigation, Defendants' Roundup products as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed were defective and unreasonably dangerous in a manner that was dangerous for use by or exposure to the public, and in particular, the Plaintiff.

111.    Defendants' Roundup products, at the time they left Defendants' control and were placed in the stream of commerce, had been manufactured defectively and designed defectively because they were in a condition that was unreasonably dangerous to the users and persons in the vicinity of the product; Roundup had been designed defectively because it failed to perform as safely as an ordinary consumer or customer would expect when used as intended or when used in a manner reasonably foreseeable by the manufacturer; Roundup had been designed defectively because the

risk of danger in its design and formulation outweighed its benefits, and because there were alternative, safer designs and formulations that were feasible; and Roundup was defective because the foreseeable risks of harm from Roundup could have been reduced or avoided by providing reasonable instructions or warnings, yet no such instructions or warnings were given. Specifically, Roundup was defective and unreasonably dangerous when placed in the stream of commerce for one or more of the following reasons:

    a.   It was defective in design and formulation and dangerous to an extent beyond that which an ordinary consumer or customer would contemplate;

    b.   It was unreasonably dangerous in that it was hazardous and posed a grave risk of serious illness when used in a reasonably anticipated manner;

    c.   It was otherwise designed in a way that exposed persons to unnecessary and unreasonable risks, including by failing to provide adequate safeguards to protect persons exposed to foreseeable injuries;

    d.   Monsanto failed to adequately test, investigate and/or study Roundup products, including both its active ingredient glyphosate and any other ingredients, to ensure their safety;

    e.   Exposure to Roundup products presents a risk of harmful side effects that outweigh any potential utility stemming from use;

    f.   Monsanto knew or should have known at the time of marketing its Roundup products that exposure to Roundup products could result in severe injuries and illness;

g.  Monsanto did not conduct adequate post-marketing surveillance of its Roundup products;

h.  Monsanto could have employed safer alternative designs and formulations;

i.  Monsanto failed to use due care in the manufacturing and formulation of Roundup products;

j.  Monsanto failed to use due care in warning of the risks associated with use of and exposure to Roundup products;

k.  Monsanto failed to use due care in minimizing the dangers to users, consumers and persons exposed to Roundup products, and to those who would foreseeably use or be harmed by Roundup products;

l.  Monsanto failed to provide adequate warnings or instructions concerning the dangerous characteristics of Roundup and/or the full and complete risks of exposure to Roundup and glyphosate-containing products;

m.  Monsanto failed to adequately label, market and promote Roundup products to ensure that such products did not cause persons exposed to them to suffer from unreasonable and dangerous risks; and

n.  Monsanto failed to give appropriate warnings about other risks of which Monsanto knew or should have known are involved in the reasonably foreseeable use of Roundup products.

o.  Monsanto failed to satisfy its continuing duty to provide warnings and information to consumers about Roundup, as required by N.C. Gen. Stat. § 99B-5(a)(2).

112.  The defects described above rendered Roundup unreasonably dangerous by making it dangerous to an extent beyond that which would be contemplated by the

Page 36 of 49

ordinary consumer or customer with the knowledge common to the community as to its characteristics.

113.   The defects in Roundup products were present when Monsanto placed it into the stream of commerce. Roundup products reached the intended customers, consumers, handlers, users and other persons coming into contact with and exposed to these products in North Carolina, including Plaintiff Joe Cockerham, without substantial change in their condition as designed, manufactured, sold, distributed, labeled and marketed by Monsanto.

114.   At all times material, Roundup products were being used in a manner intended by Monsanto, and in a manner that was reasonably foreseeable by Monsanto as involving a substantial danger not readily apparent.

115.   It was foreseeable that Plaintiff Joe Cockerham and numerous other similarly situated consumers would be exposed to Roundup products.

116.   In sum, Monsanto acted unreasonably in failing to provide warning or instruction to the consuming public, including to Plaintiff Joe Cockerham; the failure to provide adequate warning or instruction was a proximate cause of the harm for which damages are sought; and either (a) at the time the product left the control of the manufacturer or seller, the product, without an adequate warning or instruction, created an unreasonably dangerous condition that the manufacturer or seller knew, or in the exercise of ordinary care should have known, posed a substantial risk of harm

to a reasonably foreseeable claimant (such as Plaintiff Joe Cockerham), or (b) after the product left the control of the manufacturer or seller, the manufacturer or seller became aware of or in the exercise of ordinary care should have known that the product posed a substantial risk of harm to a reasonably foreseeable user or consumer like Plaintiff and failed to take reasonable steps to give adequate warning or instruction or to take other reasonable action under the circumstances.

117.    Monsanto also acted unreasonably with respect to the design and formulation of the product, and thus, considering the factors set out in N.C. Gen. Stat. § 99B-6(b), is liable to Plaintiff for the resulting damages.

118.    As a direct and proximate result of the defects of Roundup products, and the various fraudulent activities and failures of Monsanto, Plaintiff Joe Cockerham was exposed to glyphosate and other ingredients in Roundup products, causing or substantially contributing to Plaintiff's injuries – including Plaintiff's non-Hodgkin's lymphoma. But for the defects in Roundup products, Plaintiff's injuries would not have occurred.  These exposures proximately caused Plaintiff's injuries, including his NHL.

119.    Plaintiff Joe Cockerham has been damaged and claims all damages to which he is entitled, including, as applicable law may provide, but not limited to:

    a.  Bodily injury resulting in pain and suffering, disability and/or disfigurement;

    b.  Mental anguish;

    c.   Loss of capacity for enjoyment of life;

    d.   Extensive hospitalization, medical treatment and/or care which losses are either permanent or will continue; and/or

    e.   All damages available under applicable law, including but not limited to pain and suffering and punitive damages.

**SECOND CAUSE OF ACTION**
**NEGLIGENCE/ GROSS NEGLIGENCE**

120.    Plaintiffs incorporate by reference each and every allegation set forth in paragraphs 1 through 119 as if fully stated herein.

121.    Defendants, directly or indirectly, caused Roundup products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff Joe Cockerham and other similarly situated consumers.

122.    At all times relevant to this litigation, Monsanto had a duty to use reasonable care in the design, research, development, testing, assembly, packaging, manufacture, labeling, marketing, advertisement, promotion, sale and distribution of its Roundup products in order to avoid subjecting persons exposed to Roundup products to unnecessary and unreasonable risks.

123.    Monsanto's duty of care included providing accurate, true, and correct warnings concerning the potential adverse effects of exposure to Roundup products.

124.    Monsanto breached that duty by acting in a way that was reasonably careful manufacturer and designed would not act under like circumstances and by failing to take actions that a reasonably careful manufacturer and designer would take

under like circumstances. Specifically, Monsanto breached its duty of care in one or more of the following ways:

a. By manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup products without thorough and adequate pre- and post-market testing;

b. By manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup products while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate and other ingredients in Roundup products, and consequently the risk of serious harm associated with human use and exposure to Roundup;

c. By failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup products and glyphosate-containing products were safe for their intended use;

d. By failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup products so as to avoid the risk of harm associated with exposure to Roundup and/or glyphosate as an herbicide;

e. By failing to design and manufacture Roundup products so as to ensure they were at least as safe and effective as other herbicides on the market;

f. By failing to provide adequate instructions, guidelines, and safety precautions to those persons who Monsanto could reasonably foresee would use and/or be exposed to its Roundup products;

g. By failing to disclose to consumers and the general public, including

Plaintiff, that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available;

h. By failing to give appropriate warnings about other risks of which Monsanto knew or should have known are involved in the reasonably foreseeable use of and/or exposure to Roundup products;

i. By systemically suppressing or downplaying contrary evidence about the risks, incidence, and/or prevalence of the side effects of Roundup and glyphosate-containing products;

j. By representing that its Roundup products were safe for their intended use when, in fact, Monsanto knew or should have known that the products were not safe for their intended purpose;

k. By declining to make or propose any changes to Roundup products' labeling or other promotional materials that would alert consumers and the general public of the risks Roundup, glyphosate, and any other ingredients in Roundup products;

l. By advertising, marketing and recommending the use of Roundup products, while concealing and/or failing to disclose or warn of the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup, glyphosate, and any other ingredients in Roundup products;

m. By continuing to disseminate information to its consumers, which indicate or imply that Monsanto's Roundup products are not unsafe for use;

n. By continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

125.    Monsanto knew or reasonably should have foreseen that individuals

such as Plaintiff Joe Cockerham would suffer injuries as a result of Monsanto's failure to exercise reasonable care in the manufacturing, marketing, labeling, distribution, and sale of Roundup products.

126.    Plaintiff Joe Cockerham did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup or its active ingredient glyphosate.

127.    As a direct and proximate result of the negligence of Monsanto, Roundup products designed and manufactured by Monsanto caused Plaintiff's injuries, including Plaintiff's non-Hodgkin's lymphoma. Monsanto's negligence caused or substantially contributed to causing Plaintiff to suffer economic and non-economic damages. But for Monsanto's negligence, these injuries, damages and losses would not have occurred.

128.    Indeed, Monsanto's conduct far exceeds the bounds of ordinary negligence and constitutes gross negligence.

129.    Plaintiff Joe Cockerham has been damaged and claims all damages to which he is entitled, including, as applicable law may provide, but not limited to:

    a.    Bodily injury resulting in pain and suffering, disability and/or disfigurement;

    b.    Mental anguish;

    c.    Loss of capacity for enjoyment of life;

    d.    Expensive hospitalization, medical treatment and/or care which

losses are either permanent or will continue; and/or

e. All damages available under applicable law, including but not limited to damages for pain and suffering and punitive damages.

## THIRD CAUSE OF ACTION
## NEGLIGENT AND/OR FRAUDULENT MISREPRESENTATION

130.    Plaintiffs incorporate by reference each and every allegation set forth in paragraphs 1 through 129 as if fully stated herein.

131.    Monsanto is the manufacturer, designer, distributor, seller or supplier of Roundup and, while engaged in the course of such business, made representations about material facts to Plaintiff Cockerham and the public at large regarding the character and/or quality of Roundup.

132.    Monsanto had a duty to disclose material information about the serious health effects of its products. But Monsanto intentionally failed to disclose this information for the purpose of inducing consumers to purchase Monsanto's dangerous products.

133.    Specifically, Monsanto's advertisements regarding Roundup made material misrepresentations to the effect that Roundup was safe and non-toxic, which Monsanto knew to be false or lacked the basis to assert, for the purpose of fraudulently inducing consumers to purchase said product. Monsanto further misrepresented that its products were just as safe, just as effective or more effective, than other weed control products on the market.

134.   Monsanto's representations regarding the character or quality of Roundup were untrue. In addition, Monsanto fraudulently suppressed material information regarding the safety of Roundup, including the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup and glyphosate.

135.   Monsanto had actual knowledge based on the results of trials, tests, and studies of exposure to glyphosate, of the risk of serious harm associated with human use of and exposure to Roundup.

136.   Moreover, Monsanto purposefully failed to conduct trials, tests and studies of the risks associated with the full Roundup information – rather than merely the active ingredient glyphosate – because it knew that these tests were likely to reveal that Roundup was unsafe and toxic to humans.

137.   Despite this knowledge, Monsanto negligently and/or intentionally misrepresented or omitted this information in its product labeling, promotions and advertisements. Instead, Monsanto labeled, promoted and advertised its products as safe and effective when it knew such statements to be false or when it knew that it did not know the truth of such statements in order to avoid losses and sustain profits in its sale of Roundup to customers and consumers.

138.   In supplying the false information, Monsanto failed to exercise reasonable care or competence in obtaining or communicating information to its

intended recipients, including Plaintiff Joe Cockerham.

139.    Plaintiff Cockerham reasonably relied to his detriment upon Monsanto's misrepresentations and/or omissions in its labeling, advertisements, and promotions concerning the risks posed by the product. Plaintiff reasonably relied upon Monsanto's representations that Roundup was safe for use and that Monsanto's labeling, advertisements and promotions fully described all known risks of the product.

140.    As a direct and proximate result of Monsanto's negligent and/or fraudulent misrepresentations, Plaintiff Joe Cockerham has been damaged and claims all damages to which he is entitled, including, as applicable law may provide, but not limited to:

   a. Bodily injury resulting in pain and suffering, disability and/or disfigurement;

   b. Mental anguish;

   c. Loss of capacity for enjoyment of life;

   d. Expensive hospitalization, medical treatment and/or care which losses are either permanent or will continue; and/or

   e. All damages available under applicable law.

## FOURTH CAUSE OF ACTION
### CHAPTER 75- UDTPA

141.    Plaintiffs incorporate by reference as if fully set forth herein the facts alleged in paragraphs 1 through 140 of this Complaint.

142.    Monsanto's actions, as described more fully herein, constitute unfair and deceptive trade practices under Chapter 75 of the North Carolina General Statutes.

143.    Specifically, Monsanto's actions were both "unfair" and "deceptive" within the meaning of the statute.

144.    Monsanto's actions were in and affecting commerce.

145.    Monsanto's unfair and deceptive conduct proximately caused injury to Plaintiff Joe Cockerham.

146.    Plaintiff is entitled to recover treble damages and attorneys' fees under the statute and is permitted, in due course, to make an election of remedies between this award and any others he me obtain in this proceeding.

**FIFTH CAUSE OF ACTION**
**BREACH OF WARRANTIES**

147.    Plaintiffs incorporate by reference as if fully set forth herein the facts alleged in paragraphs 1 through 146 of this Complaint.

148.    By their actions, which are set out more thoroughly herein, Defendants breached express and implied warranties with respect to Roundup.

149.    At all times herein mentioned, the Defendant manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold Roundup as a broadspectrum herbicide. These actions were under the ultimate control and supervision of Defendant.

150.    At the time Defendant marketed, sold, and distributed Roundup for use

by Plaintiff, Defendant knew of Roundup's intended use and impliedly warranted the product to be of merchantable quality and safe and fit for this use.

151.   The Defendant expressly and impliedly represented and warranted to Plaintiff and users of Roundup, the agricultural community, and/or the EPA that Roundup was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.

152.   These representations and warranties were false, misleading, and inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

153.   Plaintiff and/or the EPA did rely on said implied warranty of merchantability of fitness for particular use and purpose.

154.   Plaintiff reasonably relied upon the skill and judgment of Defendant as to whether Roundup was of merchantable quality and safe and fit for its intended use.

155.   Roundup was injected into the stream of commerce by the Defendant in a defective, unsafe, and inherently dangerous condition, and the products' materials were expected to and did reach users, handlers, and persons encountering said products without substantial change in the condition in which they were sold.

156.   The Defendant breached the aforesaid implied warranties, as its herbicide Roundup was not fit for its intended purposes and uses.

157.   As a result of the foregoing acts and omissions, Plaintiff suffered from

NHL and suffered severe and personal injuries which are permanent and lasting in nature, and included physical pain and mental anguish, diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic, and noneconomic damages.

## SIXTH CAUSE OF ACTION
## LOSS OF COSORTIUM

158.    Plaintiffs incorporate by reference as if fully set forth herein the facts alleged in paragraphs 1 through 146 of this Complaint.

159.    At all times material, Plaintiffs Joe and Juanita Cockerham were, and are, legally married as husband and wife.

160.    As a direct and proximate result of Defendants' tortious conduct, and as a result of the injuries and damages to Plaintiff Joe Cockerham arising therefrom, Plaintiff Juanita Cockerham has been deprived of the love, companionship, comfort, affection, society, solace or moral support, protection, and loss of physical assistance in the operation and maintenance of the home, of her husband, Joe Cockerham, and has thereby sustained and will continue to sustain damages.

161.    Plaintiff Juanita Cockerham is entitled to recover damages for her loss of consortium in an amount to be proven at trial.

## PRAYER FOR RELIEF

Plaintiffs request that the Court enter judgment against Defendants, as follows:

A. An award to Plaintiffs of all compensatory damages awardable by law, including but not limited to damages for bodily injury resulting in pain and suffering, disability and/or disfigurement, mental anguish, loss of capacity for enjoyment of life, expensive hospitalization, medical treatment and/or care which losses are either permanent or will continue, and the risk of the cancer recurring in the future.

B. An award to Plaintiffs of attorney's' fees and costs, as allowed by law;

C. An award to Plaintiffs of prejudgment and post judgment interest, as provided by law;

D. Such other relief as may be appropriate under the circumstances.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by jury.

Dated: November 21, 2019

Respectfully submitted,

BONDURANT LAW PLLC

<u>s/Joel M. Bondurant</u>
Joel M. Bondurant
N.C. Bar No. 29621
11330 Vanstory Drive
Huntersville, NC 28078
(704) 897-0490 (ph)
(704) 559-3379 (fax)
jmbondurant@bondurantlawfirm.com