# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
# CIVIL DOCKET FOR CASE #: 2:19-cv-10105

| | |
|---|---|
| Gonzalez et al v. Monsanto Company, a Delaware Corporation et al | Date Filed: 11/26/2019 |
| Assigned to: | Jury Demand: Plaintiff |
| Case in other court:  Santa Barbara County Superior Court, 19CV03946 | Nature of Suit: 365 Personal Inj. Prod. Liability |
| Cause: 28:1332 Diversity-Personal Injury | Jurisdiction: Diversity |

**Plaintiff**

**Edilia Gonzalez**                          represented by   **Edilia Gonzalez**
                                                              PRO SE

**Plaintiff**

**Laura Balbuena Gonzalez**                  represented by   **Laura Balbuena Gonzalez**
                                                              PRO SE

**Plaintiff**

**Caesar Manuel Balbuena Gonzalez**          represented by   **Caesar Manuel Balbuena Gonzalez**
                                                              PRO SE

**Plaintiff**

**Amayrani Balbuena Gonzalez**               represented by   **Amayrani Balbuena Gonzalez**
                                                              PRO SE

V.

**Defendant**

**Monsanto Company, a Delaware**            represented by   **Eskandar Alex Beroukhim**
**Corporation**                                              Arnold and Porter Kaye Scholer LLP
                                                             777 South Figueroa Street 44th Floor
                                                             Los Angeles, CA 90017-5844
                                                             213-243-4000
                                                             Fax: 213-243-4199
                                                             Email: alex.beroukhim@arnoldporter.com
                                                             *ATTORNEY TO BE NOTICED*

**Defendant**

**Terracotta Landscapes, Inc. (aka Terra**
**Cotta Landscapes), a California**
**Corporation**

| Date Filed | # | Docket Text |
|---|---|---|
| 11/26/2019 | 1 | NOTICE OF REMOVAL from Santa Barbara County Superior Court, case number 19CV03946 Receipt No: 0973-24852875 - Fee: $400, filed by Defendant Monsanto Company, a Delaware Corporation. (Attachments: # 1 Index of Exhibits, # 2 Exhibit 1 to |

| | | |
|---|---|---|
| | | Notice of Removal (State Court Proceedings), # 3 Exhibit 2 to Notice of Removal (Declaration of Jason Downs), # 4 Proof of Service) (Attorney Eskandar Alex Beroukhim added to party Monsanto Company, a Delaware Corporation(pty:dft))(Beroukhim, Eskandar) (Entered: 11/26/2019) |
| 11/26/2019 | 2 | CIVIL COVER SHEET filed by Defendant Monsanto Company, a Delaware Corporation. (Beroukhim, Eskandar) (Entered: 11/26/2019) |
| 11/26/2019 | 3 | NOTICE of Interested Parties filed by Defendant Monsanto Company, a Delaware Corporation, identifying Bayer AG. (Beroukhim, Eskandar) (Entered: 11/26/2019) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 11/27/2019 10:51:50 | | | |
| **PACER Login:** | hllp1982:2634105:4722683 | **Client Code:** | 1417.0049 |
| **Description:** | Docket Report | **Search Criteria:** | 2:19-cv-10105 End date: 11/27/2019 |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/29/2019 3:11 PM
By: Narzralli Baksh, Deputy

1  GIRARDI | KEESE
   THOMAS V. GIRARDI, State Bar No. 36603
2  tgirardi@girardikeese.com
   CHRISTOPHER T. AUMAIS, State Bar No. 249901
3  caumais@girardikeese.com
   ASHKAHN MOHAMADI, State Bar No. 299029
4  amohamadi@girardikeese.com
   1126 Wilshire Boulevard
5  Los Angeles, California 90017
   Telephone: (213) 977-0211
6  Facsimile: (213) 481-1554

7  Attorneys for Plaintiffs

8

9              SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                    COUNTY OF SANTA BARBARA

11

12  EDILIA GONZALEZ, an individual, LAURA         Case No. 19CV03946
    BALBUENA GONZALEZ, an individual,
13  CAESAR MANUEL BALBUENA
    GONZALEZ, an individual, and AMAYRANI         COMPLAINT FOR DAMAGES
14  BALBUENA GONZALEZ, an individual,              1. NEGLIGENCE
                                                   2. STRICT PRODUCTS LIABILITY:
15                Plaintiffs,                          DESIGN DEFECT
                                                   3. STRICT PRODUCTS LIABILITY:
16           v.                                        FAILURE TO WARN
                                                   4. BREACH OF WARRANTY
17  MONSANTO COMPANY, a Delaware                   5. BREACH OF IMPLIED
    Corporation, TERRACOTTA LANDSCAPES,              WARRANTY OF
18  INC. (aka TERRA COTTA LANDSCAPES),               MERCHANTABILITY
    a California Corporation, and DOES 1-1000,     6. WRONGFUL DEATH
19  inclusive,

20
                  Defendants.
21

22

23

24         Plaintiff EDILIA GONZALEZ, an individual, as the surviving spouse of MANUEL

25  BALBUENA ("Decedent"), and Plaintiffs LAURA BALBUENA GONZALEZ, an individual,

26  CAESAR MANUEL BALBUENA GONZALEZ, an individual, and AMAYRANI BALBUENA

27  GONZALEZ, an individual, as the surviving children of Decedent, hereby bring this Complaint

28  against defendants and allege as follows:

                                          1

# I. SUMMARY

This case arises out of Defendant MONSANTO's wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and sale of the herbicide Roundup, containing the active ingredient glyphosate. Glyphosate has been found to be carcinogenic, linked to causing various forms of cancer, and in particular Multiple Myeloma. As such, Roundup is dangerous to human health and unfit to be marketed and sold in commerce, particularly without proper warnings and directions as to the dangers associated with its use. Based on information and belief, the Decedent was exposed to Roundup extensively, by and through his employment for Defendant TERRACOTTA LANDSCAPES, INC., and suffered from heart failure and kidney failure as a result of Multiple Myeloma, which caused his death. Plaintiffs are the surviving spouse and children of Decedent. (Cal. Code Civ. Proc. § 377.60.)

# II. JURISDICTION AND VENUE

1. At all times relevant to this action, named Plaintiff, EDILIA GONZALEZ ("Plaintiff"), is an individual residing in the County of Santa Barbara, State of California.

2. At all times relevant to this action, named Plaintiff, LAURA BALBUENA GONZALEZ ("Plaintiff"), is an individual residing in the County of Santa Barbara, State of California.

3. At all times relevant to this action, named Plaintiff, CAESAR MANUEL BALBUENA GONZALEZ ("Plaintiff"), is an individual residing in the County of Santa Barbara, State of California.

4. At all times relevant to this action, named Plaintiff, AMAYRANI BALBUENA GONZALEZ ("Plaintiff"), is an individual residing in the County of Santa Barbara, State of California.

5. At all times relevant to this action, the Decedent, MANUEL BALBUENA, was an individual residing in the County of Santa Barbara, State of California.

6. Defendant, MONSANTO COMPANY ("Monsanto"), is and at all relevant times herein was a Delaware Corporation, with substantial contacts in the County of Santa Barbara, State of California.

7. Defendant, TERRACOTTA LANDSCAPES, INC. (aka TERRA COTTA LANDSCAPES), is and at all relevant times herein was a California Corporation, with its principal place of business in Santa Barbara, California; prior to 2008, Defendant was an unknown California entity with

2

COMPLAINT FOR DAMAGES

1    substantial contacts in the County of Santa Barbara, State of California.

2       8. Defendant MONSANTO marked, advertised, promoted, administered, promoted, sold, and/or

3    otherwise facilitated the use of Roundup that is the subject of this lawsuit.

4       9. Defendant MONSANTO has substantial contacts with the State of California, including but

5    not limited to its contacts with Decedent, an individual who was, upon information an belief, exposed

6    to Roundup.

7       10. This Court has jurisdiction over this matter because Defendant MONSANTO, is domiciled,

8    conducts business in, and has substantial contacts within the State of California.

9       11. Venue is proper in the County of Santa Barbara pursuant to section 395(a) of the *California*

10   *Code of Civil Procedure* because the incident at the core of this lawsuit occurred in the County of

11   Santa Barbara, State of California.

12                          III. **PARTIES**

13      12. At all times mentioned herein, Plaintiff EDILIA GONZALEZ, was, and is, an individual who

14   resides in the County of Santa Barbara, California.

15      13. At all times relevant to this action, Plaintiff LAURA BALBUENA GONZALEZ, was, and is,

16   an individual who resides in the County of Santa Barbara, State of California.

17      14. At all times relevant to this action, Plaintiff CAESAR MANUEL BALBUENA GONZALEZ,

18   was, and is, an individual residing in the County of Santa Barbara, State of California.

19      15. At all times relevant to this action, Plaintiff AMAYRANI BALBUENA GONZALEZ, was,

20   and is, an individual residing in the County of Santa Barbara, State of California.

21      16. At all times mentioned herein, Decedent MANUEL BALBUENA, was an individual who

22   resided in the County of Santa Barbara, California.

23      17. Decedent was married to Plaintiff EDILIA GONZALEZ at the time of his death.

24      18. Decedent had three children with Plaintiff EDILIA GONZALEZ, Plaintiffs LAURA

25   BALBUENA GONZALEZ, CAESAR MANUEL BALBUENA GONZALEZ, and AMAYRANI

26   BALBUENA GONZALEZ.

27      19. At all times mentioned herein, Defendant MONSANTO, was, and is, a business entity doing

28   business in the County of Santa Barbara, State of California.

1    20. At all times mentioned herein, Defendant TERRACOTTA LANDSCAPES, INC. (aka

2    TERRA COTTA LANDSCAPES), a California Corporation, was and is a business entity doing

3    business in the County of Santa Barbara, State of California.

4    21. The true names and/or capacities, whether individual, corporate, associate or otherwise, of

5    Defendants Does 1 through 1000, inclusive, and each of them, are unknown to Plaintiffs, who

6    therefore sue said Defendants by such fictitious names. Plaintiffs are informed and believe, and upon

7    such information and belief allege, that each of the Defendants fictitiously named herein as a Doe is

8    legally responsible, negligently or in some other actionable manner, for the events and happenings

9    hereinafter referred to, and proximately caused the injuries and damages to Plaintiffs hereinafter

10    alleged. Plaintiffs will seek leave of Court to amend this Complaint to assert the true names and/or

11    capacities of such fictitiously named Defendants when the same have been ascertained.

12    22. Plaintiffs are informed and believe and thereupon allege, that at all times mentioned herein,

13    Defendants, and each of them, including Does 1 through 1000, were the agents, servants, employees

14    and/or joint ventures of their co-Defendants, and were, as such, acting within the course, scope and

15    authority of said agency, employment and/or joint venture, and that each and every Defendants, as

16    aforesaid, when acting as a principal, was negligent in the selection and hiring of each and every

17    Defendants as an agent, employee and/or joint venturers.

18                          **IV. FACTUAL ALLEGATIONS**

19    23. At all relevant times, Defendant Monsanto designed, researched, manufactured, tested,

20    advertised, promoted, marketed, sold, and distributed the commercial herbicide Roundup.

21    24. "Roundup" refers to all formulations of Defendant Monsanto's Roundup products, including,

22    but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom

23    Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide,

24    Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and

25    Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide,

26    Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass

27    and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer,

28    Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended

4

1   Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer,

2   Roundup Ready-to- Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide,

3   Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup

4   Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup

5   Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup

6   WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation containing the

7   active ingredient glyphosate.

8       25. Defendant Monsanto is a multinational agricultural biotechnology corporation based in St.

9   Louis, Missouri. It is the world's leading producer of glyphosate.

10      26. Defendant Monsanto discovered the herbicidal properties of glyphosate during the 1970's

11  and developed it as a broad-spectrum herbicide used to kill weeds and grasses known to compete with

12  commercial crops grown around the globe.

13      27. Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on

14  whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate

15  synthase, known as EPSP synthase.

16      28. Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that

17  interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant

18  tissue and ultimately plant death.

19      29. Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots;

20  and detectable quantities accumulate in the plant tissues.

21      30. Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial

22  nurseries, suburban lawns, parks, and golf courses. This increase in use has been driven largely by

23  the proliferation of "Roundup Ready" crops, which have been genetically engineered to resist the

24  activity of glyphosate.

25      31. Defendant Monsanto is responsible for the development, manufacture, marketing, sale, and

26  distribution of Roundup Ready seeds. By 2009, Monsanto was the world's leading producer of

27  Roundup Ready seeds. In 2010, roughly 70% of corn and cotton and 90% of soybean fields in the

28  United States were grown with Roundup Ready seeds.

1  32. Roundup was introduced in 1974 and is today one of the world's most widely-used
2  herbicides. Monsanto's glyphosate products are registered in more than 130 countries and are
3  approved for weed control in more than 100 crops. No other herbicide active ingredient compares in
4  terms of number of uses.[1]

5  33. In all this time, farmers have used Roundup unaware that it is a carcinogen.

6  ## V. MONSANTO'S FALSE REPRESENTATIONS REGARDING
7  ## THE SAFETY OF ROUNDUP

8  34. In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto
9  based on its false and misleading advertising of Roundup products. Specifically, the lawsuit
10  challenged Monsanto's general representations that its spray-on glyphosate-based herbicides,
11  including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and
12  fish. Among the representations the NYAG found deceptive and misleading about the human and
13  environmental safety of Roundup are the following:

14  35. Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build
15  up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and
16  fences.

17  36. And remember that Roundup is biodegradable and won't build up in the soil. That will give
18  you the environmental confidence you need to use Roundup everywhere you've got a weed, brush,
19  edging or trimming problem.

20  37. Roundup biodegrades into naturally occurring elements.

21  38. Remember that versatile Roundup herbicide stays where you put it. That means there's no
22  washing or leaching to harm customers' shrubs or other desirable vegetation.

23  39. This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

24  40. You can apply Accord with "confidence because it will stay where you put it" it bonds tightly
25  to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade

26

27  [1] *Backgrounder*, History of Monsanto's Glyphosate Herbicides, June 2005, available at
28  www.monsanto.com/products/documents/glyphosate-background-materials/back_ground.pdf

1   Accord into natural products.

2      41. Glyphosate is less toxic to rats than table salt following acute oral ingestion.

3      42. Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety

4   margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

5      43. You can feel good about using herbicides by Monsanto. They carry a toxicity category rating

6   of 'practically non-toxic' as it pertains to mammals, birds and fish.

7      44. "Roundup can be used where kids and pets will play and breaks down into natural material."

8   This ad depicts a person with his head in the ground and a pet dog standing in an area which has been

9   treated with Roundup.[2]

10     45. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with the

11   NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or

12   broadcasting any advertisements [in New York] that represent, directly or by implication" that:

13     46. Its glyphosate-containing pesticide products or any component thereof are safe, non-toxic,

14   harmless or free from risk;

15     47. ***

16     48. Its glyphosate-containing pesticide products or any component thereof manufactured,

17   formulated, distributed or sold by Monsanto are biodegradable;

18     49. ***

19     50. Its glyphosate-containing pesticide products or any component thereof stay where they are

20   applied under all circumstances and will not move through the environment by any means;

21     51. ***

22     52. Its glyphosate-containing pesticide products or any component thereof are "good" for the

23   environment or are "known for their environmental characteristics;"

24     53. ***

25     54. Glyphosate-containing pesticide products or any component thereof are safer or less toxic

26

27   _____

[2]  Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of

28   Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

1    than common consumer products other than herbicides; and

2    55. Its glyphosate-containing products or any component thereof might be classified as

3    "practically non-toxic."

4    56. Monsanto did not alter its advertising in the same manner in any state other than

5    57. New York, and on information and belief still has not done so today.

6    58. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of

7    Roundup and affirmed an earlier judgment that Monsanto had falsely advertised its herbicide

8    Roundup as "biodegradable" and that it "left the soil clean."[3]

9    **VI. EVIDENCE OF CARCINOGENICITY IN ROUNDUP**

10    59. As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties.

11    60. On March 4, 1985, a group of the EPA's Toxicology Branch published a memorandum

12    classifying glyphosate as a Category C oncogene.[4]   Category C oncogenes are possible human

13    carcinogens with limited evidence of carcinogenicity.

14    61. In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87- 103214). The

15    Registration standard required additional phytotoxicity, environmental fate, toxicology, product

16    chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or

17    waived.[5]

18    62. In October 1991, the EPA published a Memorandum entitled "Second Peer Review of

19    Glyphosate." The memorandum changed glyphosate's classification to Group E concur with the

20    conclusions of the committee and one member refused to sign.[6]

21    63. In addition to the toxicity of the active molecule, many studies support the hypothesis that

22

23    [3] *Monsanto Guilty in 'False Ad' Row,* BBC, Oct. 15, 2009, *available at*

24    http://news.bbc.co.uk/2/hi/europe/8308903.stm.

     [4] Consensus Review of Glyphosate, Casewell No. 661A. March 4, 1985.  United States

25    Environmental Protection Agency.

26    [5] http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheets/0178fact.pdf. (Evidence of non-carcinogenicity for humans).

27    [6] U.S. EPA, *Memorandum, Subject: SECOND Peer Review of Glyphosate* 1 (1991),  *available at*

28    http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_30-Oct-91_265.pdf.

1   glyphosate formulations found in Monsanto's Roundup products are more dangerous and toxic than

2   glyphosate alone.[7]  As early as 1991, evidence existed demonstrating that glyphosate formulations

3   were significantly more toxic than glyphosate alone.

4       64. In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division

5   Dysfunction at the Level of CDK1/Cyclin B Activation."[8]  The study found that Monsanto's

6   Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate

7   alone proved ineffective and did not alter cell cycles.

8       65. In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle

9   regulation." The study demonstrated a molecular link between glyphosate-based products and cell

10  cycle dysregulation.[9]

11      66. The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer.

12  Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of

13  cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from

14  dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting

15  cells."[10]

16      67. In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver

17  mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

18
19  [7]   See Martinez, et al. *Oral and pulmonary toxicology of the surfactant used in Roundup herbicide*,
    PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991); Nora Benachour, et al., *Glyphosate*
20  *Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryotic, and Placental*
    *Cells*, 22 CHEM. RES. TOXICOL. 97-105 (2009), *available at*
21  http://big.assets.huffington.com/france.pdf; Gasnier et al. 2010; Francisco Peixoto, *Comparative*
    *effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation*, 61
22  CHEMOSPHERE 1115, 1122 (2005), *available at*
    https://www.researchgate.net/publication/7504567_Comparative_effects_of_the_Roundup_and_gl
23  yphos ate_on_mitochondrial_oxidative_phosphorylation; March 2004.

24  [8]   Julie Marc, et al., *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of*
    *CDK1/Cyclin B Activation*, 15 CHEM. RES. TOXICOL. 326-331 (2002), *available at*
25  http://pubs.acs.org/doi/full/10.1021/tx015543g.

26  [9]   Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation,* 96 BIOLOGY OF
    THE CELL 245, 245- 249 (2004), *available at*
27  http://onlinelibrary.wiley.com/doi/10.1016/j.biolcel.2003.11.010/epdf.

28  [10]  Molinari, 2000; Stewart et al., 2003.

COMPLAINT FOR DAMAGES

68. The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

69. In 2009, Nora Benachour and Gilles-Eric Seralini published a study of the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

70. The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

71. The results of these studies were confirmed in peer-reviewed studies that were known to Monsanto.

72. Monsanto knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Decedent from Roundup.

73. Monsanto knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

74. Monsanto failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Decedent from Roundup.

75. Rather than performing appropriate tests, Monsanto relied on flawed industry-supported studies designed to protect Monsanto's economic interests rather than Decedent and the consuming public.

76. Despite its knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendant Monsanto continued to promote Roundup as safe.

10

COMPLAINT FOR DAMAGES

# VII. IARC CLASSIFICATION OF GLYPHOSATE

77. The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental agency that the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

78. An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015–2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

79. IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals: The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; and related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

80. On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Monsanto's possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Monsanto's Roundup herbicide is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

81. The IARC's full Monograph was published on July 29, 2015, and established glyphosate as a class 2A probable carcinogen to humans. According to the authors, glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

82. The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's Lymphoma ("NHL"), several subtypes of NHL and other cancers such as

## VII. IARC CLASSIFICATION OF GLYPHOSATE

77. The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental agency that the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

78. An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015–2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

79. IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals: The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; and related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

80. On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Monsanto's possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Monsanto's Roundup herbicide is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

81. The IARC's full Monograph was published on July 29, 2015, and established glyphosate as a class 2A probable carcinogen to humans. According to the authors, glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

82. The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's Lymphoma ("NHL"), several subtypes of NHL and other cancers such as

1   Multiple Myeloma, and the increased risk continued after adjustment for other pesticides.

2   83. The IARC also found that glyphosate caused DNA and chromosomal damage in human
3   cells.

## VIII. EARLIER EVIDENCE OF GLYPHOSATE'S DANGER

5   84. Despite the new classification by the IARC, Monsanto has had ample evidence of
6   glyphosate and Roundup's genotoxic properties for decades.

7   85. Genotoxicity refers to chemical agents capable of damaging the DNA within a cell through
8   genetic mutations, which is a process that is believed to lead to cancer.

9   86. In 1997, Chris Clements published "Genotoxicity of select herbicides in *Rana*
10  *catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."
11  The study found that tadpoles exposed to Roundup showed significant DNA damage when
12  compared with unexposed control animals.

13  87. Both human and animal studies have shown that glyphosate and glyphosate-base
14  formulations such as Roundup can induce oxidative stress.

15  88. Oxidative stress and associated chronic inflammation are believed to be involved in
16  carcinogenesis.

17  89. The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and
18  glyphosate-based formulations can induce oxidative stress."

19  90. In 2006, César Paz-y-Miño published a study examining DNA damage in human subjects
20  exposed to glyphosate. The study produced evidence of chromosomal damage in blood cells
21  showing significantly greater damage after exposure to glyphosate than before in the same
22  individuals, suggesting that the glyphosate formulation used during aerial spraying had a
23  genotoxic effect on exposed individuals.

24  91. The IARC Monograph reflects the volume of evidence of glyphosate pesticides'
25  genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is
26  strong."

27  92. Despite knowledge to the contrary, Monsanto denies that Roundup is genotoxic.

28  93. In addition to glyphosate and Roundup's genotoxic properties, Monsanto has long been

.12

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/29/2019 3:11 PM
By: Narzralli Baksh, Deputy

1  GIRARDI | KEESE
   THOMAS V. GIRARDI, State Bar No. 36603
2  tgirardi@girardikeese.com
   CHRISTOPHER T. AUMAIS, State Bar No. 249901
3  caumais@girardikeese.com
   ASHKAHN MOHAMADI, State Bar No. 299029
4  amohamadi@girardikeese.com
   1126 Wilshire Boulevard
5  Los Angeles, California 90017
   Telephone: (213) 977-0211
6  Facsimile: (213) 481-1554

7  Attorneys for Plaintiffs

8

9            SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                   COUNTY OF SANTA BARBARA

11

12 | EDILIA GONZALEZ, an individual, LAURA        Case No. 19CV03946
   | BALBUENA GONZALEZ, an individual,
13 | CAESAR MANUEL BALBUENA
   | GONZALEZ, an individual, and AMAYRANI        **COMPLAINT FOR DAMAGES**
14 | BALBUENA GONZALEZ, an individual,            **1. NEGLIGENCE**
   |                                              **2. STRICT PRODUCTS LIABILITY:**
15 |               Plaintiffs,                    **    DESIGN DEFECT**
   |                                              **3. STRICT PRODUCTS LIABILITY:**
16 |       v.                                     **    FAILURE TO WARN**
   |                                              **4. BREACH OF WARRANTY**
17 | MONSANTO COMPANY, a Delaware                 **5. BREACH OF IMPLIED**
   | Corporation, TERRACOTTA LANDSCAPES,          **    WARRANTY OF**
18 | INC. (aka TERRA COTTA LANDSCAPES),           **    MERCHANTABILITY**
   | a California Corporation, and DOES 1-1000,   **6. WRONGFUL DEATH**
19 | inclusive,
   |
20 |
   |               Defendants.
21 |

22

23

24      Plaintiff EDILIA GONZALEZ, an individual, as the surviving spouse of MANUEL

25 BALBUENA ("Decedent"), and Plaintiffs LAURA BALBUENA GONZALEZ, an individual,

26 CAESAR MANUEL BALBUENA GONZALEZ, an individual, and AMAYRANI BALBUENA

27 GONZALEZ, an individual, as the surviving children of Decedent, hereby bring this Complaint

28 against defendants and allege as follows:

                                    1

## I. SUMMARY

This case arises out of Defendant MONSANTO's wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and sale of the herbicide Roundup, containing the active ingredient glyphosate. Glyphosate has been found to be carcinogenic, linked to causing various forms of cancer, and in particular Multiple Myeloma. As such, Roundup is dangerous to human health and unfit to be marketed and sold in commerce, particularly without proper warnings and directions as to the dangers associated with its use. Based on information and belief, the Decedent was exposed to Roundup extensively, by and through his employment for Defendant TERRACOTTA LANDSCAPES, INC., and suffered from heart failure and kidney failure as a result of Multiple Myeloma, which caused his death. Plaintiffs are the surviving spouse and children of Decedent. (Cal. Code Civ. Proc. § 377.60.)

## II. JURISDICTION AND VENUE

1. At all times relevant to this action, named Plaintiff, EDILIA GONZALEZ ("Plaintiff"), is an individual residing in the County of Santa Barbara, State of California.

2. At all times relevant to this action, named Plaintiff, LAURA BALBUENA GONZALEZ ("Plaintiff"), is an individual residing in the County of Santa Barbara, State of California.

3. At all times relevant to this action, named Plaintiff, CAESAR MANUEL BALBUENA GONZALEZ ("Plaintiff"), is an individual residing in the County of Santa Barbara, State of California.

4. At all times relevant to this action, named Plaintiff, AMAYRANI BALBUENA GONZALEZ ("Plaintiff"), is an individual residing in the County of Santa Barbara, State of California.

5. At all times relevant to this action, the Decedent, MANUEL BALBUENA, was an individual residing in the County of Santa Barbara, State of California.

6. Defendant, MONSANTO COMPANY ("Monsanto"), is and at all relevant times herein was a Delaware Corporation, with substantial contacts in the County of Santa Barbara, State of California.

7. Defendant, TERRACOTTA LANDSCAPES, INC. (aka TERRA COTTA LANDSCAPES), is and at all relevant times herein was a California Corporation, with its principal place of business in Santa Barbara, California; prior to 2008, Defendant was an unknown California entity with

1 | substantial contacts in the County of Santa Barbara, State of California.

2 | 8. Defendant MONSANTO marked, advertised, promoted, administered, promoted, sold, and/or

3 | otherwise facilitated the use of Roundup that is the subject of this lawsuit.

4 | 9. Defendant MONSANTO has substantial contacts with the State of California, including but

5 | not limited to its contacts with Decedent, an individual who was, upon information an belief, exposed

6 | to Roundup.

7 | 10. This Court has jurisdiction over this matter because Defendant MONSANTO, is domiciled,

8 | conducts business in, and has substantial contacts within the State of California.

9 | 11. Venue is proper in the County of Santa Barbara pursuant to section 395(a) of the *California*

10 | *Code of Civil Procedure* because the incident at the core of this lawsuit occurred in the County of

11 | Santa Barbara, State of California.

12 | ### III. PARTIES

13 | 12. At all times mentioned herein, Plaintiff EDILIA GONZALEZ, was, and is, an individual who

14 | resides in the County of Santa Barbara, California.

15 | 13. At all times relevant to this action, Plaintiff LAURA BALBUENA GONZALEZ, was, and is,

16 | an individual who resides in the County of Santa Barbara, State of California.

17 | 14. At all times relevant to this action, Plaintiff CAESAR MANUEL BALBUENA GONZALEZ,

18 | was, and is, an individual residing in the County of Santa Barbara, State of California.

19 | 15. At all times relevant to this action, Plaintiff AMAYRANI BALBUENA GONZALEZ, was,

20 | and is, an individual residing in the County of Santa Barbara, State of California.

21 | 16. At all times mentioned herein, Decedent MANUEL BALBUENA, was an individual who

22 | resided in the County of Santa Barbara, California.

23 | 17. Decedent was married to Plaintiff EDILIA GONZALEZ at the time of his death.

24 | 18. Decedent had three children with Plaintiff EDILIA GONZALEZ, Plaintiffs LAURA

25 | BALBUENA GONZALEZ, CAESAR MANUEL BALBUENA GONZALEZ, and AMAYRANI

26 | BALBUENA GONZALEZ.

27 | 19. At all times mentioned herein, Defendant MONSANTO, was, and is, a business entity doing

28 | business in the County of Santa Barbara, State of California.

COMPLAINT FOR DAMAGES

20. At all times mentioned herein, Defendant TERRACOTTA LANDSCAPES, INC. (aka TERRA COTTA LANDSCAPES), a California Corporation, was and is a business entity doing business in the County of Santa Barbara, State of California.

21. The true names and/or capacities, whether individual, corporate, associate or otherwise, of Defendants Does 1 through 1000, inclusive, and each of them, are unknown to Plaintiffs, who therefore sue said Defendants by such fictitious names. Plaintiffs are informed and believe, and upon such information and belief allege, that each of the Defendants fictitiously named herein as a Doe is legally responsible, negligently or in some other actionable manner, for the events and happenings hereinafter referred to, and proximately caused the injuries and damages to Plaintiffs hereinafter alleged. Plaintiffs will seek leave of Court to amend this Complaint to assert the true names and/or capacities of such fictitiously named Defendants when the same have been ascertained.

22. Plaintiffs are informed and believe and thereupon allege, that at all times mentioned herein, Defendants, and each of them, including Does 1 through 1000, were the agents, servants, employees and/or joint ventures of their co-Defendants, and were, as such, acting within the course, scope and authority of said agency, employment and/or joint venture, and that each and every Defendants, as aforesaid, when acting as a principal, was negligent in the selection and hiring of each and every Defendants as an agent, employee and/or joint venturers.

## IV. FACTUAL ALLEGATIONS

23. At all relevant times, Defendant Monsanto designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the commercial herbicide Roundup.

24. "Roundup" refers to all formulations of Defendant Monsanto's Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended

4

1 | Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer,
2 | Roundup Ready-to- Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide,
3 | Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup
4 | Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup
5 | Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup
6 | WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation containing the
7 | active ingredient glyphosate.

8 | 25. Defendant Monsanto is a multinational agricultural biotechnology corporation based in St.
9 | Louis, Missouri. It is the world's leading producer of glyphosate.

10 | 26. Defendant Monsanto discovered the herbicidal properties of glyphosate during the 1970's
11 | and developed it as a broad-spectrum herbicide used to kill weeds and grasses known to compete with
12 | commercial crops grown around the globe.

13 | 27. Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on
14 | whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate
15 | synthase, known as EPSP synthase.

16 | 28. Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that
17 | interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant
18 | tissue and ultimately plant death.

19 | 29. Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots;
20 | and detectable quantities accumulate in the plant tissues.

21 | 30. Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial
22 | nurseries, suburban lawns, parks, and golf courses. This increase in use has been driven largely by
23 | the proliferation of "Roundup Ready" crops, which have been genetically engineered to resist the
24 | activity of glyphosate.

25 | 31. Defendant Monsanto is responsible for the development, manufacture, marketing, sale, and
26 | distribution of Roundup Ready seeds. By 2009, Monsanto was the world's leading producer of
27 | Roundup Ready seeds. In 2010, roughly 70% of corn and cotton and 90% of soybean fields in the
28 | United States were grown with Roundup Ready seeds.

32. Roundup was introduced in 1974 and is today one of the world's most widely-used herbicides. Monsanto's glyphosate products are registered in more than 130 countries and are approved for weed control in more than 100 crops. No other herbicide active ingredient compares in terms of number of uses.[1]

33. In all this time, farmers have used Roundup unaware that it is a carcinogen.

## V. MONSANTO'S FALSE REPRESENTATIONS REGARDING
## THE SAFETY OF ROUNDUP

34. In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

35. Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences.

36. And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

37. Roundup biodegrades into naturally occurring elements.

38. Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

39. This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

40. You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade

---

[1] *Backgrounder*, History of Monsanto's Glyphosate Herbicides, June 2005, available at www.monsanto.com/products/documents/glyphosate-background-materials/back_ground.pdf

COMPLAINT FOR DAMAGES

1 aware of glyphosate's carcinogenic properties.

2     94. Glyphosate and Roundup in particular have long been associated with carcinogenicity and

3 the development of numerous forms of cancer, including, but not limited to, NHL, Hodgkin's

4 Lymphoma, Multiple Myeloma, and soft tissue sarcoma.

5     95. Monsanto has known of this association since the mid-1980s and numerous human and

6 animal studies evidence the carcinogenicity of glyphosate and/or Roundup.

7     96. In 1985, the EPA studied the effects of glyphosate in mice finding a dose related response

8 in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate

9 was oncogenic.

10     97. In 2003, Lennart Hardell and Mikael Eriksson published the results of two case controlled

11 studies on pesticides as a risk factor for NHL and hairy cell leukemia. The study concluded that

12 glyphosate had the most significant relationship to NHL among all herbicide studies with an

13 increased odds ratio of 3.11.

14     98. In 2003, AJ De Roos published a study examining the pooled data of mid-western farmers,

15 examining pesticides and herbicides as risk factors for NHL. The study, which controlled for

16 potential confounders, found a relationship between increased NHL incidence and glyphosate.

17     99. In 2008, Mikael Eriksson published a population based case-control study of exposure to

18 various pesticides as a risk factor for NHL. This strengthened previous associations between

19 glyphosate and NHL.

20     100. In spite of this knowledge, Defendant Monsanto continued to issue broad and sweeping

21 statements suggesting that Roundup was, and is, safer than ordinary household items such as table

22 salt, despite a lack of scientific support for the accuracy and validity of these statements and, in

23 fact, voluminous evidence to the contrary.

24     101. On information and belief, these statements and representations have been made with the

25 intent of inducing Decedent, the agricultural community, and the public at large to purchase and

26 increase the use of Roundup for Monsanto's pecuniary gain, and in fact did induce Decedent to

27 use Roundup.

28     102. Defendant Monsanto made these statements with complete disregard and reckless

13

COMPLAINT FOR DAMAGES

1     indifference to the safety of Decedent and the general public.

2     103. Notwithstanding Monsanto's representations, scientific evidence has established a clear

3     association between glyphosate and genotoxicity, inflammation, and an increased risk of many

4     cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

5     104. Monsanto knew or should have known that glyphosate is associated with an increased risk

6     of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue

7     sarcomas.

8     105. Monsanto failed to appropriately and adequately inform and warn Decedent of the serious

9     and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup,

10     including, but not limited to the risk of developing Multiple Myeloma, NHL or other cancers, as

11     well as other severe and personal injuries, which are permanent and/or long-lasting in nature,

12     cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for

13     medical treatment, monitoring, and/or medications.

14     106. Despite the IARC's classification of glyphosate as a class 2A probable carcinogen,

15     Monsanto continues to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-

16     genotoxic, and falsely warrants to users and the general public that independent experts and

17     regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in

18     glyphosate and Roundup.

19     107. Monsanto has claimed and continues to claim that Roundup is safe, non-carcinogenic, and

20     non-genotoxic.

21     108. Monsanto claims on its website that "[r]egulatory authorities and independent experts

22     around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies

23     and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand

24     herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that

25     it is not genotoxic."[11]

26

27     [11] *Backgrounder* - Glyphosate: No Evidence of Carcinogenicity, updated November 2014,

28     available at www.monsanto.com/glyphosate/documents/no-evidence-of-carcinogenicity.pdf.

COMPLAINT FOR DAMAGES

1    Multiple Myeloma, and the increased risk continued after adjustment for other pesticides.

2    83. The IARC also found that glyphosate caused DNA and chromosomal damage in human

3    cells.

### VIII. EARLIER EVIDENCE OF GLYPHOSATE'S DANGER

5    84. Despite the new classification by the IARC, Monsanto has had ample evidence of

6    glyphosate and Roundup's genotoxic properties for decades.

7    85. Genotoxicity refers to chemical agents capable of damaging the DNA within a cell through

8    genetic mutations, which is a process that is believed to lead to cancer.

9    86. In 1997, Chris Clements published "Genotoxicity of select herbicides in *Rana*

10   *catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

11   The study found that tadpoles exposed to Roundup showed significant DNA damage when

12   compared with unexposed control animals.

13   87. Both human and animal studies have shown that glyphosate and glyphosate-base

14   formulations such as Roundup can induce oxidative stress.

15   88. Oxidative stress and associated chronic inflammation are believed to be involved in

16   carcinogenesis.

17   89. The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and

18   glyphosate-based formulations can induce oxidative stress."

19   90. In 2006, César Paz-y-Miño published a study examining DNA damage in human subjects

20   exposed to glyphosate. The study produced evidence of chromosomal damage in blood cells

21   showing significantly greater damage after exposure to glyphosate than before in the same

22   individuals, suggesting that the glyphosate formulation used during aerial spraying had a

23   genotoxic effect on exposed individuals.

24   91. The IARC Monograph reflects the volume of evidence of glyphosate pesticides'

25   genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is

26   strong."

27   92. Despite knowledge to the contrary, Monsanto denies that Roundup is genotoxic.

28   93. In addition to glyphosate and Roundup's genotoxic properties, Monsanto has long been

-12

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/29/2019 3:11 PM
By: Narzralli Baksh, Deputy

1  GIRARDI | KEESE
   THOMAS V. GIRARDI, State Bar No. 36603
2  tgirardi@girardikeese.com
   CHRISTOPHER T. AUMAIS, State Bar No. 249901
3  caumais@girardikeese.com
   ASHKAHN MOHAMADI, State Bar No. 299029
4  amohamadi@girardikeese.com
   1126 Wilshire Boulevard
5  Los Angeles, California 90017
   Telephone: (213) 977-0211
6  Facsimile: (213) 481-1554

7  Attorneys for Plaintiffs

8

9              SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                     COUNTY OF SANTA BARBARA

11

12 | EDILIA GONZALEZ, an individual, LAURA    | Case No. 19CV03946
   | BALBUENA GONZALEZ, an individual,         |
13 | CAESAR MANUEL BALBUENA                     |
   | GONZALEZ, an individual, and AMAYRANI     | **COMPLAINT FOR DAMAGES**
14 | BALBUENA GONZALEZ, an individual,          | 1. **NEGLIGENCE**
   |                                            | 2. **STRICT PRODUCTS LIABILITY:**
15 |              Plaintiffs,                   |    **DESIGN DEFECT**
   |                                            | 3. **STRICT PRODUCTS LIABILITY:**
16 |      v.                                    |    **FAILURE TO WARN**
   |                                            | 4. **BREACH OF WARRANTY**
17 | MONSANTO COMPANY, a Delaware              | 5. **BREACH OF IMPLIED**
   | Corporation, TERRACOTTA LANDSCAPES,       |    **WARRANTY OF**
18 | INC. (aka TERRA COTTA LANDSCAPES),        |    **MERCHANTABILITY**
   | a California Corporation, and DOES 1-1000,  | 6. **WRONGFUL DEATH**
19 | inclusive,                                 |
   |                                            |
20 |                                            |
   |              Defendants.                   |
21 |                                            |

22

23

24        Plaintiff EDILIA GONZALEZ, an individual, as the surviving spouse of MANUEL

25 BALBUENA ("Decedent"),  and Plaintiffs LAURA BALBUENA GONZALEZ, an individual,

26 CAESAR MANUEL BALBUENA GONZALEZ, an individual, and AMAYRANI BALBUENA

27 GONZALEZ, an individual, as the surviving children of Decedent, hereby bring this Complaint

28 against defendants and allege as follows:

## I. SUMMARY

This case arises out of Defendant MONSANTO's wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and sale of the herbicide Roundup, containing the active ingredient glyphosate. Glyphosate has been found to be carcinogenic, linked to causing various forms of cancer, and in particular Multiple Myeloma. As such, Roundup is dangerous to human health and unfit to be marketed and sold in commerce, particularly without proper warnings and directions as to the dangers associated with its use. Based on information and belief, the Decedent was exposed to Roundup extensively, by and through his employment for Defendant TERRACOTTA LANDSCAPES, INC., and suffered from heart failure and kidney failure as a result of Multiple Myeloma, which caused his death. Plaintiffs are the surviving spouse and children of Decedent. (Cal. Code Civ. Proc. § 377.60.)

## II. JURISDICTION AND VENUE

1. At all times relevant to this action, named Plaintiff, EDILIA GONZALEZ ("Plaintiff"), is an individual residing in the County of Santa Barbara, State of California.

2. At all times relevant to this action, named Plaintiff, LAURA BALBUENA GONZALEZ ("Plaintiff"), is an individual residing in the County of Santa Barbara, State of California.

3. At all times relevant to this action, named Plaintiff, CAESAR MANUEL BALBUENA GONZALEZ ("Plaintiff"), is an individual residing in the County of Santa Barbara, State of California.

4. At all times relevant to this action, named Plaintiff, AMAYRANI BALBUENA GONZALEZ ("Plaintiff"), is an individual residing in the County of Santa Barbara, State of California.

5. At all times relevant to this action, the Decedent, MANUEL BALBUENA, was an individual residing in the County of Santa Barbara, State of California.

6. Defendant, MONSANTO COMPANY ("Monsanto"), is and at all relevant times herein was a Delaware Corporation, with substantial contacts in the County of Santa Barbara, State of California.

7. Defendant, TERRACOTTA LANDSCAPES, INC. (aka TERRA COTTA LANDSCAPES), is and at all relevant times herein was a California Corporation, with its principal place of business in Santa Barbara, California; prior to 2008, Defendant was an unknown California entity with

2

1    substantial contacts in the County of Santa Barbara, State of California.

2    8. Defendant MONSANTO marked, advertised, promoted, administered, promoted, sold, and/or

3    otherwise facilitated the use of Roundup that is the subject of this lawsuit.

4    9. Defendant MONSANTO has substantial contacts with the State of California, including but

5    not limited to its contacts with Decedent, an individual who was, upon information an belief, exposed

6    to Roundup.

7    10. This Court has jurisdiction over this matter because Defendant MONSANTO, is domiciled,

8    conducts business in, and has substantial contacts within the State of California.

9    11. Venue is proper in the County of Santa Barbara pursuant to section 395(a) of the *California*

10    *Code of Civil Procedure* because the incident at the core of this lawsuit occurred in the County of

11    Santa Barbara, State of California.

12    III. <strong><u>PARTIES</u></strong>

13    12. At all times mentioned herein, Plaintiff EDILIA GONZALEZ, was, and is, an individual who

14    resides in the County of Santa Barbara, California.

15    13. At all times relevant to this action, Plaintiff LAURA BALBUENA GONZALEZ, was, and is,

16    an individual who resides in the County of Santa Barbara, State of California.

17    14. At all times relevant to this action, Plaintiff CAESAR MANUEL BALBUENA GONZALEZ,

18    was, and is, an individual residing in the County of Santa Barbara, State of California.

19    15. At all times relevant to this action, Plaintiff AMAYRANI BALBUENA GONZALEZ, was,

20    and is, an individual residing in the County of Santa Barbara, State of California.

21    16. At all times mentioned herein, Decedent MANUEL BALBUENA, was an individual who

22    resided in the County of Santa Barbara, California.

23    17. Decedent was married to Plaintiff EDILIA GONZALEZ at the time of his death.

24    18. Decedent had three children with Plaintiff EDILIA GONZALEZ, Plaintiffs LAURA

25    BALBUENA GONZALEZ, CAESAR MANUEL BALBUENA GONZALEZ, and AMAYRANI

26    BALBUENA GONZALEZ.

27    19. At all times mentioned herein, Defendant MONSANTO, was, and is, a business entity doing

28    business in the County of Santa Barbara, State of California.

3

20. At all times mentioned herein, Defendant TERRACOTTA LANDSCAPES, INC. (aka TERRA COTTA LANDSCAPES), a California Corporation, was and is a business entity doing business in the County of Santa Barbara, State of California.

21. The true names and/or capacities, whether individual, corporate, associate or otherwise, of Defendants Does 1 through 1000, inclusive, and each of them, are unknown to Plaintiffs, who therefore sue said Defendants by such fictitious names. Plaintiffs are informed and believe, and upon such information and belief allege, that each of the Defendants fictitiously named herein as a Doe is legally responsible, negligently or in some other actionable manner, for the events and happenings hereinafter referred to, and proximately caused the injuries and damages to Plaintiffs hereinafter alleged. Plaintiffs will seek leave of Court to amend this Complaint to assert the true names and/or capacities of such fictitiously named Defendants when the same have been ascertained.

22. Plaintiffs are informed and believe and thereupon allege, that at all times mentioned herein, Defendants, and each of them, including Does 1 through 1000, were the agents, servants, employees and/or joint ventures of their co-Defendants, and were, as such, acting within the course, scope and authority of said agency, employment and/or joint venture, and that each and every Defendants, as aforesaid, when acting as a principal, was negligent in the selection and hiring of each and every Defendants as an agent, employee and/or joint venturers.

## IV. FACTUAL ALLEGATIONS

23. At all relevant times, Defendant Monsanto designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the commercial herbicide Roundup.

24. "Roundup" refers to all formulations of Defendant Monsanto's Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended

1   Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer,

2   Roundup Ready-to- Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide,

3   Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup

4   Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup

5   Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup

6   WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation containing the

7   active ingredient glyphosate.

8      25.  Defendant Monsanto is a multinational agricultural biotechnology corporation based in St.

9   Louis, Missouri.  It is the world's leading producer of glyphosate.

10      26.  Defendant Monsanto discovered the herbicidal properties of glyphosate during the 1970's

11   and developed it as a broad-spectrum herbicide used to kill weeds and grasses known to compete with

12   commercial crops grown around the globe.

13      27.  Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on

14   whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate

15   synthase, known as EPSP synthase.

16      28.  Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that

17   interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant

18   tissue and ultimately plant death.

19      29.  Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots;

20   and detectable quantities accumulate in the plant tissues.

21      30.  Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial

22   nurseries, suburban lawns, parks, and golf courses.  This increase in use has been driven largely by

23   the proliferation of "Roundup Ready" crops, which have been genetically engineered to resist the

24   activity of glyphosate.

25      31.  Defendant Monsanto is responsible for the development, manufacture, marketing, sale, and

26   distribution of Roundup Ready seeds.  By 2009, Monsanto was the world's leading producer of

27   Roundup Ready seeds.  In 2010, roughly 70% of corn and cotton and 90% of soybean fields in the

28   United States were grown with Roundup Ready seeds.

1    32. Roundup was introduced in 1974 and is today one of the world's most widely-used
2    herbicides. Monsanto's glyphosate products are registered in more than 130 countries and are
3    approved for weed control in more than 100 crops. No other herbicide active ingredient compares in
4    terms of number of uses.[1]

5    33. In all this time, farmers have used Roundup unaware that it is a carcinogen.

6    ## V. MONSANTO'S FALSE REPRESENTATIONS REGARDING
7    ## THE SAFETY OF ROUNDUP

8    34. In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto
9    based on its false and misleading advertising of Roundup products.  Specifically, the lawsuit
10   challenged Monsanto's general representations that its spray-on glyphosate-based herbicides,
11   including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and
12   fish. Among the representations the NYAG found deceptive and misleading about the human and
13   environmental safety of Roundup are the following:

14   35. Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build
15   up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and
16   fences.

17   36. And remember that Roundup is biodegradable and won't build up in the soil. That will give
18   you the environmental confidence you need to use Roundup everywhere you've got a weed, brush,
19   edging or trimming problem.

20   37. Roundup biodegrades into naturally occurring elements.

21   38. Remember that versatile Roundup herbicide stays where you put it. That means there's no
22   washing or leaching to harm customers' shrubs or other desirable vegetation.

23   39. This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

24   40. You can apply Accord with "confidence because it will stay where you put it" it bonds tightly
25   to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade

26

27   [1] *Backgrounder*, History of Monsanto's Glyphosate Herbicides, June 2005, available at
28   www.monsanto.com/products/documents/glyphosate-background-materials/back_ground.pdf

1  aware of glyphosate's carcinogenic properties.

2      94. Glyphosate and Roundup in particular have long been associated with carcinogenicity and

3  the development of numerous forms of cancer, including, but not limited to, NHL, Hodgkin's

4  Lymphoma, Multiple Myeloma, and soft tissue sarcoma.

5      95. Monsanto has known of this association since the mid-1980s and numerous human and

6  animal studies evidence the carcinogenicity of glyphosate and/or Roundup.

7      96. In 1985, the EPA studied the effects of glyphosate in mice finding a dose related response

8  in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate

9  was oncogenic.

10      97. In 2003, Lennart Hardell and Mikael Eriksson published the results of two case controlled

11  studies on pesticides as a risk factor for NHL and hairy cell leukemia. The study concluded that

12  glyphosate had the most significant relationship to NHL among all herbicide studies with an

13  increased odds ratio of 3.11.

14      98. In 2003, AJ De Roos published a study examining the pooled data of mid-western farmers,

15  examining pesticides and herbicides as risk factors for NHL. The study, which controlled for

16  potential confounders, found a relationship between increased NHL incidence and glyphosate.

17      99.  In 2008, Mikael Eriksson published a population based case-control study of exposure to

18  various pesticides as a risk factor for NHL. This strengthened previous associations between

19  glyphosate and NHL.

20      100. In spite of this knowledge, Defendant Monsanto continued to issue broad and sweeping

21  statements suggesting that Roundup was, and is, safer than ordinary household items such as table

22  salt, despite a lack of scientific support for the accuracy and validity of these statements and, in

23  fact, voluminous evidence to the contrary.

24      101. On information and belief, these statements and representations have been made with the

25  intent of inducing Decedent, the agricultural community, and the public at large to purchase and

26  increase the use of Roundup for Monsanto's pecuniary gain, and in fact did induce Decedent to

27  use Roundup.

28      102. Defendant Monsanto made these statements with complete disregard and reckless

13

1  indifference to the safety of Decedent and the general public.

2      103. Notwithstanding Monsanto's representations, scientific evidence has established a clear

3  association between glyphosate and genotoxicity, inflammation, and an increased risk of many

4  cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

5      104. Monsanto knew or should have known that glyphosate is associated with an increased risk

6  of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue

7  sarcomas.

8      105. Monsanto failed to appropriately and adequately inform and warn Decedent of the serious

9  and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup,

10  including, but not limited to the risk of developing Multiple Myeloma, NHL or other cancers, as

11  well as other severe and personal injuries, which are permanent and/or long-lasting in nature,

12  cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for

13  medical treatment, monitoring, and/or medications.

14      106. Despite the IARC's classification of glyphosate as a class 2A probable carcinogen,

15  Monsanto continues to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-

16  genotoxic, and falsely warrants to users and the general public that independent experts and

17  regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in

18  glyphosate and Roundup.

19      107. Monsanto has claimed and continues to claim that Roundup is safe, non-carcinogenic, and

20  non-genotoxic.

21      108. Monsanto claims on its website that "[r]egulatory authorities and independent experts

22  around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies

23  and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand

24  herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that

25  it is not genotoxic."[11]

26

27  _____

[11] *Backgrounder* - Glyphosate: No Evidence of Carcinogenicity, updated November 2014,
28  available at www.monsanto.com/glyphosate/documents/no-evidence-of-carcinogenicity.pdf.

COMPLAINT FOR DAMAGES

1  aware of glyphosate's carcinogenic properties.

2      94. Glyphosate and Roundup in particular have long been associated with carcinogenicity and
3  the development of numerous forms of cancer, including, but not limited to, NHL, Hodgkin's
4  Lymphoma, Multiple Myeloma, and soft tissue sarcoma.

5      95. Monsanto has known of this association since the mid-1980s and numerous human and
6  animal studies evidence the carcinogenicity of glyphosate and/or Roundup.

7      96. In 1985, the EPA studied the effects of glyphosate in mice finding a dose related response
8  in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate
9  was oncogenic.

10      97. In 2003, Lennart Hardell and Mikael Eriksson published the results of two case controlled
11  studies on pesticides as a risk factor for NHL and hairy cell leukemia. The study concluded that
12  glyphosate had the most significant relationship to NHL among all herbicide studies with an
13  increased odds ratio of 3.11.

14      98. In 2003, AJ De Roos published a study examining the pooled data of mid-western farmers,
15  examining pesticides and herbicides as risk factors for NHL. The study, which controlled for
16  potential confounders, found a relationship between increased NHL incidence and glyphosate.

17      99. In 2008, Mikael Eriksson published a population based case-control study of exposure to
18  various pesticides as a risk factor for NHL. This strengthened previous associations between
19  glyphosate and NHL.

20      100. In spite of this knowledge, Defendant Monsanto continued to issue broad and sweeping
21  statements suggesting that Roundup was, and is, safer than ordinary household items such as table
22  salt, despite a lack of scientific support for the accuracy and validity of these statements and, in
23  fact, voluminous evidence to the contrary.

24      101. On information and belief, these statements and representations have been made with the
25  intent of inducing Decedent, the agricultural community, and the public at large to purchase and
26  increase the use of Roundup for Monsanto's pecuniary gain, and in fact did induce Decedent to
27  use Roundup.

28      102. Defendant Monsanto made these statements with complete disregard and reckless

13

1  indifference to the safety of Decedent and the general public.

2  103. Notwithstanding Monsanto's representations, scientific evidence has established a clear

3  association between glyphosate and genotoxicity, inflammation, and an increased risk of many

4  cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

5  104. Monsanto knew or should have known that glyphosate is associated with an increased risk

6  of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue

7  sarcomas.

8  105. Monsanto failed to appropriately and adequately inform and warn Decedent of the serious

9  and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup,

10  including, but not limited to the risk of developing Multiple Myeloma, NHL or other cancers, as

11  well as other severe and personal injuries, which are permanent and/or long-lasting in nature,

12  cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for

13  medical treatment, monitoring, and/or medications.

14  106. Despite the IARC's classification of glyphosate as a class 2A probable carcinogen,

15  Monsanto continues to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-

16  genotoxic, and falsely warrants to users and the general public that independent experts and

17  regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in

18  glyphosate and Roundup.

19  107. Monsanto has claimed and continues to claim that Roundup is safe, non-carcinogenic, and

20  non-genotoxic.

21  108. Monsanto claims on its website that "[r]egulatory authorities and independent experts

22  around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies

23  and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand

24  herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that

25  it is not genotoxic."[11]

26

27  _____

[11] *Backgrounder* - Glyphosate: No Evidence of Carcinogenicity, updated November 2014,
28  available at www.monsanto.com/glyphosate/documents/no-evidence-of-carcinogenicity.pdf.

COMPLAINT FOR DAMAGES

109. Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

110. Glyphosate, and Monsanto's Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

111. Monsanto's statements proclaiming the safety of Roundup and disregarding its dangers misled Decedent.

112. Despite Monsanto's knowledge that Roundup was associated with an elevated risk of developing cancer, Monsanto's promotional campaigns focused on Roundup's purported "safety profile."

113. Monsanto's failure to adequately warn Decedent resulted in (1) Decedent using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL and Multiple Myeloma, and other injuries associated with Roundup.

114. Monsanto failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

115. Monsanto's failure to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

116. Monsanto's failure to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

117. Monsanto's failure to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

118. By reason of the foregoing acts and omissions, Plaintiffs seek compensatory damages as a result of Decedent's use of, and exposure to, Roundup, which caused or was a substantial contributing factor in causing Decedent to suffer from cancer, specifically Multiple Myeloma, which lead to his death. Decedent suffered severe and personal injuries that were permanent and lasting in nature, and physical pain and mental anguish, including diminished enjoyment of life.

15

1    119. By reason of the foregoing, Decedent was severely and permanently injured.

2    120. By reason of the foregoing acts and omissions, Plaintiffs have endured and continue to

3    suffer, emotional and mental anguish, medical expenses, and other economic and non-economic

4    damages, as a result of Defendant Monsanto's actions and inactions.

5                    IX. **DECEDENT'S EXPOSURE TO ROUNDUP**

6    121. Upon information and belief, Decedent was regularly exposed to Roundup for

7    approximately 15 years, from on or around 2002 through 2017, while working for Defendant

8    TERRACOTTA LANDSCAPES, INC. in the fields in Santa Barbara County.

9        a.   Decedent also worked at Polo Ranch as well as at homes along a route in Santa Barbara

10           County.

11    122. Decedent was subsequently diagnosed with Multiple Myeloma, a bone marrow

12    malignancy, in or around August 2017.  Decedent also suffered from heart failure and kidney

13    failure as a result of this disease.

14    123. As a result of Decedent's injuries, Plaintiffs have incurred significant economic and non-

15    economic damages.

16    124. During the entire time that Decedent was exposed to Roundup, he did not know that

17    exposure to Roundup was injurious to his health or to the health of others.

18    125. Plaintiffs first learned that, specifically, exposure to Roundup can cause cancer and other

19    serious illnesses in or around May 2019 or June 2019.

20    126. At all times mentioned herein, Plaintiff EDILIA GONZALEZ was the wife of Decedent

21    MANUEL BALBUENA, and Plaintiffs LAURA BALBUENA GONZALEZ, CAESAR

22    MANUEL BALBUENA GONZALEZ and AMAYRANI BALBUENA GONZALEZ were the

23    children of Decedent MANUEL BALBUENA (collectively "Plaintiffs").  As a result of

24    Decedent's damages, Plaintiffs have suffered the loss of love, companionship, comfort, care,

25    assistance, protection, affection, society, and moral support.

26               X. **TOLLING OF APPLICABLE STATUTE OF LIMITATIONS**

27    A.    **DISCOVERY RULE TOLLING**

28    127. Decedent and Plaintiffs had no way of knowing about the risk of serious illness

16

COMPLAINT FOR DAMAGES

1  associated with the use of and/or exposure to Roundup and glyphosate until IARC release its

2  formal assessment of glyphosate in July 2015. This is the quintessential case for tolling.

3      128. Within the time period of any applicable statutes of limitations, Plaintiffs could not have

4  discovered, through the exercise of reasonable diligence, that exposure to Roundup and

5  glyphosate is injurious to human health.

6      129. Plaintiffs did not discover, and did not know the facts that would cause a reasonable

7  person to suspect, the risks associated with the use of and/or exposure to Roundup and

8  glyphosate; nor would a reasonable and diligent investigation by them have disclosed that

9  Roundup and glyphosate would cause their cancers.

10     130. For these reasons, all applicable statutes of limitations have been tolled by operation of

11  the discovery rule with respect to Plaintiffs' claims.

12  **B.    FRAUDULENT CONCEALMENT TOLLING**

13     131. All applicable statutes of limitations have also been tolled by Defendant Monsanto's

14  knowing and active fraudulent concealment and denial of the facts alleged herein throughout the

15  time period relevant to this action.

16     132. Instead of disclosing critical safety information about Roundup and glyphosate,

17  Defendant Monsanto has consistently and falsely represented the safety of its Roundup products.

18  **C.    ESTOPPEL**

19     133. Defendant Monsanto was under a continuous duty to disclose to consumers, users, and

20  other persons coming into contact with its products, including Decedent, accurate safety

21  information concerning its products and the risks associated with the use of and/or exposure to

22  Roundup and glyphosate.

23     134. Instead, Defendant Monsanto knowingly, affirmatively, and actively concealed safety

24  information concerning Roundup and glyphosate and the serious risks associated with the use of

25  and/or exposure to its products.

26     135. Based on the foregoing, Defendant Monsanto is estopped from relying on any statutes of

27  limitations in defense of this action.

28

## XI. FIRST CAUSE OF ACTION

## NEGLIGENCE

### (By PLAINTIFF against DEFENDANTS AND DOES 1-1000)

136. Plaintiffs re-allege each paragraph above as if fully set forth herein.

137. Monsanto had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

138. Monsanto failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup into interstate commerce in that Monsanto knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of Multiple Myeloma, as well as other severe and personal injuries that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

139. The negligence by Monsanto, its agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

140. Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly testing it;

141. Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup;

142. Not conducting sufficient testing programs to determine whether or not Roundup was safe for use; in that Monsanto knew or should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users;

143. Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Monsanto had knowledge that Roundup is, was, or could be carcinogenic;

144. Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render

18

Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

145. Negligently failing to adequately and correctly warn Decedent, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

146. Negligently failing to petition the EPA to strengthen the warnings associated with Roundup;

147. Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

148. Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

149. Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

150. Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

151. Negligently designing Roundup in a manner that was dangerous to its users;

152. Negligently manufacturing Roundup in a manner that was dangerous to its users;

153. Negligently producing Roundup in a manner that was dangerous to its users;

154. Negligently formulating Roundup in a manner that was dangerous to its users;

155. Concealing information from Decedent while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations;

156. Improperly concealing and/or misrepresenting information from Decedent, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides; and

157. Negligently selling Roundup with a false and misleading label.

158. Monsanto under-reported, underestimated, and downplayed the serious dangers of Roundup.

159. Monsanto negligently and deceptively compared the safety risks and/or dangers of Roundup with common everyday foods such as table salt, and other forms of herbicides.

160. Monsanto was negligent and/or violated California law in the designing, researching,

supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that it:

161. Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide;

162. Failed to accompany its product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

163. Failed to accompany its product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

164. Failed to accompany its product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;

165. Failed to warn Decedent of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of Multiple Myeloma;

166. Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup;

167. Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants;

168. Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity; and was otherwise careless and/or negligent.

169. Despite the fact that Monsanto knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Monsanto continues to market, manufacture, distribute, and/or sell Roundup to consumers, including Decedent.

170. Monsanto knew or should have known that consumers such as Decedent would foreseeably suffer injury as a result of Monsanto's failure to exercise ordinary care.

171. Monsanto's violations of law and/or negligence were the proximate cause of Decedent's injuries, harm and economic loss, which Plaintiffs suffered and will continue to suffer.

172. As a result of the foregoing acts and omissions, Decedent MANUEL BALBUENA suffered life-threatening Multiple Myeloma, and severe personal injuries, which were permanent and lasting

in nature, and physical pain and mental anguish, including diminished enjoyment of life, as well as financial expenses for hospitalization and medical care.

173. As a further result of Defendants' conduct, Decedent was unable to continue in his trade and business in the usual manner and suffered a loss of income that Decedent and Plaintiffs will continue to suffer in the future.  Also as a further result, Decedent and Plaintiffs suffered and Plaintiffs continue to suffer emotional distress, pain, frustration and inconvenience.

174. At all times mentioned herein, Plaintiff EDILIA GONZALEZ was the wife of Decedent MANUEL BALBUENA, and Plaintiffs LAURA BALBUENA GONZALEZ, CAESAR MANUEL BALBUENA GONZALEZ and AMAYRANI BALBUENA GONZALEZ were the children of Decedent MANUEL BALBUENA (collectively "Plaintiffs").  As a result of Decedent's damages, Plaintiffs have suffered the loss of love, companionship, comfort, care, assistance, protection, affection, society, and moral support.

175. WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## XII. SECOND CAUSE OF ACTION
### STRICT PRODUCTS LIABILITY: DESIGN DEFECT
### (By PLAINTIFF against DEFENDANTS and DOES 1-1000)

176. Plaintiffs re-allege each paragraph above as if fully set forth herein.

177. At all times herein mentioned, Monsanto designed, researched, manufactured, tested, advertised, promoted, sold, and distributed Roundup as hereinabove described that was used by Plaintiffs.

178. Roundup was expected to and did reach the usual consumers, handlers, and persons coming into contact with it without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by Monsanto.

179. At those times, Roundup was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, Decedent herein.

180. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed,

21

1   sold, and distributed by Monsanto was defective in design or formulation in that, when it left the

2   hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated

3   with the design or formulation of Roundup.

4       181. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed,

5   sold, and distributed by Monsanto was defective in design and/or formulation, in that, when it left the

6   hands of Monsanto or its manufacturers and/or suppliers, it was unreasonably dangerous,

7   unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would

8   expect.

9       182. At all times herein mentioned, Roundup was in a defective condition and unsafe, and

10  Monsanto knew or had reason to know that it was defective and unsafe, especially when used in the

11  form and manner as provided by Monsanto.  In particular, Roundup was defective in the following

12  ways:

13      183. When placed in the stream of commerce, Monsanto's Roundup products were defective in

14  design and formulation and, consequently, dangerous to an extent beyond that which an ordinary

15  consumer would anticipate.

16      184. When placed in the stream of commerce, Monsanto's Roundup products were unreasonably

17  dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses

18  when used in a reasonably anticipated manner.

19      185. When placed in the stream of commerce, Monsanto's Roundup products contained

20  unreasonably dangerous design defects and were not reasonably safe when used in a reasonably

21  anticipated manner.

22      186. Monsanto did not sufficiently test, investigate, or study its Roundup products.

23      187. Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility

24  stemming from the use of the herbicide.

25      188. Monsanto new or should have known at the time of marketing its Roundup products that

26  exposure to Roundup could result in cancer and other severe illnesses and injuries.

27      189. Monsanto did not conduct adequate post-marketing surveillance of its Roundup products.

28      190. Monsanto knew, or should have known that at all times herein mentioned its Roundup was in

22

1    a defective condition and was and is inherently dangerous and unsafe.

2       191. Decedent was exposed to Monsanto's Roundup without knowledge of Roundup's dangerous

3    characteristics.

4       192. At the time of Decedent's use of and exposure to Roundup, Roundup was being used for the

5    purposes and in a manner normally intended, as a broad-spectrum herbicide.

6       193. Armed with this knowledge, Monsanto voluntarily designed its Roundup with a dangerous

7    condition for use by the public, and in particular for use by Decedent and others.

8       194. Monsanto had a duty to create a product that was not unreasonably dangerous for its normal,

9    intended use.

10      195. Monsanto created a product that was and is unreasonably dangerous for its normal, intended

11   use.

12      196. Monsanto marketed and promoted a product in such a manner so as to make it inherently

13   defective as the product downplayed its suspected, probable, and established health risks inherent

14   with its normal, intended use.

15      197. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed,

16   sold, and distributed by Monsanto was manufactured defectively in that Roundup left the hands of

17   Monsanto in a defective condition and was unreasonably dangerous to its intended users.

18      198. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed,

19   sold, and distributed by Monsanto reached its intended users in the same defective and unreasonably

20   dangerous condition in which Monsanto's Roundup was manufactured.

21      199. Monsanto designed, researched, manufactured, tested, advertised, promoted, marketed, sold,

22   and distributed a defective product, which created an unreasonable risk to the health of consumers

23   and to Decedent in particular, and Monsanto is therefore strictly liable for the injuries sustained by

24   Decedent.

25      200. Decedent (and Plaintiffs) could not, by the exercise of reasonable care, have discovered

26   Roundup's defects herein mentioned or perceived its danger.

27      201. Monsanto is thus strictly liable to Plaintiffs for the manufacturing, marketing, promoting,

28   distribution, and selling of a defective product, Roundup.

COMPLAINT FOR DAMAGES

1    202. Monsanto's defective design of Roundup amounts to willful, wanton, and/or reckless
2 conduct.

3    203. Defects in Monsanto's Roundup were the cause or a substantial factor in causing Plaintiffs'
4 injuries.

5    204. As a result of the foregoing acts and omission, Decedent MANUEL BALBUENA developed
6 Multiple Myeloma, and suffered severe and personal injuries that were permanent and lasting in
7 nature, physical pain and mental anguish, including diminished enjoyment of life, and financial
8 expenses for hospitalization and medical care.

9    205. As a further result of Defendants' conduct, Decedent was unable to continue in his trade and
10 business in the usual manner and suffered a loss of income that Decedent and Plaintiffs will continue
11 to suffer in the future.  Also as a further result, Decedent and Plaintiffs suffered and Plaintiffs
12 continue to suffer emotional distress, pain, frustration and inconvenience.

13    206. At all times mentioned herein, Plaintiff EDILIA GONZALEZ was the wife of Decedent
14 MANUEL BALBUENA, and Plaintiffs LAURA BALBUENA GONZALEZ, CAESAR MANUEL
15 BALBUENA GONZALEZ and AMAYRANI BALBUENA GONZALEZ were the children of
16 Decedent MANUEL BALBUENA (collectively "Plaintiffs").  As a result of Decedent's damages,
17 Plaintiffs have suffered the loss of love, companionship, comfort, care, assistance, protection,
18 affection, society, and moral support.

19    207. WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in Plaintiffs'
20 favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys'
21 fees and all relief as this Court deems just and proper.

22                  **XIII. THIRD CAUSE OF ACTION**
23          **STRICT PRODUCTS LIABILITY: FAILURE TO WARN**
24           **(By PLAINTIFF against DEFENDANTS and DOES 1-1000)**

25    208. Plaintiffs re-allege each paragraph above as if fully set forth herein.
26    209. Monsanto has engaged in the business of selling, testing, distributing, supplying,
27 manufacturing, marketing, and/or promoting Roundup, and through that conduct has knowingly and
28 intentionally placed Roundup into the stream of commerce with full knowledge that it reaches

1  consumers such as Decedent who are exposed to it through ordinary and reasonably foreseeable uses.

2  210. Monsanto did in fact sell, distribute, supply, manufacture, and/or promote Roundup to

3  Plaintiffs.  Additionally, Monsanto expected Roundup that it was selling, distributing, supplying,

4  manufacturing, and/or promoting to reach -- and Roundup did in fact reach -- consumers, including

5  Decedent, without any substantial change in the condition of the product from when it was initially

6  distributed by Monsanto.

7  211. At the time of manufacture, Monsanto could have provided the warnings or instructions

8  regarding the full and complete risks of Roundup and glyphosate-containing products because it knew

9  or should have known of the unreasonable risks of harm associated with the use of and/or exposure to

10  such products.

11  212. At all relevant times, Roundup was defective and unsafe in manufacture such that it was

12  unreasonably dangerous to the user, and was so at the time it was distributed by Monsanto and at the

13  time Decedent was exposed to and/or ingested the product.  The defective condition of Roundup was

14  due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic

15  qualities and possible side effects, including, but not limited to, developing Multiple Myeloma as a

16  result of exposure and use.

17  213. Roundup did not contain a warning or caution statement, which was necessary and, if

18  complied with, was adequate to protect the health of those exposed in violation of California law.

19  214. Monsanto's failure to include a warning or caution statement that was necessary and, if

20  complied with, was adequate to protect the health of those exposed in violation of the laws of the

21  State of California.

22  215. Monsanto could have revised Roundup's label to provide additional warnings.

23  216. This defect caused serious injury to Decedent MANUEL BALBUENA, who used Roundup

24  in its intended and foreseeable manner.

25  217. At all relevant times, Monsanto had a duty to properly design, manufacture, compound, test,

26  inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and

27  take such steps to assure that the product did not cause users to suffer from unreasonable and

28  dangerous side effects.

218. Monsanto labeled, distributed, and promoted a product that was dangerous and unsafe for the use and purpose for which it was intended.

219. Monsanto failed to warn of the nature and scope of the health risks associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of Multiple Myeloma.

220. Monsanto knew of the probable consequences of Roundup. Despite this fact, Monsanto failed to exercise reasonable care to warn of the dangerous carcinogenic properties and risks of developing Multiple Myeloma and/or other cancers from Roundup exposure, even though these risks were known or reasonably scientifically knowable at the time of distribution. Monsanto willfully and deliberately failed to avoid the consequences associated with its failure to warn, and in doing so, acted with conscious disregard for Decedent's safety.

221. At the time of exposure, Decedent could not have reasonably discovered any defect in Roundup through the exercise of reasonable care.

222. Monsanto, as the manufacturer and/or distributor of Roundup, is held to the level of knowledge of an expert in the field.

223. Decedent reasonably relied on the skill, superior knowledge, and judgment of Monsanto.

224. Had Monsanto properly disclosed the risks associated with Roundup, Decedent would have avoided the risks of Multiple Myeloma or other cancers by not using Roundup.

225. The information that Monsanto provided failed to contain adequate warnings and precautions that would have enabled Decedent, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, Monsanto disseminated information that was inaccurate, false, and misleading and that failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or expo exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

226. To this day, Monsanto has failed to adequately warn of the true risks of Decedent's injuries

26

1  associated with the use of and exposure to Roundup.

2  227. As a result of its inadequate warnings, Monsanto's Roundup products were defective and

3  unreasonably dangerous when they left Monsanto's possession and/or control, were distributed by

4  Monsanto, and used by Decedent.

5  228. As a direct and proximate result of Monsanto's actions as alleged herein, and in such other

6  ways to be later shown, the subject product caused Decedent to sustain injuries as herein alleged.

7  229. As a further result of Defendants' conduct, Decedent was unable to continue in his trade and

8  business in the usual manner and suffered a loss of income that Decedent and Plaintiffs will continue

9  to suffer in the future.   Also as a further result, Decedent and Plaintiffs suffered and Plaintiffs

10  continue to suffer emotional distress, pain, frustration and inconvenience.

11  230. At all times mentioned herein, Plaintiff EDILIA GONZALEZ was the wife of Decedent

12  MANUEL BALBUENA, and Plaintiffs LAURA BALBUENA GONZALEZ, CAESAR MANUEL

13  BALBUENA GONZALEZ and AMAYRANI BALBUENA GONZALEZ were the children of

14  Decedent MANUEL BALBUENA (collectively "Plaintiffs").  As a result of Decedent's damages,

15  Plaintiffs have suffered the loss of love, companionship, comfort, care, assistance, protection,

16  affection, society, and moral support.

17  231. WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs'

18  favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys'

19  fees and all relief as this Court deems just and proper.

## XIV. FOURTH CAUSE OF ACTION

### BREACH OF WARRANTY

#### (By PLAINTIFF against DEFENDANTS and DOES 1-1000)

23  232. Plaintiffs re-allege each paragraph above as if fully stated herein.

24  233. At all times relevant to this litigation, Monsanto engaged in the business of testing,

25  developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup

26  products, which are defective and unreasonably dangerous to consumers, including Decedent,

27  thereby placing Roundup products into the stream of commerce. These actions were under

28  Monsanto's ultimate control and supervision.

27

234. At all relevant times, Monsanto expressly and impliedly represented and warranted to the purchasers of its Roundup products, by and through statements made in labels, publications, package inserts, and other written materials intended for consumers and the general public, that its Roundup products were safe to human health and the environment, effective, fit, and proper for their intended use. Monsanto advertised, labeled, marketed, and promoted Roundup products, representing the quality to consumers and the public so as to induce their purchase or use, thereby making an express and implied warranty that Roundup products would conform to the representations.

235. These express and implied representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Roundup and glyphosate. Monsanto knew and/or should have known that the risks expressly included in Roundup warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Monsanto expressly and impliedly represented that its Roundup products were safe and effective, including for use as agricultural herbicides.

236. The representations about Roundup, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express and implied warranty that the goods would conform to the representations.

237. Monsanto placed its Roundup products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup and its active ingredient glyphosate.

238. Monsanto breached these warranties because, among other things, its Roundup products were defective, dangerous, unfit for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically, Monsanto breached the warranties in the following ways:

239. Monsanto represented through its labeling, advertising, and marketing materials that its

28
COMPLAINT FOR DAMAGES

Roundup products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated with use of and/or exposure to Roundup and glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings and labels; and

240. Monsanto represented that its Roundup products were safe for use and fraudulently concealed information demonstrating that glyphosate, the active ingredient in Roundup, had carcinogenic properties, and that its Roundup products, therefore, were not safer than alternatives available on the market.

241. Decedent was exposed to the labels on the Roundup products that he mixed and applied.

242. Monsanto had sole access to material facts concerning the nature of the risks associated with its Roundup products as expressly stated within its warnings and labels, and Monsanto knew that consumers and users such as Decedent could not have reasonably discovered that the risks expressly included in Roundup warnings and labels were inadequate and inaccurate.

243. Decedent had no knowledge of the falsity or incompleteness of Monsanto's statements and representations concerning Roundup.

244. Decedent used and/or were exposed to the use of Roundup as researched, developed, designed, tested, formulated, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by Monsanto.

245. Had the warnings and labels for Roundup products accurately and adequately set forth the true risks associated with the use of such products, including Decedent's injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Decedent could have avoided the injuries complained of herein.

246. As a direct and proximate result of Monsanto's wrongful acts and omissions, Decedent suffered severe injuries. Decedent endured pain and suffering causing himself and Plaintiffs to have suffered economic losses (including significant expenses for medical care and treatment).

247. As a further result of Defendants' conduct, Decedent was unable to continue in his trade and business in the usual manner and suffered a loss of income that Decedent and Plaintiffs will continue to suffer in the future. Also as a further result, Decedent and Plaintiffs suffered and Plaintiffs continue to suffer emotional distress, pain, frustration and inconvenience.

248. At all times mentioned herein, Plaintiff EDILIA GONZALEZ was the wife of Decedent MANUEL BALBUENA, and Plaintiffs LAURA BALBUENA GONZALEZ, CAESAR MANUEL BALBUENA GONZALEZ and AMAYRANI BALBUENA GONZALEZ were the children of Decedent MANUEL BALBUENA (collectively "Plaintiffs"). As a result of Decedent's damages, Plaintiffs have suffered the loss of love, companionship, comfort, care, assistance, protection, affection, society, and moral support.

249. WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## XV. FIFTH CAUSE OF ACTION

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

### (By PLAINTIFF against DEFENDANTS and DOES 1-1000)

250. Plaintiffs re-allege the paragraphs above as if fully stated herein.

251. At all times relevant, Monsanto engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting its Roundup products, which are defective and unreasonably dangerous to users and consumers, including Decedent, thereby placing Roundup products into the stream of commerce.  These actions were under Monsanto's ultimate control and supervision.

252. Before Decedent was exposed to the use of Roundup products, Monsanto impliedly warranted to its consumers and users – including Decedent – that Roundup products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

253. Monsanto, however, failed to disclose that Roundup has dangerous propensities when used as intended and that the use of and/or exposure to Roundup and glyphosate-containing products carries an increased risk of developing severe injuries, including Decedent's injuries.

254. Decedent reasonably relied on the skill, superior knowledge and judgment of Monsanto and on its implied warranties that Roundup products were of merchantable quality and fit for their

1  intended purpose or use.

2      255. Roundup products were expected to reach and in fact reached consumers and

3      256. users, including Decedent, without substantial change in the condition in which they were

4  manufactured and sold by Monsanto.

5      257. At all relevant times, Monsanto was aware that consumers and users of its products,

6  including Decedent, would use Roundup products as marketed by Monsanto, which is to say that

7  Decedent was a foreseeable user of Roundup.

8      258. Monsanto intended that its Roundup products be used in the manner in which Decedent in

9  fact used them and Monsanto impliedly warranted each product to be of merchantable quality, safe,

10  and fit for this use, despite the fact that Roundup was not adequately tested or researched.

11      259. In reliance on Monsanto's implied warranty, Decedent used Roundup as instructed and

12  labeled and in the foreseeable manner intended, recommended, promoted and marketed by Monsanto.

13      260. Decedent could not have reasonably discovered or known of the risks of serious injury

14  associated with Roundup or glyphosate.

15      261. Monsanto breached its implied warranty to Decedent in that its Roundup products were not

16  of merchantable quality, safe, or fit for their intended use. Roundup has dangerous propensities when

17  used as intended and can cause serious injuries, including those injuries complained of herein.

18      262. The harm caused by Roundup products far outweighed their benefit, rendering the products

19  more dangerous than an ordinary consumer or user would expect and more dangerous than alternative

20  products.

21      263. As a direct and proximate result of Monsanto's wrongful acts and omissions, Decedent

22  suffered severe and permanent physical and emotional injuries.  Decedent endured pain and

23  suffering, suffered economic loss (including significant expenses for medical care and treatment).

24      264. As a further result of Defendants' conduct, Decedent was unable to continue in his trade and

25  business in the usual manner and suffered a loss of income that Decedent and Plaintiffs will continue

26  to suffer in the future.  Also as a further result, Decedent and Plaintiffs suffered and Plaintiffs

27  continue to suffer emotional distress, pain, frustration and inconvenience.

28      265. At all times mentioned herein, Plaintiff EDILIA GONZALEZ was the wife of Decedent

1   MANUEL BALBUENA, and Plaintiffs LAURA BALBUENA GONZALEZ, CAESAR MANUEL

2   BALBUENA GONZALEZ and AMAYRANI BALBUENA GONZALEZ were the children of

3   Decedent MANUEL BALBUENA (collectively "Plaintiffs").  As a result of Decedent's damages,

4   Plaintiffs have suffered the loss of love, companionship, comfort, care, assistance, protection,

5   affection, society, and moral support.

6        266. WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in Plaintiffs'

7   favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's

8   fees, and all such other and further relief as this Court deems just and proper.  Plaintiffs also demand

9   a jury trial on the issues contained herein.

10                             **XVI. <u>SIXTH CAUSE OF ACTION</u>**

11                                  **WRONGFUL DEATH**

12                   **(By PLAINTIFF against DEFENDANTS and DOES 1-1000)**

13       267. Plaintiffs re-allege the paragraphs above as if fully stated herein.

14       268. Pursuant to California Civil Procedure Code § 377.60, Decedent's wife, PLAINTIFF

15   EDILIA GONZALEZ, and Decedent's children, Plaintiffs LAURA BALBUENA GONZALEZ,

16   CAESAR MANUEL BALBUENA GONZALEZ and AMAYRANI BALBUENA GONZALEZ, are

17   entitled to a wrongful death claim.

18       269. As a result of the negligent conduct of Defendants and DOES 1 through 1000, Decedent lost

19   his life.

20       270. The negligence by Monsanto, its agents, servants, and/or employees, included but was not

21   limited to the following acts and/or omissions:

22       a.  Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup

23           without thoroughly testing it;

24       b.  Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup;

25       c.  Not conducting sufficient testing programs to determine whether or not Roundup was safe for

26           use; in that Monsanto knew or should have known that Roundup was unsafe and unfit for use

27           by reason of the dangers to its users;

28       d.  Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic

                                        32

properties even after Monsanto had knowledge that Roundup is, was, or could be carcinogenic;

e.  Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

f.  Negligently failing to adequately and correctly warn Decedent, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

g.  Negligently failing to petition the EPA to strengthen the warnings associated with Roundup;

h.  Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

i.  Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

j.  Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

k.  Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

l.  Negligently designing Roundup in a manner that was dangerous to its users;

m.  Negligently manufacturing Roundup in a manner that was dangerous to its users;

n.  Negligently producing Roundup in a manner that was dangerous to its users;

o.  Negligently formulating Roundup in a manner that was dangerous to its users;

p.  Concealing information from the Plaintiffs while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations;

q.  Improperly concealing and/or misrepresenting information from Decedent, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of

33

1    Roundup compared to other forms of herbicides; and

2    r.   Negligently selling Roundup with a false and misleading label.

3    271. PLAINTIFFS EDILIA GONZALEZ, LAURA BALBUENA GONZALEZ, CAESAR

4    MANUEL BALBUENA GONZALEZ and AMAYRANI BALBUENA GONZALEZ are entitled to

5    damages to recoup for lost financial support, loss of gifts or benefits, funeral and burial expenses, and

6    reasonable value of household services, which were suffered as a result of Decedent's death.

7    272. PLAINTIFFS EDILIA GONZALEZ, LAURA BALBUENA GONZALEZ, CAESAR

8    MANUEL BALBUENA GONZALEZ and AMAYRANI BALBUENA GONZALEZ are also

9    entitled to damages to recoup for loss of love, companionship, comfort, care, assistance, protection,

10   affection, society, moral support, training and guidance.

11   ///

12   ///

13   ///

14   ///

15   ///

16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

## XVII. PRAYER FOR RELIEF

Wherefore, PLAINTIFFS pray for judgment against Defendant MONSANTO COMPANY, TERRACOTTA LANDSCAPES, INC., and DOES 1 through 1000, inclusive, as follows:

    1. For compensatory and general damages;

    2. For past medical expenses;

    3. For costs of suit herein incurred;

    4. For punitive damages;

    5. For interest upon any judgment entered as provided by law; and

    6. For such other and further relief as the Court may deem proper.

DATED:  July 29, 2019                GIRARDI | KEESE

                                   By:
                                       THOMAS V. GIRARDI
                                       CHRISTOPHER T. AUMAIS
                                       ASHKAHN MOHAMADI
                                       Attorneys for Plaintiffs

### DEMAND FOR JURY TRIAL

DATED:  July 29, 2019

                                    By:
                                       THOMAS V. GIRARDI
                                       CHRISTOPHER T. AUMAIS
                                       ASHKAHN MOHAMADI
                                       Attorneys for Plaintiffs

COMPLAINT FOR DAMAGES