21,24,REFER

# U.S. District Court
## CENTRAL DISTRICT OF ILLINOIS (Urbana)
## CIVIL DOCKET FOR CASE #: 2:19–cv–02307–CSB–EIL

Seeley v. Monsanto Company
Assigned to: Judge Colin Stirling Bruce
Referred to: Magistrate Judge Eric I. Long
Cause: 28:1331 Fed. Question: Personal Injury

Date Filed: 11/12/2019
Jury Demand: Plaintiff
Nature of Suit: 360 P.I.: Other
Jurisdiction: Diversity

**Plaintiff**

**Michael Seeley**
*Surviving Spouse and Administrator for*
*the Estate of Gina Seeley (decedent)*

represented by **Edgar L Howard**
CHRISTIAN LEGAL SERVICES
1831 170th Street
Hazel Crest, IL 60429
708–335–2125
Email: christianlegalserv@att.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 11/12/2019 | 1 | COMPLAINT against Monsanto Company (Filing fee $ 400 receipt number 24626009087), filed by Michael Seeley. (Attachments: # 1 Civil Cover Sheet)(JMB, ilcd) (Entered: 11/12/2019) |
| 11/12/2019 | 2 | Summons Issued as to Monsanto Company and provided to counsel for the Plaintiff for service. (JMB, ilcd) (Entered: 11/12/2019) |
| 11/22/2019 | 3 | SUMMONS Returned Executed by Michael Seeley. All Defendants. (Howard, Edgar) (Entered: 11/22/2019) |
| 11/22/2019 | 4 | SUMMONS Returned Executed by Michael Seeley. All Defendants. (Howard, Edgar) (Entered: 11/22/2019) |



# UNITED STATES DISTRICT COURT

### for the

### CENTRAL DISTRICT OF ILLINOIS

### Civil Division

| | |
|---|---|
| Michael Seeley, | ) |
| | ) |
| The Surviving Spouse and Administrator | )   Case No. 19-2307 |
| | ) |
| for the Estate of Gina Seeley (decedent) | ) |
| | )   COMPLAINT FOR DAMAGES AND |
| Plaintiff(s) | )   DEMAND FOR JURY TRIAL |
| | ) |
| | )   1. Strict Liability-Design Defect |
| | )   2. Strict Liability-Failure To Warn |
| | )   3. Negligence |
| | )   4. Wrongful Death |
| | )   5. Breach of Implied Warranty |
| V. | )   6. Punitive Damages |
| | ) |
| Monsanto Company, | ) |
| | ) |
| Defendant(s) | ) |

## COMPLAINT FOR A CIVIL CAUSE

### I. The Parties to This Complaint

#### A. The Plaintiff(s)

Name   Michael Seeley, the surviving spouse and administrator for the estate of Gina Seeley (decedent)

Address 2440 Hulett Drive

City and County Decatur, Macon

State and Zip Code Illinois 62521

Telephone Number 217-519-0926

E-mail address Mseeley2015@icloud.com

#### B. The Defendant(s)

Name Monsanto Company

Job or Title

1

Address <u>2270 Ball Drive</u>

City and County <u>St. Louis, St. Louis</u>

State and Zip Code <u>Missouri 63146</u>

Telephone Number <u>314-694-1000</u>

## II. Basis for Jurisdiction

Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties

is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of

another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case. In a

diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

The basis for jurisdiction in the case at bar is Diversity of Citizenship.

### B. If the Basis for Jurisdiction Is Diversity of Citizenship

1. The Plaintiff (s)

   a. The Plaintiff, Michael Seeley, the surviving spouse and administrator for the estate of Gina
      Seeley (decedent), is a citizen of the State of Illinois.

2. The Defendant(s)

   b. The Defendant, Monsanto Company, is incorporated under the laws of the State of
      Delaware, and has its principal place of business in the State of Missouri.

3. The Amount in Controversy

   The amount in controversy-the amount the Plaintiff claims the Defendant owes or the amount at
   stake–is more than $75,000, not counting interest and costs of court, because:
   Plaintiffs lawsuit seeks one billion dollars in various multi-claim damages including punitive
   damages.

## STATEMENT OF THE CASE

1. On or about 1970, Defendants Monsanto Company, Inc. learned of the herbicide components of

glyphosate and developed, marketed and sold as their product brand name Roundup® in 1974. Roundup®

is an herbicide used to kill crop destroying weeds. By the 2000's, glyphosate had become the most

commonly used active ingredient used by American farmers with up to tens of millions of pounds used annually. By 2013, glyphosate had become the world's most used herbicide.

2.      Monsanto is an International agricultural bio-tech corporation with its main corporate headquarters being based in St. Louis, Missouri. Monsanto leads the world in the production of glyphosate. As of 2009, Monsanto was also the international leader in the production of seeds, accounting for over one-fourth (¼) of the seed market as of 2009. The vast majority of said seeds are Roundup Ready® brand, Monsanto states that Roundup Ready® seed and crops controls crop weeds and can be sprayed in the fields without harming the crops. It was estimated that by 2010, 70% of corn and cotton and 99% of soybeans produced in the United States were Roundup Ready®.

3.      Monsanto's glyphosate-based products are registered in over 100 countries for use on over 100 different types of crops. Numerous studies have shown that glyphosate is found in creeks, rivers, streams, waterways and groundwater in farm areas near where Roundup® is used. It has also been found in food, and in farm workers and city resident's urine who have not had direct contact with glyphosate.

4.      On March 20, 2015 the World Health Organization ("WHO") agency namely the International Agency for Research on Cancer ("IARC") distributed its evaluation of glyphosate and other various herbicides, based upon exposure to glyphosate experiments and studies worldwide and marking the health implications from glyphosate since the early 2000's.

5.      The IARC issued a formal monograph evaluation based upon product safety studies specifically relating to glyphosate exposure to the human race.

6.      In July and August of 2015, the IARC Working Group specifically classified glyphosate as a Group 2A herbicide that is probably carcinogenic to humans, and that cancers commonly associated with

3

glyphosate exposure are non-Hodgkin lymphoma, and other haematopoietic cancers such as lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

7.      The "WHO" agency IARC study substantially and significantly confirms many years of the belief that glyphosate is toxic, poisonous and a carcinogen to humans.

8.      Despite the long belief that glyphosate is toxic to humans, Monsanto, from its commencement of the sale of Roundup®, has always, and continues to this day, to represent it as safe to humans and the environment. Monsanto has repeatedly and continues to proclaim to the International Community and especially to United States consumers, that Roundup® and glyphosate-based herbicides pose nor create unreasonable risk of harm to human health or the environment.

9.      This case brought on behalf of Plaintiff(s) Michael Seeley the surviving spouse and administrator for the estate of Gina Seeley (decedent).

10.     This case is brought against Defendant Monsanto Company (Monsanto).

11.     Plaintiff(s) currently reside in Decatur, Illinois.

12.     Plaintiff(s) resided in Decatur, Illinois at the time of Gina Seeley's diagnosis of non-Hodgkin lymphoma (NHL). That Gina Seeley (decedent) herein, resided in Decatur, Illinois her entire life until her untimely death, succumbing to non-Hodgkin lymphoma cancer on November 18, 2014.

13.     Plaintiff Gina Seeley received medical treatment for her NHL in Illinois.

4

14.     Jurisdiction is proper based on diversity under 28 U.S.C. § 1332 because Plaintiff(s) are citizens

of Illinois, a different state than the Defendant's states of citizenship, and the aggregate amount in

controversy exceeds $75,000, exclusive of interest and costs.

15.     Plaintiff Gina Seeley alleges injury from her exposure to Defendant's Roundup® products.

16.     Plaintiff was exposed to Monsanto's Roundup® products from in or around 1989. From

approximately 1989 to 2012, Gina Seeley (decedent) purchased and used bulk loads of Monsanto's

Roundup® weed killer multiple times to spray weeds, brush and vegetation growth surrounding her 10

acres of residential woods, ponds, hunting land and garden, spraying 25-50 gallons per week during

spring, summer and fall.

17.     Plaintiff Gina Seeley used Monsanto's Roundup® products in Illinois.

18.     Plaintiff Gina Seeley was first diagnosed and endured pain and suffering with non-Hodgkin

lymphoma cancer on or about 2006 or 2007. The cancer went into remission twice with the use of

chemotherapy and stem cell extraction and replacement. Gina Seeley ultimately succumbed to NHL

cancer and died on November 18, 2014 after years of exposure to Roundup® herbicide.

19.     At all relevant times Gina Seeley (decedent) was the spouse of Michael Seeley and Michael

Seeley bringing the claims herein as a surviving spouse and administrator of the estate of Gina Seeley

Plaintiff(s).

20.     Plaintiff(s) bring claims against Monsanto under the following theories of liability:

        Strict Liability (Design Defect); Strict Liability (Failure to Warn); Negligence; Breach of Express

Warranty; Breach of Implied Warranties, and Wrongful Death.

## JURISDICTION AND VENUE

21.     The United States District Court for the Central District of Illinois (Urbana) has federal jurisdiction over the defendants(s) and subject matter hereto pursuant to the Constitution, Statute and case law. Jurisdiction is proper based upon diversity of under 28 U.S.C. § 1332, because Plaintiff(s) are citizens of Illinois, a different state than the corporate Defendant state of Missouri citizenship and the aggregate amount in the controversy exceeds $75,000 exclusive of interest and costs.

22.     The Federal Court for the Central District of Illinois has jurisdiction over the defendant(s) because an out of state Missouri based company incorporated in Delaware, authorized to do business in Illinois has sufficient minimal contacts in Illinois, or intentionally avails itself of profits in the Illinois market so as to render the exercise of jurisdiction over it by Illinois federal courts as fair, just and appropriate with traditional notions of fair play and substantial justice.

23.     Plaintiff seeks relief that is within the jurisdictional limits of the Court.

## THE PARTIES

### Plaintiff

24.     Plaintiff(s), Michael Seeley the surviving spouse and administrator for the estate of Gina Seeley (decedent), is a competent individual over the age of 18, a resident of Decatur, Illinois and a citizen of the United States, and hereby submits to the jurisdiction of the Court and alleges that venue in this Court is proper.

### Defendant(s)

6

25.     Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its headquarters and

principle place of business in St. Louis, Missouri. At all times relevant to this complaint, Monsanto is the

entity that discovered the herbicidal components and properties glyphosate and the manufacturer of

Roundup®. Monsanto has regularly, consistently, and continually transacted and conducted business

within the State of Illinois, and has derived substantial revenues for goods and products including

Roundup® used in the State of Illinois and derived substantial revenue from interstate commerce.

**FACTS**

26.     Glyphosate is a broad-spectrum, non-selective herbicide widely used internationally in herbicidal

products.

27.     Plants sprayed with glyphosate has the chemical travel throughout its roots, stem and fruits and

die within two to three days.

28.     For nearly four decades, agricultural farms internationally have used Roundup® without knowing

damages and risks it poses. This is due to Monsanto's boasting of glyphosate as a technological new

breakthrough able to kill weeds without causing harm to humans and the environments. Time has proven

these representations to be falsely presented. The World Health Organization has stated that the principal

herbicidal ingredient in Roundup® is glyphosate and that it is a probable cause of cancer. Most at risk are

farmers, landscapers, nurseries, gardeners, etc. that are exposed to Roundup®.

29.     Monsanto for four decades to current, has repeatedly championed Roundup® and the safety and

lack of harm to the public through Monsanto's use of false or paid for scientific studies to promote and

assure Roundup® was safe for human use and the environment, and produced studies that attacked the

credibility of legitimate scientist that exposed its carcinogenic damages. Monsanto engaged in a campaign

of disinformation to win over government safety approval to market Roundup®.

7

30.     A Monsanto scientist discovered glyphosate herbicidal properties in 1970 and the first glyphosate-based herbicide, Roundup® was introduced to the market by the mid 1970's. Monsanto marketed Roundup® as a safe herbicide for widespread commercial and consumer use from its inception, and continues to claim it is safe to date.

31.     Herbicide manufacture and distribution are registered under federal law under the Federal Fungicide and Rodenticide Act ("FIFRA" or "ACT") and the EPA prior to public distribution.

32.     Because pesticides are toxic to all life and the environment, the EPA requires a variety of tests to evaluate any toxic risks of harm thereto. However, registration with the EPA is not a finding or and assurance of safety, but rather, that the use of the product in accordance with the label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

33.     The EPA and State of Illinois registered Roundup® for distribution sale and manufacture in the United States.

34.     The EPA completed its ongoing review of glyphosate in early 2015 but delayed releasing its risk assessment pending further review in light of the "WHO" health related findings that Roundup® glyphosate is a probable carcinogen.

35.     In 1985, the EPA classified glyphosate as possibly carcinogenic to humans (Group C) based upon early studies showing glyphosate could cause cancer in laboratory animals. In 1991, the EPA changed its classification of glyphosate to evidence of non-carcinogenicity in humans to (Group E) after pressure from Monsanto's use of contrary studies. However, the EPA made clear that its designation was based on

evidence at that time and that it is not a conclusion that the agent will not be a carcinogen under any circumstances.

36.     On two occasions, the EPA has found that Monsanto's hired laboratories to test the toxicity of Roundup® had committed fraud when attempting to register it.

37.     The first finding of fraud was when Monsanto initially sought to register Roundup® by hiring Industrial Bio-Test Laboratories ("IBT") to evaluate pesticide herbicide use of Roundup®. In 1976 the FDA evaluated IBT and found four discrepancies in raw data and the final report relating to toxic impacts of glyphosate and the tests to be invalid.

38.     In 1983, three top executives of IBT were convicted of fraud.

39.     In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to test Roundup® herbicidal and pesticidal risks. That same year, three of Craven lab employees were indicted and later convicted of fraudulent laboratory practices in the testing of herbicides and pesticides.

40.     Despite the false testing culture, Monsanto was distributing Roundup® in over 100 countries within a few years of its initial registration.

41.     Monsanto, in order to maintain its international Roundup® herbicidal sales dominance, prior to its glyphosate United States patent expiration in the year 2000, needed a plan to ward off impending competition. It developed and distributed Roundup Ready® seeds in 1996. A genetically engineered seed that is compatible with Roundup® that farmers could spray on their crops that are resistant to glyphosate.

42.     Once again, having cornered the worldwide herbicide market with Roundup® herbicide and Roundup Ready® seed, Monsanto continued its reaping of windfall profits. By 2000, Monsanto bio-seeds were planted on over 80 million acres worldwide and 70% of American soybean fields, securing Monsanto's world herbicidal and bio-seed dominance through marketing of Roundup® and Roundup Ready® seeds accounting for 2.8 billion in sales and outselling competitor herbicide sales five to one. Today, glyphosate is a volume leader in herbicide sales.

43.     Monsanto has known for decades that if falsely advertised the safety of Roundup® and fraudulently concealed its carcinogenic risks to human exposure.

44.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto and its false misleading advertising of Roundup® products. This culminated in a November 19, 1996 "Assurance of Discontinuance Agreement" with the NYAG. The agreement required Monsanto to cease and desist from advertising that its Roundup® products containing glyphosate, are safe non-toxic and free of risk biodegradable, will not move through the environment, be good for the environment, safer than other, non-herbicide consumer products such as salt, practically non-toxic, and safe for humans, animals and where children play.

45.     In 2009, the highest court in France found that Monsanto lied about the safety of Roundup® and that it was biodegradable.

46.     The IARC classification process for glyphosate followed strict evaluation of a chemical agent procedures. Evaluations were performed by neutral panels of International experts without conflict of interest. A Working Group membership and data was selected nearly a year in advance culminating in a Working Group Monograph publishing the selected literature and evidence in the Lancet Oncology.

47.     In March 2015, the IARC working Group reassessed glyphosate. The Lancet Oncology summary reported glyphosate as a Group 2A agent and probably carcinogenic in humans.

48.     On July 29, 2105, IARC issued its Monograph for glyphosate. The Working Group consisted of a one-year study by 17 neutral experts from 11 different countries that met at IARC in March of 2015.

49.     The group found that glyphosate is the second most used household herbicide weed killer used in the United States between 2001 and 2007 and the most heavily used herbicide in the world in 2012. That exposure pathways are air identified (especially when spraying), in water and food. And community exposure to glyphosate widespread is found in soil, air, surface water, ground water and food.

50.     The Group further found an increased risk between non-Hodgkin lymphoma ("NHL") and its subtypes and exposure to glyphosate.

51.     The agency Working Group also found that DNA and chromosome damage in human cells were caused by glyphosate and rare tumors in mice and rats, and that glyphosate had been detected in the urine of agricultural workers, indicating absorption; and blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

52.     The Working Group further found genotoxic, hormonal, and enzymatic effects in mammals as well as metabolic disturbance distribution in mammals exposed to glyphosate.

53.     Glyphosate is released into the environment when used as an herbicide to control woody weedy forest right-a-ways and cropped or non-cropped sites near waterways. When manufactured, transported, spilled, stored and disposed of, occupational workers and gardeners, may be exposed by inhalation, mixing, spraying cleanup and the touching of plants and soil exposed to glyphosate.

54.     Several countries around the world have banned the sale and use of glyphosate herbicide and Roundup® products after the "WHO" agency report of March 2015.

55.     Plaintiff(s), Michael Seeley the surviving spouse and administrator for the estate of Gina Seeley (decedent) was at all relevant times purchased and used Monsanto Roundup® herbicide products to kill weeds and brush around her 10 acres of gardens, ponds, forest and unincorporated township hunting land in the Central Illinois area of Decatur, Illinois.

## CLAIM ONE

### STRICT LIABILITY (DESIGN DEFECT)

56.     Plaintiff incorporate by reference each and every allegation set forth in the proceeding paragraphs as if fully stated herein.

57.     Plaintiff brings this strict liability claim against Defendants for defective design.

58.     At all times relevant to this litigation, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendants. At all times relevant to this litigation, Defendants designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products that Plaintiff was exposed to, as described above.

59.    At all times relevant to this litigation, Defendants' Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff.

60.    At all times relevant to this litigation, Defendants' Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Illinois and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold distributed, labeled, and marketed by Defendants.

61.    Defendants' Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in that when they left the hands of the Defendants' manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

62.    Defendants' Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendants were defective in design and formulation in that when they left the hands of Defendants' manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

63.    At all times relevant to this action, Defendants knew or had reason to know that its Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendants.

64.    Therefore, at all times relevant to this litigation, Defendants' Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by

Defendants were defective in design and formulation, and consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

a.     When placed in the stream of commerce, Defendants' Roundup® products were defective in design and formulation, and consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b.     When placed in the stream of commerce, Defendants' Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c.     When placed in the stream of commerce, Defendants' Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d.     Defendants did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate.

e.     Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f.     Defendants knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g.     Defendants did not conduct adequate post-marketing surveillance of its Roundup® products.

h.     Defendants could have employed safer alternative designs and formulations.

65.     Plaintiff was exposed to Defendants' Roundup® products while living on a rural residential acreage area, as described above, without knowledge of its dangerous characteristics.

66.     At all times relevant to this litigation, Plaintiff was exposed to the use of Defendants' Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

67.     Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

68.     The harm caused by Defendants' Roundup® products far outweigh their benefit, rendering Defendants' products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendants' Roundup® products were and are more dangerous than alternative products and Defendants could have designed its Roundup® products to make them less dangerous. Indeed, at all time that Defendants designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

69.     At the time Roundup® products left Defendants' control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendants' herbicides.

70.     Defendants' defective design of its Roundup® products was willful, wanton, fraudulently concealed, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including the Plaintiff herein.

71.     Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendants are strictly liable to Plaintiff.

72.     The defects in Defendants' Roundup® products were substantial and contributing factors in causing Plaintiff grave injuries, non-Hodgkin lymphoma cancer and death, but for Defendants' misconduct and omissions, Plaintiff would not have sustained her injuries and death.

73.     Defendants' conduct, as described above, was reckless. Defendants risked the lives of consumers and users of its products, including Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, warn or inform the unsuspecting public. Defendants' reckless conduct and fraudulent concealment warrants an award of punitive damages.

74.     As a direct proximate result of Defendants placing defective Roundup® products into the stream of commerce, Plaintiff had suffered and continued to suffer grave injuries and had endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff continued to incur these expenses in the future until her death from exposure to Roundup®.

75.     WHEREFORE, Plaintiff respectfully request that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees and all such other and further relief as this Court deems fair just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## CLAIM TWO

## STRICT LIABLITIY (FAILURE TO WARN)

76.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

77.    Plaintiff brings this strict liability claim against Defendants for failure to warn.

78.    At all times relevant to this litigation, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, promoting and applying Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendants.

79.    Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiff, and persons responsible for consumers (such as employer), and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

80.    At all times relevant to this litigation, Defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warning, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendants had a continuing duty to warn the Plaintiff of the dangers associated with Roundup® use and exposure. Defendants, as manufacturer, seller, or distributor of chemical herbicides, are held to the knowledge of an expert in the field.

81.    At the time of manufacture, Defendant could have provided the warnings or instruction regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use and/or exposure to such products.

17

82.     At all times relevant to this litigation, Defendants failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of this product and to those who would foreseeably use or be harmed by Roundup®, including the Plaintiff.

83.     Despite the fact that Defendants knew or should have known that Roundup® posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, ss described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by know methods, at the time it distributed, supplied or sold the product, and not known to end users and consumers, such as Plaintiff,

84.     Defendants knew or should have known that these products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Defendants have wrongfully and fraudulently concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

85.     At all times relevant to this litigation, Defendant' Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Illinois and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, marketed and sprayed/applied by Defendants.

86.     Plaintiff was exposed to Roundup® products, as described above, without knowledge of their dangerous characteristics.

87.     At all times relevant to this litigation, Plaintiff was exposed to the use of Defendants' Roundup®

products in their intended or reasonably foreseeable manner without knowledge of their dangerous

characteristics.

88.     Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or

glyphosate-containing products prior to or at the time of Plaintiff's exposure. Plaintiff relied upon the

skill, superior knowledge, and judgment of Defendants.

89.     Defendants knew or should have known that the minimal warnings disseminated with or

accompanying the application of Roundup® products were inadequate, but they failed to communicate

adequate information on the dangers and safe use/exposure and failed to communicate warnings and

instructions that were appropriate and adequate to render the products safe for their, ordinary, intended

and reasonably foreseeable use, including agricultural and horticultural applications.

90.     The information that Defendants did provide or communicate failed to contain relevant warnings,

hazards, and precautions that would have enabled those exposed such as Plaintiff to utilize the products

safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate,

false, and misleading and which failed to communicate accurately or adequately the comparative severity,

duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate;

contained to aggressively promote the efficacy of its products, even after it knew or should have known of

the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed,

through aggressive marketing and promotion, any information or research about the risks and dangers of

exposure to Roundup® and glyphosate.

91.    To this day, Defendants have failed to adequately and accurately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

92.    As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were sold on distributed by Defendants, were applied by Defendants, and when Plaintiff became exposed.

93.    Defendants are liable to Plaintiff for injuries caused by negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of their products and the risks associated with the use of or exposure to Roundup® and glyphosate.

94.    The defects in these Roundup® products were substantial and contributing factors in causing Plaintiff' injuries, and, but Defendants' misconduct and omissions, Plaintiff would not have sustained their injuries.

95.    Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products and applications, Plaintiff could have avoided the risk of developing injuries and death as alleged herein and the company who employed Plaintiff could have obtained alternative herbicides.

96.    As a direct and proximate result of Defendants placing defective Roundup® products into the stream of commerce and exposing Plaintiff to them; Plaintiff had suffered severe injuries, and has endured physical pain and discomfort, resulting in her death, hardship, including considerable financial expenses for medical care and treatment.

97.     WHERRFORE, Plaintiff especially request that this Court enter judgment in Plaintiff's favor awarding compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## CLAIM THREE NEGLIGENCE

98.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

99.     Defendants, directly or indirectly, cause Roundup® products to be sold, distributed packaged, labeled, marketed, promoted, and/or used by Plaintiff.

100.    At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

101.    At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the marketing, advertisement, and sales of the Roundup® products. Defendants' duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate, warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

102.     At all time relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

103.     Accordingly, at all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known that use of or exposure to Roundup® products could cause or be associated with Plaintiff's injuries and death thus created dangerous and unreasonable risks of injury to the users of these products, including Plaintiff.

104.     Defendants also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use and/or exposure to Roundup® and glyphosate-containing products.

105.     As such, Defendants breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Defendants manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

106.     Despite ability and means to investigate, study, and test products and to provide adequate warnings, Defendants have failed to do so. Indeed, Defendants wrongfully and fraudulently concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

107.    Defendants' negligence included:

a.      Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® products without thorough and adequate pre and post market testing;

b.      Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c.      Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d.      Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

e.      Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f.      Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendants could reasonably foresee would use and be exposed to its Roundup® products;

g.      Failing to disclose to Plaintiff, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

h.      Failing to warn Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other consumers;

i.      Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

j.      Representing that its Roundup® products were safe for their intended use when, in fact, Defendants knew or should have known that the products were not safe for their intended purpose;

k.      Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

l.      Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendants to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m.      Continuing to disseminate information to its consumers, which indicate or imply that Defendants' Roundup® products are not unsafe for use in the agricultural industries; and

n.      Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

108.    Defendants knew and/or should have known that it was foreseeable that consumers such as Plaintiff would suffer injuries and death as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

109.    Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

110.    Defendants' negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff suffered, and continued to suffer until her death, as described herein.

111.    Defendants' conduct, as described above, was reckless. Defendants regularly risk the lives of consumers and users of their products, including Plaintiff, with full knowledge of the dangers of its products. Defendants made conscious decisions not to redesign, re-label, warn, or inform the

24

unsuspecting public, including Plaintiff. Defendants' reckless conduct therefore warrants an award of punitive damages.

112.    As a proximate result of Defendants' wrongful acts and omissions in placing defective Roundup® products into the stream of commerce without adequate warning of the hazardous and carcinogenic nature of glyphosate, Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering resulting in death, suffered economic losses (including significant expenses for medical care and treatment).

113.    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

### CLAIM FOUR

### WRONGFUL DEATH

114.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

115.    That as a result of negligent actions of Defendant Monsanto, the late Gina Seeley suffered conscious pain and suffering, physical injuries, other damages, and death stemming from non-Hodgkin lymphoma. Defendants knew and/or should have known that it was foreseeable that consumers such as Plaintiff would suffer injuries and death as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

116.    That conscious pain and suffering, physical injuries, other damages, and death suffered by the late Gina Seeley was proximately and directly caused by the negligent acts of Monsanto and failure to warn of the risk of the glyphosate chemical when using Roundup®.

117.    As a direct and proximate result of Defendant Monsanto's negligence in causing the death of Gina Seeley, the Plaintiff(s), as the survivor of the late Gina Seeley, sustained pecuniary loss, mental anguish, emotional pain and suffering, loss of consortium and other damages.

118.    That at the time of her death, Gina Seeley was married to Michael Seeley and was also survived by her adult child Matthew Sargent.

119.    That at the time of her death, Gina Seeley was earning approximately $40,000.00 per year as a highway construction flagman for Walker Brothers.

120.    At all timer herein mentioned, the Decedent Gina Seeley was acting in a careful and prudent manner and did not assume the risks of her injuries and death and was not contributorily negligent.

121.    This complaint is filed after three years after the death of Gina Seeley due to Monsanto's fraudulent concealment of the glyphosate cancer risk. The time that Michael Seeley first discovered that the use of Roundup® was a probable carcinogen that can cause cancer was while watching 2019 television Roundup® lawsuit commercials notifying consumers.

122.    WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment in favor of Plaintiff, awarding compensatory and punitive damages, together with interest, costs incurred, attorney fees and all such other and further relief as this Court deems just and proper. Plaintiff demands a jury trial on the issues contained herein.

## CLAIM FIVE

### BREACH OF IMPLIED WARRANTIED

123.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

124.    At all times relevant to this litigation, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendants.

125.    Before the time that Plaintiff was exposed to the use of the aforementioned Roundup® products, Defendants impliedly warranted to consumers and those exposed – including Plaintiff – that Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

126.    Defendants, however, failed to disclose that Roundup® has dangerous properties when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries and death.

127.    Plaintiff reasonably relied upon the skill, superior knowledge and judgment of Defendants and upon their implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

128.    Upon information and belief, Plaintiff was at all relevant times in privity with Defendants.

129.    Plaintiff is the intended third-party beneficiaries of implied warranties made by Defendants to the purchasers of their horticultural herbicides, and as such Plaintiff is entitled to assert this claim.

130.    The Roundup® products were expected to reach and did in fact reach consumers and users, including, Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendants.

131.    At all times relevant to this litigation, Defendants were aware that consumers and users of their products, including Plaintiff, would use Roundup® products as marketed by Defendants, which is to say that Plaintiff was a foreseeable user of Roundup®.

132.    Defendants intended that Roundup® products be used in the manner in which Plaintiff was exposed to them and Defendants impliedly warranted each product to be of merchantable quality, safe, and fir for this use, despite the fact that Roundup® was not adequately tested or researched.

133.    In reliance upon Defendants' implied warranty, Plaintiff used or was exposed to Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendants.

134.    Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

135.    Defendants breached their implied warranty to Plaintiff in that Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous

propensities when used as intended and can cause serious injuries, including those injuries and death complained herein.

136.    The harm caused by Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

137.    As a direct and proximate result of Defendants' wrongful acts and omissions Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, has suffered economic loss (including significant expenses for medical care and treatment) finally culminating in death.

138.    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.\

## CLAIM SIX PUNITIVE DAMAGES / FRAUDULENT CONCEALMENT

139.    Plaintiff repeats and reiterates the allegations previously set forth herein.

140.    At all times material hereto, the Defendants knew or should have known that the subject product was inherently dangerous with respect to its health risks.

141.    Defendants' misrepresentations included knowingly withholding and fraudulently concealing material information from the public, including the Plaintiff herein, concerning the safety of the subject product.

142.     At all times hereto, the Defendants knew and recklessly disregarded the fact that human exposure to Roundup® can and does cause health hazard, including non-Hodgkin lymphoma.

143.     Notwithstanding the foregoing, the Defendants continued to aggressively market and apply the subject product without disclosing and fraudulently concealing the aforesaid risks.

144.     Defendants knew of the subject product's defective and unreasonably dangerous nature, as set forth herein, but continued to design, develop, manufacture, market, distribute, sell, and apply it so as to maximize sales and profits at the expense of the health and safety of the public including the Plaintiff herein, in conscious and/or negligent disregard of the foreseeable harm caused by Roundup®..

145.     The Defendants intentionally and fraudulently concealed and/or recklessly failed to disclose to the public including the Plaintiff herein, the potentially life-threatening hazard of Roundup® in order to ensure continued and increased sales.

146.     The Defendants' intentional, fraudulent and/or reckless failure to disclose information deprived the Plaintiff of necessary information to enable Plaintiff to weigh the true risks of using or being exposed to the subject product against its benefits.

147.     As a direct and proximate result of the Defendants' conscious and deliberate disregard for the rights and safety of consumers such as the Plaintiff, Plaintiff suffered severe and permanent physical injuries, resulting in her death stemming from non-Hodgkin lymphoma. The Plaintiff had endured substantial pain and suffering and had undergone extensive medical and surgical procedures including two chemotherapy treatment and stem cell extraction and replacement. Plaintiff has incurred significant expenses for medical care and treatment. The Plaintiff has lost past earnings and has suffered a loss of

30

earning capacity. The Plaintiff has suffered and will continue to suffer economic loss, and has otherwise been physically, emotionally and economically injured. The Plaintiff's injuries and damages are permanent and resulted in her death stemming from non-Hodgkin lymphoma cancer.

148.    The aforesaid conduct of the Defendants was committed with knowing, conscious and deliberate disregard for the rights and safety of consumers, including the Plaintiff herein, thereby entitling the Plaintiff to punitive damages in an appropriate amount of one billion dollars to punish the Defendants and deter them from similar conduct in the future.

149.    WHEREFORE, Plaintiff demands judgment against Defendants for compensatory, treble, and punitive damages in the amount of one billion dollars, together with interest costs of suit, attorney's fees, and all such other relief as the Court deems proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court enter judgment in their favor and against Defendants, awarding as follows:

    A.  compensatory damages in an amount to be proven at trial;

    B.  punitive damages; in the amount of one billion dollars;

    C.  costs including reasonable attorneys' fees, court costs, and other litigation expenses; and

    D.  any other relief the Court may deem just and proper.

Respectfully submitted this 12th day of November, 2019.

**CHRISTIAN LEGAL SERVICES**

By   _____

Edgar L. Howard, Esq, ARDC. 6195101
**CHRISTIAN LEGAL SERVICES**
1831 170th Street
Hazel Crest, IL 60429
Attorney for Plaintiff

## CERTIFICATION AND CLOSING

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge,

information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to

harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing

law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual

contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support

after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise

complies with the requirements of Rule 11.

Date of Signing: _____ 11 - 12 - 19

Signature of Attorney _____

Printed Name of Attorney    Edgar L. Howard

Bar Number    6195101

Name of Law Firm    Christian Legal Services

Street Address    1831 170th Street, Hazel Crest

State and Zip Code    Illinois 60429

Telephone Number    708-335-3100 Office 708-307-5003 Cell

E-mail Address    christianlegalserv@att.net

32