ECF

# U.S. District Court
## Southern District of New York (White Plains)
## CIVIL DOCKET FOR CASE #: 7:19−cv−10880−VB

Geter v. Monsanto Company
Assigned to: Judge Vincent L. Briccetti
Cause: 28:1332pl Diversity−Product Liability

Date Filed: 11/25/2019
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Franklin Geter**

represented by **Gregory Saracino**
Saracino Morris Law Group PLLC
600 Westchester Avenue, Suite 400
Harrison, NY 10528
914−355−3330
Fax: 914−801−5907
Email: gsaracino@SMLAWGRP.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 11/25/2019 | 1 | COMPLAINT against Monsanto Company. (Filing Fee $ 400.00, Receipt Number ANYSDC−18140825)Document filed by Franklin Geter.(Saracino, Gregory) (Entered: 11/25/2019) |
| 11/25/2019 | 2 | CIVIL COVER SHEET filed. (Saracino, Gregory) (Entered: 11/25/2019) |
| 11/25/2019 | 3 | REQUEST FOR ISSUANCE OF SUMMONS as to Montsanto Company, re: 1 Complaint. Document filed by Franklin Geter. (Saracino, Gregory) (Entered: 11/25/2019) |
| 11/26/2019 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above−entitled action is assigned to Judge Vincent L. Briccetti. Please download and review the Individual Practices of the assigned District Judge, located at https://nysd.uscourts.gov/judges/district−judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at https://nysd.uscourts.gov/rules/ecf−related−instructions. (pc) (Entered: 11/26/2019) |
| 11/26/2019 | | Magistrate Judge Judith C. McCarthy is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018−06/AO−3.pdf. (pc) (Entered: 11/26/2019) |
| 11/26/2019 | | Case Designated ECF. (pc) (Entered: 11/26/2019) |
| 11/26/2019 | 4 | ELECTRONIC SUMMONS ISSUED as to Monsanto Company. (pc) (Entered: 11/26/2019) |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
FRANKLIN GETER,                                        Docket No.: 7:19-cv-10880

                        Plaintiff,

            - against -                                **COMPLAINT**

MONSANTO COMPANY,
                                                       JURY TRIAL DEMANDED
                        Defendant.
-----------------------------------------------------------------X

        The Plaintiff, by his attorneys complaining of the Defendant, respectfully alleges, upon

information and belief, as follows:

### NATURE OF THE CASE

        1.      This is an action for damages brought by Plaintiff for the harm caused to him as a

direct and proximate result of Defendant's negligent and wrongful conduct in connection with

the design, development, manufacture, testing, packaging, promoting, marketing, advertising,

distribution, labeling, and/or sale of the herbicide Roundup® containing the active ingredient

glyphosate.

        2.      Plaintiff maintains that Roundup® and/or glyphosate is defective, dangerous to

human health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper

warnings and directions as to the dangers associated with its use.

        3.      Plaintiff's injuries like those striking several similarly situated victims across the

country, were avoidable.

### JURISDICTION AND PARTIES

        4.      The Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. § 1332 by virtue of the diversity of citizenship of the Plaintiff and the Defendant and the

fact that the amount in controversy exceeds the sum of seventy-five thousand dollars ($75,000),

exclusive of interest and costs. The Court also has supplemental jurisdiction pursuant to 28

U.S.C. § 1367.

5.     Venue is proper within this district pursuant to 28 U.S.C. § 1391 in that

Defendant conducts business here and is subject to personal jurisdiction in this district. (Any

issue of appropriate personal jurisdiction can be suspended as this is a case involved in the

pending Multidistrict Litigation; should retransfer occur, Plaintiff agrees to selection of a forum

wherein personal jurisdiction would have existed.) In addition, Defendant maintains sufficient

contacts with the State of New York such that this Court's exercise of personal jurisdiction over

it does not offend traditional notions of fair play and substantial justice. Furthermore, Defendant

derives substantial revenue from goods and products used in the State of New York.

6.     The Plaintiff FRANKLIN GETER is at present a resident of Orange County, New

York State.

7.     The defendant Monsanto Company is a corporation created under the laws of the

State of Delaware with its headquarters and principal place of business in St. Louis, Missouri.

8.     "Roundup" refers to all formulations of Defendant's Roundup® products,

including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1,

Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup

Export Herbicide, Roundup Fence & HardEdger 1, Roundup Garden Foam Weed & Grass Killer,

Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k Herbicide, Roundup

Original II Herbicide, Roundup Pro Concentrate, Roundup Pro Dry Herbicide, Roundup Promax,

Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast

Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer,

Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer,
Roundup Ready- to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2,
Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide,
Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus,
Roundup Weed & Grass Killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super
Concentrate, Roundup Weed & Grass Killer 1 Ready-to-Use, Roundup WSD Water Soluble Dry
Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient
glyphosate.

9.      At all times relevant to this Complaint, Monsanto was the entity that discovered
the herbicidal properties of glyphosate and the manufacturer of Roundup® products, which
contain the active ingredient glyphosate and the surfactant POEA, as well as adjuvants and other
"inert" ingredients.

10.      Defendant engaged in the business of designing developing, manufacturing,
testing, packaging, marketing, distributing, labeling and/or selling Roundup®.

11.      Upon information and belief, Defendant did design, sell, advertise, manufacture
and/or distribute Roundup®, with full knowledge of its dangerous and defective nature.

**FACTS COMMON TO ALL CLAIMS**

12.      At all times relevant to this Complaint, Monsanto was the entity that discovered
the herbicidal properties of glyphosate and the manufacturer of Roundup®, which contains the
active ingredient glyphosate and the surfactant POEA, as well as adjuvants and other "inert"
ingredients. Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of
herbicidal products around the world.

- 3 -

13.     Defendant discovered the herbicidal properties of glyphosate during the 1970's
and subsequently began to design, research, manufacture, sell and distribute glyphosate based
"Roundup" as a broad spectrum herbicide.

14.     Plants treated with glyphosate translocate the systemic herbicide to their roots,
shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids
necessary for protein synthesis. Treated plants generally die with 2 to 3 days.

15.     For nearly 40 years, landscapers, horticulturalists and farmers worldwide have
used Roundup® without knowledge of the dangers linked to its various uses. That is because
when Monsanto first commercially introduced Roundup®, it was touted glyphosate as a
technological breakthrough in that it could kill almost every weed without causing harm either to
people or the environment. History has shown that not to be true. According to the WHO, the
main ingredient of Roundup® glyphosate – is a probable cause of cancer. Those most at risk are
landscapers, farm workers and other individuals with workplace exposure to Roundup®, such as
garden center workers and nursery workers. Monsanto assured the public that Roundup® was
harmless, and in order to bolster these claims, Monsanto championed falsified data and attacked
legitimate studies that revealed Roundup®'s dangers. Succinctly put, Monsanto has led a
prolonged campaign of misinformation to convince government agencies, farmers, and the
general population that Roundup® is safe.

16.     At all relevant times, Defendant did design, research, manufacture, test,
advertise, promote, market, sell, distribute, and have acquired and was responsible for Defendant
who has designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and
distributed the commercial herbicide Roundup®.

- 4 -

17.     Monsanto marketed Roundup® from the outset as a "safe" general purpose
herbicide for widespread commercial and consumer use. It still markets Roundup® as safe today.

18.     In addition to the active ingredient glyphosate, Roundup® formulations also
contain adjuvants and other chemicals such as the surfactant POEA, which are considered "inert"
and therefore protected as "trade secrets" in manufacturing. Growing evidence suggest that these
adjuvants and additional components of Roundup® formulations are not, in fact, inert and are
toxic in their own right.

19.     Defendant is intimately involved in the development, design, manufacture,
marketing, sale, and distribution of genetically modified ("GMO") crops, many of which are
marketed as being resistant to Roundup® *i.e.,* "Roundup Ready." As of 2009, Defendant was the
world's leading producer of seeds designed to be Roundup Ready. In 2010, an estimated 70% of
corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready seeds.

20.     The original Roundup, containing the active ingredient glyphosate, was
introduced in 1974. Today, glyphosate products are among the world's most widely used
herbicides.

21.     For nearly 40 years, consumers, farmers, and the public have used Roundup®,
unaware of its toxic properties.

<u>**REGISTRATION OF HERBICIDES UNDER FEDERAL LAW**</u>

22.     The manufacture, formulation and distribution of herbicides, such as Roundup®,
are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C.
§136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection

Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. § 136a(a).

23.     The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

24.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

25.     The EPA and the State of New York registered Roundup® for distribution, sale, and manufacture in the United States and the State of New York.

26.     FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

27.     The evaluation of each pesticide product. distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide

products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

28.     In the case of glyphosate and Roundup®, the EPA had planned on releasing its preliminary risk assessment - in relation to the registration process - no later than July 2015. The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of the World Health Organization's March 24, 2015 finding that glyphosate is a "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

## MONSANTO'S FALSE REPRESENTATIONS REGARDING THE SAFETY OF ROUNDUP®

29.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

> a) Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...
>
> b) And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.
>
> c) Roundup biodegrades into naturally occurring elements.

d) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e) This non-residual herbicide will not wash or leach in the soil. It …. stays where you apply it.

f) You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[1]

30.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in North Carolina] that represent, directly or by implication" that:

a. its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.
                                    ***

b. its glyphosate-containing pesticide products or any component thereof manufactured,  formulated, distributed or sold by Monsanto are biodegradable
                                    ***

---

[1] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

c. its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

***

d. its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

***

e. glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

***

f. its glyphosate-containing products or any component thereof might be classified as "practically" non-toxic.

31.     Monsanto did not alter its advertising in the same manner in any state other than North Carolina, and on information and belief still has not done so today.

32.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[2]

## Classification and Assessments of Glyphosate

33.     The IARC process for the classification of glyphosate followed IARC's stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined that 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and 1 agent to be Probably Not Carcinogenic.

---

[2] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009

34.     The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.[3] Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

35.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in *The Lancet Oncology*, and within a year after the meeting, the finalized Monograph is published.

36.     In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

37.     In March 2015, the IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

---

[3] World Health Org., *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble* (2006), *See*  http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf

38.     On July 29, 2015, the IARC issued its Monograph for glyphosate, Monograph Volume 112. For Volume 112, a Working Group of 17 experts from 11 countries met at the IARC from March 3-10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated an almost year-long review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

39.     The studies considered the following exposure groups: (1) occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and (2) para-occupational exposure in farming families.

40.     Glyphosate was identified as the second most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

41.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater as well as food.

42.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

- 11 -

43.     The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

44.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

45.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor: renal tubule carcinoma. A second study report a positive trend for hemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skim tumors in an initiation promotion study in mice.

46.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

47.     The IARC Working Group further found that glyphosate and glyphosate formations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

48.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.[4] Essentially, glyphosate inhibits the biosynthesis of aromatic

---

[4] Kathryn Z. Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon & Glyphosate,* *112 IARC Monographs.* Lancet Oncol. 76, section 5.4 (2015)

amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

49.    The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.[5] While this study differed from other in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and multiple myeloma, hairy cell leukemia (HCL), and chronic lymphocytic leukemia (CLL), in addition to several other cancers.

### Other Earlier Findings About Glyphosate's Dangers to Human Health

50.    The EPA published a technical fact sheet as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication relating to glyphosate. This technical fact sheet predates IARC's March 20, 2015 evaluation. The fact sheet describes the release  patterns for glyphosate as follows:

**Release Patterns:**

Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available. Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may

---

[5] Anneclare J. De Roos et al., *Cancer Incidence Among Glyphosate-Exposed Pesticide Applicators in the Agricultural Health Study.* Envt'l Health Perspectives 113; 49-54 (2005), *See* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1253709/pdf/ehp0113-000049.pdf

also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.[6]

51.    In 1995, the Northwest Coalition for Alternatives to Pesticides reports that in California, that state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly reported cause of pesticide illness among agricultural workers.[7]

### The Toxicity of Other Ingredients in Roundup®

52.    In addition to the toxicity of the active ingredient glyphosate, several studies support the hypothesis that the glyphosate-based formulation in Defendant's Roundup® products is more dangerous and toxic than glyphosate alone. Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.[8]

53.    In 2002, a study by Julie Marc, entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation," revealed that Roundup® causes delays in the cell cycles of sea urchins but that the same concentrations of glyphosate alone were ineffective and did not alter cell cycles.[9]

---

[6] U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate, See* http://npic.orst.edu/factsheets/glyphogen.html

[7] Caroline Cox, *Glyphosate, Part 2: Human Exposure and Ecological Effects*, 15 J. PESTICIDE REFORM 4 (1995); W.S. Peas et al., *Preventing pesticide-related illness in California agriculture: Strategies and priorities. Environmental Health Policy Program Report*, Univ. of Cal. School of Public Health, Calif. Policy Seminar (1993).

[8] Martinez, T.T. and K. Brown, *Oral and pulmonary toxicology of the surfactant used in Roundup herbicide*, PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991).

[9] Julie Marc, et al., *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation*, 15 CHEM. RES. TOXICOL. 326-331 (2002), *See* http://pubs.acs.org/doi/full/10.1021/tx015543g

54.     A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.[10] The researchers noted that "cell cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell cycle checkpoints leads to genomic instability and subsequent development of cancer from the initial affect cell." Further, "[s]ince cell cycle disorder such as cancer result from dysfunctions of a unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting the cells."[11]

55.     In 2005, a study by Francisco Peixoto entitled "Comparative effects of Roundup® and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that Roundup®'s effects on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone. The Peixoto study further suggested that the harmful effects of Roundup® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant POEA, or in the alternative, due to a potential synergic effect between glyphosate and other ingredients in the Roundup® formulation.[12]

56.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup® and glyphosate on human umbilical, embryonic, and placental cells. The study tested dilution levels of Roundup® and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food. The researchers ultimately

---

[10] Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation.* Biol Cell. 2004 Apr; 96(3):245-9. *See* https://www.ncbi.nlm.nih.gov/pubmed/15182708

[11] *Id.*

[12] Francisco Peixoto, *Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation*, 61 CHEMOSPHERE 1115, 1122 (2005), *See* https://www.ncbi.nlm.nih.gov/pubmed/16263381

concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability and amplify toxicity of glyphosate alone. The researchers further suggested that assessments of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants present in Roundup® are not, in fact, inert and that Roundup® is potentially far more toxic than its active ingredient glyphosate alone.[13]

57.    The results of these studies were at all times available to Monsanto. Monsanto thus knew or should have known that Roundup® was, and is more toxic than glyphosate alone and that safety studies of Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect FRANKLIN GETER from Roundup®.

58.    Despite its knowledge that Roundup® is considerably more dangerous than glyphosate alone, Monsanto continued to promote Roundup® as safe.

## Statement of Concern Regarding Glyphosate-Based Herbicides

59.    On February 17, 2016, a consensus statement published in the Journal of Environmental Health, entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement, "assessed the safety of glyphosate-based herbicides ("GBHs").58 The paper's "...focus is on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with recent discoveries about the toxicity and

---

[13] Nora Benachour, et al., Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryonic, and Placental Cells, 22 CHEM. RES. TOXICOL. 97-105 (2008), available at http://big.assets.huffingtonpost.com/france.pdf.

human health risks stemming from use of GBHs."[14] The researchers drew seven factual

conclusions about GBHs:

> 1. GBHs are the most heavily applied herbicide in the world and usage continues
> to rise;
> 2. Worldwide, GBHs often contaminate drinking water sources, precipitation, and
> air, especially in agricultural regions;
> 3. The half-life of glyphosate in water and soil is longer than previously
> recognized;
> 4. Glyphosate and its metabolics are widely present in the global soybean supply;
> 5. Human exposures to GBHs are rising;
> 6. Glyphosate is now authoritatively classified as a probable human carcinogen;
> and
> 7. Regulatory estimates of tolerable daily intakes for glyphosate in the United
> States and European Union are based on outdated science.[15]

60.    The researchers noted that GBH use has increased approximately 100-fold since

the 1970s. Further, far from posing a limited hazard to vertebrates, as previously elieved, two

decades of evidence demonstrated that "several vertebrate pathways are likely targets of action,

including hepatorenal damage, effects on nutrient balance through glyphosate chelating action

and endocrine disruption."[16]

61.    The paper attributed uncertainties in current assessments of glyphosate

formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected

---

[14] John P. Myers, et al., *Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement*, Environmental Health (2016), available at http://ehjournal.biomedcentral.com/articles/10.1186/s12940-016-0117-0

[15] *Id.*

[16] *Id.*

as 'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations." Further, the researchers argue, "[t]he distinction in regulatory review and decision processes between 'active' and 'inert' ingredients has no toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in their own right."[17]

62.     Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish." Accordingly, "risk assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone underestimate both toxicity and exposure, and thus risk." The paper concludes that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."[18]

63.     The researchers also critique the current practice of regulators who largely rely on "unpublished, non-peer-reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."[19]

---

[17] *Id.*
[18] *Id.*
[19] *Id.*

64.     The researchers also call for greater inclusion of GBHs in government-led toxicology testing programs: *[A] fresh and independent examination of GBH toxicity should be undertaken, and ... this reexamination be accompanied by systemic efforts by relevant agencies to monitor GBH levels in people and in the food supply, none of which are occurring today. The U.S. National Toxicology Program should prioritize a thorough toxicology assessment of the multiple pathways now identified as potentially vulnerable of GBHs.*[20]

65.     The researchers suggest that, in order to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which manufacturers fund the registration process and the necessary testing: *[W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part of routine registration actions and fees. Such finds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, finds would be made available to independent scientists to conduct the appropriate long-term (minimum 2 years) safety studies in recognized animal model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption, impacts on the gut microbiome, carcinogenicity, and multigenerational effects looking a reproductive capability and frequency of birth defects.*[21]

## THE PLAINTIFF'S EXPOSURE TO ROUNDUP®

66.     Plaintiff FRANKLIN GETER, an African American man, regularly used Roundup® in the course of his decades-long employment as a farm/citrus grove agricultural worker in Winter Haven, Florida.

---

[20] *Id.*
[21] *Id.*

67.     During the entire time in which Mr. GETER was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

68.     In 2018, physicians diagnosed Mr. GETER with a form of leukemia and as of the time of this writing undergoing painful courses of chemotherapy.

## TOLLING OF THE STATUTE OF LIMITATIONS
### Discovery Rule Tolling

69.     Plaintiff FRANKLIN GETER had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup® and glyphosate. This is the quintessential case for tolling.

70.     Within the time period of any applicable statute of limitations, Plaintiff could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup® and glyphosate is injurious to human health.

71.     Plaintiff did not discover, and did not know of facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup® and glyphosate; nor would a reasonable and diligent investigation by Plaintiff have disclosed that Roundup® and glyphosate would have caused his illness.

72.     For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff's claim.

### Fraudulent Concealment Tolling

73.     All applicable statutes of limitations have also been tolled by Monsanto's knowing and active fraudulent concealment and denial of the facts alleged herein through the time period relevant to this action.

74.     Instead of disclosing critical safety information about Roundup® and glyphosate, Monsanto has consistently and falsely represented the safety of its Roundup® products.

### Estoppel

75.     Monsanto was under a continuous duty to disclose to consumer, users, and other persons coming into contact with its products, including Plaintiff FRANKLIN GETER, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate.

76.     Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks with the use of and/or exposure to its products.

77.     Based on the foregoing, Monsanto is estopped from relying on any statutes of limitations in defense of this action.

### AS AND FOR A FIRST CLAIM FOR RELIEF
#### (Design Defect)

78.     Plaintiff realleges paragraphs 1 through 124 above as if fully set forth herein.

79.     Plaintiff brings this strict liability claim against Defendant for defective design.

80.     At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, users and other persons coming into contact with them, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

81.     At all times relevant to this litigation, Defendant designed, researched, developed, formulated, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold and distributed the Roundup® products used by Plaintiff to which was exposed, as described above.

82.     At all times relevant to this litigation, Defendant's Roundup® products were manufactured, designed and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, Plaintiff.

83.     At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in New York and throughout the United States, including Plaintiff without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

84.     Defendant's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant, were defective in design and formulation in that when they left the hands of the Defendant's manufacturers and/or suppliers, they were unreasonably dangerous because they

were not as safe as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

85.     Defendant's Roundup® products as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant, were defective in design and formulation in that when they left the hands of the Defendant's manufacturers and/or suppliers, the foreseeable risks associated with these products' reasonably foreseeable uses exceeded the alleged benefits associated with their design and formulation.

86.     Therefore, at all times relevant to this litigation, Defendant's Roundup® products, as researched, tested, developed, designed, licenses, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant, were defective in design and formulation, in one or more of the following ways:

   a.  When placed in the stream of commerce, Defendant's Roundup® products were
   defective in design and formulation, and, consequently, dangerous to an extent
   beyond that which an ordinary consumer would expect;
   b.  When placed in the stream of commerce, Defendant's Roundup® products were
   unreasonably dangerous in that they were hazardous and posed a grave risk of
   cancer and other serious illness when used in a reasonably anticipated manner;
   c.  When placed in the stream of commerce, Defendant's Roundup® products
   contained unreasonably dangerous design defects and were not reasonably safe
   w hen used in a reasonably anticipated or intended manner;
   d. Defendant did not sufficiently test, investigate, or study its Roundup® products
   and, specifically, the active ingredient glyphosate;
   e. Exposure to Roundup® and the glyphosate containing products presents a risk of
   harmful side effects that outweighs any potential utility stemming from the use of

the herbicide;

f.  Defendant knew or should have known at the time of marketing its Roundup®
products that exposure to Roundup® and specifically, its active ingredient
glyphosate, could result in cancer and other severe illness and injuries;

g.  Defendant did not conduct adequate post-marketing surveillance of its Roundup®
products;

h.  Defendant could have employed safer alternative designs and formulations.

87.    At all times relevant to this litigation, Plaintiff used and/or was exposed to the use
of Defendant's Roundup® products in an intended and reasonably foreseeable manner without
knowledge of their dangerous characteristics.

88.    Plaintiff could have not reasonably discovered the defects and risk associated
with Roundup® or glyphosate-containing products before or at time of exposure.

89.    The harm caused by Defendant's Roundup® products far outweighed their
benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary
consumer would contemplate. Defendant's Roundup® products were and are more dangerous
than alternative products and Defendant could have designed its Roundup® products to make
them less dangerous. Indeed, at the time that Defendant designed its Roundup® products, the
state of the industry's scientific knowledge was such that a less risky design or formulation was
attainable.

90.    At the time Roundup® products left Defendant's control, there was a practical,
technically feasible, and safer alternative design that would have prevented the harm without
substantially impairing the reasonably anticipated or intended function of Defendant's
Roundup® herbicides.

91.     Defendant's defective design of Roundup® amounts to willful, wanton, and/or reckless conduct by Defendant.

92.     Therefore, as a result of unreasonably dangerous condition of its Roundup® products, Defendant is strictly liable to Plaintiff.

93.     The defects in Defendant's Roundup® products were substantial and contributing factors in causing the Plaintiff's grave injuries, and but for Defendant's misconduct and omissions, Plaintiff would not have sustained such injuries.

94.     As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Plaintiff suffered injuries, damages and losses resulting from the negligent and/or intentional acts or omissions of Defendant as well as the dangerous defects of its Roundup® products as more fully described herein. Plaintiff's developed his condition and suffered conscious pain and suffering, grave injuries, permanent and lasting in nature along with physical pain and mental anguish, including diminished enjoyment of life, as well as economic hardship, including considerable financial expenses for medical care and treatment, and diminution in life expectancy.

## AS AND FOR A SECOND CLAIM FOR RELIEF
### (Strict Liability – Failure To Warn)

95.     Plaintiff realleges paragraphs 1 through 94 above as if fully set forth herein.

96.     Plaintiff brings this strict liability claim against Defendant for failure to warn.

97.     At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup®, which are defective and unreasonably dangerous to users, including Plaintiff, because

they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

98.     Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiff, and Defendant therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of Roundup® and glyphosate containing products and a duty to instruct on the proper, safe use of these products.

99.     At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup® products did not cause users and consumers to suffer from unreasonably and dangerous risks. Defendant had a continuing duty to instruct on the proper, safe use of these products. Defendant, as manufacturer, seller, or distributor of chemical herbicides, is held to the knowledge of an expert in the field.

100.    At the time of manufacture, Defendant could have provided warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to these products.

101.    At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety of its Roundup® products. Defendant also failed to minimize the dangers to

users and consumers of its Roundup® products and to those who would foreseeably use or be harmed by Defendant's herbicides, including Plaintiff.

102.   Despite the fact that Defendant knew or should have known that Roundup® products posed a grave risk of harm, it failed to warn of the dangerous risks associated with their use and exposure. The dangerous propensities of its products and the toxic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied, or sold the product and not known to end users and consumers, such as Plaintiff.

103.   Defendant knew or should have known that its Roundup® and glyphosate containing products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products. Defendant has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

104.   At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with the products thorough the United States, including Plaintiff without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

105.   At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

- 27 -

106.    Plaintiff could not have reasonably discovered the defects and risk associated with Roundup® or glyphosate-containing products before or at the time of her exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendant.

107.    Monsanto, as the manufacturer and/or distributor of Roundup®, is held to the level of knowledge of an expert in the field.

108.    Defendant knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, but it failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and horticultural applications.

109.    The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled agricultural workers, horticultural workers, and /or at-home users to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure of Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

110.    To this day, Defendant has failed to adequately and accurately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

111.    As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiff.

112.    Defendant is liable to Plaintiff for injuries caused by its failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its Roundup products and the risk associated with the use of or exposure to Roundup® and glyphosate.

113.    The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiff's grave injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained such injuries.

114.    Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risk associated with its Roundup® products, Plaintiff could have avoided the risk of developing injuries as alleged herein and Plaintiff could have obtained alternative herbicides.

115.    As a direct and proximate result of Defendant placing its defective Roundup® products into the steam of commerce, Plaintiff suffered injuries, damages and losses resulting from the negligent and/or intentional acts or omissions of Defendant as well as the dangerous defects of its Roundup® products as more fully described herein. Plaintiff developed his leukemia and suffered conscious pain and suffering, grave injuries, permanent and lasting in

- 29 -

nature along with physical pain and mental anguish, including diminished enjoyment of life, as well as economic hardship, including considerable financial expenses for medical care and treatment, and diminution in life expectancy.

### AS AND FOR A THIRD CLAIM FOR RELIEF
**(Negligence)**

116.    Plaintiff realleges paragraphs 1 through 115 above as if fully set forth herein.

117.    Defendant, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, and/or promoted.

118.    Defendant, directly or indirectly, caused Roundup® products to be purchased and/or used by Plaintiff.

119.    At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

120.    At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertising, and sale of its Roundup® products, Defendant's duty of care owed to consumer and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup® and, in particular, its active ingredient glyphosate.

- 30 -

121.    At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the toxic properties of the chemical glyphosate.

122.    Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use or exposure to its Roundup® products could cause Plaintiff's injuries and thus, created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

123.    Defendant knew or, in the exercise of reasonable care, should have known that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup®.

124.    Defendant knew or, in the exercise of reasonable care, should have known that tests limited to Roundup®'s active ingredient glyphosate were insufficient to prove the safety of Roundup®.

125.    Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup® and glyphosate-containing products.

126.    As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Defendant manufacture and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know

that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

127.    Defendant failed to appropriately and adequately test Roundup®, Roundup® adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup®.

128.    Despite the ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant has failed to do so. Defendant has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

129.    Defendant's negligence included:

a. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

b. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®

c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture, horticulture, and at-home use;

d. Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup® and the propensity of these ingredients to render Roundup® toxic, increase the toxicity of Roundup®, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup®, and whether or not "inert" ingredients and/or adjuvants were safe for use;

e. Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

f. Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

g. Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and/or be exposed to its Roundup® products;

h. Failing to disclose to Plaintiff, users, consumers, and the general public that the use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

i. Failing to warn Plaintiff, users, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other users or consumers;

j. Systemically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate containing products;

k. Representing that its Roundup® products were safe for their intended use when in fact, Defendant knew or should have known that the products were nor safe for their intended use;

l. Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risk of Roundup® and glyphosate;

m. Advertising, marketing, and recommending the use of Roundup® products, whole concealing and failing to disclose or warn of the dangers known by defendant to be associated with or caused by the use of and exposure to Roundup® and glyphosate;

n. Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup® products are not unsafe for use in the agricultural, horticultural industries, and/or home use; and

o. Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

- 34 -

130.    Further, Monsanto under-reported, underestimated, and downplayed the serious dangers of its Roundup® products. Specifically, Monsanto negligently and deceptively compared the safety risks and/or dangers of Roundup® with common everyday foods such as table salt and other available forms of herbicides.

131.    Defendant knew or should have known that it was foreseeable that consumers and/or users, such as Plaintiff, would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale from Roundup®.

132.    Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

133.    Defendant's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff suffered, as described herein.

134.    Defendant's conduct, as described above, was reckless. Defendant regularly risks the lives of consumers and users of its products, including Plaintiff, with full knowledge of the dangers of its products. Defendant has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff. Defendant's reckless conduct therefore warrants an award of punitive damages.

135.    As a proximate result of Defendant's wrongful acts and omission in placing its defective Roundup® products into the steam of commerce without adequate warnings of the hazardous and toxic nature of glyphosate, Plaintiff suffered injuries, damages and losses resulting from the negligent and/or intentional acts or omissions of Defendant as well as the dangerous defects of its Roundup® products as more fully described herein. Plaintiff developed his leukemia and suffered conscious pain and suffering, grave injuries, permanent and lasting in

- 35 -

nature along with physical pain and mental anguish, including diminished enjoyment of life, as well as economic hardship, including considerable financial expenses for medical care and treatment, and diminution in life expectancy.

### AS AND FOR A FOURTH CLAIM FOR RELIEF
#### (Breach Of Express Warranty)

136.    Plaintiff realleges paragraphs 1 through 135 above as if fully set forth herein.

137.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

138.    Defendant had a duty to exercise reasonable care in the researching, testing, development, design, licensing, formulation, manufacture, inspection, production, assembly, packaging, labeling, advertising, promotion, marketing, selling, supply, distribution, and release of its Roundup® products, including a duty to:

   a.  Ensure that its products did not cause the user unreasonably dangerous side effects;

   b.  Warn of dangerous and potentially fatal side effects; and

   c.  Disclose adverse material facts, such as the true risks associated with the use of and exposure to Roundup® and glyphosate containing products, when making representations to consumers and the general public, including Plaintiff.

139.    At all times relevant to this litigation, Defendant expressly represented and warranted to the purchasers of its Roundup® products, by and through statements made by

Defendant in labels, publications, package insert, and other written materials intended for consumers and the general public, that is Roundup® products were safe to human health and the environment, effective, fit, and proper for their intended use. Defendant advertised, labeled, marketed, and promoted Roundup® products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that its Roundup® products would conform to the representations.

140.   These express representations included incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Roundup® and glyphosate. Defendant knew or should have known that the risks expressly included in Roundup® warnings and labels did not and do not accurately and adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendant expressly represented that its Roundup® products were safe and effective, that they were safe and effective for use by individuals such as Plaintiff, and/or that they were safe and effective as agricultural herbicides.

141.   The representations about Roundup®, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

142.   Defendant placed its Roundup® products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate.

- 37 -

143.     Defendant breached these warranties because, among other things, its Roundup®
products were defective, dangerous, unfit for use, did not contain labels representing the true and
adequate nature of the risk associated with their use, and were not merchantable or safe for their
intended, ordinary, and foreseeable use and purpose. Specifically, Defendant breached the
warranties in the following ways:

> a. Defendant represented through its labeling, advertising, and marketing materials
> that its Roundup® products were safe, and fraudulently withheld and concealed
> information about the risks of serious injury associated with use of and/or exposure to
> Roundup® and glyphosate by expressly limiting the risks associated with use and/or
> exposure within its warnings and labels; and

> b. Defendant represented that its Roundup® products were safe for use and
> fraudulently concealed information that demonstrated that glyphosate, the active
> ingredient in Roundup®, had carcinogenic properties, and that its Roundup®
> products, therefore, were not safer than alternatives available on the market.

144.     Upon information and belief, Plaintiff justifiably and detrimentally relied on the
express warranties and representations of Defendant in the purchase and/or use of its Roundup®
products. When Plaintiff was directed at his job to use and/or purchase Roundup® and/or made
the decision to use and/or purchase use Roundup®,  he reasonably  relied upon Defendant to
disclose known defects, risks, dangers, and side effects of Roundup® products and glyphosate.

145.     Defendant has sole access to material facts concerning the nature of risks
associated with its Roundup® products as expressly stated within its warnings and labels, and
Defendant knew that consumers and users such as Plaintiff could not have reasonably discovered

that the risks expressly included in Roundup® warnings and labels were inadequate and inaccurate.

146.   Plaintiff had no knowledge of the falsity or incompleteness of Defendant's statements and representations concerning Roundup®.

147.   Plaintiff used and/or was exposed to the use of Roundup® as researched, developed, designed, tested, formulated, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by Defendant.

148.   Had the warning and labels for Roundup® products accurately and adequately set forth the true risks associated with the use of such products, including Plaintiff injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Plaintiff could have avoided the injuries complained of herein.

149.   As a direct and proximate result Plaintiff use of Roundup® as manufactured, sold, supplied, and introduced into the stream of commerce by Defendant, Plaintiff suffered injuries, damages and losses resulting from the negligent and/or intentional acts or omissions of Defendant as well as the dangerous defects of its Roundup® products as more fully described herein. Plaintiff developed his condition and suffered conscious pain and suffering, grave injuries, permanent and lasting in nature along with physical pain and mental anguish, including diminished enjoyment of life, as well as economic hardship, including considerable financial expenses for medical care and treatment, and diminution in life expectancy.

## AS AND FOR A FIFTH CLAIM FOR RELIEF
### (Breach Of Implied Warranty)

150.    Plaintiff realleges paragraphs 1 through 149 above as if fully set forth herein.

151.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to users and consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce.

152.    These actions were under the ultimate control and supervision of Defendant.

153.    Before the time that Plaintiff was exposed to the use of the aforementioned Roundup® products, Defendant impliedly warranted to its consumers and users, including Plaintiff, that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

154.    Defendant, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries. Roundup® products were and are provided to consumers/users, such as Plaintiff, in a dangerously defective and unsafe condition.

155.    Plaintiff was the intended third-party beneficiary of implied warranties made by Defendant to the purchasers of its horticultural herbicides, and as such, Plaintiff, on behalf of Plaintiff, is entitled to assert this claim.

156.    Upon information and belief, Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Defendant and upon its implied warranties that the Roundup® products were of merchantable quality and for their intended purpose or use.

157.    The Roundup® products were expected to reach and did in fact reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendant.

158.    At all times relevant to this litigation, Defendant was aware that consumers and users of its products, including Plaintiff, would use Roundup® products as marketed by Defendant, which is to say that Plaintiff was the foreseeable user of Roundup®.

159.    Defendant intended that its Roundup® products be used in the manner in which Plaintiff in fact used them and Defendant impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

160.    In reliance upon Defendant's implied warranty, Plaintiff used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended promoted, and marketed by Defendant.

161.    Plaintiff could not have reasonably discovered or known of the risk of serious injury associated with Roundup® or glyphosate.

162.    Defendant breached its implied warranty to Plaintiff in that its Roundup® products were not of merchantable quality, safe, or fit for their intended purposes and/or uses, nor adequately tested. Instead, the Roundup® products were in a dangerously defective and unsafe

- 41 -

condition. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

163.    The harm caused by Defendant's Roundup® products far outweighed their benefit, rending the products more dangerous than an ordinary customer or user would expect and more dangerous than alternative products.

164.    As a direct and proximate result Plaintiff's use of Roundup® as manufactured, sold, supplied, and introduced into the stream of commerce by Defendant, Plaintiff suffered injuries, damages and losses resulting from the negligent and/or intentional acts or omissions of Defendant as well as the dangerous defects of its Roundup® products as more fully described herein. Plaintiff developed his leukemia and suffered conscious pain and suffering, grave injuries, permanent and lasting in nature along with physical pain and mental anguish, including diminished enjoyment of life, as well as economic hardship, including considerable financial expenses for medical care and treatment, and diminution in life expectancy.

## AS AND FOR A SIXTH CLAIM FOR RELIEF
### (Negligent Misrepresentation and/or Fraud)

165.    Plaintiff realleges paragraphs 1 through 166 above as if fully set forth herein.

166.    Defendant is the designer, researcher, developer, manufacturer, tester, packager, promoter, marketer, advertiser, distributor, labeler, supplier, and/or seller of Roundup® and, while engaged in the course of such business, made representations to users, including Plaintiff, regarding the character and/or quality for guidance in the decision to select Roundup® for use.

167.    Defendant had a duty to disclose material information about serious health effects to consumers such as Plaintiff. Defendant negligently, recklessly, and/or intentionally failed to

- 42 -

disclose this information for the purpose of inducing consumers, including Plaintiff, to purchase Defendant's dangerous products.

168.    Specifically, Defendant's advertisement regarding Roundup® made material misrepresentations to the effect that Roundup® was safe, which misrepresentations Defendant knew to be false, for the purpose of fraudulently inducing customers, such as Plaintiff, to purchase said product. Defendant further misrepresented that its products were just as safe and just as effective or more effective, than other weed control products on the market.

169.    Defendant's representations regarding the character or quality of Roundup® were untrue. In addition, Defendant fraudulently suppressed material information regarding the safety of Roundup®, including the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate.

170.    Defendant had actual knowledge based on the results of trials, tests, and studies of exposure to glyphosate of the risk of serious harm associated with human use and exposure to Roundup®.

171.    Defendant negligently and/or intentionally misrepresented or omitted this information from its products labeling, promotions, and advertisements and instead labeled, promoted, and advertised its products as safe and effective in order to avoid losses and sustain profits in its sales to customers.

172.    In supplying the false information, Defendant failed to exercise a reasonable care or competence in obtaining or communicating information to their intended recipients, including Plaintiff.

- 43 -

173.    Plaintiff reasonably and justifiably relied to her detriment upon Defendant's

misrepresentations and/or omissions in its labeling, advertisements, and promotions concerning

the serious risks posed by the product. Plaintiff reasonably and justifiably relied upon

Defendant's representations to her that Roundup® was safe for use and that Defendant's labeling,

advertisements, and promotions fully described all known risk of the product.

174.    As a direct and proximate result Plaintiff's use of Roundup® as manufactured,

sold, supplied, and introduced into the stream of commerce by Defendant, Plaintiff suffered

injuries, damages and losses resulting from the negligent and/or intentional acts or omissions of

Defendant as well as the dangerous defects of its Roundup® products as more fully described

herein. Plaintiff developed his leukemia and suffered conscious pain and suffering, grave

injuries, permanent and lasting in nature along with physical pain and mental anguish, including

diminished enjoyment of life, as well as economic hardship, including considerable financial

expenses for medical care and treatment, and diminution in life expectancy.

### AS AND FOR A SEVENTH CLAIM FOR RELIEF
#### (Violation Of New York Consumer Protection Statute)

175.    Plaintiff realleges paragraphs 1 through 176 above as if fully set forth herein.

176.    Plaintiff pleads this Count in the broadest sense available under the law to include

pleading same pursuant to all substantive law that applies to this case as may be determined by

choice of law principles, regardless of whether arising under statute and/or common law.

177.    Defendant engaged in unfair competition or unfair or deceptive acts or practices

in violation of N.Y. Gen. Bus. Law §§ 349 *et seq.* and 350-e *et seq.*

178.   Defendant violated N.Y. Gen. Bus. Law §§ 349 *et seq.* and 350-e *et seq.* through their use of false or misleading misrepresentations or omissions of material fact relating to the safety of Roundup®.

179.   Defendant communicated the purported benefits of Roundup® while failing to disclose the serious and dangerous side effects related to the use of Roundup® and of the true state of Roundup®'s regulatory status and safety. Defendant made these representations to the public at large, including Plaintiff, in the marketing and advertising campaigns described herein.

180.   Plaintiff justifiably relied upon said representations, used and/or purchased Defendant's products for personal, family, and/or household purposes, used Defendant's Roundup® products, and suffered ascertainable losses as a result of Defendant's actions in violation of the aforementioned consumer protection laws.

181.   Defendant used unfair methods of competition or deceptive acts or practices that were proscribed by law including N.Y. Gen. Bus. Law §§ 349 *et seq.* and 350-e *et seq.* by doing the following:

  a.   Engaging in unfair or deceptive trade practices as defined in this statute by making false representations that Defendant's products have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have, including but not limited to, statements concerning the safety and the health consequences of the use of Roundup®;

  b.   Engaging in other fraudulent and/or deceptive conduct that creates a likelihood of confusion or misunderstanding, including but not limited to, deception, fraud, misrepresentation, knowing concealment, and/or suppression or omission of material

facts about Defendant's products and their use or safety that consumers, including Plaintiff, relied upon, in connection with the purchase, use, and continued use of Roundup®;

c. Engaging in unfair or deceptive trade practices as defined in this statute by making false and misleading oral and written statements that had the capacity, tendency, or effect of deceiving or misleading consumers about the safety of its Roundup® products; and

d. Engaging in unfair or deceptive trade practices as defined in this statute by failing to state material facts that omission of which deceived or tended to deceive, including but not limited to, facts relating to the safety and the health consequences of the use of Roundup®.

182.    Defendant had a statutory duty to refrain from engaging in unfair competition or unfair or deceptive acts or practices in the design, development, manufacture, promotion, and sale of Roundup®.

183.    Had the Defendant not engaged in the unfair competition or unfair or deceptive acts or practices herein, Plaintiff would not have purchased and/or used Roundup® products and would not have incurred ascertainable losses, including but not limited to, substantial medical bills and costs.

184.    Specifically, Plaintiff was misled by the unfair or deceptive acts and practices described herein.

185.    Defendant's deceptive, unconscionable, false, misleading and/or fraudulent representations and material omissions to the public at large, including the Plaintiff, of material facts relating to the safety of Roundup®, upon which Plaintiff justifiably relied, constituted unfair competition or unfair or deceptive acts or practices in violation of the state consumer protection statutes listed above.

186.    Defendant uniformly communicated the purported benefits of Roundup® products while failing to disclose the serious and dangerous side effects related to the use of Roundup® and the true state of Roundup® products' regulatory status and its safety.

187.    Defendant made these representations to the public at large, including Plaintiff, in the marketing and advertising campaign described herein.

188.    Defendant's conduct in connection with Roundup® was also impermissible and illegal in that it created a likelihood of confusion and misunderstanding because Defendant misleadingly, falsely, and/or deceptively misrepresented and omitted numerous material facts regarding, among other things, the safety of Roundup® products.

189.    As a direct and proximate result of Defendant's wrongful conduct, Plaintiff was diagnosed with his leukemia and the Plaintiff has incurred substantial expenses for necessary medical treatment and medication and other losses, Plaintiff is legally entitled to recover those losses.

190.    By reason of wrongful acts engaged in by the Defendant, Plaintiff suffered ascertainable loss of money and/or property and other harm or damages for which Plaintiff is legally entitled to recover.

191.   As a direct and proximate result Plaintiff's use of Roundup® as manufactured, sold, supplied, and introduced into the stream of commerce by Defendant, Plaintiff suffered injuries, damages and losses resulting from the negligent and/or intentional acts or omissions of Defendant as well as the dangerous defects of its Roundup® products as more fully described herein. Plaintiff developed his leukemia and suffered conscious pain and suffering, grave injuries, permanent and lasting in nature along with physical pain and mental anguish, including diminished enjoyment of life, as well as economic hardship, including considerable financial expenses for medical care and treatment, and diminution in life expectancy.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against the Defendant on each of the above-referenced claims and causes of action and as follows:

1.   Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to, pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

2.   Awarding compensatory damages to Plaintiff for past and future damages, including, but not limited to, Plaintiff's pain and suffering and for severe and permanent personal injuries sustained by the Plaintiff including health care costs and economic loss;

3.   Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action;

4.   Punitive and exemplary damages for the wanton, willful, fraudulent, and reckless acts of the Defendant who demonstrated a complete disregard and reckless indifference for the

safety and welfare of the general public and to the Plaintiff in an amount sufficient to punish

Defendant and deter future similar conduct, to the extent allowed by applicable law;

5.    Pre-judgment interest;

6.    Post-judgment interest;

7.    Awarding Plaintiff reasonable attorneys' fees;

8.    Awarding Plaintiff the costs of these proceedings; and

9.    Such other and further relief as this Court deems just and proper.


**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial by jury as to all issues.


Dated: Harrison, New York
      November 25, 2019

                        Respectfully submitted,

                        Gregory Saracino, Esq.
                        SARACINO MORRIS LAW GROUP PLLC
                        Attorneys for Plaintiff
                        600 Mamaroneck Ave, Suite 400
                        Harrison, NY 10528
                        (914) 355-3330 – Tel.
                        (914) 801-5907 – Fax
                        gsaracino@SMLAWGRP.com