Query    Reports    Utilities    Help    Log Out

# U.S. District Court
# Eastern District of Missouri (St. Louis)
# CIVIL DOCKET FOR CASE #: 4:19-cv-02789-SNLJ

Conaway v. Monsanto Company
Assigned to: District Judge Stephen N. Limbaugh, Jr
Cause: 28:1332 Diversity-Product Liability

Date Filed: 10/17/2019
Jury Demand: Plaintiff
Nature of Suit: 367 Personal Injury: Health
Care/Pharmaceutical Personal Injury
Product Liability
Jurisdiction: Diversity

**Plaintiff**

**Thomas Conaway**

represented by **David Matthew Haynie**
FORESTER HAYNIE PLLC
1701 N. Market St., Suite 210
Suite 210
Dallas, TX 75202
214-210-2100
Email: matthew@foresterhaynie.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 10/17/2019 | 1 | COMPLAINT against defendant Monsanto Company with receipt number AMOEDC-7525390,, in the amount of $400 Jury Demand,, filed by Thomas Conaway. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Original Filing Form)(Haynie, David) (Entered: 10/17/2019) |
| 10/17/2019 | 2 | NOTICE OF PROCESS SERVER by Plaintiff Thomas Conaway Process Server: U.S. Legal Services, Inc. (Haynie, David) (Entered: 10/17/2019) |
| 10/17/2019 | | Case Opening Notification: 1 Summons(es) issued. The summons was emailed to attorney David Matthew Haynie. All non-governmental organizational parties (corporations, limited liability companies, limited liability partnerships) must file Disclosure of Organizational Interests Certificate (moed-0001.pdf). Judge Assigned: U.S. District Judge Stephen N. Limbaugh Jr.. (BAK) (Entered: 10/17/2019) |

| PACER Service Center |
|---|
| Transaction Receipt |
| 12/10/2019 09:29:32 |

| PACER Login: | hllp1982 | Client Code: | 1417.0049 |
|---|---|---|---|
| Description: | Docket Report | Search Criteria: | 4:19-cv-02789-SNLJ |
| Billable Pages: | 1 | Cost: | 0.10 |





# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO, EASTERN DIVISION

| | | |
|---|---|---|
| <u>THOMAS CONWAY,</u> | ) | **1 05** CASE NO.: **19242** |
| **PLAINTIFF,** | ) | **Related to: MDL Case No. 1535** |
| | ) | **United States District Court for** |
| | ) | **The Northern District of Ohio,** |
| | ) | **Eastern Division, Case No.** |
| **vs.** | ) | **1:2003cv17000 (KMO)** |
| | ) | |
| | ) | **JUDGE: K.M. O'MALLEY** |
| **LINCOLN ELECTRIC COMPANY;** | ) | |
| **HOBART BROTHERS COMPANY;** | ) | |
| **ILLINOIS TOOL WORKS, INC.;** | ) | **MAG. JUDGE:** |
| **THE ESAB GROUP, INC.; SELECT** | ) | |
| **ARC, INC.; BOC GROUP, INC. f/k/a** | ) | |
| **AIRCO, INC.; J. B. ALLOY** | ) | |
| **CORPORATION a/k/a UNIBRAZE** | ) | **COMPLAINT** |
| **CORPORATION; PRAXAIR, INC.;** | ) | |
| **TDY INDUSTRIES, INC.;** | ) | |
| **TECHALLOY COMPANY, INC.;** | ) | **(Jury Demand Endorsed Hereon)** |
| **VIACOM, INC.; WESTINGHOUSE** | ) | |
| **ELECTRIC CORPORATION;** | ) | |
| **CATERPILLAR, INC.; GENERAL** | ) | |
| **ELECTRIC COMPANY; UNION** | ) | |
| **CARBIDE CORPORATION;** | ) | |
| **EUTECTIC CORPORATION; A.O.** | ) | |
| **SMITH CORPORATION; SANDVIK,** | ) | |
| **INC.; DELORO STELLITE** | ) | |
| **COMPANY, INC.; ARCOS** | ) | |
| **INDUSTRIES, L.L.C.; AIRCO, INC.;** | ) | |
| **METROPOLITAN LIFE INSURANCE** | ) | |
| **COMPANY ("METLIFE"); MILLER** | ) | |
| **ELECTRIC MANUFACTURING CO.,** | ) | |
| **INC.; and JOHN DOE** | ) | |

**DEFENDANTS A-Z** )

**DEFENDANTS.**

Plaintiff, THOMAS CONWAY for the Complaint, alleges as follows based upon personal knowledge as to his own acts, and upon information and belief as well as his attorneys' investigation as to the acts of Defendants:

## THE PARTIES

1. THOMAS CONWAY, Plaintiff herein, is a resident of Connecticut. Plaintiff has suffered and continues to suffer severe physical and emotional injuries, some or all of which may be permanent, and has incurred and will continue to incur medical expenses, as a result of exposure to toxic welding fumes.

2. LINCOLN ELECTRIC COMPANY ("LINCOLN"), Defendant herein, is a corporation incorporated under the laws of Ohio, and its registered agent is H. Jay Elliott, 22801 St. Clair Ave., Cleveland, Ohio 44117.

3. HOBART BROTHERS COMPANY ("HOBART"), Defendant herein, is a corporation incorporated under the laws of Ohio, and its registered agent is C.T. Corporation System, 1300 E. 9th St., Cleveland, Ohio 44114.

4. ILLINOIS TOOL WORKS, INC. ("ILLINOIS TOOL WORKS"), Defendant herein, is a corporation incorporated under the laws of Delaware, and its registered agent is C.T. Corporation System, 631 Lakeland East Dr., Flowood, MS 39208.

5. THE ESAB GROUP, INC. ("ESAB"), Defendant herein, is a corporation incorporated under the laws of Ohio, and its registered agent is The Corporation Trust Company, The Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801.

6. SELECT ARC, INC., ("SELECT ARC"), Defendant herein, is a corporation incorporated under the laws of Ohio, and its registered agent is Paul E. Zimmer, 2700 Ketting Tower, 40 N. Main St., Dayton, OH 45423.

7. BOC GROUP, INC. f/k/a AIRCO, INC. ("AIRCO"), Defendant herein, is a corporation incorporated under the laws of Delaware, and its registered agent is C. T. Corporation System, 1300 E. Ninth Street, Cleveland, OH 44114.

8. J. B. ALLOY CORPORATION. a/k/a UNIBRAZE CORPORATION ("UNIBRAZE"), Defendant herein, is a corporation incorporated under the laws of Texas, and its registered agent is Laurance Robinson, 1050 Penner Crest Street, Houston, TX 77055.

9. PRAXAIR, INC. ("PRAXAIR"), Defendant herein, is a corporation incorporated under the laws of Delaware, and its registered agent is Prentice-Hall Corporation System, 506 S. President St., Jackson, MS 39502.

10. TDY INDUSTRIES, INC. ("TELEDYNE"), formerly known as Teledyne Industries, Inc., Defendant herein, is a corporation incorporated under the laws of California, and its registered agent is C. T. Corporation System, 631 Lakeland East Dr., Flowood, MS 39208.

11. TECHALLOY COMPANY, INC. ("TECHALLOY"), Defendant herein, is a corporation incorporated under the laws of Pennsylvania, and its registered agent is David Daube, 370 Franklin Trunpike, Mahwah, NJ 07430.

12. VIACOM, INC. ("VIACOM"), Defendant herein, is a corporation incorporated under the laws of Delaware, and its registered agent is The Prentice-Hall Corporation Service Company, 80 State Street, Albany, NY 12207.

13. WESTINGHOUSE ELECTRIC CORPORATION ("WESTINGHOUSE"), Defendant herein, is a corporation incorporated under the laws of Pennsylvania, and its registered agent is C.T. Corporation System, 631 Lakeland E. Dr., Flowood, MS 39208.

14.     CATERPILLAR, INC. ("CATERPILLAR"), Defendant herein, is a corporation incorporated under the laws of Pennsylvania, and its registered agent is C.T. Corporation System, 1300 E. Ninth Street, Cleveland, OH 44114.

15.     GENERAL ELECTRIC COMPANY ("GENERAL ELECTRIC"), Defendant herein, is a corporation incorporated under the laws of New York, and its registered agent is C.T. Corporation System, 1300 E. Ninth Street, Cleveland, OH 44114.

16.     UNION CARBIDE CORPORATION ("UNION CARBIDE"), Defendant herein, is a corporation incorporated under the laws of New York, and its registered agent is C.T. Corporation System, 631 Lakeland E. Dr., Flowood, MS 39208.

17.     EUTECTIC CORPORATION ("EUTECTIC"), Defendant herein, is a corporation organized under the laws of New York, and its Chief Executive Officer is John Kirkwood, Eutectic Corporation, N 94 W 14355 Garwin Mace Drive, Menomonee Falls, WI 53051.

18.     A. O. SMITH CORPORATION ("SMITH"), Defendant herein, is a corporation incorporated under the laws of Delaware, and its registered agent is Prentice-Hall Corporation System, 506 S. President St., Jackson, MS 39502.

19.     SANDVIK, INC. ("SANDVIK"), Defendant herein, is a corporation incorporated under the laws of Delaware, and its registered agent is C. T. Corporation System, 818 W. 7th Street, Los Angeles, CA 90017.

20.     DELORO STELLITE COMPANY, INC. ("DELORO"), Defendant herein, is a corporation incorporated under the laws of Delaware, and its registered agent is agent is to the attention of Karl R. Wyss, 101 S. Hanley Rd., #300, St Louis, MO 63105.

21.     ARCOS INDUSTRIES, L.L.C., f/k/a ARCOS ALLOYS d/b/a HOSKINS MANUFACTURING COMPANY ("ARCOS"), Defendant herein is a limited liability company organized under the laws of the state of Michigan that has done or is doing business in West

Virginia, and may be served with process through its registered agent, Mark A. Sturing, 31731 Northwestern Highway, 250W, Farmington Hills, MI 48334.

22.     AIRCO, INC., also known as THE BOC GROUP, INC. ("Airco"), Defendant herein is a corporation duly organized under the laws of Delaware and its registered agent is CT Corporation System, 1300 East Ninth Street, Cleveland, OH 44114.

23.     METROPOLITAN LIFE INSURANCE COMPANY ("MetLife"), Defendant herein is a corporation duly organized under the laws of the State of New York that has done and is doing business in Ohio and may be served with process on CT Corporation System, 1300 East 9th Street, Suite 100, Cleveland, OH 44114, phone 216.621.4270. MetLife is a co-conspirator.

24.     MILLER ELECTRIC MANUFACTURING CO., INC., ("Miller") is a corporation duly organized under the laws of the State of Wisconsin that has done and is doing business in Georgia and may be served a copy of summons and complaint on CEO Frank S. Ptak, through its registered agent, CT Corporation, 44 E. Mifflin Street, Madison,WI 53707.

25.     JOHN DOE DEFENDANTS A-Z, Defendants herein, are of identities that are unknown to the Plaintiffs at this time, but when those parties' true identities are discovered, the pleadings will be amended by substituting their true names and giving proper notice under the Rules of this Court.  These Defendants include sellers, suppliers, distributors, and manufacturers that, at any time relevant to these proceedings, supplied welding equipment, supplies, and steel/metal products containing manganese to the site(s) at which Plaintiff was exposed to toxic fumes, and by virtue of which Plaintiff sustained the damages alleged herein.   John Doe Defendants A-Z also include unknown members of AWS, NEMA and TFA, whose negligence and breaches caused or contributed to cause the Plaintiffs' damages and injuries.

## JURISDICTION AND VENUE

26. This Court has jurisdiction pursuant to 28 U.S.C. §1332 because there is complete diversity of citizenship between Plaintiff and Defendants and the amount in controversy exceeds $75,000 exclusive of interest and costs.

27. Venue is proper in this District because Defendants reside in this District insofar as they manufactured, sold and/or marketed welding rods within this District, as well as in the District of residence of the Plaintiff, and throughout the United States, with the expectation that this product would be purchased and or used throughout this District and the United States. Further, venue is proper in that the multidistrict litigation to which this case is related, being In Re: Welding Rods Product Liability Litigation, MDL 1535, has been transferred to this District.

## FACTS

28. At all times relevant hereto, Plaintiff was exposed to toxic fumes resulting from welding operations.

29. The ordinary and intended use of welding products causes emission of fumes that contain, among other substances, manganese ("welding fumes").

30. Since 1837, manganese has been medically and scientifically recognized as toxic to the human central nervous system in levels that exceed the trace amounts normally found in the human body. Toxicity of manganese causes progressive, disabling neurological damage known alternatively as Parkinsonism secondary to manganese exposure, manganese induced Parkinsonism, manganese poisoning, manganism or neuropsychological injury. People who suffer from manganese poisoning suffer from debilitating neurological problems that amongst other things affect their ability to think, talk, eat, move, sleep, and work.

31. Persons exposed to welding fumes absorb them into their body primarily through inhalation. Cases involving manganese exposure for a period as short as 49 days

causing manganese poisoning and progressive, disabling, neurological damage have been documented.

32.     Plaintiff was exposed to welding fumes while using welding products and equipment or working in the proximity of other persons using welding products or equipment.

33.     As a direct and proximate result of exposure to welding fumes, the Plaintiff developed a neurological injury. To date the Plaintiff has suffered, continues to suffer, and will continue to suffer permanent neurological and physical damage, severe physical and mental pain, loss of wages, loss of earning capacity, disability, medical expenses, and loss of enjoyment of life.

34.     At all relevant times, the Plaintiff was unaware of the dangerous nature of welding fumes, manganese, and the neurological injuries that could occur because of exposure to welding fumes.

35.     Any reasonable persons, including the Plaintiff, if adequately informed of the hazards of exposure to welding fumes, would not have willingly exposed him or herself to welding fumes in workplaces without necessary precautionary measures.

36.     Through industry and medical studies, unknown to the Plaintiff, Defendants knew or should have known of the health hazards inherent in the products they were selling, distributing, or using. Defendants ignored or deliberately and fraudulently concealed that information, or condoned the concealment, and/or conspired with, devised, encouraged, or aided others and/or each other to do so, to advance their conspiracy to continue to sell their harmful products without the consequences of selling a product known to cause these injuries and/or avoid the costs of safety precautions, and/or avoid litigation by people injured by welding fumes. Defendants' actions and omissions constitute gross negligence and demonstrate a reckless disregard for the rights and safety of others, justifying punitive damages against the

7

Thomas Conway v. Lincoln Electric Company, et al
Plaintiff's Original Complaint

Defendants.

37.     Defendants committed numerous tortious acts that included fraudulently and negligently misrepresenting, concealing, suppressing, and omitting material information about the health effects of welding fumes and precautionary measures as specifically alleged below.

38.     Most Defendants are or were manufacturers of welding products (consumables and machines) and were members, or participants though their executive employees or designated representatives, in the National Electric Manufacturer's Association ("NEMA"), The Ferroalloys Association ("TFA") and/or the American Welding Society ("AWS"), (collectively "trade organizations") during all relevant times.

39.     NEMA is a trade organization comprised of manufacturers that has a section devoted to the manufacturers of welding products known as "NEMA Electric Welding Section" or "NEMA Arc Welding Section" ("NEMA Welding Section").

40.     TFA is an industry advocacy group consisting of producers of chromium, manganese, silicon, and vanadium ferroalloys that sponsored a manganese subcommittee that includes representatives from welding manufacturers and the AWS and NEMA. The TFA's membership included management representatives of companies that produce welding products and large consumers that purchase the products for use in their operations.

41.     AWS is a trade organization that includes within its membership management representatives of companies that manufacture and sell welding products, and large consumers that buy the products for use in their operations.

42.     Defendants created committees within these trade organizations and then used the committees to fraudulently and negligently misrepresent, conceal, suppress, and omit material information about the health effects of welding fumes and necessary precautionary measures.

43.     Specific examples of the trade association committees controlled by Defendants

and their activities are identified below. Defendants controlled and used the committees to conceal the dangers from people exposed to welding fumes by:

a. limiting individual membership on relevant committees exclusively or primarily to employees of the Defendants or their designated representatives;

b. maintaining, through Defendants' delegates, majority or exclusive voting control of the committees at all times;

c. selecting the assignments or proposals considered by each committee;

d. funding projects chosen by Defendants;

e. using Defendants' delegates to prepare the written records of the business transacted by each committee; and

f. reviewing and editing, to the satisfaction of Defendants, studies performed by consultants hired by the committees.

44. From at least 1937 to the present, Defendants, by their actions and through trade association committees they controlled, undertook studies, issued product labels and other health and safety information, and issued specifications and standards for ventilation, safety equipment, and other precautionary measures.

45. At all times, Defendants acted with the intent to conceal the health hazards of welding fumes, and specifically manganese, knowing that their studies, publications, specifications, and standards would be adopted and relied upon by manufacturers, sellers, and consumers of welding products, as the authoritative source for warnings, instructions, and precautionary measures printed on product labels and otherwise distributed in the stream of commerce.

46. Defendants had actual knowledge about the causal relationship between manganese-containing welding fumes and neurological injury. Defendants concealed this information from workers' exposed to welding fumes.

47. The causal connection between neurological injuries and welding fumes

containing manganese was scientifically documented no later than 1932. In 1932, a medical article authored by Dr. Erich Beintker was published documenting two cases of welders with neurological injury caused by manganese poisoning from welding fumes. The copy of this article or a summary of the medical article was received in the libraries of many or all Defendants at or near the time of publication.

48.     In 1937, NEMA's Welding Section received further notice of the contents of the 1932 medical article through a welding safety booklet published by an insurance company stating that manganese in welding fumes "causes a disease similar to *paralysis agitans* [Parkinson's disease]."

49.     In 1944, NEMA's Welding Section received notice of a claim of manganese poisoning in a welder.

50.     In 1958, the AWS sponsored Z49 Committee issued a technical document, (not intended for use by welders) approved by the AWS Technical Committee, an oversight committee for AWS activities, reflecting its knowledge that manganese in welding fumes is a potentially toxic substance.

51.     In 1966, at a meeting of a task group of the AWS Filler Metal Committee, members of the committee reviewed an industrial hygiene article identifying manganese as a toxic substance in welding fumes, and the Committee discussed neurological injuries in welders.

52.     In 1970, the AWS Task Group on Welding Fumes received notice, through a literature search submitted by a consultant hired by the Task Group on Welding Fumes, that welding fumes could cause neurological damage due to manganese poisoning, and that the symptoms of manganese poisoning resemble the symptoms of Parkinson's disease.

53.     In 1970, the AWS Task Group on Welding Fumes received notice, through a welding fume study conducted by a consultant hired by the Task Group on Welding Fumes, that

10
Thomas Conway v. Lincoln Electric Company, et al
Plaintiff's Original Complaint

welding fumes could easily exceed the recommended occupational exposure guidelines, even when ventilation standards specified by Defendants were followed.

54. Beginning at least in the late 1970s, the AWS Safety and Health Committee received notice of claims of welders suffering neurological injuries from manganese in welding fumes.

55. In 1978, the AWS Safety and Health Committee received notice, through a literature search report submitted by a consultant hired by the Committee, that welders can suffer neurological damage from manganese in welding fumes. A portion of this report is quoted below:

> "Although a number of cases...have been reported, there are no recent studies reported in the literature which explore the magnitude of the problem of chronic manganese poisoning in welders. In future epidemiological studies of various welding populations, the prevalence of this disease should be investigated.
>
> Early symptoms of chronic manganism include restlessness, irritability and a tendency to laugh or cry without purpose. These symptoms may be followed by apathy, visual hallucinations, uncontrollable impulse, flight of ideas, mental confusion or euphoria.
>
> Mask-like facial expression, spastic grin, muscle rigidity, slow gait with sliding of the feet, increased and abnormal reflexes, monotonous blurred speech with poor articulation, tremors, irregular handwriting, impaired hearing, double vision, abnormal reactions to pain, touch, heat and pressure, excessive salivation and perspiration, sexual impotence and diminution of libido have been described by various authors.... Mental activity is reported to be slowed, judgment impaired and memory weakened, but intelligence remains normal.
>
> The observation that manganism resembles Parkinson's disease deserves emphasis. Although no data on the prevalence of Parkinsonism in welders are available, there is a concern that some cases of manganese poisoning could be mistakenly diagnosed as Parkinson's disease. Further investigations may be warranted.
>
> Manganism, like Parkinsonism, responds favorably to treatment with the drug levodopa (L-dopa), indicating that the two diseases may share certain biological abnormalities: depletion of

11

> dopamine (a neurotransmitter in the basal ganglia of the brain) and
> depletion of melanin pigment content of the nerve cells of the
> substantia nigra, also in the brain."

56.    In 1978, the same consultant described above in paragraph 60 reported to the AWS Safety and Health Committee that manganese poisoning from welding fumes could be misdiagnosed as idiopathic Parkinson's disease, and that the problem was so widespread that it recommended that an epidemiologic study be conducted.

57.    In 1979, the AWS Research Committee and the AWS Executive Committee on Safety and Health concluded that there was sufficient evidence to justify the funding of an epidemiologic study that would include the study of neurological problems in welders. The committee voted to undertake this epidemiologic study, although it was never completed.

58.    In 1983, the AWS Safety and Health Committee received notice through an independent literature search that manganese poisoning is "readily confused with Parkinson's disease," and also that in a study in India, 40% of the welders studied suffered "neurological injury."

59.    Beginning in the late 1970s and early 1980s, Defendants through the AWS Safety and Health Committee and NEMA Welding Section sponsored "Industry Defense Committee," received notice of claims of manganese poisoning filed as lawsuits against companies in the welding industry.

60.    In 1984, the chairperson of the AWS Safety and Health Committee admitted "manganese fumes can cause a disease quite similar to Parkinson's disease after six months to two years of exposure." Defendants knew or should have known of this admission.

61.    Beginning in 1985 and continuing to the present, certain Defendants admitted in their Manufacturer Safety Data Sheets ("MSDS"), which are technical documents not intended for reading by welders, their knowledge that manganese in welding fumes could cause

neurological damage.

62.     Because not all Defendants attended each trade organization meeting, it was a regular practice of the trade organization committees to publish written minutes that were disseminated to all committee members, including those not in attendance, for the purpose of ratifying and adopting the actions taken and decisions made at the meetings.

63.     At a meeting of NEMA's Welding Section held on March 16, 1937, Defendants in attendance agreed to and did intentionally, knowingly, and recklessly conceal known hazards associated with welding fumes by forming a "Dust and Smoke Committee" to preempt investigation of welding fume hazards by independent sources that were not controlled by Defendants.

64.     During meetings of NEMA's Welding Section held between January 20 and June 23, 1938, Defendants in attendance agreed to and did intentionally, knowingly, and recklessly conceal known hazards of welding fumes by changing the language of a publication issued by an insurance company to delete the original statement in the publication that manganese in welding fumes causes a disabling illness similar to Parkinson's disease.

65.     In 1939-40, at meetings of NEMA's Welding Section, Defendants in attendance agreed to and did intentionally, knowingly, and recklessly conceal the hazards of welding fumes by purporting to undertake an investigation of the health hazards of welding fumes and then, upon its completion, changing the conclusions of the study, so as to falsely represent that welding fumes were not harmful to welders.

66.     In 1949, as part of a scheme to create and disseminate false evidence useful in defending against claims brought by persons injured by exposure to welding fumes, Defendant members of NEMA's Arc Welding Section agreed to and did intentionally, knowingly, and recklessly conceal known hazards of welding fumes by providing information for and causing

publication in a welding trade journal of a two-part article that made the misrepresentation that welding fumes were not toxic.

67.     In 1949 and 1951, at meetings of NEMA's Arc Welding Section which considered precautionary measures, Defendants in attendance agreed to and did intentionally, knowingly, and recklessly conceal the health hazards of welding fumes by rejecting the adoption of any precautionary product labels for welding products because Defendants feared that welders would be afraid to use welding products if they saw precautionary product labels, and therefore sales of welding products would be reduced.

68.     In 1952, Defendants reorganized the AWS Safety Recommendations Committee and called a meeting to consider the furnishing of safety and health information at which they agreed to, and did intentionally, knowingly, and recklessly conceal the health hazards of welding fumes by rejecting the adoption of any precautionary product labels for welding products.

69.     In 1952, at another meeting of the AWS Safety Recommendations Committee, Defendants in attendance agreed to, and did intentionally, knowingly, and recklessly adopt a policy of refuting existing reports of welding fume hazards by publishing their own reports that misrepresented exposure to welding fumes as safe.

70.     In 1957, Defendants agreed to, and did intentionally, knowingly, and recklessly conceal the health hazards of welding fumes by sponsoring the publication of an article in the *Welding Engineer* trade publication that made the misrepresentation that "toxic gases are not produced by electrode coatings."

71.     In 1966, at meetings of the AWS A5 Filler Metal Committee and a task group, Defendants in attendance intentionally, knowingly, and recklessly agreed to publication in a trade journal or an article misrepresenting the health hazards of welding fumes as causing only "temporary disability."

72.     In 1966, at other meetings of the A5 Filler Metal Committee of the AWS and a task group of that committee, the Defendants in attendance agreed to, and did intentionally, knowingly, and recklessly conceal health hazards of welding fumes by establishing industry-wide specifications for precautionary product labels that failed to warn workers of the danger of manganese in welding fumes. This precautionary label stated:

> Welding may produce fumes and gases hazardous to health. Avoid breathing these fumes and gases. Use adequate ventilation. See USAS Z49.1 "Safety in Welding & Cutting," published by the American Welding Society.

At these meetings of the A5 Filler Metal Committee of the AWS and a Task Group of that committee, Defendants in attendance established industry-wide specifications for precautionary product labels which did intentionally, knowingly, and recklessly omit instructions about necessary ventilation, precautionary measures, and other information, needed to protect workers against the toxic effect of manganese.

73.     In 1966-67, through votes on ballots distributed to Defendants through the A5 Filler Metal Committee of the AWS, Defendants did intentionally, knowingly, and recklessly approve, as part of the AWS required specifications for most welding products, a precautionary product label concealing health hazards from welding fumes and omitting instructions about necessary ventilation, precautionary measures, and other information.

74.     From 1975-79 Defendants, through the AWS Committee on Safety and Health, did intentionally, knowingly, and recklessly conceal the known hazards of welding fumes by providing information that misrepresented the hazards associated with welding fumes as part of a deliberate scheme to prevent an independent standard-setting organization from lowering the occupational exposure guidelines for iron oxide and general welding fumes.

75.     In 1979, at meetings of a joint AWS-NEMA committee consisting of a special Task Group of the A5 Filler Metal Committee of the AWS and the Labeling and Safe

Practices Committee of NEMA's Arc Welding Section, Defendants intentionally, knowingly, and recklessly established industry-wide specifications for precautionary product labels that concealed the health hazards of welding fumes by omitting any reference to the toxic effects of manganese in welding fumes. At these meetings, Defendants also intentionally, knowingly, and recklessly established inadequate industry specifications for precautionary measures, and other information needed to protect workers against the toxic effects of manganese in welding fumes.

76.     In 1979, through votes on a ballot distributed to Defendants through the AWS-NEMA Joint Committee On Precautionary Labels and the A5 Filler Metal Committee of the AWS, Defendants did intentionally, knowingly, and recklessly approve as part of the required industry-wide specifications for most welding products a precautionary product label concealing health hazards and omitting instructions about necessary ventilation, precautionary measures, and other information. This precautionary label stated in pertinent part:

> "WARNING: Protect yourself and others. Read and understand this label.
> FUMES AND GASES can be dangerous to your health.
> Read and understand the manufacturer's instructions and your employer's safety practices.
> Keep your head out of the fumes.
> Use enough ventilation, exhaust at the arc, or both, to keep the fumes and gases from your breathing zone, and the general area.
> See American National Standard Z49.1 "Safety in Welding and Cutting" published by the American Welding Society."

77.     Beginning in 1979 and continuing until the present time, at meetings of the AWS Technical Council and Board of Directors, Defendants in attendance did intentionally, knowingly, and recklessly conceal the health hazards of welding fumes by failing and refusing to perform an epidemiological study, recommended by other AWS committees and an independent consultant retained by the Defendants, to investigate the neurological effects of welding fumes on persons exposed to welding fumes.

78.     In   1980,   at   meetings   of   NEMA's Ad Hoc Committee on Precautionary

Labeling, Defendants in attendance did intentionally, knowingly, and recklessly conceal health hazards of welding fumes by approving industry specifications for precautionary product labels for welding power sources that omitted reference to the toxic effects of manganese in welding fumes on persons exposed to welding fumes.

79. Beginning in 1980, at meetings of the NEMA Ad Hoc Committee on Precautionary Labeling, Defendants in attendance did intentionally, knowingly, and recklessly approve industry specifications for precautionary product labels for welding power sources that omitted necessary instructions about ventilation, precautionary measures, and other information needed to protect against the toxic effects of manganese in welding fumes.

80. Beginning in 1980 and continuing until 1996, at meetings of the NEMA MSDS Task Force Committee and the AWS SH-4 Ad Hoc Committee on Suggestions and Changes to NEMA Publication EW 5-1982, Defendants in attendance did intentionally, knowingly, and recklessly agree to conceal health hazards of welding fumes by adopting a recommended format for the Hazardous Material and Health Hazard Data sections of the Material Safety Data Sheets (MSDS) for welding products that omitted reference to the manganese content of welding fumes, the neurological damage caused by manganese in welding fumes, and necessary instructions for protection against the health hazards of welding fumes.

81. Beginning in 1993 and continuing to the present time, Defendants, through the AWS Safety and Health Committee and NEMA Welding Section, did intentionally, knowingly, and recklessly seek to conceal the health hazards of manganese in welding fumes by appointing designated representatives to become committee members of, and providing funding for, the TFA to oppose restrictions on the guidelines for manganese exposure levels established by various authorities.

82. In 1993-95, Defendants, through the above described organization sponsored by

the AWS Safety and Health Committee and NEMA Welding Section, as part of a scheme to prevent the lowering of occupational exposure guidelines for manganese in welding fumes established by the American Conference of Governmental Industrial Hygienists ("ACGIH"), did intentionally, knowingly, and recklessly seek to conceal the health hazards of manganese in welding fumes by providing false and misleading information that exposure to manganese in welding fumes did not cause neurological injury.

## FIRST CLAIM -- CONSPIRACY AND FRAUDULENT CONCEALMENT

83. Plaintiff re-alleges and incorporates the foregoing allegations.

84. At all relevant times Defendants with knowledge of the health hazards of manganese in welding fumes, acted in concert and conspired in pursuance of a common plan or design to commit the tortious acts against Plaintiff.

85. Defendants combined with each other, and with non-defendants, to engage in unlawful conduct. In furtherance of the conspiracy, Defendants committed the following overt and tortious acts:

a. fraudulently concealing, misrepresenting, and suppressing material scientific and medical information about the toxic effects of manganese in welding fumes;

b. deliberately failing to adequately warn persons in proximity of welding fumes of the known health hazards of manganese in welding fumes;

c. deliberately breaching their duty to instruct about proper ventilation, safety equipment, or other precautionary measures which would protect against the health hazards of manganese in the welding process;

d. deliberately breaching their duty to investigate the health hazards of manganese welding;

e. selling welding products in a defective condition and/or without necessary warnings of the catastrophic health hazards or instructions concerning precautionary measures; and

f. avoiding the results of the scrutiny of governmental and safety organizations that would have occurred had Defendants not concealed the true nature and extent of the dangers of their manganese containing welding consumables.

86. Defendants knowingly agreed to participate in the conspiracy by one or more of the following means:

a. actively taking part;

b. furthering it by cooperation; and/or

c. ratifying and adopting acts of other conspirators done for their benefit.

87. Defendants participated in furthering the unlawful purposes of the conspiracy by delegating responsibilities to and carrying these tasks out through the trade organization committees.

88. Upon information and belief, Defendants committed numerous other overt and tortious acts that are unknown to Plaintiff at this time, in furtherance of the conspiracy through letters, memoranda, publications, meetings, telephone conversations, and other forms of communication directly between Defendants and through the trade organization committees.

89. Plaintiff relied on Defendants' misrepresentation and fraud; but for Defendants' misrepresentation and fraud, Plaintiff would not have been exposed to manganese in welding fumes. As a direct and proximate result of Defendants' conspiratorial acts, Plaintiff was exposed to welding fumes at toxic levels resulting in neurological injuries and damages.

90. Because Defendants have engaged in the conspiracy outlined above, all Defendants are jointly and severally liable for Plaintiffs' damages.

## **SECOND CLAIM -- COMMON LAW FRAUD -- FAILURE TO DISCLOSE**

91. Plaintiff re-alleges and incorporates the foregoing allegations.

92. Defendants committed common law fraud against the Plaintiff.

93. Defendants failed to disclose and concealed material facts within their knowledge.

94. Defendants knew that Plaintiff was ignorant of the fact and did not have an equal

opportunity to discover the truth about the dangers presented by Defendants' products.

95.    These Defendants intended to induce Plaintiff to take some action, among other things, to buy and use their products, by failing to disclose the fact.

96.    Plaintiff relied on Defendants' fraud; but for Defendants' fraud, he would not have been exposed to toxic levels of manganese in welding fumes.

97.    Plaintiff suffered injury as a result of acting without knowledge of the undisclosed facts.

## THIRD CLAIM -- NEGLIGENCE

98.    Plaintiff re-alleges and incorporates the foregoing allegations.

99.    At all relevant times, it was reasonably foreseeable by Defendants that welders and persons in proximity to welders, including Plaintiff, would be exposed to welding fumes containing manganese by using welding products or working in proximity of other workers using welding products.

100.    Defendants have the duty imposed by law, or have assumed the duty, to exercise reasonable care for the safety of Plaintiff and similarly situated persons.

101.    Because exposure to welding fumes presents a risk of physical harm, all Defendants had a legal duty to exercise reasonable care for the safety of Plaintiff when making representations about welding safety and health in warning labels, publications, instructions for ventilation and other precautionary measures.

102.    Defendants knew, or in the exercise of ordinary care should have known, that persons exposed to welding fumes would act in reliance upon representations made by Defendants about the health hazards associated with welding fumes and the precautionary measures required to protect against those health hazards.

103.    Defendants knew, or in the exercise of ordinary care should have known, that

welding fumes would cause neurological damage to workers like Plaintiff.

104. Defendants breached their duty of reasonable care and were negligent, without regard to whether the acts were intentional, knowing, or reckless.

105. Beginning in 1970, Defendants violated OSHA standards about publication of information about health hazards through MSDS guidelines that omitted necessary instructions about target organs, ventilation, precautionary measures, and other information needed to protect against the toxic effects of manganese in welding fumes.

106. Defendants violated industry standards about health and safety as set forth in the Z49 documents adopted by the AWS sponsored Z49.1 committee beginning in 1950 by failing to publish adequate warning of precautionary instructions and other information to welders or persons in the proximity to welding fumes about the standard.

107. Defendants' negligent acts and omissions were the direct and proximate causes of the occurrence in question and Plaintiff's injuries and damages.

## FOURTH CLAIM -- NEGLIGENCE-SALE OF PRODUCT

108. The Plaintiff re-alleges and incorporates the foregoing allegations.

109. Certain Defendants, during some or all relevant times, manufactured sold, and/or distributed welding products that were supplied to Plaintiff and/or Plaintiff's coworkers for use.

110. Plaintiff was exposed to welding fumes containing manganese from products sold by these Defendants, while using the products or working in the proximity of others using the products.

111. These Defendants had the duty, as product sellers, to exercise reasonable care for the safety of the foreseeable users of the product and those around them, including Plaintiff.

112 These duties included the responsibility for the following safety and health

matters relating to welding fumes:

a. the investigation of the health hazards;

b. writing and publishing adequate and timely precautionary product labels and other health and safety information; and

c. writing and publishing adequate and timely specifications and standards about ventilation, safety equipment, and other precautionary measures.

113. These Defendants knew, or in the exercise of reasonable care should have known, that welding fumes would cause neurological damage to welders and/or those around them like Plaintiff.

114. These Defendants breached their duty of reasonable care to Plaintiff and were negligent, without regard to whether the acts were intentional, knowing, malicious or reckless.

115. These Defendants violated industry standards about health and safety as set forth in the Z49 documents adopted by the AWS sponsored Z49.1 committee beginning in 1950 by failing to publish adequate and timely warning of precautionary instructions and other information to welders or persons in the proximity to welding fume about the standard.

116. These Defendants' negligent acts and omissions were the direct and proximate causes of the occurrence in question and Plaintiff's injuries and damages.

## FIFTH CLAIM -- STRICT LIABILITY
## -- UNREASONABLY DANGEROUS PRODUCT -- MARKETING DEFECT -- MISREPRESENTATION

117. Plaintiff re-alleges and incorporates the foregoing allegations.

118. Certain defendants are manufacturers, sellers or distributors of welding machines and consumables that produce manganese-containing welding fumes. These products were expected to and did reach various industrial and commercial locations, where Plaintiff's exposure occurred, without substantial change in the condition of the product from that in which

it was sold.

119.    Plaintiff was exposed to welding fumes containing manganese from products sold
by the seller Defendants, while using the products or working in the proximity of others using
the products.

120.    These Defendants' products are unreasonably dangerous because, when used for
their reasonably foreseeable and intended purposes in the welding process, they produce harmful
fumes that cause neurological injuries.

121.    These Defendants' products are defective because:

a.      adequate and timely warnings were not provided to users that the products
produce harmful fumes;

b.      adequate and timely instructions were not provided to users about ventilation,
safety equipment, or other precautionary measures;

c.      Defendants failed to test or investigate the health hazards associated with the
products; and

d.      Defendants represented to the public that welding was generally safe when it was
not, Plaintiff relied on the representation and was damaged, and Plaintiff invokes
Restatement (Second) of Torts §402B for all purposes.

122.    The defects in Defendants' products existed when the products left Defendants'

control.

123.    The defects in Defendants' products were the producing and proximate causes of

the occurrences in question and Plaintiff's injuries and damages.

124.    At all relevant times, Plaintiff had no knowledge of the defects in the Defendants'

products.

## SIXTH CLAIM -- STRICT LIABILITY -- DESIGN DEFECT

125.    Plaintiff re-alleges and incorporates the foregoing allegations.

126.    Certain defendants are manufacturers, sellers or distributors of welding machines

and consumables that produce manganese- containing welding fumes.    These products

were expected to and did reach various industrial and commercial locations, where Plaintiff's exposure occurred, without substantial change in the condition of the product from that in which it was sold.

127. These Defendants are strictly liable for the defective design of both the welding machines and welding consumables. At the time these welding machines and consumables were designed, manufactured and sold by said defendants, safer alternative designs existed, which included designs other than those actually used, that had they been selected by said defendants, would have prevented or significantly reduced the likelihood of Plaintiff's injuries, and such designs were both economically and technologically feasible at the time these products left the possession of said Defendants, and had they been used, would have not have impaired the utility of the product.

128. Specifically, Plaintiff alleges that safer alternative designs of welding consumables include those that significantly reduce welding fume in addition to allowing for source capture ventilation in all situations.

129. Further, Plaintiff alleges that safer alternative designs of welding machines include integrated fume extraction guns, which would have captured the welding fumes at the arc, prior to entering the welder's breathing zone, and would therefore, have prevented or significantly reduced the likelihood of Plaintiff's injuries.

130. The defects in Defendants' products existed when the products left Defendants' control.

131. The defects in Defendants' products were the producing and proximate causes of the occurrences in question and Plaintiff's injuries and damages.

## **SEVENTH CLAIM -- WARRANTY**

132. The Plaintiff re-alleges and incorporates the foregoing allegations.

24
Thomas Conway v. Lincoln Electric Company, et al
Plaintiff's Original Complaint

133.	At all relevant times, Defendants expressly warranted in words and substance that welding products were generally safe which proved to be false. That wrongful and misleading conduct was a producing and/or proximate cause of the occurrence and Plaintiff's injuries and damages.

134.	Plaintiff relied upon Defendants' warranties to his detriment.

## EIGHTH CLAIM -- DAMAGES / PUNITIVE DAMAGES

135.	The Plaintiff re-alleges and incorporates the foregoing allegations.

136.	As a direct and proximate cause of Defendants' conduct, Plaintiff suffered the following injuries and damages:

a.	general and special damages in an amount that will conform to proof at time of trial;

b.	loss of earnings and impaired earning capacity, according to proof at time of trial;

c.	medical expenses, past and future, according to proof at time of trial;

d.	for past and future pain, suffering and disfigurement, according to proof;

e.	for past and future mental and emotional distress, according to proof;

f.	for diminution in his quality and enjoyment of life;

g.	for punitive or exemplary damages, according to proof against Defendants;

h.	for interest as provided by law; and

i.	for such other and further relief as the Court may deem just and proper.

**WHEREFORE**, Plaintiff demands judgment from Defendants, jointly and severally, for compensatory damages and punitive damages in an amount exceeding the minimal jurisdictional limit of the Court, pre-judgment interest from the date of judicial demand, interest on the judgment at the legal rate until paid, attorney's fees, and costs of court.

**JURY DEMAND**

The Plaintiff demands a trial by jury of the maximum number of jurors allowed by law.

Dated: November 29, 2005

Respectfully submitted,

*Grant Kaiser*

Grant Kaiser
E-mail: gkaiser@thekaiserfirm.com
**THE KAISER FIRM, LLP**
8441 Gulf Freeway, Suite 600
Houston, Texas 77017-5001
713.223.0000
713.223.0440 (fax)

John R. Climaco (Ohio #0011456)
E-mail: jrclim@climacolaw.com
**CLIMACO, LEFKOWITZ, PECA,**
**WILCOX & GAROFOLI CO., LPA**
1220 Huron Road, Suite 1000
Cleveland, Ohio 44115
Telephone: (216) 621-8484
Facsimile: (216) 771-1632