# U.S. District Court
## District of Delaware (Wilmington)
## CIVIL DOCKET FOR CASE #: 1:19-cv-02274-LPS

Humphrey et al v. Monsanto Company
Assigned to: Judge Leonard P. Stark
Cause: 28:1332 Diversity-Personal Injury

Date Filed: 12/13/2019
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Federal Question

**Plaintiff**

**Paul Humphrey**

represented by **Ian Connor Bifferato**
The Bifferato Firm, P.A.
1007 N. Orange Street, 4th Floor
Wilmington, DE 19801
(302) 225-7600
Email: cbifferato@tbf.legal
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Mary Humphrey**

represented by **Ian Connor Bifferato**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 12/13/2019 | 1 | COMPLAINT filed with Jury Demand against Monsanto Company - Magistrate Consent Notice to Pltf. ( Filing fee $ 400, receipt number 0311-2801472.) - filed by Paul Humphrey, Mary Humphrey. (Attachments: # 1 Civil Cover Sheet)(mal) (Entered: 12/13/2019) |
| 12/13/2019 | 2 | Notice, Consent and Referral forms re: U.S. Magistrate Judge jurisdiction. (mal) (Entered: 12/13/2019) |
| 12/13/2019 | | Summons Issued with Magistrate Consent Notice attached as to Monsanto Company on 12/13/2019. Requesting party or attorney should pick up issued summons at the Help Desk, Room 4209, or call 302-573-6170 and ask the Clerk to mail the summons to them. (mal) (Entered: 12/13/2019) |
| 12/16/2019 | 3 | SUMMONS Returned Executed by Paul Humphrey, Mary Humphrey. Monsanto Company served on 12/16/2019, answer due 1/6/2020. (Bifferato, Ian) (Entered: 12/16/2019) |
| 12/18/2019 | | Case Assigned to Judge Leonard P. Stark. Please include the initials of the Judge (LPS) after the case number on all documents filed. (rjb) (Entered: 12/18/2019) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 12/19/2019 16:49:05 | | | |
| **PACER Login:** | hllp1982:2634105:4722683 | **Client Code:** | 1417.0049 |
| **Description:** | Docket Report | **Search Criteria:** | 1:19-cv-02274-LPS Start date: 1/1/1970 End date: 12/19/2019 |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PAUL HUMPHREY and MARY HUMPHREY, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No.: |
| | ) | |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| MONSANTO COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Come now the Plaintiffs, Paul and Mary Humphrey, by their attorneys, bring this
Complaint for cause of action against Defendant, Monsanto Company ("Monsanto"), and allege
as follows:

## NATURE OF THE CASE

1.      This case arises out of Monsanto's wrongful conduct in connection with the
design, development, manufacture, testing, packaging, promoting, marketing, advertising,
distribution, labeling, and sale of the herbicide Roundup, containing the active ingredient
glyphosate.  Glyphosate has been found to be carcinogenic, linked to causing various forms of
cancer, and in particular, non-Hodgkin's Lymphoma.  As such, Roundup is dangerous to human
health and unfit to be marketed and sold in commerce, particularly without proper warnings and
directions as to the dangers associated with its use.  Plaintiff Paul Humphrey, who used Roundup
extensively, was diagnosed with B-cell, and he and his wife, Mary Humphrey, bring this action
for the injuries and losses they have incurred.

## JURISDICTION AND VENUE

1

2.      This court has personal jurisdiction over Monsanto under 28 U.S.C. § 1332 because complete diversity exists. Monsanto is a citizen of Delaware and transacts business in the state.  Monsanto knows that its Roundup products are and were sold throughout Delaware, and, more specifically, caused Roundup to be sold across the United States, including Delaware. In addition, Monsanto maintains sufficient contacts with the Delaware such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

3.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the Plaintiffs and the Defendant and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4.      Venue is proper in this District under 28 U.S.C. §1391(b) and (c).

### PARTIES

5.      The Plaintiffs, Paul and Mary Humphrey, are natural persons and at all relevant times were residents and citizens of Marion County, Arkansas.  The Plaintiffs bring this action for personal injuries sustained from exposure to Roundup, and its active ingredient glyphosate and the surfactant POEA.  As a direct and proximate result of being exposed to Roundup, the Plaintiff, Paul Humphrey, developed B-cell lymphoma as well as other health problems as a result of developing NHL.

### FACTUAL ALLEGATIONS

6.      At all relevant times, Monsanto designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the commercial herbicide Roundup.

2

7.     "Roundup" refers to all formulations of Monsanto's Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak Herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Week Killer, Roundup Herbicide, Roundup Original 2k Herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promas, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass Killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer 1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation containing the active ingredient glyphosate.

8.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri.  It is the world's leading producer of glyphosate.

9.     Monsanto discovered the herbicidal properties of glyphosate during the 1970's and developed it as a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

10.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phospate synthase, known as EPSP synthase.

11.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3 phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

12.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots; and detectable quantities accumulate in the plant tissues.

13.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses.  This increase in use has been driven largely by the proliferation of "Roundup Ready" crops, which have been genetically engineered to resist the activity of glyphosate.

14.     Monsanto is responsible for the development, manufacture, marketing, sale, and distribution of Roundup Ready seeds.  By 2009, Monsanto was the world's leading producer of Roundup ready seeds.  In 2010, roughly 70% of corn and cotton and 90% of soybean fields in the United States were grown with Roundup Ready seeds.

15.     Roundup was introduced in 1974 and is today one of the world's most widely-used herbicides.  Monsanto's glyphosate products are registered in more than 130 countries and are approved for weed control in more than 100 crops.  No other herbicide active ingredient compares in terms of number of uses.[1]

16.     In all this time, farmers have used Roundup unaware it is a carcinogen.

## REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

17.     The manufacture, formulation, and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq.*  FIFRA requires that all pesticides be registered with the Environmental Protection

---

[1] *Backgrounder*, History of Monsanto's Glyphosate Herbicides, June 2005, available at www.monsanto.com/products/documents/glyphosate-background-materials/back_ground.pdf

4

Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. § 136a(a).

18.     The EPA requires a variety of tests as part of the registration process to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

19.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

20.     The EPA and the Commonwealth of Massachusetts registered Roundup for distribution, sale, and manufacture in the United States and the Commonwealth of Massachusetts.

21.     FIFRA generally requires that the registrant, here Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

22.     Each pesticide product distributed, sold, or manufactured is evaluated at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticides through a

Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. To re-evaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

**MONSANTO'S FALSE REPRESENTATIONS REGARDING
THE SAFETY OF ROUNDUP**

23.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

a.    Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences.

b.    And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c.    Roundup biodegrades into naturally occurring elements.

d.    Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e.    This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f.   You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching.  Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g.   Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h.   Glyphosate's safety margin is much greater than required.  It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i.   You can feel good about using herbicides by Monsanto.  They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j.   "Roundup can be used where kids and pets will play and breaks down into natural material."  This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[2]

24.   On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with the NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a.   its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

---

[2] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15)(Nov. 1996).

b.    its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;

c.    its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

d.    its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics;"

e.    glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and

f.    its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

25.    Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

26.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup and affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[3]

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP

---

[3] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.

8

27.     As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties.

28.     On March 4, 1985, a group of the EPA's Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[4]  Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

29.     In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214).  The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies.  All of the data required was submitted and reviewed and/or waived.[5]

30.     In October 1991, the EPA published a Memorandum entitled "Second Peer Review of Glyphosate."  The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans).  Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.[6]

31.     In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Monsanto's Roundup products are more dangerous and toxic than glyphosate alone.[7]  As early as 1991, evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.

---

[4] Consensus Review of Glyphosate, Casewell No. 661A.  March 4, 1985.  United States Environmental Protection Agency.
[5] http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheets/0178fact.pdf.
[6] U.S. EPA, *Memorandum, Subject:  SECOND Peer Review of Glyphosate* 1 (1191), *available at* http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_30-Oct-91_265.pdf
[7] See Martinez, et al. *Oral and pulmonary toxicology of the surfactant used in Roundup herbicide,* PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991); Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryotic, and Placental Cells,* 22 CHEM. RES. TOXICOL. 97-105 (2009), *available at http://big.assets.huffington.com/france.pdf;* Gasnier et al. 2010, Francisco Peixoto, *Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation,* 61 CHEMOSPHERE 1115, 1122 (2005), *available at* https://www.researchgate.net/publication/7504567_Comparative_effects_of_the_Roundup_and_glyphosate_on_mitochondrial_oxidative_phosphorylation; March 2004.

32.     In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."[8] The study found that Monsanto's Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

33.     In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.[9]

34.     The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[10]

35.     In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

36.     The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

---

[8] Julie Marc, et al., *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation*, 15 CHEM. RES. TOXICOL. 326-331 (2002), *available at* http://pubs.acs.org/doi/full/10.1021/tx015543g.
[9] Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation*, 96 BILIOGY OF THE CELLS 245, 245-249 (2004), *available at* http://onlinelibrary.wiley.com/doi/10.1016/j.biolcel.2003.11.010/epdf.
[10] Molinari, 2000; Stewart et al., 2003.

37.    In 2009, Nora Benachour and Gilles-Eric Seralini published a study of the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

38.    The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food.  The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone.  The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide.  The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

39.    The results of these studies were confirmed in peer-reviewed studies that were known to Monsanto.

40.    Monsanto knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect the Plaintiff from Roundup.

41.    Monsanto knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

42.    Monsanto failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect the Plaintiff from Roundup.

43.    Rather than performing appropriate tests, Monsanto relied on flawed industry-supported studies designed to protect Monsanto's economic interests rather than the Plaintiff and the consuming public.

11

44.     Despite its knowledge that Roundup was considerably more dangerous than glyphosate alone, Monsanto continued to promote Roundup as safe.

### IARC CLASSIFICATION OF GLYPHOSATE

45.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental agency that the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

46.     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015-2019 met in April 2014.  Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs:  there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

47.     IARC set glyphosate for review in 2015-2016.  IARC uses five criteria for determining priority in reviewing chemicals.  The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; and related agents similar to one given high priority by the above considerations.  Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

48.     On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Monsanto's possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Monsanto's Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the

mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

49.     The IARC's full Monograph was published on July 29, 2015, and established glyphosate as a class 2A probable carcinogen to humans. According to the authors, glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

50.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's Lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

51.     The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

### EARLIER EVIDENCE OF THE DANGERS OF GLYPHOSATE

52.     Despite the new classification by the IARC, Monsanto has had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

53.     Genotoxicity refers to chemical agents capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

54.     In 1997, Chris Clements published "Genotoxicity of select herbicides in Rana catesbeiana tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

55.     The study found that tadpoles exposed to roundup showed significant DNA damage when compared with unexposed control animals.

56.     Both human and animal studies have shown that glyphosate and glyphosate-base formulations such as Roundup can induce oxidative stress.

13

57.     Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

58.     The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

59.     In 2006, César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

60.     The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

61.     The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

62.     Despite knowledge to the contrary, Monsanto denies that Roundup is genotoxic.

63.     In addition to glyphosate and Roundup's genotoxic properties, Monsanto has long been aware of glyphosate's carcinogenic properties.

64.     Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, NHL, Hodgkin's Lymphoma, Multiple Myeloma, and soft tissue sarcoma.

65.     Monsanto has known of this association since the mid-1980's and numerous human and animal studies evidence the carcinogenicity of glyphosate and/or Roundup.

14

66.     In 1985, the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor.  The study concluded the glyphosate was oncogenic.

67.     In 2003, Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

68.     The study concluded that glyphosate had the most significant relationship to NHL among all herbicide studies with an increased odds ratio of 3.11.

69.     In 2003, AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

70.     The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

71.     In 2008, Mikael Eriksson published a population based case-control study of exposure to various pesticides as a risk factor for NHL.

72.     This strengthened previous associations between glyphosate and NHL.

73.     In spite of this knowledge, Monsanto continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

74.     On information and belief, these statements and representations have been made with the intent of inducing Plaintiff, the agricultural community, and the public at large to purchase, and increase the use of, Roundup for Monsanto's pecuniary gain, and in fact did induce the Plaintiff to use Roundup.

15

75.     Monsanto made these statements with complete disregard and reckless indifference to the safety of the Plaintiff and the general public.

76.     Notwithstanding Monsanto's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

77.     Monsanto knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

78.     Monsanto failed to appropriately and adequately inform and warn the Plaintiff of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring, and/or medications.

79.     Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Monsanto continues to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

80.     Monsanto has claimed and continues to claim that Roundup is safe, non-carcinogenic, and non-genotoxic.

81.     Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity

16

studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup
brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses,
and that it is not genotoxic."[11]

82.    Ironically, the primary source for this statement is a 1986 report by the WHO, the
same organization that now considers glyphosate to be a probable carcinogen.

83.    Glyphosate, and Monsanto's Roundup products in particular, have long been
associated with serious side effects and many regulatory agencies around the globe have banned
or are currently banning the use of glyphosate herbicide products.

84.    Monsanto's statements proclaiming the safety of Roundup and disregarding its
dangers misled the Plaintiff.

85.    Despite Monsanto's knowledge that Roundup was associated with an elevated
risk of developing cancer, Monsanto's promotional campaigns focused on Roundup's purported
"safety profile."

86.    Monsanto's failure to adequately warn the Plaintiffs, resulted in (1) the Plaintiff,
Paul Humphrey, using and being exposed to glyphosate instead of using another acceptable and
safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to
warn and instruct consumers about the risk of cancer, including NHL, and other injuries
associated with Roundup.

87.    Monsanto failed to seek modification of the labeling of roundup to include
relevant information regarding the risks and dangers associated with Roundup exposure.

88.    Monsanto's failure to appropriately warn and inform the EPA has resulted in
inadequate warnings in safety information presented directly to users and consumers.

---

[11] *Backgrounder* – Glyphosate:  No Evidence of Carcinogenicity, updated November 2014, available at
www.monsanto.com/glyphosate/documents/no-evidence-of-carcinogenicity.pdf

89.     Monsanto's failure to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

90.     Monsanto's failure to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

91.     By reason of the foregoing acts and omissions, the Plaintiffs seek compensatory damages as a result of the Plaintiff's use of, and exposure to, Roundup, which caused or was a substantial contributing factor in causing the Plaintiff to suffer from cancer, specifically NHL, and the Plaintiffs suffered severe and personal injuries that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

92.     By reason of the foregoing, the Plaintiff is severely and permanently injured.

93.     By reason of the foregoing acts and omissions, the Plaintiffs have endured and continues to suffer, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of Monsanto's actions and inactions.

## PLAINTIFF'S EXPOSURE TO ROUNDUP

94.     The Plaintiffs, Paul and Mary Humphrey's are residents of the state of Arkansas. Mr. Humphrey began using Roundup during the course of his employment as a landscaper from approximately 1994 to 2010.

95.     The Plaintiff, Paul Humphrey, followed all safety and precautionary warnings during the course of his use of Roundup.

96.     The Plaintiff used Roundup products, including but not limited to, the Roundup Pro Concentrate, on average 26 times per month at more than a dozen different properties.

18

97.     The Plaintiff got Roundup on his hands and skins during the mixing and application process.

98.     The Plaintiff, Paul Humphrey, was diagnosed with B cell non-Hodgkin's lymphoma a in June of 2019.  The development of Plaintiff's NHL, and subsequent health problems, was proximately and actually caused by exposure to Monsanto's Roundup products.

99.     The Plaintiffs have incurred significant economic and non-economic damages resulting from his injuries.

100.    During the period of Plaintiff's exposure to Roundup, he did not know that exposure to Roundup was injurious to his health or the health of others.

101.    The Plaintiff first learned that Roundup caused NHL in 2018 after seeing a television advertisement regarding the correlation between the two.

102.    The Plaintiff continued to work with Roundup until he became too sick to continue working in the landscaping business.

## COUNT I – NEGLIGENCE

103.    The Plaintiff, Paul Humphrey, re-alleges each paragraph above as if fully set forth herein.

104.    Monsanto had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

105.    Monsanto failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup into interstate commerce in that Monsanto knew

19

or should have known that using Roundup created a high risk of unreasonable, dangerous side

effects, including, but not limited to, the development of NHL, as well as other severe and

personal injuries that are permanent and lasting in nature, physical pain and mental anguish,

including diminished enjoyment of life, as well as need for lifelong medical treatment,

monitoring, and/or medications.

106.   The negligence by Monsanto, its agents, servants, and/or employees, included but

was not limited to the following act and/or omissions:

a.   Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly testing it;

b.   Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup;

c.   Not conducting sufficient testing programs to determine whether or not Roundup was safe for use; in that Monsanto knew or should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users;

d.   Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Monsanto had knowledge that Roundup is, was, or could be carcinogenic;

e.   Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

f.   Negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

g.   Negligently failing to petition the EPA to strengthen the warnings associated with Roundup;

h.   Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with roundup;

i.     Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

j.     Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

k.     Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

l.     Negligently designing Roundup in a manner that was dangerous to its users;

m.    Negligently manufacturing Roundup in a manner that was dangerous to its users;

n.     Negligently producing Roundup in a manner that was dangerous to its users;

o.     Negligently formulating Roundup in a manner that was dangerous to its users;

p.     Concealing information from the Plaintiffs while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations;

q.     Improperly concealing and/or misrepresenting information from the Plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides; and

r.     Negligently selling Roundup with a false and misleading label.

107.    Monsanto under-reported, underestimated, and downplayed the serious dangers of Roundup.

108.    Monsanto negligently and deceptively compared the safety risks and/or dangers of roundup with common everyday foods such as table salt, and other forms of herbicides.

109.    Monsanto was negligent and/or violated Arkansas law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that it:

a.  Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide;

b.  Failed to accompany its product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

c.  Failed to accompany its product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

d.  Failed to accompany its product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;

e.  Failed to warn the Plaintiff of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of CLL;

f.  Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup;

g.  Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants;

h.  Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity; and

i.  Was otherwise careless and/or negligent.

110.  Despite the fact Monsanto knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Monsanto continues to market, manufacture, distribute, and/or sell Roundup to consumers, including the Plaintiff.

111.  Monsanto knew or should have known that consumers such as the Plaintiff would foreseeably suffer injury as a result of Monsanto's failure to exercise ordinary care.

22

112.    Monsanto's violations of law and/or negligence were the proximate cause of the
Plaintiff's injuries, harm and economic loss, which the Plaintiff suffered and will continue to
suffer.

113.    As a result of the foregoing acts and omissions, the Plaintiff, Paul Humphrey,
suffered NHL and severe personal injuries, which are permanent and lasting in nature, physical
pain and mental anguish, including diminished enjoyment of life, as well as financial expenses
for hospitalization and medical care.

WHEREFORE, the Plaintiff, Paul Humphrey, respectfully requests that this Court enter
judgment in the Plaintiff's favor for compensatory damages together with interest, costs herein
incurred, attorneys' fees and all relief as this Court deems just and proper.

## COUNT II – BREACH OF IMPLIED WARRANTIES OF
## MERCHANTABILITY AND FITNESS

114.    The Plaintiffs re-allege the paragraphs above as if fully stated herein.

115.    At all times relevant, Monsanto engaged in the business of testing, developing,
designing, formulating, manufacturing, marketing, selling, distributing, and promoting its
Roundup products, which are defective and unreasonably dangerous to users and consumers,
including the Plaintiff, thereby placing Roundup products into the stream of commerce.  These
actions were under Monsanto's ultimate control and supervision.

116.    Before the Plaintiff was exposed to Roundup products, Monsanto impliedly
warranted to its consumers and users – including the Plaintiff – that Roundup products were of
merchantable quality and safe and fit for the use for which they were intended; specifically, as
horticultural herbicides.

117.    Monsanto, however, failed to disclose that Roundup has dangerous propensities
when used as intended and that the use of and/or exposure to Roundup and glyphosate-

containing products carries and increased risk of developing severe injuries, including the Plaintiff's injuries.

118.    The Plaintiff reasonably relied on the skill, superior knowledge and judgment of Monsanto and on its implied warranties that Roundup products were of merchantable quality and fit for their intended purpose or use.

119.    Roundup products were expected to reach and, in fact, reached consumers and users, including the Plaintiff, without substantial changed in the condition in which they were manufactured and sold by Monsanto.

120.    At all relevant times, Monsanto was aware that consumers and users of its products, including the Plaintiff, would use Roundup products as marketed by Monsanto, which is to say that the Plaintiff was a foreseeable user of Roundup.

121.    Monsanto intended that is Roundup products be used in the manner in which the Plaintiff, in fact, used them and Monsanto impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup was not adequately tested or researched.

122.    In reliance on Monsanto's implied warranty, the Plaintiff used Roundup as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Monsanto.

123.    The Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup or glyphosate.

124.    Monsanto breached its implied warranty to the Plaintiff in that its Roundup products were not of merchantable quality, safe, or fit for their intended use.  Roundup has

24

dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

125.    The harm caused by Roundup products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

126.    As a direct and proximate result of Monsanto's wrongful acts and omissions, the Plaintiff, David Plummer, has suffered severe and permanent physical and emotional injuries. The Plaintiff has endured pain and suffering, suffered economic loss (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

WHEREFORE, the Plaintiff, Paul Humphrey, respectfully requests that the Court enter judgment in the Plaintiff's favor for compensatory, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. The Plaintiff also demands a jury trial on the issues contained herein.

## COUNT III - LOSS OF CONSORTIUM

127.    The Plaintiffs re-allege the paragraphs above as if fully stated herein.

128.    The Plaintiff, Mary Humphrey, is the wife of Paul Humphrey and at all pertinent times was the wife of Paul Humphrey.

129.    As a direct and proximate result of the breach of duty and wrongdoing of the defendants and the resultant injury to Paul Humphrey as more particularly described in Counts I through II, the plaintiff, Mary Humphrey, suffered a loss of her right to consortium with her husband and the loss of her husband's services, society and companionship, and has suffered great mental anguish.

WHEREFORE, the Plaintiff, Mary Humphrey, demands compensatory damages, plus

interest and costs.  The Plaintiff also demands a jury trial on the issues contained herein.

<u>**DEMAND FOR JURY TRIAL**</u>

The Plaintiffs hereby demand trial by jury as to all issues.

DATED:  October 29, 2019                    THE BIFFERATO FIRM, PA

                                            */s/ Ian Connor Bifferato*
                                            Ian Connor Bifferato (#3273)
                                            1007 N. Orange Street, 4th Floor
                                            Wilmington, DE 19801
                                            (302) 225-7600
                                            cbifferato@tbf.legal

                                            and

                                            David C. Strouss, BBO#546253
                                            Evan R. Hoffman, BBO# 678975
                                            Jasmine M. Howard, BBO#698130
                                            **THORNTON LAW FIRM LLP**
                                            One Lincoln Street
                                            Boston, MA  02111
                                            (617) 720-1333  FAX (617) 720-2445
                                            dstrouss@tenlaw.com
                                            ehoffman@tenlaw.com
                                            jhoward@tenlaw.com