ECF

# U.S. District Court
## Southern District of New York (White Plains)
## CIVIL DOCKET FOR CASE #: 7:19−cv−10659−VB

Fallon et al v. Monsanto Company
Assigned to: Judge Vincent L. Briccetti
Demand: $9,999,000
Cause: 28:1332pl Diversity−Product Liability

Date Filed: 11/18/2019
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod.
Liability
Jurisdiction: Diversity

**Plaintiff**

**Thomas I. Fallon**

represented by **Manuel D. Gomez**
Manuel D. Gomez & Associates P.C.
225 Broadway Suite 1010
New York, NY 10007
(212) 571−2640
Fax: (212) 571−2302
Email: manueldgomezesq@gmail.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Brigitte B. Fallon**


V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 11/18/2019 | 1 | COMPLAINT against Monsanto Company. (Filing Fee $ 400.00, Receipt Number ANYSDC−18085071)Document filed by Thomas I. Fallon.(Gomez, Manuel) (Entered: 11/18/2019) |
| 11/19/2019 | | ***NOTICE TO ATTORNEY TO ELECTRONICALLY FILE CIVIL COVER SHEET. Notice to Attorney Manuel D. Gomez. Attorney must electronically file the Civil Cover Sheet. Use the event type Civil Cover Sheet found under the event list Other Documents. (pc) (Entered: 11/19/2019) |
| 11/19/2019 | | ***NOTICE TO ATTORNEY REGARDING CIVIL. CASE OPENING STATISTICAL ERROR CORRECTION: Notice to attorney Manuel D. Gomez. The following case opening statistical information was erroneously selected/entered: Dollar Demand $10,000,000,000; Fee Status code due (due);. The following correction(s) have been made to your case entry: the Dollar Demand has been modified to blank; the Fee Status code has been modified to pd (paid);. (pc) (Entered: 11/19/2019) |
| 11/19/2019 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above−entitled action is assigned to Judge J. Paul Oetken. Please download and review the Individual Practices of the assigned District Judge, located at http://nysd.uscourts.gov/judges/District. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at http://nysd.uscourts.gov/ecf_filing.php. (pc) (Entered: 11/19/2019) |
| 11/19/2019 | | Magistrate Judge Sarah L. Cave is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: http://nysd.uscourts.gov/forms.php. (pc) (Entered: 11/19/2019) |

| 11/19/2019 | | Case Designated ECF. (pc) (Entered: 11/19/2019) |
|---|---|---|
| 11/19/2019 | 2 | CIVIL COVER SHEET filed. (Gomez, Manuel) (Entered: 11/19/2019) |
| 11/20/2019 | | NOTICE OF CASE REASSIGNMENT to Judge Vincent L. Briccetti. Judge J. Paul Oetken is no longer assigned to the case. (wb) (Entered: 11/20/2019) |
| 11/20/2019 | | Magistrate Judge Paul E. Davison is so redesignated. (wb) (Entered: 11/20/2019) |
| 11/21/2019 | 3 | **FILING ERROR – DEFICIENT SUMMONS REQUEST PDF ERROR –** REQUEST FOR ISSUANCE OF SUMMONS as to Monsanto Company, re: 1 Complaint. Document filed by Thomas I. Fallon. (Gomez, Manuel) Modified on 11/22/2019 (pne). (Entered: 11/21/2019) |
| 11/22/2019 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT REQUEST FOR ISSUANCE OF SUMMONS. Notice to Attorney Manuel D. Gomez to RE–FILE Document No. 3 Request for Issuance of Summons. The filing is deficient for the following reason(s): attorney information was omitted from the summons request PDF; no district court selection was made. Re–file the document using the event type Request for Issuance of Summons found under the event list Service of Process – select the correct filer/filers – and attach the corrected summons form PDF. (pne)** (Entered: 11/22/2019) |
| 11/22/2019 | 4 | REQUEST FOR ISSUANCE OF SUMMONS as to Monsanto Company, re: 1 Complaint. Document filed by Thomas I. Fallon. (Gomez, Manuel) (Entered: 11/22/2019) |
| 11/25/2019 | 5 | ELECTRONIC SUMMONS ISSUED as to Monsanto Company. (pc) (Entered: 11/25/2019) |

Manuel D  Gomez (MDG – 6851)
**Law Office of Manuel D. Gomez, P.C**
225 Broadway Suite 1010
New York, NY, 10007
Tel   212-571-2640
Fax · 212-571-2302
ManuelDGomezesq@gmail com
*Attorney for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

THOMAS I. FALLON and BRIGITTE
B  FALLON,

| | |
|---|---|
| *Plaintiffs,* | **CIVIL No.:** |
| vs | |
| MONSANTO COMPANY, | **COMPLAINT;** <br> **DEMAND FOR JURY TRIAL** |
| *Defendant* | |

## COMPLAINT

1  In 1970, Defendant Monsanto Company, Inc  discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with growing of crops  By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85-90 million of pounds used annually  That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

2. Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri  It is the world's leading producer of glyphosate  As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market  The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve framer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops  In 2010, an estimated 70% of corn and cotton, and 90% of the soybean fields in the United States were Roundup Ready®

3  Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops.4 They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate

4  On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate  That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001

5  On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

6  The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans  The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other hematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma

7  The IARC evaluation is significant. It confirms what has been believed for years  that glyphosate is toxic to humans

8. Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment

## JURISDICTION AND VENUE

9. Federal diversity jurisdiction in this Court is proper under 28 U S C  § 1332 because Plaintiffs are citizen of a different state from the Defendant Monsanto Company's states of citizenship, and the aggregate amount in controversy exceeds $75,000, exclusive of interest and costs

10. This Court has personal jurisdiction over Monsanto under C C P. §410, because Monsanto knows or should have known that its Roundup® products are sold throughout the State of New York

11. Monsanto maintains sufficient contacts with the State of New York such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice. Additionally, Monsanto caused the Plaintiff's tortious injury by acts and omissions in this judicial district and caused  tortious injury in the district by acts and omissions

outside this district while regularly doing and soliciting business, engaging in a persistent course of conduct, and deriving substantial revenue from goods used or consumed and services rendered in this judicial district.

12  Venue is proper within this District under 28 U S C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred within this judicial District

## THE PARTIES

### Plaintiffs

13. Plaintiff Thomas J  Fallon resides in Rockland County, New York. Plaintiff Brigitte B  Fallon was at all relevant times the lawful spouse of Thomas J. Fallon

### Defendant

14  Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.

15  At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®

## FACTS

16  Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world

17. Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for

protein synthesis. Treated plants generally die within two to three days  Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains

18  For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses  That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough. it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®— glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Agricultural workers are, once again, victims of corporate greed  Monsanto assured the public that Roundup® was harmless  In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers  Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® was safe.

### *The Discovery of Glyphosate and Development of Roundup®*

19  The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. 11 From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use. It still markets Roundup® as safe today.

### *Registration of Herbicides under Federal Law*

20. The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U S C § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act  7 U.S.C § 136a(a).

21  Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential nontarget organisms, and other adverse effects on the environment  Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S C § 136a(c)(5)(D).

22. FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U S.C § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

23. The EPA and the State of New York registered Roundup® for distribution, sale, and manufacture in the United States and the State of New York

24. FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests  The data produced by the registrant must be submitted to the EPA for review and evaluation  The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer

25 The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration " 7 U.S.C § 136a1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation

26 In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment —in relation to the reregistration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.


### Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup

27. Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

28. On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud

29. In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies

relating to Roundup® 14 IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®

30. In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate  The EPA subsequently audited IBT, it too found the toxicology studies conducted for the Roundup® herbicide to be invalid  An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

31. Three top executives of IBT were convicted of fraud in 1983

32  In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

33  Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries


*The Importance of Roundup® to Monsanto's Market Dominance Profits*

34  The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly  But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition

35  In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop  This

allowed Monsanto to expand its market for Roundup® even further, by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds  It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

36  Through a three-pronged strategy of increased production, decreased prices, and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product  In 2000, Roundup® accounted for almost $2 8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue 18 Today, glyphosate remains one of the world's largest herbicides by sales volume

### *Monsanto has known for decades that it falsely advertises the safety of Roundup®*

37. In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup ® products  Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were **"safer than table salt"** and **"practically non-toxic"** to mammals, birds, and fish  Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following

a) Remember that environmentally friendly Roundup herbicide is biodegradable  It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences  .

b) And remember that Roundup is biodegradable and won't build up in the soil  That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem

c) Roundup biodegrades into naturally occurring elements

d) Remember that versatile Roundup herbicide stays where you put it  That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation

e) This non-residual herbicide will not wash or leach in the soil. It .   stays where you apply it.

f) You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching  Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h) Glyphosate's safety margin is much greater than required  It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically nontoxic' as it pertains to mammals, birds and fish.

j) "Roundup can be used where kids and pets will play and breaks down into natural material " This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.


38. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that.

 a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

* * *

b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

* * *

c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

 * * *

d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics "

* * *

e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides,

f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

39. Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today

40  In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®  The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean "

*Classifications and Assessments of Glyphosate*

41  The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent  Over time, the IARC Monograph program has reviewed 980 agents  Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens), 287 agents to be Group

2B (Possible Human Carcinogens), 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic

42  The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. 21 Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest

43  One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts  Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation  Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published

44  In assessing an agent, the IARC Working Group reviews the following information  (a) human, experimental, and mechanistic data, (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study. 45  In March 2015, IARC reassessed glyphosate  The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

46. On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112  For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015 to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest

available scientific evidence  According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available".

47. The studies considered the following exposure groups. occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom, and para-occupational exposure in farming families

48  Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

49  Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food

50  The assessment of the IARC Working Group identified several case controls studies of occupational exposure in the United States, Canada, and Sweden  These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

51  The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides

52  The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells  One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed

53  In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice

Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies   A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

54  The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption  Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

55  The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

56  The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.22 Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption

57  The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers

***Other Earlier Findings About Glyphosate's Dangers to Human Health***

58  The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation  The fact sheet describes the release patterns for glyphosate as follows

**Release Patterns**

Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of way, cropped and non-cropped sites  These sites may be around water and in wetlands.

It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills  Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup  They may also be exposed by touching soil and plants to which glyphosate was applied  Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal

59  In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

*Recent Worldwide Bans on Roundup®/Glyphosate*

60  Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup® become more widely known  The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which takes effect by the end of 2015  In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated. "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons  In garden centers,

Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Children, in particular, are sensitive to toxic substances and should therefore not be exposed to it."

61. The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate

62. France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

63 Bermuda banned both the private and commercial sale of glyphosates, including Roundup® The Bermuda government explained its ban as follows  "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

 64  The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that Glyphosate has been linked to fatal kidney disease in agricultural workers

65  The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

***Plaintiff's Exposure to Roundup®***

66  Plaintiff Thomas J. Fallon used Roundup extensively in his garden in Palisades, New York until 2016.

67  Following this exposure to Roundup, Mr  Fallon was diagnosed in 2016 with non-Hodgkin lymphoma and leukemia

68. As a result of this illness, Mr Fallon underwent chemotherapy and other treatment and has had his life irreversibly altered

## CLAIM ONE

### STRICT LIABILITY (DESIGN DEFECT)

69 Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein

70 Plaintiff brings this strict liability claim against Defendant for defective design

71 At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant. At all times relevant to this litigation, Defendant designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by the Plaintiff, as described above.

72. At all times relevant to this litigation, Defendant's Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff.

73 At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in New York

and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant

74 Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of the Defendant's manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

75. Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

76. At all times relevant to this action, Defendant knew or had reason to know that its Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendant.

77. Therefore, at all times relevant to this litigation, Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendant were defective in design and formulation, in one or more of the following ways:

a. When placed in the stream of commerce, Defendant's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c  When placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d  Defendant did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate

e. Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f. Defendant knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries

g. Defendant did not conduct adequate post-marketing surveillance of its Roundup® products.

h  Defendant could have employed safer alternative designs and formulations


78  Plaintiff was exposed to Defendant's Roundup® products in the course of his garden, as described above, without knowledge of their dangerous characteristics.

79. At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics

80  Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure

81  The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate  Defendant's Roundup® products were and are more dangerous than alternative products and Defendant could have designed its Roundup® products to make them less dangerous. Indeed, at

the time that Defendant designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable

82  At the time Roundup® products left Defendant's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant's herbicides

83. Defendant's defective design of its Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including the Plaintiff herein.

84. Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendant is strictly liable to Plaintiff

85  The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiff's grave injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained her injuries

86. Defendant's conduct, as described above, was reckless  Defendant risked the lives of consumers and users of its products, including Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Defendant made conscious decisions not to redesign, warn, or inform the unsuspecting public Defendant's reckless conduct warrants an award of punitive damages

87. As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment  Plaintiff will continue to incur these expenses in the future.

88  WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees,

and all such other and further relief as this Court deems just and proper  Plaintiff also demands a jury trial on the issues contained herein

## CLAIM TWO

## STRICT LIABILITY (FAILURE TO WARN)

89  Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein

90  Plaintiff brings this strict liability claim against Defendant for failure to warn

91  At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate  These actions were under the ultimate control and supervision of Defendant

92. Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiff, Plaintiff's employer, Plaintiff's coworkers, and persons responsible for consumers (such as employers), and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products

93  At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks  Defendant had a continuing duty to warn the Plaintiff of the dangers associated with Roundup® use and exposure  Defendant, as

manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field

94. At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products

95  At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its products and to those who would foreseeably use or be harmed by Defendant's herbicides, including Plaintiff

96. Despite the fact that Defendant knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied, or sold the product, and not known to end users and consumers, such as Plaintiff

97  Defendant knew or should have known that its products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products  Defendant has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

98. At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in New York and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant

99. Plaintiff was exposed to Defendant's Roundup® products in the course in his garden, as described above, without knowledge of their dangerous characteristics

100  At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics

101  Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendant

102  Defendant knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, but they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and landscaping applications

103  The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled horticultural workers such as Plaintiff to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate, continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure, and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

104  To this day, Defendant has failed to adequately and accurately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

105. As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiff

106. Defendant is liable to Plaintiff for injuries caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its products and the risks associated with the use of or exposure to Roundup® and glyphosate

107. The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiff's injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained their injuries

108  Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup® products, Plaintiff could have avoided the risk of developing injuries as alleged herein and the company who employed Plaintiff could have obtained alternative herbicides

110. As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer severe injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

111  WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper  Plaintiff also demands a jury trial on the issues contained herein.

## CLAIM THREE

### NEGLIGENCE

112. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

113 Defendant, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff

114 At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product

115 At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products  Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate

116 At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate

117. Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff  Defendant also knew or, in the exercise of reasonable

care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

118. As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries

119. Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant has failed to do so  Indeed, Defendant has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate

120. Defendant's negligence included.

a. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing,

b. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture,

d. Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

e. Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f. Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and be exposed to its Roundup® products;

g. Failing to disclose to Plaintiff, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

h. Failing to warn Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other consumers;

i. Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

j. Representing that its Roundup® products were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended purpose;

k. Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

l. Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m  Continuing to disseminate information to its consumers, which indicates or implies that Defendant's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

n  Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

121  Defendant knew and/or should have known that it was foreseeable that consumers such as Plaintiff would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

122. Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate

123  Defendant's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff suffered, and will continue to suffer, as described herein.

124  Defendant's conduct, as described above, was reckless. Defendant regularly risks the lives of consumers and users of their products, including Plaintiff, with full knowledge of the dangers of its products  Defendant has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff  Defendant's reckless conduct therefore warrants an award of punitive damages

125  As a proximate result of Defendant's wrongful acts and omissions in placing its defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff has suffered and continues to suffer severe and permanent physical and emotional injuries  Plaintiff has endured pain and suffering, has suffered economic losses (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future

126. WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper  Plaintiff also demands a jury trial on the issues contained herein.

## CLAIM FOUR

## BREACH OF EXPRESS WARRANTIES

127. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

128  At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce  These actions were under the ultimate control and supervision of Defendant.

129  Before the time that Plaintiff was exposed to the use of aforementioned Roundup® products, Defendant impliedly warranted to its consumers-including Plaintiff- that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides

130  Defendant, however, failed to disclosed that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

131  Plaintiff reasonably relied upon the skill, superior knowledge and judgment of Defendant and upon its implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use

132  Upon information and belief, Plaintiff was at all relevant times in privity with the Defendant

133  Plaintiff is the intended third-party beneficiaries of implied warranties made by Defendant to the purchasers of its horticultural herbicides, and as such plaintiff is entitled to assert this claim.

134  The Roundup® products were expected to reach and did in fact reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendant.

135  At all times relevant to this litigation, Defendant was aware that consumers and users of its products, including Plaintiff, would use Roundup® products as marketed by Defendant, which is to say that Plaintiff was a foreseeable user of Roundup®.

136  Defendant intended that its Roundup® products be used in the manner in which Plaintiff in fact used them and Defendant impliedly warranted each product to be merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched

137. In reliance upon Defendant's implied warranty, Plaintiff used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendant.

138  Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate

139  Defendant breached its implied warranty to Plaintiff in that its Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested  Roundup® has

dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein

140. The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products

141  As a direct and proximate result of Defendant's wrongful acts and omissions Plaintiff has suffered severe and permanent physical and emotional injuries  Plaintiff had endured pain and suffering, have suffered economic loss (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future

142  WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper  Plaintiff also demands a jury trial on the issues contained herein.

## CLAIM FIVE

### BREACH OF IMPLIED WARRANTIES

143  Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein

144. The law imposes a duty on Monsanto to be responsible in the event the product sold, namely Roundup, is fit for the use and purposes intended

145  Defendant breached its contractually assumed implied warranty by supplying a product that caused Mr  Fallon non-Hodgkin lymphoma and related injuries

146  Any warranty disclaimer or limitation of liability clause offered by Defendant for a product as dangerous as Roundup would be unconscionable and unenforceable by law

## CLAIM SIX

### LOSS OF CONSORTIUM

147. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein

148  Plaintiffs were married at the time of Mr  Fallon injuries, and Mrs  Fallon was entitled to her comfort, care, affection, companionship, services, society, advice, guidance, counsel and consortium

149  As a direct and proximate result of one or more of those wrongful acts or omissions of the Defendants described above, Mrs. Fallon has been and will be deprived of Mr. Fallon's comfort, care affection, companionship, services, society, advice, guidance, counsel and consortium

150  Plaintiff's demand judgment against Defendants for compensatory, treble, and punitive damages, together with interest, cost of suits, attorneys' fees, and all such other relief as the Court deems proper

## COUNT SEVEN

### PUNITIVE DAMAGES

151  Plaintiffs repeat and reiterate the allegations previously set forth herein.

152. At all times material hereto, the Defendants knew or should have known that the subject product was inherently dangerous with respect to its health risks.

153. At all times material hereto, the Defendants knew or should have known that the subject product was inherently dangerous with respects to its health risks

154. Defendants' misrepresentations included knowingly withholding material information from the pubic, including the Plaintiffs herein, concerning the safety of the subject product.

155  At all times material hereto, the Defendants knew and recklessly disregarded the fact that human exposure to Roundup can and does cause health hazards, including non-Hodgkin lymphoma

156  Notwithstanding the foregoing, the Defendants continued to aggressively market and apply the subject product without disclosing the aforesaid risks.

157  Defendants knew of the subject product's defective and unreasonably dangerous nature, as set forth herein, but continued to design, develop, manufacture, market, distribute, sell, and apply it so as to maximize sales and profits at the expense of the health and safety of the public including the Plaintiffs herein, in conscious and/or negligent disregard of the foreseeable harm caused by Roundup.

158. The Defendants intentionally concealed and/or recklessly failed to disclose to the public, including the Plaintiffs herein, the potentially life-threatening hazards of Roundup in order to ensure continued and increased sales

159  The Defendants' intentional and/or reckless failure to disclose information deprived the Plaintiffs of necessary information to enable Plaintiffs to weigh the true risks of using or being exposed to subject product against its benefits.

160. As a direct and proximate result of the Defendants' conscious and deliberate disregard for the rights and safety of consumers such as the plaintiffs, Plaintiffs suffered severe and permanent physical injuries. The plaintiffs have endured substantial pain and suffering and have undergone

extensive medical and surgical procedures  Plaintiffs have incurred significant expenses for medical care and treatment, and will continue to incur such expenses in the future  The Plaintiffs have lost past earnings and have suffered a loss of earning capacity  The Plaintiffs have suffered and will continue to suffer economic loss, and have otherwise been physically, emotionally, and economically injured  The Plaintiffs injuries and damages are permanent and will continue into the future.

161  The aforesaid conduct of the Defendants was committed with knowing, conscious, and deliberate disregard for the rights and safety of consumers, including the Plaintiffs herein, thereby entitling the Plaintiffs to punitive damages in an amount appropriate to punish the Defendants and deter them from similar conduct in the future

## LIMITATION ON ALLEGATIONS

162. The allegations in this pleading are made pursuant to New York law. To the extend New York law imposes a duty or obligation on the Defendants exceeds those required by federal law, Plaintiffs do not assert such claims. All claims asserted herein run parallel to federal law, i e , the Defendant's violations of New York law were also violations of federal law  Had Defendant honestly complied with New York law, it would also have complied with federal law

163. Additionally, Plaintiffs' claims do not seek to enforce federal law. These claims are brought under New York law, notwithstanding the fact that such claims run parallel to federal law.

164. As alleged in this pleading, the Defendant violated U S C 136j and 40 C F.R 156.10(s)(5) by distributing Roundup, which was misbranded pursuant to 7 U.S C  136(g)  Federal law specifically prohibits the distribution of a misbranded herbicide.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court enter judgment in their favor and against Monsanto, awarding as follows

A. compensatory damages in an amount to be proven at trial;

B  punitive damages;

C. costs including reasonable attorneys' fees, court costs, and other litigation expenses; and

D. any other relief the Court may deem just and proper

Respectfully submitted,

/s/ Manuel D. Gomez
Manuel D  Gomez (MDG – 6851)
**Law Office of Manuel D. Gomez, P.C**
225 Broadway Suite 1010
New York, NY, 10007
Tel   212-571-2640
Fax   212-571-2302
ManuelDGomezesq@gmail com

*Attorney for Plaintiffs*