# U.S. District Court
## District of New Jersey [LIVE] (Trenton)
## CIVIL DOCKET FOR CASE #: 3:19-cv-21365-AET-TJB

KEARINS v. MONSANTO COMPANY et al
Assigned to: Judge Anne E. Thompson
Referred to: Magistrate Judge Tonianne J. Bongiovanni
Cause: 28:1332 Diversity-(Citizenship)

Date Filed: 12/13/2019
Jury Demand: Plaintiff
Nature of Suit: 245 Tort Product Liability
Jurisdiction: Diversity

**Plaintiff**

**MICHAEL F. KEARINS**

represented by **RYAN MILUN**
THE KILLIAN FIRM PC
555 ROUTE 1 SOUTH
SUITE 430
ISELIN, NJ 08830
732-912-2100
Email: rmilun@tkfpc.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**MONSANTO COMPANY**

**Defendant**

**ABC CORPORATIONS 1-10**

**Defendant**

**JOHN DOES 1-10**

| Date Filed | # | Docket Text |
|---|---|---|
| 12/13/2019 | 1 | COMPLAINT against All Defendants ( Filing and Admin fee $ 400 receipt number 0312-10179556) with JURY DEMAND, filed by MICHAEL F. KEARINS.(MILUN, RYAN) (Entered: 12/13/2019) |
| 12/13/2019 | | CLERK'S QUALITY CONTROL MESSAGE - The case you electronically filed has been processed, however, the following deficiencies were found: In the future when choosing parties please choose each party individually. Do **NOT** select the **ALL PLAINTIFFS** or **ALL DEFENDANTS** button. The Clerk's Office has made the appropriate changes. Please refer to the Attorney Case Opening Guide for processing electronically filed cases. (jjc, ) (Entered: 12/13/2019) |
| 12/16/2019 | | Judge Anne E. Thompson and Magistrate Judge Tonianne J. Bongiovanni added. (abr) (Entered: 12/16/2019) |
| 12/16/2019 | 2 | SUMMONS ISSUED as to MONSANTO COMPANY. Attached is the official court Summons, please fill out Defendant and Plaintiffs attorney information and serve. (abr) (Entered: 12/16/2019) |

### PACER Service Center

| Transaction Receipt | | | |
|---|---|---|---|
| 12/23/2019 17:35:06 | | | |
| **PACER Login:** | hllp1982:2634105:4722683 | **Client Code:** | 1417.0049 |
| **Description:** | Docket Report | **Search Criteria:** | 3:19-cv-21365-AET-TJB Start date: 1/1/1970 End date: 12/23/2019 |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

Eugene Killian, Jr. (Bar No. 002081990)
Ryan Milun (Bar No. 043412006)
THE KILLIAN FIRM, P.C.
555 Route 1 South, Suite 430
Iselin, NJ 08830
732-912-2100
ekillian@tkfpc.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MICHAEL F. KEARINS;<br><br>*Plaintiff,*<br><br>vs.<br><br>MONSANTO COMPANY; and ABC CORPORATIONS 1-10 and JOHN DOES 1-10,<br><br>*Defendants.* | Civil Action No.<br><br>*Civil Action*<br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff, Michael F. Kearins with an address at 4 Hardy Drive, Bridgewater, New Jersey for his complaint against defendants Monsanto Company, with an address at 800 N. Lindbergh Blvd., St. Louis, MO 63167 and ABC Corporations 1-10 and JOHN DOES 1-10, states as follows:

### NATURE OF THE CASE

1.     This is an action for damages suffered by plaintiff, Michael F. Kearins ("Michael") as a direct and proximate result of defendants negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling and/or sale of the herbicide Roundup, containing the active ingredient glyphosate.

2. Michael maintains that Roundup and/or glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper warnings and directions as to the dangers associated with its use.

3. Michael's injuries, and specifically him contracting non-Hodgkin's Lymphoma were avoidable had defendants not engaged in negligent and wrongful conduct.

## PARTIES:

4. Michael is a natural person and at all relevant times was a resident of Somerset County, New Jersey. Michael brings this action for personal injuries sustained by exposure to Roundup containing the active ingredient glyphosate and the surfactant POEA. As a direct and proximate result of being exposed to Roundup, Michael developed non-Hodgkin's Lymphoma.

5. "Roundup" refers to all formulations of defendants Roundup products that contain the active ingredient glyphosate.

6. Defendant Monsanto Company ("Monsanto"), is a Delaware corporation and is currently registered as an active "for profit" company in the State of New Jersey. Monsanto has a principal place of business at 800 N. Lindbergh Blvd, St. Louis, MO 63167; however, Monsanto regular sold and advertised its Roundup products throughout the state of New Jersey including to individuals (such as Michael and his family) and businesses within Somerset County.

7. Upon information and belief, defendants ABC Corporations 1-10 and JOHN DOES 1-10 are subsidiaries, partners or other entities that were involved in the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling and/or sale of the herbicide Roundup, containing the active ingredient glyphosate. The identities of ABC Corporations 1-10 and JOHN DOES 1-10 are unknown to Michael at this time. Michael will move the Court to specifically name ABC Corporations 1-10 and JOHN DOES 1-10 as their identifies

2

become known to Michael through discovery.

8.     Monsanto, ABC Corporations 1-10 and JOHN DOES 1-10 are collectively referred to as "Monsanto" or "Monsanto Defendants" unless otherwise stated.

## JUISDICTION AND VENUE

9.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) because there is complete diversity of citizenship between the parties. In addition, Plaintiffs seek damages in excess of $75,000, exclusive of interest and costs.

10.     This Court has personal jurisdiction over Monsanto insofar as Monsanto is authorized and licensed to conduct business in the State of New Jersey, maintains and carries on systematic and continuous contacts in this judicial district, regularly transacts business within this judicial district, and regularly avails itself of the benefits of this judicial district.

11.     The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

12.     Additionally, Monsanto caused tortious injury by acts and omissions in this judicial district and caused tortious injury in this district by acts and omissions outside this district while regularly doing and soliciting business, engaging in a persistent course of conduct, and deriving substantial revenue from goods used or consumed and services rendered in this judicial district.

13.     Venue is proper before this Court pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to this claim occurred within this judicial district.

## FACTS COMMON TO ALL COUNTS

14.     At all relevant times, Monsanto was in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or have acquired and are responsible for entities who have designed, researched, manufactured, tested, advertised,

3

promoted, marketed, sold, and distributed the commercial herbicide Roundup

15.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. On information and belief, it is the world's leading producer of glyphosate.

16.     Monsanto discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate based "Roundup" as a broad-spectrum herbicide.

17.     Glyphosate is the active ingredient in Roundup.

18.     Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses.

19.      Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

20.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

21.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

22.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses.

23.     The original Roundup, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the world's most widely used herbicides. Monsanto's glyphosate products are registered in more than 130 countries and are approved for weed control in more than 100 crops. No other herbicide active ingredient compares in terms of number of approved uses.

24. For over 45 years, farmers, homeowner and their families, including Michael's family and Michael himself, have used Roundup, unaware of its carcinogenic properties.

## MONSANTO'S FALSE REPRESENTATIONS
## REGARDING THE SAFETY OF ROUNDUP

25. In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products.

26. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer **than table salt**" and "practically **non-toxic**" to mammals, birds, and fish.

27. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following"

a. Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

b. And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c. Roundup biodegrades into naturally occurring elements.

d. Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e. This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it

f. You can apply Accord with "confidence because it will stay where you put it"

5

it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g. Glyphosate **is less toxic to rats than table salt following acute oral ingestion**.

h. Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i. You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of **'practically non-toxic'** as it pertains to mammals, birds and fish.

j. "Roundup can be used **where kids and pets will play** and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

28.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a. its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b. its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable.

c. its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d. its glyphosate-containing pesticide products or any component thereof are

"good" for the environment or are "known for their environmental characteristics."

    e.   glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides.

    f.   its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

29.    Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

30.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean

### EVIDENCE OF THE CANCER-CAUSING PROPERTIES OF ROUNDUP

31.    As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties.

32.    On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene. Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

33.    In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.

34.    In October 1991 the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of

non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.

35.     In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendants' Roundup products are more dangerous and toxic than glyphosate alone. As early as 1991 evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.

36.     In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

37.     The study found that Defendants' Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

38.     In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

39.     The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "since cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."

40.     In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

41.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the

effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

42.    The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone.

43.    The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that **Roundup is always more toxic** than its active ingredient glyphosate.

44.    The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendants.

45.    Defendants knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Michael and/or similarly situated consumers or users from Roundup.

46.    Defendants knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

47.    Defendants failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Michael or other similarly situated consumers/ users of the product.

48.    Rather than performing appropriate tests, Defendants relied upon flawed industry-supported studies designed to protect Defendants' economic interests rather than Michael or other similarly situated consumers/ users of the product.

49.     Despite their knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendants continued to promote Roundup as "safe for humans."

## IARC CLASSIFICATION OF GLYSOPHATE

50.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency for the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

51.     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015–2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

52.     IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

53.     On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendants' possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Defendants' Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in

animals.

54.     The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A *probable* carcinogen to humans. According to the authors glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

55.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

56.     The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

## EARLIER EVIDENCE OF GLYPHOSATE'S DANGER

57.     Despite the new classification by the IARC, Defendants have had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

58.     Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

59.     In 1997, Chris Clements published "Genotoxicity of select herbicides in *Rana catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

60.     The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

61.     Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

62.     Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

63.     The IARC Monograph notes that "strong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

64.     The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

65.     Despite knowledge to the contrary, Defendants maintain that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

## GLYSOPHATE LINKS TO NON-HODGKIN'S LYMPHOMA

66.     In addition to glyphosate and Roundup's genotoxic properties, Defendants have long been aware of glyphosate's carcinogenic properties.

67.     Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, **non-Hodgkin's lymphoma**, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

68.     On information and believe, Defendants have known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

69.     In 1985 the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

70.     In 2003 Lennart Hardell and Mikael Eriksson published the results of two case-controlled studies on pesticides as a risk factor for non-Hodgkin's Lymphoma and hairy cell leukemia.

71.     The study concluded that glyphosate had the most significant relationship to non-Hodgkin's Lymphoma among all herbicides studies with an increased odds ratio of 3.11.

72.     In 2003 AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for non-Hodgkin's Lymphoma.

73.     The study, which controlled for potential confounders, found a relationship between increased non-Hodgkin's Lymphoma incidence and glyphosate.

74.     In 2008 Mikael Eriksson published a study a population-based case-control study of exposure to various pesticides as a risk factor for non-Hodgkin's Lymphoma.

75.     This strengthened previous associations between glyphosate and non-Hodgkin's Lymphoma.

76.     Despite this knowledge, Defendants continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt.  These statements by Defendants lacked scientific support and in fact, there was voluminous evidence to the contrary.

77.     Upon information and belief, these statements and representations have been made by Defendants with the intent of inducing homeowners and their families, and the public at large to purchase, and to increase the use of Defendants' Roundup for Defendants' pecuniary gain.

78.     Defendants made these statements with complete disregard and reckless indifference to the safety of Michael and the general public.

79.     Notwithstanding Defendants' representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, non-Hodgkin's Lymphoma, Multiple Myeloma, and soft tissue sarcoma.

80.     Defendants knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, non-Hodgkin's Lymphoma, Multiple Myeloma, and soft tissue sarcomas.

81.     Defendants failed to appropriately and adequately inform and warn Michael of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing non-Hodgkin's Lymphoma, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

82.     Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendants continue to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

83.     Defendants have claimed and continue to claim that Roundup is safe, non-carcinogenic, and non-genotoxic

84.     Glyphosate, and Defendants' Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

85.     Despite Defendants' knowledge that Roundup was associated with an elevated risk of developing cancer, Defendants' promotional campaigns focused on Roundup's purported "safety profile."

86.     Defendants' failure to adequately warn homeowners and the general public resulted

in (1) Michael using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including non-Hodgkin's Lymphoma, and other injuries associated with Roundup.

87.     Defendants failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

88.     The failure of Defendants to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

89.     The failure of Defendants to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

90.     The failure of Defendants to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

91.     By reason of the foregoing acts and omissions, Michael seeks compensatory damages as a result of Michael's use of, and exposure to, Roundup which caused or was a substantial contributing factor in causing Michael to suffer from cancer, specifically non-Hodgkin's Lymphoma, and Michael suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

92.     By reason of the foregoing, Michael is severely and permanently injured.

93.     By reason of the foregoing acts and omissions, Michael has endured and, in some categories continues to suffer, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of the actions and inactions of the Defendants.

## PLAINTIFFS EXPOSURE TO ROUNDUP

94.     Michael began using Roundup beginning in the mid-1980s as a young child of approximately 8 years old.

95.     At that time, Michael was charged with conducting the yardwork at his childhood home, which included the use of Roundup on a regular basis between the months of April and October to combat the growth of weeds and other unwanted grasses.

96.     For years, while Michael was living at his parents' home, he was the only one of his siblings that was tasked with this type of yardwork and the only one in his family that routinely and consistently used Roundup.

97.     For many years, Michael sprayed Roundup on a regular basis. Michael followed all safety precautions during the course of use, but he would also routinely inhale the "fumes" from the Roundup spray and/or get Roundup residue on his arms and legs during his prolonged use of the product.

98.     On information and belief, the cancer-causing properties of Roundup were even more damaging to Michaesl because he was exposed to the product at a young age when his cells and body were more susceptible to Roundup's cancer-causing properties.

99.     In around 1995, when Michael was just 19 years old, he was diagnosed with non-Hodgkin's Lymphoma. The doctors believed that Michael may have contracted the disease earlier, but his official diagnosis was when he was 19 years old.

100.    As a result of being diagnosed with non-Hodgkin's Lymphoma, Michael was required to undergo grueling and painful treatments, which included lengthy bouts of chemotherapy and multiple stays at Sloan Kettering in New Jersey.

101.    Between 1995 (the initial diagnosis) and 2000 (when the disease went into

remission), Michael had multiple relapses of non-Hodgkin's Lymphoma that also required additional grueling and painful treatments, including additional cycles of chemotherapy and additional stays at Sloan Kettering in New Jersey.

102.    As a result of his exposure to Roundup, Michael has incurred significant economic and non-economic damages, including significant pain and suffering as a result of his treatment for non-Hodgkin's Lymphoma.

103.    On information and belief, due to the nature of non-Hodgkin's Lymphoma it is highly likely that Michael will be forced to battle this horrible disease again.

## EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

104.    Plaintiff repeats the previous allegations of this Complaint.

105.    The running of any statute of limitations has been tolled by reason of Defendants' fraudulent concealment. Defendants, through their affirmative misrepresentations and omissions, actively concealed from Plaintiff the true risks associated with Roundup and glyphosate. Indeed, even as of December 2019, Defendants continue to represent to the public that there is no evidence glysophate causes cancer, despite ample evidence to the contrary.

106.    As a result of Defendants' actions, Plaintiff was unaware, and could not reasonably know or have learned through reasonable diligence that Roundup and/or glyphosate contact, exposed Plaintiff to the risks alleged herein and his ultimately contracting non-Hodgkin's Lymphoma, and that the risks and injury were the direct and proximate result of Defendants' acts and omissions.

107.    Furthermore, Defendants are estopped from relying on any statute of limitations because of their fraudulent concealment of the true character, quality and nature of Roundup. Defendants were under a duty to disclose the true character, quality, and nature of Roundup

because this was non-public information over which Defendants had and continue to have exclusive control, and because Defendants knew that this information was not available to Plaintiff or to distributors of Roundup. In addition, Defendants are estopped from relying on any statute of limitations because of their intentional concealment of these facts.

108.    Michael had no knowledge that Defendants were engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendants, Plaintiff could not have reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud should be considered. Defendants had the ability to and did spend enormous amounts of money in furtherance of their purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Plaintiff and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendants' representations. Accordingly, Defendants are precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

## FIRST COUNT
### (Negligence)

109.    Michael repeats the previous allegations of this Complaint.

110.    Defendants had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable dangerous side effects.

111.    Defendants failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup into interstate commerce in that Defendants knew

or should have known that using Roundup created a high risk of unreasonable dangerous side effects, including, but not limited to, the development of non-Hodgkin's Lymphoma , as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

112.    The negligence by the Defendants, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

a.  Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly testing it;

b.  Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

c.  Negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

d.  Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

e.  Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such

as table salt, when, in fact, it was unsafe;

f.   Negligently designing Roundup in a manner, which was dangerous to its users;

g.   Negligently manufacturing Roundup in a manner, which was dangerous to its users;

h.   Negligently producing Roundup in a manner, which was dangerous to its users;

i.   Negligently formulating Roundup in a manner, which was dangerous to its users;

j.   Concealing information from the Plaintiff and other users while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations;

k.   Negligently selling Roundup with a false and misleading label.

113.   Defendants negligently and deceptively compared the safety risks and/or dangers of Roundup with common everyday foods such as table salt, and other forms of herbicides.

114.   Defendants were negligent and/or violated New Jersey law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that they:

a.   Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide;

b.   Failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

c.   Failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

d.   Failed to accompany their product with accurate warnings regarding the risks

20

       of all possible adverse side effects concerning Roundup;

    e.   Failed to warn Plaintiff of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of non-Hodgkin's Lymphoma;

    f.   Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants;

    g.   Were otherwise careless and/or negligent.

    115.   Despite the fact that Defendants knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Defendants continued and continue to market, manufacture, distribute, and/or sell Roundup to consumers, including to Michael and his family.

    116.   Defendants knew or should have known that users of their product, such as Michael, would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care, as set forth above.

    117.   Defendants' violations of law and/or negligence were the proximate cause of Michael's injuries, harm and economic loss, which Michael suffered and/or will continue to suffer.

    118.   As a result of the foregoing acts and omissions, the Plaintiff suffered from serious and dangerous side effects including, but not limited to contracting non-Hodgkin's Lymphoma, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care.

    119.   Further, Plaintiff suffered life-threatening non-Hodgkin's Lymphoma, and severe

personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life

WHEREFORE, Michael requests that this Court enter judgment on this First Count of the Complaint against Monsanto for the following damages:

a. Compensatory damages;

b. Punitive damages;

c. Interest and costs of suit;

d. Attorneys fees; and

e. Such other relief as the Court deems just and proper.

## SECOND COUNT
### Strict Product Liability -- Design Defect

120.    Michael repeats the previous allegations of this Complaint.

121.    At all times herein mentioned, the Defendants designed, researched, manufactured, tested, advertised, promoted, sold, distributed, and/or have acquired the Defendants who have designed, researched, tested, advertised, promoted, marketed, sold, and distributed Roundup as hereinabove described that was used by the Plaintiff.

122.    Defendants' Roundup was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendants.

123.    At those times, Roundup was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, the Plaintiff herein.

124.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits

associated with the design or formulation of Roundup.

125.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective in design and/or formulation, in that, when it left the hands of the Defendants manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

126.    At all times herein mentioned, Roundup was in a defective condition and unsafe, and Defendants knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendants. In particular, Defendants' Roundup was defective in the following ways:

    a.  When placed in the stream of commerce, Defendants' Roundup Products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate.

    b.  When placed in the stream of commerce, Defendants' Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

    c.  When placed in the stream of commerce, Defendants' Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

    d.  Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

    e.  Defendants new or should have known at the time of marketing its Roundup

products that exposure to Roundup and could result in cancer and other severe illnesses and injuries.

127.  Defendants knew, or should have known that at all times herein mentioned its Roundup was in a defective condition, and was and is inherently dangerous and unsafe.

128.  Michael was exposed to Defendants' Roundup in the manner described above without knowledge of Roundup's dangerous characteristics.

129.  At the time of Michael's use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

130.  Defendants with this knowledge voluntarily designed its Roundup with a dangerous condition for use by the public, and knew or should have known that persons such as the plaintiff would also use the product.

131.  Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

132.  Defendants created a product that was and is unreasonably dangerous for its normal, intended use.

133.  Defendants marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

134.  The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was manufactured defectively in that Roundup left the hands of Defendants in a defective condition and was unreasonably dangerous to its intended users.

135.  The Roundup designed, researched, manufactured, tested, advertised, promoted,

marketed, sold, and distributed by Defendants reached their intended users in the same defective and unreasonably dangerous condition in which the Defendants' Roundup was manufactured.

136. Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to the Plaintiff in particular, and Defendants are therefore strictly liable for the injuries sustained by the Plaintiff.

137. The Plaintiff could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

138. By reason of the foregoing, the Defendants have become strictly liable to the Plaintiff for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup.

139. Defendants' defective design, of Roundup amounts to willful, wanton, and/or reckless conduct by Defendants.

140. Defects in Defendants' Roundup were the cause or a substantial factor in causing Plaintiff's injuries.

141. As a result of the foregoing acts and omission, the Plaintiff developed non-Hodgkin's Lymphoma, and suffered severe and personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

WHEREFORE, Michael requests that this Court enter judgment on this Second Count of the Complaint against Monsanto for the following damages:

a. Compensatory damages;

b. Punitive damages;

c. Interest and costs of suit;

d. Attorneys fees; and

e. Such other relief as the Court deems just and proper.

## THIRD COUNT
### (Strict Products Liability – Failure to Warn)

142.    Michael repeats the previous allegations of this Complaint.

143.    Defendants have engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting Roundup, and through that conduct have knowingly and intentionally placed Roundup into the stream of commerce with full knowledge that it reaches consumers and would be used by persons such as Plaintiff who are exposed to it through ordinary and reasonably foreseeable uses.

144.    Defendants expected the Roundup that they were selling, distributing, supplying, manufacturing, and/or promoting to reach – and Roundup did in fact reach – consumers and would be used by persons such as plaintiff, without any substantial change in the condition of the product from when it was initially distributed by Defendants.

145.    At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

146.    At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Defendants and at the time Plaintiff was exposed to and/or ingested the product. The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited

to, developing non-Hodgkin's lymphoma as a result of exposure and use.

147. Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect health those exposed in violation of 7 U.S.C. § 136j(a)(1)(E).

148. Defendants' failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. § 136j(a)(1)(E) as well as the laws of the State of New Jersey.

149. Defendants could have amended the label of Roundup to provide additional warnings.

150. This defect caused serious injury to Plaintiff, who used Roundup in its intended and foreseeable manner.

151. At all times herein mentioned, Defendants had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

152. Defendants labeled, distributed, and promoted the aforesaid product that it was dangerous and unsafe for the use and purpose for which it was intended.

153. Defendants failed to warn of the nature and scope of the side effects associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of non-Hodgkin's Lymphoma.

154. Defendants were aware of the probable consequences of the aforesaid conduct. Despite the fact that Defendants knew or should have known that Roundup caused serious injuries, Defendants failed to exercise reasonable care to warn of the dangerous carcinogenic properties and

side effect of developing non-Hodgkin's Lymphoma from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution.

155.   Defendants willfully and deliberately failed to avoid the consequences associated with their failure to warn, and in doing so, Defendants acted with a conscious disregard for the safety of Plaintiff.

156.   At the time of exposure, Plaintiff could not have reasonably discovered any defect in Roundup through the exercise of reasonable care.

157.   Defendants, as the manufacturers and/or distributors of the subject product, are held to the level of knowledge of an expert in the field.

158.   Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Defendants.

159.   Had Defendants properly disclosed the risks associated with Roundup, specifically the risk of causing cancer, Plaintiff would have avoided the risk of contracting non-Hodgkin's Lymphoma by not using Roundup.

160.   The information that Defendants did provide or communicate failed to contain adequate warnings and precautions that would have enabled Plaintiff, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to

Roundup and glyphosate.

161.    To this day, Defendants have failed to adequately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup.

162.    As a result of their inadequate warnings, Defendants' Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiff.

163.    As a direct and proximate result of Defendants' actions as alleged herein, and in such other ways to be later shown, the subject product caused Plaintiff to sustain injuries as herein alleged.

WHEREFORE, Michael requests that this Court enter judgment on this Third Count of the Complaint against Monsanto for the following damages:

a.  Compensatory damages;

b.  Punitive damages;

c.  Interest and costs of suit;

d.  Attorneys fees; and

e.  Such other relief as the Court deems just and proper.

## FOURTH COUNT
### Breach of Implied Warranties

164.    Michael repeats the previous allegations of this Complaint.

165.    At all times herein mentioned, the Defendants manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold Roundup and/or have recently acquired the Defendants who have manufactured, compound portrayed, distributed, recommended, merchandized, advertised, promoted, and sold Roundup, as a broad spectrum herbicide. These actions were under the ultimate control and supervision of Defendants.

166. At the time Defendants marketed, sold, and distributed Roundup for use by Plaintiff, Defendants knew of Roundup's intended use and impliedly warranted the product to be of merchantable quality and safe and fit for this use.

167. The Defendants impliedly represented and warranted to the users of Roundup, including plaintiff, the agricultural community, and/or the EPA that Roundup was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.

168. These representations and warranties were false, misleading, and inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

169. Plaintiff did rely on said implied warranty of merchantability of fitness for particular use and purpose.

170. Plaintiff reasonably relied upon the skill and judgment of Defendants as to whether Roundup was of merchantable quality and safe and fit for its intended use.

171. Roundup was injected into the stream of commerce by the Defendants in a defective, unsafe, and inherently dangerous condition, and the products' materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

172. The Defendants breached the aforesaid implied warranties, as their herbicide Roundup was not fit for its intended purposes and uses.

173. As a result of the foregoing acts and omissions, Plaintiff suffered from NHL and Plaintiff suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic, and non-economic damages.

30

WHEREFORE, Michael requests that this Court enter judgment on this Fourth Count of the Complaint against Monsanto for the following damages:

a. Compensatory damages;

b. Punitive damages;

c. Interest and costs of suit;

d. Attorneys fees; and

e. Such other relief as the Court deems just and proper.

Dated: December _13_, 2019

THE KILLIAN FIRM, P.C.
*Attorneys for Plaintiff*

By: _____
Ryan Milun

## DEMAND FOR JURY TRIAL

Michael hereby demands trial by jury as to all issues so triable as of right.

Dated: December _13_, 2019

THE KILLIAN FIRM, P.C.
*Attorneys for Plaintiff*

By: _____
Ryan Milun