JURY,PSH

A TRUE COPY I CERTIFY

James W. McCormack, Clerk

By: TammyDowns D.C. on
**Dec 26, 2019**

For the United States District Court
Eastern District of Arkansas

# U.S. District Court
## Eastern District of Arkansas (Central Division)
## CIVIL DOCKET FOR CASE #: 4:19-cv-00916-LPR
## Internal Use Only

Bingaman v. Monsanto Company et al
Assigned to: Judge Lee P. Rudofsky
Cause: 28:1332 Diversity-Personal Injury-Product Liability

Date Filed: 12/19/2019
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod.
Liability
Jurisdiction: Diversity

### Plaintiff

**Robert Bingaman**
*Special Administrator of the Estate of*
*Janice Bingaman and on behalf of the*
*wrongful death beneficiaries of Janice*
*Bingaman*
*other*
Janice Bingaman

represented by  **Gene A. Ludwig**
Ludwig Law Firm, PLC
1217 West Third Street
Little Rock, AR 72201
501-868-7500
Email: gene@ludwiglawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kyle P. Ludwig**
Ludwig Law Firm, PLC
1217 West Third Street
Little Rock, AR 72201
501-868-7500
Email: kyle@ludwiglawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

### Defendant

**Monsanto Company**

### Defendant

**John Does**
*I-V*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/19/2019 | 1 | COMPLAINT with Jury Demand against All Defendants filed by Robert Bingaman (Fee $400 paid. Receipt Number LIT075286.) Summons issued and |

| | | returned to counsel. (Attachments: # [1] Civil Cover Sheet)(ajt) (Entered: 12/19/2019) |
|---|---|---|
| 12/19/2019 | [2] | AFFIDAVIT as to Unknown Tortfeasors by Robert Bingaman. (ajt) (Entered: 12/19/2019) |

A TRUE COPY I CERTIFY

James W. McCormack, Clerk

By: TammyDowns D.C. on
**Dec 26, 2019**
For the United States District Court
Eastern District of Arkansas

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

DEC 1 9/2019

JAMES W. McCORMACK, CLERK
By: _____
DEP CLERK

**ROBERT BINGAMAN AS SPECIAL ADMINISTRATOR
OF THE ESTATE OF JANICE BINGAMAN AND ON
BEHALF OF THE WRONGFUL DEATH BENEFICIARIES
OF JANICE BINGAMAN**                                    **PLAINTIFF**

**vs.**                         CASE NO. *4:19CV916-LPR*

**MONSANTO COMPANY; AND
JOHN DOES I-V**                                          **DEFENDANTS**

**COMPLAINT**    This case assigned to District Judge *Rudofsky*
and to Magistrate Judge *Harris*

COMES NOW, the Plaintiff, Robert Bingaman, as Special Administrator of the Estate of

Janice Bingaman, deceased, and on behalf of the wrongful death beneficiaries of Janice

Bingaman, by and through his attorneys, Ludwig Law Firm, PLC, and for his causes of action

against Defendants, states as follows:

## NATURE OF THE CASE

1.      This is an action for damages suffered by Janice Bingaman as a direct and

proximate result of Defendant's negligent and wrongful conduct in connection with the design,

development, manufacture, testing, packaging, promoting, marketing, advertising, distribution,

labeling, and/or sale of the herbicide Roundup®, containing the active ingredient glyphosate.

2.      Plaintiff maintains that Roundup® and/or glyphosate is a defective, dangerous to

human health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper

warnings and directions as to the dangers associated with its use.

3.      Janice Bingaman's injuries, like those striking thousands of similarly situated

victims across the country, were avoidable.

1

Case MDL No. 2741 Document 1533-1 Filed 12/26/19 Page 4 of 45

4. "Roundup®" refers to all formulations of Defendant's Roundup® products, including, but not limited to, Roundup® Concentrate Poison Ivy and Tough Brush Killer 1, Roundup® Custom Herbicide, Roundup® D-Pak Herbicide, Roundup® Dry Concentrate, Roundup® Export Herbicide, Roundup® Fence & Hard Edger 1, Roundup® Garden Foam Weed & Grass Killer, Roundup® Grass and Weed Killer, Roundup® Herbicide, Roundup® Original 2k Herbicide, Roundup® Original II Herbicide, Roundup® Pro Concentrate, Roundup® Prodry Herbicide, Roundup® Promax, Roundup® Quik Stik Grass and Weed Killer, Roundup® Quikpro Herbicide, Roundup® Rainfast Concentrate Weed & Grass Killer, Roundup® Rainfast Super Concentrate Weed & Grass Killer, Roundup® Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup® Ready-to-Use Weed & Grass Killer, Roundup® Ready-to-Use Weed and Grass Killer 2, Roundup® Ultra Dry, Roundup® Ultra Herbicide, Roundup® Ultramax, Roundup® VM Herbicide, Roundup® Weed & Grass Killer Concentrate, Roundup® Weed & Grass Killer Concentrate Plus, Roundup® Weed & Grass Killer Ready-to-Use Plus, Roundup® Weed & Grass Killer Super Concentrate, Roundup® Weed & Grass Killer 1 Ready-to-Use, Roundup® WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation containing the active ingredient glyphosate.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over Defendant and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendant. Defendant is either incorporated and/or has its principal place of business outside of the state in which the Plaintiff resides.

6. The amount in controversy between Plaintiff and Defendant exceeds $75,000, exclusive of interest and cost.

7.     The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

8.     Venue is proper within this district pursuant to 28 U.S.C § 1391 in that Defendant conducts business here and is subject to personal jurisdiction in this district. Furthermore, Defendant sells, markets, and/or distributes Roundup® within the Western District of Arkansas. Also, a substantial part of the acts and/or omissions giving rise to these claims occurred within this district.

## PARTIES

9.     Robert Bingaman is the Special Administrator of the Estate of Janice Bingaman as shown by the December 6, 2019 Order Approving Appointment of Special Administrator which is attached hereto as **Exhibit A**, and brings this action on behalf of Janice Bingaman

10.     Robert Bingaman is Janice Bingaman's spouse. Robert Bingaman is an Arkansas citizen and resides at 4 Donaghey Ct., North Little Rock, Pulaski County, Arkansas 72116.

11.     Janice Bingaman, until her death on August 5, 2018, was at all relevant times a resident and citizen of 4 Donaghey Ct., North Little Rock, Pulaski County, Arkansas 72116. Janice Bingaman suffered personal injuries sustained by exposure to Roundup® ("Roundup®") containing the active ingredient glyphosate and surfactant such as polyethoxylated tallow amine ("POEA"). As a direct and proximate result of being exposed to Roundup®, Janice Bingaman developed Non-Hodgkin's Lymphoma.

12.     Defendant, MONSANTO COMPANY ("Defendant" or "Monsanto"), is, and at all relevant times was, a Delaware corporation, with its principal place of business located at 800 North Lindbergh Avenue, St. Louis, Missouri 63167, and is authorized to do business in the state of Arkansas and is doing business in the state of Arkansas. Defendant should be served at its

3

registered agent for service of process, Corporation Service Company, 300 Spring Building, Suite 900, 300 S. Spring Street, Little Rock, Arkansas 72201.

13.     Plaintiff is listing five John Doe's as potential defendants. Kyle P. Ludwig, the attorney for the Plaintiff, will file an Affidavit as to Unknown Tortfeasors at the time of the filing of this Complaint. Plaintiff reserves the right to file as to additional parties, and serve those additional parties, who may be additional defendants, pursuant to Ark. Code Ann. § 16-56-125 and other statutes dealing with the John Doe procedure in this state. Plaintiff alleges that there may be additional defendants, described herein as John Doe's I through V, who had authority to affect, make, enforce, change, or otherwise implement policies, procedures, or other aspects of Roundup® including, but not limited to, those which relate or refer to any of the allegations in this Complaint.

14.     Defendant advertises and sells goods, specifically Roundup®, in the state of Arkansas.

15.     Defendant transacted and conducted business within the state of Arkansas that relates to the allegations in this Complaint.

16.     Defendant derived substantial revenue from goods and products used in the state of Arkansas.

17.     Defendant expected or should have expected its acts to have consequences within the state of Arkansas, and derived substantial revenue from interstate commerce.

18.     Defendant engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup®.

19.     Defendant is authorized to do business in Arkansas and derives substantial income from doing business in this state.

4

Case MDL No 2741   Document 1533-1   Filed 12/26/19   Page 7 of 42

20.     Upon information and belief, Defendant purposefully availed itself of the privilege of conducting activities with the state of Arkansas, thus invoking the benefits and protections of its laws.

21.     Upon information and belief, Defendant did design, sell, advertise, manufacture, and/or distribute Roundup®, with full knowledge of its dangerous and defective nature.

## FACTUAL ALLEGATIONS

22.     At all relevant times, Defendant was in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or has acquired and is responsible for the commercial herbicide Roundup®.

23.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate.

24.     Defendant discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate based "Roundup®" as a broad spectrum herbicide.

25.     Glyphosate is the active ingredient in Roundup®.

26.     Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

27.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, a 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

28.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

29.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

30.     Each year approximately 250 million pounds of glyphosate is sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

31.     Defendant is intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup® *i.e.,* "Roundup® Ready®." As of 2009, Defendant was the world's leading producer of seeds designed to be Roundup® Ready®. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup® Ready® seeds.

32.     The original Roundup®, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the world's most widely used herbicides.[1]

33.     For nearly 40 years, consumers, farmers, and the public have used Roundup®, unaware of its carcinogenic properties.

### REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

34.     The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7. U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental

---

[1] *Backgrounder,* History of Monsanto's Glyphosate Herbicides, June 2005.

Protection Agency ("EPA) prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. 136a(a).

35.  The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C.§ 136(a)(c)(5)(D).

36.  FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

37.  The EPA and the State of Missouri registered Roundup® for distribution, sale, and manufacture in the United States and the State of Missouri.

38.  FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

39.  The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The date necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1.

In order to re-evaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

40. In the case of glyphosate and Roundup®, the EPA had planned on releasing its preliminary risk assessment – in relation to the registration process – no later then July 2015. The EPA completed its review of glyphosate in early 2015 but delayed releasing the assessment pending further review in light of the World Health Organization's March 24, 2015 finding that glyphosate is a "probate carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

## MONSANTO'S FALSE REPRESENTATIONS REGARDING THE SAFETY OF ROUNDUP®

41. In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer **than table salt**" and "practically **non-toxic**" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

    a) Remember that environmentally friendly Roundup® herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks and fences …

    b) And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got a weed, brush edging or trimming problem.

    c) Roundup® biodegrades into naturally occurring elements.

    d) Remember that versatile Roundup® herbicide stays where you put it. That means there's no washing or leaching to harm customers shrubs or other desirable vegetation.

e) This non-residual herbicide will not wash or leach in the soil. It … stays where you apply it.

f) You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as pertains to mammals, birds and fish.

j) "Roundup® can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup®.[2]

42. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable.

c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all

---

[2] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

circumstances and will not move through the environment by any means.

d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

43.     Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

44.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[3]

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP®

45.     As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties.

46.     On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[4] Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

47.     In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate,

---

[3] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.

[4] Consensus Review of Glyphosate, Casewell No. 661A. March 4, 1985. United States Environmental Protection Agency.

toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.[5]

48.     In October 1991 the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.[6]

49.     In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendant's Roundup® products are more dangerous and toxic than glyphosate alone.[7] As early as 1991 evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.[8]

50.     In 2002, Julie Marc published a study entitled "Pesticide Roundup® Provokes Cell Division Dysfunction at Level of CDK1/Cyclin B Activation."

51.     The study found that Defendants Roundup® caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

52.     In 2004, Julie Marc Published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

53.     The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such

---

[5] http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheets/0178fact.pdf

[6] Second Peer Review of Glyphosate, CAS No. 1071-83-6. October 30, 1881. United States Environmental Protection Agency.

[7] Martinez et al. 2007; Benachour 2009; Gasnier et al. 2010; Peixoto 2005; Marc 2004

[8] Martinez et al 1991

as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[9]

54.   In 2005, Francisco Peixoto published a study showing that Roundup®'s effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

55.   The Peixoto study suggested that the harmful effects of Roundup® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to possible synergy between glyphosate and Roundup® formulation products.

56.   In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup® and glyphosate on human umbilical, embryonic, and placental cells.

57.   The study used dilution levels of Roundup® and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup® are not inert and that Roundup® is always more toxic than its active ingredient glyphosate.

58.   The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendant.

---

[9] (Molinari, 2000; Stewart et al., 2003)

59. Defendant knew or should have know that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant were necessary to protect Janice Bingaman from Roundup®.

60. Defendant knew or should have known that Roundup®'s active ingredient glyphosate were insufficient to prove the safety of Roundup®.

61. Defendant failed to appropriately and adequately test Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant to protect Janice Bingaman from Roundup®.

62. Rather than preforming appropriate tests, Defendant relied upon flawed industry-supported studies designed to protect Defendant's economic interests rather than Janice Bingaman and the consuming public.

63. Despite its knowledge that Roundup® was considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup® as safe.

## IARC CLASSIFICATION OF GLYPHOSATE

64. The Internal Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

65. An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015-2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

13

66.    IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

67.    On March 25, 2015, after its cumulative review of human, animal, and DNA studies for more than (1) year, many of which have been in Defendant's possession since as early as 1985, the IRAC's working group published its conclusion that the glyphosate contained in Defendant's Roundup® herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

68.    The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A *probable* carcinogen to humans. According to the authors, glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

69.    The IARC Working Group found an increased risk between exposure between glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

70.    The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

## EARLIER EVIDENCE OF GLYPHOSATE'S DANGER

71.     Despite the new classification by the IARC, Defendant has had ample evidence of glyphosate and Roundup®'s genotoxic properties for decades.

72.     Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

73.     In 1997, Chris Clements published "Genotoxicity of select herbicides in *Rana catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

74.     The study found that tadpoles exposed to Roundup® showed significant DNA damage when compared with unexposed control animals.

75.     Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup® can induce oxidative stress.

76.     Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

77.     The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

78.     In 2006 César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

79.     The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

80. The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting, "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

81. Despite knowledge to the contrary, Defendant maintains that there is no evidence that Roundup® is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup® is not genotoxic, and that there is no evidence that Roundup® is genotoxic.

82. In addition to glyphosate and Roundup®'s genotoxic properties, Defendant has long been aware of glyphosate's carcinogenic properties.

83. Glyphosate and Roundup® in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

84. Defendant has known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup®.

85. In 1985, the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

86. In 2003, Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

87. The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studies with an increased odds ratio of 3.11.

88. In 2003, AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as a risk factor for NHL.

89.     The study, which controlled for potential cofounders, found a relationship between increased NHL incidence and glyphosate.

90.     In 2008, Mikael Eriksson published a population-based case-control study of exposure to various pesticides as a risk factor for NHL.

91.     The strengthened previous associations between glyphosate and NHL.

92.     In spite of this knowledge, Defendant continued to issue broad and sweeping statements suggesting Roundup® was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

93.     Upon information and belief, these statements and representations have been made with the intent of including Janice Bingaman, the agricultural community, and the public at large to purchase and increase the use of Defendant's Roundup® for Defendant's pecuniary gain, and in fact, did induce Janice Bingaman to use Roundup®.

94.     Defendant made these statements with complete disregard and reckless indifference to the safety of Janice Bingaman and the general public.

95.     Notwithstanding Defendant's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, soft tissue sarcoma.

96.     Defendant knows or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

97.     Defendant failed to appropriately and adequately inform and warn Janice Bingaman of the serious and dangerous risks associated with the use of an exposure to

17

glyphosate and/or Roundup®, including, but not limited to, the risk of developing NHL, as well as other and severe personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

98.  Despite the IRA's classification of glyphosate as a class 2A probable carcinogen, Defendant continues to maintain that glyphosate and/or Roundup® is safe, non-carcinogenic, non-genotoxic, and falsely warrants to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup®.

99.  Defendant has claimed and continue to claim that Roundup® is safe, non-carcinogenic, and non-genotoxic. These misrepresentations are consistent with Defendant's cavalier approach to investigating and ensuring the safety of its products, the safety of the public at large, and the safety of Janice Bingaman.

## SCIENTIFIC FRAUD UNDERLYING THE SAFETY DETERMINATIONS OF GLYPHOSATE

100.  After the EPA's 1985 classification of glyphosate as possibly carcinogenic to humans (Group C), Monsanto exerted pressure upon the EPA to change its classification.

101.  This culminated the EPA's reclassification of glyphosate to Group E, which was based upon evidence of non-carcinogenicity in humans.

102.  In so classifying, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

103.    On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed scientific fraud.

104.    In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed approximately 30 tests on glyphosate and glyphosate-containing products, including 11 of the 19 chronic toxicology studies needed to register Roundup® with the EPA.

105.    In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to toxicology impacts of glyphosate. The EPA subsequently audited IBT and determined that the toxicology studies conducted for Roundup® were invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that is was "hard to believe the scientific integrity of the studies when they took specimens of the uterus from male rabbits.

106.    Three top executives of IBT were convicted of fraud in 1983.

107.    In the second incident Monsanto hired Craven Laboratories ("Craven") in 1990 to perform pesticide and herbicide studies, including several studies on Roundup®.

108.    In March of 1991, the EPA announced that it was investigating Craven for "allegedly falsifying test data used by chemical firms to win EPA approval of pesticides."

109.    The investigation lead to the indictments of the laboratory owner and a handful of employees.

## MONSANTO'S CONTINUING DISREGARD FOR THE SAFETY OF JANICE BINGAMAN AND THE PUBLIC

110.    Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup®

brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."[10]

111.    Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

112.    Glyphosate, and Defendant's Roundup® products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

113.    Defendant's statements proclaiming the safety of Roundup® and disregarding its dangers misled Janice Bingaman.

114.    Despite Defendant's knowledge that Roundup® was associated with an elevated risk of developing cancer, Defendant's promotional campaigns focused on Roundup®'s purported "safety profile."

115.    Defendant's failure to adequately warn Janice Bingaman resulted in (1) Janice Bingaman using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk cancer, including NHL, and other injuries associated with Roundup®.

116.    Defendant failed to seek modification of the labeling of Roundup® to include relevant information regarding the risks and dangers associated with Roundup® exposure.

117.    The failure of Defendant to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

---

[10] Backgrounder – Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9, 2015)

118.    The failure of Defendant to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

119.    The failure of Defendant to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

120.    By reason of the foregoing acts and omissions, Plaintiff seeks compensatory damages as a result of Janice Bingaman's use of, and exposure to, Roundup® which causes or was a substantial contributing factor in causing Janice Bingaman to suffer from cancer, specifically NHL, and Janice Bingaman suffered severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, death and wrongful death for her beneficiaries.

121.    By reason of the foregoing, Janice Bingaman is severely and permanently injured.

122.    By reason of the foregoing acts and omissions, Janice Bingaman has endured and, in some categories continues to suffer, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of the actions and inactions of the Defendant.

### JANICE BINGAMAN'S EXPOSURE TO ROUNDUP®

123.    Janice Bingaman used Roundup® beginning in the early 1990s until her death on August 5, 2018.

124.    For more than twenty-five (25) years, Janice Bingaman sprayed Roundup® on her property on a regular basis approximately three times per month during the spring and summer months every year. Janice Bingaman followed all safety and precautionary warning during the course of use.

125. Janice Bingaman was subsequently diagnosed with a form of Non-Hodgkin's Lymphoma in 2018. The development of Ms. Bingaman's Non-Hodgkin's Lymphoma was proximately and actually caused by exposure to Defendant's Roundup® products.

126. As a result of her injury, Janice Bingaman incurred significant physical, economic, non-economic, dignitary, and wrongful death damages.

## FIRST CAUSE OF ACTION
### (NEGLIGENCE)

127. Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

128. Defendant had a duty to exercise reasonable care in the designing, researching, testing manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup® into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

129. Defendant failed to exercise ordinary care in the designing, researching, testing, quality assurance, quality control, and/or distribution of Roundup® into interstate commerce in that Defendant knew or should have known that using Roundup® created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as a need for lifelong medical treatment, monitoring, and/or medications.

130. The negligence by the Defendant, its agent, servants, and/or employees, including but was not limited to the following acts and/or omissions:

a) Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup® without thoroughly testing it;

b) Failing to test Roundup® and/or failing to adequately, sufficiently, and properly test Roundup®;

c) Not conducting sufficient testing programs to determine whether or not Roundup® was safe for use; in that Defendant herein knew or should have known that Roundup® was unsafe and unfit for use by reason of the dangers to its users;

d) Not conducting sufficient testing programs and studies to determine Roundup®'s carcinogenic properties even after Defendant had knowledge that Roundup® is, was, or could be carcinogenic;

e) Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup® and the propensity of these ingredients to render Roundup® toxic, increase the toxicity of Roundup®, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup® toxic, and whether or not "inert" ingredients and/or adjuvants were safe for use;

f) Negligently failing to adequately and correctly warn the Janice Bingaman, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup®;

g) Negligently failing to petition the EPA to strengthen the warnings associated with Roundup®;

h) Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeable come into contact with Roundup®;

i) Negligently marketing, advertising, and recommending the use of Roundup® without sufficient knowledge as to its dangerous propensities;

j) Negligently representing that Roundup® was safe for use for its intended purpose, and/or that Roundup® was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

k) Negligently representing that Roundup® had equivalent safety and efficacy as other forms of herbicides;

l) Negligently designing Roundup® in a manner, which was dangerous to its users;

m) Negligently manufacturing Roundup® in a manner, which was dangerous to its users;

n) Negligently producing Roundup® in a manner, which was dangerous to its users;

o) Negligently formulating Roundup® in a manner, which was dangerous to its users;

p) Concealing information from Janice Bingaman while knowing that Roundup® was unsafe, dangerous, and/or non-conforming with EPA regulations;

q) Improperly concealing and/or misrepresenting information from Janice Bingaman, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup® compared to other forms of herbicides; and

r) Negligently selling Roundup® with a false and misleading label.

131.    Defendant under-reported, underestimated, and downplayed the serious dangers of Roundup®.

132.    Defendant negligently and deceptively compared the safety risks and/or dangers of Roundup® with common everyday foods such as table salt, and other forms of herbicides.

133.    At all times relevant, Defendant knew that Roundup® was dangerous and defective, concealed the dangers and risks from Janice Bingaman, made misrepresentations to Janice Bingaman and the public in general as to the safety of Roundup® and with full knowledge of the risks associated with Roundup®, without adequate warnings of same, manufactured, designed, packaged, labeled, marketed, advertised, distributed, and sold Roundup® to the general public, and to Janice Bingaman. Defendant engaged in malicious, fraudulent and grossly negligent conduct toward Janice Bingaman and the public, and acted with willful and wanton and/or reckless disregard for the safety of the general public and Janice Bingaman.

134.    Defendant was negligent and/or violated Arkansas law in the designing, researching, supplying, manufacturing, promotion, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup® in that they:

a) Failed to use ordinary care in designing and manufacturing Roundup® so as to avoid the aforementioned risks to individuals when Roundup® was use as an herbicide;

b) Failed to accompany its product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup®;

c) Failed to accompany its product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup®;

d) Failed to accompany its product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup®;

e) Failed to warn Janice Bingaman of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms or severity of the side effects including, but not limited to, the development of NHL;

f) Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup®;

g) Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup®'s "inert" ingredients and/or adjuvants;

h) Negligently misrepresented the evidence of Roundup®'s genotoxicity and carcinogenicity; and

i) Was otherwise careless and/or negligent.

135.    Despite the fact that Defendant knew or should have known that Roundup® caused or could cause, unreasonably dangerous side effects, Defendant continued and continues to market, manufacture, distribute, and/or sell Roundup® to consumers.

136.     Defendant knew or should have known that consumers such as Janice Bingaman would foreseeably suffer injury as a result of Defendant's failure to exercise ordinary care as set forth above.

137.     Defendant's violations of law and/or negligence were the proximate cause of Janice Bingaman's injuries, harm and economic loss, which Janice Bingaman suffered.

138.     As a result of the foregoing acts and omissions, Janice Bingaman suffered from serious and dangerous side effects including, but not limited to, NHL, as well as other severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, financial expenses for hospitalization and medical care, and death. Further, Janice Bingaman suffered NHL (which eventually took her life), and severe personal injuries, which were permanent and lasting in nature, physical pain and mental anguish including diminished enjoyment of life and death.

139.     Defendant's conduct was committed with knowing, reckless, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers, including Janice Bingaman, thereby entitling Janice Bingaman to punitive and exemplary damages so as to punish and deter similar conduct in the future.

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## SECOND CASE OF ACTION
## (STRICT PRODUCTS LIABILITY – DESIGN DEFECT)

140.    Plaintiff repeats, reiterates and, re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

141.    At all times herein mentioned, the Defendant designed, researched, manufactured, tested, advertised, promoted, sold, and distributed Roundup® as hereinabove described that was used by Janice Bingaman.

142.    Defendant's Roundup® was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed and marketed by the Defendant.

143.    At those times, Roundup® was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, Janice Bingaman herein.

144.    The Roundup® designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

145.    At all times herein mention, Roundup® was in defective condition and unsafe, and Defendant knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendant. In particular, Defendant's Roundup® was defective in the following ways:

> a) When placed in the stream of commerce, Defendant's Roundup® products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate.

b) When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c) When placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

d) Defendant did not sufficiently test, investigate, or study its Roundup® products.

e) Exposure to Roundup® presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f) Defendant knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® could result in cancer and other severe illness and injuries.

g) Defendant did not conduct adequate post-marketing surveillance of its Roundup® products.

146.   Defendant knew or should have known that at all times herein mentioned its Roundup® was in a defective condition and was and is inherently dangerous and unsafe.

147.   Janice Bingaman was exposed to Defendant's Roundup®, as described above, without knowledge of Roundup®'s dangerous characteristics.

148.   At the time of Janice Bingaman's use of and exposure to Roundup®, Roundup® was being used for the purposes and in a manner normally intended as a broad-spectrum herbicide.

149.   Defendant with this knowledge voluntarily designed its Roundup® with a dangerous condition for use by the public, and in particular Janice Bingaman.

150.   Defendant had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

151. Defendant created a product that was and is unreasonably dangerous for its normal, intended use.

152. Defendant marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

153. The Roundup® designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was manufactured defectively in that Roundup® left the hands of Defendant in a defective condition and was unreasonably dangerous to its intended users.

154. The Roundup® designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant reached its intended users in the same defective and unreasonably dangerous condition in which the Defendant's Roundup® was manufactured.

155. Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to Janice Bingaman in particular, and Defendant is therefore strictly liable for the injuries sustained by Janice Bingaman.

156. Janice Bingaman could not, by the exercise of reasonable care, have discovered Roundup®'s defects herein mentioned or perceived its danger.

157. By reason of the foregoing, the Defendant has become strictly liable to Janice Bingaman for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup®.

158. Defendant's defective design of Roundup® amounts to willful, wanton, and/or reckless conduct by Defendant.

29

159.  Defects in Defendant's Roundup® were the cause or a substantial factor in causing Janice Bingaman's injuries.

160.  As a result of the foregoing acts and omission, Janice Bingaman developed NHL, and suffered severe and personal injuries, which were permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, financial expenses for hospitalization and medical care, and death.

161.  Defendant's conduct was committed with knowing, reckless, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers, including Janice Bingaman, thereby entitling Plaintiff to punitive and exemplary damages so as to punish and deter similar conduct in the future.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.  Additionally, Plaintiff demands a jury trial on all issues contained herein.

### THIRD CAUSE OF ACTION
### (STRICT PRODUCTS LIABILITY – FAILURE TO WARN)

162.    Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

163.  Defendant has engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting Roundup®, and through that conduct have knowingly and intentionally placed Roundup® into the stream of commerce with full knowledge that it reached consumers such as Janice Bingaman who were exposed to it through ordinary and reasonably foreseeable uses.

164.     Defendant did in fact sell, distribute, supply, manufacture, and/or promote Roundup® to Janice Bingaman.  Additionally, Defendant expected the Roundup® that it was selling, distributing, supplying, manufacturing, and/or promoting to reach – and Roundup® did in fact reach – consumers, including Janice Bingaman, without any substantial change in the condition of the product from when it was initially distributed by Defendant.

165.     At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

166.     At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user and was so at the time it was distributed by Defendant and at the time Janice Bingaman was exposed to and/or ingested the product.  The defective condition of Roundup® was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing non-Hodgkin's lymphoma as a result of exposure and use.

167.     Roundup® did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect the health of those exposed in violation of 7 U.S.C. § 136j(a)(1)(E).

168.     Defendant's failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. § 136j(a)(1)(E) as well as the laws of the Commonwealth of Kentucky.

169.   Defendant could have amended the label of Roundup® to provide additional warnings.

170.  This defect caused serious injury to Janice Bingaman, who used Roundup® in its intended and foreseeable manner.

171.   At all times herein mentioned, Defendant had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

172.   Defendant labeled, distributed, and promoted the aforesaid product that was dangerous and unsafe for the use and purpose for which it was intended.

173.  Defendant failed to warn of the nature and scope of the side effects associated with Roundup®, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of NHL.

174.   Defendant was aware of the probable consequences of the aforesaid conduct. Despite the fact that Defendant knew or should have known that Roundup® caused serious injuries, Defendant failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of developing NHL from Roundup® exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution. Defendant willfully and deliberately failed to avoid the consequences associated with its failure to warn, and in doing so, Defendant acted with a conscious disregard for the safety of Janice Bingaman.

175.  At the time of exposure, Janice Bingaman could not have reasonably discovered any defect in Roundup® prior through the exercise of reasonable care.

176. Defendant, as the manufacturer and/or distributor of the subject product, is held to the level of knowledge of an expert in the field.

177. Janice Bingaman reasonably relied upon the skill, superior knowledge, and judgment of Defendant.

178. Had Defendant properly disclosed the risks associated with Roundup® products, Janice Bingaman would have avoided the risk of NHL by not using Roundup® products.

179. The information that Defendant did not provide or communicate failed to contain adequate warnings and precautions that would have enabled Janice Bingaman, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup® and glyphosate; continued to promote the efficacy of Roundup®, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

180. To this day, Defendant has failed to adequately warn of the true risks of Janice Bingaman's injuries associated with the use of and exposure to Roundup®.

181. As a result of its inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Janice Bingaman.

182.  As a direct and proximate result of Defendant's actions as alleged herein, and in such other ways to be later shown, the subject product caused Janice Bingaman to sustain injuries and death as herein alleged.

183.  Defendant's conduct was committed with knowing, reckless, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers, including Janice Bingaman, thereby entitling Plaintiff to punitive and exemplary damages so as to punish and deter similar conduct in the future.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees and all relief as this Court deems just and proper.  Additionally, Plaintiff demands a jury trial on all issues contained herein.

### FOURTH CAUSE OF ACTIONS
### (BREACH OF IMPLIED WARRANTIES)

184. Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

185.   At all times herein mentioned, the Defendant manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold Roundup® as a broad-spectrum herbicide.  These actions were under ultimate control and supervision of Defendant.

186.  At the time Defendant marketed, sold, and distributed Roundup® for use by Janice Bingaman, Defendant knew of Roundup®'s intended use and impliedly warranted the product to be merchantable quality and safe and fit for this use.

187. The Defendant impliedly represented and warranted to Janice Bingaman and users of Roundup®, the agricultural community, and/or the EPA that Roundup® was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.

188. These representations and warranties were false, misleading, and inaccurate in that Roundup® was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

189. Janice Bingaman and/or the EPA did rely on said implied warranty of merchantability of fitness for particular use and purpose.

190. Janice Bingaman reasonably relied upon the skill and judgment of Defendant as to whether Roundup® was of merchantable quality and safe and fit for its intended use.

191. Roundup® was injected into the stream of commerce by the Defendant in a defective, unsafe, and inherently dangerous condition, and the products' materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

192. The Defendant breached the aforesaid implied warranties, as its herbicide Roundup® was not fit for its intended purposes and uses.

193. As a result of the foregoing acts and omissions, Janice Bingaman suffered from NHL and Janice Bingaman suffered severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic, non-economic damages, and death.

194. Defendant's conduct was committed with knowing, reckless, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of

35

consumers, including Janice Bingaman, thereby entitling Plaintiff to punitive and exemplary damages so as to punish and deter similar conduct in the future.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

**FIFTH CAUSE OF ACTION**
**(VIOLATION OF ARKANSAS DECEPTIVE AND UNFAIR**
**TRADE PRACTICES ACT)**

195.    Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

196.    Defendant is liable to the Plaintiff pursuant to the Arkansas Deceptive Trade Practices act. A.C.A. § 4-88-101, *et seq.*, (hereinafter, "ADTPA"). Defendant is, and at all relevant times was, in the business of manufacturing and marketing Roundup®. Defendant and/or its agents designed, formulated, manufactured, assembled, prepared for sale, distributed, marketed, and/or sold Roundup®, which was in a defective condition unreasonably dangerous when used as intended in the usual and customary manner.

197.    Privity existed between Plaintiff and Defendant.

198.    Defendant violated the ADTPA by the use of false and misleading misrepresentations and/or omissions of material fact in connection with the marketing, promotion, and sale of Roundup®. Defendant communicated the purported benefits of Roundup® while failing to disclose the serious and dangerous injuries related to the use of Roundup® with the intent that consumers, like Janice Bingaman, would rely upon the

misrepresentations and purchase Roundup® believing it to be safe for use in the usual and customary manner.

199. Janice Bingaman, while using the product in the usual and customary manner as it was intended to be used, suffered injuries as a proximate result of Defendant placing the product on the market, which was unreasonably dangerous and defective at the time it was placed on the market by Defendant.

200. As a direct and proximate result of the Defendant's violations of the ADTPA, Plaintiff, and the wrongful death beneficiaries, have suffered significant and permanent damages, including but not limited to physical injury, past and future medical expenses, past and future physical and mental pain and suffering, and will continue to suffer all such damages in the future. Additionally, Plaintiff, and the wrongful death beneficiaries, are entitled to recover attorney's fees and punitive damages. Plaintiff demands a jury trial on all issues contained herein.

201. Defendant's conduct was committed with knowing, reckless, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers, including Janice Bingaman, thereby entitling Plaintiff to punitive and exemplary damages so as to punish and deter similar conduct in the future.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Robert Bingaman, as Special Administrator of the Estate of Janice Bingaman, prays for judgment against Defendants as follows:

1.     For all general and special damages caused by the alleged conduct of Defendants in an amount adequate to compensate Plaintiff for the injuries and damages sustained by Janice Bingaman and her wrongful-death beneficiaries and exceeding that required by federal court jurisdiction in diversity of citizenship cases, including but not limited to recovery for:

a) The nature, extent, and duration, and permanency of her injuries;

b) The aggravation of any preexisting diseases or conditions;

c) The reasonable expense of necessary medical care, treatment and services received, including transportation, board and lodging expenses necessarily incurred in securing that care, treatment or services;

d) For past pain and suffering and mental anguish;

e) For any scars, disfigurement and visible results of her injuries;

f) For the reasonable value of funeral expenses;

g) For Janice Bingaman's loss of her own life and conscious pain and suffering prior to death;

h) For pecuniary injuries suffered by Janice Bingaman's wrongful-death beneficiaries, including (i) what the deceased customarily contributed in the past and might have been reasonably expected to contribute had she lived; (ii) the period during which any beneficiary might reasonably expect to have received contributions from the deceased; and (iii) what instruction moral training, and supervision of education the deceased might have reasonably given her descendants had she lived; and

i) For mental anguish suffered by Janice Bingaman's wrongful-death beneficiaries.

2.     For the costs of litigating this case.

3.     For prejudgment and post judgment interest.

4.     For attorney's fees pursuant to Ark. Code Ann. § 16-22-308 and Ark. Code Ann. § 4-88-204.

5.      For punitive damages sufficient to punish Defendants for their egregious and malicious misconduct in reckless disregard and conscious indifference to the consequences to Janice Bingaman and to deter Defendants and others from repeating such atrocities.

6.      For all other relief to which Plaintiff is entitled.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all issues.

Date: ___12/19___, 2019.

Respectfully submitted,

Gene A. Ludwig, Ark. Bar No. 82096
Kyle P. Ludwig, Ark. Bar No. 2012089
**LUDWIG LAW FIRM, PLC**
1217 W. 3rd St.
Little Rock, Arkansas 72201
Telephone: (501) 868-7500
Facsimile: (501) 868-7501
Email:  Gene@ludwiglawfirm.com
Email:  kale@ludwiglawfirm.com
Email:  kyle@ludwiglawfirm.com

**Attorneys for Plaintiff**

ELECTRONICALLY FILED
Pulaski County Circuit Court
Terri Hollingsworth, Circuit/County Clerk
2019-Dec-06 09:40:02
60PR-19-2557
C06D03 : 3 Pages

## IN THE CIRCUIT COURT OF PULASKI COUNTY, ARKANSAS
## THIRD DIVISION SIXTH CIRCUIT

**IN THE MATTER OF THE ESTATE**
**OF JANICE BINGAMAN, DECEASED**                    **NO. 60PR-19-2557**

### ORDER APPROVING PETITION FOR APPOINTMENT
### OF SPECIAL ADMINISTRATOR

On this day comes to be heard the Petition for Appointment of Special Administrator, requesting that Robert Bingaman, husband of decedent, be appointed Special Administrator of the Estate of Janice Bingaman, deceased, for the limited purpose of pursuing certain damages and product liability claims, and the Court finds as follows:

1.  Petitioner is the husband of decedent and is a resident of 4 Donaghey Ct, North Little Rock, Pulaski County, Arkansas.

2.  Janice Bingaman died on or about August 5, 2018 as a resident of North Little Rock, Pulaski County, Arkansas.

3.  Pursuant to Ark. Code Ann. § 28-48-103, Petitioner asks the Court for appointment as Special Administrator of the Estate of Janice Bingaman, deceased, for the special purpose of investigating and pursuing certain nursing home claims. Ark. Code Ann. § 28-48-103 (b) authorizes appointment without notice. Time is of the essence regarding nursing home related proceedings.

4.  No settlement should be consummated without Circuit Court approval and no settlement or judgment proceeds should be distributed pending further order of this Court.

5.  This Court has jurisdiction and venue properly lies in this County.



EXHIBIT
A

6. Petitioner is qualified to be appointed and shall serve without bond.

7. Petitioner has retained the Ludwig Law Firm PLC, 1217 W. 3rd St., Little Rock, Arkansas 72201 to represent him in investigating and pursuing claims.

8. **IT IS THEREFORE CONSIDERED, ORDERED AND ADJUDGED THAT** Robert Bingaman be and is hereby appointed Special Administrator of the Estate of Janice Bingaman, deceased for the sole purpose of investigating and pursuing certain nursing home claims without bond. The Clerk is directed to issue Letters of Special Administration herein. No settlement should be consummated without Circuit Court approval and no settlement or judgment proceeds should be distributed pending further order of this Court.

IT IS SO ORDERED ON THIS _____ DAY OF _____, 2019.

_____
**HONORABLE CATHLEEN V. COMPTON,**
PUALSKI COUNTY CIRCUIT COURT

APPROVED:

_____
Gene A. Ludwig, Ark. Bar No. 82096
Kale C. Ludwig, Ark. Bar No. 2011137
Kyle P. Ludwig, Ark. Bar No. 2012089
Ludwig Law Firm, PLC
1217 W. 3rd St.
Little Rock, AR 72201
Telephone: (501) 868-7500
kyle@ludwiglawfirm.com

Attorneys for Petitioner



Arkansas Judiciary

**Case Title:** JANICE BINGAMAN

**Case Number:** 60PR-19-2557

**Type:** ORDER APPT ADMINISTRATOR/IX

So Ordered

Judge Compton

Electronically signed by JBMEACHAM on 2019-12-06 09:40:16    page 3 of 3

JS 44 (Rev. 09/19)

# CIVIL COVER SHEET

4:19CV916-LPR

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Robert Bingaman as Special Administrator of the Estate of Janice Bingaman and on Behalf of the Wrongful Death Beneficiaries of Janice Bingaman | MONSANTO COMPANY; and John Does I-V |

**(b)** County of Residence of First Listed Plaintiff    Pulaski
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Ludwig Law Firm, PLC    501-868-7500
1217 W. 3rd St.
Little Rock, AR 72201

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1   U.S. Government Plaintiff
- ☐ 2   U.S. Government Defendant
- ☐ 3   Federal Question *(U.S. Government Not a Party)*
- ☒ 4   Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*    *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☒ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) ☐ 864 SSID Title XVI | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | **IMMIGRATION** | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 465 Other Immigration Actions | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other ☐ 550 Civil Rights ☐ 555 Prison Condition ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332, 1367, 1391
Brief description of cause:
PRODUCT LIABILITY - Manufacture/sale of unsafe, unfit product

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE        DOCKET NUMBER

DATE
12/19/19

SIGNATURE OF ATTORNEY OF RECORD
*Kyle T. Ludwig*

**FOR OFFICE USE ONLY**

RECEIPT #     AMOUNT     APPLYING IFP     JUDGE     MAG. JUDGE