# U.S. District Court
## Middle District of Louisiana (Baton Rouge)
## CIVIL DOCKET FOR CASE #: 3:20-cv-00007-JWD-EWD
## Internal Use Only

Martin v. Monsanto Company et al
Assigned to: Judge John W. deGravelles
Referred to: Magistrate Judge Erin Wilder-Doomes
Cause: 28:1332 Diversity-Product Liability

Date Filed: 01/06/2020
Jury Demand: Plaintiff
Nature of Suit: 385 Prop. Damage Prod.
Liability
Jurisdiction: Federal Question

**Plaintiff**

**Wade Martin**         represented by    **Wade Martin**
8285 Tuscaloosa Avenue
Port Allen, LA 70767
PRO SE

V.

**Defendant**

**Monsanto Company**

**Defendant**

**Bayer AG**

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 01/06/2020 | 1 | COMPLAINT against Bayer AG, Monsanto Company (Filing fee $ 400 Receipt Number ALAMDC 469902999), filed by Wade Martin.(KMW) (Entered: 01/06/2020) |

**Case #: 3:20-cv-00007-JWD-EWD**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA
FILED   JAN 0 6 2020
CLERK

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

WADE MARTIN                                      CIVIL ACTION_____

Versus                                           MAGISTRATE _____

MONSANTO COMPANY and BAYER AG                    JUDGE _____

## *COMPLAINT*

AND NOW, comes the Plaintiff, Wade Martin, who files this Civil Complaint in proper person:

### *NATURE OF CASE*

1. This Civil Action is for the damages suffered by Plaintiff as a direct and proximate result of the Defendants' careless, reckless, negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, labeling, distribution and sale of the herbicide known as "Roundup", containing the carcinogenic chemical "glyphosate" and/or a carcinogenic formulate which includes glyphosate.

2. "Roundup" refers to all formulations of Defendant Monsanto's and Defendant Bayer AG's Monsanto Roundup products or any other formulation of containing the active ingredient glyphosate.

3. Plaintiff maintains that "Roundup" is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce. Further, Plaintiffs allege that "Roundup" lacked all the proper and necessary warnings as to the associated risks, harm, and damages with its use and exposure.

### *II. PARTIES*

4. Plaintiff, Wade Martin, is domiciled in the State of Louisiana and who resides at 8285 Tuscaloosa Avenue, Port Allen, Louisiana 70767.

5. Defendant, Monsanto Company is a Delaware corporation, with a headquarters in Creve Coeur, Missouri, and it regularly conducts business in Louisiana.

6. Defendant, Bayer AG, is a German multinational corporation with its global headquarters located in Leverkusen, Germany. Bayer AG's U.S. headquarters is located at 100 Bayer Blvd., Whippany, New Jersey and it regularly conducts business in Louisiana.

7. In June of 2018, Defendant Monsanto Company was acquired by Bayer AG in a 66 billion dollar acquisition in such a manner that Bayer AG acquired the liabilities of Monsanto Company.

8. Defendant Monsanto Company's "Roundup" products continues to be sold, distributed and marketed in the same manner following the acquisition by Defendant Bayer AG.

9. All references to the acts and omissions of Defendant Monsanto in this Complaint shall mean and refer to the actions of Defendant Monsanto as well as any acts and omissions of Defendant Bayer AG on or after the date Defendant Bayer AG acquired Defendant Monsanto. Further Defendant Bayer AG is jointly and/or severally liable with Defendant Monsanto for all acts, omissions, and wrongdoing of Defendant Monsanto as set forth in this Complaint as a parent of Defendant Monsanto, as an affiliate of Defendant Monsanto and under the doctrine of successor liability by contract, the common law, or otherwise.

10. Upon best information and belief, Defendants are entities that were involved in the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide "Roundup", containing the active ingredient glyphosate.

11. For the period of time regarding Plaintiffs exposure, Defendants advertised and sold goods, specifically "Roundup" products, throughout Louisiana and specifically to Mr. Martin's employer, Chevron for use at its facilities in Pointe Coupee and West Baton Rouge Parishes, where the plaintiff suffered his exposures that led to his injuries.

12. For the period of time regarding Plaintiff's exposure, Defendants transacted and conducted business within Louisiana that relates to the allegations in this Complaint.

13. Defendants derived substantial revenue from all "Roundup" products used and sold in Louisiana.

14. Defendants expected or should have expected their acts to have consequences within Louisiana.

15. Defendants engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling "Roundup" and "Roundup" products.

16. Upon information and belief, Defendants purposefully availed themselves of the privilege of conducting activities within Louisiana, thus invoking the benefits and protections of its laws.

17. Upon information and belief, Defendants did act together to sell, advertise and/or distribute "Roundup" with full knowledge of its dangerous and defective nature.

*FACTUAL ALLEGATIONS*

18. At all relevant times, Defendant Monsanto was in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or is responsible for the other Defendants who promoted, marketed, sold and distributed the commercial herbicide "Roundup".

19. Defendant Monsanto discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate based "Roundup" as a broad spectrum herbicide to the various distributor and retailers who in turn sold to the plaintiff's employer.

20. Glyphosate is the active ingredient in "Roundup" which also contains water and a surfactant blend.

21. Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses.

22. Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acide-3-phosphatge synthase, known as EPSP synthase.

23. Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acide-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

24. Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, ball fields, and golf courses.

25. The original Defendant Monsanto Roundup, containing the active ingredient glyphosate, was introduced in 1974. Today's glyphosate products (now Bayer AG's) are among the world's most widely used herbicides. Defendant Monsanto's and/or Bayer AG's glyphosate products are registered in more than 130 countries and are approved for weed control in more than 100 crops. No other herbicide active ingredient compares in terms of number of approved uses. For more than 40 years, farmers and landscape developers across the globe, including Plaintiff have used Roundup, unaware of its carcinogenic properties.

26. Soil does not need to be highly contaminated to be harmful to humans.

27. Soil that is not significantly polluted may still harm humans directly though bioaccumulation, which occurs when plants are grown in lightly polluted soil, which continuously absorb molecules of the pollutants.

28. The plaintiff was employed in the "oil patch" first as a contractor and then directly by Chevron and work consistently at Chevron facilities from 1979-1993 in Pointe Coupee and West Baton Rouge Parishes.

29. Roundup products were being used consistently and frequently at those facilities in order to maintain and control weeds, which use also resulted in exposure to the plaintiff. Plaintiff's exposure was also enhanced by the prevalence of Roundup in other environments in which the Plaintiff was located and by consumption of foods tainted with Roundup.

30. In 1987, after eight years of almost constant exposure to Roundup at his work sites, the Plaintiff was diagnosed with Non-Hodgkins Lymphoma, as a direct result of his exposure to Roundup.

31. It was not until around February or March, 2019, after viewing television commercials that spoke of a possible link between Roundup and Non-Hodgins Lymphoma, that Plaintiff had any reason to suspect that this Non-Hodgkins Lymphoma was in any way related to his exposure to Roundup.

### DEFENDANT MONSANTO'S FALSE REPRESENTATIONS REGARDING THE SAFETY OF ROUNDUP®

32. In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Defendant Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Defendant Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

a. Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences...

b. Remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, bush, edging or trimming problem.

c. Roundup biodegrades into naturally occurring elements.

d. Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e. This non-residual herbicide will not wash or leach in the soil. It... stays where you apply it.

f. You can apply Roundup with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Roundup into natural products.

g. Glyphosate is less to rats than table salt following acute oral ingestion.

h. Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for Workers who manufacture it or use it.

i. You can feel good about using herbicides by Defendant Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j. "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet standing in an area which has been treated with Roundup.[1]

33. On November 19, 1996, Defendant Monsanto entered into an Assurance of Discontinuance with NYAG, in which Defendant Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a. its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b. its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Defendant Monsanto are biodegradable.

c. its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

---

[1] Attorney General of the State of New York, In the Matter of Defendant Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63 (15) (Nov. 1996).

    d. its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

    e. glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

    f. its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

34. Defendant Monsanto did not alter its advertising in the same manner in any state other than New York, and based on information and belief still has not done so today.

35. In 2009, France's highest court ruled that Defendant Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Defendant Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[2]

*EVIDENCE OF CARCINOGENICITY IN ROUNDUP*

36. As early as the 1980's Defendant Monsanto was aware of glyphosate's carcinogenic properties.

58. On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") toxicology Branch published a memorandum classifying glyphosate as a Category C. oncogene.[3] Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

38. In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.[3]

39. In October 1991 the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-

---

[2] *Defendant Monsanto Guilty in "False Ad" Row,* BBC, Oct. 15, 2009, *available at http://news.bbc.co.uk/2/hi/europe* 8308903.stm.
[3] http://www.epa.gov/oppsrrdl/reregistration/REDs/factsheets/0178fact.pdf.

carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.[4]

40. In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found that Defendant Monsanto Roundup products are more dangerous and toxic than glyphosate alone.[5] As early as 1991 evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.[6]

41. In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

42. The study found that Defendant Monsanto's Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

43. In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

44. The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[7]

---

[4] Second Peer Review of Glyphosate, CAS No. 1071-83-6. October 30, 1881. United States Environmental Protection Agency.
[5] Martinez, et al. 2007; Benachour 2009; Gasnier et al. 2010; Peixoto 2005; Marc 2004.
[6] Martinez et al 1991.
[7] (Molinari, 2000; Stewart et al., 2003).

45. In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

46. The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

47. In 2009, Nora Benachour and Grilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic and placental cells.

48. The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

49. The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendants.

50. Defendants knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients and/or that surfactant POEA were necessary to protect Plaintiff from Roundup.

51. Defendants knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

52. Defendants failed to appropriately and adequately test Roundup, Roundups adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup.

53. Rather than performing appropriate tests, Defendants relied upon flawed industry-supported studies designed to protect Defendants' economic interests rather than Plaintiff and the consuming public.

54. Despite their knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendants continued to promote Roundup as safe.

*IARC CLASSIFICATION OF GLYPHOSATE*

55. The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

56. An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015-2016 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

57. IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agent similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

58. On March 24, 2015, after its cumulative review of human, animal and DNA studies for more than one (1) year, many of which have been in Defendant Monsanto's possession since as early as 1985, the IARC's working group published its conclusion that the gly0phosate contained in Defendants' Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

59. The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A *probable* carcinogen to humans. According to the authors glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

60. The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

61. The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

*EARLIER EVIDENCE OF GLYPHOSATE'S DANGER*

62. Despite the new classification by the IARC, Defendant Monsanto had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

63. Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

64. In 1997, Chris Clements published "Genotoxicity of select herbicides in *Rana catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

65. The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

66. Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

67. Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

68. The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

69. In 2006 Cesar Paz-y-Mino published a study examining DNA damage in human subjects exposed to glyphosate.

70. The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

71. The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

72. Despite knowledge to the contrary, Defendant Monsanto maintained that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

73. In addition to glyphosate and Roundup's genotox properties, Defendant Monsanto has long been aware of glyphosate's carcinogenic properties.

74. Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma and soft tissue sarcoma.

75. Defendant Monsanto has known of this association since the early to mid 1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

76. In 1985 the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubular adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

77. In 2003 Lennart Hardell and Mikael Eriksson published the results to two case controlled studies on pesticides as risk factor for NHL and hairy cell leukemia.

78. The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studies with an increased odds ratio of 3.11.

79. In 2003, AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

80. The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

81. In 2008 Mikael Eriksson published a study a population based case-control study of exposure to various pesticides as a risk factor for NHL.

82. This strengthened previous associations between glyphosate and NHL

83. In spite of this knowledge, Defendant Monsanto continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

84. Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiff, the agricultural community, and the public at large to purchase, and increase the use of Defendant Monsanto's Roundup for all Defendants' pecuniary gain, and in fact did induce Plaintiff and others to use Roundup.

85. Defendants made these statements with complete disregard and reckless indifference to the safety of Plaintiff and the general public.

86. Notwithstanding Defendants' representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to NHL, Multiple Myeloma, and soft tissue sarcoma.

87. Defendants, in particular Defendant Monsanto, knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma and soft tissue sarcomas.

88. Defendants failed to appropriately and adequately inform and warn Plaintiffs of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

89. Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendants continue to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

90. Defendants have claimed and continue to claim that Roundup is safe, non-carcinogenic, and non-genotoxic. Defendants continue to promote the use of Roundup in a large scale basis.

91. Defendant Monsanto had claimed on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand

herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic".[8]

92. Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

93. Glyphosate, and Defendant Monsanto's Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

94. Defendant Monsanto's statements proclaiming the safety of Roundup and the distribution and sell of Roundup by Defendants in disregarding its dangers misled the public at large and the Plaintiff in particular.

95. Despite Defendant Monsanto's knowledge that Roundup was associated with an elevated risk of developing cancer, Defendant Monsanto's promotional campaigns focused on Roundup's purported "safety profile."

96. Defendants' failure to adequately warn resulted in (1) Plaintiff using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

97. Defendant Monsanto failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

98. The failure of Defendant Monsanto to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

---

[8] Backgrounder-Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9, 2015)

99. The failure of Defendant Monsanto to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

100. The failure of Defendants to appropriately warn and inform consumers has resulted in the directions for use that are not adequate to protect the health of humans and the environment as a whole.

*EMERGING EVIDENCE FROM PRIOR DEFENDANT MONSANTO TRIALS*

101. Of the many revelations that have emerged from prior Defendant Monsanto trials, it is alleged:

   a. Defendant Monsanto never conducted epidemiology studies for Roundup and its other formulations made with the active ingredient glyphosate to evaluate the cancer risks for users.

   b. Defendant Monsanto was aware that the surfactants in Roundup were much more toxic than glyphosate alone.

   c. Defendant Monsanto spent millions of dollars on covert public relations campaigns to finance ghostwritten studies and articles aimed at discrediting independent scientists whose work found dangers with Defendant Monsanto's herbicides.

   d. When the U.S. Agency for Toxic Substances and Disease Registry sought to evaluate glyphosate toxicity in 2015, Defendant Monsanto engaged the assistance of EPA officials to delay that review.

   e. Defendant Monsanto enjoyed a close relationship with certain officials within the Environmental Protection Agency (EPA), who have repeatedly backed Defendant Monsanto's assertions about the safety of its glyphosate products.

   f. Defendant Monsanto internally had worker safety recommendations that called for wearing a full range of protective gear when applying glyphosate herbicides, but did not warn the public to do the same.

102. By reason of the foregoing acts and omissions, Plaintiffs seek compensatory and punitive damages as a result of Plaintiff's use of and exposure to Roundup which caused or was a substantial contributing factor in causing Plaintiff to suffer from cancer, specifically NHL, and Plaintiff

suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including enjoyment of life.

103. By reason of the foregoing acts and omissions, Plaintiff is severely and permanently injured and has endured and, in some categories, continues to suffer, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of the actions and inactions of the Defendants.

*PLAINTIFF'S EXPOSURE TO ROUNDUP*

104. Plaintiff was exposed to Roundup during his work for Chevron beginning in 1979 through the early 1990's.

105. Plaintiff was also otherwise exposed to Roundup both before and after his employment with Chevron.

106. Plaintiff followed all safety and precautionary warnings that he was aware of for the periods of use of Roundup products.

107. In 1987, Plaintiff was diagnosed with Non-Hodgkin Lymphoma.

108. Plaintiff has had to endure chemotherapy treatment and immunotherapy and the dread of living with this disease.

109. In February or March of 2019, Plaintiff first became aware of the possible association between his disease and the use of Roundup after having seen advertisements that: "Roundup causes Non-Hodgkin Lymphoma." At no time prior to March 2019 had the Plaintiff, his wife or his treating physician ever correlated the relationship of his using Roundup, Roundup products and his cancer.

110. As a result of his injuries, Plaintiffs have incurred significant economic and non-economic damages.

*EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS AND PRESCRIPTION*

111. Plaintiffs incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

112. The running of any statute of limitations has been tolled by reason of Defendant Monsanto's fraudulent concealment. Defendant Monsanto, through its affirmative misrepresentations and omissions, actively concealed from Plaintiffs the true risks associated with Roundup and glyphosate. Indeed, even as of 2019, Defendant Bayer AG continues to represent to the public that Roundup does not cause cancer.

113. As a result of Defendants' actions, Plaintiffs were not aware, and could not reasonably know or have learned through reasonable diligence that Roundup and/or glyphosate contact, exposed Plaintiff to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

114. Furthermore, Defendant Monsanto is estopped from relying on any statute of limitations because of its fraudulent concealment of the true character, quality and nature of Roundup. Defendant Monsanto was under a duty to disclose the true character, quality and nature of Roundup because this was non-public information over which Defendant Monsanto had and continues to have exclusive control, and because Defendant Monsanto knew that this information was not available to Plaintiff. However, it is averred that the other Defendants knew or should have known of Defendant Monsanto's information and knowledge about the hazards of Roundup. Defendants are now estopped from relying on any statute of limitations because of their intentional concealment of these facts.

115. Plaintiffs had no knowledge that Defendants were engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendants, Plaintiffs could not

have reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud should be considered. Defendants had the ability to and did spend enormous amounts of money in furtherance of their purpose of marketing, promoting, selling, and distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Plaintiff and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent and identity of related health risks, and were forced to rely on only the Defendants' representations. Accordingly, Defendants are precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

FIRST CAUSE OF ACTION (<em>NEGLIGENCE</em>)

116. Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

117. Defendants had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

118. Defendants failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup into interstate commerce that Defendants knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

119. The negligence by the Defendants, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

    a. Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly testing it;

    b. Failing to test Roundup and/or failing to adequately, sufficiently and properly test Roundup;

    c. Not conducting sufficient test programs to determine whether or not Roundup was safe for use; in that Defendants herein knew or should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users;

    d. Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Defendants had knowledge that Roundup is, was, or could be carcinogenic;

    e. Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

    f. Negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

    g. Negligently failing to petition the EPA to strength the warnings associated with Roundup;

    h. Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup and/or consumed food and water contaminated with Roundup;

    i. Negligently marketing, advertising, and recommending the use of Roundup and/or GM crops without sufficient knowledge as to its dangerous propensities;

    j. Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

    k. Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

    l. Negligently designing Roundup in a manner, which was dangerous to its users;

m. Negligently manufacturing Roundup in a manner, which was dangerous to its users;

n. Negligently producing Roundup in a manner, which was dangerous to its users;

o. Negligently formulating Roundup in a manner, which was dangerous to its users;

p. Concealing information from the Plaintiff and others similarly situated, while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations;

q. Improperly concealing and/or misrepresenting information from the Plaintiff scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides;

r. Negligently selling Roundup with a false and misleading label;

s. Negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup to those consumers that regularly eat and drink Roundup contaminated products; and

t. Negligently failing to warn the Plaintiff, the public, the medical and agricultural professions, and the EPA the extent that consumers of food and drink are regularly consuming products contaminated with Roundup products and the levels and regularity thereof.

120. Defendants under-reported, underestimated, and downplayed the serious dangers of Roundup.

143. Defendants negligently and deceptively compared the safety risks and/or dangers of Roundup with common everyday foods such as table salt, and other forms of herbicides.

121. Defendants were negligent and/or violated health and safety laws in the designing, researching, supplying, manufacturing, promoting, packaging distributing, testing, advertising, warning, marketing, and selling of Roundup in that they:

a. Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide;

b. Failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

c. Failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

d. Failed to accompany their product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;

e. Failed to warn Plaintiff of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of NL;

f. Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup;

g. Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants;

h. Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity;

i. Failing to instruct on the use of proper personal protective equipment and clothing when using its products; and

j. Were otherwise careless and/or negligent.

122. Despite the fact that Defendants knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Defendants continued and continue to market, manufacture, distribute, and/or sell Roundup to consumers.

123. Defendants knew or should have known that consumers such as the Plaintiff would foreseeably suffer injury as a result of their failure to exercise ordinary care, as set forth above.

124. Defendants' violations of law and/or negligence were the direct proximate cause of Plaintiff's injuries, harm and economic loss, which Plaintiff suffered and/or will continue to suffer.

125. As a result of the foregoing acts and omissions, the Plaintiff suffered from serious and dangerous side effects including, but not limited to, NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, Plaintiff

suffered life-threatening NHL, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

WHEREFORE, Plaintiffs, respectfully request that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury trial on all issues contained herein.

## SECOND CAUSE OF ACTION
*(STRICT PRODUCTS LIABILITY - DESIGN DEFECT)*

126. Plaintiffs repeat, reiterate and, re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

127. At all times herein mentioned, the Defendants designed and/or researched and/or manufactured and/or tested and/or advertised and/or promoted and/or sold and/or distributed, Roundup as hereinabove described that was used by the Plaintiff and/or have acquired the Defendants who have designed and/or researched and/or manufactured and/or tested and/or advertised and/or promoted and/or sold and/or distributed Roundup as hereinabove described that was used by the Plaintiff.

128. Defendants' Roundup was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and/or marketed by the Defendants.

129. At those times, Roundup was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular the Plaintiff herein.

130. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective in design or formulation in that, when it left the

hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup.

131. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed by Defendants was defective in design and/or formulation, in that, when it left the hands of the Defendants manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

132. At all times herein mentioned, Roundup was in a defective condition and unsafe, and Defendants knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendants. In particular, Defendant Monsanto Roundup was defective in the following ways:

> a. When placed in the stream of commerce, Defendant Monsanto Roundup was defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate.

> b. When placed in the stream of commerce, Defendant Monsanto Roundup was unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

> c. When placed in the stream of commerce, Defendant Monsanto Roundup contained unreasonably dangerous design defects and was not reasonably safe when used in a reasonably anticipated manner.

> d. Defendant Monsanto did not sufficiently test, investigate, or study its Roundup products.

> e. Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

> f. Defendant Monsanto knew or should have known at the time of marketing its Roundup products that exposure to Roundup could result in cancer and other severe illnesses and injuries.

> g. Defendant Monsanto did not conduct adequate post-marketing surveillance of its Roundup products.

133. Defendant Monsanto knew, or should have known that at all times herein mentioned, its Roundup was in a defective condition, and was and is inherently dangerous and unsafe.

134. Plaintiff was exposed to Defendant Monsanto Roundup in the course of his employment, as described above, without knowledge of Roundup's dangerous characteristics.

135. At the time of the Plaintiff use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

136. Defendant Monsanto with this knowledge voluntarily designed its Roundup with a dangerous condition for use by the public, and in particular, the Plaintiff.

137. Defendant Monsanto had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

138. Defendant Monsanto created a product that was and is unreasonably dangerous for its normal intended use.

139. Defendants then marketed and promoted a product in such a manner so as to market it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

140. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was manufactured defectively in that Roundup left the hands of Defendant Monsanto in a defective condition and was unreasonably dangerous to its intended users.

141. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants reached their intended users in the same defective and unreasonably dangerous condition in which it was manufactured.

142. Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to the Plaintiff in particular, and Defendants are therefore strictly liable for the injuries sustained by the Plaintiff.

143. The Plaintiff could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

144. By reason of the foregoing, the Defendants have become strictly liable to the Plaintiff for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup.

145. Defendants' defective design, of Roundup amounts to willful, wanton, and/or reckless conduct by Defendants.

146. Defects in Defendants' Roundup were the direct and proximate cause or a substantial factor in causing Plaintiff.

147. As a result of the foregoing acts and omission, Plaintiff developed NHL, and suffered severe and personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury trial on all issues contained herein.

THIRD CAUSE OF ACTION
*(STRICT PRODUCTS LIABILITY - FAILURE TO WARN)*

148. Plaintiffs repeat, reiterates and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

149. Defendants have engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and and/or promoting Roundup, and through that conduct have knowingly and intentionally placed Roundup into the stream of commerce with full knowledge that it reaches consumers such as Plaintiff who are exposed to it through ordinary and reasonably foreseeable uses.

150. Defendants did, in fact, sell, distribute, supply, manufacture, and/or promote Roundup to Plaintiff. Additionally, Defendants expected the Roundup that they were selling, distributing, supplying, manufacturing and/or promoting to reach - and Roundup did, in fact, reach - consumers, including Plaintiff, without any substantial change in the condition of the product when it was initially distributed to Defendants.

151. At the time of the manufacture, Defendant Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

152. At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Defendants and at the time Plaintiff was exposed to by inhalation and/or ingestion, and/or dermal absorption of the product. The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side

effects, including, but not limited to developing non-Hodgkin's lymphoma as a result of exposure and use.

153. Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect the health of those exposed in violation of 7 U.S.C. § 136j(a)(1)(E).

154. Defendants' failure to include a warning or caution statement which was necessary and/if complied with, was adequate to protect the health of those exposed, violated U.S.C. § 136j(a)(1)(E) as well as the laws of Louisiana.

155. Defendant Monsanto could have amended the label of Roundup to provide additional warnings.

156. This defect caused serious injury to Plaintiff who used Roundup in its intended and foreseeable manner.

157. At all times herein mentioned, Defendants had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

158. Defendants labeled, distributed, and promoted the aforesaid product that it was dangerous and unsafe for the use and purpose for which it was intended.

159. Defendants failed to warn of the nature and scope of the side effects associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of NHL.

160. Defendants were aware of the probable consequences of the aforesaid conduct. Despite the fact that Defendants knew or should have known that Roundup caused serious injuries, Defendants

failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of developing NHL from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution. Defendants willfully and deliberately failed to avoid the consequences associated with their failure to warn, and in doing so, Defendant acted with a conscious disregard for the safety of Plaintiff.

161. At the time of exposure, Plaintiff could not have reasonably discovered any defect in Roundup prior through the exercise of reasonable care.

162. Defendants, as the developer, manufacturers and/or distributors of the subject product, are held to the level of knowledge of an expert in the field.

163. Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Defendants.

164. Had Defendants properly disclosed the risks associated with Roundup, Plaintiff would have avoided the risk of NHL by not using Roundup.

165. The information that Defendants did provide or communicate failed to contain adequate warnings and precautions that would have enabled Plaintiff and similarly situated individuals, to utilize the product safety and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marking and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

166. To this day, Defendants have failed to adequately warn of the true risks of Plaintiffs injuries associated with the use of and exposure to Roundup.

167. As a result of their inadequate warnings, Defendants' Roundup were defective and unreasonably dangerous when they left the possession and/or control of Defendant Monsanto, and sold and distributed by Defendants.

168. As a direct and proximate result of Defendants' actions as alleged herein, and in such other ways to be later shown, the subject product caused Plaintiff to sustain injuries as herein alleged.

WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand jury trial on all issues contained herein.

## FOURTH CAUSE OF ACTION
### (*BREACH OF IMPLIED WARRANTIES*

169. Plaintiffs, repeat, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

170. At all times herein mentioned, the Defendants manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold Roundup and/or have recently acquired the Defendants who have manufactured, compound portrayed, distributed, recommended, merchandized, advertised, promoted, and sold Roundup, as a broad spectrum herbicide. These actions were under the ultimate control and supervision of Defendants.

171. At the time Defendants marketed, sold, and distributed Roundup for use by Plaintiff, Defendants knew of Roundup's intended use and impliedly warranted the product to be of merchantable quality and safe and fit for this use.

172. The Defendants impliedly represented and warranted to Plaintiff and users of Roundup, the agricultural community, and/or the EPA that Roundup was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.

173. These representations and warranties were false, misleading, and inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

174. Plaintiff did rely on said implied warranty of merchantability of fitness for particular use and purpose.

175. Plaintiff reasonably relied upon the skill and judgment of Defendants as to whether Roundup was of merchantable quality and safe and fit for its intended use.

176. Roundup was injected into the stream of commerce by the Defendants in a defective, unsafe, and inherently dangerous condition, and the products' materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

177. The Defendants breached the aforesaid implied warranties, as their herbicide Roundup was not fit for its intended purposes and uses.

178. As a result of the foregoing acts and omissions, Plaintiff suffered from NHL and Plaintiff suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic, and non-economic damages.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury trial on all issues contained herein.

## FIFTH CAUSE OF ACTION
## UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW

179. Plaintiffs repeat, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

180. Plaintiffs have suffered damages due to the actions of Defendants under the Pennsylvania Unfair Trade Practices and Consumer Protection Law (UTPCPL) 73 Pa. Stat. Ann. § 201-1 *Et. Seq.* and more specifically as follows:

a. Fraudulent or deceptive acts or representations were made by Defendants, their employees, agents and/or servants as to the safety of their glyphosate containing herbicides and GM crops.

b. Defendants caused confusion and misunderstanding as to the source, sponsorship, approval or certification of their goods, including glyphosate containing herbicides and GM crops;

c. Defendants caused confusion and misunderstanding as to their affiliation, connection or association with, or certification by the EPA and others;

d. Defendants represented that their goods have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have;

e. Making false or misleading statements of fact regarding its product;

f. Engaging in other fraudulent or deceptive conduct which created confusion and/or misunderstanding; and

g. Glyphosate is never used in its pure form - it's always mixed with additives (adjuvants) that are toxic in their own right. So comparisons based on the pure chemical made by the Defendants are and were meaningless.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury trial on all issues contained herein.

*PRAYER FOR RELIEF*

WHEREFORE, Plaintiffs demand judgment against the Defendants both jointly and severally on each of the above-referenced claims and causes of action and for damages as follows:

183. Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to, physical pain and suffering due to Plaintiffs diagnosis and treatment of Non-Hodgkin Lymphoma and the metastasis to his lungs and liver, emotional distress, loss of enjoyment of life, inconvenience, decreased life expectancy and other non-economic damages in an amount to be determined at trial of this action;

184. Awarding compensatory damages to Plaintiff for past and future damages, including, but not limited to, Plaintiffs pain and suffering and for severe and permanent personal injuries sustained by the Plaintiff;

185. Awarding economic damages in the form of past and future medical expenses, out of pocket expenses, lost earnings, loss of earning capacity, and other economic damages in an amount to be determined at trial of this action;

186. Punitive and/or exemplary damages and/or treble damages for the wanton, willful, fraudulent, deceptive and reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiffs, in an amount sufficient to punish Defendants and deter future similar conduct, to the extent allowed by applicable law;

187. Pre-judgment interest;

188. Post-judgment interest;

189. Awarding Plaintiffs the costs of these proceedings;

190. Attorney fees; and/or

191. Such other and further relief as this Court deems just.

*DEMAND FOR JURY TRIAL*

Plaintiff hereby demands trial by jury as to all issues.

Respectfully submitted

Wade Martin
*In Proper Person*
8285 Tuscaloosa Avenue
Port Allen, Louisiana 70767
(225) 259-0128