CASE-REFERRED,NEWBERN

# U.S. District Court
## Middle District of Tennessee (Nashville)
## CIVIL DOCKET FOR CASE #: 3:19-cv-00792

Porter v. Monsanto Company
Assigned to: District Judge Eli J. Richardson
Referred to: Magistrate Judge Alistair Newbern
Cause: 28:1391 Personal Injury

Date Filed: 09/10/2019
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Federal Question

**Plaintiff**

**Karen Porter**
*An Individual*

represented by **Behram Parekh**
Kirtland & Packard LLP
1638 S. Pacific Coast Highway
Redondo Beach, CA 90277
(310) 536-1000
Fax: (310) 536-1001
Email: bvp@kirtlandpackard.com
*ATTORNEY TO BE NOTICED*

**James C. Bradshaw, III**
Wyatt, Tarrant & Combs (Nashville Office)
333 Commerce Street
Suite 1400
Nashville, TN 37201
(615) 244-0020
Fax: (615) 256-1726
Email: jbradshaw@wyattfirm.com
*TERMINATED: 10/10/2019*

**Michael F. Braun**
P.O. Box 364
Brentwood, TN 37024
(615) 378-8942
Fax: (615) 255-4445
Email: mfb@braun-law.com
*ATTORNEY TO BE NOTICED*

**Michael L. Kelly**
Kirtland & Packard LLP
1638 S. Pacific Coast Highway
Redondo Beach, CA 90277
(310) 536-1000
Fax: (310) 536-1001
Email: mlk@kirtlandpackard.com
*ATTORNEY TO BE NOTICED*

**Raymond T. Throckmorton , III**
Law Office of Raymond T. Throckmorton, III
2412 Eugenia Ave.
Nashville, TN 37211
(615) 297-1009
Fax: (615) 297-9007
Email: rttiii@bellsouth.net
*ATTORNEY TO BE NOTICED*

**Ruth Rizkalla**
Kirtland & Packard LLP
1638 S. Pacific Coast Highway
Redondo Beach, CA 90277
(310) 536-1000
Fax: (310) 536-1001
Email: rr@kirtlandpackard.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**
*A corporation*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/08/2020 | 12 | ORDER: Porter is therefore ORDERED TO SHOW CAUSE by January 21, 2020, why her claims against Monsanto should not be dismissed under Rule 4(m) for failure to effect service or under Rule 41(b) for failure to prosecute her claims and comply with this Court's orders. Signed by Magistrate Judge Alistair Newbern on 1/8/2020. **(DOCKET TEXT SUMMARY ONLY-ATTORNEYS MUST OPEN THE PDF AND READ THE ORDER.)**(am) (Entered: 01/09/2020) |
| 12/16/2019 | 11 | ORDER granting 10 Motion to Continue Initial Case Management Conference. Signed by Magistrate Judge Alistair Newbern on 12/16/2019. **(DOCKET TEXT SUMMARY ONLY-ATTORNEYS MUST OPEN THE PDF AND READ THE ORDER.)**(am) (Entered: 12/16/2019) |
| 12/16/2019 | 10 | MOTION to Continue *Case Management Conference* by Karen Porter. (Braun, Michael) (Entered: 12/16/2019) |
| 11/07/2019 | 9 | ORDER: Initial Case Management Conference reset for 12/17/2019 at 10:30 AM before Magistrate Judge Alistair Newbern. Signed by Magistrate Judge Alistair Newbern on 11/7/2019. **(DOCKET TEXT SUMMARY ONLY-ATTORNEYS MUST OPEN THE PDF AND READ THE ORDER.)**(am) (Entered: 11/07/2019) |
| 10/30/2019 | | TN State Bar status verified as active for Michael F. Braun. (am) (Entered: 10/30/2019) |
| 10/29/2019 | 8 | NOTICE of Appearance by Michael F. Braun on behalf of Karen Porter (Braun, Michael) |

| | | (Entered: 10/29/2019) |
|---|---|---|
| 10/10/2019 | 7 | ORDER granting 6 Motion to Substitute Attorney. Signed by Magistrate Judge Alistair Newbern on 10/10/2019. **(DOCKET TEXT SUMMARY ONLY-ATTORNEYS MUST OPEN THE PDF AND READ THE ORDER.)**(am) (Entered: 10/10/2019) |
| 10/09/2019 | 6 | MOTION for Order of Substitution of Counsel by Karen Porter. (Bradshaw, James) Modified Text on 10/10/2019 (am). (Entered: 10/09/2019) |
| 09/13/2019 | | NOTICE TO COUNSEL Ruth Rizkalla, Michael Kelly, Behram Parekh: WITHIN 21 DAYS, counsel shall file a Motion to Appear Pro Hac Vice, a Certificate of Good Standing signed by the Clerk of a United States District Court or a U. S. appellate court where admitted, and pay a fee of $100.00 (LR 83.01(b)). PHV due by 10/4/2019. (am) (Entered: 09/13/2019) |
| 09/13/2019 | | State Bar status verified as active for (CA) Ruth Rizkalla, (CA) Michael Kelly, (CA) Behram Parekh, (TN) James C. Bradshaw, III. (am) (Entered: 09/13/2019) |
| 09/11/2019 | 5 | ORDER: This case is REFERRED to the Magistrate Judge for customized case management in accordance with Local Rule 16.01 and 28 U.S.C. § 636(b)(1)(A). Signed by District Judge Eli J. Richardson on 9/11/2019. **(DOCKET TEXT SUMMARY ONLY-ATTORNEYS MUST OPEN THE PDF AND READ THE ORDER.)**(am) (Entered: 09/12/2019) |
| 09/11/2019 | 4 | NOTICE of Initial Case Management Conference set for 11/12/2019 at 11:00 AM in Courtroom 774 before Magistrate Judge Alistair Newbern. (am) (Entered: 09/11/2019) |
| 09/11/2019 | 3 | NOTICE of Business Entity Disclosure Statement filing requirement. (am) (Entered: 09/11/2019) |
| 09/11/2019 | 2 | NOTICE/INFORMATION regarding Consent of the Parties to the Magistrate Judge. (am) (Entered: 09/11/2019) |
| 09/10/2019 | 1 | COMPLAINT against Monsanto Company (Filing fee $400, Receipt number 0650-2989809), filed by Karen Porter. (Attachments: # 1 Attachment - Civil Cover Sheet)(am) (Entered: 09/11/2019) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 01/09/2020 18:37:25 | | |
| **PACER Login:** | bparekh180361:2907218:0 | **Client Code:** | 2623-1 |
| **Description:** | Docket Report | **Search Criteria:** | 3:19-cv-00792 |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **KAREN PORTER, an individual,** | ] | |
| | ] | |
| **Plaintiff** | ] | |
| | ] | |
| **V.** | ] | **CASE NO:** _____ |
| | ] | **JURY DEMAND** |
| **MONSANTO COMPANY, a corporation** | ] | |
| | ] | |
| **Defendant** | ] | |

**<u>COMPLAINT</u>**

Comes now Plaintiff Karen Porter, by and through her counsel of record, and for cause of action against Monsanto Company, states and show the following:

1.      Plaintiff Karen Porter is and was at all relevant times a resident of Tennessee and currently resides in Hermitage, Tennessee. Ms. Porter was exposed to Roundup® throughout the state of Tennessee.

2.      Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri. At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®. Monsanto has regularly transacted and conducted business within the state of Tennessee, and has derived substantial revenue from goods and products, including Roundup, used in the State of Tennessee.

3.      Defendant Monsanto Company principal place of business is 800 N. Lindbergh Blvd, Saint Louis, Missouri, 63167.  Defendant Monsanto Company can be served through their Registered Agent at Corporation Service Company, 2908 Poston Avenue, Nashville, Tennessee 37203.

1

## JURISDICTION AND VENUE

4.      Federal diversity jurisdiction in this Court is proper under 28 U.S.C. § 1332 because Plaintiff is a citizen of a different state from the Defendant's states of citizenship, and the aggregate amount in controversy exceeds $75,000, exclusive of interests and costs.

5.      This Court has personal jurisdiction over Defendant under C.C.P. § 410, because Defendant knew or should have known that its Roundup® products are sold throughout the state of Tennessee.

6.      Defendant maintains sufficient contacts with the State of Tennessee such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

7.      Additionally, Defendant caused Plaintiff's tortious injury by acts and omissions in this judicial district and caused tortious injury in this district by acts and omissions outside this district while regularly doing and soliciting business, engaging in a persistent course of conduct, and deriving substantial revenue from goods used or consumed and services rendered in this judicial district.

8.      Monsanto expected or should have expected their acts to have consequences within the State of Tennessee, and derived substantial revenue from interstate commerce.

9.      Plaintiff is informed and believes, and based thereon alleges, that in committing the acts alleged herein, each and every managing agent, agent, representative and/or employee of the Defendant was working within the course and scope of said agency, representation and/or employment with the knowledge, consent, ratification, and authorization of the Defendant and their directors, officers and/or managing agents.

2

10.     Venue is proper within this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred within this judicial District.

## FACTS

11.     In 1970, Defendant Monsanto Company, Inc. discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 millions of pounds used annually. That number grew to 185 million pounds by 2007.  As of 2013, glyphosate was the world's most widely used herbicide.

12.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

13.     Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

14.     On March 20, 2015, the International Agency for Research on Cancer ("IARC"),

3

an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

15.    On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

16.    The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other haematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

17.    The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

18.    Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

19.    Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

4

20.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis.

21.     Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

22.     For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®— glyphosate—is a probable cause of cancer. Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers. Agricultural workers are, once again, victims of corporate greed.

23.     Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® was safe.

### *The Discovery of Glyphosate and Development of Roundup*®

24.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as

a "safe" general-purpose herbicide for widespread commercial and consumer use. It still markets Roundup® as safe today.

### Registration of Herbicides under Federal Law

25.     The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

26.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

27.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(b). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

28.     The EPA and the State of Tennessee registered Roundup® for distribution, sale, and manufacture in the United States and the State of Tennessee.

6

29.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

30.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

31.     In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment —in relation to the reregistration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

### Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup

32.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent

in Group E is based on the available evidence at the time of evaluation and should not be

interpreted as a definitive conclusion that the agent will not be a carcinogen under any

circumstances."

33.     On two occasions, the EPA found that the laboratories hired by Monsanto to test

the toxicity of its Roundup® products for registration purposes committed fraud.

34.     In the first instance, Monsanto, in seeking initial registration of Roundup® by

EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide

toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and

glyphosate-containing products, including nine of the 15 residue studies needed to register

Roundup®.

35.     In 1976, the United States Food and Drug Administration ("FDA") performed an

inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw

data and the final report relating to the toxicological impacts of glyphosate. The EPA

subsequently audited IBT; it too found the toxicology studies conducted for the Roundup®

herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at

IBT, that it was "hard to believe the scientific integrity of the studies when they said they took

specimens of the uterus from male rabbits."

36.     Three top executives of IBT were convicted of fraud in 1983.

37.     In the second incident of data falsification, Monsanto hired Craven Laboratories

in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year,

the owner of Craven Laboratories and three of its employees were indicted, and later convicted,

of fraudulent laboratory practices in the testing of pesticides and herbicides.

8

38.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

### *The Importance of Roundup® to Monsanto's Market Dominance Profits*

39.     The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

40.     In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate; farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

41.     Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

9

***Monsanto has known for decades that it falsely advertises the safety of Roundup®***

42.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "**safer than table salt"** and "**practically non-toxic**" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a) Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

b) And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c) Roundup biodegrades into naturally occurring elements.

d) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e) This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f) You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

43.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

* * *

b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

* * *

c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

* * *

d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

11

\* \* \*

e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic".

44.     Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

45.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

### Classifications and Assessments of Glyphosate

46.     The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

47.     The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.  Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

48.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working

Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

49.   In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

50.   In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

51.   On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly

13

available scientific literature" as well as "data from governmental reports that are publicly available."

52.     The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

53.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

54.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

55.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

56.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

57.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

14

58.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

59.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

60.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

61.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

62.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

15

### *Other Earlier Findings About Glyphosate's Dangers to Human Health*

63.     The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

Release Patterns

a)     Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

b)     It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

* * *

c)     Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

64.     In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

16

*Recent Worldwide Bans on Roundup®/Glyphosate*

65.     Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in light of the as the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which takes effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

66.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

67.     France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

68.     Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

69.     The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that Glyphosate has been linked to fatal kidney disease in agricultural workers.

17

70.     The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

## STATEMENT OF THE CASE

71.     Plaintiff Karen Porter was at all relevant times a resident of Tennessee.

72.      Karen Porter consistently applied Roundup® in her home garden for approximately 11 years.

73.      Karen Porter was diagnosed with Non-Hodgkin's Lymphoma.

## FIRST CAUSE OF ACTION
## STRICT LIABILITY (DESIGN DEFECT)

74.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

75.     Plaintiff brings this strict liability claim against Defendant for defective design.

76.     At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant. At all times relevant to this litigation, Defendant designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products that Plaintiff was exposed to, as described above.

18

77.     At all times relevant to this litigation, Defendant's Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff.

78.     At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Tennessee and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

79.     Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of the Defendant's manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

80.     Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

81.     At all times relevant to this action, Defendant knew or had reason to know that its Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendant.

82.     Therefore, at all times relevant to this litigation, Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled,

distributed, sold and marketed by Defendant were defective in design and formulation, in one or more of the following ways:

a. When placed in the stream of commerce, Defendant's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b. When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c. When placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d. Defendant did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate.

e. Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f. Defendant knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g. Defendant did not conduct adequate post-marketing surveillance of its Roundup® products.

h. Defendant could have employed safer alternative designs and formulations.

20

83.     Plaintiff was exposed to Defendant's Roundup® products without knowledge of its dangerous characteristics.

84.     At all times relevant to this litigation, Plaintiff was exposed to the use of Defendant's Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

85.     Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

86.     The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendant's Roundup® products were and are more dangerous than alternative products and Defendant could have designed its Roundup® products to make them less dangerous. Indeed, at the time that Defendant designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

87.     At the time Roundup® products left Defendant's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant's herbicides.

88.     Defendant's defective design of its Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including the Plaintiff herein.

89.     Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendant is strictly liable to Plaintiff.

21

90.     The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiff's grave injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained her injuries.

91.     Defendant's conduct, as described above, was reckless. Defendant risked the lives of consumers and users of its products, including Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Defendant made conscious decisions not to redesign, warn or inform the unsuspecting public. Defendant's reckless conduct warrants an award of punitive damages.

92.     As a direct and proximate result of Defendant placing defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

93.     WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

**SECOND CAUSE OF ACTION**
**STRICT LIABILITY (FAILURE TO WARN)**

94.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

95.     Plaintiff brings this strict liability claim against Defendant for failure to warn.

22

96.     At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, promoting and applying Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

97.     Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiff, and persons responsible for consumers (such as employers), and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

98.     At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn the Plaintiff of the dangers associated with Roundup® use and exposure. Defendant, as a manufacturer, seller, or distributor of chemical herbicides, is held to the knowledge of an expert in the field.

99.     At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

100.    At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of this product and to those who would foreseeably use or be harmed by Roundup, including Plaintiff.

101.    Despite the fact that Defendant knew or should have known that Roundup® posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied or sold the product, and not known to end users and consumers, such as Plaintiff.

102.    Defendant knew or should have known that these products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Defendant have wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

103.    At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Tennessee and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, marketed and sprayed/applied by Defendant.

104.    Plaintiff was exposed to Roundup® products, as described above, without knowledge of their dangerous characteristics.

105.    At all times relevant to this litigation, Plaintiff was exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

106.    Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendant.

107.    Defendant knew or should have known that the minimal warnings disseminated with or accompanying the application of Roundup® products were inadequate, but they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

108.    The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled those exposed, such as Plaintiff, to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

25

109.    To this day, Defendant has failed to adequately and accurately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

110.    As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were sold or distributed by Defendant, were applied by Defendant, and when Plaintiff became exposed.

111.    Defendant is liable to Plaintiff for injuries caused by negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of their products and the risks associated with the use of or exposure to Roundup® and glyphosate.

112.    The defects in these Roundup® products were substantial and contributing factors in causing Plaintiff's injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained his injuries.

113.    Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products and application, Plaintiff could have avoided the risk of developing injuries as alleged herein and the company who employed Plaintiff could have obtained alternative herbicides.

114.    As a direct and proximate result of Defendant placing defective Roundup® products into the stream of commerce and exposing Plaintiff to them, Plaintiff has suffered and continue to suffer severe injuries, and have endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

26

115.   WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## THIRD CAUSE OF ACTION
## NEGLIGENCE

116.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

117.   Defendant, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

118.   At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

119.   At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

120.   At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

27

121.    Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to Roundup® products could cause or be associated with Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

122.    Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

123.    As such, Defendant breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the  defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

124.    Despite their ability and means to investigate, study, and test products and to provide adequate warnings, Defendant has failed to do so. Indeed, Defendant wrongfully concealed information and have further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

125.    Defendant's negligence included:

a. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® products without thorough and adequate pre- and post-market testing;

28

b. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d. Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

e. Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f. Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and be exposed to its Roundup® products;

g. Failing to disclose to Plaintiff, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

h. Failing to warn Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff's and other consumers;

i. Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

29

j. Representing that its Roundup® products were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended purpose;

k. Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

l. Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m. Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

n. Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

126.    Defendant's knew and/or should have known that it was foreseeable that consumers such as Plaintiff would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

127.    Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

128.    Defendant's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff suffered, and will continue to suffer, as described herein.

129.    Defendant's conduct, as described above, was reckless. Defendant regularly risks the lives of consumers and users of their products, including Plaintiff, with full knowledge of the

30

dangers of its products. Defendant made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff. Defendant's reckless conduct therefore warrants an award of punitive damages.

130.    As a proximate result of Defendant's wrongful acts and omissions in placing defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff has suffered from severe and permanent physical and emotional injuries. Plaintiff endured pain and suffering, suffered economic losses (including significant expenses for medical care and treatment).

131.    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## **FOURTH CAUSE OF ACTION: FRAUD**

132.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

133.    Defendant Monsanto has defrauded the agricultural community in general and Plaintiff in particular by misrepresenting the true safety of its Roundup® and by failing to disclose known risks of cancer.

134.    Defendant Monsanto misrepresented and/or failed to disclose, *inter alia,* that: glyphosate and its major metabolite aminomethylphosphonic acid (AMPA) could cause cancer; glyphosate and AMPA are known to be genotoxic in humans and laboratory animals because exposure is known to cause DNA strand breaks (a precursor to cancer); glyphosate and AMPA are known to induce oxidative stress in humans and laboratory animals (a precursor to cancer);

glyphosate and AMPA interfere with the aromatic amino acids within the human gut, leading to downstream health conditions including cancer; exposure to glyphosate and AMPA is causally associated with non-Hodgkin lymphoma; and the laboratory tests attesting to the safety of glyphosate were flawed and/or fraudulent.

135.     Due to these misrepresentations and omissions, at all time relevant to this litigation, Defendant Monsanto's Roundup® was misbranded under 7 U.S.C. § 136(g) and its distribution within Tennessee and around the United States was a violation of 7 U.S.C. § 136 (j) and 40 C.F.R § 156.10(a)(5).

136.     Plaintiff relied on the Defendant's misrepresentations and/or omissions regarding the safety of Roundup® and its active ingredient glyphosate in deciding whether to purchase and/or use the product. Plaintiff did not know nor could they reasonably have known of the misrepresentations and/or material omissions by Defendant concerning Roundup® and its active ingredient glyphosate.

137.     The misrepresentations and/or material omissions that form the basis of this fraud claim are not limited to statements made on the Roundup® labeling, as defined under federal law, but also involve Defendant Monsanto's representations and omissions made as part of its promotion and marketing, including on the Internet, television, and in print advertisements. Nothing prevented Defendant from disclosing the truth about the risks associated with Roundup® in its promotional efforts outside of the labeling context, using the forms of media and promotion that Defendant traditionally used to promote the product's efficacy and benefits.

138.     When Defendant Monsanto made the misrepresentations and/or omissions as alleged in this Complaint, it did so with the intent of defrauding and deceiving the public and

agricultural community and with the intent of inducing the public and agricultural community to purchase and use Roundup®.

139.    Defendant Monsanto made these misrepresentations and/or material omissions with malicious, fraudulent and/or oppressive intent toward Plaintiff and the public generally. Defendant's conduct was willful, wanton, and/or reckless. Defendant deliberately recommended, manufactured, produced, marketed, sold, distributed, merchandized, packaged, promoted and advertised the dangerous and defective herbicide Roundup®. This constitutes an utter, wanton, and conscious disregard of the rights and safety of a large segment of the public, and by reason thereof, Defendant is liable for reckless, willful, and wanton acts and omissions which evidence a total and conscious disregard for the safety of Plaintiff and others which proximately caused the injuries set forth herein.

140.    As a proximate result of Defendant Monsanto's fraudulent and deceitful conduct and representations, Plaintiff has sustained damages and other losses in an amount to be proven at trial.

141.    As a proximate result of Defendant Monsanto's fraud, as alleged herein, Plaintiff sustained a loss of income, loss of earning capacity and property damage.

142.    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

### FIFTH CAUSE OF ACTION
### BREACH OF IMPLIED WARRANTY

143.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

144.    At all times relevant to this litigation, Defendant Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant Monsanto.

145.    Before the time that Plaintiff was exposed to the use of the aforementioned Roundup® products, Defendant impliedly warranted to consumers and those exposed— including Plaintiff—that  Roundup® products were of  merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

146.    Defendant, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

147.    Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Defendant and upon their implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

148.    Upon information and belief, Plaintiff was at all relevant times in privity with Defendant.

34

149.    Plaintiff is the intended third-party beneficiary of implied warranties made by Defendant Monsanto to the purchasers of their horticultural herbicides, and as such Plaintiff is entitled to assert this cause of action.

150.    The Roundup® products were expected to reach and did in fact reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendant.

151.    At all times relevant to this litigation, Defendant was aware that consumers and users of their products, including Plaintiff, would use Roundup® products as marketed by Defendant, which is to say that Plaintiff was a foreseeable user of Roundup®.

152.    Defendant intended that Roundup® products be used in the manner in which Plaintiff was exposed to them and Defendant impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

153.    In reliance upon Defendant Monsanto's implied warranty, Plaintiff used or was exposed to Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendant.

154.    Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

155.    Defendant Monsanto breached their implied warranty to Plaintiff in that Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

156.    The harm caused by Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

157.    As a direct and proximate result of Defendant Monsanto's wrongful acts and omissions, Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff endured pain and suffering, economic losses (including significant expenses for medical care and treatment).

158.    WHEREFORE, Plaintiff respectfully request that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## SIXTH CAUSE OF ACTION
## PUNITIVE DAMAGES

159.    Plaintiff repeats and reiterates the allegations previously set forth herein.

160.    At all times material hereto, the Defendant knew or should have known that the subject product was inherently dangerous with respect to its health risks

161.    At all times material hereto, the Defendant attempted to misrepresent and did misrepresent facts concerning the safety of the subject product.

162.    Defendant's misrepresentations included knowingly withholding material information from the public, including the Plaintiff herein, concerning the safety of the subject product.

163.    At all times material hereto, the Defendant knew and recklessly disregarded the fact that human exposure to Roundup can and does cause health hazard, including non Hodgkin lymphoma.

164.    Notwithstanding the foregoing, the Defendant continued to aggressively market and apply the subject product without disclosing the aforesaid risks.

165.    Defendant knew of the subject product's defective and unreasonably dangerous nature, as set forth herein, but continued to design, develop, manufacture, market, distribute, sell, and apply it so as to maximize sales and profits at the expense of the health and safety of the public, including the Plaintiff herein, in conscious and/or negligent disregard of the foreseeable harm caused by Roundup.

166.    The Defendant intentionally concealed and/or recklessly failed to disclose to the public, including the Plaintiff herein, the potentially life threatening hazards of Roundup in order to ensure continued and increased sales.

167.    The Defendant's intentional and/or reckless failure to disclose information deprived the Plaintiff of necessary information to enable Plaintiff to weigh the true risks of using or being exposed to the subject product against its benefits.

168.    As a direct and proximate result of the Defendant's conscious and deliberate disregard for the rights and safety of consumers such as the Plaintiff, each suffered severe and permanent physical injuries.  The Plaintiff endured substantial pain and suffering and underwent extensive medical and surgical procedures.  Plaintiff incurred significant expenses for medical care and treatments.

169.    The aforesaid conduct of the Defendant was committed with knowing, conscious, and deliberate disregard for the rights and safety of consumers, including the Plaintiff herein, thereby entitling the Plaintiff to punitive damages in an amount appropriate to punish the Defendant and deter them from similar conduct in the future.

37

170.    WHEREFORE, Plaintiff demands judgment against Defendant for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter judgment in their favor and against Defendant, awarding as follows:

A.    compensatory damages in an amount to be proven at trial;

B.    punitive damages;

C.    costs including reasonable attorneys' fees, court costs, and other litigation expenses;

D.    a jury of twelve to decide this matter; and

E.    any other relief the Court may deem just and proper.

Respectfully submitted,

s/ *James C. Bradshaw III*
James C. Bradshaw III,  BPR #013170
**Wyatt, Tarrant & Combs, LLP**
333 Commerce Street, Suite 1400
Nashville, Tennessee  37201
(615) 244-0020  /  Fax:  (615) 256-1726
jbradshaw@wyattfirm.com

Michael Kelly *(Pro Hac Vice Motion to be filed)*
Behram Parekh *(Pro Hac Vice Motion to be filed)*
Ruth Rizkalla *(Pro Hac Vice Motion to be filed)*
Kirtland & Packard LLP
1638 S. Pacific Coast Highway
Redondo Beach, California  90277
(310) 536-1000 / Fax: (310) 536-1001
kcb@KirtlandPackard.com

38

JS 44 (Rev. 07/16)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| **(b)**  County of Residence of First Listed Plaintiff _____<br>*(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant _____<br>*(IN U.S. PLAINTIFF CASES ONLY)*<br>NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF<br>THE TRACT OF LAND INVOLVED. |
| **(c)**  Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |

## II.  BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ❑ 1  U.S. Government Plaintiff
- ❑ 2  U.S. Government Defendant
- ❑ 3  Federal Question *(U.S. Government Not a Party)*
- ❑ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III.  CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❑ 1 | ❑ 1 | Incorporated *or* Principal Place of Business In This State | ❑ 4 | ❑ 4 |
| Citizen of Another State | ❑ 2 | ❑ 2 | Incorporated *and* Principal Place of Business In Another State | ❑ 5 | ❑ 5 |
| Citizen or Subject of a Foreign Country | ❑ 3 | ❑ 3 | Foreign Nation | ❑ 6 | ❑ 6 |

## IV.  NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❑ 110 Insurance<br>❑ 120 Marine<br>❑ 130 Miller Act<br>❑ 140 Negotiable Instrument<br>❑ 150 Recovery of Overpayment<br>& Enforcement of Judgment<br>❑ 151 Medicare Act<br>❑ 152 Recovery of Defaulted<br>Student Loans<br>(Excludes Veterans)<br>❑ 153 Recovery of Overpayment<br>of Veteran's Benefits<br>❑ 160 Stockholders' Suits<br>❑ 190 Other Contract<br>❑ 195 Contract Product Liability<br>❑ 196 Franchise | **PERSONAL INJURY**<br>❑ 310 Airplane<br>❑ 315 Airplane Product<br>Liability<br>❑ 320 Assault, Libel &<br>Slander<br>❑ 330 Federal Employers'<br>Liability<br>❑ 340 Marine<br>❑ 345 Marine Product<br>Liability<br>❑ 350 Motor Vehicle<br>❑ 355 Motor Vehicle<br>Product Liability<br>❑ 360 Other Personal<br>Injury<br>❑ 362 Personal Injury -<br>Medical Malpractice | **PERSONAL INJURY**<br>❑ 365 Personal Injury -<br>Product Liability<br>❑ 367 Health Care/<br>Pharmaceutical<br>Personal Injury<br>Product Liability<br>❑ 368 Asbestos Personal<br>Injury Product<br>Liability<br>**PERSONAL PROPERTY**<br>❑ 370 Other Fraud<br>❑ 371 Truth in Lending<br>❑ 380 Other Personal<br>Property Damage<br>❑ 385 Property Damage<br>Product Liability | ❑ 625 Drug Related Seizure<br>of Property 21 USC 881<br>❑ 690 Other | ❑ 422 Appeal 28 USC 158<br>❑ 423 Withdrawal<br>28 USC 157<br><br>**PROPERTY RIGHTS**<br>❑ 820 Copyrights<br>❑ 830 Patent<br>❑ 840 Trademark | ❑ 375 False Claims Act<br>❑ 376 Qui Tam (31 USC<br>3729(a))<br>❑ 400 State Reapportionment<br>❑ 410 Antitrust<br>❑ 430 Banks and Banking<br>❑ 450 Commerce<br>❑ 460 Deportation<br>❑ 470 Racketeer Influenced and<br>Corrupt Organizations<br>❑ 480 Consumer Credit<br>❑ 490 Cable/Sat TV<br>❑ 850 Securities/Commodities/<br>Exchange<br>❑ 890 Other Statutory Actions<br>❑ 891 Agricultural Acts |
| **REAL PROPERTY**<br>❑ 210 Land Condemnation<br>❑ 220 Foreclosure<br>❑ 230 Rent Lease & Ejectment<br>❑ 240 Torts to Land<br>❑ 245 Tort Product Liability<br>❑ 290 All Other Real Property | **CIVIL RIGHTS**<br>❑ 440 Other Civil Rights<br>❑ 441 Voting<br>❑ 442 Employment<br>❑ 443 Housing/<br>Accommodations<br>❑ 445 Amer. w/Disabilities -<br>Employment<br>❑ 446 Amer. w/Disabilities -<br>Other<br>❑ 448 Education | **PRISONER PETITIONS**<br>**Habeas Corpus:**<br>❑ 463 Alien Detainee<br>❑ 510 Motions to Vacate<br>Sentence<br>❑ 530 General<br>❑ 535 Death Penalty<br>**Other:**<br>❑ 540 Mandamus & Other<br>❑ 550 Civil Rights<br>❑ 555 Prison Condition<br>❑ 560 Civil Detainee -<br>Conditions of<br>Confinement | **LABOR**<br>❑ 710 Fair Labor Standards<br>Act<br>❑ 720 Labor/Management<br>Relations<br>❑ 740 Railway Labor Act<br>❑ 751 Family and Medical<br>Leave Act<br>❑ 790 Other Labor Litigation<br>❑ 791 Employee Retirement<br>Income Security Act<br><br>**IMMIGRATION**<br>❑ 462 Naturalization Application<br>❑ 465 Other Immigration<br>Actions | **SOCIAL SECURITY**<br>❑ 861 HIA (1395ff)<br>❑ 862 Black Lung (923)<br>❑ 863 DIWC/DIWW (405(g))<br>❑ 864 SSID Title XVI<br>❑ 865 RSI (405(g))<br><br>**FEDERAL TAX SUITS**<br>❑ 870 Taxes (U.S. Plaintiff<br>or Defendant)<br>❑ 871 IRS—Third Party<br>26 USC 7609 | ❑ 893 Environmental Matters<br>❑ 895 Freedom of Information<br>Act<br>❑ 896 Arbitration<br>❑ 899 Administrative Procedure<br>Act/Review or Appeal of<br>Agency Decision<br>❑ 950 Constitutionality of<br>State Statutes |

## V.  ORIGIN *(Place an "X" in One Box Only)*

- ❑ 1  Original Proceeding
- ❑ 2  Removed from State Court
- ❑ 3  Remanded from Appellate Court
- ❑ 4  Reinstated or Reopened
- ❑ 5  Transferred from Another District *(specify)*
- ❑ 6  Multidistrict Litigation - Transfer
- ❑ 8  Multidistrict Litigation - Direct File

## VI.  CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause:

## VII.  REQUESTED IN COMPLAINT:

❑ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:

**JURY DEMAND:**  ❑ Yes  ❑ No

## VIII.  RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE _____   SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations.  If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)**   **County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing.  (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)**   **Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.
United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States.  In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked**.  (See Section III below; NOTE: federal question actions take precedence over diversity cases.)**

**III.**   **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.**   **Nature of Suit.**  Place an "X" in the appropriate box.  If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit.  If the cause fits more than one nature of suit, select the most definitive.

**V.**   **Origin.**  Place an "X" in one of the seven boxes.
Original Proceedings.  (1) Cases which originate in the United States district courts.
Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
When the petition for removal is granted, check this box.
Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.
Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.
Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File.  (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.**  Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**   **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553  Brief Description: Unauthorized reception of cable service

**VII.**   **Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.