Case: MDL No. 2741 Document: 1583-20 Filed: 03/23/2020 Page: 1 of 26
Case: 1:20-cv-00491 Document: 1 Filed: 01/22/20 Page 1 of 26

KIM

# United States District Court
## Northern District of Illinois – CM/ECF LIVE, Ver 6.3.1 (Chicago)
### CIVIL DOCKET FOR CASE #: 1:20–cv–00491

Glavanovits v. Monsanto Company
Assigned to: Honorable Matthew F. Kennelly
Demand: $50,001,000
Case in other court:  Circuit Court of Cook County, Illinois,
             Law Div., 2020–L–000063
Cause: 28:1446pl Petition for Removal – Product Liability

Date Filed: 01/22/2020
Jury Demand: Both
Nature of Suit: 367 Personal Injury: Health
Care/Pharmaceutical Personal Injury
Product Liability
Jurisdiction: Diversity

**Plaintiff**

**Michele Glavanovits**      represented by  **Michele Glavanovits**
Syregelas & Kasmarick, LLC
19 North Green Street
Chicago, IL 60607
3122430900
Email: kkasmarick@syregelaslaw.com
PRO SE

V.

**Defendant**

**Monsanto Company**      represented by  **Thomas Joseph Dammrich , II**
Shook, Hardy & Bacon LLP (Chicago)
111 South Wacker Drive
Suite 4700
Chicago, IL 60606
312 704 7721
Email: docket@shb.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Francis O'Neill**
Shook, Hardy & Bacon Llp
111 S. Wacker
Chicago, IL 60606
(312) 704–7710
Email: pfoneill@shb.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/22/2020 | 1 | NOTICE of Removal from Circuit Court of Cook County, Illinois, Law Division, case number (2020–L–000063) filed by Monsanto Company Filing fee $ 400, receipt number 0752–16641445. *SUMMONS, COMPLAINT AND AFFIDAVIT OF DAMAGES* (Attachments: # 1 Exhibit 1 – Summons and Complaint)(Dammrich, Thomas) (Entered: 01/22/2020) |
| 01/22/2020 | 2 | CIVIL Cover Sheet (Dammrich, Thomas) (Entered: 01/22/2020) |
| 01/22/2020 | 3 | ATTORNEY Appearance for Defendant Monsanto Company by Thomas Joseph Dammrich, II (Dammrich, Thomas) (Entered: 01/22/2020) |
| 01/22/2020 | 4 | NOTIFICATION of Affiliates pursuant to Local Rule 3.2 by Monsanto Company (Dammrich, Thomas) (Entered: 01/22/2020) |
| 01/22/2020 | 5 | ATTORNEY Appearance for Defendant Monsanto Company by Peter Francis O'Neill (O'Neill, Peter) (Entered: 01/22/2020) |

| 01/22/2020 | | CASE ASSIGNED to the Honorable Matthew F. Kennelly. Designated as Magistrate Judge the Honorable Young B. Kim. Case assignment: Random assignment. (lw, ) (Entered: 01/22/2020) |
|---|---|---|
| 01/23/2020 | 6 | ANSWER to Complaint with Jury Demand by Monsanto Company(Dammrich, Thomas) (Entered: 01/23/2020) |

FILED
1/2/2020 12:27 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020L000063

7912474

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

| | |
|---|---|
| **MICHELE GLAVANOVITS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )    **Case No.** 2020L000063 |
| | ) |
| **MONSANTO COMPANY,** | )    **Jury Trial Demanded** |
| | ) |
| **Defendant.** | ) |

## COMPLAINT AT LAW

NOW COMES the Plaintiff, MICHELE GLAVANOVITS, by and through her attorneys, SYREGELAS & KASMARICK, LLC, and complaining of Defendant, MONSANTO COMPANY ("Monsanto"), states as follows:

### Parties

1.      At all times relevant to this Complaint, Plaintiff MICHELE GLAVANOVITS was a resident and citizen of the State of Illinois.

2.      At all times relevant to this Complaint, Defendant MONSANTO COMPANY was a Delaware corporation with its principal place of business in St. Louis, Missouri, licensed to do business in the State of Illinois.

3.      At all times relevant to this Complaint, Defendant designed, manufactured, marketed, and sold a product known as Roundup® ("Roundup"), a broad-spectrum herbicide marketed to homeowners and other consumers to kill weeds.

4.      "Roundup" refers to all formulations of Defendant's Roundup products that contain the active ingredient glyphosate, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer1, Roundup Concentrate, Roundup Custom Herbicide, Roundup D-Pak, Roundup Fence and Hard Edge1, Roundup Foam Weed & Grass Killer,

FILED DATE: 1/2/2020 12:27 PM   2020L000063

FILED DATE: 1/2/2020 12:27 PM   2020L000063

Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2K Herbicide, Roundup Promax, Roundup QuikStik Grass and Weed Killer, Roundup Quickpro Herbicide, Roundup Rainforest Concentrate Weed and Grass Killer, Roundup Rainforest SuperConcentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer1 Plus Weed Preventer, Roundup Ready-To-Use Weed and Grass Killer III, Roundup Precision Gel Weed and Grass Killer, Roundup Ready-To-Use Max Control 365, Roundup Concentrate MAX Control 365, Roundup Ready-To-Use Extended Control Weed and Grass Killer Plus Weed Preventer II, Roundup Concentrate Extended Control Weed and Grass Killer Plus Weed Preventer, Roundup Ready-To-Use Poison Ivy Plus Tough Brush Killer, Roundup Concentrate Poison Ivy Plus Tough Brush Killer, Roundup Weed and Grass Killer Concentrate Plus, and Roundup Weed and Grass Killer Super Concentrate, *inter alia*.

5.     Plaintiff brings this action for personal injuries sustained through exposure to Defendant's Roundup.  As a direct and proximate result of being exposed to Roundup, Plaintiff developed non-Hodgkin's follicular lymphoma in late August 2019.

**Jurisdiction and Venue**

6.     Pursuant to 735 ILCS 5/2-209, jurisdiction is proper because at all times relevant to this Complaint, Defendant was in the business of researching, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, labeling, packaging, marketing, promoting, advertising and selling its Roundup products throughout Cook County, Illinois.

7.     Pursuant to 735 ILCS 5/2-101, venue is proper because at all times relevant to this Complaint, Defendant was in the business of researching, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, labeling,

2

FILED DATE: 1/2/2020 12:27 PM   2020L000063

packaging, marketing, promoting, advertising and selling its Roundup products throughout Cook County, Illinois.

8.      At all times relevant to this Complaint, Defendant maintained sufficient and ongoing contacts within Cook County, Illinois such that the Court's exercise of personal jurisdiction does not offend traditional notions of fair play and substantial justice.

9.      The amount of damages sought by Plaintiff is above the minimum jurisdictional limit.

### The Discovery of Glyphosate and Development of Roundup

10.     Glyphosate, the active ingredient in Roundup, is a broad-spectrum herbicide used to kill weeds and grasses known to compete with desirable plants grown around the globe.

11.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues, resulting in the plant's death.

12.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses.

13.     During the 1970s, Defendant discovered the herbicidal properties of glyphosate and subsequently began to design, research, manufacture, sell and distribute glyphosate-based Roundup as a broad-spectrum herbicide.  The original Roundup, containing the active ingredient glyphosate, was introduced in 1974.

14.     Defendant is the world's leading producer of glyphosate.  Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops.

15.     Defendant is also intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified crops, many of which are marketed as being resistant to Roundup, *i.e.*, "Roundup Ready®."

3

FILED DATE: 1/2/2020 12:27 PM   2020L000063

16.     As of 2009, Defendant was the world's leading producer of seeds designed to be Roundup Ready®.  In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States, contained Roundup Ready® seeds.

**Registration of Herbicides Under Federal Law**

17.     The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq.*  FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale or use, except as described by the Act. 7 U.S.C. § 136a(a).

18.     The EPA requires as part of the registration process a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people/other potential non-target organisms, and other adverse effects on the environment.  Registration by the EPA, however, is not an assurance or finding of safety.  The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

19.     FIFRA defines "unreasonable adverse effects on the environment" to be "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb).  FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

20.     The EPA and the State of Illinois registered Roundup for distribution, sale, and manufacture in the United States and the State of Illinois.

FILED DATE: 1/2/2020 12:27 PM   2020L000063

21.     FIFRA generally requires that the registrant, Defendant in the case of Roundup, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests itself that are required of the manufacturer.

22.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time, however, and the EPA has reevaluated all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA demanded the completion of additional tests and the submission of data for the EPA's review and evaluation.

23.     In the case of glyphosate and Roundup, the EPA originally planned on releasing its preliminary risk assessment – in relation to the registration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of a March 24, 2015 finding by the World Health Organization ("WHO") that glyphosate is a "probable carcinogen."

## Glyphosate's Carcinogenic Properties and Dangers to Human Health

24.     For nearly 40 years, consumers, farmers, and the public have used Roundup, unaware of its carcinogenic properties. According to the WHO, glyphosate, the main chemical ingredient of Roundup, is a probable cause of cancer. Those most at risk are farm workers, other individuals with workplace exposure to Roundup, and consumers with persistent and continued use of Roundup or similar herbicide products containing glyphosate.

25.     Defendant has known of Roundup's association with numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple

FILED DATE: 1/2/2020 12:27 PM   2020L000063

myeloma, and soft tissue sarcoma, since the early to mid-1980s, as a number of human and animal studies have evidenced the carcinogenicity of glyphosate.

26.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985. After pressure from Defendant, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991.  In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

27.     In 2003, Lennart Hardell and Mikael Eriksson published the results of two case-controlled studies on pesticides as a risk factor for non-Hodgkin's lymphoma and hairy cell leukemia.  The study concluded that glyphosate had the most significant relationship to non-Hodgkin's lymphoma among all herbicides studied.

28.     That same year, AJ De Roos published a study examining the pooled data of Midwestern farmers, examining pesticides and herbicides as risk factors for non-Hodgkin's lymphoma.  The study, which controlled for potential confounders, found a relationship between increased non-Hodgkin's lymphoma incidence and glyphosate.

29.     In 2004, Julie Marc published a study entitled "Glyphosate-based Pesticides Affect Cell Cycle Regulation."  The study demonstrated a molecular link between glyphosate-based products and cell-cycle dysregulation, noting that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer.  Failure in the cell-cycle checkpoints leads to genomic

FILED DATE: 1/2/2020 12:27 PM   2020L000063

instability and subsequent development of cancers from the initial affected cell." The study further noted, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cells, it was of interest to evaluate the threshold dose of glyphosate affecting cells."

30.     In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendant's Roundup products are more dangerous and toxic than glyphosate alone.

31.     In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation." The study found that Defendant's Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone did not alter cell cycles.

32.     In 2009, Nora Benachour and Gilles-Erie Seralini published a study examining the effects of Roundup and glyphosate on human-umbilical, embryonic, and placental cells. The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly the surfactant polythoxylated tallowamine, changed human cell permeability and amplified the toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvant, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

33.     Animal studies have also shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress, which is believed to be involved in carcinogenesis.

34.     In 1985, the EPA studied the effects of glyphosate in mice, finding a dose-related response in male mice linked to renal tubal adenomas, a rare tumor.  The study concluded that glyphosate was oncogenic.

35.     In 1997, Chris Clements published "Genotoxicity of select herbicides in *Rana caresbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."  The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

## IARC Classification of Glyphosate

36.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency which the WHO tasked with conducting and coordinating research into the causes of cancer.

37.     In April 2014, an IARC Advisory Group met to recommend priorities for IARC Monographs during 2015-2019.  A substance must meet two criteria to be eligible for review by the IARC Monographs: (1) there must already be some evidence of carcinogenicity of the substance; and (2) there must be evidence that humans are exposed to the substance.

38.     IARC set glyphosate for review in 2015-2016.  IARC uses five criteria for determining priority in reviewing chemicals: (1) the substance must have a potential for direct impact on public health; (2) scientific literature to support suspicion of carcinogenicity; (3) evidence of significant human exposure; (4) high public interest and/or potential to bring clarity to a controversial area and or reduce public anxiety or concern; and (5) related agents similar to one given high priority by the above considerations.

39.     On March 24, 2015, after its cumulative review of human, animal, and DNA studies, many of which had been in Defendant's possession since as early as 1985, the IARC's

FILED DATE: 1/2/2020 12:27 PM   2020L000063

FILED DATE: 1/2/2020 12:27 PM   2020L000063

Working Group published its conclusion that the glyphosate contained in Defendant's Roundup herbicide is a Class 2A *probable* carcinogen to humans.

40.     The IARC's full Monograph was published on July 29, 2015. According to the authors, glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

41.     The IARC's Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma, including several subtypes, and that glyphosate caused DNA and chromosomal damage in human cells.

42.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Genotoxic chemical agents are those that are capable of damaging the DNA within a cell through genetic mutations, which is a process that can lead to cancer.

43.     The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

### Scientific Fraud Underlying the Safety Determination of Glyphosate

44.     On two separate occasions, the EPA found that laboratories hired by Defendant to test the toxicity of its Roundup products for registration purposes committed scientific fraud.

45.     In the first instance, Defendant hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup. IBT performed approximately 30 tests on glyphosate containing products, including 11 of the 19 chronic toxicology studies needed to register Roundup with the EPA.

FILED DATE: 1/2/2020 12:27 PM   2020L000063

46.     The United States Food and Drug Administration ("FDA") performed an inspection of IBT in 1976 and discovered discrepancies between the raw data and the final report relating to toxicological impacts of glyphosate.  The EPA subsequently audited IBT and determined that the toxicology studies conducted for Roundup were invalid, finding "routine falsification of data" at IBT.  Three top executive of IBT were convicted of fraud in 1983.

47.     In the second instance, Defendant hired Craven Laboratories ("Craven") in 1990 to perform pesticide and herbicide studies, including several studies on Roundup.  In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

## Defendant's False Representations Regarding the Safety of Roundup

48.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Defendant based on its false and misleading advertising of Roundup products.  Specifically, the lawsuit challenged Defendant's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds and fish.  Among the representations the NYAG found deceptive and misleading were the following:

a.      Remember that environmentally friendly Roundup herbicide is biodegradable.  It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences…

b.      And remember that Roundup is biodegradable and won't build up in the soil.  That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c.      Roundup biodegrades into naturally occurring elements.

d.      Remember that versatile Roundup herbicide stays where you put it.  That means there's no washing or leaching to harm customer's shrubs or other desirable vegetation.

10

FILED DATE: 1/2/2020 12:27 PM   2020L000063

e.  This non-residual herbicide will not wash or leach in the soil.  It...stays where you apply it.

f.  Glyphosate is less toxic to rats than table salt following acute oral ingestion.

g.  Glyphosate's safety margin is much greater than required.  It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

h.  You can feel good about using herbicides by Monsanto.  They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

i.  Roundup can be used where kids and pets will play and breaks down into natural material.

49.  On November 19, 1996, Defendant entered into an Assurance of Discontinuance with NYAG in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a.  its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b.  its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable.

c.  its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d.  its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e.  glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides.

f.  its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

FILED DATE: 1/2/2020 12:27 PM   2020L000063

50.     Defendant did not alter its advertising in the same manner in any state other than New York.

**<u>Defendant's Continued Disregard for the Safety of Plaintiff and the Public</u>**

51.     Despite the IARC's classification of glyphosate as a Class 2A probable carcinogen, Defendant continues to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-genotoxic, and falsely warrants to users and the general public that independent experts and regulatory agencies agree there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

52.     Defendant has continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

53.     These statements have been made with the intent of inducing homeowners, the agricultural community, and the public at large to purchase and increase the use of Roundup for Defendant's pecuniary gain, and in fact, did induce Plaintiff to purchase and use Roundup. Defendant's misrepresentations are consistent with its cavalier approach to investigating and ensuring the safety of its products and the public at large.

54.     Notwithstanding Defendant's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, and an increased risk of many cancers, including, but not limited to, non-Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

55.     Defendant knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

FILED DATE: 1/2/2020 12:27 PM 2020L000063

56.     Defendant knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients were necessary to protect Plaintiff and the consuming public from Roundup.

57.     Defendant knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, non-Hodgkin's lymphoma, multiple myeloma and soft tissue sarcomas.

58.     Defendant failed to appropriately and adequately test Roundup, Roundup's adjuvants, and its "inert" ingredients. Rather than performing the appropriate tests, Defendant relied on flawed industry-supported studies designed to protect Defendant's economic interests over the safety of Roundup's users, including Plaintiff.

59.     Defendant failed to appropriately and adequately inform and warn regulatory agencies, consumers, and users of Roundup, including Plaintiff, of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing non-Hodgkin's lymphoma.

## COUNT I – STRICT PRODUCTS LIABILITY – DEFECTIVE DESIGN

1-59.   Plaintiff incorporates by reference paragraphs 1-59 of this Complaint as if fully set forth herein and further alleges as follows.

60.     Plaintiff brings this strict products liability claim against Defendant for defective design.

61.     At all times relevant to this Complaint, Defendant designed, researched, manufactured, tested, advertised, promoted, sold, and distributed the Roundup that Plaintiff used and/or was exposed to.

13

FILED DATE: 1/2/2020 12:27 PM   2020L000063

62.     At all times relevant to this Complaint, Defendant's Roundup was expected to and did reach the usual consumers, handlers, and persons coming into contact with the product in the State of Illinois, including Plaintiff, without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by Defendant.

63.     At all times relevant to this Complaint, at the time it left the control of Defendant, Roundup was in an unsafe, defective, and inherently dangerous condition to its users, including the Plaintiff.

64.     At all times relevant to this Complaint, the Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective in design and/or formulation in that, when it left the hands of the manufacturers and/or suppliers, the foreseeable risks exceeded the benefits associated with the design and/or formulation of Roundup.

65.     At all times relevant to this Complaint, the Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendant was defective in design and/or formulation, in that, when it left the hands of Defendant's manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and more dangerous that an ordinary consumer would expect.

66.     At all times relevant to this Complaint, Roundup was in a defective condition and unsafe, and Defendant knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by Defendant.  In particular, Defendant's Roundup was defective in one or more of the following ways:

      a)     When placed in the stream of commerce, Defendant's Roundup products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate;

14

FILED DATE: 1/2/2020 12:27 PM   2020L000063

b)  When placed in the stream of commerce, Defendant's Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and/or other serious illness when used in a reasonably anticipated manner.

c)  When placed in the stream of commerce, Defendant's Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner;

d)  Defendant did not sufficiently test, investigate, or study its Roundup products;

e)  Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from use of the herbicide;

f)  Defendant knew or should have known at the time of marketing its Roundup products that exposure to Roundup could result in cancer and/or other serious illness or injury; and

g)  Defendant Monsanto did not conduct adequate post-marketing surveillance of Roundup.

67.   For approximately twenty-nine years, from March to October, Plaintiff used and applied Roundup to her property in Illinois.  Plaintiff followed all instructions and safety and precautionary warnings provided by Defendant.

68.   At the time of Plaintiff's use and exposure to Roundup, Roundup was being used for the purpose and in a manner normally intended, as a broad-spectrum herbicide.  The Plaintiff could not, by the exercise of reasonable care, have discovered Roundup's defects and risks associated with Roundup before or at the time of exposure.

69.   At all times relevant to this Complaint, Defendant voluntarily designed its Roundup with a dangerous condition for use by the public, and in particular the Plaintiff.

70.   At all times relevant to this Complaint, Defendant marketed and promoted a product in such a manner so as to make it inherently defective and downplayed Roundup's suspected, probable, and establish health risks inherent with its normal, intended use.

15

FILED DATE: 1/2/2020 12:27 PM   2020L000063

71.　　At all times relevant to this Complaint, the Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was manufactured defectively in that Roundup left the hands of Defendant in a defective condition and was unreasonably dangerous to its intended users.

72.　　At all times relevant to this Complaint, Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers, and to the Plaintiff in particular, and Defendant is therefore strictly liable for the injuries sustained by the Plaintiff.

73.　　Defendant's defective design of Roundup amounts to willful, wanton, and/or reckless conduct by Defendant.

74.　　As a direct and proximate result of Defendant's conduct and the defective design of Roundup, Plaintiff was diagnosed with non-Hodgkin's follicular lymphoma in late August 2019.

75.　　As a direct and proximate result of Defendant's conduct and defective design of Roundup, Plaintiff suffered and continues to suffer grave injuries and has endured physical pain and mental anguish, diminished enjoyment of life, and economic hardship, including, but not limited to, considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

WHEREFORE, Plaintiff, MICHELE GLAVANOVITS, demands judgment against Defendant, MONSANTO COMPANY, for compensatory damages in excess of $50,000.00, post-judgment interest, the costs of this action, and for such other relief as this Court deems just and proper.

FILED DATE: 1/2/2020 12:27 PM   2020L000063

## COUNT II – STRICT PRODUCTS LIABILITY – FAILURE TO WARN

1-59.    Plaintiff incorporates by reference paragraphs 1-59 of this Complaint as if fully set forth herein and further alleges as follows.

60.      Plaintiff brings this strict products liability claim against Defendant for failure to warn.

61.      At all times relevant to this Complaint, Defendant engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting Roundup, and through that conduct intentionally placed Roundup into the stream of commerce with full knowledge that it reaches consumers who are exposed to it through ordinary and reasonably foreseeable uses.

62.      At all times relevant to this Complaint, Defendant expected the Roundup they were selling, distributing, supplying, manufacturing, and/or promoting to reach – and Roundup did in fact reach – consumers, including Plaintiff, without any substantial change in the condition of the product from when it was initially distributed by Defendant.

63.      At all times relevant to this Complaint, Roundup was defective and unsafe in manufacture such that it was unreasonably dangerous to the user.  The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including but not limited to, the development non-Hodgkin's lymphoma as a result of use and/or exposure.

64.      At all times relevant to this Complaint, Defendant's failure to include a warning or caution statement, which was necessary to protect the health of those exposed to Roundup, was in violation of the laws of the State of Illinois.

17

FILED DATE: 1/2/2020 12:27 PM    2020L000063

65. At all times relevant to this Complaint, Defendant had a duty to provide proper warnings and take necessary steps in order to assure Roundup did not cause users to suffer from unreasonably dangerous side effects.

66. At all times relevant to this Complaint, Defendant labeled, distributed, and promoted Roundup so that it was dangerous and unsafe for the use and purpose for which it was intended.

67. At all times relevant to this Complaint, Defendant failed to warn of the nature and scope of the side effects associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of non-Hodgkin's lymphoma.

68. At all times relevant to this Complaint, Defendant failed to exercise reasonable care to warn of the dangerous carcinogenic properties and risk of developing non-Hodgkin's lymphoma, even though these risks were known or reasonably scientifically knowable at the time of distribution. Defendant willfully and deliberately failed to warn users and consumers of these risks and in doing so, acted with conscious disregard for the safety of Plaintiff.

69. At all times relevant to this Complaint, Defendant's Roundup products failed to contain adequate warnings and precautions that would have enabled Plaintiff, and similarly situated individuals, to utilize the product safely and with adequate protection.

70. At all times relevant to this Complaint, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate.

FILED DATE: 1/2/2020 12:27 PM   2020L000063

71.     At all times relevant to this Complaint, Defendant promoted the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure, and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

72.     To this day, Defendant has failed to adequately warn of the true risks associated with the use of and exposure to Roundup.

73.     For approximately twenty-nine years, from March to October, Plaintiff used and applied Roundup to her property in Illinois.  Plaintiff followed all instructions and safety and precautionary warnings provided by Defendant.

74.     Plaintiff could not, through the exercise of reasonable care, have discovered Roundup's defects and/or the risks associated with Roundup before or at the time of exposure.

75.     As a direct and proximate result of Defendant's inadequate warnings and the defective design of Roundup, Plaintiff was diagnosed with non-Hodgkin's follicular lymphoma in late August 2019.

76.     As a direct and proximate result of Defendant's inadequate warnings and the defective design of Roundup, Plaintiff suffered and continues to suffer grave injuries and has endured physical pain and mental anguish, diminished enjoyment of life, and economic hardship, including, but not limited to, considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

WHEREFORE, Plaintiff, MICHELE GLAVANOVITS, demands judgment against Defendant, MONSANTO COMPANY, for compensatory damages in excess of $50,000.00,

19

post-judgment interest, the costs of this action, and for such other relief as this Court deems just and proper.

## COUNT III – NEGLIGENCE – PERSONAL INJURY

1-59.   Plaintiff incorporates by reference paragraphs 1-59 of this Complaint as if fully set forth herein and further alleges as follows.

60.   At all times relevant to this Complaint, Defendant designed, researched, manufactured, tested, marketed, advertised, promoted, sold, and distributed the Roundup that Plaintiff used.

61.   At all times relevant to this Complaint, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and end users of the product.

62.   At all times relevant to this Complaint, Defendant had a duty to exercise reasonable care in providing consumers and the general public with accurate, true, and correct information concerning the risks of using Roundup, and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup.

63.   At all times relevant to this Complaint, Defendant knew, or in the exercise of reasonable care, should have known of the hazards and dangers associated with Roundup and specifically, the carcinogenic properties of the chemical glyphosate.

64.   At all times relevant to this Complaint, Defendant knew, or in the exercise of reasonable care should have known, that use of and/or exposure to Roundup created a dangerous and unreasonable risk of injury to the users of these products, including the Plaintiff.

20

FILED DATE: 1/2/2020 12:27 PM   2020L000063

FILED DATE: 1/2/2020 12:27 PM   2020L000063

65.     At all times relevant to this Complaint, Defendant knew, or in the exercise of reasonable care should have known, that users and consumers of Roundup were unaware of the risks and/or the magnitude of the risks associated with use of and/or exposure to Roundup.

66.     At all times relevant to this Complaint, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of Roundup, in that Defendant knew or had reason to know of the defects inherent in Roundup, knew or had reason to know that a user or consumer's exposure to Roundup created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and/or injuries.

67.     At all times relevant to this Complaint, Defendant was negligent in one or more of the following ways:

a)     Manufactured, produced, promoted, formulated, created, developed, designed, distributed and/or sold Roundup without thoroughly, sufficiently and adequately testing it;

b)     Failed to conduct necessary testing and undertake sufficient studies to determine whether Roundup products were safe for their intended use and whether the ingredients/adjuvants contained in Roundup were toxic and/or carcinogenic;

c)     Failed to adequately and correctly warn Plaintiff, the consuming public, and the EPA of the risk of serious harm associated with human use of and exposure to Roundup, including serious risk of cancer;

d)     Failed to provide adequate safety precautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably use and/or be exposed to Roundup;

e)     Marketed, advertised, and recommended the use of Roundup without sufficient knowledge as to its dangerous propensities;

f)     Represented that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as

21

FILED DATE: 1/2/2020 12:27 PM   2020L000063

table salt, when, in fact, Defendant knew, or should have known, that Roundup was in a defective condition and was inherently dangerous and unsafe;

g) Manufactured, produced, promoted, formulated, created, developed, designed, distributed and/or sold Roundup in a manner which was dangerous to its users;

h) Concealed information from the public while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations;

i) Sold Roundup with a false and misleading label; and

j) Was otherwise careless and/or negligent.

68.     For approximately twenty-nine years, from March to October, Plaintiff used and applied Roundup to her property in Illinois.  Plaintiff followed all instructions and safety and precautionary warnings provided by Defendant.

69.     At the time of the Plaintiff's use and exposure to Roundup, Roundup was being used for the purpose and in a manner normally intended, as a broad-spectrum herbicide.

70.     Plaintiff was exposed to Defendant's Roundup without knowledge of its dangerous characteristics or the nature and extent of the injuries that could result from the intended use and/or exposure to Roundup.

71.     Defendant knew, and/or should have known, that it was foreseeable that consumers such as Plaintiff would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup. Defendant voluntarily designed its Roundup with a dangerous condition for use by the public, and in particular, by Plaintiff.

72.     Defendant marketed and promoted Roundup in such a manner so as to make it inherently defective and downplayed its suspected, probable, and established health risks associated with its normal, intended use.

FILED DATE: 1/2/2020 12:27 PM   2020L000063

73.     As a direct and proximate result of one or more of the foregoing negligent acts and/or omissions by Defendant, Plaintiff was diagnosed with non-Hodgkin's follicular lymphoma in late August 2019.

74.     As a direct and proximate result or one of more of the foregoing negligent acts and/or omissions by Defendant, Plaintiff suffered and continues to suffer grave injuries and has endured physical pain and mental anguish, diminished enjoyment of life, and economic hardship, including, but not limited to, considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

WHEREFORE, Plaintiff, MICHELE GLAVANOVITS, demands judgment against Defendant, MONSANTO COMPANY, for compensatory damages in excess of $50,000.00, post-judgment interest, the costs of this action, and for such other relief as this Court deems just and proper.

Respectfully submitted,

Kyle R. Kasmarick

Syregelas & Kasmarick, LLC
19 North Green Street
Chicago, IL 60607
312-243-0900
Firm No. 11010
kkasmarick@syregelaslaw.com
cshaw@syregelaslaw.com
zreynolds@syregelaslaw.com

FILED
1/2/2020 12:27 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020L000063

FILED DATE: 1/2/2020 12:27 PM  2020L000063

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| **MICHELE GLAVANOVITS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.** 2020L000063 |
| | ) | |
| **MONSANTO COMPANY,** | ) | **Jury Trial Demanded** |
| | ) | |
| **Defendant.** | ) | |

### AFFIDAVIT

I, Kyle R. Kasmarick, state under oath:

1.     I am an attorney associated with Syregelas & Kasmarick, LLC and am responsible for filing the Complaint at Law in this matter.

2.     The total of money damages sought by Plaintiff Michele Glavanovits does exceed $50,000.00, exclusive of interest and costs.

Respectfully submitted,

_____
Kyle R. Kasmarick

Syregelas & Kasmarick, LLC
19 North Green Street
Chicago, IL 60607
312-243-0900
Firm No. 11010
kkasmarick@syregelaslaw.com
cshaw@syregelaslaw.com
zreynolds@syregelaslaw.com