2741,XMDL

# U.S. District Court
## District of Maryland (Greenbelt)
## CIVIL DOCKET FOR CASE #: 8:20−cv−00072−PJM

Haren et al v. Monsanto Company
Assigned to: Judge Peter J. Messitte
Case in other court:  USDC for the Northern District of California, 3:16−md−2741
Cause: 28:1332 Diversity−Personal Injury

Date Filed: 01/10/2020
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Joseph A Haren**

represented by **Aaron L Moore**
Bekman, Marder & Adkins, LLC
300 West Pratt Street, Suite 450
Baltimore, MD 21201
14105396633
Fax: 14106259554
Email: moore@bmalawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Dawn A. Haren**

represented by **Aaron L Moore**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 01/10/2020 | 1 | COMPLAINT *and Demand for Jury Trial* against Monsanto Company ( Filing fee $ 400 receipt number 0416−8446011.), filed by Joseph A Haren, Dawn A. Haren. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Notice of Related Case)(Moore, Aaron) (Entered: 01/10/2020) |
| 01/10/2020 | | Case Assigned to Judge Peter J. Messitte. (kos, Deputy Clerk) (Entered: 01/10/2020) |
| 01/13/2020 | 2 | Summons Issued 21 days as to Monsanto Company.(jf3s, Deputy Clerk) (Entered: 01/13/2020) |
| 01/21/2020 | 3 | SUMMONS Returned Executed by Joseph A Haren, Dawn A. Haren. Monsanto Company served on 1/16/2020, answer due 2/6/2020.(Moore, Aaron) (Entered: 01/21/2020) |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **JOSEPH A. HAREN**<br>10105 Durango Drive<br>Damascus, Maryland 20872 | |
| AND | Case No.: _____ |
| **DAWN A. HAREN**<br>10105 Durango Drive<br>Damascus, Maryland 20872 | **DEMAND FOR JURY TRIAL** |
| *Plaintiffs* | |
| v. | |
| **MONSANTO COMPANY**<br>800 North Lindbergh Boulevard<br>St. Louis, Missouri 63167 | |
| **Serve**:<br>Resident Agent<br>CSC-Lawyers Incorporating Svc. Co.<br>7 St. Paul Street, Suite 820<br>Baltimore, Maryland 21202 | |
| *Defendant* | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, Joseph A. Haren and Dawn A. Haren, by their attorneys, E. Dale Adkins, III,

Gregory G. Hopper, Ryan S. Perlin, Aaron L. Moore and Bekman, Marder & Adkins, LLC, sue

the Defendant, Monsanto Company, and allege the following:

### INTRODUCTION

1.      Plaintiffs, Joseph A. Haren and Dawn A. Haren, seek compensatory and punitive

damages from Defendant, Monsanto Co., for injuries they have suffered as a direct and

proximate result of Mr. Haren's exposure to Roundup®, a herbicide containing the active

ingredient glyphosate. Like thousands of other people who have suffered injuries similar to his,

the Plaintiffs seek damages on three theories: (a) Monsanto negligently developed, designed, tested, manufactured, packaged, promoted, marketed, advertised, distributed, and sold Roundup®; (2) Monsanto sold Roundup® in a defective and unreasonably dangerous condition (design, manufacturing, and warnings theories); and (3) Monsanto marketed and sold Roundup® knowing that exposure to it would cause serious, permanent injuries in many of the people who bought and used it, actions that demonstrate actual malice, evil motive, intent to injure, or ill will.

2.      Throughout this Complaint, the term "Roundup®" refers to all formulations of Defendant's Roundup® products, including, but not limited to, Roundup® Concentrate Poison Ivy and Tough Brush Killer 1, Roundup® Custom Herbicide, Roundup® D-Pak Herbicide , Roundup® Dry Concentrate, Roundup® Export Herbicide, Roundup® Fence & Hard Edger 1, Roundup® Garden Foam Weed & Grass Killer, Roundup® Grass and Weed Killer, Roundup® Herbicide, Roundup® Original 2k Herbicide, Roundup® Original H Herbicide, Roundup® Pro Concentrate, Roundup® Prodry Herbicide, Roundup® Promax, Roundup® Quik Stik Grass and Weed Killer, Roundup® Quikpro Herbicide, Roundup® Rainfast Concentrate Weed & Grass Killer, Roundup® Rainfast Super Concentrate Weed & Grass Killer, Roundup® Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup® Ready-to-Use Weed & Grass Killer, Roundup® Ready-to-Use Weed and Grass Killer 2, Roundup® Ultra Dry, Roundup® Ultra Herbicide, Roundup® Ultramax, Roundup® VM Herbicide, Roundup® Weed & Grass Killer Concentrate, Roundup® Weed & Grass Killer Concentrate Plus, Roundup® Weed & Grass Killer Ready-to-Use Plus, Roundup® Weed & Grass Killer Super Concentrate, Roundup® Weed & Grass Killer 1 Ready-to-Use, Roundup® WSD Water Soluble Dry

2

Herbicide Deploy Dry Herbicide, Roundup® Max Control 365, or any other formulation of Roundup® containing the active ingredient glyphosate.

## JURISDICTION AND VENUE

3.      This court has jurisdiction over Defendant and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiffs and Defendant. Defendant is either incorporated and/or has its principal place of business outside of the state in which the Plaintiffs reside.

4.      The amount in controversy between Plaintiffs and Defendant exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs.

5.      The Court has also supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

6.      Venue is proper within this district pursuant to 28 U.S.C. § 1391 in that Defendant conducts business in Maryland and is subject to personal jurisdiction in this district. Furthermore, Defendant sells, markets, and/or distributes Roundup® within the State of Maryland.  Also, a substantial part of the acts and/or omissions giving rise to these claims occurred within the State of Maryland and the Plaintiff sustained injuries (e.g., non-Hodgkin's lymphoma) in the State of Maryland arising out of the Defendant's conduct.

## PARTIES

7.      Plaintiffs, Joseph Haren and Dawn Haren are, and at all relevant times were, residents and citizen of Damascus, Maryland.  The Plaintiffs are husband and wife.  Plaintiffs bring this action for injuries sustained by exposure to Roundup® containing the active ingredient glyphosate and the surfactant polyethoxylated tallow amine ("POEA").  As a direct and proximate result of being exposed to Roundup®, Plaintiff, Joseph Haren, developed injuries

3

including but not limited to, a form of Non-Hodgkin's lymphoma. Their marriage has been damaged.

8.      Defendant, Monsanto Company (referred herein as either "Defendant" or "Monsanto"), is, and at all relevant times was, a corporation created and existing under the laws of the State of Delaware, and was a citizen of the State of Missouri and/or State of Delaware, with its headquarters and principal place of business located at 800 North Lindbergh Avenue, St. Louis, Missouri 63167. Defendant is authorized to do business in the State of Maryland and, at all relevant times, has purposefully availed itself of the privilege of conducting business activities in Maryland and invoked the benefits and protections of its laws. Defendant's Registered Agent in Maryland is CSC-Lawyers Incorporating Service Company, 7 St. Paul Street, Suite 820, Baltimore, Maryland 21202.

9.      Upon information and belief, Monsanto regularly transacts business in Maryland by marketing Roundup® and its other products to customers here, entering into contracts with wholesalers and retailers here, and distributing and supplying Roundup® and its other products here.

10.      Monsanto is a multinational agricultural biotechnology corporation and it is the world's leading producer of glyphosate.

11.      Upon information and belief, Monsanto derives substantial revenue from the sale of Roundup® and its other products in Maryland. It derived revenue from the sale of Roundup® at issue in this case.

12.      Monsanto's sale of Roundup® has caused tortious injury in Maryland. There are a number of cases pending by citizens of Maryland who were injured here and Plaintiff was

injured here. It either expected or should have expected its acts to have consequences in Maryland.

13.     Upon information and belief, Monsanto sold Roundup® and placed it into the stream of commerce knowing that it would be distributed to Maryland where it would be purchased and used by Plaintiff and other citizens of Maryland.

## FACTUAL ALLEGATIONS

14.     Monsanto designed, researched, manufactured, tested, advertised, promoted, marketed, distributed, and sold Roundup® to customers knowing that they and others would use it and be exposed to it.

15.     Monsanto designed, researched, manufactured, tested, advertised, promoted, marketed, distributed, and sold the specific Roundup® products that Plaintiff bought, used and to which he was exposed.

16.     Monsanto discovered the herbicidal properties of glyphosate during the 1970s and subsequently began to design, research, manufacture, sell and distribute glyphosate based "Roundup®" as a broad-spectrum herbicide.

17.     Glyphosate is the active ingredient in Roundup®.

18.     Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops.

19.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a give organism produced a specific enzyme, 5-enolpyruvylshikimic acid 3–phosphate synthase, known as EPSP synthase.

20.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid 3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

21.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

22.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks and golf courses. This increase in use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

23.     Monsanto is and has been intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup®, i.e., "Roundup® Ready®." As of 2009, Defendant was the world's leading producer of seeds designed to be Roundup® Ready®. In 2010, an estimated 70% of corn and cotton, and 90% of soybean field in the United States contained Roundup® Ready® seeds.

24.     The original Roundup®, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate is among the world's most widely used herbicides.[1]

25.     For nearly 40 years, consumers, farmers, and other members of the public like the Plaintiff have used Roundup®, unaware of its carcinogenic properties.

## REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

26.     The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C.

---

[1] *Backgrounder*, History of Monsanto's Glyphosate Herbicides, June 2005.

§ 135 et seq. FIFRA required that all pesticides be registered with the Environmental Protection

Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C.

§36a(a).

27.     The EPA required as part of the registration process, among other requirements, a

variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other

potential non-target organisms, and other adverse effects on the environment. Registration by

the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in

registering or re-registering a product is not that the product is "safe," but rather that use of the

product in accordance with its label directions "will not generally cause unreasonable adverse

effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

28.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any

unreasonable risk to man or the environment, taking into account the economic, social, and

environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus

requires the EPA to make a risk/benefit analysis in determining whether a registration should be

granted or allowed to continue to be sold in commerce.

29.     The EPA and the State of Missouri registered Roundup® for distribution, sale,

and manufacture in the United States and the State of Missouri.

30.     FIFRA generally requires that the registrant, Monsanto, conduct health and safety

testing of pesticide products. The government is not required, nor is it able, to perform the

product tests that are required of the manufacturer.

31.     The evaluation of each pesticide product distributed, sold, or manufactured is

completed at the time the product is initially registered. The data necessary for registration of a

pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide

products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to re-evaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

32.     In the case of glyphosate and Roundup®, the EPA had planned on releasing its preliminary risk assessment – in relation to the registration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of the World Health Organization's March 24, 2015 finding that glyphosate is a "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

**MONSANTO'S FALSE REPRESENTATIONS REGARDING
THE SAFETY OF ROUNDUP®**

33.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products.  Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-Based herbicides, including Roundup®, were "safer than table salt" and "practically **non-toxic**" to mammals, birds, and fish.  Among the presentations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

   a.  Remember that environmentally friendly Roundup® herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks and fences . . .

   b.  And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got a week, brush, edging or trimming problem.

   c.  Roundup® biodegrades into naturally occurring elements. Remember that versatile Roundup® herbicide stays where you put

8

it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

d. This non-residual herbicide will not wash or leach in the soil. It. . . stays where you apply it.

e. You can apply Accord with "confidence because it will stay where you put it." It bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

f. Glyphosate is less toxic to rats than table salt following acute oral ingestion.

g. Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in good and over a 700-fold safety margin for workers who manufacture it or use it.

h. You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

i. "Roundup® can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup®.[2]

34.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisement in New York that represents, directly or by implication" that:

a. its glyphosate-containing pesticide products or any other component thereof are safe, non-toxic, harmless or free from risk.

b. its glyphosate-containing pesticide products or any other component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable.

_____

[2] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov.1996).

    c.   its glyphosate-containing pesticide products or any other component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

    d.   its glyphosate-containing pesticide products or any other component thereof are "good" for the environment or are "known for their environmental characteristics."

    e.   its glyphosate-containing pesticide products or any other component thereof are safer or less toxic than common consumer products other than herbicides.

    f.   its glyphosate-containing products or any other component thereof might be classified as "practically non-toxic."

35.    Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief, still has not done so today.

36.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[3]

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP®

37.    As early as the 1980s, Monsanto was aware of glyphosate's carcinogenic properties.

38.    On March 4, 1985, a group of the Environmental Protection Agency's Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[4] Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

39.    In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental safety,

---

[3] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, available at http://news.bbc.co.uk/2/hi/Europe/8308903.stm.
[4] Consensus Review of Glyphosate, Casewell No. 661A, March 4, 1985. United States Environmental Protection Agency.

toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.[5]

40.     In October 1991, the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.[6]

41.     In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendant's Roundup® products are more dangerous and toxic than glyphosate alone.[7] As early as 1991, evidence existed demonstrating the glyphosate formulations were significantly more toxic than glyphosate alone.[8]

42.     In 2002, Julie Marc published a study entitled "Pesticide Roundup® Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

43.     The study found that Defendant Roundup® caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

44.     In 2004, Julie Marc published a study entitled "Glyphosate-based Pesticides Affect Cell Cycle Regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

45.     The study noted that "cell-Cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent

---

[5] http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheets/0178fact.pdf
[6] Second Peer Review of Glyphosate, CAS No. 1071-83-6. October 30, 1981. United States Environmental Protection Agency.
[7] Martinez, et al. 2007; Benachour 2009; Gasnier, et al. 2010; Peixoto 2005; Marc 2004
[8] Martinez, et al 1991

development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[9]

46.     In 2005, Francisco Peixoto published a study showing that Roundup®'s effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

47.     The Peixoto study suggested that the harmful effects of Roundup® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup® formulation products.

48.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup® and glyphosate on human umbilical, embryonic, and placental cells.

49.     The study used dilution levels of Roundup® and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food.  The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone.  The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide.  The study confirmed that the adjuvants in Roundup® are not inert and that Roundup® is always more toxic than its active ingredient glyphosate.

50.     The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendant.

---

[9] (Molinari, 2000; Stewart, et al. 2003)

51.     Defendant knew or should have known that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiffs from Roundup®.

52.     Defendant knew or should have known that tests limited to Roundup®'s active ingredient glyphosate were insufficient to prove the safety of Roundup®.

53.     Defendant failed to appropriately and adequately test Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POE to protect Plaintiffs from Roundup®.

54.     Rather than performing appropriate tests, Defendant relied upon flawed industry-supported studies designed to protect Defendant's economic interests rather than Plaintiffs and the consuming public.

55.     Despite its knowledge that Roundup® was considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup® as safe.

## IARC CLASSIFICATION OF GLYPHOSATE

56.     The International Agency for Research on Center ("IARC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

57.     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015-2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

13

58.     IARC set glyphosate for review in 2015-2016. IARC uses five criteria for
determining priority in reviewing chemicals. The substance must have a potential for direct
impact on public health scientific literature to support suspicion of carcinogenicity; evidence of
significant human exposure; high public interest and/or potential to bring clarity to a
controversial area and/or reduce public anxiety or concern; related agents similar to one give
high priority by the above considerations. Data reviewed is sourced preferably from publicly
accessible, peer-reviewed data.

59.     On March 24, 2015, after its cumulative review of human, animal and DNA
studies for more than one (1) year, many of which have been in Defendant's possession since as
early as 1985, the IARC's working group published its conclusion that the glyphosate contained
in Defendant's Roundup® herbicide, is a Class 2A "probably carcinogen" as demonstrated by
the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity
in animals.

60.     The IARC's full Monograph was published on July 29, 2015 and established
glyphosate as a class 2A *probable* carcinogen to humans. According to the authors, glyphosate
demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A
classification based on evidence of carcinogenicity in humans and animals.

61.     The IARC Working Group found an increased risk between exposure to
glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the
increased risk continued after adjustment for other pesticides.

62.     The IARC also found that glyphosate caused DNA and chromosomal damage in
human cells.

## EARLIER EVIDENCE OF GLYPHOSATE'S DANGER

63.     Despite the new classification by the IARC, Defendant had had ample evidence of glyphosate and Roundup®'s genotoxic properties for decades.

64.     Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

65.     In 1997, Chris Clements published "Genotoxicity of select herbicides in *Rana catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

66.     The study found that tadpoles exposed to Roundup® showed significant DNA damage when compared with unexposed control animals.

67.     Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup® can induce oxidative stress.

68.     Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

69.     The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

70.     In 2006, Cesar Paz-y-Mino published a study examining DNA damages in human subjects exposed to glyphosate.

71.     The study produces evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

72.     The IARC Monograph reflects the volume of evidence of glyphosate pesticides'
genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is
strong."

73.     Despite knowledge to the contrary, Defendant maintains that there is no evidence
that Roundup® is not genotoxic, and that there is no evidence that Roundup® is genotoxic.

74.     In addition to glyphosate and Roundup®'s genotoxic properties, Defendant has
long been aware of glyphosate's carcinogenic properties.

75.     Glyphosate and Roundup® in particular have long been associated with
carcinogenicity and the development of numerous forms of cancer, including, but not limited to,
non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

76.     Defendant has known of this association since the early to mid-1980s and
numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or
Roundup®.

77.     In 1985, the EPA studied the effects of glyphosate in mice finding a dose related
response in male mice linked to renal tubal adenomas, a rate tumor.  The study concluded the
glyphosate was oncogenic.

78.     In 2003, Lennart Hardell and Mikael Eriksson published the results of two case-
controlled studies on pesticides as a risk factor for NHO and hairy cell leukemia.

79.     The study concluded that glyphosate had the most significant relationship to NHL
among all herbicides studies with an increased odds ratio of 3:11.

80.     In 2003, Al De Roos published a study examining the pooled date of mid-western
farmers, examining pesticides and herbicides as risk factors for NHL.

81.     The study, which controlled for potential confounders, found a relationship between increased NHL, incidence and glyphosate.

82.     In 2008, Mikael Eriksson published a population-based case-control study of exposure to various pesticides as a risk factor for NHL.

83.     This strengthened previous associations between glyphosate and NHL.

84.     In spite of this knowledge, Defendant continued to issue broad and sweeping statements suggesting that Roundup® was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

85.     Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiffs, the agricultural community, and the public at large to purchase and increase the use of Defendant's Roundup® for Defendant's pecuniary gain, and in fact, did induce Plaintiffs to use Roundup®.

86.     Defendant made these statements with complete disregard and reckless indifference to the safety of Plaintiff and the general public.

87.     Notwithstanding Defendant's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, multiple myeloma and soft tissue sarcoma.

88.     Defendant knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, multiple myeloma and soft tissue sarcomas.

89.     Defendant failed to appropriately and adequately inform and warn Plaintiffs of the serious risks associated with the use of and exposure to glyphosate and/or Roundup®, including,

but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

90.     Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendant continues to maintain that glyphosate and/or Roundup® is safe, non-carcinogenic, non-genotoxic, and falsely warrants to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup®.

91.     Defendant has claimed and continues to claim that Roundup® is safe, non-carcinogenic, and non-genotoxic.  These misrepresentations are consistent with Defendant's cavalier approach to investigating and ensuring the safety of its products, the safety of the public at large, and the safety of Plaintiff.

<u>**SCIENTIFIC FRAUD UNDERLYING THE
SAFETY DETERMINATIONS OF GLYPHOSATE**</u>

92.     After the EPA's 1985 classification of glyphosate as possibly carcinogenic to humans (Group C), Monsanto exerted pressure upon the EPA to change its classification.

93.     This culminated in the EPA's reclassification of glyphosate to Group E, which was based upon evidence of non-carcinogenicity in humans.

94.     In so classifying, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

95.     On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed scientific fraud.

96.     In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed approximately 30 tests on glyphosate and glyphosate-containing products, including 11 of the 19 chronic toxicology studies needed to register Roundup® with the EPA.

97.     In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to toxicological impacts of glyphosate. The EPA subsequently audited IBT and determined that the toxicology studies conducted for Roundup® were invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

98.     Three top executives of IBT were convicted of fraud in 1983.

99.     In the second instance, Monsanto hired Craven Laboratories ("Craven") in 1990 to perform pesticide and herbicide studies, including several studies on Roundup®.

100.     In March of 1991, the EPA announced that it was investigating Craven for "allegedly falsifying test data used by chemical firms to win EPA approval of pesticides.:

101.     The investigation lead to the indictments of the laboratory owner and a handful of employees.

## MONSANTO'S CONTINUING DISREGARD
## FOR THE SAFETY OF PLAINTIFFS AND THE PUBLIC

102.     Monsanto claimed on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup®

19

brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."[10]

103.    Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

104.    Glyphosate, and Defendant's Roundup® products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

105.    Despite Defendant's knowledge that Roundup® was associated with an elevated risk of developing cancer, Defendant's promotional campaigns focused on Roundup®'s purported "safety profile."

106.    Defendant made its statements about the supposed safety of Roundup® despite having actual knowledge that they were false and that Roundup® caused serious, permanent injuries to people who used and were exposed to it.

107.    Defendant's statements proclaiming the safety of Roundup® and disregarding its dangers misled the Plaintiffs.

108.    Defendant's refusal to adequately warn Plaintiffs about the risks of using and being exposed to Roundup® directly and proximately caused Plaintiff to use and be exposed to glyphosate instead of using another acceptable and safe method or controlling unwanted weeds and pests.  Plaintiff was misled into believing that Roundup® was safe for use and he relied on these statements when he purchased and used Roundup®.  Additionally, Defendant's refusal to disclose the risks meant that scientists and physicians lacked adequate information about the

---

[10] Backgrounder – Glyphosate: No Evidence of Carcinogenicity.  Updated November 2014. (download October 9, 2015)

risks of Roundup® and could not warn and instruct consumers, like Plaintiff, about the risk of cancer, including NHL, and other injuries associated with Roundup®, warnings and instructions that would have prevented them and him to choose other products.

109.    Defendant did no modification of the labeling of Roundup® to include relevant information regarding the risks and dangers associated with Roundup® exposure despite its knowledge.

110.    Defendant did not warn and inform the EPA about these dangers, resulting in inadequate warnings in safety information presented directly to users and consumers.

111.    Defendants actions and omissions resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

112.    The failure of Defendant to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

113.    By reason of the foregoing acts and omissions, Plaintiffs seek compensatory damages as a result of Plaintiff's use of and exposure to, Roundup®, which caused or was a substantial contributing factor in causing Plaintiff to suffer from cancer, specifically NHL.

114.    By reason of the foregoing acts and omissions, Plaintiffs have endured and, in some categories, continues to suffer, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of the actions and inaction of the Defendant.

### **PLAINTIFF'S EXPOSURE TO ROUNDUP®**

115.    Plaintiff, Joseph Haren, began using Roundup® in approximately 1984.  He purchased Roundup® and continued to purchase it because of Monsanto's marketing and his belief that Monsanto was selling a safe product free from defects.

116. For years, Plaintiff, Joseph Haren, sprayed Roundup® on a regular basis, both residentially and as a landscaper.

117. At all relevant times, Mr. Haren followed all safety and precautionary warnings known to him during the course of use.

118. Mr. Haren was diagnosed in Maryland with a form of Non-Hodgkin's Lymphoma in 2015 and was forced to undergo chemotherapy treatments. Mr. Haren suffered a relapse of his cancer in 2019 and was again forced to undergo chemotherapy treatments. The development of Plaintiff's Non-Hodgkin's Lymphoma was proximately and actually caused by exposure to Monsanto's Roundup®'s products.

119. Mr. Haren was unaware of Roundup's carcinogenic properties until 2018.

120. As a result of his injury, Plaintiff incurred significant economic and non-economic damages and damages to the marital relationship.

## EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

121. Plaintiffs incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

122. The running of any statute of limitations has been tolled by reason of Defendant's fraudulent concealment. Defendant, through its affirmative misrepresentations and omissions, actively concealed from Plaintiffs the true risks associated with Roundup® and glyphosate.

123. At all relevant times, Defendant has maintained that Roundup® is safe, non-toxic and non-carcinogenic.

124. Indeed, the Defendant continued to represent to the public that "regulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and *agree* that there is *no evidence* that glyphosate,

the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides,

causes cancer, even at very high doses, and that it is not genotoxic."[11]  (emphasis added).

125.    As a result of Defendant's actions, Plaintiffs were unaware, and could not

reasonably know or have learned through reasonable diligence that Roundup® and/or glyphosate

contact, exposed Plaintiff to the risks alleged herein and that those risks were the direct and

proximate result of Defendant's acts and omissions.

126.    Furthermore, Defendant is estopped from relying on any statute of limitations,

repose, or other time limitation, because of its fraudulent concealment of the true character,

quality and nature of Roundup®.  Defendant was under a duty to disclose the true character,

quality, and nature of Roundup® because this was non-public information over which Defendant

had and continues to have exclusive control, and because Defendant knew that this information

was not available to Plaintiffs or to distributors of Roundup®.  In addition, Defendant is

estopped from relying on any statute of limitations, repose, or other time limitation because of its

intentional concealment of these facts.

127.    Plaintiffs had no knowledge that Defendant was engaged in the wrongdoing

alleged herein.  Because of the fraudulent acts of concealment of wrongdoing by Defendant,

Plaintiffs could not have reasonably discovered the wrongdoing at any time prior.  Also, the

economics of this fraud should be considered.  Defendant had the ability to and did spend

enormous amounts of money in furtherance of its purpose of marketing, promoting and/or

distributing a profitable herbicide, notwithstanding the known or reasonably known risks.

Plaintiffs and medical professionals could not have afforded and could not have possibly

---

[11] Backgrounder – Glyphosate: No Evidence of Carcinogenicity.  Updated November 2014.
(download October 9, 2015)

conducted studies to determine the nature, extent and identity of related health risks, and were

forced to rely on only the Defendant's representations. Accordingly, Defendant is precluded by

the discovery rule and/or doctrine of fraudulent concealment from relying upon any statute of

limitations.

## COUNT I
## (NEGLIGENCE)

128.    Plaintiffs repeat, reiterate, and reallege each and every allegation of this

Complaint contained in each of the foregoing paragraphs inclusive, with the same force and

effect as if more fully set forth here.

129.    Defendant had a duty to exercise reasonable care in the designing, researching,

testing, manufacturing, marketing, supplying, promoting, packaging, sale and/or distribution of

Roundup® into the stream of commerce, including a duty to assure that the product would not

cause users to suffer unreasonable, dangerous side effects.

130.    Defendant failed to exercise ordinary care in the designing, researching, testing,

manufacturing, marketing, supplying, promoting, packaging, sale, quality assurance, quality

control, and/or distribution of Roundup® into interstate commerce in that Defendant knew or

should have known that using Roundup® created a high risk of unreasonable, dangerous side

effects, including, but not limited to, the development of NHL, as well as other severe and

personal injuries which are permanent and lasting in nature, physical pain and mental anguish,

including diminished enjoyment of life, as well as need for lifelong medical treatment,

monitoring, and/or medications.

131.    The negligence by the Defendant its agents, servants, and/or employees, includes,

but is not limited to, the following acts and/or omissions:

(a)  Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup® without thoroughly testing it;

(b)  Failing to test Roundup® and/or failing to adequately, sufficiently, and properly test Roundup®;

(c)  Not conducting sufficient testing programs to determine whether or not Roundup® was safe for use; in that Defendant herein knew or should have known that Roundup® was unsafe and unfit for use by reason of the dangers to its users;

(d)  Not conducting sufficient testing programs and studies to determine Roundup®'s carcinogenic properties, even after Defendant had knowledge that Roundup® is, was, or could be carcinogenic;

(e)  Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup®, and the propensity of these ingredients to render Roundup® toxic, increase the toxicity of Roundup®, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup®, and whether or not "inert" ingredients and/or adjuvants were safe for use;

(f)  Negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup®;

(g)  Negligently failing to petition the EPA to strengthen the warnings associated with Roundup®;

(h)  Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup®;

(i)  Negligently marketing, advertising, and recommending the use of Roundup® without sufficient knowledge as to its dangerous propensities;

(j)  Negligently representing that Roundup® was safe for use for its intended purpose, and/or that Roundup® was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

(k)  Negligently representing that Roundup® had equivalent safety and efficacy as other forms of herbicides;

(l)  Negligently designing Roundup® in a manner which was dangerous to its users;

  (m) Negligently manufacturing Roundup® in a manner which was dangerous to its users;

  (n) Negligently producing Roundup® in a manner which was dangerous to its users;

  (o) Negligently formulating Roundup® in a manner which was dangerous to its users'

  (p) Concealing information from the Plaintiff while knowing that Roundup® was unsafe, dangerous, and/or non-conforming with EPA regulations;

  (q) Improperly concealing and/or misrepresenting information from the Plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup® compared to other forms of herbicides; and

  (r) Negligently selling Roundup® with a false and misleading label.

132. Defendant underreported, underestimated, and downplayed the serious dangers of Roundup®.

133. Defendant negligently and deceptively compared the safety risks and/or dangers of Roundup® with common everyday foods, such as table salt, and other forms of herbicides.

134. At all times relevant, Defendant knew that Roundup® was dangerous and defective, concealed the dangers and risks from Plaintiffs, made misrepresentations to Plaintiffs and the public in general as to the safety of Roundup® and with full knowledge of the risks associated with Roundup®, without adequate warnings of same, manufactured, designed, packaged, labeled, marketed, advertised, distributed and sole Roundup® to the general public, and to Plaintiffs.  Defendant engaged in malicious, fraudulent and grossly negligent conduct toward Plaintiffs and the public, acted with willful and wanton and/or reckless disregard for the safety of the general public and Plaintiff.

135.   Defendant was negligent and/or violated Maryland law in the designing,

researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising,

warning, marketing, and sell of Roundup® in that they:

(a)   Failed to use ordinary care in designing and manufacturing Roundup® so as to avoid the aforementioned risks to individuals when Roundup® was used as an herbicide;

(b)   Failed to accompany its product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup®;

(c)   Failed to accompany its product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup®;

(d)   Failed to accompany its product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup®;

(e)   Failed to warn Plaintiff of the severity and duration of such adverse effects, as the warning given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of NHL;

(f)   Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup®;

(g)   Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup®'s "inert" ingredients and/or adjuvants;

(h)   Negligently misrepresented the evidence of Roundup®'s genotoxicity and carcinogenicity; and

(i)   Was otherwise careless and/or negligent.

136.   Despite the fact that Defendant knew or should have known that Roundup®

caused, or could cause, unreasonable dangerous side effects, Defendant continued and continues

to market, manufacture, distribute, and/or sell Roundup® to consumers, including the Plaintiffs.

137. Defendant knew or should have known that consumers such as the Plaintiffs would foreseeably suffer injury as a result of Defendant's failure to exercise ordinary care, as set forth above.

138. Defendant's violations of law and/or negligence were the proximate cause of Plaintiff's injuries, harm and economic loss, which he suffered and/or will continue to suffer.

139. As a proximate cause of Defendant's actions and omissions, Plaintiff developed NHL and was otherwise injured and he suffered and will likely suffer from the remainder of his life from physical, mental anguish, emotional distress, scarring, disfigurement, permanent disabilities and impairments, loss of enjoyment of life, difficult and frustrating medical treatment, fear for himself and his family, and other noneconomic damages and injuries. As a result, he has also suffered and will likely suffer from the for the remainder of his life from unnecessary and expensive medical treatment, will lose time from work, will suffer a reduced work capacity, and will incur additional bills, expenses, losses and economic damages and injuries.

140. Defendant's conduct was committed with knowing, reckless, conscious, wanton, willful and deliberate disregard for the value of human life and the rights and safety of consumers, including Plaintiffs, thereby entitling Plaintiffs to punitive and exemplary damages so as to punish and deter similar conduct in the future.

WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in Plaintiffs favor for compensatory damages in the amount of $10,000,000 (Ten Million Dollars), together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demands a jury trial on all issues contained here.

## COUNT II
## (STRICT PRODUCTS LIABILITY – DESIGN DEFECT)

141.    Plaintiffs repeat, reiterate and reallege each and every allegation of this Complaint contained paragraphs 1 through 127 herein, with the same force and effect as if more fully set forth herein.

142.    At all times herein mentioned, the Defendant designed, researched, manufactured, tested, advertised, promoted, sold and distributed Roundup® as hereinabove described, that was used by the Plaintiff.

143.    Defendant's Roundup® was expected to and did reach the usual consumers, handlers and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sole, distributed and marketed by the Defendant.

144.    At those times, Roundup® was in an unsafe, defective and inherently dangerous condition, which was dangerous to users, and in particular, the Plaintiffs herein.

145.    The Roundup® designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendant was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup®.

146.    The Roundup® designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendant was defective in design and/or formulation, in that, when it left the hands of the Defendant manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

147.    At all times herein mentioned, Roundup® was in a defective conduction and unsafe, and Defendant knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendant.  In particular, Defendant's Roundup® was defective in the following ways:

(a)    When placed in the stream of commerce, Defendant's Roundup® products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate.

(b)    When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

(c)    When placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

(d)    Defendant did not sufficiently test, investigate or study its Roundup® products.

(e)    Exposure to Roundup® presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

(f)    Defendant knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® could result in cancer and other severe illnesses and injuries.

(g)    Defendant did not conduct adequate post-marketing surveillance of its Roundup® products.

148.    Defendant knew or should have known that at all times herein mentioned, its Roundup® was in a defective condition and was and is inherently dangerous and unsafe.

149.    Plaintiff was exposed to Defendant's Roundup® as described above, without knowledge of Roundup®'s dangerous characteristics.

150.    At all times of the Plaintiff's use of and exposure to Roundup®, Roundup® was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

151.    Defendant with this knowledge voluntarily designed its Roundup® with a dangerous condition for use by the public, and in particular by the Plaintiffs.

152.    Defendant had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

153.    Defendant created a product that was and is unreasonably dangerous for its normal, intended use.

154.    Defendant marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable and established health risks inherent with its normal, intended use.

155.    The Roundup® designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendant was manufactured defectively in that Roundup® left the hand of Defendant in a defective condition and was unreasonably dangerous to its intended users, including the Plaintiffs.

156.    The Roundup® designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendant reached its intended users in the same defective and unreasonably dangerous condition in which the Defendant's Roundup® was manufactured.

157.    Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed a defective product, which created an unreasonable risk to the health of consumers and to the Plaintiff in particular, and Defendant is therefore strictly liable for the injuries sustained by the Plaintiff.

31

158.    The Plaintiffs could not, by the exercise of reasonable care, have discovered Roundup®'s defects herein mentioned or perceived its danger.

159.    By reason of the foregoing, the Defendant has become strictly liable to the Plaintiffs for the manufacturing, marketing, promoting, distribution and selling of a defective product – Roundup®.

160.    Defendant's defective design of Roundup® amounts to willful, wanton and/or reckless conduct by Defendant.

161.    Defects in Defendant's Roundup® were the cause or a substantial contributing factor in causing Plaintiff's injuries.

162.    As a proximate cause of Defendant's actions and omissions, Plaintiff developed NHL and was otherwise injured and he suffered and will likely suffer from the remainder of his life from physical, mental anguish, emotional distress, scarring, disfigurement, permanent disabilities and impairments, loss of enjoyment of life, difficult and frustrating medical treatment, fear for himself and his family, and other noneconomic damages and injuries. As a result, he has also suffered and will likely suffer from the for the remainder of his life from unnecessary and expensive medical treatment, will lose time from work, will suffer a reduced work capacity, and will incur additional bills, expenses, losses and economic damages and injuries.

163.    Defendant knew that Roundup® was defective and unreasonably dangerous and would cause injury to the general public and Plaintiffs who purchased, used and were exposed to it.

164.    Defendant knew that its lack of warnings or instructions would mean that the general public and Plaintiffs would purchase Roundup® believing it to be safe for them to buy, use and to be exposed.

165.    Defendant knew that the general public and Plaintiffs would rely on its marketing and misleading statements about the safety of Roundup® and make decisions to purchase, use and be exposed to carcinogens that would cause them harm.

166.    Defendant knew that scientists, doctors, the EPA, and others would rely on its marketing and misleading statements about the safety of Roundup® and make decisions that would lead to the general public, and the Plaintiffs, into purchasing, using, and being exposed to carcinogens that would cause them harm.

167.    Despite its knowledge, Defendants intentionally distributed and sold Roundup® and placed it into the stream of commerce because it considered the money it made and the reputation it protected was more important than the lives and health of the people who purchased, used, and were exposed to Roundup®.

168.    Defendant's actions were intentional and committed with actual malice.  It had actual knowledge that Roundup® was defective and would cause harm to people who purchased, used, and were exposed to it and it deliberately, knowingly, consciously, wantonly, and willfully disregarded this risk when it intentionally distributed and sold Roundup® and intentionally placed it into the stream of commerce.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs favor for compensatory damages in the amount of $10,000,000 (Ten Million Dollars) and punitive damages in the amount of $100,000,000 (One Hundred Million Dollars), together with

interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

Additionally, Plaintiffs demand a jury trial on all issues contained herein.

## COUNT III
## (STRICT PRODUCTS LIABILITY – FAILURE TO WARN)

169.    Plaintiffs repeat, reiterate and reallege paragraphs 1 through 127 and paragraphs

141 through 168, with the same force and effect as if more fully set forth herein.

170.    Defendant has engaged in the business of selling, testing, distributing, supplying,

manufacturing, marketing and/or promoting Roundup®, and through that conduct have

knowingly and intentionally placed Roundup® into the stream of commerce with full knowledge

that it reaches consumers such as Plaintiffs, who are exposed to it through ordinary and

reasonably foreseeable users.

171.    Defendant did in fact sell, distribute, supply, manufacture and/or promote

Roundup® to Plaintiffs.  Additionally, Defendant expected the Roundup® that it was selling,

distributing, supplying, manufacturing and/or promoting to reach – and Roundup® did in fact

reach – consumers, including Plaintiffs, without any substantial change in the condition of the

product from when it was initially distributed by Defendant.

172.    At all times of manufacture, Defendant could have provided the warnings or

instructions regarding the full and complete risks of Roundup® and glyphosate-containing

products because it knew or should have known of the unreasonable risks of harm associated

with the use of and/or exposure to such products.

173.    At all times herein mentioned, the aforesaid product was defective and unsafe in

manufacture such that it was unreasonably dangerous to the user, and was o at the time it was

distributed by Defendant and at the time Plaintiff was exposed to and/or ingested the product.

The defective condition of Roundup® was due in part to the fact that it was not accompanied by

34

proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing non-Hodgkin's lymphoma as a result of exposure and use.

174.    Roundup® did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect the health of those exposed in violation of 7 U.S.C. § 136j(a)(1)(E) and Maryland law.

175.    Defendant's failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. § 136j(a)(1)(E), as well as the laws of the State of Maryland.

176.    Defendant could have amended the label of Roundup® to provide additional warnings.

177.    This defect caused serious injury to Plaintiff, who used roundup® in its intended and foreseeable manner.

178.    At all times herein mentioned, Defendant had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain, supply, provide proper warnings and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

179.    Defendant labeled, distributed, and promoted the aforesaid product that it was dangerous and unsafe for the use and purpose for which it was intended.

180.    Defendant failed to warn of the nature and scope of the side effects associated with roundup®, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of NHL.

181.    Defendant was aware of the probable consequences of the aforesaid conduct. Despite the fact that Defendant knew or should have known that roundup® caused serious

injuries, Defendant failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of developing NHL from Roundup® exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution. Defendant willfully and deliberately failed to avoid the consequences associated with its failure to warn, and in doing so Defendant acted with a conscious disregard for the safety of Plaintiffs.

182.    At the time of exposure, Plaintiffs could not have reasonably discovered any defect in Roundup® prior through the exercise of reasonable care.

183.    Defendant, as the manufacturer and/or distributor of the subject product, is held to the level of knowledge of an expert in the field.

184.    Plaintiffs reasonably relied upon the skill, superior knowledge and judgment of Defendant.

185.    Had Defendant properly disclosed the risks associated with Roundup® products, Plaintiff would have avoided the risk of NHL by not using Roundup® products.

186.    The information that Defendant did provide or communicate failed to contain adequate warnings and precautions that would have enabled Plaintiffs and similarly situated individuals to utilize the product safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false and misleading and which failed to communicate accurately or adequately the comparative severity, duration and extent of the risk of injuries associated with the use of and/or exposure to Roundup® and glyphosate; continued to promote the efficacy of Roundup®, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed or otherwise suppressed through aggressive marketing and promotion any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

187.    To this day, Defendant has failed to adequately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup®.

188.    As a result of its inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of defendant, were distributed by Defendant, and used by Plaintiff.

189.    As a proximate cause of Defendant's actions and omissions, Plaintiff developed NHL and was otherwise injured and he suffered and will likely suffer from the remainder of his life from physical, mental anguish, emotional distress, scarring, disfigurement, permanent disabilities and impairments, loss of enjoyment of life, difficult and frustrating medical treatment, fear for himself and his family, and other noneconomic damages and injuries.  As a result, he has also suffered and will likely suffer from the for the remainder of his life from unnecessary and expensive medical treatment, will lose time from work, will suffer a reduced work capacity, and will incur additional bills, expenses, losses and economic damages and injuries.

190.    Defendant knew that Roundup® lacked these warnings and instructions making it defective and unreasonably dangerous.

191.    Defendant knew that the lack of warnings or instructions would mean that the general public and Plaintiffs would purchase Roundup® believing it to be safe for them to buy, use and to be exposed.

192.    Defendant knew that the general public and Plaintiffs would rely on its lack of warnings and instructions and purchase, use, and be exposed to Roundup®.

193.    Defendant knew that the lack of warnings and instructions would cause scientists, doctors, the EPA, and others to believe that Roundup® was safe and to not make the general public and Plaintiffs aware that it would cause them harm.

194.    Despite its knowledge, Defendants intentionally distributed and sold Roundup® and placed it into the stream of commerce because it considered the money it made and the reputation it protected was more important than the lives and health of the people who purchased, used, and were exposed to Roundup®.

195.    Defendant's actions were intentional and committed with actual malice.  It had actual knowledge that Roundup® was defective and would cause harm to people who purchased, used, and were exposed to it and it deliberately, knowingly, consciously, wantonly, and willfully disregarded this risk when it intentionally distributed and sold Roundup® and intentionally placed it into the stream of commerce.

WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in Plaintiffs favor for compensatory damages in the amount of $10,000,000 (Ten Million Dollars) and punitive damages in the amount of $100,000,000 (One Hundred Million Dollars), together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury trial on all issues contained herein.

## COUNT IV
### (VIOLATION OF CONSUMER PROTECTION LAWS –
### Md. Code Ann., Comm. Law §§ 13-101 *et seq.*)

196.    Plaintiffs repeat, reiterate and reallege each and every allegation of this Complaint contained paragraphs 1 through 127 and paragraphs 141 through 195 with the same force and effect as if more fully set forth herein.

38

197.    Defendant is liable to the Plaintiffs pursuant to Maryland's Consumer Protection Act, specifically, Md. Code Ann., Com. Law §§ 13-101 *et seq.* Defendant is and, at all relevant times was, in the business of manufacturing and marketing Roundup®. Defendant and/or its agents designed, formulated, manufactured, assembled, prepared for sale, distributed, marketed and/or sold Roundup®, which was in a defective condition unreasonably dangerous when used as intended in the usual and customary manner.

198.    Privity existed between Plaintiffs and Defendant.

199.    Defendant violated Md. Code Ann., Comm. Law §§ 13-101 et seq. by the use of false and misleading misrepresentations and/or omissions of material fact in connection with the marketing, promotion and sale of Roundup®. Defendant communicated the purported benefits of Roundup® while failing to disclose the serious and dangerous injuries related to the use of Roundup® with the intent that consumers, like Plaintiffs, would rely upon the misrepresentations and purchase Roundup® believing it to be safe for use in the usual and customary manner.

200.    Plaintiff, while using the product in the usual and customary manner as it was intended to be used, suffered injuries as a proximate result of Defendant placing the product on the market, which was unreasonably dangerous and defective at the time it was placed on the market by Defendant.

201.    As a direct and proximate result of the Defendant's violations of Md. Code Ann., Comm. Law §§ 13-101 et seq., Plaintiff developed NHL and was otherwise injured and he suffered and will likely suffer from the remainder of his life from physical, mental anguish, emotional distress, scarring, disfigurement, permanent disabilities and impairments, loss of enjoyment of life, difficult and frustrating medical treatment, fear for himself and his family, and other noneconomic damages and injuries. As a result, he has also suffered and will likely suffer

from the for the remainder of his life from unnecessary and expensive medical treatment, will lose time from work, will suffer a reduced work capacity, and will incur additional bills, expenses, losses and economic damages and injuries.

202.    Defendant knew that it marketed and sold Roundup® based on false information which would result in the general public and Plaintiffs purchasing Roundup® believing it to be safe for them to buy, use, and to be exposed when it was not.

203.    Defendant knew that the general public and Plaintiffs would rely on Defendant's false information and statements to purchase, use and be exposed to Roundup®.

204.    Defendant knew that the false information and statements would cause scientists, doctors, the EPA, and others to believe that Roundup® was safe and to not make the general public and Plaintiffs aware that it would cause them harm.

205.    Despite its knowledge, Defendants intentionally distributed and sold Roundup® and placed it into the stream of commerce because it considered the money it made and the reputation it protected was more important than the lives and health of the people who purchased, used, and were exposed to Roundup®.

206.    Defendant's actions were intentional and committed with actual malice. It had actual knowledge that Roundup® was defective and would cause harm to people who purchased, used, and were exposed to it and it deliberately, knowingly, consciously, wantonly, and willfully disregarded this risk when it intentionally distributed and sold Roundup® and intentionally placed it into the stream of commerce.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory damages in the amount of $10,000,000 (Ten Million Dollars) and punitive damages in the amount of $100,000,000 (One Hundred Million Dollars), together with

interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

Additionally, Plaintiffs demand a jury trial on all issues contained herein.

## COUNT V
### (Fraudulent Misrepresentation and Concealment)

207.    Plaintiffs repeat, reiterate and re-allege each and every allegation of this

Complaint contained paragraphs 1 through 127 and 141 through 206 inclusive, with the same

force and effect as if more fully set forth herein.

208.    Defendant has defrauded the agricultural community in general and Plaintiffs in

particular by misrepresenting the true safety of its Roundup® and by failing to disclose known

risks of cancer.

209.    Defendant misrepresented, failed to disclose, and intentionally chose not to

disclose, inter alia, that: glyphosate and its major metabolite aminomethylphosphonic acid

(AMPA) could cause cancer; glyphosate and AMPA are known to be genotoxic in humans and

laboratory animals because exposure is known to cause DNA strand breaks (a precursor to

cancer); glyphosate and AMPA are known to induce oxidative stress in humans and laboratory

animals (a precursor to cancer); glyphosate and AMPA interfere with the aromatic amino acids

within the human gut, leading to downstream health conditions including cancer; exposure to

glyphosate and AMPA is causally associated with non-Hodgkin's lymphoma; and the laboratory

tests attesting to the safety of glyphosate were flawed and/or fraudulent.

210.    Due to these misrepresentations and omissions, at all times relevant to this

litigation, Defendant's Roundup® was misbranded under 7 U.S.C. § 136(g) and Maryland law

and its distribution within Maryland and around the United States was a violation of 7 U.S.C. §

136j and 50 C.F.R. 56.10(a)(5).

211.    Plaintiffs relied on the Defendant's misrepresentations and/or material omissions

regarding the safety of Roundup® and its active ingredient glyphosate in deciding whether to

purchase and/or use the product. Plaintiffs did not know, nor could they reasonably have known

of the misrepresentations and/or material omissions by Defendant concerning roundup® and its

active ingredient glyphosate.

212.    The misrepresentations and/or material omissions that form the basis of this fraud

claim are not limited to statements made on the Roundup® labeling, as defined under federal

law, but also involve Defendant's representations and omissions made as part of its promotion

and marketing of roundup®, including on the Internet, television, in print advertisements, etc.

Nothing preventing Defendant Monsanto from disclosing the truth about the risks associated

with Roundup® in its promotional efforts outside of the labeling context, using the forms of

media and promotion Defendant Monsanto traditionally used to promote the product's efficacy

and benefits.

213.    When Defendant made the misrepresentations and/or omissions as alleged in this

pleading, it did so with the intent of defrauding and deceiving the public in general and the

agricultural community and with the intent of inducing the public and agricultural community to

purchase and use Roundup®.

214.    Defendant Monsanto made these misrepresentations and/or material omissions

with malicious, fraudulent and/or oppressive intent toward Plaintiffs and the public generally.

Defendant's conduct was willful, wanton, and/or reckless.  Defendant deliberately

recommended, manufactured, produced, marketed, sold, distributed, merchandized, packaged,

promoted and advertised the dangerous and defective herbicide Roundup®.  This constitutes an

utter, wanton and conscious disregard of the right and safety of a large segment of the public,

and by reason thereof, Defendant is liable for reckless, willful and wanton acts and omissions which evidence a total and conscious disregard for the safety of Plaintiffs and others which proximately caused the injuries as set forth herein.

215.    As a proximate result of Defendant's fraudulent and deceitful conduct and representations, Plaintiff developed NHL and was otherwise injured and he suffered and will likely suffer from the remainder of his life from physical, mental anguish, emotional distress, scarring, disfigurement, permanent disabilities and impairments, loss of enjoyment of life, difficult and frustrating medical treatment, fear for himself and his family, and other noneconomic damages and injuries.  As a result, he has also suffered and will likely suffer from the for the remainder of his life from unnecessary and expensive medical treatment, will lose time from work, will suffer a reduced work capacity, and will incur additional bills, expenses, losses and economic damages and injuries.

216.    Defendant knew that its fraudulent statements, concealment, and conduct would cause the general public and Plaintiffs to purchase Roundup® believing it to be safe for them to buy, use, and to be exposed to its harmful properties.

217.    Defendant knew that the general public and Plaintiffs would rely on Defendant's fraudulent statements, concealment, and conduct to purchase, use and be exposed to Roundup®.

218.    Defendant knew that fraudulent statements, concealment and conduct would cause scientists, doctors, the EPA, and others to believe that Roundup® was safe and to not make the general public and Plaintiffs aware that it would cause them harm.

219.    Despite its knowledge, Defendants intentionally distributed and sold Roundup® and placed it into the stream of commerce because it considered the money it made and the

reputation it protected was more important than the lives and health of the people who purchased, used, and were exposed to Roundup®.

220.     Defendant's actions were intentional and committed with actual malice. It had actual knowledge that Roundup® was defective and would cause harm to people who purchased, used, and were exposed to it and it deliberately, knowingly, consciously, wantonly, and willfully disregarded this risk when it intentionally distributed and sold Roundup® and intentionally placed it into the stream of commerce.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory damages in the amount of $10,000,000 (Ten Million Dollars) and punitive damages in the amount of $100,000,000 (One Hundred Million Dollars), together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury trial on all issues contained herein.

## COUNT VI
## (LOSS OF CONSORTIUM

221.     Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in all preceding paragraphs with the same force and effect as if more fully set forth herein.

222.     The Plaintiffs are husband and wife.

223.     As a direct and proximate result of the Defendant's conduct, the Plaintiffs marital relationship has been damaged in that they have been caused to suffer severe mental anguish and emotional pain, and have lost and been deprived of the advice, aid, assistance, attention, care, comfort, companionship, counsel, services, society, and support of each other.

WHEREFORE, the Plaintiffs respectfully requests that this Court enter judgment in Plaintiffs' favor for compensatory damages in the amount of $10,000,000 (Ten Million Dollars) and punitive damages in the amount of $100,000,000 (One Hundred Million Dollars), together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.  Additionally, the Plaintiffs demand a jury trial on all issues contained herein.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all counts alleged and all issues raised in this Complaint.

_____
E. Dale Adkins, III  (Bar ID No. 01425)
adkins@bmalawfirm.com

Gregory G. Hopper (Bar ID No. 26150)
hopper@bmalawfirm.com

Ryan S. Perlin  (Bar ID No. 28040)
perlin@bmalawfirm.com

Aaron L. Moore  (Bar ID No. 29476)
moore@bmalawfirm.com

BEKMAN, MARDER & ADKINS, L.L.C.
300 West Pratt Street, Suite 450
Baltimore, Maryland 21201
410-539-6633
410-625-9554  (Fax)

*Attorneys for Plaintiffs*

Dated: JAN. 10, 2020