# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:19–cv–12359–LTS

Nicolacopoulos v. Monsanto Company
Assigned to: District Judge Leo T. Sorokin
Cause: 28:1332 Diversity–Personal Injury

Date Filed: 11/15/2019
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Nicoletta Nicolacopoulos**

represented by **David C. Strouss**
Thornton Law Firm LLP
One Lincoln Street, 25th Flr.
100 Summer Street
Boston, MA 02111
617–720–1333
Fax: 617–720–2445
Email: dstrouss@tenlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jasmine M. Howard**
Thornton Law Firm
One Lincoln Street
Boston, MA 02111
617–720–1333
Email: jhoward@tenlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 11/15/2019 | 1 | COMPLAINT against All Defendants Filing fee: $ 400, receipt number 0101–7973761 (Fee Status: Filing Fee paid), filed by Nicoletta Nicolacopoulos. (Attachments: # 1 Civil Cover Sheet, # 2 Category Sheet)(Howard, Jasmine) (Entered: 11/15/2019) |
| 11/18/2019 | 2 | ELECTRONIC NOTICE of Case Assignment. District Judge Leo T. Sorokin assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Donald L. Cabell. (Finn, Mary) (Entered: 11/18/2019) |
| 11/18/2019 | 3 | Summons Issued as to All Defendants. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (Warnock, Douglas) (Entered: 11/18/2019) |
| 11/18/2019 | 4 | Set Deadlines: Service to be completed by 2/18/2020. (Montes, Mariliz) (Entered: 11/18/2019) |
| 01/21/2020 | 5 | AMENDED COMPLAINT *First* against All Defendants, filed by Nicoletta Nicolacopoulos. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Strouss, David) (Entered: 01/21/2020) |
| 01/23/2020 | 6 | SUMMONS Returned Executed Monsanto Company served on 1/22/2020, answer due 2/12/2020. (Strouss, David) (Entered: 01/23/2020) |

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NICOLETTA NICOLACOPOULOS )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>MONSANTO COMPANY, )<br>)<br>Defendant. ) | Case No.: 19-12359<br><br>**JURY TRIAL DEMANDED** |

**FIRST AMENDED COMPLAINT**

The Plaintiff, Nicoletta Nicolacopoulos, bring this First Amended Complaint for damages against Defendant, Monsanto Company ("Monsanto"), and allege as follows:

**NATURE OF THE CASE**

1.      This case arises out of Monsanto's wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and sale of the herbicide Roundup, containing the active ingredient glyphosate.  Glyphosate has been found to be carcinogenic, linked to causing various forms of cancer, and in particular, non-Hodgkin's Lymphoma.  As such, Roundup is dangerous to human health and unfit to be marketed and sold in commerce, particularly without proper warnings and directions as to the dangers associated with its use.  Plaintiff Nicoletta Nicolacopoulos, who used Roundup extensively, was diagnosed with follicular lymphoma, a type of non-Hodgkin's lymphoma, and she bring this action for the injuries and losses she has incurred.

**JURISDICTION AND VENUE**

2.      This court has personal jurisdiction over Monsanto under 28 U.S.C. § 1391(c) because Monsanto transacts business in the Commonwealth of Massachusetts and is a corporation doing business within the Commonwealth of Massachusetts.  Monsanto knows that

1

its Roundup products are and were sold throughout Massachusetts, and, more specifically, caused Roundup to be sold to the Plaintiffs in Massachusetts. In addition, Monsanto maintains sufficient contacts with the Commonwealth of Massachusetts such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

3.      Monsanto advertises and sells goods, specifically Roundup, throughout Massachusetts. It derived substantial revenue from goods and products used in Massachusetts. It expected its acts to have consequences within Massachusetts and derived substantial revenue from interstate commerce. Specific to this case, Monsanto engaged in the business of developing, manufacturing, testing, packaging, marketing, distributing, labeling, and selling Roundup. Monsanto purposefully availed itself of the privilege of conducting activities within Massachusetts, thus invoking the benefits and protections of its laws.

4.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the Plaintiffs and the Defendant. Monsanto is a citizen of Delaware (where it is incorporated) and Missouri (where it has its principal place of business). The Plaintiff is a citizen of the Commonwealth of Massachusetts, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.      Venue is proper in this District under 28 U.S.C. §1391(b0(2) because the Plaintiff was exposed to Roundup in this District.

6.      The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

**PARTIES**

7.      The Plaintiff, Nicoletta Nicolacopoulos, are natural persons and at all relevant times were residents and citizens of Essex County, Massachusetts. The Plaintiff brings this

2

action for personal injuries sustained from exposure to Roundup, and its active ingredient glyphosate and the surfactant POEA. As a direct and proximate result of being exposed to Roundup, the Plaintiff, Nicoletta Nicolacopoulos, developed Follicular Lymphoma, as well as other health problems as a result of developing NHL.

8.      Monsanto is a Delaware corporation, and it is listed as Massachusetts Secretary of State Business ID No. 356754, in "active" status, with a principle place of business in St. Louis, Missouri.

## **FACTUAL ALLEGATIONS**

9.      At all relevant times, Monsanto designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the commercial herbicide Roundup.

10.     "Roundup" refers to all formulations of Monsanto's Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak Herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Week Killer, Roundup Herbicide, Roundup Original 2k Herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promas, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass Killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup

Weed & Grass Killer 1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation containing the active ingredient glyphosate.

11.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate.

12.     Monsanto discovered the herbicidal properties of glyphosate during the 1970's and developed it as a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

13.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phospate synthase, known as EPSP synthase.

14.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3 phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

15.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots; and detectable quantities accumulate in the plant tissues.

16.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has been driven largely by the proliferation of "Roundup Ready" crops, which have been genetically engineered to resist the activity of glyphosate.

17.     Monsanto is responsible for the development, manufacture, marketing, sale, and distribution of Roundup Ready seeds. By 2009, Monsanto was the world's leading producer of Roundup ready seeds. In 2010, roughly 70% of corn and cotton and 90% of soybean fields in the United States were grown with Roundup Ready seeds.

18.     Roundup was introduced in 1974 and is today one of the world's most widely-used herbicides.  Monsanto's glyphosate products are registered in more than 130 countries and are approved for weed control in more than 100 crops.  No other herbicide active ingredient compares in terms of number of uses.[1]

19.     In all this time, farmers have used Roundup unaware it is a carcinogen.

## REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

20.     The manufacture, formulation, and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq.*  FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. § 136a(a).

21.     The EPA requires a variety of tests as part of the registration process to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.  Registration by the EPA, however, is not an assurance or finding of safety.  The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment."  7 U.S.C. § 136(a)(c)(5)(D).

22.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide."  7 U.S.C. § 136(bb).  FIFRA thus

---

[1] *Backgrounder*, History of Monsanto's Glyphosate Herbicides, June 2005, available at www.monsanto.com/products/documents/glyphosate-background-materials/back_ground.pdf

requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

23.      The EPA and the Commonwealth of Massachusetts registered Roundup for distribution, sale, and manufacture in the United States and the Commonwealth of Massachusetts.

24.      FIFRA generally requires that the registrant, here Monsanto, conduct health and safety testing of pesticide products.  The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

25.      Each pesticide product distributed, sold, or manufactured is evaluated at the time the product is initially registered.  The data necessary for registration of a pesticide has changed over time.  The EPA is now in the process of re-evaluating all pesticides through a Congressionally-mandated process called "re-registration."  7 U.S.C. § 136a-1.  To re-evaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

## MONSANTO'S FALSE REPRESENTATIONS REGARDING THE SAFETY OF ROUNDUP

26.      In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products.  Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish.  Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

a.      Remember that environmentally friendly Roundup herbicide is biodegradable.  It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences.

b.    And remember that Roundup is biodegradable and won't build up in the soil.  That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c.    Roundup biodegrades into naturally occurring elements.

d.    Remember that versatile Roundup herbicide stays where you put it.  That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e.    This non-residual herbicide will not wash or leach in the soil.  It ... stays where you apply it.

f.    You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching.  Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g.    Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h.    Glyphosate's safety margin is much greater than required.  It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i.    You can feel good about using herbicides by Monsanto.  They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j.    "Roundup can be used where kids and pets will play and breaks down into natural material."  This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[2]

27.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with the NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a.    its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

---

[2] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15)(Nov. 1996).

b.  its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;

c.  its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

d.  its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics;"

e.  glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and

f.  its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

28.   Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

29.   In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup and affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[3]

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP

30.   As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties.

31.   On March 4, 1985, a group of the EPA's Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[4]  Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

---

[3] *Monsanto Guilty in 'False Ad' Row,* BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.
[4] Consensus Review of Glyphosate, Casewell No. 661A.  March 4, 1985.  United States Environmental Protection Agency.

8

32.     In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-

103214).  The Registration standard required additional phytotoxicity, environmental fate,

toxicology, product chemistry, and residue chemistry studies.  All of the data required was

submitted and reviewed and/or waived.[5]

33.     In October 1991, the EPA published a Memorandum entitled "Second Peer

Review of Glyphosate."  The memorandum changed glyphosate's classification to Group E

(evidence of non-carcinogenicity for humans).  Two peer review committee members did not

concur with the conclusions of the committee and one member refused to sign.[6]

34.     In addition to the toxicity of the active molecule, many studies support the

hypothesis that glyphosate formulations found in Monsanto's Roundup products are more

dangerous and toxic than glyphosate alone.[7]  As early as 1991, evidence existed demonstrating

that glyphosate formulations were significantly more toxic than glyphosate alone.

35.     In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell

Division Dysfunction at the Level of CDK1/Cyclin B Activation."[8]  The study found that

Monsanto's Roundup caused delays in the cell cycles of sea urchins, while the same

concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

---

[5] http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheets/0178fact.pdf.
[6] U.S. EPA, *Memorandum, Subject:  SECOND Peer Review of Glyphosate* 1 (1191), *available at*
http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_30-Oct-91_265.pdf
[7] See Martinez, et al. *Oral and pulmonary toxicology of the surfactant used in Roundup herbicide*, PROC. WEST.
PHARMACOL. SOC. 34:43-46 (1991); Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and
Necrosis in Human Umbilical, Embryotic, and Placental Cells*, 22 CHEM. RES. TOXICOL. 97-105 (2009),
*available at http://blg.assets.huffington.com/france.pdf; Gasnier et al. 2010, Francisco Peixoto, Comparative effects
of the Roundup and glyphosate on mitochondrial oxidative phosphorylation*, 61 CHEMOSPHERE 1115, 1122
(2005), *available at*
https://www.researchgate.net/publication/7504567_Comparative_effects_of_the_Roundup_and_glyphosate_on_mit
ochondrial_oxidative_phosphorylation; March 2004.
[8] Julie Marc, et al., *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B
Activation*, 15 CHEM. RES. TOXICOL. 326-331 (2002), *available at*
http://pubs.acs.org/doi/full/10.1021/tx015543g.

36.    In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.[9]

37.    The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[10]

38.    In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

39.    The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

40.    In 2009, Nora Benachour and Gilles-Eric Seralini published a study of the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

41.    The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate

---

[9] Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation*, 96 BILIOGY OF THE CELLS 245, 245-249 (2004), *available at* http://onlinelibrary.wiley.com/doi/10.1016/j.biolcel.2003.11.010/epdf.
[10] Molinari, 2000; Stewart et al., 2003.

toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

42. The results of these studies were confirmed in peer-reviewed studies that were known to Monsanto.

43. Monsanto knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect the Plaintiff from Roundup.

44. Monsanto knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

45. Monsanto failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect the Plaintiff from Roundup.

46. Rather than performing appropriate tests, Monsanto relied on flawed industry-supported studies designed to protect Monsanto's economic interests rather than the Plaintiff and the consuming public.

47. Despite its knowledge that Roundup was considerably more dangerous than glyphosate alone, Monsanto continued to promote Roundup as safe.

## IARC CLASSIFICATION OF GLYPHOSATE

48. The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental agency that the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

49.     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015-2019 met in April 2014.  Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs:  there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

50.     IARC set glyphosate for review in 2015-2016.  IARC uses five criteria for determining priority in reviewing chemicals.  The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; and related agents similar to one given high priority by the above considerations.  Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

51.     On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Monsanto's possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Monsanto's Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

52.     The IARC's full Monograph was published on July 29, 2015, and established glyphosate as a class 2A probable carcinogen to humans.  According to the authors, glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

53.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's Lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

54.     The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

## EARLIER EVIDENCE OF THE DANGERS OF GLYPHOSATE

55.     Despite the new classification by the IARC, Monsanto has had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

56.     Genotoxicity refers to chemical agents capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

57.     In 1997, Chris Clements published "Genotoxicity of select herbicides in Rana catesbeiana tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

58.     The study found that tadpoles exposed to roundup showed significant DNA damage when compared with unexposed control animals.

59.     Both human and animal studies have shown that glyphosate and glyphosate-base formulations such as Roundup can induce oxidative stress.

60.     Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

61.     The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

62.     In 2006, César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

13

63. The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

64. The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

65. Despite knowledge to the contrary, Monsanto denies that Roundup is genotoxic.

66. In addition to glyphosate and Roundup's genotoxic properties, Monsanto has long been aware of glyphosate's carcinogenic properties.

67. Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, NHL, Hodgkin's Lymphoma, Multiple Myeloma, and soft tissue sarcoma.

68. Monsanto has known of this association since the mid-1980's and numerous human and animal studies evidence the carcinogenicity of glyphosate and/or Roundup.

69. In 1985, the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

70. In 2003, Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

71. The study concluded that glyphosate had the most significant relationship to NHL among all herbicide studies with an increased odds ratio of 3.11.

14

72.    In 2003, AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

73.    The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

74.    In 2008, Mikael Eriksson published a population based case-control study of exposure to various pesticides as a risk factor for NHL.

75.    This strengthened previous associations between glyphosate and NHL.

76.    In spite of this knowledge, Monsanto continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

77.    On information and belief, these statements and representations have been made with the intent of inducing Plaintiff, the agricultural community, and the public at large to purchase, and increase the use of, Roundup for Monsanto's pecuniary gain, and in fact did induce the Plaintiff to use Roundup.

78.    Monsanto made these statements with complete disregard and reckless indifference to the safety of the Plaintiff and the general public.

79.    Notwithstanding Monsanto's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

80.    Monsanto knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

15

81.     Monsanto failed to appropriately and adequately inform and warn the Plaintiff of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring, and/or medications.

82.   .   Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Monsanto continues to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

83.     Monsanto has claimed and continues to claim that Roundup is safe, non-carcinogenic, and non-genotoxic.

84.     Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."[11]

85.     Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

---

[11] *Backgrounder* – Glyphosate:  No Evidence of Carcinogenicity, updated November 2014, available at www.monsanto.com/glyphosate/documents/no-evidence-of-carcinogenicity.pdf

86. Glyphosate, and Monsanto's Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

87. Monsanto's statements proclaiming the safety of Roundup and disregarding its dangers misled the Plaintiff.

88. Despite Monsanto's knowledge that Roundup was associated with an elevated risk of developing cancer, Monsanto's promotional campaigns focused on Roundup's purported "safety profile."

89. Monsanto's failure to adequately warn the Plaintiff, resulted in (1) the Plaintiff, Nicoletta Nicolacopoulos, using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

90. Monsanto failed to seek modification of the labeling of roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

91. Monsanto's failure to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

92. Monsanto's failure to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

93. Monsanto's failure to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

17

94.     By reason of the foregoing acts and omissions, the Plaintiffs seek compensatory damages as a result of the Plaintiff's use of, and exposure to, Roundup, which caused or was a substantial contributing factor in causing the Plaintiff to suffer from cancer, specifically NHL, and the Plaintiffs suffered severe and personal injuries that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

95.     By reason of the foregoing, the Plaintiff is severely and permanently injured.

96.     By reason of the foregoing acts and omissions, the Plaintiffs have endured and continues to suffer, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of Monsanto's actions and inactions.

## PLAINTIFF'S EXPOSURE TO ROUNDUP

97.     The Plaintiff, Nicoletta Nicolacopoulos, is Massachusetts resident who began using Roundup residentially in the 1980's.

98.     The Plaintiff used Roundup continuously for at least 30 years.

99.     The Plaintiff, Nicoletta Nicolacopoulos, followed all safety and precautionary warnings during the course of his use of Roundup.

100.    The Plaintiff recalls using Roundup products, including but not limited to, the Roundup Grass and Weed Killer and/or Roundup Concentrate, multiple times per month during the spring and fall. The Plaintiff recalls getting the Roundup on her hands and skins during the mixing and application process.

101.    The Plaintiff, Nicoletta Nicolacopoulos, was first diagnosed diffuse large B-cell lymphoma, a non-Hodgkin's lymphoma in October 2006.

102.    In May of 2018 her cancer returned and she was diagnosed with follicular lymphoma, a type of non-Hodgkin's lymphoma. The development of Plaintiff's NHL, and

18

subsequent health problems, was proximately and actually caused by exposure to Monsanto's Roundup products.

103.    The Plaintiff has incurred significant economic and non-economic damages resulting from her injuries.

104.    During the period of Plaintiff's exposure to Roundup, she did not know that exposure to Roundup was injurious to her health or the health of others.

## TOLLING OF APPLICABLE STATUTE OF LIMITATIONS
## DISCOVERY RULE TOLLING

105.    The Plaintiff had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup and glyphosate until 2019. This is the quintessential case for tolling.

106.    Within the time period of any applicable statutes of limitations, the Plaintiff could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup and glyphosate is injurious to human health.

107.    The Plaintiff did not discover, and did not know the facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup and glyphosate; nor would a reasonable and diligent investigation by them have disclosed that Roundup and glyphosate would cause their cancers.

108.    For these reasons, all applicable statute of limitations have been tolled by operation of the discovery rule with respect to the Plaintiff's claims

## FRAUDULENT CONCEALMENT TOLLING

109.    All applicable statutes of limitations have also been tolled by Monsanto's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

19

110.    Instead of disclosing critical safety information about Roundup and glyphosate, Monsanto has consistently and falsely represented the safety of its Roundup products.

## ESTOPPEL

111.    Monsanto was under a continuous duty to disclose to consumers, users, and other persons coming into contact with its products, including the Plaintiff, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup and glyphosate.

112.    Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup and glyphosate and the serious risks associated with the use of and/or exposure to its products.

113.    Based on the foregoing, Monsanto is estopped from relying on any statutes of limitations in defense of this action.

## COUNT I – NEGLIGENCE

114.    The Plaintiffs re-alleges each paragraph above as if fully set forth herein.

115.    Defendant is in the business of designing, manufacturing, selling, marketing, packaging, selling, and/or distributing products used in the agricultural industry. The products used by the Plaintiff and to which the Plaintiff was exposed to were designed, produced, manufactured, marketed, sold and/or otherwise put into the stream of commerce by the Defendant, and were used for their intended purpose.

116.    Defendant Monsanto had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

117.    Monsanto failed to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup into interstate commerce in that Monsanto knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of NHL, as well as other severe and personal injuries that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

118.    The negligence by Defendant, its agents, servants, and/or employees, included but was not limited to the following act and/or omissions:

   a.    Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly testing it;

   b.    Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup;

   c.    Not conducting sufficient testing programs to determine whether or not Roundup was safe for use; in that Monsanto knew or should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users;

   d.    Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Monsanto had knowledge that Roundup is, was, or could be carcinogenic;

   e.    Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

   f.    Negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

   g.    Negligently failing to petition the EPA to strengthen the warnings associated with Roundup;

21

h. Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with roundup;

i. Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

j. Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

k. Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

l. Negligently designing Roundup in a manner that was dangerous to its users;

m. Negligently manufacturing Roundup in a manner that was dangerous to its users;

n. Negligently producing Roundup in a manner that was dangerous to its users;

o. Negligently formulating Roundup in a manner that was dangerous to its users;

p. Concealing information from the Plaintiffs while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations;

q. Improperly concealing and/or misrepresenting information from the Plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides; and

r. Negligently selling Roundup with a false and misleading label.

119. Monsanto under-reported, underestimated, and downplayed the serious dangers of Roundup.

120. Monsanto negligently and deceptively compared the safety risks and/or dangers of roundup with common everyday foods such as table salt, and other forms of herbicides.

121.   Monsanto was negligent and/or violated Massachusetts law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that it:

a.   Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide;

b.   Failed to accompany its product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

c.   Failed to accompany its product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

d.   Failed to accompany its product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;

e.   Failed to warn the Plaintiff of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of NHL;

f.   Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup;

g.   Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants;

h.   Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity; and

i.   Was otherwise careless and/or negligent.

122.   Despite the fact that Monsanto knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Defendant continues to market, manufacture, distribute, and/or sell Roundup to consumers, including the Plaintiff.

123.    Defendant knew or should have known that consumers such as the Plaintiff would foreseeably suffer injury as a result of Monsanto's failure to exercise ordinary care.

124.    Defendant's violations of law and/or negligence were the proximate cause of the Plaintiff's injuries, harm and economic loss, which the Plaintiff suffered and will continue to suffer.

125.    As a result of the foregoing acts and omissions, the Plaintiff suffered life-threatening NHL, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as financial expenses for hospitalization and medical care.

WHEREFORE, the Plaintiff, Nicoletta Nicolacopoulos, respectfully requests that this Court enter judgment in the Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## COUNT II – BREACH OF EXPRESS AND IMPLIED WARRANTIES

126.    The Plaintiff re-alleges each paragraph above as if fully stated herein.

127.    At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup products, which are defective and unreasonably dangerous to consumers, including the Plaintiff, thereby placing Roundup products into the stream of commerce.  These actions were under Defendant's ultimate control and supervision.

128.    At all times relevant to this litigation, Monsanto were engaged in the business of marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, including the Plaintiff, thereby placing Roundup products into the stream of commerce.

24

129.    Plaintiff, Nicoletta Nicolacopoulos, was a person whom Monsanto could reasonably have expected to use, consume or be affected by Defendant's products within the meaning of Massachusetts General Laws c. 106, §2-318.

130.    At all relevant times, Monsanto expressly and impliedly represented and warranted to the purchasers of its Roundup products, by and through statements made in labels, publications, package inserts, and other written materials intended for consumers and the general public, that its Roundup products were safe to human health and the environment, effective, fit, safe, and proper for their ordinary and particular purpose for which they were manufactured, sold, supplied or distributed. Defendant advertised, labeled, marketed, and promoted Roundup products, representing the quality to consumers and the public so as to induce their purchase or use, thereby making an express and implied warranty that Roundup products would conform to the representations.

131.    These express and implied representations include incomplete warnings and instructions that purport, but fail, to include the complete array or risks associated with use of and/or exposure to Roundup and glyphosate. Monsanto knew and/or should have known that the risks expressly included in Roundup warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendant expressly and impliedly represented that its Roundup products were safe and effective, including for use as agricultural herbicides.

132.    The representations about Roundup, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express and implied warranty that the goods would conform to the representations.

25

133. Monsanto placed Roundup products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup and its active ingredient glyphosate.

134. Defendant breached these warranties because, among other things, its Roundup products were defective, dangerous, unfit for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically, Defendant breached the warranties in the following ways;

      a.    Monsanto represented through its labeling, advertising, and marketing materials that its Roundup products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated with the use of and/or exposure to Roundup and glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings and labels; and

      b.    Monsanto represented that its Roundup products were safe for use and fraudulently concealed information demonstrating that glyphosate, the active ingredient in Roundup, had carcinogenic properties, and that its Roundup products, therefore, were not safer than alternatives available on the market.

135. The Plaintiff was exposed to the labels on the Roundup products that she mixed and applied.

136. Monsanto had sole access to material facts concerning the nature of the risks associated with its Roundup products as expressly stated within its warnings and labels, and knew that consumers and users such as the Plaintiff could not have reasonably discovered that the risks expressly included in Roundup warnings and labels were inadequate and inaccurate.

137. The Plaintiff had no knowledge of the falsity or incompleteness of Defendant's statements and representations concerning Roundup.

138.    The Plaintiff used and/or were exposed to the use of Roundup as researched, developed, designed, tested, formulated, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by Defendant.

139.    Had the warnings and labels for Roundup products accurately and adequately set forth the true risks associated with the use of such products, including the Plaintiff's injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, the Plaintiff could have avoided the injuries complained of herein.

140.    As a direct and proximate result of Defendant Monsanto's wrongful acts and omissions, the Plaintiffs have suffered severe injuries.  The Plaintiff has endured pain and suffering, has suffered economic losses (including significant expenses for medical care and treatment), and will continue to incur these expenses in the future.

WHEREFORE, the Plaintiff Nicoletta Nicolacopoulos, respectfully requests that this Court enter judgment in the Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

## COUNT III - VIOLATION OF M.G.L. ch. 93A, §9

141.    Plaintiffs incorporate by reference, as if fully set forth herein each and every allegation as set forth in the preceding paragraphs and further allege as follows:

142.    At all times relevant to this complaint, Defendant Monsanto was engaged in trade or commerce.

143.   The acts and conduct of Monsanto alleged in this Complaint, including but not limited to, Counts I and II, constitute unfair or deceptive acts or practices within the meaning of M.G.L. ch. 93A, §§2 and 3, 940 C.M.R. 3.05(1), and 940 C.M.R. 3.16(1) and (2).

144.   The actions of Monsanto described herein were performed willfully and knowingly.

145.   As a result of the unfair or deceptive acts or practices alleged in this complaint, including but not limited to, Counts I and II, the Plaintiff, Nicoletta Nicolacopoulos, sustained injuries including, but not limited to the injuries detailed above.

146.   Prior to the filing and service of this Amended Complaint on Defendant Monsanto, on November 18, 2019, the Plaintiff, through her attorneys, sent Monsanto a written demand for relief pursuant to M.G.L. ch. 93A, §9(3), identifying the claimant and reasonably describing the unfair and deceptive acts or practices by the Defendant, and the injuries the Plaintiff suffered as a result. This written demand was sent via certified mail, return receipt requested, and Plaintiff's counsel received signed confirmation of the delivery of the demand letter. A copy of this demand letter is attached hereto as "Exhibit 1."

147.   Plaintiff has received Monsanto's reply to Plaintiff's written demand for relief, in which Monsanto declined to make a settlement offer.  Attached hereto as "Exhibit 2."

148.   The requisite 30 days, pursuant to M.G.L. ch. 93A, §9, has elapsed since service of Plaintiff's demand and Defendant has not provided a satisfactory response.

WHEREFORE, the Plaintiff, Nicoletta Nicolacopoulos, demands compensatory damages, double or treble damages, attorneys' fees, plus interest and costs.

## DEMAND FOR JURY TRIAL

The Plaintiff hereby demand trial by jury as to all issues.

DATED:  January 21, 2020

<div style="margin-left: 40%">

The Plaintiff,
By her Attorneys,


/s/ David C. Strouss
David C. Strouss, Esq. (BBO# 546253)
Evan R. Hoffman, Esq. (BBO# 678975)
Jasmine M. Howard, Esq. (BBO# 698130)
**THORNTON LAW FIRM, LLP**
One Lincoln Street
Boston, MA  02111
(617) 720-1333  FAX (617) 72-2445
dstrouss@tenlaw.com
ehoffman@tenlaw.com
jhoward@tenlaw.com

</div>