CASREF,JURY,LC2

# U.S. District Court
## Southern District of Ohio (Cincinnati)
## CIVIL DOCKET FOR CASE #: 1:19–cv–01000–DRC–KLL

Dektas et al v. Monsanto Company
Assigned to: Judge Douglas R. Cole
Referred to: Magistrate Judge Karen L. Litkovitz
Cause: 28:1332 Diversity–Personal Injury

Date Filed: 11/22/2019
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Linda L. Dektas**

represented by **Terence Richard Coates**
Markovits, Stock & DeMarco, LLC
3825 Edwards Road
Suite 650
Cincinnati, OH 45209
513/651–3700
Fax: 513/665–0219
Email: tcoates@msdlegal.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Wilbert Benjamin Markovits**
Markovits, Stock & DeMarco LLC
3825 Edwards Road
Suite 650
Cincinnati, OH 45209
513–651–3700
Fax: 513–665–0219
Email: bmarkovits@msdlegal.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin Charles Walker**
Markovits, Stock & DeMarco LLC
3825 Edwards Road
Suite 650
Cincinnati, OH 45209
5136650205
Email: jwalker@msdlegal.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Michael C. Dektas**

represented by **Terence Richard Coates**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Wilbert Benjamin Markovits**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin Charles Walker**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 11/22/2019 | 1 | COMPLAINT with JURY DEMAND against Monsanto Company ( Filing fee $ 400 paid – receipt number: 0648–7214230), filed by Linda L. Dektas, Michael C. Dektas. (Attachments: # 1 Civil Cover Sheet) (Walker, Justin) (Entered: 11/22/2019) |
| 11/22/2019 | 2 | NOTICE of Appearance by Wilbert Benjamin Markovits for Plaintiffs Linda L. Dektas, Michael C. Dektas (Markovits, Wilbert) (Entered: 11/22/2019) |
| 11/22/2019 | 3 | NOTICE of Appearance by Terence Richard Coates for Plaintiffs Linda L. Dektas, Michael C. Dektas (Coates, Terence) (Entered: 11/22/2019) |
| 11/25/2019 | | If this case is referred, it will be to Magistrate Judge Karen L. Litkovitz. (eh) (Entered: 11/25/2019) |
| 11/26/2019 | 4 | ORDER REFERRING CASE to Magistrate Judge Magistrate Judge Karen L. Litkovitz. Signed by Judge Michael R. Barrett on 11/25/19. (ba) (Entered: 11/26/2019) |
| 12/11/2019 | 5 | ORDER REASSIGNING CASE. Case reassigned to Judge Douglas R. Cole for all further proceedings. Signed by Chief Judge Algenon L. Marbley on 12/11/2019. (ss)(This document has been sent by regular mail to the party(ies) listed in the NEF that did not receive electronic notification.) (Entered: 12/11/2019) |
| 01/29/2020 | 6 | WAIVER OF SERVICE Returned Executed. Waiver sent to Monsanto Company on 11/22/2019, answer due 1/21/2020. (Walker, Justin) (Entered: 01/29/2020) |

## UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**LINDA L. DEKTAS**

**and**

**MICHAEL C. DEKTAS,**

    *Plaintiffs*,

   v.

**MONSANTO COMPANY,**
 Serve: Corporation Service Company
 50 West Broad St., Suite 1330
 Columbus, Ohio 43215

    *Defendant.*

Case No.

**Judge** _____

**Magistrate Judge**_____

**JURY TRIAL DEMANDED**

---

## COMPLAINT
---

 Now comes plaintiffs Linda L. Dektas and Michael C. Dektas ("Plaintiffs") against

defendant Monsanto Company ("Defendant" or "Monsanto"), and state as follows:

### NATURE OF THE CASE

 1. This action seeks to recover damages for the injuries of Linda Dektas as the direct

and proximate result of the wrongful conduct and negligence of the Defendant in connection with

the design, development, manufacture, testing, packaging, promoting, marketing, advertising,

distributing, labeling, and selling of the herbicide Roundup® ("Roundup®"), containing the active ingredient glyphosate.[1]

2. Linda Dektas was exposed to Roundup® containing the active ingredient glyphosate and the surfactant polyethoxylated tallow amine ("POEA") from about 1976 through 2018. As a direct and proximate result of being exposed to Roundup®, Mrs. Dektas developed a form of non-Hodgkin's Lymphoma in 2018.

3. Plaintiffs maintain that Roundup® and/or glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper warnings and directions as to the dangers associated with its use.

4. Linda Dektas's injuries, like those striking thousands of similarly situated victims across the country, were avoidable. Her spouse, Michael Dektas's injuries, like those affecting thousands of similarly situated spouses around the country, were avoidable.

## JURISDICTION AND VENUE

5. Federal diversity jurisdiction in this Court is proper under 28 U.S.C. § 1332 because Plaintiffs are citizens of Ohio, a different state than the Defendant's states of citizenship, and the aggregate amount in controversy exceeds $75,000, exclusive of interest and costs.

---

[1] "Roundup®" refers to all formulations of Defendant's Roundup® products, including, but not limited to, Roundup® Concentrate Poison Ivy and Tough Brush Killer 1, Roundup® Custom Herbicide, Roundup® D-Pak herbicide, Roundup® Dry Concentrate, Roundup® Export Herbicide, Roundup® Fence & Hard Edger 1, Roundup® Garden Foam Weed & Grass Killer, Roundup® Grass and Weed Killer, Roundup® Herbicide, Roundup® Original 2k herbicide, Roundup® Original II Herbicide, Roundup® Pro Concentrate, Roundup® Prodry Herbicide, Roundup® Promax, Roundup® Quik Stik Grass and Weed Killer, Roundup® Quikpro Herbicide, Roundup® Rainfast Concentrate Weed & Grass Killer, Roundup® Rainfast Super Concentrate Weed & Grass Killer, Roundup® Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup® Ready-to-Use Weed & Grass Killer, Roundup® Ready-to-Use Weed and Grass Killer 2, Roundup® Ultra Dry, Roundup® Ultra Herbicide, Roundup® Ultramax, Roundup® VM Herbicide, Roundup® Weed & Grass Killer Concentrate, Roundup® Weed & Grass Killer Concentrate Plus, Roundup® Weed & Grass killer Ready-to-Use Plus, Roundup® Weed & Grass Killer Super Concentrate, Roundup® Weed & Grass Killer1 Ready-to-Use, Roundup® WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

6.      This Court has personal jurisdiction over Monsanto because Monsanto knows or should have known that its Roundup® products are sold throughout the State of Ohio, and, more specifically, caused Roundup® to be sold to Mrs. Dektas in the State of Ohio.

7.      The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(a), because Defendant marketed, advertised, and distributed the dangerous product in this District; Plaintiffs resided in this District; Plaintiffs' harms, losses, and damages occurred in this District; Defendant does substantial business in the State of Ohio  and within this District; and at all times relevant hereto, Defendant developed, manufactured, promoted, marketed, distributed, warranted, and sold Roundup® in interstate commerce.

9.      Defendant is authorized to do business in the State of Ohio and derives substantial income from doing business in this state.

10.      Upon information and belief, Defendant purposefully availed itself of the privilege of conducting activities with the State of Ohio, thus invoking the benefits and protections of its laws.

**THE PARTIES**

*Plaintiff*

11.      Plaintiff Linda Dektas is, and at all relevant times has been, a resident of the Greater Cincinnati area, in the State of Ohio. Plaintiff Michael Dektas is, and at all relevant times has been, Linda Dektas's spouse.

*Defendant*

12.      Defendant, Monsanto Company ("Defendant" or "Monsanto"), is, and at all relevant times was, a Delaware corporation, in "active" status, with its principal place of business

located at 800 North Lindbergh Avenue, St. Louis, Missouri 63167, and is authorized to do business in the State of Ohio and is doing business in the State of Ohio.

13.     Defendant advertises and sells goods, specifically Roundup, in Hamilton County, Ohio.

14.     Defendant transacted and conducted business within the State of Ohio that relates to the allegations in this Complaint.

15.     Defendants derived substantial revenue from goods and products used in the State of Ohio.

16.     Defendant expected or should have expected their acts to have consequences within the State of Ohio, and derived substantial revenue from interstate commerce.

17.     Defendant engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup. Defendant is authorized to do business in Ohio and derives substantial income from doing business in this state.

18.     Upon information and belief, Defendant purposefully availed themselves of the privilege of conducting activities with the State of Ohio, thus invoking the benefits and protections of its laws.

19.     Upon information and belief, Defendant did design, sell, advertise, manufacture and/or distribute Roundup, with full knowledge of its dangerous and defective nature.

**FACTUAL ALLEGATIONS**

20.     At all relevant times, Defendant was in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or has acquired and is responsible for the commercial herbicide Roundup®.

21.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate.

4

22.    As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market.[2]

23.    Defendant discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate based "Roundup®" as a broad-spectrum herbicide.[3]

24.    Glyphosate is the active ingredient in Roundup®.[4]

25.    Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.[5]

26.    Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.[6]

27.    Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

28.    Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

29.    Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

---

[2] ETC Group, *Who Will Control the Green Economy?* 22 (2011), available at http://www.etcgroup.org/files/publication/pdf_file/ETC_wwctge_4web_Dec2011.pdf
[3] Monsanto, *Backgrounder, History of Monsanto's Glyphosate Herbicide* (Sep. 2, 2015), https://monsanto.com/app/uploads/2017/06/back_history.pdf.
[4] *Id.*
[5] *Id.*
[6] *Id.*

30.     Defendant is intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup® i.e., "Roundup® Ready®." As of 2009, Defendant was the world's leading producer of seeds designed to be Roundup® Ready®. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup® Ready® seeds.[7]

31.     The original Roundup®, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the world's most widely used herbicides.[8]

32.     Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops.[9]

33.     Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used.[10]

34.     For nearly 40 years, consumers, farmers, and the public have used Roundup®, unaware of its carcinogenic properties.

### Registration of Herbicides Under Federal Law

35.     The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7. U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection

---

[7] William Neuman & Andrew Pollack, *Farmers Cope With Roundup-Resistant Weeds*, N.Y. TIMES, May 3, 2010, available at http://www.nytimes.com/2010/05/04/business/energyenvironment/04weed.html?pagewan.

[8] *Monsanto, Backgrounder, History of Monsanto's Glyphosate Herbicide* (Sep. 2, 2015), https://monsanto.com /app/uploads/2017/06/back_history.pdf.

[9] *Id.*

[10] See U.S. Geological Survey, *USGS Technical Announcement: Widely Used Herbicide Commonly Found in Rain and Streams in the Mississippi River Basin* (2011), available at http://www.usgs.gov/newsroom/article.asp?ID=2909; *see also* U.S. Envtl. Prot. Agency, *Technical Factsheet on: Glyphosate*, available at http://www.epa.gov/safewater /pdfs/factsheets/soc/tech/glyphosa.pdf.

Agency ("EPA) prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. 136a(a).

36.     The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

37.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

38.     The EPA and the State of Missouri registered Roundup® for distribution, sale, and manufacture in the United States and the State of Missouri.

39.     FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

40.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally mandated process called "re-registration." 7 U.S.C. § 136a-1.

In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

41.     In the case of glyphosate and Roundup®, the EPA had planned on releasing its preliminary risk assessment – in relation to the registration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of the World Health Organization's March 24, 2015 finding that glyphosate is a "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

### Monsanto's False Representations Regarding the Safety of Roundup®

42.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

  a) Remember that environmentally friendly Roundup® herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks and fences ...And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got a weed, brush, edging or trimming problem.
  b) Roundup® biodegrades into naturally occurring elements.
  c) Remember that versatile Roundup® herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.
  d) This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.
  e) You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

f) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

g) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

h) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

i) "Roundup® can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup®.[11]

43.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic.

44.     Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

45.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[12]

**Evidence of Carcinogenicity in Roundup®**

---

[11] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

[12] *Monsanto Guilty in 'False Ad' Row,* BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.

46.     As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties.

47.     On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[13] Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

48.     In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.[14]

49.     In October 1991 the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.[15]

50.     In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendant's Roundup® products are more dangerous and toxic than glyphosate alone.7 As early as 1991 evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.[16]

51.     In 2002, Julie Marc published a study entitled "Pesticide Roundup® Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

---

[13] Consensus Review of Glyphosate, Casewell No. 661A. March 4, 1985. United States Environmental Protection Agency.
[14] http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheets/0178fact.pdf
[15] Second Peer Review of Glyphosate, CAS No. 1071-83-6. October 30, 1881. United States Environmental Protection Agency. 7 Martinez et al. 2007; Benachour 2009; Gasnier et al. 2010; Peixoto 2005; Marc 2004.
[16] Martinez et al 1991

52.     The study found that Defendant's Roundup® caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.[17]

53.     In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.[18]

54.     The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[19]

55.     In 2005, Francisco Peixoto published a study showing that Roundup®'s effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.[20]

56.     The Peixoto study suggested that the harmful effects of Roundup® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup® formulation products.[21]

---

[17] Julie Marc, et al., *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation*, 15 CHEM. RES. TOXICOL. 326-331 (2002), available at http://pubs.acs.org/doi/full/10.1021/tx015543g
[18] Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation*, 96 BIOLOGY OF THE CELL 245, 245-249 (2004), available at http://onlinelibrary.wiley.com/doi/10.1016/j.biolcel.2003.11.010/epdf.
[19] *Id.*
[20] Francisco Peixoto, *Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation*, 61 CHEMOSPHERE 1115, 1122 (2005), available at https://www.researchgate.net/publications /7504567_Comparative_effects_of_the_Roundup_and_glyphosate_on_mitochondrial_oxidative_phosphorylation.
[21] *Id.*

57.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup® and glyphosate on human umbilical, embryonic, and placental cells.[22]

58.     The study used dilution levels of Roundup® and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup® are not inert and that Roundup® is always more toxic than its active ingredient glyphosate.[23]

59.     The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendant.

60.     Defendant knew or should have known that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Mrs. Dektas from Roundup®.

61.     Defendant knew or should have known that tests limited to Roundup®'s active ingredient glyphosate were insufficient to prove the safety of Roundup®.

62.     Defendant failed to appropriately and adequately test Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Mrs. Dektas from Roundup®.

---

[22] See Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human Ubilical, Embryonic, and Placental Cells*, 22 CHEM. RES. TOXICOL. 97-105 (2008), available at http://big.assets.huffingtonpost.com/france.pdf.
[23] *Id.*

63.     Rather than performing appropriate tests, Defendant relied upon flawed industry-supported studies designed to protect Defendant's economic interests rather than Mrs. Dektas and the consuming public.

64.     Despite its knowledge that Roundup® was considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup® as safe.

### IARC Classification of Glyphosate

65.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

66.     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015–2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

67.     IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

68.     On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendant's possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in

Defendant's Roundup® herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.[24]

69.     The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A probable carcinogen to humans. According to the authors glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.[25]

70.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's Lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.[26]

71.     The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

**Earlier Evidence of Glyphosate's Danger**

72.     Despite the new classification by the IARC, Defendant has had ample evidence of glyphosate and Roundup®'s genotoxic properties for decades.

73.     Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

74.     In 1997, Chris Clements published "Genotoxicity of select herbicides in Rana catesbeiana tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."[27]

---

[24] World Health Organization Question and Answer on Glyphosate: See https://www.iarc.fr/featured-news/media-centre-iarc-news-glyphosate/.
[25] Available at https://monographs.iarc.fr/wp-content/uploads/2018/06/mono112-10.pdf.
[26] See Guyton et al., *Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon &Glyphosate, supra.*
[27] Clements, C., Ralph, S. & Petras, M. Genotoxicity of select herbicides in *Rana catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay. *Environ. Mol. Mutagen* 29, 277–288 (1997).

75. The study found that tadpoles exposed to Roundup® showed significant DNA damage when compared with unexposed control animals.[28]

76. Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup® can induce oxidative stress.

77. Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

78. The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

79. In 2006 César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

80. The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

81. The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

82. Despite knowledge to the contrary, Defendant maintains that there is no evidence that Roundup® is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup® is not genotoxic, and that there is no evidence that Roundup® is genotoxic.

83. In addition to glyphosate and Roundup®'s genotoxic properties, Defendant has long been aware of glyphosate's carcinogenic properties.

---

15

84.     Glyphosate and Roundup® in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

85.     Defendant has known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup®.

86.     In 1985, the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

87.     In 2003, Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

88.     The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studies with an increased odds ratio of 3.11.

89.     In 2003, AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

90.     The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

91.     In 2008, Mikael Eriksson published a population based case-control study of exposure to various pesticides as a risk factor for NHL.

92.     This strengthened previous associations between glyphosate and NHL.

93.     In spite of this knowledge, Defendant continued to issue broad and sweeping statements suggesting that Roundup® was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

16

94.     Upon information and belief, these statements and representations have been made with the intent of inducing Mrs. Dektas, the agricultural community, and the public at large to purchase and increase the use of Defendant's Roundup® for Defendant's pecuniary gain, and in fact, did induce Plaintiff to use Roundup®.

95.     Defendant made these statements with complete disregard and reckless indifference to the safety of Mrs. Dektas and the general public.

96.     Notwithstanding Defendant's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

97.     Defendant knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

98.     Defendant failed to appropriately and adequately inform and warn Mrs. Dektas of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup®, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

99.     Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendant continues to maintain that glyphosate and/or Roundup® is safe, non-carcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup®.

100.     Defendant has claimed and continue to claim that Roundup® is safe, non-carcinogenic, and non-genotoxic. These misrepresentations are consistent with Defendant's cavalier approach to investigating and ensuring the safety of its products, the safety of the public at large, and the safety of Mrs. Dektas.

### SCIENTIFIC FRAUD UNDERLYING THE SAFETY DETERMINATIONS OF GLYPHOSATE

101.     After the EPA's 1985 classification of glyphosate as possibly carcinogenic to humans (Group C), Monsanto exerted pressure upon the EPA to change its classification.

102.     This culminated in the EPA's reclassification of glyphosate to Group E, which was based upon evidence of non-carcinogenicity in humans.

103.     In so classifying, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."[29]

104.     On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed scientific fraud.

105.     In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®.[30] IBT performed approximately 30 tests on glyphosate and glyphosate-containing products, including 11 of the 19 chronic toxicology studies needed to register Roundup® with the EPA.

---

[29] U.S. Envtl. Prot. Agency, Memorandum, Subject: SECOND Peer Review of Glyphosate 1 (1991), available at http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC103601_30-Oct-91_265.pdf.
[30] Monsanto, Backgrounder, Testing Fraud: IBT and Craven Laboratories, https://monsanto.com/app/uploads/2017/06/ibt_craven_bkg.pdf

106.    In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to toxicological impacts of glyphosate. The EPA subsequently audited IBT and determined that the toxicology studies conducted for Roundup® were invalid.[31] An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[32]

107.    Three top executives of IBT were convicted of fraud in 1983.

108.    In the second incident, Monsanto hired Craven Laboratories ("Craven") in 1990 to perform pesticide and herbicide studies, including several studies on Roundup®.

109.    In March of 1991, the EPA announced that it was investigating Craven for "allegedly falsifying test data used by chemical firms to win EPA approval of pesticides."

110.    The investigation lead to the indictments of the laboratory owner and a handful of employees.

**Recent Worldwide Bans on Roundup® / Glyphosate**

111.    Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in march 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup® become more widely known. The Netherlands issued a ban on all

---

[31] U.S. Envtl. Prot. Agency, Summary of the IBT Review Program Office of Pesticide Programs (1983), available at https://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA&Index=1981+Thru +1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&QF ieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles %5CIndex%20Data%5C81thru85%5CTxt%5C00000022%5C91014ULV.txt&User=ANONYMOUS&Password=an onymous&SortMethod=h%7C-&MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y 150g16/i425&Display=hpfr&DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%2 0page&MaximumPages=1&ZyEntry=1&SeekPage=x&ZyPURL
[32] Marie-Monique Robin, The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply (2011) (citing U.S. Envtl. Prot. Agency, Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch. Washington, D.C. (August 9, 1978)).

glyphosate-based herbicides in April 2014, including Roundup®, which took effect at the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."[33]

112.    The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.[34]

113.    France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.[35]

114.    Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."[36]

---

[33] Holland's Parliament Bans Glyphosate Herbicides, The Real Agenda, April 14, 2014, available at http://real-agenda.com/hollands-parliament-bans-glyphosate-herbicides/

[34] Christina Sarich, Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals Following Recent Glyphosate-Cancer Link, GLOBAL RESEARCH, MAY 14, 2015, available at http://www.globalresearch.ca/brazils-public-prosecutor-wants-to-ban-monsantos-chemicals-following-recent-glyphosate-cancer-link/5449440.

[35] Zoe Schlanger, France Bans Sales of Monsanto's Roundup in Garden Centers, 3 Months After U.N. Calls it "Probable Carcinogen", NEWSWEEK, JUNE 15, 2015, available at http://www.newsweek.com/france-bans-sale-monsantos-roundup-garden-ceners-after-un-namesit-probable-343311.

[36] Health Minister: Importation of Roundup Weed Spray Suspended, Today in Bermuda, May 11, 2015, available at http://www.todayinbermuda.com/news/health/item/1471-health-ministerimportation-of-roundup-weed-spray-suspended.

115.     The Sri Lankan government banned the private and commercial use of glyphosate, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.[37]

116.     The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.[38]

### Proposition 65 Listing

117.     On September 4, 2015, California's Office of Environmental Health Hazard Assessment ("OEHHA") published a notice of intent to include glyphosate on the state's list of known carcinogens under Proposition 65.[39] California's Safe Drinking Water and Toxic Enforcement Act of 1986 (informally known as "Proposition 65"), requires the state to maintain and, at least, once a year, revise and republish a list of chemicals "known to the State of California to cause cancer or reproductive toxicity."[40] The OEHHA determined that glyphosate met the criteria for the listing mechanism under the Labor Code following IARC's assessment of the chemical.[41]

118.     The listing process under the Labor Code is essentially automatic. The list of known carcinogens, at a minimum, must include substances identified by reference in Labor Code §

---

[37] Sri Lanka's New President Puts Immediate Ban on Glyphosate Herbicides, Sustainable Pulse, May 25, 2015, available at http://sustainablepulse.com/2015/05/25/sri-lankas-new-presidentputs-immediate-ban-on-glyphosate-herbicides/#.VeduYk3bKAw.
[38] Columbia to ban coca spraying herbicide glyphosate, BBC, May 10, 2015, available at http://www.bbc.com/news/world-latin-america-32677411.
[39] Cal. Envtl. Prot. Agency Office of Envtl. Health Hazard Assessment, Notice of Intent to List Chemicals by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion, Glyphosate (Sept. 4, 2015), available at http://oehha.ca.gov/prop65/CRNR_notices/admin_listing/intent_to_list/pdf_zip/090415NOIL_L CSet27.pdf
[40] Frequently Asked Questions, STATE OF CAL. DEPT OF JUSTICE, OFFICE OF THE ATTORNEY GENERAL, available at http://oag.ca.gov/prop65/faq.
[41] Cal. Envtl. Prot. Agency Office of Envtl. Health Hazard Assessment, Notice of Intent to List Chemicals by the Labor Code Mechanism: Tetrachlorvinphos, Parathion, Malathion, Glyphosate (Sept. 4, 2015), available at http://oehha.ca.gov/prop65/CRNR_notices/admin_listing/intent_to_list/pdf_zip/090415NOIL_L CSet27.pdf.

6382(b)(1). That section of the Labor Code identifies "[s]ubstances listed as human or animal carcinogens by the International Agency for Research on Cancer (IARC)." IARC's classification of glyphosate as a Group 2A chemical ("probably carcinogenic to humans") therefore triggered the listing.

119.    A business that deploys a listed chemical in its products must provide "clear and reasonable warnings" to the public prior to exposure to the chemical. To be clear and reasonable, a warning must "(1) clearly communicate that the chemical is known to cause cancer, and/or birth defects or other reproductive harm; and (2) effectively reach the person before exposure."[42] The law also prohibits the discharge of listed chemicals into drinking water.

120.    Monsanto disputed the listing decision and, in January 2016, filed a lawsuit against OEHHA and the agency's acting director, Lauren Zeise, in California state court, seeking declaratory and injunctive relief to prevent OEHHA from listing glyphosate.[43]

121.    Monsanto alleged that OEHHA's exclusive reliance on the IARC decision signified that "OEHHA effectively elevated the determination of an ad hoc committee of an unelected, foreign body, which answers to no United States official (let alone any California state official), over the conclusions of its own scientific experts."[44] Monsanto further alleged that the Labor Code listing mechanism presented various constitutional violations because it "effectively empowers an unelected, undemocratic, unaccountable, and foreign body to make laws applicable in California.[45] Among other things, Monsanto argued that Proposition 65's requirement to provide a "clear and

---

[42] Frequently Asked Questions, STATE OF CAL. DEPARTMENT OF JUSTICE, OFFICE OF HE ATTORNEY GENERAL, supra.
[43] Monsanto Company's Verified Petition for Writ of Mandate and Complaint for Preliminary and Permanent Injunctive and Declaratory Relief, Monsanto Co. v. Office of the Envt'l Health Hazard Assessment, et al., No. 16-CECG-00183 (Cal. Super. Ct.), available at http://www.monsanto.com/files/documents/monvoehha.pdf.
[44] *Id*. at 2.
[45] *Id*. at 3.

reasonable warning" to consumers that the chemical is a known carcinogen would damage its reputation and violate its First Amendment rights.[46]

122.   The case remains pending.

### EFSA Report on Glyphosate

123.   On November 12, 2015, the European Food Safety Authority (EFSA), the European Union's primary agency for food safety, reported on its evaluation of the Renewal Assessment Report (RAR) on glyphosate.[47]  The Rapporteur Member State assigned to glyphosate, the German Federal Institute for Risk Assessment (BfR), had produced the RAR as part of the renewal process for glyphosate in the EU.

124.   BfR sent its draft RAR to EFSA and the RAR underwent a peer review process by EFSA, other member states, and industry groups. As part of the on-going peer review of Germany's reevaluation of glyphosate, EFSA had also received a second mandate from the European Commission to consider IARC's findings regarding the potential carcinogenicity of glyphosate and glyphosate-containing products.

125.   Based on a review of the RAR, which included data from industry-submitted unpublished studies, EFSA sent its own report ("Conclusion") to the European Commission, finding that "glyphosate is unlikely to pose a carcinogenic hazard to humans and the evidence does not support classification with regard to its carcinogenic potential according to Regulation (EC) No 1272/2008."[48]  EFSA therefore disagreed with IARC: glyphosate was not genotoxic and did

---

[46] *Id.*
[47] European Food Safety Auth., Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate, *available at* http://www.efsa.europa.eu/sites/default/files/scientific_output/files/main_documents /4302.pdf.

[48] *Id.*

not present a carcinogenic threat to humans.

126.    In explaining why its results departed from IARC's conclusion, EFSA drew a distinction between the EU and IARC approaches to the study and classification of chemicals.[49] Although IARC examined "both glyphosate—an active substance—and glyphosate-based formulations, grouping all formulations regardless of their composition," EFSA explained that it considered only glyphosate and that its assessment focuses on "each individual chemical, and each marketed mixture separately."[50] IARC, on the other hand, "assesses generic agents, including groups of related chemicals, as well as occupational or environmental exposure, and cultural or behavioral practices."[51] EFSA accorded greater weight to studies conducted with glyphosate alone than studies of formulated products.[52]

127.    Based on a review of the RAR, which included data from industry-submitted unpublished studies, EFSA sent its own report ("Conclusion") to the European Commission, finding that "glyphosate is unlikely to pose a carcinogenic hazard to humans and the evidence does not support classification with regard to its carcinogenic potential according to Regulation (EC) No 1272/2008."[53]  EFSA therefore disagreed with IARC: glyphosate was not genotoxic and did not present a carcinogenic threat to humans.

128.    In explaining why its results departed from IARC's conclusion, EFSA drew a distinction between the EU and IARC approaches to the study and classification of chemicals.[54] Although IARC examined "both glyphosate—an active substance—and glyphosate-based

---

[49] EFSA Fact Sheet: Glyphosate, EFSA http://www.efsa.europa.eu/sites/default/files/corporate_publications/files/efsaexplainsglyphosate151112en.pdf.

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] *Id.*

[54] EFSA Fact Sheet: Glyphosate, EFSA http://www.efsa.europa.eu/sites/default/files/corporate_publications/files/efsaexplainsglyphosat e151112en.pdf.

formulations, grouping all formulations regardless of their composition," EFSA explained that it considered only glyphosate and that its assessment focuses on "each individual chemical, and each marketed mixture separately."[55] IARC, on the other hand, "assesses generic agents, including groups of related chemicals, as well as occupational or environmental exposure, and cultural or behavioral practices."[56] EFSA accorded greater weight to studies conducted with glyphosate alone than studies of formulated products.[57]

129.    EFSA went further and noted:

> [A]lthough some studies suggest that certain glyphosate-based formulations may be genotoxic (i.e. damaging to DNA), others that look solely at the active substance glyphosate do not show this effect. It is likely, therefore, that ***the genotoxic effects observed in some glyphosate-based formulations are related to the other constituents or "co-formulants"***. Similarly, certain glyphosate-based formulations display higher toxicity than that of the active ingredient, presumably because of the presence of co-formulants. In its assessment, ***EFSA proposes that the toxicity of each pesticide formulation and in particular its genotoxic potential should be further considered and addressed by Member State authorities while they re-assess uses of glyphosate-based formulations in their own territories***.[58]

130.    Notwithstanding its conclusion, EFSA did set exposure levels for glyphosate. Specifically, EFSA proposed an acceptable daily intake (ADI) of 0.5 mg/kg of body weight per day; an acute reference dose (ARD) of 0.5 mg/kg of body weight; and an acceptable operator exposure level (AOEL) of 0.1 mg/kg bw per day.[59]

**Leading Scientists Dispute EFSA's Conclusion**

131.    On November 27, 2015, 96 independent academic and governmental scientists from around the world submitted an open letter to the EU health commissioner, Vytenis

---

[55] *Id.*
[56] *Id.*
[57] *Id.*
[58] *Id.*
[59] European Food Safety Auth., Conclusion on the peer review of the pesticide risk assessment of the active substance glyphosate, *supra.*

Andriukaitis.[60] The scientists expressed their strong concerns and urged the commissioner to disregard the "flawed" EFSA report, arguing that "the BfR decision is not credible because it is not supported by the evidence and it was not reached in an open and transparent manner."[61]

132.    Signatories to the letter included Dr. Christopher J. Portier, Ph.D., and other renowned international experts in the field, some of whom were part of the IARC Working Group assigned to glyphosate.

133.    In an exhaustive and careful examination, the scientists scrutinized EFSA's conclusions and outlined why the IARC Working Group decision was "by far the more credible":

> The IARC WG decision was reached relying on open and transparent procedures by independent scientists who completed thorough conflict-of-interest statements and were not affiliated or financially supported in any way by the chemical manufacturing industry. It is fully referenced and depends entirely on reports published in the open, peer-reviewed biomedical literature. It is part of a long tradition of deeply researched and highly credible reports on the carcinogenicity of hundreds of chemicals issued over the past four decades by IARC and used today by international agencies and regulatory bodies around the world as a basis for risk assessment, regulation and public health policy.[62]

134.    With respect to human data, the scientists pointed out that EFSA agreed with IARC that there was "*limited evidence* of carcinogenicity" for non-Hodgkin's lymphoma, but EFSA nonetheless dismissed an association between glyphosate exposure and carcinogenicity. IARC applies three levels of evidence in its analyses of human data, including sufficient evidence and limited evidence. EFSA's ultimate conclusion that "there was no unequivocal evidence for a clear and strong association of NHL with glyphosate" was misleading because it was tantamount to IARC's highest level of evidence: "sufficient evidence," which means that a

---

[60] Letter from Christopher J. Portier et al. to Commission Vytenis Andriukaitis, Open letter: Review of the Carcinogenicity of Glyphosate by EFSA and BfR (Nov. 27, 2015), http://www.zeit.de/wissen/umwelt/2015-11/glyphosat-offener-brief.pdf; http://www.theguardian.com/environment/2016/jan/13/eu-scientists-in-row-over-safety-of- glyphosate-weedkiller.
[61] *Id.*
[62] *Id.*

causal relationship has been established. However, the scientists argued, "[l]egitimate public health concerns arise when 'causality is credible,' i.e., when there is *limited evidence*."[63]

135.     Among its many other deficiencies, EFSA's conclusions regarding animal carcinogenicity data were "scientifically unacceptable," particularly in BfR's use of historical control data and in its trend analysis. Indeed, BfR's analysis directly contradicted the Organisation for Economic Co-operation and Development ("OECD") testing guidelines while citing and purporting to follow those same guidelines. For instance, the EFSA report dismisses observed trends in tumor incidence "because there are no individual treatment groups that are significantly different from controls and because the maximum observed response is reportedly within the range of the historical control data." However, according to the scientists, concurrent controls are recommended over historical controls in all guidelines, scientific reports, and publications, and, if it is employed, historical control data "should be from studies in the same timeframe, for the same exact animal strain, preferably from the same laboratory or the same supplier and preferably reviewed by the same pathologist." BfR's use of historical control data violated these precautions: "only a single study used the same mouse strain as the historical controls, but was reported more than 10 years after the historical control dataset was developed." Further deviating from sound scientific practices, the data used by the BfR came from studies in seven different laboratories.  The scientists concluded:

> BfR reported seven positive mouse studies with three studies showing increases in renal tumors, two with positive findings for hemangiosarcomas, and two with positive findings for malignant lymphomas. BfR additionally reported two positive findings for tumors in rats. Eliminating the inappropriate use of historical data, the unequivocal conclusion is that these are not negative studies, but in fact document the carcinogenicity of glyphosate in laboratory animals.[64]

---

[63] *Id.*
[64] *Id.*

136.     The letter also critiqued the EFSA report's lack of transparency and the opacity surrounding the data cited in the report: "citations for almost all of the references, even those from the open scientific literature, have been redacted from the document" and "there are no authors or contributors listed for either document, a requirement for publication in virtually all scientific journals." Because BfR relied on unpublished, confidential industry-provided studies, it is "impossible for any scientist not associated with BfR to review this conclusion with scientific confidence."[65]

137.     On March 3, 2016, the letter was published in the Journal of Epidemiology & Community Health.[66]

### Statement of Concern Regarding Glyphosate-Based Herbicides

138.     On February 17, 2016, a consensus statement published in the journal *Environmental Health*, entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement," assessed the safety of glyphosate-based herbicides (GBHs).[67] The paper's "focus is on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with recent discoveries about the toxicity and human health risks stemming from use of GBHs."[68] The researchers drew seven factual conclusions about GBHs:

> 1.     GBHs are the most heavily applied herbicide in the world and usage continues to rise;

---

[65] *Id.*

[66] Christopher J. Portier, et al., *Differences in the carcinogenic evaluation of glyphosate between the International Agency for Research on Cancer (IARC) and the European Food Safety Authority (EFSA)*, JOURNAL OF EPIDEMIOLOGY & CMTY. HEALTH, Mar. 3, 2016, *available at* http://jech.bmj.com/content/early/2016/03/03/jech-2015-207005.full.

[67] John P. Myers, et al, *Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement*, Environmental Health (2016), *available at* http://ehjournal. biomedcentral.com/articles/10.1186/s12940-016-0117-0.

[68] *Id.*

> 2. Worldwide, GBHs often contaminate drinking water sources, precipitation, and air, especially in agricultural regions;
>
> 3. The half-life of glyphosate in water and soil is longer than previously recognized;
>
> 4. Glyphosate and its metabolites are widely present in the global soybean supply;
>
> 5. Human exposures to GBHs are rising;
>
> 6. Glyphosate is now authoritatively classified as a probable human carcinogen; and
>
> 7. Regulatory estimates of tolerable daily intakes for glyphosate in the United States and European Union are based on outdated science.[69]

139. The researchers noted that GBH use has increased approximately 100-fold since the 1970s. Further, far from posing a limited hazard to vertebrates, as previously believed, two decades of evidence demonstrated that "several vertebrate pathways are likely targets of action, including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."[70]

140. The paper attributes uncertainties in current assessments of glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations." Further, the researchers argue, "[t]he distinction in regulatory review and decision processes between 'active' and 'inert' ingredients has no toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in their own right."[71]

---

[69] *Id.*
[70] *Id.*
[71] *Id.*

29

141.     Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further, "GBH-product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish." Accordingly, "risk assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone underestimate both toxicity and exposure, and thus risk." The paper concludes that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."[72]

142.     The researchers also critique the current practice of regulators who largely rely on "unpublished, non-peer reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."[73]

143.     The researchers also call for greater inclusion of GBHs in government-led toxicology testing programs:

> [A] fresh and independent examination of GBH toxicity should be undertaken, and . . . this re-examination be accompanied by systematic efforts by relevant agencies to monitor GBH levels in people and in the food supply, none of which are occurring today. The U.S. National Toxicology Program should prioritize a thorough toxicological assessment of the multiple pathways now identified as potentially vulnerable to GBHs.[74]

144.     The researchers suggest that, in order to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which

---

[72] *Id.*
[73] *Id.*
[74] *Id.*

30

manufacturers fund the registration process and the necessary testing:

> "[W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part of routine registration actions and fees. Such funds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would be made available to independent scientists to conduct the appropriate long-term (minimum 2 years) safety studies in recognized animal model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption, impacts on the    gut microbiome, carcinogenicity, and multigenerational effects looking at reproductive capability and frequency of birth defects."[75]

### FDA Announces Testing of Glyphosate Residue In Foods

145.    On February 17, 2016, the U.S. Food and Drug Administration ("FDA") announced that, for the first time in its history, the agency planned to start testing certain foods for glyphosate residues. FDA spokeswoman Lauren Sucher explained: "The agency is now considering assignments for Fiscal Year 2016 to measure glyphosate in soybeans, corn, milk, and eggs, among other potential foods.[76]

146.    In 2014, the U.S. Government Accountability Office (GAO) had severely rebuked the FDA for its failures to both monitor for pesticide residue, including that of glyphosate, and to disclose the limitations of its monitoring and testing efforts to the public.[77] The GAO had cited numerous undisclosed deficiencies in the FDA's process, specifically highlighting its omission of glyphosate testing.

147.    Indeed, in the past, both the FDA and the U.S. Department of Agriculture

---

[75] *Id.*

[76] Carey Gillam, *FDA to Start Testing for Glyphosate in Food*, TIME, Feb. 17, 2016, *available at* http://time.com/4227500/fda-glyphosate-testing/?xid=tcoshare.

[77] U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-15-38, FDA AND USDA SHOULD STRENGTHEN PESTICIDE RESIDUE MONITORING PROGRAMS AND FURTHER DISCLOSE MONITORING LIMITATIONS (2014), *available at* http://www.gao.gov/products/GAO-15-38.

(USDA) had routinely excluded glyphosate from their testing for the residues of hundreds of other pesticides, on the rationale that it was too expensive and unnecessary to protect public health. Ms. Sucher, the FDA spokeswoman, however, now states that "the agency has developed 'streamlined methods' for testing for the weed killer."[78]

### Monsanto's Continuing Disregard for the
### Safety of Mrs. Dektas and the Public

148. Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."[79]

149. Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

150. Glyphosate, and Defendant's Roundup® products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

151. Defendant's statements proclaiming the safety of Roundup® and disregarding its dangers misled Plaintiff.

152. Despite Defendant's knowledge that Roundup® was associated with an elevated risk of developing cancer, Defendant's promotional campaigns focused on Roundup®'s purported "safety profile."

---

[78] Gillam, *supra* note 46.
[79] Backgrounder - Glyphosate: No Evidence of Carcinogenicity. Updated November 2014, available at https://monsanto.com/app/uploads/2017/06/no-evidence-of-carcinogenicity.pdf (downloaded July 10, 2019).

153. Defendant's failure to adequately warn Mrs. Dektas resulted in (1) Mrs. Dektas using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup®.

154. Defendant failed to seek modification of the labeling of Roundup® to include relevant information regarding the risks and dangers associated with Roundup® exposure.

155. The failure of Defendant to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

156. The failure of Defendant to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

157. The failure of Defendant to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

158. By reason of the foregoing acts and omissions, Plaintiff seeks compensatory damages as a result of Mrs. Dektas's use of, and exposure to, Roundup® which caused or was a substantial contributing factor in causing Mrs. Dektas to suffer from cancer, specifically NHL, and Mrs. Dektas suffered, physical pain and mental anguish, including diminished enjoyment of life.

159. By reason of the foregoing acts and omissions, Mrs. Dektas endured and suffered, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of the actions and inactions of the Defendant.

**Mrs. Dektas's Exposure to Roundup®**

160.     From at least 1976, Mrs. Dektas purchased and used Roundup® continuously to control weeds on her property, including throughout her yard, flower bed, and extensive landscaping.

161.     Mrs. Dektas's persistent use of Roundup® around 1976 began immediately after the purchase of her and her husband's first house.  She continued to use Roundup® approximately each year thereafter on at least a weekly basis. Mrs. Dektas followed all safety and precautionary warnings while using Roundup®.

162.     Mrs. Dektas was an extremely active landscaper and would often use Roundup® daily due to the size and scope of her landscaping projects from roughly March through November of each year.

163.     Mrs. Dektas continued using Roundup® until 2018 for a total of approximately 42 years of using Roundup®.

164.     Mrs. Dektas generally applied Roundup® using a hand sprayer.

165.     Although she sometimes wore gloves while mixing and spraying Roundup®, Mrs. Dektas usually wore no mask, suit, or other protection. Because Roundup® was often applied during the warmer spring, summer, or fall months, Mrs. Dektas would wear a T-Shirt, and often wore shorts.

166.     During the entire time that Mrs. Dektas was exposed to Roundup®, she did not know that exposure to Roundup® would cause her any injury, including but not limited to negatively impacting her health and/or causing her to suffer from non-Hodgkin's lymphoma.

**Mrs. Dektas's Diagnosis of non-Hodgkin's Lymphoma**

167.    On or around May 2018, Mrs. Dektas was diagnosed with a form of non-Hodgkin's Lymphoma by her oncologist, Dr. Saulius Girnius of Bethesda North Hospital in Cincinnati, Ohio.

168.    In order for her to receive a proper diagnosis, Mrs. Dektas suffered through a three-hour long operation to remove a lymph node from deep in her abdomen which caused her severe pain and complications.

169.    Mrs. Dektas continued bleeding from her surgical incisions and developed blood clots in her legs due to complications during the lymph node removal surgery.  As a precautionary measure and in follow-up visits after the surgery, doctors implanted IV filters to address the blood clots.

170.    To treat her cancer, starting in July 2018, Mrs. Dektas was forced to have frequent chemotherapy treatments to treat her non-Hodgkin's Lymphoma. Her chemotherapy treatment is ongoing.

171.    Due to her blood clotting issues, which resulted from her lymph node removal surgery, Mrs. Dektas was required daily to take two shots of the blood thinner medication, Lovenox, into her stomach for several months.

172.    Mrs. Dektas's cancer is in remission, but she will never be completely cured.  She continues to have Stage 2 cancer and will remain in treatment and on medication for the remainder of her life.

**Tolling of the Statute of Limitations**

*Discovery Rule Tolling*

173.    Plaintiffs incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

35

174. Mrs. Dektas had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup® and glyphosate until well-after IARC released its formal assessment of glyphosate in July 2015.

175. Within the time period of any applicable statutes of limitations, Mrs. Dektas could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup® and glyphosate is injurious to human health.

176. Mrs. Dektas did not discover, and did not know of facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup® and glyphosate; nor would a reasonable and diligent investigation by her have disclosed that Roundup® and glyphosate would cause her illness.

177. For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff's claims.

### *Fraudulent Concealment Tolling*

178. All applicable statutes of limitations have also been tolled by Monsanto's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

179. Instead of disclosing critical safety information about Roundup® and glyphosate, Monsanto has consistently and falsely represented the safety of its Roundup® products.

180. At all relevant times, Defendant has maintained that Roundup® is safe, non-toxic, and non-carcinogenic.

181. Indeed, even as of July 2016, Defendant continued to represent to the public that "Regulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate,

the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic" (emphasis added).[80]

182.    As a result of Defendant's actions, Mrs. Dektas was unaware, and could not reasonably know or have learned through reasonable diligence that Roundup® and/or glyphosate contact, exposed Mrs. Dektas to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

### Estoppel

183.    Monsanto was under a continuous duty to disclose to consumers, users and other persons coming into contact with its products, including Mrs. Dektas, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate.

184.    Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

185.    Also, the economics of this fraud should be considered. Defendant had the ability to and did spend enormous amounts of money in furtherance of its purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Mrs. Dektas and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendant's representations.

---

[80] Backgrounder - Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9, 2015)

186.     Based on the foregoing, Monsanto is estopped from relying on any statutes of limitations in defense of this action.

## FIRST CAUSE OF ACTION
### (NEGLIGENCE)

187.     Plaintiffs restate and incorporate all other allegations in this Complaint as if fully set forth herein.

188.     Defendant had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup® into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

189.     Defendant failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup® into interstate commerce in that Defendant knew or should have known that using Roundup® created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

190.     The negligence by the Defendant, its agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

a)   Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup® without thoroughly testing it;

b)   Failing to test Roundup® and/or failing to adequately, sufficiently, and properly test Roundup®;

c)   Conducting insufficient testing programs to determine whether or not Roundup®
     was safe for use; in that Defendant knew or should have known that Roundup®
     was unsafe and unfit for use by reason of the dangers to its users;

d)   Conducting insufficient testing programs and studies to determine Roundup®'s
     carcinogenic properties even after Defendant had knowledge that Roundup® is,
     was, or could be carcinogenic;

e)   Failing to conduct sufficient testing programs to determine the safety of "inert"
     ingredients and/or adjuvants contained within Roundup®, and the propensity of
     these ingredients to render Roundup® toxic, increase the toxicity of Roundup®,
     whether these ingredients are carcinogenic, magnify the carcinogenic properties of
     Roundup®, and whether or not "inert" ingredients and/or adjuvants were safe for
     use;

f)   Negligently failing to adequately and correctly warn Mrs. Dektas, the public,
     medical and agricultural professions, and the EPA of the dangers of Roundup®;

g)   Negligently failing to petition the EPA to strengthen the warnings associated with
     Roundup®;

h)   Failing to provide adequate cautions and warnings to protect the health of users,
     handlers, applicators, and persons who would reasonably and foreseeably come into
     contact with Roundup®;

i)   Negligently marketing, advertising, and recommending the use of Roundup®
     without sufficient knowledge as to its dangerous propensities;

    j)   Negligently representing that Roundup® was safe for use for its intended purpose, and/or that Roundup® was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

    k)   Negligently representing that Roundup® had equivalent safety and efficacy as other forms of herbicides;

    l)   Negligently designing Roundup® in a manner which was dangerous to its users;

    m)  Negligently manufacturing Roundup® in a manner which was dangerous to its users;

    n)   Negligently producing Roundup® in a manner which was dangerous to its users;

    o)   Negligently formulating Roundup® in a manner which was dangerous to its users;

    p)   Negligently selling Roundup® with a false and misleading label;

    q)   Concealing information from Mrs. Dektas while knowing that Roundup® was unsafe, dangerous, and/or non-conforming with EPA regulations; and

    r)   Improperly concealing and/or misrepresenting information from Mrs. Dektas, the scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup® compared to other forms of herbicides.

191.    Defendant under-reported, underestimated, and downplayed the serious dangers of Roundup®.

192.    Defendant negligently and deceptively compared the safety risks and/or dangers of Roundup® with common everyday foods such as table salt, and other forms of herbicides.

193.    At all times relevant, Defendant knew that Roundup® was dangerous and defective, concealed the dangers and risks from Mrs. Dektas, made misrepresentations to Mrs. Dektas and the public in general as to the safety of Roundup® and with full knowledge of the risks associated

with Roundup®, without adequate warnings of the same, manufactured, designed, packaged, labeled, marketed, advertised, distributed, and sold Roundup® to the general public, and to Mrs. Dektas. Defendant engaged in malicious, fraudulent, and grossly negligent conduct toward Mrs. Dektas and the public, acted with willful and wanton and/or reckless disregard for the safety of the general public and Mrs. Dektas.

194. Defendant was negligent and/or violated Ohio law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup® in that it:

a) Failed to use ordinary care in designing and manufacturing Roundup® so as to avoid the aforementioned risks to individuals when Roundup® was used as an herbicide;

b) Failed to accompany its product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup®;

c) Failed to accompany its product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup®;

d) Failed to accompany its product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup®;

e) Failed to warn Mrs. Dektas of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of NHL;

f) Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup®;

g) Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup®'s "inert" ingredients and/or adjuvants;

h) Negligently misrepresented the evidence of Roundup®'s genotoxicity and carcinogenicity; and,

i) Was otherwise careless and/or negligent.

195.    Despite the fact that Defendant knew or should have known that Roundup® caused, or could cause, unreasonably dangerous side effects, Defendant continued and continues to market, manufacture, distribute, and/or sell Roundup®.

196.    Defendant knew or should have known that individuals such as Mrs. Dektas would foreseeably suffer injury as a result of Defendant's failure to exercise ordinary care, as set forth above. Mrs. Dektas endured pain and suffering, as well as economic losses (including significant expenses for medical care and treatment).

197.    Defendant's negligence was the proximate cause of Mrs. Dektas's severe physical and emotional injuries.

198.    As a result of the foregoing acts and omissions, Mrs. Dektas suffered from serious and dangerous side effects including, but not limited to, non-Hodgkin's Lymphoma, as well as other severe and personal injuries, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care.

199.    WHEREFORE, Mrs. Dektas demands judgment against Defendant for compensatory and punitive damages together with interest, costs herein incurred, attorneys' fees, and all such other and further relief that fairly and fully compensate her in an amount in excess of the minimum jurisdiction of this Court.

## SECOND CAUSE OF ACTION
## PRODUCT DEFECT DUE TO DEFECTIVE DESIGN/FORMULATION
## (OHIO REV. CODE ANN. § 2307.75)

200.    Plaintiffs restate and incorporate all other allegations in this Complaint as if fully set forth herein.

201.    Defendant is a "manufacturer" within the meaning of Ohio Rev. Code Ann. § 2307.71(A)(9).

202.    Pursuant to O.R.C. § 2307.75, Defendant's Roundup® had foreseeable design defects, which were capable of causing and, in fact, did cause serious bodily injuries to the users and consumers thereof, including Linda L. Dektas, while being used in a reasonably foreseeable manner, thereby rendering Roundup® defective and unreasonably dangerous to consumers, users, and other persons coming into contact with it.

203.    At all times relevant, Defendant's Roundup®, as designed, researched, tested, developed, formulated, manufactured, licensed, packaged, labeled, distributed, sold, and marketed by Defendant, was defective in design and formulation in that when it left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks associated with its reasonably foreseeable uses exceeded the alleged benefits associated with its design and formulation.

204.    Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

205.    Accordingly, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause Mrs. Dektas's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Mrs. Dektas.

206.    Defendant knew or, in the exercise of reasonable care, should have known that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Mrs. Dektas from Roundup®. Defendant failed to appropriately and adequately test Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Mrs. Dektas from harm and unreasonably dangerous side effects. Defendant knew or, in the exercise of reasonable care, should have known that tests limited to Roundup®'s active ingredient glyphosate were insufficient to prove the safety of Roundup®.

207.    Defendant's Roundup® was expected to and did reach the intended consumers, handlers, and users or other persons coming into contact with said product throughout the United States, including Mrs. Dektas, without substantial change in the condition in which it was designed, produced, sold, distributed, labeled, and marketed by Defendant.

208.    Therefore, at all times relevant to this litigation, Defendant's Roundup® was defective, in one or more of the following ways:

a)  When placed in the stream of commerce, Defendant's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate;

b)  When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;

c)  When placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner;

d) Defendant did not sufficiently test, investigate, or study its Roundup® products;

e) Exposure to Roundup® presents a risk of harmful side effects that outweighs any potential utility stemming from the use of the herbicide;

f) Defendant knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® could result in cancer and other severe illnesses and injuries;

g) Defendant did not conduct adequate post-marketing surveillance of its Roundup® products; and

h) Defendant could have employed safer alternative designs and formulations.

209. At all times relevant to this litigation, Mrs. Dektas used and/or was exposed to the use of Defendant's Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

210. Mrs. Dektas could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

211. The harm caused by Defendant's Roundup® products far outweighed their benefit. Defendant's Roundup® products were and are more dangerous than alternative products and Defendant could have designed its Roundup® products to make them less dangerous. Indeed, at the time that Defendant designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

212. At the time Roundup® left Defendant's control, there was a practical, technically feasible, and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant's Roundup® herbicides.

213. Defects in Defendant's Roundup were the cause or a substantial factor in causing

Mrs. Dektas's injuries.

214.    As a direct and proximate result of the Defendant's acts and omissions, Mrs. Dektas developed Non-Hodgkin's Lymphoma, and suffered severe and personal injuries, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.  Mrs. Dektas's injuries constitute "harm" as defined under Ohio Rev. Code Ann. § 2307.71(A)(7).

215.    As a result of the acts and omissions, Plaintiff Linda L. Dektas has experienced physical pain and suffering, mental anguish, economic damages, and any and all other damages recoverable under law.

216.    Furthermore, Defendant's actions and omissions were in flagrant disregard of the safety of Mrs. Dektas and were oppressive, fraudulent or malicious, so as to warrant the imposition of punitive damages, in accordance with Ohio Rev. Code Ann. § 2307.80.

217.    WHEREFORE, Mrs. Dektas demands judgment against Defendant for compensatory and punitive damages together with interest, costs herein incurred, attorneys' fees, and all such other and further relief that fairly and fully compensate her in an amount in excess of the minimum jurisdiction of this Court.

### THIRD CAUSE OF ACTION
### PRODUCT DEFECT DUE TO INADEQUATE WARNING OR INSTRUCTION
### (OHIO REV. CODE ANN. § 2307.76)

218.    Plaintiffs restate and incorporate all other allegations in this Complaint as if fully set forth herein.

219.    Defendant is a "manufacturer" within the meaning of Ohio Rev. Code Ann. § 2307.71(A)(9).

220.     Defendant knew or had reason to know of the defects inherent in Roundup®; knew or had reason to know that a user's or consumer's exposure to Roundup® created a significant risk of harm and unreasonably dangerous side effects, including but not limited to the development of NHL; and failed to prevent or adequately warn of these risks and injuries.

221.     Defendant failed to provide accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to glyphosate, the surfactant POEA, and other adjuvants and "inert" ingredients in Roundup®.

222.     Defendant knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup®.

223.     Defendant has further wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

224.     Defendant's conduct included but was not limited to the following acts and/or omissions:

a)    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

b)    Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and/or be exposed to its Roundup® products;

c) Failing to disclose to Mrs. Dektas, users, consumers, and the general public that the use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

d) Failing to warn Mrs. Dektas, users, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Mrs. Dektas and other users or consumers;

e) Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

f) Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

g) Advertising, marketing, and recommending the use of Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate; and

h) Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup® is safe for use.

225.    Mrs. Dektas did not know the nature and extent of the injuries that could result from the use of and/or exposure to Roundup® or its active ingredient glyphosate.  Mrs. Dektas relied upon the skill, superior knowledge, and judgment of Defendant.

226.    Defendant's conduct, as described above, was reckless. Defendant regularly risks the lives of consumers and users of its products, including Mrs. Dektas, with full knowledge of the dangers of its products. Defendant has made conscious decisions not to redesign, re-label,

warn, or inform the unsuspecting public, including Mrs. Dektas. Defendant's reckless conduct therefore warrants an award of punitive damages in accordance with Ohio Rev. Code Ann. § 2307.80.

227. As a direct and proximate result of the Defendant's acts and omissions in placing Roundup® into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Roundup® and other co-formulants, Mrs. Dektas developed non-Hodgkin's Lymphoma, and suffered severe and personal injuries, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care. Mrs. Dektas's injuries constitute "harm" as defined under Ohio Rev. Code Ann. § 2307.71(A)(7).

228. Plaintiff is entitled to damages pursuant to Ohio Rev. Code Ann. §2307.71-.80. Furthermore, Defendant's actions and omissions as identified in this Complaint were in flagrant disregard of the safety of Plaintiff, and were oppressive, fraudulent or malicious, so as to warrant the imposition of punitive damages, in accordance with Ohio Rev. Code Ann. § 2307.80.

229. As a direct and proximate result of Defendant's acts and omissions, Mrs. Dektas has experienced physical pain and suffering, mental anguish, economic damages, and any and all other damages recoverable under law.

230. WHEREFORE, Mrs. Dektas demands judgment against Defendant for compensatory and punitive damages together with interest, costs herein incurred, attorneys' fees, and all such other and further relief that fairly and fully compensate her in an amount in excess of the minimum jurisdiction of this Court.

## FOURTH CAUSE OF ACTION
## PRODUCT DEFECT DUE TO NONCONFORMANCE WITH REPRESENTATIONS
## (OHIO REV. CODE ANN. § 2307.77)

231.     Plaintiffs restate and incorporate all other allegations in this Complaint as if fully set forth herein.

232.     Defendant is a "manufacturer" within the meaning of Ohio Rev. Code Ann. § 2307.71(A)(9).

233.     Defendant's Roundup® was defective because it did not conform, when it left Defendant's control, to Defendant's representations that Roundup® was safe and acceptable to users and consumers.

234.     Defendant expressly represented to the purchasers of Roundup®, by and through statements made by Defendant in labels, publications, package inserts, and other written materials intended for consumers and the general public, that its Roundup® products were safe to human health and the environment. Defendant advertised, labeled, marketed, and promoted Roundup® products, representing the quality to consumers and the public in such a way as to induce their purchase or use.

235.     These express representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Roundup® and glyphosate.

236.     Defendant knew and/or should have known that the risks expressly included in Roundup® warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Thus, Defendant knew that its Roundup® products did not conform, when they left its control, to its representations that Roundup® is safe and acceptable.

237.     Nevertheless, Defendant expressly represented that its Roundup® products were safe and effective, that they were safe and effective for use by individuals such as Plaintiff, and/or that they were safe and effective as agricultural herbicides.

238.     Defendant placed its Roundup® products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate.

239.     Defendant represented through its labeling, advertising, and marketing materials that its Roundup® products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated with use of and/or exposure to Roundup® and glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings and labels.

240.     Defendant represented that its Roundup® products were safe for use and fraudulently concealed information that demonstrated that glyphosate, the active ingredient in Roundup®, had carcinogenic properties, and that its Roundup® products, therefore, were not safer than alternatives available on the market.

241.     Defendant had sole access to material facts concerning the nature of the risks associated with its Roundup® products as expressly stated within its warnings and labels, and Defendant knew that consumers and users such as Mrs. Dektas could not have reasonably discovered that the risks expressly included in Roundup® warnings and labels were inadequate and inaccurate.

242.     Mrs. Dektas had no knowledge of the falsity or incompleteness of

Defendant's statements and representations concerning Roundup®.

243.    To this day, Defendant has failed to adequately warn Plaintiff of the true risks that are associated with the use of and exposure to Roundup®and its active ingredient glyphosate, a probable carcinogen.

244.    As a direct and proximate result of Defendant's wrongful acts and omissions, Mrs. Dektas developed non-Hodgkin's Lymphoma, and suffered severe and personal injuries, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.  Mrs. Dektas's injuries constitute "harm" as defined under Ohio Rev. Code Ann. § 2307.71(A)(7).

245.    Plaintiff is entitled to damages pursuant to Ohio Rev. Code Ann. § 2307.73. Furthermore, Defendant's actions and omissions as identified in this Complaint were in flagrant disregard of the safety of Mrs. Dektas, and were oppressive, fraudulent or malicious, so as to warrant the imposition of punitive damages, in accordance with Ohio Rev. Code Ann. § 2307.80.

246.    WHEREFORE, Mrs. Dektas demands judgment against Defendant for compensatory and punitive damages together with interest, costs herein incurred, attorneys' fees, and all such other and further relief that fairly and fully compensate her in an amount in excess of the minimum jurisdiction of this Court.

## FIFTH CAUSE OF ACTION
## (BREACH OF EXPRESS WARRANTY)

247.    Plaintiffs restate and incorporate all other allegations in this Complaint as if fully set forth herein.

248.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including

Mrs. Dektas, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

249.     At all times relevant to this litigation, Defendant expressly represented and warranted to the purchasers of its Roundup® products, by and through statements made by Defendant in labels, publications, package inserts, and other written materials intended for consumers and the general public, that its Roundup® products were safe to human health and the environment, effective, fit, and proper for their intended use. Defendant advertised, labeled, marketed, and promoted Roundup® products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that its Roundup® products would conform to the representations.

250.     These express representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Roundup® and glyphosate. Defendant knew and/or should have known that the risks expressly included in Roundup® warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendant expressly represented that its Roundup® products were safe and effective, that they were safe and effective for use by individuals such as Mrs. Dektas, and/or that they were safe and effective as agricultural herbicides.

251.     The representations about Roundup®, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

252.     Defendant placed its Roundup® products into the stream of commerce for sale

and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate.

253.    Defendant breached these warranties because, among other things, its Roundup® products were defective, dangerous, unfit for use, did not contain label representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically, Defendant breached the warranties by representing through its labeling, advertising, and marketing materials that its Roundup® products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated with use of and/or exposure to Roundup® and glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings and labels.

254.    Defendant represented that its Roundup® products were safe for use and fraudulently concealed information that demonstrated that glyphosate, the active ingredient in Roundup®, had carcinogenic properties, and that its Roundup® products, therefore, were not safer than alternative products available on the market. Defendant had sole access to material facts concerning the nature of the risks associated with its Roundup® products as expressly stated within its warnings and labels, and Defendant knew that consumers and users, such as Mrs. Dektas, could not have reasonably discovered that the risks expressly included in Roundup® warnings and labels were inadequate and inaccurate.

255.    Mrs. Dektas had no knowledge of the falsity or incompleteness of Defendant's statements and representations concerning Roundup®.

256.    Mrs. Dektas used and/or was exposed to the use of Roundup® as researched, developed, designed, tested, formulated, manufactured, inspected, labeled, distributed, packaged,

marketed, promoted, sold, or otherwise released into the stream of commerce by Defendant.

257.    Had the warnings and labels for Roundup® products accurately and adequately set forth the true risks associated with the use of such products, including Mrs. Dektas's injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Mrs. Dektas could have avoided the injuries complained of herein.

258.    As a direct and proximate result of Defendant's wrongful acts and omissions, Mrs. Dektas developed NHL, and suffered severe and personal injuries, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

259.    WHEREFORE, Mrs. Dektas demands judgment against Defendant for compensatory and punitive damages together with interest, costs herein incurred, attorneys' fees, and all such other and further relief that fairly and fully compensate her in an amount in excess of the minimum jurisdiction of this Court.

## SIXTH CAUSE OF ACTION
## (BREACH OF IMPLIED WARRANTIES)

260.    Plaintiffs restate and incorporate all other allegations in this Complaint as if fully set forth herein.

261.    At all times herein mentioned, Defendant manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold Roundup® as a broad-spectrum herbicide. These actions were under the ultimate control and supervision of Defendant.

262.    At the time Defendant marketed, sold, and distributed Roundup® for use by Mrs. Dektas, Defendant knew of Roundup®'s intended use and impliedly warranted the product to be of merchantable quality and safe and fit for this use.

263. The Defendant impliedly represented and warranted to Mrs. Dektas and users of Roundup®, the agricultural community, and/or the EPA that Roundup® was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.

264. These representations and warranties were false, misleading, and inaccurate in that Roundup® was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

265. Mrs. Dektas and/or the EPA did rely on said implied warranty of merchantability of fitness for particular use and purpose.

266. Mrs. Dektas reasonably relied upon the skill and judgment of Defendant as to whether Roundup® was of merchantable quality and safe and fit for its intended use.

267. Roundup® was injected into the stream of commerce by the Defendant in a defective, unsafe, and inherently dangerous condition, and the products' materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

268. The Defendant breached the aforesaid implied warranties, as its herbicide Roundup® was not fit for its intended purposes and uses.

269. As a direct and proximate result of Defendant's wrongful acts and omissions, Mrs. Dektas developed NHL, and suffered severe and personal injuries, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

270. WHEREFORE, Mrs. Dektas demands judgment against Defendant for compensatory and punitive damages together with interest, costs herein incurred, attorneys' fees, and all such other and further relief that fairly and fully compensate her in an amount in excess of the minimum jurisdiction of this Court.

## SEVENTH CAUSE OF ACTION
### (Loss of Consortium)

271.     Plaintiffs restate and incorporate all other allegations in this Complaint as if fully set forth herein.

272.     Plaintiffs were married at the time of Mrs. Dektas's injuries.  As a direct and proximate result of Defendant's wrongful acts and omissions, Mr. Dektas has sustained the loss of consortium, love, affection, solace, and services of his spouse, Mrs. Dektas.

273.     WHEREFORE, Mr. Dektas demands judgment against Defendant for compensatory and punitive damages together with interest, costs herein incurred, attorneys' fees, and all such other and further relief that fairly and fully compensate him in an amount in excess of the minimum jurisdiction of this Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against the Defendant on each of the above-referenced claims and causes of action and as follows:

A.     Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to past and future pain and suffering, emotional distress, loss of enjoyment of life, loss of consortium, and other non-economic damages in an amount to be determined at trial of this action;

B.     Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings, and other economic damages in an amount to be determined at trial of this action;

C.     Awarding punitive and/or exemplary damages for the wanton, willful, fraudulent, and reckless acts of the Defendant who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general

public and of Mrs. Dektas, in an amount sufficient to punish Defendant and deter future similar conduct, to the extent allowed by applicable law; costs including reasonable attorneys' fees, court costs, and other litigation expenses;

D.      Awarding Pre- and Post-judgment interest;

E.      Awarding Plaintiffs reasonable attorneys' fees;

F.      Awarding Plaintiffs the costs of these proceedings; and

G.      Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all issues so triable.

*\s\ Justin C. Walker*

W.B. Markovits (0018514)
Terence R. Coates (0085579)
Justin C. Walker (0080001)
MARKOVITS, STOCK & DEMARCO LLC
3825 Edwards Road, Suite 650
Cincinnati, OH 45209
Telephone: (513) 651-3700
Fax: (513) 665-0219
bmarkovits@msdlegal.com
tcoates@msdlegal.com
jwalker@msdlegal.com

*Attorneys for Plaintiffs*