# U.S. District Court
## Eastern District of Missouri (St. Louis)
## CIVIL DOCKET FOR CASE #: 4:20–cv–00063–JAR

Johnson v. Monsanto Company et al
Assigned to: District Judge John A. Ross
Cause: 28:1332 Diversity–Product Liability

Date Filed: 01/13/2020
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Michael Henry Johnson**

represented by **Emily Jo Kirk**
MCCUNE WRIGHT, LLP
3281 East Guasti Rd.
Suite 100
Ontario, CA 91761
909–557–1250
Fax: 909–557–1275
Email: ejk@mccunewright.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

**Defendant**

**Does 1 through 100 inclusive**

| Date Filed | # | Docket Text |
|---|---|---|
| 01/13/2020 | 1 | COMPLAINT against defendant All Defendants with receipt number AMOEDC–7687992, in the amount of $400 Jury Demand,, filed by Michael Henry Johnson. (Attachments: # 1 Summons, # 2 Civil Cover Sheet, # 3 Form Notice of Intent to Use Process Server, # 4 Original Filing Form)(Kirk, Emily) (Entered: 01/13/2020) |
| 01/13/2020 | 2 | NOTICE OF PROCESS SERVER by Plaintiff Michael Henry Johnson Process Server: Civil Action Group dba APS International (MFG) (Entered: 01/14/2020) |
| 01/14/2020 | | Case Opening Notification: 1 Summons(es) issued. The summons was emailed to Emily Jo Kirk. All non–governmental organizational parties (corporations, limited liability companies, limited liability partnerships) must file Disclosure of Organizational Interests Certificate  (moed–0001.pdf). Judge Assigned: Honorable John A. Ross. (MFG) (Entered: 01/14/2020) |
| 01/29/2020 | 3 | SUMMONS Returned Executed filed by Michael Henry Johnson. Monsanto Company served on 1/21/2020, answer due 2/11/2020. (Kirk, Emily) (Entered: 01/29/2020) |

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| MICHAEL HENRY JOHNSON, | **Civil No.:** |
| Plaintiff, | |
| v. | **COMPLAINT FOR MONEY DAMAGES** |
| MONSANTO COMPANY; JOHN DOES 1 through 100 inclusive, | |
| Defendants. | **Demand for Jury Trial** |

## COMPLAINT FOR MONEY DAMAGES

Plaintiff, by and through his undersigned counsel, brings this Complaint for damages against Defendants Monsanto Company and John Does 1-50 ("Monsanto" or "Defendants"), and alleges the following:

## NATURE OF THE ACTION

1.     This is an action by Plaintiff, who has suffered damages as a direct and proximate result of Defendants' negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup® ("Roundup"), containing the active ingredient glyphosate.

COMPLAINT FOR MONEY DAMAGES

2.      Plaintiff maintains that Roundup and/or glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce and lacked proper warnings and directions as to the dangers associated with its use.

3.      Plaintiff's injuries, like those striking thousands of similarly situated victims across the country, were avoidable.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over Defendants and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendants. Defendants are all either incorporated and/or have their principal place of business outside of the state in which the Plaintiff resides.

5.      The amount in controversy between Plaintiff and Defendants exceeds $75,000, exclusive of interest and costs.

6.      In the further alternative, the Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

7.      The Court has personal jurisdiction over Monsanto, a Delaware corporation whose headquarters and principal place of business is in St. Louis, Missouri as a result of Monsanto's substantial, continuous and systematic contacts with the state and because Monsanto has purposely availed itself of the benefits and privileges of conducting business activities within the state.

2
**COMPLAINT**

8.      Venue is proper within this district pursuant to 28 U.S.C. § 1391 in that Defendants conduct business here and are subject to personal jurisdiction in this district. A substantial part of the acts and/or omissions giving rise to these claims occurred within this district.

9.      Plaintiff respectfully notifies this Court that a transfer order, pertaining to Roundup related actions, has been issued by the United States Judicial Panel on Multidistrict Litigation, *In re: Roundup Products Liability Litigation, MDL No. 2741*. The Order transfers tag-along actions pending outside the Northern District of California to the Northern District of California for coordinated or consolidated pretrial hearings.

## PARTIES

*Plaintiff*

10.     Plaintiff, Michael Henry Johnson, is a natural person and at all relevant times a resident and citizen of Minnesota. Mr. Johnson brings this action for personal injuries sustained by exposure to Roundup containing the active ingredient glyphosate and the surfactant POEA.  As a direct and proximate result of being exposed to Roundup, Plaintiff Johnson developed non-Hodgkin's Lymphoma.

*Defendants*

11.     Defendant MONSANTO COMPANY is a Delaware corporation, Missouri Secretary of State Charter No. F00488018, in "good standing" status, with a principal place of business in St. Louis, Missouri.

3
**COMPLAINT**

12.     Upon best information and belief, Defendants JOHN DOES 1-50 are subsidiaries, partners, or other entities that were involved in the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup, containing the active ingredient glyphosate. The identities of JOHN DOES 1-50 are unknown to Plaintiff at this time. Plaintiff will move the Court to specifically name JOHN DOES 1- 50 as their identities become known to Plaintiff through discovery.

13.     Upon information and belief, Defendants did act together to design, sell, advertise, manufacture and/or distribute Roundup, with full knowledge of its dangerous and defective nature.

## BACKGROUND

14.     In 1970, Defendant Monsanto discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup. Roundup is a non-selective herbicide used to kill weeds and grasses that commonly compete with the growing of crops.

15.     By 2001, glyphosate had become the most-used active ingredient in American agriculture.  As of 2013, glyphosate was the world's most widely used herbicide.

16.      Today "Roundup" refers to all formulations of Defendants' Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough

Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry

Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup

Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup

Herbicide, Roundup Original 2k Herbicide, Roundup Original II Herbicide, Roundup Pro

Concentrate, Roundup Pro Dry Herbicide, Roundup Promax, Roundup Quik Stik Grass

and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed &

Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup

Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup

Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2,

Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM

Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer

Concentrate Plus, Roundup Weed & Grass Killer Ready-to-Use Plus, Roundup Weed &

Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup

WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation

containing the active ingredient glyphosate.

17.     Monsanto is a multinational agricultural biotechnology corporation based in

St. Louis, Missouri.  It is the world's leading producer of glyphosate.  As of 2009,

Monsanto was the world's leading producer of seeds, accounting for 27% of the world

seed market.  The majority of those seeds are the Roundup Ready® brand.  The stated

advantage of Roundup Ready® crops is that they substantially improve a farmer's ability

to control weeds, since glyphosate can be sprayed in fields during the growing season without harming the crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

18.    Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup is used. It has been found in food, in urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

19.    On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposure to glyphosate in several countries around the world, and it traced the health implications from exposure to glyphosate since 2001.

20.    On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provided a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

21.    The IARC Working Group classified glyphosate as a Group 2A herbicide, which means it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate are NHL and other

6
**COMPLAINT**

hematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia,
B-cell lymphoma, and multiple myeloma.

22.     The IARC evaluation is significant.  It confirms what has been believed for
years: that glyphosate is toxic to humans.

23.     Nevertheless, Defendants, since they began selling Roundup, have
represented it as safe to humans and the environment.  Indeed, Defendants have
repeatedly proclaimed and continue to proclaim to the world, and particularly to United
States consumers, that glyphosate-based herbicides, including Roundup, create no
unreasonable risks to human health or to the environment.

## FACTUAL ALLEGATIONS

24.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide
variety of herbicidal products around the world.

25.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves,
stems, and roots, and detectable quantities accumulate in the plant tissues. Treated plants
usually die in two to three days.  Because plants absorb glyphosate, it cannot be
completely removed by washing or peeling produce or by milling, baking or brewing
grains.

26.     For more than 40 years, farms across the world have used Roundup without
knowing of the dangers its use poses.  That is because when Defendants first introduced
Roundup, it touted glyphosate as a technological breakthrough: it could kill almost every

weed without causing harm either to people or to the environment.  Of course, history has shown that not to be true.  According to the WHO, the main chemical ingredient of Roundup – glyphosate – is a probable cause of cancer.  Those most at risk are farm workers and other individuals with workplace exposure to Roundup, such as workers in garden centers, nurseries, and landscapers.  But Defendants assured the public that Roundup was harmless and led a prolonged campaign of misinformation to convince government agencies, farmers, and the general population (including Plaintiff) that Roundup was safe and continue this campaign today.

27.     Meanwhile, for more than 40 years, farmers and other consumers across the globe have used Roundup, unaware of its carcinogenic properties. All the while, Monsanto has made massive profits

### *The Discovery of Glyphosate and Development of Roundup*

28.     The herbicide properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz.  The first glyphosate-based herbicide was introduced to the market in the mid-1970's under the brand name Roundup.  From the outset, Monsanto marketed Roundup as a "safe" general-purpose herbicide for widespread commercial and consumer use.  Defendants still market Roundup as safe today.

### *Registration of Herbicides Under Federal Law*

29.     The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act

("FIFRA"), 7 U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA. 7 U.S.C. § 136a(a).

30.    Because pesticides are toxic to plants, animals and humans, at least to some degree, the EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

31.    FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

32.    The EPA registered Roundup for distribution, sale, and manufacture in the United States.

**COMPLAINT**

33.   FIFRA generally requires that the registrant, Monsanto in the case of Roundup, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

34.   The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of reevaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

35.   In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment – in relation to the re-registration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015 but delayed releasing the assessment pending further review in light of the WHO's health-related findings.

**_Defendants Have Known For Decades That They Falsely Advertise the Safety of Roundup_**

36.   In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and

10
**COMPLAINT**

"practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

    a.  Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

    b.  And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

    c.  Roundup biodegrades into naturally occurring elements.

    d.  Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

    e.  This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

    f.  You can apply Accord with…confidence because it will stay where you put it…it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

    g.  Glyphosate is less toxic to rats than table salt following acute oral ingestion.

    h.  Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

11
**COMPLAINT**

    i.  You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

    j.  "Roundup can be used where kids and pets'll play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

37.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

    a.  its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

***

    b.  its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable.

***

    c.  its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

***

    d.  its glyphosate-containing pesticide products or any component thereof are "good" for the environment.

***

12

**COMPLAINT**

    e.  glyphosate-containing pesticide products or any component thereof are safer or less toxic than common household products.

***

    f.  its glyphosate-containing products or any component thereof might be classified as "practically non-toxic".

38.    Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

39.    In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."

### *Evidence of Carcinogenicity in Roundup*

40.    As early as the 1980's Defendants were aware of glyphosate's carcinogenic properties.

41.    Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as *possibly carcinogenic* to *humans* (Group C) in 1985.  After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991.  In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer:  "It should be

13<br><b>COMPLAINT</b>

emphasized, however, that designation of an agent in Group E is based on available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

42.     In addition, many studies support the hypothesis that glyphosate formulations found in Defendants' Roundup products are more dangerous and toxic than glyphosate alone.  As early as 1991, evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.

43.     In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

44.     The study found that Defendants' Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

45.     In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

46.     The study noted that "[c]ell-cycle dysregulation is a hallmark of tumor cells and human cancers. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cells, it was of interest to evaluate the threshold dose of glyphosate affecting cells."

47.    In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

48.    The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

49.    In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

50.    The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

51.    The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendants.

15
**COMPLAINT**

52.     Defendants knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup.

53.     Defendants knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

54.     Defendants failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup.

55.     Rather than performing appropriate tests, Defendants relied upon flawed industry-supported studies designed to protect Defendants' economic interests rather than Plaintiff and the consuming public.

56.     Despite their knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendants continued to promote Roundup as safe.

### *IARC Classification of Glyphosate*

57.     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015–2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

**COMPLAINT**

58.     IARC set glyphosate for review in 2015-2016. IARC uses two main criteria for determining priority of agents for review. There must be evidence of human exposure and there must be some evidence or suspicion of carcinogenicity.  Chemical analogues and compounds with biological or physical characteristics similar to those of suspected carcinogens may also be considered, even in the absence of data on a possible carcinogenic effect in humans or experimental animals. In addition, scientific literature is surveyed for published data relevant to an assessment of carcinogenicity.

59.     In March 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendants' possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Defendants' Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

60.     The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A probable carcinogen to humans. According to the authors, glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

**COMPLAINT**

61.     The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

62.     The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

**_Earlier Evidence of Glyphosate's Danger_**

63.     Defendants have also had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

64.     Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

65.     In 1997, Chris Clements published "Genotoxicity of select herbicides in _Rana catesbeiana_ tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

66.     The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

67.     Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.  Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.  This is

consistent with the IARC Monograph which notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

68.    In 2006, César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

69.    The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

70.    The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

71.    Despite knowledge to the contrary, Defendants maintain that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

72.    In addition to glyphosate and Roundup's genotoxic properties, Defendants have long been aware of glyphosate's carcinogenic properties.

73.    Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, NHL, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

74.    Defendants have known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

75.    In 1985, the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded that glyphosate was oncogenic.

76.    In 2003, Lennart Hardell and Mikael Eriksson published the results of two case-controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

77.    The study concluded that glyphosate had the most significant relationship to NHL among all herbicide studies with an increased odds ratio of 3:11.

78.    In 2003, AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

79.    The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

80.    In 2008, Mikael Eriksson published a population-based case-control study of exposure to various pesticides as a risk factor for NHL.

81.    This strengthened previous associations between glyphosate and NHL.

82.    In spite of this knowledge, Defendants continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household

items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

83.    Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiff, the agricultural community, and the public at large to purchase, and increase the use of, Defendants' Roundup for Defendants' pecuniary gain, and in fact did induce Plaintiff to use Roundup.

84.    Defendants made these statements with complete disregard and reckless indifference to the safety of Plaintiff and the general public.

85.    Notwithstanding Defendants' representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

86.    Defendants knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

87.    Defendants failed to appropriately and adequately inform and warn Plaintiff of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature,

cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

88.     Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendants continue to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, nongenotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

89.     Defendants have claimed and continue to claim that Roundup is safe, non-carcinogenic, and non-genotoxic.

90.     Glyphosate, and Defendants' Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

91.     Defendants' statements proclaiming the safety of Roundup and disregarding its dangers misled Plaintiff.

92.     Despite Defendants' knowledge that Roundup was associated with an elevated risk of developing cancer, Defendants' promotional campaigns have focused on Roundup's purported "safety profile."

93.     Defendants' failure to adequately warn Plaintiff resulted in (1) Plaintiff using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing

22
**COMPLAINT**

to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup exposure.

94.    Defendants failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

95.    The failure of Defendants to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

96.    The failure of Defendants to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

97.    The failure of Defendants to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

98.    By reason of the foregoing acts and omissions, Plaintiff seeks compensatory damages as a result of Plaintiff's use of, and exposure to, Roundup which caused or was a substantial contributing factor in causing Plaintiff to suffer from cancer, specifically NHL, and Plaintiff suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

99.    By reason of the foregoing, Plaintiff is severely and permanently injured.

100.   By reason of the foregoing acts and omissions, Plaintiff has endured and, in some categories continues to suffer, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of the actions and inactions of the Defendants.

## *Plaintiff's Exposure to Roundup*

101.   Plaintiff was exposed to Roundup that was used in and around his personal property to control weeds and/or unwanted plant growth.

102.   For many years and on a regular basis, Plaintiff was exposed to the Roundup product.

103.   Plaintiff was subsequently diagnosed with non-Hodgkin's Lymphoma in and around November 2016.

104.   As a result of his injuries, Plaintiff has incurred significant economic and non-economic damages.

## *Equitable Tolling of Applicable Statute of Limitations*

105.   Plaintiff incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

106.   Plaintiff has suffered an illness that has a latency period that does not arise until years after exposure.  Plaintiff had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup and glyphosate until he was made aware that his illness, including NHL, could be caused by his use and/or

**COMPLAINT**

exposure to Roundup.  The discovery rule applies to these cases, and the statute of limitations has been tolled until the day the Plaintiff knew or had reason to know that his illness, including NHL, was linked to his use and/or exposure to Roundup.

107.   Within the time period of any applicable statute of limitations, Plaintiff could not have discovered through the exercise of reasonable diligence that exposure to Roundup and glyphosate is injurious to human health.

108.   Plaintiff did not discover and did not know of facts that would cause a reasonable person to suspect the risks associated with the use of and/or exposure to Roundup and glyphosate nor would a reasonable and diligent investigation by him have disclosed that Roundup and glyphosate would cause his illnesses.

109.   The expiration of any applicable statute of limitations has been equitably tolled by reason of Defendants' fraudulent misrepresentations and fraudulent concealment and fraudulent conduct.  Through affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiff the true risks associated with use of and/or exposure to Roundup.

110.   As a result of Defendants' actions, Plaintiff was unaware, and could not reasonably know or have learned through reasonable diligence that Roundup and/or glyphosate contact, exposed Plaintiff to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

111.   Furthermore, Defendants are estopped from relying on any statute of limitations because of their concealment of the truth regarding the safety of Roundup. Defendants had a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which it continues to have exclusive control.  Defendants knew that this information was not available to Plaintiff, his medical providers and/or his health facilities, yet they failed to disclose this information to the public.

112.   Defendants had the ability to and did spend enormous amounts of money in furtherance of the purposes of marketing and promoting a profitable product, notwithstanding the known or reasonably knowable risks.  Plaintiff and medical professionals could not have afforded to and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and they were forced to rely on Defendants' representations.

113.   Plaintiff had no knowledge that Defendants were engaged in the wrongdoing alleged herein. Because of the fraudulent and intentional acts of concealment of wrongdoing by Defendants, Plaintiff could not have reasonably discovered the wrongdoing at any time prior. Accordingly, Defendants are precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

## FIRST CAUSE OF ACTION
## (NEGLIGENCE)

114.   Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

115.   Defendants directly or indirectly, caused Roundup products to be sold, distributed, packaged, labeled, marketed, advertised, promoted, and/or used by Plaintiff.

116.   At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, advertising, supplying, promoting, packaging, selling, and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

117.   Defendants failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, advertising, supplying, promoting, packaging, selling, quality assurance, quality control, and/or distribution of Roundup into interstate commerce in that Defendants knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring, and/or medications.

118.   The negligence by Defendants, their agents, servants, and/or employees, include but is not limited to the following acts and/or omissions:

   a.  Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly testing it;

   b.  Failing to adequately, sufficiently, and properly test Roundup;

   c.  Not conducting sufficient testing programs to determine whether or not Roundup was safe for use; in that Defendants herein knew or should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users;

   d.  Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Defendants had knowledge that Roundup is, was, or could be carcinogenic;

   e.  Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

   f.  Negligently failing to adequately and correctly warn Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

   g.  Negligently failing to petition the EPA to strengthen the warnings associated with Roundup;

   h.  Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

i. Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

j. Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

k. Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

l. Negligently designing Roundup in a manner which was dangerous to its users;

m. Negligently manufacturing Roundup in a manner which was dangerous to its users;

n. Negligently producing Roundup in a manner which was dangerous to its users;

o. Negligently formulating Roundup in a manner which was dangerous to its users;

p. Concealing information from Plaintiff while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations;

q. Improperly concealing and/or misrepresenting information from Plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides; and

r. Negligently selling Roundup with a false and misleading label.

119.   Defendants under-reported, underestimated, and downplayed the serious

dangers of Roundup.

120.    Defendants negligently and deceptively compared the safety risks and/or dangers of Roundup with common everyday foods such as table salt, and other forms of herbicides.

121.    Defendants were negligent in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that they:

        a.    Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide;

        b.    Failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

        c.    Failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

        d.    Failed to accompany their product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;

        e.    Failed to warn Plaintiff of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of NHL;

        f.    Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup;

g. Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants;

h. Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity; and

i. Were otherwise careless and/or negligent.

122.    Despite the fact that Defendants knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Defendants continued and continue to market, manufacture, distribute, and/or sell Roundup to consumers, including the Plaintiff.

123.    Defendants knew or should have known that consumers such as the Plaintiff would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care, as set forth above.

124.    Defendants' violations of law and/or negligence were the proximate cause of Plaintiff's injuries, harm and economic loss, which Plaintiff suffered and/or will continue to suffer.

125.    As a result of the foregoing acts and omissions, the Plaintiff suffered from serious and dangerous side effects including, but not limited to, NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, Plaintiff suffered life-threatening NHL, and severe personal

injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

126.   WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## SECOND CAUSE OF ACTION
## (STRICT PRODUCTS LIABILITY – DESIGN DEFECT)

127.   Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

128.   At all times herein mentioned, Defendants designed, researched, manufactured, tested, advertised, marketed, promoted, sold, distributed, and/or have acquired the Defendants who have designed, researched, tested, advertised, promoted, marketed, sold, and distributed Roundup as hereinabove described that was used by the Plaintiff.

129.   Defendants' Roundup was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendants.

130.   At those times, Roundup was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, the Plaintiff herein.

131.   The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup.

132.   The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective in design and/or formulation, in that, when it left the hands of Defendants' manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

133.   At all times herein mentioned, Roundup was in a defective condition and unsafe, and Defendants knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendants. In particular, Defendants' Roundup was defective in the following ways:

> a.   When placed in the stream of commerce, Defendants' Roundup products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate.

b.  When placed in the stream of commerce, Defendants' Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c.  When placed in the stream of commerce, Defendants' Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

d.  Defendants did not sufficiently test, investigate, or study its Roundup products.

e.  Exposure to Roundup and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f.  Defendants knew or should have known at the time of marketing its Roundup products that exposure to Roundup and could result in cancer and other severe illnesses and injuries.

g.  Defendants did not conduct adequate post-marketing surveillance of its Roundup products.

134.  Defendants knew, or should have known, that at all times herein mentioned its Roundup was in a defective condition and was and is inherently dangerous and unsafe.

135.  Plaintiff was exposed to Defendants' Roundup in the course of work, as described above, without knowledge of Roundup's dangerous characteristics.

136.  At the time of the Plaintiff's use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

137.   Defendants, with this knowledge, voluntarily designed its Roundup with a dangerous condition for use by the public, and in particular the Plaintiff.

138.   Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

139.   Defendants created a product that was and is unreasonably dangerous for its normal, intended use.

140.   Defendants marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

141.   The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was manufactured defectively in that Roundup left the hands of Defendants in a defective condition and was unreasonably dangerous to its intended users.

142.   The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants reached their intended users in the same defective and unreasonably dangerous condition in which the Defendants' Roundup was manufactured.

143.   Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an

unreasonable risk to the health of consumers and to the Plaintiff in particular, and Defendants are therefore strictly liable for the injuries sustained by the Plaintiff.

144.   Plaintiff could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

145.   By reason of the foregoing, the Defendants have become strictly liable to the Plaintiff for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup.

146.   Defendants' defective design of Roundup amounts to willful, wanton, and/or reckless conduct by Defendants.

147.   Defects in Defendants' Roundup were the cause or a substantial factor in causing Plaintiff's injuries.

148.   As a result of the foregoing acts and omission, Plaintiff developed NHL, and suffered severe and personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

149.   WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

///

## THIRD CAUSE OF ACTION
## (STRICT PRODUCTS LIABILITY – FAILURE TO WARN)

150.   Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

151.   At all times relevant to this litigation, Defendants have engaged in the business of selling, testing, developing, designing, distributing, supplying, manufacturing, marketing, and/or promoting Roundup, and through that conduct have knowingly and intentionally placed Roundup into the stream of commerce with full knowledge that it reaches consumers such as Plaintiff who are exposed to it through ordinary and reasonably foreseeable uses.

152.   Defendants did in fact sell, distribute, supply, manufacture, market and/or promote Roundup to Plaintiff. Additionally, Defendants expected the Roundup that they were selling, distributing, supplying, designing, developing, manufacturing, marketing and/or promoting to reach – and Roundup did in fact reach – consumers, including Plaintiff, without any substantial change in the condition of the product from when it was initially distributed by Defendants.

153.   At the time of manufacture, Defendants had a duty to provide warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing

products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

154.   At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user and was so at the time it was distributed by Defendants and at the time Plaintiff was exposed to and/or ingested the product. The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing NHL as a result of exposure and use.

155.   Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect the health of those exposed in violation of 7 U.S.C. § 136j(a)(1)(E).

156.   Defendants' failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. § 136j(a)(1)(E) as well as the applicable State's laws.

157.   Defendants could have amended the label of Roundup to provide additional warnings.

158.   This defect caused serious injury to Plaintiff, who used Roundup in its intended and foreseeable manner.

159.   At all times herein mentioned, Defendants had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

160.   Defendants labeled, distributed, and promoted the aforesaid product despite knowing that it was dangerous and unsafe for the use and purpose for which it was intended.

161.   Defendants failed to warn of the nature and scope of the side effects associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of NHL.

162.   Defendants were aware of the probable consequences of the aforesaid conduct. Despite the fact that Defendants knew or should have known that Roundup caused serious injuries, Defendants failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effects of developing NHL from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution. Defendants willfully and deliberately failed to avoid the consequences associated with their failure to warn, and in doing so, Defendants acted with a conscious disregard for the safety of Plaintiff.

163.   At the time of exposure, Plaintiff could not have reasonably discovered any defect in Roundup through the exercise of reasonable care.

**COMPLAINT**

164. Defendants, as the manufacturers and/or distributors of the subject product, are held to the level of knowledge of an expert in the field.

165. Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Defendants.

166. Had Defendants properly disclosed the risks associated with Roundup, Plaintiff would have avoided the risk of NHL by not using Roundup.

167. The information that Defendants did provide or communicate failed to contain adequate warnings and precautions that would have enabled Plaintiff, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

168. To this day, Defendants have failed to adequately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup.

169.   As a result of their inadequate warnings, Defendants' Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were distributed by Defendants, and used by Plaintiff.

170.   As a direct and proximate result of Defendants' actions as alleged herein, and in such other ways to be later shown, the subject product caused Plaintiff to sustain injuries as herein alleged.

171.   WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## FOURTH CAUSE OF ACTION
## (BREACH OF EXPRESS WARRANTIES)

172.   Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein

173.   At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, advertising, marketing, selling, distributing, and promoting of Roundup products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Defendants.

**COMPLAINT**

174.   Defendants had a duty to exercise reasonable care in the research, development, design, testing, packaging, manufacture, inspection, labeling, distributing, advertising, marketing, promotion, sale, and release of Roundup products, including a duty to:

a.   ensure that its products did not cause the user unreasonably dangerous side effects;

b.   warn of dangerous and potentially fatal side effects; and

c.   disclose adverse material facts, such as the true risks associated with the use of and exposure to Roundup and glyphosate-containing products, when making representations to consumers and the general public, including Plaintiff.

175.   As alleged throughout this pleading, the ability of Defendants to properly disclose those risks associated with Roundup is not limited to representations made on the labeling.

176.   At all relevant times, Defendants expressly represented and warranted to the purchasers of its products, by and through statements made by Defendants in labels, publications, package inserts, and other written materials intended for consumers and the general public, that Roundup products were safe to human health and the environment, as well as effective, fit, and proper for their intended use. Defendants advertised, labeled, marketed, and promoted Roundup products, representing the quality to consumers and

42
**COMPLAINT**

the public in such a way as to induce their purchase or use, thereby making an express

warranty that Roundup products would conform to the representations.

177.   These express representations include incomplete warnings and instructions

that purport, but fail, to include the complete array of risks associated with use of and/or

exposure to Roundup and glyphosate. Defendants knew and/or should have known that

the risks expressly included in Roundup warnings and labels did not and do not

accurately or adequately set forth the risks of developing the serious injuries complained

of herein. Nevertheless, Defendants expressly represented that Roundup products were

safe and effective, that they were safe and effective for use by individuals such as the

Plaintiff, and/or that they were safe and effective as agricultural herbicides.

178.   The representations about Roundup, as set forth herein, contained or

constituted affirmations of fact or promises made by the seller to the buyer, which related

to the goods and became part of the basis of the bargain, creating an express warranty

that the goods would conform to the representations.

179.   Defendants placed Roundup products into the stream of commerce for sale

and recommended their use to consumers and the public without adequately warning of

the true risks of developing the injuries associated with the use of and exposure to

Roundup and its active ingredient glyphosate.

180.   Defendants breached these warranties because, among other things,
Roundup products were defective, dangerous, and unfit for use, did not contain labels
representing the true and adequate nature of the risks associated with their use, and were
not merchantable or safe for their intended, ordinary, and foreseeable use and purpose.
Specifically, Defendants breached the warranties in the following ways:

   a.      Defendants represented through its labeling, advertising, and marketing
           materials that Roundup products were safe, and fraudulently withheld and
           concealed information about the risks of serious injury associated with use
           of and/or exposure to Roundup and glyphosate by expressly limiting the
           risks associated with use and/or exposure within its warnings and labels; and

   b.      Defendants represented that Roundup products were safe for use and
           fraudulently concealed information that demonstrated that glyphosate, the
           active ingredient in Roundup, had carcinogenic properties, and that Roundup
           products, therefore, were not safer than alternatives available on the market.

181.   Plaintiff detrimentally relied on the express warranties and representations of
Defendants concerning the safety and/or risk profile of Roundup in making a decision to
purchase the product. Plaintiff reasonably relied upon Defendants to disclose known
defects, risks, dangers, and side effects of Roundup and glyphosate. Plaintiff would not
have purchased or used Roundup had Defendants properly disclosed the risks associated
with the product, either through advertising, labeling, or any other form of disclosure.

182.   Defendants had sole access to material facts concerning the nature of the
risks associated with its Roundup products, as expressly stated within their warnings and

labels, and knew that consumers and users such as Plaintiff could not have reasonably discovered that the risks expressly included in Roundup warnings and labels were inadequate and inaccurate.

183.   Plaintiff has no knowledge of the falsity or incompleteness of Defendants' statements and representations concerning Roundup.

184.   Plaintiff used and/or was exposed to Roundup as researched, developed, designed, tested, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by Defendants.

185.   Had the warnings, labels, advertisements, or promotional material for Roundup products accurately and adequately set forth the true risks associated with the use of such products, including Plaintiff's injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Plaintiff could have avoided the injuries complained of herein.

186.   As a direct and proximate result of Defendants' breach of express warranty, Plaintiff has sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

187.   As a proximate result of Defendants' breach of express warranty, as alleged herein, there was a measurable and significant interval of time during which Plaintiff suffered great mental anguish and other personal injury and damages.

188.   As a proximate result of Defendants' breach of express warranty, as alleged herein, Plaintiff sustained a loss of income, loss of earning capacity, and property damage.

189.   WHEREFORE, Plaintiff respectfully requests this Court to enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.  Additionally, Plaintiff demands a jury trial on all issues contained herein.

## FIFTH CAUSE OF ACTION
## (BREACH OF IMPLIED WARRANTIES)

190.   Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

191.   At all times herein mentioned, Defendants manufactured, distributed, compounded, recommended, merchandized, advertised, marketed, promoted, and sold Roundup and/or have recently acquired the Defendants who have manufactured, compounded, portrayed, distributed, recommended, merchandized, advertised, marketed, promoted, and sold Roundup, as a broad-spectrum herbicide. These actions were under the ultimate control and supervision of Defendants.

192.    At the time Defendants marketed, sold, and distributed Roundup for use by Plaintiff, Defendants knew of Roundup's intended use and impliedly warranted the product to be of merchantable quality and safe and fit for this use.

193.    Defendants impliedly represented and warranted to Plaintiff and users of Roundup, the agricultural community, and/or the EPA that Roundup was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.

194.    These representations and warranties were false, misleading, and inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

195.    Plaintiff and/or the EPA did rely on said implied warranties of merchantability of fitness for particular use and purpose.

196.    Plaintiff reasonably relied upon the skill and judgment of Defendants as to whether Roundup was of merchantable quality and safe and fit for its intended use.

197.    Roundup was injected into the stream of commerce by the Defendants in a defective, unsafe, and inherently dangerous condition, and the products' materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

198.    Defendants breached the aforesaid implied warranties, as their herbicide Roundup was not fit for its intended purposes and uses.

199.   As a result of the foregoing acts and omissions, Plaintiff suffered from NHL and Plaintiff suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic, and non-economic damages.

200.   WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## SIXTH CAUSE OF ACTION
## (FRAUD)

201.   Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

202.   Defendants have defrauded the agricultural community in general and Plaintiff in particular by misrepresenting the true safety of Roundup and by failing to disclose known risks of cancer.

203.   Defendants misrepresented and/or failed to disclose, *inter alia*, that: glyphosate could cause cancer; glyphosate is known to be genotoxic in humans and laboratory animals because exposure is known to cause DNA strand breaks (a precursor

to cancer); glyphosate is known to induce oxidative stress in humans and laboratory animals (a precursor to cancer); exposure to glyphosate is causally associated with NHL; and the laboratory tests attesting to the safety of glyphosate were flawed and/or fraudulent.

204.   Due to these misrepresentations and omissions, at all times relevant to this litigation, Defendants' Roundup was misbranded under 7 U.S.C. § 136(g) and its distribution around the United States was a violation of 7 U.S.C. § 136j and 40 C.F.R. § 156.10(a)(5).

205.   Plaintiff relied on the Defendants' misrepresentations and/or material omissions regarding the safety of Roundup and its active ingredient glyphosate in deciding whether to purchase and/or use the product. Plaintiff did not know, nor could he reasonably have known of the misrepresentations and/or material omissions by Defendants concerning Roundup and its active ingredient glyphosate.

206.   The misrepresentations and/or material omissions that form the basis of this fraud claim are not limited to statements made on the Roundup labeling, as defined under federal law, but also involve Defendants' representations and omissions made as part of its promotion and marketing of Roundup, including on the Internet, television, in print advertisements, etc. Nothing prevented Defendants from disclosing the truth about the risks associated with Roundup in its promotional efforts outside of the labeling context,

using the forms of media and promotion Defendants traditionally used to promote the product's efficacy and benefits.

207.   When Defendants made the misrepresentations and/or omissions as alleged in this Complaint, it did so with the intent of defrauding and deceiving the public in general and the agricultural community and with the intent of inducing the public and agricultural community to purchase and use Roundup.

208.   Defendants made these misrepresentations and/or material omissions with malicious, fraudulent and/or oppressive intent toward Plaintiff and the public generally. Defendants' conduct was willful, wanton, and/or reckless. Defendants deliberately recommended, manufactured, produced, marketed, sold, distributed, merchandized, packaged, promoted and advertised the dangerous and defective herbicide Roundup. This constitutes an utter, wanton, and conscious disregard of the rights and safety of a large segment of the public, and by reason thereof, Defendants are liable for reckless, willful, and wanton acts and omissions which evidence a total and conscious disregard for the safety of Plaintiff and others which proximately caused the injuries as set forth herein.

209.   As a proximate result of Defendants' fraudulent and deceitful conduct, representations, and omissions, Plaintiff has sustained damages and other losses in an amount to be proven at trial.

210.   As a proximate result of Defendants' fraud, as alleged herein, Plaintiff has sustained a loss of income, loss of earning capacity and property damage, including lost income.

211.   WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.  Additionally, Plaintiff demands a jury trial on all issues contained herein.

## SEVENTH CAUSE OF ACTION
## (VIOLATION OF CONSUMER FRAUD ACTS)

212.   Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

213.   Defendants fraudulently, intentionally, negligently, and/or innocently misrepresented to the public, and to the Plaintiff, both directly and by and through the media, the safety of Roundup products, and/or fraudulently, intentionally, negligently and/or innocently concealed, suppressed, or omitted material, adverse information regarding the safety of Roundup.  This deception caused injury to Plaintiff in violation of

51
**COMPLAINT**

the Consumer Fraud Acts of the Plaintiff's home state which creates a private right of

action by the Plaintiff.

214.   The intentional, negligent, and/or innocent misrepresentations and omissions

of Defendants regarding the safety of Roundup products were communicated to Plaintiff

directly through national and regional advertising, marketing and promotion efforts, as

well as the packaging and sales aids.  The safety of Roundup products was also

intentionally, negligently and/or innocently misrepresented to Plaintiff and the public

with the intent that such misrepresentations would cause Plaintiff and other potential

consumers to purchase and use or continue to purchase and use Roundup products.

215.   Defendants either knew or should have known of the material

misrepresentations it was making regarding the safety and relative utility of Roundup

products.

216.   Defendants fraudulently, intentionally, negligently, and/or innocently made

the misrepresentations and/or actively concealed, suppressed, or omitted this material

information with the specific desire to induce Plaintiff, and the consuming public to

purchase and use Roundup products.  Defendants fraudulently, intentionally, negligently,

and/or innocently, knew or should have known that Plaintiff and the consuming public

would rely on such material misrepresentations and/or omissions in selecting and

**COMPLAINT**

applying Roundup products.  Defendants knew or should have known that Plaintiff would rely on their false representations and omissions.

217.   Defendants made these misrepresentations and actively concealed adverse information including the risk of NHL, at a time when their agents and/or employees knew or should have known, the product had defects, dangers, and characteristics that were other than what was represented to the consuming public.  Specifically, Defendants misrepresented and actively concealed, suppressed, and omitted that there had been inadequate testing of the safety and efficacy of Roundup, and that prior studies, research, reports, and/or testing had been conducted linking the use of Roundup with serious health events, including NHL.

218.   Despite the fact that Defendants knew or should have known of reports of severe risks including NHL, with Roundup use and exposure, this information was strategically minimized, understated, or omitted in order to create the impression that the human dangers of Roundup were nonexistent, particularly in light of its purported utility.

219.   The fraudulent, intentional, negligent, and/or innocent material misrepresentations and/or active concealment, suppression, and omissions by Defendants were perpetuated directly and/or indirectly through the advertisements, packaging, sales aids, furtive public relations efforts, and other marketing and promotional pieces

authored, analyzed, created, compiled, designed, drafted, disseminated, distributed, edited, evaluated, marketed, published, and supplied by Defendants.

220. If Plaintiff had known the true facts concerning the risks associated with Roundup exposure, Plaintiff would have used a safer alternative.

221. Plaintiff's reliance upon the material misrepresentations and omissions was justified, among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Roundup while Plaintiff was not in a position to know the true facts because Defendants overstated the benefits and safety of Roundup and downplayed the risk of cancer, thereby inducing Plaintiff to use the herbicide rather than safer alternatives.

222. Federal law and the EPA do not authorize and specifically prohibit the deceptions, misrepresentations and omissions made by Defendants.

223. As a direct and proximate result of Defendants' actions and inactions, Plaintiff was exposed to Roundup and suffered and will continue to suffer injuries and damages, as set forth herein.

224. WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory, treble, and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court

deems just and proper.  Additionally, Plaintiff demands a jury trial on all issues contained herein.

## DEMAND FOR JURY TRIAL

225.  Plaintiff hereby demands trial by jury as to all issues within this pleading.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants on each of the above-referenced claims and causes of action and as follows:

1.  Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

2.  Awarding compensatory damages to Plaintiff for past and future damages, including, but not limited to, Plaintiff's pain and suffering and for severe and permanent personal injuries sustained by Plaintiff including health care costs and economic loss;

3.  Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determined at trial of this action;

**COMPLAINT**

4.  Punitive and/or exemplary damages for the wanton, willful, fraudulent, and reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to Plaintiff in an amount sufficient to punish Defendants and deter future similar conduct, to the extent allowed by applicable law;

5.  Pre-judgment interest;

6.  Post-judgment interest;

7.  Awarding Plaintiff reasonable attorneys' fees;

8.  Awarding Plaintiff the costs of these proceedings; and

9.  Such other and further relief as this Court deems just and proper.

Dated: January 13, 2020                    Respectfully submitted,

/s/ Emily J. Kirk
MCCUNE WRIGHT AREVALO, LLP

Emily J. Kirk, Esq. (SBN: 65367-MO)
ejk@mccunewright.com
Kristy M. Arevalo, Esq. (SBN: 216308 - CA)
kma@mccunewright.com
3281 East Guasti Road, Suite 100
Ontario, California 91761
Telephone: (909) 557-1250
Facsimile: (909) 557-1275

**COMPLAINT**