# U.S. DISTRICT COURT
## U.S. District Court, Western District of New York (Buffalo)
## CIVIL DOCKET FOR CASE #: 1:20–cv–00117–CCR

| | |
|---|---|
| Rieman v. Monsanto Company | Date Filed: 01/30/2020 |
| Assigned to: Hon. Christina Clair Reiss | Jury Demand: Plaintiff |
| Cause: 28:1332 Diversity–Product Liability | Nature of Suit: 365 Personal Inj. Prod. Liability |
| | Jurisdiction: Diversity |

**Plaintiff**

**Barbara M Rieman**  represented by  **Nicholas James Shemik**
The Dietrich Law Firm
1323 N. Forest Rd.
Williamsville, NY 14221
716–839–3939
Fax: 716–408–8888
Email: nshemik@calljed.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 01/30/2020 | 1 | COMPLAINT against Monsanto Company $ 400 receipt number 0209–3722799, filed by Barbara M Rieman. (Attachments: # 1 Civil Cover Sheet, # 2 Summons)(Shemik, Nicholas) (Entered: 01/30/2020) |
| 01/31/2020 | | Case assigned to Hon. Christina Clair Reiss. Notification to Chambers of on–line civil case opening. (CGJ) (Entered: 01/31/2020) |
| 01/31/2020 | | AUTOMATIC REFERRAL to Mediation The ADR Plan is available for download at http://www.nywd.uscourts.gov/alternative–dispute–resolution(CGJ) (Entered: 01/31/2020) |
| 01/31/2020 | | Notice of Availability of Magistrate Judge: A United States Magistrate of this Court is available to conduct all proceedings in this civil action in accordance with 28 U.S.C. 636c and FRCP 73. The Notice, Consent, and Reference of a Civil Action to a Magistrate Judge form (AO–85) is available for download at http://www.uscourts.gov/services–forms/forms. (CGJ) (Entered: 01/31/2020) |
| 01/31/2020 | 2 | Summons Issued as to Monsanto Company. (CGJ) (Entered: 01/31/2020) |

# UNITED STATES DISTRICT COURT

## for the

## WESTERN DISTRICT OF NEW YORK

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**BARBARA M. RIEMAN,**
                              Plaintiff,                    **COURT FILE NO.:**

    vs.
                                                            **COMPLAINT**

**MONSANTO COMPANY,**
                              Defendant.                    JURY TRIAL DEMANDED

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The plaintiff, BARBARA M. RIEMAN (herein "plaintiff"), by and through her attorneys, The Dietrich Law Firm P.C., for her Complaint against the defendant, Monsanto Company, alleges upon information and belief:

## NATURE OF THE CASE

1.    This is an action for damages suffered by the plaintiff as a direct and proximate result of the defendant's negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling and/or sale of the herbicide Roundup®, containing the active ingredient glyphosate.

2.    The plaintiff maintains that Roundup® and/or glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper warnings and directions as to the dangers associated with its use.



**The Dietrich Law Firm P.C.**
1323 North Forest Road
Williamsville, New York 14221

3.     The plaintiff's injuries, like those striking thousands of similarly situated victims across the country, were avoidable.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over the defendant, Monsanto Company, and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the plaintiff and the defendant. The defendant is either incorporated and/or has the principle place of business outside of the state in which the plaintiff resides.

5.     The amount in controversy between the plaintiff and the defendant exceeds $75,000.00, exclusive of interest and cost.

6.     The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

7.     Venue is proper within this district pursuant to 28 U.S.C. § 1391 in that the defendant conducts business here and is subject to personal jurisdiction in this district. Furthermore, the defendant sells, markets and/or distributes Roundup® within the Western District of New York. Also, a substantial part of the acts and/or omissions giving rise to these claims occurred within this district.

## PARTIES

8.     At all times herein relevant the plaintiff Barbara M. Rieman has been a resident of the County of Erie and the State of New York.

9.     The plaintiff brings this action for injuries sustained by the plaintiff from exposure to Roundup® ("Roundup") containing the active ingredient glyphosate

and the surfactant POEA. As a direct and proximate result of being exposed to Roundup, the plaintiff, Barbara M. Rieman developed Hairy Cell Leukemia.

10.     "Roundup" refers to all formulations of the defendant's Roundup products including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak Herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k Herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass & Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed and Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass Killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer 1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation containing the active ingredient glyphosate.

11.     The defendant, Monsanto Company is a Delaware corporation, with its principle place of business in St. Louis, Missouri.

3

12.    The defendant Monsanto Company is collectively referred to as "Monsanto" or "defendant."

13.    The defendant advertises and sells goods, specifically Roundup, in Bowmansville, New York.

14.    The defendant transacted and conducted business within the State of New York that relates to the allegations of this Complaint.

15.    The defendants derived substantial revenue from goods and products used in the State of New York.

16.    The defendant expected or should have expected their acts to have consequences within the State of New York, and derived substantial revenue from interstate commerce.

17.    The defendant engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling. and/or selling Roundup.

18.    The defendant is authorized to do business in the State of New York, and derives substantial income from doing business in this state.

19.    The defendant purposely availed itself of the privilege of conducting activities with the State of New York, thus invoking the benefits and protections of its laws.

20.    The defendant did act to design, sell, advertise, manufacture and/or distribute Roundup, with full knowledge of its dangerous and defective nature.

## FACTUAL ALLEGATIONS

21.     At all times herein relevant, the defendant was in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute and/or had acquired and was responsible for the defendant who has designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the commercial herbicide Roundup.

22.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate.

23.     The defendant discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate-based "Roundup" as a broad-spectrum herbicide.

24.     Glyphosate is the active ingredient in Roundup.

25.     Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

26.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

27.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

28.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

29.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks and golf courses. This increase in use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

30.     The defendant is intimately involved in the development, design, manufacture, marketing, sale and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup i.e., "Roundup Ready®." As of 2009, the defendant was the world's leading producer of seeds designed to be Roundup Ready®. In 2010, and estimated of 70% of corn and cotton, and 90% of soybeans fields in the United States contained Roundup Ready® seeds.

31.     The original Roundup, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the world's most widely used herbicides.[1]

32.     For nearly 40 years, consumers, farmers, and the public have used Roundup, unaware of its carcinogenic properties.

### REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

33.     The manufacture, formulation and the distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. §136 et seq. FIFRA requires that all pesticides

---

[1] Backgrounder, History of Monsanto's Glyphosate Herbicides, June 2005.

be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. § 136a(a).

34. The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe,", but rather that the use of product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

35. FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

36. The EPA and the State of New York registered Roundup for distribution, sale, and manufacturing in the United States and the State of New York.

37. FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

7

38.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

39.     In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk-assessment – in relation to the registration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of the World Health Organization's findings.

## MONSANTO'S FALSE REPRESENTATIONS
## REGARDING THE SAFETY OF ROUNDUP®

40.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer **than table salt**" and "practically **non-toxic**" to mammals, birds, and fish. Among the representations that the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

a)      Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the

soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences...

b)   And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence that you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c)   Roundup biodegrades into naturally occurring elements.

d)   Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e)   This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f)   You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g)   Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h)   Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i)   You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j)   "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and

a pet dog standing in an area which has been treated with Roundup.[2]

41.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with the NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a)      Its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b)      Its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable.

c)      Its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d)      Its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e)      Its glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides.

f)      Its glyphosate-containing pesticide products or any component thereof might be classified as "practically non-toxic."

42.     Monsanto did not alter its advertising in the same manner in any state other than New York, and upon information and belief, still has not done so today.

---

[2] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

43.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French Court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[3]

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP

44.     As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties.

45.     On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[4] Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

46.     In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.[5]

47.     In October 1991 the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review

---

[3] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.
[4] Consensus Review of Glyphosate, Casewell No. 661A. March 4, 1985. United States Environmental Protection Agency.
[5] http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheets/0178fact.pdf

committee members did not concur with the conclusions of the committee and one member refused to sign.[6]

48.    In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in the defendant's Roundup products are more dangerous and toxic than glyphosate alone.[7] As early as 1991 evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.[8]

49.    In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

50.    The study found that the defendant's Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

51.    In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

52.    The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of a

---

[6] Second Peer Review of Glyphosate, CAS No.1071-83-6. October 30, 1991. United States Environmental Protection Agency.
[7] Martinez et al. 2007; Benachour 2009; Gasnier et al. 2010; Peixoto 2005; Marc 2004
[8] Martinez et al 1991

unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[9]

53.     In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

54.     The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

55.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic and, placental cells.

56.     The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

57.     The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to the defendant.

[9] (Molinari, 2000; Stewart et al., 2003)

58.     The defendant knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect the plaintiff from Roundup.

59.     The defendant knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

60.     The defendant failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect the plaintiff from Roundup.

61.     Rather than performing appropriate tests, the defendant relied upon flawed industry-supported studies designed to protect the defendant's economic interests rather than the plaintiff and the consuming public.

62.     Despite their knowledge that Roundup was considerably more dangerous than glyphosate alone, the defendant continued to promote Roundup as safe.

## IARC CLASSIFICATION OF GLYPHOSATE

63.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

64.     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015-2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs; there must already be some evidence of the carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

65.     IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

66.     On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in the defendant's possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in the defendant's Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

67.     The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A *probable* carcinogen to humans. According to

the authors glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

68.    The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's Lymphoma ("NHL") and several subtypes of NHL, and other haematopoietic cancers, including Hairy Cell Leukemia, and the increased risk continued after adjustment for other pesticides.

69.    The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

## EARLIER EVIDENCE OF GLYPHOSATE'S DANGER

70.    Despite the new classification by the IARC, the defendant has had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

71.    Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

72.    In 1997, Chris Clements published "Genotoxicity of select herbicides in *Rana catesbeiana* tadpoles using the alkaline single-cell DNA electrophoresis (comet) assay."

73.    The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

74.    Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

16

75.     Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

76.     The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

77.     In 2006, César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

78.     The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had genotoxic effect on exposed individuals.

79.     The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

80.     Despite knowledge to the contrary, the defendant maintains that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

81.     In addition to glyphosate and Roundup's genotoxic properties, the defendant has long been aware of glyphosate's carcinogenic properties.

82.     Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but

not limited to, non-Hodgkin's Lymphoma, Hodgkin's Lymphoma, and other haematopoietic cancers, including Hairy Cell Leukemia.

83.     The defendant has known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

84.     In 1985 the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tube adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

85.     In 2003 Lennart Hardell and Mikael Eriksson published the results of two case-controlled studies on pesticides as a risk factor for haematopoietic cancers.

86.     The study concluded that glyphosate had the most significant relationship to NHL among all herbicide studies with an increased odds ratio of 3:11.

87.     In 2003 AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

88.     The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

89.     In 2008 Mikael Eriksson published a study a population based case-control study of exposure to various pesticides as a risk factor for NHL.

90.     This strengthened previous associations between glyphosate and NHL.

91.     In spite of this knowledge, the defendant continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary

household items such as table salt, despite a lack of scientific support for the accuracy and validity of the statements and, in fact, voluminous evidence to the contrary.

92.     Upon information and belief, these statements and representations have been made with the intent of inducing the plaintiff, the agricultural community and the public at large to purchase and increase the use of, the defendant's Roundup for the defendant's pecuniary gain and in fact did induce the plaintiff to use Roundup.

93.     The defendant made these statements with complete disregard and reckless indifference to the safety of the plaintiff and the general public.

94.     Notwithstanding the defendant's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation and an increased risk of many cancers, including, but not limited to, NHL, and other haematopoietic cancers, including Hairy Cell Leukemia.

95.     The defendant knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, and Hairy Cell Leukemia.

96.     The defendant failed to appropriately and adequately inform and warn the plaintiff of the serious danger and risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL or Hairy Cell Leukemia, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and

mental anguish, diminished enjoyment of life and the need for medical treatment, monitoring and/or medications.

97.    Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, the defendant continues to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-genotoxic and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

98.    The defendant has claimed and continues to claim that Roundup is safe, non-carcinogenic and non-genotoxic. These misrepresentations are consistent with the defendant's cavalier approach to investigating and ensuring the safety of its products, the safety of the public at large and the safety of the plaintiff.

99.    Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."[10]

100.    Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

---

[10] Backgrounder – Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9 2015)

101. Glyphosate, and the defendant's Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

102. The defendant's statements proclaiming the safety of Roundup and disregarding its dangers misled the plaintiff.

103. Despite the defendant's knowledge that Roundup was associated with an elevated risk of developing cancer, the defendant's promotional campaigns focused on Roundup's purported "safety profile."

104. The defendant's failure to adequately warn the plaintiff resulted in (1) the plaintiff using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL and Hairy Cell Leukemia and other injuries associated with Roundup.

105. The defendant failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

106. The failure of the defendant to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

107.    The failure of the defendant to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

108.    The failure of the defendant to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

109.    By reason of the foregoing acts and omissions, the plaintiff seeks compensatory damages as a result of the plaintiff's use of and exposure to, Roundup which caused or was a substantial contributing factor in causing the plaintiff to suffer from cancer, specifically Hairy Cell Leukemia, and the plaintiff suffered severe and personal injuries which rare permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

110.    By reason of the foregoing, the plaintiff was severely and permanently injured.

111.    By reason of the foregoing acts and omissions, the plaintiff has endured and, in some categories, continues to suffer emotional and mental anguish, medical expenses, other economic and non-economic damages as a result of the actions and inactions of the defendant.

## THE PLAINTIFF'S EXPOSURE TO ROUNDUP

112.    The plaintiff repeats and re-alleges the above paragraphs as if set forth in their entirety herein.

113. For many years, the plaintiff sprayed Roundup on a regular basis for personal use. The plaintiff followed all safety and precautionary warnings during the course of use.

114. The plaintiff developed Hairy Cell Leukemia, and was diagnosed by her physician on or about September 6, 2017.

115. The plaintiff developed Hairy Cell Leukemia as a result of her exposure to the defendant's Roundup product. As a result of her injury, the plaintiff has incurred physical injury, significant economic and non-economic damages.

## EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

116. The plaintiff repeats and re-alleges the above paragraphs as if set forth in their entirety herein.

117. The running of any statute of limitations has been tolled by reason of the defendant's fraudulent concealment. The defendant, through their affirmative misrepresentations and omissions, actively concealed from the plaintiff the true risks associated with Roundup and glyphosate.

118. At all times herein relevant, the defendant has maintained that Roundup is safe, non-toxic, and non-carcinogenic.

119. Indeed, even as of July 2016, the defendant continues to represent to the public that "Regulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and *agree* that there is *no evidence* that glyphosate, the active ingredient in Roundup®

brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic." (emphasis added)[11]

120.   As a result of the defendant's actions, the plaintiff was unaware, and could not have reasonably known or have learned through reasonable diligence that Roundup and/or glyphosate contact, exposed the plaintiff to the risks alleged herein and that those risks were the direct and proximate result of the defendant's acts and omissions.

121.   Furthermore, the defendant is estopped from relying on any statute of limitations because of their fraudulent concealment of the true character, quality, and nature of Roundup. The defendant was under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which the defendant had and continues to have exclusive control, and because the defendant knew that this information and was not available to the plaintiff or to distributors of Roundup. In addition, the defendant is estopped from relying on any statute of limitations because of their intentional concealment of these facts.

122.   The plaintiff had no knowledge that the defendant was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by the defendant, the plaintiff could not have reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud should be considered. The defendant had the ability to and did spend enormous amounts of money in furtherance of their purpose of marketing, promoting and/or distributing a

---

[11] Backgrounder – Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9 2015)

profitable herbicide, notwithstanding the known or reasonably known risks. The plaintiff and medical professionals could not have afforded and could not have possibly conducted studies to determine the extent, nature and identity of related health risks, and were forced to rely on only the defendant's representation. Accordingly, the defendant is precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

## FIRST CAUSE OF ACTION
## (NEGLIGENCE)

123.   The plaintiff repeats and re-alleges the above paragraphs as if set forth in their entirety herein.

124.   The defendant had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

125.   The defendant failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, quality assurance, quality control and/or distribution of Roundup into interstate commerce in that the defendant knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of NHL and/or Hairy Cell Leukemia, as well as other severe and personal injuries which are permanent and lasting in nature,

physical pain and mental anguish including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring and/or medications.

126. The negligence by the defendant, its servants, agents and/or employees, included but was not limited to the following acts and/or omissions:

a) Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly testing it;

b) Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup;

c) Not conducting sufficient testing programs to determine whether or not Roundup was safe for use; in that the defendant herein knew or should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users;

d) Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after the defendant had knowledge that Roundup is, was, or could be carcinogenic;

e) Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

f) Negligently failing to adequately and correctly warn the plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

g) Negligently failing to petition the EPA to strengthen the warnings associated with Roundup;

h)     Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

i)     Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

j)     Negligently representing that Roundup was safe for use for its intended purpose and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

k)     Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

l)     Negligently designing Roundup in a manner which was dangerous to its users;

m)     Negligently manufacturing Roundup in a manner which was dangerous to its users;

n)     Negligently producing Roundup in a manner which was dangerous to its users;

o)     Negligently formulating Roundup in a manner which was dangerous to its users;

p)     Concealing information from the plaintiff while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations;

q)     Improperly concealing and/or misrepresenting information from the plaintiff, scientific and medical professionals and/or the EPA concerning the severity of risks and dangers of Roundup compared to other forms of herbicides; and

r)  Negligently selling Roundup with a false and misleading label.

127.  The defendant under-reported, underestimated, and downplayed the serious dangers of Roundup.

128.  The defendant negligently and deceptively compared the safety risks and/or dangers of Roundup with common everyday foods such as table salt, and other forms of herbicides.

129.  The defendant was negligent and/or violated New York law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that they:

a)  Failed to use ordinary care in designing and manufacturing Roundup as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide;

b)  Failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

c)  Failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

d)  Failed to accompany their product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;

e)  Failed to warn the plaintiff of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not

limited to, the development of NHL and/or Hairy Cell Leukemia;

f) Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup;

g) Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants;

h) Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity; and

i) Were otherwise careless and/or negligent.

130. Despite the fact that the defendant knew or should have known that Roundup caused, or could cause, unreasonable dangerous side effects, the defendant continued and continues to market, manufacture, distribute, and/or sell Roundup to consumers, including the plaintiff.

131. The defendant knew or should have known that consumers such as the plaintiff would foreseeably suffer injury as a result of the defendant's failure to exercise ordinary care, as set forth in the paragraphs above.

132. The defendant's violations of law and/or negligence were the proximate cause of the injuries, harm and economic loss, which the plaintiff suffered and/or will continue to suffer.

133. As a result of the foregoing acts and omissions, the plaintiff suffered from serious and dangerous side effects including but not limited to Hairy Cell Leukemia, as well as other severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life

and financial expenses for hospitalization and medical care. Further, the plaintiff suffered life-threatening Hairy Cell Leukemia and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

134.    WHEREFORE, the plaintiff respectfully requests that this Court enter judgment in the plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, the plaintiff demands a jury trial on all issues contained herein.

## SECOND CAUSE OF ACTION
## (STRICT PRODUCTS LIABILITY – DESIGN DEFECT)

135.    The plaintiff repeats and re-alleges the above paragraphs as if set forth in their entirety herein.

136.    At all times herein relevant, the defendant designed, researched, manufactured, tested, advertised, promoted, sold, distributed, and/or acquired the entity who has designed, researched, tested, advertised, promoted, manufactured, sold, and distributed Roundup as described in the paragraphs above and that was used by the plaintiff.

137.    The defendant's Roundup was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the defendant.

138.    At all times herein relevant, Roundup was in an unsafe, defective and inherently dangerous condition, which was dangerous to users, and in particular, the plaintiff herein.

139.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by the defendant were defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup.

140.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by the defendant were defective in design and/or formulation, in that, when it left the hands of the defendant's manufacturer and/or supplier, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

141.    At all times herein relevant, Roundup was in a defective condition and unsafe, and the defendant knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the defendant. In particular, the defendant's Roundup was defective in the following ways:

        a)    When placed in the stream of commerce, the defendant's Roundup products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate.

        b)    When placed in the stream of commerce, the defendant's Roundup products were unreasonably

31

dangerous in that they were hazardous and posed a grave risk or cancer and other serious illnesses when used in a reasonably anticipated manner.

c)  When placed in the stream of commerce, the defendant's Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

d)  The defendant did not sufficiently test, investigate, or study its Roundup products.

e)  Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f)  The defendant knew or should have known at the time of marketing its roundup products that exposure to Roundup could result in cancer and other severe illnesses and injuries.

g)  The defendant did not conduct adequate post-marketing surveillance of its Roundup products.

142.  The defendant knew or should have known that at all times herein mentioned, its Roundup products were in a defective condition and were inherently dangerous and unsafe.

143.  The plaintiff was exposed to the defendant's Roundup, as described in the paragraphs above, without knowledge of Roundup's dangerous characteristics.

144.  At the time of the plaintiff's use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

145.  The defendant with this knowledge voluntarily designed its Roundup with a dangerous condition for use by the public and in particular the plaintiff.

146. The defendant had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

147. The defendant created a product that was and is unreasonably dangerous for its normal, intended use.

148. The defendant marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probably, and established health risks inherent with its normal intended use.

149. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by the defendant was manufactured defectively in that Roundup left the hands of the defendant in a defective condition and was unreasonably dangerous to its intended users.

150. The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by the defendant reached their intended users in the same defective and unreasonably dangerous condition in which the defendant's Roundup was manufactured.

151. The defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to the plaintiff in particular, and the defendant is therefore strictly liable for the injuries sustained by the plaintiff.

152. The plaintiff could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

153.    By reasoning of the aforementioned, the defendant has become strictly liable to the plaintiff for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup.

154.    The defendant's defective design of Roundup amounts to willful, wanton, and/or reckless conduct by the defendant.

155.    Defects in the defendant's Roundup were the cause of, or a substantial factor in causing, the plaintiff's injuries.

156.    As a result of the foregoing acts and omissions, the plaintiff developed Hairy Cell Leukemia, and suffered severe and personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life and financial expenses for hospitalization and medical care.

157.    WHEREFORE, the plaintiff respectfully requests that this Court enter judgment in the plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, the plaintiff demands a jury trial on all issues contained herein.

## THIRD CAUSE OF ACTION
## (STRICT PRODUCTS LIABILITY – FAILURE TO WARN)

158.    The plaintiff repeats and re-alleges the above paragraphs as if set forth in their entirety herein.

159.    The defendant has engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting Roundup, and

through that conduct has knowingly and intentionally placed Roundup into the stream of commerce with full knowledge that it reaches consumers such as the plaintiff who are exposed to it through ordinary and reasonably foreseeable uses.

160.   The defendant did in fact sell, distribute, supply, manufacture, and/or promote Roundup to the plaintiff. Additionally, the defendant expected the Roundup that they were selling, distributing, supplying, manufacturing and/or promoting to reach – and Roundup did in fact reach – consumers, including the plaintiff, without any substantial change in the condition of the product from when it was initially distributed by the defendant.

161.   At the time of manufacture, the defendant could have provided warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

162.   At all times herein relevant, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user and was so at the time it was distributed by the defendant and at the time the plaintiff was exposed to and/or ingested the product. The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing Hairy Cell Leukemia as a result of exposure and use.

163. Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect the health of those exposed in violation 7 U.S.C. § 136j(a)(1)(E).

164. The defendant's failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. § 136j(a)(1)(E) as well as the laws of the State of New York.

165. The defendant could have amended the label of Roundup to provide additional warnings.

166. This defect caused serious injury to the plaintiff, who used Roundup in its intended and foreseeable manner.

167. At all times herein relevant, the defendant had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain, supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

168. The defendant labeled, distributed, and promoted the above-mentioned product without warning that it was dangerous and unsafe for the use and purpose for which it was intended.

169. The defendant failed to warn of the nature and scope of the side effects associated with Roundup, namely its carcinogenic properties and its propensity to

cause or serve as a substantial contributing factor in the development of Hairy Cell Leukemia.

170. The defendant was aware of the probable consequences of the aforesaid conduct. Despite the fact that the defendant knew or should have known that Roundup caused serious injuries, the defendant failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effects of developing Hairy Cell Leukemia from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution. The defendant willfully and deliberately failed to avoid the consequences associated with their failure to warn, and in doing so, the defendant acted with a conscious disregard for the safety of the plaintiff.

171. At the time of exposure, the plaintiff could not have reasonably discovered any defect in Roundup through the exercise of reasonable care.

172. The defendant, as the manufacturer and/or distributor of the subject product, is held to the level of knowledge of an expert in the field.

173. The plaintiff reasonably relied upon the skill, superior knowledge and judgment of the defendant.

174. Had the defendant properly disclosed the risks associated with Roundup, the plaintiff would have avoided the risk of Hairy Cell Leukemia by not using Roundup.

175. The information that the defendant did provide or communicate failed to contain adequate warnings and precautions that would have enabled the plaintiff

and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, the defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with the use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

176.   To this day, the defendant has failed to adequately warn of the true risks of the plaintiff's injuries associated with the use of and exposure to Roundup.

177.   As a result of their inadequate warnings, the defendant's Roundup products were defective and unreasonably dangerous when they left the possession and/or control of the defendant, were distributed by the defendant and used by the plaintiff.

178.   As a direct and proximate result of the defendant's actions as alleged herein, and in such other ways to be later shown, the subject product caused the plaintiff to sustain injuries as herein alleged.

179.   WHEREFORE, the plaintiff respectfully requests that this Court enter judgment in the plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court

deems just and proper. Additionally, the plaintiff demands a jury trial on all issues contained herein.

## FOURTH CAUSE OF ACTION
## (BREACH OF IMPLIED WARRANTIES)

180. The plaintiff repeats and re-alleges the above paragraphs as if set forth in their entirety herein.

181. At all times herein relevant, the defendant manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold Roundup and/or have recently acquired the entity who manufactured, compounded portrayed, distributed, recommended, merchandised, advertised, promoted, and sold Roundup, as a bread-spectrum herbicide. These actions were under the ultimate control and supervision of the defendant.

182. At the time that the defendant marketed, sold, and distributed Roundup for use by the plaintiff, the defendant knew of Roundup's intended use and impliedly warranted the product to be of merchantable quality and safe and fit for this use.

183. The defendant impliedly represented and warranted to the plaintiff and users of Roundup, the agricultural community, and/or the EPA that Roundup was safe and of merchantable quality and fit for the purpose for which it was to be used.

184. These representations and warranties were false, misleading and inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

185.    The plaintiff and/or the EPA did rely on said implied warranty of merchantability of fitness for particular use and purpose.

186.    The plaintiff reasonably relied upon the skill and judgment of the defendant as to whether Roundup was of merchantable quality and safe and fit for its intended use.

187.    Roundup was injected into the stream of commerce by the defendant in a defective, unsafe, and inherently dangerous condition and the products' materials were expected to and did reach users, handlers and persons coming into contact with said products without substantial change in the condition in which they were sold.

188.    The defendant breached the aforesaid implied warranties, as their herbicide Roundup was not fit for its intended purposes and uses.

189.    As a result of the foregoing acts and omissions, the plaintiff suffered from Hairy Cell Leukemia, the plaintiff also suffered severe and personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic and non-economic damages.

190.    WHEREFORE, the plaintiff respectfully requests that this Court enter judgment in the plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court

deems just and proper. Additionally, the plaintiff demands a jury trial on all issues contained herein.

## FIFTH CAUSE OF ACTION
## (VIOLATION OF THE CONSUMER FRAUD ACT)

191.    The plaintiff repeats and re-alleges the above paragraphs as if set forth in their entirety herein.

192.    The plaintiff brings this cause of action pursuant to N.Y. Gen. Bus. Law §§ 349 & 350 and N.Y. Exec. Law § 63(12).

193.    The defendant fraudulently, intentionally, negligently and/or innocently misrepresented to the public, and the plaintiff, both directly and by and through the media and purported "community outreach" programs, the safety of Roundup products, and/or fraudulently, intentionally, negligently and/or innocently concealed, suppressed or omitted material, adverse information regarding the safety of Roundup. This deception caused injury to the plaintiff in violation of the Consumer Fraud Act of the plaintiff's home state which creates a private right of action by the plaintiff.

194.    The intentional, negligent, and/or innocent misrepresentations and omissions of the defendant regarding the safety of Roundup products were communicated to the plaintiff directly through national and regional advertising, marketing and promotion efforts, as well as the packaging and sales aids. The safety of Roundup products was also intentionally, negligently, and/or innocently misrepresented to the plaintiff and the public with the intent that such

41

misrepresentations would cause the plaintiff and other potential consumers to purchase and use or continue to purchase and use Roundup products.

195. The defendant either knew or should have known of the material representations they were making regarding the safety and relative utility of Roundup products.

196. The defendant either knew or should have known of the material representations they were making regarding the safety and relative utility of Roundup products.

197. The defendant fraudulently, intentionally, negligently, and/or innocently made the misrepresentations and/or actively concealed, suppressed or omitted this material information with the specific desire to induce the plaintiff, and the consuming public to purchase and use Roundup products. The defendant fraudulently, intentionally, negligently, and/or innocently, knew or should have known that the plaintiff and the consuming public would rely on such material misrepresentations and/or omissions in selecting and applying Roundup products. The defendant knew or should have known that the plaintiff would rely on their false representations and omissions.

198. The defendant made these misrepresentations and actively concealed adverse information including the risk of NHL and/or Hairy Cell Leukemia, at a time when, their agents and/or employees knew or should have known that the product had defects, dangers and characteristics that were other than what was represented to the consuming public. Specifically, the defendant misrepresented

and actively concealed, suppressed and omitted that there had been inadequate testing of the safety and efficacy of Roundup and that prior studies, research, reports and/or testing had been conducting linking the use of the drug with serious health events, including Hairy Cell Leukemia and/or NHL.

199.   Despite the fact that the defendant knew or should have known of reports of severe risks including NHL and/or Hairy Cell Leukemia, with Roundup use and exposure, this information was strategically minimized, understated or omitted in order to create the impression that the human dangers of Roundup were nonexistent, particularly in light of its purported utility.

200.   The fraudulent, intentional, negligent and/or innocent material misrepresentations and/or active concealment, suppression, and omissions by the defendant were perpetuated directly and/or indirectly through the advertisements, packaging, sales aids, furtive public relations efforts, and other marketing and promotional pieces authored, analyzed, created, compiled, designed, drafted, disseminated, distributed, edited, evaluated, marketed, published, and supplied by the defendant.

201.   If the plaintiff had known the true facts concerning the risks associated with Roundup exposure, the plaintiff would have used a safer alternative.

202.   The plaintiff's reliance upon the material misrepresentations and omissions was justified, among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position to know the

true facts concerning Roundup while the plaintiff was not in a position to know the true facts because the defendant overstated the benefits and safety of Roundup and downplayed the risk of Lymphoma, thereby inducing the plaintiff to use the herbicide rather than safer alternatives.

203.    Federal law and the EPA do not authorize and specifically prohibit the deceptions, misrepresentations and omissions made by the defendant.

204. As a direct and proximate result of the defendant's actions and inactions, the plaintiff was exposed to Roundup and suffered and will continue to suffer injuries and damages, as set forth herein.

205.    WHEREFORE, the plaintiff respectfully requests that this Court enter judgment in the plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, the plaintiff demands a jury trial on all issues contained herein.

## **PRAYER FOR RELIEF**

WHEREFORE, the plaintiff demands judgment against the defendant on each of the above-referenced claims and causes of actions and as follows:

1.    Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

2. Awarding compensatory damages to the plaintiff for past and future damages, including, but not limited to, the plaintiff's pain and suffering and for severe and permanent personal injuries sustained by the plaintiff including healthcare costs and economic loss;

3. Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determined at trial of this action;

4. Punitive and/or exemplary damages for the wanton, willful, fraudulent, and reckless acts of the defendant who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the plaintiff in an amount sufficient to punish the defendant and deter future similar conduct, to the extent allowed by applicable law;

5. Pre-judgement interest;

6. Post-judgement interest;

7. Awarding the plaintiff reasonable attorney's fees;

8. Awarding the plaintiff the costs of these proceedings; and

9. Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

The plaintiff hereby demands trial by jury as to all issues.

DATED:   January 29, 2020

THE DIETRICH LAW FIRM P.C.

By:

Nicholas J. Shemik, Esq.
Attorneys for Plaintiff
1323 North Forest Road
Williamsville, New York 14221
(716) 839-3939
