# U.S. District Court
## Middle District of Florida (Jacksonville)
### CIVIL DOCKET FOR CASE #: 3:20–cv–00006–MMH–PDB

Salem et al v. Monsanto Company
Assigned to: Judge Marcia Morales Howard
Referred to: Magistrate Judge Patricia D. Barksdale
Cause: 28:1332 Diversity–Product Liability

Date Filed: 01/06/2020
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**John Salem**

represented by **Christopher Shakib**
Terrell Hogan, PA
8th Floor
233 E Bay St
Jacksonville, FL 32202
904/632–2424
Fax: 904/632–2027
Email: shakib@terrellhogan.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Sandra Salem**

represented by **Christopher Shakib**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 01/06/2020 | 1 | COMPLAINT against Monsanto Company with Jury Demand (Filing fee $ 400 receipt number 113A–16319014) filed by Sandra Salem, John Salem. (Attachments: # 1 Civil Cover Sheet)(Shakib, Christopher) (Entered: 01/06/2020) |
| 01/06/2020 | 2 | NEW CASE ASSIGNED to Judge Marcia Morales Howard and Magistrate Judge Patricia D. Barksdale. New case number: 3:20–cv–6–J–34PDB. (SJB) (Entered: 01/06/2020) |
| 01/10/2020 | 3 | **NOTICE of designation under Local Rule 3.05 – track 2. Signed by Deputy Clerk on 1/10/2020. (Attachments: # 1 Case Management Report Form, # 2 Consent Letter and Form)(JW) (Entered: 01/10/2020)** |

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

JOHN JOSEPH SALEM, and
SANDRA M. SALEM, his wife,

     Plaintiffs,

                                    Case No:

v.                                    JURY TRIAL DEMANDED

MONSANTO COMPANY,
a foreign corporation,

     Defendant.
_____/

## **COMPLAINT**

The Plaintiffs, JOHN JOSEPH SALEM (hereinafter "Mr. Salem") and SANDRA M. SALEM (hereinafter "Mrs. Salem"), sue the Defendant, MONSANTO COMPANY (hereinafter "Monsanto"), and allege the following:

## **NATURE OF THE CASE**

1.     This is an action for damages suffered by Mr. and Mrs. Salem as a direct and proximate result of Monsanto's negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup®, containing the active ingredient glyphosate.

2.     Mr. and Mrs. Salem maintain that Roundup® and/or glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper warnings and directions as to the dangers associated with its use.

3.     Mr. and Mrs. Salem' injuries, like those striking thousands of similarly situated victims across the country, were avoidable.

1

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over Monsanto and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Mr. and Mrs. Salem and Monsanto.  Monsanto is incorporated and has its principal place of business outside of the State of Florida, where Mr. and Mrs. Salem reside and are permanently domiciled.

5.      The amount in controversy exceeds $75,000, exclusive of interest and cost.

6.      The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

7.      Venue is proper within this district pursuant to 28 U.S.C. § 1391, in that Monsanto conducts business here and is subject to personal jurisdiction in this district, including in Jacksonville, Duval County, Florida. Furthermore, Monsanto sells, markets, and/or distributes Roundup® within the Middle District of Florida, including within Jacksonville, Duval County, Florida.  Also, a substantial part of the acts and/or omissions giving rise to these claims occurred within this district.

## PARTIES

8.      Mr. and Mrs. Salem natural persons who are residents of, and permanently domiciled in, Jacksonville, Duval County, Florida.  Mr. and Mrs. Salem bring this action for personal injuries and loss of consortium sustained by exposure to Roundup® ("Roundup") containing the active ingredient glyphosate and the surfactant polyethoxylated tallow amine ("POEA"). As a direct and proximate result of being exposed to Roundup, Mr. Salem developed non-Hodgkin's lymphoma (hereinafter "NHL"), including but not limited to, small b-cell lymphoma.

9.      "Roundup" refers to all formulations of Monsanto's Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide,

Case MDL No 2741 Document 1626-6 Filed 02/19/20 Page 4 of 37

Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready- to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

10.     Monsanto is a Delaware corporation, with a principle place of business in St. Louis, Missouri.

11.     Monsanto advertises and sells goods, specifically Roundup, in the State of Florida, and in Jacksonville, Duval County, Florida in particular.

12.     Monsanto transacted and conducted business within the State of Florida, and within Jacksonville, Duval County, Florida in particular, that relates to the allegations in this *Complaint*.

13.     Monsanto derived substantial revenue from goods and products used in the State of Florida, and in Jacksonville, Duval County, in particular.

14.     Monsanto expected or should have expected its acts to have consequences within the State of Florida, and in particular, in Jacksonville, Duval County, Florida, and derived substantial revenue from interstate commerce.

15.     Monsanto engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup.

16.     Monsanto is authorized to do business in the State of Florida, and did and does derive substantial income from doing business in the State of Florida, including in Jacksonville, Duval County, Florida.

17.     Upon information and belief, Monsanto purposefully availed itself of the privilege of conducting activities with the State of Florida, thus invoking the benefits and protections of its laws.

18.     Upon information and belief, Monsanto did design, sell, advertise, manufacture and/or distribute Roundup, with full knowledge of its dangerous and defective nature.

## **FACTUAL ALLEGATIONS**

19.     At all relevant times, Monsanto was in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or has acquired and is responsible for the commercial herbicide Roundup.

20.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri.  It is the world's leading producer of glyphosate.

21.     Monsanto discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate based "Roundup" as a broad spectrum herbicide.

22.     Glyphosate is the active ingredient in Roundup.

23.     Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

24.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3- phosphate synthase, known as EPSP synthase.

25.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

26.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

27.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

28.     Monsanto is highly involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup *i.e.,* "Roundup Ready®." As of 2009, Monsanto was the world's leading producer of seeds designed to be Roundup Ready®. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready® seeds.

29.     The original Roundup, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the world's most widely used

herbicides.[1]

30.    For nearly 40 years, consumers, farmers, and the public have used Roundup, unaware of its carcinogenic properties.

## REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

31.    The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency (the "EPA") prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. § 136a(a).

32.    The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.  Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

33.    FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb).  FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

---

[1] *Backgrounder*, History of Monsanto's Glyphosate Herbicides, June 2005.

34.     The EPA and the State of Florida registered Roundup for distribution, sale, and manufacture in the United States and within the State of Florida.

35.     FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

36.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. §  136a-1.  In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

37.     In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment – in relation to the registration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of the World Health Organization's March 24, 2015 finding that glyphosate is a "probable carcinogen," as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

## MONSANTO'S FALSE REPRESENTATIONS REGARDING THE SAFETY OF ROUNDUP®

38.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on

glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

a) Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

b) And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c) Roundup biodegrades into naturally occurring elements.

d) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e) This non-residual herbicide will not wash or leach in the soil. It stays where you apply it.

f) You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

8

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[2]

39.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a)      its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b)      its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

c)      its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d)      its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental                    characteristics."

e)      glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f)      its glyphosate-containing products or any component thereof might be classified as "practically non-toxic.

40.     Monsanto did not alter its advertising in the same manner in any state other

---

[2] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

than New York, and on information and belief still has not done so today.

41.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable," and that it "left the soil clean."[3]

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP

42.     As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties.

43.     On March 4, 1985, a group of the EPA's Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[4] Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

44.     In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87- 103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.[5]

45.     In October 1991 the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.[6]

---

[3] *Monsanto Guilty in 'False Ad' Row,* BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm
[4] Consensus Review of Glyphosate, Casewell No. 661A. March 4, 1985. United States Environmental Protection Agency.
[5] http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheets/0178fact.pdf
[6] Second Peer Review of Glyphosate, CAS No. 1071-83-6. October 30, 1881. United States Environmental Protection Agency.

46.     In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Monsanto's Roundup products are more dangerous and toxic than glyphosate alone.[7] As early as 1991 evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.[8]

47.     In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

48.     The study found that Monsanto's Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

49.     In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

50.     The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[9]

51.     In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

52.     The Peixoto study suggested that the harmful effects of Roundup on

---

[7] Martinez et al. 2007; Benachour 2009; Gasnier et al. 2010; Peixoto 2005; March 2004
[8] Martinez et al. 1991.
[9] (Molinari, 2000; Stewart et al., 2003)

mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

53. In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

54. The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

55. The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Monsanto.

56. Monsanto knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Mr. Salem from Roundup.

57. Monsanto knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

58. Monsanto failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Mr.

12

Salem from Roundup.

59.    Rather than performing appropriate tests, Monsanto relied upon flawed industry- supported studies designed to protect Monsanto's economic interests rather than Mr. Salem and the consuming public.

60.    Despite its knowledge that Roundup was considerably more dangerous than glyphosate alone, Monsanto continued to promote Roundup as safe.

## IARC CLASSIFICATION OF GLYPHOSATE

61.    The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

62.    An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015–2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

63.    IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

64.    On March 24, 2015, after its cumulative review of human, animal, and

13

DNA studies for more than one (1) year, many of which have been in Monsanto's possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Monsanto's Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

65.     The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A *probable* carcinogen to humans. According to the authors glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

66.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

67.     The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

**EARLIER EVIDENCE OF GLYPHOSATE'S DANGER**

68.     Despite the new classification by the IARC, Monsanto has had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

69.     Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

70.     In 1997, Chris Clements published "Genotoxicity of select herbicides in *Rana catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

71.     The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

72.     Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

73.     Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

74.     The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

75.     In 2006 César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

76.     The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

77.     The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

78.     Despite knowledge to the contrary, Monsanto maintains that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

79.     In addition to glyphosate and Roundup's genotoxic properties, Monsanto has long been aware of glyphosate's carcinogenic properties.

15

80.    Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, NHL, multiple myeloma, and soft tissue sarcoma.

81.    Monsanto has known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

82.    In 1985 the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

83.    In 2003 Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

84.    The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studies with an increased odds ratio of 3.11.

85.    In 2003 AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

86.    The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

87.    In 2008 Mikael Eriksson published a population based case-control study of exposure to various pesticides as a risk factor for NHL.

88.    This strengthened previous associations between glyphosate and NHL.

89.    In spite of this knowledge, Monsanto continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

16

90.     Upon information and belief, these statements and representations have been made with the intent of inducing Mr. Salem, the agricultural community, and the public at large to purchase and increase the use of Monsanto's Roundup for Monsanto's pecuniary gain, and in fact, did induce Mr. Salem to use Roundup.

91.     Monsanto made these statements with complete disregard and reckless indifference to the safety of Mr. Salem and the general public.

92.     Notwithstanding Monsanto's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

93.     Monsanto knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

94.     Monsanto failed to appropriately and adequately inform and warn Mr. Salem of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

95.     Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Monsanto continues to maintain that glyphosate and/or Roundup is safe, non- carcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

96. Monsanto has claimed and continue to claim that Roundup is safe, non-carcinogenic, and non-genotoxic. These misrepresentations are consistent with Monsanto's cavalier approach to investigating and ensuring the safety of its products, the safety of the public at large, and the safety of Mr. Salem.

## SCIENTIFIC FRAUD UNDERLYING THE SAFETY DETERMINATIONS OF GLYPHOSATE

97. After the EPA's 1985 classification of glyphosate as possibly carcinogenic to humans (Group C), Monsanto exerted pressure upon the EPA to change its classification.

98. This culminated in the EPA's reclassification of glyphosate to Group E, which was based upon evidence of non-carcinogenicity in humans.

99. In so classifying, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

100. On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed scientific fraud.

101. In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup. IBT performed approximately 30 tests on glyphosate and glyphosate-containing products, including 11 of the 19 chronic toxicology studies needed to register Roundup with the EPA.

102.     In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to toxicological impacts of glyphosate. The EPA subsequently audited IBT and determined that the toxicology studies conducted for Roundup were invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

103.     Three top executives of IBT were convicted of fraud in 1983.

104.     In the second incident, Monsanto hired Craven Laboratories ("Craven") in 1990 to perform pesticide and herbicide studies, including several studies on Roundup.

105.     In March of 1991, the EPA announced that it was investigating Craven for "allegedly falsifying test data used by chemical firms to win EPA approval of pesticides."

106.     The investigation lead to the indictments of the laboratory owner and a handful of employees.

## MONSANTO'S CONTINUING DISREGARD FOR THE SAFETY OF MR. SALEM AND THE PUBLIC

107.     Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."[10]

---

[10] Backgrounder - Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9 2015)

108.     Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

109.     Glyphosate, and Monsanto's Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

110.     Monsanto's statements proclaiming the safety of Roundup and disregarding its dangers misled Mr. Salem.

111.     Despite Monsanto's knowledge that Roundup was associated with an elevated risk of developing cancer, Monsanto's promotional campaigns focused on Roundup's purported "safety profile."

112.     Monsanto's failure to adequately warn Mr. Salem resulted in (1) Mr. Salem using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

113.     Monsanto failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

114.     The failure of Monsanto to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

115.     The failure of Monsanto to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

116.     The failure of Monsanto to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

117.     By reason of the foregoing acts and omissions, Mr. Salem seeks compensatory damages as a result of Mr. Salem' use of, and exposure to, Roundup which caused or was a substantial contributing factor in causing Mr. Salem to suffer from cancer, specifically NHL, and Mr. Salem suffered severe and personal injuries which are permanent and lasting in nature,  physical pain and mental anguish, including diminished enjoyment of life.

118.     By reason of the foregoing, Mr. Salem is severely and permanently injured.

119.     By reason of the foregoing acts and omissions, Mr. Salem has endured and, in some categories continues to suffer, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of the actions and inactions of the Monsanto.

## **MR. SALEM' EXPOSURE TO ROUNDUP**

120.     Mr. Salem began using Roundup in his yard in the late 1980s.

121.     For at least 30 years, Mr. Salem sprayed Roundup one to two times per week in his yard. Mr. Salem followed all safety and precautionary warnings during the course of use.

122.     Mr. Salem was subsequently diagnosed with small b-cell lymphoma NHL. The development of Mr. Salem's NHL was proximately and actually caused by exposure to Monsanto's Roundup products.

123.     As a result of his injury, Mr. Salem has incurred significant economic and non- economic damages.

## <u>EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS</u>

124.    The running of any statute of limitations has been tolled by reason of Monsanto's fraudulent concealment. Monsanto, through its affirmative misrepresentations and omissions, actively concealed from Mr. Salem the true risks associated with Roundup and glyphosate

125.    At all relevant times, Monsanto has maintained that Roundup is safe, non-toxic, and non-carcinogenic.

126.    Indeed, even as of July 2016, Monsanto continued to represent to the public that "Regulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and *agree* that there is *no evidence* that glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic" (emphasis added).[11]

127.    As a result of Monsanto's actions, Mr. Salem was unaware, and could not reasonably know or have learned through reasonable diligence that Roundup and/or glyphosate contact, exposed Mr. Salem to the risks alleged herein and that those risks were the direct and proximate result of Monsanto's acts and omissions.

128.    Furthermore, Monsanto is estopped from relying on any statute of limitations because of its fraudulent concealment of the true character, quality and nature of Roundup. Monsanto was under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Monsanto had and continues to have exclusive control, and because Monsanto knew that this information was not available to Mr. Salem or to distributors of Roundup. In addition,

---

[11] <u>Backgrounder - Glyphosate: No Evidence of Carcinogenicity</u>. Updated November 2014. (downloaded October 9 2015)

Monsanto is estopped from relying on any statute of limitations because of its intentional concealment of these facts.

129.    Mr. Salem had no knowledge that Monsanto was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Monsanto, Mr. Salem could not have reasonably discovered the wrongdoing at any time prior.  Also, the economics of this fraud should be considered. Monsanto had the ability to and did spend enormous amounts of money in furtherance of its purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Mr. Salem and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Monsanto's representations. Accordingly, Monsanto is precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

## COUNT I - NEGLIGENCE

130.    Mr. Salem re-alleges and incorporates by reference paragraphs 1 through 129.

131.    Monsanto had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

132.    Monsanto failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup into interstate commerce in that Monsanto knew or should have known that using Roundup created a high risk of

unreasonable, dangerous side effects, including, but not limited to, the development of NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

133.    The negligence by the Monsanto, its agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

a.    Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly testing it;

b.    Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup;

c.    Not conducting sufficient testing programs to determine whether or not Roundup was safe for use; in that Monsanto herein knew or should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users;

d.    Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Monsanto had knowledge that Roundup is, was, or could be carcinogenic;

e.    Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

f.    Negligently failing to adequately and correctly warn the Mr. Salem, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

g.    Negligently failing to petition the EPA to strengthen the warnings associated with Roundup;

h.    Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

i.    Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

j.      Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

k.      Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

l.      Negligently designing Roundup in a manner, which was dangerous to its users;

m.      Negligently manufacturing Roundup in a manner, which was dangerous to its users;

n.      Negligently producing Roundup in a manner, which was dangerous to its users;

o.      Negligently formulating Roundup in a manner, which was dangerous to its users;

p.      Concealing information from the Mr. Salem while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations; and

q.      Improperly concealing and/or misrepresenting information from the Mr. Salem scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides.

r.      Negligently selling Roundup with a false and misleading label.

134.    Monsanto under-reported, underestimated, and downplayed the serious dangers of Roundup.

135.    Monsanto negligently and deceptively compared the safety risks and/or dangers of Roundup with common everyday foods such as table salt, and other forms of herbicides.

136.    Monsanto was negligent and/or violated Florida law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that they:

a.      Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide;

b.     Failed to accompany its product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

c.     Failed to accompany its product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

d.     Failed to accompany its product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;

e.     Failed to warn Mr. McEvoy of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of NHL;

f.     Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup;

g.     Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants;

h.     Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity;

i.     Was otherwise careless and/or negligent.

137.     Despite the fact that Monsanto knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Monsanto continued and continues to market, manufacture, distribute, and/or sell Roundup to consumers, including the Mr. Salem.

138.     Monsanto knew or should have known that consumers such as the Mr. Salem would foreseeably suffer injury as a result of Monsanto's failure to exercise ordinary care, as set forth above.

139.     Monsanto's violations of law and/or negligence were the proximate cause of Mr. Salem's injuries, harm and economic loss, which Mr. Salem suffered and/or will continue to suffer.

140.     As a direct and proximate result of the foregoing acts and/or omissions by Monsanto, Mr. Salem suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition.  These losses are permanent or continuing in nature, and he will suffer them in the future.

WHEREFORE, Mr. Salem respectfully requests that this Court enter judgment in his favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Mr. Salem demands a jury trial on all issues so triable that are contained herein.

## COUNT II – STRICT LIABILITY
## DESIGN EFECT

141.     Mr. Salem re-alleges and incorporates by reference paragraphs 1 through 129.

142.     At all times herein mentioned, Monsanto designed, researched, manufactured, tested, advertised, promoted, sold, distributed Roundup as hereinabove described that was used by the Mr. Salem.

143.     Monsanto's Roundup was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Monsanto.

144.     At all times material, Roundup was in an unsafe, defective, and inherently

dangerous condition, which was dangerous to users, and in particular, to the Mr. Salem.

145.     The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Monsanto was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup.

146.     The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Monsanto was defective in design and/or formulation, in that, when it left the hands of the Monsanto manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

147.     At all times herein mentioned, Roundup was in a defective and unsafe condition, and Monsanto knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by Monsanto. In particular, Monsanto's Roundup was defective in the following ways:

    a.     When placed in the stream of commerce, Monsanto's Roundup products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate.

    b.     When placed in the stream of commerce, Monsanto's Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

    c.     When placed in the stream of commerce, Monsanto's Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

    d.     Monsanto did not sufficiently test, investigate, or study its Roundup products.

    e.     Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

    f.     Monsanto new or should have known at the time of marketing its Roundup

products that exposure to Roundup could result in cancer and other severe illnesses and injuries.

g.     Monsanto did not conduct adequate post-marketing surveillance of its Roundup products.

148.     Monsanto knew, or should have known that at all times herein mentioned its Roundup was in a defective condition, and was and is inherently dangerous and unsafe.

149.     Mr. Salem was exposed to Monsanto's Roundup, as described above, without knowledge of Roundup's dangerous characteristics.

150.     At the time of the Mr. Salem' use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

151.     Monsanto, with this knowledge, voluntarily designed its Roundup with a dangerous condition for use by the public, and in particular the Mr. Salem.

152.     Monsanto had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

153.     Monsanto created a product that was and is unreasonably dangerous for its normal, intended use.

154.     Monsanto marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

155.     The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Monsanto was manufactured defectively when the Roundup "left the hands of Monsanto" in a defective condition which was unreasonably dangerous to its intended users.

156.     The Roundup designed, researched, manufactured, tested, advertised,

promoted, marketed, sold, and distributed by Monsanto reached its intended users in the same defective and unreasonably dangerous condition in which Monsanto's Roundup was manufactured.

157.    Monsanto designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to the Mr. Salem in particular, and Monsanto is therefore strictly liable for the injuries sustained by the Mr. Salem.

158.    Mr. Salem could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned, or perceived its danger.

159.    By reason of the foregoing, Monsanto has become strictly liable to the Mr. Salem for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup.

160.    Defects in Monsanto's Roundup were the cause or a substantial factor in causing Mr. Salem's injuries.

161.    As a direct and proximate result of the foregoing acts and/or omissions by Monsanto, Mr. Salem suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition.  These losses are permanent or continuing in nature, and he will suffer them in the future.

WHEREFORE, Mr. Salem respectfully requests that this Court enter judgment in his favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Mr. Salem demands a jury trial on all issues so triable that are contained herein.

Case MDL No. 2741 Document 1626-1 Filed 02/10/20 Page 32 of 37

## COUNT III – STRICT LIABILITY
## FAILURE TO WARN

162.    Mr. Salem re-alleges and incorporates by reference paragraphs 1 through 129.

163.    Monsanto has engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting Roundup, and through that conduct, have knowingly and intentionally placed Roundup into the stream of commerce with full knowledge that it would reach consumers such as Mr. Salem who are exposed to it through ordinary and reasonably foreseeable uses.

164.    Monsanto did in fact sell, distribute, supply, manufacture, and/or promote Roundup to Mr. Salem. Additionally, Monsanto expected the Roundup that it was selling, distributing, supplying, manufacturing, and/or promoting to reach – and Roundup did in fact reach – consumers, including Mr. Salem, without any substantial change in the condition of the product from when it was initially distributed by Monsanto.

165.    At the time of manufacture, Monsanto could have provided warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

166.    At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Monsanto and at the time(s) Mr. Salem was exposed to and/or ingested the product. The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities

and possible side effects, including, but not limited to, developing NHL as a result of exposure and use.

167.    Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect the health of those exposed in violation of 7 U.S.C. § 136j(a)(1)(E).

168.    Monsanto's failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated  7 U.S.C. § 136j(a)(1)(E) as well as the laws of the State of Florida.

169.    Monsanto could have amended the label of Roundup to provide additional warnings.

170.    This defect caused serious injury to Mr. Salem, who used Roundup in its intended and foreseeable manner.

171.    At all times herein mentioned, Monsanto had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such  steps  to  assure  that  the product  did  not  cause users to suffer from unreasonable and dangerous side effects.

172.    Monsanto labeled, distributed, and promoted the aforesaid product that it was dangerous and unsafe for the use and purpose for which it was intended.

173.    Monsanto failed to warn of the nature and scope of the side effects associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of NHL.

174.    Monsanto was aware of the probable consequences of the aforesaid conduct.  Despite the fact that Monsanto knew or should have known that Roundup caused serious injuries, Monsanto failed to exercise reasonable care to warn of the

dangerous carcinogenic properties and      side effect of developing NHL from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution. Monsanto willfully and deliberately failed to avoid the consequences associated with its failure to warn, and in doing so, Monsanto acted with a conscious disregard for the safety of Mr. Salem.

175.    At the time of exposure, Mr. Salem could not have reasonably discovered any defect in Roundup prior through the exercise of reasonable care.

176.    Monsanto, as the manufacturer and/or distributor of the subject product, is held to the level of knowledge of an expert in the field.

177.    Mr. Salem reasonably relied upon the skill, superior knowledge, and judgment of Monsanto.

178.    Had Monsanto properly disclosed the risks associated with Roundup products, Mr. Salem would have avoided the risk of NHL by not using Roundup products.

179.    The information that Monsanto did provide or communicate failed to contain adequate warnings and precautions that would have enabled Mr. Salem, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, Monsanto disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

180. To this day, Monsanto has failed to adequately warn of the true risks of Mr. Salem' injuries associated with the use of and exposure to Roundup.

181. As a result of its inadequate warnings, Monsanto's Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed by Monsanto, and used by Mr. Salem.

182. As a direct and proximate result of the foregoing acts and/or omissions by Monsanto, Mr. Salem suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and he will suffer them in the future.

WHEREFORE, Mr. Salem respectfully requests that this Court enter judgment in his favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Mr. Salem demands a jury trial on all issues so triable that are contained herein.

## COUNT IV – BREACH OF IMPLIED WARRANTIES

183. Mr. Salem re-alleges and incorporates by reference paragraphs 1 through 129.

184. At all times herein mentioned, Monsanto manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold Roundup as a broad spectrum herbicide. These actions were under the ultimate control and supervision of Monsanto.

185. At the time Monsanto marketed, sold, and distributed Roundup for use by Mr. Salem, Monsanto knew of Roundup's intended use and impliedly warranted the

34

product to be of merchantable quality and safe and fit for this use.

186.     Monsanto impliedly represented and warranted to Mr. Salem and users of Roundup, the agricultural community, and/or the EPA that Roundup was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.

187.     These representations and warranties were false, misleading, and inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

188.     Mr. Salem and/or the EPA did rely on said implied warranty of merchantability of fitness for particular use and purpose.

189.     Mr. Salem reasonably relied upon the skill and judgment of Monsanto as to whether Roundup was of merchantable quality and safe and fit for its intended use.

190.     Roundup was injected into the stream of commerce by the Monsanto in a defective, unsafe, and inherently dangerous condition, and the products' materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

191.     Monsanto breached the aforesaid implied warranties, as its herbicide Roundup was not fit for its intended purposes and uses.

192.     As a direct and proximate result of the foregoing acts and/or omissions by Monsanto, Mr. Salem suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition.  These losses are permanent or continuing in nature, and he will suffer them in the future.

WHEREFORE, Mr. Salem respectfully requests that this Court enter judgment in

his favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Mr. Salem demands a jury trial on all issues so triable that are contained herein.

### COUNT V – LOSS OF CONSORTIUM

193.    Mrs. Salem re-alleges and incorporates by reference paragraphs 1 through 192.

194.    At all relevant times hereto, Mrs. Salem was and is the lawful wedded wife of Mr. Salem, and did and does reside with him.

195.    As a direct and proximate result of the above described wrongful conduct of Monsanto, Mrs. Salem has lost the care, comfort, and companionship of Mr. Salem, and she will suffer these losses in the future.

WHEREFORE, Mrs. Salem respectfully requests that this Court enter judgment in her favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Mrs. Salem demands a jury trial on all issues so triable that are contained herein.

Dated this 6th day of January, 2020.

/s/ Christopher Shakib
**Christopher Shakib, Esquire**
**TERRELL HOGAN & YEGELWEL, P.A.**
233 East Bay Street, 8th Floor
Jacksonville, Florida  32202
Telephone:     (904) 632-2424
Facsimile:      (888) 575-3241
Primary Email: shakib@terrellhogan.com
Secondary Email: jfleury@terrellhogan.com
Florida Bar No.: 0947865
Attorney for the Plaintiffs

36