# U.S. District Court
## Northern District of Alabama (Middle)
## CIVIL DOCKET FOR CASE #: 4:20–cv–00145–JEO

Brown v. Monsanto Company Corporation
Assigned to: Magistrate Judge John E Ott
Cause: 28:1332 Diversity–Product Liability

Date Filed: 01/31/2020
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Amy Bryan Brown**
*individually and as the Administratrix of the Estate of Terry Wayne Brown*

represented by **Donald P McKenna , Jr**
HARE WYNN NEWELL & NEWTON LLP
2025 Third Avenue North, Suite 800
Birmingham, AL 35203–3331
205–328–5330
Fax: 205–324–2165
Email: Don@hwnn.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company Corporation**
*a Missouri Corporation*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/31/2020 | 1 | COMPLAINT against Monsanto Company Corporation, filed by Amy Bryan Brown.(KAM) (Entered: 01/31/2020) |
| 01/31/2020 | | Filing Fee: Filing fee $ 400, receipt_number 1126–3526576. related document 1 COMPLAINT against Monsanto Company Corporation, filed by Amy Bryan Brown.(KAM). (McKenna, Donald) (Entered: 01/31/2020) |
| 01/31/2020 | 2 | Request for service by certified mail filed by Amy Bryan Brown. (McKenna, Donald) (Entered: 01/31/2020) |
| 01/31/2020 | 3 | Summons Issued as to Monsanto Company Corporation mailed certified mail (KAM (Entered: 01/31/2020) |
| 02/07/2020 | 4 | SUMMONS Returned Executed by Amy Bryan Brown. Monsanto Company Corporation served on 2/4/2020, answer due 2/25/2020. (KEK) (Entered: 02/07/2020) |

FILED
2020 Jan-31  AM 11:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

### UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

| | | |
|---|---|---|
| **AMY BROWN BRYAN,** | * | |
| **INDIVIDUALLY and as** | * | |
| **ADMINISTRATRIX OF THE** | * | |
| **ESTATE OF TERRY WAYNE** | * | |
| **BROWN,** | * | **CIVIL ACTION NO. _____** |
| | * | |
| **PLAINTIFFS,** | * | |
| | * | |
| **VS.** | * | |
| | * | _____ |
| **MONSANTO COMPANY** | * | |
| **CORPORATION, a Missouri** | * | |
| **Corporation;** | * | |
| | * | |
| **DEFENDANT.** | * | |

## COMPLAINT

Plaintiff, Estate of Terry Wayne Brown, ("Plaintiff" or "Decedent"), by and through Amy Brown Bryan, individually as the daughter of the Decedent, and as Administratrix of the Estate of Terry Wayne Brown, by and through undersigned counsel, respectfully submits the following Complaint for damages and Jury Demand against Monsanto Company, ("Defendant"), and alleges the following:

## NATURE OF THE ACTION

1.     This action seeks to recover damages for the death sustained by Decedent as the direct and proximate result of the wrongful conduct and negligence of the Defendant in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distributing, labeling, and selling of the herbicide Roundup®, containing the active ingredient glyphosate.

1

2.    Plaintiff maintains that Roundup® and/or glyphosate is defective, dangerous to human health, unfit and unsustainable to be marketed and sold in commerce and lacked proper warnings and directions as to the dangers associated with its use.

3.    Decedent's injuries and death, like those striking thousands of similarly situated victims across the country were unavoidable and not warned against by Defendant.

## JURISDICTION AND VENUE

4.    The Court has jurisdiction over Defendant pursuant to 28 U.S.C. §1332 because there is complete diversity of citizenship between Decedent and Defendant. Defendant is incorporated and has its principal place of business outside of the state in which Decedent resided.

5.    The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

6.    There is complete diversity of citizenship between Plaintiff and Defendant. Decedent was a resident and citizen of Alabama and was domiciled in the State of Alabama. As set forth more fully below, Defendant is an entity organized in states other than the State of Alabama, Defendant's principal place of business is in states other than the State of Alabama, and Defendant is not a citizen or resident of the State of Alabama.

7.    In addition, Defendant maintains sufficient contacts with the State of Alabama such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

8.    Venue is proper in this District pursuant to 28 U.S.C. §1391 (b)(2), because Defendant marketed, advertised, and distributed the dangerous products in this District; Plaintiff Amy Brown Bryan lives in this District and brings this action individually as the surviving daughter of the Decedent, and as the Administratrix of the Estate of the Decedent Terry Wayne

2

Brown, Decedent was exposed in this district; Decedent's harms, losses, and damages occurred in this District; Defendant does substantial business in the State of Alabama and within the District; and at all times relevant hereto, Defendant developed, manufactured, promoted, marketed, distributed, warranted, and sold Roundup® in interstate commerce. Further, Defendant, as a corporate entity, is deemed to reside in any judicial district in which it is subject to personal jurisdiction.

## PARTIES

9. Plaintiff, Amy Brown Bryan as the Administratrix of the Estate of Terry Wayne Brown is a citizen of Alabama and resides in the city of Gadsden, County of Etowah. Plaintiff brings this lawsuit individually as the surviving daughter of Terry Wayne Brown and as Administratrix of the Estate of Terry Wayne Brown, deceased. Decedent was a citizen of Alabama and resided in Gadsden, Etowah County Alabama. Decedent was exposed to Roundup®, which contained the active ingredient glyphosate and the surfactant polyethoxylated tallow amine ("POEA"). As a direct and proximate result of being exposed to Roundup®, Decedent Terry Wayne Brown developed Non-Hodgkin's Lymphoma.

10. "Roundup" refers to all formulations of Defendant's Roundup® products that contain the active ingredient glyphosate.

11. Defendant, Monsanto Company, is a Delaware corporation in "active" status with a principle place of business in St. Louis, Missouri.

12. At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®, which contains the active ingredient glyphosate and the surfactant POEA, as well as adjuvants and other "inert" ingredients.

13. Defendant, Monsanto Company, is referred to as "Monsanto" or "Defendant."

3

## FACTUAL ALLEGATIONS

14.     At all relevant times, Defendant was in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or has acquired and is responsible for the commercial herbicide Roundup®.

15.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis Missouri. It is the world's leading producer of glyphosate.

16.     Defendant discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate based "Roundup" as a broad-spectrum herbicide.

17.     Glyphosate is the active ingredient in Roundup®.

18.     Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

19.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

20.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

21.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

4

22.     Each year, approximately 250 million pounds of glyphosate is sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

23.     Defendant is intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup® i.e., "Roundup Ready." As of 2009, Defendant Monsanto was the world's leading producer of seeds designed to be Roundup Ready®. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready® seeds.

24.     The original Roundup®, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the world's most widely used herbicides. For nearly 40 years, consumers, farmers, and the public have used Roundup®, unaware of its carcinogenic properties.

## REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

25.     The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7. U.S.C. §136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA) prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. 136a(a).

26.     The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the

5

EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. §136(a)(c)(5)(D).

27. FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. §136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

28. The EPA and the State of Alabama registered Roundup® for distribution, sale, and manufacture in the United States and in the State of Alabama.

29. FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

30. The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. §136a-1. In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

31. In the case of glyphosate and Roundup®, the EPA had planned on releasing its preliminary risk assessment — in relation to the registration process — no later than July 2015. The EPA completed its review of glyphosate in early 2015 but delayed releasing the assessment

6

pending further review in light of the World Health Organization's March 24, 2015 finding that glyphosate is a "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

## MONSANTO'S FALSE REPRESENTATIONS REGARDING

## THE SAFETY OF ROUNDUP®

32.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a.     Remember that environmentally friendly Roundup® herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence along customer's driveways, sidewalks, and fences ...

b.     And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got weed, brush, edging, or trimming problem.

c.     Roundup® biodegraded into naturally occurring elements.

d.     Remember that versatile Roundup® herbicide stays where you put it. That means there's no washing or leaching to harm customer's shrubs or other desirable vegetation.

e.     This non-residual herbicide will not wash or leach in the soil. It ... stays where you put it.

f.     You can apply Roundup® with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Roundup® into natural products.

g.     Glyphosate is less toxic to rats than table salt following acute oral ingestion.

7

     h.     Glyphosate's safety margin is much greater than required. It has over 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

     i.     You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

     j.     "Roundup® can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup®.

33.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

     a.     its glyphosate—containing pesticide products or any component thereof are safe, non-toxic, harmless, or free of risk.

     b.     its glyphosate—containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable.

     c.     its glyphosate—containing pesticide products or any component thereof stays where they are applied under all circumstances and will not move through the environment by any means.

     d.     its glyphosate—containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics"

     e.     its glyphosate—containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides.

     f.     its glyphosate —containing pesticide products or any component thereof might be classified as "practically non-toxic."

34.     Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

35.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

## EVIDENCE OF CARCINOGENCITY IN ROUNDUP®

36.    As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties.

37.    On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene. Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

38.    In 1986, the EPA issues a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.

39.    In October 1991 the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.

40.    In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in the Defendant Roundup® products are more dangerous and toxic than glyphosate alone. As early as 1991 evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.

41.    In 2002, Julie Marc published a study entitled "Pesticide Roundup® Provokes Cell Division Dysfunction at the Level of CDK1/CYclin B Activation."

9

42.     The study found that Defendant Roundup® caused delays in the cell cycles of sea urchin, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

43.     In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

44.     The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."

45.     In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

46.     The Peixoto study suggested that the harmful effects of Roundup® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup® formulation products.

47.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup® and glyphosate on human umbilical, embryonic, and placental cells.

48.     The study used dilution levels of Roundup® and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify

10

toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup® are not inert and that Roundup® is always more toxic than its active ingredient glyphosate.

49.     The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendant Monsanto.

50.     Defendant Monsanto knew or should have known that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup®.

51.     Defendant knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup®.

52.     Defendant failed to appropriately and adequately test Roundup®, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup®.

53.     Rather than performing appropriate tests, Defendant relied upon flawed industry-supported studies designed to protect Defendant's economic interests rather than Plaintiff and the consuming public.

54.     Despite its knowledge that Roundup® was considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup® as safe.

**IARC CLASSIFICATION OF GLYPHOSATE**

55.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

56.     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015-2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

57.     IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

58.     On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendant Monsanto's possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Defendant Roundup® herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

59.     The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A probable carcinogen to humans. According to the authors glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

60.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

61.     The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

## EARLIER EVIDENCE OF GLYPHOSATE'S DANGER

62.     Despite the new classification by the IARC, Defendant Monsanto has had ample evidence of glyphosate and Roundup's® genotoxic properties for decades.

63.     Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

64.     In 1997, Chris Clements published "Genotoxicity of select herbicides in Rana catesbeiana tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

65.     The study found that tadpoles exposed to Roundup® showed significant DNA damage when compared with unexposed control animals.

66.     Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup® can induce oxidative stress.

67.     Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

68.     The IARC Monograph notes that "[s]ong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

69.     In 2006, Cesar Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

13

70.     The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

71.     The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

72.     Despite knowledge to the contrary, Defendant maintains that there is no evidence that Roundup® is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup® is not genotoxic, and that there is no evidence that Roundup® is genotoxic.

73.     In addition to glyphosate and Roundup's genotoxic properties, Defendant has long been aware of glyphosate's carcinogenic properties.

74.     Glyphosate and Roundup® in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

75.     Defendant Monsanto has known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup®.

76.     In 1985, the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

77.     In 2003, Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

14

78. The study concluded that glyphosate had the most significant relationship to NHL among all herbicide's studies with an increased odds ratio of 3.11.

79. In 2003, AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

80. The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

81. In 2008, Mikael Eriksson published a population based case-control study of exposure to various pesticides as a risk factor for NHL.

82. This strengthened previous associations between glyphosate and NHL.

83. In spite of this knowledge, Defendant continued to issue broad and sweeping statements suggesting that Roundup® was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

84. Upon information and belief, these statements and representations have been made with the intent of inducing Decedent, the agricultural community, and the public at large to purchase and increase the use of Defendant's Roundup® for Defendant's pecuniary gain, and in fact, did induce Decedent to use Roundup®.

85. Defendant made these statements with complete disregard and reckless indifference to the safety of Decedent and the general public.

86. Notwithstanding Defendant representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

15

87. Defendant knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

88. Defendant failed to appropriately and adequately inform and warn Decedent of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup®, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

89. Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendant continues to maintain that glyphosate and/or Roundup® is safe, non-carcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup®.

90. Defendant has claimed and continued to claim that Roundup® is safe, non-carcinogenic, and non-genotoxic. These misrepresentations are consistent with Defendant's cavalier approach to investigating and ensuring the safety of its products, the safety of the public at large, and the safety of Decedent.

## SCIENTIFIC FRAUD UNDERLYING
## THE SAFTEY DETERMINATION OF GLYPHOSATE

91. After the EPA's 1985 classification of glyphosate as possibly carcinogenic to humans (Group C), Monsanto exerted pressure upon the EPA to change its classification.

92.     This culminated in the EPA's reclassification of glyphosate to Group E, which was based upon evidence of non-carcinogenicity in humans.

93.     In so classifying, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

94.     On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed scientific fraud.

95.     In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed approximately 30 tests on glyphosate and glyphosate-containing products, including 11 of the 19 chronic toxicology studies needed to register Roundup® with the EPA.

96.     In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to toxicological impacts of glyphosate. The EPA subsequently audited IBT and determined that the toxicology studies conducted for Roundup® were invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

97.     Three top executives of IBT were convicted of fraud in 1983.

98.     In the second incident, Monsanto hired Craven Laboratories ("Craven") in 1990 to perform pesticide and herbicide studies, including several studies on Roundup®.

99.     In March of 1991, the EPA announced that it was investigating Craven for "allegedly falsifying test data used by chemical firms to win EPA approval of pesticides."

100.     The investigation led to the indictments of the laboratory owner and a handful of employees.

## MONSANTO'S CONTINUING DISREGARD FOR THE
## SAFETY OF PLAINTIFF AND THE PUBLIC

101.     Monsanto claims on its website that "[r]regulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."

102.     Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

103.     Glyphosate, and Defendant's Roundup® products in particular, have long been associated with serious, side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

104.     Defendant's statements proclaiming the safety of Roundup® and disregarding its dangers misled Decedent.

105.     Despite Defendant's knowledge that Roundup® was associated with an elevated risk of developing cancer, Defendant's promotional campaigns focused on Roundup's purported "safety profile."

106.     Defendant's failure to adequately warn Decedent resulted in (1) Decedent using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and

instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup®.

107.    Defendant failed to seek modification of the labeling of Roundup® to include relevant information regarding the risks and dangers associated with Roundup® exposure.

108.    The failure of Defendant to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

109.    The failure of Defendant to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

110.    The failure of Defendant to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

111.    By reason of the foregoing acts and omissions, Plaintiff seeks punitive damages pursuant to Alabama's wrongful death law. In Alabama, punitive damages are the only damages awarded in wrongful death cases. They are awarded to punish defendants' wrongful conduct and deter other similar conduct in the future. Decedent's wrongful death was a result of Decedent's use of, and exposure to Roundup® which caused or was a substantial contributing factor in causing the Decedent's death, by suffering from cancer, specifically NHL, also Decedent suffered severe and personal injuries, physical pain and mental anguish, including diminished enjoyment of life.

112.    By reason of the foregoing, Plaintiff Terry Wayne Brown passed away on September 8, 2019.

113.    By reason of the foregoing acts and omissions, Decedent endured and suffered emotional and mental anguish, incurred medical expenses, and other economic and non-economic damages, including death, as a result of the actions and inactions of the Defendant.

### DECEDENT'S EXPOSURE TO ROUNDUP®

114.    Decedent passed away on September 8, 2019 of T-cell lymphoma a type of non-Hodgkins lymphoma, at the age of 67.

115.    Decedent was exposed to Roundup® in Gadsden, Alabama. Decedent used Roundup® personally at his home every year to kill unwanted weeds on his property. Decedent purchased Roundup® for use at Walmart and/or Home Depot. Decedent wore no protective gear while spraying Roundup®. Decedent used concentrated Roundup®, which he mixed himself.

116.    On or about March 2019, Plaintiff Terry Wayne Brown was diagnosed with T-cell lymphoma in Birmingham, Alabama at Brookwood Medical Center.

117.    During the entire time that Decedent was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

118.    Plaintiff Amy Brown Bryan first learned that exposure to Roundup® can cause NHL sometime around July/August 2019, after viewing a legal advertisement on television. Decedent was unaware that exposure to Roundup® could cause cancer.

### TOLLING OF THE STATUTE OF LIMITATIONS

#### *Discovery Rule Tolling*

119.    Decedent had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup® and glyphosate until well after IARC released its formal assessment of glyphosate in July 2015. This is the quintessential case for tolling.

120. Within the time period of any applicable statutes of limitations, Decedent could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup® and glyphosate is injurious and sometimes deadly to human health.

121. Decedent did not discover and did not know of facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup® and glyphosate; nor would a reasonable and diligent investigation by him have disclosed that Roundup® and glyphosate would cause his illness.

122. For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff's claims.

### Fraudulent Concealment Tolling

123. All applicable statutes of limitations have also been tolled by Monsanto's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

124. Instead of disclosing critical safety information about Roundup® and glyphosate, Defendant has consistently and falsely represented the safety of its Roundup® products.

### Estoppel

125. Monsanto was under a continuous duty to disclose to consumers, users and other persons coming into contact with its products, including Decedent, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate.

126. Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

127. Based on the foregoing, Monsanto is estopped from relying on any statutes of limitations in defense of this action.

## COUNT ONE

### STRICT LIABILITY (DESIGN DEFECT)

128. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

129. Plaintiff brings this strict liability claim against Defendant for defective design.

130. At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers and users and other persons coming into contact them, including the Decedent, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant. At all times relevant to this litigation, Defendant designed, researched, developed, formulated, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by Decedent, and/or to which Decedent was exposed, as described above.

131. At all times relevant to this litigation, Defendant's Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Decedent.

132. At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Alabama and throughout the United States, including Decedent, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

22

133. Defendant's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of the Defendant's manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

134. Defendant's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks associated with these products reasonably foreseeable uses exceeded the alleged benefits associated with their design and formulation.

135. Therefore, at all times relevant to this litigation, Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendant, were defective in design and formulation, in one or more of the following ways:

a.  When placed in the stream of commerce, Defendant's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b.  When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c.  When placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d.  Defendant did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate.

e.  Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweighs any potential utility stemming from the use of the herbicide.

23

f.    Defendant knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g.    Defendant did not conduct adequate post-marketing surveillance of its Roundup® products.

h.    Defendant could have employed safer alternative designs and formulations.

136.    At all times relevant to this litigation, Decedent used and/or was exposed to the use of Defendant's Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

137.    Decedent could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before, during or after the time of exposure.

138.    The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendant's Roundup® products were and are more dangerous than alternative products and Defendant could have designed their Roundup® products to make them less dangerous. Indeed, at the time that Defendant designed their Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

139.    At the time Roundup® products left Defendant's control, there was a practical, technically feasible, and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant's Roundup® herbicides.

140.    Defendant's defective design of Roundup® amounts to willful, wanton, and/or reckless conduct by Defendant.

141.     Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendant is strictly liable to Decedent.

142.     The defects in Defendant's Roundup® products were substantial and contributing factors in causing Decedent's grave injuries and death, and, but for Defendant's misconduct and omissions, Decedent would not have sustained his injuries.

143.     As a direct and proximate result of Defendant placing their defective Roundup® products into the stream of commerce, Decedent suffered grave injuries including death, Decedent endured pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.

144.     **WHEREFORE,** Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive Alabama wrongful death damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT TWO

## STRICT LIABILITY (FAILURE TO WARN)

145.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

146.     Plaintiff brings this strict liability claim against Defendant for failure to warn.

147.     At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Decedent, because they do not contain adequate warnings or instructions concerning the

dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

148. Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Decedent, Defendant therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of Roundup® and glyphosate-containing products.

149. At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn Decedent of the dangers associated with Roundup® use and exposure. Defendant, as manufacturer, seller, or distributor of chemical herbicides, is held to the knowledge of an expert in the field.

150. At the time of manufacture, Defendant could have provided warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to these products.

151. At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its Roundup® products and to those who would foreseeably use or be harmed by Defendant's herbicides, including Decedent.

152.    Despite the fact that Defendant knew or should have known that Roundup® products posed a grave risk of harm, it failed to warn of the dangerous risks associated with their use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied, or sold the product, and not known to end users and consumers, such as Decedent.

153.    Defendant knew or should have known that its Roundup® and glyphosate-containing products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products. Defendant has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

154.    At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products throughout the United States, including Decedent, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

155.    At all times relevant to this litigation, Decedent used and/or was exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

156.    Decedent could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before, during or after the time of Decedent's exposure. Decedent relied upon the skill, superior knowledge, and judgment of Defendant.

27

157. Defendant knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, but it failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and horticultural applications.

158. The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled agricultural workers, horticultural workers and/or at-home users such as Decedent to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

159. To this day, Defendant has failed to adequately and accurately warn of the true risks of Decedent injuries and death associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

160. As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Decedent.

161.     Defendant is liable to Plaintiffs for injuries caused by its failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its Roundup® products and the risks associated with the use of or exposure to Roundup® and glyphosate.

162.     The defects in Defendant's Roundup® products were substantial and contributing factors in causing Decedent's injuries and death, and, but for Defendant's misconduct and omissions, Decedent would not have sustained his injuries and died.

163.     Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup® products, Decedent could have avoided the risk of developing injuries as alleged herein.

164.     As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, the Decedent suffered and died as a result, and Decedent endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment, and funeral expenses.

165.     **WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in Plaintiffs' favor for compensatory and punitive Alabama wrongful death damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT THREE

### NEGLIGENCE

166.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

167. Defendant, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Decedent.

168. At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of their Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

169. At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of its Roundup® products. Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup® and, in particular, its active ingredient glyphosate.

170. At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

171. Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products caused Decedent's death and thus created a dangerous and unreasonable risk of injury to the users of these products, including Decedent.

172. Defendant knew or, in the exercise of reasonable care, should have known that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup's

adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Decedent from Roundup®.

173.     Defendant knew or, in the exercise of reasonable care, should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup®.

174.     Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup® and glyphosate-containing products.

175.     As such, Defendant breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

176.     Defendant failed to appropriately and adequately test Roundup®, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Decedent from Roundup®.

177.     Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant has failed to do so. Indeed, Defendant has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

178.    Defendant's negligence included:

a.    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

b.    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

c.    Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture, horticulture, and at-home use;

d.    Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup®, and the propensity of these ingredients to render Roundup® toxic, increase the toxicity of Roundup®, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup®, and whether or not "inert" ingredients and/or adjuvants were safe for use;

e.    Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup/glyphosate as an herbicide;

f.    Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

g.    Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and/or be exposed to its Roundup® products;

h.    Failing to disclose to Decedent, users, consumers, and the general public that the use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

i.    Failing to warn Decedent, users, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Decedent and other users or consumers;

j.    Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

k.    Representing that its Roundup® products were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended use;

1.    Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate; Advertising, marketing, and recommending the use of Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

m.    Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup® products are not unsafe for use in the agricultural, horticultural industries, and/or home use; and

n.    Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

179.    Defendant knew and/or should have known that it was foreseeable that consumers and/or users, such as Decedent, would suffer injuries and/or death as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

180.    Decedent did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

181.    Defendant's negligence was the proximate cause of the death, injuries, harm, and economic losses that Decedent suffered.

182.    Defendant's conduct, as described above, was reckless. Defendant regularly risks the lives of consumers and users of their products, including Decedent, with full knowledge of the dangers of its products. Defendant has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Decedent. Defendant's reckless conduct therefore warrants an award of punitive damages.

183.    As a proximate result of Defendant's wrongful acts and omissions in placing its defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Decedent suffered and died as a result, and Decedent endured physical pain, emotional injuries, and untimely death. Amy Brown Bryan has suffered economic losses, (including significant expenses for medical care and treatment) and will continue to suffer emotional injuries and the loss of her father's love and support.

184.    **WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive Alabama wrongful death damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT FOUR
## WRONGFUL DEATH

185.    Plaintiffs incorporates by reference all prior allegations contained in this Complaint.

186.    Defendant's negligence caused the death of plaintiff, Terry Wayne Brown.

187.    As a consequence of Decedent's death, his daughter, Amy Brown Bryan suffered pain, grief, sorrow, anguish, stress, shock and mental suffering already experienced and reasonably probable to be experienced for the rest of her life.

188.    As a further consequence of Decedent's death, Plaintiff Amy Brown Bryan incurred expenses for funeral and burial, medical care and services for the injury that resulted in Decedent's death.

189.    As a further consequence of Decedent's death caused by Defendant, Plaintiff, Amy Brown Bryan incurred the loss of love and guidance of her father, the Decedent in the future.

190.    **WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in Plaintiffs' favor for compensatory and punitive Alabama wrongful death damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiffs also demand a jury trial on the issues contained herein.

## JURY TRIAL DEMAND

191.    Plaintiff demands a trial by jury on all of the triable issues within this pleading.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that the Court enter judgment in her favor, in favor of the Estate and against Monsanto, awarding as follows:

a.      compensatory damages in an amount to be proven at trial;

b.      punitive damages including, but not limited to, Alabama wrongful death damages.

c.      costs including reasonable attorneys' fees, court costs, and other litigation expenses; and

d. any other relief the Court may deem just and proper.

Dated: 01/31/2020          **HARE, WYNN, NEWELL & NEWTON LLP**

s/Don McKenna

Don McKennaASB-6494-C66D
Hare, Wynn, Newell & Newton LLP
2025 Third Avenue North, Suite 800
Birmingham, AL 35203
Telephone: (205) 328-5330
Facsimile: (205) 324-2165
don@hwnn.com
Attorney for Plaintiffs