# U.S. District Court
## District of Delaware (Wilmington)
## CIVIL DOCKET FOR CASE #: 1:20–cv–00113–RGA

Warrell et al v. Monsanto Company
Assigned to: Judge Richard G. Andrews
Cause: 28:1332 Diversity–Personal Injury

Date Filed: 01/24/2020
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Norman Warrell**
*as husband and wife*

represented by **Chase Traver Brockstedt**
Baird Mandalas Brockstedt LLC
1413 Savannah Rd
Suite 1
Lewes, DE 19958
(302) 644–0302
Email: chase@bmbde.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen Anthony Spence**
Baird Mandalas Brockstedt LLC
1413 Savannah Rd
Suite 1
Lewes, DE 19958
302–645–2262
Email: sas@bmbde.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Barbara Warrell**
*as husband and wife*

represented by **Chase Traver Brockstedt**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen Anthony Spence**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**
*a Delaware Corporation*

| Date Filed | # | Docket Text |
| --- | --- | --- |
| 01/24/2020 | 1 | COMPLAINT – filed with Jury Demand against Monsanto Company – Magistrate Consent Notice to Pltf. ( Filing fee $ 400, receipt number 0311–2834758.) – filed by Norman Warrell, Barbara Warrell. (Attachments: # 1 Civil Cover Sheet) (lak) (Entered: 01/24/2020) |
| 01/24/2020 | 2 | Notice, Consent and Referral forms re: U.S. Magistrate Judge jurisdiction. (lak) (Entered: 01/24/2020) |
| 01/24/2020 | | Summons Issued with Magistrate Consent Notice attached as to Monsanto Company on 1/24/2020. Requesting party or attorney should pick up issued summons at the Help Desk, Room 4209, or call 302–573–6170 and ask the Clerk to mail the summons to them. (lak) (Entered: 01/24/2020) |

| 01/24/2020 | | Remark: Summons mailed to Counsel's office on 1/24/2020. (lak) (Entered: 01/24/2020) |
|---|---|---|
| 01/29/2020 | | Case Assigned to Judge Richard G. Andrews. Please include the initials of the Judge (RGA) after the case number on all documents filed. (rjb) (Entered: 01/29/2020) |
| 02/10/2020 | 3 | AFFIDAVIT of Service for Complaint served on Monsanto Company c/o Lyanne Gares c/o Corporation Service Co. on 2/7/2020, filed by Barbara Warrell, Norman Warrell. (Brockstedt, Chase) (Entered: 02/10/2020) |

## IN THE UNTED STATE DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

NORMAN WARRELL and BARBARA  :
WARRELL, as husband and wife,  :  Case No.:
          :
  Plaintiffs,     :
          :
  v.        :  DEMAND FOR JURY TRIAL
          :
MONSANTO COMPANY, a Delaware  :
Corporation,       :
          :
  Defendant.     :

## COMPLAINT

The Plaintiffs, Norman Warrell and Barbara Warrell, bring this Complaint for damages against Defendant, Monsanto Company ("Monsanto"), and allege as follows:

## NATURE OF THE CASE

1. This case arises out of Monsanto's wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and sale of the herbicide Roundup, containing the active ingredient glyphosate. Glyphosate has been found to be carcinogenic, linked to causing various forms of cancer, and in particular, non-Hodgkin's Lymphoma. As such, Roundup is dangerous to human health and unfit to be marketed and sold in commerce, particularly without proper warnings and directions as to the dangers associated with its use. Plaintiff Norman Warrell, who used Roundup extensively, was diagnosed with Non Hodgkins Lymphoma, and his spouse, Barbara Warrell bring this action for the injuries and losses they have incurred.

## JURISDICTION AND VENUE

2.     This Court has personal jurisdiction over Monsanto under 28 U.S.C. § 1332 because complete diversity exists. Monsanto is a citizen of Delaware and transacts business in the state. Monsanto knows that its Roundup products are and were sold throughout Delaware, and, more specifically, caused Roundup to be sold across the United States, including Delaware. In addition, Monsanto maintains sufficient contacts with the Delaware such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

3.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the Plaintiffs, residents of Rhodesdale, Maryland, and the Defendant, incorporated in Delaware, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4.     Venue is proper in this District under 28 U.S.C. §1391(b) and (c).

## PARTIES

5.     The Plaintiffs, Norman Warrell and Barbara Warrell, are natural persons and at all relevant times were residents and citizens of Dorchester County, Maryland. The Plaintiffs bring this action for personal injuries sustained from exposure to Roundup, and its active ingredient glyphosate and the surfactant polyethoxylated tallow amine ("POEA"). As a direct and proximate result of being exposed to Roundup, the Plaintiff, Norman Warrell, developed Non Hodgkins Lymphoma, as well as other health problems as a result.

## FACTUAL ALLEGATIONS

6.     At all relevant times, Monsanto designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the commercial herbicide Roundup.

2

7.     "Roundup" refers to all formulations of Monsanto's Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak Herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Week Killer, Roundup Herbicide, Roundup Original 2k Herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promas, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass Killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer 1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation containing the active ingredient glyphosate.

8.     Monsanto is a multinational agricultural biotechnology corporation incorporated under the laws of the State of Delaware with its principal place of business located in St. Louis, Missouri. It is the world's leading producer of glyphosate.

9.     Monsanto discovered the herbicidal properties of glyphosate during the 1970's and developed it as a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

10.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phospate synthase, known as EPSP synthase.

11.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3 phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

12.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots; and detectable quantities accumulate in the plant tissues.

13.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has been driven largely by the proliferation of "Roundup Ready" crops, which have been genetically engineered to resist the activity of glyphosate.

14.     Monsanto is responsible for the development, manufacture, marketing, sale, and distribution of Roundup Ready seeds. By 2009, Monsanto was the world's leading producer of Roundup ready seeds. In 2010, roughly 70% of corn and cotton and 90% of soybean fields in the United States were grown with Roundup Ready seeds.

15.     Roundup was introduced in 1974 and is today one of the world's most widely-used herbicides. Monsanto's glyphosate products are registered in more than 130 countries and are approved for weed control in more than 100 crops. No other herbicide active ingredient compares in terms of number of uses.[1]

16.     In all this time, farmers have used Roundup unaware it is a carcinogen.

---

[1] *Backgrounder*, History of Monsanto's Glyphosate Herbicides, June 2005, available at www.monsanto.com/products/documents/glyphosate-background-materials/back_ground.pdf

## REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

17.     The manufacture, formulation, and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. § 136a(a).

18.     The EPA requires a variety of tests as part of the registration process to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or reregistering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

19.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

20.     The EPA and the Commonwealth of Massachusetts registered Roundup for distribution, sale, and manufacture in the United States and the Commonwealth of Massachusetts.

21.     FIFRA generally requires that the registrant, here Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

22.     Each pesticide product distributed, sold, or manufactured is evaluated at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticides through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. To re-evaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

## MONSANTO'S FALSE REPRESENTATIONS REGARDING THE SAFETY OF ROUNDUP

23.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

a.     Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences.

b.     And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c.     Roundup biodegrades into naturally occurring elements.

d.     Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e.   This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f.   You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g.   Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h.   Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i.   You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j.   "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[2]

24.   On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with the NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a.   its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

---

[2] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15)(Nov. 1996).

7

      b.     its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;

      c.     its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

      d.     its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics;"

      e.     glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and

      f.     its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

25.     Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

26.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup and affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[3]

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP

27.     As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties.

---

[3] *Monsanto Guilty in 'False Ad' Row,* BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.

28.     On March 4, 1985, a group of the EPA's Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[4] Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

29.     In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.[5]

30.     In October 1991, the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.[6]

31.     In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Monsanto's Roundup products are more dangerous and toxic than glyphosate alone.[7] As early as 1991, evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.

---

[4] Consensus Review of Glyphosate, Casewell No. 661A. March 4, 1985. United States Environmental Protection Agency.

[5] http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheets/0178fact.pdf.

[6] U.S. EPA, *Memorandum, Subject: SECOND Peer Review of Glyphosate* 1 (1191), *available at* http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_30-Oct-91_265.pdf

[7] See Martinez, et al. *Oral and pulmonary toxicology of the surfactant used in Roundup herbicide,* PROC. WEST. PHARMACOL. SOC. 34:43-46 (1991); Nora Benachour, et al., *Glyphosate Formulations Induce Apoptosis and Necrosis in Human Umbilical, Embryotic, and Placental Cells,* 22 CHEM. RES. TOXICOL. 97-105 (2009), *available at* http://big.assets.huffington.com/france.pdf; Gasnier et al. 2010, Francisco Peixoto, *Comparative effects of the Roundup and glyphosate on mitochondrial oxidative phosphorylation,* 61 CHEMOSPHERE 1115, 1122 (2005), *available at* https://www.researchgate.net/publication/7504567_Comparative_effects_of_the_Roundup_and_glyphosate_on_mitochondrial_oxidative_phosphorylation; March 2004.

32.     In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell

Division Dysfunction at the Level of CDK1/Cyclin B Activation."[8] The study found that

Monsanto's Roundup caused delays in the cell cycles of sea urchins, while the same concentrations

of glyphosate alone proved ineffective and did not alter cell cycles.

33.     In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect

cell cycle regulation." The study demonstrated a molecular link between glyphosate-based

products and cell cycle dysregulation.[9]

34.     The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and

human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent

development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such

as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose

of glyphosate affecting cells."[10]

35.     In 2005, Francisco Peixoto published a study showing that Roundup's effects on

rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate

alone.

36.     The Peixoto study suggested that the harmful effects of Roundup on mitochondrial

bioenergetics could not be exclusively attributed to glyphosate and could be the result of other

chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between

glyphosate and Roundup formulation products.

---

[8] Julie Marc, et al., *Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation*, 15 CHEM. RES. TOXICOL. 326-331 (2002), *available at* http://pubs.acs.org/doi/full/10.1021/tx015543g.
[9] Julie Marc, et al., *Glyphosate-based pesticides affect cell cycle regulation*, 96 BILIOGY OF THE CELLS 245, 245-249 (2004), *available at* http://onlinelibrary.wiley.com/doi/10.1016/j.biolcel.2003.11.010/epdf.
[10] Molinari, 2000; Stewart et al., 2003.

37.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study of the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

38.     The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

39.     The results of these studies were confirmed in peer-reviewed studies that were known to Monsanto.

40.     Monsanto knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect the Plaintiff from Roundup.

41.     Monsanto knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

42.     Monsanto failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect the Plaintiff from Roundup.

43.     Rather than performing appropriate tests, Monsanto relied on flawed industry-supported studies designed to protect Monsanto's economic interests rather than the Plaintiff and the consuming public.

44.     Despite its knowledge that Roundup was considerably more dangerous than glyphosate alone, Monsanto continued to promote Roundup as safe.

### IARC CLASSIFICATION OF GLYPHOSATE

45.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental agency that the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

46.     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015-2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

47.     IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; and related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

48.     On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Monsanto's possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Monsanto's Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the

mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

49.     The IARC's full Monograph was published on July 29, 2015, and established glyphosate as a class 2A probable carcinogen to humans. According to the authors, glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

50.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's Lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

51.     The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

## EARLIER EVIDENCE OF THE DANGERS OF GLYPHOSATE

52.     Despite the new classification by the IARC, Monsanto has had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

53.     Genotoxicity refers to chemical agents capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

54.     In 1997, Chris Clements published "Genotoxicity of select herbicides in Rana catesbeiana tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

55.     The study found that tadpoles exposed to roundup showed significant DNA damage when compared with unexposed control animals.

56.     Both human and animal studies have shown that glyphosate and glyphosate-base formulations such as Roundup can induce oxidative stress.

57.     Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

58.     The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

59.     In 2006, César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

60.     The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

61.     The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

62.     Despite knowledge to the contrary, Monsanto denies that Roundup is genotoxic.

63.     In addition to glyphosate and Roundup's genotoxic properties, Monsanto has long been aware of glyphosate's carcinogenic properties.

64.     Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, NHL, Hodgkin's Lymphoma, Multiple Myeloma, and soft tissue sarcoma.

65.     Monsanto has known of this association since the mid-1980's and numerous human and animal studies evidence the carcinogenicity of glyphosate and/or Roundup.

66.     In 1985, the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

67.     In 2003, Lennart Hardell and Mikael Eriksson published the results of two case-controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

68.     The study concluded that glyphosate had the most significant relationship to NHL among all herbicide studies with an increased odds ratio of 3.11.

69.     In 2003, AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

70.     The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

71.     In 2008, Mikael Eriksson published a population-based case-control study of exposure to various pesticides as a risk factor for NHL.

72.     This strengthened previous associations between glyphosate and NHL.

73.     In spite of this knowledge, Monsanto continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

74.     On information and belief, these statements and representations have been made with the intent of inducing Plaintiff, the agricultural community, and the public at large to purchase, and increase the use of, Roundup for Monsanto's pecuniary gain, and in fact did induce the Plaintiff to use Roundup.

75.     Monsanto made these statements with complete disregard and reckless indifference to the safety of the Plaintiff and the general public.

76.     Notwithstanding Monsanto's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

77.     Monsanto knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

78.     Monsanto failed to appropriately and adequately inform and warn the Plaintiff of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring, and/or medications.

79.     Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Monsanto continues to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

80.     Monsanto has claimed and continues to claim that Roundup is safe, non-carcinogenic, and non-genotoxic.

81.     Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity

studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."[11]

82.     Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

83.     Glyphosate, and Monsanto's Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

84.     Monsanto's statements proclaiming the safety of Roundup and disregarding its dangers misled the Plaintiff.

85.     Despite Monsanto's knowledge that Roundup was associated with an elevated risk of developing cancer, Monsanto's promotional campaigns focused on Roundup's purported "safety profile."

86.     Monsanto's failure to adequately warn the Plaintiffs, resulted in (1) the Plaintiff, Norman Warrell, using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

87.     Monsanto failed to seek modification of the labeling of roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

88.     Monsanto's failure to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

---

[11] *Backgrounder* – Glyphosate: No Evidence of Carcinogenicity, updated November 2014, available at www.monsanto.com/glyphosate/documents/no-evidence-of-carcinogenicity.pdf

89.     Monsanto's failure to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

90.     Monsanto's failure to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

91.     By reason of the foregoing acts and omissions, the Plaintiffs seek compensatory damages as a result of the Plaintiff's use of, and exposure to, Roundup, which caused or was a substantial contributing factor in causing the Plaintiff to suffer from cancer, specifically NHL, and the Plaintiffs suffered severe and personal injuries that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

92.     By reason of the foregoing, the Plaintiff is severely and permanently injured.

93.     By reason of the foregoing acts and omissions, the Plaintiffs have endured and continues to suffer, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of Monsanto's actions and inactions.

## PLAINTIFF'S EXPOSURE TO ROUNDUP

94.     Plaintiff, Mr. Warrell, began using Roundup products in the 1970's at his brother's farm and then father-in-law's farm in Maryland.   In 1980, Mr. Warrell purchased a farm of approximately 40 acres where he used Roundup products for more than 15 years.

95.     Mr. Warrell used Roundup products on farm fields and areas around his residence through the use of a 300-gallon sprayer he pulled behind his tractor and a hand sprayer.

96.     Mr. Warrell's use of Roundup products for more than 40 years was frequent, often daily, to ensure crops were eliminated prior to re-planting, to control weeds and other grasses at the outer edge of the fields, and weeds around Plaintiffs' residence.

97.     Mr. Warrell's use of Roundup products was pervasive and he recalls getting the products on his hands and skin. Mr. Warrell also recalls smelling the product and most likely unintentionally inhaling it during the mixing process or when it was being used.

98.     Mr. Warrell followed all safety and precautionary warnings during his use of Roundup products.

99.     During the period of time that Mr. Warrell used Roundup products, he was unaware that exposure to Roundup products was injurious to his health or the health of others.

100.    Mr. Warrel was diagnosed with a form of Non Hodgkins Lymphoma in 2005. The development of Non Hodgkins Lymphoma, and subsequent health problems, was proximately and actually caused by exposure to Defendant's Roundup products.

101.    As a result of the injuries sustained by Plaintiffs as a result of exposure to Roundup products, Plaintiffs have suffered severe injuries that are permanent and lasting in nature, physical pain, mental anguish, and diminished enjoyment of life.

102.    The Plaintiffs have suffered significant economic and non-economic damages resulting from the injuries.

103.    Plaintiff, Barbara Warrell, is the spouse of Plaintiff, Norman Warrell, and brings a claim for loss of consortium.

## TOLLING OF APPLICABLE STATUTE OF LIMITATIONS
## DISCOVERY RULE TOLLING

104.    The Plaintiff had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup and glyphosate until 2018. This is the quintessential case for tolling.

105.   Within the time period of any applicable statutes of limitations, the Plaintiff could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup and glyphosate is injurious to human health.

106.   The Plaintiff did not discover, and did not know the facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup and glyphosate; nor would a reasonable and diligent investigation by them have disclosed that Roundup and glyphosate would cause their cancers.

107.   For these reasons, all applicable statute of limitations have been tolled by operation of the discovery rule with respect to the Plaintiff's claims.

### FRAUDULENT CONCEALMENT TOLLING

108.   All applicable statutes of limitations have also been tolled by Monsanto's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

109.   Instead of disclosing critical safety information about Roundup and glyphosate, Monsanto has consistently and falsely represented the safety of its Roundup products.

### ESTOPPEL

110.   Monsanto was under a continuous duty to disclose to consumers, users, and other persons coming into contact with its products, including the Plaintiffs, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup and glyphosate.

111.   Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup and glyphosate and the serious risks associated with the use of and/or exposure to its products.

112.    Based on the foregoing, Monsanto is estopped from relying on any statutes of limitations in defense of this action.

## COUNT I – NEGLIGENCE

113.    The Plaintiffs re-allege each paragraph above as if fully set forth herein.

114.    Monsanto had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

115.    Monsanto failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup into interstate commerce in that Monsanto knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of Non Hodgkins Lymphoma, as well as other severe and personal injuries that are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

116.    The negligence by Monsanto, its agents, servants, and/or employees, included but was not limited to the following act and/or omissions:

a.    Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly testing it;

b.    Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup;

21

d.  Not conducting sufficient testing programs to determine whether or not Roundup was safe for use; in that Monsanto knew or should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users;

e.  Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Monsanto had knowledge that Roundup is, was, or could be carcinogenic;

f.  Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

g.  Negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

h.  Negligently failing to petition the EPA to strengthen the warnings associated with Roundup;

i.  Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with roundup;

j.  Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

22

k.   Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;·

l.   Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

m.   Negligently designing Roundup in a manner that was dangerous to its users;

n.   Negligently manufacturing Roundup in a manner that was dangerous to its users;

o.   Negligently producing Roundup in a manner that was dangerous to its users;

p.   Negligently formulating Roundup in a manner that was dangerous to its users;

q.   Concealing information from the Plaintiffs while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations;

q.   Improperly concealing and/or misrepresenting information from the Plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides; and

r.   Negligently selling Roundup with a false and misleading label.

116.   Monsanto under-reported, underestimated, and downplayed the serious dangers of Roundup.

117.   Monsanto negligently and deceptively compared the safety risks and/or dangers of roundup with common everyday foods such as table salt, and other forms of herbicides.

118.   Monsanto was negligent and/or violated Delaware and Maryland law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that it:

  a. Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide;

  b. Failed to accompany its product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

  c. Failed to accompany its product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

  d. Failed to accompany its product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;

  e. Failed to warn the Plaintiff of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of Non Hodgkins Lymphoma;

  f. Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup;

  g. Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants;

     h.     Negligently misrepresented the evidence of Roundup's genotoxicity and

             carcinogenicity; and

     i.     Was otherwise careless and/or negligent.

119.    Despite the fact Monsanto knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Monsanto continues to market, manufacture, distribute, and/or sell Roundup to consumers, including the Plaintiffs.

120.    Monsanto knew or should have known that consumers such as the Plaintiffs would foreseeably suffer injury as a result of Monsanto's failure to exercise ordinary care.

121.    Monsanto's violations of law and/or negligence were the proximate cause of the Plaintiff's injuries, harm and economic loss, which the Plaintiffs suffered and will continue to suffer.

122.    As a result of the foregoing acts and omissions, the Plaintiff, Norman Warrell, suffered from Non Hodgkins Lymphoma and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as financial expenses for hospitalization and medical care.

WHEREFORE, the Plaintiffs respectfully request that this Court enter judgment in the Plaintiffs' favor for compensatory damages together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## <u>COUNT II – STRICT PRODUCTS LIABILITY – DESIGN DEFECT</u>

123.    The Plaintiffs re-allege the paragraphs above as if fully stated herein.

124.    At all times herein mentioned, the Defendant designed, researched, manufactured, tested, advertised, promoted, sold, and distributed Roundup as hereinabove described that was used by the Plaintiff.

125.    Defendant's Roundup was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendant.

126.    At those times, Roundup was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, the Plaintiff herein.

127.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup.

128.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective in design and/or formulation in that, when it left the hands of the Defendant manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

129.    At all times herein mentioned, Roundup was in a defective condition and unsafe, and Defendant knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendant.  In particular, Defendant's Roundup was defective in the following ways:

        a.   When placed in the stream of commerce, Defendant's Roundup products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate.

26

b. When placed in the stream of commerce, Defendant's Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c. When placed in the stream of commerce, Defendant's Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

d. Defendant's did not sufficiently test, investigate, or study its Roundup products.

e. Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f. Defendant knew or should have known at the time of marketing its Roundup products that exposure to Roundup could result in cancer and other severe illnesses and injuries.

g. Defendant did not conduct adequate post-marketing surveillance of its Roundup products.

130.    Defendant knew or should have known that at all times herein mentioned, its Roundup was in a defective condition, and was and is inherently dangerous and unsafe.

131.    Plaintiff was exposed to Defendant's Roundup, as described above, without knowledge of Roundup's dangerous characteristics.

132.    At the time of Plaintiff's use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

133.    Defendant with this knowledge voluntarily designed its Roundup with a dangerous condition for use by the public, and in particular the Plaintiff.

134.    Defendant had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

135.    Defendant created a product that was and is unreasonably dangerous for its normal, intended use.

136.    Defendant marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

137.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was manufactured defectively in that Roundup left the hands of Defendant in a defective condition and was unreasonably dangerous to its intended users.

138.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant reached its intended users in the same defective and unreasonably dangerous condition in which the Defendant's Roundup was manufactured.

139.    Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to the Plaintiff in particular, and Defendant is therefore strictly liable for the injuries sustained by the Plaintiff.

140.    The Plaintiffs could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

141.    By reason of the foregoing, the Defendant has become strictly liable to the Plaintiffs for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup.

142.    Defendant's defective design of Roundup amounts to willful, wanton, and/or reckless conduct by Defendant.

143.    Defects in Defendant's Roundup were the cause of or a substantial factor in causing Plaintiff's injuries.

144.    As a result of the foregoing acts and omissions, the Plaintiff developed NHL, and suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

145.    Defendant's conduct was committed with knowing, reckless, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers, including Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so as to punish and deter similar conduct in the future.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury trial on all issues contained herein.

## COUNT III – STRICT PRODUCTS LIABILITY – FAILURE TO WARN

146.    Plaintiffs re-allege the paragraphs above as if fully stated herein.

147.    Defendant has engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting Roundup, and through that conduct have knowingly

and intentionally placed Roundup into the stream of commerce with full knowledge that it reaches consumers such as Plaintiff who are exposed to it through ordinary and reasonably foreseeable uses.

148.    Defendant did in fact sell, distribute, supply, manufacture, and/or promote Roundup to Plaintiff.   Additionally, Defendant expected the Roundup that it was selling, distributing, supplying, manufacturing, and/or promoting to reach – and Roundup did in fact reach – consumers, including Plaintiff, without any substantial change in the condition of the product from when it was initially distributed by the Defendant.

149.    At the time of manufacture, Defendant could have provided warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

150.    At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user and was so at the time it was distributed by Defendant and at the time Plaintiff was exposed to and/or ingested the product.  The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing non-Hodgkin's lymphoma as a result of exposure and use.

151.    Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect the health of those exposed in violation of 7 U.S.C. § 136j(a)(1)(E).

152.   Defendant's failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. § 136j(a)(1)(E) as well as the laws of the states of Maryland and Delaware.

153.   Defendant could have amended the label of Roundup to provide additional warnings.

154.   This defect caused serious injury to Plaintiff, who used Roundup in its intended and foreseeable manner.

155.   At all times herein mentioned, Defendant had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain, supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

156.   Defendant labeled, distributed, and promoted the aforesaid product that was dangerous and unsafe for the use and purpose for which it was intended.

157.   Defendant failed to warn of the nature and scope of the side effects associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of NHL and CLL.

158.   Defendant was aware of the probable consequences of the aforesaid conduct. Despite the fact that Defendant knew or should have known that Roundup caused serious injuries, Defendant failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of developing NHL from Roundup exposure, even though these side effects were known or were reasonably scientifically knowable at the time of distribution. Defendant willfully and deliberately failed to avoid the consequences associated with its failure to warn, and in doing so, Defendant acted with a conscious disregard for the safety of Plaintiff.

159.    At the time of exposure, Plaintiff could not have reasonably discovered any defect in Roundup through the prior exercise of reasonable care.

160.    Defendant, as the manufacturer and/or distributor of the subject product, is held to the level of knowledge of an expert in the field.

161.    Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Defendant.

162.    Had Defendant properly disclosed the risks associated with Roundup products, Plaintiff would have avoided the risk of NHL by not using Roundup products.

163.    The information that Defendant did provide or communicate failed to contain adequate warnings and precautions that would have enabled Plaintiff, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

164.    To this day, Defendant has failed to adequately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup.

165.    As a result of its inadequate warnings, Defendant's Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiff.

166.    As a direct and proximate result of Defendant's actions as alleged herein, and in such other ways to be later shown, the subject product caused Plaintiff to sustain injuries as herein alleged. Defendant's conduct was committed with knowing, reckless, conscious, willful, and deliberate disregard for the value of human life and the rights and safety of consumers, including Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so as to punish and deter similar conduct in the future.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury trial on all issues contained herein.

## COUNT IV – BREACH OF IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS

167.    Plaintiffs re-allege the paragraphs above as if fully stated herein.

168.    At all times relevant, Monsanto engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting its Roundup products, which are defective and unreasonably dangerous to users and consumers, including the Plaintiff, thereby placing Roundup products into the stream of commerce. These actions were under Monsanto's ultimate control and supervision.

169.    Before the Plaintiff was exposed to Roundup products, Monsanto impliedly warranted to its consumers and users – including the Plaintiff – that Roundup products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

170.    Monsanto, however, failed to disclose that Roundup has dangerous propensities when used as intended and that the use of and/or exposure to Roundup and glyphosate-containing products carries and increased risk of developing severe injuries, including the Plaintiff's injuries.

171.    The Plaintiff reasonably relied on the skill, superior knowledge and judgment of Monsanto and on its implied warranties that Roundup products were of merchantable quality and fit for their intended purpose or use.

172.    Roundup products were expected to reach and, in fact, reached consumers and users, including the Plaintiff, without substantial changed in the condition in which they were manufactured and sold by Monsanto.

173.    At all relevant times, Monsanto was aware that consumers and users of its products, including the Plaintiff, would use Roundup products as marketed by Monsanto, which is to say that the Plaintiff was a foreseeable user of Roundup.

174.    Monsanto intended that is Roundup products be used in the manner in which the Plaintiff, in fact, used them and Monsanto impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup was not adequately tested or researched.

175.    In reliance on Monsanto's implied warranty, the Plaintiff used Roundup as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Monsanto.

176.    The Plaintiffs could not have reasonably discovered or known of the risks of serious injury associated with Roundup or glyphosate.

177.    Monsanto breached its implied warranty to the Plaintiff in that its Roundup products were not of merchantable quality, safe, or fit for their intended use. Roundup has

34

dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

178.    The harm caused by Roundup products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

179.    As a direct and proximate result of Monsanto's wrongful acts and omissions, the Plaintiff, Norman Warrell, has suffered severe and permanent physical and emotional injuries. The Plaintiff has endured pain and suffering, suffered economic loss (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

WHEREFORE, Plaintiffs, respectfully request that the Court enter judgment in the Plaintiffs' favor for compensatory, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. The Plaintiffs also demand a jury trial on the issues contained herein.

## COUNT V – VIOLATION OF CONSUMER PROTECTION LAWS – MD. CODE ANN., COM. LAW §§ 13-101 *ET SEQ.* – DEL. CODE ANN. TIT. 6, §§ 2511, *ET SEQ.*

180.    Plaintiffs re-allege the paragraphs above as if fully stated herein.

181.    As a direct and proximate result of Monsanto's wrongful acts and omissions, the Plaintiff, Norman Warrell, has suffered severe and permanent physical and emotional injuries. The Plaintiff has endured pain and suffering, suffered economic loss (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

182.    Defendant is liable to the Plaintiffs pursuant to Maryland's and Delaware's unfair trade practices acts, specifically, Md. Code Ann., Com. Law §§ 13-101, *et seq.*, and Del. Code Ann. Tit. 6, §§ 2511, *et seq.*, respectively. Defendant is, and at all relevant times was, in the business of manufacturing and marketing Roundup. Defendant and/or its agents designed,

formulated, manufactured, assembled, prepared for sale, distributed, marketed, and/or sold Roundup, which was in a defective condition and was unreasonably dangerous when used as intended in the usual and customary manner.

183.    Defendant violated Md. Code Ann., Com. Law §§ 13-101, *et seq.*, and Del. Code Ann. Tit. 6, §§ 2511, *et seq.* by the use of false and misleading misrepresentations and/or omissions of material fact in connection with the marketing, promotion, and sale of Roundup. Defendant communicated the purported benefits of Roundup while failing to disclose the serious and dangerous injuries related to the use of Roundup with the intent that consumers, like Plaintiff, would rely upon the misrepresentations and purchase Roundup believing it to be safe for use in the usual and customary manner.

184.    Plaintiff, while using the product in the usual and customary manner as it was intended to be used, suffered injuries as a proximate result of Defendant placing the product on the market, which was unreasonably dangerous and defective at the time it was placed on the market by Defendant.

185.    As a direct and proximate result of the Defendant's violations of Md. Code Ann., Com. Law §§ 13-101, *et seq.*, and Del. Code Ann. Tit. 6, §§ 2511, *et seq.*, Plaintiffs have suffered significant and permanent damages, including but not limited to physical injury, past and future medical expenses, past and future physical and mental pain and suffering, and will continue to suffer all such damages in the future. Additionally, Plaintiffs are entitled to recover attorney's fees and punitive damages. Plaintiffs demand a jury trial on all issues contained herein.

186.    Defendant's conduct was committed with knowing, reckless, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers,

including Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so as to punish and deter similar conduct in the future.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury trial on all issues contained herein.

## COUNT VI - LOSS OF CONSORTIUM

187.    The Plaintiffs re-allege the paragraphs above as if fully stated herein.

188.    The Plaintiff, Barbara Warrell, is the wife of Norman Warrell and at all pertinent times was the wife of Norman Warrell.

189.    As a direct and proximate result of the breach of duty and wrongdoing of the defendants and the resultant injury to Norman Warrell as more particularly described in Counts I through V, the plaintiff, Barbara Warrell, suffered a loss of her right to consortium with her husband and the loss of her husband's services, society and companionship, and has suffered great mental anguish.

WHEREFORE, the Plaintiff, Barbara Warrell, demands compensatory damages, plus interest and costs. The Plaintiff also demands a jury trial on the issues contained herein.

## DEMAND FOR JURY TRIAL

190.    The Plaintiffs hereby jointly demand trial by jury as to all issues.

37

**BAIRD MANDALAS BROCKSTEDT, LLC**

*/s/ Chase T. Brockstedt*
Chase T. Brockstedt, Esq. (DE Id. No. 3815)
Stephen A. Spence, Esq. (DE Id. No. 5392)
Savannah Road, Suite 1
Lewes, DE 19958
Phone: (302) 645-2262
Fax: (302) 644-0306
chase@bmbde.com

OF COUNSEL:
Philip C. Federico, Esq. *(to be admitted pro hac vice)*
Brent Ceryes, Esq. *(to be admitted pro hac vice)*
SCHOCHOR, FEDERICO AND STATON, P.A.
1211 St. Paul Street
Baltimore, Maryland 21202
(410) 234-1000

Dated: January 24, 2020            *Attorneys for Plaintiffs*