# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
# CIVIL DOCKET FOR CASE #: 2:20-cv-01340

Rolish v. Monsanto Company
Assigned to:
Cause: 28:1332 Diversity-Personal Injury

Date Filed: 02/10/2020
Jury Demand: Plaintiff
Nature of Suit: 360 P.I.: Other
Jurisdiction: Diversity

**Plaintiff**

**Lois Rolish**

represented by **Steven Noel Williams**
Joseph Saveri Law Firm, Inc.
601 California Street
Suite 1000
San Francisco, CA 94108
4155006800
Fax: 4153959940
Email: swilliams@saverilawfirm.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 02/10/2020 | 1 | COMPLAINT Receipt No: 0973-25296597 - Fee: $400, filed by plaintiff Lois Rolish. (Attorney Steven Noel Williams added to party Lois Rolish(pty:pla))(Williams, Steven) (Entered: 02/10/2020) |
| 02/10/2020 | 2 | CIVIL COVER SHEET filed by Plaintiff Lois Rolish. (Williams, Steven) (Entered: 02/10/2020) |
| 02/10/2020 | 3 | NOTICE of Interested Parties filed by Plaintiff Lois Rolish. (Williams, Steven) (Entered: 02/10/2020) |
| 02/10/2020 | 4 | NOTICE of Related Case(s) filed by Plaintiff Lois Rolish. Related Case(s): 16-cv-01609, 16-cv-01988 (Williams, Steven) (Entered: 02/10/2020) |
| 02/10/2020 | 5 | Request for Clerk to Issue Summons on Complaint (Attorney Civil Case Opening) 1 filed by Plaintiff Lois Rolish. (Williams, Steven) (Entered: 02/10/2020) |

Steven N. Williams (State Bar No. 175489)
JOSEPH SAVERI LAW FIRM, INC.
601 California Street, Suite 1000
San Francisco, California 94108
Telephone: (415) 500-6800
Fax: (415) 395-9940
Email: swilliams@saverilawfirm.com

*Attorneys for Plaintiff Lois Rolish*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **LOIS ROLISH, a resident of Arizona,**<br><br>Plaintiff,<br><br>v.<br><br>**MONSANTO COMPANY, a Delaware Corporation, and DOES 1-20,**<br><br>Defendant. | Case No. _____<br><br>**COMPLAINT FOR DAMAGES:**<br>   **(1) Negligence**<br>   **(2) Strict Liability – Design Defect**<br>   **(3) Strict Liability – Failure to Warn**<br>   **(4) Breach of Implied Warranty**<br><br>JURY TRIAL DEMANDED |

I.    NATURE OF THE ACTION ........................................................................ 1

II.   JURISDICTION AND VENUE................................................................... 4

III.  PARTIES ...................................................................................................... 5

      A.   Plaintiff............................................................................................. 5

      B.   Defendants ....................................................................................... 5

      C.   Doe Defendants............................................................................... 5

IV.   FACTUAL ALLEGATIONS ...................................................................... 6

      A.   Glyphosate is an herbicide used to kill weeds and grasses. ................. 6

      B.   Monsanto publicly emphasized that Roundup® was safe for human
           use. ................................................................................................... 6

      C.   Monsanto disregarded scientific evidence of the adverse health effects
           resulting from its Roundup® formulation. .......................................... 10

      D.   Monsanto went to great lengths to conceal evidence regarding the
           dangers of Roundup®. .......................................................................13

           a.   Monsanto "ghost wrote" scientific papers concluding that
                glyphosate was safe. ................................................................13

           b.   Monsanto worked to discredit the agency that declared
                glyphosate to be a probable carcinogen....................................17

      E.   Plaintiff developed non-Hodgkin's lymphoma after her exposure to
           Roundup®...........................................................................................19

V.    PUNITIVE DAMAGE ALLEGATIONS AGAINST MONSANTO ....... 20

VI.   EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS ....... 21

VII.  CAUSES OF ACTION .............................................................................. 23

      FIRST CAUSE OF ACTION .................................................................... 23

      SECOND CAUSE OF ACTION ............................................................... 25

      THIRD CAUSE OF ACTION ................................................................... 26

VIII. PRAYER FOR RELIEF............................................................................. 26

REQUEST FOR JURY TRIAL.......................................................................... 27

Plaintiff Lois Rolish ("Plaintiff" or "Ms. Rolish") brings this Complaint for damages against defendants Monsanto Company and Does 1-20 as follows:

## I.  NATURE OF THE ACTION

1.  Plaintiff was diagnosed with non-Hodgkin's lymphoma ("NHL") in 2005.  A substantial factor in causing the onset of NHL in Plaintiff was her long-term, close exposure to Roundup®, the herbicide which the Monsanto Company ("Monsanto") developed and sold for many years in the United States. While Bayer AG acquired Monsanto in 2018, because this complaint covers the period prior to and after the acquisition, and for ease of reading, both Bayer AG and Monsanto shall be referred to herein as Monsanto unless the context requires otherwise.

2.  For decades Plaintiff worked in fields that were heavily treated with Roundup®, and on trails that were cleared of vegetation through heavy applications of Roundup®. In Plaintiff's case, Roundup® was being used in the manner in which Monsanto had designed it and following the directions provided by Monsanto. Monsanto maintained for years – and still does – that Roundup® is safe and poses no threat to human health. Monsanto is wrong. The State of California and the International Agency for the Research of Cancer are among those who have recognized that the chemicals in Roundup® are likely to cause cancer in humans. Recent discoveries indicate that Monsanto has known this for years, all the while denying the truth and propagating a fake scientific view that Roundup® is not

COMPLAINT FOR DAMAGES

harmful to humans through manipulation of the public discourse, fake and/or conflicted scientific studies supporting Monsanto's viewpoint, and millions of dollars of marketing and advertising.

3.     Monsanto developed, manufactures and markets Roundup®, Roundup PRO®, and Ranger PRO®[1] brand weed killer and other herbicides. The company refers to these as "agricultural productivity products." These herbicides are extremely lucrative for Monsanto and critical to the company's financial success. In fiscal year 2017 alone, Monsanto's agricultural productivity business reported net sales of $3,727,000,000, with a gross profit of $892,000,000.[2]

4.     The active ingredient in Roundup® is the herbicide glyphosate. Roundup® also includes an inert ingredient called polyethoxylated tallowamine ("POEA"). Combining POEA and glyphosate is designed to ensure that the product will adhere to and interact with unwanted vegetation. However, the combination of glyphosate and POEA amplifies the human health risks posed by glyphosate.

---

[1] "Roundup" refers collectively to all Roundup®, Roundup PRO,® and Ranger PRO® brand products.

[2] Monsanto Company, Form 10-K for the fiscal year ended August 31, 2017, filed with the Securities and Exchange Commission on October 27, 2017, at p. 26 (available at: https://www.sec.gov/Archives/edgar/data/1110783/000111078317000187/mon-20170831x10k.htm#s6A2A0B59C2A35F7895A98A3DE435AABB).

COMPLAINT FOR DAMAGES

5. Monsanto has always represented that Roundup® is safe for human use. Monsanto concealed adverse information that it knew about Roundup®, and generated phony scientific papers supporting the view that there was no link between Roundup® and human health problems. Monsanto did this so that it could continue to sell and profit from Roundup® products.

6. A report in the July-September 2019 issue of *Mutation Research/Reviews in Mutation Research* publicly validates what Monsanto has known covertly for many years: exposure to glyphosate significantly increases the risk of developing NHL. Researchers at the University of California at Berkeley, Mount Sinai School of Medicine, and the University of Washington conducted a meta-analysis of the literature, focusing on individuals with high exposure to glyphosate-based herbicides based on their occupations or other circumstances.[3] The researchers confirmed that such individuals have a 41% increased risk of developing NHL.

7. Ms. Rolish worked for the public schools in her neighborhoods in California. For decades, she worked with pre-teen children with an emphasis on special needs children. She supervised their outside time, accompanying them on

---

[3] Luoping Zhang, et al., "Exposure to glyphosate-based herbicides and risk for non-Hodgkin lymphoma: A meta-analysis and supporting evidence," *Mutation Research/Reviews in Mutation Research*, Vol. 781 (July-September 2019), pages 186-206, available at https://doi.org/10.1016/j.mrrev.2019.02.001 (accessed September 11, 2019).

COMPLAINT FOR DAMAGES

walks and watching them as they enjoyed outdoor time. She spent almost all of her time outside in fields which were receiving routine applications of tremendous amounts of Roundup®. In 2005 she developed non-Hodgkin's lymphoma after prolonged exposure to Roundup. ® As a result, Ms. Rolish underwent years of treatment and pain and suffering, including brain and memory injuries. She brings this action to hold Monsanto accountable for the harm it caused her.

## II. JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction over all causes of action alleged in this Complaint pursuant to 28 U.S.C. § 1332, as the Plaintiff is a resident of California and the Defendant is a Delaware corporation with its principal place of business in St. Louis, Missouri. Plaintiff's claims arise under the laws of the State of California and are based upon acts, transactions, and occurrences that took place in the State of California. *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco County*, 137 S. Ct. 1773, 1781-1783 (2017).

9.    The amount in controversy between Plaintiff and Defendant exceeds $75,000.

10.    The Court has personal jurisdiction over the Defendants because they conduct business in this District and sold, marketed and distributed Roundup® within this District.

COMPLAINT FOR DAMAGES

11. Venue is proper within this District pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events and omissions giving rise to the claim occurred in this District.

## III. PARTIES

### A. Plaintiff

12. Plaintiff Lois Rolish is an adult resident of Buckeye, Arizona. For fifteen years she worked in fields heavily treated with Roundup® as part of her duties as a school teacher and assistant in Orange County, California. At the time she was injured by Defendants' wrongful conduct, Ms. Rolish lived and worked in Orange County.

### B. Defendants

13. Defendant Monsanto Company is a Delaware corporation headquartered in Saint Louis, Missouri, and authorized to do business in the State of California. Monsanto developed and manufactures Roundup® herbicide products. Monsanto was acquired by Bayer Aktiengesellschaft ("Bayer AG") effective June 7, 2018.

### C. Doe Defendants

14. Plaintiff is ignorant of the true names and capacities of Does 1 through 20. Plaintiff will amend this Complaint to include the true names and capacities of these defendants when their identities are ascertained.

## IV.   FACTUAL ALLEGATIONS

### A.   Glyphosate is an herbicide used to kill weeds and grasses.

15.    The active ingredient in Roundup® is the herbicide N-phosphonomethylglycine, commonly referred to as glyphosate. Glyphosate is a non-selective herbicide, *i.e.*, it will kill most plants to which it is applied. Glyphosate is absorbed through the leaves and stems and interferes with the metabolism of amino acids necessary for plant growth. Plants exposed to glyphosate die within a few days or weeks.

16.    The Roundup® formula includes a mixture of ingredients. In addition to the active ingredient – glyphosate – it also uses inert ingredients. Inert ingredients, such as POEA, help the active ingredient adhere to or be absorbed by the vegetation on which the solution is sprayed. A combination of glyphosate and POEA amplifies the health risks posed by glyphosate in isolation.

### B.   Monsanto publicly emphasized that Roundup® was safe for human use.

17.    Monsanto registered glyphosate as an herbicide with the U.S. Environmental Protection Agency ("EPA") in 1974. The EPA permitted the registration based on then-available evidence regarding human and environmental risks. Monsanto began selling Roundup® later that year.

18.    Ever since the initial sales in 1974, Monsanto has maintained that the Roundup® is safe for humans. At various times, Monsanto has represented that:

- Roundup® is "safer than table salt."

- "You can feel good using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

- "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture or work with it[.]"

- "Roundup® can be used where kids and pets play and breaks down into natural material."[4]

- "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

- "Remember that environmentally friendly Roundup® herbicide is biodegradable."

- "Roundup® biodegrades into naturally occurring elements."

---

[4] The advertisement in which this representation is made shows a person with his head on the ground and a dog standing in an area treated with Roundup®.

- Roundup® "won't build up in the soil so you can use
Roundup with confidence along customers' driveways,
sidewalks and fences."

- Roundup® "is biodegradable and won't build up in the
soil. That will give you the confidence you need to use
Roundup everywhere you've got a weed, brush,
edging or trimming problem."

- "…Roundup® herbicide stays where you put it. That
means there's no washing or leaching to harm
customers' shrubs or other desirable vegetation."

- "This non-residual herbicide will not wash or leach in
the soil. It . . . stays where you spray it."

- You can apply the product with "confidence because it
will stay put where you put it."

- "Won't spread to nearby plants. And breaks down into
natural materials."

COMPLAINT FOR DAMAGES

19. For more than 40 years, Monsanto has consistently represented that "there is no evidence that glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides causes cancer[.]"[5] Even today,

---

[5] Monsanto, "Backgrounder – Glyphosate: No Evidence of Carcinogenicity (updated Nov. 2014), available at: https://monsanto.com/app/uploads/2017/06/no-evidence-of-carcinogenicity.pdf (accessed Aug. 28, 2019).

COMPLAINT FOR DAMAGES

Monsanto continues to "stand[] behind the safety of glyphosate and will continue to vigorously defend its glyphosate-based products."[6]

**C.    Monsanto disregarded scientific evidence of the adverse health effects resulting from its Roundup® formulation.**

20.    Early studies regarding glyphosate did not identify links between glyphosate and adverse health conditions. However, over time, the scientific community began to question the safety of glyphosate.

21.    For example, on February 11, 1985, the Toxicology Branch of the U.S. Environmental Protection Agency ("EPA") met to discuss the data available about glyphosate and whether it was a potential carcinogen. Following that meeting, the Toxicology Branch issued a memorandum classifying glyphosate as a Category C oncogene, *i.e.*, there was some evidence that glyphosate was a possible human carcinogen:[7]

---

[6] Bayer AFG, press release dated April 8, 2019, "More than 100 Bayer-owned glyphosate safety study reports accessible as Monsanto integration continues," available at: https://media.bayer.com/baynews/baynews.nsf/id/More-Bayer-owned-glyphosate-safety-study-reports-accessible-Monsanto-integration-continues (accessed September 11, 2019).

[7] https://www3.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_4-Mar-85_171.pdf

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
WASHINGTON, D.C. 20460

MAR 4 1985

**MEMORANDUM**

OFFICE OF
PESTICIDES AND TOXIC SUBSTANCES

SUBJECT:   Consensus Review of Glyphosate
           Caswell No. 661A

TO:        Robert Taylor
           Product Manager
           Herbicide – Fungicide Branch
           Registration Division

    On February 11, 1985, a group of Toxicology Branch personnel
met to evaluate and discuss the data base on Glyphosate, and in
particular the potential oncogenic response of Glyphosate.

* * *

E.   Classification of Glyphosate:

     In accordance with EPA proposed guidelines (FR of Nov. 23,
     1984) the panel has classified Glyphosate as a Category C
     oncogen.

22.     Research from the 1970 to mid-2000s focused only on the short-term

safety of glyphosate. As a result, there was little data regarding its long-term efforts.

Furthermore, there was little or no research whether combining glyphosate with

other ingredients increased any adverse health effects. This changed with a 2009

study by researchers at the University of Caen in France. A study in the journal

*Chemical Research in Toxicology* titled "Glyphosate Formulations Induce Apoptosis

and Necrosis in Human Umbilical, Embryonic, and Placental Cells"[8] evaluated the

toxicity of four glyphosate-based herbicides in Roundup® formulations on three

---

[8] Nora Benachour and Gilles-Eric Seralini, "Glyphosate Formulations Induce
Apoptosis and Necrosis in Human Umbilical, Embryonic, and Placental Cells,"
*Chem. Res. Toxicol.* 2009, 22, 1, 97-105 (Dec. 23, 2008)
https://doi.org/10.1021/tx800218n

COMPLAINT FOR DAMAGES

types of human cells. The formulations, which included both glyphosate and POEA, were compared to glyphosate without the addition of other ingredients. The researchers concluded that the inert ingredients in Roundup® were *not* chemically inactive. To the contrary, they found that glyphosate and POEA was a toxic combination of ingredients that posed a risk to humans.

23.    The 2009 study found that all four of the Roundup® formulations caused changes to the cells' DNA. Even more noteworthy, however, was the finding that the adverse effects were not proportional to glyphosate concentrations, but depended on the inert ingredients mixed with the glyphosate. The combination of glyphosate and POEA changed human cell permeability and amplified the glyphosate's health effects. As a result, the researchers concluded that "[t]he real threshold of [glyphosate] toxicity must take into account the presence of adjuvants but also [glyphosate] metabolism and time-amplified effects or bioaccumulation. This should be discussed when analyzing the in vivo toxic actions of [Roundup]. This work clearly confirms that the adjuvants in Roundup formulations are not inert. Moreover, the proprietary mixtures available on the market could cause cell damage and even death around residual levels to be expected, especially in food and feed derived from [Roundup] formulation-treated crops."

24.    More recently, scientific evidence has confirmed that the Roundup® formulation increases the risk of developing NHL, particularly for those using

Roundup® in commercial settings or over long periods of time. In a 2019 study,

researchers from U.C. Berkeley, Mount Sinai School of Medicine, and the

University of Washington conducted a meta-analysis of the literature regarding

glyphosate-based herbicides, focusing on people in the highest exposure groups

(*e.g.*, those applying herbicides in agricultural settings).[9] They found that people in

the high exposure groups had a 41% increased risk of developing NHL. The

scientists concluded, "Together, all of the meta-analyses conducted to date,

including our own, consistently report the same key finding: exposure to

[glyphosate-based herbicides] are associated with an increased risk of NHL."

Multiple sensitivity tests confirmed the validity of their findings.

### D. Monsanto went to great lengths to conceal evidence regarding the dangers of Roundup®.

#### a. Monsanto "ghost wrote" scientific papers concluding that glyphosate was safe.

25. For more than 20 years, Monsanto has actively worked to taint the

scientific literature to deceive or influence regulators regarding the supposed safety

of Roundup®. Scientists at Monsanto would write all or parts of what appeared to

be legitimate research papers which were then published under the names of

---

[9] Luoping Zhang, et al., "Exposure to glyphosate-based herbicides and risk for non-Hodgkin lymphoma: A meta-analysis and supporting evidence," *Mutation Research/Reviews in Mutation Research*, Vol. 781 ( July-September 2019), pages 186-206, https://doi.org/10.1016/j.mrrev.2019.02.001

COMPLAINT FOR DAMAGES

seemingly independent scientists. By "ghost writing" these papers, Monsanto

sought to mislead regulators, who then relied on those papers to conclude –

erroneously – that glyphosate does not cause cancer.

26. The first falsified scientific report was published in 2000, titled

"Safety Evaluation and Risk Assessment of the Herbicide Roundup and Its Active

Ingredient, Glyphosate, for Humans."[10] The supposed authors of the article are

Gary M. Williams of the Department of Pathology at New York Medical College,

along with Robert Kroes of The Netherlands and Ian C. Munro of Canada.

Following its publication in 2000, the Williams, Kroes, and Munro paper has been

cited as authority hundreds of times. Among those relying on the paper is the

Environmental Protection Agency ("EPA"), which relied on it as supporting a

conclusion that glyphosate was "not likely" carcinogenic.[11]

27. The Williams, Kroes, and Munro (2000) paper was discussed again in

a February 19, 2015 email written by Monsanto toxicology manager Williams

Heydens. Heydens proposed that Monsanto ghost write another paper, suggesting

---

[10]
https://pdfs.semanticscholar.org/5c28/f74103fe3c8904f3b6be7d9e820d951a9ee5.pdf

[11] See Environmental Protection Agency, Glyphosate issue paper: evaluation of carcinogenic potential, September 12, 2016.
https://www.epa.gov/sites/production/files/2016-09/documents/glyphosate_issue_paper_evaluation_of_carcincogenic_potential.pdf

COMPLAINT FOR DAMAGES

that the process be similar to that used for the Williams, Kroes, and Munro (2000)

article, noting that "we would be keeping the cost down by us [Monsanto] doing the

writing," while the academic researchers "would just edit & sign their names so to

speak."[12]

---

**From:** HEYDENS, WILLIAM F [AG/1000]
**Sent:** Thursday, February 19, 2015 7:53 AM
**To:** FARMER, DONNA R [AG/1000]
**Cc:** KOCH, MICHAEL S [AG/1000]; SALTMIRAS, DAVID A [AG/1000]; HODGE-BELL, KIMBERLY C [AG/1000]
**Subject:** RE: IARC Planning

* * *

For the overall plausibility paper that we discussed with John (where he gave the butadiene example),
I'm still having a little trouble wrapping my mind around that. If we went full-bore, involving experts
from all the major areas (Epi, Tox, Genetox, MOA, Exposure - not sure who we'd get), we could be
pushing $250K or maybe even more. A less expensive/more palatable approach might be to involve
experts only for the areas of contention, epidemiology and possibly MOA (depending on what comes
out of the IARC meeting), and we ghost-write the Exposure Tox & Genetox sections. An option would
be to add Greim and Kier or Kirkland to have their names on the publication, but we would be keeping
the cost down by us doing the writing and they would just edit & sign their names so to speak. Recall
that is how we handled Williams Kroes & Munro, 2000.

28.     The plan suggested by Heydens in the February 19, 2015 email was

adopted. An August 2015 document from the files of Monsanto toxicology manager

David Saltmiras confirms that he "ghostwrote cancer review paper Greim et al.

(2015)…"[13] Saltmiras was referring to a scientific paper for which German scientist

Helmut Greim was identified as Saltmiras' co-author. Greim worked as a consultant

---

[12] https://usrtk.org/wp-content/uploads/2017/03/Heydens.png (accessed Sept. 6, 2019).

[13] https://usrtk.org/wp-content/uploads/2017/08/18-Monsanto-Scientist-Admits-to-Ghostwriting-Cancer-Review-Paper.pdf

to Monsanto who helped the company have its data appear in peer-reviewed publications.

29.     Another example of Monsanto seeking to improperly influence the scientific literature appears in the September 2016 issue of *Critical Reviews in Toxicology (*"*CRT*"), which included a review of glyphosate along with four related sub-papers. Monsanto hired a consulting firm to write the paper titled "An Independent Review of the Carcinogenic Potential of Glyphosate." The analysis was not "independent" and, not surprisingly, concluded that the International Agency for Research on Cancer ("IARC") erred in classifying glyphosate as a probable human carcinogen and that glyphosate was "unlikely to pose a carcinogenic risk to humans."

30.     In the 2016 *CRT* review, the authors misrepresented their ties to Monsanto. In the "declaration of interests" section – where authors are supposed to disclose any potential conflicts -- the authors falsely stated that they were "not directly contacted by the Monsanto Company," and that "Neither any Monsanto company employees nor any attorneys reviewed any of the Expert Panel's manuscripts prior to submission to the journal." This was not true, as Monsanto was significantly involved in reviewing and editing the drafts. Monsanto scientist William Heydens wrote in an email to his contact at Intertek, "Here are my suggested edits to the Draft Combined Manuscript... I think I caught all the

differences and made the changes in the Combined Manuscript as part of my editing." In another email, Heydens wrote that he had reviewed the entire draft and indicated "what I think should stay, what can go." Heydens corresponded directly with at least one of the papers' authors. In addition, at least one of the authors was under contract with Monsanto while the paper was being drafted, which is not disclosed in the declaration of interests. In yet another email exchange, Heydens states that he had written an introduction to a paper and then talked about "who should be the ultimate author."

> **b.** **Monsanto worked to discredit the agency that declared glyphosate to be a probable carcinogen.**

31.    The IARC is a specialized agency of the World Health Organization. In 2014, an advisory group of scientists and government officials recommended that the IARC evaluate the safety of several pesticides, including glyphosate.

32.     Even before the IARC released its review, Monsanto anticipated that

the IARC scientists would recognize the connection between glyphosate and

cancer. In an effort to preempt the negative findings, Monsanto scientist Bill

Heydens wrote in an email dated October 15, 2014 that the company needed to

allocate resources to "fight" the IARC's predicted results:

| Message | |
|---------|--|
| From: | HEYDENS, WILLIAM F [AG/1000] ███████████████ |
| Sent: | 10/15/2014 9:08:37 PM |
| To: | GARNETT, RICHARD P [AG/5040] ████████████ |
| CC: | GUSTIN, CHRISTOPHE [AG/5040] ██████████████  FARMER, DONNA R [AG/1000] |
| | █████████████  SALTMIRAS, DAVID A [AG/1000] █████████████, KOCH, |
| | MICHAEL S [AG/1000] ████████ |
| Subject: | IARC Evaluation of Glyphosate |

Richard,

It is my recollection that you notified the EU-GTF of this IARC evaluation, but I am not aware that there has been any talk
of approaching the GTF about providing funding to fight this because it is not considered in the remit of achieving Annex
I renewal.  If so, is this really the case?  I thought the EU evaluation could go well into the summer of 2015, and wouldn't
an adverse IARC evaluation have the real potential to impact the results of the Annex I renewal?

I really started thinking about this after our phone call yesterday with the outside epidemiology experts that Donna lined
up.  The bottom line of the call was that there really is no meaningful publication that we can complete prior to the
February submission to positively impact the epidemiology discussion outcome in March.  One has to consider that this
situational timing did not happen by chance and that more than just pure bad luck is working against glyphosate.

And while we have vulnerability in the area of epidemiology, we also have potential vulnerabilities in the other areas
that IARC will consider, namely, exposure, genetox, and mode of action (David has the animal onco studies under
control).  If there is a force working against glyphosate, there is ample fodder to string together to help the cause even
though it is not scientifically justified in its purest form.  Putting all this in the proper perspective will be quite resource
intensive, so can't we consider approaching the GTF?  Recall that the PAG already agreed to fund the onco publication
2+ years ago for this exact reason.

33.     On March 20, 2015, following a meeting of experts from around the

world, the IARC issued a report titled "IARC Monographs Volume 112: evaluation

of five organophosphate insecticides and herbicides." The agency concluded that

COMPLAINT FOR DAMAGES

glyphosate should be classified as "probably carcinogenic to humans (Group 2A)."[14]

### E. Plaintiff developed non-Hodgkin's lymphoma after her exposure to Roundup®.

34. NHL is a group of blood cancers that develop from a type of white blood cell called lymphocytes. NHL develops when changes in the DNA of normal lymphocytes cause them to mutate into lymphoma cells.

35. Ms. Rolish was diagnosed with NHL in 2005.

36. Though Ms. Rolish's NHL is currently in remission, she will continue to suffer from the uncertainty of her medical condition for the rest of her life.[15] Lymphoma can recur even years after treatment,[16] so she will need to vigilantly monitor her health through follow up exams and tests. Further, as a result of her illness and treatment she has suffered devastating loss of memory and continued

---

[14] International Agency for Research on Cancer, "IARC Monographs Volume 112: evaluation of five organophosphate insecticides and herbicides," March 20, 2015, available at: https://www.iarc.fr/wp-content/uploads/2018/07/MonographVolume112-1.pdf (accessed September 11, 2019).

[15] American Cancer Society, "Life After Cancer," available at: https://www.cancer.org/treatment/survivorship-during-and-after-treatment/be-healthy-after-treatment/life-after-cancer.html (accessed August 29, 2019).

[16] American Cancer Society, "Living as a Non-Hodgkin Lymphoma Survivor," available at: https://www.cancer.org/cancer/non-hodgkin-lymphoma/after-treatment/follow-up.html (accessed August 29, 2019).

COMPLAINT FOR DAMAGES

inability to remember. This includes her most treasured family memories, which were taken from her as a result of Defendants' misconduct.

37.     In addition, as an NHL survivor, Ms. Rolish will always have an increased risk of developing other forms of cancer, including melanoma skin cancer, lung cancer, kidney cancer, kaposi sarcoma, cancers of the head/neck area (includes the lip, tongue, floor of the mouth, throat,  salivary glands, and voice box), colon cancer, thyroid cancer, bone and soft tissue cancer, bladder cancer, leukemia and myelodysplastic syndrome, and Hodgkin disease.[17]

## V.     PUNITIVE DAMAGE ALLEGATIONS AGAINST MONSANTO

38.     In engaging in the wrongdoing alleged herein, Monsanto acted with malice, oppression, or fraud.

39.     The conduct constituting malice, oppression, or fraud was committed, authorized, adopted, and/or approved by one or more officers, directors, or managing agents of Monsanto, who were acting on behalf of Monsanto.

40.     Monsanto acted with malice because its conduct was intended to cause injury to the Plaintiff, was despicable, and was carried on by the defendant with a willful and conscious disregard of the rights or safety of others.

---

[17] American Cancer Society, "Second Cancers After Non-Hodgkin Lymphoma," available at: https://www.cancer.org/cancer/non-hodgkin-lymphoma/after-treatment/second-cancers.html (accessed August 29, 2019).

41.     Monsanto's conduct was oppressive because its despicable conduct subjected Plaintiff to cruel and unjust hardship in conscious disregard of Plaintiff's rights.

42.     Monsanto's conduct was fraudulent because it made intentional misrepresentations, acted with deceit, and/or concealed material facts known to Monsanto with the intention of depriving Plaintiff of property or legal rights or otherwise caused injury.

## VI.     EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS

43.     Plaintiff has had neither actual nor constructive knowledge of the pertinent facts underlying her claims for relief, despite her diligence in trying to discover such facts. Plaintiff could not have discovered through the exercise of reasonable diligence the existence of the wrongdoing alleged herein until shortly before this complaint was filed. As a result of Defendants' conduct in misleading and concealing the public about the risks of Roundup®, and the memory and brain injuries suffered by Plaintiff, she could not have filed suit sooner. All of Defendants' misrepresentations entered the scientific mainstream, perpetrating an ongoing fraud that Roundup® was not dangerous. Plaintiff relied upon this.

44.     Through its misrepresentations and omissions, Monsanto actively concealed the risks associated with glyphosate and Roundup®. For example, in November 2014, Monsanto published on its website a document titled,

COMPLAINT FOR DAMAGES

"Backgrounder – Glyphosate: No Evidence of Carcinogenicity."[18] Despite its

internal information regarding the risks of glyphosate, Monsanto represented in the

Backgrounder that:

> Regulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic.

45.     The "Backgrounder" document also refers to reports or statements by

the World Health Organization, the Canadian Pest Management Regulatory

Agency, the U.S. Environmental Protection Agency, the European Commission's

Health and Consumer Protection Directorate-General, and other sources as

supposedly confirming Monsanto's conclusion that glyphosate is not carcinogenic.

However, the "Backgrounder" is misleading because it does not explain that many

of these reports or statements were made based on information Monsanto provided

or improperly influenced. Moreover, the "Backgrounder" fails to even acknowledge

the growing body of scientific evidence questioning the safety of glyphosate and

glyphosate-based herbicides.

---

[18] Monsanto, "Backgrounder – Glyphosate: No Evidence of Carcinogenicity (updated Nov. 2014), available at: https://monsanto.com/app/uploads/2017/06/no-evidence-of-carcinogenicity.pdf (accessed Aug. 28, 2019).

46.     Based on Monsanto's extensive efforts to conceal the truth, Plaintiff had neither actual nor constructive knowledge of the facts underlying her claims for relief until recently.

## VII.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### NEGLIGENCE
### (Against all Defendants)

47.     Plaintiff realleges and incorporates by reference all allegations above.

48.     Defendants has a duty to exercise reasonable care in the design, manufacture, distribution, and sale of Roundup®. This included a duty to ensure that Roundup® would not cause unreasonable or dangerous effects to those using the product.

49.     Defendants failed to exercise reasonable care in the design, manufacture, distribution, and sale of Roundup® because they knew the product created a high risk of unreasonable harm to those using the product.

50.     Defendants' negligence included, but is not limited to, the following acts and omissions:

    a.      Formulating, manufacturing, and selling Roundup® without thoroughly and adequately testing its safety;

b.  Continuing to formulate, manufacture, and sell Roundup® after scientific evidence began to show connections between glyphosate and adverse health effects;

c.  Failing to adequately warn Roundup® users of the potential adverse health effects exposure to the product could cause;

d.  Affirmatively representing to the public that Roundup® was safe for human use;

e.  Failing to adequately test whether glyphosate and any of the other ingredients in Roundup® interacted in a way that created a heightened risk to users;

f.  Failing to properly investigate the risks associated with using large amounts of Roundup® or using the product over a prolonged period of over time;

g.  Improperly seeking to influence the scientific literature and government agencies regarding the risks associated with glyphosate; and

h.  Discrediting researchers and agencies that sought to present evidence of the health risks associated with Roundup®.

51.  As a result of Defendants' conduct, Plaintiff was harmed. Ms. Rolish was diagnosed with NHL in 2005, underwent many years of treatment, continues

to suffer from her illness and course of treatment, and is at heightened risk of

recurrence and of developing other maladies as a result of Defendants' conduct.

52.    Defendants' negligence was a substantial factor in causing Plaintiff's

harm.

## SECOND CAUSE OF ACTION
## STRICT PRODUCTS LIABILITY – DESIGN DEFECT
### (Against All Defendants)

53.    Plaintiff realleges and incorporates by reference all allegations above.

54.    Defendants manufacture, distribute, and/or sell Roundup®.

55.    Roundup is designed in a manner that poses an unreasonable risk to

consumers using the product.

56.    Roundup did not perform as safely as an ordinary consumer would

have expected it to perform when used or misused in an intended or reasonably

foreseeable way.

57.    Plaintiff was harmed by her use of Roundup® as described herein.

58.    The failure of Roundup® to perform safely was a substantial factor in

causing Plaintiff's harm.

## THIRD CAUSE OF ACTION
### STRICT PRODUCTS LIABILITY – FAILURE TO WARN
### (Against all Defendants)

59.     Plaintiff realleges and incorporates by reference all allegations above.

60.     Defendants manufacture, distribute, and/or sell Roundup®.

61.     Roundup® is designed in a manner that poses an unreasonable risk to consumers using the product. Roundup® had potential risks that were known or knowable in light of the scientific knowledge that was generally accepted in the scientific community as the time of Roundup®'s manufacture, distribution, and sale.

62.     Defendants did not include sufficient warning of Roundup®'s potential safety hazards to its users.

63.     Roundup® did not perform as safely as an ordinary consumer would have expected it to perform when used or misused in an intended or reasonably foreseeable way.

64.     Plaintiff was harmed by her exposure to Roundup® as alleged herein.

65.     The lack of sufficient instructions or warnings of Roundup® was a substantial factor in causing Plaintiff's harm.

## VIII.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment against Defendants and award the following relief:

COMPLAINT FOR DAMAGES

a. Compensatory damages including, but not limited to, pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial;

b. Economic damages for medical expenses, out of pocket expenses, lost earnings, and other economic damages in an amount to be determined at trial;

c. Punitive damages from defendant Monsanto for the wanton, willful, fraudulent, and reckless acts of defendants who demonstrated complete disregard and reckless indifference for the safety and welfare of the general public in an amount sufficient to punish defendants and deter future similar conduct;

d. Pre-judgment interest;

e. Post-judgment interest;

f. Reasonable attorneys' fees;

g. Costs;

h. Such other and further relief as the Court deems just and proper.

## REQUEST FOR JURY TRIAL

Plaintiffs demands a jury trial on all issues so triable.

COMPLAINT FOR DAMAGES

Dated: February 10, 2020

Respectfully Submitted,
JOSEPH SAVERI LAW FIRM, INC.

By:     */s/ Steven N. Williams*
          Steven N. Williams

Steven N. Williams (State Bar No. 175489)
JOSEPH SAVERI LAW FIRM, INC.
601 California Street, Suite 1000
San Francisco, California 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940

*Attorneys for Plaintiff Lois Rolish*