15,REFER

# U.S. District Court
## CENTRAL DISTRICT OF ILLINOIS (Rock Island)
## CIVIL DOCKET FOR CASE #: 4:19–cv–04220–SLD–JEH

Gibbs v. Monsanto Company
Assigned to: Chief Judge Sara Darrow
Referred to: Magistrate Judge Jonathan E. Hawley
Case in other court:  Northern District of California,
                      3:16–md–02741–VC
Cause: 28:1332 Diversity–Product Liability

Date Filed: 10/25/2019
Jury Demand: Plaintiff
Nature of Suit: 245 Tort Product Liability
Jurisdiction: Diversity

**Plaintiff**

**Rex A Gibbs**                          represented by   **Christopher L Coffin**
                                                          PENDLEY BAUDIN & COFFIN LLP
                                                          24110 Eden St
                                                          PO Drawer 71
                                                          Plaquemine, LA 70765
                                                          225–687–6396
                                                          Fax: 225–687–6398
                                                          Email: ccoffin@pbclawfirm.com
                                                          *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 10/25/2019 | 1 | COMPLAINT *at Law* against Monsanto Company ( Filing fee $ 400 receipt number 0753–3227559.), filed by Rex A Gibbs. (Attachments: # 1 Civil Cover Sheet, # 2 Summons)(Coffin, Christopher) (Entered: 10/25/2019) |
| 10/28/2019 | 2 | ORDER re subject matter jurisdiction. Entered by Magistrate Judge Jonathan E. Hawley on 10/28/2019. (KZ, ilcd) (Entered: 10/28/2019) |
| 10/28/2019 | | Set/Reset Deadlines: Amended Pleadings due by 11/11/2019 – See Order entered 10/28/2019 2 . (KB, ilcd) (Entered: 10/28/2019) |
| 11/04/2019 | 3 | AMENDED COMPLAINT *pursuant to the Court's Order* against Monsanto Company, filed by Rex A Gibbs.(Coffin, Christopher) (Entered: 11/04/2019) |

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| REX A. GIBBS,<br><br>                    Plaintiff,<br><br>     vs.<br><br>MONSANTO COMPANY,<br><br>                    Defendant. | Case No.  4:19-cv-4220<br><br>DEMAND FOR JURY TRIAL |

## FIRST AMENDED COMPLAINT

Plaintiff REX A. GIBBS, by and through his attorneys, respectfully submits the following Complaint and Jury Demand against Defendant MONSANTO COMPANY, and alleges the following upon personal knowledge; information and belief; and investigation of counsel.

## INTRODUCTION

1.     In 1970, the Monsanto Company discovered the herbicidal properties of glyphosate and began using it in its products by 19745, marketing it under the brand name herbicide Roundup.  Roundup is a non-selective herbicide used to kill weeds.  By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85-90 million pounds used annually.  That number grew to 185 million pounds by 2007.

2.     Rex A. Gibbs used the weed killer Roundup, an herbicide created and manufactured by the Monsanto Company, on his farm for over 40 years, including for Roundup Ready corn and beans.  Roundup was supposed to be safe.  After all, Monsanto promoted Roundup as being harmless to humans for over thirty years—going

1

so far as to proclaim the product safe as table salt. The truth, however, is far more insidious. The active chemical in Roundup, glyphosate, is a carcinogen, and Monsanto has known this fact for decades.

3.      In October 2017, Mr. Gibbs saw his doctors for health concerns and was initially diagnosed with Follicular lymphoma, and subsequently with Diffuse Large B Cell lymphoma.

4.      In 2015, the International Agency for Research on Cancer (IARC), an organization within the World Health Organization (WHO), conducted an exhaustive analysis on the toxicity of glyphosate. The IARC, which has already reviewed hundreds of other chemical agents, convened a panel of seventeen renowned scientists from eleven countries, specifically screened to avoid potential conflicts of interest, to conduct a systematic review of all publicly available information about glyphosate. The year-long study resulted in the publication of an IARC Monograph—the authoritative standard for cancer hazard assessment around the world. The IARC classified glyphosate as a Group 2A hazard, meaning it is a probable human carcinogen—the second highest hazard rating. Additionally, the IARC concluded there was a positive association between glyphosate exposure and non-Hodgkin lymphoma.

5.      In 1970, Defendant Monsanto discovered the herbicidal properties of glyphosate and began using it in its products in 1974, and marketing it under the brand name Roundup. Roundup is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85–90 million pounds used annually. That number grew to 185 million pounds by 2007.

6.      Monsanto has represented Roundup as being safe to humans and the environment since it began selling the herbicide. Indeed, Monsanto has proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup, create no unreasonable risks to human health or to the environment. This is untrue. Before glyphosate was first approved by

the Environmental Protection Agency (EPA), Monsanto knew that glyphosate could pose significant risks to human health, including a risk of causing cancer. This lawsuit seeks to hold Monsanto accountable for this misconduct.

## PARTIES

7.     Plaintiff Rex A. Gibbs resides in and is domiciled in the County of Knox, Illinois. Plaintiff owns a home and farm in Gilson, Illinois, where he has resided for over 40 years. The Plaintiff regularly used Roundup on his crops and residential yard.

8.     Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri. At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and was the manufacturer of the Roundup at issue.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. There is complete diversity of citizenship between the parties. In addition, Plaintiff seeks damages in excess of $75,000, exclusive of interest and costs.

10.     This Court has personal jurisdiction over Monsanto insofar as Monsanto is authorized and licensed to conduct business in the State of Illinois, maintains and carries on systematic and continuous contacts in this judicial district, regularly transacts business within this judicial district, and regularly avails itself of the benefits of this judicial district.

11.     Additionally, Monsanto caused tortious injury by acts and omissions in this judicial district and caused tortious injury in this district by acts and omissions outside this district while regularly doing and soliciting business, engaging in a persistent course of conduct, and deriving substantial revenue from goods used or consumed and services rendered in this judicial district.

12.     Venue is proper before this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred within this judicial district.

## **FACTUAL ALLEGATIONS**

13.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world, including the popular herbicide Roundup.

14.     Glyphosate interferes with a plant's ability to form aromatic amino acids necessary for protein synthesis. Plants treated with glyphosate generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce, or by milling, baking, or brewing grains.

15.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup.

16.     For about 40 years, farmers and the general population around the world have used Roundup, containing glyphosate, without knowing of the dangers its use poses. That is because, when Monsanto first introduced Roundup, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. History, however, has demonstrated otherwise. According to the WHO, the main chemical ingredient of Roundup—glyphosate—is a probable carcinogen. Those most at risk are farm workers and other individuals with workplace exposure to Roundup, such as workers in garden centers, nurseries, and landscapers. Monsanto assured the public that Roundup was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies exposing glyphosate's dangers. Monsanto orchestrated a prolonged campaign of misinformation to convince government agencies, farmers, and the general population that Roundup was safe. As a result of this deception, agricultural workers, farmers and the general public have been exposed to a carcinogen, while Monsanto has made billions.

## I.     **Registration of Herbicides**

17.     The manufacture, formulation, and distribution of herbicides, such as

4

Roundup, is regulated under the Federal Insecticide, Fungicide, and Rodenticide Act
(FIFRA), 7 U.S.C. §§ 136 *et seq.* FIFRA requires that all pesticides be registered with
the EPA prior to distribution, sale, or use, except as described by the Act. 7 U.S.C. §
136a(a).

18.     Because pesticides are toxic to plants, animals, and humans, at least to
some degree, the EPA requires as part of the registration process, among other things,
a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people
and other potential non-target organisms, and other adverse effects on the environment.
Registration by the EPA, however, is not an assurance or finding of safety. The EPA
does not deem certain products "safe," but only that use of the product in accordance
with its label directions "will not generally cause unreasonable adverse effects on the
environment." 7 U.S.C. § 136a(c)(5)(D).

19.     FIFRA defines "unreasonable adverse effects on the environment" to mean
"any unreasonable risk to man or the environment, taking into account the economic,
social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. §
136(bb).  FIFRA thus requires EPA to make a risk/benefit analysis in determining
whether a registration should be granted or allowed to continue to be sold in commerce.

20.     FIFRA generally requires that the registrant, Monsanto in the case of
Roundup, conduct the health and safety testing of pesticide products. The EPA has
protocols governing the conduct of tests required for registration and the laboratory
practices that must be followed in conducting those tests. The data produced by the
registrant must be submitted to the EPA for review and evaluation.  The government is
not required, nor is it able, to perform the tests that are required of the manufacturer.

21.     The evaluation of each pesticide product distributed, sold, or
manufactured is completed at the time the product is initially registered. The data
necessary for registration of a pesticide has changed over time. The EPA is now in the
process of re-evaluating all pesticide products through a congressionally-mandated
process called "re-registration." 7 U.S.C. § 136a-1.  In order to reevaluate these

5

pesticides, the EPA is demanding the completion of additional tests and the submission
of data for the EPA's review and evaluation.

22.    In the case of glyphosate, the EPA planned on releasing its preliminary
risk assessment—in relation to the re-registration process—no later than July 2015.
The EPA completed its review of glyphosate in early 2015, but it delayed releasing the
risk assessment pending further review in light of the WHO's health-related findings.

## II.    Scientific Fraud Underlying the Marketing and Sale of Glyphosate

23.    Based on early studies that glyphosate could cause cancer in laboratory
animals, the EPA originally classified glyphosate as possibly carcinogenic to humans
(Group C) in 1985. After pressure from Monsanto, including contrary studies it
provided to the EPA, the EPA changed its classification to evidence of non-
carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however,
the EPA stated that "[i]t should be emphasized, however, that designation of an agent in
Group E is based on the available evidence at the time of evaluation and should not be
interpreted as a definitive conclusion that the agent will not be a carcinogen under any
circumstances."

24.    On two occasions, the EPA found that laboratories hired by Monsanto to
test the toxicity of its Roundup products for registration purposes committed fraud.

25.    In the first instance, Monsanto hired Industrial Bio-Test Laboratories
("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup. IBT
performed approximately 30 tests on glyphosate and glyphosate-containing-products,
including 9 of the 15 residue studies needed to register Roundup with the EPA.

26.    In 1976, the Food and Drug Administration ("FDA") performed an
inspection of IBT and discovered discrepancies between the raw data and the final
report relating to the toxicological impacts of glyphosate. The EPA subsequently
audited IBT and determined that the toxicology studies conducted for the Roundup
were invalid. An EPA reviewer stated, after finding "routine falsification of data" at
IBT, that it was "hard to believe the scientific integrity of the studies when they said

they took specimens of the uterus from male rabbits."

27.     Three top executives of IBT were convicted of fraud in 1983.

28.     In the second incident, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including several studies on Roundup. That same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

## III.    Monsanto's Market Dominance

29.     The success of Roundup was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup market dominance and to ward off impending competition.

30.     In response, Monsanto began the development and sale of genetically engineered "Roundup Ready" seeds in 1996. Since Roundup Ready crops are resistant to glyphosate, farmers can spray Roundup onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup even further. By 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup market through a marketing strategy that coupled proprietary Roundup Ready seeds with continued sales of its Roundup herbicide.

31.     Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready seeds, Roundup became Monsanto's most profitable product. In 2000, Roundup accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest

herbicides by sales volume.

## IV.    Monsanto Falsely Advertised Roundup as Being Safe for Decades

32.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish.  Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are:

a.  "Remember that environmentally friendly Roundup herbicide is biodegradable.  It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences."

b.  "And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem."

c.  "Roundup biodegrades into naturally occurring elements."

d.  "Remember that versatile Roundup herbicide stays where you put it.  That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e.  "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it."

f.  You can apply Roundup with "confidence because it will stay where you put it," it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Roundup into natural products.

g.  "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

8

    h. "Glyphosate's safety margin is much greater than required.  It has over a
1,000-fold safety margin in food and over a 700-fold safety margin for
workers who manufacture it or use it."

    i. "You can feel good about using herbicides by Monsanto. They carry a
toxicity category rating of 'practically non-toxic' as it pertains to
mammals, birds and fish."

    j. "Roundup can be used where kids and pets will play and breaks down into
natural material." This ad depicts a person with his head in the ground and
a pet dog standing in an area that has been treated with Roundup.

33.    On November 19, 1996, Monsanto entered into an Assurance of
Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease
and desist from publishing or broadcasting any advertisements [in New York] that
represent, directly or by implication" that:

    a. glyphosate-containing pesticide products or any component thereof are
safe, non-toxic, harmless or free from risk;

    b. glyphosate-containing pesticide products or any component thereof
manufactured, formulated, distributed or sold by Monsanto are
biodegradable;

    c. glyphosate-containing pesticide products or any component thereof stay
where they are applied under all circumstances and will not move through
the environment by any means;

    d. glyphosate-containing pesticide products or any component thereof are
"good" for the environment or are "known for their environmental
characteristics";

    e. glyphosate-containing pesticide products or any component thereof are
safer or less toxic than common consumer products other than herbicides;
and,

    f. glyphosate-containing products or any component thereof might be

classified as "practically non-toxic."

34.     Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

35.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup.  The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."

## V.     Assessments of Glyphosate

36.     The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent.  Over time, the IARC Monograph program has reviewed 980 agents.  Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

37.     The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.  Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

38.     A year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts.  Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members.  One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment.  Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation.  Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in Lancet

Oncology, and within a year after the meeting, the final Monograph is finalized and published.

39.    In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

40.    In March 2015, IARC reassessed glyphosate.  The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

41.    On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, the Working Group consisted of 17 experts from 11 countries who met from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate.  The March meeting culminated after a nearly one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence.  According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

42.    The studies considered the various exposure groups, including occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland, municipal weed-control workers in the United Kingdom, and para-occupational exposure in farming families.

43.    Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

44.    Exposure pathways are identified as air (especially during spraying), water, and food.  Community exposure to glyphosate is widespread and found in soil,

11

air, surface water, and groundwater, as well as in food.

45.    The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies showed a human health concern from agricultural and other work-related exposure to glyphosate.

46.    The IARC Working Group conducted a systematic review of over 15 studies designed to assess whether there was an association between Roundup exposure in agricultural workers and Non-Hodgkin Lymphoma (NHL). The researchers reviewed each study, identified the results and assessed each study's strengths and weaknesses. The IARC Working Group concluded that, despite the limited evidence concerning the carcinogenicity of glyphosate in humans, a "positive association has been observed for non-Hodgkin lymphoma."

47.    In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

48.    The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed. In assessing the genotoxicity of glyphosate (the property of chemical agents that damages the genetic information within a cell causing mutations, which may lead to cancer), the IARC Working Group concluded "[t]here is strong evidence that glyphosate causes genotoxicity."

49.    Additionally, the IARC assessed whether glyphosate exposure can induce oxidative stress, which is thought to be involved in the development of numerous conditions, including cancer, autism, and Parkinson's disease. The IARC concluded that "strong evidence exists that glyphosate . . . can induce oxidative stress." This

could be an important mechanism by which Roundup causes cancer.[1]

50.     The IARC Working Group also noted that glyphosate has been detected in urine of agricultural workers, indicating absorption.  The IARC Working Group specifically evaluated farm workers in the United States, and found that, within the days following the application of Roundup to a crop, approximately 60% of farm workers tested positive for glyphosate in the urine.   Additionally, the IARC Working Group noted that soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA).  Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

51.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.  While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

52.     In addition to the IARC's assessment, in 2014, scientists published a systematic review and meta-analysis on the relationship between non-Hodgkin lymphoma and occupational exposure to agricultural pesticides, including glyphosate, in the International Journal of Environmental Research and Public Health. The study showed a statistically significant association between farm workers exposed to Roundup and non-Hodgkin lymphoma.  The study confirmed two smaller studies from 2002 and 2008, published in the journal Leukemia & Lymphoma (2002) and the International Journal on Cancer (2008), both of which also showed a statistically significant increase in non-Hodgkin lymphoma among agricultural workers exposed to

---

[1] In addition to DNA damage and oxidative stress, some scientists have suggested that Roundup's association with various serious health conditions is linked to the effect Roundup has on the digestive system.  Specifically, some scientists believe the same mechanism that makes Roundup toxic to weeds also makes it toxic to the microbes within the human gut. When humans are exposed to Roundup, it leads to a chronic inflammatory state in the gut, as well an impaired gut barrier, which can lead to many long-term health effects, including an increased risk of cancer.

glyphosate.

53. Recent studies, including a glyphosate residue study published in the
Journal of Environmental & Analytical Toxicology in 2014, indicate that "chronically
ill humans showed significantly higher glyphosate residues in urine than healthy
population." Glyphosate has been detected in the blood and urine of agricultural
workers, indicating that agricultural use of Roundup leads to its absorption.

54. Several countries around the world have instituted bans on the sale of
Roundup and other glyphosate-containing herbicides, both before and since IARC first
announced its assessment for glyphosate in March 2015, and more countries
undoubtedly will follow suit as the dangers of the use of Roundup are more widely
known.

55. The Netherlands issued a ban on all glyphosate-based herbicides in April
2014, including Roundup, which takes effect by the end of 2015. In issuing the ban,
the Dutch Parliament member who introduced the successful legislation stated:
"Agricultural pesticides in user-friendly packaging are sold in abundance to private
persons. In garden centers, Roundup is promoted as harmless, but unsuspecting
customers have no idea what the risks of this product are. Especially children are
sensitive to toxic substances and should therefore not be exposed to it."

56. The Brazilian Public Prosecutor in the Federal District requested that the
Brazilian Justice Department suspend the use of glyphosate.

57. France banned the private sale of Roundup and glyphosate following the
IARC assessment.

58. Bermuda banned both the private and commercial sale of glyphosate,
including Roundup. The Bermuda government explained: "Following a recent
scientific study carried out by a leading cancer agency, the importation of weed spray
'Roundup' has been suspended."

59. The Sri Lankan government banned the private and commercial use of
glyphosate out of concern that glyphosate has been linked to fatal kidney disease in

14

agricultural workers.

60.   The government of Columbia announced a ban on using Roundup and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine in response to the IARC's assessment.

61.   In November 2015, 96 prominent experts, including almost the whole IARC team, reiterated IARC's assessment that Roundup is probably a human carcinogen.

62.   In late February 2016, another 14 scientists signed a consensus statement in the Environmental Health journal, saying regulatory estimates of tolerable exposure levels for glyphosate were based on outdated science.

## VI.   The Plaintiff's Exposure to Glyphosate

63.   Mr. Gibbs has been a farmer since the 1970s.

64.   Mr. Gibbs purchased Roundup from various Farm Supply companies in Illinois.  He applied it to crops on his farm for over 40 years, including on Roundup Ready corn and beans for many years, using a large sprayer pulled by a tractor with no closed cab.

65.   When Mr. Gibbs purchased Roundup he believed it was not a carcinogen and believed it was safe for humans.

66.   Mr. Gibbs was not a smoker and has always been in generally good health until becoming diagnosed with non Hodgkin lymphoma.

67.   In 2017, Mr. Gibbs visited his doctors because of various health issues and eventually was diagnosed with Follicular lymphoma, and then subsequently diagnosed with Diffuse Large B Cell lymphoma.

68.   Over the next several months Mr. Gibbs received multiple rounds of chemotherapy, and in July 2019 underwent stem cell transplant therapy.

## LIMITATION ON ALLEGATIONS

69.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

15

70.     The allegations in this pleading are made pursuant to Illinois law. To the extent Illinois law imposes a duty or obligation on the Defendant that exceeds those required by federal law, Plaintiff does not assert such claims. All claims asserted herein run parallel to federal law, i.e., the Defendant's violations of Illinois law were also violations of federal law. Had Defendant honestly complied with Illinois law, it would also have complied with federal law.

71.     Additionally, Plaintiff's claims do not seek to enforce federal law. These claims are brought under Illinois law, notwithstanding the fact that such claims run parallel to federal law.

72.     As alleged in this pleading, the Defendant violated U.S.C. § 136j and 40 C.F.R. § 156.10(a)(5) by distributing Roundup, which was misbranded pursuant to 7 U.S.C. § 136(g). Federal law specifically prohibits the distribution of a misbranded herbicide.

## COUNT I:  STRICT LIABILITY (DESIGN DEFECT)

73.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

74.     Plaintiff brings this strict liability claim against Defendant for defective design.

75.     At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, including the Plaintiff, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant. At all times relevant to this litigation, Defendant designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup products used by Plaintiff, as described above.

76.     At all times relevant to this litigation, Defendant's Roundup products

were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff.

77.    At all times relevant to this litigation, Defendant's Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Illinois and throughout the United States, including the Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

78.    Defendant's Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that, when they left the hands of the Defendant's manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

79.    Defendant's Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that, when they left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

80.    At all times relevant to this action, Defendant knew or had reason to know that its Roundup products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendant.

81.    Therefore, at all times relevant to this litigation, Defendant's Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendant were defective in design and formulation, in one or more of the following ways:

      a. When placed in the stream of commerce, Defendant's Roundup products were defective in design and formulation, and, consequently, dangerous to

an extent beyond that which an ordinary consumer would contemplate.

b. When placed in the stream of commerce, Defendant's Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c. When placed in the stream of commerce, Defendant's Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d. Defendant did not sufficiently test, investigate, or study its Roundup products and, specifically, the active ingredient glyphosate.

e. Exposure to Roundup and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f. Defendant knew or should have known at the time of marketing its Roundup products that exposure to Roundup and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g. Defendant did not conduct adequate post-marketing surveillance of its Roundup products.

h. Defendant could have employed safer alternative designs and formulations.

82.    The Plaintiff was exposed to Defendant's Roundup products in the course of his activity as a farmer, without knowledge of Roundup's dangerous characteristics.

83.    At all times relevant to this litigation, the Plaintiff used and/or was exposed to the use of Defendant's Roundup products in an intended or reasonably foreseeable manner, i.e., as a farmer, without knowledge of Roundup's dangerous characteristics.

84.    The Plaintiff could not reasonably have discovered the defects and risks associated with Roundup or glyphosate-containing products before or at the time of

exposure due to the Defendant's suppression of scientific information linking glyphosate to cancer.

85.    The harm caused by Defendant's Roundup products far outweighed their benefit, rendering Defendant's product dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendant's Roundup products were and are more dangerous than alternative products and Defendant could have designed its Roundup products to make them less dangerous. Indeed, at the time Defendant designed its Roundup products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

86.    At the time Roundup products left Defendant's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant's herbicides.

87.    Defendant's defective design of its Roundup products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup products, including Plaintiff herein.

88.    Therefore, as a result of the unreasonably dangerous condition of its Roundup products, Defendant is strictly liable to Plaintiff.

89.    The defects in Defendant's Roundup products were substantial and contributing factors in causing Plaintiff's injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained his injuries.

90.    Defendant's conduct, as described above, was reckless. Defendant risked the lives of consumers and users of its products, including Plaintiff, with knowledge of the safety problems associated with Roundup and glyphosate-containing products, and suppressed this knowledge from the general public. Defendant made conscious decisions not to redesign, warn or inform the unsuspecting public. Defendant's reckless conduct warrants an award of punitive damages.

91.    As a direct and proximate result of Defendant placing its defective

Roundup products into the stream of commerce, Plaintiff was injured and has sustained pecuniary loss and general damages in a sum in excess of the jurisdictional minimum of this Court.

92.     WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT II:  STRICT LIABILITY (FAILURE TO WARN)

93.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

94.     Plaintiff brings this strict liability claim against Defendant for failure to warn.

95.     At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

96.     Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiff, and therefore had a duty to warn of the risks associated with the use of Roundup and glyphosate-containing products.

97.     At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary

to ensure its Roundup products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn Plaintiff of the dangers associated with Roundup use and exposure. Defendant, as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

98. At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

99. At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by Defendant's herbicides, including Plaintiff.

100. Despite the fact that Defendant knew or should have known that Roundup posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied or sold the product, and not known to end users and consumers, such as Plaintiff.

101. Defendant knew or should have known that its products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers, i.e., the reasonably foreseeable users, of the risks of exposure to its products. Defendant has wrongfully concealed information concerning the dangerous nature of Roundup and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup and glyphosate.

102. At all times relevant to this litigation, Defendant's Roundup products reached the intended consumers, handlers, and users or other persons coming into

contact with these products in Illinois and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

103.   Plaintiff was exposed to Defendant's Roundup products in the course of his activity as a farmer, as described above, without knowledge of their dangerous characteristics.

104.   At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup products while using them for their intended or reasonably foreseeable purposes, without knowledge of their dangerous characteristics.

105.   Plaintiff could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products prior to or at the time of Plaintiff's exposure.   Plaintiff relied upon the skill, superior knowledge, and judgment of Defendant to know about and disclose serious health risks associated with using the products.

106.   Defendant knew or should have known that the minimal warnings disseminated with its Roundup products were inadequate, failed to communicate adequate information on the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

107.   This alleged failure to warn is not limited to the information contained on Roundup's labeling.   The Defendant was able, in accord with federal law, to comply with Illinois law by disclosing the known risks associated with Roundup through other non-labeling mediums, i.e., promotion, advertisements, public service announcements, and/or public information sources.   The Defendant, however, did not disclose these known risks through any medium.

108.   To this day, Defendant has failed to adequately and accurately warn of the risks of cancer associated with the use of and exposure to Roundup and its active

ingredient glyphosate.

109. As a result of their inadequate warnings, Defendant's Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiff in the course of his activity as a farmer.

110. Defendant is liable to Plaintiff for injuries caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its products and the risks associated with the use of or exposure to Roundup and glyphosate.

111. Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup products, Plaintiff could have avoided the risk of developing injuries and could have obtained or used alternative herbicides.

112. As a direct and proximate result of Defendant placing its defective Roundup products into the stream of commerce, Plaintiff sustained pecuniary loss and general damages in a sum in excess of the jurisdictional minimum of this Court.

113. WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT III: NEGLIGENCE

114. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

115. Defendant, directly or indirectly, caused Roundup products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

116. At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup products, including the

duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

117.   At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup products. Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup, and, in particular, its active ingredient glyphosate.

118.   At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup and specifically, the carcinogenic properties of the chemical glyphosate.

119.   Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup products could cause or be associated with Plaintiff's injuries, and thus, created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

120.   Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup and glyphosate-containing products.

121.   As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

24

122. Defendant was negligent in its promotion of Roundup, outside of the labeling context, by failing to disclose material risk information as part of its promotion and marketing of Roundup, including the Internet, television, print advertisements, etc. Nothing prevented Defendant from being honest in its promotional activities, and in fact, Defendant had a duty to disclose the truth about the risks associated with Roundup in its promotional efforts, outside of the of the context of labeling.

123. Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant has failed to do so. Indeed, Defendant has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup and glyphosate.

124. Defendant's negligence included:

a. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup products without thorough and adequate pre- and post-market testing;

b. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup;

c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d. Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup products so as to avoid the risk of serious harm associated with the prevalent use of Roundup/glyphosate as an herbicide;

e. Failing to design and manufacture Roundup products so as to ensure they were at least as safe and effective as other herbicides on the market;

f.  Failing to provide adequate instructions, guidelines, and safety precautions to those persons Defendant could reasonably foresee would use and be exposed to its Roundup products;

g.  Failing to disclose to Plaintiff, users/consumers, and the general public that use of and exposure to Roundup presented severe risks of cancer and other grave illnesses;

h.  Failing to warn Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to the Plaintiff and other consumers;

i.  Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup and glyphosate-containing products;

j.  Representing that its Roundup products were safe for their intended use when, in fact, Defendant knew or should have known the products were not safe for their intended purpose;

k.  Declining to make or propose any changes to Roundup products' labeling or other promotional materials that would alert consumers and the general public of the risks of Roundup and glyphosate;

l.  Advertising, marketing, and recommending the use of the Roundup products, while concealing and failing to disclose or warn of the dangers known (by Defendant) to be associated with or caused by the use of or exposure to Roundup and glyphosate;

m.  Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup products are not unsafe for use in the agricultural and horticultural industries; and

n.  Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

125.   Defendant knew and/or should have known that it was foreseeable consumers such as the Plaintiff would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup.

126.   The Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup or its active ingredient glyphosate.

127.   Defendant's negligence was the proximate cause of Plaintiff's injuries, i.e., absent Defendant's negligence, Plaintiff would not have developed cancer.

128.   Defendant's conduct, as described above, was reckless. Defendant regularly risks the lives of consumers and users of its products, including Plaintiff, with full knowledge of the dangers of its products.  Defendant has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff. Defendant's reckless conduct therefore warrants an award of punitive damages.

129.   WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT IV:  FRAUD

130.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

131.   Defendant has defrauded the agricultural community in general and Plaintiff in particular by misrepresenting the true safety of Roundup and by failing to disclose known risks of cancer.

132.   Defendant misrepresented and/or failed to disclose, *inter alia*, that: glyphosate and its major metabolite aminomethylphosphonic acid (AMPA) could cause cancer; glyphosate and AMPA are known to be genotoxic in humans and laboratory

animals because exposure is known to cause DNA strand breaks (a precursor to cancer); glyphosate and AMPA are known to induce oxidative stress in humans and laboratory animals (a precursor to cancer); glyphosate and AMPA interfere with the aromatic amino acids within the human gut, leading to downstream health conditions including cancer; exposure to glyphosate and AMPA is causally associated with non-Hodgkin lymphoma; and the laboratory tests attesting to the safety of glyphosate were flawed and/or fraudulent.

133.   Due to these misrepresentations and omissions, at all times relevant to this litigation, Defendant's Roundup was misbranded under 7 U.S.C. § 136(g) and its distribution within Illinois and around the United States was a violation of 7 U.S.C. § 136j and 40 C.F.R. § 156.10(a)(5).

134.   The following are a selection of specific instances when the Defendant made the above misrepresentations and/or omissions concerning Roundup and/or glyphosate to Plaintiff:

    a.  In 2012, the Plaintiff purchased Roundup from Riverland FS, Inc in Galesburg, Illinois.  When Plaintiff purchased Roundup, the labeling on the product did not warn or disclose the true safety risks of Roundup to Plaintiff, as described in the preceding numbered paragraph.  Since that true risk information was known to Defendant and was not reasonably knowable to reasonable consumers, the Plaintiff was unaware of these material facts and/or omissions prior to purchasing the product.  Plaintiff paid money for the product, money the Plaintiff would not have expended absent the Defendant's misrepresentations and/or material omissions.

    b.  In the years between 2013 and 2016, the Plaintiff purchased Roundup several more times, from West Central FS, Inc in Galesburg, Illinois. When Plaintiff purchased Roundup, the labeling on the product did not warn or disclose the true safety risks of Roundup to the Plaintiff, as described in the preceding numbered paragraph.  Since that true risk

information was known to Defendant and was not reasonably knowable to reasonable consumers, Plaintiff was unaware of these material facts and/or omissions prior to purchasing the product. Plaintiff paid money for the product, money the Plaintiff would not have expended absent Defendant's misrepresentations and/or material omissions.

135.   Plaintiff relied on the Defendant's misrepresentations and/or material omissions regarding the safety of Roundup and its active ingredient glyphosate in deciding whether to purchase and/or use the product on his farm. Plaintiff did not know nor could he reasonably have known of the misrepresentations and/or material omissions by Defendant concerning Roundup and its active ingredient glyphosate.

136.   The misrepresentations and/or material omissions that form the basis of this fraud claim are not limited to statements made on the Roundup labeling, as defined under federal law, but also involve Defendant's representations and omissions made as part of its promotion and marketing of Roundup, including on the Internet, television, in print advertisements, etc. Nothing prevented Defendant from disclosing the truth about the risks associated with Roundup in its promotional efforts outside of the labeling context, using the forms of media and promotion Defendant traditionally used to promote the product's efficacy and benefits.

137.   When Defendant made the misrepresentations and/or omissions as alleged in this pleading, it did so with the intent of defrauding and deceiving the public in general and the agricultural community and with the intent of inducing the public and agricultural community to purchase and use Roundup.

138.   Defendant made these misrepresentations and/or material omissions with malicious, fraudulent and/or oppressive intent toward Plaintiff and the public generally. Defendant's conduct was willful, wanton, and/or reckless. Defendant deliberately recommended, manufactured, produced, marketed, sold, distributed, merchandized, packaged, promoted and advertised the dangerous and defective herbicide Roundup. This constitutes an utter, wanton, and conscious disregard of the

rights and safety of a large segment of the public, and by reason thereof, Defendant, is liable for reckless, willful, and wanton acts and omissions which evidence a total and conscious disregard for the safety of Plaintiff and others which proximately caused the injuries as set forth herein.

139.   As a proximate result of Defendant's fraudulent and deceitful conduct and representations, Plaintiff has sustained damages and other losses in an amount to be proven at trial.

140.   WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT V:  BREACH OF EXPRESS WARRANTIES

141.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

142.   At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

143.   Defendant had a duty to exercise reasonable care in the research, development, design, testing, packaging, manufacture, inspection, labeling, distributing, marketing, promotion, sale, and release of its Roundup products, including a duty to:

    a.   ensure that its products did not cause the user unreasonably dangerous side effects;

    b.   warn of dangerous and potentially fatal side effects; and

    c.   disclose adverse material facts, such as the true risks associated with the use of and exposure to Roundup and glyphosate-containing products,

when making representations to consumers and the general public,
including Plaintiff.

144.   As alleged throughout this pleading, the ability of Defendant to properly
disclose those risks associated with Roundup is not limited to representations made on
the labeling.

145.   At all times relevant to this litigation, Defendant expressly represented
and warranted to the purchasers of its products, by and through statements made by
Defendant in labels, publications, package inserts, and other written materials intended
for consumers and the general public, that its Roundup products were safe to human
health and the environment, effective, fit, and proper for their intended use. Defendant
advertised, labeled, marketed, and promoted Roundup products, representing the
quality to consumers and the public in such a way as to induce their purchase or use,
thereby making an express warranty that its Roundup products would conform to the
representations.

146.   These express representations include incomplete warnings and
instructions that purport, but fail, to include the complete array of risks associated with
use of and/or exposure to Roundup and glyphosate. Defendant knew and/or should
have known that the risks expressly included in Roundup warnings and labels did not
and do not accurately or adequately set forth the risks of developing the serious injuries
complained of herein. Nevertheless, Defendant expressly represented that its Roundup
products were safe and effective, that they were safe and effective for use by individuals
such as the Plaintiff, and/or that they were safe and effective as agricultural herbicides.

147.   The representations about Roundup, as set forth herein, contained or
constituted affirmations of fact or promises made by the seller to the buyer, which
related to the goods and became part of the basis of the bargain, creating an express
warranty that the goods would conform to the representations.

148.   Defendant placed its Roundup products into the stream of commerce for
sale and recommended their use to consumers and the public without adequately

warning of the true risks of developing the injuries associated with the use of and exposure to Roundup and its active ingredient glyphosate.

149.   Defendant breached these warranties because, among other things, its Roundup products were defective, dangerous, unfit for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically, Defendant breached the warranties in the following ways:

    a.   Defendant represented through its labeling, advertising, and marketing materials that its Roundup products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated with use of and/or exposure to Roundup and glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings and labels; and

    b.   Defendant represented that its Roundup products were safe for use and fraudulently concealed information that demonstrated that glyphosate, the active ingredient in Roundup, had carcinogenic properties, and that its Roundup products, therefore, were not safer than alternatives available on the market.

150.   The Plaintiff detrimentally relied on the express warranties and representations of Defendant concerning the safety and/or risk profile of Roundup in making a decision to purchase the product.  Plaintiff reasonably relied upon Defendant to disclose known defects, risks, dangers, and side effects of Roundup and glyphosate. Once Plaintiff discovered the relationship between Roundup and cancer, the Plaintiff stopped using the product at his farm.  He would not have purchased or used Roundup had the Defendant properly disclose the risks associated with the product, either through advertising, labeling, or any other form of disclosure.

151.   Defendant had sole access to material facts concerning the nature of the risks associated with its Roundup products as expressly stated within its warnings and

labels, and Defendant knew that consumers and users such as Plaintiff could not have reasonably discovered that the risks expressly included in Roundup warnings and labels were inadequate and inaccurate.

152.   Plaintiff had no knowledge of the falsity or incompleteness of Defendant's statements and representations concerning Roundup.

153.   Plaintiff used and/or was exposed to the use of Roundup as researched, developed, designed, tested, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by Defendant.

154.   Had the warnings, labels, advertisements, or promotional material for Roundup products accurately and adequately set forth the true risks associated with the use of such products, including Plaintiff's injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Plaintiff could have avoided the injuries complained of herein.

155.   As a direct and proximate result of Defendant breach of express warranty, the Plaintiff has sustained pecuniary loss and general damages in a sum in excess of the jurisdictional minimum of this Court.

156.   WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

## COUNT V:  BREACH OF IMPLIED WARRANTIES

157.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

158.   At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup products, which are defective and unreasonably dangerous to consumers, including the Plaintiff, thereby placing Roundup products into the stream

of commerce.  These actions were under the ultimate control and supervision of Defendant.

159.   Before the time Plaintiff was exposed to the aforementioned Roundup products, Defendant impliedly warranted to its consumers that its Roundup products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as agricultural herbicides.

160.   Defendant, however, failed to disclose that Roundup has dangerous propensities when used as intended and that use of and/or exposure to Roundup and glyphosate-containing products carries an increased risk of developing severe injuries and death, including Plaintiff's injuries.

161.   Plaintiff was the intended beneficiary of the implied warranties made by Defendant to the purchasers of its herbicides.

162.   The Roundup products were expected to reach and did in fact reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendant.

163.   At all times relevant to this litigation, Defendant was aware that consumers and users of its products, including Plaintiff, would use Roundup products as marketed by Defendant, which is to say that Plaintiff was a foreseeable user of Roundup.

164.   Defendant intended that its Roundup products be used in the manner in which Plaintiff in fact used them and which Defendant impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup was not adequately tested or researched.

165.   In reliance upon Defendant's implied warranty, Plaintiff used Roundup as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendant.

166.   Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup or glyphosate.

167. Defendant breached its implied warranty to the Plaintiff in that its Roundup products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

168. The harm caused by Defendant's Roundup products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

169. As a direct and proximate result of Defendant's breach of implied warranty, Plaintiff has sustained pecuniary loss and general damages in a sum in excess of the jurisdictional minimum of this Court.

170. WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## EXEMPLARY DAMAGES ALLEGATIONS

171. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

172. Defendant's conduct as alleged herein was done with oppression, fraud, and malice. Defendant was fully aware of Roundup's safety risks. Nonetheless, Defendant deliberately crafted its label, marketing, and promotion to mislead farmers and consumers.

173. This was not done by accident or through some justifiable negligence. Rather, Defendant knew that it could turn a profit by convincing the agricultural industry and the general population that Roundup was harmless to humans, and that full disclosure of Roundup's true risks would limit the amount of money Defendant would make selling Roundup in Illinois. This was accomplished not only through its misleading labeling, but through a comprehensive scheme of selective fraudulent research and testing, misleading advertising, and deceptive omissions as more fully

alleged throughout this pleading. Plaintiff was robbed of his right to make an informed decision about whether to purchase and use an herbicide on his farm, knowing the full risks attendant to that use. Such conduct was done with conscious disregard of the Plaintiff's rights.

174. There is no indication that Defendant will stop its deceptive and unlawful marketing practices unless it is punished and deterred. Accordingly, Plaintiff requests punitive damages against the Defendant for the harms caused to the Plaintiff.

## JURY TRIAL DEMAND

175. Plaintiff demands a trial by jury on all of the triable issues within this pleading.

## PRAYER FOR RELIEF

176. WHEREFORE, Plaintiff requests that the Court enter judgment in his favor and against the Defendant, awarding the Plaintiff:

    a. actual or compensatory damages in such amount to be determined at trial and as provided by applicable law;

    b. exemplary and punitive damages sufficient to punish and deter the Defendant and others from future fraudulent practices;

    c. pre-judgment and post-judgment interest;

    d. costs including reasonable attorneys' fees, court costs, and other litigation expenses; and

    e. any other relief the Court may deem just and proper.

Dated: November 4, 2019        Respectfully submitted,

/s/ Christopher L. Coffin
Christopher L. Coffin
**PENDLEY, BAUDIN & COFFIN, L.L.P.**
1100 Poydras St. Ste 2505
New Orleans, LA 70163
Tel: (504) 355-0086
E-mail: ccoffin@pbclawfirm.com

Michael L. Baum
R. Brent Wisner
Pedram Esfandiary
Frances M. Phares
**Baum Hedlund Aristei & Goldman, P.C.**
10940 Wilshire Blvd, 17th Floor
Los Angeles, CA 90024
Tel: (310) 207-3233
mbaum@baumhedlundlaw.com
rbwisner@baumhedlundlaw.com
pesfandiary@baumhedlundlaw.com
fphares@baumhedlundlaw.com

*Attorneys for Plaintiff Rex A. Gibbs*