ASBESTOS

# United States District Court
## Eastern District of Pennsylvania (Philadelphia)
### CIVIL DOCKET FOR CASE #: 2:20−cv−00186−PBT

BORDNER et al v. MONSANTO COMPANY et al
Assigned to: HONORABLE PETRESE B. TUCKER
Cause: 28:1332 Diversity−Personal Injury

Date Filed: 01/10/2020
Jury Demand: Plaintiff
Nature of Suit: 367 P.I.: Health
Care/Pharmaceutical Personal Injury
Product Liability
Jurisdiction: Diversity

**Plaintiff**

**KAREN BORDNER**

represented by **CLIFFORD A. RIEDERS**
Rieders, Travis, Humphrey, Waters &
Dohrmann
161 WEST THIRD STREET
WILLIAMSPORT, PA 17701
570−323−8711
Fax: 570−567−1025
Email: crieders@rienderstravis.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**RITA LIVESAY**
*EXECUTRICES*

represented by **CLIFFORD A. RIEDERS**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**DENNIS MAURER**
*EXECUTOR OF THE ESTATE OF
ALLEN MAURER, DECEASED*

represented by **CLIFFORD A. RIEDERS**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**MONSANTO COMPANY**

**Defendant**

**JOHN DOES 1−50**

| Date Filed | # | Docket Text |
|---|---|---|
| 01/10/2020 | 1 | COMPLAINT against JOHN DOES 1−50, MONSANTO COMPANY ( Filing fee $ 400 receipt number 209598.), filed by KAREN BORDNER, RITA LIVESAY, DENNIS MAURER. (Attachments: # 1 Civil Cover Sheet, DESIGNATION FORM, CASE MANAGEMENT TRACK FORM)(amas) (Entered: 01/13/2020) |
| 01/10/2020 | | DEMAND for Trial by Jury by KAREN BORDNER, RITA LIVESAY, DENNIS MAURER. (amas) (Entered: 01/13/2020) |
| 01/10/2020 | | 1 Summons Issued as to MONSANTO COMPANY. Forwarded To: PLAINTIFFS COUNSEL on 1/13/2020 (amas) (Entered: 01/13/2020) |
| 02/18/2020 | 2 | WAIVER OF SERVICE Returned Executed by KAREN BORDNER, RITA LIVESAY, DENNIS MAURER. MONSANTO COMPANY waiver sent on 1/22/2020, answer due 3/23/2020. (RIEDERS, CLIFFORD) (Entered: 02/18/2020) |

UNITED STATE DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KAREN BORDNER and RITA LIVESAY,
Executrices, and DENNIS MAURER,
Executor of the ESTATE OF ALLEN
MAURER, DECEASED,

        Plaintiffs

        vs

MONSANTO COMPANY and JOHN
DOES 1-50,

        Defendants

CIVIL ACTION NO

JUDGE

COMPLAINT
AND DEMAND FOR JUR
TRIAL

## COMPLAINT

Plaintiffs, Karen Bordner and Rita Livesay, Executrices, and Dennis Maurer, Executor ("Plaintiffs"), by and through their undersigned attorneys, hereby bring this Complaint for damages against Defendants Monsanto Company and John Does 1-50, and alleges the following.

## NATURE OF THE CASE

1       This is an action for damages suffered by decedent Allen Maurer which were factually caused by Defendants' negligent and wrongful conduct in connection with the design development, manufacture, testing, packaging promoting marketing, advertising distribution, labeling, and/or sale of the herbicide Roundup®, containing the active ingredient glyphosate

2       Plaintiffs Karen Bordner and Rita Livesay, Executrices and Dennis Maurer, Executor ("Plaintiffs"), are the legal fiduciaries of the estate of the deceased party, Allen Maurer

Plaintiffs maintain that Roundup® and/or its active ingredient glyphosate is defective, dangerous to human health  unfit and unsuitable to be marketed and sold in commerce and lacked proper warnings and directions as to the dangers associated with its use.  Plaintiffs maintain that the dangers of Roundup were not known or acceptable to the average and ordinary consumer, including decedent under the "consumer expectations test"  The likelihood and seriousness of severe injury or death caused by the product outweighs the burden or costs of taking precautions," under the "risk-utility standard." *Id.* at 385-91

3       Decedent's injuries, like those striking thousands of similarly situated victims across the country  were avoidable

## JURISDICTION AND VENUE

4.      The Court has jurisdiction over Defendant and this action pursuant to 28 U S C § 1332 because there is complete diversity of citizenship between Plaintiffs and Defendants  Defendants are all either incorporated and/or have their principal place of business outside of the state in which the Plaintiffs reside

5       The amount in controversy between Plaintiffs and Defendants exceeds $75,000, exclusive of interest and cost

6       The Court has also supplemental jurisdiction pursuant to 28 U S C § 1367

7       Venue is proper within this district pursuant to 28 U S C § 1391  Defendants conduct in business in the Eastern District of Pennsylvania, selling,

advertising and promoting Roundup products at issue in this lawsuit in this judicial district. Therefore, Defendants are subject to personal jurisdiction in this district.

PARTIES

8      Plaintiffs Karen Bordner and Rita Livesay are natural persons and at all relevant times residents and citizens of the Commonwealth of Pennsylvania, Dauphin County. Plaintiffs bring this action on behalf of their father, Allen Maurer ("decedent"), for injuries sustained by exposure to Roundup® ("Roundup") containing the active ingredient glyphosate and surfactant POEA, to which Mr. Maurer was exposed in a pesticide application, mixing and spraying Roundup for the purpose of maintaining the 125-acre property which he owned and resided on.  They were appointed as executrices of the estate of decedent. Plaintiff Dennis Maurer is a natural person and at all relevant times a resident and citizen of the state of Virginia, Rockingham County. Plaintiff brings this action on behalf of his father, Allen Maurer, for injuries sustained by exposure to Roundup® ("Roundup").  He has been appointed as an executor of the estate of decedent.

9      Mr. Maurer's exposure to Roundup was the factual cause of his development of Non-Hodgkin's follicular lymphoma grade 3, which was diagnosed for the first time on January 23, 2019 in a cytology report of Penn State Health Milton S Hershey Medical Center (medical institution), and later communicated to decedent. Mr. Maurer's Non-Hodgkin's follicular lymphoma later transformed to diffuse large B-cell lymphoma.

10     "Roundup" refers to all formulations of Defendants' Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide. Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Pro Herbicide, Roundup Promax  Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Grass & Weed Killer, Roundup Ready-to- Use Weed & Grass Killer, Roundup Ready-to-Use Weed & Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation containing the active ingredient glyphosate

11.     Defendant Monsanto Company ("Monsanto') is incorporated in the State of Delaware and is a Foreign For-Profit Corporation registered with the Corporations Unit of the State of Missouri under Charter Number F00488018, in active, 'Good Standing" status, with a principal place of business in St Louis, Missouri

12     Upon best information and belief, Defendants, John Does 1-50 are subsidiaries, partners, or other entities that were involved in the design  development, manufacture. testing, packaging, promoting  marketing  advertising  distribution

labeling, and/or sale of the herbicide Roundup, containing the active ingredient glyphosate The identities of John Does 1-50 are unknown to Plaintiffs at this time Plaintiffs will move the Court to specifically name John Does 1- 50 as their identities become known to Plaintiffs through discovery

13     Defendants Monsanto Company and John Does 1-50 are collectively referred to as "Monsanto Defendants" or as 'Defendants "

14     Defendants engaged in the business of designing, developing, manufacturing, testing, packaging marketing, distributing, labeling, and/or selling Roundup

15     Upon information and belief, Defendants did act together to design, sell, advertise, manufacture and/or distribute Roundup, with full knowledge of its dangerous and defective nature

16     Defendants transacted and conducted business both within the State of Pennsylvania and the State of Pennsylvania that relates to the allegations in this Complaint, specifically within the Eastern District of Pennsylvania

17     Defendants advertise and sell goods, specifically Roundup, within the Eastern District of Pennsylvania

18     Upon best information and belief, Defendants derived substantial revenue from its Roundup goods and products sold in the State of Pennsylvania, specifically within the Eastern District of Pennsylvania

19     Upon best information and belief, Defendants derived substantial revenue from sales of its Roundup products within the State of Pennsylvania, specifically within the Eastern District of Pennsylvania

20      Defendants expected or should have expected their acts to have consequences within the State of Pennsylvania, as Defendants derived substantial revenue from interstate commerce

## FACTUAL ALLEGATIONS

21      At all relevant times, Defendants were in the business of, and did, design, research, manufacture, test, advertise promote, market, sell, distribute, and/or have acquired and are responsible for Defendants who have designed, researched, manufactured, tested advertised, promoted. marketed, sold, and distributed the commercial herbicide Roundup

22      Monsanto is a multinational agricultural biotechnology corporation based in St Louis Missouri It is the world's leading producer of glyphosate

23      Defendants discovered the herbicidal properties in glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate based "Roundup" as a broad-spectrum herbicide.

24      Glyphosate is the active ingredient in Roundup

25      Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe

26      Glyphosate is a 'non-selective" herbicide meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid 3- phosphate synthase known as EPSP synthase

27      Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid 3-phosphate synthase that interferes with the shikimic pathway in plants resulting in the accumulation of shikimic acid in plants and tissue and ultimately plant death

28      When sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues

29      Each year, approximately 250 million pounds of glyphosate are sprayed on crops. commercial nurseries, suburban lawns, parks, and golf courses   This increase in use has been driven largely by proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate

30      Defendants are intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops  many of which are marketed as being resistant to Roundup  i.e., "Roundup Ready®"  As of 2009, Defendants were the world's leading producer of seeds designed to be Roundup Ready®  In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready® seeds

31.      The original Roundup, containing the active ingredient glyphosate, was introduced in 1974  Today, glyphosate products are among the world's most widely used herbicides  Monsanto's glyphosate products are registered in more than 130 countries and are approved for weed control in more than 100 crops  No other herbicide active ingredient compares in terms of number of approved uses [1]

32      For nearly 40 years, farmers across the globe have used Roundup, unaware of its carcinogenic properties

Backgrounder, History of Monsanto's glyphosate herbicides ... 2011

## REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

33      The manufacture, formulation and distribution of herbicides such as Roundup, are regulated under the Federal Insecticide  Fungicide and Rodenticide Act ("FIFRA"), 7  U S C  § 136 *et seq*  FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA) prior to their distribution, sale, or use, except as described by FIFRA 7 U S C  136a(a).

34      The EPA requires as a part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment  Registration by the EPA, however, is not an assurance or finding of safety  The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment " 7 U S C  § 136(a)(c)(5)(D)

35      FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment  taking into account the economic, social  and environmental costs and benefits of the use of any pesticide ' 7 U S C  § 136 (bb)  FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce

36      The EPA and the State of Pennsylvania  registered Roundup for distribution, sale  and manufacture in the United States  and the State of Pennsylvania

37     FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing or pesticide products  The government is not required, nor is it able, to perform the product tests that are required of the manufacturer

38     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered  The date necessary for registration of a pesticide has changed over time  The EPA is in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration "  7 U S C  § 136a-1  In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation

39     In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment- in relation to the registration process – no later than July 2015  The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of the World Health Organization's findings

## MONSANTO'S FALSE REPRESENTATIONS REGARDING THE SAFETY OF ROUNDUP

40     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products  Specifically, the lawsuit challenged Monsanto s general representations that it's spray-on glyphosate-based herbicides, including Roundup, were **"safer than table salt"** and  **practically non-toxic"** to mammals  birds, and fish  Among the statements made by defendants which NY AG found deceptive and misleading about the human and environmental safety of Roundup are the following

a) Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks, and fences

b) And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging, or trimming problem

c) Roundup biodegrades into naturally occurring elements

d) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation

e) This non-residual herbicide will not wash or leach in the soil. It stays where you apply it

f) You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion

h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it

i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds, and fish

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in the area which has been treated with Roundup.[2]

41    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, to cease

Attorney General of the State of New York. In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law §63(15) (Nov. 1996)

10

and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication that.

    a    its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

                                        ***

    b    its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed, or sold by Monsanto are biodegradable

                                        ***

    c    its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means

                                        ***

    d    its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics"

                                        ***

    e    glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides,

                                        ***

    f    its glyphosate- containing products or any component thereof might be classified as 'practically non-toxic "

42      Monsanto did not alter its advertising in the same manner in any state , other than New York, and on information and belief still has not done so today

43      In 2009, France's highest court ruled that Monsanto had not told the truth about Safety of Roundup  The French court affirmed an earlier judgment that

Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it 'left the soil clean "[3]

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP

44      As early as the 1980's Defendant Monsanto was aware of glyphosate's carcinogenic properties

45      On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[4] Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity

46      In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87- 103214)   The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies  All of the data required was submitted and reviewed and/or waived [5]

47      In October 1991 the EPA published a Memorandum entitled 'Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans)  Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign [6]

48      In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendants  Roundup products

Monsanto Guilty in False Ad Row, BBC, Oct 15 2009, available at
http://news.bbc.co.uk/2/hi/europe/8309039.stm
Consensus Review of Glyphosate, Casewell No. C014, March 1 1985 United States Environmental Protection Agency
http://www.epa.gov/oppsrrd1/reregistration/REDs facts/old ac FloodTxt
Second Peer Review of Glyphosate, CAS No. 1071-83-6, October 30, 1991 United States Environmental Protection Agency

are more dangerous and toxic than glyphosate alone.[7] As early as 1991, evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.[8]

49.    In 2002 Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

50.    The study found that the Defendants' Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

51.    In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

52.    The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further "[s]ince cell cycle disorders such as a cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[9]

53.    In 2005 Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

54.    The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could

Martinez et al. 2007, Benachour 2009, Gasnier et al. 2010, Peixoto 2005, Marc 2004
[8]Martinez et al 1991
[9] (Molinari, 2000. Stewart et al., 2003)

be the result of other chemicals, name the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products

55     In 2009. Nora Benachour and Giles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells

56     The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone  The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide  The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate

57     The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendants

58     Defendants knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients  and/or the surfactant POEA were necessary to protect decedent from Roundup

59     Defendants knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup

60     Defendants failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect decedent from Roundup

61     Rather than performing appropriate tests, Defendants relied upon flawed industry- supported studies designed to protect Defendants' economic interests rather than decedent and the consuming public

62.     Despite their knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendants continued to promote Roundup as safe

IARC CLASSIFICATION OF GLYPHOSATE

63     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer

64     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015-2019 met in April 2014  Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs  there must already by some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance

65     IARC set glyphosate for review in 2015-2016  IARC uses five criteria for determining priority in reviewing chemicals  The substance must have potential for direct impact on public health  scientific literature to support suspicion of carcinogenicity  evidence of significant human exposure  high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern,

related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

66.     On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendants' possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Defendants' Roundup herbicide, is a Class 2A 'probable carcinogen' as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

67.     The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A probable carcinogen to humans. According to the authors, glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

68.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL.") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

69.     The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

EARLIER EVIDENCE OF GLYPHOSATE'S DANGER

70.     Despite the new classification by the IARC. Defendants have had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

71     Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer

72     In 1997, Chris Clements published "Genotoxicity of select herbicides in *Rana catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay "

73.     The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals

74     Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress

75     Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis

76     The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress "

77     In 2006 Cesar Paz-y-Mino published a study examining DNA damages in human subjects exposed to glyphosate

78     The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals

79     The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence of genotoxicity caused by glyphosate-based formulations is strong

80.     Despite knowledge to the contrary, Defendants maintain that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

81.     In addition to glyphosate and Roundup's genotoxic properties, Defendants have long been aware of glyphosate's carcinogenic properties.

82.     Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

83.     Defendants have known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

84.     In 1985 the EPA studied the effects of glyphosate in mice, finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded that glyphosate was oncogenic.

85.     In 2003 Lennart Hardell and Mikael Eriksson published the results of two case-controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

86.     The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studied with an increased odds ratio of 3.11.

87.     In 2003 AJ De Roos published a study examining the pooled data of mid western farmers, examining pesticides and herbicides as risk factors for NHL.

88      The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate

89      In 2008 Mikael Eriksson published a study a population based case-control study of exposure to various pesticides as a risk factor for NHL

90      This strengthened previous associations between glyphosate and NHL

91      In spite of this knowledge. Defendants continued to issue broad and sweeping statements suggesting that Roundup was, and is safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary

92      Upon information and belief, these statements and representations have been made with the intent of inducing decedent, the agricultural community, and the public at large to purchase, and increase the use of, Defendants' Roundup for Defendants' pecuniary gain, and in fact did induce decedent to use Roundup

93      Defendants made these statements with complete disregard and reckless indifference to the safety of decedent and the general public

94      Notwithstanding Defendants' representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma

95      Defendants knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL Multiple Myeloma, and soft tissue sarcomas

96      Defendants failed to appropriately and adequately inform and warn decedent of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications

97      Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendants continue to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity in glyphosate and Roundup

98.      Defendants have claimed and continue to claim that Roundup is safe, non- carcinogenic, and non-genotoxic

99      Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate based herbicides, causes cancer, even at very high doses, and that it is not genotoxic "[19]

100      Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen

101    Glyphosate, and Defendants Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products

102    Defendants' statements proclaiming the safety of Roundup and disregarding its dangers misled decedent.

103    Despite Defendants' knowledge that Roundup was associated with an elevated risk of developing cancer, Defendants' promotional campaigns focused on Roundup's purported "safety profile "

104    Defendants failure to adequately warn decedent resulted in (1) Decedent using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup exposure

105    Defendants failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure

106    The failure of Defendants to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers

107    The failure of Defendants to appropriately warn and inform the EPA has resulted in the absence of warnings or caution statements that are adequate to protect health and the environment

108    The failure of Defendants to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment

109    Plaintiffs' seek compensatory damages arising out of decedent Allen Maurer's use of, and exposure to, Roundup which factually caused him to suffer from cancer, specifically follicular lymphoma which transformed into diffuse large B-cell lymphoma, and decedent suffered severe and permanent injuries, including physical pain and mental anguish, diminished enjoyment of life and death  The foregoing acts and omissions of Defendants were the factual cause of decedent's Non-Hodgkin's lymphoma and subsequent death

110    By reason of the foregoing acts and omissions, decedent suffered death, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of the actions and inactions of the Defendants.

## DECEDENT'S EXPOSURE TO ROUNDUP

111    Decedent Allen Maurer used Roundup beginning in 1992 for the purpose of maintaining the 125-acre property which he owned and resided in Northumberland, Pennsylvania  He used it to spray on his crops on his farm

112    For approximately 14 years  until 2004/2005, Decedent sprayed pesticides including various Roundup products, several times a week beginning at the end of April until June and then a few times a month through the end of August each year, including specific records of extensive Roundup use in 1994, 1999, 2000  2001 and beyond    Decedent followed all safety and precautionary warnings he was

provided during the course of his use of Roundup. Mr. Maurer attended training and was certified in the application of pesticides.

113.   Decedent was subsequently diagnosed with Non-Hodgkin's follicular lymphoma, on or about January 23, 2019 which transformed to diffuse large B-cell lymphoma.

114   As a result of his injury, decedent suffered severe physical, economic and non-economic injuries, including his death.

### EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

115   Plaintiffs incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

116   The running of any statute of limitations has been tolled by reason of the Defendants' fraudulent concealment under the laws of the State of Pennsylvania. Further, Decedent's diagnosis and death were both within the Statute of Limitations. In the alternative, Defendants, through their affirmative misrepresentations and omissions, actively concealed from decedent the true risks associated with Roundup and glyphosate. Indeed, even as of October 2015 Defendants continued to represent to the public that "*Scientists are in agreement* that there is *no evidence* glyphosate causes cancer." (emphasis added).[11]

117   As of November 2018, Defendants continue to represent to the public that "Regulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and *agree* that there is *no evidence* that glyphosate, the active ingredient in Roundup ® brand herbicides and

[11] _Backgrounder, Glyphosate and Environmental Fate and Toxicology (available: November 2014), downloaded October 19, 2015._

other glyphosate-based herbicides, causes cancer even at very high doses, and that it is not genotoxic." (emphasis added) [12]

118    In the alternative, as a result of Defendants' actions decedent was unaware, and could not reasonably know or have learned through reasonable diligence that Roundup and/or glyphosate and POEA contact exposed decedent Allen Maurer to the risks alleged herein and that those risks were the direct result of Defendants' acts and omissions until in or around January 2019, when he received his follicular lymphoma diagnosis, when decedent first learned that his follicular lymphomas may have been caused by his exposure to Roundup.

119    In the alternative, Defendants are estopped from relying on any statute of limitations because of their fraudulent concealment of the true character, quality, and nature of Roundup. Defendants were under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Defendants had and continue to have exclusive control, and because Defendants knew that this information was not available to decedent or to distributors of Roundup. In addition, Defendants are estopped from relying on any statute of limitations because of their intentional concealment of these facts.

120    Decedent had no knowledge that Defendants were engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment and wrongdoing by Defendants, Decedent could not have reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud should be considered. Defendants had the ability to and did spend enormous amounts of money in

[12] "Backgrounder- Glyphosate: No Evidence of Carcinogenicity. Updated November 2014 (downloaded November 1, 2018 from https://monsanto.com/app/uploads/2017/06/no-evidence-of-carcinogenicity.pdf)

furtherance of their purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonable known risks Decedent and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendants' representations Accordingly, Defendants are precluded by the date of the decedent's diagnosis and death, as well as the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations defense

1
(STRICT PRODUCTS LIABILITY -- DESIGN DEFECT)

121    Plaintiffs repeat each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

122    At all times herein mentioned, the Defendants designed, researched, manufactured, tested, advertised, promoted, sold distributed, and/or have acquired the Defendants who have designed, researched, tested, advertised, promoted, marketed, sold, and distributed Roundup as hereinabove described that was used by the decedent

123    Defendants' Roundup was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced manufactured, sold, distributed, and marketed by the Defendants

124     At those times, Roundup was 'n an unsafe, defective, and inherently dangerous condition, which was dangerous to users  and in particular  the decedent herein

125     The Roundup designed  researched, manufactured  tested  advertised  promoted, marketed, sold, and distributed by Defendants was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup

126     The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective in design and/or formulation, in that, when it left the hands of the Defendant manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was unknowable and unacceptable to the ordinary consumer under the consumer expectations standard.

127     At all times herein mentioned, Roundup was in a defective condition and unsafe  and Defendants knew or had reason to know that said product was defective and unsafe  especially when used in the form and manner as provided by the Defendants  In particular, Defendants' Roundup was defective in the following ways

      a   When placed in the stream of commerce, Defendants  Roundup products were defective in design and formulation and, consequently dangerous to an extent beyond that which an ordinary consumer would anticipate

      b   When placed in the stream of commerce  Defendants  Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner

c   When placed in the stream of commerce Defendants' Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in reasonably anticipated manner

d   Defendants did not sufficiently test, investigate, or study its Roundup products

e   Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide

f   Defendants knew or should have known at the time of marketing its Roundup products that exposure to Roundup and could result in cancer and other severe illnesses and injuries

g   Defendants did not conduct adequate post-marketing surveillance of its Roundup products

128   Defendants knew or should have known, that at all times herein mentioned its Roundup was in a defective condition, and was and is inherently dangerous and unsafe

129   Decedent Allen Maurer was exposed to Defendants' Roundup as described above, without knowledge of Roundup's dangerous characteristics

130   At the time of decedent's use of and exposure to Roundup Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide

131   Defendants with this knowledge voluntarily designed its Roundup with a dangerous condition for use by the public, and in particular the decedent

132   Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use

133   Defendants created a product that was and is unreasonably dangerous for its normal intended use

134     Defendants marketed and promoted their Roundup product in such a manner so as to make it inherently defective, as the product downplayed the suspected, probable, and established health risks inherent with its normal, intended use

135     The Roundup product designed  researched, manufactured  tested advertised,  promoted,  marketed,  sold,  and  distributed  by  Defendants  was manufactured defectively in that Roundup left the hands of Defendants in a defective condition and was unreasonably dangerous to its intended users

136     The Roundup designed  researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants reached their intended users in the same defective and unreasonably dangerous condition in which the Defendants' Roundup was manufactured

137     Defendants designed  researched, manufactured, tested, advertised promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to the decedent in particular, and Defendants are therefore strictly liable for the injuries sustained by the decedent

138     The nature of the defects mentioned herein and the products' dangers were  unknowable  and  unacceptable  to  the  ordinary  consumer,  including  decedent, under the consumer expectations standard   Reasonable alternatives existed

139     By reason of the foregoing  Defendants have become strictly liable to decedent for the manufacturing  marketing, promoting  distribution, and selling of a defective product, Roundup

140     Defendants  defective  design  of Roundup amounts to willful  wanton and/or reckless conduct by the Defendants

141     Defects in Defendants' Roundup were the cause or a substantial factor in causing decedent's injuries

142     As a result of the foregoing acts and omissions, decedent developed NHL, and died, and further suffered and suffered severe extreme physical pain and mental anguish, including diminished enjoyment of life and his subsequent death, and financial expenses for hospitalization and medical care

WHEREFORE, Plaintiffs respectfully request that this Court enter a judgment in excess of $75,000, exclusive of interests and costs, for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper

## 2
## (STRICT PRODUCTS LIABILITY -- FAILURE TO WARN)

143     Plaintiffs repeat each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein

144     Defendants have engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting Roundup, and through that conduct have knowingly and intentionally placed Roundup into the stream of commerce with full knowledge that it reaches users such as decedent who are exposed to it through ordinary and reasonably foreseeable uses

145     Defendants did in fact sell, distribute, supply, manufacture, and/or promote Roundup to decedent Additionally, Defendants expected the Roundup that they were selling, distributing, supplying manufacturing and/or promoting to reach – and Roundup did in fact reach end consumers and users including decedent, without

any substantia change in the condition of the product from when it was initially distributed by Defendants

146.    At the time of manufacture, Defendants could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known the unreasonable risks of harm associated with the use of and/or exposure to such products

147    At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Defendants and at the time decedent was exposed to and/or ingested the product  The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to developing NHL as a result of exposure and use

148    Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect health those exposed, in violation of 7 U S §136j(a)(1)(E)

149    Defendants' failure to include a warning or caution statement which was necessary and  if complied with, was adequate to protect the health of those exposed  violated  7  U S  §136j(a)(1)(E) as well as the laws of the State of Pennsylvania

150    Defendants could have amended the label of Roundup to provide additional warnings

151     This defect caused serious injury to decedent, who used Roundup in its intended and foreseeable manner

152     At all times herein mentioned, Defendants had a duty to properly design, manufacture, compound, test inspect, package, label distribute, market, examine, maintain, supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects

153     Defendants labeled, distributed, and promoted the aforesaid product such that it was dangerous and unsafe for the use and purpose for which it was intended

154     Defendants failed to warn of the nature and scope of the side effects associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of NHL

155     Defendants were aware of the probable consequences of the aforesaid conduct  Despite the fact that Defendants knew or should have known that Roundup causes serious injuries, Defendants failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of developing NHL from Roundup exposure, even though these properties and side effect were known or reasonably scientifically knowable at the time of distribution  Defendants willfully and deliberately failed to avoid the consequences associated with their failure to warn and in doing so, Defendants acted with a conscious disregard for the safety of decedent

156     The risks of the products mentioned herein and its dangers were unknowable and unacceptable to the ordinary consumer, including decedent under the consumer expectations standard   Defendants, as the manufacturers and/or distributors of the subject product, are held to the level of knowledge of an expert in the field

157     Decedent reasonably relied upon the skill, superior knowledge, and judgment of Defendants

158     Had Defendants properly disclosed the risks associated with Roundup, Decedent would have avoided the risk of NHL by not using Roundup

159     The information that Defendants did provide or communicate failed to contain adequate warnings and precautions that would have enabled Decedent, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead   Defendants disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity  duration and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate. continued to promote the efficacy of Roundup, even after it knew or should have known the unreasonable risks from use or exposure, and concealed  downplayed, or otherwise suppressed  through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate

160     To this day, Defendants have failed to adequately warn of the true risks of Decedent s injuries associated with the use of and exposure to Roundup

161     As a result of their inadequate warnings  Defendants' Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were distributed by Defendants, and used by Decedent Defendants failed to adequately warn of these defects, risks and dangers of its products  as described herein

162     As a direct factual result of Defendants' actions as alleged herein, and in such other ways to be later shown, the subject product caused Decedent to sustain injuries as herein alleged

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in excess of $75,000, exclusive of interests and costs, for compensatory and punitive damages, together with interest, costs  herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## 3
## NEGLIGENCE

163     Plaintiffs repeat each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein

164     Defendants had a duty to exercise reasonable care in the designing, researching  testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects

165     Defendants failed to exercise ordinary care in the designing, researching, testing  manufacturing, marketing, supplying  promoting, packaging  sale testing, quality assurance  quality control, and/or distribution of Roundup into interstate

commerce in that Defendants knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life as well as need for lifelong medical treatment, monitoring, and/or medications

166    The negligence by the Defendants, and their agents, servants, and/or employees, included by was not limited to the following acts and/or omissions

   a   Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without adequately testing it,

   b   Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup,

   c   Not conducting sufficient testing programs to determine whether or not Roundup was safe for use, in that Defendants herein knew or should have known that Roundup was unsafe and unfit for use by reasons of the dangers to its users,

   d   Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Defendants had knowledge that Roundup is was, or could be carcinogenic,

   e   Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use.

   f   Negligently failing to adequately and correctly warn the decedent, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup

   g   Negligently failing to petition the EPA to strength the warnings associated with Roundup

h   Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup,

i   Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities,

j   Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

k   Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides,

l   Negligently designing Roundup in a manner which was dangerous to its users,

m   Negligently manufacturing Roundup in a manner which was dangerous to its users,

n   Negligently producing Roundup in a manner which was dangerous to its users,

o   Negligently formulating Roundup in a manner which was dangerous to its users,

p   Concealing information from the decedent while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations,

q   Improperly concealing and/or misrepresenting information from the decedent, scientific and medical professionals, and/or the EPA concerning the severity risks and dangers of Roundup compared to other forms of herbicides, and

r   Negligently selling Roundup with a false and misleading label

167   Defendants under reported, underestimated, and downplayed the serious dangers of Roundup

168   Defendants negligently and deceptively compared the safety risks and/or dangers of Roundup with common everyday foods such as table salt, and with other forms of herbicides

169    Defendants were negligent and violated the law in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup in that they

   a   Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide,

   b   Failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

   c   Failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup,

   d   Failed to accompany their product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup,

   e.  Failed to warn decedent of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of NHL,

   f   Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup,

   g   Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants,

   h   Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity, and

       Were otherwise careless and/or negligent

170    Despite the fact that Defendants knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Defendants continued and continue to market, manufacture, distribute, and/or sell Roundup to consumers, government entities, and consumers, including Plaintiff,

171     Defendants knew or should have known that consumers such as decedent would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care, as set forth above

172     Defendants' violations of law and/or negligence were the cause of Decedent's injuries, harm and economic loss, which decedent suffered and/ or will continue to suffer

173     Defendant's actions and omissions factually caused decedent Allen Maurei suffered from serious and dangerous side effects including, but not limited to, follicular lymphoma which transformed into diffuse large B-cell lymphomas, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish  diminished enjoyment of life, and financial expenses for hospitalization and medical care  Further, decedent suffered life-threatening follicular lymphoma which transformed to diffuse large B-cell lymphoma, and severe personal injuries, physical pain and mental anguish, diminished enjoyment of life and death

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in excess of $75,000, exclusive of interests and costs, for compensatory and punitive damages  together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper

4
FRAUD, MISREPRESENTATION

174     Plaintiffs incorporate by reference each and every paragraph of this Complaint as if fully set forth herein

175    Throughout the relevant time periods, it was known or knowable to Defendants that their Roundup products caused Non-Hodgkin's lymphoma and that this occurrence was not rare

176    Defendants knew or had reason to know that the safety of its Roundup products had not been tested or proven

177    Defendants knew, or had reason to know that there was no evidence that its Roundup products were safe

178    In the alternative, Defendants knowingly failed to warn that its Roundup products were safe and cased and/or increased the risk of Non-Hodgkin's lymphoma

179    Despite this knowledge, Defendants continued to represent through its advertising, marketing and product labeling that its Roundup products were safe, and continued to advertise and promote these products to consumers for the purchase of killing weeds

180    Despite what Defendants knew and/or had reason to know about the lack of safety of their Roundup products through the relevant time periods, Defendants failed to disclose these risks and concealed this material information from decedent Allen Maurer, and from the public at large

181    In the alternative, despite this knowledge, Defendants continued to market and sell their Roundup products as safe, but with evidence to the contrary that the products were unsafe and caused Non-Hodgkin's lymphoma

182    Defendants had the duty and obligation to disclose to decedent and the public at large in its advertising and labeling the true material facts concerning the aforesaid Roundup Products, that is  that said Products were dangerous and defective

and lacking safety in normal and intended use, and how likely it was to cause serious consequences to users including permanent and debilitating injuries  Defendants concealed these material facts prior to the time that decedent purchased and used Roundup products

183    Decedent relied on these material misrepresentations and/or omissions on the labeling of the products themselves to his detriment as the products themselves did not indicate that Roundup increased the risk of Non-Hodgkin's lymphoma

184    Defendants were under a duty to decedent to disclose and warn of these materials facts concerning the defective nature of Roundup products because

> 184 1    Defendants were in a superior position to know the true dangers of the Product,

> 184 2    Defendants knowingly made false claims about the safety and quality of the Defendants' Roundup products on the label of the products to decedent and the general public and it its advertising  and

> 184 3    Defendants fraudulently and affirmatively concealed the defective nature of its Products from decedent,

185    The facts concealed and/or not disclosed by Defendants to decedent were material facts in decedent deciding whether or not to purchase the Roundup products

186    In the alternative  Defendants willfully, intentionally, and maliciously concealed the material facts as set forth above from decedent with the intent to defraud as herein alleged

187    In the alternative, Defendants intentionally concealed and/or failed to disclose these material facts illustrating the true defective nature of the Products so that Decedent would purchase the Roundup products. Such fraudulent concealment was material as decedent justifiably acted or relied upon, to his detriment, the concealed and/or non-disclosed facts, as evidenced by the purchase of these products

188    Decedent could not have been aware of these material defects, despite reasonable diligence

189    At all times herein mentioned, decedent was unaware of the material facts set forth above, and had he been aware of said facts he would not have acted as he did, that is, would not reasonably relied upon said representations of safety and purchased the Roundup products

190    Defendants knew and had reason to know of these defects, and knowingly and fraudulently disregarded these defects to decedent's detriment

191    Defendant's actions were the factual cause of decedent's Non-Hodgkin's lymphoma and subsequent death

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in excess of $75,000, exclusive of interest and costs, for compensatory and punitive damages together with interest, costs herein incurred attorneys fees and all relief as this Court deems just and proper

## VIOLATION OF PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW

192   Plaintiffs incorporate by reference each and every paragraph of this Complaint as if fully set forth herein

193.   Decedent purchased and used Defendant's Roundup products and therefore suffered ascertainable losses as a result of Defendants' actions in violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL).

194   Unfair methods of competition or deceptive acts or practices that were proscribed by law, as set forth in Count IV, include the following.

194 1   Representing that Roundup products have safe characteristics, uses, and/or benefits that they do not have,

194 2   Advertising the Roundup products with the intent not to sell them as advertised, and

194 3   Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding with respect to its Roundup products

195   Defendants violated consumer protection laws, specifically the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P S § 201 1 et seq , through their use of false and misleading misrepresentations or omissions of material facts relating its Roundup products

196   Defendants uniformly communicated the purported benefits of Roundup while failing to disclose the serious and dangerous risks associated with the product, its safety its efficacy and its usefulness  Defendants made these representations to

consumers, including decedent, on the face of the product and in its marketing and advertising

197     Defendants' conduct in connection with the Product was also impermissible and illegal in that it created a likelihood of confusion and misunderstanding because Defendants misleadingly, falsely and/or deceptively misrepresented and omitted numerous material facts regarding among other things, the utility, benefits, safety, and advantages of its Roundup products

198     Had Defendants not engaged in the deceptive conduct described herein, Decedent would not have purchased and/or paid for Defendants' Roundup products and would not have incurred related medical costs and injuries

199     As a result of these violations, decedent developed non-Hodgkin's lymphoma and died   Defendants have a statutory duty pursuant to Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P S  §§201-1 - 201-9 , to refrain from unfair and deceptive acts or trade practices in the design, labeling, development  manufacture  promotion and sale of Defendants' Roundup products

200     Plaintiffs are entitled to treble damages and such additional relief as deems necessary or proper pursuant to 73 P S  § 201-9 2

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in excess of $75,000, exclusive of interest and costs  for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper

<u>6</u>

## WRONGFUL DEATH ACTION

201     Plaintiffs repeat each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein

202     Due to the conduct of Defendants, as aforesaid, decedent died and has left individuals entitled to recover for his death

203     Plaintiffs, by reason of death of decedent, have suffered such losses as permitted by law for recovery including funeral expenses, financial losses, including loss of right to future maintenance and support and other expenses of administration of the estate

204     Decedent's statutory survivors consist of the following persons: Plaintiffs Karen Bordner, Dennis Maurer and Rita Livesay

205     Decedent's statutory survivors suffered the loss of Decedent's services, companionship, society, comfort guidance, solace, and protection, and other damages as are recoverable under the Wrongful Death Act of Pennsylvania

206     Plaintiffs bring this action under and by virtue of the Act of 1855 P L 309, as amended, and Pa R C P 2202(a)   Plaintiffs are entitled to recover in addition to damages, amounts for reasonable hospital nursing, medical and funeral expenses and expenses of administration necessitated by reason of the conduct, omissions, and failures to act causing death or increased risk of harm

WHEREFORE  Plaintiffs respectfully request that this Court enter judgment in excess of $75,000, exclusive of interest and costs, for compensatory and punitive

damages together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper

## 7
## SURVIVAL ACTION

207    Plaintiffs repeat each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein

208    Plaintiffs bring this action on behalf of the Estate of Allen Maurer under and by virtue of the laws of the Commonwealth of Pennsylvania, 20 Pa C S A § 3373, 42 Pa C S A § 8302 and Pa R.C.P 2352(a)

209    Plaintiffs claim, on behalf of said estate, damages suffered by reason of the death of Decedent, including the following

   a)    Decedent's mental and physical pain, suffering and inconvenience prior to his death,

   b)    Decedent's financial losses suffered as a result of his death, and

   c)    Such other damages as are recoverable in a survival action

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in excess of $75,000, exclusive of interest and costs, for compensatory and punitive damages together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs demands judgment against the Defendants on each of the above referenced claims and causes of actions and as follows

1   Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and any other non-economic damages in an amount to be determined at trial of this action,

2   Awarding compensatory damages to Plaintiffs for past and future damages, including, but not limited to, decedent's pain and suffering and for severe and permanent personal injuries and death sustained by the Plaintiff including health care costs and economic loss,

3   Awarding economic damages to Plaintiffs in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determined at trial of this action,

4.   Punitive and/or exemplary damages for the wanton, willful, fraudulent, and reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the decedent in an amount sufficient to punish Defendants and deter future similar conduct, to the extent allowed by applicable law;

5.   Pre-judgment interest,

6   Post-judgment interest,

7   Awarding Plaintiffs reasonable attorneys' fees as may be appropriate pursuant to statute or other applicable law,

8   Awarding Plaintiffs the costs of these proceedings, and

9   Such other and further relief as this Court deems just

and proper

RIEDERS, TRAVIS, HUMPHREY, WATERS & DOHRMANN

Clifford A Rieders, Esquire PA 20962
Sasha B Coffiner, Esquire PA 320294
161 West Third Street
Williamsport, PA 17701
P  570 323 8711
F  570 323 4192
Attorneys for Plaintiffs