# U.S. District Court
## Eastern District of Michigan (Detroit)
## CIVIL DOCKET FOR CASE #: 2:20–cv–10314–TGB–APP

Stone et al v. Monsanto Company
Assigned to: District Judge Terrence G. Berg
Referred to: Magistrate Judge Anthony P. Patti
Demand: $75,000
Cause: 28:1331 Product Liability

Date Filed: 02/06/2020
Jury Demand: Plaintiff
Nature of Suit: 245 Tort Product Liability
Jurisdiction: Diversity

**Plaintiff**

**Barbara Stone**

represented by **Brian T. Dailey**
Dailey Law Firm, PC
36700 Woodward Avenue
Suite 107
Bloomfield Hills, MI 48304
312 927 2611
Fax: 248–744–4440
Email: briandailey@daileylawyers.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Tomas Stone**

represented by **Brian T. Dailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 02/06/2020 | 1 | COMPLAINT filed by All Plaintiffs against Monsanto Company with Jury Demand. Plaintiff requests summons issued. Receipt No: 0645–7592855 – Fee: $ 400. County of 1st Plaintiff: Wayne – County Where Action Arose: Wayne – County of 1st Defendant: Out of State. [Previously dismissed case: No] [Possible companion case(s): None] (Attachments: # 1 Document Continuation Jury Demand) [DOCUMENT TITLED FIRST AMENDED COMPLAINT](Dailey, Brian) Modified on 2/7/2020 (DAll). (Entered: 02/06/2020) |
| 02/07/2020 | 2 | SUMMONS Issued for *Monsanto Company* (DAll) (Entered: 02/07/2020) |
| 02/07/2020 | | A United States Magistrate Judge of this Court is available to conduct all proceedings in this civil action in accordance with 28 U.S.C. 636c and FRCP 73. The Notice, Consent, and Reference of a Civil Action to a Magistrate Judge form is available for download at http://www.mied.uscourts.gov (DAll) (Entered: 02/07/2020) |

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

Barbara Stone and Tom Stone,

      Plaintiffs,

                                                  Case No.:

v                                                   District Judge

MONSANTO COMPANY,

      Defendant.

DAILEY LAW FIRM, P.C.
Brian T. Dailey (P39945)
Attorney for Plaintiff
36700 Woodward Avenue, Suite 107
Bloomfield Hills, MI 48304
(248) 744-5005
(248) 744-4440 Fax
BrianDailey@DaileyLawyers.com

## PLAINTIFF'S FIRST AMENDED COMPLAINT

NOW COMES Plaintiffs, **BARBARA STONE and TOM STONE**, by and through their Attorneys, DAILEY LAW FIRM, PC, and for their Complaint against the above-named Defendant states unto this Honorable Court as follows:

### Jurisdictional Allegations

1.      Pursuant to 28 USC § 1332, there is complete diversity in that Plaintiffs, and Defendant, Monsanto Company (hereinafter "Monsanto") are residents / incorporated in different States; Plaintiff being a resident of the City of Wyandotte in the County of Wayne and the State of Michigan, and Defendant Corporation who is incorporated in the State of Delaware with its principal place of business in St. Louis, Missouri.

2.      Pursuant to LR. 81.1(a) and (b) and 28 USC § 1332(a), the amount in controversy

exceeds the sum of Seventy-Five Thousand and 0/100 ($75,000) Dollars, exclusive of costs, interest, and attorney fees, and venue is otherwise proper in this Court.

### Allegations Common to All Counts

1. Defendant, MONSANTO COMPANY ("Monsanto"), is a foreign profit corporation registered to do business in the State of Michigan with a registered agent in the city of East Lansing, County of Ingham and State of Michigan

2. At all times relevant, Defendant Monsanto designed, manufactured, marketed, and sold an herbicide known as Roundup.

3. Roundup is a non-selective herbicide marketed to homeowners and others to kill weeds.

4. Monsanto is a multinational biotechnology company with its principal place of business in St. Louis, Missouri.

5. "Roundup" refers here to all formulations of Defendant's Roundup products that contain the active ingredient glyphosate, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer I, Roundup Concentrate, Roundup Custom Herbicide, Roundup D-Pak, Roundup Fence and Hard Edge I, Roundup Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2K Herbicide, Roundup Promax, Roundup QuikStik Grass and Weed Killer, Roundup Quickpro Herbicide, Roundup Rainforest Concentrate Weed and Grass Killer, Roundup Rainforest Super Concentrate Weed & Grass Killer, and Roundup Ready-to-Use Extended Control Weed & Grass Killer I Plus Weed Preventer, *inter alia.*

6. Defendant Monsanto has advertised and sold goods, including Roundup, in

Wayne County, Michigan for many years.

7.    Defendant Monsanto has transacted and conducted business in the County if Wayne and State of Michigan for many years.

8.    Defendant Monsanto has derived substantial revenue from goods and products sold and used in the State of Michigan.

9.    Defendant Monsanto has transacted and conducted extensive business within the State of Michigan that directly relates to the allegations in this Complaint.

10.    Defendant Monsanto expected or reasonably should have expected that its acts would have consequences within the State of Michigan, and derived substantial revenue from interstate commerce, including commerce in Michigan.

11.    Defendant Monsanto purposely availed itself of the privileges of conducting activities within the State of Michigan and invoked the benefits and protections of Michigan law.

12.    Plaintiffs **BARBARA STONE (BSTONE)** is a Michigan resident who purchased and/or used Roundup in Michigan many times, over many years, including within the Eastern Division in her profession as a Master Gardner. Plaintiff, **TOM STONE (TSTONE)**, is **BSTONE'S** spouse and he also at all times relevant was and currently is a resident of the City of Wyandotte in the County of Wayne and State of Michigan

13.    Defendant Monsanto maintains sufficient and ongoing contacts within the State of Michigan such that this Court's exercise of personal jurisdiction does not offend traditional notions of fair play and substantial justice.

14.    Defendant Monsanto is the world's leading producer of glyphosate.

15.     Glyphosate is the active ingredient in Roundup.

16.     Defendant Monsanto discovered the herbicidal properties of glyphosate during the 1970s and subsequently began to design, research, manufacture, sell and distribute glyphosate-based Roundup as a broad-spectrum herbicide.

17.     Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with desirable plants grown around the globe.

18.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

19.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately in plant death.

20.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

21.     Each year, approximately 280 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses.

22.     Defendant is intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup *i.e.,* "Roundup Ready®."

23.     As of 2009, Defendant Monsanto was the world's leading producer of seeds designed to be Roundup Ready®. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States, contained Roundup Ready® seeds.

24.     The original Roundup, containing the active ingredient glyphosate, was

introduced in 1974. Today, glyphosate products are among the world's most widely used herbicides.

25.     For nearly 40 years, consumers, farmers, and the public have used Roundup, unaware of its carcinogenic properties.

26.     The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. 136a(a).

27.     The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

28.     FIFRA defines "unreasonable adverse effects on the environment" to be "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of the pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

29.     The EPA and the State of Michigan registered Roundup for the distribution,

sale, and manufacture in the United States and the State of Michigan.

30. FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

31. The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA has reevaluated all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-l. In order to reevaluate these pesticides, the EPA demanded the completion of additional tests and the submission of data for the EPA's review and evaluation.

32. In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment-in relation to the registration process-no later than July 2015. The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of the World Health Organization's March 24, 2015, finding that glyphosate is a "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

33. In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

a)    Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences.

b)    And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c)    Roundup biodegrades into naturally occurring elements.

d)    Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e)    This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f)    Glyphosate is less toxic to rats than table salt following acute oral ingestion.

g)    Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

h)    You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds, and fish.

i)    Roundup can be used where kids and pets will play and breaks down into natural material.

34.    On November 19, 1996, Defendant Monsanto entered into an Assurance of Discontinuance with the NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a)    its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b)    its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are

biodegradable.

c)   its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d)   its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are ..known for their environmental characteristics."

e)   glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides.

t)   its glyphosate-containing products or any component thereof might be classified as ..practically non-toxic."

35.   Monsanto did not alter its advertising in the same manner in any other state.

36.   In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as ..biodegradable" and that it "left the soil clean."

37.   As early as the 1980's, Monsanto was aware of glyphosate's carcinogenic properties.

38.   On March 4, 1985, a group of the EPA's Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene. Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

39.   In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.

40.   In October 1991, the EPA published a Memorandum entitled   second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to

GroupE (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.

41.    In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendant Monsanto's Roundup products are more dangerous and toxic than glyphosate alone. As early as 1991, evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.

42.    In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

43.    The study found that Defendant's Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone did not alter cell cycles.

44.    In 2004, Julie Marc published a study entitled "Glyphosate-based Pesticides Affect Cell Cycle Regulation." The study demonstrated a molecular link between glyphosate- based products and cell-cycle dysregulation.

45.    The study noted that "Cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers form the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cells, it was of interest to evaluate the threshold dose of glyphosate affecting cells."

46.    In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations to

glyphosate alone.

47.    The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, such as the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

48.    In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

49.    The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food.  The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone.  The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide.  The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

50.    The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendant Monsanto.

51.    Defendant Monsanto knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect **PLAINIFF BSTONE** from Roundup.

52.    Defendant Monsanto knew or should have known that tests limited to

Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

53.    Defendant  Monsanto  failed  to  appropriately  and  adequately  test
Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to
protect **BSTONE** from Roundup.

54.    Rather than performing appropriate tests, Defendant Monsanto relied upon
flawed industry-supported  studies  designed  to  protect  Defendant  Monsanto's  economic
interests rather than **PLAINTIFF, BSTONE** and the consuming public.

55.    Despite its knowledge that Roundup was considerably more dangerous
than glyphosate alone, Defendant continued to promote Roundup as safe.

56.    The International Agency for Research on Cancer {"IARC") is the specialized
intergovernmental  cancer  agency  which  the  World  Health  Organization  ("WHO")  of  the
United Nations tasked with conducting and coordinating research into the causes of cancer.

57.    An IARC Advisory Group to Recommend Priorities for IARC Monographs
during 2015-2019 met in April, 2014.  Though nominations for the review were solicited, a
substance must meet two criteria to be eligible for review by the IARC Monographs: there must
already be some evidence of carcinogenicity of the substance, and there must be evidence that
humans are exposed to the substance.

58.    IARC set glyphosate for review in 2015-2016.  IARC uses five criteria for
determining priority in reviewing chemicals. The substance must have a potential for direct
impact on public health; scientific literature to support suspicion of carcinogenicity; evidence
of significant human exposure; high public interest and/or potential to bring clarity to a
controversial area and/or reduce public anxiety or concern; and related agents similar to one

given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

59.   On March 24,2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendant's possession since as early as 1985, the IARC's Working Group published its conclusion that the glyphosate contained in Defendant's Roundup herbicide is a Class 2A probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

60.   The IARC's full Monograph was published on July 29, 2015, and established glyphosate as a Class 2A *probable* carcinogen to humans.   According to the authors, glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

61.   The IARC's Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

62.   The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

63.   Even without the new classification by the IARC, Defendant has had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

64.   Genotoxic chemical agents are those that are capable of damaging the DNA within a cell through genetic mutations, which is a process that can lead to cancer.

65.   In 1997, Chris Clements published "Genotoxicity of select herbicides in

*Rana catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

66.    The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

67.    Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

68.    Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

69.    The IARC Monograph notes that [s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

70.    In 2006 Cesar Paz-y-Mio published a study examining DNA damage in human subjects exposed to glyphosate.

71.    The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

72.    The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

73.    Despite knowledge to the contrary, Defendant Monsanto maintains that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup

is genotoxic.

74.     In addition to glyphosate and Roundup's genotoxic properties, Defendant

Monsanto has long been aware of glyphosate's carcinogenic properties.

75.     Glyphosate and Roundup, in particular, have long been associated with

carcinogenicity and the development of numerous forms of cancer, including, but not limited

to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue

sarcoma.

76.     Defendant Monsanto has known of this association since the early to mid-

1980s and numerous human and animal studies have evidenced the carcinogenicity of

glyphosate and/or Roundup.

77.     In 1985, the EPA studied the effects of glyphosate in mice, finding a dose-

related response in male mice linked to renal tubal adenomas, a rare tumor.  The study

concluded that glyphosate was oncogenic.

78.     In 2003, Lennart Hardell and Mikael Eriksson published the results of two

case- controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

79.     The study concluded that glyphosate had the most significant relationship to

NHL among all herbicides studied.

80.     In 2003, AJ DeRoos published a study examining the pooled data of

midwestern farmers, examining pesticides and herbicides as risk factors for NHL.

81.     The study, which controlled for potential confounders, found a relationship

between increased NHL incidence and glyphosate.

82.     In 2008, Mikael Eriksson published a population based case-controlled study

of exposure to various pesticides as a risk factor for NHL.

83.    This study strengthened previous associations between glyphosate and NHL.

84.    In spite of this knowledge, Defendant Monsanto continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

85.    These statements and representations have been made with the intent of inducing homeowners, the agricultural community, and the public at large to purchase and increase the use of Defendant Monsanto's Roundup for Defendant Monsanto's pecuniary gain, and in fact, did induce **PLAINTIFF, BSTONE** to use Roundup.

86.    Defendant Monsanto made these statements with complete disregard and reckless indifference to the safety of **PLAINTIFF, BSTONE** and the general public.

87.    Notwithstanding Defendant Monsanto's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, multiple myeloma, and soft tissue sarcoma.

88.    Defendant Monsanto knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, multiple myeloma, and soft tissue sarcomas.

89.    Defendant Monsanto failed to appropriately and adequately inform and warn **PLAINTIFF, BSTONE** of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing

NHL.

90.    Despite the IARC's classification of glyphosate as a Class 2A probable carcinogen, Defendant Monsanto continues to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-genotoxic, and falsely warrants to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

91.    Defendant Monsanto has claimed and continues to claim that Roundup is safe, non-carcinogenic, and non-genotoxic.   These misrepresentations are consistent with Defendant Monsanto's cavalier approach to investigating and ensuring the safety of its products, the safety of the public at large, and the safety of **PLAINTIFF, BSTONE**.

92.    After the EPA's 1985 classification of glyphosate as possibly carcinogenic to humans (Group C), Defendant Monsanto exerted pressure upon the EPA to change its classification.

93.    This culminated in the EPA's reclassification of glyphosate to Group E, which was based upon evidence of non-carcinogenicity in humans.

94.    In so classifying, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

95.    On two occasions, the EPA found that laboratories hired by Defendant Monsanto to test the toxicity of its Roundup products for registration purposes committed scientific fraud.

96.   In the first instance, Defendant Monsanto hired Industrial Bio-Test Laboratories C'IBT") to perform and evaluate pesticide toxicology studies relating to Roundup. IBT performed approximately 30 tests on glyphosate and glyphosate-containing products, including 11 of the 19 chronic toxicology studies needed to register Roundup with the EPA.

97.   In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to toxicological impacts of glyphosate. The EPA subsequently audited IBT and determined that the toxicology studies conducted for Roundup were invalid. An EPA reviewer stated, after finding routine falsification of data" at IBT, that it was hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

98.   Three top executives of IBT were convicted of fraud in 1983.

99.   In the second incident, Monsanto hired Craven Laboratories (Craven") in 1990 to perform pesticide and herbicide studies, including several studies on Roundup.

100.   In March of 1991, the EPA announced that it was investigating Craven for allegedly falsifying test data used by chemical firms to win EPA approval of pesticides."

101.   The investigation led to the indictments of the laboratory owner and a handful of employees.

102.   Defendant Monsanto claims on its website that [r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity

and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."

103.   Ironically, the primary source for this statement is an outdated 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

104.   Glyphosate, and Defendant Monsanto's Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate-containing herbicide products.

105.   Defendant Monsanto's statements proclaiming the safety of Roundup and disregarding its dangers misled **PLAINTIFF, BSTONE**.

106.   Despite Defendant Monsanto's knowledge that Roundup was associated with an elevated risk of developing cancer, Defendant Monsanto's promotional campaigns focused on Roundup's purported Safety profile."

107.   Defendant Monsanto's failure to adequately warn consumers resulted in (1) **PLAINTIFF, BSTONE** using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

108.   Defendant Monsanto failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

109.   The failure of Defendant Monsanto to appropriately warn and inform the EPA

has resulted in inadequate instructions and warnings in safety information presented directly
to users and consumers.

110.   The failure of Defendant Monsanto to appropriately warn and inform the EPA
has resulted in the lack of warning or caution statements that are adequate to protect health
and the environment.

## COUNT I

### Strict Products Liability—Design Defect

1-110. Plaintiff repeats, realleges, and incorporates herein all Allegations Common to
All Counts.

111.   **PLAINTIFF, BSTONE** used Roundup regularly at her home and in
her occupation as a Master Gardener for more than 2 decades.

112. **PLAINTIFF, BSTONE** followed all instructions and safety and
precautionary warnings provided by Monsanto.

113.   At all times relevant, Defendant Monsanto designed, researched,
manufactured, tested, advertised, promoted, sold, and distributed the Roundup that
**PLAINTIFF, BSTONE** used.

114.   Defendant Monsanto's Roundup was expected to and did reach the usual
consumers, handlers, and persons coming into contact, including **PLAINTIFF,
BSTONE**, without substantial change in the condition in which it was produced,
manufactured, sold, distributed, and marketed by Defendant Monsanto.

115.   At the time it left the control of the Defendant Monsanto, Roundup was
in an unsafe, defective, and inherently dangerous condition, which was dangerous to

users, and in particular, **PLAINTIFF, BSTONE**.

116.   The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant Monsanto was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup.

117.   The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendant Monsanto was defective in design and/or formulations, in that, when it left the hands of the Defendant Monsanto's manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

118.   At all times herein mentioned, Roundup was in a defective condition and unsafe, and Defendant Monsanto knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendant Monsanto. In particular, Defendant Monsanto's Roundup was defective in one or more of the following ways:

    a)    When placed in the stream of commerce, Defendant Monsanto's Roundup products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate;

    b)    When placed in the stream of commerce, Defendant Monsanto's Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;

    c)    When placed in the stream of commerce, Defendant Monsanto's Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated

manner;

d)    Defendant Monsanto did not sufficiently test, investigate, or study its Roundup products;

e)    Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide;

f)    Defendant Monsanto knew or should have known at the time of marketing its Roundup products that exposure to Roundup could result in cancer and other severe illnesses and injuries;

g)    Defendant Monsanto did not conduct adequate post-marketing surveillance of its Roundup products; and

h)    Defendant Monsanto failed to warn consumers, foreseeable users, government agencies and others that exposure to Roundup could result in cancer and other severe illnesses and injuries.

119.    Defendant Monsanto knew, or should have known, that at all times herein mentioned its Roundup was in a defective condition, and was and is inherently dangerous and unsafe.

120.    **PLAINTIFF, BSTONE** was exposed to Defendant Monsanto's Roundup, as described above, without knowledge of Roundup's dangerous characteristics.

121.    At the time of **PLAINTIFF, BSTONE'S** use and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

122.    Defendant Monsanto with this knowledge voluntarily designed its Roundup with a dangerous condition for use by the public, and in particular, **PLAINTIFF, BSTONE**.

123.    Defendant Monsanto marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and

established health risks inherent with its normal, intended use.

124. Defendant had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

125. Defendant created a product that was and is unreasonably dangerous for its normal, intended use.

126. As a proximate result of one or more of the foregoing unreasonably dangerous conditions of Defendant Monsanto's Roundup, **PLAINTIFF, BSTONE** was exposed to it.

127. As a proximate result of one or more of the foregoing unreasonably dangerous conditions of Defendant Monsanto's Roundup, **PLAINTIFF, BSTONE** was diagnosed with **NON-HODGKINS LYMPHOMA** 2019 when she experienced a fractured leg though at the time she was no engaged in any strenuous activity that one might believe was sufficient to cause the fracture.

128. As a proximate result of one or more of the foregoing unreasonably dangerous conditions, **PLAINTIFF, BSTONE** has suffered and continues to suffer grave injuries, has endured pain and discomfort, as well as economic hardship, including, but not limited to, considerable financial expenses for medical care and treatment. Plaintiff will continue to incur both economic damages and non economic damages for the remainder of her life.

129. Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product which created an unreasonable risk to the health of consumers and to the Plaintiff in particular, and Defendant is therefore

strictly liable for the injuries sustained by Plaintiff.

130. The Plaintiff could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

131. By reason of the foregoing, the Defendant has become strictly liable to the Plaintiff for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup.

132. Defendant's defective design of Roundup amounts to willful, wanton, and/or reckless conduct by Defendant.

133. Defects in Defendant's Roundup were the cause or a substantial factor in causing Plaintiff's injuries.

134. As a result of the foregoing acts and omissions, the Plaintiff developed NHL, and suffered severe and personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## COUNT II

### Strict Products Liability—Failure to Warn

1-110. Plaintiff repeats, realleges, and incorporates herein all Allegations Common to

All Counts.

111.    Plaintiff repeats, reiterates and re-alleges each and every allegation of this
Complaint contained in each of the foregoing paragraphs inclusive, with the same force
and effect as if more fully set forth herein.

112.    Defendant has engaged in the business of selling, testing, distributing, supplying,
manufacturing, marketing, and/or promoting Roundup, and through that conduct have
knowingly and intentionally placed Roundup into the stream of commerce with full
knowledge that it reaches consumers such as Plaintiff who are exposed to it through
ordinary and reasonably foreseeable uses.

113.    Defendant did in fact sell, distribute, supply, manufacture, and/or promote
Roundup to Plaintiff. Additionally, Defendant expected the Roundup that it was selling,
distributing, supplying, manufacturing, and/or promoting to reach -- and Roundup did in
fact reach -- consumers, including Plaintiff, without any substantial change in the
condition of the product from when it was initially distributed by Defendant.

114.    At the time of manufacture, Defendant could have provided the warnings or
instructions regarding the full and complete risks of Roundup and glyphosate-containing
products because it knew or should have known of the unreasonable risks of harm
associated with the use of and/or exposure to such products.

115.    At all times herein mentioned, the aforesaid product was defective and unsafe in
manufacture such that it was unreasonably dangerous to the user, and was so at the time
it was distributed by Defendant and at the time Plaintiff was exposed to and/or ingested
the product. The defective condition of Roundup was due in part to the fact that it was
not accompanied by warnings regarding its carcinogenic qualities and possible side

effects, including, but not limited to, developing non-Hodgkin's lymphoma as a result of exposure and use.

116.    Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect the health of those exposed in violation of 7 U.S.C. § 136j(a)(1)(E).

117.    Defendant's failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. § 136j(a)(1)(E).

118.    Defendant could have amended the label of Roundup to provide additional warnings.

119.    This defect caused serious injury to Plaintiff, who used Roundup in its intended and foreseeable manner.

120.    At all times herein mentioned, Defendant had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

121.    Defendant labeled, distributed, and promoted the aforesaid product that it was dangerous and unsafe for the use and purpose for which it was intended.

122.    Defendant failed to warn of the nature and scope of the side effects associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of NHL.

123.    Defendant was aware of the probable consequences of the aforesaid conduct. Despite the fact that Defendant knew or should have known that Roundup caused serious

injuries, Defendant failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of developing NHL from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution. Defendant willfully and deliberately failed to avoid the consequences associated with its failure to warn, and in doing so, Defendant acted with a conscious disregard for the safety of Plaintiff.

124.   At the time of exposure, Plaintiff could not have reasonably discovered any defect in Roundup prior through the exercise of reasonable care.

125.   Defendant, as the manufacturer and/or distributor of the subject product, is held to the level of knowledge of an expert in the field.

126.   Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Defendant.

127.   Had Defendant properly disclosed the risks associated with Roundup products, Plaintiff would have avoided the risk of NHL by not using Roundup products.

128.   The information that Defendant did provide or communicate failed to contain adequate warnings and precautions that would have enabled Plaintiff, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed,

or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

129.     To this day, Defendant has failed to adequately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup.

130.     As a result of its inadequate warnings, Defendant's Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiff.

131.     As a direct and proximate result of Defendant's actions as alleged herein, and in such other ways to be later shown, the subject product caused Plaintiff to sustain injuries as herein alleged.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## COUNT III

### Negligence//Gross Negligence/Personal Injury

1-110. Plaintiff repeats, realleges, and incorporates herein all Allegations Common to All Counts.

111.     **PLAINTIFF, BSTONE** used Roundup regularly at her home and at many other locations as she carried out the gardening of her clients for more than 2 decades.

112.     **PLAINTIFF, BSTONE** followed all instructions and safety and precautionary warnings provided by Defendant Monsanto.

113.   At all times relevant, Defendant Monsanto designed, researched, manufactured, tested, advertised, promoted, sold, and distributed the Roundup that **PLAINTIFF, BSTONE** used.

114.   Defendant Monsanto's Roundup was expected to and did reach the usual consumers, handlers, and persons coming into contact, including **PLAINTIFF, BSTONE**, without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by Defendant Monsanto.

115.   At the time it left the control of the Defendant Monsanto, Roundup was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, **PLAINTIFF, BSTONE**.

116.   The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant Monsanto was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup.

117.   The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendant Monsanto was defective in design and/or formulations, in that, when it left the hands of Defendant Monsanto's manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

118.   On and before October 7, 2016, Defendant Monsanto, individually and by and through its agents and employees, was negligent in one or more of the following ways:

      a)   Manufactured, produced, promoted, formulated, created, and/or designed Roundup without thoroughly testing it;

b)   Failed to test Roundup and/or failed to adequately, sufficiently, and properly test Roundup;

c)   Failed to conduct sufficient testing to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup; the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, or magnify the carcinogenic properties of Roundup; whether these ingredients are carcinogenic; and whether or not "inert" ingredients and/or adjuvants were safe for use;

d)   Failed to adequately and correctly warn the Plaintiff, the public, and the EPA of the dangers of Roundup;

e)   Failed to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

f)   Marketed, advertised, and recommended the use of Roundup without sufficient knowledge as to its dangerous propensities;

g)   Represented that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table
salt, when, in fact, it was unsafe;

h)   Manufactured, produced, and formulated Roundup in a manner, which was dangerous to its users;

i)   Concealed information from the Public while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations; and

j)   Sold Roundup with a false and misleading label.

119.   Defendant Monsanto knew, or should have known, that Roundup was in a defective condition, and was and is inherently dangerous and unsafe.

120.   **PLAINTIFF, BSTONE** was exposed to Defendant Monsanto's Roundup, as described above, without knowledge of Roundup's dangerous characteristics.

121. At the time of **PLAINTIFF, BSTONE's** use and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

122. Defendant Monsanto with this knowledge voluntarily designed its Roundup with a dangerous condition for used by the public and in particular, **PLAINTIFF, BSTONE.**

123. Defendant Monsanto marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

124. As a proximate result of one or more of the foregoing negligent acts and/or omissions, **PLAINTIFF, BSTONE** was exposed to Roundup.

125. As a proximate result of one or more of the foregoing negligent acts and/or omissions, **PLAINTIFF, BSTONE** was diagnosed with **NON-HODGKINS LYMPHOMA in the fall of 2019.**

126. As a proximate result of one or more of the foregoing negligent acts and/or omissions, **PLAINTIFF, BSTONE** has suffered and continues to suffer grave injuries, has endured pain and discomfort, as well as economic hardship, including, but not limited to, considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

127. **PLAINTIFF, BSTONE** had no knowledge regarding Roundup's carcinogenicity until the fall of 2019.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## COUNT IV
### Fraudulent Concealment

1-110.  Plaintiff repeats, realleges, and incorporates herein all Allegations Common to All Counts.

111.      Plaintiff had no way of knowing about the risk of serious illness associated with the use of an/or exposure to Roundup® and glyphosate. The earliest date one could have learned of the link would have been after IARC released its formal assessment of glyphosate in July 2015. This is the quintessential case for tolling.

112.      Within the time period of any applicable statutes of limitations, Plaintiff could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup® and glyphosate is injurious to human health.

113.      Plaintiff did not discover, and did not know of facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup® and glyphosate; nor would a reasonable and diligent investigation by Plaintiff have disclosed that Roundup and glyphosate would cause Plaintiff's illness.

114.      For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff's claim.

115.      All applicable statutes of limitations have also been tolled by Monsanto's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the

time period relevant to this action.

116.    Instead of disclosing critical safety information about Roundup and glyphosate,
Monsanto has consistently and falsely represented the safety of its Roundup products.

117.    Monsanto was under a continuous duty to disclose to consumers, users, and other
persons coming into contact with its products, including Plaintiff BSTONE, accurate safety
information concerning its products and the risks associated with the use of an/or exposure
to Roundup and glyphosate.

118.    Instead, Monsanto knowingly, affirmatively, and actively concealed safety
information concerning Roundup and glyphosate and the serious risks associated with the
use of an/or exposure to its products.

119.    Based on the foregoing, Monsanto is estopped from relying of any statutes of
limitations in defense of this action.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's
favor for compensatory and punitive damages, together with interest, costs herein incurred,
attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands
a jury trial on all issues contained herein.

## COUNT V

## Breach of Express Warranties

1-110. Plaintiff repeats, realleges, and incorporates herein all Allegations Common to
All Counts.

111.    At all times relevant to this litigation, Defendant Monsanto engaged in the
business of testing, developing, designing, manufacturing, marketing, selling,
distributing, and promoting its Roundup products, which are defective and

unreasonably dangerous to consumers including **BSTONE,** thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant Monsanto.

112.    At all times relevant to this litigation, Defendant intended that Roundup be used in the manner Plaintiff used it, and Defendant expressly warranted that each Roundup product was safe and fit for use by consumers, that it was of merchantable quality, that its health and side effects were minimal, and that it was adequately tested and fit for this intended use.

113.    At all relevant times, Defendant was aware that consumers, including Plaintiff, would use Roundup products, which is to say that Plaintiff was a foreseeable user of the Defendant's Roundup products.

114.    At all times relevant to this litigation, Defendant Monsanto expressly represented and warranted to the purchasers of its Roundup products, by and through statements made by Defendants in labels, publications, package inserts, and other written materials intended for consumers and the general public, that its Roundup products were safe to human health and the environment, effective, fit, and proper for their intended use. Defendant Monsanto advertised, labeled, marketed, and promoted Roundup products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that its Roundup products would conform to the representations.

115.    These express representations include incomplete warnings and

instructions that purport, but fail, to include the complete array of risks associated with the use of and/or exposure to Roundup and glyphosate. Defendant Monsanto knew and/or should have known that the risks expressly included in Roundup warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendant expressly represented that its Roundup products were safe and effective, that they were safe and effective for use by individuals such as **BSTONE,** and/or that they were safe and effective as agricultural herbicides.

116.     The representations about Roundup, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain creating an express warranty that the goods would conform to the representations.

117.     Defendant Monsanto placed its Roundup products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup and its active ingredient glyphosate.

118.     Defendant breached these warranties because, among other things, its Roundup products were defective, dangerous, unfit for use, did not contain label representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically, Defendant breached the warranties in the following ways:

a. Defendant represented through its labeling, advertising, and marketing materials that its Roundup products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated with use of and/or exposure to Roundup and glyphosate by expressly limiting the risks associated with the use and/or exposure within its warnings and labels; and

b. Defendant represented that its Roundup products were safe for use and fraudulently concealed information that demonstrated that glyphosate, the active ingredient in Roundup, had carcinogenic properties, and that its Roundup products, therefore, were not safer than alternatives available on the market.

119.     Defendant Monsanto had sole access to the material facts concerning the nature of the risks associated with its Roundup products as expressly stated within its warnings and labels, and Defendant knew that consumers and users such as **BSTONE** could not have reasonably discovered that the risks expressly included in Roundup warnings and labels were inadequate and inaccurate.

120.     Defendant's Roundup did not conform to these express representations because Roundup was not safe and had, at all relevant times, an increased risk of serious side effects including but not limited to non-Hodgkin's Lymphoma, when used according to Defendant's directions.

121.     Plaintiff purchased Roundup manufactured by Defendant.

122.     Defendant fraudulently concealed information from Plaintiff regarding the

true dangers and relative risks of Roundup.

123.    **BSTONE** had no knowledge of the falsity or incompleteness of Defendant's statements and representations concerning Roundup.

124.    Plaintiff did rely on the express warranties of the Defendant herein.

125.    **BSTONE** used and/or was exposed to the use of Roundup as researched, developed, designed, tested, formulated, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by Defendant.

126.    Had the warning labels for Roundup products accurately and adequately set forth the true risks associated with the use of such products, including **BSTONE's** injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, **BSTONE** could have avoided the injuries complained of herein.

127.    Defendant herein breached the aforesaid express warranties, as its product Roundup is defective.

128.    Defendant knew or should have known that, in fact, said warranties were false, misleading, and untrue in that there is evidence that Roundup is toxic, genotoxic, and carcinogenic, and that scientists and/or regulatory authorities around the world are not in agreement that Roundup is not carcinogenic or genotoxic and that it is safe.

129.    As a direct and proximate result of Defendant's wrongful acts and omissions, **BSTONE** suffered severe injuries. **BSTONE** endured pain and

suffering and suffered economic losses (including significant expenses for medical care and treatment).

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## COUNT VI

### Breach of Implied Warranties

1-110. Plaintiff repeats, realleges, and incorporates herein all Allegations Common to All Counts.

111.    At all times relevant to this litigation, Defendant Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup products, which are defective and unreasonably dangerous to consumers including **BSTONE**, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant Monsanto.

112.    Before the time that **BSTONE** was exposed to the use of the aforementioned Roundup products, Defendant Monsanto impliedly warranted to its consumers and users, including **BSTONE**, that its Roundup products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

113.    At the time Defendant marketed, sold, and distributed Roundup for use by

Plaintiff, Defendant knew of Roundup's intended use and impliedly warranted the product t be of merchantable quality and safe and fit for this use.

114.      These representations and warranties were false, misleading, and inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

115.      Defendant, however, failed to disclose that Roundup has dangerous propensities when used as intended and that the use of and/or exposure to Roundup and glyphosate-containing products carries an increased risk of developing severe injuries, including **BSTONE's** injuries.

116.      Upon information and belief, **BSTONE** reasonably relied upon the skill, superior knowledge and judgment of Defendant and upon its implied warranties that the Roundup products were of merchantable quality and fit for their intended purpose or use.

117.      The Roundup products were expected to reach and did in fact reach consumers and users, including **BSTONE,** without substantial change in the condition in which they were manufactured and sold by Defendant.

118.      At all times relevant to this litigation, Defendant was aware that consumers and users of its products, including **BSTONE,** would use Roundup products as marketed by Defendant, which is to say that **BSTONE** was the foreseeable user of Roundup.

119.      Defendant intended that its Roundup products be used in the manner in which **BSTONE** in fact used them and Defendant impliedly warranted each

product to be of merchantable quality, safe, and fit for this use, despite the fact

that Roundup was not adequately tested or researched.

120.    In reliance upon Defendant's implied warranty, **BSTONE** used Roundup

as instructed and labeled and in the foreseeable manner intended, recommended,

and promoted and marketed by Defendant.

121.    **BSTONE** could not have reasonably discovered or known of the risks of

serious injury associated with Roundup or glyphosate.

122.    Defendant breached its implied warranty to **BSTONE** in that its Roundup

products were not of merchantable quality, safe, or fit for their intended use, or

adequately tested, Roundup has dangerous propensities when used as intended

and can cause serious injuries, including the injuries complained of herein.

123.    The harm caused by Defendant's Roundup products far outweighed their

benefit, rendering the products more dangerous than an ordinary consumer or u

ser would expect and more dangerous than alternative products.

124.    As a direct and proximate result of Defendant's wrongful acts and

omissions, **BSTONE** suffered from NHL and severe and permanent physical and

emotional injuries, pain and suffering, and economic loss (including significant

expenses for medical care and treatment).

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's

favor for compensatory and punitive damages, together with interest, costs herein incurred,

attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands

a jury trial on all issues contained herein.

## COUNT VII

### Fraud/Misrepresentation

1-110. Plaintiff repeats, realleges, and incorporates herein all Allegations Common to All Counts.

111.     Defendant Monsanto represented to the general public, including Plaintiff, that its Roundup products were safe to use for their intended purposes.

112.     As has been more thoroughly discussed above herein, Defendant's Roundup products are not safe to use for their intended purposes and in fact when used for their intended purposes cause severe and permanent injuries including but not limited to non-Hodgkin's lymphoma, various leukemias, other forms of cancer, and death.

113.     At all times relevant Defendant Monsanto knew that its Roundup products were not safe to use in their intended manner and for their intended purposes.

114.     Defendant Monsanto nevertheless marketed and continued to market its Roundup products as safe, natural, environmentally friendly, and not harmful to induce consumers including Plaintiff to purchase its products.

115.     Plaintiff, relying upon Defendant's representations that Roundup products are safe to use, purchased and used Defendant's Roundup products for over two decades.

116.     Plaintiff did not know and could not have reasonably known of the falsity of Defendant's claims or of the dangers and harmful effects of Roundup products.

117.     Plaintiff was justified in relying upon Defendant's representations as to the safety of Roundup products and did not/could not have known of the dangers or

harmful effects of Defendant's Roundup products.

118.    As a direct and proximate result of Plaintiff's reliance on Defendant's

representations regarding the safety of its Roundup products and of Plaintiff's use

of Defendant's Roundup products, Plaintiff developed non-Hodgkin's

Lymphoma and suffered physical, emotional, and economic damages including

but not limited to expenses for medical treatment and care.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's

favor for compensatory and punitive damages, together with interest, costs herein incurred,

attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands

a jury trial on all issues contained herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against the Defendant on each of the above-

referenced claims and causes of action and as follows:

1.  Awarding compensatory damages in excess of the jurisdictional amount, including but

    not limited to pain, suffering, emotional distress, loss of enjoyment of life, and economic

    damages in an amount to be determined at trial of this action;

2.  Awarding compensatory damages to Plaintiff for past and future damages, including but

    not limited to Plaintiff's pain and suffering and for severe and permanent personal

    injuries sustained by the Plaintiff including health care costs and economic loss;

3.  Awarding economic damages in the form of medical expenses, out-of-pocket expenses,

    lost earnings, and other economic damages in an amount to be determined at trial in this

    action;

4. Punitive damages for Defendant's knowingly placing an unreasonably dangerous product into the stream of commerce, knowing of its defective and dangerous condition and indifference to or conscious disregard for the safety of others;

5. Exemplary Damages for the increased injury to the Plaintiff occasioned by the Defendant's conduct as alleged and as will be further revealed as this case continues;

6. Pre-judgment interest;

7. Post-judgment interest;

8. Awarding Plaintiff reasonable attorney's fees;

9. Awarding Plaintiff the costs of these proceedings; and

10. Such other relief as this Court deems just and proper for Defendant's gross negligence and other counts included in this Complaint.

/s/ Brian T. Dailey_____

Brian T. Dailey (P39945)
Dailey Law Firm, P.C.
Attorneys for Plaintiff
36700 Woodward Ave., Suite 107
Bloomfield Hills, MI 48304
Office:(248) 744-5005
Cell: (312) 927 2611
Fax: (248) 744 4440
briandailey@daileylawyers.com