STANDARD

# United States District Court
## Eastern District of Pennsylvania (Philadelphia)
## CIVIL DOCKET FOR CASE #: 2:20–cv–00480–ER

GRIFFIN–YOUNG v. MONSANTO COMPANY
Assigned to: HONORABLE EDUARDO C. ROBRENO
Cause: 28:1332 Diversity–Product Liability

Date Filed: 01/28/2020
Jury Demand: Plaintiff
Nature of Suit: 365 P.I.: Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**JOSEPH GRIFFIN–YOUNG**

represented by **TERENCE MATTHEW LECKMAN**
LECKMAN LAW LLC
527 BETHAN ROAD
ELKINS PARK, PA 19027
215–635–0584
Email: matt@leckmanlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**MONSANTO COMPANY**

| Date Filed | # | Docket Text |
|---|---|---|
| 01/28/2020 | 1 | COMPLAINT against MONSANTO COMPANY ( Filing fee $ 400 receipt number PPE210384.), filed by JOSEPH GRIFFIN–YOUNG.(bw, ) (Entered: 01/29/2020) |
| 01/28/2020 | | DEMAND for Trial by Jury by JOSEPH GRIFFIN–YOUNG. (bw, ) (Entered: 01/29/2020) |
| 01/28/2020 | | 1 Summons Issued as to MONSANTO COMPANY. Forwarded To: COUNSEL on 1/29/2020 (bw, ) (Entered: 01/29/2020) |

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Joseph Griffin-Young<br>    Plaintiff,<br><br>vs.<br><br>MONSANTO COMPANY,<br>    Defendant. | Civil Action<br><br>Case No.: **20cv480**<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

## COMPLAINT

Plaintiff Joseph Griffin-Young, by and through the undersigned counsel, brings this Complaint for damages against Defendant Monsanto Company ("Defendant"), and alleges as follows:

### INTRODUCTION

1.     Joseph Griffin-Young began using Roundup® roughly in 1994 for weed prevention on his property in Pennsylvania. Plaintiff continued to use Roundup® until approximately 2011.

2.     Plaintiff was later diagnosed with non-Hodgkins lymphoma at Jefferson Hospital in Philadelphia, PA.

3.     In 1970 the Defendant, Monsanto Company, discovered the herbicidal properties of glyphosate and in 1974 began utilizing it in their products and marketing it to the public under the brand name, Roundup®. Roundup® is a non-selective herbicide used to kill weeds that compete with the growing of crops. By 2001, glyphosate was the most used active ingredient in American agriculture with 85-90 million pounds used annually. The number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

4.     The Defendant is a multinational agricultural biotechnology corporation that is based in St. Louis, Missouri and is the world's leading producer of glyphosate. It is the worlds

1

leading producer of glyphosate. As of 2009, the Defendant was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, because glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

5.     Defendant's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous to the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used.

6.     On March 20, 2015, the International Agency for Research on Cancer ("IARC"), and agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. The evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

7.     On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

8.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other haematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

2

9. Defendant has represented to the public that Roundup® is safe to humans and the environment since the 1970s. The Defendant continues to defend the idea that their glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

## PARTIES

10. Plaintiff Joseph Griffin-Young is an individual who resides in Columbia County, Pennsylvania. Mr. Griffin-Young began using Roundup® in 1994 and continued using it through approximately 2011 on his farm. Columbia County is the jurisdiction in which a substantial part of the events or omissions giving rise to Plaintiff's claim occurred, pursuant to 28 U.S.C.§1391(b)(2).

11. Defendant Monsanto Company ("Defendant") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri. Defendant is a citizen of the State of Missouri and Delaware and is not a citizen of the State of Pennsylvania. At all times relevant to this complaint, Defendant was the entity that discovered the herbicidal properties of glyphosate and was the sole or exclusive manufacturer of the Roundup® at issue.

12. Defendant Monsanto is registered to conduct business in the Commonwealth of Pennsylvania as a foreign business corporation.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332 because the Plaintiff is a citizen of a different state, Pennsylvania, than the Defendant Monsanto Company, which is a citizen of Delaware and Missouri, and the aggregate amount in controversy exceeds $75,000, exclusive of interest and costs.

3

14.     This Court has personal jurisdiction over the Defendant under the Pennsylvania Long-Arm Statute, as the Defendant is authorized and licensed to conduct business in the State of Pennsylvania, maintains and caries on systematic and continuous contacts in this judicial district, regularly transacts business within this judicial district, and regularly avails itself of the benefits of this judicial district.

15.     In addition, Defendant maintains sufficient contacts with the Commonwealth of Pennsylvania such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

16.     Venue is proper before this court pursuant to 28 U.S.C. 1391 (b)(2), because a substantial part of the events or omissions giving rise to the claims asserted in this Complaint occurred in this District. Further, the Defendant, as a corporate entity, is deemed to reside in any jurisdiction in which it is subject to personal jurisdiction.

17.     Plaintiff is informed and believe, and based thereon allege, that in committing the acts alleged herein, each and every managing agent, agent, representative and/or employee of the Defendant was working within the course and scope of said agency, representation and/or employment with the knowledge, consent, ratification, and authorization of the Defendant and their directors, officers and/or managing agents.

## FACTUAL ALLEGATIONS

18.     At all relevant times, Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the commercial herbicide Roundup®.

19.     Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world. The herbicidal properties of glyphosate were discovered in

4

1970 by Monsanto chemist, John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®.

20.    Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots; and detectable quantities accumulate in the plant tissue. Glyphosate interferes with a plant's ability to form aromatic amino acids which are necessary for protein synthesis; and as such, plants that are treated with glyphosate generally die within two or three days.

21.    For approximately 40 years, Roundup® has been used by consumers worldwide without understanding the dangers that glyphosate poses to public health. The Defendant marketed glyphosate as a technological breakthrough stating that  it could quickly kill weeds without harming people or the environment. Of course that has been shown to be patently untrue. According to the WHO,  glyphosate ---the main ingredient of Roundup®--- is a probable carcinogen.

22.    Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in use ha been driven largely by the proliferation of "Roundup Ready®" crops, which have been genetically engineered to resist glyphosate. It has been shown that those who are most at risk are farm workers and other individuals with workplace exposure to Roundup®.

23.    The Defendant assured consumers that Roundup® will benefit the environment and that it was safe by promoting and promulgating studies based on  falsified data and undercutting studies that revealed legitimate dangers associated with the product.

24.    In all this time, farmers have used Roundup® unaware that it is a carcinogen.

5

## Registration of Herbicides under Federal Law

25.     The manufacture, formulation, and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C.§136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. §136a(a).

26.     The EPA requires a variety of tests, among other things, as part of the registration process to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. The EPA requires these tests because pesticides are toxic to plants, animals, and humans. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. §136(a)(c)(5)(D).

27.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C.§136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

28.     Roundup®-branded products are registered by the EPA for manufacture, sale, and distribution, and are registered by Pennsylvania for sale and distribution.

29.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the

6

conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product test that are required of the manufacturer.

30.     Each pesticide product distributed, sold, or manufactured is evaluated at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticides products through a Congressionally-mandated process called "re-registration." 7 U.S.C.§136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

31.     In the case of glyphosate, the EPA planned on releasing its preliminary risk assessment—in relation to the re-registration process- no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

**Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®**

32.     The EPA originally classified glyphosate as *possibly carcinogenic to humans* (Group C) in 1985, based on early studies that showed that glyphosate could cause cancer in laboratory animals. After pressure from the Defendant, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans (*Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on available evidence at the time of evaluation and should not be

interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

33. On two occasions, the EPA found that the laboratories hired by the Defendant to test the toxicity of its Roundup® products for registration purposes committed fraud.

34. In the first instance, the Defendant, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

35. In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found that toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

36. Three top executives of IBT were convicted of fraud in 1983.

37. In the second incident of data falsification, Defendant hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

38. Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

8

**The Importance of Roundup® to Defendant's Market Dominance Profits**

39.     The success of Roundup® was key to the Defendant's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Defendant's agriculture division was out-performing its chemical division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Defendant's needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

40.     In response, the Defendant began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate; farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Defendant to expand its market for Roundup® even further; by 2000, Defendant's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seed. It also secured Defendant's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

41.     Through a three-pronged strategy of increased production, decreased prices, and by coupling with Roundup Ready® seeds, Roundup® became Defendant's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Defendant's revenue. Today, glyphosate remains one of the worlds largest herbicides by sales volume.

**Defendant's False Representations Regarding the Safety of Roundup®**

42.     In, 1996, the New York Attorney General ("NYAG") filed a lawsuit against the Defendant based on its false and misleading advertising of Roundup® products. Specifically, the

9

lawsuit challenged Defendant's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a. Remember that environmentally friendly Roundup® herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks and fences.

b. And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got a weed, brush, edging or trimming problem.

c. Roundup® biodegrades into naturally occurring elements.

d. Remember that versatile Roundup® herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e. This non-residual herbicide will not wash or leach in the soil. It … stays where you apply it.

f. You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g. Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h. Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i. You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j. 'Roundup can be used where kids and pets will play and breaks down into natural material.' This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup®.[1]

---

[1] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law §63(15)(Nov. 1996).

43.     On November 19, 1996, the Defendant entered into an Assurance of Discontinuance with the NYAG, in which the Defendant agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a.  its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;
    ***
b.  its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;
    ***
c.  its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;
    ***
d.  its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics;"
    ***
e.  its glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and

f.  its glyphosate-containing pesticide products or any component thereof might be classified as "particularly non-toxic."[2]

44.     Defendant did not alter its advertising in the same manner in any state other than New York and, based on information and belief, still has not done so today.

45.     In 2009, France's highest court ruled that the Defendant had not told the truth about the safety of Roundup® and affirmed an earlier judgment that Defendant had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[3]

### Classifications and Assessments of Glyphosate

46.     The IARC was created in 1965 as the specialized cancer agency of the World Health Organization with support of the United States. IARC promotes international collaboration in

_____

[2] *Id.* at 8-9.
[3] *Monsanto Guilty in 'False Ad' Row*, BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm

11

cancer research, "bringing together skills in epidemiology, laboratory sciences, and biostatistics to identify that causes of cancer[.]"

47.     IARC is transparent. The minutes and documents presented at its council meeting are publicly available and, thus, are subject to scientific scrutiny. Starting in 1971, IARC began assessing whether chemicals were carcinogenic through the Monograph program.

48.     The IARC process for classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probably Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

49.     The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panel of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

50.     A year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before Monograph meeting, the Working Group membership is selected, and the sections of the Monographs are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalize review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

12

51.     In assessing an agent, the IARC Working Group reviews the following information:
(a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and caner
bioassays; and (c) representative mechanistic data. The studies must be publicly available and have
sufficient detail for meaningful review, and reviewers cannot be associated with the underlying
study.

52.     In March 2015, IARC reassessed glyphosate. The summary published in *The
Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in
humans.

53.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112.
For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11
countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides,
including glyphosate. The March meeting culminated nearly a one-year review and preparation by
the IARC Secretariat and the Working Group, including a comprehensive review of the latest
available scientific evidence. According to published procedures, the Working Group considered
"reports that have been published or accepted for publication in the openly available scientific
literature" as well as "data from governmental reports that are publicly available."

54.     The studies considered the following exposure groups: occupational exposure of
farmers and tree nursery workers in the United States, forestry workers in Canada and Finland
and municipal weed-control workers in the United Kingdom; and para-occupational exposure in
farming families. Glyphosate was identified as the second-most used household herbicide in the
United States for weed control between 2001 and 2007 and the most heavily used herbicide in the
world in 2012.

13

55.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

56.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

57.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

58.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

59.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

60.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

61.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

14

62.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

63.     IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

**Other Earlier Findings About Glyphosate's Dangers to Human Health**

64.     The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available.

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

15

65.     In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

66.     California maintains a list of carcinogenic chemicals under the law known as Proposition 65 which requires businesses to provide warnings to Californians about significant exposures to chemicals that cause cancer, birth defects and other reproductive harm.

67.     In 2017, the California Office of Environmental Health Hazardous Assessment determined that glyphosate will be added to California's list of chemicals that cause cancer.

68.     In 2017, the State of California added glyphosate to the Proposition 65 list, a list of chemicals known to cause cancer.

### Recent Worldwide Bans on Roundup®/Glyphosate

69.     Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in light of the as the dangers of the use of Roundup® are more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which takes effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

70.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian

Justice Department suspend the use of glyphosate.

71. France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

72. Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

73. The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that Glyphosate has been linked to fatal kidney disease in agricultural workers.

74. The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

### Plaintiff's Exposure to Roundup®

75. From 1994 through approximately 2011, Joseph Griffin-Young, purchased, used, and was exposed to Roundup® to control weeds on his property.

76. During the entire time that Joseph Griffin-Young used Roundup®, he did not know that exposure to Roundup® could be injurious to his health or the health of others.

77. Joseph Griffin-Young was diagnosed with non-Hodgkin's lymphoma at Jefferson Hospital in Philadelphia, PA.

78. As a direct result of the conduct of the Defendant and exposure to Roundup®, David Rittenhouse, suffered a loss of earnings and/or earning capacity.

17

79.    As a direct result of the conduct of the Defendant and exposure to Roundup®, Joseph Griffin-Young suffered loss of life's pleasures, severe physical pain, mental anguish, emotional suffering and humiliation.

## EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

80.    Plaintiff incorporates by reference each and every allegation of this Complaint set forth as if fully stated herein.

81.    The running of any statute of limitations has been tolled by reason of Defendant's fraudulent concealment. Defendant through its affirmative misrepresentations and omissions, actively concealed from the Plaintiff the true risks associated with Roundup® and glyphosate.

82.    At all relevant times, Defendant has maintained that Roundup® is safe, nontoxic, and non-carcinogenic.

83.    Through the date of filing this Complaint, Defendant continues to maintain that its Roundup® brand herbicides do not cause cancer and are not genotoxic.

84.    As a result of Defendant's action, Plaintiff was unaware, and could not reasonably know or have learned through reasonable diligence, that Roundup® contact exposed Plaintiff to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.

85.    Defendant is equitably estopped to assert a statute of limitations defense. It made, and continues to make, statements intended to be relied upon by the public that Roundup® is safe and harmless to humans. Plaintiff relied on these statements.

86.    Plaintiff did not discover and did not know of facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup® and glyphosate, nor would a reasonable and diligent investigation by him have disclosed that

18

Roundup® and glyphosate would cause his illnesses. For these reasons, all applicable statute of limitations have been tolled by operation of the discovery rule and its invocation is estopped by Defendant's actions.

87. Defendant was under a continuous duty to disclose to consumers, users, and other persons coming into contact with its products, including Plaintiff, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate. Instead, the Defendant knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the risks associated with the use of and/or exposure to its products.

88. As a proximate result of Defendant's wrongful acts and omissions in placing its defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, and in breach of its warranties, negligence and strict liability, Plaintiff has suffered and continues to suffer severe and permanent physical and emotional injuries. Plaintiff has endured the anguish of a cancer diagnosis, pain and suffering, and economic losses and special damages, which are accruing and not now known.

## COUNT I: STRICT LIABILTY -DESIGN DEFECT

89. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

90. Plaintiff bring this strict liability claim against Defendant for defective design.

91. At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including the Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the

ultimate control and supervision of Defendant. At all times relevant to this litigation, the Defendant designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products that Plaintiff was exposed to, as described above.

92.     At all times relevant to this litigation, Defendant's Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff.

93.     At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Pennsylvania and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

94.     Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure due to Defendant's suppression of scientific information linking glyphosate to cancer.

95.     The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendant's Roundup® products were and are more dangerous than alternative products and Defendant could have designed its Roundup® products to make them less dangerous. Indeed, at the time that Defendant designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

96.     At the time Roundup® products left Defendant's control, there was a practical,

20

technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant's herbicides.

97.     Defendant's defective design of its Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including the Plaintiff.

98. Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendant is strictly liable to the Plaintiff.

99. The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiff's injuries and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained his injuries.

100.     Defendant's conduct, as described above, was reckless. Defendant risked the lives of consumers and users of its products, including the Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products and suppressed this knowledge from the general public. Defendant made conscious decisions not to redesign, warn or inform the unsuspecting public. Defendant's reckless conduct warrants an award of punitive damages.

101.     As a direct and proximate result of Defendant placing defective Roundup® products into the stream of commerce, Plaintiff developed non-Hodgkin's lymphoma.

102.     As a proximate result of Defendant placing a defective its defective Roundup® products into the stream of commerce, as alleged herein, there was a measurable and significant interval of time during which Plaintiff suffered personal injury.

21

103. As a proximate result of Defendant placing its defective Roundup® products into the stream of commerce, as alleged herein, Plaintiff sustained a loss of income, loss of earning capacity, and property damage.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## COUNT II: STRICT LIABILITY (FAILURE TO WARN)

104. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

105. Plaintiff brings this strict liability claim against Defendant for failure to warn.

106. At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, promoting and applying Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

107. Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiff, and persons responsible for consumers (such as employers), and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

22

108.    At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn the Plaintiff of the dangers associated with Roundup® use and exposure. Defendant, as manufacturer, seller, or distributor of chemical herbicides, is held to the knowledge of an expert in the field.

109.    At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

110.    At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of this product and to those who would foreseeably use or be harmed by Roundup®, including the Plaintiff.

111.    Despite the fact that Defendant knew or should have known that Roundup® posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied or sold the product, and not known to end users and consumers, such as the Plaintiff.

112.    Defendant knew or should have known that its products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn

23

consumers, i.e., the reasonably foreseeable users, of the risks of exposure to its products. Defendant has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

113.    Plaintiff was exposed to Roundup® products, as described above, without knowledge of their dangerous characteristics.

114.    At all times relevant to this litigation, Plaintiff was exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

115.    Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of his exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendant.

116.    Defendant knew or should have known that the minimal warnings disseminated with or accompanying the application of Roundup® products were inadequate, but they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

117.    The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled those exposed such as the Plaintiff to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of

24

injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

118. This alleged failure to warn is not limited to the information contained on Roundup® labeling. Defendant was able, in accord with federal law, to comply with Pennsylvania law by disclosing the known risks associated with Roundup® through other non-labeling mediums, i.e. promotion, advertisements, public service announcements, and/or public information sources. Defendant, however, did not disclose these known risks through any medium.

119. To this day, Defendant has failed to adequately and accurately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

120. As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were sold or distributed by Defendant, and when the Plaintiff became exposed.

121. Defendant is liable to the Plaintiff for injuries caused by negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of their products and the risks associated with the use of or exposure to Roundup® and glyphosate.

122. The defects in these Roundup® products were substantial and contributing factors in causing Plaintiff's injuries, and, but for Defendant's misconduct and omissions, Plaintiff's would not have sustained his injuries.

25

123.     Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products and application, Plaintiff could have avoided the risk of developing injuries as alleged herein and could have obtained or used alternative herbicides.

124.     As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Plaintiff developed Non-Hodgkin Lymphoma and endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment, and loss of earnings and earning capacity.

125.     As a direct and proximate result of Defendant placing defective Roundup® products into the stream of commerce and exposing Plaintiff to them, there was measurable and significant interval of time during which Plaintiff suffered great mental anguish and other personal injury.

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiff also demand a jury trial on the issues contained herein.

## COUNT III: NEGLIGENCE

126.     Plaintiff incorporates by reference each and every allegation set forth in all of the paragraphs of this Complaint as if fully stated herein.

127.     Defendant, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by the Plaintiff.

128.     At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion,

packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

129.    At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

130.    At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

131.    Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to Roundup® products could cause or be associated with Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including the Plaintiff.

132.    Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

133.    As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate,

27

knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

134.    Despite ability and means to investigate, study, and test products and to provide adequate warnings, Defendant has failed to do so. Indeed, Defendant wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

135.    Defendant's negligence included, but are not limited to:

  a.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® products without thorough and adequate pre- and post-market testing;

  b.  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

  c.  Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

  d.  Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

  e.  Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

  f.  Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and be exposed to its Roundup® products;

28

g. Failing to disclose to the Plaintiff, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

h. Failing to warn the Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to the Plaintiff and other consumers;

i. Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

j. Representing that its Roundup® products were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended purpose;

k. Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

l. Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate.

m. Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

n. Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

136. Defendant knew and/or should have known that it was foreseeable that consumers such as the Plaintiff would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

137. The Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

138. Defendant's negligence was the proximate cause of the injuries, harm, death, and economic losses that the Plaintiff suffered, as described herein.

29

139. Defendant's conduct, as described above, was reckless. Defendant regularly risked the lives of consumers and users of their products, including the Plaintiff, with full knowledge of the dangers of its products. Defendant made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including the Plaintiff. Defendant's reckless conduct therefore warrants an award of punitive damages.

140. As a direct and proximate result of Defendant's wrongful acts and omissions in placing defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff suffered great mental anguish and other personal injury and damages.

141. As a direct and proximate result of Defendant's negligence, Plaintiff suffered economic losses (including significant expenses for medical care and treatment), and loss of earnings and earning capacity.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## COUNT IV: BREACH OF IMPLIED WARRANTIES

142. Plaintiff incorporates by reference each and every allegation set forth in all of the paragraphs of this Complaint as if fully stated herein.

143. At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff,

30

thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

144.    Before the time that the Plaintiff was exposed to the use of the aforementioned Roundup® products, Defendant impliedly warranted to consumers and those exposed—including the Plaintiff—that Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

145.    Defendant failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate containing products carries an increased risk of developing severe injuries, including Plaintiff's cancer.

146.    Plaintiff reasonably relied upon the skill, superior knowledge and judgment of Defendant and upon their implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

147.    Plaintiff was the intended beneficiary of the implied warranties made by the Defendant to purchasers of its herbicides.

148.    The Roundup® products were expected to reach and did in fact reach consumers and/or users, including the Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendant.

149.    At all times relevant to this litigation, Defendant was aware that consumers and users of their products, including the Plaintiff, would use Roundup® products as marketed by Defendant. Plaintiff was a foreseeable user of Roundup®.

150.    Defendant intended that Roundup® products be used in the manner in which the Plaintiff was exposed to it and Defendant impliedly warranted each product to be of merchantable

31

quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested and/or researched.

151.    In reliance upon Defendant's implied warranty, Plaintiff used or was exposed to Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendant.

152.    Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

153.    Defendant breached their implied warranty to the Plaintiff in that Roundup® products were not of merchantable quality, safe, or fit for their intended use, and/or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

154.    The harm caused by Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

155.    As a direct and proximate result of Defendant's wrongful acts and omissions Plaintiff suffered severe and permanent physical and emotional injuries, including but not limited to his diagnoses of non-Hodgkin lymphoma. Plaintiff endured pain and suffering, suffered economic loss (including significant expenses for medical care and treatment), and loss of earnings and earning capacity.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demand a jury trial on the issues contained herein.

32

## COUNT V: BREACH OF EXPRESS WARRANTIES

156. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraph as if fully stated herein. Defendant has special knowledge skill and expertise germane to herbicides and their design, manufacture testing, and marketing. At all times relevant, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant. Plaintiff asserts his breach of express warranty claims.

157. Defendant had a duty to exercise reasonable care in the research, development, design, testing, packaging, manufacture, inspection, labeling, distributing, marketing, promotion, sale, and release of its Roundup® products, including a duty to:

   a. Reasonable assure that its products did not cause the user unreasonably dangerous side effects;

   b. Warn of dangerous and potentially fatal side effects; and

   c. Disclose adverse material facts, such as the true risks associated with use of Roundup® and glyphosate-containing products, when making representations to consumers and the general public, including Plaintiff.

158. Defendant expressly represented and warranted matters to Plaintiff and other consumers and users, and through statements made by Defendants in labels, publications, package inserts, and other written materials. These representations included assurances that its Roundup® products were safe to human health and the environment, effective, fit, and proper for their intended use and posed on risks of harm to humans. Defendant advertised, labeled, marketed, and promoted Roundup® products, representing the quality to consumers and the public in such a way

33

as to induce purchase or use, thereby making an express warranty that its Roundup® products would conform to the representations.

159.    These express representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Roundup® and glyphosate. Defendant knew and/or should have known that the risks expressly included in Roundup® warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendant expressly represented that its Roundup® products were safe and effective, that they were safe and effective for use by individuals such as Plaintiff, and/or that they were safe and effective as agricultural herbicides.

160.    The representations about Roundup®, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations. Defendant placed its Roundup® products into the stream of commerce for sale and recommended use without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate.

161.    Defendant breached these warranties. Its Roundup® products were defective, dangerous, unfit for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Defendant breached the warranties as follows:

        a.  Monsanto represented through its labeling, advertising, and marketing materials that its Roundup® products were safe, and intentionally withheld and concealed information about the risks of serious injury and disease associated with use of and/or exposure within its warnings and labels; and

34

b. Monsanto represented that its Roundup® products were safe for use and fraudulently concealed information that demonstrated that glyphosate, the active ingredient in Roundup®, had carcinogenic properties, and that its Roundup® products, were not safer than alternatives available on the market.

162.    Plaintiff justifiably and detrimentally relied on the express warranties and representations of Defendant in the purchase and use of its Roundup® products. When Plaintiff made the decision to purchase Roundup®, he reasonably relied upon the Defendant to disclose the known risks, dangers, and effects of Roundup® and glyphosate and he relied on Defendant continuing representations that the product is safe.

163.    Plaintiff had no knowledge of the falsity or incompleteness of Defendant's statements and representations concerning Roundup®.

164.    As a direct and proximate result of Defendant's breach of implied warranty, Plaintiff sustained a loss of income, loss of earning capacity and property damage.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as the Court deems just and proper.

## EXEMPLARY AND PUNITIVE DAMAGES ALLEGATIONS

165.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

166.    Defendant's conduct as alleged herein was one with oppression and malice. Defendant was fully aware of the safety risks associated with Roundup®. Nonetheless, the Defendant deliberately crafted its labeling, marketing, and promotion to mislead consumers.

167.    This was not done by accident or through some justifiable negligence. Rather, Defendant knew that it could turn a profit by convincing the agricultural industry that Roundup®

was harmless to humans, and that full disclosure of the true risks associated with Roundup® would limit the amount of money the Defendant would make selling Roundup® in Pennsylvania.

168.    This was accomplished through misleading labeling, and through a comprehensive scheme of selective fraudulent research and testing, misleading advertising, and deceptive omissions as more fully alleged throughout this pleading. Plaintiff, like all other consumers in Pennsylvania, was robbed of his right to make an informed decision about whether to purchase and use an herbicide on her property, knowing that full risks attendant to that use. Such conduct was done with conscious disregard of the Plaintiff's rights.

169.    There is no indication that the Defendant will stop its deceptive and unlawful marketing practices unless its punished and deterred. Accordingly, Plaintiff requests punitive damages against the Defendant for the harms caused to the Plaintiff.

## JURY DEMANDED

170.    Plaintiff demands a trial by jury on all of the triable issues within this pleading.

## TRANSFER TO MASTER DOCKET

171.    Plaintiff requests for this case to be transferred to the UNITED STATES JUDICIAL PANEL on the MULTIDISTRICT LITIGATION Master Docket, under the style "In Re: Roundup Products Liability Litigation" and the identification MDL No. 2741, within the Northern District of California as so ordered in the Transfer Order attached hereto as Exhibit 1.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the court enter judgment in their favor and against the Defendant, Monsanto, awarding as follows:

1.   Actual or compensatory damages in such amount to be determined at trial and as
     provided by applicable law;

2. Pain and suffering;

3. Lost earnings and earning capacity;

4. For default judgment as a sanction for the bad faith destruction of evidence, if any, and according to proof, if any;

5. Exemplary and punitive damages sufficient to punish and deter Monsanto and others from fraudulent practices;

6. Pre-judgment and post-judgment interest;

7. Costs including reasonable attorneys' fees, court costs, and other litigation expenses; and

8. Any other relief the Court may deem just and proper.

Dated: January 28th, 2020

Respectfully submitted,

/s/ T. Matthew Leckman
T. MATT LECKMAN, ESQ. (PA ID 92241)
**LECKMAN LAW, LLC**
527 Bethan Rd.
Elkins Park, PA 19027
Telephone: (215) 635-0584
Fax: (215) 635-0584
matt@leckmanlaw.com

37

# EXHIBIT 1

UNITED STATES JUDICIAL PANEL
on
MULTIDISTRICT LITIGATION

IN RE: ROUNDUP PRODUCTS
LIABILITY LITIGATION                                           MDL No. 2741

TRANSFER ORDER

**Before the Panel:** Plaintiffs in the *Giglio* and *Hardeman* actions listed on Schedule A move under 28 U.S.C. § 1407 to centralize pretrial proceedings in this litigation in the Southern District of Illinois. This litigation consists of twenty-one actions pending in fourteen districts, as listed on Schedule A. The actions allege that Roundup, a widely used glyphosate-based herbicide manufactured by Monsanto Company, can cause non-Hodgkin's lymphoma and that Monsanto failed to warn consumers and regulators about the alleged risks of Roundup. Since the filing of the motion, the parties have notified the Panel of another sixteen related actions pending in twelve districts.[1]

All responding plaintiffs support centralization, but suggest different transferee districts. Plaintiffs in three actions and a potential tag-along action support centralization in the Southern District of Illinois. Plaintiffs in another three actions propose centralization in the Central District of California. Plaintiffs in one action suggest centralization in the Southern District of Illinois, the Central District of California, or the Eastern District of California. Plaintiffs in five actions suggest instead centralization in the District of Hawaii. Plaintiff in one action does not oppose the Southern District of Illinois, but suggests that the Eastern District of Louisiana is a more appropriate transferee district. Finally, plaintiff in one potential tag-along action suggests centralization in the Northern District of Illinois. Various plaintiffs alternatively support the Central District of California, the District of Hawaii, or the Southern District of Illinois.

Defendant Monsanto Company opposes centralization. Should the Panel centralize this litigation over Monsanto's objections, it alternatively proposes centralization in the Northern District of California, the Southern District of California, or the Southern District of Florida. Monsanto's primary arguments against centralization are that: (1) individualized facts concerning each plaintiff's case, such as the nature of plaintiff's exposure, the formulation of Roundup to which plaintiff was exposed, and the specific type of non-Hodgkins' lymphoma plaintiff developed, will predominate over common factual issues; and (2) informal coordination and cooperation among the involved parties and courts are preferable to centralization. We are not persuaded by either argument.

There undoubtedly are some individualized factual issues presented by these actions, but they do not negate the efficiencies to be gained by centralization. Regardless of the particular formulation

---

[1] These and any other related actions are potential tag-along actions. *See* Panel Rules 1.1(h), 7.1, and 7.2.

-2-

of Roundup at issue (all of which employ glyphosate as the active ingredient), or the nature of plaintiff's exposure to glyphosate, all the actions entail an overarching query- ·whether glyphosate causes non-Hodgkin's lymphoma in persons exposed to it while using Roundup. Monsanto itself implicitly acknowledges the predominance of this common question as it has moved in a number of the underlying actions to bifurcate discovery to address general causation issues before plaintiff-specific ones. In any event, almost all personal injury litigation involves plaintiff-specific questions of causation and damages. Those differences are not an impediment to centralization when common questions of fact are multiple and complex, as they are here. *See In re Xarelto (Rivaroxaban) Prods. Liab. Litig.*, 65 F. Supp. 3d 1402, 1404 (J.P.M.L. 2014). When discovery and other pretrial proceedings related to the common issues have been completed, the transferee judge may suggest Section 1407 remand of the actions to their transferor courts for more individual discovery and trial, if necessary. *See In re Darvocet, Darvon & Propoxyphene Prods. Liab. Litig.*, 780 F. Supp. 2d 1379, 1381 (J.P.M.L. 2011).

Turning to Monsanto's second argument, we conclude that informal coordination among the involved courts and counsel is not practicable in this instance. Including the potential tag-along actions, there are now thirty-seven actions pending in twenty-one districts. More than ten different law firms represent plaintiffs in these actions, which are spread across the country. Even if no additional actions are filed, the present number of cases, districts, and involved counsel, as well as the complexity of the issues presented, warrants centralization.

On the basis of the papers filed and hearing session held, we find that these actions involve common questions of fact, and that centralization in the Northern District of California will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation. These actions share common factual questions arising out of allegations that Monsanto's Roundup herbicide, particularly its active ingredient, glyphosate, causes non-Hodgkin's lymphoma. Plaintiffs each allege that they or their decedents developed non-Hodgkin's lymphoma after using Roundup over the course of several or more years. Plaintiffs also allege that the use of glyphosate in conjunction with other ingredients, in particular the surfactant polyethoxylated tallow amine (POEA), renders Roundup even more toxic than glyphosate on its own. Issues concerning general causation, the background science, and regulatory history will be common to all actions. Centralization will eliminate duplicative discovery; prevent inconsistent pretrial rulings (including with respect to discovery, privilege, and *Daubert* motion practice); and conserve the resources of the parties, their counsel, and the judiciary.

We select the Northern District of California as the appropriate transferee district for this litigation. Two of the earliest-filed and most procedurally advanced actions are pending in this district. The Northern District of California is both convenient and easily accessible for all parties, and we are convinced that the district has the necessary judicial resources and expertise to efficiently manage this litigation. Furthermore, centralization in this district allows us to assign this litigation to the Honorable Vince Chhabria, a skilled jurist who has not yet had the opportunity to preside over an MDL.

-3-

IT IS THEREFORE ORDERED that the actions listed on Schedule A and pending outside the Northern District of California are transferred to the Northern District of California and, with the consent of that court, assigned to the Honorable Vince Chhabria for coordinated or consolidated pretrial proceedings.

PANEL ON MULTIDISTRICT LITIGATION

_Sarah Vance_

Sarah S. Vance
Chair

Marjorie O. Rendell          Charles R. Breyer
Lewis A. Kaplan              Ellen Segal Huvelle
R. David Proctor            Catherine D. Perry

**IN RE: ROUNDUP PRODUCTS**
**LIABILITY LITIGATION**                                   MDL No. 2741

## SCHEDULE A

Central District of California

MCCALL v. MONSANTO COMPANY, C.A. No. 2:16-01609
HERNANDEZ, ET AL. v. MONSANTO COMPANY, C.A. No. 2:16-01988
JOHANSING v. MONSANTO COMPANY, C.A. No. 2:16-05035
SANDERS, ET AL. v. MONSANTO COMPANY, C.A. No. 5:16-00726

Eastern District of California

MENDOZA v. MONSANTO COMPANY, C.A. No. 1:16-00406

Northern District of California

HARDEMAN v. MONSANTO COMPANY, ET AL., C.A. No. 3:16-00525
STEVICK, ET AL. v. MONSANTO COMPANY, C.A. No. 3:16-02341

Southern District of California

GIGLIO v. MONSANTO COMPANY, ET AL., C.A. No. 3:15-02279

Southern District of Florida

RUIZ, ET AL. v. MONSANTO COMPANY, C.A. No. 9:16-80539

District of Hawaii

SHEPPARD, ET AL. v. MONSANTO COMPANY, C.A. No. 1:16-00043
JOHNSON v. MONSANTO COMPANY, C.A. No. 1:16-00075

Northern District of Illinois

GIBBS v. MONSANTO COMPANY, C.A. No. 1:16-07588

Southern District of Illinois

BRIDGEMAN v. MONSANTO COMPANY, C.A. No. 3:16-00812
HARRIS v. MONSANTO COMPANY, ET AL., C.A. No. 3:16-00823
PATTERSON v. MONSANTO COMPANY, C.A. No. 3:16-00825

-A2-

Western District of Kentucky

MEANS v. MONSANTO COMPANY, C.A. No. 5:16-00112

Eastern District of Louisiana

WORK v. RAGAN AND MASSEY, INC., ET AL., C.A. No. 2:16-07491

District of Massachusetts

SCHEFFER v. MONSANTO COMPANY, C.A. No. 1:16-11489

Northern District of Mississippi

COUEY v. MONSANTO COMPANY, C.A. No. 4:16-00149

District of Nebraska

DOMINA, ET AL. v. MONSANTO COMPANY, C.A. No. 4:16-03074

Western District of Wisconsin

PORATH v. MONSANTO COMPANY, C.A. No. 3:16-00518

**Civil Justice Expense and Delay Reduction Plan**
**Section 1:03 - Assignment to a Management Track**

(a)    The clerk of court will assign cases to tracks (a) through (d) based on the initial pleading.

(b)    In all cases not appropriate for assignment by the clerk of court to tracks (a) through (d), the plaintiff shall submit to the clerk of court and serve with the complaint on all defendants a case management track designation form specifying that the plaintiff believes the case requires Standard Management or Special Management. In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

(c)    The court may, on its own initiative or upon the request of any party, change the track assignment of any case at any time.

(d)    Nothing in this Plan is intended to abrogate or limit a judicial officer's authority in any case pending before that judicial officer, to direct pretrial and trial proceedings that are more stringent than those of the Plan and that are designed to accomplish cost and delay reduction.

(e)    Nothing in this Plan is intended to supersede Local Civil Rules 40.1 and 72.1, or the procedure for random assignment of Habeas Corpus and Social Security cases referred to magistrate judges of the court.

**SPECIAL MANAGEMENT CASE ASSIGNMENTS**
**(See §1.02 (e) Management Track Definitions of the**
**Civil Justice Expense and Delay Reduction Plan)**

Special Management cases will usually include that class of cases commonly referred to as "complex litigation" as that term has been used in the Manuals for Complex Litigation. The first manual was prepared in 1969 and the Manual for Complex Litigation Second, MCL 2d was prepared in 1985. This term is intended to include cases that present unusual problems and require extraordinary treatment. See §0.1 of the first manual. Cases may require special or intense management by the court due to one or more of the following factors: (1) large number of parties; (2) large number of claims or defenses; (3) complex factual issues; (4) large volume of evidence; (5) problems locating or preserving evidence; (6) extensive discovery; (7) exceptionally long time needed to prepare for disposition; (8) decision needed within an exceptionally short time; and (9) need to decide preliminary issues before final disposition. It may include two or more related cases. Complex litigation typically includes such cases as antitrust cases; cases involving a large number of parties or an unincorporated association of large membership; cases involving requests for injunctive relief affecting the operation of large business entities; patent cases; copyright and trademark cases; common disaster cases such as those arising from aircraft crashes or marine disasters; actions brought by individual stockholders; stockholder's derivative and stockholder's representative actions; class actions or potential class actions; and other civil (and criminal) cases involving unusual multiplicity or complexity of factual issues. See §0.22 of the first Manual for Complex Litigation and Manual for Complex Litigation Second, Chapter 33.