MDL,TRIAL–OMAHA

# U.S. District Court
## District of Nebraska (8 Omaha)
## CIVIL DOCKET FOR CASE #: 8:20–cv–00075–JFB–SMB

| | |
|---|---|
| Vollmar v. Monsanto Company | Date Filed: 02/24/2020 |
| Assigned to: Senior Judge Joseph F. Bataillon | Jury Demand: Plaintiff |
| Referred to: Magistrate Judge Susan M. Bazis | Nature of Suit: 365 Personal Inj. Prod. Liability |
| Case in other court:  District Court of Lancaster County, Nebraska, CI 20–00207 | Jurisdiction: Diversity |
| Cause: 28:1332 Diversity–Product Liability | |

**Plaintiff**

| | | |
|---|---|---|
| **Janice Lee Vollmar** *A Single Person* | represented by | **David A. Domina** DOMINA LAW GROUP 2425 South 144th Street Omaha, NE 68144–3267 (402) 493–4100 Fax: (402) 493–9782 Email: ddomina@dominalaw.com *ATTORNEY TO BE NOTICED* |

V.

**Defendant**

| | | |
|---|---|---|
| **Monsanto Company** *a Missouri Corporation* | represented by | **Michael K. Huffer** CASSEM, TIERNEY LAW FIRM 9290 West Dodge Road Suite 302 Omaha, NE 68114–3320 (402) 390–0300 Fax: (402) 390–9676 Email: mhuffer@ctagd.com *ATTORNEY TO BE NOTICED* |
| | | **Ronald F. Krause** CASSEM, TIERNEY LAW FIRM 9290 West Dodge Road Suite 302 Omaha, NE 68114–3320 (402) 390–0300 Fax: (402) 390–9676 Email: rkrause@ctagd.com *ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 02/24/2020 | 1 | NOTICE OF REMOVAL against All Plaintiffs from District Court of Lancaster County, Nebraska, Case number CI 20–0000207 ( Filing fee $ 400, receipt number ANEDC–4119088) with attached state court pleadings, by Attorney Michael K. Huffer on behalf of Monsanto Company (Attachments: # 1 Exhibit 1)(Huffer, Michael) (Entered: 02/24/2020) |
| 02/24/2020 | 2 | NOTICE of *Request for Location of Trial* by Attorney Michael K. Huffer on behalf of Defendant Monsanto Company (Huffer, Michael) (Entered: 02/24/2020) |
| 02/24/2020 | 3 | TEXT NOTICE OF JUDGES ASSIGNED: Senior Judge Joseph F. Bataillon and Magistrate Judge Susan M. Bazis assigned. In accordance with 28 U.S.C. 636(c)(2), the parties are notified that, if all parties consent, a magistrate judge may conduct a civil action or proceeding, including a jury or nonjury trial, subject to the courts rules and policies governing the assignment of judges in civil cases. See Fed. R. Civ. P. 73; |

| | | NEGenR 1.4. (ADB) (Entered: 02/24/2020) |
|---|---|---|
| 02/24/2020 | 4 | LETTER by Clerk regarding Notice of Removal Attorney – Complaint 1 with a copy of docket sheet to Multidistrict Litigation Clerks Office. (ADB) (Entered: 02/24/2020) |
| 02/25/2020 | 5 | TEXT NOTICE REGARDING CORPORATE DISCLOSURE STATEMENT by Deputy Clerk as to Defendant Monsanto Company. Pursuant to Fed. R. Civ. P. 7.1, non–governmental corporate parties are required to file Corporate Disclosure Statements (Statements). The parties shall use the form Corporate Disclosure Statement, available on the Web site of the court at http://www.ned.uscourts.gov/forms/. If you have not filed your Statement, you must do so within 15 days of the date of this notice. If you have already filed your Statement in this case, you are reminded to file a Supplemental Statement within a reasonable time of any change in the information that the statement requires.(CS) (Entered: 02/25/2020) |

Filed in Lancaster District Court
*** EFILED ***
Case Number: D02CI200000207
Transaction ID: 0010077616
Filing Date: 01/20/2020 02:43:32 PM CST

## District Court, Lancaster County, Nebraska

| | |
|---|---|
| **Janice Lee Vollmar,**<br>**A Single Person,** | **Case No.: CI 20 -_____** |
| **Plaintiff,** | |
| **v.** | **Complaint & Jury Demand** |
| **Monsanto Company, a Missouri Corporation,** | **and** |
| | **Trial Location Designation** |
| **Defendant.** | |

Plaintiff alleges:

1.     Plaintiff Janice Lee Vollmar is a resident of Lancaster County, Nebraska. She sues Monsanto for her personal injuries and the occurrence of non-Hodgkin's lymphoma. Plaintiff was diagnosed with non-Hodgkin's lymphoma in August 2018. Her NHL was proximately caused by her reliance upon the false assurances of Monsanto, Monsanto's failure to warn, and its unsafe, negligent, and intentionally wrongful disregard for human safety in the design, formulation, testing, manufacturing, advertising, and promotion, and distribution of its Roundup® herbicide. Monsanto concealed that its Roundup® products cause non-Hodgkin's lymphoma, a cancer.

2.     Roundup®'s primary ingredient is glyphosate, a carcinogen. Monsanto formulates glyphosate to create Roundup® with surfactants that multiply the aggressive carcinogen quality of its product. Monsanto failed to warn consumers about what it knew; it perpetuated false representations of Roundup® dangers even though it knew or had reason to know of them. When confronted with the facts, Monsanto denied that its product was harmful and denied specifically that it causes non-Hodgkin's lymphoma. Monsanto continues to sell Roundup® in Nebraska as safe and without danger of causing cancer to users.

3.     Plaintiff's use of Roundup® occurred primarily in Lancaster County, Nebraska.   Plaintiff used Roundup® with this approximate frequency and under these circumstances based on her recollections and reasonable estimates:

| Years | Product | Use/Frequency Duration | Clothing |
|---|---|---|---|
| 1976 – 2018 Used in Lancaster County, NE. | Roundup® grass and weed killer – sprayed with a hand sprayer to control weeds at home, fences, veterinary clinic | 1 time per week x 20 weeks per year 1 hours use x 42 years = 840 exposures @ 1 hrs 840 hours | Gloves while filling sprayer for farm purposes. Canvas shoes or cowboy boots. Black stretchy slacks. Blouse. |
| 1998 – 2018 Used in Lancaster County, NE. | Roundup® grass and weed killer – sprayed with a hand sprayer to control weeds at farm and assist with husband, now deceased, who was a farmer – weed control in and around fields – selective application and later over-top spraying | 32 oz. per acre x 60 acres 3 spraying days per year x 5 tank fills per event = 15 tank fills per year x 0.30 min per event = 7.5 hours per year x 20 yrs = 150 hours | Gloves while filling sprayer for farm purposes. Canvas shoes or cowboy boots. Black stretchy slacks. Blouse. |
| | Total | Total: 1,140 exposures. 990 hrs or Equiv of 123.5 8 hr days of exposures | |

Plaintiff had no significant exposures to other herbicides or pesticides.   She occasionally used Weed-B-Gon® in the yard for crabgrass control.   She used Endure® fly spray for horses 1, 2 times per month during Lancaster County Fair and Nebraska State Fair, and at other times during fly season. She did not have significant exposures to solvents other than normal cleaning  solvents for home, office or similar uses.   She has no significant family history of cancer and no other predispositions to contracting NHL.   Roundup is the primary or sole causative agent in Plaintiff's history.

4.     For decades, including throughout the time Plaintiff used Roundup®, Monsanto promoted it as harmless to human beings.   In some representations, Roundup®

1031259

was described as being a product as safe as table salt, and even as "safe enough to drink" Monsanto documents disclose.

5. Plaintiff used and consumed Roundup in accord with its label at all times, and for its intended purposes to control weeds. The label did not caution about personal protective equipment  and gave no indication of any health risks associated with it. Monsanto has not acknowledged the carcinogenic properties of Round-Up®.

6. As recently as 2019 and continuing up to nearby the date of the commencement of this action, Monsanto persistently denied that Roundup® has carcinogenic properties or is associated with an increase in incidence of cancers of any kind. It continues to do so.

7. Plaintiff seeks a money judgment for her general damages and for all her special damages for medical expenses and expenses incidental to medical care, lost  earning capacity, travel expenses, and all related out of pocket costs she incurred. Plaintiffs' special damages are accruing. She requests leave to amend at the final pretrial conference. Plaintiff's special damages are accruing.

**Jurisdiction, Venue**

8. The District Court has subject matter jurisdiction pursuant to its general grant of jurisdictional authority. *Neb Rev Stat* § 24-302. The Nebraska judiciary has personal jurisdiction over the Defendant because Monsanto maintains a business presence here, is registered to transact business here, contracts for sale of, and sells its products, including Roundup® herbicides in multiple presentations here, promotes the sale of Roundup® here, and caused tortious injury to Plaintiff by its failure to warn and misrepresentations of its product, all of which occurred here. *Neb Rev Stat* § 25-536. Venue is proper in Lancaster County where a substantial part of the activity giving rise to this claim occurred, Defendant may be served with process, and where Plaintiff resides. *Neb Rev Stat* § 25-403.01.

**Facts: Glyphosate, Roundup® & Monsanto**

9. Plaintiff, born in 1939, enjoyed good health, and had no predispositions, family history, or medical history that suggested she had any propensity to develop non-

3

Hodgins lymphoma ("NHL").   Plaintiff is a widow.   Her husband is deceased.   She seeks both general and special damages. Plaintiff was exposed to Roundup® as alleged above

10.     Roundup® was sold as safe and not posing lethal dangers to human users. Plaintiff was not warned otherwise. Roundup® is formulated with glyphosate as a principal ingredient.   In 2019, Monsanto purchased full-page advertisements in U.S. national newspapers advertising its Roundup® products as safe and as a product that cannot cause cancer despite evidence of the international scientific community, and the virtually universal judgments of courts in the United States and in international settings, is to the contrary. Monsanto gave no warning of these matters, even as late as December 2019, and thereafter.

11.     Glyphosate is a broad-spectrum, non-selective herbicide used in Monsanto's Roundup®. Glyphosate disrupts a plant's ability to form certain amino acids necessary for protein synthesis. Roundup® generally kills targeted plants within two to three days. Before they die, target and non-target plants absorb Roundup® containing glyphosate. The absorbed substance cannot be removed by washing, peeling, or even by milling, baking or brewing. In the human body, glyphosate and Roundup® are absorbed through the skin and respiration. They introduce a foreign protein blood. Some cells and particularly lymphocytes are inclined to absorb this foreign protein, some but not all the time. When this occurs, the cell that absorbs the foreign protein is significantly more likely to divide irregularly and become cancerous. This also occurs some but not all the time, though it certainly occurs on a statistically significant basis.

12.     The first glyphosate-based herbicide was introduced by Monsanto in the mid-1970s under the brand name Roundup®.   Roundup® was not truthfully portrayed though Monsanto did, or should have, known the truth at the outset about the dangers of its product. It gave no warnings in the beginning, or thereafter. Despite known and mounting evidence of the dangers of Roundup®, Monsanto did not change its formulation, marketing or disclosure practices. Since then, Monsanto has promoted use of its Roundup® product containing glyphosate, touting it as a remarkable technological breakthrough that could kill weeds without causing harm to people or the environment.

4

13.    Roundup® was marketed so aggressively commencing in 1976 and thereafter by Monsanto that it became a term synonymous with "weed killer" for residential and commercial users and later with the farming community. In 1996, Monsanto introduced soybean seed with traits that made it tolerant of Roundup®, and in 1998 it produced seed corn with traits that made it tolerant of Roundup®. These events caused a sweeping change in agriculture and made it a virtual impossibility to raise corn or soybeans in Nebraska unless Roundup-tolerant soybean and corn hybrid seeds were used. Roundup® became the most used weed killer in Nebraska, in the United States and in the world. Monsanto promote its Roundup® as a remarkable technological breakthrough that can kill weeds without causing harm to people or the environment.

14.    Monsanto knew, for all or substantially all of those forty (40) years that its statements were false. Internally at Monsanto, Roundup® was so popular, and had so much profit potential for Monsanto that the company falsified data, sponsored, promoted, developed and distributed false studies masquerading as science, and vilified accurate studies suggesting problems with the product. It did so for the purpose of masking Monsanto's knowledge of Roundup®'s dangers from the unsuspecting public and inducing the public to believe that Roundup® is safe and harmless to human beings. Defendant did so to maximize its sales to foreseeable users who were targets of the Monsanto public relations campaign and who relied upon the statements made by Monsanto about the safety of the product. Plaintiff is a victim of this deception.

15.    In the United States, Monsanto paid massive political campaign contributions, spent huge sums for "government relations", and expended large amounts of money on universities to influence and purchase their research, and for university endorsements to disguise dangers of Roundup®. This was a part of its effort to conceal the truth about Monsanto's product.

16.    The World Health Organization's International Agency for Research of Cancer (IARC), an organization of the United Nations World Health Organization, announced in 2015 that its research established that glyphosate, and Roundup® are probable carcinogens. This was the first information of any significant public availability, and it

5

informed only a small, select part of the public in the United States of the cancer-causing dangers of Roundup® products. Since then, other medical and scientific studies have also revealed this fact, and evidence of the cancerous nature of the substance continues to grow. It is now established by objective scientific research that glyphosate and Roundup® cause NHL. Roundup® was a proximate cause of the NHL developed by Plaintiff.

### Registration of Herbicides

17.     In the United States, the manufacture, formulation, and distribution of certain chemicals, including herbicides and specifically including Roundup® is regulated under federal law by 7 USC §§ 136 et. seq.  The statute is known the *Federal Insecticide, Fungicide and Rodenticide Act* ("FIFRA").

18.     Under FIFRA, all pesticides must be registered with the Environmental Protection Agency before they may be distributed, sold, or used. This is because they are toxic to plants, animals, and humans. The EPA, as a part of the registration process, requires that products be tested, pass those tests, and that the results be submitted to the EPA for assessment. Even after assessment  the EPA's decision is not an assurance of safety or endorsement. EPA approval for marketing is not a regulatory decision about safety.

19.     The EPA does not deem products "safe," but only that use of a product it decided to so classify in accordance with its label directions as one that "will not generally cause unreasonable adverse effects on the environment." 7 USC § 136a(c)(5)(D).

20.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 USC § 136(bb). FIFRA thus requires EPA to conduct a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

21.     FIFRA generally requires that a registrant, Monsanto in the case of Roundup®, conduct the health and safety testing of pesticide products in accord with approved protocols. The data produced by the registrant must be submitted to the EPA for review and evaluation. The manufacturer's submission must be full, complete, and truthful.

1031259

6

22.     Each product submitted to the EPA for evaluation undergoes initial registration.   Singular registration is not an all-encompassing, all-times, and non-changing event.   Data necessary to achieve registration has changed from time to time. Re-registration is required by 7 U.S.C. § 136a-1.   This requires additional tests and submissions.   In Monsanto's case, it undertook those additional tests and performed them.   The tests were falsified[1] and the laboratories that conducted them for Monsanto were caught and punished.[2] Still, Monsanto concealed these events and used Roundup® profits to obscure and conceal adverse information with its marketing campaigns.   It did so successfully for many years.  Originally named "Monsanto Chemical Works", Monsanto has a history of dangerous products including polychlorinated biphenyls, dioxin, 2-4D-T, Agent Orange, and others. Monsanto denied in each instance, that these substances were carcinogenic and lethal to humans, just as it does with Roundup® now and has done for decades.

23.     By the late 1990s, Monsanto concealed its indifference to human health by rebranding itself as a "life sciences" company, reorganizing, and re-incorporating in 2002 and officially declared itself an "agricultural company." In its company literature in about 2005-10, Monsanto referred to itself disingenuously as a "relatively new company" whose primary goal is helping "farmers around the world in their mission to feed, clothe, and fuel" a growing planet. Monsanto tried to conceal its history of bad acts by advertising itself as "Today's Monsanto", but it continued the pattern of actions of its past with Roundup®.

---

[1] U.S. EPA. Communications and Public Affairs. 1991. Note to correspondents. Washington, D.C. (March 1.); U.S. EPA. Communications, Education, And Public Affairs. 1994. Press advisory. Craven Laboratories, owner, and 14 employees sentenced for falsifying pesticide tests. Washington, D.C. (March 4.); U.S. EPA. Communications and Public Affairs. 1991. Press advisory. EPA lists crops associated with pesticides for which residue and environmental fate studies were allegedly manipulated. Washington, D.C. (March 29.); U.S. Dept. of Justice. United States Attorney. Western District of Texas. 1992. Texas laboratory, its president, 3 employees indicted on 20 felony counts in connection with pesticide testing. Austin, TX. (September 29.)

[2] For example, U.S. Congress. House of Representatives. Committee on Government Operations. 1984. Problems plague the Environmental Protection Agency's pesticide registration activities. House Report 98-1147. Washington, D.C.: U.S. Government Printing Office; False data, Journal of Pesticide Reform, Volume 15, Number 3, Fall 1995. Northwest Coalition for Alternatives to Pesticides, Eugene, OR. Glyphosate, Part 1: Toxicology, by Caroline Cox

7

1031259

24.     Monsanto manipulated "scientific" data to market its Roundup® products, using many of the tactics it perfected with dioxin[3], Pydraul 150[4] and PCBs.[5]

25.     At least as early as 1985, studies existed demonstrating that the glyphosate component of Roundup® was believed to be an agent that caused cancer in laboratory animals and that it was possibly carcinogenic to humans. Monsanto knew of these studies. However, Monsanto flexed its political and government relations muscles, provided studies to the EPA, and the EPA changed its classification of the substance. When it did so in 1991, the EPA classified the glyphosate component of Roundup® as yielding evidence of non-carcinogenicity in humans. The EPA announcement, however, emphasized that the designation of Roundup® or glyphosate in what it called Group E, i.e., non-carcinogenicity in humans, was "based on the available evidence at the time of evaluation and should not be interrupted as a definitive conclusion that the agent will not be a carcinogen...." Monsanto, continued to sell its Roundup® products as safe, not carcinogenic, and without warnings. It also aggressively denied any health hazard associated with the use of Roundup® products.

26.     The EPA, itself, however found that Monsanto, and laboratories it employed, manipulated tests of toxicity, misrepresented them, and affirmatively committed fraud. Monsanto's laboratories used for this purpose in committing these wrongful acts included Industrial Bio-Test Laboratories. The studies falsely included at least thirty (30) test runs on glyphosate and products containing it including residue studies required by the EPA to register Roundup® for sale.

27.     The U.S. Food and Drug Administration discovered in an inspection of IBT, significant discrepancies between raw data and final reports. This led to an EPA audit of IBT and a determination that its toxicology studies on Roundup® were invalid. The EPA

---

[3] The name dioxin refers to a group of highly toxic chemicals linked to heart disease, liver disease, human reproductive disorders, and developmental problems. Even in small amounts, dioxin persists in the environment and accumulates in the body. In 1997 the International Agency for Research on Cancer, classified dioxin as a substance that causes cancer in humans. In 2001 the U.S. government listed the chemical as a "known human carcinogen."
[4] Pydraul 150 was a lethal hydraulic for submarines manufactured and sold by Monsanto as safe for humans at the same time the company concealed that it knew the product was too toxic for use in submarines.
[5] PCBs were versatile and fire-resistant, and became accepted in lubricants, hydraulic fluids, and sealants. But PCBs are toxic. A member of a family of chemicals that mimic hormones, PCBs have been linked to damage in the liver and in the neurological, immune, endocrine, and reproductive systems. The Environmental Protection Agency (E.P.A.) and the Agency for Toxic Substances and Disease Registry, part of the Department of Health and Human Services, now classify PCBs as "probable carcinogens."

8

found the firm engaged in routine falsification of data making it "hard to believe the scientific integrity of the studies when they said they took specimens from the uterus of male rabbits." Three (3) senior executives of IBT were convicted of criminal fraud.[6]

28.    Monsanto engaged Craven Laboratories to preform tests, including studies of Roundup®.   During the same year that they were engaged by Monsanto, Craven Laboratories had three (3) of its employees indicted and convicted of fraudulent laboratory testing practices involving pesticides and herbicides.[7]   While Monsanto denies that the laboratories acted at its direction, it did not disavow the results until it was forced to by the Federal Government through the prosecutions noted above.  Monsanto has failed to explain why it did not aggressively and publicly disavow the occurrences and make its customers and the public aware of the testing results immediately. It continues to market Roundup® and continues, even on its website, to contend glyphosate is safe. It has made no new disclosures or warnings, but marches on with its statements, undaunted by rejection from science, courts, juries and hundreds of national and local governments.[8]

29.    Monsanto dominates the market.   Its RoundupReady® seed, became so dominant in row crop production, and production of many small grains and alfalfa that farmers across the United States were forced to use Roundup® and RoundupReady® seed and therefore to use Roundup® herbicides.   The U.S. Geological Survey found that glyphosate on crops increased from 13.9 million pounds in 1992 to 287 million pounds in 2016.[9] The Midwest, including Nebraska, account for 65% of total U.S. consumption of glyphosate by 2016.

---

[6] Bio-Test lab officials Moreno Keplinger, Paul L. Wright and James Plank were convicted of collectively 14 federal felonies. *U.S. v. Keplinger,* 776 F.2d 678 (7th Cir 1985).

[7] Id.

[8] For example, on February 4, 2019 researchers at the University of Washington made findings were published online journal *Mutation Research/Reviews in Mutation Research.* "Our analysis focused on providing the best possible answer to the question of whether or not glyphosate is carcinogenic," said senior author Lianne Sheppard, a professor in the UW departments of Environmental & Occupational Health Sciences and Biostatistics. "As a result of this research, I am even more convinced that it is." Luoping Zhang, Iemaan Rana, Rachel M. Shaffer, Emanuela Taioli, Lianne Sheppard. **Exposure to Glyphosate-Based Herbicides and Risk for Non-Hodgkin Lymphoma: A Meta-Analysis and Supporting Evidence.** *Mutation Research/Reviews in Mutation Research,* 2019; DOI: 10.1016/j.mrrev.2019.02.001

[9] USGS, Pesticide National Synthesis Project, Estimated Annual Agriculture Pesticide Use, https://water.usgs.gov/nawqa/pnsp/usage/maps/show_map.php?year=02&map=GLYPHOSATE&hilo=L&disp=Gly

30.     Monsanto became so dominant that its product crowded out competitors, and it became virtually impossible in many markets to find or secure herbicides that were compatible with seeds and grasses that were not Monsanto products containing glyphosate marketed under the Roundup® label. Plaintiffs and the public faced this circumstance.[10]

31.     Monsanto continued to conceal what it knew or should have known about Roundup®. It is believed to have continued to perpetuate its conscious, deliberate disregard for the truth about Roundup® because the product was a key ingredient to Monsanto's dominance in the market place, its dramatically expanding market share, and its assumption of a position of influence, power, and authority in the industry that was essentially unparalleled.  Roundup® became synonymous with "weed killer". Monsanto continues to promote Roundup® to encourage its name's use as a synonym for "weed killer", claiming "Where There's A Weed There's a Way" and pointing to its Roundup® products without any disclosure of risks known to Monsanto to be present in the use of its product.[11]

32.     As a result of Roundup® sales, Monsanto's primary corporate focus shifted to its agricultural division, because it outperformed the chemicals division in revenues and income by dramatic margins and with rapid growth.

33.     Monsanto developed genetically modified seeds which it called and labeled as "Roundup® Ready".  Defendant recognized its potential to secure even more market gains with control over seed for crops that could be made resistant to Roundup®. These were seeds resistant to glyphosate and permitted farmers to use Roundup® on their fields during the growing season without harming the crop.  This effort permitted Monsanto to expand the market for Roundup® to the nation's farmers and to use the income from those sales to further dominate the domestic market for commercial uses and residential uses akin to the uses experienced by the sickened Plaintiff.

34.     Monsanto's biotechnology seeds became dominant worldwide. Roundup® was the odds-on, and virtually ubiquitous herbicide with what, through the company's marketing strategy, became a household term synonymous with weed killer or herbicide.

phosate and USGS, Common Weed Killer is Widespread in the Environment,
https://toxics.usgs.gov/highlights/2014-04-23-glyphosate_2014.html
10. Id.
[11]  https://www.roundup.com/en-us  visited December 24, 2019, 9:20 am CST.  This is a home-users promotion.

10

Roundup®, and weed killer, and herbicide, became indistinguishable in the minds of many Americans.    Plaintiff is among these victims.    Mrs. Vollmar is a person who was a foreseeable human user of Defendant's Roundup®. Plaintiff used Roundup® in accord with manufacturer directions, the label, and for its intended purposes at all times.

### Monsanto Falsely Promoted Roundup® as Safe Despite Contrary Acknowledgements

35.    Monsanto has been taken to task by law enforcement.  Monsanto negotiated a solution to its problem by making a solemn promise  to discontinue its false statements about Roundup® but failed to keep its word, even after being compelled in a Consent Agreement with a Chief State Law Enforcement Official to do so.  The Consent Agreement is called an "Assurance of Discontinuance Pursuant to Executive Law § 63(15)".

36.    In 1996, the New York Attorney General ("NYAG") sued Monsanto for false and misleading advertising of Roundup® products. The New York case challenged Monsanto's representations that its spray-on glyphosate-based herbicides, including Roundup®, were:

36.1.    "Safer than table salt" and "practically non-toxic" to mammals, birds, and fish.

36.2.    "Remember that environmentally friendly Roundup® herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks, and fences."

36.3.    "And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got a weed, brush, edging or trimming problem."

36.4.    "Roundup® biodegrades into naturally occurring elements."

36.5.    "Remember that versatile Roundup® herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

36.6.    "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it."

11

36.7. You can apply Roundup® with "confidence because it will stay where you put it," it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Roundup® into natural products.

36.8. "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

36.9. "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

36.10. "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds, and fish."

36.11. "Roundup® can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area that has been treated with Roundup®.

37. Monsanto either could not, or chose not to, defend these and similar hyperbolic false statements. On November 19, 1996, Monsanto entered into an agreement called an Assurance of Discontinuance with the Attorney General of New York. In it, Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that Monsanto Glyphosate-containing pesticide products or any of them, possessed any of these features, advantages or elements described below. These are assurances were made by Monsanto to the Attorney General: Monsanto would cease and desist in representing its glyphosate-containing pesticide products or any components thereof as:

37.1. Safe, non- toxic, harmless or free from risk;

37.2. Biodegradable;

37.3. Stable so they will stay where applied and will not move through the environment;

12

1031259

37.4.   "Good" for the environment or are "known for their environmentally friendly characteristics";

37.5.   Safer or less toxic than consumer products other than herbicides; and,

37.6.   "Practically non-toxic."

38.     Monsanto double crossed the Attorney General of New York, and the public because it did not alter its advertising in the same manner in any State other than New York and, for the most part still has not done so today.

39.     Monsanto also misled the people of the world.  France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean." France withdrew approval of 36 glyphosate-based products. Around the world, nations, cities, and counties have banned Roundup® and glyphosate herbicides. Countries with bans, or with major municipal and subdivision bans include France, Austria, Australia (urban and local bans), Belgium, Bermuda, Canada (8 of 10 provinces have some restrictions, and the cities of Montreal and Vancouver), Czech Republic, Denmark (restrictions, bans in some cities), Mexico, Netherlands, Sri Lanka, Colombia, El Salvador, India (Punjab and Kerala States), Italy (restrictions), Luxembourg (restrictions and EU vote to ban), Netherlands, New Zealand (large urban bans), Portugal (in public places), Scotland (large urban bans), Spain (large urban bans), United Kingdom (bans in many boroughs and townships), Vietnam,  Saudi Arabia, Kuwait, Qatar, Bahrain, Oman, United Arab Emirates, and others. Germany recently announced a ban by the end of 2023. In the United States, Roundup® has been banned in or its sale has been conditioned to require warnings or curbs on usage, in California, and communities in Colorado, Iowa, Florida, North Carolina, Virginia, Maryland, Illinois, California, Oregon, Massachusetts, New Mexico, the U.S. cities of Seattle, Miami, Austin, Portland ME, Key West, and others.[12]

### Assessments of Glyphosate and Roundup®

40.     Monsanto concealed what it knew of glyphosate and Roundup® from the scientific community and the world for many years. The International Agency for Research

---

[12] Sources: Public news agencies and compendiums deemed reasonably reliably by Plaintiff's counsel.

13

of Cancer ("IARC") is the specialized cancer agency of the World Health Organization, an organization of the United Nations. IARC promotes international collaboration in cancer research, "bringing together skills in epidemiology, laboratory sciences, and biostatistics to identify the causes of cancer[.]" IARC assesses whether chemicals are carcinogenic through its Monograph issuance program and protocol.

41.   IARC Monographs identify environmental factors that are carcinogenic hazards to humans. These include chemicals, complex mixtures, occupational exposures, physical agents, biological agents, and lifestyle factors. National health agencies can use this information as scientific support for their actions to prevent exposure to potential carcinogens. Interdisciplinary working groups of expert scientists review the published studies and assess the strength of the available evidence that an agent can cause cancer in humans.

42.   The principles, procedures, and scientific criteria that guide the evaluations are described in the Preamble to the IARC Monographs. The preamble is a forty + page expression of one of the most sophisticated scientific processes used in the world to review and evaluate substances for their impact on human health.   The procedure requires evaluations to be performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest. The studies considered the various exposure groups, including occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland, municipal weed-control workers in the United Kingdom, and para-occupational exposure in farming families.

43.   In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology journal reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

44.   The assessment of the IARC Working Group identified several case-controlled studies of occupational exposure in the United States, Canada, and Sweden. These studies showed a human health concern from agricultural and other work-related exposure to glyphosate. The IARC Working Group conducted a systematic review of over 15 studies designed to assess whether there was an association between Roundup® exposure in

14

agricultural workers and Non-Hodgkin's lymphoma (NHL). The researchers reviewed each study, identified the results and assessed each study's strengths and weaknesses. The IARC Working Group concluded that, despite limited evidence of carcinogenicity of glyphosate in humans, a "positive association has been observed for non-Hodgkin's lymphoma."

45.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. It was authored with input of 17 experts from 11 countries who met from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. Among the members were Lauren Zeise, Ph.D., of the California Environmental Protection Agency, Matthew T. Martin, Ph.D, a scientist with the U.S. Environmental Protection Agency, and Gloria D. Jahnke, D.V.M., D.A.B.T. of the National Institute of Environmental Health Sciences. The 2015 Monograph was updated in 2016.[13] Plaintiff did not learn, and could not have learned, of this information until much later.

46.     After adherence to its established procedures, the IARC Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

47.     Glyphosate was the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012. Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

48.     The IARC Working Group found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed. In assessing the genotoxicity of glyphosate (the property of chemical agents that damages the genetic information within a cell causing mutations, which may lead to cancer), the IARC Working Group concluded "[t]here is strong evidence that glyphosate causes genotoxicity."

---

[13]   The 2016 updated Monograph can be seen at https://monographs.iarc.fr/wp-content/uploads/2018/06/mono112-10.pdf

15

49.     IARC also assessed whether glyphosate exposure can induce oxidative stress, which is thought to be involved in the development of numerous conditions, including cancer, autism, and Parkinson's disease.   IARC concluded that "strong evidence exists that glyphosate … can induce oxidative stress." This could be an important mechanism by which Roundup® causes cancer.

50.     A   section of the IARC monograph for glyphosate is devoted to exposure to humans; it examines studies of glyphosate exposures in various settings including agricultural ones. The IARC Working Group noted that glyphosate has been detected in urine of agricultural workers, indicating absorption. The IARC Working Group specifically evaluated farm workers in the United States, and found that, within the days following the application of Roundup® to a crop, approximately 60% of farm workers tested positive for glyphosate in the urine. Additionally, the IARC Working Group noted that soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

51.     IARC reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. It found that results of this study support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic lymphocytic Leukemia (CLL), and several other cancers.

52.     In 2014 and before, scientists published a systematic review and meta-analysis on the relationship between non-Hodgkin lymphoma and occupational exposure to agricultural pesticides, including glyphosate, in the International Journal of Environmental Research and Public Health. The study showed a statistically significant association between farm workers exposed to Roundup® and non-Hodgkin lymphoma. The study confirmed two smaller studies from 2002 and 2008, published in the journal Leukemia & Lymphoma (2002) and the International Journal on Cancer (2008).

53.     Recent studies, including a glyphosate residue study published in the Journal of Environmental & Analytical Toxicology in 2014, concludes that "chronically ill humans showed significantly higher glyphosate residues in urine than healthy population."

16

Glyphosate has been detected in the blood and urine of agricultural workers, indicating that agricultural use of Roundup® leads to its absorption. Monsanto continues to promote Roundup® as safe even in May 2019. During May, Monsanto ran newspaper advertisements, full-page in size, in the Wall Street Journal and other widespread magazines, as well as in advertisements and promotions on television, radio, in other media, and multiple languages, across the United States. It did not acknowledge or change its actions after researchers at the University of Washington disclosed, on February 13, 2019, findings and a new study conducted there, including a comprehensive review of existing literature, that exposure to Roundup® increases the risks of certain cancers, including NHL, by more than 40%. The University of Washington studies, entitled Mutation Research - Fundamental and Molecular Mechanisms of Mutagenesis (2019) (ISSN:0027-5107, available at https://www.journals.elsevier.com/mutation-research-fundamental-and-molecular-mechanisms-of-mutagenesis).

54.     Scientific research also discloses that carcinogenic properties of Roundup® are magnified by the addition of adjuvants in the Roundup® formulation. Adjuvants are chemicals designed to modify or enhance the effects of other agents. Monsanto includes adjuvants with glyphosate in its Roundup® products; they are designed to increase the effectiveness of the herbicide. But the added adjuvants greatly increase the carcinogenic properties of Roundup®. Monsanto systematically tested glyphosate without adjuvants. The results are misleading. Yet, Monsanto used those tests and results to tout Roundup® as safe to U.S. federal regulators.

55.     In at least three lawsuits tried to jury verdicts in the United States, and in the State of California in both state and federal courts, judgments on jury verdicts finding that Roundup® causes cancer have been rendered and entered. Plaintiff is entitled to assert the general causation findings of fact against Monsanto as conclusive against Monsanto in this proceeding under the doctrines of issue preclusion and fact preclusion.

### Exposure to Glyphosate and Estoppel

56.     Plaintiff's intensive adult use of Roundup® commenced in approximately 1976 and continued until 2018. Plaintiff was diagnosed with non-Hodgkin's lymphoma in

17

August 2018, with only brief prior symptoms.  She suffers from confirmed, diagnosed, aggressive non-Hodgkin's lymphoma which has required ongoing treatment since diagnosis and is expected to continue to require treatment for at least two (2) years on an ongoing basis.  Plaintiff has undergone aggressive care. Her health is uncertain.

57.     Monsanto effectively concealed the dangers of Roundup® and glyphosate. Many steps were taken by Monsanto to achieve this objective.  Among others they included:

57.1. Disregarded scientific studies drawing a link between Roundup® and glyphosates herbicides in general, and human illness including blood born cancers and NHL.

57.2. Concealment or denial of epidemiologic studies disclosing the link the between Roundup®, glyphosates and blood born cancers including NHL.

57.3. Concealment or denial of internal scientific data, warnings, and revelations from its own personnel which were quashed by Monsanto internally.

57.4. Influence practiced on politicians and government officials to paralyze, delay, or wholly prevent government action to protect the public from Roundup® and glyphosate.

57.5. An aggressive campaign, which continues to present, designed to inculcate the safety of Roundup® and to deny the scientific evidence linking it to cancers, including NHL, that are lethal to human beings.

57.6. Assertion, despite overwhelming contrary evidence by objective scientific research not financed by Monsanto, disclosing that glyphosate causes changes in the human body that produce cancers because of cellular level damage to human tissue.

57.7. Affirmative financing activities masked as objective scientific studies, despite the lack of objectivity in the studies, in order to produce skewed results, further masquerading as research.  These results were then used by Monsanto to promote, teach, and advance used of its products despite the dangers posed by them.

1031259

58.    Monsanto's conduct induced members of the public, including Plaintiff to rely upon Monsanto's statements. Monsanto is by virtue of its conduct equitably estopped to assert certain defenses, including a) contributory fault, b) comparative fault, c) alternate causation, d) the statute of limitations, and e) used of its products without wearing protective equipment. Monsanto's statements inducing reliance and action by users like Plaintiff were false statements of material fact. They were intended to induce reliance and did so. These statements were made when Monsanto knew they were false or at a minimum knew that they were highly controverted and that substantial scientific evidence, denied by Monsanto, concluded that a causal connection exists between Roundup® and cancers including NHL.

59.    Plaintiff did not discover, and did not know of facts that would cause a reasonable person to suspect the risks associated with the use of and/or exposure to Roundup® and glyphosate, nor would a reasonable and diligent investigation have disclosed that Roundup® and glyphosate would cause Plaintiff's illnesses. Monsanto also persistently denied the existence of any link between Roundup® and NHL or bloodstream cancers.

60.    Monsanto was under a continuous duty to disclose to consumers, users and other persons coming into contact with its products, including Plaintiff accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate. Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the risks associated with the use of and/or exposure to its products.

61.    As a proximate result of Monsanto's wrongful acts and omissions in placing its defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, and in breach of its warranties, negligence and strict liability, Plaintiff used, and continued to use, Roundup®. The carcinogenic properties of Roundup® caused or acted as material, proximate causes of Plaintiff's disease. Plaintiff must now endure the anguish of life-threatening non-Hodgkin's lymphoma.

**Theories; Claim.**

62.    All allegations above are renewed here.

19

63.     Plaintiff's claims are made under the law of Nebraska where Plaintiff's primary use of Roundup® and injuries occurred, where her injuries occurred and where she resides and used Defendant's product.  Nebraska is where the Defendant sold the products she used.  In the event Nebraska law imposes a duty or obligation on Monsanto in excess of those required by Federal Law, Plaintiff does not assert the state law claims. On the contrary, all claims asserted by Plaintiff's are claims parallel with Federal Law and Federal Legal Duties.  Accordingly, Monsanto violations of Nebraska law so limited were also violations of Federal Law.

64.     Plaintiff does not seek to enforce Federal Law, instead she invokes the law of Nebraska, but limit the scope and extent of her claims under Nebraska law so those claims assert duties against Monsanto equal to but no greater than Federal Law imposed on Monsanto.  Accordingly, Plaintiff's claims that Monsanto violated 7 USC § 136, including subparts (g) & (j), and Federal regulations including 40 CFR § 156.10 (a) (5). She did so by distributing Roundup® when it was misbranded contrary to legal requirements. The distribution of a misbranded herbicide is a violation of law and is a tort, because it violates Nebraska law when considered in parallel with Federal requirements.   These violations are evidence of negligence and support Plaintiff's claims of strict liability in tort, strict liability for failure to warn, negligence, and breaches of implied warranties and express warranties.

**First Theory: Strict Liability (Design Defect)**

65.     All allegations above are renewed here

66.     Monsanto is strictly liable in tort to Plaintiff for defective design and formulation of its Roundup® products. A substantial part of the activity undertaken by Monsanto as described in this Complaint occurred in Nebraska.

67.     At relevant times, Monsanto was engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products. These products, including the ones used by Plaintiff were defective and unreasonably dangerous to foreseeable users like Plaintiff and including her. The products were unreasonably dangerous when they were placed by Monsanto into the stream of

20

commerce. Monsanto ultimately controlled and supervised these actions. At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by Plaintiff as safe when they were not as described above.

68.     On the contrary, Monsanto's Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and Plaintiff. These products left Monsanto's immediate control and were placed onto the market and reached intended consumers, handlers, and users coming into contact with these products in Nebraska and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

69.     Monsanto's Roundup® products including those to which Plaintiff was exposed were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate. The product, Roundup®, is itself defective because it contains glyphosate and danger enhancing surfactants. Roundup® is sold in containers with labeling on them that were designed, styled, written, and manufactured by or for Monsanto for the purpose of contain arising Roundup® and presenting it for sale and distribution to foreseeable users including Plaintiff. The product, separately and the product with deceptive label, are each individually defective and are each products placed in the stream of commerce by Monsanto in a defective and dangerous condition because the glyphosate and its risks were not revealed in the product is inherently dangerous to human users, and because the label and packaging products contained independent defects in that they did not match the descriptions they contained with the truth about the content of the containers upon which Monsanto placed them. The risks and dangers of those products exceeded the benefits allegedly associated with them as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto. Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

21

70.     Monsanto knew or had reason to know that its Roundup® products when placed in the stream of commerce were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto in one or more of these ways:

    70.1.   Monsanto's Roundup® products were defective in design and formulation. Consequently, these products are dangerous to an extent beyond that which an ordinary consumer would contemplate.

    70.2.   Monsanto's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

    70.3.   Monsanto did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate alone or with surfactants added by Monsanto before or while marketing them.

    70.4.   Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products.

    70.5.   Monsanto could have employed safer alternative designs and formulations but did not do so.

71.     At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Monsanto's Roundup® products in an intended or reasonably foreseeable manner, i.e., as a consumer, without knowledge of Roundup®'s dangerous characteristics.

72.     Monsanto's Roundup® products were and are more dangerous than alternative products.   Monsanto could have designed its Roundup® products to make them less dangerous. Indeed, at the time Monsanto designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky formulation was attainable.

73.     At the time Roundup® products left Monsanto's control, practical, feasible and safer alternative designs were available that would have prevented the harm without substantially impairing the reasonably anticipated function of Monsanto's herbicides.

74.     As a result of the unreasonably dangerous condition of its Roundup® products, Monsanto is strictly liable to Plaintiff. The defects in Monsanto's Roundup®

1031259

products were substantial and contributing factors in causing Plaintiff's injuries and, but for Monsanto's misconduct and omissions, Plaintiff would not have sustained injuries.

75. Monsanto's defective design of its Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including Plaintiff.

76. Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including Plaintiff with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Monsanto made conscious decisions not to redesign, warn or inform the public. Monsanto's reckless conduct warrants punitive damages.

77. As a proximate result of Monsanto placing its defective Roundup® products into the stream of commerce, Plaintiff developed aggressive non-Hodgkin's lymphoma and personal injuries which are permanent in nature.

78. As a further proximate result of Monsanto placing its defective Roundup® products into the stream of commerce, as alleged herein, Plaintiff sustained past and future loss of earning capacity and property damage.

### Second Theory: Strict Liability (Failure to Warn)

79. All allegations above are renewed here.

80. Monsanto had a duty to exercise reasonable care to avoid physical harm to Plaintiff by preventing the recognizable and foreseeable harm it would cause by its marketing of its Roundup® ® products.[14] Plaintiff contends that Monsanto sold its Roundup® products in a defective condition unreasonably dangerous to consumers, including her. Plaintiff contends Monsanto was engaged in the business of selling the product which was expected to and did reach her without substantial change in condition from that in which it was sold, and that it was not misused by Plaintiff. Plaintiff's damages are not subject to the economic loss rule.[15]

---

[14] *Stahlecker v. Ford Motor Co.*, 266 Neb 601, 667 NW2d 244 (2003) Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 7 (2010), and Restatement (Second) of Torts § 402A. Also, *Jay v. Moog Automotive, Inc.*, 264 Neb 875, 652 NW2d 872 (2002)(defective design).
[15] See *Lesiak v. Central Valley Ag.*, 283 Neb 103, 808 NW2d 67 (2012).

23

81.     Monsanto is strictly liable in tort to her for failure to warn of the dangers of its Roundup® products. At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate either alone or with adjuvants and surfactants. These actions were under the ultimate control and supervision of Monsanto. It did so from its headquarters in St. Louis Missouri.

82.     Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products. While doing so, Monsanto advertised or marketed Roundup® to consumers including Plaintiff, Monsanto had, but failed to discharge, a duty to warn Plaintiff and the public of risks associated with use of Roundup®.

83.     Monsanto had a duty to reasonably test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn Plaintiffs of dangers associated with Roundup® use and exposure. Monsanto, as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

84.     At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

85.     Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by Monsanto's herbicides, including Plaintiff.

24

1031259

86.     Despite knowing or having a duty to know, that Roundup® posed a grave risk of harm, Monsanto failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. Monsanto failed to adequately warn Plaintiff and other consumers, i.e., the reasonably foreseeable users, of the risks of exposure to its products. Monsanto wrongfully concealed information concerning the dangerous nature of Roundup® and glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

87.     Monsanto's Roundup® reached the intended consumers, handlers, and users or other persons coming into contact with these products, including Plaintiff without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto. Plaintiff was exposed to Monsanto's Roundup® products in the course of spraying Roundup® without knowledge of their dangerous characteristics. Plaintiff used the dangerous product for its intended purpose and without misuse.

88.     Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to and at the time of her exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Monsanto to know about and disclose serious health risks associated with using the products.

89.     Monsanto knew or should have known that the minimal cautions disseminated with its Roundup® products were inadequate, failed to communicate adequate information on the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural, and horticultural applications.

90.     The information Monsanto did impart failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiff to utilize the products safely and with adequate protection. Instead, Monsanto disseminated information that was inaccurate, false, and misleading. This misleading information and denial of the danger of glyphosate has been unremitting conduct of Monsanto to the present day.

91.     This failure to warn is not limited to the information contained on Roundup®'s labeling. Monsanto was able, in accord with federal law, to comply with Nebraska law by

25

disclosing the known risks associated with Roundup® through other non-labeling mediums, i.e., promotion, advertisements, public service announcements, and/or public information sources. Monsanto, however, deliberately did not do so.

92.     Monsanto is liable to Plaintiff for injuries caused by its negligent or willful failure, as described above, to provide adequate warning and precautions as alleged. As a proximate result of Monsanto placing its defective Roundup® products into the stream of commerce, Plaintiff developed non-Hodgkin's lymphoma. As a further proximate result of Monsanto placing its defective Roundup® products into the stream of commerce, there was a measurable and significant interval of time during which Plaintiff suffered great mental anguish and other personal injury. Plaintiff continues to be aware of the presence of NHL disease in her body.  She suffers ongoing emotional distress as a result. This distress is chronic and expected to be permanent.

### Third Theory: Negligence

93.     All allegations above are renewed here.

94.     Monsanto owed a duty of reasonable care to all foreseeable users, including Plaintiff but it breached that duty as alleged below. The breach proximately caused damages to Plaintiff.[16]

95.     Monsanto, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

96.     Monsanto owed to Plaintiff and the public the duties that follow:

> 96.1.  To exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products. This included the duty to take all reasonable steps necessary to manufacture, promote, and/or sell products that are not unreasonably dangerous to consumers and users.

> 96.2.  To exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Monsanto's duty of care owed to consumers and the general public. This included the duty to provide accurate, true, and

---

[16] *Deviney v. UPRR*, 280 Neb 450, 786 NW2d 902 (2010).

26

correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup® and its active ingredient glyphosate.

96.3.   To warn of the risks.

96.4.   To withhold the product from the market.

96.5.   To inform Plaintiff of the risks.

96.6.   To exercise reasonable care in the marketing and representation of Roundup® to the public.

96.7.   To refrain from falsifying, withholding or manipulating unfavorable research data, or feigning the favorable research data.

96.8.   To label its product with complete disclosures of risks.

97.     Monsanto breached each and all of its duties as alleged above. It was negligent in that it:

97.1.   Negligently designed and formulated its Roundup® products.

97.2.   Negligently tested its Roundup® products and negligently failed to continue to test them.

97.3.   Negligently mixed and batched its Roundup® products.

97.4.   Negligently submitted and withheld information about its Roundup® products for governmental regulatory purposes.

97.5.   Negligently failed to supplement its governmental submissions with new information about the dangers of Glyphosate and its Roundup® products.

97.6.   Negligently manufactured its Roundup® products.

97.7.   Negligently labeled its Roundup® products.

97.8.   Negligently marketed its Roundup® products.

97.9.   Negligently packaged its Roundup® products.

97.10.  Negligently advertised & commercialized Roundup® products.

97.11.  Negligently distributed Roundup® products in commerce.

97.12.  Negligently advertised and commercialized  Roundup®

27

97.13.   Negligently violated its agreement with New York's A.G.

97.14.   Negligently failed to disclose the truth about the risks associated with Roundup® in its promotional efforts, outside of the context of labeling.

97.15.   Negligently disregarded scientific, medical and epidemiological studies and findings about the dangers of Roundup®.

97.16.   Negligently caused or permitted its advertising inaccuracies to continue even after it knew exposure to the products created a significant risk of harm. It failed to prevent or adequately warn of these risks and injuries.

97.17.   Negligently failed to provide adequate instructions, guidelines, and safety precautions to reasonable users including Plaintiff.

97.18.   Negligently failed to inform Plaintiff and the public of safer alternatives though it knew they existed.

97.19.   Negligently failed to disclose that its Roundup® products are probably carcinogens and do cause NHL in a population of foreseeable users including Plaintiff.

97.20.   Negligently withheld information necessary permit an informed user with an option to use something else to make an informed selection.

97.21.   Negligently failed to comply with safe practices, good product quality assurance practices, and thereby failed to inform both government regulators and foreseeable users, including Plaintiff.

98.   These negligent acts and omissions occurred after Monsanto, knew or had reason to know of defects inherent in its products, and knew or had reason to know that a consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

99.   Monsanto knew and/or should have known that it was foreseeable consumers such as and including Plaintiff would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®. She could not have known of her injuries until she was diagnosed.

28

100.    Plaintiff did not know and could not discover without full disclosure by Defendant, the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

101.    Monsanto's conduct was negligent. But it was also reckless. Monsanto made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff. Monsanto's reckless conduct warrants an award of punitive damages.

102.    As a proximate result of Monsanto's negligence, Plaintiff sustained temporary and permanent bodily impairments, personal injuries, illness, medical and rehabilitation care and emotional distress. Plaintiff remains under medical supervision and care. She also suffered permanent loss of ability to enjoy life with confidence of good Plaintiff's injuries. Plaintiff's damages were proximately caused by Monsanto in this way.

103.    The amount of damages continues to accrue. Medical care expenses in medicine continue to be necessary and accrue.    Her full damages are not yet known. Leave of Court is requested to amend this Complaint at the time of the final pretrial conference and a trial to state the full amount.

**Fourth & Fifth Theories:**
**Intentional and/ or Negligent Misrepresentation**

104.    All allegations above are renewed here.

105.    Monsanto made the affirmative representations alleged above, and below.

106.    Monsanto's representations were false. These false claims included false affirmative statements and concealed facts that made affirmative statements, in the context in which they were made, false. They were made to induce reasonable, foreseeable members of the public including Plaintiff to rely upon them. Plaintiff did so rely, and she did so reasonably. Monsanto knew its representations were false, or in the alternative it negligently made and repeated the representations without disclosing material information contradicting the representations or drawing them into serious question. This made discovery of Plaintiff's condition more complex.

107.    Plaintiff sustained damages and contracted NHL as a proximate result of the misrepresentations of Monsanto. All damages described above and requested in the Request for Relief below are sought.

29

1031259

### Sixth Theory: Implied Warranty

108.   All allegations above are renewed here.

109.   Monsanto engaged in the business of testing developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Monsanto. Monsanto impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

110.   Monsanto is a merchant with respect to herbicides, herbicide labeling and warnings, crop, lawn, and garden chemicals including herbicides and including its Roundup® products. It employs persons with special knowledge, skill, and experience in the products and plants.

111.   Before Plaintiff was exposed to the aforementioned Roundup® products, Monsanto impliedly warranted to its consumers—including Plaintiff—that its Roundup® products were of merchantable quality, safe and fit for the use for which they were intended; specifically, as agricultural herbicides to kill weeds without harm to humans.

112.   Monsanto failed to disclose that Roundup® has dangerous propensities when used as intended and that use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing severe injuries and death, including Plaintiff's cancer. Plaintiff was the intended beneficiary of the implied warranties made by Monsanto to the purchasers of its herbicides as a foreseeable human user. She used the Roundup® products as intended and without alteration.

113.   In reliance upon Monsanto's implied warranty, Plaintiff used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Monsanto.

114.   Monsanto breached its implied warranty to Plaintiff in that its Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately

30

tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

115.    The harm caused by Monsanto's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

116.    As a proximate result of Monsanto's breach of implied warranty, Plaintiff sustained a loss of earning capacity, and property damage.[17]

### Seventh Theory: Breach of Express Warranties

117.    All allegations above are renewed here.

118.    Monsanto is liable to Plaintiff for breaches of express warranties. Monsanto made affirmative representations and warranties about its Roundup® products which were material parts the basis of the bargain whereby Plaintiff purchased and used Roundup® products.[18] These affirmative representations promised a specific result, i.e., that Roundup® products could be used by Plaintiff without personal injury, illness, or cancer caused or induced by the products; Monsanto represented that the products were safe, but knew or should have known, they were not. Plaintiff was a person whom Monsanto might reasonably expect to use, consume and be affected by the Roundup® products.[19]

119.    Monsanto has special knowledge skill and expertise germane to herbicides and their design, manufacture testing, and marketing. Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under Monsanto's control and supervision.

120.    Monsanto expressly represented and warranted matters to Plaintiff and other consumers and users, and through statements made by Monsanto in labels, publications, package inserts, and other written materials that its Roundup® products were:

---

[17] Proof of negligence establishes breach of implied warranty. *Adams v. American Cyanamid Co.*, 1 Neb. App. 337, 498 N.W.2d 577 (1992). *El Fredo Pizza, Inc. v. Roto-Flex Oven Co,* 199 Neb 697, 261 NW2d 358 (1978); *Christensen v. Eastern Nebraska Equip Co.,* 199 Neb 741, 261 NW2d 367 (1978).
[18] Neb UCC § 2-313(a) and (b).
[19] Neb UCC § 2-318.

1031259

120.1.   Safe to human health and the environment.

120.2.   Effective, fit, and proper for their intended use and posed no risks of harm to humans.

120.3.   Did not cause unreasonably dangerous side effects.

120.4.   Among Monsanto's "safety is a top priority for us" products.

120.5.   Safe enough to drink.

120.6.   "…safer than table salt" and "practically non-toxic" to mammals, birds, and fish despite its agreement with the New York Attorney General to the contrary.

120.7.   Roundup®'s Glyphosate is good for the environment.

121.    These representations about Roundup® were affirmations of fact or promises made by Monsanto to the public including Plaintiff. The representations related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations. Monsanto placed its Roundup® products into the stream of commerce for sale and recommended use without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate.

122.    Monsanto breached these warranties because its affirmations were not true. Its Roundup® products were defective, dangerous, unfit for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose.

123.    Plaintiff justifiably and detrimentally relied on the express warranties and representations of Monsanto in the purchase and use of its Roundup® products. When Plaintiff decided to purchase Roundup®, she reasonably relied upon Monsanto to disclose known risks, dangers, and effects of Roundup® and glyphosate. She did not know the representations were false.

124.    As a proximate result of Monsanto's breach of implied warranty, Plaintiff sustained personal injuries and illness, loss of income, loss of earning capacity and financial losses and their consequences.

32

**Claim: Janice Lee Vollmar**
**Personal Injuries; Economic and Non-Economic Damages**

125.   All allegations and all theories above are invoked here.

126.   As a direct, proximate result of the acts and omissions of Monsanto, Plaintiff contracted non-Hodgkin's lymphoma, and has been required to undergo extensive care, including life altering and debilitating chemical and other therapies. She continues to be under medical care.

127.   Plaintiff's non-economic, general damages include emotional and physical pain and anguish; cancer treatment pain; anxiety, depression, uncertainty and fear associated with cancer diagnoses, treatment and uncertain outcomes; nausea and illness associated with medical care for her condition; sleep disruption; loss of self-confidence and change of personality; emotional distress; loss of ability to engage in the activities of daily living including the daily joys of life. Plaintiff also incurred a probable loss of reasonable life expectancy. She also suffers from depression, stress and mental anguish over her uncertain and threatening health circumstances.

128.   Plaintiff's economic, special damages include emotional distress of cancer, lost earning capacity; medical expenses and medical care costs; transportation and over-the-counter expenses; adaptations and accommodations to the household; lost retirement security; and related economic losses.

**Exemplary and Punitive Damages**

129.   All allegations above are renewed here. Plaintiff is aware that Nebraska law permits the recovery of punitive damages but requires that they be paid to the State. Monsanto's willful, wanton, reckless and malicious conduct in pursuit of profit at the expense of human safety and well-being of foreseeable users of its Roundup® products was caused, effectuated, or directed from Missouri. Missouri law permits Plaintiff to collect punitive damages.

130.   Plaintiff contends that Missouri law governs the punitive damages aspect of her case. The most significant contacts between Monsanto's products and Plaintiff occurred in Nebraska. But the reprehensible conduct justifying punitive damages occurred in Missouri

33

and may be policed and prevented only by judicial proceedings against Monsanto inflicting punishment for its wrongdoing in Missouri. Missouri's contact with an interest in this subject is governing.

131. Plaintiff seeks punitive damages against Monsanto under Missouri law for this reason. In the alternative in the event the Court concludes that Missouri law does not govern the punitive damages aspects of this case, Plaintiff seeks punitive damages under the law of Nebraska and request that the punitive damages recovery, subject to payment of proportionate fees and expenses, be awarded to the common school fund of Nebraska.

### Requests For Relief

132. On the foregoing basis, Plaintiff, requests judgment in her favor on her claims and all theories of recovery on Plaintiff's claim special damages as alleged, and accruing special damages not yet fully known, general damages, prejudgment interest, attorney's fees to the extent permitted by law, and costs.

133. Plaintiff also seeks punitive damages under Missouri law and alternatively Nebraska law, because Monsanto's and its acts and omissions display requisite contempt for public health, self-serving greed as its motivation, and malice. Plaintiff seeks the maximum amount of punitive damages permissible.

134. On all claims prejudgment interest to the extent permitted by law, attorneys' fees to the extent permitted by law and costs.

### Jury Demand; Trial Location Designation

135. Plaintiff demands trial by jury. She designates Lincoln, Nebraska as the place for trial if this case is not tried in State Court in Nebraska.

**Janice Lee Vollmar, Plaintiff**

By: /s/ David A. Domina
David A. Domina, #11043NE
Domina Law Group pc llo
2425 S. 144th St. Omaha, NE 68144
(402) 493-4100
ddomina@dominalaw.com

*Plaintiff's Lawyers*

1031259