# U.S. District Court
## Eastern District of Michigan (Detroit)
## CIVIL DOCKET FOR CASE #: 2:20–cv–10214–DML–MJH

Katz v. Monsanto Company  
Assigned to: District Judge David M. Lawson  
Referred to: Magistrate Judge Michael J. Hluchaniuk  
Demand: $250,000  
Cause: 28:1331 Product Liability

Date Filed: 01/28/2020  
Jury Demand: Plaintiff  
Nature of Suit: 245 Tort Product Liability  
Jurisdiction: Federal Question

**Plaintiff**

**Bernice Katz**

represented by **Jerard M. Scanland**  
Mussin and Scanland, PLLC  
13351 Reeck Court  
Suite 5  
Southgate, MI 48195  
734–282–6037  
Fax: 734–447–5853  
Email: jscanland@milawoffices.com  
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 01/28/2020 | 1 | COMPLAINT filed by Bernice Katz against Monsanto Company with Jury Demand. Plaintiff requests summons issued. Receipt No: 0645–7577958 – Fee: $ 400. County of 1st Plaintiff: St. Clair – County Where Action Arose: Wayne – County of 1st Defendant: Wayne. [Previously dismissed case: California District Court, 19–cv–13453–LVP–EAS, Judge Vince Chhabria] [Possible companion case(s): None] (Scanland, Jerard) (Entered: 01/28/2020) |
| 01/30/2020 | 2 | SUMMONS Issued for *Monsanto Company* (DAll) (Entered: 01/30/2020) |
| 01/30/2020 | | A United States Magistrate Judge of this Court is available to conduct all proceedings in this civil action in accordance with 28 U.S.C. 636c and FRCP 73. The Notice, Consent, and Reference of a Civil Action to a Magistrate Judge form is available for download at http://www.mied.uscourts.gov (DAll) (Entered: 01/30/2020) |

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**BERNICE KATZ,**
Plaintiff,

Case No: 20-cv-          -GC
COMPLAINT FOR DAMAGES AND
DEMAND FOR JURY TRIAL
APPEARANCE PRO HAC VICE

1. Strict Liability-Design
   Defect
2. Strict Liability-Failure t
   Warn
3. Negligence
4. Breach of Implied
   Warranty
5. Punitive Damage

-vs.-

## MONSANTO COMPANY,
Defendants.

## PLANITIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL

**COMES NOW THE** Plaintiff, **BERNICE KATZ,** through the law firm of MUSSIN and

SCANLAND, PLLC and by attorney Jerard M. Scanland, and for the First Amended

Complaint herein alleges upon information and belief the following:

## STATEMENT OF THE CASE

1.      In 1970, Defendants Monsanto Company, Inc. discovered the herbicidal properties of

glyphosate and began marketing it in products in 1974 under the brand name Roundup®.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops.  By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85-90 million pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

2.      Monsanto is a multinational agriculture biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world see market. The majority of these seeds are of the Roundup Ready® brand.  The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be spayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States were Roundup Ready®.

3.      Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

4.      On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides including glyphosate. That evaluation was based, in part, on studies of exposure to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

5.  On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

6.  The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma and other Hematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

7.  The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

8.  Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

## JURISDICTION AND VENUE

9.  Jurisdiction exists pursuant to 28 U.S.C. §1332. Plaintiff alleges the matter in controversy exceeds the sum of $75,000.00 exclusive of interest, and complete diversity of citizenship exists between Plaintiff and Defendant because Plaintiff is a citizen of the State of Michigan,

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

10.    The United States District Court For The Eastern District of Michigan has jurisdiction over the Defendant because, based on information and belief, the Defendant has a registered agent in the City of Plymouth, County of Wayne and State of Michigan, corporation and/or entity organized under the laws of the State of Michigan, a foreign corporation or association authorized to do business in Michigan and registered with the Michigan Secretary of State or has sufficient minimum contacts in Michigan, or otherwise intentionally avails itself of the Michigan market so as to render the exercise of jurisdiction over it by the Michigan courts consistent with traditional notions of fair play and substantial justice.

11.    Venue is proper in this Court because the Defendant conducts business in the State of Michigan and has a registered agent in the City of Plymouth, County of Wayne and State of Michigan.  The events out of which this controversy arose occurred in the Eastern District of Michigan.

12.    Furthermore, the Defendant has purposefully availed themselves of the benefits and the protections of the laws within the State of Michigan. Monsanto has had sufficient contact such that the exercise of jurisdiction would be consistent with the traditional notions of fair play and substantial justice.

13.    Plaintiff seeks relief that is within the jurisdictional limits of the court.

## **THE PARTIES**

### Plaintiff

14.    Plaintiff, Bernice Katz, is competent individual over the age of 18, a resident and citizen of the United States, and hereby submits to the jurisdiction of the Court and alleges venue in this court is proper. She currently resides in property, Michigan.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

## Defendants

15. Defendants Monsanto Company ("'Monsanto") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri. At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®. Monsanto has regularly transacted and conducted business within the state of California and has derived substantial revenue from goods and services including Roundup®, in the State of California. Monsanto expected or should have expected their acts to have consequences within the State of California, and derived substantial revenue from interstate commerce.

16. Plaintiff is informed and believes, and based thereon alleges, that in committing the acts alleged herein, each and every managing agent, agent, representative and/or employee of the Defendants was working within the course and scope of said agency, representation and/or employment with the knowledge, consent, ratification, and authorization of the Defendants and their directors, officers and/or managing agents.

### FACTS

17. Glyphosate is a broad-spectrum non-selective herbicide used in a wide variety of herbicidal products around the world.

18. Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plaint's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

19.     For nearly 40 years, farms across the world have used Roundup® without knowing of

the dangers its use poses. That is because when Monsanto first introduced Roundup® it touted

glyphosate as a technological breakthrough: it could kill almost every weed without causing

harm either to people or to the environment. Of course, history has shown that not to be true.

According to the WHO, the main chemical ingredient of Roundup®-glyphosate-is a probable

cause of cancer. Those most at risk are farm workers and other individuals with workplace

exposure to Roundup®, such as workers in garden centers, nurseries, and landscapers.

Agricultural workers are, once again, victims of corporate greed.

20.     Monsanto assured the public that Roundup® was harmless. In order to prove this,

Monsanto championed falsified data and attacked legitimate studies that revealed its dangers.

Monsanto led a prolonged campaign of misinformation to convince government agencies,

farmers and the general population that Roundup® was safe.

### The Discovery of Glyphosate and Development of Roundup®

21.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist

John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970's

under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a "safe"

general-purpose herbicide for widespread commercial and consumer use. It still markets

Roundup® as safe today.

### Registration of Herbicides under Federal Law

22.     The manufacture, formulation and distribution of herbicides, such as Roundup®, are

regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

U.S.C § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act, 7 U.S.C. § 136a(a).

23.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

24.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economics, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sole in commerce.

25.     The EPA and the State of California registered Roundup® for distribution should be granted or allowed to continue to be sold in commerce.

26.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests.  The data produced by the registrant must be submitted to the EPA for

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

27.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered.  The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-I. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

28.     In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment-in relation to the reregistration process-no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

### *Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup*

29.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly *carcinogenic to humans* (Group C) in 1985. After pressure form Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to *evidence of non-carcinogenicity in humans* (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

30.    On two occasions, the EPA that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

31.    In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

32.    In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the final report relating to the toxicological impacts if glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

33.    The top executives of IBT were convicted of fraud in 1983.

34.    In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

35.    Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.


**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

*The Importance of Roundup® to Monsanto's Market Dominance Profits*

36.     The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

37.     In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate; farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/ Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® **herbicide.**

38.     Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

*Monsanto has known for decades that it falsely advertises the safety of Roundup®*

39.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto

based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit

challenged Monsanto's general representations that its spray-on glyphosate-based herbicides,

including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds,

and fish. Among the representations the NYAG found deceptive and misleading about the human

and environmental safety of Roundup® are the following:

a)  Remember that environmentally friendly Roundup herbicide is biodegradable. It

won't build up in the soil so you can use Roundup with confidence along customers driveways,

sidewalks and fences…

b)  And remember that Roundup is biodegradable and won't build up in the soil. That will

give you the environmental confidence you need to use Roundup everywhere you've got a weed,

brush, edging or trimming problem.

c)  Roundup biodegrades into naturally occurring elements.

d)  Remember that versatile Roundup herbicide stays where you put it. That means there's

no washing or leaching to harm customers' shrubs or other desirable vegetation.

e)  This non-residential herbicide will not wash or leach in the soil. It…stays where you

apply it.

f)  You can apply Roundup® with "confidence because it will stay where you put it" it

bonds tightly to soil particles, preventing leaching. Then, soon after application, soil

microorganisms biodegrade Roundup® into natural products.


**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 7-fold safety margin for workers who manufacture it or use it.

i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of "practically non-toxic" as it pertains to mammals, birds and fish.

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

40.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a) Its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

***

b) Its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

***

c) Its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

***

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

d)  Its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

***

e)  Glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

***

f)  Its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

***

41.  Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

42.  In 2009m France's highest court ruled that Monsanto has not told the truth about the safety of Roundup®. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

### *Classifications and Assessments of Glyphosate*

43.  The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

44.     The established procedure for IARC Monograph evaluations is described in the IARC
Programme's Preamble. Evaluations are performed by panels of international experts, selected
on the basis of their expertise and the absence of actual or apparent conflicts of interest.

45.     One year before the Monograph meeting, the meeting is announced and there is a call
both for data and for experts. Eight months before the Monograph meeting, the meeting is
announced and there is a call both for data for experts. Eight months before the Monograph
meeting, the Working Group membership is selected, and the sections of the Monograph are
developed by the Working Group members. One month prior to the Monograph meeting, the call
for data is closed and the various draft sections are distributed amount Working Group members
for review and comment. Finally, at the Monograph meeting, the Working Group finalizes
review of all literature, evaluates the evidence in each category, and completes the overall
evaluation. Within two weeks after the Monograph meeting the summary of the Working Group
findings are published in Lancet Oncology, and within a year after the meeting, the final
Monograph is finalized and published.

46.     In assessing an agent, the IARC Working Group reviews the following information: (a)
human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer
bioassays; and (c) representative mechanistic data. The studies must be publicly available and
have sufficient detail for meaningful review, and reviewers cannot be associated with the
underlying study.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

47.     In Mach 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

48.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3-10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as week as "data from governmental reports that are publicly available."

49.     The studies considered the following exposure groups; occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

50.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

51.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

52.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

53.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

54.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

55.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for hemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

56.     The IARC Working Group also noted that glyphosate has been detected in the urine of agriculture workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA. Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

57.     The IARC Working Group further found that glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

58.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis or aromatic amino acids, which leads to several metabolic disturbances, including the inhibition or protein and secondary product biosynthesis and general metabolic disruption.

59.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57, 311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCK), and Chronic Lymphocytic Leukemia (CCL), in addition to several other cancers.

### *Other Earlier Findings About Glyphosate's Dangers to Human Health*

60.     The EPA have a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

   Glyphosate is released to the environment in its use as a herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands.

   It may also be released to the environment during its manufacture, formulation transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, date on releases during its manufacture and handling are not available.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

61.    In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

### *Recently Worldwide Bans on Roundup®/Glyphosate*

62.    Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in light of the dangers of the use of Roundup® are more widely known. The Netherland issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which takes effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

63.    The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

64.     France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

65.     Bermuda banned both the private and commercial sale of glyphosate, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

66.     The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that Glyphosate has been linked to fatal kidney disease in agricultural workers.

67.     The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

68.     On information and belief, Wilbur-Ellis was, at all relevant times, engaged in the distribution of Roundup, Roundup-ready crops and other glyphosate-containing products from Monsanto to retailers and commercial/agricultural users in California.

69.     Wilbur-Ellis had superior knowledge compared to Roundup users and consumers, including regarding the carcinogenic properties of the product, yet failed to accompany its sales and/or marketing of Roundup with any warnings or precautions for that grave danger. On information and belief, Wilbur-Ellis was one of the distributors providing Roundup and other glyphosate-containing products actually used by the Plaintiff.

70.     Steven Gould is the National IT&O Account Manager for Monsanto, responsible for sales and marketing to distributors and users of Roundup and other glyphosate-containing

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

products in California. Mr. Gould engaged in the marketing, promotion and sale of these products, aware of their carcinogenic or potentially carcinogenic properties, but failed to inform any of his sales targets of such danger.

### *Plaintiff's Exposure to Roundup®*

71.     Plaintiff, Bernice Katz, had direct contact with Roundup® as she applied Roundup to weeds on her property for a period of approximately fifteen years. The application occurred on Ms. Katz property located throughout Michigan.

72.     Ms. Katz was diagnosed with non-Hodgkin lymphoma in March of 2018 at the age of 83.

### CLAIM-I
### STRICT LIABILITY (DESIGN DEFECT)

73.     Plaintiff incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

74.     Plaintiff brings this strict liability claim against Defendants for defective design.

75.     At all times relevant to this litigation, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendants. At all times relevant to this litigation, Defendants designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products Plaintiff was exposed to as described above.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

76.    At all times relevant to this litigation, Defendants' Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff.

77.    At all times relevant to this litigation, Defendants' Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Michigan, California, and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold distributed, labeled, and marketed by Defendants.

78.    Defendants' Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in that when they left the hands of the Defendants' manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

79.    Defendants' Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in that when they left the hands of Defendants' manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

80.    At all times relevant to this action, Defendants knew or had reason to know that Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendants.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

81.    Therefore, at all times relevant to this litigation, Defendants' Roundup® products, as researched, tested developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendants were defective in design and formulation, in one or more of the following ways:

      a.   When placed in the stream of commerce, Defendants' Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

      b.   When placed in the stream of commerce, Defendants' Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

      c.   When placed in the stream of commerce, Defendants' Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

      d.   Defendants did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient in glyphosate.

      e.   Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

      f.   Defendants knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

      g.   Defendants did not conduct adequate post-marketing surveillance of its Roundup® products.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

h. Defendants could have employed safer alternative designs and formulations.

82. Plaintiff were exposed to Defendants' Roundup® products while using the product for the purposes of controlling weeds on her property located in Michigan.

83. At all times relevant to this litigation, Plaintiff was exposed to the use of Defendants' Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

84. Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® of glyphosate-containing products before or at the time of exposure.

85. The harm caused by Defendants' Roundup® products far outweighed their benefit, rendering Defendants' products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendants' Roundup® products were and are more dangerous than alternative products and Defendants could have designed its Roundup® products to make them less dangerous. Indeed, at the time that Defendants designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

86. At the time Roundup® products left Defendants' control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendants' herbicides.

87. Defendants defective design of its Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including the Plaintiff herein.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

88.     Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendants are strictly liable to Plaintiff.

89.     The defects in Defendants' Roundup® products were substantial and contributing factors in causing Plaintiff grave injuries, and, but for Defendants' misconduct and omissions, Plaintiff would not have sustained her injuries.

90.     Defendants' conduct, as described above, was reckless. Defendants risked the lives of consumers and users of its products, including Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, warn or inform the unsuspecting public. Defendants' reckless conduct warrants an award of punitive damages.

91.     As a direct and proximate result of Defendants placing defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

92.     **WHEREFORE,** Plaintiff respectfully requests this Honorable Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## CLAIM-II
## STRICT LIABILITY (FAILURE TO WARN)

93.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

94.    Plaintiff brings this strict liability claim against Defendants for failure to warn.

95.    At all times relevant to this litigation, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, promoting and applying Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendants.

96.    Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiff, and persons responsible for consumers (such as employers), and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

97.    At all times relevant to this litigation, Defendants had a duty to properly test develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendants had a continuing duty to warn the Plaintiff of the dangers associated with Roundup® use and exposure. Defendants, as manufacture, seller, or distributor of chemical herbicides, are held to the knowledge of an expert in the field.

98.    At the time of manufacture, Defendants could have provided the warnings or

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

99.     At all times relevant to this litigation, Defendants failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of this product and to those who would foreseeably use or be harmed by Roundup, including Plaintiff.

100.   Despite the fact that Defendants knew or should have known that Roundup® posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time it distributed, supplied or sold the product, and not known to end users and consumers, such as Plaintiff.

101.   Defendants knew or should have known that these products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Defendants have wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

102.   At all times relevant to this litigation, Defendants' Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

products in Michigan and California and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, marketed and sprayed/applied by Defendants.

103. Plaintiff was exposed to Roundup® products, as described above, without knowledge of their dangerous characteristics.

104. At all times relevant to this litigation, Plaintiff was exposed to the use of Defendants' Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

105. Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendants.

106. Defendants knew or should have known that the minimal warnings disseminated with or accompanying the application of Roundup® products were inadequate, but they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

107. The information that Defendants did provide failed to contain relevant warnings, hazards, and precautions that would have enabled those exposed such as Plaintiff to utilize the products safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; contained to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

108. To this day, Defendants have failed to adequately and accurately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

109. As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were sold or distributed by Defendants, were applied by Defendants, and when Plaintiff became exposed.

110. Defendants are liable to Plaintiff for injuries caused by negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of their products and the risks associated with the use of or exposure to Roundup® and glyphosate.

111. The defects in these Roundup® products were substantial and contributing factors in causing Plaintiff's injuries, and, but for Defendants' misconduct and omissions, Plaintiff would not have sustained her injuries.

112. Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products and application,

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

Plaintiff could have avoided the risk of developing injuries as alleged herein and would have chosen a different weed killing product.

113.    As a direct and proximate result of Defendants placing defective Roundup® products into the stream of commerce and exposing Plaintiff to them, Plaintiff has suffered and continues to suffer severe injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

114.    **WHEREFORE,** Plaintiff respectfully requests this Honorable Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Honorable Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## CLAIM-III
## NEGLIGENCE

115.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

116.    Defendants, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

117.    At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

unreasonably dangerous to consumers and users of the product.

118.   At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the marketing, advertisement, and sale of Roundup® products. Defendants' duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

119.   At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

120.   Accordingly, at all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known that use of or exposure to Roundup® products could cause or be associated with Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

121.   Defendants also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup® and glyphosate-containing products.

122.   As such, Defendants breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that Defendants manufactured and produced defective herbicides containing the chemical

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

123. Despite ability and means to investigate, study, and test products and to provide adequate warnings, Defendants have failed to do so. Indeed, Defendants wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

124. Defendants negligence included:

    a. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® products without thorough and adequate pre-and-post-market testing;

    b. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

    c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture, private home use, and horticulture;

    d. Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

the prevalent use of Roundup®/glyphosate as an herbicide;

    e.  Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

    f.  Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendants could reasonably foresee would use and be exposed to its Roundup® products;

    g.  Failing to disclose to Plaintiff, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

    h.  Failing to warn Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other consumers;

    i.  Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

    j.  Representing that its Roundup® products were safe for their intended use when, in fact, Defendants knew or should have known that the products were not safe for their intended purpose;

    k.  Declining to make or propose any changes to Roundup® products labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

    l.  Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendants to be associated with or caused by the use of or exposure to Roundup® and glyphosate.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

m.  Continuing to disseminate information to its consumers, which indicate or imply that Defendants' Roundup® products are not unsafe for use in the agricultural, private home use and horticultural industries; and

n.  Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

125.  Defendants knew and/or should have known that it was foreseeable that consumers such as Plaintiff would suffer injuries as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®

126.  Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

127.  Defendants' negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff suffered, and will continue to suffer, as described herein.

128.  Defendants' conduct, as described above, was reckless. Defendants regularly risk the lives of consumers and users of their products, including Plaintiff, with full knowledge of the dangers of its products. Defendants made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff. Defendants reckless conduct therefore warrants an award of punitive damages.

129.  As a proximate result of Defendants' wrongful acts and omissions in placing defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff has suffered and continues to suffer severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering,

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

have suffered economic losses (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

130.   **WHEREFORE,** Plaintiff respectfully prays this Honorable Court enters a judgement in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## CLAIM-IV
## BREACH OF IMPLIED WARRANTIES

131.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

132.   At all times relevant to this litigation, Defendants engaged in the business of testing developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce.  These actions were under the ultimate control and supervision of Defendants.

133.   Before the time that Plaintiff was exposed to the use of the aforementioned Roundup® products, Defendants impliedly warranted to consumers and those exposed-including Plaintiff-that Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

134.   Defendants, however, failed to disclose that Roundup ® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

135.   Plaintiff reasonably relied upon the skill, superior knowledge and judgment of Defendants and upon their implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

136.   Upon information and belief, Plaintiff was at all relevant times in privity with Defendants.

137.   Plaintiff is the intended third-party beneficiaries of implied warranties made by Defendants to the purchasers of their horticultural herbicides, and as such Plaintiff is entitled to assert this claim.

138.   The Roundup® products were expected to reach and did in fact reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendants.

139.   At all times relevant to this litigation, Defendants were aware that consumers and users of their products, including Plaintiff, would use Roundup® products as marketed by Defendants which is to say that Plaintiff was a foreseeable user of Roundup®.

140.   Defendants intended that Roundup® products be used in the manner in which Plaintiff was exposed to them and Defendants impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

141.   In reliance upon Defendants' implied warranty, Plaintiff used or was exposed to

Roundup® as instructed and labeled and in the foreseeable manner intended, recommended

**promoted and marketed by Defendants.**

142.   Plaintiff could not have reasonably discovered or known of the risks of serious

injury associated with Roundup® or glyphosate.

143.   Defendants breached their implied warranty to Plaintiff in that Roundup®

products were not of merchantable quality, safe, or fit for their intended use, or adequately

tested. Roundup® has dangerous propensities when used as intended and can cause serious

injuries, including those injuries complained of herein.

144.   The harm caused by Roundup® products far outweighed their benefit, rendering

the products more dangerous than an ordinary consumer or user would expect and more

**dangerous than alternative products.**

145.   As a direct and proximate result of Defendants wrongful acts and omissions

Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has

endured pain and suffering, has suffered economic loss (including significant expenses for

medical care and treatment) and will continue to incur these expenses in the future.

146.   **WHEREFORE,** Plaintiff respectfully prays this Honorable Court enter a

judgment in Plaintiff's favor for compensatory and punitive damages, together with interest,

costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems

just and proper. Plaintiff also demands a jury trial on the issues contained herein.

**COUNT-V**
**<u>PUNITIVE DAMAGES</u>**

147.   Plaintiff repeats and reiterates the allegations previously set forth herein.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

148. At all times material hereto, the Defendants knew or should have known that the subject product was inherently dangerous with respect to its health risks.

149. At all times material hereto, the Defendants attempted to misrepresent and did misrepresent facts concerning the safety of the subject product.

150. Defendants misrepresentations included knowingly withholding material information from the public, including the Plaintiff herein, concerning the safety of the subject product.

151. At all times material hereto, the Defendants knew and recklessly disregarded the fact that human exposure to Roundup® can and does cause health hazards, including non-Hodgkin lymphoma.

152. Notwithstanding the foregoing, the Defendants continued to aggressively market and apply the subject product without disclosing the aforesaid risks.

153. Defendants knew of the subject product's defective and unreasonably dangerous nature, as set forth herein, but continued to design, develop, manufacture, market, distribute, sell, and apply it so as to maximize sales and profits at the expense of the health and safety of the public, including the Plaintiff herein, in conscious and/or negligent disregard of the foreseeable harm caused by Roundup®.

154. The Defendants intentionally concealed and/or recklessly failed to disclose to the public, including the Plaintiff herein, the potentially life-threatening hazards of Roundup® in order to ensure continued and increased sales.

155. The Defendants' intentional and/or reckless failure to disclose information

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

deprived the Plaintiff of necessary information to enable Plaintiff to weigh the true risks of using or being exposed to the subject product against its benefits.

156. As a direct and proximate result of the Defendants' conscious and deliberate disregard for the rights and safety of consumers such as the Plaintiff, Plaintiff suffered severe and permanent physical injuries. The Plaintiff has endured substantial pain and suffering and has undergone extensive medical and surgical procedures. Plaintiff has incurred significant expenses for medical care and treatment and will continue to incur such expenses in the future. The Plaintiff has suffered and will continue to suffer economic loss, and has otherwise been physically, emotionally and economically injured. The Plaintiff's injuries and damages are permanent and will continue into the future.

157. The aforesaid conduct of the Defendants was committed with knowing, conscious, and deliberate disregard for the rights and safety of consumers, including the Plaintiff herein, thereby entitling the Plaintiff to punitive damages in an amount appropriate to punish the Defendants and deter from similar conduct in the future.

158. **WHEREFORE,** Plaintiff respectfully demands this Honorable Court enter judgment against Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## **PRAYER FOR RELEIF**

**WHEREFORE,** Plaintiff respectfully requests this Honorable Court enter judgment in her favor and against Defendants, awarding as follows:

A. Compensatory damages in an amount to be proven at trial;

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

B. Punitive damages;

C. Costs including reasonable attorneys' fees, court costs and other litigation expenses;

D. And any other relief the Court may deem just and proper.

Dated: January 28, 2020                              Respectfully Submitted,


**MUSSIN & SCANLAND, PLLC**


**BY:**<u>JERARD M. SCANLAND</u>
       **JERARD M. SCANLAND (P74992)**
Attorneys for Plaintiff
13351 Reeck Court, Suite 5
Southgate, Michigan 48195
Phone: (734)-282-6037
Fax: (734)-447-5853
JScanland@milawoffices.com