ACCO,(PVCx),DISCOVERY,MANADR

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA (Western Division – Los Angeles)
# CIVIL DOCKET FOR CASE #: 2:20–cv–01637–GW–PVC

Dona Rawson v. Monsanto Company
Assigned to: Judge George H. Wu
Referred to: Magistrate Judge Pedro V. Castillo
Cause: 28:1332 Diversity–Product Liability

Date Filed: 02/19/2020
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Dona Rawson**
*an individual*

represented by **Charles D Reiter**
Reiter Gruber LLP
100 Wilshire Boulevard Suite 700
Santa Monica, CA 90401
310–496–7799
Email: creiter@reitergruber.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert H Gruber**
Reiter Gruber LLP
100 Wilshire Boulevard Suite 700
Santa Monica, CA 90401
310–496–7799
Email: rgruber@reitergruber.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**
*a Delaware corporation*

**Defendant**

**Does**
*1–50*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/19/2020 | 1 | COMPLAINT Receipt No: ACACDC–25413952 – Fee: $400, filed by Plaintiff Dona Rawson. (Attorney Charles D Reiter added to party Dona Rawson(pty:pla))(Reiter, Charles) (Entered: 02/19/2020) |
| 02/19/2020 | 2 | CIVIL COVER SHEET filed by Plaintiff Dona Rawson. (Reiter, Charles) (Entered: 02/19/2020) |
| 02/19/2020 | 3 | NOTICE of Interested Parties filed by Plaintiff Dona Rawson, (Reiter, Charles) (Entered: 02/19/2020) |
| 02/19/2020 | 4 | Request for Clerk to Issue Summons on Complaint (Attorney Civil Case Opening) 1 filed by Plaintiff Dona Rawson. (Reiter, Charles) (Entered: 02/19/2020) |
| 02/19/2020 | 5 | NOTICE of Related Case(s) filed by Plaintiff Dona Rawson. Related Case(s): MDL No. 2741 (Reiter, Charles) (Entered: 02/19/2020) |
| 02/20/2020 | 6 | NOTICE OF ASSIGNMENT to District Judge George H. Wu and Magistrate Judge Pedro V. Castillo. (lh) (Entered: 02/20/2020) |
| 02/20/2020 | 7 | NOTICE TO PARTIES OF COURT–DIRECTED ADR PROGRAM filed. (lh) (Entered: 02/20/2020) |

| 02/20/2020 | 8 | 21 DAY Summons Issued re Complaint (Attorney Civil Case Opening) 1 as to Defendant Monsanto Company. (lh) (Entered: 02/20/2020) |
|---|---|---|
| 02/26/2020 | 9 | STANDING ORDER RE FINAL PRE–TRIAL CONFERENCES FOR CIVIL JURY TRIALS BEFORE JUDGE GEORGE H. WU by Judge George H. Wu. (See document for details) (mrgo) (Entered: 02/26/2020) |
| 02/26/2020 | 10 | ORDER RE TRANSFER PURSUANT TO GENERAL ORDER 19–03 (Related Case) filed. Transfer of case declined by Judge Dolly M. Gee, for the reasons set forth on this order. Related Case No. 2:15–cv–07426 DMG(Ex) (rn) (Entered: 02/26/2020) |

CHARLES D. REITER (SBN 306381)
creiter@reitergruber.com
ROBERT H. GRUBER (SBN 301620)
rgruber@reitergruber.com
REITER GRUBER LLP
100 Wilshire Boulevard, Suite 700
Santa Monica, California 90401
Telephone: (310) 496-7799

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONA RAWSON, an individual,<br><br>Plaintiff,<br><br>v.<br><br>MONSANTO COMPANY, a Delaware corporation; and DOES 1-50,<br><br>Defendants. | Case No. _____<br><br>[Request transfer to MDL No. 2741]<br><br>**COMPLAINT FOR DAMAGES:**<br><br>1. Strict Products Liability – Design Defect<br>2. Strict Products Liability – Failure to Warn<br>3. Negligence<br>4. Breach of Express Warranties<br>5. Breach of Implied Warranties<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Dona Rawson ("Mrs. Rawson" or "Plaintiff"), by and through her undersigned attorneys, hereby alleges upon personal knowledge with respect to her own acts, and upon information and belief as to all other matters, as follows:

## STATEMENT OF THE CASE

1.     Mrs. Rawson brings this suit for damages as a direct and proximate result of Defendants' negligent and wrongful conduct in connection with the design, development, manufacturing, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup®, which contains the active ingredient glyphosate.

2.     Mrs. Rawson owns a landscaping business and has been a landscaper for over thirty years.  During that time period, Mrs. Rawson regularly purchased and used Roundup® and/or other of Defendants' glyphosate-containing products ("Roundup").  Indeed, Mrs. Rawson has receipts and purchase records detailing her regular purchasing of Roundup.

3.     In 1970, Defendant Monsanto discovered the herbicidal properties of glyphosate and by 1974 had begun using it in its products by 1974, marketing it under the brand name Roundup.  Roundup is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops.  By 2001, glyphosate had become the most-used active ingredient in American agriculture, with 85–90 million pounds used annually.  That figure grew to 185 million pounds by 2007.

4. Defendant Monsanto has consistently represented Roundup as being safe to humans and the environment since it began selling the herbicide. Indeed, Monsanto has proclaimed—and continues to proclaim, particularly to United States consumers—that glyphosate-based herbicides, including Roundup, create no unreasonable risks to human health or to the environment. This is untrue. Before glyphosate was first approved by the Environmental Protection Agency ("EPA"), Monsanto knew that glyphosate could pose significant risks to human health, including a risk of causing cancer. This lawsuit seeks to hold Monsanto accountable for that misconduct and for the damages that misconduct caused Mrs. Rawson.

5. In November of 2009, Mrs. Rawson was diagnosed with leukemia.

6. Mrs. Rawson maintains that Roundup and/or glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper warnings and directions as to the dangers associated with its use. Mrs. Rawson further maintains that Roundup and/or glyphosate are direct and proximate causes of her leukemia.

7. Mrs. Rawson is not alone in maintaining that Roundup and/or glyphosate is dangerous to human health. The International Agency for Research on Cancer ("IARC"), an organization within the World Health Organization ("WHO"), conducted an exhaustive analysis on the toxicity of glyphosate. The IARC, which has already reviewed hundreds of other chemical agents, convened a panel of seventeen renowned scientists from eleven countries, specifically screened to avoid

potential conflicts of interest, to conduct a systematic review of all publicly available information about glyphosate. The year-long study resulted in the publication of an IARC Monograph—the authoritative standard for cancer hazard assessment around the world. The IARC classified glyphosate as a Group 2A hazard, meaning it is a probable human carcinogen—the second highest hazard rating. Additionally, the IARC concluded there was a positive association between glyphosate exposure and leukemia. As a result of the IARC's study of glyphosate, the State of California's Office of Environmental Health Hazard Assessment ("OEHHA") has decided to list glyphosate as an agent "known to the state to cause cancer" under Proposition 65.[1]

8. Moreover, California juries in multiple trials in the past two years have already found in favor of plaintiffs who were injured by Roundup. Those juries found Defendants liable for a combined hundreds of millions of dollars.

9. The sad reality is that Mr. Rawson's injuries—like those affecting thousands of similarly situated victims across the country—were avoidable.

## THE PARTIES

10. Plaintiff Dona Rawson is a natural person and at all relevant times a resident and citizen of Los Angeles County, California. Mrs. Rawson owns a

---

[1] On February 26, 2018, the U.S. District Court for the Eastern District of California denied Monsanto's motion for a preliminary injunction enjoining California from listing glyphosate as a chemical known to the State of California to cause cancer.

landscaping business and has been a landscaper for over 30 years. Mrs. Rawson

brings this action for personal injuries sustained by exposure to Roundup containing

the active ingredient glyphosate. As a direct and proximate result of being exposed

to Roundup, Mrs. Rawson developed leukemia.

11. "Roundup" refers to all formulations of Defendants' Roundup products,

including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush

Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry

Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup

Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup

Herbicide, Roundup Original 2k Herbicide, Roundup Original II Herbicide,

Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup

Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast

Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed &

Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus

Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-

Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide,

Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer

Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed &

Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate,

Roundup Weed & Grass Killer 1 Ready-to-Use, Roundup WSD Water Soluble Dry

Herbicide Deploy Dry Herbicide, and/or any other formulation containing the active ingredient glyphosate.

12.     Defendant MONSANTO COMPANY ("Monsanto") is a Delaware corporation, California Secretary of State Entity No. C2362863, in "active" status, with a principle place of business in St. Louis, Missouri.

13.     Upon information and belief, Defendants DOES 1-50 are subsidiaries, partners, or other entities that were involved in the design, development, manufacturing, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup, containing the active ingredient glyphosate.   The identities of DOES 1-50 are unknown to Mrs. Rawson at this time. Mrs. Rawson will move the Court to specifically name DOES 1-50 as their identities become known to her.

14.     Defendants advertise and sell goods—specifically, Roundup—in Los Angeles County, California.

15.     Defendants engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup.

16.     Defendants are authorized to do business in California.   They derive substantial income and revenue from doing business in this state and from goods and products used in the State of California.

6

17.     Defendants expected or should have expected their acts to have consequences within the State of California, and derived substantial revenue from interstate commerce.

18.     Upon information and belief, Defendants purposefully availed themselves of the privilege of conducting activities with the State of California, thus invoking the benefits and protections of its laws.

19.     Upon information and belief, Defendants acted together to design, sell, advertise, manufacture and/or distribute Roundup, with full knowledge of its dangerous and defective nature.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over Defendants and this action pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship between Plaintiff and Defendants.  Defendants are all either incorporated and/or have their principal place of business outside of the state in which Plaintiff resides (*i.e.* California).

21.     The amount in controversy between Plaintiff and Defendants exceeds $75,000, exclusive of interest and cost.

22.     The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

23.     Venue is proper within this district pursuant to 28 U.S.C. § 1391, in that Defendants conduct business here and are subject to personal jurisdiction in this

district.  Furthermore, Defendants sell, market, and/or distribute Roundup within the Central District of California.  Also, a substantial part of the acts and/or omissions giving rise to these claims occurred within this district.

## **TOLLING OF THE STATUTE OF LIMITATIONS**

24.     Mrs. Rawson has suffered an illness that has a latency period and does not arise until years after exposure.  Mrs. Rawson had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup and glyphosate until made aware that her illnesses, including leukemia, could be caused by the use of and/or exposure to Roundup.  The discovery rule applies, and the statute of limitations was tolled until Mrs. Rawson knew or had reason to know that her illnesses, including leukemia, were linked to her use of and/or exposure to Roundup.  Indeed, leukemia was only recently linked to the use of and/or exposure to Roundup.

25.     Within the time period of any applicable statute of limitations, Mrs. Rawson could not have discovered through the exercise of reasonable diligence that exposure to Roundup and glyphosate is injurious to human health.

26.     Mrs. Rawson did not discover and did not know of facts that would cause a reasonable person to suspect the risk associated with the use of and/or exposure to Roundup and glyphosate, nor would a reasonable and diligent investigation by Mrs. Rawson have disclosed that Roundup and glyphosate would cause Mrs. Rawson's illnesses.

8

27.     The expiration of any applicable statute of limitations has been equitably tolled by reason of Defendants' fraudulent misrepresentations, fraudulent concealment, and fraudulent conduct.  Through affirmative misrepresentations and omissions, Defendants actively concealed from Mrs. Rawson the true risks associated with the use of and/or exposure to Roundup.  In fact, to this very day, Defendants continue to actively conceal the true risks associated with the use of and/or exposure to Roundup and maintain that Roundup is not injurious to human health.

28.     As a result of Defendants' actions, Mrs. Rawson could not reasonably have known or learned through reasonable diligence (i) that she had been exposed to the risks alleged herein or (ii) that those risks were the direct and proximate result of Defendants' acts and omissions.

29.     Defendants are estopped from relying on any statute of limitations because of their concealment of the truth regarding the Roundup's safety. Defendants had a duty to disclose the true character, quality, and nature of Roundup, because this was non-public information over which Defendants continue to have exclusive control.  Defendants knew that this information was not available to Mrs. Rawson, Mrs. Rawson's medical providers, and/or Mrs. Rawson's health facilities, yet Defendants failed to disclose the information to the public (including Mrs. Rawson).

30.     Defendants had the ability to, and did, spend enormous amounts of money in furtherance of marketing and promoting a profitable product, notwithstanding the product's known or reasonably knowable risks. Mrs. Rawson and medical professionals could not have afforded to and could not possibly have conducted studies to determine the nature, extent, and identity of related health risks and were forced to rely on Defendants' representations. Accordingly, Defendants are precluded by the discovery rule, the doctrine of fraudulent concealment, and/or estoppel from relying upon any statute of limitations.

## FACTUAL ALLEGATIONS

31.     At all relevant times, Defendants were in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, and distribute the commercial herbicide Roundup, and/or have acquired and are responsible for Defendants who have designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed Roundup.

32.     Defendant Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate.

33.     Defendants discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate-based Roundup as a broad-spectrum herbicide.

34.     Glyphosate is the active ingredient in Roundup.

35.     Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

36.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

37.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase—which interferes with the shikimic pathway in plants—resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

38.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

39.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses.

40.     For approximately 40 years, consumers around the world, including landscapers such as Mrs. Rawson, have used Roundup, containing glyphosate, without knowing the dangers it poses to users.  That is because—when Monsanto first introduced Roundup—Monsanto touted glyphosate as a technological breakthrough capable of killing almost every weed without causing harm either to people or to the environment.

41.     This was untrue.  According to the WHO, the main chemical ingredient

of Roundup— glyphosate—is a probable carcinogen.  Monsanto assured the public

that Roundup was harmless.  In order to prove this, Monsanto championed falsified

data and attacked legitimate studies exposing glyphosate's dangers.  Monsanto

orchestrated a prolonged campaign of disinformation to convince government

agencies and the general population that Roundup was safe.  As a result of this

deception, the public has been exposed to a carcinogen, while Monsanto and

Defendants have made billions of dollars.

## I.     Registration of Herbicides

42.     The manufacture, formulation, and distribution of herbicides such as

Roundup are regulated under the Federal Insecticide, Fungicide, and Rodenticide

Act ("FIFRA"), 7 U.S.C. §§ 136 *et seq.*  FIFRA requires that all pesticides be

registered with the EPA prior to distribution, sale, or use, except as otherwise

described by the Act. 7 U.S.C. § 136a(a).

43.     Because herbicides are toxic to plants, animals, and humans, at least to

some degree, the EPA requires among other things that, as part of the registration

process, a variety of tests be undertaken to evaluate herbicides' potential for

exposure, toxicity (to people and to other potential non-target organisms), and other

adverse effects on the environment.  Registration by the EPA, however, is not an

assurance or finding of safety.  The EPA does not deem certain products "safe," but

instead deems only that use of a product in accordance with its label directions "will

not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

44. FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or a product allowed to continue to be sold in commerce.

45. FIFRA generally requires that the registrant—Monsanto, in the case of Roundup—conduct the health and safety testing of herbicide/pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting those tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required—nor is it able—to perform the tests that are required of the manufacturer/registrant.

46. The evaluation of each herbicide/pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA currently is in the process of re-evaluating all pesticide products through a congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate

these products, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

47.     In the case of glyphosate, the EPA planned on releasing its preliminary risk assessment—in relation to the re-registration process—no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

48.     In April 2016, the EPA posted a risk assessment of glyphosate on its website and then immediately retracted it. The EPA subsequently indicated that the posting was inadvertent, that the document posted was not the EPA's final assessment or even a preliminary one, and that the EPA intended to issue a final report by the end of 2016.

## II.     Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup

49.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation

and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

50. On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup products for registration purposes committed fraud.

51. In the first instance of fraud, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup. IBT performed approximately 30 tests on glyphosate and glyphosate-containing-products, including 9 of the 15 residue studies needed to register Roundup with the EPA.

52. In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT and determined that the toxicology studies conducted for the Roundup were invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

53. In 1983, three top executives of IBT were convicted of fraud.

54. In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including several studies on Roundup. That same year, the owner of Craven Laboratories and three of

its employees were indicted—and later convicted—of fraudulent laboratory practices in the testing of pesticides and herbicides.

### III.   Monsanto's Market Dominance

55.   The success of Roundup was key to Defendants' continued reputation and dominance in the marketplace.  Largely due to the success of Roundup sales, Monsanto's Agriculture division was outperforming its Chemicals division in operating income, and that gap increased yearly.  But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup market dominance and to ward off impending competition.

56.   In response, Monsanto began the development and sale of genetically engineered "Roundup Ready" seeds in 1996.  Since Roundup Ready crops are resistant to glyphosate, farmers can spray Roundup onto their fields during the growing season without harming the crop.  This allowed Monsanto to expand its market for Roundup even further.  By 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready seeds.  It also secured Monsanto's dominant share of the glyphosate/Roundup market through a marketing strategy that coupled proprietary Roundup Ready seeds with continued sales of its Roundup herbicide.

57.     Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready seeds, Roundup became Monsanto's most profitable product.  In 2000, Roundup accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue.  Today, glyphosate remains one of the world's largest herbicides by sales volume.

## IV.     Monsanto Knew for Decades That It Was Falsely Advertising Glyphosate/Roundup As Safe

58.     In 1996, the New York Attorney General (the "NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products.  Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish.  Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are:

a.      "Remember that environmentally friendly Roundup herbicide is biodegradable.  It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences."

b.      "And remember that Roundup is biodegradable and won't build up in the soil.  That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem."

c.    "Roundup biodegrades into naturally occurring elements."

d.    "Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e.    "This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it."

f.    You can apply Roundup with "confidence because it will stay where you put it, it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Roundup into natural products.

g.    "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

h.    "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700- fold safety margin for workers who manufacture it or use it."

i.    "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

j.    "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area that has been treated with Roundup.

59.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with the NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a.      glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk;

b.      glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable;

c.      glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means;

d.      glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics";

e.      glyphosate-containing products or any component thereof are safer or less toxic than common consumer products other than herbicides; and,

f.      glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

60.     Monsanto did not alter its advertising in the same manner in any state other than New York and, on information and belief, still has not done so today.

61.　In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."

## V.　Assessments of Glyphosate and Roundup

62.　IARC was created in 1965 as the specialized cancer agency of the World Health Organization with support of the United States. IARC promotes international collaboration in cancer research, "bringing together skills in epidemiology, laboratory sciences, and biostatistics to identify the causes of cancer[.]"

63.　IARC is transparent. The minutes and documents presented at its council meetings are publicly available and, thus, are subject to scientific scrutiny. Starting in 1971, IARC began assessing whether various chemicals were carcinogenic through the Monograph program. The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

64.     The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.  Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

65.     A year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts.  Eight months before the Monograph meeting, the Working Group membership is selected, and the sections of the Monograph are developed by the Working Group members.  One month prior to the Monograph meeting, the call for data is closed, and the various draft sections are distributed among Working Group members for review and comment.  Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation.  Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

66.     In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data.  The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

21

67.     In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

68.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112.

69.     For Volume 112, the volume that assessed glyphosate, the Working Group consisted of seventeen experts from eleven countries who met from March 3–10, 2015 to assess the carcinogenicity of certain herbicides, including glyphosate. Among the members were Lauren Zeise, Ph.D., of the California Environmental Protection Agency, Matthew T. Martin, Ph.D., a scientist with the U.S. Environmental Protection Agency, and Gloria D. Jahnke, D.V.M., D.A.B.T., of the National Institute of Environmental Health Sciences. ,

70.     The March meeting culminated after a nearly one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence.  According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

71.     The studies considered the various exposure groups, including occupational exposure of farmers and tree nursery workers in the United States,

22

forestry workers in Canada and Finland, municipal weed-control workers in the United Kingdom, and para-occupational exposure in farming families.

72.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

73.     Exposure pathways are identified as air (especially during spraying), water, and food.  Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

74.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies showed a human health concern from agricultural and other work-related exposure to glyphosate.

75.     The IARC Working Group conducted a systematic review of over 15 studies designed to assess whether there was an association between Roundup exposure in agricultural workers and Non-Hodgkin Lymphoma ("NHL").  The researchers reviewed each study, identified the results and assessed each study's strengths and weaknesses.  The IARC Working Group concluded that cancers most associated with glyphosate exposure included, among others, NHL and leukemia.

76.     Overall, nine epidemiological studies showed positive associations between glyphosate and NHL, with several studies showing statistically significant relative risks of NHL exceeding 2.0 and even 3.0.

77.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma.  A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies.  A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

78.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells.  One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.  In assessing glyphosate's genotoxicity (the property of chemical agents that damages the genetic information within a cell causing mutations, which may lead to cancer), the IARC Working Group concluded "[t]here is strong evidence that glyphosate causes genotoxicity."

79.     Additionally, the IARC assessed whether glyphosate exposure can induce oxidative stress, which is thought to be involved in the development of numerous conditions, including cancer, autism, and Parkinson's disease.  The IARC concluded that "strong evidence exists that glyphosate ... can induce oxidative stress."  This is an important mechanism by which Roundup causes cancer.

80.     In the IARC monograph for glyphosate, there is an entire section devoted to exposure to humans, looking at studies examining glyphosate exposures in various settings.  The IARC Working Group noted that glyphosate has been detected in urine of agricultural workers, indicating absorption.  The IARC Working

Group specifically evaluated farm workers in the United States, and found that, within the days following the application of Roundup to a crop, approximately 60% of farm workers tested positive for glyphosate in the urine. Additionally, the IARC Working Group noted that soil microbes degrade glyphosate into aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

81. The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.

82. The results support an association between glyphosate exposure and multiple types of leukemia in addition to several other cancers.

83. In addition to the IARC's assessment, in 2014, scientists published a systematic review and meta-analysis on the relationship between NHL and occupational exposure to agricultural pesticides, including glyphosate, in the International Journal of Environmental Research and Public Health. The study showed a statistically significant association between farm workers exposed to Roundup and NHL. The study confirmed two smaller studies from 2002 and 2008, published in the journal Leukemia & Lymphoma (2002) and the International Journal on Cancer (2008).

84. Recent studies, including a glyphosate residue study published in the Journal of Environmental & Analytical Toxicology in 2014, indicate that

25

1  "chronically ill humans showed significantly higher glyphosate residues in urine

2  than healthy population."  Glyphosate has been detected in the blood and urine of

3

4  agricultural workers, indicating that agricultural use of Roundup leads to its

5  absorption.

6      85.    In November 2015, 96 prominent experts, including almost the whole

7

8  IARC team, reiterated IARC's assessment that Roundup is probably a human

9  carcinogen.

10     86.    In late February 2016, another 14 scientists signed a consensus

11

12  statement in the Environmental Health journal, saying regulatory estimates of

13  tolerable exposure levels for glyphosate were based on outdated science.

14     87.    In June 2016, the European Union parliament refused to re-register

15

16  glyphosate-containing herbicides due to safety concerns.

17

18  **VI.   Recent Worldwide Bans on Roundup/Glyphosate**

19     88.    Several countries around the world have instituted bans on the sale of

20  Roundup and other glyphosate-containing herbicides, both before and since IARC

21

22  first announced its assessment for glyphosate in March 2015, and more countries

23  undoubtedly will follow suit in light of this assessment as the dangers of the use of

24  Roundup are more widely known.

25

26     89.    The Netherlands issued a ban on all glyphosate-based herbicides in

27  April 2014, including Roundup, which takes effect by the end of 2015.  In issuing

28

the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

90. The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

91. France banned the private sale of Roundup and glyphosate following the IARC assessment for Glyphosate.

92. Bermuda banned both the private and commercial sale of glyphosates, including Roundup. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

93. The Sri Lankan government banned the private and commercial use of glyphosates. particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

94. The government of Columbia announced its ban on using Roundup and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

## VII. Monsanto's Troubling Conduct is Exposed in Litigation

95. Discovery in the federal Roundup MDL litigation (pending in the Northern District of California) reveals Monsanto's concerning actions.

96. Recently unsealed documents show the extent to which Monsanto has been able to leverage its contacts within the EPA to protect glyphosate and Roundup from scrutiny and review. Such internal documents, including email communications, demonstrate that Jess Rowland, former Deputy Division of the EPA's OPP, and formerly the chair of the CARC (the same committee that inadvertently leaked the EPA's glyphosate report in April 2016), repeatedly and directly intervened on Monsanto's behalf. The same documents reveal that Monsanto was secure in the knowledge that it had allies within the EPA who could help Monsanto avoid a finding of the link between glyphosate and cancer. *See, e.g.,* Plaintiffs' Motion to Compel the Deposition of Jess Rowland, Exs. D, E, G *In re: Roundup Products Liability Litigation*, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF Nos. 189-4, 189-5, 189-7.

97. In addition, Monsanto's own chief toxicologist Donna Farmer has admitted that she cannot say that Roundup does not cause cancer because Monsanto has not performed carcinogenicity studies with the formulated product Roundup. Indeed, she further admitted that in the 35 years that Monsanto has marketed Roundup to the public, Monsanto has conducted no chronic carcinogenicity studies on the formulated Roundup product merely because EPA did not require that such

a study be performed for registration of glyphosate. *See* Plaintiffs' Submission in Response to Pretrial Order No. 8, Ex. 7, *In re Roundup Products Liability Litigation*, MDL No. 2741 (N.D. Cal., Mar. 14, 2017), ECF No. 187-7.

## VIII. Mrs. Rawson's Exposure to Roundup

98.     Mrs. Rawson used Roundup extensively while performing her landscaping duties for over thirty years. Mrs. Rawson began landscaping in the Los Angeles area in or around 1989. From 1989 to 1993, Mrs. Rawson used Roundup in connection with her landscaping duties. In 1993, Mrs. Rawson started her own landscaping business, in which she continued to use Roundup regularly. In fact, Mrs. Rawson's landscaping business has purchased Roundup on a monthly basis since 1993, and Mrs. Rawson used Roundup virtually every week during that time period up until she became aware of the link between Roundup and her illnesses. Mrs. Rawson regularly applied Roundup herself and further was frequently exposed to Roundup during the course of her job duties. In addition, Mrs. Rawson has receipts and purchase records detailing her regular purchasing of Roundup.

99.     Mrs. Rawson was unaware of Roundup's carcinogenic properties until it was far too late; she was diagnosed with leukemia in November 2009. She continued to use Roundup even after her diagnosis because she was unaware of the connection between Roundup and cancer, which Monsanto concealed from the public. It was not until Mrs. Rawson discovered a link between Roundup and leukemia in the past year that Mrs. Rawson began to investigate her claims. Before

that time, Mrs. Rawson did not know about and did not see any information linking Roundup exposure to leukemia. Indeed, Monsanto actively promoted and stated (and still actively promotes and states) that Roundup was safe to humans, and thus, Mrs. Rawson could not reasonably have known that her cancer was caused by Monsanto's Roundup.

100. Upon being diagnosed with leukemia, Mrs. Rawson did inquire as to what may have caused her injury with her doctors, but neither her doctors nor any credible authority informed her of the association between her use of Roundup and her injury. No reasonable inquiry would have discovered that Roundup was the cause of her cancer.

### FIRST CAUSE OF ACTION
**(Strict Liability—Design Defect)**
**(Brought Against All Defendants)**

101. Mrs. Rawson realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

102. Mrs. Rawson brings this strict liability claim against Defendants for defective design.

103. At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products—which are defective and unreasonably dangerous to consumers, including Mrs. Rawson—thereby placing

Roundup products into the stream of commerce. These actions were under Defendant Monsanto's ultimate control and supervision. At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup products that were used by Mrs. Rawson as described above.

104. At all times relevant to this litigation, Monsanto's Roundup products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, Mrs. Rawson.

105. At all times relevant to this litigation, Monsanto's Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in California and throughout the United States, including Mrs. Rawson, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

106. Monsanto's Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto, were defective in design and formulation in that, when they left the hands of Monsanto's manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

107. Monsanto's Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto, were defective in design and formulation in that, when they left the hands of Monsanto's manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

108. At all times relevant to this action, Monsanto knew or had reason to know that its Roundup products were defective and were inherently dangerous and unsafe as provided and as used in the manner instructed by Monsanto.

109. Therefore, at all times relevant to this litigation, Monsanto's Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto, were defective in design and formulation, in one or more of the following ways:

a. When placed in the stream of commerce, Monsanto's Roundup products were defective in design and formulation and, consequently, were dangerous to an extent beyond that which an ordinary consumer would contemplate.

b. When placed in the stream of commerce, Monsanto's Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c.      When placed in the stream of commerce, Monsanto's Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d.      Monsanto did not sufficiently test, investigate, or study its Roundup products and, specifically, the active ingredient glyphosate.

e.      Exposure to Roundup and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f.      Monsanto knew or should have known at the time of marketing its Roundup products that exposure to Roundup—and, specifically, its active ingredient glyphosate—could result in cancer and other severe illnesses and injuries.

g.      Monsanto did not conduct adequate post-marketing surveillance of its Roundup products.

h.      Monsanto could have employed safer alternative designs and formulations.

110. Mrs. Rawson was exposed to Monsanto's Roundup products in the course of spraying properties and vegetation as part of her landscaping business on a weekly basis for over 30 years, as described above, without knowledge of Roundup's dangerous characteristics.

111.  At all times relevant to this litigation. Mrs. Rawson used and/or was exposed to the use of Defendants' Roundup products in an intended or reasonably foreseeable manner, without knowledge of Roundup's dangerous characteristics.

112.  Mrs. Rawson could not reasonably have discovered the defects and risks associated with Roundup or glyphosate before or at the time of exposure, due to the Defendants' suppression of scientific information linking glyphosate to cancer.

113.  The harms caused by Defendants' Roundup products far outweighed the benefits, rendering Defendants' products dangerous to an extent beyond that which an ordinary consumer would contemplate.  Defendants' Roundup products were and are more dangerous than alternative products, and Defendants could have designed Roundup products to make them less dangerous.  Indeed, at the time Defendants designed Roundup products, the state of the industry's scientific knowledge was such that a less risky design or formulation was possible.

114.  At the time Roundup products left Defendants' control, there was a practical, technically feasible, and safer alternative design that would have prevented the harms without substantially impairing the reasonably anticipated or intended function of Defendants' herbicides.

115.  Defendants' defective design of Roundup products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup products, including Mrs. Rawson.

34

116. Therefore, as a result of the unreasonably dangerous condition of their Roundup products, Defendants are strictly liable to Mrs. Rawson.

117. The defects in Defendants' Roundup products were substantial and contributing factors in causing Mrs. Rawson's injuries. But for Defendants' misconduct and omissions, Mrs. Rawson would not have sustained injuries.

118. Defendants' conduct, as described above, was reckless. Defendants risked the lives of consumers of its products or others exposed to its products, including Mrs. Rawson, despite Defendants' knowledge of the safety problems associated with Roundup and glyphosate-containing products, which Defendants suppressed from the general public. Defendants made conscious decisions not to redesign, warn, or inform the unsuspecting public. Defendants' reckless conduct warrants an award of punitive damages.

119. As a direct and proximate result of Defendants' placing their defective Roundup products into the stream of commerce, and the resulting injuries, Mrs. Rawson has sustained pecuniary loss including general damages in a sum which exceeds the jurisdictional minimum of this Court.

120. As a proximate result of Defendants' placing their defective Roundup products into the stream of commerce, as alleged herein, there was a measurable and significant interval of time during which Mrs. Rawson has suffered great mental anguish and other personal injury and damages.

121. As a proximate result of the Defendants placing their defective Roundup products into the stream of commerce, as alleged herein, Mrs. Rawson has sustained loss of income and/or loss of earning capacity.

122. WHEREFORE, Mrs. Rawson respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other or further relief as this Court deems just and proper.

## SECOND CAUSE OF ACTION
### (Strict Liability—Failure to Warn)
### (Brought Against All Defendants)

123. Mrs. Rawson realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

124. Mrs. Rawson brings this strict liability claim against Defendants for failure to warn.

125. At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products. Roundup products are defective and unreasonably dangerous to consumers—including Mrs. Rawson—because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup and, specifically, the active ingredient glyphosate. These actions were under Defendants' ultimate control and supervision. At all relevant times,

Defendants registered, researched, manufactured, distributed, marketed and sold Roundup, and other glyphosate-based formulations, within California and aimed at a California consumer and industrial market.

126. Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup products and, in the course of so doing, directly advertised or marketed the products to consumers and end users, including Mrs. Rawson. Therefore, Defendants had a duty to warn regarding the risks associated with the use of Roundup and glyphosate-containing products.

127. At all relevant times, Defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, and provide proper warnings regarding their Roundup products, and to take such steps as necessary to ensure their Roundup products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendants had a continuing duty to warn Mrs. Rawson of dangers associated with Roundup use and exposure. Defendants, as manufacturers, sellers, and/or distributors of chemical herbicides, are held to the knowledge of an expert in the field.

128. At the time of manufacture, Defendants could have provided warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products, because they knew or should have known of the unreasonable risks of harm associated with the use of or exposure to such products.

129. At all relevant times, Defendants failed and deliberately refused to investigate, study, test, or promote the safety of their Roundup products, and failed to minimize the dangers to users and consumers of their products and to those who would foreseeably use or be harmed by Defendants' herbicides, including Mrs. Rawson.

130. Despite the fact that Defendants knew or should have known that Roundup posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure thereto. The dangerous propensities of their products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendants, or were scientifically knowable to Defendants through appropriate research and testing by known methods, at the time they distributed, supplied, or sold the products, and were not known to end users and consumers such as Mrs. Rawson.

131. Defendants knew or should have known that their products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn consumers (*i.e.*, the reasonably foreseeable users) of the risks of exposure to their products. Defendants have wrongfully concealed information concerning the dangerous nature of Roundup and its active ingredient glyphosate and, further, have made false and/or misleading statements concerning the safety of Roundup products and glyphosate.

132. At all relevant times, Defendants' Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in California and throughout the United States, including Mrs. Rawson, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

133. Mrs. Rawson was exposed to Defendants' Roundup products without knowledge of their dangerous characteristics.

134. At all relevant times, Mrs. Rawson used and/or was exposed to the use of Defendants' Roundup products while using them for their intended or reasonably foreseeable purposes, without knowledge of their dangerous characteristics.

135. Mrs. Rawson could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products prior to or at the time of Plaintiffs exposure. Mrs. Rawson relied upon the skill, superior knowledge, and judgment of Defendants to know about and disclose serious health risks associated with using Defendants' products.

136. Defendants knew or should have known that the minimal warnings disseminated with their Roundup products were inadequate, failed to communicate adequate information on the dangers and safe use/exposure of the products, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and horticultural applications.

137. The information that Defendants *did* provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Mrs. Rawson to utilize the products safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false, and misleading and that failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup and glyphosate. Defendants continued to aggressively promote the efficacy of their products even after they knew or should have known of the unreasonable risks from use or exposure, and concealed, downplayed, or otherwise suppressed through aggressive marketing and promotion any information or research about the risks and dangers of exposure to Roundup and glyphosate.

138. This alleged failure to warn is not limited to the information contained on Roundup's labeling. The Defendants were able, in accord with federal law, to comply with California law by disclosing the known risks associated with Roundup through other non-labeling mediums, *i.e.,* promotion, advertisements, public service announcements, and/or public information sources. But the Defendants did not disclose these known risks through any medium.

139. To this day, Defendants have failed to adequately and accurately warn of the risks of cancer associated with the use of and exposure to Roundup and its active ingredient glyphosate.

140. As a result of their inadequate warnings, Defendants' Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were distributed by Defendants, and were used by Mrs. Rawson.

141. Defendants are liable to Mrs. Rawson for injuries caused by their negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding (i) the appropriate use of their products and (ii) the risks associated with the use of or exposure to Roundup and glyphosate.

142. Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with their Roundup products, Mrs. Rawson could have avoided the risk of developing injuries and/or could have obtained or used alternative herbicides.

143. As a direct and proximate result of Defendants' placing defective Roundup products into the stream of commerce, Mrs. Rawson was injured and has sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

144. As a proximate result of Defendants' placing defective Roundup products into the stream of commerce, as alleged herein, there was a measurable and significant interval of time during which Mrs. Rawson suffered great mental anguish and other personal injury and damages.

145. As a proximate result of Defendants' placing defective Roundup products into the stream of commerce, as alleged herein, Mrs. Rawson has sustained loss of income and/or loss of earning capacity.

146. WHEREFORE, Mrs. Rawson respectfully requests this Court to enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other or further relief as this Court deems just and proper.

### THIRD CAUSE OF ACTION
**(Negligence)**
**(Brought Against All Defendants)**

147. Mrs. Rawson realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

148. Defendants, directly or indirectly, caused Roundup products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Mrs. Rawson. At all relevant times, Defendants registered, researched, manufactured, distributed, marketed and sold Roundup, and other glyphosate-based formulations, within California and aimed at a California consumer and industrial market.

149. At all relevant times, Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup products, including the duty to take all

reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

150. At all relevant times, Defendants had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup products. Defendants' duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup, as well as appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup and, in particular, its active ingredient glyphosate.

151. At all relevant times, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup and, specifically, the carcinogenic properties of the chemical glyphosate.

152. Accordingly, at all relevant times, Defendants knew or, in the exercise of reasonable care, should have known that use of or exposure to Roundup products could cause or be associated with Mrs. Rawson's injuries and, thus, created a dangerous and unreasonable risk of injury to the users of these products, including Mrs. Rawson.

153. Defendants also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup and glyphosate-containing products.

154. As such, Defendants breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of Roundup products, in that Defendants: manufactured and produced defective herbicides containing the chemical glyphosate; knew or had reason to know of the defects inherent in its products; knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects; and failed to prevent or adequately warn of these risks and injuries. Indeed, Defendants deliberately refused to test Roundup products because they knew that the chemical posed serious health risks to humans.

155. Defendants were negligent in their promotion of Roundup, outside of the labeling context, by failing to disclose material risk information as part of their promotion and marketing of Roundup, including through the Internet, television, print advertisements, and other media. Nothing prevented Defendants from being honest in their promotional activities and, in fact, Defendants had a duty to disclose the truth about the risks associated with Roundup in their promotional efforts outside of the context of labeling.

156. Despite having the ability and means to investigate, study, and test the products and to provide adequate warnings, Defendants have failed to do so. Indeed, Defendants have wrongfully concealed information and have further made false

and/or misleading statements concerning the safety of and/or exposure to Roundup and glyphosate.

157. Defendants' negligence included:

a. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup products without thorough and adequate pre- and post-market testing;

b. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup while negligently and/or intentionally concealing and failing to disclose (i) the results of trials, tests, and studies of exposure to glyphosate and (ii) the risk of serious harm associated with human use of and exposure to Roundup;

c. Failing to undertake sufficient studies or conduct necessary tests to determine whether or not Roundup products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d. Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup products so as to avoid the risk of serious harm associated with the prevalent use of Roundup/glyphosate as an herbicide;

e. Failing to design and manufacture Roundup products so as to ensure they were at least as safe and effective as other herbicides on the market;

f.     Failing to provide adequate instructions, guidelines, and safety precautions to those persons Defendants could reasonably foresee would use or be exposed to Roundup products;

g.     Failing to disclose to Mrs. Rawson, users/consumers, and the general public that use of or exposure to Roundup presented severe risks of cancer and other grave illnesses;

h.     Failing to warn Mrs. Rawson, consumers, and the general public that the risk of harm from Defendants' products was unreasonable and that there were safer and effective alternative herbicides available to Mrs. Rawson and other consumers;

i.     Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup and glyphosate-containing products;

j.     Representing that their Roundup products were safe for their intended use when, in fact, Defendants knew or should have known the products were not safe for their intended purpose;

k.     Declining to make or propose any changes to Roundup products' labeling or other promotional materials that would alert consumers and the general public of the risks of Roundup and glyphosate;

l.     Advertising, marketing, and recommending the use of the Roundup products, while concealing and failing to disclose or warn of the dangers

46

known (by Defendants) to be associated with or caused by the use of or exposure to Roundup and glyphosate;

m.  Continuing to disseminate information to its consumers, which indicate or imply that Defendants' Roundup products are not unsafe for use in the agricultural and horticultural industries; and

n.  Continuing the manufacture and sale of their products with the knowledge that the products were unreasonably unsafe and dangerous.

158.  Defendants knew and/or should have known that it was foreseeable consumers such as Mrs. Rawson would suffer injuries as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup.

159.  Mrs. Rawson did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup or its active ingredient glyphosate.

160.  Defendants' negligence was the proximate cause of Mrs. Rawson's injuries (*i.e.,* absent Defendants' negligence, Mrs. Rawson would not have developed cancer).

161.  Defendants' conduct, as described above, was reckless. Defendants regularly risked the lives of consumers and users of their products, including Mrs. Rawson, with full knowledge of the dangers of their products. Defendants have made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting

public, including Mrs. Rawson. Defendants' reckless conduct therefore warrants an award of punitive damages.

162. As a direct and proximate result of Defendants' placing detective Roundup products into the stream of commerce, Mrs. Rawson was injured and has sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

163. As a proximate result of Defendants' placing defective Roundup products into the stream of commerce, as alleged herein, there was a measurable and significant interval of time during which Plaintiff suffered great mental anguish and other personal injury and damages.

164. As a proximate result of Defendants' placing defective Roundup products into the stream of commerce, as alleged herein, Plaintiff sustained a loss of income and/or loss of earning capacity.

165. WHEREFORE, Mrs. Rawson respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other or further relief as this Court deems just and proper.

## FOURTH CAUSE OF ACTION
### (Breach of Express Warranties)
### (Brought Against All Defendants)

166. Mrs. Rawson realleges and incorporates by reference all proceeding paragraphs as though fully set forth herein.

167. At all relevant times, Defendant Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup, products—which are defective and unreasonably dangerous to consumers, including Mrs. Rawson—thereby placing Roundup products into the stream of commerce.  These actions were under Defendant Monsanto's ultimate control and supervision.

168. Defendant Monsanto had a duty to exercise reasonable care in the research, development, design, testing, packaging, manufacture, inspection, labeling, distributing, marketing, promotion, sale, and release of Roundup products, including a duty to:

a.     ensure that its products did not cause the user unreasonably dangerous side effects;

b.     warn of dangerous and potentially fatal side effects; and

c.     disclose adverse material facts, such as the true risks associated with the use of and exposure to Roundup and glyphosate-containing products, when

49

making representations to consumers and the general public, including Mrs. Rawson.

169. As alleged throughout this pleading, the ability of Defendant Monsanto to properly disclose those risks associated with Roundup is not limited to representations made on the labeling.

170. At all relevant times, Defendant Monsanto expressly represented and warranted to the purchasers of its products, by and through statements made by Defendant Monsanto in labels, publications, package inserts, and other written materials intended for consumers and the general public, that Roundup products were safe to human health and the environment, effective, fit, and proper for their intended use. Defendant Monsanto advertised, labeled, marketed, and promoted Roundup products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that Roundup products would conform to the representations.

171. These express representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Roundup and glyphosate. Defendant Monsanto knew and/or should have known that the risks expressly included in Roundup warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendant Monsanto expressly represented that Roundup products were safe and effective, that

they were safe and effective for use by individuals such as Mrs. Rawson, and/or that they were safe and effective as agricultural herbicides.

172. The representations about Roundup, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

173. Defendant Monsanto placed Roundup products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup and its active ingredient glyphosate.

174. Defendant Monsanto breached these warranties because, among other things, Roundup products were defective, dangerous, unfit for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically, Defendant Monsanto breached the warranties in the following ways:

a. Defendant Monsanto represented through its labeling, advertising, and marketing materials that Roundup products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated with use of and/or exposure to Roundup and glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings and labels; and

b.     Defendant Monsanto represented that Roundup products were safe for use and fraudulently concealed information that demonstrated that glyphosate, the active ingredient in Roundup, had carcinogenic properties and that Roundup products, therefore, were not safer than alternatives available on the market.

175. Mrs. Rawson detrimentally relied on the express warranties and representations of Defendant Monsanto concerning the safety and/or risk profile of Roundup in making a decision to purchase the product. Mrs. Rawson reasonably relied upon Defendant Monsanto to disclose known defects, risks, dangers, and side effects of Roundup and glyphosate. Mrs. Rawson would not have purchased or used Roundup had Defendant Monsanto properly disclosed the risks associated with the product, either through advertising, labeling, or any other form of disclosure.

176. Defendant Monsanto had sole access to material facts concerning the nature of the risks associated with its Roundup products, as expressly stated within their warnings and labels, and knew that consumers and users such as Mrs. Rawson could not have reasonably discovered that the risks expressly included in Roundup warnings and labels were inadequate and inaccurate.

177. Mrs. Rawson had no knowledge of the falsity or incompleteness of Defendant Monsanto's statements and representations concerning Roundup.

178. Mrs. Rawson used and/or was exposed to Roundup as researched, developed, designed, tested, manufactured, inspected, labeled, distributed,

packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by Defendant Monsanto.

179. Had the warnings, labels, advertisements, or promotional material for Roundup products accurately and adequately set forth the true risks associated with the use of such products, including Mrs. Rawson's injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Mrs. Rawson could have avoided the injuries complained of herein.

180. As a direct and proximate result of Defendant Monsanto's breach of express warranty, Mrs. Rawson has sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

181. As a proximate result of Defendant Monsanto's breach of express warranty, as alleged herein, there was a measurable and significant interval of time during which Mrs. Rawson suffered great mental anguish and other personal injury and damages.

182. As a proximate result of Defendant Monsanto's breach of express warranty, as alleged herein, Mrs. Rawson sustained a loss of income and/or loss of earning capacity.

183. WHEREFORE, Mrs. Rawson respectfully requests this Court to enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other or further relief as this Court deems just and proper.

## FIFTH CAUSE OF ACTION
### (Breach of Implied Warranties)
### (Brought Against All Defendants)

184. Mrs. Rawson realleges and incorporates by reference all proceeding paragraphs as though fully set forth herein.

185. At all relevant times, Defendant Monsanto engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which were and are defective and unreasonably dangerous to consumers, including Mrs. Rawson, thereby placing Roundup products into the stream of commerce.

186. Before the time Mrs. Rawson was exposed to the aforementioned Roundup products, Defendant Monsanto impliedly warranted to its consumers, including Mrs. Rawson, that Roundup products were of merchantable quality and safe and fit for the use for which they were intended: specifically, as agricultural herbicides.

187. But Defendant Monsanto failed to disclose that Roundup has dangerous propensities when used as intended or that use of and/or exposure to Roundup and glyphosate-containing products carries an increased risk of developing severe injuries, including Mrs. Rawson's injuries.

188. Mrs. Rawson was an intended beneficiary of the implied warranties made by Defendant Monsanto to purchasers of its herbicides.

189. The Roundup products were expected to, and did in fact, reach consumers and users including Mrs. Rawson without substantial change in the condition in which they were manufactured and sold by Defendant Monsanto.

190. At all relevant times, Defendant Monsanto was aware that consumers and users of its products, including Mrs. Rawson, would use Roundup products as marketed by Defendant Monsanto (*i.e.*, Mrs. Rawson was a foreseeable user of Roundup).

191. Defendant Monsanto intended that Roundup products be used in the manner in which Mrs. Rawson, in fact, used them and which Defendant Monsanto impliedly warranted to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup was not adequately tested or researched.

192. In reliance upon Defendant Monsanto's implied warranty, Mrs. Rawson used Roundup as instructed and labeled and in the foreseeable manner intended, recommended, promoted, and marketed by Defendant Monsanto.

193. Mrs. Rawson could not have reasonably discovered or known of the risks of serious injury associated with Roundup or glyphosate.

194. Defendant Monsanto breached its implied warranty to Plaintiff in that Roundup products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

55

195. The harms caused by Defendant's Roundup products far outweighed their benefits, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

196. As a direct and proximate result of Defendant's breach of implied warranty, Mrs. Rawson has sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

197. As a proximate result of the Defendant's breach of implied warranty, as alleged herein, there was a measurable and significant interval of time during which Mrs. Rawson suffered great mental anguish and other personal injury and damages.

198. As a proximate result of Defendant's breach of implied warranty, as alleged herein, Mrs. Rawson sustained a loss of income, loss of earning capacity, and property damage.

199. WHEREFORE, Mrs. Rawson respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other or further relief as this Court deems just and proper.

## PUNITIVE DAMAGES ALLEGATIONS

200. Mrs. Rawson realleges and incorporates by reference all proceeding paragraphs as though fully set forth herein.

201. Defendants' conduct as alleged herein was done with oppression, fraud, and malice. Defendants were fully aware of the safety risks of Roundup.

Nonetheless, Defendants deliberately crafted their label, marketing, and promotion to mislead landscapers and other consumers.

202. This was not done by accident or through some justifiable negligence. Rather, Defendants knew that they could turn a profit by convincing the landscaping industry that Roundup was harmless to humans, and that full disclosure of the true risks of Roundup would limit the amount of money Defendants would make selling Roundup in California. Defendants' goal was accomplished not only through their misleading labeling, but through a comprehensive scheme of selective fraudulent research and testing, misleading advertising, and deceptive omissions as more fully alleged throughout this pleading. Mrs. Rawson was denied the right to make an informed decision about whether to purchase, use, or be exposed to an herbicide while possessing knowledge of the full risks attendant to that use. Such conduct was done with conscious disregard of Mrs. Rawson's rights.

203. There is no indication that Defendants will stop their deceptive and unlawful marketing practices unless they are punished and deterred. In fact, Defendants continue to market Roundup as safe. Accordingly, Mrs. Rawson requests punitive damages against the Defendants for the harms they have caused her and others.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for a judgment against Defendants, and each of them, as follows:

57

1.   Actual or compensatory damages in such amount to be determined at trial and as provided by applicable law;

2.   Exemplary and punitive damages sufficient to punish and deter the Defendants and others from future fraudulent practices;

3.   Pre-judgment and post-judgment interest;

4.   Costs including reasonable attorneys' fees, court costs, and other litigation expenses; and

5.   Such other or further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a jury trial on all triable issues.

## TRANSFER TO MASTER DOCKET

Plaintiff requests transfer to the U.S. Judicial Panel on Multidistrict Litigation Master Docket styled "In Re: Roundup Products Liability Litigation," MDL No. 2741, within the Northern District of California, pursuant to the applicable Transfer Order (Dkt. 1, N.D. Cal. Case No. 3:16-md-2741 VCN).

Dated:      February 19, 2020

REITER GRUBER LLP

By /s/ Charles D. Reiter
Charles D. Reiter
Robert H. Gruber

*Attorneys for Plaintiff Dona Rawson*

58