# U.S. District Court
## Southern District of Georgia (Augusta)
## CIVIL DOCKET FOR CASE #: 1:20–cv–00029–JRH–BKE

Webber v. Monsanto Company
Assigned to: Chief Judge J. Randal Hall
Referred to: Magistrate Judge Brian K. Epps
Cause: 28:1332 Diversity–Product Liability

Date Filed: 02/25/2020
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod.
Liability
Jurisdiction: Diversity

**Plaintiff**

**Robert S. Webber, Jr.**
      represented by  **N. Kirkland Pope**
Pope McGlamry Kilpatrick Morrison &
Norwood PC
3391 Peachtree Road, NE
Suite 300
Atlanta, GA 30326
404–523–7706
Fax: 440–524–1648
Email: kirkpope@pmkm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 02/25/2020 | 1 | COMPLAINT against Monsanto Company, filed by Robert S. Webber, Jr. (Attachments: # 1 Civil Cover Sheet)(thb) (Entered: 02/26/2020) |
| 02/25/2020 | | Filing fee: $ 400.00, receipt number 113J–2790692. (thb) (Entered: 02/26/2020) |
| 02/26/2020 | 2 | Summons Issued as to Monsanto Company. (thb) (Entered: 02/26/2020) |
| 02/26/2020 | 3 | RULE 26(f) ORDER. Signed by Magistrate Judge Brian K. Epps on 02/26/2020. (Attachments: # 1 Blank forms for new civil case filings) (thb) (Entered: 02/26/2020) |
| 03/04/2020 | 4 | SUMMONS Returned Executed by Robert S. Webber, Jr. Monsanto Company served on 3/2/2020, answer due 3/23/2020. (Pope, N.) (Entered: 03/04/2020) |

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| ROBERT S. WEBBER, JR., | ) | |
| | ) | |
| *Plaintiff,* | ) | Case No. |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| MONSANTO COMPANY, | ) | |
| | ) | |
| *Defendant.* | ) | |

## COMPLAINT

Plaintiff, Robert S. Webber, Jr., brings this action against Defendant Monsanto Company, (hereinafter "Monsanto" or "Defendant"), and alleges as follows:

## INTRODUCTION

1.      This is a civil action for damages suffered by Plaintiff as a direct and proximate result of Defendant's negligence and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, sale and/or application of glyphosate-containing products.

## JURISDICTION AND VENUE

2.      Federal diversity jurisdiction in this Court is proper under 28 U.S.C. § 1332 because Plaintiff at all relevant times hereto was a citizen of Georgia, a different state than the Defendant's states of citizenship (Delaware and Missouri), and the aggregate amount in controversy exceeds $75,000, exclusive of interest of costs.

3.      This Court has personal jurisdiction over Defendant because Defendant knows or should have known that its Roundup® products are sold throughout the State of Georgia, and, more specifically, caused Roundup® to be sold to Plaintiff in the State of Georgia.

4.     In addition, Defendant maintains sufficient contacts with the State of Georgia such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

5.     Venue is proper within this District under 28 U.S.C. § 1391(b)(2) because Defendant, as a corporate entity, is deemed to reside in any judicial district in which it is subject to personal jurisdiction, and a substantial part of the events or omissions giving rise to this claim occurred in this judicial District.

6.     A transfer order, pertaining to Roundup® related actions, has been issued by the United States Judicial Panel on Multidistrict Litigation.  *In re: Roundup Products Liability Litigation*, MDL No. 2741.  The Order transfers related/tag along actions pending outside the Northern District of California to the Northern District of California for coordinated or consolidated pretrial proceedings.

## PARTIES

7.     At all times material, Plaintiff Robert S. Webber, Jr. was and is a citizen of Georgia and resided in Evans, Columbia County, Georgia.  Plaintiff Webber was exposed to Roundup® in and around Evans, Georgia from approximately 2009 to 2018.  Prior to that, Plaintiff was exposed to Roundup® in and around Mechanicsburg, Pennsylvania from approximately 1998 to 2001, in and around Manchester, New Hampshire from approximately 2001 to 2004, and in and around Powder Springs, Georgia from approximately 2005 to 2009. Plaintiff Webber was diagnosed with non-Hodgkin lymphoma ("NHL") in Augusta, Georgia, in 2017.

8.     "Roundup®" refers to all formulations of Defendant's Roundup® products, including, but not limited to, Roundup® Concentrate Poison Ivy and Tough Brush Killer 1,

Roundup® Custom Herbicide, Roundup® D-Pak Herbicide, Roundup® Dry Concentrate, Roundup® Export Herbicide, Roundup® Fence & Hard Edger 1, Roundup® Garden Foam Weed & Grass Killer, Roundup® Grass and Weed Killer, Roundup® Herbicide, Roundup® Original 2k Herbicide, Roundup® Original II Herbicide, Roundup® Pro Concentrate, Roundup® Prodry Herbicide, Roundup® Promax, Roundup® Quik Stik Grass and Weed Killer, Roundup® Quickpro Herbicide, Roundup® Rainfast Concentrate Weed & Grass Killer, Roundup® Rainfast Super Concentrate Weed & Grass Killer, Roundup® Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup® Ready-to-Use Weed & Grass Killer, Roundup® Ready-to-Use Weed and Grass Killer 2, Roundup® Ultra Dry, Roundup® Ultra Herbicide, Roundup® Ultramax, Roundup® VM Herbicide, Roundup® Weed & Grass Killer Ready-to-Use Plus, Roundup® Weed & Grass Killer Super Concentrate, Roundup® Week & Grass Killer1 Ready-to-Use, Roundup® WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, RangerPro Herbicide, or any other formulation containing the active ingredient glyphosate.

9.      At all times material hereto, Defendant Monsanto Company was a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri. Monsanto was the entity that discovered the herbicidal properties of glyphosate and manufactured Roundup®, which contains the active ingredient glyphosate, as well as other "inert" ingredients.  Defendant Monsanto Company may be served with process by serving its registered agent for service, CSV of St. Louis County, Inc., at 130 South Bemiston Avenue, Suite 700, Clayton, MO  63105.

## **FACTS**

10.      Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

11.      Glyphosate is the active ingredient in Roundup®.

12.     Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis.  Treated plants generally die within two to three days.  Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce, or by milling, baking or brewing grains.

13.     For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use poses.  That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough that could kill almost every weed without causing harm to people or the environment.  However, history has shown that not to be true.  According to the WHO, the main chemical ingredient in Roundup® - glyphosate – is a probable cause of cancer.  Those most at risk are farm workers and other individuals with workplace exposure to Roundup®, such as garden center workers, nursery workers, and landscapers.  Agricultural works are, once again, victims of corporate greed.  Monsanto assured the public that Roundup® was harmless.  In order to prove this, Monsanto has championed falsified data and has attacked legitimate studies that revealed Roundup®'s dangers.  Monsanto has led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® is safe.

### *The Discovery of Glyphosate and the Development of Roundup®*

14.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz.  The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®.  From the outset, Monsanto marketed Roundup® as

a "safe" general-purpose herbicide for widespread commercial and consumer use. It still markets Roundup® as safe today.[1]

15.     In addition to the active ingredient glyphosate, Roundup® formulations also contain adjuvants and other chemicals, such as the surfactant POEA, which are considered "inert" and therefore protected as "trade secrets" in manufacturing. Growing evidence suggests that these adjuvants and additional components in Roundup® formulations are not inert, and in fact are toxic in their own right.

### Registration of Herbicides Under Federal Law

16.     The manufacture, formulation, and distribution of herbicides such as Roundup® are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq*. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale or use, except as described by the Act. 7 U.S.C. § 136a(a).

17.     Because pesticides are toxic to plants, animals and humans, at least to some degree, the EPA requires as part of the registration process a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that the use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

---

[1] Monsanto/Bayer, *Is Glyphosate Safe?* (last updated June 10, 2019), https://www.bayer.com/en/is-glyphosate-safe.aspx.

18.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or a pesticide be allowed to continue to be sold in commerce.

19.     The EPA and the State of Georgia registered Roundup® for distribution, sale and manufacture in the United States and the State of Georgia.

20.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

21.     Based on early studies showing that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

22. On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

23. In the first instance, Monsanto, in seeking initial registration of Roundup® by the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

24. In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

25. Three top executives at IBT were convicted of fraud in 1983.

26. In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

27. Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in over 100 countries.

### The Importance of Roundup® to Monsanto's Market Dominance and Profits

28. The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's

agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. Because Monsanto's patent for glyphosate was set to expire in the United States in the year 2020, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

29.     In response, Monsanto began the development and sale of genetically-engineered Roundup® Ready seeds in 1996. Since Roundup® Ready crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without banning the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup® Ready seeds. It also secured Monsanto's dominant share of the glyphosate/ Roundup® market through a marketing strategy that coupled proprietary Roundup® Ready seeds with continued sales of its Roundup® herbicide.

30.     Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup® Ready seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

### *Monsanto's Knowledge About the Toxicity of Roundup®*

31.     Since Roundup® was introduced to the market, Monsanto has made broad claims through its advertising and promotional materials that its products are safe, non-toxic, and rigorously tested. But, in reality, the company hardly tested the real-world toxicity of its products, actively avoided pursuing studies which might show unwelcomed results, and ghostwrote studies of supposedly independent scientists.

8

32.     The first valid chronic oncogenicity study on glyphosate was submitted to the EPA in 1983 (the Bio/dynamic mouse study).  It showed an increase in renal tubular adenomas in the male mice that Monsanto claimed was not treatment-related.  The EPA disagreed and classified glyphosate as a "possible human oncogene" in 1985.

33.     Monsanto challenged the EPA's determination through multiple avenues for years, leading to an EPA request for Monsanto to do a new and better study.  A Scientific Advisory Panel convened by the EPA to provide guidance in resolving the controversy over the 1983 Bio/dynamic study called for a repeat study.  The EPA adopted the SAP's advice and required a repeat mouse study in its 1986 Registration Standard document on glyphosate.  Monsanto refused to conduct it and, upon information and belief, has not done so to this day.

34.     The 1986 glyphosate Registration Standard document issued by the EPA required Monsanto to add several commonsense worker-safety provisions onto Roundup® product labels (e.g. wear gloves, chemical resistant shoes and goggles or a face shield when applying Roundup®; discard clothes that are drenched; wash clothes separately from other laundry).  Monsanto refused to add the majority of these provisions to their product labels.

35.     Monsanto has refused since the mid-1980s to conduct the studies needed to resolve uncertainty over the oncogenicity of Roundup®, including studies specifically requested by the EPA.  The failure of Monsanto to invest in new and better science, such as the more powerful mouse cancer replacement study requested by the EPA in 1986, has perpetuated scientific uncertainty and undermined the EPA's ability to understand and quantify the health risks of Roundup®.

36.     Dr. Donna Farmer, a senior Monsanto scientist, wrote the following to a Monsanto communications professional: "You cannot say that Roundup® is not a carcinogen . . .

we have not done the necessary testing on the formulation to make that statement.  The testing of the formulations are not anywhere near the level of the [testing on] the active ingredient."[2]

37.     In the same email, Dr. Farmer warned that Monsanto "cannot support the statement" that Roundup® produces "no adverse effects whatsoever on flora, or fauna or on the human body.'"  This is because, as Dr. Farmer explained, "[a]dverse effects are seen on flora (glyphosate is meant to kill vegetation), adverse effects on fauna – in studies with laboratory animals – even death is seen (LD50 studies for example) and in humans – mild reversible eye and skin irritation are seen with normal use and death can occur in suicide attempts."[3]

38.     In addition to the active ingredient glyphosate, surfactants are added to Roundup® products to speed up the movement of glyphosate through weed leaf surfaces, and then into the cells of weeds.  Roundup® surfactants act roughly the same way when Roundup® comes into contact with human skin.  In other words, the formulation penetrates human skin, making Roundup® markedly more toxic to exposed humans than glyphosate alone.

39.     Studies have shown that formulated Roundup® is more toxic than pure, 100% technical glyphosate.  Most of the surfactants in Roundup®-brand herbicides are even more toxic, ounce for ounce, than glyphosate.  Plus, pure glyphosate does not move as readily through the skin or into cells, whereas Roundup® does.

40.     Despite knowledge of the differences in toxicity and risks arising from exposures to formulated Roundup® in contrast to pure glyphosate, Monsanto has not carried out critical, long-term cancer feeding studies with Roundup®.

---

[2] Email dated November 22, 2003; available at http://baumhedlundlaw.com/pdf/monsanto-documents/27-Internal-Monsanto-Email-You-Cannot-Say-That-Roundup-is-not-a-Carcinogen.pdf.
[3] *Id*.

41.     Monsanto has refused to conduct state-of-the-art genotoxicity assays in mammals and in human populations exposed to formulated Roundup®.

42.     In 1999, Monsanto hired Dr. James Parry, a world-renowned genotoxicity expert, to advise the company on what steps it should take to better understand and respond to public literature studies reporting evidence of a genotoxic response following exposures to glyphosate and/or a glyphosate-based herbicide. Dr. Parry identified several deficiencies in the available data on glyphosate. For one, he explained there is "[n]o adequate in vitro clastogenicity data available for glyphosate formulations." He thus recommended that Monsanto "provide comprehensive in vitro cytogenetic data on glyphosate formulations." He also concluded, "[m]y overall view is that if the reported genotoxicity of glyphosate and glyphosate formulations can be shown to be due to the production of oxidative damage then a case could be made that any genetic damage would be thresholded . . . it may be necessary to consider the possibility of susceptible groups within the human population."

43.     In total, Dr. Parry provided Monsanto with 11 specific recommendations for further genotoxicity research. Monsanto refused to conduct new studies in 9 of the 11 areas. In a September 1999 email, Monsanto's chief of regulatory science, William Heydens, wrote to his Monsanto colleagues after reading Dr. Parry's report on glyphosate. In his correspondence, Heydens stated: "We want to find/develop someone who is comfortable with the genetox profile of glyphosate/ Roundup® and who can be influential with regulators and Scientific Outreach operations when genetox issues arise. My read is that Parry is not currently such a person, and it would take quite some time and $$$/studies to get him there. We simply aren't going to do the studies Parry suggests."

44.    In another email the same month, Monsanto executive Stephen Wratten said he was "disappointed in the Parry report," asking "[h]as he ever worked with industry before on this sort of project?"  Later in the same email, Wratten intoned that the Parry report is not useful for Monsanto: "I do not see that he has stuck his neck out on anything at all controversial, and therefore, there is little value in the write-up as written that could be useful.  Hope it didn't cost much . . . ."

45.    Later on, in the same email chain, Monsanto toxicologist Donna Farmer discussed the fallout from Dr. Parry's report on glyphosate with her colleagues.  She wrote: "right now the only person I think that can dig us out of this 'genetox hole' is the Good Dr. Kier . . . I am concerned about leaving Perry [sic] out there with this as the final projection/his final impressions.

46.    In correspondence, Monsanto personnel expressed reluctance to conduct studies on glyphosate, Roundup® formulations, or surfactant ingredients, suggesting Monsanto was concerned about the results it would find if it did the tests.  In a September 1999 email, for example, Stephen Wratten criticized the Parry report by noting that "of course" Monsanto knew there was no data to support points it wanted to make relating to Roundup®'s genotoxicity, and Monsanto scientists "didn't need [Dr.Parry] to tell [them] that."  What Monsanto wanted Dr. Parry to do (instead of suggesting additional independent and rigorous testing) was to argue against the reliability of independent studies that were bad for Monsanto's bottom line.

47.    In another email from 1999, Dr. Farmer resisted the suggestion that the company do additional studies on the genotoxicity of Roundup®, including formulations or other surfactant ingredients.

48.     Other internal correspondence demonstrates that some of Monsanto's executives were concerned about the safety of Roundup® and results that would be obtained if Roundup® were rigorously tested according to Parry's recommendations.  One Monsanto scientist wrote in 2001: "If someone came to me and said they wanted to test Roundup® I know how I would react – with serious concern."

49.     Comments made by other Monsanto executives indicate their awareness that glyphosate becomes toxic when mixed with other ingredients.  Thus the formulated product - Roundup® - is more toxic than its active ingredient.  In 2002, William Heydens and Donna Farmer discussed various studies observing adverse effects by the formulated Roundup® product. Specifically, Farmer acknowledged: "[t]he interest point is glyphosate all basically had no effect the formulated product did – does this point us to the coformulants – surfactants? [sic]"  Heydens also admitted, after discussing with Monsanto consultant John DeSesso, that "we are in pretty good shape with glyphosate but vulnerable with surfactants . . . . What I've been hearing from you is that this continues to be the case with these studies – Glyphosate is OK but the formulated product (and thus the surfactant) does the damage."

50.     Despite Monsanto's longstanding awareness of the danger of the formulated product, and the damage caused by the addition to Roundup® of the surfactants in particular, Bayer-Monsanto's website continues to advertise, to this day, that "[t]here is an extensive body of research on glyphosate and Bayer's glyphosate-based herbicides . . . which confirms these products can be used safely and that glyphosate is not carcinogenic."[4]

---

[4] Glyphosate's Impact on Human Health and Safety, available at https://www.bayer.com/en/glyphosate-impact-on-human-health-and-safety.aspx (last visited August 16, 2019).

51.     Rather than conduct the more sophisticated genotoxicity studies recommended by Dr. Parry and others, Monsanto instead commissioned members of its third-party network of glyphosate-friendly scientists to write and publish articles arguing that evidence of genotoxicity in public literature studies is the result of flawed study designs, excessive dose levels, inappropriate routes of administration, overt toxicity, or other technical problems.  Many of these reviews were ghost-written by Monsanto scientists not listed among the co-authors.  "Ghost-writing" refers to contributions to a written document by a person not listed as an author, or among the co-authors of the document.  The practice is considered to be serious ethical misconduct.

52.     Monsanto made heavy use of supposedly independent scientists in its "Scientific Outreach" and PR campaigns in support of the safety of glyphosate and Roundup®-brand herbicides.  In some instances, such individuals were appointed to an ad hoc, or standing advisory committee or panel.  In other cases, they simply worked on a fee-for-service basis on a defined task.  Many of these glyphosate-friendly experts had once worked for Monsanto.  Many have authored or co-authored papers commissioned and paid for by Monsanto.  Most of these papers contained passages ghost-written by Monsanto scientists, and some were largely ghost-written by Monsanto.

53.     As far back as 1999, Monsanto was operating behind the scenes to influence the science and bolster the public perception of the safety of glyphosate and Roundup®.  William Heydens, the Monsanto executive who spearheaded Monsanto's manipulation of the scientific literature via ghostwriting, wrote in a May 1999 email that Monsanto's plan for scientific outreach planning involved maintaining a cohort of "outside scientific experts who are influential

at driving science, regulators, public opinion, etc.  We would have they [sic] people directly or indirectly/behind-the-scenes work on our behalf."

54.     Heydens succinctly summarized Monsanto's goal: to encourage "people to get up and shout Glyphosate is Non-toxic."

55.     The more formal statement of the "Overall purpose" of Monsanto's "Glyphosate Scientific Outreach Plan" (SO Plan) appears at the beginning of a June 1999 document: "Ensure that Monsanto's glyphosate-containing herbicides are widely viewed throughout the scientific community as posing no threat to human health or environment.  This support [from third-party network experts] will be used to favorably influence current and future possible challenges in the regulatory and public arena."

56.     The unconditional statement in the above-quoted paragraph – "no threat to human health or the environment" – stands in sharp contrast to the more nuanced statements by scientists Monsanto itself commissioned to review the genotoxicity or oncogenicity literature, or by the EPA.  No scientist has been willing to say that Roundup® poses no threat to human health. For example, Kier and Kirkland, two Monsanto-commissioned scientists, concluded in a 2013 review of glyphosate genotoxicity that "Glyphosate and typical [glyphosate-based herbicides] do not appear to present a significant genotoxic risk under normal conditions of human or environmental exposures."  The scientists do not rule out the possibility of some genotoxic risk from exposures to glyphosate-based herbicides under normal conditions, nor the possibility of significant genotoxic risk in the event of unusually high glyphosate-based herbicide exposure episodes.

57.     Over the years, Monsanto systematically attacked scientists whose research threatened their profits.  For example, in an April 2001 email, Heydens warned his colleagues

that "[d]ata generated by academics has always been a major concern for us in the defense of our products."

58.     In an email from October 2008, Dean Nasser, a Monsanto employee, sent his colleagues a study published in Beyond Pesticides entitled "Study Shows Herbicides Increase Risk of Non-Hodgkin's Lymphoma," showing the link between glyphosate and non-Hodgkin's lymphoma.

59.     Dr. Farmer, one of the recipients, responded: "We have been aware of this paper for awhile [sic] now and knew it would only be a matter of time before the activists pick it up . . . how do we combat this?"

60.     In 2012, Monsanto executives discussed their efforts to retract a paper written by Professor Seralini in the journal Food and Chemical Toxicology, which pertained to the biological plausibility of glyphosate as a human carcinogen – a conclusion adverse to Monsanto's commercial agenda.  Specifically, Monsanto executives galvanized scientists to send letters to the magazine's Editor-in-Chief seeking retraction of the Seralini study.  In correspondence from September 2012, Monsanto employee Dr. Goldstein stated: "I was uncomfortable even letting shareholders know we are aware of this LET . . . it implies we had something to do with it- otherwise how do we have knowledge of it?  I could add 'Aware of multiple letters to editor including one signed by 25 scientists from 14 countries' if you both think this is OK."  He added that he was being asked "to keep internal correspondence down on this subject."

61.     In response, Eric Sachs said: "We are 'connected' but did not write the letter or encourage anyone to sign it."

16

62.     In a document outlining the "Business Goals" of Monsanto employee David
Saltmiras for the fiscal year 2013, Dr. Saltmiras wrote: "Throughout the late 2012 Seralini rat
cancer publication and media campaign, I leveraged my relationship with Editor in Chief of the
publishing journal, Food and Chemical Toxicology and was the single point of contact between
Monsanto and the Journal."  Moreover, Dr. Saltmiras acknowledged that he "[s]uccessfully
facilitated numerous third party expert letters to the editor which were subsequently published,
reflecting the numerous significant deficiencies, poor study design, biased reporting and
selective statistics employed by Seralini."

63.     In multiple other letters and correspondence, Monsanto has expressed its intent to
attack independent scientists who raised concerns about the toxicity of its products.

64.     In late 2014, the International Agency for Research on Cancer (IARC) announced
that it was recommending dozens of pesticides for evaluation, including glyphosate.  When the
IARC review was announced, Monsanto's Donna Farmer wrote to former employee, John
Acquavella, in an email dated September 19, 2014: "Just wanted to let you know that what we
have long been concerned about has happened. [sic] Glyphosate is on for an IARC review in
March 2015."  Farmer then wrote: "Glyphosate had been listed as a medium priority for 2015-
2016 but clearly something happened and it got *moved* up to ultra priority."

65.     Monsanto not only anticipated the carcinogenic classification for glyphosate and
glyphosate-based formulations, but pro-actively sought to combat the expected result by
engaging supposed third-party academics who acted on Monsanto's behalf as purportedly
"independent" experts in signing onto Monsanto ghostwritten reports which were then published
in leading toxicology journals and in the media.

66.     In an email dated February 19, 2015, one month prior to the release of the IARC report on glyphosate, Monsanto executive William Heydens proposed that the company "ghost-write" sections of a paper on Roundup's toxicity.  In the email, Heydens wrote that they would "add Greim and Kier or Kirkland to have their names on the publication, but we would be keeping the cost down by us doing the writing and they would just edit & sign their names so to speak."  Heydens also wrote that this is how Monsanto had "handled" an earlier paper on glyphosate's safety.

67.     As discussed more fully in the following section, the IARC released its findings in March 2015.  The report classified Roundup® as "probably carcinogenic."  After the release of the IARC report, Monsanto set to work on a campaign to influence the press and public perception regarding the safety of its products.  Again, the campaign involved ghostwriting drafts of articles that would appear in respected news magazines.  In an email dated March 12, 2015, Eric Sachs of Monsanto asked Henry Miller, a Forbes contributor and fellow of the Standford Hoover Institute, to write about the IARC "process and controversial decision" to classify Roundup® as probably carcinogenic.  Mr. Miller responded that he would be willing to assist Monsanto if he "could start from a high-quality draft."  In response, Monsanto informed Mr. Miller that Monsanto already had "a draft nearly done" that it would send to Mr. Miller by tomorrow.

68.     In another email dated May 11, 2015 and entitled "RE: Post-IARC Activities to Support Glyphosate," Heydens wrote that Monsanto would ghost-write a manuscript refuting the animal data cited by the IARC, noting that the manuscript "would be more powerful if authored by non-Monsanto scientists (e.g. Kirkland, Kier, Williams, Greim, and maybe Keith Solomon)."

69.     After the IARC report came out, Monsanto also organized an ostensibly independent "Expert Panel" for the purpose of conducting an evaluation of the IARC data.  But the Expert Panel was anything but an independent collection of neutral scientists rendering an opinion on the toxicity of glyphosate.  The conclusions of the Expert Panel were substantially edited and/or authored by Monsanto's own executives.

70.     The question of the ethical permissibility of ghostwriting arose when, in the course of assigning authorship, a member of the Expert Panel and former Monsanto employee, John Acquavella, was excluded from a poster planned for a 2015 Society for Risk Analysis meeting.  In response, Heydens wrote in an email to Acquavella dated November 3, 2015: "I thought we discussed previously that it was decided by our management that we would not be able to use you or Larry [Kier] as Panelists/authors because of your prior employment at Monsanto . . . ."  Acquavella responded: "I didn't realize that Bill.  Also, I don't think that will be okay with my panelists.  We call that ghost writing and it is unethical."  In another email to Heydens in the same chain, Acquavella wrote: "I can't be part of deceptive authorship on a presentation or publication.  Please note the ICJME guidelines below that everyone goes by to determine what is honest/ethical regarding authorship."

71.     These concerns did not stop Monsanto from continuing to influence and author reviews on the safety of glyphosate, while advertising the work as independent.  In July 2016, the journal Critical Reviews in Toxicology published, "A review of the carcinogenic potential of glyphosate by four independent expert panels and comparison to the IARC assessment."  Sixteen scientists signed their names to the published work, declaring to readers that their conclusions were free of Monsanto's intervention.  Underscoring the supposed independence of the work, the declaration of interest section of the published review stated: "Neither any Monsanto company

employees nor any attorneys reviewed any of the Expert Panel's manuscripts prior to submission to the journal." This was false. Internal Monsanto documents reveal that Heydens not only reviewed the manuscripts but had a hand in drafting and editing them. The finished papers were aimed directly at discrediting IARC's classification. In one internal email, Heydens told the organizer of the panel: "I have gone through the entire document and indicated what I think should stay, what can go, and in a couple spots I did a little editing."

72.    Internal Monsanto documents show that Heydens even argued over statements that he wanted included but that John Acquavella deemed "inflammatory" and "not necessary" criticisms of the IARC. Heydens' edits to draft documents contradicted Acquavella, even though Heydens was not supposed to have even reviewed the papers. Heydens went so far as to state: "I would ignore John's comment: and "I don't see a reason for deleting the text that John did below."

73.    The scientific literature is littered with ghostwritten papers declaring Roundup® and glyphosate to be safe. Through its ghostwriting campaigns, Monsanto sought to hide or discredit independent research showing that its products were hazardous to human health. All the while, Monsanto advertised its products as completely safe and non-toxic to an unsuspecting public.

**False Representations Regarding the Safety of Roundup®**

74.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds and fish. Among the representations the NY AG found deceptive and

misleading about the safety of glyphosate and/or Roundup® to humans and the environment are the following:

    a.   "Remember that environmentally friendly Roundup® herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks and fences . . . ."

    b.   "And remember that Roundup® is biodegradable and won't build up in soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got weed, brush, edging or trimming problem."

    c.   "Roundup® biodegrades into naturally occurring elements."

    d.   "Remember that versatile Roundup® herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

    e.   "This non-residual herbicide will not wash or leach in the soil. It . . . stays where you apply it."

    f.   "You can apply Accord with . . . confidence because it will stay where you put it . . . it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products."

    g.   "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

    h.   "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

    i.   "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

    j.   "Roundup® can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup®.

    75.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

21

a.   Its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b.   Its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed, or sold by Monsanto are biodegradable.

c.   Its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d.   Its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristic."

e.   Glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides.

f.   Its glyphosate-containing pesticide products or any component thereof might be classified as "practically non-toxic."

76.     Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief it still has not done so today.

## IARC Classification of Glyphosate

77.     On March 15, 2015, the International Agency for Research on Cancer (IARC), an agency of the World Health Organization (WHO), issued an evaluation of several herbicides, including glyphosate.  That evaluation was based, in part, on studies of exposure to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.  The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic to humans.

78.     On July 29, 2015, IARC issued the formal monograph relating to glyphosate.  In that monograph, the IARC Working Group provides a thorough review of the numerous studies and dates relating to glyphosate exposure in humans.

79.     The IARC process for the classification of glyphosate followed IARC's stringent procedures for the evaluation of a chemical agent.  Evaluations are performed by panels of international experts, selected based on their expertise and the absence of actual or apparent conflicts of interest.

80.     In preparing its monograph, a Working Group of 17 experts from 11 countries met at IARC from March 3-10, 2015 to assess the carcinogenicity of certain herbicides, including glyphosate.

81.     The March meeting culminated a nearly one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence.

82.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

83.     Exposure pathways are identified as air (especially during spraying), water, and food.  Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

84.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada and Sweden.  These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

85.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma and several subtypes of non-Hodgkin's lymphoma, and the increased risk persisted after adjustment for other pesticides.

86.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells.  One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

87.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption.  Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA).  Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

88.     In addition, the IARC Working Group found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

89.     The IARC Working Group noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.  Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

90.     Additionally, the IARC Working Group reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and Georgia. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and multiple myeloma, hairy cell leukemia (HCL), and chronic lymphocytic leukemia (CLL), in addition to several other cancers.

91.     The IARC evaluation confirms that glyphosate is toxic to humans.

92.     Nevertheless, since it began selling Roundup®, Monsanto has represented it as safe to humans and the environment.  Monsanto has repeatedly proclaimed, and continues to

proclaim, that glyphosate-based herbicides, including Roundup®, create no unreasonable risk to human health or to the environment.

93.     In a document titled "Glyphosate/ Roundup® in the News, Safety Information" issued on March 27, 2017, Monsanto disputed the findings of the IARC and stated the following: "All labeled uses of glyphosate are safe for human health and supported by one of the most extensive worldwide human health databases ever compiled on a pesticide."[5]

## The EPA's Review of Glyphosate

94.     On September 12, 2016, the EPA's Office of Pesticide Program ("OPP") submitted a report, titled "Glyphosate Issue Paper: Evaluation of Carcinogenic Potential," wherein it issued a "proposed conclusion" that glyphosate is "not likely to be carcinogenic to humans at doses relevant to human health risk assessment."[6]

95.     The report is based upon a review of industry-sponsored articles and studies.  The OPP acknowledged that it rejected all studies that considered Roundup® - the formulated product – instead of studies that isolated glyphosate because "[g]lyphosate formulations contain various components other than glyphosate and it has been hypothesized these components are more toxic than glyphosate alone."[7]

96.     Thus the OPP notes that dozens of studies considered by IARC were not reviewed by the OPP because the OPP's "evaluation focused on studies on the active ingredient

---

[5] Glyphosate/ Roundup in the News, Safety Information, available at
http://www.monsantoito.com/docs/Glyphosate_IT_O_Briefing.pdf (last visited September 11, 2019).
[6] Glyphosate Issue Paper: Evaluation of Carcinogenic Potential, EPA's Office of Pesticide Program, September 12, 2016, available at https://www.epa.gov/sites/production/files/2016-09/documents/glyphosate_issue_paper_evaluation_of_carcincogenic_potential.pdf (last visited September 11, 2019).
[7] Id.

25

glyphosate" and "additional research could also be performed to determine whether formulation components, such as surfactants, influence the toxicity of glyphosate formulations."[8]

97.     The OPP draft assessment does not actually consider how glyphosate, in conjunction with other chemicals, affects not only carcinogenicity but other physical injuries and illnesses.

### Plaintiff's Exposure to Roundup®

98.     Plaintiff Robert Webber is 59 years old.

99.     Plaintiff Webber was exposed to Roundup® from approximately 1998 through 2018 while spraying Roundup® in his yard for residential purposes such as lawn care and gardening.

100.     Plaintiff Webber applied Roundup® at least eight times every year, if not more frequently, from 1998 until approximately 2018.  Plaintiff used pre-mixed Roundup®, which he purchased from local stores such as Lowe's and Home Depot.

101.     Each application of Roundup® from 1998 - 2018 would take at least thirty minutes per application, and often took longer than thirty minutes to apply.  Plaintiff did not wear protective gear when applying Roundup® but would wash his hands after each application.

102.     In September of 2017, Plaintiff Webber was diagnosed with grade 2 follicular non-Hodgkin's lymphoma (NHL) in Augusta, Georgia at Augusta Oncology, and was required to undergo fifteen sessions of radiation treatment. After his initial radiation treatments, Plaintiff Webber must follow up with his oncologist regularly to monitor his condition.

103.     Plaintiff Webber has suffered the effects of NHL as a direct and proximate result of the unreasonably dangerous and defective nature of Roundup® and Defendant's wrongful and

---

[8] *Id.*

negligent conduct in the research, development, testing, manufacture, production, promotion, distribution, marketing and sale of Roundup®.

104.    As a direct and proximate result of these injuries, Plaintiff Webber has incurred medical expenses, will incur additional future expenses, and has endured and will continue to endure pain and suffering and loss of enjoyment of life, and Plaintiff Webber has otherwise been damaged in a personal and pecuniary nature.

105.    During the entire time that Plaintiff Webber was exposed to Roundup®, he did not know that exposure to Roundup® was injurious to his health or the health of others.

### Tolling of Statute of Limitations

#### *Discovery Rule Tolling*

106.    Plaintiff Webber had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup® and glyphosate until well after IARC released its formal assessment of glyphosate in July 2015.  This is the quintessential case for tolling.

107.    Within the time period of any applicable statutes of limitations, Plaintiff could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup® and glyphosate is injurious to human health.

108.    Plaintiff Webber did not discover, and did not know of facts that would cause a reasonable person to suspect, the risks associated with the use of and/or exposure to Roundup® and glyphosate; nor would a reasonable and diligent investigation by him have disclosed that Roundup® and glyphosate would cause his illness.

109.    For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiff's claims.

*Fraudulent Concealment Tolling*

110.    All applicable statutes of limitations have also been tolled by Monsanto's knowing and active fraudulent concealment and denial of the facts throughout the time period relevant to this action, as alleged above.

111.    Instead of disclosing critical safety information about Roundup® and glyphosate, Monsanto has consistently and falsely represented the safety of its Roundup® products.

112.    Any applicable statute of limitations has therefore been tolled by Monsanto's knowledge, active concealment, and denial of the facts alleged herein.  This behavior is still ongoing.

*Estoppel*

113.    Monsanto was under a continuous duty to disclose to consumers, users and other persons coming into contact with its products, including Plaintiff, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate.

114.    Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

115.    Based on the foregoing, Monsanto is estopped from relying on any statutes of limitations in defense of this action.

## COUNT I

## STRICT PRODUCTS LIABILITY

116.    Plaintiff incorporates by reference each and every allegation set forth in paragraphs 1 through 115 as if fully stated herein.

117.    Plaintiff brings this strict products liability claim against Defendant for design defect, manufacturing defect and failure to warn.

118.    Monsanto designed, developed, manufactured, marketed, tested, assembled, labeled, distributed, sold, advertised, promoted, and placed into the stream of commerce Roundup® products, which are defective and unreasonably dangerous, and to which Plaintiff was exposed.  Monsanto knew or reasonably should have foreseen that the ultimate users, customers, consumers, and persons exposed to Roundup® products could not properly inspect for defects or dangers and that the detection of such defects or dangers could be beyond the capabilities of such persons.

119.    At all times relevant to this litigation, Defendant's Roundup® products as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed were defective and unreasonably dangerous in a manner that was dangerous for use by or exposure to the public, and in particular, the Plaintiff.

120.    Defendant's Roundup® products, at the time they left Defendant's control and were placed in the stream of commerce, had been manufactured defectively and designed defectively because they were in a condition that was unreasonably dangerous to the users and persons in the vicinity of the product; Roundup® had been designed defectively because it failed to perform as safely as an ordinary consumer or customer would expect when used as intended or when used in a manner reasonably foreseeable by the manufacturer; Roundup® had been designed defectively because the risk of danger in its design and formulation outweighed its benefits, and because there were alternative, safer designs and formulations that were feasible; and Roundup® was defective because the foreseeable risks of harm from Roundup® could have been reduced or avoided by providing reasonable instructions or warnings, yet no such

29

instructions or warnings were given. Specifically, Roundup® was defective and unreasonably dangerous when placed in the stream of commerce for one or more of the following reasons:

    a.  It was defective in design and formulation and dangerous to an extent beyond that which an ordinary consumer or customer would contemplate;

    b.  It was unreasonably dangerous in that it was hazardous and posed a grave risk of serious illness when used in a reasonably anticipated manner;

    c.  It was otherwise designed in a way that exposed persons to unnecessary and unreasonable risks, including by failing to provide adequate safeguards to protect persons exposed to foreseeable injuries;

    d.  Monsanto failed to adequately test, investigate and/or study Roundup® products, including both its active ingredient glyphosate and any other ingredients, to ensure their safety;

    e.  Exposure to Roundup® products presents a risk of harmful side effects that outweigh any potential utility stemming from use;

    f.  Monsanto knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® products could result in severe injuries and illness;

    g.  Monsanto did not conduct adequate post-marketing surveillance of its Roundup® products;

    h.  Monsanto could have employed safer alternative designs and formulations;

    i.  Monsanto failed to use due care in the manufacturing and formulation of Roundup® products;

j. Monsanto failed to use due care in warning of the risks associated with use of and exposure to Roundup® products;

k. Monsanto failed to use due care in minimizing the dangers to users, consumers and persons exposed to Roundup® products, and to those who would foreseeably use or be harmed by Roundup® products;

l. Monsanto failed to provide adequate warnings or instructions concerning the dangerous characteristics of Roundup® and/or the full and complete risks of exposure to Roundup® and glyphosate-containing products;

m. Monsanto failed to adequately label, market and promote Roundup® products to ensure that such products did not cause persons exposed to them to suffer from unreasonable and dangerous risks; and

n. Monsanto failed to give appropriate warnings about other risks of which Monsanto knew or should have known are involved in the reasonably foreseeable use of Roundup® products.

121.    The defects described above rendered Roundup® unreasonably dangerous by making it dangerous to an extent beyond that which would be contemplated by the ordinary consumer or customer with the knowledge common to the community as to its characteristics.

122.    The defects in Roundup® products were present when Monsanto placed it into the stream of commerce.  Roundup® products reached the intended customers, consumers, handlers, users and other persons coming into contact with and exposed to these products in Georgia, including Plaintiff  Webber, without substantial change in their condition as designed, manufactured, sold, distributed, labeled and marketed by Monsanto.

123.    At all times material, Roundup® products were being used in a manner intended by Monsanto, and in a manner that was reasonably foreseeable by Monsanto as involving a substantial danger not readily apparent.

124.    It was foreseeable that Plaintiff Webber would be exposed to Roundup® products.

125.    As a direct and proximate result of the defects of Roundup® products, Plaintiff Webber was exposed to glyphosate and other ingredients in Roundup® products, causing or substantially contributing to Plaintiff's injuries – including Plaintiff's non-Hodgkin's lymphoma. But for the defects in Roundup® products, Plaintiff's injuries would not have occurred.

126.    Plaintiff Webber has been damaged and claims all damages to which he is entitled, including, as applicable law may provide, but not limited to:

   a.  Bodily injury resulting in pain and suffering, disability and/or disfigurement;

   b.  Mental anguish;

   c.  Loss of capacity for enjoyment of life;

   d.  Extensive hospitalization, medical treatment and/or care which losses are either permanent or will continue; and/or

   e.  All damages available under applicable law.

## COUNT II

## NEGLIGENCE

127.    Plaintiff incorporates by reference each and every allegation set forth in paragraphs 1 through 115 as if fully stated herein.

128.    Defendant, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff Webber.

129.   At all times relevant to this litigation, Monsanto had a duty to use reasonable care in the design, research, development, testing, assembly, packaging, manufacture, labeling, marketing, advertisement, promotion, sale and distribution of its Roundup® products in order to avoid subjecting persons exposed to Roundup® products to unnecessary and unreasonable risks.

130.   Monsanto's duty of care included providing accurate, true, and correct warnings concerning the potential adverse effects of exposure to Roundup® products.

131.   Monsanto breached that duty by acting in a way that was reasonably careful manufacturer and designed would not act under like circumstances and by failing to take actions that a reasonably careful manufacturer and designer would take under like circumstances. Specifically, Monsanto breached its duty of care in one or more of the following ways:

    a.   By manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® products without thorough and adequate pre- and post-market testing;

    b.   By manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® products while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate and other ingredients in Roundup® products, and consequently the risk of serious harm associated with human use and exposure to Roundup®;

    c.   By failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use;

d. By failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of harm associated with exposure to Roundup® and/or glyphosate as an herbicide;

e. By failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f. By failing to provide adequate instructions, guidelines, and safety precautions to those persons who Monsanto could reasonably foresee would use and/or be exposed to its Roundup® products;

g. By failing to disclose to consumers and the general public, including Plaintiff, that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available;

h. By failing to give appropriate warnings about other risks of which Monsanto knew or should have known are involved in the reasonably foreseeable use of and/or exposure to Roundup® products;

i. By systemically suppressing or downplaying contrary evidence about the risks, incidence, and/or prevalence of the side effects of Roundup® and glyphosate-containing products;

j. By representing that its Roundup® products were safe for their intended use when, in fact, Monsanto knew or should have known that the products were not safe for their intended purpose;

k. By declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert consumers and the general

public of the risks Roundup®, glyphosate, and any other ingredients in
Roundup® products;

l.    By advertising, marketing and recommending the use of Roundup® products,
while concealing and/or failing to disclose or warn of the dangers known by
Monsanto to be associated with or caused by the use of or exposure to
Roundup®, glyphosate, and any other ingredients in Roundup® products;

m.    By continuing to disseminate information to its consumers, which indicate or
imply that Monsanto's Roundup® products are not unsafe for use;

n.    By continuing the manufacture and sale of its products with the knowledge
that the products were unreasonably unsafe and dangerous.

132.    Monsanto knew or reasonably should have foreseen that individuals such as
Plaintiff Webber would suffer injuries as a result of Monsanto's failure to exercise reasonable
care in the manufacturing, marketing, labeling, distribution, and sale of Roundup® products.

133.    Plaintiff Webber did not know the nature and extent of the injuries that could
result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

134.    As a direct and proximate result of the negligence of Monsanto, Roundup®
products designed and manufactured by Monsanto caused Plaintiff's injuries, including
Plaintiff's non-Hodgkin's lymphoma.  Monsanto's negligence caused or substantially
contributed to causing Plaintiff to suffer economic and non-economic damages.  But for
Monsanto's negligence, these injuries, damages and losses would not have occurred.

135.    Plaintiff Webber has been damaged and claims all damages to which he is
entitled, including, as applicable law may provide, but not limited to:

a.    Bodily injury resulting in pain and suffering, disability and/or disfigurement;

    b.   Mental anguish;

    c.   Loss of capacity for enjoyment of life;

    d.   Expensive hospitalization, medical treatment and/or care which losses are

        either permanent or will continue; and/or

    e.   All damages available under applicable law.

<u>**COUNT III**</u>

**NEGLIGENT AND/OR FRAUDULENT MISREPRESENTATION**

136.    Plaintiff incorporates by reference each and every allegation set forth in paragraphs 1 through 115 as if fully stated herein.

137.    Monsanto is the manufacturer, designer, distributor, seller or supplier of Roundup® and, while engaged in the course of such business, made representations about material facts to Plaintiff Webber and the public at large regarding the character and/or quality of Roundup®.

138.    Monsanto had a duty to disclose material information about the serious health effects of its products. But Monsanto intentionally failed to disclose this information for the purpose of inducing consumers to purchase Monsanto's dangerous products.

139.    Specifically, Monsanto's advertisements regarding Roundup® made material misrepresentations to the effect that Roundup® was safe and non-toxic, which Monsanto knew to be false or lacked the basis to assert, for the purpose of fraudulently inducing consumers to purchase said product. Monsanto further misrepresented that its products were just as safe, just as effective or more effective, than other weed control products on the market.

140.    Monsanto's representations regarding the character or quality of Roundup® were untrue. In addition, Monsanto fraudulently suppressed material information regarding the safety

of Roundup®, including the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup® and glyphosate.

141.     Monsanto had actual knowledge based on the results of trials, tests, and studies of exposure to glyphosate, of the risk of serious harm associated with human use of and exposure to Roundup®.

142.     Moreover, Monsanto purposefully failed to conduct trials, tests and studies of the risks associated with the full Roundup® information – rather than merely the active ingredient glyphosate – because it knew that these tests were likely to reveal that Roundup® was unsafe and toxic to humans.

143.     Despite this knowledge, Monsanto negligently and/or intentionally misrepresented or omitted this information in its product labeling, promotions and advertisements.  Instead, Monsanto labeled, promoted and advertised its products as safe and effective when it knew such statements to be false or when it knew that it did not know the truth of such statements in order to avoid losses and sustain profits in its sale of Roundup® to customers and consumers.

144.     In supplying the false information, Monsanto failed to exercise reasonable care or competence in obtaining or communicating information to its intended recipients, including Plaintiff Webber.

145.     Plaintiff Webber reasonably relied to his detriment upon Monsanto's misrepresentations and/or omissions in its labeling, advertisements, and promotions concerning the serious risks posted by the product.  Plaintiff reasonably relied upon Monsanto's representations that Roundup® was safe for use and that Monsanto's labeling, advertisements and promotions fully described all known risks of the product.

146.     Monsanto is estopped from relying on any statute of limitations defenses because Monsanto actively concealed the defects from customers and consumers.  Instead of revealing the defects, Monsanto continued to represent its product as safe for its intended use.

147.     As a direct and proximate result of Monsanto's negligent and/or fraudulent misrepresentations, Plaintiff has been damaged and claims all damages to which he is entitled, including, as applicable law may provide, but not limited to:

     a.  Bodily injury resulting in pain and suffering, disability and/or disfigurement;

     b.  Mental anguish;

     c.  Loss of capacity for enjoyment of life;

     d.  Expensive hospitalization, medical treatment and/or care which losses are either permanent or will continue; and/or

     e.  All damages available under applicable law.

## PRAYER FOR RELIEF

Plaintiff requests that the Court enter judgment against Defendant, as follows:

A.  An award to Plaintiff of all compensatory damages awardable by law, including but not limited to damages for bodily injury resulting in pain and suffering, disability and/or disfigurement, mental anguish, loss of capacity for enjoyment of life, expensive hospitalization, medical treatment and/or care which losses are either permanent or will continue, and the risk of the cancer recurring in the future.

B.  An award to Plaintiff of attorney's' fees and costs, as allowed by law;

C.  An award to Plaintiff of prejudgment and post judgment interest, as provided by law;

D.  Leave to amend this Complaint to conform to the evidence produced at trial; and

E.  Such other relief as may be appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury

trial as to all issues triable by jury.

Dated: February 25, 2020.                    Respectfully submitted,

                                             */s/ N. Kirkland Pope*
                                             N. Kirkland Pope
                                             GA Bar Number 584255
                                             POPE McGLAMRY, P.C.
                                             3391 Peachtree Road, NE, Suite 300
                                             Atlanta, GA 30326
                                             Ph: 404-523-7706
                                             Fx: 404-524-1648
                                             Email: efile@pmkm.com