Query    Reports    Utilities    Help    Log Out

ACO

# U.S. District Court
## Eastern District of New York (Central Islip)
## CIVIL DOCKET FOR CASE #: 2:19-cv-07295-GRB-LB

Nakash v. Monsanto Company                  Date Filed: 12/31/2019
Assigned to: Judge Gary R. Brown             Jury Demand: Plaintiff
Referred to: Magistrate Judge Lois Bloom     Nature of Suit: 365 Personal Inj. Prod.
Cause: 28:1332 Diversity-(Citizenship)       Liability
                                             Jurisdiction: Diversity

**Plaintiff**

**Jay Nakash**                 represented by    **Edward James Hynes**
                                                The Jacob D. Fuchsberg Law Firm, LLP
                                                3 Park Avenue
                                                37th Floor
                                                New York, NY 10016
                                                (212) 869-3500
                                                Fax: (212) 398-1532
                                                Email: e.hynes@fuchsberg.com
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

                                                **Joseph Lanni**
                                                The Jacob D. Fuchsberg Law Firm, LLP
                                                3 Park Avenue
                                                37th Floor
                                                New York, NY 10016
                                                (212) 869-3500
                                                Email: j.lanni@fuchsberg.com
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 12/31/2019 | 1 | COMPLAINT *Jay Nakash* against Monsanto Company filing fee $ 400, receipt number ANYEDC-12202492 Was the Disclosure Statement on Civil Cover Sheet completed -No,, filed by Jay Nakash. (Lanni, Joseph) Modified on 1/3/2020 (Flanagan, Doreen). (Entered: 12/31/2019) |
| 12/31/2019 | 2 | Civil Cover Sheet.. Re 1 Complaint by Jay Nakash (Lanni, Joseph) (Entered: 12/31/2019) |
| 01/03/2020 | 3 | This attorney case opening filing has been checked for quality control. See the attachment |

| | | for corrections that were made. (Davis, Kimberly) Modified on 1/3/2020 (Flanagan, Doreen). (Additional attachment(s) added on 1/3/2020: # 1 Additional Quality Control Check Sheet) (Flanagan, Doreen). (Entered: 01/03/2020) |
|---|---|---|
| 01/03/2020 | | Case Assigned to Judge Eric N. Vitaliano and Magistrate Judge Lois Bloom. Please download and review the Individual Practices of the assigned Judges, located on our website. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. (Flanagan, Doreen) (Entered: 01/03/2020) |
| 01/03/2020 | 4 | In accordance with Rule 73 of the Federal Rules of Civil Procedure and Local Rule 73.1, the parties are notified that *if* all parties consent a United States magistrate judge of this court is available to conduct all proceedings in this civil action including a (jury or nonjury) trial and to order the entry of a final judgment. Attached to the Notice is a blank copy of the consent form that should be filled out, signed and filed electronically **only if all** parties wish to consent. The form may also be accessed at the following link: http://www.uscourts.gov/uscourts/FormsAndFees/Forms/AO085.pdf. **You may withhold your consent without adverse substantive consequences**. **Do NOT return or file the consent unless all parties have signed the consent.** (Flanagan, Doreen) (Entered: 01/03/2020) |
| 01/16/2020 | 5 | Proposed Summons. Re 1 Complaint, by Jay Nakash (Lanni, Joseph) (Entered: 01/16/2020) |
| 01/17/2020 | 6 | Summons Issued as to Monsanto Company. (Almonte, Giselle) (Entered: 01/17/2020) |
| 01/29/2020 | | Case reassigned to Judge Gary R. Brown. Judge Eric N. Vitaliano no longer assigned to the case. Please download and review the Individual Practices of the assigned Judges, located on our website. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. (Florio, Lisa) (Entered: 01/29/2020) |
| 03/20/2020 | 7 | SUMMONS Returned Executed by Jay Nakash. Monsanto Company served on 3/9/2020, answer due 3/30/2020. (Lanni, Joseph) (Entered: 03/20/2020) |
| 03/20/2020 | 8 | SUMMONS Returned Executed by Jay Nakash. Monsanto Company served on 3/10/2020, answer due 3/31/2020. (Lanni, Joseph) (Entered: 03/20/2020) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 03/23/2020 17:39:29 | | |
| **PACER Login:** | hllp1982 | **Client Code:** | 1417.0049 |
| **Description:** | Docket Report | **Search Criteria:** | 2:19-cv-07295-GRB-LB |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JAY NAKASH, | **COMPLAINT** |
| Plaintiff, | Civil Action No. |
| v. | |
| MONSANTO COMPANY, | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiff Jay Nakash alleges against Monsanto Company as follows:

**INTRODUCTION**

1.      In 1970, Defendant Monsanto Company, Inc. discovered the herbicidal properties
of glyphosate and began marketing it in products in 1974 under the brand name Roundup®.
Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the
growing of crops. By 2001, glyphosate had become the most-used active ingredient in American
agriculture with 85–90 million pounds used annually. That number grew to 185 million pounds
by 2007.[1] As of 2013, glyphosate was the world's most widely used herbicide.

2.      Monsanto is a multinational agricultural biotechnology corporation based in St.
Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the
world's leading producer of seeds, accounting for 27% of the world seed market.[2]  In 2010, an

---

[1] Grube et al, on behalf of EPA, Pesticides Industry Sales and Usage, 2006-2007 Market Estimates, 14,
(2011) available at http://www.epa.gov/pesticides/pestsales/07pestsales/market_estimates2007.pdf.
[2] ETC Group, Who Will Control the Green Economy?, 22, (2011) available at
http://www.etcgroup.org/files/publication/pdf_file/ETC_wwctge_4web_Dec2011.pdf.

estimated 70% of corn and cotton, and 90% of soybean fields in the United Stated were Roundup® ready. [3]

3.      Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops.[4] They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used[5]. It has been found in food[6], in the urine of agricultural workers[7] [8], and even in the urine of urban dwellers who are not in direct contact with glyphosate. [9]

4.      On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

---

[3] William Neuman and Andrew Pollack, Farmers Cope With Roundup-Resistant Weeds, N.Y. Times, May 3, 2010, available at http://www.nytimes.com/2010/05/04/business/energy-environment/04weed.html?pagewan.

[4] Backgrounder -History of Monsanto's Glyphosate Herbicides, Monsanto, (Sept. 2, 2015), available at http://www.monsanto.com/products/documents/glyphosate-background-materials/back_history.pdf.

[5] See: USGS, USGS Technical Announcement: Widely Used Herbicide Commonly Found in Rain and Streams in the Mississippi River Basin, 2011, available at http://www.usgs.gov/newsroom/article.asp?ID=2909; See also; U.S. EPA, Technical Factsheet on: Glyphosate, http://www.epa.gov/safewater/pdfs/factsheets/soc/tech/glyphosa.pdf.

[6] Bohn, et al., Compositional differences in soybeans on the market: Glyphosate accumulates in Roundup Ready GM soybeans, 153 Food Chemistry, 207, (2013), available at http://www.sciencedirect.com/science/article/pii/S0308814613019201.

[7] Acquavella, et al., Glyphosate Biomonitoring for Farmers and Their Families: Results from the Farm Family Exposure Study, 112(3) Environmental Health Perspectives, 321, (2004), available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1241861/ .

[8] Guyton, et al. Carcinogenicity of tetrachlorvinphos, parathion, malathion, diazinon and glyphosate, 112 IARC Monographs , 76, section 5.4 (2015), available at http://dx.doi.org/10.1016/S1470-2045(15)70134-8.

[9] Brändli D, Reinacher S, Herbicides found in Human Urine, 1 Ithaka Journal, 270 (2012), available at http://www.ithaka-journal.net/druckversionen/e052012-herbicides-urine.pdf.

5.     On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

6.     The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers most associated with glyphosate exposure are non-Hodgkin's lymphoma and other haematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.[10]

7.     The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

8.     Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

## JURISDICTION AND VENUE

9.     Federal diversity jurisdiction in this Court is proper under 28 U.S.C. § 1332 because Plaintiff Jay Nakash is a citizen of a different state from the Defendant Monsanto Company's states of citizenship, and the aggregate amount in controversy exceeds $75,000, exclusive of interest and costs.

10.     This Court has personal jurisdiction over Monsanto under the New York Long-Arm Statute, N.Y. C.P.L.R. § 302, because Monsanto knows or should have known that its

---

[10] *See* Guyton, *et al.* Carcinogenicity of tetrachlorvinphos, parathion, malathion, diazinon and glyphosate, *supra.*

Roundup® products are sold throughout the State of New York, and, more specifically, caused Roundup® to be sold to Jay Nakash in the State of New York.

11.    In addition, Monsanto maintains sufficient contacts with the State of New York such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

12.    Venue is proper within this District under 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claims asserted in this Complaint occurred in this District. Further, Monsanto, as a corporate entity, is deemed to reside in any judicial district in which it is subject to personal jurisdiction.

## THE PARTIES

### PLAINTIFF

13.    Plaintiff Jay Nakash resides in Cedarhurst, New York. Plaintiff was exposed to Roundup® in Cedarhurst, New York, from in and around 1983 to approximately 2018.

### DEFENDANT

14.    Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.

15.    At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®.

### FACTS

16.    Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

17.    Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids

necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

18.     For nearly 40 years, people across the world have used Roundup® without knowing of the dangers its use poses. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup®— glyphosate—is a probable cause of cancer. Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® was safe.

### *The Discovery of Glyphosate and Development of Roundup®*

19.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®.[11] From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use. Roundup® is still marketed as safe today.[12]

---

[11] Backgrounder -History of Monsanto's Glyphosate Herbicide, Monsanto, (Sept. 2, 2015), http://www.monsanto.com/products/documents/glyphosate-background-materials/back_history.pdf.

[12] Glyphosate's Impact on Human Health and Safety, (Dec. 26, 2019), https://www.bayer.com/en/glyphosate-impact-on-human-health-and-safety.aspx

### *Registration of Herbicides under Federal Law*

20.     The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

21.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

22.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

23.     The EPA and New York State registered Roundup® for distribution, sale, and manufacture in the United States and New York State.

24.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conducts the health and safety testing of pesticide products. The EPA has protocols governing

the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

25.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time.

### *Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup*

26.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."[13]

27.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

---

[13] U.S. Environmental Protection Agency, Memorandum, Subject: SECOND Peer Review of Glyphosate, 1, (1991), available at http://www.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_30-Oct-91_265.pdf.

28.     In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®.[14] IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup®.

29.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid.[15] An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[16]

30.     Three top executives of IBT were convicted of fraud in 1983.

31.     In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year,

_____

[14] Backgrounder. Testing Fraud: IBT and Craven Laboratories, Monsanto, (Sept. 2, 2015), available at http://www.monsanto.com/products/documents/glyphosate-background-materials/ibt_craven_bkg.pdf.

[15] U.S. EPA, Summary of the IBT Review Program Office of Pesticide Programs, (1983), available at http://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA&Index=1981+Thru +1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&QF ieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles %5CIndex%20Data%5C81thru85%5CTxt%5C00000022%5C91014ULV.txt&User=ANONYMOUS&Password=an onymous&SortMethod=h%7C- &MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=p%7Cf&De fSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page&MaximumPages=1&ZyE ntry=1&SeekPage=x&ZyPURL.

[16] Robin, Marie-Monique. The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply (2011). Citing U.S. EPA. Data validation. Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch. Washington, D.C. (August 9, 1978).

the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.[17]

32.    Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

### The Importance of Roundup® to Monsanto's Market Dominance Profits

33.    The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

34.    In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate; farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup®herbicide.

---

[17] Backgrounder: Testing Fraud: IBT and Craven Laboratories, Monsanto, *supra*.

35.     Through a three-pronged strategy of increased production, decreased prices, and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue.[18] Today, glyphosate remains one of the world's largest herbicides by sales volume.

### *Monsanto has known for decades that it falsely advertises the safety of Roundup®*

36.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup ® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

   a) Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

   b) And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

   c) Roundup biodegrades into naturally occurring elements.

   d) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

---

[18] David Barboza, The Power of Roundup: A Weed Killer Is A Block for Monsanto to Build On, N.Y. Times, Aug. 2, 2001, available at http://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weed-killer-is-a-block-for-monsanto-to-build-on.html.

e) This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f) You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h) Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non- toxic' as it pertains to mammals, birds and fish.

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup. [19]

37.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a) its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

\*       \*       \*

b) its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable

\*       \*       \*

c) its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

---

[19] *In the Matter of Monsanto Company,* Office of the Attorney General of the State of New York, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

\*       \*       \*

d) its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

\*       \*       \*

e) glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f) its glyphosate-containing products or any component thereof might be classified as "practically non-toxic".

38.     Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

39.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."[20]

### *Classifications and Assessments of Glyphosate*

40.     The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

---

[20] Monsanto Guilty in 'false ad' row. BBC, Oct. 15, 2009, available at http://news.bbc.co.uk/2/hi/europe/8308903.stm.

41.     The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble.[21] Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

42.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings are published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

43.     In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

44.     In March 2015, IARC reassessed glyphosate. The summary published in *The Lancet Oncology* reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

---

[21] World Health Organization, IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Preamble, (2006), available at http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf.

45.     On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3–10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available".

46.     The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

47.     Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

48.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

49.     The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

50.     The IARC Working Group found an increased risk between exposure to

glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

51.    The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed

52.    In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study of mice.

53.    The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

54.    The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

55.    The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.[22] Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

---

[22]    Guyton, *et al.* Carcinogenicity of tetrachlorvinphos, parathion, malathion, diazinon and glyphosate, *supra* at 77.

56.     The IARC Working Group also reviewed an Agricultural Health Study, consisting

of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina.

While this study differed from others in that it was based on a self-administered questionnaire,

the results support an association between glyphosate exposure and Multiple Myeloma, Hairy

Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other

cancers.

### Other Earlier Findings About Glyphosate's Dangers to Human Health

57.     The EPA has a technical fact sheet, as part of its Drinking Water and Health,

National Primary Drinking Water Regulations publication, relating to glyphosate. This technical

fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes  the release

patterns for glyphosate as follows:

> **Release Patterns**
>
> Glyphosate is released to the environment in its use as a herbicide
> for controlling woody and herbaceous weeds on forestry, right-of-
> way, cropped and non-cropped sites. These sites may be around
> water and in wetlands.
>
> It may also be released to the environment during its manufacture,
> formulation, transport, storage, disposal and cleanup, and from
> spills. Since glyphosate is not a listed chemical in the Toxics
> Release Inventory, data on releases during its manufacture and
> handling are not available.
>
> Occupational workers and home gardeners may be exposed to
> glyphosate by inhalation and dermal contact during spraying,
> mixing, and cleanup. They may also be exposed by touching soil
> and plants to which glyphosate was applied. Occupational
> exposure may also occur during glyphosate's manufacture,
> transport storage, and disposal.[23]

---

[23] U.S. EPA, Technical Factsheet on: Glyphosate, *supra*.

58.     In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.[24]

### Recent Worldwide Bans on Roundup®/Glyphosate

59.     Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup® become more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which took effect in 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Children, in particular, are sensitive to toxic substances and should therefore not be exposed to it."[25]

60.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.[26]

---

[24] Cox, Caroline. Glyphosate, Part 2: Human Exposure and Ecological Effects, 15:4 *J Pesticide Reform*, (1995). Peas, W.S., et al. Preventing pesticide-related illness in California agriculture: Strategies and priorities. Environmental Health Policy Program Report. Berkeley, CA: Univ. of Calif. School of Public Health. Calif. Policy Seminar (1993).

[25] Holland's Parliament Bans Glyphosate Herbicides, The Real Agenda, 14 April 2014, available at http://real-agenda.com/hollands-parliament-bans-glyphosate-herbicides/.

[26] Christina Sarich, Brazil's Public Prosecutor Wants to Ban Monsanto's Chemicals Following Recent Glyphosate-Cancer Link, Global Research 14 May 2015, available at http://www.globalresearch.ca/brazils-public-prosecutor-wants-to-ban-monsantos-chemicals-following-recent-glyphosate-cancer-link/5449440 ; *see* Ministério Público Federal, MPF/DF reforça pedido para que glifosato seja banido do mercado naciona, April, 14, 2015, available at http://noticias.pgr.mpf.mp.br/noticias/noticias-do-site/copy_of_meio-ambiente-e-patrimonio-cultural/mpf-df-reforca-pedido-para-que-glifosato-seja-ba

61.     France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.[27]

62.     Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."[28]

63.     The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that Glyphosate has been linked to fatal kidney disease in agricultural workers.[29]

64.     The government of Colombia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.[30]

### Plaintiff's Exposure to Roundup®

65.     Jay Nakash was born in November 1944. From approximately 1983 until 2018 he personally applied Roundup® in the backyard of his home in Cedarhurst, New York, about twice per month during the spring and summer months.

---

[27] Zoe Schlanger, France Bans Sales of Monsanto's Roundup in Garden Centers, 3 Months After U.N. Calls it 'Probable Carcinogen', Newsweek, June 15, 2015, available at http://www.newsweek.com/france-bans-sale-monsantos-roundup-garden-centers-after-un-names-it-probable-343311.

[28] Health Minister: Importation of Roundup Weed Spray Suspended. Today in Bermuda, May, 11 2015, available at http://www.todayinbermuda.com/news/health/item/1471-health-minister-importation-of-roundup-weed-spray-suspended.

[29] Sri Lanka's New President Puts Immediate Ban on Glyphosate Herbicides, Sustainable Pulse, May 25, 2015, available at http://sustainablepulse.com/2015/05/25/sri-lankas-new-president-puts-immediate-ban-on-glyphosate-herbicides/#.VeduYk3bKAw.

[30] Columbia to ban coca spraying herbicide glyphosate, BBC, May 10, 2015, available at http://www.bbc.com/news/world-latin-america-32677411.

66.     During the entire time he used Roundup® Mr. Nakash did not know that exposure to Roundup® was injurious to his health or to the health of others.

67.     Mr. Nakash was diagnosed with monoclonal B-cell lymphocytosis (which may progress to chronic lymphocytic leukemia) and with Mantle Cell carcinoma in 2011.

68.     Mr. Nakash initially learned that monoclonal B-cell lymphocytosis, Mantle Cell carcinoma and other cancers and serious illnesses can be caused by exposure to Roundup® sometime in early 2019 after seeing an advertisement on television.

### COUNT ONE

### STRICT LIABILITY
### (DESIGN DEFECT)

69.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

70.     Plaintiff brings this strict liability claim against Defendant for defective design.

71.     At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant. At all times relevant to this litigation, Defendant designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products used by the Plaintiff, as described above.

72.     At all times relevant to this litigation, Defendant's Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner

that was dangerous for use by the public, and, in particular, the Plaintiff and/or exposure to the public, and, in particular, the Plaintiff.

73.     At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in New York and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

74.     Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of the Defendant's manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

75.     Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

76.     At all times relevant to this action, Defendant knew or had reason to know that its Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendant.

77.     Therefore, at all times relevant to this litigation, Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendant were defective in design and formulation, in one or more of the following ways:

a.     When placed in the stream of commerce, Defendant's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b.     When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c.     When placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in the intended manner and/or in a reasonably anticipated or foreseeable manner.

d.     Defendant did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient glyphosate.

e.     Exposure to Roundup® and glyphosate-containing products presented a risk of serious illnesses, injuries, harm and side effects that outweigh any potential utility stemming from the use of the herbicide.

f.     Defendant knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g.     Defendant did not conduct adequate post-marketing surveillance of its Roundup® products.

h.     Defendant could have employed safer alternative designs and

formulations.

78.     Plaintiff was exposed to Defendant's Roundup® products in the course of conducting yard work at his home over the course of many years, as described above, without knowledge of their dangerous characteristics and properties.

79.     At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup® products in an intended manner and/or reasonably foreseeable manner without knowledge of their dangerous characteristics and properties.

80.     Plaintiff could not have reasonably discovered the defects and risks of serious illnesses, injuries and/or harm associated with Roundup® or glyphosate-containing products before or at the time of exposure.

81.     The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendant's Roundup® products were and are more dangerous than alternative products and Defendant could have designed its Roundup® products to make them less dangerous. Indeed, at the time that Defendant designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

82.     At the time Roundup® products left Defendant's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the intended and/or reasonably anticipated function of Defendant's herbicides.

83.     Defendant's defective design of its Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of

the Roundup® products, including the Plaintiff herein.

84.     Therefore, as a result of the unreasonably dangerous condition of its Roundup®
products, Defendant is strictly liable to Plaintiff.

85.     The defects in Defendant's Roundup® products were substantial and contributing
factors in causing Plaintiff's grave injuries, and, but for Defendant's foregoing misconduct,
wrongdoing, errors and omissions, Plaintiff would not have sustained his serious illnesses,
injuries and harm.

86.     Defendant's conduct, as described above, was reckless. Defendant risked the
lives, health and safety of consumers and users of its products, including Plaintiff, and other
persons exposed to those products, with knowledge of the safety problems associated with
Roundup® and glyphosate-containing products, and suppressed this knowledge from the general
public and, in particular, the Plaintiff. Defendant made conscious decisions not to redesign the
product and/or warn or inform the unsuspecting public, including the Plaintiff, about the dangers
and risks of serious illnesses, injuries and harm presented by Roundup® and glyphosate-
containing products. Defendant's reckless conduct warrants an award of punitive damages.

87.     As a direct and proximate result of Defendant placing its defective Roundup®
products into the stream of commerce, Plaintiff has suffered and continues to suffer grave
injuries, and has endured physical pain and discomfort, as well as economic hardship, including
considerable financial expenses for medical care and treatment. Plaintiff will continue to incur
these expenses in the future.

88.     WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in
Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein
incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

Plaintiff also demands a jury trial on the issues contained herein.

## COUNT TWO

### STRICT LIABILITY
### (FAILURE TO WARN)

89.     Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

90.     Plaintiff brings this strict liability claim against Defendant for failure to warn.

91.     At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

92.     Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiff, and persons responsible for consumers (such as employers), and therefore had a duty to warn of the risks associated with the use of Roundup® and glyphosate-containing products.

93.     At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup® products did not cause consumers, users and exposed persons to suffer from unreasonable and

dangerous risks of serious illnesses, injuries and/or harm. Defendant had a continuing duty to warn consumers and users, including the Plaintiff, of the dangers associated with Roundup® use and exposure. Defendant, as manufacturer, seller and/or distributor of Roundup® and glyphosate-containing products and other chemical herbicides is held to the knowledge of an expert in the field.

94.     At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

95.     At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its products and to those who would foreseeably use or be harmed by Defendant's herbicides, including Plaintiff.

96.     Despite the fact that Defendant knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied, or sold the product, and not known to end users and consumers, such as Plaintiff.

97.     Defendant knew or should have known that its products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Defendant has wrongfully concealed information concerning the dangerous nature of Roundup® and its

active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

98.     At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other exposed persons (persons coming into contact with these products) in New York and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

99.     Plaintiff was exposed to Defendant's Roundup® products in the course of doing yard work at his home, as described above, without knowledge of their dangerous characteristics.

100.    At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup® products in the intended manner and/or in a reasonably foreseeable manner without knowledge of their dangerous characteristics and properties.

101.    Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendant.

102.    Defendant knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, but they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

103.    The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled horticultural workers, consumers, and users, such as Plaintiff, to utilize the products safely and with adequate

protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of serious illnesses, injuries and/or harm from use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

104.   To this day, Defendant has failed to adequately and accurately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

105.   As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiff in the course of yard work he performed at his home.

106.   Defendant is liable to Plaintiff for injuries caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its products and the risks associated with the use of or exposure to Roundup® and glyphosate.

107.   The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiff's injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained their injuries.

108.   Had Defendant provided proper, adequate and sufficient warnings and

instructions and properly disclosed and disseminated the risks of serious illnesses, injuries and/or

harm associated with its Roundup® products, Plaintiff could have avoided the risk of developing

the serious injuries as alleged herein.

109.    As a direct and proximate result of Defendant placing its defective Roundup®

products into the stream of commerce without proper, adequate and sufficient warnings and

instructions and without properly disclosing and disseminating the risks of serious illnesses,

injuries and/or harm, Plaintiff suffered and continues to suffer severe injuries, endured physical

pain and discomfort, and economic hardship, including considerable financial expenses for

medical care and treatment. Plaintiff will continue to incur these expenses in the future.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's

favor for compensatory and punitive damages, together with interest, costs herein incurred,

attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff

also demands a jury trial on the issues contained herein.

## COUNT THREE

## NEGLIGENCE

110.    Plaintiff incorporates by reference each and every allegation set forth in the

preceding paragraphs as if fully stated herein.

111.    Defendant, directly or indirectly, caused Roundup® products to be sold,

distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

112.    At all times relevant to this litigation, Defendant had a duty to exercise reasonable

care in the design, research, manufacture, marketing, advertisement, supply, promotion,

packaging, sale, and distribution of its Roundup® products, including the duty to take all

reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

113.    At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of serious illnesses, injuries and/or harm from the use of and exposure to Roundup® products and glyphosate-containing products, and providing appropriate, complete, and accurate warnings concerning the potential adverse effects from the use of and exposure to Roundup®, and, in particular, its active ingredient glyphosate.

114.    At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

115.    Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

116.    Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks of serious illnesses, injuries and/or harm and the magnitude of the risks associated with the use of and/or exposure to Roundup® and glyphosate-containing products.

117.    As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products, in that

Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that the exposure of consumers and users to these products created significant risks of serious illnesses, injuries and/or harm, and failed to prevent or adequately warn of such risks of serious illnesses, injuries and/or harm.

118.   Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant has failed to do so. Indeed, Defendant has wrongfully concealed information and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate-containing products during use or exposure.

119.   Defendant's negligence included:

a.   Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

b.   Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious illnesses, injuries and/or harm associated with human use of and exposure to Roundup® and glyphosate-containing products;

c.   Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d.   Failing to use reasonable and prudent care in the design, research,

manufacture, and development of Roundup® products so as to avoid the risk of serious illnesses, injuries and/or harm associated with the use of Roundup®/glyphosate as an herbicide;

e.  Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and reasonably effective as other herbicides on the market;

f.  Failing to provide adequate instructions, guidelines, and safety precautions to those persons whom Defendant could reasonably foresee would use and be exposed to its Roundup® products;

g.  Failing to disclose to Plaintiff, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other serious illnesses, injuries and/or harm;

h.  Failing to warn Plaintiff, consumers, and the general public that the product's risk of serious illnesses, injuries and/or harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other consumers;

i.  Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of serious illnesses, injuries and/or harm presented by the use of and/or exposure to Roundup® and glyphosate-containing products;

j.  Representing that its Roundup® products were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended purpose and/or reasonably foreseeable

purposes;

k.     Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public to the risks of serious illnesses, injuries and/or harm from the use of and/or exposure to Roundup® and glyphosate-containing products;

l.     Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers and risks of serious illnesses, injuries and/or harm known by the Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate-containing products;

m.    Continuing to disseminate information to its consumers and users that indicated or implied that Defendant's Roundup® products are not unsafe for use in agricultural and horticultural activities; and

n.     Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

120.    Defendant knew and/or should have known that it was foreseeable that consumers and users, such as the Plaintiff, would suffer serious illnesses, injuries and/or harm as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup® products.

121.    Plaintiff did not know the nature and extent of the serious illnesses, injuries and/or harm that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

122.    Defendant's negligence was the proximate cause of the serious illnesses, injuries, harm and economic losses that the Plaintiff suffered, and will continue to suffer, as described herein.

123.    Defendant's conduct, as described above, was reckless. Defendant regularly risked the lives of consumers and users of their products, including the Plaintiff, with full knowledge of the dangers of its Roundup® products. Defendant has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including the Plaintiff. Defendant's reckless conduct therefore warrants an award of punitive damages.

124.    As a proximate result of Defendant's wrongful acts and omissions in placing its defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff has suffered and continues to suffer severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, has suffered economic losses (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## COUNT FOUR

### BREACH OF EXPRESS WARRANTIES

125.    Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

126.   At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

127.   Defendant had a duty to exercise reasonable care in the research, development, design, testing, packaging, manufacture, inspection, labeling, distributing, marketing, promotion, sale, and release of its Roundup® products, including a duty to:

  a.   ensure that its products did not subject the user to unreasonable dangers including risks of potentially fatal serious illnesses, injuries and/or harm;

  b.   warn of dangerous and potentially fatal serious illnesses, injuries and/or harm; and

  c.   disclose adverse material facts, such as the true risks serious illnesses, injuries and/or harm presented by and/or associated with the use of and exposure to Roundup® and glyphosate-containing products, when making representations to consumers and the general public, including Plaintiff.

128.   At all times relevant to this litigation, Defendant expressly represented and warranted to the purchasers of its products, by and through statements made by Defendant in labels, publications, package inserts, and other written materials intended for consumers, users and the general public, that its Roundup® products were safe to human health and the environment, effective, fit, and proper for their intended use. Defendant advertised, labeled, marketed, and promoted Roundup® products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that

its Roundup® products would conform to the representations.

129.     These express representations include incomplete warnings and instructions that purport but fail to include the complete array of risks of serious illnesses, injuries and/or harm presented by and/or associated with the use of and/or exposure to Roundup® and glyphosate, a proven carcinogen. Defendant knew or should have known that the risks expressly included in Roundup® warnings and labels did not and do not properly, accurately, adequately or sufficiently set forth the risks of developing the serious illnesses, injuries and harm to consumers and users, including those illnesses, injuries and harm sustained by the Plaintiff that is complained of herein. Nevertheless, Defendant expressly represented to the Plaintiff that its Roundup® products were safe and effective, that they were safe and effective for use by individuals such as Plaintiff, and/or that they were safe and effective as agricultural herbicides.

130.     The representations about Roundup®, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

131.     Defendant placed its Roundup® products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of serious illnesses, injuries and harm injuries presented by and/or associated with the use of and exposure to Roundup® and its active ingredient glyphosate.

132.     Defendant breached these warranties because, among other things, its Roundup® products were defective, dangerous, unfit for use, did not contain labels representing the true and adequate nature of the risks of serious illnesses, injuries and harm presented by and/or associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable

use and purpose. Specifically, Defendant breached the warranties in the following ways:

a.   Defendant represented through its labeling, advertising, and marketing materials that its Roundup® products were safe, and fraudulently withheld and concealed information about the risks of serious illnesses, injuries and harm presented by and/or associated with use of and/or exposure to Roundup® and glyphosate by expressly limiting the risks associated with use and/or exposure within its warnings and labels; and

b.   Defendant represented that its Roundup® products were safe for use and fraudulently concealed information that demonstrated that glyphosate, the active ingredient in Roundup®, had carcinogenic properties, and that its Roundup® products, therefore, were not safer than alternatives available on the market.

133.   Plaintiff was at all relevant times in privity with Defendant.

134.   Plaintiff is among the intended third-party beneficiaries of express warranties made by Defendant to the purchasers of its herbicides, and as such Plaintiff is entitled to assert this claim.

135.   Plaintiff justifiably and detrimentally relied on the express warranties and representations of Defendant in the purchase and use of its Roundup® products. When Plaintiff made the decision to purchase Roundup®, he reasonably relied upon Defendant to disclose known defects, risks, dangers, and side effects of Roundup® and glyphosate.

136.   Defendant had sole access to material facts concerning the nature of the risks of serious illnesses, injuries and harm presented by and/or associated with with its Roundup® products which should have been expressly stated within its warnings and labels, and Defendant

knew that consumers and users, such as the Plaintiff, could not have reasonably discovered that the risks expressly included in Roundup® warnings and labels were inadequate and inaccurate.

137.   Plaintiff had no knowledge of the falsity or incompleteness of Defendant's statements and representations concerning Roundup®.

138.   Plaintiff used and/or was exposed to the use of Roundup® as researched, developed, designed, tested, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by Defendant.

139.   Had the warnings and labels for Roundup® products properly, sufficiently, accurately and adequately set forth the true risks of serious illnesses, injuries and harm presented by and/or associated with the use of such products, including Plaintiff's injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Plaintiff could have avoided the injuries complained of herein.

140.   As a direct and proximate result of Defendant's wrongful acts and omissions, Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, has suffered economic losses (including significant expenses for medical care and treatment), and will continue to incur these expenses in the future.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## COUNT FIVE

### BREACH OF IMPLIED WARRANTIES

141.   Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

142.   At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

143.   Before the time that Plaintiff used and/or was exposed to the Defendant's Roundup® products, Defendant impliedly warranted to its consumers—including Plaintiff—that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

144.   Defendant, however, failed to disclose that Roundup® has dangerous characteristics, properties and propensities when used in the intended manner and/or reasonably foreseeable manners and that the use of and/or exposure to Roundup® and glyphosate-containing products carries an increased risk of developing serious illnesses, injuries and harm, including the Plaintiff's injuries.

145.   Upon information and belief, Plaintiff reasonably relied upon the skill, superior knowledge and judgment of Defendant and upon its implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

146.   Upon information and belief, Plaintiff was at all relevant times in privity with Defendant.

147.   Plaintiff is among the intended third-party beneficiaries of implied warranties

made by Defendant to the purchasers of its horticultural herbicides, and as such Plaintiff is entitled to assert this claim.

148.   The Roundup® products were expected to reach and did in fact reach consumers and users, including the Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendant.

149.   At all times relevant to this litigation, Defendant was aware that consumers and users of its products, including the Plaintiff, would use Roundup® products as marketed by Defendant, which is to say that Plaintiff was a foreseeable user of Roundup®.

150.   Defendant intended that its Roundup® products be used in the manner in which the Plaintiff in fact used them and Defendant impliedly warranted those products to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched.

151.   In reliance upon Defendant's implied warranty, Plaintiff used Roundup® as instructed and labeled and in the manner intended, recommended, promoted and marketed by Defendant.

152.   Plaintiff could not have reasonably discovered or known of the risks of serious illness, injuries and harm presented by and/or associated with Roundup® or glyphosate.

153.   Defendant breached its implied warranty to Plaintiff in that its Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested; Roundup® has dangerous characteristics, properties and propensities when used as intended and/or in a foreseeable manner and can cause serious illnesses, injuries and harm, including those severe injuries sustained by the Plaintiff complained of herein.

154.   The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

155.   As a direct and proximate result of Defendant's wrongful acts and omissions, the Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, have suffered economic loss (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper. Plaintiff also demands a jury trial on the issues contained herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter judgment in their favor and against Monsanto, awarding on COUNTS ONE, TWO, THREE, FOUR and FIVE as follows:

A.   compensatory damages in an amount to be proven at trial;

B.   punitive damages;

C.   costs including reasonable attorneys' fees, court costs, and other litigation expenses; and

D.   any other relief the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all of the triable issues presented by this Complaint.

Dated: New York, New York
December 27, 2019

Respectfully submitted,

JAY NAKASH

By his attorneys:

/s/ *Joseph Lanni*
Joseph Lanni, Esq.
The Jacob D. Fuchsberg Law Firm, LLP
3 Park Avenue, 37th Floor
New York, New York  10016
(212) 869-3500
j.lanni@fuchsberg.com
josephlanni@msn.com

and

Edward Hynes, Esq.
The Jacob D. Fuchsberg Law Firm, LLP
3 Park Avenue, 37th Floor
New York, New York  10016
(212) 869-3500
e.hynes@fuchsberg.com