JURY,PSH

# U.S. District Court
## Eastern District of Arkansas (Central Division)
### CIVIL DOCKET FOR CASE #: 4:20–cv–00311–LPR

Duck v. Monsanto Company
Assigned to: Judge Lee P. Rudofsky
Case in other court:  Lonoke County Circuit Court,
                43CV–20–00224
Cause: 28:1441 Petition for Removal– Personal Injury

Date Filed: 03/25/2020
Jury Demand: Both
Nature of Suit: 365 Personal Inj. Prod.
Liability
Jurisdiction: Federal Question

**Plaintiff**

| | | |
|---|---|---|
| **Albert Ray Duck** | represented by | **James Harrison Kemp** |
| | | Mann & Kemp, PLLC |
| | | 221 West Second Street, Suite 408 |
| | | Little Rock, AR 72201 |
| | | 501–222–7378 |
| | | Email: harrison@mannkemp.com |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |

V.

**Defendant**

| | | |
|---|---|---|
| **Monsanto Company** | represented by | **Graham Caughman Talley** |
| | | Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C. |
| | | 425 West Capitol Avenue |
| | | Suite 1800 |
| | | Little Rock, AR 72201 |
| | | 501–688–8853 |
| | | Email: gtalley@mwlaw.com |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Lyn Peeples Pruitt** |
| | | Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C. |
| | | 425 West Capitol Avenue |
| | | Suite 1800 |
| | | Little Rock, AR 72201 |
| | | 501–688–8869 |
| | | Email: lpruitt@mwlaw.com |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 03/25/2020 | 1 | NOTICE OF REMOVAL by Monsanto Company from Lonoke County Circuit Court, case number 43CV–20–00224. Fee of $400 paid; receipt number LIT076579. (Attachments: # 1 Civil Cover Sheet) (jbh) (Entered: 03/25/2020) |
| 03/25/2020 | 2 | COMPLAINT with Jury Demand against Monsanto Company, filed by Albert Ray Duck. (jbh) (Entered: 03/25/2020) |
| 03/25/2020 | 3 | ANSWER to 2 Complaint with Jury Demand by Monsanto Company. (jbh) (Entered: 03/25/2020) |
| 03/25/2020 | 4 | Corporate Disclosure Statement (Rule 7.1) by Monsanto Company. (jbh) (Entered: 03/25/2020) |

ELECTRONICALLY FILED
Lonoke County Circuit Court
Deborah Oglesby, Circuit Clerk
2020-Mar-05  12:03:26
43CV-20-224
C23D03 : 36 Pages

## IN THE CIRCUIT COURT OF LONOKE COUNTY, ARKANSAS
## CIVIL DIVISION

ALBERT RAY DUCK                                                    **PLAINTIFF**

v.                              **CASE NO. 43CV-2020-____**

MONSANTO COMPANY                                                   **DEFENDANT**

### COMPLAINT

Plaintiff Albert Ray Duck ("Plaintiff"), for his complaint against the Defendant Monsanto Company ("Defendant"), states:

### NATURE OF THE CASE

1.     This is an action for brought in strict products liability, negligence, and breach of warranty, for damages suffered by Plaintiff as a direct and proximate result of Defendant's negligent and wrongful conduct in connection with the design, development, manufacturing, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup®, containing the active ingredient glyphosate.

2.     Roundup® refers to all formulations of Defendant's Roundup® products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer,

Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

3.      Plaintiff maintains that Roundup® and/or glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper warnings and directions as to the dangers associated with its use.

4.      Plaintiff's use of Roundup® directly and proximately resulted in his injuries, which were wholly avoidable.

## JURISDICTION AND VENUE

5.      Jurisdiction is proper pursuant to Ark. Code Ann. § 16-13-201(a), which states that circuit courts shall have original jurisdiction of all justiciable matters not otherwise assigned pursuant to the Arkansas Constitution. Jurisdiction is also proper pursuant to Ark. Const. amend. LXXX, § 6(A), which asserts that circuit courts are established as the trial courts of original jurisdiction of all justiciable matters not otherwise assigned pursuant to this Constitution.

6.      This Court has personal jurisdiction over Defendant because it conducts business in Arkansas and has sufficient minimum contacts with the State of Arkansas by way of advertising, marketing, selling, leasing, distributing and offering to sell, leasing and distributing its Roundup®

products to Arkansas residents, including the Roundup® that was the source of Plaintiff's injuries and subject of this Complaint.

7.      Venue is proper in this Court because a substantial part of the events or omissions giving rise to this cause of action occurred in Lonoke County, and/or because Plaintiff resided in Lonoke County at the time of the events or omissions giving rise to this cause of action. Ark. Code Ann. § 16-60-101(a)(1), (3)(A).

PARTIES

8.      Plaintiff, Albert Duck, is a natural person and at all times relevant to this Complaint, a resident and citizen of Lonoke County, Arkansas. Plaintiff brings this action for personal injuries sustained by exposure to Roundup® containing the active ingredient glyphosate. As a direct and proximate result of being exposed to Roundup®, Plaintiff developed non-Hodgkin's Lymphoma.

9.      Defendant is a foreign for-profit Delaware corporation registered to do business in the State of Arkansas with its principle place of business in St. Louis, Missouri. Defendant can be served with process in this matter by serving its registered agent, Corporation Service Company, at 300 Spring Building, Suite 900, 300 S. Spring Street, Little Rock, Arkansas 72201. At all times material to this Complaint, Defendant engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup® in Arkansas, including Lonoke County. Upon information and belief, Defendant did so with full knowledge of its dangerous and defective nature. Authorized to do business in Arkansas, Defendant derived substantial income and revenue from transactions made and business conducted Arkansas, as well as its goods and products used in Arkansas. As such, Defendant expected or should have expected its acts to have consequences within the State of Arkansas. Upon information and belief, Defendant purposefully

3

availed itself of the privilege of conducting activities with the State of Arkansas, thus invoking the benefits and protections of its laws.

### FACTUAL ALLEGATIONS

10.     At all relevant times, Defendant was in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or has acquired and is responsible for any person or entity that has designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the commercial herbicide Roundup®.

11.     Defendant is a multinational agricultural biotechnology corporation and the world's leading producer of glyphosate.

12.     Defendant discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate-based Roundup® as a broad-spectrum herbicide.

13.     Glyphosate, the active ingredient in Roundup®, is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops, as well as a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase. Glyphosate inhibits the enzyme that interferes with the shikimate pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

14.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues. Each year, approximately 250 million pounds of glyphosate are sprayed on crops as well as other surfaces.

15.     Defendant is intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as

4

being resistant to Roundup® i.e., "Roundup Ready®." As of 2009, Defendant was the world's leading producer of seeds designed to be Roundup Ready®. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready® seeds.

16.     The original Roundup®, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the world's most widely used herbicides. Monsanto's glyphosate products are registered in more than 130 countries and are approved for weed control in more than 100 crops. No other herbicide active ingredient compares in terms of number of approved uses.

17.     For nearly 40 years, farmers across the globe, including Plaintiff, have used Roundup®, unaware of its carcinogenic properties.

18.     Plaintiff began farming around 1973, and at all times relevant to this cause of action, Plaintiff owned and operated a farming business in Lonoke County, Arkansas.

19.     Plaintiff first began using Roundup® around 1975. While farming, he sprayed Roundup® on a regular basis. Plaintiff followed all safety and precautionary warnings during the course of use.

20.     Nonetheless, Plaintiff was diagnosed with non-Hodgkin's Lymphoma.

21.     As a result of his injury, Plaintiff has incurred significant economic and non-economic damages.

### MONSANTO'S FALSE REPRESENTATIONS REGARDING THE SAFETY OF ROUNDUP®

22.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and

fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

    a.   Remember that environmentally friendly Roundup® herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks and fences ...

    b.   And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got a weed, brush, edging or trimming problem.

    c.   Roundup® biodegrades into naturally occurring elements.

    d.   Remember that versatile Roundup® herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

    e.   This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

    f.   You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

    g.   Glyphosate is less toxic to rats than table salt following acute oral ingestion.

    h.   Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

    i.   You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j. "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup®.

23. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that its glyphosate-containing pesticide products or any component thereof:

a. are safe, non-toxic, harmless or free from risk;

b. as manufactured, formulated, distributed or sold by Monsanto are biodegradable;

c. stay where they are applied under all circumstances and will not move through the environment by any means;

d. are "good" for the environment or are "known for their environmental characteristics.";

e. are safer or less toxic than common consumer products other than herbicides; and,

f. might be classified as "practically non-toxic."

24. Defendant did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

EVIDENCE OF CARCINOGENICITY IN ROUNDUP®

25. As early as the 1980's Defendant was aware of glyphosate's carcinogenic properties.

26. On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene. Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

27.     In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived. In October 1991 the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of noncarcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.

28.     In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendant's Roundup® products are more dangerous and toxic than glyphosate alone. As early as 1991 evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.

29.     In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation.", which found that Defendant's Roundup® caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles. In 2004, she published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation. The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."

30.     In 2005, Francisco Peixoto published a study showing that Roundup®'s effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate

alone. The Peixoto study suggested that the harmful effects of Roundup® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup® formulation products.

31.    In 2009, Nora Benachour and Gilles-Eric Serallini published a study examining the effects of Roundup® and glyphosate on human umbilical, embryonic, and placental cells. The study used dilution levels of Roundup® and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup® are not inert and that Roundup® is always more toxic than its active ingredient glyphosate.

32.    The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendant.

33.    Defendant knew or should have known that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup®.

34.    Defendant knew or should have known that tests limited to Roundup®'s active ingredient glyphosate were insufficient to prove the safety of Roundup®.

35.    Defendant failed to appropriately and adequately test Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup®.

9

36.     Rather than performing appropriate tests, Defendant relied upon flawed industry-supported studies designed to protect its economic interests rather than Plaintiff and the consuming public.

37.     Despite its knowledge that Roundup® was considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup® as safe.

### IARC CLASSIFICATION OF GLYPHOSATE

38.     The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

39.     An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015–2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

40.     IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; and/or related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

41.     On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendant's possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Defendant's

Roundup® herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

42.     The IARC's full Monograph was published on July 29, 2015, and established glyphosate as a Class 2A probable carcinogen to humans, asserting that glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

43.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma and several subtypes of non-Hodgkin's Lymphoma, and the increased risk continued after adjustment for other pesticides.

44.     The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

### EARLIER EVIDENCE OF GLYPHOSATE'S DANGER

45.     Despite the new classification by the IARC, Defendant has had ample evidence of glyphosate and Roundup®'s genotoxic properties for decades.

46.     Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

47.     In 1997, Chris Clements published "Genotoxicity of select herbicides in Rana catesbeiana tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay.", which found that tadpoles exposed to Roundup® showed significant DNA damage when compared with unexposed control animals.

48.     Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup® can induce oxidative stress, and oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis. The IARC Monograph notes that

"[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

49.     Despite knowledge to the contrary, Defendant maintains that there is no evidence that Roundup® is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup® is not genotoxic, and that there is no evidence that Roundup® is genotoxic.

50.     In addition to glyphosate and Roundup®'s genotoxic properties, Defendant has long been aware of glyphosate's carcinogenic properties.

51.     Glyphosate and Roundup® in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

52.     Defendant has known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup®.

53.     In 1985 the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

54.     In 2003 Lennart Hardell and Mikael Eriksson published the results of two case-controlled studies on pesticides as a risk factor for non-Hodgkin's Lymphoma and hairy cell leukemia.

55.     The study concluded that glyphosate had the most significant relationship to non-Hodgkin's Lymphoma among all herbicide studies with an increased odds ratio of 3.11.

56.     In 2003 AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for non-Hodgkin's Lymphoma. The study, which controlled for potential confounders, found a relationship between increased non-Hodgkin's Lymphoma incidence and glyphosate.

12

57.     In 2008 Mikael Eriksson published a study a population-based case-control study of exposure to various pesticides as a risk factor for non-Hodgkin's Lymphoma. This strengthened previous associations between glyphosate and non-Hodgkin's Lymphoma.

58.     In spite of this knowledge, Defendant continued to issue broad and sweeping statements suggesting that Roundup® was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

59.     Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiff, the agricultural community, and the public at large to purchase, and increase the use of Defendant's Roundup® for Defendant's pecuniary gain, and in fact did induce Plaintiff to do so.

60.     Defendant made these statements with complete disregard and reckless indifference to the safety of Plaintiff and the general public.

61.     Notwithstanding Defendant's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, non-Hodgkin's Lymphoma, Multiple Myeloma, and soft tissue sarcoma.

62.     Defendant knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, non-Hodgkin's Lymphoma, Multiple Myeloma, and soft tissue sarcomas.

63.     Defendant failed to appropriately and adequately inform and warn Plaintiff of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup®, including, but not limited to, the risk of developing non-Hodgkin's Lymphoma, as well as other severe

and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

64.    Despite the IARC's classification of glyphosate as a Class 2A probable carcinogen, Defendant continued to maintain that glyphosate and/or Roundup® is safe, non-carcinogenic, nongenotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup®.

65.    Defendant has claimed and continues to claim that Roundup® is safe, non-carcinogenic, and non-genotoxic.

66.    Monsanto claimed on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic".

67.    Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

68.    Glyphosate, and Defendant's Roundup® products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

69.    Defendant's statements proclaiming the safety of Roundup® and disregarding its dangers misled Plaintiff.

70. Despite Defendant's knowledge that Roundup® was associated with an elevated risk of developing cancer, Defendant's promotional campaigns focused on Roundup®'s purported "safety profile."

71. Defendant's failure to adequately warn Plaintiff resulted in (1) Plaintiff using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including non-Hodgkin's Lymphoma, and other injuries associated with Roundup®.

72. Defendant failed to seek modification of the labeling of Roundup® to include relevant information regarding the risks and dangers associated with Roundup® exposure.

73. The failure of Defendant to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

74. The failure of Defendant to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment, as well as the absence of warning or caution statements that are adequate to protect health and the environment

75. By reason of the foregoing acts and omissions, Plaintiff seeks compensatory damages as a result of Plaintiff's use of, and exposure to, Roundup® which caused or was a substantial contributing factor in causing Plaintiff to suffer from cancer, specifically non-Hodgkin's Lymphoma and Plaintiff suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

76. By reason of the foregoing, Plaintiff is severely and permanently injured.

77. By reason of the foregoing acts and omissions, Plaintiff has endured and, in some categories continues to suffer, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of the actions and inactions of Defendant.

### EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

78.    Plaintiff incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

79.    The running of any statute of limitations has been tolled by reason of Defendant's fraudulent concealment. Defendant, through its affirmative misrepresentations and omissions, actively concealed from Plaintiff the true risks associated with Roundup® and glyphosate.

80.    Defendant's aforementioned affirmative misrepresentations and omissions regarding the causal link between glyphosate and cancer constituted a positive act of fraud, which was actively concealed and not discoverable by reasonable diligence.

81.,    As a result of Defendant's actions, Plaintiff was unaware, and could not reasonably know or have learned through reasonable diligence that Roundup® and/or glyphosate contact exposed Plaintiff to the risks and ultimate injuries alleged herein, and those risks and injuries were the direct and proximate result of Defendant's acts and omissions.

82.    Furthermore, Defendant is estopped from relying on any statute of limitations because of its fraudulent concealment of the true character, quality and nature of Roundup®. Defendant was under a duty to disclose the true character, quality, and nature of Roundup® because this was non-public information over which Defendant had and continues to have exclusive control, and because Defendant knew that this information was not available to Plaintiff or to distributors of Roundup®. In addition, Defendant is estopped from relying on any statute of limitations because of its intentional concealment of these facts.

83.    Plaintiff had no knowledge that Defendant was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendant, Plaintiff could not have reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud

should be considered. Defendant had the ability to and did spend enormous amounts of money in furtherance of its purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Plaintiff and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on only the Defendant's representations. Accordingly, Defendant is precluded from relying upon any statute of limitations due to the discovery rule and/or the doctrine of fraudulent concealment to suspend the running of the statute of limitations.

### FIRST CAUSE OF ACTION
### (STRICT PRODUCTS LIABILITY)

84.     Plaintiff repeats, reiterates and, re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

85.     At all times herein mentioned, the Defendant was engaged in the business of designing, researching, manufacturing, testing, advertising, promoting, selling, distributing, and/or had acquired any individual or entity who designed, researched, tested, advertised, promoted, marketed, sold, and distributed Roundup® used by Plaintiff.

86.     Defendant's Roundup® was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product, including Plaintiff, without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by Defendant.

87.     At those times, Roundup® was in an unsafe, defective, and inherently dangerous condition regarding its reasonably foreseeable use and/or consumption, which was unreasonably dangerous to users, and in particular, the Plaintiff herein.

17

88.     The Roundup® designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup®, and it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

89.     At all times herein mentioned, Roundup® was in a defective condition and unsafe, and Defendant knew or had reason to know that said product was in a defective condition, inherently dangerous and unsafe, especially when used in the form and manner as provided by the Defendant. In particular, Defendant's Roundup® was defective in the following ways:

> a.  When placed in the stream of commerce, Defendant's Roundup® Products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate.
>
> b.  When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.
>
> c.  When placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.
>
> d.  Defendant did not sufficiently test, investigate, or study its Roundup® products.
>
> e.  Exposure to Roundup® presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

    f.   Defendant knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and could result in cancer and other severe illnesses and injuries.

    g.   Defendant did not conduct adequate post-marketing surveillance of its Roundup® products.

90.    Due to its defective condition, the Roundup® designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was dangerous to an extent beyond that which would be contemplated by the ordinary an reasonable buyer, consumer, or user who acquired or used the product, assuming the ordinary knowledge of the community or of similar buyers, users, or consumers as to its characteristics, propensities, risks, dangers, and proper and improper uses, as well as any special knowledge, training, or experience possessed by the particular buyer, user, or consumer or which Plaintiff was required to possess.

91.    Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to the Plaintiff in particular, and Defendant is therefore strictly liable for the injuries sustained by the Plaintiff.

92.    At all times herein mentioned, Roundup® was in a defective condition and unsafe, and Defendant knew or had reason to know that said product was in a defective condition, inherently dangerous and unsafe, especially when used in the form and manner as provided by the Defendant. In particular, Defendant's Roundup® was defective in that it was hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

93.    Plaintiff was exposed to Defendant's Roundup® in the course of his work as a farmer, as described above, without knowledge of Roundup®'s dangerous characteristics.

19

94.     At the time of the Plaintiff's use of and exposure to Roundup®, Roundup® was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

95.     The Roundup® designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant reached its intended users in the same defective and unreasonably dangerous condition in which the Defendant's Roundup® was manufactured.

96.     Plaintiff could not, by the exercise of reasonable care, have discovered Roundup®'s defects herein mentioned or perceived its danger.

97.     By reason of the foregoing, Defendant has become strictly liable to the Plaintiff for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup®.

98.     Defendant's defective design of Roundup® amounts to willful, wanton, and/or reckless conduct by Defendant.

99.     Defects in Defendant's Roundup® were the cause or a substantial factor in causing Plaintiff's injuries, in that the foregoing acts and omission, specifically the defective condition of Roundup®, proximately caused the Plaintiff to develop non-Hodgkin's Lymphoma and suffer severe and personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

100.     Plaintiff, exercising ordinary care, could not have discovered the defect present, did not use the product with knowledge of the defect, used the product in a foreseeable manner, properly maintained and made normal use of the product, and made no alterations or changes to the product.

101.     WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## SECOND CAUSE OF ACTION
### (NEGLIGENCE)

102.     Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

103.     At all times herein mentioned, the Defendant was engaged in the business of designing, researching, manufacturing, testing, advertising, promoting, selling, distributing, and/or had acquired any individual or entity who designed, researched, tested, advertised, promoted, marketed, sold, and distributed Roundup® used by Plaintiff.

104.     At all times herein mentioned, Defendant, as the manufacturer of Roundup®, had a duty to use ordinary care in its design, in the selection of the materials used in it, in its assembly, and to inspect it, to test it, and to package it in order to protect those who would use it from unreasonable risk of harm while it is being used for its intended purpose or while it is being used for any purpose which should reasonably be expected by the manufacturer.

105.     At all times herein mentioned, Defendant had a duty to give a reasonable and adequate warning of dangers inherent or reasonably foreseeable in Roundup®'s use for a purpose and in a manner that it should reasonably foresee, given that the dangers known to Defendant were not obvious or those in which Plaintiff knew or should have reasonably discovered for himself.

106.     At all times herein mentioned, Defendant had a duty to exercise reasonable care to design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

21

107.    At all times herein mentioned, Defendant, as a manufacturer, had a duty to give reasonable and adequate instructions with respect to the conditions and methods pertaining to Roundup®'s safe usage when danger was reasonably foreseeable in its use.

108.    Defendant labeled, distributed, and promoted the aforesaid product that was dangerous and unsafe for the use and purpose for which it was intended.

109.    At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Defendant and at the time Plaintiff was exposed to and/or ingested the product.

110.    At those times, Roundup® was in an unsafe, defective, and inherently dangerous condition regarding its reasonably foreseeable use, which was dangerous to users, and in particular, the Plaintiff herein.

111.    Defendant failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup® into interstate commerce in that Defendant knew or should have known that using Roundup® created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of non-Hodgkin's Lymphoma, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

112.    At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

113.    The negligence by the Defendant, its agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

 a. Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup® without thoroughly testing it;

 b. Failing to test Roundup® and/or failing to adequately, sufficiently, and properly test Roundup®;

 c. Not conducting sufficient testing programs to determine whether or not Roundup® was safe for use; in that Defendant herein knew or should have known that Roundup® was unsafe and unfit for use by reason of the dangers to its users;

 d. Not conducting sufficient testing programs and studies to determine Roundup®'s carcinogenic properties even after Defendant had knowledge that Roundup® is, was, or could be carcinogenic;

 e. Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup®, and the propensity of these ingredients to render Roundup® toxic, increase the toxicity of Roundup®, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup®, and whether or not "inert" ingredients and/or adjuvants were safe for use;

 f. Negligently failing to adequately and correctly warn Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup®;

 g. Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup®;

23

h.  Negligently marketing, advertising, and recommending the use of Roundup® without sufficient knowledge as to its dangerous propensities;

i.  Negligently representing that Roundup® was safe for use for its intended purpose, and/or that Roundup® was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

j.  Negligently representing that Roundup® had equivalent safety and efficacy as other forms of herbicides;

k.  Negligently designing Roundup® in a manner, which was dangerous to its users;

l.  Negligently manufacturing Roundup® in a manner, which was dangerous to its users;

m.  Negligently producing Roundup® in a manner, which was dangerous to its users;

n.  Negligently formulating Roundup® in a manner, which was dangerous to its users;

o.  Concealing information from the Plaintiff while knowing that Roundup® was unsafe, dangerous, and/or non-conforming with EPA regulations;

p.  Improperly concealing and/or misrepresenting information from the Plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup® compared to other forms of herbicides; and,

q.  Negligently selling Roundup® with a false and misleading label.

r.  Failed to use ordinary care in designing, selecting materials for the product and its assembly, and manufacturing Roundup® so as to avoid the aforementioned risks to individuals when Roundup® was used as an herbicide;

s.  Failed to inspect it and to test it and to package it in order to protect those who would use it from unreasonable risk of harm while being used or its intended purpose or any reasonably foreseeable purpose;

24

t.  Failed to accompany its product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup®;

u.  Failed to accompany its product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup®;

v.  Failed to accompany its product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup®;

w.  Failed to warn Plaintiff of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of non-Hodgkin's Lymphoma;

x.  Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup®;

y.  Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup®'s "inert" ingredients and/or adjuvants;

z.  Negligently misrepresented the evidence of Roundup®'s genotoxicity and carcinogenicity; and,

aa.  Was otherwise careless and/or negligent.

114.  Defendant under-reported, underestimated, and downplayed the serious dangers of Roundup®.

115.  Defendant could have amended the label of Roundup® to provide additional warnings.

116.  Defendant negligently and deceptively compared the safety risks and/or dangers of Roundup® with common everyday foods such as table salt, and other forms of herbicides.

25

117.    At the time of exposure, Plaintiff could not have reasonably discovered any defect in Roundup® prior through the exercise of reasonable care.

118.    Defendant, as the manufacturer and/or distributor of the subject product, is held to the level of knowledge of an expert in the field.

119.    Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Defendant.

120.    Had Defendant properly disclosed the risks associated with Roundup®, Plaintiff would have avoided the risk of non-Hodgkin's Lymphoma by not using Roundup.

121.    The information that Defendant did provide or communicate failed to contain adequate warnings and precautions that would have enabled Plaintiff, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup® and glyphosate; continued to promote the efficacy of Roundup®, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

122.    Plaintiff did not use the product with knowledge of the defect, used the product in a foreseeable manner, properly maintained and made normal use of the product, and made no alterations or changes to the product.

123.    Defendant knew or should have known that consumers such as Plaintiff would foreseeably suffer injury as a result of Defendant's failure to exercise ordinary care, as set forth above.

124.    Despite the fact that Defendant knew or should have known that Roundup® caused, or could cause, unreasonably dangerous side effects, Defendant continued and continue to market, manufacture, distribute, and/or sell Roundup® to consumers, including Plaintiff.

125.    The foregoing acts and omissions proximately caused Plaintiff to suffer from serious and dangerous side effects including, but not limited to, non-Hodgkin's Lymphoma, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, Plaintiff suffered life threatening non-Hodgkin's Lymphoma, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

126.    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

### THIRD CAUSE OF ACTION
### (BREACH OF EXPRESS WARRANTY)

127.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

128.    At all relevant and material times, Defendant was engaged in the business of manufacturing, distributing, advertising, promoting, and selling Roundup®.

129.    At all relevant times, Defendant was aware that consumers, including Plaintiff, would use Roundup® products; which is to say that Plaintiff was a foreseeable user of the Defendant's Roundup® products.

130.     Plaintiff purchased Roundup® manufactured by Defendant.

131.     Defendant's Roundup® products were expected to reach and did in fact reach consumers, including Plaintiff, without any substantial change in the condition in which it was manufactured and sold by Defendant.

132.     Defendant expressly warranted that Roundup® was safe and not dangerous to users.

133.     Defendant expressly represented to Plaintiff, scientists, the agricultural community, and/or the EPA that Roundup® was safe and fit for use for the purposes intended, that it was of merchantable quality, that it did not produce dangerous side effects in excess of those risks associated with other forms of herbicides, that the side effects it did produce were accurately reflected in the warnings, and that it was adequately tested and fit for its intended use.

134.     Defendant breached various express warranties with respect to Roundup® including the following particulars:

   a.   Monsanto's website expressly stated that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic"

   b.   Defendant has expressly warrantied that Roundup® is "safer than table salt" and "practically nontoxic."

135.     Roundup® did not conform to these express representations because Roundup® was not safe and had, at all relevant times, an increased risk of serious side effects, including non-Hodgkin's lymphoma, when used according to Defendant's instructions.

136.     Defendant fraudulently concealed information from Plaintiff regarding the true dangers and relative risks of Roundup®.

137.     The global scientific community is not, and was never, in agreement that Roundup® is non-carcinogenic.

138.     Plaintiff did rely on the express warranties of the Defendant herein.

139.     Plaintiff, consumers, and members of the agricultural community relied upon the representation and warranties of the Defendant for use of Roundup® in recommending, using, purchasing, mixing, handling, applying, and/or dispensing Roundup®.

140.     The Defendant herein breached the aforesaid express warranties, as its product Roundup® was defective.

141.     Defendant knew or should have known that, in fact, said representations and warranties were false, misleading, and untrue in that Roundup® was not safe and fit for the use intended, and, in fact, produced serious injuries to the users that were not accurately identified and represented by Defendant.

142.     Defendant knew or should have known that, in fact, said warranties were false, misleading, and untrue in that there is evidence that Roundup® is toxic, genotoxic, and carcinogenic and that scientists and/or regulatory authorities around the world are not in agreement that Roundup® is not carcinogenic or genotoxic and that it is safe.

143.     Plaintiff notified Defendant within a reasonable time after he discovered or should have discovered that the Roundup® did not conform with Defendant's description, affirmation, and or promise regarding Roundup®'s safety.

144.     The foregoing acts and omissions proximately caused the Plaintiff to suffer from life-threatening non-Hodgkin's Lymphoma and suffer severe and personal injuries, which are permanent

29

and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

145.    As a result of the foregoing acts and omissions, Plaintiff has suffered and incurred damages, including medical expenses and other economic and non-economic damages.

146.    WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

### FOURTH CAUSE OF ACTION
### (BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY)

147.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

148.    At all times herein mentioned, the Defendant was engaged in the business of designing, researching, manufacturing, testing, advertising, promoting, distributing, compounding, recommending, merchandizing, marketing, selling and/or had acquired any individual or entity who designed, researched, manufactured, tested, advertised, promoted, distributed, compounded, recommended, merchandised, marketed, sold, and distributed Roundup® used by Plaintiff, as a broad spectrum herbicide. These actions were under the ultimate control and supervision of Defendant.

149.    At the time Defendant marketed, sold, and distributed Roundup® for use by Plaintiff, Defendant knew of Roundup®'s intended use and impliedly warranted the product to be of merchantable quality and safe and fit for this use.

150.    Defendant's Roundup® was not fit for the ordinary purposes for which such good was to be used, specifically the spraying of crops, at the time Defendant sold it to Plaintiff, nor was it

adequately contained, packaged, and labeled or conforming to the promises or affirmations of fact made on the container or label regarding any risks posed to users.

151.     Defendant's Roundup® was not labeled with the appropriate risk warnings, and its hazardous qualities did not conform to any promises or affirmations of fact regarding safety made on the container or label, given that it failed to convey the truly hazardous nature of the product.

152.     Plaintiff was a person whom Defendant might reasonably expect to use, consume, or be affected by the Roundup® because Plaintiff was in the business of farming.

153.     Defendant impliedly represented and warranted to Plaintiff and users of Roundup®, the agricultural community, and/or the EPA that Roundup® was safe and of merchantable quality.

154.     These representations and warranties were false, misleading, and inaccurate in that Roundup® was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

155.     Plaintiff and/or the EPA did rely on said implied warranty of merchantability.

156.     Roundup® was injected into the stream of commerce by the Defendant in a defective, unsafe, and inherently dangerous condition, and the product's materials were expected to and did reach users, handlers, and persons coming into contact with said product, specifically Plaintiff, without substantial change in the condition in which they were sold.

157.     Defendant breached the implied warranty of merchantability, as its herbicide Roundup® was not of merchantable quality or safe and fit for it its intended purposes and uses, posing a significant health hazard to Plaintiff as a consumer.

158.     Plaintiff put Defendant on notice of the breach of this implied warranty within a reasonable time after he discovered it or should have discovered it.

159.     The foregoing acts and omissions proximately caused Plaintiff to suffer from non-Hodgkin's Lymphoma and suffer severe and personal injuries which are permanent and lasting in

nature, physical pain and mental anguish, including diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic, and non-economic damages.

160.     WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

### FIFTH CAUSE OF ACTION
### (BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE)

161.     Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

162.     At all times herein mentioned, the Defendant was engaged in the business of designing, researching, manufacturing, testing, advertising, promoting, distributing, compounding, recommending, merchandizing, marketing, selling and/or had acquired any individual or entity who designed, researched, manufactured, tested, advertised, promoted, distributed, compounded, recommended, merchandised, marketed, sold, and distributed Roundup® used by Plaintiff, as a broad spectrum herbicide. These actions were under the ultimate control and supervision of Defendant.

163.     Plaintiff was a person whom Defendant would reasonably have expected to use, consume, or be affected by the Roundup® given that Plaintiff was in the business of farming.

164.     At the time of contracting, Defendant had reason to know the particular purpose for which Roundup® was required by Plaintiff, given that Roundup® is an herbicide and Plaintiff was in the business of farming. Knowing of this intended use, Defendant impliedly warranted the product to be safe and fit for this use.

32

165.   At the time of contracting, Defendant had reason to know the particular purpose for which the product was required and that Plaintiff was relying on its skill or judgment to select or furnish a suitable product, meanwhile it was aware that Roundup® was not fit for the particular purpose for which it was required.

166.   The Defendant impliedly represented and warranted to Plaintiff and users of Roundup®, the agricultural community, and/or the EPA that Roundup® was safe and fit for the ordinary purpose for which it was to be used, which included agricultural purposes.

167.   These representations and warranties were false, misleading, and inaccurate in that Roundup® was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

168.   Plaintiff reasonably relied upon the skill and judgment of Defendant as to whether Roundup® was safe and fit for a particular purpose.

169.   Roundup® was injected into the stream of commerce by the Defendant in a defective, unsafe, and inherently dangerous condition, and the product's materials were expected to and did reach users, handlers, and persons coming into contact with said product, specifically Plaintiff, without substantial change in the condition in which they were sold.

170.   Defendant breached the implied warranty of merchantability, as its herbicide Roundup® was not safe and fit for it its intended purposes and uses, posing a significant health hazard to Plaintiff as a consumer.

171.   Plaintiff put Defendant on notice of the breach of this implied warranty within a reasonable time after he discovered it or should have discovered it.

172.   The foregoing acts and omissions proximately caused Plaintiff to suffer from non-Hodgkin's Lymphoma and suffer severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, financial expenses

33

for hospitalization and medical care, including medical expenses and other economic, and non-economic damages.

173. WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

**SIXTH CAUSE OF ACTION**
**(ARKANSAS DECEPTIVE TRADE PRACTICES)**

174. Plaintiff, as a farmer, was a person whom the Defendant manufacturer or seller might reasonably have expected to use, consume, or be affected by Defendant's Roundup.

175. Defendant's deceptive and unconscionable trade practices include, but are not limited to, the following:

    a. Defendant knowingly made false representations as to the characteristics, ingredients, uses, benefits, alterations, source, sponsorship, approval, or certification of Round or as to whether Roundup® met a particular standard, quality, grade, style, or model;

    b. Defendant advertised Roundup® as harmless with the intent to not sell it as advertised;

    c. Defendant knowingly took advantage of Plaintiff, a consumer, who was reasonably unable to protect his interest, due to Defendant's intentional suppression of the dangerous qualities and risks relating to the use of Roundup; and

    d. Defendant engaged in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade.

176. Plaintiff relied on Defendant's use of deceptive and unconscionable practices.

34

177.   As a result of Plaintiff's reliance, Plaintiff suffered an actual financial loss, which was proximately caused by his reliance on Defendant's unlawful practices.

178.   Defendant acted, used, and/or employed a deception, fraud, and/or false pretense in connection with the sale and/or advertisement of Roundup.

179.   Defendant concealed, suppressed, and/or omitted material facts with intent that Plaintiff, as a consumer, rely upon the concealment, suppression, or omission in connection with the sale and/or advertisement of Roundup.

180.   Plaintiff relied on Defendant's conduct, and as a result, Plaintiff suffered an actual financial loss, which was proximately caused by his reliance on the unlawful conduct.

181.   WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorney's fees and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays this Court enter judgment against Defendant on each of the above-referenced claims and causes of action and as follows:

1.   Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

2.   Awarding compensatory damages to Plaintiff for past and future damages, including, but not limited to, Plaintiff's pain and suffering and for severe and permanent personal injuries sustained by the Plaintiff including health care costs and economic loss;

35

3.     Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determined at trial of this action;

4.     Punitive and/or exemplary damages for the wanton, willful, fraudulent, and reckless acts of Defendant, who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to Plaintiff in an amount sufficient to punish Defendant and deter future similar conduct, to the extent allowed by applicable law;

5.     Pre-judgment interest;

6.     Post-judgment interest;

7.     Awarding Plaintiff reasonable attorney's fees;

8.     Awarding Plaintiff the costs of these proceedings; and

9.     Such other and further relief as this Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all issues.

Respectfully submitted:

Harrison Kemp, ABA # 2008307
Mann & Kemp, PLLC
221 West Second Street, Suite 408
Little Rock, Arkansas 72201
501-222-7378
888-711-0660 (f)
harrison@mannkemp.com

36