**U.S. District Court**
**Alabama Middle District (Montgomery)**
**CIVIL DOCKET FOR CASE #: 2:20-cv-00193-MHT-WC**
**Internal Use Only**

Sanchez v. Monsanto Company                    Date Filed: 03/18/2020
Assigned to: Honorable Judge Myron H. Thompson    Jury Demand: Plaintiff
Referred to: Honorable Judge Wallace Capel, Jr    Nature of Suit: 365 Personal Inj. Prod. Liability
Cause: 28:1332 Diversity-Product Liability        Jurisdiction: Diversity

**Plaintiff**

**Maria Sanchez**                    represented by   **Joseph Holland Aughtman**
*Individually and on Behalf of The Estate of Lesbia M.*              Aughtman Law Firm LLC
*Pineda*                                                             1772 Platt Place
                                                                     Montgomery, AL 36117
                                                                     334-215-9873
                                                                     Fax: 334-213-5663
                                                                     Email: jay@aughtmanlaw.com
                                                                     *LEAD ATTORNEY*
                                                                     *ATTORNEY TO BE NOTICED*
                                                                     **Bar Status: Active**

                                                                     **Matthew Bruce Alfreds**
                                                                     Law Office of Matthew B. Alfreds
                                                                     445 South Decatur St.
                                                                     Montgomery, AL 36104
                                                                     334-264-1498
                                                                     Fax: 334-264-1468
                                                                     Email: mbalfreds@mattalfreds.com
                                                                     *LEAD ATTORNEY*
                                                                     *ATTORNEY TO BE NOTICED*
                                                                     **Bar Status: Active**

                                                                     **Nicholas Cole Hughes**
                                                                     Argo I Hughes LLC
                                                                     475 Providence Main Street; Suite 303D
                                                                     Huntsville, AL 35806
                                                                     334-279-0088
                                                                     Fax: 334-279-8830
                                                                     Email: nick@argohughes.com
                                                                     *LEAD ATTORNEY*
                                                                     *ATTORNEY TO BE NOTICED*
                                                                     **Bar Status: Active**

                                                                     **Paul Edward Burkett**
                                                                     Azar and Azar LLC
                                                                     4276 Lomac Street
                                                                     Montgomery, AL 36106
                                                                     334-265-8551
                                                                     Fax: 334-264-9453
                                                                     Email: pburkett@azarlaw.com
                                                                     *LEAD ATTORNEY*
                                                                     *ATTORNEY TO BE NOTICED*
                                                                     **Bar Status: Active**

ATTEST: A True Copy
Certified to: March 24, 2020
Clerk, U.S. District Court,
Middle District of Alabama
By: /s/ Amy Ford,
Deputy Clerk

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 03/18/2020 | 1 | COMPLAINT against Monsanto Company (Filing fee $ 400.00, receipt number 4602057352), filed by Maria Sanchez. (Attachments: # 1 Civil Cover Sheet, # 2 Filing Fee Receipt)(amf, ) (Entered: 03/24/2020) |
| 03/18/2020 | | DEMAND for Trial by Jury by Maria Sanchez. (No PDF attached to this entry - See doc 1 for PDF) (amf, ) (Entered: 03/24/2020) |
| 03/24/2020 | 2 | Notice of Deficiency requiring filing of Corporate Disclosure/Conflict Statement sent to Maria Sanchez; Corporate Disclosures due by 4/3/2020. (Attachments: # 1 Corporate/Conflict Disclosure Attachment)(amf, ) (Entered: 03/24/2020) |

ATTEST: A True Copy
Certified to: March 24, 2020
Clerk, U.S. District Court,
Middle District of Alabama
By: /s/ Amy Ford,
Deputy Clerk

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

2020 MAR 18  P 3: 48

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

MARIA SANCHEZ, Individually and on
Behalf of The Estate of Lesbia M. Pineda,

Plaintiffs,

v.

MONSANTO COMPANY,
Defendant.

\*CIVIL ACTION NO:
\*
\*          2:20-cv-00193-MHT-WC
\*
\*
\*
\*
\*
\* JURY TRIAL DEMANDED

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## COMPLAINT

NOW INTO COURT, through undersigned counsel, come Plaintiffs, Maria Sanchez, a person of the full age of majority, domiciled in Montgomery County, Alabama, individually and on behalf of The Estate of Lesbia M. Pineda, who respectfully represent:

## INTRODUCTION

1.      In 1970, Defendant Monsanto Company ("Monsanto") discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name of Roundup®.  Roundup® is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85-90 million of pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

2.      Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate. As of 2009, Monsanto was the

world's leading producer of seeds, accounting for 27% of the world seed market. The majority of these seeds are of the Roundup Ready® brand. The stated advantage of Roundup Ready® crops is that they substantially improve a farmer's ability to control weeds, since glyphosate can be sprayed in the fields during the growing season without harming their crops. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields, in the United States were Roundup Ready®.

3.  Monsanto's glyphosate products are registered in 130 countries and approved for use on over 100 different crops. They are ubiquitous in the environment. Numerous studies confirm that glyphosate is found in rivers, streams, and groundwater in agricultural areas where Roundup® is used. It has been found in food, in the urine of agricultural workers, and even in the urine of urban dwellers who are not in direct contact with glyphosate.

4.  On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several herbicides, including glyphosate. That evaluation was based, in part, on studies of exposures to glyphosate in several countries around the world, and it traces the health implications from exposure to glyphosate since 2001.

5.  On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provided a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

6.  The IARC Working Group classified glyphosate as a Group 2A herbicide, which means that it is probably carcinogenic to humans. The IARC Working Group concluded that the cancers

most associated with glyphosate exposure are non-Hodgkin's lymphoma and other maematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.

7.      The IARC evaluation is significant. It confirms what has been believed for years: that glyphosate is toxic to humans.

8.      Nevertheless, Monsanto, since it began selling Roundup®, has represented it as safe to humans and the environment. Indeed, Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

## JURISDICTION AND VENUE

9.      Federal diversity jurisdiction in this Court is proper under 28 U.S.C. § 1332 because Plaintiff is a citizen of a different state from the Defendant Monsanto Company's states of citizenship, and the aggregate amount in controversy exceeds $75,000, exclusive of interest and costs.

10.     This Court has personal jurisdiction over Monsanto because Monsanto knows or should have known that its Roundup® products are sold throughout the State of Alabama, and, more specifically, caused Roundup® to be sold to Plaintiffs in the State of Alabama and this District.

11.     In addition, Monsanto maintains sufficient contacts with the State of Alabama such that this Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play and substantial justice.

12. Venue is proper within this District under 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claims asserted in this Complaint occurred in this District. Further, Monsanto, as a corporate entity, is deemed to reside in any judicial district in which it is subject to personal jurisdiction.

## PARTIES

13. At all material times, Plaintiff Maria Sanchez and her mother-in-law, Lesbia M. Pineda (hereinafter "Ms. Pineda"), resided in Montgomery, Alabama.

14. Sanchez is the personal representative of the Estate of Lesbia Pineda, Probate Case No. 20-127 in the Montgomery County Probate Court.

15. On information and belief, Pineda was exposed to Roundup® in Alabama from approximately September 2004 until around the time of her death on March 15, 2016. In or around July 2015, Ms. Pineda was diagnosed with mantel cell lymphoma in her abdomen at UAB Hospital in Birmingham, AL.

16. Defendant Monsanto Company is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.

17. At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and was the manufacturer of Roundup®.

## STATEMENT OF CLAIMS

18. Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

19. Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because

plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

20. For nearly 40 years, farms across the world have used Roundup® without knowing of the dangers its use posed. That is because when Monsanto first introduced Roundup®, it touted glyphosate as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true. According to the WHO, the main chemical ingredient of Roundup® -- glyphosate -- is a probable cause of cancer. Monsanto assured the public that Roundup® was harmless. In order to prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® was safe.

21. The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use. It still markets Roundup® as safe today.

22. The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or "Act"), 7 U.S.C. § 136, *et seq*. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a.

23. Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to

evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or reregistering a product is not that the product is "safe," but rather that use of the product in accordance with its label direction "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

24.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

25.     The EPA and the State of Alabama registered Roundup® for distribution, sale, and manufacture in the United States and the State of Alabama.

26.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conduct the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

27.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide

products through a Congressionally mandated process called "re-registration." 7 U.S.C. § 136a-l. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

28.     In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its primary risk assessment - in relation to the reregistration process - no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

**Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup**

29.     Based on early studies showing that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991. In so classifying glyphosate, however, the EPA made clear the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

30.     On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

31.     In the first instance, Monsanto, in seeking initial registration of Roundup® by the EPA, hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate containing products, including nine of the 15 residue studies needed to register Roundup®.

32.     In 1976, the United States Food and Drug Administration ("FDA") performed an

inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An EPA reviewer stated, after finding "routine" falsification of data at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

33.     Three top executives of IBT were convicted of fraud in 1983.

34.     In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

35.     Despite the falsity of the tests that underlie its registration, within a few years of its launch, Monsanto was marketing Roundup® in 115 countries.

## The Importance of Roundup® to Monsanto's Profits

36.     The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was outperforming its chemical division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

37.     In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate, farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further; by 2000, Monsanto's

biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup® seeds with continued sales of its Roundup® herbicide.

38.     Through a three-pronged strategy of increasing production, decreasing prices, and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

### Monsanto Falsely Advertises the Safety of Roundup®

39.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of glyphosate and/or Roundup® are the following:

a.     "Remember that environmentally friendly Roundup® herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks and fences ..."

b.     "And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got a weed, brush, edging or trimming problem."

c.     "Roundup® biodegrades into naturally occurring elements."

d.   "Remember that versatile Roundup® herbicides stay were you put it. That means there's no washing or leaching to harm customer's shrubs or other desirable vegetation."

e.   "This non-residual herbicide will not wash or leach in the soil. It...stays where you apply it."

f.   "You can apply Roundup® with 'confidence because it will stay where you put it'; it binds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Roundup® into natural products."

g.   "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

h.   "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

i.   "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

j.   "Roundup® can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup®.

40.   On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertising [in New York] that represent, directly or by implication" that:

a   Its glyphosate-containing pesticide products or any component thereof are safe, non- toxic, harmless or free from risk.

b      Its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are

biodegradable.

c      Its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d      Its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental

characteristics."

e      Glyphosate-containing pesticides products or any component thereof are safer or less toxic than common consumer products other than herbicides.

f      Its glyphosate-containing products or any component thereof might be

classified as "practically non-toxic."

41.      Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief it still has not done so as of today.

42.      In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

43.      The IARC process for classification of glyphosate following IARC's stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be

Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

44.     The established procedure for IARC Monograph evaluations is described in the IARC Program's Preamble. Evaluations are performed by a panel of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

45.     One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected, and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in The Lance Oncology, and within a year after the meeting, the finalized Monograph is published.

46.     In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

47.     In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

48.     Only July 29, 2015, IARC issued its Monograph for glyphosate, Monograph Volume 112. For Volume 112, a Working Group of 17 experts from 11 countries met at IARC from March 3 - March 10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated a nearly one-year review and preparation by the IARC Secretariat and the Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

49.     The studies considered the following exposure groups: (1) occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and (2) para-occupational exposure in farming families.

50.     Glyphosate was identified as the second-most-used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

51.     Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

52.     The assessment of the IARC Working Group identified several case controls studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

53.     The IARC Working Group found an increased risk between exposure to glyphosate and NHL and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

54.     The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

55.     In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor: renal tubule carcinoma. A second study reported a positive trend for hemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation promotion study in mice.

56.     The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

57.     The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

58.     The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

59.     The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While

this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and multiple myeloma, hairy cell leukemia (HCL), and chronic lymphocytic leukemia (CLL), in addition to several other cancers.

60.     The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates IARC's March 20, 2015 evaluation. The fact sheet describes the release patterns for glyphosate as follows:

"Release Patterns:

> Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available. Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal."

61.     In 1995, the Northwest Coalition for Alternatives to Pesticides reports that in California, the state with the most comprehensive program for reporting of pesticide caused illness, glyphosate was the third most commonly reported cause of pesticide illness among agricultural workers.

## The Toxicity of Other Ingredients in Roundup®

62.     In additional to the toxicity of the active ingredient, glyphosate, several studies support the hypothesis that the glyphosate-based formulation in Defendant's Roundup® products is more dangerous and toxic than glyphosate alone. Indeed, as early as 1991, available evidence demonstrated that glyphosate formulations were significantly more toxic than glyphosate alone.

63.     In 2002, a study by Julie Marc, entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDKl/Cyclin B Activation," revealed that Roundup® causes delays in the cell cycles of sea urchins but that the same concentration of glyphosate alone were ineffective and did not alter cell cycles.

64.     A 2004 study by Marc and others, entitled "Glyphosate-based pesticides affect cell cycle regulation," demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation. The researchers noted that "cell cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell cycle checkpoints leads genomic instability and subsequent development of cancer from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of a unique cell, it was of interest to evaluate the threshold does of glyphosate affecting the cells."

65.     In 2005, a study by Francisco Peixoto entitled, "Comparative effects of the Roundup® and glyphosate on mitochondrial oxidative phosphorylation," demonstrated that the effects of Roundup® on rat liver mitochondria are far more toxic than equal concentrations of glyphosate alone. The *Peixoto* study further suggested that the harmful effects of Roundup® on mitochondrial bioenergetics could not be exclusively attributed to glyphosate but could be the result of other chemicals, such as the surfactant polyethoxylated tallow amine (POEA), or in the

alternative, due to a potential synergic effect between glyphosate and other ingredients in the Roundup® formulation.

66.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup® and glyphosate on human umbilical, embryonic, and placental cells. The study tested dilution levels of Roundup® and glyphosate that were far below agricultural recommendations, corresponding with low levels of residue in food. The researches ultimately concluded that supposed "inert" ingredients, and possibly POEA, alter human cell permeability and amplify toxicity of glyphosate alone. The researchers further suggested that assessment of glyphosate toxicity should account for the presence of adjuvants or additional chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants present in Roundup® are not, in fact, inert and that Roundup® is potentially far more toxic than its active ingredient glyphosate alone.

67.     The results of these studies were at all times available to Defendant. Defendant thus knew or should have known that Roundup® is more toxic than glyphosate alone and that safety studies of Roundup®, Roundup®'s adjuvants, and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiffs from Roundup®.

### Recent Worldwide Bans on Roundup®/Glyphosate

68.     Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit as the dangers of the use of Roundup® become more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which took effect at the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation

stated: "agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

69.     The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

70.     France banned the private sale of Roundup® and glyphosate following the IARC assessment for glyphosate.

71.     Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup®' has been suspended."

72.     The Sri Lankan Government banned the private and commercial use of glyphosate, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

73.     The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the finding that glyphosate is probably carcinogenic.

**California's Proposition 65 Listing**

74.     On September 4, 2015, California's Office of Environmental Health Hazard Assessment ("OEHHA") published a notice of intent to include glyphosate on the state's list of known carcinogens under Proposition 65. California's Safe Drinking Water and Toxic Enforcement Act of 1986 (informally known as "Proposition 65"), requires the state to maintain and, at least, once a year, revise and republish a list of chemicals "known to the State of California

to cause cancer or reproductive toxicity." The OEHHA determined that glyphosate met the criteria for the listing mechanism under the Labor Code following IARC's assessment of the chemical.

75. The listing process under the Labor Code is essentially automatic. The list of known carcinogens, at a minimum, must include substances identified by reference in Labor Code § 6382(b)(l). That section of the Labor Code identifies "[s]ubstances listed as human or animal carcinogens by the International Agency for Research on Cancer (IARC)." IARC's classification of glyphosate as a Group 2A chemical ("probably carcinogenic to humans") therefore triggered the listing.

76. A business that deploys a listed chemical in its products must provide "clear and reasonable warnings" to the public prior to exposure to the chemical. To be clear and reasonable, a warning must "(1) clearly communicate that the chemical is known to cause cancer, and/or birth defects or other reproductive harm; and (2) effectively reach the person before exposure." The California law also prohibits the discharge of listed chemicals into drinking water.

77. Monsanto disputed the listing decision and, in January 2016, filed a lawsuit against OEHHA and the agency's acting director, Lauren Zeise, in California state court, seeking declaratory and injunctive relief to prevent OEHHA from listing glyphosate.

78. Monsanto alleged that OEHHA's exclusive reliance on the IARC decision signified that "OEHHA effectively elevated the determination of an *ad hoc* committee to an unelected, foreign body, which answers to no United States official (let alone any California state official), over the conclusions of its own scientific experts." Monsanto further alleged that the Labor Code listing mechanism presented various constitutional violations because it "effectively empowers an unelected, undemocratic, unaccountable, and foreign body to make laws applicable in California." Among other things, Monsanto argued that Proposition 65's requirement to provide a "clear and

reasonable warning" to consumers that the chemical is a known carcinogen would damage its reputation and violate its First Amendment rights.

## EFSA Report on Glyphosate

79. On November 12, 2015, the European Food Safety Authority (EFSA), the European Union's primary agency for food safety, reported on its evaluation of the Renewal Assessment Report (RAR) on glyphosate. The Rapporteur Member State assigned to glyphosate, the German Federal Institute for Risk Assessment, had produced the RAR as part of the renewal process for glyphosate in the EU.

80. BfR sent its draft RAR to EFSA and the RAR underwent a peer review process by EFSA, other member states, and industry groups. As part of the on-going peer review of Germany's reevaluation of glyphosate, EFSA had also received a second mandate from the European Commission to consider IARC's findings regarding the potential carcinogenicity of glyphosate and glyphosate-containing products.

81. Based on a review of RAR, which included data from industry submitted unpublished studies, EFSA sent its own report ("Conclusions") to the European Commission, finding that "glyphosate is unlikely to pose a carcinogenic hazard to humans and the evidence does not support classification with regard to its carcinogenic potential according to Regulation (EC) No 1272/2008." EFSA therefore disagreed with IARC: glyphosate was not genotoxic and did not present a carcinogenic threat to humans.

82. In explaining why its results departed from IARC's conclusions, EFSA drew a distinction between the EU's and IARC's approaches to the study and classification of chemicals. Although IARC examined "both glyphosate - an active substance - and glyphosate-based formulations, grouping all formulations regardless of their composition," EFSA explained that it

considered only glyphosate and that its assessment focuses on "each individual chemical, and each marketed mixture separately." IARC, on the other hand, "assesses generic agents, including groups of related chemicals, as well as occupational or environmental exposure, and cultural or behavioral practices." EFSA accorded greater weight to studies conducted with glyphosate alone than studies of formulated products.

83.     EFSA went further and noted: "[A]lthough some studies suggest that certain glyphosate-based formulations may be genotoxic (i.e., damaging to DNA), others that look solely at the active substance glyphosate do not show this effect. It is likely, therefore, that the genotoxic effects observed in some glyphosate-based formulations are related to the other constituents or "co-formulants." Similarly, certain glyphosate-based formulations display higher toxicity than that of the active ingredient, presumably because of the presence of co-formulants. In its assessment, EFSA proposes that the toxicity of each pesticide formulation and in particular its genotoxic potential should be further considered and addressed by Member State authorities while they re-assess uses of glyphosate-based formulations in their own territories."

84.     Notwithstanding its conclusion, EFSA did set exposure levels for glyphosate. Specifically, EFSA proposed an acceptable daily intake (ADI) of 0.5 mg/kg of body weight per day; an acute reference dose (ARfD) of 0.5 mg/kg of body weight; and an acceptable operator exposure level (AOEL) of 0.1 mg/kg of body weight per day.

### Leading Scientists Dispute EFSA's Conclusion

85.     On November 27, 2015, 96 independent academic and governmental scientists from around the world submitted an open letter to the EU health commissioner, Vytenis Andriukaitis. The scientists expressed their strong concerns and urged the commissioner to

disregard the "flawed" EFSA report, arguing that "the BfR decision is not credible because it is not supported by the evidence and it was not reached in an open and transparent manner."

86.     Signatories to the letter included Dr. Christopher J. Portier, Ph.D., and other renowned international experts in the field, some of whom were part of the IARC Working Group assigned to glyphosate.

87.     In an exhaustive and careful examination, the scientists scrutinized EFSA's conclusions and outlined why the IARC Working Group decision was "by far more credible": The IARC WG decision was reached relying on open and transparent procedures by independent scientists who completed thorough conflict-of-interest statements and were not affiliated or financially supported in any way by the chemical manufacturing industry. It is fully referenced and depends entirely on reports published in the open, peer-reviewed biomedical literature. It is part of a long tradition of deeply researched and highly credible reports on the carcinogenicity of hundreds of chemicals issued over the past four decades by IARC and used today by international agencies and regulatory bodies around the world as a basis for risk assessment, regulation and public health policy.

88.     With respect to human data, the scientists pointed out that EFSA agreed with IARC that there was "limited evidence of carcinogenicity" for non-Hodgkin's lymphoma but EFSA nonetheless dismissed an association between glyphosate exposure and carcinogenicity. IARC applies three levels of evidence in its analyses of human data, including sufficient evidence and limited evidence. EFSA's ultimate conclusion that "there was no unequivocal evidence for a clear and strong association of NHL with glyphosate" was misleading because it was tantamount to IARC's highest level of evidence: "sufficient evidence," which means that a causal relationship

has been established. However, the scientists argued, "[l]egitimate public health concerns arise when 'causality is credible,' i.e., when there is limited evidence."

89.     Among its many other deficiencies, EFSA's conclusions regarding animal carcinogenicity data were "scientifically unacceptable," particularly in BfR's use of historical control data and in its end analysis. Indeed, BfR's analysis directly contradicts the Organization for Economic Cooperation and Development ("OECD") testing guidelines while citing and purporting to follow those same guidelines. For instance, the EFSA report dismisses observed trends in tumor incidence "because there are no individual treatment groups that are significantly different from controls and because the maximum observed response is reportedly within the range of the historical control data." However, according to the scientists, concurrent controls are recommended over historical controls in all guidelines, scientific reports, and publications, and, if it is employed, historical control data "should be from studies in the same timeframe, for the same exact animal strain, preferably from the same laboratory or the same supplier and preferably reviewed by the same pathologist." BfR's use of historical control data violated these precautions: "only a single study used the same mouse strain as the historical controls but was reported more than 10 years after the historical control dataset was developed." Further deviating from sound scientific practices, the data used by the BfR came from studies in seven different laboratories. The scientists concluded:

> BfR reported seven positive mouse studies with three studies showing increases in renal tumors, two with positive findings for hemangiosarcomas, and two with positive findings for malignant lymphomas. BfR additionally reported two positive findings for tumors in rats. Eliminating the inappropriate use of historical data, the unequivocal conclusion is that

these are not negative studies, but in fact document the carcinogenicity of glyphosate in laboratory animals.

90.     The letter also critiqued the EFSA report's lack of transparency and the opacity surrounding the data cited in the report: "citations for almost all of the references, even those form the open scientific literature, have been redacted from the document" and "there are no authors or contributors listed for either document, a requirement for publication in virtually all scientific journals." Because BfR relied on unpublished, confidential industry provided studies, it is "impossible for any scientist not associated with BfR to review this conclusion with scientific confidence."

91.     On March 3, 2016, the letter was published in the Journal of Epidemiology & Community Health.

92.     On February 17, 2016, a consensus statement published in the journal Environmental Health, entitled "Concerns over use of glyphosate-based herbicides and risks associated with exposures: a consensus statement," assessed the safety of glyphosate-based herbicides (GBHs). The paper's "focus is on the unanticipated effects arising from the worldwide increase in use of GBHs, coupled with the recent discoveries about the toxicity and human health risks stemming from use of GBHs." The researchers drew seven factual conclusions about GBHs:

a       GBHs are the most heavily applied herbicide in the world and usage continues to rise;

b       Worldwide, GBHs often contaminate drinking water sources, precipitation, and air, especially in agricultural regions;

c       The half-life of glyphosate in water and soil is longer than previously recognized;

d      Glyphosate and its metabolites are widely present in the global soybean supply; (5) Human exposures to GBHs are rising;

e      Glyphosate is now authoritatively classified as a probable human carcinogen.

93.    The researchers noted that GBH use has increased approximately 100-fold since the 1970s. Furthermore, far from posing a limited hazard to vertebrates, as previously believed, two decades of evidence demonstrated that "several vertebrate pathways are likely targets of action, including hepatorenal damage, effects on nutrient balance through glyphosate chelating action and endocrine disruption."

94.    The paper attributed uncertainties in current assessments of glyphosate formulations to the fact that "[t]he full list of chemicals in most commercial GBHs is protected as 'commercial business information,' despite the universally accepted relevance of such information to scientists hoping to conduct an accurate risk assessment of these herbicide formulations." Further, the researches argue, "[t]he distinction in regulatory review and decision processes between 'active' and 'inert' ingredients has no toxicological justification, given increasing evidence that several so-called 'inert' adjuvants are toxic in their own right."

95.    Among various implications, the researchers conclude that "existing toxicological data and risk assessments are not sufficient to infer that GBHs, as currently used, are safe." Further, "GBH product formulations are more potent, or toxic, than glyphosate alone to a wide array of non-target organisms including mammals, aquatic insects, and fish." Accordingly, "risk assessments of GBHs that are based on studies quantifying the impacts of glyphosate alone underestimate both toxicity and exposure, and thus risk." The paper concludes that this "shortcoming has repeatedly led regulators to set inappropriately high exposure thresholds."

96.     The researchers also critique the current practice of regulators who largely rely on "unpublished, non-peer-reviewed data generated by the registrants" but ignore "published research because it often uses standards and procedures to assess quality that are different from those codified in regulatory agency data requirements, which largely focus on avoiding fraud." In the researchers' view, "[s]cientists independent of the registrants should conduct regulatory tests of GBHs that include glyphosate alone, as well as GBH-product formulations."

97.     The researchers also call for greater inclusion of GBHs in government-led toxicology testing programs:

> [A] fresh and independent examination of GBH toxicity should be undertaken, and . . . this reexamination be accompanied by systematic efforts by relevant agencies to monitor GBH levels in people and in the food supply, none of which are occurring today. The U.S. National Toxicology Program should prioritize a thorough toxicological assessment of the multiple pathways now identified as potentially vulnerable of GBHs.

98.     The researchers suggest that, in order to fill the gap created by an absence of government funds to support research on GBHs, regulators could adopt a system through which manufacturers fund the registration process and the necessary testing:

> [W]e recommend that a system be put in place through which manufacturers of GBHs provide funds to the appropriate regulatory body as part of routine registration actions and fees. Such funds should then be transferred to appropriate government research institutes, or to an agency experienced in the award of competitive grants. In either case, funds would be made available to independent scientists to conduct the appropriate long-term

(minimum 2 years) safety studies in recognized animal model systems. A thorough and modern assessment of GBH toxicity will encompass potential endocrine disruption, impacts on the gut microbiome, carcinogenicity, and multigenerational effects looking at reproductive and frequency of birth defects.

**FDA Announces Testing of Glyphosate in Foods**

99.     On February 17, 2016, the U.S. Food and Drug Administration ("FDA") announced that, for the first time in its history, the agency planned to start testing certain foods for glyphosate residues. FDA spokeswoman Lauren Sucher explained: "The agency is now considering assignments for fiscal year 2016 to measure glyphosate in soybeans, corn, milk, and eggs, among other potential foods."

100.     In 2014, the U.S. Government Accountability Office (GAO) had severely rebuked the FDA for its failures to both monitor for pesticide residue, including that of glyphosate, and to disclose the limitations of its monitoring and testing efforts to the public. The GAO had cited numerous undisclosed deficiencies in the FDA's process, specifically highlighting its omission of glyphosate testing.

101.     Indeed, in the past, both the FDA and the U.S. Department of Agriculture (USDA) had routinely excluded glyphosate from their testing for the residues of hundreds of other pesticides, on the rationale that it was too expensive and unnecessary to protect public health. Ms. Sucher, the FDA spokeswoman, however, now states that "the agency has developed 'streamlined methods' for testing the weed killer."

102.     The FDA's move is significant as the agency possesses enforcement authority and can seek action if pesticide residues exceed enforcement guidelines.

**Plaintiffs' Exposure to Roundup®**

103.    Plaintiff, Lesbia M. Pineda, routinely used Roundup® on her property in Cecil, Alabama, from September 2004 through the time of her death in 2016 as indicated above.

104.    Plaintiff frequently purchased Roundup® in its liquid form in Alabama.

105.    In or around 2015, doctors diagnosed Lesbia Pineda with Mantel Cell Lymphoma.

106.    From the time of her diagnosis through the time of her death one year later, Lesbia Pineda was treated for the cancer, including undergoing radical chemotherapy and radiation treatments, and other treatments and evaluations, at UAB Hospital in Birmingham, Alabama.

107.    During the entire time in which Ms. Pineda was exposed to Roundup®, the Plaintiffs did not know exposure to Roundup® was injurious to her health or the health of others.

108.    Plaintiffs first learned that the exposure to Roundup® can cause cancer and other serious illness after an August 11, 2018 jury verdict in California in favor of Dewayne Johnson, a groundskeeper who was exposed to Roundup® and was later diagnosed with lymphoma.

## TOLLING OF PRESCRIPTIVE PERIOD
## DISCOVERY RULE TOLLING

109.    Plaintiffs had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup®. The earliest date Plaintiffs learned about a possible connection was after the August 11, 2018 verdict in favor of Mr. Johnson. This is the quintessential case for tolling or for applying the doctrine of *contra non valentum* and/or the discovery rule.

110.    Within the time period of any applicable statutes of limitations, Plaintiffs could not have discovered, through the exercise of reasonable diligence, the exposure to Roundup® and glyphosate were injurious to human health.

111.    Plaintiffs did not discover, and did not know of facts that would cause a reasonable person to suspect the risks associated with the use of and/or exposure to Roundup®; nor would a reasonable and diligent investigation by Plaintiffs have disclosed that Roundup® would cause illness to Lesbia Pineda.

112.    For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiffs' claim.

### Fraudulent Concealment Tolling

113.    All applicable statutes of limitations have also been tolled by Monsanto's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

114.    Instead of disclosing critical safety information about Roundup® and glyphosate, Monsanto has consistently and falsely represented the safety of its Roundup® products.

115.    Monsanto to this day continues to make these false representations.

### Estoppel

116.    Monsanto was under a continuous duty to disclose to consumers, users and other person coming into contact with its products, including Plaintiffs, accurate safety information concerning its products and the risks associated with the use of and/or exposure to Roundup® and glyphosate.

117.    Instead, Monsanto knowingly, affirmatively, and actively concealed safety information concerning Roundup® and glyphosate and the serious risks associated with the use of and/or exposure to its products.

118.    Based on the foregoing, Monsanto is estopped from relying on any statutes of limitations in defense of this action.

## COUNT I- DESIGN DEFECT

119.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein, and further allege:

120.    Plaintiffs bring this strict liability claim against Defendant for defective design.

121.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, users and other persons coming into contact with them, including Plaintiffs, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

122.    At all times relevant to this litigation, Defendant designed, researched, developed, formulated, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold and distributed the Roundup® products used by Plaintiffs and/or to which Plaintiffs were exposed, as described above.

123.    At all times relevant to this litigation, Defendant's Roundup® products were manufactured, designed and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, Plaintiff.

124.    At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Alabama and throughout the United States, including Plaintiff without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

125.    Defendant's Roundup® products, at the time of manufacture and sale, were defective in design and unreasonably dangerous, subjecting users to dangerous chemicals.

126. Defendant's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant, were defective in design and formulation in that when they left the hands of Defendant's manufacturers and/or suppliers, they were unreasonably dangerous because they were not as safe as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

127. Defendant's Roundup® products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant, were defective in design and formulation in that when they left the hands of Defendants' manufacturers and/or suppliers, the foreseeable risks associated with these products exceeded the alleged benefits associated with their design and formulation.

128. Defendant's Roundup® products caused harm to Lesbia Pineda despite the fact that Plaintiffs used Roundup® products in the manner intended by Defendants.

129. Therefore, at all times relevant to this litigation, Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendant, were defective in design and formulation and were inherently dangerous for their intended use due to the following:

    a.    When placed in the stream of commerce, Defendant's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would expect.

    b.    Defendant's Roundup® products were not reasonably safe as intended to be used.

c.     When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

d.     When placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

e.     Defendant did not sufficiently test, investigate or study its Roundup® products and, specifically, the active ingredient glyphosate, and the use of glyphosate in conjunction with POEA.

f.     Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweighs any potential utility stemming from the use of the herbicide.

g.     Defendant knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

h.     Defendant did not conduct adequate post-marketing surveillance of its Roundup® products.

i.     Defendant could have employed safer alternative designs and formulations.

j.     Defendant's Roundup® products were inadequately designed.

k.     The defective design of Defendant's Roundup® products resulted in products that were more dangerous than the ordinary consumer would expect.

l. The Defendant's Roundup® products failed to perform in a manner reasonably expected in light of its nature and intended function and subjected the Plaintiffs to an unreasonable risk of harm beyond that contemplated by an ordinary person.

m. The Defendant's Roundup® products were insufficiently tested.

130. At all times relevant to this litigation, Plaintiffs used and/or was exposed to the use of Defendant's Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

131. Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

132. Plaintiffs could not have discovered the defects and dangers in the Defendant's Roundup® products through the exercise of due care prior to August 2018.

133. Defendant, as the designer, manufacturer, marketer, and seller of Roundup®, is held to the level of knowledge of an expert in its field, and Plaintiffs did not have substantially the same knowledge.

134. Due to the above, Defendant's Roundup® products were defective as defined by the Alabama Products Liability Act (Alabama Revised Statute 9:2800.51 *et seq*.) including, but not limited to, having defects in design, composition, manufacture, and inadequate warnings and instructions regarding the use and reasonably foreseeable misuse of the product.

135. Defendant's Roundup® products were defective and Defendant, as manufacturer and vendor, is liable to Plaintiffs under the law of redhibition (Alabama Civil Code Article 2509 as a bad faith seller and Alabama Civil Code Article 2520 for economic loss, *et seq*.)

136. The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendant's Roundup® products were and are more dangerous than alternative products and Defendant could have designed its Roundup® products to make them less dangerous. Indeed, at the time that Defendant designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

137. At the time Roundup® products left Defendant's control, there was a practical, technically feasible, and safe alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant's Roundup® herbicides.

138. Defendant's defective design of Roundup® amounts to willful, wanton, and/or reckless conduct by Defendant.

139. Therefore, as a result of unreasonably dangerous condition of its Roundup® products, Defendant is strictly liable to Plaintiffs.

140. The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiff's grave injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained his injuries.

141. As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Lesbia Pineda suffered from grave injuries, repeatedly endured pain and discomfort associated with the disease and the chemotherapy and radiation treatments, and ultimately died from the disease caused by exposure to Defendant's product, as well as economic hardship incurred by the Plaintiffs, including considerable financial expenses for medical care and treatment.

## COUNT II-FAILURE TO WARN

142.     Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein, and further allege:

143.     Plaintiffs bring this strict liability claim against Defendant for failure to warn.

144.     At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate and the use of adjuvants and/or surfactants such as POEA. These actions were under the ultimate control and supervision of Defendants.

145.     Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiffs, and Defendant therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of Roundup® and glyphosate containing products and a duty to instruct on the proper, safe use of these products.

146.     At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks.

Defendant had a continuing duty to instruct on the proper, safe use of these products. Defendant, as manufacturer, seller, or distributor of chemical herbicides, is held to the knowledge of an expert in the field.

147.    At the time of manufacture, Defendant could have provided warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to these products.

148.    At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety of its Roundup® products. Defendant also failed to minimize the dangers to users and consumer of its Roundup® products and to those who would foreseeably use or be harmed by Defendant's herbicides, including Plaintiffs.

149.    Despite the fact that Defendant knew or should have known that Roundup® products posed a grave risk of harm, it failed to warn of the dangerous risks associated with their use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied, or sold the product, and not known to end users and consumers, such as Plaintiffs.

150.    Defendant knew or should have known that its Roundup® and glyphosate-containing products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products. Defendant has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

151.    At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

152.    At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

153.    Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of their exposure. Plaintiffs relied upon the skill, superior knowledge, and judgment of Defendant.

154.    Defendant knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, but it failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural and horticultural applications.

155.    The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled agricultural workers, horticultural workers and/or at-home users to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk or injuries associated with use of and/or exposure of Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks form use or exposure; and concealed, downplayed, or otherwise

suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

156.    To this day, Defendant has failed to adequately and accurately warn of the true risks of injuries and/or death associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen, along with the adjuvants and/or surfactants such as POEA.

157.    As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiffs.

158.    Defendant is liable to Plaintiffs for injuries and death to Lesbia Pineda caused by Defendant's failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its Roundup® products and the risks associated with the use of or exposure to Roundup® and glyphosate.

159.    The defects in Defendant's Roundup® products were substantial and contributing factors in causing Ms. Pineda's injuries and death, and, but for Defendant's misconduct and omissions, Ms. Pineda would not have sustained his injuries and would not have died from mantel cell lymphoma.

160.    Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup® products, Plaintiffs would have avoided the risk of developing injuries as alleged herein and Plaintiffs could have obtained alternative herbicides.

161.    As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Ms. Pineda suffered from grave injuries, repeatedly endured

pain and discomfort associated with the disease and the chemotherapy and radiation treatments, and ultimately died from the disease caused by exposure to Defendant's product, as well as economic hardship incurred by the Plaintiffs, including considerable financial expenses for medical care and treatment.

## COUNT III-NEGLIGENCE

162. Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein, and further allege:

163. Defendant, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, and/or promoted.

164. Defendant, directly or indirectly, caused Roundup® products to be purchased and/or used by Plaintiffs.

165. At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

166. At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertising, and sale of its Roundup® products. Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup® and, in particular, its active ingredient glyphosate along with adjuvants and/or surfactants such as POEA.

167.    At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate along with adjuvants and/or surfactants such as POEA.

168.    Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause Ms. Pineda's injuries and death and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiffs.

169.    Defendant knew or, in the exercise of reasonable care, should have known that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup®.

170.    Defendant knew or, in the exercise of reasonable care, should have known that tests limited to Roundup®'s active ingredient glyphosate and Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were insufficient to prove the safety of Roundup®.

171.    Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup® and glyphosate-containing products and Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA.

172.    As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, packaging, sale, and distribution of its Roundup® products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, adjuvants and "inert" ingredients, and the surfactant POEA, and knew or had reason to know of

the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

173.    Defendant failed to appropriately and adequately test Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiffs from Roundup®.

174.    Despite the ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant has failed to do so. Indeed, Defendant has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate and Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA.

175.    Defendant's negligence includes, but is not limited to:

(1)    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

(2)    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®.

(3)    Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture, horticulture, and at-home use;

(4)    Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or adjuvants and/or surfactants contained within Roundup®, and the propensity of these ingredients to render Roundup® toxic, increase the toxicity of Roundup®, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup®, and whether or not "inert" ingredients and/or adjuvants were safe for use;

(5)    Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

(6)    Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

(7)    Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and/or be exposed to its Roundup® products;

(8)    Failing to disclose to Plaintiffs, users, consumers, and the general public that the use of and exposure of Roundup® presented severe risks of cancer and other grave illnesses;

(9) Failing to warn Plaintiffs, users, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other users or consumers;

(10) Systemically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate containing products;

(11) Representing that its Roundup® products were safe for their intended use when in fact, Defendant knew or should have known that the products were not safe for their intended use;

(12) Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

(13) Advertising, marketing, and recommending the use of Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

(14) Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup® products are not unsafe for use in the agricultural, horticultural industries, and/or home use; and

(15) Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

176.     Defendant knew and/or should have known that it was foreseeable that consumers and/or users, such as Plaintiffs, would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

177.     Plaintiffs did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate and Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA.

178.     Defendant's negligence was the proximate cause of the injuries and death of Ms. Pineda, harm, and economic losses that Plaintiffs suffered as described herein.

179.     Defendant's conduct, as described above, was reckless. Defendant regularly risks the lives of consumers and users of its products, including Plaintiffs, with full knowledge of the dangers of its products. Defendant has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiffs. Defendant's reckless conduct therefore warrants an award of punitive damages.

180.     As a proximate result of Defendant's wrongful acts and omissions in placing its defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature glyphosate and Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA, Lesbia Pineda suffered from grave injuries, repeatedly endured pain and discomfort associated with the disease and the chemotherapy and radiation treatments, and ultimately died from the disease caused by exposure to Defendant's product, as well as economic hardship incurred by the Plaintiffs, including considerable financial expenses for medical care and treatment.

## COUNT IV: BREACH OF EXPRESS WARRANTY

181.    Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein, and further allege:

182.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

183.    At all times relevant to this litigation, Defendant expressly represented and warranted to the purchasers of its Roundup® products, by and through statements made by Defendant in labels, publications, package inserts, and other written materials intended for consumers and the general public, that its Roundup® products were safe to human health and the environment, effective, fit, and proper for their intended use. Defendant advertised, labeled, marketed, and promoted Roundup® products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that its Roundup® products would conform to the representations.

184.    These express representations include incomplete warnings and instructions that purport, but fail, to include the complete array of risks associated with use of and/or exposure to Roundup® and glyphosate and Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA. Defendant knew and/or should have known that the risks expressly included in Roundup® warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendant expressly

represented that its Roundup® products were safe and effective, that they were safe and effective for use by individuals such as Plaintiffs, and/or that they were safe and effective as agricultural herbicides.

185.   The representations about Roundup®, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

186.   Defendant placed its Roundup® products into the stream of commerce for sale and recommended their use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate and Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA.

187.   Defendant breached these warranties because, among other things, its Roundup® products were defective, dangerous, unfit for use, did not contain label representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically, Defendant breached the warranties in the following ways:

a.   Defendant represented through its labeling, advertising, and marketing materials that its Roundup® products were safe, and fraudulently withheld and concealed information about the risks of serious injury associated with use of and/or exposure to Roundup and glyphosate and Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA by expressly limiting the risks associated with the use and/or exposure within its warnings and labels; and

b. Defendant represented that its Roundup® products were safe for use and fraudulently concealed information that demonstrated that glyphosate, the active ingredient in Roundup, and Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA, had carcinogenic properties, and that its Roundup® products, therefore, were not safer than alternatives available on the market.

188. Monsanto's warranties and representations, as described herein, concerning the qualities of Roundup® products, became a basis of the bargain for Plaintiffs' purchases of Roundup® products.

189. Plaintiffs justifiably and detrimentally relied on the express warranties and representations of Defendant in the purchase and use of its Roundup® products. When Plaintiffs made the decision to purchase Roundup®, they reasonably relied upon Defendant to disclose known defects, risks, dangers, and side effects of Roundup® and glyphosate and Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA.

190. Lesbia Pineda was exposed to the labels on the Roundup® products that he applied.

191. Defendant had sole access to material facts concerning the nature of the risks associated with its Roundup® products as expressly stated within its warnings and labels, and Defendant knew that consumers and users such as Plaintiffs could not have reasonably discovered that the risks expressly included in Roundup® warnings and labels were inadequate and inaccurate.

192. Plaintiffs had no knowledge of the falsity or incompleteness of Defendant's statements and representations concerning Roundup®.

193. Plaintiffs used and/or were exposed to the use of Roundup® as researched, developed, designed, tested, formulated, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by Defendant.

194. Had the warnings and labels for Roundup® products accurately and adequately set forth the true risks associated with the use of such products, including Ms. Pineda's injuries and death, rather than expressly excluding such information and warranting that the products were safe for their intended use, Plaintiffs could have avoided the injuries and death and damages complained of herein.

195. Defendant breached both implied and express warranties, and is liable for misrepresentations, breach of contract, fraud and deceptive business practices as defined under Alabama law.

196. As a direct and proximate result of Defendant's wrongful acts of omissions, Ms. Pineda suffered from grave injuries, repeatedly endured pain and discomfort associated with the disease and the chemotherapy and radiation treatments, and ultimately died from the disease caused by exposure to Defendant's product, as well as economic hardship incurred by the Plaintiffs, including considerable financial expenses for medical care and treatment.

## **COUNT V: BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

197. Plaintiff incorporate by reference all other paragraphs of this Complaint as if fully set forth herein, and further allege:

198. At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to users and consumers, including Plaintiffs, thereby placing Roundup® products into the stream of commerce.

199. These actions were under the ultimate control and supervision of Defendant.

200. Before the time that Ms. Pineda was exposed to the aforementioned Roundup® products, Defendant impliedly warranted to its consumers and users, including Plaintiffs, that its Roundup® products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

201. Defendant, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing products and Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA an increased risk of developing severe injuries, including Ms. Pineda's injuries and death.

202. Plaintiffs reasonably relied upon what was reasonably assumed to be skill, superior knowledge and judgment of Defendant and upon its implied warranties that Roundup® products were of merchantable quality and fit for their intended purpose or use.

203. The Roundup® products were expected to reach and did in fact reach consumers and users, including Plaintiffs, without substantial change in the condition in which they were manufactured and sold by Defendant.

204. At all times relevant to this litigation, Defendant was aware that consumers and users of its products, including Plaintiffs, would use Roundup® products as marketed by Defendant, which is to say that Plaintiffs were the foreseeable users of Roundup®.

205. Defendant intended that its Roundup® products be used in the manner in which Plaintiffs in fact used them and Defendant impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup® was not adequately tested or researched. 204. In reliance upon Defendant's implied warranty, Plaintiff used Roundup® as

instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendant.

206.    Plaintiffs could not have reasonably discovered or known of the risks of serious injury and death associated with Roundup® or glyphosate or Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA.

207.    Defendant breached its implied warranty to Plaintiffs in that its Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

208.    The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

209.    As a direct and proximate result of Defendant's wrongful acts and omissions, Plaintiffs have suffered severe and permanent physical and emotional injuries and Ms. Pineda suffered from grave injuries, repeatedly endured pain and discomfort associated with the disease and the chemotherapy and radiation treatments, and ultimately died from the disease caused by exposure to Defendant's product, as well as economic hardship incurred by the Plaintiffs, including considerable financial expenses for medical care and treatment.

210.    As a result of the actions of Defendant, Plaintiffs have been damaged and are entitled to and seeks all damages reasonable in the premises as follows:

a.      Death;

b.      Ms. Pineda's past pain and suffering;

c.      Past, present, and future mental anguish and anxiety;

d.      Past, present, and future lost wages and earning capacity;

e.      Past medical expenses;

f.      Loss of enjoyment of life;

g.      Permanent injury;

h.      Travel expenses; and

i.      All other damages inherent in these pleadings, or which may appear through discovery or trial of this case.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Defendant be cited and served with the summons and complaint, and after due proceedings are had there be judgment in their favor and against Defendant in a full and true sum to compensate Plaintiffs for compensatory damages in an amount to be proven at trial, punitive damages, attorneys' fees, costs, litigation expenses, judicial interest, and any for all other general and equitable relief.

Joseph "Jay" H. Aughtman (ASB-8081-A43J)
Paul Burkett (ASB-8019-U66P)
Nicholas Cole Hughes (ASB-5981-S73H),
Matthew Bruce Alfreds (ASB-1428-T68A)
Attorneys for Plaintiffs

**OF COUNSEL**:
**Aughtman Law Firm, LLC**
1772 Platt Place
Montgomery, AL 36117
T: (334) 215-9873
F: (334) 213-5663
**jay@aughtmanlaw.com**

**Argo | Hughes, LLC**
6706 Taylor Circle
Montgomery, AL 36117
Tel:     334-279-0088

Fax:    334-279-8830
nick@argohughes.com
matt@argohughes.com
paul@argohughes.com

## CERTIFICATE OF SERVICE

I, Joseph "Jay" H. Aughtman, do hereby certify that a true and correct copy of the foregoing

has been furnished by the Court's via certified mail on this 18th day of March 2020.

s/ Jay Aughtman
Of Counsel

Complaint to Be Served Upon Defendant at the following address:

Monsanto Company
641 South Lawrence Street
Montgomery, AL 36104

JS 44 (Rev. 02/19)

# CIVIL COVER SHEET

RECEIVED

2020 MAR 18 P 3:47

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Maria Sanchez, Individually and on Behalf of The Estate of Lesbia M. Pineda,

**(b)** County of Residence of First Listed Plaintiff   Montgomery
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Aughtman Law Firm, LLC
1772 Platt Place
Montgomery, AL 36117

## DEFENDANTS
Monsanto Company,

County of Residence of First Listed Defendant   St. Louis
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | ☐ 3  Federal Question *(U.S. Government Not a Party)* |
| ☐ 2  U.S. Government Defendant | ☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☒ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | **PERSONAL PROPERTY** | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| | | | | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer     ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause:
negligence, warranty, failure to warn

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE   3.18.20

SIGNATURE OF ATTORNEY OF RECORD

## FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

```
Court Name: U S DISTRICT COURT - AL/M
Division: 2
Receipt Number: 4602057352
Cashier ID: estrong
Transaction Date: 03/23/2020
Payer Name: AUGHTMAN LAW FIRM LLC

CIVIL FILING FEE
 For: AUGHTMAN LAW FIRM LLC
 Case/Party: D-ALM-2-20-CV-000193-001
 Amount:      $400.00
------------------------------------
CHECK
 Check/Money Order Num: 3751
 Amt Tendered:  $400.00
------------------------------------
Total Due:       $400.00
Total Tendered:  $400.00
Change Amt:      $0.00

2:20-cv-00193

Sanchez v. Monsanto Company
```