MEDIATION

# U.S. DISTRICT COURT
## U.S. District Court, Western District of New York (Buffalo)
### CIVIL DOCKET FOR CASE #: 1:20–cv–00381–WMS

Helmich v. Monsanto Company
Assigned to: Hon. William M. Skretny
Cause: 28:1332 Diversity–Product Liability

Date Filed: 03/30/2020
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Federal Question

**Plaintiff**

**Gerald Helmich**
*By and through his representative, Helen Helmich, surviving spouse of Gerald Helmich on behalf of all legal heirs of Gerald Helmich*

represented by **Jessica D. Sparacino**
Sparacino & Sparacino, PLLC
131 Scudder Ave
Northport, NY 11768
631 651–8783
Fax: 631 240–4802
Email: jessica@sparacinoesq.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 03/30/2020 | 1 | COMPLAINT against Monsanto Company $ 400 receipt number 0209–3784383, filed by Gerald Helmich.(Sparacino, Jessica) (Entered: 03/30/2020) |
| 03/31/2020 | | E–Filing Notification: Attorney is directed to file a civil cover sheet, pursuant to Local Rule 3. No judge assignment will be made until filing is entered on the docket. Please utilize the Continuation of Exhibits event, located within the Responses and Replies category. (CGJ) (Entered: 03/31/2020) |
| 04/02/2020 | | SECOND E–Filing Notification: Attorney is directed to file a civil cover sheet, pursuant to Local Rule 3. No judge assignment will be made until filing is entered on the docket. Please utilize the Continuation of Exhibits event, located within the Responses and Replies category. (Entered: 04/02/2020) |
| 04/02/2020 | 2 | CONTINUATION OF EXHIBITS by Gerald Helmich. filed by Gerald Helmich. (Sparacino, Jessica) (Entered: 04/02/2020) |
| 04/02/2020 | | Case assigned to Hon. William M. Skretny. Notification to Chambers of on–line civil case opening. (CGJ) (Entered: 04/02/2020) |
| 04/02/2020 | | AUTOMATIC REFERRAL to Mediation The ADR Plan is available for download at http://www.nywd.uscourts.gov/alternative–dispute–resolution.(CGJ) (Entered: 04/02/2020) |
| 04/02/2020 | | Notice of Availability of Magistrate Judge: A United States Magistrate of this Court is available to conduct all proceedings in this civil action in accordance with 28 U.S.C. 636c and FRCP 73. The Notice, Consent, and Reference of a Civil Action to a Magistrate Judge form (AO–85) is available for download at http://www.uscourts.gov/services–forms/forms. (CGJ) (Entered: 04/02/2020) |

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
ESTATE OF GERALD HELMICH, by and through
His representative, Helen Helmich, surviving spouse
of Gerald Helmich on behalf of all legal heirs of Gerald
Helmich,

                                 Plaintiffs        Index Number:

                                                  **COMPLAINT AND DEMAND**
     -against-                                   **FOR JURY TRIAL**

    MONSANTO COMPANY,

                                   Defendant.
------------------------------------------------------------------------x
Plaintiffs, Gerald Helmich by and through his personal representative Helen

Helmich, and Helen Helmich, surviving spouse of Gerald Helmich on behalf of

all legal heirs of Gerald Helmich ("Plaintiffs"), by and through their undersigned

attorneys, hereby bring this Complaint for damages against Defendant Monsanto

Company and alleges the following:

## <u>NATURE OF THE CASE</u>

1.     This is an action for damages suffered by Plaintiffs as a direct and proximate result of

Defendant's negligent and wrongful conduct in connection with the design, development,

manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling,

and/or sale of the herbicide Roundup®, containing the active ingredient glyphosate.

2.     Plaintiffs maintain that Roundup® and/or glyphosate is defective, dangerous to human

health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper

warnings and directions as to the dangers associated with its use.

1

3.  As a direct result of Gerald Helmich's exposure to Roundup products, Gerald Helmich developed Chronic Lymphocytic Leukemia, also known as Non Hodgkin's Lymphoma (NHL), a fatal injury that was avoidable.

## JURISDICTION AND VENUE

4.  This Court has jurisdiction over Defendant and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiffs and Defendant. Defendant are either incorporated and/or have their principal place of business outside of the state in which the Plaintiffs reside.

5.  The amount in controversy between Plaintiffs and Defendant exceeds $75,000, exclusive of interest and cost.

6.  The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

7.  Venue is proper within this district pursuant to 28 U.S.C. § 1391 in that Defendant have transacted business in the state of New York and are subject to personal jurisdiction in this district. Furthermore, Defendant sold, marketed, and/or distributed Roundup® within the Western District of New York throughout the relevant time frame. Finally, a substantial part of the acts and/or omissions giving rise to these claims occurred within this District.

## PARTIES

8.  Plaintiff Helen Helmich is the wife of Gerald Helmich, deceased, and☐ is a resident and citizen of Ransomville, New York located in the Western District of New York. Helen Helmich is the duly appointed Personal Representative☐ of the Estate of Gerald Helmich, a New York Estate.

9.  At all times relevant to this action, Gerald Helmich resided in Ransomville, New York,

2

Niagara County. Gerald Helmich was diagnosed with Chronic Lymphocytic Leukemia in New York and was a resident and citizen of Ransomville, New York at the time of his death.

10. Plaintiffs bring this action for personal injuries sustained by his exposure to Roundup® ("Roundup®") containing the active ingredient glyphosate and the surfactant polyethoxylated tallowamine ("POEA"). As a direct and proximate result of being exposed to Roundup, Plaintiff Gerald Helmich developed a form of Non-Hodgkin's Lymphoma known as Chronic Lymphocytic Leukemia (hereinafter, "CLL" or "Non-Hodgkin's Lymphoma" or "NHL"), which resulted in his untimely death.

11. "Roundup®" refers to all formulations of Defendant's Roundup® products, including, but not limited to, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Export Herbicide, Roundup Fence & Yard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k Herbicide, Roundup Original II Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Ready Soybeans, Roundup Ready Corn, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer 1 Ready-to-Use, or any other formulation of containing the active ingredient glyphosate.

12.     Defendant MONSANTO COMPANY (hereinafter, "Defendant" or "Monsanto") is a
        Delaware corporation, with its principle place of business in St. Louis, Missouri and
        currently a subsidiary of Defendant BAYER CORPORATION.

13.     Defendant advertised and sold goods, including Roundup® products, in the State of New
        York.

14.     Defendant Monsanto transacted and conducted business within the State of New York
        that relates to the allegations in this Complaint.

15.     Defendant Monsanto derived substantial revenue from goods and products used in the
        State of New York and Defendant expected or should have expected its acts to have
        consequences within the State of New York, and derived substantial revenue from said
        interstate commerce.

16.     Defendant Monsanto engaged in the business of designing, developing, manufacturing,
        testing, packaging, marketing, distributing, labeling, and/or selling Roundup®.

17.     Defendant is authorized to do business in New York and derive substantial income from
        doing business in this state.

18.     Upon information and belief, Defendant Monsanto purposefully availed itself of the
        privilege of conducting activities with the State of New York, thus invoking the benefits
        and protections of its laws.

19.     Upon information and belief, Defendant Monsanto designed, sold, advertised,
        manufactured and/or distributed Roundup®, with full knowledge of its dangerous and
        defective nature.

## FACTUAL ALLEGATIONS

## MONSANTO'S FALSE REPRESENTATIONS REGARDING
## THE SAFETY OF ROUNDUP®

31. In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were **"safer than table salt"** and **"practically non-toxic"** to mammals, birds, and fish. Among the representations the NY AG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

    a.    "Remember that environmentally friendly Roundup® herbicide is biodegradable. It won't build up in the soil so you can use Roundup® with confidence along customers' driveways, sidewalks and fences..."

    b.    "And remember that Roundup® is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup® everywhere you've got a weed, brush, edging or trimming problem."

    c.    "Roundup® biodegrades into naturally occurring elements."

    d.    "Remember that versatile Roundup® herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

    e.    "This non-residual herbicide will not wash or leach in the soil. It stays where you apply it."

    f.    "You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products."

    g.    "Glyphosate is less toxic to rats than table salt following acute oral

            ingestion."

    h.    "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

    i.    "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

    j.    "Roundup® can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area that has been treated with Roundup®.[2]

32.    In the State of New York, these advertisements continued until November 19, 1996, when Monsanto entered into an Assurance of Discontinuance☐ with NY AG, in which Monsanto agreed, among other things, "to cease and desist from publishing☐ or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

    a.    Monsanto's glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

    b.    Monsanto's glyphosate-containing pesticide products or any component manufactured, formulated, distributed or sold by Monsanto are biodegradable

    c.    Monsanto's glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

    d.    Monsanto's glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

    e.    Glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

    f.    Monsanto's glyphosate-containing products or any component

---

[2] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance☐ Pursuant to Executive Law § 63(15) (Nov. 1996).

thereof might be classified as "practically non-toxic.

33.  In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean "[3]

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP®

34.  As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties.

35.  On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[4] Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

36.  In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.[5]

37.  In October 1991 the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.[6]

38.  In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendant's Roundup® products are more

---

[3] *Monsanto Guilty in 'False Ad' Row,* BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm

[4] Consensus Review of Glyphosate, Casewell No. 661A. March 4, 1985. United States Environmental Protection Agency (EPA).

[5] http://www.epa.gov/oppsrrdl/reregistration/REDs/factsheets/0178fact.pdf

[6] Second Peer Review of Glyphosate, CAS No. 1071-83-6. October 30, 1881. United States Environmental Protection Agency.

dangerous and toxic than glyphosate alone.[7] As early as 1991 evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.[8]

39. In 2002, Julie Marc published a study entitled "Pesticide Roundup® Provokes Cell Division Dysfunction at the Level of CDKl/Cyclin B Activation."

40. The study found that Defendant's Roundup® caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

41. In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

42. The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[9]

43. In 2005, Francisco Peixoto published a study showing that Roundup®'s effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

44. The Peixoto study suggested that the harmful effects of Roundup® on mitochondrial

---

[7] Martinez et al. 2007; Benachour 2009; Gasnier et al. 2010; Peixoto 2005; Marc 2004
[8] Martinez et al 1991
[9] (Molinari, 2000; Stewart et al., 2003)

bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup® formulation products.

45. In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup® and glyphosate on human umbilical, embryonic, and placental cells.

46. The study used dilution levels of Roundup® and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup® are not inert and that Roundup® is always more toxic than its active ingredient glyphosate.

47. The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendant.

48. Defendant knew or should have known that Roundup® is more toxic than glyphosate alone and that safety studies on Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup®.

49. Defendant knew or should have known that tests limited to Roundup®'s active ingredient glyphosate were insufficient to prove the safety of Roundup®.

50. Defendant failed to appropriately and adequately test Roundup®, Roundup®'s adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup®.

51. Rather than performing appropriate tests, Defendant relied upon flawed industry-

supported studies designed to protect Defendant's economic interests rather than Plaintiff and the consuming public.

52.  Despite its knowledge that Roundup® was considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup® as safe.

## IARC CLASSIFICATION OF GLYPHOSATE

53.  The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

54.  An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015-2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

55.  IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

56.  On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendant's possession since as early

as 1985, the IARC's working group published its conclusion that the glyphosate contained in Defendant's Roundup® herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

57.     The IARC's full Monograph was published on July 29, 2015 and **established glyphosate as a class 2A *probable* carcinogen to humans**. According to the authors glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

58.     The IARC Working Group **found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides**.

59.     The IARC also found that **glyphosate caused DNA and chromosomal damage in human cells**.

## EARLIER EVIDENCE OF GLYPHOSATE'S DANGER

60.     Despite the new classification by the IARC, Defendant has had ample evidence of glyphosate and Roundup®'s genotoxic properties for decades.

61.     Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

62.     In 1997, Chris Clements published "Genotoxicity of select herbicides in *Rana catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

63.     The study found that tadpoles exposed to Roundup® showed significant DNA damage

when compared with unexposed control animals.

64. Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup® can induce oxidative stress.

65. Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

66. The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

67. In 2006 Cesar Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

68. The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

69. The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

70. Despite knowledge to the contrary, Defendant maintains that there is no evidence that Roundup® is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup® is not genotoxic, and that there is no evidence that Roundup® is genotoxic.

71. In addition to glyphosate and Roundup®'s genotoxic properties, Defendant has long been aware of glyphosate's carcinogenic properties.

72. Glyphosate and Roundup® in particular have long been associated with carcinogenicity

12

and the development of numerous forms of cancer, including, but not limited to, Chronic Lymphocytic Leukemia or Non-Hodgkin's lymphoma (NHL), Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

73. Defendant has known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup®.

74. In 1985 the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

75. In 2003 Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

76. The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studies with an increased odds ratio of 3.11.

77. In 2003 AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

78. The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

79. In 2008 Mikael Eriksson published a population based case-control study of exposure to various pesticides as a risk factor for NHL. This strengthened previous associations between glyphosate and NHL.

80. In spite of this knowledge, Defendant continued to issue broad and sweeping statements suggesting that Roundup® was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

13

81.     Upon information and belief, these statements and representations have been made with the intent of inducing Gerald Helmich, the agricultural community, and the public at large to purchase and increase the use of Defendant's Roundup® for Defendant's pecuniary gain, and in fact, did induce Gerald Helmich to use Roundup®.

82.     Defendant made these statements with complete disregard and reckless indifference to the safety of Gerald Helmich and the general public.

83.     Notwithstanding Defendant's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

84.     Defendant knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

85.     Defendant failed to appropriately and adequately inform and warn Gerald Helmich of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup®, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

86.     Despite the IARC s classification of glyphosate as a class 2A probable carcinogen, Defendant continues to maintain that glyphosate and/or Roundup® is safe, non-carcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of

14

carcinogenicity or genotoxicity in glyphosate and Roundup®.

87. Defendant has claimed and continues to claim that Roundup® is safe, non-carcinogenic, and non-genotoxic. These misrepresentations are consistent with Defendant's cavalier approach to investigating and ensuring the safety of its products, the safety of the public at large, and the safety of Gerald Helmich.

## SCIENTIFIC FRAUD UNDERLYING THE SAFETY
## DETERMINATIONS OF GLYPHOSATE

88. After the EPA's 1985 classification of glyphosate as possibly carcinogenic to humans (Group C), Monsanto exerted pressure upon the EPA to change its classification.

89. This culminated in the EPA's reclassification of glyphosate to Group E, which was based upon evidence of non-carcinogenicity in humans.

90. In so classifying, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

91. On two occasions, the EPA found that laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed scientific fraud.

92. In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup®. IBT performed approximately 30 tests on glyphosate and glyphosate-containing products, including 11 of the 19 chronic toxicology studies needed to register Roundup® with the EPA.

93. In 1976, the Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to

15

toxicological impacts of glyphosate. The EPA subsequently audited IBT and determined that the toxicology studies conducted for Roundup® were invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

94. Three top executives of IBT were convicted of fraud in 1983.

95. In the second incident, Monsanto hired Craven Laboratories ("Craven") in 1990 to perform pesticide and herbicide studies, including several studies on Roundup®.

96. In March of 1991, the EPA announced that it was investigating Craven for "allegedly falsifying test data used by chemical firms to win EPA approval of pesticides."

97. The investigation lead to the indictments of the laboratory owner and a handful of employees.

## MONSANTO'S CONTINUING DISREGARD FOR THE SAFETY OF GERALD HELMICH AND THE PUBLIC

98. Monsanto claims on its website that "[regulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup® brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic."[10]

99. Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

100. Glyphosate, and Defendant's Roundup® products in particular, have long been associated

---

[10] Backgrounder - Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9 2015)

with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

101. Defendant's statements proclaiming the safety of Roundup® and disregarding its dangers misled Gerald Helmich.

102. Despite Defendant's knowledge that Roundup® was associated with an elevated risk of developing cancer, Defendant's promotional campaigns focused on Roundup®'s purported "safety profile."

103. Defendant's failure to adequately warn Gerald Helmich resulted in (1) Gerald Helmich using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, other cancers and other injuries associated with Roundup®.

104. Defendant failed to seek modification of the labeling of Roundup® to include relevant information regarding the risks and dangers associated with Roundup® exposure.

105. The failure of Defendant to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

106. The failure of Defendant to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

107. The failure of Defendant to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

108. By reason of the foregoing acts and omissions, Plaintiffs seek compensatory damages as a result of Gerald Helmich's use of, and exposure to, Roundup® which caused or was a

substantial contributing factor in causing Gerald Helmich to suffer from cancer, specifically Chronic Lymphocytic Leukemia or NHL, and Gerald Helmich suffered severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, leading to his untimely death.

109. By reason of the foregoing acts and omissions, Plaintiffs have endured and continued to suffer, emotional and mental anguish, and other economic and non-economic damages, as a result of the actions and inactions of the Defendant.

### GERALD HELMICH'S EXPOSURE TO ROUNDUP®

110. Plaintiff Gerald Helmich co-owned and operated Helmich Farm in Ransomville, New York from the late 1960s until 2005 when he became too sick to continue. They eventually expanded the farm to about 1500 acres with the purchase of plots of land in Porter, New York, Wilson, New York and Lewiston, New York - - which were all located within Niagara County, New York.

111. Helmich Farm was a fruit and vegetable farm where they grew soy beans, corn, peas, alfalfa, wheat, cabbage, tomatoes, cucumbers, pumpkins, pears, apples, peaches, prunes and apricots.

112. Gerald Helmich was exposed to Monsanto's Roundup® products from in or about 1976, shortly after the herbicide initially hit the market.

113. From approximately 1976 to 2005, close to 30 years, Gerald Helmich sprayed Roundup® on his farm on a regular basis. Gerald initially used the Roundup® herbicide to control weeds around their fruit trees. They eventually began using on the entire farmland including Roundup Ready® crops (*i.e.,* soy beans, corn, *etc.*). As the farm grew, he purchased more and more Roundup®. Gerald Helmich initially purchased the Roundup®

products in 2.5-gallon jugs.  Then he started purchasing 30- and 50-gallon drums of Roundup®.  At some point, he started purchasing between 2 and 4 500-gallon totes, which would last year round.

114.    The Helmich Farm was active year round with the majority of work occurring in the spring and summer, seven days per week.  They used less Roundup® products during the fall and winter months.

115.    Gerald Helmich used a variety of tools to spray the Roundup® products on the farm including the following:

        a.      Hand sprayer to kill poison ivy around pears;

        b.      200 Gallon Weed Sprayer on the back of tractor;

        c.      500-Gallon Tank w/ Hand Crank Wisconsin 2 Cylinder Engine (Tow behind unit with open cab);

        d.      Spray Coop with a 500-Gallon Tank (Self-propelled spray machine with a closed cab); and

        e.      Rogator, a 500-Gallon tank (Self-propelled spray machine with a closed cab).

116.    As a result of the advertisements alleging that Roundup® was safe for use as described above, while Gerald Helmich followed safety and precautionary warnings during the course of use of other products, he typically did not wear any protective gear while using Roundup® products.

117.    Gerald Helmich was subsequently diagnosed with Chronic Lymphocytic Leukemia, a form of Non-Hodgkin's Lymphoma, in or about November/December 2006 and died suddenly in January 2007.  The development of Gerald Helmich's illness was proximately and actually caused by exposure to Defendant's Roundup® products.

118.    At all relevant times, Helen Helmich was the spouse of Gerald Helmich and brings these

claims on behalf of her as his wife and Gerald Helmich's heirs including his three sons and their children.

119.    As a result of Gerald Helmich's injuries and subsequent death, Plaintiffs have incurred significant economic and non-economic damages.

## EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

120.    Plaintiffs incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

121.    The running of any statute of limitations has been tolled by reason of Defendant's fraudulent concealment. Defendant, through its affirmative misrepresentations and omissions, actively concealed from Plaintiffs the true risks associated with Roundup® and glyphosate.

122.    At all relevant times, Defendant has maintained that Roundup® is safe, non-toxic, and non-carcinogenic. Indeed, even as of March 2020, Defendant continues to represent to the public that "Glyphosate has a 40-year history of safe and effective use. In evaluations spanning those four decades, the overwhelming conclusion of experts worldwide, including the Environmental Protection Agency (EPA), has been that glyphosate can be used safely."[11]

123.    As a result of Defendant's actions, Plaintiff was unaware, and could not reasonably know or have learned through reasonable diligence that Roundup® and/or glyphosate contact, exposed Plaintiff to the risks alleged herein and that those risks were the direct and proximate result of Defendant's acts and omissions.  Plaintiffs had no way of knowing about the risk of serious illness associated with the use of and/or exposure to Roundup and glyphosate until in or about April 2019 when the Helmich family first made the possible

---

[11] Monsanto.com; Get the Facts: Glyphosate and Roundup Brand Herbicides, Last Updated September 23, 2019.

connection between Roundup® and Gerald Helmich's cancer diagnosis after seeing a lawyer advertisement on television.

124.   Furthermore, Defendant is estopped from relying on any statute of limitations because of its fraudulent concealment of the true character, quality and nature of Roundup®. Defendant was under a duty to disclose the true character, quality, and nature of Roundup® because this was non-public information over which Defendant had and continues to have exclusive control, and because Defendant knew that this information was not available to Plaintiffs or to distributors of Roundup®. In addition, Defendant is estopped from relying on any statute of limitations because of its intentional concealment of these facts.

125.   Plaintiffs had no knowledge that Defendant Monsanto was engaged in the wrongdoing alleged herein.

126.   Because of the fraudulent acts of concealment of wrongdoing by Defendant, Plaintiffs could not have reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud should be considered. Defendant had the ability to and did spend enormous amounts of money in furtherance of its purpose of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Plaintiffs and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identities of related health risks, and were forced to rely on only the Defendant's representations. Accordingly, Defendant is precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

## FIRST CAUSE OF ACTION
### (NEGLIGENCE)

127.   Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint

contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

128.  Defendant had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup® into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

129.  Defendant failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup® into interstate commerce in that Defendant knew or should have known that using Roundup® created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of CLL or NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

130.  The negligence by the Defendant, its agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

> a.   Manufacturing, producing, promoting, formulating, creating, and/or☐ designing Roundup® without thoroughly testing it;
>
> b.   Failing to test Roundup® and/or failing to adequately, sufficiently, and☐ properly test Roundup®;
>
> c.   Not conducting sufficient testing programs to determine whether or not☐ Roundup® was safe for use; in that Defendant herein knew or should have☐ known that Roundup® was unsafe and unfit for use by reason of the dangers☐ to its users;
>
> d.   Not conducting sufficient testing programs and studies to determine☐ Roundup®'s carcinogenic properties even after

22

Defendant had knowledge☐ that Roundup® is, was, or could be carcinogenic;

e.      Failing to conduct sufficient testing programs to determine the safety of☐ "inert" ingredients and/or adjuvants contained within Roundup®, and the☐ propensity of these ingredients to render Roundup® toxic, increase the☐ toxicity of Roundup®, whether these ingredients are carcinogenic, magnify☐ the carcinogenic properties of Roundup®, and whether or not "inert"☐ ingredients and/or adjuvants were safe for use;

f      Negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup®;

g.      Negligently failing to petition the EPA to strengthen the warnings associated with Roundup®;

h.      Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup®;

i.      Negligently marketing, advertising, and recommending the use of Roundup® without sufficient knowledge as to its dangerous propensities;

j.      Negligently representing that Roundup® was safe for use for its intended purpose, and/or that Roundup® was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

k.      Negligently representing that Roundup® had equivalent safety and efficacy as other forms of herbicides;

l.      Negligently designing Roundup® in a manner, which was dangerous to its users;

m.      Negligently manufacturing Roundup® in a manner, which was dangerous to its users;

n.      Negligently producing Roundup® in a manner, which was dangerous to its users;

o.      Negligently formulating Roundup® in a manner, which was dangerous to its users;

p.      Concealing information from the Plaintiffs while knowing that Roundup® was unsafe, dangerous, and/or non-conforming with

EPA regulations; and

q.  Improperly concealing and/or misrepresenting information from the Plaintiffs, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup® compared to other forms of herbicides.

r.  Negligently selling Roundup® with a false and misleading label.

131. Defendant under-reported, underestimated, and downplayed the serious dangers of Roundup®.

132. Defendant negligently and deceptively compared the safety risks and/or dangers of Roundup® with common everyday foods such as table salt, and other forms of herbicides.

133. Defendant was negligent in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing, and selling of Roundup® in that they:

a.  Failed to use ordinary care in designing and manufacturing Roundup® so as to avoid the aforementioned risks to individuals when Roundup® was used as an herbicide;

b.  Failed to accompany its product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup®;

c.  Failed to accompany its product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup®;

d.  Failed to accompany its product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup®;

e.  Failed to warn Gerald Helmich of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of CLL or NHL;

f.  Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup®;

g.  Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup®'s "inert" ingredients and/or adjuvants;

        h.     Negligently misrepresented the evidence of Roundup®'s genotoxicity and carcinogenicity; and

        i.      Was otherwise careless and/or negligent.

134.    Despite the fact that Defendant knew or should have known that Roundup® caused, or could cause, unreasonably dangerous side effects, Defendant continued and continues to market, manufacture, distribute, and/or sell Roundup® to consumers, including the Plaintiff.

135.    Defendant knew or should have known that consumers such as the Plaintiff would foreseeably suffer injury as a result of Defendant's failure to exercise ordinary care, as set forth above.

136.    Defendant's violations of law and/or negligence were the proximate cause of Gerald Helmich's injuries and ultimate death as well as the harm and economic loss, which Plaintiff's family has suffered and/or will continue to suffer as a consequence of his death.

137.    As a result of the foregoing acts and omissions, the Plaintiffs suffered from serious and dangerous side effects including, but not limited to, fatal CLL, as well as other severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care leading up to his death.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury trial on all issues contained herein.

## SECOND CAUSE OF ACTION
## (STRICT PRODUCTS LIABILITY - DESIGN DEFECT)

138.   Plaintiffs repeat, reiterate and, re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

139.   At all times herein mentioned, the Defendant designed, researched, manufactured, tested, advertised, promoted, sold, distributed Roundup® as hereinabove described that was used by the Plaintiff.

140.   Defendant's Roundup® was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendant. At those times, Roundup® was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, the Plaintiff herein.

141.   The Roundup® designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup®.

142.   The Roundup® designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was defective in design and/or formulation, in that, when it left the hands of the Defendant manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

143.   At all times herein mentioned, Roundup® was in a defective condition and unsafe, and Defendant knew or had reason to know that said product was defective and unsafe,

26

especially when used in the form and manner as provided by the Defendant. In particular, Defendant's Roundup® was defective in the following ways:

    a.    When placed in the stream of commerce, Defendant's Roundup® products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate.

    b.    When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

    c.    When placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

    d.    Defendant did not sufficiently test, investigate, or study its Roundup® products.

    e.    Exposure to Roundup® presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

    f.    Defendant new or should have known at the time of marketing its Roundup® products that exposure to Roundup® and could result in cancer and other severe illnesses and injuries.

    g.    Defendant did not conduct adequate post-marketing surveillance of its Roundup® products.

144. Defendant knew, or should have known that at all times herein mentioned its Roundup® was in a defective condition, and was and is inherently dangerous and unsafe.

145. Gerald Helmich was exposed to Defendant's Roundup®, as described above, without knowledge of Roundup®'s dangerous characteristics.

146. At the time of the Plaintiff s use of and exposure to Roundup®, Roundup® was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

147. Defendant with this knowledge voluntarily designed its Roundup® with a dangerous

condition for use by the public, and in particular the Plaintiff.

148.    Defendant had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

149.    Defendant created a product that was and is unreasonably dangerous for its normal, intended use.

150.    Defendant marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

151.    The Roundup® designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant was manufactured defectively in that Roundup® left the hands of Defendant in a defective condition and was unreasonably dangerous to its intended users.

152.    The Roundup® designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendant reached its intended users in the same defective and unreasonably dangerous condition in which the Defendant's Roundup® was manufactured.

153.    Defendant designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to the Gerald Helmich in particular, and Defendant is therefore strictly liable for the injuries sustained by the Plaintiffs.

154.    The Plaintiffs could not, by the exercise of reasonable care, have discovered Roundup®'s defects herein mentioned or perceived its danger.

155.    By reason of the foregoing, the Defendant has become strictly liable to the Plaintiffs for the

manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup®.

156.    Defendant's defective design, of Roundup® amounts to willful, wanton, and/or reckless conduct by Defendant.

157.    Defects in Defendant's Roundup® were the cause or a substantial factor in causing Plaintiffs injuries.

158.    As a result of the foregoing acts and omission, Gerald Helmich developed CLL, and suffered severe and personal injuries, which were permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care leading up to his untimely death.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury trial on all issues contained herein.

## THIRD CAUSE OF ACTION
## (STRICT PRODUCTS LIABILITY - FAILURE TO WARN)

159.    Plaintiffs repeat, reiterate and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

160.    Defendant has engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting Roundup®, and through that conduct have knowingly and intentionally placed Roundup® into the stream of commerce with full knowledge that it reaches consumers such as Gerald Helmich who are exposed to it

through ordinary and reasonably foreseeable uses.

161. Defendant did in fact sell, distribute, supply, manufacture, and/or promote Roundup® to Plaintiff. Additionally, Defendant expected the Roundup® that it was selling, distributing, supplying, manufacturing, and/or promoting to reach - and Roundup® did in fact reach - consumers, including Gerald Helmich, without any substantial change in the condition of the product from when it was initially distributed by Defendant.

162. At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

163. At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Defendant and at the time Plaintiff was exposed to and/or ingested the product. The defective condition of Roundup® was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing non-Hodgkin's lymphoma as a result of exposure and use.

164. Roundup® did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect the health of those exposed in violation of 7 U.S.C. § 136j(a)(l)(E).

165. Defendant's failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. § 136j(a)(l)(E) as well as the laws of the State of New York.

166. Defendant could have amended the label of Roundup® to provide additional warnings.

167. This defect caused serious injury to Plaintiff, who used Roundup® in its intended and foreseeable manner.

168. At all times herein mentioned, Defendant had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

169. Defendant labeled, distributed, and promoted the aforesaid product that it was dangerous and unsafe for the use and purpose for which it was intended.

170. Defendant failed to warn of the nature and scope of the side effects associated with Roundup®, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of NHL.

171. Defendant Monsanto was aware of the probable consequences of the aforesaid conduct. Despite the fact that Defendant knew or should have known that Roundup® caused serious injuries, Defendant failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of developing NHL from Roundup® exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution. Defendant willfully and deliberately failed to avoid the consequences associated with its failure to warn, and in doing so, Defendant acted with a conscious disregard for the safety of Gerald Helmich and other farmers.

172. At the time of exposure, Plaintiffs could not have reasonably discovered any defect in Roundup® prior through the exercise of reasonable care.

173. Defendant, as the manufacturer and/or distributor of the subject product, is held to the

level of knowledge of an expert in the field.

174.    Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Defendant.

175.    Had Defendant properly disclosed the risks associated with Roundup® products, Plaintiff would have avoided the risk of NHL by not using Roundup® products.

176.    The information that Defendant did provide or communicate failed to contain adequate warnings and precautions that would have enabled Plaintiff, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup® and glyphosate; continued to promote the efficacy of Roundup®, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate. To this day, Defendant has failed to adequately warn of the true risks of Plaintiff s injuries associated with the use of and exposure to Roundup®.

177.    As a result of its inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiff.

178.    As a direct and proximate result of Defendant's actions as alleged herein, and in such other ways to be later shown, the subject product caused Plaintiff to sustain injuries as herein alleged.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs'

favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury trial on all issues contained herein.

## FOURTH CAUSE OF ACTION
## (BREACH OF IMPLIED WARRANTIES)

179. Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

180. At all times herein mentioned, the Defendant manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold Roundup® as a broad spectrum herbicide. These actions were under the ultimate control and supervision of Defendant.

181. At the time Defendant marketed, sold, and distributed Roundup® for use by Plaintiff, Defendant knew of Roundup®'s intended use and impliedly warranted the product to be or merchantable quality and safe and fit for this use. The Defendant impliedly represented and warranted to Plaintiffs and users of Roundup®, the agricultural community, and/or the EPA that Roundup® was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.

182. These representations and warranties were false, misleading, and inaccurate in that Roundup® was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

183. Plaintiffs and/or the EPA did rely on said implied warranty of merchantability of fitness for particular use and purpose.

184. Plaintiffs reasonably relied upon the skill and judgment of Defendant as to whether Roundup® was of merchantable quality and safe and fit for its intended use.

185. Roundup® was injected into the stream of commerce by the Defendant in a defective, unsafe, and inherently dangerous condition, and the products' materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

186. The Defendant breached the aforesaid implied warranties, as its herbicide Roundup® was not fit for its intended purposes and uses.

187. As a result of the foregoing acts and omissions, Plaintiff suffered from NHL and Plaintiff suffered severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic, and non-economic damages leading up to his death.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury trial on all issues contained herein.

## FIFTH CAUSE OF ACTION
## (WRONGFUL DEATH)

188. Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

189. Plaintiffs bring this claim on behalf of and for the benefit of the Plaintiff Gerald

Helmich's lawful beneficiaries.

190.  As a direct and proximate result of the conduct of the Defendant and the defective nature of Roundup® as outlined above, Plaintiff Gerald Helmich suffered bodily injury resulting in pain and suffering, disability, disfigurement, mental anguish, loss of capacity of the enjoyment of life, shortened life expectancy, expenses for hospitalization, medical and nursing treatment, loss of earnings, loss of ability to earn, funeral expenses and death.

191.  As a direct and proximate cause of the conduct of Defendant, Gerald Helmich's beneficiaries have incurred hospital, nursing and medical expenses, estate administration expenses and loss of earnings as a result of Gerald Helmich's illness and subsequent death. Plaintiffs bring this claim on behalf of Gerald Helmich's lawful beneficiaries for these damages and for all pecuniary losses under applicable state statutory and/or common laws.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury trial on all issues contained herein.

## SEVENTH CAUSE OF ACTION
## (SURVIVAL ACTION)

192.  Plaintiffs repeat, reiterate, and re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

193.  As a direct and proximate result of the conduct of Defendant, where appropriate, Gerald Helmich, prior to his death, closed down Helmich Farm causing the family to lose future

earnings and income. Gerald Helmich also was obligated to spend various sums of money to treat his injuries, which debts have been assumed by the Estate. As a direct and proximate cause of the aforesaid, Gerald Helmich endured pain and suffering, mental anguish and impairment of the enjoyment of life, until the date of his death; and, as a direct and proximate result of the aforesaid, Gerald Helmich's lawful beneficiaries suffered a loss of earnings and earning capacity, loss of enjoyment, etc. Plaintiffs bring this claim on behalf of Gerald Helmich's estate under applicable state statutory and/or common laws of the State of New York.

194. As a direct and proximate result of the conduct of Defendant, Gerald Helmich and his spouse and heirs, until the time of his death, suffered a disintegration and deterioration of the family unit and the relationships existing therein, resulting in enhanced anguish, depression and other symptoms of psychological stress and disorder.

195. As a direct and proximate result of the aforesaid, Gerald Helmich's spouse, Helen Helmich as Personal Representative of the estate of Gerald Helmich, brings the claim on behalf of the estate for damages under applicable statutory and/or common laws, and in his own right.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper. Additionally, Plaintiffs demand a jury trial on all issues contained herein.

**<u>PRAYER FOR RELIEF</u>**

**WHEREFORE**, Plaintiffs demand judgment against the Defendant on each of the above-referenced claims and causes of action and as follows:

1. Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

2. Awarding compensatory damages to Plaintiffs for past and future damages, including, but not limited to, Plaintiffs pain and suffering and for severe and permanent personal injuries sustained by the Plaintiffs including health care costs and economic loss;

3. Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action;

4. Pre-judgment interest;

5. Post-judgment interest;

6. Awarding Plaintiffs' reasonable attorneys' fees;

7. Awarding Plaintiffs the costs of these proceedings; and

8. Such other and further relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand trial by jury as to all issues.

**WHEREFORE**, the Plaintiff, THE ESTATE OF GERALD HELMICH, demand judgment jointly and severally against Defendants for his first and second causes of action, together with the costs and disbursements of this action.

Dated: March 30, 2020
Northport, New York

JESSICA D. SPARACINO, ESQ.
SPARACINO & SPARACINO, PLLC.
Attorneys for the Plaintiff
131 Scudder Avenue
Northport, NY 11768
(631)-651-8783

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ESTATE OF GERALD HELMICH, by and through
His representative, Helen Helmich, surviving spouse of
Gerald Helmich on behalf of all legal heirs of Gerald
Helmich,

Index No.:

                    Plaintiff,

    - against -

MONSANTO COMPANY,

                    Defendant.

# COMPLAINT

## SPARACINO & SPARACINO, PLLC.

Attorneys for Plaintiff

Office and Post Office Address
131 Scudder Avenue
Northport, NY 11768
Phone: 631.651.8783

Pursuant to 22 NYCRR 130-1.1a, the undersigned, an attorney duly admitted to practice law before the Courts of the State of New York, certifies that upon information and belief and after reasonable inquiry, the allegations contained in the annexed document are not frivolous.

Jessica D. Sparacino, Esq.

Dated: March 30, 2020
       Northport, NY