Cat08,Knepp

# U.S. District Court
## Northern District of Ohio (Toledo)
## CIVIL DOCKET FOR CASE #: 3:20–cv–00716–JZ

Augsburger et al v. Monsanto Company
Assigned to: Judge Jack Zouhary
Demand: $75,000
Cause: 28:1332 Diversity–Product Liability

Date Filed: 04/02/2020
Jury Demand: Plaintiff
Nature of Suit: 367 Personal Injury: Health
Care/Pharmaceutical Personal Injury
Product Liability
Jurisdiction: Diversity

**Plaintiff**

**Wanda Augsburger**

represented by **Jonathan M. Ashton**
Gallon, Takacs, Boissoneault & Schaffer
3516 Granite Circle
Toledo, OH 43617
419–843–2001
Fax: 419–841–2608
Email: jashton@gallonlaw.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Brad Augsburger**

represented by **Jonathan M. Ashton**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 04/02/2020 | 1 | **Complaint** with jury demand against Monsanto Company. Filing fee paid $ 400, Receipt number AOHNDC–9898538Filed by Wanda Augsburger , BradAugsburger . (Attachments: # 1 Civil Cover Sheet, # 2 Summons) (Ashton, Jonathan) (Entered: 04/02/2020) |
| 04/02/2020 | | Judge Jack Zouhary assigned to case. (R,Ke) (Entered: 04/02/2020) |
| 04/02/2020 | | Random Assignment of Magistrate Judge pursuant to Local Rule 3.1. In the event of a referral, case will be assigned to Magistrate Judge James R. Knepp, II. (R,Ke) (Entered: 04/02/2020) |
| 04/02/2020 | 2 | Original Summons and Magistrate Consent Form issued to counsel for service upon Monsanto Company. (Attachments: # 1 Magistrate Consent Form) (R,Ke) (Entered: 04/02/2020) |
| 04/02/2020 | | **Notice re Prompt Service.** Counsel for Plaintiff is responsible for **promptly** serving the Complaint on Defendant(s) upon receiving the issued summons from the Clerk and, after service has been perfected, electronically filing a Return of Service or an executed Waiver of Service for each Defendant. <br><br> Service is to be accomplished pursuant to Fed. R. Civ. P. 4, which includes provisions for personal service and waiver of service, and Local Rule 4.2. If you wish the Clerk to serve the Complaint on Defendant(s) (a seldom used alternative because it does not save time or money), you **must** provide the Clerk's office with copies of the Complaint along with other necessary documents, in the manner set forth in Local Rule 4.2(a). <br><br> After Defendant(s) have been served and counsel enter an appearance, this Court will promptly hold an Initial Phone Status Conference. No Motion to Dismiss may be filed |

| | | in advance of this Conference. The responsive pleading deadline will be automatically tolled until that time. (R,Ke) (Entered: 04/02/2020) |
|---|---|---|
| 04/02/2020 | 3 | Civil Case Management Procedures Order. Judge Jack Zouhary on 4/2/2020. (R,Ke) (Entered: 04/02/2020) |

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## TOLEDO DIVISION

| | | |
|---|---|---|
| **WANDA AUGSBURGER**<br>**and**<br>**BRAD AUGSBURGER,**<br><br>                    **Plaintiffs,**<br><br><br><br><br><br><br><br>**MONSANTO COMPANY**<br><br>                    **Defendant.** | ) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) | Case No.:  3:20-cv-716<br><br><br>**COMPLAINT WITH**<br>**JURY DEMAND ENDORSED**<br>**HEREIN** |

### COMPLAINT

Now come Plaintiffs Wanda Augsburger and Brad Augsburger ("Plaintiffs"), by and through their undersigned counsel, and, for their Complaint against Defendant Monsanto Company ("Defendant"), hereby allege:

### NATURE OF THE CASE

1. This is an action for damages suffered by Plaintiff Wanda Augsburger as a direct and proximate result of Defendant's tortious, negligence, and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup, containing the active ingredient glyphosate.

1

2. Plaintiffs maintain that Roundup and/or glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper warnings and directions as to the dangers associated with its use.

3. Plaintiff Wanda Augsburger's injuries, like other similarly situated victims across the country, were avoidable.

4. "Roundup" refers to all formulations of Monsanto's Roundup, including but not limited to: Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fender and Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Original 2k Herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Pro Dry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Preventer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Weed & Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass Killer Ready-to-Use 1, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over Defendants and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiffs and Defendant.

2

Defendant is incorporated and has their principal place of business outside the state in which the Plaintiffs reside.

6. The amount in controversy between Plaintiff and Defendant exceeds $75,000, exclusive of interest and cost.

7. The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

8. Venue is proper within this district pursuant to 28 U.S.C. § 1391 in that Defendant conducts business here and it subject to personal jurisdiction in this district. Furthermore, Defendant sells, markets, and/or distributes Roundup within the Northern District of Ohio. Also, a substantial part of the acts and/or omissions giving rise to these claims occurred within this district.

## PARTIES

9. Plaintiff Wanda Augsburger is a resident and citizen of Allen County, Ohio. Plaintiff brings this action for personal injuries sustained by the exposure to Roundup containing the active ingredient glyphosate and the surfactant polyethoxylate tallow amine ("POEA"). Plaintiff used Roundup products from approximately 1970 to 2016. Plaintiff would spray Roundup weed killer periodically a few times a week at her residential home and apartment complex she owned to kill and control the weeds in yard, garden, landscaping during the spring, summer and fall seasons. As a direct and proximate result of being exposed to Roundup, Plaintiff Wanda Augsburger developed Chronic Lymphocytic Leukemia (CLL) b-cell type approximately on March 14, 2016.

10. Plaintiff Brad Augsburger is and was at all relevant times a resident and citizen of Allen County, Ohio. Mr. Augsburger is the spouse of Mrs. Wanda Augsburger and has a claim for loss of consortium to the injuries of his wife.

3

11. Defendant Monsanto is and was at all relevant times a Delaware corporation with its principal place of business located in St. Louis, Missouri. Defendant is authorized to do business in Ohio and is doing business in Ohio.

12. Monsanto should be served at its registered agent for service of process: Corporation Service Company, 50 West Broad Street, Suite 1330, Columbus, OH 43215.

13. Monsanto advertises and sells goods, specifically Roundup, throughout Ohio.

14. Monsanto transacted and conducted business within Ohio that relates to the allegations in this Complaint.

15. Monsanto derived substantial revenue from goods and products used in Ohio.

16. Monsanto expected or should have expected its acts to have consequences within Ohio and derived substantial revenue from commerce in Ohio and from interstate commerce.

17. Monsanto engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup.

18. Monsanto purposefully availed itself of the privilege of conducting activities within Ohio, thus invoking the benefits and protections of its laws.

19. Plaintiffs are informed and believe, and based therein allege, that in committing the acts alleged herein, each and every managing agent, representative, and/or employee of the collective Defendant were working within the course and scope of said agency, representation and/or employment with the knowledge, consent, ratification, and authorization of the Defendant and its directors, officers, and/or managing agents.

## FACTUAL ALLEGATIONS

4

20. At all times relevant, Defendant was in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or has acquired and is responsible for the commercial herbicide Roundup.

21. Defendant is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate.

22. Defendant discovered the herbicidal properties of glyphosate during the 1970s and subsequently began to design, research, manufacture, sell and distribute-based Roundup as a broad-spectrum herbicide.

23. Glyphosate is the active ingredient in Roundup.

24. Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

25. Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvyshikimate-3-phosphate synthase, known as EPSP synthase.

26. Glyphosate inhibits the enzyme 5-enolpyruvyshikimate-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

27. Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

28. Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

5

29. Defendant is intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are markets as being resistant to Roundup (called "Roundup Ready"). As of 2009, Defendant Monsanto was the world's leading producer of seeds designed to be Roundup Ready. In 2010, as estimated 70% of corn and cotton, and 80% or soybean fields in the United States contained Roundup Ready seeds.

30. The original Roundup, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the world's most widely used herbicides.[1]

31. For nearly 40 years, consumers, farmers, and the public have used Roundup, unaware of its carcinogenic properties.

**A. Registration of Herbicides Under Federal Law**

32. The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. § 136a(a).

33. As part of the registration process the EPA requires a variety of tests to evaluate the potential for exposure to pesticides, toxicity, to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe", but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. §136(a)(c)(5)(D).

---

[1] *Backgrounder,* History of Monsanto's Glyphosate Herbicides, June 2005.

34. FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

35. The EPA and the State of Missouri registered Roundup for distribution, sale, and manufacture in the United States and the State of Missouri.

36. FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

37. The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is not in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 139a-1. In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

38. In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment – in relation to the registration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015 but delayed releasing the assessment pending further review in light of the World Health Organization's March 24, 2015 finding that glyphosate is a "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

**B.**   Monsanto's False Representations Regarding the Safety of Roundup

39. In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto
    based on its false and misleading advertising of Roundup products. Specifically, the
    lawsuit challenged Monsanto's general representations that its spray-on glyphosate-base
    herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to
    mammals, birds, and fish. Among the representations the NYAG found deceptive and
    misleading about the human and environmental safety of Roundup are the following:

    a.   Remember that environmentally friendly Roundup herbicide is biodegradable. It
         won't build up in the soil so you can use Roundup with confidence along
         customers' driveways, sidewalks, and fences...

    b.   And remember that Roundup is biodegradable and won't build up in the soil. That
         will give you the environmental confidence you need to use Roundup everywhere
         you've got a weed, brush, edging or trimming problem.

    c.   Roundup biodegrades into naturally occurring elements.

    d.   Remember that versatile Roundup herbicide stays where you put it. That means
         there's no washing or leaching to harm customers' shrubs or other desirable
         vegetation.

    e.   This non-residual herbicide will not wash or leach in the soil. It ... stays where
         you apply it.

    f.   You can apply accordingly with "confidence because it will stay where you put
         it" it bonds tightly to soil particles, preventing leaching. Then, soon after
         application, soil microorganisms biodegrade accordingly into natural products.

    g.   Glyphosate is less toxic to rats than table salt following acute oral ingestion.

8

h. Glyphosate's safety margin is much greatly than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i. You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of "practically non-toxic" as it pertains to mammals, birds and fish.

j. "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup. [2]

40. Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief it still has not done so today.

41. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and it "left the soil clean."[3]

## C. Evidence of Carcinogenicity in Roundup

42. As early as the 1980s, Monsanto was aware of glyphosate's carcinogenic properties.

43. On March 4, 1985, a group of EPA's Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[4] Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

44. In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate,

---

[2] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996)

[3] Monsanto Guilty in 'False Ad' Row, BBC, Oct. 15, 2009, available at http://bbc.co.uk/2/hi/europe/8308903.stm.

[4] Consensus Review of Glyphosate, Casewell NO. 661A. March 4, 1985. United States Environmental Protection Agency.

toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.[5]

45. In October 1991, the EPA published a Memorandum entitled, "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.[6]

46. In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Monsanto's Roundup products are more dangerous and toxic that alone.[7] As early as 1991 evidence exited demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.[8]

47. In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

48. The study found that Monsanto's Roundup caused delays in cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

49. In 2004, Julie March published a study entitled "Glyphosate-based pesticide affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

50. The study noted that "cell cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle

---

[5] http://www.epa.gov/oppsrdd1/reregistration/REDs/factsheets/0178fact.pdf
[6] Second Peer Review of Glyphosate, CAS No. 1071-83-6. October 30, 1991. United States Environmental Protection Agency.
[7] Martinez et al. 2007; Benachour 2009; Gasnier et al. 2010; Peixoto 2005; Marc 2004
[8] Martinez et al. 1991.

10

disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[9]

51. In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

52. The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possibly synergy between glyphosate and Roundup formulation products.

53. In 2009, Nora Benachhour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic, and placental cells.

54. The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determination of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

55. The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Monsanto.

---

[9] Molinari, 2000; Stewart et al., 2003.

56. Monsanto knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant of POEA were necessary to protect Plaintiff from Roundup.

57. Monsanto know or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

58. Monsanto failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup.

59. Rather than performing appropriate tests, Monsanto relied upon flawed industry-supported studies designed to protect Monsanto's economic interests rather than Plaintiff and the consuming public.

60. Despite its knowledge that Roundup was considerably more dangerous than glyphosate alone, Monsanto continued to promote Roundup as safe.

**D. IARC Classification of Glyphosate**

61. The International Agency for Research on Cancer ("IRAC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

62. An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015-2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

63. IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on

12

public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessibly, peer-reviewed data.

64. On March 24, 2015 after its cumulative review of human, animal and DNA studies for more than one (1) year, many of which have been in Monsanto's possession since as early as 1985, IARC's working group published its conclusion that the glyphosate contained in Monsanto's Roundup herbicide is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals. IARC's full Monograph was published on July 29, 2015, and established glyphosate as a class 2A probable carcinogen to humans.

65. The IARC Working Group found an increased risk between exposure and glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

66. The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells.

## E. Earlier Evidence of Glyphosate's Danger

67. Despite the new classification by the IARC, Monsanto has had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

68. Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutation, which is a process that is believed to lead to cancer.

13

69. In 1997, Chris Clements published "Genotoxicity of select herbicides in Rana catesbeiana tadpoles using the alkaline single-sell DNA electrophoresis (comet) assay."

70. The study found that tadpoles exposed to Roundup show significant DNA damage when compared with unexposed control animals.

71. Both human and animal studies have shown that glyphosate and glyphosate-based formulation such as Roundup can induce oxidative stress.

72. Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

73. The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

74. In 2006, César Paz-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

75. The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

76. The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

77. Despite the knowledge to the contrary, Monsanto maintains that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

14

78. In addition to glyphosate and Roundup's genotoxic properties, Monsanto has long been aware of glyphosate's carcinogenic properties.

79. Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

80. Monsanto has known of this association since the early mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

81. In 1985, EPA studied that effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

82. In 2003, Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

83. The study concluded glyphosate had the most significant relationship to NHL among all herbicides studies with an increased odds ratio of 3.11.

84. In 2003, AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risks for NHL.

85. The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

86. In 2008, Mikael Eriksson published a population based on case-control study of exposure to various pesticides as a risk factor for NHL.

87. This strengthened previous associations between glyphosate and NHL.

88. In spite of this knowledge, Monsanto continues to issue broad and sweeping statements suggesting the Roundup was, and is, safer than ordinary household items such as tale salt,

15

despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

89. Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiff, the grounds-keeping community, the agricultural community, and the public at large to purchase and increase the use of Monsanto's Roundup for Monsanto's pecuniary gain, and in fact, did induce Plaintiff to use Roundup.

90. Monsanto made these statements with complete disregard and reckless indifference to the safety of Plaintiff and the general public.

91. Notwithstanding Monsanto's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

92. Monsanto knew of should have known that glyphosate is associated with an increased risk of develop cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

93. Monsanto failed to appropriately and adequately inform and warn Plaintiff of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of lies, and the need for medical treatment, monitoring and/or medications.

94. Despite IRAC's classification of glyphosate as a class 2A probably carcinogen, Monsanto continues to maintain the glyphosate and/or Roundup is safe, non-carcinogenic, non-

genotoxic, and falsely warrant to users and the general public that independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

95. Monsanto has claimed and continues to claim that Roundup is safe, non-carcinogenic, and non-genotoxic. These misrepresentations are consistent with Monsanto's cavalier approach to investigating and ensuring the safety of its products, the safety of the public at large, and the safety of Plaintiff.

**F.  Scientific Fraud Underlying the Safety Determinations of Glyphosate**

96. After the EPA's 1985 classification of glyphosate as possibly carcinogenic to humans (Group C), Monsanto exerted pressure upon the EPA to change its classification.

97. This culminated in the EPA's reclassification of glyphosate to Group E, which was based upon evidence of non-carcinogenicity in humans.

98. In so classifying, the EPA stated that "[i]t should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."

99. On two occasions, the EPA found that laboratories hired Monsanto to test the toxicity of its Roundup products for registration purposes committed scientific fraud.

100.     In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies relating to Roundup. IBT performed approximately 30 tests on glyphosate and glyphosate-containing products, including 11 of the 19 chronic toxicology studies needed to register Roundup with the EPA.

101.     In 1976, The Food and Drug Administration ("FDA") performed an inspection of
         IBT and discovered discrepancies between the raw data and the final report relating to
         toxicological impacts of glyphosate. The PED subsequently audited IBT and determined
         that the toxicology studies conducted for Roundup were invalid. An EPA reviewer stated,
         after finding "routine falsification of data" at IBT, that is was "hard to believe the
         scientific integrity of the studies when they said they took specimen of the uterus from
         male rabbits."

102.     Three top executives of IBT were convicted of fraud in 1983.

103.     In the second incident, Monsanto hired Craven Laboratories ("Craven") in 1990
         to perform pesticide and herbicide studies, including several studies of Roundup.

104.     In March of 1991, the EPA announced that it was investigating Craven for
         "allegedly falsifying test data used by chemical firms to win EPA approval of pesticides."

105.     The investigation lead to the indictments of the laboratory owner and a handful of
         employees.

**G. Monsanto's Continuing Disregard for the Safety of Plaintiff and the Public**

106.     Monsanto claims on its website "[r]egulatory authorities and independent experts
         around the world have reviewed numerous long-term/carcinogenicity and genotoxicity
         studies and agree that there is no evidence that glyphosate, the active ingredient in
         Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at
         very high doses, and that it is not genotoxic."[10]

107.     Ironically, the primary source of this statement is a 1986 report by the WHO, the
         same organization that now considers glyphosate to be a probably carcinogen.

---

[10] Backgrounder – Glyphosate: No Evidence of Carcinogenicity. Updated November 2014.
(downloaded October 9 2015)

108.    Glyphosate, and Monsanto's Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

109.    Monsanto's statement proclaiming the safety of Roundup and disregarding its dangers misled Plaintiff.

110.    Despite Monsanto's knowledge that Roundup was associated with an elevated risk of developing cancer, Monsanto's promotional campaigns focused on Roundup's purported "safety profile."

111.    Monsanto's failure to adequately warn Plaintiff resulted in (1) Plaintiff using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pets; and (2) scientists and physicians failing to warn and instruct consumers about the risks of cancer, including NHL, and other injuries associated with Roundup.

112.    Monsanto failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

113.    The failure of Monsanto to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

114.    The failure of Monsanto to appropriately warn and inform EPA has resulted in the directions for use that are not adequate to protect health and the environment.

115.    By reason of the foregoing acts and omissions, Plaintiff seeks compensatory damages as a result of Plaintiff's use of, and exposure to, Roundup which caused od was a substantial contributing factor in causing Plaintiff to suffer from cancer, specifically

19

NHL, and Plaintiff suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

116.    By reason of the foregoing, Plaintiff is severely and permanently injured.

117.    By reason of the foregoing acts and omissions, Plaintiff has endured and, in some categories continues to suffer, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of the actions and inactions of the Monsanto.

## PLAINTIFF EXPOSURE TO ROUNDUP
## EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

118.    Plaintiffs incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

119.    If applicable, the running of any statute of limitations has been tolled by reason of Defendant's fraudulent concealment. Defendant, through its affirmative misrepresentations and omissions, actively concealed from Plaintiffs the true risks associated with Roundup and glyphosate.

120.    At all relevant times, Defendant has maintained that Roundup is safe, non-toxic, and non-carcinogenic.

121.    Indeed, even as of July 2016, Monsanto continues to represent to the public that "Regulatory authorities and independent experts around the world have reviewed numerous++ long-term/carcinogenicity and genotoxicity studies and *agree* that there is *no evidence* that glyphosate, the active ingredient in Roundup brand herbicides and other

20

glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic." (emphasis added).[11]

122.      As a result of Monsanto's actions, Plaintiffs were unaware, and could not reasonably know or have learned through reasonable diligence that Roundup and/or glyphosate contact, exposed Plaintiff Wanda Augsburger to the risks alleged herein and that those risks were a direct and proximate result of Monsanto's acts and omissions.

123.      As a result of his injury, the Augsburger's have incurred significant economic and non-economic damages.

124.      Furthermore, Monsanto is estopped from relying on any statute of limitations because of its fraudulent concealment of the true character, quality and nature of Roundup. Monsanto was under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Monsanto had and continues to have exclusive control, and because Monsanto knew that this information was not available to the Plaintiff, the public or distributors of Roundup.

125.      In addition, Monsanto is estopped from relying on any statute of limitations because of its intentional concealment of these facts.

126.      Plaintiffs had no knowledge that Monsanto was engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Monsanto, Plaintiffs could not have reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud should be considered. Monsanto had the ability to and did spend enormous amounts of money in furtherance of its purpose of marketing, promoting, and/or distributing a profitable herbicide, notwithstanding the known or

---

[11] Backgrounder – Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9 2015).

reasonably known risks. Plaintiffs and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extend, and identify of related health risks, and were forced to rely on the Monsanto's representations. Accordingly, Monsanto is precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

## FIRST CAUSE OF ACTION
## NEGLIGENCE

127.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein, and further allege:

128.    Monsanto had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sales, and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangers side effects.

129.    Monsanto failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup into interstate commerce in that Monsanto knew of or should have known that using Roundup created a high risk or unreasonable, dangerous side effects, including, but not limited, to the development of NHL, as well as other personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

130.    At all times relevant to this litigation, Roundup products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for the use by or exposure to the public, and, in particular, the Plaintiff.

131.    At all times relevant to this litigation, Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Missouri and throughout the United States, including Plaintiff, without substantial changes in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

132.    Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when the left the hands of the manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to the extend beyond that which an ordinary consumer would contemplate.

133.    Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation that when they left the hands of the manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

134.    At all times relevant to this action, Monsanto knew or had reason to know that Roundup products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

135.    The negligence of Monsanto, its agents, servants, and/or employees, included but was no limited to the following acts and/or omissions:

   a.   Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly testing it;

23

b. Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup;

c. Not conducting sufficient testing programs to determine whether or not Roundup was safe for use; in that Monsanto herein knew of should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users;

d. Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Monsanto had knowledge that Roundup is, was, or could be carcinogenic.

e. Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

f. Negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

g. Negligently failing to petition the EPA to strengthen the warnings associated with Roundup;

h. Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

i. Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

     j.   Negligently representing that Roundup was safe for sue for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

     k.   Negligently representing that Roundup had equivalent safety and efficacy as other forms or herbicides;

     l.   Negligently designing Roundup in a manner, which was dangerous to its users;

     m.  Negligently manufacturing Roundup in a manner, which was dangerous to its users;

     n.   Negligently producing Roundup in a manner, which was dangerous to its users;

     o.   Negligently formulating Roundup in a manner, which was dangerous to its users;

     p.   Concealing information from the Plaintiff while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations;

     q.   Improperly concealing and/or misrepresenting information form the Plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides; and

     r.   Negligently selling Roundup with a false and misleading label.

136.     Monsanto underreported, underestimates, and downplayed the serious dangers of Roundup.

137.     Monsanto negligently and deceptively compare the safety risks and/or dangers of Roundup with common everyday foods such as table salt and other forms of herbicides.

138.     Monsanto's violations of law and/or negligence were the proximate cause of Plaintiffs' injuries, harm and economic loss, which Plaintiff suffered and/or will continue to suffer.

139.    As a result of the foregoing acts and omissions, Plaintiff suffered from serious and
dangerous side effects including, but not limited to CLL b-cell type, as well as other
severe and personal injuries which are permanent and lasting in nature, physical pain and
mental anguish, diminished enjoyment of life, and financial expenses for hospitalization
and medical care.

140.    Monsanto's conduct was committed with knowing, reckless, conscious, wanton,
willful, and deliberate disregard for the value of human life and the rights and safety of
consumers, including Plaintiff, thereby entitling Plaintiff to punitive and exemplary
damages so as to punish and deter similar conduct in the future.

141.    WHEREFORE, Plaintiffs respectfully request this Court enter judgement in
Plaintiffs' favor for compensatory and punitive damages, together with interest, costs
herein occurred, attorneys' fees and all relief as this Court deems just and proper.

## SECOND CAUSE OF ACTION
## STRICT PRODUCT LIABILITY – DESIGN DEFECT

142.    Plaintiffs incorporate by reference all proceeding paragraphs of this Complaint as
if fully set forth herein, and further allege:

143.    At all times herein mentioned, the Monsanto designed, researched, manufactured,
tested, advertised, promoted, sold, and distributed Roundup as hereinabove described that
was used by the Plaintiff.

144.    Monsanto's Roundup was expected to and did reach the usual consumers,
handlers, and persons coming into contact with said product without substantial change in
the condition in which it was produced, manufactured, sold, distributed, and marketed by
Monsanto.

26

145.    At those times, Roundup was in an unsafe, defective and inherently dangerous condition, which was dangerous to users, and in particular, the Plaintiff herein.

146.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Monsanto was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup.

147.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Monsanto was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, it was unreasonably dangerous, unreasonably in normal use, and it was more dangerous than an ordinary consumer would expect.

148.    At all times herein mentioned, Roundup was in a defective condition and unsafe, and Monsanto knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by Monsanto.

149.    In particular, Monsanto's Roundup was defective in the following ways:

    a.  When placed in the stream of commerce, Monsanto's Roundup products were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate.

    b.  When placed in the stream of commerce, Monsanto's Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner,

27

    c. When placed in the stream of commerce, Monsanto's Roundup products contained unreasonably dangerous design defects and were not reasonably sage when used in a reasonably anticipated manner.

    d. Monsanto did not sufficiently test, investigate, or study its Roundup products.

    e. Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

    f. Monsanto knew or should have known at the time of marketing its Roundup products that exposure to Roundup could result in cancer and other severe illnesses and injuries.

    g. Monsanto did not conduct adequate post-marketing surveillance of its Roundup products.

150. Monsanto knew or should have known that at all times herein mentioned its Roundup was in a defective condition and was and is inherently dangerous and unsafe.

151. Plaintiff was exposed to Monsanto's Roundup, as described above, without knowledge or Roundup's dangerous characteristics.

152. At the time of Plaintiff's use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

153. Monsanto, with this knowledge, voluntarily designed its Roundup with a dangerous condition for use by the public, and in particular the Plaintiff.

154. Monsanto created a product that was and is unreasonably dangerous for its normal, intended use.

155.   Monsanto marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

156.   The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Monsanto was manufactured defectively in that Roundup left the hands of Monsanto in a defective condition and was unreasonably dangerous to its intended users.

157.   The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Monsanto reached its intended users in the same defective and unreasonably dangerous condition in which the Monsanto's Roundup was manufactured.

158.   Monsanto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed a defective product, which created an unreasonable risk to the health or consumers and to the Plaintiff in particular, and Monsanto is therefore strictly liable for the injuries sustained by the Plaintiff.

159.   The Plaintiff could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its dangers.

160.   By reason of the foregoing, Monsanto has become strictly liable to the Plaintiff for the manufacturing, marketing, promoting, distribution, and selling or a defective product, Roundup.

161.   Monsanto's defective design of Roundup amounts to willful, wanton, and/or reckless conduct by Monsanto.

162.     Defects in Monsanto's Roundup were the cause or s substantial factor in causing

Plaintiff's injuries.

163.     As a result of the foregoing acts and omissions, the Plaintiff developed high grade

NHL, and suffered severe and personal injuries, which are permanent and lasting in

nature, physical pain and mental anguish, including diminished enjoyment of life, and

financial expenses for hospitalizations and medical care.

164.     Monsanto's conduct was committed with knowing, reckless, conscious, wanton,

willful, and deliberate disregard for the value of human life and the rights and safety of

consumers, including Plaintiff, thereby entitling Plaintiff to punitive and exemplary

damages so as to punish and deter similar conduct in the future.

WHEREFORE, Plaintiffs respectfully request this court to enter judgement in

Plaintiff's favor for compensatory and punitive damages, together with interest, costs

herein incurred, attorneys' fees and all relief as this Court deems just and proper.

### THIRD CAUSE OF ACTION
### STRICT PRODUCT LIABILITY – FAILURE TO WARN

165.     Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if

fully set forth herein, and further allege:

166.     Monsanto has engaged in the business of selling, testing, distributing, supplying,

manufacturing, marketing, and/or promoting Roundup, and through that conduct have

knowingly and intentionally placed Roundup into the stream of commerce with full

knowledge that it reaches consumers such as Plaintiff who are exposed to it through

ordinary and reasonably foreseeable uses.

167.     Monsanto did in fact sell, distribute, supply, manufacture, and/or promote

Roundup to Plaintiff. Additionally, Monsanto expected the Roundup that it was selling,

distributing, supplying, manufacturing, and/or promoting to reach – and Roundup did in fact reach – consumers, including Plaintiff without any substantial change in the condition of the product from when it was initially distributed by Monsanto.

168.    At the time of the manufacture, Monsanto could have provided the warnings or instructions regarding he full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

169.    At all times here mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Monsanto and at the time Plaintiff was exposed to and/or ingested the product. The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing CLL b-cell type as a result of exposure and use.

170.    Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect the health of those exposed in violation of 7 U.S.C. § 136j(a)(1)(E) as well as the laws of Ohio.

171.    Monsanto could have amended the label of Roundup to provide additional warnings.

172.    This defect caused serious injury to Plaintiff, who used Roundup in its intended and foreseeable manner.

173.    At all times herein mentioned, Monsanto had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine,

31

maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

174. Monsanto labeled, distributed, and promoted the aforesaid product that it was dangerous and unsafe for the use and purpose for which it was intended.

175. Monsanto failed to warn of the nature and scope of the side effects associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of NHL.

176. Monsanto was aware of the probable consequences of the aforesaid conduct. Despite the fact that Monsanto knew or should have known that Roundup caused serious injuries, Monsanto failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effects of developing NHL from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution. Monsanto willfully and deliberately failed to avoid the consequences associated with its failure to warn, and in doing so, Monsanto acted with a conscious disregard for the safety of Plaintiff.

177. At the time of exposure, Plaintiff could not have reasonably discovered any defect in Roundup prior through the exercise of reasonable care.

178. Monsanto, as the manufacturer and/or distributor of the subject product, is held to the level or knowledge of an expert in the field.

179. Plaintiff reasonably relied upon the skill, superior knowledge, and judgement of Monsanto.

180. Had Monsanto properly disclosed the risks associated with Roundup products, Plaintiff would have avoided the risk of CLL b-cell type by not using Roundup products.

32

181.    The information that Monsanto did provide or communicate failed to contain adequate warnings and precautions that would have enabled Plaintiff, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, Monsanto disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extend of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

182.    To this day, Monsanto has failed to adequately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup.

183.    As a result of its inadequate warnings, Monsanto's Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Monsanto, were distributed by Monsanto, and used by Plaintiff.

184.    As a direct and proximate result of Monsanto's actions as alleged herein, Monsanto's Roundup caused Plaintiff to sustain injuries as herein alleged.

185.    Monsanto's conduct was committed with knowing, reckless, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers, including Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so as to punish and deter similar conduct in the future.

WHEREFORE, Plaintiffs respectfully request this court to enter judgement in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## FOURTH CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTIES

186.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein, and further allege:

187.    At all times herein mentioned, Monsanto manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold Roundup as a brand spectrum herbicide.

188.    These actions were under the ultimate control and supervision of Monsanto.

189.    At the time Monsanto marketed, sold and distributed Roundup for use by Plaintiff, Monsanto knew of Roundup's intended used and impliedly warranted the product to be or merchantable quality and safe and fit for its use.

190.    Monsanto impliedly represented and warranted to Plaintiff and users of Roundup, the agricultural community, and/or the EPA that Roundup was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.

191.    These representations and warranties were false, misleading, and inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

192.    Plaintiff and/or the EPA did rely on said implied warrant of merchantable fitness for particular use and purpose.

193.    Plaintiff reasonably relied upon the skill and judgement of Monsanto as to whether Roundup was of merchantable quality and safe and fit for its intended use.

34

194.    Roundup was injected into the stream of commerce by Monsanto in a defective, unsafe, and inherently dangerous condition, and the products' materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

195.    Monsanto breached the aforesaid implied warranties, as its herbicide Roundup was not fit for its intended purposes and uses.

196.    As a result of the forgoing acts and omissions, Plaintiff suffered from CLL b-cell type and Plaintiff suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic, and non-economic damages.

197.    Monsanto's conduct was committed with knowing, reckless, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers, including Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so as to punish and deter similar conduct in the future.

WHEREFORE, Plaintiffs respectfully request this court to enter judgement in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## FIFTH CAUSE OF ACTION
## VIOLATION OF THE OHIO CONSUMER SALES PRACTICES ACT

198.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein, and further allege:

199.    Monsanto is liable to the Plaintiff pursuant to the Ohio Consumer Sales Practices Act ("OCSPA").

200.     Monsanto is and, at all relevant times was, in the business of manufacturing and
         marketing Roundup.

201.     Monsanto and/or its agents designed, formulated, manufactured, assembles,
         prepared for sale, distributed, marketed, and/or sold Roundup, which was in a defective
         condition unreasonably dangerous when used as intended in the usual and customary
         manner.

202.     Privity existed between Plaintiff and Monsanto.

203.     Monsanto violated the OCSPA by the use of dales and misleading
         misrepresentations and/or omissions of material fact in connection with the marketing,
         promotion, and sale of Roundup.

204.     Monsanto communicated the purported benefits of Roundup while failing to
         disclose the serious and dangerous injuries related to the use of Roundup with the intent
         that consumers, like Plaintiff, would rely upon the misrepresentations and purchase of
         Roundup believing it to be safe for use in the usual and customary manner.

205.     Plaintiff, while using the product in the usual and customary manner, suffered
         injuries as a proximate result of Monsanto placing the product on the market which was
         unreasonably dangerous and defective.

206.     As a direct and proximate result of Monsanto's violations of the OCSPA, Plaintiff
         has suffered significant and permanent damages, including but not limited to physical
         injury, past and future medical expenses, past and future physical and mental pain and
         suffering, and will continue to suffer all such damages in the future.

207.     Monsanto's conduct was committed with knowing, reckless, conscious, wanton,
         willful, and deliberate disregard for the value of human life and the rights and safety of

36

consumers, including Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so as to punish and deter similar conduct in the future.

WHEREFORE, Plaintiffs respectfully request this Court enter judgement in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

## SIXTH CAUSE OF ACTION
## LOSS OF CONSORTIUM

208.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein, and further allege:

209.    Monsanto's conduct and its product, Roundup, caused Wanda Augsburger to develop CLL b-cell type. Mrs. Augsburger's illness and ongoing care have deprived her spouse, Brad Augsburger, of her services and companionship.

WHEREFORE, Plaintiffs respectfully request this Court enter judgement in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all relief this Court deems just and proper.

## DEMAND FOR JURY TRIAL

210.    Plaintiffs hereby demand trial by jury as to all issues.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Wanda Augsburger and Brad Augsburger pray for judgement against Defendant in an amount the jury may award, for:

A. General damages in an amount that will conform to proof at the time of trial;

B. Special damages in an amount within the jurisdiction of this Court and according to proof at the time of trial;

C. Loss of earnings and impaired earning capacity according to proof at the time of trial;

D.  Medical expenses, past and future, according to proof at the time of trial;

E.  Past and future mental and emotional distress, according to proof at the time of trial;

F.  Damages for loss of care, comfort, society, and companionship in an amount within jurisdiction of this Court and according to proof at the time of trial;

G.  Punitive or exemplary damages according to proof at the time of trial;

H.  Restitution, disgorgement of profits, and other equitable relief;

I.  Injunctive relief;

J.  Attorneys' fees;

K.  Costs of suit incurred herein;

L.  Pre-judgement interest as provided by law; and

M.  Such other and further relief as the Court may deem just and proper.

April 2, 2020.

Respectfully Submitted,

_/s/ Jonathan M. Ashton_____
Jonathan M. Ashton (0083588)
**GALLON, TAKACS &
BOISSONEAULT, CO., L.P.A.**
3516 Granite Circle
Toledo, OH 43617
Phone: (419) 843-2001
Fax:    (419) 843-8022
Email: jashton@gallonlaw.com

*Counsel for Plaintiffs*