STD

# U.S. District Court
## DISTRICT OF ARIZONA (Phoenix Division)
## CIVIL DOCKET FOR CASE #: 2:20–cv–00688–MTL

Lewenstein v. Monsanto Company et al
Assigned to: Judge Michael T Liburdi
Case in other court:  Maricopa County Superior Court,
               CV2020–002417
Cause: 28:1441 Petition for Removal– Product Liability

Date Filed: 04/07/2020
Jury Demand: Both
Nature of Suit: 365 Personal Injury: Prod.
Liability
Jurisdiction: Diversity

**Plaintiff**

**Alan Lewenstein**
*an individual*

represented by **Jenna Constance Bailey**
Bailey Law Firm PLLC
4435 E Chandler Blvd., Ste. 200
Phoenix, AZ 85048
480–681–5408
Email: jbailey@baileylawfirmaz.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rebecca Sackett**
Bailey Law Firm PLLC
4435 E Chandler Blvd., Ste. 200
Phoenix, AZ 85048
480–681–5408
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**
*a Delaware Corporation*

represented by **Ian Matthew Fischer**
Husch Blackwell LLP – Phoenix, AZ
2415 E Camelback Rd., Ste. 420
Phoenix, AZ 85016
480–824–7885
Email: ian.fischer@huschblackwell.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Unknown Parties**
*Doe Defendants 1–10*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/07/2020 | 1 | *NOTICE OF REMOVAL from Maricopa County Superior Court, case number CV2020–002417. Filing fee received: $400.00, receipt number 0970–18154281 filed by Monsanto Company. (Fischer, Ian) (Attachments: # 1 Civil Cover Sheet, # 2 Supplemental Civil Cover Sheet, # 3 Exhibit 1 – State Court Record)(BAC) Modified to correct filer on 4/7/2020 (BAC). (Entered: 04/07/2020) |
| 04/07/2020 | 2 | Corporate Disclosure Statement by Monsanto Company. (Fischer, Ian) (BAC) (Entered: 04/07/2020) |
| 04/07/2020 | | ***STATE COURT RECORD RECEIVED***SERVICE EXECUTED: re: Waiver of Service of Summons upon Monsanto Company on 3/19/20 (original filed in Maricopa County Superior Court on 3/19/20).(BAC) This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (Entered: 04/07/2020) |

| 04/07/2020 | 3 | Filing fee paid, receipt number 0970–18154281. This case has been assigned to the Honorable Michael T Liburdi. All future pleadings or documents should bear the correct case number: CV–20–00688–PHX–MTL. Notice of Availability of Magistrate Judge to Exercise Jurisdiction form attached.(BAC) (Entered: 04/07/2020) |
|---|---|---|
| 04/07/2020 | 4 | *VACATED by Doc. 5. NOTICE TO THE PARTIES – The Court is participating in the Mandatory Initial Discovery Pilot (MIDP) and this case is subject to that pilot. The key features and deadlines are set forth in the attached Notice which includes General Order 17–08. Also attached is a checklist for use by the parties. All parties must respond to the mandatory initial discovery requests set forth in the General Order before initiating any further discovery in this case. Please note: The discovery obligations in the General Order supersede the disclosures required by Rule 26(a)(1). Any party seeking affirmative relief must serve a copy of the attached documents (Notice to Parties, including General Order 17–08 and MIDP Checklist) on each new party when the Complaint, Counterclaim, Crossclaim, or Third–Party Complaint is served. (BAC) Modified on 4/7/2020 (BAC). (Entered: 04/07/2020) |
| 04/07/2020 | 5 | MINUTE ORDER: the 4 NOTICE subjecting this case to the Mandatory Initial Discovery Pilot (MIDP) program is VACATED. This case will not be subject to the MIDP Pilot program requirements. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry.(BAC) (Entered: 04/07/2020) |
| 04/07/2020 | 6 | ANSWER to Complaint with Jury Demand by Monsanto Company.(Fischer, Ian) (Entered: 04/07/2020) |

**BAILEY LAW FIRM, PLLC**
JENNA C. BAILEY (029333)
REBECCA SACKETT (034436)
4435 East Chandler Boulevard, Suite 200
Phoenix, Arizona 85048
Telephone: (480) 681-5408
JBailey@BaileyLawFirmAz.com
RSackett@BaileyLawFirmAz.com
*Attorneys for Plaintiff*

COPY

FEB 21 2020

COURT SEAL

CLERK OF THE SUPERIOR COURT
M. MESSMER
DEPUTY CLERK

# IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| Alan Lewenstein, an individual,<br><br>                        Plaintiff,<br><br>       vs.<br><br>Monsanto Company, a Delaware<br>Corporation; and Doe Defendants 1-10.<br><br>                        Defendants. | Case No:<br>CV2020-002417<br><br>**COMPLAINT**<br><br>(Strict Products Liability, Design Defect;<br>Strict Products Liability, Failure to Warn;<br>Negligence; Breach of Implied<br>Warranties) |

Plaintiff Alan Lewenstein, through undersigned counsel, for his causes of action against the Defendant, states and alleges the following:

**IDENTIFICATION OF PARTIES**

1.    Plaintiff Alan Lewenstein (hereinafter "Plaintiff") is an individual residing in Maricopa County, Arizona. Plaintiff suffered serious injury as a result of using a product designed, manufactured, and distributed by Defendant.

2.    Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its headquarters and principle place of business in St. Louis, Missouri. At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the Manufacturer of Roundup® ("Roundup"), Monsanto has regularly transacted and conducted business within the State of Arizona, and has derived substantial revenue from goods and products, including Roundup, used in the state of Arizona. Monsanto expected or should have expected its acts to have consequences within the State of Arizona, and derived substantial revenue from interstate commerce.

3.     Plaintiff is informed and believes, and based thereon alleges, that in committing the acts alleged herein, each and every managing agent, agent, representative, and/or employee of Defendant was working within the course and scope of said agency, representation and/or employment with the knowledge, consent, ratification, and authorization of Defendant and its directors, officers and/or managing agents.

4.     Plaintiff is informed and believes, and based thereon alleges, that one or more of Does 1 through 10, or some of them, are responsible for the harm suffered by Plaintiff. Does 1 through 10, in engaging in the conduct herein complained of, were at all times acting within the course and scope of their employment, agency, ownership, joint venture, management, or their status as an officer, director, or managing agent of the Defendant.

**JURISDICTION AND VENUE**

5.     Jurisdiction and venue are proper because Defendant conducts business in Phoenix, Arizona.

6.     The Court has jurisdiction over non-residents who transact business in the State of Arizona based on the state laws, statutes, and regulations currently in effect.

7.     Monsanto is active daily in the State of Arizona and has necessary minimum contacts required by the constitution.

8.     All acts, errors, and omissions of Defendant complained of herein occurred in Maricopa County, Arizona.

9.     The amount in controversy is in excess of the jurisdictional limits of this Court.

10.    The statute of limitations for a personal injury products liability case in Arizona is two (2) years and begins running when the plaintiff knew or should have known that he or she had a claim. Plaintiff had no reason to know at the time he was using the product that it would cause devastating health consequences. That is because Monsanto not only did not disclose the risk, they advertised the opposite. At the time of Plaintiff's diagnosis and treatment, the connection between Roundup exposure and Non-Hodgkin Lymphoma was

1  not widely known. If his providers did not know, then certainly Plaintiff had no reason to
2  know of his potential claim against Defendant.

3       11.    It is only within the last year that it has become well-known in the Phoenix
4  area (where Plaintiff lives) that Roundup causes Non-Hodgkin Lymphoma. The first jury
5  verdict of a case of this type was in 2018 (in California). Therefore, the statute of limitations
6  was tolled until Plaintiff knew (or should have known) the cause of his injury, which
7  occurred within the last year.

8                              **COMMON ALLEGATIONS**

9       12.    Plaintiff incorporates by reference each and every allegation above as if fully
10 set forth herein.

11      13.    Glyphosate is a broad-spectrum, non-selective herbicide used in a wide
12 variety of herbicidal products around the world.

13      14.    Plants treated with glyphosate translocate the systemic herbicide to their
14 roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic
15 amino acids necessary for protein synthesis. Treated plants generally die within two to
16 three days. Because plants absorb glyphosate, it cannot be completely removed by washing
17 or peeling produce or by milling, baking, or brewing grains.

18      15.    For nearly 40 years, consumers across the world have used Roundup without
19 knowing of the dangers its use poses. That is because when Monsanto first introduced
20 Roundup, it touted glyphosate as a technological breakthrough: it could kill almost every
21 weed without causing harm either to people or to the environment. Of course, history has
22 shown that not to be true.

23      16.    According to the World Health Organization ("WHO"), the main chemical
24 ingredient of Roundup – glyphosate – is a probable cause of cancer.

25      17.    Monsanto assured the public that Roundup was harmless.

26
27
28 ///

                                        3

**The Discovery of Glyphosate
and Development of Roundup**

18.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup. From the outset, Monsanto marketed Roundup as a "safe" general-purpose herbicide for widespread commercial and consumer use. It still markets Roundup as safe today.

**Registration of Herbicides
Under Federal Law**

19.     The manufacture, formulation, and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

20.     The EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

21.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

22.     The EPA and the State of Arizona registered Roundup for distribution, sale, and manufacture in the United States and the State of Arizona.

23.     FIFRA generally requires that the registrant, Monsanto in the case of Roundup, conduct the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

24.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

25.     In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment in relation to the re-registration process no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

### Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup

26.     Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of non-carcinogenicity in humans (Group E) in 1991.

27.     In so classifying glyphosate, however, the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the

1    time of evaluation and should not be interpreted as a definitive conclusion that the agent
2    will not be a carcinogen under any circumstances."

3        28.    On two occasions, the EPA found that the laboratories hired by Monsanto to
4    test the toxicity of its Roundup products for registration purposes committed fraud.

5        29.    In the first instance, Monsanto hired Industrial Bio-Test Laboratories ("IBT")
6    to perform and evaluate pesticide toxicology studies relating to Roundup. IBT performed
7    approximately 30 tests on glyphosate and glyphosate-containing products, including 11 of
8    the 19 chronic toxicology studies needed to register Roundup with the EPA.

9        30.    In 1976, the United States Food and Drug Administration ("FDA")
10   performed an inspection of IBT and discovered discrepancies between the raw data and the
11   final report relating to the toxicological impacts of glyphosate. The EPA subsequently
12   audited IBT and determined that the toxicology studies conducted for Roundup were
13   invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it
14   was "hard to believe the scientific integrity of the studies when they said they took
15   specimens of the uterus from male rabbits."

16       31.    Three top executives of IBT were convicted of fraud in 1983.

17       32.    In the second incident of data falsification, Monsanto hired Craven
18   Laboratories in 1991 to perform pesticide and herbicide studies, including several studies
19   on Roundup.

20       33.    In that same year, the EPA announced that it was investigating Craven for
21   "allegedly falsifying test data used by chemical firms to win EPA approval of pesticides."
22   The investigation lead to indictment of the owner of Craven Laboratories and three of its
23   employees. They were later convicted of fraudulent laboratory practices in the testing of
24   pesticides and herbicides.

25       34.    Despite the falsity of the tests that underlie its registration, within a few years
26   of its launch, Monsanto was marketing Roundup in 115 countries.

27

28   ///

**Monsanto has known for decades that it
falsely advertises the safety of Roundup**

35.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were **"safer than table salt"** and **"practically non-toxic"** to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

a)     Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

b)     And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c)     Roundup biodegrades into naturally occurring elements.

d)     Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e)     This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f)     You can apply Accord with "confidence because it will stay where you put it"[;] it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g)     Glyphosate is less toxic to rats than table salt following acute oral ingestion.

7

h)      Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i)      You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j)      "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[1]

36.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a)      its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b)      its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable.

c)      its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d)      its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

---

[1]      Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996)

e)   its glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides; and

f)   its glyphosate-containing products or any component thereof might be classified as practically non-toxic.

37.   Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

**Classifications and Assessments
of Glyphosate**

38.   The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the WHO tasked with conducting and coordinating research into the causes of cancer.

39.   The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

40.   An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015-2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance; and there must be evidence that humans are exposed to the substance.

41.   IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have: a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; and related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

42.    The process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent.

43.    Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

44.    On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which were in Defendant's possession since as early as 1985, the IARC's Working Group published its conclusion that the glyphosate contained in Defendant's Roundup herbicide, is a Group 2A agent and probably carcinogenic.

45.    The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a Group 2A *probable* carcinogen to humans. According to the authors, glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

46.    The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

47.    The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

### Other Earlier Findings About
### Glyphosate's Dangers to Human Health

48.    Despite the classification by the IARC, Defendant had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

49.     Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

50.     In 1997, Chris Clements published "Genotoxicity of select herbicides in *Rana catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

51.     The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

52.     Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

53.     Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

54.     The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

55.     In 2006 César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

56.     The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

57.     The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

58.     Despite knowledge to the contrary, Defendant maintains that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts agree that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

59.     In addition to glyphosate and Roundup's genotoxic properties, Defendant has long been aware of glyphosate's carcinogenic properties.

11

60.     Glyphosate, and Roundup in particular, have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, NHL, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

61.     Defendant has known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

62.     In 1985 the EPA studied the effects of glyphosate in mice, finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

63.     In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly reported cause of pesticide illness among agricultural workers.

64.     In 2003 Lennart Hardell and Mikael Eriksson published the results of two case-controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

65.     The studies concluded that glyphosate had the most significant relationship to NHL among all herbicides studies with an increased odds ratio of 3:11.

66.     In 2003, AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

67.     The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

68.     In 2008, Mikael Eriksson published a population based case-control study of exposure to various pesticides as a risk factor for NHL.

69.     This strengthened previous associations between glyphosate and NHL.

70.     In spite of this knowledge, Defendant continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

**Plaintiff's Exposure to Roundup**

71.     Plaintiff moved into his Arizona condo in 2012 where he still lives today. Like many Arizonans, Plaintiff had a weed problem in his backyard.

72.     Plaintiff saw several advertisements regarding how effective Roundup was for killing weeds while remaining safe for the user.

73.     These advertisements, and the general popularity of the product, led Plaintiff to use Roundup on the weeds in his backyard.

74.     He started using Roundup exclusively to manage his backyard weeds in late 2012.

75.     Plaintiff used Roundup several times a year from 2012 until approximately 2017.

76.     On September 5, 2017, Plaintiff was diagnosed with T-Cell Non-Hodgkin Lymphoma.

77.     During the month of October 2017, Plaintiff underwent eighteen (18) rounds of radiation therapy.

78.     Plaintiff's radiation therapy concluded on October 26, 2017, and he continues to have follow-up care every six months.

79.     Plaintiff is still not in remission.

## COUNT 1

**Strict Products Liability (Design Defect)**

80.     Plaintiff incorporates each and every allegation above as if fully set forth herein.

81.     Plaintiff brings this strict liability claim against Defendant for defective design.

82.     At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup products into the stream of

13

1  commerce. These actions were under the ultimate control and supervision of Defendant.
2  At all times relevant to this litigation, Defendant designed, researched, developed,
3  manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold,
4  and distributed the Roundup products that Plaintiff was exposed to, as described above.

5       83.    At all times relevant to this litigation, Defendant's Roundup products were
6  manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous
7  manner that was dangerous for use by or exposure to the public, and in particular, Plaintiff.

8       84.    At all times relevant to this litigation, Defendant's Roundup products reached
9  the intended consumers, handlers, and users or other persons coming into contact with these
10  products in Arizona and throughout the United States, including Plaintiff, without
11  substantial change in their condition as designed, manufactured, sold, distributed, labeled,
12  and marketed by Defendant.

13       85.    Defendant's Roundup products, as researched, tested, developed, designed,
14  licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant
15  were defective in design and formulation in that when they left the hands of the Defendant's
16  manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an
17  extent beyond that which an ordinary consumer would contemplate.

18       86.    Defendant's Roundup products, as researched, tested, developed, designed,
19  licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant
20  was defective in design and formulation in that when they left the hands of Defendant's
21  manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits
22  associated with their design and formulation.

23       87.    At all times relevant to this action, Defendant knew or had reason to know
24  that its Roundup products were defective and were inherently dangerous and unsafe when
25  used in the manner instructed and provided by Defendant.

26       88.    Therefore, at all times relevant to this litigation, Defendant's Roundup
27  products, as researched, tested, developed, designed, licensed, manufactured, packaged,
28

14

labeled, distributed, sold and marketed by Defendant was defective in design and formulation, in one or more of the following ways:

a.   When placed in the stream of commerce, Defendant's Roundup products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b.   When placed in the stream of commerce, Defendant's Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c.   When placed in the stream of commerce, Defendant's Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d.   Defendant did not sufficiently test, investigate, or study its Roundup products and, specifically, the active ingredient glyphosate.

e.   Exposure to Roundup products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f.   Defendant knew or should have known at the time of marketing its Roundup products that exposure to Roundup could result in cancer and other severe illnesses and injuries.

g.   Defendant did not conduct adequate post-marketing surveillance of its Roundup products.

h.   Defendant could have employed safer alternative designs and formulations.

89.   Plaintiff was exposed to Defendant's Roundup, as described above, without knowledge of its dangerous characteristics.

15

90.     At all times relevant to this litigation, Plaintiff was exposed to the use of Defendant's Roundup products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

91.     Plaintiff could not have reasonably discovered the defects and risks associated with Roundup before or at the time of exposure.

92.     The harm caused by Defendant's Roundup products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendant's Roundup products were and are more dangerous than alternative products and Defendant could have designed its Roundup products to make them less dangerous. Indeed, at the time that Defendant designed its Roundup products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

93.     At the time Roundup products left Defendant's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant's herbicides.

94.     Defendant's defective design of its Roundup products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup products, including the Plaintiff herein.

95.     Therefore, as a result of the unreasonably dangerous condition of its Roundup products, Defendant is strictly liable to Plaintiff.

96.     The defects in Defendant's Roundup products were substantial and contributing factors in causing Plaintiff grave injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained his injuries.

97.     As a direct and proximate result of Defendant placing defective Roundup products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured physical pain and discomfort, as well as economic hardship,

including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

98.    Defendant's conduct, as described above, was reckless. Defendant risked the lives of consumers and users of its products, including Plaintiff, with knowledge of the safety problems associated with Roundup and glyphosate containing products, and suppressed this knowledge from the general public. Defendant made conscious decisions not to redesign, warn, or inform the unsuspecting public. Defendant's reckless conduct warrants an award of punitive damages.

99.    Plaintiff further alleges that Defendant knew or should have known that death and/or catastrophic injuries could occur due to its negligent, careless, and reckless conduct. Nonetheless, Defendant disregarded these dangers and the risks they posed. Such acts and/or omissions constitute willful, wanton, reckless, and malicious behavior and/or a conscious disregard of the substantial risk that such conduct might threaten the life, health, and safety of Plaintiff. Such conduct by Defendant evinced evil hands guided by evil minds thereby compelling an award of punitive damages.

## COUNT 2

### Strict Products Liability (Failure to Warn)

100.    Plaintiff incorporates each and every allegation above as if fully set forth herein.

101.    Plaintiff brings this strict liability claim against Defendant for failure to warn.

102.    At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, promoting and applying Roundup products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

103.    Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup products, and in the course of same, directly advertised or marketed the products to consumers and end users, including the Plaintiff, and therefore had a duty to warn of the risks associated with the use of Roundup and glyphosate-containing products.

104.    At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn the Plaintiff of the dangers associated with Roundup use and exposure.

105.    At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

106.    At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of this product and to those who would foreseeably use or be banned by Roundup, including Plaintiff.

107.    Despite the fact that Defendant knew or should have known that Roundup posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods, at the time it distributed, supplied or sold the product, and not known to end users and consumers, such as Plaintiff.

108.   Defendant knew or should have known that these products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Defendant has wrongfully concealed information concerning the dangerous nature of Roundup and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup.

109.   At all times relevant to this litigation, Defendant's Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Arizona and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, marketed and sprayed/applied by Defendant.

110.   Plaintiff was exposed to Roundup products, as described above, without knowledge of their dangerous characteristics.

111.   At all times relevant to this litigation, Plaintiff was exposed to the use of Defendant's Roundup products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

112.   Plaintiff could not have reasonably discovered the defects and risks associated with Roundup or glyphosate-containing products prior to or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendant.

113.   Defendant knew or should have known that the minimal warnings disseminated with or accompanying the application of Roundup products were inadequate, but they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

114.   The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled those exposed such

as Plaintiff to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

115.   To this day, Defendant has failed to adequately and accurately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup and its active ingredient glyphosate, a probable carcinogen.

116.   As a result of their inadequate warnings, Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were sold or distributed by Defendant, were applied by Defendant, when Plaintiff became exposed.

117.   Defendant is liable to Plaintiff for injuries caused by negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of their products and the risks associated with the use of or exposure to Roundup and glyphosate.

118.   The defects in these Roundup products were substantial and contributing factors in causing Plaintiff's injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained his injuries.

119.   Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup products and application, Plaintiff could have avoided the risk of developing injuries as alleged herein and could have obtained alternative herbicides.

120.   As a direct and proximate result of Defendant placing defective Roundup products into the stream of commerce and exposing Plaintiff to them, Plaintiff has suffered

and continues to suffer severe injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

121.   Plaintiff further alleges that Defendant knew or should have known that death and/or catastrophic injuries could occur due to its negligent, careless, and reckless conduct. Nonetheless, Defendant disregarded these dangers and the risks they posed. Such acts and/or omissions constitute willful, wanton, reckless and malicious behavior and/or a conscious disregard of the substantial risk that such conduct might threaten the life, health, and safety of Plaintiff. Such conduct by Defendant evinced evil hands guided by evil minds thereby compelling an award of punitive damages.

## COUNT 3

### Negligence

122.   Plaintiff incorporates each and every allegation above as if fully set forth herein.

123.   Defendant, directly or indirectly, caused Roundup products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

124.   At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, testing, manufacturing, marketing, advertisement, supply, promotion, packaging, sale, and/or distribution of Roundup into the stream of commerce, including the duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

125.   At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup products. Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup, and, in particular, its active ingredient glyphosate.

126.   At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup and specifically, the carcinogenic properties of the chemical glyphosate.

127.   Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to Roundup products could cause or be associated with Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

128.   Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup.

129.   As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and/or distribution of its Roundup products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

130.   Despite ability and means to investigate, study, and test products and to provide adequate warnings, Defendant has failed to do so.

131.   Defendant wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup and glyphosate.

132.   The negligence by the Defendant, its agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

      a)   Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup products without thorough and adequate pre- and post- market testing;

b)      Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup;

c)      Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup products were safe for their intended use in agriculture and horticulture;

d)      Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup products so as to avoid the risk of serious harm associated with the prevalent use of Roundup as a herbicide;

e)      Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Defendant had knowledge that Roundup is, was, or could be carcinogenic;

f)      Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

g)      Failing to petition the EPA to strengthen the warnings associated with Roundup;

h)      Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

i)   Marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

j)   Advertising, marketing, and recommending the use of the Roundup products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup;

k)   Representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, Defendant knew or should have known that the products were unsafe;

l)   Representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

m)   Designing Roundup in a manner which was dangerous to its users;

n)   Manufacturing Roundup in a manner which was dangerous to its users;

o)   Producing Roundup in a manner which was dangerous to its users;

p)   Formulating Roundup in a manner which was dangerous to its users;

q)   Concealing information from the Plaintiff while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations;

r)   Improperly concealing and/or misrepresenting information from the Plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides;

s)   Selling Roundup with a false and misleading label;

t)   Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup and glyphosate-containing products; and

u)   Declining to make or propose any changes to Roundup products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup.

133.   Defendant knew and/or should have known that it was foreseeable that consumers such as Plaintiff would suffer injuries as a result of Defendant's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Roundup.

134.   Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup or its active ingredient glyphosate.

135.   Defendant's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff suffered, and will continue to suffer, as described herein.

136.   As a proximate result of Defendant's wrongful acts and omissions in placing defective Roundup products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff has suffered and continues to suffer severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, has suffered economic losses (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

137.   Defendant's conduct, as described above, was reckless. Defendant regularly risks the lives of consumers and users of its products, including Plaintiff, with full knowledge of the dangers of its products. Defendant made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff. Defendant's reckless conduct therefore warrants an award of punitive damages.

138.   Plaintiff further alleges that Defendant knew or should have known that death and/or catastrophic injuries could occur due to its negligent, careless, and reckless conduct. Nonetheless, Defendant disregarded these dangers and the risks they posed. Such acts and/or omissions constitute willful, wanton, reckless and malicious behavior and/or a conscious disregard of the substantial risk that such conduct might threaten the life, health,

and safety of Plaintiff. Such conduct by Defendant evinced evil hands guided by evil minds thereby compelling an award of punitive damages.

<u>**COUNT 4**</u>

**Breach of Implied Warranties**

139.  Plaintiff incorporates each and every allegation above as if fully set forth herein.

140.  At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant.

141.  Before the time that Plaintiff was exposed to the use of the aforementioned Roundup products, Defendant impliedly warranted to consumers and those exposed- including Plaintiff-that Roundup products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

142.  Defendant, however, failed to disclose that Roundup has dangerous propensities when used as intended and that the use of and/or exposure to Roundup and glyphosate-containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

143.  Plaintiff reasonably relied upon the skill, superior knowledge and judgment of Defendant and upon its implied warranties that the Roundup products were of merchantable quality and fit for their intended purpose or use.

144.  Upon information and belief, Plaintiff was at all relevant times in privity with Defendant.

145.  Plaintiff is the intended third-party beneficiary of implied warranties made by Defendant to the purchasers of its horticultural herbicides.

146.    The Roundup products were expected to reach and did in fact reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendant.

147.    At all times relevant to this litigation, Defendant was aware that consumers and users of its products, including Plaintiff, would use Roundup products as marketed by Defendant, which is to say that Plaintiff was a foreseeable user of Roundup.

148.    Defendant intended that Roundup products be used in the manner in which Plaintiff was exposed to them and Defendant impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Roundup was not adequately tested or researched.

149.    In reliance upon Defendant's implied warranty, Plaintiff used or was exposed to Roundup as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendant.

150.    Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup.

151.    Defendant breached its implied warranty to Plaintiff in that Roundup products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

152.    The harm caused by Roundup products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

153.    As a direct and proximate result of Defendant's wrongful acts and omissions Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, has suffered economic loss (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

154.    Plaintiff further alleges that Defendant knew or should have known that death and/or catastrophic injuries could occur due to its negligent, careless, and reckless conduct.

Nonetheless, Defendant disregarded these dangers and the risks they posed. Such acts and/or omissions constitute willful, wanton, reckless and malicious behavior and/or a conscious disregard of the substantial risk that such conduct might threaten the life, health, and safety of Plaintiff. Such conduct by Defendant evinced evil hands guided by evil minds thereby compelling an award of punitive damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment against Defendant as follows:

A.     For general and special damages according to proof at trial.

B.     For punitive damages in such a sum, to be proven at trial, as may be necessary to punish the Defendant for its wrongful acts.

C.     For Plaintiff's costs incurred with interest at the highest lawful rate from the date of judgment until paid in full.

D.     For such other and further relief as the Court deems just and proper under the circumstances.

Respectfully submitted this 21st day of February 2020.

BAILEY LAW FIRM, PLLC

/s/ Jenna C. Bailey
Jenna C. Bailey
Rebecca Sackett
*Attorneys for Plaintiff*