JYTRL

# U.S. District Court
## Southern District of Georgia (Statesboro)
## CIVIL DOCKET FOR CASE #: 6:20-cv-00037-JRH-CLR

Yarbough v. Monsanto Company
Assigned to: Chief Judge J. Randal Hall
Referred to: Magistrate Judge Christopher L. Ray
Case in other court:  State Court of Evans County,
                STCV2020000009
Cause: 28:1332 Diversity of citizenship

Date Filed: 04/09/2020
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod.
Liability
Jurisdiction: Diversity

**Plaintiff**

**David Yarbrough**

V.

**Defendant**

**Monsanto Company**

represented by **William V. Custer**
Bryan Cave Leighton Paisner, LLP
One Atlantic Center
1201 W. Peachtree St., NW
14th Floor
Atlanta, GA 30309-3488
404-572-6600
Fax: 404-572-6999
Email: bill.custer@bclplaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/09/2020 | 1 | NOTICE OF REMOVAL by Monsanto Company from State Court of Evans County, case number STCV2020000009. ( Filing fee $ 400 receipt number AGASDC-2821157). (Attachments: # 1 State Court Pleadings, # 2 Civil Cover Sheet)(loh) (Entered: 04/10/2020) |
| 04/09/2020 | 2 | Disclosure Statement pursuant to Local Rule 7.1.1 by Monsanto Company. (loh) (Entered: 04/10/2020) |
| 04/10/2020 | 3 | GENERAL ORDER: Report of Rule 26(f) planning meeting. Signed by Magistrate Judge Christopher L. Ray on 4/10/2020. (loh) (Entered: 04/10/2020) |
| 04/10/2020 | | Notice to All Counsel of Record : Magistrate Judge Christopher L. Ray has updated the Standard Procedures for Discovery Disputes and Settlement Conferences, Notice of Discovery Dispute Form and Request for Settlement Conference Form. CLICK HERE TO READ. (loh) (Entered: 04/10/2020) |
| 04/10/2020 | 4 | NOTICE TO ALL COUNSEL OF RECORD re 1 Notice of Removal. (loh) (Entered: 04/10/2020) |

| 04/10/2020 | Set/Reset Deadlines: Notice of Appearance/Pro Hac Vice due by 4/20/2020. Compliance due by 4/20/2020. (loh) (Entered: 04/10/2020) |
|---|---|

<table>
<tr><td colspan="4" align="center"><strong>PACER Service Center</strong></td></tr>
<tr><td colspan="4" align="center"><strong>Transaction Receipt</strong></td></tr>
<tr><td colspan="4" align="center">04/10/2020 10:45:33</td></tr>
<tr><td><strong>PACER Login:</strong></td><td>hllp1982</td><td><strong>Client Code:</strong></td><td>1417.0005</td></tr>
<tr><td><strong>Description:</strong></td><td>Docket Report</td><td><strong>Search Criteria:</strong></td><td>6:20-cv-00037-JRH-CLR</td></tr>
<tr><td><strong>Billable Pages:</strong></td><td>1</td><td><strong>Cost:</strong></td><td>0.10</td></tr>
</table>

⚜ **EFILED IN OFFICE**
CLERK OF STATE COURT
EVANS COUNTY, GEORGIA

**STSV2020000009**
RWH
MAR 09, 2020 10:00 AM

*Kathy P. Hendrix*
Kathy Hendrix, Clerk
Evans County, Georgia

IN THE STATE COURT OF EVANS COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| DAVID YARBROUGH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No._____ |
| | ) | |
| MONSANTO COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

COMES NOW, David Yarbrough Plaintiff in the above styled action, and files his Complaint against Defendant Monsanto Company and show the Court the following:

### I.   PARTIES, JURISDICTION AND VENUE

1.   Plaintiff David Yarbrough ("Yarbrough") files this suit for damage asserting claims against Defendant Monsanto Company ("Monsanto").

2.   Plaintiff Yarbrough is a citizen and resident of Evans County, Georgia.

3.   Defendant is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri. Defendant is registered to do business in Georgia as a foreign profit corporation. Defendant's registered agent name is Corporation Service Company and can be served with process at 40 Technology Parkway South, Suite 300, Norcross, Georgia 30092.

4.   At all times relevant to this complaint, Monsanto was the entity that discovered the herbicidal properties of glyphosate and the manufacturer of Roundup®

5.   This Court has personal jurisdiction over Monsanto pursuant to O.C.G.A.§ 9-10-91, because Monsanto knows or should have known that its Roundup® products are sold throughout the State of Georgia.

1

6.    In addition, Monsanto maintains sufficient contacts with the State of Georgia such that this
      Court's exercise of personal jurisdiction over it does not offend traditional notions of fair play
      and substantial justice.

7.    Venue is proper pursuant to O.C.G.A.§ 14-2-510 because the injury alleged in this Complaint
      originated in this county.

## II.    FACTUAL ALLEGATIONS

8.    Plaintiff renews and reaffirms each and every allegation set forth in paragraphs above.

9.    Glyphosate is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal
      products around the world.

10.   Plants treated with glyphosate translocate the systemic herbicide to their roots, shoot regions, and
      fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for
      protein synthesis. Treated plants generally die within two to three days. Because plants absorb
      glyphosate, it cannot be completely removed by washing or peeling produce or by milling,
      baking, or brewing grains.

11.   For nearly 40 years, homeowners across the world have used Roundup® without knowing of the
      dangers its use poses. That is because when Monsanto first introduced Roundup®, it marketed
      glyphosate as a technological breakthrough: it could kill almost every weed without causing
      harm either to people or to the environment. Of course, history has shown that not to be true.
      According to the WHO, the main chemical ingredient of Roundup®-glyphosate-is a probable
      cause of cancer. Those most at risk are individuals that are exposed to Roundup® with direct
      application to their lawns. Monsanto assured the public that Roundup® was harmless. In order to
      prove this, Monsanto championed falsified data and attacked legitimate studies that revealed its

2

dangers. Monsanto led a prolonged campaign of misinformation to convince government agencies, farmers and the general population that Roundup® was safe.

### *The Discovery of Glyphosate and Development of Roundup®*

12.     The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use. It still markets Roundup® as safe today.

### *Registration of Herbicides under Federal Law*

13.     The manufacture, formulation and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA or "ACT"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, use, except as described by the Act. 7 U.S.C. §136a(a).

14.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. §136a(c)(5)(D).

15.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable

3

risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. §136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

16.    The EPA and the State of Georgia registered Roundup® for distribution, sale, and manufacture in the United States and the State of Georgia.

17.    FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conduct the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

18.    The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. §136a-1. In order to reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

19.    In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment - in relation to the reregistration process no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

4

### *Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup®*

20.    Based on early studies that glyphosate could cause cancer in laboratory animals, the EPA
       originally classified glyphosate as possibly carcinogenic to humans (Group C) in 1985. After
       pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its
       classification to evidence of non- carcinogenicity in humans (Group E) in 1991. In so classifying
       glyphosate, however, the EPA made clear that the designation did not mean the chemical does
       not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is
       based on the available evidence at the time of evaluation and should not be interpreted as a
       definitive conclusion that the agent will not be a carcinogen under any circumstances."

21.    On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of
       its Roundup® products for registration purposes committed fraud.

22.    In the first instance, Monsanto, in seeking initial registration of Roundup® by EPA, hired
       Industrial Bio-Test Laboratories ("IBT") to perform and evaluate pesticide toxicology studies
       relating to Roundup®. IBT performed about 30 tests on glyphosate and glyphosate-containing
       products, including nine of the 15 residue studies needed to register Roundup®.

23.    In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of
       Industrial Bio-Test Industries ("IBT") that revealed discrepancies between the raw data and the
       final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited
       IBT; it too found the toxicology studies conducted for the Roundup® herbicide to be invalid. An
       EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to
       believe the scientific integrity of the studies when they said they took specimens of the uterus
       from male rabbits."

24.    Three top executives of IBT were convicted of fraud in 1983.

25. In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

26. Despite the falsity of the tests that underlie its registration, within a few years of is launch, Monsanto was marketing Roundup® in 115 countries.

### *The Importance of Roundup® to Monsanto's Market Dominance Profits*

27. The success of Roundup® was key to Monsanto's continued reputation and dominance in the marketplace. Largely due to the success of Roundup® sales, Monsanto's agriculture division was out-performing its chemicals division's operating income, and that gap increased yearly. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup® market dominance and to ward off impending competition.

28. In response, Monsanto began the development and sale of genetically engineered Roundup Ready® seeds in 1996. Since Roundup Ready® crops are resistant to glyphosate; farmers can spray Roundup® onto their fields during the growing season without harming the crop. This allowed Monsanto to expand its market for Roundup® even further, by 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready® seeds. It also secured Monsanto's dominant share of the glyphosate/Roundup® market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of its Roundup® herbicide.

29. Through a three-pronged strategy of increased production, decreased prices and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000,

Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue. Today, glyphosate remains one of the world's largest herbicides by sales volume.

*Monsanto has known for decades that it falsely advertises the safety of Roundup®*

30.    In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup® products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were **"safer than table salt"** and **"practically non-toxic"** to mammals, birds and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

a) Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences...

b) And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

c) Roundup biodegrades into naturally occurring elements.

d) Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e) This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f) You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

7

g) Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h) Glyphosate's safety margin is much greater than required. It has over a 1,000- fold safety margin in food and over a 700-fold safety margin for workers who manufacture or use it.

i) You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j) "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

31.  On November 19,1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting and advertisements [in New York] that represent, directly or by implication" that:

a) Its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b) Its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable.

c) Its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d) Its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e) Glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f) Its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

8

32.   Monsanto did not alter its advertising in the same manner in any state other than New York, and
      on information and belief still has not done so today.

33.   In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of
      Roundup®. The French court affirmed an earlier judgment that Monsanto had falsely advertised
      its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

### Classifications and Assessments of Glyphosate

34.   The International Agency for Research on Cancer's (IARC) process for the classification of
      glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time,
      the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined
      116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable
      Human Carcinogens); 287 agents to Group 2B (Possible Human Carcinogens); 503 agents to be
      Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

35.   The established procedure for IARC Monograph evaluations is described in the IARC
      Programme's Preamble. Evaluations are performed by panels of international experts, selected
      on the basis of their expertise and the absence of actual or apparent conflicts of interest.

36.   One year before the Monograph meeting, the meeting is announced and there is a call both for
      data and for experts. Eight months before the Monograph meeting, the Working Group
      membership is selected, and the sections of the Monograph are developed by the Working
      Groups members. One month prior to the Monograph meeting, the call for data is closed and the
      various draft sections are distributed among Working Group members for review and comment.
      Finally, at the Monograph meeting, the Working Group finalizes review of all literature,
      evaluates the evidence in each category, and completes the overall evaluation. Within two weeks
      after the Monograph meeting, the summary of the Working Group findings are published in

Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

37.  In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

38.  In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

39.  On July 29, 2015, IARC issued at Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3-10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting culminated nearly a one-year review and preparation by the IARC Secretariat and Working Group, including a comprehensive review of the latest available scientific evidence. According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

40.  The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

41.  Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

10

42. Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

43. The assessment of the IARC Working group identified several case-control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

44. The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

45. The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

46. In male CD-I mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for haemangiosarcoma in male mice. Glyphosate increased pancreatic islet-call adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

47. The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethlyphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

48. The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

11

49.    The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

50.    The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

### *Other Earlier Findings About Glyphosate's Dangers to Human Health*

51.    The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**Release Patterns**

Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way and cropped sites. These sites may be around water and in wetlands. It may also be released to the environment during its manufacture, formulation, transport, storage, and disposal.

52.    In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

12

*Recent Worldwide Bans on Roundup®/Glyphosate*

53.     Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015, and more countries undoubtedly will follow suit in light of the dangers of Roundup® being more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup® which took effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers, Roundup ® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

54.     Germany has announced that it will ban the use of glyphosate by 2023, implementing a systemic reduction strategy as they phase out its use.

55.     France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

56.     Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

57.     The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that Glyphosate has been linked to fatal kidney disease in agricultural workers.

58.     Luxembourg has revoked the market authorization of glyphosate in February of 2020 with a

13

total ban by January 1, 2021.

59.   The United Arab Emirates have issued a total glyphosate ban.

60.   The government of Columbia announced its ban on using Roundup® and glyphosate to destroy
      illegal plantation of coca, the raw ingredient for cocaine, because of the WHO's finding that
      glyphosate is probably carcinogenic.

### *Plaintiff's Exposure to Roundup®*

61.   Plaintiff Yarbrough began applying Roundup® /Glyphosate on or around 1976 for personal and
      professional use. The product had been used continually until recently for use in agricultural
      related farming needs, "Christmas Tree" farms, muscadine grape vineyards, home, and property
      maintenance.

62.   Plaintiff was diagnosed in October of 2019 with large B-cell lymphoma following
      approximately forty (40) years of Roundup® application.

63.   As a result of exposure to Roundup®, Plaintiff suffered harm.

### III.   CAUSES OF ACTION

*First Cause of Action - Strict Liability (Design Defect)*

64.   Plaintiff renews and reaffirms each and every allegation set forth above.

65.   Plaintiff brings this strict liability claim against Defendant for defective design.

66.   At all times relevant to this litigation, Defendant engaged in the business of testing, developing,
      designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products,
      which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby
      placing Roundup® products into the stream of commerce. These actions were under the ultimate
      control and supervision of Defendant. At all times relevant to this litigation, Defendant designed,

14

researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold and distributed the Roundup® products used by the Plaintiff, as described above.

67.    At all times relevant to this litigation, Defendant's Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, the Plaintiff.

68.    At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Georgia and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

69.    Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of the Defendant's manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

70.    Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation in that when they left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

71.    At all times relevant to this action, Defendant knew or had reason to know that its Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendant.

15

72.    Therefore, at all times relevant to this litigation, Defendant's Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant were defective in design and formulation, in one or more of the following ways:

a) When placed in the stream of commerce, Defendant's Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b) When placed in the stream of commerce, Defendant's Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c) When placed in the stream of commerce, Defendant's Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d) Defendant did not sufficiently test, investigate, or study its Roundup® products and, specifically, the active ingredient, glyphosate.

e) Exposure to Roundup® and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f) Defendant knew or should have known at the time of marketing its Roundup® products that exposure to Roundup® and specifically, its active ingredient glyphosate, could result in cancer and other severe illnesses and injuries.

g) Defendant did not conduct adequate post-marketing surveillance of its Roundup® products.

h) Defendant could have employed safer alternative designs and formulations.

16

73.     At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

74.     Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

75.     The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering Defendant's products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendant's Roundup® products were and are more dangerous than alternative products and Defendant could have designed its Roundup® products to make them less dangerous. Indeed, at the time that Defendant designed its Roundup® products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

76.     At the time Roundup® products left Defendant's control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant's herbicides.

77.     Defendant's defective design of its Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including the Plaintiff herein.

78.     Therefore, as a result of the unreasonably dangerous condition of its Roundup® products, Defendant is strictly liable to Plaintiff.

79.     The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiffs grave injuries, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained his injuries.

80.   Defendant's conduct, as described above, was reckless. Defendant risked the lives of consumers and users of its products, including Plaintiff, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Defendant made conscious decisions not to redesign, warn, or inform the unsuspecting public. Defendant's reckless conduct warrants an award of punitive damages.

81.   As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.

*Second Cause of Action- Strict Liability (Failure to Warn)*

82.   Plaintiff renews and reaffirms each and every allegation set forth above.

83.   Plaintiff brings this strict liability claim against Defendant for failure to warn.

84.   At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendant.

85.   Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup® products, and in the course of the same, directly advertised or marketed the products to consumers and end users, including the Plaintiff, and therefore had a duty to

18

warn of the risks associated with the use of Roundup® and glyphosate-containing products.

86.     At all times relevant to this litigation, Defendant had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant had a continuing duty to warn the Plaintiff of the dangers associated with Roundup® use and exposure. Defendant, as manufacturer, seller, or distributor of chemical herbicides is held to the knowledge of an expert in the field.

87.     At the time of manufacture, Defendant could have provided warnings or instructions regarding the full and complete risks of Roundup® and glyphosate- containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

88.     At all times relevant to this litigation, Defendant failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by Defendant's herbicides, including Plaintiff.

89.     Despite the fact that Defendant knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with the use and exposure. The dangerous propensities of its products and the carcinogenic characteristics of glyphosate, as described above, were known to Defendant, or scientifically knowable to Defendant through appropriate research and testing by known methods at the time it distributed, supplied, or sold the product, and not known to end users and consumers, such as Plaintiff.

90.     Defendant knew or should have known that its products created significant risks of serious

19

bodily harm to consumers, as alleged herein, and Defendant failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to its products. Defendant has wrongfully concealed information concerning the dangerous nature of Roundup® and its active ingredient glyphosate, and further made false and/or misleading statements concerning the safety of Roundup® and glyphosate.

91.    At all times relevant to this litigation, Defendant's Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Georgia and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant.

92.    Plaintiff was exposed to Defendant's Roundup® products in the course of his regular lawn maintenance, without knowledge of their dangerous characteristics.

93.    At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendant's Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

94.    Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiffs exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of the Defendant.

95.    Defendant knew or should have known that the minimal warnings disseminated with its Roundup® products were inadequate, but they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to rend the products safe for their ordinary, intended, and reasonably foreseeable uses.

96.  The information that Defendant did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled horticultural workers such as Plaintiff to utilize the products safely and with adequate protection. Instead, Defendant disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative safety, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

97.  To this day, Defendant has failed to adequately and accurately warn of the true risks of Plaintiffs injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

98.  As a result of their inadequate warnings, Defendant's Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiff.

99.  Defendant is liable to Plaintiff for injuries caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its products and the risks associated with the use of or exposure to Roundup® and glyphosate.

100.  The defects in Defendant's Roundup® products were substantial and contributing factors in causing Plaintiffs injuries, and, but for Defendant's misconduct and omissions, Plaintiff would

not have sustained his injuries.

101. Had Defendant provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with its Roundup® products, Plaintiff could have avoided the risk of developing injuries as alleged herein and Plaintiff could have obtained alternative herbicides.

102. As a direct and proximate result of Defendant placing its defective Roundup® products into the stream of commerce, Plaintiff has suffered and continues to suffer severe injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.

### Third Cause of Action- Negligence

103. Plaintiff renews and reaffirms each and every allegation set forth above.

104. Defendant, directly or indirectly, caused Roundup® products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

105. At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

106. At all times relevant to this litigation, Defendant had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Defendant's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings

22

concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

107.   At all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

108.   Accordingly, at all times relevant to this litigation, Defendant knew or, in the exercise of reasonable care, should have known that use of or exposure to its Roundup® products could cause or be associated with Plaintiffs injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

109.   Defendant also knew or, in the exercise of reasonable care, should have known that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Roundup® and glyphosate-containing products.

110.   As such, Defendant breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sales, and distribution of its Roundup® products, in that Defendant manufactured and produced defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

111.   Despite its ability and means to investigate, study, and test its products and to provide adequate warnings, Defendant has failed to do so. Indeed, Defendant has wrongfully concealed information and has further made false and/or misleading statements concerning the safety

23

and/or exposure to Roundup® and glyphosate.

112.   Defendant's negligence included:

a) Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing.

b) Manufacturing, producing, promoting, formulating, creating, developing, designing, selling and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and consequently, the risk of serious harm associated with human use of and exposure to Roundup®.

c) Failing to undertake sufficient studies and conduct necessary tests to determine whether Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

d) Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

e) Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market;

f) Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonable foresee would use and be exposed to its Roundup® products.

g) Failing to disclose to Plaintiffs, users/consumers, and the general public that use of and

24

exposure to Roundup® presented severe risks of cancer and other grave illnesses;

h) Failing to warn Plaintiff, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other consumers;

i) Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate- containing products;

j) Representing that its Roundup® products were safe for their intended use when, in fact, Defendant knew or should have known that the products were not safe for their intended purpose.

k) Declining to make or propose any changes to Roundup® products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

l) Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to Roundup® and glyphosate.

m) Continuing to disseminate information to its consumers, which indicate or imply that Defendant's Roundup® products are not unsafe; and

n) Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

113.   Defendant knew and/or should have known that it was foreseeable that consumers such as Plaintiff would suffer injuries as a result of Defendant's failure to exercise ordinary care in

25

the manufacturing, marketing, labeling, distribution, and sale of Roundup®.

**114.**   Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Roundup® or its active ingredient glyphosate.

**115.**   Defendant's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff suffered, and will continue to suffer as described herein.

**116.**   Defendant's conduct, as described above, was reckless. Defendant regularly risks the lives of consumers and users of their products, including Plaintiff, with full knowledge of the dangers of its products. Defendant has made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff. Defendant's reckless conduct therefore warrants an award of punitive damages.

**117.**   As a proximate result of Defendant's wrongful acts and omissions in placing its defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff has suffered and continues to suffer severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, and has suffered economic losses (including significant expenses for medical care and treatment) and will continue.

*Fourth Cause of Action- Breach of Implied Warranties*

**118.**   Plaintiff renews and reaffirms each and every allegation set forth above.

**119.**   At all times relevant to this litigation, Defendant engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Roundup® products into the stream of commerce. These actions were under the

26

ultimate control and supervision of the Defendant.

120. Before the time that Plaintiff was exposed to the use of the aforementioned Roundup® products, Defendant impliedly warranted to its consumers - including Plaintiff - that its Roundup® products were of merchantable quality and safe for the use for which they were intended; specifically, as horticultural herbicides.

121. Defendant, however, failed to disclose that Roundup® has dangerous propensities when used as intended and that the use of and/or exposure to Roundup® and glyphosate-containing product carries an increased risk of developing severe injuries, including Plaintiff's injuries.

122. Plaintiff reasonably relied upon the skill, superior knowledge and judgment of Defendant and upon its implied warranties that the Roundup® products were of merchantable quality and fit for their intended purpose or use.

123. Upon information and belief, Plaintiff was at all relevant times in privity with Defendant.

124. Plaintiff is the intended third-party beneficiary of implied warranties made by Defendant to the purchasers of its horticultural herbicides, and as such Plaintiff is entitled to assert this claim.

125. The Roundup® products were expected to reach and did in fact reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendant.

126. At all times relevant to this litigation, Defendant was aware that consumers and users of its products, including Plaintiff, would use Roundup® products as marketed by Defendant, which is to say that Plaintiff was a foreseeable user of Roundup®.

127. Defendant intended that its Roundup® products be used in the manner in which Plaintiff in fact used them and Defendant impliedly warranted each product to be of merchantable quality, safe,

27

and for this use, despite the fact that Roundup® was not adequately tested or researched.

128.   In reliance upon Defendant's implied warranty, Plaintiff used Roundup® as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendant.

129.   Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Roundup® or glyphosate.

130.   Defendant breached its implied warranty to Plaintiff in that its Roundup® products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Roundup® has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

131.   The harm caused by Defendant's Roundup® products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

132.   As a direct and proximate result of Defendant's wrongful acts and omissions Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, and has suffered economic loss (including significant expenses for medical care and treatment).

## IV.   DAMAGES

133.   Plaintiff renews and reaffirms each and every allegation set forth above.

134.   As a result of the aforesaid acts and/or omissions of Defendant's Roundup® products, Plaintiff Yarbrough has suffered and will continue to suffer damages, including, but not limited to medical expenses, pain and suffering, and permanent disability.

**135.**  Said damages were directly, proximately, and solely caused by Defendant's Roundup® products.

**136.**  Plaintiff is entitled to recover said damages.

WHEREFORE, Plaintiff prays as follows:

(A)  That service be perfected upon Defendant as provided by law;

(B)  That Plaintiff have judgment against Defendant in an amount to be proven and as determined by the enlightened conscience of a fair and impartial jury; and

(C)  For such other and further relief as the Court deems just and proper.

This 9th day of March, 2020

**TATE LAW GROUP, LLC**

/s/ Mark A. Tate
Mark A. Tate, Esq.
Georgia Bar No. 698820
/s/ Andrew A. Zemany
Andrew A. Zemany Esq.
Georgia Bar No. 459060

2 E. Bryan Street, Suite 600
Savannah, GA 31401
Phone: 912-234-3030
Fax: 912-234-9700

29