# U.S. District Court
## SOUTHERN DISTRICT OF TEXAS (Houston)
## CIVIL DOCKET FOR CASE #: 4:20−cv−00869

| | |
|---|---|
| Banks et al v. Monsanto Company | Date Filed: 03/10/2020 |
| Assigned to: Judge Kenneth M Hoyt | Jury Demand: Plaintiff |
| Cause: 28:1332 Diversity−Product Liability | Nature of Suit: 245 Tort Product Liability |
| | Jurisdiction: Diversity |

**Plaintiff**

**Lula Banks**　　　　　　　　represented by　**Charles Rene Houssiere , III**
Houssiere Durant Houssiere, LLP
1990 Post Oak Blvd
Ste 800
Houston, TX 77056−3812
713−626−3700
Fax: 713−626−3709
Email: Choussiere@hdhtex.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randal Alan Kauffman**
Houssiere Durant Houssiere
1990 Post Oak Blvd
Ste 800
Houston, TX 77056
713−626−3700
Fax: 713−626−3709
Email: rkauffman@hdhtex.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Vetonya Taylor**　　　　　　represented by　**Charles Rene Houssiere , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randal Alan Kauffman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Dabecca Smith**　　　　　　represented by　**Charles Rene Houssiere , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randal Alan Kauffman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Cynthia Jean Pierre**　　　　represented by　**Charles Rene Houssiere , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randal Alan Kauffman**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Willie, Estate of Banks**                    represented by    **Charles Rene Houssiere , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Randal Alan Kauffman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 03/10/2020 | 1 | COMPLAINT against All Plaintiffs (Filing fee $ 400 receipt number 0541−24374114) filed by Willie, Estate of Banks, Dabecca Smith, Vetonya Taylor, Lula Banks, Cynthia Jean Pierre. (Attachments: # 1 Exhibit)(Kauffman, Randal) (Entered: 03/10/2020) |
| 03/10/2020 | 2 | Request for Issuance of Summons as to Monsanto Company, filed.(Kauffman, Randal) (Entered: 03/10/2020) |
| 03/11/2020 | 3 | ORDER for Initial Pretrial and Scheduling Conference by Telephone and Order to Disclose Interested Persons. Counsel who filed or removed the action is responsible for placing the conference call and insuring that all parties are on the line. The call shall be placed to (713)250−5613. Telephone Conference set for 6/29/2020 at 09:30 AM by telephone before Judge Kenneth M Hoyt (Signed by Judge Kenneth M Hoyt) Parties notified.(hcarradi, 4) (Entered: 03/11/2020) |
| 03/12/2020 | 4 | Summons Issued as to Monsanto Company. Issued summons delivered to plaintiff by NEF, filed.(mmapps, 4) (Entered: 03/12/2020) |
| 03/27/2020 | 5 | CERTIFICATE of INTERESTED PARTIES by Lula Banks, Willie, Estate of Banks, Cynthia Jean Pierre, Dabecca Smith, Vetonya Taylor, filed.(Kauffman, Randal) (Entered: 03/27/2020) |
| 04/13/2020 | 6 | WAIVER OF SERVICE Returned Executed as to Monsanto Company served on 3/11/2020, answer due 5/11/2020, filed.(Kauffman, Randal) (Entered: 04/13/2020) |

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **LULA BANKS, VETONYA TAYLOR,** | ) | |
| **DABECCA SMITH and CYNTHIA** | ) | |
| **JEAN PIERRE, individually as** | ) | |
| **Wrongful Death Beneficiaries of** | ) | |
| **WILLIE BANKS, deceased; and on** | ) | |
| **behalf of the Estate of WILLIE BANKS,** | ) | |
| **Deceased** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. _____** |
| | ) | |
| **MONSANTO COMPANY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

COME(S) NOW LULA BANKS, VETONYA TAYLOR, DABECCA SMITH and CYNTHIA

JEAN PIERRE, individually as Wrongful Death Beneficiaries of WILLIE BANKS, deceased;

and on behalf of the Estate of WILLIE BANKS, Deceased, Plaintiff(s) herein, complaining of

MONSANTO COMPANY, , Defendants herein, and for cause of action says:

### Parties

1.      Plaintiffs Lula Banks, Vetonya Taylor, Dabecca Smith and Cynthia Jean Pierre

are, and at all times material hereto were,  residents and Citizens of the State of Texas. Lula

Banks is the surviving spouse of Willie Banks, deceased. Plaintiff Vetonya Taylor is a surviving

daughter of Willie Banks, deceased. Plaintiff Dabecca Smith is a surviving daughter of Willie

Banks, deceased. Plaintiff Cynthia Jean Pierre is the surviving daughter of Willie Jerome Banks,

the surviving son of Willie Banks, deceased. Plaintiffs Lula Banks, Vetonya Taylor, Dabecca

Smith and Cynthia Jean Pierre are all of the surviving heirs of Willie Banks, deceased. No

administration is pending and none is necessary. Therefore, these Plaintiffs are able to bring this claim on behalf of the Estate of Willie Banks.

2.    Defendant Monsanto Company ("Monsanto" or "Defendant") is, and at all times material hereto was, a corporation organized under the laws of the State of Delaware with its principal place of business in Missouri, a Citizen of Delaware and Missouri, and may be served with process by serving its registered agent for service, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, at 211 E. 7th Street, Suite 620, Austin, TX 78701-3218.

### Jurisdiction

3.    The amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

4.    This civil action is between citizens of different states.

5.    By reason of the foregoing circumstances, this Court has diversity jurisdiction over this lawsuit.  28 U.S.C. § 1332(a)(1).

6.    Each Defendant maintained sufficient minimum contacts with the State of Texas such that the exercise of jurisdiction by Courts of this State, and by this Court, does not offend traditional notions of fair play and substantial justice (i.e., general jurisdiction). Further, Plaintiffs claims arose out of events occurring in this State (i.e., specific jurisdiction).

7.    The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

### Venue

8.    A substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district.  Thus, venue over this lawsuit lays in this Judicial District.  28 U.S.C. § 1391(b)(2).

## Statement of Facts Applicable to All Counts

9.      This is an action for damages suffered by Plaintiff as a direct and proximate result of Defendants' negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup®, containing the active ingredient glyphosate.

10.      Plaintiff(s) maintain(s) that Roundup® and/or glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper warnings and directions as to the dangers associated with its use.

11.      Plaintiff's injuries, like those striking thousands of similarly situated victims across the country, were avoidable.

12.      Plaintiffs are natural persons and at all relevant times residents and citizens of Harris County, Texas. Plaintiff brings this action for personal injuries sustained by exposure to Roundup® ("Roundup") containing the active ingredient glyphosate and the surfactant POEA. As a direct and proximate result of being exposed to Roundup, Plaintiff developed Non-Hodgkin's Lymphoma.

13.      "Roundup" refers to all formulations of Defendants' roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup

Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

14.     Defendants advertise and sell goods, specifically Roundup, in Harris County, Texas.

15.     Defendants transacted and conducted business within the State of [State] that relates to the allegations in this Complaint.

16.     Defendants derived substantial revenue from goods and products used in the State of Texas.

17.     Defendants expected or should have expected their acts to have consequences within the State of Texas, and derived substantial revenue from interstate commerce.

18.     Defendants engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup.

19.     Defendants are authorized to do business in Texas and derive substantial income from doing business in this state.

20.     Upon information and belief, Defendants purposefully availed themselves of the privilege of conducting activities with the State of Texas, thus invoking the benefits and protections of its laws.

21.     Upon information and belief, Defendants did act together to design, sell, advertise, manufacture and/or distribute Roundup, with full knowledge of its dangerous and defective nature.

22.     At all relevant times, Defendants were in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or have acquired and are responsible for Defendants who have designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the commercial herbicide Roundup.

23.     Monsanto is a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It is the world's leading producer of glyphosate.

24.     Defendants discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate based "Roundup" as a broad spectrum herbicide.

25.     Glyphosate is the active ingredient in Roundup.

26.     Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses known to compete with commercial crops grown around the globe.

27.     Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as EPSP synthase.

28.     Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acid-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

29.     Sprayed as a liquid, plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

30.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, parks, and golf courses. This increase in use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity of glyphosate.

31.     Defendants are intimately involved in the development, design, manufacture, marketing, sale, and/or distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup *i.e.,* "Roundup Ready®." As of 2009, Defendants were the world's leading producer of seeds designed to be Roundup Ready®. In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready® seeds.

32.     The original Roundup, containing the active ingredient glyphosate, was introduced in 1974. Today, glyphosate products are among the world's most widely used herbicides. Monsanto's glyphosate products are registered in more than 130 countries and are approved for weed control in more than 100 crops. No other herbicide active ingredient compares in terms of number of approved uses.[1]

33.     For nearly 40 years, farmers across the globe have used Roundup, unaware of its carcinogenic properties.

**Registration of Herbicides Under Federal Law**

34.     The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq*. FIFRA requires that all pesticides be registered with the Environmental Protection

---

[1] *Backgrounder*, History of Monsanto's Glyphosate Herbicides, June 2005.

Agency ("EPA) prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. 136a(a).

36.     The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

36.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

37.     The EPA and the State of Texas registered Roundup for distribution, sale, and manufacture in the United States and the State of Texas.

38.     FIFRA generally requires that the registrant, Monsanto, conduct health and safety testing of pesticide products. The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

39.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-

1. In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

40.     In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment – in relation to the registration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015, but delayed releasing the assessment pending further review in light of the World Health Organization's findings.

**Monsanto's False Representations Regarding the Safety of Roundup®**

41.     In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer **than table salt"** and "practically **non-toxic"** to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

   (a)     Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

   (b)     And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

   (c)     Roundup biodegrades into naturally occurring elements.

   (d)     Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

   (e)     This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

   (f)     You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

(g)    Glyphosate is less toxic to rats than table salt following acute oral ingestion.

(h)    Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

(i)    You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

(j)    "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[2]

42.    On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

(a)    its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

(b)    its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable.

(c)    its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

(d)    its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

(e)    glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides.

---

[2] Attorney General of the State of New York, In the Matter of Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63(15) (Nov. 1996).

      (f)     its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

43.     Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

44.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[3]

**Evidence of Carcinogenicity of Roundup**

45.     As early as the 1980's Monsanto was aware of glyphosate's carcinogenic properties.

46.     On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.[4] Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

47.     In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214). The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies. All of the data required was submitted and reviewed and/or waived.[5]

48.     In October 1991 the EPA published a Memorandum entitled "Second Peer Review of Glyphosate." The memorandum changed glyphosate's classification to Group E

---

[3] *Monsanto Guilty in 'False Ad' Row,* BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe/8308903.stm.

[4] Consensus Review of Glyphosate, Casewell No. 661A. March 4, 1985. United States Environmental Protection Agency.

[5] http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheets/0178fact.pdf

(evidence of non-carcinogenicity for humans). Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.[6]

49.     In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found in Defendants' Roundup products are more dangerous and toxic than glyphosate alone.[7] As early as 1991 evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.[8]

50.     In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

51.     The study found that Defendants' Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

52.     In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

53.     The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[9]

---

[6] Second Peer Review of Glyphosate, CAS No. 1071-83-6. October 30, 1881. United States Environmental Protection Agency.
[7] Martinez et al. 2007; Benachour 2009; Gasnier et al. 2010; Peixoto 2005; Marc 2004
[8] Martinez, et al 1991
[9] (Molinari, 2000; Stewart et al., 2003)

54.     In 2005, Francisco Peixoto published a study showing that Roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

55.     The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

56.     In 2009, Nora Benachour and Gilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic and placental cells.

57.     The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food. The study concluded that supposed "inert" ingredients and possibly POEA change human cell permeability and amplify toxicity of glyphosate alone. The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formulation of the complete pesticide. The study confirmed that the adjuvants in Roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

58.     The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendants.

59.     Defendants knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiff from Roundup.

60.     Defendants knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

61.    Defendants failed to appropriately and adequately test Roundup, Roundup's adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup.

62.    Rather than performing appropriate tests, Defendants relied upon flawed industry-supported studies designed to protect Defendants' economic interests rather than Plaintiff and the consuming public.

63.    Despite their knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendants continued to promote Roundup as safe.

**IARC Classification of Glyphosate**

64.    The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency in the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the cause of cancer.

65.    An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015-2019 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: the must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

66.    IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

67.     On March 24, 2015, after its cumulative review of human, animal, and DNA studies for more than one (1) year, many of which have been in Defendants' possession since as early as 1985, the IARC's working group published its conclusion that the glyphosate contained in Defendants' Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

68.     The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A *probable* carcinogen to humans. According to the authors glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

69.     The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

70.     The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

**Earlier Evidence of Glyphosate's Danger**

71.     Despite the new classification by the IARC, Defendants have had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

72.     Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

73.     In 1997, Chris Clements published "Genotoxicity of select herbicides in *Rana catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

74.     The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

75.     Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

76.     Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

77.     The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

78.     In 2006 César Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

79.     The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

80.     The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

81.     Despite knowledge to the contrary, Defendants maintain that there is no evidence that Roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

82.     In addition to glyphosate and Roundup's genotoxic properties, Defendants have long been aware of glyphosate's carcinogenic properties.

15

83.     Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma, and soft tissue sarcoma.

84.     Defendants have known of this association since the early to mid-1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

85.     In 1985 the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

86.     In 2003 Lennart Hardell and Mikael Eriksson published the results of two case controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia.

87.     The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studies with an increased odds ratio of 3.11.

88.     In 2003 AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

89.     The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

90.     In 2008 Mikael Eriksson published a study a population based case-control study of exposure to various pesticides as a risk factor for NHL.

91.     This strengthened previous associations between glyphosate and NHL.

92.     In spite of this knowledge, Defendants continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as

16

table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

93.     Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiff, the agricultural community, and the public at large to purchase, and increase the use of, Defendants' Roundup for Defendants' pecuniary gain, and in fact did induce Plaintiff to use Roundup.

94.     Defendants made these statements with complete disregard and reckless indifference to the safety of Plaintiff and the general public.

95.     Notwithstanding Defendants' representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcoma.

96.     Defendants knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma, and soft tissue sarcomas.

97.     Defendants failed to appropriately and adequately inform and warn Plaintiff of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries, which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

98.     Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendants continue to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-genotoxic, and falsely warrant to users and the general public that independent

experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

99.    Defendants have claimed and continue to claim that Roundup is safe, non-carcinogenic, and non-genotoxic.

100.    Monsanto claims on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term/carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in Roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic".[10]

101.    Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

102.    Glyphosate, and Defendants' Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

103.    Defendants' statements proclaiming the safety of Roundup and disregarding its dangers misled Plaintiff.

104.    Despite Defendants' knowledge that Roundup was associated with an elevated risk of developing cancer, Defendants' promotional campaigns focused on Roundup's purported "safety profile."

105.    Defendants' failure to adequately warn Plaintiff resulted in (1) Plaintiff using and being exposed to glyphosate instead of using another acceptable and safe method of controlling

---

[10] Backgrounder - Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9 2015)

unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

106.    Defendants failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

107.    The failure of Defendants to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

108.    The failure of Defendants to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

109.    The failure of Defendants to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

110.    By reason of the foregoing acts and omissions, Plaintiff seeks compensatory damages as a result of Plaintiff's use of, and exposure to, Roundup which caused or was a substantial contributing factor in causing Plaintiff to suffer from Non-Hodgkin's Lymphoma, and Plaintiff suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

By reason of the foregoing, Plaintiff is severely and permanently injured.

111.    By reason of the foregoing acts and omissions, Plaintiff has endured and, in some categories continues to suffer, emotional and mental anguish, medical expenses, and other economic and non-economic damages, as a result of the actions and inactions of the Defendants.

**Plaintiff's Exposure to Roundup**

112.    Mr. Banks worked with Roundup on a daily basis on his ranch. He used industrial-sized containers/dispensers.

113.    For many years, Plaintiff sprayed Roundup on a regular basis. Plaintiff followed all safety and precautionary warnings during the course of use.

114.    Mr. Banks died in February of 2017 of Non-Hodgkin's Lymphoma (NHL).

115.    As a result of his injury, Plaintiff has incurred significant economic and non-economic damages.

## Equitable Tolling of Applicable Statute of Limitations

116.    Plaintiff incorporates by reference all prior paragraphs of this Complaint as if fully copied and set forth at length herein.

117.    The running of any statute of limitations has been tolled by reason of Defendants' fraudulent concealment. Defendants, through their affirmative misrepresentations and omissions, actively concealed from Plaintiff the true risks associated with Roundup and glyphosate.[11] Indeed, even as of October 2015, Defendants continued to represent to the public that "*Scientists are in agreement* that there is *no evidence* glyphosate causes cancer." (emphasis added).[12]

118.    As a result of Defendants' actions, Plaintiff was unaware, and could not reasonably know or have learned through reasonable diligence that Roundup and/or glyphosate contact, exposed Plaintiff to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

119.    Furthermore, Defendants are estopped from relying on any statute of limitations because of their fraudulent concealment of the true character, quality and nature of Roundup. Defendants were under a duty to disclose the true character, quality, and nature of Roundup because this was non-public information over which Defendants had and continue to have

---

[11] Backgrounder - Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9 2015)

[12] Backgrounder - Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9 2015)

exclusive control, and because Defendants knew that this information was not available to

Plaintiff or to distributors of Roundup. In addition, Defendants are estopped from relying on any

statute of limitations because of their intentional concealment of these facts.

120.   Plaintiffs learned only in October of 2019 that Roundup causes Non-Hodgkin's

Lymphoma when they received an advertisement from an attorney (not the attorneys who have

signed this Complaint).

121.   Plaintiff had no knowledge that Defendants were engaged in the wrongdoing

alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendants,

Plaintiff could not have reasonably discovered the wrongdoing at any time prior. Also, the

economics of this fraud should be considered. Defendants had the ability to and did spend

enormous amounts of money in furtherance of their purpose of marketing, promoting and/or

distributing a profitable herbicide, notwithstanding the known or reasonably known risks.

Plaintiff and medical professionals could not have afforded and could not have possibly

conducted studies to determine the nature, extent, and identity of related health risks, and were

forced to rely on only the Defendants' representations. Accordingly, Defendants are precluded

by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any

statute of limitations.

## Count One – Negligence

For negligence cause of action against Defendants, Plaintiffs says:

122.   Plaintiffs adopts by reference each and every Paragraph of the Statement of Facts

Applicable to All Counts of this Complaint as if fully copied and set forth at length herein.

123.   Defendants owed a legal duty to Plaintiffs. Defendants owed Plaintiffs a duty to

exercise reasonable care in designing, selling and manufacturing Roundup. Defendants owed

Plaintiffs a duty of reasonable care.  Defendants owed Plaintiffs a duty to exercise care to

discover dangerous propensities of the product.  Defendant owed Plaintiff a duty to exercise

ordinary care in the design, production (manufacture) and sale (marketing) of the product.

124.   Defendants had a duty to exercise reasonable care in the designing, researching,

testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of

Roundup into the stream of commerce, including a duty to assure that the product would not

cause users to suffer unreasonable, dangerous side effects.

125.   Defendants failed to exercise ordinary care in the designing, researching, testing,

manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance,

quality control, and/or distribution of Roundup into interstate commerce in that Defendants knew

or should have known that using Roundup created a high risk of unreasonable, dangerous side

effects, including, but not limited to, the development of NHL, as well as other severe and

personal injuries which are permanent and lasting in nature, physical pain and mental anguish,

including diminished enjoyment of life, as well as need for lifelong medical treatment,

monitoring, and/or medications.

126.   The negligence by the Defendants, their agents, servants, and/or employees,

included but was not limited to the following acts and/or omissions:

(a)   Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly testing it;

(b)   Failing to test Roundup and/or failing to adequately, sufficiently, and properly test Roundup;

(c)   Not conducting sufficient testing programs to determine whether or not Roundup was safe for use; in that Defendants herein knew or should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users;

    (d)    Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Defendants had knowledge that Roundup is, was, or could be carcinogenic;

    (e)    Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of Roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

    (f)    Negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

    (g)    Negligently failing to petition the EPA to strength the warnings associated with Roundup;

    (h)    Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup;

    (i)    Negligently marketing, advertising, and recommending the use of Roundup without sufficient knowledge as to its dangerous propensities;

    (j)    Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

    (k)    Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

    (l)    Negligently designing Roundup in a manner, which was dangerous to its users;

    (m)    Negligently manufacturing Roundup in a manner, which was dangerous to its users;

    (n)    Negligently producing Roundup in a manner, which was dangerous to its users;

    (o)    Negligently formulating Roundup in a manner, which was dangerous to its users;

(p)     Concealing information from the Plaintiff while knowing that
        Roundup was unsafe, dangerous, and/or non-conforming with EPA
        regulations; and

(q)     Improperly concealing and/or misrepresenting information from
        the Plaintiff, scientific and medical professionals, and/or the EPA,
        concerning the severity of risks and dangers of Roundup compared
        to other forms of herbicides.

(r)     Negligently selling Roundup with a false and misleading label.

127.    Defendants under-reported, underestimated, and downplayed the serious dangers

of Roundup.

128.    Defendants negligently and deceptively compared the safety risks and/or dangers

of Roundup with common everyday foods such as table salt, and other forms of herbicides.

129.    Defendants were negligent and/or violated Texas law in the designing,

researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising,

warning, marketing, and selling of Roundup in that they:

(a)     Failed to use ordinary care in designing and manufacturing Roundup so as
        to avoid the aforementioned risks to individuals when Roundup was used
        as an herbicide;

(b)     Failed to accompany their product with proper and/or accurate warnings
        regarding all possible adverse side effects associated with the use of
        Roundup;

(c)     Failed to accompany their product with proper warnings regarding all
        possible adverse side effects concerning the failure and/or malfunction of
        Roundup;

(d)     Failed to accompany their product with accurate warnings regarding the
        risks of all possible adverse side effects concerning Roundup;

(e)     Failed to warn Plaintiff of the severity and duration of such adverse
        effects, as the warnings given did not accurately reflect the symptoms, or
        severity of the side effects including, but not limited to, the development
        of NHL;

24

(f)    Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup;

(g)    Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants;

(h)    Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity;

(i).    Were otherwise careless and/or negligent.

130.    Despite the fact that Defendants knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Defendants continued and continue to market, manufacture, distribute, and/or sell Roundup to consumers, including the Plaintiff.

131.    Defendants knew or should have known that consumers such as the Plaintiff would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care, as set forth above.

132.    Defendants' violations of law and/or negligence were the proximate cause of Plaintiff's injuries, harm and economic loss, which Plaintiff suffered and/or will continue to suffer.

133.    As a result of the foregoing acts and omissions, the Plaintiff suffered from serious and dangerous side effects including, but not limited to, NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, Plaintiff suffered life-threatening NHL, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

134.    One or more of Defendant's acts, omissions, or both, proximately caused Plaintiffs' injuries and damages, more particularly set forth below.

### Count Two – Strict Liability

For strict liability cause of action against Defendant, Plaintiffs says:

135.    Plaintiffs adopt by reference each and every Paragraph of the Statement of Facts Applicable to All Counts of this Complaint as if fully copied and set forth at length herein.

### Marketing Defect/Failure to Warn

136.    Defendants have engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting Roundup, and through that conduct have knowingly and intentionally placed Roundup into the stream of commerce with full knowledge that it reaches consumers such as Plaintiff who are exposed to it through ordinary and reasonably foreseeable uses.

137.    Defendants did in fact sell, distribute, supply, manufacture, and/or promote Roundup to Plaintiff. Additionally, Defendants expected the Roundup that they were selling, distributing, supplying, manufacturing, and/or promoting to reach – and Roundup did in fact reach – consumers, including Plaintiff, without any substantial change in the condition of the product from when it was initially distributed by Defendants.

138.    At the time of manufacture, Defendant could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

139.    At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was

distributed by Defendants and at the time Plaintiff was exposed to and/or ingested the product. The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to, developing non-Hodgkin's lymphoma as a result of exposure and use.

140.    Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect health those exposed in violation of 7 U.S.C. § 136j(a)(1)(E).

141.    Defendants' failure to include a warning or caution statement which was necessary and, if complied with, was adequate to protect the health of those exposed, violated 7 U.S.C. § 136j(a)(1)(E) as well as the laws of the State of Texas.

142.    Defendants could have amended the label of Roundup to provide additional warnings.

143.    This defect caused serious injury to Plaintiff, who used Roundup in its intended and foreseeable manner.

144.    At all times herein mentioned, Defendants had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

145.    Defendants labeled, distributed, and promoted the aforesaid product that it was safe for the use and purpose for which it was intended.

146.    Defendants failed to warn of the nature and scope of the side effects associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of NHL.

147.     Defendants were aware of the probable consequences of the aforesaid conduct. Despite the fact that Defendants knew or should have known that Roundup caused serious injuries, Defendants failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of developing NHL from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution. Defendants willfully and deliberately failed to avoid the consequences associated with their failure to warn, and in doing so, Defendants acted with a conscious disregard for the safety of Plaintiff.

148.     At the time of exposure, Plaintiff could not have reasonably discovered any defect in Roundup prior through the exercise of reasonable care.

149.     Defendants, as the manufacturers and/or distributors of the subject product, are held to the level of knowledge of an expert in the field.

150.     Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Defendants.

151.     Had Defendants properly disclosed the risks associated with Roundup, Plaintiff would have avoided the risk of NHL by not using Roundup.

152.     The information that Defendants did provide or communicate failed to contain adequate warnings and precautions that would have enabled Plaintiff, and similarly situated individuals, to utilize the product safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through

aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

153.    To this day, Defendants have failed to adequately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Roundup.

154.    As a result of their inadequate warnings, Defendants' Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendant, were distributed by Defendant, and used by Plaintiff.

155.    As a direct and proximate result of Defendants' actions as alleged herein, and in such other ways to be later shown, the subject product caused Plaintiff to sustain injuries as herein alleged.

**Design Defect**

156.    At all times herein mentioned, the Defendants designed, researched, manufactured, tested, advertised, promoted, sold, distributed, and/or have acquired the Defendants who have designed, researched, tested, advertised, promoted, marketed, sold, and distributed Roundup as hereinabove described that was used by the Plaintiff.

157.    Defendants' Roundup was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendants.

158.    At those times, Roundup was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, the Plaintiff herein.

159.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective in design or formulation in that,

when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the

benefits associated with the design or formulation of Roundup.

160.    The Roundup designed, researched, manufactured, tested, advertised, promoted,

marketed, sold, and distributed by Defendants was defective in design and/or formulation, in

that, when it left the hands of the Defendants manufacturers and/or suppliers, it was

unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than

an ordinary consumer would expect.

161.    At all times herein mentioned, Roundup was in a defective condition and unsafe,

and Defendants knew or had reason to know that said product was defective and unsafe,

especially when used in the form and manner as provided by the Defendants. In particular,

Defendants' Roundup was defective in the following ways:

(a)     When placed in the stream of commerce, Defendants' Roundup Products
        were defective in design and formulation and, consequently, dangerous to an
        extent beyond that which an ordinary consumer would anticipate.

(b)     When placed in the stream of commerce, Defendants' Roundup products
        were unreasonably dangerous in that they were hazardous and posed a grave
        risk of cancer and other serious illnesses when used in a reasonably
        anticipated manner.

(c)     When placed in the stream of commerce, Defendants' Roundup products
        contained unreasonably dangerous design defects and were not reasonably
        safe when used in a reasonably anticipated manner.

(d)     Defendants did not sufficiently test, investigate, or study its Roundup
        products.

(e)     Exposure to Roundup presents a risk of harmful side effects that outweigh
        any potential utility stemming from the use of the herbicide.

(f)     Defendants new or should have known at the time of marketing its Roundup
        products that exposure to Roundup and could result in cancer and other
        severe illnesses and injuries.

(g)     Defendants did not conduct adequate post-marketing surveillance of its

        Roundup products.

30

162.    Defendants knew, or should have known that at all times herein mentioned its Roundup was in a defective condition, and was and is inherently dangerous and unsafe.

163.    Plaintiff was exposed to Defendants' Roundup without knowledge of Roundup's dangerous characteristics.

164.    At the time of the Plaintiff's use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

165.    Defendants with this knowledge voluntarily designed its Roundup with a dangerous condition for use by the public, and in particular the Plaintiff.

166.    Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

167.    Defendants created a product that was and is unreasonably dangerous for its normal, intended use.

168.    Defendants marketed and promoted a product in such a manner so as to make it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

169.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was manufactured defectively in that Roundup left the hands of Defendants in a defective condition and was unreasonably dangerous to its intended users.

170.    The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants reached their intended users in the same defective and unreasonably dangerous condition in which the Defendants' Roundup was manufactured.

171.   Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to the Plaintiff in particular, and Defendants are therefore strictly liable for the injuries sustained by the Plaintiff.

172.   The Plaintiff could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

173.   By reason of the foregoing, the Defendants have become strictly liable to the Plaintiff for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup.

174.   Defendants' defective design, of Roundup amounts to willful, wanton, and/or reckless conduct by Defendants.

175.   Defects in Defendants' Roundup were the cause or a substantial factor in causing Plaintiff's injuries.

176.   As a result of the foregoing acts and omission, the Plaintiff developed NHL, and suffered severe and personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, and financial expenses for hospitalization and medical care.

177.   The product was unreasonably dangerous because:

(a)   the utility of the mesh to the user and to the public as a whole was outweighed by the gravity and likelihood of injury from its use.

(b)   a substitute product which would meet the same need and not be unsafe or unreasonably expensive was available.

(c)   Defendants had the ability to eliminate the unsafe character of the product without seriously impairing its usefulness or significantly increasing its costs.

(d)     Plaintiff was not aware (and it could not be anticipated to be aware) of the danger the of the product; or, of how to prevent or avoid that danger. These dangers were not general public knowledge or obvious.

(e)     Plaintiff did not expect the product to cause NHL, or other serious illness.

178.    The above five factors considered holistically, with no single factor needing to be proven on its own, working together show that the product was unreasonably dangerous.

**Causation**

179.    The above defects, or any of them, were producing and/or proximate causes of Plaintiff's injuries and damages, more particularly set forth below.

**Count Three – Breach of Implied Warranty**

For Breach of implied warranty cause of action, Plaintiffs says:

180.    Plaintiffs adopts by reference each and every Paragraph of the Statement of Facts Applicable to All Counts of this Complaint as if fully copied and set forth at length herein.

181.    Defendant sold the Roundup Plaintiff used.

182.    The Roundup Plaintiff used was unmerchantable. It was unfit for ordinary purposes. It was unfit for ordinary purposes because it was constructed in such a way that made it unreasonably dangerous. It was unreasonably dangerous because it contained ingredients, more particularly described above, that made the Roundup carcinogenic, and had an unreasonable risk of causing NHL and other dangerous diseases and illnesses.

183.    Plaintiff notified Defendant of the breach of this warranty. *Exhibit 1.*

184.    The breach of warranty of merchantability proximately caused Plaintiff's injuries and damages more particularly set forth below.

185.    At all times herein mentioned, the Defendants manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold Roundup and/or

have recently acquired the Defendants who have manufactured, compound portrayed, distributed, recommended, merchandized, advertised, promoted, and sold Roundup, as a broad spectrum herbicide. These actions were under the ultimate control and supervision of Defendants.

186.    At the time Defendants marketed, sold, and distributed Roundup for use by Plaintiff, Defendants knew of Roundup's intended use and impliedly warranted the product to be or merchantable quality and safe and fit for this use.

187.    The Defendants impliedly represented and warranted to Plaintiff and users of Roundup, the agricultural community, and/or the EPA that Roundup was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.

188.    These representations and warranties were false, misleading, and inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

189.    Plaintiff and/or the EPA did rely on said implied warranty of merchantability of fitness for particular use and purpose.

190.    Plaintiff reasonably relied upon the skill and judgment of Defendants as to whether Roundup was of merchantable quality and safe and fit for its intended use.

191.    Roundup was injected into the stream of commerce by the Defendants in a defective, unsafe, and inherently dangerous condition, and the products' materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

192.    The Defendants breached the aforesaid implied warranties, as their herbicide Roundup was not fit for its intended purposes and uses.

193.     As a result of the foregoing acts and omissions, Plaintiff suffered from Non-Hodgkin's Lymphoma and Plaintiff suffered severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic, and non-economic damages.

194.     The breaches of the implied warranties described above proximately caused Plaintiff(s) to suffer injuries and damages, more particularly described below.

### Damages Applicable to All Counts

195.     Plaintiffs adopts by reference each and every Paragraph of the Statement of Facts Applicable to All Counts of this Amended Complaint as if fully copied and set forth at length herein.

196.     Plaintiffs adopts by reference each and every Count of this Complaint as if fully copied and set forth at length herein.

197.     Plaintiffs suffered sustained and incurred, and in reasonable medical probability will suffer, sustain and incur, the following injuries and damages as a producing or proximate result (or both) of Defendant's conduct, the defective product, or both, among others:

(a)     pecuniary loss (loss of care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value), past and future;

(b)     loss of companionship and society, past and future;

(c)     mental anguish, past and future.

198.     Plaintiff's estate suffered sustained and incurred the following injuries and damages as a producing or proximate result (or both) of Defendant's conduct, the defective product, or both, among others:

      (a)     pain and mental anguish;

      (b)     medical expenses;

      (c)     funeral and burial expenses.

### Jury Demand

199.    Plaintiffs request trial by jury.

### Prayer

200.    Plaintiffs pray that Defendant be cited to appear herein, and that upon final trial, Plaintiffs have judgment against Defendants, jointly and severally, for the following, among other things:

      (a)     Compensatory damages in an amount above the minimum jurisdictional limits of the Court;

      (b)     Pre-judgment interest;

      (c)     Post-judgment interest;

      (d)     Costs of court;

      (e)     Such other and further relief to which Plaintiffs show themselves justly entitled to receive.

Respectfully submitted,
**Houssiere, Durant & Houssiere, LLP**
By: */s/Randal Kauffman-*
    Charles R. Houssiere, III
    Attorney in Charge
    Texas Bar No. 10050700
    Federal ID No. 5202
    choussiere@HDHtex.com
    Randal A. Kauffman
    Texas Bar No. 11111700
    Federal ID No. 6707
    rkauffman@HDHtex.com
    1990 Post Oak Blvd., Suite 800
    Houston, Texas 77056-3812
    Telephone: (713)626-3700
    Facsimile: (713)626-3709

ATTORNEYS FOR PLAINTIFFS

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **LULA BANKS, VETONYA TAYLOR,** | ) | |
| **DABECCA SMITH and CYNTHIA** | ) | |
| **JEAN PIERRE, individually as** | ) | |
| **Wrongful Death Beneficiaries of** | ) | |
| **WILLIE BANKS, deceased; and on** | ) | |
| **behalf of the Estate of WILLIE BANKS,** | ) | |
| **Deceased** | ) | |
| | ) | |
| **Plaintiff(s)** | ) | |
| | ) | |
| **v.** | ) | Civil Action No. _____ |
| | ) | |
| **MONSANTO COMPANY, MECS, INC.,** | ) | |
| **formerly known as MONSANTO** | ) | |
| **ENVIRO-CHEM SYSTEMS, INC.,** | ) | |
| **MONSANTO PRODUCTION SUPPLY** | ) | |
| **LLC.** | ) | |
| | ) | |
| **Defendants.** | ) | |

**EXHIBIT A TO COMPLAINT**

**NOTICE OF BREACH OF IMPLIED WARRANTY**